IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SERTA SIMMONS BEDDING LLC, *et al.*, | § | Case No. 23-90020 |
| | § | |
| | § | |
| | § | **(Joint Administration Requested)** |
| Debtors.[1] | § | |
| | § | |

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SERTA SIMMONS BEDDING Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SERTA SIMMONS BEDDING Hospitality, LLC (2016); SERTA SIMMONS BEDDING Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SERTA SIMMONS BEDDING Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address is 2451 Industry Avenue, Doraville, Georgia 30360.

| | | |
|---|---|---|
| SERTA SIMMONS BEDDING, LLC, | § | |
| INVESCO SENIOR SECURED | § | Adversary No: _____ |
| MANAGEMENT, INC., CREDIT SUISSE | § | |
| ASSET MANAGEMENT, LLC, AND | § | |
| BARINGS LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| AG CENTRE STREET PARTNERSHIP | § | |
| L.P., AG CREDIT SOLUTIONS NON-ECI | § | |
| MASTER FUND, L.P., AG SF MASTER | § | |
| (L), L.P., AG SUPER FUND MASTER, | § | |
| L.P., SILVER OAK CAPITAL, L.L.C., | § | |
| ASCRIBE III INVESTMENTS, LLC, | § | |
| COLUMBIA CENT CLO 21 LIMITED, | § | |
| COLUMBIA CENT CLO 27 LIMITED, | § | |
| COLUMBIA FLOATING RATE INCOME | § | |
| FUND, A SERIES OF COLUMBIA | § | |
| FUNDS SERIES TRUST II, COLUMBIA | § | |
| STRATEGIC INCOME FUND, A SERIES | § | |
| OF COLUMBIA FUNDS SERIES TRUST | § | |
| I, CONTRARIAN CAPITAL FUND I, L.P., | § | |
| CONTRARIAN CENTRE STREET | § | |
| PARTNERSHIP, L.P., CONTRARIAN | § | |
| DISTRESSED DEBT FUND, L.P., | § | |
| GAMUT CAPITAL SERTA SIMMONS | § | |
| BEDDING, LLC, LCM XXII LTD., LCM | § | |
| XXIII LTD., LCM XXIV LTD., LCM XXV | § | |
| LTD., LCM 26 LTD., LCM 27 LTD., LCM | § | |
| 28 LTD., NORTH STAR DEBT | § | |
| HOLDINGS, L.P., SHACKLETON 2013- | § | |
| III CLO, LTD., SHACKLETON 2013-IV-R | § | |
| CLO, LTD., SHACKLETON 2014-V-R | § | |
| CLO, LTD., SHACKLETON 2015-VII-R | § | |
| CLO, LTD., SHACKLETON 2017-XI | § | |
| CLO, LTD., Z CAPITAL CREDIT | § | |
| PARTNERS CLO 2018-1 LTD., AND Z | § | |
| CAPITAL CREDIT PARTNERS CLO | § | |
| 2019-1 LTD. | § | |
| | § | |
| Defendants. | § | |
| | § | |

## ADVERSARY COMPLAINT

Serta Simmons Bedding, LLC ("Serta Simmons Bedding" or the "Company") as debtor and debtor in possession in the above-captioned Chapter 11 cases (the "Debtor"), and as Plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding") along with Barings LLC ("Barings"), Credit Suisse Asset Management, LLC ("Credit Suisse"), and Invesco Senior Secured Management, Inc. ("Invesco") (together, the "PTL Lenders"), hereby file this complaint against the following Defendants: AG Centre Street Partnership L.P., AG Credit Solutions Non-ECI Master Fund, L.P., AG SF Master (L), L.P., AG Super Fund Master, L.P., Silver Oak Capital, L.L.C. (together, "Angelo Gordon"), Ascribe III Investments, LLC ("Ascribe"), Columbia Cent CLO 21 Limited, Columbia Cent CLO 27 Limited, Columbia Floating Rate Income Fund, a series of Columbia Funds Series Trust II, Columbia Strategic Income Fund, a series of Columbia Funds Series Trust I (together, "Columbia"), Contrarian Capital Fund I, L.P., Contrarian Centre Street Partnership, L.P., Contrarian Distressed Debt Fund, L.P. (together "Contrarian"), Gamut Capital Serta Simmons Bedding, LLC ("Gamut"), LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd.., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd., LCM 28 Ltd. (together, "LCM"), North Star Debt Holdings, L.P. ("North Star" or "Apollo"), Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., Shackleton 2017-XI CLO, Ltd. (together, "Shackleton"), Z Capital Credit Partners CLO 2018-1 Ltd., and Z Capital Credit Partners CLO 2019-1 Ltd. (together, "Z Capital") (collectively, "Non-PTL Term Loan Lenders" or "Defendants").  In support, Serta Simmons Bedding and the PTL Lenders allege the following:

## I.      INTRODUCTION

1.      This adversary proceeding seeks to enforce a financing and debt exchange transaction (the "Transaction") that provided Serta Simmons Bedding with much-needed

3

liquidity during the depths of the COVID-19 pandemic.  Without this recapitalization during the summer of 2020, Serta Simmons Bedding likely would have been forced to seek a restructuring much earlier than today.  The Transaction reduced the company's debt by roughly $400 million, lowered its all-in interest expense, and increased its cash position to $300 million.  The pre-existing first-lien lenders who entered into the deal—Plaintiff PTL Lenders—had held a majority of Serta Simmons Bedding's debt.  In exchange for the substantial reduction in that debt, the PTL Lenders obtained super priority status on the new debt they issued.  The recapitalization also added collateral that would benefit all lenders.

2.     The PTL Lenders' successful proposal was not the only one presented to Serta Simmons Bedding.  A proposal by other lenders, including Defendants Angelo Gordon, Gamut, and North Star, would have siphoned off a large portion of collateral—including Serta Simmons Bedding's crown-jewel intellectual property—away from the first-lien lenders and into a newly formed subsidiary to benefit those participating lenders alone.  After an extensive review process that involved outside advisors and the creation of an independent finance committee, the independent directors rejected that much-less favorable proposal and accepted the PTL Lenders' proposal.

