# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| | § | |
| | § | Chapter 11 |
| In re: | § | |
| | § | Chapter 11 |
| SERTA SIMMONS BEDDING, LLC, et al., | § | |
| | § | |
| Debtors. | § | Case No. 23-90020 (DRJ) |
| | § | |
| | | (Jointly Administered) |

| | | |
|---|---|---|
| **SERTA SIMMONS BEDDING, LLC, INVESCO SENIOR SECURED MANAGEMENT, INC., CREDIT SUISSE ASSET MANAGEMENT, LLC, BOSTON MANAGEMENT AND RESEARCH, EATON VANCE MANAGEMENT, AND BARINGS LLC,** | § § § § § § § | **Adversary No. 23-09001** |
| **Plaintiffs,** | § § § | |
| **v.** | § § | |
| **AG CENTRE STREET PARTNERSHIP L.P., AG CREDIT SOLUTIONS NON-ECI MASTER FUND, L.P., AG SF MASTER (L), L.P., AG SUPER FUND MASTER, L.P., SILVER OAK CAPITAL, L.L.C., ASCRIBE III INVESTMENTS, LLC, COLUMBIA CENT CLO 21 LIMITED, COLUMBIA CENT CLO 27 LIMITED, COLUMBIA FLOATING RATE INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST II, COLUMBIA STRATEGIC INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST I, CONTRARIAN CAPITAL FUND I, L.P., CONTRARIAN CENTRE STREET PARTNERSHIP, L.P., CONTRARIAN DISTRESSED DEBT FUND, L.P., GAMUT CAPITAL SSB, LLC, LCM XXII LTD., LCM XXIII LTD., LCM XXIV LTD., LCM XXV LTD., LCM 26 LTD., LCM 27 LTD., LCM 28 LTD., NORTH STAR DEBT HOLDINGS, L.P., SHACKLETON 2013- III CLO, LTD., SHACKLETON 2013-IV-R CLO, LTD., SHACKLETON 2014-V-R CLO, LTD., SHACKLETON 2015-VII-R CLO, LTD., SHACKLETON 2017-XI CLO, LTD., Z CAPITAL CREDIT PARTNERS CLO 2018-1 LTD., AND Z CAPITAL CREDIT PARTNERS CLO 2019-1 LTD.** | § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| **Defendants.** | § § | |

## SERTA SIMMONS BEDDING, LLC'S MOTION FOR SUMMARY JUDGMENT

**This motion seeks an order that may adversely affect you. If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted hearing on this matter on March 28, 2023 at 9:00 AM CT in Courtroom 400, 515 Rusk, Houston, TX 77002. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click on Judge Jones's home page. The meeting code is "judgejones." Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jones's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

# **TABLE OF CONTENTS**

I.      Preliminary Statement ........................................................................................1

II.     Statement of Facts .............................................................................................6

    A.      The Parties ..............................................................................................6

    B.      The Transaction ......................................................................................7

    C.      The Terms of the Term Loan Agreement .................................................9

    D.      Procedural History ................................................................................12

III.    Legal Standard .................................................................................................15

IV.     Argument .........................................................................................................17

    A.      The Transaction Was Expressly Permitted by the Term Loan
          Agreement ..............................................................................................17

          1.      The Debt-for-Debt Exchange Was an Open Market Purchase
                 Expressly Permitted by the Term Loan Agreement...................18

          2.      The Debt-for-Debt Exchange Did Not Require Each Lender's
                 Consent and the Amendments to the Term Loan Agreement
                 Required Only the PTL Lenders' Consent...................................22

          3.      The Transaction Does Not Violate the Waterfall Provision or Pro
                 Rata Sharing Provision, and Does Not Strip Plaintiffs of Collateral
                 or Guarantee Value .................................................................24

    B.      The Implied Covenant of Good Faith and Fair Dealing Was Not
          Breached Because the Transaction Was Expressly Permitted by the
          Term Loan Agreement and Any Such Claim Would Be
          Duplicative ............................................................................................27

    C.      North Star is a Disqualified Institution Under the Term Loan
          Agreement and Therefore Not Allowed to Hold First Lien Term
          Loans .....................................................................................................27

V.      Conclusion .......................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................................16

*Ashwood Cap., Inc. v. OTG Mgmt., Inc.*,
99 A.D.3d 1 (N.Y. App. Div. 1st Dep't 2012)..............................................17, 23

*Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*,
2021 WL 3619753 (N.Y. Sup. Ct. Aug. 16, 2021).......................................25, 26

*Bayside Cap. Inc. v. TPC Grp., Inc. (In re TPC Grp., Inc.)*,
2022 WL 2498751 (Bankr. D. Del. July 6, 2022)...............................................21

*Brown v. Deutsche Bank Nat'l Tr. Co.*,
120 A.D.3d 440 (N.Y. App. Div. 1st Dep't 2014)..............................................27

*Camreta v. Greene*,
563 U.S. 692 (2011).............................................................................................21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).............................................................................................16

*Chase Equip. Leasing Inc. v. Architectural Air, L.L.C.*,
84 A.D.3d 439 (N.Y. App. Div. 1st Dep't 2011)................................................27

*Courtney v. Arthur Andersen LLP*,
264 F. App'x. 426 (5th Cir. 2008) ......................................................................17

*Currier, McCabe & Assocs., Inc. v. Maher*,
75 A.D.3d 889 (N.Y. App. Div. 3rd Dep't 2010) ...............................................17

*D.E.W., Inc. v. Local 93, Laborers' Int'l Union*,
957 F.2d 196 (5th Cir. 1992) ..............................................................................17

*Dalton v. Paccar Fin. Corp.*,
95 F.3d 49 (5th Cir. 1996) (text available at 1996 WL 457309) ........................16

*FDIC v. Murex LLC*,
500 F. Supp. 3d 76 (S.D.N.Y. 2020)...................................................................17

*Fesseha v. TD Waterhouse Inv'r Servs., Inc.*,
305 A.D.2d 268 (N.Y. App. Div. 1st Dep't. 2003).............................................26

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*,
 889 F.2d 1274 (2d Cir. 1989)...............................................................................17

*ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*,
 2022 WL 10085886 (Sup. Ct. N.Y. Cnty. Oct. 17, 2022) ...........................................20, 21, 22

*Iconoclast Advisers LLC v. Petro-Suisse Ltd.*,
 2010 WL 2218406 (N.Y. Sup. Ct. May 14, 2010)..................................................28

*L. Debenture Tr. Co. v. Maverick Tube Corp.*,
 595 F.3d 458 (2d Cir. 2010)...............................................................................17

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
 2021 WL 918705 (S.D.N.Y. Mar. 10, 2021) ....................................................3, 14

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
 2022 WL 953109 (S.D.N.Y. March 29, 2022) .......................................... *passim*

*Little v. Liquid Air Corp.*,
 37 F.3d 1069 (5th Cir. 1994) ...............................................................................16

*Maxon Int'l Inc. v. Int'l Harvester Co.*,
 82 A.D.2d 1006 (N.Y. App. Div. 3d Dep't 1981), *aff'd*, 56 N.Y.2d 879 (1982) ...................27

*MedImmune, Inc. v. Genetech, Inc.*,
 549 U.S. 118 (2007)...............................................................................16

*Mid-State Indus., Ltd. v. State*,
 117 A.D.3d 1255 (N.Y. App. Div. 3d Dep't 2014) ...............................................17

*Mill Fin., LLC v. Gillet*,
 122 A.D.3d 98 (N.Y. App. Div. 1st Dep't 2014).................................................27

*Muzak Corp. v. Hotel Taft Corp.*,
 1 N.Y.2d 42 (1956) ...............................................................................19

*Ndudzi v. Perez*,
 509 F. Supp. 3d 943 (S.D. Tex. 2020) ...............................................................21

*North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*,
 2020 WL 3411267 (N.Y. Sup. Ct. June 19, 2020)........................................ *passim*

*Prevot v. Phillips Petroleum Co.*,
 133 F. Supp. 2d 937 (S.D. Tex. 2001) ...............................................................21

