# Exhibit 18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LCM XXII LTD., LCM XXIII LTD., LCM XXIV LTD.,
LCM XXV LTD., LCM 26 LTD., LCM 27 LTD., and LCM
28 LTD.,

        *Plaintiffs,*

        -against-

SERTA SIMMONS BEDDING, LLC, ADVENT
INTERNATIONAL CORPORATION, EATON VANCE
MANAGEMENT, INVESCO SENIOR SECURED
MANAGEMENT INC., CREDIT SUISSE ASSET
MANAGEMENT LLC, BOSTON MANAGEMENT AND
RESEARCH, and BARINGS LLC

        *Defendants.*

**CIVIL ACTION NO.** 20-cv-5090

**COMPLAINT**

---

     Plaintiffs LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM 26

Ltd., LCM 27 Ltd., and LCM 28 Ltd. ("Plaintiffs"), by and through their undersigned attorneys,

for their Complaint against Defendants Serta Simmons Bedding, LLC ("Serta"), Advent

International Corporation ("Advent"), Eaton Vance Management, Invesco Senior Secured

Management Inc., Credit Suisse Asset Management LLC, Boston Management and Research,

and Barings LLC, (collectively with the Company, the "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

     1.    This action challenges a transaction in which Serta, guided by its owner Advent,

engaged in an improper debt exchange with a handpicked group of its first-lien lenders (the

"Handpicked Lenders") to unlawfully deprive the remaining first-lien lenders, including

Plaintiffs, of their bargained-for first-lien, priority, *pro rata* rights. In the transaction, the

handpicked first-lien lenders exchanged their own erstwhile first-lien and second-lien holdings

for new "super-priority" debt—some $1 billion in all—that was placed *above* the "first-lien"

1

debt that the minority was left with.  Leaving no doubt as to the Defendants' awareness of their wrongdoing, they negotiated the series of maneuvers necessary to accomplish this subordination entirely in secret, publicly announced it with only two weeks to closing, and neither sought nor obtained contractually required consents from the minority lenders to the adverse changes to their *pro-rata* rights of payment.

2.      Defendants now purport to defend their debt exchange, which was arranged in private and then offered to some while being closed to others, under a provision in the First Lien Term Loan Agreement (the "First Lien Agreement") allowing Serta to retire first-lien debt via "open market" purchases without the consent of all affected lenders.  But this provision obviously does not apply, and therefore provides no end-around to the requirement of unanimous approval to adverse changes to first lien lenders' *pro rata* rights.  *First*, Serta's acquisition of the handpicked lenders' loans was not accomplished through "open market" transactions in any sense of that term—open market deals are offered to market participants generally; they are not negotiated in private on terms not available to or even derived from the market.[1]  *Second*, the transaction involved *an exchange, not a retirement*, of debt, and there is an entirely separate provision of the First Lien Agreement addressing exchanges (and making clear the "first lien" loans could not be subordinated in the process).  *Third*, in the transaction at issue, Defendants violated the obligation not to use new debt to finance a debt-retirement transaction (and in so doing placed themselves in an event of default).

3.      Despite burying the excluded first-lien lenders (including Plaintiffs) under $1 billion of new debt and favoring the participating first lien lenders with higher ranking holdings,

---

[1] Underscoring that only true open market purchases are permitted, the only alternative the First Lien Agreement allows for is a Dutch Auction, which by definition is an open market auction in which a price is offered to all and then adjusted upwards until it hits a level at which willing sellers emerge.

defendants have argued that the First Lien Agreement's unanimous consent requirement did not apply because the excluded first-lien lenders' rights have not been affected *at all*. The facts say otherwise. Under the amendments defendants made to the First Lien Agreement, before the excluded lenders (including Plaintiffs) receive a penny in the event of any default, the new "super-priority" lenders (that is, the Handpicked Lenders who placed their own holdings at the front of the line) are entitled to receive *full* payment from the collateral proceeds that previously were required to be shared *pro rata* among *all* first lien lenders. Moreover, given Serta's precarious financial condition, the excluded first lien lenders have not just been subordinated but left practically unsecured. Arguing that this state of affairs does not implicate the excluded lenders' *pro rata* rights—and thus does not require unanimous consent—so ignores the economic and contractual reality as to be lacking in good faith.

