# Exhibit 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LCM XXII LTD., LCM XXIII LTD., LCM
XXIV LTD., LCM XXV LTD., LCM 26
LTD., LCM 27 LTD., LCM 28 LTD.,

           Plaintiffs,

-v.-

SERTA SIMMONS BEDDING, LLC,

           Defendant.

21 Civ. 3987 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiffs in this case are a cadre of securities issuers, who collectively hold approximately $7.4 million of Defendant Serta Simmons Bedding LLC's ("Serta") first-lien loans. In June 2020, Defendant entered into a transaction (the "Transaction") whereby it received $200 million of new-money financing from a group of lenders — which did not include Plaintiffs — who also agreed to redeem their first- and second-lien loans for a new category of super-priority debt with payment rights ahead of the first-lien loans. Plaintiffs brought suit against Defendant, alleging that the Transaction breached the terms of the First Lien Term Loan Agreement (the "Agreement"), and that Defendant impermissibly amended the Agreement to facilitate the Transaction without Plaintiffs' consent. Plaintiffs additionally claim that Defendant pursued the Transaction with the aim of destroying their rights as senior creditors, thus violating the Agreement's implied covenant of good faith and fair dealing. Defendant now moves to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that the Agreement expressly

permitted the Transaction and that the related amendments to the Agreement required approval from only a majority of first-lien lenders. For the reasons set forth below, the Court denies Defendant's motion to dismiss.

## BACKGROUND[1]

### A. Factual Background

#### 1. The Parties

Plaintiffs LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd., and LCM 28 Ltd. (together, "Plaintiffs") are all exempted companies incorporated under the laws of the Cayman Islands that issue collateralized loan obligations. (Compl. ¶¶ 7, 13). Defendant Serta Simmons Bedding LLC is a Delaware limited liability company and North America's largest bedding manufacturer, owning and managing various mattress brands that are distributed across the continent by means of various retail channels. (*Id.* at ¶¶ 8, 16). Defendant's sole member is Dawn Intermediate LLC, whose sole member is, in turn, Dawn Holdings, Inc. (*Id.* at ¶ 8).

---

[1]  This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), the well-pleaded allegations of which are taken as true on this motion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies on the documents appended to the Declaration of David J. Lender in support of Defendant's motion to dismiss ("Lender Decl., Ex. [ ]" (Dkt. #26)), which documents are either incorporated by reference in the Complaint or proper subjects of judicial notice. *See United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (describing materials extraneous to a complaint that a court may consider on a motion to dismiss).

For ease of reference, the Court refers to Defendant's memorandum of law in support of its motion to dismiss as "Def. Br." (Dkt. #25); Plaintiffs' memorandum of law in opposition to Defendant's motion to dismiss as "Pl. Opp." (Dkt. #31); and Defendant's reply memorandum of law as "Def. Reply" (Dkt. #32).

### 2. The Terms of the First Lien Term Loan Agreement

Since approximately October 2016, Plaintiffs have consistently held first-lien loans issued by Defendant. (Compl. ¶ 13). As of the date of the filing of the Complaint, Plaintiffs held approximately $7.4 million in Defendant's first-lien loans, most of which were purchased at or near par value. (*Id.*).

On November 8, 2016, Defendant entered into the First Lien Term Loan Agreement with various affiliates and counterparties, which originally provided for $1.95 billion in first-lien term loans. (Compl. ¶ 17; *see also* Lender Decl., Ex. A ("Agreement")).[2] Generally speaking, the Agreement establishes that first-lien lenders are entitled to payments on a *pro rata* basis, based on their percentage ownership of the total amount of first-lien loans. (Agreement § 2.18(a)-(c); Compl. ¶¶ 20-21). For instance, Section 2.18(b), the Agreement's waterfall provision, specifies that in the event of default, after the payment of certain administrative expenses and subject to any applicable intercreditor agreements, the proceeds of collateral are to be divided *pro rata* among all first-lien lenders. (Agreement 2.18(b); Compl. ¶ 20). Likewise, Section 2.18(c) requires that any first-lien lender who receives a principal or interest payment on its first-lien loan that exceeds its *pro rata* share pay the excess ratably to the other first-lien lenders. (Agreement 2.18(c); Compl. ¶ 20).

---

[2] On this same date, Defendant also entered into two additional credit facility agreements: (i) the Second Lien Term Loan Agreement, which originally provided for $450 million in second-lien term loans; and (ii) a $225 million asset-based revolving credit facility. (Compl. ¶ 17).

As discussed in greater detail below, Defendant and a subset of the first-lien lenders amended the Agreement incident to the Transaction that forms the basis of Plaintiffs' claims in this case.  Section 9.02(b) sets forth the default rule that amendments to the Agreement require the approval of first-lien lenders representing the majority of the outstanding face amount of this class of loans.  (Agreement § 9.02(b); Compl. ¶ 21).[3]  This default rule does not apply to the select few provisions of the Agreement that enshrine the lenders' so-called "sacred rights."[4]  Such provisions may only be waived, amended, or modified by obtaining "the consent of each Lender directly and adversely affected thereby."  (Agreement § 9.02(b)(A); Compl. ¶ 21).  The only "sacred right" plausibly impacted by the Transaction is contained in Section 9.02(b)(A)(6), which provides that all affected lenders must give their consent to any amendment that "waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the *pro rata* sharing of payments required thereby (except in connection with any

---

[3]     Section 9.02(b) of the Agreement provides, in relevant part, that "neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Top Borrower and the Required Lenders[.]"  (Agreement § 9.02(b)).  The Agreement identifies the "Top Borrower" as Serta (*id.*, Preamble), and defines "Required Lenders" as "Lenders having Loans or unused Commitments representing more than 50% of the sum of the total Loans and such unused commitments at such time" (*id.*, § 1.01).

[4]     Section 9.02(b)(A) of the Agreement outlines six sacred rights, related to which the consent of all impacted lenders is required to: (i) increase any first-lien lender's commitment; (ii) reduce the principal amount of any loan; (iii) extend the maturity of a loan or postpone any interest or principal payments; (iv) reduce the rate of interest on a loan; (v) extend the expiry date of a lender's commitment; and (vi) waive, amend, or modify the *pro rata* sharing of payments required by Sections 2.18(b) or (c).  (Agreement § 9.02(b)(A)(1)-(6)).

transaction permitted under Sections 2.22, 2.23, 9.02(c) and/or 9.05(g) or as otherwise provided in this Section 9.02)[.]" (Agreement § 9.02(b)(A)(6); Compl. ¶ 22). In other words, absent a connection to one of the four enumerated types of transactions, the consent of all affected lenders is required for an amendment that would alter the first-lien lenders' *pro rata* rights under the Agreement's waterfall provision (Section 2.18(b)) or the provision calling for the reallocation of payments made in excess of a lender's *pro rata* share (Section 2.18(c)).

The Agreement also guards against concerted attempts to circumvent the amendment procedures by requiring unanimous Lender consent to alter the amendment provisions themselves. (Agreement § 9.02(b)(B)(1); Compl. ¶ 23).[5] Consent from all first-lien lenders is also required to authorize any agreement that would release all or substantially all of the collateral or the value of the guarantees. (Agreement § 9.02(b)(B)(2)-(3); Compl. ¶ 39).

