# Exhibit 22

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

AG Centre Street Partnership L.P., AG Credit Solutions
Non-ECI Master Fund, L.P., AG Super Fund Master,
L.P., AG SF Master (L), L.P., Contrarian Capital Fund I,
L.P., Contrarian Distressed Debt Fund, L.P., Contrarian
Centre Street Partnership, L.P., Gamut Capital SSB,
LLC, North Star Debt Holdings, L.P., Silver Oak Capital,
L.L.C., Shackleton 2013-III CLO, Ltd., Shackleton 2013-
IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd.,
Shackleton 2015-VII-R CLO, Ltd., Shackleton 2017-XI
CLO, Ltd., Z Capital Credit Partners CLO 2018-1 Ltd.,
and Z Capital Credit Partners CLO 2019-1 Ltd.,

*Plaintiffs*,

v.

Serta Simmons Bedding, LLC, Eaton Vance
Management, Invesco Senior Secured Management, Inc.,
Credit Suisse Asset Management, LLC, Boston
Management and Research, Barings LLC, and
Does 1-50,

*Defendants*.

Index No. _____/2022

**COMPLAINT**

---

Plaintiffs AG Centre Street Partnership L.P., AG Credit Solutions Non-ECI

Master Fund, L.P., AG Super Fund Master, L.P., AG SF Master (L), L.P., and Silver Oak

Capital, L.L.C. (collectively, "Angelo Gordon"), Contrarian Capital Fund I, L.P., Contrarian

Distressed Debt Fund, L.P., and Contrarian Centre Street Partnership, L.P. (collectively,

"Contrarian"), Gamut Capital SSB, LLC, ("Gamut"), Z Capital Credit Partners CLO 2018-1

Ltd. and Z Capital Credit Partners CLO 2019-1 Ltd. (collectively, "Z Capital"), Shackleton

2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd.,

Shackleton 2015-VII-R CLO, Ltd., and Shackleton 2017-XI CLO, Ltd. (collectively,

"Alcentra"), and North Star Debt Holdings, L.P. ("Apollo") (Angelo Gordon, Contrarian,

Gamut, Z Capital, Alcentra, and Apollo, collectively, "Plaintiffs"), by and through their

undersigned attorneys, for their Complaint against defendants Serta Simmons Bedding, LLC

("Serta" or the "Company"), Eaton Vance Management, Invesco Senior Secured

3695764.1

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 3 of 40

Management, Inc., Credit Suisse Asset Management, LLC, Boston Management and Research, Barings LLC, and Does 1-50 (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This Action challenges Defendants' unlawful scheme to rob certain of Serta's lenders, including Plaintiffs, of their bargained-for rights under a credit agreement while providing special benefits to a group of favored lenders who agreed to participate and assist in the scheme.  The consequence has been to transform Plaintiffs from secured first lien lenders to effectively unsecured creditors in a highly distressed company.

2.      Serta, a manufacturer of bedding products, was in financial distress even before the COVID-19 pandemic.  The pandemic simply exacerbated the company's problems, which are ongoing.  In June 2020, Serta undertook a transaction that indisputably and blatantly violated the rights of a significant minority of its existing lenders (the "First Lien Lenders"), including Plaintiffs.

3.      Plaintiffs are First Lien Lenders who collectively own over $600 million of the $1.9 billion in loans (the "First Lien Term Loans") that were outstanding in June 2020 under Serta's First Lien Term Loan Agreement (the "Credit Agreement").  Under the Credit Agreement, "First Lien" meant what it said:  if there is an event of default, the lenders under that agreement, including Plaintiffs, had rights to collateral that were contractually superior to all others.  In addition, a bedrock principle of the Credit Agreement is that the First Lien Lenders share ratably in all payments of principal or interest on their First Lien Term Loans.  Indeed, the proceeds waterfall and *pro rata* sharing are "sacred rights" that are so fundamental that, under the Credit Agreement, the provisions governing these issues cannot be amended without the consent of 100% of the adversely affected lenders, while a simple majority is all that is necessary to amend most other provisions of the agreement.

2

3695764.1

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 4 of 40

4.      On June 8, 2020, Serta announced a recapitalization transaction (the "Unlawful Exchange Transaction") that brazenly upended the priorities under the proceeds waterfall and violated the requirement of *pro rata* sharing.  In the transaction, bare majorities of Serta's first and second lien lenders (the "Favored Lenders") exchanged their loans for special benefits.  The Favored Lenders received more than $850 million in new "super-priority" term loans (the "Priority Term Loans") in exchange for their existing First Lien Term Loans, without Serta paying (or even offering) the same consideration to the other lenders (including Plaintiffs).  Nor did the Favored Lenders offer to share these benefits ratably with the other lenders (including Plaintiffs), despite their obligation to do so under the Credit Agreement.  Due to their new "super-priority" position, the Favored Lenders now claim the right to be paid in full before Plaintiffs and the other First Lien Lenders can receive a penny.  The mechanics of the Unlawful Exchange Transaction were complex, and involved not only numerous amendments to the Credit Agreement, but the execution of a new intercreditor agreement which allegedly binds the Excluded Lenders without their consent.

5.      The following diagram illustrates the sweeping changes to Serta's capital structure produced by the Unlawful Exchange Transaction:

3695764.1

3



6.    The consequence of the Unlawful Exchange Transaction is nothing less than the stripping of Plaintiffs' collateral and right to ratable repayment, for the sole benefit of the Favored Lenders.  Soon after the transaction, and as a result of it, Moody's Investors Service downgraded the credit rating of the First Lien Term Loans from Caa3 to Ca, Moody's second lowest rating, indicating that Moody's believed the First Lien Term Loans to be "highly speculative and with likelihood of being near or in default."  Moody's also noted that the Excluded Lenders "will potentially be left with little or no remaining collateral coverage in Serta Simmons, as well as in a position that is subordinated to new, higher priority debt."  Moody's also said that Serta's *pro forma* capital structure "is not sustainable, and as a result, there is a continued high risk of additional distressed debt exchanges and/or a more comprehensive debt restructuring."  Moody's thus essentially concluded that Serta was insolvent at the time of the Unlawful Exchange Transaction. Moody's has maintained that view, and Plaintiffs' First Lien Term Loans retain these "junk"

4

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 6 of 40

ratings today.  Moreover, Serta faces significant maturities in 2023—including of Plaintiffs'

First Lien Term Loans, as well as of the Favored Lenders' new "super priority" loans—which

Serta will be unable to satisfy in full.  Plaintiffs thus are now "First Lien Lenders" in name

only; in reality, they are subordinated—and likely effectively unsecured—lenders to a

company that is careening head-on into a massive wall of maturities.

7.     To justify their blatant violations of the Credit Agreement, Defendants

claim to rely on a limited exception to the provisions protecting Plaintiffs' "sacred rights"

that permits Serta to make "open market purchases" of First Lien Term Loans on a non-*pro

rata* basis.  But the Unlawful Exchange Transaction was not an "open market purchase."  It

was a wholly private, exclusionary transaction—an exchange, at a substantial premium to

market prices, in which Serta handpicked a group of its lenders (excluding the remainder),

paid for their counsel and negotiated a complex, bespoke transaction memorialized in

multiple agreements running many hundreds of pages.

8.     Indeed, in a case in federal court in which another Excluded Lender

(which is not one of the Plaintiffs here) is challenging the Unlawful Exchange Transaction,

the District Court denied Serta's motion to dismiss the claims, and noted that, "[o]n a plain

reading of the term, the Transaction . . . did not take place in what is conventionally

understood as an 'open market.'"  *LCM XII Ltd.* v. *Serta Simmons Bedding, LLC*, 2022 WL

953109, at *8 (S.D.N.Y. Mar. 29, 2022).  Similarly, in another case involving a similar credit

agreement and transaction structure, this Court ruled that the term "open market purchase"

was ambiguous and therefore denied the defendants' motions to dismiss claims alleging that a

privately negotiated uptier exchange with a group of favored lenders did not qualify as an

"open market purchase."  *See ICG Global Loan Fund 1 DAC* v. *Boardriders Inc.*, Index No.

