# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** | § | **Case No. 23-90020 (DRJ)** |
| *et al.,* | § | |
| | § | |
| Debtors.[1] | § | **(Joint Administration Requested)** |
| | § | |
| -------------------------------------------------------- | § | |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** | § | **Adversary Proc. No. 23-09001** |
| *et al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| **AG CENTRE STREET PARTNERSHIP** | § | |
| **L.P.,** *et al.,* | § | |
| | § | |
| Defendants. | § | |
| -------------------------------------------------------- | § | |

## LENDER PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); Serta Simmons Bedding Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); Serta Simmons Bedding Hospitality, LLC (2016); Serta Simmons Bedding Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); Serta Simmons Bedding Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

**This motion seeks an order that may adversely affect you. If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on March 28, 2023 at 9:00 AM CT in Courtroom 400, 515 Rusk, Houston, TX 77002. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click on Judge Jones's home page. The meeting code is "judgejones." Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jones's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ......................................................................................5

LEGAL STANDARD ............................................................................................5

ARGUMENT .........................................................................................................5

I.    Plaintiffs Are Entitled To A Declaration That The Transaction Complied With
      The Non-PTL Term Loan Agreement ...........................................................6

      A.    The Amendments To The Non-PTL Term Loan Agreement Did Not
            Require Unanimous Consent. ................................................................8

      B.    The Non-PTL Term Loan Agreement Unambiguously Permitted The
            Transaction..........................................................................................11

            1.    The Transaction Did Not Violate The Waterfall Or Pro Rata Sharing
                  Provisions Of The Non-PTL Term Loan Agreement. ..............................11

            2.    The 2020 Transaction Did Not Release The Loan's Collateral Value Or
                  The Value Of The Guarantees. ..............................................................13

            3.    The 2020 Transaction Was An Open Market Purchase Under The Non-
                  PTL Term Loan Agreement....................................................................14

            4.    Written Amendments To The Non-PTL Term Loan Agreement Ratified
                  The Open Market Purchase Component Of The 2020 Transaction..........22

      C.    Even If The Term "Open Market Purchase" Were Ambiguous, The
            Evidence Presented Establishes That The Non-PTL Term Loan Agreement
            Permitted The 2020 Transaction...........................................................24

II.   Plaintiffs Are Entitled To A Declaration That They Did Not Violate The Implied
      Covenant Of Good Faith And Fair Dealing.......................................................24

      A.    Defendants' Implied Covenant Theory Is Duplicative Of Their Breach Of
            Contract Claim And Can Impose No Independent Obligations............................25

      B.    Lender Plaintiffs Did Not Deprive Defendants Of Bargained-For Benefits..........26

CONCLUSION......................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*260-261 Madison Ave., LLC v. Bower Monte & Greene, P.C.*,
137 A.D. 3d 457 (N.Y. App. Div. 2016) ...............................................................16

*Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*,
2021 WL 3619753 (Sup. Ct. N.Y. Cnty. Aug. 16, 2021) ........................................11

*Black Bull Contracting, LLC v. Indian Harbor Ins. Co.*,
135 A.D.3d 401 (N.Y. App. Div. 2016) ................................................................16

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011)........................................................................................16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..........................................................................................5

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*,
70 N.Y.2d 382 (N.Y. 1987) ..............................................................................25

*Compagnie Financière de CIC et de l'Union Européenne v. Merrill Lynch,
Pierce, Fenner & Smith Inc.*,
232 F.3d 153 (2d Cir. 2000)..........................................................................5, 24

*Dallas Cnty. v. Com. Union Assur. Co.*,
286 F.2d 388 (5th Cir. 1961) ............................................................................17

*Dalton v. Educ. Testing Serv.*,
87 N.Y.2d 384 (N.Y. 1995) ..........................................................................24, 25

*Dipizio Constr. Co. v. Niagara Frontier Transp. Auth.*,
107 A.D.3d 1565 (N.Y. App. Div. 2013) ............................................................26

*Donohue v. Cuomo*,
38 N.Y.3d 1 (N.Y. 2022) ...................................................................................7

*Fesseha v. TD Waterhouse Inv. Servs.*,
305 A.D.2d 268 (N.Y. App. Div. 2003) ..............................................................26

*Fox Film Corp. v. Springer*,
273 N.Y. 434 (N.Y. 1937) ................................................................................18

*Greenfield v. Philles Records*,
98 N.Y.2d 562 (N.Y. 2002) ................................................................................7

ii

*Hicks v. Charles Pfizer & Co Inc.*,
  466 F. Supp. 2d 799 (E.D. Tex. 2005) ...................................................................17

*ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*,
  2022 WL 10085886 (Sup. Ct. N.Y. Cnty. Oct. 17, 2022) ...........................10, 20, 28

*In re iHeartMedia, Inc.*,
  597 B.R. 339 (Bankr. S.D. Tex. 2019) ....................................................................6

*J.P. Morgan Inv. Mgmt. Inc. v. AmCash Grp., LLC*,
  106 A.D.3d 559 (N.Y. App. Div. 2013) ...................................................................21

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*,
  424 F.3d 195 (2d Cir. 2005) ...................................................................................5

*Last Time Beverage Corp. v. F&V Distrib. Co., LLC*,
  98 A.D.3d 947 (N.Y. App. Div. 2012) .....................................................................24

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
  595 F.3d 458 (2d Cir. 2010) ...................................................................................18

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
  2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ..................................................... *passim*

*Lee v. Offshore Log. & Transp., L.L.C.*,
  859 F.3d 353 (5th Cir. 2017) .................................................................................17

*Lehman Bros. Int'l (Europe) v. AG Fin. Prods., Inc.*,
  60 Misc.3d 1214(A) (Sup. Ct. N.Y. Cnty. 2018) ......................................................18

*MBIA Ins. Corp. v. Merrill Lynch*,
  81 A.D.3d 419 (N.Y. App. Div. 2011) .....................................................................25

*In re New York Skyline, Inc.*,
  471 B.R. 69 (Bankr. S.D.N.Y. 2012) .......................................................................26

*NLRB v. SW Gen., Inc.*,
  580 U.S. 288 (2017) ..............................................................................................16

*North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*,
  2020 WL 3411267 (Sup. Ct. N.Y. Cnty. June 19, 2020) ...................................... *passim*

*Quadrant Structured Prods. Co. v. Vertin*,
  23 N.Y.3d 549 (N.Y. 2014) .................................................................................9, 16

*Richard Feiner & Co. Inc. v. Paramount Pictures Corp.*,
  95 A.D.3d 232 (N.Y. App. Div. 2012) .....................................................................15

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
  60 A.D.3d 61 (N.Y. App. Div. 2008) ....................................................................9, 16

*In re Rollings*,
   451 F. App'x 340 (5th Cir. 2011) ........................................................5

*Roque v. Harvel*,
   2019 WL 5265292 (W.D. Tex. Oct. 16, 2019) ...................................17

*RST (2005) Inc. v. Rsch. in Motion Ltd.*,
   597 F. Supp. 2d 362 (S.D.N.Y. 2009)..................................................26

*Schron v. Troutman Sanders LLP*,
   20 N.Y.3d 430 (N.Y. 2013) ...............................................................17

*Smile Train, Inc. v. Ferris Consulting Corp.*,
   117 A.D.3d 629 (N.Y. App. Div. 2014) ..............................................25

*In re TPC Grp. Inc.*,
   2022 WL 2498751 (Bankr. D. Del. July 6, 2022).........................8, 9, 12

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001)..............................................................................16

*United States v. Chavis*,
   772 F.2d 100 (5th Cir. 1985) ..............................................................17

*United States v. Utah, Nev. & Cal. Stage Co.*,
   199 U.S. 414 (1905)............................................................................15

*Zurakov v. Register.Com, Inc.*,
   304 A.D.2d 176 (N.Y. App. Div. 2003) ..............................................18

**Rules**

Fed. R. Bankr. P. 7056..............................................................................5

Fed. R. Civ. P. 56 .....................................................................................5

Federal Rule of Evidence 807...................................................................17

**Other Authorities**

Restatement (Second) of Contracts § 202(2) (1979) ....................................15

10A Wright & Miller, Fed. Prac. & Proc. § 2721 (4th ed. 2022) ..................17

## INTRODUCTION

1.      Serta Simmons Bedding, LLC (the "Company") and the Lender Plaintiffs (Barings LLC, Boston Management and Research, Credit Suisse Asset Management, LLC, Eaton Vance Management, and Invesco Senior Secured Management, Inc.) filed this Adversary Proceeding to comprehensively resolve issues that are fundamental to the resolution of this bankruptcy—chiefly, the validity of credit agreements between the Company and its creditors and the priority of various creditors under those agreements.[1]  Until Defendants' persistent attacks on these agreements—as evidenced most recently by the counterclaims and third-party claims filed on February 23, 2023 (ECF No. 66)—are resolved by this Court, the Company cannot achieve the fresh start that the bankruptcy process is designed to achieve.[2]

2.      Summary judgment in favor of the Company and the Lender Plaintiffs declaring the legitimacy of a 2020 financing and debt purchase transaction (the "2020 Transaction") is warranted.  The 2020 Transaction was permitted under the plain and unambiguous terms of the 2016 Non-PTL Term Loan Agreement.  And because the terms of that Agreement indisputably covered the subject matter of, and authorized, the 2020 Transaction, the Company and the participating lenders could not have violated the implied covenant of good faith and fair dealing.

3.      The 2020 Transaction helped fortify the Company during the depths of the COVID-19 pandemic.  To deal with the significant financial headwinds the pandemic created, in early 2020 the Company engaged in an extensive competitive process to restructure its debt.  After months of

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.  "Ex. __" refers to exhibits attached to this motion.

[2] Defendants and Third-Party Plaintiffs only filed their answer, counterclaims, and third-party claims the day before the deadline to file this Motion.  Lender Plaintiffs reserve the right to raise additional issues and arguments with respect to the counterclaims and third-party claims in the future.  Because the counterclaims and third-party claims mirror Plaintiffs' claim for declaratory relief, however, Lender Plaintiffs respectfully request that those counterclaims and third-party claims be resolved in Plaintiffs' favor, together with this Motion, in the interest of efficient resolution of the underlying dispute.

1

negotiations with multiple lender groups, the Company entered into an agreement with certain of its lenders (the "PTL Lenders"), including the Lender Plaintiffs, to engage in the 2020 Transaction. The 2020 Transaction provided $200 million of much-needed liquidity to the Company, while also deleveraging its balance sheet, lowering its overall interest expenses, and reducing its funded debt obligations by approximately $400 million. The agreement effectuating the 2020 Transaction—which Required Lenders under the Non-PTL Term Loan Agreement expressly agreed was structured to, and did, comply with all requirements of the Non-PTL Term Loan Agreement—was memorialized on June 22, 2020 in the PTL Credit Agreement, the Open Market Purchase Agreement, and the First Lien Intercreditor Agreement.

4. The PTL Lenders' proposal was not the only proposal made to the Company. Other lenders (the "Non-PTL Lenders")—including Defendants North Star Debt Holdings, L.P. (a deliberately masking pseudonym for Apollo Global Management, Inc.), Gamut Capital SSB, LLC, and various entities affiliated with Angelo Gordon—unsuccessfully proposed a predatory lending transaction by way of a "drop-down" structure that would have removed assets from the lenders' shared collateral pool on terms much less favorable to the Company and non-participating creditors, and that necessarily relied upon the same "open market purchase" provision of the 2016 Non-PTL Term Loan Agreement.

5. After their competing proposal was rejected by the Company, the Non-PTL Lenders spent the last two-and-a-half years, in court after court, trying to achieve through litigation what they could not accomplish through negotiation. Those efforts have been unsuccessful. A New York state court rejected the Non-PTL Lenders' attempt to block the 2020 Transaction, concluding that the breach of contract and implied covenant claims were unlikely to succeed on the merits. Undeterred, the Non-PTL Lenders have filed suit after suit over the intervening years, repeatedly seeking a different result from different courts—all to no avail. The original lawsuit filed by certain Non-PTL Lenders in federal court was dismissed for lack of subject-matter

jurisdiction, and their refiled federal lawsuit against just the Company suffered a blow when the court rejected most of their arguments on the Company's motion to dismiss.  The court allowed their case to proceed past the pleading stage only on the narrow question of the meaning of "open market purchase" and on their implied covenant claim.  But the court reached that decision without the benefit of all of the contract interpretation arguments in this motion that explain why the "open market purchase" provision of the Non-PTL Term Loan Agreement is clear and unambiguous.  That court also lacked the undisputed industry evidence proffered herewith in the alternative.

6.      The 2020 Transaction complied in all respects with the Non-PTL Term Loan Agreement.  *First*, the amendments entered into to effectuate the 2020 Transaction do not impact any of the "sacred rights" subject to heightened consent requirements (including the first-lien lenders' sacred right to pro rata payments in relation to other first-lien lenders), and therefore required only the consent of the lenders representing more than 50% of the outstanding face amount of the loans (the Required Lenders), *see* ECF No. 2-3 § 9.02(b)(A).  There is no dispute that the Company obtained that consent.

7.      *Second*, the 2020 Transaction did not alter any of the waterfall and pro rata payment provisions in the original 2016 Non-PTL Term Loan Agreement, which remain unchanged in the amended Non-PTL Term Loan Agreement.

8.      *Third*, the 2020 Transaction did not release the collateral or the value of the guarantees that protected the first lien lenders.  The Non-PTL Lenders' first lien loans are secured by the same lien, and guaranteed by the same guarantors, as the day the original Non-PTL Term Loan Agreement was executed, and the incurrence of new super-priority debt is not equivalent to the release of liens or guarantees.

9.      *Fourth*, the Non-PTL Term Loan Agreement expressly permits the Company to repurchase outstanding debt on a non-pro rata basis via "open market purchases," as occurred in the 2020 Transaction.  Section 9.05(g) of the Agreement unambiguously sets forth the parties'

mutual understanding that an open market purchase may be conducted on a non-pro rata basis and—unlike a Dutch Auction—an open market purchase need not be "open to all Lenders."  The words of the agreement and familiar canons of contract interpretation make that plain.  While unnecessary to resolve this motion, industry custom and usage also confirm that "open market purchases" include debt exchanges in which not all lenders are invited to participate.  And even if the term "open market purchase" were ambiguous (it is not), the Required Lenders amended and modified the Non-PTL Term Loan Agreement by setting forth in the Transaction documents that the Transaction was a permissible "open market purchase" to which the Required Lenders consented.  Because open market purchases are carved out of the sacred rights in the Non-PTL Term Loan Agreement, only the Required Lenders' consent was needed to enter into and effectuate the 2020 Transaction.

10.     The Non-PTL Lenders also cannot establish that the Company or the PTL Lenders violated the implied covenant of good faith and fair dealing as that claim is entirely duplicative of their breach of contract claims—it arises from the same set of facts, asserts the same allegedly wrongful conduct, and pleads the same damages.  Under New York law, it cannot be pleaded in the alternative where, as here, a valid contract indisputably governs the dispute.  In any event, the undisputed evidence negates any assertion that the Company or the PTL Lenders acted in bad faith because their proposal was an alternative to the Non-PTL Lenders' own proposal that would have created new super-priority debt—without nearly the same value to the Company.

11.     This Court should now declare, as a matter of law, on the undisputed facts, and after review of the unambiguous terms of the underlying documents, that the 2020 Transaction complied in all respects with the Non-PTL Term Loan Agreement and did not violate the implied covenant of good faith and fair dealing.

## STATEMENT OF FACTS

12.     The Lender Plaintiffs incorporate the Statement of Facts set forth in Serta Simmons Bedding, LLC's Motion for Summary Judgment ("SSB's Motion").  *See* ECF No. 69 at 6–15.

## LEGAL STANDARD

13.     Summary judgment is warranted if the movant "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56).  In a declaratory judgment action, the movant bears the burden of establishing the underlying claim.  *See In re Rollings*, 451 F. App'x 340, 346 (5th Cir. 2011).  For matters of contract interpretation under New York law, summary judgment is warranted if the contract is unambiguous.  *See, e.g.*, *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 205 (2d Cir. 2005).  A court may also "resolve ambiguity in contractual language as a matter of law" on summary judgment if the extrinsic evidence presented is uncontested, or "so one-sided that no reasonable person could decide the contrary."  *Compagnie Financière de CIC et de l'Union Européenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) (citation omitted).

## ARGUMENT

14.     Summary judgment should be granted in favor of the Company and the Lender Plaintiffs because the unambiguous terms of the Non-PTL Term Loan Agreement—as well as undisputed evidence—establish the lawfulness of the 2020 Transaction.[3]

15.     By its plain terms, the Non-PTL Term Loan Agreement permitted the 2020 Transaction.  Because the Agreement does not contain an anti-subordination provision or otherwise prevent the Company from engaging in a debt-for-debt purchase on a non-pro rata basis,

---

[3] In light of the substantial controversy between the parties to date, and for the reasons discussed in SSB's Motion, this claim is ripe for declaratory relief.  *See* ECF No. 69 at 16.

the 2020 Transaction required only the consent of the Required Lenders, who gave it.  Nothing about the 2020 Transaction infringed the Non-PTL Lenders' rights under the Agreement's waterfall or pro rata sharing provisions, nor released the collateral or value of the guarantees securing the first lien loans.  The 2020 Transaction—which was the result of arm's length negotiations the Company undertook with both the PTL Lenders and Non-PTL Lenders to obtain the most favorable restructuring arrangement—was structured as an open market purchase.  The Agreement specifically recognizes this option need not be made available to all holders of the underlying instrument at the same time—as participants in the commercial lending market know full well.

16.     Any claim for breach of the implied covenant of good faith and fair dealing in the Non-PTL Term Loan Agreement must be rejected as impermissibly duplicative of the breach of contract claim as a matter of law; under New York law, the implied covenant cannot supply a term or obligation inconsistent with the parties' express agreement.  Plaintiffs are independently entitled to a declaration that they did not violate any implied covenant of good faith and fair dealing because the undisputed evidence establishes that neither the Company nor the PTL Lenders acted in bad faith or abused their discretion to deprive Defendants of the benefit of their bargain.

17.     Until these claims are resolved, the Company cannot successfully obtain confirmation of its Plan and emerge from chapter 11, thereby depriving its estate and creditors (including Plaintiffs and Defendants) of the finality, security, and other rights to which they are entitled under the Bankruptcy Code.  A prompt ruling on these issues is essential to provide the Company and its personnel with the fresh start that the bankruptcy laws promise.

I.      **Plaintiffs Are Entitled To A Declaration That The Transaction Complied With The Non-PTL Term Loan Agreement**

18.     This contract dispute is governed by New York law under the Non-PTL Term Loan Agreement's choice of law provision.  ECF No. 2-3 § 9.10(a); *see In re iHeartMedia, Inc.*, 597

B.R. 339, 350 (Bankr. S.D. Tex. 2019) (applying contractual choice of law provision).  Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."  *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002).  "The best evidence of what parties to a written agreement intend is what they say in their writing."  *Id.* (quoting *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (N.Y. 1992)).  "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion.'"  *Id.* (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (N.Y. 1978)).  Courts should be reluctant to interpret a contract to impliedly include terms not specifically included—particularly when the negotiating parties are sophisticated.  *See Donohue v. Cuomo*, 38 N.Y.3d 1, 12 (N.Y. 2022).

19.     The words these highly sophisticated parties used in the Non-PTL Term Loan Agreement authorized the actions the Company and the PTL Lenders took to propose, negotiate, and enter into the 2020 Transaction.  Each of the Non-PTL Lenders' breach-of-contract arguments is negated by that plain language.  First, their argument that unanimous consent was required to amend the Agreement to create super-priority debt ignores the Agreement's explicit allowance for the Required Lenders to amend any provision other than a limited set of inapplicable "sacred rights."  Second, their argument that the 2020 Transaction violated the Non-PTL Term Loan Agreement's waterfall and pro rata sharing provisions fails because the rights conferred by those provisions were not impacted by the 2020 Transaction, because the rights therein are expressly subject to intercreditor agreements in any event, and because the pro rata payment right applies only to debt within the same debt class.  Third, contrary to the Non-PTL Lenders' argument that the 2020 Transaction impermissibly released the loans' collateral or the value of the guarantees without the consent of all lenders, the first lien loans are secured by the same lien, and guaranteed by the same guarantors, as they were the day the Non-PTL Term Loan Agreement was executed.

Finally, any assertion that the 2020 Transaction was not an "open market purchase" as contemplated by Section 9.05(g) of the Agreement violates hornbook principles of contract interpretation and the ratification of the 2020 Transaction set forth in the properly-executed, written amendments to the Non-PTL Term Loan Agreement.  That assertion also cannot be reconciled with well-established industry custom and practice.

### A.   The Amendments To The Non-PTL Term Loan Agreement Did Not Require Unanimous Consent.

20.     Most provisions in the Non-PTL Term Loan Agreement may be amended with the consent of only the Company and the Required Lenders, who "represent[] more than 50% of the outstanding face amount of the loans."  ECF No. 2-3 §§ 1.01, 9.02(b)(A).  Only a handful of enumerated "sacred rights" require "the consent of each Lender directly and adversely affected." *Id.*  The 2020 Transaction did not implicate those sacred rights.

21.     As Judge Failla of the Southern District of New York ruled in reviewing the same claims, "anti-subordination is not a sacred right" under the Non-PTL Term Loan Agreement.  *See LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *10 (S.D.N.Y. Mar. 29, 2022).  Had the parties intended to prohibit subordination, they could have provided in Section 9.02(b) that the Agreement cannot be amended if the effect of such amendment would be to subordinate the first-lien term loans' payment priority without unanimous lender consent.  They did not—even though many other credit agreements *do* contain such anti-subordination provisions.  *See In re TPC Grp. Inc.*, 2022 WL 2498751, at *11 (Bankr. D. Del. July 6, 2022) (observing that "the inclusion of express anti-subordination clauses are sufficiently commonplace").[4]   That

---

[4] *See, e.g.*, Ex. 1 (Krayton Polymers U.S. LLC Loan, Security and Guarantee Agreement), at 172 (prior written consent of all Lenders required in Section 14.1(d) for any modification that would subordinate existing debt obligations); Ex. 2 (Tessco Technologies Inc. Credit Agreement), at 115–16 (Section 10.2(b)(x): "[N]o amendment, waiver or consent shall . . . (x) subordinate the Obligations to any other Indebtedness or subordinate the Liens securing the Obligations to any other Liens (except as expressly contemplated hereby), without the written consent of each Lender."); Ex. 3 (BJ's Wholesale Club, Inc. Credit Agreement), at 182–83 (Section 12.1(i): "[N]o

8

omission is telling.  When "parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560 (N.Y. 2014); *see also Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 66 (N.Y. App. Div. 2008) ("A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties.").

22.    In fact, Defendants have previously conceded that the Non-PTL Term Loan Agreement permits super-priority new money loans "without a unanimous vote," and stated that they are not challenging the new money tranche of the 2020 Transaction. *AG Centre St. P'Ship L.P. v. Serta Simmons Bedding, LLC*, No. 654181/2022, Dkt. 11 ¶ 70 (N.Y. Sup. Ct. Nov. 16, 2022) ("Prepetition Am. Compl.").   The debt-for-debt exchange component of the 2020 Transaction is no different.  *Cf. In re TPC Grp.*, 2022 WL 2498751, at *1 (concluding that "the original loan documents did permit the majority holders to amend the loan documents to provide for the subordination of the old debt to the new").  Contrary to Defendants' contention that "[t]he non-*pro rata* payment of the [PTL] Lenders' First Lien Term Loans using new Priority Term Loans" violates the Non-PTL Term Loan Agreement, *see* Prepetition Am. Compl. ¶ 70, nothing in the Non-PTL Term Loan Agreement prevents the Company from engaging in open market purchases on a non-pro rata basis.  The New York state court recognized this when it permitted the 2020 Transaction to proceed, ruling that the Non-PTL Term Loan Agreement expressly "permits the debt-to-debt exchange on a non-pro rata basis as part of an open market transaction."

---

such amendment, waiver or consent shall: . . . (i) without the prior written consent of all Lenders directly affected thereby, (i) subordinate the Obligations hereunder to any other Indebtedness, or (ii) except as provided by operation of applicable Law or in the Intercreditor Agreement, subordinate the Liens granted hereunder or under the other Loan Documents to any other Lien."). Exhibits 1–3 are excerpts of agreements publicly available on Bloomberg Law.  In interpreting contractual terms in a specialized context like a term loan agreement, the Court may consider industry custom and practice.  *See infra* ¶ 40.

9

*North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*, 2020 WL 3411267, at *4 (Sup. Ct. N.Y. Cnty. June 19, 2020).

23.    In particular, Section 9.02(b)(A)(6) expressly exempts from any unanimous consent requirement "any transaction permitted under Section[] . . . 9.05(g)."  ECF No. 2-3 § 9.02(b)(A)(6).[5]  Section 9.05(g) in turn provides that "any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender [including the Company] on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases, in each case with respect to clauses (A) and (B), without the consent of the Administrative Agent."  *Id.* § 9.05(g).  Notably, as discussed below, *see infra* ¶¶ 33–38, the "open to all Lenders" limitation qualified only the Dutch Auction option, not the "open market purchases" option.

24.    Further, as explained *infra* ¶¶ 53–56, the Company and the Required Lenders specifically "acknowledge[d] and agree[d]" in the 1L Amendment to the Non-PTL Term Loan Agreement dated June 22, 2020, that any actions to effectuate the PTL Credit Agreement "shall be and are permitted" by operation of the 1L Amendment.  ECF No. 2-4 § 4.  This consent to the 2020 Transaction by Required Lenders made explicit that the non-pro rata open market purchase was allowed by the Agreement as amended, to the extent there was any ambiguity on the point prior to the amendment.

---

[5] In this and other respects, the Non-PTL Term Loan Agreement differs from the credit agreement at issue in Justice Masley's decision in *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, 2022 WL 10085886 (Sup. Ct. N.Y. Cnty. Oct. 17, 2022).  The sacred rights provision in the Boardriders credit agreement did not explicitly carve out open market purchases as an exception.  *See* ECF No. 2-3 §§ 9.02(b)(A)(6), 9.05(g).

**B.      The Non-PTL Term Loan Agreement Unambiguously Permitted The Transaction.**

**1.      The Transaction Did Not Violate The Waterfall Or Pro Rata Sharing Provisions Of The Non-PTL Term Loan Agreement.**

25.      One of the limited set of "sacred rights" in the Non-PTL Term Loan Agreement involves payment priority rights following an event of default and receipt of proceeds of the collateral, set forth in Section 2.18 of the Agreement. *See* ECF No. 2-3 § 2.18(b)–(c). Contrary to the Non-PTL Lenders' contention, the 2020 Transaction did not violate the Non-PTL Lenders' rights under Section 2.18 for several independent reasons.

26.      *First*, the 2020 Transaction did nothing to alter the waterfall provision in Section 2.18(b). That provision remains exactly the same in the amended Non-PTL Term Loan Agreement. *Compare* ECF No. 2-3 § 2.18, *with* ECF No. 2-2 § 2.18. Likewise, the pro-rata payment provision in Section 2.18(c) is unaffected. As Judge Failla recognized, "no facet of the Transaction altered the rights of the first-lien lenders to receive pro rata payments in relation to other first-lien lenders in the event of default." *LCM XXII*, 2022 WL 953109, at *11. Because the waterfall and pro rata sharing provisions of Section 2.18(b) and 2.18(c) were unaltered, consent of the affected lenders is irrelevant. *See id.*[6]

27.      *Second*, the waterfall provision in Section 2.18(b) is expressly "subject, in all respects, to the provisions of each applicable Intercreditor Agreement." ECF No. 2-3 § 2.18(b);

---

[6]  This feature of the Non-PTL Term Loan Agreement contrasts sharply with the agreement at issue in *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, 2021 WL 3619753 (Sup. Ct. N.Y. Cnty. Aug. 16, 2021). *Audax* also involved an "uptier" restructuring transaction, in which the company, TriMark, entered into a "Super Senior Credit Agreement" pursuant to which it issued $120 million of new "First-Out Super Senior Debt," as well as $307.5 million of new "Second-Out Super Senior Debt" in a dollar-for-dollar exchange. *Id.* at *4. But unlike here, the credit agreement in *Audax* explicitly stated that consent of all lenders was required for any amendments that would "alter the order of application of proceeds." *Id.* at *11. The Agreement here contains no such language, and the parties' pro rata sharing rights under the waterfall provision in the Agreement remain exactly the same today.

*see id.* ("[A]ll proceeds of Collateral received by the Administrative Agent while an Event of Default exists . . . shall be applied . . . as provided in each applicable Intercreditor Agreement."). Thus, as Judge Failla found, "per the waterfall provision's plain terms, even prior to the Transaction and the Amendments, the first-lien lenders' rights under the waterfall provision were subject to the terms of separate intercreditor agreements," "without any perceptible limitation on the entry of new intercreditor agreements." *LCM XXII*, 2022 WL 953109, at *11 & n.15. Relatedly, Section 8.08 of the amended Non-PTL Term Loan Agreement authorizes the Administrative Agent to enter into an intercreditor agreement and provides that that agreement could bear on indebtedness that was senior, *pari passu*, or junior to the first-lien loans. ECF No. 2-2 § 8.08. Consistent with those provisions, the Company and the PTL Lenders entered into a new intercreditor agreement (the "PTL Intercreditor Agreement"). As Judge Failla held, the amended Agreement "authorized" the PTL Intercreditor Agreement. *LCM XXII*, 2022 WL 953109, at *11 n.15. Because the PTL Intercreditor Agreement was validly entered into, and because Section 2.18(b) is "subject, in all respects," to that Intercreditor Agreement, the 2020 Transaction did not violate Section 2.18(b) for this reason as well.

28. *Third*, "the plain terms of Section 2.18 of the Non-PTL Term Loan Agreement make clear that the first-lien lenders' rights to pro rata payments apply only to debt within the same 'Class,' *viz.*, among first-lien lenders." *LCM XXII*, 2022 WL 953109, at *10; *see also* ECF No. 2-3 §§ 2.18(a) ("each payment of interest in respect of the Loans of a given Class . . . shall be allocated pro rata among the Lenders in accordance with their respective Applicable Percentage of the *applicable Class*") (emphasis added), 2.18(c) (providing for benefit of Loan payments to "be shared by the Lenders *of such Class* ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class") (emphasis added); *cf. In re TPC Grp.*, 2022 WL 2498751, at *11 ("[U]nder the customs and usages that are common in the trade, a provision providing for ratable distribution (in the absence of an express anti-

subordination clause) would more naturally apply to distributions *within* a class, and not prohibit subordination of an entire class to another, different class.").  The priority term loans were entered into pursuant to an entirely separate incremental facility, which, under the Non-PTL Term Loan Agreement, places them in a different Class.  *See* ECF No. 2-3 at § 2.22 (describing incremental credit facilities adding new Classes).  The priority term loans are thus not in the same "Class" as the first lien term loans, and the rights of first-lien lenders to pro rata payments within their "Class" of loans thus remains intact.

29.     Every court to have considered the Non-PTL Lenders' argument that the waterfall and pro rata sharing provisions were violated has rejected it.  This Court should do the same.

**2.     The 2020 Transaction Did Not Release The Loan's Collateral Value Or The Value Of The Guarantees.**

30.     As both Judge Failla of the United States District Court for the Southern District of New York and Justice Masley of the New York Supreme Court have held, nothing about the 2020 Transaction implicated the collateral or loan guarantee provisions of Section 9.02(b)(B) of the Non-PTL Term Loan Agreement.

31.     Sections 9.02(b)(B)(2) and (3) provide that prior written consent of each lender is required to "release all or substantially all of the Collateral" and to "release all or substantially all of the value of the Guarantees under the Loan Guaranty."  ECF No. 2-3 § 9.02(b)(B)(2)–(3).  Ironically, it is exactly the type of "drop-down" transaction that the Non-PTL Lenders proposed that would have implicated this provision by removing hundreds of millions of dollars in first-lien collateral from the non-participating first-lien lenders.  *See* Serta Simmons Bedding's Statement of Uncontroverted Facts in Support of Their Motion for Summary Judgment, ECF No. 70 (hereinafter "Statement of Uncontroverted Facts"), at ¶ 24.

32.     As Justice Masley held in permitting the 2020 Transaction to go forward, the Transaction "does not require the release of . . . any collateral that is subject to [the Company's]

existing First Lien Term Loans." *North Star*, 2020 WL 3411267, at *4.   Judge Failla likewise recognized that "no feature of the Transaction released the collateral or the value of the loan guarantees," and that the Non-PTL Lenders' "'substance over form' argument . . . is incompatible with the plain text of the Agreement." *LCM XXII*, 2022 WL 953109, at *12.   The Non-PTL Lenders' first-lien loans are secured by the same liens today, and guaranteed by the same guarantees, as the day the Non-PTL Term Loan Agreement was executed.   The incurrence of new debt with payment priority is not equivalent to the *release* of collateral or loan guarantees.   Any such release of liens or guarantees would need to be effectuated through a separate agreement signed by the Borrower and the Administrative Agent and no such documents exist.

### 3.   The 2020 Transaction Was An Open Market Purchase Under The Non-PTL Term Loan Agreement.

#### i.   Plain Meaning Of "Open Market Purchase"

33.   In an effort to evade the clear language in Section 9.02 and 9.05 of the Non-PTL Term Loan Agreement permitting open market purchases, Defendants have argued that the debt-for-debt exchange here "was not an 'open market purchase'" because it was "private" and "exclusionary" rather than open to all lenders.   ECF No. 66 ¶ 100.   Their reading ignores business reality and other language in the same provision making clear that an "open market purchase" need not be "open to all Lenders."

34.   An open market purchase for a private company's loans—unlike an open market purchase on the public stock exchange, which could hypothetically be open to any buyer or seller—necessarily involves direct and private dealings with the lender who owns those loans.   *See* ECF No. 2-3 § 9.05(g) (recognizing that an open market purchase would involve an assignment of rights and obligations "to any Affiliated Lender").   Because syndicated loan debt is not traded through a

public exchange, a purchase or sale of a private company's debt will never be available to all market participants in the same way as a stock market trade.[7]

35.    In any event, Section 9.05(g) gives the Borrower two options to purchase (that is, take assignment of) its first-lien loans: (i) "a Dutch Auction" "open to all Lenders," or (ii) "an open market purchase"—with the loans in both cases expressly subject to assignment "on a non-pro rata basis."  ECF No. 2-3 § 9.05(g).  Under hornbook principles of contract interpretation, specifying that a Dutch Auction must be "open to all Lenders" but not so specifying for "open market purchases" means that the latter need not be open to all lenders.  *See, e.g.*, *Richard Feiner & Co. Inc. v. Paramount Pictures Corp.*, 95 A.D.3d 232, 239 (N.Y. App. Div. 2012) (reading two provisions together to conclude that when the parties meant to convey something "they did so explicitly"); *see generally United States v. Utah, Nev. & Cal. Stage Co.*, 199 U.S. 414, 423 (1905) ("[P]articular words may [not] be isolatedly considered."); Restatement (Second) of Contracts § 202(2) (1979) ("A writing is interpreted as a whole").  The parties clearly knew how to require that a type of purchase be made available to all lenders.  They added that requirement for Dutch Auctions but chose not to do so for open market purchases.  That critical distinction must be afforded contractual significance.[8]

---

[7]  Judge Failla acknowledged "the distinction . . . between open-market purchases for a private company's loans and open-market transactions for public stock," noting that "in the context of the Agreement, the open-market provision may contemplate loan-repurchase transactions that involve fewer than all lenders in any given class of debt."  *LCM XXII*, 2022 WL 953109, at *8.

[8]  Judge Failla recognized the fact "[t]hat the provision specifies that Dutch Auctions must be open to all Lenders, but does not do so for open market purchases, may indicate the parties' conscious choice to exclude such a requirement from loan purchases pursued in the open market."  *LCM XXII*, 2022 WL 953109, at *8 n.12.  But in refusing to find this important distinction decisive at the motion to dismiss stage, she ignored that the canons of contract construction compel that interpretation.  Judge Failla also did not have before her all of the arguments and evidence that Plaintiffs now present, including arguments relating to the amendment and Open Market Purchase Agreement, *see infra* ¶¶ 53–56, and evidence of industry usage of the phrase "open market purchase," *see infra* ¶¶ 39–52.

36.    Under the *expressio unius* canon, if parties to a contract omit terms readily found elsewhere in an agreement—particularly within the same provision—"the inescapable conclusion is that the parties intended the omission."  *Quadrant*, 23 N.Y.3d at 560; *accord 260-261 Madison Ave., LLC v. Bower Monte & Greene, P.C.*, 137 A.D. 3d 457, 457–58 (N.Y. App. Div. 2016); *see also NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) ("If a sign at the entrance to a zoo says 'come see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health.").  And canons of construction—especially one as well-established as the *expressio unius* canon—commonly are used to conclude that a contract is unambiguous.  *See, e.g.*, *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 232–33 (2011).  It would violate fundamental principles of contract interpretation to add to the parties' contract a requirement for open market purchases—that they "be open to all Lenders"—that the parties chose not to include.  *See Riverside S. Planning*, 60 A.D.3d at 66.

37.    Canons of construction also require that the terms "Dutch Auction" and "open market purchase" be read to give each independent meaning.  *See, e.g.*, *Black Bull Contracting, LLC v. Indian Harbor Ins. Co.*, 135 A.D.3d 401, 406 (N.Y. App. Div. 2016) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect." (quoting *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (N.Y. 1956))); *see also, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (applying the canon against surplusage).  Here, a Dutch Auction, as defined in the Non-PTL Term Loan Agreement, must be "open to all Lenders" and requires certain procedural steps to involve all Lenders:  The "Borrower" must retain an "Auction Agent" to provide notice to all lenders of the face value of loans and the range of prices, and then await the lenders' response specifying the amount and price of the loans they are willing to sell, among many other procedures.  *See* ECF No. 2-3, Sched. 1.01(b).  By contrast, the open market purchase is not required to be open to "all Lenders"; the Borrower may approach one lender

16

or a subset of lenders, thereby reducing the transaction costs associated with a Dutch Auction and maximizing efficiency, at the risk of obtaining a less optimal price than at a Dutch Auction open to all.

38.     The Non-PTL Lenders' interpretation, which would render "Dutch Auction" and "open market purchase" effectively duplicative and deprive them of independent meaning, is barred by black-letter contract interpretation principles for this reason as well.

### ii.     Evidence Of Industry Usage Shows That "Open Market Purchase" Does Not Require Inquiries To Every Lender

39.     Industry usage of the phrase "open market purchase" reinforces what the plain language and canons of construction make clear—that the 2020 Transaction was an open market purchase.[9]  Although the Court need not resort to industry usage because the ordinary meaning of the contract is clear, if it chooses to do so the answer is the same:  The 2020 Transaction complied with the Non-PTL Term Loan Agreement.

40.     While New York courts do not typically consider extrinsic evidence in making the threshold assessment of whether contract language is ambiguous, *see, e.g.*, *Schron v. Troutman*

---

[9] At summary judgment, evidence "may be presented in a form that would not, in itself, be admissible" if the proponent could "present[] [it] in a form that would be admissible at trial." *Lee v. Offshore Log. & Transp., L.L.C.*, 859 F.3d 353, 355–56 (5th Cir. 2017) (cleaned up); *see also* 10A Wright & Miller, Fed. Prac. & Proc. § 2721 (4th ed. 2022).  Here, the cited publications would be admissible at trial for the non-truth purpose of showing the fact these articles were published in industry publications, *see, e.g.*, *United States v. Chavis*, 772 F.2d 100, 105 (5th Cir. 1985) (Texas Attorney General consumer protection complaint files admissible because "the complaint was not admitted to prove the truth of the matter asserted in it, but rather as proof of notice" that the company had notice of consumer complaints); *Roque v. Harvel*, 2019 WL 5265292, at *10 (W.D. Tex. Oct. 16, 2019) (newspaper articles submitted with summary judgment briefing admissible "to show that the City of Austin had notice of complaints of discriminatory policing and excessive use of force"); under the residual hearsay exception of Federal Rule of Evidence 807, *see, e.g.*, *Hicks v. Charles Pfizer & Co Inc.*, 466 F. Supp. 2d 799, 807–08 (E.D. Tex. 2005) (considering a newspaper article under the residual hearsay exception to find that there was an issue of material fact precluding summary judgment); *Dallas Cnty. v. Com. Union Assur. Co.*, 286 F.2d 388, 397 (5th Cir. 1961) (considering a newspaper article in "the exercise of common sense in deciding the admissibility of hearsay evidence"); or in connection with testimony about industry standards.

*Sanders LLP*, 20 N.Y.3d 430, 436 (N.Y. 2013), they may consider industry custom and usage "where necessary to understand the context in which the parties have used terms that are specialized." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010); *see also Zurakov v. Register.Com, Inc.*, 304 A.D.2d 176, 179 (N.Y. App. Div. 2003) ("[T]he custom and usage of 'registration' of a domain name in the Internet context is certainly more relevant than the literal definition of 'registration' found in the dictionary."). The term "open market purchase" has a specialized meaning in credit agreements in the syndicated loan market. *Cf. Lehman Bros. Int'l (Europe) v. AG Fin. Prods., Inc.*, 60 Misc.3d 1214(A), at *9–11 (Sup. Ct. N.Y. Cnty. 2018) (looking to industry custom and usage to make "the threshold determination of whether" a provision in an agreement governing a credit default swap transaction "is ambiguous"). Courts may therefore use industry custom and usage evidence to interpret the phrase as "understood by those who use [it] in connection with [the relevant] business." *Fox Film Corp. v. Springer*, 273 N.Y. 434, 436 (N.Y. 1937).[10]

41.    The widespread use of the term "open market purchase" in the syndicated loan industry reflects the understanding that not all lenders are necessarily free to opt in to an "open market purchase."

42.    Reports from multiple law firms with expertise in syndicated loan markets and corporate finance generally but uninvolved with the 2020 Transaction confirm this industry understanding of the term.

43.    A Client Alert by King & Spalding from March 2020, for example, cites Dutch auctions and open market purchases as the primary methods to buy back debt. *See* Ex. 8. In a

---

[10] In any event—as stated *infra* ¶ 57—if the Court declines to consider extrinsic evidence at the threshold stage of determining whether a contract is ambiguous and to the extent the Court finds "open market purchase" ambiguous, it may rely on industry custom and usage evidence on summary judgment to resolve that ambiguity.

Dutch auction, the borrower indicates a willingness to purchase loans from the existing lenders; "each lender" signals its willingness to sell; and "all lenders are given the opportunity to sell their loans." *Id.* at 2.  By contrast, in an open market purchase, "the Borrower approaches all *or a subset* of the lenders (*or even just one lender*)" and inquires about the lenders' willingness to sell, such that the Borrower can "shop around to first buy back the most expensive debt that a lender is willing to sell, including on a non-pro rata basis" and can "cherry-pick which Lenders are permitted to exit the facility." *Id.* (emphasis added).

44.    Similarly, a memorandum by Cravath, Swaine, & Moore from approximately the same time defines "Open Market Purchases" as the purchasing of loans "as they become available in the secondary market on a non-pro rata basis." *See* Ex. 9 at 1–2.  In any arm's length transaction, availability depends on the seller's willingness to sell and the buyer's willingness to buy on mutually beneficial terms.  Debt thus "becomes available" and purchasable when two parties want to transact and ultimately consummate a transaction.  *Id.*  Nothing requires the buyer first to ask every seller for their debt.  As the memorandum explains, this feature distinguishes open market purchases from Dutch Auction purchases, which are described as purchase offers sent "ratably to all lenders." *Id.*

45.    In a note published in the *International Financial Law Review* in the summer of 2020, partners of Davis Polk & Wardwell wrote about liability management transactions that "benefit[] certain creditors at the expense of others" and often feature the purchase of "existing loans of only the participating lenders into more senior loans on a non-pro rata basis." *See* Ex. 10 at 1, 3.  As they explained, "there are traditionally two" ways these buybacks happen: "Dutch auctions" and "open market purchases." *Id.* at 3.  "Dutch auctions typically require all lenders . . . to be offered the opportunity to participate," whereas open market purchases "*contain no such requirement.*" *Id*. (emphasis added).  And, they noted, "many" have interpreted the phrase open market purchase "to permit privately negotiated buyback transactions by the borrower and selling

19

lenders with few restrictions." *Id*. The authors ultimately advocate for "Dutch auctions (*or another mechanism that required an offer to all lenders*)" over open market purchases as more fair—precisely because, unlike open market purchases, they do not "exclude[]" "lenders . . . from the opportunity to participate." *Id*. (emphasis added).[11]

46.   Additionally, a 2013 article by Wachtell, Lipton, Rosen & Katz stated that borrowers during the Great Recession would "spend up to some fixed amount of dollars making open market repurchases of their own loans" or would initiate debt repurchases "*offered to all lenders* pursuant to 'Dutch auction' proceedings." *See* Ex. 11 at 21 (emphasis added). Again, the distinction is clear—Dutch auctions involve offers to all lenders, whereas borrowers' "open market" purchases of debt do not.

47.   Finally, *The LSTA's Complete Credit Agreement Guide*, an authoritative source on credit agreements and the syndicated loan market issued by the Loan Syndications and Trading Association, explains:

> Buyback methodologies can be grouped into two broad categories: pro rata offered buybacks available to all lenders and non-pro rata open market purchases that are made available on a narrower basis to individual lenders. . . . In the category of open market purchases, a **borrower is allowed to negotiate one-on-one with individual lenders** to repurchase loans up to a pre-agreed dollar amount.

Ex. 12 at 642.

---

[11] Here, the price negotiated in the open market purchase was in fact very favorable to Serta: The Transaction employed an exchange ratio of $74 of super-priority "second out" debt in exchange for each $100 of Existing First Lien Term Loans and $39 of super-priority debt in exchange for each $100 of Existing Second Lien Term Loans, allowing Serta to benefit from significant discount capture. *See* Statement of Uncontroverted Facts, at ¶¶ 19 – 21. Not all open market purchases yield such favorable outcomes for the company; for example, in *Boardriders*, the exchange tranches were dollar-for-dollar, such that $286 million in loans were rolled up into $286 million in new Tranche B-2 Priority Loans. *Boardriders*, 2022 WL 10085886, at *4 (noting that the term loans were exchanged at par even though the trading value of the debt was allegedly at 50-60% of par).

48.     These industry sources make clear that an "open market" purchase, as the term is used within the debt buyback context and as a matter of plain meaning within the industry, does not require borrowers to solicit every existing lender.[12]  The usage of that term was "so notorious in the industry that a person of ordinary prudence in the exercise of reasonable care would be aware of it." *J.P. Morgan Inv. Mgmt. Inc. v. AmCash Grp., LLC*, 106 A.D.3d 559, 559 (N.Y. App. Div. 2013) (citation omitted).

49.     A recent restructuring transaction similarly involving a debt exchange—as well as one of the defendants here—confirms this industry understanding.  In 2022, Envision Healthcare needed more liquidity.  To achieve that, Envision assets were moved away from the existing lender group's collateral package into an Envision subsidiary that then entered into new credit facilities. Envision used "proceeds" from those new facilities to "fund non-pro-rata purchases of pre-existing debt at Envision Healthcare Corp."  *See* Ex. 5 at 1.  Specifically, Envision used proceeds from a new second lien facility to repurchase approximately $1.5 billion in principal amount of outstanding first lien term loans, $326 million in principal amount of outstanding incremental term loans, and $87 million in principal amount of senior unsecured notes, all at a discounted rate.  *See* Ex. 4.

---

[12] Defendants have previously cited a 2009 Weil Gotshal Private Equity Alert and a 2009 *Deal Lawyers* article authored by Gibson Dunn attorneys in support of their contention that the 2020 Transaction was not an "open market purchase."  *See* Prepetition Am. Compl. ¶ 9.  But those documents, unlike the publications cited herein, do not attempt to define "open market purchase." The Weil alert emphasizes that "the optimal type of bond buyback transaction will depend on the relevant indenture documents and, if applicable, credit documents."  *See* Glenn D. West et al., *De-Levering Portfolio Companies Through Debt Buybacks – US and UK Perspectives*, at 3, https://www.weil.com/~/media/files/pdfs/Private_Equity_Alert_March_2009.pdf.    And the Gibson Dunn article notes that issuers without cash on hand may not be able to avail themselves of options such as repurchasing outstanding convertible securities "through a cash tender offer before the debt reaches maturity."  *See* James Monoley et al., *Convertible Debt Exchange Offers: Considerations for Distressed Issuers*, at 2, https://www.gibsondunn.com/wpcontent/uploads/documents/publications/Moloney-Pollner-Shaw-ConvertDebtExchangeOffers.pdf.

50.     That transaction was referred to as "an open-market purchase of existing creditors' holdings"—even though only "certain" creditors participated.  *Id.*  In other words, like Serta, Envision used an open market purchase provision in its credit agreement to accomplish a debt-for-debt exchange.

51.     Notably, in the Envision transaction, one of the providers of the new financing, who "effectively . . . step[ped] ahead of everyone else in the repayment waterfall," was none other than Angelo Gordon—despite the fact that Angelo Gordon was among the Non-PTL Lenders that sought to enjoin the 2020 Transaction in the *North Star* action and is now a defendant here.  *See* Ex. 6, at 1–2.  And Envision's banker for the transaction was none other than PJT Partners, *see* Ex. 4, which also represents the Non-PTL Lenders in this action and represented them when they were making their alternative proposal to the Company, *see* Ex. 7.  Evidently, Angelo Gordon and PJT Partners are wholly comfortable when companies rely on open market purchase provisions in credit agreements—provided they are the beneficiary.  At a minimum, they fully understood that Envision was using its open market purchase provision to engage in a debt-for-debt exchange with select lenders, consistent with the widespread industry understanding of the term.

52.     In sum, given the technical nature of credit agreements within the syndicated loan industry, this Court may look to this substantial industry custom and practice to confirm that the term "open market purchase," as used in the Non-PTL Term Loan Agreement, unambiguously need not be open to all lenders.  Accordingly, the open market purchase, like all other aspects of the 2020 Transaction, did not require unanimous consent.

### 4.     Written Amendments To The Non-PTL Term Loan Agreement Ratified The Open Market Purchase Component Of The 2020 Transaction.

53.     If any doubt remained as to whether the Non-PTL Term Loan Agreement unambiguously permitted the 2020 Transaction, written amendments to the Non-PTL Term Loan Agreement not referenced in the motion to dismiss decided by Judge Failla and presented for the

first time here reflect the Required Lenders' acknowledgement of, and consent to, the open market purchase component of the 2020 Transaction.[13]   Those amendments—which the Agreement authorized a majority of lenders to enact because they did not impact sacred rights—render irrelevant any alleged ambiguity in the term "open market purchase" as used in the original Agreement, because the requisite number of lenders properly amended the Agreement expressly to allow the debt-for-debt purchases, in effect defining the term "open market purchases."

54.     According to Section 9.02(b) of the Agreement, the terms of the Agreement (except the sacred rights provisions) may be "waived, amended or modified . . . pursuant to an agreement or agreements in writing entered into by [the Company] and the Required Lenders."  ECF No. 2-3 § 9.02(b).  The Company and a majority of the lenders effectuated such an agreement in 2020. They signed, *inter alia*, the 1L Amendment and the Open Market Purchase Agreement, both of which explicitly state that a majority of lenders—the amount needed for any amendment not affecting sacred rights—consented to the debt-for-debt exchanges as an open market purchase.

55.     The 1L Amendment provides that each Required Lender "acknowledges and agrees that the borrowing and/or incurrence" of the super-priority loans and all "step[s] necessary to effectuate" the 2020 Transaction "shall be and are permitted."  ECF No. 2-4 (1L Amendment) § 4; *see also id.* § 14 (lenders granting consent for Administrative Agent to effectuate the Transaction). Likewise, the Open Market Purchase Agreement, which was entered into by the Required Lenders, provides that "pursuant to Section 9.05(g) of the First Lien Credit Agreement, the Specified Borrowers will purchase on the open market from such Specified Lender all of its Existing First Lien Term Loans," that "[e]ach of the Specified Lenders" instruct each Bank Agent to take necessary actions to effectuate the debt purchase transaction, and that each Specified Lender

---

[13] Because amending the definition of open market purchase is not an action requiring 100% consent of the lenders under the sacred rights provisions of the Non-PTL Term Loan Agreement, only the consent of the Required Lenders and Serta was necessary.

agreed that all conditions precedent to the 2020 Transaction were satisfied.  ECF No. 2-5 §§ 2.1(f), 2.2.

56.     These documents are "agreements in writing entered into by [the Company] and the Required Lenders," ECF No. 2-3 § 9.02(b), that amend the Non-PTL Term Loan Agreement. And because they did not affect any sacred rights, they required consent of only the Required Lenders.  *See LCM XXII Ltd.*, 2022 WL 953109, at *11.  The requisite majority of lenders have, pursuant to the Agreement's terms and procedures, amended that Agreement to approve the discounted debt-for-debt open market purchases as part of the 2020 Transaction, rendering "open market purchases" unambiguous for this additional reason as well.

> **C.     Even If The Term "Open Market Purchase" Were Ambiguous, The Evidence Presented Establishes That The Non-PTL Term Loan Agreement Permitted The 2020 Transaction.**

57.     If the Court were to conclude that the meaning of "open market purchase" is not resolved unambiguously based on the arguments set forth above, it may consult extrinsic evidence to resolve any ambiguity.  *See Last Time Beverage Corp. v. F&V Distrib. Co., LLC*, 98 A.D.3d 947, 951–52 (N.Y. App. Div. 2012).  To the extent the Court does not consider the expert analyses and recent restructuring transaction discussed above as industry custom and usage establishing the plain meaning of the contract, it can certainly consider them to resolve any ambiguity.  They do so in Plaintiffs' favor as a matter of law, as uncontested or lopsided extrinsic evidence that "no reasonable person" could understand differently.  *Compagnie Financière*, 232 F.3d at 158.

> **II.     Plaintiffs Are Entitled To A Declaration That They Did Not Violate The Implied Covenant Of Good Faith And Fair Dealing**

58.     The failure of the Non-PTL Lenders' contract claims also dooms their good-faith-and-fair-dealing claim.  Under New York law, a covenant of good faith and fair dealing is implied in every contract.  This covenant includes a promise "not to act arbitrarily or irrationally in exercising [] discretion" granted by the agreement.  *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384,

389 (N.Y. 1995).  The implied covenant is limited in scope, however, and, "no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'"  *Id.* (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (N.Y. 1983)).  The claim here is inconsistent with the parties' contract.

59.     Plaintiffs also are entitled to summary judgment on the implied covenant claim because the 2020 Transaction did not deprive Defendants of the benefit of their bargain in bad faith.  To the contrary, it is the Non-PTL Lenders whose proposal would have siphoned off a large portion of the first lien loan collateral for their benefit alone—and would not have permitted the Company to benefit from discount capture in the way the 2020 Transaction did.

### A.     Defendants' Implied Covenant Theory Is Duplicative Of Their Breach Of Contract Claim And Can Impose No Independent Obligations.

60.     Defendants' claim for breach of the implied covenant of good faith and fair dealing is "identical to [their] breach of contract claim," and should be dismissed as a matter of law for that reason.  *North Star*, 2020 WL 3411267, at *5.  Both are based on the same interpretations of the unanimity, "open market," waterfall, and pro rata provisions of the Non-PTL Term Loan Agreement.  *See* Prepetition Am. Compl. ¶¶ 81, 82, 136, 138, 140, 142, 144, 145, 150.

61.     Under these circumstances, the implied covenant of good faith and fair dealing imposes no additional obligations and cannot establish an independent claim.  *See, e.g.*, *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (N.Y. 1987) ("It is impermissible, however, to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties."); *Smile Train, Inc. v. Ferris Consulting Corp.*, 117 A.D.3d 629, 630 (N.Y. App. Div. 2014) ("[A] claim for 'breach of the implied covenant of good faith and fair dealing . . . may not be used as a substitute for a nonviable claim of breach of contract.'") (citation omitted); *MBIA Ins. Corp. v. Merrill Lynch*, 81 A.D.3d 419, 419–20 (N.Y.

App. Div. 2011) (good faith and fair dealing claim cannot be maintained where it is "intrinsically tied to the damages allegedly resulting from a breach of contract"); *Fesseha v. TD Waterhouse Inv. Servs.*, 305 A.D.2d 268, 268 (N.Y. App. Div. 2003) (claimant may not "create independent contractual rights" using implied covenant of good faith and fair dealing).

62.     When courts have permitted plaintiffs to alternatively plead both breach of contract and implied covenant claims at the motion to dismiss stage, they have done so because they have found "a *bona fide* dispute over whether a contract covers the contested issue." *LCM XXII*, 2022 WL 953109, at *15.  But there is no "bona fide dispute" here—on summary judgment—when the contract and other undisputed evidence makes clear that the challenged actions fall squarely within the express language of the contract.  *See, e.g.*, *RST (2005) Inc. v. Rsch. in Motion Ltd.*, 597 F. Supp. 2d 362, 367 (S.D.N.Y. 2009) (granting summary judgment because "New York law does not support a separate claim for the breach of the implied covenant of good faith and fair dealing when it is based on the same facts as the breach of contract claim"); *In re New York Skyline, Inc.*, 471 B.R. 69, 88 (Bankr. S.D.N.Y. 2012) (same); *Dipizio Constr. Co. v. Niagara Frontier Transp. Auth.*, 107 A.D.3d 1565, 1566–67 (N.Y. App. Div. 2013) (affirming summary judgment on implied covenant claim because it "was duplicative of the breach of contract causes of action").

## B.     Lender Plaintiffs Did Not Deprive Defendants Of Bargained-For Benefits.

63.     Defendants cannot breathe life into a meritless and duplicative implied covenant claim by alleging that Plaintiffs engaged in "bad faith."  *See* Prepetition Am. Compl. ¶ 144.  To the contrary, the Defendants themselves were seeking to obtain super-priority creditor status on terms far less favorable to the Company and other creditors than the 2020 Transaction.  In any event, the 2020 Transaction respected all of Defendants' bargained-for liens and contractual rights, while offering the Company a financial life-line at a critical juncture.

64. The Company chose the PTL Lenders' proposal after a transparent bidding process in which many of the Defendants fully participated, such that the Company negotiated with more than two-thirds of its lenders. *See* Statement of Uncontroverted Facts, at ¶¶ 10–12.

65. Among other options considered by the Company, a group of Non-PTL Lenders comprised of the Angelo Gorgon entities, Gamut, and Apollo-affiliate North Star Debt Holdings, L.P. submitted a proposal that would have increased the Company's total debt by $38 million and increased its total interest payments by approximately $37 million. *Id.* ¶ 25. Moreover, their proposal called for the creation of a new bankruptcy remote subsidiary that would have been assigned the Company's crown-jewel intellectual property (which secured the Company's existing First Lien debt), as well as certain real estate assets and a pledge of the stock of Serta, Inc. *Id.* at ¶ 24. The new bankruptcy remote entity would have been the Guarantor for the Apollo group's new debt. *Id.* In other words, the Apollo group's proposal would have stripped hundreds of millions of dollars in collateral from other first-lien lenders and added substantial new collateral for the Apollo group's benefit only. *See id. at* ¶¶ 23–25.

66. Although the outcome of the Apollo group's competing proposal would have been far less favorable to the Company and other lenders, the structure, with a new money tranche and a debt-for-debt exchange component, was substantially similar; their proposal contemplated $200 million in new money and a debt-for-debt exchange of approximately $630 million of existing First Lien Term Loans and Second Lien Term Loans into approximately $470 million of exchanged debt, all to be effectuated pursuant to the "open market purchase" language in the agreement. *Id.* at ¶ 23. As Justice Masley recognized, "had [Non-PTL Lenders] succeeded, they would have been in the coveted super priority position." *North Star*, 2020 WL 3411267, at *2.[14]

---

[14] In addition, the only way that the Non-PTL Lenders could have structured their alternative transaction would have been through use of the same "open market purchase" provision of the

67.     Because the PTL Lenders' proposal was more favorable to the Company than the Apollo group proposal and the other options available to it, the Company ultimately elected to go with the PTL Lenders' proposal.  The 2020 Transaction exchanged $1.2 billion in loans at a material discount for approximately $875 million as part of an overall deal that, again, Justice Masley recognized "provide[d] Serta with more liquidity, less debt and flexibility for additional decreases in debt." *North Star*, 2020 WL 3411267, at *6; *see* Statement of Uncontroverted Facts, at ¶ 18.[15]  In the depths of the COVID-19 pandemic, when the Company was hurting for cash to keep operations running and employees paid, the Lender Plaintiffs provided meaningful liquidity and discount capture, permitting the Company to stave off bankruptcy much longer than it otherwise would have.

68.     Because the undisputed evidence shows that Plaintiffs did not act in bad faith and because, in any event, the implied covenant claim is duplicative of the breach of contract claim, this Court should award summary judgment in favor of Plaintiffs on their request for a declaration that the Plaintiffs did not violate the implied covenant.

## CONCLUSION

69.     Summary judgment should be granted because Lender Plaintiffs have established an entitlement to relief and no genuine issues of material fact preclude immediate resolution of this substantial dispute between the parties.  Accordingly, the Court should enter a judgment

---

Non-PTL Term Loan Agreement to exchange certain of the Non-PTL Term Loan Lenders' debt for new debt backed by the subsidiaries that received the transferred collateral.

[15] The circumstances here are thus a far cry from those that led Justice Masley to deny a motion to dismiss the implied covenant claim in *Boardriders*, 2022 WL 10085886, at *9.  There, "the Transaction was carried out in secret"—despite multiple attempts by plaintiffs "to gauge whether the Company needed additional capital[] which plaintiffs . . . were willing to provide." *Id.*  The defendants there allegedly "abused their ability to amend the Credit Agreement to effectuate the Transaction, going so far as to amend the no-action provisions to hinder plaintiffs' ability to sue and eliminating every affirmative and negative covenant[]." *Id.*  And, unlike Serta in the 2020 Transaction proposed by the PTL Lenders, Boardriders did not benefit from any discount capture in that transaction. *Id.*

declaring that (1) the 2020 Transaction was permitted under the Non-PTL Term Loan Agreement and (2) the Company and the PTL Lenders did not violate the covenant of good faith and fair dealing by entering into the 2020 Transaction.  For the same reasons, Lender Plaintiffs respectfully request that the Court enter judgment in their favor on Defendants' and Third-Party Plaintiffs' mirror-image claims and counterclaims.

Dated: February 24, 2023
    Houston, Texas

/s/ Gregg Costa
_____

GIBSON, DUNN & CRUTCHER LLP
Gregg Costa (24028160)
811 Main Street, Suite 3000
Houston, TX 77002
Telephone: (346) 718-6600
Facsimile: (346) 718-6620
gcosta@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (admitted *pro hac vice*)
Amanda M. Aycock (admitted *pro hac vice*)
C. Lee Wilson (*pro hac vice* pending)
Akiva Shapiro (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
Tel:    (212) 351-4000
Fax:    (212) 351-4035
Email: osnyder@gibsondunn.com
        aaycock@gibsondunn.com
        clwilson@gibsondunn.com
        ashapiro@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Helgi C. Walker (*pro hac vice* forthcoming)
1050 Connecticut Avenue N.W.
Washington, DC 20036
Tel:    (202) 955-8500
Fax:    (202) 467-0539
Email: hwalker@gibsondunn.com

*Counsel for Plaintiffs Invesco Senior*
*Secured Management, Inc., Boston*
*Management and Research, Credit Suisse*
*Asset Management, LLC, Eaton Vance*
*Management, and Barings, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.

*/s/ Bruce J. Ruzinsky*
Bruce J. Ruzinsky

# Exhibit 1

Exhibit 10.1

**SECOND AMENDED AND RESTATED LOAN, SECURITY AND GUARANTEE AGREEMENT**

Dated as of April 15, 2020

among

**KRATON POLYMERS U.S. LLC,**

and,

**KRATON CHEMICAL, LLC,**

as U.S. Borrowers and Guarantors,

**KRATON CORPORATION,**

as Parent,

**KRATON POLYMERS LLC,**

**KRATON POLYMERS CAPITAL CORPORATION,**

**AZ CHEM US HOLDINGS INC.,**

**AZ CHEM US INC.,**

**AZ CHEM PARTNERS I LLC,**

**AZ CHEM PARTNERS II LLC,**

**AZ CHEM HOLDINGS LP,**

**AZ CHEM INTERMEDIATE LP,**

and

**ELASTOMERS HOLDINGS LLC,**

as Guarantors,

**KRATON POLYMERS NEDERLAND B.V.,**

as Initial Dutch Kraton Borrower,

**KRATON POLYMERS HOLDINGS B.V.,**

**KRATON POLYMERS RESEARCH B.V.  ,**

and

**K.P. INVESTMENT B.V.**

as Foreign Guarantors,

any other Borrowers party hereto from time to time,

certain Persons party hereto from time to time as Guarantors,

**CERTAIN FINANCIAL INSTITUTIONS,**

as Lenders,

**BANK OF AMERICA, N.A.,**

as Administrative Agent, Collateral Agent and Security Trustee

**BANK OF AMERICA, N.A.,**

As Sole Lead Arranger and Sole Book Manager

**13.3.4.**   <u>Replacement of Certain Lenders</u> .  If (a) a Lender (i) fails to give its consent to any amendment, waiver or action for which consent of either all Lenders or all affected Lenders was required and, in each case, Required Lenders consented (any such Lender, a "Non- Consenting Lender"), (ii) is a Defaulting Lender, or (iii) gives a notice under Section 3.5 or requests compensation under Section 3.7 or (b) if any Borrower is required to pay additional amounts or indemnity payments with respect to a Lender under Section 5.8, then, in addition to any other rights and remedies that any Person may have, the Agent or a Loan Party Agent may, by notice to such Lender within 120 days after such event, require such Lender to assign all of its rights and obligations under the Loan Documents to one or more Eligible Assignees, pursuant to appropriate Assignment and Acceptances, within twenty (20) days after the notice. The Agent is irrevocably appointed as attorney-in-fact to execute any such Assignment and Acceptance if the Lender fails to execute it. Such Lender shall be entitled to receive, in cash, concurrently with such assignment, all amounts owed to it under the Loan Documents at par, including all principal, interest and fees through the date of assignment (but excluding any prepayment charge).

**SECTION 14.  MISCELLANEOUS**

**14.1.  Consents, Amendments and Waivers** .

**14.1.1.**   <u>Amendment</u>  .  No modification of any Loan Document, including any extension or amendment of a Loan Document or any waiver of a Default or Event of Default, shall be effective without the prior written agreement of the Required Lenders and each Loan Party to such Loan Document; *provided, however,* that:

(a) without the prior written consent of the Agent, no modification shall be effective with respect to any provision in a Loan Document that relates to any rights, duties or discretion of the Agent;

(b) (i) without the prior written consent of each affected U.S. Fronting Bank (such consent not to be unreasonably withheld), no modification shall be effective with respect to any U.S. LC Obligations or Sections 2.3.1, 2.3.2 or 2.3.3 or any other provision in a Loan Document that relates to any rights, duties or discretion of any U.S. Fronting Bank and (ii) without the prior written consent of each affected Dutch Kraton Fronting Bank (such consent not to be unreasonably withheld), no modification shall be effective with respect to any Dutch Kraton LC Obligations or Sections 2.2.1, 2.2.2 or 2.2.3 or any other provision in a Loan Document that relates to any rights, duties or discretion of the Dutch Kraton Fronting Bank;

(c) without the prior written consent of each affected Lender, including a Defaulting Lender, no modification shall be effective that would (i) increase the Borrower Group Commitment of such Lender; (ii) reduce the amount of, or waive or delay payment of, any principal, interest or fees payable to such Lender (except as provided in Section 4.2), (iii) extend any Revolver Commitment Termination Date or the Facility Termination Date; or (iv) change the currency in which any Loan is denominated;

(d) without the prior written consent of all (i) Lenders (except any Defaulting Lender as provided in Section 4.2), no modification shall be effective that would (A) alter Section 5.3 or waive any condition in Section 6.1; (B) amend the definitions of Pro Rata, Required Lenders or Super-Majority Lenders; (C) amend this Section 14.1.1 or Section 5.5.1 or 12.6; (D) increase the Maximum Facility Amount; (E) except as permitted under Section 10.2.2 subordinate the Agent's Lien on any Collateral or subordinate any Obligation in right payment to any other Debt; or (F) except as permitted under Section 12.3, release all or substantially all of the Collateral; or (G) except as permitted under Section 12.3,

[Kraton] Second A&R Loan, Security and Guarantee Agreement

# Exhibit 2

Exhibit 10.1

AMENDED AND RESTATED CREDIT AGREEMENT

dated as of October 19, 2017,

among

**TESSCO TECHNOLOGIES INCORPORATED,**
as Parent,

**TESSCO INCORPORATED, GW SERVICE SOLUTIONS, INC.,**
**TESSCO SERVICE SOLUTIONS, INC.,** and
**TCPM, INC.**
as Borrowers,

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**

and

**SUNTRUST BANK**
as Administrative Agent

**SUNTRUST ROBINSON HUMPHREY, INC.**
as Sole Lead Arranger and Sole Book Manager

reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive Non-Public Information.

(d) Private Side Information Contacts. Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including Unites States federal and state securities laws, to make reference to information that is not made available through the "Public Side Information" portion of the Platform and that may contain Non-Public Information with respect to the Parent, any Borrower, its Affiliates or any of their securities or loans for purposes of United States federal or state securities laws. In the event that any Public Lender has determined for itself not to access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) other Lenders may have availed themselves of such information and (ii) none of the Parent, any Borrower, nor the Administrative Agent has any responsibility for such Public Lender's decision to limit the scope of the information it has obtained in connection with this Agreement and the other Loan Documents.

**Section 10.2    Waiver; Amendments** .

(a) No failure or delay by the Administrative Agent, the Issuing Bank or any Lender in exercising any right or power hereunder or under any other Loan Document, and no course of dealing between the Loan Parties and the Administrative Agent or any Lender **,** shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power hereunder or thereunder. The rights and remedies of the Administrative Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies provided by law. No waiver of any provision of this Agreement or of any other Loan Document or consent to any departure by the Loan Parties therefrom shall in any event be effective unless the same shall be permitted by subsection (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or the issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default or Event of Default at the time.

(b) No amendment or waiver of any provision of this Agreement or of the other Loan Documents (other than the Fee Letter), nor consent to any departure by the Loan Parties therefrom, shall in any event be effective unless the same shall be in writing and signed by each of the Parent, each Borrower, and the Required Lenders, or each of the Parent, each Borrower, and the Administrative Agent with the consent of the Required Lenders, and then such amendment, waiver or consent shall be effective only in the

specific instance and for the specific purpose for which given; provided that, in addition to the consent of the Required Lenders, no amendment, waiver or consent shall:

(i)      increase the Commitment of any Lender without the written consent of such Lender;

(ii)     reduce the principal amount of any Loan or reimbursement obligation with respect to a LC Disbursement or reduce the rate of interest thereon, (other than to waive the Default Interest), or reduce any fees payable hereunder, without the written consent of each Lender directly affected thereby;

(iii)    postpone the date fixed for any payment of any principal of, or interest on, any Loan or LC Disbursement or any fees hereunder or reduce the amount of, waive or excuse any such payment (other than to waive the Default Interest), or postpone the scheduled date for the termination or reduction of any Commitment, without the written consent of each Lender directly affected thereby;

(iv)    change Section 2.23(b) or (c) in a manner that would alter the *pro rata* sharing of payments required thereby, without the written consent of each Lender;

(v)     change any of the provisions of this subsection (b) or the definition of "Required Lenders" or "Supermajority Lenders" or any other provision hereof specifying the number or percentage of Lenders which are required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the consent of each Lender;

(vi)    release all or substantially all of the guarantors, or limit the liability of such guarantors, under any guaranty agreement guaranteeing any of the Obligations, without the written consent of each Lender;

(vii)   release all or substantially all Collateral (if any) securing any of the Obligations, without the written consent of each Lender; or

(viii)  (A) increase the advance rates specified in the definition of Borrowing Base or (B) otherwise change the definition of Availability or Borrowing Base or any of the definitions used therein if the effect thereof is to increase Availability, without the written consent of Supermajority Lenders;

(ix)    change Section 8.2 , without the written consent of each Lender; or

(x)     subordinate the Obligations to any other Indebtedness or subordinate the Liens securing the Obligations to any other Liens (except as expressly contemplated hereby), without the written consent of each Lender;

provided , further , that no such amendment, waiver or consent shall amend, modify or otherwise affect the rights, duties or obligations of the Administrative Agent, the Swingline Lender or the Issuing Bank without the prior written consent of such Person.

# Exhibit 3

**Exhibit 10.1**

**[EXECUTION VERSION]**

$1,000,000,000

AMENDED AND RESTATED CREDIT AGREEMENT

Dated as of February 3, 2017

among

BJ'S WHOLESALE CLUB, INC.,
as the Borrower,

BEACON HOLDING INC.,
as Holdings,

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Administrative Agent,
and
THE OTHER LENDERS AND ISSUERS PARTY HERETO

BANK OF AMERICA, NATIONAL ASSOCIATION and DEUTSCHE BANK SECURITIES INC.,
as Co-Syndication Agents,

BMO HARRIS BANK N.A.,
CAPITAL ONE, NATIONAL ASSOCIATION,
ING CAPITAL LLC,
TD BANK, N.A. and
U.S. BANK NATIONAL ASSOCIATION,
as Co-Documentation Agents,

WELLS FARGO BANK, NATIONAL ASSOCIATION,
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED and
DEUTSCHE BANK SECURITIES INC.,
as Arrangers,

WELLS FARGO BANK, NATIONAL ASSOCIATION,
MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED and
DEUTSCHE BANK SECURITIES INC.,
as Joint Bookrunners

Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

## ARTICLE XII

## MISCELLANEOUS

SECTION 12.1 Amendments, Etc.

Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Requisite Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a) extend or increase any Commitment of any Lender without the written consent of such Lender directly adversely affected thereby (it being understood that (i) a waiver of any condition precedent set forth in *Section 4.2* and (ii) the waiver of any Default, mandatory prepayment or mandatory reduction of the Revolving Credit Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(b) postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under *Section 2.6* or *2.10* without the written consent of each Lender directly adversely affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(c) reduce the principal of, or the rate of interest specified herein on, any Loan or Letter of Credit Borrowing, or (subject to *clause (iii)* of the second proviso to this *Section 12.1* ) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby (it being understood that any change to any component of "Excess Availability" shall not constitute a reduction in the rate of interest); *provided* that only the consent of the Requisite Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d) change any provision of this *Section 12.1* , the definition of "Requisite Lenders", "Requisite Class Lenders", "Supermajority Lenders" or any other provision specifying the number of Lenders or portion of the Loans or Commitments required to take any action under the Loan Documents, without the written consent of each Lender affected thereby;

(e) other than in a transaction permitted under *Section 9.4* or *9.5* , release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

182

(f) other than in a transaction permitted under *Section 9.4* or *9.5* , release all or substantially all of the aggregate value of the Guaranty or all or substantially all of the Guarantors, without the written consent of each Lender;

(g) change the definition of the term "Borrowing Base", "Term Borrowing Base" or any component definition thereof, but excluding the definitions of "Revolving Eligible Accounts Advance Rate", "Revolving Credit Card Advance Rate", or "Revolving Inventory Advance Rate", "Term Eligible Accounts Advance Rate", "Term Credit Card Advance Rate", or "Term Inventory Advance Rate" or the numerical percentage of Qualified Cash in the definition of "Borrowing Base", in each case the amendment or modifications of which shall be subject to clause (h) below, if as a result thereof the amounts available to be borrowed by the Borrower would be increased, without the written consent of the Supermajority Lenders and the Requisite Class Lenders under the Term Facility, provided that the foregoing shall not limit the discretion of the Administrative Agent to change, establish or eliminate any Availability Reserves, Inventory Reserves or Shrink Reserves without the consent of any Lenders;

(h) increase the numerical percentage contained in "Revolving Eligible Accounts Advance Rate", "Revolving Credit Card Advance Rate", or "Revolving Inventory Advance Rate", "Term Eligible Accounts Advance Rate", "Term Credit Card Advance Rate", or "Term Inventory Advance Rate" or the numerical percentage of Qualified Cash in the definition of "Borrowing Base" without the written consent of each Lender; provided that the foregoing shall not limit the discretion of the Administrative Agent to change, establish or eliminate any Availability Reserves, Inventory Reserves or Shrink Reserves without the consent of any Lenders;

(i) without the prior written consent of all Lenders directly affected thereby, (i) subordinate the Obligations hereunder to any other Indebtedness, or (ii) except as provided by operation of applicable Law or in the Intercreditor Agreement, subordinate the Liens granted hereunder or under the other Loan Documents to any other Lien; or

(j) change the order of the application of funds specified in *Section 10.3* without the written consent of each Lender directly affected thereby;

and *provided further* that (i) no amendment, waiver or consent shall, unless in writing and signed by each Issuer in addition to the Lenders required above, affect the rights or duties of an Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or consent shall, unless in writing and signed by the Swing Loan Lender in addition to the Lenders required above, affect the rights or duties of the Swing Loan Lender under this Agreement; (iii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (iv) [reserved]; (v) *Section 12.2(g)* may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; (vi) the consent of Requisite Class Lenders shall be required with respect to any amendment that by its terms directly adversely affects the rights of such Class in respect of payments hereunder in a manner different than such amendment affects other Classes; and (vii)

183

# Exhibit 4

**Reorg**®

*2023-02-07 04:52:08*

**Envision Healthcare Corporation**

# Envision Healthcare Closes Recapitalization With $1.3B of New Money, Designation of Portion of AmSurg as UnSub, Open-Market Purchase of Existing Debt, Incurrence of Intercompany Loan

Fri 04/29/2022 16:59 PM

Envision Healthcare closed a recapitalization today that features $1.3 billion of additional capital, the designation of a portion of AmSurg as an unrestricted subsidiary, the reduction of about $580 million of total debt, an open-market purchase of certain existing creditors' holdings as well as an intercompany loan, according to sources.

The transactions boost the medical group's liquidity for general corporate purposes, including executing potential liability transactions in the future, expanding the business and pursuing acquisitions, the sources said. The company would also have a clean audit and continue as a going concern, they said. However, certain aspects of the deal are expected to draw criticism and potential litigation, due to the leakage of a portion of the ambulatory surgery center business from the perspective of the restricted group, and the fact that some term lenders were left out of participation in the transactions.

AmSurg incurred a $1.1 billion first lien loan, and about 83% of the business was designated as an unrestricted subsidiary, the sources said. AmSurg also incurred a $200 million first lien delayed-draw term loan. Existing and new lenders funded the facilities, the sources said. AmSurg's guarantee of Envision's existing loans was released after the designation.

In addition, the company incurred a $1.3 billion second lien loan at AmSurg, the proceeds of which were sent to Envision in the form of an intercompany loan on a first lien basis, for Envision to make open-market repurchases of certain term lenders' existing loans and bonds at a discount, the sources said. Envision negotiated the repurchases with a number of creditors individually, they added.

Envision Healthcare believes the transactions strictly comply with the terms of the existing credit agreement, the sources said.

The L+375 bps term loan due 2025 was quoted today at 60.5/61.5, down from 64/65 on Thursday, according to a trading desk. The 8.75% unsecured notes due 2026 last traded in size at 41.75 on April 26, according to TRACE.

Envision Healthcare is advised by Kirkland & Ellis as counsel, PJT Partners as investment banker and Alvarez & Marsal as financial advisor, as reported.

Representatives for Envision Healthcare and sponsor KKR declined to comment.

--Harvard Zhang

This publication has been prepared by Reorg Research, Inc. or one of its affiliates (collectively, "Reorg") and is being provided to the recipient in connection with a subscription to one or more Reorg products. Recipient's use of the Reorg platform is subject to Reorg's Terms of Use or the user agreement pursuant to which the recipient has access to the platform (the "Applicable Terms").  The recipient of this publication may not redistribute or republish any portion of the information contained herein other than with Reorg's express written consent or in accordance with the Applicable Terms. The information in this publication is for general informational purposes only and should not be construed as legal, investment, accounting or other professional advice on any subject matter or as a substitute for such advice. The recipient of this publication must comply with all applicable laws, including laws regarding the purchase and sale of securities. Reorg obtains information from a wide variety of sources, which it believes to be reliable, but Reorg does not make any representation, warranty, or certification as to the materiality or public availability of the information in this publication or that such information is accurate, complete, comprehensive or fit for a particular purpose. Recipients must make their own decisions about investment strategies or securities mentioned in this publication. Reorg and its officers, directors, partners and employees expressly disclaim all liability relating to

or arising from actions taken or not taken based on any or all of the information contained in this publication. © 2023 Reorg. All rights reserved. Reorg® is a registered trademark of Reorg Research, Inc.

© Copyright 2012 - 2023

# Exhibit 5

 **Debtwire**

# Envision lenders map out litigation angles following asset transfer

04 May 2022 | 14:55 EDT

First there was JCrew, then Petsmart, a few in between and now Envision Healthcare. The latest balance sheet ploy by the KKR-backed physician staffing company has enraged an ad hoc group of lenders that is now contemplating a potential litigation offensive rooted in allegations of covenant violations and fraudulent conveyance, according to five sources familiar with the situation.

On Friday (29 April), the borrower disclosed that it moved its AMSURG ambulatory surgery business away from its existing lender group's collateral package and into an unrestricted subsidiary called AMSURG Holdco LLC. The new AMSURG entity then issued a USD 1.1bn first lien TL and USD 200m delayed draw term loan and a USD 1.3bn second lien loan. Proceeds will be used to fund operations and fund non-pro rata **purchas**es of pre-existing debt at Envision Healthcare Corp. Additionally, the new AMSURG Holdco then reverted proceeds of the second lien loan back to Envision Healthcare Corp in the form of an intercompany loan with Envision Healthcare as the intercompany borrower, one of the sources surmised.

The buybacks are broken down as targeting USD 1.5bn of the company's USD 5.45bn Libor+ 375ps TLB due October 2025 at 66% of par, USD 326m of its USD 394.81m L+ 450bps/150bps PIK (1% floor) incremental term loan due October 2025 at 90% of par and USD 87m of its USD 1bn 8.75% senior unsecured notes at 46% of par. The company also reserved the right to **purchas**e debt with the funds in the future.

For years, investors had feared that Envision could move assets to a dropdown box, given the flexibility of the credit agreements that invite such balance sheet aggression to alleviate financial pressure.

The company did just that - opting to strip collateral from the lenders and transfer 83% of AMSURG into the new AMSURG Holdco LLC unrestricted subsidiary. The new debt was backed by a group of investors, including existing lender PIMCO as well as new lenders Angelo Gordon and Centerbridge.

In response, Kasowitz, which serves as litigation counsel to an ad hoc group of first lien lenders, held a call Monday (2 May) to outline potential litigation angles, the sources added. The group is also working with Guggenheim and Gibson Dunn, as reported.

Disenfranchised lenders who got left out of the transactions plan to argue that the deal was a breach of good faith and fair dealing. Moreover, the lender group could contend that the creation and leveraging of the dropdown – specifically the issuance of the intercompany second lien to Envision Healthcare as borrower – violated the incurrence test and indebtedness covenant under the existing credit agreement at Envision Healthcare.

 **PROPRIETARY**

**North America**

Medical
USA

**Issuer**
Envision Healthcare Corporation

**Financial Advisor(S)**
Alvarez & Marsal
PJT Partners Inc



**First Lien Lender Advisor(S)**
Guggenheim Partners, LLC

**First Lien Lender Counsel(S)**
Gibson, Dunn & Crutcher LLP

**Lawyer(S)**
Kirkland & Ellis LLP



Envision lenders map out litigation toolbox following asset transfer - Debtwire

Lenders will likely claim that there was no debt capacity at the Envision Healthcare level to allow the structuring of a USD 1.3bn intercompany loan, which was structured as short-term debt, allowing the company to circumvent the indebtedness covenant.

Another flashpoint of contention will likely zero in how the non-pro-rata execution of the buybacks may be in violation of a mandatory prepayment provision that gets triggered by a material change in the business, sources added. To that point, there has been some debate as to whether the designation of AMSURG as an unrestricted subsidiary fits into a material change definition, because if it does, lenders would be in line to receive pro-rata paydowns at par – as opposed to the discounted, non-pro-rata buybacks that occurred only to the benefit of the backstop participating lenders.

Envision's Libor+ 375ps TLB due October 2025 term loan is currently quoted at 49.023/51.383, compared to 60.75/62.611 on 29 April and 66.181/67.556 on 31 March, according to Markit.

Messages left with Kasowitz and KKR were not returned.

by Reshmi Basu

© MERGERMARKET GROUP. ALL RIGHTS RESERVED.

To be used for the internal business of the assigned users only. Sharing, distributing or forwarding the entirety or any part of this article in any form to anyone that does not have access under your agreement is strictly prohibited and doing so violates your contract and is considered a breach of copyright. Any unauthorised recipient or distributor of this article is liable to Debtwire for unauthorised use and copyright breach.

# Exhibit 6

## Markets
Markets Magazine

# The Debt Deal That Shows How Ugly Things Are Getting for Lenders

Investors who once flocked to the loans that financed the takeover of Envision Health ended up fighting over crumbs. Rising rates and recession risk augur more such battles ahead.



KKR Debt Deal Shows How Ugly Things Are for Lenders

By Eliza Ronalds-Hannon and Davide Scigliuzzo
October 5, 2022 at 9:00 AM EDT

From

The lawyers filing into Kirkland & Ellis's New York headquarters on April 7 had cleared their calendars for days. They knew they were attempting one of the most ambitious and complex financial maneuvers in corporate finance history, and it would require marathon negotiations.

Coffee, sandwiches, and a seemingly endless supply of fresh popcorn–a Kirkland staple–were on hand. The law firm was hosting the talks on behalf of its client, Envision Healthcare Corp., a hospital staffing company owned by KKR & Co.



Featured in the Oct./Nov. issue of *Bloomberg Markets* *Illustrator: Carolina Moscoso for Bloomberg Markets*

Envision was in deep trouble. Higher labor costs, a drop in hospital visits unrelated to Covid-19 during the pandemic, and new legislation to protect patients from surprise medical bills had dealt a blow to its prospects. That was raising concern about Envision's ability to support the roughly $7 billion debt load KKR had layered onto the company to finance its 2018 buyout. KKR was underwater on what had been its largest-ever equity investment.

On the other side of the table that day were representatives from Angelo Gordon & Co. and Centerbridge Partners, fund managers known for making bold bets on distressed debt. They hadn't previously lent to Envision. Now they were offering more than $1 billion of fresh financing–with a catch. To get the cash, Envision would have to strip the company's most promising division–a business called Amsurg–from existing creditors and pledge it as collateral for the new loan.

Amsurg (short for "ambulatory surgery") was capitalizing on a huge shift in health care: Doctors are increasingly able to perform same-day procedures outside of traditional hospital settings. The unit, which accounted for about 15% of Envision's revenue, had lower costs and less exposure to uninsured patients than other parts of the company and had bounced back quickly after the pandemic, according to a report by Moody's Investors Service.

The collateral move relied on an aggressive interpretation of Envision's debt documents that was sure to anger existing creditors, including Pacific Investment Management Co., the company's largest lender. The two hedge funds were confident they could pull it off.

Ryan Mollett, who joined Angelo Gordon from Blackstone Inc.'s credit unit in 2019 and ran the distressed debt business, had a penchant for creative financings. He was the mastermind behind a controversial deal for Hovnanian Enterprises Inc. that upended the market for credit-default swaps in 2018. The Centerbridge team, led by Shanshan Cao and Gavin Baiera, knew Envision particularly well. The firm's private equity arm had itself looked at the company as a potential acquisition before KKR's purchase in 2018.

To tell this story, *Bloomberg Markets* talked to 10 people with direct knowledge of the negotiations, who spoke on condition of anonymity because they weren't authorized to comment publicly.

Other struggling companies owned by private equity funds–including J. Crew, Neiman Marcus, and Petsmart–had used similar asset moves in recent years to restructure their debt and stave off bankruptcy. But the Envision deal marked the first time that an investment giant like KKR, viewed as more conservative than its peers, was willing to take the gloves off in this way.

## Eroding Protections

Composite document scores for loans that cleared the market from January 2018 to August 2022, by month of issuance



Scores range from 1 (most protective to lenders) to 5 (least). Includes loans analyzed by Covenant Review and may not represent the entire market. There were no scored PE-sponsored deals in April 2020.
Source: Covenant Review, a Fitch Solutions Service

Such maneuvers had been a decade in the making. Easy money after the global financial crisis made debt investors hungry to buy loans and bonds that provided higher yields. Funds began to agree to weaker protections in their creditor agreements. Loan and bond documents riddled with loopholes and imprecise language gave borrowers more flexibility in times of stress.

# "If we go into a real recession, we are going to see more and more borrowers and sponsors seeking to exploit document loopholes to create leverage against and among their creditors"

The documents didn't explicitly allow future creditors to grab collateral. But they left just enough ambiguity, sometimes called "trap doors," for lawyers with a bit of ingenuity and a lot of motivation to move assets to new entities and give dying companies some fresh capital. Because of these often-

overlooked provisions, some creditors were surprised to discover they'd been left with almost worthless loans and bonds after struggling companies restructured.

"Loose documents have become the norm rather than the exception," says Damian Schaible, co-head of restructuring at Davis Polk & Wardwell. "If we go into a real recession, we are going to see more and more borrowers and sponsors seeking to exploit document loopholes to create leverage against and among their creditors."

## Competing on Covenants

Average document score for loans that cleared the market from Jan. 1, 2018, to Aug. 31, 2022, by sponsor



◀ More protective to lenders                    Less protective ▶

**KKR deals scored 4.06 on average, above the 3.73 average for all private equity-led deals**

Scores range from 1 (most protective to lenders) to 5 (least). Includes loans analyzed by Covenant Review and may not represent the entire market. Includes sponsors with 20 deals or more. For deals with multiple sponsors, the first sponsor listed is counted here.
Source: Covenant Review, a Fitch Solutions Service

Credit rating companies and analysts have warned that these looser protections could leave debt investors struggling to recover their money when borrowers file for bankruptcy or pursue out-of-court restructurings. In 2020, as the pandemic pushed scores of heavily indebted companies into default in spite of an unprecedented intervention by the Federal Reserve, recovery rates on corporate debt lagged those of previous default cycles, according to Moody's.

Envision, which also explored a consensual debt exchange that would have raised less funding, ultimately opted for what is considered one of the most controversial and coercive out-of-court

restructurings to date. The deal with Angelo Gordon and Centerbridge would prove to be just the beginning of a series of maneuvers that eventually allowed the company to restructure the vast majority of its debt but forced creditors to turn against one another.

The strategy rested on two pillars. The first was a drop-down transaction, in which a company's most valuable assets are moved away from existing creditors and used as collateral for new debt. The second was a series of debt repurchases and exchanges that gave certain creditors priority over others and pushed anyone who declined to participate to the end of the line for repayment.

## Law Firm Rankings

Average document score for loans that cleared the market from Jan. 1, 2018, to Aug. 31, 2022, by borrower law firm



◀ More protective to lenders

Less protective ▶

**Simpson Thacher and Kirkland & Ellis devised the most favorable terms for borrowers**

| Firm | Score |
|------|-------|
| Simpson Thacher & Bartlett | 4.0 |
| Kirkland & Ellis | |
| Ropes & Gray | |
| Davis Polk & Wardwell | |
| Cleary Gottlieb Steen & Hamilton | |
| Debevoise & Plimpton | |
| Sullivan & Cromwell | |
| White & Case | |
| Weil, Gotshal & Manges | |
| Latham & Watkins | |
| Paul, Weiss, Rifkind, Wharton & Garrison | |
| Goodwin Procter | |
| Willkie Farr & Gallagher | |
| Fried, Frank, Harris, Shriver & Jacobson | |
| Sidley Austin | |
| Wachtell, Lipton, Rosen & Katz | |
| Cravath, Swaine & Moore | |
| Gibson, Dunn & Crutcher | |
| Dechert | |
| Paul Hastings | |
| Schulte Roth & Zabel | |
| Skadden* | |
| Jones Day | |

*Skadden, Arps, Slate, Meagher & Flom.
Scores range from 1 (most protective to lenders) to 5 (least).
Includes loans analyzed by Covenant Review and may not represent the entire market. Includes firms with 20 deals or more.
Source: Covenant Review, a Fitch Solutions Service

Kirkland was particularly adept at finding trap doors in bond and loan language for its clients. For the past decade, the firm had touted its ability to design agreements that give an edge to the borrower, as well as its skill in handling the restructurings and bankruptcies that may follow. Crafting and exploiting loopholes in debt documents had become an art form for Kirkland's attorneys.

Simpson Thacher & Bartlett, which counts KKR as a top client, had also honed this skill. The two firms have produced the most borrower-friendly loan agreements since at least 2018, according to data from

Covenant Review, a research firm owned by Fitch Group that analyzes credit agreements and bond indentures for investors.

Simpson Thacher had negotiated the Envision documents on KKR's behalf. But as Envision's outlook darkened, it turned to a team at Kirkland led by two veterans known for their prowess in navigating through bankruptcy and restructuring.

Josh Sussberg is possibly the most ubiquitous bankruptcy attorney in the US, appearing often in courts from New York to Texas. In 2017 he represented Toys 'R' Us in an Eastern District of Virginia court when it filed the biggest retail bankruptcy in over a decade.

An expert in corporate governance, Sussberg ensured that the flow of information to, and decision-making by, Envision's board of directors didn't open it or the company to litigation. Like any company owned by private equity, Envision needed to prioritize its long-term survival over the returns of its owner, in this case KKR. Complex restructurings often raise questions about whether those priorities are being respected. Sussberg had to ensure that important decisions throughout the process were made by the board's independent directors–those without an official affiliation with KKR–to indicate that KKR wasn't pulling the strings.

Meanwhile, David Nemecek, a finance partner at Kirkland, examined the documents for months to determine how best to structure an asset move that would preclude legal objections. On this he worked closely with Envision's investment bank, PJT Partners.

Nemecek and his team hit on the idea of using an intercompany loan from Amsurg to Envision to transfer the proceeds of the new debt. The main reason for the deal was to inject new cash into Envision, but structuring the payment as a loan served an additional purpose: It increased Amsurg's value in a way that supported discounting the original lenders' term loan and exchanging it for second-lien debt, an important part of cutting Envision's total liabilities.

Envision first designated Amsurg as a so-called unrestricted subsidiary, effectively moving it out of reach of existing creditors without violating provisions in the credit agreement that prohibited moving or transferring the asset. The Amsurg assets would then be used as collateral to borrow $1.3 billion from Angelo Gordon and Centerbridge, who'd effectively be stepping ahead of everyone else in the repayment waterfall. Envision could then use the cash raised from the hedge funds to boost liquidity and to repurchase some of its existing debt at steep discounts.

Some of Envision's existing lenders organized to stop the plan. They considered suing the company with the help of the law firm of Marc Kasowitz, a top Wall Street litigator who's also served as one of Donald Trump's personal attorneys. But before too long, the group dissolved. After a series of tense phone calls, at times punctuated by expletives, some of the lenders recognized that Envision and Kirkland were unmoved by threats of litigation.

# Matt Levine's Money Stuff is what's missing from your inbox.Matt Levine's Money Stuff is what's missing from your inbox.Matt Levine's Money Stuff is what's missing from your inbox.

We know you're busy. Let Bloomberg Opinion's Matt Levine unpack all the Wall Street drama for you.We know you're busy. Let Bloomberg Opinion's Matt Levine unpack all the Wall Street drama for you.We know you're busy. Let Bloomberg Opinion's Matt Levine unpack all the Wall Street drama for you.

 Sign up to this newsletter

A group of lenders led by Pimco and including HPS Investment Partners, King Street Capital Management, and Sculptor Capital Management, took stock of their options. They decided to participate in the new financing alongside Angelo Gordon and Centerbridge, providing a large chunk of the new loan. They also exchanged their existing holdings for new debt with a second-priority claim on the same Amsurg assets at a steep discount of 66¢ on the dollar. The rest of Envision's creditors had to fight for the leftovers, without Amsurg. They were able to exchange their debt for longer-dated debt backed by the remaining Envision assets in a transaction that split lenders into four classes. Ultimately, only $153 million of the original loan was left outstanding, as owners of 96% of the debt had exchanged their holdings and waived their rights to litigate the transaction in the future.

There was a bitter irony in the way most of the company's creditors ended up competing for crumbs. Four years earlier, when Credit Suisse Group AG sold the debt that financed KKR's purchase of Envision, demand was so high that a salesperson teased investors with a picture of cake crumbs on a plate. The message then: Hurry up and grab it before it's all gone.

For some, the Envision tale is just a prelude in what could become a series of aggressive out-of-court restructurings. "The sponsors still have the leverage," says Davis Polk's Schaible. "Creditors recognize at this point that everyone is on their own."

*Ronalds-Hannon covers distressed debt for Bloomberg News in Atlanta, and Scigliuzzo is a senior credit market reporter in Los Angeles.*

Terms of Service  Do Not Sell or Share My Personal Information  Trademarks  Privacy Policy
©2023 Bloomberg L.P. All Rights Reserved
Careers  Made in NYC  Advertise  Ad Choices  ▷  Help

# Exhibit 7

# Reorg®

*2023-02-21 14:59:31*

## Serta Simmons Bedding

## Serta Simmons Rejects Alternative Recap Proposal From 1L Lenders Angelo Gordon, Apollo, Gamut; Term Sheet Outlines $285M Loan Facility Secured by Intellectual Property Owned By Non-Guarantor Restricted, Unrestricted Subsidiaries

Thu 06/11/2020 18:14 PM

Serta Simmons rebuffed a proposal from first lien lenders Angelo Gordon, Apollo Global Management and Gamut Capital that provided an alternative to the transaction the company announced on June 8 with the support of a majority of its first lien and second lien lenders, according to sources. The proposal contemplated a $285 million new term loan facility at a new borrower that would be a non-guarantor restricted subsidiary under the existing credit agreements, according to a term sheet reviewed by Reorg. The alternative proposal group has been working with Paul Weiss as legal advisor and PJT Partners as financial advisor, the sources said.

According to the term sheet, the proposed new term loan would be split between $200 million of new money and $85 million exchange component. The facility would be issued out of a newly formed borrower that is a non-guarantor restricted subsidiary under the existing credit agreements and guaranteed by an immediate parent entity and a direct subsidiary entity that are also non-guarantor restricted subsidiaries under the existing credit agreements, the term sheet said. The direct subsidiary entity would be jointly owned by the new borrower and an unrestricted subsidiary, with the new borrower owning 51% and the unrestricted subsidiary owning 49%.

The new term loan facility would be secured on a perfected first-priority basis by all of the assets the direct subsidiary guarantor, including certain Simmons / T+N intellectual property related to the manufacture, marketing and sale of Simmons, Beautyrest and Tuft & Needle products, including trademarks and service marks (and associated goodwill), patens, domain names, trade secrets andor other proprietary rights, and royalty streams associated with certain third-party licenses but excluding such third-party licenses themselves, the term sheet said.

In its press release announcing the recapitalization, the company noted it has entered into a transaction support agreement with a majority of its first lien and second lien term lenders. The supporting lenders are organized with Gibson Dunn as legal advisor and Centerview Partners as financial advisor, according to sources.

The transaction would reduce net debt by approximately $400 million and provides for $200 million in new capital. As part of the transaction, Serta Simmons will amend certain existing loan documents to permit $200 million of newly funded super-priority "first out" debt ranking ahead of the existing first lien term loans, and $875 million of super-priority "second out" debt ranking ahead of the existing first lien term loans in exchange for certain existing first lien term loans and existing second lien term loans, at 74 for the first lien term loan and 39 for the second lien term loans.

The amendments will also provide for an additional basket for third out debt ahead of the existing first lien loans to be used for future loan exchanges and the use of certain assets for future liquidity enhancing and/or liability management transactions.

Serta Simmons, Apollo, Angelo Gordon, Gamut, Paul Weiss, PJT Partners, Gibson Dunn and Centerview Partners did not respond to requests for comment.

--Harvard Zhang

This publication has been prepared by Reorg Research, Inc. or one of its affiliates (collectively, "Reorg") and is being provided to the recipient in connection with a subscription to one or more Reorg products. Recipient's use of the Reorg platform is subject to Reorg's Terms of Use or the user agreement pursuant to which the recipient has access to the platform (the "Applicable Terms").  The recipient of this publication may not redistribute or republish any portion of the information contained herein other than with Reorg's express written consent or in accordance with the Applicable Terms. The information in this publication is for general informational purposes only and should not be construed as legal, investment, accounting or other professional advice on any subject matter or as a substitute for such advice. The recipient of this publication must comply with all applicable laws, including laws regarding the purchase and sale of securities. Reorg obtains information from a wide variety of sources, which it believes to be reliable, but Reorg does not make any representation, warranty, or certification as to the materiality or public availability of the information in this publication or that such information is accurate, complete, comprehensive or fit for a particular purpose. Recipients must make their own decisions about investment strategies or securities mentioned in this publication. Reorg and its officers, directors, partners and employees expressly disclaim all liability relating to or arising from actions taken or not taken based on any or all of the information contained in this publication. © 2023 Reorg. All rights reserved. Reorg® is a registered trademark of Reorg Research, Inc.

© Copyright 2012 - 2023

# Exhibit 8

March 21, 2020

# Company Debt Buybacks

William Fuller III, Aleksandra Kopec, Joseph Polonsky

King & Spalding

( + Follow )    Contact



As market uncertainty continues, companies are taking proactive measures to ensure short- and medium-term liquidity, including by fully drawing on revolving credit facilities. In turn, financial institutions would be wise to focus on another tool companies (especially those with financial sponsors willing to infuse additional cash onto the balance sheet) might use once the immediate liquidity crunch passes – permitted debt buybacks.

In general, syndicated credit facilities follow the same axiom with respect to prepayments: senior debt is repaid first, on a dollar-for-dollar basis (plus interest) for amounts loaned and ratably to all lenders. Debt buybacks turn this scenario upside down. When a Borrower buys back its debt, it is incentivized to (a) repurchase junior, more expensive debt first (to the extent otherwise permitted under the credit documentation), (b) buy such debt from those lenders willing to sell, and (c) repurchase such debt at the greatest discount to par available. This Client Alert briefly analyzes why and how Borrowers extinguish their own debt and then considers standard limitations most credit agreements have on such activities. It concludes by noting practical steps lenders can take to prepare before Borrowers begin buying back debt.

Why Borrowers Repurchase Debt

Debt buybacks permit Borrowers to reduce their overall net leverage in an economically advantageous manner as compared to traditional voluntary prepayments. For example, consider the case where a Borrower has a $100,000,000 term loan outstanding and a healthy balance sheet that would permit the Borrower to make a $10,000,000 debt prepayment. If the debt is trading at 75% to par, rather than voluntarily prepaying $10,000,000 of the outstanding term loan on a dollar-for-dollar basis, the Borrower could use the $10,000,000 to repurchase and retire $12,500,000 of its own debt. In addition to reducing overall net leverage, it has the corresponding effect of reduced interest and amortization expense.

How Borrowers Repurchase Debt

Borrowers repurchase the debt through one of two ways: a Dutch auction or an open market purchase. Most credit agreements contain provisions for Dutch auctions, whereas open market purchases are a less common option for Borrowers.

*Dutch Auction*

In a Dutch auction, the Borrower notifies an auction manager of its willingness to purchase an aggregate amount of term loans from the existing lenders at a specified price. The Borrower also notifies the auction manager of the range of discounts to par at which it would be willing to purchase the term loans. Each lender thereafter notifies the auction manager of its willingness to sell term loans to the Borrower, including the amount of term loans such lender is willing to sell as well as the discount to par at which such lender is willing to sell. The auction manager then calculates the lowest purchase price that will allow the Borrower to complete the auction by purchasing the full offered amount (or such lesser amount for which there are qualifying bids made by the lenders). Dutch auctions are viewed as more lender-favorable because all lenders are given the opportunity to sell their loans, the Borrower is buying at lowest cost and not favoring any party otherwise and the Borrower must incur significant economic and time costs engaging the auction manager and running the auction.

*Open Market Purchases*

In an open market purchase, the Borrower approaches all or a subset of the lenders (or even just one lender) and inquiries about its willingness to sell its term loans to the Borrower at a discount to par. To the extent permitted under the credit agreement, this approach circumvents the basic tenets of a syndicated facility described above: it allows the Borrower to shop around to first buy back the most expensive debt that a lender is willing to sell, including on a non-pro rata basis, and gives the Borrower significant leverage to encourage lenders to down-bid against one another, especially in the instance where one or more lenders desires to exit the facility. It also allows the Borrower to cherry-pick which Lenders are permitted to exit the facility. Thus, open market buybacks are viewed as more Borrower-favorable.

Common Limitations on Debt Buybacks

Most credit agreements that permit debt buybacks also include certain customary limitations on the Borrower's right to buyback debt:

- Any debt repurchased is automatically and permanently cancelled upon acquisition thereof by a loan party (this may also result in the cancellation of indebtedness income, potentially

increasing tax distributions required to be made to the Borrower and its parent entities);

- The Borrower is often not permitted to make any debt buyback if any event of default has occurred and is continuing; and

- No proceeds from any revolving loans shall be used to fund such purchase.

In the context of current market considerations, the third bullet is particularly interesting. As Borrowers continue to draw significant amounts down on their revolving loan facilities, it is incumbent on the administrative agent and the lenders to ensure that such drawings are not later used to repurchase term loans. Given the fungible nature of cash, it is important that the Borrower be able to trace the in-flow of cash being used to repurchase the loans to a source other than the revolving draw.

Practical Considerations for Lenders

- Be active managers of your portfolio! Stay abreast of where the debt is trading on a regular basis and understand your risk tolerance (i.e., how far below par you would be willing to sell) will enable you to make decisions quickly when you receive notice of a Dutch action or an unsolicited solicitation from the Borrower.

- Understand how repurchases might otherwise flow through the credit agreement and open up the potential for further leakage. For example, many credit agreements increase the Available Amount by the amount spent to buy back the debt. For deals currently being negotiated or amended, be sure this amount correlates to the amount being repurchased, not the par amount being retired.

  

---

## LATEST POSTS

- **State regulation of PFAS continued to increase in 2022**

- **NAIC Developments Affecting Insurer Investment Portfolios** • **Rule 192**

- **New York Budget Bill Proposes New Approval Process for Acquisitions of Health Care Entities**

- **State AG Actions Filed In Numerous States**



See more »

DISCLAIMER: Because of the generality of this update, the information provided herein may not be applicable in all situations and should not be acted upon without specific legal advice based on particular situations.

© King & Spalding 2023 | Attorney Advertising

**WRITTEN BY:**



King & Spalding

Contact          + Follow

William Fuller III                                    + Follow

Aleksandra Kopec                                     + Follow

Joseph Polonsky                                      + Follow

**PUBLISHED IN:**

Buyback Programs                                     + Follow

Credit Agreements                                    + Follow

Debt                                                 + Follow

Financial Institutions                               + Follow

Financial Services Industry                          + Follow

Liquidity                                            + Follow

Syndicated Loans                                     + Follow

General Business                                     + Follow

Finance & Banking                                    + Follow

**KING & SPALDING ON:**



CMRK 13-04002    DATTMAMA 12   bJW5 N 1XDB IN CODY/C3   bJWN 14 IN 306



# Exhibit 9

# Debt Buyback Considerations in Light of Covid–19

*March 30, 2020*

In light of recent market volatility resulting from the outbreak of coronavirus disease 2019 ("Covid-19"), responsive measures to address the pandemic, recent shocks in commodity markets and other related events, companies may be evaluating opportunities to repurchase their outstanding debt at significantly reduced prices. This memorandum provides a general overview of debt buybacks and certain considerations that companies should take into account when analyzing potential debt buyback opportunities.

## POTENTIAL RESTRICTIONS ON DEBT BUYBACKS

As a threshold matter, a company contemplating a debt buyback should analyze whether the buyback is both advisable (e.g., from a liquidity perspective) and permissible (e.g., from a contractual compliance perspective). Review of company credit agreements, indentures and other relevant debt documents should be undertaken to ensure restrictive covenants (such as limitations on restricted payments or junior debt prepayments and, if applicable, passive holding company covenants) do not prohibit the contemplated debt buyback, particularly if the debt contemplated to be purchased is junior lien, unsecured or subordinated debt. In the case of loan buybacks, the governing credit agreement should be reviewed to determine if there are provisions that expressly permit the buyback. In the absence of such express permission, there may be technical provisions in the governing credit agreement that would operate to prohibit the buyback (e.g., assignment provisions that prohibit assignments to the borrower or its affiliates or ratable sharing provisions that require loan payments received from the borrower or its affiliates to be shared ratably among all lenders). Provisions relating to loan buybacks commonly appear in credit agreements with term loan B structures, but rarely appear in credit agreements with term loan A structures.

## LOAN BUYBACKS

### Types of Loan Buybacks

Provisions in credit agreements relating to loan buybacks will vary depending upon the entity that is purchasing the loans. In general, there are three categories of potential purchasers of loans:

- Borrower Buybacks: buybacks by the borrower and its restricted subsidiaries.

- Debt Fund Affiliate Buybacks: buybacks by affiliates of the borrower that are "bona fide debt funds" (i.e., entities that are primarily engaged in the extension of credit in the ordinary course of business and with respect to which neither the borrower nor any affiliate of the borrower exercises control over investment decisions) ("Debt Fund Affiliates").

- Non-Debt Fund Affiliate Buybacks: buybacks by affiliates of the borrower that are not Debt Fund Affiliates ("Non-Debt Fund Affiliates").

If the governing credit agreement has a "Holdings" entity that guarantees the obligations of the borrower, review of the credit agreement should be undertaken to determine if a buyback by that entity would be treated as a "borrower buyback" or as a "non-debt fund affiliate buyback". The same review should be undertaken in respect of buybacks contemplated to be made by unrestricted subsidiaries of the borrower.

### Mechanics of Loan Buybacks

There are three primary mechanisms for effecting loan buybacks:

- Open Market Purchases: process in which loans are purchased as they become available in the secondary market on a non-pro rata basis; likely to involve smaller increments of loans and to be less costly than purchasing via a Dutch Auction.

- Open Market Purchase Programs Via Intermediary: process in which a third-party purchasing agent (typically a market maker in the loans, such as the administrative agent under the relevant credit agreement) is directed to purchase loans subject to pre-agreed pricing parameters for a set period of time, similar to a Rule 10b5-1 share repurchase plan. Once such a program is established, loans purchased by the purchasing agent pursuant to the program will be required to be repurchased from it by the borrower or other relevant purchaser. Depending on the particular circumstances, it may be the case that utilizing such a program (versus open market purchases without the use of an intermediary) could achieve more optimal pricing, as the identity of the ultimate purchaser of the loans is not generally disclosed to the loan market.

- Dutch Auction Purchases: process in which an offer to purchase a certain amount of loans within certain pricing parameters is submitted ratably to all lenders; after interested lenders submit their bids, the auction agent (typically the administrative agent under the relevant credit agreement) determines the applicable price (which typically will be the lowest price for which the purchaser can purchase the amount of loans subject to the offer) and the purchaser then purchases loans from each interested lender at such set price or, depending on the structure of the particular auction, such lender's bid price, if lower.

**Considerations for Loan Buybacks**

Companies contemplating loan buybacks should take into account certain considerations when analyzing potential loan buyback opportunities. The considerations typically vary depending upon the entity that is purchasing the loans.

***Borrower Buybacks***

- Cancellation of Principal: once purchased by the borrower or its restricted subsidiaries, the relevant loans will be extinguished and no longer remain outstanding; as such, the borrower or such subsidiary will not have any rights as a lender under the credit agreement.

- Impact on Scheduled Amortization: the governing credit agreement should be reviewed to determine if there are provisions that address the impact of the buyback on scheduled amortization (i.e., whether future scheduled amortization installments and the remaining bullet payment at maturity are to be reduced in forward order of maturity, reverse order of maturity or on a pro rata basis); many credit agreements will expressly address this issue and typically provide for pro rata reduction of scheduled amortization installments and the payment due at maturity. In the event that the credit agreement is silent on the issue, advice of counsel should be taken to determine the appropriate approach.

- Not a Voluntary Prepayment: the borrower buyback likely does not constitute a voluntary prepayment (and many credit agreements will state that expressly), unless the governing credit agreement expressly provides otherwise. This generally means that reduction of scheduled amortization installments in direct order of maturity is unlikely to be achievable with a loan buyback.

- Types of Loans: the governing credit agreement should be reviewed for restrictions on the types of loans that may be purchased by the borrower; most credit agreements limit borrower buybacks to term loans only.

- Impact on Leverage Ratios: the borrower buyback will have a direct effect on the borrower's leverage ratios through a reduction in the numerator equal to the full principal amount of the extinguished debt. In credit agreements that permit unlimited cash netting in the calculation of leverage ratios (i.e., the amount of debt included in the numerator is reduced by the amount of unrestricted cash of the borrower and its restricted subsidiaries), a benefit will still be achieved but would be more muted, as the net reduction to the numerator will be limited to the excess of the principal amount of the debt extinguished over the amount of cash expended in the buyback.

- Impact on Excess Cash Flow and Incremental Facility Capacity: the borrower buyback will have a direct effect through a deduction in the calculation of excess cash flow and, in many credit agreements, an increase in the

maximum permitted amount of incremental facilities. In each case, review of the governing credit agreement should be undertaken to determine whether the borrower would receive credit for the full principal amount of the debt extinguished or only the amount of cash expended in the buyback.

- Source of Funds: the governing credit agreement often will include a prohibition of the use of the borrower's revolver to fund loan buybacks; to the extent other long-term indebtedness is used to finance a loan buyback, the credit agreement may provide that the loan buyback will not be deducted in the determination of excess cash flow or will not increase the maximum permitted amount of incremental facilities.

### *Affiliate Buybacks*

- No Cancellation of Principal and No Impact on Scheduled Amortization: loans purchased by an affiliate of the borrower will remain outstanding and will not affect scheduled amortization installments or the bullet payment at maturity, unless and until the loans are contributed to the borrower; once contributed to the borrower, the relevant loans will be extinguished and scheduled amortization installments and/or the bullet payment at maturity will be adjusted (see "Impact on Scheduled Amortization" under "Borrower Buybacks" above).

- Types of Loans: the governing credit agreement should be reviewed for restrictions on the types of loans that may be purchased by affiliates; the restrictions in many credit agreements vary depending upon the type of affiliate that is purchasing the loans:

  - Debt Fund Affiliates: buybacks are often permitted with respect to term loans or revolving loans and are typically not subject to a cap on the aggregate amount of loans that may be held by such affiliates (but see "Voting Rights" below).

  - Non-Debt Fund Affiliates: buybacks are typically limited to term loans only and are typically subject to a cap on the aggregate amount of term loans that may be held by such affiliates (commonly in the range of 25% to 35% of the aggregate outstanding amount of all term loans).

- Voting Rights: the governing credit agreement should be reviewed for restrictions on the voting rights of loans purchased by affiliates; the restrictions in many credit agreements vary depending upon the type of affiliate that is purchasing the loans:

  - Debt Fund Affiliates: voting limitations are generally less restrictive, but most credit agreements provide that Debt Fund Affiliates may not constitute more than 49.9% of the lenders for purposes of voting; as such, the majority of the consenting lenders in a required lender vote cannot be Debt Fund Affiliates.

  - Non-Debt Fund Affiliates: voting limitations are generally more restrictive and most credit agreements provide that loans held by Non-Debt Fund Affiliates either do not count at all for purposes of lender votes or are deemed to have been voted ratably with the votes of other lenders. Restrictions often apply in the bankruptcy context as well, and many credit agreements require the Non-Debt Fund Affiliate to grant a power of attorney to the administrative agent authorizing the administrative agent to vote on behalf of the Non-Debt Fund Affiliate in connection with bankruptcy proceedings. A common exception to the foregoing limitations exists for matters that would disproportionately and adversely affect the relevant Non-Debt Fund Affiliate, in which case the vote of such affiliate would be required. In addition to limitations on voting rights, a Non-Debt Fund Affiliate is typically not permitted to participate in lender-only meetings or receive certain lender-only communications.

- Impact on Leverage Ratios: the affiliate buyback will not have a direct effect on the borrower's leverage ratios, unless and until the loans are contributed to the borrower; once contributed to the borrower, the ensuing extinguishment of the loans will have a direct effect on such leverage ratios (see "Impact on Leverage Ratios" under "Borrower Buybacks" above).

- Impact on Excess Cash Flow and Incremental Facility Capacity: the affiliate buyback will not have a direct effect on the calculation of excess cash flow or the maximum permitted amount of incremental facilities under the governing credit agreement, unless and until the loans are contributed to the borrower; once contributed to the borrower, the ensuing extinguishment of the loans will, in many credit agreements, have a direct effect on the maximum permitted

amount of incremental facilities but likely will not have any effect on the calculation of excess cash flow as the borrower did not expend any cash in connection with the buyback (see "Impact on Excess Cash Flow and Incremental Facility Capacity" under "Borrower Buybacks" above).

- Impact on Available Amount Basket: the affiliate buyback will not have a direct effect on any "Available Amount" basket contained in the governing credit agreement, unless and until the loans are contributed to the borrower; the contribution to the borrower will typically increase such an "Available Amount" basket, providing the borrower with a greater capacity to make investments, restricted payments or junior debt prepayments.

- Additional Equity Fund Considerations: while an in-depth discussion of such issues is beyond the scope of this memorandum, an equity fund contemplating the purchase of loans of a portfolio company should take into account applicable fund-level considerations, including, among other things, the permissibility of the loan buyback under the fund's constituent documents, possible conflicts of interest or fiduciary duty issues associated with the buyback and the potential impact on co-investors and other equity owners (including management) if the loans are ultimately intended to be contributed to the borrower.

### Disclosure Considerations

Although bank loans are not securities for purposes of the Federal securities laws, companies should nonetheless be careful to take into account disclosure considerations to ensure compliance with relevant internal policies and external requirements. Most credit agreements today do not require the purchaser of loans (including the borrower) to make a "no-MNPI" representation that neither it nor any of its affiliates is in possession of material non-public information that has not been disclosed to other lenders. However, for its own protection, the purchasing agent in an intermediated open market purchase program may require the purchaser to make a no-MNPI representation. Further, if the borrower (or its parent) is an SEC reporting company, it should consider whether the plan to purchase outstanding loans may, in and of itself, be material information that subjects the borrower to Regulation FD. Disclosure considerations may also arise in respect of general anti-fraud principles, particularly when the purchaser is indirectly purchasing the loans through an intermediary (as in an intermediated open market purchase program) and the identity of the purchaser has not been made known to the selling lender by the intermediary.

## BOND BUYBACKS

### Mechanics of Bond Buybacks

- Cash Tender Offers: In a cash tender offer, an issuer offers to purchase all or a portion of one or more series of its bonds either at a fixed price, a variable price based on a spread to benchmark securities or a range of prices within which it solicits Dutch auction bids as to the price at which individual holders are willing to sell. Cash tender offers for non-convertible debt securities are primarily governed by Regulation 14E under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), whose chief requirements are that a tender offer (other than an abbreviated tender offer, discussed below) remain open for at least 20 business days (and at least 10 business days following a change in the amount of, or consideration for, the securities that are the subject of the tender offer). Cash tender offers for convertible debt securities also are subject to Regulation 14D under the Exchange Act.

  Issuers conducting a tender offer also may choose to simultaneously solicit consents to amend the indenture governing the bonds. These amendments usually eliminate covenants that may otherwise restrict the issuer if any bonds remain outstanding following the tender offer, and the consent is delivered substantially simultaneously with the delivery of the tendered bond (hence the commonly used term "exit consent").

- Abbreviated Tender Offers: A January 2015 SEC no-action letter reduced the minimum number of days that certain issuer self-tender offers for non-convertible debt securities must remain open (including following a change in the amount of, or consideration for, the securities that are the subject of the tender offer) to five business days. Tender offers must satisfy numerous criteria in order to qualify for this abbreviated timeline, including that they cover "any

or all" of a class or series of non-convertible debt, be made for cash or other qualified debt securities, provide for certain withdrawal rights and not contain any solicitations for exit consents.

- Open Market and One-off Private Purchases: An issuer looking for greater flexibility in pricing or timing may repurchase its bonds on the open market using a broker-dealer, or in privately negotiated transactions. Any such repurchase program that is not conducted in compliance with the traditional requirements of Regulation 14E or the no-action letter described above must be structured to ensure that it is not inadvertently deemed to be a tender offer (often referred to as a "creeping tender offer"). Under SEC guidance, a tender offer is defined by certain key features, including active and widespread solicitation, a purchase price at a premium to the market price and/or pressure on the offerees to sell.

**Considerations for Bond Buybacks**

In addition to deciding whether to structure a bond buyback as a tender offer, an abbreviated tender offer or otherwise, issuers should evaluate the following considerations when analyzing potential bond buyback opportunities.

*Antifraud Considerations*

Cash tender offers are subject to the antifraud provisions of Section 14(e) of the Exchange Act, which provide that it is "unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."

U.S. courts have consistently held that the antifraud provisions of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder do not give rise to liability for "nondisclosure" (or withholding information) by a person transacting in securities − even if that person possesses material non-public information − absent a "duty to speak." Because the relationship between an issuer and holders of its debt securities is contractual, courts have consistently held that the issuer does not have a fiduciary duty to those holders and, therefore, does not have the duty to speak that would give rise to liability for non-disclosure.[1] Despite the settled law in this area, an issuer nevertheless will wish to consider whether it should repurchase its debt securities while in possession of material non-public information that would reasonably be expected to influence the trading price of those debt securities. Even if an aggrieved debt holder is unlikely to be able successfully to make a fraud claim under Rule 10b-5 in these circumstances, the cost of defending such a claim could be significant, a plaintiff may seek relief under state anti-fraud or other laws and the issuer may suffer reputational damage that could affect its future ability to access the credit markets and other potential adverse consequences.

To reduce these potential risks, an issuer generally has two options:

(1) ensure that it is not in possession of any material non-public information while engaging in the repurchases; or

(2) make repurchases pursuant to a written trading plan in accordance with Rule 10b5-1(c) (a "10b5-1 Plan").[2]

*Black-Out Periods*

Issuers' internal insider trading policies usually impose "black-out periods" during which insiders are prohibited from purchasing or selling issuer securities due to the increased likelihood that the insiders possess material non-public information with respect to upcoming results. These periods typically occur around the close of each fiscal quarter,

---

[1]   It is important to distinguish "non-disclosure" from affirmative misstatements. While an issuer may not have fiduciary duties to the holders of its debt securities, if it elects to speak, it must speak truthfully to avoid potential Rule 10b-5 liability.

[2]   To qualify as a 10b5-1 Plan, a trading plan must:
- be adopted at a time when the issuer is not aware of any material non-public information;
- either specify the date, price and volume of securities to be purchased, include a written formula, algorithm or computer program to determine such parameters, or otherwise restrict the issuer's influence over the 10b5-1 Plan after adoption; and
- be entered into in good faith and not as part of a plan or scheme to evade liability under the securities laws.

An issuer currently considering the adoption of a 10b5-1 Plan to facilitate bond repurchases in light of Covid-19 should ensure that it does not possess material non-public information at the time of the 10b5-1 Plan's adoption, including with respect to the effect of the pandemic on the issuer's business or prospects. The SEC's Division of Corporation Finance underscored this point in guidance issued on March 25, 2020, which reminded issuers and their insiders to refrain from trading in an issuer's securities if they are in possession of material non-public information regarding the effects of Covid-19 on the issuer.

meaning that issuers with fiscal years ending December 31 currently may be in or nearing their black-out periods as they approach the end of the first fiscal quarter.

Issuers may be contemplating repurchases during their black-out periods. In connection with any determination to do so, an issuer in this situation should consider the anti-fraud considerations described above.

### Effect on Voting

Following a repurchase, bonds are typically canceled unless there are tax or accounting benefits to holding them on the issuer's (or its affiliates') balance sheet. Further, most indentures provide that bonds held by the issuer or its affiliates are not "outstanding" for purposes of voting calculations.

### Disclosure Considerations

An issuer must consider the overall materiality of the bond repurchase when deciding whether and to what extent advance disclosure would be appropriate. Factors to consider include the reduction in the trading volume of the bonds and whether the effect of the repurchase on the issuer's cash on hand and debt profile materially alter its financial condition and prospects. If required, disclosure can be made in current and period reports filed with the SEC—issuers typically refer to these plans in broad terms, indicating an intention to "from time to time" repurchase bonds using one or more methods as appropriate in light of then-prevailing market conditions and financial needs.

## TAX CONSIDERATIONS

Companies considering debt buybacks should assess the tax consequences of a buyback. Although debt buybacks can raise a variety of tax issues, this discussion highlights two considerations that are frequently significant in connection with a buyback: cancellation of indebtedness income and interest deductibility. We also note certain statutory changes relevant to debt buybacks that have been implemented in response to Covid-19.

### Cancellation of Indebtedness Income

In general, when a lender agrees to forgive any portion of a debt, the obligor will realize cancellation of indebtedness income ("CODI") to the extent of the debt forgiveness. Accordingly, if an obligor repurchases outstanding debt at a price less than its adjusted issue price, the repurchase will be treated as a partial forgiveness of the debt, and the obligor will generally have CODI in an amount equal to the excess of the debt's adjusted issue price over the repurchase price. An obligor will likewise have CODI if certain related parties acquire the obligor's debt at a discount. In limited circumstances, such as where the obligor has filed for bankruptcy or is otherwise insolvent, the obligor may reduce its tax attributes (such as NOLs) by the amount of any CODI in lieu of recognizing CODI in the current period.

Critically, the impact of the CODI rules is that a debt buyback may generate an upfront cash tax liability to the obligor even though the obligor will not have received any cash (and, indeed, will have paid cash) in the transaction.

In connection with a buyback by an affiliate of the obligor, if the debt remains outstanding after the repurchase, the obligor will be treated for tax purposes as having issued new debt to the related party with an issue price equal to the buyback price. Companies should consider the tax implications of having debt remain outstanding following a buyback, including the possibility of the "new" debt being issued with original issue discount and whether interest payments will become subject to withholding tax.

### Interest Deductibility

Buybacks may reduce the amount of interest that is payable (and potentially deductible) by the obligor; the loss of the deduction may, in turn, increase the amount of cash taxes payable by the obligor. In estimating the potential tax cost of the foregone deduction, companies should consider whether the obligor's ability to deduct interest payments is currently, or in the future will be, subject to limitation.

Moreover, if repurchased debt remains outstanding following a debt buyback, interest deductions attributable to the debt may become subject to limitation. For instance, the tax benefit of deductions attributable to related party debt may

effectively be disallowed as a result of the U.S. base erosion and anti-abuse tax, depending on the company's size and existing tax planning.

**Statutory Changes**

Congress has implemented statutory changes in response to Covid-19 that may affect the tax considerations relevant to debt buybacks. In particular, these changes loosen restrictions on the ability of companies to deduct interest payments and to use NOLs.

**CONCLUDING THOUGHTS**

Covid-19 increases the relevance of debt buybacks and companies contemplating debt buybacks should be careful to review the relevant debt documents, securities laws and tax regulations and to consider the implications of such buybacks, many of which may vary depending upon the entity that is purchasing the underlying debt.

Please feel free to contact us if we can provide further information on these matters.

**NEW YORK**
Michael S. Goldman
Andrew J. Pitts
George E. Zobitz
Paul H. Zumbro
Craig F. Arcella
Tatiana Lapushchik
Joseph D. Zavaglia
Stephen M. Kessing
D. Scott Bennett
Nicholas A. Dorsey
Sasha Rosenthal-Larrea
C. Daniel Haaren

**LONDON**
Philip J. Boeckman
George A. Stephanakis
Alyssa K. Caples

*This publication, which we believe may be of interest to our clients and friends of the firm, is for general information only. It should not be relied upon as legal advice as facts and circumstances may vary. The sharing of this information will not establish a client relationship with the recipient unless Cravath is or has been formally engaged to provide legal services.*

**New York**
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
+1-212-474-1000

**London**
CityPoint
One Ropemaker Street
London EC2Y 9HR
+44-20-7453-1000

www.cravath.com

# Exhibit 10

**BANKING**

LIABILITY MANAGEMENT

# Lessons for the loan market from recent liability management transactions

Partners from Davis Polk in New York provide an overview of the structural elements of these transactions and examine practical changes that could be made to loan documentation

Much has been written recently about high profile liability management transactions that have benefited certain creditors at the expense of others. While, in many cases, a technical reading of the financing documentation confirms the permissibility of these transactions, many market participants have expressed concern that these transactions violate the spirit of such documentation and upend fundamental tenets of the loan market. It is far from clear that there is consensus – between or amongst arrangers, lenders, borrowers and sponsors – as to the right answer to these concerns. What is clear is that unambiguous, express contractual provisions will generally be respected by the courts. In this note, we provide an overview of the structural elements of these transactions and examine practical changes that could be made to loan documentation to address some of these concerns.

## Types of Liability Management Transactions

There is a wide range of liability management transactions, the two basic types examined in this note are drop-down financings and uptiering transactions. In this note we assume the reader's familiarity with leveraged loan market conventions for distinguishing among the rights and obligations of various constituents in the borrower's corporate structure, including restricted subsidiaries, unrestricted subsidiaries and guarantors (and, relatedly, loan parties and credit parties).

**Drop-Down Financings: Structural Subordination**

In a drop-down financing, a borrower identifies assets that may be readily separated from the rest of the business (such as a separate business line or intellectual property) and transfers the assets to either an unrestricted subsidiary or non-guarantor (excluded) restricted subsidiary (NewCo). Upon such transfer, the lien securing the existing credit facility is automatically

released and such (newly) unencumbered assets are available to secure indebtedness of NewCo provided by new creditors.

A drop-down financing may also be structured with a roll-up feature, pursuant to which existing lenders both (x) provide the new financing to NewCo as well as (y) exchange existing debt of the borrower for new debt of NewCo, thereby rolling up existing (subordinated) exposures into a structural senior position. The amount of indebtedness that may be incurred at NewCo may be limited by the existing credit facility covenants (in the case of non-guarantor (excluded) restricted subsidiaries) or unlimited (in the case of unrestricted subsidiaries).

In either case, the claims of the new creditors against this NewCo – and the transferred assets – are structurally senior to the claims of the existing lenders. The providers of the new structurally senior loans may also have a *pari passu* or junior claim against the borrower (and existing credit parties). The quintessential drop-down financing was the 2017 J. Crew transaction, but more recent examples include Travelport (2020), Cirque de Soliel (2020) and Revlon (2020).

## Uptiering Transactions: Contractual Subordination

In an uptiering transaction, rather than transferring assets outside of the credit group, a borrower offers new lenders a claim against the existing loan parties and collateral that is contractually senior (either through collateral priority or in the form of payment priority through a waterfall) to the claims of existing lenders. An uptiering transaction will typically be offered to existing (majority) lenders, who will provide all or a portion of the new senior financing, and typically will be permitted to exchange (or refinance) all or a portion of their existing exposure into contractually senior debt. Such exchanges are typically made at a discount to par and, to facilitate the transaction, the participating existing (majority) lenders will effect any necessary amendments to the existing credit facility through an exit consent.

The result for the borrower is much-needed new money loans, reduced overall debt burden (on account of the exchange) and often additional covenant flexibility. One of the earliest examples of an uptiering transaction was the 2017 NYDJ transaction, but more recent examples include Murray Energy (2018; litigated/decided in 2020) and Serta Simmons (2020).

## Loans vs Bonds
It is worth noting that uptiering transactions and drop-down financings (and related exit consents) have been commonplace in the high yield bond market for many years. Given the convergence in investor base and documentation between the two markets over the past few years, it is not surprising that borrowers have increasingly sought to deploy these strategies in the loan market.

Many features of these strategies, however, frustrate traditional expectations of loan market participants, including pro rata treatment with respect to payments and recoveries (or at least an equal opportunity to participate) and capital structure seniority (without fear of priming). Furthermore, although the loan market is far more liquid than it was ten years ago, structural limitations such as borrower consent rights to assignments and disqualified lender lists leave lenders with less flexibility to manage risk than bondholders.

## Competing Objectives
From a lender's perspective, the most troubling characteristic of liability management transactions is that existing creditors who do not participate in the financing (and who may not even be given an opportunity to participate) may find themselves structurally junior or contractually subordinated to other lenders, contrary to some of the key assumptions underlying their investment decision.

From the borrower's perspective, a key objective in negotiating loan documentation is to maximise flexibility to manage the borrower's capital structure since, in the broadly syndicated loan market, it may not be economically feasible to obtain amendments, extensions or incremental liquidity in times of distress. To increase the likelihood of financing being available in such circumstances, borrowers seek the ability to offer the carrot of priming liens or senior claims to those willing to provide additional liquidity or covenant flexibility. From the borrower's perspective, a drop-down financing or uptiering transaction can offer a route to stabilising its capital structure at a critical time.

Reconciling these competing interests and negotiating a set of contractual provisions that clearly delineate a compromise position is challenging. While market conditions will dictate a borrower's or lender's negotiating leverage, both sides will have an incentive to agree to clear, comprehensible and

unambiguous loan documentation, if only to reduce the likelihood of future litigation.

## Key Points of Negotiation

### A Loan Documentation Checklist
Set forth below is an outline of liability management-related provisions that the parties should consider when negotiating loan documentation and in analysing the permissibility of liability management transactions.

*Investments Covenant and Unrestricted/Excluded Subsidiaries*: A drop-down financing depends for its execution on the availability of an unrestricted subsidiary or a non-guarantor restricted subsidiary with assets – including the ability of the credit group to invest new assets – and debt capacity sufficient to allow the new financing. Accordingly a first step for all parties is reviewing all baskets or exceptions in the investments covenant that might be used for the investment, as well as any J. Crew-driven limits on the types of assets that may be invested.

Designation of an unrestricted subsidiary will often be subject to a separate set of conditions which must also be evaluated. Finally, valuation matters: review the standard for assessing the value on the assets or assets and liabilities invested. Is it fair market value of the assets only? The value of the overall investment? Does the borrower have the right to determine value in good faith?

*Release of all or Substantially All Collateral*: Most credit agreements require the consent of 100% of lenders to release all or substantially all of the collateral, subject to an exception for transactions otherwise permitted by the loan documentation. While the transfer of material assets to an unrestricted/excluded subsidiary in drop-down financings (and consequent release from the liens) may reduce the existing collateral package, if it is permitted by the investments covenant a 100% vote should not be required.

In challenges to uptiering transactions, however, aggrieved creditors have argued that a subordination of the existing loans to one or more new classes of super-priority loans or a new super-priority credit facility – which may materially impair expected recoveries on the existing debt through that collateral — constitutes, in effect, a release requiring the 100% vote. The courts in Murray Energy and, implicitly, Serta, appear to have rejected this argument, distinguishing release of a lien from subordination.


Indeed, a primary element of the lenders' defense in Serta was that requiring a 100% vote for subordination would have been simple to draft for, so it would be inappropriate for courts to read those words into the documentation where they are not otherwise included.

*Pro-Rata Sharing:* At the heart of most liability management transactions is the ability to offer certain groups of lenders more favorable treatment than others by exchanging or rolling up existing exposures into more senior loans. The ability to do so depends on finding exceptions to the general rule that all lenders should receive their pro rata share of payments and recoveries, since receipt of new consideration in the form of senior loans by these lenders is treated as a receipt of payment by those lenders (and only those lenders).

The erosion over the past decade of pro rata protections, either directly (so that those protections can be modified by majority vote) or indirectly (through permissive debt buyback provisions) has therefore been a key factor in recent liability management transactions. In addition, even where changes to pro rata sharing provisions are 100% (or all affected) lender votes, as they were in Serta, this requirement applied solely to amendments that by their terms impact pro rata sharing provisions. It is an open question whether the court would have come to a different conclusion if the consent requirement applied more broadly to amendments that had the effect of modifying pro rata sharing provisions.

*The Fine Print:* Aggressive loan documentation often includes broad flexibility to refinance debt with more senior debt, without having to comply with limitations on junior debt prepayments or fitting the senior debt into any existing debt basket. Loan documentation also increasingly permits agents and borrowers to enter into intercreditor agreements satisfactory to them, without clarifying that such intercreditor agreement may only provide for *pari* or junior liens.

Finally, there is a recent trend towards limiting the remedies of individual lenders, or requiring that all claims must be brought by the agent at the direction of the majority lenders. Such language, developed as a reaction to the rise in debt activism over the last few years, may have the effect of depriving a minority lender group subordinated in a liability management transaction of standing to prosecute its claim that the transaction was not permitted.

**Time to Rethink Loan Documentation?**
It may be possible to rethink certain provisions entirely and introduce new technology (or borrow existing technology from other markets) to address the tensions between borrowers and lenders described in this note.

*Exit Consents:* One of the primary tools distressed borrowers use to encourage lenders to approve amendments necessary to consummate liability management transactions is the exit consent – a consent granted by a lender who immediately thereafter is rolled into the structurally or contractually senior loans. Exit consents, long a feature of the bond market, have become more common in loan market in recent years and have so far withstood judicial scrutiny.

However, many indentures include language that requires any consideration for an exit consent be offered to all bondholders. Including corresponding language in loan documentation would constrain a borrower's ability to offer preferential treatment to only a subgroup of lenders where an amendment is needed to permit the transaction.

*Open Market Purchases:* As noted above, another key to many liability management transactions is the ability to rollup or exchange existing loans of only the participating lenders into more senior loans on a non-pro rata basis. Very often the mechanism for achieving this exchange is a borrower buyback of which there are traditionally two types. Dutch auctions typically require all lenders (or all lenders of a particular class) to be offered the opportunity to participate in the buyback. Open market purchases, on the other hand, contain no such requirement, and have been interpreted by many to permit privately negotiated buyback transactions by the borrower and selling lenders with few restrictions.

Were buybacks only permitted to proceed through Dutch auctions (or another mechanism that required an offer to all lenders) – and if amendments to such requirements were permitted only with a 100% vote – then the unfairness of such transactions lamented by those lenders that are excluded from the opportunity to participate would be eliminated, while the Borrower would maintain the flexibility to opportunistically delever.

*Guarantor Coverage Tests:* By borrowing a concept from the European leveraged loan markets, it may be possible to limit "J. Crew" style dilutive transactions, while continuing to offer borrowers the flexibility to operate their

business and engage in accretive strategic transactions. A guarantor coverage test requires that the borrower and the other loan parties maintain at all times a minimum percentage of the assets and EBITDA of the consolidated company. This requirement would reduce the need to impose specific limits on investments by credit parties in non-credit parties, and is now feasible for more borrowers in light of new tax rules which in many circumstances are more accommodating of guarantees by foreign subsidiaries.

Under this regime, if the borrower seeks to invest in a foreign subsidiary, it would be free to do so as long as that subsidiary is added as a guarantor to the extent necessary to satisfy the guarantor coverage requirement. This approach has its limitations, as there is an additional expense associated with non-US guarantees and non-US guarantees and collateral are often subject to regulatory limits that are not applicable in the US guarantor coverage requirements also tend to be subject to significant exceptions which can undermine their effectiveness."

**No "One Size Fits All"**
Certain of the potential changes to loan documentation highlighted above, such as requiring a higher voting threshold for lien subordination or adjustments to pro rata sharing requirements, will likely remain a focus for investors in light of recent liability management transactions. But in a market characterised by fidelity to precedent, there is no one-size-fits-all solution. Parties will need to continue to engage in a thoughtful analysis of loan documentation and agree to targeted adjustments that take into account both borrowers' need for flexibility to manage its capital structure and lenders' desire for certainty in its credit position.



**Jason Kyrwood**
Partner
Davis Polk, New York



**James Florack**
Partner
Davis Polk, New York



**Meyer Dworkin**
Partner
Davis Polk, New York



**Kenneth Steinberg**
Partner
Davis Polk, New York

# Exhibit 11

WACHTELL, LIPTON, ROSEN & KATZ

# DISTRESSED MERGERS AND ACQUISITIONS

2013

## *Summary of Contents*

Introduction ................................................................................................... 1

I.   Out-of-Court Workouts of Troubled Companies ................................. 3
     A.  Initial Responses to Distress ....................................................... 4
     B.  Out-of-Court Transactions ........................................................... 9

II.  Prepackaged and Pre-Negotiated Bankruptcy Plans ......................... 40
     A.  Prepackaged Plans ...................................................................... 41
     B.  Pre-Negotiated Plans ................................................................. 46
     C.  Pre-Negotiated Section 363 Sales .............................................. 48

III. Acquisitions Through Bankruptcy ................................................... 48
     A.  Acquisitions Through a Section 363 Auction .............................. 48
     B.  Acquisitions Through the Conventional Plan Process ............... 101

IV. Acquisition and Trading in Claims of Distressed Companies ......... 150
     A.  What Claims Should an Investor Seeking Control Buy? .......... 150
     B.  What Rights Does the Claim Purchaser Obtain? ...................... 154
     C.  Acquisition of Claims Confers Standing to Be Heard in a Chapter 11
         Case ......................................................................................... 162
     D.  What Enforcement Rights Does the Claim Have? .................... 166
     E.  Antitrust Considerations ........................................................... 203
     F.  Creditors and Tax-Free Reorganizations .................................. 205

*Table of Contents*

Introduction................................................................................................1

I.    Out-of-Court Workouts of Troubled Companies...............................3
      A. Initial Responses to Distress .......................................................4
          1.   Forbearance.........................................................................4
          2.   Waivers and Amendments ...................................................5
               a.   Basics of Waiver and Amendment ...............................5
               b.   Implications of Obtaining Consents..............................5
               c.   Tax Implications ...........................................................7
          3.   Costs to Borrowers of Forbearance, Waiver and Amendment ............8
      B.  Out-of-Court Transactions ...........................................................9
          1.   Sales of Assets Outside of Bankruptcy...............................10
               a.   Fraudulent Transfer Risks............................................10
               b.   Other Risks...................................................................14
          2.   Sales of Securities by Distressed Companies .....................15
               a.   PIPEs............................................................................15
               b.   Rights Offerings...........................................................16
               c.   Shareholder Approval Requirements.............................17
                    (i)   Financial Viability Exception...............................18
                    (ii)  Issuing Securities That Do Not Require Shareholder Approval ..........18
          3.   Debt Repurchases................................................................19
               a.   Issues in Bank Debt Repurchases .................................20
                    (i)   Pro Rata Sharing Provisions and Eligible Assignees ............20
                    (ii)  Dutch Auction and Open Market Repurchases; Sponsor Purchases..............21
               b.   Other Repurchase Considerations.................................21
                    (i)   Corporate Opportunity Doctrine ...........................21
                    (ii)  Equitable Subordination and Recharacterization .................22
                    (iii) Insider Trading ....................................................22
          4.   Exchange Offers...................................................................23
               a.   Targeted Holders..........................................................26
               b.   Inducements..................................................................27
               c.   Certain Mechanics .......................................................27
               d.   Disclosure .....................................................................28
               e.   Whether the Securities Must Be Registered .................29
               f.   Change-of-Control Concerns ........................................30
               g.   Ratings Implications .....................................................31
               h.   Tax Implications ..........................................................31

5. Foreclosure Sales and Assignments for the Benefit of Creditors ........39

II. Prepackaged and Pre-Negotiated Bankruptcy Plans ........................................40
   A. Prepackaged Plans .................................................................................41
      1. Generally ...........................................................................................41
      2. Requirements ....................................................................................44
   B. Pre-Negotiated Plans .............................................................................46
      1. Lock-Up Agreements .......................................................................47
   C. Pre-Negotiated Section 363 Sales ........................................................48

III. Acquisitions Through Bankruptcy ....................................................................48
   A. Acquisitions Through a Section 363 Auction .......................................48
      1. Section 363 of the Bankruptcy Code Generally ...............................48
         a. Standard for Approval of Sales Outside the Ordinary Course .......49
            (i) Justification for the Sale ...........................................................49
            (ii) Other Requirements .................................................................55
         b. The Sub Rosa Plan Doctrine .....................................................56
         c. The Good Faith Requirement .....................................................58
         d. Prohibition on Collusive Bidding ..............................................60
      2. Benefits and Risks of Using Section 363 ..........................................63
         a. Benefits of Using Section 363 ....................................................63
            (i) Speed ........................................................................................63
            (ii) Ability to "Cherry Pick" Assets .............................................66
            (iii) Protections That Can Be Obtained from Bankruptcy
                 Court's Approval Order ....................................................68
                (A) Finding of Good Faith—Section 363(m)
                    Protection from Reversal on Appeal ...........................68
                (B) Insulation from Fraudulent Transfer Challenge ............70
                (C) Successor Liability Issues:  Purchasing Assets
                    "Free and Clear" ......................................................70
                (D) Scope of "Interests" Subject to Section 363(f) .............71
                (E) The Five Triggers of Section 363(f) Protection ............73
                (F) Other Potential Pitfalls in Cutting Off Purchaser
                    Liability ...................................................................76
         b. Risks and Disadvantages of Using Section 363 ........................78
            (i) Public Auction Generally Required .......................................78
            (ii) Potential for Delay .................................................................78
            (iii) Transfer Taxes .....................................................................80
      3. The Auction Process ........................................................................80
      4. Bidding Incentives ..........................................................................85
         a. Types of Bidding Incentives and Protections ...........................85
            (i) Expense Reimbursement .........................................................86

(ii) Break-Up Fees ........................................................................86
(iii) Minimum Overbids ................................................................88
(iv) Other Terms of Sale ..............................................................88
b. When to Seek Bidding Protections ...............................................89
5. To Be or Not To Be the Stalking Horse ..............................................93
6. Credit Bidding ............................................................................94
a. Credit Bidding Existing Claims .....................................................94
b. Secured DIP Financing Debt as Currency .......................................97
7. The Foreign Bidder/CFIUS ...........................................................99
B. Acquisitions Through the Conventional Plan Process .............................101
1. Control Over the Restructuring Process .............................................101
a. Venue .....................................................................................101
b. Exclusivity ...............................................................................102
2. Confirmation Requirements ..........................................................105
a. Classification of Claims and Interests ...........................................105
b. Impairment and Reinstatement ....................................................107
c. Voting Rules ............................................................................110
d. The "Best Interests" Test—Protection for Holdouts ..................110
e. Feasibility ...............................................................................111
f. Cramdown: A Crucial Chapter 11 Power ...................................112
g. Disclosure Requirements ............................................................118
h. Obtaining Confirmation .............................................................119
3. Protections That Can Be Obtained from Confirmation Order ..........119
4. Advantages of Chapter 11—Ability to Purchase Assets Under a
Plan Free and Clear of Liabilities .................................................122
a. Notice .....................................................................................123
b. Future Claims—Mass-Tort Cases ..............................................124
5. Another Advantage of Chapter 11—Potential Ability to
Restructure Indebtedness of Special Purpose Entities .................126
6. Another Advantage of Chapter 11—Exemption from Registration
for Securities Issued Under a Plan ...............................................129
a. Scope of the Exemption .............................................................129
b. The Underwriter Exception .........................................................130
(i) Purchase of Claims with a View to Distribution .................130
(ii) The Definition of "Issuer" ....................................................132
c. Exemption of Prepetition Solicitation ...........................................132
d. When Registration May Be Advisable .......................................133
(i) Large Creditors .....................................................................133
(ii) Directors and Officers ..........................................................134
(iii) Issuance of Stock by Third Parties .......................................134
(iv) Rights Offerings ...................................................................135
7. Another Chapter 11 Benefit—Antitrust Exemption .........................135

8. Another Chapter 11 Benefit—Assumption, Assumption and
   Assignment, and Rejection of Contracts and Leases ....................138
   a. Conditions to Assumption or Rejection......................................139
   b. Timing of Assumption or Rejection ............................................141
   c. Ability to Override Anti-Assignment Provisions ......................142
      (i)  In General ..................................................................142
      (ii)  Shopping Center Leases ....................................................144
9. Issues Regarding Lock-Up Agreements ...........................................145
   a. Restrictions on Solicitation of Votes Through  Postpetition
      Lock-Up Agreements ..................................................................145
   b. Prepetition Lock-Up Agreements:  Ineligibility to Sit on a
      Creditors' Committee ................................................................148
   c. Prepetition Lock-Up Agreements:  Difficulty of Assumption.....149

IV. Acquisition and Trading in Claims of Distressed Companies ......................150
    A. What Claims Should an Investor Seeking Control Buy?........................150
       1. The Claim Purchaser Should Identify and Acquire the "Fulcrum
          Security"...............................................................................150
       2. Strategic Considerations in Accumulating a Blocking  or
          Controlling Position ................................................................152
    B. What Rights Does the Claim Purchaser Obtain? .....................................154
       1. Assignment or Sale Is Required........................................................154
       2. Claims Purchasers Acquire the Rights of the Transferor, No More,
          No Less .........................................................................156
       3. Whether Disabilities Travel with Transferred Claims:   Equitable
          Subordination in *Enron* ................................................................157
       4. Recharacterization of Debt as Equity ................................................160
       5. Revolving Debt ...........................................................................162
    C. Acquisition of Claims Confers Standing to Be Heard in a Chapter 11
       Case.........................................................................................162
       1. Section 1109(b)...........................................................................162
       2. Service on the Official Committee of Unsecured Creditors ..............164
    D. What Enforcement Rights Does the Claim Have?..................................166
       1. Generally....................................................................................166
       2. Enforcement Rights of Bank Agent versus Lender .........................167
       3. Allocation of Enforcement Rights Between Indenture Trustee and
          Bondholders ................................................................................168
       4. Intercreditor Agreements and Further Constraints  on Creditor
          Action ................................................................................169
          a. Typical Intercreditor Agreements .................................................170
          b. Enforceability in Bankruptcy of Intercreditor Agreements ........171
          c. Postpetition Interest ................................................................174

5. Anti-Assignment Provisions and Required Consents Under Loan Documents..................................................................................175
6. Risks Accompanying Acquisition of Claims......................................176
   a. Investment at Risk.........................................................................176
   b. Interest Rate and Prepayment Risks ............................................177
   c. Substantive Consolidation Risk ...................................................179
   d. Fraudulent Transfer Risks ...........................................................180
   e. Certain Tax Risks.........................................................................181
      (i) Restrictions on Trading ......................................................181
      (ii) Risks from Actual or Deemed Exchange of Debt ...............183
7. Risks from Insider or Fiduciary Status .............................................184
   a. Who Is an Insider or a Fiduciary Under the Bankruptcy Code?..184
   b. Insider Trading:  When Do Federal Securities Anti-Fraud Rules Apply to Debt Trading? ...................................................185
   c. Bankruptcy-Specific Remedies—the Papercraft Case.................186
8. Potential Safeguards.........................................................................188
   a. "Public Side" versus "Private Side" .............................................188
   b. Trading Walls...............................................................................189
   c. "Big Boy" Letters .........................................................................191
      (i) Are Big Boy Letters Effective Defenses to Common Law Fraud Actions?.................................................................192
      (ii) Are Big Boy Letters Effective Defenses to Private Insider Trading Actions?..........................................................192
      (iii) Are Big Boy Letters Effective Defenses to SEC Enforcement Actions?.....................................................193
      (iv) Potential Problems Arising from Downstream Transfers ....194
9. Risk of Vote Designation...................................................................195
   a. Factual Inquiry into What Constitutes "Bad Faith".....................195
   b. Purchases of Claims with the Purpose of Acquiring Control ......197
   c. Other Motivations for Purchasing Claims That Have Been Found to Be "Bad Faith" .......................................................199
   d. Purchases of Claims for Permissible Purposes ............................200
      (i) Holding Claims in Multiple Classes Is Not Bad Faith .........200
      (ii) Purchasing Claims to Block a Plan Is Not Necessarily Evidence of Bad Faith.....................................................200
10. Risk to Insiders Who Purchase Claims.............................................201
11. Risk of Duty to Disclose Information Related to Acquired Claims ..202
E. Antitrust Considerations .........................................................................203
F. Creditors and Tax-Free Reorganizations ................................................205

# Introduction

The topic of this outline is mergers and acquisitions where the target company is "distressed." Distress for these purposes generally means that a company is having difficulty dealing with its liabilities—whether in making required payments on borrowed money, obtaining or paying down trade credit, addressing debt covenant breaches, or raising additional debt to address funding needs.

Distressed companies can represent attractive acquisition targets. Their stock and their debt often trade at prices reflecting the difficulties they face, and they may be under pressure to sell assets or securities quickly to raise capital or pay down debt. Accordingly, prospective acquirors may have an opportunity to acquire attractive assets or securities at a discount. This outline considers how best to acquire a distressed company from every possible point of entry, whether that consists of buying existing or newly-issued stock, merging with the target, buying assets, or buying existing debt in the hope that it converts into ownership.

Some modestly distressed companies require a mere "band-aid" (such as a temporary waiver of a financial maintenance covenant when the macroeconomy has led to a temporary decline in earnings, but the company is able to meet all of its obligations as they come due). Others require "major surgery" (as where the company is fundamentally over-levered and must radically reduce debt).

Before discussing the law and practice of distressed acquisitions, we undertake a review of corporate responses to debt crises. Each response can represent an entry point for a would-be acquiror, and a basic understanding of how companies first respond to distress is necessary for an acquiror. Part I.A of this outline therefore considers the fundamentals of forbearance agreements, waivers and amendments of bank and bond debt, the mildest of corporate responses to distress. When the measures described in Part I.A are unavailing, a non-bankruptcy solution may still be available if the financially distressed company takes other measures, which are covered in Part I.B. These often involve a dilution or change in the equityholders' control of the distressed company or its assets, and thus may provide opportunities for a potential investor to acquire interests in, assets from, or ownership of, the distressed company. Examples include sales of assets, PIPE investments, rights offerings, debt repurchases or restructurings, exchange offers, and foreclosure sales. Dealing with a company in this stage, however, entails numerous risks for an investor. Part I.B, therefore, highlights potential benefits and risks of working with a distressed company on the verge of bankruptcy, as well as some methods that can be used to avoid these risks and capture those benefits.

Out-of-court transactions like those described in Part I.B tend to be less costly and time-consuming than in-court transactions, but they often require shareholder approval or creditor consensus—and non-consenting parties typically cannot be bound against their will to changes in their fundamental rights (*e.g.*, a reduction of principal or interest on or an extension of maturity of an obligation owed to a creditor).

By contrast, a transaction executed pursuant to the United States Bankruptcy Code can bind non-consenting parties and does not require shareholder approval. Therefore, in-court solutions are often imperative for firms experiencing acute distress.

Hybrid approaches such as "prepackaged" and "pre-negotiated" reorganization plans are discussed in Part II of this outline. These plans are appropriate for troubled companies with sufficient lead time before they are in acute distress to engage in out-of-court bargaining prior to offering in-court solutions.  They tend to result in cheaper, faster, less confrontational bankruptcies with less collateral damage (less impact on trade credit terms, less risk of outright loss of suppliers, less reputational harm with customers, fewer employee defections, etc.).  Sometimes the mere fact that a borrower is prepared to file bankruptcy brings dissenting creditors into line and makes a fully out-of-court solution possible.

Part III of this outline considers acquisitions of companies in and through bankruptcy.  Asset sales in bankruptcy—addressed in Part III.A—may be consummated pursuant to section 363 of the Bankruptcy Code on an expedited basis.  Such sales (commonly referred to as "363 sales") had traditionally been disfavored where the assets to be sold constituted a significant portion of a bankrupt company's business and time was not of the essence.  This general rule has frayed as several large debtors have been allowed to sell substantially all of their assets despite having a lengthy liquidity runway, and major 363 sales are now quite common.  Another alternative is the acquisition of a bankrupt company, or a significant portion thereof, by either creditors or outside investors through implementation of a reorganization plan, which is addressed in Part III.B.

Part IV of this outline addresses specific considerations regarding trading in claims against distressed companies.  Claims trading can be a strategy for obtaining control (*e.g.*, by buying claims that will receive ownership of the restructured company under a plan of reorganization or that can be used as consideration in a 363 sale) or an investment opportunity for the trader with a shorter-term horizon.  For either class of investor, trading claims is fraught with

risks and opportunities that generally do not exist for acquirors of claims against non-distressed companies.

Regardless of an investor's ultimate point of entry, it will not surprise the reader that we believe a good first step when considering a transaction with a distressed company is to hire counsel familiar with the process.  Counsel will be able to review all relevant documentation, verify that collateral has been properly secured and perfected (or not), expose vulnerabilities, find opportunities, and safeguard against undue risk.

We welcome your comments or questions on this outline.

# I

## Out-of-Court Workouts of Troubled Companies

A variety of circumstances may indicate financial distress.  Among other signs, companies may have triggered or be close to triggering financial covenants in their debt, or find themselves unable to deliver clean (unqualified) audit opinions or satisfy material adverse effect or solvency-related conditions to a draw on a revolving line of credit.  Impending debt maturities, even of healthy companies, may be a potential source of financial difficulty depending on the state of the capital markets.  Well before a crisis erupts and thoughts turn to formal bankruptcy procedures, a distressed company may try to mitigate its exposure by seeking amendments or waivers to its credit facilities or debt securities.  If those options are not sufficient, then it may take other measures, such as attempting to exchange its existing debt for new debt or equity in the company, selling assets or raising equity capital.  All of these out-of-court options tend to be best suited for over-leveraged, rather than operationally flawed, companies.

The nascent stages of a company's distress also present an opportunity for an interested investor to gain leverage.  An investor that purchases or already holds debt of a distressed company can use the company's need for forbearances and waivers as leverage to require the company to take certain steps, such as expanding collateral, making significant payments, selling assets or engaging in control-changing transactions.  Part I of this outline surveys certain actions that a distressed company may take short of a bankruptcy filing and the opportunities that those actions may create for an investor.

A.       **Initial Responses to Distress**

1.       **Forbearance**

Financially troubled companies that have breached debt covenants or determine that they are imminently likely to do so may, as an initial matter, approach their creditors to seek forbearance.  A forbearance is an agreement by a lender to refrain from exercising certain rights that are available to it under a credit agreement or indenture as a result of an event of default.  A forbearance typically is not permanent.  After the period of forbearance is over, a lender may exercise any of its rights or enforce any of its remedies.

A forbearance often is a first step to a waiver or amendment.  It is useful as a stopgap measure to permit a lender to assess its position *vis-à-vis* both the distressed company and other creditors.  The forbearance period can be used to enter into more advanced negotiations within and among creditor constituencies and with the distressed company, and to undertake due diligence, free from concerns that other lenders will use the period of forbearance to exercise their remedies and gain a relative advantage.  When the forbearance period ends, each debtholder can decide what steps to take next based on careful investigation and consideration of its options during the forbearance period.

Because a forbearance is not a waiver of the underlying event of default, during the period of forbearance:  (a) interest typically continues to accrue at the rate applicable after an event of default has occurred, (b) the continued existence of an event of default generally makes it impossible for the company to draw on lines of credit, (c) cross-defaults to other financial instruments may be triggered and (d) there may be concern among vendors, business partners and the financial community about the long-term viability of the enterprise.  The possibility of default in other credit documentation, including through cross-defaults, is a significant concern.  A lender considering forbearance frequently will condition such forbearance on all other lenders that could assert a default also agreeing to forbear during the specified period.

Forbearance agreements are entered into more frequently by lenders under credit agreements than under indentures.  As a practical matter, it is generally more feasible for a debtor to seek and obtain a forbearance from a relatively small number of holders of bank debt, as compared to holders of bonds that have been more widely distributed.  In addition, the process required for bondholders to exercise their remedies can be time-consuming and thus alleviates the need for an immediate forbearance agreement.  Generally, indenture trustees need instructions from at least 25% of bondholders to send a notice of default, followed by a cure

period of 30 to 90 days.   After the cure period, a subsequent instruction by bondholders typically is required to exercise their rights against the debtor.

### 2.      Waivers and Amendments

#### a.      Basics of Waiver and Amendment

Forbearance is typically a short-term solution that allows time for a distressed company and its debtholders to evaluate the company's capital structure in light of its current prospects and business plan and to consider next steps.   As discussed in more detail below, these next steps can run the gamut from repricing the debt to a prepackaged bankruptcy.   Should the parties decide that no permanent change to the basic capital structure is required, typical next steps would be to seek a waiver or amendment.   A waiver is an agreement to suspend enforcement of one or more provisions of the credit agreement; it can be either temporary or permanent in duration.   It differs from a forbearance in that the effect of a waiver is that compliance with the underlying obligation is affirmatively excused, while in a forbearance a lender merely agrees to refrain from enforcing its remedies for noncompliance.   After a temporary waiver expires, the breach returns to unwaived status and lenders may enforce rights and remedies in respect of the breach.

Waivers should be contrasted with amendments.   While a waiver merely excuses a breach, an amendment operates to modify the underlying agreement. Amendments are used to modify existing agreements for a variety of reasons, including to make financial covenants more realistic in current economic conditions, to modify restrictions on incurring additional debt or raising capital through the issuance of equity or to allow or require dispositions of business units.

#### b.      Implications of Obtaining Consents

Modification of a credit agreement or indenture requires consensus among holders of a contractually specified percentage of the debt.   Required approval thresholds vary both between indentures and credit agreements and also among the various types of modifications.   Starting at the lowest threshold, indentures generally have a category of amendments that can be taken without the consent of bondholders, such as adding covenants and events of default and taking other actions that benefit the bondholders.   Most substantive waivers and modifications for both bank debt and bonds require holders of a majority in amount of the outstanding debt to consent.   Certain core waivers and amendments, such as waiving principal or interest payments, releasing substantially all collateral or guarantees or extending maturity, generally require unanimous approval (or at

least the approval of each affected lender) and in practice are very difficult to obtain.[1]

The process of negotiating and obtaining waivers or amendments may raise important federal securities law issues for the issuer, debtholders and potential debt purchasers. In order to procure the requisite lender consents, an issuer of public debt securities typically will undertake a consent solicitation. Depending on the nature of the requested amendments and consideration an issuer is willing to offer in order to obtain debtholder consents, solicitations may be coupled with a tender or exchange offer and thus be subject to the requirements of Regulation 14E promulgated under the Securities Exchange Act of 1934 (as amended, the "Exchange Act"), as discussed in more detail in Part I.B.4 of this outline.

Furthermore, if a distressed company has issued public securities— regardless of whether the debtor is seeking to amend those securities—the federal securities laws, including the antifraud and fair disclosure requirements of Rule 10b-5 and Regulation FD, will impact the behavior of the company and its debtholders. Regulation FD prohibits issuers from making selective disclosure of material nonpublic information, and Rule 10b-5 prohibits trading on the basis of material nonpublic information. Thus, creditors (and potential investors) seeking nonpublic information in order to evaluate and negotiate a waiver or amendment request will be required to agree to keep that information confidential and will not be permitted to trade in the debtor's securities while in possession of such material nonpublic information.[2] In addition, holders of debt that is convertible into equity must be aware of the disclosure requirements under section 13(d) of the Exchange Act and Regulation 13D-G. Under this disclosure regime, an individual or a "group" must file a statement with the United States Securities and Exchange Commission (the "SEC") within 10 days when more than 5% of a class of equity securities is acquired. Among the required data to be disclosed are: the source of funds, the intent to acquire control, and any plans for liquidating, selling or merging the issuer. The disclosure statements also must be amended promptly to reflect any material changes in the above categories.

---

[1] Most credit agreements and indentures of United States companies are governed by the laws of New York State. Indentures for public issuances of bonds in amounts in excess of $10 million are also governed by the Trust Indenture Act of 1939. 15 U.S.C. § 77ddd(a)(9).

[2] Credit agreements often provide for dissemination of information to two separate classes of lenders: those who elect to receive only public information and may freely trade in the debtor's securities and those who elect to receive nonpublic information and are therefore restricted from trading.

In evaluating the level of consent required to obtain an amendment as well as the effect of a proposed amendment, issuers and investors must consider the voting status of outstanding debt.  A borrower or its affiliate that is able to obtain and vote a large percentage or a majority of its own debt may be able to strip covenants and other protections from remaining debtholders.  Under the Trust Indenture Act of 1939 (the "TIA"), bonds owned by the issuer and its affiliates are not considered outstanding for voting purposes.  With bank credit agreements, the question of voting is covered by contract.  While historical strictures on purchases of bank debt by issuer affiliates have loosened considerably in recent years, it remains taboo, as a general matter, for such affiliates, including private equity sponsors, to vote their purchased debt.

Yet even in credit agreements that purport to restrict voting by a borrower and its affiliates, the language is generally incapable of preventing informal arrangements whereby parties that have relinquished an economic stake in the debt effectively defer to their transferees—a problem exacerbated by the latest forms of financial engineering.  Credit agreements generally are drafted to address potential assignments of, or participations in, the debt in which a buyer purchases a contractual right to an issuer's payments to the seller and assumes the duty to fund the seller's funding obligations.  However, credit agreements do not address participations in real detail and frequently do not address other derivative forms of debtholding, such as credit default swaps and total return swaps, at all.

c.      Tax Implications

A waiver or modification of debt can have significant tax consequences to the issuer and creditor.  Those consequences depend on whether the waiver or modification constitutes a "significant modification" for tax purposes.[3]  If so, then the old debt is treated as having been exchanged for new debt (even absent an actual exchange of old debt for new debt) and cancellation of debt ("COD") income on the old debt and original issue discount ("OID") on the new debt may result.[4]  If, on the other hand, there has been no significant modification, then the modification (even if there is an actual exchange of debt) is not a taxable event.[5]

---

[3] See 26 C.F.R. § 1.1001-3; Treas. Reg, § 1.1001-3.

[4] See 26 U.S.C. § 61(a)(12), I.R.C. § 61(a)(12); 26 U.S.C. § 1273(a), I.R.C. § 1273(a).  Furthermore, the "applicable high yield discount obligation" ("AHYDO") rules can limit the issuer's deductions for OID.  This is discussed further in Part I.B.4.h of this outline.

[5] An exchange of debt for stock also would give rise to COD income, but not to OID.  See Part I.B.4.h of this outline for a discussion of such exchanges.

A change that occurs by operation of the terms of the debt instrument generally is not a modification.  A change is considered to occur by operation of the terms if it occurs automatically (*e.g.*, a specified increase in the interest rate if the value of the collateral declines below a specified level).  Thus, an increase in the interest rate that occurs automatically upon a breach of a covenant—*i.e.*, a default rate—should not be a significant modification.

In the case of a significant modification of the debt or an exchange of debt for debt or equity, the COD income generally is measured by reference to fair market value (except in the case of a debt modification or debt-for-debt exchange if the debt is not publicly traded for tax purposes, as explained below).  If an issuer's debt is presently worth significantly less than par, the COD income may be considerable.  However, in the case of a debt modification or debt-for-debt exchange, the COD income should be offset by future OID deductions.  Further, in a debt modification or a debt-for-debt or debt-for-stock exchange, the COD income may be able to be excluded in the case of bankruptcy or insolvency.  These and other tax issues are explained in greater detail in Part I.B.4.h of this outline.

If the pricing of a debt instrument is modified, there may be a deemed exchange for tax purposes.  This is because a change in yield constitutes a significant modification if the yield of the modified debt differs from the yield on the unmodified debt (determined as of the date of the modification) by more than the greater of (a) 25 basis points and (b) 5% of the annual yield of the unmodified debt.[6]

### 3.    Costs to Borrowers of Forbearance, Waiver and Amendment

When market yields exceed those prevailing when outstanding debt was issued, it is typical for creditors who agree to a waiver or amendment to insist on effectively repricing the debt through a combination of fees, interest rate margin increases and floors on index rates (such as LIBOR) in excess of the actual index rate.[7]  Other typical requests include commitment reductions on revolving credit

---

[6] 26 C.F.R. § 1.1001-3(e)(2)(ii); Treas. Reg, § 1.1001-3(e)(2)(ii).  For this purpose, the yield on the modified debt takes into account, as a reduction in issue price, any payment to the holders as consideration for the modification.  In the case of a variable rate debt instrument that bears interest at a "qualified floating rate," the yield is calculated based on an assumed fixed rate equal to the value, as of the date of modification, of the variable rate debt.  26 C.F.R. § 1.1001-3(e)(2)(iv); Treas. Reg, § 1.1001-3(e)(2)(iv).

[7] Unsecured creditors are relatively more likely to take up-front fees in a situation of significant distress.  Secured creditors, in contrast, will also seek a higher interest rate because, in the event of a subsequent bankruptcy, section 506(b) of the Bankruptcy Code will enable them to receive

lines, additional collateral, paydowns, new caps on investments, new money from equity investments or junior debt, if feasible, and subordination or forgiveness of debt held by a controlling equityholder.

In practice, restructuring debt generally involves a combination of the measures mentioned above. For example, Neiman Marcus Inc. announced in November 2010 that it had extended the maturity of more than $1 billion of its debt in exchange for a 10 basis point amendment fee and a 200 basis point margin increase.[8] In January 2011, CRC Health Corporation extended the maturity of, and renegotiated certain covenants on, approximately $520 million of its debt at a cost of a 25 basis point amendment fee and a 225 basis point margin increase.[9] In March 2012, however, Ford Motor Company—below-investment grade but a slightly stronger credit than Neiman Marcus and CRC Health—extended the maturity of approximately $9 billion of revolving commitments in exchange for a 25 basis point amendment fee without any margin increase.[10] Ultimately, a vast array of circumstances influence the cost and extent of concessions that can be obtained.

**B.      Out-of-Court Transactions**

If a financially distressed company cannot restructure its debt with the cooperation of its lenders through forbearance, waiver or amendment agreements, then it may be forced to take other measures addressed in the remainder of this Part I. Most of the following actions involve a dilution or change in the equityholders' control of the distressed company, and thus provide opportunities for a potential investor to acquire interests in, assets from, or ownership of, the distressed company. Dealing with a company in this stage, however, entails numerous risks for investors. For example, a restructuring could lead to a reduction in the principal amount of the outstanding debt, and purchases of assets may later be challenged on fraudulent conveyance grounds. Additionally, if an exchange offer is contemplated, the tax implications should be carefully

---

interest post-petition to the extent that they are oversecured—a benefit that unsecured creditors cannot obtain. However, the fees and pricing increases implemented in connection with a waiver or amendment may be limited by intercreditor agreements; in a typical formulation, first and second lienholders agree that neither will increase its interest rate, or take corresponding fees, in excess of an agreed level without the consent of the other.

[8] *See* Neiman Marcus Inc., Current Report (Form 8-K) (November 23, 2010).

[9] *See* CRC Health Corporation, Current Report (Form 8-K) (Mar. 1, 2011); GLEACHER & COMPANY, AMENDMENT PRICING ENVIRONMENT, 5 (Jan. 2011) (on file with authors).

[10] *See* Ford Motor Company, Current Report (Form 8-K) (Mar. 15, 2012).

considered.  This section highlights potential benefits and risks of dealing with a company on the verge of bankruptcy, as well as some techniques to capture those benefits.

### 1.       Sales of Assets Outside of Bankruptcy

A financially distressed company may attempt to sell assets or businesses for a variety of strategic reasons, including to raise cash and to eliminate distractions to management from non-core businesses.  While selling a portion of a distressed company is not an easy task, it may be the company's best or only option.  Indeed, the company's lenders may require it to actively market assets for sale or even complete a sale by a specified date in order to obtain needed amendments to its credit agreement.  Conversely, credit agreements frequently restrict dispositions of assets not in the normal course of business, so lender consents may be required for the transaction.  Either way, a distressed company's lenders will likely have a role.

#### a.       Fraudulent Transfer Risks

An investor looking to purchase assets from a distressed company must consider and address the risk of fraudulent transfer claims.  Under section 548 of the Bankruptcy Code, a company may avoid transfers it made or obligations it incurred prior to its bankruptcy filing date if it made the transfer or incurred the obligation within two years before the filing date "with actual intent to hinder, delay, or defraud" creditors.[11]  More significantly, a transfer or obligation made during that two-year period may be avoided as a "constructive" fraudulent transfer if the company received less than "reasonably equivalent value" in exchange for the transfer, and the company (1) was insolvent at the time of transfer or became insolvent as a result of the transfer, (2) was engaged in, or about to engage in, a business or transaction for which any property remaining with the company was "unreasonably small capital," (3) intended or believed that it would incur debt that would be beyond its ability to pay as such debt matured or (4) made the transfer or incurred the obligation to or for the benefit of an insider under an employment contract and not in the ordinary course of business.[12]

In addition to the Bankruptcy Code, most states have fraudulent transfer or fraudulent conveyance provisions of their own, which generally provide for recovery periods that are longer than the Bankruptcy Code's (either four or six

---

[11] 11 U.S.C. § 548(a)(1)(A).

[12] 11 U.S.C. § 548(a)(1)(B).

years in most states—*e.g.*, six years in New York State).[13]   In bankruptcy, a representative of the bankrupt estate generally can invoke all of the avoidance rights any creditor would have under state law.[14]

Although the purpose of a transaction may be to stabilize a distressed seller, there is a risk that a court looking back as long as six years could find that the purchase price paid by the acquiror was less than "reasonably equivalent value," and, thus, invalidate the sale as a fraudulent conveyance. Indeed, because they are made under pressure and often involve troubled assets for which potential bidders are wary of overpaying, sales by severely distressed companies carry a higher risk of being made at less than "reasonably equivalent value" and of the seller being found to have been insolvent at the time of sale. For example, in *In re Bridgeport Holdings, Inc.*, the debtor conducted what the court termed a "fire sale" of a substantial portion of its assets just one day before filing bankruptcy, and the purchaser ultimately settled a fraudulent transfer action brought by the Trustee for $25 million (thereby nearly doubling the initial purchase price of $28 million).[15]

A conveyance might be deemed fraudulent not only if it transfers assets outside of a corporate group but also if it transfers assets within a corporate group to the detriment of certain creditors. The recent saga of Dynegy provides an example of the latter case. Shortly before filing for bankruptcy, Dynegy Holdings, LLC conveyed certain valuable coal-related assets to its parent, Dynegy Inc., in exchange for an unsecured "undertaking" obligating Dynegy Inc. to make certain payments on debt owed by Dynegy Holdings. As this undertaking was seen to be worth less than the assets transferred, the conveyance benefitted Dynegy Inc.'s equity holders, including Carl Icahn, to the detriment of the creditors of Dynegy Holdings. After Dynegy Holdings filed for bankruptcy, a court-appointed examiner concluded the conveyance was fraudulent on potentially two grounds. First, the examiner concluded that the conveyance was

---

[13] The Uniform Fraudulent Transfer Act has been enacted by most states with the notable exception of New York (which still adheres to its predecessor, the Uniform Fraudulent Conveyance Act).

[14] *See* 11 U.S.C. § 544(b).

[15] *Bridgeport Holdings, Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 553-58 (Bankr. D. Del. 2008). *In re Bridgeport* also presents important lessons in corporate governance when dealing with severely distressed companies. The bankruptcy court found that the directors and officers of Bridgeport, as well as an outside restructuring advisor who had been appointed as chief operating officer, breached their fiduciary duties of loyalty and care in connection with the sale. *Id.*

effectuated to hinder and delay creditors.  Second, assuming, that the subsidiary was insolvent at the time of the transfer, the examiner deemed the transfer constructively fraudulent because the subsidiary received less than reasonably equivalent value.  Against the backdrop of the examiner's findings, Dynegy Holdings ultimately settled with creditors, giving them 99% of the stock in the reorganized entity and leaving old equity holders with just 1% and warrants.[16]

A related risk arises when a parent company spins off a weak subsidiary, potentially in preparation for a sale of some or all of itself.  While such a transaction may strengthen the parent and make it more attractive to buyers, the pre-sale transfer could constitute a fraudulent conveyance.  In 2006, for example, Kerr-McGee Corporation transferred its valuable oil and gas business into a new wholly owned subsidiary ("New Kerr-McGee"), leaving behind only certain underperforming assets and significant legacy liabilities from its chemical business.  The remaining business was renamed "Tronox" and spun off.  With the weaker assets and legacy liabilities gone, New Kerr-McGee then went on to sell itself to Anadarko Petroleum for $18.4 billion.  Creditors of Tronox, which filed for bankruptcy soon after the spin-off, alleged that the transfer of the oil and gas business to New Kerr-McGee was a constructive fraudulent conveyance because Tronox did not receive reasonably equivalent value and was insolvent at the time of or made insolvent by the transfer.[17]  The lawsuit, which as of early 2013 continues to be pursued by a litigation trust established under Tronox's chapter 11 plan, seeks to recover at least $14 billion.

Several strategies are helpful in mitigating the risks arising from a sale or spin-off of distressed assets, although none can eliminate the risk completely.  To start, the parties to a transaction should ensure that there is a record of a reasonable sale process conducted in good faith and resulting in arm's-length terms.  As part of that process it may be helpful for a distressed company and/or its counterparty to seek a solvency, capital adequacy/surplus or valuation opinion or some combination thereof from a third-party expert.  In a significant asset sale or other transfer that might be challenged after the fact as having undermined the solvency of the company or to have been made for less than reasonably equivalent value, such an opinion may be useful in defending the transaction against

---

[16] *See* Report of Susheel Kirpalani, Examiner, *In re* Dynegy Holdings, LLC, No. 11-38111 (Bankr. S.D.N.Y. March 9, 2012).

[17] *See* Adversary Complaint, *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, Case No. 09-01198 (ALG) (Bankr. S.D.N.Y. May 12, 2009).

fraudulent conveyance claims.[18]  Of course, no opinion can serve as a guaranteed insurance policy, as the claimant seeking to unwind the applicable transaction will present competing expert analyses.  For this reason, purchasers of assets from a distressed company frequently insist that the company actually file bankruptcy and condition the purchase on court approval, which insulates the purchaser from a subsequent contention that the purchaser underpaid.[19]

Despite its importance, the appropriate measure of "reasonably equivalent value" is not specified in the Bankruptcy Code, and the definition of solvency in the applicable statutes is likewise less than crystal clear.[20]  This lack of certainty—combined with the ready availability of experts able to make plausible cases for wide ranges of values, and the tempting inference that, because a company is insolvent now, it was probably insolvent at the time the challenged transaction occurred—historically has worked to the advantage of parties challenging transactions as fraudulent conveyances.  In recent years, however, courts have moved toward objective tests that have made it more difficult for such claims to prevail.  In *VFB LLC v. Campbell Soup Co.*, the Third Circuit held that the market capitalization of a publicly traded entity that had been spun off from its parent constituted a proper measure of its value, noting that market capitalization reflects all publicly available information at the time of measurement and that "[a]bsent some reason to distrust it, the market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'"[21]  Thus, it is highly advisable for investors seeking to purchase assets

---

[18] In addition, sections 141(e) and 172 of the Delaware General Corporation Law allow the directors of any company, including one that is in financial distress, to rely in good faith on reports of the company's officers or experts selected with reasonable care as to matters reasonably believed to be within the professional or expert competence of such persons, and a solvency opinion may help to establish that the directors approved the transaction in good faith in accordance with their fiduciary duties.

[19] *See* Part III of this outline describing the various methods by which a distressed company and would-be acquiror can use the Bankruptcy Code to their advantage in shaping a sale of part or all of a company.

[20] The Bankruptcy Code defines "insolvent" as meaning "with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a *fair valuation*" (emphasis added).  11 U.S.C. § 101(32).  The meaning of "fair valuation" has been left to the courts.

[21] *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (quoting *In re Prince*, 85 F.3d 314, 320 (7th Cir. 1996)); *see also* Statutory Comm. Of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc. (In re *Iridium Operating LLC*), 373 B.R. 283, 291 (Bankr. S.D.N.Y. 2007) (endorsing the Third Circuit's reasoning in *VFB*).

from a distressed company to consider the trading prices of the company's debt and equity and other contemporaneous market evidence of value.

### b. Other Risks

In the event a company files for bankruptcy protection after the signing but prior to the closing of the transaction, investors are subject to risk that the now-bankrupt company will exercise its rights under section 365 of the Bankruptcy Code to reject the sale agreement, attempt to renegotiate the terms of the sale by threatening rejection, or "cherry pick" among the different transaction agreements by rejecting some and assuming others.[22]   Upon rejection, the company will have no further obligations to perform under the agreement and the purchaser generally will have an unsecured prepetition claim for the damages it incurs from the loss of the transaction.   Further, if a target company files for bankruptcy after an acquisition agreement is signed but before the transaction closes, the company may be unable to pass on intellectual property licenses to the purchaser without the licensor's consent, which can be a significant concern where intellectual property rights are material to the business.[23]

Similar risks may exist when a transaction closes and the company then files for bankruptcy.   For example, the company will have gained the ability to reject undesirable contracts, such as a post-closing transition agreement, while the buyer may be left with relatively worthless representations, warranties and indemnities, since any claims for breach against a bankrupt company will be prepetition unsecured claims which are often paid far less than 100 cents on the dollar.   In addition, payments received by the purchaser post-closing but pre-filing, including true-up payments or purchase price adjustments, may be avoidable by the company as preferences.

Even if the company does not later file for bankruptcy protection, it may become unable to provide transition services, satisfy indemnification requirements or fulfill other ongoing obligations relating to the sale.   The investor should also be mindful of the impact of the company's financial distress and deteriorating creditworthiness on its relationships with key customers, suppliers, landlords and other business partners.

---

[22] *See* Part III.B.8 of this outline discussing executory contracts.

[23] Since nonexclusive licenses are deemed personal and non-assignable, a seller may not be able to assume and assign certain intellectual property arrangements it holds as a non-exclusive licensee unless its counterparty consents.  This matter is discussed in greater detail in Part III.B.8.c.i of this outline.

There are several measures that an investor may wish to negotiate with a distressed company that may alleviate these concerns to some extent. For example, transaction documents may be drafted to include language evidencing the parties' intent to integrate the agreements and thereby reduce the company's ability to "cherry pick" the more favorable transaction agreements. Other potential protections for a purchaser include the granting of a lien in other assets of a company to secure indemnification, damages and other claims, or structuring the transaction to include a holdback note or escrow account.[24]

Despite these protective measures, a purchaser may be reluctant to enter into an agreement with the company in view of the considerable uncertainty regarding the company's financial condition and future viability. As an alternative, purchasers may be willing to suffer the delay, auction-related deal risk and additional expense associated with the bankruptcy process and, accordingly, may insist that the company actually file for bankruptcy and condition the purchase on court approval, which alleviates most of these risks and may afford the purchaser certain additional benefits, as discussed in Part III.A of this outline.

## 2. Sales of Securities by Distressed Companies

A company in distress may seek new capital to provide the company the time it needs to get over a rough financial period or to make a key investment. Frequently, however, distressed companies find that their ability to raise additional debt or equity capital is limited by restrictions in the terms of the company's existing debt, unfavorable credit or equity markets, the extent of the company's then-current leverage, regulatory restrictions or other factors that may be beyond the company's control. In recent years, some companies have been able to successfully navigate these limitations and raise capital by means of a private investment in public equity (a "PIPE") investment or a rights offering.

### a. PIPEs

A PIPE investment involves a privately negotiated purchase of equity in a public company, usually by one or more sophisticated investors, such as private equity firms or hedge funds. While each PIPE investment is unique and individually negotiated, an investor typically purchases an issuer's securities at a discount to market, and, depending on the relative size of the investment, may receive certain governance rights, such as a right to designate one or more members of the issuer's board of directors. Securities issued in privately

---

[24] An escrow account may be structured so that the automatic stay will not prevent a purchaser from obtaining the escrowed funds.

negotiated PIPE investments are not typically registered with the SEC at issuance, so issuers will often enter into a registration rights agreement committing to register the securities within a specified period of time.  In some cases, for example when the issuer already has an effective shelf registration statement on file with the SEC, it may issue registered securities in a private placement (a "registered direct offering").

Many companies that were financially stressed by the 2008 financial crisis and subsequent recession raised capital by means of PIPE investments.  In December 2010, for example, Ruth's Hospitality Group completed a series of interrelated transactions designed to improve its financial condition, including a PIPE investment by Bruckmann, Rosser, Sherrill & Co., a common stock rights offering and an amendment to its credit facility, the closing of which was contingent on raising a minimum amount of proceeds in the PIPE investment and the rights offering.  BRS's $25 million investment was in the form of convertible preferred stock and was conditioned on both shareholder approval and the successful completion of the rights offering.

PIPE investments have also occurred more recently.  For example, in February 2011, Central Pacific Financial Corp. completed a $325 million PIPE transaction in which it issued common stock to the Carlyle Group and Anchorage Capital Group as part of a recapitalization that also included a rights offering.

> b.      *Rights Offerings*

Another capital-raising option that may be appropriate for a distressed company is a rights offering, which can reduce the "sting" to existing shareholders of issuing new stock at a low price because all shareholders have the opportunity to participate *pro rata*.  In a typical transaction, the issuer would distribute to its shareholders the right, for a limited period of time (typically 30 to 45 days), to subscribe for additional shares at a subscription price that is at or below the market price of its outstanding shares at the close of trading immediately before the offering.  To help ensure the success of the rights offering, issuers often obtain a standby commitment (or a "backstop") from one or more investors to purchase any unsubscribed shares.

Rights offerings have historically been much more common in Europe and Canada and relatively rare in the U.S. However, several U.S. companies have completed rights offerings in recent years, including  Ruth's Hospitality Group ( in conjunction with the PIPE investment described above), Builders FirstSource, Inc., Standard Pacific Corporation, KKR Financial Holdings LLC, and others.

### c.      *Shareholder Approval Requirements*

Both the New York Stock Exchange ("NYSE") and Nasdaq rules generally require a listed company to obtain shareholder approval prior to an issuance of shares of common stock (or securities convertible into or exercisable for common stock) that would represent 20% or more of the company's currently outstanding voting power or number of common shares (or securities convertible into or exercisable for common stock), and prior to an issuance of shares that will result in a change in control of the company.  This requirement does not apply to public offerings for cash or to private sales of common stock for cash through a broker-dealer or to multiple purchasers at a price not less than the greater of the book value and the market value of the common stock.[25]   This exemption, however, is rarely available for PIPE investments, where shares are typically acquired at a discount.

State corporation laws may also necessitate shareholder approval.  If a company wishes to engage in a transaction that requires the issuance of more shares than are currently authorized for issuance under its certificate of incorporation, it may need to amend its certificate of incorporation to increase the number of authorized shares, which typically requires shareholder approval under state law.[26]

To obtain shareholder approval for the issuance, the company will need to prepare and circulate a proxy statement and hold a shareholder meeting.  This process typically requires a time period of several months, depending in part on whether the SEC reviews the proxy statement.  If the company is facing acute financial distress, a delay in issuing the securities can have various adverse consequences and, in some cases, may even jeopardize the company's survival.

Many transactions are structured so that they do not require a shareholder vote.  For example, a distressed company may seek to rely on the financial

---

[25] NYSE Listed Company Manual § 312.03(c); NASDAQ Listing Rule 5635.

[26] In addition, the structure and size of a PIPE investment in certain financial institutions may be impacted by federal laws relating to control of financial institutions.  An investor in a bank or bank holding company may be subject to supervision, regulation and other requirements under the Bank Holding Company Act if the investor has the power to vote 25% or more of any class of "voting securities" of the company, if it has the power to control the election of a majority of the company's board, or if the Federal Reserve determines that the investor has the power to directly or indirectly exercise a controlling influence over the management or policies of the company. *See, e.g.*, 12 U.S.C. § 1841(a)(2); *see also* Federal Reserve Policy Statement on Equity Investments in Banks and Bank Holding Companies, 12 C.F.R. § 225.144.

viability exception available in both the NYSE and Nasdaq rules or it may issue multiple classes of stock, either to avoid crossing the 20% threshold or to limit the issuance to securities that do not require immediate amendment of its certificate of incorporation, until shareholder approval is obtained.   These strategies are discussed below.

(i)        Financial Viability Exception

NYSE rules provide an exception from the shareholder approval requirements where "the delay in securing stockholder approval would seriously jeopardize the financial viability of the enterprise."[27]    Nasdaq has a similar exception to its shareholder approval policy.[28]   In each case, the exchange and the issuer's audit committee must approve reliance on the exception, and the issuer must notify shareholders that it is relying on the exception.   This hardship exemption has been used by several companies in connection with PIPE or other equity investments in recent years, including NuPathe Inc., Knight Capital Group, Inc., Post Rock Energy, Central Pacific Financial Corp., NCI Building Systems, Inc., MoneyGram International, Wachovia Corporation, Conseco, Inc., Bear Stearns and Central Pacific Financial Corp.   Public disclosure of this extreme level of distress can have a number of negative consequences, including negative impact on customers and suppliers, and the possibility of triggering defaults under debt instruments and key contracts.   Companies should assess these risks carefully before invoking the "financial viability" exception.

(ii)       Issuing Securities That Do Not Require Shareholder Approval

If the financial viability exemption is not available, or the company does not have a sufficient number of common shares authorized under its certificate of incorporation, the company may be able to avoid a shareholder vote by issuing multiple classes of stock, or securities that convert into common stock upon receipt of shareholder approval.   For example, at the closing of the equity investment, investors could receive a combination of common stock (up to the maximum allowed without a shareholder vote) and nonvoting, nonconvertible preferred stock, with the nonvoting preferred stock becoming convertible into common stock when shareholder approval is received.   The terms of the substitute securities may be crafted to provide the desired economics to an investor, including fair participation in any appreciation of the common stock.   This

---

[27] NYSE Listed Company Manual § 312.05.

[28] NASDAQ Listing Rule 5635(f).

approach was utilized by Jarden Corporation in 2004, when it obtained a sizeable investment from Warburg Pincus to finance its acquisition of American Household, Inc.  Because the issuance of common stock to Warburg Pincus would have exceeded 20% of Jarden's then-outstanding shares, Jarden issued a combination of common and preferred stock, including a separate series of preferred stock that became convertible into common stock following shareholder approval.

In some cases, terms of the preferred securities have been structured to incentivize shareholders to approve their conversion into common stock by providing that increased dividend rates or other terms less favorable to common shareholders become effective if shareholder approval is not obtained within a specified time period.  However, unless there is no issuance of common stock prior to shareholder approval, Nasdaq-listed companies may not rely on an initial 20% cap to avoid a shareholder vote at the time of issuance if the terms of the transaction are subject to change based on the outcome of the shareholder vote.[29]

### 3.      Debt Repurchases

Whether due to broad market conditions or firm- or industry-specific distress, a company's debt may trade below par.  During the one-year period ending with the first quarter of 2009, the height of the recent financial crisis, high-yield bonds of even well-capitalized companies traded at significant discounts, at an average yield across the asset class of 22.6%.[30]  With the end of the crisis, the slow return to economic growth and a near-zero interest rate environment, the average price of high-yield bonds reached record levels in the beginning of 2013, soaring to a premium to par of nearly 6%.[31]  As such, idiosyncratic distress is presently likely to prove a greater source of discount pricing than capital market dislocation.

---

[29] NASDAQ Listing Rules, IM-5635-2, Interpretive Material Regarding the Use of Share Caps to Comply with Rule 5635, adopted March 12, 2009.

[30] *Merrill Lynch High Yield Index*, WALL ST. J., April 1, 2009, at C6.  Yields among the 100 largest high-yield bonds as defined by the Merrill Lynch High Yield 100 Index reached as high as 17%, and the riskiest bonds as defined by the Merrill Lynch Triple C Index reached yields of almost 41.9%.  *See id.*

[31] The average yield of the Bank of America Merrill Lynch High Yield Master II Index hit an all-time record low of 5.626% on January 24, 2013. Michael Aneiro, *Daily Junk-Bond Update: More Records, Yet Again*, BARRON'S (Jan. 24, 2013), http://blogs.barrons.com/incomeinvesting/2013/01/24/daily-junk-bond-update-more-records-yet-again/?mod=BOL_qtoverview_barlatest.

However caused, discount pricing of any magnitude presents an opportunity for a debt issuer to delever by repurchasing some or all of its own debt. There are two primary ways to repurchase debt: for cash, if the company has sufficient liquidity, or through an exchange offer (discussed in Part I.B.4 of this outline). There are several issues involved in repurchasing debt, no matter the method of repurchase or the premium paid.

a.   *Issues in Bank Debt Repurchases*

(i)   Pro Rata Sharing Provisions and Eligible Assignees

Syndicated credit agreements generally contain a clause relating to *pro rata* sharing of payments. Under these provisions, any payment on loans under the credit agreement, no matter how obtained, must be allocated ratably among all lenders based on the proportion of the overall loans held by each lender. Originally, *pro rata* sharing clauses were included in credit agreements to address the practice of lenders exercising their rights of setoff against the borrower's bank accounts, thereby reducing the assets available to satisfy the claims of the other lenders and causing different recoveries among members of the same lender group.

While *pro rata* sharing clauses in credit agreements are generally thought not to require sharing of proceeds of sales of the loans to third parties (even though they are sometimes drafted broadly enough to capture such "payments"), repurchases by the borrower and its affiliates are more problematic, as a sale of a loan back to the borrower is economically identical to a repayment of that loan. This economic reality may lead to a dispute with other lenders in the group about whether the *pro rata* sharing clause applies, and the prospect of such a dispute may itself serve as a barrier to the repurchase. Many borrowers and their sponsors confronted this issue in 2008 and 2009 when repurchase opportunities were everywhere but loan documentation often required amendments of the type described below  in order to take advantage. When a credit agreement clearly prohibits sales of the loans back to the borrower unless the proceeds are shared *pro rata* among all lenders, an amendment (typically requiring 100% lender consent) is required to make discounted repurchases possible. Meanwhile, credit agreements that exclude repurchase by the borrower from the *pro rata* sharing clause may nevertheless contain a separate prohibition on assignments of debt to the borrower and its subsidiaries, again requiring an amendment (in this case, typically requiring only majority consent) to make discounted repurchases possible.

(ii)     Dutch Auction and Open Market Repurchases;
Sponsor Purchases

During the crisis, the desire of lenders to obtain liquidity from any source possible led to a robust practice of amending the pro rata sharing and assignee provisions described above to specifically allow buybacks/purchases of debt by borrowers and their affiliates on specified terms.  Typically, (i) borrowers would be permitted to spend up to some fixed amount of dollars making open market repurchases of their own loans, and to spend significantly more on repurchases offered to all lenders pursuant to "Dutch auction" procedures;[32] and (ii) affiliates/sponsors would be permitted to buy up to a set percentage of the aggregate loan obligations in the open market, subject to certain conditions, including a waiver of the right to vote the purchased debt.

The genie having left the bottle, these seeming financial crisis band-aids are now spreading throughout the market, baked into original loan documentation in various forms, especially in connection with private equity sponsored deals.

*b.     Other Repurchase Considerations*

(i)     Corporate Opportunity Doctrine

Sponsors and affiliates face a special set of issues when repurchasing debt. Where an affiliate or insider of a company purchases debt of the company at a discount, there may be some risk that the purchase could be challenged later as an improper usurpation of a corporate opportunity.  The "corporate opportunity" doctrine generally provides that a person with a fiduciary relationship to a company may not pursue an opportunity that is within the company's line of business if the company has an interest or expectancy in the opportunity and is financially able to exploit the opportunity.[33]   Sponsors and affiliates should

---

[32] In a typical Dutch auction for bank debt, the borrower offers to buy debt of up to a specified face amount at a discount to par of not less than a specified percentage.  Each lender then submits a bid whereby they commit to sell to the borrower a set amount of loans at a specified  discount to par.  The clearing price is the greatest discount to par at which the borrower has received enough bids to sell the entirety of the proposed face amount.

[33] The origin of the corporate opportunity doctrine generally is attributed to *Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939), which first established the doctrine as a distinct branch of fiduciary duty law.  *See also* William Savitt, *A New New Look at Corporate Opportunities* (Columbia Law Sch. Ctr. for Law and Econ. Studies, Working Paper No. 235, 2003), *available at* http://ssrn.com/abstract=446960.

consider whether to disclose to the company their intention to repurchase in order to give the company the opportunity to repurchase instead.

### (ii)    Equitable Subordination and Recharacterization

Another risk for parties that have relationships with an issuer is that the nature or priority of their investment may be modified by a bankruptcy court under certain circumstances.  Section 510(c) of the Bankruptcy Code permits a bankruptcy court to "equitably subordinate" all or part of a creditor's claim to the claims of other creditors in order to remedy harm suffered as a result of inequitable conduct.  Debt purchased by an affiliate, fiduciary or insider of an issuer (including a private equity sponsor) may be subject to claims by creditors that such debt should be "equitably subordinated" in the event the company files bankruptcy, on grounds that such parties controlled the borrower and are accountable either for the insolvency or for some other allegedly culpable action.

Along with the risk of equitable subordination, there is a risk that debt of a troubled firm purchased by a sponsor, parent, affiliate, insider or fiduciary of such firm may be recharacterized by a bankruptcy court as equity rather than debt.  Because such persons have the ability to denominate advances to the firm as either "debt" or "equity," bankruptcy courts have the ability to look behind the name assigned to a particular infusion of funds and determine whether the arrangement should, in substance, be treated as equity in a bankruptcy case.  Equitable subordination and recharacterization are both more fully discussed in Part IV of this outline.

### (iii)    Insider Trading

A company considering a debt buyback should consider the implications of the insider trading prohibition set forth in Exchange Act Rule 10b-5.  While bonds generally are considered "securities," and therefore subject to the federal securities laws, interests in bank debt typically have been considered not to constitute "securities" for purposes of the federal securities laws.[34]  Although bank debt is not a "security," a seller may pursue common law theories of wrongdoing—such as common law fraud.

Case law applying Rule 10b-5 in the context of debt securities is limited.  At least one federal district court has held that a Rule 10b-5 remedy is not

---

[34] *See Banco Español de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51, 55-56 (2d Cir. 1992) (widely cited case holding that a loan participation agreement among sophisticated financial institutions did not generate covered "securities").

available for convertible noteholders because the issuer does not owe a fiduciary or other analogous duty to such noteholders.[35]    Notwithstanding this case, companies frequently consider limiting bond purchases to a customary window period, such as a short period after the announcement of its quarterly results, and avoid purchases during sensitive periods (such as near the end of a quarter until earnings are announced or when the company is seriously pursuing a significant transaction).    Similarly, even during window periods, companies engaging in repurchases frequently seek to confirm that they (or the person who authorizes the trade)[36] are not otherwise in possession of material nonpublic information.[37]   While there are strong arguments that the securities laws should be applied differently in the context of a bond purchase (particularly in the case of non-convertible debt), supporting a modification of window trading policies, there is no cause to abandon such policies entirely.

> ### 4.    Exchange Offers

A financially troubled company may attempt to restructure its obligations out of court through an exchange of one type of security or other obligation for another.  For a public company, both a "debt-for-equity swap" and a "debt-for-debt exchange" typically take the form of an exchange offer.   In either case, additional consideration may be offered to exchanging securityholders in the form of equity or equity derivatives (in the case of a primarily debt-for-debt exchange offer) or cash.

Debt exchange offers often are coupled with a consent solicitation or "exit consent" in which the exchanging securityholders agree to amend the indenture or

---

[35] *Alexandra Global Master Fund, Ltd. v. IKON Office Solutions, Inc.*, 2007 WL 2077153 (S.D.N.Y. Jul 20, 2007).

[36] Rule 10b5-1(c)(2) promulgated under the Exchange Act provides an affirmative defense to a claim that a purchase or sale of securities was made "on the basis of" material nonpublic information if "the individual making the investment decision on behalf of the person to purchase or sell the securities was not aware of the information" and "the person had implemented reasonable policies and procedures, taking into consideration the nature of the person's business, to ensure that individuals making investment decisions would not violate the laws prohibiting trading on the basis of material nonpublic information."  The SEC has indicated that this defense is available to an issuer of securities for a repurchase plan.  *See* SEC Compliance and Disclosure Interpretations (Exchange Act Rules), Question 120.25 (updated Mar. 25, 2009), *available at* http://www.sec.gov/divisions/corpfin/guidance/ exchangeactrules-interps.htm.

[37] A question to consider, and about which counsel should be consulted, is whether the set of information that is material to debtholders is conterminous with that which is material to equityholders.

other documentation governing the security to be exchanged, even though they themselves are "exiting" the security in connection with the exchange. Because indentures typically require only majority approval for most amendments, consent solicitations encourage participation in exchange offers by confronting non-exchanging holders with the prospect of retaining securities stripped of covenants, change-of-control rights and other protective provisions.[38]

An instructive example of an out-of-court, debt-for-equity transaction involved SunCom Wireless Holdings, Inc., a wireless telephone company that had been struggling with too much leverage. In 2007, SunCom exchanged approximately $700 million in subordinated bonds for approximately 90% of the common equity of the restructured company, while simultaneously amending the subordinated bond indenture to strip nonparticipating bondholders of covenant protection.[39] The bondholders that had elected to become shareholders quickly sold the company to T-Mobile, earning significantly greater returns on their equity than the face amount of the exchanged bonds. Other recent debt-for-equity exchanges include those by Georgia Gulf Corporation and YRC Worldwide Inc.[40] in 2009 and C&D Technologies, Inc.[41] in 2010.

Rather than exchange debt for equity, a distressed company might instead exchange debt for other debt. Indeed, during the last several years, numerous companies have used debt exchange offers as a means to reduce their total outstanding debt, offering a lesser face amount of higher priority or secured debt for a greater face amount of lower priority or unsecured debt—or push out maturities. Examples include two exchanges by Harrah's Entertainment, Inc. in 2008 that together reduced its outstanding debt by $2.9 billion,[42] GMAC LLC's exchange of approximately $21.2 billion of old debt for $11.9 billion of new debt and $2.6 billion of preferred stock in connection with its application to become a bank holding company in 2008,[43] and, more recently, Clear Channel

---

[38] As discussed in greater detail below, an issuer must consider whether proposed amendments to the terms of the existing security amount to the issuance of a new security requiring reregistration under the Securities Act of 1933 (the "Securities Act").

[39] *See* SunCom Wireless Holdings, Inc., Current Report (Form 8-K) (May 15, 2007).

[40] *See* YRC Worldwide Inc., Current Report (Form 8-K) (Dec. 31, 2009).

[41] *See* C&D Technologies, Inc., Current Report (Form 8-K) (Dec. 21, 2010).

[42] *See* Harrah's Entertainment, Inc., Current Report (Form 8-K) (Apr. 9, 2009). Along with the second exchange offer, Harrah's consummated two tender offers that reduced debt by an additional $547 million. *See id.*

[43] *See* GMAC LLC, Current Report (Form 8-K) (Dec. 28, 2008).

Communications' October 2012 exchange of $2 billion of term loans for $2 billion of other debt securities maturing in 2019.[44]

A distressed company may pair an exchange offer and consent solicitation with a solicitation of acceptances for a prepackaged plan of reorganization pursuant to section 1126(b) of the Bankruptcy Code.  This is sometimes referred to as a "stapled prepack."  In a stapled prepack, an out-of-court restructuring is the intended outcome.  But if the exchange consideration, combined with threats of bankruptcy and stripped covenants, does not procure the necessary consents, then the votes collected in the out-of-court solicitation can be used in a bankruptcy case to bind all creditors to a substantially similar chapter 11 plan of reorganization, where acceptance of the plan by an impaired class requires only two-thirds by dollar amount, and a majority in number, of the claims that vote in that class.  For example, in 2009, CIT launched several exchange offers for its outstanding unsecured notes, conditioned on an overall debt reduction of $5.7 billion, while also soliciting support for a prepackaged plan of reorganization if the exchanges failed.  The offers were not successful, but CIT received high levels of support for the prepackaged plan, filed for bankruptcy after the expiration of the offers, and the prepackaged plan was approved by the bankruptcy court.[45]

Soliciting consents to a prepackaged plan does not preclude a successful out-of-court restructuring.  For example, in 2011, Dune Energy, Inc.  launched debt-for-debt and debt-for-equity exchanges while soliciting consents to a prepackaged bankruptcy plan.  Unlike CIT's attempted out-of-court restructuring, Dune's exchanges succeeded, resulting in the transfer of approximately 97% of its equity ownership  to debtholders and enabling Dune to avoid a bankruptcy filing.[46]  Similarly, in 2011, Travelport Holdings Limited, the parent of Travelport Limited, launched an out-of-court restructuring alongside a backup prepackaged plan.  Like Dune, Travelport Holdings avoided bankruptcy by successfully

---

[44] *See* Clear Channel Communications, Inc., Current Report (Form 8-K) (Oct. 25, 2012). In conjunction with this well-received transaction aimed at extending its maturities, Clear Channel also entered into amendments that, among other things, would allow it to exchange a further $3 billion of term loans.

[45] *See* Findings of Fact, Conclusions of Law and Order (I) Approving (A) the Disclosure Statement Pursuant to Sections 1125 and 1126(c) of the Bankruptcy Code, (B) Solicitation of Votes and Voting Procedures, and (C) Forms of Ballots, and (II) Confirming the Modified Second Amended Prepackaged Reorganization Plan of CIT Group Inc. and CIT Group Funding Company of Delaware LLC, *In re CIT Group Inc.*, No. 09-16565 (ALG) (Bankr. S.D.N.Y. Dec. 8, 2009).

[46] *See* Dune Energy, Inc., Current Report (Form 8-K) (Dec. 27, 2011).

-25-

completing its contemplated out-of-court transaction as requisite consents were obtained not only from the holders of existing PIK term loans issued by Travelport Holdings but also from the lenders under Travelport Limited's credit agreement, which had to be amended to consummate the transaction. With these consents, approximately $715 million of existing PIK term loans were ultimately exchanged for a combination of cash, new extended PIK term loans, structurally senior debt issued by a subsidiary of Travelport Limited and at least 40% of the equity of the parent of Travelport Holdings.[47]

In addition to the power of a "stapled prepack" to induce lenders to consent to an out-of-court restructuring, issuers can also take advantage of the fact that Regulation 14D under the Exchange Act does not apply to offers to exchange non-convertible debt.[48] This means that key restrictions applicable to equity tender and exchange offers, such as the "best price" and "all holders" rules, do not constrain debt exchange offers. As a result of the considerable flexibility they enjoy in structuring debt exchange offers, issuers must consider: (1) whether to open the offer to all holders of a given security or only a subset (*e.g.*, accredited investors), (2) whether to offer added inducements to certain participants in the exchange, (3) how best to structure the mechanics of the offer, *i.e.* withdrawal rights and time frames, (4) what disclosure documents may be necessary and (5) whether the securities that are being issued in the exchange offer (whether debt or equity) must be registered or qualifies for an exception from registration. Each of these considerations is discussed below, as are change-of-control, ratings, and tax implications of exchanges.

### a.    Targeted Holders

Because a debt exchange offer is not subject to Regulation 14D's all holders rule, an offer for a particular class of an issuer's debt securities need not be made to every holder of such securities. When speed is a key objective and an issuer requires the services of a financial advisor to solicit participation by securityholders, an offer under section 3(a)(9) of the Securities Act (discussed below) is not a viable option. Therefore, to avoid the SEC registration process for the new securities, the requirements of which would significantly extend the time required to complete the exchange, the offer may be conducted as a private placement open only to accredited investors.

---

[47] *See* Travelport Limited, Current Report (Form 8-K) (Sept. 28, 2011); Travelport Limited, Current Report (Form 8-K) (Oct. 6, 2011).

[48] The general antifraud rules of Regulation 14E do, however, apply to debt exchange offers.

### b.    Inducements

The best price rule found in Rule 14d-10 under the Exchange Act is not applicable to debt exchange offers.  This permits an issuer to offer inducements to certain participating holders but not others.  Debt exchange offers often provide that holders that tender within a specified time period after the launch of the offer receive a larger payment for their securities than investors tendering later.  Often, an early tender deadline is contemporaneous with the withdrawal rights deadline, such that an issuer trades this higher payment for the ability to "lock in" tendering securityholders.  This results in an issuer paying two prices in the offer—a higher price for early tenders and a lower price for those tendering after the early deadline but prior to the expiration of the offer.

As noted in the beginning of Part I.B.4, issuers seeking to obtain relief from covenants or make other amendments to indentures or other governing documents often couple debt tender offers with  consent solicitations.  This provides a powerful incentive for holders to participate because, if the consent solicitation is successful, non-tendering holders will lose some of their original protections.  Amendments to the terms of an existing security may, under certain circumstances, result in the issuance of a new security requiring reregistration under the Securities Act or qualification of the resulting indenture under the TIA.[49]  Although the SEC frequently has granted no-action relief in this context, issuers should take care to consider this issue prior to undertaking a consent solicitation that will result in significant alterations to the terms of the existing security.[50]

### c.    Certain Mechanics

*Time periods*.  Regulation 14E requires that any tender or exchange offer remain open for at least 20 business days.[51]  If a change is made to the percentage

---

[49] Andrew R. Brownstein & Mitchell S. Presser, *Tendering for Debt:  Structuring, Tactical and Legal Issues* in RESTRUCTURING THE CORPORATE PRACTICE:  FROM BUYOUTS TO BAILOUTS, SECOND ANNUAL SEMINAR (March 1991).

[50] In at least one instance, the SEC has declined to grant relief to an issuer seeking to extend the maturity date of a debenture, reasoning that it "would constitute an 'offer to sell' and 'sale' of a new security within the meaning of Section 2(3) of the 1933 Act, and Section 303(2) of the Trust Indenture Act of 1939."  Allied-Carson Corp., SEC No-Action Letter, 1976 WL 10614 (Mar. 12, 1976).

[51] The SEC has, however, expressed support in no-action letters for offering periods of less than 20 business days in the case of tender offers by an issuer for straight debt securities if the offer meets certain criteria.  *See* Michael H. Friedman & Joshua Ashley Klayman, "*Are We There Yet? Issuer Debt Tender Offers and Offering Period Requirements*," DEAL LAWYERS (May-June 2009).

of securities sought or the consideration offered, then the offer must remain open for at least 10 business days following such change.  An issuer enjoys considerable flexibility with respect to other modifications to a debt exchange offer.

*Thresholds for participation*.  As noted above, in a distressed situation, exchange offers often are coupled with consent solicitations and conditioned on high levels of participation, often above 90%, so as to avoid significant holdouts or "free rider" problems.  However, as discussed below, a successful solicitation of a high percentage of debtholders in a debt-for-equity exchange may trigger change-of-control provisions in a company's debt, employment or other agreements.  In certain circumstances, therefore, maximum tender conditions—limiting the amount that can be tendered—may be appropriate; otherwise, a restructuring in bankruptcy may be required.  In debt exchange offers undertaken to reduce debt but without a need for a specific percentage of participation, an issuer may structure the offer as an "any and all" offer without any minimum condition.

*Withdrawal rights*.  In tender offers for equity or convertible debt securities, Regulation 14D mandates that securityholders be permitted to withdraw their tenders at any time prior to an offer's expiration.  As noted above, holders of debt securities do not have withdrawal rights as a matter of law and an issuer may terminate withdrawal rights in advance of the expiration of the offer or provide that a holder cannot revoke its consent to indenture amendments even if it withdraws the tendered securities.

### d.    Disclosure

Registration statements filed with the SEC and offering documents distributed in exempt transactions must provide material information regarding the issuer, the exchange offer and the new securities.  This includes a description of the new securities, *pro forma* financial information giving effect to the offer, risk factors relating to the offer and the new securities and analysis of the potential vulnerabilities of the issuer with respect to litigation (including bankruptcy).  The offering documents typically will also contain or incorporate by reference information provided in an issuer's periodic reports filed with the SEC under the Exchange Act, including financial statements and management's discussion and analysis.

### e.     Whether the Securities Must Be Registered

Under the Securities Act, an offering of debt or equity securities by a company in exchange for its existing obligations must be registered with the SEC unless an exemption from registration is available.  The company must file with the SEC and make publicly available an effective registration statement containing extensive disclosure regarding the company and the exchange offer.  The registration process, including SEC review, generally takes at least two months.  The time and expense of the registration process may be more than a distressed company can bear.  Also, in certain circumstances (*e.g.*, where required financial statements are unavailable, which is not uncommon for distressed companies), registration may not be possible.  Consequently, where widespread solicitation and distribution are unnecessary or where otherwise permitted by law, companies frequently seek to rely on one of the Securities Act's exemptions from registration.

Section 4(2) of the Securities Act exempts from securities registration private placements, which are transactions "not involving any public offering."  To avoid constituting a public offering, an exchange offer generally must be privately made to a limited group of qualified investors.  Therefore, private placements are most appropriately used where a small number of sophisticated holders, usually qualified institutional buyers under Rule 144A of the Securities Act, own the subject securities.  Whether limiting the offeree class is a viable option depends on the nature of the issuer's investor base and the number of participants an issuer needs to achieve its intended purpose.  Securities offered under the section 4(2) exemption of the Securities Act will not be freely tradable when issued, so securities issued in private placements typically carry registration rights enabling the exchanging holders, following the consummation of the offer and subsequent registration, to sell the new securities publicly.[52]

Section 3(a)(9) of the Securities Act exempts from registration exchanges of securities between an issuer and its existing securityholders where the issuer pays no commission to any person for soliciting participation in the exchange.  Although an offering document with registration statement-like disclosure is used to offer the new securities, no SEC review is required.  The new securities offered

---

[52] On February 15, 2008, changes to the resale exemption provided by Rule 144 under the Securities Act shortened the holding period conditions pursuant to which transfers of restricted securities may take place.  For reporting companies, purchasers of privately placed debt securities that are not affiliates of the issuer can freely resell these securities after six months so long as the issuer's public filings are up to date.  Nevertheless, purchasers in a private placement generally continue to request registration rights.

will be freely tradable or restricted under the Securities Act to the same extent as the old securities for which they were exchanged.  In a section 3(a)(9) offering, the solicitation activities of an issuer, as well as those of its advisors and agents, are significantly limited.  For example, while an issuer's financial advisor may advise on an issuer's strategy privately, it may not recommend that holders participate in the exchange.[53]   An advisor, however, may, depending on the circumstances, participate in discussions with legal and financial advisors to certain institutional holders of the existing securities or a committee of such holders.  However, depending on the circumstances, it may not be feasible to complete an exchange if the financial advisors are not permitted to actively solicit shareholder support.

> ### f.    Change-of-Control Concerns

Debt-for-equity exchanges—like other transactions that alter a company's ownership—risk violating change-of-control provisions in the company's debt documents or other material contracts.  In particular, in credit agreements, a change of control is often an event of default that can result in the acceleration of all outstanding loans.  In bond indentures, meanwhile, a change of control frequently requires the company to make an offer to repurchase the bonds at a specified premium, which, for a distressed company that is short on cash, could be impossible.

Change of control provisions in debt documents are often drafted so they will be triggered by a person or "group" acquiring a threshold percentage of the voting power of the company's voting stock.  In the context of an exchange offer, the analysis often turns on the meaning of "group."  That is, unless one entity will receive enough equity to trigger a change of control by itself, a change of control will occur only if entities receiving a sufficient percentage of the company's equity are deemed a "group."  The term "group" is often defined with reference to Sections 13(d) and 14(d) of the Exchange Act, which asks whether individuals have agreed to act together "for the purpose of acquiring, holding, or disposing of securities."[54] While this definition is ultimately fact-specific (and according to at least one recent decision, should be construed narrowly[55]), to be safe, institutions

---

[53] *See* Exxon Mobil Corp., SEC No-Action Letter, 2002 WL 1438789 (June 28, 2002); SunTrust Banks, Inc., SEC No-Action Letter, 1999 WL 506640 (July 16, 1999); Petroleum Geo-Services ASA, SEC No-Action Letter, 1999 WL 377870 (June 8, 1999).

[54] 15 U.S.C. § 78m(d)(3).

[55] *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 239 (Bankr. S.D.N.Y. 2009).

participating in an exchange offer should be cautious when entering into any agreement or understanding to act in coordination with other holders.

### g.     Ratings Implications

Issuers considering a debt exchange offer should also consider how ratings agencies will view the exchange. An offer by a distressed issuer to exchange its debt for other securities may be viewed by the agencies as a last alternative to a default, and, therefore, be treated from a ratings perspective as analogous to an out-of-court restructuring.[56] A rating indicating default with respect to an issuer and/or targeted specific security could have a material impact on an issuer's relations with trade creditors, key customers and other business partners. Even issuers acting opportunistically must carefully evaluate whether ratings agencies will consider the exchange offer as distressed, which could lead to downgrades.

### h.     Tax Implications

The most critical tax issue for an issuer involved in an exchange offer is whether the transaction will give rise to COD income. COD income is a long-standing doctrine under the Internal Revenue Code (the "Code").[57] When a borrower borrows funds, the borrower is not taxed on those funds because the borrower has an obligation to repay them. If that obligation goes away, then the borrower has taxable income generally in an amount equal to the "forgiven" amount of the loan.[58] For example, if a borrower borrows $100 and then, some time later, the lender agrees that the borrower may pay off the loan for only $60 and the borrower does so, the borrower will have $40 of COD income.

COD income is generally taxable.[59] However, depending on the circumstances, issuers that incur COD income may have a number of choices. First, an issuer often will have substantial net operating losses ("NOLs") or current year losses. Those losses generally may be applied against the COD income.[60] If the losses are large enough, they may reduce or eliminate the tax that

---

[56] Standard & Poor's, *Rating Implications of Exchange Offers and Similar Restructurings* (Jan. 28, 2009); Moody's Investors Service, *Moody's Approach to Evaluating Distressed Exchanges* (Mar. 23, 2009).

[57] *United States v. Kirby Lumber*, 284 U.S. 1 (1931).

[58] 26 C.F.R. § 1.61-12, Treas. Reg. § 1.61-12.

[59] 26 U.S.C. § 61(a)(12), I.R.C. § 61(a)(12).

[60] 26 U.S.C. § 172(a), I.R.C. § 172(a).

would otherwise apply.  Issuers relying on net operating losses should be aware, however, that alternative minimum tax may nevertheless apply because NOLs can be used to reduce but not eliminate alternative minimum tax.[61]  Second, an issuer may exclude COD from income if the issuer is bankrupt or insolvent.[62]  If the issuer is insolvent, the exclusion is available only to the extent of the insolvency.[63]  Any exclusion under the bankruptcy or insolvency exception requires a corresponding reduction in tax attributes, including NOLs.[64]  Finally, under legislation enacted in 2009, a borrower was able to elect to defer the inclusion of COD income.[65]  If this election was made, then generally the COD income is included ratably over five years beginning in 2014.  However, the election was only available for COD income that was triggered after December 31, 2008 and before January 1, 2011.  All of these issues are described in further detail below.

*Exchanges*.  An exchange of debt for anything—new debt, stock, cash—can give rise to COD income because the exchange is viewed as a repayment of the original debt.  If the repayment is for an amount less than the amount of the old debt, then there will be COD income.  Specifically, COD income generally is calculated as the excess of the "adjusted issue price" of the old debt over the price paid by the issuer to repurchase the debt.[66]  In simple cases, the adjusted issue price of the old debt is its face amount.  If the old debt was itself issued at a discount, then the adjusted issue price of the old debt is the issue price of the old debt, increased by any accrued original issue discount.[67]

*Debt-for-Debt Exchanges*.  In a debt-for-debt exchange, the issuer is treated as repaying the old debt with an amount equal to the "issue price" of the new debt.[68]  The issue price of the new debt depends on whether the old debt or

---

[61] 26 U.S.C. § 56(d), I.R.C. § 56(d).

[62] 26 U.S.C. § 108(a), I.R.C. § 108(a).

[63] 26 U.S.C. § 108(a), I.R.C. § 108(a)(3).

[64] 26 U.S.C. § 108(b), I.R.C. § 108(b).

[65] 26 U.S.C. § 108(i), I.R.C. § 108(i).  As discussed below, if the election was made, corresponding deductions for OID (discussed below) are similarly deferred.

[66] 26 C.F.R. § 1.61-12(c)(2)(ii), Treas. Reg. § 1.61-12(c)(2)(ii).

[67] 26 U.S.C. § 1272(a)(4), I.R.C. § 1272(a)(4).

[68] 26 U.S.C. § 108(e)(10), I.R.C. § 108(e)(10).

the new debt is "publicly traded."  If the new debt is publicly traded, then the issue price is its fair market value.[69]  If the new debt is not publicly traded but the old debt is publicly traded, the issue price of the new debt is the fair market value of the old debt.[70]  If neither the old debt nor the new debt is publicly traded, then, assuming that the new debt has an interest rate in excess of the "applicable federal rate" (the "AFR") (a rate published by the Department of the Treasury every month), the issue price of the new debt is its face amount.[71]  To take an example, suppose that an issuer has outstanding debt of $100 that was issued some years ago for $100.  Now, the issuer is in distress, the debt trades at $55, and the issuer exchanges the old debt for new debt worth $60.  If the new debt is considered to be publicly traded, then the issue price of the new debt is $60 and the issuer will have $40 of COD income.  If the new debt is not publicly traded but the old debt is publicly traded, then the issue price of the new debt is $55 (the fair market value of the old debt) and the issuer will have $45 of COD income.  If instead neither the new debt nor the old debt is publicly traded and the new debt bears an interest rate in excess of the AFR, as normally it would, then the issue price of the new debt is $100 and the issuer will not have any COD income.  Thus, an issuer of publicly traded debt that is exchanged for new debt will often have COD income.

The definition of "publicly traded" changed recently.  The prior definition was broad and anachronistic, and had been much criticized as containing numerous ambiguities, especially in light of modern trading practices.[72]  It included debt that appeared on a quotation medium that provided either recent price quotations or actual prices of recent sales transactions.[73]  Debt need not have been traded on an exchange in order to have been considered publicly traded under the former rules.  Since price quotes or recent sale prices for debt often can be found on the internet,[74] debt that one might not expect to be publicly traded often was (and still may be).  In 2012, the IRS finalized new regulations intended

---

[69] 26 U.S.C. § 1273(b)(3), I.R.C. § 1273(b)(3); 26 C.F.R. § 1.1273-2(b)(1), Treas. Reg. § 1.1273-2(b)(1).

[70] 26 C.F.R. § 1.1273-2(c)(1), Treas. Reg. § 1.1273-2(c)(1).

[71] 26 U.S.C. § 1274-4, I.R.C. § 1274-4.

[72] *See* New York State Bar Association Tax Section, Report on Definition of "Traded on an Established Market" within the Meaning of Section 1273 (Aug. 12, 2004).

[73] Former 26 C.F.R. § 1.1273-2(f), Former Treas. Reg. § 1.1273-2(f).

[74] *See, e.g.*, the FINRA TRACE system, *available at* http://cxa.marketwatch.com/finra/BondCenter/AdvancedScreener.aspx.

to simplify and clarify the definition of "publicly traded."[75]   Generally, under these new rules, a debt instrument is publicly traded if either (a) a sale price for a debt instrument is reasonably available, (b) a firm price to buy or sell a debt instrument is available, or (c) there is a price quote (other than a firm quote) that is provided by at least one  dealer, broker or pricing service (referred to as an "indicative quote"). While the new rules aim to account for changes in trading practices since the prior rules were issued in 1994, the new definition may cause more debt instruments to be treated as "publicly traded"—and thus cause more issuers to realize COD income—than under the former definition.  However, the new definition has been praised as being clearer and simpler than under prior regulations.[76]

As discussed in Part I.A.2.c of this outline, COD income can be triggered as a result of a deemed exchange of old debt for new debt, as well as an actual exchange.  The tax law treats a "significant modification" of a debt instrument as if the old debt were exchanged for the new debt.[77]   While changing customary covenants does not give rise to a significant modification, changes in yield (taking into account any fee paid for the modification, as well as changes in the amount of principal or interest), maturity or credit support can.  Thus, renegotiations of a debt instrument must be reviewed from a tax perspective to determine if they constitute a significant modification.   Often, in the context of a distressed company, modifications will result in a significant modification for tax purposes.

*OID*.   If a debt-for-debt exchange results in COD income, it also may result in future "original issue discount" ("OID") deductions for the issuer.  To return to our example, suppose an issuer with a $100 debt outstanding exchanges the debt (or is deemed to exchange the debt) for a new debt instrument that also has a face amount of $100.  Suppose that the new debt is publicly traded at a price of $60.  In that event, the issue price of the new debt instrument is $60 and, as described above, the issuer will have $40 of COD income in the year of the exchange (subject to the bankruptcy or insolvency exclusions or elective deferral described below).  The new debt instrument will be considered to have been issued with OID.  OID is the excess of the "stated redemption price at maturity," in simple cases the face amount of the debt, over the issue price of the debt.[78]  In

---

[75] 26 C.F.R. § 1.1273-2(f), Treas. Reg. § 1.1273-2(f).

[76] *See, e.g.*, NYSBA Tax Section Report No. 1276, "Comments on Final Regulations on the Definition of Public Trading under Section 1273 and Related Issues" (November 12, 2012) (also suggesting that Treasury address a few aspects of the final regulations that "remain unclear").

[77] 26 C.F.R. § 1.1001-3, Treas. Reg. § 1.1001-3.

[78] 26 U.S.C. § 1273(a)(1), I.R.C. § 1273(a)(1).

our example, the stated redemption price at maturity generally is the face amount of $100 and the issue price is $60.  Thus, the new debt has $40 of OID (not coincidentally, the same amount as the COD income on the exchange).  The OID generally is deductible by the issuer over the term of the debt instrument.[79]  Thus, in a debt-for-debt exchange in which the new debt has the same principal amount as the old debt, the COD income that currently is includible in income generally is offset by the OID deductions that the issuer is entitled to over the term of the new debt.  The OID deductions do not fully compensate an issuer for the tax hit resulting from the COD income because the OID deductions occur over the term of the new debt while the COD income generally occurs in the year of the exchange.  Nonetheless, the OID deductions ameliorate the cost of the COD income.[80]

*AHYDO*.  The "applicable high yield discount obligation" ("AHYDO") rules can limit an issuer's OID deductions, however.  Those rules were aimed at limiting deductions on debt instruments that resemble equity.  Generally, the rules provide that, if a debt instrument has a term of more than five years, has a yield at least equal to the AFR plus 5% and has "significant OID" (generally, OID accruals in excess of cash payments of interest plus one year's worth of yield, measured at any time beginning with the end of the first accrual period ending after the fifth anniversary of issuance), then the yield that exceeds the AFR plus 6% is non-deductible and the rest of the yield is only deductible when cash payments are made.[81]

The AHYDO rules exact a painful toll on a distressed issuer.  The tax on COD income itself can be a major cost.  The inability to take offsetting deductions over the term of the new debt instrument, as a result of the AHYDO rules, exacerbates that cost.  Recognizing this, in February 2009, as part of the American Recovery and Reinvestment Act of 2009, legislation was passed that generally suspended the AHYDO rules in the case of debt exchanges occurring on or after September 1, 2008 and on or before December 31, 2009 if the original

---

[79] 26 U.S.C. § 163(e)(1), I.R.C. § 163(e)(1).

[80] While a debt-for-debt exchange may result in OID for tax purposes, it may not result in original issue discount for purposes of determining the allowable amount of a claim in bankruptcy.  *See*, *e.g.*, *In re Allegheny Int'l*, 100 B.R. 247 (Bankr. W.D. Penn. 1989), *In re Chateaugay Corp*., 961 F.2d 378 (2d. Cir. 1992).

[81] 26 U.S.C. § 163(e)(5), I.R.C. § 163(e)(5).  To avoid this problem, many loan agreements contain AHYDO catch-up provisions mandating that all "payable in kind" (and other) interest on a debt instrument be paid in cash by the fifth anniversary of the issue date, or the term of the debt instrument is limited to five years.

debt is not an AHYDO instrument.[82]  With respect to debt issued after December 31, 2009, the legislation also authorized the Secretary of the Treasury to limit the scope of instruments that would be subject to the AHYDO rules.[83]  Pursuant to such authority, in December 2009 the Treasury Department issued Notice 2010-11, which generally continued the suspension of the AHYDO rules for debt exchanges occurring on or prior to December 31, 2010.  The Notice imposed additional requirements in order for such suspension to apply, including that no "contingent interest" (as specifically defined for these purposes) is paid with respect to the debt instrument and that the debt is not issued to a person "related" to the debtor for tax purposes.[84]  The suspension of the AHYDO rules was not further extended beyond 2010.  However, the effect of the suspension continues, as it affects deductions of OID in later years on debt issued during the period that the suspension was in effect.

*Debt-for-Stock Exchanges*.  As noted above, an exchange of stock for outstanding debt also can create COD income because, for purposes of the COD rules, if a company issues stock in satisfaction of its indebtedness, it is treated as satisfying the debt in an amount equal to the fair market value of the stock.[85]  Thus, if the amount of debt exchanged exceeds the fair market value of the stock issued, the issuer will have COD income in the amount of such excess.  However, the tax cost of the COD income will not be ameliorated by any OID deductions that otherwise might be available in a debt-for-debt exchange.

*Bankruptcy and Insolvency Exclusions for COD Income*.  COD income is not includible in income if the discharge of indebtedness occurs in a bankruptcy case or if the discharge occurs while the taxpayer is insolvent (but then only to the extent the taxpayer is insolvent).[86]  Any amount excluded from income under these rules requires a concomitant reduction in tax attributes, such as net operating losses, general business credits, minimum tax credits, capital loss carryovers and basis, passive activity loss and credit carryovers and foreign tax credit carryovers.[87]

---

[82] 26 U.S.C. § 163(e)(5)(F), I.R.C. § 163(e)(5)(F).

[83] *Id.*

[84] Notice 2010-11, 2010-4 I.R.B. 326.

[85] 26 U.S.C. § 108(e)(8)(A), I.R.C. § 108(e)(8)(A).

[86] 26 U.S.C. § 108(a)(1), I.R.C. § 108(a)(1).

[87] 26 U.S.C. § 108(b), I.R.C. § 108(b).

*Elective Deferral of COD Income for Transactions Occurring Before January 1, 2011.* Recognizing the harshness of the COD income regime to distressed debtors, legislation permitted, for a limited period, the deferral of the inclusion of COD income. The American Recovery and Reinvestment Act of 2009 provided, in general, that companies that bought back their debt at a discount after December 31, 2008 and before January 1, 2011 could elect to defer inclusion of the COD income arising from the transaction.[88] The deferred income would be includible ratably over a five-year period beginning, generally, in 2014. A cash purchase of debt, a debt-for-debt exchange (including a modification that is treated as an exchange), a stock-for-debt exchange, a contribution to capital and complete forgiveness of debt all are considered re-acquisitions eligible for the election. If an issuer has made this election, then OID deductions on the new debt are also deferred in order to prevent a windfall to the issuer (OID deductions prior to 2014 without current COD income).[89]

*NOL Limitation Under Section 382.* If an exchange offer results in an "ownership change," the issuer's ability to utilize net operating losses and other favorable tax attributes may be limited to an annual amount referred to as the "section 382 limitation."[90] In general, an "ownership change" will be deemed to have occurred if the percentage of the value of the company's stock owned by one or more direct or indirect "5% shareholders" increases by more than 50 percentage points over the lowest percentage of value owned by the 5% shareholders at any time during the preceding three years or since the most recent ownership change.[91] Accordingly, the issuance of a significant block of stock to a debtholder as part of an exchange offer, or the issuance of convertible securities

---

[88] 26 U.S.C. § 108(i), I.R.C. § 108(i). While this election is not available to defer COD income resulting from transactions occurring after January 2011, issuers who reacquired their debt during the relevant time period should be aware of the availability of the election and its consequences.

[89] *Id.*

[90] Code section 382 generally provides that the applicable limitation is computed by multiplying the value of the stock of the company immediately before the ownership change by the AFR.

[91] 26 U.S.C. § 382(g), I.R.C. § 382(g). By contrast, Code section 382(l)(5) provides that an ownership change in bankruptcy will not result in any annual limitation on a debtor's pre-change tax attributes if the shareholders and/or "qualified creditors" of the debtor own at least 50% of the stock of the company following the ownership change. However, NOLs generated prior to the ownership change are reduced by certain interest deductions with respect to debt that is converted into stock. Furthermore, if a second ownership change takes place within two years of the change to which Code section 382(l)(5) is applied, the debtor will thereafter be precluded from using any pre-change NOLs.

or warrants, may cause section 382 to apply.  *See* Part IV.D.6.e of this outline for a fuller discussion of the rules under section 382.

*Purchases by Related Parties*.  If a person "related" to the issuer purchases the issuer's debt, then the debt is treated as if it had been repurchased by the issuer and is deemed to be reissued to the related person.[92]  Accordingly, the issuer could have COD income and the new debt could have OID, making it non-fungible with other outstanding debt of the same class.

*Treatment of Holders*.  Debt exchanges and significant modifications of debt are, in general, taxable exchanges for a holder.[93]  If the exchange does not qualify as a "recapitalization," a holder would recognize gain or loss on the exchange equal to the difference between the issue price of the new debt and the holder's tax basis in the old debt.[94]  As discussed above, generally the issue price of the new debt is its fair market value if the debt is publicly traded, and, if not publicly traded, is the principal amount of the new debt if the new debt carries an interest rate equal to at least the AFR.  A debt exchange is not taxable to a participating holder, however, if the old notes and the new notes are "securities" for federal income tax purposes.  If that is the case, then the exchange is a "recapitalization," a type of corporate reorganization.[95]  In that event, the holder would recognize no gain or loss and the holder's tax basis in the old debt generally would carry over to the new debt.[96]  "Securities" for this purpose are debt instruments that provide an issuer with a long-term proprietary interest in the issuer.[97]  Debt with a term from the time of issuance to the time of maturity of more than 10 years generally is considered a security, while debt with a term of less than five years is not.  For this purpose, in measuring the term of the new

---

[92] 26 U.S.C. § 108(e)(4), I.R.C. § 108(e)(4); 26 C.F.R. § 1.108-2, Treas. Reg. § 1.108-2.

[93] *Cottage Savings Ass'n v. Comm'r*, 499 U.S. 554 (1991).

[94] 26 U.S.C. § 1001, I.R.C. § 1001.

[95] 26 U.S.C. § 368(a)(1)(E), I.R.C. § 368(a)(1)(E).

[96] 26 U.S.C. §§ 354(a)(1) & 358, I.R.C. §§ 354(a)(1) & 358.

[97] *See, e.g.*, *Le Tulle v. Scofield*, 308 U.S. 415, 420 (1940) ("[R]eceipt of long term bonds as distinguished from short term notes constitutes the retention of an interest in the purchasing corporation."); *Pinellas Ice & Cold Storage Co. v. Comm'r*, 287 U.S. 462, 470 (1933) ("[T]o be within the exemption the seller must acquire an interest in the affairs of the purchasing company more definite than that incident to ownership of its short-term purchase-money notes.").

debt, in many cases, it is permissible to include the period that the old debt was outstanding prior to the exchange.[98]

Whether or not the exchange qualifies as a recapitalization, a holder may be required to include, over the term of the new debt on a constant yield basis, all or a portion of the OID on the new debt, if that new debt has OID as described above.[99]

### 5.     Foreclosure Sales and Assignments for the Benefit of Creditors

A buyer seeking to acquire assets from a distressed seller can avoid the burdens of a bankruptcy proceeding but still achieve certain of its benefits by using state law procedures for foreclosure of assets subject to security interests. In general, liens on personal property, *i.e.*, assets other than real estate, are governed by the Uniform Commercial Code, which authorizes both private and public foreclosure sales.  Liens on interests in real estate, or mortgages, are governed by more complex and arcane rules of state real property law and the foreclosure procedures will vary from state to state.

A purchaser interested in either real estate or personal property that may be subject to foreclosure due to an owner's precarious financial condition can follow one of two approaches.  The simpler approach is to wait for the secured party to exercise its remedies under state law and then buy the assets at the foreclosure sale.  This approach is subject to the disadvantage that it does not permit a purchaser to control the timing of the foreclosure process, or whether it occurs at all, which will instead be determined by the secured party.  The alternative, more active approach is to acquire the debt from the secured party. Acquiring the debt affords the purchaser greater control of the foreclosure process and allows it to credit bid for the assets at the foreclosure sale.

Compared to a private acquisition of assets outside of bankruptcy from a distressed seller, which carries fraudulent conveyance risk, as discussed above in Part I.B.a foreclosure has the advantage of providing a purchaser with an official imprimatur on the *bona fides* of the transaction.  Accordingly, neither the price paid nor other aspects of the transaction should be subject to second-guessing if the distressed seller subsequently files bankruptcy.  Indeed, in *BFP v. Resolution Trust Corp.*,[100] the United States Supreme Court rejected a fraudulent transfer

---

[98] Rev. Rul. 2004-78, 2004-2 C.B. 108.

[99] 26 U.S.C. § 1272(a)(1), I.R.C. § 1272(a)(1).

[100] 511 U.S. 531, 545 (1994).

lawsuit under section 548 of the Bankruptcy Code based on the contention that a pre-bankruptcy foreclosure sale of a house for $433,000 was not for "reasonably equivalent value," holding that any foreclosure sale in compliance with applicable state law was conclusively a sale for "reasonably equivalent value."

Foreclosure on equity interests in a multi-layer ownership structure can facilitate creditors' efforts to obtain control of the bankruptcy process. For example, a number of years ago, affiliates of Carl Icahn temporarily obtained control over Marvel Entertainment Group during its bankruptcy case by acquiring structurally subordinate debt of certain holding companies and foreclosing on the equity of subsidiaries that had been pledged as collateral for the debt.[101] Similarly, in early 2011, before the MSR Resorts group filed for bankruptcy, a group led by Paulson & Co. that held a $200 million mezzanine loan issued by an intermediate holding company foreclosed on certain pledged equity interests, thereby replacing Morgan Stanley Real Estate as the ultimate equity holder in control of the group's eight luxury resorts. After obtaining control, the foreclosing lenders effected an out-of-court restructuring to eliminate $800 million of debt and preferred equity, and shortly thereafter, placed five of the eight resorts into bankruptcy, where they were able to win confirmation of a plan to sell the five resorts for approximately $1.5 billion.[102]

Another state law procedure that can be useful in acquiring assets in a relatively simple transaction is known as the assignment for the benefit of creditors. This statutory procedure, which is best developed in western states such as California, allows a distressed company to assign all of its assets to a representative who then liquidates the assets and distributes the proceeds ratably among the creditors. This can be a relatively inexpensive means of acquiring the assets of a distressed company that provides some of the protections of a bankruptcy sale without the expense and delay of a bankruptcy proceeding.

## II

## Prepackaged and Pre-Negotiated Bankruptcy Plans

---

[101] *See In re Marvel Entm't Grp.*, 140 F.3d 463, 467 (3d Cir. 1998).

[102] *See* Findings of Fact, Conclusions of Law, and Order Confirming the Second Amended Joint Plan of Reorganization of MSR Resort Golf Course LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code, *In re MSR Resort Golf Course LLC*, No. 11-10372 (Bankr. S.D.N.Y. Feb. 22, 2013).

When the methods to restructure a company's balance sheet or debt maturities discussed in Part I of this outline are unsuccessful, a distressed company may decide to use the bankruptcy process.  In a conventional chapter 11 bankruptcy, after filing a bankruptcy petition, the debtor negotiates the terms of its reorganization plan, obtains approval of a disclosure statement, solicits votes and then requests plan confirmation, all under the supervision of the bankruptcy court.  "Prepackaged" and "pre-negotiated" chapter 11 plans are intended to minimize the disadvantages of the bankruptcy process—including delay and expense—while still taking advantage of many of its benefits.  In a pre-negotiated plan, the plan distribution and other details are negotiated prior to filing the petition (and are often memorialized in a "lock-up" or "plan support" agreement between a company and its principal creditors), with vote solicitation principally occurring after the bankruptcy filing.  In a prepackaged plan, the negotiation of the plan and solicitation of votes all take place before the filing.  Part II of this outline details the steps necessary for the implementation of a prepackaged or pre-negotiated bankruptcy plan and the costs and benefits of such plans for potential investors.

## A.      Prepackaged Plans

### 1.      Generally

The Bankruptcy Code provides mechanisms for the conduct of a shortened chapter 11 case to secure confirmation, or bankruptcy court approval, of a special type of workout negotiated outside of bankruptcy, referred to as a "prepackaged plan of reorganization" or "prepack."  A debtor may file a plan simultaneously with its bankruptcy petition[103] and seek confirmation of that plan on the basis of votes solicited before the bankruptcy filing.[104]   A committee of creditors established prior to a bankruptcy filing may continue to serve as the official creditors' committee in bankruptcy.[105]

In an appropriate situation, prepackaged plans have many advantages.  They reduce litigation costs by committing major constituencies to a negotiated course of action and generally are less disruptive to a company's operations and prospects.  Prepacks also minimize the time that a company needs to be in bankruptcy by enabling the case to proceed directly to confirmation of a

---

[103] 11 U.S.C. § 1121(a).

[104] 11 U.S.C. § 1126(b).

[105] 11 U.S.C. § 1102(b)(1).

reorganization plan and reducing the scope and extent of judicial involvement in the life of the company.  The process of building a consensus on the terms of a transaction can proceed without the publicity that an immediate bankruptcy court filing would yield and, to the extent stakeholders are informed, the promise of a short proceeding and the existence of a prepackaged plan may induce constituencies such as trade creditors that would otherwise shun (or demand onerous terms from) a distressed company to continue to do business with the company more or less as usual.

As with out-of-court workouts, prepackaged plans are best suited for over-leveraged, rather than operationally flawed, companies.  Indeed, the paradigmatic use of a prepackaged bankruptcy is when an out-of-court restructuring would be optimal, but bankruptcy law is needed to bind a minority of non-consenting creditors whose participation is necessary to complete a deal.  For instance, in March 2013, two yellow pages publishers, Dex One Corporation (formerly known as R.H. Donnelley) and SuperMedia Inc., which had previously agreed to merge, separately filed for bankruptcy in the District of Delaware with prepackaged plans that would bind a small minority of each company's senior secured lenders that refused to agree to amendments necessary to enable the merger.[106] As an inducement for hold-out lenders to consent, prepacks are often "stapled" to exchange offers, as acceptance of a plan of reorganization by an impaired class of claims requires only two-thirds by dollar amount, and a majority in number, of the claims that vote in that class.

A company that files a prepackaged plan may need financing for payouts under the plan.  A recent transaction provides a template for procurement of such financing.  In November 2010, shortly before filing its chapter 11 petition along with a prepackaged plan, American Media, Inc. launched and priced an approximately $400 million high-yield bond offering.  The proceeds of the offering were to be used to make distributions to American Media's creditors upon consummation of the plan; however, by launching the offering prior to filing, American Media was able to take advantage of favorable conditions in the bond market. Several features of the financing were designed to protect the bondholders, who provided funds well in advance of American Media's eventual emergence from bankruptcy.  The bonds were issued by a special-purpose, non-debtor subsidiary of American Media which, upon consummation of the plan, merged into the reorganized American Media (which became the obligor on the bonds).   In addition, the bond proceeds were held in escrow pending

---

[106] Joint Administration Motion, Docket No. 2, *In re Dex One Corp.*, No. 13-10533 (Bankr. D. Del.); Joint Administration Motion, Docket No. 2, *In re SuperMedia Inc.*, No. 13-10545 (Bankr. D. Del.).

consummation of the pre-packaged plan and satisfaction of certain other conditions. If the plan had not been approved or other escrow release conditions had not been satisfied, the escrow would have terminated, and the escrow agent would have returned to the bondholders their investment plus interest. Also, as a condition to the issuance of the bonds, the underwriters required American Media to obtain an order from the Bankruptcy Court (i) authorizing American Media to transfer to the issuer up to $15 million to fund fees and expenses related to the bond offering, including the interest payable upon termination of the escrow and (ii) confirming that the bond proceeds and other assets held by the non-debtor issuer would not be deemed property of American Media's bankruptcy estate.[107] This creative financing technique could prove useful for future debtors seeking to mitigate the risks of volatile capital markets when entering a prepackaged chapter 11 case.

As discussed in Part III of this outline, bankruptcy affords significant opportunities to improve aspects of a company's operating environment, such as rejecting onerous and burdensome executory contracts and leases. It is possible, but difficult, to undertake such bankruptcy "fixes" in a prepackaged bankruptcy. Such actions may lead to litigation and delays, thus undermining the rationale for proceeding with a prepack, as well as potentially complicating voting procedures by creating new classes of claims whose consent to the plan must be solicited. Further, in arranging a prepackaged bankruptcy, it is desirable to have as many "unimpaired" classes of claims as possible since classes that are "unimpaired" under the prepackaged plan will be deemed to have accepted the plan under section 1126 of the Bankruptcy Code without the requirement of a vote.

It is particularly difficult to implement a prepackaged plan in which general trade creditors will receive less than 100% on their claims. First, trade creditors, unlike bondholders and lending groups, generally are not represented by a single agent or trustee, making solicitation difficult absent the procedures available under the Bankruptcy Code. Second, trade claims fluctuate constantly as a company operates day-to-day, making accurate estimates of the amount of claims and number and identities of trade claimants difficult in the absence of a set bankruptcy filing date. Finally, negotiations for a prepackaged plan alert creditors that a bankruptcy filing is imminent; if trade creditors do not receive satisfactory assurance that they will be paid in full in bankruptcy, then trade credit

---

[107] *See In re Am. Media, Inc.*, 2010 WL 5483463 (Bankr. S.D.N.Y. Dec. 20, 2010) (confirming the debtors' amended joint prepackaged plan of reorganization); *In re Am. Media, Inc.*, No. 10-16140 (MG) (Bankr. S.D.N.Y. Nov. 29, 2010) (order authorizing the debtors to assume or enter into certain agreements in connection with the new financing).

is likely to dry up during the pre-bankruptcy negotiation and solicitation period, thereby exacerbating a company's financial difficulties.

### 2.      Requirements

At least some of the financial benefits of prepack bankruptcies are offset by prepetition bargaining and solicitation costs (including, as described below, the time and expense required to comply with the federal securities laws, if applicable).  Achieving the other benefits of a prepack requires close attention to the procedural requirements surrounding pre-bankruptcy vote solicitation.  A proponent of a prepackaged plan takes a calculated risk that at the confirmation stage of the chapter 11 case, the bankruptcy court may determine that the pre-bankruptcy disclosure and solicitation process was inadequate.  In such a case, a second solicitation in bankruptcy—with the attendant delay and cost—will be required.[108]

Under section 1126(b) of the Bankruptcy Code, pre-bankruptcy solicitations of chapter 11 plan votes must either have complied with applicable nonbankruptcy law or meet the requirements for disclosure statements that accompany a plan of reorganization in a conventional bankruptcy case.  Rule 3018(b) of the Federal Rules of Bankruptcy Procedure additionally requires that the materials used to solicit votes be submitted to substantially all members of a class of claims or interests and that a reasonable time be provided for such class members to vote.  Although there is no firm rule as to what constitutes a reasonable time period, 28 days, the minimum time specified for considering a disclosure statement in bankruptcy,[109] often is considered to be a safe minimum time period for voting as well.

Importantly, any contemplated solicitation of votes on a prepack under which new securities are being offered must confront the unsettled question of whether such new securities would be exempt from the registration requirements of the Securities Act.  Section 1145(a) of the Bankruptcy Code exempts from registration new securities of a reorganized debtor that are exchanged for pre-

---

[108] *See, e.g.*, *In re City of Colorado Springs Spring Creek Gen. Imp. Dist.*, 177 B.R. 684, 691 (Bankr. D. Colo. 1995) (noting that "[a] proponent of a prepackaged plan takes a substantial risk that … the Court may determine that the proposed disclosure statement or process of solicitation are inadequate" and observing that "'any shortcoming … would require going back to the drawing board for a bankruptcy regulated disclosure statement hearing with notice, and the usual bankruptcy process toward a hearing on confirmation'" (quoting *In re Southland Corp.*, 124 B.R. 211, 225 (Bankr. N.D. Tex. 1991)).

[109] Fed. R. Bankr. P. 2002(b).

bankruptcy securities under a confirmed chapter 11 plan. This provision would seem to provide a safe harbor for the issuance of new securities under a confirmed prepack. However, it is uncertain whether the section 1145 exemption applies to a prepetition solicitation of votes for a prepack since the text of section 1145 exempts only "a security of the debtor" from registration, whereas the issuer technically is not a "debtor" until a chapter 11 proceeding is commenced. The SEC staff has informally asserted in the past that the section 1145 exemption is not available for prepacks. Some years ago, the National Bankruptcy Review Commission, because of the questionable status of such an exemption, recommended that Congress amend section 1145 to exempt a qualified, prepetition solicitation made in connection with a prepackaged plan. No statutory amendment has been enacted to date, however, and no court or official SEC pronouncement has addressed this issue.

Given the uncertainty in the current state of the law and the gravity of a potential securities law violation, parties considering prepetition solicitation of votes for a plan involving the issuance of securities should proceed cautiously. A prudent course would be to file a registration statement with the SEC, particularly in a "stapled" situation where the goal is to conclude a successful exchange without a bankruptcy filing. Of course, the potential delay and cost from such a registration must be factored into the assessment of whether to undertake a prepackaged plan rather than a pre-negotiated or conventional chapter 11 process in the first place, given that the securities-law exemption provided by section 1145 is clearly available to protect actions taken after commencement of a bankruptcy case.

Not only the securities laws, but also creditors' rights under the Bankruptcy Code require compliance with certain formalities, including the need to solicit *beneficial* holders of securities, and to demonstrate that record holders have authority to vote securities held in their name in connection with a bankruptcy plan. In *In re Pioneer Finance Corp.*,[110] for example, a prepackaged plan solicitation was held not to qualify under section 1126(b) of the Bankruptcy Code because "under the wording of the offering, the bondholders consented only to agree to vote on a plan in the *future*, they did not vote on a present plan" and the solicitation package only went to record, not beneficial, bondholders.[111]

---

[110] 246 B.R. 626,  (Bankr. D. Nev. 2000).

[111] *Id.* at 628.

### B.      Pre-Negotiated Plans

Largely because of the potential for judicial second-guessing of the disclosure and solicitation process employed pre-bankruptcy, but also because financial market players have simply grown more tolerant of bankruptcy and the risks of operating in bankruptcy loom less large in many industries, in recent years, distressed practice has moved toward pre-negotiated plans.  Pre-negotiated transactions necessitate a longer stay in bankruptcy for a distressed company than prepacks because the solicitation and voting process occurs postpetition. However, given the minimum offer periods applicable to prepacks in the tender and bankruptcy rules, it need not be the case that pre-negotiated transactions take much longer to consummate in the aggregate than prepackaged plans.

Pre-negotiated transactions eliminate the risk of a later finding of a flawed solicitation because the disclosure statement and other solicitation procedures and materials are approved by the bankruptcy court in advance.  As discussed at greater length in Part III.B.2.g, the disclosure statement sets forth the terms of a proposed plan of reorganization and provides adequate information required by creditors and interest holders to vote on the plan, including information on a debtor's prepetition capital structure and the circumstances that resulted in its chapter 11 filing.  While disclosure statements can be lengthy documents, their basic form and content are well established, and pre-negotiated cases may move quickly to the required hearing to consider the adequacy of a disclosure statement, especially if the disclosure statement is drafted prior to the filing.  And although any interested party may object to a proposed disclosure statement and related procedures, even successful objections tend not to delay the plan process significantly, since the typical remedy simply is to expand the disclosure.

Like prepacks, pre-negotiated plans can have significant advantages over both out-of-court restructurings and conventional chapter 11 filings.   Those advantages may include:

- minimizing negative publicity or reputational harm;

- minimizing judicial scrutiny and inquiry;

- lowering administrative expenses;

- avoiding a formal auction (at least where the plan is not premised upon the new value exception (discussed in Part III.B.2.f of this outline)); and

- availability of clean title, fraudulent transfer protection and other protections of a bankruptcy court order.

Realizing these advantages often requires significant planning and, in particular, agreements that secure the support of key constituencies, as described below.

## 1.    Lock-Up Agreements

Lock-up or plan support agreements are agreements to propose, vote in favor of or otherwise support a particular chapter 11 plan or a sale of assets under section 363 of the Bankruptcy Code.   Such agreements are an essential component of "pre-negotiated" chapter 11 plans:   with the benefit of a lock-up agreement among key constituents, an acquiror of a company may enter the chapter 11 process knowing that its transaction has the requisite support and at least some protection against a retrade of the transaction.

A lock-up agreement cannot provide a bidder with ironclad protection against its proposed transaction being renegotiated or abandoned because a chapter 11 debtor has a fiduciary obligation to creditors to seek higher and better bids; however, a bidder that has locked up the key players does not enter the chapter 11 process entirely exposed.   At a minimum, a prepetition lock-up agreement should provide some certainty for a bidder that is required to lock in financing and pay commitment fees or other third-party costs for which it will receive expense reimbursement if its bid is ultimately topped.

Prepetition lock-up agreements also can be useful in gaining control over the many different constituencies that a complex capital structure may entail.   For example, the 2008 merger of American Color Graphics[112] and Vertis Holdings, Inc.[113] was accomplished through dual prepackaged chapter 11 cases that were preceded by lock-up agreements.   The lock-up agreements were essential to completion of the negotiations among the many competing constituencies of the two companies.[114]

---

[112] *In re ACG Holdings, Inc.*, Case No. 08-11467 (CSS) (Bankr. D. Del. July 16, 2008).

[113] *In re Vertis Holdings, Inc.*, Case No. 08-11460 (CSS) (Bankr. D. Del. July 16, 2008).

[114] In some circumstances, lock-up agreements also can be used postpetition to "lock in" a deal before a chapter 11 plan is proposed.   As discussed in Part III.B.9.a of this outline, however, postpetition lock-up agreements face greater obstacles than their prepetition counterparts because of the restrictions imposed by the Bankruptcy Code on the plan solicitation process.

C.      **Pre-Negotiated Section 363 Sales**

As discussed in detail in Part III.A.1 of this outline, a "section 363" sale of all or a portion of a distressed company's assets must, by definition, occur in bankruptcy (pursuant to section 363 of the Bankruptcy Code). However, stalking-horse bidders may be and often are lined up prior to the bankruptcy filing. Although a negotiated acquisition agreement ultimately will be subject to court approval and, as described below, higher and better bids, prepetition stalking-horse bids may be advantageous to both would-be buyers and distressed sellers. Buyers get lead time to conduct diligence and negotiate a sensible and favorable agreement at a time when target management is not diverted by the bankruptcy process itself. Sellers get the comfort of avoiding a "free fall" bankruptcy and are better able to preserve going concern value by providing some assurance of business continuity to suppliers, employees and other stakeholders.

# III

# Acquisitions Through Bankruptcy

There is a limited period of time in which to orchestrate a pre-negotiated or prepackaged bankruptcy. While a financially distressed target is negotiating transaction details, debt may mature and cash may run out. Thus, a company may be forced to enter bankruptcy without having a pre-arranged safe landing. When a company enters bankruptcy, it can be acquired either through an auction of its assets or through a plan of reorganization. Auctions conducted under section 363 of the Bankruptcy Code generally are expeditious processes to sell assets that are rapidly losing value. In contrast, the full bankruptcy process is more deliberate and time-consuming, and involves developing a plan of reorganization, soliciting votes on the plan, and confirming the plan with a court order. Part III of this outline details how to participate as an acquiror in section 363 sales and bankruptcy plans and highlights the benefits and costs of each, as well as the roles that an investor may choose to play.

A.      **Acquisitions Through a Section 363 Auction**

1.      **Section 363 of the Bankruptcy Code Generally**

Section 363 of the Bankruptcy Code authorizes a trustee or a debtor to sell all or part of a debtor's assets. Transactions that occur on a day-to-day or other routine basis, such as a retailer's sale of inventory to customers, will be considered to be in the ordinary course of business, and do not require approval of the bankruptcy court. On the other hand, the sale of all or a significant portion of

a debtor's assets, or an otherwise large or unusual transaction, will be a sale outside the ordinary course of business, requiring notice to interested parties and bankruptcy court approval under section 363(b)(1).

### a. Standard for Approval of Sales Outside the Ordinary Course

#### (i) Justification for the Sale

In a chapter 7 bankruptcy case, liquidation of a debtor's assets is required. By contrast, chapter 11 of the Bankruptcy Code is intended to reorganize the debtor through a chapter 11 plan, so in principle, sales of substantial assets or the entire company are not contemplated. Nonetheless, such sales can and do occur, with increasing frequency. The standard for approval of outside-the-ordinary-course sales of assets in chapter 11 was first addressed by the United States Court of Appeals for the Second Circuit in *In re Lionel Corp.*, which held that in order to approve sales of major assets outside a plan of reorganization, the bankruptcy court must be presented with evidence demonstrating that there is a "good business reason" for the proposed sale.[115]   In exercising its discretion in considering major sales of assets, the bankruptcy court should consider all salient factors, including the value of the assets to be sold in relation to the estate as a whole, the effect that disposing of the assets would have on the ability to confirm a plan of reorganization and whether the value of the assets is increasing or decreasing.[116]

Generally, a chapter 11 debtor may obtain permission without difficulty to divest itself of business operations that are "non-core," even when the operations are profitable and not declining in value. If a debtor can articulate sound business reasons for shedding operations, such as ending a diversion of capital or management attention, then a section 363 sale is likely to be permitted. During the bankruptcy of Delphi Corporation, for example, the debtor used section 363 as a tool to sell an array of non-core businesses, including its steering, wheel bearings and "interiors and enclosures" businesses.

A more difficult issue is presented when a chapter 11 debtor requests permission to sell one or more of its core operations, or all or substantially all of its assets. Inasmuch as the fundamental purpose of chapter 11 is to reorganize a debtor's business, a proposed sale that will leave few if any assets around which

---

[115] 722 F.2d 1063 (2d Cir. 1983).

[116] *Id.*

to reorganize generally requires a strong justification.[117]   Courts may be reluctant to allow a sale of an important asset if it may be necessary for a successful reorganization.[118]

Significant asset sales outside of a plan of reorganization are most readily permitted where there is some sort of emergency, or where the relevant assets are deteriorating in value or perishable, such that, absent a prompt sale, the value available to creditors would be irretrievably lost.[119]   The paradigmatic emergency justifying a sale exists in the case of physically perishable assets—the proverbial "melting ice cube."   However, significant asset sales have also been permitted in the following situations:

---

[117] *See, e.g.*, *In re Summit Global Logistics, Inc.*, 2008 WL 819934, at *9 (Bankr. D.N.J. March 6, 2008) ("[W]hen a pre-confirmation [section] 363(b) sale is of all, or substantially all, of the Debtor's property, and is proposed during the beginning stages of the case, the sale transaction should be 'closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization.'" (quoting *In re Med. Software Solutions*, 286 B.R. 431, 445 (Bankr. D. Utah 2002)); *In re Channel One Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) ("A sale of substantially all of the Debtor's assets other than in the ordinary course of business and without the structure of a Chapter 11 Disclosure Statement and Plan . . . must be closely scrutinized and the proponent bears a heightened burden of proving the elements necessary for authorization."); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987) (a sale of virtually all of the debtor's assets "can be permitted only when a good business reason for conducting a pre-confirmation sale is established and . . . the burden of proving the elements for approval of any sale out of the ordinary course of business— including provision of proper notice, adequacy of price, and 'good faith'—is heightened").

[118] *In re Beker Indus. Corp.*, 64 B.R. 900, 906-07 (Bankr. S.D.N.Y. 1986) (denying motion to approve asset sale in part because asset could potentially contribute to reorganization and case was at early stage where path of debtor's reorganization was still unclear), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988); *but cf. In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 676-77 (Bankr. S.D.N.Y. 1989) (noting that proposed sale of the debtors' Eastern Air Lines shuttle business would not likely affect debtor's non-shuttle operations or future plans of reorganization, and distinguishing facts from those in *Beker* by concluding that sale of shuttle business at that stage in the case would not preclude estate's options for future reorganization).

[119] Prior to enactment of the Bankruptcy Code in 1978, many courts regarded the existence of an "emergency" or "perishability" as a requirement for a sale of substantial assets out of the ordinary course of business. *See, e.g.*, *In re Pure Penn Petroleum Co.*, 188 F.2d 851, 854 (2d Cir. 1951) (debtor must prove "existence of an emergency involving imminent danger of loss of the assets if they were not promptly sold"); *In re Solar Mfg. Corp.*, 176 F.2d 493, 494 (3d Cir. 1949) (preconfirmation sales should be "confined to emergencies where there is imminent danger that the assets of the ailing business will be lost if prompt action is not taken").   The Bankruptcy Code, by contrast, does not contain such a requirement.   *See Lionel*, 722 F.2d at 1067 ("[T]he new Bankruptcy Code no longer requires such strict limitations on a bankruptcy judge's authority to order disposition of the estate's property; nevertheless, it does not go so far as to eliminate all constraints on that judge's discretion.").

- *Businesses for which going concern value is declining, and for which financing is contingent on a rapid sale*:  In the Chrysler case, the bankruptcy court, affirmed by the Court of Appeals,[120] approved the sale of substantially all of the debtors' assets, finding that such approval was "necessary to preserve some portion of the going concern value of the Chrysler business and to maximize the value of the Debtors' estates."[121]  Chrysler had suspended operations in order to conserve resources, but had done so "with a view towards ensuring that the facilities were prepared to resume normal production quickly after any sale," meaning that "any material delay would result in substantial costs."[122]  Furthermore, the financing being offered by the government to fund Chrysler was contingent on a quick closing, and the purchaser of the assets had the option to withdraw its commitment if the sale were not closed within a few weeks.[123]  Similarly, the bankruptcy court in the General Motors bankruptcy determined that "a good business reason" justified a sale of substantially all of the debtors' assets where General Motors had "no liquidity of its own and [a] need to quickly address consumer and fleet owner doubt," and where the U.S. Treasury's willingness to continue funding the company was contingent upon the approval of a section 363 sale within days.[124]

- *Businesses that depend critically upon the continued confidence of customers*:  For example, Lehman Brothers' section 363 sale of essentially all of its multibillion-dollar broker-dealer business less than a week after its September 15, 2008 chapter 11 filing was justified on the ground that the value of the business was rapidly eroding due to customer and counterparty defections.  Similarly, Refco LLC sold its regulated commodities futures trading business

---

[120] *See In re Chrysler LLC*, 576 F.3d 108 (2d Cir. 2009), *affirming In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009).  The Second Circuit's decision was vacated on the technical ground that the case became moot before the Supreme Court could hear an appeal.  *Indiana State Police Pension Trust v. Chrysler LLC*, 130 S. Ct. 1015 (2009).

[121] *In re Chrysler LLC*, 405 B.R. at 96.

[122] *Id.*

[123] *Id*. at 96-97.

[124] *In re Gen. Motors Corp.*, 407 B.R. 463, 491-92 (Bankr. S.D.N.Y. 2009).  No appeal was taken from the *General Motors* decision.

to Man Financial less than one month after its parent company filed under chapter 11 in October 2005, and American Home Mortgage Investment Corporation sold its mortgage loan servicing business just over a month after its August 2007 chapter 11 filing.

- *Businesses that depend on the availability of trade credit*:  The archetypal business in this situation is a distributorship:  if it cannot obtain inventory, it cannot survive.   For example, FoxMeyer Corporation was a wholesale distributor of pharmaceutical products and health and beauty aids.  In 1996, with FoxMeyer posting losses, its vendors eliminated approximately $100 million of liquidity from FoxMeyer's trade credit, shortened repayment terms and began requiring prepayment for inventory purchases.  With lines of credit tightening, FoxMeyer was forced to file chapter 11 and its principal assets were sold to McKesson Corporation within three months of the filing.

- *Businesses where operating expenses exceed revenues*:  In these cases, the very cost of operating a going concern is deleterious to the estate.  For example, in 2012, after 10 months in bankruptcy, Hostess Brands Inc. found itself unable to renegotiate labor costs down to the point where it could survive and opted to liquidate and sell off its brand names instead, generating initial stalking horse bids of double what the company was thought to be worth as an operating business.   Similarly, while the 2010 bankruptcy of Boston Generating involved a company that was not quite *in extremis*, a section 363 sale of nearly all its assets was approved and consummated within four months of the petition date. The debtors' revenues had decreased sharply because of a decline in fuel prices, and were expected imminently to decline further because valuable hedge agreements were due to expire.  Although the court recognized that the debtors might not "die on the operating table" if the sale were deferred, it approved an immediate sale over the junior lenders' objection that the company would fetch a higher price in the future, finding that the company would soon be severely cash constrained and that "there well could be degradation in the value of their assets simply because buyers may perceive that the Debtors needed to sell the assets immediately."[125]

---

[125] *In re Boston Generating, LLC*, 440 B.R. 302, 329 (Bankr. S.D.N.Y. 2010).

- *Bank holding companies facing severe undercapitalization*: The conventional wisdom has long been that bankruptcy, even a quick 363 sale process, is not a viable method for solving the capitalization issues of bank holding companies (which, unlike their bank subsidiaries, are eligible for chapter 11 protection) because a bankruptcy would lead to a run on the bank and intervention by regulators.  But necessity—in the form of the significant pressures that the 2008 financial crisis placed on the FDIC, as well as the ongoing problem of undercapitalized banks—has been the mother of invention.  In the 2010 bankruptcy of bank holding company AmericanWest Bancorp, the debtor sought to stave off an imminent regulatory seizure of its wholly owned bank subsidiary by entering into a sale transaction with a private-equity-backed buyer.  The stalking-horse agreement provided that the buyer would acquire all the equity of the debtor's bank subsidiary for $6.5 million in a section 363 sale and, upon closing, provide up to $200 million in additional capital to meet regulatory requirements.  After a bankruptcy auction that produced no topping bids, the bankruptcy court approved the sale to the stalking-horse barely one month after AmericanWest's bankruptcy filing.[126]  Similarly, in 2012, Big Sandy Holding Company filed for bankruptcy and sought to sell the stock in its bank subsidiary Mile High Banks for $5.5 million on the condition that the purchaser infuse up to $90 million in capital in the bank to keep it in regulatory compliance.  After a bankruptcy auction won by the stalking horse bidder, the court approved the sale, noting the "compelling circumstances" presented by the FDIC's imminent seizure of Mile High Banks.[127]  Other recent examples of 363 sales by bank holding companies include the bankruptcies of First Financial Corp., Premier Bank Holding Company, and Outsource Holdings, Inc.

---

[126] Order (i) Authorizing and Approving the Sale of Certain Assets Free and Clear of All Encumbrances, (ii) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts, and (iii) Waiving the 14-day Stay of Fed. R Bankr. P. 6004(h) and 6006(d), *In re AmericanWest Bancorporation*, No. 10-06097-PCW11 (Bankr. E.D. Wash. Dec. 9, 2010)**.**

[127] Order Authorizing and Approving (I) the Sale of Certain Assets Free and Clear and (II) the Assumption and Assignment of Certain Executory Contracts and Waiving the 14-Day Stay of Fed. Bankr. P. 6004(h) and 6006(d), *In re Big Sandy Holding Co.*, No. 12-30138-MER (Bankr. D. Colo. Dec. 7, 2012).

Absent a compelling reason to sell all or substantially all of a debtor's assets, courts may be unlikely to approve the use of section 363 as an alternative to confirmation of a conventional plan of reorganization. For example, in the 2009 bankruptcy of Gulf Coast Oil Corp., the bankruptcy court for the Southern District of Texas denied a motion for a section 363 sale of the entire company to its sole secured lender as inconsistent with the bankruptcy statutory scheme.[128] The court acknowledged that the secured lender was likely undersecured and that the price received for the assets would therefore be immaterial to general unsecured creditors, who would receive nothing regardless of whether the court approved the sale. Nevertheless, the court held that while "there [was] no indication that an expedited plan process would not achieve the same result, that is not the test. The movant must show that there is a need to sell prior to the plan confirmation hearing. It is not sufficient to suggest in an uncontested hearing that the secured lender will be the only beneficiary under either scenario."[129] The court found that no such need had been shown and that section 363 was not the appropriate statutory tool to achieve what was essentially a "foreclosure supplemented materially by a release, by assignment of executory contracts (but only the contracts chosen by the secured lender), by a federal court order eliminating any successor liability, and by preservation of the going concern."[130] Obtaining these additional benefits, the court held, requires confirmation of a plan of reorganization.[131]

The trend, however, is toward an increasing number of significant asset sales. According to one researcher, 42% of all large public-company bankruptcies disposed of in 2011 and 18% disposed of in 2012 involved 363 sales of all or substantially all assets.[132]

---

[128] *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 428 (Bankr. S.D. Tex. 2009).

[129] *Id.*

[130] *Id.*

[131] *Id.* ("Congress provided a process by which these benefits could be obtained. That scheme requires bargaining, voting, and a determination by the Court that Bankruptcy Code § 1129 requirements are met. The Court sees no authority to provide the benefits of the Congressional scheme in this case without compliance with Congressional requirements.")

[132] *363 Sales of All or Substantially All Assets in Large Public Company Bankruptcies, as a Percentage of All Cases Disposed, by Year of Case Disposition*, UCLA-LOPUCKI BANKRUPTCY RESEARCH DATABASE, http://lopucki.law.ucla.edu/tables_and_graphs/363_sale_percentage.pdf (last visited March 12, 2013).

(ii)     Other Requirements

In addition to a sound business justification for a sale, a debtor also must demonstrate that it provided adequate and reasonable notice of the sale, that the price it obtained for the assets is "fair and reasonable," and that the parties acted in good faith.[133]  Thus, a proposed sale may be disapproved if, for example, the court finds that the debtor did not conduct a robust sale process.[134]  Conversely, a court will be more likely to be persuaded that a sale price is fair if there is evidence of substantial prior marketing of the assets sold.   In the Boston Generating bankruptcy for example, the debtors held a competitive prepetition auction to obtain a stalking-horse bid, and then continued to solicit higher offers (which ultimately did not emerge) while in bankruptcy.  Junior creditors, relying on expert valuation testimony, argued that the sale price generated by this auction process was too low.  But the bankruptcy court approved the sale at the auction price, concluding that "absent a showing that there has been a clear market failure, the behavior in the marketplace is the best indicator of enterprise value."[135]

Accordingly, section 363 sales routinely occur through a public auction process.   While section 363(b) does not explicitly require an auction, this procedure "has developed over the years as an effective means for producing an arm's-length fair value transaction."[136]  If a sale is to an insider of the debtor, then the court will impose a greater level of scrutiny on the sale procedures and the price.[137]

---

[133] Several courts have held that four elements are necessary to gain approval of a sale of all or substantially all of a debtor's assets under section 363:  (1) accurate and reasonable notice to all creditors and interested parties, (2) a sound business purpose, (3) a "fair and reasonable" price and (4) good faith, *i.e.*, that the sale does not unfairly benefit insiders or the purchaser.  *See, e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *accord Polvay v. B.O. Acquisition, Inc. (In re Betty Owens Schools, Inc.)*, 1997 WL 188127, at *4 (S.D.N.Y. Apr. 17, 1997); *In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995); *In re George Walsh Chevrolet, Inc.*, 118 B.R. 99, 101-02 (Bankr. E.D. Mo. 1990).

[134] *In re Exaeris, Inc.*, 380 B.R. at 744-47 (denying motion to approve asset sale where the debtor failed to present evidence of efforts to market assets to parties other than the proposed insider-purchaser).

[135] *In re Boston Generating, LLC*, 440 B.R. 302, 325-26 (Bankr. S.D.N.Y. 2010).

[136] *In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *4 (Bankr. D. Del. Apr. 2, 2001).

[137] *See, e.g.*, *In re Med. Software Solutions*, 286 B.R. 431, 445 (Bankr. D. Utah 2002) (noting that where sale is to an insider, the purchaser has a "heightened responsibility to show that the sale is

As with all bankruptcy matters, the likelihood of judicial approval of a sale increases if the sale is supported by the official committee of unsecured creditors and little or no opposition from other parties in interest emerges.  It is, therefore, extremely important for a buyer to attempt to resolve the concerns of major creditors and other constituencies in structuring a proposed asset sale.  It is also common for the creditors' committee to demand a formal role in the auction process and for the auction rules to so provide.

### b.    The Sub Rosa Plan Doctrine

A sale outside the ordinary course of business, particularly one involving all or substantially all of a debtor's assets, can also raise the issue of whether the sale is actually a "disguised plan of reorganization."  Because the Bankruptcy Code's requirements for confirmation of a plan are specially designed to ensure both the democratic participation by, and fair treatment of, creditors, a sale of assets under section 363(b), which does not impose such requirements, cannot serve as a substitute for a chapter 11 plan.[138]   Accordingly, an element in the bankruptcy court's assessment of transactions outside the ordinary course of business is whether the transaction infringes upon creditor priorities and other protections afforded by the plan-confirmation process.   A sale will not be approved if it constitutes a *sub rosa* (secret) chapter 11 plan.

The "*sub rosa*" plan doctrine was first articulated in *In re Braniff Airways, Inc.*[139]   In *Braniff*, the debtor airline had entered into an agreement to sell certain of its landing slots, which constituted significant assets of its business. The sale agreement, among other things, (1) required secured creditors to vote in favor of a future plan of reorganization, (2) released the claims of all parties against the debtor and (3) dictated certain aspects of a future plan.  The United States Court of Appeals for the Fifth Circuit held that the proposed sale agreement attempted to fix the terms of a chapter 11 plan and thus could not be approved.[140]

---

proposed in good faith and for fair value"); *In re W.A. Mallory Co.*, 214 B.R. 834, 837 (Bankr. E.D. Va. 1995) (proposed sales to insiders must face higher scrutiny).

[138] Under the Bankruptcy Code, even where a sale of all assets is accomplished via a section 363 sale, a plan still is needed to distribute the proceeds from the sale to the appropriate stakeholders.

[139] 700 F.2d 935 (5th Cir. 1983).

[140] Other courts have referred to a *sub rosa* plan as a "creeping plan of reorganization" or a "*de facto* plan."  *See, e.g.*, *In re Dow Corning Corp.*, 192 B.R. 415, 427-28 (Bankr. E.D. Mich. 1996); *In re Lion Capital Group*, 49 B.R. 163, 175 (Bankr. S.D.N.Y. 1985).

After *Braniff*, the *sub rosa* plan or *Braniff* objection became ubiquitous in bankruptcy litigation, although it has rarely been successful.  Generally speaking, a straightforward sale of an asset in exchange for a fixed consideration, without specification of how the sale proceeds will be distributed, is not at risk of disapproval as a *sub rosa* plan.  Similarly, a sale transaction pursuant to which the bulk of the proceeds would be distributed to the secured lenders, with any remaining proceeds to be distributed in accordance with a plan, was found not to run afoul of the *sub rosa* plan doctrine in the Boston Generating case.[141]  More ambitious transactions, however, may risk running afoul of the doctrine.  For example, in the WestPoint Stevens chapter 11 case, a long-running contest between rival groups of creditor-bidders led by WL Ross and the Icahn Group resulted in a section 363 sale to the Icahn Group that required not only the transfer of the business, but also direct distribution of the sale consideration to creditors and the involuntary termination of liens and other interests.[142]  On appeal, the district court ruled that this further relief "clearly constituted an attempt to determine or preempt plan issues in the context of the section 363(b) sale and was improper to that extent."[143]

The General Motors and Chrysler bankruptcies each generated *sub rosa* plan objections, neither of which succeeded.  The bankruptcy court in the General Motors case approved the sale of substantially all of General Motors' assets over a *sub rosa* plan objection where the debtor had "no liquidity of its own," "need[ed] to quickly address consumer and fleet owner doubt," and required a sale to be approved quickly in order to continue receiving government bailout money.[144]  According to the court, "it is hard to imagine circumstances that could more strongly justify an immediate § 363 sale."[145]  Similarly, in the Chrysler bankruptcy, the Second Circuit noted the "'apparent conflict' between the expedient of a § 363(b) sale and the otherwise applicable features and safeguards

---

[141] *See In re Boston Generating, LLC*, 440 B.R. 302, 331 (Bankr. S.D.N.Y. 2010) ("Here, the proposed sale of the Debtors' assets is not a 'sub rosa' plan of reorganization.  The Debtors' assets are simply being sold; the First Lien Lenders will receive most of the proceeds in accordance with their lien priority; and remaining consideration will be subsequently distributed under a plan.").

[142] *Contrarian Funds, LLC v. WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.)*, 333 B.R. 30 (S.D.N.Y. 2005).

[143] *Id.* at 52 (remanding for further proceedings in bankruptcy court).

[144] *In re Gen. Motors Corp.*, 407 B.R. 463, 491-92 (Bankr. S.D.N.Y. 2009).

[145] *Id.* at 491.

of Chapter 11."[146]   But the court went on to affirm the approval of the sale of substantially all of Chrysler's assets—again over a *sub rosa* plan objection—based primarily on evidence that Chrysler's going concern value was declining rapidly.   The court reached its conclusion with almost no discussion of whether the sale had the effect of evading the plan confirmation process, stating that a good business reason existed for the sale because Chrysler "fit the paradigm of the melting ice cube."[147]

### c.      The Good Faith Requirement

The bankruptcy court will scrutinize a proposed section 363 transaction, including the conduct of both the debtor and the proposed purchaser, for "good faith."   It is in the interest of the buyer at a section 363 sale to procure such a finding, as the finding significantly limits appellate review of the sale.   Under section 363(m), so long as the acquisition is found to be in good faith and the sale order is not stayed pending appeal, a reversal or modification of the sale order on appeal will not affect the validity of the sale in most instances.

Forms of conduct that lack good faith include fraud, collusion (discussed in Part III.A.1.d of this outline), or a bidding process that affords an unfair advantage to a particular bidder.[148]   This is not to say that all advantages made available to a bidder necessarily will be found to be unfair, especially in exigent circumstances.   In the sale by Lehman Brothers of its Neuberger Berman investment management unit, the debtor proposed sale procedures in which the stalking-horse bidder would be entitled immediately to solicit the consent of Neuberger's customers to the purchase of Neuberger by the stalking-horse, notwithstanding that the stalking-horse bid was subject to higher and better offers. The court found that the procedure would advantage the stalking-horse bid but approved it nonetheless, noting that Neuberger's customers had been fleeing until

---

[146] *In re Chrysler LLC*, 576 F.3d 108, 113 (2d Cir. 2009), *vacated as moot*, *Indiana State Police Pension Trust v. Chrysler LLC*, 130 S. Ct. 1015 (2009).

[147] *See id.* at 117-19.   The judgment of the Second Circuit in *Chrysler* was vacated by the Supreme Court on the sole ground that the case became moot before the Court could hear the appeal. *Indiana State Police Pension Trust v. Chrysler LLC*, 130 S. Ct. 1015 (2009). The Supreme Court's order, however, did not disturb the approval of the sale, nor did the order say anything to undermine the Second Circuit's reasoning.   Accordingly, the Court of Appeals' opinion in *Chrysler*, while no longer binding precedent in the Second Circuit, remains a source of reasoning on the subject of section 363 sales, the *sub rosa* plan doctrine, and other issues, to which other courts may continue to refer. *See, e.g.*, *In re Motors Liquidation Co.*, 430 B.R. 65, 84-86 (S.D.N.Y. 2010) (relying on *Chrysler* in rejecting a *sub rosa* plan objection).

[148] *See In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (Bankr. D. Del. 1996).

the stalking-horse bid was announced and that the withdrawal of the stalking-horse bid (which was conditioned on approval of the procedures) would certainly destroy value unless another bidder immediately stepped up.  No other potential bidder was ready to do so.

A heightened standard of review has generally been applied to transactions in which the proposed purchaser is an insider or a fiduciary.[149]  In fact, some courts have noted that the element of "good faith" focuses primarily on whether an insider has received any special treatment in connection with a section 363 sale.[150]

For example, in *In re Abbotts Dairies of Pennsylvania, Inc.*,[151] the debtor entered into an arrangement with the prospective purchaser pursuant to which the CEO of the debtor would become a consultant to the purchaser during the bankruptcy process and would serve as an executive of the purchaser for five years after the completion of the transaction.  The prospective purchaser also agreed to waive any claim of personal liability against the CEO.  The bankruptcy court approved the sale without addressing the purchaser's good faith.  On appeal, appellants argued that the CEO, in return for the employment offer, contrived an "emergency" to justify the section 363 sale and manipulated the timing of the bankruptcy filing to preclude truly competitive bidding.  The Third Circuit reversed the bankruptcy court's approval of the sale, holding that, in approving a sale of assets under section 363(b)(1), the bankruptcy court must make a finding as to whether the prospective purchaser is acting in good faith, and that the appellants' allegations would constitute collusion with an insider and would not be consistent with a finding of good faith.[152]

Similarly, in *In re Bidermann Industries U.S.A., Inc.*,[153] the bankruptcy court rejected a proposed leveraged buyout of the debtor for lack of good faith due to conflicts of interest and self-dealing between the proposed purchaser and

---

[149] *See* 11 U.S.C. § 101(2),(31) (if a debtor is a corporation, an insider is (1) a director, officer, general partner or person in control of the corporation or a relative of such person, (2) a partnership in which the debtor is a general partner or (3) an affiliate of the debtor (which would include a shareholder holding greater than 20% of the voting stock)).

[150] *See In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

[151] 788 F.2d 143 (3d Cir. 1986).

[152] *See id.* at 148-50.

[153] 203 B.R. 547 (Bankr. S.D.N.Y. 1997).

the debtor's management.  The proposed transaction contemplated an acquisition of the debtor by a private equity investor and a consulting firm hired by the debtor in its bankruptcy.  The debtor agreed not to solicit any other proposals or offers; the consultant was to receive a minority interest in the new company "financed in part by a success fee which [the private equity investor] will pay;" and an officer of the consultant was to act as the CEO of the new company and chairman of the board.[154]   None of the negotiations were conducted with the assistance of an investment bank or an independent financial advisor to "test the marketplace for other expressions of interest," a fact which the court found "astounding."[155]   The court rejected the arrangement, stating that the consultant and the majority shareholder  had "done little to ensure the integrity of this process because they are motivated by the possibility of personal gain."[156]

Particularly if a sale under section 363(b) of the Bankruptcy Code involves an insider, the parties should be sure to disclose fully to the court and creditors the relationship between the buyer and the seller, the nature and quality of the negotiation and marketing processes, and how the debtor determined that the price was fair and reasonable.  And, to minimize the likelihood of the sale being invalidated on appeal, a finding of good faith by the bankruptcy court should be included in the order approving the sale, as discussed further in part III.A.2.

### d.    Prohibition on Collusive Bidding

The prohibition on collusive bidding in section 363(n) of the Bankruptcy Code is an important component of the good faith analysis, although it is an issue on which the courts have provided limited guidance.[157]   Section 363(n) permits the bankruptcy court to decline to approve a sale of assets where the "sale price was controlled by an agreement among potential bidders at such sale."[158]   It also permits an approved sale to be avoided, or for damages to be obtained from a bidder, if a collusive agreement among bidders deprived the estate of value.[159]

---

[154] *Id.* at 549-50.

[155] *Id.* at 551.

[156] *Id.* at 553.

[157] *See generally* Jason Binford, *Collusion Confusion:  Where Do Courts Draw the Lines in Applying Bankruptcy Code Section 363(n)?*, 24 EMORY BANKR. DEV. J. 41 (2008).

[158] 11 U.S.C. § 363(n).

[159] *See id.*; *see also In re Intermagnetics Am., Inc.*, 926 F.2d 912, 917 (9th Cir. 1991).

Finally, if the purchaser acted in willful disregard of section 363(n), the court can order punitive damages, although to date no reported decision has done so.

It is often difficult to draw the line between improper collusion and benign team bidding. Yet as section 363(n) provides drastic consequences for violators, it is important to attempt to do so. Section 363(n) clearly prohibits a potential bidder from agreeing not to bid in order to permit another bidder to purchase assets at a discount with an agreement to divide the assets or receive a cash payment after the auction.[160] For conduct to violate section 363(n), however, bidders entering into an agreement must do so with the intention to control the price of the asset, and the purportedly collusive action must "control" rather than incidentally affect the sale price.[161] Ultimately, the distinction between collaboration and collusion may be difficult to delineate and may turn on fact-intensive matters such as the parties' motivation in joining together in a bid.[162]

In practice, potential buyers often bid jointly—especially where the pool of assets is too large or too diverse to interest any one of them alone, and a bid for only part of the assets, leaving the estate with the orphaned remains, would be disfavored. Such bidding groups may be necessary for certain transactions to occur at all. There is little guidance on how courts will apply section 363(n) in these circumstances. Factors likely to be considered by the courts include whether: (1) the members of the bidding group have the financial ability to bid individually for the entire business, (2) the members of the bidding group only have a strategic interest in select assets regardless of financial capability, (3) the bidding group's bid is higher than what any individual bid by the members would have been, (4) other competitors remain that are bidding on the business (*i.e.*, does the group consist of all of the parties interested in the assets?), and (5) the

---

[160] *See, e.g.*, *Ramsay v. Vogel*, 970 F.2d 471, 474 (8th Cir. 1992) (bidding agreement by which two highest bidders split increment between themselves was "precisely the evil Congress intended to deal with in § 363(n)"); *In re Stroud Ford, Inc.*, 163 B.R. 730, 733 (Bankr. M.D. Pa. 1993) (denying motion to sell assets because potential bidders violated section 363(n) by agreeing to withdraw their bid in exchange for cash).

[161] *See In re N.Y. Trap Rock Corp.*, 42 F.3d 747, 752-53 (2d Cir. 1994) (noting that "[t]he influence on the sale price must be an intended objective of the agreement, and not merely an unintended consequence," but finding that collusion claim could be sustained where bidder dropped out in exchange for sharing of marginal bid value).

[162] *See In re Edwards*, 228 B.R. 552, 565 (Bankr. E.D. Pa. 1998) (agreement between joint bidders not intended to control price).

group timely communicated its desire to bid together and its rationale for forming itself to the relevant interested parties.[163]

Given the few cases interpreting section 363(n) and the serious consequences of a violation, purchasers should act cautiously when entering into arrangements with other bidders in connection with a possible asset purchase.  It is important, for example, that the existence of the group be disclosed to the seller.  While full disclosure of a bidding agreement will not necessarily negate a claim of improper collusion, failure to disclose might well prove fatal to an arrangement that would otherwise survive section 363(n) scrutiny.[164]  Group members should, of course, avoid any agreement under which a member plans to withdraw or withhold its bid with the expectation that it will nonetheless share in the assets sold.[165]  To limit the opportunity for collusion, it is common for auction rules to require the debtor's permission to share confidential information or form bidding groups.

Many of these issues were at the fore in June 2011 when Nortel Networks sold its portfolio of more than 6,000 mobile telecommunications patents at an auction under section 363.  Because intellectual property portfolios are often held by consortia whose members cross-license technology to one another, the bidding procedures for the auction expressly contemplated group bids, but required each bidder in a group to disclose to the debtor and other bidders its relationship to the other group members and to affirm that it had not engaged in collusive behavior.  As the bids increased over the course of the auction, individual bidders dropped out only to resurface as part of a group.[166] Ultimately, an ad hoc consortium of industry heavyweights that included Apple, Microsoft, Research in Motion, Sony and Ericsson won with a bid of $4.5 billion—a price higher, it seemed, than any member of the group was willing to pay on its own—prevailing over a competing

---

[163] *See* Ilene Knable Gotts & Franco Castelli, *Special Antitrust Issues Raised by Private Equity Minority Investments*, The Threshold, Vol. III, No. 3 (Summer 2008), at 15-22.

[164] *See, e.g.*, *In re Colony Hill Assocs.*, 111 F.3d 269, 277 (2d Cir. 1997) ("Many courts ruling on challenges to a purchaser's good faith status have focused on whether the acts about which the appellant complained were disclosed to the bankruptcy court . . . .  Although full disclosure to the bankruptcy court may not always neutralize conduct that would otherwise constitute bad faith, disclosure should certainly weigh heavily in a bankruptcy court's decision on that issue.").

[165] *See Boyer v. Gildea*, 374 B.R. 645, 660 (N.D. Ind. 2007) (in deciding whether the trustee put forth sufficient evidence for a claim under section 363(n), the court noted that a reasonable trier of fact could infer collusion from the fact that one potential bidder did not submit a bid but purchased the assets from the highest bidder shortly after the sale).

[166] *In re Nortel Networks Inc.*, 2011 WL 4831218, at *5 (Bankr. D. Del. July 11, 2011).

bidding group comprising Google Inc. and Intel Corporation. This case demonstrates the benefits of cooperative bidding arrangements in certain circumstances and the ways in which open disclosure—including, in this case, pursuant to court-approved bidding procedures—can help achieve those benefits while minimizing the risk of violating section 363(n).

## 2.      Benefits and Risks of Using Section 363

### a.      Benefits of Using Section 363

#### (i)      Speed

Plan confirmation is a complex process that generally requires a significant amount of time.  Even when a plan is not contested, parties need time to build consensus and adhere to the procedural formalities surrounding plan presentation and voting.  If a plan is non-consensual, parties require additional time to litigate objections and renegotiate if objections prove well-founded.  By contrast, a section 363 sale is designed to be expeditious.  Although the marketing process and auction required before an asset of a bankrupt estate may be sold pursuant to section 363 will involve some delay, the process generally permits buyers to acquire the assets without substantial plan-related delay unrelated to the purchase.

For companies facing severe liquidity or business challenges, one common approach is to negotiate a sale with a stalking-horse bidder and file bankruptcy with a stalking-horse bid and set of bidding rules in hand.  Generally, under the terms of the asset purchase agreement, the stalking-horse bidder is allowed to terminate the agreement if a court order approving bidding procedures and setting an auction date is not entered shortly after the bankruptcy commences.  A typical period of time from approval of the bidding procedures to auction is 30 to 60 days.[167]  Other bidders interested in the assets are required to accommodate this timeline.  Further, in order to participate in the process and gain access to confidential diligence materials, potential bidders may be required to demonstrate their financial wherewithal to make a bid, disclose any special conditions their bid

---

[167] Even where a robust pre-bankruptcy shopping has occurred, it is customary for the auction process to last at least 30 days after filing to ascertain if there are any other bids forthcoming. Thus, apart from truly extraordinary emergencies such as the Lehman Brothers case, where the broker-dealer subsidiary was sold within five days of the parent's bankruptcy filing, or the auto company bankruptcies, such as Chrysler, where the bankruptcy court entered the sale order within one month of the filing, a rapid pace from bankruptcy filing to sale is likely to occur only where the assets have been thoroughly auctioned prior to filing, and nothing remains to be done but to seek bankruptcy court approval, with any objectors to the sale having the opportunity to be heard.

will involve (such as approval by the bidder's shareholders, antitrust clearance, lender consents, etc.), and provide an indicative price range.

The auction of computer maker Silicon Graphics, Inc. is illustrative of the speedy timetable. Silicon Graphics filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New York on April 1, 2009 with a stalking-horse agreement with Rackable Systems, Inc. already signed.[168] On April 3, 2009, the court approved Silicon Graphics' bidding procedures order.[169] An auction was held on April 28, 2009—not even a month after filing—and the sale hearing two days after that.[170] Similarly, battery maker A123 Systems, Inc. filed for bankruptcy on October 16, 2012 with a stalking-horse agreement with Johnson Controls already signed,[171] obtained approval of its bidding procedures on November 8, 2012,[172] held an auction from December 6 to 8, 2012, and obtained approval of the sale to the winning bidder on December 11, 2012.[173] There are numerous other examples of similarly-quick auctions.

Given the potential for such a truncated process, a buyer who wants to participate in a bankruptcy sale—especially one that has not participated in the bidding round that often occurs pre-bankruptcy to identify potential stalking horse bidders, and is therefore behind the curve in terms of information—must be prepared to mobilize the resources necessary to act very quickly. A variety of financial and legal issues will need to be addressed. In addition to the matters that must be considered in any acquisition—such as value, financing, operational challenges, labor matters, management issues, environmental risks, major contracts and leases, and particularly in the case of retailers, the seller's owned and leased real estate portfolio—an acquisition in bankruptcy presents the opportunity to reshape the debtor by leaving behind unwanted contracts or operations. A buyer also must stand ready to object to proposed auction

---

[168] Silicon Graphics, Inc., Current Report (Form 8-K) (Apr. 1, 2009).

[169] *See* Order Approving Bid Procedures and Bid Protections and the Form and Manner of Notices Thereof, *In re Silicon Graphics, Inc.*, No. 09-11701 (Bankr. S.D.N.Y. Apr. 3, 2009).

[170] Rackable Systems, Inc., Current Report (Form 8-K) (May 5, 2009).

[171] A123 Systems, Inc., Current Report (Form 8-K) (Oct. 16, 2012).

[172] *See* Order (I) Approving Bid Procedures in Connection with Sale of Certain Assets of the Debtors; (II) Scheduling Hearing to Consider Sale of Assets; (III) Approving Form and Manner of Notice Thereof; (IV) Approving Break-up Fee and Expense Reimbursement; and (V) Granting Related Relief, *In re A123 Systems, Inc.*, No. 12-12859 (Bankr. D. Del. Nov. 8, 2012).

[173] A123 Systems, Inc., Current Report (Form 8-K) (Dec. 14, 2012).

procedures, garner the support of key constituents and, if necessary, litigate the merits of a proposed deal, all on an expedited timetable.

Where circumstances require a significant lag between signing and closing, such as where regulatory or other approvals are required, there may be a need for the parties to negotiate an interim operating arrangement, which itself requires court approval. Tools commonly used include a management agreement, whereby the acquiror takes over the operations pursuant to contract with the debtor, and funding mechanisms, whereby the acquiror assumes responsibility for the profits and losses of the business by the seller between the time the sale is approved and the closing. Such arrangements are intended to make the estate whole for the cost of doing a transaction with an acquiror that is incapable of closing immediately.

While not specific to acquisition transactions, it should be noted that a creditor's request for appointment of an examiner could slow down every aspect of a case, including potentially a 363 sale or confirmation of a plan. In chapter 11 cases, it can be difficult for a debtor or other parties in interest to fend off a request for an examiner since section 1104(c) of the Bankruptcy Code, which governs appointment of an examiner, contains language that many, but not all, courts have interpreted as requiring appointment of an examiner upon request.[174] As discharge of an examiner's duties generally takes a substantial amount of time and as the examiner is ordinarily compensated by the debtor's estate, any such appointment may both slow the proceeding in question and inflict substantial costs upon the estate.[175] The resulting delay may impede consummation of an acquisition.

---

[174] *Compare Loral Stockholders Protective Comm. v. Loral Space & Commc'ns Ltd. (In re Loral Space & Commc'ns Ltd.)*, 2004 WL 2979785, at *4 (S.D.N.Y. Dec. 23, 2004) ("On its face, Section 1104(c)(2) mandates the appointment of an examiner where a party in interest moves for an examiner and the debtor has $5,000,000 of qualifying debt."), *with U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 126-28 (Bankr. D. Del. 2010) (declining to appoint an examiner despite satisfaction of the debt threshold), *appeal dismissed as equitably moot*, 2011 WL 3420441 (D. Del. Aug. 4, 2011). Even if a court determines that appointment of an examiner is mandatory, however, it may be possible to curtail the scope of the examiner's duties. *See, e.g.*, *In re Erickson Ret. Cmties., LLC*, 425 B.R. 309, 317 (Bankr. N.D. Tex. 2010) (suggesting that, although appointment of an examiner may be mandatory, a court may appoint an examiner with no duties under appropriate circumstances).

[175] *See In re Dynegy Holdings, LLC*, Case No. 11-38111 (CGM) (Bankr. S.D.N.Y. Jan. 12, 2012) (order approving appointment of examiner); *In re Tribune Co.*, Case No. 08-13141 (KJC) (Bankr. D. Del. May 10, 2010) (order approving appointment of examiner).

(ii)      Ability to "Cherry Pick" Assets

A purchaser under section 363 of substantially all or a portion of a debtor's assets often is given the flexibility to cherry pick from among those assets. For example, the buyers in both the *Pillowtex* and *Refco* chapter 11 cases negotiated for the right to pick through the company's assets for several months after closing and receive whatever assets they chose without paying additional consideration (but without a reduction in the purchase price if they declined to take certain assets). Assets to be cherry picked can be of any type, but most frequently include leases and executory contracts that can be rejected by the debtor or assumed and assigned to the buyer pursuant to section 365 of the Bankruptcy Code (discussed in Part III.B.8 of this outline) and that often are not assignable outside bankruptcy. Typically, the buyer will direct which "executory" contracts and leases will be assumed and assigned following the sale.[176] Such a process allows the buyer the opportunity not only to conduct post-closing diligence, but also to renegotiate contracts with the debtor's landlords and counterparties. Technically, under the Bankruptcy Code, contracts must either be accepted or rejected (*i.e.*, there is no renegotiation option); however, the power of a debtor to reject a contract that is economically unfavorable creates strong leverage with which to compel a counterparty to renegotiate.

It is not uncommon for a debtor to require the buyer to pay "cure" costs associated with whichever leases and contracts are assigned to it post-closing, or even to cover the rejection costs associated with the leases and contracts the purchaser chooses not to take (although inasmuch as rejection costs are prepetition claims payable in discounted "bankruptcy dollars," calculation of the purchaser's liability is difficult). A buyer with substantial leverage, however, may be able to avoid those costs. In *Refco*, for example, the purchaser of the debtor's global commodities trading business was able to decide, months after the fact and after conducting significant due diligence for which there was no time prior to the acquisition, that it preferred not to take certain potentially money-losing foreign offices and also was able to require the debtor to assume and assign to it the leases and contracts it designated over an 18-month post-closing period, with the debtor paying the costs of either cure or rejection.

Prospective purchasers' differing intentions with respect to assumption or rejection of leases and executory contracts, or other assets that might be cherry picked, can cause significant complications in comparing the value of competing

---

[176] *See, e.g.*, *In re: United Retail Group, Inc.*, Case No. 12-10405 (SMB) (Bankr. S.D.N.Y. Aug. 10, 2012) (order authorizing the winning bidder in the 363 sale to continue to conduct diligence on which leases it would assume for 90 days following entry of the sale order).

-66-

bids in a bankruptcy auction.  In *Refco*, the debtor treated bidders willing to take on its London business as if the value of their bids was more than $30 million greater than their face amount.  In the *Cable and Wireless* chapter 11 case, bids were evaluated on the basis of an assumed monetary cost of a rejection claim, with bids that contemplated rejections being assessed a penalty for valuation purposes (because the resulting rejection damages would dilute the recovery of other already-existing unsecured claims).  Further complications can result from the fact that creditors may be impacted differently by the competing bids, with creditors that are being paid in full (because, for example, they are fully secured or will have their contracts assumed) viewing the competing deals differently than those who will have to share their recovery with any new claimants created by the rejected leases and executory contracts.  A prospective acquiror, whether under section 363 or in the plan context, should carefully analyze its own ability and that of its potential competitors to advantage or disadvantage their respective bids depending upon their unique willingness or ability to accept or reject executory contracts and unexpired leases.  Wise cherry picking and related treatment of rejection and cure claims and costs may lead to substantial relative discounting or enhancement of what may otherwise be competitive bids.

The cherry picking process can take other forms, especially where the assets at issue are leases or other interests in real property, and if environmental liabilities are a concern.  In cases such as *Kmart* and *Pillowtex*, for example, parties were permitted to purchase "designation rights" to real property interests.  Such rights allowed the purchaser to market the debtor's owned properties or leases for a fixed period of time and, if the properties or leases were sold, keep a share of the sale proceeds without ever having to take direct title.  Leases that were not sold still could be rejected by the debtor pursuant to section 365, at no additional cost to the purchaser.

While the ability to assume or reject the debtor's contracts under section 365 does not apply to non-executory contracts, the debtor's rights under such contracts may also be assigned to an asset purchaser if the rights are assignable under nonbankruptcy law.  Indeed, it may be advantageous that the contract under which a debtor retains rights is not executory, since the contract counterparty loses the ability to obstruct the transaction and impose costs with cure and adequate assurance objections, and the debtor's rights can be transferred to the acquiror as an asset in a section 363 sale or under a plan.[177]

---

[177] Order Regarding Objection of Cargill, Inc. to the Notice of Assumption and Assignment of, and Amounts Necessary to Cure Defaults Under, Contracts and Leases to be Assumed and Assigned to Man Financial Inc., *In re Refco Inc.*, No. 05-60006 (RDD), Docket No. 1311 (Bankr. S.D.N.Y. Feb. 14, 2006) (exclusivity agreement that was non-executory contract could be

(iii)     Protections That Can Be Obtained from
Bankruptcy Court's Approval Order

(A)     Finding of Good Faith—Section 363(m)
Protection from Reversal on Appeal

A bankruptcy court order approving a section 363 sale typically includes a number of protections for a buyer.  Under section 363(m) of the Bankruptcy Code, once an asset sale under section 363 is approved, so long as the bankruptcy court finds a buyer to have acted in good faith, the validity of a sale will not be subject to reversal or modification on appeal unless the party challenging the sale order can meet the stringent requirements for a stay pending appeal, including the requirement that a bond be posted.  It is therefore critical that a factual record establishing a purchaser's good faith be made at the sale hearing and that the court make an explicit finding of good faith in its approval order.[178]

Courts have generally interpreted section 363(m) broadly to preclude reversal or modification of nearly all aspects of the sale order.[179]  For example, in

_____

assigned by debtor to purchaser), *aff'd*, *In re Refco Inc.*, 2006 WL 2664215 (S.D.N.Y. Sept. 13, 2006).

[178] Some jurisdictions require that a court make an affirmative finding of good faith when approving a section 363 sale.  *See, e.g.*, *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986).  In other jurisdictions, however, courts may consider good faith at the approval stage or when a section 363 sale is appealed pursuant to section 363(m).  *See In re Thomas*, 287 B.R. 782, 785 (B.A.P. 9th Cir. 2002) (noting that a finding of "good faith" is not an essential element of approving a sale under section 363(b)); *accord In re Zinke*, 97 B.R. 155 (Bankr. E.D.N.Y. 1989).  Purchasers in a section 363 sale should, at a minimum, try to obtain an explicit section 363(m) finding in the bankruptcy court's order approving the sale.  Creating a record at the sale hearing to support such a finding will go even further to ensure that the protections of section 363(m) apply.  *See Crowder v. Given (In re Crowder)*, 314 B.R. 445, 447 (B.A.P. 10th Cir. 2004) ("While the court failed to make detailed findings supporting its finding of good faith under § 363(m), the conclusion is amply supported by the record."); *see also Fitzgerald v. Ninn Worx Sr, Inc. (In re Fitzgerald)*, 428 B.R. 872, 881 (B.A.P. 9th Cir. 2010) ("The boilerplate 'good faith' finding in the Sale Order does not suffice under section 363(m), and the bankruptcy court should not have signed such an order without an evidentiary foundation." (citing *T.C. Investors v. Joseph (In re M Capital Corp.)*, 290 B.R. 743, 752 (B.A.P. 9th Cir. 2003)); *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996) ("[W]here the good faith of the purchaser is at issue, the district court is required to review the bankruptcy court's finding of good faith before dismissing any subsequent appeal as a moot under section 363(m).").

[179] *But see Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 35–36 (B.A.P. 9th Cir. 2008) (protections of section 363(m) limited to transfer of the asset to first lienholder who won auction and did not preclude reversal of portion of sale order extinguishing second lien).  *Clear Channel* is an outlier and has generally not been followed.  *See, e.g.*, *Official Comm. of Unsecured Creditors v. Anderson Senior Living Property, LLC (In re Nashville Senior Living,*

*In re Nashville Senior Living, LLC*, the Sixth Circuit Bankruptcy Appellate Panel held that the protections of section 363(m) extended to the portion of an order approving the sale of property jointly owned by the debtor and a non-debtor as tenants in common, as permitted in certain circumstances under section 363(h). Similarly, in *Asset Based Resource Group, LLC v. United States Trustee (In re Polaroid Corp.)*, the Eighth Circuit concluded that section 363(m) applied not only to provisions in a sale order authorizing the transfer of title, but also to a provision extinguishing interests in the property being sold.[180]

The Second Circuit has also construed section 363(m) broadly. In *WestPoint Stevens*, the court held that under section 363(m), an appellate court has no jurisdiction to review any portion of a bankruptcy court's sale order, except to hear challenges to the "good faith" aspect of the sale, or possibly challenges to provisions of the order "that are so divorced from the overall transaction" that they "would have affected none of the considerations on which the purchaser relied."[181]   In that case, the challenged order provided that the sale would be accomplished in two steps:   first, the debtor's assets would be transferred to a shell entity established for purposes of the sale, with replacement liens in favor of the secured lenders attaching to the shell entity's securities; second, those securities would be directly distributed to the secured lenders to satisfy their claims, thus releasing the liens.   The overall effect of this transaction was to ensure that the winning bidder at auction, one of the secured lenders, would gain a controlling share of the acquiring entity.   On appeal, the Second Circuit held that because the "main concern in this case with any plan of reorganization or section 363(b) sale was 'control,'" and because the multiple steps ordered by the bankruptcy court accomplished that end, "any challenges to [those] integral and integrated provisions of the Sale Order do not serve to

---

*LLC)*, 407 B.R. 222, 231 (B.A.P. 6th Cir. 2009) (describing *Clear Channel* as "an aberration in well-settled bankruptcy jurisprudence applying § 363(m)" and observing that "the overwhelming weight of authority disagrees with [*Clear Channel*'s] holding"); *Asset Based Resource Group, LLC v. United States Trustee (In re Polaroid Corp.)*, 611 F.3d 438, 440 (8th Cir. 2010) (expressly disagreeing with *Clear Channel*).

[180] *Asset Based Resource Group, LLC v. United States Trustee (In re Polaroid Corp.)*, 611 F.3d at 440; *accord United States v. Asset Based Resource Group, LLC*, 612 F.3d 1017, 1019 n.2 (8th Cir. 2010).

[181] *Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.)*, 600 F.3d 231, 248-49 (2d Cir. 2010).

undermine the statutory mootness of this appeal as provided by section 363(m)."[182]

(B)    Insulation from Fraudulent Transfer
         Challenge

The order approving a section 363 sale should also include a specific finding that the consideration paid for the debtor's assets was fair and reasonable. This finding should protect a purchaser from a subsequent claim that the sale constituted a fraudulent transfer—*i.e.*, a transfer by an insolvent or undercapitalized debtor for which the debtor did not receive adequate consideration.  In contrast, when sales are completed with a financially distressed seller outside of bankruptcy, and the seller files for bankruptcy court protection soon after the sale is completed, an acquiror can find itself subject to legal challenges relating to the reasonableness of the sale process and the price paid, as discussed above in Part I.B.1.a.

(C)    Successor Liability Issues:  Purchasing
         Assets "Free and Clear"

Section 363(f) of the Bankruptcy Code authorizes the sale of assets "free and clear" of any interest in the property; such interests attach to the proceeds of the sale instead.  Although the protections afforded by such an order are not absolute, a section 363 order can limit significantly any liabilities that a purchaser may be deemed to assume in an acquisition.

In an acquisition of the assets of a business outside of bankruptcy, a buyer typically will agree to assume some of the seller's liabilities, such as unpaid trade debts incurred in the ordinary course of the seller's business, but no buyer wants to incur additional liabilities involuntarily.  Whenever assets are transferred and the transferor ceases to exist, however, there is some risk that the transferee will succeed to certain liabilities of its predecessor, such as debts or tort claims, by operation of law—so-called "successor liability."

While a sale in bankruptcy does not *per se* bar the assertion against an asset purchaser of any and all claims against the seller, it does offer substantial protection for a buyer from involuntarily becoming responsible for the seller's liabilities.  Specifically, section 363(f) insulates purchasers of estate property,

---

[182] *Id.* at 251; *see also, e.g.*, *In re Gucci*, 126 F.3d 380, 392-93 (2d Cir. 1996) (because section 363(m) permits only consideration of good faith, an appellate court may not review whether property sold was in fact property of bankrupt estate).

permitting under certain circumstances the acquisition of property from the debtor "free and clear of any interest in such property" and relegating holders of "interests" to a recovery from the sale proceeds.

(D)    Scope of "Interests" Subject to Section 363(f)

The "free and clear" protection for a section 363 buyer applies only to holders of "interests."   A minority of courts have read the word "interest" in section 363(f) as representing solely an *in rem* property right such as a security interest, to the exclusion of the general ability to seek a recovery from the debtor based on a contract or other legal right.[183]  Most courts, however, have interpreted the "interest in . . . property" that may be discharged under section 363(f) to permit sales free not just from liens and secured claims, but also from other kinds of claims, such as general unsecured claims with a connection to the property being sold.   *In re Trans World Airlines, Inc.*[184] is a leading case holding that the type of interest in property that may be extinguished through a section 363(f) sale should be read quite broadly.  Relying on section 363(f)(5) and the fact that the claim could be subsequently satisfied via payment of money following the sale, the court ruled that assets of the debtor can be sold free and clear of general unsecured claims attributable to prior operation of those assets.[185]   This interpretation, which has been accepted by most courts,[186] enables a broad

---

[183] *See In re White Motor Credit Corp.*, 75 B.R. 944, 948-49 (Bankr. N.D. Ohio 1987) (section 363 solely bars assertion of secured claims against sold property because general unsecured claimants do not hold "interests," though bankruptcy court has wide equitable powers to cut off unsecured claims); *In re New England Fish Co.*, 19 B.R. 323, 326-28 (Bankr. W.D. Wash. 1982) (holding that unsecured claims do not constitute "interests" under section 363(f), but cutting off successor liability as inconsistent with the claims priority scheme outlined in the Bankruptcy Code).

[184] 322 F.3d 283 (3d Cir. 2003).

[185] *Id.* at 290-91 (no buyer liability for employment discrimination claims).

[186] The Second Circuit expressly adopted the *Trans World Airlines* approach in the Chrysler bankruptcy, agreeing that "the term 'any interest in property' encompasses those claims that arise from the property being sold," and thus approved a transaction where the "possibility of transferring assets free and clear of existing tort liability was a critical inducement to the Sale." *In re Chrysler LLC*, 576 F.3d 108, 126 (2d Cir. 2009) (citation and internal quotation marks omitted), *vacated as moot*, *Indiana State Police Pension Trust v. Chrysler LLC*, 130 S. Ct. 1015 (2009). The Second Circuit's opinion in the Chrysler bankruptcy was vacated on technical grounds, but nevertheless may remain a source of guidance to courts in the Second Circuit, including on this issue.  Further, in at least one non-precedential summary order, the Second Circuit indicated a willingness to continue following the reasoning of *Trans World Airlines* and *Chrysler*.  In *Douglas v. Stamco*, the court held that a tort claimant could not sue the purchaser of the debtor's property

spectrum of unsecured claims to be barred by a sale under section 363, so that a well-drafted sale order entered pursuant to this section expressly protects a buyer from any liability for claims against the seller that the buyer has not agreed to assume.[187]  As discussed in Part III.B.4.b, however, due process concerns have led some courts to hold that a section 363 sale will not extinguish a purchaser's liability for claims arising from the purchased assets after the sale, including claims for injuries caused by defects in products manufactured before the bankruptcy.[188]

However, in two recent decisions the District Court for the Southern District of New York has somewhat curtailed the protection available under section 363(f).  In *In re Grumman Olson Industries, Inc.*,[189] the court, citing due process concerns, held that the sale order could not extinguish the plaintiffs' claims for post-sale injuries caused by defective products manufactured before the bankruptcy.  Since at the time of the sale "there was no way for anyone to know that the [plaintiffs] ever would have a claim," it would deprive them of due process "to take away their right to seek redress . . . when they did not have notice or an opportunity to participate in the proceedings that resulted in that order."[190] And in *Hispanic Independent Television Sales LLC v. Kaza Azteca America Inc*,[191] the court rejected a section 363 purchaser's argument that a third party's recoupment defense against the debtor's breach of contract claim (to which the purchaser had acceded) was an "interest" within the meaning of section 363(f).  While the recoupment defense was based on the third party's allegation that the debtor breached the contract, it was nevertheless an affirmative defense, not a

---

since permitting the claim to go forward "would be inconsistent with the Bankruptcy Code's priority scheme" and would have a "chilling effect" on buyers in bankruptcy sales.  *See* 363 F. App'x 100, 102-03 (2d Cir. 2010).

[187] *Compare In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 582 (4th Cir. 1996) (lack of express statutory limitation of "interests" supported expansive reading), *with In re Eveleth Mines, LLC*, 312 B.R. 634, 654 (Bankr. D. Minn. 2004) (criticizing the *Trans World Airlines* reading of "interest" and finding it inapplicable to state tax liability computed on basis of mining production).

[188] *See Morgan Olson, LLC v. Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243, at 254 (Bankr. S.D.N.Y. 2011)  ("[F]or reasons of practicality or due process, or both, . . .  a person injured after the sale (or confirmation) by a defective product manufactured and sold prior to the bankruptcy does not hold a 'claim' in the bankruptcy case and is not affected by either the § 363(f) sale order or the discharge under 11 U.S.C. § 1141(d).").

[189] 467 B.R. 694 (S.D.N.Y. 2012).

[190] *Id.* at 708.

[191] 2012 WL 1079959 (S.D.N.Y. March 30, 2012).

counterclaim, and "sales pursuant to section 363(f) do not extinguish affirmative defenses."[192]

(E)    The Five Triggers of Section 363(f) Protection

Section 363(f) affords a sale "free and clear" status if any of five conditions are met. Each of the conditions, summarized below, may present traps for the unwary in any particular case. Consequently, any sale likely to implicate holders of significant "interests" in the assets requires careful assessment of how section 363(f) can be satisfied.

- Section 363(f)(1) permits a trustee to sell property free and clear of any interests if applicable nonbankruptcy law permits such a sale. The relevant nonbankruptcy law often is state law, such as state property law,[193] or section 9-307(1) of the Uniform Commercial Code—which permits the sale of inventory free of security interests when sold in the ordinary course of business.

- Under section 363(f)(2), a trustee may sell property free and clear of all interests such as liens if the parties holding the interests consent to the sale free of such interests. It is common for an intercreditor agreement to provide for the junior creditors' consent in advance to such transactions, which should satisfy this section. In addition, where a credit agreement vests authority in a single agent to act on behalf of a group of lienholders, the agent's consent will bind even those individual lienholders that oppose the sale.[194]

- Section 363(f)(3) provides that if property is sold for an amount greater than the aggregate value of all the liens on the property, it may be sold free and clear of all liens. There is a split of authority over the proper interpretation of "value"—whether the term refers

---

[192] *Id.* at *5.

[193] *See, e.g.*, *In re Rose*, 113 B.R. 534, 538 (W.D. Mo. 1990) (holding that property could be sold free and clear of life estate interest under section 363(f)(1) as permitted by state law providing for sale of burdensome life estate).

[194] *See In re Chrysler LLC*, 405 B.R. 84, 101-03 (Bankr. S.D.N.Y. 2009) (all lenders deemed to have consented for section 363(f)(2) purposes where majority vote of lenders authorized single administrative agent to direct collateral trustee to consent to sale).

to the economic value of the liens or the face value.[195]  Interpreting "value" to mean face value gives more protection to secured creditors because collateral cannot be sold free and clear under section 363(f)(3) unless lienholders are paid in full.  In contrast, interpreting "value" to mean economic value provides an undersecured creditor "little more than unsecured status for the amount its lien exceed[s] the value of collateral" because the economic value of the lien is determined by the value of the collateral.[196]

- Section 363(f)(4) permits a free-and-clear sale where the interest is "in bona fide dispute."  This provision codifies long-established law that allows property to be sold free and clear of a disputed debt.  However, it does not justify a sale free and clear when the dispute concerns tangential matters, such as the validity of covenants or the distribution of proceeds from a sale.[197]  Rather, the provision permits a sale where the fundamental validity of a lien or other property interest is debatable, although it cannot be used as a mechanism to sell property that does not truly belong to the estate.[198]

- Section 363(f)(5) permits a sale free and clear of interests when an interestholder "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  This

---

[195] *Compare In re Beker Indus. Corp.*, 63 B.R. 474, 475-76 (Bankr. S.D.N.Y. 1986) ("value" means "actual value as determined by the Court"), *and In re Boston Generating, LLC*, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010) ("The 'value' of a lien is to be determined by reference to section 506(a)—that is, it is the amount by which the lienholder's claim is actually secured."), *with In re Riverside Inv. P'ship*, 674 F.2d 634, 640 (7th Cir. 1982) (stating general rule that a bankruptcy court should not order property to be sold free and clear of liens unless the sale proceeds will fully compensate secured lienholders and produce equity for the estate), *and Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 41 (B.A.P. 9th Cir. 2008) ("section 363(f)(3) does not authorize the sale free and clear of a lienholder's interest if the price of the estate property is equal to or less than the aggregate amount of all claims held by creditors who hold a lien or security interest in the property being sold").

[196] *In re Lehigh Coal & Navigation Co.*, 2012 WL 27465, at *2 (M.D. Pa. Jan. 5, 2012).

[197] *See, e.g.*, *In re Restaurant Assocs., L.L.C.*, 2007 WL 951849, at *9 (N.D. W. Va. Mar. 28, 2007) (covenants); *In re Stroud Wholesale, Inc.*, 47 B.R. 999, 1002 (E.D.N.C. 1985) (proceeds).

[198] *See, e.g.*, *In re Nicole Energy Servs.*, 385 B.R. 201, 229 (Bankr. S.D. Ohio 2008); *In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, at *4 (Bankr. D. Del. July 28, 2008) (consignors' ownership rights must be determined pre-sale).

subsection protects a purchaser from liability for unsecured claims that arose from operation of the purchased assets prior to the sale. As to the effect of section 363(f)(5) on secured claims, the conventional wisdom among many bankruptcy practitioners and commentators has been that section 363(f)(5) allows a sale over the objection of a secured creditor whose claim will not be paid in full by the purchase price whenever release of the security could hypothetically be compelled, as in a foreclosure action by a lienholder senior to the objecting creditor, or in a "cramdown" by a debtor confirming a chapter 11 plan.[199]

While some bankruptcy courts have endorsed the conventional view of section 363(f)(5), that the hypothetical availability of a "cramdown" is sufficient to allow a sale free and clear of a secured creditor's interests,[200] the much criticized *Clear Channel* decision from the Bankruptcy Appellate Panel in the Ninth Circuit, reached a contrary conclusion.  The court there held in substance that a holder of an out-of-the-money security interest could effectively block any sale of its collateral under section 363.[201]  The *Clear Channel* holding would complicate section 363 sales of assets subject to underwater security interests, in some instances necessitating resort to the chapter 11 plan process instead.

Cases addressing *Clear Channel*'s interpretation of section 363(f)(5), however, suggest that courts—even those in the Ninth Circuit—favor a more expansive reading of the statute.  The bankruptcy court in *In re Jolan, Inc*[202] stated that *Clear Channel* took a particularly narrow view of section

---

[199] *See* George W. Kuney, *Misinterpreting Bankruptcy Code Section 363(f) and Undermining the Chapter 11 Process*, 76 AM. BANKR. L.J. 235, 252 (2002); Robert M. Zinman, *Precision in Statutory Drafting:  The Qualitech Quagmire and the Sad History of § 365(h) of the Bankruptcy Code*, 38 J. MARSHALL L. REV. 97, 138-39 (2004).

[200] *See, e.g.*, *In re Boston Generating, LLC*, 440 B.R. 302, 333 (Bankr. S.D.N.Y. 2010) ("[T]he existence of judicial and nonjudicial foreclosure and enforcement actions under state law can satisfy section 363(f)(5)."); *In re Jolan, Inc.*, 403 B.R. 866, 870 (Bankr. W.D. Wash. 2009); *In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002); *In re Healthco Int'l, Inc.*, 174 B.R. 174, 176 (Bankr. D. Mass. 1994); *In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 829 (N.D. Ill. 1993); *In re Hunt Energy Co.*, 48 B.R. 472, 485 (Bankr. N.D. Ohio 1985).

[201] *See Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 42-46 (B.A.P. 9th Cir. 2008) (finding that section 363(f)(5) requires that there be a legal or equitable proceeding in which a court could compel an interest holder to release its interest for payment of an amount that is less than the full value of the claim and that the cramdown procedure of section 1129(b)(2) does not meet that standard).

[202] 403 B.R. 866 (Bankr. W.D. Wash. 2009).

363(f)(5) because the parties in that case had not identified legal and equitable proceedings that would satisfy the provision's requirements, and because the court chose to limit its holding to the arguments presented by the parties.[203]  The *Jolan* court then identified numerous "legal and equitable proceedings [under applicable state law] in which a junior lienholder could be compelled to accept a money satisfaction."[204]  It thus held that a trustee could auction property free and clear of all liens, notwithstanding that the proceeds might be insufficient to pay junior lienholders.[205]  In *In re Boston Generating, LLC*, the bankruptcy court for the Southern District of New York similarly declined to follow *Clear Channel* and held that "the existence of judicial and nonjudicial foreclosure and enforcement actions under state law can satisfy section 363(f)(5)."[206]

Buyers should weigh carefully the risk of sale objections from undersecured creditors where the cash purchase price likely will not satisfy all lienholders' claims.  That said, it is probable that underwater liens subject to a customary intercreditor agreement will be deemed to have consented to the sale under section 363(f)(2), since typical intercreditor agreements include the consent of the junior lienholder to any sale approved by the senior lienholder, including by way of a credit bid.  Thus, multi-tiered lien structures may not prove fatal to section 363 sales.

(F)    Other Potential Pitfalls in Cutting Off Purchaser Liability

The scope of liability assumed by an asset purchaser can, of course, have a substantial impact on the economic benefits of a purchase.  Thus, when drafting an asset purchase agreement and proposed court order that will govern and approve the section 363 sale transaction, a purchaser must carefully specify what liabilities are to be assumed.  Because any voluntary assumption on the part of a purchaser may itself create successor liability,[207] overbreadth in drafting can result in unexpected liabilities, even where the court is otherwise willing to limit

---

[203] *See id.* at 869.

[204] *Id.* at 869-70.

[205] *Id.* at 870.

[206] 440 B.R. at 333.

[207] *See Brzozowski v. Corr. Physician Servs., Inc.*, 360 F.3d 173, 177 (3d Cir. 2004).

the purchaser's liability.[208]  Failing to include language in a sale order specifically releasing the purchaser from certain claims similarly can result in unexpected liabilities.  In *Morgan Olson, LLC v. Frederico (In re Grumman Olson Industries, Inc.)*,[209] for example, the sale order provided that the purchaser would not assume the liabilities "of the debtor" arising from the purchased assets,[210] but the court held that this language did not relieve the purchaser of liability for an injury that was caused after the purchase by a defective product manufactured and sold before the bankruptcy.  According to the court, "[t]he Sale Order did not give [the purchaser] a free pass on future conduct," and so did not bar liability where the purchaser continued the product line after the purchase.[211]  Accordingly, an asset purchase agreement and bankruptcy court order approving a purchase of assets should include the broadest possible language, listing all potential excluded liabilities against the purchaser.

On the other hand, courts may carefully scrutinize transactions that appear to have the sole purpose of shielding an asset purchaser from liability that would be imposed under state law.  In *Nelson v. Tiffany Industries, Inc.*,[212] for example, the Ninth Circuit found that a bankruptcy filing coupled with an agreement to structure an asset sale as a section 363 sale constituted possible evidence of a "collusive agreement to use bankruptcy proceedings to shield the successor corporation" from the tort liabilities of the debtor.[213]  The Ninth Circuit indicated that if a purchaser induced the seller to enter bankruptcy in order to avoid successor liability, such liability would nonetheless attach.[214]  This ruling raises concerns for asset purchasers in the Ninth Circuit (which includes California), especially if a purchaser can be said to have direct influence over a debtor.  Likewise, in *Esopus Creek Value LP v. Hauf*,[215] the Delaware Court of Chancery

---

[208] *See, e.g.*, *In re Trans World Airlines, Inc.*, 180 F. App'x 330, 333 (3d Cir. 2006) (buyer held to have assumed workers compensation claim); *In re Safety-Kleen Corp.*, 380 B.R. 716, 736-37 (Bankr. D. Del. 2008) (purchaser assumed environmental liability at issue under terms of acquisition agreement and sale order); *Mickowski v. Visi-Trak Worldwide, LLC*, 321 F. Supp. 2d 878, 883 (N.D. Ohio 2003) (liability for patent infringement not cut off by terms of order).

[209] 445 B.R. 243 (Bankr. S.D.N.Y. 2011).

[210] *Id.* at 246.

[211] *Id.* at 250.

[212] 778 F.2d 533 (9th Cir. 1985).

[213] *Id.* at 537.

[214] *Id.* at 538.

[215] 913 A.2d 593 (Del. Ch. 2006).

refused to allow a company to enter into an asset purchase agreement that would be immediately followed by a bankruptcy filing where the court found that this procedure was contemplated solely as a means of avoiding certain corporate and securities-law obligations. The Delaware Court of Chancery acknowledged that it lacked the power to enjoin the company's filing for bankruptcy, but determined that it could enjoin the company's entry into an agreement before a filing.[216] Moreover, as discussed above in Part III.A.2.a.iii.C of this outline, the scope of section 363(f)'s protection is limited to purchasing property free and clear of *interests*; in contrast, as discussed in Part III.B.4 of this outline, a chapter 11 plan enjoys the benefit of section 1141 of the Bankruptcy Code, which discharges liabilities of the debtor for *claims* and therefore could result in broader protection for the purchaser from unwanted liabilities.[217]

*b.*   *Risks and Disadvantages of Using Section 363*

(i)   Public Auction Generally Required

Buying assets in a bankruptcy cannot be done quietly. To meet the requirements of section 363, courts generally require that a debtor conduct a robust public auction process under which all parties in interest, including all creditors, receive adequate notice of the auction and the applicable deadlines and procedures. If there is a stalking-horse bid, stakeholders must first be given the opportunity to object to any deal-protection measures to be provided to the stalking horse. By contrast, companies operating outside of bankruptcy and the would-be purchasers of their assets have the option to conduct a private sale.

The bankruptcy court process required under section 363 inevitably exposes any transaction, whether initially entered into inside or outside of bankruptcy, to the view of competing bidders, the target's creditors, regulators and other interested parties. Such exposure can make a transaction more expensive. It also may create greater execution risk for both buyers and sellers than would be present outside of bankruptcy.

(ii)   Potential for Delay

Although bankruptcy sales sometimes happen very quickly, the bankruptcy process generally is known more for its delays than for expedition.

---

[216] *Id.* at 604-05.

[217] See *In re White Motor Credit Corp.*, 75 B.R. 944, 948-49 (Bankr. N.D. Ohio 1987) (finding that while tort claims were not barred against asset purchaser by virtue of purchase because they did not constitute "interests," they were barred due to discharge under debtor's chapter 11 plan).

One potential drawback to purchasing assets inside bankruptcy is that it can involve delays that would not be encountered in an out-of-court transaction. Generally, the Bankruptcy Rules require at least 20 days' notice of a proposed transaction to be provided to parties-in-interest, although some courts will shorten that notice period upon a showing that exigent circumstances require greater speed. If objections are lodged to a proposed sale, the sale can be further delayed while the parties seek to resolve the objections consensually or while the court conducts a hearing and issues its decision. Given the fluidity of the sale process in bankruptcy and the differing styles of bankruptcy judges, the success of a potential transaction sometimes can be determined by the venue or even the particular judge to whom the case is assigned.

Even after an auction has been conducted and concluded in accordance with bankruptcy court-approved rules, it is not out of the realm of possibility for creditors to surface and file objections to particular aspects of the sale or the sale order, or for the creditors' committee, which may well have participated in the auction, to try to renegotiate terms of the purchase contract. It also is not unheard of for potential acquirors to submit bids, and for courts to entertain those late-coming offers, even after the formal auction process has ended, but before the order approving a sale to any particular bidder has been entered and become final. Unfortunately, the seemingly endless opportunities for renegotiation can be standard operating procedure in an asset sale transaction in bankruptcy where the goal of maximizing value for the debtor's estate is paramount and where the court can be expected to be sympathetic to complaints that more value remains to be extracted. The risk that a bidder who has been topped in the bankruptcy auction will resurface after the auction has closed and try to prevail with a higher, albeit late, bid is discussed below at Part III.A.3.

Once the bankruptcy court approves a transaction, the sale normally can close in 15 business days. Bankruptcy Rule 6004(h) provides for a 14-day automatic stay from the entry of an order approving a sale. Parties that objected in the bankruptcy court can appeal from the order within that 14-day period and seek a stay from either the bankruptcy court or the district court that will hear the appeal. The same rule, however, permits the court to make exceptions to that waiting period. Courts regularly shorten the 14-day waiting period where the parties make a showing that value will be lost if the sale does not close immediately. Typically, unsuccessful bidders do not have standing to appeal an approved sale,[218] except to challenge improprieties in the bidding process.[219] The

---

[218] *See In re O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 531 (3d Cir. 1999); *In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997).

grant of a stay ordinarily will require the posting of a bond by the appellant to protect the debtor against any damages that could result from delay.  Absent a stay, which may require a prohibitively expensive bond, the transaction may close.

(iii)    Transfer Taxes

Asset sales made pursuant to a plan of reorganization are exempt from state and local transfer taxes under section 1146(a) of the Bankruptcy Code. While courts previously had split over the issue, the Supreme Court ruled in 2008 that the section 1146(a) exemption is not applicable to asset sales made pursuant to section 363 rather than under a plan of reorganization.[220]  These taxes can be substantial.  For example, the sales tax payable on transfers of tangible personal property is 9% in Los Angeles and is generally 8.875% in New York City (combined state and city rates), numbers large enough to make a difference to a buyer and seller in a bankruptcy sale (depending on which of them has bargained to be liable for the payment).  These taxes would generally not be incurred in the context of a sale of stock of the owner of the relevant property;[221] however, they will be incurred in an asset sale, such as a 363 sale in bankruptcy, unless another exception applies.  Where such taxes are a major economic issue, resort to a plan process should be considered.

**3.    The Auction Process**

The typical procedure for a section 363 sale of substantial assets that commences before a seller has filed a case under chapter 11 would consist of the following:

- The Board of Directors of the seller decides to file bankruptcy and sell assets or the entire company through a section 363 sale.

- The seller and its investment banker or broker, if any, market the assets, either privately or publicly, to likely purchasers, with a

---

[219] *In re Colony Hill Assocs.*, 111 F.3d 269, 274 (2d Cir. 1997) (holding that unsuccessful bidder had standing to assert that successful bidder destroyed the "intrinsic fairness" of the sale transaction and lacked good faith).

[220] *Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S. Ct. 2326 (2008).

[221] Some states and localities impose real estate transfer taxes on the transfer of an controlling interest in an entity that owns real property or an interest therein—notably, New York State (0.4%) and New York City (up to 2.625%).

view to filing a bankruptcy petition with a contract from a bidder in hand.

- After a bidder is identified as offering the highest and best price, agreement on a term sheet, including bid protections for the bidder as "stalking horse," is reached.

- The seller negotiates and enters into a definitive purchase agreement with the bidder, subject to higher and better bids resulting from an auction process to occur after bankruptcy is filed. An asset purchase agreement with a chapter 11 debtor is usually relatively unconditional. Buyer's recourse for misrepresentations is through an escrow or a holdback of part of the purchase price. All of a seller's obligations under the purchase agreement are expressly conditioned on obtaining bankruptcy court authorization, except that the seller commits to file promptly a motion with the bankruptcy court to establish procedures for obtaining approval of the sale.

- The seller simultaneously prepares other necessary papers for bankruptcy filings, including a petition in bankruptcy and schedules of assets and liabilities. Debtor-in-possession financing also must be found, fees, terms and documents must be negotiated and motions for bankruptcy court approval prepared. In some circumstances, it may be appropriate for the prospective acquiror to provide the debtor-in-possession financing.

- The seller files its chapter 11 petition, accompanied by a motion seeking approval of the sale procedures and other matters requiring immediate authorization, such as debtor-in-possession financing. Exhibits to the sale motion should include forms of court orders to be entered upon approval of sale, schedules of assets sold and proposed bidding rules.

- The bankruptcy court conducts a hearing on the sale procedures motion, typically within ten days of the filing of the motion.

- The sale process then goes forward in accordance with the court-approved sale procedures. Prospective competing bidders will have a specified time period to conduct due diligence and submit conforming bids. If other qualified bidders emerge, an auction is then conducted in the bankruptcy court, or, more typically, at the

offices of the seller's law firm. A stenographer should be present to record the auction. (This is especially important if changes to the asset purchase agreement are agreed to during the auction and will need to be reduced to writing later.) After each round of bidding, the seller and its advisors, together with the creditors' committee and its advisors, if one has already been appointed, will analyze the bid and conclude which bid is highest and best.

- Once the winning offer is selected, the final agreement is signed, a motion is made to the bankruptcy court requesting confirmation of the winning bid, and a court order approving the sale to that bidder is entered.

As can readily be seen, the process is intended to cause, and often succeeds in causing, a stalking horse to be out-bid between the time it enters into the initial agreement with a seller and the entry of a bankruptcy court order approving a sale. As a result, the eventual purchase price may greatly exceed the amount of the stalking horse bid, as evidenced by the 2011 sales of substantially all of the assets of Graceway Pharmaceuticals, LLC (in which a stalking-horse bid of $275 million was topped by a winning bid at auction of $455 million) and a patent portfolio held by Nortel Networks (in which a stalking-horse bid of $900 million was topped by a winning bid at auction of $4.5 billion), and by the 2012 sale of substantially all of the assets of A123 Systems, Inc. (in which a stalking-horse bid of $125 million was topped by a winning bid at auction of $256.6 million).

It is advisable for the winning bidder to insist that the debtor seek bankruptcy court confirmation of the auction results as soon as possible to avoid the possibility of a bidder belatedly seeking to top its bid. The pressure in a bankruptcy case to achieve as much value as possible for the estate means that violations of bidding rules approved in a bankruptcy court order sometimes are countenanced, although certainly some (and perhaps most) bankruptcy judges will respect the sanctity of court-approved procedures. In the *Comdisco* chapter 11 case, for example, the winning bidder at an auction for a portion of the debtor's business was SunGard Data Systems, Inc. The United States Department of Justice sued to enjoin the closing on antitrust grounds and Hewlett-Packard Company, the losing bidder, came back with a new offer. Although Hewlett-Packard's bid was lower than SunGard's winning bid, the Creditors' Committee asked the court to approve it because it was not subject to antitrust risk. The court

ruled that the debtor was required to continue with SunGard, in compliance with the court-approved bidding rules.[222]

In another example, in April 2009, in the bankruptcy of Polaroid Corp., the court ordered the reopening of the auction for the assets of Polaroid, allowing the two leading bidders, Patriarch Partners and a joint venture between Hilco Consumer Capital and Gordon Brothers Group LLC, to resubmit bids after the close of the auction.[223]  Patriarch originally had won the auction with a $59.1 million bid, which certain creditors and the debtor preferred to Hilco-Gordon Brothers' $61.5 million bid, which included less cash but granted creditors a larger stake in the company that would be created from the acquired assets.  The Creditors' Committee objected to the results and asked the court to reopen bidding.  Ultimately, the Hilco-Gordon Brothers joint venture won the auction ten days after the order extending it, paying $87.6 million for Polaroid's assets.  The final outcome was further put into doubt when Patriarch, the erstwhile auction winner, filed a notice of appeal after it failed to win the subsequent auction.  Finally, in late May 2009, Patriarch withdrew its appeal, thus ending the saga.[224]

Clearly, then, it is not unheard of for potential acquires to submit "upset" bids even after an auction has formally closed, nor for bankruptcy courts to entertain these late-coming offers.  Recognizing that reopening bidding implicates the competing concerns of maximizing creditors' recovery and ensuring finality and regularity in bankruptcy sales, courts frequently use a "sliding scale" approach, holding that the further along the parties have gotten in the sales process, and the more "crystallized" their expectations of finality, the less likely an upset bid will be allowed.[225]  Thus, if the bankruptcy court has already entered a sale order, a late offer generally will not be allowed except where the previously accepted bid was grossly inadequate or tainted by fraud or mistake.[226]  Before a sale order is entered, however, some bankruptcy courts have exercised broad

---

[222] *See* Bret Rappaport & Joni Green, *Calvinball Cannot Be Played on This Court:  The Sanctity of Auction Procedures in Bankruptcy*, 11 J. BANKR. L. & PRAC. 189 (2002).

[223] Order Continuing Hearing to Authorize (I) the Sale of Certain of the Debtors' Assets, Free and Clear of Liens, Claims, Encumbrances and Interests; and (II) the Granting of Related Relief *In re Polaroid Corp.*, Case No. 08-46617 (GFK) (Bankr. D. Minn. Apr. 7, 2009).

[224] *Lithograph Legends, LLC v. United States Trustee*, Case No. 09-CV-943 (JMR)  (D. Minn. May 20, 2009).

[225] *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 565 (8th Cir. 1997).

[226] *See id.*; *Corporate Assets, Inc. v. Paloian*, 368 F.3d 761, 768 (7th Cir. 2004).

discretion to accept upset bids; courts may be inclined to exercise that discretion depending on the formality and complexity of the auction process, the difficulty in valuing offers, and the clarity of the auction's resolution.[227]  To reduce the risk of upset bids being accepted before a sale order is entered, parties should agree to and follow clear terms in the bidding procedures that unambiguously specify when bidding is to end or, in a suitable case where the bankruptcy judge is amenable and a publicly held auction is not undesirable, hold the auction on the record in open court.[228]

It is not uncommon for a debtor/seller to demand that an underbidder agree to remain bound by its bid until the winning bidder closes.  A cautious underbidder should seek to preserve for itself the opportunity to reconsider its options if a high bidder walks from its deal.  The winning bidder may or may not have been genuine about its intent to close, and may have driven up the price for an underbidder.  If so, an underbidder may find itself not wanting to be bound to what may be an artificially inflated bid.  In addition, the failure of the winning bidder to close may result from its discovery of some problem with the assets or company to be acquired of which the underbidder was unaware, causing the high bidder to renege.  In *In re WestPoint Stevens, Inc.*, the court refused to approve the company's request in its sale procedures motion that losing bidders be

---

[227] *Compare In re Gil-Bern Indus., Inc.*, 526 F.2d 627, 629 (1st Cir. 1975) (not allowing upset bid following straightforward auction involving all-cash offers), *and In re Bigler, LP*, 443 B.R. 101, 108-12 (Bankr. S.D. Tex. 2010) (not allowing upset bid where debtor followed clear and unambiguous bidding procedures and announced a winner, who spent several days preparing to show at the sale hearing that it was ready, willing, and able to close), *with Paloian*, 368 F.3d at 770-71 (allowing upset bid where debtor changed bidding requirements without informing all bidders before auction, bidding procedures order gave debtor wide discretion to reject any bid or impose additional restrictions before sale hearing, and debtor's attorney informed bidders that auction results were not final until approved by the court); *Food Barn Stores*, 107 F.3d at 566 (allowing upset bid where the bankruptcy judge adopted "very informal and flexible" bidding procedures, the "auction [was] marked by a lack of applicable rules and guidelines," the late bidder had received no notice that the auction was about to close and submitted a late bid "[l]iterally seconds" after the end of the auction was announced), *and Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.)*, 980 F.2d 165, 170 (2d Cir. 1992) (allowing upset bid where the auction process was "complex and fluid," "[n]o clear winner emerged," "creditors were split as to which offer presented the best terms, and the bankruptcy court did not rule").

[228] *See Bigler*, 443 B.R. at 116-17 (disallowing upset bid where debtor followed clear bidding procedures and conducted the auction "in a manner that, in all facets, was beyond reproach," but stating also that "the most appropriate approach to maximizing value for the estate—and also the soundest method of maintaining confidence in the system—is to hold auctions in the courtroom, on the record, with the Court serving as auctioneer").

required to keep their down payments in escrow until the closing of the sale to the winning bidder.[229]

Typically, unsuccessful bidders do not have standing to appeal an approved sale, nor do potential bidders have standing to challenge the creation of bid procedures, unless these parties are also creditors.[230]  As discussed in detail in Part IV.C. of this outline, the purchase of claims in a bankrupt company is one way to obtain standing to make these challenges.  Investors should realize that timing is crucial for these purposes.  Once involved in the bidding process, an investor may be forced to enter a nondisclosure agreement with a standstill provision that would make it impossible to buy claims to confer standing.

### 4.    Bidding Incentives

Bidding incentives serve at least three useful functions for a firm selling its assets:  attracting or retaining an initial bid, establishing a bid minimum and attracting additional bidders.[231]  Although some courts have indicated that they will apply a more stringent standard of review to the use of bidding incentives in bankruptcy, the majority of courts permit debtors to use bidding incentives as long as the parties negotiate at arm's length and such incentives encourage, rather than chill, bidding for the assets.[232]

#### a.    Types of Bidding Incentives and Protections

Sellers customarily offer potential stalking horses incentives and protections to induce them to act as a stalking horse.  Typical bidding protections include the following:

---

[229] Order Denying Debtors' Motion to Approve Bidding Procedures and Related Relief, *In re WestPoint Stevens Inc.*, No. 03-13532 (RDD) (Bankr. S.D.N.Y. Apr. 7, 2005); Motion to Approve Bidding Procedures and Related Relief, *In re WestPoint Stevens, Inc.*, No. 03-13532 (RDD) (Bankr. S.D.N.Y. Mar. 9, 2005).

[230] *Compare In re O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 531 (3d Cir. 1999) (holding that disappointed bidder who was not a creditor lacked appellate standing), *with In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997) (holding that disappointed bidders had standing as creditors of the estate).

[231] *In re Integrated Res., Inc.*, 147 B.R. 650, 662 (S.D.N.Y. 1992).

[232] *See id.* at 657; Cf. *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d at 535 (holding that bidding incentives such as break-up fees will be approved only if they are actual and necessary expenses of the estate).

### (i)    Expense Reimbursement

At a minimum, a stalking horse will require that a seller commit to reimbursing the out-of-pocket costs of its due diligence, generally subject to a cap, in the event that the stalking horse is outbid.  One frequent area of dispute is whether expense reimbursement is limited to out-of-pocket costs or whether compensation for time invested by a prospective purchaser's personnel is included as well.  Provided that an initial bidder has made a fully committed, unconditional bid, expense reimbursement makes sound economic sense for a seller's estate, which benefits from a stalking horse's efforts to the extent of the excess of the ultimate purchaser's price over the stalking horse's offer, minus the cost of reimbursement.[233]  An expense reimbursement provision thus is considered to be the least controversial form of bidding protection.[234]

### (ii)    Break-Up Fees

A break-up fee is "an incentive payment to a prospective purchaser with which a company fails to consummate a transaction."[235]  Generally, a seller agrees to provide a stalking horse with a break-up fee of a specified dollar amount or a percentage of the transaction value (often in the range of 3%) if the stalking horse's bid attracts better offers and the seller consummates a sale to a higher bidder.[236]  A potential stalking horse may argue that the risk of non-consummation should fall on the estate if an alternative purchaser is selected, but the debtor frequently insists that the fee is only payable if a sale actually occurs. Measuring the transaction value (for example, the extent to which assumed liabilities should be included in "transaction value") is often a fertile field for contention.  The amount of a break-up fee creates an initial bidding increment:  a seller will not accept a bid lower than the sum of a stalking horse's offer plus the break-up fee (plus expense reimbursement).  Break-up fees in bankruptcy are not

---

[233] *See* Paul B. Lackey, Comment, *An Empirical Survey and Proposed Bankruptcy Code Section Concerning the Propriety of Bidding Incentives in a Bankruptcy Sale of Assets*, 93 COLUM. L. REV. 720, 739-40 (1993).

[234] For purchases of small amounts of assets, courts have approved fees in the amount of actual expenses up to 30% of the purchase price.  *See In re Tama Beef Packing, Inc.*, 321 B.R. 496 (B.A.P. 8th Cir. 2005) (approving grant of expenses totaling 29.4% of ultimate purchase price of $153,000).

[235] *In re Integrated Resources*, 147 B.R. at 653.  Break-up fees also are known as termination fees because they represent compensation for the termination (or break-up) of the relationship between a seller and a stalking horse.

[236] *See In re S.N.A. Nut Co.*, 186 B.R. 98, 101, 106 (Bankr. N.D. Ill. 1995).

unique to section 363 sales. They also have been used to incentivize stalking-horse bidders in agreements to purchase an entire debtor company pursuant to a chapter 11 plan of reorganization.[237]

Break-up fees can be far more controversial than expense reimbursement provisions because they provide an opportunity for a stalking horse to "profit" at the expense of a seller's estate. Stalking horses and sellers often characterize break-up fees as compensation for establishing a bidding floor and for the opportunity cost of time and money incurred by the stalking horse in preparing a bid.[238] This position is likely most powerful with acquisition agreements that have a high degree of certainty of closing. Detractors note that a break-up fee also can be a powerful tool for a seller aiming to "steer" a sale to a favored prospective purchaser, *e.g.*, a bidder that is likely to retain current management after completing the sale.[239] However, because opportunity costs are difficult to quantify, the precise amount of a large break-up fee can be difficult to defend in the face of arguments that the break-up fee may chill bidding, will reduce the net proceeds to the seller's estate or is being used to improperly influence the outcome of an auction. The larger the break-up fee, the more the fee has the potential to chill bidding and produce an unattractive result from an estate's perspective.[240] It generally is accepted among bankruptcy practitioners that a court is likely to approve a break-up fee that does not exceed 3% of transaction

---

[237] *See In re Fruit of the Loom, Inc.*, No. 99-4497, (PJW) (Bankr. D. Del. 2002), No. 3463 (approving $22.5 million break-up fee representing 2.75% of $835 million bid to purchase debtor corporation); *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 639 (Bankr. S.D.N.Y. 2006) (referring to $443 million break-up fee, which represented 2.5% of $17.6 billion bid to purchase debtor corporation), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006).

[238] *See* Lackey, *An Empirical Survey*, *supra* n. 233, at 739-40.

[239] *Id.* at 738.

[240] There are few published opinions declining to approve a purchase agreement based on the size of the break-up fee alone. For a rare example, *see In re Twenver, Inc.*, 149 B.R. 954, 956-57 (Bankr. D. Colo. 1992) (holding that 11% break-up fee on $450,000 bid was unreasonable and could hamper prospects for a higher bid). Rather, courts tend to focus on the *process* by which a debtor and a stalking horse bidder entered into an agreement. *See Gey Assocs. Gen. P'ship v. 310 Assocs., L.P.*, 2002 WL 31426344, at *2 (S.D.N.Y. Oct. 29, 2002) (noting that bankruptcy judge rescinded approval of break-up fee after discovery that there were already multiple interested bidders and that imposition of break-up fee would hamper the debtor's ability to sell to highest bidder); *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 552-53 (Bankr. S.D.N.Y. 1997) (rejecting topping and expense-reimbursement fees on finding of "manifest self-dealing" and lack of full and fair bidding process, and characterizing fees of 4.4% to 6% as "on the high side").

price, although break-up fees in bankruptcy cases are often smaller.[241]   Three percent, however, is not a hard and fast limit, especially in situations of particular seller distress.  In the *Lehman Brothers* chapter 11 case, for example, a break-up fee of 8% on a bid for the investment management company Neuberger Berman was approved by a bankruptcy court concerned that failure to approve the break-up fee could cause the purchaser to walk and leave no bidders for the asset.

(iii)    Minimum Overbids

In addition to requiring any competing bidder to top a stalking horse's bid by the amount of the break-up fee, sale procedures often require the initial competing bid to exceed a stalking-horse bid by a certain amount.  Minimum overbids generally are approved if reasonable; aside from providing some modicum of deal protection, they minimize the incurrence of unnecessary transaction costs related to overbids that do not materially benefit an estate.

(iv)    Other Terms of Sale

A sale transaction typically involves important terms other than the price. For example, provisions regarding the extent of the assets included in the sale, the treatment of executory contracts, the assumption or other treatment of debt secured by the assets included in the sale, any upfront deposit against the purchase price, the treatment of management and other employees, the timing of the closing, and closing conditions may be material in the context of a particular transaction.

---

[241] Courts tend to approve as reasonable a break-up fee in the range of 1% to 3% of the purchase price in the bid, with an additional allowance for expenses incurred by the bidder.  *See, e.g.*, *In re APP Plus, Inc.*, 223 B.R. 870, 876 (Bankr. E.D.N.Y. 1998) (approving 1.25% break-up fee on $20 million bid); *In re CXM, Inc.*, 307 B.R. 94, 97 (Bankr. N.D. Ill. 2004) (break-up fee of 3.2%, inclusive of expenses, on $6.254 million bid); *In re Fortunoff Fine Jewelry & Silverware, LLC*, 2008 WL 618986, at *47 (Bankr. S.D.N.Y. Feb. 15, 2008) (2.8% break-up fee, plus reimbursement of expenses up to additional 1.25%, on $80 million bid); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 118 (Bankr. D. Del. 2005) (2.9% break-up fee, plus reimbursement of expenses up to additional 1.9%, on $1.75 million bid).  Some cases appear to have approved larger break-up fees.  *See In re Republic Engineered Products Holdings LLC*, No. 03-55118 (Bankr. N.D. Ohio Nov. 7, 2003) (No. 205) (7.5% break-up fee, plus reimbursement of expenses up to additional 2.5%, on $40 million bid); *In re Philip Servs. Corp.*, No. 03-37718 (Bankr. S.D. Tex. Aug. 4, 2003) (No. 524) (14.3% break-up fee, plus reimbursement of expenses up to additional 2.9%, on $35 million bid); *cf. In re Global Crossing Ltd.*, 295 B.R. 726, 740 n.51 (Bankr. S.D.N.Y. 2003) (applying business judgment rule and approving liquidated damages provision that had "the effect of a break-up fee in material respects" of 12% of $250 million bid). *See also In re Hupp Indus., Inc.*, 140 B.R. 191, 193 (Bankr. N.D. Ohio 1992) (deeming reasonable 2.1% break-up fee, plus reimbursement of expenses up to additional 1.1%, on $4.75 million bid).

The importance of these terms is vividly illustrated by the sale of certain assets of the Innkeepers USA Trust.  The successful bidder at an auction of the Innkeepers assets signed a commitment letter that provided for a deposit of less than 2% of the value of the successful bid (a deposit of $20 million in comparison to a bid value of more than $1.1 billion) and that arguably limited the seller's damages in the event of a default by the bidder to the deposit.  In light of the small size of the deposit and the limitation on damages, the seller had little ability to enforce consummation of the sale.  Accordingly, when the bidder threatened to walk away from the sale, the seller was forced to renegotiate, resulting in a substantially reduced purchase price.[242]

In the past, it was not uncommon to require that competing bidders be limited to the form of purchase contract negotiated by the stalking horse.  This may be viewed as enhancing the comparability of competing offers, creating a "level playing field" or reducing the costs of the transaction, but it also can provide effective—and arguably unfair—protections for the stalking horse that will insist on a structure that suits it and may be designed to chill bidding by firms with different bid characteristics.  For example, a financial purchaser may agree to a purchase agreement that does not require the inclusion of a provision conditioning its obligations on compliance with antitrust laws and obligates the purchaser to retain the existing management, whereas a strategic purchaser might find such a purchase agreement problematic.  Today, competing bidders generally are permitted to submit non-conforming bids, though they are generally required to submit a markup of their proposed form against the stalking horse's form of agreement.

> b.     *When to Seek Bidding Protections*

Ideally, a potential purchaser would obtain the benefit of bidding protections and incentives *before* commencing due diligence.  That is unusual, however, and given the need for court approval, could not occur prior to the bankruptcy filing.  Normally, a seller is unable to provide a binding commitment before the potential purchaser incurs its due diligence costs, and a potential purchaser must proceed on a non-binding promise from a seller that, if the potential purchaser is the stalking horse, then the seller will seek to include the

---

[242] *See* Order (I) Authorizing Fixed/Floating Debtors to Enter Into Second Amended Commitment Letter, (II) Approving (A) Modifications to Fixed/Floating Plan and Confirmation Order and (B) Amended New HoldCo/Midland Commitment, (III) Authorizing Fixed/Floating Debtors to Settle Adversary Proceeding Upon Consummation of Modified Fixed/Floating Plan, *In re Innkeepers USA Trust*, No. 10-13800 (SCC) (Bankr. S.D.N.Y. Oct. 21, 2011).

agreed-upon bid protections in the bid procedures order submitted for bankruptcy court approval.[243]

Although reimbursement for actual expenses incurred, subject to a cap, is unlikely to meet substantial opposition, a seller is unable to provide a stalking-horse bidder with any assurance that break-up fees or other protections and incentives will be approved.  Thus, in determining the sufficiency of proposed bidding incentives and protections, a potential bidder often will have to take into consideration both (1) the precedents and predictability of the specific bankruptcy court to which the sale procedures will be submitted for authorization and (2) whether opposition may be expected from key parties in interest, including the official committee of unsecured creditors and the United States Trustee.

Another risk to stalking horse bidders that is difficult to eliminate is that, prior to a bid procedures hearing, a competing bidder will make a superior bid and demand to be substituted as the stalking horse.  For example, at the bid procedures hearing for the sale of the Baltimore Orioles in the bankruptcy of its majority owner, a group led by Peter Angelos that eventually ended up winning the auction offered to match the transaction that the stalking-horse bidder had negotiated, but drop the bid protections required by that bidder.

When a stalking horse is replaced prior to or at the bid procedures hearing, it can be difficult for that party to convince the court and other stakeholders that it is entitled to deal protection measures previously agreed to by the debtor, such as a break-up fee.  In the 2005 bankruptcy of commodities brokerage Refco, the initial stalking-horse bidder, J.C. Flowers & Co., emerged with a bid to save the company, which was rapidly losing customers in the wake of revelations of financial fraud, and sought a break-up fee in excess of $20 million.   However, competing bidders showed up at the bid procedures hearing and offered to take Flowers' terms (which significantly undervalued the company) with no break-up fee at all.  The court declined to approve the Flowers break-up fee and Man Financial ultimately prevailed in the auction.  Similarly, after Penn National Gaming agreed to make a stalking-horse bid for the troubled Fontainebleau Las Vegas casino resort in November 2009, Carl Icahn emerged just days before the

---

[243] *See, e.g.*, *In re Beth Isr. Hosp. Ass'n of Passaic*, 2007 WL 2049881, at *15-16 (Bankr. D.N.J. July 12, 2007) (declining to authorize expenses pursuant to an agreement that was not binding on the debtor because it was not approved by the bankruptcy court); *In re Asia Global Crossing, Ltd.*, 326 B.R. 240, 256 (Bankr. S.D.N.Y. 2005) (holding that a debtor that has executed a contract for the sale of its assets is not bound by that contract until it receives court approval, and that, prior to such approval, the debtor may, without consequence, abandon the contract and withdraw the application for court approval).  *See also* Part II.C of this outline pertaining to pre-negotiated 363 sales.

bid procedures hearing with an offer that topped Penn's and, after a live auction between Penn and Icahn at the bid procedures hearing, was ultimately selected as the stalking horse.  When no other bidders emerged and Penn did not submit another bid at the subsequent auction, Icahn won uncontested. Despite coming forward with serious bids, creating a floor for the seller and investing their own resources in due diligence and negotiations, these would-be stalking horse bidders were left with no bid protections or even expense reimbursements to show for their trouble.[244]

A related risk is that, to obtain court approval of its bid protections, the stalking-horse bidder will have to increase its offer in the face of a competing bid. For example, in the 2012 bankruptcy of Residential Capital LLC, Fortress Investment Group LLC signed a stalking-horse agreement for ResCap's mortgage unit that included a $72 million break-up fee, but did not promptly obtain court approval of its bid protections.  One month later Berkshire Hathaway offered the same price with only a $24 million break-up fee.  Fortress was ultimately able to remain the stalking horse, but only by raising its bid by $125 million and agreeing to reduce its break-up fee to $24 million.

To combat these risks, buyers with the leverage to do so may seek to insert a "no shop" provision in the stalking-horse asset purchase agreement, prohibiting the seller from cooperating with other potential bidders until after the stalking horse bid is approved at the bid procedures hearing. Although such a provision may be unenforceable against the debtor until the court approves it, at a minimum it gives the stalking horse bidder the right to terminate its bid if the debtor courts other offers prior to the hearing.  A debtor who disregards such a provision thus risks termination of its stalking horse bid before an alternate bid can be secured, and the prospect of being left with no stalking horse whatsoever should provide at least some incentive to abide by the no-shop.

Even when no competing stalking horse bid emerges, some bankruptcy courts have been reluctant to approve bidding protections and incentives at a bid procedures hearing, particularly in the face of substantial opposition, and thus

---

[244] A recent case suggests an alternative route for losing bidders seeking reimbursement of legal fees and expenses.  In *In re S & Y Enterprises, LLC*, 2012 Bankr. LEXIS 4622, at *4-*5 (Bankr. E.D.N.Y., September 28, 2012), the court held that the losing bidder had standing to apply for reimbursement on the theory that its legal fees and expenses constituted a "substantial contribution" to the reorganization of the debtor, giving rise to an administrative expense claim under section 503(b)(3)(D).  Ultimately, however, the court declined to award reimbursement because the bidder failed to prove that its expenditures were "of such consequence to the bankruptcy process and the parties as a whole that the debtor's estate, rather than the entity should bear the reasonable cause of those contributions…." *Id.*, at *2.

have deferred a decision on such matters until a final hearing on a sale.  A bidder that does not receive its bargained-for protections at a bid procedures hearing generally is entitled under the purchase agreement to withdraw its bid.  If a bidder moves forward with that bid, however, it may later find it difficult to obtain desired protections and incentives in the event it is outbid.[245]

Investors considering transactions in bankruptcy proceedings in the Third Circuit, most notably Delaware, should be aware that the standard for approval of breakup fees there is more onerous than in other jurisdictions.  Rather than deferring to the debtor's business judgment, courts in the Third Circuit evaluate whether a break-up fee is "actually necessary to preserve the value of the estate" under the Bankruptcy Code's postpetition administrative expense provision, section 503(b).

This heightened standard for approval stems from the decision of the Third Circuit Court of Appeals in *In re O'Brien Environmental Energy*,[246] which rejected a break-up fee where a potential purchaser did not obtain bid protection prior to bidding and seemingly would have bid regardless of whether a break-up fee was offered.[247]  Without articulating a specific set of factors for determining the propriety of a break-up fee, the court concluded that any right to a break-up fee would have to derive from Bankruptcy Code section 503's requirement that an administrative expense be "actually necessary to preserve the value of the estate."[248]  The court found that awarding the stalking-horse fees was unnecessary to the preservation of the estate because the large difference between the stalking-horse's original offer and the final price "strongly suggests that it was the prospect of purchasing [the debtor] cheaply, rather than the prospect of break-up fees or expenses, that lured [the stalking horse] back into the bidding."[249]  The court also determined the break-up fee to be unnecessary because the stalking horse could produce no evidence that its bid was a catalyst for further bidding, rather than simply a minimum bid.  Finally, because the debtor gathered and

---

[245] *See In re Dorado Marine, Inc.*, 332 B.R. 637 (Bankr. M.D. Fla. 2005) (holding that stalking-horse bidder was not entitled to negotiated break-up fee where initial court order had deferred consideration of fee); *In re Diamonds Plus, Inc.*, 233 B.R. 829 (Bankr. E.D. Ark. 1999) (refusing to award break-up fee because of lack of binding agreement approved by court).

[246] 181 F.3d 527 (3d Cir. 1999).

[247] *Id.* at 532-38.

[248] *Id.* at 532-33, 535-37.

[249] *Id.* at 537.

provided to all bidders much of the information they needed to decide whether to bid, and the stalking horse had "strong financial incentives to undertake the cost of submitting a bid," the court found that reimbursement of expenses was unnecessary to preserve value for the estate.[250]

A more recent opinion from the Third Circuit, in *In re Reliant Energy Channelview LP*,[251] involved an asset purchase agreement by Kelson Channelview LLC which included certain bid protections, including a break-up fee, and required the debtors to seek court approval of those protections. The bankruptcy court approved some of the bid protections but rejected the break-up fee and declined to authorize the sale without a competitive auction. Kelson did not participate in the auction and was outbid. Following *O'Brien*, the Third Circuit concluded that the break-up fee was not necessary to preserve the estate because Kelson's agreement was conditioned only on the debtors' seeking approval of the bidding protections, not on the court's actual approval. The fact that Kelson made its bid without assurance that it would be paid a break-up fee "destroy[ed] Kelson's argument that the fee was needed to induce it to bid."[252] In addition, the court recognized that the break-up fee provision might have benefited the estate by preventing Kelson from abandoning the transaction, but agreed with the bankruptcy court that such a benefit was outweighed by the potential harm the break-up fee could do by chilling bidding, especially given evidence of another suitor willing to make a higher offer.[253]

### 5.    To Be or Not To Be the Stalking Horse

In addition to the bidding incentives and protections often granted to a stalking horse, discussed in Part III.A.4.a of this outline, there are many other advantages for a prospective purchaser to be selected as the stalking horse bidder, as well as a few reasons why it may not want to be. A stalking horse generally has superior access to information from and communication with a debtor. The stalking horse will be able to perform its due diligence before others are on the scene and will have some ability to set the transaction timetable. Members of a seller's management likely will make themselves available to a stalking horse, making it possible for the stalking horse to perceive value in the company or the assets that cannot be perceived from the outside, as well as to discern potential

---

[250] *Id.* at 537-38.

[251] 594 F.3d 200 (3d Cir. 2010).

[252] *Id.* at 207.

[253] *Id.* at 207-08.

risks that may otherwise be difficult to discern. This superior information flow allows the stalking horse to make its bid with greater confidence and, thus, may well enable it to bid more than others. Competing bidders, which will likely bid with less time to perform due diligence and less access to management, may discount their price to compensate for the greater uncertainty as to the value and risk of the assets they are purchasing. A stalking horse also has the advantage of being able to shape the transaction—identifying the assets to be purchased, the timing and other matters in a way that is particularly advantageous to it but not necessarily to competing bidders.

Why, then, might a potential bidder choose not to be the stalking horse? In bankruptcy, a prospective acquiror always will be given the opportunity to bid even without investing the time and expense that a stalking horse must put in. A competing bidder has the ability to lie in the weeds, waiting to see what the stalking horse will do, taking advantage of the stalking horse's due diligence, its work in drafting a purchase contract and its signaling of value by making an initial bid. Moreover, as discussed above, it may be possible for a competing bidder to oust a would-be stalking horse from that position before any bid protections have been approved at the bidding procedures hearing.

### 6. Credit Bidding

#### a. *Credit Bidding Existing Claims*

Whether in a foreclosure sale governed by state law or in a bankruptcy sale pursuant to section 363, secured creditors ordinarily may use their claims as consideration for a purchase of their collateral.[254] Since a creditor is not bidding with cash, it may be able to bid more than a competing bidder that will be required to pay cash, providing the creditor with a substantial advantage in an auction. Additionally, as the holder of the debt secured by the property, a credit bidder benefits directly from any increase in the sale price if others bid cash in response to its credit bid. And when no one shows up to become a stalking horse bidder and start an auction off well, or only one bidder surfaces, a back-up bid from a debtor's secured creditors can stimulate bidding and drive prices higher. Of course, an astute third-party bidder, noting the ease with which secured creditors can top a cash bid, will take this into account in bargaining for bidding incentives.

---

[254] *See, e.g.*, 11 U.S.C. § 363(k) (providing that a holder of a claim that is secured by property may bid at a sale of such property and offset such claim against the purchase price unless the court for cause orders otherwise).

Difficulties with credit bidding can arise if the secured creditors' claims or liens are subject to challenge, either by the debtor or by other creditors. For example, in the 2012 bankruptcy of United Retail Group, Inc., a potential purchaser acquired and attempted to credit bid secured claims originally held by the debtor's parent. The creditors' committee objected to the proposed credit bidding on several grounds including (i) the calculation of the amount of the secured claims and (ii) the insider status of the entity that had originally held the secured claims. Although a settlement permitting the purchaser to credit bid the claims in question was reached in a timely fashion, a buyer seeking to employ a credit bid must be mindful that such a bid may be subject to the risk and delay of litigation.

Difficulties may also arise if not all creditors within a class holding a lien on a debtor's assets are willing to credit bid. In *In re GWLS Holdings, Inc.*,[255] the Bankruptcy Court for the District of Delaware suggested that it will not allow dissenting lenders to prevent a class of lenders from credit bidding. Specifically, the court, relying on contractual provisions entitling the collateral agent under a secured credit facility to exercise all available rights and remedies, including the right to dispose of all or a portion of the collateral, on behalf of the lenders, concluded that the collateral agent could credit bid the whole of the outstanding debt under the credit facility over the objection of a lender holding a small portion of the debt.[256]

A similar result was reached by the Bankruptcy Court for the Southern District of New York in *In re Metaldyne Corp.*[257] Relying both on *GWLS* and the Second Circuit's decision in *Chrysler*—which held that an agent could consent to the sale free and clear of a group of lenders' liens—the court authorized the sale of substantially all of the debtor's assets in accordance with the credit bid of an agent for a consortium of lenders under a term loan facility. The court rejected the argument of a holder of less than 1% of the facility that each lender had the sole authority to control the bidding of its own claim where the loan documents gave the agent the right to "exercise any and all rights afforded to a secured party"

---

[255] 2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009).

[256] *Id.* at *5-6; *accord* Transcript of Hearing at 33-34, *In re Foamex Int'l*, No. 09-10560 (Bankr. D. Del. May 26, 2009) ("[I]t's a natural consequence of the authority given the agent in the credit agreement that it be able to do a 363(k) credit bid. . . . To read it any other way would . . . lead to chaos in 363 sales.").

[257] 409 B.R. 671 (Bankr. S.D.N.Y. 2009), *aff'd*, 421 B.R. 620 (S.D.N.Y. 2009). *See also In re GSC, Inc.*, 453 B.R. 132 (Bankr. S.D.N.Y. 2011).

under applicable law.[258]   It is not entirely certain, however, whether courts will follow *GWLS* and *Metaldyne* in cases where the dissenting lenders form a larger portion of the relevant class of secured creditors.

Special problems in obtaining clear title also can arise if the collateral is subject to junior liens.  Foreclosing credit bidders often take the view that their credit bid is equivalent to putting up cash, receiving it back and paying down their debt (*i.e.*, "round-tripping" their cash).   Accordingly, they argue that any competing bid that defeats their bid must be in cash or at least include enough cash to pay down their debt.  Competing bidders, particularly those junior to a credit bidder, may have difficulty putting up enough cash depending upon the economic environment and are likely to bid cash together with other securities.

A typical multi-lien intercreditor agreement will provide that junior creditors may not receive any proceeds until the senior creditors are paid in full in cash.  Thus, junior bidders hoping to bid in a combination of cash and securities or other assets may not be able to distribute anything but cash to the senior creditors.  This issue was squarely presented in the section 363 sale of WestPoint Stevens, in which Carl Icahn and others in his "cross-lien" group that held debt in multiple classes attempted to bid with both cash and a minority share of equity in the acquiring entity's parent company.  The district court found that nothing in the underlying credit documents or the Bankruptcy Code allowed the Icahn bid's in-kind (rather than cash) distribution to the first-lien lenders and vacated the bankruptcy court's approval of the sale to Icahn.[259]   Subsequently, however, the Second Circuit concluded that, although the district court had correctly interpreted the underlying credit documents, section 363(m) (discussed in Part III.A.2.a.iii.A of this outline) precluded the district court from overturning the sale and allowed only a limited remedy by increasing the compensation to various interested parties.[260]

Another typical intercreditor provision forbids junior creditors from taking any action that would hinder or delay the senior creditors' enforcement of their liens on the collateral.   Such a provision also could potentially prohibit a competing junior bid, depending on the court's willingness to enforce it.

---

[258] *See Metaldyne*, 409 B.R. at 676-78.

[259] *See Contrarian Funds, LLC v. WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.)*, 333 B.R. 30 (S.D.N.Y. 2005).

[260] *See Contrarian Funds, LLC v. Aretex LLC (In re WestPoint Stevens, Inc.)*, 600 F.3d 231, 254-60 (2d Cir. 2010).

Since the Third Circuit's decision in *Cohen v. KB Mezzanine Fund II, L.P.*—better known as "the SubMicron case"—there is little doubt that creditors may credit bid up to the full face amount of their debt regardless of the underlying collateral value.[261]  This allows a credit bidder whose claim is substantially undersecured to push the price well above the value of the asset.  Nevertheless, creditors should bear in mind that credit bidding less than face value may also be desirable for reasons such as preserving deficiency claims on the debtor's residual estate or conserving a credit bid cushion to defeat competing bids.

Until recently, there was a split of authority as to whether credit bidding must be allowed in connection with a sale free and clear of a secured creditor's liens that is effectuated under a reorganization plan, rather than pursuant to section 363.[262]  However, as discussed in greater detail in Part III.B.2.f of this outline, the Supreme Court resolved that split in favor of secured creditors' right to credit bid in *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,[263] holding that proponents of a plan that calls for collateral to be sold free and clear of liens cannot circumvent the requirement under section 1129(b)(2)(A)(ii) that secured creditors be allowed to credit bid their collateral by instead giving those secured creditors the "indubitable equivalent" of their claims under section 1129(b)(2)(A)(iii).  After *RadLAX*, the right to credit bid can no longer be limited more readily through the plan process than under section 363.  Under both provisions of the Bankruptcy Code, credit bidding must be allowed when an asset is sold free and clear of liens, "unless the court for cause orders otherwise."[264]

### b.  Secured DIP Financing Debt as Currency

A potential acquiror may want to consider the value of extending to the debtor post-bankruptcy secured DIP financing as a mechanism to facilitate the purchase of assets in bankruptcy.  Where it is apparent that a debtor (1) requires DIP financing to fund its operations in bankruptcy and (2) will be selling desirable assets during the case, the acquiror can provide secured financing on the

---

[261] *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448 (3d Cir. 2006).

[262] *See In re River Road Hotel Partners, LLC*, 651 F.3d 642 (7th Cir. 2011); *In re Phila. Newspapers, LLC*, 599 F.3d 298 (3d Cir. 2010); *In re Pac. Lumber Co.*, 584 F.3d 229 (5th Cir. 2009).

[263] 132 S. Ct. 2065 (2012).

[264] *See* 11 U.S.C. § 1129(b)(2)(A)(ii) (providing for sale free and clear of liens under plan "subject to section 363(k)"); 11 U.S.C. § 363(k) (requiring credit bidding to be allowed "unless the court for cause orders otherwise").

express understanding that it will be entitled to "bid in" or "credit bid" that debt to purchase those assets of the debtor that secure its financing, as section 363(k) of the Bankruptcy Code expressly permits.  Or, more ambitiously, the DIP financing can be used as currency to fund a plan in which the DIP lender takes control and cashes out the prepetition creditors for their appropriate share of the loan proceeds.

In the *Frank's Nursery & Crafts, Inc*. chapter 11 case, for example, Kimco Capital Corporation extended a $75 million prepetition facility to the debtor, secured by the debtor's owned and leased real estate assets, and purchased a significant amount of the company's equity.[265]  Following the bankruptcy filing, Kimco extended an additional $27.5 million in credit to fund the debtor's postpetition operations, including the funding of a sale process for certain collateral assets, the proceeds of which reduced Kimco's prepetition debt.  In addition, Kimco extended a special $7.5 million DIP loan to allow the debtor to exercise a purchase option on a valuable piece of property.  Kimco ultimately took control of the company (including the new property) through a plan process in which it essentially rolled its DIP loans into a combination of new equity and new exit financing and funded the lion's share (and backstopped the entirety) of the amount required to pay the plan's distributions to other debt and equityholders.

It is also possible to have the DIP financing exchanged for equity in the post-bankruptcy entity.  For example, in the bankruptcy of General Growth Properties, Pershing Square Capital Management proposed a credit agreement for DIP financing pursuant to which, upon the effective date of a plan of reorganization, General Growth would issue warrants to Pershing to acquire equity securities of General Growth and certain subsidiaries for a nominal exercise price.  While an alternative DIP agreement ultimately prevailed, that agreement, like the Pershing proposal, allowed General Growth to satisfy a portion of the DIP obligation with stock of the reorganized company.

The provision of DIP financing may also enable a creditor to receive enhanced treatment of its prepetition claims.  During the 2008 financial crisis, with its negative impact on the availability of traditional DIP financing, the available DIP loans were frequently so-called "defensive" DIP loans, provided by existing secured lenders in an effort to protect their prepetition liens and claims against the losses that could result from liquidation.  When there were no realistic alternatives to DIP financing offered by existing lenders, debtors had to offer

---

[265] *In re Frank's Nursery & Crafts, Inc.*, Case No. 01-52415 (Bankr. D. Md. 2001).

extraordinary terms for such financing, including generous commitment and exit fees, high interest rates, and other creative inducements.  Included among these inducements were so-called "roll-up" financing structures, which afforded prepetition secured lenders the opportunity to convert their prepetition claims into postpetition claims.  Bankruptcy courts generally approved such structures when the prepetition lenders were over-secured and agreed in connection with the roll-up to advance new money loans that the debtor demonstrated were critical in a situation where the debtor had no reasonable alternative financing options. Typically, roll-up loans were secured by postpetition liens on substantially all of the debtor's assets, subject only to the liens securing the new money loans, and enjoyed superpriority administrative expense status, again subject only to such status afforded to the new money loans.

*In re Lyondell Chemical Company* provides an illustration of this structure.  In *Lyondell*, the bankruptcy court approved an arrangement whereby a portion of the debtor's first lien prepetition debt was rolled up into a new tranche of postpetition DIP loans in connection with the  first lien lenders' providing new-money financing to the debtors.  The court order approved the characterization of the roll-up loans as postpetition secured obligations entitled to super-priority administrative expense status junior only to the new money tranches of the DIP facility.  While requiring the debtors to use reasonable efforts to repay the roll-up loans upon consummation of a plan, the final DIP order permitted the debtors to refinance the roll-up loans with debt securities of the reorganized debtor subject to pre-negotiated terms regarding maturity and security.[266]  Ultimately, the approved roll-up loans proved to be key fulcrum currency that the roll-up lenders could employ to obtain confirmation of the Lyondell chapter 11 plan.

With the abatement of the 2008 financial crisis, DIP loan structures (such as roll-ups) prevalent during the crisis have become less common.

### 7.    The Foreign Bidder/CFIUS

Non-U.S. purchasers face additional regulatory and political hurdles when bidding on U.S. assets.  Any transaction in which a non-U.S. purchaser obtains

---

[266] *See In re Lyondell Chem. Co.*, No. 09-10023 (REG), slip op. (Bankr. S.D.N.Y. Mar. 1, 2009); *see also* Final Order Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to (I) Use Cash Collateral, and (II) Obtain Postpetition Financing, and (B) Granting Adequate Protection; *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS) (Bankr. D. Del. Mar. 18, 2009) (approving DIP loan consisting of $575 million revolver and approximately $500 million new money term loan and permitting DIP lenders to roll-up as much as $540 million of prepetition debt).

control of a U.S. business or invests in U.S. infrastructure, technology, or energy assets is subject to review by the Committee on Foreign Investment in the United States ("CFIUS"), an inter-agency committee headed by the Secretary of the Treasury.  Although CFIUS has the ability to investigate any transaction at its discretion, it is prudent to make a voluntary filing if the likelihood of investigation is reasonably high.  CFIUS undertakes a 30-day review process to identify any national security concerns arising from a transaction, during which it can request additional information from the parties and initiate a subsequent 45-day investigation.  Under certain circumstances, CFIUS may also refer a transaction to the President for approval, in which case the President must announce a decision within 15 days.

CFIUS has received more attention recently due to its recommendations against Chinese-owned Ralls Corp.'s purchase of U.S. wind farms near a U.S. Navy base and Huawei's purchase of intellectual property and other assets from 3Leaf Systems.  The perceived risk of CFIUS disapproval may in some cases provide a benefit to U.S. bidders, leading a debtor to apply a discount to a bid from a foreign company.  To reduce the risk of CFIUS rejection, non-U.S. bidders can benefit from suggesting methods of mitigation early in the review process and initiating discussions with the Treasury Department prior to a formal filing.  Retaining advisors with significant CFIUS experience and crafting a communications plan is crucial to successfully navigating the CFIUS process.

A pair of recent bankruptcy cases illustrates the importance of planning and accounting for the CFIUS review process.  In the Hawker Beechcraft bankruptcy, the proposed sale of assets to the Chinese buyer Superior Aviation Beijing Co. was not completed, and Hawker eventually emerged from chapter 11 as a standalone company.  Although the CFIUS process had not yet begun, press reports suggest that CFIUS-related risk, and in particular the potential difficulty in separating Hawker's defense business from the remainder of the business, was a factor in the unsuccessful sale negotiations.[267]  In contrast, the Chinese automotive parts manufacturer Wanxiang successfully purchased the assets of A123 Systems, an electric car battery manufacturer, in a section 363 auction and obtained CFIUS approval for the transaction.  In the auction, Wanxiang paired up with the U.S.-based company Navitas, which bid separately on A123's defense business.  Additionally, the deal was structured so that Wanxiang, rather than A123 and its creditors, would bear the risk of CFIUS disapproval:  The parties agreed that the sale would close into a trust pending CFIUS approval, so that if

---

[267] See Staff, Report: *Hawker's deal in China scuttled by governmental concerns*, WHICHITA BUSINESS JOURNAL (Oct. 19, 2012), *available at* http://www.bizjournals.com/wichita/morning_call/2012/10/report-hawkers-deal-in-china.html.

CFIUS approved the sale the trust would dissolve and the assets would go to Wanxiang, but if CFIUS rejected the sale the trust would sell the assets and Wanxiang would receive the proceeds.  Ultimately, the trust structure was not employed before CFIUS approved the sale.  The A123 case serves as a potential model for how a non-U.S. bidder can make itself more attractive to a debtor and its constituents by minimizing the risk that a sale will not close due to failure to obtain regulatory approvals.

**B.  Acquisitions Through the Conventional Plan Process**

The acquisition of a company through a plan of reorganization, rather than through a section 363 sale, requires an understanding of an elaborate system of rules, timetables and requirements imposed by the Bankruptcy Code and the Bankruptcy Rules.  While it is important to retain experienced counsel, those who are engaged in making the business decisions involved in structuring and pursuing such a transaction will benefit from a basic understanding of the bankruptcy regime.

**1.  Control Over the Restructuring Process**

*a.  Venue*

A bankruptcy proceeding's location, or venue, can greatly impact the success of a potential transaction.  Many debtors prefer filing in jurisdictions that have had significant experience with large and complex Chapter 11 cases, most notably New York and Delaware.  If any member of a corporate family is incorporated in New York or Delaware, any member can file there.

Some debtors attempt to establish venue in New York or Delaware by forming a subsidiary there shortly before filing bankruptcy and later "bootstrapping" their cases to those of their newly formed subsidiaries. While such practices technically satisfy the requirements of the venue statute,[268] in *Patriot Coal* the bankruptcy court for the Southern District of New York recently transferred venue out of New York "in the interest of justice," notwithstanding the existence of a newly-formed New York subsidiary.[269]

---

[268] A person or entity generally must reside in the district in which it files for at least 180 days prior  to filing.  28 U.S.C. § 1408.

[269] *Id*. at 738.

### b.    Exclusivity

For the first 120 days following the filing of a chapter 11 petition, the debtor has the exclusive right to propose a plan of reorganization.  Additionally, if the debtor files a plan within that period, other parties in interest may not file a plan until 180 days have passed since the filing of the debtor's chapter 11 petition without creditor acceptance of a plan filed by the debtor.[270]  A court may reduce or increase both the 120-day and the 180-day periods "for cause."[271]  Bankruptcy courts regularly extended the initial time periods, often up to several years in the largest cases, until a 2005 amendment to the Bankruptcy Code limited extensions of the exclusive periods for filing and confirming a plan to a total of 18 months and 20 months, respectively, following the petition date.[272]  After the expiration of these periods, any party in interest may propose a plan.

Establishing cause to extend plan exclusivity turns on a number of factors, including, but not necessarily limited to, (1) the size and complexity of the case, (2) the necessity of further time to negotiate and prepare adequate information, (3) the existence of good faith progress toward reorganization, (4) whether the debtor is paying its debts as they come due, (5) whether the debtor has demonstrated reasonable prospects of filing a viable plan, (6) whether the debtor has made progress in negotiating with creditors, (7) the length of time the case has been pending, (8) whether the debtor is seeking the extension to pressure creditors and (9) whether unresolved contingencies exist.[273]

Courts have declined to extend exclusivity in a variety of situations, including where the debtor has failed to obtain financing or continued to incur operating losses to creditors' detriment, and have suggested that undue exploitation of exclusivity as a negotiating tool with creditors may justify refusal to extend the exclusive period.[274]  A debtor's proposal of a "new value" plan, in

---

[270] 11 U.S.C. § 1121(a)-(c).

[271] 11 U.S.C. § 1121(d).

[272] 11 U.S.C. § 1121(d)(2).

[273] *See In re Borders Grp., Inc.*, 460 B.R. 818, 822 (Bankr. S.D.N.Y. 2011); *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006); *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 674 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006); *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996); *see also* Novica Petrovski, *The Bankruptcy Code, Section 1121:  Exclusivity Reloaded*, 11 AMER. BANKR. INST. L. REV. 451, 505-13 (2003).

[274] *See, e.g.*, *In re EUA Power Corp.*, 130 B.R. 118 (Bankr. D.N.H. 1991) (refusing to extend exclusivity where debtor failed to obtain financing); *In re Ravenna Indus., Inc.*, 20 B.R. 886

which existing equityholders propose to "purchase" ownership of the reorganized company, also may constitute sufficient cause to end the debtor's exclusivity.[275]

Traditionally, control of exclusivity was a critical mechanism used by debtors-in-possession to control the pace and direction of their chapter 11 cases and a key battleground for other parties in interest. Exclusive control over the plan process gives a debtor substantial negotiating leverage in the initial stages of its bankruptcy case. Creditors, however, are not prevented from exploring an alternative plan during the exclusivity period. In *Century Glove*, the Third Circuit held that the Bankruptcy Code's prohibition on "solicitation" of votes, even in combination with the exclusivity provisions of the Bankruptcy Code, does not preclude negotiation of a prospective plan.[276] The court accordingly held that "a party does not solicit acceptances when it presents a draft plan for the consideration of another creditor, but does not request that creditor's vote."[277] Similarly, creditors and other constituencies may be able to persuade the debtor to pursue their preferred strategic alternative, notwithstanding the continuation of the debtor's exclusivity period. In the ongoing bankruptcy of American Airlines, for example, American's creditors were able to persuade the company's board to consider a merger with US Airways, after gaining the support of key

---

(Bankr. N.D. Ohio 1982) (refusing to extend exclusivity in light of debtor's deteriorating cash position); *cf. In re Adelphia Commc'ns Corp.*, 342 B.R. 122, 131 (S.D.N.Y. 2006) (noting that debtor was not seeking extension of exclusivity for purpose of improperly pressuring its creditors).

[275] *In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859, 864 (Bankr. D. Mass. 2000) ("Automatic termination of exclusivity whenever owners propose a new value plan would equalize the parties' bargaining positions. . . . If creditors disagree with the amount of value allocated to them under the plan, they may automatically propose their own plan, thus neutralizing owners' use of their control of the debtor." (quoting Bruce A. Markell, *Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations*, 44 STAN. L. REV. 69, 118-19 (1991))); *see also H.G. Roebuck & Son, Inc. v. Alter Commc'ns, Inc.*, 2011 WL 2261483, at *9 (D. Md. June 3, 2011) (noting that "when old equity seeks to retain its share in a reorganized debtor, the debtor must undergo market valuation," and "[o]ne way to satisfy that requirement is through the termination of exclusivity and by allowing competing reorganization plans to be filed"); Petrovski, *supra*, at 510 & n. 273 (collecting authorities).

[276] *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 101-02 (3d Cir. 1988); *see also* 11 U.S.C. § 1125(b).

[277] *Century Glove*, 860 F.2d at 102. *But see In re Clamp-All Corp.*, 233 B.R. 198 (Bankr. D. Mass. 1999) (demonstrating minority view that distribution of an alternative plan during the exclusive period constitutes prohibited "solicitation" and is therefore prohibited).

constituencies including American's unions.[278] The deal was ultimately signed and is currently awaiting court approval.

The 18-month limit on exclusivity tends to level the playing field by giving creditors the ability to file a plan sooner, and for the same reason, creates a greater sense of urgency for the debtor. Additionally, the limit on exclusivity can create a negotiation dynamic that helps to frame issues, as in the *Lehman Brothers* bankruptcy where the bondholders and the derivative dealers filed competing plans supporting and opposing substantive consolidation.

From the standpoint of a potential acquiror, an important advantage of the exclusivity period is that it gives an acquiror the opportunity to work in conjunction with a party to the bankruptcy case to formulate an acquisition strategy. The debtor is likely to be a potential purchaser's first choice for a partner given its exclusive control over plan proposal, at least at the outset of the case. A frequent second choice is the official committee of unsecured creditors because of the committee's ability to influence the plan process or to obtain judicial relief terminating exclusivity.

By working with creditor constituencies to develop a superior alternative chapter 11 plan proposal, distressed investors have sometimes been able to persuade the bankruptcy court to terminate the debtor's exclusivity. In *In re Pliant Corporation*, the debtor's pre-negotiated chapter 11 plan would have distributed essentially all of the equity of the reorganized debtor to the first lien creditors, with only a *de minimis* recovery reserved for second lien, trade and other creditors. The largest holder of second lien debt teamed up with the creditors' committee to develop an alternative plan that provided a superior recovery for creditors, including the right of second lien creditors to acquire the reorganized debtor's equity through a rights offering, and filed a motion to terminate the debtor's exclusivity based on the superior plan alternative. After a two-day trial, the bankruptcy court terminated exclusivity so that creditors might have a choice of plans, relying expressly upon the endorsement of the alternative plan by the official creditors' committee.[279] Soon thereafter, all parties settled on

---

[278] David Koenig, *Bankrupt American Airlines Will Finally Merge with US Airways – Creating World's Biggest Airline*, BUS. INSIDER (Feb. 13, 2013).

[279] *See In re Pliant Corp.*, No. 09-10443 (MFW) (Bankr. D. Del. July 2, 2009) (order terminating the debtor's exclusive period); *see also* Transcript of Hearing, *In re Pliant Corp.*, No. 09-10443 (MFW) (Bankr. D. Del. June 30, 2009); Transcript of Hearing, *In re Pliant Corp.*, No. 09-10443 (MFW) (Bankr. D. Del. June 29, 2009).

a chapter 11 plan substantially similar to the alternative plan, whereby a portfolio company of the second lien creditor acquired the debtor.[280]

Relatedly, in *In re TCI 2 Holdings, LLC*, the debtor, after soliciting plan proposals from first and second lien creditors, adopted the proposal of the first lien creditors, pursuant to which first lien creditors along with Donald Trump (a former officer and equityholder and current creditor) would receive the equity of the reorganized debtor in exchange for a substantial capital contribution, the reorganized debtor would remain liable for the first lien debt, and the remaining debt would be wiped out. An ad hoc committee of second lien noteholders asked that exclusivity be terminated so that it might propose an alternative plan providing for superior second lien recoveries using equity in the reorganized debtor. The bankruptcy court granted the motion, noting, among other things, the difficulties in evaluating the debtor's plan proposal because of the involvement of the insider Mr. Trump and the lack of an official committee of unsecured creditors.[281] The ad hoc committee's plan was subsequently confirmed by the bankruptcy court over the objections of the first lien creditors.[282]

## 2. Confirmation Requirements

An investor seeking to gain control of a company through a chapter 11 plan needs to be aware of the rights and obligations of the debtor and creditors with respect to the plan confirmation process. The Bankruptcy Code contains numerous specific requirements for confirmation of a chapter 11 plan of reorganization. A central requirement is found in section 1126(c) of the Bankruptcy Code, which provides that the acceptance of a plan requires the votes of at least two-thirds in amount and the majority in number of claims in each accepting class. Additional statutory requirements for the plan confirmation process are discussed below.

### a. Classification of Claims and Interests

Every plan of reorganization must classify creditor claims and equity interests; that is, it must create groups of claims and interests for purposes of

---

[280] *See In re Pliant Corp.*, No. 09-10443 (MFW) (Bankr. D. Del. Oct. 6, 2009) (order confirming chapter 11 plan of reorganization).

[281] *See In re TCI 2 Holdings, LLC*, No. 09-13654 (Bankr. D.N.J. Aug. 31, 2009) (order terminating the debtor's exclusive period); *see also* Transcript of Hearing, *In re TCI 2 Holdings, LLC.*, No. 09-13654 (Bankr. D.N.J. Aug. 27, 2009).

[282] *See In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D.N.J. 2010).

voting and treatment under the plan.  To be placed in the same class, claims and interests must be "substantially similar,"[283] as determined by the legal nature of the claim, rather than by attributes of the claimant.[284]  Debt claims cannot be placed in the same class with equity interests (such as stock or partnership interests) and different classes of equity interests generally are classified separately.[285]  In addition, claims that are accorded special priority by section 507(a) of the Bankruptcy Code, such as employee wage claims up to $11,725, contributions to an employee benefit plan, consumer deposits up to $2,600 and tax claims, must be classified separately from general unsecured claims.[286]

Generally, each secured claim will be classified separately based upon its distinct collateral or lien priority.[287]  Secured claims of identical rank that share in the same collateral, such as the claims of members of a secured bank group, or claims of holders of a junior secured bond issue, typically will be placed in the same class.[288]

Classification of claims may not be used to "gerrymander" classes to secure approval of a plan.  Thus, while there is no explicit requirement that all claims or interests that are "substantially similar" be placed in the same class,[289] the plan proponent may not separate similar claims into different classes merely to ensure that there is at least one impaired class of creditors that accepts a plan (as is required by section 1129(a)(10) of the Bankruptcy Code).[290]  The Bankruptcy

---

[283] 11 U.S.C. § 1122(a).

[284] *See In re Loop 76, LLC*, 442 B.R. 713, 715-16 (Bankr. D. Ariz. 2010) *aff'd*, *In re Loop 76, LLC*, 465 B.R. 525 (B.A.P. 9th Cir. 2012); *In re Coram Healthcare Corp.*, 315 B.R. 321, 349-50 (Bankr. D. Del. 2004).

[285] *See* 7 COLLIER ON BANKRUPTCY ¶ 1122.03[2], [3] (16th ed. 2010).

[286] 11 U.S.C. §§ 507(a), 1123(a)(1); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1122.03[3][b] (16th ed. 2010).

[287] *See* 7 COLLIER ON BANKRUPTCY ¶ 1122.03[3][c] (16th ed. 2010).

[288] *See, e.g.*, *In re Keck, Mahin & Cate*, 241 B.R. 583, 589-90 (Bankr. N.D. Ill. 1999).

[289] *See, e.g.*, *Boston Post Rd. Ltd. P'ship v. Fed. Deposit Ins. Corp. (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 481 (2d Cir. 1994).

[290] *See, e.g.*, *id. at 483*; *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1279 (5th Cir. 1991) ("[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan. . . . [C]lassification may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims.").

Code, however, does permit separate classification of unsecured claims falling below a court-approved threshold amount for purposes of administrative convenience.[291]  Employing this "convenience class" provision, plan proponents often choose to pay off in full all claims that fall below a threshold amount in order to avoid the expense of soliciting votes from a large number of small claimholders.

> ### b.    Impairment and Reinstatement

As a general matter, only claims that have been "impaired" (as defined in section 1124 of the Bankruptcy Code)[292] may vote on the confirmation of the plan.[293]  As noted above, the acceptance of a plan generally requires the votes of two-thirds in amount and the majority in number of the claims in each class.[294]  Unimpaired classes are deemed to accept the plan.[295]  A claim is considered unimpaired where the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."[296]  Conversely, classes receiving or retaining nothing under a plan are deemed to reject the plan.[297]  Because unimpaired classes generally are excluded from voting on the plan, the determination that a class of claims is impaired or unimpaired can have important consequences for the success or failure of a plan.

Section 1129(a)(10) of the Bankruptcy Code requires that in order to confirm a plan that leaves a class of claims impaired, "at least one class of claims that is impaired under the plan" must accept the plan, excluding the vote of any

---

[291] 11 U.S.C. § 1122(b).

[292] Several courts have interpreted the statutory definition to permit "artificial impairment"—*i.e.*, "the technique of minimally impairing a class of creditors solely to satisfy the prerequisite to cramdown of an accepting class"—as long as the separate "good faith" confirmation requirement is not violated.  *See In re Village at Camp Bowie I, L.P.*, 454 B.R. 702, 707 (Bankr. N.D. Tex. 2011); *see also In re Quigley Co.*, 437 B.R. 102, 126 n.31 (Bankr. S.D.N.Y. 2010) (surveying different approaches courts have taken with respect to artificial impairment).

[293] 11 U.S.C. § 1129(a)(8); *see also* 11 U.S.C. 1126(f) (unimpaired classes are presumed to have accepted the plan).

[294] 11 U.S.C. § 1126(c) (the thresholds are determined based on the number of voters (*i.e.*, abstentions are not counted)).

[295] 11 U.S.C. § 1126(f).

[296] 11 U.S.C. § 1124(1).

[297] 11 U.S.C. § 1126(g).

creditor who is an "insider." Where a joint plan is filed in a jointly administered bankruptcy case involving multiple related debtors, courts have differed in whether they read section 1129(a)(10) to require acceptance by one impaired class for each separate debtor, as opposed to requiring only the acceptance by one impaired class pertaining to any of the debtors provided for by the plan. In re Tribune Company, the Bankruptcy Court for the District of Delaware held that section 1129(a)(10) must be applied on a "per debtor" basis, distinguishing three earlier cases that had endorsed the "per plan" approach.[298] While another bankruptcy court in the District of Delaware has since reaffirmed the per debtor approach,[299] it is unclear whether other courts will follow the lead of Tribune. However, if they do, a greater number of impaired creditors will be able to exercise leverage in the negotiation of joint plans through their effective veto power over confirmation.

An important corollary to the concept of impairment is reinstatement. Under section 1124(2), a plan can provide for a class of claims to be reinstated, which places the class in the same position it would have been in had the bankruptcy not occurred, subject to the benefits and burdens of its original contract with the debtors. A claim that is properly reinstated will be de-accelerated and treated as unimpaired for purposes of voting on the bankruptcy plan.[300] In order to reinstate a claim, a debtor must cure all defaults other than "ipso facto" defaults through the bankruptcy plan.[301] The benefits of being able to reinstate claims are significant: where a debtor's cost of borrowing under extant agreements is less than could be obtained currently in the open market, the ability

---

[298] 464 B.R. 126, 180-83 (Bankr. D. Del. 2011). The Tribune court noted certain limitations on this holding, however. First, the court suggested that the result would be different if the debtors had been substantively consolidated. See id. at 182-83. Second, the court observed that "deemed acceptance" by a non-voting impaired class could in certain circumstances suffice as consent for purposes of section 1129(a)(10). Id. at 183-84.

[299] In re JER/Jameson Mezz Borrower II, LLC, 461 B.R. 293, 302-03 (Bankr. D. Del. 2011).

[300] 11 U.S.C. § 1124(2).

[301] Id. (specifying that the plan must cure any "default that occurred before or after the commencement of the case . . . other than a default of a kind specified in section 365(b)(2) of [the Bankruptcy Code] or of a kind that section 365(b)(2) [of the Bankruptcy Code] expressly does not require to be cured"). Section 365(b)(2) provides that the following list of defaults, which are so-called ipso facto defaults, do not require curing: "(A) the insolvency or financial condition of the debtor at any time before the closing of the case; (B) the commencement of a case under [the Bankruptcy Code]; (C) the appointment of or taking possession by a trustee in a case under [the Bankruptcy Code] or a custodian before such commencement; or (D) the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease."

to reinstate existing debt instruments can be quite valuable. As a practical matter, however, reinstating debt is only worthwhile if the debt to be reinstated has sufficient time left to maturity to allow the debtor to avoid the time and expense of a short-term refinancing. The ability to reinstate also will depend on whether the original debt terms include covenants with which the reorganized debtor is unable to comply: where a bankruptcy plan contemplates a reorganization that is inconsistent with the terms of existing debt, reinstatement of that debt is not possible.

For an investor in distressed securities, the debtor's ability to reinstate poses both opportunities and risks. On the one hand, reinstatement is a useful tool that can minimize the leverage of reinstated classes and maximize the debtor's value. On the other hand, an investor may acquire claims in contemplation of obtaining equity for them, only to have the debtor or another stakeholder put forth a plan that reinstates those claims on their original terms. In such a case, the investor would have no ability to vote against the plan.

Where existing debt is roughly market-priced, a contest over reinstatement can be mooted by refinancing. But reinstatement looms large in periods in which interest rates are rising and refinancing may not be possible. For example, in the Spectrum Brands bankruptcy filed in early 2009, Spectrum's proposed plan sought to reinstate the company's roughly $1.2 billion in senior secured debt, which had conditions and pricing that would not have been obtainable in the market at the time of the bankruptcy filing, with Spectrum agreeing to pay principal and interest on contract terms.[302] The plan had been pre-negotiated with a group of Spectrum's subordinated noteholders, who were to receive the equity in the company post-bankruptcy, and was opposed by the secured lenders. After litigation through a trial, the matter settled with a significant increase in the effective interest rate and loan terms for the secured lenders.

A similar set of circumstances existed in the 2009 bankruptcy of Charter Communications. The debtors' plan, pre-negotiated with a committee of noteholders, contemplated reinstatement of upwards of $11 billion in senior secured debt at favorable interest rates, which would have saved the debtors hundreds of millions of dollars in annual interest expenses compared to the then-prevailing market rates.[303] The senior secured lenders fought approval of the plan, acknowledging that their goal was to obtain an increased interest rate that

---

[302] Spectrum Brands, Inc., Current Report (Form 8-K) (Feb. 3, 2009).

[303] *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 254 (Bankr. S.D.N.Y. 2009).

reflected what would be charged for a new loan in the then-prevailing market conditions of the financial crisis.[304]   The bankruptcy court rejected the senior secured lenders' contentions that they were impaired because of various non-monetary defaults under the senior credit agreement, and approved the plan.[305] The senior debt was thus reinstated on terms and pricing that would have been unobtainable in the market at the time the debtors filed for bankruptcy.

c.       <i>Voting Rules</i>

Generally, a holder of a claim or interest that has been properly filed and to which no objection has been made is entitled to vote such claim or interest for or against a plan of reorganization.[306]   A holder of a claim to which an objection has been made may file a motion requesting that the claim be temporarily allowed by the court for the purposes of voting.[307]   A partially secured creditor may vote both the secured and unsecured portions of its claim as if it were the holder of two separate claims.[308]   Finally, as discussed in greater detail in Part IV.D.9.a of this outline, claims may be disqualified from voting upon a showing of "bad faith."

d.       <i>The "Best Interests" Test—Protection for Holdouts</i>

While a creditor that opposes a plan may be bound by the approval of the plan by its class, such creditor is afforded certain limited protection by the so-called "best interests" test.   The best interests test requires that each individual creditor that does not accept the plan receive at least as much as that creditor would have received in a hypothetical liquidation of the debtor under chapter 7 of the Bankruptcy Code.[309]   Any individual creditor that votes to reject a plan may object to plan confirmation on the basis that the best interests test is not satisfied, regardless of whether its class has voted to accept the plan.   As a result of this provision, the disclosure statement describing a proposed chapter 11 plan typically contains a liquidation analysis.[310]

---

[304] *Id.* at 233-34.

[305] *Id.* at 252, 271.

[306] 11 U.S.C. § 1126(a); *see also In re Quigley Co.*, 383 B.R. 19, 24 (Bankr. S.D.N.Y. 2008).

[307] Fed. R. Bankr. P. 3018(a).

[308] Fed. R. Bankr. P. 3018(d); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1126.02[3] (16th ed. 2010).

[309] 11 U.S.C. § 1129(a)(7)(A)(ii).

[310] 7 COLLIER ON BANKRUPTCY ¶ 1129.02[7][b][iii] (16th ed. 2010).

It is rare, although not unheard of, for the best interests test to preclude plan confirmation, *i.e.*, for the bankruptcy court to find that liquidation would yield a greater recovery for the individual creditor than the plan does. One example of an issue that arises regarding the best interests test is when a holder in a class of secured claims asserts that it is worse off under the proposed plan than it would be if the collateral were liquidated.[311]

*e.*      Feasibility

Plan confirmation requires the bankruptcy court to determine that the plan is "feasible," *i.e.*, that the debtor is not likely to need to refile bankruptcy or to liquidate after implementation of the plan (unless the plan itself provides for the debtor's liquidation).[312] Courts generally require that a plan offer a "reasonable assurance of success," but need not guarantee it.[313] In practice, this is not a particularly difficult legal standard for a debtor to meet.[314] Feasibility may be an issue in reinstatement cases because of the risk that the financial covenants—which have not been amended—could be breached.

In evaluating whether a plan is feasible, bankruptcy courts typically consider the following factors: "(1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and

---

[311] *See In re Valencia Flour Mill, Ltd.*, 348 B.R. 573, 576-77 (Bankr. D.N.M. 2006) (secured creditor successfully objected to plan confirmation based on plan's failure to meet the "best interests" test).

[312] 11 U.S.C. § 1129(a)(11).

[313] *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988); *see also In re Quigley Co.*, 437 B.R. 102, 142 (Bankr. S.D.N.Y. 2010) ("To establish feasibility, the debtor must present proof through reasonable projections, which are not speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations." (internal quotation marks omitted)); *In re Young Broad. Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010) ("[T]he purpose of the feasibility test is to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation." (internal quotation marks omitted)).

[314] *See DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 108 (2d Cir. 2011) (noting that a "small or even moderate chance of failure" does not render a plan infeasible); *see also id.* at 107-08 (specificity of evidence required to establish feasibility decreases as time period under consideration moves farther from the confirmation date (*i.e.*, evidence of feasibility immediately following implementation of the plan should be quite specific, while only generalized evidence of feasibility is necessary with respect to a period several years in the future)).

(6) any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan."[315] Frequently at issue in determining feasibility is whether a debtor's business plan is overly optimistic.[316]

### f.   Cramdown:  A Crucial Chapter 11 Power

Plan confirmation can be either consensual—*i.e.*, by approval of all classes entitled to vote on the plan—or not.  Nonconsensual plan confirmation is referred to as "cramdown"[317] because plan confirmation is crammed "down the throat of an unwilling party" (*i.e.*, a dissenting class)."[318]   Cramdown is a powerful and unique feature of the Bankruptcy Code that allows for a reorganization plan to be confirmed despite its rejection by one or more classes of dissenting creditors or equityholders.

Before the bankruptcy court will consider a request to cram down one or more rejecting classes, all of the confirmation requirements set forth in section 1129(a) of the Bankruptcy Code must be met, other than the acceptance of the plan by all impaired classes.[319]   Specifically, as discussed above, cramdown is only available if at least one class of creditors whose claims are "impaired" voted to accept the plan (determined without taking into account the vote of any creditor who is an "insider").[320]

---

[315] *Young Broad.*, 430 B.R. at 129; *see also In re Leslie Fay Cos.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997) (listing three additional factors:  (1) the availability of prospective capital and trade credit; (2) the adequacy of funds for equipment replacement; and (3) the provisions for adequate working capital); 7 COLLIER ON BANKRUPTCY ¶ 1129.02[11] (16th ed. 2010) (collecting authorities).

[316] *See, e.g.*, *Young Broad.*, 430 B.R. at 132-39 (determining, based in part on a finding that the debtor's business plan was overly optimistic, that a proposed plan was not feasible); *cf. In re Las Vegas Monorail Co.*, 462 B.R. 795, 801-04 (Bankr. D. Nev. 2011) (determining that proposed plan was not feasible because it failed to make appropriate provisions for capital expenditures and debt retirement).

[317] Some practitioners refer to a plan as a "cram-up" if it is imposed upon senior classes by plan proponents in a junior class and a "cramdown" if it is imposed upon junior classes.  Others, including us in this outline, refer to both as "cramdown" plans.

[318] Jack Friedman, *What Courts Do to Secured Creditors in Chapter 11 Cram Down*, 14 CARDOZO L. REV. 1495, 1496 & n.1 (1993).

[319] 11 U.S.C. § 1129(b)(1).

[320] 11 U.S.C. § 1129(a)(10).

Cramdown requires that the plan not "discriminate unfairly . . . with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."[321] The "unfair discrimination" test ensures that creditors of the same priority level are not forced to accept meaningfully different levels of risk or recovery under a plan. Although creditors of the same priority may, in some cases, be paid at different times and in different forms of consideration, courts generally will *not* allow such creditors to receive differing percentage returns on their allowed claims.[322] Separately, courts also will not permit a class to receive more than payment in full under a plan that is to be crammed down over the objection of a junior class.[323]

In addition, cramdown requires that the proposed plan be "fair and equitable."[324] Whereas the "unfair discrimination" test is intended to ensure that similarly situated creditors receive similar treatment, the "fair and equitable" test is intended to preserve priorities among the different types of claims and interests, including the priority of secured claims over unsecured claims.

There are three alternative ways in which a plan can be "fair and equitable" to a holder of a secured claim: (1) the claimant retains its liens and receives deferred cash payments totaling at least the allowed amount of its claim and with a present value at least equal to its interest in the underlying collateral; (2) the claimant's collateral is sold, the claimant is allowed to credit bid and the

---

[321] 11 U.S.C. § 1129(b)(1).

[322] *In re Dow Corning Corp.*, 244 B.R. 705, 710 (Bankr. E.D. Mich. 1999) ("[A] rebuttable presumption that a plan is unfairly discriminatory will arise when there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class . . . or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution."), *aff'd in pertinent part and rev'd in part on other grounds*, 255 B.R. 445 (E.D. Mich. 2000); *see also In re Aztec Co.*, 107 B.R. 585, 588-90 (Bankr. M.D. Tenn. 1989) ("[s]ection 1129(b)(1) prohibits only unfair discrimination, not all discrimination," and test examines such factors as: (1) whether discrimination is supported by a reasonable basis; (2) whether confirmation and consummation of a plan is possible without discrimination; (3) whether the debtor proposed the discrimination in "good faith"; and (4) the treatment of the classes discriminated against).

[323] *In re Victory Constr. Co.*, 42 B.R. 145, 155 (Bankr. C.D. Cal. 1984) ("It is clear that the drafters intended the court to deny confirmation where the plan proposes to pay more than 100 percent to a senior class without the consent of a junior.").

[324] 11 U.S.C. § 1129(b)(1).

claimant's lien attaches to the proceeds; or (3) the claimant receives the "indubitable equivalent" of its secured claim.[325]

If a plan provides that a secured creditor will retain its liens and receive deferred cash payments, then the critical question is how to determine the value of those payments—*i.e.*, the appropriate discount rate to apply. The Bankruptcy Code is silent as to the rate of interest required to provide a secured creditor with the "present value" of its allowed secured claim. Although some courts traditionally used the contract rate under existing loan documents,[326] the more commonly accepted approach was to determine the "market rate" for a similar loan as of the time of confirmation.[327] A splintered decision from the United States Supreme Court in the context of a chapter 13 (individual debtor) case, *Till v. SCS Credit Corp.*, suggests that the cramdown rate may be calculated by adjusting the prime rate (typically by a factor not to exceed 3%) based on the risks attendant to the loan.[328] Although the application of *Till* to chapter 11 cases remains uncertain, most courts to have considered the matter have concluded that the appropriate interest rate following *Till* is the market rate, if a relevant efficient market exists, and the *Till* formula rate otherwise.[329]

Alternatively, a plan that provides for the sale of a creditor's collateral free and clear of the creditor's lien may be "fair and equitable," and therefore able to be confirmed over the claimant's objection, if it provides that (i) the creditor's

---

[325] 11 U.S.C. § 1129(b)(2)(A).

[326] *See, e.g.*, *Green Tree Fin. Servicing Corp. v. Smithwick (In re Smithwick)*, 121 F.3d 211, 213 (5th Cir. 1997) ("[N]umerous courts have chosen the contract rate if it seemed to be a good estimate as to the appropriate discount rate." (internal quotation marks omitted)), *overruling recognized by Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 350 (5th Cir. 2008) (declining to apply "presumptive contract rate approach" in light of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004)).

[327] *See, e.g.*, *Conn. Gen. Life Ins. Co. v. Hotel Assocs. of Tucson (In re Hotel Assoc. of Tucson)*, 165 B.R. 470, 476 (B.A.P. 9th Cir. 1994); *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 706 (Bankr. S.D.N.Y. 1993), *aff'd*, 165 B.R. 773 (S.D.N.Y. 1994), *aff'd*, 41 F.3d 1502 (2d Cir. 1994) (mem.).

[328] 541 U.S. 465 (2004) (plurality opinion).

[329] *See, e.g.*, *Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. HomePatient, Inc.)*, 420 F.3d 559, 568 (6th Cir. 2005); *In re S. Canaan Cellular Invs., Inc.*, 427 B.R. 44, 78 (Bankr. E.D. Pa. 2010); In re Texas Grand Prairie Hotel Realty, L.L.C., --- F.3d ---, 2013 WL 776317, at *9 (5th Cir. Mar. 1, 2013) (Approving the use of the *Till* formula without concluding "that the prime-plus formula is the only—or even the optimal—method for calculating the Chapter 11 cramdown rate.")

liens attach to the proceeds of the sale, (ii) the liens on the sale proceeds are provided for under one of the statutory alternatives, *i.e.*, through deferred cash payments (discussed in the paragraph above) or realization of an "indubitable equivalent" (discussed in the paragraph below), and (iii) the creditor is allowed to credit bid during the sale.[330]  As discussed further in Part III.A.6, the Supreme Court recently held that a debtor cannot confirm a plan that provides for a creditor's collateral to be sold free and clear of the claimant's lien without allowing the secured claimant to credit bid.[331]

Finally, if a secured creditor does not retain a lien on its collateral, the plan may nonetheless be confirmed if it provides the creditor with the "indubitable equivalent" of its secured claim.  One way to provide the "indubitable equivalent" of a secured claim simply is to transfer the collateral to the creditor.  Alternatively, a plan may provide for substitute collateral that typically exceeds the amount of the claim.[332]  Where the substituted collateral has a different risk profile, however, a court may reject the plan for a lack of indubitable equivalence.[333]  Similarly, a secured creditor may not be crammed down through

---

[330] 11 U.S.C. § 1129(b)(2)(A)(ii).

[331] *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, --- U.S. ---, 132 S. Ct. 2065 (2012).

[332] 7 COLLIER ON BANKRUPTCY ¶ 1129.04[2][c] (16th ed. 2010); *accord Metro. Life Ins. Co. v. San Felipe & Voss, Ltd. (In re San Felipe & Voss, Ltd.)*, 115 B.R. 526, 530 (S.D. Tex. 1990) ("A bankruptcy court can guard against any potential instability in value or in the [substitute collateral's] market generally through the use of a margin between the value of the [substitute collateral] and the secured creditor's allowed claim."); *In re Keller*, 157 B.R. 680 (Bankr. E.D. Wash. 1993) (substitute collateral was "indubitably equivalent" where creditor was given annuity as well as security interest sufficient to maintain collateral cushion of one-and-one-half times the value of her claim).

[333] In its 2012 decision in *In re River East Plaza, LLC*, the Seventh Circuit rejected the debtor's attempt to eliminate a secured creditor's mortgage lien on real estate valued at $13.5 million by transferring that lien to substitute collateral in the form of $13.5 million in Treasury bonds.  The secured creditor was substantially undersecured (it was owed $38.3 million), and rather than having its claim dealt with as partially secured and partially unsecured, it elected pursuant to section 1111(b) of the Bankruptcy Code to obtain a single secured claim for $38.3 million. Writing for the court, Judge Posner observed that "[b]anning substitution of collateral indeed makes good sense when as in the present case the creditor is undersecured, unlike a case in which he's oversecured, in which case the involuntary shift of his lien to substitute collateral is proper as long as it doesn't increase the risk of his becoming under-secured in the future."  669 F.3d 826, 831 (7th Cir. 2012).  The court acknowledged the possibility that the substituted collateral "might . . . turn out to be more valuable than the building and thus provide . . . more security."  *Id.* at *832.  "But because of the different risk profiles of the two forms of collateral," the court held, "they are not equivalents, and there is no reason why the choice between them should be made for the creditor by the debtor."  *Id.*

a distribution of equity in the reorganized debtor on account of its secured claim. Bankruptcy courts have concluded that equity in a reorganized debtor is too speculative to constitute the "indubitable equivalent" of a secured claim.[334]

If the dissenting class is a class of *unsecured* claims or equity interests, section 1129(b)'s test for a "fair and equitable" cramdown is simpler:  Each dissenting unsecured class must receive the full value of its allowed claims, or else the plan must provide that no classes junior to the dissenting class receive any distributions—a principle known as the "absolute priority rule."[335]

According to a recent Second Circuit decision, the section 1129(b) absolute priority rule applies even when a senior creditor consensually "gifts" a portion of its recovery to a junior creditor.  In *DISH Network Corp. v. DBSD North America, Inc. (In re DBSD North America, Inc.)*, the Second Circuit considered a chapter 11 plan that distributed the bulk of the reorganized debtor's equity to certain of the debtor's secured creditors, with a relatively significant distribution going to the debtor's existing equity, while the unsecured creditors received a minimal distribution. [336]  The debtor defended the distribution to the old equity while unsecured creditors were left unpaid as a "gift" from the value that belonged to the secured creditors, who also were not fully paid and were senior to the unsecured creditors.

The Second Circuit rejected this justification, ruling that a distribution to a junior class may not be made under a chapter 11 plan in violation of the absolute priority rule even if a senior class is enabling the distribution by giving up value to which it would otherwise be entitled.  The court distinguished an earlier case, *Official Unsecured Creditors' Committee v. Stern (In re SPM Manufacturing Corp.)*,[337] which has long been invoked for the ability of a senior class to make "gifts" to junior classes in contravention of the absolute priority rule, reasoning that *SPM* was a chapter 7 case to which the section 1129(b) absolute priority rule does not apply and in which the "gift" was made out of the senior lenders'

---

[334] *See, e.g.*, *In re TM Monroe Manor Assocs., Ltd.*, 140 B.R. 298, 300-01 (Bankr. N.D. Ga. 1992) ("the use [in cramdown] of *equity securities in the reorganized debtor* was not contemplated in the Bankruptcy Code" (emphasis in original); refusing to approve plan under which secured creditors would be satisfied mainly with limited partnership interests in reorganized debtor); *In re San Felipe & Voss, Ltd.*, 115 B.R. 526, 529 (Bankr. S.D. Tex. 1990) (equity in reorganized debtor is not the "indubitable equivalent" of an allowed secured claim).

[335] 11 U.S.C. § 1129(b)(2)(B)-(C).

[336] 634 F.3d 79, 86 (2d Cir. 2011).

[337] 984 F.2d 1305 (1st Cir. 1993).

collateral after the court had lifted the automatic stay, meaning that the property no longer belonged to the debtor.[338] The *DBSD* court did leave open the possibility that "gifts" made outside of a plan may still be permissible.[339]  As a result, senior lenders may attempt other avenues to obtain the support of junior creditors or equity, but whether these alternatives will present their own legal infirmities remains to be seen.

A controversial issue relating to cramdown of unsecured claims is the so-called "new value" exception to the absolute priority rule.  This judge-made rule, which developed under the former Bankruptcy Act, permitted a debtor's old equityholders to retain their equity in a bankrupt company—even when creditors were not paid in full—in exchange for an infusion of new capital into the company.[340] Since enactment of the Bankruptcy Code, courts to consider the issue have held that the new value exception only "permits old equity owners to participate in a plan, without full payment to the dissenting creditors, if they make a new contribution (1) in money or money's worth, (2) that is reasonably equivalent to the value of the new equity interests in the reorganized debtor and (3) that is necessary for implementation of a feasible reorganization plan."[341]

The United States Supreme Court last considered the new value exception in 1999 in *Bank of America National Trust & Savings Association v. 203 North LaSalle Street Partnership*.  There, the Supreme Court declined to rule on the validity of the new value exception, but opined that, if the exception exists, equityholders may not retain their equity in the company by investing new capital without subjecting that investment to competition and "without the benefit of market valuation."[342]  The Supreme Court did not decide what kind of market test

---

[338] *See DBSD*, 634 F.3d at 94-100; *see also In re Armstrong World Indus., Inc.*, 432 F.3d 507, 513-15 (3d Cir. 2005) (similarly concluding that a purported "gift" from an unsecured senior class of creditors to a junior class in the context of a plan ran afoul of the section 1129(b) absolute priority rule).

[339] *See DBSD*, 634 F.3d at 95-96.

[340] *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 444-45 (1999).

[341] *In re Woodbrook Assocs.*, 19 F.3d 312, 319-20 (7th Cir. 1994); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1129.03[c][iv] (16th ed. 2010); *cf. In re G-I Holdings Inc.*, 420 B.R. 216, 269 (D.N.J. 2009) (articulating the three factors listed above, and adding "[4] substantial and [5] proffered by the debtor at the outset, *i.e.*, up front." (internal quotation marks omitted)).

[342] *203 N. LaSalle*, 526 U.S. at 458 (reversing lower court's approval of plan for lack of such features).

was required, and since *LaSalle*, no clear consensus has emerged.  Some lower courts have found that the market test requirement could be satisfied where the debtor co-proposed the plan with creditors holding a blocking vote,[343] an examiner's report valued the consideration received by equityholders,[344] a lockup agreement between the debtor and equityholders obligated the debtor to solicit alternative offers,[345] or the debtor's exclusive right to propose a plan of reorganization was terminated.[346]   However, in a recent opinion, the Seventh Circuit remanded a case involving new value to the bankruptcy court "with directions to open the proposed plan of reorganization to competitive bidding," stating that the rationale of *LaSalle* did not depend on whether the plan was proposed during the debtor's exclusivity period or who proposed it.[347]

### g.    Disclosure Requirements

Prior to soliciting acceptances of its plan of reorganization, the plan proponent must prepare, serve on all parties in interest and obtain bankruptcy court approval of a "disclosure statement" with respect to the plan.[348]   To be approved, the disclosure statement must provide "adequate information,"[349] which the Bankruptcy Code defines as information "of a kind, and in sufficient detail" that would allow a "hypothetical investor of the relevant class to make an informed judgment about the plan."[350]

Preparing and obtaining bankruptcy court approval for a disclosure statement is rarely a significant challenge for the plan proponent if it is the debtor.  Typically, any objections to the adequacy of disclosure are resolved by supplementing the proposed disclosure statement with additional information,

---

[343] *In re G-I Holdings Inc.*, 420 B.R. at 269.

[344] *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000).

[345] *In re Union Fin. Servs. Grp, Inc.*, 303 B.R. 390, 423-26 (Bankr. E.D. Mo. 2003).

[346] *H.G. Roebuck & Son, Inc.* v. *Alter Comms., Inc.*, 2011 WL 2261483, at *8-9 (D. Md. June 3, 2011).

[347] *In re Castleton Plaza, LP*, No. 12-2639, 2013 WL 537269 (7th Cir. Feb. 14, 2013).

[348] 11 U.S.C. § 1125(b).

[349] *Id.*

[350] 11 U.S.C. § 1125(a)(1).  In determining whether "adequate information" has been provided, courts are instructed to compare the benefit of providing additional information to parties in interest against the cost of doing so. *Id.*

including the views and positions of the objecting parties.  For a plan proponent other than the debtor, however, drafting and securing approval of a disclosure statement can be a challenge if the debtor is unable or unwilling to provide its management's assistance and access to its books and records.

Although it is not uncommon for parties who intend to oppose confirmation of the plan to raise their confirmation objections at the disclosure statement hearing, bankruptcy courts rarely will consider such objections on the merits, instead deferring them to the confirmation hearing.  Occasionally, a court will disapprove a disclosure statement and prevent a plan from going forward at the disclosure stage if it finds the plan to be patently non-confirmable.[351]

The requirement that votes on a plan be solicited only in accordance with a court-approved disclosure statement can interfere with the typical pre-packaged or pre-negotiated plan proponent's goal of locking creditors up to a plan support agreement as soon as possible.  This tension between the statutory mandate and attainment of the plan proponent's objective is discussed at length below in Part III.B.9.

> h.      *Obtaining Confirmation*

Once a disclosure statement is approved, the proponent of the plan may solicit acceptances of the plan by serving copies of the court-approved disclosure statement, the proposed plan and ballots on all parties who are entitled to vote.  It is important that the proper procedures be used to determine eligible voters and allow them enough time to vote.  Plan solicitation should be directed at the actual beneficial owners rather than the record holder, analogous to the "street name" concept for normal corporate voting practices.[352]

> **3.      Protections That Can Be Obtained from Confirmation Order**

After entry of the order by the bankruptcy court confirming a chapter 11 plan, generally a 14-day period must elapse to permit any party seeking to appeal

---

[351] *See, e.g.*, *In re Monroe Well Serv., Inc.*, 80 B.R. 324 (Bankr. E.D. Pa. 1987); *In re Pecht*, 57 B.R. 137 (Bankr. E.D. Va. 1986).

[352] *See In re Southland Corp.*, 124 B.R. 211, 227 (Bankr. N.D. Tex. 1991) ("Taking the plain words of Congress in § 1126, only the holder of a claim, or a creditor, or the holder of an interest, may accept or reject a plan.  If the record holder of a debt is not the owner of a claim, or a true creditor, he may not vote validly to accept or reject, unless he is an authorized agent of the creditor, and this authority is established under appropriate Bankruptcy law and rules."); *see also* Fed. R. Bankr. P. 3018(b).

the order to file a notice of appeal and to seek a stay of the effectiveness of the order pending resolution of the appeal.[353]  If no stay is obtained, then the debtor may begin to implement the plan on the fifteenth day, regardless of whether an appeal has been filed.

To secure a stay of a confirmation order, the appealing party generally will be required to post a bond.[354]  Unlike bonds to secure appeals from money judgments, where the amount of the judgment determines the amount of the bond, it is difficult to predict the amount of a bond that will be required to secure an appeal of a confirmation order.  A stay of a confirmation order will prevent creditors from receiving their anticipated distributions under the plan, and also will halt the consummation of whatever transactions were to occur pursuant to the plan, which might include the financing of the exit from bankruptcy, sales of assets, changes in corporate form and raising of new equity in the capital markets. It is difficult for a court to predict what damages might be caused by delaying such matters, making the calculation of the amount of the bond to stay an appeal of a confirmation order quite uncertain.  When calculating the necessary amount to bond a confirmation appeal, courts have included as possible costs of delay the accrual of interest on postpetition debt and additional professional fees,[355] as well as various forms of consequential damage, most notably the risk of losing exit financing.[356]  The cost of bonding an appeal from a confirmation order frequently

---

[353] Fed. R. Bankr. P. 3020(e).  The bankruptcy court may extend or reduce the length of this period.  *See* Fed. R. Bankr. P. 3020(e), 9006(b)-(c).

[354] Bankruptcy and appellate courts have discretion to dispense with the bond requirement.  *See* Fed. R. Bankr. P. 8005; *In re Sphere Holding Corp.*, 162 B.R. 639, 644-45 (E.D.N.Y. 1994); *In re Byrd*, 172 B.R. 970, 973-74 (Bankr. W.D. Wash. 1994); *see also In re Chemtura Corp.*, 2010 WL 4638898, at *5 & n.23 (Bankr. S.D.N.Y. Nov. 8, 2010) (discussing standards governing supersedeas bonds).  In addition, the federal government cannot be required to post a bond to secure a stay of the confirmation order.  Fed. R. Bankr. P. 8005.

[355] *See ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 352-53 (S.D.N.Y. 2007) (debtors estimated $70 million per month in interest costs and $10 million per month in professional fees); *see also In re Pub. Serv. Co. of N.H.*, 116 B.R. 347, 350 (Bankr. D.N.H. 1990) (noting that a potential supersedeas bond would have to include accruing interest as well as various other costs of delay).

[356] *See In re Calpine Corp.*, 2008 WL 207841, at *5, 7 (Bankr. S.D.N.Y. Jan. 24, 2008) (explaining that granting a stay would threaten the existing exit financing and a bond would have to include additional interest expense that would result from the debtors' need to acquire alternative exit financing); *see also Lynch v. Cal. Pub. Utils. Comm'n*, 2004 WL 793530, at *3-4 (N.D. Cal. Apr. 9, 2004) (denying stay of confirmation order in part as a result of numerous financial harms to the debtor that would result from a stay, including risk to the debtor's exit financing and the associated potential need to raise alternative financing, the obligation to pay an

presents a dilemma for the appellant, and a significant advantage for the successful plan proponent, as the posting of the bond may not be economically rational for the appellant when compared to the potential benefit to be gained from, and likelihood of success on, the appeal.

For example, in *ACC Bondholder Group v. Adelphia Communications Corp. (In re Adelphia Communications Corp.)*, a group of bondholders that held approximately $1 billion of the debtor's $5 billion in notes and debentures had objected to confirmation of the plan. The district court granted the bondholders' request for a stay pending appeal of the confirmation order, but set the bond requirement at $1.3 billion, to be posted within 72 hours. The bondholders then sought further appellate review of the bond requirement, arguing that the setting of such a high bond amount was in essence a denial of the stay. The bondholders, however, "did not (and could not) claim that they were *unable* to post [the required] amount. Rather, their position was that the posting of a bond in that amount would be an imprudent business decision for their clients."[357] The Court of Appeals dismissed the appeal of the bond amount, and the bondholders returned to the district court to seek modification of the bond amount. After the appellants offered to post only $10 million at the hearing on the modification issue, the court vacated the stay and the plan became effective.[358]

Nevertheless, the bondholders attempted to proceed with their appeal on the merits even after the plan became effective. The district court, however, dismissed the appeal, concluding both that the bondholders were estopped from asserting that their appeal was not moot and that, even if they were not so estopped, the effectiveness and consummation of the plan had rendered their appeal equitably moot. In so doing, the court took particular note of the bondholders' unwillingness to post a bond in an amount greater than $10 million, which it characterized as "a complete refusal to post a reasonable bond."[359]

As illustrated by the *Adelphia* decision, and more recently in *In re Charter Communications, Inc.*,[360] the "equitable mootness" doctrine can provide another

---

additional $1.7 million per day in interest costs to existing creditors, and the possibility of having to return the proceeds of recently sold bonds and pay substantial redemption premiums).

[357] *ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 367 B.R. 84, 88-89 (S.D.N.Y. 2007) (emphasis in original).

[358] *Id.* at 89-90.

[359] *Id.* at 98-99.

[360] 691 F.3d 476 (2d Cir. 2012).

significant advantage to a successful plan proponent.  The doctrine essentially arises from the fact that implementation of a plan often involves complex transactions that, once done, are difficult to undo as a practical matter.  Applying this doctrine, appellate courts will often decline to reach the merits of an appeal of an unstayed confirmation order based upon the impracticality and inequity of "unscrambl[ing]" transactions already implemented pursuant to the confirmation order.[361]  The Second Circuit has gone even further, finding that an "appeal is presumed equitably moot where the debtor's plan of reorganization has been substantially consummated."[362]

Where the characteristics of a particular plan are such that a stay will be granted only if a prospective appellant posts a prohibitively large bond, it may be practically impossible to obtain appellate review prior to plan effectiveness and the accompanying consummation of the transactions contemplated in the plan.  As a result, the mere confirmation of certain plans may effectively immunize them from review.

### 4.    Advantages of Chapter 11—Ability to Purchase Assets Under a Plan Free and Clear of Liabilities

As an alternative to a sale during a chapter 11 case pursuant to section 363, discussed in Part III.A of this outline, a debtor may sell some or all of its assets pursuant to a plan of reorganization.  One advantage to an acquiror of assets under a plan is that the acquiror can benefit from the theoretically more expansive discharge of "claims" that a debtor obtains under a confirmed plan of reorganization than from an order approving a sale under section 363.  In practice, however, orders approving section 363 sales typically provide for broad and comprehensive preclusions of liability such that any difference in the scope of relief between a plan and a section 363 order is relatively slight.  The applicable scope of the discharge of claims available under a confirmed chapter 11 plan is of particular interest to a plan investor or acquiror because (like the permitted

---

[361] *See, e.g.*, *In re Cont'l Airlines*, 91 F.3d 553, 566 (3d Cir. 1996) (en banc); *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 169 (3d Cir. 2012) (courts should only "apply the equitable mootness doctrine if doing so will [unscramble] complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract") (internal citation and quotation marks omitted); *see also, e.g.*, *In re Idearc, Inc.*, 662 F.3d 315 (5th Cir. 2011); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 145 (2d Cir. 2005).

[362] *Charter Communications*, 691 F.3d at 482.  Coupled with the Second Circuit's adoption of an abuse of discretion standard of review for equitable mootness determinations made by district courts, parties in the Second Circuit likely face a difficult path in appealing a substantially consummated plan. *Id.* at 483.

parameters of a section 363 sale order) it defines the purchaser's ability to "cleanse" with judicial finality the acquired assets from and against pre-bankruptcy claims and interests.

As discussed in Part III.A, a sale pursuant to section 363 is "free and clear of any *interest* in such property."[363]   The discharge afforded by a chapter 11 plan, however, is established by section 1141(c) of the Bankruptcy Code, which states that, "after confirmation of a plan, *the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor*."[364]   The term "claims," which defines what can be discharged as part of a plan, generally is understood to be somewhat broader than the term "interests" in a section 363 sale.[365]

Even with the greater breadth of "claims" that are discharged under section 1141, however, as discussed below, there remains a risk that existing claims of creditors that did not receive adequate notice of the bankruptcy, or claims that had not yet arisen at the time of the sale, could still be asserted against a purchaser of assets pursuant to a confirmed plan, notwithstanding the discharge by the bankruptcy court.

### a.      Notice

Both the Bankruptcy Rules and constitutional due process require notice to a claimant to discharge a claim.[366]   Notice becomes problematic with claimants

---

[363] 11 U.S.C. § 363(f) (emphasis added).

[364] 11 U.S.C. § 1141(c) (emphasis added).

[365] *Cf.* 11 U.S.C. § 101(5) ("The term 'claims' means . . . (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment . . . .").   At least one appellate court has conflated the two terms by reading the term "claim" into the scope of 363(f). *See Al Perry Enters. v. Appalachian Fuels, LLC*, 503 F.3d 538, 543 (6th Cir. 2007) ("The bankruptcy court has clear power to approve the sale of debtors' assets free and clear *of any interest or claims* . . . pursuant to 11 U.S.C. § 363(f)." (emphasis added)); *see also In re Chrysler LLC*, 576 F.3d 108, 126 (2d Cir. 2009) ("Given the expanded role of § 363 in bankruptcy proceedings, it makes sense to harmonize the application of § 1141(c) and § 363(f) to the extent permitted by the statutory language."), *vacated as moot*, *Ind. State Police Pension Trust v. Chrysler LLC*, 130 S. Ct. 1015 (2009).

[366] *See, e.g.,* Fed. R. Bankr. P. 4004(a); *Zurich Am. Ins. Co. v. Tessler (In re J.A. Jones, Inc.)*, 492 F.3d 242, 249-51 (4th Cir. 2007); *In re Grumman Olson Indus., Inc.*, 467 B.R. 694, 706 (S.D.N.Y. 2012) (discussing constitutional due process requirements of notice in the section 363 context).

that cannot be located, as well as with claims that arise in the future.[367]   Courts have held, however, that notice published in newspapers with wide circulation may be sufficient to overcome due process issues as to claimants "whose interests or whereabouts could not with due diligence be ascertained."[368]

### b.    *Future Claims—Mass-Tort Cases*

Courts have addressed the problem of providing notice to unknown claimants in the chapter 11 plan context by appointing a representative for the holders of likely future claims and establishing a fund for the treatment of such claims under a plan of reorganization.   The future claims representative acts as a representative of the interests of persons that are likely in the future to have claims based on acts already committed by a debtor.[369]   Appointment of a future claims representative is most likely to be employed by companies subject to mass tort liability stemming from past conduct that injured a significant number of as-yet unknown future victims, so that a successful reorganization will be short-lived unless it addresses them.[370]   This procedure has been codified in section 524(g) of the Bankruptcy Code as part of an elaborate set of specialized rules for bankruptcies involving asbestos claims.[371]

---

[367] *See, e.g.*, *In re Gen. Motors Corp.*, 407 B.R. 463, 506-07 (Bankr. S.D.N.Y. 2009) (recognizing constitutional problem in the section 363 context regarding notice to claimants who did not yet know if they had asbestos-related injuries stemming from the debtors' conduct), *aff'd*, *Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65 (S.D.N.Y. 2010); *Campbell v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43 (S.D.N.Y. 2010).

[368] *J.A. Jones*, 492 F.3d at 250 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950)); *see also In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) (approving notice by publication in connection with section 363 sale), *aff'd*, 576 F.3d 108 (2d Cir. 2009), *vacated as moot*, *Ind. State Police Pension Trust v. Chrysler LLC*, 130 S. Ct. 1015 (2009); *In re U.S. Airways, Inc.*, 2008 WL 850659, at *5-6 (Bankr. E.D. Va. Mar. 27, 2008) (approving notice by publication in connection with discharge following confirmation of chapter 11 plan).

[369] *See, e.g.*, *In re Forty-Eight Insulations, Inc.*, 58 B.R. 476 (Bankr. N.D. Ill. 1986); *In re Johns-Manville Corp.*, 36 B.R. 743, 757-59 (Bankr. S.D.N.Y. 1984), *aff'd*, 52 B.R. 940 (S.D.N.Y. 1985).

[370] *See, e.g.*, *In re A.H. Robins Co.*, 88 B.R. 742, 743-48 (E.D. Va. 1988) (use of future claims representative for persons injured by Dalkon Shield contraceptive device); *see also* Frederick Tung, *The Future Claims Representative in Mass Tort Bankruptcy:  A Preliminary Inquiry*, 3 CHAP. L. REV. 43, 50-52 (2000).

[371] Section 524(g) also contains a provision allowing injunctions barring actions against non-debtor third parties whose liability arises "by reason of" of a relationship between the debtor and the third party.   These relationships include an ownership interest in or managerial involvement with the debtor.   However, the Second Circuit has limited the use of this provision to cases where the third party's liability was "a legal consequence" of such enumerated relationships.   As such,

There is long-standing controversy among courts as to where and how to draw the line between dischargeable claims and potential future claims that cannot be cut off either through a section 363 sale or through the confirmation of a reorganization plan.  For example, the right to equitable enforcement of a covenant not to compete, available as a form of relief where monetary relief is not an adequate remedy for breach of the covenant, has been held not to be a "claim" and therefore not subject to discharge by a bankruptcy court.[372]  More broadly, decisions have held that "where persons are injured by post-confirmation activities of a reorganized debtor, they have no prepetition claim," and claimants that may not be able to participate in a bankruptcy proceeding may be able to assert successor liability against an asset purchaser.[373]

The influential decision *Epstein v. Official Committee of Unsecured Creditors (In re Piper Aircraft Corp.)* sets forth one test for whether a particular situation has ripened into a dischargeable "claim."[374]  *Piper Aircraft* involved a manufacturer of aircraft and aircraft parts that had been named in lawsuits alleging that its products were defective.  When the company filed for bankruptcy, the bankruptcy court appointed a representative for future tort claimants who filed a large claim in the case based on statistical assumptions regarding the number of people likely to suffer future injury.  In concluding that the claim filed by the future creditors' representative could not be allowed, the Eleventh Circuit explained that a "claim" should only be dealt with by a plan if:  "(i) events occurring before [plan] confirmation create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor's product; and (ii) the basis for liability is the debtor's prepetition conduct in designing, manufacturing and selling the allegedly defective or dangerous product."[375] Based on this test, the court concluded that claims asserted on behalf of the unidentifiable individuals who had not yet been injured by, or even exposed to, the debtor's products prior to confirmation of a plan were not cognizable under

---

bankruptcy courts' ability to shield solvent parent companies from asbestos-related tort liabilities is somewhat limited.  *In re Quigley Co., Inc.*, 676 F.3d 45, 62 (2d Cir. 2012).

[372] *See Kennedy v. Medicap Pharmacies, Inc.*, 267 F.3d 493, 496-98 (6th Cir. 2001).

[373] *See In re Kewanee Boiler Corp.*, 198 B.R. 519, 528 (Bankr. N.D. Ill. 1996); *accord Morgan Olson, LLC v. Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243, 249-55 (Bankr. S.D.N.Y. 2011) (where plaintiff suffered postpetition injuries from defective product manufactured by the debtor prior to the petition date, asset purchaser could be held liable notwithstanding free-and-clear sale under section 363(f)).

[374] 58 F.3d 1573 (11th Cir. 1995).

[375] *Id.* at 1577.

the Bankruptcy Code.[376]  In contrast, courts applying the *Piper Aircraft* test have found that a "claim" does exist where a specific postpetition injury to specific persons can be traced to prepetition conduct.[377]

In short, an acquiror of a company with significant mass tort or other long-tailed liabilities (such as environmental or product-related liabilities) must analyze carefully the distinctive problems the future claims may pose in order to maximize the protection of a bankruptcy discharge for the assets to be acquired—a particularly acute problem where a selling debtor will be liquidated following the acquisition.  A potential solution for a purchaser in such situations is to require the creation of a fund to satisfy estimated future claims liabilities.

### 5.  Another Advantage of Chapter 11—Potential Ability to Restructure Indebtedness of Special Purpose Entities

It is not uncommon for a business to organize its capital structure such that significant portions of its overall debt are incurred by one or more subsidiaries created solely for the purpose of incurring such debt, which is secured only by those subsidiaries' own assets.[378]  A subsidiary of this type is commonly referred to as a "special-purpose entity" or "SPE."[379]

---

[376] *Id*. at 1577-78.

[377] *See, e.g.*, *In re Pan Am. Hosp. Corp.*, 364 B.R. 839, 847-48 (Bankr. S.D. Fla. 2007) (wrongful death claim against hospital based on alleged prepetition negligence of medical personnel was a "claim" for bankruptcy purposes even though the relevant injury—*i.e.*, the plaintiff's death—occurred postpetition).  In *Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.)*, 744 F.2d 332 (3d Cir. 1984), the Third Circuit held that a claim arises when it "accrue[s]" under applicable nonbankruptcy law.  *Id.* at 337.  Applying this principle, the *Frenville* court concluded that a claimant who had been affected by the debtor's conduct, but had not acquired an actionable right to payment under applicable state law on the petition date, did not possess a prepetition claim.  *See id.*  Following twenty-five years of uniform criticism that this decision defined "claim" too narrowly, the Third Circuit overruled *Frenville* and held that "a 'claim' arises when an individual is exposed prepetition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code."  *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 125 (3d Cir. 2010) (en banc).

[378] Arrangements of the type described here are commonly used in securitizations of assets.  *See* Steven L. Schwarcz, *The Alchemy of Asset Securitization*, 1 STAN. J. L. BUS. & FIN. 133, 135 (1994).

[379] *See* David B. Stratton, *Special Purpose Entities and Authority to File Bankruptcy*, AM. BANKR. INST. J., Mar. 2004, at 36, 36.

The loan documents for borrowing by an SPE generally preclude the SPE from incurring additional debt, selling assets, changing its organizational structure, merging or consolidating with another entity, or liquidating. These restrictions are intended to ensure that the value of the SPE's assets remains in the SPE and to prevent the SPE from becoming insolvent absent a decrease in the value of its assets. SPE loan documents also commonly include so-called "bankruptcy remoteness" covenants, which are intended to prevent the SPE's assets and liabilities from being consolidated with those of its parent and affiliates in a bankruptcy. Among other things, these covenants generally require the SPE to conduct its business affairs separately from its parent and affiliates, and to retain at least one independent director or manager whose consent is required to file the SPE for bankruptcy.[380]

Until recently, the provisions described above were commonly believed to ensure both that the value of an SPE's assets would remain with the SPE and that the SPE would not be drawn into a bankruptcy case of its parent or substantively consolidated with its parent in such a proceeding. Accordingly, lenders to an SPE generally had little incentive to consent to restructuring its obligations, even if doing so would alleviate the financial distress of the SPE's parent.

The 2009 decision in *In re General Growth Properties, Inc.*, however, suggests that a parent-debtor may be able to file its SPE subsidiaries for bankruptcy, notwithstanding any "bankruptcy remoteness" covenants, and thereby facilitate restructuring of SPE debt.[381] In that case, the parent-debtor, which had defaulted under its credit facilities, filed a bankruptcy petition and also caused a large number of its SPE subsidiaries—which had not defaulted—to file as well (in many cases, after replacing their existing independent directors with other persons amenable to such filings). The bankruptcy court refused to dismiss the petitions of the SPE subsidiaries as having been filed in bad faith, concluding, among other things, that in determining to file a bankruptcy petition, an entity need not itself face imminent default; rather, the extent of its financial distress may be evaluated from the perspective of a parent-debtor and its subsidiaries considered as a whole. The court also determined that the refusal of the lenders to the SPE subsidiaries to accede to any plan of reorganization did not render a bankruptcy proceeding futile and that the various filing entities had not demonstrated subjective bad faith by replacing their independent directors. The bankruptcy court expressly disclaimed any implication that General Growth's SPE subsidiaries would or should be substantively consolidated with the parent-debtor, suggesting that most of the

---

[380] *See id.*

[381] *In re Gen. Growth Props., Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y. 2009).

protections that the SPE structure is generally believed to afford lenders would remain in place.[382]   Nevertheless, the lenders to the SPE subsidiaries, which had previously been unwilling to restructure the SPE subsidiaries' debt, agreed to such a restructuring shortly thereafter.[383]   The ability to draw SPEs into bankruptcy may provide a debtor, or a potential purchaser, with sufficient leverage to cause lenders to agree to restructuring the debt of SPE subsidiaries, or even make it possible to force a restructuring on non-consenting lenders if consistent with applicable bankruptcy law.

An additional feature of some SPE transactions is also noteworthy:  To mitigate their potential for loss upon a bankruptcy filing involving an SPE, lenders to an SPE may seek guarantees from the SPE's parent or sponsor that only spring to life if the SPE takes certain actions, including commingling funds with the parent,[384] amending the SPE's articles of incorporation,[385] declaring its insolvency in writing,[386] or filing for bankruptcy.  When triggered, these "springing recourse guarantees," known colloquially as "bad boy guarantees," make what is otherwise a non-recourse loan to the SPE, secured only by the SPE's assets, into joint and several obligations of the SPE and its guarantors.  A bad boy guarantee is especially significant when the contingent guarantor (*e.g.*, a real-estate developer) otherwise is solvent and would not itself file bankruptcy.

Courts have recently wrestled with whether an SPE's mere insolvency can trigger liability for its principals under a bad boy guaranty tied to certain bankruptcy remoteness covenants.   One such case, *Wells Fargo Bank, NA v. Cherryland Mall Ltd. P'ship*,[387] involved a mortgage loan backed by the Cherryland shopping mall and subject to a bad boy guarantee from the developer.

---

[382] *See id.* at 69.

[383] *Compare id.* at 53-54 (discussing failed attempts to restructure SPE subsidiaries' debt), *with In re Gen. Growth Props., Inc.*, No. 09-11977 (ALG), slip op. (Bankr. S.D.N.Y. Dec. 15, 2009) (confirming plan restructuring SPE subsidiaries' debt).

[384] *Blue Hills Office Park LLC v. J.P. Morgan Chase Bank*, 477 F. Supp. 2d 366 (D. Mass. 2007) (guaranty triggered when company breached SPE covenants by commingling funds with parent).

[385] *LaSalle Bank N.A. v. Mobile Hotel Props.*, 367 F. Supp. 2d 1022 (E.D. La. 2004) (guaranty triggered when company breached SPE covenants by amending its articles of incorporation).

[386] *See, e.g.*, *DB Zwirn v. SCC Acquisitions, Inc.*, 74 A.D.3d 530 (N.Y. App. 1st Dept. 2010) (guaranty not triggered when issuer sent lender financial statements showing greater liabilities than assets; rather, only an actual, express admission of insolvency would suffice to trigger the non-recourse carve out.)

[387] 812 N.W.2d 799 (Mich. App. 2011).

When Cherryland defaulted on the mortgage, the lender sued the developer on the guarantee. The note, mortgage, and guarantee were all governed by Michigan law and provided that the loan would become fully recourse to the guarantor in the event that Cherryland breached a covenant that it "is and will remain solvent and […] will pay its debts and liabilities […] from its assets as the same shall become due."[388] The court held that the developer was liable for the deficiency in the lenders' recovery upon foreclosure, merely because the Cherryland SPE had failed to "remain solvent." The court noted that such a result "seems incongruent with the perceived nature of a nonrecourse debt,"[389] as it would always lead to guarantor liability unless the lenders recover in full. Nevertheless, the court felt compelled by the documents as written to find the developer liable.[390] The Michigan legislature has since passed the Nonrecourse Mortgage Act[391] to eliminate the possibility that a bad boy guarantee would be interpreted this way again in Michigan. However, the perceived need for a legislative solution leads to perhaps greater uncertainty in other jurisdictions where such laws have yet to be adopted. Accordingly, potential acquirors of businesses with significant SPE debt should be mindful of the impact of any related guarantees.

### 6. Another Advantage of Chapter 11—Exemption from Registration for Securities Issued Under a Plan

Section 1145 of the Bankruptcy Code affords a useful and important exemption to the application of the federal securities laws to the debt and equity securities issued under a reorganization plan.

#### a. Scope of the Exemption

Section 1145(a) exempts securities of a debtor (or its affiliate or successor) distributed under a plan in exchange for claims against, or interests in, the debtor from the requirement to register securities under the Securities Act and

---

[388] *Id.* at 806-08.

[389] *Id.* at 815.

[390] *Id.*; *see also 51382 Gratiot Ave. Holdings, LLC v. Chesterfield Dev. Co., LLC*, 835 F. Supp. 2d 384 (E.D. Mich. 2011) *reconsideration denied*, 2012 WL 205843 (E.D. Mich. Jan. 24, 2012) (finding that a commercial mortgage loan became fully recourse when the shopping mall it was secured by became insolvent or unable to pay its debts as they became due).

[391] *See* Senate Bill 0992 (2012), Public Act 67 of 2012, *available at* http://legislature.mi.gov/doc.aspx?2012-SB-0992.

state blue-sky laws.[392]   Thus, creditors that receive securities as part of a reorganization plan may resell those securities even though the debtor issued them without an effective registration statement.   The existence of this exemption "promotes creditor acceptance of reorganization plans by allowing certain creditors to accept a reorganization with a view to reselling securities obtained under the plan."[393]

### b.   The Underwriter Exception

While section 1145(a) exempts from registration securities received "in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor," the section 1145(a) exemption is not available to an underwriter.   For purposes of this provision, an entity is an underwriter if, among other things, it either:

> (A) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is *with a view to distribution* of any security received or to be received in exchange for such claim or interest; or
>
> . . .
>
> (D) is an issuer, as used in [section 2(a)(11) of the Securities Act], with respect to such securities.[394]

Case law interpreting the underwriter exception to the section 1145(a) exemption is sparse and, as discussed below, the scope of the underwriter exception under section 1145(b) is itself subject to debate.

### (i)   Purchase of Claims with a View to Distribution

Current law is unsettled as to whether the underwriter exception in section 1145(b) should deprive purchasers of distressed debt claims of the protection of section 1145(a)'s securities registration exemption.

---

[392] *See In re Treasure Bay Corp.*, 212 B.R. 520, 545 (Bankr. S.D. Miss. 1997); *In re Kenilworth Sys. Corp.*, 55 B.R. 60, 62 (Bankr. E.D.N.Y. 1985); 8 COLLIER ON BANKRUPTCY ¶ 1145.02[1] (16th ed. 2010).

[393] *Kenilworth Sys.*, 55 B.R. at 62.

[394] 11 U.S.C. § 1145(b)(1) (emphasis added).

Some practitioners take the view that, on its face, section 1145(b)(1)(A) "would appear to remove purchasers of distressed debt, whether or not a security, at discounted prices from the safe harbor of section 1145(a)."[395]   Even the proponents of this view recognize that "section 1145(b)(1)(A)'s focus on post-reorganization securities may indicate that Congress' only interest in the application of the federal securities laws to the acquisition of claims in bankruptcy cases was in the limited, post-confirmation context.   Moreover, section 1145(b)(1)(A) does not appear ever to have been used against an investor in distressed securities, and the only case to have construed the underwriter exception applied it narrowly."[396]

Other practitioners take a less restrictive view:  whether a recipient of securities on account of acquired claims qualifies as an underwriter should depend on when and for what purpose the claims were acquired.  Thus, because section 1145(b)(1)(A) only includes within the definition of underwriter "those who purchase claims or stock 'with a view to distribution of any security received or to be received,'" a postpetition investor should retain the protection of the safe harbor of section 1145(a), so long as the investor "purchase[d] prior to the filing of a plan providing for the issuance of securities, [and without] some particular knowledge that securities were to be issued."[397]  According to this logic, "[i]f the postpetition investor purchased claims or stock before there was any indication that securities would be issued on account of such claims or stock, . . . the investor can hardly be said to have purchased with a view to distribution."[398]  Of course, if the investor purchased claims after the plan was filed and with a view to obtaining distribution of the security, under this view, the investor would fall outside of section 1145(a)'s "safe harbor" based upon section 1145(b)(1)(A).

Thus, investors who regularly acquire distressed debt for purposes of obtaining control of the debtor through the issuance of securities under a plan should be aware that the law and practice presently are unclear as to the scope of the underwriter exception to section 1145(a), and such investor should consult with counsel regarding the possible advisability of complying with registration requirements of the federal securities laws.

---

[395] Hon. Robert D. Drain & Elizabeth J. Schwartz, *Are Bankruptcy Claims Subject to the Federal Securities Laws?*, 10 AM. BANKR. INST. L. REV. 569, 600 (2002).

[396] *Id.*; *see also Kenilworth Sys.*, 55 B.R. at 62 ("[L]egislative history reveals that [section] 1145 was not intended to draw 'technical' underwriters into the same net as 'real' underwriters.").

[397] 6 COLLIER BANKRUPTCY PRACTICE GUIDE § 94.09 (2009) (citation omitted).

[398] *Id.*

(ii)     The Definition of "Issuer"

Section 1145(b)(1)(D) provides that an entity is an "underwriter" for purposes of the statute if it is an "issuer" for purposes of section 2(a)(11) of the Securities Act.  This provision has the potential to yield an odd result:  if a debtor, in its capacity as the "issuer" of new securities, is covered by section 1145(b)(1)(D)'s definition of "underwriter," then the exemption from registration offered by section 1145(a) would not extend to the debtor, thus defeating the purpose of the provision.

Rather than accepting this result, which would render section 1145(a) ineffectual, courts have construed section 1145(b)(1)(B) to include as underwriters only control persons and not the debtor itself.[399]  This reading of the statute is supported by section 2(a)(11) of the Securities Act, in which the portion relevant to the definition of "issuer" indicates only that the term shall include, among others, "any person directly or indirectly controlling . . . the issuer."[400]

The legislative history of section 1145 indicates that any creditor receiving 10% or more of the relevant securities is a "control person" who should not be able to enjoy the section 1145(a) safe harbor.[401]  The SEC, however, has never embraced the 10% test and has, instead, suggested that it will look at all of the facts in a case-by-case control analysis.[402]  Whether or not a straight percentage ownership test is used, however, "ultimately the size of the security holding in relation to the size of the issue will have a significant effect on the determination of underwriter status."[403]

c.     *Exemption of Prepetition Solicitation*

Section 1145 "provides a clear safe harbor for the actual issuance of . . . new securities under [a] confirmed prepackaged plan."[404]  However, there is

---

[399] *See, e.g.*, *In re Standard Oil & Exploration of Del., Inc.*, 136 B.R. 141, 149-50 (Bankr. W.D. Mich. 1992).

[400] 15 U.S.C. § 77b(a)(11).  *Cf.* 15 U.S.C. § 77b(a)(4) (providing the primary definition of the term "issuer").

[401] *See* COLLIER BANKRUPTCY PRACTICE GUIDE § 94.09 (2009).

[402] *See, e.g.*, Drain & Schwartz, *supra*, at 599 n. 394.

[403] COLLIER BANKRUPTCY PRACTICE GUIDE § 94.09 (2009).

[404] Kurt A. Mayr, *Enforcing Prepackaged Restructurings of Foreign Debtors Under the U.S. Bankruptcy Code*, 14 AM. BANKR. INST. L. REV. 469, 501 (2006) [hereinafter Mayr, *Enforcing*].

uncertainty as to whether prepetition solicitation activity for a chapter 11 plan that contemplates the issuance of securities—routinely an element of prepackaged plans—is exempted from registration by section 1145. The uncertainty stems from the fact that section 1145's text exempts only "a security of the debtor" from registration, although the issuer is not technically the "debtor" until chapter 11 proceedings have commenced with a bankruptcy filing.[405] The interpretation that prepetition negotiations may not benefit from section 1145 has been called "hyper-technical and inconsistent with prior SEC guidelines regarding the scope of section 1145's statutory predecessor."[406] Indeed, in 1997, the National Bankruptcy Review Commission recommended that Congress amend section 1145 to exempt explicitly qualified, prepetition solicitations made in connection with a prepackaged plan, though no amendment to this effect has been enacted.[407]

### d.      *When Registration May Be Advisable*

While the relative paucity of case law applying section 1145 and the fact-based analysis employed by the SEC make offering clear guidance difficult, the following general observations may prove helpful to acquirors that expect to receive securities under reorganization plans.

### (i)      Large Creditors

Although having a large stake (10% or greater) of the relevant security does not *per se* make such holder a controlling person and, thus, an "issuer" that is excepted from the section 1145(a) safe harbor, such large holders may well face greater scrutiny of their relationship with the debtor. This is particularly true if a creditor has negotiated other indicia of control under the chapter 11 plan. Parties holding 10% or more of a security of the reorganized debtor, or that have otherwise obtained board, voting or contractual rights to control the reorganized

---

[405] *See* N. SAGGESE & ALESIA RANNEY-MARINELLI, A PRACTICAL GUIDE TO OUT-OF-COURT RESTRUCTURINGS AND PREPACKAGED PLANS OF REORGANIZATION 4.04[D] (2000); *see also* Abigail Arms, *Current Issues and Rulemaking Projects*, 939 PLI/CORP 747, 870-71 (1996) (noting that the SEC adopts the position that prepetition negotiations involving the offer and sale of a security are subject to registration under the Securities Act and may not benefit from section 1145).

[406] Mayr, *Enforcing*, *supra* n.403, at 501-02; *accord* Corinne Ball & Reginald A. Greene, *Strategies in "Prepackaged" Bankruptcies and Implication of Security Laws*, 827 PLI/COMM 201, 226-27 (2001).

[407] Mayr, *Enforcing*, *supra* n.403, at 502.

debtor, may be well-advised either to seek a no-action letter or negotiate for the right to demand shelf or piggy-back registration rights as part of the plan.[408]

Alternatively, large creditors and acquirors may be able to rely on other registration exemptions under the federal securities laws, such as Rule 144, which allows non-affiliates to sell restricted securities to the public after a six-month holding period, provided that there is adequate current information about the issuer on file with the SEC (this information requirement lapses for non-affiliates an additional six months after the initial six-month holding period ends). It is best to consult with experienced securities lawyers to verify that the putative seller meets the requirements for Rule 144 and that proper procedures are being followed with respect to the sale of any securities.

(ii)     Directors and Officers

Directors and officers of an issuer are "control persons" and, thus, are excepted from the safe harbor discussed above. As with larger creditors, directors and officers may use the Rule 144 safe harbor. Indeed, the SEC has issued guidance that section 4(1) of the Securities Act and Rule 144 both are available for the control persons obtaining securities in a reorganization.[409]

(iii)     Issuance of Stock by Third Parties

Issuance of stock by "an affiliate participating in a joint plan with the debtor" receives the same protection under section 1145(a) of the Bankruptcy Code as an issuance by the debtor.[410] This exception generally is understood to allow third-party plan proponents to issue securities within the exemption. However, to the extent that the securities being offered by a third party are not in "exchange for a claim against, an interest in or a claim for an administrative expense" in the debtor's or the affiliate's bankruptcy case, an investor and possibly a plan proponent should consider registering the securities. This may be the case if a plan proponent is raising fresh capital in connection with the restructuring.

---

[408] *See, e.g.*, *In re Viatel, Inc.*, No. 01-1599 (LHK) (Bankr. D. Del. May 21, 2002) (order confirming first amended joint chapter 11 plan of reorganization) (prepackaged plan required the debtor to file registration statement on demand of holders of 25% of the authorized common stock distributed under the plan).

[409] *See* Jacques Sardas, SEC No-Action Letter, 1993 WL 273674, at *4-5 (July 16, 1993); Calstar, Inc., SEC No-Action Letter, 1985 WL 54372, at *1 (Sept. 26, 1985).

[410] 11 U.S.C. § 1145(a)(1).

(iv)   Rights Offerings

As discussed in Part I.B.2.b of this outline, rights offerings are popular and effective ways of issuing securities and raising exit capital.[411]   The issuance of rights and the ultimate issuance of securities underlying those rights are exempt under section 1145.   Section 1145(a)(1)(B) requires that the new securities be exchanged "principally" for claims in bankruptcy, but this leaves some room for cash or property.   Rights offerings—particularly ones with over-subscription features—create the risk that the cash or property received will exceed the value of the claim.   This is particularly true for back-stopped offerings where a third party commits to buy rights in excess of claims it actually owns.   For example, in *In re Penn Pacific Corporation*, the SEC challenged a disclosure statement and plan as requiring registration where the claims that were being traded were considered worthless.[412]

### 7.   Another Chapter 11 Benefit—Antitrust Exemption

As further discussed in Part IV.E of this outline, distributions of assets or voting securities to creditors under a plan of reorganization generally are exempt from the notification and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act").   Pursuant to 16 C.F.R. § 802.63(a) ("HSR Rule 802.63(a)"), an acquisition of assets or voting securities in connection with a "*bona fide* debt work-out" is exempt from HSR Act requirements so long as the creditor extended credit "in a *bona fide* credit transaction entered into in the ordinary course of the creditor's business."   The Federal Trade Commission (the "FTC") staff has determined that distributions of voting common stock to creditors under a plan of reorganization fall within the definition of "bona fide debt work-out."[413]   This HSR Act exemption includes secondary purchasers of a debtor's debt securities as well as banks and other

---

[411] It is critical that parties intending to participate in a rights offering pursuant to a chapter 11 plan fully understand the subscription requirements established by the plan.   At least one bankruptcy court has determined that a participant was entitled to no compensation when it received less than its fair share of the securities distributed in such a rights offering as a result of mistakenly submitting erroneous information on a subscription form.   *See In re Accuride Corp.*, 439 B.R. 364 (Bankr. D. Del. 2010).

[412] No. 94-00230-C (Bankr. N.D. Okla. Jan. 27, 1994) *cited in Bankruptcy Developments*, 882 PLI/Corp 47, 53-54 (1995).

[413] *See* AM. BAR ASS'N, SECTION OF ANTITRUST LAW, PREMERGER NOTIFICATION PRACTICE MANUAL 289 (4th ed. 2007) [hereinafter PREMERGER NOTIFICATION PRACTICE MANUAL].

traditional lenders.[414]   There is, however, an exception to this exemption, the so-called "vulture fund exception."   Under this exception, if the fact that a debtor is going to petition for bankruptcy relief becomes public and subsequently an investor purchases claims and seeks to acquire securities in exchange therefor, HSR Rule 802.63(a) will not apply to that investor.[415]   For acquisitions not otherwise exempt, though, the standard 30-day waiting period under the HSR Act is shortened to 15 days for bankruptcy.[416]

Nonetheless, bankruptcy transactions are not immune from scrutiny.   The 2008 financial crisis did not result in any major shifts in analytic approaches by either the FTC or DOJ when reviewing the acquisition of a firm that is in financial distress.   In some instances, the economic decline and crisis made it more difficult to establish as a defense that entry barriers are low or expansion likely, even if the parties were to restrict output or raise prices, because other firms may not be able to get the capital to expand.   Even though there may be legitimate reasons for asserting that the combination of firms in the same industry will result in greater long-term commitment and investment that may be critical to innovation and efficient use of assets, to date, there have been no reported instances in which the agencies cleared a merger on that basis.[417]

Moreover, the fact that a business currently may be facing bankruptcy or financial distress does not eliminate the potential that, in the hands of another firm, that business would remain a competitive force. In *CCC/Mitchell*, for instance, the FTC rejected as a defense that "but for" the transaction, the seller would have altered its operations and stopped competing.   To meet the failing company defense, the agencies require that the assets be shopped and the target show that there is no viable alternative that raises less competition concerns.[418]

---

[414] *See, e.g.*, FTC Informal Staff Opinion, File No. 0407006 (July 22, 2004) (applying exemption to bond fund that acquired the debtor's bonds in the secondary market pre-bankruptcy); FTC Informal Staff Opinion, File No. 9502019 (Feb. 22, 1995).

[415] FTC Informal Interpretations No. 0202007 (Feb. 21, 2002) and No. 0204006 (Apr. 22, 2002); *see also* PREMERGER NOTIFICATION PRACTICE MANUAL, *supra*, at 289.

[416] 11 U.S.C. § 363(b)(2)(B).

[417] *See* Ramsey Shehadeh, Joseph D. Larson & Ilene Knable Gotts, *The Effect of Financial Distress on Business Investment:  Implication for Merger Review*s, ANTITRUST, Spring 2009, at 12, 12-14.

[418] *See, e.g.,* Bill McConnell, *Failing Upward*, The Deal Magazine, Apr. 25, 2011, at 26, *available at* http://www.thedeal.com/ magazine/ID/039139/2011/failing-upward.php (Discussing the DOJ's review process for Hercules Offshore Inc.'s purchase of oil rigs from competitor Seahawk Drilling Inc.)

The bankruptcy court has at times been critical in establishing to the agencies that such alternative bidders were not legitimate from a financial perspective.[419]

On the other hand, the agencies have acknowledged that time may be of the essence in a bankruptcy and have expedited their review, even in situations in which the relevant agency believed that a divestiture would be required to resolve competition concerns.   To that end, the antitrust authorities have permitted transactions involving bankrupt companies to proceed prior to the culmination of the investigation, although in at least one of these cases, the FTC obtained a "blank check" that would permit it to order any divestiture it later determined was needed,[420] and in another situation, the FTC ultimately required some divestitures.[421]  Similarly, in the Nortel proceeding the DOJ cleared all bidders participating in the auction under the HSR Act to provide a level playing field for bidding but kept open the investigation of the June 2011 acquisition by the successful bidders, the Apple/Rockstar consortium.   In February 2012, the DOJ closed its investigation after the consortium provided certain remedial actions and behavioral commitments.[422]   Courts deciding whether to grant a preliminary injunction in an agency challenge to an acquisition involving a distressed entity may also take into account the company's  financial conditions.[423]

---

[419] Shehadeh, Larson, & Gotts, *supra, n. 416,* at 15-16.

[420] Press Release, FTC, FTC Order Requires Tops Markets to Sell Seven Penn Traffic Supermarkets (Aug. 4, 2010), *available at* http://www.ftc.gov/opa/2010/08/tops.shtm.   Penn Traffic had declared bankruptcy in November 2009.  The only two bidders for Penn Traffic's assets were Tops Markets and a liquidator.  To avoid the liquidation, the FTC and Tops Markets entered into an agreement that permitted Tops to purchase the assets but required Tops to divest any stores which the FTC later determined presented competitive concerns.  The eventual FTC settlement required the divestiture of seven stores in New York and Pennsylvania.

[421] Press Release, FTC, Fidelity National Financial Settles FTC Charges that its Acquisition of LandAmerica Subsidiaries Reduced Competition in Title Information Markets (July 16, 2010), *available at* http://www.ftc.gov/opa/2010/07/fidelity.shtm.   An eventual settlement of the complaint brought by the FTC that required Fidelity to sell a portion of its ownership in a title information database in Portland, Oregon, as well as share title data with competitors in four other Oregon counties and Detroit, Michigan.

[422] See U.S. Dep't of Justice, STATEMENT OF THE DEPARTMENT OF JUSTICE'S ANTITRUST DIVISION ON ITS DECISION TO CLOSE ITS INVESTIGATIONS OF GOOGLE INC.'S ACQUISITION OF MOTOROLA MOBILITY HOLDINGS INC. AND THE ACQUISITIONS OF CERTAIN PATENTS BY APPLE INC., MICROSOFT CORP. AND RESEARCH IN MOTION LTD, (Feb. 13, 2012), *available at* http://www.justice.gov/atr/public/press_releases/2012/280190.htm.

[423] *See, e.g.*, *FTC v. Lab. Corp. of Am.*, 2011 WL 3100372, at *23 (C.D. Cal. Mar. 11, 2011).  The FTC withdrew its appeal of the district court's denial of the injunction.  Press Release, FTC

### 8.      Another Chapter 11 Benefit—Assumption, Assumption and Assignment, and Rejection of Contracts and Leases

The debtor's "executory contracts" and "unexpired leases" often are among the most valuable assets of a bankruptcy estate.   Section 365(a) of the Bankruptcy Code provides a debtor with the right, subject to court approval, to "assume or reject any executory contract or unexpired lease."[424]   In both the conventional plan process and the section 363 context, this ability to assume or reject executory contracts and unexpired leases creates an opportunity for a potential acquiror in the plan context to reshape an acquisition target.

The Bankruptcy Code does not define the term "executory contract."   In determining whether a contract is executory, courts typically consider whether "the obligation of both the bankrupt and the other party [under] the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."[425]   In other words, an executory contract is one that has substantial performance remaining on both sides.   While the term "unexpired leases" is more easily understood, courts vigilantly limit the application of section 365 to true leases, as opposed to disguised financing arrangements.[426]   If a putative lease is determined not to be a true lease, then it will not be subject to assumption or rejection.

---

Withdraws Appeal Seeking a Preliminary Injunction to Stop LabCorp's Integration With Westcliff Medical Laboratories (Mar. 24, 2011), *available at* http://www.ftc.gov/opa/2011/03/labcorp.shtm.

[424] 11 U.S.C. § 365(a).

[425] Vern Countryman, *Executory Contracts in Bankruptcy:  Part I*, 57 MINN. L. REV. 439, 460 (1973); *see also* 3 COLLIER ON BANKRUPTCY ¶ 365.02[2] (16th ed. 2010) (collecting authorities). The rationale underlying the so-called "Countryman" definition of "executory contract" is that a debtor with no remaining material obligations (*i.e.*, only the non-debtor has obligations) gains nothing by rejecting the contract—the debtor is the beneficiary of performance and will choose to enforce the right to performance.  If the non-debtor has no remaining material obligations (*i.e.*, only the debtor has remaining obligations), then there is no point in assuming the contract—the contract is essentially a liability and the debtor will choose to reject it.  Discretion should therefore exist only where both parties still have material obligations.  A minority of courts have rejected the "Countryman" definition in favor of a "functional test," pursuant to which the primary consideration is the impact of the assumption or rejection decision on the estate.  A classic executory contract would be a long-term supply contract under which a debtor is required to take delivery and pay for goods in the future.

[426] *See, e.g.*, *Big Buck Brewery & Steakhouse, Inc. v. Eyde (In re Big Buck Brewery & Steakhouse, Inc.)*, 2005 WL 1320165, at *7-8, *10-11 (E.D. Mich. May 25, 2005) (indicia of disguised financing arrangement include whether transaction (1) transfers normal risks of ownership to the lessee, (2) sets rent payments equal to debt service and (3) leaves lessor without an economic

An investor should work in tandem with the debtor to identify those contracts and leases that are valuable to the business, and seek their assumption. At least as important is the identification of those contracts and leases that are economically burdensome so that an acquisition target can shed their costs by moving to reject the contracts and leaseholds. In addition to eliminating the ongoing expense of carrying unnecessary contracts and leases during the case, rejection converts damages arising from breach into prepetition claims payable in bankruptcy dollars at a fraction of their face value, whereas assumption results in administrative expenses that must be paid in full.[427]  In addition, claims asserted by landlords upon rejection of long-term leases are subject to a significant cap: Rejection damages are limited to the greater of one-year's rent or 15%, not to exceed three years, of the remaining term of the lease in question.[428]

The Bankruptcy Code also confers on a debtor a valuable right to assign executory contracts and leases in conjunction with their assumption.[429]  This allows a debtor, or its acquiror, to monetize valuable contracts and leases that are not needed for the long-term business strategy of the company.  Moreover, the Bankruptcy Code generally overrides contractual anti-assignment provisions, thereby maximizing the ability to extract value from a debtor's portfolio of contracts and leases.[430]

### a.    Conditions to Assumption or Rejection

A debtor cannot assume an executory contract or unexpired lease until all prepetition and postpetition defaults have been cured.[431]  Specifically, in order to assume the contract or lease, a debtor must  (1) cure, or provide adequate assurance that it will promptly cure, the default; (2) compensate, or provide adequate assurance that it will promptly compensate, its counterparty for any

---

interest in the leased property upon expiration of the agreement); *see also United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 614-18 (7th Cir. 2005) (fact that lessor has no interest in the premises at expiration of lease term indicated "lease" was disguised financing).

[427] *See* 11 U.S.C. § 365(g); *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 386-87 (2d Cir. 1997).

[428] 11 U.S.C. § 502(b)(6).

[429] 11 U.S.C. § 365(f)(2).

[430] 11 U.S.C. § 365(f)(1), (3).

[431] As discussed at n. 300, *ipso facto* defaults—*i.e.*, those arising from the debtors' bankruptcy or financial condition—need not be cured.

actual pecuniary loss resulting from the default; and (3) provide adequate assurance of its ability to perform the contract or lease in the future.[432] Further, in order to assign an executory contract or unexpired lease, a debtor must first assume it and the assignee must provide adequate assurance of its ability to perform in the future.[433] The debtor must also establish that the decision to assume the contract is an appropriate exercise of reasonable business judgment.[434]

In contrast to assumption, court approval of a debtor's request to reject an executory contract or unexpired lease is virtually assured, as the debtor need only make the limited showing that such rejection falls within its reasonable business judgment.[435]

Collective bargaining agreements are given special treatment in the Bankruptcy Code, and the rejection of collective bargaining agreements is subject to a higher standard set forth in section 1113. A collective bargaining agreement may only be rejected if the debtor first makes a proposal to the covered employees' representative about modifications necessary to permit the reorganization and confers with the representative about the proposal. If such negotiations fail, before the debtor can reject the collective bargaining agreement, the court must find that: (1) the debtor made the requisite proposal, (2) the representative refused the proposal without good cause, and (3) the balance of the equities favors rejection.

In order to establish that the union representative rejected the debtor's proposal without good cause, the debtor must first establish that its proposed modification is necessary to its reorganization. The Third Circuit, which includes Delaware, applies a strict test, considering whether the modification is necessary for the debtor to avoid liquidation, not merely needed for its long-term financial health.[436] On the other hand, the Second Circuit, which includes New York, has a more flexible approach, which looks to what the debtor needs to attain ultimate

---

[432] 11 U.S.C. § 365(b)(1).

[433] 11 U.S.C. § 365(f)(2).

[434] *See In re Vencor, Inc.*, 2003 WL 21026737, at *3 (Bankr. D. Del. Apr. 30, 2003); *see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

[435] *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831-32 (Bankr. D. Del. 2009).

[436] *Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of Am., AFL-CIO-CLC*, 791 F.2d 1074, 1089-90 (3d Cir. 1986).

financial health.[437]  Even this looser standard is demanding, however, and New York bankruptcy judges have closely scrutinized motions to reject collective bargaining agreements in recent cases.   For example, in the bankruptcy of American Airlines, the debtor and the pilot's union were at odds over the appropriate level of codesharing, with the union seeking to  limit codesharing in order to restrict the airline's ability to outsource flying to low-cost or non-unionized subcontractors and subsidiaries.   The court denied the debtor's motion to reject its collective bargaining agreement with the pilots' union, finding that, although American had adequately justified *some* expansion in codesharing, it had not established that the essentially unlimited codesharing contemplated by the modified collective bargaining agreement, which exceeded that used by comparable companies, was necessary to a successful reorganization.[438] However, just weeks later, the court granted the debtor's renewed motion, which set forth a more limited codesharing plan.[439]

### b.      Timing of Assumption or Rejection

Generally, executory contracts and unexpired leases may be assumed or rejected at any time until confirmation of a plan of reorganization.[440]  The most significant exception to this rule is for unexpired leases of commercial real estate.

Prior to 2005, a debtor was ordinarily required to assume or reject unexpired commercial real estate leases within 60 days of the petition date, but the bankruptcy court could extend such period "for cause."[441]  Relying on this provision, courts routinely permitted debtors to exercise the right of assumption and rejection of such leases until confirmation of a chapter 11 plan.

---

[437] *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82, 89-90 (2d Cir. 1987).

[438] *In re AMR Corp.*, 477 B.R. 384, 433 (Bankr. S.D.N.Y. 2012).

[439] *In re AMR Corp.*, 2012 WL 3834798 (Bankr. S.D.N.Y. Sept. 5, 2012).   Similarly, in the Hostess bankruptcy, the court denied the debtor's motion to reject a collective bargaining agreement with the Teamsters on narrow grounds — namely, that it had not established that one percent difference in EBITDA between the debtor's proposal and the union's proposal was necessary to reorganization.  *See* Transcript of Hearing at 129*, In re Hostess Brands, Inc.*, No. 12-22052 (RDD) (Bankr. S.D.N.Y. May 14, 2012).   The Teamsters later agreed to revised modifications proposed by Hostess.

[440] 11 U.S.C. § 365(d)(2).

[441] 11 U.S.C. § 365(d)(4) (2000 & Supp. IV 2004).

However, as a result of the 2005 Bankruptcy Code amendments, a debtor now is required to assume unexpired commercial real estate leases within 120 days of the petition date; if a debtor fails to assume a lease within this period, the lease is deemed rejected. A debtor may request that the bankruptcy court extend the 120-day period only once, by an additional 90 days, "for cause." Any further extension requires the lessor's written consent.[442]

The tightened time frame imposed by this amendment requires debtors with substantial commercial leasehold interests to make critical decisions about those leases in the early stages of their bankruptcy cases, perhaps well before the long-term prospects for the business can be known or assessed and before buyers have been identified whose views about acceptance or rejection can be taken into account. This requirement has contributed to the demise of a number of retail debtors, including Sharper Image, Linens 'n Things, Steve & Barry's, Wickes, Mervyns, Circuit City and Filene's Basement, each of which ultimately wound up in liquidation. The pressure of having to decide within 210 days whether to assume or reject long-term leases may deprive a retail debtor of the essential ability to operate through the first postpetition holiday season in order to assess which stores might be viable. Absent a landlord willing to consent to extend that period, debtors may be forced to close stores rather than risk assuming a long-term lease that will result in a large administrative expense claim against the chapter 11 estate if the assumption decision turns out to have been a mistake. In a weak real estate environment, such consents may well be obtainable on leases that provide for rent at or near market, but likely are to be unattainable on the below-market long-term leases that many older retail chains possess. If nothing else, the need to act quickly on assumption/rejection decisions puts a premium on thorough preparation and analysis, as well as the ability to make quick decisions.

### c.    Ability to Override Anti-Assignment Provisions

#### (i)    In General

Provisions in an executory contract or unexpired lease that prohibit, restrict or condition a debtor's ability to assign are rendered unenforceable by section 365(f)(1) of the Bankruptcy Code. Section 365(f)(1) covers both express anti-assignment provisions and provisions, such as continuous operation covenants (commonly known as "go darks"), which, if enforced, could have the practical effect of precluding assignment.[443] This ability to override contractual

---

[442] 11 U.S.C. § 365(d)(4); Robert N.H. Christmas, *Designation Rights—A New, Post-BAPCPA World*, AM. BANKR. INST. J., Feb. 2006, at 10, 10, 63.

[443] 1 COLLIER REAL ESTATE TRANS. & BANKRUPTCY CODE ¶ 3.06[5] (2008).

provisions is a powerful tool in a debtor's arsenal to enhance the value of its assets. For example, interpreting section 365(f)(1) broadly, the bankruptcy court in *In re Kmart Corp.* authorized Kmart to assign commercial real estate leases pursuant to a "designation rights agreement" despite the debtor's default under continuous operation covenants.[444] Further, the court authorized the assignees to keep the properties "dark" for up to an additional 12 months after the assignment. The court reasoned that the continuous operation covenants were unenforceable anti-assignment clauses within the meaning of section 365(f)(1).

An express exception to this general rule negating anti-assignment provisions is found in section 365(c)(1), which provides that a debtor may not assume or assign a contract without the consent of another party if "applicable law"—*i.e.*, nonbankruptcy law—permits that party to refuse assignment of the contract even if contractual anti-assignment provisions are given no effect.[445] Thus, a debtor may not, without the consent of its counterparty, assign a contract if, for example, it is a "personal services contract," certain licenses to use intellectual property or any other type of contract that cannot be freely assigned outside of bankruptcy.[446]

The 2005 amendments to the Bankruptcy Code narrowed a debtor's ability to override certain anti-assignment provisions. The amended version of section

---

[444] *In re Kmart Corp.*, No. 02-B02474 (SPS) (Bankr. N.D. Ill. June 28, 2002) (order approving designation rights agreement and related relief).

[445] 11 U.S.C. § 365(c)(1)(A).

[446] *See, e.g.*, *Everex Sys., Inc. v. Cadtrak Corp. (In re CFLC Inc.)*, 89 F.3d 673, 677-80 (9th Cir. 1996) (federal common law, and therefore section 365(c)(1), prohibits assignment of nonexclusive patent licenses absent counterparty consent); *PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 943 (5th Cir. 1983) (state law, and therefore section 365(c)(1), prohibits assignment of licenses to occupy and use airport space); *N.C.P. Mktg. Grp. v. Blanks (In re N.C.P. Mktg. Grp., Inc.)*, 337 B.R. 230, 236-37 (D. Nev. 2005) (federal common law, and therefore section 365(c)(1), prohibits assignment of nonexclusive trademark licenses absent counterparty consent), *aff'd*, 279 F. App'x 561 (9th Cir. 2008); *In re Patient Educ. Media, Inc.*, 210 B.R. 237, 240-43 (Bankr. S.D.N.Y. 1997) (federal common law, and therefore section 365(c)(1), prohibits assignment of nonexclusive copyright licenses absent counterparty consent); *In re Grove Rich Realty Corp.*, 200 B.R. 502, 506-07 (Bankr. E.D.N.Y. 1996) (state law, and therefore section 365(c)(1), prohibits assignment in bankruptcy of "personal service contracts" and other contracts that are not freely assignable under nonbankruptcy law). It is a subject of some dispute whether an exclusive license to intellectual property is assignable without counterparty consent. *Compare Gardner v. Nike, Inc.*, 279 F.3d 774, 777-81 (9th Cir. 2002) (federal law bars assignment of exclusive copyright licenses absent counterparty consent), *with In re Golden Books Family Entm't, Inc.*, 269 B.R. 311, 314-19 (Bankr. D. Del. 2001) (federal law permits assignment of exclusive copyright licenses regardless of counterparty consent).

365(b)(1)(A) provides that a default relating to a debtor's nonmonetary obligations under an unexpired lease of real property must be cured "by performance at and after the time of assumption in accordance with such lease." Thus, while section 365(b)(1)(A) does not prevent a debtor from assuming and assigning a commercial real estate lease under which the debtor previously breached its nonmonetary obligations, it does require that a default arising from a failure to operate in accordance with the terms of the lease be cured at the time of the assumption, and that any assignee abide by such nonmonetary obligations thereafter.[447]   Under this amendment, a debtor desiring to assume or assign a commercial real estate lease with respect to which it had defaulted under a "go dark" provision should be prepared to turn the lights back on as a condition to assumption and assignment.

(ii)     Shopping Center Leases

Section 365(b)(3) provides that adequate assurance of future performance under a shopping center lease necessarily includes, *inter alia*, adequate assurance of compliance with all of the lease provisions restricting "radius, location, use, or exclusivity" and "tenant mix or balance," thereby effectively ensuring that the "essential terms" of the debtor's shopping center lease are "not . . . changed in order to facilitate assignment."[448]   Thus, if assumption or assignment would violate any such provision in a shopping center lease, neither the debtor nor the assignee of the lease can provide adequate assurance of future performance and assumption and assignment will not be permitted.

The 2005 amendments to the Bankruptcy Code expressly carve out section 365(b)(3) from section 365(f)(1)'s general override of anti-assignment provisions. The effect of this carveout is to require that all restrictive covenants in a shopping center lease be complied with by an assignee of the debtor.  Applying this new provision, the Bankruptcy Court for the District of Delaware held in *In re Three A's Holdings, L.L.C.* that the debtor could not assume and assign its shopping center lease where an incurable default under a restrictive use covenant would have resulted.[449]

---

[447] 3 COLLIER ON BANKRUPTCY ¶ 365.06[3][c] (16th ed. 2010).

[448] *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) (citation and internal quotation marks omitted) (alteration in original).

[449] 364 B.R. 550, 557, 560-61 (Bankr. D. Del. 2007) (no assignment allowed where assignee proposed to use property as pharmacy rather than as a purveyor of "health supplies").

While the Bankruptcy Code does not define the term "shopping center," the Third Circuit articulated a multifactor test that courts regularly use to determine whether leased premises are in a shopping center.[450]   The most important factors to be considered in making this determination are likely to be whether there is "a combination of leases held by a single landlord, leased to commercial retail distributors of goods, with the presence of a common parking area."[451]

### 9.   Issues Regarding Lock-Up Agreements

#### a.   Restrictions on Solicitation of Votes Through Postpetition Lock-Up Agreements

A "lock-up" agreement, also known as a plan support agreement, is an agreement by a creditor to cast its vote either in favor of or against a plan of reorganization.  Essentially a device designed to assure in advance the successful confirmation of a plan based upon its agreed treatment of particular creditors or creditor groups, the lock-up agreement has generated substantial legal controversy, at least some of which appears to have been resolved by a 2005 amendment to the Bankruptcy Code.

The controversy arises because section 1125(b) of the Bankruptcy Code generally prohibits the solicitation of votes to accept or reject a plan after a case is commenced and prior to the approval of a disclosure statement.[452]   Votes that were properly solicited without a disclosure statement and cast before the bankruptcy filing are shielded by section 1126(b) to permit a prepackaged plan of reorganization, but votes cast after the filing are not covered by that section.

---

[450] *See In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1087-88 (3d Cir. 1990).  The full list of *Joshua Slocum* factors includes whether:  (i) there is a combination of leases; (ii) all leases are held by a single landlord; (iii) all tenants are engaged in commercial retail distribution of goods; (iv) a common parking area is present; (v) the premises was purposefully developed as a shopping center; (vi) a master lease exists; (vii) there are fixed hours during which all stores are open; (viii) joint advertising exists; (ix) the tenants are contractually interdependent as evidenced by restrictive use covenants; (x) there are percentage rent provisions in the tenants' leases; (xi) the tenants have the right to terminate their leases if the anchor tenant terminates its lease; (xii) the tenants share responsibility for trash removal and maintenance; (xiii) a tenant mix exists; and (xiv) the stores are contiguous.  Not all of these factors need to be present for the court to conclude that a property constitutes a shopping center.  *See id.*

[451] *In re Ames Dep't Stores, Inc.*, 348 B.R. 91, 95 (Bankr. S.D.N.Y. 2006) (citation and internal quotation marks omitted).

[452] 11 U.S.C. § 1125(b).

Arguably, a lock-up agreement is an agreement by a creditor to vote either in favor of or against a plan that is entered into at a time when there is no court-approved disclosure statement and, thus, violates section 1125(b).[453]   Two controversial decisions in 2002 of the bankruptcy court for the District of Delaware found postpetition lock-up agreements to violate section 1125(b)'s proscription against vote solicitation prior to dissemination of an approved disclosure statement and disqualified the creditors' votes on the chapter 11 plan as a result.[454]

Section 1125(g) was added to the Bankruptcy Code in 2005, apparently in response to these decisions.  Pursuant to section 1125(g), solicitation is permitted notwithstanding section 1125(b)'s prohibition on post-filing pre-disclosure-statement solicitation "if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law."  In other words, postpetition solicitation is allowed so long as the solicitation of the claim holder commenced prior to the bankruptcy filing and any applicable law (presumably the federal securities laws) was complied with.[455]

The effect of section 1125(g) is to protect pre-negotiated bankruptcies in the event that a bankruptcy petition is filed before a lock-up agreement is signed. Without this safe harbor provision, parties that were moving toward a consensual plan but had not yet finalized an agreement risked having their negotiations thwarted by a bankruptcy filing.[456]

---

[453] *See generally* Josef S. Athanas & Caroline A. Reckler, *Lock-Up Agreements—Valuable Tool or Violation of the Bankruptcy Code?*, 15 J. BANKR. L. & PRAC. 4 Art. 4, Part II (2006).

[454] *See* Transcript of Motions Hearing, *In re NII Holdings, Inc.*, No. 02-11505 (MFW) (Bankr. D. Del. Oct. 22, 2002); Transcript of Omnibus Hearing, *In re Stations Holding Co.*, No. 02-10882 (MFW) (Bankr. D. Del. Sept. 25, 2002); *see also In re NII Holdings, Inc.*, 288 B.R. 356, 362, 367 (Bankr. D. Del. 2002); *In re Stations Holding Co., Inc.*, 2002 WL 31947022, at *3 (Bankr. D. Del. Sep. 30, 2002).

[455] *See, e.g.*, *In re CIT Group Inc.*, 2009 WL 4824498, at *3-4 (Bankr. S.D.N.Y. Dec. 8, 2009).

[456] Kurt A. Mayr, *Unlocking the Lock-Up:  The Revival of Plan Support Agreements Under New § 1125(g) of the Bankruptcy Code*, 15 J. BANKR. L. & PRAC. 6 Art. 1 (2006) [hereinafter Mayr, *Unlocking*] ("[A]bsent § 1125(g), a debtor in the midst of finalizing a prenegotiated bankruptcy filing would risk forgoing the benefit of that process if it became necessary for the debtor to file for bankruptcy before it was able to gather all necessary plan support agreement signatures because of the potential that any postpetition plan support agreement activity could be deemed a 'solicitation.'").

Section 1125(g) does not, however, on its face, protect lock-up agreements that are negotiated entirely postpetition. With respect to lock-up agreements negotiated entirely postpetition, it remains to be seen whether courts will continue to follow the rule articulated by the Delaware bankruptcy court that lock-up agreements signed without an approved disclosure statement constitute an impermissible solicitation under section 1125(b). One consequence of improper solicitation is that the locked-up votes may be disqualified. The fact that parties have acted in good faith to secure their recoveries as creditors by entry into a lock-up agreement may not be enough to avoid disqualification of their votes.[457] While protective devices, such as "fiduciary outs," which allow a party to the lock-up to support a different agreement to fulfill its fiduciary duty, *may* prevent a court from disqualifying votes where a "lock-up" serves a legitimate purpose and has reasonable terms, some bankruptcy courts have disqualified votes simply because they are "locked up" postpetition, as discussed above.[458]

An unpublished Delaware decision suggests that, following the enactment of section 1125(g), courts may be loosening the approach articulated in the two Delaware decisions described above. In *In re Owens Corning*, the court held that a plan support agreement did not necessarily constitute a "solicitation."[459] In that case, the creditors negotiated a settlement agreement that included a term sheet that would be reflected in a sixth amended plan.[460] The U. S. Trustee argued that the plan support agreement constituted an impermissible solicitation under section 1125(b). The court disagreed, noting that "negotiation and settlement do not

---

[457] But see *In re Indianapolis Downs, LLC*, 2013 WL 395137 at *6 (Bankr. D. Del. Jan. 31, 2013) (noting that where parties to a plan support agreement "were acting at all times to maximize their own recoveries and to advance the Debtors' reorganization process to facilitate a prompt and substantial return on their respective claims[, d]esignation of their votes is neither required nor warranted.").

[458] See *In re NII Holdings* and *In re Stations Holding Co.*, *supra* n. 453.

[459] Transcript of Hearing at 8-15, *In re Owens Corning*, No. 00-03837 (JKF) (Bankr. D. Del. June 23, 2006) [hereinafter June 23 Hearing Transcript]; *see also* Transcript of Hearing at 16-17, *In re Owens Corning*, No. 00-03837 (JKF) (Bankr. D. Del. June 19, 2006) [hereinafter June 19 Hearing Transcript] (indicating that the parties to the plan support agreement agreed to support the plan only if (1) the plan, the disclosure statement and the rights offering documents are satisfactory to the holders, (2) the material terms of the plan are substantially identical to the terms set forth in the plan support agreement, (3) the disclosure statement accurately describes terms of the plan and is approved by the court and (4) no material modifications of the plan documents or material breaches of the plan support agreement occur); *see generally* Kurt A. Mayr, *Postpetition Plan Support Agreements*; *Delaware Bankruptcy Court Gives Approval*, BANKR. STRATEGIST, Sept. 2006, at 1.

[460] *See* June 19 Hearing Transcript, *supra*, at 14-16.

constitute solicitation."[461]   The court seems to have been swayed, in part, by the existence of an approved disclosure statement for a prior fourth amended plan, which had been found to contain "adequate information" with regard to that earlier plan.[462]

Similarly, in its recent opinion in *In re Indianapolis Downs, LLC*,[463] the Delaware bankruptcy court denied a motion to disqualify votes based on a post-petition lock-up agreement that was signed and filed with the court on the same day that the debtor filed a disclosure statement. Given the timing and the fact that the creditors' "commitment to vote was limited to a plan conforming to the [agreement], after Court approval of an appropriate and conforming disclosure statement."[464]   the court held that the solicitation should be "deemed to have taken place after the Court approved the amended disclosure statement."[465] In any case, the court noted that "[w]hen a deal is negotiated in good faith between a debtor and sophisticated parties, and that arrangement is memorialized a written commitment and promptly disclosed," automatic designation is not required. While the *Owens Corning* and *Indianapolis Downs* decisions have reduced the risk that a postpetition lock-up may be invalidated in Delaware, debtors and creditors should continue to consider carefully the circumstances of their particular case in assessing whether any lock-up they agree upon will be sustained.

> ### b.   Prepetition Lock-Up Agreements:  Ineligibility to Sit on a Creditors' Committee

Entry into a prepetition lock-up agreement also may have the unintended consequence of depriving a creditor of the ability to serve on an official creditors' committee.  In 2002, the Office of the U.S. Trustee for the Third Circuit (which includes Delaware) adopted the position that any creditor that executes a

---

[461] June 23 Hearing Transcript, *supra*, at 15.

[462] *See id.* at 13 ("[T]he parties, through their counsel, know all there is to know about the debtors and how the debtors' operations have changed in the two years since the disclosure statement was approved"); *see also* June 19 Hearing Transcript, *supra*, at 36-39.

[463] 2013 WL 395137, at *6 (Bankr. D. Del. Jan. 31, 2013).

[464] *Id.*

[465] *Id.*, at *7 (citing *In re Kellogg Square Partnership*, 160 B.R. 336 (Bankr. D.Minn. 1993))

prepetition lock-up agreement is ineligible to serve on a creditors' committee.[466] This position appears to have been motivated by a concern that the use of pre-negotiated chapter 11 plans and lock-up agreements harms small creditors and official committees by depriving them of a meaningful role in the chapter 11 plan formulation process:  if major creditors negotiate lock-ups prepetition, then, by the time a creditors' committee can be appointed, the plan is effectively a *fait accompli*.

In any jurisdiction, creditors wishing to preserve their ability to serve on an official committee should consider including "fiduciary out" provisions in lock-up agreements.  There is no guarantee, however, that the inclusion of a "fiduciary out" provision will prevent the U.S. Trustee from opposing such a creditor's bid to serve on an official committee.  Prior to entering into lock-up agreements, creditors must consider this risk.  At the same time, potential purchasers and plan sponsors should recognize that compelling friendly unsecured creditors to enter into lock-up agreements prepetition could result in control of the creditors' committee being turned over to potentially less friendly creditors.

### c.    Prepetition Lock-Up Agreements:  Difficulty of Assumption

Entry into a lock-up agreement will generally provide tangible benefits to a debtor.  From the perspective of a creditor, however, any benefits expected to arise from a prepetition lock-up agreement may be ephemeral, as such a contract will be subject to rejection and, unless assumed, exceedingly difficult to enforce. Moreover, assumption of a lock-up agreement, even if sought by a debtor, will not always be granted by a bankruptcy court.  For example, in *In re Innkeepers USA Trust*, the bankruptcy court declined to permit a debtor to assume a lock-up agreement.[467]

---

[466] *See* Roberta A. DeAngelis & Nan Roberts Eitel, *Committee Formation and Reformation: Considerations and Best Practices*, AM. BANKR. INST. J., Oct. 2011, at 58 (citing lock-ups and intercreditor agreements as conflicts that disqualify creditors from serving on a committee).

[467] *See* 442 B.R. 227 (Bankr. S.D.N.Y. 2010).  *Innkeepers* appears to have presented particularly problematic circumstances, however.  The bankruptcy court found that entry into the agreement, which purported to bind the debtor to propose a plan favoring certain of its secured creditors over others, was not a disinterested business transaction, as the debtor's controlling shareholder stood to gain from the transaction.  Moreover, in light of the debtor's truncated marketing process and minimal diligence, the substantial possibility that consenting creditors would not be obligated to support the proposed plan, and the limited fiduciary out retained by the debtor, the bankruptcy court determined that the debtor had exercised neither due care nor good faith in entering into the lock-up agreement and that the debtor would not benefit from its assumption.

# IV

# Acquisition and Trading in Claims of Distressed Companies

Purchase of a distressed company's debt can create a number of opportunities for a potential purchaser:  It can open the door to an information advantage  over other potential buyers and a profit opportunity if the acquisition is not consummated but the debt appreciates in value.  Owning claims pre-bankruptcy can provide leverage to require a company to sell assets, raise equity or offer to exchange debt for equity.  Owning claims also can provide an inside track if an issuer decides to enter a prepackaged or pre-negotiated bankruptcy.  A debtholder also has advantages in the bankruptcy process, including the right to be heard in court as well as, for a secured creditor, the ability to credit bid in an auction.  The purchase of sufficient amounts of debt also gives a holder the ability to influence the confirmation of a bankruptcy plan.  This Part IV raises issues for an investor to consider with respect to purchasing claims both pre- and post-bankruptcy filing.  In addition to bankruptcy law considerations, the trading of claims also should be considered in light of the tax, securities laws  and HSR Act implications discussed below.

## A.    What Claims Should an Investor Seeking Control Buy?

### 1.    The Claim Purchaser Should Identify and Acquire the "Fulcrum Security"

Claims may trade in organized markets or *ad hoc*.  Bond debt, bank debt and trade debt are all traded, with bond debt generally proving the least challenging investment and trade debt the most challenging due to the greater uncertainty of how much, if any, of the claim will be allowed.[468]  In certain recent cases, such as the Lehman Brothers and MF Global bankruptcies, the volume of claims traded has been extremely high.  For instance, claims trading market operator SecondMarket recorded 867 MF Global trades with a total value of $3.79 billion in October 2012 alone.[469]

---

[468] *See* Adam Levitin, *Bankruptcy Markets: Making Sense of Claims Trading*, 4 Brook.J. Corp. Fin. & Com. L. 64, 82 (2010).

[469] Jacqueline Palank, *Lehman, MF Global Dominate October Claims Trading*, WALL ST. J. (Nov. 29, 2012), http://blogs.wsj.com/bankruptcy/2012/11/29/lehman-mf-global-dominate-october-claims-trading/. SecondMarket has since shut down its bankruptcy claims trading platform.  Rachel Feintzeig, *SecondMarket Shuts Down Bankruptcy Claims Platform*, DAILY BANKR. REV., Mar. 19, 2013, at 5.

An investor seeking to acquire a controlling stake in a reorganized debtor generally will want to accumulate the so-called "fulcrum" security—*i.e.*, the claims or interests that are entitled to the debtor's residual value. When a debtor has adequate collateral to refinance or reinstate all of its secured debt, the "fulcrum security" is likely to be the unsecured debt. In contrast, when a debtor can reinstate or repay its first-lien lenders, but not lenders with junior liens, the company's second- or even third-lien debt will be the fulcrum security. And in situations where a debtor is solvent, prepetition equity interests are the fulcrum security. Regardless of which security is ultimately at the fulcrum, its holders are in a position to control a debtor if that security is converted to new equity.

It may be beneficial for a potential acquiror to buy more than just the fulcrum security. For one thing, subject to the cramdown rules discussed in Part III.B.2.f of this outline, which may obviate the need for an affirmative vote by a class, the ability to ensure confirmation (or rejection) of a plan depends on the tally of votes of various classes. Thus, to influence the process, it can be beneficial to hold large positions in other classes in addition to the one that holds the "fulcrum security."

Further, often there is uncertainty and controversy over what class is at the fulcrum, in addition to the possibility that the actual or perceived value of a debtor, and, hence, the location of the fulcrum, may shift over time before or during the chapter 11 case. In the *Calpine* case, for example, the debtors' equityholders fiercely disputed the assertion that they were "out of the money," but ultimately settled for only a small portion of the debtors' new equity. In the *Collins & Aikman* case, the primary issue during the course of the case was whether unsecured creditors were "out of the money," or, alternatively, whether they were the residual claimants to the company's value. In the *Six Flags* case, the fulcrum was a moving target, shifting between the secured and unsecured debt during the course of the restructuring. The original plan of reorganization would have converted secured bank debt into equity. Subsequent plans resulted in two groups of unsecured bondholders (one at the operating-company level and one at the parent-company level) fighting over the equity. Another dramatic example of a shifting fulcrum security is the restructuring of General Growth Properties, where the fulcrum swung from the unsecured debt to the equity, with offers to purchase the equity reaching a value of more than $15/share.

Of course, many variables can affect the ultimate valuation at the end of a case, from a failure to achieve projected post-bankruptcy operating results (*e.g.*, *Collins & Aikman*) to deteriorating capital markets and industry conditions (*e.g.*, *Delphi*). In light of this inherent uncertainty, a purchaser that buys only claims or interests in a junior class that could prove to be "out of the money" runs the risk

of having a plan confirmed through a cramdown based on a low-end valuation of the debtor, leaving the purchaser with little or no recovery.  In contrast, a purchaser seeking to control a reorganized entity that buys only claims in a class of senior debt that ultimately could be reinstated runs the risk of holding unwanted debt in the reorganized debtor rather than new equity.  Buying a controlling share of claims at the fulcrum can require a significant investment, particularly at the general unsecured level, given that both unsecured financial debt and significant trade claims, lease rejection and contract claims may be classified together.  The proponent of a plan of reorganization can manipulate classification within the limits of section 1122 of the Bankruptcy Code so as to dilute control of a class by enlarging the class to include claims of a like legal nature or can reduce the size of a class by splitting out likely dissidents into a class of their own and then cramming that class down, as discussed in Part III.B.2.f of this outline.  The ultimate size of the general unsecured class will be affected by contract rejection, liquidation of contingent or unliquidated claims and the materialization of other previously unknown claimants such as environmental and tort claimants.  Thus, it may be impossible to achieve certainty with respect to control of such a class. We now turn to strategic considerations in accumulating a control position in a class of claims.

### 2.   Strategic Considerations in Accumulating a Blocking or Controlling Position

Buying a control position in a class of claims can be trickier than it appears.   Generally, confirmation of a plan of reorganization requires the affirmative vote of at least two-thirds in amount plus a majority in number of those voting in each creditor class entitled to vote.[470]  Thus, although a purchaser can *block* the acceptance of a plan by a class by acquiring more than one-third in amount of the claims in that class, to acquire a control position, *i.e.*, one that is sufficient to ensure that the class *approves* a plan, a purchaser must acquire two-thirds in amount and a majority in number of the relevant claims.  As a result, if, for example, a purchaser were to acquire $99 million of a separately classified $100 million note issue, and a holdout, refusing to sell its $1 million of the issue, was the only other creditor in the class, the holdout can, nonetheless, block plan acceptance by the class despite the purchaser's overwhelming dominance in amount.[471]

---

[470] *See* 11 U.S.C. § 1126(c).

[471] For the relatively rare case of a debtor with meaningful value for equity interests, control of a class of interests is simpler.  Acceptance of a plan by a class of equity interests, such as a class of

The majority-in-number ("numerosity") requirement of section 1126(c) does not mesh well with the significant increase in the trading of claims that has occurred in recent years. Application of the numerosity requirement to traded claims raises some difficult questions, including whether claims originally held by separate parties continue to count as separate claims when they are consolidated into the hands of one party and, conversely, whether a claim originally held by a single party will be counted as multiple claims once it is split into pieces and sold.

The law is relatively clear that—for purposes of the numerosity test—holders of multiple purchased *trade* claims are entitled to as many votes as they have acquired claims.[472] Courts analyzing the voting of purchased trade claims have reasoned that each such claim arises out of a separate transaction with the debtor and, thus, constitutes a separate right to payment against the debtor. Using the same logic, a single trade claim arguably *cannot* be split among various buyers for voting purposes. Indeed, en route to holding that a purchaser of multiple claims is entitled to vote each claim separately, the Ninth Circuit cautioned: "Of course, that is not to say that a creditor can get away with splitting one claim into many, but that is not what happened here."[473] The Ninth Circuit further explained that "votes of acceptance . . . are to be computed only on the basis of filed and allowed proofs of claim," regardless of whether those claims are later split.[474] Thus, just as the Ninth Circuit did not allow votes pertaining to separately filed proofs of claim to be collapsed, it appears that it might not allow multiple votes to be cast on account of a claim that was evidenced by a single proof of claim if the claim were sold to multiple buyers. Moreover, it is unclear which buyer (if any) would retain the right to vote if the claim were sold to multiple buyers.

In contrast, claims based on notes or bonds from the same issue generally are not counted separately once they are concentrated in the hands of one creditor.[475] Thus, for example, even bondholders that have accumulated positions

---

preferred stock, is tallied solely by reference to the vote of two-thirds in "amount" of the interests. 11 U.S.C. § 1126(d).

[472] *See, e.g.*, *In re Figter Ltd.*, 118 F.3d 635 (9th Cir. 1997); *In re Concord Square Apartments of Wood County, Ltd.*, 174 B.R. 71 (Bankr. S.D. Ohio 1994); *In re Gilbert*, 104 B.R. 206 (Bankr. W.D. Mo. 1989).

[473] *In re Figter*, 118 F.3d at 641.

[474] *Id.* at 640 (quoting *In re Gilbert*, 104 B.R. at 211).

[475] *See In re Bd. of Dirs. of Multicanal S.A.*, 314 B.R. 486, 515 (Bankr. S.D.N.Y. 2004) (suggesting, *in dicta*, that holders rather than holdings are counted under U.S. law to determine numerosity in the case of notes and bonds); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 36

from multiple sellers at varying prices are likely to receive only a single vote. Although few cases have squarely addressed the issue, the apparent rationale for treating bond or note claims differently from trade claims is that, unlike trade claims, claims arising out of a single financing transaction do not arise out of separate contractual relationships and transactions.

An acquiror can seek to maximize its influence over the voting process by paying attention to the Bankruptcy Code's numerosity requirement. When buying trade claims, an acquiror can seek to buy a large number of small claims rather than a small number of large claims. It should be noted, however, that purchasing multiple trade claims can bring a significant practical burden: each claim requires individual scrutiny to ensure that the claim is not burdened with potential objections to its validity or amount.

At least in certain circumstances, moreover, an acquiror of financial debt can monitor who else owns the debt; if the debt is dispersed, a purchaser can buy from multiple parties, thus decreasing the risk that a favored plan will be voted down based on the numerosity requirement.[476] Finally, a buyer of financial debt might purchase claims through multiple entities, understanding that there is some risk that a court ultimately might deem the claims to be held by one entity due to their common control.

**B.      What Rights Does the Claim Purchaser Obtain?**

**1.      Assignment or Sale Is Required**

It is generally better, though not always possible, for a potential acquiror to purchase claims against a debtor by assignment or sale, rather than through a participation agreement or synthetically through a total return swap.

A participation is an arrangement between an investor and a claim holder in which the investor receives the economic rights that accompany a given claim without taking an assignment of the claim itself. In other words, the actual claim holder agrees to forward to the investor payments and distributions it receives from the debtor as a holder of the claim. However, because the claim holder

---

(Bankr. D. Del. 2000) (minority of noteholders rejected a reorganization plan since each noteholder had one vote regardless of the size of their holdings, resulting in 321 of 497 noteholders rejecting the plan, though those 321 noteholders only held $6 million worth of notes, compared to $98 million held by those who voted to accept the plan).

[476] As a general matter, the plan proponent will establish a record date for determining the ownership of claims, at which time the numerosity requirement is determined.

remains as a pass-through vehicle for payments to the investor, the investor becomes a creditor of the claim holder, not of the debtor directly, and assumes the counterparty risk of the claim holder in addition to the inherent credit risk of the debtor.  During the bank and hedge fund failures of the past years, this potential risk of participations was significant.

Buying a participation in a claim can be an effective means of sharing in the economics of the debt instrument when the purchaser either is not a permitted assignee or does not want to identify itself to the issuer.[477]  However, a holder of a participation does not have a claim against the debtor,[478] meaning the participant may not have a "seat at the table" in negotiations with the debtor.

Credit agreements typically prohibit a lender from contracting with the holder of a participation for the right to direct the lender's vote or consent rights, subject to an exception for certain fundamental matters that require the consent of each holder. These matters typically include funding commitment increases, forgiveness of principal or interest, payment date postponements and changes to the percentage of holders required to amend or waive various provisions of a credit agreement.  Thus, while the buyer of a participation in bank or other loan debt may obtain some significant rights in the acquired claim, such an indirect investor nevertheless will not be directly entitled to significant benefits and advantages that can only be gained by an outright purchase of the claim.

This said, as a practical matter, significant economic stakeholders in a company are often able to negotiate with a debtor whether they hold directly or derivatively through a participation or total return swap.  For example, a seller of a participation may (and often does) vote as directed by the buyer of a participation, even if not obliged to do so under contract.  And while the seller of a total return swap generally will not contract to vote the wishes of the buyer, the

---

[477] There is a risk, however, that buying a participation may not be possible for non-permitted assignees.  In one case, a court enjoined a lender from selling a 90% participation in a loan to another bank that was under common ownership with the borrower's competitor.  *Empresas Cablevision, S.A.B. DE C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631-32 (S.D.N.Y. 2010), *aff'd and remanded*, 381 F. App'x 117, 118 (2d Cir. 2010) (limiting injunction to prohibition on "exercise of any right . . . that might tend to give [competitor] a competitive advantage").  The district court found that the participation was a violation of the covenant of good faith and fair dealing because the lender only attempted to sell the participation (which contained extraordinary information access provisions) after the borrower refused to consent to an assignment.  680 F. Supp. 2d at 631-32.

[478] *See In re Okura & Co.*, 249 B.R. 596, 602 (S.D.N.Y. 2000) ("In order for a claim to arise there must be a 'right to payment.'").

practice has tended toward consultation with the buyer. In addition, a buyer of a total return swap that will be physically settled may be able to claim certain advantageous entitlements of the seller, or actual holder of the debt, during bankruptcy proceedings.

A related issue concerns the claims of those who believe they hold a security but actually do not have an interest, such as a party whose prime broker has loaned out the relevant security. While not common, putative holders of debt claims against firms seeking to reorganize occasionally have discovered that their securities were loaned out by their brokers and could not be voted until retrieved, which can prove nearly impossible where the company is in play and the security in question appears to be the fulcrum. Distressed investors should consider removing securities of reorganizing companies from margin accounts and/or making other arrangements with their brokers to ensure they can vote their economic interests. Similarly, investors should pay close attention to the obligor of any claims they may purchase, as the investor's rights in a bankruptcy case may be limited if the obligor is not a debtor. For example, in *In re Innkeepers USA Trust*, the bankruptcy court for the Southern District of New York held that a holder of certificates of two CMBS securitization trusts had no standing to be heard in the debtor's case despite the securitization trusts' ownership of mortgage loans made to the debtor.[479]

### 2.   Claims Purchasers Acquire the Rights of the Transferor, No More, No Less

There is no provision of the Bankruptcy Code that explicitly regulates claims trading.[480]   Nonetheless, trading in claims against debtors is clearly contemplated, as Bankruptcy Rule 3001(e) requires filing with the court clerk proof of any transfer of a claim for which a proof of claim has already been filed.

Under Bankruptcy Rule 3001(e), when a claim is transferred outright before a proof of claim has been filed, only the transferee may file a proof of claim.[481]   Apart from limited circumstances where bankruptcy principles may

---

[479] 448 B.R. 131, 143 (Bankr. S.D.N.Y. 2011).

[480] *See RenGen Capital I, Inc. v. UAL Corp. (In re UAL Corp.)*, 635 F.3d 312, 324 (7th Cir. 2011) ("Claims trading remains a gray area in bankruptcy law that the courts and Congress have left to the parties to negotiate.").

[481] A Sixth Circuit decision clarified that transferees, when filing proofs of claim, may rely on industry-standard warranties and typical due diligence as to the underlying claim. *See B-Line, LLC v. Wingerter (In re Wingerter)*, 594 F.3d 931 (6th Cir. 2010) (reversing lower court decision sanctioning creditor for failing to make reasonable pre-filing inquiry into validity of claim).

limit the validity or amount of a purchased claim, the general rule applied by bankruptcy courts is that a claim has the same rights and disabilities in the hands of the purchaser as it did in the hands of the original claimant.[482]

The purchase of a claim may not result in the acquisition of related tort or securities law claims for losses suffered by the original holder unless specified in the transaction documentation.  The standard documentation used to trade bank debt explicitly transfers rights to litigation against the debtor and third parties, but those standard documents may be modified by the parties.[483]

### 3.  Whether Disabilities Travel with Transferred Claims: Equitable Subordination in *Enron*

Section 510(c) of the Bankruptcy Code permits a bankruptcy court to "equitably subordinate" all or part of a particular creditor's claim to the claims of other creditors.  Equitable subordination is an extraordinary remedy that is available when a creditor has engaged in inequitable conduct—such as fraud— that injured other creditors.  In such circumstances, the bankruptcy court has the authority, in its capacity as a court of equity, to alter the payment priorities of the Bankruptcy Code to remedy the harm suffered on account of the claimant's inequitable conduct.[484]

In 1977, the Fifth Circuit in *In re Mobile Steel Co.* articulated what has become the most commonly accepted standard for equitably subordinating a creditor's claim.[485]  Under *Mobile Steel*, a claim may be equitably subordinated if (1) the claimant engaged in some type of inequitable conduct, (2) the misconduct

---

[482] *See generally* Chaim J. Fortgang & Thomas Moers Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11*, 12 CARDOZO L. REV. 1, 13 & n.74 (1990).

[483] *See* Amicus Curiae Brief of the Loan Syndications & Trading Association, Inc. at 8-9, *Trust for Certificate Holders of Merrill Lynch Mortg. Investors, Inc. Mortg. Pass-Through Certificates, Series 1999-C1 v. Love Funding Corp.*, 13 N.Y.3d 190 (2009) (No. 07-1050).

[484] *See Pepper v. Litton*, 308 U.S. 295, 304-06 (1939) (bankruptcy court has exclusive jurisdiction over subordination, allowance and disallowance of claims, and may reject a claim in whole or in part according to the equities of each case).  Some courts have determined that they have the power to disallow, rather than merely subordinate, a claim on equitable grounds, although the question remains controversial.  *See, e.g.*, *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1350 (7th Cir. 1987) ("If the court finds that [transactions between the debtor and an insider] are inherently unfair, it is within its equitable powers to subordinate or disallow the insider's claims pursuant to section 510(c)."); *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64, 76 (S.D.N.Y. 2008) (concluding that equitable disallowance remains a viable remedy).

[485] 563 F.2d 692, 699-700 (5th Cir. 1977).

resulted in injury to creditors (or conferred an unfair advantage on the claimant) and (3) equitable subordination of the claim is otherwise consistent with the provisions of the Bankruptcy Code.[486]  Where a claimant is an insider, courts will apply stricter scrutiny to the claimant's conduct in determining whether subordination is appropriate.[487]

Although the case law is clear that claim purchasers generally acquire the same rights as the transferor, the law is less settled as to whether or when a cause of action against the transferor travels with the claim itself.  For example, the cases are split as to whether section 502(d) of the Bankruptcy Code—which mandates disallowance of a claim until a creditor has repaid any avoidable transfers—warrants disallowance of a claim held by a transferee based on the transferor's receipt of a preference.[488]

In *In re Enron Corp.*, the Bankruptcy Court for the Southern District of New York considered whether the inequitable conduct of a transferor could serve as a basis for the equitable subordination of the claims held by an innocent transferee.[489]  The bankruptcy court ruled that the transferee of a claim *is* subject to any equitable subordination claim that could be asserted against the transferor—reasoning that "[t]here is no basis to find or infer that transferees should enjoy greater rights than the transferor."[490]  On appeal, the United States District Court for the Southern District of New York vacated the bankruptcy

---

[486] *See, e.g.*, *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998); *In re Hydrogen, L.L.C.*, 431 B.R. 337, 360-61 (S.D.N.Y. 2010) (noting, however, that third prong carries "minimal significance" today because current version of Bankruptcy Code explicitly provides for remedy of equitable subordination); *In re Verestar, Inc.*, 343 B.R. 444, 460-61 (Bankr. S.D.N.Y. 2006); *In re Lois/USA, Inc.*, 264 B.R. 69, 132-33 (Bankr. S.D.N.Y. 2001).

[487] *See, e.g.*, *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 744 (6th Cir. 2001) ("When reviewing equitable subordination claims, courts impose a higher standard of conduct upon insiders."); *In re Herby's Foods, Inc.*, 2 F.3d 128, 131 (5th Cir. 1993) ("if the claimant is an insider, less egregious conduct may support equitable subordination"); *In re Interstate Cigar Co.*, 182 B.R. 675, 681 (Bankr. E.D.N.Y. 1995) ("Court gives 'special scrutiny' to [an insider's] transactions with the Debtor").

[488] *Compare In re Wood & Locker*, No. MO 88 CA 11 (LDB), 1988 U.S. Dist. LEXIS 19501, *8-9 (W.D. Tex. June 17, 1988) (transferee's claim not disallowed based on transferor's receipt of preference), *with In re Metiom, Inc.*, 301 B.R. 634, 642-43 (Bankr. S.D.N.Y. 2003) (transferee's claim could be disallowed based on the transferor's receipt of preference).

[489] *See* 333 B.R. 205 (Bankr. S.D.N.Y. 2005), *vacated* 379 B.R. 425 (S.D.N.Y. 2007).

[490] 333 B.R. at 223.

court's ruling, holding that "[e]quitable subordination and disallowance are personal disabilities of the claimant and travel with the claim only when the claim is assigned, [and] not when it is sold."[491]  The district court pointed out that, under nonbankruptcy law, transferees can enjoy greater rights than their transferor in some instances.[492]

Under the district court's standard, whether a disability travels with a claim turns on whether the claim was transferred via an "assignment" or via a "sale."  While an assigned claim in the hands of the transferee can be equitably subordinated, a claim transferred by a true sale cannot be.[493]  The district court's opinion, however, provides little practical guidance on how to effectuate a "sale" as opposed to an "assignment," stating only that "the legal effect" of a transfer agreement, and "not [its] name," is controlling.[494]  The district court's distinction is a surprising one:  before the district court's decision, market actors generally did not distinguish between an assignment and a sale of a claim, and claim transfer documents have routinely provided for the "sale" *and* "assignment" of claims.

The district court in *Enron* remanded the matter to the bankruptcy court for additional fact-finding as to whether the claims at issue were transferred by way of sale or assignment, and the dispute was settled thereafter.  The district court's decision in *Enron* has been criticized by other courts, including in a recent bankruptcy case in Delaware. In *In re KB Toys*, the Bankruptcy Court for the District of Delaware came to the opposite conclusion and found that a disability travels with trade claims, criticizing the *Enron* decision.[495]  Unimpressed by the trustee's assertions that the transfers were assignments and transferee's assertion that the transfers were sales, the *KB Toys* court stated that drawing a distinction between a sale and an assignment was "unrevealing of the appropriate outcome" even if there were a clear way to distinguish between the two.[496]  The court

---

[491] *In re Enron Corp.*, 379 B.R. 425, 439 (S.D.N.Y. 2007).

[492] *Id.* at 436 (applying principles of the law of sales, where a purchaser can attain more rights than the seller has).  *See, e.g.*, N.Y. U.C.C. § 8-202(d) (all defenses of the issuer of a security, with enumerated exceptions, are ineffective against a purchaser for value who has taken the security without notice of the particular defense).

[493] *See In re Enron Corp.*, 379 B.R. at 439.

[494] *Id.* at 435.

[495] *In re KB Toys, Inc.*, 470 B.R. 331 (Bankr. D. Del. 2012).

[496] *Id.* at 341.

considered the fact that many of the claim transfer agreements contained indemnification provisions in favor of the transferees in case of disallowance to be an indication that the transferee understood and accepted the risk.[497]   The bankruptcy court's decision was appealed to the District Court for the District of Delaware, which affirmed the ruling, and is now on appeal to the Third Circuit Court of Appeals.

Pending further development in the law, the *Enron* district court's distinction between "transfers by assignment" and "transfers by sale" should give claim purchasers strong incentive to attempt to characterize a claim transfer as a sale rather than as an assignment.[498]   Additionally, claims purchasers should continue to seek indemnity agreements from their transferors (such as an indemnity against or representation and warranty with respect to the existence of defenses to the transferred claims) and structure transactions so as to take advantage of all commercially reasonable protections.

### 4.        Recharacterization of Debt as Equity

Along with the risk of equitable subordination, a claim buyer also faces the risk that an ostensible debt will be recharacterized as equity.  Recognizing that a counterparty to a troubled firm, such as, in particular, a sponsor, parent, affiliate, insider or fiduciary, may have the ability to denominate advances to the firm as either "debt" or "equity," many courts have held that a bankruptcy court has the power to look behind the name assigned to a particular infusion of funds and determine whether the arrangement should be treated as debt or equity in a bankruptcy case.[499]

Recharacterization focuses on whether a debt actually exists and not on whether a claim should be reprioritized.  If a court determines that an advance is

---

[497] *Id.* at 342.

[498] Some have characterized the district court's decision as "merely reinstat[ing] the *status quo* in the claims-trading market," and nullifying a decision that would have "severely chilled a booming industry."  Aaron L. Hammer & Michael A. Brandess, *Enron and the Bravado Sheriff of Claims Trading*, Am Bankr. Inst. J., Jan. 2011, at 86.  *But see In re KB Toys, Inc.*, 470 B.R. at 342 ("[T]he assertion that subjecting transferred claims to section 502(d) allowance would cause disruption in the claims trading market is a hobgoblin without a house to haunt.").

[499] *See, e.g.*, *In re SubMicron Sys. Corp.*, 432 F.3d 448 (3d Cir. 2006) (recognizing power to recharacterize, but affirming refusal to do so); *In re Autostyle*, 269 F.3d 726 (6th Cir. 2001); *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 73-75 (Bankr. S.D.N.Y. 2007).  A minority of courts have held that bankruptcy courts lack power to recharacterize as equity what has been labeled debt, but, at present, this represents neither the majority view nor the trend in the cases.

equity rather than debt, then the claim will be treated as an ownership interest in respect of which no portion of the company's assets can be distributed unless and until its debts are paid in full.  Moreover, once a court deems purported loans to be infusions of equity, the court may also conclude that any transfers to the holder on account thereof were dividends that the estate can recover as fraudulent transfers.  By contrast, in the case of equitable subordination, where an otherwise legitimate creditor engaged in misconduct, the remedy is subordination of the creditor's claim to the claims of other creditors—but not to equity interests—and only to the extent necessary to offset injury or damage caused by the offending creditor.

Recharacterization is within the equitable discretion of the bankruptcy court, and the decision to impose it is highly fact dependent.  Courts may consider, among other factors, the labels given to the debt; the presence or absence of a fixed maturity date, interest rate and schedule of payments; whether the borrower is adequately capitalized; any identity of interest between the borrower and the equity owner; whether the loan is secured; and the borrower's ability at the time the putative debt was incurred to obtain financing from non-insider lending sources.[500]  The gist of the analysis is "typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity)."[501]

A claim purchaser, therefore, should assess the risk of recharacterization before buying debt that was incurred in circumstances that create a risk of recharacterization.  Such an analysis may be particularly important for private equity firms:  purchases by a private equity firm of its portfolio company's debt may be exposed to less risk if the debt is purchased in the secondary market, rather than originated by making a direct extension of credit to the issuer.

In "rescue capital" transactions involving the issuance of both debt and equity where the investor ultimately obtains control, the risk of recharacterization of the debt portion of an investment may be heightened given the intent to control manifested by the equity component of the transaction.

---

[500] Paradoxically, because the inability to obtain loans from a third-party financing source is a factor weighing in favor of recharacterizing an insider's loan as equity, insiders may be deterred from making loans to save their failing businesses when non-insiders are unwilling to do so.

[501] *See In re SubMicron*, 432 F.3d at 456*; accord In re Autostyle*, 269 F.3d at 748-53.

5.      **Revolving Debt**

The risks and benefits discussed above are also applicable to the purchase of claims under revolving debt facilities. However, because the purchase of revolving debt involves a commitment to fund yet-to-be funded obligations (and/or re-fund amounts paid on such debt), market practice for the purchase of revolver debt in the secondary market has some peculiarities worth noting. When a seller of revolving debt that includes an unfunded portion assigns it to a buyer, the seller must provide a *pro rata* share of the unfunded portion related to the selling price. For example, if the debt is being sold at 75 cents on the dollar, the buyer will receive 25 cents for every unfunded dollar.[502] This amount, which is to be offset against the purchase price of the debt, is intended to compensate the buyer in case it must fund the currently unfunded portion.

The market practices for trading in revolving claims have led to different sets of forms being developed to accommodate the variance in trading terms. The Loan Syndications and Trading Association ("LSTA") has developed form contracts for both at-par and below-par trades of revolving debt as well as taking into account purchase price adjustments for commitment reductions and permanent repayments of fees.[503]

C.      **Acquisition of Claims Confers Standing to Be Heard in a Chapter 11 Case**

1.      **Section 1109(b)**

An investor that wishes to participate in a company's chapter 11 case generally needs to qualify as "a party in interest" under section 1109(b) of the Bankruptcy Code. That section grants a party in interest the right to "raise and . . . be heard on any issue." While section 1109(b) specifically defines certain parties as "parties in interest" (including the debtor, the creditors' committee, the equity committee, any creditor, any equity security holder or an indenture trustee), the provision is not intended to be exhaustive.[504]

---

[502] *See generally*, THE LOAN SYNDICATIONS AND TRADING ASSOCIATION, INC., STANDARD TERMS AND CONDITIONS FOR DISTRESSED TRADE CONFIRMATIONS, Section 4 (Feb. 6, 2009).

[503] *Id. See also* LSTA website, Standard Documents and Market Practices, http://www.lsta.org/hub_stddoc.aspx?id=110.

[504] *See, e.g.*, *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.21 (3d Cir. 2004) (noting that statutory list of "parties in interest" is not exhaustive); *In re Co Petro Mktg. Group, Inc.*, 680 F.2d 566, 572-73 & n.12 (9th Cir. 1982) (holding that a regulatory agency with supervisory

Despite the broad definition of "party in interest," the Third Circuit, as well as other courts, has ruled that a prospective acquiror is not, by virtue of such status, a "party in interest" with standing to be heard in a chapter 11 case even if the acquiror has signed a purchase agreement.[505]

Nevertheless, some bankruptcy courts have allowed prospective acquirors to object to bid procedures and breakup fees.  For example, in both the *Lehman Brothers* bankruptcy (in connection with the auction of Neuberger Berman) and the *Refco* bankruptcy (in connection with the auction of Refco's broker-dealer), the Bankruptcy Court for the Southern District of New York entertained and considered formal written objections to proposed auction rules by prospective acquirors.   Likewise, in the *Linens 'N Things* bankruptcy in the District of Delaware, competing bidders were allowed to be heard on objections to the terms of a stalking-horse bid.  Although none of these bankruptcy courts ruled on the prospective acquirors' standing, by considering the prospective acquirors' objections, the courts appear to have adopted a pragmatic, expansive view of section 1109(b)'s requirement that only a "party in interest" may be heard.  Further, at least one court has explicitly held that even if a potential bidder lacks standing, its voice still should be heard.  In the *Jon J. Peterson, Inc.* bankruptcy, the court stated:  "As parties with interest, prospective bidders may be positioned to offer valuable insight and perspective.  Though arguably not parties in interest, they are welcomed to appear at least as friends of the court."[506]

Aside from appearing in court directly, there are several other ways for a prospective acquiror to communicate its position on matters that relate to a potential sale.   First, a prospective acquiror can share any concerns about a proposed sale process with the creditors' committee, other official or unofficial committees, or the U.S. Trustee.  Given the role of the creditors' committee as a fiduciary for all unsecured creditors, the bankruptcy court will likely give more weight to a prospective acquiror's views if they are voiced by the committee.

---

responsibility over the debtor was a "party in interest," but stating that the agency, though a party in interest, was only one for the purpose of intervening to move to dismiss an improperly filed chapter 11 petition); *In re First Humanics Corp.*, 124 B.R. 87, 90 (Bankr. W.D. Mo. 1991) (claims purchaser who did not technically comply with the rules governing claims purchases had standing as a party in interest to propose a reorganization plan).

[505] *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999) (acquiror lacked standing to object to bankruptcy court order denying approval of a proposed purchase agreement between the acquiror and the debtor); *accord In re Rook Broad. of Idaho, Inc.*, 154 B.R. 970, 974 (Bankr. D. Idaho 1993); *In re Crescent Mfg. Co.*, 122 B.R. 979, 981 (Bankr. N.D. Ohio 1990).

[506] *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 135 (Bankr. W.D.N.Y. 2009).

Alternatively, if a prospective acquiror wishes to be heard in court without facing technical challenges to its standing, an acquiror may be able to purchase a nominal amount of claims to become a creditor of the debtor, as that status is sufficient to confer standing. A number of cases have held that under the broad language of section 1109(b), a creditor is no less a "party in interest" simply because it acquired its claims postpetition, even if the creditor's sole purpose in acquiring claims was to ensure standing.[507]   However, an acquiror considering this tactic should be careful to acquire a direct claim against the debtor.   As discussed above in Part IV.B.2., a "creditor of a creditor"—such as the holder of a participation in a claim—does not automatically have standing.

A prospective acquiror who becomes a creditor must also make sure it deals with any issues arising from any possession of nonpublic information, has not signed a standstill or similar agreement that may prohibit such a purchase, and there is no other impediment to buying such claims.  If this approach is pursued, then the prospective acquiror should of course make clear in any court filing that, in addition to its status as a creditor, it is an actual or  potential bidder for the debtor or the debtor's assets.

### 2.        Service on the Official Committee of Unsecured Creditors

Beyond the simple right to be heard in the bankruptcy court, one of the most effective ways to participate in the reorganization process is to serve on the creditors' committee.  With rare exceptions, an official committee of unsecured creditors is appointed soon after the commencement of every chapter 11 case. The members of the committee are selected by the United States Trustee at an organizational meeting that generally occurs within ten days of the filing of a chapter 11 case.   Pursuant to section 1102(b)(1), the committee generally will consist of the seven creditors holding the largest unsecured claims against the debtor (such as large trade creditors and bond indenture trustees), and may have more members in larger more complex cases.   In cases in which an informal committee of creditors was formed prior to the chapter 11 filing, that committee may continue to serve as the official committee if it is representative of unsecured claims generally.

---

[507] *See In re Embrace Sys. Corp.*, 178 B.R. 112, 121-22 (Bankr. W.D. Mich. 1995)  (noting that "mere status as an interested purchaser does not negate [potential purchaser's] rights as a creditor"); *In re First Humanics Corp.*, 124 B.R. 87, 91 (Bankr. W.D. Mo. 1991) (holding that since the code expressly specifies that a creditor is a "party in interest," when claims were purchased is "of no consequence.").

Service on an official creditors' committee in a chapter 11 case enables committee members to be intimately involved in the reorganization process and to receive nonpublic information concerning the company. Additionally, committee members get the advice and benefit of counsel and financial advisors at the cost of the estate. Generally, a debtor will provide significant operational, financial and strategic information to a committee on a confidential basis, and will consult with the committee on all matters of importance. A committee also is generally viewed by the bankruptcy court as the spokesperson for the interests of the unsecured creditors. In practice, the positions taken by a committee are often afforded significant deference by bankruptcy judges in making rulings affecting the interests of the estate and creditors generally.

While there are considerable informational and access advantages to service on a committee, such service also can have significant downsides for prospective acquirors. The individuals who serve on a committee are restricted from using the nonpublic information they receive as committee members to engage in trading of a debtor's securities or the purchase or sale of claims against the debtor. As noted in Part IV.D.8.b of this outline, however, it is possible to create a so-called "Chinese wall" to help reduce these risks. In addition, committee members cannot simply pursue their own interests, but, rather, must serve as fiduciaries for all unsecured creditors. Such fiduciary duties are also likely to restrict the ability of a committee member to acquire claims or to purchase assets in a section 363 sale. In rare cases, the court may permit a committee member to remain on a committee and participate in a financing facility for a debtor, such as the ruling in *Delphi* permitting Capital Research and Management, the chair of the committee, to be part of the backstop for the debtor's exit facility, subject to certain restrictions.[508]

In addition to the official creditors' committee, section 1102(a) authorizes the bankruptcy court in its discretion to order the appointment of additional committees of creditors or equity security holders if it finds such an appointment necessary to assure adequate representation of creditors or equity security holders, as the case may be. If the court orders the appointment of an additional committee, the United States Trustee is charged with appointing its members. Additional official committees of creditors are appointed only in exceptional circumstances, particularly given that the incremental professional fees will be borne by the estate; although some groups such as retirees entitled to benefits are granted a committee by statute.[509] More commonly, subgroups of creditors (such

---

[508] Entering into a lock-up agreement, however, may disqualify a party from serving on the creditors' committee. *See* Part III.B.9.b of this outline.

[509] *See* 11 U.S.C. § 1113(a); 11 U.S.C. § 1114(d).

as bondholders, retirees or trade creditors) will form "ad hoc" committees, particularly in larger and more complex chapter 11 cases. Such ad hoc committees must bear the cost of any counsel or professional advisors they retain to advise them, unless the stringent requirements of a substantial contribution application under section 503(b) can be met.

While at first blush it may seem inappropriate to add a secured creditor to a committee of unsecured creditors, it is not unknown for a junior secured creditor, where the senior secured creditors are under-collateralized, to acknowledge, formally or informally, that it is undersecured and seek to be added to the unsecured creditors' committee. Indeed, in several cases, such as the *Pliant* chapter 11 case in 2009, United States Trustees agreed to place effectively unsecured creditors on the unsecured creditors' committee.

The appointment of an equity committee is warranted only where there is at least a reasonable prospect of a recovery to the equityholders. A finding that an estate is hopelessly insolvent will preclude the appointment of an official equity committee, whose professional fees would also be borne by the estate. The willingness to order the appointment of an equity committee varies by district and among individual judges, but is not available as of right. If an official equity committee is appointed, it acts in a fiduciary capacity for all holders of a debtor's common stock.

### D.    What Enforcement Rights Does the Claim Have?

#### 1.    Generally

The rights of holders of bank debt to enforce the provisions of the agreements governing their debt can be markedly different than the rights of noteholders. These differences derive from the disparate sources of their rights: in a credit agreement context, the loan contract alone governs the relationship among the lenders, the agent for the lenders and the borrower; in the context of debt governed by an indenture, a federal statute, the TIA, governs many of the key terms of the relationship among the noteholders, the trustee for the noteholders and the note issuer, with the indenture filling in the remaining terms. As a result, while a potential investor in bank debt can look to the terms of the credit agreement alone to understand the rights of the lenders, a potential noteholder must understand both the applicable federal law and the provisions of the indenture. Finally, even if a credit agreement or indenture purports to give lenders or noteholders certain enforcement rights, an intercreditor agreement[510]

---

[510] References to "intercreditor agreement" customarily refer to agreements among different classes of secured lenders in a multi-tiered secured debt capital structure.

within a multi-lien capital structure can limit or alter the rights of junior secured creditors in meaningful ways.

### 2.      Enforcement Rights of Bank Agent versus Lender

A credit agreement typically provides for the appointment by a syndicate of lenders of an administrative agent who is authorized to act on their behalf.  The powers delegated to the administrative agent pursuant to a credit agreement materially affect the enforcement rights of individual lenders and the lenders as a group.  New York law, which governs the vast majority of sophisticated U.S. credit agreements, provides that an individual lender does not have the right to sue a borrower to enforce its rights under a credit agreement unless the credit agreement contains a specific provision providing for such a right.  Indeed, under New York law, individual creditor action is precluded by language typically contained in credit agreements that authorizes the administrative agent, acting upon the instructions of lenders holding a certain percentage of the debt, to declare the loan accelerated and pursue remedies against the borrower in the event of default.[511]  This inability of the individual lender to act persists even after the maturity of the loan.  In the *Delphi* chapter 11 case, for example, the bankruptcy court approved a forbearance agreement entered into by the first two tranches of the debtor-in-possession financing facility, and held that the individual lenders in the third tranche, which was part of the same facility, lacked standing to sue to enforce a payment default at the stated maturity.  Lenders (or those purchasing the claims of lenders) also should be aware that a typical credit agreement protects the administrative agent in a number of ways, absolving the agent of any fiduciary or similar duties, including any duties to disclose to the lenders information relating to the borrower that is communicated to the administrative agent.[512]  Courts applying New York law have vigorously enforced these provisions.  For example, in a suit brought by syndicate lenders to Enron against their administrative agents alleging that the agents knew that Enron's disclosures were materially misleading, a federal court in New York held that "[i]n transactions between sophisticated financial institutions, ''no extra-contractual duty of

---

[511] *See Beal Savings Bank v. Sommer*, 865 N.E.2d 1210 (N.Y. 2007).

[512] One commonly used form of credit agreement entirely lacks any mechanism for the lenders to remove an agent even where an agent has allied with the borrower, such as where the borrower has engaged the agent to advise.

disclosure exists'"[513] and "no obligation can be implied that would be inconsistent with other terms of the contractual relationship."[514]

### 3.   Allocation of Enforcement Rights Between Indenture Trustee and Bondholders

The appointment by bondholders of an indenture trustee pursuant to a bond indenture is mandated by the TIA, which regulates contractual terms of publicly issued debt securities issued in amounts greater than $10 million, including bonds, notes and debentures.  The provisions of the TIA, taken together with the terms of the indenture, combine to allocate the rights and powers of holders and the indenture trustee as to acceleration of the debt upon a default and the exercise of remedies.

As a baseline rule, the TIA deems an indenture to provide that holders of not less than a majority of the principal amount of securities have the power to direct the trustee's enforcement of the noteholders' rights, to exercise noteholders' remedies and to consent to the waiver of any past default and its consequences.  Most indentures supplement these rights by providing that holders of a majority of the principal amount of securities may rescind an acceleration and waive certain types of past defaults.

On the other hand, most indentures give the indenture trustee the authority to act on its own in pursuing any available remedy to enforce the rights of the bondholders, accelerate the maturity of the debt upon a default, and, in a bankruptcy proceeding, file a claim for the unpaid balance of the securities and cause the claim to be allowed.  Most indentures, however, do not empower the trustee to consent on behalf of noteholders to a plan of reorganization affecting the securities or the rights of any holder, or to vote the claims of noteholders.  The power to accelerate the debt in the first instance is often shared:  standard indentures give the trustee the authority to accelerate the maturity of the debt upon a default, of its own volition, but also allow holders of a certain percentage of the principal amount of securities (typically 25%) to declare an acceleration on their own, subject to deceleration upon a vote by 51% or some higher percentage.

Unlike a typical credit agreement, a typical indenture provides individual noteholders with the ability to pursue certain remedies on their own, albeit in very

---

[513] *UniCredito Italiano SpA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 498 (S.D.N.Y. 2003) (citation omitted).

[514] *Id.* at 503 (citation omitted).

limited circumstances.  An indenture contains what is customarily referred to as a no-action clause, which provides that, in order to exercise its own remedies, a holder first must follow a specific multi-step process:  (1) the holder must give notice to the trustee of a continuing event of default, (2) holders of at least 25% in principal amount of the securities must make a request to the trustee to pursue a remedy, (3) either the trustee must give notice that it will not comply with such request or the trustee must not comply for a period of time (usually 15 to 30 days) from receipt of such notice and (4) holders of a majority in principal amount of securities must not give the trustee a direction inconsistent with such request.  Notwithstanding this customary procedure, the TIA protects the rights of individual holders to institute collection actions for the payment of principal or interest due under the indenture, with certain limited exceptions.  For example, in *Brady v. UBS Financial Services*, the Tenth Circuit found that bondholders had "an unqualified, individual right to bring suit for the payment of principal and interest" at the stated maturity date even though bonds had been accelerated due to default more than 10 years earlier.[515]   Finally, the TIA requires that an indenture trustee, in the case of a default, exercise its rights and powers with the same degree of care and skill as a prudent person would exercise.  The application of the prudent person standard is an expression of the philosophy of the TIA that the functions of the trustee under ordinary conditions are largely administrative, but under the special conditions that prevail during the continuance of an event of default, the functions of the trustee may become active and executive as circumstances require in order to protect the interests of bondholders.[516]

### 4.     Intercreditor Agreements and Further Constraints on Creditor Action

Capital structures with multiple tiers of debt have become increasingly popular.  Because these structures are still relatively new, intercreditor agreements governing the relationships among the secured creditors at various levels of seniority have yet to become fully standardized, and very few courts have evaluated whether certain commonly-used provisions are even enforceable.  As a result, when considering an investment in debt of a borrower whose capital

---

[515] 538 F.3d 1319, 1325-26 (10th Cir. 2008) (holding that the applicable provision in the indenture "was designed to provide an individual remedy to a bondholder, in contrast to the collective remedies outlined in the other provisions of the Indenture.").

[516] *See generally* AM. BAR FOUNDATION, COMMENTARIES ON MODEL DEBENTURE INDENTURE PROVISIONS, 1965; MODEL DEBENTURE INDENTURE PROVISIONS, ALL REGISTERED ISSUES, 1967; AND CERTAIN NEGOTIABLE PROVISIONS WHICH MAY BE INCLUDED IN A PARTICULAR INCORPORATING INDENTURE 250 (1971).

structure includes multiple layers of secured debt, it is important for a potential investor to review the intercreditor agreement and to understand that a court may not enforce all of its protections for senior lienholders.

### a.    Typical Intercreditor Agreements

A first-lien lender's top priority in an intercreditor agreement should be to ensure that it will receive payment from the collateral of both principal and interest ahead of the second-lien lenders. To further this objective, first-lien lenders often seek to freeze second-lien lenders' ability to enforce their remedies until the first-lien debt has been fully satisfied. The contours of these "silent" second-lien provisions are heavily negotiated and often include the following:

- A standstill provision, pursuant to which junior secured lenders agree not to take any enforcement actions against the collateral: (1) until the expiration of a specific time period (often 120-180 days, but sometimes until the discharge of the senior secured lenders' claims) from declaration of default, and (2) as long as the senior lenders are exercising and diligently pursuing their remedies on the common collateral. The junior lenders also may agree not to contest any lien enforcement action against the collateral brought by the senior lenders. Such standstill provisions, at times, merely prevent junior lenders from proceeding against the collateral, leaving open the possibility that they may remain able to accelerate the debt during the standstill period and thereby force a bankruptcy.

- An agreement by junior secured lenders not to raise any objection to or seek adequate protection in connection with any of the following transactions, provided that the senior secured lenders consent to such transactions:

  o    use of cash collateral on which a first-lien lender has a lien;

  o    entry by the borrower into DIP financing up to an agreed maximum amount (or, less customarily, an uncapped amount), and the subordination of the junior liens to the DIP financing to the same extent that the senior liens are subordinated; or

o     the sale of collateral free and clear of liens under section 363 of the Bankruptcy Code (including by way of credit-bidding the first-lien debt).

- A commitment by junior secured creditors not to seek relief from the automatic stay in a bankruptcy case of the borrower.

- An agreement by junior secured creditors not to contest any request by the senior secured lenders for adequate protection under section 362 of the Bankruptcy Code.

Often such prohibitions are qualified by permitting a second lienholder to raise any objection or seek any relief that would be available to an unsecured creditor and to be granted a replacement or additional lien on additional collateral on which a first priority lien has been granted to the first lienholder as adequate protection. Qualifications of this nature may help the restrictions described above survive judicial scrutiny by permitting a second lienholder some rights, while at the same time reserving fully to the first-lien creditors the prerogatives of a lienholder.

Whatever the rights allocated, the existence of a multi-tiered lien structure is likely to complicate negotiations over a restructuring. Whereas unsecured bondholders typically fall into the same class as general unsecured creditors (and are, regardless of classification, entitled to identical treatment under the Bankruptcy Code), a second-lien tranche will create a new class between the first lienholder and the unsecured creditors, and thus constitute a new constituency with a separate interest in a valuation fight. This "Goldilocks" class (that is: not too senior, not too junior, but just right) may argue that the company is worth more than enough to cover the first lien, but not so much that the unsecured creditors are entitled to any value. Moreover, the existence of a second lien and the rights attendant thereto may complicate the debtor's post-bankruptcy capital structure and exit financing. The second-lien class also may retain its own attorneys and, perhaps, financial advisors, all at the potential expense of the estate (e.g., if the class turns out to be oversecured or successfully argues it has made a substantial contribution to the case). The existence of this class, or of multiple tiers of junior secured debt, can also complicate the prospective acquiror's hunt for the elusive fulcrum security.

### b.    *Enforceability in Bankruptcy of Intercreditor Agreements*

Section 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is enforceable in a case . . . to the same extent that such agreement is

-171-

enforceable under applicable nonbankruptcy law."[517]   As a result of section 510(a), the essential provisions of intercreditor agreements—those that establish lien priority or payment priority—remain enforceable in bankruptcy.[518]   Under existing case law, it is not clear whether provisions that reach beyond payment and lien priority to waive basic bankruptcy rights will be upheld.   For example, courts have not always been willing to enforce contractual provisions that purport to deprive a second-lien lender of the right to vote as it wishes on a plan of reorganization.[519]   As a related matter, where the intercreditor agreement does not infringe on the second-lien lenders' right to vote on a plan, a bankruptcy court may enforce contractual terms that prevent second-lien lenders from challenging the priority of the first liens and from objecting to the plan of reorganization.[520]

In the 2010 *Boston Generating* case, the court held that an intercreditor agreement between first- and second-lien lenders was enforceable, but declined to interpret it as prohibiting the second-lien lenders from objecting to a section 363 sale that would provide the debtors with enough cash to pay the first-lien debt nearly in full, but that would leave nothing for junior creditors.   The intercreditor agreement provided that the first-lien lenders had the "exclusive right" to make decisions regarding the sale of collateral regardless of whether the debtors were inside or outside of bankruptcy, and that the second-lien lenders' "sole right" with respect to the collateral was to hold a lien, which would attach to the proceeds of any sale.   Although the court stated that it went "against the spirit of the subordination scheme in the Intercreditor Agreement to allow the Second Lien Lenders to be heard and to attempt to block the disposition of the Collateral

---

[517] 11 U.S.C. § 510(a).

[518] Section 510(a)'s reference to "subordination agreement[s]" has been found to encompass both agreements subordinating rights to payment and agreements adjusting lien priority.  *See In re Boston Generating, LLC*, 440 B.R. 302, 318-20 (Bankr. S.D.N.Y. 2010) (lien priority); *Kobak v. Nat'l City Bank (In re Kobak)*, 280 B.R. 164 (Bankr. N.D. Ohio 2002) (lien priority); *In re Best Prods. Co.*, 168 B.R. 35 (Bankr. S.D.N.Y. 1994) (payment subordination), *appeal dismissed*, 177 B.R. 791 (S.D.N.Y. 1995), *aff'd*, 68 F.3d 26 (2d Cir. 1995).

[519] *Compare In re Aerosol Packaging, LLC*, 362 B.R. 43 (Bankr. N.D. Ga. 2006) (senior lender entitled to vote junior lender's claim in debtor's bankruptcy pursuant to express terms of subordination agreement), *and In re Curtis Ctr. Ltd. P'ship*, 192 B.R. 648, 659-60 (Bankr. E.D. Pa. 1996) (subordination agreement providing that senior lienholder was authorized to vote the junior lienholder's claims was enforceable under section 510(a) of the Bankruptcy Code), *with In re SW Boston Hotel Venture, LLC*, 460 B.R. 38, 51-52 (Bankr. D. Mass. 2011) (intercreditor provision assigning plan voting rights from junior lender to senior lender unenforceable), *and In re 203 N. LaSalle St. P'ship*, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000) ("Subordination thus affects the order of priority of payment claims in bankruptcy, but not the transfer of voting rights.").

[520] *See In re Ion Media Networks, Inc.*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009).

supported by the First Lien Agent," it nonetheless held that the second-lien lenders had standing to object both to the debtors' bidding-procedures motion and to their sale motion. The court based this decision on findings that (1) the agreement did not expressly mention objections to section 363 sales, as does the Model Intercreditor Agreement authored by the American Bar Association; (2) the agreement contained a clause preserving the second-lien lenders' rights to file pleadings as unsecured creditors; (3) most of the restrictions imposed on second-lien lenders applied upon an "exercise of remedies" by the first-lien lenders, which the parties agreed had not occurred; and (4) the second-lien lenders were on the "cusp" of a recovery and were not engaged in obstructionist behavior in objecting to the sale.[521]

In the event the secured creditors' liens are avoided in a fraudulent conveyance challenge, a further question arises as to whether the second lienholders are still contractually obligated under the intercreditor agreement to turn over any distributions they receive to the first lienholders. The answer to this question will likely turn on the particular language of the intercreditor agreement at issue—some intercreditor agreements only cover lien subordination (*i.e.*, subordination of the right to proceeds of shared collateral), some only cover payment subordination (*i.e.*, subordination in right of payment), and many cover both.

Finally, note that, while an oversecured class is ordinarily entitled to postpetition interest and reimbursement of certain expenses, the manner of documentation of the multi-tiered lien structure can have important ramifications for this principle: a "waterfall" provision under a security document may entitle particular creditors to payment before others, but, if all such creditors possess only a single lien worth less than their aggregate debt, then even the "oversecured" first lien piece may not be entitled to postpetition interest from the debtor's estate or to treatment as an "oversecured" claim generally. Thus, even the first lienholders may not be entitled to receive current interest payments during the pendency of a bankruptcy case. Instead, the first lienholders will have to collect such interest, if permitted by the intercreditor agreement, from the distribution to which the second lienholders would otherwise be entitled under the plan. Perhaps for this reason, most multi-level lien structures are documented through separate, if similar, security and other collateral documents.

---

[521] *Boston Generating*, 440 B.R. at 320.

### c.      Postpetition Interest

Many debtors have issued unsecured debt that is subject to strict payment subordination under an intercreditor agreement or indenture.  Such agreements are indisputably enforceable under section 510(a) of the Bankruptcy Code to the extent they merely provide that, in the event of a default, the *principal* amounts and prepetition interest due to the senior creditors must be paid before principal amounts and prepetition interest are repaid to junior creditors.

Litigation has ensued in cases where senior creditors seek to be paid postpetition *interest* before junior creditors receive their principal and prepetition interest.  In these cases, subordinated debtholders have invoked a pre-Bankruptcy Code principle called the "Rule of Explicitness."  Under the Rule of Explicitness:

> If a creditor desires to establish a right to postpetition interest and a concomitant reduction in the dividends due to subordinated creditors, the agreement should clearly show that the general rule that interest stops on the date of the filing of the petition is to be suspended, at least vis-à-vis these parties.[522]

There is a split in authority as to whether the Rule of Explicitness survived the enactment of section 510(a).  The Eleventh Circuit concluded that the continued vitality of the Rule of Explicitness depends entirely on state law, and thus certified the question to the New York Court of Appeals.[523]  New York's highest court then concluded that "New York law would require specific language in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of allowing the payment of a senior creditor's postpetition interest demand."[524]  In *First Fidelity Bank, National Ass'n v. Midlantic National Bank (In re Ionosphere Clubs, Inc.)*, the court found that a mere reference to

---

[522] *In re Time Sales Fin. Corp.*, 491 F.2d 841, 844 (3d Cir. 1974).

[523] *Chem. Bank v. First Trust of N.Y. (In re Se. Banking Corp.)*, 156 F.3d 1114, 1125-26 (11th Cir. 1998); *see also In re Wash. Mut., Inc.*, 461 B.R. 200, 249 (Bankr. D. Del. 2011) (similarly concluding that the continuing validity of the rule of explicitness is left to applicable state law), *vacated in part on other grounds*, *In re Wash. Mut., Inc.*, Case No. 08-12229 (Bankr. D. Del. Feb. 23, 2012).

[524] *Se. Banking Corp. v. First Trust of N.Y., Nat'l Ass'n (In re Se. Banking Corp.)*, 93 N.Y.2d 178, 186 (1999).

postpetition interest is not enough to satisfy the Rule of Explicitness, and gave the following example of a clause that would satisfy the Rule:

> [H]olders of Senior Debt shall be entitled to receive payment in full of all Obligations with respect to the Senior Debt (*including interest after the commencement of any such proceeding at the rate specified in the applicable Senior Debt, whether or not such interest is an allowable claim in any such proceeding*) before Security holders shall be entitled to receive any payment . . . .[525]

In contrast, the First Circuit has held that section 510(a) does not permit states such as New York to make bankruptcy-specific rules; that New York contract law does *not* include a Rule of Explicitness; and, therefore, that the Rule of Explicitness no longer has any vitality.[526]

As long as the applicability of the Rule of Explicitness remains unsettled, prospective buyers of subordinated debt that is subject to an intercreditor agreement are well-advised to analyze the language of the agreement prior to purchasing such claims.  If the language does not clearly state that postpetition interest must be paid to the senior creditors before any principal is paid to junior creditors, then purchasers should expect litigation and delay relating to the issue of postpetition interest.  Also, in a lengthy bankruptcy case, junior creditors run the risk of losing substantial value if the Rule of Explicitness either is satisfied by the relevant contractual language or is deemed inapplicable.

### 5.      Anti-Assignment Provisions and Required Consents Under Loan Documents

Credit agreements usually require the borrower's (and often the administrative agent's) consent for lenders to assign their interests outside of the existing lender group.  Under a typical credit agreement, the borrower forfeits its

---

[525] 134 B.R. 528, 535 n.14 (Bankr. S.D.N.Y. 1991).

[526] *In re Bank of New England Corp.*, 364 F.3d 355, 364-65 (1st Cir. 2004).  The court also concluded that, even without the Rule of Explicitness, the issue of whether the parties intended postpetition interest to fall within the subordination language of their agreement was a factual question that could not be decided based on the language of the agreement alone.  *Id.* at 368; *see also Bank of New England Corp. v. Bank of N.Y. Mellon Trust Co. (In re Bank of New England Corp.)*, 646 F.3d 90 (1st Cir. 2011) (affirming decision that relevant subordination agreement did not encompass postpetition interest).

consent right over assignments during a bankruptcy proceeding and often during certain other serious events of default.

To counter activist acquirors of bank debt, private equity sponsors often include in debt commitment letters and credit agreements a provision allowing them to prohibit assignments to a confidential list of potential lenders.  There is very little guidance on the subject of whether these provisions restricting assignments are enforceable in bankruptcy, or how a confidential list of prohibited lenders will be treated, including whether there is a risk of such lists becoming public.

### 6.     Risks Accompanying Acquisition of Claims

A potential acquiror of a distressed company through the purchase of claims faces various risks.  Some of those risks are unique to particular investors; others are inherent to the bankruptcy process or the accumulation of large claims positions.  This subsection summarizes some of the risks to be considered prior to and in the process of accumulating claims.

#### a.     Investment at Risk

First, and most obvious, is the risk that the value of claims against a debtor will fall.  Although an investor's ultimate goal may be to own a controlling stake of the reorganized debtor's equity, there is always a possibility that the debtor will not be able to reorganize or that the reorganization value of the debtor will decline after an investment is made.  While this is of course true for any investment, bankruptcy adds another layer of risk:  any bankruptcy case, even the shortest of proceedings, is accompanied by substantial uncertainty, generated by, among other things, the bankruptcy law itself, the particular judge in whose hands the case is placed and the stresses that the overlay of bankruptcy places on the operation of any business.  In addition, as discussed further below, bankruptcy proceedings routinely proceed slowly, imposing intervening operational and professional expenses of administration, borne by the estate, as well as a time-value loss.  Moreover, some participants may find delay beneficial and will therefore take steps designed to slow down the process. For example, out-of-the-money creditors often prefer delay, whether as a tool to earn nuisance payments from in-the-money constituencies or out of hope that the debtor's reorganization value will eventually increase to the point where they are in the money. Meanwhile, other participants such as the Environmental Protection Agency or the Internal Revenue Service may not be motivated by economic concerns at all and may therefore be indifferent to the passage of time.

Further compounding the risk of a bad investment in a troubled company is the reality that claims against a debtor are often purchased based on limited and/or unreliable financial information.  For example, it will be difficult if not impossible to discern from public filings the extent of a retailer's likely exposure to lease rejection claims from its landlords in bankruptcy or the value of undermarket leases.  Similarly, a debtor's pension liabilities, the exact amount of which may be difficult to divine from public filings, may have a significant impact on any recovery.[527]  Moreover, despite their disclosure obligations under the Exchange Act which continue even during bankruptcy proceedings, companies in distress often fail to meet filing deadlines for financial statements, or have defective financial statements that will require restatement.  Finally, a purchase of claims based on consolidated financials will not reveal intercompany indebtedness.  These claims have the potential to dilute recoveries, although such claims are often subordinated or waived.

### b.        Interest Rate and Prepayment Risks

Section 502(b)(2) of the Bankruptcy Code provides for the disallowance of claims for "unmatured interest."  The effect of that provision, at least in the case of an insolvent debtor, is to prevent unsecured or undersecured creditors from collecting interest on their claims, including default and compound interest, that would otherwise accrue after a bankruptcy filing.

Oversecured creditors—*i.e.*, those with security interests in collateral with a higher value than the amount of their claims—are not similarly disadvantaged.  Under section 506(b), oversecured creditors are entitled not only to postpetition interest but also to any reasonable fee, cost or charge (including attorneys' fees) provided for in a loan agreement to the extent the value of their interest in the collateral exceeds their prepetition claims.  Some courts read section 502(b) to allow unsecured creditors to claim attorneys' fees incurred post-petition if reimbursement of such fees is provided for in a prepetition contract.[528]

Despite their entitlement to postpetition interest and fees, secured creditors of a chapter 11 debtor still face major risks to their recovery.  Recent cases, including *American Airlines* and *Calpine*,[529] highlight one of those risks:  chapter

---

[527] A full discussion of the treatment of pension and other post-employment benefits is beyond the scope of this outline, but needless to say, the resolution of these issues is often sought in bankruptcy cases, potentially diluting other creditor recoveries.

[528] *See Centre Ins. Co. v. SNTL Corp. (In re SNTL Corp.)*, 380 B.R. 204 (B.A.P. 9th Cir. 2007).

[529] *See In re AMR Corporation*, Case No. 11-15463 (Bankr. S.D.N.Y. Jan. 17, 2013); *In re Calpine Corp.*, 356 B.R. 585, 597 (S.D.N.Y. 2007).

11 debtors will seek to take advantage of favorable borrowing conditions to repay debt that is either "noncallable" (*i.e.*, not subject to prepayment) or callable only with a prepayment fee.[530]   Courts have consistently held that noncallable debt may be prepaid in bankruptcy.[531]   Some courts, moreover, have permitted prepayment of noncallable secured debt either without awarding *any* damages to the lenders[532] or by awarding such damages only on an unsecured basis.[533]   Thus, where a loan agreement does not include a prepayment fee as an alternative to a provision precluding prepayment, lenders may be forced to accept prepayment in bankruptcy without receiving a secured claim (or perhaps any claim at all) for any damages resulting from reinvestment at a lower yield.

Lenders that negotiate prepayment *fees* are somewhat better off:  while courts scrutinize the "reasonableness" of such fees under section 506(b), they generally will enforce fees that do not exceed the actual damages resulting from prepayment.[534]   Indeed, in some cases, courts have enforced prepayment fees even absent a showing of actual damages.[535]   Debtors, on the other hand, have argued

---

[530] For a comprehensive discussion of the law governing prepayment of secured and unsecured debt in bankruptcy, *see* Scott K. Charles & Emil A. Kleinhaus, *Prepayment Clauses in Bankruptcy*, 15 Am. Bankr. Inst. L. Rev. 537 (2007).

[531] *See, e.g.*, *In re Calpine Corp.*, 356 B.R. 585, 597 (S.D.N.Y. 2007); *Cont'l Sec. Corp. v. Shenandoah Nursing Home P'ship*, 193 B.R. 769, 774-79 (W.D. Va. 1996); *In re Vest Assocs.*, 217 B.R. 696, 699 (Bankr. S.D.N.Y. 1998); *In re Skyler Ridge*, 80 B.R. 500, 502 (Bankr. C.D. Cal. 1987).  In one outlier case, a bankruptcy court refused to allow a debtor to repay a debt that was subject to a no-call provision in connection with a motion to obtain debtor-in-possession financing.  *See In re Premier Entm't Biloxi LLC*, No. 06-50975 (ERG), 2007 Bankr. LEXIS 3939 at *8 (Bankr. S.D. Miss. Feb. 2, 2007).  A subsequent decision in the *Premier Entertainment Biloxi* bankruptcy clarified that prepayment of the debt at issue was not prohibited where the debt was paid through the plan.  *In re Premier Entm't Biloxi LLC*, 445 B.R. 582, 633-34 (Bankr. S.D. Miss. 2010).

[532] *See, e.g.*, *In re Vest Assocs.*, 217 B.R. at 699-700; *Shenandoah Nursing*, 193 B.R. at 774.

[533] *See In re Premier Entm't Biloxi LLC*, 2010 WL 3504105, at *49; *In re Calpine*, 365 B.R. 392, 399-400 (Bankr. S.D.N.Y. 2007).

[534] *See, e.g.*, *In re Imperial Coronado Partners*, 96 B.R. 997, 1001 (B.A.P. 9th Cir. 1989); *In re Schwegmann Giant Supermarkets P'ship*, 264 B.R. 823, 828-31 (Bankr. E.D. La. 2001); *In re Anchor Resolution Corp.*, 221 B.R. 330, 340-41 (Bankr. D. Del. 1998).

[535] *See, e.g.*, *In re Saint Vincent's Catholic Med. Ctrs. of New York*, 440 B.R. 587, 594-95 (Bankr. S.D.N.Y. 2010); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 131-34 (Bankr. E.D.N.Y. 2002); *In re Hidden Lake Ltd. P'ship*, 247 B.R. 722, 729 (Bankr. S.D. Ohio 2000); *In re Lappin Elec. Co.*, 245 B.R. 326, 328-30 (Bankr. E.D. Wis. 2000); *In re Fin. Ctr. Assocs.*, 140 B.R. 829, 835-36 (Bankr. E.D.N.Y. 1992).

that because the automatic acceleration resulting from a bankruptcy filing means that the debt in question has matured, there can be no "*pre*payment" in bankruptcy, and hence no prepayment fee.[536]  This argument has recently been successful.  An appeal arising out of the *Calpine* bankruptcy rejected the damages claims of certain lenders on the grounds that the automatic acceleration of the loans at issue resulting from the debtor's bankruptcy filing rendered the no-call provision relating to the loans inapplicable on its face.[537]  The bankruptcy court in American Airlines recently reached a similar conclusion with respect to a prepayment provision.[538]

### c.   Substantive Consolidation Risk

The "substantive consolidation" of two or more affiliated debtors—so that their assets and liabilities are pooled for the purpose of distribution—is a tool that may be used when the financial affairs of separate debtors are entangled, at least where some stakeholders object.  The law has been and remains unfavorable to the use of substantive consolidation.  A proponent of substantive consolidation generally must show either (1) that prepetition, the entities for whom substantive consolidation is sought "disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity," or (2) that "postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors."[539]

---

[536] There is language in some cases that supports this argument.  *See In re LHP Realty Corp.*, 726 F.2d 327, 330-31 (7th Cir. 1984) ("[A]cceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made after maturity."); *In re Solutia*, 379 B.R. 473, 484 (Bankr. S.D.N.Y. 2007) ("Acceleration moves the maturity date from the original maturity date to the acceleration date and that date becomes the new maturity date.").  On the other hand, cases that have squarely considered the issue have concluded that "[t]he automatic acceleration of a debt upon the filing of a bankruptcy case is not the kind of acceleration that eliminates the right to a prepayment premium."  *In re Skyler Ridge*, 80 B.R. 500, 507; *accord In re Imperial Coronado Partners*, 96 B.R. at 998-1000.

[537] *HSBC Bank USA, Nat'l Ass'n v. Calpine Corp.*, 2010 WL 3835200,  at *4 (S.D.N.Y. Sept. 15, 2010).  *But cf. In re Chemtura Corp.*, 439 B.R. 561, 603-04, 606 (Bankr. S.D.N.Y 2010) (suggesting that *HSBC Bank v. Calpine* should not be read to prohibit all damage claims relating to no-call breaches, and holding that settlement for one such breach was "well within the range of reasonableness").

[538] *In re AMR Corporation*, Case No. 11-15463 (Bankr. S.D.N.Y. Jan. 17, 2013)

[539] *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005); *see also Union Sav. Bank v. Augie/Restivo Banking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988).

Notwithstanding the high legal barriers to substantive consolidation, debtors often propose to consolidate members of their corporate family. Buyers of trade claims are in some cases particularly at risk from substantive consolidation: to the extent the trade claims are held against an operating subsidiary, the effect of consolidation is to make claims against the corporate parent *pari passu* with that trade debt. Where operating subsidiaries have guaranteed a parent company's financial debt, however, the ability of the parent company's creditors to "double dip" by bringing a guarantee claim against the operating subsidiaries is eliminated, and the incentives of trade creditors can change. In that circumstance, substantive consolidation may benefit trade creditors by allowing them to share in the parent company's assets and the assets of other subsidiaries. The *Adelphia* and *Lehman Brothers* chapter 11 cases demonstrate how substantive consolidation can be used by parent company creditors to coerce greater recoveries by attempting to eliminate such parent company's guarantees.

### d.       *Fraudulent Transfer Risks*

To the extent disabilities travel with transferred claims, as discussed in Part IV.B.3 above, a purchased claim may be avoided if it arises from a fraudulent transfer to the initial holder of the claim.

A recent fraudulent transfer case highlights the need for diligence before purchasing claims. In *In re TOUSA, Inc.,* the Eleventh Circuit upheld a bankruptcy court's decision to unwind a secured loan transaction on fraudulent-transfer grounds.[540] Prior to filing for bankruptcy, the parent debtor, TOUSA, Inc., borrowed $500 million in new loans, which it then caused its key operating subsidiaries to guarantee and secure. The parent used the loan proceeds to settle litigation with a prior unsecured lender group, which had claims against the parent but not against the operating subsidiaries. The unsecured creditors' committee, representing the interests of more than $1 billion in bond debt that had been incurred several years before the secured loan, challenged both the grant of security from the operating subsidiaries for the new loans and the transfer to the prior lender group. The bankruptcy court found that the pledge of assets by the operating subsidiaries was a fraudulent transfer because the transaction occurred at a time when TOUSA's bankruptcy was "inevitable" and because the operating subsidiaries did not receive reasonably equivalent value in exchange for guaranteeing and securing a loan that would pay off the parent's, but not the subsidiaries', creditors. On appeal, the Eleventh Circuit Court of Appeals granted

---

[540] *In re TOUSA, Inc.*, 680 F3d 1298 (2012), *rev'g* 444 B.R. 613 (S.D. Fla. 2011).

deference to the bankruptcy court's factual findings and concluded that challenged transfers could be clawed back from the prior lender group.[541] Rejecting the argument that the lenders had no obligation to investigate the source of funds being used to repay them, including the involvement of their borrower's subsidiaries, the Court of Appeals ruled that "every creditor must exercise some diligence when receiving payment from a struggling debtor."[542]   Accordingly, the court remanded the case to the district court to consider the proper remedies.

*TOUSA* represents an important warning to holders of claims that arose during a time when the debtor was in distress.  Although cases in this area are highly fact-dependent, *TOUSA* shows that in reviewing financing transactions completed in proximity to a bankruptcy, a court may draw conclusions about the debtor's financial condition based on evidence that was not available to lenders at the time, with potentially severe consequences.

### e.  Certain Tax Risks

#### (i)  Restrictions on Trading

The claims market in large chapter 11 cases often is constrained by court orders that seek to protect a debtor's net operating losses ("NOLs").  NOLs generally are an excess of tax deductions over income in a particular year, and are valuable because they can be applied against taxable income in other years.

Section 382 of the Internal Revenue Code limits a company's ability to use NOLs and certain built-in losses after an ownership change by limiting the company's ability to offset taxable income for any post-ownership change taxable year against pre-ownership change losses.  The annual limitation (*i.e.*, the amount of such income that can be offset by such losses) generally is the value of the stock of the company immediately before the date of the ownership change multiplied by a prescribed rate.[543]   In general, an ownership change occurs under section 382 if the percentage of stock owned by one or more 5% shareholders (as specifically defined for purposes of this rule) has increased by more than 50 percentage points over the lowest percentage of stock owned by those shareholders during a specified testing period (usually three years).[544]  As a very

---

[541] *Id.* at 1311-13.

[542] *Id.* at 1315.

[543] 26 U.S.C. §§ 382(b) & 382(e)(1), I.R.C. §§ 382(b) & 382(e)(1).

[544] 26 U.S.C. § 382(g), I.R.C. § 382(g).

general matter, in determining whether an ownership change has taken place, all shareholders that own less than 5% of the stock in a company are treated as a single shareholder.

Because overleveraged debtors often emerge from bankruptcy by distributing a controlling equity interest to their creditors, section 382's general change of ownership rule could have a drastic effect on many chapter 11 debtors. However, there is a bankruptcy exception pursuant to which the section 382 limitation will not apply if (1) the company is under the jurisdiction of the bankruptcy court and (2) the shareholders and "qualified creditors" of the debtor own, as a result of having been shareholders and creditors, at least 50% (by vote and value) of the stock in the reorganized debtor.[545]   A "qualified creditor" is a creditor that receives stock in the reorganized debtor in satisfaction of debt either (1) held at least 18 months prior to the commencement of the bankruptcy case or (2) that arose in the ordinary course of the debtor's business and that has been held by the creditor at all times.[546]   Under a special rule, a creditor is also deemed to be a "qualified creditor" if, immediately after the ownership change, it is not a 5% shareholder in the debtor (and is not an entity through which a 5% shareholder owns an indirect interest).[547]   Therefore, a creditor that purchases claims less than 18 months before the company files for bankruptcy and receives 5% or more of the stock of the reorganized debtor endangers the availability of the NOLs for the company.

It has become the norm for chapter 11 debtors that wish to exploit the bankruptcy exception to section 382 to seek (and obtain) early in their cases orders that (1) prevent creditors from purchasing claims to the extent that such claims would convert into 5% or more of the stock of the debtor, and (2) permit the debtor to require creditors to "sell down" claims acquired after entry of an NOL protection order to the extent such claims endanger the debtor's NOLs.[548] Thus, if two creditors each purchase 30% of the debtor's "fulcrum security" after

---

[545] 26 U.S.C. § 382(l)(5), I.R.C. § 382(l)(5).  Debtors may elect out of section 382(l)(5).  Many consider doing so because absent the election, if a second ownership change occurs within two years, no amount of pre-change losses can be used to offset taxable income for post-change years. If section 382(l)(5) does not apply, for purposes of determining the section 382 limitation the value of the corporation is increased by the value resulting from surrender or cancellation of creditors' claims.  26 U.S.C. § 382(l)(6), I.R.C. § 382(l)(6).

[546] 26 C.F.R. § 1.382-9(d)(1)-(2), Treas. Reg. § 1.382-9(d)(1)-(2).

[547] 26 C.F.R. § 1.382-9(d)(3), Treas. Reg. § 1.382-9(d)(3).

[548] Debtors often also seek orders to limit trading with respect to their stock in order to avoid an ownership change in connection with the consummation of the plan of reorganization.

entry of an NOL protection order, they may be required to sell down those positions or, if they fail to do so, forfeit part of the equity stake they would otherwise receive in the reorganized debtor.

The legality of NOL-protection orders is largely untested. In the *United Airlines* case, the Seventh Circuit suggested that the only arguable basis for such orders—namely, the Bankruptcy Code's prohibition on acts "to exercise control over property of the estate"—is not legally sufficient, because the mere purchase of claims against a debtor is not an act to "control" estate property.[549] Nonetheless, in the 2006 bankruptcy of Dana Corp., despite a five-month battle between Dana and several groups of creditors that argued that the court did not have such authority, the court finally entered an NOL-protection order that contained the standard sell-down provisions.[550] Some commentators have noted a trend towards courts allowing trading of claims but requiring that substantial creditors sell down their claims if the plan of reorganization ultimately relies on Section 382(l)(5).[551] So long as courts in major jurisdictions continue to enter NOL-protection orders, strategic investors will be subject to the risk of pressured sales.

(ii)  Risks from Actual or Deemed Exchange of Debt

A creditor may have gain or loss from an actual or deemed exchange of debt as the result of a workout or debt restructuring.[552] If the modified debt results in a "significant modification" for tax purposes, and the exchange does not qualify as a tax-free recapitalization,[553] a creditor will recognize gain or loss as if it sold the old debt for an amount equal to the "amount realized," which is the issue price of the new debt. Under certain circumstances, a change in maturity date and/or interest rate, a change in the subordination of the debt or the security

---

[549] *In re UAL Corp.*, 412 F.3d 775, 778-79 (7th Cir. 2005).

[550] *See* Dan A. Kusnetz, *Loss of Control:  The Clash of Codes in the Battle Over a Debtor's Net Operating Losses*, Tax Review Number, Nov. 13, 2006, at 243.

[551] Jenks, Ridgway, Purnell and Laduzinski, 790-2nd T.M., *Corporate Bankruptcy*, IV.B. (citing, among other cases, *In re Circuit City Stores, Inc,* Case No. 08-35653-KRH (Bankr, E.D.Va, Order dated Nov. 13, 2008).

[552] If the creditor has properly claimed a bad debt deduction with respect to the old debt in prior taxable years, the gain may be offset by an amount equal to the excess of the creditor's basis in the old debt over the fair market value of the debt (or, if greater, the amount of debt recorded on the creditor's books and records).  26 C.F.R. § 1.166-3(a)(3), Treas. Reg. § 1.166-3(a)(3).  This effectively prevents a reversal of the earlier deduction.

[553] Tax-free reorganizations are discussed in Part IV.F of this outline.

underlying the debt, or a change in obligor can result in a significant modification and, therefore, an "exchange" for tax purposes, even without an actual exchange of the underlying debt.[554]  These and related issues are more fully explored in Part I.A.2.c of this outline and Part I.B.4.h of this outline (see especially "Treatment of Holders").

### 7.    Risks from Insider or Fiduciary Status

Access to information about a debtor can subject an acquiror of claims to various risks and obligations, some of which are unique to the bankruptcy process.  In this section, we consider the circumstances that give rise to fiduciary or insider status, and the potential sanctions faced by fiduciaries and insiders who trade in claims or interests.  In the next section, we address ways in which an investor can mitigate the risks.

#### a.    Who Is an Insider or a Fiduciary Under the Bankruptcy Code?

An "insider" is "one who has a sufficiently close relationship with a debtor that [its] conduct is . . . subject to closer scrutiny than those dealing at arm's length with the debtor."[555]  The Bankruptcy Code provides a non-exclusive list of insiders that includes officers, directors, affiliates, controlling shareholders, general partners and persons that are "in control of the debtor."[556]  To determine whether a person is in control of the debtor, courts generally will look at whether the person has "day-to-day" control of the debtor.[557]  Exertion of lesser influence generally will not be sufficient to confer insider status; however, it is possible that a lesser degree of control, if used to extract a better than arm's length deal with the debtor, may be sufficient for a person to be deemed an insider with respect to that specific transaction, thereby triggering the longer 1-year lookback for preferences, as compared to 90 days for non-insiders.[558]

---

[554] *See* 26 C.F.R. § 1.1001-3, Treas. Reg. § 1.1001-3

[555] *See* S. REP. NO. 95-989, at 25 (1978); H.R. REP. NO. 95-595, at 312 (1979).

[556] *See* 11 U.S.C. § 101(31).

[557] *See, e.g.*, *In re Radnor Holdings Corp.*, 353 B.R. 820, 847 (Bankr. D. Del. 2006); *In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 428 (Bankr. S.D.N.Y. 2005).

[558] *See In re Winstar*, 554 F.3d at 395 (3rd Cir. 2009) (*citing In re U.S. Med.*, 531 F.3d at 1277 n.5. (10th Cir. 2008)) (noting that there are "non-statutory insiders," and that the requisite level of "control" need not rise to the level of "actual, legal control over the debtor's business" or "the ability to order, organize or direct" the debtor's operations," since if that were the test it would be

Findings of insider status based on control have, at times, even extended to lenders. For example, the Third Circuit, in an adversary proceeding related to the bankruptcy of broadband provider Winstar Communications, found that Winstar's lender and supplier, Lucent Technologies, was liable as an insider for preferential payments because Lucent exercised control over Winstar's day-to-day operations, including controlling the expansion of Winstar's broadband network and forcing the purchase of unneeded equipment from Lucent.[559]

Another source of fiduciary status is membership on an official committee of unsecured creditors. Such committees and their members owe fiduciary duties to their constituencies. In addition, certain insiders such as officers and directors will owe fiduciary duties to a debtor under applicable state laws.

When an investor seeking to acquire a debtor serves on an official committee or otherwise has a close relationship with or has received material nonpublic information from the debtor, that potential acquiror needs to consider the implications of its status under both bankruptcy and nonbankruptcy law.

> b.    *Insider Trading:  When Do Federal Securities Anti-Fraud Rules Apply to Debt Trading?*

In order for the prohibition against insider trading under the federal securities laws to apply, the instruments being traded must be "securities." Neither trade claims nor interests in bank debt are typically considered to constitute "securities" for purposes of the federal securities laws.[560] Because of

---

no broader than the category, enumerated in section 101(31), of a "person in control of the debtor").

[559] *See Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234, 279 (Bankr. D. Del. 2005) ("The true test of 'insider' status is whether one's dealings with the debtor cannot accurately be characterized as arm's-length." (internal quotation marks omitted)), *aff'd*, 2007 WL 1232185 (D. Del. Apr. 26, 2007), *aff'd in part and modified in part by* 554 F.3d 382 (3d Cir. 2009).

[560] For a widely cited case holding that a loan participation agreement among sophisticated financial institutions did not generate covered "securities," *see Banco Español de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51, 55-56 (2d Cir. 1992). Moreover, it is possible that subsequent courts analyzing these issues will reach a different conclusion regarding the status of bank debt as a "security." Indeed, in *Banco Español de Credito*, Judge Oakes would have held that the debt participations at issue were in fact "securities," *id.* at 60 (Oakes, J., dissenting), and the majority cautioned that "the manner in which participations in [the debt] instrument are used, pooled, or marketed might establish that such participations are securities." *Id.* at 56; *see also SEC v. Texas Int'l Co.*, 498 F. Supp. 1231 (N.D. Ill. 1980) (unsecured claims, including bank debt, entitled to receive stock pursuant to a confirmed bankruptcy plan of reorganization of insolvent debtor were held to constitute "securities").

this, the consensus has been that SEC Rule 10b-5 (restricting insider trading) does not apply to trading in such claims and interests. Bonds, however, generally are considered "securities" covered by the federal securities laws. Notwithstanding the fact that at least one federal district court has held that a Rule 10b-5 remedy is not available to convertible noteholders seeking recovery against an issuer that repurchased bonds, on the theory that the issuer does not owe a fiduciary or other analogous duty to such noteholders,[561] bond traders act as if Rule 10b-5 applies, and the risk that a remedy may be available under Rule 10b-5 is heightened where a plaintiff can allege that the person trading while in possession of material nonpublic information violated a fiduciary or other duty.

Although bank debt is not considered a "security," common law theories of wrongdoing nonetheless remain. Trading with a sophisticated counterparty through the use of a so-called "big boy" letter may help to shield an insider from common law fraud liability.[562] However, "big boy" letters may present problems of their own, or be inadequate to protect the parties from legal risk, as discussed in Part IV.D.8.c of this outline.

c.     *Bankruptcy-Specific Remedies—the* Papercraft *Case*

An insider that purchases discounted claims in breach of its fiduciary duties to the debtor, its creditors or its shareholders may be subject to court-imposed sanctions.[563] The Third Circuit's *Papercraft* decision is the leading case in this area. *Papercraft* held that fiduciaries that trade in claims risk disgorgement of profits and equitable subordination of their claims under section 510(c) of the Bankruptcy Code.[564] In *Papercraft*, Citicorp Venture Capital, a 28% equityholder in Papercraft Corporation, held a seat on the board of directors of each of Papercraft, Papercraft's corporate parent and two of Papercraft's subsidiaries.[565]

---

[561] *Alexandra Global Master Fund, Ltd. v. IKON Office Solutions, Inc.*, 2007 WL 2077153 (S.D.N.Y. July 20, 2007). *See* Part I.B.3.b.iii of this outline.

[562] In a transaction of securities where one party may have or at least be expected to have access to material, nonpublic information, a "big boy" letter or representation is an acknowledgment by the counterparty that (1) it is possible that material, nonpublic information exists, (2) it has made the decision based on its own investigation, (3) it is a sophisticated investor and (4) it waives remedies.

[563] *See* Part IV.D.10 of this outline, which discusses the attendant risks to insiders who purchase claims.

[564] *In re Papercraft Corp.*, 160 F.3d 982, 991 (3d Cir. 1998).

[565] *In re Papercraft Corp.*, 187 B.R. 486, 491 (Bankr. W.D. Pa. 1995).

After Papercraft filed its chapter 11 petition and an initial plan of reorganization, and without prior disclosure, Citicorp Venture purchased approximately 40.8% of Papercraft's unsecured claims at a substantial discount, eventually leading to the filing of a second plan of reorganization (a cash offer by Citicorp Venture to buy certain assets of the debtor).[566]   At the same time, Citicorp Venture, by virtue of its board representation, received confidential, nonpublic information about Papercraft's financial stability and assets.[567]

In deciding an objection to the allowance of Citicorp Venture's claims, the bankruptcy court ruled that Citicorp Venture's claims would be disallowed to the extent that they exceeded their purchase price, but did not otherwise subordinate the claims.[568]   On appeal, the Third Circuit went further, holding that fiduciaries that trade in claims risk not only disgorgement of profits but also equitable subordination of their claims.   The court concluded that, in the circumstances presented, equitable subordination was an appropriate remedy given the bankruptcy court's findings that the debt was purchased:  (1) for the dual purpose of making a profit for Citicorp Venture and enabling Citicorp Venture to influence the reorganization, (2) with the benefit of nonpublic information and (3) without disclosure.[569]   The court also emphasized that any subordination remedy must be proportional to the level of harm suffered by the creditors.[570]   The Third Circuit remanded the case to the bankruptcy court to determine whether subordination beyond the level necessary to disgorge profits was justified given an examination of the specific harms caused by Citicorp Venture's actions upon the creditors who would benefit from the subordination.[571]   On remand, the bankruptcy court held that the record supported the subordination of Citicorp Venture's claim in addition to disgorgement of profit.[572]

---

[566] *Id.* at 498.

[567] *Id.* at 492-93.

[568] *Id.* at 501.

[569] *In re Papercraft Corp.*, 160 F.3d 987.

[570] *Id.* at 991.

[571] *Id.* at 991-92.

[572] *In re Papercraft Corp.*, 247 B.R. 625, 628 (Bankr. W.D. Pa. 2000).

### 8.    Potential Safeguards

To avoid subordination, recovery limitation, fraud liability and other potential negative consequences of buying or selling claims while in possession of nonpublic information, a potential acquiror may choose both to avoid any access to nonpublic information until it has accumulated all of the claims or interests it needs to execute its strategy, including by remaining on the "public side" of a debt syndicate, and to refrain from liquidating its position until all such initially nonpublic information has become public.  Alternatively, an acquiror can seek to limit its risk by, among other things, implementing "trading walls," and/or entering into contracts with its counterparties that are aimed at preventing any claims of improper trading.  Whatever methods are chosen, issuers and investors are strongly cautioned to use the highest levels of care to avoid even the appearance of impropriety, particularly in light of the current renewed SEC focus on potential insider trading and related violations.

#### a.    "Public Side" versus "Private Side"

Particularly with respect to bank debt, where nonpublic information frequently is made available to syndicate members, the syndicate is generally managed so that an investor may opt out of receiving private-side information, thereby maintaining the ability to trade.   Both public-side and private-side information is generally provided subject to express confidentiality requirements.  The biggest difference between public-side and private-side information is the completeness of the information received, with private-side information usually recognized by the issuer as containing or potentially containing material nonpublic information.   While public-side information often comes with a representation that it does not include material nonpublic information, this may not always be the case.

If an investor chooses to receive private-side information, it should then (1) trade only with counterparties with the same type of access to information, (2) be prepared to accept restrictions against trading in the issuer's other securities and (3) depending on the sensitivity of the private-side information, consider requiring counterparties to enter into "big boy" letters.  Additionally, private-side investors who are part of a "steering committee" of bank lenders who receive more sensitive information than the broader private-side group, or who are involved actively in negotiating a restructuring that has not yet been disclosed to the broader private-side group, should consider more stringent trading limits, such as only trading with other "steering committee" members, or not trading at all, while the information disparity exists.  Certain information may be designated for outside advisors and will be reviewed by them on behalf of the steering

committee; in this way, the committee has the benefit of the substantive conclusions without having been directly exposed to the material nonpublic information.

It is important for each investor to establish clear internal standards regarding the authority to accept confidentiality restrictions and sign confidentiality agreements.  This will limit the risk that employees and officers may either informally agree to confidentiality restrictions or be accused of having done so.  Limiting authority in this way will better position an investor to make these choices and to adopt effective compliance measures to control and monitor access to, and avoid misuse of, material nonpublic information.

It is also important for each investor to bear in mind that, notwithstanding any sunset provision or representation by a counterparty as to disclosure in a confidentiality agreement, it may have an independent duty to ensure that initially nonpublic information in its possession actually has become public prior to trading.  In the interest of caution, an investor should not solely rely on the representation of another party, such as an issuer or borrower, regarding disclosure without conducting further diligence.

### b.      Trading Walls

Another way to avoid the misuse of information is for the investor to employ some form of internal trading wall.  Members of an official committee in bankruptcy owe fiduciary duties to those they represent, such that the SEC has argued that "[i]n the bankruptcy context, the members of an official committee are properly viewed as ''temporary insiders' of the debtor . . . subject to the same insider trading restrictions as true insiders such as corporate directors."[573]   In numerous bankruptcy cases in recent years, given the size and diversity of trading activities that occur in many institutions, prospective committee members who have wanted to trade have requested that bankruptcy courts preapprove trading walls and other trading guidelines so as to attempt to immunize them from violating their fiduciary duties as committee members when their employer trades in a debtor's claims and interests.[574]

---

[573] Brief for the SEC as Amicus Curiae in Support of Motion of Fidelity Mgmt. & Research Co., *see In re Federated Dep't Stores, Inc.*, 1991 WL 11688857, at *5 (Bankr. S.D. Ohio Jan. 22, 1991) (supporting a motion by Fidelity Management & Research Company, a member of the Offical Bondholders' Committee, for an order permitting it to trade in the debtors' securities subject to effective implementation of a trading wall).

[574] Since the concept of trading walls gained currency in *In re Federated Dep't Stores, Inc.*, 1991 WL 79143 (Bankr. S.D. Ohio Mar. 7, 1991), numerous bankruptcy courts have issued orders

"Trading walls" (or "ethical walls") consist of policies and procedures implemented within a firm to isolate trading from other activities. Such barriers are one potential solution to the misuse of information and have been approved in a number of bankruptcy cases. However, a trading wall may not always provide robust protection.

Typically, an order approving a trading wall will require that the following information-blocking procedures, among others, be implemented:

- a committee member must cause all of its personnel engaged in committee-related activities to execute a letter acknowledging that they may receive nonpublic information, and that they are aware of the order and the procedures in effect with respect to the debtor's securities;

- committee personnel may not share nonpublic committee information with other employees (except auditors and legal personnel for the purpose of rendering advice and who will not share such nonpublic committee information with other employees);

- committee personnel must keep nonpublic information that is generated from committee activities in files inaccessible to other employees;

- committee personnel must not receive information regarding trades related to a debtor in advance of such trades; and

- compliance department personnel must review, from time to time as necessary, trades made by non-committee personnel and the trading wall procedures to insure compliance with the order, and keep and maintain records of such review.

---

allowing committee members to trade in the debtor's securities, provided that adequate information-blocking procedures are established. *See, e.g.*, *In re Calpine Corp.*, No. 05-60200 (BRL) (S.D.N.Y. Jan. 25, 2006); *In re Delta Air Lines, Inc.*, No. 05-17923 (ASH) (S.D.N.Y. Jan. 13, 2006); *In re Fibermark, Inc.*, No. 04-10463 (S.D.N.Y. Oct. 19, 2004); *In re Pacific Gas & Electric Co.*, No. 01-30923 (DM) (Bankr. N.D. Cal. June 26, 2001); *In re Integrated Health Services, Inc.*, No. 00-389 (MFW) (Bankr. D. Del. May 4, 2000). Occasionally, a court will refrain from granting this relief. *See, e.g.*, *In re Spiegel*, 292 B.R. 748, 749 (Bankr. S.D.N.Y. 2003); *In re Leslie Fay Cos.*, No. 93-B-41724 (Bankr. S.D.N.Y. Aug. 12, 1994).

Similarly, SEC Rule 10b5-1(c)(2) permits an organization that is in possession of nonpublic information to continue trading, so long as the person authorizing the trade does not have access to the information and the organization has implemented reasonable policies and controls to prevent that person from trading on the basis of material nonpublic information.  A committee member should be mindful, however, that, regardless of bankruptcy court approval of a trading wall, a committee member should comply with SEC Rule 10b-5.

### c. "Big Boy" Letters

If a prospective trader of bank debt possesses nonpublic information, it may consider entering into a letter agreement with its counterparty, known as a "big boy" letter.[575]  In a big boy letter, the counterparty acknowledges that (1) it is a sophisticated market actor, (2) the insider may possess material nonpublic information, (3) it will not sue the insider in connection with the insider's alleged use of material nonpublic information in the transaction and (4) it is relying only on its own research and analysis in entering the transaction.  There is sparse case law addressing the efficacy of this type of agreement between private parties.  Particularly in view of the general law disfavoring any advance waiver of fraud claims, the effectiveness of big boy letters in shielding insiders from liability cannot be assured.  However, many standard-form bank debt trading documents contain such big boy language.

At least in the context of "securities" (but not in the context of standard-form bank debt trading documentation), transactions involving big boy letters have been the subject of significant investigation by the SEC. Particularly in situations involving "securities," the participants should consider whether use of a big boy letter could raise concerns regarding potential information abuse.  There may be additional steps that can be taken in advance of prospective trades in order to enhance the likelihood that the trade will pass muster if scrutinized by the SEC. This is a case-by-case, fact-specific analysis, affected by the nature of the trade, the type of nonpublic information involved, the source of the information and the conditions under which it was obtained, and the relative positions and sophistication of the trading partners.  If handled properly, these letters continue to serve a useful purpose in some transactions.

---

[575] *See, e.g.*, THE LOAN SYNDICATIONS AND TRADING ASSOCIATION, INC., STANDARD TERMS AND CONDITIONS FOR DISTRESSED TRADE CONFIRMATIONS, Section 20 (Feb. 6, 2009).

         (i)      Are Big Boy Letters Effective Defenses to Common Law Fraud Actions?

Big boy letters may help shield insider purchasers and sellers from liability to their counterparties for common law fraud. The cause of action for common law fraud generally consists of the following elements: (1) misrepresentation or concealment of a material fact, (2) scienter, (3) justifiable reliance by the other party and (4) resulting injury.[576] An acknowledgement by a sophisticated party that it is not relying on the insider-seller for information makes it more difficult to sustain a contention of justifiable reliance by that party.[577] Judicial analysis of "big boy" non-reliance agreements may be context dependent, however, with courts more likely to approve of agreements that indicate a greater level of specificity and pre-agreement exchange of information.[578]

         (ii)     Are Big Boy Letters Effective Defenses to Private Insider Trading Actions?

Section 29(a) of the Exchange Act states that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder . . . shall be void."[579] Courts interpret Section 29(a) as prohibiting parties from contracting around or waiving compliance with substantive obligations of the Exchange Act, including the duties imposed by SEC Rule 10b-5.[580] To the extent that big boy letters are viewed as purporting to waive SEC Rule 10b-5's anti-fraud requirements, they may run afoul of Section 29(a). Indeed, the First and Third Circuit Courts of Appeal have

---

[576] See, e.g., Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1994); Zanett Lombardier, Ltd. v. Maslow, 815 N.Y.S.2d 547, 547 (N.Y. App. Div. 2006). In the case of a claim of fraudulent concealment, plaintiff also must prove that defendant owed a duty to disclose to the plaintiff. Banque Arabe, 57 F.3d at 153.

[577] See, e.g., Bank of the West v. Valley Nat'l Bank of Ariz., 41 F.3d 471, 477-78 (9th Cir. 1994) (holding participating bank's reliance is unjustified where loan participation agreement contained liability waiver and non-reliance provisions similar to those contained in a big boy letter); Valassis Commc'ns, Inc. v. Weimer, 758 N.Y.S.2d 311, 312 (N.Y. App. Div. 2003) (holding that, under New York law, reliance is unjustified where a sophisticated contract party expressly disclaims reliance on the extra-contractual representations of its counterparty and fails to verify the accuracy of information in its possession).

[578] See, e.g., Lazard Frères & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1542-43 (2d Cir. 1997).

[579] See 15 U.S.C. § 78cc(a) (2000).

[580] See, e.g., AES Corp. v. Dow Chem. Co., 325 F.3d 174, 179-80 (3d Cir. 2003).

held that big boy and non-reliance letters cannot, consistent with Section 29(a), bar private securities actions as a matter of law, even if "the existence of [a] non-reliance clause [is] one of the circumstances to be taken into account in determining whether the plaintiff's reliance was reasonable."[581]   However, the Second Circuit Court of Appeals has upheld non-reliance agreements against challenges under Section 29(a).[582]

Even if a big boy letter cannot bar a 10b-5 claim, the letter still may help undermine the factual basis of a private securities fraud action, which requires proof of elements that generally are the same as those required for a common law fraud claim.[583]   As in the common law fraud context, given the representations made in the big boy letter, a party may find it difficult to prove that it actually relied on its counterparty's omissions or that any such reliance was justifiable.[584]

(iii)   Are Big Boy Letters Effective Defenses to SEC Enforcement Actions?

Big boy letters may *not* be a defense to insider trading actions brought by the SEC.[585]   Unlike a private litigant, the SEC is not required to prove reliance to sustain a charge of securities fraud.[586]   In addition, trading by the insider may be a breach of a duty of confidentiality owed to the issuer or the other source of the information, and the SEC may charge insider trading solely on that basis.

In one SEC civil action filed in the Southern District of New York, *SEC v. Barclays Bank PLC and Steven J. Landzberg*, the SEC alleged that the defendants committed insider trading when they purchased and sold bonds while aware of

---

[581] *Id.* at 183; *see also Rogen v. Ilikon Corp.*, 361 F.2d 260, 268 (1st Cir. 1966).

[582] *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195-96 (2d Cir. 2003); *Harsco Corp. v. Segui*, 91 F.3d 337, 342-44 (2d Cir. 1996).

[583] *Compare Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996) (detailing the elements for securities fraud actions) *with Banque Arabe*, 57 F.3d at 153 (detailing the elements for common law fraud actions).

[584] *See, e.g.*, *Emergent Capital*, 343 F.3d at 195-96; *Paracor Fin.*, 96 F.3d at 1159; *Harsco*, 91 F.3d at 342-44.

[585] *See* Rachel McTague, *"Big Boy" Letter Not a Defense to SEC Insider Trading Charge, Official Says*, 39 SEC. REG. & L. REP. 1832, 1832 (2007) (quoting statement by associate director in the SEC's Enforcement Division that big boy letters are no defense to SEC charges of insider trading).

[586] *See SEC v. Pirate Investor LLC*, 580 F.3d 233, 239 & n.10 (4th Cir. 2009); *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993) (collecting authority).

material nonpublic information acquired by serving on six creditors' committees.[587]  The fact that Barclays and some of its bond trading counterparts had executed big boy letters did not stop the SEC from investigating the defendants' actions or bringing an enforcement action ultimately resulting in a monetary settlement and injunction against Landzberg's participation on any creditors' committees.[588]  This case also illustrates a broader point:  Careful attention must be paid to managing legal and reputational risk when using potentially nonpublic information to trade debt.

(iv)   Potential Problems Arising from Downstream Transfers

Even if a big boy letter were to insulate a seller from a common law or federal securities fraud claim brought by a purchaser counterparty, future purchasers of the debt instrument—who were not parties to the initial big boy letter—may attempt to bring fraud claims against the original seller or against the original counterparty to the big boy letter.  For example, a downstream purchaser may argue that it has a viable action for fraud because it purchased the instrument without entering a big boy agreement and without the benefit of the material nonpublic information possessed by the upstream seller.  In a case in the Southern District of New York, *R$^2$ Investments LDC v. Salomon Smith Barney, Inc.,*[589] a downstream purchaser acquired notes from the original big boy purchaser on the same day that the original purchaser had acquired the notes from the big boy seller.  Because standard practice for a broker or trading desk is to engage in back-to-back trades, this immediate resale situation, where the broker counterparty to the big boy letter is only an intermediary, is not uncommon.  The original purchaser-reseller did not inform the downstream plaintiff that the original parties had entered into a big boy letter or that the original seller possessed material nonpublic information concerning the notes.  The notes declined in value after the issuer disclosed its financial difficulties, and the downstream plaintiff brought federal securities and state law claims against the original big boy parties.  The district court denied the defendants' motion for summary judgment,[590] and the parties settled for an undisclosed amount on the first day of trial.  Because of this type of risk, it may be wise for a seller to require

---

[587] *See SEC v. Barclays Bank PLC and Steven J. Landzberg*, 07-CV-04427, Litigation Release No. 20132, 2007 WL 1559227 (S.D.N.Y. May 30, 2007).

[588] *Id.*

[589] 2005 WL 6194614 (S.D.N.Y. Jan. 13, 2005).

[590] *Id.*

a purchaser to use a big boy provision in its second-step trade in any transaction that is likely to be viewed as integrated in this way if it is challenged.

### 9.    Risk of Vote Designation

Perhaps the most paradoxical source of risk for a prospective acquiror is that its very reason for acquiring claims—*i.e.*, to obtain a controlling position in the reorganized debtor—has been considered by some courts (including the United States Court of Appeals that oversees chapter 11 cases in New York) to be a basis for depriving a purchaser of its right to have its vote on a chapter 11 plan counted.

Section 1126(e) of the Bankruptcy Code allows the court to "designate"—*i.e.*, not count—the vote of any creditor whose vote is not cast in "good faith."[591] Based on that provision, a party that purchases claims with the intent of taking control of the debtor might face an allegation that its vote on the debtor's plan ought to be set aside.

#### a.    Factual Inquiry into What Constitutes "Bad Faith"

There is no definition of "good faith" or "bad faith" in the Bankruptcy Code.  One line of cases has defined "bad faith" as using "obstructive" tactics to gain an advantage.  The United States Supreme Court, for example, has stated that the good faith requirement imposed under the former Bankruptcy Act was intended "to prevent creditors from participating who by the use of obstructive tactics and hold-up techniques exact for themselves undue advantages . . . ."[592] Other cases have held that a creditor acts in bad faith when it acts with an "ulterior motive."[593]

Although the "good faith" language in the statute is indeterminate, there is little doubt that a creditor is entitled to pursue its self-interest as a creditor, *i.e.*, to

---

[591] *See* 11 U.S.C. § 1126(e) ("On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.")

[592] *See Young v. Higbee Co.*, 324 U.S. 204, 213 n.10 (1945) (internal quotation omitted).

[593] *See, e.g., Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter Ltd.)*, 118 F.3d 635, 639 (9th Cir. 1997); *255 Park Plaza Assocs. Ltd. P'ship v. Conn. Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. Ltd. P'ship)*, 100 F.3d 1214, 1219 (6th Cir. 1996); *Insinger Mach. Co. v. Fed. Support Co. (In re Fed. Support Co.)*, 859 F.2d 17, 19 (4th Cir. 1988).

increase recovery on its claims, without being subject to vote designation.  As the Ninth Circuit has held:

> If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass muster.  On the other hand, pure malice, "strikes" and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business, all plainly constituting bad faith, are motives which may be accurately described as ulterior.[594]

In applying section 1126(e) of the Bankruptcy Code, courts have eschewed clear rules in favor of a case-by-case approach.[595]  One bankruptcy court in the Southern District of New York reviewed the relevant case law and outlined a list of "badges" of bad faith.  Such badges include "creditor votes designed to (1) assume control of the debtor, (2) put the debtor out of business or otherwise gain a competitive advantage, (3) destroy the debtor out of pure malice or (4) obtain benefits available under a private agreement with a third party that depends on the debtor's failure to reorganize."[596]  Applying these badges, in a later case (discussed in depth below), the same court found, in a decision upheld on appeal, that acquiring claims as a strategic investor, as opposed to as a traditional creditor seeking to maximize recovery on its claims, was sufficient, under the circumstances of that case, to show a lack of good faith resulting in vote designation.[597]

---

[594] *In re Figter*, 118 F.3d at 639 (citation omitted); *see also In re GSC, Inc.*, 453 B.R. 132, 158-62 (Bankr. S.D.N.Y. 2011) (designation of the votes of a creditor is improper where such creditor can articulate valid business reasons for rejecting a plan, even if such rejection may facilitate allocation of estate assets to such creditor beyond the amount to which such creditor would otherwise be entitled).

[595] *See Figter*, 118 F.3d at 639 ("[T]he concept of good faith is a fluid one, and no single factor can be said to inexorably demand an ultimate result, nor must a single set of factors be considered. It is always necessary to keep in mind the difference between a creditor's self interest as a creditor and a motive which is ulterior to the purpose of protecting a creditor's interest.").

[596] *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006).

[597] *In re DBSD North America, Inc.*, 421 B.R. 133 (Bankr. S.D.N.Y. 2009), *aff'd*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part and rev'd in part by* 634 F.3d 79 (2d Cir. 2011).

### b.     Purchases of Claims with the Purpose of Acquiring Control

In a well-known case, *In re Allegheny International, Inc.*, Japonica Partners, an investor, bought certain of the debtor's subordinated notes after the debtor had proposed a plan of reorganization.[598]   After proposing its own plan, Japonica proceeded to purchase a blocking position in a class of unsecured claims as well as a class of secured bank debt, in some instances at highly inflated prices. The bankruptcy court concluded that Japonica had accumulated its claims in bad faith, noting the following facts:

- Japonica's stated purpose was to take control of the debtor;

- Japonica amassed its position only after it had proposed a competing chapter 11 plan;

- Japonica purchased claims at highly inflated values solely to acquire a blocking position in certain classes;

- in its capacity as a plan proponent, Japonica was a fiduciary of the debtor and had received nonpublic information; and

- Japonica acquired large positions in classes that had directly conflicting interests in pending litigation.[599]

The bankruptcy court concluded that Japonica had acted in bad faith and designated its votes under section 1126(e), noting that its purpose was to take control of the debtor rather than recover the value of its claims, and citing as evidence that it had amassed its position only after the debtor had proposed a plan and had purchased claims at highly inflated prices.   It is relatively clear that the court considered Japonica a "bad actor" that had exploited its position as a fiduciary.   It is less clear, however, whether the court considered Japonica's purchase of claims for the purpose of taking control of the debtor as a sufficient basis for designating Japonica's votes.

Until recently, the *Allegheny* decision stood as somewhat of an outlier, but in *DISH Network Corp. v. DBSD North America, Inc. (In re DBSD North*

---

[598] 118 B.R. 282 (Bankr. W.D. Pa. 1990).

[599] *See generally* Scott K. Charles, *Trading Claims in Chapter 11 Cases:   Legal Issues Confronting the Postpetition Investor*, 1991 ANN. SURV. AM. L. 261, 303-04 (1991).

*America, Inc.*),[600] the United States Court of Appeals for the Second Circuit affirmed lower court rulings which had relied principally on *Allegheny* in holding that acquiring claims "to establish control over [a] strategic asset" constituted bad faith.[601]   *DBSD* concerned the actions of DISH Network, a satellite television provider and a competitor of the debtors.  After the debtors filed their plan and disclosure statement, DISH purchased all of the first lien debt of the debtors at par.  DISH then opposed DBSD's chapter 11 plan, and separately offered to enter into a strategic transaction with DBSD.  The bankruptcy court designated DISH's vote rejecting the debtor's plan as "not in good faith," and the Court of Appeals both affirmed this ruling and further held that the designation of the vote of the sole entity in the class of first lien creditors eliminated the need for the plan to satisfy the cramdown test for that class.

In affirming the bankruptcy court's decision that DISH acted in bad faith, the Court of Appeals reasoned that DISH was a competitor of DBSD that had "bought a blocking position in (and in fact the entirety of) a class of claims, after a plan had been proposed, with the intention not to maximize its return on the debt" but to "vot[e] against any plan that did not give it a strategic interest in the reorganized company."[602] The Court was particularly troubled by the timing of the purchases, which were made after the debtor's filing of a plan, and the evidence that DISH's purpose was to thwart any plan that did not meet its acquisition goal, reflected in internal DISH communications stating that its purpose was "'to obtain a blocking position' and 'control the bankruptcy process for this potentially strategic asset.'"[603]  This ruling represents a possible game changer for distressed M&A effected through a plan.  While the appellate court stated that vote designation is a fact-specific remedy to be employed "sparingly,"

---

[600] 634 F.3d 79 (2d Cir. 2011).

[601] *In re DBSD N. Am., Inc.*, 421 B.R. 133, 137 (Bankr. S.D.N.Y. 2009).

[602] *In re DBSD N. Am.*, 634 F.3d at 104.  Other cases similarly have stated that acts by a creditor that are divorced from its motivation to protect or maximize its rights as a creditor constitute bad faith.  *See In re Waterville Valley Town Square Assocs., Ltd. P'ship*, 208 B.R. 90, 95 (Bankr. D.N.H. 1997) ("A problem arises when a creditor purchases claims in a manner that advances a *noncreditor* interest, *e.g.*, to gain control of the debtor's operation."); *In re Holly Knoll P'ship*, 167 B.R. 381, 389 (Bankr. E.D. Pa. 1994) (creditor's purchase of claims was in bad faith because motivated by desire to become general partner of debtor); *In re Landing Assocs., Ltd.*, 157 B.R. 791, 807-08 (Bankr. W.D. Tex. 1993) ("[W]hen the voting process is being used as a device with which to accomplish some ulterior purpose, out of keeping with the purpose of the reorganization process itself, and only incidentally related to the creditor's status *qua* creditor, section 1126(e) is rightly invoked.").

[603] *In re DBSD N. Am.*, 634 F.3d at 105.

declined to decide whether a "preexisting" creditor would be similarly at risk of designation, and relied on lower court findings of extremely late and disruptive conduct on the part of DISH, parties purchasing claims to further a strategic acquisition through a chapter 11 plan need to consider the decision carefully.  It may be possible to restrict *DBSD* to situations in which a competitor to the debtor strategically purchases claims; however, it remains to be seen as few courts have addressed the Second Circuit's opinion at length.[604]

### c.    Other Motivations for Purchasing Claims That Have Been Found to Be "Bad Faith"

Unsurprisingly, courts have found voting with the intent to "put the debtor out of business or otherwise gain a competitive advantage" to constitute bad faith, as well as acting out of malice or to "obtain benefits available under a private agreement with a third party which depends on the debtor's failure to reorganize."[605]   Moreover, some courts have suggested in other contexts that a creditor who interferes with litigation brought by the debtor or trustee and in which such creditor is a defendant may be acting in bad faith.[606]

---

[604] In one of the only opinions thus far to deal extensively with *DBSD* in factually analogous circumstances, the Bankruptcy Court for the Eastern District of North Carolina declined to designate the vote of a creditor, ERGS, who was not a pre-petition creditor but purchased secured notes after the filing.  *In re Lichtin/Wade, LLC*, 2012 WL 6576416 (Bankr. E.D.N.C. Dec. 17, 2012).  ERGS purchased additional claims after the debtor filed its plan of reorganization, then moved to terminate exclusivity and submitted a draft plan that would result in ERGS owning the debtor's buildings.  The court found that "ERGS purchased claims for the purpose of maximizing its investment and advancing its own economic interest rather than for the purpose of advancing a strategic competitive interest against the Debtor," and that the evidence did not support the conclusion that ERGS was motived primarily to take control of the debtor's business, despite the fact that ERGS had a membership interest in a competitor to the debtor.  Notably, this opinion distinguished *DBSD* on its facts but did not disagree that purchasing claims to take control of a debtor for strategic purposes would be improper.

[605] *See In re Dune Deck Owners Corp.*, 175 B.R. 839, 844-45 (Bankr. S.D.N.Y 1995) (citations omitted).

[606] *Cf. In re Keyworth*, 47 B.R. 966, 971-72 (D. Colo. 1985) (denying standing of a creditor to object to the treatment in bankruptcy of the proceeds of a cause of action brought by the debtor against such creditor on the equitable ground that the creditor had acted in bad faith by purchasing its claim for the purpose of interfering with the assertion of such cause of action); *In re Kuhns*, 101 B.R. 243, 247 (Bankr. D. Mont. 1989) (rejecting proposed settlement of claims asserted by a debtor against a party who had purchased offsetting claims against the debtor, which were also to be settled, with funds provided by the debtor's wife).  *But see In re Lehigh Valley Prof'l*, 2001 WL 1188246, at *6 (Bankr. E.D. Pa. 2001) ("The fact that [the creditor] voted against a plan because its centerpiece was a suit against it without more is not a basis to find bad faith.  A creditor is expected to act in its own self interest."); *In re A.D.W., Inc.*, 90 B.R. 645, 651 (Bankr. D.N.J.

### d. *Purchases of Claims for Permissible Purposes*

Where creditors can draw a connection between their conduct in a case and their self-interest *as a creditor*, it is unlikely that their votes will be designated, even if they end up controlling the debtor or its property.[607]

#### (i) Holding Claims in Multiple Classes Is Not Bad Faith

Courts have found that buying and holding claims in multiple classes is not evidence of bad faith. For instance, in *Adelphia*, it was argued that votes by certain creditors in favor of the plan should be designated because they were driven by an ulterior motive—to maximize their recovery in another class.[608] The court found no cognizable claim of bad faith: the creditor's motive was "to maximize an economic recovery, or to hedge, by owning bonds of multiple debtors in a single multi-debtor Chapter 11 case."[609]

#### (ii) Purchasing Claims to Block a Plan Is Not Necessarily Evidence of Bad Faith

Outside of the Second Circuit, numerous courts have held that the purchase of claims to obtain a blocking position in connection with a plan of reorganization, absent some other evidence of an ulterior motive, does not amount to bad faith warranting the designation of votes.[610]

---

1988) ("The existence of the district court litigation involving [the creditor], the debtor and the debtor's principals does not constitute grounds to designate the vote of [the creditor] as not in good faith. The plan, if approved would leave the pending litigation undisturbed.").

[607] *See Three Flint Hill Ltd. P'ship v. Prudential Ins. Co. (In re Three Flint Hill Ltd. P'ship)*, 213 B.R. 292, 301 (D. Md. 1997) (creditor did not act in bad faith by buying claims in order to block a plan of reorganization and force the debtor to liquidate; creditor's desire to buy the debtor's property was consistent with a desire to "maximize the amount recovered from the defaulted loan").

[608] *See In re Adelphia Commcn's Corp.*, 359 B.R. at 63.

[609] *Id.*; *see also In re Pleasant Hill Partners, L.P.*, 163 B.R. 388, 395 (Bankr. N.D. Ga. 1994) (purchasing claims to control the vote in one class for the benefit of another is not an ulterior motive evidencing bad faith).

[610] *See, e.g.*, *In re 255 Park Plaza Assocs.*, 100 F.3d at 1219; *In re Three Flint Hill Ltd. P'ship*, 213 B.R. at 301; *In re Waterville Valley Town Square Assocs.*, 208 B.R. at 95-96. *But see In re Applegate Prop., Ltd.*, 133 B.R. 827, 836 (Bankr. W.D. Tex. 1991) ("Sanctioning claims acquisition for purposes of blocking an opponent's plan would also ignite a scramble for votes

In *Figter*, the Court of Appeals for the Ninth Circuit examined whether a claims purchaser who acquires claims to obtain a blocking position acts in bad faith for purposes of section 1126(e) of the Bankruptcy Code.[611]   A secured creditor, Teachers Insurance and Annuity Association of America, which opposed the debtor's proposed plan, purchased 21 of the 34 unsecured claims against the debtor.   Because that purchase precluded a cramdown under section 1129(b) of the Bankruptcy Code due to the lack of a consenting impaired class, the debtor sought to have Teachers' votes designated under section 1126(e).   The Ninth Circuit affirmed the bankruptcy court's denial of the debtor's motion, reasoning that "'[a]s long as a creditor acts to preserve what he reasonably perceives as his fair share of the debtor's estate, bad faith will not be attributed to his purchase of claims to control a class vote.'"[612]

### 10.    Risk to Insiders Who Purchase Claims

In a distressed environment where debt trades well below par value, an attractive prospect is for insiders or affiliates of an issuer to purchase claims of that issuer either as a long-term investment with the belief that the debt is underpriced compared to potential future return or as a method to increase their stake or seniority in a company experiencing distress.   Historically, recovery to an insider was limited to the cost at which it purchased its claims.[613]   While under current law an insider's recovery is not likely to be *per se* limited to the amount of its investment in a claim, the equitable powers of the bankruptcy court still may be used to limit recovery through the doctrine of equitable subordination.[614] Particular actions that an insider could take that may be inequitable in the view of a court include, among others, the usurpation of a corporate opportunity, the use of material nonpublic information or the use of a previously undisclosed position to influence the bankruptcy process.

Certain precautions should be taken to limit an insider's risk of having its purchased claims subordinated.   For example, insiders should consider presenting

---

conducted almost entirely outside the Code's carefully developed structure . . . leaving creditors to select not the best plan but the best deal they might be able to individually negotiate.").

[611] *See In re Figter*, 118 F.3d at 638-40.

[612] *Id.* at 639 (*quoting In re Gilbert*, 104 B.R. 206, 217 (Bankr. W.D. Mo. 1989)).

[613] *See Young v. Higbee Co.*, 324 U.S. 204, 213 (1945) ("The money [the investors] received in excess of their own interest as stockholders was not paid for anything they owned.").

[614] Discussed in detail in Parts I.B.3.b.ii and IV.B of this outline.

the opportunity to purchase claims to the board of directors before purchasing claims themselves or obtaining approval from independent members of the board for the insider's purchase plan. Insiders also should consider avoiding the purchase of claims if a default by the issuer has occurred or is believed to be imminent. This is especially true if the insider is in possession of nonpublic information. Insiders should consider disclosing their identities to the seller and seller's broker. Finally, insiders should be careful to follow practices for complying with applicable federal securities laws such as adhering to company trading windows and verifying that the company is not in possession of material nonpublic information. A company also should disclose that an insider is considering purchasing debt.

**11.     Risk of Duty to Disclose Information Related to Acquired Claims**

Investors in a distressed company, including would-be owners of a reorganized debtor, often act in concert in order to reduce expenses and/or maximize influence over a case. In doing so, such investors need to be cognizant not only of the potential securities law issues raised by joint action, but also of the disclosure requirements imposed by the Bankruptcy Rules.

Prior to a recent revision, Bankruptcy Rule 2019 required any "entity" or "committee" representing multiple creditors or equityholders, other than official committees appointed pursuant to the Bankruptcy Code, to file a statement setting forth, among other things, the names of the investors represented by the entity or committee, their holdings, the times the holdings were acquired and, at least in the case of a committee, the amount its members paid for their holdings. Courts struggled to determine whether the rule should apply to ad hoc groups of creditors—a key issue since application of Rule 2019 to require such disclosure could effectively force disclosure of sensitive information such as the price paid for any position.[615]

A revised version of Rule 2019 went into effect on December 1, 2011. The revised rule clearly applies to an ad hoc group of creditors (even one disclaiming "committee" status). It also expands the scope of the positions that must be disclosed—the rule applies to all "disclosable economic interests," which are defined to include, among other things, claims, derivative instruments, options

---

[615] *See In re Phila. Newspapers, LLC*, 422 B.R. 553 (Bankr. E.D. Pa. 2010) (finding Rule 2019 inapplicable); *In re Northwest Airlines Corp.*, 363 B.R. 701 (Bankr. S.D.N.Y. 2007) (applying Rule 2019); *In re Owens Corning, Inc.*, No. 00-3837 (JKF), Docket No. 13091 (Bankr. D. Del. Oct. 22, 2004) (requiring disclosure, on a confidential basis).

or "any other right or derivative right that grants the holder an economic interest that is affected by the value, acquisition, or disposition of a claim or interest." Most importantly, the revised rule "no longer requires the disclosure of the precise date of acquisition or the amount paid for disclosable economic interests," although the official note states that "nothing in this rule precludes either the discovery of that information or its disclosure when ordered by the court pursuant to authority outside this rule."[616] The revised rule requires disclosure of information relating to the identity of any group members and the nature and amount of their claims, as well as the quarter and year of purchase of any disclosable economic interests in certain circumstances (*e.g.*, where an ad hoc committee claims to represent entities other than its members) and in those cases, only if such interests were acquired less than one year before the petition date.[617]

Despite the recent amendment, compliance with Rule 2019 is likely to remain contentious, as hedge funds and other investors may want to keep their strategic positions confidential.

## E.      Antitrust Considerations

Section 7 of the Clayton Act prohibits purchasers from acquiring, in whole or part, "the stock or other share capital . . . of another person engaged . . . in commerce, where . . . the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly."[618] While section 7 typically applies in the context of equity or asset acquisitions, some courts have extended its application to acquisitions of a competitor's debt. Rarely, however, will the mere purchase of debt create antitrust concerns absent the potential that the creditor-competitor will use its debt position to thwart a debtor's ability to compete as effectively in the relevant market. Thus, concerns may arise if the creditor-competitor uses its debt holdings to participate in the bankruptcy process with the intent to delay or defeat a debtor's exit from bankruptcy.

A creditor may face antitrust issues if it is deemed to have used its debt holdings as a means to harm its competitor and to deter its exit from bankruptcy. In 1987, AMERCO, the parent company of U-Haul, settled alleged violations of section 5 of the Federal Trade Commission Act with the FTC. U-Haul had sued

---

[616] Fed. R. Bankr. P. 2019 advisory committee's note.

[617] Report of the Advisory Committee on Bankruptcy Rules, Revised Proposed Amendments to the Federal Rules of Bankruptcy Procedure B24-B28 (May 27, 2010), *available at* http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/jc09-2010/2010-09-Appendix-B.pdf.

[618] *See* 15 U.S.C. § 18.

Jartran, a competing provider of rental moving equipment, for false and misleading advertising.  Jartran subsequently filed for reorganization under chapter 11, and U-Haul filed a claim as a creditor in the bankruptcy case based on damages arising from Jartran's alleged false and misleading advertising.  The FTC alleged that U-Haul engaged in "sham litigation" in the bankruptcy court proceeding, and that U-Haul had "in fact injured competition by jeopardizing and substantially delaying Jartran's emergence as a reorganized company, capable of resuming its role as an effective competitor."[619]  Although there is very limited precedent in this area, the *U-Haul* consent order provides notice that the antitrust agencies may challenge perceived abuses of the bankruptcy process by a competitor.

On the other hand, in *Vantico Holdings S.A. v. Apollo Management LP*,[620] an Apollo investment fund owned a 79% interest in Resolution Holdings LLC, a competitor of Vantico in the market for epoxy resin products, while another Apollo investment fund acquired a 35% blocking position in the senior bank debt of Vantico.  Vantico sought a preliminary injunction preventing Apollo from voting its blocking position against Vantico's proposed voluntary restructuring plan.  The District Court for the Southern District of New York denied the injunction, holding that Apollo's purchase of the senior bank debt did not violate section 7 of the Clayton Act because Apollo had little incentive to harm Vantico's competitive position given its fund's investment in that company.  The court held that, absent indicia of anti-competitive behavior, the mere fact that a company's horizontal competitor or its shareholder acquires the company's debt is insufficient to find a violation of section 7.[621]

Under the HSR Act Rules, purchasers are exempt from the notification and waiting period requirements when exchanging their claims for the debtor's assets and/or voting securities as part of a "*bona fide* debt work-out," so long as the creditor extended credit in a *bona fide* credit transaction that was entered into in the ordinary course of the original creditor's business.  The exchange of debt issued under such circumstances is eligible generally for the exemption irrespective of whether the original creditor or a subsequent claim purchaser owns the debt at the time of the exchange.[622]

---

[619] *See In re AMERCO*, 109 F.T.C. 135, at ¶¶ 21-22 (1987) (consent order containing Complaint filed June 24, 1985).  *See also* FED. TRADE COMM'N ANN. REP. 55 (1985).

[620] 247 F. Supp. 2d 437 (S.D.N.Y. 2003).

[621] *Id*. at 455.

[622] *See* PREMERGER NOTIFICATION PRACTICE MANUAL, *supra* n. 412 at 225 (4th ed. 2007).

A claim purchaser is eligible for the HSR Act exemption provided it satisfies the "*bona fide* credit transaction" requirement.  To do so, it must purchase the debt before public announcement of an intention to initiate bankruptcy proceedings by or against the debtor.[623]  If it purchases the debt after such announcement, the FTC will not view the claim purchaser as a "creditor in a *bona fide* credit transaction" and the exemption will not apply on the theory that the claim purchaser seeks control rather than debt repayment (the "Vulture Fund Exception" to the exemption).[624]  However, where a creditor holds some bonds acquired *before*, and other bonds acquired *after*, public announcement of the intention to initiate bankruptcy proceedings, the exchange of bonds in the first group remains eligible for the HSR Act exemption.  The assets and/or voting securities received in exchange for the nonexempt bonds will be valued separately to determine whether they satisfy the HSR Act size-of-transaction test (currently $63.1 million) and are therefore subject to HSR Act review.[625]

## F.    Creditors and Tax-Free Reorganizations

In certain circumstances, a restructuring of an insolvent or bankrupt company may qualify as a tax-free reorganization.  Specifically, the Internal Revenue Code contains a provision permitting a company under a "title 11 or similar case"[626] to transfer assets in a tax-free reorganization (known as a "G" reorganization) where the acquiror issues stock or securities as consideration,[627] but other types of reorganizations may be available to troubled companies.  There are many requirements for a transaction to qualify as a reorganization for tax purposes and such requirements vary depending on the type of the transaction. While a full discussion of the reorganization rules is beyond the scope of this outline, certain of those specific to creditors are highlighted below.

Generally, in order for a transaction to qualify as a tax-free reorganization (including a G reorganization), the shareholders of the target company must

---

[623] *Id.*

[624] *Id.*

[625] *See, e.g.*, FTC Informal Staff Opinion, File No. 0407006 (Aug. 11, 2004).

[626] "Title 11 or similar case" means a case under title 11 of the United States Code or a receivership, foreclosure or similar proceeding in a federal or state court.

[627] *See* 26 U.S.C. § 368(a)(1)(G), I.R.C. § 368(a)(1)(G).

maintain "continuity of interest." **628**   This means that a substantial part of the consideration received by the target shareholders must consist of stock of the surviving entity.[629]   In certain circumstances, creditors of the target company that receive stock in the reorganization can count towards satisfaction of this requirement (essentially being treated as the shareholders of the debtor), but, historically, guidance on this point was limited.  Finally, in December 2008, the IRS issued regulations clarifying when and to what extent creditors are treated as holding a proprietary interest in a target company for purposes of the continuity of interest requirement.[630]   Notably, these rules extend beyond G reorganizations to reorganizations of insolvent companies outside of bankruptcy.

The regulations set forth detailed rules about valuing the claims of creditors as proprietary interests.  The treatment is different depending on the seniority of the claim.  The value of a claim of the most senior class of creditors is determined by a formula based on the value of the interests and other consideration received in exchange for the claim, while the value of a claim of a junior class of creditors is the fair market value of the claim.[631]

Where reorganization treatment is desired, these rules may be of particular importance, because they expand the circumstances in which creditors can participate in a tax-free reorganization (such as a situation where a company formed by creditors acquires substantially all of the assets of an insolvent company outside of bankruptcy).[632]   However, where a distressed company or its creditors wish to avoid a tax-free reorganization (for example, where the creditors

---

[628] Note that, for reorganizations that are recapitalizations or mere changes of identity or form for tax purposes, the continuity of interest requirement does not apply.  26 C.F.R. § 1.368-1(b), Treas. Reg. § 1.368-1(b).

[629] *See generally* 26 C.F.R. § 1.368-1(e), Treas. Reg. § 1.368-1(e).

[630] T.D. 9434, 2009 I.R.B. 4 (Dec. 12, 2008).

[631] *See* 26 C.F.R § 1.368-1(e)(6)(ii), Treas. Reg. § 1.368-1(e)(6)(ii).

[632] Note that proposed regulations would deny reorganization treatment under many circumstances where there is no "exchange of net value"—these rules otherwise could impact the ability of an insolvent company to reorganize on a tax-free basis.  The proposed regulations explain in detail when a target or acquiror is treated as surrendering and receiving net value.  For asset reorganizations, this is dependent on whether (a) the fair market value of a target company's assets exceeds the amount of the liabilities assumed by the acquiring company and any other consideration received by the target and (b) the fair market value of the acquiror/issuer's assets exceeds the amount of its liabilities; the rules are modified slightly for a stock reorganization (including where the target survives in a "triangular" stock reorganization).  Proposed Treas. Reg. § 1.368-1(f).

want to recognize a loss on the exchange or where the company wants to recognize gain on its assets in order to achieve a step-up in tax basis), such avoidance may prove more difficult.

Even though as a general rule creditors now may satisfy the continuity of interest requirement, as noted above, there are many other requirements for a transaction to qualify as a tax-free reorganization. Notably, the new rules do not alter the requirement that a creditor claim must be a "security" for tax purposes in order for the exchange to be tax free.[633] This could present an issue, for example, if the claim represents trade debt or other short-term debt.

Even if a claim is a security and all of the requirements for a reorganization are met, a creditor will be required to recognize gain (but not loss) with respect to other property (besides stock or securities of the reorganized entity) received in the exchange.[634] Also, a portion of the consideration received by the creditors (even if solely stock or securities) may be treated as accrued and unpaid interest, and will be taxable as such.[635]

In addition, a tax-free reorganization still may trigger an "ownership change" that could limit a debtor's ability to use prior operating losses to offset future taxable income. This is discussed further in Part IV.D.6.e.i of this outline.

Finally, even in an otherwise tax-free reorganization, a debtor may be required to recognize COD income to the extent that it is relieved of the obligation to repay its outstanding debt.[636] Where a debtor issues stock in satisfaction of its debt, it is treated as paying an amount of money equal to the fair market value of the stock so issued; thus, the debtor will recognize COD income to the extent that the fair market value of the stock is less than the amount of debt exchanged therefor.[637] If a company is a debtor in a chapter 11 case, or is

---

[633] *See* 26 U.S.C. § 354(a), I.R.C § 354(a). *See* "Treatment of Holders" in Part I.B.4.h of this outline.

[634] *See* 26 U.S.C. § 356, I.R.C. § 356.

[635] *See* 26 U.S.C. § 354(a)(2)(B), I.R.C. § 354(a)(2)(B); *see also* 26 C.F.R. 1.446-2, Treas. Reg. § 1.446-2.

[636] *See* 26 U.S.C. § 61(a)(12), I.R.C. § 61(a)(12), also discussed in Part I.A.2.c and Part I.B.4.h of this outline (where a new election to defer COD income also is discussed).

[637] *See* 26 U.S.C. § 108(e)(8), I.R.C. § 108(e)(8).

insolvent,[638] its COD income is excluded from its income and thus is not taxable.[639]   However, the amount excluded from income reduces the amount of certain tax attributes of the corporation, including NOL and tax basis in property held by the company.[640]

While some of these issues do not directly affect the taxation of a creditor participating in a reorganization, the potential impact on a rehabilitated debtor's cash flow likely is of concern to creditors.

---

[638] For this purpose, "insolvent" means the excess of liabilities over the fair market value of the company's assets, measured as of immediately before the debt discharge.  26 U.S.C. § 108(d)(3), I.R.C. § 108(d)(3).  It should be noted that in the case of a debtor that is entitled to exclude COD income because it is insolvent, such rules (and corresponding attribute reduction) apply only to the extent that the debtor is insolvent.  26 U.S.C. § 108(a)(3), I.R.C. 108(a)(3).  If there is COD income remaining after application of the insolvency exception, it will not be excluded from tax.

[639] *See* 26 U.S.C. § 108(a), I.R.C. § 108(a), also discussed in Parts I.A.2.c and I.B.4.h of this outline.

[640] *Id.*

# Exhibit 12

# THE LSTA'S COMPLETE CREDIT AGREEMENT GUIDE

SECOND EDITION

**Michael Bellucci and Jerome McCluskey**

**Milbank**



New York   Chicago   San Francisco   Athens   London
Madrid   Mexico City   Milan   New Delhi
Singapore   Sydney   Toronto

Copyright © 2017 by McGraw-Hill Education. All rights reserved. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written permission of the publisher.

ISBN: 978-1-25-964487-0

MHID: 1-25-964487-1.

The material in this eBook also appears in the print version of this title: ISBN: 978-1-25-964486-3, MHID: 1-25-964486-3.

eBook conversion by codeMantra
Version 1.0

All trademarks are trademarks of their respective owners. Rather than put a trademark symbol after every occurrence of a trademarked name, we use names in an editorial fashion only, and to the benefit of the trademark owner, with no intention of infringement of the trademark. Where such designations appear in this book, they have been printed with initial caps.

McGraw-Hill Education eBooks are available at special quantity discounts to use as premiums and sales promotions or for use in corporate training programs. To contact a representative, please visit the Contact Us page at www.mhprofessional.com.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that neither the author nor the publisher is engaged in rendering legal, accounting, securities trading, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional person should be sought.

*—From a Declaration of Principles Jointly Adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations*

**TERMS OF USE**

This is a copyrighted work and McGraw-Hill Education and its licensors reserve all rights in and to the work. Use of this work is subject to these terms. Except as permitted under the Copyright Act of 1976 and the right to store and retrieve one copy of the work, you may not decompile, disassemble, reverse engineer, reproduce, modify, create derivative works based upon, transmit, distribute, disseminate, sell, publish or sublicense the work or any part of it without McGraw-Hill Education's prior consent. You may use the work for your own noncommercial and personal use; any other use of the work is strictly prohibited. Your right to use the work may be terminated if you fail to comply with these terms.

THE WORK IS PROVIDED "AS IS." McGRAW-HILL EDUCATION AND ITS LICENSORS MAKE NO GUARANTEES OR WARRANTIES AS TO THE ACCURACY, ADEQUACY OR COMPLETENESS OF OR RESULTS TO BE OBTAINED FROM USING THE WORK, INCLUDING ANY INFORMATION THAT CAN BE ACCESSED THROUGH THE WORK VIA HYPERLINK OR OTHERWISE, AND EXPRESSLY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. McGraw-Hill Education and its licensors do not warrant or guarantee that the functions contained in the work will meet your requirements or that its operation will be uninterrupted or error free. Neither McGraw-Hill Education nor its licensors shall be liable to you or anyone else for any inaccuracy, error or omission, regardless of cause, in the work or for any damages resulting therefrom. McGraw-Hill Education has no responsibility for the content of any information accessed through the work. Under no circumstances shall McGraw-Hill Education and/or its licensors be liable for any indirect, incidental, special, punitive, consequential or similar damages that result from the use of or inability to use the work, even if any of them has been advised of the possibility of such damages. This limitation of liability shall apply to any claim or cause whatsoever whether such claim or cause arises in contract, tort or otherwise.

When lenders are concerned about a borrower or its subsidiaries using its or their own resources for the buyback and thereby depleting liquidity, they may insist that the buyback be made directly by, or with the proceeds of equity contributions from, other affiliates of the borrower and not from the proceeds of new loans under the facility (or even other new debt of the borrower). If it is anticipated that loans bought by affiliates remain outstanding (in some cases the documents will require that they be immediately retired, though this is increasingly rare), it is likely that lenders will require that the affiliates forfeit voting rights under the credit agreement and agree not to participate as a creditor in discussions with other lenders, in each case in order to avoid any taint resulting from a conflict.

### 13.9.3   Buyback Methodologies

Buyback methodologies can be grouped into two broad categories: pro rata offered buybacks available to all lenders and non-pro rata open market purchases that are made available on a narrower basis to individual lenders. In the former category, there are two principal methodologies that have developed to determine the price and total amount of the loans to be prepaid or acquired: a fixed-price tender offer and a reverse (or modified) Dutch auction. While there is no particular magic to using these methodologies, the market has come to regard them as fair and transparent—two considerations of utmost importance to lenders. Each lender (or at least each lender of a certain tranche for tranche-specific buybacks) is offered the opportunity to sell its loan and, even if it passes on the offer, at least the borrower cannot be accused of favoritism. In the category of open market purchases, a borrower is allowed to negotiate one-on-one with individual lenders to repurchase loans up to a pre-agreed dollar amount. This approach is the most borrower-friendly, but may not pass the "fair and transparent" tests.

In a fixed-price tender offer, the borrower or its affiliate (referred to here as the "initiating party"), specifies a price, and all loans tendered by lenders of the relevant tranche at that price are accepted. The offer is structured so that all lenders in the tranche receive notice of the offer and sufficient time to react. If the borrower has specified a maximum amount of loans that it wishes to prepay or repurchase (or, alternatively, if the agreement sets out a cap on the total amount that may be repaid or repurchased), and tenders by the lenders exceed these amounts, the tendered loans will be retired ratably.

In a reverse (or modified) Dutch auction, instead of the borrower conjuring a specified price the initiating party specifies a *range* of acceptable prices and either the total amount of loans it is seeking to purchase (or prepay) or the total purchase price (or prepayment amount) it is willing to pay. In this way, the Dutch auction aims to solicit offers from lenders within a predetermined range. Each lender that wishes to bid tenders an amount of loans that it is willing to include in the buyback and the price at which it is willing to offer those loans. The highest price is then determined that clears the market for the total amount of loans or total purchase price specified by the initiating party. All lenders that tender at or below that price will have their loans included in the buyback. If the total amount of the loans tendered or the total purchase price (or prepayment amount) to be paid at that price would otherwise exceed the limits set by the initiating party (these limits may sometimes be increased at the discretion of the initiating party), the buyback procedures set forth an allocation mechanism to keep the buyback within those limits. Generally, the allocation would result either in all loans tendered at or below the market clearing price receiving ratable treatment or in loans tendered at the lowest prices being the first ones to be included in the buyback with the ratable cutback to be applied only to the loans tendered at the market clearing price.

Regardless of the methodology, certain other requirements may be imposed on the buyback. There may be, for example, a requirement that the buyback not be allowed if a default or event of default exists. As noted above, the market has permitted borrower buybacks on the assumption that the borrower's liquidity is not adversely impacted and, as a way to police liquidity, minimum liquidity levels may be required to be maintained and often the borrower is prohibited from using its revolving credit facility for funding buybacks. Typically, an aggregate dollar or percentage cap will limit the total amount of loans that may be bought back by a borrower and its subsidiaries or any nondebt fund affiliates—rarely will such parties be permitted to effect buybacks in excess of one-third (more typically 20 percent to 30 percent) of the entire principal of the tranche. This percentage is not arbitrary as in bankruptcy, creditor class acceptance of a plan requires two-thirds in dollar amount and one-half in number of the class and a borrower or nondebt fund affiliate of the borrower holding a third of the amount could find itself in a critical blocking position for adoption of a plan of reorganization. Such leverage can change the dynamics of any workout negotiations to the detriment of the lenders.