## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** | § | **Case No. 23-90020 (DRJ)** |
| *et al.,* | § | |
| | § | |
| Debtors.[1] | § | **(Joint Administration Requested)** |
| | § | |
| ----------------------------------------------------------- § | | |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** | § | **Adversary Proc. No. 23-09001** |
| *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| **AG CENTRE STREET PARTNERSHIP** | § | |
| **L.P.,** *et al.,* | § | |
| | § | |
| Defendants. | § | |
| ----------------------------------------------------------- § | | |

## LENDER PLAINTIFFS' AMENDED[2] MOTION FOR SUMMARY JUDGMENT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); Serta Simmons Bedding Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); Serta Simmons Bedding Hospitality, LLC (2016); Serta Simmons Bedding Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); Serta Simmons Bedding Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

[2] This Amended motion is being filed to remove one parenthetical statement from the original filing. No substantive changes have been made.

**This motion seeks an order that may adversely affect you. If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on March 28, 2023 at 9:00 AM CT in Courtroom 400, 515 Rusk, Houston, TX 77002. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click on Judge Jones's home page. The meeting code is "judgejones." Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jones's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ...........................................................................................4

LEGAL STANDARD ...................................................................................................5

ARGUMENT .................................................................................................................5

I.    Plaintiffs Are Entitled To A Declaration That The Transaction Complied With The Non-PTL Term Loan Agreement ....................................................................6

    A.    The Amendments To The Non-PTL Term Loan Agreement Did Not Require Unanimous Consent. ...................................................................8

    B.    The Non-PTL Term Loan Agreement Unambiguously Permitted The Transaction.............................................................................................11

        1.    The Transaction Did Not Violate The Waterfall Or Pro Rata Sharing Provisions Of The Non-PTL Term Loan Agreement. ..............................11

        2.    The 2020 Transaction Did Not Release The Loan's Collateral Value Or The Value Of The Guarantees. ................................................................13

        3.    The 2020 Transaction Was An Open Market Purchase Under The Non-PTL Term Loan Agreement.....................................................................14

        4.    Written Amendments To The Non-PTL Term Loan Agreement Ratified The Open Market Purchase Component Of The 2020 Transaction...........22

    C.    Even If The Term "Open Market Purchase" Were Ambiguous, The Evidence Presented Establishes That The Non-PTL Term Loan Agreement Permitted The 2020 Transaction....................................................................24

II.    Plaintiffs Are Entitled To A Declaration That They Did Not Violate The Implied Covenant Of Good Faith And Fair Dealing ..........................................................24

    A.    Defendants' Implied Covenant Theory Is Duplicative Of Their Breach Of Contract Claim And Can Impose No Independent Obligations............................25

    B.    Lender Plaintiffs Did Not Deprive Defendants Of Bargained-For Benefits..........26

CONCLUSION..............................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*260-261 Madison Ave., LLC v. Bower Monte & Greene, P.C.*,
   137 A.D. 3d 457 (N.Y. App. Div. 2016) ...............................................................16

*Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*,
   2021 WL 3619753 (Sup. Ct. N.Y. Cnty. Aug. 16, 2021) .......................................11

*Black Bull Contracting, LLC v. Indian Harbor Ins. Co.*,
   135 A.D.3d 401 (N.Y. App. Div. 2016) ...............................................................16

*Bruesewitz v. Wyeth LLC*,
   562 U.S. 223 (2011).............................................................................................16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...............................................................................................5

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*,
   70 N.Y.2d 382 (N.Y. 1987) ..................................................................................25

*Compagnie Financière de CIC et de l'Union Européenne v. Merrill Lynch,*
   *Pierce, Fenner & Smith Inc.*,
   232 F.3d 153 (2d Cir. 2000).............................................................................5, 24

*Dallas Cnty. v. Com. Union Assur. Co.*,
   286 F.2d 388 (5th Cir. 1961) ...............................................................................17

*Dalton v. Educ. Testing Serv.*,
   87 N.Y.2d 384 (N.Y. 1995) .............................................................................24, 25

*Dipizio Constr. Co. v. Niagara Frontier Transp. Auth.*,
   107 A.D.3d 1565 (N.Y. App. Div. 2013) .............................................................26

*Donohue v. Cuomo*,
   38 N.Y.3d 1 (N.Y. 2022) ........................................................................................7

*Fesseha v. TD Waterhouse Inv. Servs.*,
   305 A.D.2d 268 (N.Y. App. Div. 2003) ...............................................................26

*Fox Film Corp. v. Springer*,
   273 N.Y. 434 (N.Y. 1937) ....................................................................................18

*Greenfield v. Philles Records*,
   98 N.Y.2d 562 (N.Y. 2002) ....................................................................................7

*Hicks v. Charles Pfizer & Co Inc.*,
    466 F. Supp. 2d 799 (E.D. Tex. 2005) .................................................................................17

*ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*,
    2022 WL 10085886 (Sup. Ct. N.Y. Cnty. Oct. 17, 2022) ...........................................10, 20, 28

*In re iHeartMedia, Inc.*,
    597 B.R. 339 (Bankr. S.D. Tex. 2019) ................................................................................6

*J.P. Morgan Inv. Mgmt. Inc. v. AmCash Grp., LLC*,
    106 A.D.3d 559 (N.Y. App. Div. 2013) ..............................................................................21

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*,
    424 F.3d 195 (2d Cir. 2005).................................................................................................5

*Last Time Beverage Corp. v. F&V Distrib. Co., LLC*,
    98 A.D.3d 947 (N.Y. App. Div. 2012) ................................................................................24

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010)................................................................................................18

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
    2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) .................................................................. *passim*

*Lee v. Offshore Log. & Transp., L.L.C.*,
    859 F.3d 353 (5th Cir. 2017) .............................................................................................17

*Lehman Bros. Int'l (Europe) v. AG Fin. Prods., Inc.*,
    60 Misc.3d 1214(A) (Sup. Ct. N.Y. Cnty. 2018)................................................................18

*MBIA Ins. Corp. v. Merrill Lynch*,
    81 A.D.3d 419 (N.Y. App. Div. 2011) ................................................................................25

*In re New York Skyline, Inc.*,
    471 B.R. 69 (Bankr. S.D.N.Y. 2012)..................................................................................26

*NLRB v. SW Gen., Inc.*,
    580 U.S. 288 (2017)............................................................................................................16

*North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*,
    2020 WL 3411267 (Sup. Ct. N.Y. Cnty. June 19, 2020).................................................. *passim*

*Quadrant Structured Prods. Co. v. Vertin*,
    23 N.Y.3d 549 (N.Y. 2014).............................................................................................9, 16

*Richard Feiner & Co. Inc. v. Paramount Pictures Corp.*,
    95 A.D.3d 232 (N.Y. App. Div. 2012) ................................................................................15

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
    60 A.D.3d 61 (N.Y. App. Div. 2008) ...............................................................................9, 16

*In re Rollings*,
 451 F. App'x 340 (5th Cir. 2011) ........................................................................5

*Roque v. Harvel*,
 2019 WL 5265292 (W.D. Tex. Oct. 16, 2019) ..................................................17

*RST (2005) Inc. v. Rsch. in Motion Ltd.*,
 597 F. Supp. 2d 362 (S.D.N.Y. 2009)................................................................26

*Schron v. Troutman Sanders LLP*,
 20 N.Y.3d 430 (N.Y. 2013) ..............................................................................17

*Smile Train, Inc. v. Ferris Consulting Corp.*,
 117 A.D.3d 629 (N.Y. App. Div. 2014) .............................................................25

*In re TPC Grp. Inc.*,
 2022 WL 2498751 (Bankr. D. Del. July 6, 2022)........................................8, 9, 12

*TRW Inc. v. Andrews*,
 534 U.S. 19 (2001)..............................................................................................16

*United States v. Chavis*,
 772 F.2d 100 (5th Cir. 1985) .............................................................................17

*United States v. Utah, Nev. & Cal. Stage Co.*,
 199 U.S. 414 (1905)............................................................................................15

*Zurakov v. Register.Com, Inc.*,
 304 A.D.2d 176 (N.Y. App. Div. 2003) .............................................................18

**Rules**

Fed. R. Bankr. P. 7056....................................................................................................5

