**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SERTA SIMMONS BEDDING, LLC, et al. | : | Case No. 23-90020 (DRJ) |
| | : | |
| | : | (Jointly Administered) |
| SERTA SIMMONS BEDDING, LLC, INVESCO SENIOR SECURED MANAGEMENT, INC., CREDIT SUISSE ASSET MANAGEMENT, LLC, BOSTON MANAGEMENT AND RESEARCH, EATON VANCE MANAGEMENT, and BARINGS LLC, | : : : : : : : | Adversary Proc. No. 23-09001 (DRJ) |
| *Plaintiffs,* | : | |
| | : | |
| - against – | : | |
| | : | |
| | : | |
| AG CENTRE STREET PARTNERSHIP L.P., AG CREDIT SOLUTIONS NON-ECI MASTER FUND, L.P., AG SF MASTER (L), L.P., AG SUPER FUND MASTER, L.P., SILVER OAK CAPITAL, L.L.C., ASCRIBE III INVESTMENTS, LLC, COLUMBIA CENT CLO 21 LIMITED, COLUMBIA CENT CLO 27 LIMITED, COLUMBIA FLOATING RATE INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST II, COLUMBIA STRATEGIC INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST I, CONTRARIAN CAPITAL FUND I, L.P., CONTRARIAN CENTRE STREET PARTNERSHIP, L.P., CONTRARIAN DISTRESSED DEBT FUND, L.P., GAMUT CAPITAL SSB, LLC, LCM XXII LTD., LCM XXIII LTD., LCM XXIV LTD., LCM XXV LTD., LCM 26 LTD., LCM 27 LTD., LCM 28 LTD., NORTH STAR DEBT HOLDINGS, L.P., SHACKLETON 2013- III CLO, LTD., SHACKLETON 2013-IV-R CLO, LTD., SHACKLETON 2014-V-R CLO, LTD., SHACKLETON 2015-VII-R CLO, LTD., SHACKLETON 2017-XI CLO, LTD., Z CAPITAL CREDIT PARTNERS CLO 2018-1 LTD., AND Z CAPITAL CREDIT PARTNERS CLO 2019-1 LTD., | : : : : : : : : : : : : : : : : : : : : : : : : : : : | |
| *Defendants.* | : | |

**LCM DEFENDANTS' MEMORANDUM OF LAW IN
<u>OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT</u>**[*]

HOLWELL SHUSTER & GOLDBERG
425 Lexington Ave., 14th Floor
New York, New York 10017
Tel: 646.837.5151

MCKOOL SMITH P.C.
600 Travis Street, Suite 7000
Houston, Texas 77002
Tel. 713.485.7300

*Counsel for the LCM Defendants*

---

[*] The LCM Defendants are LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd. and LCM 28 Ltd.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 3

      A.      Serta Enters A First-Lien Credit Agreement ........................................... 3

      B.      Serta And The Handpicked Lenders Engineer The Exchange Transaction ........... 4

      C.      The LCM Defendants Pursue Litigation ................................................... 6

      D.      Procedural History ..................................................................................... 8

LEGAL STANDARD ................................................................................................................. 9

ARGUMENT ............................................................................................................................... 9

I.       THE EXCHANGE TRANSACTION BREACHED SECTION 9.05(g) ......................... 9

      A.      The Plain Meaning Of "Open Market Purchase" Does Not Encompass The Exchange Transaction ............................................................................... 10

            1.      In Plain English, To "Purchase" Means To Buy For Money .................. 10

            2.      The Exchange Transaction Was Not Done On The "Open Market" ........ 12

      B.      The Structure Of The Credit Agreement Confirms Defendants' Interpretation Of The Term "Open Market Purchase" .......................... 15

            1.      The Separate Provisions For Debt Exchanges Confirm That A Debt Exchange Is Not An "Open Market Purchase" .................. 16

            2.      The Term "Open Market Purchase" Should Be Read In Context, And In Light Of Section 9.05(g)'s Purpose ......................... 20

      C.      Lender Plaintiffs' Throwaway Ratification Argument Makes No Sense ............ 24

II.      IN THE ALTERNATIVE, THE COURT SHOULD DENY THE MOTION BECAUSE THE TERM "OPEN MARKET PURCHASE" IS AMBIGUOUS .............. 26

      A.      Extrinsic Evidence Supports The LCM Defendants' Interpretation .................. 26

      B.      Judge Failla's Decision Further Precludes Summary Judgment for Plaintiffs ........................................................................................................ 28

III..     PLAINTIFFS FAIL TO ESTABLISH THEIR
ENTITLEMENT TO RELIEF ON THE IMPLIED-COVENANT CLAIM ................... 30

       A.     The Disfavored Lenders Were Deprived Of The "Fruits Of The Contract" ......... 30

       B.     Plaintiffs' "Transparent Process" Defense Fails ................................................... 33

       C.     Plaintiffs' "Duplicative Claim" Defense Fails ..................................................... 34

       D.     The Ability To Participate In The Exchange
Transaction Depended On Arbitrary Considerations ........................................... 35

       E.     Summary Judgment Is Inappropriate
Because Discovery Has Not Concluded ............................................................... 38

CONCLUSION ............................................................................................................................. 40

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*,
   634 F.3d 112 (2d Cir. 2011) ................................................................ 10

*Anthem, Inc. v. Express Scripts, Inc.*,
   2022 WL 1558879 (S.D.N.Y. Mar. 31, 2022) ....................................... 10

*Apex Custom Lease Corp. v. State Tax Assessor*,
   677 A.2d 530 (Me. 1996) ...................................................................... 11

*Atkins v. Salazar*,
   677 F.3d 667 (5th Cir. 2011).................................................................. 25

*Beazley Ins. Co., Inc. v. ACE Amer. Ins. Co.*,
   197 F.Supp.3d 616 (S.D.N.Y. 2016)...................................................... 23

*Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC*,
   549 F. Supp. 2d 249 (E.D.N.Y. 2008).................................................... 21

*Brown v. Miss. Valley State Univ.*,
   311 F.3d 328 (5th Cir. 2002).................................................................. 39

*Cap. Ventures Int'l v. Republic of Argentina*,
   652 F.3d 266 (2d Cir. 2011) .................................................................. 18

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................ 9

*Cities Serv. Co. v. United States*,
   522 F.2d 1281 (2d Cir. 1974)................................................................. 13

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner*
   232 F.3d 153 (2d Cir. 2000)..................................................................... 9

*Conage v. United States*,
   346 So. 3d 594 (Fla. 2022)..................................................................... 11

*Cornhill Corp. v. S.S. Plants, Inc.*,
   9 N.Y.2d 595 (1961) .............................................................................. 17

*Dalton v. Educ. Testing Serv.*,
   87 N.Y.2d 384 (1995) ........................................................................ 3, 30

*Elwell v. Chamberlin*,
    31 N.Y. 611 (1865) ............................................................................................ 11

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*,
    680 F. Supp. 2d 625 (S.D.N.Y. 2010) .......................................................... 30

*Fantozzi v. Axsys Techs.*, Inc.,
    2008 WL 4866054 (S.D.N.Y. Nov. 6, 2008) ................................................ 34

*Feinman v. Dean Witter Reynolds, Inc.*,
    84 F.3d 539 (2d Cir. 1996) ............................................................................ 13

*Frank B. Hall & Co. v. Orient Overseas Associates*,
    48 N.Y.2d 958 (1979) .................................................................................... 19

*Global Reins. Corp. of Amer. v. Century Indem. Co.*,
    442 F. Supp. 3d 576 (S.D.N.Y. 2020) .......................................................... 23

*Gomez v. Jackson Hewitt, Inc.*,
    427 Md. 128 (2012) ....................................................................................... 11

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ....................................................................................... 22

*Harris v. Allstate Ins. Co.*,
    309 N.Y. 72 (1955) ........................................................................................ 20

*Highbridge Dev. BR, LLC v. Diamond Dev., LLC*,
    67 A.D. 3d 1112 (N.Y. App. Div. 3d Dep't 2009) ...................................... 39

*Hine v. Manhattan R. Co.*,
    132 N.Y. 477 (N.Y. 1892) ............................................................................ 13

*Hovey v. Elliott*,
    118 N.Y. 124 (N.Y. 1890) ............................................................................ 13

*Hoyt v. Hoyt*,
    195 Misc. 330 (Sup. Ct. Bronx Cty. 1949) ................................................. 10

*Hoyt v. Van Alstyne*,
    1853 WL 5779 (Sup. Ct. 1853) .................................................................... 10

*In re Ampal-Am. Israel Corp.*,
    2023 WL 1094593 (Bankr. S.D.N.Y. Jan. 27, 2023) .................................. 24

*In re Cragar Indus., Inc.*,
    706 F.2d 503 (5th Cir. 1983) ................................................................. 29

*In re Lapp's Will*,
    3 A.D.2d 55 (N.Y. App. Div. 4th Dep't 1956); ................................. 10

*In re LightSquared Inc.*,
    511 B.R. 253 (Bankr. S.D.N.Y. 2014) ........................................... 30, 34

*In re Pilgrim's Pride Corp.*,
    2012 WL 3260260 (Bankr. N.D. Tex. Aug. 8, 2012) ........................ 29

*Israel v. Chabra*,
    12 N.Y.3d 158 (2009) ........................................................................ 18

*KFC Corp. v. Iron Horse of Metairie Rd., LLC*,
    2019 WL 13225874 (E.D. La. June 7, 2019) .................................... 25

*Kirk La Shelle Co. v. Armstrong Co.*,
    263 N.Y. 79 (1933) ....................................................................... 3, 30

*Lawyers' Fund for Client Protection of State of N.Y. v. Bank Leumi Tr. Co. of N.Y.*,
    94 N.Y.2d 398 (2000) ................................................................... 17, 18

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
    2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ............................... *passim*

*Lee v. Marvel Enterprises, Inc.*,
    386 F. Supp. 2d 235 (S.D.N.Y. 2005) .............................................. 24

*Lincoln Gen. Ins. Co. v. Reyna*,
    401 F.3d 347 (5th Cir. 2005) .............................................................. 9

*Louisiana Stadium & Exposition Dist. v. Fin. Guar. Ins. Co.*,
    701 F.3d 39 (2d Cir. 2012) ............................................................... 21

