# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

LCM XXII LTD., LCM XXIII LTD., LCM XXIV ) 
LTD., LCM XXV LTD., LCM 26 LTD., LCM 27 ) 
LTD., and LCM 28 LTD., )
)
      *Plaintiffs*, )
)     Case No. 21-cv-3987 (KPF)
v. )
)
SERTA SIMMONS BEDDING, LLC, )
)
      *Defendant*. )
_____ )

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Attorneys for Defendant*
*Serta Simmons Bedding, LLC*

## TABLE OF CONTENTS

    **Page**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ..............................................................................................4

    A.    The Parties ...................................................................................4

    B.    The Transaction ..............................................................................5

    C.    The Terms of the Credit Agreement ....................................................6

    D.    Procedural History .........................................................................9

LEGAL STANDARD.....................................................................................................11

ARGUMENT ................................................................................................................12

I.    PLAINTIFFS' BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED
BECAUSE THE TRANSACTION WAS EXPRESSLY PERMITTED BY THE
CREDIT AGREEMENT .....................................................................................12

    A.    The Credit Agreement Expressly Permits the Transaction....................12

    B.    The Debt-for-Debt Exchange Did Not Require Each Lender's Consent and
the Amendments to the Credit Agreement Required Only the Participating
Lenders' Consent .........................................................................15

    C.    The Transaction Does Not Violate the Waterfall Provision ...................16

II.    PLAINTIFFS' BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED
BECAUSE THE COMPLAINT ALSO FAILS TO ALLEGE COGNIZABLE
DAMAGES.........................................................................................................18

III.    PLAINTIFFS' CLAIMS AGAINST SSB SHOULD BE DISMISSED BECAUSE
PLAINTIFFS DO NOT HAVE CONTRACTUAL STANDING TO BRING
THEM ...............................................................................................................21

IV.    PLAINTIFFS' IMPLIED COVENANT CLAIM SHOULD ALSO BE
DISMISSED BECAUSE THE TRANSACTION WAS PERMITTED UNDER
THE CREDIT AGREEMENT..............................................................................22

V.    PLAINTIFFS' PERMANENT INJUNCTION CLAIM IS NOT A STAND
ALONE CAUSE OF ACTION AND SHOULD BE DISMISSED.................................23

CONCLUSION..............................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*,
 634 F.3d 112 (2d Cir. 2011)............................................................................................14

*Alden Global Value Recovery Master Fund, L.P. v. KeyBank Nat'l Assoc.*,
 159 A.D. 3d 618 (1st Dep't 2018) ..................................................................................21

*Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*,
 2020 WL 6063539 (S.D.N.Y. Oct. 14, 2020) ................................................................19

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)........................................................................................................11

*Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.*,
 2010 WL 4449366 (S.D.N.Y. Oct. 13, 2010) ................................................................20

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)........................................................................................................11

*Brown v. Deutsche Bank Nat'l Tr. Co.*,
 120 A.D.3d 440 (1st Dep't 2014) ...................................................................................23

*Chase Equip. Leasing Inc. v. Architectural Air, L.L.C.*,
 84 A.D.3d 439 (1st Dep't 2011) .....................................................................................22

*Chiste v. Hotels.com L.P.*,
 756 F. Supp. 2d 382 (S.D.N.Y. 2010) ............................................................................23

*Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*,
 810 F.3d 861 (2d Cir. 2015)...........................................................................................23

*DiFolco v. MSNBC Cable L.L.C.*,
 622 F.3d 104 (2d Cir. 2010).............................................................................................4

*Eaton Vance Mgmt. v. Wilmington Sav. Fund Soc., FSB*,
 2018 WL 1947405 (N.Y. Sup. Ct. Apr. 25, 2018)..........................................................22

*Exp.-Imp. Bank of the U.S. v. Agricola del Mar BCS, S.A. de C.V.*,
 536 F. Supp. 2d 345 (S.D.N.Y. 2008), *aff'd*, 334 F. App'x 353 (2d Cir. 2009).....................14

*Fed. Ins. Co. v. Am. Home Assurance Co.*,
 639 F.3d 557 (2d Cir. 2011)...........................................................................................11

*Fesseha v. TD Waterhouse Inv. Servs., Inc.*,
 305 A.D.2d 268 (1st Dep't. 2003) .............................................................22

*Gamm v. Sanderson Farms, Inc.*,
 944 F.3d 455 (2d Cir. 2019) ....................................................................19

*Ganino v. Citizens Utils. Co.*,
 228 F.3d 154 (2d Cir. 2000) ....................................................................19

*Hauptman v. Interactive Brokers, LLC*,
 2018 WL 4278345 (S.D.N.Y. June 12, 2018) ...........................................24

*Int'l Bus. Machines Corp. v. Dale*,
 2011 WL 4012399 (S.D.N.Y. Sept. 9, 2011).............................................20

*Landmark Ventures, Inc. v. Wave Sys. Corp.*,
 2012 WL 3822624 (S.D.N.Y. Sept. 4, 2012), *aff'd*, 513 F. App'x 109 (2d Cir.
 2013) .......................................................................................................19

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
 2021 WL 918705 (S.D.N.Y. Mar. 10, 2021) .............................................11

*M/A-COM Sec. Corp. v. Galesi*,
 904 F.2d 134 (2d Cir. 1990).....................................................................22

*Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*,
 52 F. Supp. 3d 601 (S.D.N.Y. 2014), *aff'd sub nom. Maria Re Ltd. ex rel.
 Varga v. Am. Fam. Mut. Ins. Co.*, 607 F. App'x 123 (2d Cir. 2015).....................19

*Mariano v. CVI Inv. Inc.*,
 809 F. App'x 23 (2d Cir. 2020) ...............................................................15

*Markov v. Katt*,
 176 A.D.3d 401 (1st Dep't 2019) ..............................................................12

*Mill Fin., LLC v. Gillet*,
 122 A.D.3d 98 (1st Dep't 2014) ...............................................................23

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
 861 F. Supp. 2d 344 (S.D.N.Y. 2012)......................................................22

*In re Navidea Biopharmaceuticals Litig.*,
 2019 WL 7187111 (S.D.N.Y. Dec. 26, 2019) .....................................12, 16

*North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*,
 No. 652243/2020, 2020 WL 3411267 (N.Y. Sup. Ct. June 19, 2020) ........... *passim*

*Oppenheimer & Co. v. Trans Energy, Inc.*,
   946 F. Supp. 2d 343 (S.D.N.Y. 2013) .............................................................11, 13

*Penades v. Republic of Ecuador*,
   2016 WL 5793412 (S.D.N.Y. Sept. 30, 2016), *aff'd*, 690 F. App'x 733 (2d
   Cir. 2017) ...........................................................................................................21

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
   23 N.Y.3d 549 (2014) .........................................................................................21

