# EXHIBIT 21

1          IN THE UNITED STATES BANKRUPTCY COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                   HOUSTON DIVISION

4   SERTA SIMMONS BEDDING, LLC,    §    CASE NO. 23-03007-ADV
    ET AL                          §
5                                  §    HOUSTON, TEXAS
    VERSUS                         §    FRIDAY,
6                                  §    JANUARY 27, 2023
    AG CENTRE STREET PARTNERSHIP,  §
7   ET AL                          §    3:30 P.M. TO 4:38 P.M.
    ***********************************************************
8   SERTA SIMMONS BEDDING, LLC,    §    CASE NO. 23-09001-ADV
    ET AL                          §
9                                  §    HOUSTON, TEXAS
    VERSUS                         §    FRIDAY,
10                                 §    JANUARY 27, 2023
    AG CENTRE STREET PARTNERSHIP,  §
11  ET AL                          §    3:30 P.M. TO 4:38 P.M.

12          **MOTION TO EXTEND THE STAY (VIA ZOOM)**

13          BEFORE THE HONORABLE DAVID R. JONES
               UNITED STATES BANKRUPTCY JUDGE

14

15

        APPEARANCES:                    SEE NEXT PAGE

16

17             (Recorded via CourtSpeak)

18

19

20             TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
               935 Eldridge Road, #144
22             Sugar Land, TX 77478
                  281-277-5325
23           www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.

1                      APPEARANCES (VIA ZOOM):

2

3  FOR THE DEBTORS:              WEIL GOTSHAL & MANGES, LLP
                                 Ray C. Schrock, Esq.
4                                Alexander W. Welch, Esq.
                                 David J. Lender, Esq.
5                                767 Fifth Avenue
                                 New York, NY  10153
6                                212-310-8000

7

8  FOR THE AD HOC GROUP OF
   FIRST LIEN LENDERS:           PAUL WEISS RIFKIND WHARTON
9                                & GARRISON, LLP
                                 Brian Hermann, Esq.
10                               Andrew J. Ehrlich, Esq.
                                 1285 Avenue of the Americas
11                               New York, NY  10019-6064
                                 212-373-3000
12
                                 PORTER HEDGES, LLP
13                               John F. Higgins, Esq.
                                 1000 Main St., 36th Fl.
14                               Houston, TX  77002
                                 713-226-6404
15

16
   FOR THE PRIORITY TERM LOAN
17 LENDERS:                      GIBSON DUNN
                                 Scott J. Greenberg, Esq.
18                               200 Park Avenue
                                 New York, NY  10166
19                               212-351-5298

20                               GIBSON DUNN
                                 Gregg J. Costa, Esq.
21                               811 Main Street, Ste. 3000
                                 Houston, TX  77002-6117
22                               346-718-6649

