IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SERTA SIMMONS BEDDING, LLC, *et al.*,[1] | ) | Case No. 23-90020 (DRJ) |
| | ) | |
|    Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| SERTA SIMMONS BEDDING, LLC, INVESCO SENIOR SECURED MANAGEMENT, INC., CREDIT SUISSE ASSET MANAGEMENT, LLC, and BARINGS LLC, | ) ) ) ) ) ) | Adversary Case No. 23-09001 (DRJ) |
| | ) | |
|    *Plaintiffs*, | ) | |
| | ) | |
|    v. | ) | |
| | ) | |
| AG CENTRE STREET PARTNERSHIP, L.P., AG CREDIT SOLUTIONS NON-ECI MASTER FUND, L.P., AG SF MASTER (L), L.P., SILVER OAK CAPITAL, L.L.C., ASCRIBE III INVESTMENTS, LLC, COLUMBIA CENT CLO 21 LIMITED, COLUMBIA CENT CLO 27 LIMITED, COLUMBIA FLOATING RATE INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST II, COLUMBIA STRATEGIC INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST I, CONTRARIAN CAPITAL FUND I, L.P., CONTRARIAN CENTRE STREET PARTNERSHIP, L.P., CONTRARIAN DISTRESSED DEBT FUND, L.P., GAMUT CAPITAL SERTA SIMMONS BEDDING, LLC, LCM XXII LTD., LCM XXIII LTD., LCM XXIV LTD., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

| | |
|---|---|
| LCM XXV LTD., LCM 26 LTD., LCM 27 LTD., LCM 28 LTD., NORTH STAR DEBT HOLDINGS, L.P., SHACKLETON 2013-III CLO, LTD., SHACKLETON 2013-IV-R CLO, LTD., SHACKLETON 2014-V-R CLO, LTD., SHACKLETON 2015-VII-R CLO, LTD., SHACKLETON 2017-XI CLO, LTD., Z CAPITAL CREDIT PARTNERS CLO 2018-1 LTD, and Z CAPITAL CREDIT PARRTNERS CLO 2019-1 LTD., | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| *Defendants*. | )<br>) |

## DECLARATION OF PROFESSOR VINCENT BUCCOLA IN SUPPORT OF THE LCM DEFENDANTS' OPPOSITION TO SUMMARY JUDGMENT

I, Vincent Buccola, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am a professor at the Wharton School of the University of Pennsylvania, where my rank is Associate Professor of Legal Studies and Business Ethics with Tenure. My research and teaching concern, among other things, leveraged finance and restructuring. A copy of my curriculum vitae is attached as **Appendix A**.

2. I have studied and written about recent trends in the syndicated loan market, including, in particular, developments in relation to non-*pro rata* recapitalization transactions such as the one at issue in this adversary proceeding (the "2020 Transaction"). *See* Vincent S.J. Buccola & Greg Nini, *The Loan Market Response to Dropdown and Uptier Transactions* (working paper, 2022); Vincent S.J. Buccola, *Efficacious Answers to the Non-Pro Rata Workout*, 171 U. Pa. L. Rev. __ (forthcoming 2023); Vincent S.J. Buccola, *Sponsor Control: A New Paradigm for Corporate Reorganization*, 90 U. Chi. L. Rev. 1 (2023). I have been invited to speak on the subject

2

at academic and industry conferences, including the annual meeting of the Loan Syndication & Trading Association, and as a featured speaker at Dechert's annual Distressed Investing Forum.

3.      LCM Asset Management LLC has asked me, on behalf of certain investment vehicles it advises, Defendants in this adversary proceeding, to offer my opinions about the development and significance of the "open market purchase" concept found in many leveraged loan agreements, including the loan agreement at issue in this adversary proceeding (the "2016 First Lien Loan Agreement"), and about whether the 2020 Transaction involved open market purchases. I have no financial interest in the outcome of this adversary proceeding, nor in the outcome of any matter posing similar issues.

4.      In connection with this matter, I studied a representative corpus of approximately 500 publicly available leveraged loan agreements originated between 2011 and November 2016, when the 2016 First Lien Loan Agreement was made and when, therefore, the meaning of its terms was determined. Unless noted otherwise, the data and charts offered below are products of that study. A description of my methodology can be found in **Appendix B**.

