**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>SERTA SIMMONS BEDDING, LLC, et al.,<br><br>          Debtors, | Chapter 11<br><br>Case No. 23-90020 (DRJ)<br>(Jointly Administered) |
| SERTA SIMMONS BEDDING, LLC, et al.,<br><br>    Plaintiffs and Counterclaim Defendants,<br><br>       v.<br><br>AG CENTRE STREET PARTNERSHIP L.P., et al.,<br><br>    Defendants, Counterclaim Plaintiffs and Third-<br>Party Plaintiffs,<br><br>       v.<br><br>AGF FLOATING RATE INCOME FUND, et al.,<br><br>    Third-Party Defendants. | Adversary Proc. No. 23-09001 (DRJ) |

**EXCLUDED LENDERS' MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
7 Times Square
New York, NY 11036-6516
(212) 833-1100

*Attorneys for the Excluded Lenders*

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, TX 77002
(713) 226-6000

*Attorneys for the Excluded Lenders with respect to Plaintiffs' Claims and Counterclaims Only*

3714825.1

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF RELEVANT FACTS .......................................................................7

    A.    The 2016 Credit Agreement and the *Pro Rata* Sharing Principle ..........................7

    B.    Serta's Discussions with the First Lien Lender Group at the Start of 2020 ...........8

    C.    Serta Announces the Unlawful Exchange Transaction...........................................9

    D.    The Unlawful Exchange Transaction Was Anything But "Open Market"...........10

    E.    The Market Immediately Reacts to the Negative Impact of the Unlawful
        Exchange................................................................................................................12

    F.    Three First Lien Lenders Seek to Enjoin the Transaction in New York
        State Court .............................................................................................................13

    G.    Another Group of Excluded Lenders Commences Litigation in Federal
        Court .....................................................................................................................14

    H.    Justice Masley Denies the Borrower's Motion to Dismiss in *Boardriders* ..........15

    I.    The Excluded Lenders File a New Action Before Justice Masley and
        Subsequently Remove It to Federal Court.............................................................16

    J.    Serta's Interference with Apollo's Purchase of First Lien Term Loans ................17

LEGAL STANDARD...................................................................................................19

ARGUMENT................................................................................................................22

I.    THE UNLAWFUL EXCHANGE TRANSACTION BREACHED THE CREDIT
    AGREEMENT......................................................................................................22

    A.    The Unlawful Exchange Transaction Violated the Sacred *Pro Rata* Right
        Provided by Section 2.18 .......................................................................................22

    B.    The Unlawful Exchange Transaction Was Not an "Open Market
        Purchase" ...............................................................................................................23

    C.    Evidence of Industry Custom and Practice Confirms That the Unlawful
        Exchange Transaction Was Not an "Open Market Purchase"...............................31

    D.    Plaintiffs' "Ratification" of the Unlawful Exchange Transaction Did Not
        Transform It Into an "Open Market Purchase"....................................................39

**Page**

E.   If the Court Finds That the Unlawful Exchange Transaction Was Not an "Open Market Purchase," It May Grant Summary Judgment for the Excluded Lenders ............................................................................................................. 40

F.   Alternatively, If the Court Finds the Term "Open Market Purchase" to Be Ambiguous, the Parties Should Be Authorized to Conduct Discovery ................ 41

G.   The Unlawful Exchange Transaction Also Breached Section 9.02 of the Credit Agreement ............................................................................................... 44

II.   EVEN IF THE UNLAWFUL EXCHANGE TRANSACTION DID NOT BREACH THE CREDIT AGREEMENT, THERE IS A FACT ISSUE WHETHER PLAINTIFFS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING .............................................................. 46

III.   NORTH STAR IS NOT A DISQUALIFIED INSTITUTION UNDER THE CREDIT AGREEMENT ................................................................................... 53

CONCLUSION ...................................................................................................................... 55

3714825.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
    98 N.Y. 2d 144 (N.Y. 2002) ...........................................................................46

*Acosta v. Suomy S.R.L.*,
    2015 WL 6674546 (S.D. Tex. Oct. 30, 2015)..........................................................51

*AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*,
    2023 WL 2394680 (N.Y. App. Div. (1st Dep't) Mar. 7, 2023)....................................6, 47, 50

*Alabama Farm Bureau Mut. Cas. Co., Inc. v. Am. Fidelity Life Ins. Co.*,
    606 F.2d 602 (5th Cir. 1979) ...........................................................................19, 20

*An v. Leviev Fulton Club, LLC*,
    2010 WL 3291402 (S.D.N.Y. Aug. 10, 2010) ........................................................23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)....................................................................................20

*Anexia, Inc. v. Horizon Data Sols. Ctr., LLC*,
    2022 WL 1195436 (N.Y. Sup. Ct. (N.Y. Cnty.) Apr. 21, 2022) ...............................47

*Audax Credit Opportunities Offshore Ltd.* v. *TMK Hawk Parent, Corp.*,
    2021 WL 3671541 (N.Y. Sup. Ct. (N.Y. Cnty.) Aug. 16, 2021)................................29, 30, 40

*Bailey v. KS Mgmt. Servs., L.L.C.*,
    35 F.4th 397 (5th Cir. 2022) ...........................................................................51

*BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*,
    112 A.D.3d 509 (N.Y. App. Div. (1st Dep't) 2013) ...............................................30

*Benvenuto v. Rodriguez*,
    279 A.D. 162 (N.Y. App. Div. (1st Dep't) 1951) .................................................26

*Boazman v. Econ. Lab'y, Inc.*,
    537 F.2d 210 (5th Cir. 1976) ...........................................................................20

*Burlington N. Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Rsrv.*,
    323 F.3d 767 (9th Cir. 2003) ...........................................................................42

*Byrd v. Roadway Express, Inc.*,
    687 F.2d 85 (5th Cir. 1982) ...........................................................................20

*Centurion Bulk Pte Ltd v. NuStar Energy Servs., Inc.*,
    2020 WL 8368320 (S.D. Tex. Sept. 25, 2020) ...................................................21, 42

*Chase Manhattan Bank v. Keystone Distribs., Inc.*,
   873 F. Supp. 808 (S.D.N.Y. 1994) ...........................................................46, 47

*Cities Serv. Co. v. United States*,
   522 F.2d 1281 (2d Cir. 1974).........................................................................25

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,*
   *Pierce, Fenner & Smith Inc.*,
   232 F.3d 153 (2d Cir. 2000)..........................................................................41

*Credit Agricole Corp. v. BDC Fin., LLC*,
   135 A.D.3d 561 (N.Y. App. Div. (1st Dep't) 2016).......................................47, 50

*CSI Inv. Partners II, L.P. v. Cendant Corp.*,
   507 F. Supp. 2d 384 (S.D.N.Y. 2007)............................................................46

*D-Z Inv. Co. v. Holloway.*,
   1974 WL 440 (S.D.N.Y. Aug. 23, 1974) .......................................................34

*In re Deepwater Horizon*,
   2021 WL 3501651 (5th Cir. Aug. 9, 2021).....................................................20

*E. Ramapo Cent. Sch. Dist. v. New York Sch. Ins. Reciprocal*,
   199 A.D.3d 881 (N.Y. App. Div. (2d Dep't) 2021).........................................46

*Eastman Kodak Co. v. Altek Corp.*,
   936 F. Supp. 2d 342 (S.D.N.Y. 2013).....................................................2, 23, 25

*Empresas Cablevision S.A.B. de C.V. v. JPMorgan Chase Bank*,
   680 F. Supp. 2d 625 (S.D.N.Y. 2010)............................................................50

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938)........................................................................................49

*Exec. Off. Network, Ltd. v. 666 Fifth Ave. Ltd. P'ship*,
   294 A.D.2d 166 (N.Y. App. Div. (1st Dep't) 2002) .......................................44

*Friedman v. Lockheed Aircraft Corp*,
   138 F. Supp. 530 (E.D.N.Y. 1956) ...............................................................45

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995)......................................................................................28

*Harrop & Co., Ltd. v. Apollo Inv. Fund VII, L.P.*,
   2015 WL 3989030 (N.Y. Sup. Ct. (N.Y. Cnty.) June 25, 2015) ...........................23

*Herrmann Holdings Ltd. v. Lucent Techs. Inc.*,
   302 F.3d 552 (5th Cir. 2002) ........................................................................48

iv

*ICG Global Loan Fund 1 DAC* v. *Boardriders, Inc.*,
   2022 WL 10085886 (N.Y. Sup. Ct. (N.Y. Cnty.) Oct. 17, 2022) .................................6, 16, 50

*J.P. Morgan Inv. Mgmt., Inc. v. AmCash Grp. LLC*,
   106 A.D.3d 559 (N.Y. App. Div. (1st Dep't) 2013) ...................................................43

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*,
   2009 WL 321222 (S.D.N.Y. Feb. 9, 2009).................................................................47

*Kellerman v. Askew*,
   541 F.2d 1089 (5th Cir. 1976) ....................................................................................19

*Khan v. AIG, Inc.*,
   654 F. Supp. 2d 617 (S.D. Tex. 2009) ..............................................................20, 40, 41

*LCM XII Ltd.* v. *Serta Simmons Bedding, LLC*,
   2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ...................................................... *passim*

*Lehman Bros. Int'l (Europe) v. AG Fin. Prods., Inc.*,
   2018 WL 3432593 (N.Y. Sup. Ct. (N.Y. Cnty.) July 2, 2018) .........................................31, 43

*In re LightSquared, Inc.*,
   511 B.R. 253 (Bankr. S.D.N.Y. 2014)........................................................................50

*Louisiana Stadium & Exposition Dist. v. Fin. Guar. Ins. Co.*,
   701 F.3d 39 (2d Cir. 2012)...........................................................................................28

*Macy's, Inc. v. J.C. Penney Corp.*,
   989 N.Y.S.2d 238 (N.Y. Sup. Ct. (N.Y. Cnty.) 2014).................................................52

*MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*,
   512 U.S. 218 (1994)......................................................................................................29

*McPherson v. Rankin*,
   736 F.2d 175 (5th Cir. 1984) ...............................................................................19, 20

*Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*,
   2007 WL 2197830 (S.D.N.Y. July 31, 2007) .....................................................29, 30

*Mill Fin. LLC v. Gillett*,
   2013 WL 5476020 (N.Y. Sup. Ct. (N.Y. Cnty.) Sept. 27, 2013)..............................50

*United States ex rel. Mitchell v. CIT Bank, N.A.*,
   2021 WL 4950301 (E.D. Tex. Oct. 25, 2021) .....................................................21, 42

*In re Murray Energy Holdings Co.*,
   634 B.R. 951 (Bankr. S.D. Ohio 2021)......................................................................31

*Octagon Credit Invs., LLC v. NYDJ Apparel LLC*,
   Index No. 656677/2017 (N.Y. Sup. Ct. (N.Y. Cnty.) Jan. 9, 2018) ........................50

3714825.1

*Patrolmen's Benevolent Ass'n of City of New York, Inc. v. City of New York*,
    46 A.D.3d 378 (N.Y. App. Div. (1st Dep't) 2007) ...................................................................26

*In re PCH Assocs.*,
    804 F.2d 193 (2d Cir. 1986).......................................................................................................45

*Popkin v. Sec. Mut. Ins. Co. of N.Y.*,
    48 A.D.2d 46 (N.Y. App. Div. (1st Dep't) 1975) ....................................................................27

*In re Sackman Mortg. Corp.*,
    158 B.R. 926 (Bankr. S.D.N.Y. 1993).......................................................................................45

*Scholastic, Inc. v. Harris*,
    259 F.3d 73 (2d Cir. 2001).........................................................................................................41

*Servs. v. Jupiter Partners*,
    309 A.D.2d 288 (N.Y. App. Div. (1st Dep't) 2020); ...............................................................50

*St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*,
    78 F.3d 202 (5th Cir. 1996) .......................................................................................................26

*Sumitomo Mitsui Banking Corp. v. Credit Suisse*,
    89 A.D.3d 561 (N.Y. App. Div. (1st Dep't) 2011) ..................................................................45

*T.G.I. Friday's Inc. v. Nat'l Restaurants Mgmt., Inc.*,
    59 F.3d 368 (2d Cir. 1995).........................................................................................................26

*Total E&P USA, Inc. v. Marubeni Oil & Gas USA, Inc.*,
    2017 WL 86875 (S.D. Tex. Jan. 10, 2017) ...............................................................................51

*Town of Camillus v. Comm'r of Dep't of Env't Conservation*,
    256 A.D.2d 967 (N.Y. App. Div. (3d Dep't) 1998)..................................................................27

*Trustees of Amherst Coll. v. Ritch*,
    151 N.Y. 282 (1897) ...................................................................................................................45

*Weatherly v. Pershing, L.L.C.*,
    945 F.3d 915 (5th Cir. 2019) .....................................................................................................48

*Xerox Corp. v. Genmoora Corp.*,
    888 F.2d 345 (5th Cir. 1989) ...............................................................................................20, 41

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................................19

Fed. R. Civ. P. 56(d) .......................................................................................................................20

Fed. R. Civ. P. 56(f).................................................................................................................20, 40

3714825.1

**Dictionaries**

*Open Market*, *Black's Law Dictionary* (11th ed. 2019).................................................23

Oxford English Dictionary (3d ed. 2004) ............................................................2, 23

*Release*, *Black's Law Dictionary* (11th ed. 2019) .......................................................45

**Other Authorities**

Cleary Gottlieb Steen & Hamilton LLP, *U.S. Regulation of the International
    Securities and Derivatives Markets* 553 (11th and 12th eds. 2014-2017).............................38

Jones Day LLP, *Deleveraging and Capital-Raising Alternatives in a Turbulent
    Market* (Nov. 2008) ............................................................................38

 Milbank LLP, *Debt Repurchases in the Open Market and Privately Negotiated
    Transactions* (Mar. 24, 2020) .................................................................37

Proskauer Rose LLP, *INSIGHT: Out-of-Court Restructuring Alternatives for
    Distressed Bond* (May 29, 2020) ...............................................................35

Weil Gotshal & Manges LLP, *LevFin Quarterly* (Q4 2015)...........................................38

Weil Gotshal & Manges LLP, *Private Equity Alert: De-levering Portfolio
    Companies Through Debt Buy-backs* (Mar. 2009) ..............................................3, 37

*Williston on Contracts* § 1820 ...................................................................46

Defendants and counterclaim/third-party plaintiffs AG Centre Street Partnership L.P., AG Credit Solutions Non-ECI Master Fund, L.P., AG Super Fund Master, L.P., AG SF Master (L), L.P., Silver Oak Capital, L.L.C., Ascribe III Investments, LLC, Cent CLO 21 Limited, Columbia Cent CLO 27 Limited, Columbia Floating Rate Fund, a series of Columbia Funds Series Trust II, Columbia Strategic Income Fund, a series of Columbia Funds Series Trust I, Contrarian Capital Fund I, L.P., Contrarian Distressed Debt Fund, L.P., Contrarian Centre Street Partnership, L.P., Gamut Capital SSB, LLC, North Star Debt Holdings, L.P., Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., Shackleton 2017-XI CLO, Ltd., Z Capital Credit Partners CLO 2018-1 Ltd., and Z Capital Credit Partners CLO 2019-1 Ltd. (collectively, the "Excluded Lenders") respectfully submit this memorandum of law in opposition to the motions for partial summary judgment of plaintiff/counterclaim defendant Serta Simmons Bedding ("Serta") (ECF Dkt. No. 69), and plaintiffs Invesco Senior Secured Management, Inc., Credit Suisse Asset Management, LLC, Boston Management and Research, and Eaton Vance Management (collectively, the "Favored Lenders") (ECF Dkt No. 73).