3.     The lenders with the losing proposal then sought to achieve in litigation what they could not achieve in negotiation.  But their litigation has proven just as unsuccessful.  They first sued in New York state court to try to block the Transaction before it closed, arguing that the Transaction unlawfully subordinated their debt under the Non-PTL Term Loan Agreement.  The New York court rejected that request and allowed the Transaction to close.  Undeterred, Defendants have spent the last two and a half years asking both state and federal courts in New York to undo the 2020 refinancing Transaction.  No court has done so.

4

4.      Defendants' lack of success in litigation is not surprising.  Although they contend that Serta Simmons Bedding's Non-PTL Term Loan Agreement could not be amended to give the new loans senior priority payment, the Non-PTL Term Loan Agreement contains no anti-subordination clause.  Anti-subordination clauses, found in many credit agreements but absent here, require the consent of all lenders to subordinate existing obligations to new indebtedness. The Non-PTL Term Loan Agreement, by contrast, allows most provisions to be amended by a majority of lenders.  That majority approval is all that was required for Serta Simmons Bedding to permit the incurrence of incremental equivalent debt.

5.      The Non-PTL Term Loan Agreement thus gave Serta Simmons Bedding the flexibility to refinance and incur additional priority indebtedness with the approval of only a majority of lenders.

6.      Specifically, Section 9.05(g) of the Non-PTL Term Loan Agreement unambiguously permits debt-for-debt exchange on a non-pro rata basis as part of an open market transaction.  In order to evade this plain language in the contract, Defendants have argued that the Transaction was not an open market purchase because it was not open to all lenders.  But the Non-PTL Term Loan Agreement is clear—only a Dutch Auction is required under the agreement to be "open to all Lenders," not an open market purchase.  Nor can Defendants plausibly contend there is anything unfair or impermissible about Serta Simmons Bedding dealing directly with a subset of lenders, as Defendants' own proposal would have required Serta Simmons Bedding to do the same thing.

7.      A ruling in this bankruptcy is necessary to finally resolve this issue, enforce the plain terms of the Non-PTL Term Loan Agreement, and recognize the opportunity to refinance that Serta Simmons Bedding bargained for.  Because this adversary proceeding will determine

the priority status of a number of lenders, its resolution is critical to the development of the

Chapter 11 plan of reorganization.  Plaintiffs therefore seek a declaratory judgment that the

Transaction fully complied with the terms of the Non-PTL Term Loan Agreement and that

Plaintiffs did not violate the covenant of good faith and fair dealing by entering into the

Transaction.

## II.    PARTIES

8.    Plaintiff Serta Simmons Bedding, LLC is a Delaware limited liability company

with its principal place of business at 2451 Industry Avenue, Doraville, GA, 30360.

9.    Plaintiff Barings LLC is a Delaware limited liability company with its principal

place of business at 300 South Tryon Street, Suite 2500, Charlotte, NC 28202.

10.    Plaintiff Credit Suisse Asset Management, LLC is a Delaware limited liability

company with its principal place of business at 11 Madison Avenue, New York, NY 10010.

11.    Plaintiff Invesco Senior Secured Management, Inc. is a Delaware corporation with

its principal place of business at 1166 Avenue of the Americas, 26th Floor, New York, NY 10036.

12.    Upon information and belief, defendants AG Centre Street Partnership, L.P., AG

Credit Solutions Non-ECI Master Fund, L.P., and Silver Oak Capital, L.L.C., affiliates of Angelo,

Gordon & Co., L.P., are Delaware limited liability companies and/or limited partnerships with

their principal place of business at 245 Park Avenue, New York, NY 10167.

13.    Upon information and belief, defendants AG SF Master (L), L.P. and AG Super

Fund Master, L.P., affiliates of Angelo, Gordon & Co., L.P., are Cayman Islands limited

partnerships with their principal place of business at 245 Park Avenue, New York, NY 10167.

14.    Upon information and belief, defendant Ascribe III Investments, LLC, an affiliate

of AS Birch Grove LP, is a limited liability company with its principal place of business at 590

Madison Avenue, 38th Floor, New York, NY 10022.

15.     Upon information and belief, defendants Columbia Cent CLO 21 Limited and Columbia Cent CLO 27 Limited are Cayman Islands exempted companies with their principal place of business at 1099 Ameriprise Financial Center, Minneapolis, MN 55474.

16.     Upon information and belief, defendant Columbia Floating Rate Income Fund is a series of Columbia Funds Series Trust II, a Massachusetts business trust with its principal place of business at 290 Congress St., Boston, MA 02210.

17.     Upon information and belief, defendant Columbia Strategic Income Fund is a series of Columbia Funds Series Trust I, a Massachusetts business trust with its principal place of business at 290 Congress St., Boston, MA 02210.

18.     Upon information and belief, defendants Contrarian Capital Fund I, L.P., Contrarian Distressed Debt Fund, L.P., and Contrarian Centre Street Partnership, L.P., affiliates of Contrarian Capital Management L.L.C., are Delaware limited partnerships with their principal place of business at 411 West Putnam Avenue, Greenwich, CT 06830.

19.     Upon information and belief, defendant Gamut Capital Serta Simmons Bedding, LLC, an affiliate of funds managed by Gamut Capital Management, LP, is a Delaware limited liability company with its principal place of business at 250 West 55th Street, New York, NY 10019.

20.     Upon information and belief, defendants LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd.., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd., and LCM 28 Ltd., affiliates of LCM Asset Management LLC, are exempted companies incorporated under the laws of the Cayman Islands whose principal place of business is in New York.

21.     Upon information and belief, defendant North Star Debt Holdings, L.P., an affiliate of funds managed by Apollo Global Management, Inc., is a Delaware limited partnership with its principal place of business at 9 West 57th Street, New York, NY 10019.

22.     Upon information and belief, defendants Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., and Shackleton 2017-XI CLO, Ltd., affiliates of Alcentra NY, LLC, are Cayman Islands limited liability companies with their principal place of business at 9 West 57th Street, Suite 4920, New York, NY 10019.