*Quadrant Structured Prods. Co. v. Vertin*,
 23 N.Y.3d 549 (2014) ...............................................................................18

*Raleigh v. Ill. Dep't of Revenue*,
    530 U.S. 15 (2000)............................................................................................16

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
    60 A.D.3d 61 (N.Y. App. Div. 1st Dep't 2008), *aff'd*, 13 N.Y.3d 398 (2009)........................26

*Scrip World, LLC v. ASARCO LLC (In re Asarco LLC)*,
    2012 WL 3686674 (S.D. Tex. Aug. 24, 2012), *aff'd*, 522 F. App'x 209 (5th
    Cir. 2013) ........................................................................................................16

*Seeking Valhalla Tr. v. Deane*,
    182 A.D.3d 457 (N.Y. App. Div. 1st Dep't 2020).................................................24

*Trendsetter HR L.L.C. v. Zurich Am. Ins. Co. (In re Trendsetter HR L.L.C.)*,
    949 F.3d 905 (5th Cir. 2020) ............................................................................16

*Vanguard Operating, LLC v. Klein (In re Vanguard Natural Res., LLC)*,
    624 B.R. 400 (Bankr. S.D. Tex. 2020) ..............................................................17

*W.W.W. Assocs., Inc. v. Giancontieri*,
    77 N.Y.2d 157 (1990) ......................................................................................17

*Wachtel v. Park Ave & 84th St., Inc.*,
    180 A.D.3d 545 (N.Y. App. Div. 1st Dep't 2020).................................................17

*Weiner v. Anesthesia Assocs. of W. Suffolk, P.C.*,
    203 A.D.2d 455 (N.Y. App. Div. 2d Dep't 1994) ...............................................17

**Statutes**

28 U.S.C. § 2201 .....................................................................................................16

**Other Authorities**

*Fair Market Value*, Black's Law Dictionary (11th ed. 2019)........................................20

FED. R. BANKR. P. 7056 .............................................................................................15

FED. R. CIV. P. 56(a).................................................................................................15

iv

Serta Simmons Bedding, LLC (the "**Company**")[1] respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment (the "**Motion**") declaring (i) that the recapitalization transaction that the Company entered into in 2020 (the "**Transaction**") was permitted under the term loan agreement dated November 8, 2016 (the "**Term Loan Agreement**"), (ii) that the Company did not breach the implied covenant of good faith and fair dealing in entering the Transaction; and (iii) that North Star is a Disqualified Institution under the Term Loan Agreement and therefore not allowed to hold First Lien Term Loans.  On February, 23, 2023, Defendants filed counterclaims against Plaintiffs and certain third-party defendants challenging the Transaction.  ECF 66.  Since Defendants assert the same claims at issue in this adversary, Plaintiffs respectfully request that the Court grant summary judgment in favor of Plaintiffs for the reasons discussed herein.

## I.   PRELIMINARY STATEMENT

The Company filed this adversary proceeding to confirm (once and for all) that the Transaction entered into between the Company and a majority of its lenders (the "**PTL Lenders**") to recapitalize the Company complied with the plain terms of the Term Loan Agreement.  The Transaction, which provided the Company with an economic lifeline during the unprecedented COVID-19 pandemic, was comprised of a new super-priority term loan facility with two tranches: (i) a $200 million new money tranche and (ii) a debt-for-debt exchange tranche, pursuant to which the Company purchased approximately $1.2 billion of First and Second Lien Term Loans (collectively, the "**PTL Loans**") on the open market in exchange for approximately $875 million

---

[1] Capitalized terms not otherwise defined herein have the meaning given to them in the Term Loan Agreement or the Complaint filed in this adversary proceeding, *Serta Simmons Bedding, LLC v. AG Centre Street Partnership L.P.*, No. 23-9001 (Bankr. S.D. Tex. Jan. 24, 2023), ECF No. 1, or as the context otherwise requires.

of priority term loans.  Before entering into the Transaction, the Company engaged in a competitive marketing process and negotiated separately with other lenders, including a group of lenders named in this litigation (the "**Drop-Down Group"**), which collectively held approximately 20% of the Company's aggregate outstanding debt obligations.  Ultimately, the Company rejected the Drop-Down Group's proposal in favor of the Transaction because it would have increased the amount of debt and interest that the Company would owe and would have stripped valuable collateral from other existing lenders. The Transaction, on the other hand, ultimately reduced the Company's debt by approximately $400 million, lowered the Company's all-interest expense, added new collateral for the benefit of all First Lien Term Loan Lenders and Second Lien Term Loan Lenders (the "**Lenders**"), and increased the Company's cash positon to $300 million.

After the Company rejected the Drop-Down Group's proposal, they sought a preliminary injunction in New York state court to enjoin the Transaction from closing, claiming that the proposed Transaction would create new superpriority loans that would effectively subordinate their First Lien Term Loans (the "**Prepetition Action**").  That effort failed when the state court denied the preliminary injunction after finding, among other things, that the Drop-Down Group was not likely to succeed on the merits because the Term Loan Agreement "seems to permit" the Transaction and that the amendments entered into only required the consent of "a simple majority of the First Lien [Term Loan] Lenders," which the PTL Lenders provided.  *See North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*, 2020 WL 3411267, at *4 (N.Y. Sup. Ct. June 19, 2020).  Since the court's findings would have materially impaired their claims, the Drop-Down Group voluntarily dismissed their suit over the Company's objection.  The Transaction closed on June 22, 2020, nearly three years ago.

Since then, there have been four additional lawsuits filed against the Company concerning

the propriety of the Transaction.  Three of those were brought in New York state court and then New York federal court by another set of Defendants ("**LCM**").[2]  In the LCM case, the federal court ruled, among other things, that the Transaction was permitted under the Term Loan Agreement with majority consent and did not violate the waterfall provision.  *LCM XXII Ltd. v. Serta Simmons Bedding*, *LLC*, 2022 WL 953109, at *10-12 (S.D.N.Y. Mar. 29, 2022).  The court, however, denied the motion to dismiss because it concluded that it could not resolve at the motion to dismiss stage whether the non-*pro rata* debt-for-debt exchange qualified as an open market purchase.  The federal case proceeded to discovery.

Meanwhile, the Drop-Down Group continued to sit on the sidelines while the Company defended the Transaction in federal court.  After lying in wait for two years, the Drop-Down Group refiled its litigation against the Company and the PTL Lenders in New York state court, as a clear pretext to attempt to challenge this Court's jurisdiction to decide the issue, only to remove that case to New York federal court solely against the PTL Lenders, mere hours after the Company filed for chapter 11 protection; a tactic the Debtors maintain was in violation of the Bankruptcy Code's automatic stay.

To successfully emerge from this Chapter 11 as a going concern with a substantially de-levered balance sheet, the Company and the PTL Lenders filed this adversary proceeding to consolidate and resolve the pending litigations regarding the propriety of the Transaction.  This

---

[2] LCM brought suit shortly after the Prepetition Action was commenced in state court, but then voluntarily discontinued that action after the state court preliminary injunction ruling.  LCM then filed in federal court the same day, however that case was dismissed for lack of subject matter jurisdiction.  *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2021 WL 918705 (S.D.N.Y. Mar. 10, 2021).  LCM then filed yet another complaint but this time without naming the PTL Lenders to keep the case in federal court.

proceeding should be the last in the string of lawsuits because the Transaction was permitted under the plain terms of the Term Loan Agreement.

*First*, the Term Loan Agreement expressly allows the Company to repurchase debt through either a Dutch Auction or an open market purchase. The Term Loan Agreement is clear that the repurchase of debt facilitated through a Dutch Auction requires that it be open to all lenders, but an open market purchase does not. Here, it is undisputed that the Company engaged in a competitive process to repurchase its debt. It is undisputed that the Company—through its advisors—negotiated with ***over 70%*** of its existing Lenders holding approximately $1.719 billion of the $2.314 billion debt and other outside investors before determining—through an independent finance committee[3]—that the PTL Lenders' offer was the best deal for the Company. Such a competitively negotiated process is the definition of an open market purchase under the Term Loan Agreement.