4.     Not content with the injury already caused Plaintiffs and other remaining first-lien lenders by the placing of a massive new super-priority tranche ahead of their holdings, the Handpicked Lenders have purported to allow Serta to add still further super-priority tranches in the future, by amending the loan agreement they exchanged their way out of (and therefore are no longer parties to), ensuring that Plaintiffs' position, and that of the other first lien lenders who have been elbowed to the back of the line, can only get worse, never better. In wiping out the first-lien rights of other first-lien lenders and amending the First Lien Agreement to allow still further tranches to be placed above the excluded first lien lenders' holdings, the defendants violated their contractual duty of good faith and fair dealing.

5.     None of this was necessary. Serta could have achieved its stated objectives of bringing in new money and deleveraging by conducting a debt exchange open to *all* first-lien holders, in full compliance with the First Lien Agreement, and without prejudicing any first-lien

holders. That it chose to proceed as it did when other, compliant alternatives were available indicates bad faith and places its directors—David Swift, David Mussafer, David McKenna and Jefferson Case—squarely in violation of their fiduciary duties (which, by virtue of Serta's avowedly precarious financial conditions, were owed to *all* stakeholders).

6.      Plaintiffs, issuers of collateralized loan obligations ("CLOs"), acquired Serta first-lien loans via *real* open-market purchases, over the course of several years. Plaintiffs are not distressed-debt investors and are not in the habit of purchasing heavily discounted paper with the idea of pursuing legal claims; they purchased their Serta holdings (face value approximately $7.4 million) at or near par with the intention of holding them. Plaintiffs also regularly purchase and hold other first-lien debt with similar characteristics and contractual protections. Plaintiffs seek a declaration that the loan amendments pursuant to which the transaction was effected are null and void, a permanent injunction against further actions violative of plaintiffs' first-lien *pro-rata* rights, including further drawdowns under the newly created super-priority facility and creation of further super-priority tranches, and damages for their injuries.[2]

## THE PARTIES

7.      Plaintiff LCM XXII is an exempted company incorporated under the laws of the Cayman Islands with a principal place of business in the Cayman Islands.

8.      Plaintiff LCM XXIII is an exempted company incorporated under the laws of the Cayman Islands with a principal place of business in the Cayman Islands.

---

[2] Before the debt exchange deal closed, a different lender moved for a temporary restraining order in New York state court. That motion was denied. *See North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC, et al.*, Index No. 652243/2020 Dkt. 88 (N.Y. Sup. Ct. 2020). The Collateral Manager for Plaintiffs moved to intervene in that action, and also filed a separate action, but upon Defendants' opposition to the motion to intervene, withdrew the motion to intervene and discontinued the separate action.

9.      Plaintiff LCM XXIV is an exempted company incorporated under the laws of the Cayman Islands with a principal place of business in the Cayman Islands.

10.      Plaintiff LCM XXV is an exempted company incorporated under the laws of the Cayman Islands with a principal place of business in the Cayman Islands.

11.      Plaintiff LCM 26 is an exempted company incorporated under the laws of the Cayman Islands with a principal place of business in the Cayman Islands.

12.      Plaintiff LCM 27 is an exempted company incorporated under the laws of the Cayman Islands with a principal place of business in the Cayman Islands.

13.      Plaintiff LCM 28 is an exempted company incorporated under the laws of the Cayman Islands with a principal place of business in the Cayman Islands.

14.      Upon information and belief, Defendant Serta Simmons Bedding, LLC is a Delaware limited liability company with its principal place of business at 2451 Industry Avenue, Doraville, GA 30360.  Its sole member is Dawn Intermediate LLC, whose sole member is Dawn Holdings, Inc., a Delaware corporation with a principal place of business in Georgia.

15.      Upon information and belief, Defendant Advent International Corporation is a Delaware corporation with a principal place of business at Prudential Tower, 800 Boylston Street, Boston, MA 02199.