By its terms, Section 9.02(b)(A)(6) exempts four types of transactions from the requirement that all impacted lenders must consent to any waiver, amendment, or modification of their *pro rata* rights pursuant to Sections 2.18(b) and (c). *First*, Section 2.22 provides that Defendant can issue incremental credit facilities, so long as the new debt is *pari passu* or junior to

---

[5] Section 9.02(b)(B)(1) of the Agreement provides that no agreement between Serta and a majority of lenders shall "change any of the provisions of Section 9.02(a) or Section 9.02(b) or the definition of 'Required Lenders' to reduce any voting percentage required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, without the prior written consent of each Lender[.]" (Agreement § 9.02(b)(B)(1)).

the first-lien loans.  (Agreement § 2.22(a)(x); Compl. ¶ 24).  *Second*, Section 2.23 permits Defendant to extend the maturity on existing first-lien loans, so long as the extension offer is made to all first-lien lenders on the same terms and the extended loans are *pari passu* with existing first-lien loans. (Agreement § 2.23(a)-(c); Compl. ¶ 24).  *Third*, Section 9.02(c) empowers Defendant to refinance or replace "all or any portion of the outstanding Term Loans under the applicable Class … with one or more replacement term loans … pursuant to a Refinancing Amendment," subject to the requirement that such replacement loans be *pari passu* or junior to the existing first-lien loans.  (Agreement § 9.02(c)(i)(C); Compl. ¶ 24).  *Lastly,* Section 9.05(g) allows first-lien lenders to assign their rights under the Agreement to Defendant or its affiliates on a non-*pro rata* basis through either a Dutch Action or an "open market purchase" for the purpose of retiring first-lien loans.  (Agreement § 9.05(g); Compl. ¶ 24).[6]  As relevant here, Defendant invokes Section 9.05(g) in arguing that the Transaction was an "open market purchase" of first-lien loans, and thus expressly authorized by the Agreement.  (Def. Br. 12-15).

---

[6]    Pursuant to Section 9.05(g) of the Agreement,

> [A]ny Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-*pro rata* basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a *pro rata* basis or (B) through open market purchases, in each case with respect to clauses (A) and (B), without the consent of the Administrative Agent[.]

(Agreement § 9.05(g)).  The Agreement defines "Affiliated Lender" as any "Non-Debt Fund Affiliate" (*i.e.*, any investor who directly or indirectly controls Serta or an affiliate of such investor), Dawn Intermediate, LLC, Serta, or any of Serta's subsidiaries.  (*Id.*, Preamble, § 1.10).

6

### 3. The Transaction and the Amendments

On June 8, 2020, Defendant issued a press release announcing the Transaction, which involved an agreement with a majority of first- and second-lien lenders (the "Participating Lenders") to deleverage and enhance the company's liquidity. (Lender Decl., Ex. B ("June 8, 2020 Press Release"); Compl. ¶ 26). Plaintiffs maintain that prior to the issuance of this press release, they were unaware of Defendant's plan to restructure its debt and were never afforded an opportunity to participate in discussions to renegotiate the terms of their first-lien loans. (Compl. ¶ 25). Defendant closed the Transaction on June 22, 2020. (Lender Decl., Ex. C ("June 22, 2020 Press Release"); Compl. ¶ 27).

The Transaction created two new tranches of debt, both of which ranked ahead of the existing first-lien loans: (i) a new-money tranche comprising $200 million of new-money financing and (ii) an exchange tranche comprising $875 million of loans created through an exchange of the Participating Lenders' first- and second-lien loans (together, the "Priority Term Loans" or "PTL Loans"). (Compl. ¶ 28; June 8, 2020 Press Release). The Transaction also set aside capacity for Defendant to incur additional debt through future exchanges that would also rank ahead of the existing first-lien loans. (Compl. ¶ 28; June 8, 2020 Press Release). As a result of the Transaction, the Participating Lenders hold at least $1.075 billion of super-priority loans with rights senior to those of the remaining first-lien lenders, including Plaintiffs. (Compl. ¶ 30).

In order to effectuate the Transaction, Defendant garnered the approval of the Participating Lenders to amend the Agreement to allow Defendant to incur the PTL Loans (the "Amendments").[7]  Among other things, the Amendments modified the definition of "Incremental Equivalent Debt" permissible under the Agreement to include "Indebtedness issued under the PTL Credit Agreement … which may be senior, *pari passu* or junior in right of payment and/or with respect to security with the Obligations hereunder[.]" (Agreement § 1.01; *see also id.*, § 6.01(z) (allowing Defendant to incur Incremental Equivalent Debt)).  The Amendments also altered Section 8.08 of the Agreement to authorize the Administrative Agent to enter into a separate intercreditor agreement establishing senior payment priority for the PTL Loans (the "PTL Intercreditor Agreement").  (Agreement § 8.08(d)).  Furthermore, the Amendments added a new subpart to Section 2.11(b), the provision outlining the circumstances triggering mandatory prepayment of the first-lien loans, which affirmed that the PTL Loans had rights of payment senior to that of the first-lien lenders.  (Agreement § 2.11(b)(vii); Compl. ¶ 33).  In addition, the Amendments excised Section 7.01(l) from the Agreement, which provision previously designated subordination of the first-lien loans as an event of default.  (Agreement 7.01(l)).[8]

---

[7]     The version of the Agreement included in the Lender Declaration is a redline reflecting the Amendments made to facilitate the Transaction.  In this redline, additions to the Agreement are designated in blue underlined text, with deletions in stricken red text.

[8]     Prior to its deletion, Section 7.01 defined subordination as an event of default under the Agreement.  This provision provided, in full,

        Subordination.  The Obligations ceasing or the assertion in writing by any Loan Party that the Obligations cease to constitute senior

8

## B.    Procedural Background

This case is not the first legal challenge to the Transaction.  Three days after Defendant publicly announced the Transaction, on June 11, 2020, a group of lenders who are not parties to this action filed suit in New York State Supreme Court seeking to enjoin the Transaction before it closed.  *See N. Star Debt Holdings, L.P.* v. *Serta Simmons Bedding, LLC*, No. 652243/2020, 2020 WL 3411267, at *3 (N.Y. Sup. Ct. June 19, 2020).  In addition, Plaintiffs' Collateral Manager sought to intervene in the *North Star* action on behalf of Plaintiffs and separately filed its own action in New York state court challenging the Transaction.[9]  By Decision and Order dated June 19, 2020, the judge presiding over the *North Star* action denied the lenders' request for a preliminary injunction and allowed the Transaction to close.  *Id.* at *3-6.

Following the consummation of the Transaction, Plaintiffs' Collateral Manager withdrew its request to intervene in the *North Star* action and voluntarily discontinued its state court suit.  (Def. Br. 10; Pl. Opp. 4).  On

---

indebtedness under the subordination provisions of any document or instrument evidencing any Junior Lien Indebtedness in excess of the Threshold Amount or any such subordination provision being invalidated by a court of competent jurisdiction in a final non-appealable order, or otherwise ceasing, for any reason, to be valid, binding and enforceable obligations of the parties thereto[.]

(Agreement § 7.01(l)).  The Amendments also removed "Junior Lien Indebtedness" as a defined term in the Agreement.  (*Id.*, § 1.10).

[9]   Both parties agree on the facts of Plaintiffs' Collateral Manager's state court action and its attempt to intervene in the *North Star* action.  (Def. Br. 1, 9-10; Pl. Opp. 4).  However, these legal filings are not mentioned in the Complaint, and the parties do not provide citations in their briefing to the underlying documents.  The Court makes mention of Plaintiffs' Collateral Manager's prior legal maneuvers for the sake of completeness and notes that neither state court filing impacts the Court's legal analysis on this motion.

July 2, 2020, Plaintiffs brought suit in this District before Judge George B. Daniels, asserting claims against Defendant and a number of the Participating Lenders concerning the Transaction. *See LCM XXII Ltd.* v. *Serta Simmons Bedding, LLC*, No. 20 Civ. 5090 (GBD), 2021 WL 918705, at *2 (S.D.N.Y. Mar. 10, 2021). By Memorandum Decision and Order dated March 10, 2021, Judge Daniels dismissed the suit for want of subject matter jurisdiction, because the parties were not completely diverse. *Id.* at *3-6.

On May 4, 2021, Plaintiffs filed the Complaint initiating this action, which asserted claims only against Serta. (Dkt. #1). Defendant noticed its appearance on May 26, 2021 (Dkt. #14, 16-17), and simultaneously filed a letter indicating its intent to file a motion to dismiss (Dkt. #15). The following day, the Court endorsed Defendant's letter to schedule a pre-motion conference on Defendant's anticipated motion. (Dkt. #18). Thereafter, on June 1, 2021, Plaintiffs filed a letter opposing Defendant's stated grounds to dismiss their claims. (Dkt. #19). On June 9, 2021, the Court held a conference with the parties, at which the Court set a briefing schedule for Defendant's motion to dismiss. (Minute Entry for June 9, 2021; *see also* Dkt. #22 (Transcript)).