655175/2020, 2022 WL 10085886, at *9 (Sup. Ct. N.Y. Cnty. Oct. 17, 2022).

3695764.1

9.      As suggested by both this Court's decision in the *Boardriders* case and the District Court's decision in the *LCM* action against Serta, the Unlawful Exchange Transaction was not an "open market" transaction under any plain-English interpretation of that term.  One need look no further than a client memorandum published by counsel for Defendant Serta, the Weil Gotshal firm, which has opined that an "open market" transaction "requir[es] the purchaser to pay a set market price," and "normally, the parties involved . . . are not aware of one another's identity."  Similarly, the Gibson Dunn firm (which was counsel to nearly all of the Favored Lenders in related litigation) notes that an issuer must make a "cash outlay . . . to effect [an open market] purchase," and cautions that "issuers without sufficient cash on hand may not be able to" do so.  In planning and implementing their transactions, Defendants ignored the published views of their own counsel.

10.      To characterize the Unlawful Exchange Transaction as an "open market purchase" would make a mockery of the term, and render meaningless the requirement that all affected lenders approve changes to the *pro rata* treatment provisions of the Credit Agreement.  Indeed, if *this* is an open market purchase, then nearly *any* transaction would be, and the *pro rata* protections of the Credit Agreement are effectively meaningless. But that is neither a logical reading of the term "open market" nor a permissible interpretation of the contract.

11.      Moreover, under the terms of the Credit Agreement, even a true open market purchase—which is not present here—cannot be used to reorder Serta's entire capital structure and strip contractual protections from Plaintiffs and the other First Lien Lenders that did not participate in the Unlawful Exchange Transaction.  As set forth below, the Credit Agreement contains numerous protections against the subordination of the loans held by the First Lien Lenders in the way Serta and the Favored Lenders did it here.  Among them, an agreement to release all or substantially all of the Collateral (except under limited

6

circumstances that do not apply in this context) requires the prior written consent of each

Lender, as does an agreement to release all or substantially all of the value of the guarantees

of the borrower's obligations under the Credit Agreement.  Although the Unlawful Exchange

Transaction *did* reorder the capital structure and strip existing lenders of their protections,

Serta did not seek the requisite consent of each affected lender.  Instead, Serta obtained only

the consent of the Favored Lenders—by offering them consideration Plaintiffs did not

receive.

        12.     Majority lenders cannot be permitted to conspire with borrowers to

bypass critical minority-lender protections which are expressly insulated from majority rule

by requiring consent of *all* affected lenders; otherwise, those protections, which appear in

innumerable agreements, are worthless.  Permitting such a transaction would upend the

lending markets and make it impossible for lenders to price the risk of first lien debt which

could at any time be "primed" by previously *pari passu* debt owned by a mere majority of

lenders under the guise of an "open market purchase."  Plaintiffs therefore bring this action to

require the Favored Lenders to share all the benefits of the Unlawful Exchange Transaction

ratably with them, as required by the Credit Agreement; to obtain a declaration that the

Unlawful Exchange Transaction and the agreements purporting to implement it are invalid;

and to recover damages for the huge injury they have suffered as a result of Serta and the

Favored Lenders' Unlawful Exchange Transaction.

        13.     In addition to robbing Plaintiffs of value through the Unlawful

Exchange Transaction, Serta deprived one Plaintiff, Apollo, of its rights as the purchaser of

$192 million of First Lien Term Loans from a third-party lender.  In March 2020, when

Apollo purchased these loans under the Credit Agreement, it obtained confirmation from

UBS AG, Stamford Branch ("UBS"), administrative agent for the Credit Agreement, that

Apollo was not on the applicable list of Disqualified Institutions (the "DQ List" or the

3695764.1

Case 23-09001 Document 70-18 Filed in TXSB on 02/24/23 Page 9 of 40

"List"), meaning that it could be assigned loans. Serta nonetheless has delayed and interfered with Apollo's efforts to close these loan purchases. As a result of Serta's misconduct, Apollo is now in limbo, saddled with $192 million in First Lien Term Loans that it can neither close on nor dispose of. Accordingly, Apollo seeks a declaration that it is entitled to assignment of its properly and validly purchased loans.

## **PARTIES**

14.     Plaintiffs Silver Oak Capital, L.L.C., AG Credit Solutions Non-ECI Master Fund, L.P., and AG Centre Street Partnership, L.P., affiliates of Angelo, Gordon & Co., L.P., are Delaware limited liability companies and/or limited partnerships with their principal place of business at 245 Park Avenue, New York, NY 10167.

15.     Plaintiffs AG Super Fund Master, L.P. and AG SF Master (L), L.P., affiliates of Angelo, Gordon & Co., L.P., are Cayman Islands limited partnerships with their principal place of business at 245 Park Avenue, New York, NY 10167.

16.     Plaintiffs Contrarian Capital Fund I, L.P., Contrarian Distressed Debt Fund, L.P., and Contrarian Centre Street Partnership, L.P., affiliates of Contrarian Capital Management L.L.C., are Delaware limited partnerships with their principal place of business at 411 West Putnam Avenue, Greenwich, CT 06830.

17.     Plaintiff North Star Debt Holdings, L.P., an affiliate of funds managed by Apollo Global Management, Inc., is a Delaware limited partnership with its principal place of business at 9 West 57th Street, New York, NY 10019.

18.     Plaintiff Gamut Capital SSB, LLC, an affiliate of funds managed by Gamut Capital Management, LP, is a Delaware limited liability company with its principal place of business at 250 West 55th Street, New York, NY 10019.

19.     Plaintiffs Z Capital Credit Partners CLO 2018-1 Ltd. and Z Capital Credit Partners CLO 2019-1 Ltd., affiliates of Z Capital Group L.L.C., are exempted

companies incorporated with limited liability under the laws of the Cayman Islands with their principal place of business at 1330 Avenue of the Americas, 16th Floor, New York, NY 10019.

20.    Plaintiffs Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., and Shackleton 2017-XI CLO, Ltd., affiliates of Alcentra NY, LLC, are Cayman Islands limited liability companies with their principal place of business at 9 West 57th Street, Suite 4920, New York, NY 10019.

21.    Upon information and belief, defendant Serta Simmons Bedding, LLC is a Delaware limited liability company with its principal place of business at 2451 Industry Avenue, Doraville, GA 30360.

22.    Upon information and belief, funds managed by defendant Eaton Vance Management (together with Eaton Vance Management, "Eaton Vance") have participated in the Unlawful Exchange Transaction.  Eaton Vance Management's principal place of business is located at Two International Place, Boston, MA 02110.

23.    Upon information and belief, funds managed by defendant Invesco Senior Secured Management, Inc. (together with Invesco Senior Secured Management, Inc., "Invesco") have participated in the Unlawful Exchange Transaction.  Invesco Senior Secured Management, Inc. is a Delaware corporation with its principal place of business at 1166 Avenue of the Americas, 26th Floor, New York, NY 10036.

24.    Upon information and belief, funds managed by defendant Credit Suisse Asset Management, LLC (together with Credit Suisse Asset Management, LLC, "Credit Suisse") have participated in the Unlawful Exchange Transaction.  Credit Suisse Asset Management, LLC is a Delaware limited liability company with its principal place of business at 11 Madison Avenue, New York, NY 10010.