Fed. R. Civ. P. 56..........................................................................................................5

Federal Rule of Evidence 807........................................................................................17

**Other Authorities**

Restatement (Second) of Contracts § 202(2) (1979) ....................................................15

10A Wright & Miller, Fed. Prac. & Proc. § 2721 (4th ed. 2022) .................................17

## INTRODUCTION

1.      Serta Simmons Bedding, LLC (the "Company") and the Lender Plaintiffs (Barings LLC, Boston Management and Research, Credit Suisse Asset Management, LLC, Eaton Vance Management, and Invesco Senior Secured Management, Inc.) filed this Adversary Proceeding to comprehensively resolve issues that are fundamental to the resolution of this bankruptcy—chiefly, the validity of credit agreements between the Company and its creditors and the priority of various creditors under those agreements.[1]  Until Defendants' persistent attacks on these agreements—as evidenced most recently by the counterclaims and third-party claims filed on February 23, 2023 (ECF No. 66)—are resolved by this Court, the Company cannot achieve the fresh start that the bankruptcy process is designed to achieve.[2]

2.      Summary judgment in favor of the Company and the Lender Plaintiffs declaring the legitimacy of a 2020 financing and debt purchase transaction (the "2020 Transaction") is warranted.  The 2020 Transaction was permitted under the plain and unambiguous terms of the 2016 Non-PTL Term Loan Agreement.  And because the terms of that Agreement indisputably covered the subject matter of, and authorized, the 2020 Transaction, the Company and the participating lenders could not have violated the implied covenant of good faith and fair dealing.

3.      The 2020 Transaction helped fortify the Company during the depths of the COVID-19 pandemic.  To deal with the significant financial headwinds the pandemic created, in early 2020 the Company engaged in an extensive competitive process to restructure its debt.  After months of

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.  "Ex. __ " refers to exhibits attached to this motion.

[2] Defendants and Third-Party Plaintiffs only filed their answer, counterclaims, and third-party claims the day before the deadline to file this Motion.  Lender Plaintiffs reserve the right to raise additional issues and arguments with respect to the counterclaims and third-party claims in the future.  Because the counterclaims and third-party claims mirror Plaintiffs' claim for declaratory relief, however, Lender Plaintiffs respectfully request that those counterclaims and third-party claims be resolved in Plaintiffs' favor, together with this Motion, in the interest of efficient resolution of the underlying dispute.

negotiations with multiple lender groups, the Company entered into an agreement with certain of its lenders (the "PTL Lenders"), including the Lender Plaintiffs, to engage in the 2020 Transaction. The 2020 Transaction provided $200 million of much-needed liquidity to the Company, while also deleveraging its balance sheet, lowering its overall interest expenses, and reducing its funded debt obligations by approximately $400 million. The agreement effectuating the 2020 Transaction—which Required Lenders under the Non-PTL Term Loan Agreement expressly agreed was structured to, and did, comply with all requirements of the Non-PTL Term Loan Agreement—was memorialized on June 22, 2020 in the PTL Credit Agreement, the Open Market Purchase Agreement, and the First Lien Intercreditor Agreement.

4.      The PTL Lenders' proposal was not the only proposal made to the Company. Other lenders (the "Non-PTL Lenders")—including Defendants North Star Debt Holdings, L.P., Gamut Capital SSB, LLC, and various entities affiliated with Angelo Gordon—unsuccessfully proposed a predatory lending transaction by way of a "drop-down" structure that would have removed assets from the lenders' shared collateral pool on terms much less favorable to the Company and non-participating creditors, and that necessarily relied upon the same "open market purchase" provision of the 2016 Non-PTL Term Loan Agreement.

5.      After their competing proposal was rejected by the Company, the Non-PTL Lenders spent the last two-and-a-half years, in court after court, trying to achieve through litigation what they could not accomplish through negotiation. Those efforts have been unsuccessful. A New York state court rejected the Non-PTL Lenders' attempt to block the 2020 Transaction, concluding that the breach of contract and implied covenant claims were unlikely to succeed on the merits. Undeterred, the Non-PTL Lenders have filed suit after suit over the intervening years, repeatedly seeking a different result from different courts—all to no avail. The original lawsuit filed by certain Non-PTL Lenders in federal court was dismissed for lack of subject-matter jurisdiction, and their refiled federal lawsuit against just the Company suffered a blow when the

2

court rejected most of their arguments on the Company's motion to dismiss.  The court allowed their case to proceed past the pleading stage only on the narrow question of the meaning of "open market purchase" and on their implied covenant claim.  But the court reached that decision without the benefit of all of the contract interpretation arguments in this motion that explain why the "open market purchase" provision of the Non-PTL Term Loan Agreement is clear and unambiguous. That court also lacked the undisputed industry evidence proffered herewith in the alternative.

6.      The 2020 Transaction complied in all respects with the Non-PTL Term Loan Agreement.  *First*, the amendments entered into to effectuate the 2020 Transaction do not impact any of the "sacred rights" subject to heightened consent requirements (including the first-lien lenders' sacred right to pro rata payments in relation to other first-lien lenders), and therefore required only the consent of the lenders representing more than 50% of the outstanding face amount of the loans (the Required Lenders), *see* ECF No. 2-3 § 9.02(b)(A).  There is no dispute that the Company obtained that consent.

7.      *Second*, the 2020 Transaction did not alter any of the waterfall and pro rata payment provisions in the original 2016 Non-PTL Term Loan Agreement, which remain unchanged in the amended Non-PTL Term Loan Agreement.

8.      *Third*, the 2020 Transaction did not release the collateral or the value of the guarantees that protected the first lien lenders.  The Non-PTL Lenders' first lien loans are secured by the same lien, and guaranteed by the same guarantors, as the day the original Non-PTL Term Loan Agreement was executed, and the incurrence of new super-priority debt is not equivalent to the release of liens or guarantees.

9.      *Fourth*, the Non-PTL Term Loan Agreement expressly permits the Company to repurchase outstanding debt on a non-pro rata basis via "open market purchases," as occurred in the 2020 Transaction.  Section 9.05(g) of the Agreement unambiguously sets forth the parties' mutual understanding that an open market purchase may be conducted on a non-pro rata basis

and—unlike a Dutch Auction—an open market purchase need not be "open to all Lenders." The words of the agreement and familiar canons of contract interpretation make that plain. While unnecessary to resolve this motion, industry custom and usage also confirm that "open market purchases" include debt exchanges in which not all lenders are invited to participate. And even if the term "open market purchase" were ambiguous (it is not), the Required Lenders amended and modified the Non-PTL Term Loan Agreement by setting forth in the Transaction documents that the Transaction was a permissible "open market purchase" to which the Required Lenders consented. Because open market purchases are carved out of the sacred rights in the Non-PTL Term Loan Agreement, only the Required Lenders' consent was needed to enter into and effectuate the 2020 Transaction.

10.     The Non-PTL Lenders also cannot establish that the Company or the PTL Lenders violated the implied covenant of good faith and fair dealing as that claim is entirely duplicative of their breach of contract claims—it arises from the same set of facts, asserts the same allegedly wrongful conduct, and pleads the same damages. Under New York law, it cannot be pleaded in the alternative where, as here, a valid contract indisputably governs the dispute. In any event, the undisputed evidence negates any assertion that the Company or the PTL Lenders acted in bad faith because their proposal was an alternative to the Non-PTL Lenders' own proposal that would have created new super-priority debt—without nearly the same value to the Company.

11.     This Court should now declare, as a matter of law, on the undisputed facts, and after review of the unambiguous terms of the underlying documents, that the 2020 Transaction complied in all respects with the Non-PTL Term Loan Agreement and did not violate the implied covenant of good faith and fair dealing.

## STATEMENT OF FACTS

12.     The Lender Plaintiffs incorporate the Statement of Facts set forth in Serta Simmons Bedding, LLC's Motion for Summary Judgment ("SSB's Motion"). *See* ECF No. 69 at 6–15.