*Madison Ave. Baptist Church v. Baptist Church in Oliver St.*,
    46 N.Y. 131 (1871) ........................................................................... 11

*Madison Hudson Assocs. LLC v. Neumann*,
    44 A.D.3d 473 (N.Y. App. Div. 1st Dep't 2007) .......................... 15, 19

*Matter of Lipper Holdings v. Trident Holdings*,
    1 A.D.3d 170 (N.Y. App. Div. 1st Dep't 2003) ............................... 19

v

*Ministers & Missionaries Ben. Bd. v. Snow*,
   26 N.Y.3d 466 (2015) ................................................................................................. 24

*Muzak Corp. v. Hotel Taft Corp.*,
   1 N.Y.2d 42 (1956) ....................................................................................... 12, 14, 18

*N. Fork Land & Cattle, LLLP v. First Am. Title Ins. Co.*,
   362 P.3d 341 (Wyo. 2015) ........................................................................................ 11

*NFL Enterprises LLC v. Comcast Cable Communications*,
   51 A.D.3d 52 (N.Y. App. Div. 1st Dep't 2008) ....................................................... 19

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*,
   30 N.Y.3d 572 (2017) ............................................................................................... 18

*North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*,
   Index No. 652243/2020 (N.Y. Sup. Ct. 2020) ........................................................... 5

*Octagon Credit Investors LLC, et al. v. NYDJ Apparel, et al.*,
   Index No. 656677/2017 (N.Y. Sup. Ct. 2017) ......................................................... 35

*Patterson v. Comm'r of Internal Revenue*,
   42 F.2d 148 (2d Cir. 1930) ....................................................................................... 13

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*,
   568 F.3d 374 (2d Cir. 2009) ..................................................................................... 13

*Quorum Health Res., L.L.C. v. Maverick Cnty. Hosp. Dist.*,
   308 F.3d 451 (5th Cir. 2002) ...................................................................................... 9

*Richbell Info. Servs. v. Jupiter Partners*,
   309 A.D.2d 288 (N.Y. App. Div. 1st Dep't 2003) .............................................. 31, 32

*Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*,
   920 N.E.2d 359 (N.Y. 2009) ..................................................................................... 15

*RLI Ins. Co. v. Athan Contracting Corp.*,
   667 F. Supp. 2d 229 (E.D.N.Y. 2009) ...................................................................... 24

*Ronnen v. Ajax Elec. Motor Corp.*,
   88 N.Y.2d 582 (1996) ............................................................................................... 16

*Rowe v. Great Atl. & Pac. Tea Co.*,
   46 N.Y.2d 62 (1978) ................................................................................................. 30

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
    7 F.3d 1091 2d Cir. 1993) ................................................................................ 26

*Sec. & Exch. Comm'n v. Texas Gulf Sulphur Co.*,
    401 F.2d 833 (2d Cir. 1968) ............................................................................ 13

*Shatz v. Chertok*,
    180 A.D.3d 609 (N.Y. App. Div. 1st Dep't 2020) ........................................... 31

*State, by & through Pub. Welfare Comm'n v. Bonnett*,
    201 P.2d 939 (Utah 1949) ............................................................................... 11

*Tekelec, Inc. v. Verint Sys., Inc.*,
    708 F.3d 658 (5th Cir. 2013) ........................................................................... 26

*Trimboli v. Kinkel*,
    226 N.Y. 147 (1919) ....................................................................................... 11

*U. S. Fid. & Guar. Co. v. Clover Creek Cattle Co.*,
    452 P.2d 993 (Idaho 1969) .............................................................................. 11

*United States v. Bilzerian,*
    926 F.2d 1285 (2d Cir. 1991) ......................................................................... 14

*United States v. Conage,*
    50 F.4th 81 (11th Cir. 2022) ........................................................................... 11

*United States v. Mulheren,*
    938 F.2d 364 (2d Cir. 1991) ........................................................................... 13

*Wease v. Ocwen Loan Servicing, L.L.C.*,
    915 F.3d 987 (5th Cir. 2019) ........................................................................... 39

*William C. Atwater & Co. v. Panama R. Co.*,
    246 N.Y. 519 (1927) ....................................................................................... 15


**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .............................................................. 12, 14

Edward S. Best, *et al.*, *Structuring Liability Management Transactions* .................... 27

Edward F. Greene, *et al.*, *U.S. Regulation of Int'l Securities and Derivatives Market* ............... 27

Glenn D. West, *et al.*, *Private Equity Alert: De-levering Portfolio Companies Through Debt
    Buybacks—US and UK Perspectives* (Mar. 2009) ...................................................... 26

Merriam-Webster Dictionary, *Purchase* ..................................................................... 11

Random House Dictionary, *Purchase* (2015) .............................................................. 11

The American Heritage Dictionary of the English Language, *Purchase* (3d ed. 1992) .............. 11

Webster's Third New International Dictionary Unabridged, *Purchase* (1966 ed.) ...................... 11

**Rules**

Fed. R. Civ. P. 56 ........................................................................................... 9, 39

Fed. R. Bankr. P. 7056 ........................................................................................ 9

**Treatises**

Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4478.4 .............. 29, 33

## PRELIMINARY STATEMENT

1.      In June 2020, Plaintiff Serta Simmons Bedding, LLC ("**Serta**") engaged in an improper debt exchange (the "**Exchange Transaction**") with an exclusive group of its first-lien and second-lien lenders (the "**Handpicked Lenders**") advised by Centerview Partners LLC ("**Centerview**") and Gibson, Dunn & Crutcher LLP ("**Gibson Dunn**") to unlawfully deprive the remaining first-lien lenders, including the LCM Defendants, of their bargained-for first-lien, priority, *pro-rata* rights. In concert with its financial advisor Evercore Group LLC ("**Evercore**") and its principal sponsor, Advent International Corp. ("**Advent**"), Serta selectively issued new, so-called "super-priority" debt, and engaged in the Exchange Transaction with the Handpicked Lenders, leaving the remaining first- and second-lien lenders behind in payment priority. A principal architect of this scheme—now lead counsel to the Debtors—later boasted that this was a "*novel structure[]* to effectively give the company better financing solutions . . . by *interpreting* contractual provisions in *effective* ways."[1] (emphases added).

2.      Almost three years later, Serta has nothing to show for this "novel structure": it has faced a long tail of post-transaction litigation brought by objecting lenders who have sought to vindicate that "first-lien" means "*first*-lien," and it now finds itself before this Court, having failed to solve the liquidity crisis that allegedly necessitated the extraordinary Exchange Transaction.

3.      The Handpicked Lenders, however, stand to benefit handsomely: under Serta's proposed Chapter 11 plan, the Handpicked Lenders will receive up to 100% of the equity in the reorganized company, whereas those left behind, like the LCM Defendants, will get, at *most*, their *pro rata* share of 4% of the equity—even less than the 8% Serta has allocated for management.

---

[1] *MVP: Weil's Ray Schrock*, Law360 (Oct. 26, 2020), *available at* https://www.law360.com/ articles/1314480/mvp-weil-s-ray-c-schrock (last visited March 15, 2023).

4.      Why this stark contrast in treatment of *first*-lien lenders? Because Serta violated the Credit Agreement and chose to deal exclusively with and benefit only some of its lenders, and because the LCM Defendants, like many others, had the misfortune of never being offered the opportunity to join the club deal that Serta and the Handpicked Lenders cobbled together.

5.      The Plaintiffs' motions for summary judgment must fail: ***First***, as is undisputed, Plaintiffs can only justify the Exchange Transaction if it qualifies as an "open market purchase" within the meaning of Section 9.05(g), but the Exchange Transaction was unambiguously not a "purchase"—it was an exchange—and there was nothing remotely "open market" about it. New York law is indeed clear that a purchase occurs when an item is acquired for a sum of money, and distinguishes "purchases" from "exchanges." Moreover, judicial decisions and dictionary definitions alike lead to the conclusion that an "open market" purchase occurs when the price is set by anonymous market actors; the term does not encompass a transaction in which the acquiror negotiates in private to obtain goods for consideration that no other market participant could offer (here, priming). And the context in which the term "open market purchase" appears further shows that summary judgment cannot be awarded to the Plaintiffs: The Credit Agreement contains an express provision for debt exchanges, but that provision specifies as a condition to such exchanges that any new debt be junior or *pari passu* to Serta's first lien loans. New York law prohibits interpreting the limited provision for "open market purchases" as a giant loophole on the contract's clear prohibition on exchanges that would result in subordination.

6.      ***Second***, in the alternative, the Court should hold that the term "open market purchase" is at best ambiguous. The term is undefined in the Credit Agreement; the parties have vigorously disputed it (including in prior litigation); and the debtor's own counsel, among other market participants, has publicly stated that a privately-negotiated "cashless exchange" is not an

"open market purchase." This sort of extrinsic evidence confirms that the term is, at best for Plaintiffs, ambiguous, thus foreclosing summary judgment for the Plaintiffs.

7.      **Third**, and finally, there is myriad evidence that the Exchange Transaction violated New York's implied covenant of good faith and fair dealing, which is "a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (quoting *Kirk La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87 (1933)). Judge Failla has already held as much, explaining that Plaintiffs "systematically combed through the Agreement tweaking every provision that seemingly prevented [Serta] from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one," *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *15 (S.D.N.Y. Mar. 29, 2022). On this summary record, judgment cannot be entered for the Plaintiffs before a single deposition is taken.

## STATEMENT OF FACTS

### A.      Serta Enters A First-Lien Credit Agreement

8.      On November 8, 2016, Serta raised capital by entering into a First Lien Term Loan Agreement (the "**Credit Agreement**" or "**Agreement**") with a number of lenders (the "**First Lien Lenders**"). That Agreement specifies in Section 2.18 that any payment by Serta will be made *pro rata* to all First Lien Lenders based on the face amount of ownership—meaning no First Lien Lender would receive better treatment in payment priority (the "**First Lien Loans**").

9.      The Agreement specifies a number of ways in which Serta could acquire these First Lien Loans back. First, and most relevant here, the Agreement states in Section 9.05(g) that it could participate in an "open market purchase" of First Lien Loans, subject to certain conditions, including that the loans be retired upon acquisition. Second, the Agreement states *inter alia* in Section 2.22 that Serta could participate in an exchange of First Lien Loans for newly issued debt,

3

but subject to the condition that any new debt would be junior or *pari passu*, meaning, as the name implies, that the First Lien Loans would always be senior.