*Quintanilla v. WW Int'l, Inc.*,
   2021 WL 2077935 (S.D.N.Y. May 24, 2021) ......................................................22

*Ridenhour v. Bryant*,
   2020 WL 1503626 (S.D.N.Y. Mar. 29, 2020) ......................................................12

*Riverside S. Planning Corp. v CRP/Extell Riverside, L.P.*,
   60 A.D.3d 61 (1st Dep't 2008) ............................................................................18

*Rounds v. Beacon Assocs. Mgmt. Corp.*,
   2009 WL 4857622 (S.D.N.Y. Dec. 14, 2009) ......................................................12

*Seeking Valhalla Tr. v. Deane*,
   182 A.D.3d 457 (1st Dep't 2020) ........................................................................17

*Smith v. New Line Cinema*,
   2004 WL 2049232 (S.D.N.Y. Sept. 13, 2004) .....................................................24

*Tchrs. Ins. & Annuity Ass'n of Am. v. CRIIMI MAE Servs. LP*,
   481 F. App'x 686 (2d Cir. 2012) .........................................................................21

*Trodale Holdings LLC v. Bristol Healthcare Invs., L.P.*,
   2017 WL 5905574 (S.D.N.Y. Nov. 29, 2017) ......................................................23

*Util Auditors, LLC v. Honeywell Int'l Inc.*,
   2018 WL 5830977 (S.D.N.Y. Nov. 7, 2018) ........................................................19

*WestLB AG v. BAC Fl. Bank*,
   912 F. Sup. 2d 86, 93 (S.D.N.Y Oct. 4, 2012) .....................................................20

*Wigdor v. SoulCycle, LLC*,
   139 A.D.3d 613 (1st Dep't 2016) ........................................................................23

*Williams Trading LLC v. Wells Fargo Sec., LLC*,
   2013 WL 1718916 (S.D.N.Y. Apr. 19, 2013), *aff'd*, 553 F. App'x 33 (2d Cir.
   2014) ...................................................................................................................24

**Other Authorities**

*Fair Market Value*, Black's Law Dictionary ...........................................................13, 14

Fed. R. Evid. 201 ...........................................................................................................19

Federal Rules of Civil Procedure Rule 12(b)(6) ................................................1, 4, 11

IHS Markit, *Pricing Data- Loans*, https://cdn.ihsmarkit.com/www/pdf/Loan-
   Pricing-Data.pdf (last accessed July 9, 2021) ............................................................19

Defendant Serta Simmons Bedding, LLC ("SSB") respectfully submits this Memorandum of Law in Support of its Motion to Dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This is now Plaintiffs' fourth attempt to challenge a transaction entered into between SSB and certain of its lenders to recapitalize the company (the "Transaction") in the midst of the unprecedented COVID-19 pandemic. Plaintiffs' first and second attempt followed on the heels of another set of lenders (the "North Star Lenders"), which sought a preliminary injunction in New York state court to halt the Transaction (the "State Action") shortly before it closed on June 22, 2020. At the time, Plaintiffs' Collateral Manager filed a related complaint in state court on behalf of various LCM funds (including the Plaintiffs here) challenging the Transaction and asserting essentially the same claims alleged here (the "LCM Action"). Plaintiffs' Collateral Manager also separately sought to intervene in the State Action to block the Transaction. Both of those efforts failed.

In a well-reasoned Decision & Order, the state court denied the preliminary injunction and allowed the Transaction to close, in part because the state court concluded that the North Star Lenders' claims for breach of contract and the implied covenant of good faith and fair dealing were not likely to succeed on the merits. *See North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC,* No. 652243/2020, 2020 WL 3411267, at *4 (N.Y. Sup. Ct. June 19, 2020). In denying the preliminary injunction, the state court recognized that the transaction was "the culmination of months of negotiation" and that the COVID-19 pandemic had "impacted Serta's liquidity." *Id.* at *2. The court held, among other things, that the Credit Agreement "seems to permit" the Transaction and that the amendments entered into to facilitate the Transaction only required the consent of "a simple majority of the First Lien Term Lenders,"

which the lenders participating in the Transaction (the "Participating Lenders") provided. *Id*. at
*4. Since these findings would have demolished Plaintiffs' claims before the state court,
Plaintiffs decided to cut and run.

On July 2, 2020, Plaintiffs' Collateral Manager withdrew its motion to intervene in the
State Action and voluntarily discontinued its standalone action. Then, presumably to
manufacture diversity, a subset of the original LCM Funds represented by the Collateral
Manager in state court filed a new complaint in this Court (its third attempt) alleging the exact
same causes of action as those alleged in state court but claiming federal jurisdiction was proper
because the parties were diverse. After Judge George B. Daniels dismissed Plaintiffs' complaint
for lack of subject matter jurisdiction, Plaintiffs re-filed a nearly identical Complaint in this
Court (now, its fourth attempt) removing the Participating Lenders as defendants.

Plaintiffs' latest Complaint should be its last. Plaintiffs have failed to plead any plausible
claim for relief, and their Complaint should be dismissed with prejudice in its entirety. *See* ECF
No. 22, Transcript of June 9, 2021 Conference ("Tr.") at 7:3–14 (declining opportunity to amend
Complaint).

*First*, Plaintiffs' breach of contract claim fails because the plain terms of the Credit
Agreement expressly permitted the Transaction, and the amendments to the Credit Agreement
entered into to effectuate the Transaction only required the consent of a majority of the lenders,
which the Participating Lenders provided. Plaintiffs complain that the Transaction stripped them
of their first-lien, priority, *pro rata* rights without their consent but point to nothing in the Credit
Agreement that prohibited SSB from doing so. While Plaintiffs may have preferred SSB to
refinance or issue new debt under the Credit Agreement or to offer Plaintiffs an opportunity to
participate in the Transaction, SSB was required to do no such thing. Instead, SSB chose to

engage with a select group of lenders to repurchase their debt in open-market purchases, which the Credit Agreement expressly permitted SSB to do.

Plaintiffs also repeatedly allege that the Transaction amended the waterfall provision of the Credit Agreement, but the fact remains that the provision was never amended and remains exactly the same. And while SSB entered into a new credit facility and a new intercreditor agreement to govern the payment priority, that was also expressly permitted under the Amended Credit Agreement and did not require Plaintiffs' consent.

*Second*, Plaintiffs' failure to plead cognizable damages is an independent basis for dismissal. Plaintiffs' claim that their debt has diminished in value because of the Transaction is directly refuted by the real-world pricing data, which show that their debt has nearly doubled in value since the Transaction closed. The Transaction benefited not only SSB, but also Plaintiffs and other first lien lenders. Separately, Plaintiffs' theory that they are damaged because they would be deprived of a *pro rata* share of collateral proceeds *if* SSB were to default on its obligations is entirely speculative and may never come to pass. Indeed, Plaintiffs do not even attempt to allege in the Complaint that SSB has failed to pay any principal or interest or has otherwise defaulted on its obligations.