23

24

25

```
 1                    APPEARANCES (CONT'D) (VIA ZOOM):

 2

 3   FOR THE LCM LENDERS:           HOLWELL SHUSTER & GOLDBERG,
                                    LLP
 4                                  Neil R. Lieberman, Esq.
                                    425 Lexington Avenue
 5                                  New York, NY  10017
                                    646-837-5168
 6
                                    MCKOOL SMITH
 7                                  John J. Sparacino, Esq.
                                    600 Travis St., Ste. 7000
 8                                  Houston, TX  77002
                                    713-485-7300
 9

10

11

12   (Please also see electronic appearances.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **HOUSTON, TEXAS; FRIDAY, JANUARY 27, 2023; 3:30 P.M.**

2          THE COURT:  Then good afternoon, everyone.  This

3  is Judge Jones.  The time is 3:30 Central -- hold on,

4  someone just raised their hand.

5          All right.  Let me start over.

6          Today is -- the time is 3:30 Central, today is

7  January the 27th, 2023.  This is the Docket for Houston,

8  Texas.

9          We have matters this afternoon in a set of

10  adversaries.  They are Adversary No. 23-3007, 23-9001.

11          Folks, what I would ask that you do, if you would

12  make sure you make your electronic appearance.  Obviously on

13  my website it will only reflect the main case.  Trust that I

14  will move that to the Adversary.  If you have a specific

15  reason to appear in only one of the adversaries and not

16  both, if you would indicate that when you do the electronic

17  sign-in and when you first announce this afternoon, we'll

18  make sure that we get that straight.

19          We are recording this afternoon using CourtSpeak.

20  We'll have the audio up on the Docket.  We'll put the audio

21  -- because we have to pick, we can't duplicate, so we'll put

22  the audio file to the extent that you are interested in it,

23  in Adversary No. 23-3007.  Again, we'll put the audio of

24  this afternoon's hearing in 23-3007.

25          As always, first time that you speak, if you would

1  please state your name and who you represent.  Really does

2  help the Court folks do a very tough job when they are

3  requested to make a transcript.

4         All right.  I'd like to take a few minutes before

5  we get started and I would really like to hear from each of

6  the major constituents as to their goals this afternoon.

7  I've read everything that's been filed.  I have my own

8  thoughts.  I have a ton of questions.  Perhaps you-all have

9  thought through them.  Didn't look like we made a lot of

10 progress in the meet-and-confer, but that's just the way

11 that it goes sometimes.

12        But Mr. Schrock, let me ask -- let me start with

13 the Debtors.  Are you the point person this afternoon, or

14 are you deferring?

15        MR. SCHROCK:  I am the point person, Your Honor.

16        THE COURT:  All right.  So again, just a couple of

17 minutes.  And just as a general overview, --

18        MR. SCHROCK:  Sure.

19        THE COURT:  -- I would love to figure out an

20 efficient way to have only one adversary and not two.  And I

21 want --

22        MR. SCHROCK:  Yes.

23        THE COURT:  -- to think -- I had -- because I

24 quite frankly was trying to figure out what was going on.  I

25 want to especially thank Ms. Morrison for taking time to

1  talk to Mr. Alonzo, because quite frankly, we were headed

2  down a path.  We were worried that there was something else

3  wrong internally with the Clerk's Office, just given the

4  amount of duplication.  So I very much appreciate her

5  spending time with Mr. Alonzo.

6           So you can tell me sort of where you think we're

7  headed.  I may interrupt you and I'll apologize beforehand

8  for doing that.  I just want to try to get us all on the

9  same page.

10          MR. SCHROCK:  Yeah, thanks very much, Your Honor.

11  And again, Ray Schrock, Weil Gotshal & Manges for both of

12  the Debtors.  I'm here this afternoon with my partner, Alex

13  Welch, and also my litigation partner, David Lender.  I

14  believe he's one of the boxes at least on my screen.

15          THE COURT:  He is.

16          MR. SCHROCK:  So Your Honor, we did have the meet-

17  and-confer.  It lasted, I believe, a little over an hour.  I

18  think it's always helpful -- even if we don't agree on

19  everything, it's always helpful to talk so we can understand

20  where everyone is coming from and see, you know, if there is

21  any common ground.

22          I do think that unfortunately, you know, there is

23  some -- you know, from our perspective we're convinced that

24  this matter must be heard in this Court.  We filed a

25  separate adversary to extend the stay just because it's

1   injunctive relief, but I think frankly it could be, you

2   know, just a motion that we file in the initial adversary

3   would be another way to do it to confirm that the stay

4   applies or in the alternative to extend the stay, would be

5   another way to handle it if we didn't want to have two

6   adversary proceedings, but from our perspective -- and we

7   made this clear in the supplement statement that we filed

8   that, you know, these matters accord to the company.

9   There's no getting out of Chapter 11 we believe without

10  doing this.  We need to get on with it.  We've got a very

11  deliberate schedule.

12          I did see what Paul Weiss filed on behalf of the

13  Defendants and, you know, some of the scheduling issues, and

14  I think some of the litigation parties -- or the litigation

15  partners at our respective firms, that had some dialog and

16  back-and-forth about when we could actually have things

17  heard, but I think there's very little doubt that, you know,

18  in light of, you know, the fact that these are at heart

19  contracts with the Debtors and we're deciding the claim,

20  priority, and treatment of claims against the Debtors that

21  these have to be in a separate court, having duplicate

22  proceedings where we would have to monitor it and not have

23  -- understand how our bankruptcy would even end.

24          And the indemnification brings this, frankly, full

25  circle in my mind and you know, that's something that we're

1 | very cognizant about when we even entered into the 2020

2 | transaction.  And of course, somebody is not going to enter

3 | into a transaction and just as Mr. Hermann's clients would

4 | have asked to be indemnified for entering into the

5 | transaction that they were proposing, these lenders did, as

6 | well.

7 |        But Your Honor, you're the one hearing the

8 | Chapter 11.  Everybody is here already, even today.  You

9 | know, we certainly feel that this is, you know, having this

10 | on the same track as confirmation of the Plan makes imminent

11 | sense.  I know that the parties here are capable of doing

12 | that.

13 |        If we do have to have any initial proceedings

14 | while discovery is proceeding around extension of the stay,

15 | we will move as quickly as everybody needs to move on that.

16 | I know they proposed some dates in their letter.  The only

17 | thing that was causing us any hesitation on just agreeing to

18 | those dates that they had suggested is I think that we had

19 | some issues with the witness availability if they want to

20 | depose Mr. Kempner (phonetic) on extension of the stay

21 | because he's going to be in court next week on another

22 | matter, but we can -- listen, we'll work through that.

23 |        I think that the stay issue is primarily a legal

24 | issue fundamentally in any regard, but I don't want to -- I

25 | don't want to sit here and just repeat what's in our

1    supplemental statement, Judge.  We really do think that, you

2    know, it is imperative we get going and we would ask the

3    Court to enter the Scheduling Order and you know, we will

4    work with the parties and we will do whatever we have to do

5    to pull this across the finish line within the time that's

6    required, but our paramount interest here is making sure

7    that these core proceedings are heard before this Court and

8    making sure that, you know, we walk out of here today with a

9    schedule.

10            I mean, that's my goal is to say that we can have

11    some type of Scheduling Order, or alternatively, if Judge,

12    you say, listen, I want you guys to meet over the weekend

13    and agree on the dates, you know, that fit within

14    confirmation, we'll do it.  You know, we'll -- but we need

15    to get moving.

16            So that's what I'm looking for today and

17    requesting humbly before the Court.

18            THE COURT:  All right.  Let me ask you one

19    question.  As I work my way through this and again,

20    litigators are always going to work on things from every

21    possible angle, because they're always worried about, what

22    if I'm wrong about A, --

23            MR. SCHROCK:  Sure.

24            THE COURT:  -- I have to have position B fallback.

25    As I look at what -- at least what I think you're attempting

1  to do, is, one, you've got an issue -- at least I think --

2  that is a really important issue, did the agreements between

3  the parties allow the 2020 transaction to occur?

4          MR. SCHROCK:  Correct.

5          THE COURT:  And I don't think -- at least I

6  haven't read anything that suggests that the parties

7  disagree as to what happened in the 2020 transaction.  Why

8  does that --

9          MR. SCHROCK:  I agree.

10         THE COURT:  Why does that require discovery?

11         MR. SCHROCK:  You know, Judge, I think it's

12  excellent point, you know?  This is a transaction where both