5.      I have reviewed the loan documents at issue in this adversary proceeding. Otherwise, my understanding of the 2020 Transaction derives solely from publicly available information, including representations that the Plaintiffs have made in this adversary proceeding and in other judicial proceedings.

6.      A list of the materials I considered in connection with preparing my opinions is attached as **Appendix C**.

**Summary of Opinions**

7. The "open market purchase" concept, which appears frequently in leveraged loan agreements originated since the 2008–2009 financial crisis, can be understood only in the context in which it emerged—in particular, as an exception to a ubiquitous, general rule barring borrower loan repurchases altogether.

8. The open market purchase concept, while open textured, is not so capacious as to characterize any transaction that a lender and the borrower find mutually advantageous. Such an understanding would swallow the general prohibition of borrower repurchases.

9. The open market purchase exception, like its frequently co-appearing cousin, the Dutch auction purchase exception, was designed to allow borrowers and their affiliates to provide secondary market liquidity for underpriced loans, while preserving the functional significance of several other ubiquitous, interlocking loan provisions that jointly establish an equal standing principle among syndicate lenders.

10. In light of the phrase's history and evident function in leveraged loan agreements, including in the 2016 First Lien Loan Agreement, an open market purchase is best understood as a purchase effected via a non-auction process that is calibrated to match buyers and sellers according to their willingness to buy and sell the loan, respectively, as determined by a universal criterion of value such as dollars. This means, among other things, that a borrower or its affiliate seeking to effect an open market purchase must approach the universe of potential sellers as any other buyer might, offering the same type of consideration that any other buyer can offer.

11. Judged against this standard, the 2020 Transaction did not involve open market purchases. As I understand the 2020 Transaction, Serta, through its financial advisors, sought proposals for a recapitalization transaction. The participating lenders' proposal, on which Serta

settled, included not only (1) the assignment to Serta of certain participating lenders' first-lien loans in exchange for a class of newly-to-be-issued superpriority loans, but also (2) certain participating lenders' assignment of second-lien loans in exchange for the same, (3) certain participating lenders' purchase of a different class of newly-to-be-issued superpriority loans, (4) an amendment of the 2016 First Lien Loan Agreement to (putatively) permit the transaction, (5) execution of agreements governing the exchange and newly-to-be-issued superpriority loans, and (6) an agreement to indemnify the participating lenders from liability for their role in the transaction. The bundling of so many diverse sources of value, including forms of consideration that no one but Serta could legally offer, not only avoided—it logically precluded—comparable assessment of the value other willing buyers and sellers attributed *to the loans*. For that reason alone, the 2020 Transaction cannot have involved open market purchases.

**The Equal Standing Rationale for a General Prohibition on Borrower Repurchases**

12.   The institutional (*i.e.*, non-bank) leveraged loan market developed in the years immediately preceding the financial crisis of 2008–2009. Before then, loan syndicates were composed principally of small groups of banks, the average syndicate between 1992–2003 consisting of approximately 8 lenders. *See* Amir Sufi, *Information Asymmetry and Financing Arrangements: Evidence from Syndicated Loans*, 62 J. FIN. 629, 638 (2007).

13.   Syndicates in the nascent institutional loan market differed in two important respects: the lenders were heterogeneous in type, including CLOs (such as some of the Defendants here), loan mutual funds, private credit funds, and others, and the number of lenders grew dramatically, the average institutional term loan facility consisting of approximately 200 lenders.

*See* Mitchell Berlin, Greg Nini & Edinson G. Yu, *Concentration of Control Rights in Leveraged Loan Syndicates*, 137 J. F IN. E CON. 249, 261 (2020).