## PRELIMINARY STATEMENT

Plaintiffs' partial summary judgment motions present a central question:  Was the plaintiffs' June 8, 2020 restructuring transaction an "open market purchase" within the meaning of Section 9.05(g) of the Serta 2016 Credit Agreement?  If it was *not*, then the 2020 restructuring was indisputably a breach of contract.  So it beggars belief that in nearly 60 pages of briefing, plaintiffs never answer the most basic question:  what exactly *is* an "open market purchase"?

The text of the Credit Agreement, applicable case law, and established commercial practice answer that question dispositively.  Under the plain language of Section 9.05(g), an "open market purchase" must, first and foremost, actually be "open" to participants.

As one court wrote, "[a]n open market refers to 'an unrestricted market in which any buyer or seller may trade freely, and where prices are determined by supply and demand.'" *Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 352 (S.D.N.Y. 2013) (quoting Oxford English Dictionary (3d ed. 2004)).  As described in the accompanying expert reports of Marti Murray and Sarah Ward, there is a vast and active "open market" for leveraged loans such as Serta's First Lien debt.  (*See* Declaration of Marti P. Murray dated March 16, 2023 ("Murray Decl.") ¶ 48; Declaration of Sarah M. Ward dated March 16, 2023 ("Ward Decl.") ¶ 4.)

Why don't plaintiffs venture a definition?  The answer seems apparent:  the 2020 restructuring (the "Unlawful Exchange Transaction") lacked all the hallmarks of an "open market purchase," which is a limited exception to lenders' "sacred right" to *pro rata* distributions under Serta's 2016 Credit Agreement.  As Judge Failla of the Southern District of New York wrote, in rejecting Serta's motion to dismiss, "[o]n a plain reading of the term," the Unlawful Exchange Transaction "did not take place in what is conventionally understood as an 'open market.'" *LCM XII Ltd.* v. *Serta Simmons Bedding, LLC*, No. 21 Civ. 3987 (KFP), 2022 WL 953109, at *8 (S.D.N.Y. Mar. 29, 2022).  Far from employing the "open market," the Unlawful Exchange Transaction "was closed to a swath of possible participants" and the plaintiffs did not transact at "a price set by market forces."  *Id.*

Indeed, Debtors' own lawyers aptly described the "open market purchase" process – and distinguished it from "privately negotiated purchases" – in a publicly issued alert in 2009:

> An open market purchase is accomplished through a broker or agent and requires the purchaser to pay a set market price. Normally, the parties involved in an open market purchase are not aware of one another's identity. Conversely, in a privately negotiated purchase, the buyer (acting directly or through an agent) would approach individuals or groups (usually sophisticated

> institutional sellers) that own large percentages of the portfolio
> company's debt securities and purchase the debt securities for a
> negotiated price.[1]

Counsel for the Favored Lenders similarly distinguished between "open market purchases" and "privately negotiated transactions" in an alert issued in the same year.

Plaintiffs and their sophisticated advisors knew that, typically, "open market" transactions utilize brokers, are payable in cash, are governed by standard agreements, take place at prevailing market prices and impose no obligations or conditions on a seller other than to tender the debt it is selling. Such open market transactions benefit both the borrower, which can capture discount, and lenders, who seek a fair opportunity to sell. Lenders who continue to hold also gain, because their position in the capital structure is unimpaired while the overall amount of debt burdening the borrower is reduced. Lenders and borrowers agree to credit agreements permitting open market purchases precisely because of these shared benefits.

Serta repeatedly used the open market in just this way to purchase its debt. But rather than comply with the Credit Agreement and use the open market in 2020, the Favored Lenders engaged in the polar opposite: the deal was privately negotiated; Serta paid a significant premium, rather than transacting at a market price and capturing a traditional market discount; a large group of lenders was intentionally *excluded* (and, in fact, the benefits derived from the Unlawful Exchange Transaction by the Favored Lenders are due solely to its exclusionary nature); rather than simply selling debt according to standard terms, the Favored Lenders were required to commit to invest new money and negotiate and execute a series of complicated

---

[1] Ex. A, Glenn D. West et al., Weil Gotshal & Manges LLP, *Private Equity Alert: De-levering Portfolio Companies Through Debt Buy-backs* (Mar. 2009), https://weil.com/~/media/files/pdfs/Private_Equity_Alert_March_2009.pdf.

agreements, including amendments to the Credit Agreement and new intercreditor agreements; and the Excluded Lenders found their rights buried beneath a billion dollars of newly-created super-priority debt.  This was not an "open market purchase," but instead a sweeping, coercive and unfair restructuring which blatantly violated the Credit Agreement.  Indeed, in public statements and internal documents – and even in its motion papers – Serta candidly and repeatedly describes the Unlawful Exchange Transaction not as an "open market purchase" but as a "recapitalization."  (*See, e.g.*, Serta Br. at 1; Ex. B, Serta Simmons Bedding LLC, "Serta Simmons Bedding Enters into Agreement with Majority of Lenders on Deleveraging and Liquidity Enhancing Transaction," June 8, 2020 ("June 8, 2020 Press Release").)

This scheme was particularly pernicious because, while masquerading as an "open market purchase," it intentionally subverted the Excluded Lenders' rights to *pro rata* distribution of payments and collateral under the plain language of Section 2.18(b) of the Credit Agreement.  *Pro rata* distribution is one of a handful of "sacred rights" under the Credit Agreement, which may not be impaired absent the consent of all affected lenders.  As this rule of unanimous consent reflects, sacred rights are the most fundamental aspects of the bargain between the borrower and lenders.  By benefiting the Favored Lenders' First Lien Loans and priming the Excluded Lenders, the June 2020 restructuring eviscerated the sacred *pro rata* right.

Plaintiffs fail to present a cogent defense of the Transaction.  In their view, an open market purchase encompasses *any* transaction, whether or not conducted in the "open market."  That simply cannot be true.

While the Court is appropriately focused on the impact of the Unlawful Exchange Transaction on this bankruptcy case, the market impact of sanctioning this type of transaction should not be overlooked.  If the Unlawful Exchange Transaction is held to constitute an "open

4

market purchase," any lender that participates in a leveraged loan transaction will be at the mercy of a borrower.  A borrower will be free, at any time, to join forces with a bare majority of lenders to transform any lender into an Excluded Lender without its consent or any warning.  A lender will find it nearly impossible to price the risk of purchasing such loans, if it cannot know whether it will be chosen as a Favored Lender, or left out in the cold, transformed involuntarily from a first-lien (secured) lender into a deeply subordinated and effectively unsecured lender.  And if authorized by this Court, that risk could materialize at any time.  Trading prices in the secondary market for such loans will fall – further punishing lenders as they seek to exit their positions. While Serta seeks a short-term benefit in this bankruptcy, a ruling sanctioning the Unlawful Exchange Transaction will create significant uncertainty in the secondary markets for loans with "open market purchase" provisions.

We submit that summary judgment is appropriate here – summary judgment in favor of the Excluded Lenders enforcing the plain meaning of the agreement, which the Court has the power to grant under Fed. R. Civ. P. 56(f).  Plaintiffs' motions, by contrast, should be denied.

Apart from the merits of the Excluded Lenders' contract claims under Section 2.18(c), there are several independent reasons why plaintiffs' motions for partial summary judgment should be denied.  First, as discussed below, the Unlawful Exchange Transaction violated Sections 9.02(b)(B)(2) and (3) of the agreement, which provide that no amendment shall "release all or substantially all of the Collateral from the [First Term Lien Loans]" or "release all or substantially all of the value of the Guarantees, without the prior consent of each" First Lien Lender.  (Ex. C, Credit Agreement § 9.02(b)(B)(2)-(3).)  That is just what happened here:  the Excluded Lenders now are deeply subordinated creditors, standing in line behind roughly

3714825.1

$1 billion in debt owned by the Favored Lenders, holding first-lien loans that have no significant value.

Second, the Unlawful Exchange Transaction breached the covenant of good faith and fair dealing implied in every New York contract. As we discuss below, New York courts vigorously enforce this duty in intercreditor disputes, as evidenced most recently by the appellate decision in *AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*, No. 16877, 2023 WL 2394680 (N.Y. App. Div. (1st Dep't) Mar. 7, 2023), as well as by the decisions in *LCM*, which sustained a good faith claim challenging the very same Unlawful Exchange Transaction, and in *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, Index No. 655175/2020, 2022 WL 10085886 (N.Y. Sup. Ct. (N.Y. Cnty.) Oct. 17, 2022) ("*Boardriders*"). The Unlawful Exchange Transaction was designed and implemented in bad faith to deprive the Excluded Lenders of the expected fruits of the agreement. As the Court recognized in the January 27, 2023 hearing on plaintiffs' motion to extend the automatic stay, "[g]ood faith and fair dealing most often is a factual intensive inquiry and requires discovery and understanding of all the circumstances." (ECF No. 21, Jan. 27, 2023 Hr'g Tr. at 26:8-10.) Discovery should continue on that claim.

Third, if the Court finds the agreement to be ambiguous (which was the view of the court in *LCM*), discovery on the contract claim is appropriate. The parties have had no meaningful opportunity to conduct discovery regarding the intent of the parties and the interpretation of the agreement, and the Court should not resolve an ambiguity without that evidence. In this dispute, where the Excluded Lenders seek only a monetary recovery solely from the Favored Lenders – which have known all along of the Excluded Lenders' claims – there is no legitimate reason for a rush to judgment.

## STATEMENT OF RELEVANT FACTS

### A.  The 2016 Credit Agreement and the *Pro Rata* Sharing Principle

In  2016, Serta, North America's largest bedding manufacturer, undertook a $2.6 billion refinancing pursuant to three agreements dated November 8, 2016:  (1) a first lien term loan agreement (the "Credit Agreement") providing for $1.95 billion in term loans (the "First Lien Term Loans"); (2) a second lien term loan agreement providing for $450 million in term loans (the "Second Lien Term Loans"); and (3) a $225 million asset-based revolving credit facility.

A fundamental feature of the Credit Agreement is its strict requirement for the *pro rata* distribution of collateral and the *pro rata* sharing of payments among the lenders who participated in the First Lien Term Loans (the "First Lien Lenders").  Section 2.18(b) of the Credit Agreement provides that, upon an event of default (including bankruptcy and acceleration of the loans (Ex. C, Credit Agreement § 2.18(b)), the proceeds of any collateral, after payment of certain expenses, *must* be divided among the First Lien Lenders on a *pro rata* basis.  (*Id.*)  And Section 2.18(c) provides that if any First Lien Lender somehow receives any payment "in respect of any principal or interest" in excess of its proportional share, it must pay that excess ratably to all other First Lien Lenders.  (*Id.* § 2.18(c).)

Creditors regard these *pro rata* rights as fundamental, and the Credit Agreement confirms the point.  Although most of the provisions of the Agreement may be amended merely by a favorable vote of the "Required Lenders" – in particular, lenders representing more than 50% of the face value of the loans – the waterfall and *pro rata* sharing provisions, referred to, appropriately, as "sacred rights," may be amended only with "the consent of *each* Lender directly and adversely affected thereby."  (*Id.* § 9.02(b)(A) (emphasis added).)  As Section

7

9.02(b)(A)(6) emphatically declares, "*the consent of each Lender directly and adversely affected thereby . . . shall be required* for any waiver, amendment or modification that . . . waives, amends or modifies Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the *pro rata* sharing of payments required thereby (*except* in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c), and/or 9.05(g) or as otherwise provided in this section 9.02)."  (*Id.* § 9.02(b)(A)(6) (emphasis added).)

The only exceptions to this ironclad rule of *pro rata* treatment are narrow. Section 9.05(g) permits a lender under the Credit Agreement to "assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) *through open market purchases*[.]"  (*Id.* § 9.05(g) (emphasis added).)  Plaintiffs' motions for partial summary judgment hinge on the meaning of that second exception, for "open market purchases."

### B.  Serta's Discussions with the First Lien Lender Group at the Start of 2020

In the years following the execution of the 2016 Credit Agreement, Serta suffered a series of financial struggles.  By March 2020, when the COVID-19 pandemic reached the United States, Serta's First Lien Term Loans were trading in the secondary market at less than fifty cents on the dollar, and its Second Lien Term Loans at less than thirty cents.  (*See* Declaration of Ryan Mollett dated March 16, 2023 ("Mollett Decl.") ¶ 16.)

In April 2020, as the pandemic deepened its financial troubles, Serta began discussions with certain of its existing First Lien Lenders – Apollo, Angelo Gordon, and Gamut (the "First Lien Lender Group") – to find a way to alleviate Serta's liquidity issues.  (*See* Mollett Decl. ¶ 11; Declaration of Michael Hanigan dated March 16, 2023 ("Hanigan Decl.") ¶ 5;

8

Declaration of Theodore Kwon dated March 16, 2023 ("Kwon Decl.") ¶ 19.)  These discussions focused on a potential "drop-down" transaction structure, which would have involved a new loan to an unrestricted subsidiary of Serta using existing basket capacity under the Credit Agreement and would not have required any amendments to the Credit Agreement.  (Mollett Decl. ¶ 9.) Whether any transaction ultimately agreed upon by the parties, if consummated, would have run afoul of the Credit Agreement never became a ripe issue, because Serta abruptly ended discussions with the First Lien Lender Group on June 5, 2020. (Mollett Decl. ¶ 14; Hanigan Decl. ¶ 8; Kwon Decl. ¶ 23.)