23.     Upon information and belief, defendants Z Capital Credit Partners CLO 2018-1 Ltd. and Z Capital Credit Partners CLO 2019-1 Ltd., affiliates of Z Capital Group L.L.C., are exempted companies incorporated with limited liability under the laws of the Cayman Islands with their principal place of business at 1330 Avenue of the Americas, 16th Floor, New York, NY 10019.

### III.     JURISDICTION AND VENUE

24.     The Court has jurisdiction to consider this matter under 28 U.S.C. §1334.

25.     This is a core proceeding under 28 U.S.C. §157(b).  The claims concern the allowance or disallowance of certain claims against the estate and determinations of the validity, extent, or priority of liens against the Debtor.  *See, e.g.*, 28 U.S.C. § 157(b)(2)(B), (K). Specifically, Defendants have challenged the priority of their liens vis-à-vis those of the PTL Lenders in a series of state and federal actions.  The first state court and first federal actions were each dismissed.  Two later-filed actions, one in New York state court and one in the Southern District of New York, remain pending.

26.     Under Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas (the

"Local Rules"), Plaintiffs consent to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

27.     Venue is proper under 28 U.S.C. §1409.  This proceeding arises in or relates to the Chapter 11 case pending in this District.

## IV.     FACTUAL BACKGROUND

### 1.   Serta Simmons Bedding Enters into the Non-PTL Term Loan Agreement in 2016

28.     Serta Simmons Bedding is one of the largest manufacturers and distributors of mattresses in North America.  It owns and manages some of the best-selling bedding brands in the mattress industry: Serta®, Beautyrest®, Simmons®, and Tuft & Needle®.

29.     Serta Simmons Bedding manufactures, sells, and distributes its bedding products to retailers and to individual consumers through a number of channels.  Serta Simmons Bedding primarily sells its products in the United States through a diverse base of dealers, predominantly through one or more specialty sleep shops, as well as furniture stores, department stores, furniture rental stores, mass merchandisers, and juvenile specialty stores.  Serta Simmons Bedding also sells its products (i) to hospitality customers, such as hotels, casinos and resort properties; (ii) to third party resellers, who purchase overstock and discontinued models; and (iii) direct to consumers through their e-commerce platforms and retail stores.

30.     Before the Transaction, Serta Simmons Bedding was a party to three separate Non-PTL Term Loan Agreements: (1) the Non-PTL Term Loan Agreement[2] that provided for $1.95

---

[2] The Non-PTL Term Loan Agreement (*See*, Ex. 1) was amended by that certain Amendment No. 1 to First Lien Term Loan Agreement, dated June 22, 2020 (the "Amended Non-PTL Term Loan Agreement").  *See* Ex. 2.  The Amended Non-PTL Term Loan Agreement includes a redline to the original Non-PTL Term Loan Agreement.  Additions are marked in blue double underlined text and deletions are marked with struck red text.

billion in first lien term loans ("First Lien Term Loans"); (2) a second lien term loan agreement, dated November 8, 2016[3] that provided for $450 million in second lien term loans ("Second Lien Term Loans"); and (3) a $225 million asset-based revolving credit facility, dated November 8, 2016.

31.     At the time of the Transaction, the PTL Lenders and Non-PTL Term Loan Lenders (except for North Star)[4] both held first lien and second lien Serta Simmons Bedding debt.

**2. Serta Simmons Bedding Explores Potential Transactions and Engaged in a Competitive Process**

32.     In late 2019, Serta Simmons Bedding faced economic headwinds stemming from the restructuring of its largest retail partner and competition from new direct-to-consumer businesses.  Although Serta Simmons Bedding took steps to, and did, improve its financial condition in early 2020, the spread of COVID-19 beginning in March 2020 severely impacted Serta Simmons Bedding's financial position.  Serta Simmons Bedding experienced a significant contraction in sales as both retailers of Serta Simmons Bedding products and Serta Simmons Bedding's manufacturing facilities were subject to government closures, which materially impacted Serta Simmons Bedding's liquidity.

33.     In response, Serta Simmons Bedding began to explore various re-financing alternatives, seeking to raise liquidity and reduce its debt and interest expense.  In March 2020, Serta Simmons Bedding's Board of Directors (the "Board") established an independent finance

---

[3] The second lien term loan agreement was amended by that certain Amendment No. 1 to Second Lien Term Loan Agreement, dated June 22, 2020.

[4] Although North Star attempted to purchase First Lien Term Loans on the secondary market in March 2020, North Star's parent entity, Apollo, was or was affiliated with a Disqualified Institution, as defined under the Non-PTL Term Loan Agreement, and therefore the purchase was rejected.  North Star also failed to obtain the requisite consent of both Serta Simmons Bedding and the administrative agent to effectuate the purchase.  North Star's trades did not settle and North Star did not—and does not—hold any of Serta Simmons Bedding's debt and is not a party to the Non-PTL Term Loan Agreement.

committee (the "Finance Committee") to evaluate and consider strategic alternatives for Serta Simmons Bedding.  The Board appointed two independent directors as members of the Finance Committee.

34.     In the spring of 2020, Serta Simmons Bedding, advised by its outside professionals, solicited proposals for potential liability managements transactions from both existing holders of Serta Simmons Bedding's debt and new lenders.  Various lender groups, including the PTL Lenders and a group comprised defendants of Angelo Gordon, Gamut, North Star, and Silver Oak (the "North Star Lenders"), submitted proposals for Serta Simmons Bedding's consideration.  As such, Serta Simmons Bedding negotiated with more than 70% of its lenders before proceeding with the Transaction with the PTL Lenders.

35.     The North Star Lenders sought to obtain unfettered control over Serta Simmons Bedding.  Specifically, the North Star Lenders' proposal included $200 million in new money and an exchange of approximately $630 million of existing First and Second Lien loans into approximately $470 million of new debt.  This proposal not only would have increased Serta Simmons Bedding's total debt by $38 million, it also would have increased its total interest payments by approximately $37 million.