*Second*, the amendments to the Term Loan Agreement that allowed the Company to incur senior debt only required majority lender consent. The Drop-Down Group conceded this when they expressly stated that the incurrence of $200 million in new debt from the Transaction could receive priority without unanimous consent, but yet they claim that the debt-for-debt exchange somehow required their consent. This argument cannot be squared with the plain terms of the Term Loan Agreement.

*Third*, the waterfall provision of the Term Loan Agreement was never amended and remains exactly the same. The Company entered into a new credit facility and intercreditor agreement to govern the payment priority with respect to proceeds of Collateral, and those

---

[3] The independent finance committee (the "**Independent Finance Committee**") was established by the Company's parent, Dawn Intermediate, LLC's ("**Dawn**") board of managers (the "**Board**").

amendments were expressly permitted under the Term Loan Agreement which did not require Defendants' consent.  Since the new debt was incurred through an entirely new credit facility, any payments from the new debt did not need to be shared ratably with the Defendants; further, the Transaction did not release collateral or the loan guarantees, but added new collateral for the benefit of all Lenders.

*Fourth*, since the Transaction was permitted by the express terms of the Term Loan Agreement and any claim related to the implied covenant of good faith and fair dealing would be duplicative of a contract claim, any such cause of action would fail as a matter of law.

*Fifth*, North Star is a Disqualified Institution or, at a minimum, an Affiliate of a Disqualified Institution and is therefore not permitted to hold First Lien Term Loans.  Additionally, any assignment to North Star requires the consent of both the Company and the administrative agent (the "**Agent**"), which North Star failed to obtain.

Fundamentally, Defendants did not bargain for any rights that would have foreclosed the Transaction.   There is no anti-subordination clause in the Term Loan Agreement and the amendments entered into by the Company only required majority consent, which the PTL Lenders provided.  And the debt-for-debt exchange was effectuated through an open market purchase under the terms of the Term Loan Agreement.  Accordingly, the Court should declare that the Transaction was permissible under the Term Loan Agreement, that the Company did not violate the covenant of good faith and fair dealing by entering into the Transaction, and that North Star is a Disqualified Institution under the Term Loan Agreement and therefore not allowed to hold First Lien Term

Loans.

## II.    STATEMENT OF FACTS

### A.    The Parties

The Company, together with its subsidiaries and affiliates, is one of the leading manufacturers and distributors of mattresses in North America, and owns and manages some of the best-selling bedding brands in the mattress industry:  Serta®, Beautyrest®, Simmons®, and Tuft & Needle®.  *See* The Company's Statement of Uncontroverted Facts in Support of Its Motion for Summary Judgment ¶ 1 (hereinafter "SUF").  The Company distributes its brands through national, hospitality, and regional and independent retail channels as well as through direct-to-consumer channels.  *Id.* ¶ 2.

Prior to the Transaction, the Company was a party to three separate credit agreements: (1) the Term Loan Agreement,[4] *see* ECF 1-1,[5] that provided for $1.95 billion in first lien term loans ("**First Lien Term Loans**"); (2) a second lien term loan agreement, dated as of November 8, 2016[6] that provided for $450 million in second lien term loans ("**Second Lien Term Loans**"); and (3) a $225 million asset-based revolving credit facility, dated as of November 8, 2016.  SUF ¶¶ 3-5.

---

[4] The Term Loan Agreement was amended by that certain Amendment No. 1 to First Lien Term Loan Agreement, dated June 22, 2020 (the "**Amended Term Loan Agreement**").  *See* ECF 1-2. The Amended Term Loan Agreement includes a redline to the original Term Loan Agreement. Additions are marked in blue double underlined text and deletions are marked with struck red text.

[5] Unless otherwise indicated, citations to the electronic case filing docket, ECF, are to the following adversary proceeding, *Serta Simmons Bedding, LLC v. AG Centre Street Partnership*, No. 23-9001 (Bankr. S.D. Tex. Jan. 24, 2023).

[6] The second lien term loan agreement was amended by that certain Amendment No. 1 to Second Lien Term Loan Agreement, dated June 22, 2020.

Plaintiffs Invesco Senior Secured Management, Inc., Credit Suisse Asset Management, LLC, Boston Management and Research, Eaton Vance Management, and Barings LLC—all of whom were PTL Lenders—were, at the time of the Transaction, Company debt holders. *Id.* ¶ 17. The PTL Lenders held, at the time of the Transaction, a majority of the First and Second Lien Term Loans. *Id.*

Defendants, except North Star Debt Holdings, L.P. ("**North Star**"), are First and Second Lien Term Loan Lenders. *Id.* ¶¶ 10, 44. North Star attempted to purchase First Lien Term Loans on the secondary market in March 2020 at large discounts. *Id.* ¶ 45. Although North Star attempted to settle the trades and submitted assignment agreements to the Agent, the trades did not settle. *Id.* Thus, North Star does not hold any of the Company's debt and is not a party to the Term Loan Agreement.

## B.      The Transaction

In early 2020, as COVID-19 spread throughout the United States, the Company negotiated with numerous lender groups to explore alternatives for raising liquidity and reducing its debt and interest expense. *Id.* ¶ 6.

The Company's advisor, Evercore Group, L.L.C. ("**Evercore**"), solicited proposals from numerous Lenders, including the Drop-Down Group, the PTL Lenders, Barings LLC ("**Barings**"), Oaktree Capital Management ("**Oaktree**"), and Sixth Street Partners ("**Sixth Street**"). *Id.* ¶ 11. In total, the Company negotiated with Lenders holding over 70% of the Company's existing debt, as well as financial institutions outside of the existing capital structure. *Id.*  ¶ 12.

The decision ultimately came down to proposals from two Lender groups: (1) the PTL Lenders and (2) the Drop-Down Group. *Id.* ¶ 13. The Drop-Down Group's proposal would have: (1) provided $200 million in new money; (2) created a new bankruptcy remote subsidiary that would have been assigned the Company's valuable intellectual property to secure only the Drop-

Down Group's debt; and (3) exchanged their existing debt for new debt, which would have been effectuated presumably through non-*pro rata* open market purchases.  *Id.* ¶¶ 23-24.  Their proposal would have increased the Company's total debt by $38 million and increased the Company's total interest payments by approximately $37 million.  *Id.* ¶ 25.

On the other hand, the Transaction provided for a new super-priority term loan facility with two tranches: (i) a $200 million new money tranche and (ii) a debt-for-debt exchange tranche, pursuant to which approximately $875 million of priority terms loans were issued as consideration for the open market purchase of approximately $1.2 billion of First and Second Lien Term Loans.  *See, e.g., North Star*, 2020 WL 3411267, at *2; SUF ¶ 18.  The Transaction reduced the Company's debt by approximately $400 million, lowered the Company's all-in interest expense, created new collateral for the benefit of all Lenders including Defendants, and increased the Company's cash position to $300 million.  *Id.* ¶ 20.

The Company's advisors presented the two competing offers to a newly-formed Independent Finance Committee appointed by the Board to consider, evaluate, and ultimately approve a restructuring transaction for the Company.  *Id.* ¶¶ 7-8, 14.  On June 5, 2020, the Independent Finance Committee selected the PTL Lenders' proposal.  *Id.* ¶ 14; *see also North Star*, 2020 WL 3411267, at *2.  After the decision was made, Barings, Oaktree, and Sixth Street ultimately joined the PTL Lenders' proposal and participated in the Transaction, resulting in a transaction that claimed the support of Lenders' holding in aggregate, over half of the Company's secured indebtedness.  *Id.* ¶¶ 16-17.

On June 8, 2020, the Company announced in a press release that it had entered into a transaction support agreement with the PTL Lenders to effectuate the Transaction.  *Id.* ¶ 15.  On June 22, 2020, the Transaction closed.  *Id.* ¶ 30.