16.      Upon information and belief, Defendant Eaton Vance Management is a Massachusetts business trust.  Its sole member is Eaton Vance Corp., a Maryland corporation with a principal place of business in Massachusetts.

17.      Upon information and belief, Defendant Invesco Senior Secured Management, Inc. is a Delaware corporation with its principal place of business in New York.

18.      Upon information and belief, Defendant Credit Suisse Asset Management LLC is

a limited liability company whose sole member is CSAM Americas Holding Corp., which is a Delaware corporation with its principal place of business in New York.

19.     Upon information and belief, Defendant Boston Management and Research is a Massachusetts business trust.  Its sole member is Eaton Vance Management.  As noted above, Eaton Vance Management's sole member is Eaton Vance Corp., a Maryland corporation with a principal place of business in Massachusetts.

20.     Upon information and belief, Defendant Barings LLC is a limited liability company whose ultimate owner is Massachusetts Mutual Life Insurance Co., a Massachusetts corporation with its principal place of business in Massachusetts.

## JURISDICTION AND VENUE

21.     The Court has subject-matter jurisdiction over the claims asserted against the Defendants under 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000 and Plaintiffs are citizens of a foreign state while the Defendants are all citizens of U.S. states.

22.     This Court has personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the privilege of conducting business in New York; Plaintiffs' claims arise from or relate to that conduct; and it is reasonable to adjudicate plaintiffs' claims against all Defendants in New York.

23.     This Court also has personal jurisdiction over Defendants pursuant to Section 9.10(b) of the First Lien Agreement, under which the Defendants irrevocably and unconditionally consented to the jurisdiction of this Court for any civil action relating to the First Lien Agreement.

24.     Venue in this action is proper in the United States District Court for the Southern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events or

omissions giving rise to the claims herein occurred in New York, and in view of Section 9.10(b) of the First Lien Agreement.

## **FACTUAL BACKGROUND**

25.     Plaintiffs are issuers of collateralized loan obligations.  Plaintiffs have consistently held first-lien loans issued by Serta since October 2016.  Since then, Plaintiffs, collectively, have purchased and sold additional loans, and they currently hold approximately $7.4 million in first-lien Serta loans, most of which were purchased over two years ago at or near par value.

26.     A key aspect of Plaintiffs' business is selecting which assets to include in the collateral pools that form the respective CLOs.  Critical to this analysis is the associated risks of investing in any given issuance, including the structural seniority of the loans.

27.     Investors typically pay a premium to secure top structural seniority because it affords the greatest protection in the event of a debtor's default by providing a claim to the debtors' assets that supersedes other creditors' claims.  If debtors can change the structural seniority and subrogate the rights of minority debtholders by negotiating in private with a majority of the lenders and offering them an incentive to subrogate the minority—as the Defendants have purported to do here—it would substantially and adversely affect not just Plaintiffs' holdings in Serta debt, but Plaintiffs' business more generally.  Indeed, Plaintiff has never seen anyone seek to engage in the sort of transaction being challenged here.  And if a group of lenders, forming a majority, can collude with a borrower to strip the minority of its priority claims on collateral, the entire concept of syndicated lending is put into question.

28.     Serta is North America's largest bedding manufacturer.  Based in Atlanta, Serta owns and manages various mattress brands, which are distributed through national, hospitality,

7

and regional and independent retail channels throughout North America, as well as directly to consumers.

29.     Advent acquired a majority interest in Serta in October 2012.

***The First Lien Agreement***

30.     Under Advent's ownership, Serta entered into three credit facility agreements dated as of November 8, 2016, each of which was executed by Serta and various affiliates and counterparties.  The executed agreements include: (1) a first-lien term-loan agreement (i.e., the First Lien Agreement at issue here) originally providing for $1.95 billion in first-lien term loans (the "First Lien Loans"); (2) a second-lien term-loan agreement originally providing for $450 million in second-lien term loans (the "Second Lien Loans"); and (3) a $225 million asset-based revolving-credit facility (the "ABL").

31.     The First Lien Agreement includes a waterfall providing for the allocation of proceeds in the case of an event of default or if the loans are accelerated.