Defendant filed its motion to dismiss and supporting papers on July 9, 2021. (Dkt. #24-29). Plaintiffs filed their opposition brief on August 9, 2021. (Dkt. #31). Defendant filed its reply brief on August 23, 2021. (Dkt. #32). Accordingly, Defendant's motion is fully briefed and ripe for consideration.

# DISCUSSION

## A.  Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).  "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks, alterations, and citation omitted); *see also Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (explaining that a court need not accept "conclusory allegations or legal conclusions masquerading as factual conclusions").

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials."  *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).  This narrow universe includes "the facts alleged in the

complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (citation omitted).  On this motion, the Court may consider the copy of the Agreement attached to the Lender Declaration, which is incorporated by reference in the Complaint.  (Compl. ¶ 21 n.2 (expressly incorporating the Agreement and the relevant amendments thereto); Lender Decl., Ex. A).  The Court may also consider the two press releases issued by Defendant announcing the signing and closing of the Transaction (Lender Decl., Ex. B, C), as well as the copy of the IHS Markit pricing data for Defendant's first-lien term loans (*id.*, Ex. D), all of which are appropriate subjects of judicial notice.  *See* Fed. R. Evid. 201(b)(2) (permitting judicial notice of a "fact that is not subject to reasonable dispute because it" "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) (noting that a "district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment").

## B.  Plaintiffs Have Adequately Alleged a Breach of the Agreement

Plaintiffs assert that Defendant breached the Agreement in three primary ways by engaging in the Transaction and ratifying the Amendments.  *First*, Plaintiffs allege that the Transaction involved a structured debt exchange that was negotiated in private and thus cannot be justified by Section 9.05(g)'s authorization for lenders to assign their loans to Defendant via "open market

12

purchases." (Pl. Opp. 6-11). *Second*, Plaintiffs claim that Defendant flouted their "sacred right" to *pro rata* payments by not seeking their consent prior to entering into the Transaction and amending the Agreement, which conduct enabled a select group of first- and second-lien lenders to leapfrog their priority rights. (*Id.* at 11-14). *Third*, Plaintiffs assert that the Transaction violated the Agreement's waterfall provision by leaving them effectively unsecured after the issuance of the PTL Loans. (*Id.* at 14-15). Defendant mounts arguments in opposition to all of Plaintiffs' theories of breach (Def. Br. 12-18), and further contends that Plaintiffs have not alleged cognizable damages stemming from any purported breach (*id.* at 18-20). Defendant also argues that Plaintiffs' claims are barred by the Agreement's no-action clause. (*Id.* at 21-22).

The Court begins by outlining the applicable principles of contract interpretation, before engaging with each of Plaintiffs' theories of breach. The Court ultimately concludes that Plaintiffs have alleged a breach of the Agreement, as well as cognizable damages stemming therefrom, and that the no-action clause does not defeat Plaintiffs' standing to bring this contractual claim.

### 1. Principles of Contract Interpretation Under New York Law[10]

"To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties;

---

[10] The Agreement includes a choice-of-law provision, which provides that "any claim, controversy, or dispute arising under or related to this agreement and the other loan documents … shall be governed by, and construed and interpreted in accordance with, the laws of the state of New York." (Agreement § 9.10(a)). Accordingly, New York law applies to Plaintiffs' claims in this action.

(ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Edwards* v. *Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (citation omitted).  Under New York law, "a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties." *Matter of MPM Silicones, L.L.C.*, 874 F.3d 787, 795 (2d Cir. 2017).  The best evidence of what parties to a written agreement intend is what they say in their writing. *See Abdullayeva* v. *Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019).

"The threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous," *Revson* v. *Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000), which is a question of law for the courts to decide, *see, e.g., Broder* v. *Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005).  Ambiguity exists where the terms of the contract "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Orchard Hill Master Fund Ltd.* v. *SBA Commc'ns Corp.*, 830 F.3d 152, 156-57 (2d Cir. 2016) (citation omitted).  A contract is unambiguous, by contrast, if its language "has a definite and precise meaning ... [about] which there is no reasonable basis for a difference of opinion." *Electra* v. *59 Murray Enters., Inc.*, 987 F.3d 233, 245 (2d Cir. 2021) (citation omitted).  "[C]lear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations."

Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 869 N.Y.S.2d 511, 517
(1st Dep't 2008) (citations omitted), aff'd, 13 N.Y.3d 398 (2009); accord JA
Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009).

"If the terms of a contract are clear, courts must take care not to alter or
go beyond the express terms of the agreement, or to impose obligations on the
parties that are not mandated by the unambiguous terms of the agreement
itself." Fisher v. SD Prot. Inc., 948 F.3d 593, 606 (2d Cir. 2020) (internal
quotation marks omitted). "At the motion to dismiss stage, a district court may
dismiss a breach of contract claim only if the terms of the contract are
unambiguous." Edwards, 938 F.3d at 13 (citation omitted); see also, e.g.,
Rounds v. Beacon Assocs. Mgmt. Corp., No. 09 Civ. 6910 (LBS), 2009 WL
4857622, at *3 (S.D.N.Y. Dec. 14, 2009) ("Where there is no ambiguity to a
contract and the intent of the parties can be determined from the face of the
agreement, interpretation is a matter of law, and a claim turning on that
interpretation may be resolved on a motion to dismiss."). But "when the
language of a contract is ambiguous, its construction presents a question of
fact, which of course precludes summary dismissal" on a motion to dismiss
under Rule 12(b)(6). Crowley v. VisionMaker, LLC, 512 F. Supp. 2d 144, 152
(S.D.N.Y. 2007) (internal quotation marks omitted); see also Bayerische
Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 56 (2d
Cir. 2012) (explaining that "where the contract language creates ambiguity,
extrinsic evidence as to the parties' intent may properly be considered, and in
the context of a motion to dismiss, if a contract is ambiguous as applied to a

15

particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim" (internal quotation marks and citations omitted)).

### 2. The Agreement Did Not Clearly Permit the Transaction

The parties sharply dispute whether the Agreement expressly permitted the Transaction. Defendant contends that the Transaction qualifies as an open-market purchase of the Participating Lenders' loans, which types of transactions are authorized by the plain terms of Section 9.05(g). (Def. Br. 13). Plaintiffs submit that no facet of the Transaction occurred in the open market, as Defendant negotiated it in private with only a subset of lenders and arrived at a price that was not set by market forces. (Pl. Opp. 7). It follows from Plaintiffs' argument that, if the loan repurchases did not occur on the open market, any consideration that Defendant paid to the Participating Lenders would have violated the remaining lenders' *pro rata* rights to receive concurrent payments under the Agreement. Because the Court finds the term "open market purchase" to admit of ambiguity in the context of the Agreement, the Court cannot determine on this motion that Section 9.05(g) clearly authorized the Transaction.

To begin, "open market purchase" is not a defined term in the Agreement. This term appears in Section 9.05(g), which states that "any Lender may, at any time, assign all ... of its rights and obligations ... in respect of its Term Loans to any Affiliated Lender on a non-*pro rata* basis ... through open market purchases[.]" (Agreement § 9.05(g)). Unconstrained by any contractual definition, the parties present divergent interpretations of what

16

constitutes an "open market purchase" under this provision. Defendant argues that in the context of a loan repurchase — where the universe of possible buyers and sellers is necessarily restricted to the borrower (or its affiliates) and the lenders — "open market" can only mean the price that a willing buyer and a willing seller can obtain in an arm's-length negotiation. (Def. Br. 13 (quoting *Fair Market Value*, BLACK'S LAW DICTIONARY (11th ed. 2019))). According to Defendant, this aptly describes the Transaction, which represented the culmination of arm's-length negotiations with the Participating Lenders, who agreed to assign their loans back to Defendant in exchange for approximately $850 million of PTL Loans. (*Id.*).