3695764.1

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 11 of 40

25.     Upon information and belief, funds managed by defendant Boston Management and Research (together with Boston Management and Research, "Boston Management") have participated in the Unlawful Exchange Transaction.  Boston Management's principal place of business is located at 2 International Place, Boston, MA 02110.

26.     Upon information and belief, funds managed by defendant Barings LLC (together with Barings LLC, "Barings") have participated in the Unlawful Exchange Transaction.  Barings LLC is a Delaware limited liability company with its principal place of business at 300 South Tryon Street, Suite 2500, Charlotte, NC 28202.

27.     Does 1-50 are those other Lenders unknown to Plaintiffs who entered into the transaction support agreement described by the Company in its press release dated June 8, 2020, and participated in the Unlawful Exchange Transaction.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over Serta pursuant to CPLR § 301 because, upon information and belief, Serta regularly does business in the State of New York, pursuant to CPLR § 302 because Serta transacts business in the State of New York, and/or pursuant to Section 9.10(b) of the Credit Agreement, under which Serta irrevocably and unconditionally consented to the jurisdiction of this Court for any civil action relating to the Credit Agreement.

29.     This Court has jurisdiction over Eaton Vance pursuant to CPLR § 301 because, upon information and belief, Eaton Vance regularly does business in the State of New York, pursuant to CPLR § 302 because Eaton Vance transacts business in the State of New York, and/or pursuant to Section 9.10(b) of the Credit Agreement, under which Eaton Vance irrevocably and unconditionally consented to the jurisdiction of this Court for any civil action relating to the Credit Agreement.

10

3695764.1

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 12 of 40

30.     This Court has jurisdiction over Invesco pursuant to CPLR § 301 because, upon information and belief, Invesco regularly does business in the State of New York, pursuant to CPLR § 302 because Invesco transacts business in the State of New York and maintains an office at 1166 Avenue of the Americas, 26th Floor, New York, NY 10036, and/or pursuant to Section 9.10(b) of the Credit Agreement, under which Invesco irrevocably and unconditionally consented to the jurisdiction of this Court for any civil action relating to the Credit Agreement.

31.     This Court has jurisdiction over Credit Suisse pursuant to CPLR § 301 because, upon information and belief, Credit Suisse regularly does business in the State of New York, pursuant to CPLR § 302 because Credit Suisse transacts business in the State of New York and maintains an office at Eleven Madison Avenue, New York, NY 10010, and/or pursuant to Section 9.10(b) of the Credit Agreement, under which Credit Suisse irrevocably and unconditionally consented to the jurisdiction of this Court for any civil action relating to the Credit Agreement.

32.     This Court has jurisdiction over Boston Management pursuant to CPLR § 301 because, upon information and belief, Boston Management regularly does business in the State of New York, pursuant to CPLR § 302 because Boston Management transacts business in the State of New York, and/or pursuant to Section 9.10(b) of the Credit Agreement, under which Boston Management irrevocably and unconditionally consented to the jurisdiction of this Court for any civil action relating to the Credit Agreement.

33.     This Court has jurisdiction over Barings pursuant to CPLR § 301 because, upon information and belief, Barings regularly does business in the State of New York, pursuant to CPLR § 302 because Barings transacts business in the State of New York and maintains an office at 340 Madison Avenue, 18th Floor, New York, NY 10173, and/or pursuant to Section 9.10(b) of the Credit Agreement, under which Barings irrevocably and

11

3695764.1

unconditionally consented to the jurisdiction of this Court for any civil action relating to the

Credit Agreement.

34.     This Court has jurisdiction over Does 1-50 pursuant to CPLR § 301

because, upon information and belief, the Favored Lenders regularly do business in the State

of New York, pursuant to CPLR § 302 because the Favored Lenders transact business in the

State of New York, and/or pursuant to Section 9.10(b) of the Credit Agreement, under which

any Lender irrevocably and unconditionally consented to the jurisdiction of this Court for any

civil action relating to the Credit Agreement.

35.     Venue properly lies in New York County pursuant to CPLR § 503

because Plaintiffs reside in New York County and because a substantial part of the events or

omissions giving rise to their claims occurred in New York County, and because pursuant to

Section 9.10(b) of the Credit Agreement, Serta and the Lenders consented to venue in New

York County.

## FACTUAL ALLEGATIONS

36.     Serta is North America's largest bedding manufacturer.  Based in

Atlanta, Serta owns and manages the Serta® and Beautyrest® mattress brands.  Serta today is

the successor to two well-known American brands, Serta and Simmons, which were

combined in 2010 when an investor group that already owned the parent of Serta purchased

Simmons, as Simmons emerged from a Chapter 11 reorganization.  The company's various

brands, which also include the online retailer Tuft & Needle®, are distributed through

national, hospitality, and regional and independent retail channels throughout North America,

as well as directly to consumers.

***The Credit Agreement Requires*** **Pro Rata** ***Payments to First Lien Lenders,***
***Which May Be Circumvented Only with the Consent of All Affected Lenders***

37.     Serta entered into three credit facilities dated as of November 8, 2016,

each of which was executed by Serta and various affiliates and counterparties.  The executed

12

agreements include: (1) the Credit Agreement, which provided for $1.95 billion in First Lien Term Loans; (2) the Second Lien Credit Agreement, which provided for $450 million in Second Lien Term Loans; and (3) a $225 million asset-based revolving credit facility.  The proceeds of these facilities were used, in part, to pay a dividend to Serta's private equity sponsor.

38.     The Credit Agreement includes a waterfall providing for the allocation of collateral proceeds upon an event of default, which includes a bankruptcy, or if the loans are accelerated.  From a lender's perspective, this is among the most critical sections of the Credit Agreement.  Section 2.18(b) of the Credit Agreement, which contains the payment waterfall, provides that after certain expenses are paid, the proceeds of collateral are to be divided *pro rata* among the First Lien Lenders, based on the face amount of their ownership of loans.  This means that all First Lien Lenders share ratably in the available value based on the percentage of the loans that they own.

39.     In addition, all payments of principal and interest must be allocated to First Lien Lenders on a *pro rata* basis, and any First Lien Lender that receives more than its *pro rata* share must pay the excess ratably to the other First Lien Lenders, which is known as "*pro rata* sharing."  Specifically, Section 2.18(c) provides (with emphasis added):

> If any Lender obtains payment . . . in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with Loans of such Class, **then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans of other Lenders of such Class at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such Class ratably** in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class . . . .

40.     The Credit Agreement's amendment provisions, to which all lenders agreed when they acquired the loans, underscore the centrality of the proceeds waterfall in

13

Section 2.18(b) and the *pro rata* sharing provision in Section 2.18(c).  Most provisions in the

Credit Agreement may be amended by "Required Lenders," defined as lenders representing

more than 50% of the outstanding face amount of the loans.  However, a handful of

provisions in the Credit Agreement, often called "sacred rights," may be amended only by

securing "the consent of each Lender directly and adversely affected thereby."  Section

9.02(b)(A).  This unanimity requirement is reserved for the waiver or amendment of the most

important provisions of the agreement, including changes to the interest rate, the maturity

date, and other provisions that are core to protecting a lender's right to be repaid on the terms

upon which it made the original loans.  The proceeds waterfall and *pro rata* distribution and

sharing set forth in Sections 2.18(b) and (c) are among the Credit Agreement's sacred rights,

whose amendment requires consent of "each Lender directly and adversely affected

thereby"—that is, all of the First Lien Lenders.