**LEGAL STANDARD**

13.     Summary judgment is warranted if the movant "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see* Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56). In a declaratory judgment action, the movant bears the burden of establishing the underlying claim. *See In re Rollings*, 451 F. App'x 340, 346 (5th Cir. 2011). For matters of contract interpretation under New York law, summary judgment is warranted if the contract is unambiguous. *See, e.g.*, *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 205 (2d Cir. 2005). A court may also "resolve ambiguity in contractual language as a matter of law" on summary judgment if the extrinsic evidence presented is uncontested, or "so one-sided that no reasonable person could decide the contrary." *Compagnie Financière de CIC et de l'Union Européenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) (citation omitted).

**ARGUMENT**

14.     Summary judgment should be granted in favor of the Company and the Lender Plaintiffs because the unambiguous terms of the Non-PTL Term Loan Agreement—as well as undisputed evidence—establish the lawfulness of the 2020 Transaction.[3]

15.     By its plain terms, the Non-PTL Term Loan Agreement permitted the 2020 Transaction. Because the Agreement does not contain an anti-subordination provision or otherwise prevent the Company from engaging in a debt-for-debt purchase on a non-pro rata basis, the 2020 Transaction required only the consent of the Required Lenders, who gave it. Nothing about the 2020 Transaction infringed the Non-PTL Lenders' rights under the Agreement's

---

[3] In light of the substantial controversy between the parties to date, and for the reasons discussed in SSB's Motion, this claim is ripe for declaratory relief. *See* ECF No. 69 at 16.

waterfall or pro rata sharing provisions, nor released the collateral or value of the guarantees securing the first lien loans. The 2020 Transaction—which was the result of arm's length negotiations the Company undertook with both the PTL Lenders and Non-PTL Lenders to obtain the most favorable restructuring arrangement—was structured as an open market purchase. The Agreement specifically recognizes this option need not be made available to all holders of the underlying instrument at the same time—as participants in the commercial lending market know full well.

16.     Any claim for breach of the implied covenant of good faith and fair dealing in the Non-PTL Term Loan Agreement must be rejected as impermissibly duplicative of the breach of contract claim as a matter of law; under New York law, the implied covenant cannot supply a term or obligation inconsistent with the parties' express agreement. Plaintiffs are independently entitled to a declaration that they did not violate any implied covenant of good faith and fair dealing because the undisputed evidence establishes that neither the Company nor the PTL Lenders acted in bad faith or abused their discretion to deprive Defendants of the benefit of their bargain.

17.     Until these claims are resolved, the Company cannot successfully obtain confirmation of its Plan and emerge from chapter 11, thereby depriving its estate and creditors (including Plaintiffs and Defendants) of the finality, security, and other rights to which they are entitled under the Bankruptcy Code. A prompt ruling on these issues is essential to provide the Company and its personnel with the fresh start that the bankruptcy laws promise.

## I.     Plaintiffs Are Entitled To A Declaration That The Transaction Complied With The Non-PTL Term Loan Agreement

18.     This contract dispute is governed by New York law under the Non-PTL Term Loan Agreement's choice of law provision. ECF No. 2-3 § 9.10(a); *see In re iHeartMedia, Inc.*, 597 B.R. 339, 350 (Bankr. S.D. Tex. 2019) (applying contractual choice of law provision). Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are

construed in accord with the parties' intent." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* (quoting *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (N.Y. 1992)). "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Id.* (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (N.Y. 1978)). Courts should be reluctant to interpret a contract to impliedly include terms not specifically included—particularly when the negotiating parties are sophisticated. *See Donohue v. Cuomo*, 38 N.Y.3d 1, 12 (N.Y. 2022).

19.     The words these highly sophisticated parties used in the Non-PTL Term Loan Agreement authorized the actions the Company and the PTL Lenders took to propose, negotiate, and enter into the 2020 Transaction. Each of the Non-PTL Lenders' breach-of-contract arguments is negated by that plain language. First, their argument that unanimous consent was required to amend the Agreement to create super-priority debt ignores the Agreement's explicit allowance for the Required Lenders to amend any provision other than a limited set of inapplicable "sacred rights." Second, their argument that the 2020 Transaction violated the Non-PTL Term Loan Agreement's waterfall and pro rata sharing provisions fails because the rights conferred by those provisions were not impacted by the 2020 Transaction, because the rights therein are expressly subject to intercreditor agreements in any event, and because the pro rata payment right applies only to debt within the same debt class. Third, contrary to the Non-PTL Lenders' argument that the 2020 Transaction impermissibly released the loans' collateral or the value of the guarantees without the consent of all lenders, the first lien loans are secured by the same lien, and guaranteed by the same guarantors, as they were the day the Non-PTL Term Loan Agreement was executed. Finally, any assertion that the 2020 Transaction was not an "open market purchase" as contemplated by Section 9.05(g) of the Agreement violates hornbook principles of contract

interpretation and the ratification of the 2020 Transaction set forth in the properly-executed, written amendments to the Non-PTL Term Loan Agreement.  That assertion also cannot be reconciled with well-established industry custom and practice.

**A.    The Amendments To The Non-PTL Term Loan Agreement Did Not Require Unanimous Consent.**

20.    Most provisions in the Non-PTL Term Loan Agreement may be amended with the consent of only the Company and the Required Lenders, who "represent[] more than 50% of the outstanding face amount of the loans."  ECF No. 2-3 §§ 1.01, 9.02(b)(A).  Only a handful of enumerated "sacred rights" require "the consent of each Lender directly and adversely affected." *Id.*  The 2020 Transaction did not implicate those sacred rights.

21.    As Judge Failla of the Southern District of New York ruled in reviewing the same claims, "anti-subordination is not a sacred right" under the Non-PTL Term Loan Agreement.  *See LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *10 (S.D.N.Y. Mar. 29, 2022).  Had the parties intended to prohibit subordination, they could have provided in Section 9.02(b) that the Agreement cannot be amended if the effect of such amendment would be to subordinate the first-lien term loans' payment priority without unanimous lender consent.  They did not—even though many other credit agreements *do* contain such anti-subordination provisions. *See In re TPC Grp. Inc.*, 2022 WL 2498751, at *11 (Bankr. D. Del. July 6, 2022) (observing that "the inclusion of express anti-subordination clauses are sufficiently commonplace").[4]   That

---

[4] *See, e.g.*, Ex. 1 (Krayton Polymers U.S. LLC Loan, Security and Guarantee Agreement), at 172 (prior written consent of all Lenders required in Section 14.1(d) for any modification that would subordinate existing debt obligations); Ex. 2 (Tessco Technologies Inc. Credit Agreement), at 115–16 (Section 10.2(b)(x): "[N]o amendment, waiver or consent shall . . . (x) subordinate the Obligations to any other Indebtedness or subordinate the Liens securing the Obligations to any other Liens (except as expressly contemplated hereby), without the written consent of each Lender."); Ex. 3 (BJ's Wholesale Club, Inc. Credit Agreement), at 182–83 (Section 12.1(i): "[N]o such amendment, waiver or consent shall: . . . (i) without the prior written consent of all Lenders directly affected thereby, (i) subordinate the Obligations hereunder to any other Indebtedness, or (ii) except as provided by operation of applicable Law or in the Intercreditor Agreement, subordinate the Liens granted hereunder or under the other Loan Documents to any other Lien.").

omission is telling.  When "parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560 (N.Y. 2014); *see also Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 66 (N.Y. App. Div. 2008) ("A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties.").

22.     In fact, Defendants have previously conceded that the Non-PTL Term Loan Agreement permits super-priority new money loans "without a unanimous vote," and stated that they are not challenging the new money tranche of the 2020 Transaction. *AG Centre St. P'Ship L.P. v. Serta Simmons Bedding, LLC*, No. 654181/2022, Dkt. 11 ¶ 70 (N.Y. Sup. Ct. Nov. 16, 2022) ("Prepetition Am. Compl.").  The debt-for-debt exchange component of the 2020 Transaction is no different.  *Cf. In re TPC Grp.*, 2022 WL 2498751, at *1 (concluding that "the original loan documents did permit the majority holders to amend the loan documents to provide for the subordination of the old debt to the new").  Contrary to Defendants' contention that "[t]he non-*pro rata* payment of the [PTL] Lenders' First Lien Term Loans using new Priority Term Loans" violates the Non-PTL Term Loan Agreement, *see* Prepetition Am. Compl. ¶ 70, nothing in the Non-PTL Term Loan Agreement prevents the Company from engaging in open market purchases on a non-pro rata basis.  The New York state court recognized this when it permitted the 2020 Transaction to proceed, ruling that the Non-PTL Term Loan Agreement expressly "permits the debt-to-debt exchange on a non-pro rata basis as part of an open market transaction." *North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*, 2020 WL 3411267, at *4 (Sup. Ct. N.Y. Cnty. June 19, 2020).