10.     Recognizing the importance of the lenders' seniority and *pro rata* payment rights, the Agreement specifies that the payment rights can be altered only with the approval of all directly and adversely affected lenders—*i.e.*, every First Lien Lender. Thus, Section 9.02(b)(A)(6) specifies that each affected lender would have to approve any agreement that "waives, amends or modifies Sections 2.18(b) or (c) of this Agreement [*i.e.*, the waterfall] *in a manner that would by its terms alter the pro rata sharing of payments required thereby*." (emphasis added). Sections 9.02(b)(B)(2) and 9.02(b)(B)(3) also provide that any agreement to release all or substantially all of either the collateral or the value of the guarantees generally requires the consent of each First Lien Lender. These provisions have an exception for "open market purchases," to allow Serta to retire First Lien Loans obtained on a non–*pro rata* basis through an "open market purchase."

   **B.     Serta And The Handpicked Lenders Engineer The Exchange Transaction**

11.     Despite the Agreement's protections for First Lien Lenders' *pro rata* rights, and the provisions making clear that any exchange could be effectuated only for junior or *pari passu* debt, Serta announced on June 8, 2020 that it had agreed in private to an exchange with the Handpicked Lenders, whereby certain of these lenders would infuse additional capital in exchange for them and the other Handpicked Lenders becoming *super-priority* lenders ahead of everyone in payment priority, as illustrated below:



13.     After the announcement, a co-defendant lender in this Adversary Proceeding immediately but unsuccessfully moved in New York state court for preliminary relief halting the Exchange Transaction. *See North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*, Index No. 652243/2020, at Dkt. 1 (N.Y. Sup. Ct. 2020). The LCM Defendants' Collateral Manager, LCM Asset Management LLC, sought to intervene in that case, but, after the transaction closed

---

[2] The "*Octagon*" case refers to a prior case in New York state court, involving a similar type of priming transaction, in which the New York state court of first instance (per Justice Ramos), denied the defendant company's motion to dismiss on the basis stated in the text, after which point the lenders who sought to prime their co-lenders demurred, allowing all lenders that would have been affected to participate in the transaction. *See generally Octagon Credit Investors LLC, et al. v. NYDJ Apparel, et al.*, Index No. 656677/2017 (N.Y. Sup. Ct. 2017).

and Serta objected to the Collateral Manager's intervention, the Collateral Manager withdrew that suit.

14.     The Exchange Transaction thus closed on June 22, 2020 without putting the matter to a vote of all lenders. At the time, Serta and the Handpicked Lenders purported to amend the Agreement without asking the balance of lenders (the "**Disfavored Lenders**"). The amendments were designed to purportedly permit the issuance of new "super-priority" loans that ranked ahead of the erstwhile First Lien Loans. Certain of the Handpicked Lenders purchased $200 million of those loans. At the same time, the Handpicked Lenders exchanged their first- and second-lien holdings for over $875 million of new "super-priority" debt. Together with the new money loans, the exchange buried the Disfavored Lenders under more than $1 billion of the new "super-priority" debt. The LCM Defendants were never invited to the discussions, and were also never offered to join the Exchange Transaction before or after it was announced; nor did they (or any of the remaining Disfavored Lenders) provide their consent. Serta and the Handpicked Lenders have justified their conduct on the basis that the Exchange Transaction was supposedly an "open market purchase" by Serta of its loans.

### C.     The LCM Defendants Pursue Litigation

15.     The LCM Defendants are Collateralized Loan Obligations ("CLOs") that have held First Lien Term Loans since 2016. Declaration of Farboud Tavangar ("Tavangar Decl."), ¶¶ 3, 9. Most purchases took place over five years ago, at or near par value, consistent with the CLOs' investment strategy. The LCM Defendants are not "loan-to-own" funds, do not generally hold equity investments, did not participate in any negotiations with Serta, and indeed, were unaware of the Exchange Transaction until it was publicly announced in June 2020. *Id*. ¶¶ 10-11. The Exchange Transaction unsettled the market for secured corporate loans; ███████████

███████████████████████████████████████████████ ██ ██

███████████████████████████████████████████████

16.     After the LCM Defendants' Collateral Manager withdrew its action in New York state court in light of Serta's objections to the intervention motion, certain of the LCM lenders (the "**LCM Defendants**") brought litigation in the SDNY. They initially sued Serta and certain Handpicked Lenders, but that court dismissed for lack of complete diversity. The LCM Defendants then dropped the Handpicked Lenders and sought their damages solely from Serta.

17.     For almost two years, the LCM Defendants' claims have been before Judge Failla in the Southern District of New York, No. 21-cv-03987 (KPF) (the "**LCM Action**"), who denied Serta's motion to dismiss and presided over that case until this bankruptcy stayed it.

18.     In denying Serta's motion to dismiss, Judge Failla rejected the assertion made by the Plaintiffs on this motion that the Exchange Transaction was valid as a matter of law, holding that she "cannot agree that [Serta's] definition of open market, which equates the term with fair market value, is the only susceptible meaning of this phrase." As that court explained:

> "[T]he Transaction depicted in the Complaint did not take place in what is conventionally understood as an 'open market.' Significantly, the Transaction was closed to a swath of possible participants (*i.e.*, those lenders who did not participate in the Transaction), and rather than agreeing on a price set by market forces, Defendant and the Participating Lenders are alleged to have engaged in secretive discussions to arrive at a price for the loan repurchases that necessitated both intricate amendments to the Agreement and additional agreements, the terms of which were withheld from Plaintiffs until they were publicly announced."

*LCM XXII Ltd.*, 2022 WL 953109, at *7–8.

---

[3] According to its website, "[t]he LSTA has been the leading advocate for the U.S. syndicated loan market since 1995, fostering cooperation and coordination among all loan market participants, facilitating just and equitable market principles, and inspiring the highest degree of confidence among investors in corporate loan assets."  *See* LSTA, *https://www.lsta.org/*.

19.     For similar reasons, Judge Failla concluded that, even if the Agreement permitted the Exchange Transaction, the LCM Defendants' claim for breach of the implied covenant of good faith and fair dealing survived. The court explained, "notwithstanding their contractual entitlement to be treated on a *pro rata* basis with other first-lien lenders, [Serta] engaged in furtive negotiations with a select few creditors, manipulated the Agreement to subordinate Plaintiffs' debt without their knowledge, and struck a deal at Plaintiffs' expense." *Id.* at *15. This, the court held as a matter of pleading, violates the implied covenant. *Id.*

**D.     Procedural History**

20.     As the LCM Action approached the close of fact discovery, which had been set for January 31, 2023, Serta began to come up with convenient excuses to postpone depositions and to defer addressing certain discovery disputes. For example, the LCM Defendants noticed a Rule 30(b)(6) deposition on November 10, 2022, but Serta's counsel designated two witnesses who were only claimed to be available in the final week of January. Similarly, the LCM Defendants' notices of deposition to the key third-party advisors who engineered the Exchange Transaction were met with the curiously uniform responses that those individuals were also only available in the final week of January. These depositions never occurred, as the discovery deadline was deferred in view of these delays, and Serta and its now-co-debtors petitioned for Chapter 11 relief on January 23, 2023, putting a halt to discovery. The result is that fact discovery did not conclude in the LCM Action, and no deposition was taken of any party or third party.

21.     In the early morning hours of January 24, Serta and certain of the Handpicked Lenders (the "**Lender Plaintiffs**") also filed this adversary proceeding, naming the LCM Defendants among the defendants. Tellingly, Serta and the Lender Plaintiffs sought declaratory relief in two counts corresponding precisely to the two issues left open by Judge Failla's decision in the LCM Action: (1) that the Exchange Transaction was permitted under the Agreement as an

"open market purchase" pursuant to Section 9.05(g) of the Agreement; and (2) that the Exchange Agreement did not violate New York's implied covenant. *See* Dkt. 1 ("**Complaint**") at 27.

22.     On February 24, 2023, Serta and the Lender Plaintiffs moved for summary judgment. *See* Dkt. 69 ("**Serta MSJ**"); Dkt. 73 ("**Lenders' MSJ**").

## LEGAL STANDARD

23.     Summary judgment is appropriate only if the movant establishes there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Fed. R. Bankr. P. 7056 (incorporating Fed. R. Civ. P. 56). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick Cnty. Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002).

24.     Under New York law, "[s]ummary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir. 2000). The question *whether* a contract is ambiguous "is a question of law to be decided by the court." *Id.* The meaning of an ambiguous term, however, is a fact question. *Id.*

## ARGUMENT

## I.     THE EXCHANGE TRANSACTION BREACHED SECTION 9.05(g)

25.     In arguing that the structured transaction and debt exchange were permitted under the Agreement, Plaintiffs rely solely upon Section 9.05(g), which allows Serta to make "open market purchases" of First Lien Loans to retire them. Plaintiffs say the Exchange Transaction fit the bill. But they are wrong. The Exchange Transaction—which was negotiated in private and

consisted of a structured debt *exchange*—does not qualify as a "*purchase*," let alone as anything resembling an "*open market*" purchase.[4] And the context in which the provision appears confirms the point that the Exchange Transaction was not an "open market purchase," particularly because the Agreement separately provided the conditions according to which Serta could conduct a debt exchange. The Court should deny Plaintiffs' summary judgment motions, or grant summary judgment in favor of the Defendants, on that basis.

### A.    The Plain Meaning Of "Open Market Purchase" Does Not Encompass The Exchange Transaction

#### 1.    In Plain English, To "Purchase" Means To Buy For Money

26.    Courts applying New York law discern the plain meaning of a contractual term by reference to its common, ordinary usage. And "[i]t is common practice for the courts of [New York] to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011); *see Anthem, Inc. v. Express Scripts, Inc.*, 2022 WL 1558879, at *5 (S.D.N.Y. Mar. 31, 2022) ("New York courts will commonly refer to dictionary definitions to determine that meaning.").

27.    New York law has long adopted the widely-held understanding of the meaning of the word "purchase": "Purchase means 'to buy for a sum of money.'" *In re Lapp's Will*, 3 A.D.2d 55, 59 (N.Y. App. Div. 4th Dep't 1956); *see Hoyt v. Hoyt*, 195 Misc. 330, 331 (N.Y. Sup. Ct. Bronx Cty. 1949) (to "[p]urchase" is to "obtain[] property by paying an equivalent in money"); *Hoyt v. Van Alstyne*, 1853 WL 5779 (N.Y. Sup. Ct. 1853) ("The definition of the word 'purchase,' in common usage . . . is to buy; to obtain property by paying an equivalent in money." (quotation marks omitted)).