*Third*, Plaintiffs have no standing to bring these claims because the Credit Agreement's "no-action clause" prohibits lenders from directly enforcing certain provisions of the Credit Agreement and instead only allows the designated Administrative Agent to assert claims.

*Fourth*, the good faith and fair dealing claim should be dismissed because it is duplicative and because, as explained above, the plain terms of the Credit Agreement expressly permitted the Transaction, and parties cannot use an implied covenant claim to imply obligations inconsistent

with the terms of a contract.

*Finally*, the Court should dismiss the request for injunctive relief, as an injunction is not a cause of action that can stand on its own. At bottom, Plaintiffs are upset that their loans were subordinated but there is nothing in the Credit Agreement that prohibited such subordination and the *only* provision dealing with such subordination was not one of the "sacred rights" that required Plaintiffs' consent. Simply put, Plaintiffs did not bargain for those rights. Accordingly, the Court should reject Plaintiffs' attempt to rewrite the Credit Agreement and dismiss the Complaint in its entirety with prejudice.

## STATEMENT OF FACTS

Unless otherwise noted, the following facts are taken from the Complaint, the terms of the Credit Agreement and the Amended Credit Agreement, certain press releases concerning the Transaction, and pricing data for the loans at issue, (*see, e.g.*, Compl. ¶¶ 25-26, 49, and p. 7 n.2), which this Court may consider because the Complaint explicitly incorporates them by reference or otherwise relies on them such that they are integral to the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, . . . documents incorporated by reference in the complaint[,] . . . . [and] document[s] 'integral' to the complaint.").

### A. The Parties

SSB is one of the largest manufacturers and distributors of mattresses in North America, and owns and manages some of the best-selling bedding brands in the mattress industry: Serta®, Beautyrest®, Simmons®, and Tuft & Needle®. SSB distributes its brands through national, hospitality, and regional and independent retail channels as well as through direct-to-consumer

4

channels.  Compl. ¶ 16.

Prior to the Transaction, SSB was a party to three separate credit agreements dated

November 8, 2016: (1) a first lien term loan agreement (the "Credit Agreement")[1] that provided

for $1.95 billion in first lien term loans ("First Lien Term Loans"); (2) a second lien term loan

agreement[2] that provided for $450 million in second lien term loans ("Second Lien Term

Loans"); and (3) a $225 million asset-based revolving credit facility.  *Id.* ¶ 17.

Plaintiffs LCM XXII Ltd., LCM XXIII Ltd. LCM XXIV Ltd., LCM XXV Ltd., LCM 26

Ltd., LCM 27 Ltd., and LCM 28 Ltd. are issuers of collateralized loan obligations ("CLOs").  *Id.*

¶ 13.  Plaintiffs have held SSB First Lien Term Loans since October 2016, and currently hold

approximately $7.4 million worth of such loans.  *Id.*

### B.     The Transaction

In April 2020, as the COVID-19 pandemic spread throughout the United States forcing

businesses to halt operations and customers to quarantine, SSB solicited proposals from and

entered into separate discussions with potential lenders, including the Participating Lenders, to

explore alternatives for raising liquidity and reducing its debt and interest expense.  Compl. ¶ 25.

SSB analyzed multiple proposals and negotiated with numerous lender groups, including the

North Star Lenders, before ultimately selecting—with the approval of an independent finance

committee—the Participating Lenders' proposal.  Compl. ¶¶ 25-27; *see also North Star*, 2020

WL 3411267, at *2.  On June 8, 2020, SSB announced in a press release that it had entered into a

Transaction Support Agreement with the Participating Lenders to recapitalize the company.

---

[1] The Credit Agreement was amended by that certain Amendment No. 1 to First Lien Term Loan
Agreement, dated June 22, 2020 (the "Amended Credit Agreement").  *See* Ex. A.

[2] The second lien term loan agreement was amended by that certain Amendment No. 1 to Second
Lien Term Loan Agreement, dated June 22, 2020.

Compl. ¶ 26; *see also* Ex. B.  On June 22, 2020, the Transaction closed.  Compl. ¶ 27; *see also* Ex. C.

The Transaction provided for a new super-priority term loan facility with two tranches: (i) a $200 million new money tranche and (ii) a debt-for-debt exchange tranche, pursuant to which approximately $850 million of priority terms loans were issued as consideration for the open market purchase of over $1 billion of First and Second Lien Term Loans (collectively, the "PTL Loans").  *See, e.g.*, Compl. ¶ 28; *see also* Exs. B & C.  In connection with the Transaction, SSB entered into certain amendments to the Credit Agreement to allow for the incurrence of the PTL Loans.  SSB also entered into a separate Super-Priority Term Loan Agreement, dated June 22, 2020 (the "PTL Credit Agreement"), and First Lien Intercreditor Agreement, dated June 22, 2020 (the "PTL Intercreditor Agreement"), pursuant to which the PTL Loans rank senior in right of payment, but *pari passu* with respect to security, to the First Lien Term Loans under the Credit Agreement.  *See North Star*, 2020 WL 3411267, at *2, *4.

C.     **The Terms of the Credit Agreement**

The Credit Agreement expressly permits SSB to incur incremental equivalent debt, which as explained in more detail below, is defined to include indebtedness issued under the PTL Loans.  *See* Ex. A § 6.01(z) ("The Top Borrower shall not . . . directly . . . incur any Indebtedness, except . . . Incremental Equivalent Debt"); *see also* § 1.01 (defining Incremental Equivalent Debt).

The Credit Agreement also permits SSB to repurchase First Lien Term Loans from lenders on a non-pro rata basis as part of an open market transaction.  The Credit Agreement does not define, or otherwise limit the scope of, open market purchases.  Specifically, Section

9.05(g) provides, in relevant part, that

> Notwithstanding anything to the contrary contained herein, any
> Lender may, at any time assign all or a portion of its rights and
> obligations under this Agreement in respect of its Term Loans to
> any Affiliated Lender[3] **on a non-pro rata basis** . . . . through (B)
> open market purchases, each case with respect to clauses (A) and
> (B) without the consent of the Administrative Agent.

*See* Ex. A § 9.05(g) (emphasis added); *see also North Star*, 2020 WL 3411267, at *4 ("The

Credit Agreement seems to permits the debt-to-debt exchange on a non-pro rata basis as part of

an open market transaction.").