13  parties, you know, were part of the competitive lending

14  process.  Everybody was there.  You know, everybody lived

15  the facts at that time, and I think that, you know, the

16  Debtors, literally we were negotiating with both sets and

17  then, you know, when we're dealing with just a contract

18  interpretation issue --

19         THE COURT:  Uh-huh.

20         MR. SCHROCK:  -- I know various parties that used

21  to need an expert report.  I happen to think we don't for

22  something like that.

23         But you know, fundamentally, you know, I don't

24  think there needs to be a lot of discovery.  That being

25  said, we're sensitive to the fact that these -- that the

1  parties that have brought claims in different courts have

2  said, "Listen, we want to understand, you know, the good

3  faith nature of, you know, your" --

4          THE COURT:  So let me, if I could, I want to parse

5  this just a little bit with you.

6          MR. SCHROCK:  Sure.

7          THE COURT:  I got that.  I think that when you get

8  to a good faith/bad faith argument, I absolutely -- I don't

9  think that is a legal issue.  I do think that that is

10 entitled to discovery from both sides.

11         But on the single issue of whether or not the 2020

12 transaction was allowed under the agreement, unless and

13 until there's a finding of ambiguity, why is -- why is there

14 any discovery, I mean, at all?

15         And again --

16         MR. SCHROCK:  Judge?

17         THE COURT:  -- you know, read a few --

18         MR. SCHROCK:  We agree with you.

19         THE COURT:  -- read of few of these in my

20 lifetime.  You know, I have not made it all the way through

21 this one.  I mean, it's -- you know, I've had a couple

22 things to do since we were last together, so I've not made

23 it through 400-and-some-odd pages, but you know, if -- and

24 I'm also going to bet that not the entire 450 pages turns

25 out to be relevant.

1              But why -- as a threshold issue, because it seems

2    to me that it would tee up sort of the next branch of the

3    decision tree, why isn't this one of those situations where

4    there ought to be a motion for summary judgment or competing

5    motions for summary judgment on that single issue?

6              Now, I don't know what that does to

7    Mr. Greenberg's comfort zone and at this point I hadn't

8    gotten to him, so I'm -- and I don't mean this

9    disrespectfully -- I don't care right now.

10             But in terms of moving this forward, why isn't

11   that just a threshold issue that could be done relatively

12   quickly?  I mean, the last amendments to Rule 56 clearly

13   allow for this.  Why aren't we just taking that path?  That

14   will give everybody a view of at least how I see the world,

15   and if there -- if that generates some sort of review right,

16   I don't -- I'm still trying to think through.  I think that

17   would be interlocutory, but maybe not, maybe the parties

18   would agree that it has some finality to it.

19             Again, don't know, hadn't thought all the way

20   through that.  But it just seems to me that we are a lot

21   more efficient and focused if we pick sort of that threshold

22   issue.  And of course, this would be without anybody's

23   rights to file a Rule 12 motion.  I mean, I'm not trying to

24   shortcut that process at all.

25             I think it can exist -- and I think they both can

1  exist.  You know, I will tell you and again, I want -- you

2  know I try to be as -- just as transparent as I can possibly

3  be, I have thought a lot about this.  I've looked at it.

4  You know, it's a tough argument to argue that this just

5  isn't a fundamental part of what I am required to do under

6  the directive that I was given by Congress.

7         I think this goes to the heart of the findings

8  that I'm required to make under 1129.  I don't know how I

9  did -- if I were doing my job, I don't know how I could make

10 this decision without knowing the answer to this.

11        I've also got views on the stay issue.  I know

12 everybody went scrambling for Isgur's *Honx* opinion.

13        MR. SCHROCK:  Yes.

14        THE COURT:  I just believe that you can't -- you

15 know, you can't use a procedure to circumvent the intent --

16 and again, I'm not criticizing anybody, but you can't use --

17 you can't use the process to circumvent what it's intended

18 to protect.

19        And so you can't really allege that by trying to

20 say, oh, well, we just want to pursue damage claims only

21 against the lenders, that it doesn't affect the Debtor, the

22 estate, and quite frankly what I'm required to do under

23 1129.  I also think that it makes it really tough to meet

24 the requirements under 1123.  I think it makes it tough to

25 meet the requirements under 1125.

1        I mean, it's going to be a tough argument.  I'm

2   going to hear it, but again, I'm just trying to be as

3   transparent as I possibly can be.  And I will tell everyone

4   and I'm going to give you the opportunity to argue against

5   it.

6        I know that parties wanted to respond to your

7   motion to extend the stay.  I've got the ability to do it on

8   an interim basis and what I came out prepared to do -- just

9   because of my own thoughts about how important this is to

10  the overall process, I came out today prepared to -- however

11  you want to put it, extend the stay, use my equitable power

12  to stay, confirm at least on an interim basis that I think

13  362 applies -- I can go through all of the legs of that if I

14  need to, but to do it for 60 days and then give everybody an

15  opportunity to fully brief the issue.

16        Again, my only goal is to get it right, but I do

17  think --

18        MR. SCHROCK:  Yeah.

19        THE COURT:  -- I mean, with the report I got that

20  I have a district judge in New York that I don't even know

21  if she knows that I exist.  Maybe she does and she doesn't

22  care.  I mean, that's certainly her entitlement to do.

23        But I just think that this -- the path that we're

24  on is going to lead to just a problem in one forum or

25  another and I don't want there to be -- I certainly don't

1   want there to be competition of who can get a ruling first.

2   I want a District Court in New York to have full information

3   when it makes decisions.  I know that I want all of the

4   information that I can possibly get when I make a decision.

5          So that's kind of where I came out.  And again,

6   just -- I'm trying to give Mr. Hermann the ability to focus

7   on where he's going to try and push me.

8          But that's sort of where I am, just having read

9   through everything.  And again, --

10         MR. SCHROCK:  Yes.

11         THE COURT:  -- looking at the schedule -- and I

12  promise I'll be quiet in just a couple of minutes.  Looking

13  at the schedule, that schedule is complicated to me.  It's

14  so hard for me to try to figure out what might and might not

15  happen.  You know, I would -- if you ask me what I would

16  prefer to do -- and again, I'm going to -- you-all are the

17  ones who have to work through this and again, I'm very

18  sensitive to sitting where you-all are sitting.

19         You know, again, I try not to burden folks when I

20  don't know the full impact of that burden.  You know, my

21  view is, is that we have a Disclosure Statement hearing

22  date.  You-all can work on that Disclosure Statement.  We

23  can have the Disclosure Statement hearing.  If you want to

24  make voluntary production and you want to voluntarily engage

25  in discovery, you don't need my blessing to do that.

1          Once that Disclosure Statement is approved and we
2    have a confirmation scheduled, you know, then parties can
3    tee up what they think the issues are.

4          And again, my inclination is, is that I really
5    think this threshold issue in the adversary -- and I think
6    it's 9001, which is why I want to get confident as to which
7    adversary we're talking about.  I think it's 9001 -- is that
8    we just deal with the threshold issue, again, which I think
9    is a legal basis.

10         I know that one court said that they thought there
11   was an ambiguity.  I've read that specific provision and I'm
12   going to respectfully disagree with that court.  If someone
13   wants to convince me that I'm bound by that, then I'll
14   certainly hear that argument.  But I've read the provision.
15   I don't find it ambiguous at all.

16         I've lived in that world.  I simply don't find it
17   difficult at all.

18         MR. SCHROCK:  Judge, you know, we actually really
19   debated whether or not this -- you know, not to file any
20   adversary and frankly just have confirmation of the Plan
21   because that's the way we frankly think about.  And we're
22   perfectly happy to proceed.  You know, brief the matter,
23   make sure we're heading towards confirmation.  We do want to
24   make sure that there's a stay -- confirmation that there's a
25   stay or extend the stay entered so we don't have competing

1    rulings, but you know, we're very much on the same page,

2    Judge.

3              THE COURT:  All right.  Let me ask:  Mr. Hermann,

4    do you want to go next?

5              MR. HERMANN:  Sure.  Thank you, Your Honor.

6              Brian Hermann with the Ad Hoc Group of First Lien

7    Lenders, Paul Weiss Rifkind Wharton & Garrison, and let me

8    also say I'm joined by Mr. Higgins from Porter Hedges, who I

9    saw on the screen, but I don't see now.  And my partner,

10   Andrew Ehrlich, who is our litigation partner.

11             Your Honor, let me start -- and I want to address

12   some specific -- and I will address some of the specific