14. In the new environment, where parties could no longer rely on a small number of repeat players to self-enforce industry norms, pressure was on standard contract terms to ensure parity among lenders in a facility—that is, to ensure that lenders would face the same risks and rewards in relation to their credits. Loan agreements came to achieve lender parity through the interaction of several ubiquitous provisions, no one of which, therefore, can be fully grasped except in relation to the others. The standard volume on modern credit agreements, published by the Loan Syndication & Trading Association, refers to this idea as the "general principle in virtually all credit agreements . . . that the lenders are treated on a 'ratable' basis." M ICHAEL B ELLUCCI & J EROME M CCLUSKEY, T HE LSTA'S C OMPLETE C REDIT A GREEMENT G UIDE 521 (2d ed. 2017). The standard provisions are as follows:

15. *Pro Rata Application of Payments.* Borrowers are directed to make their loan payments (and prepayments) to an agent for the lenders—the "administrative agent." The administrative agent is directed, in turn, to pay lenders in a facility *pro rata* according to their outstanding loans. *See* 2016 First Lien Loan Agreement § 2.18(a) ("Each [payment required to be made] shall be made to the Administrative Agent . . . . Except as provided in Sections 2.19(b) and 2.20, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest in respect of the Loans of a given Class and each conversion of any Borrowing to, or continuation of any Borrowing as, a Borrowing of any Type (and of the same Class) shall be allocated pro rata among the Lenders in accordance with their respective Applicable Percentages of the applicable Class."). Mandatory prepayments are likewise offered to lenders on a *pro rata* basis. *See* 2016 First Lien Loan Agreement § 2.11(b).

16.     *Waterfall Distribution.* If the administrative agent realizes on borrower collateral, a so-called "waterfall" provision directs the agent in the application of proceeds. The waterfall inevitably includes a *pro rata* stipulation within each class. Most loan contracts do not allow the waterfall to be amended without unanimous (or "affected lender") consent. The 2016 First Lien Loan Agreement is typical in this respect. *See* 2016 First Lien Loan Agreement § 2.18(b) (directing the administrative agent, upon realization of collateral and after paying itself for costs and fees, to distribute proceeds "on a pro rata basis in accordance with the amounts of the Secured Obligations . . . owed to the Secured Parties on the date of any such distribution, to the payment in full of the Secured Obligations").

17.     *Pro Rata Sharing.* The administrative agent's distributional directives alone are insufficient to ensure equal standing among lenders, however, because the directives do not speak to the possibility that some lenders might be able to realize value from the borrower or its assets outside of the loan repayment or collective action mechanisms. Thus, virtually every leveraged loan has a "*pro rata* sharing" rule. The *pro rata* sharing rule provides that a lender who recovers excess value, generally or by exercise of certain enumerated self-help remedies, such as by asserting set-off rights, must buy participations in the loans of every other lender in the syndicate so as to equalize recovery. That is, the lender who achieves a nominally superior position must share the proceeds of its good fortune or self-help. Most loans—76 percent of the sample I studied—do not allow the *pro rata* sharing rule to be amended without unanimous (or "affected lender" consent). The 2016 First Lien Loan Agreement is typical in this respect. *See* 2016 First Lien Loan Agreement § 9.02(b)(A)(6) ("[T]he consent of each Lender directly and adversely affected thereby . . . shall be required for any waiver, amendment or modification that . . . waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that

7

would by its terms alter the pro rata sharing of payments required thereby (except in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c) and/or 9.05(g) or as otherwise provided in this Section 9.02).").

18.  *Prohibition of Borrower Repurchases*. A general prohibition of loan repurchases by the borrower and its affiliates was the final piece of the puzzle. A liquid secondary market was an important part of the development of the institutional loan asset class. The managers of loan portfolios wanted to be able to—indeed had often promised their own investors that they would—manage exposures to credit risks as conditions changed. They needed to be able to sell out of particular investments. Every leveraged loan agreement thus confirms lenders' right to assign their loans and specifies conditions on that right. The prospect of borrower repurchases posed a dilemma, however. On one hand, borrowers can usefully augment secondary market demand for their loans. On the other hand, it was evident that a borrower and lender might exploit a repurchase option collusively to allow one lender to gain an advantage over other members of the syndicate by assigning its loan to the borrower or an affiliate for more than the market-implied value. (Doing so would replicate the economic effects of a selective *prepayment*, which standard payment and *pro rata* sharing provisions together preclude.)