**C.  Serta Announces the Unlawful Exchange Transaction**

Three days later, on June 8, 2020, Serta announced in a press release that it had entered into a transaction support agreement with a different group of lenders (the "Favored Lenders") with the goal of "recapitaliz[ing] the company."  (Ex. B, June 8, 2020 Press Release.) The press release stated that Serta and certain of the Favored Lenders, holding a majority of the company's First and Second Lien Term Loans, planned to execute a transaction that would create:

- $200 million of new money super-priority "first out" debt, funded by the Favored Lenders, which would rank ahead of the Excluded Lenders' existing First Lien Term Loans;

- Up to $875 million of super-priority "second out" debt, issued in exchange for First Lien Term Loans and Second Lien Term Loans held by the Favored Lenders, which also would rank ahead of the Excluded Lenders' existing First Lien Term Loans; and

- An unspecified amount of capacity to incur still more super-priority debt, which would be "third out" and also would rank ahead of the Excluded Lenders' existing First Lien Term Loans.

(*Id.*)  Tellingly, Serta did not seek the Excluded Lenders' consent to amend or modify the terms of the Credit Agreement to facilitate the Unlawful Exchange Transaction.  Nor did Serta offer or

permit either the First Lien Lender Group or any of the other Excluded Lenders to exchange their First Lien Term Loans for the "super-priority" loans granted to the Favored Lenders.[2]  (*See* Hanigan Decl. ¶ 9; Kwon Decl. ¶ 24; Declaration of Daniel Ryan dated March 16, 2023 ("Ryan Decl.") ¶¶ 5-6; Declaration of Erik Kreutzer dated March 16, 2023 ("Kreutzer Decl.") ¶¶ 5-7.)

To the contrary, Serta and the Favored Lenders sought, at every turn, to keep their favored (and decidedly *non-pro rata*) treatment to themselves.  When certain of the Excluded Lenders (which were not in the First Lender Group) attempted to participate in the Unlawful Exchange Transaction, they were rebuffed.  In April 2020, Alcentra sought, repeatedly, to join the Favored Lenders Group, without success.  (Ryan Decl. ¶ 5.)  Even after the Unlawful Exchange Transaction was announced, Alcentra asked that the size of the "second out" exchange tranche be increased so it could participate, and the Favored Lenders refused to modify the structure to include Alcentra.  (Ryan Decl. ¶ 6.)  So, too, for Z Capital, another of the Excluded Lenders.  When that firm contacted Evercore on June 8, 2020, ███████████████████ ██████████████████████████████████████████████  Evercore told Z Capital the transaction was *not* being offered on a *pro rata* basis.  (Kreutzer Decl. ¶ 6.)

**D.  The Unlawful Exchange Transaction Was Anything But "Open Market"**

As announced, the Unlawful Exchange Transaction purported to give the holders of the newly created $1.075 billion of Super-Priority First Lien Term Loans (the "Priority Term Loans") payment priority over the First Lien Term Loans.  (Ex. B, June 8, 2020 Press Release.)  This arrangement rendered the Excluded Lenders' loans "First Lien" in name only, as over $1

---

[2] On or about June 5, 2020, Serta's banker Evercore offered Angelo Gordon the opportunity to participate in a transaction that would have excluded Apollo and Gamut.  Evercore did not, however, provide any details about that transaction.  (Mollett Decl. ¶ 15.)

billion in debt now owned by the Favored Lenders would have to be paid in full before the Excluded Lenders could receive a cent.

What is more, plaintiffs' loans were not purchased at market prices but instead were exchanged at a substantial premium. Prior to the Serta Transaction, the Company's first-lien debt was trading at or around 43 cents on the dollar, and the Company's second-lien debt was trading at or around 8 cents on the dollar. (Mollett Decl. ¶ 16.) According to Serta, the Unlawful Exchange Transaction exchanged the Favored Lenders' first-lien debt at a rate of 74 cents on the dollar, and their second-lien debt at 39 cents on the dollar, neither of which represent a discount to market rates. (*See* ECF No. 70, Serta Statement of Uncontroverted Facts dated February 24, 2023 ¶ 19.) In addition, the new Priority Term Loans issued in exchange for the First Lien Term Loans of the Favored Lenders would bear interest at a rate 4.00% per annum higher, or a margin that is more than 100% greater, than the margin of the First Lien Term Loans**.** (Ex. D, Super-Priority Term Loan Agreement dated June 22, 2020, § 1.01, "Applicable Rate.")

Rather than sign the type of standard documentation used for a customary open market purchase, Serta and the Favored Lenders agreed to: (i) a new, bespoke, 558-page Super-Priority Term Loan Agreement; (ii) an exchange agreement they titled an "Open Market Purchase and Cashless Exchange Agreement" (as if such a label alone could transform it into an "open market purchase"); and (iii) a new First Lien Intercreditor Agreement that purported to rank the Priority Term Loans senior in right of payment to the First Lien Term Loans held by the Excluded Lenders under the Credit Agreement. In addition, Serta and the Favored Lenders purported to amend at least two dozen provisions of the Credit Agreement to: (i) authorize the Super-Priority Term Loan Agreement, (ii) ratify the Unlawful Exchange Transaction, and (iii)

11

instruct the Administrative Agent to enter into the new intercreditor agreement providing for payment subordination of the First Lien Term Loans to the new Priority Term Loans.  (*See* Ex. E, Open Market Purchase and Cashless Exchange Agreement dated June 22, 2020; Ex. F, Amendment No. 1 to First Lien Term Loan Agreement dated June 22, 2020; Ex. D, Super-Priority Term Loan Agreement; Ex. G, Priority Intercreditor Agreement dated June 22, 2020.)

The effect of these purported amendments and new intercreditor agreement was exactly what Serta and the Favored Lenders had intended from the outset:  to recapitalize the Company and eviscerate the Excluded Lenders' contractual priority rights, demoting the Excluded Lenders to, for all intents and purposes, deeply subordinated lenders, while giving other lenders – including Second Lien Lenders – a new "super-priority" status that would entitle them to repayment before the Excluded Lenders.  Adding insult to injury, when Serta announced the transaction, it did not even deign to provide the transaction documents to the Excluded Lenders.  It took litigation to pry those deal documents loose.

And yet it gets worse.  As a transparently punitive measure, and as part of the Unlawful Exchange Transaction, Serta added the members of the First Lender Group to its list of "disqualified" lenders, not only for purposes of the amended Credit Agreement but also for purposes of the Priority Term Loan credit facility.  Serta thereby barred the First Lender Group from acquiring any interests in those new loans in the open market.

### E.  <u>The Market Immediately Reacts to the Negative Impact of the Unlawful Exchange</u>

After Serta announced the transaction, the market reacted swiftly.  The First Lien Term Loans held by the Excluded Lenders, which were trading at about 43 cents to the dollar before the transaction was announced, plunged to 31 cents.  (Mollett Decl. ¶ 16.)  Within days, Moody's Investors Service downgraded the First Lien Term Loans from Caa3 to Ca, reflecting

Moody's belief that "term loan lenders who do not consent to the transaction will potentially be left with little or no remaining collateral coverage in Serta Simmons, as well as in a position that is subordinated to new, higher priority debt." (Ex. H, Moody's Rating Action, *Moody's views Serta Simmons' transaction as distressed exchange, downgrades existing first and second lien term loans; outlook negative* (June 11, 2020).) Moody's "Ca" rating is given to obligations that "are highly speculative and are likely in, or very near, default, with some prospect of recovery in principal and interest." (Ex. I, Moody's Rating Scale and Definitions.)

### F. <u>Three First Lien Lenders Seek to Enjoin the Transaction in New York State Court</u>

On June 11, 2020, before the precise mechanics of the Unlawful Exchange Transaction were fully known, certain of the Excluded Lenders filed a lawsuit in the Supreme Court of the State of New York, seeking a temporary restraining order and preliminary injunction to prevent the consummation of the Unlawful Exchange Transaction. (Ex. J, Complaint, *North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC* ("*North Star*"), Index No. 652243/2020 (N.Y. Sup. Ct. (N.Y. Cnty.) (June 11, 2020) [NYSECF No. 1].) Eight days later, Justice Masley denied the motion for a preliminary injunction. The court concluded, based on the then-available evidence, that the *North Star* plaintiffs had not shown a likelihood of success and had not established irreparable harm because of the availability of monetary damages. *See North Star*, 2020 WL 3411267, at *4-6 (June 19, 2020). The Unlawful Exchange Transaction closed on June 22, 2020. (Ex. K, Serta Simmons Bedding LLC, "Serta Simmons Bedding Closes Previously Announced Deleveraging and Liquidity Enhancing Transaction," June 22, 2020.)

The *North Star* plaintiffs thereafter moved to withdraw their claims without prejudice, noting that they should be allowed to "determine whether, and how, to pursue their

rights at the appropriate time" in light of newly disclosed documents related to the Unlawful

Exchange Transaction, and that no prejudice would inure to defendants because they already

were required to defend similar claims in a federal action filed by another set of Excluded

Lenders, as discussed below.  (Ex. L, Plaintiffs' Memorandum of Law, *North Star*, at 2 (July 10,

2020) [NYSECF No. 170].)  At the hearing on the withdrawal motion, Justice Masley agreed that

there was no prejudice, including because she had made only a preliminary ruling at the

preliminary injunction stage, and "wasn't deciding a motion to dismiss."  (Ex. M, November 30,

2020 Hr'g Tr., *North Star*, at 19:5 [NYSECF No. 214].)  Following the hearing, Justice Masley

granted the motion, conditioned on a requirement that the *North Star* plaintiffs "request

assignment to this court if plaintiffs file a new action in this court."  (Ex. N, Decision and Order

on Motion, *North Star* (Dec. 1, 2020) [NYSECF No. 212].)

### G.  Another Group of Excluded Lenders Commences Litigation in Federal Court

On July 2, 2020, investment funds managed by affiliates of LCM Asset

Management LLC ("LCM") challenged the Unlawful Exchange Transaction in the Southern

District of New York.  *LCM XII Ltd.* v. *Serta Simmons Bedding, LLC*, No. 20 Civ. 05090 (GBD)

(S.D.N.Y.).  After an initial complaint was dismissed without prejudice on diversity grounds (Ex.

O, Memorandum Decision & Order, *LCM XXII Ltd.* v. *Serta Simmons Bedding, LLC*, No. 1:20-

cv-05090-GBD (S.D.N.Y. Mar. 10, 2021) [ECF No. 86]), LCM filed a new action, this time

asserting claims only against diverse defendant Serta.  (Ex. P, Complaint, *LCM XXII Ltd.* v.

*Serta Simmons Bedding, LLC*, No. 21 Civ. 3987 (S.D.N.Y. May 4, 2021) [ECF No. 1].)

On March 29, 2022, after extensive briefing, Judge Failla denied a motion to

dismiss the LCM plaintiffs' claims for breach of contract and breach of the implied covenant of

good faith and fair dealing.  *See LCM*, 2022 WL 953109, at *6, *14.  The court noted at the

outset that Justice Masley's decision in *North Star* "was decided on a preliminary posture, and is not controlling on the merits." *Id.* at *8 n.13. Turning to the question whether the Unlawful Exchange Transaction passed muster under the "open market purchase" exception, the court stated:

> On a plain reading of the term, the Transaction depicted in the Complaint did not take place in what is conventionally understood as an "open market." Significantly, the Transaction was closed to a swath of possible participants (i.e., those lenders who did not participate in the Transaction), and rather than agreeing on a price set by market forces, Defendant and the Participating Lenders are alleged to have engaged in secretive discussions to arrive at a price for the loan repurchases that necessitated both intricate amendments to the Agreement and additional agreements, the terms of which were withheld from Plaintiffs until they were publicly announced.

*Id.* at *8. The court held that "[a]t minimum," the term "open market purchase" is ambiguous, *id.* at *7, and denied Serta's motion to dismiss LCM's breach of contract claim. *Id.* at *9.

The court also denied Serta's motion to dismiss LCM's good faith and fair dealing claim. Judge Failla explained that "one could reasonably conclude from [LCM's] allegations that [Serta] systematically combed through the [Credit] Agreement tweaking every provision that seemingly prevented it from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one." *Id.* at *15. The court further found that LCM had pleaded "sufficient factual allegations to support a non-speculative claim that [it] suffered damages as a result of [Serta's] creation of a superior class of credit." *Id.* at *13.

### H. <u>Justice Masley Denies the Borrower's Motion to Dismiss in *Boardriders*</u>

On October 17, 2022, Justice Masley denied a motion to dismiss filed in a challenge to a similar "uptier" transaction in *Boardriders*. The court rejected Boardriders'

argument that the underlying credit agreement allowed amendments that effectively subordinated

liens, removed affirmative and negative covenants, and modified the relevant no-action clause,

noting that this would "essentially vitiate the equal repayment provisions." *Boardriders*, 2022

WL 10085886, at *7.  Justice Masley also rejected the defendants' arguments that, as a matter of

law, there was no breach of the underlying *pro rata* sharing provisions as a result of a purported

"open market purchase" exception, finding, just as Judge Failla had with respect to the Credit

Agreement at issue in this case, that the term "open market purchase" was ambiguous and could

not be interpreted based solely on the pleadings.  *Id.* at *9.

I.  **The Excluded Lenders File a New Action Before Justice
Masley and Subsequently Remove It to Federal Court**

Mere weeks later, and with the *LCM* and *Boardriders* decisions now in hand, the

Excluded Lenders – joined by a half-dozen additional lenders who likewise had been shut out of

the Unlawful Exchange Transaction – filed a new action before Justice Masley.  In an amended

complaint filed on November 16, 2022, the Excluded Lenders asserted nine causes of action

against Serta and the Favored Lenders, including for breach of contract and breach of the implied

covenant of good faith and fair dealing.  (Ex. Q, Amended Complaint, *AG Centre Street P'ship

L.P. v. Serta Simmons Bedding*, *LLC*, Index No. 654181/2022 (N.Y. Sup. Ct. (N.Y. Cnty.) Nov.

16, 2022) [NYSECF No. 11].)  Serta and the Favored Lenders moved to dismiss the amended

complaint, but briefing was suspended when, two weeks later, Serta filed its petition under

chapter 11 in this Court.

Serta filed its chapter 11 petition on January 23, 2023, (Voluntary Petition, *In re

Serta Simmons Bedding, LLC*, No. 23-90020 (Bankr. S.D. Tex. Jan. 23, 2023) [ECF No. 1]) and

the Excluded Lenders immediately removed the claims against the Favored Lenders in the *AG

Centre Street* action to the United States District Court for the Southern District of New York.