36.     Moreover, the North Star Lenders' proposal would have stripped valuable collateral from Serta Simmons Bedding's other existing first and second lien lenders.  The proposal would have required Serta Simmons Bedding to transfer substantial, existing collateral from the First Lien Term Loans (which included significant intellectual property assets, as well as royalty streams associated with third-party intellectual property licenses worth millions of dollars) to newly created Serta Simmons Bedding subsidiaries that would have served as borrowers and/or guarantors of the new debt, thereby stripping $465-590 million in collateral away from other

lenders.  The North Star Lenders' proposal also contemplated adding new collateral to these newly created subsidiaries, including real estate assets and a pledge of the stock of Serta, Inc.

37.    In contrast, the PTL Lenders' proposal provided Serta Simmons Bedding with better terms that did not require Serta Simmons Bedding to strip valuable collateral away from the First Lien Term Loans. In fact, more collateral was added that was shared *pari passu* with all other existing lenders. The PTL Lenders' proposal included $200 million in new money loans and the repurchase of more than $1 billion in existing debt in exchange for the issuance of $850 million in new priority term loans.  This proposal thus allowed Serta Simmons Bedding to raise liquidity through new money financing, to capture approximately $400 million in debt discounts, and to lower its overall interest expense.

38.    Following a robust, competitive evaluation process, in early June 2020, the Finance Committee determined that the PTL Lenders' proposal was the best option for Serta Simmons Bedding on a going forward basis.  The Transaction allowed Serta Simmons Bedding to both raise liquidity with new money financing and capture debt discount through an open market purchase of the PTL Lenders' existing Serta Simmons Bedding debt on a non-pro rata basis, as permitted under the Non-PTL Term Loan Agreement.  The Finance Committee approved Serta Simmons Bedding proceeding with the Transaction.[5]

39.    The Transaction provided for a new super-priority term loan facility with two tranches: (i) a $200 million new money tranche and (ii) a debt-for-debt exchange tranche, pursuant to which approximately $850 million of priority terms loans were issued as consideration for the

---

[5] On June 3, 2020, the Board delegated full decision-making authority to the Finance Committee to approve, negotiate, and implement a re-financing transaction for Serta Simmons Bedding.

open market purchase of over $1 billion of First and Second Lien Term Loans (collectively, the "PTL Loans").

40.     To effectuate the Transaction, Serta Simmons Bedding entered into certain amendments to the Non-PTL Term Loan Agreement (discussed *infra*) and also entered into a separate Super-Priority Term Loan Agreement, dated June 22, 2020 (the "PTL Credit Agreement"), an Open Market Purchase and Cashless Exchange Agreement, dated June 22, 2020 (the "Exchange Agreement"), and a First Lien Intercreditor Agreement, dated June 22, 2020 (the "PTL Intercreditor Agreement"), pursuant to which the PTL Loans rank senior in right of payment, but *pari passu* with respect to security, to the First Lien Loans under the Non-PTL Term Loan Agreement.

41.     Ultimately, the Transaction reduced Serta Simmons Bedding's debt by approximately $400 million, lowered Serta Simmons Bedding's all-in interest expense, created new collateral for the benefit of all Lenders (including Defendants), and increased Serta Simmons Bedding's cash position to $300 million.  Absent the Transaction, which allowed Serta Simmons Bedding to deleverage its balance sheet, Serta Simmons Bedding would likely have been on the path to restructuring far sooner.

42.     Serta Simmons Bedding issued a press release on June 8, 2020 announcing the Transaction.

### 3.  The Transaction Complies with the Non-PTL Term Loan Agreement

#### a.  The Non-PTL Term Loan Agreement Permits the Transaction

43.     Many credit agreements contain anti-subordination clauses, requiring the consent of all lenders to subordinate the obligations under the agreement to any other indebtedness.  The Non-PTL Term Loan Agreement here does not contain an anti-subordination provision; the

sophisticated parties here agreed to allow the Company the flexibility to incur additional priority indebtedness under this Non-PTL Term Loan Agreement.

44.     The plain terms of the Non-PTL Term Loan Agreement permit the incurrence of incremental equivalent debt and the repurchase of existing loans on the open market on a non-pro rata basis.

45.     The Non-PTL Term Loan Agreement permits Serta Simmons Bedding to incur the additional $200 million in new money in the form of incremental equivalent debt.  Section 6.01(z) of the Non-PTL Term Loan Agreement provides "[t]he Top Borrower [defined as Serta Simmons Bedding] shall not . . . directly . . . incur . . . any Indebtedness, except . . . Incremental Equivalent Debt."  Ex. 1 § 6.01(z); *see also id.* at §1.01 (defining Incremental Equivalent Debt).  Serta Simmons Bedding incurred the $200 million new financing under this provision.

46.     The Non-PTL Term Loan Agreement also allows Serta Simmons Bedding to repurchase First Lien Loans from its existing lenders on a non-pro rata basis through an open market transaction.  Specifically, § 9.05(g) of the Non-PTL Term Loan Agreements provides, in relevant part, that:

> Notwithstanding anything to the contrary contained herein, any Lender may, at any time assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender[6] ***on a non-pro rata basis*** (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases, in each case with respect to <u>clauses (A)</u> and <u>(B),</u> without the consent of the Administrative Agent.

Ex. 1, § 9.05(g) (emphasis added).

---

[6] The Non-PTL Term Loan Agreement defines Affiliated Lender to include "any Non-Debt Fund Affiliate, Holdings, the Top Borrower and/or any subsidiary of the Top Borrower."  *Id.* at § 1.01.  Serta Simmons Bedding is the Top Borrower.

47.     In the context of a loan repurchase, "open market" means the price that a willing buyer and a willing seller are able to obtain in an arms-length negotiation—in other words, the price that Serta Simmons Bedding and any lender agreed to in the "open market."[7]  Here, Serta Simmons Bedding negotiated with, and entered into, arms-length transactions in the "open market" with the PTL Lenders, which held a majority of Serta Simmons Bedding's debt, to repurchase their debt in exchange for the issuance of PTL Loans.  Serta Simmons Bedding also negotiated on the open market with the North Star Lenders, but the PTL Lenders offered better terms.  Neither Section 9.05(g) nor any other provision required Serta Simmons Bedding to offer the Transaction to all its existing lenders.  Section 9.05(g) expressly provides that an open market transaction may occur on a "non-pro rata basis."  Ex. 1, § 9.05(g).  Notably, the remainder of Section 9.05(g), which alternatively allows an exchange transaction through a Dutch auction, specifically provides that, unlike an open market purchase, a Dutch Auction must be "open to all Lenders."