### C.      The Terms of the Term Loan Agreement

Section 9.05(g) of the Term Loan Agreement governs the assignment of loans to "**Affiliated Lenders**," defined to include the "Top Borrower [the Company]."  *See* ECF 1-1 § 1.01.  It provides, in relevant part:

> Notwithstanding anything to the contrary contained herein, any Lender may, at any time assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender[7] on a *non-pro rata basis* (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases, each case with respect to clauses (A) and (B) without the consent of the [Agent.]

*Id.* § 9.05(g) (emphasis added).    Thus, Section 9.05(g) expressly permits the Company to repurchase debt from its Lenders on a non-*pro rata* basis.  Section 2.18 of the Term Loan Agreement also makes clear that the *pro rata* sharing rights are "[s]ubject in all respects to the provisions of each applicable Intercreditor Agreement."  *Id.* § 2.18(b).  Section 2.18 of the Term Loan Agreement further provides that:

> If any Lender obtains payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of *such Class* . . . , then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans of other Lenders of *such Class* at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of *such Class* ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of *such Class*; provided that . . . (ii) the provisions of this paragraph shall not apply to . . . (B) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with Sections 2.22, 2.23, 9.02(c) and/or *Section 9.05*.

---

[7] "**Affiliated Lender**" means "any Non-Debt Fund Affiliate, Holdings, the Top Borrower and/or any subsidiary of the Top Borrower."  ECF 1-1 § 1.01.  The Company is the Top Borrower.

*Id.* § 2.18(c) (emphasis added).  Thus, while First Lien Term Loan Lenders are generally entitled to payments on a *pro rata* basis pursuant to a waterfall, it only applies to payment in the same Class of debt, *see id.*; *see also id.* § 2.18(a), and there are exceptions where *pro rata* sharing is *not* required, including any assignment of a loan under Section 9.05(g).  *See id.* § 2.18(c).

To effectuate the Transaction, the Company and the PTL Lenders, holding more than 50% of the outstanding loans, entered into certain permitted amendments to the Term Loan Agreement to allow the PTL Loans to have senior payment priority.[8,9]  SUF ¶¶ 17, 26; ECF 1-2.  Specifically, the Term Loan Agreement was amended to allow the Company to incur incremental equivalent debt—as permitted under Section 6.01(z)—that is senior in right of payment to the First Lien Term Loans, which only requires the consent of "Required Lenders."  The definition of Incremental Equivalent Debt, as amended, is:

> Indebtedness issued, incurred or implemented in lieu of loans under an Incremental Facility in the form of notes or loans and/or commitments in respect of the foregoing (***including Indebtedness issued under the PTL Credit Agreement*** (including the Priority New Money Term Loans and the Priority Exchange Term Loans)) in each case, ***which may be senior***, *pari passu* or junior ***in right of payment*** and/or with respect to security with the Obligations hereunder . . . .

---

[8] The Company also entered into a separate Super-Priority Term Loan Agreement, dated June 22, 2020 (the "**PTL Credit Agreement**"), an Open Market Purchase and Cashless Exchange Agreement, dated June 22, 2020 (the "**Exchange Agreement**"), *see* ECF 1-3, and a First Lien Intercreditor Agreement, dated June 22, 2020, pursuant to which the PTL Loans rank senior in right of payment, but *pari passu* with respect to security, to the First Lien Term Loans under the Term Loan Agreement.  *See North Star*, 2020 WL 3411267, at *2, *4; SUF ¶¶ 27-29.

[9] The Company and the PTL Lenders made certain other amendments to the Term Loan Agreement, none of which are relevant to this dispute.

10

*See* ECF 1-2 § 1.01 (emphasis added).  Section 8.08 of the Term Loan Agreement was also amended to authorize the Agent to enter into a separate intercreditor agreement to establish senior payment priority for the new loans.  Section 8.08, as amended, provides:

> Each Secured Party irrevocably authorizes and instructs the Agent to, and the Agent shall: . . . (d) enter into subordination, intercreditor, collateral trust and/or similar agreements with respect to Indebtedness (including the Initial Intercreditor Agreement, the PTL First Lien Intercreditor Agreement and any other Acceptable Intercreditor Agreement . . . that is (i) required or permitted to be senior, *pari passu* or subordinated hereunder . . . .

*See id.* § 8.08.

Under the Term Loan Agreement, only the consent of a simple majority of the First Lien Term Loan holders (the "**First Lien Term Loan Lenders**") is required to amend the Term Loan Agreement, unless the amendment involves so-called "sacred rights."  The "sacred rights" deal with the payment waterfall in the event of a default, which provides that proceeds of Collateral be shared "*pro rata*" and that any overpayment received by a Lender be paid to the other Lenders ratably.  ECF 1-1 § 2.18(b)-(c).  Section 9.02(b) provides, in relevant part:

> . . . . [N]either this Agreement nor any other Loan Document or any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by [the Company] and the Required Lenders . . . .

*Id.* § 9.02(b).  "**Required Lenders**" are defined as "Lenders having Loans or unused Commitments representing more than 50% of the sum of the total Loans and such unused commitments at such time."  *See id.* § 1.01.  Even for the handful of "sacred rights" there is an express carveout for open market purchases under 9.05(g):

> [T]he consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders) shall be required for any waiver, amendment and modification that: . . . waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby (*except in connection with any*

***transaction permitted under Sections 2.22, 2.23, 9.02(c) and/or 9.05(g)*** or as otherwise provided in this Section 9.02);

*Id.* § 9.02(b)(A)(6) (emphasis added).

As part of the Transaction, the only amendments made were permitted by consent of a majority of lenders, which the PTL Lenders provided. No changes were made to the waterfall provision or any other "sacred right" in the Term Loan Agreement and no liens were stripped away from other First Lien Term Loan Lenders. *See* ECF 1-2 § 2.18; *supra* Section II.B. Importantly, the Term Loan Agreement does not include an "anti-subordination" provision, which would have required all affected lenders to agree to any amendment that subordinates the loans governed by the underlying Term Loan Agreement to other new or existing loans. ECF 1-1.

The Term Loan Agreement also does not permit assignment to a Disqualified Institution, *see* ECF 1-1 § 9.05(a), and any Affiliate of a Disqualified Institution is itself a Disqualified Institution. *Id.* § 1.01 ("**Disqualified Institution**" definition). In the event an attempt is made to assign Loans to a Disqualified Institution, the assignment is declared "null and void." *See id* § 9.05(f)(i).

### D.   Procedural History

On June 11, 2020, the Drop-Down Group filed a complaint in New York state court seeking a temporary restraining order and preliminary injunction to halt the Transaction, as well as alleging causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, a declaratory judgment that the Transaction violates the Term Loan Agreement, and a declaratory judgment deeming North Star's assignment valid. *North Star Debt Holdings L.P. v. Serta Simmons Bedding LLC*, No. 652243/2020, NYSCEF 1 (N.Y. Sup. Ct. June 11, 2020).

Two days after a June 16, 2020 hearing, and before the state court ruled on the preliminary injunction, LCM's collateral manager simultaneously sought to intervene in the Prepetition Action

and filed its own separate complaint in New York state court on behalf of LCM collateralized loan

obligations ("**CLOs**").  *See North Star*, No. 652243/2020, NYSCEF 57-61 (N.Y. Sup. Ct. June 18,

2020); *LCM Asset Mgmt. LLC v. Serta Simmons Bedding, LLC*, No. 652555/2020, NYSCEF 1

(N.Y. Sup. Ct. June 18, 2020).

On June 20, 2020, the New York court denied the request for a preliminary injunction.  *See*

*North Star*, 2020 WL 3411267, at *6.  The court concluded that the Drop-Down Group was not

likely to succeed on the merits of their breach of contract and implied covenant claims.  *See id.* at

*4–5.  As to the breach of contract claim, the court held that the "[Term Loan Agreement] seems

to permit[] the debt-to-debt exchange on a non-pro rata basis as part of an open market transaction"

and that "[s]ince the amendments do not affect plaintiffs so-called 'sacred rights' under the [Term

Loan Agreement], plaintiffs' consent does not appear to be required."  *Id.* at *4.  On the implied

covenant claim, the court concluded that it was unlikely to succeed on the merits because it was

"identical to its breach of contract claim."  *Id.* at *5.