32.     From a lender's perspective, the waterfall is among the most critical sections in credit agreements, as it specifies how collateral will be allocated and divided among lenders if the loans become due as the result of an event of default or bankruptcy.

33.     In this case, Section 2.18(b) of the First Lien Agreement specified the relevant payment waterfall for First Lien Lenders.  It provided that, after certain expenses are paid, the proceeds of collateral would be divided *pro rata* among all First Lien Lenders, based on the face amount of their ownership of loans.  This means that all First Lien Lenders would share ratably in the available value based on the percentage of their loans, and that no First Lien Lender would have a superior right to the collateral over any other.  Indeed, the *pro rata* sharing of collateral proceeds is so fundamental that Section 2.18(c) of the First Lien

8

Agreement requires any First Lien Lender that receives payment on account of its loans—including a distribution of collateral proceeds—that is greater than its *pro rata* share to pay the excess ratably to the other First Lien Lenders.

34. The centrality of the provisions requiring *pro rata* distribution is further underscored by the First Lien Agreement's amendment provisions. Many provisions in the First Lien Agreement may be amended by approval of the "Required Lenders," defined as lenders representing more than 50% of the outstanding face amount of the loans. But a handful of provisions in the First Lien Agreement (sometimes called "sacred rights") may only be amended by securing "the consent of ***each Lender*** directly and adversely affected thereby."[3] This unanimity requirement is reserved for the waiver or amendment of the First Lien Agreement's most important provisions, including changes to the interest rate, the maturity date, and other provisions that are core of the lender's repayment rights. Critically, the *pro rata* distribution rights set forth in Sections 2.18 are among the First Lien Agreement's provisions requiring the consent of "each Lender directly and adversely affected thereby"—that is, ***everyone***.

35. Specifically, Section 9.02(b)(A)(6) provides that each affected lender must approve any agreement that "waives, amends or modifies Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the *pro rata* sharing of payments required thereby (except in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c), and/or 9.05(g) or as otherwise provided in this section 9.02)." As such, unless one of these four enumerated exceptions applies (and, as demonstrated below, they do not in this case), Plaintiffs' *pro rata* rights could not be changed without their consent.

---

[3] The First Lien Agreement and the Subordination Amendment are incorporated by reference herein.

36.     The First Lien Agreement also prevented any effort to end-run these provisions by protecting the amendment provisions themselves.  Thus, the First Lien Agreement stated that no agreement by the Required Lenders (meaning a mere majority of the First Lien Lenders) could "change any of the provisions of Section 9.02(a) or Section 9.02(b) or the definition of 'Required Lenders' to reduce any voting percentage required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, without the prior written consent of each Lender." § 9.02(b)(B)(1).  In other words, any amendment to the process for amending the First Lien Agreement's *pro rata* sharing provision required the consent of all First Lien Lenders.

37.     As noted, the First Lien Agreement carved out four types of transactions from the unanimity requirement.  *First*, Serta could invoke Section 2.22 to issue incremental additional loans (subject to the requirement that any additional loans be *pari passu* or junior to the First Lien Loans).  *Second*, Serta could invoke Section 2.23 to extend the maturity on existing First Lien Loans (subject to the same non-subordination requirement).  *Third*, Serta could invoke Section 9.02(c) to enter into certain transactions to refinance or replace (i.e., exchange) existing First Lien Loans (again, subject to the same non-subordination requirement).  And *finally*, Section 9.05(g) allowed First Lien Lenders to assign to a Borrower (like Serta) their loans on a non-*pro rata* basis in certain limited circumstances—*i.e.*, through either a Dutch Auction or an "open market" transaction to retire First Lien Loans.

***The Subordination Transaction***

38.     As Plaintiffs learned when Serta issued its June 2020 press release, in April 2020, Serta began having private discussions with certain individual lenders to negotiate the possibility of restructuring Serta's debt.  Plaintiffs were never invited to participate in those discussions,

were never consulted, and, before the press release, had no knowledge whatsoever of Serta's

private plans to restructure its debt.  Plaintiffs engaged in no conversations with Serta about that

matter, and their consent was never sought or obtained.