The Court cannot agree that Defendant's definition of open market, which equates the term with fair market value, is the only susceptible meaning of this phrase. Offering an alternative interpretation, Plaintiffs submit that the Transaction contained none of the hallmarks of what a reasonable observer would conceive to be a transaction in the open market, as it "was negotiated *in private* by Serta and consisted of a structured debt exchange that *was not open to everyone* and that *did not reflect terms set by the market*[.]" (Pl. Opp. 7 (emphases in original)). Plaintiffs highlight the fact that Defendant's reading of open-market purchase relies on *Black's Law Dictionary*'s definition of "fair market value," but ignores its definition of "open market." (Pl. Opp. 7-8). As *Black's* defines the term, an "open market" is "[a] market in which any buyer or seller may trade and in which prices and product availability are determined by free competition — Also termed free market." *Open Market*, BLACK'S LAW

17

DICTIONARY (11th ed. 2019).  In emphasizing the contrast between private transactions and open-market transactions, Plaintiffs additionally point to judicial decisions contrasting the two types of transactions (*see* Pl. Opp. 8-9), as well as a 2009 industry alert authored by Defendant's counsel describing a typical open-market purchase as one "accomplished through a broker or agent and requir[ing] the purchaser to pay a set market price" (*id.* at 10-11).[11]  While the Court is unable to conclude that any of these sources reflects the definitive meaning of "open market purchases" as used in Section 9.05, the Court agrees with Plaintiffs that these sources, at minimum, demonstrate that the term is ambiguous in this context.

On a plain reading of the term, the Transaction depicted in the Complaint did not take place in what is conventionally understood as an "open market."  Significantly, the Transaction was closed to a swath of possible participants (*i.e.*, those lenders who did not participate in the Transaction), and rather than agreeing on a price set by market forces, Defendant and the Participating Lenders are alleged to have engaged in secretive discussions to arrive at a price for the loan repurchases that necessitated both intricate amendments to the Agreement and additional agreements, the terms of which were withheld from Plaintiffs until they were publicly announced.  (Compl. ¶¶ 1, 25, 37).  The Court appreciates the distinction highlighted by Defendant

---

[11]     *See* Glenn D. West, Jacky A. Kelly, Lucas E. Spivey & Danek A. Freeman, *Private Equity Alert: De-Leveraging Portfolio Companies Through Debt Buy-Backs — US and UK Perspectives* (Weil Gotshal, Mar. 2009), *available at* https://www.weil.com/~/media/ files/pdfs/Private_Equity_Alert_March_2009.pdf.

between open-market purchases for a private company's loans and open-market transactions for public stock (*see* Def. Reply 5-6) and admits of the possibility that in the context of the Agreement, the open-market provision may contemplate loan-repurchase transactions that involve fewer than all lenders in any given class of debt.[12]  That said, the Court cannot conclude based on the contractual context, the plain meaning of the words "open market," and the materials cited by the parties that Defendant has proffered the "definite and precise meaning" of the term "open market purchase" about "which there is no reasonable basis for a difference of opinion."  *Electra*, 987 F.3d at 245.

Defendant avers that the Transaction was arrived at following a competitive process involving multiple lender groups and that it was under no obligation to apprise Plaintiffs of the debt exchange offer.  (Def. Br. 13-14; Def. Reply 5).  However, Plaintiffs plead no details regarding the offers that Defendant made to other lenders, and thus the Court cannot consider Defendant's factual representations on this point at this stage in the proceedings.  Relying on Plaintiffs' allegations in the Complaint, as the Court must at this stage, Plaintiffs first learned of Defendant's plans to restructure its debt when Defendant issued the June 8, 2020 Press Release.  (Compl. ¶ 25).

---

[12]    Indeed, there exists a plausible textual basis for this interpretation in Section 9.05, itself.  This provision provides that lenders may reassign their loan rights through "Dutch Actions *open to all Lenders* holding the relevant Term Loans" or "open market purchases."  (Agreement § 9.05(g) (emphasis added)).  That the provision specifies that Dutch Auctions must be open to all lenders, but does not do so for open-market purchases, may indicate the parties' conscious choice to exclude such a requirement from loan repurchases pursued in the open market.  *See, e.g., Export-Import Bank of U.S.* v. *Agricola Del Mar BCS*, 536 F. Supp. 2d 345, 353 (S.D.N.Y. 2008) (finding a requirement "not available under the plain language" of the contract where "the parties know how to provide for [it]" but "did not so provide").

What is more, Defendant allegedly held secretive discussions with certain individual lenders, without ever affording Plaintiffs an opportunity to participate. (*Id.* at ¶¶ 1, 25, 29). Even if an open-market purchase under the Agreement did not require that all lenders be privy to a debt-repurchase offer, the Court is unable to conclude as a matter of law that the Transaction was expressly permitted by Section 9.05.[13]

Plaintiffs separately argue that Defendant's reliance on Section 9.05(g) is misplaced because the Agreement contains two other provisions that more specifically pertain to debt exchanges, neither of which sanctioned the Transaction. (Pl. Opp. 9). These two provisions are (i) Section 2.22(a)(x), which allows for new classes of credit facilities that are *pari passu* or junior to the existing first-lien loans; and (ii) Section 9.02(c), which allows for agreements between Defendant and a lender to create replacement loans that refinance or

---

[13] Defendant notes that the state court decision denying the motion for a preliminary injunction in the *North Star* action acknowledged that the Transaction was the culmination of months of negotiation, which involved the consideration of several alternatives from competing groups of lenders. (Def. Br. 13 (citing *N. Star Debt Holdings, L.P.* v. *Serta Simmons Bedding, LLC*, No. 652243/2020, 2020 WL 3411267, at *2 (N.Y. Sup. Ct. June 19, 2020))). However, the Court declines to accept this fact at the pleading stage of this case for at least three reasons. *First*, as previously mentioned, the Complaint does not include any allegations concerning Defendant's negotiations leading up to the Transaction, other than that Plaintiffs were uninvolved and had no knowledge of Defendant's plans to restructure its debt. (Compl. ¶¶ 25, 29). To the extent Defendant engaged in robust negotiations with many lenders prior to agreeing on the terms of the Transaction, that is a proper avenue for discovery. *Second*, the state court in *North Star* gave short shrift to the question of whether the Transaction constituted an open-market purchase, and it is unclear whether this was a contested point on the motion for injunctive relief. *Third*, the *North Star* decision was decided on a preliminary posture, and is not controlling on the merits. *See, e.g.*, *Town of Concord* v. *Duwe*, 4 N.Y.3d 870, 875 (2005) ("[M]ere denial of the motion for a preliminary injunction did not constitute the law of the case or an adjudication on the merits[.]"). Accordingly, to the extent Defendant attempts to rely on the *North Star* decision to substantiate its representation that it engaged in extensive negotiations with various lenders in arriving at the Transaction, the Court declines to import these factual allegations into the Complaint.

replace all or a portion of a lender's outstanding first-lien loans, subject to the same anti-subordination limitation.  (Pl. Opp. 9; Def. Br. 14-15).  The Court agrees with Defendant that the existence of these provisions does not curtail its ability to invoke the separate provisions of the Agreement providing express permission to retire existing loans via the open market and to incur additional debt.  (*See* Def. Br. 14-15; Def. Reply 6-7).  As described above, Section 6.01(z) of the Agreement was amended to expressly allow Defendant to incur Incremental Equivalent Debt (including the PTL Loans), while Section 9.05(g) empowered Defendant to engage in open-market purchases of first-lien loans. It remains to be seen whether the Transaction qualifies as an open-market purchase under Section 9.05(g), but Defendant is nevertheless entitled to invoke the provision to justify the Transaction.  To put it succinctly, Plaintiffs' preference that Defendant structure the Transaction under a provision other than Section 9.05(g) does not give rise to a separate breach of the Agreement.

In sum, the Court concludes that Plaintiffs have alleged a breach of Section 9.05 of the Agreement, on the grounds that the Transaction constituted an impermissible loan repurchase that did not occur in the open market.

### 3.    The Amendments to the Agreement Did Not Require Plaintiffs' Consent

Plaintiffs proffer an additional theory of breach predicated on Defendant's failure to obtain Plaintiffs' consent to engage in the Transaction and to effectuate the Amendments, which operated to alter their *pro rata* payment rights under the Agreement in ostensible violation of Section 9.02(b).  (Pl. Opp. 11-14).  Defendant contends that Section 9.02(b) expressly exempts open-

market loan repurchases from the unanimous-consent requirement, and that none of the Amendments implicated any of the "sacred rights" that triggered the Agreement's heightened consent requirement.  While the Court cannot decide at this stage of the proceedings whether the Transaction, itself, required unanimous consent, it agrees with Defendant that the Amendments did not.