       41.     Specifically, Section 9.02(b)(A)(6) provides that each affected lender

must approve any agreement that "waives, amends or modifies Sections 2.18(b) or (c) of this

Agreement in a manner that would by its terms alter the *pro rata* sharing of payments

required thereby (except in connection with any transaction permitted under Sections 2.22,

2.23, 9.02(c), and/or 9.05(g) or as otherwise provided in this section 9.02)."  As such, absent

these four enumerated exceptions (which as demonstrated below, do not permit this type of

transaction), the proceeds waterfall and *pro rata* sharing of proceeds may not be modified

absent consent of *all* adversely affected Lenders.

       42.     The Credit Agreement buttresses the inviolability of the sacred rights

provisions, including the proceeds waterfall and *pro rata* sharing requirement, by also

protecting the amendment provisions themselves.  Thus, the Credit Agreement states that no

agreement by the Required Lenders (meaning a mere majority of the First Lien Lenders) may

"change any of the provisions of Section 9.02(a) or Section 9.02(b) or the definition of

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 16 of 40

'Required Lenders' to reduce any voting percentage required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, *without the prior written consent of each Lender*." Section 9.02(b)(B)(1) (emphasis added). In other words, to prevent an end-run around the sacred rights provisions, any amendment of the provisions for amending the sacred rights—including the proceeds waterfall and *pro rata* sharing provisions—also requires the consent of *all* First Lien Lenders.

43.     Section 9.02 also protects the First Lien Lenders by providing that, without the prior written consent of each of them, no agreement shall "release all or substantially all of the Collateral from the Lien granted pursuant to the Loan Documents (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Article 8 or Section 9.22 hereof)" or "release all or substantially all of the value of the Guarantees under the Loan Guaranty (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Section 9.22 hereof)." Section 9.02(b)(B)(3). These provisions protect the First Lien Lenders' collateral from being stripped of its value, which backstops both the loans and the First Lien Term Loan Guaranty Agreement.

***Serta Negotiates the Unlawful Exchange Transaction with Favored Lenders***

44.     Even before the COVID-19 pandemic, Serta had been struggling financially for some time. Indeed, in early March 2020, before the most serious effects of the pandemic began to impact the economy, Serta's First Lien Term Loans were trading at less than fifty cents on the dollar, and its Second Lien Term Loans were trading at less than twenty cents. Its issuer credit rating by S&P was CC, deep into the territory of "junk." Serta was regularly featured on its own page of the industry publication *Reorg Research*, which

15

focuses on companies in distress.  Then came COVID-19, which exacerbated the Company's already difficult circumstances.

45.     In early 2020, Serta and certain of the Plaintiffs began discussing providing additional loans and restructuring their First Lien Term Loans to reduce Serta's indebtedness and interest expense.  On or about April 30, 2020, those parties entered into non-disclosure agreements ("NDAs") with Serta in order to allow them to receive non-public information about the Company so that they could evaluate and negotiate a potential transaction.  The NDAs, which expired on May 29, 2020, also restricted certain of the Plaintiffs from open-market trading in Serta loans.

46.     Serta and certain of the Plaintiffs discussed a transaction whereby those Plaintiffs would lend against certain of Serta's non-collateral assets, which transaction would clearly be permitted by the terms of the Credit Agreement without requiring any amendment.  Neither Serta nor any of the Plaintiffs proposed or discussed a transaction involving an amendment to the Credit Agreement that would have violated the sacred *pro rata* payment rights of the First Lien Term Loans or any other provision of the Credit Agreement.  On June 5, 2020, Serta abruptly ended the parties' negotiations.

47.     On the evening of June 8, 2020, Serta announced in a press release that it had entered into a transaction support agreement with a group of Favored Lenders—holders of a majority of its First Lien and Second Lien Term Loans.  The press release said that the transaction was designed to "*recapitalize* the company" (emphasis added), and made no reference to "open market purchases."  The press release disclosed that Serta and the Favored Lenders were preparing documentation for a transaction that would create:

(a)     $200 million of new money super-priority "first out" debt, funded by the Favored Lenders, which would rank ahead of the existing First Lien Term Loans;

16

(b)      Up to $875 million of super-priority "second out" debt, issued in exchange for First Lien Term Loans and Second Lien Term Loans (defined below) held by the Favored Lenders, which also would rank ahead of the existing First Lien Term Loans; and

(c)      An unspecified amount of capacity to incur still more super-priority debt, which would be "third out" and would also rank ahead of the existing First Lien Term Loans.

48.      The press release did not explain how Serta and the Favored Lenders planned to implement the Unlawful Exchange Transaction.  As Plaintiffs later learned, the Favored Lenders approved amendments to the Credit Agreement and Serta's Second Lien Term Loan Agreement (the "Second Lien Credit Agreement") that (i) authorized the Priority Term Loan Agreement, (ii) ratified the Unlawful Exchange Transaction, and (iii) instructed the administrative agent for the Credit Agreement to enter into a new intercreditor agreement providing for payment subordination of the First Lien Term Loans to the new Priority Term Loans.

49.      Among other things, the amendments approved by the Favored Lenders (but not by other First Lien Lenders, including Plaintiffs) modified the definition of "Incremental Equivalent Debt" permissible under the Agreement to include "Indebtedness issued under the PTL [Priority Term Loan] Credit Agreement . . . which may be senior, *pari passu* or junior in right of payment and/or with respect to security with the Obligations hereunder[.]"  Agreement § 1.01; *see also id.*, § 6.01(z) (allowing Serta to incur Incremental Equivalent Debt).  Notably, such amendments effectively allow *unlimited* additional debt to come in on a "super senior" basis to the First Lien Term Loans.  The amendments also altered Section 8.08 of the Agreement to authorize the Administrative Agent to enter into a separate intercreditor agreement establishing senior payment priority for the PTL Loans.  Agreement

3695764.1

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 19 of 40

§ 8.08(d).  Furthermore, the Amendments added a new subpart to Section 2.11(b), which outlines the circumstances triggering mandatory prepayment of the First Lien Term Loans, and which affirmed that the PTL Loans had rights of payment senior to that of the First Lien Lenders.  Agreement § 2.11(b)(vii).  In addition, the Amendments excised Credit Agreement Section 7.01(l), which designates any subordination of the First Lien Term Loans as an event of default.  Agreement § 7.01(l).

50.     Defendants also excluded the proceeds of the sale of "AI Dream," a joint venture between Serta and King Koil that is one of the "largest players in China's premium mattress market," from the definition of "Prepayment Asset Sale" (which feeds into the mandatory prepayment requirements of the Credit Agreement).  Agreement § 1.01. Accordingly, though Serta disposed of its stake in AI Dream in August 2021, it purportedly is no longer required to apply the substantial net cash proceeds received from that sale to satisfy Plaintiffs' First Lien Term Loans, a direct consequence of the Unlawful Exchange Transaction.

51.     In total, Defendants amended no fewer than two dozen provisions of the Credit Agreement to effect their unlawful scheme.

52.     As Defendants knew and intended, given the condition of Serta's business, this was tantamount to transforming the Excluded Lenders from First Lien Lenders into subordinated unsecured lenders, while allowing other lenders—including Second Lien Lenders—improperly to leapfrog into a new, purportedly "super-priority" position.  Under the new intercreditor agreement, the Priority Term Loan Lenders took over priority rights to repayment from Serta, including with respect to the collateral.  Adding insult to injury, in addition to their "super-senior" priority, the Priority Term Loans issued in exchange for the First Lien Term Loans of the Favored Lenders bear interest at a rate 4.00% per annum higher, or a margin that is more than 100% greater, than the First Lien Term Loans.

18

3695764.1

*Certain of the Plaintiffs Initiate Litigation, and Defendants Refuse to Provide*
*Information About the Unlawful Exchange Transaction Prior to Closing*

53.     Certain of the Plaintiffs filed a Complaint in this Court on June 11,

2020, seeking to enjoin the proposed transaction, under the caption *North Star Debt*

*Holdings, L.P.* v. *Serta Simmons Bedding, LLC*, Index No. 652243/2020.  The Court entered

an Order to Show Cause providing for a temporary restraining order on June 12, 2020, and

held a preliminary injunction hearing on June 16, 2020.