Exhibits 1–3 are excerpts of agreements publicly available on Bloomberg Law.  In interpreting contractual terms in a specialized context like a term loan agreement, the Court may consider industry custom and practice.  *See infra* ¶ 40.

23.     In particular, Section 9.02(b)(A)(6) expressly exempts from any unanimous consent requirement "any transaction permitted under Section[] . . . 9.05(g)."  ECF No. 2-3 § 9.02(b)(A)(6).[5]  Section 9.05(g) in turn provides that "any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender [including the Company] on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases, in each case with respect to clauses (A) and (B), without the consent of the Administrative Agent."  *Id.* § 9.05(g).  Notably, as discussed below, *see infra* ¶¶ 33–38, the "open to all Lenders" limitation qualified only the Dutch Auction option, not the "open market purchases" option.

24.     Further, as explained *infra* ¶¶ 53–56, the Company and the Required Lenders specifically "acknowledge[d] and agree[d]" in the 1L Amendment to the Non-PTL Term Loan Agreement dated June 22, 2020, that any actions to effectuate the PTL Credit Agreement "shall be and are permitted" by operation of the 1L Amendment.  ECF No. 2-4 § 4.  This consent to the 2020 Transaction by Required Lenders made explicit that the non-pro rata open market purchase was allowed by the Agreement as amended, to the extent there was any ambiguity on the point prior to the amendment.

---

[5] In this and other respects, the Non-PTL Term Loan Agreement differs from the credit agreement at issue in Justice Masley's decision in *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, 2022 WL 10085886 (Sup. Ct. N.Y. Cnty. Oct. 17, 2022).  The sacred rights provision in the Boardriders credit agreement did not explicitly carve out open market purchases as an exception.  *See* ECF No. 2-3 §§ 9.02(b)(A)(6), 9.05(g).

B.   **The Non-PTL Term Loan Agreement Unambiguously Permitted The Transaction.**

1.   **The Transaction Did Not Violate The Waterfall Or Pro Rata Sharing Provisions Of The Non-PTL Term Loan Agreement.**

25.      One of the limited set of "sacred rights" in the Non-PTL Term Loan Agreement involves payment priority rights following an event of default and receipt of proceeds of the collateral, set forth in Section 2.18 of the Agreement.  *See* ECF No. 2-3 § 2.18(b)–(c).  Contrary to the Non-PTL Lenders' contention, the 2020 Transaction did not violate the Non-PTL Lenders' rights under Section 2.18 for several independent reasons.

26.      *First*, the 2020 Transaction did nothing to alter the waterfall provision in Section 2.18(b).  That provision remains exactly the same in the amended Non-PTL Term Loan Agreement.  *Compare* ECF No. 2-3 § 2.18, *with* ECF No. 2-2 § 2.18.  Likewise, the pro-rata payment provision in Section 2.18(c) is unaffected.  As Judge Failla recognized, "no facet of the Transaction altered the rights of the first-lien lenders to receive pro rata payments in relation to other first-lien lenders in the event of default." *LCM XXII*, 2022 WL 953109, at *11.  Because the waterfall and pro rata sharing provisions of Section 2.18(b) and 2.18(c) were unaltered, consent of the affected lenders is irrelevant.  *See id.*[6]

27.      *Second*, the waterfall provision in Section 2.18(b) is expressly "subject, in all respects, to the provisions of each applicable Intercreditor Agreement."  ECF No. 2-3 § 2.18(b);

---

[6]  This feature of the Non-PTL Term Loan Agreement contrasts sharply with the agreement at issue in *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, 2021 WL 3619753 (Sup. Ct. N.Y. Cnty. Aug. 16, 2021).  *Audax* also involved an "uptier" restructuring transaction, in which the company, TriMark, entered into a "Super Senior Credit Agreement" pursuant to which it issued $120 million of new "First-Out Super Senior Debt," as well as $307.5 million of new "Second-Out Super Senior Debt" in a dollar-for-dollar exchange.  *Id.* at *4.  But unlike here, the credit agreement in *Audax* explicitly stated that consent of all lenders was required for any amendments that would "alter the order of application of proceeds."  *Id.* at *11.  The Agreement here contains no such language, and the parties' pro rata sharing rights under the waterfall provision in the Agreement remain exactly the same today.

*see id.* ("[A]ll proceeds of Collateral received by the Administrative Agent while an Event of Default exists . . . shall be applied . . . as provided in each applicable Intercreditor Agreement."). Thus, as Judge Failla found, "per the waterfall provision's plain terms, even prior to the Transaction and the Amendments, the first-lien lenders' rights under the waterfall provision were subject to the terms of separate intercreditor agreements," "without any perceptible limitation on the entry of new intercreditor agreements." *LCM XXII*, 2022 WL 953109, at *11 & n.15. Relatedly, Section 8.08 of the amended Non-PTL Term Loan Agreement authorizes the Administrative Agent to enter into an intercreditor agreement and provides that that agreement could bear on indebtedness that was senior, *pari passu*, or junior to the first-lien loans. ECF No. 2-2 § 8.08. Consistent with those provisions, the Company and the PTL Lenders entered into a new intercreditor agreement (the "PTL Intercreditor Agreement"). As Judge Failla held, the amended Agreement "authorized" the PTL Intercreditor Agreement. *LCM XXII*, 2022 WL 953109, at *11 n.15. Because the PTL Intercreditor Agreement was validly entered into, and because Section 2.18(b) is "subject, in all respects," to that Intercreditor Agreement, the 2020 Transaction did not violate Section 2.18(b) for this reason as well.

28. *Third*, "the plain terms of Section 2.18 of the Non-PTL Term Loan Agreement make clear that the first-lien lenders' rights to pro rata payments apply only to debt within the same 'Class,' *viz.*, among first-lien lenders." *LCM XXII*, 2022 WL 953109, at *10; *see also* ECF No. 2-3 §§ 2.18(a) ("each payment of interest in respect of the Loans of a given Class . . . shall be allocated pro rata among the Lenders in accordance with their respective Applicable Percentage of the *applicable Class*") (emphasis added), 2.18(c) (providing for benefit of Loan payments to "be shared by the Lenders *of such Class* ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class") (emphasis added); *cf. In re TPC Grp.*, 2022 WL 2498751, at *11 ("[U]nder the customs and usages that are common in the trade, a provision providing for ratable distribution (in the absence of an express anti-

subordination clause) would more naturally apply to distributions *within* a class, and not prohibit subordination of an entire class to another, different class.").  The priority term loans were entered into pursuant to an entirely separate incremental facility, which, under the Non-PTL Term Loan Agreement, places them in a different Class.  *See* ECF No. 2-3 at § 2.22 (describing incremental credit facilities adding new Classes).  The priority term loans are thus not in the same "Class" as the first lien term loans, and the rights of first-lien lenders to pro rata payments within their "Class" of loans thus remains intact.

29.     Every court to have considered the Non-PTL Lenders' argument that the waterfall and pro rata sharing provisions were violated has rejected it.  This Court should do the same.

### 2.     The 2020 Transaction Did Not Release The Loan's Collateral Value Or The Value Of The Guarantees.

30.     As both Judge Failla of the United States District Court for the Southern District of New York and Justice Masley of the New York Supreme Court have held, nothing about the 2020 Transaction implicated the collateral or loan guarantee provisions of Section 9.02(b)(B) of the Non-PTL Term Loan Agreement.

31.     Sections 9.02(b)(B)(2) and (3) provide that prior written consent of each lender is required to "release all or substantially all of the Collateral" and to "release all or substantially all of the value of the Guarantees under the Loan Guaranty."   ECF No. 2-3 § 9.02(b)(B)(2)–(3). Ironically, it is exactly the type of "drop-down" transaction that the Non-PTL Lenders proposed that would have implicated this provision by removing hundreds of millions of dollars in first-lien collateral from the non-participating first-lien lenders.  *See* Serta Simmons Bedding's Statement of Uncontroverted Facts in Support of Their Motion for Summary Judgment, ECF No. 70 (hereinafter "Statement of Uncontroverted Facts"), at ¶ 24.