---

[4] Interpretation of the contract is governed by New York law. *See* Agreement, § 9.10(a).

28.     So too have courts around the country. They have recognized that "dictionaries are essentially uniform in how they define the word 'purchase' . . . 'purchase' means 'to obtain in exchange for money or its equivalent." *United States v. Conage*, 50 F.4th 81, 85 (11th Cir. 2022) (quoting The American Heritage Dictionary of the English Language, *Purchase* (3d ed. 1992)); *see, e.g.*, *N. Fork Land & Cattle, LLLP v. First Am. Title Ins. Co.*, 362 P.3d 341, 348 (Wyo. 2015) ("[I]n common parlance, "purchase" means "to acquire by the payment of money or its equivalent; buy." (quoting Random House Dictionary, *Purchase* (2015)); *accord Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 153 (2012). This has long been the plain meaning of the term "purchase."[5]

29.     Moreover, New York law has long distinguished a "purchase" from an "exchange." As New York's highest court long ago explained, "the difference between a sale and exchange is this, the former is a transferring of goods for money, the latter for goods by way of barter." *Elwell v. Chamberlin*, 31 N.Y. 611, 624 (1865) (citing *Chitty on Contracts*, § 374). That court reaffirmed the point a few years later, explaining that in "a sale, . . . one man gives a thing for a price in current money" which "differs from a barter or exchange [where] the price, instead of being paid in money, is paid in goods or merchandise." *Madison Ave. Baptist Church v. Baptist Church in Oliver St.*, 46 N.Y. 131, 139–40 (1871). And that court, and lower New York courts, have said the same thing many times over since. *E.g.*, *Trimboli v. Kinkel*, 226 N.Y. 147, 149 (1919) (holding relied on conclusion that "[t]he transaction [is] not a sale for money, but an exchange").

---

[5] For other authorities, consider, for example, *Conage v. United States*, 346 So. 3d 594, 599 (Fla. 2022) ("purchase" means "[t]o obtain in exchange for money or its equivalent; buy."); *Apex Custom Lease Corp. v. State Tax Assessor*, 677 A.2d 530, 533 (Me. 1996) (same); *U. S. Fid. & Guar. Co. v. Clover Creek Cattle Co.*, 452 P.2d 993, 1000 (Idaho 1969) (same); *State, by & through Pub. Welfare Comm'n v. Bonnett*, 201 P.2d 939, 944 (Utah 1949) (same); Merriam-Webster, *Purchase* (last accessed March 12, 2023) (defining "purchase" as "[t]o obtain by paying money or its equivalent"); Webster's Third New International Dictionary Unabridged, *Purchase* (1966 ed.) ("to get into one's possession; to obtain . . . by paying money or its equivalent").

## 2.    The Exchange Transaction Was Not Done On The "Open Market"

30.    Plaintiffs seek to justify the Exchange Transaction by reference to the words "open market," but those words cannot be separated from the verb ("purchase") that they modify, and in any event these words further confirm Plaintiffs' contract breach. Thus, Serta has said that "[i]n the context of a loan repurchase, the term 'open market' can only mean the price that a willing buyer and a willing seller are able to obtain in an arms-length negotiation." Lieberman Decl., Ex. 3 at 13; *see also* Complaint ¶ 47. That approach deprives the words "open market" of any meaning, for indeed Plaintiffs' definition would cover *any* transaction between Serta and a willing counterpart. *Cf. Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956) ("no provision of a contract should be left without force and effect"). Whatever the words encompass, and to the extent an open market purchase can be made by way of non-cash consideration (contrary to the plain meaning of the word "purchase"), an "open market" transaction cannot possibly include a private deal in which the so-called purchaser transfers consideration that no other market participant could provide (here, the priming of liens and issuance of new super-priority debt).

31.    Black's definition of "open market"—which Plaintiffs unsurprisingly ignore—contemplates "[a] market in which *any* buyer or seller may trade and in which prices and product availability are determined by free competition. Also termed *free market*." *See Open Market*, Black's Law Dictionary (11th ed. 2019) (emphases added). Thus, the common-sense notion of competition on an "open market" of buyers and sellers is based on the idea that a commodity (here, loans) is bought and sold at a price determined by anonymized market participants. On an "open market," the price of the commodity is set through bids and asks by buyers and sellers. Thus, per the dictionary definition, the term "open market," particularly as it modifies the verb "purchase," embraces a transaction to acquire loans for the payment of money at the market price. In other words, the term covers cash purchases on the secondary market for corporate loans. *See* Tavangar

Decl., ¶¶ 5-8 (describing that market). The "open market purchase" term does not include a back-room deal where one participant obtains loans for consideration that only the issuer of the loans can provide—namely, new, super-priority treatment.

32.     Judicial decisions interpreting or using the words "open market" underscore the point that, under New York law, an "open market" transaction occurs when the party acquiring a "uniform good" offers consideration determined *not* in private negotiation but by *anonymous participants in a secondary market*. *Hine v. Manhattan R. Co.*, 132 N.Y. 477, 479–80 (N.Y. 1892) ("It must be borne in mind that we are not considering the admissibility of an offer made in an open market, . . . constantly bought and sold in the market, and having a place in the daily reports of prices current, such as No. 1 wheat or corn, but that of an unaccepted offer for a piece of real estate, having a market value, it is true, but one not generally known in the market or to the public."); *Hovey v. Elliott*, 118 N.Y. 124, 147 (N.Y. 1890) ("[T]he plaintiffs having sold them in open market, to strangers, it would doubtless, be difficult, if not impossible, to trace them, and the lien must, therefore, be deemed as practically terminated or destroyed.").[6]

_____

[6] Within the federal circuit covering New York, *see also, e.g., Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*, 568 F.3d 374, 378 (2d Cir. 2009) ("The Funds' purchases were made in private transactions; they did not involve free-trading common stock, but rather securities not traded on the open market."); *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 541 (2d Cir. 1996) ("In [*Basic*], the Supreme Court held that reliance on material misrepresentations may be presumed in open-market transactions because such investors rely on the integrity of the market to set a fair price and in that sense rely on any misrepresentations that distort the market price."); *United States v. Mulheren*, 938 F.2d 364, 371 (2d Cir. 1991) ("[I]n an open market transaction, the only information the floor broker provides to the seller is the name of the clearing broker, not the ultimate buyer."); *Cities Serv. Co. v. United States*, 522 F.2d 1281, 1289 (2d Cir. 1974) ("Where bonds are issued for cash in the open market, the marketplace determines this adjustment. But where the transaction is insulated from the market, as in National Alfalfa, there are no market forces to perform the evaluation process."); *Sec. & Exch. Comm'n v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 858 (2d Cir. 1968) ("The idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings about a situation where the market price reflects as nearly as possible a just price."); *Patterson v. Comm'r of Internal Revenue*, 42 F.2d 148, 149-50 (2d Cir. 1930) ("When

33.     Perhaps most striking is the Second Circuit's decision in *United States v. Bilzerian*, where the Second Circuit affirmed a criminal conviction **for fraud** where the defendant "misrepresent[ed]" that a "privately-negotiated transaction" was an "'open market' purchase." 926 F.2d 1285, 1290 (2d Cir. 1991) ("The offering statement [falsely] claimed that 347,567 shares were purchased 'in an open market transaction.' The existence and terms of the privately-negotiated transaction were not disclosed."). Although the circumstances here may not lend themselves to fraud claims, the *Bilzerian* decision underscores the point that a privately negotiated transaction like the Exchange Transaction cannot be an "*open market* purchase."

34.     In the face of all this, Plaintiffs attempt to justify their definition of the words "open market" by citing Black's Law Dictionary definition of "fair market value," arguing that "'open market' means the price that a willing buyer and a willing seller are able to obtain in an arms-length negotiation—in other words, the price that Serta Simmons Bedding and any lender agreed to in the 'open market.'" Complaint ¶ 47 & n.7. As already discussed, Plaintiffs' definition renders *any* bilateral deal an "open market" transaction, a construction that must be rejected as it renders the contract's use of the term meaningless. *See supra* ¶ 30; *Muzak*, 1 N.Y.2d at 46. Further, Plaintiffs do not explain why "open market" means the same as "fair market value," or why that inapposite dictionary definition could overcome more than a century of judicial precedent.

35.     But, in any event, Plaintiffs' preferred dictionary definition does not help them: Black's defines "fair market value" to mean "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect." *Fair Market Value*, Black's Law Dictionary (11th ed. 2019). But

---

property is not sold on an open market where a number of buyers can establish its value, it will seldom be possible to contradict the first honest judgment formed.").

14

"supply and demand intersect" at a purchase *price*, and, indeed, the definition itself speaks of a "price" paid, as well as "the open market" through which that price is derived. In combination with the word "purchase," therefore, the definition of the words "fair market value" (to the extent relevant) confirms that the Agreement contemplates Serta's acquisition of first-lien loans for a sum certain; it does not capture consideration (priming) that only Serta is in a position to offer, and that is not set by an open market at the point where supply and demand intersect.

36.     In sum, the concept of an open market purchase requires that the price paid by the buyer reflects *standard* market terms, which must mean, at the very least, that the *nature* of the consideration offered by the "buyer" can be offered by any other market participant, and that the price is set by anonymous buyers and sellers. In the "open market" for corporate debt, a seller offers debt and a buyer offers cash; there are no other conditions. Priming liens were consideration only Serta could offer, and consideration it could only purport to offer *with* the consent of the Handpicked Lenders. The Exchange Transaction was a ***non***–open market purchase twice over.

## B.     The Structure Of The Credit Agreement Confirms Defendants' Interpretation Of The Term "Open Market Purchase"

37.     New York law is clear that "particular words [in a contract] should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *See Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009). Unlocking the meaning of contract terms requires "examin[ing] the entire contract." *William C. Atwater & Co. v. Panama R. Co.*, 246 N.Y. 519, 524 (1927); *see Riverside S. Planning Corp.*, 13 N.Y.3d at 404. In New York, "[t]he crucial principle of law in this regard is that contracts must be read as a whole and all terms of a contract must be harmonized whenever reasonably possible." *Madison Hudson Assocs. LLC v. Neumann*, 44 A.D.3d 473, 480 (N.Y. App.