      As Plaintiffs admit, Compl. ¶ 21, all but a "handful" of the Credit Agreement's

provisions can be amended with the consent of a simple majority of the First Lien Term Loan

lenders. Indeed, the only exceptions are amendments involving so-called "sacred rights." *Id.*

Section 9.02(b) provides, in relevant part:

> . . . . [N]either this Agreement nor any other Loan Document or
> any provision hereof or thereof may be waived, amended or
> modified, except (i) in the case of this Agreement, pursuant to an
> agreement or agreements in writing entered into by [SSB] and the
> Required Lenders. . . .

*See* Ex. A § 9.02(b). "Required Lenders" is defined as "Lenders having Loans or unused

Commitments representing more than 50% of the sum of the total Loans and such unused

commitments at such time." *See* Ex. A § 1.01.

      The handful of "sacred rights," however, requires consent of each lender directly and

adversely affected thereby. Section 9.02(b)(A)(6) provides that the consent of each lender

directly and adversely affected thereby is required for any amendment that

> waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this
> Agreement in a manner that would by its terms alter the pro rata sharing of

---

[3] Affiliated Lender means "any Non-Debt Fund Affiliate, Holdings, the Top Borrower and/or any
subsidiary of the Top Borrower." Ex. A § 1.01. SSB is the Top Borrower.

payments required thereby (**except in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c) and/or 9.05(g) or as otherwise provided in this Section 9.02**);

Importantly, Section 9.02(b)(A)(6) expressly carved out certain provisions from the unanimous consent requirement, including any transaction permitted under section 9.05(g).

To effectuate the Transaction, SSB and the Participating Lenders, holding more than 50% of the outstanding First and Second Lien Term Loans, entered into certain permitted amendments to the Credit Agreement to allow the PTL Loans to have senior payment priority.[4] Ex. B; *see also North Star*, 2020 WL 3411267, at *4 ("Since the amendments do not affect plaintiffs' so-called 'sacred rights' under the Credit Agreement, plaintiffs' consent does not appear to be required. Rather, the Credit Agreement requires only the consent of a simple majority of the First Lien Term Lenders to amend the Credit Agreement").[5]

Specifically, the Credit Agreement was amended to allow SSB to incur incremental equivalent debt that is senior in right of payment to the First Lien Term Loans, which only requires the consent of "Required Lenders." The definition of Incremental Equivalent Debt, as amended, is defined as:

> Indebtedness issued, incurred or implemented in lieu of loans under an Incremental Facility in the form of notes or loans and/or commitments in respect of the foregoing (***including Indebtedness issued under the PTL Credit Agreement*** (including the Priority New Money Term Loans and the Priority Exchange Term Loans)) in each case, ***which may be senior***, *pari passu* or junior ***in right of***

---

[4] SSB and the Participating Lenders made certain other amendments to the Credit Agreements, none of which are directly relevant to this dispute. For example, the Credit Agreement was amended to reflect legal and regulatory market documentary updates since the original agreement was signed, and also removed certain audit qualification requirements and restrictions on prepayment of the Second Lien Term Loans. *See* Ex. A.

[5] The Amended Credit Agreement includes a redline to the original Credit Agreement. Additions are marked in blue double underlined text and deletions are marked with stricken red text.

> *payment* and/or with respect to security with the Obligations
> hereunder . . . .

*See* Ex. A § 1.01 (emphasis added).  Section 8.08 of the Credit Agreement was also amended to

authorize the administrative agent to enter into a separate intercreditor agreement to establish

senior payment priority for the new loans.  Section 8.08, as amended, provides:

> Each Secured Party irrevocably authorizes and instructs the
> Administrative Agent to, and the Administrative Agent shall: . . .
> (d) enter into subordination, intercreditor, collateral trust and/or
> similar agreements with respect to Indebtedness (including the
> Initial Intercreditor Agreement, the PTL First Lien Intercreditor
> Agreement and any other Acceptable Intercreditor Agreement. . .
> that is (i) required or permitted to be senior, *pari passu* or
> subordinated hereunder . . . .

*See* Ex. A § 8.08(d).  No amendments were made to section 2.18(b) or (c), which governs the

payment waterfall in the event of a default, or to any of the other sacred rights.

Finally, under the Credit Agreement, only the administrative agent can bring claims to

realize upon any of the Collateral or to enforce the Loan Guaranty.  Section 8.04 provides in

relevant part, that --

> no Secured Party shall have any right individually to realize upon any of the
> Collateral or to enforce the Loan Guaranty . . . [that right] may be exercised solely
> by the Administrative Agent on behalf of the Secured Parties.

Ex. A § 8.04(a).  In other words, the administrative agent must act at the direction of the

Required Lenders (*i.e.*, a majority of the First Lien Term Loan lenders).  Ex. A § 8.

### D.    Procedural History

On June 11, 2020, the North Star Lenders filed a complaint in New York state court

seeking nearly the same relief here along with a temporary restraining order and preliminary

injunction.  *North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*, Index No.

652243/2020 Dkt. 1 (N.Y. Sup. Ct. 2020).

On June 16, 2020, the state court held an expedited hearing to address the North Star

Lenders' request for a preliminary injunction.  Two days after that hearing and before the state

court rendered its opinion, Plaintiffs' Collateral Manager simultaneously sought to intervene in

the State Action and filed its own separate complaint in the New York state court on behalf of

Plaintiffs and other CLOs.  *See LCM Asset Mgmt. LLC v. Serta Simmons Bedding, LLC*, Index

No. 65255/2020 (N.Y. Sup. Ct. 2020).

On June 20, the state court denied the North Star Lenders' request for a preliminary

injunction.  *See North Star*, 2020 WL 3411267, at *6.  As relevant here, the state court concluded

that the North Star Lenders were not likely to succeed on the merits of their breach of contract

and breach of the covenant of good faith and fair dealing claims.  *See id.* at *4–*5.  In particular,

as to the breach of contract claim, the state court held that the "Credit Agreement seems to

permit the debt-to-debt exchange on a non-pro rata basis as part of an open market transaction"

and that "[s]ince the amendments do not affect plaintiff's so-called 'sacred rights' under the

Credit Agreement, plaintiffs' consent does not appear to be required."  *Id.* at *4.  On the good

faith and fair dealing claim, the state court concluded that it was unlikely to succeed because it

was "identical to its breach of contract claim."  *Id.* at *5.[6]

After the state court denied the North Star Lenders' motion for a preliminary injunction,

Plaintiffs' Collateral Manager withdrew its request to intervene and voluntarily discontinued the

LCM Action without prejudice. That same day, Plaintiffs filed a new complaint in this Court

before Judge George B. Daniels alleging the exact same causes of action as those in state court,

but claiming that diversity jurisdiction existed between the parties given that it dropped certain

clearly non-diverse CLOs as plaintiffs.  Judge Daniels, however, disagreed and dismissed

Plaintiffs' complaint for lack of subject matter jurisdiction because "Plaintiffs' primary activities

---

[6] The State Action was voluntarily discontinued over SSB's objection on December 1, 2020.

and principal place of business are in New York" and, as a result, the parties were not completely diverse. *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2021 WL 918705, at *5 (S.D.N.Y. Mar. 10, 2021).