13   things that you just raised, but let me start with your

14   first question, which are:  What are our goals?

15             As I see it, our goals really are simplicity,

16   efficiency, and making sure that our third-party litigation

17   claims are preserved -- and those exist against the lenders

18   as I said the other day.

19             We made a suggestion, Your Honor, that I think

20   really makes this as simple as possible, which is the

21   Debtors can go forward with their plan.  There really does

22   not need to be a contested matter in this case regarding the

23   2020 transaction and its validity, or the priorities that

24   are specified in the Plan, and we think that that actually

25   makes the Debtors' life very easy and we'll just pursue the

1  lenders elsewhere.

2          We think that is actually the simplest way to

3  proceed.

4          They raised the indemnity and you touched on the

5  indemnity.  I actually think the indemnity is a red herring

6  for a few different reasons.  First, under their own Plan,

7  Your Honor, the indemnity is an assumed obligation, and so

8  they have basically presumed or they will take the position,

9  I assume, although it's a little unclear from their papers,

10 but I think they will take the position that the indemnity

11 -- or the contingent indemnity claim is not a feasibility

12 issue because they're already willing to assume it and even

13 if Your Honor were to hear the case and rule against us, if

14 we were to take an appeal and prevail, they would have a

15 Plan that I assume they would go effective with before the

16 appeal, and take the risk that the company would have to pay

17 out under the indemnity.  So it can't be a feasibility

18 issue.

19         So the way I look at it, we can pursue our claims

20 for -- I'm sorry, Your Honor?

21         THE COURT:  No, my fault.  There was a delay.

22 I'll wait for you to finish.  My apologies.

23         MR. HERMANN:  No problem.

24         So the way I see it, we could pursue our claims

25 against the lenders.  The extent that there was a claim

1  asserted under the indemnity, that's not our claim, that's

2  their claim, maybe at some point down the road pursuant to

3  the assumption provision in the Plan, so there's nothing

4  core about the litigation with us.  Our claims would not be

5  implicated in the bankruptcy from the perspective of the

6  2020 transaction.  As I said the other day, we would be

7  essentially treated as unsecured creditors that are entitled

8  to whatever the Plan provides and we have whatever rights we

9  have in that capacity.

10         But there's no need to decide the priority of our

11 claim vis-à-vis the other lenders and the Debtor because

12 that wouldn't be an issue in this case.

13         So I think that's an easy way to proceed.

14         The other think I would say about the indemnity is

15 we don't know for sure, although presumably the Debtors and

16 the favored lenders do, but we think there is substantial

17 overlap between the lenders who would claim under the

18 indemnity and the lenders who would take virtually all the

19 equity up under the Plan.

20         And so it's really right pocket/left pocket.  I

21 don't think this is -- I don't think this is a big concern.

22 So that's our response in terms of what we think is the best

23 path forward.

24         If on the other hand, nobody wants to take us up

25 on our offer, which to-date nobody has.  We think the right

1    way to proceed is to first determine the 105 -- what they've

2    titled as the "105 lawsuit."  And figure out which court we

3    really are going to be in.

4          Now I heard what you said about putting in place

5    an injunction without necessarily responding, but I think

6    that the threshold issue here is which court is to hear the

7    litigation.  And although they styled it as a 105 request,

8    it's really a venue transfer motion.  The action is to move

9    to Judge Vela (phonetic).  She does know about this case, as

10   far as the Debtors could make them aware of it.

11         So the action was removed to Judge Vela.  The

12   appropriate procedure under the rules is to file a motion in

13   that court to transfer venue to this court, which is their

14   right and we don't take issue with that.  But it's not to

15   try to stay a litigation in New York court, only to bring it

16   to this court.  That is effectively what they want to do and

17   that is a transfer of venue, that is not an extension of the

18   stay or 105 injunction.

19         So we think we should brief that.  We think we

20   should have that heard and then based on the determination

21   of whether it's a venue transfer motion or a 105 hearing, we

22   will then know which court we're in, which I think is a very

23   important thing to figure out as a threshold matter.

24         THE COURT:  So let me -- if I could step in?

25   Because I don't want to forget these issues.

1          MR. HERMANN:  Yes.

2          THE COURT:  So if I were -- and I haven't yet done

3     it, but if I were to agree with you on that issue, would you

4     agree to a temporary stay until that issue was teed up

5     appropriately?

6          MR. HERMANN:  I think we would, Your Honor.

7          THE COURT:  Okay.  It makes sense to me.

8          MR. HERMANN:  But --

9          THE COURT:  No, I got all of that and that's where

10    I was trying to get to when I said that's where I came out.

11    I read your schedule.  If you think about our first hearing,

12    you know, number one, if you remember, I questioned -- I

13    asked you a question about whether or not you were waiving

14    any claim that you had against the Debtor.  You know me, I

15    never ask anything unless there's something floating around

16    inside my head -- and you said, no, we're going to take what

17    we're entitled to.

18          And I think that that triggers an awful lot of

19    responsibility on my part.  You know, I've said it before,

20    I'll say it again.  I still think the Debtors are making a

21    mistake in the way that they've handled the distribution of

22    those two classes, but you know, they'll do whatever they're

23    going to do.

24          I agree with you on the venue issue.  If you

25    remember, I think it was Mr. Schrock, I asked him if I was

1   going to see that lawsuit or both of those lawsuits at some

2   future point in time, and he wasn't -- and appropriately so,

3   he wasn't prepared to give me that answer at the first days.

4          But my inclination is that I don't disagree with

5   you and timing may be an issue and my sense that we can

6   proceed concurrently because I think those issues can get

7   teed up and we are in a time crunch, you know, I considered

8   the whole, you know, venue issue, motion to dismiss, all in

9   the Rule 12 comment that I made, but I don't want -- and I'm

10  not suggesting that anyone would do this, but I've also been

11  around a long time -- I don't want courts being played off

12  on one another.  I don't want the process being used to try

13  and gain a surreptitious advantage.

14         I mean, people try to get litigation advantages

15  all the time and that's just fine with me.  But I don't want

16  geography and my lack of communication between a District

17  Court in New York and a Bankruptcy Court in the Southern

18  District of Texas to create an advantage or detriment to any

19  party.

20         And so, you know, while we deal with that issue,

21  if your folks are willing to agree to a temporary stay --

22  without prejudice to your right to make any argument that

23  you wanted to make, that makes sense to me, and quite

24  honestly it's where I was headed to begin with.  Makes it a

25  whole lot easier for you -- for me to give you a schedule

1  that is more in line with what your letter was requesting.

2          But I also don't think -- and I want to hear your

3  thoughts on this.  It seems to me that it's -- I'd like to

4  hear your views on make the assumption -- this was without

5  prejudice to anything you're going to raise or argue in the

6  future.  I'd like your view on the issue that I talked to

7  Mr. Schrock about, is that dealing with the threshold issue

8  of is the 2020 transaction prohibited by the agreement?

9          Is that Mr. Ehrlich's thing to handle?  I saw you

10 pointing, I saw him nodding.

11    (Laughter.)

12          MR. EHRLICH:  Yes.  Mr. Ehrlich will handle that

13 that issue.

14          THE COURT:  All right.

15          MR. EHRLICH:  Your Honor, for the Record, Andrew

16 Ehrlich on behalf of the First Lien Ad Hoc Group.

17          With respect to that question, Your Honor, the

18 question obviously is whether the 2020 transaction, whether

19 the exchange that was undertaken constitutes an open market

20 purchase under that agreement.

21          And while obviously, you know, it is an opinion,

22 Judge Vela in the Southern District of New York on the

23 Debtors' motion to dismiss LCN's complaint -- and counsel

24 for LCN, Mr. Lieberman is at the conference today and he can

25 speak to it from first-hand experience -- she concluded that

1  at a minimum the term is ambiguous.  And that therefore, LCN

2  had stated a claim, first for breach of contract.

3              THE COURT:  Right.

4              MR. EHRLICH:  And second, for breach of the

5  covenant of good faith and fair dealing, and she reached

6  that conclusion in part because her reasoning was that this

7  privately negotiated transaction amongst parties was not --

8  it was, you know, not an open market as that term is

9  conventionally understood.  Indeed, she cited to a memo

10 published by the Weil Gotshal Law Firm defining open market