19.  The industry standard prohibiting borrower repurchases reflects a view that the risks of undermining lender parity outweighed the potential benefits. Almost all leveraged loans—some 97 percent of loans in the sample I studied—thus include a caveat to lenders' assignment right: neither the borrower nor its affiliates can purchase the borrower's loans. Often loan agreements do this by authorizing lenders to assign their loans only to "eligible assignees" and defining that term to exclude the borrower and its affiliates. The 2016 First Lien Loan Agreement is typical in this respect. *See* 2016 First Lien Loan Agreement § 9.05(b) ("Subject to the conditions

set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement . . . ."), § 1.01 ("[I]n any event, 'Eligible Assignee' shall not include . . . the Top Borrower or any of its Affiliates.").

20.     Moreover, the *pro rata* sharing rule often gives this general prohibition additional teeth by distinguishing between the proceeds of *valid* assignments (which a lender not need share) and *invalid* assignments such as assignments to the borrower or an affiliate (which a lender must share). Among the *pro rata* sharing provisions I studied that address the topic of assignments at all, 82 percent expressly draw a line between the proceeds of valid and invalid assignments. The 2016 First Lien Loan Agreement is typical in this respect. *See* 2016 First Lien Loan Agreement § 2.18(c) (specifying that the *pro rata* sharing provisions "shall not apply to . . . any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans *to any permitted assignee* or participant, including any payment made . . . in connection with . . . Section 9.05.") (emphasis added).

### Repurchase Exceptions Emerge after Financial Crisis

21.     During the 2008–2009 financial crisis, many leveraged loans traded at depressed prices. Some borrowers (and their sponsor affiliates) thought their loans were cheap and would have liked to retire the debt much as bond issuers typically are permitted to do.

22.     In response, some loan agreements began to carve out exceptions to the general prohibition of borrower purchases. *See, e.g.*, BELLUCCI & MCCLUSKEY, *supra*, at 549–50. Two exceptions, in particular, became prevalent beginning in the early 2010s: the Dutch auction and the "open market" purchase. In my sample, which includes loans originated from 2011 to 2016, 33 percent of agreements allow a Dutch auction and 20 percent allow an "open market" purchase.

The exceptions are often a package deal. Most loan agreements that allow open market repurchases also contemplate Dutch auctions. The 2016 First Lien Loan Agreement is typical in this respect. *See* § 9.05(g) ("Notwithstanding anything to the contrary herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases . . . .").

23.   The proportion of leveraged loan agreements that carve out a repurchase exception increased over time. In the sample of loans I studied, the proportion of loans with a repurchase exception increased from approximately 20 percent, in 2011, to more than 40 percent, in 2016. Over the same interval, the proportion of loans that allow open market purchases, in particular, increased from less than 10 percent to more than 30 percent. (These figures are almost certainly higher for loans to non-public borrowers, such as Serta: non-public borrowers are more likely to be sponsor-backed, and sponsor-backed borrowers are more likely to have a repurchase exception.)



24. To make the Dutch auction and open market purchase exceptions effective, loan agreements had to adjust the equality-oriented provisions discussed above in two respects. First, and most obviously, loan agreements had to authorize assignments of a selling lender's loans to the borrower or an affiliate, provided the purchase complied with one of the exceptions. *See, e.g.* 2016 First Lien Loan Agreement § 9.05(g). Second, they had to ensure that a lender's proceeds from an exceptional repurchase would not be subject to sharing with other lenders under the contract's *pro rata* sharing provision. Thus, most loans that contemplate Dutch auctions or open market purchases expressly exempt from the sharing rule the proceeds of assignments effected under one or the other exception. *See, e.g.*, 2016 First Lien Loan Agreement § 2.18(c) (excluding from the obligation to share *pro rata* the proceeds of loan assignments made consistently with section 9.05).

25. Notably, however, agreements including Dutch auction and open market purchase exceptions did *not* relax the standard requirement of unanimous lender consent to amend the *pro rata* sharing provision. The proceeds of assignments other than those carved out of the *pro rata* sharing rule must be shared absent unanimous consent. This means that a standard, "unamendable" *pro rata* sharing rule—such as that in the 2016 First Lien Loan Agreement—can practically prevent assignments that don't fall within the Dutch auction or open market exceptions *even if a majority of lenders would prefer to relax the assignment rules*.