16

(Ex. R, Notice of Removal, *AG Centre Street P'ship L.P. v. Eaton Vance Mgmt.*, No. 23 Civ. 587 (S.D.N.Y.) (KPF) [ECF No. 1].)  As requested by the Excluded Lenders, the case was assigned to Judge Failla, who had been presiding over similar claims in the LCM Action, in which fact discovery was close to completion.  Serta and the Favored Lenders subsequently filed a declaratory judgment action as an adversary proceeding in the chapter 11 proceeding, seeking a declaration that they did not breach the Credit Agreement or the implied covenant of good faith and fair dealing by entering into the Unlawful Exchange Transaction.  (ECF No. 1.)

### J.   Serta's Interference with Apollo's Purchase of First Lien Term Loans

Serta was not content simply to seek this Court's approval of its wholesale repudiation of the Credit Agreement.  It now also seeks a declaratory judgment that North Star Debt Holdings, L.P., an affiliate of funds managed by Apollo Global Management, Inc. ("Apollo"), is not a party to the Credit Agreement because Apollo supposedly was on Serta's list of disqualified lenders ("DQ List") at the time North Star Debt Holdings, L.P. attempted to purchase First Lien Term Loans in March 2020.  The facts regarding that claim are as follows:

Apollo purchased and sold First Lien Term Loans on multiple occasions between the years 2016 and 2018.  (Kwon Decl. ¶ 4.)  On March 12, 2020, Apollo, through its affiliate North Star Debt Holdings L.P., executed two trades with Barclays to purchase Serta First Lien Term Loans, with an aggregate face value of $35.3 million.  (Kwon Decl. ¶ 6.)  On March 13, 2020, Rachel Dwyer from Apollo spoke with a representative from UBS to inquire whether Apollo appeared on Serta's DQ List.  (Kwon Decl. ¶ 7.)  The UBS employee confirmed to Ms. Dwyer that Apollo did not appear on the DQ List. (*Id.*)

On March 17, 2020, an employee at IHS Markit, a third party assisting UBS with its administrative duties under the Credit Agreement, separately confirmed in a comment posted

17

to the trade settlement platform that "Apollo is not a disqualified institution" on Serta's DQ List. (Kwon Decl. ¶ 8.)  On March 20, 2020, UBS advised Apollo that it had requested Serta's consent to start the process of settling this trade.  (Kwon Decl. ¶ 10.)

On April 14, 2020, the 15-day consent period under the Credit Agreement expired with no response from Serta.  (Kwon Decl. ¶ 11.)  Accordingly, Cindy Wong from Barclays wrote to UBS, requesting that the trades be executed.  (*Id.*)  In mid-April, with the trades still pending, Rachel Dwyer from Apollo had additional conversations with personnel from UBS in which she asked again that UBS confirm whether or not Apollo was on the DQ List.  (Kwon Decl. ¶ 12.)  The UBS representative confirmed several times that Apollo was not on the DQ List.  (*Id.*)

On April 23, 2020, Lacary Sharpe from Apollo emailed Michael Roudnev from UBS, asking for updates on Serta's consent to the trade.  (Kwon Decl. ¶ 13.)  On April 24, 2020, Mr. Roudnev responded that UBS had been in touch with Serta, and that "Serta basically said the delay in approving the trade is due to COVID and signing online. They did say they will approve, however, so hopefully they can get us the signed document later today or Monday." (*Id.*)

On April 28, 2020, UBS executed the trade.  (Kwon Decl. ¶ 14.)  Later that same day, UBS "retracted" the execution and said it was made in error.  (*Id.*)  On May 1, 2020, Serta "rejected" the trade, even though its time to do so was long past.  (Kwon Decl. ¶ 15.)  Kenneth Prince, an investment professional at Serta's private equity sponsor Advent, spoke with Matt Manin from Apollo, and said that Serta would approve the trade only if Apollo would promise to make a new money investment in Serta.  (*Id.*)

18

Apollo and Barclays both thereafter asked UBS for a copy of the DQ List.  (Kwon Decl. ¶ 16.)  In response to an inquiry from Barclays, a UBS representative acknowledged that Barclays had a contractual right to the list, but said that Serta "has expressed disagreement with [UBS] about the contents of the DQ list," and was "working on it" with Serta.  UBS never provided Apollo or Barclays with a copy of the DQ List.  (*Id.*)

In discovery in connection with this action, Serta produced a document showing that, in fact, Apollo was not on the DQ List.  In 2016, ███████ sent an email to UBS, the Administrative Agent for the First Lien Term Loans, with ███████ in the subject line and, in the text, instructing ███████████  (*See* Ex. S, Email ████████████ dated October 18, 2016; *see also* Ex. T, Email █████████████ dated May 26, 2020 (referencing ███████ 2016 email ████████████████████████").)

## LEGAL STANDARD

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984) ("If there is a genuine issue of material fact which would cause a dispute to reasonably be resolved in favor of the party resisting the summary judgment, the summary judgment cannot stand.").  On a motion for summary judgment, "the moving party must demonstrate that the facts underlying all relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment should be denied."  *McPherson*, 736 F.2d at 180; *see also Alabama Farm Bureau Mut. Cas. Co., Inc. v. Am. Fidelity Life Ins. Co.*, 606 F.2d 602, 609 (5th Cir. 1979) ("The burden is on the party seeking summary judgment to show that there is no genuine issue of material fact.").  The "party opposing the motion is to be given the benefit of all reasonable doubt in determining whether a

19

genuine factual issue exists," *Kellerman v. Askew*, 541 F.2d 1089, 1092 (5th Cir. 1976), and "the inferences most favorable to the party opposing the motion will be drawn." *Alabama Farm Bureau*, 606 F.2d at 609 (citing *Boazman v. Econ. Lab'y, Inc.*, 537 F.2d 210, 214 (5th Cir. 1976)). It "is not the province of the trial court on motion for summary judgment to weigh evidence, assess its probative value or decide factual issues." *McPherson*, 736 F.2d at 178 (citing *Byrd v. Roadway Express, Inc.*, 687 F.2d 85, 87 (5th Cir. 1982)); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

Pursuant to Rule 56(f), after giving notice and a reasonable time to respond, a court may grant summary judgment to a non-movant *sua sponte*. *See* Fed. R. Civ. P. 56(f); *In re Deepwater Horizon*, 2021 WL 3501651, at *2 (5th Cir. Aug. 9, 2021).

Rule 56(d) of the Federal Rules of Civil Procedure authorizes a court to defer ruling on a motion for summary judgment – or to deny it altogether – "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d)(1). Rule 56 also authorizes courts to "allow time to obtain affidavits or declarations or to take discovery" or to "issue any other appropriate order." Fed. R. Civ. P. 56(d)(2)-(3). The Fifth Circuit has held that "[s]ummary judgment should not . . . ordinarily be granted before discovery has been completed." *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 354 (5th Cir. 1989) (ellipsis in original); *accord Liberty Lobby*, 477 U.S. at 250 n.5 ("[S]ummary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition."); *see also Khan v. AIG, Inc.*, 654 F. Supp. 2d 617, 625 (S.D. Tex. 2009) ("The Fifth Circuit has held it to be an abuse of

discretion not to grant a Rule 56([d]) motion if the discovery opportunity has clearly been inadequate.") (citing *Xerox*, 888 F.2d at 355); *United States ex rel. Mitchell v. CIT Bank, N.A.*, 2021 WL 4950301, at \*5 (E.D. Tex. Oct. 25, 2021) (granting Rule 56(d) relief where plaintiff had "diligently pursued discovery" and court found it "plausible that additional discovery [could] influence" the summary judgment motion); *Centurion Bulk Pte Ltd v. NuStar Energy Servs., Inc.*, 2020 WL 8368320, at \*2 (S.D. Tex. Sept. 25, 2020) (granting Rule 56(d) motion where discovery "still ongoing").

Under the plain language of the Credit Agreement, the Excluded Lenders are entitled to summary judgment.  If summary judgment is not granted in favor of the Excluded Lenders, however, plaintiffs have not come close to meeting the summary judgment standard, as shown below.  Plaintiffs are seeking partial summary judgment – before the parties have had an adequate opportunity for discovery – that the Unlawful Exchange Transaction was permitted under the Credit Agreement as an "open market purchase."  Yet plaintiffs do not even purport to offer any definition of an "open market purchase," let alone prove beyond dispute that the Unlawful Exchange Transaction was one.  Judge Failla, looking at the same Credit Agreement and same Transaction, was skeptical that the Unlawful Exchange Transaction was an "open market purchase" and held that, at the very least, the term is ambiguous.  Indeed, the limited record that the Excluded Lenders have been able to compile to date shows that the Unlawful Exchange Transaction was *not* an open market purchase.  At a bare minimum, the term is ambiguous and requires discovery and development of the record.  Moreover, as discussed below, regardless of the Court's ruling on the breach of contract claim, the Unlawful Exchange Transaction violated the covenant of good faith and fair dealing that inheres in every contract under New York law.

21

**ARGUMENT**

**I.**
**THE UNLAWFUL EXCHANGE TRANSACTION**
**BREACHED THE CREDIT AGREEMENT**

As discussed below, the Unlawful Exchange Transaction breached Section 2.18 of the Credit Agreement by violating the Excluded Lenders' sacred right to *pro rata* treatment, because it was not an "open market purchase" under Section 9.05(g) of the Credit Agreement, which narrowly exempts open market purchases from the *pro rata* requirement.  The Unlawful Exchange Transaction also breached 9.02 of the Credit Agreement because it released all or substantially all of the collateral of the First Lien Term Loans without the requisite consent of each First Lien Lender.  Because the Unlawful Exchange Transaction breached the Credit Agreement, plaintiffs are not entitled to a declaration that the Transaction was permitted under the Credit Agreement; rather, it is the Excluded Lenders that are entitled to summary judgment on this issue.

**A.    The Unlawful Exchange Transaction Violated the**
**Sacred *Pro Rata* Right Provided by Section 2.18**

Section 2.18(c) provides that any First Lien Lender that receives more than its *pro rata* share of the principal or interest payments on its First Lien Loans must pay the excess ratably to the other First Lien Lenders.  Section 2.18(b) states, in no uncertain terms, that, after certain (inapplicable) expenses are paid, the proceeds of collateral must be divided *pro rata* among *all* First Lien Lenders, including the Excluded Lenders, based on the face amount of their ownership of loans.

No one before the Court disputes that the Unlawful Exchange Transaction deprived the Excluded Lenders of such ratable treatment.  Instead, plaintiffs claim that the

22

narrow "open market purchase" exception in Section 9.05(g) allowed them to escape their obligations under Section 2.18(b).  As we show next, it did not.

**B.**     **The Unlawful Exchange Transaction Was Not an "Open Market Purchase"**

The text is dispositive.  Section 9.05(g) permits a lender to "assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-*pro rata* basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a *pro rata* basis or (B) through open market purchases."  (Credit Agreement § 9.05(g).)  Although the Credit Agreement does not define the term "open market purchase," the words carry their ordinary meaning, including by reference to contemporaneous dictionaries.  *See An v. Leviev Fulton Club, LLC*, 2010 WL 3291402, at *5-6 (S.D.N.Y. Aug. 10, 2010) (observing that, under New York law, courts are required to construe contractual terms in accordance with their plain meaning); *Harrop & Co., Ltd. v. Apollo Inv. Fund VII, L.P.*, 2015 WL 3989030, at *4 (N.Y. Sup. Ct. (N.Y. Cnty.) June 25, 2015) (noting that "New York courts frequently consult dictionary definitions to determine a word's plain meaning" when a contractual term is undefined).

Dictionaries define the term "open market" as "[a] market in which *any buyer or seller* may trade and in which prices and product availability are determined by *free competition*."  *Open Market*, *Black's Law Dictionary* (11th ed. 2019) (emphases added); *see also Eastman Kodak*, 936 F. Supp. 2d at 352 ("An open market refers to an 'unrestricted market in which *any buyer or seller may trade freely, and where prices are determined by supply and demand.*'") (emphasis added) (quoting *Oxford English Dictionary* (3d ed. 2004)).  At a minimum, therefore, an "open market purchase" is one in which neither the supply side nor the

demand side is artificially restricted such that the price is supra-competitive or potential

participants are shut out.

> As Judge Failla explained in analyzing the same Credit Agreement at issue here:
>
>> On a plain reading of the term, the Transaction depicted in the
>> Complaint did not take place in what is conventionally understood
>> as an "open market." Significantly, the Transaction was closed to a
>> swath of possible participants (*i.e.*, those lenders who did not
>> participate in the Transaction), and rather than agreeing on a price
>> set by market forces, [Serta] and the Participating Lenders are
>> alleged to have engaged in secretive discussions to arrive at a price
>> for the loan repurchases that necessitated both intricate
>> amendments to the Agreement and additional agreements, the
>> terms of which were withheld from Plaintiffs until they were
>> publicly announced.

*LCM*, 2022 WL 953109, at *8.

> The sorry facts of this case confirm Judge Failla's conclusion:  the Unlawful

Exchange Transaction was about as far from "open" as a deal can be.  In an "open market" an

issuer does not handpick certain favored lenders to participate in a transaction while

simultaneously concealing the availability of the deal from the rest of the interested market.  Still

less does it actively exclude existing lenders that learn of the deal and seek to join.  Yet that is

precisely what Serta and its allies did.  In a maneuver that would make Vice President Elbridge

Gerry (progenitor of the term "gerrymander") blush, plaintiffs structured the transaction to work

*only* if other First Lien Lenders were excluded.  If that is what an "open market" looks like, what

would a "closed market" be?  Plaintiffs do not say.

> Indeed, despite filing almost 60 pages of briefing, plaintiffs never answer – in

fact, do not even *address* – this key question:  What, exactly, is an "open market purchase"?

Plaintiffs suggest (erroneously, as we will show) what an "open market purchase" is *not*.  But

they never tell us, or this Court, what it *is*.  They fail to grapple with the text.  They offer no dictionary meanings.  They offer no competing case law.