### b.  The Non-PTL Term Loan Agreement Permits the Amendments

48.     To effectuate the Transaction, Serta Simmons Bedding and the PTL Lenders, who held more than 50% of the outstanding loans under the Non-PTL Term Loan Agreement (the "Required Lenders" under the Non-PTL Term Loan Agreement), first entered into certain permitted amendments to the Non-PTL Term Loan Agreement to allow the PTL Loans to have senior payment priority.

49.     The Non-PTL Term Loan Agreement provides that all provisions, except a small number of provisions involving "sacred rights," may be amended with the consent of a simple majority of the First Lien Lenders.  Section 9.02(b) provides, in relevant part, that:

> [N]either this Agreement nor any other Loan Document or any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to

---

[7] *See Fair Market Value*, BLACK'S LAW DICTIONARY (11th ed. 2019).

> an agreement or agreements in writing entered into by [Serta Simmons Bedding] and the Required Lenders.

*See* Ex. 1 §9.02(b).   "Required Lenders" is defined to include "Lenders having Loans or unused Commitments representing more than 50% of the sum of the total Loans and such unused commitments at such time."   *See* Ex. 1 §1.01.

50.     In contrast to the simple majority requirement for most amendments, an amendment of any specifically enumerated "sacred right" provision requires the consent of each lender directly or adversely affected by the amendment.  But even for the "sacred right" requiring such heightened approval to amend, the Non-PTL Term Loan Agreement contains an express carve out for non-pro rata open market purchases.  Section 9.02(b)(A)(6) requires the consent of each lender directly and adversely effected by an amendment that

> waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby (**except in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c), and/or 9.05(g) or as otherwise provided in this Section 9.02**).

Ex. 1, § 9.02(b)(A)(6) (emphasis added).   This express carveout directly applies because the Transaction was a non-pro rata open market purchase as permitted under section 9.05(g) of the Non-PTL Term Loan Agreement; even for the handful of "sacred rights" which required such heightened approval to amend, the Non-PTL Term Loan Agreement contains an express carve out for non-pro rata open market purchases under § 9.05(g).

51.     Defendants have also argued that the Transaction violated another "sacred right"— Section 9.02(b)(B), which prohibits Serta Simmons Bedding and the Required Lenders from entering into an agreement that would "release all or substantially all of the Collateral from the Lien granted pursuant to the Loan Documents" or to "release all or substantially all of the value of the Guarantees under the Loan Guaranty," "except as otherwise permitted herein or in the other Loan Documents," "without the prior written consent of each Lender."  Ex. 1 § 9.02(b)(B)(2)-(3).

However, the Transaction did not release the collateral or the value of the loan guarantees. The Non-PTL Term Loan Lenders' loans are secured by the same lien, and guaranteed by the same guarantees, as the day the Non-PTL Term Loan Agreement was executed.

52. The Transaction also did not interfere with the Non-PTL Term Loan Lenders' sacred right to receive pro rata payment in the event of a default. Section 2.18(b) and (c), the waterfall provision, states

> (b) . . . [A]ll proceeds of Collateral received by the Administrative Agent while an Event of Default exists and all or any portion of the Loans have been accelerated hereunder pursuant to Section 7.01, shall be applied, <u>first</u>, to the payment of all costs and expenses then due incurred by the Administrative Agent . . . <u>second</u>, on a pro rata basis, to pay any fees, indemnities or expense reimbursements then due to the Administrative Agent . . . <u>third</u>, on a pro rata basis in accordance with the amounts of the Secured Obligations . . . owed to the Secured Parties on the date of any such distribution, to the payment in full of the Secured Obligations, <u>fourth</u>, as provided in each applicable Intercreditor Agreement, and <u>fifth</u>, to, or at the direction of, the Top Borrower or as a court of competent jurisdiction may otherwise direct.
>
> (c) If any Lender obtains payment . . . in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with Loans of such Class, then the Lender receiving such greater proportion shall purchase . . . participations in the Loans of other Lenders of such Class at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such Class ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class; **provided that . . . (ii) the provisions of this paragraph shall not apply to (A) any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with Sections 2.22, 2.23, 9.02(c) and/or Section 9.05.**

Ex. 1, § 2.18(b), (c) (emphasis added).

53. No amendments were made to Section 2.18(b) or (c), which govern the payment waterfall in the event of default and the pro rating sharing provisions, respectively.

54. In any event, Section 2.18(c) provides for payments obtained to "be shared by the Lenders *of such Class* ratably in accordance with the aggregate amount of principal of and accrued

interest on their respective Loans *of such Class*." *Id.* § 2.18(c) (emphasis added).  Accordingly, the first-lien lenders' rights to pro rata payments under Section 2.18 only applies to debt within the same "Class"—that is, among first-lien lenders.  The PTL Loans are not in the same "Class" as the first-lien term loans.

55.    Further, by Section 2.18(b)'s plain language, its waterfall provision is expressly "[s]ubject, in all respects, to the provisions of each applicable Intercreditor Agreement."  Ex. 1, § 2.18(b).

56.    The Non-PTL Term Loan Agreement was amended to allow Serta Simmons Bedding to incur incremental equivalent debt that is senior in right of payment to the First Lien Loans.  The definition of Incremental Equivalent Debt was amended to read as follows:

> Indebtedness issued, incurred or implemented in lieu of loans under an Incremental Facility in the form of notes or loans and/or commitments in respect of the foregoing (***including Indebtedness issued under the PTL Credit Agreement*** (including the Priority New Money Term Loans and the Priority Exchange Term Loans)) in each case, ***which may be senior***, *pari passu* or junior ***in right of payment*** and/or with respect to security with the Obligations hereunder . . . .