Following the court's ruling, both the Drop-Down Group and LCM fled New York state

court.  The Drop-Down Group voluntarily discontinued their action over the Company's objection,

*North Star*, No. 652243/2020, NYSCEF 170 (July 10, 2020), and the court granted the motion on

November 30, 2020.  *North Star*, No. 652243/2020, NYSCEF 212 (Dec. 1, 2020).

Likewise, LCM's collateral manager withdrew its request to intervene and voluntarily

discontinued their standalone action without prejudice.  *North Star*, No. 652243/2020, NYSCEF

124 (July 2, 2020); *LCM Asset Mgmt.*, No. 652555/2020, NYSCEF 14 (July 2, 2020).

Shortly thereafter, a subgroup of the LCM CLOs holding approximately $7.4 million in

First Lien Term Loans, filed successive suits in a New York federal court alleging similar claims

against the Company and certain of the PTL Lenders.  It appeared that LCM selected certain CLOs

to sue in order to try to manufacture diversity and avoid the state court judge who had denied the preliminary injunction. Despite their effort, the first suit was dismissed for lack of subject matter jurisdiction, *see LCM XXII Ltd.*, 2021 WL 918705, so LCM refiled against the Company alone. The second court, while denying the Company's motion to dismiss, rejected nearly all of LCM's claims that the Company improperly subordinated their debt. Specifically, the court found that the Term Loan Agreement permitted the amendments in the Transaction with majority consent as they did not affect the "*pro rata* rights of first-lien lenders vis-à-vis other first-lien lenders." *LCM*, 2022 WL 953109, at *10 ("[A]nti-subordination is not a sacred right protected by Section 9.02(b)(A)(6), or any other provision of Section 9.02 . . . . [T]he [Credit] Agreement permitted such changes to be made with the consent of only a majority of lenders"). The court also held that the Transaction did not violate the waterfall provisions of the Term Loan Agreement because it permitted the Company to enter into a new intercreditor agreement and no collateral or value of the loan guarantees were released. *Id.* at *11-12. Finally, the court concluded that the term "open market purchase" was ambiguous, and on that basis denied the motion to dismiss as to that issue, but credited the Company's position that the open-market provision may not require that the Company offer the Transaction to all Lenders, and that other provisions for debt-exchanges in the Term Loan Agreement did not preclude the Company's use of the open market purchase provision for the Transaction. *Id.* at *8-9, *11-12.[10]

After two years, the Drop-Down Group refiled a nearly identical complaint, once again, in New York state court in November 2022 against the Company and certain of the PTL Lenders. In their belated complaint, the Drop-Down Group alleged, as they had done previously, that the

---

[10] As discussed below, this Court should find that the Transaction constituted an open market purchase.

14

Transaction: (1) breached the waterfall and *pro rata* sharing provisions of the Term Loan Agreement; (2) breached the implied covenant of good faith and fair dealing by stripping them of the value of their guarantees and altering the proceeds waterfall and *pro rata* provisions without their consent; and (3) released all or substantially all of the collateral and value of the guarantees without the Lenders' consent.  Amended Complaint, *AG Centre Street Partnership L.P. v. Serta Simmons Bedding,* LLC, No. 654181/2022, NYSCEF 11 (N.Y. Sup. Ct. Nov. 16, 2022).  The Drop-Down Group also sought a declaratory judgment (1) invalidating the Transaction and all agreements used to effectuate the Transaction and (2) that the Company breached the Term Loan Agreement by failing to execute the assignment of First Lien Term Loans to North Star.  *Id.*

On January 23, 2023, the Company filed for chapter 11 protection in this Court.  *In re Serta Simmons Bedding, LLC*, No. 23-90020 (Bankr. S.D. Tex. Jan. 23, 2023).  Before the clock struck midnight on filing day, but after the imposition of the automatic stay, the Drop-Down Group sought to remove their pending case, solely against certain of the PTL Lenders, from New York state court to the Southern District of New York.  Notice of Removal, *AG Centre Street Partnership L.P. v. Eaton Vance Management*, No. 1:23-cv-587 (S.D.N.Y. Jan. 23, 2023), ECF No. 1.  Also within a few hours of filing for chapter 11 protection, the Company filed the pending adversary proceeding seeking a declaratory judgment that the Transaction was valid under the Term Loan Agreement and that the Transaction did not breach the implied covenant of good faith and fair dealing.  Adversary Complaint, *Serta Simmons Bedding, LLC v. A.G. Centre Street Partnership L.P.*, No. 23-9001 (Bankr. S.D. Tex. Jan. 24, 2023), ECF No. 1.

### III.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate where, as here, "the movant shows that there is no genuine dispute as to any material fact."  FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056.  Although courts must view the facts in the light most favorable to the non-moving party and draw all

reasonable inferences in the non-moving party's favor, this burden cannot be satisfied with "some metaphysical doubt as to the material facts," by "conclusory allegations," by "unsubstantiated assertions," or by only a "scintilla" of evidence.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (collecting authorities).  Rather, courts grant summary judgment unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Once the moving party has met the initial burden of demonstrating that there are no genuine issues of material fact, the non-moving party must establish the existence of each element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If the nonmoving party has "failed to make a sufficient showing on an essential element of her case," summary judgment should be granted.  *Id.*

Courts possess jurisdiction to issue declaratory relief when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007); 28 U.S.C § 2201.

Although bankruptcy law governs this proceeding, the state law that "governs the contracts . . . [governs] the 'substance of [the bankruptcy] claims.'"  *Trendsetter HR L.L.C. v. Zurich Am. Ins. Co. (In re Trendsetter HR L.L.C.)*, 949 F.3d 905, 910 (5th Cir. 2020) (quoting *Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15, 20 (2000)).  Here, "New York law indisputably governs the [Term Loan Agreement] contract[] pursuant to the contractual choice-of-law clauses."  *Id.* at 910 n.13 (citing *Dalton v. Paccar Fin. Corp.*, 95 F.3d 49 (5th Cir. 1996) (text available at 1996 WL 457309, at *3)); ECF 1-1 § 9.10 (choice-of-law provision of the Term Loan Agreement); *see also Scrip World, LLC v. ASARCO LLC (In re Asarco LLC)*, 2012 WL 3686674, at *5 n.4 (S.D. Tex. Aug. 24, 2012) (applying Utah law in the bankruptcy context because the provision of the operative

contract stated that "the contract shall be interpreted and enforced in accordance with the laws of the state of Utah"), *aff'd*, 522 F. App'x 209 (5th Cir. 2013).

IV.     <u>**ARGUMENT**</u>

    A.     **The Transaction Was Expressly Permitted by the Term Loan Agreement**

The plain terms of a contract govern when they are unambiguous.  *See Wachtel v. Park Ave & 84th St., Inc.*, 180 A.D.3d 545, 547 (N.Y. App. Div. 1st Dep't 2020) (dismissing breach of contract claim where "allegations [were] conclusively refuted by the unambiguous [contract] language"); *Mid-State Indus., Ltd. v. State*, 117 A.D.3d 1255, 1256 (N.Y. App. Div. 3d Dep't 2014) ("[I]f the contract is not ambiguous, it must be enforced according to the plain meaning of its terms.").  Whether a contract is ambiguous is a question of law for the Court to decide.  *FDIC v. Murex LLC*, 500 F. Supp. 3d 76, 93 (S.D.N.Y. 2020) (applying New York law); *Ashwood Cap., Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7-8 (N.Y. App. Div. 1st Dep't 2012); *Vanguard Operating, LLC v. Klein (In re Vanguard Natural Res., LLC)*, 624 B.R. 400, 424 (Bankr. S.D. Tex. 2020) (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)); *Courtney v. Arthur Andersen LLP*, 264 F. App'x. 426, 429 (5th Cir. 2008).