39.     On June 8, 2020, as noted above, Serta announced to the market that it planned to

enter into the Subordination Transaction.  The press release stated that it had agreed to enter into

the transaction with a subset of the First Lien Lenders comprising a majority of the holders.

Under the Subordination Transaction, Serta would obtain $200 million of new money financing,

and the Handpicked Lenders would trade all their existing first- and second-lien loans for "super-

priority" loans with rights of payment ahead of the erstwhile "first lien" holders.  Despite the

unanimity-consent provisions, the Subordination Transaction was not subject to the consent of

the Excluded Lenders.

40.     On June 22, 2020, Defendants closed the Subordination Transaction.

41.     The Subordination Transaction purported to create, among other things, the

following tranches of super-priority debt (together, the "Super-Priority Loans"):

a.  $200 million of newly funded super-priority "first out" debt, which would rank

    ahead of the existing First Lien Loans;

b.  $875 million of super-priority "second out" debt, which also would rank ahead

    of existing First Lien Loans, and which was created through an "exchange" of

    the Handpicked Lenders' first- and second-lien loans; and

c.  An unspecified amount of capacity to incur still more super-priority debt

    through further exchanges with the Handpicked Lenders, which would be

    "third out" and would also rank ahead of the existing First Lien Loans.

42.     As noted, the Handpicked Lenders received the "first out" tranche of Super-Priority Loans by extending $200 million in new financing.  In exchange for the Handpicked Lenders' agreement to extend this new super-priority financing and to amend the First Lien Agreement so as to subordinate the Excluded Lenders (as further described herein), the Handpicked Lenders also "exchanged" their holdings in First Lien Loans (with a face value of roughly $992,292,703.97) and Second Lien Loans (with a face value of roughly $299,027,231.08) for new "second out" Super-Priority Loans.

43.     Plaintiffs were never offered the opportunity to exchange *their* holdings, and were also never offered an opportunity to participate in the new super-priority $200 million financing.

44.     As a result of the Subordination Transaction, there is now at least $1.075 billion in Super-Priority Loans (and there may well be more in the future, given the "third out" capacity) with priority liens on the collateral that currently secures the First Lien Loans, ahead of the $814 million remaining First Lien Loans owned by the CLOs and the other Excluded Lenders.

45.     Given the precarious condition of Serta's business, this is tantamount to transforming Plaintiffs and the other Excluded Lenders into unsecured lenders, while allowing the Handpicked Lenders to leap-frog into a new super-priority position.

46.     In the case of an event of default, more than $1 billion in debt would be paid in full to the Handpicked Lenders before the Plaintiffs (and other Excluded Lenders) could receive even a single penny, notwithstanding that they purchased "first lien" debt at or near par value, and that the First Lien Agreement precluded any changes to the waterfall absent Plaintiffs' consent (which Plaintiffs never provided).  What is more, by creating a third-out tranche of Super-Priority Loans, Serta has indicated it may yet undertake additional improper exchanges to further subordinate and prejudice Plaintiffs and the other Excluded Lenders.

12

*The Subordination Amendment*

47.     The Subordination Transaction was effectuated by amending the First Lien Agreement through the Subordination Amendment.  By its terms, the Subordination Amendment altered Plaintiffs' rights to the *pro rata* sharing of payments as erstwhile "first-lien" lenders.

48.     The Subordination Amendment altered the *pro rata* rights of Excluded Lenders as follows, among other things:

a.     Defendants added an entirely new provision to Section 2.11 of the First Lien Agreement, making express and clear that the newly issued Super-Priority Loans would have a right of payment that is not *pro-rata* but rather senior to the right of the remaining First-Lien Lenders.  In other words, the rights of the Handpicked Lenders would rank ahead of the Excluded Lenders—and would cease being *pro rata*.

b.     Defendants negotiated among themselves and agreed to a new inter-creditor agreement governing the relationship between the First-Lien Lenders and the Priority Lenders.  That inter-creditor agreement expressly places the Priority Lenders' rights of payment ahead of the minority of First-Lien Lenders left behind.

c.     The Subordination Amendment was contingent on the Handpicked Lenders assuming the role of "Priority Lenders."  Indeed, the exchange transaction that placed the Handpicked Lenders in the pole-position of Priority Lenders was expressly made a "condition subsequent" to the amendments to the First-Lien Credit Agreement.