As noted above, the Agreement allowed Defendant to waive, amend, or modify most provisions with the consent of a majority of first-lien lenders by face value of their loans, with a carve-out for changes that would impact the first-lien lenders' "sacred rights."  (Agreement § 9.02(b)).  To effectuate changes impacting these "sacred rights," the Agreement required Defendant to procure the consent of each lender that stood to be adversely affected by the change. (*Id.*).  Plaintiffs contend that the Transaction and the Amendments impacted the sacred contractual right enunciated in Section 9.02(b)(A)(6), which provides that consent from all affected lenders is required for any waiver, amendment, or modification of "the provisions of Sections 2.18(b) or (c) … in a manner that would by its terms alter the *pro rata* sharing of payments required thereby (except in connection with any transaction permitted under Section[ ] … 9.05(g))."  (Pl. Opp. 11-12).

As a logical extension of its position that the Transaction was an open-market purchase of the Participating Lenders' loans under Section 9.05(g), Defendant maintains that it was not required to obtain Plaintiffs' consent. (Def. Br. 15).  But this argument does not carry the day, because the Court has already determined that the term open-market purchase admits of ambiguity in

the context of the Agreement.  If the Transaction did not qualify as an open-market purchase, it follows that Defendant needed to secure the consent of all lenders to engage in this deal that involved paying some first-lien lenders, but not others.  (Agreement §§ 2.18(c), 9.02(b)(A)(6)).

With respect to the Amendments that created space for the PTL Loans to have senior priority over the first-lien loans, Defendant claims that they did not impact any of Plaintiffs' sacred rights and thus could be effectuated with only majority approval of the lenders.  (Def. Br. 15-16).  On Defendant's interpretation, Section 2.18 of the Agreement only endows Plaintiffs with rights to *pro rata* payments among existing first-lien lenders who held the same class of debt under the Agreement, which rights do not extend to an entirely different class of debt governed by separate agreements.  (Def. Br. 18 n.8; Def. Reply 7).  Plaintiffs contend that Defendant proffers an overly formalistic interpretation of their *pro rata* rights under the Agreement.  (Pl. Opp. 13-14).  Plaintiffs urge the Court to consider the practical effect of the Amendments, which reshuffled the priority rights of certain first-lien lenders at their expense and sanctioned a new class of debt that was patently barred by the previous version of the Amendment.  (*Id.*).  The Amendments impacted their *pro rata* rights, Plaintiffs argue, because prior to the Amendments, the Agreement endowed them with a right to *pro rata* payments equal to that of all first-lien lenders; but after the Amendments, certain first-lien lenders possessed superior, non-*pro rata* payment rights in relation to the remaining first-lien lenders.  (*Id.* at 14).

23

The Court acknowledges the intricacy of the editing exercise that Defendant undertook to allow for the creation of a new classes of super-priority debt under the Agreement.  Be that as it may, the Court is unmoved by Plaintiffs' proffered interpretation of their sacred rights to *pro rata* payments. The plain terms of Section 2.18 of the Agreement make clear that the first-lien lenders' rights to *pro rata* payments apply only to debt within the same "Class," *viz.,* among first-lien lenders.  To illustrate the point, Section 2.18(c) of the Agreement makes repeated reference to loans of the same class:

> If any Lender obtains payment … on any of its Loans *of any Class* held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans *of such Class* … then the Lender receiving such greater proportion shall purchase … participations in the Loans of other Lenders *of such Class* at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders *of such Class* ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans *of such Class*[.]

(Agreement § 2.18(c) (emphases added); *see also id.*, § 2.18(a) ("[E]ach payment of interest in respect of the Loans *of a given Class* … shall be allocated *pro rata* among the Lenders in accordance with their respective Applicable Percentage of the *applicable class*." (emphases added))).  While the Amendments had the effect of extinguishing certain first-lien lenders' loans in exchange for an elevation of their priority rights under a new class of debt, the Amendments left untouched the *pro rata* rights of first-lien lenders vis-à-vis other first-lien lenders.  At base, Plaintiffs' objection to the Transaction is not the interruption of their *pro rata* payment rights within the same class of lenders — which

24

remain fully intact — but rather the subordination of their first-lien loans. Despite Plaintiffs' protestations, anti-subordination is not a sacred right protected by Section 9.02(b)(A)(6), or any other provision of Section 9.02. Thus, the Agreement permitted such changes to be made with the consent of only a majority of lenders.

Plaintiffs mount two additional arguments to support their reading that the Amendments to the Agreement required their consent. *First*, Plaintiffs suggest that Section 9.02(b)(A)(6)'s exception to the unanimous-consent requirement as it concerns Section 9.05(g) transactions is limited in scope and serves only to prevent open-market purchases of first-lien loans from triggering a class-wide tender offer. (Pl. Opp. 12). Put differently, when it comes to open-market purchases, Plaintiffs construe Section 9.02(b)(A)(6) as operating exclusively to inhibit lenders who decide not to sell their loans from claiming entitlement to *pro rata* payments coincident with payments received by other lenders who did choose to sell their loans. (*Id.*). A broader reading of Section 9.02(b)(A)(6), Plaintiffs argue, would allow Defendant to collude with a bare majority of lenders to alter nearly any provision of the Agreement, thus rendering the unanimous-consent requirement toothless. (*Id.*).

The issue is that Plaintiffs' construction of Section 9.02(b)(A)(6) does not comport with the Agreement's plain text. Broadly speaking, Section 9.02(b) sets forth the general rule that Defendant may amend the Agreement with written authorization from a majority of lenders, so long as the amendment does not "waiv[e], amend[ ], or modif[y]" any of the six "sacred rights"

25

enumerated in the ensuing subsections.  (*See* Agreement § 9.02(b)).  Section 9.02(b)(A)(6) outlines one of these sacred rights, and provides that Defendant must secure consent from all affected lenders for any action that "waives, amends, or modifies the provisions of Sections 2.18(b) or (c) … in a manner that would by its terms alter the *pro rata* sharing of payments required thereby," unless the action is connected to a transaction permitted under Section 9.05(g) (or several other provisions).  (*Id.*, § 9.02(b)(A)(6)).  In this provision, the reference to Section 9.05(g) allows Defendant to engage in an open-market purchase of certain lenders' loans — which could be understood as "waiving" the non-selling lenders' rights to *pro rata* payments — without seeking permission from all lenders in the class.  Contrary to Plaintiffs' suggestion, however, Section 9.02(b)(A)(6) does not further restrict Defendant's ability to alter the Agreement in ways that do not "by [their] terms alter the *pro rata* sharing of payments" required by Sections 2.18(b) or (c).  To sharpen the point, Plaintiffs seek to read into Section 9.02(b)(A)(6) a requirement that when engaging in a transaction under Section 9.05(g), Defendant must acquire unanimous consent for any amendment that does more than prevent a remaining first-lien lender from demanding a *pro rata* payment when a first-lien lender receives payment for selling their loan.  But neither this provision, nor any other in the Agreement, imposes such a limitation.  As just explained, the unanimous-consent requirement is restricted to those actions taken by Defendant that affect lenders' "sacred rights," and the Court has already determined that the Amendments do not alter the first-lien lenders' sacred

26

right to *pro rata* payments in relation to other first-lien lenders.  As such, Defendant was permitted to amend the Agreement with majority consent.