54.     On June 19, 2020, the Court denied the motion for a preliminary

injunction.  The Court ruled that those Plaintiffs had not shown a likelihood of success on

their claims at that juncture based on the available information, and had not established

irreparable harm because money damages were available.

55.     The Unlawful Exchange Transaction closed on June 22, 2020.  Only

after it closed did Defendants provide the Plaintiffs that had sued with certain of the

transaction documents, which demonstrated the mechanics of the transaction, including the

new Priority Term Loan Agreement, as well as the amendments to the existing Credit

Agreement and the new intercreditor agreement.

56.     Pursuant to these agreements, the Favored Lenders exchanged $992

million of First Lien Term Loans for $734 million of new Priority Term Loans (reflecting an

exchange rate of 74%) and $299 million of loans under the Second Lien Credit Agreement

(the "Second Lien Term Loans") for $116 million of new Priority Term Loans (reflecting an

exchange rate of 39%).  Upon an event of default, there now are at least $850 million in new

Priority Term Loans in line ahead of the First Lien Lenders asserting rights to collateral that

is supposed to be distributed *pro rata*.

57.     This does not even take into account the fact that Serta and the Favored

Lenders amended the Credit Agreement, to which the Favored Lenders no longer are parties,

to permit an unlimited amount of additional loans to jump ahead of Plaintiffs' loans.

19

3695764.1

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 21 of 40

Consequently, Plaintiffs, which had been first-lien and first-priority lenders, may well become effectively *fourth* in line (or worse) to collect even a single dollar from Serta.  Given the condition of Serta's business, this effectively transforms Plaintiffs and other First Lien Lenders into unsecured lenders, while other lenders—including current Second Lien Lenders—leapfrog into a new super-priority position.

58.     Moreover, in a transparently punitive measure, as part of the Unlawful Exchange Transaction, Serta added Plaintiffs Apollo, Angelo Gordon, and Gamut to the DQ List not only for the amended Credit Agreement but also for the PTL Credit Facility, barring them from acquiring any interests in those loans.

59.     Shortly after the denial of the motion for a preliminary injunction in the prior action in this Court, investment funds managed by affiliates of LCM Asset Management LLC ("LCM") initiated an action challenging the Unlawful Exchange Transaction in the United States District Court for the Southern District of New York.  After their initial complaint, which named as defendants both Serta and the Favored Lenders, was dismissed for lack of federal subject matter jurisdiction (due to an absence of complete diversity), LCM re-filed its case against Serta alone (the "LCM Action").  On March 29, 2022, United States District Judge Katherine Polk Failla, who was assigned to the LCM Action, denied Serta's motion to dismiss LCM's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  *See LCM XII Ltd.* v. *Serta Simmons Bedding, LLC*, 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022).

60.     Separately, following this Court's denial of the motion for preliminary injunction, the Plaintiffs that had filed that action filed a motion to voluntarily dismiss their prior state court action without prejudice, which this Court granted in December 2020.

20

3695764.1

***The Unlawful Exchange Transaction Does Not Satisfy the "Open Market Purchases"
Exception to the* Pro Rata *Sharing Requirement of the Credit Agreement***

61. Defendants also have argued in the prior action in this Court and the LCM Action that the Unlawful Exchange Transaction complied with the Credit Agreement because it was accomplished through "open market purchases," as purportedly permitted under Section 9.05(g). This assertion makes a mockery of the notion of "open market purchases."

62. The Credit Agreement, prior to the Unlawful Exchange Transaction, recognized that four types of amendments are permissible without unanimous consent, and expressly carved such amendments out of the limitations on amendments to the "sacred rights" provisions:

(a)   Section 2.22 provides for the **issuance of incremental additional loans** and Section 2.23 provides for the **extension of the maturity of existing loans**. Both sections, however, provide that the incremental or extended loans (as the case may be) must be either *pari passu* with—i.e., have no greater right to receive the collateral proceeds—or junior to the existing loans. Section 2.23 also requires that any extended loan be offered to each of the First Lien Lenders on the same terms, and made available on a *pro rata* basis.

(b)   Section 9.02(c) permits **refinancing or replacement of existing loans**. Like Sections 2.22 and 2.23, this provision, too, requires that any replacement loans be *pari passu* with or junior to existing loans.

(c)   Finally, Section 9.05(g) allows a First Lien Lender to assign its loans on a non- *pro rata* basis in certain limited circumstances through either a **Dutch Auction or an open market purchase**.

63. In the litigation that has occurred to date, Defendants have not purported to justify the Unlawful Exchange Transaction under any of the first three

provisions, and have asserted only that the transaction constitutes "open market purchases" which would be permitted under Section 9.05(g).

64.     The Unlawful Exchange Transaction, however, does not remotely resemble an open market purchase.  Rather, Serta dealt directly and in private with a bare majority of its existing first and second lien lenders (excluding the remainder) who participated in an exchange that required the execution of voluminous documentation— including (1) a new Priority Term Loan Agreement, which is over 400 pages long; (2) amendments to the Credit Agreement and Second Lien Term Loan Agreement, each of which is over 200 pages long; and (3) a new intercreditor agreement with the agent for the Priority Term Loan Agreement that subordinated other lenders holding *pari passu* loans.

65.     To interpret the Unlawful Exchange Transaction as an open market purchase would allow nearly *any* transaction to be considered an open market purchase, capable of circumventing the stringent *pro rata* payment requirements and the associated "sacred rights" protections.  Indeed, in Serta's own words, the Unlawful Exchange Transaction constituted a "*recapitaliz[ation]* of the company."  Permitting a wholesale recapitalization of the company (with participation only open to a majority of the Lenders, and excluding the remainder) to qualify as a purported open market purchase would allow the limited exception to swallow the rule entirely.

66.     Defendants cannot point to a *single* comparable precedent transaction that has qualified as an "open market purchase."  In their pleadings in the prior case in this Court and in the LCM Action, Defendants have cited a handful of transactions as purportedly adopting their contorted view of "open market purchases," but such transactions involved *solely new money* loans.  Plaintiffs do not dispute that the new money aspect of the Unlawful Exchange Transaction was permitted, since new money loans could be given priority without a unanimous vote.  The non-*pro rata* payment of the Favored Lenders' First Lien Term Loans

22

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 24 of 40

using new Priority Term Loans violated the Credit Agreement's requirement that all First

Lien Term Loans share ratably in payments. None of the so-called precedent transactions

cited by Defendants included an exchange of existing loans on a non-*pro rata* basis.

67.    Notably, in denying Serta's motion to dismiss the LCM Action, Judge

Failla rejected the company's view that, on its face, the Unlawful Exchange Transaction

involved an "open market purchase" that would be an exception to the *pro rata* sharing

requirement. She held that "at a minimum," the term "open market purchase" is "ambiguous

in this context." *LCM*, 2022 WL 953109, at *7. Judge Failla went on to conclude that "[o]n

a plain reading of the term, the [Unlawful Exchange] Transaction depicted in the Complaint

did not take place in what is conventionally understood as an 'open market.'" *Id.* at *8. For

this reason, among others, she denied Serta's motion to dismiss LCM's claims challenging

the non-*pro rata* treatment of First Lien Lenders other than the Favored Lenders. *Id.*

68.    In the *Boardriders* case, this Court also concluded that the term "open

market purchase" was ambiguous and declined to dismiss a challenge to a similar "uptier

transaction" engineered by Boardriders Inc. and a select group of its lenders. *See ICG Global

Loan Fund 1 DAC* v. *Boardriders Inc.*, Index No. 655175/2020, 2022 WL 10085886 (Sup.