32.     As Justice Masley held in permitting the 2020 Transaction to go forward, the Transaction "does not require the release of . . . any collateral that is subject to [the Company's]

13

existing First Lien Term Loans." *North Star*, 2020 WL 3411267, at *4. Judge Failla likewise recognized that "no feature of the Transaction released the collateral or the value of the loan guarantees," and that the Non-PTL Lenders' "'substance over form' argument . . . is incompatible with the plain text of the Agreement." *LCM XXII*, 2022 WL 953109, at *12. The Non-PTL Lenders' first-lien loans are secured by the same liens today, and guaranteed by the same guarantees, as the day the Non-PTL Term Loan Agreement was executed. The incurrence of new debt with payment priority is not equivalent to the *release* of collateral or loan guarantees. Any such release of liens or guarantees would need to be effectuated through a separate agreement signed by the Borrower and the Administrative Agent and no such documents exist.

### 3. The 2020 Transaction Was An Open Market Purchase Under The Non-PTL Term Loan Agreement.

#### i. Plain Meaning Of "Open Market Purchase"

33.     In an effort to evade the clear language in Section 9.02 and 9.05 of the Non-PTL Term Loan Agreement permitting open market purchases, Defendants have argued that the debt-for-debt exchange here "was not an 'open market purchase'" because it was "private" and "exclusionary" rather than open to all lenders. ECF No. 66 ¶ 100. Their reading ignores business reality and other language in the same provision making clear that an "open market purchase" need not be "open to all Lenders."

34.     An open market purchase for a private company's loans—unlike an open market purchase on the public stock exchange, which could hypothetically be open to any buyer or seller—necessarily involves direct and private dealings with the lender who owns those loans. *See* ECF No. 2-3 § 9.05(g) (recognizing that an open market purchase would involve an assignment of rights and obligations "to any Affiliated Lender"). Because syndicated loan debt is not traded through a

public exchange, a purchase or sale of a private company's debt will never be available to all market participants in the same way as a stock market trade.[7]

35.     In any event, Section 9.05(g) gives the Borrower two options to purchase (that is, take assignment of) its first-lien loans: (i) "a Dutch Auction" "open to all Lenders," or (ii) "an open market purchase"—with the loans in both cases expressly subject to assignment "on a non-pro rata basis."  ECF No. 2-3 § 9.05(g).  Under hornbook principles of contract interpretation, specifying that a Dutch Auction must be "open to all Lenders" but not so specifying for "open market purchases" means that the latter need not be open to all lenders.  *See, e.g.*, *Richard Feiner & Co. Inc. v. Paramount Pictures Corp.*, 95 A.D.3d 232, 239 (N.Y. App. Div. 2012) (reading two provisions together to conclude that when the parties meant to convey something "they did so explicitly"); *see generally United States v. Utah, Nev. & Cal. Stage Co.*, 199 U.S. 414, 423 (1905) ("[P]articular words may [not] be isolatedly considered."); Restatement (Second) of Contracts § 202(2) (1979) ("A writing is interpreted as a whole").  The parties clearly knew how to require that a type of purchase be made available to all lenders.  They added that requirement for Dutch Auctions but chose not to do so for open market purchases.  That critical distinction must be afforded contractual significance.[8]

---

[7]  Judge Failla acknowledged "the distinction . . . between open-market purchases for a private company's loans and open-market transactions for public stock," noting that "in the context of the Agreement, the open-market provision may contemplate loan-repurchase transactions that involve fewer than all lenders in any given class of debt."  *LCM XXII*, 2022 WL 953109, at *8.

[8]  Judge Failla recognized the fact "[t]hat the provision specifies that Dutch Auctions must be open to all Lenders, but does not do so for open market purchases, may indicate the parties' conscious choice to exclude such a requirement from loan purchases pursued in the open market."  *LCM XXII*, 2022 WL 953109, at *8 n.12.  But in refusing to find this important distinction decisive at the motion to dismiss stage, she ignored that the canons of contract construction compel that interpretation.  Judge Failla also did not have before her all of the arguments and evidence that Plaintiffs now present, including arguments relating to the amendment and Open Market Purchase Agreement, *see infra* ¶¶ 53–56, and evidence of industry usage of the phrase "open market purchase," *see infra* ¶¶ 39–52.

36.     Under the *expressio unius* canon, if parties to a contract omit terms readily found elsewhere in an agreement—particularly within the same provision—"the inescapable conclusion is that the parties intended the omission."  *Quadrant*, 23 N.Y.3d at 560; *accord 260-261 Madison Ave., LLC v. Bower Monte & Greene, P.C.*, 137 A.D. 3d 457, 457–58 (N.Y. App. Div. 2016); *see also NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) ("If a sign at the entrance to a zoo says 'come see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health.").   And canons of construction—especially one as well-established as the *expressio unius* canon—commonly are used to conclude that a contract is unambiguous.  *See, e.g.*, *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 232–33 (2011).  It would violate fundamental principles of contract interpretation to add to the parties' contract a requirement for open market purchases—that they "be open to all Lenders"—that the parties chose not to include.  *See Riverside S. Planning*, 60 A.D.3d at 66.

37.     Canons of construction also require that the terms "Dutch Auction" and "open market purchase" be read to give each independent meaning.  *See, e.g.*, *Black Bull Contracting, LLC v. Indian Harbor Ins. Co.*, 135 A.D.3d 401, 406 (N.Y. App. Div. 2016) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect." (quoting *Muzak Corp. v. Hotel Taft Corp*., 1 N.Y.2d 42, 46 (N.Y. 1956))); *see also, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (applying the canon against surplusage).  Here, a Dutch Auction, as defined in the Non-PTL Term Loan Agreement, must be "open to all Lenders" and requires certain procedural steps to involve all Lenders:  The "Borrower" must retain an "Auction Agent" to provide notice to all lenders of the face value of loans and the range of prices, and then await the lenders' response specifying the amount and price of the loans they are willing to sell, among many other procedures.  *See* ECF No. 2-3, Sched. 1.01(b).  By contrast, the open market purchase is not required to be open to "all Lenders"; the Borrower may approach one lender

or a subset of lenders, thereby reducing the transaction costs associated with a Dutch Auction and maximizing efficiency, at the risk of obtaining a less optimal price than at a Dutch Auction open to all.

38.     The Non-PTL Lenders' interpretation, which would render "Dutch Auction" and "open market purchase" effectively duplicative and deprive them of independent meaning, is barred by black-letter contract interpretation principles for this reason as well.

### ii.     Evidence Of Industry Usage Shows That "Open Market Purchase" Does Not Require Inquiries To Every Lender

39.     Industry usage of the phrase "open market purchase" reinforces what the plain language and canons of construction make clear—that the 2020 Transaction was an open market purchase.[9]  Although the Court need not resort to industry usage because the ordinary meaning of the contract is clear, if it chooses to do so the answer is the same:  The 2020 Transaction complied with the Non-PTL Term Loan Agreement.

40.     While New York courts do not typically consider extrinsic evidence in making the threshold assessment of whether contract language is ambiguous, *see, e.g.*, *Schron v. Troutman*

---

[9] At summary judgment, evidence "may be presented in a form that would not, in itself, be admissible" if the proponent could "present[] [it] in a form that would be admissible at trial."  *Lee v. Offshore Log. & Transp., L.L.C.*, 859 F.3d 353, 355–56 (5th Cir. 2017) (cleaned up); *see also* 10A Wright & Miller, Fed. Prac. & Proc. § 2721 (4th ed. 2022).  Here, the cited publications would be admissible at trial for the non-truth purpose of showing the fact these articles were published in industry publications, *see, e.g.*, *United States v. Chavis*, 772 F.2d 100, 105 (5th Cir. 1985) (Texas Attorney General consumer protection complaint files admissible because "the complaint was not admitted to prove the truth of the matter asserted in it, but rather as proof of notice" that the company had notice of consumer complaints); *Roque v. Harvel*, 2019 WL 5265292, at *10 (W.D. Tex. Oct. 16, 2019) (newspaper articles submitted with summary judgment briefing admissible "to show that the City of Austin had notice of complaints of discriminatory policing and excessive use of force"); under the residual hearsay exception of Federal Rule of Evidence 807, *see, e.g.*, *Hicks v. Charles Pfizer & Co Inc.*, 466 F. Supp. 2d 799, 807–08 (E.D. Tex. 2005) (considering a newspaper article under the residual hearsay exception to find that there was an issue of material fact precluding summary judgment); *Dallas Cnty. v. Com. Union Assur. Co.*, 286 F.2d 388, 397 (5th Cir. 1961) (considering a newspaper article in "the exercise of common sense in deciding the admissibility of hearsay evidence"); or in connection with testimony about industry standards.