Div. 1st Dep't 2007). Here, the structure of the Agreement as a whole confirms that the Exchange

Transaction cannot be understood as an "open market purchase."

> **1.      The Separate Provisions For Debt Exchanges Confirm That A Debt Exchange Is Not An "Open Market Purchase"**

38.      In portions of the Agreement that Plaintiffs actively ignore, the parties specifically

provide Serta with mechanisms to replace, restructure, or increase the principal amount of the First

Lien Loans through an "exchange"—but subject to prescribed conditions including, critically, that

any new debt issued has to "rank ***pari passu or junior*** to any then-existing Class of Term Loans."

*See* Section 2.22(a)(x); Section 9.02(c). Those provisions further confirm that an exchange is not

an "open market purchase," because under New York law, a contract must be construed in a

manner which gives effect to each and every part, so as not to render any provision "meaningless

or without force or effect." *Ronnen v. Ajax Elec. Motor Corp.,* 88 N.Y.2d 582, 589 (1996). And

accepting Plaintiffs' definition of the term "open market purchase" to capture any debt exchange,

including those debt exchanges that fail to abide by the Agreement's conditions on exchanges,

would flout those cardinal principles of New York law.

39.      The Agreement specifies in Section 9.02(b) that it may not be amended except in

specified circumstances. Section 9.02(c) specifies one of those circumstances: If Serta engages in

a debt restructuring or an exchange of First Lien Loans for newly issued debt, which is defined as

a "Replacement Term Loan," only the "written consent" of the "relevant Borrower and the

Lenders" providing "the relevant Replacement Term Loans" is needed. However, any such

exchange is subject to a non-subordination condition:

> Any Class of Replacement Term Loans may be *pari passu* with or junior to any
> then-existing Class of Term Loans in right of payment and may be *pari passu*
> with or junior to such Class of Term Loans with respect to the Collateral or
> unsecured[.]

Agreement, § 9.02(c)(i)(C).

40.     Moreover, for the issuance of new debt, Section 2.22(a)(x)(A) of the Agreement contains a similar restriction on subordination:

> [A]ny Incremental Term Facility . . . may rank *pari passu* with or junior to any then-existing Class of Term loans . . . in right of payment and/or security . . . or may be unsecured (and to the extent the relevant Incremental Facility is secured, it shall be subject to an Acceptable Intercreditor Agreement)[.]

41.     Thus, neither Section 2.22 nor Section 9.02(c), nor any other part of the Agreement, requires the unanimous consent of the existing lenders for the issuance of incremental or replacement loans, but both provisions impose as a condition on any exchange transaction that the new loans be *pari passu* with or junior to the First Lien Loans. That constraint is why Serta and the Handpicked Lenders chose not to engage in a transaction under Section 2.22 or Section 9.02(c), and why they now seek to push through the square peg of a non-conforming exchange transaction through the round hole of an "open market purchase."

42.     Their gambit does not work for three reasons. *First*, Plaintiffs' approach flouts the hornbook New York rule rejecting contractual interpretations that render any term or portions superfluous. *See Lawyers' Fund for Client Protection of State of N.Y. v. Bank Leumi Tr. Co. of N.Y.*, 94 N.Y.2d 398, 404 (2000); *Cornhill Corp. v. S.S. Plants, Inc.*, 9 N.Y.2d 595, 599 (1961) ("[W]ere we to sustain defendant's interpretation of this [contract] [an] express provision . . . would be rendered entirely meaningless, and this we may not do."). The Agreement includes specific provisions governing debt exchanges. It is nonsensical to read the "open market purchase" provision as a giant loophole permitting debt "exchanges" that fail to abide by the contractual limits upon exchanges. Said differently, accepting Plaintiffs' interpretation of the word "open market purchase" in Section 9.05 renders Section 2.22(a)(x) and Section 9.02(c) dead letters. That also violates the precept that "[c]ourts may not, through their interpretation of a contract, . . . excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract

17

under the guise of interpreting the parties' own agreements." *Nomura Home Equity Loan, Inc.,*
*Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 30 N.Y.3d 572, 581 (2017).

43.     *Second*, Plaintiffs' approach ignores the precept that the specific must govern over
the general. "New York . . . follows the common (and commonsensical) rule that a specific
provision . . . governs the circumstance to which it is directed, even in the face of a more general
provision[.]" *Cap. Ventures Int'l v. Republic of Argentina*, 652 F.3d 266, 271 (2d Cir. 2011). There
are specific provisions governing exchange transactions, and they specify numerous conditions to
the sorts of exchanges that the Agreement permits. Even if the term "open market purchase" could
be read to encompass a privately negotiated exchange, "the more specific clause [would] control[]
the more general." *Israel v. Chabra*, 12 N.Y.3d 158, 168 n.3 (2009) (citing 11 Lord, Williston on
Contracts § 32:15, at 507–510 (4th ed.)); *Muzak Corp.*, 1 N.Y.2d at 46 ("Even if there was an
inconsistency between a specific provision and a general provision of a contract (we find none),
the specific provision controls.").

44.     *Capital Ventures* itself is instructive. There, Argentina sought to justify a debt
exchange by reference to a general provision of the relevant collateral agreement; the Second
Circuit rejected the argument, observing that a different section of the agreement "govern[ed]"
exchanges, and Argentina was bound by its strictures. 652 F.3d at 270–72.

45.     Similarly, here, it makes no sense to read the term "open market purchase" to
encompass exchanges when there are specific provisions that govern the conditions under which
an exchange or the issuance of new debt may take place. Serta's preferred interpretation of the
contract elevates the general over the specific, rendering those specific provisions superfluous—
making it an unsupportable interpretation. *See Lawyers' Fund*, 94 N.Y.2d at 404.

46.     By contrast to Plaintiffs' unsupportable reading, the LCM Defendants' reading "harmonizes" the Agreement's various provisions. *Madison Hudson*, 44 A.D.3d at 480. Serta could use the "open market purchase" provision to buy individual loans on the secondary loan market in order to retire them—as set forth in Section 9.05(g). It could also engage in a non-subordinating debt exchange without the consent of all lenders under Sections 2.22 and 9.02. What it could not do is eviscerate the limits on exchanges in the Agreement by improperly branding its exchange an open market purchase, thus making those limitations a dead letter. *See also Matter of Lipper Holdings v. Trident Holdings*, 1 A.D.3d 170, 171 (N.Y. App. Div. 1st Dep't 2003) (internal citation omitted) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.").

47.     *Third*, the use of the two different concepts, purchases and exchanges, in the same contract confirms the distinction under New York law between the two kinds of transactions. As noted previously, *supra* ¶ 29, New York law already gives the term "purchase" a meaning distinct from the concept of an exchange; New York law further instructs that, when a contract uses different terms or concepts in the same contract, that implies they have different meaning. *NFL Enterprises LLC v. Comcast Cable Communications*, 51 A.D.3d 52, 61 (N.Y. App. Div. 1st Dep't 2008) (giving different meaning to "distribution" and "dividend" and explaining, "[t]he use of different terms in the same agreement strongly implies that the words are to be accorded different meanings." (citing *Frank B. Hall & Co. v Orient Overseas Associates*, 48 N.Y.2d 958 (1979)). That is demonstrably the case here; the parties to the Agreement permitted Serta to engage in an exchange of First Lien Loans for incremental or replacement loans *pari passu* with or junior to those First Lien Loans, and it makes no sense to read the word "purchase" to encompass exchanges.

19

2.     **The Term "Open Market Purchase" Should Be Read In Context, And In Light Of Section 9.05(g)'s Purpose**

48.     The context in which the phrase "open market purchase" appears within Section 9.05 also requires rejecting Plaintiffs' definition of the term. Section 9.05 begins in subsection (a) by specifying the general rule that Serta may not acquire loans from First Lien Lenders, and it then enumerates exceptions to this general rule. Agreement, §§ 9.05(b)–(g). Section 9.05(g), the last of the exceptions, states that Serta or certain of its affiliates may, subject to the conditions therein, acquire loans from First Lien Lenders "on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases." *Id.* § 9.05(g). Among the conditions placed upon acquisitions made under Section 9.05(g) is that "any Term Loans acquired by Holdings, the Top Borrower or any of its Restricted Subsidiaries shall, to the extent permitted by applicable Requirements of Law, be retired and cancelled immediately upon the acquisition thereof." *Id.* § 9.05(g)(i). Moreover, although the term "open market purchase" is undefined, the Agreement specifies in Schedule 1.01(g) specific procedures that must be followed in a "Dutch Auction," including the notice and acceptance procedures.

49.     This context again shows that the provision for "open market purchases" covers only acquisitions for a market-based cash consideration made solely to retire portions of the debt— *i.e.*, cash purchases on the anonymized secondary market—and not bespoke debt exchanges.

50.     *First*, given their juxtaposition, the undefined term "open market purchase" should be considered alongside the provision for "Dutch Auctions," consistent with "the familiar principle of *noscitur a sociis*," according to which a term in a contract "must be read and considered in relation to [where] it is . . . grouped." *Harris v. Allstate Ins. Co.*, 309 N.Y. 72, 76 (1955). Plaintiffs argue that the Agreement's Dutch auction procedure provides that it must be "'open to all

Lenders," and that it follows that "not so specifying for 'open market purchases' means that the latter need not be open to all lenders." Lenders' MSJ at 15.

51.    This argument misses the mark. The LCM Defendants do not allege the debt exchange would have qualified as an open market purchase if it had been offered to all lenders; the LCM Defendants assert that a debt exchange like the Exchange Transaction is not an "open market purchase" because it is not a purchase of debt for a sum of money at a price set extrinsically by a secondary market.