Rather than re-file in state court, Plaintiffs instead chose to drop the Participating Lenders as defendants and filed yet another complaint in this Court. On May 26, 2021, SSB requested a pre-motion conference in anticipation of this motion to dismiss. ECF No. 15. Plaintiffs responded on June 1, 2021. ECF No. 19. At the June 9, 2021 pre-motion conference, Plaintiffs expressly declined an opportunity to amend their Complaint and elected to move forward with the existing Complaint. *See* Tr. at 7:3–14 ("THE COURT: . . . . I'd actually like to try and save resources of the Court and the parties by asking you at the outset whether you wish to amend before the briefing schedule is set? MR. LIEBERMAN: That is not our current intention . . . .").

## LEGAL STANDARD

On a motion to dismiss, the Court need not accept as true legal conclusions, naked assertions, mere conclusory statements, or implausible inferences. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In order to survive a motion under Rule 12(b)(6), a Complaint's allegations must raise more than the "mere possibility of misconduct" – the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678-79. With respect to breach of contact claims in particular, a Court should grant a motion to dismiss if the alleged acts of "breach" do not violate the plain language of the contract. *See Oppenheimer & Co. v. Trans Energy, Inc*., 946 F. Supp. 2d 343, 349 (S.D.N.Y. 2013); *see also Fed. Ins. Co. v. Am. Home Assurance Co*., 639 F.3d 557, 568 (2d Cir. 2011) ("The question of whether the language of a contract is clear or ambiguous is one of law, and therefore must be decided by the court" (internal quotation marks omitted));

*Rounds v. Beacon Assocs. Mgmt. Corp.*, 2009 WL 4857622, at *3 (S.D.N.Y. Dec. 14, 2009) ("Where there is no ambiguity to a contract and the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may be resolved on a motion to dismiss.").

## ARGUMENT

### I.   PLAINTIFFS' BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED BECAUSE THE TRANSACTION WAS EXPRESSLY PERMITTED BY THE CREDIT AGREEMENT

Plaintiffs' breach of contract claim fails under the plain language of the Credit Agreement.  Under New York Law, in order for their breach of contract claim to survive a motion to dismiss, Plaintiffs must plead "(1) the existence of a contract; (2) adequate performance of the contract by plaintiff; (3) defendant's breach of the contract; and (4) damages."  *Ridenhour v. Bryant*, 2020 WL 1503626, at *4 (S.D.N.Y. Mar. 29, 2020); *see also Markov v. Katt*, 176 A.D.3d 401, 401–02 (1st Dep't 2019).  Since the Transaction was expressly permitted under the plain terms of the Credit Agreement, and the amendments required only the consent of a majority of the First Lien Term Loan lenders, which the Participating Lenders held and approved, Plaintiffs cannot state a claim for breach of contract.  *See In re Navidea Biopharmaceuticals Litig.*, 2019 WL 7187111, at *5 (S.D.N.Y. Dec. 26, 2019) (dismissing breach of contract claim where the "express language" was "unambiguous" and failed to support claim of breach).

#### A.   The Credit Agreement Expressly Permits the Transaction

Plaintiffs allege that the debt exchange was not an open market purchase under section 9.05(g) since it "was negotiated in private by Serta and consisted of a structured debt exchange that was not open to everyone and that did not reflect terms set by the market."  Compl. ¶ 37.

Plaintiffs are wrong.

Section 9.05(g) does not define or otherwise limit the scope of open market purchases. Its plain terms state only that any "Lender may, at any time assign all . . . of its rights and obligations . . . in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis . . . through open market purchases." That is precisely what occurred here. The Participating Lenders, which collectively owned $1.2 billion of First and Second Lien Term Loans, agreed to assign those loans back to SSB—which SSB subsequently retired—in exchange for approximately $850 million of PTL Loans, resulting in a significant net debt reduction and substantial interest savings to the Company.  Compl. ¶ 40; *North Star*, 2020 WL 3411267, at \*4; Ex. C.

Plaintiffs' claims that the Transaction was negotiated in "private" and do not reflect market terms ignore reality.  In the context of a loan repurchase, the term "open market" can only mean the price that a willing buyer and a willing seller are able to obtain in an arms-length negotiation—in other words, the price that SSB and any lender agreed to in the "open market." *See Fair Market Value*, Black's Law Dictionary (11th ed. 2019).  Here, SSB negotiated with, and entered into, arms-length transactions in the "open market" with the Participating Lenders, which held a majority of SSB's debt, to repurchase their debt in exchange for the issuance of priority terms loans.  *See Oppenheimer*, 946 F. Supp. 2d at 351 (granting motion to dismiss where alleged act of breach did not violate plain language of the contract).  And prior to accepting the Participating Lenders' proposal, SSB solicited proposals from and entered into discussions with numerous other lenders.  In fact, the state court specifically noted that SSB engaged in a robust, competitive process with multiple lender groups to obtain the best possible terms, which is the epitome of an arms-length, open-market transaction between buyers and sellers.  *See North Star*,

2020 WL 3411267, at *2, *6; *Fair Market Value*, Black's Law Dictionary.

Plaintiffs also claim that the debt exchange does not constitute an open market purchase because Plaintiffs were never invited to participate in the Transaction. Compl. ¶ 29. But there is simply no provision requiring SSB to offer the Transaction to all lenders – to the contrary, section 9.05(g) expressly states that an open market transaction may occur on a "non-pro rata basis." And while Plaintiffs claim that the Dutch Auction procedure "underscore[s]" that the Transaction must be "offered to all," Compl. ¶ 2 n.1, it in fact highlights that the opposite is true. The Dutch Auction provision—unlike the open market provision—specifically provides that it must be "open to all Lenders." If the parties had intended to require that open market purchases be offered to all lenders, they clearly could have provided so in the Credit Agreement but they did not. *See* Ex. A § 9.05(g). Accordingly, Plaintiffs attempt to add terms to the contract to support their preferred reading should be rejected. *See 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 125 (2d Cir. 2011) ("[C]ourts may not by construction add or excise terms . . . under the guise of interpreting the writing."); *Exp.-Imp. Bank of the U.S. v. Agricola del Mar BCS, S.A. de C.V.*, 536 F. Supp. 2d 345, 353 (S.D.N.Y. 2008) (where the parties "knew how to provide for" a certain requirement "and did not so provide for [it]," the requirement "is not available under the plain language of" the agreement), *aff'd*, 334 F. App'x 353 (2d Cir. 2009).