11 purchase in stark contrast to the facts and circumstances

12 here.

13             For her conclusion that it's ambiguous and

14 therefore discovery of those facts and experts varieties

15 were appropriate and indeed, that went on for approximately

16 a year.  In fact, discovery is very close to conclusion in

17 that case.

18             THE COURT:  Do you --

19             MR. EHRLICH:  So -- yeah.

20             THE COURT:  Do you think that I am bound by her

21 determination?

22             MR. EHRLICH:  Well, I think under principals of

23 collateral estoppel, given that the Debtors were a party to

24 that, there's certainly a strong argument maybe.

25             THE COURT:  Well, so wait a minute.  Collateral

1  estoppel doesn't affect me.  I mean, the judge said, "I've

2  read this."

3           MR. EHRLICH:  So does the Debtor.

4           THE COURT:  Well, let me finish my question, if I

5  could.

6           MR. EHRLICH:  Sorry.

7           THE COURT:  No, it's okay.

8           The question that I'm asking is:  A judge says,

9  "Hum, I've read the agreement and I think there's an

10 ambiguity," and that determination is not final because it

11 was in the context of denying a motion to dismiss.  So

12 there's no finality to it.  There's no *res judicata* issues.

13          And I read the agreement, and again, we all have

14 our own views on contract construction and what principles

15 we apply, and we also have our own backgrounds and just

16 general commercial knowledge.

17          Do I get to look at that -- do I get to look at

18 that issue free of her determination?

19          MR. EHRLICH:  I believe, although we'll have to

20 consider this further, I don't believe as a legal matter you

21 are bound by it because it's not a final judgment, but it's

22 certainly in our view influential and he's the only other

23 court we're aware of to construe this term in an analogous

24 lawsuit, which is the Supreme Court in the State of New York

25 in the *Fordwriters* (phonetic) matter, reached a similar

1  conclusion.

2         It's the same breach of contract and breach of

3  covenants good faith and fair dealings.

4         THE COURT:  So if we could, I want you to pull out

5  the good faith and fair dealing, because I totally agree

6  with you on that.  Good faith and fair dealing is -- I'm not

7  going to say never, 'cause that's hard to live in that

8  world.  Good faith and fair dealing most often is a factual

9  intensive inquiry and requires discovery and understanding

10  all of the circumstances.  So I got that.  I want to pull

11  that out.

12         Just the issue, I want to focus on just the issue

13  of whether or not the 2020 transaction was allowed by the

14  agreement.  I mean, you don't dispute what happened, right?

15         MR. EHRLICH:  The transaction documents, you know,

16  are what they are, they're --

17         THE COURT:  No, but you're not asserting that

18  there was some undisclosed side agreement or that there was

19  a fraud afoot or anything like that?  I mean, you got a set

20  of documents and what you're complaining about is what the

21  documents actually say, correct?

22         MR. EHRLICH:  That's fair, Your Honor.

23         THE COURT:  Okay.  All right.  So with that, why

24  isn't it really important to everyone with the understanding

25  that, again, I want you to make the assumption that I'm the

1   one that's doing it and I'm not trying to prejudice again

2   any arguments that you may have against that.

3           But why isn't that a really critical step in

4   understand where we're headed, to have my view on what I

5   think about that?  And why isn't that a -- why isn't that --

6   to be competing summary judgments, I don't think that's

7   necessary.  It can be a summary judgment and a response,

8   because maybe you want to file your own summary judgment and

9   say it violated the agreement.  I don't know.  I think you

10  can do that in your response and cross-motion, but I'm not

11  trying to tell you how to practice law.  I really wasn't

12  trying to do that.

13          But it seemed to me that that just -- that's

14  really important, wouldn't take that much time, doesn't in

15  any way stop or infringe because you both have ample support

16  to pursue both a summary judgment avenue, as well as what

17  I'm going to call the "Rule 12 avenue."  And if we get to

18  the point where I go, hey, you know, maybe I'm not -- maybe

19  you've convinced me that I'm not the right one to hear this

20  and that it doesn't impact confirmation.  I told you that's

21  going to be a steep hill to climb, just looking at it.

22          But maybe that's right, but at that point, you

23  know, I don't see that there's been any loss in efficiency.

24  It just means that the person who may determine those

25  competing motions for summary judgment is somebody other

1  than me.

2           MR. EHRLICH:  Well, I guess, Judge Jones, one

3  reaction as I listen to you is the question of whether this

4  transaction is an open market purchase.  It would seem to us

5  would be dependent almost necessarily on a factual record --

6  to whom it was offered, how it germinated, how it was

7  negotiated, how it came to be, which it seems to us to be

8  very, very hard to determine from the face of the document

9  without a record.

10          THE COURT:  So let me disagree with you there.

11  You have taken -- and I say "you" collectively.   You have

12  taken all sorts of positions that what they did was outside

13  the contract.  So you've already got a set of facts that

14  you're relying on.  I mean, that sounds to me a whole lot

15  like a set of stipulated facts because you made your Rule 11

16  inquiry when you made all of those assertions, which means

17  you've certified to me that you've made reasonable inquiry,

18  you've done your due diligence, and here's where we are, so

19  I don't see a factual dispute.  You've -- we've already

20  crossed that bridge in my mind.

21          But if I'm wrong, please tell me.

22          MR. EHRLICH:  Well, I suppose, Your Honor, we

23  would certainly be of the view that the transaction as we

24  understand it from just the mechanics alone was not an open

25  market purchase.  It would seem that a complete adjudication

1   of that question would involve facts beyond the contract,

2   but we certainly agree with you we could prevail on the four

3   corners of the document.

4           THE COURT:  Okay.  But it seems to me -- and

5   again, this would be without infringing upon your right to

6   say that there's a factual issue present.  I mean, isn't

7   that what everyone does when they are trying to avoid losing

8   a summary judgment?

9           I mean, they all go, "Oh, there's a factual

10  dispute."  That's always my fallback.

11          So this seems to me that once we get that

12  threshold issue resolved, then again, I mean, it may very

13  well be that the Debtors go, oops, we've got to come up with

14  a Plan B.  It may very well be that the lending group says,

15  ooh, we've got to go to our Plan B.

16          But it just seems to me that we should exhaust

17  that because I think everything else in that complaint in

18  large part tees off of the answer to that question.  I may

19  be wrong, but just seems to me that it does.

20          MR. EHRLICH:  Your Honor, may I raise a practical

21  consideration?

22          THE COURT:  I am all for practical issues.

23          MR. EHRLICH:  If the Court is inclined to

24  undertake a threshold motion practice, we obviously, you

25  know, will work out a schedule and we'll do it promptly.

1          But you know, we have heard the Debtors say at
2     both of these appearances thus far in the case that it's
3     critical for them to adjudicate this issue in connection
4     with confirmation.  And if, in fact, that's where we end up,
5     and obviously you've heard from Mr. Hermann, that's not our
6     view of the world.  But if that's where we end up, we don't
7     want to be handicapped in litigating that issue.
8          And we think we should get started on document
9     discovery and you know, there has been a whole litigation in
10    the Southern District of New York where both the Debtors and
11    the lenders have produced lots of discovery on precisely the
12    issue here.  And so our view is there is no burden to them
13    in pressing the button and providing that discovery to us as
14    early as next week, and if, in fact, you know, we have
15    threshold motion practice and the Court determines that the
16    term is at a minimum ambiguous, if not unambiguously
17    preclusive of the transaction, then we don't want to be
18    starting at square one at that point.
19         We'd like to get started and we'd like to start
20    immediately, no matter what court we're in.
21              THE COURT:  Got it.
22         Mr. Schrock, do you want to respond to that?
23         Mr. Greenberg, I haven't forgotten about you yet.
24    I'm just not ready to get to you.
25              Mr. Schrock?

1        MR. SCHROCK:  Yeah, Judge, we'll do whatever we
2   have to do, frankly, and whatever the Court thinks is
3   appropriate to -- you know, to get this heard promptly.  I
4   do think that there's a question of, you know, what
5   discovery is, in fact, appropriate, just -- you know, just
6   frankly pressing a button on some prior discovery.  I'm not
7   sure, I'd have to defer to my litigation partners on that.
8        But I do just want to emphasize that I really
9   think what would get away from here is because they said we
10  just want money damages, that what we're talking about is
11  the treatment of claims against -- in the Debtor's Plan.
12  Like in order to say you're junior, you're senior, your