26. To summarize—with respect to borrower and affiliate repurchases, the 2016 First Lien Loan Agreement features an architecture typical of loan agreements of post-financial crisis vintage: a general prohibition of borrower repurchases coupled with an exception for buybacks effected through a Dutch auction or open market mechanism, the exceptions being practically set in stone by an unamendable *pro rata* sharing provision.

**Making Sense of the Open Market Exception**

27. Interpretation of the open market exception must reconcile two competing facts. First, the exception is broadly enough phrased to contemplate borrower or affiliate purchases through a variety of possible secondary market mechanisms, including at least the dealer-mediated mechanism that, as I understand, has long prevailed in fact. Second, in light of the exception's history and the contractual context in which it is typically embedded, the open market purchase concept (a) cannot be understood in a way that would negate the general prohibition of borrower repurchases and (b) must be understood in a way that vindicates, or at least does not eviscerate, the fortifications against lender favoritism found in the interaction of standard payment, waterfall, *pro rata* sharing, and assignment provisions. These considerations imply that a purchase must be effected through a process that preserves lenders' equal standing to qualify as an "open market" purchase.

*The Open Market Exception Cannot Negate the General Prohibition of Borrower Repurchases*

28. First, the open market exception must be understood broadly enough to encompass the institutions through which secondary market loan transactions traditionally were (and still are) typically effected. Indeed, the mechanisms through which the actual secondary market traditionally functioned (and still functions) ought to be taken as paradigmatic of the "open market" concept.

29. I understand that the secondary market for leveraged loans is dealer-mediated. Would-be buyers (sellers) of a loan ask one or more dealer banks for a quote. For any given loan, a dealer may make a market, holding inventory on its own account, or may source interest from potential sellers (buyers) to make a match. In either case, the dealer interposes itself between buyer

and seller, who do not know one another's identity. The buyer seeks a low price; the seller, a high price.

30. Moreover, I understand that borrower and affiliate purchases specifically are typically effected the same way, notwithstanding unsupported assertions to the contrary in Serta's and the Participating Lenders' memoranda. *See* Serta Motion for Summary Judgment, at 19 ("In order for the Company to repurchase its debt through an open market purchase, it has to approach individual existing lenders in the open market and negotiate the terms of a repurchase . . . ."); Lender Plaintiffs' Motion for Summary Judgment, at 14 ("An open market purchase for a private company's loans—unlike an open market purchase on the public stock exchange, which could hypothetically be open to any buyer or seller—necessarily involves direct and private dealings with the lender who owns those loans."). I understand that borrowers seeking to repurchase loans in the standard case do not want potential sellers to know who is bidding. Anonymity is thus not only empirically typical but is something that market participants, perhaps especially borrowers and their affiliates, actively insist upon.

31. For basic linguistic reasons, the open market exception cannot be understood in a manner that has it swallow the general rule prohibiting borrower repurchases. That general rule would be surplus, as would the *pro rata* sharing rule's distinction between valid and invalid assignees, if any mutually beneficial transaction between the borrower and a lender were for that reason an "open market" transaction.

32. The Plaintiffs' apparent rationale for describing Serta's retirement of loans in the 2020 Transaction as "open market" purchases—namely, that the assignments were part of the result of bilateral negotiations between willing counterparties, *see* Serta Complaint ¶ 47 ("In the context of a loan repurchase, 'open market' means the price that a willing buyer and a willing

seller are able to obtain in an arms-length negotiation[.]"); Serta Motion for Summary Judgment, at 4 (describing a "competitively negotiated process" in which Serta determined "that the PTL Lenders' offer was the best deal for the company" as "the definition of an open market purchase")—would make the general prohibition of borrower repurchases a dead letter.

*The Open Market Exception Must Vindicate Lender Equality*

33. Second, the open market exception ought to be interpreted in a manner that would have it vindicate the standard contractual fortifications against lender favoritism long embedded in leveraged loan agreements. Only such an understanding permits *other* ubiquitous leveraged loan provisions, such as the sharing requirement for lenders who receive a unique or selective recovery, to have functional significance.