Nor do plaintiffs address a second necessary feature of the term "open market purchase":  That the prices in the transaction be informed by prices found in the "open market." *See Eastman Kodak*, 936 F. Supp. 2d at 352 (defining open market as an "unrestricted market . . . where *prices are determined by supply and demand*") (emphasis added); *Cities Serv. Co. v. United States*, 522 F.2d 1281, 1289 (2d Cir. 1974) ("Where bonds are issued for cash in the open market, the marketplace determines this adjustment.  But where the transaction is insulated from the market . . . there are no market forces to perform the evaluation process.").  Plaintiffs' reticence is scarcely surprising.  As Judge Failla found, the Unlawful Exchange Transaction was not "set by market forces" in the secondary debt market that normally would inform the price; it was a privately negotiated, multilateral transaction among a subset of chosen lenders.  Indeed, plaintiffs' loans were not purchased at or near market value but instead were exchanged at a substantial premium to market prices.  Prior to the Serta Transaction, the Company's first-lien debt was trading at or around 43 cents on the dollar, and the Company's second-lien debt was trading at or around 8 cents on the dollar.  (Mollett Decl. ¶ 16.)  The Unlawful Exchange Transaction exchanged the Favored Lenders' first-lien debt at a rate of 74 cents, and their second-lien debt at 39 cents (ECF No. 70, Serta Statement of Uncontroverted Facts ¶ 19) – rates completely untethered to secondary debt market prices.  And, to further illustrate how far astray the Unlawful Exchange Transaction was from a valid open market purchase, the new super-priority debt obtained by Serta actually bears a *higher* interest rate (by 4.00% per annum) than the now-junior stripped-down debt held by the Excluded Lenders.  (Ex. D, Super-Priority Term Loan Agreement, § 1.01, "Applicable Rate.")

3714825.1

As best we can tell, plaintiffs contend that *any* voluntary exchange of loans for some consideration qualifies as an "open market purchase."  But if virtually *any* transaction is an "open market purchase," then the term "open market" carries no narrowing significance.  Such a reading, needless to say, violates the well-settled maxim under New York law that every term in a contract must be given independent force.  *Benvenuto v. Rodriguez*, 279 A.D. 162, 164 (N.Y. App. Div. (1st Dep't) 1951) (a contract must be construed "to give effect and meaning to every word and expression contained in the agreement"); *Patrolmen's Benevolent Ass'n of City of New York, Inc. v. City of New York*, 46 A.D.3d 378, 380 (N.Y. App. Div. (1st Dep't) 2007) ("[E]very clause and word should be given meaning."); *T.G.I. Friday's Inc. v. Nat'l Restaurants Mgmt., Inc.*, 59 F.3d 368, 373 (2d Cir. 1995) ("[W]hen interpreting a contract, the court generally must consider the contract as a whole so that it may give significance to each term." ).

In the face of the text, case law, and dictionary definitions recognized under New York law, what do plaintiffs argue?  They contend that, because the "Dutch Auction" exception expressly states that it must be "open to all lenders," it follows that the "open market purchase" exception need not be.  "*Expressio unius*," they declare.  Even on its own terms, however, that Latin maxim takes the Court nowhere.  If a Dutch auction must be open to all, does that mean an "open market purchase" need be open to only one seller?  Two?  Some number fewer than all?  Just north of 50% (as here)?  Plaintiffs do not say, because – again – they are not willing to venture what an "open market purchase" *is*.

Moreover, Latin maxims are not thunderbolts from on high but just tools of construction that must be sensibly applied.  *See, e.g.*, *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 206-07 (5th Cir. 1996) (rejecting application of *expressio unius* because "it would produce a result that contravenes the intention of the parties").  Here, the *expressio unius*

maxim makes no sense.  The baseline here is a "sacred" right – a right to *pro rata* treatment stated, restated, and reinforced throughout the Credit Agreement.  Any exception from that basic right must honor the premise of the right itself.  That is what Section 9.05(g), properly construed, does.  Section 9.05(g) says that Serta may purchase its loans on a non-*pro rata* basis through:  (i) a "Dutch Auction" that is "open to all Lenders," and (ii) an "open market purchase."  Why those two mechanisms?  Because each protects the lenders' *pro rata* sacred rights in its own way.  The Dutch auction is mandated to be open to all lenders; similarly, in an open market, all lenders have the ability to sell their loans in the market at the market price at any given time.  Lenders that choose not to participate in the market when the borrower seeks to buy get the additional benefit of a borrower's open market purchase because the loans typically are acquired at a discount and are then retired, deleveraging *pari passu* debt.  Both mechanisms ensure all creditors in a single class are treated fairly and equally when a borrower wants to purchase loans of that class.  The term "open market purchase" must be interpreted in a way that gives effect to this purpose.  Plaintiffs, by contrast, advocate an interpretation subverts, rather than furthers, the basic principles underlying *pro rata* treatment.

          If one seeks Latinisms, the right choice is *noscitur a sociis*, "whereby the meaning of a word in a provision may be ascertained by a consideration of the company in which it is found and the meaning of the words which are associated with it."  *Popkin v. Sec. Mut. Ins. Co. of N.Y.*, 48 A.D.2d 46, 48 (1st Dep't 1975); *accord Town of Camillus v. Comm'r of Dep't of Env't Conservation*, 256 A.D.2d 967, 968 (3d Dep't 1998) ("[T]he meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it.").  By reading the two exceptions *in harmony,* courts honor what is fundamental here:  the right to *pro rata* distribution.  The fact that a Dutch auction is open to all lenders powerfully supports, rather than

negates, the proposition that an open market purchase must take place in the context of a fair market and cannot be exclusionary.

Indeed, plaintiffs' invocation of *expressio unius* suggests that the contracting parties were utterly irrational.  On the one hand, the parties took care to craft a reticulated, highly detailed Dutch auction exception, according to which the parties would have to follow carefully prescribed (and widely accessible) procedures if they want to avoid *pro rata* treatment.  On the other hand – to hear plaintiffs tell it – the issuer simply could invoke the "open market purchase" exception where, as far as plaintiffs are concerned, anything goes.  That makes no sense.  *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) ("[W]e rely upon [*noscitur a sociis*] to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words.").  Indeed, it would render even the Dutch auction exception superfluous.

Moreover, one need not cast about for Latin maxims to understand why "open to all" was included in the Dutch auction exception but not the "open market purchase" exception.  A Dutch auction is simply a method of selling in which the price is reduced until buyers are found for everything the offeror wishes to sell.[3]  Accordingly, to convey the intent that a sale by Dutch auction must be open to all of Serta's lenders, the parties needed to say so.  By contrast, an "open market purchase" means precisely what it says, and needs no additional clarifying language to convey that it must occur on the open market.  Plaintiffs cannot use the availability

---

[3] "At a Dutch auction, buy orders are filled starting with the lowest rate bid until all the securities offered for sale are matched with purchase orders.  The rate at which the final sell order is filled is known as the 'clearing rate,' and the clearing rate applies to all outstanding [securities] in that issue until the next Dutch auction."  *Louisiana Stadium & Exposition Dist. v. Fin. Guar. Ins. Co.*, 701 F.3d 39, 42 (2d Cir. 2012).

3714825.1

of a Dutch auction procedure to excise the words "open market" from the phrase "open market purchase."

Plaintiffs insist, however, that the Unlawful Exchange Transaction did not violate Section 2.18 because the amendments to the Credit Agreement left unaltered the literal text of that provision.  (Serta Br. at 24; Lenders Br. ¶ 26.)  Talk about form over substance.  The practical (and obviously intended) effect of the amendments was to "waive" the Excluded Lenders' *pro rata* payment rights relative to the other First Lien Lenders, and "modif[y]" the waterfall provision by allowing the Favored Lenders to leapfrog the Excluded Lenders in their payment rights.  *See MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994) ("[E]very dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion.").  Nor does the new intercreditor agreement do plaintiffs any good.  (Serta Br. at 24-25; Lender Br. ¶ 27.)  Although the parties' rights may have been subject to applicable intercreditor agreements, it is obviously improper to use intercreditor agreements to leapfrog certain loans in priority to others, in violation of the amendment process.  Here, the intercreditor agreement on which plaintiffs rely was entered into in secret, as part of a transaction that deliberately denied the Excluded Lenders the opportunity to participate in violation of their right to *pro rata* treatment.  *See Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*, 2007 WL 2197830, at *14 (S.D.N.Y. July 31, 2007) ("It is the parties' intention as it existed at the time the contract was executed which must control rather than any subsequent intention tailored to complement an individual's posture once an agreement has gone sour.") (internal quotation marks omitted)).

A recent New York case rejected a nearly identical ploy in connection with a nearly identical transaction.  *See Audax Credit Opportunities Offshore Ltd.* v. *TMK Hawk Parent, Corp.*, 2021 WL 3671541 (N.Y. Sup. Ct. (N.Y. Cnty.) Aug. 16, 2021) ("*Trimark*").  In

*Trimark*, as here, a borrower entered into a transaction with one group of its first lien lenders that left non-participating first lien lenders subordinated to a new category of "super senior" debt.  There, like here, the favored lenders argued that the transaction did not violate the "sacred rights" provisions of the credit agreement, because they made the requisite changes by amending the terms of the parties' intercreditor agreement, rather than the "sacred rights" provisions themselves.  But the court saw through that ploy and ruled that, because the changes to the intercreditor agreement flowed through to change the priorities in the "sacred rights" provision, the credit agreement could reasonably be read as requiring the consent of all lenders to the changes to the intercreditor agreement.  *Id.* at *12.

As for plaintiffs' argument that the *pro rata* requirement applies only to lenders of the same "class," (Serta Br. at 25; Lender Br. ¶ 28), this, too, is a non-starter.  At the time of the relevant breaches, the Excluded Lenders were in exactly the same class as the Favored Lenders.  Only by virtue of the Unlawful Exchange Transaction were separate classes created.  To permit the fruits of the breach to insulate the transaction from challenge is the worst sort of bootstrapping.  *See Mercury Partners,* 2007 WL 2197830, at *14; *see also BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, 112 A.D.3d 509, 510 (N.Y. App. Div. (1st Dep't) 2013) (voiding amendment to the definition of term that "had the effect of amending" sacred rights provision requiring unanimous consent); *Trimark*, 2021 WL 3619753 at *7 (rejecting as unenforceable favored lenders' amendment of no-action provision in governing credit agreement where amendment was "strategically deployed . . . by a subset of lenders, without notice or consent, as part of a larger scheme to breach and then exit the agreement," and was "purpose-built to prevent these [p]laintiffs from suing these [d]efendants in connection with this transaction") (emphases omitted).

30

**C.**  **Evidence of Industry Custom and Practice Confirms That the Unlawful Exchange Transaction Was Not an "Open Market Purchase"**

The Court need not look beyond the plain language of Section 9.05(g) to conclude that the Unlawful Exchange Transaction violated the Credit Agreement.  The Court nevertheless may consider evidence of industry custom and practice, "not for the improper purpose of interpreting or varying an agreement without ambiguity, but for the permissible purpose of providing guidelines for an unexplained term."  *See Lehman Bros. Int'l (Europe) v. AG Fin. Prods., Inc.*, 2018 WL 3432593, at *11 (N.Y. Sup. Ct. (N.Y. Cnty.) July 2, 2018) (ellipsis and alteration omitted); *accord In re Murray Energy Holdings Co.*, 634 B.R. 951, 972 (Bankr. S.D. Ohio 2021) (applying New York law) (in determining whether challenged transaction constituted a modified Dutch auction, "evidence to show the meaning of technical terms is permitted because such evidence does not contradict or vary the written instrument, but simply places the court in the position of the parties when they made the contract, and enables it to appreciate the force of the words they used in reducing it to writing.") (cleaned up).  Here, the overwhelming evidence of industry custom and practice confirms the lesson of the text:  the Unlawful Exchange Transaction was not an "open market purchase."

As explained in the accompanying declarations submitted by experts Marti P. Murray and Sarah M. Ward, an "open market purchase" in the context of a credit agreement is a purchase of bank debt, typically for cash, in the secondary bank debt market conducted at arm's length at or close to the prevailing market price. (Murray Decl. ¶¶ 130-131; Ward Decl. ¶¶ 4, 42, 44.)  The secondary bank debt market is a well-developed market where buyers and sellers regularly come together to transact, through banks and broker-dealers that serve as intermediaries, in the purchase and sale of both par and distressed bank debt.  (Murray Decl. ¶¶ 46, 48, 51; *see also* Ward Decl. ¶¶ 4, 44.)

31

The mechanics of open market purchases are standardized.  (Murray Decl. ¶ 51; Ward Decl. ¶ 44.)  Open market purchases typically are conducted over the counter through broker-dealers, which often are large investment banks.  (Murray Decl. ¶¶ 47, 49; Ward Decl. ¶ 44.)  Purchases of loan interests typically are structured as assignments, in which the assignee becomes the lender of record.  (Ward Decl. ¶ 44.)  Open market purchases are almost universally transacted pursuant to standard documentation, such as that published by the Loan Syndications and Trading Association ("LSTA"), which has developed protocols for trading procedures and conduct for market participants.  (Murray Decl. ¶ 51.)  The documentation is limited to a trade ticket, a trade confirmation, an assignment and assumption agreement (substantially in the form of an exhibit attached to the credit agreement), and a funding memorandum.  (Ward Decl. ¶ 44.) The trade confirmation is executed between the buyer and the seller.  (Murray Decl. ¶ 77.) Furthermore, there are no special conditions attendant to an open market purchase, other than representations and warranties and details about how the trade will settle.  (Murray Decl. ¶ 55.) The seller's only obligation is to tender the agreed debt in exchange for the buyer's payment of the agreed consideration.  (Ward Decl. ¶ 42.)  No separate agreements are required, in contrast to the amendments to existing loan documents, additional credit facility, and new intercreditor agreement imposed by the Transaction here.  (Murray Decl. ¶¶ 60, 64; Ward Decl. ¶¶ 42, 46.) Similarly, no conditions would be imposed that would alter the rights of any non-participating lender with respect to payment priority or lien priority. (Ward Decl. ¶ 61; Murray Decl. ¶¶ 55, 64.)

In addition, open market purchases typically are settled for cash consideration. (Murray Decl. ¶¶ 72-73; Ward Decl. ¶¶ 42, 46.)  The LSTA standard trade confirmations for both par and distressed bank debt trades specify that payment is to be made in U.S. or foreign

currency, and they do not contain any provisions for the trades to be settled for anything but cash.  (Murray Decl. ¶ 76.)  To the extent there is any exception to this cash-for-debt protocol, that would be specified in the relevant loan agreement.  (Murray Decl. ¶ 73.)