*See* Ex. 2 § 1.01 (emphasis added).  As this amendment did not amend, modify, or waive a "sacred right," it required only the consent of the Required Lenders.

57.    Section 8.08 of the Non-PTL Term Loan Agreement was also amended to authorize the administrative agent to enter into a separate intercreditor agreement to establish senior payment priority for the new loans.  As amended, Section 8.08 provides:

> Each Secured Party irrevocably authorizes and instructs the Administrative Agent to, and the Administrative Agent shall . . . (d) enter into subordination, intercreditor, collateral trust and/or similar agreements with respect to Indebtedness (including the Initial Intercreditor Agreement, the PTL First Lien Intercreditor Agreement and any other Acceptable Intercreditor Agreement . . . ) that is (i) required  or permitted to be senior, pari passu or subordinated hereunder . . . .

See Ex. 2 § 8.08(d).  Again, as this amendment did not amend, modify, or waive a "sacred right," it required only consent of the "Required Lenders."

58.     Serta Simmons Bedding and the PTL Lenders also made clear in the amended Non-PTL Term Loan Agreement that the Transaction, as documented, was a permissible "open market purchase" to which the PTL Lenders consented.  Specifically, Amendment No. 1 to the Non-PTL Term Loan Agreement provides that each Required Lender "acknowledges and agrees that the borrowing and/or incurrence" of the super-priority loans and all "step[s] necessary to effectuate" the Transaction "shall be and are permitted," Ex. 2, § 4, and that each Required Lender "consent[s], request[s] and instruct[s] the Administrative Agent" to take "any and all actions . . . necessary, advisable or desirable in carrying out, effectuating or otherwise in furtherance of the transactions related to or in connection with" the amendment, *id.* § 14(a).  As there is no sacred right relating to the definition of "open market purchase," the consent of the PTL Lenders, who represent more than 50% of the First Lien Term Loan holders, was all that was required to amend the Non-PTL Term Loan Agreement in this manner.  *See* Ex. 1 §9.02(b)(A).

59.     The Exchange Agreement entered into by Serta Simmons Bedding and the PTL Lenders in connection with the Transaction similarly provides that "pursuant to Section 9.05(g) of the First Lien [Non-PTL Term Loan] Agreement, the Specified Borrowers will purchase on the open market from such Specified Lender all of its Existing First Lien Term Loans," that "[e]ach of the Specified Lenders . . . instruct[] each Bank Agent to take any and all actions . . . necessary, advisable or desirable . . . [to] effectuat[e]" the debt purchase transaction, and that each Specified Lender agreed that all conditions precedent to the transaction were satisfied.  Ex. 3, Preamble, § 2.1(f).  Like Amendment No. 1 to the Non-PTL Term Loan Agreement, then, the Exchange Agreement confirms that the Required Lenders understood the Transaction to be an open market purchase and consented to the Transaction.

**4. The North Star Lenders Seek, and Fail, to Block the Transaction and the Transaction Closes on June 22, 2020**

60.     After Serta Simmons Bedding announced its intent to proceed with the Transaction, the North Star Lenders were evidently upset that Serta Simmons Bedding had selected the PTL Lenders' proposal rather than their own, which, again, would have stripped collateral from other lenders and resulted in more debt and interests owed by Serta Simmons Bedding.  On June 11, 2020, the North Star Lenders filed a complaint in New York State court against Serta Simmons Bedding and the PTL Lenders (the "North Star Lenders Action")[8] and sought a preliminary injunction to enjoin the Transaction from closing.  The North Star Lenders claimed that the proposed Transaction would create new superpriority loans that would effectively subordinate their First Lien Loans purportedly in violation of the Non-PTL Term Loan Agreement.[9]

61.     On June 19, 2020, the New York state court denied the North Star Lenders' request for a preliminary injunction.  The court concluded that the North Star Lenders were not likely to succeed on the merits of their breach of contract and breach of the implied covenant of good faith and fair dealing claims.[10]  As to the breach of contract claim, the court held that that the "[Non-PTL Term Loan Agreement] seems to permit[] the debt-to-debt exchange on a non-pro rata basis as part of an open market transaction" and that "[s]ince the amendments do not affect plaintiffs['] so-called 'sacred rights' under the [Non-PTL Term Loan Agreement], plaintiffs' consent does not appear to be required."[11]  The New York court further concluded that the good faith and fair

---

[8] LCM sought to intervene in the North Star Action, which was denied.  *North Star Debt Holdings, L.P., et al., v. Serta Simmons Bedding, LLC et al.*, No. 652243/2020 (N.Y. Sup. Ct. N.Y. Cnty.), Dkt. 61.

[9] *North Star*, No. 652243/2020, Dkt. 1.

[10] *See North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC,* No. 652243/2020, 2020 WL 3411267, at *4 (N.Y. Sup. Ct. N.Y. Cnty. June 19, 2020).

[11] *Id.*

dealing claim was unlikely to succeed because it was "identical to its breach of contract claim."[12] In denying the motion, the court recognized that the Transaction was "the culmination of months of negotiation" and that the COVID-19 pandemic had "impacted Serta's liquidity."[13]

62.     The Transaction closed on June 22, 2020.

63.     Since the Transaction closed, Serta Simmons Bedding continued to pay its debt as it came due both under the PTL Credit Agreement and the Non-PTL Term Loan Agreement.

64.     The Non-PTL Term Loan Lenders and PTL Lenders' loans have continued to trade on the market since the Transaction closed, with all parties (including non-parties to this adversary proceeding) relying on the validity and finality of the Transaction.

## 5.     The North Star Lenders Withdraw Their State Court Action, Only To Refile Two Years Later

65.     Following the denial of their motion for a preliminary injunction, the North Star Lenders voluntarily discontinued the North Star Action over Serta Simmons Bedding and the PTL Lenders' vigorous objection.[14]   The New York state court granted the motion to voluntarily discontinue the North Star Action on November 30, 2020 over Defendants' objection.[15]

66.     In November 2022, two years after voluntarily dismissing the North Star Action, the North Star Lenders and other Non-PTL Term Loan Lenders filed a renewed complaint against Serta Simmons Bedding and the PTL Lenders in New York state court.  This complaint alleges near identical claims to those in the complaint the North Star Lenders voluntarily withdrew in November 2020:  they allege the Transaction breached the waterfall and pro rata sharing provisions

---

[12] *Id.* at *5.