Moreover, just because parties offer differing interpretations of the contract does not itself create an ambiguity.  *L. Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (applying New York law); *Murex*, 500 F. Supp. 3d at 94; *Vanguard*, 624 B.R. at 424 (citing *Weiner v. Anesthesia Assocs. of W. Suffolk, P.C.*, 203 A.D.2d 455, 456 (N.Y. App. Div. 2d Dep't 1994)); *D.E.W., Inc. v. Local 93, Laborers' Int'l Union*, 957 F.2d 196, 199 (5th Cir. 1992).  Disagreement by the parties over the meaning of an unambiguous contract does not turn an otherwise unambiguous contract into one that is ambiguous.  *Maverick Tube*, 595 F.3d at 467 (citing *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)); *Currier, McCabe & Assocs., Inc. v. Maher*, 75 A.D.3d 889, 891 (N.Y. App. Div. 3rd Dep't 2010).  Since

the Transaction was expressly permitted under the Term Loan Agreement, and the amendments

required only the consent of a majority of the First Lien Term Loans, which the PTL Lenders held

and approved, the Transaction was proper.

> **1.     The Debt-for-Debt Exchange Was an Open Market Purchase Expressly Permitted by the Term Loan Agreement**

The Transaction, pursuant to which the Company purchased debt from existing Lenders in

exchange for newly issued debt, complied with the plain terms of the Term Loan Agreement.

Nothing in the Term Loan Agreement required the Company to include all of its existing First Lien

Term Loan Lenders in that process.   To the contrary, the Term Loan Agreement allowed the

Company to repurchase debt through open market purchases on a ***non-pro rata*** basis from its

existing Lenders.

Section 9.05(g) provides that:

> [A]ny Lender may, at any time assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a ***non-pro rata basis*** (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases, each case with respect to <u>clauses (A)</u> and <u>(B)</u> without the consent of the Agent.

ECF 1-1 § 9.05(g) (emphasis added).   Moreover, based on the plain terms of the contract, unlike a

Dutch Auction, which must be "open to all Lenders," an "open market purchase" does not.   The

*expressio unius* canon of construction provides that when a party omits a term found elsewhere in

the agreement, it leads to the "inescapable conclusion [] that the parties intended the omission."

*Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014).   In fact, even the federal

court in New York noted that the fact that the "provision specifies that Dutch Auctions must be

open to all lenders, but does not do so for open-market purchases, may indicate the parties'

conscious choice to exclude such a requirement from loan repurchases pursued in the open

market." *LCM XXII*, 2022 WL 953109, at *8 n.12.

The terms of Section 9.05(g) and the definition of Dutch Auction both make clear that only the Dutch Auction requires an offer made to all Lenders. *See* ECF 1-1, Schedule 1.01(b) (for Dutch Auctions, requiring the "Auction Agent," among other things, to provide notice to all Lenders of the face value of the loans and range of prices). By contrast, an open market purchase under Section 9.05(g) does not require an offer to be provided to "all Lenders," and thus, could be offered to one Lender, two Lenders, or many at the Company's own discretion. Words of a contract must be read to give each word its own independent meaning. *See Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect."). Reading it otherwise would strip the Company of a valuable and bargained for right under the Term Loan Agreement that is clearly not set out in the express words of the contract.

Moreover, it is undisputed that an open market purchase for loans, unlike those for registered trades on a public stock exchange, can only be consummated by those lenders who own the existing loans. *See* ECF 1-1 § 9.05(g) (permitting open market purchases for "rights and obligations under this Agreement in respect of its Term Loans to any *Affiliated Lender*") (emphasis added). In order for the Company to repurchase its debt through an open market purchase, it has to approach individual existing lenders in the open market and negotiate the terms of a repurchase, as it did here.

While the Company was not required to reach out to specific Lenders under the Term Loan Agreement, much less all Lenders, the Company nevertheless undertook a robust, competitive process to find the best deal possible for the Company. The Company solicited proposals from,

and entered into negotiations with, numerous lenders that accounted for over 70% of the aggregate outstanding principal amount of First Lien Term Loans and Second Lien Term Loans, including the Drop-Down Group.   SUF ¶ 12.   In addition to the Drop-Down Group and the PTL Lenders, the Company also solicited and obtained proposals from Lenders Barings, Oaktree, and Sixth Street, all of whom wound up joining the Transaction.   Moreover, the Company also negotiated with other outside entities to increase leverage on the existing Lenders to obtain the best deal for the Company.   *Id.* ¶ 11.   This is the epitome of an arms-length, open-market transaction between buyers and sellers in the debt market that resulted in the best deal for the Company.   *See North Star*, 2020 WL 3411267, at *2; *Fair Market Value*, Black's Law Dictionary (11th ed. 2019).

Finally, the Drop-Down Group must have known that the debt-for-debt exchange was an open market purchase because their proposed transaction would have presumably been effectuated through non-*pro rata* open market purchases.   SUF ¶ 23.   As explained above, the Drop-Down Group's proposal would have: (1) provided new money; (2) created a new bankruptcy remote subsidiary that would have been assigned intellectual property to secure only the Drop-Down Group's debt; and (3) exchanged only their existing debt for new debt issued by an unrestricted subsidiary formed for the purpose of the transaction.   *Id.* ¶¶ 23-24.   Thus, the Drop-Down Group's proposal would have also subordinated the other Lenders, albeit through a bankruptcy remote entity, and also would have involved a debt-for-debt exchange open to only a subset of Lenders, which makes sense because the terms of the Term Loan Agreement expressly allow for debt-for-debt exchanges on a non-*pro rata* basis as part of an open market purchase under Section 9.05(g).   *See* ECF 1-2 § 9.05(g); SUF ¶¶ 23-24; *see also North Star*, 2020 WL 3411267, at *4. Yet, the Drop-Down Group now claims that the same type of debt-for-debt exchange by the PTL

Lenders breaches the Term Loan Agreement.

A recent decision in *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, 2022 WL 10085886 (Sup. Ct. N.Y. Cnty. Oct. 17, 2022), cited at a prior court hearing by one of the Defendant's counsel, is not to the contrary.[11]  *See Serta Simmons Bedding, LLC v. AG Centre Street Partnership, L.P.*, No. 23-3007 (Bankr. S.D. Tex. Jan. 27, 2023), ECF No. 49, at 25–26.  In that case, the surfing and skateboarding apparel company, Boardriders, borrowed $450 million pursuant to its credit agreement to finance an acquisition of Billabong International Limited and to refinance Boardriders' and Billabong's debt through an uptier restructuring transaction.[12]  A group of lenders of first lien term loans that were excluded from the restructuring transaction filed suit, alleging that certain amendments to effectuate the restructuring transaction breached the credit agreement at issue.  A New York court denied the defendant lenders' motions to dismiss, holding that it could not determine as a matter of law whether the transaction was permitted under the "open market" exception in the credit agreement.  This case differs from *Boardriders* in several

---

[11] This court is not bound by a New York state court trial decision based on a different credit agreement in any event.  *See Prevot v. Phillips Petroleum Co.*, 133 F. Supp. 2d 937, 941 n.3 (S.D. Tex. 2001) (noting that the court "is not bound by the ruling of intermediate state courts when deciding questions of state law").  The same is true for the district court's decision in the LCM case.  *Ndudzi v. Perez*, 509 F. Supp. 3d 943, 949 (S.D. Tex. 2020) (noting that the Court was "not bound by the opinions of other district judges—in 'either a different judicial district, the same judicial district, or even upon the same judge in a different case.'" (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011))).

[12] In an "uptier" transaction, distressed borrowers access new capital by amending their existing loan agreements to permit new super-priority secured debt.  *See Bayside Cap. Inc. v. TPC Grp., Inc. (In re TPC Grp., Inc.)*, 2022 WL 2498751, at *1 (Bankr. D. Del. July 6, 2022).  Provided such transactions "comport[] with the terms of the applicable loan documents," they are permissible— and indeed, increasingly common.  *Id.*

key respects.