13

49.     These provisions violated the amendment provisions of the First Lien Agreement. Indeed, as set forth in Section 9.02(b) of the First Lien Agreement, all affected Lenders—not just a bare majority of Lenders—must approve any amendment that "amends or modifies the provisions of Sections 2.18(b) or (c) of [the Credit] Agreement in a manner that would by its terms alter the *pro rata* sharing of payments required thereby." The Subordination Amendment constitutes such an amendment. But it was not approved by all affected Lenders.

50.     Defendants have sought to justify their decision to proceed unilaterally by invoking one of the exceptions to the unanimity requirement—namely, the exception in Section 9.05(g). But that exception does not apply. Most fundamentally, if a majority of handpicked first-lien lenders could evade the unanimity requirement through the expedient of structuring the transaction as a debt exchange and labeling it an "open market" exchange, the unanimity requirement would be rendered toothless.

51.     The plain text of Section 9.05(g) makes clear that it does not apply. Indeed, Section 9.05(g) applies only to debt-retirement transactions, not to restructurings or exchanges.

52.     Section 9.05(g) also requires "open market" or certain "Dutch Auction" transactions, and this transaction was neither. The First Lien Agreement indeed makes express that "Dutch Auction" transactions have to be open to everyone (with the consideration set by the lenders who participate), while the plain meaning of Section 9.05(g) make clear that "open market" transactions have to be set by *open* markets. By contrast, the Subordination Transaction was negotiated in private and consisted of a structured debt exchange that was not open to everyone and that did not reflect terms set by the market.

53.     Section 9.05(g) did not apply for another reason. Prior to the Subordination Amendment, Section 9.05(g) expressly did not apply to transactions that either (a) required Serta

14

to issue new debt, as this one did (*see* ¶ 39) or that (b) resulted in the First Lien Lenders being subordinated (*see* ¶¶ 41–42). Defendants recognized the trip-wire and sought to avoid it by modifying these two provisions through the Subordination Amendment; but that modification was ineffective to alter the scope of the unanimity requirement under Section 9.02(b)(B)(1), described above.

54.     And if that were not enough, the Handpicked Lenders agreed to and did exchange not just their first-lien holdings, but also their *second*-lien holdings. But Section 9.05(g) applied only to transactions involving First Lien Loans.

55.     If there were any doubt that Section 9.05(g) was not an available path to complete this transaction without unanimous approval, the structure of the First Lien Agreement dispels it. Indeed, the First Lien Agreement devotes an entirely different section (Section 9.02(c)) to refinancing and debt-exchange transactions of the type at issue here. But Defendants did not attempt to structure the Subordination Transaction under Section 9.02(c), because Section 9.02(c) required that any new debt **be junior to or pari passu** to the paper held by the First Lien Lenders. And, of course, the whole point of this transaction was to evade that requirement.

56.     The Subordination Amendment violated the First Lien Agreement in another important way. Under Sections 9.02(b)(B)(2) and 9.02(b)(B)(3) of the First Lien Agreement, an agreement to release all or substantially all of the Collateral generally requires the prior written consent of each Lender, as does an agreement to release all or substantially all of the value of the guarantees of the borrowers' obligations under the First Lien Agreement. The Subordination Amendment did both of these things: It effectively released all or substantially all of the First Lien collateral from the current first-priority ranking lien by modifying the ranking of the loans,

15

and also released all or substantially all of the value of the guarantees that protect the First Lien Lenders, because those guarantees are now effectively worthless.