*Second*, Plaintiffs assert that Defendant improperly altered the scope of Section 9.02(b)'s exception to the unanimous-consent rule that allowed it to engage in the Transaction in the first place.  (Pl. Opp. 12-13).  Plaintiffs point to the interplay of several provisions to articulate this point.  As an initial matter, Plaintiffs explain that the Agreement allows "open market purchases" so long as "no Event of Default exists at the time of … the confirmation of such open market purchase."  (Agreement § 9.05(g)(v)).  Plaintiffs then home in on the Amendment that deleted Section 7.01(l) — which made subordination of the first-lien loans an event of default — thereby eliminating a critical roadblock standing in the way of the creation of the PTL Loans.  (Pl. Opp. 12-13).[14] Plaintiffs conclude the argument by asserting that because the Amendments authorized a change to one "of the provisions of … Section 9.02(b) … to reduce any voting percentage required to waive, amend, or modify any right thereunder," Defendant needed unanimous lender consent to approve the

---

[14]    The Court agrees with Defendant that the Transaction would not have triggered an event of default if Section 7.01(l) remained in effect.  (*See* Def. Br. 18 n.7).  Section 7.01(l) provided that an event of default would occur if the first lien debt "cease[d] to constitute senior indebtedness under the subordination provisions of any document or instrument evidencing any Junior Lien Indebtedness[.]"  (Agreement § 7.01(l)).  Although the Amendments also eliminated the definition of the term "Junior Lien Indebtedness," it was previously defined as any indebtedness "that is secured by a security interest on the Term Loan Priority Collateral that is expressly junior or subordinated to the Lien securing the Credit Facilities with respect to the Term Loan Priority Collateral[.]"  (*Id.*, § 1.01).  Because the Transaction did not subordinate any debt that was "expressly junior or subordinated to" the first-lien debt, the creation of the PTL Loans would not have triggered an event of default under Section 7.01(l).

deletion of Section 7.01(l), or implement the other Amendments that subordinated the first-lien loans.  (Agreement § 9.02(b)(B)(1); Pl. Opp. 13).

Here, too, Plaintiffs seek to expand the ambit of the unanimous-consent requirement beyond what the text of the Agreement can bear.  Contrary to Plaintiffs' argument, none of the Amendments, including that which eliminated subordination as an event of default, reduced any voting percentage required to waive, amend, or modify any right afforded to the first-lien lenders under Section 9.02(b).  In other words, the Amendments left unchanged the requirement that approval from all affected lenders was required to authorize a modification of any "sacred right" under the Agreement, including lenders' rights to *pro rata* payments under Sections 2.18(b) or (c).  Notably, the Agreement does not designate anti-subordination as a "sacred right" or requires unanimous lender consent to alter what constitutes an event of default.  As such, Defendant was permitted to eliminate Section 7.01(l) from the Agreement with approval from a majority of first-lien lenders.  (*See* Agreement § 9.02(b) (establishing that amendments to the Agreement could be made "pursuant to an agreement or agreements in writing entered into by [Serta] and [a majority of lenders]")).

Accordingly, the Court determines that Plaintiffs have plausibly alleged that Defendant breached the Agreement by engaging in a non-open-market loan repurchase, but have not plausibly alleged that Plaintiff breached the Agreement by enacting the Amendments without the consent of all lenders.

### 4. The Transaction Did Not Violate the Agreement's Waterfall Provision

As a third theory of breach, Plaintiffs argue that the Transaction violated the Agreement's waterfall provision and impermissibly released all or substantially all of the collateral and the value of the guarantees. (Pl. Opp. 14-15). The Court disagrees.

The Agreement's waterfall provision provides that the order of payments in the event of default is "[s]ubject *in all respects* to the provisions of each applicable Intercreditor Agreement[.]" (Agreement § 2.18(b) (emphasis added)). As per the waterfall provision's plain terms, even prior to the Transaction and the Amendments, the first-lien lenders' rights under the waterfall provision were subject to the terms of separate intercreditor agreements. Relatedly, Section 8.08 of the Agreement, as amended, authorized the Administrative Agent to enter a new intercreditor agreement, specifically the PTL Intercreditor Agreement. (*Id.*, § 8.08). The revised Section 8.08 further provided that the PTL Intercreditor Agreement could bear on indebtedness that was senior, *pari passu*, or junior to the first-lien loans. (*Id.*).[15] Plaintiffs argue that the

---

[15] Plaintiffs argue that the pre-Amendment version of Section 8.08 did not authorize an intercreditor agreement that contemplated indebtedness with senior priority rights above the first-lien loans. (Pl. Opp. 15). The Court acknowledges that prior to the Transaction, the Agreement's definition of "Acceptable Intercreditor Agreement" contemplated only intercreditor agreements relating to indebtedness secured on a *pari passu* basis (not senior) to the first-lien loans. (Agreement § 1.01). However, Plaintiffs point to no provision of the Agreement that mandates that all lenders must provide their consent to an amendment of Section 8.08 or the definition of this term. Furthermore, even prior to the Amendments, Plaintiffs' *pro rata* rights under the waterfall provision were not absolute, but were conditioned on intercreditor agreements, without any perceptible limitation on the entry of new intercreditor agreements. (*See* Agreement § 2.18(b)). The Court thus sees no basis to challenge the validity of the PTL Intercreditor Agreement because it was authorized by the amended Agreement.

Transaction "waived or modified" the *pro rata* payments of the remaining first-lien lenders without their consent (Pl. Opp. 14), but this is not true. For one thing, no facet of the Transaction altered the rights of the first-lien lenders to receive *pro rata* payments in relation to other first-lien lenders in the event of default — which undoubtedly would have required Plaintiffs' consent pursuant to Section 9.02(b)(A)(6). In any event, the Agreement expressly permitted Defendant and the Participating Lenders to enter into a separate intercreditor agreement that governed the payment priority of creditors in the event of a default. While the Court sympathizes with Plaintiffs' objections to the Amendments that authorized the PTL Intercreditor Agreement, there is nothing in the Agreement that prevented Defendant from making these changes with consent from the majority of lenders.

Plaintiffs' additional argument that Defendant breached the Agreement because they did not consent to the Transaction, which left them "practically unsecured," also fails. (Pl. Opp. 15). Sections 9.02(b)(B)(2) and (3) of the Agreement provide that prior written consent of each lender is required to "release all or substantially all of the Collateral" (Agreement § 9.02(b)(B)(2)) and to "release all or substantially all of the value of the Guarantees under the Loan Guaranty" (*id.* § 9.02(b)(B)(3)). Even accepting as true Plaintiffs' allegations that Defendant remains in a "precarious financial position" (Compl. ¶ 3), no feature of the Transaction released the collateral or the value of the loan guarantees. On this point, Plaintiffs are asserting a "substance over form" argument that is incompatible with the plain text of the Agreement.

30

Accordingly, Plaintiffs have not alleged a breach of Section 2.18(b) or Section 9.02(b)(B)(2)-(3) of the Agreement.

### 5. Plaintiffs Have Pleaded Cognizable Damages

As a corollary to its arguments against breach, Defendant argues that any breach-of-contract claim should be dismissed for the independent reason that Plaintiffs have failed to allege any cognizable damages. (Def. Br. 18-20). To the contrary, the Court finds that Plaintiffs have alleged facts demonstrating that they have suffered damages as a result of the allegedly violative Transaction, and thus declines to dismiss Plaintiffs' breach-of-contract claim on this basis.

"Under New York law, a plaintiff must prove the existence of damages with certainty in order to recover for breach of contract." *Whitehurst* v. *230 Fifth, Inc.*, 998 F. Supp. 2d 233, 246 (S.D.N.Y. 2014) (citation omitted). Ordinarily, the purpose of contract damages is to give the injured party the benefit of the bargain by awarding a sum of money that will, to the extent possible, put that party in the position it would have been in had the contract been performed. *See Terwilliger* v. *Terwilliger*, 206 F.3d 240, 248 (2d Cir. 2000) (citing *Freund* v. *Washington Square Press, Inc.*, 34 N.Y.2d 379, 382 (1974)). "[F]actual allegations showing damages are essential: 'In the absence of any allegations of fact showing damage, mere allegations of breach of contract are not sufficient to sustain a complaint.'" *Mariah Re Ltd.* v. *Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601, 611 (S.D.N.Y. 2014) (quoting *Lexington 360 Assocs.* v. *First Union Nat'l Bank of N.C.*, 651 N.Y.S.2d 490, 492 (1st Dep't 1996)), *aff'd*

31

*sub nom. Maria Re Ltd. ex rel. Varga* v. *Am. Fam. Mut. Ins. Co.*, 607 F. App'x 123 (2d Cir. 2015) (summary order). Defendant contends that Plaintiffs' allegations of damages are either specious or speculative. (Def. Br. 19-20).