Ct. N.Y. Cnty. Oct. 17, 2022).

***The Unlawful Exchange Transaction Violates the
Payment Waterfall and* Pro Rata *Sharing Provision***

69.    Beyond the fact that the Unlawful Exchange Transaction was not a

permitted open market purchase, the Credit Agreement does not permit an amendment that

would prioritize repayment of the First Lien Term Loans held by some lenders over those of

others. However, by authorizing a new Priority Intercreditor Agreement that granted

Defendants "super-priority" status with respect to loans issued in exchange for their First

Lien Term Loans, Defendants used their position as majority lenders to illegally usurp the

sacred rights held by *each* lender.

3695764.1

Case 23-09001  Document 70-18  Filed in TXSB on 02/24/23  Page 25 of 40

70.     It is fundamental that a party may not lawfully do indirectly that which is unlawful to be done directly under a contract.  Section 2.18(b) of the Credit Agreement, which contains the payment waterfall, provides that after certain expenses are paid, the proceeds of collateral are to be divided *pro rata* among the First Lien Lenders, based on the face amount of their loans and other obligations.  This means that all First Lien Lenders share ratably in the available value based on the percentage of the loans that they own, and no First Lien Lender (or group of such lenders) has a superior right to the collateral over any other(s). Thus, Section 2.18(b) provides:

> Subject in all respects to the provisions of each applicable Intercreditor Agreement, all proceeds of Collateral received by the Administrative Agent while an Event of Default exists and all or any portion of the Loans have been accelerated hereunder pursuant to Section 7.01, shall be applied, first, to the payment of all costs and expenses then due incurred by the Administrative Agent in connection with any collection, sale or realization on Collateral or otherwise in connection with this Agreement, any other Loan Document or any of the Secured Obligations, including all court costs and the fees and expenses of agents and legal counsel, the repayment of all advances made by the Administrative Agent hereunder or under any other Loan Document on behalf of any Loan Party and any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document, second, on a pro rata basis, to pay any fees, indemnities or expense reimbursements then due to the Administrative Agent (other than those covered in clause first above) from the Top Borrower constituting Secured Obligations, ***third, on a pro rata basis in accordance with the amounts of the Secured Obligations (other than contingent indemnification obligations for which no claim has yet been made) owed to the Secured Parties on the date of any such distribution, to the payment in full of the Secured Obligations***, fourth, as provided in each applicable Intercreditor Agreement, and fifth, to, or at the direction of, the Top Borrower or as a court of competent jurisdiction may otherwise direct.  (emphasis added)

71.     As with the *pro rata* sharing provision, Section 2.18(b) of the Credit Agreement is treated as a "sacred" right, and may not be amended absent the consent of all adversely affected First Lien Lenders.

72.     To carry out the Unlawful Exchange Transaction, however, Defendants, by a mere majority vote, amended the Credit Agreement to permit Priority Term

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 26 of 40

Loans pursuant to a new Priority Intercreditor Agreement that was never before contemplated.  This agreement threw out the Credit Agreement's *pro rata* distribution requirement and replaced it with a new, multi-tier "waterfall" in which, in the event of a default, more than $850 million would be paid to holders of the Priority Term Loans issued in exchange for First Lien Term Loans before a single penny is paid to Plaintiffs and the other First Lien Lenders on account of the same First Lien Term Loans.

73.    While Serta has protested that the payment waterfall found in Section 2.18 was not formally amended by elevating the First Lien Term Loans of the Favored Lenders ahead of all others through a new "super-priority" term loan, as a practical matter, the Unlawful Exchange Transaction has effected just such an amendment and, in so doing, radically reordered the waterfall.  As this Court held in its decision in *Boardriders*, it is axiomatic that contracts entered into at the same time, in the context of the same transaction, should be read together as one instrument, and here—as there—these contract amendments, read together, entirely vitiate Plaintiffs' sacred rights to *pro rata* treatment.

74.    Serta neither obtained nor even sought the requisite consent of any First Lien Lenders other than the Favored Lenders, who all are beneficiaries of the new super-priority status in the new waterfall.  Defendants thus clearly have done indirectly what they were not permitted to do directly under the Credit Agreement—namely, provide for the payment of the First Lien Term Loans previously held by the Favored Lenders ahead of all other First Lien Lenders.

75.    The Favored Lenders also violated the *pro rata* sharing provision by failing to share *pro rata* with the Excluded Lenders the benefits they received through the Unlawful Exchange Transaction, as required by Section 2.18(c) of the Credit Agreement.

3695764.1

***The Unlawful Exchange Transaction Violates the Credit
Agreement by Stripping Plaintiffs' Loans of Their Collateral and Value***

76.     The Unlawful Exchange Transaction also violates the Credit
Agreement because it improperly strips Plaintiffs' loans of their collateral and value.
Sections 9.02(b)(B)(2) and (3) of the Credit Agreement provide that no amendment to the
Credit Agreement shall "release all or substantially all of the Collateral from the Lien granted
pursuant to the Loan Documents," or "release all or substantially all of *the value of* the
Guarantees, without the prior written consent of each" First Lien Lender.

77.     By placing over $1 billion in Priority Term Loans ahead of the
guarantees of the First Lien Term Loans, the Unlawful Exchange Transaction released all or
substantially all of the collateral and of *the value of* the guarantees that protected the First
Lien Lenders.  The notion that, in the event of a default, Serta could make good on the $1
billion in Priority Term Loans and also settle its debts to Plaintiffs is fanciful.  Thus, the
collateral and guarantees of the First Lien Term Loans no longer have any value.  Because
Defendants did not obtain—or even request—Plaintiffs' consent before releasing the value of
such guarantees, they violated Sections 9.02(b)(B)(2) and (3) of the Credit Agreement.

***Serta Improperly Interfered with Apollo's Purchase of First Lien Term Loans***

78.     The Unlawful Exchange Transaction also came on the heels of Serta's
improper interference with Apollo's legitimate purchases of First Lien Term Loans beginning
in March 2020.  As set forth in more detail below, Serta improperly and unjustifiably blocked
the assignment of loans to Apollo in further support of its strategy to deprive Plaintiffs of
their lawful entitlements under the Credit Agreement.

79.     Section 9.05 of the Credit Agreement grants each of the First Lien
Lenders the right to transfer its rights and obligations under the Credit Agreement to "Eligible
Assignees," broadly defined to include any fund that invests in loans, such as Apollo.

26

3695764.1

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 28 of 40

80.     Such a transfer could occur either as an assignment, whereby a purchaser becomes a First Lien Lender of record and is entitled to full rights under the Credit Agreement (including voting and economic rights), or as a participation, whereby a purchaser does not become a First Lien Lender of record but acquires economic rights and limited voting rights indirectly through an existing First Lien Lender, which remains the First Lien Lender of record.

81.     The Credit Agreement restricted a First Lien Lender's ability to transfer its rights and obligations to a specified list of Disqualified Institutions.  Disqualified Institutions included entities named as such in writing by Serta prior to closing and placed on a so-called "DQ List."

82.     The DQ List is largely fixed as of the closing date.  An entity may be added to the DQ List only in limited instances, including where it is an affiliate of an entity already on the DQ List, a competitor of Serta, or an affiliate of a competitor of Serta.  Upon request, Serta must provide the DQ List to a Lender, who may share it with a proposed assignee.

83.     When an interest in loans under the Credit Agreement is assigned, the process begins with the execution of a trade confirmation between the assignor and the assignee.  The parties then execute an assignment agreement and deliver a copy to UBS, as administrative agent.  UBS then seeks Serta's consent to the assignment, which, as is common, may not be unreasonably withheld, conditioned, or delayed.  Serta is deemed to have consented to an assignment if it does not object in writing within 15 business days.  The only valid ground for refusing to consent to an assignment is that it violates the Credit Agreement—for example, because the proposed assignee is on the DQ List.