*Sanders LLP*, 20 N.Y.3d 430, 436 (N.Y. 2013), they may consider industry custom and usage "where necessary to understand the context in which the parties have used terms that are specialized." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010); *see also Zurakov v. Register.Com, Inc.*, 304 A.D.2d 176, 179 (N.Y. App. Div. 2003) ("[T]he custom and usage of 'registration' of a domain name in the Internet context is certainly more relevant than the literal definition of 'registration' found in the dictionary."). The term "open market purchase" has a specialized meaning in credit agreements in the syndicated loan market. *Cf. Lehman Bros. Int'l (Europe) v. AG Fin. Prods., Inc.*, 60 Misc.3d 1214(A), at *9–11 (Sup. Ct. N.Y. Cnty. 2018) (looking to industry custom and usage to make "the threshold determination of whether" a provision in an agreement governing a credit default swap transaction "is ambiguous"). Courts may therefore use industry custom and usage evidence to interpret the phrase as "understood by those who use [it] in connection with [the relevant] business." *Fox Film Corp. v. Springer*, 273 N.Y. 434, 436 (N.Y. 1937).[10]

41.     The widespread use of the term "open market purchase" in the syndicated loan industry reflects the understanding that not all lenders are necessarily free to opt in to an "open market purchase."

42.     Reports from multiple law firms with expertise in syndicated loan markets and corporate finance generally but uninvolved with the 2020 Transaction confirm this industry understanding of the term.

43.     A Client Alert by King & Spalding from March 2020, for example, cites Dutch auctions and open market purchases as the primary methods to buy back debt. *See* Ex. 8. In a

_____

[10] In any event—as stated *infra* ¶ 57—if the Court declines to consider extrinsic evidence at the threshold stage of determining whether a contract is ambiguous and to the extent the Court finds "open market purchase" ambiguous, it may rely on industry custom and usage evidence on summary judgment to resolve that ambiguity.

Dutch auction, the borrower indicates a willingness to purchase loans from the existing lenders; "each lender" signals its willingness to sell; and "all lenders are given the opportunity to sell their loans." *Id.* at 2.  By contrast, in an open market purchase, "the Borrower approaches all *or a subset* of the lenders (*or even just one lender*)" and inquires about the lenders' willingness to sell, such that the Borrower can "shop around to first buy back the most expensive debt that a lender is willing to sell, including on a non-pro rata basis" and can "cherry-pick which Lenders are permitted to exit the facility." *Id.* (emphasis added).

44.    Similarly, a memorandum by Cravath, Swaine, & Moore from approximately the same time defines "Open Market Purchases" as the purchasing of loans "as they become available in the secondary market on a non-pro rata basis." *See* Ex. 9 at 1–2.  In any arm's length transaction, availability depends on the seller's willingness to sell and the buyer's willingness to buy on mutually beneficial terms.  Debt thus "becomes available" and purchasable when two parties want to transact and ultimately consummate a transaction.  *Id.*  Nothing requires the buyer first to ask every seller for their debt.  As the memorandum explains, this feature distinguishes open market purchases from Dutch Auction purchases, which are described as purchase offers sent "ratably to all lenders." *Id.*

45.    In a note published in the *International Financial Law Review* in the summer of 2020, partners of Davis Polk & Wardwell wrote about liability management transactions that "benefit[] certain creditors at the expense of others" and often feature the purchase of "existing loans of only the participating lenders into more senior loans on a non-pro rata basis." *See* Ex. 10 at 1, 3.  As they explained, "there are traditionally two" ways these buybacks happen: "Dutch auctions" and "open market purchases." *Id.* at 3.  "Dutch auctions typically require all lenders . . . to be offered the opportunity to participate," whereas open market purchases "*contain no such requirement*." *Id*. (emphasis added).  And, they noted, "many" have interpreted the phrase open market purchase "to permit privately negotiated buyback transactions by the borrower and selling

lenders with few restrictions." *Id*. The authors ultimately advocate for "Dutch auctions (*or another mechanism that required an offer to all lenders*)" over open market purchases as more fair—precisely because, unlike open market purchases, they do not "exclude[]" "lenders . . . from the opportunity to participate." *Id*. (emphasis added).[11]

46.     Additionally, a 2013 article by Wachtell, Lipton, Rosen & Katz stated that borrowers during the Great Recession would "spend up to some fixed amount of dollars making open market repurchases of their own loans" or would initiate debt repurchases "*offered to all lenders* pursuant to 'Dutch auction' proceedings." *See* Ex. 11 at 21 (emphasis added). Again, the distinction is clear—Dutch auctions involve offers to all lenders, whereas borrowers' "open market" purchases of debt do not.

47.     Finally, *The LSTA's Complete Credit Agreement Guide*, an authoritative source on credit agreements and the syndicated loan market issued by the Loan Syndications and Trading Association, explains:

> Buyback methodologies can be grouped into two broad categories: pro rata offered buybacks available to all lenders and non-pro rata open market purchases that are made available on a narrower basis to individual lenders. . . . In the category of open market purchases, a ***borrower is allowed to negotiate one-on-one with individual lenders*** to repurchase loans up to a pre-agreed dollar amount.

Ex. 12 at 642.

---

[11] Here, the price negotiated in the open market purchase was in fact very favorable to Serta: The Transaction employed an exchange ratio of $74 of super-priority "second out" debt in exchange for each $100 of Existing First Lien Term Loans and $39 of super-priority debt in exchange for each $100 of Existing Second Lien Term Loans, allowing Serta to benefit from significant discount capture. *See* Statement of Uncontroverted Facts, at ¶¶ 19 – 21. Not all open market purchases yield such favorable outcomes for the company; for example, in *Boardriders*, the exchange tranches were dollar-for-dollar, such that $286 million in loans were rolled up into $286 million in new Tranche B-2 Priority Loans. *Boardriders*, 2022 WL 10085886, at *4 (noting that the term loans were exchanged at par even though the trading value of the debt was allegedly at 50-60% of par).

48.     These industry sources make clear that an "open market" purchase, as the term is used within the debt buyback context and as a matter of plain meaning within the industry, does not require borrowers to solicit every existing lender.[12]  The usage of that term was "so notorious in the industry that a person of ordinary prudence in the exercise of reasonable care would be aware of it."  *J.P. Morgan Inv. Mgmt. Inc. v. AmCash Grp., LLC*, 106 A.D.3d 559, 559 (N.Y. App. Div. 2013) (citation omitted).

49.     A recent restructuring transaction similarly involving a debt exchange—as well as one of the defendants here—confirms this industry understanding.  In 2022, Envision Healthcare needed more liquidity.  To achieve that, Envision assets were moved away from the existing lender group's collateral package into an Envision subsidiary that then entered into new credit facilities.  Envision used "proceeds" from those new facilities to "fund non-pro-rata purchases of pre-existing debt at Envision Healthcare Corp."  *See* Ex. 5 at 1.  Specifically, Envision used proceeds from a new second lien facility to repurchase approximately $1.5 billion in principal amount of outstanding first lien term loans, $326 million in principal amount of outstanding incremental term loans, and $87 million in principal amount of senior unsecured notes, all at a discounted rate.  *See* Ex. 4.