52.    And the *noscitur a sociis* principle supports Defendants' view. If the "open market" price is not used to repurchase loans, and if Serta wishes to purchase its loans back for the purpose of retiring them, then Serta must follow the prescribed "Dutch Auction" procedure.[7] In such an auction, Serta would, among other things, "specify the discount to par . . . that represents the range of purchase prices that [Serta] would be willing to accept," lenders would make a bid in response, and there is a procedure for determining the price at which the "purchase" is made. Agreement, Schedule 1.01(b)(a)

53.    This context reinforces the point that both Dutch auctions and "open market purchases" entail transactions in which Serta buys its loans for cash. If effectuated by the open market purchase mechanism, then the secondary-market price is used. But the transaction remains a cash purchase. *Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC*, 549 F. Supp. 2d 249, 273 (E.D.N.Y. 2008) ("Under the traditional canon of . . . contract construction, *noscitur a sociis*, 'a

---

[7] "At a Dutch auction, buy orders are filled starting with the lowest rate bid until all the securities offered for sale are matched with purchase orders. The rate at which the final sell order is filled is known as the 'clearing rate,' and the clearing rate applies to all outstanding ARS in that issue until the next Dutch auction." *Louisiana Stadium & Exposition Dist. v. Fin. Guar. Ins. Co.*, 701 F.3d 39, 42 (2d Cir. 2012).

word is known by the company it keeps.'" (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)).

54.     *Second*, the canon against surplusage further drives this point home. According to Plaintiffs, an "open market purchase" is *any* transaction negotiated at arms' length between Serta and lenders. But if that is true, then the term "open market purchase" would itself permit Dutch auctions, including Dutch auctions that do not follow the means prescribed in the contract for completing them. There would then be no need to separately provide for Dutch auctions, let alone to prescribe in a three-page schedule of single-spaced text the specific procedures that Serta would need to follow. Similarly, a definition of "open market purchase" that encompasses any transactions between a willing seller and Serta renders a nullity the general prohibition on repurchases set forth in Section 9.05. As earlier explained, New York law rejects contract interpretations that render any portion of a contract surplusage, and instead requires contract provisions to be harmonized; Plaintiffs' approach to contract interpretation fails to pass these bedrock requirements of New York law. *See supra* ¶¶ 30, 34, 38, 42.

55.     *Third*, as is plain, the purpose behind Section 9.05(g) and the "open market purchase" provision is to allow borrowers to capture discounts in the market for their debt if they have sufficient liquidity to do so, thus permitting the retirement of some portion of the debt at a discount. *See* Section 9.05(g)(i) ("any Term Loans acquired [by the foregoing provisions, such as through an "open market purchase"] shall, to the extent permitted by applicable Requirements of Law, be retired and cancelled immediately upon the acquisition thereof."). It is not intended to, nor does it permit, exchanges for newly issued super-priority debt.

56.     In that regard, the Court may consider ordinary industry usage and custom to confirm this unambiguous meaning and purpose of Section 9.05(g). *See, e.g.*, *Global Reins. Corp.*

*of Amer. v. Century Indem. Co.*, 442 F. Supp. 3d 576, 590 (S.D.N.Y. 2020) ("This textual interpretation is confirmed by the credible expert testimony regarding the relevant industry custom and practice."); *Beazley Ins. Co., Inc. v. ACE Amer. Ins. Co.*, 197 F. Supp. 3d 616, 623-24 (S.D.N.Y. 2016) ("Custom and usage . . . establishes that" the term at issue was "unambiguous[].").

57.     As the LCM Defendants' expert, Wharton Professor Vincent Buccola, explains, the "open market purchase" exception to the general prohibition on debtor repurchases of their loans arose during the 2008 financial crisis, and was often paired alongside the Dutch auction exception, as it is in Section 9.05(g). Buccola Decl., ¶¶ 7, 9, 21–22. As the contractual text instructs, both exceptions were designed to permit borrowers to retire their debt at a discount; at the time, loans were trading at depressed prices, and "borrowers (and their sponsor affiliates) thought their loans were cheap and [wanted] to retire the debt much as bond issuers typically are permitted to do." *Id.*, ¶ 20. Thus, "open market purchase" (and Dutch auction) provisions arose in credit agreements "to allow borrowers and their affiliates to provide secondary market liquidity for underpriced loans [.]" *Id.*, ¶ 9.

58.     Moreover, borrowers who seek to repurchase their own debt typically do so through an "dealer-mediated" process. Buccola Decl., ¶ 27, 29; *see also* Tavangar Decl., ¶ 5. Indeed, debt buybacks such as these are designed to occur on secondary markets. Buccola Decl., ¶ 9 ("The open market purchase exception . . . was designed to allow borrowers and their affiliates to provide secondary market liquidity[.]"). Thus, the open market purchase provision contemplates a borrower buying back its debt at a price set by a market—just as any other secondary-market participant might.

59.     Here, however, Serta was not seeking to use excess cash to retire debt at a discount based on beneficial market conditions; it was suffering a liquidity crisis, and offered new super-

23

priority debt in an exchange for old debt and liquidity. Reading the "open market purchase" provision to allow such a transaction flouts the principle of New York law that "a contract should be construed in light of its objective, and should not be read in a fashion that defeats its purpose." *Lee v. Marvel Enterprises, Inc.*, 386 F. Supp. 2d 235, 244 (S.D.N.Y. 2005) (applying New York law). Holding that Section 9.05(g) unambiguously permits the Exchange Transaction would "interfere with, and ignore, the parties' intent, contrary to the basic tenets of contract interpretation," and that reading should be rejected. *Ministers & Missionaries Ben. Bd. v. Snow*, 26 N.Y.3d 466, 475 (2015).

### C. Lender Plaintiffs' Throwaway Ratification Argument Makes No Sense

60.     The Lender Plaintiffs suggest that the Handpicked Lenders' vote to amend the Credit Agreement "ratified" the argument that debt-for-debt exchanges qualify as "open market purchases." Lenders' MSJ at 21-23. This makes no sense. "Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding." *In re Ampal-Am. Israel Corp.*, 2023 WL 1094593, at *11 (Bankr. S.D.N.Y. Jan. 27, 2023). Said differently, it requires affirmative acts by the party ***opposing*** the challenged conduct. *RLI Ins. Co. v. Athan Contracting Corp.*, 667 F. Supp. 2d 229, 235 (E.D.N.Y. 2009) ("Ratification is the express or implied adoption, *i.e.* recognition and approval, of the unauthorized acts of another.").

61.     There has of course never been "recognition and approval" by the LCM Defendants or any of the Disfavored Lenders. ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

Meanwhile, the LCM Defendants have consistently engaged in litigation challenging the Exchange Transaction and disputing that there has been an "open market purchase." The Handpicked Lenders do not speak for the LCM Defendants, and nothing they have done could ratify their own

misconduct. Their arguments to the contrary are simply misbegotten. *Compare* Lenders' MSJ at 21, 23 ("The Company and a majority of the lenders" "consented to the debt-for-debt exchange" and thereby "ratified" Plaintiffs' definition).

*       *       *

62.     As Plaintiffs admit, in this case there was a "debt-for-debt ***exchange***." Lenders' MSJ ¶ 22; Serta MSJ at 3, 4, 5, 8 (emphasis added). That is not a "purchase," still less an "open market purchase." Rather than buy loans for a sum of money at a price determined on the secondary market for corporate loans, Serta issued new "super-priority loans." For its part, the Handpicked Lenders were the ones who paid money (to the tune of $200 million), in addition to (a) turning in their First and Second Lien Loans and (b) undertaking to amend the Agreement in a way that disadvantaged the First Lien Lenders. This is an exchange, not an open market *purchase*, and no amount of linguistic contortion can alter the plain meaning of the Agreement. *Cf.* Serta MSJ at 18 ("[T]he Company purchased debt from existing Lenders in exchange for newly issued debt[.]").

63.     There is simply no doubt that under the Agreement, a debt-for-debt exchange is not an "open market purchase" within the ambit of Section 9.05(g). If Plaintiffs wanted to pursue an exchange, they needed to abide by the terms set forth in the Agreement for consummating exchanges, including the prohibition on subordination. Serta and the Handpicked Lenders' attempt to shoehorn their extraordinarily elaborate transaction into the single (and inapt) term "open market purchase" makes a mockery of the parties' Agreement. The Court should deny Plaintiffs' motion for summary judgment on this claim and, because the Exchange Transaction is not an "open market purchase," the Court should enter summary judgment in favor of Defendants on this claim instead. *See KFC Corp. v. Iron Horse of Metairie Rd., LLC,* 2019 WL 13225874, at *7 (E.D. La. June 7, 2019) (citing *Atkins v. Salazar*, 677 F.3d 667, 681 (5th Cir. 2011)).

II.     **IN THE ALTERNATIVE, THE COURT SHOULD DENY THE MOTION BECAUSE THE TERM "OPEN MARKET PURCHASE" IS AMBIGUOUS**

A.     **Extrinsic Evidence Supports The LCM Defendants' Interpretation**

64.     Under New York law, a contract is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (applying New York law). The LCM Defendants' position is that the term "open market purchase" unambiguously excludes the sort of exchange carried out here. Alternatively, and at best for Plaintiffs, the term is ambiguous, and that ambiguity precludes summary judgment. Indeed, that is the settled law in New York and in this Circuit, and the Lender Plaintiffs' suggestion in a footnote to the contrary (*see* Lenders' MSJ n.10) is without authority and invites legal error. *Tekelec, Inc. v. Verint Sys., Inc.*, 708 F.3d 658, 664 (5th Cir. 2013) ("If a contract's terms are ambiguous, summary judgment is generally inappropriate.").

65.     There is ample extrinsic evidence supporting the LCM Defendants' interpretation of the term "open market purchase" and showing that, at best for the Plaintiffs, the term is ambiguous. To start, consider what Serta's lawyers at Weil told the marketplace back in 2009:

> An ***open market purchase is accomplished through a broker or agent and requires the purchaser to pay a set market price***. Normally, the parties involved in an open market purchase are not aware of one another's identity. ***Conversely, in a privately negotiated purchase, the buyer*** (acting directly or through an agent) ***would approach individuals or groups*** (usually sophisticated, institutional sellers) that own large percentages of the portfolio company's debt securities and purchase the debt securities for a negotiated price.[8]

(emphases added). Industry guidance from other sophisticated law firms was in accord until the Serta transaction; open market purchases are cash acquisitions on the secondary market for

---

[8] Glenn D. West, *et al.*, *Private Equity Alert: De-levering Portfolio Companies Through Debt Buybacks—US and UK Perspectives* (Weil Gotshal & Manges) (Mar. 2009), *available at* https://www.weil.com/~/media/files/pdfs/Private_Equity_Alert_March_2009.pdf

corporate loans.[9] If Plaintiffs' definition is deemed reasonable, then such widespread guidance from industry participants is plainly enough to conclude, at best for Plaintiffs, that the term is ambiguous.