Because the Transaction qualifies as an open market purchase under Section 9.05(g), there is no merit to Plaintiffs' argument that SSB was required to comply with Sections 2.22 and 9.02(c), which concerns refinancing the debt under the existing documentation. Section 2.22 allows for new classes of term facilities, while Section 9.02(c) permits amendments that refinance or replace "all or any portion of the outstanding Term Loans under the applicable Class

. . . with one or more replacement term loans . . . pursuant to a Refinancing Amendment." *See*

Ex. A §§ 2.22, 9.02(c).  SSB was expressly permitted under the Credit Agreement to engage in

open market purchases (as opposed to a refinancing), and while Plaintiffs may have preferred

that SSB structure the Transaction differently, SSB was not required to do so. Put simply,

Sections 2.22 and 9.02(c) do not apply because there was no refinancing or replacement of the

loans.

### B.      The Debt-for-Debt Exchange Did Not Require Each Lender's Consent and the Amendments to the Credit Agreement Required Only the Participating Lenders' Consent

Plaintiffs allege that SSB breached the Credit Agreement by failing to obtain their

consent for the Transaction. But the provision that Plaintiffs rely on—Section 9.02(b)—

expressly carves out open market purchases, including debt-for-debt exchanges under section

9.05(g), from the unanimity requirement.  Section 9.02(b) provides:

> [T]he consent of each Lender directly and adversely affected
> thereby (but not the consent of the Required Lenders) shall be
> required for any waiver, amendment or modification that…
> waives, amends or modifies the provisions of Sections 2.18(b) or
> (c) of this Agreement in a manner that would by its terms alter the
> pro rata sharing of payments required thereby (***except in
> connection with any transaction permitted under Sections 2.22,
> 2.23, 9.02(c) and/or 9.05(g)*** or as otherwise provided in this
> Section 9.02…).

*See* Ex. A § 9.02(b) (emphasis added).  Since the Transaction complied with Section 9.05(g) of

the Credit Agreement, SSB was not required to obtain Plaintiffs' consent. *See North Star*, 2020

WL 3411267, at *4; *see also Mariano v. CVI Inv. Inc.*, 809 F. App'x 23, 25 n.1 (2d Cir. 2020)

(affirming dismissal where "the contract unambiguously permits the alleged conduct" supporting

a breach of contract claim).

The remaining amendments to the Credit Agreement also did not require Plaintiffs'

consent.  As discussed *supra*, SSB and the Participating Lenders entered into certain permitted

amendments to the Credit Agreement to allow the PTL loans to have senior payment priority. *See supra* Section B-C. Specifically, SSB and the Participating Lenders amended the definition of Incremental Equivalent Debt to allow SSB to incur the PTL Loans as senior in right of payment to the First Lien Term Loans, and amended Section 8.08 to authorize the administrative agent to enter into a separate intercreditor agreement to establish senior payment priority for the PTL Loans. *See* Ex. A §§ 1.01, 8.08. These amendments did not affect the so-called sacred rights of the First Lien Term Loan lenders and, thus, did not require 100 percent lender consent. *See* Ex. A § 9.02(b)(A)(6). Since the amendments were approved by the Participating Lenders comprising a majority of the First Lien Term Loan lenders, SSB was permitted under the Credit Agreement to enter into the amendments. *See* Ex. A § 9.02(b) (". . . . [N]either this Agreement nor any other Loan Document or any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by [SSB] and the Required Lenders. . . ."); *Navidea*, 2019 WL 7187111, at *5 ("On a motion to dismiss, the Court may dismiss a breach of contract claim for failure to state a claim if the terms of the contract are unambiguous and the 'plain language' of the contract contradicts or fails to support plaintiff's allegations of breach."); *see also North Star*, 2020 WL 3411267, at *4 (finding the breach of contract claim unlikely to succeed on the merits based on the provision of the Credit Agreement).

### C.  The Transaction Does Not Violate the Waterfall Provision

Plaintiffs also allege that the Transaction breached Section 2.18(b) of the Credit Agreement, which governs payment priority rights following an event of default and receipt of proceeds of the collateral, because the Transaction ***effectively amends*** Section 2.18(b)'s waterfall provision in a way that alters the *pro rata* sharing of payments. Compl. ¶ 34. Not so. The waterfall remains the same under the Amended Credit Agreement, *see* Ex. A § 2.18(b), and the

16

Transaction could not breach – "effectively" or otherwise – the Credit Agreement because the Transaction complied with the plain terms of the Credit Agreement. *See Seeking Valhalla Tr. v. Deane*, 182 A.D.3d 457 (1st Dep't 2020) (affirming dismissal of breach of contract and good faith and fair dealing claims where defendant exercised her express sole discretion as provided in the contract).

More importantly, Plaintiffs' rights under Section 2.18 are not absolute. In fact, Section 2.18(b) by its terms is expressly "subject, in all respects to the provisions of *each applicable Intercreditor Agreement*." *Id.* § 2.18(b) (emphasis added) ("[A]ll proceeds of Collateral received by the Administrative Agent while an Event of Default exists . . . shall be applied . . . as provided in each applicable Intercreditor Agreement."). Under the Credit Agreement, the administrative agent is expressly authorized to enter into a separate intercreditor agreement to establish senior payment priority for the PTL Loans, which is precisely what occurred here. *See supra* Section C.

And contrary to Plaintiffs' claim, the Transaction did not release the Collateral or the loan guarantees and thus did not violate Sections 9.02(b)(B)(2) or (3). Plaintiffs do not (and cannot) claim otherwise and argue instead that the Transaction "effectively" did so. Compl. ¶ 39. But the Transaction did not "effectively" release the Collateral. Rather, the Transaction *added* Collateral to support Plaintiffs' loans by narrowing the category of non-collateral assets. *See* Ex. A § 1.01 (amendment of "Excluded Assets"); *see also North Star*, 2020 WL 3411267, at *4.

In sum, Plaintiffs' breach of contract claim fails on the plain terms of the Credit Agreement. Plaintiffs cannot point to a single provision in the Credit Agreement that prohibited SSB from subordinating their debt. And the problem for Plaintiffs is that anti-subordination is

*not a sacred right* under the Credit Agreement. In fact, the only provision in the Credit

Agreement that dealt with subordination did not require all lenders to consent to an amendment.[7]

Plaintiffs could have but did not bargain for anti-subordination language in the Credit

Agreement. Accordingly, the Transaction did not breach the terms of the Credit Agreement and

Plaintiffs' breach of contract claim should be dismissed. *Riverside S. Planning Corp. v*

*CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 66 (1st Dep't 2008) ("A court may not, in the guise of

interpreting a contract, add or excise terms or distort the meaning of those used to make a new

contract for the parties.").[8]

## II. PLAINTIFFS' BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED BECAUSE THE COMPLAINT ALSO FAILS TO ALLEGE COGNIZABLE DAMAGES

The Court should also dismiss Plaintiffs' breach of contract claim because Plaintiffs have

not sufficiently pled damages. Mere conclusory allegations of damages are not enough.