13  claim's allowed, your claim's not -- I mean, this is all
14  just -- it's the Plan.
15       And so I don't know how anybody says, let's go do
16  this someplace else.  It doesn't make any sense to me, and I
17  just feel like we've torn ourselves into an adversary
18  proceeding when it's really, you know, a Plan.
19       But I understand the adversaries, but I'm not
20  saying -- the adversary is important for a lot of reasons.
21  We want to get it done, but you know, I will have to defer
22  to my litigation partners on the -- you know, the getting
23  the discovery.  If it's a matter of getting discovery out,
24  we don't want -- that's not going to be a barrier.  We'll do
25  whatever we have to do.

1          THE COURT:  So let me say this, is if there is --
2    if there are agreements on discovery, I think I said
3    somewhere in talking too long that parties want to agree to
4    voluntarily make discovery on issues.  I mean, you don't
5    need my blessing for that.  You'll do whatever it is you
6    want to do.
7          What I'm looking at -- again, trying to be
8    efficient -- and obviously if there are disputes, everyone
9    knows I don't mind -- I don't mind discovery disputes.  It's
10   what I do.  You also know what I do.  You know, if there's
11   an argument over interrogatories, we will go through them
12   one-by-one and that will be the most painful thing for
13   everybody, except for me.  I enjoy it.
14         But that's why I'm here, but again, I want to
15   focus on at least how I see the landscape as we sit here
16   today.  You've got a Plan.  You've got a Disclosure
17   Statement.  Maybe there needs to be tweaks made, maybe not,
18   I don't know.  You've got a date for a Disclosure Statement
19   hearing.  I can't imagine with the sophistication of the
20   folks that I've got involved in this case that that's going
21   to be a big fight.  You know, my view of Disclosure
22   Statements always was when I was a Debtor's lawyer, you want
23   something in the Disclosure Statement, you draft it.  I'm
24   going to bracket it.  These are the rants of a crazy person.
25   And I'm going to put it in the Disclosure Statement.  I'm

1  somewhat being facetious, but I mean, that's just my view of

2  that.

3       And so I can't imagine that that process is going

4  to be that complicated, and then we can focus on

5  confirmation.  My belief, the only thing I'm relatively

6  certain of, things are going to change.  One way or the

7  other, things are going to change.

8       With respect to the adversary, and I appreciate

9  Mr. Hermann's practical approach.  I mean, he's a practical

10 and very talented lawyer, but I appreciate the approach, is

11 I do think that it's great if it's by agreement, is there

12 ought to be a temporary stay to allow proper briefing on why

13 I should or shouldn't extend the stay, use my equitable

14 authority to impose a stay, or find that 362 already

15 applies.

16      And again, my view isn't that different from

17 Isgur's on that particular issue.  We've talked about it a

18 lot.  I think we've actually spoken on it together.

19      And then the rest, Mr. Schrock, it would seem to

20 me, you've got an avenue.  Again, Rule 56 says you can file

21 a summary judgment motion with a complaint if you want to.

22      MR. SCHROCK:  Right.  Understood.

23      THE COURT:  And I just think that with the

24 threshold issue, at least as I see it -- and again, I'm not

25 asking anybody to agree with my view of the threshold issue,

1    is that once that's determined, people are going to have a

2    much better idea as to what the risks are.

3           And one of the things you are all doing is you're

4    all assessing risk and what opportunities that provides.  I

5    got that.  But it just seems to me with that answer, then

6    again, things will change and we can figure out what to do

7    next.

8           To Mr. Ehrlich's point, if he want -- if there's

9    targeted discovery that he wants to do -- and Mr. Ehrlich,

10   I'm not putting words in your mouth, I'm just making

11   something up.  If there is targeted discovery that he wants

12   to do on -- let me pick something that I don't think is an

13   issue -- on valuation.  It's a complicated case and I

14   encourage parties to voluntarily exchange information on

15   complex issues.

16          So if there's targeted information that the

17   parties want to do in preparation for what they think might

18   happen, again, you know the era that I went to business

19   school in.  I'm a decision tree kind of guy and I march down

20   all of the branches.  I think that's smart.

21          If there are disputes, happy to do that, but where

22   I really wanted to focus -- Mr. Schrock, you want a schedule

23   and I agree, you should have a schedule.

24          And my -- you know, we can do -- if you agree with

25   the approach -- and I want you to tell me.  If you don't, I

1  want you to tell me that, too, but I'm going to trigger

2  everything off of -- you asked me what I came prepared to do

3  today.  I'm going to trigger everything off of your filing a

4  motion for summary judgment on the issue of does the 2020

5  transaction -- or is it allowed by the parties' agreement,

6  or does it violate the parties' agreement, you can phrase

7  that question however you want.  You know what I'm talking

8  about.

9          MR. SCHROCK:  Yes.

10         THE COURT:  And then, you know, I'll get a

11 response in 21 days, get a reply in seven days, and we'll

12 have a hearing.

13         MR. SCHROCK:  Okay.

14         THE COURT:  It seems to me that that will tell us

15 what the next step is and in the meantime, Mr. Hermann wants

16 to file a motion to dismiss or you want to file a motion to

17 transfer venue, those aren't mutually exclusive in my mind.

18         MR. HERMANN:  Your Honor, can I raise one other

19 practical --

20         THE COURT:  Of course.

21         MR. HERMANN:  -- consideration?

22         THE COURT:  Of course.

23         MR. HERMANN:  Thank you, Your Honor.

24         You know, we raised this in our letter.  We don't

25 have all the necessary -- I don't even know -- in the

1   adversary proceeding for sure we don't have all the

2   necessary parties because there are people who -- there are

3   lenders who participated in the exchange in June 2020 who we

4   know had sold since then and they're not appearing in the

5   case today.  They're not named in the adversary proceeding.

6   We have John Does in our litigation.  We now know who they

7   are.

8          But we have said to the Debtors and to the favored

9   lenders and I will say to you that if we're going to proceed

10  down this path, we just want to know whatever ruling we get,

11  if it's decided that this Court is going to make the ruling,

12  affords us complete relief in the sense it cannot be the

13  case that we go down this path, we prevail, and then some

14  other lender who is not a lender today, but you know, was a

15  lender in June 2020, comes in and says, well, that's not

16  preclusive of me and they get a redo.

17         So we have to solve to that problem as part of

18  whatever solution comes out of this.

19         THE COURT:  So that was certainly on my list to

20  talk about and I appreciate the way you explain it because

21  I'm not sure I understood it when I read it in the letter.

22         Mr. Schrock, have you had time to think through

23  that and digest it?

24         MR. SCHROCK:  Well, just a couple of issues,

25  Judge.  I think some of the numbers they -- if I'm not

1  mistaken, some of the numbers they're coming up with or go

2  down to the fund level rather than the institutional level.

3           THE COURT:  Uh-huh.

4           MR. SCHROCK:  So you know, it will be like several

5  funds within one institution, for instance.  You know, we

6  have the term loan register.  You know, I mean, this is not

7  like it's a bond issuance or something, so we have a

8  register, we have an agent.  We can determine who the

9  lenders were at the time.  It's not that complicated and

10 it's not 150 parties, okay?  That's not -- that's certainly

11 not the way we look at it.

12          THE COURT:  Sure.

13          MR. SCHROCK:  I think you have to look at it

14 within the institutions.  I think that what they're looking

15 at is just different, you know, but you know, I think that

16 frankly Mr. Costa and Mr. Greenberg also can probably speak

17 to that, you know, but obviously we want to make sure we

18 have the right parties.  Frankly the fact that the funds --

19 you know, the loans that traded was one of our points around

20 why we just need to decide this issue in the context of the

21 Plan and an adversary proceeding.  But you know, they

22 probably should hit this issue for you, Judge.

23          THE COURT:  Sure.  So let me tell me how I am --

24 and I'm happy to hear that, but let me tell you how I

25 thought through the issue, is that by me picking the issue

1  that I picked, it doesn't matter in my mind.

2          MR. SCHROCK:  And I think the primary parties are

3  here, that's for sure.

4          THE COURT:  Well, I mean, it's -- the parties to

5  the agreement are here and that's the important part in my

6  mind, but again, could be wrong.

7          Let me do this -- and I'm watching Mr. Greenberg's

8  thermometer just rise.  He wants to go.  I don't want to

9  deny him --

10          MR. GREENBERG:  Not at all.

11          THE COURT:  -- the opportunity any longer.

12          Mr. Greenberg, and I'm just picking on you.  Good

13  afternoon.

14          MR. GREENBERG:  Good afternoon, Your Honor.  Scott

15  Greenberg for the Record on behalf of the priority term loan

16  lenders.

17          Your Honor, and I'm going to pass for the time in