34. The Dutch auction exception—with which the open market exception is often paired—does just that. The Dutch auction exception allows a borrower to repurchase loans through an auction conducted by the administrative agent. Typically, the borrower specifies an amount it wishes to repurchase and a price range in which it is willing to buy. Lenders who offer their loans at or below the market-clearing price receive that price, on a *pro rata* basis to the extent that the total amount of loans offered exceeds the amount the borrower wishes to repurchase. So conceived, a Dutch auction is consistent with the equal standing principle underlying the *general* prohibition of borrower repurchases: no lender can gain an advantage, because all are allowed to participate and have their offers settled *pro rata*.

*The Most Sensible Understanding of The Open Market Exception*

35. A summary way to express the above principles is as follows: an open market purchase is best understood as a purchase effected via a non-auction process that is calibrated to

match buyers and sellers according to their willingness to buy and sell the loan, respectively, as determined by a universal criterion of value such as dollars.

36. The standard I offer comfortably characterizes the prevalent dealer-mediated market, where investors' identities are suppressed and dealers, who themselves operate under competitive pressure, seek to match dollar-denominated bids and offers in a manner that produces trading activity.

37. The standard I offer is also flexible enough to encompass other, plausible market structures even if unknown at the time a loan is originated. For example, it would characterize an exchange-mediated market, should loans someday be traded on an exchange. It may also characterize some forms of decentralized, "direct" solicitation, if, in combination with dealer- or exchange-mediated mechanisms, the solicitation is calibrated to match buyers and sellers according to their willingness to buy and sell, respectively. That is, to the extent a borrower were to supplement a dealer-mediated system by directly asking lenders to, in effect, beat the quotes provided by dealers, such a solicitation could result in an open market purchase.

38. At the same time, the standard I offer preserves the functional significance of ubiquitous terms of payment, waterfall, *pro rata* sharing, and assignment provisions. The evident function of these provisions is to prevent lenders seeking preferential position, including by way of a collusive deal with the borrower. As Serta and the participating lenders correctly point out, a borrower need not solicit all lenders simultaneously to make an open market purchase. (Indeed, properly speaking, the borrower solicits loans only from a dealer in the standard case.) But the equal standing principle is nonetheless vindicated. The requirement that a valid process be calibrated to match buyers and sellers according to their willingness to transact precludes pernicious forms of favoritism. Whether a borrower purchases loans from any particular lender

15

depends only on the desirability, from a generic buyer's perspective, of the financial terms of any offer the lender registers with the relevant institution of exchange. The seller's *identity* is irrelevant—just as is the case with a Dutch auction repurchase.

**The 2020 Transaction**

39. Judged against this standard, the 2020 Transaction did not involve open market purchases, as that term is used in standard loan agreements such as the 2016 First Lien Loan Agreement. The 2020 Transaction bundled Serta's repurchase of loans with other forms of consideration, including the making of contractual amendments, the origination of new loans, and the offering of indemnifications, that set Serta and the participating lenders apart from any other, willing buyers and sellers of loans. That bundling may have been crucial to the kind of comprehensive recapitalization that Serta pursued, but it also necessarily foreclosed recourse to any market institution or other mechanism, such as dealer mediation, calibrated to match buyers and sellers of the loans according to their willingness to buy and sell *the loans*.

40. To conclude that "open market purchase" describes a bespoke, identity-conscious negotiation would require giving the term a meaning that belies its history, ignores its contextual significance, and undermines the function of a number of other, ubiquitous loan terms. Properly understood, the loan assignment component of the 2020 Transaction was something more prosaic: an assignment to a person not an Eligible Transferee—and thus invalid.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 16, 2023
       Philadelphia, PA

                                                       /s/ Vincent Buccola
                                           Name: Vincent Buccola
                                           Title: Associate Professor of Legal Studies
                                                      and Business Ethics,
                                                      The Wharton School of the
                                                      University of Pennsylvania

**CERTIFICATE OF SERVICE**

  This is to certify that a true and correct copy of the foregoing Declaration was served by electronic delivery on all persons and entities receiving ECF notice in this adversary proceeding on March 16, 2023.

                */s/ John J. Sparacino*
                John J. Sparacino