       As a general matter, the price at which an open market purchase is executed would be at or close to the prevailing market price, rather than at a substantial premium, because the objective of an open market purchase is for the borrower to capture as much market discount as possible and retire the debt to reduce its overall debt load.  (Murray Decl. ¶¶ 74, 128; Ward Decl. ¶ 60.)  The more the price of the trade diverges from the prevailing market price, the less likely a transaction resembles an open market purchase.  (Murray Decl. ¶ 75.)  Indeed, a payment of a substantial premium over the market price raises serious questions about whether the borrower paid such a premium in return for a "quid pro quo" or other special condition or commitment.  (Murray Decl. ¶ 75.)  Because the key objective of an open market purchase is to obtain the best possible price, the borrower typically is agnostic about who the seller is.  (Murray Decl. ¶ 74.)  Furthermore, because it is a credit-enhancing transaction, the expected result of an open market purchase is not a decrease in the trading price of the debt, but rather a potential increase, as the borrower has in fact de-levered its balance sheet by the face amount of the obligation (leaving a greater share of the borrower's remaining assets for the non-participating lenders).  (Murray Decl. ¶¶ 78, 125.)

       The open market purchase provision utilized in credit agreements historically is intended to be a narrow exception to the general rule that all lenders are to be treated ratably. (Ward Decl. ¶ 61.)  Following the 2008-2009 credit crisis, as a measure to preserve de-levering and investment options for sponsors, credit agreements increasingly began to include provisions permitting the borrower and/or its affiliates to purchase term loans either through non-*pro rata*

33

open market purchases or through a "Dutch auction" process typically open to all lenders of the

class of loans being purchased.  (Ward Decl. ¶ 59.)  This approach evolved from and was

informed by the practices used in the high yield bond market, whose participants overlapped

considerably with the bank debt market.  (Ward Decl. ¶ 51.)

   Significantly, in case law and industry practice, the term "open market purchase"

describes a transaction understood to be distinct from a tender offer, which is regulated by SEC

rules.  *See D-Z Inv. Co. v. Holloway*, No. 74 Civ. 2379, 1974 WL 440, at *4 (S.D.N.Y. Aug. 23,

1974) ("[I]t seems clear, however, that open market purchases cannot be a 'tender offer.'");

Ward Decl. ¶¶ 62-63.)  Typically, a bond purchase will be deemed to constitute a tender offer –

as opposed to an open market purchase – if it involves active and widespread solicitation by the

company or a third party to purchase a substantial percentage of the company's securities at a

premium over the prevailing market price.  (Ward Decl. ¶ 64.)  Unlike an open market purchase,

a tender offer for securities is subject to substantial disclosure and procedural requirements.

(Ward Decl. ¶ 65.)  Bond tender offers may be structured in a variety of ways, including by

"modified Dutch auction."  (Ward Decl. ¶ 66.)  To avoid characterization of a bond repurchase

as a tender offer, companies engaging in both open market purchases and privately negotiated

purchases typically keep the number of holders solicited to a minimum, purchase a relatively

small percentage of the issuer's securities by face amount, and do not offer to purchase at a

premium over the prevailing market price, among other factors.  (Ward Decl. ¶ 67.)

   Accordingly, open market purchase provisions in credit agreements are intended

to permit one-off purchases of term loans on a non-*pro rata* basis in a quick, cost-efficient

manner in ways that do not resemble tender offers.  (Ward Decl. ¶ 61.)  Solicitation (both of

holders and the percentage of outstanding loans) is limited and the amount of term loans that

may be obtained in an open market purchase is limited by normal trading volume, and thus has little or no impact on non-participating lenders. (*Id.*) The requirement that a Dutch auction be open to all lenders makes sense in the context of the *pro rata* sharing provision, as no lender should receive a premium not offered to others or be excluded from an offering involving numerous investors holding a substantial percentage of the outstanding loans. (Ward Decl. ¶ 69.) To interpret the open market provision to permit a privately negotiated loan repurchase with a large number of lenders holding a majority of the outstanding loans at a price above market not only would defeat the purpose of the general rule that all lenders are to be treated ratably, but also would read out the Dutch auction exception, as no borrower would elect to repurchase loans through the costlier, slower, and more burdensome procedure if it were permitted to engage in quick, efficient open market purchases at above-market prices with a large group of lenders holding a substantial portion of the outstanding loans. (Ward Decl. ¶ 70.)

For all of the reasons discussed above, as both Ms. Ward and Ms. Murray conclude, the Unlawful Exchange Transaction in no way constituted an open market purchase. It was instead a privately negotiated, comprehensive restructuring, or at most, a privately negotiated debt exchange and financing. (Ward Decl. ¶¶ 73-79; Murray Decl. ¶¶ 109, 123, 128.) Indeed, the Transaction bears none of the hallmarks of an open market purchase:

| Open Market Purchase | Unlawful Exchange Transaction |
|---|---|
| Conducted on the secondary debt market through a broker-dealer intermediary | Conducted via private negotiation without the involvement of a broker-dealer intermediary or the solicitation of bids |
| Limited number of loan holders solicited | Active, widespread solicitation of loan holders |
| Transaction settled as a single trade between buyer and seller | Required phased negotiation and execution of multiple interwoven agreements |

35

| Open Market Purchase | Unlawful Exchange Transaction |
|---|---|
| Executed pursuant to standard trade documentation, including a trade confirmation executed between buyer and seller | Bespoke, highly negotiated transaction not executed pursuant to standard trade documentation |
| Cash consideration exchanged for bank debt | Debt-for-debt exchange pursuant to which approximately $850 million of priority term loans were issued as consideration for approximately $1.2 billion of existing First Lien Term Loans and Second Lien Term Loans |
| Debt purchased at or near prevailing market price | Debt purchased at substantial premium to market price, of 74 cents on the dollar for First Lien Loans and 39 cents on the dollar for Second Lien Loans |
| No special conditions imposed on sellers | Required lenders to provide $200 million in new money under a new credit facility; vote in favor of a series of complex amendments to existing credit instruments |
| No special conditions imposed by sellers on purchasers | Favored Lenders conditioned their participation upon negotiation and execution of a new intercreditor agreement that purported to prioritize their First Lien Loans over those of the Excluded Lenders |
| No detrimental effect on pre-existing *pari-passu* debt | Altered the priority status of the Favored Lenders at the expense of the Excluded Lenders by priming them |
| Debt reduced in amount equivalent to amount of debt repurchased | Debt not reduced by the amount purportedly acquired ($850 million shortfall) because the bulk of the debt was exchanged for new debt |
| No decline in trading price of legacy debt | Material price drop in price of First Lien Term Loans (40% decline within days following announcement of Unlawful Exchange Transaction) and downgrade of Second Lien Term Loans from Ca to D within two weeks of announcement |

3714825.1

The views expressed by Ms. Murray and Ms. Ward are confirmed by guidance published by many major law firms that counsel clients undertaking leveraged finance transactions, including the very firms representing plaintiffs in this action.  Indeed, counsel for Serta, the Weil Gotshal firm, all but set out the Excluded Lenders' position in a 2009 industry alert:

> An open market purchase is accomplished through a broker or agent and requires the purchaser to pay a set market price. Normally, the parties involved in an open market purchase are not aware of one another's identity. Conversely, in a privately negotiated purchase, the buyer (acting directly or through an agent) would approach individuals or groups (usually sophisticated, institutional sellers) that own large percentages of the portfolio company's debt securities and purchase the debt securities for a negotiated price.[4]

A client memorandum published by the Gibson Dunn firm, counsel for the Favored Lenders, likewise distinguishes between "open market purchases" and "privately negotiated transactions."[5]  Publications by other firms that have written client alerts on the

---

[4] Ex. A, Glenn D. West et al., Weil Gotshal & Manges LLP, *Private Equity Alert: De-levering Portfolio Companies Through Debt Buy-backs* (Mar. 2009), https://weil.com/~/media/files/pdfs/Private_Equity_Alert_March_2009.pdf.

[5] Ex. V, James Moloney et al., Gibson Dunn & Crutcher LLP, *Convertible Debt Exchange Offers: Considerations for Distressed Issuers*, Deal Lawyers (Sept.-Oct. 2009), https://www.gibsondunn.com/wp-content/uploads/documents/publications/Moloney-Pollner-Shaw-ConvertDebtExchangeOffers.pdf.  The guidance offered by Weil Gotshal and Gibson Dunn is in line with publications from other well-known law firms.  *See e.g.*, Ex. W, Apostolos Gkoutzinis & Rebecca Marques, Milbank LLP, *Debt Repurchases in the Open Market and Privately Negotiated Transactions* (Mar. 24, 2020), https://www.milbank.com/a/web/129427/Debt-Repurchases-in-the-Open-Market-and-Privately-Negotiated-Tra.pdf ("Purchases of debt securities in the open market are accomplished through a broker, dealer or agent and require the purchasers to pay a market price.  The parties involved in an open market purchase are not aware of one another's identity.  In a privately negotiated transaction, the buyer (acting either directly or indirectly through an agent) approaches holders of the debt securities and negotiates a specified purchase price."); Ex. X, Maximillian P. Kirchner, et al. Proskauer Rose LLP, *INSIGHT: Out-of-Court Restructuring Alternatives for Distressed Bond* (May 29, 2020), https://news.bloomberglaw.com/bankruptcy-law/insight-out-of-court-

subject recognize that open market purchases are intended to be used to buy back only a relatively small amount of the issuer's debt.[6]

Additionally, in a 2015 publication discussing "key issues" in debt buybacks, Weil Gotshal acknowledged that open market purchase transactions are an exception to the *pro rata* distribution mechanism because they allow a borrower to use its capital permanently to retire debt at a discounted price:

> Whether the buyback is affected through a Dutch Auction, an open market purchase or through the purchase and contribution by the sponsor, the borrower is generally required to cancel and extinguish any bank loans that are ultimately held by it, ensuring that the borrower has no lender rights and that the transaction is de-levering.[7]

---

restructuring-alternatives-for-distressed-bonds ("A company can repurchase a portion of its binds (likely trading at a discount) directly, through a broker-dealer, or with the help of a limited number of banks that make market inquiries on behalf of the company, as open-market repurchases or privately-negotiated transactions.")

[6] *See, e.g.*, Ex. Y, Edward F. Greene et al., Cleary Gottlieb Steen & Hamilton LLP, *U.S. Regulation of the International Securities and Derivatives Markets* 553 (11th and 12th eds. 2014-2017), https://www.clearygottlieb.com/-/media/files/isdm-12th-edition/13-chapter-9-pdf ("Open market purchase programs are typically implemented by the acquiring party (most commonly the issuer) giving instructions to a broker-dealer to purchase a limited amount of debt securities at prevailing market prices in accordance with stipulated procedures and limits.  The broker will typically post bids on a screen based trading system. . . . Other than posting bids, the broker's role in an open market program is necessarily passive and such programs typically result in relatively small purchases (less than 25%) of the outstanding debt of the target series."); Ex. Z, Jones Day LLP, *Deleveraging and Capital-Raising Alternatives in a Turbulent Market* (Nov. 2008), https://www.jonesday.com/en/insights/2008/11/deleveraging-and-capital-raising-alternatives-in-a-turbulent-market ("Privately negotiated or open market purchases are frequently appropriate when a company wants to purchase a small percentage of a series of securities or an issue of securities is concentrated among very few holders.")

[7] Ex. AA, Heather Emmel et al., Weil Gotshal & Manges LLP, *LevFin Quarterly* (Q4 2015), https://privateequity.weil.com/wp-content/uploads/2016/11/LevFin-Quarterly-Q4-2015_WEIL_95618787_2.pdf.

38

The materials cited by the Favored Lenders at paragraphs 43-47 of their brief are not to the contrary.  True, those sources assert that open market purchases "do [] not require borrowers to solicit every existing lender," (Lenders' Br. ¶ 48), but that is a red herring.  Not a single one of those sources suggests that a transaction cooked up in secret, gerrymandered to work only if others are excluded, featuring premium prices, assiduously policed so that none but the favored few may participate, and requiring an extensive package of bespoke amendments, transactions and commitments could be an "open market purchase."

Nor does the Envision Healthcare transaction support plaintiffs' position.  (Lenders' Br. ¶¶ 50-51.)  Significantly, as far as the Excluded Lenders are aware, the relevant credit agreement did not contain a "sacred right" to *pro rata* treatment, and the plaintiffs never suggest otherwise.  What is more, Angelo Gordon was not a party to the transaction, nor did it participate in the exchange of Envision loans for second lien loans in the Envision subsidiary, but rather, loaned new money to the subsidiary only.  (*See* Mollett Decl. ¶ 18.)

**D.    Plaintiffs' "Ratification" of the Unlawful Exchange Transaction Did Not Transform It Into an "Open Market Purchase"**

As a last, futile line of defense, plaintiffs assert that they entered into "written amendments" to the Credit Agreement that "in effect defin[ed] the term 'open market purchases,'" thus "render[ing] irrelevant any alleged ambiguity in the term 'open market purchase' as used in the original Agreement."  (Lenders' Br. ¶ 53.)  But none of the documents and provisions that plaintiffs cite actually purports to define "open market purchase."  Section 4 of Amendment No. 1 to the First Lien Term Loan Agreement states *only* that the Favored Lenders and Serta agree that the Unlawful Exchange Transaction is permitted, without any mention of "open market purchases." (Ex. E, § 4.)  Similarly, Section 14 says nothing about "open market purchases," and does not amend the Credit Agreement in any way.  (*Id.* § 14.)

39

And even if these amendments did purport to amend the definition of the term, plaintiffs cannot simply amend the Credit Agreement in a way that alters the *pro rata* treatment without the requisite consent of all of the First Lien Lenders. *See Trimark*, 2021 WL 3619753 at *7.

As for the Exchange Agreement, which plaintiffs also cite, it is telling that this is the first time plaintiffs have mentioned, disclosed, or invoked this agreement. Plaintiffs cannot transmute a wholesale restructuring transaction into an "open market purchase" simply by calling it one. Most importantly, none of these amendments or agreements was approved by all affected lenders, and therefore cannot abridge the sacred *pro rata* rights of the Excluded Lenders. *See Trimark*, 2021 WL 3619753 at *7.

**E.     If the Court Finds That the Unlawful Exchange Transaction Was Not an "Open Market Purchase," It May Grant Summary Judgment for the Excluded Lenders**

Pursuant to Federal Rule of Civil Procedure 56(f)(1), the Court "may . . . grant summary judgment for a nonmovant." Fed. R. Civ. P. 56(f)(1). The Excluded Lenders submit that, if the Court finds that the Unlawful Exchange Transaction was not an "open market purchase," it should grant summary judgment in favor of the Excluded Lenders.