[13] *Id*. at *2.

[14] *North Star*, Index No. 652243/2020, Dkt. 170.

[15] *North Star*, Index No. 652243/2020, Dkt. 212.

of the Non-PTL Term Loan Agreement, and that the Transaction breached the implied covenant of good faith and fair dealing by stripping them of the value of their guarantees and altering the proceeds waterfall and pro rata provisions without their consent.  The Plaintiffs in the New York state court action also allege the Transaction released all or substantially all of the collateral and value of the guarantees without the non-participating lender' consent.  However, the Plaintiffs in the New York state court action concede that under the Non-PTL Term Loan Agreement, Serta Simmons Bedding can subordinate their debt without their consent because the incurrence of $200 million in new debt from the Transaction "could be given priority without a unanimous vote."[16] The complaint also asserts a related, but distinct, claim for a declaratory judgement that Serta Simmons Bedding breached the Non-PTL Term Loan Agreement by failing to perfect the assignment of Apollo's first lien loans.  As described in detail below, the North Star Lenders chose to file its litigation shortly before Serta Simmons Bedding's filing for Chapter 11.

67.     On January 9, 2023, Serta Simmons Bedding and the PTL Lenders both moved to dismiss the case.[17]

**6.  LCM Litigation**

68.     Following the New York State court's denial of the preliminary injunction, LCM, which held approximately $7.4 million in First Lien Debt, filed successive suits in federal court challenging the Transaction and alleging similar causes of action as the North Star Lenders.  LCM first sued Serta Simmons Bedding in New York state court in June 2020, but withdrew the action shortly thereafter.[18] LCM then sued Serta Simmons Bedding and the PTL Lenders in the Southern

---

[16] *AG Centre Street Partnership L.P., et al. v. Serta Simmons Bedding, LLC, et al.*, No. 654181/2022, Dkt. 11, at 23.

[17] *AG Centre*, No. 654181/2022, Dkts. 47, 55, 57.

[18] *LCM Asset Management, LLC v. Serta Simmons Bedding, LLC, et al.*, No. 652555/2020 (N.Y. Sup. Ct. N.Y. Cnty.), Dkt. 14.

District of New York in July 2020. The Southern District of New York granted Serta Simmons Bedding and the PTL Lenders' motions to dismiss the complaint for lack of subject matter jurisdiction because there was incomplete diversity between LCM and the PTL Lenders.[19]

69.     LCM then filed a new action in the Southern District of New York against Serta Simmons Bedding alone, which remains pending (the "LCM Action"). In the complaint, LCM alleges the Transaction did not constitute an open market purchase under Section 9.05(g) of the Non-PTL Term Loan Agreement as it was negotiated in private and not offered to all existing lenders. LCM further argued that the amendments to the Non-PTL Term Loan Agreement implicated their sacred rights under the Non-PTL Term Loan Agreement (specifically, their right to *pro rata* payment) and thus required 100% lender consent, rather than a simple majority. LCM further argues that the Transaction "effectively" released all or substantially all of the collateral securing the First Lien Loans due to the PTL Loans receiving higher priority than the First Lien Loans.[20]

70.     Serta Simmons Bedding moved to dismiss the claims in July 2021, and the Southern District of New York court rejected nearly all of LCM's contentions that Serta Simmons Bedding breached the Non-PTL Term Loan Agreement through the Transaction. The Southern District of New York held that the Non-PTL Term Loan Agreement permitted the amendments in the Transaction as they did not affect the "*pro rata* rights of first-lien lenders vis-à-vis other first-lien lenders."[21] The Southern District of New York also concluded that the Transaction did not violate

---

[19] *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 20-cv-05090, 2021 WL 918705, at *5 (S.D.N.Y. Mar. 10, 2021).

[20] *LCM XXI Ltd. v. Serta Simmons Bedding, LLC*, No. 21 Civ. 3987 (KPF) (S.D.N.Y), Dkt. 1, at 12.

[21] *LCM XXI Ltd. v. Serta Simmons Bedding, LLC*, No. 21 Civ. 3987 (KPF), 2022 WL 953109, at *10 (S.D.N.Y. Mar. 29, 2022) ("anti-subordination is not a sacred right protected by § 9.02(b)(A)(6), or any other provision of § 9.02 . . .

the waterfall provisions of the Non-PTL Term Loan Agreement because the Non-PTL Term Loan Agreement permitted Serta Simmons Bedding to enter into the First Lien Intercreditor Agreement and no collateral or value of the loan guarantees were released in the Transaction.[22]  However, the Southern District of New York ultimately denied Serta Simmons Bedding's motion to dismiss the breach of contract claim in part because it concluded that the term "open market purchase" as used in Section 9.05(g) was ambiguous and discovery on that issue should proceed.[23]  Nevertheless, in so holding, the Southern District of New York recognized that the open-market provision may contemplate loan-repurchase transactions "that involve *fewer than all lenders in any given class of debt*" (emphasis added), and observed "[t]hat the provision specifies that Dutch Auctions must be open to all lenders, but does not do so for open-market purchases, may indicate the parties' conscious choice to exclude such a requirement from loan repurchases pursued in the open market."[24]  The Southern District of New York also noted that the mere existence of other mechanisms for debt exchanges in the Non-PTL Term Loan Agreement did not preclude Serta Simmons Bedding's use of the open market provision for the Transaction.[25]

71.    LCM and Serta Simmons Bedding substantially completed their document productions in the LCM Action on August 19, 2022.  To date, no depositions have occurred and expert discovery has not begun.

---

. the [Non-PTL Term Loan] Agreement permitted such changes to be made with the consent of the majority of lenders").

[22] *Id.* at *11-12.