First, and most importantly, the sacred rights provision in the *Boardriders* credit agreement did not explicitly carve out open market purchases, which the Term Loan Agreement does. *See* ECF 1-2 §§ 9.02(b)(A)(6), 9.05(g); *infra* Section IV.A.2.

Second, in *Boardriders*, the court held that one "reasonable interpretation" of the transaction is that the open market purchase agreements in the restructuring transaction "reduc[ed] the principal amount of [the plaintiffs'] debt to zero." *Boardriders*, 2022 WL 10085886, at *8. Here, the First Lien Term Loans still have value, and the PTL Loans were simply taken on a "super senior" basis to the existing First Lien Term Loans. *See, e.g.*, *supra* Section II.B.

Third, unlike the Company, Boardriders did not benefit from discount capture because the exchange tranches in *Boardriders* were dollar-for-dollar, whereas the exchange tranches in the Transaction were discounted, which reduced the Company's overall debt and interest payments. *Boardriders*, 2022 WL 10085886, at *4. And the exchange component of the Transaction cannot be viewed in isolation; as part of the overall Transaction, the Company also received $200 million in new money which allowed the Company to weather the economic impact of COVID-19. *See* SUF ¶ 18.

Finally, the amendments in *Boardriders* had far more sweeping consequences for the plaintiffs there, including the elimination of certain negative and affirmative covenants and a new requirement to pre-fund a cash indemnity—none of which is present in this Transaction. *See* *Boardriders*, 2022 WL 10085886, at *3.

> **2.      The Debt-for-Debt Exchange Did Not Require Each Lender's Consent and the Amendments to the Term Loan Agreement Required Only the PTL Lenders' Consent**

Since the debt-for-debt exchange was effectuated through an open market purchase, the unanimity requirement does not apply to the Transaction. Section 9.02(b), which sets forth the

22

sacred rights that require unanimity to amend, expressly carves out open market purchases under Section 9.05(g) from the unanimity requirement.   Section 9.02(b)(A)(6) (emphasis added) (requiring consent from directly and adversely effected Lenders for amendments to Section 2.18(b) or (c) "*except in connection with any transaction permitted under Section[] . . . 9.05(g)* . . . ."). ECF 1-1 § 9.02(b)(A)(6).  Accordingly, Section 9.02(b)(A) does not apply to the Transaction.  *See North Star*, 2020 WL 3411267, at *4; *Ashwood Cap.*, 99 A.D.3d at 7-8.

Nor did the Term Loan Agreement amendments or modifications require each Lender's consent.  *See North Star*, 2020 WL 3411267, at *4 ("The [Term Loan Agreement] . . . does not require [all lenders] approval under all circumstances.").  Because the amendments did not affect the so-called sacred rights of the First Lien Term Loan Lenders, they could be effectuated with only majority consent, which the PTL Lenders provided.  *See* ECF 1-1 § 9.02(b)(A)(6); *LCM*, 2022 WL 953109, at *9-10; *North Star*, 2020 WL 3411267, at *4.

Moreover, the Drop-Down Group's admissions in their most recent counterclaim complaint that the $200 million in new debt "was permitted[] since new money loans could be given priority without a unanimous vote" and that the Term Loan Agreement "permits [the Company] to make 'open market purchases' . . . on a non-*pro rata* basis" demolishes any notion that the amendments were not allowed.  ECF 66 ¶ 100, 265, 269.  The Company and the PTL Lenders entered into permitted amendments to the Term Loan Agreement to allow the Company to incur the PTL Loans with senior payment priority.  *See supra* Section II.C.  Specifically, the Company and the PTL Lenders amended the definition of Incremental Equivalent Debt to allow the Company to incur the PTL Loans as senior in right of payment to the First Lien Term Loans, and amended Section 8.08 to authorize the Agent to enter into a separate intercreditor agreement to establish senior payment priority for the PTL Loans.  *See* ECF 1-2 §§ 1.01, 8.08.  Since the

Drop-Down Group concedes that the incurrence of $200 million in new debt is "permitted[]," ECF 66 ¶ 269, the Drop-Down Group effectively concedes that subordination of their debt was permissible, which applies equally to the debt-for-debt exchange.

Additionally, the Company and the PTL Lenders both signed the Amended Term Loan Agreement and the Exchange Agreement, in which they both expressly consented to the debt-for-debt exchange as an open market purchase. ECF 1-2 § 4; ECF 1-3 §§ 2.1(f), 2.2. Thus, while the Transaction was permitted under the express terms of the Term Loan Agreement, the Term Loan Agreement was also expressly amended to permit the Transaction with the Required Lenders' vote. *Id.*

### 3. The Transaction Does Not Violate the Waterfall Provision or Pro Rata Sharing Provision, and Does Not Strip Plaintiffs of Collateral or Guarantee Value

The waterfall remains the same and was never amended. *See* ECF 1-2 § 2.18(b); *North Star*, 2020 WL 3411267, at *4. *See Seeking Valhalla Tr. v. Deane*, 182 A.D.3d 457, 458 (N.Y. App. Div. 1st Dep't 2020) (affirming dismissal of breach of contract and implied covenant claims where defendant exercised her express sole discretion as provided in the contract).

More importantly, Defendants' rights under Section 2.18 of the Term Loan Agreement are not absolute. In fact, Section 2.18(b) by its terms is expressly "subject, in all respects to the provisions of *each applicable Intercreditor Agreement*." ECF 1-1 § 2.18(b) (emphasis added) ("[A]ll proceeds of Collateral received by the Agent while an Event of Default exists . . . shall be applied . . . as provided in each applicable Intercreditor Agreement."). Under the Term Loan Agreement, the Agent is expressly authorized to enter into a separate intercreditor agreement to establish senior payment priority for the PTL Loans, which is precisely what occurred here. *See supra* Section II.C. The New York federal court—analyzing the same Term Loan Agreement— also found that "there is nothing in the Agreement that prevented [the Company] from making

these changes with consent from the majority of lenders." *LCM*, 2022 WL 953109, at *11.

Likewise, 2.18(c) only requires Lenders to share ratably if that Lender "obtains payment . . . on any of its Loans of any *Class* . . . resulting in such Lender receiving payment of a greater proportion . . . of its Loans of such *Class*." ECF 1-1 § 2.18(c) (emphasis added); *see also id.* § 2.18(a) (providing for *pro rata* payment only for debt in the same "Class" of the Term Loan Agreement and expressly does not apply to any debt outside the Term Loan Agreement). Since the PTL Loans were entered into pursuant to an entirely separate facility, they are not in the same Class as the First Lien Term Loans.

In addition, the Transaction did not release the collateral or the loan guarantee values and thus did not violate Sections 9.02(b)(B)(2) or (3). *LCM*, 2022 WL 953109, at *12 ("[N]o feature of the Transaction released the collateral or the value of the loan guarantees."). Rather, the Transaction *added* collateral to support Defendants' loans by narrowing the category of non-collateral assets. *See* ECF 1-2 § 1.01 (amendment of "Excluded Assets"); *see also North Star*, 2020 WL 3411267, at *4. Thus, the "Transaction [d]id [n]ot [v]iolate the [a]greement's [w]aterfall [p]rovision." *LCM*, 2022 WL 953109, at *11.

As stated above, Defendants did not bargain for anti-subordination language in the Term Loan Agreement. *See LCM*, 2022 WL 953109, at *10 ("Despite Plaintiffs' protestations, anti-subordination is not a sacred right protected by Section 9.02(b)(A)(6), or any other provision of Section 9.02."). The only provision in the Term Loan Agreement that dealt with subordination did not require all lenders to consent to an amendment.[13]  *Audax Credit Opportunities Offshore*

---

[13] Section 7.01(*l*) provided that subordination of the first lien debt by any junior debt would be an event of default. This provision was deleted in the Amended Term Loan Agreement with majority consent, which was plainly allowed by the broad amendment provisions. *See* ECF 1-1 § 9.02(b).