57.     The economics of the Subordination Transaction underscore the breach and Defendants' lack of good faith.  Defendants have sought to justify the Subordination Transaction on the basis that it permitted Serta to decrease its leverage and increase liquidity, while leaving its interest expense neutral.  But Serta could have accomplished the same result by dealing with all First Lien Lenders (instead of just the Handpicked Lenders) on a *pro rata* basis.  Indeed, if Serta had exchanged all First Lien Loans for 65.9 cents on the dollar (the blended exchange rate that allowed the Handpicked Lender's holdings to be exchanged into $851MM in new super-priority loans), it would have ended up with $1.2 billion of new first-lien loans, $427MM of second-lien loans, and $200MM of new money for a total debt of $2,012MM—which is less than the debt it now has ($2,216MM).  The interest expense would have been $161MM vs. $142MM if the same rate structure had been maintained, but reducing the spread over LIBOR on this hypothetical *pro rata* basis exchange scenario to 5.9% from the 7.5% applied to the Super-Priority Loans would have achieved cash interest expense neutrality.

58.     But instead of pursuing this path (or any of the other options open to Serta under the First Lien Agreement), Serta chose to deal in private with the Handpicked Lenders, and the Handpicked Lenders obtained the benefit of placing not just their First-Lien Loans ahead of the minority, but also succeeded in placing their own *Second-Lien* Loans at the front of the line, all while selling out the Excluded Lenders.

59.     Not only did the Subordination Transaction violate the plain terms of the First Lien Agreement, it was also undertaken in bad faith to favor Serta's majority owner, Advent, and certain lenders, while squeezing out others.

16

60.     Defendants' bad faith is further evidenced by Serta's financial condition and the massive conflicts of interest of a majority of its board members.

61.     Upon information and belief, as of June 22, 2020, Serta's liabilities were greatly in excess of its assets. On March 24, 2020, Moody's downgraded Serta's debt, noting that its "very highly leveraged capital structure is unsustainable" and that because of its "very high financial leverage of about 10.3x debt-to-EBITDA . . . the probability increases that the company will pursue a [transaction]" that would be "consider[ed] . . . a default." Then, on June 11, Moody's again downgraded Serta's debt, noted that the debt-to-EBITDA ratio had risen to 10.6x, predicted that the metric would increase to "15x," and commented that the "capital structure is not sustainable." Moody's even noted that some of Serta's debt would be marked with an "/LD designation to indicate a *limited default*." *Id.*

62.     Indeed, in the Subordination Amendment, Serta brought down all of its representations and warranties to the date of the Subordination Amendment, *except for the representation that it is solvent*. This further indicates that Serta was insolvent as of the date of the Subordination Amendment, and that Defendants knew that when they pursued the Subordination Transaction.

63.     A majority of Serta's Board of Directors are, or were recently, executives at defendant Advent. David Swift, David Mussafer, David McKenna and Jefferson Case placed Advent's interests over Serta's and Serta's constituents.

64.     Defendant Advent plainly benefited from the Subordination Transaction. Because Advent's equity holdings in Serta would be wiped out in a restructuring—or at a minimum, would be paid junior to the First Lien Lenders—Advent stood to benefit from a debt restructuring.

17

65.     In the Subordination Transaction, Advent is permitted to buy second lien loans, jump ahead of the remaining First Lien Lenders, and then convert such loans to equity upon bankruptcy.  Accordingly, the Subordination Transaction conferred an outsized and disproportionate benefit to Advent, with no particular benefit to Serta.  As Moody's noted, the Subordination Transaction did not improve Serta's financial outlook—indeed, Moody's downgraded its debt despite the deal—in part because the Subordination Transaction "will *meaningfully increase* the company's cash interest cost, and leverage will remain substantial."

66.     But the Subordination Transaction will meaningfully benefit Advent, because it can now hedge its nearly worthless equity stake for valuable, super-priority liens.  As executives of Advent with equity stakes in it, a majority of Serta's board stands to reap large personal benefits from this deal.

67.     Such self-dealing plainly constitutes a conflict of interest and reflects the bad faith of all Defendants in pursuing the Subordination Transaction

## FIRST CAUSE OF ACTION
### (Breach of Contract)

68.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 67 above as if fully set forth herein.

69.     Serta, the Handpicked Lenders, and the CLOs are parties to the First Lien Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.  Plaintiffs are authorized to exercise any and all remedies under the First Lien Agreement.