In their Complaint, Plaintiffs allege that as a result of Defendant's breaches, they "have been deprived of their contractual rights, including to receive a *pro-rata* share of collateral proceeds on a first-lien basis, and the value of their loans and rights materially declined." (Compl. ¶ 49). Defendant contends that these allegations do not suffice to plead cognizable damages, because (i) the value of Plaintiffs' loans has, in fact, more than doubled since the Transaction[16] and (ii) Plaintiffs' damages predicated on their lost right to recover collateral proceeds on a first-lien basis are entirely speculative, as there is no indication that Defendant will default on any of its obligations. (Def. Br. 19-20).

Plaintiffs' theory of damages is neither specious nor speculative. Plaintiffs allege that Defendant harmed them by stripping them of their senior payment rights and creating a new class of loans that possess the rights Plaintiffs previously held. (Compl. ¶¶ 1, 4, 15, 49). In this regard, Plaintiffs explain that as issuers of collateralized loan obligations, they

> typically pay a premium to secure top structure seniority because it affords the greatest protection in the event of a debtor's default by providing a claim to the debtor's assets that supersedes other creditors' claims. If an issuer can change the structural seniority

---

[16] Defendant submits pricing data from IHS Markit, showing that its first-lien term loans have seen an approximately 181% increase in value between the date the Transaction closed ($23.86) and the date Defendant filed its motion to dismiss ($67.12). (Lander Decl., Ex. D). Plaintiffs do not contest the veracity of these metrics.

and subrogate the rights of minority debtholders … it
would substantially and adversely affect not just
Plaintiffs' holdings in Serta debt, but Plaintiffs' business
more generally.

(*Id.* at ¶ 15). Plaintiffs go on to explain that as a result of the subordination of

their debt, "the value of their loans and rights materially declined." (*Id.* at

¶ 49). That Plaintiffs do not plead precisely how they expect to quantify their

damages does not void their factual allegations suggesting the harm they

allegedly suffered as a consequence of Defendant's alleged breach. (*See, e.g.,*

*id.* at ¶ 3 (alleging that Defendant "bur[ied] the excluded first-lien lenders

(including Plaintiffs) under $1 billion of new debt and favor[ed] the participating

first-lien lenders with higher ranking holdings"); *id.* at ¶ 4 (describing the injury

caused by Defendant "by the placing of a massive new super-priority tranche

ahead of their holdings"); *id.* at ¶ 60 (alleging that the Transaction "permits

Serta to continue to violate the … Agreement by incurring more super-priority

debt through further exchanges, which would further subordinate the existing

First Lien loans")). These allegations demonstrate that this case is a far cry

from those cited by Defendant in which courts have found insufficient factual

material to plead the damages element of a breach of contract claim. *See, e.g.,*

*Util Auditors, LLC* v. *Honeywell Int'l Inc.*, No. 17 Civ. 4673 (JFK), 2018 WL

5830977, at *3 (S.D.N.Y. Nov. 7, 2018) (dismissing breach-of-contract claim for

failure to plead damages where plaintiff alleged defendant had a contingent

payment obligation based on services to be rendered, but failed to plead full

performance of the services); *Landmark Ventures, Inc.* v. *Wave Sys. Corp.*, No.

11 Civ. 8440 (PAC), 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012)

(dismissing breach-of-contract claim for failure to plead damages where plaintiff failed to plead how much money it was allegedly owed, what services plaintiff performed, or the dates on which services were rendered); *Int'l Bus. Machines Corp.* v. *Dale*, No. 11 Civ. 951 (VB), 2011 WL 4012399, at *2 (S.D.N.Y. Sept. 9, 2011) (rejecting breach-of-contract claim for failure to plead damages where complaint merely alleged that defendant "suffered damages," without any additional facts).

Further, Defendant mischaracterizes Plaintiffs' theory of damages when it argues that Plaintiffs' loans could not have materially declined in value given the pricing data showing that the loans trade at a higher price than they did on the date of the Transaction. (Def. Br. 19-20). Plaintiffs do not dispute that, in absolute terms, their loans have increased in value, but instead argue that their loans would have been worth *even more* had they not been stripped of their priority rights. (Pl. Opp. 17-18). Defendant urges the Court to disregard this theory of damages, because Plaintiffs did not plead it in the Complaint. (Def. Br. 20). But the Court declines Defendant's invitation, because, as just described, Plaintiffs have included sufficient factual allegations to support a non-speculative claim that they suffered damages as a result of Defendant's creation of a superior class of credit.

In this suit, Plaintiffs seek the customary contractual remedy of expectation damages that would place them in the position they would have been in had Defendant not breached the Agreement. *See Umbach* v. *Carrington Inv. Partners (US) LP*, 851 F.3d 147, 162 (2d Cir. 2017) (explaining that

expectation damages are "the standard remedy for breach of contract," which "is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract"). The Court determines that Plaintiffs have pleaded sufficient facts suggesting they were harmed by Defendant's alleged breach of the Agreement to survive this motion to dismiss.[17]

### 6. The Agreement's No-Action Clause Does Not Defeat Plaintiffs' Standing

As a final challenge to Plaintiffs' breach-of-contract claim, Defendant argues that Plaintiffs lack contractual standing because of the Agreement's no-action clause. (Def. Br. 21-22). The Court finds it clear that the no-action clause does not strip Plaintiffs of standing to bring the claims asserted in this action.

The Agreement contains a no-action clause, which provides that "no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Loan Guaranty … [which rights] may be exercised solely by the Administrative Agent on behalf of the Secured Parties[.]" (Agreement § 8.04(a)). Even under a strict construction of this no-action clause, *see Tchrs. Ins. & Annuity Ass'n of Am.* v. *CRIIMI MAE Servs. Ltd. P'ship*, 481 F. App'x 686, 687 (2d Cir. 2012) (summary order) (noting that no-action

---

[17]    Defendant additionally argues that to the extent Plaintiffs' damages rest on their right to receive collateral proceeds *pari passu* with the Participating Lenders in the event of default, these damages are speculative. (Def. Br. 20). However, Plaintiffs have not pursued this theory of damages in their opposition brief. Thus, the Court does not address it further.

clauses are common and "strictly construed"), Plaintiffs' claims do not fall within its proscription.  As Plaintiffs note, "realization" of collateral refers to the "conversion of noncash assets into cash assets" (Pl. Opp. 18 (quoting *Realization*, BLACK'S LAW DICTIONARY (11th ed. 2019)), which Plaintiffs do not seek in this action.  Furthermore, Plaintiffs are not demanding payment on their loans or seeking to enforce any guaranty under the Agreement; rather, they seek damages and injunctive relief stemming from an allegedly improper transaction.  (*See id.* at 19).  As such, Plaintiffs' contractual claims are not barred by the Agreement's no-action clause.

## C. Plaintiffs Have Adequately Pleaded a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

In the alternative to their breach-of-contract claim, Plaintiffs allege that Defendant breached the implied covenant of good faith and fair dealing that inhered in the Agreement.  (Compl. ¶¶ 51-55).  Defendant moves to dismiss this claim on the grounds that the Agreement expressly permitted the Transaction and that the claim is duplicative of Plaintiffs' breach-of-contract claim.  (Def. Br. 22-23; Def. Reply 9-10).  As the Court will explain, Plaintiffs' claim for breach of the implied covenant of good faith is adequately pleaded and may proceed to discovery as an alternative theory of recovery to their breach-of-contract claim.