84.     Once in receipt of an executed assignment agreement and Serta's consent, among other things, UBS then must promptly accept the assignment agreement and

27

record the assignment in its register of Lenders and their assignees.  The assignment then becomes effective.

85.     Apollo originally purchased First Lien Term Loans under the Credit Agreement at the time the Credit Agreement closed in 2016.  Apollo continued to hold those loans until May 23, 2018.

86.     On March 12, 2020, Apollo executed trade confirmations with Barclays Bank PLC ("Barclays") to purchase additional First Lien Term Loans.  Although Apollo had previously owned First Lien Term Loans under the Credit Agreement, it nevertheless sought the necessary confirmation from UBS that Apollo was not on the DQ List.  UBS twice confirmed that it was not—once orally on March 13, 2020, and again in writing on March 17, 2020.  Notably, Apollo is not an affiliate of any entity already on the DQ List, nor is it a competitor or an affiliate of a competitor of Serta.

87.     On March 20, 2020, Apollo submitted executed assignment agreements with Barclays to UBS, which promptly requested Serta's consent.  Serta did not object by April 14, and pursuant to the Credit Agreement consent was deemed effective as of that date.

88.     Yet the trade did not settle.  Apollo and its counterparties repeatedly contacted UBS to inquire why the trades were not settling, despite the satisfaction of all requirements for an assignment under the Credit Agreement.  UBS told Apollo that it had followed up with Serta on several occasions, but received no response as to when Serta would indicate its position on the assignments.  UBS also confirmed to Apollo several times in mid-April that it was not on the DQ List.

89.     On April 24, 2020, Serta represented to UBS that the reason for its delay in providing borrower's consent was difficulty in obtaining the necessary signatures

3695764.1

Case 23-09001 Document 70-18 Filed in TXSB on 02/24/23 Page 30 of 40

due to the effects of the COVID-19 pandemic. Serta further represented to UBS that it would approve the transactions, and UBS relayed that representation to Apollo.

90.     A few days later, UBS executed the assignment agreements. The same day, however, UBS retracted its executions as having occurred "in error." UBS provided no further explanation.

91.     On April 30, 2020, as set forth above, Apollo agreed to an NDA and one-month restriction period to explore providing new money and liability management solutions to Serta. Serta acknowledged Apollo's loan holdings by countersigning the NDA, which referenced Apollo's $192 million position, which included the assignments submitted to UBS on March 20, 2020.

92.     On May 1, 2020, Serta dropped the pretext that its delays were due to COVID-19 and purported to *reject* Apollo's assignments, saying Serta would consent to the assignments *only if* Apollo made a new money investment in Serta.

93.     Serta lacks any lawful reason to withhold its consent to the Apollo assignment or otherwise refuse to recognize it as valid. Moreover, consent was effectively given as of April 14, 2020; UBS had confirmed that Apollo was not on the DQ List; and Serta had confirmed just days before that it would approve the trades, without timely raising any basis for objecting to the trades (and there is none).

94.     Later in May 2020, Barclays, as an existing Lender seeking to assign its interests to Apollo, asked for a copy of the DQ List. UBS declined to provide the list to either Apollo or Barclays—an existing lender with a contractual right to review its contents.

95.     Indeed, UBS acknowledged that it was obligated to provide Barclays with the DQ List, but that Serta did not agree with its contents and UBS was "working on it" with them. Serta plainly was attempting to manufacture a reason to withhold consent to the Apollo assignments when none existed.

3695764.1

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 31 of 40

96.     As a result of Serta's interference with its assignments, Apollo has been unable to settle approximately $192 million in face amount of purchases of Serta loans. Given the Unlawful Exchange Transaction, Apollo will be unable to exit its positions without significant losses, caused by Serta's willful misconduct.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**(Declaratory Judgment That the Unlawful Exchange Transaction and All Agreements Purporting to Implement It Are Invalid – By All Plaintiffs Against Serta)**

97.     Plaintiffs reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

98.     Plaintiffs and Serta are parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

99.     This Court is authorized to issue a declaratory judgment as to the rights and other legal relations of Plaintiffs and Serta pursuant to CPLR § 3001.

100.     The proper interpretation and application of the Credit Agreement, including whether the Unlawful Exchange Transaction and the agreements purporting to implement it are permissible and valid, is a justiciable, present, and actual controversy among the parties.

101.     The Unlawful Exchange Transaction and the agreements purporting to implement it violate the express terms of the Credit Agreement as well as the implied covenant of good faith and fair dealing and are therefore invalid and *void ab initio*, or in the alternative are voidable and should be rescinded (or Plaintiffs should be awarded rescissionary damages).  Plaintiffs retain the rights they had prior to the Unlawful Exchange Transaction, and they are entitled to a declaratory judgment to that effect.

3695764.1

## SECOND CAUSE OF ACTION
### (Breach of Contract, Section 2.18 –
### By All Plaintiffs Against Serta)

102.     Plaintiffs reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

103.     Plaintiffs and Serta are parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

104.     Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

105.     Serta, by contrast, has breached the express terms of the Credit Agreement by entering into the Unlawful Exchange Transaction, which breaches the proceeds waterfall and *pro rata* sharing provisions of Section 2.18.

106.     As a consequence of Serta's material breaches, Plaintiffs have been deprived of their bargain as First Lien Lenders—namely, the right to parity of treatment with loans of the same class.  Moreover, the Unlawful Exchange Transaction will result in the Favored Lenders receiving payment of a greater proportion of the aggregate amount of their loans and accrued interest than the proportion received by Plaintiffs and other First Lien Lenders.  As a result, the loans held by Plaintiffs have lost significant value and Plaintiffs have therefore been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing –
### By All Plaintiffs Against Serta)

107.     Plaintiffs reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

108.     Plaintiffs and Serta are parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

31

3695764.1

109.    Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

110.    The Unlawful Exchange Transaction has destroyed Plaintiffs' rights to receive the fruits of the Credit Agreement, including by stripping them of the value of their guarantees and altering the proceeds waterfall and *pro rata* treatment provisions of the Credit Agreement without their consent, in violation of the implied covenant of good faith and fair dealing.

111.    Serta's actions in pursuing the Unlawful Exchange Transaction have disregarded Plaintiffs' rights and have not been in good faith.  Indeed, in the LCM Action, Judge Failla also denied Serta's motion to dismiss LCM's claim for a violation of the covenant of good faith and fair dealing, holding that even if the Unlawful Exchange Transaction was permitted by the Credit Agreement, the effective subordination of the LCM's loans (like Plaintiffs' here) is such a departure from the intended purpose of the Credit Agreement as to be a potential violation of the covenant.  In so holding, Judge Failla observed that "one could reasonably conclude from Plaintiff's allegations that Defendant [Serta] systematically combed through the [First Lien Credit] Agreement tweaking every provision that seemingly prevents it from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one."

112.    The loans that Plaintiffs hold have lost significant value as a result of Serta's bad faith actions.

113.    Plaintiffs therefore should be awarded damages in an amount to be proven at trial.

3695764.1

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 34 of 40

## FOURTH CAUSE OF ACTION
### (Breach of Contract, Section 9.02 – By All Plaintiffs Against Serta)

114.    Plaintiffs reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

115.    Plaintiffs and Serta are parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

116.    Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

117.    Serta breached the express terms of the Credit Agreement by entering into the Unlawful Exchange Transaction, in violation of Sections 9.02(b)(B)(2) and (3), which, without the First Lien Lenders' consent, releases all or substantially all of the collateral from the lien granted pursuant to the First Lien Lenders and of the value of their guarantees, including under the First Lien Term Loan Guaranty Agreement.

118.    Plaintiffs therefore should be awarded damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Declaratory Judgment of Valid Assignment – By Apollo Against Serta)

119.    Plaintiffs reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

120.    As alleged herein, Apollo purchased First Lien Term Loans in legitimate transactions for which it is entitled to assignment of the loans.  All requirements for assignment under the Credit Agreement have been satisfied.

121.    Nevertheless, Serta has wrongfully prevented execution of the assignment in contravention of the Credit Agreement.  It continues to do so to this day.

33

3695764.1

Case 23-09001  Document 70-18  Filed in TXSB on 02/24/23  Page 35 of 40

122.    The dispute between the parties is therefore ripe for adjudication by way of declaratory judgment in order to establish the rights and obligations of the parties.

123.    For the foregoing reasons, Apollo is entitled to a declaratory judgment that it has a valid assignment of the $192 million in face amount First Lien Term Loans that it has purchased.

### SIXTH CAUSE OF ACTION
**(Declaratory Judgment That the Unlawful Exchange Transaction
and All Agreements Purporting to Implement It Are Invalid –
By All Plaintiffs Against the Favored Lenders)**

124.    Plaintiffs reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

125.    Plaintiffs and the Favored Lenders are or were parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

126.    This Court is authorized to issue a declaratory judgment as to the rights and other legal relations of Plaintiffs and the Favored Lenders pursuant to CPLR § 3001.

127.    The proper interpretation and application of the Credit Agreement, including whether the Unlawful Exchange Transaction and the agreements purporting to implement it are permissible and valid, is a justiciable, present, and actual controversy between Plaintiffs and the Favored Lenders.

128.    The Unlawful Exchange Transaction and the agreements purporting to implement it violate the express terms of the Credit Agreement as well as the implied covenant of good faith and fair dealing and are therefore invalid and *void ab initio*, or in the alternative are voidable and should be rescinded (or Plaintiffs should be awarded rescissionary damages).  Plaintiffs retain the rights they had prior to the Unlawful Exchange Transaction, and they are entitled to a declaratory judgment to that effect.

3695764.1

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 36 of 40

## SEVENTH CAUSE OF ACTION
### (Breach of Contract, Section 2.18 –
### By All Plaintiffs against the Favored Lenders)

129.    Plaintiffs reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

130.    Plaintiffs and the Favored Lenders are or were parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

131.    Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

132.    The Favored Lenders, by contrast, have breached the express terms of the Credit Agreement by entering into the Unlawful Exchange Transaction, which breaches the proceeds waterfall and *pro rata* sharing provisions of Section 2.18.

133.    As a consequence of the Favored Lenders' material breaches, Plaintiffs have been deprived of their bargain as First Lien Lenders—namely, the right to parity of treatment with loans of the same class.  Moreover, the Unlawful Exchange Transaction will result in the Favored Lenders receiving payment of a greater proportion of the aggregate amount of their loans and accrued interest than the proportion received by Plaintiffs and other First Lien Lenders.  As a result, the loans held by Plaintiffs have lost significant value and Plaintiffs have therefore been damaged.

134.    In addition to other relief, Plaintiffs are entitled to the consideration provided by Section 2.18(c) of the Credit Agreement—that is, the Favored Lenders must be required to purchase (for cash at face value) participations in the First Lien Term Loans held by Plaintiffs and the other holders of First Lien Term Loans so that the benefit of the Unlawful Exchange Transaction are shared by the lenders ratably in accordance with the

35

3695764.1

aggregate amount of principal of and accrued interest on their respective loans. Plaintiffs also should be awarded damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing – By All Plaintiffs Against the Favored Lenders)

135.    Plaintiffs reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

136.    Plaintiffs and the Favored Lenders are or were parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

137.    Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

138.    The Unlawful Exchange Transaction has destroyed Plaintiffs' rights to receive the fruits of the Credit Agreement, including by stripping them of the value of their guarantees and altering the proceeds waterfall and *pro rata* treatment provisions of the Credit Agreement without their consent, in violation of the implied covenant of good faith and fair dealing.

139.    The Favored Lenders' actions in pursuing the Unlawful Exchange Transaction have disregarded Plaintiffs' rights and have not been in good faith. Indeed, in the LCM Action, Judge Failla denied a motion to dismiss LCM's claim for a violation of the covenant of good faith and fair dealing, holding that even if the Unlawful Exchange Transaction was permitted by the Credit Agreement, the effective subordination of LCM's loans (like Plaintiffs' here) is such a departure from the intended purpose of the Credit Agreement as to be a potential violation of the covenant.

3695764.1

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 38 of 40

140. The loans that Plaintiffs hold have lost significant value as a result of the Favored Lenders' bad faith actions.

141. Plaintiffs therefore should be awarded damages in an amount to be proven at trial.

### NINTH CAUSE OF ACTION
### (Breach of Contract, Section 9.02 – By All Plaintiffs Against the Favored Lenders)

142. Plaintiffs reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

143. Plaintiffs and the Favored Lenders are or were parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

144. Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

145. The Favored Lenders breached the express terms of the Credit Agreement by entering into the Unlawful Exchange Transaction, in violation of Sections 9.02(b)(B)(2) and (3), which, without the First Lien Lenders' consent, releases all or substantially all of the collateral from the lien granted pursuant to the First Lien Lenders and of the value of their guarantees, including under the First Lien Term Loan Guaranty Agreement.

146. Plaintiffs therefore should be awarded damages in an amount to be proven at trial.

3695764.1

37

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 39 of 40

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)    Requiring the Favored Lenders to specifically perform their obligations under Section 2.18(c) of the Credit Agreement by purchasing (for cash at face value) participations in the First Lien Term Loans held by Plaintiffs and the other holders of First Lien Term Loans to the extent necessary so that the benefits of the Unlawful Exchange Transaction are shared by the lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective loans;

(b)    Awarding damages to Plaintiffs in an amount to be proven at trial for all economic, monetary, actual, consequential, and compensatory damages that Plaintiffs suffered as a result of Serta's breach of contract and other misconduct, together with pre- and post-judgment interest at the maximum rate allowable by law;

(c)    Awarding damages to Plaintiffs in an amount to be proven at trial for all economic, monetary, actual, consequential, and compensatory damages that Plaintiffs suffered as a result of the Favored Lenders' breach of contract and other misconduct, together with pre- and post-judgment interest at the maximum rate allowable by law;

(d)    Declaring that the Unlawful Exchange Transaction and all agreements purporting to implement it are invalid and *void ab initio*, and that Plaintiffs retain the absolute and relative rights they had prior to the transaction, or in the alternative that Plaintiffs are entitled to rescission or rescissionary damages;

38

3695764.1

Case 23-09001   Document 70-18   Filed in TXSB on 02/24/23   Page 40 of 40

(e)    Declaring that Apollo has a valid assignment of the $192 million in face

amount of First Lien Term Loans that it purchased;

(f)    Awarding Plaintiffs the costs of their suit, including reasonable attorneys' fees

and expenses; and

(g)    Awarding such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        November 3, 2022

                                  FRIEDMAN KAPLAN SEILER &
                                    ADELMAN LLP


                                  s/ Eric Seiler
                                  _____
                                  Lawrence S. Robbins
                                  Eric Seiler
                                  Anne E. Beaumont
                                  Blair R. Albom
                                  7 Times Square
                                  New York, NY 10036-6516
                                  (212) 833-1100
                                  lrobbins@fklaw.com
                                  eseiler@fklaw.com
                                  abeaumont@fklaw.com
                                  balbom@fklaw.com

                                  *Attorneys for Plaintiffs*

39

3695764.1