---

[12] Defendants have previously cited a 2009 Weil Gotshal Private Equity Alert and a 2009 *Deal Lawyers* article authored by Gibson Dunn attorneys in support of their contention that the 2020 Transaction was not an "open market purchase."  *See* Prepetition Am. Compl. ¶ 9.  But those documents, unlike the publications cited herein, do not attempt to define "open market purchase."  The Weil alert emphasizes that "the optimal type of bond buyback transaction will depend on the relevant indenture documents and, if applicable, credit documents."  *See* Glenn D. West et al., *De-Levering Portfolio Companies Through Debt Buybacks – US and UK Perspectives*, at 3, https://www.weil.com/~/media/files/pdfs/Private_Equity_Alert_March_2009.pdf.  And the Gibson Dunn article notes that issuers without cash on hand may not be able to avail themselves of options such as repurchasing outstanding convertible securities "through a cash tender offer before the debt reaches maturity."  *See* James Monoley et al., *Convertible Debt Exchange Offers: Considerations for Distressed Issuers*, at 2, https://www.gibsondunn.com/wpcontent/uploads/documents/publications/Moloney-Pollner-Shaw-ConvertDebtExchangeOffers.pdf.

50.     That transaction was referred to as "an open-market purchase of existing creditors' holdings"—even though only "certain" creditors participated.  *Id.*  In other words, like Serta, Envision used an open market purchase provision in its credit agreement to accomplish a debt-for-debt exchange.

51.     Notably, in the Envision transaction, one of the providers of the new financing, who "effectively . . . step[ped] ahead of everyone else in the repayment waterfall," was none other than Angelo Gordon—despite the fact that Angelo Gordon was among the Non-PTL Lenders that sought to enjoin the 2020 Transaction in the *North Star* action and is now a defendant here.  *See* Ex. 6, at 1–2.  And Envision's banker for the transaction was none other than PJT Partners, *see* Ex. 4, which also represents the Non-PTL Lenders in this action and represented them when they were making their alternative proposal to the Company, *see* Ex. 7.  Evidently, Angelo Gordon and PJT Partners are wholly comfortable when companies rely on open market purchase provisions in credit agreements—provided they are the beneficiary.  At a minimum, they fully understood that Envision was using its open market purchase provision to engage in a debt-for-debt exchange with select lenders, consistent with the widespread industry understanding of the term.

52.     In sum, given the technical nature of credit agreements within the syndicated loan industry, this Court may look to this substantial industry custom and practice to confirm that the term "open market purchase," as used in the Non-PTL Term Loan Agreement, unambiguously need not be open to all lenders.  Accordingly, the open market purchase, like all other aspects of the 2020 Transaction, did not require unanimous consent.

### 4.     Written Amendments To The Non-PTL Term Loan Agreement Ratified The Open Market Purchase Component Of The 2020 Transaction.

53.     If any doubt remained as to whether the Non-PTL Term Loan Agreement unambiguously permitted the 2020 Transaction, written amendments to the Non-PTL Term Loan Agreement not referenced in the motion to dismiss decided by Judge Failla and presented for the

first time here reflect the Required Lenders' acknowledgement of, and consent to, the open market purchase component of the 2020 Transaction.[13]   Those amendments—which the Agreement authorized a majority of lenders to enact because they did not impact sacred rights—render irrelevant any alleged ambiguity in the term "open market purchase" as used in the original Agreement, because the requisite number of lenders properly amended the Agreement expressly to allow the debt-for-debt purchases, in effect defining the term "open market purchases."

54.   According to Section 9.02(b) of the Agreement, the terms of the Agreement (except the sacred rights provisions) may be "waived, amended or modified . . . pursuant to an agreement or agreements in writing entered into by [the Company] and the Required Lenders."  ECF No. 2-3 § 9.02(b).  The Company and a majority of the lenders effectuated such an agreement in 2020. They signed, *inter alia*, the 1L Amendment and the Open Market Purchase Agreement, both of which explicitly state that a majority of lenders—the amount needed for any amendment not affecting sacred rights—consented to the debt-for-debt exchanges as an open market purchase.

55.   The 1L Amendment provides that each Required Lender "acknowledges and agrees that the borrowing and/or incurrence" of the super-priority loans and all "step[s] necessary to effectuate" the 2020 Transaction "shall be and are permitted."  ECF No. 2-4 (1L Amendment) § 4; *see also id.* § 14 (lenders granting consent for Administrative Agent to effectuate the Transaction). Likewise, the Open Market Purchase Agreement, which was entered into by the Required Lenders, provides that "pursuant to Section 9.05(g) of the First Lien Credit Agreement, the Specified Borrowers will purchase on the open market from such Specified Lender all of its Existing First Lien Term Loans," that "[e]ach of the Specified Lenders" instruct each Bank Agent to take necessary actions to effectuate the debt purchase transaction, and that each Specified Lender

---

[13] Because amending the definition of open market purchase is not an action requiring 100% consent of the lenders under the sacred rights provisions of the Non-PTL Term Loan Agreement, only the consent of the Required Lenders and Serta was necessary.

agreed that all conditions precedent to the 2020 Transaction were satisfied.  ECF No. 2-5 §§ 2.1(f), 2.2.

56.     These documents are "agreements in writing entered into by [the Company] and the Required Lenders," ECF No. 2-3 § 9.02(b), that amend the Non-PTL Term Loan Agreement. And because they did not affect any sacred rights, they required consent of only the Required Lenders.  *See LCM XXII Ltd.*, 2022 WL 953109, at *11.  The requisite majority of lenders have, pursuant to the Agreement's terms and procedures, amended that Agreement to approve the discounted debt-for-debt open market purchases as part of the 2020 Transaction, rendering "open market purchases" unambiguous for this additional reason as well.

**C.     Even If The Term "Open Market Purchase" Were Ambiguous, The Evidence Presented Establishes That The Non-PTL Term Loan Agreement Permitted The 2020 Transaction.**

57.     If the Court were to conclude that the meaning of "open market purchase" is not resolved unambiguously based on the arguments set forth above, it may consult extrinsic evidence to resolve any ambiguity.  *See Last Time Beverage Corp. v. F&V Distrib. Co., LLC*, 98 A.D.3d 947, 951–52 (N.Y. App. Div. 2012).  To the extent the Court does not consider the expert analyses and recent restructuring transaction discussed above as industry custom and usage establishing the plain meaning of the contract, it can certainly consider them to resolve any ambiguity.  They do so in Plaintiffs' favor as a matter of law, as uncontested or lopsided extrinsic evidence that "no reasonable person" could understand differently.  *Compagnie Financière*, 232 F.3d at 158.

**II.     Plaintiffs Are Entitled To A Declaration That They Did Not Violate The Implied Covenant Of Good Faith And Fair Dealing**

58.     The failure of the Non-PTL Lenders' contract claims also dooms their good-faith-and-fair-dealing claim.  Under New York law, a covenant of good faith and fair dealing is implied in every contract.  This covenant includes a promise "not to act arbitrarily or irrationally in exercising [] discretion" granted by the agreement.  *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384,

389 (N.Y. 1995).  The implied covenant is limited in scope, however, and, "no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'"  *Id.* (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (N.Y. 1983)).  The claim here is inconsistent with the parties' contract.

59.     Plaintiffs also are entitled to summary judgment on the implied covenant claim because the 2020 Transaction did not deprive Defendants of the benefit of their bargain in bad faith.  To the contrary, it is the Non-PTL Lenders whose proposal would have siphoned off a large portion of the first lien loan collateral for their benefit alone—and would not have permitted the Company to benefit from discount capture in the way the 2020 Transaction did.

### A.     Defendants' Implied Covenant Theory Is Duplicative Of Their Breach Of Contract Claim And Can Impose No Independent Obligations.

60.     Defendants' claim for breach of the implied covenant of good faith and fair dealing is "identical to [their] breach of contract claim," and should be dismissed as a matter of law for that reason.  *North Star*, 2020 WL 3411267, at *5.  Both are based on the same interpretations of the unanimity, "open market," waterfall, and pro rata provisions of the Non-PTL Term Loan Agreement.  *See* Prepetition Am. Compl. ¶¶ 81, 82, 136, 138, 140, 142, 144, 145, 150.

61.     Under these circumstances, the implied covenant of good faith and fair dealing imposes no additional obligations and cannot establish an independent claim.  *See, e.g.*, *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (N.Y. 1987) ("It is impermissible, however, to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties."); *Smile Train, Inc. v. Ferris Consulting Corp.*, 117 A.D.3d 629, 630 (N.Y. App. Div. 2014) ("[A] claim for 'breach of the implied covenant of good faith and fair dealing . . . may not be used as a substitute for a nonviable claim of breach of contract.'") (citation omitted); *MBIA Ins. Corp. v. Merrill Lynch*, 81 A.D.3d 419, 419–20 (N.Y.

App. Div. 2011) (good faith and fair dealing claim cannot be maintained where it is "intrinsically tied to the damages allegedly resulting from a breach of contract"); *Fesseha v. TD Waterhouse Inv. Servs.*, 305 A.D.2d 268, 268 (N.Y. App. Div. 2003) (claimant may not "create independent contractual rights" using implied covenant of good faith and fair dealing).

62.     When courts have permitted plaintiffs to alternatively plead both breach of contract and implied covenant claims at the motion to dismiss stage, they have done so because they have found "a *bona fide* dispute over whether a contract covers the contested issue." *LCM XXII*, 2022 WL 953109, at *15.  But there is no "bona fide dispute" here—on summary judgment—when the contract and other undisputed evidence makes clear that the challenged actions fall squarely within the express language of the contract.  *See, e.g.*, *RST (2005) Inc. v. Rsch. in Motion Ltd.*, 597 F. Supp. 2d 362, 367 (S.D.N.Y. 2009) (granting summary judgment because "New York law does not support a separate claim for the breach of the implied covenant of good faith and fair dealing when it is based on the same facts as the breach of contract claim"); *In re New York Skyline, Inc.*, 471 B.R. 69, 88 (Bankr. S.D.N.Y. 2012) (same); *Dipizio Constr. Co. v. Niagara Frontier Transp. Auth.*, 107 A.D.3d 1565, 1566–67 (N.Y. App. Div. 2013) (affirming summary judgment on implied covenant claim because it "was duplicative of the breach of contract causes of action").

### B.   Lender Plaintiffs Did Not Deprive Defendants Of Bargained-For Benefits.

63.     Defendants cannot breathe life into a meritless and duplicative implied covenant claim by alleging that Plaintiffs engaged in "bad faith."  *See* Prepetition Am. Compl. ¶ 144.  To the contrary, the Defendants themselves were seeking to obtain super-priority creditor status on terms far less favorable to the Company and other creditors than the 2020 Transaction.  In any event, the 2020 Transaction respected all of Defendants' bargained-for liens and contractual rights, while offering the Company a financial life-line at a critical juncture.

64.     The Company chose the PTL Lenders' proposal after a transparent bidding process in which many of the Defendants fully participated, such that the Company negotiated with more than two-thirds of its lenders.  *See* Statement of Uncontroverted Facts, at ¶¶ 10–12.

65.     Among other options considered by the Company, a group of Non-PTL Lenders comprised of the Angelo Gorgon entities, Gamut, and Apollo-affiliate North Star Debt Holdings, L.P. submitted a proposal that would have increased the Company's total debt by $38 million and increased its total interest payments by approximately $37 million.  *Id.* ¶ 25.  Moreover, their proposal called for the creation of a new bankruptcy remote subsidiary that would have been assigned the Company's crown-jewel intellectual property (which secured the Company's existing First Lien debt), as well as certain real estate assets and a pledge of the stock of Serta, Inc.  *Id.* at ¶ 24.  The new bankruptcy remote entity would have been the Guarantor for the Apollo group's new debt.  *Id.*  In other words, the Apollo group's proposal would have stripped hundreds of millions of dollars in collateral from other first-lien lenders and added substantial new collateral for the Apollo group's benefit only.  *See id. at ¶¶* 23–25.

66.     Although the outcome of the Apollo group's competing proposal would have been far less favorable to the Company and other lenders, the structure, with a new money tranche and a debt-for-debt exchange component, was substantially similar; their proposal contemplated $200 million in new money and a debt-for-debt exchange of approximately $630 million of existing First Lien Term Loans and Second Lien Term Loans into approximately $470 million of exchanged debt, all to be effectuated pursuant to the "open market purchase" language in the agreement.  *Id.* at ¶ 23.  As Justice Masley recognized, "had [Non-PTL Lenders] succeeded, they would have been in the coveted super priority position."  *North Star*, 2020 WL 3411267, at *2.[14]

---

[14] In addition, the only way that the Non-PTL Lenders could have structured their alternative transaction would have been through use of the same "open market purchase" provision of the

67.     Because the PTL Lenders' proposal was more favorable to the Company than the Apollo group proposal and the other options available to it, the Company ultimately elected to go with the PTL Lenders' proposal.  The 2020 Transaction exchanged $1.2 billion in loans at a material discount for approximately $875 million as part of an overall deal that, again, Justice Masley recognized "provide[d] Serta with more liquidity, less debt and flexibility for additional decreases in debt." *North Star*, 2020 WL 3411267, at *6; *see* Statement of Uncontroverted Facts, at ¶ 18.[15]  In the depths of the COVID-19 pandemic, when the Company was hurting for cash to keep operations running and employees paid, the Lender Plaintiffs provided meaningful liquidity and discount capture, permitting the Company to stave off bankruptcy much longer than it otherwise would have.

68.     Because the undisputed evidence shows that Plaintiffs did not act in bad faith and because, in any event, the implied covenant claim is duplicative of the breach of contract claim, this Court should award summary judgment in favor of Plaintiffs on their request for a declaration that the Plaintiffs did not violate the implied covenant.

## <u>CONCLUSION</u>

69.     Summary judgment should be granted because Lender Plaintiffs have established an entitlement to relief and no genuine issues of material fact preclude immediate resolution of this substantial dispute between the parties.  Accordingly, the Court should enter a judgment

---

Non-PTL Term Loan Agreement to exchange certain of the Non-PTL Term Loan Lenders' debt for new debt backed by the subsidiaries that received the transferred collateral.

[15] The circumstances here are thus a far cry from those that led Justice Masley to deny a motion to dismiss the implied covenant claim in *Boardriders*, 2022 WL 10085886, at *9.  There, "the Transaction was carried out in secret"—despite multiple attempts by plaintiffs "to gauge whether the Company needed additional capital[] which plaintiffs . . . were willing to provide." *Id.*  The defendants there allegedly "abused their ability to amend the Credit Agreement to effectuate the Transaction, going so far as to amend the no-action provisions to hinder plaintiffs' ability to sue and eliminating every affirmative and negative covenant[]." *Id.*  And, unlike Serta in the 2020 Transaction proposed by the PTL Lenders, Boardriders did not benefit from any discount capture in that transaction.  *Id.*

declaring that (1) the 2020 Transaction was permitted under the Non-PTL Term Loan Agreement and (2) the Company and the PTL Lenders did not violate the covenant of good faith and fair dealing by entering into the 2020 Transaction.  For the same reasons, Lender Plaintiffs respectfully request that the Court enter judgment in their favor on Defendants' and Third-Party Plaintiffs' mirror-image claims and counterclaims.

Dated: March 15, 2023
    Houston, Texas

*/s/ Gregg Costa*
_____

GIBSON, DUNN & CRUTCHER LLP
Gregg Costa (24028160)
811 Main Street, Suite 3000
Houston, TX 77002
Telephone: (346) 718-6600
Facsimile: (346) 718-6620
gcosta@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Orin Snyder (admitted *pro hac vice*)
Amanda M. Aycock (admitted *pro hac vice*)
C. Lee Wilson (*pro hac vice* pending)
Akiva Shapiro (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
Tel:   (212) 351-4000
Fax:   (212) 351-4035
Email: osnyder@gibsondunn.com
       aaycock@gibsondunn.com
       clwilson@gibsondunn.com
       ashapiro@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Helgi C. Walker (*pro hac vice* forthcoming)
1050 Connecticut Avenue N.W.
Washington, DC 20036
Tel:   (202) 955-8500
Fax:   (202) 467-0539
Email: hwalker@gibsondunn.com

*Counsel for Plaintiffs Invesco Senior*
*Secured Management, Inc., Boston*
*Management and Research, Credit Suisse*
*Asset Management, LLC, Eaton Vance*
*Management, and Barings, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.

*/s/ Bruce J. Ruzinsky*
Bruce J. Ruzinsky