66.    Recognizing the reality that Serta's counsel previously issued industry guidance contrary to Plaintiffs' litigation position, the Handpicked Lenders try to anticipate the point with a hodge-podge of law-firm strategy memos and treatises, but at best these create a dispute of fact; regardless, they in fact do not help Plaintiffs. Thus, the March 2020 King & Spalding client alert (Lenders' MSJ, Ex. 8) expressly states that an "open market purchase" occurs when a lender "***sell[s]*** its term loans to the Borrower at a discount to par" (Ex. 8 at 2 (emphasis added)), which is Defendants' interpretation. Similarly, the Cravath, Swaine & Moore memorandum (*id.*, Ex. 9) advises, again, that an "open market purchase" is done on the "secondary market" and consists of a "purchase." Ex. 9 at 1-2. The other law firm memos are even worse for Plaintiffs—Davis Polk & Wardwell advised in the summer of 2020, *after* the Exchange Transaction (*id.*, Ex. 10), that uptiering deals "frustrate traditional expectations of loan market participants." The 2013 primer published by Wachtell Lipton Rosen & Katz, which is over 200 pages long and focuses on

---

[9] *See, e.g.*, Edward F. Greene, *et al.*, *U.S. Regulation of International Securities and Derivatives Markets* (Cleary Gottlieb), *available at* https://www.clearygottlieb.com/-/media/files/isdm-12th-edition/13-chapter-9-pdf ("Open market purchase programs are typically implemented by the acquiring party (most commonly the issuer) giving instructions to a broker-dealer to purchase a limited amount of debt securities at prevailing market prices in accordance with stipulated procedures and limits.  The broker will typically post bids on a screen based trading system . . . . Other than posting bids, the broker's role in an open market program is necessarily passive and such programs typically result in relatively small purchases (less than 25%) of the outstanding debt of the target series."); Edward S. Best, *et al.*, *Structuring Liability Management Transactions* (Mayer Brown), *available at* https://www.iflr.com/pdfsiflr/ IFLR_LiabilityMan2018RSA.pdf (distinguishing "open market purchases" from tender offers: "open market repurchases will provide only selective or limited relief for the issuer," while "[a] tender . . . may be necessary to retire all or a significant portion of a class of outstanding securities").

distressed M&A (*id.*, at Ex. 11), **differentiates** between an "open market purchase" and a "debt-for-debt exchange." (*compare* Ex. 11 at 21 *with* Ex. 11 at 23). And finally, the 2017 LSTA treatise explains that an "open market purchase" contemplates a "repurchase" of "loans up to a pre-agreed dollar amount." Lenders' MSJ, Ex. 12 at 642. Not one of these memos sanctions the view that the concept unambiguously captures a debt exchange, let alone of the sort at issue in this case.

████████████████████████████████

68.     And the expert evidence further supports the point. Professor Buccola opines that the open market exception "is best understood as a purchase effected via a non-auction process that is calibrated to match buyers and sellers according to their willingness to buy and sell the loan, respectively, as determined by a universal criterion of value such as dollars." Buccola Decl., ¶ 35. Such a definition, he explains, is the only one that is consistent with how loans regularly trade for a sum certain on dealer-mediated exchanges; Serta's definition, on the other hand, is so expansive as to "swallow the general rule prohibiting borrower repurchases." *Id.*, ¶ 31. He also observes that this definition is the only one that gives substantive meaning to the *pro rata* sharing provisions in standard credit agreements. *Id.*, ¶ 32. As such, the Exchange Transaction "did not involve open market purchases[.]" *Id.*, ¶ 39.

**B.      Judge Failla's Decision Further Precludes Summary Judgment for Plaintiffs**

69.     Further precluding summary judgment for Plaintiffs on the meaning of "open market purchase" is the precept that "courts tend to adhere to earlier rulings by other courts";

"indeed, there is at least a hint of special deference that arises from comity, the desire to deter strategic changes of court to reargue lost positions, and the need to avoid protracted jurisdictional disputes." Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4478.4 (3d ed.).

70.     After over sixty pages of briefing, Judge Failla declined to dismiss the LCM Defendants' complaint. Serta urged dismissal of the LCM Defendants' complaint as a matter of law based on the same arguments that it now advances. *Compare* Serta MSJ at 20 ("open market" means "arms-length" deal) *with* Lieberman Decl., Ex. 2 at 13 ("open market" means "arms-length negotiation"). Serta cited the very same dictionary definitions, *supra* ¶¶ 34-35, but was rebuffed. *LCM XXII Ltd.*, 2022 WL 953109, at *7 ("The court cannot agree [with] Defendant's definition of open market, which equates the term with fair market value."). Instead, Judge Failla ruled that "the term 'open market purchase' . . . admit[s] of ambiguity in the context of the Agreement," and therefore declined to rule "that Section 9.05(g) clearly authorized the Transaction." *Id.* at *15.

71.     Although this ruling was made on a Rule 12(b)(6) posture, it would be untoward to award summary judgment on precisely the same question, based on identical factual assumptions, in a case between the same parties, brought after the fact through a declaratory-judgment action in bankruptcy court. *See In re Pilgrim's Pride Corp.,* 2012 WL 3260260 n.19 (Bankr. N.D. Tex. Aug. 8, 2012) (agreeing with prior federal district court decision on same issue); *see also In re Cragar Indus., Inc.*, 706 F.2d 503, 505 (5th Cir. 1983) ("Failure to abide the original transfer order contains the . . . potential mischief of tossing cases back and forth to the detriment of an adjudication of the underlying merits of the case and respect due sister courts.").

72.     In sum, if the Court concludes that the term "open market purchase" does not unambiguously exclude the Exchange Transaction, it should hold that this is still a reasonable

interpretation of the term in light of the words used in the Agreement and the extrinsic evidence. As the meaning of the term would then be a fact question, the Court should deny the Motions for Summary Judgment on this claim.

### III. PLAINTIFFS FAIL TO ESTABLISH THEIR ENTITLEMENT TO RELIEF ON THE IMPLIED-COVENANT CLAIM

#### A. The Disfavored Lenders Were Deprived Of The "Fruits Of The Contract"

73.     Under New York law, every contract contains an implied covenant of good faith and fair dealing, which contemplates that "'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (quoting *Kirk La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87 (1933)). Put otherwise, "the undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promise would be justified in understanding were included." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978); *see also Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 632 (S.D.N.Y. 2010) ("[A]n end-run [around contractual terms], if not a downright sham, is not permissible if, as here, it does away with the 'fruits' of the contract."); *In re LightSquared Inc.*, 511 B.R. 253, 333 (Bankr. S.D.N.Y. 2014) (noting that *Empresas* "found that conduct technically permissible under a credit agreement may nevertheless give rise to a breach of the implied covenant of good faith and fair dealing if it is intended to achieve a result that is prohibited").

74.     In this case, Plaintiffs abused their contract rights by jettisoning the Disfavored Lenders' *pro rata* rights and stripping the value of the Disfavored Lenders' so-called first-priority liens and rights to payment. That fact is much harder to dispute now that a reorganization plan proposes to give its "first-lien lenders" as little as 1% of the equity in the reorganized entity. On their motions, Plaintiffs have failed to establish their entitlement to relief as a matter of law.

75.     Plaintiffs' chief defense is that, according to them, they could engage in the Exchange Transaction and were entitled to make amendments to the Agreement with only a bare majority. If they are correct that the Exchange Transaction counts as an "open market purchase," then that conduct still amounts to an abuse of their contract rights. Serta could have achieved its goal of decreasing leverage and increasing liquidity by offering the Exchange Transaction to all first-lien holders. Instead, it engaged in furtive negotiations with a select group of Handpicked Lenders—including lenders who held only *second*-lien debt—to purportedly achieve the same end.

76.     Moreover, to the extent the Agreement could be amended by a simple majority to allow for subordination of the First Lien Loans, there was plainly an abuse of the amendment right. That is so for two related reasons. *First*, the Handpicked Lenders effectively sold their consent, and in exchange for their approval of the amendment, they obtained a benefit that was not shared equally by all First Lien Lenders (namely, they became super-priority lenders). *Second*, although the Handpicked Lenders consented to change the Agreement to allow the issuance of super-priority loans, they did so only on the condition that the changes would *not* apply to them; it became effective only once they stopped being First Lien Lenders and the Exchange Transaction was consummated. In other words, if the Agreement does allow a bare majority of the First Lien Lenders to change the capital structure and permit Serta to issue new *super-priority* loans, those changes cannot be made in a way that adversely affects only non-consenting first-lien lenders.

77.     New York law is clear that this sort of conduct is actionable as a breach of the implied covenant. "[E]xplicit[] . . . right[s] cannot be exercised *in bad faith* so as to deprive the other party of the benefit of the bargain." *Shatz v. Chertok*, 180 A.D.3d 609, 610 (N.Y. App. Div. 1st Dep't 2020) (emphasis added). That principle is well illustrated in *Richbell Info. Servs. v. Jupiter Partners*, 309 A.D.2d 288 (N.Y. App. Div. 1st Dep't 2003), in which the Appellate

Division held that notwithstanding the "apparently unfettered" contractual right of the majority partners in a joint venture to veto a particular transaction, "even where one has an apparently unlimited right under the contract, that right may not be exercised *solely for personal gain* in such a way as to deprive the party of the fruits of the contract." *Id.* at 302 (emphasis added).

78.     That is precisely what happened here: solely for the personal gain of Serta and the Handpicked Lenders, they took a scalpel to the Agreement, transformed it into a nearly worthless piece of paper, then abandoned it, so that Serta could de-lever its balance sheet and the Handpicked Lenders could jump the line.

79.     Judge Failla correctly assessed the situation when she upheld the implied covenant claim in the LCM Action. "[T]he economic reality of the Transaction suggests an intent to harm a subset of first-lien lenders by subordinating their debt," the court explained, and the LCM Defendants "adequately alleged that [Serta] deprived them of the benefit of their bargain in bad faith" in breach of the implied covenant. *LCM XXII Ltd.*, 2022 WL 953109, at *15–16. Serta improperly "offer[ed] the [super-priority loans] to only a subset of first lien lenders, rather than to all of them on a *pro rata* basis," and "colluded with a bare majority of lenders to abuse its power to amend the Agreement, which maneuver was barred by the previous terms of the Agreement." *Id.* at *16.

80.     In short, *even if* Serta had unlimited rights under the Agreement to consummate the Exchange Transaction (which it did not), it was still a gross abuse of those rights to secretly engineer the Exchange Transaction, *de facto* stripping the liens of the first-lien lenders and allowing *second*-lien lenders to jump ahead, all in service of a de-levering exercise that Serta *could* have lawfully undertaken. Given Judge Failla's ruling and the indisputable facts regarding the nature of the Exchange Transaction, the Court should reject the motion for summary judgment on

the implied-covenant claim out of hand. *See* Wright & Miller, § 4478.4 (3d ed.); *supra* at ¶¶ 69-72.

**B.    Plaintiffs' "Transparent Process" Defense Fails**

81.    Plaintiffs say that the Exchange Transaction emerged from a "transparent bidding process in which many of the Defendants fully participated, such that the Company negotiated with more than two-thirds of its lenders." Lenders' MSJ at 27; Serta MSJ at 19 (Serta "undertook a robust, competitive process to find the best deal possible for the Company.").

82.    Plaintiffs' characterization is inaccurate, and inapt. The LCM Defendants were never invited to the discussions, and were also never offered to join the Exchange Transaction before or after it was announced. Moreover, the means by which Plaintiffs arrived at the Exchange Transaction are irrelevant if the ends were unlawful. In that respect, it is no defense that other lenders proposed a different collateral-stripping transaction. Lenders' MSJ ¶¶ 65–67; Serta MSJ at 7–8.

83.    It is particularly rich for the Handpicked Lenders to credit Serta for having negotiated with "more than two-thirds of its lenders" when the linchpin of the Exchange Transaction was getting exactly 50.1% participation. Indeed, the value of the Handpicked Lenders' new priming liens was based on limiting participation in the new super-priority tranche, and it was inversely proportional to participating lenders; the economics of the Exchange Transaction only worked because it left behind the Disfavored Lenders—and it behooved Serta and the Handpicked Lenders to leave behind as many Disfavored Lenders as possible.

84.    To be sure, the Exchange Transaction did not literally strip the Disfavored Lenders' liens. ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ the

Disfavored Lenders, who putatively retain *pari passu* rights in the collateral but are junior in right

of payment, are now set to receive up to 99% less equity in the reorganized entity than the

Handpicked Lenders (and not a single cent in repayment of their loans).

### C.     Plaintiffs' "Duplicative Claim" Defense Fails

85.     Plaintiffs also argue that the implied-covenant claim cannot survive because it is

impermissibly "duplicative" of the breach-of-contract claim. Lenders' MSJ at 25; Serta MSJ at 27.

Not so. "[A] claim for breach of contract does not preclude a party from bringing a claim for breach

of the implied covenant of good faith and fair dealing when they are brought in the alternative,"

because the law only precludes a party "from recovering on both theories at the same time."

*Fantozzi v. Axsys Techs.*, Inc., 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008). Thus, "a single

claim for recovery in the form of a breach of contract claim, [with a] theory of breach of the implied

covenant of good faith and fair dealing in the alternative, [is] permissible." *In re LightSquared* 511

B.R. at 333 n.119.

86.     The LCM Defendants' claim for breach of the implied covenant fits foursquare

within this case law. The LCM Defendants have always sought a single recovery, with breach of

contract serving as one claim, and breach of the implied covenant pleaded ***in the alternative***. As

Judge Failla ruled, "Plaintiffs' pursuit of an implied-covenant claim is contingent on the Court's

determination that the Transaction and Amendments did not violate the express terms of the

Agreement" and therefore the court "d[id] not perceive there to be a risk of redundant recoveries."

*LCM XXII Ltd.*, 2022 WL 953109, at *15. Judge Failla was plainly correct—the LCM Defendants

have pursued the implied-covenant claim as an alternative to the breach of contract claim (*i.e.*, if

the Court were to find that the Exchange Transaction did not violate the Agreement). Judge Failla's

decision was no outlier, either—courts have routinely allowed implied-covenant claims to survive

in analogous situations. *See, e.g.*, Lieberman Decl., Ex. 6 (Transcript in *Octagon Credit Investors, LLC v. NYDJ Apparel LLC*, Index No. 656677/2017 (N.Y. Sup. Ct. 2017), Dkt. No. 91) at 35:8-20, 43:6-7.

**D.    The Ability To Participate In The Exchange Transaction Depended On Arbitrary Considerations**







93. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████. They had no warrant to capriciously cobble

together a group that would sum to almost exactly 50.1% of the outstanding first- and second-lien

loans so as to destroy the bargained-for rights of the Disfavored Lenders by using those Disfavored

Lenders' drop in the capital structure as consideration for their club deal.

94. ██████████████████████████████████████████████████

███████████████████████████████████████████████, the

Court cannot grant summary judgment to the Plaintiffs on their claim for a declaration that the

Exchange Transaction did not violate the implied covenant of good faith and fair dealing. As Judge

Failla held, "one could reasonably conclude from [the LCM Defendants'] allegations that [Serta]

systematically combed through the Agreement tweaking every provision that seemingly prevented

it from issuing a senior tranche of debt, thereby transforming a previously impermissible

transaction into a permissible one." *LCM XXII Ltd.*, 2022 WL 953109, at *15. That is not just a

"reasonable" conclusion, but the most logical conclusion—and a fuller record will bear it out.

### E.  Summary Judgment Is Inappropriate Because Discovery Has Not Concluded

95.    As the Court noted at the January 27, 2023 hearing regarding the motion to extend

the stay, claims for violating the implied covenant inevitably raise questions of fact; they go to the

intent and conduct of the parties engaged in the alleged misconduct and require detailed

exploration of those parties' motivations. Lieberman Decl., Ex. 21 at 11:7–10; 26:8–11. That is

exactly right, and it is another reason why summary judgment is inappropriate on Plaintiffs'

implied-covenant claim—discovery never concluded.

96.    Document discovery in the LCM Action, while substantially complete, had not

concluded. To take but a few examples: the Handpicked Lenders never provided a privilege log to

permit the LCM Defendants to assess their privilege claims—which is particularly relevant where, as here, Gibson Dunn did not in fact represent *all* the Handpicked Lenders as the transaction moved toward closing, and there are serious questions about whether it was appropriate to assert privilege on behalf of parties they may have never represented. Furthermore, counsel for Advent, having agreed with the LCM Defendants several months before that it would produce responsive documents through July 15, 2020, arbitrarily decided at the eleventh hour—January 13, 2023—to withhold documents post-dating the close of the transaction, erroneously claiming they were simply following what "the other parties producing in the litigation had done[.]" Lieberman Decl., Ex. 22 at 1. But this dispute was never resolved before the automatic stay took effect.

97.     Moreover, the LCM Defendants never had the opportunity to depose the key architects of the Exchange Transaction, including Serta's advisors at Evercore, the Handpicked Lenders' advisors at Centerview, and representatives of Serta's principal private-equity sponsor, Advent. Their testimony would bear directly on why they believed they were acting in good faith when they nonetheless elected to pursue a transaction in which the principal bargaining chip was the evisceration of the Disfavored Lenders' bargained-for contractual rights. Indeed, the LCM Defendants never had the opportunity to take *any* depositions.

98.     Assuming *arguendo* that the outstanding issues outlined above could be decided at summary judgment (and they cannot), it would be premature to grant summary judgment on an implied-covenant claim in this posture. *See* Fed. R. Civ. P. 56(d); *Brown v. Miss. Valley State Univ.*, 311 F.3d 328, 332 (5th Cir. 2002) (vacating grant of summary judgment because nonmoving party had not been permitted to depose individuals with knowledge of the claims at issue); *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 995 (5th Cir. 2019) (similar); *see also Highbridge Dev. BR, LLC v. Diamond Dev., LLC*, 67 A.D. 3d 1112, 1115 (N.Y. App. Div. 3d Dep't 2009)

(reversing grant of summary judgment to plaintiff and remanding for reconsideration of defendants' counterclaim for violating the implied covenant).

99.     As explained in the Declaration of Neil Lieberman filed herewith, the LCM Defendants' opposition is necessarily limited to the documentary evidence in their possession. *See* Lieberman Decl., ¶¶ 7–10. The LCM Defendants were excluded from the Exchange Transaction, and they lack first-hand knowledge about the back-room deal struck among the Plaintiffs (or even the larger process that they claim is relevant). It would be—at the very least—premature for the Court to grant summary judgment on the implied-covenant claim without allowing Defendants to obtain depositions.

## CONCLUSION

100.     The Court should deny Plaintiffs' Motions for Summary Judgment, and enter summary judgment in favor of Defendants on the claim that the Exchange Transaction was permitted under the Agreement as an "open market purchase" pursuant to Section 9.05(g) of the Agreement; and the Court should deny Plaintiffs' Motions for Summary Judgment on the claim that the Exchange Agreement did not violate New York's implied covenant of good faith and fair dealing.

Dated: March 16, 2023
Houston, Texas

**McKool Smith, PC**

*/s/ John J. Sparacino*
John J. Sparacino (SBN 18873700)
S. Margie Venus (SBN 20545900)
Regan S. Jones (SBN 24110060)
600 Travis Street, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile (713) 485-7344
jsparacino@mckoolsmith.com
mvenus@mckoolsmith.com
rjones@mckoolsmith.com

-and-

Michael Shuster (admitted *pro hac vice*)
Vincent Levy (admitted *pro hac vice*)
Neil R. Lieberman (admitted *pro hac vice*)
Alison B. Miller (admitted *pro hac vice*)
Brian T. Goldman (admitted *pro hac vice*)
Patrick J. Woods (admitted *pro hac vice*)
**Holwell Shuster & Goldberg LLP**
425 Lexington Avenue
New York, New York 10017
mshuster@hsgllp.com
vlevy@hsgllp.com
nlieberman@hsgllp.com
amiller@hsgllp.com
bgoldman@hsgllp.com
pwoods@hsgllp.com

*Counsel for the LCM Defendants*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing Memorandum of Law was served by electronic delivery on all persons and entities receiving ECF notice in this adversary proceeding on March 16, 2023.

*/s/ John J. Sparacino*
John J. Sparacino