---

[7] Section 7.01(*l*) provided that subordination of the first lien debt by any junior debt would be an event of default. Specifically, it provided that it would be a default if the first lien debt "cease[d] to constitute senior indebtedness under the subordination provisions of any document or instrument evidencing any Junior Lien Indebtedness," which is defined as indebtedness "that is secured by a security interest on the Term Loan Priority Collateral that is expressly junior or subordinated to the Lien securing the Credit Facilities with respect to the Term Loan Priority Collateral." Ex. A. § 1.01. This provision was deleted in the Amended Credit Agreement with majority consent and Plaintiffs do not claim that deletion of this provision was a breach of the Credit Agreement, nor could they because it was plainly allowed by the broad amendment provisions. *See* Ex. A § 9.02(b). In any event, the Transaction would not have resulted in a default under this provision because the first lien debt did not cease to constitute senior indebtedness under any Junior Lien Indebtedness.

[8] Plaintiffs' claim also fails because Section 2.18(a) provides for *pro rata* payment only for debt in the same "Class" of the Credit Agreement and expressly does not apply to any debt outside the Credit Agreement. *See* Ex. A § 2.18(a) (emphasis added) ("each payment or prepayment of principal of any Borrower, . . . shall be allocated pro rata among the Lenders in accordance with their respective Applicable Percentage of the ***applicable Class***."). Since the PTL Loans were entered into pursuant to an entirely separate facility, they are not in the same Class as the First Lien Term Loans. As explained above, Plaintiffs' actual complaint is that their loans were subordinated and that another "Class" of loans now has priority over them.

*Landmark Ventures, Inc. v. Wave Sys. Corp.*, 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012), *aff'd*, 513 F. App'x 109 (2d Cir. 2013). Rather, the complaint must be supported by "allegations of fact showing damages." *Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601, 614 (S.D.N.Y. 2014), *aff'd sub nom. Maria Re Ltd. ex rel. Varga v. Am. Fam. Mut. Ins. Co.*, 607 F. App'x 123 (2d Cir. 2015). Because damages are an essential element of a breach of contract claim, the failure to adequately allege damages is fatal on a motion to dismiss. *See Util Auditors, LLC v. Honeywell Int'l Inc.*, 2018 WL 5830977, at *3 (S.D.N.Y. Nov. 7, 2018).

Plaintiffs allege two categories of damages: first, that "the value of their loans and rights materially declined" as a result of the Transaction, and second, that they have been deprived of their right to "receive a pro-rata share of collateral proceeds on a first lien basis." Compl. ¶ 49. Both measures of damages fail.

First, it is simply not true that the value of Plaintiffs' loans and rights have materially declined. *Id.* In fact, the value of Plaintiffs' loans has nearly doubled since the Transaction. *See* Ex. D.[9] Plaintiffs do not dispute that their loans have actually increased in value, showing the

---

[9] The Court may take judicial notice of the pricing data of the loans and consider them on this motion to dismiss. *See Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 461 (2d Cir. 2019); *see also* Fed. R. Evid. 201(d). Specifically, a court may take judicial notice of a fact "not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Applying this standard, courts routinely take judicial notice of stock prices, which are analogous to loan prices. *See, e.g.*, *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) ("[T]he district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment."); *Altimeo Asset Mgmt. v. WuXi PharmaTech (Cayman) Inc.*, 2020 WL 6063539, at *1 n.1 (S.D.N.Y. Oct. 14, 2020) (taking judicial notice on a motion to dismiss of historical stock prices). Like stock prices, the loan prices at issue here are provided by IHS Markit, which can be determined from a source "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). IHS Markit provides, as relevant here, pricing data and pricing systems for loan facilities. To do so, they aggregate quotes from banks and publishers like Bloomberg. *See* IHS Markit, *Pricing Data- Loans*, https://cdn.ihsmarkit.com/www/pdf/ Loan-Pricing-Data.pdf (last accessed July 9, 2021).

Transaction benefited them while allowing SSB to weather the pandemic. Rather, Plaintiffs ignore the alleged damages they actually pled in their Complaint and now claim that their damages are the difference in trading values between the PTL loans and their own. *See* Tr. 12:15 – 13:12. But this new theory of damages was never alleged in the Complaint and, despite being given the opportunity to amend their Complaint, Plaintiffs declined to do so. Accordingly, this measure of damages should not be considered. *See Int'l Bus. Machines Corp. v. Dale*, 2011 WL 4012399, at *2 (S.D.N.Y. Sept. 9, 2011) (rejecting claim for damages, in part, because articulated theory of injury had not been pleaded).

Second, Plaintiffs' alleged damages based on their right to "receive a pro-rata share of collateral proceeds on a first lien basis" are entirely speculative, as they may never actually come to pass.[10] There is no allegation in the Complaint that SSB has failed to make its principal or interest payments, or have otherwise defaulted on its obligations. Therefore, Plaintiffs', "claim[s] for damages based on the subordination of its security interest is an undefined future harm [that] is too speculative to constitute a compensable injury." *Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.*, 2010 WL 4449366, at *3 (S.D.N.Y. Oct. 13, 2010); *see also WestLB AG v. BAC Fl. Bank*, 912 F. Sup. 2d 86, 93 (S.D.N.Y Oct. 4, 2012) (noting in granting a motion to dismiss that complaint lacked allegations defendant failed to make principal or interest payments and that "allegations of a decrease in the value of collateral are insufficient to adequately plead damages for a breach of contract to pay money"). Because Plaintiffs have not pleaded any cognizable damages, the breach of contract claim should be dismissed for this

_____

[10] Plaintiffs also appear to have abandoned this theory of damages at the pre-motion conference. *See* Tr. at 13:13 – 14:4. SSB nevertheless addresses it for completeness.

reason as well.

## III.    PLAINTIFFS' CLAIMS AGAINST SSB SHOULD BE DISMISSED BECAUSE PLAINTIFFS DO NOT HAVE CONTRACTUAL STANDING TO BRING THEM

Under the Credit Agreement's expansive "no-action clause," only the designated Administrative Agent may bring suit, not individual lenders. Ex. A § 8; *see also Penades v. Republic of Ecuador*, 2016 WL 5793412, at *3 (S.D.N.Y. Sept. 30, 2016), *aff'd*, 690 F. App'x 733 (2d Cir. 2017); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560-61 (2014) (noting that "no-action clause[s]" should be strictly construed and applied broadly when the words of the contract permit). The no-action clause broadly provides that "no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Loan Guaranty . . . [that right] may be exercised solely by the Administrative Agent on behalf of the Secured Parties." Ex. A § 8.04(a). The Administrative Agent, in turn, must act at the direction of the Required Lenders (i.e., a majority of the lenders). *Id.* § 8.

No action clauses like section 8 of the Credit Agreement are "strictly construed." *Tchrs. Ins. & Annuity Ass'n of Am. v. CRIIMI MAE Servs. LP*, 481 F. App'x 686, 687 (2d Cir. 2012). Because only the necessary Required Lenders can direct the administrative agent to take action with respect to the Collateral or the Loan Guaranty, Plaintiffs cannot bring their claims since they do not constitute a sufficient majority.

To the extent that Plaintiffs argue that their claims fall outside of the no action clause because they are not seeking to realize upon any collateral or to enforce the guaranty, the Court need not look any further than Plaintiffs' own claim that SSB breached the Credit Agreement by effectively releasing collateral. *See supra* I.C; *see also* Compl. ¶ 39. Since Plaintiffs' claims fall squarely within the no action clause, Plaintiffs lack standing to assert their claims. *See, e.g., Alden Global Value Recovery Master Fund, L.P. v. KeyBank Nat'l Assoc.*, 159 A.D. 3d 618,

626–27 (1st Dep't 2018) (holding that plaintiff did not have standing to sue when no-action clause barred suit); *Eaton Vance Mgmt. v. Wilmington Sav. Fund Soc., FSB*, 2018 WL 1947405, at *6 (N.Y. Sup. Ct. Apr. 25, 2018) ("[I]f the lenders expressly agree to delegate to an agent the exclusive right to bring legal action to enforce the lenders' rights, courts will hold the parties to their bargain.").

## IV. PLAINTIFFS' IMPLIED COVENANT CLAIM SHOULD ALSO BE DISMISSED BECAUSE THE TRANSACTION WAS PERMITTED UNDER THE CREDIT AGREEMENT

Plaintiffs also allege, in the alternative, that the Transaction violated the implied covenant of good faith and fair dealing. *See* Compl. ¶¶ 51-55. But an implied covenant claim is not a means to "undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990). Since the Transaction was expressly permitted under the plain terms of the Credit Agreement, Plaintiffs' implied covenant of good faith and fair dealing claim also must fail. *See Quintanilla v. WW Int'l, Inc.*, 2021 WL 2077935, at *13 (S.D.N.Y. May 24, 2021) (granting motion to dismiss implied covenant claim where it would thus "impermissibly nullify other express terms of a contract and create independent contractual rights"); *Fesseha v. TD Waterhouse Inv. Servs., Inc.*, 305 A.D.2d 268, 268 (1st Dep't. 2003) ("While the covenant of good faith and fair dealing is implicit in every contract, it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights"); *see also North Star*, 2020 WL 3411267, at *5 (concluding that the good faith and fair dealing claim was unlikely to succeed on the merits). Indeed, an implied covenant claim cannot be used to "imply obligations inconsistent with contractual provisions," *Chase Equip. Leasing Inc. v. Architectural Air, L.L.C.*, 84 A.D.3d 439 (1st Dep't 2011), or to add new terms to the contract, *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F.

Supp. 2d 344, 364 (S.D.N.Y. 2012); *Brown v. Deutsche Bank Nat'l Tr. Co.*, 120 A.D.3d 440, 441 (1st Dep't 2014).

Moreover, where, as here, the implied covenant claim "arise[s] from the same facts and seek the identical damages for each alleged breach" it should be dismissed as duplicative. *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) (affirming dismissal of a breach of good faith and fair dealing claim as duplicative of a breach of contract claim); *see also Mill Fin., LLC v. Gillet*, 122 A.D.3d 98, 104 (1st Dep't 2014); *North Star*, 2020 WL 3411267, at *5 (finding similar claim by another group of lenders was redundant because it was "intrinsically tied to the damages allegedly resulting from a breach of the contract.").

Finally, Plaintiffs' allegation that the Transaction "destroyed the CLOs' rights to receive the fruits of their bargain" misconstrues the Transaction. Compl. ¶ 52. Contrary to Plaintiffs' allegations, the Transaction did not release any of Plaintiffs' liens. As explained *supra*, Plaintiffs retained their existing *pari passu* liens on the First Lien Term Loan collateral, and gained **additional collateral** as a result of the Transaction. *See* Ex. A § 1.01 (definition of "Excluded Assets," which narrows the universe of non-collateral assets in both the PTL Loans and the First Lien Term Loans). Accordingly, Plaintiffs fail to assert a claim for breach of the implied covenant of good faith and fair dealing. *See Wigdor v. SoulCycle, LLC*, 139 A.D.3d 613, 614 (1st Dep't 2016) (dismissing plaintiff's claim for breach of the obligation of good faith and fair dealing because "plaintiff has failed to plead facts and circumstances constituting a breach").

## V.      PLAINTIFFS' PERMANENT INJUNCTION CLAIM IS NOT A STAND ALONE CAUSE OF ACTION AND SHOULD BE DISMISSED

Finally, Plaintiffs' claim for a permanent injunction cannot stand alone and should be dismissed. An "[i]injunction is not a separate cause of action; it is a remedy." *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 407–08 (S.D.N.Y. 2010); *see also Trodale Holdings LLC*

*v. Bristol Healthcare Invs., L.P.*, 2017 WL 5905574, at \*11 (S.D.N.Y. Nov. 29, 2017).  As such, in the event that Plaintiffs' underlying claims fail, then the claim for injunctive relief must also fail.  *See Hauptman v. Interactive Brokers, LLC*, 2018 WL 4278345, at \*9 (S.D.N.Y. June 12, 2018) ("Because all of Plaintiffs' underlying claims fail, their request for declaratory and injunctive relief is also dismissed."); *Smith v. New Line Cinema*, 2004 WL 2049232, at \*5 (S.D.N.Y. Sept. 13, 2004).

## <u>CONCLUSION</u>

Accordingly, SSB respectfully requests that this Court grant its Motion and dismiss the Complaint in its entirety with prejudice.[11]

---

[11] Plaintiffs should not be given any further chances to amend.  Plaintiffs have had numerous opportunities to amend the complaint to state a claim, most recently before this Court. *See* Tr. at 7:3-14.  Moreover, as explained above, the plain terms of the Credit Agreement defeat all of Plaintiffs' claims.  Thus, any further amendment would be futile. *Williams Trading LLC v. Wells Fargo Sec., LLC*, 2013 WL 1718916, at \*9 (S.D.N.Y. Apr. 19, 2013), *aff'd*, 553 F. App'x 33 (2d Cir. 2014).

Dated: New York, New York
      July 9, 2021

Respectfully submitted,

*s/ David J. Lender*
David J. Lender
Luna Barrington
Richard D. Gage
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
david.lender@weil.com
luna.barrington@weil.com
richard.gage@weil.com

*Attorneys for Defendant*
*Serta Simmons Bedding, LLC.*