18  a minute to my partner, Mr. Costa, who has been patiently

19  waiting for me.  But look, I think our focus, you've read

20  the papers, right?  I'm not going to sit here on a Friday

21  afternoon and repeat, you know, where we live.  I think we

22  live in a similar world with the Debtor in that we want to

23  get resolution of these issues.  We think they belong in

24  front of this court -- courtroom, I think.

25          From what we've heard today, it sounds like we

1  should really focus on the process and the procedure to make

2  that happen.  And I think we could all do that in good faith

3  and get that resolved hopefully amongst ourselves for Your

4  Honor.

5       I do think there were a couple of procedural

6  issues that Mr. Costa wanted to hit on while we're here, but

7  obviously, Your Honor, you know, I have a lot of history as

8  you know with the underlying facts in this case.  So if Your

9  Honor has any questions for me, I'm ready, willing and able

10 to answer all of those.

11      But with that, I'll probably turn it over to my

12 partner, Mr. Costa.

13      THE COURT:  No.  And thank you, and there may be a

14 point in time where I do have a ton of factual questions,

15 but again, the way I've kind of looked at this, I just -- I

16 don't think it matters at present, but I'm happy to be

17 proven wrong.

18      Mr. Costa, good afternoon.

19      MR. COSTA:  Good afternoon, Your Honor.  Gregg

20 Costa for the PPL lenders.

21      And to address the main question the Court's been

22 asking this afternoon, one, we think summary judgment is

23 appropriate to tee up now and we had proposed doing that in

24 just a couple of weeks and we can even do it sooner.

25      We do think it's the part of the agreement

1    unambiguously allowed this.

2            And I want to address a few things about the Judge

3    Vela ruling.  For one thing, we weren't a party to that case

4    -- only the Debtor was.  Number two, in no way does the

5    motion to dismiss have any preclusive or binding effect on

6    another court.  It's a preliminary ruling, so the Court is

7    obviously free to rule on these issues fresh, and that's

8    what we'll ask the Court to do.  And we do think it's a

9    legal issue of contract interpretation.

10            I also want to clarify, the Southern District of

11   New York's opinion did not put a thumb on the side of the

12   other lenders.  Judge Vela recognized that our position on

13   open market purchase was rational because the agreement also

14   mentioned the possibility of an auction open to all.  It has

15   to be contrasted with the more limited open market purchase.

16            So we've happy to tee that up as soon as possible.

17            I do want to emphasize, I'm newer to this case

18   than many of the other lawyers, but in studying it, it's

19   just hard to find a issue that is more core than the

20   relative priority of we.  That's one of the reasons

21   bankruptcy courts exist is to have one central forum where

22   like creditors can be treated the same.

23            And the stay power allows the Bankruptcy Court to

24   centralize that dispute, prevent other courts from ruling in

25   ways that are going to affect creditors who are similarly

1   situated in different ways.

2          And despite all the filing this week, despite all

3   the talk this week, I don't think I've ever heard the other

4   lenders dispute that this is a core proceeding.

5          So it is something that's appropriate for this

6   court to decide.  The Delaware Bankruptcy Court, in the PPC

7   group opinion, recently concluded that a similar dispute

8   about an up transaction was a core proceeding.  Because it's

9   core, it's something that should be decided in this Court.

10          And the final point I want to make is on the issue

11   of the removal.  Because it occurred post-petition and we do

12   -- there's case law that says that's a violation of the

13   automatic stay.  At a minimum, it's debatable, it is

14   arguable that it's a violation of the automatic stay, and

15   that's where Judge Isgur's opinion in *Honx* comes in, relying

16   on the Fifth Circuit's *Chestnut* decision to say authority

17   had to be sought from Your Honor to issue that removal in a

18   case once the automatic stay was pending.

19          So we think the removal was void.  And your

20   suggestion at a minimum a temporary stay on the Southern

21   District of New York litigation is necessary.  The one issue

22   with that is if we do need to file for a venue transfer, and

23   if we do need to file for a remand because the removal was

24   improper, we need to sort out how those deadlines are going

25   to be effective.

1         But I do think the 105 ruling is a more efficient

2    way.  The problem with the transfer is going to be a

3    briefing schedule, we're going to wait for the Southern

4    District of New York Court to rule.  A 105 motion is a -- we

5    think, a more efficient path for ensuring that this Court is

6    going to be the Court to decide these core issues.

7         THE COURT:  I got it and thank you.

8         Mr. Lieberman, you've got an awfully concerned

9    look on your face.  Did you want to be heard?

10        MR. LIEBERMAN:  Well, we just filed a statement

11   that joined the Ad Hoc First Lien Lenders' statement.  I

12   don't know if I need to step back.  I'm Neil Lieberman with

13   Holwell Shuster & Goldberg.  I, along with my colleagues at

14   HSG and John Sparacino, who I see on my screen, represents

15   the LCM Lenders.

16        The LCM Lenders are across the platform CLOs that

17   own about 18 million in face value of the first lien loans.

18   We were not parties to the negotiations in 2020.  We learned

19   about the transaction when the market learned about the

20   transaction.

21        And as CLOs, our investment -- our client's

22   investments are in senior secured loans.  And our clients

23   felt that this decision -- and I think it's widely known,

24   that the transaction was bad for that market and Mr. Schrock

25   raised the question at the First Day Hearing, you know, why

1  were we fighting?  That's one of the reasons.  It's bad for

2  our client's business.

3          We've litigated indications then.  We obtained the

4  favorable decision on the motion to dismiss.  We think that

5  it's at a minimum persuasive, and on the basis that it's

6  just on its face a transaction that is, you know, heavily

7  negotiated involving several -- you know, dozens of

8  documents that need to be amended -- is not an open market

9  purchase.

10         And I think the other thing we wanted to make

11  clear is that we have -- you know, we -- the lenders, the

12  preferred lenders or the favored lenders are not parties to

13  our claims now and we understand that our case is stayed,

14  but we do have timely claims against them.

15         And so whatever the Court decides in terms of

16  where those claims should be heard, we intend to bring them.

17         THE COURT:  All right.  And so Mr. Lieberman, let

18  me ask you -- and thank you for speaking up.  You

19  acknowledged that your particular litigation is stayed.  Do

20  I need to be worried about at present -- and you're free to

21  change your mind.  I'm not suggesting that this is trying to

22  box you in.

23         Am I going to see an imminent motion for relief

24  from the automatic stay?  Is it you're going to wait and see

25  what happens?  And again, just trying to make sure that you

1   have sufficient access if you decide to take action.

2          MR. LIEBERMAN:  I'm not -- that is right now not

3   something that we're considering.

4          THE COURT:  Okay.  And with respect to -- let me

5   go down a path.  Let's assume that I decide that I'm going

6   to hear at least the threshold question that we've talked

7   about today.  Is that something that you are then going to

8   want to intervene in the adversary for and participate, or

9   what would -- I mean, because you run the risk, obviously,

10  of being collaterally estopped, what's -- do you have

11  thoughts about that?

12         MR. LIEBERMAN:  We're parties to the adversary.

13         THE COURT:  You're parties?  Okay.  Got it.  Okay.

14  Then you don't need to intervene on anything, my apologies.

15  I've read too much paper.

16      (Laughter.)

17         THE COURT:  Okay.  All right.  Thank you.

18         Anyone else that I have overlooked that wanted to

19  make comments?

20      (No audible response.)

21         THE COURT:  All right.  Mr. Hermann?

22         MR. HERMANN:  Thank you, Your Honor.

23         I just wanted to -- Brian Hermann for the Record

24  from Paul Weiss.

25         I just wanted to respond to a couple of points.

1  One is I think it was Mr. Schrock who said all the parties

2  are here.  I just don't want to lose sight of that point.

3  All the parties are not here.  There are lenders who

4  participated in the 2020 transaction.  They're not part of

5  the Gibson Dunn group and they need to be part of whatever

6  process we go down.

7         And I think since Mr. Schrock knows who they are,

8  I think the burden is probably appropriately on him to

9  figure out a way to get them into this process.  That's

10  point number one.

11         THE COURT:  Okay.

12         MR. HERMANN:  Point number two, Mr. Costa made the

13  point that these are core -- I'm not going to debate it

14  further, but obviously on the basis upon which (glitch in

15  the audio), we don't agree with that.

16         Third, he cited to the existence of cases that

17  suggest that the removal of violation of the automatic stay

18  putting aside *Honx*, there are cases that suggest that is

19  absolutely not a violation of the automatic stay.

20         THE COURT:  Totally agree.

21         MR. HERMANN:  And I want to make that clear.

22         THE COURT:  Yeah, as I hope I conveyed last time

23  and I'll do it again.  The point that I was trying to make

24  last time is that it's not a black-and-white issue.  That's

25  all I was trying to do.  I think you have to look at what

1    the intent is and what the effect is.

2              So again, I totally agree with you.

3              MR. HERMANN:  Thank you, Your Honor.

4              And then the last point -- well, maybe two more

5    points -- is that I also wanted to make clear, like

6    Mr. Lieberman's client, while some of our clients were

7    participants in the negotiations in 2020, many of our

8    clients were not.  So we should not be thought of as

9    monolithic in that respect.

10             And then the last point is at some point I take it

11   we will address the process beyond the summary judgment

12   process, if we go down that path with respect to good faith,

13   fair dealing, and the rest of the claims.

14             THE COURT:  Absolutely.  At some point we have to.

15   It's just my whole belief -- and I haven't heard anything

16   that really convinces me otherwise today -- is that once we

17   get through that issue, it's just my belief that everybody's

18   assessment of what is a good claim, what is a bad claim, may

19   change.  That's -- and at that point, you know, we'll have

20   better information.  We can react to it and figure out an

21   efficient way to proceed.

22             So wasn't trying at all to push anything off into

23   the corner or to say that, no, you weren't going to get

24   ample opportunity to present whatever it is you wanted to

25   with respect to that claim.  I just think that that

47

1   threshold issue -- if I've looked at this right -- and

2   again, I'm not saying that I have.  It just jumps out at me

3   as to the right way to go about this.

4           I just think that's going to change -- it's going

5   to change, sort of, the landscape and in my mind that makes

6   good sense.

7           Mr. Schrock, let me ask you -- you gave me a lot

8   of dates and I've in a roundabout way saying, wow.  I really

9   don't like all of these dates, but as I told you before, I

10  have a fundamental belief with these types of cases, you

11  have to drive for speed.  The longer it stays, the harder it

12  gets.

13          What dates do you need from me so that we can

14  proceed forward?  Do you want to -- and let me give you

15  options.  One, you know, you already got some dates.  If you

16  need additional ones, I will give them to you to the extent

17  that I can.

18          If you want to take what I've said today and talk

19  to the constituents and see if there's consensus on

20  additional dates or ways to proceed, while reserving all

21  rights, I'm happy to do that, too.

22          Again, I have such immense respect for all of you

23  that if you say, look, you know, Jones, you've done enough

24  damage for one week.  We want to go off and repair it

25  ourselves.  I would perfectly understand that.

1        MR. SCHROCK:  Judge, I think probably the most

2   productive thing is going to be for us to take what you've

3   said, your guidance.  We can put together a proposed

4   schedule, get on the phone with the parties and you know,

5   take everything you've said around the guidance for, you

6   know, the 105 relief and you know, some of those issues, the

7   temporary stay, and see if we can frankly hammer them out in

8   light of your guidance and then come back to you in a couple

9   of days.  That would be my preference.

10        THE COURT:  So I only have --

11        MR. SCHROCK:  And in the meantime, I think if we

12   want to have a stipulated stay order that we draft and

13   present to you.

14        THE COURT:  So I'm accepting Mr. Hermann's --

15   subject to seeing the paper, I'm going to accept

16   Mr. Hermann's statement that it just makes sense to have a

17   temporary stay without prejudice to anything that may be

18   subsequently filed or defense that may be brought.

19        What I would like is I would like a separate stay

20   order.  I want it simple so that a district judge doesn't

21   have to become a bankruptcy expert to understand it.  And I

22   would also like a paragraph to make it very clear that the

23   Bankruptcy Court stands ready to answer any questions that

24   the District Court may have and include my general chambers

25   phone number.

1          And if anybody has an objection to that, I want to

2    know about it, but it just seems to me I want to make sure

3    the District Court understands that I am very happy to

4    answer any question to make sure that we don't create

5    problems for you-all.  Because at the end of the day, if

6    there are problems, it's going to be on your shoulders to go

7    fix.

8          MR. SCHROCK:  Understood.  Yeah, we can definitely

9    do that.

10         THE COURT:  So let me ask, today is Friday.  I

11   can't remember if I'm seeing any of this group on Sunday,

12   Monday, and Tuesday.  Any GWG takers here?

13      (No audible response.)

14         THE COURT:  All right.  So you don't --

15         MALE SPEAKER:  No.

16         THE COURT:  All right.  So I am scheduled right

17   now to be in New York Sunday, Monday and Tuesday for a

18   mediation.  Doesn't mean I can't -- I will have all of my

19   mobile equipment, so I can set up and have a virtual

20   courtroom.  Obviously, you know, I get distracted when I'm

21   doing that.

22         Is Wednesday too late, or would you like to do it

23   Monday or Tuesday?

24         MR. SCHROCK:  I just -- you cut out on my phone,

25   Your Honor, when you said the day.  I'm sorry.

1          THE COURT:  Oh, my apologies.  So I am in New York
2   for the GWG mediation the 29th, the 30th, and the 31st.
3   That's Sunday, Monday and Tuesday.
4          The question that I asked was is Wednesday too
5   late to for us to get back together, or would you like to do
6   it Monday or Tuesday?
7          MR. SCHROCK:  Your Honor, I think just to give the
8   parties a couple of days, frankly, to work through this, I
9   would suggest, you know -- and I'm open to the other
10  parties.  I'm certainly expressing a view here obviously,
11  but you know, Tuesday seems to make sense to me to be back
12  in front of you and at least we can hammer out -- we can try
13  and get something out here over the next, you know, 24 hours
14  or so and then we can talk about it for a day or two.
15         But otherwise, we could be there Wednesday, as
16  well, Your Honor.
17         THE COURT:  Wednesday is obviously easier for me,
18  but again, I told you I wouldn't be the problem.  If you
19  tell me that everybody wants us on Tuesday, then you know,
20  I'll tell 100 people that Ray Schrock is stopping the
21  mediation so that we can have a hearing.
22         MR. SCHROCK:  No, no, no.  I can take a hint,
23  Judge.  How about Wednesday?  Let's go with Wednesday.
24         THE COURT:  How about Wednesday at noon?
25         MR. SCHROCK:  Okay, very good.

51

1          THE COURT:  Or Wednesday at 9:00.  You can have

2     your pick.

3          MR. SCHROCK:  Wednesday at noon sounds a lot

4     better, Judge.

5          THE COURT:  And just so that we're all clear on

6     the phone, Wednesday noon Central.  So that would be

7     1:00 o'clock for most of you.

8          MR. SCHROCK:  Understood.  Thanks very much, Your

9     Honor.

10          We also -- before I forget, we also wanted to --

11     we spoke to your chambers just about moving the second day

12     hearing for all matters, I think other than the utilities

13     motion, to February 28th and I believe that that was

14     acceptable to your --

15          THE COURT:  To my Associate Judge Alonzo?  He sent

16     me an email telling me what the proposed schedule was.  It's

17     just fine with me.  If you worked that out with him, it's

18     just fine.

19          MR. SCHROCK:  Okay.  Very good, Judge.  We'll make

20     sure that that gets appropriately noticed.  We'll let the

21     other parties know.  We'll send around the phone about that

22     as well.

23          THE COURT:  All right.  Anything else we need to

24     do this afternoon?

25          (No audible response.)

1          THE COURT:  All right.  When you get the stay

2   order done, if you would just alert Mr. Alonzo and it

3   doesn't matter whether it's later today, Saturday or Sunday,

4   if you just shoot him a text or an email, I will turn that

5   round.

6          And again, I want the stay order to be simple so

7   that the District Court can understand it and I also want

8   you to promptly -- however it is that that particular judge

9   accepts things, get that on file in the docket so that she

10  knows that it's there.

11          MR. SCHROCK:  Very good.

12          THE COURT:  All right.

13          MR. SCHROCK:  We will do, Your Honor.

14          THE COURT:  All right.  Thank you.

15          And with that, everyone have a good weekend.

16  We'll be adjourned.

17      (The parties thank the Court.)

18      (Hearing adjourned at 4:38 p.m.)

19

20

21

22

23

24

25                    * * * * *

1            I certify that the foregoing is a correct

2    transcript to the best of my ability from the electronic

3    sound recording of the ZOOM/video/telephonic proceedings in

4    the above-entitled matter.

5    /S/ MARY D. HENRY

6    CERTIFIED BY THE AMERICAN ASSOCIATION OF

7    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9    JTT TRANSCRIPT #66787

10   DATE FILED:  JANUARY 31, 2023

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25