Section 9.02(b)(A)(6) the Credit Agreement recognizes four types of transactions as exceptions to the contract's prohibition on waiver, modification or amendment of the *pro rata* distribution and sharing provisions. Plaintiffs rely on only one of these: that the transaction was an "open market purchase" within the meaning of Section 9.05(g).[8] Because that contention is

---

[8] Section 2.22 provides that Serta can issue incremental credit facilities, as long as the new debt is *pari passu* or junior to the first-lien loans. (Ex. C, Credit Agreement § 2.22(a)(x).) Section 2.23 permits Serta to extend the maturity on existing first-lien loans, as long as the extension offer is made to all first-lien lenders on the same terms and the extended loans are *pari passu* with existing first-lien loans. (*Id.* § 2.23(a)-(c).) Section 9.02(c) allows Serta to refinance or replace "all or any portion of the outstanding Term Loans under the applicable Class … with one or more replacement term loans … pursuant to a Refinancing Amendment," subject to the

3714825.1

legally unsustainable, the Court should conclude that plaintiffs breached Section 2.18(b) and (c) of the Credit Agreement and enter summary judgment in favor of the Excluded Lenders.

**F.    Alternatively, If the Court Finds the Term "Open Market Purchase" to Be Ambiguous, the Parties Should Be Authorized to Conduct Discovery**

If, on the other hand, the Court finds that the term "open market purchase" is ambiguous, it should deny plaintiffs' motions for partial summary judgment, and permit the parties to conduct discovery concerning the intent and interpretation of the Credit Agreement. *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) ("Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous."); *Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d Cir. 2001) ("When the language of a contract is ambiguous and there is relevant extrinsic evidence regarding the actual intent of the parties, an issue of fact is presented for a jury to resolve, thereby precluding summary judgment.").

Discovery has only just begun in this matter, and there has been virtually no opportunity for the parties to gather and present evidence of their intent concerning their use of the term "open market purchase."  For that reason, if the Court finds that the term "open market purchase" is ambiguous, it should permit discovery into the parties' actual intent in using the term.  *See Liberty Lobby, Inc.*, 477 U.S. at 250 n.5 ("[S]ummary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."); *Xerox*, 888 F.2d at 354 ("Summary judgment should not . . . ordinarily be granted before discovery has been completed.") (ellipsis in original); *see also Khan*, 654 F. Supp.

---

requirement that such replacement loans be *pari passu* or junior to the existing first-lien loans. (*Id.* § 9.02(c)(i)(C).)  None of those provisions is implicated by the Unlawful Exchange Transaction.

2d at 625 ("The Fifth Circuit has held it to be an abuse of discretion not to grant a Rule 56([d])

motion if the discovery opportunity has clearly been inadequate.") (citing *Xerox*, 888 F.2d at

355); *accord Mitchell*, 2021 WL 4950301, at *5 (granting Rule 56(d) relief where plaintiff had

"diligently pursued discovery" and court found it "plausible that additional discovery [could]

influence" the summary judgment motion); *Centurion Bulk*, 2020 WL 8368320, at *2 (granting

Rule 56(d) motion where discovery in the case was "still ongoing"); *Burlington N. Santa Fe R.R.*

*Co. v. Assiniboine & Sioux Tribes of Fort Peck Rsrv.*, 323 F.3d 767, 773-74 (9th Cir. 2003)

(when "a summary judgment motion is filed so early in the litigation, before a party has had any

realistic opportunity to pursue discovery relating to its theory of the case, district courts should

grant any Rule 56([d]) motion fairly freely").

As described in the Excluded Lenders' accompanying Declaration of Anne E.

Beaumont, discovery is necessary for the Excluded Lenders to present facts essential to justify

their opposition to plaintiffs' motions.  First, to rebut plaintiffs' claim that the Unlawful

Exchange Transaction was valid under the Credit Agreement because it was an "open market

purchase," discovery is needed concerning plaintiffs' own use of the term "open market

purchase," including, *inter alia*, how Serta and the Favored Lenders have applied the term "open

market purchases" in their other transactions of Serta's First Lien Term Loans, because there is

good reason to believe that they have conducted *bona fide* "open market purchases" of Serta's

first-lien debt both before and after the Unlawful Exchange Transaction that bear little or no

resemblance to the Unlawful Exchange Transaction.  (*See* Declaration of Anne E. Beaumont

dated March 16, 2023 ("Beaumont Decl.") ¶ 25.)  Second, to rebut plaintiffs' claim that they

undertook the Unlawful Exchange Transaction in good faith, discovery is needed concerning

plaintiffs' intentions with respect to the Transaction, including why they chose to pursue a course

of action that intentionally excluded the Excluded Lenders, how the members of the Favored

Lenders group were selected (and the Excluded Lenders not selected), and whether and on what

basis plaintiffs believed the Unlawful Exchange Transaction was reasonably justifiable.  (*Id.* ¶

28.)  Third, as to Serta's claim that North Star, as an affiliate of Apollo, was on the DQ List at

the time North Star executed trades in Serta's First Lien Loans in March 2020, the limited

discovery produced by Serta already flatly refutes this contention, as discussed in Section IV,

*infra*, and further discovery would bolster this position.  (*Id.* ¶¶ 31-35.)

Plaintiffs' cursory references to alleged industry custom and practice do not

remotely entitle them to summary judgment (partial or otherwise).  As noted in Section I.B,

*supra*, extrinsic evidence is properly considered "not for the improper purpose of interpreting or

varying an agreement without ambiguity, but for the permissible purpose of providing guidelines

for an unexplained term."  *See Lehman Bros.*, 2018 WL 3432593, at *11 (cleaned up).  Where a

contract term is undefined, summary judgment based upon extrinsic evidence of industry custom

and practice is appropriate *only* where "(1) there is no question as to the credibility of the

extrinsic evidence, which is of such a definitive nature as to establish, as a matter of law, the

meaning of that term to the industry; (2) it has been shown either that the parties are actually

aware of the established usage of the term, or that the usage in the business to which the

transaction relates is so notorious that a person of ordinary prudence in the exercise of reasonable

care would be aware of it; and (3) there is no question that the intention of the parties was to

follow, rather than depart from, the particular industry custom at issue."  *J.P. Morgan Inv.*

*Mgmt., Inc. v. AmCash Grp. LLC*, 106 A.D.3d 559, 559-60 (N.Y. App. Div. (1st Dep't) 2013)

(citations and internal quotation marks omitted).

Plaintiffs' extrinsic evidence falls well short of this standard.  Most notably, implicit in the third factor is that the parties will have had an opportunity to explore the intent of the parties in discovery, which the parties here have not had an opportunity to do.  *Exec. Off. Network, Ltd. v. 666 Fifth Ave. Ltd. P'ship*, 294 A.D.2d 166, 168 (N.Y. App. Div. (1st Dep't) 2002) ("Industry custom affords no assistance where it is unclear whether the intention was to follow it or depart from it.").  And, as to the first two factors, there can be no question that the law firm memoranda cited by plaintiffs do not definitively establish the meaning of the term "open market purchase," let alone define the term to encompass a transaction like the Unlawful Exchange Transaction, for the reasons discussed in Section I.B, *supra*.

**G.     The Unlawful Exchange Transaction Also
         Breached Section 9.02 of the Credit Agreement**

Sections 9.02(b)(B)(2) and (3) provide, in relevant part, that no amendment to the agreement shall "release all or substantially all of the Collateral from the [First Term Lien Loans]" or "release all or substantially all of the value of the Guarantees, without the prior consent of each" First Lien Lender.  (Ex. C, Credit Agreement § 9.02(b)(B)(2)-(3).)  That is precisely what has happened as a result of the Unlawful Exchange Transaction.  The Excluded Lenders now are deeply subordinated creditors in Serta's bankruptcy, behind roughly $1 billion in debt owned by the Favored Lenders.  The Unlawful Exchange Transaction was more than just a hypothetical risk to collateral (as it was when Judge Failla considered this argument in the LCM action); rather, it was a foreseeable, de facto "release" of the collateral's value which now has been borne out in fact.  As Judge Failla recognized, altering the Excluded Lenders' rights to receive *pro rata* payments in relation to other first-lien lenders in the event of default – as has happened here – "undoubtedly would have required Plaintiffs' consent pursuant to Section

9.02(b)(A)(6)."  *LCM*, 2022 WL 953109, at *11.  Of course, no such consent was sought or given.

Plaintiffs' suggestion that the incurrence of new debt with payment priority is "not equivalent" to the release of collateral, or that such release must be effectuated through a separate agreement executed between the issuer and the administrative agent, (Lenders' Br. at 14), ignores the practical effect of the Unlawful Exchange Transaction.  It is well settled that courts should not elevate substance over form when determining the true nature of a transaction. *See, e.g.*, *In re Sackman Mortg. Corp.*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993) ("It is well established that a bankruptcy court, as a court of equity, may look through form to substance when determining the true nature of a transaction as it relates to the rights of parties against a debtor's estate."); *In re PCH Assocs.*, 804 F.2d 193, 198 (2d Cir. 1986) ("[W]e look to the economic realities of the [agreement] and not to the labels applied by the parties to determine the true nature of a transaction.") (internal quotation marks omitted); *Sumitomo Mitsui Banking Corp. v. Credit Suisse*, 89 A.D.3d 561, 564 (1st Dep't 2011) ("[I]t is the economic substance of a transaction that should determine the rights and obligations of interested parties.").[9]

---

[9] To the extent plaintiffs suggest that a "release" of collateral must be made pursuant to a separate agreement, (Serta Br. at 25, Lenders' Br. ¶¶ 30-32), "release" is not a defined term in the Credit Agreement, and there is no requirement that a release of collateral value be effectuated by a formal document with "release" in its title.  Indeed, several authoritative sources define "release" without reference to a writing requirement.  *See, e.g., Release*, *Black's Law Dictionary* (11th ed. 2019) (defining "release" as "[l]iberation from an obligation, duty, or demand; the act of giving up a right or claim to the person against whom it could have been enforced"); *Friedman v. Lockheed Aircraft Corp*, 138 F. Supp. 530, 533 (E.D.N.Y. 1956) ("'A release, as the word is used technically in speaking of Executory Contracts, is a discharge of an existing obligation or right or action.'") (quoting 6 *Williston on Contracts* § 1820); *Trustees of Amherst Coll. v. Ritch*, 151 N.Y. 282, 338 (1897) ("While the word 'release' is sometimes used in conveyancing to transfer a title, its general meaning is to surrender a right or to discharge a liability.")

## II.

## EVEN IF THE UNLAWFUL EXCHANGE TRANSACTION DID NOT BREACH THE CREDIT AGREEMENT, THERE IS A FACT ISSUE WHETHER PLAINTIFFS <u>BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING</u>

Even if the Court were to find that the Unlawful Exchange Transaction did not breach the express terms of the Credit Agreement, summary judgment for plaintiffs is unwarranted because genuine issues of material fact exist as to whether plaintiffs breached the implied covenant of good faith and fair dealing.

As a threshold matter, plaintiffs' attack on the implied covenant claim is premature. The Excluded Lenders filed that claim as part of their counterclaims and third-party claims the day before plaintiffs filed their motions for partial summary judgment. It follows, as a matter of basic civil procedure, that the implied covenant claim will be ripe for review only after the third-party defendants have appeared in the case (none yet has) and subject to the procedures outlined in Federal Rule of Civil Procedure 12.

In addition, the Court should permit discovery on the covenant claim before it addresses the merits. Under New York law, "all contracts imply a covenant of good faith and fair dealing in the course of performance," *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y. 2d 144, 153 (2002), which constitutes a "pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract, *even if the terms of the contract do not explicitly prohibit such conduct*." *E. Ramapo Cent. Sch. Dist. v. N.Y. Sch. Ins. Reciprocal*, 199 A.D.3d 881, 884, N.Y. App. Div. (2d Dep't) 2021 (emphasis added); *accord CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007) (a claim for breach of the implied covenant may be brought "where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain"); *Chase Manhattan Bank v.*

*Keystone Distribs., Inc.*, 873 F. Supp. 808, 815 (S.D.N.Y. 1994) ("[A] party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations.").

These are quintessentially factual inquiries. Resolving them without meaningful discovery would be a precipitous and unfair rush to judgment. Plaintiffs argue that these covenant claims are legally foreclosed because they supposedly duplicate the Excluded Lenders' breach of contract claim. (Lenders' Br. ¶ 60; Serta Br. at 27.) That is not correct. "New York courts have repeatedly affirmed that a party may be in breach of an implied duty of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruit of its bargain." *Anexia, Inc. v. Horizon Data Sols. Ctr., LLC*, 2022 WL 1195436, at *3 (N.Y. Sup. Ct. (N.Y. Cnty.) Apr. 21, 2022); *Credit Agricole Corp. v. BDC Fin., LLC*, 135 A.D.3d 561, 561 (N.Y. App. Div. (1st Dep't) 2016) (in intercreditor dispute, causes of action for breach of contract and breach of the implied covenant were not duplicative, based on allegations that defendants failed to share collateral ratably, and deliberately manipulated and depressed bids thereby depriving plaintiffs of the benefit of their bargain); *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009) (implied covenant claim survives where plaintiff "base[s] its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims").

Just this month, the First Department of the Appellate Division of the New York Supreme Court (the state's intermediate appellate court) confirmed – in an intercreditor dispute – that causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing are not duplicative. *See AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset*

47

*Mgmt., LLC*, 2023 WL 2394680 (N.Y. App. Div. (1st Dep't) Mar. 7, 2023) ("*AEA Middle Market*"). Just as plaintiffs do here, the defendants in *AEA Middle Market* argued that the plaintiffs' claims were "nothing more than a claim that defendants failed to share collateral ratably." *Id.* at *12. The court rejected that argument, holding that the plaintiffs had alleged "bad faith conduct in conspiring to manufacture a restructuring process that deprived plaintiffs of the benefit of their bargain under the terms of the Credit Agreement." *Id.* Although the plaintiffs' claims in that case related to a different type of transaction that was prohibited under the relevant credit agreement, the basis for their implied covenant claim is remarkably similar to what defendants have alleged in their counterclaims here, including allegations that the favored creditors "secretly designed the Restructuring Transaction so as to defeat [p]laintiffs' contractual expectations of pro rata treatment, concealed the transaction from [p]laintiffs until it could be revealed as a *fait accompli*, [and] withheld information from [p]laintiffs necessary for them to effectively participate in the restructuring process." *Id.*[10]

As in *AEA Middle Market*, the Excluded Lenders' implied covenant claim here is based on a different theory and different facts from their breach of contract claim. The Excluded Lenders' breach of contract claim is based on the fact that the Credit Agreement did not permit the Unlawful Exchange Transaction. In the alternative implied covenant claim, the Excluded Lenders allege that, even if the Transaction is permitted, plaintiffs abused the Credit

---

[10] It is well settled, of course, that a decision of an intermediate state appellate court is compelling evidence of what the highest state court would conclude, for purposes of *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). *See Weatherly v. Pershing, L.L.C.*, 945 F.3d 915, 923 (5th Cir. 2019) ("When making an *Erie* guess, if the state supreme court has not spoken, we defer to intermediate state appellate courts that have addressed the issue, unless we are 'convinced by other persuasive data that the highest court of the state would decide otherwise.'") (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 558 (5th Cir. 2002)).

3714825.1

Agreement's voting rights provisions by purportedly making amendments intended to gain financial benefits on non-market terms; deprived the Excluded Lenders of critical, bargained-for rights and protections; and improperly extracted value from the Company that otherwise should have been shared with the Excluded Lenders and the rest of the minority lenders.  Specifically, the Excluded Lenders allege that they expressly bargained for "First Lien" loans with rights to collateral that were contractually superior to all others in the event of a default, and the right to share ratably in all payments of principal or interest on those loans (ECF No. 68, Answer, Counterclaims & Third-Party Claims ¶ 96); that plaintiffs "used their position as majority lenders to illegally usurp" those rights (*id.* ¶ 271), doing "indirectly what they were not permitted to do directly under the Credit Agreement" (*id.* ¶ 276); and that the Unlawful Exchange Transaction "threw out the Credit Agreement's *pro rata* distribution requirement" and instead "elevat[ed] the First Lien Term Loans of the Favored Lenders ahead of all others through a "new 'super-priority' term loan," (*id.* ¶¶ 274-275), thereby "destroy[ing] the Excluded Lenders' rights to receive the fruits of the Credit Agreement."  (*Id.* ¶ 340.)

Judge Failla sustained the *LCM* plaintiffs' claim against Serta for breach of the implied covenant based on nearly identical allegations.  Judge Failla found plausible the *LCM* plaintiffs' allegations that their first-lien rights under the Credit Agreement "were subverted by [Serta's] creation of a new tranche of debt with priority rights senior to those held by [p]laintiffs," *LCM*, 2022 WL 953109, at *15, and that even if the "letter of the Agreement permitted" certain actions by the majority lenders, those actions plausibly were alleged to have breached the implied covenant where Serta "colluded with a bare majority of lenders to abuse its power to amend the Agreement to create a new class of debt," and "systematically combed through the Agreement tweaking every provision that seemingly prevented it from issuing a

49

senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one."  *Id.* at *15-16.

   The *LCM* decision is consistent with other recent New York state court decisions considering "uptier" transactions.  In *Boardriders*, which involved a similar credit agreement and transaction structure, the court denied motions to dismiss the plaintiffs' claims for breach of the implied covenant, based on allegations that "'majority lenders' under the Credit Agreement[] abused their ability to amend the Credit Agreement to effectuate the Transaction" and "worked in concert and in secret to deprive plaintiffs of the benefit of their bargain."  *Boardriders*, 2022 WL 10085886, at *9.[11]  Similarly, in *Octagon Credit Invs., LLC v. NYDJ Apparel LLC*, Index No. 656677/2017 (N.Y. Sup. Ct. (N.Y. Cnty.) Jan. 9, 2018), the court denied motions to dismiss claims that the covenant of good faith in a credit agreement was violated, where the express terms arguably allowed a majority of the lenders to adopt an amendment to disadvantage the minority without notifying all lenders.  (*See* Ex. U, Jan. 9, 2018 Hr'g Tr. at 21, 31, 43 [NYSECF No. 91].)[12]

---

[11] Plaintiffs purport to distinguish *Boardriders* on the ground that the transaction in that case was "carried out in secret" and "did not benefit from any discount capture."  (Lenders' Br. at 28 n.15.)  Of course, the Excluded Lenders allege much the same conduct in this case, and these are the very types of unproven assertions that warrant discovery, not a precipitous summary judgment filing.

[12] These cases are not outliers—end runs around contract prohibitions repeatedly have been found to violate the implied covenant.  *See, e.g.*, *AEA Middle Mkt.* 2023 WL 2394680, at *12; *Credit Agricole*, 135 A.D.3d at 561; *Richbell Info. Servs. v. Jupiter Partners*, 309 A.D.2d 288, 302-303 (N.Y. App. Div. (1st Dep't) 2020); *Empresas Cablevision S.A.B. de C.V. v. JPMorgan Chase Bank*, 680 F. Supp. 2d 625, 631-33 (S.D.N.Y. 2010); *In re LightSquared, Inc.*, 511 B.R. 253, 317-339 (Bankr. S.D.N.Y. 2014); *Mill Fin. LLC v. Gillett*, 2013 WL 5476020, at *7-8 (N.Y. Sup. Ct. (N.Y. Cnty.) Sept. 27, 2013).

As the Court recognized at the January 27, 2023 hearing on plaintiffs' motion seeking a section 105 stay, "[g]ood faith and fair dealing most often is a factual intensive inquiry and requires discovery and understanding of all the circumstances." (ECF No. 21, Jan. 27, 2023 Hr'g Tr. at 26:8-10.) As part of this colloquy, the Court invited the parties to file motions for summary judgment prior to the commencement of discovery in this matter. (*Id.* at 27:5-17.) In light of the Court's remarks, including its comment to "pull out" the good faith and fair dealing portion of plaintiffs' claim when considering whether the claims could be determined on summary judgment, (*id.* at 26: 4-5), the Excluded Lenders understood the Court to be suggesting that the implied covenant claim was not ripe for summary judgment. And indeed, it is not. There has been virtually no discovery in this matter, such that the Excluded Lenders "cannot present facts essential to justify [their] opposition," (*see generally* Beaumont Decl.), and the Court should deny summary judgment to permit discovery to go forward. *See Acosta v. Suomy S.R.L.*, 2015 WL 6674546, at *2 (S.D. Tex. Oct. 30, 2015) (denying summary judgment without prejudice and granting Rule 56(d) motion upon finding that "the discovery [p]laintiffs seek to conduct would create a genuine fact issue if it supports their factual theory"); *Total E&P USA, Inc. v. Marubeni Oil & Gas USA, Inc.*, 2017 WL 86875, at *2 (S.D. Tex. Jan. 10, 2017) (same); *Bailey v. KS Mgmt. Servs., L.L.C.*, 35 F.4th 397, 405 (5th Cir. 2022) (finding denial of discovery to constitute abuse of the district court's discretion and vacating district court order that granted summary judgment to defendant and denied plaintiff's Rule 56(d) motion).

Indeed, there are ample indicia of bad faith that are ripe for discovery. For example, while it was negotiating the Unlawful Exchange Transaction, Serta also was actively discussing with the First Lien Lender Group potential transaction structures that would reduce Serta's debt load within the confines of the Credit Agreement. (Mollett Decl. ¶¶ 5-14; Hanigan

51

Decl. ¶¶ 5-7; Kwon Decl. ¶¶ 19-22.)  Three days before the Unlawful Exchange Transaction was publicly announced, Serta abruptly ended these negotiations and, indicating its willingness to "play favorites" with its lenders, contacted one of the three members of the First Lien Lender Group to expressly invite that lender – but not the other two – to be involved in discussions relating to an unspecified transaction, which the lender declined.  (Mollett Decl. ¶ 15.)  Other lenders who also were not invited to participate, upon hearing of the public announcement of the Transaction, contacted Serta seeking to participate, and were rebuffed.  (Ryan Decl. ¶¶ 5-6; Kreutzer Decl. ¶¶ 5-6.)  Additionally, as discussed in Section I.C, *supra*, plaintiffs took the unusual step of "ratifying" their own transaction in the written amendments to the Credit Agreement.  That self-serving amendment is evidence of bad faith.  *See Macy's, Inc. v. J.C. Penney Corp.*, 989 N.Y.S.2d 238, 262-63 (N.Y. Sup. Ct. (N.Y. Cnty.) 2014) (considering co-defendant's indemnification of other co-defendant as evidence that co-defendant had "certainty" or "substantial certainty" that it was causing other co-defendant to commit a breach of the latter's agreement with plaintiff), *aff'd as modified*, *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48 (N.Y. App. Div. (1st Dep't) 2015).

Plaintiffs nevertheless insist that, as a matter of law, they did not act in bad faith.  And why?  First and foremost because, according to plaintiffs, the Excluded Lenders themselves once sought "to obtain super-priority credit status." (Lenders' Br. ¶ 63.)  But the First Lien Lender Group's proposal was never consummated, and there is no way of knowing what its ultimate terms would have been, or whether it would have passed muster under the Credit Agreement had it been concluded.  As for plaintiffs' contention that the Unlawful Exchange Transaction permitted Serta to "stave off bankruptcy," that is plainly a question of fact, and an irrelevant one at that.  An attempt to avoid bankruptcy, which apparently did not work, does not

provide plaintiffs with legal justification to willfully violate the rights of 49 percent of Serta's

creditors, and plaintiffs have made no effort to show they lacked any lawful options.

### III.
### NORTH STAR IS NOT A DISQUALIFIED
### INSTITUTION UNDER THE CREDIT AGREEMENT

Serta's contention that North Star, as an affiliate of Apollo, is a "Disqualified

Institution" under § 9.05(a) of the Credit Agreement, thus rendering it ineligible to hold First

Lien Term Loans, and making its purchase of $192 million worth of Serta debt "null and void,"

(Serta Br. at 27-28), should be rejected based on undisputed evidence that Serta itself produced.

Serta fails to establish the absence of a question of material fact as to North Star's inclusion as a

Disqualified Institution; to the contrary, the undisputed facts establish that it was not, and the

Court should enter judgment that North Star is in fact a party to the First Lien Credit Agreement.

The record contradicts Serta's assertion that Apollo was on Serta's DQ List for its

First Lien Term Loans in a stunning fashion.  In 2016, ███████████████████████

███████████████████████████████████ unambiguously instructed UBS, the

Administrative Agent for the First Lien Term Loans, ███████████████ (*See* Ex. S,

Email ████████████ dated October 18, 2016; *see also* Ex. T, Email ███████████

███ dated May 26, 2020 (referencing ██████ 2016 email ██████████████████

████████████).)  The document – produced in this litigation *by Serta* – could not be clearer

on its face and admits of no ambiguity:  the subject line is "██████" and the text of the email

says, in its entirety, "███████████████."  It is therefore inarguable that in March 2020, when

North Star sought to buy Serta debt from Barclays, Apollo was eligible to do so—it had been

removed from the DQ list four years earlier ████████████ .  Tellingly, Serta's motion does

not acknowledge the existence of ███████ email to UBS ██████████████████████ ███████, or UBS's ████████████████████████████. ████████████████████████████████████████████████████████ should be the beginning and end of the story. But additional evidence supports the conclusion that North Star holds valid assignments of First Lien Term Loans under the Credit Agreement. Perhaps most notably, Apollo purchased and sold First Lien Term Loans on multiple occasions between 2016 and 2018. (Kwon Decl. ¶¶ 4-5.) This would not have been possible if Apollo were on the DQ List. Moreover, when Apollo entered into a non-disclosure agreement with Serta in respect of restructuring negotiations in March 2020, that document – which Serta signed, without objection – referenced Apollo's increased $192 million position, thereby again acknowledging Apollo's ownership of the First Lien Term Loans acquired at that time, which Serta now challenges. (Kwon Decl. ¶ 20.) As if this were not sufficient, UBS confirmed *multiple* times to Apollo in Spring 2020 that Apollo was not on the DQ List, and later executed the assignment agreements for the loans Apollo purchased, after having corresponded with Serta on the issue. (Kwon Decl. ¶¶ 7-8, 12-13.) All of this demonstrates conclusively that Apollo was not on the DQ List, and the Court should exercise its discretion to grant summary judgment for North Star on this claim under Rule 56(f).

Finally, Serta contends that the assignment of Serta debt from Barclays to North Star was invalid because North Star did not receive written consent from UBS. (*See* Serta Br. at 28 (citing Credit Agreement § 9.05(b)(i)).) That contention is meritless. Apollo executed trade confirmations for two trades with Barclays on March 12, 2020. Under the Credit Agreement, the Borrower is deemed to have consented to an assignment of loans if it does not object within 15 business days after having been notified of a proposed assignment. (*See* Ex. C, Credit

3714825.1

Agreement § 9.05(b)(1)(A).)  That notice was provided on March 20, 2020 and the objection period expired on April 14, 2020, without objection.  (Kwon Decl. ¶¶ 10-11.)  As such, Serta waived any objection to the trades, and its arguments should be rejected.[13]

## CONCLUSION

For the foregoing reasons, the Excluded Lenders respectfully request that the Court deny plaintiffs' motions for partial summary judgment, grant summary judgment in favor of the Excluded Lenders pursuant to Federal Rule of Civil Procedure 56(f), and grant such other and further relief as the Court deems just and proper.

Dated:   New York, New York
          March 16, 2023

                              Respectfully Submitted,

                              **FRIEDMAN KAPLAN SEILER ADELMAN &**
                              **  ROBBINS LLP**

                              *s/ Eric Seiler*
                              Lawrence S. Robbins*
                              Eric Seiler*
                              Anne E. Beaumont*
                              Elizabeth Bierut (*pro hac vice* application pending)
                              Jamuna D. Kelley*
                              Blair R. Albom*
                              7 Times Square
                              New York, NY 10036-6516
                              (212) 833-1100
                              lrobbins@fklaw.com
                              eseiler@fklaw.com
                              abeaumont@fklaw.com

---

[13] Under Credit Agreement § 9.05(b)(1)(A), an objection is not required with respect to a Disqualified Institution.  But because Apollo was not a Disqualified Institution, as demonstrated *supra*, Serta *was* required to object and not having done so, any contention based on the presence or absence of its consent has been waived.

3714825.1

jkelley@fklaw.com
balbom@fklaw.com

*Attorneys for the Excluded Lenders*

**PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP**
Kenneth S. Ziman*
Brian S. Hermann*
Lewis R. Clayton*
Andrew J. Ehrlich*
Michael J. Colarossi*
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000
kziman@paulweiss.com
bhermann@paulweiss.com
lclayton@paulweiss.com
aehrlich@paulweiss.com
mcolarossi@paulweiss.com

*Attorneys for the Excluded Lenders with respect to
Plaintiffs' Claims and Counterclaims Only*

**PORTER HEDGES LLP**
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan N. Young-John (TX 24088700)
1000 Main Street, 36th Floor
Houston, TX  77002
(713) 226-6000
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com

*admitted pro hac vice

*Attorneys for the Excluded Lenders with respect to
Plaintiffs' Claims and Counterclaims Only*

56