[23] *Id.* at *6-*9.  The Southern District of New York also permitted the claim for breach of the implied covenant of good faith and fair dealing to proceed.  *Id.* at *14-*16.

[24] *See id.* at *8.

[25] *Id.* at *8-9.

**7.  Serta Simmons Bedding filed for Chapter 11 Protection**

72.     As is described more fully in the Declaration of John Linker in Support of Debtors'
Chapter 11 Petitions and First Day Relief, due to continuing poor market conditions, Serta
Simmons Bedding and 13 of its affiliates commenced the above-captioned Chapter 11 cases on
January 23, 2023 (the "Petition Date").

73.     Both the LCM Action and the North Star Lenders' Action[26] are subject to the
automatic stay.  *See* 11 U.S.C. § 362(a) (the Automatic Stay operates as a stay, applicable to all
entities, of "the commencement or continuation . . . of a judicial, administrative, or other action or
proceeding against the debtor that was or could have been commenced before the commencement
of the case under [chapter 11]").

74.     Whether the Transaction was valid under the Non-PTL Term Loan Agreement is a
core issue that goes to the heart of Serta Simmons Bedding's efforts to reorganize its capital
structure pursuant to the Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated
Debtors (the "Plan").  This issue must be resolved for Serta Simmons Bedding to successfully
emerge from Chapter 11.

## V.     CAUSES OF ACTION

**COUNT 1 – DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. §2201**

75.     Serta Simmons Bedding and the PTL Lenders incorporate by reference the
allegations in Paragraphs 1-74 as if set forth fully herein.

76.     Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy
within its jurisdiction . . . any court of the United States . . . may declare the rights and other

---

[26] Serta Simmons Bedding intends to file a motion to extend the automatic stay to the entirety of the North Star Action
(including those claims against the PTL Lenders).

legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a).  Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments.

77.     Courts possess jurisdiction to issue declaratory relief when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007).

78.     There is a substantial controversy between Serta Simmons Bedding and the PTL Lenders and the Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  Without resolution of this controversy, Serta Simmons Bedding anticipates the Defendants will continue to assert their priority status in Serta Simmons Bedding's capital structure vis-à-vis the PTL Lenders.  Such claims would prevent Serta Simmons Bedding from successfully obtaining confirmation of its Plan and preclude Serta Simmons Bedding from emerging from chapter 11, to the detriment of its estate and its creditors.

79.     There is also a substantial controversy concerning whether Serta Simmons Bedding breached the Non-PTL Term Loan Agreement by failing to perfect the assignment of Apollo's first lien loans.  Without resolution of this controversy, Apollo may continue to assert it holds additional amounts of Serta Simmons Bedding's first lien loans, which could similarly impact Serta Simmons Bedding's ability to successfully obtaining confirmation of its Plan and preclude Serta Simmons Bedding from emerging from chapter 11, to the detriment of its estate and its creditors.

80.     Serta Simmons Bedding and the PTL Lenders seek a declaratory judgment confirming that (1) the Transaction was permitted under the Non-PTL Term Loan Agreement

26

and (2) Plaintiffs did not violate the covenant of good faith and fair dealing by entering into the Transaction.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request relief as follows:

a.    Enter judgment that the Transaction was permitted under the Non-PTL Term Loan Agreement;

b.    Enter judgment that the Plaintiffs did not violate the covenant of good faith and fair dealing by entering into the Transaction;

c.    Enter a judgment that Apollo is a Disqualified Institution under the Non-PTL Term Loan Agreement and therefore not allowed to hold First Lien Loans;

d.    Enter judgment awarding costs and attorneys' fees, as this Court deems just and proper; and

e.    Enter judgment awarding such additional and further relief as this Court deems just and proper under the circumstances.

Dated: January 24, 2023

*Gabriel A. Morgan*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 1700
Houston, TX 77002
Tel:  (713) 546-5040
Fax: (713) 224-9511
Email:  Gabriel.Morgan@weil.com
           Stephanie.Morrison@weil.com

WEIL, GOTSHAL & MANGES LLP
David J. Lender (*pro hac vice* forthcoming)
Luna Barrington (*pro hac vice* forthcoming)
Richard Gage (*pro hac vice* forthcoming)
Taylor B. Dougherty (*pro hac vice* forthcoming)
Joseph R. Rausch (*pro hac vice* forthcoming)
Michael P. Goodyear (*pro hac vice* forthcoming)
Nicholas J. Reade (*pro hac vice* forthcoming)
767 Fifth Avenue
New York, NY 10153
Tel:    (212) 310-8000
Fax:    (212) 310-8007
Email: david.lender@weil.com
           luna.barrington@weil.com
           richard.gage@weil.com
           taylor.dougherty@weil.com
           joseph.rausch@weil.com
           michael.goodyear@weil.com
           nick.reade@weil.com

*Counsel for Defendant Serta Simmons Bedding, LLC*

Dated: January 24, 2023

*Gregg J. Costa*

GIBSON, DUNN & CRUTCHER LLP
Gregg J. Costa (24028160)
811 Main Street, Suite 3000
Houston, TX 77002
Tel: (346) 718-6600
Fax: (346) 718-6620
Email: gcosta@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (*pro hac vice* forthcoming)
Jennifer L. Conn (*pro hac vice* forthcoming)
Amanda M. Aycock (*pro hac vice* forthcoming)
200 Park Avenue
New York, NY 10166
Tel:    (212) 351-4000
Fax:    (212) 351-4035
Email: osnyder@gibsondunn.com
           jconn@gibsondunn.com
           aaycock@gibsondunn.com

*Counsel for Invesco Senior Secured Management, Inc. and Credit Suisse Asset Management, LLC*

Dated: January 24, 2023

*/s/ Madlyn Gleich Primoff*

FRESHFIELDS BRUCKHAUS DERINGER US LLP
Madlyn Gleich Primoff (*pro hac vice* forthcoming)
601 Lexington Avenue
New York, NY 10022
Tel:    (212) 277-4000
Fax:    (212) 277-4001
Email: madlyn.primoff@freshfields.com

*Counsel for Barings LLC*