*Ltd. v. TMK Hawk Parent, Corp.*, 2021 WL 3619753 (N.Y. Sup. Ct. Aug. 16, 2021), another case

Defendants have raised previously, is distinguishable.   In *Audax*, the plaintiffs challenged a

transaction in which the terms of the company's existing credit agreement were amended to enable

it to issue two tranches of "super senior" debt senior in right of payment to plaintiff lenders'

existing first lien debt.  *Id.* at *4.  The company issued the second tranche of "super senior" debt

in a dollar-for-dollar exchange, and both the first and second tranches of the new "super senior"

debt were secured by the same collateral securing the existing first lien debt held by the company's

lenders who did not participate in the transaction, effectively subordinating such lenders.  *Id.*

Unlike here, the credit agreement in *Audax* explicitly stated that consent was required for

any amendments that would "alter the order of application of proceeds."  *Id.* at *11.  In denying

the motion to dismiss, the court held that it was plausible that the transaction entered into altered

"the order of application of proceeds by subordinating Plaintiffs' priority interest to the new Super-

Priority Intercreditor Agreement."  *Id.* at 12 (quotation marks omitted).  Here, the Term Loan

Agreement language does not concern the order of payments, and only protects "pro rata sharing

of payments," as set forth in two specific sections of the Term Loan Agreement (Sections 2.18(b)

and (c)), while also expressly carving out transactions permitted by Section 9.05(g).  *See* ECF 1-1

§§ 2.18(b)-(c), 9.02(b)(A)(6).   As explained *supra*, Defendants' rights under the waterfall

provision in the Term Loan Agreement remain exactly the same.

Accordingly, the Transaction did not breach the terms of the Term Loan Agreement, and

Plaintiffs' request for a declaratory judgment that the Transaction was permissible should be

granted.  *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 66 (N.Y. App.

---

In any event, the Transaction would not have resulted in a default under this provision because the first lien debt did not cease to constitute senior indebtedness under any junior debt.

Div. 1st Dep't 2008) ("A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties."), *aff'd*, 13 N.Y.3d 398 (2009).

> **B.** **The Implied Covenant of Good Faith and Fair Dealing Was Not Breached Because the Transaction Was Expressly Permitted by the Term Loan Agreement and Any Such Claim Would Be Duplicative**

Since the Transaction was expressly permitted under the terms of the contract, any implied covenant claim must also fail as a matter of law. *See Fesseha v. TD Waterhouse Inv'r Servs., Inc.*, 305 A.D.2d 268, 268 (N.Y. App. Div. 1st Dep't. 2003) ("While the covenant of good faith and fair dealing is implicit in every contract, it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights."); *Maxon Int'l Inc. v. Int'l Harvester Co.*, 82 A.D.2d 1006, 1007 (N.Y. App. Div. 3d Dep't 1981) (same), *aff'd*, 56 N.Y.2d 879 (1982). And this makes sense, as an implied covenant claim cannot be used to "imply obligations inconsistent with contractual provisions," *Chase Equip. Leasing Inc. v. Architectural Air, L.L.C.*, 84 A.D.3d 439, 439 (N.Y. App. Div. 1st Dep't 2011), or to add new terms to the contract. *Brown v. Deutsche Bank Nat'l Tr. Co.*, 120 A.D.3d 440, 441 (N.Y. App. Div. 1st Dep't 2014). Here, since the Transaction was permitted under the plain terms of Term Loan Agreement, *supra* Section IV.A, any implied covenant claim must also fail.

Additionally, New York law expressly holds that where, as here, the "good faith claim arises from the same facts and seeks the same damages as a breach of contract claim, it should be dismissed." *Mill Fin., LLC v. Gillet,* 122 A.D.3d 98, 104 (N.Y. App. Div. 1st Dep't 2014).

> **C.** **North Star is a Disqualified Institution Under the Term Loan Agreement and Therefore Not Allowed to Hold First Lien Term Loans**

North Star is a Disqualified Institution under the Term Loan Agreement, and therefore not allowed to hold First Lien Term Loans. *See* ECF 1-1 § 9.05(a) ("[N]o Lender may assign or

otherwise transfer its rights or obligations hereunder except in accordance with the terms of this Section (any attempted assignment or transfer not complying with the terms of this Section shall be null and void . . . .").  The Term Loan Agreement provides that "[a]ny Assignment . . . to or with any Disqualified Institution . . . shall be null and void."  *See id.* § 9.05(f)(i).  North Star is an Affiliate of an entity on the Disqualification List, Apollo Investment Corporation,[14] which means that North Star is a Disqualified Institution.  SUF ¶¶ 47-48; *see also* ECF 1-1 § 1.01.  Accordingly, any assignment to North Star was automatically void and there was no assignment for the Company to execute.  *See Iconoclast Advisers LLC v. Petro-Suisse Ltd.*, 2010 WL 2218406, at *6–7 (N.Y. Sup. Ct. May 14, 2010) (dismissing declaratory judgment and breach of contract claim where the language of the engagement agreement showed that the transaction was not within the scope of the agreement such that defendant did not have to pay plaintiff an investment banking fee for the transaction).

Moreover, the Term Loan Agreement requires both the consent of the Agent and the Company to effectuate an assignment, *see* ECF 1-1 § 9.05(b)(i), and North Star cannot claim they ever received written consent from the Agent prior to executing the assignments.  Without an effective consent, North Star's attempted assignment is invalid, and the Company is permitted to withhold its consent to an Affiliate of any Disqualified Institution without regard to any time limitations or the application of the deemed consent provision.  *See* ECF 1-2 § 9.05(b).  Because North Star is an Affiliate of a Disqualified Institution, it is not permitted to close the transaction.  *Iconoclast Advisers*, 2010 WL 2218406, at *6–7.

---

[14] North Star is an Affiliate of Apollo Global Management, Inc., *see* SUF ¶ 47, which is an Affiliate of Apollo Investment Corporation.

## V.   <u>**CONCLUSION**</u>

Accordingly, the Company respectfully requests that this Court grant its Motion and declare the Transaction permitted under the Term Loan Agreement, that the Company did not breach the implied covenant of good faith and fair dealing, and that North Star is a Disqualified Institution under the Term Loan Agreement and therefore not allowed to hold First Lien Term Loans.   For the same reasons, the Company also respectfully requests that this Court grant summary judgment in Plaintiffs' favor on Defendants' mirror image counterclaims.


WEIL, GOTSHAL & MANGES LLP

*/s/ David J. Lender*

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
David J. Lender (admitted *pro hac vice*)
Alexander W. Welch (admitted *pro hac vice*)
Luna N. Barrington (admitted *pro hac vice*)
Richard D. Gage (admitted *pro hac vice*)
Taylor B. Dougherty (admitted *pro hac vice*)
Joseph R. Rausch (admitted *pro hac vice*)
Michael P. Goodyear (admitted *pro hac vice*)
Nicholas J. Reade  (admitted *pro hac vice*)
767 Fifth Avenue
New York, NY 10153
Tel:    (212) 310-8000
Fax:    (212) 310-8007
Email: Ray.Schrock@weil.com
         David.Lender@weil.com
         Alexander.Welch@weil.com
         Luna.Barrington@weil.com
         Richard.Gage@weil.com
         Taylor.Dougherty@weil.com
         Joseph.Rausch@weil.com
         Michael.Goodyear@weil.com
         Nick.Reade@weil.com

Gabriel A. Morgan
Stephanie N. Morrison
700 Louisiana Street, Suite 1700
Houston, TX 77002
Tel:  (713) 546-5040
Fax: (713) 224-9511
Email:  Gabriel.Morgan@weil.com
          Stephanie.Morrison@weil.com


*Proposed Attorneys for Serta Simmons Bedding, LLC, as debtor and debtor-in-possession*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 24, 2023, a true and correct copy of the foregoing

document was served by the Electronic Case Filing System for the United States Bankruptcy Court

for the Southern District of Texas.


*/s/ Nicholas J. Reade*
Nicholas J. Reade