70.     The CLOs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the First Lien Agreement.

71.     Defendants, by contrast, have breached the express terms of the First Lien Agreement by entering into the Subordination Amendment, which violates the First Lien Agreement's restrictions on any collateral- or guarantee-releasing "agreement," and which purports to alter the *pro rata* distribution provisions of Sections 2.18(b) and 2.18(c) without obtaining the consent of all affected Lenders as required by Section 9.02.  Moreover, in the alternative, to the extent the exchange was a permissible transaction, Plaintiffs should have been allowed to participate.

72.      As a consequence of Defendants' material breaches, the CLOs have been deprived of their contractual right to receive a pro-rata share of collateral proceeds on a first-lien basis.

73.     Plaintiffs have suffered damages as a result of Defendants' breach, in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

74.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 73 above as if fully set forth herein.

75.     The Subordination Transaction destroyed the CLOs' rights to receive the fruits of their bargain in violation of the implied covenant of good faith and fair dealing.

76.     Defendants' actions in pursuing and then consummating the Subordination Transaction disregarded the CLOs' rights and were not taken in good faith because they proceeded in secret, did not seek the consent of all debtholders, and did not offer Plaintiffs the opportunity to participate in the Subordination Transaction (and the exchange of debt).

77.     The rights of amendment and exchange under the First Lien Agreement were used abusively and for an improper purpose, to injure first lien lenders.

19

78.     Indeed, the Handpicked Lenders abused their rights as First-Lien Lenders to arrange a transaction that purports to permit them to exchange their Second-Lien Loans for priority debt ahead of the Minority's remaining First-Lien Loans.

79.     And the Defendants abused their rights under the First Lien Agreement to create an unlimited capacity to exchange further Second-Lien Debt, solely for the benefit of Advent and the Handpicked Lenders.

80.     Defendants further abused their rights under the First Lien Agreement by entering into the Subordination Transaction notwithstanding a massive conflict-of-interest between the members of Serta's Board of Directors affiliated with defendant Advent, which caused Serta to enter into a transaction that favored Advent at the expense of Serta and the Excluded Lenders.

81.     Plaintiffs have suffered damages as a result of Defendants' breach, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### (Declaratory Judgment – Defendants)

82.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 81 above as if fully set forth herein.

83.     As stated herein, Section 9.02(b) of the First Lien Agreement requires consent from all affected Lenders to any amendments to the pro-rata sharing provisions set forth in Sections 2.18(b) and (c) of the First Lien Agreement.

84.     The Subordination Transaction purported to effectuate such an amendment by creating Super-Priority Loans that have priority liens on the collateral that secures the First Lien Agreement, ahead of the remaining First Lien Loans owned by the CLOs and others.

85. Nevertheless, the Subordination Transaction was never consented to by Plaintiffs. Indeed, Plaintiffs were not made aware of the transaction before it was announced by the press. As a result, its consummation violated the First Lien Agreement.

86. There is a ripe dispute between the parties.

87. For the foregoing reasons, Plaintiffs are entitled to a declaratory judgment that the Subordination Transaction violates the First Lien Agreement and that the Subordination Amendment is null and void.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

(a) That the Court award damages against Defendants for all economic, monetary, actual, consequential, and compensatory damages Plaintiffs suffered as a result of Defendants' conduct, together with pre- and post-judgment interest at the maximum rate allowable by law;

(b) That the Court enter a judgment permanently enjoining Defendants for engaging in any further exchanges of first- and second-lien loans for super-priority loans;

(c) That the Court enter a declaratory judgment that the Subordination Transaction violates the First Lien Agreement and that the Subordination Amendment is null and void;

(d) That the Court award Plaintiffs the costs of their suit, including reasonable attorney' fees and expenses; and

(e) That the Court award such other and further relief as the Court may deem just and proper.

21

Dated: New York, New York
       July 2, 2020

                                HOLWELL SHUSTER & GOLDBERG LLP

                                By: */s/ Michael S. Shuster*
                                Michael S. Shuster
                                Vincent Levy
                                Neil Lieberman
                                Brian T. Goldman
                                Denisha S. Bacchus

                                425 Lexington Ave., 14th Floor
                                New York, New York 10017
                                Tel: 646.837.5151
                                mshuster@hsgllp.com

                                *Attorneys for Plaintiff*