### 1. Applicable Law

Under New York law, a duty of good faith and fair dealing is implied in every contract, to the effect that neither party "shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits

36

of the contract." *Thyroff* v. *Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (citation omitted). The implied covenant does not include any term inconsistent with the terms of the contractual relationship, or "create duties which are not fairly inferable from the express terms of that contract." *Interallianz Bank AG* v. *Nycal Corp.*, No. 93 Civ. 5024 (RPP), 1994 WL 177745, at *8 (S.D.N.Y. May 6, 1994); *accord UMB Bank, N.A.* v. *Sanofi*, No. 15 Civ. 8725 (GBD), 2016 WL 4938000, at *6 (S.D.N.Y. Sept. 8, 2016). Nor can it "be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Nasdaq, Inc.* v. *Exch. Traded Managers Grp., LLC*, 431 F. Supp. 3d 176, 252 (S.D.N.Y. 2019) (quoting *Peter R. Friedman, Ltd.* v. *Tishman Speyer Hudson L.P.*, 968 N.Y.S.2d 41, 41 (1st Dep't 2013)). But the implied covenant does include promises that a "reasonable person in the position of the promisee would be justified in understanding were included" in the contract and, when the contract involves the exercise of discretion, a promise "not to act arbitrarily or irrationally in exercising that discretion." *Dalton* v. *Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (citation omitted). Thus, "[a] claim for breach of the covenant of good faith and fair dealing may be brought, if at all, only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." *CSI Inv. Partners II, L.P.* v. *Cendant Corp.*, 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007) (internal quotation marks and citation omitted). "[S]ince there is a presumption that all parties act in good faith, the burden of proving a breach of

the covenant of good faith and fair dealing is on the person asserting the absence of good faith." *Tractebel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (quoting 23 WILLISTON ON CONTRACTS § 63:22 (4th ed. 2006)).

A claim for breach of the implied covenant of good faith and fair dealing must be dismissed as duplicative when a breach-of-contract claim is pleaded on the same facts, *see Harris* v. *Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80-81 (2d Cir. 2002), or when the conduct at issue "is also the predicate for breach of the underlying contract," *Cary Oil Co., Inc.* v. *MG Refin. & Mktg., Inc.*, 90 F. Supp. 2d 401, 419 (S.D.N.Y. 2000). *See also Transcience Corp.* v. *Big Time Toys, LLC*, 50 F. Supp. 3d 441, 451-52 (S.D.N.Y. 2014) ("New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pleaded."). However, when there is a *bona fide* dispute over whether a contract covers the contested issue, a plaintiff may assert a claim for breach of the implied covenant of good faith and fair dealing in the alternative. *See Hard Rock Café Int'l, (USA), Inc.* v. *Hard Rock Hotel Holdings, LLC,* 808 F. Supp. 2d 552, 567 (S.D.N.Y. 2011); *see also Fantozzi* v. *Axsys Techs., Inc.*, No. 07 Civ. 2667 (LMM), 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008) (noting that "[a] claim for breach of contract does not preclude a party from bringing a claim for breach of the implied covenant of good faith and fair dealing when they are brought in the alternative," because the law only precludes a party "from recovering on both theories at the same time").

38

### 2.    Analysis

At the outset, the Court declines to dismiss Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing as duplicative.  It is true that the law precludes a party from simultaneously recovering for a breach of the implied covenant of good faith and fair dealing and for a breach of contract.  *See Hard Rock Café Int'l*, 808 F. Supp. at 567.  But here the Court does not perceive there to be a risk of redundant recoveries, as Plaintiffs' pursuit of an implied-covenant claim is contingent on the Court's determination that the Transaction and Amendments did not violate the express terms of the Agreement — an issue that remains unresolved on this motion.  (Pl. Opp. 23).  In this case, Plaintiffs "[have] asserted a single claim for recovery in the form of a breach of contract claim, presenting its equitable theory of breach of the implied covenant of good faith and fair dealing in the alternative, which the Court finds permissible."  *In re LightSquared Inc.*, 511 B.R. 253, 333 n.119 (Bankr. S.D.N.Y. 2014).

The Court also finds that Plaintiffs have pleaded sufficient facts to make out their implied-covenant claim.  The Complaint alleges that in negotiating the Agreement, Plaintiffs expressly bargained for "first-lien, priority, *pro rata* rights" (Compl. ¶¶ 1, 15), which rights were subverted by Defendant's creation of a new tranche of debt with priority rights senior to those held by Plaintiffs (*id.* at ¶¶ 1, 52).  Plaintiffs further allege that notwithstanding their contractual entitlement to be treated on a *pro rata* basis with other first-lien lenders, Defendant engaged in furtive negotiations with a select few creditors,

manipulated the Agreement to subordinate Plaintiffs' debt without their knowledge, and struck a deal at Plaintiffs' expense.  (*Id.* at ¶¶ 1-3, 53). Plaintiffs ascribe bad faith to the manner in which Defendant exercised its contractual power to amend the Agreement and engage in debt exchanges because the economic reality of the Transaction suggests an intent to harm a subset of first-lien lenders by subordinating their debt.  (*Id.* at ¶¶ 3-5, 54). Indeed, one could reasonably conclude from Plaintiffs' allegations that Defendant systematically combed through the Agreement tweaking every provision that seemingly prevented it from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one.  (*See, e.g.,* Amendment § 1.01 (altering, *inter alia*, the definitions of Acceptable Intercreditor Agreement and Incremental Equivalent Debt); *id.,* § 7.01(l) (removing subordination as an event of default); *id.,* § 8.08 (authorizing the Administrative Agent to enter the PTL Intercreditor Agreement)).  To the extent the letter of the Agreement permitted Defendant to take these actions, Plaintiffs argue that Defendant violated the implied covenant of good faith and fair dealing by offering the PTL Loans to only a subset of first-lien lenders, rather than to all of them on a *pro rata* basis.  (Pl. Opp. 23).  On these allegations, Plaintiffs have adequately alleged that Defendant deprived them of the benefit of their bargain in bad faith.

In reaching this conclusion, the Court is informed by caselaw establishing the principle that "even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to

40

the benefit under [an] agreement." *Richbell Info. Servs., Inc.* v. *Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 587 (1st Dep't 2003) (finding claim for breach of the implied covenant to be viable where defendant invoked its contractually ordained veto power for allegedly illegitimate purpose and in bad faith); *see also Empresas Cablevision, S.A.B. de C.V.* v. *JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631-33 (S.D.N.Y. 2010) (denying motion to dismiss implied-covenant claim where defendant allegedly effectuated forbidden transaction by cloaking assignment of a loan, which required plaintiff's consent, as "participation" transaction, which did not require plaintiff's consent). Assuming the Transaction qualifies as a permissible open-market purchase of the Participating Lenders' loans under Section 9.05(g), Plaintiffs argue that Defendant colluded with a bare majority of lenders to abuse its power to amend the Agreement to create a new class of debt, which maneuver was barred by the previous terms of the Agreement. (Pl. Opp. 21-23). To the extent Plaintiffs seek to pursue their claim for breach of the implied covenant of good faith and fair dealing on this theory, it may proceed.

### D.  Plaintiffs Can Maintain Their Request for Injunctive Relief

Lastly, Defendant argues that Plaintiffs' claim for injunctive relief resting on breach of contract should be dismissed because an injunction is not a separate cause of action. (Def. Br. 23-24). The Court declines to dismiss Plaintiffs' request for a permanent injunction merely because they pleaded it as a separate cause of action for breach of contract as well as in their prayer for relief. *See, e.g.*, *Pace* v. *Schwartz*, 680 F. Supp. 2d 591, 594 (S.D.N.Y. 2010)

41

("The fact that plaintiffs have pleaded their request for injunctive relief as a separate claim rather than as a part of the prayer of relief in no way disentitles them to seek injunctive relief. And since the request for injunctive relief is for the Court, not the jury, there is no potential for confusion arising from its misplacement.").

Defendant is correct when it notes that "[i]n the event that Plaintiffs' underlying claims fail, then the claim for injunctive relief must also fail." (Def. Br. 24). But the Court has not determined that Plaintiffs' underlying claims have failed at the pleading stage. Accordingly, Plaintiffs may continue to pursue their request for a permanent injunction as a remedy for their breach-of-contract claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is DENIED. Defendant is ordered to file an Answer to the Complaint by April 20, 2022. Furthermore, the parties are directed to file a joint status letter and proposed case management plan by May 4, 2022.

The Clerk of Court is directed to terminate the pending motions at docket entries 24 and 33.

SO ORDERED.

Dated:     March 29, 2022
           New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge