### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| SERTA SIMMONS BEDDING, LLC, et al., | : | Case No. 23-90020 (DRJ) |
| Debtors, | : | (Jointly Administered) |

| | | |
|---|---|---|
| SERTA SIMMONS BEDDING, LLC, et al., | : | |
| Plaintiffs and Counterclaim Defendants, | : | Adversary Proc. No. 23-09001 (DRJ) |
| v. | : | |
| AG CENTRE STREET PARTNERSHIP L.P., et al., | : | |
| Defendants, Counterclaim Plaintiffs and Third-Party Plaintiffs, | : | |
| v. | : | |
| AGF FLOATING RATE INCOME FUND, et al., | : | |
| Third-Party Defendants. | : | |

## <u>DECLARATION OF MARTI P. MURRAY</u>

Pursuant to 28 U.S.C. § 1746, MARTI P. MURRAY declares as follows:

1.  I am a Partner in the Finance Practice at Bates White, LLC.

2.  Annexed hereto is a true and correct copy of my expert report dated March 16, 2023 which I prepared in the above-captioned case. The report and its exhibits accurately set forth my qualifications, the procedures I performed, the opinions I have reached, and a summary of the grounds for each opinion. If called as a witness, I could and would testify to the contents of the report, appendices, and exhibits.

3713771.1

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 16, 2023.

_____
MARTI P. MURRAY

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| SERTA SIMMONS BEDDING, LLC, et al., | : | Case No. 23-90020 (DRJ) |
| Debtors, | : | (Jointly Administered) |
| SERTA SIMMONS BEDDING, LLC, et al., | : | |
| Plaintiffs and Counterclaim Defendants, | : | Adversary Proc. No. 23-09001 (DRJ) |
| v. | : | |
| AG CENTRE STREET PARTNERSHIP L.P., et al., | : | |
| Defendants, Counterclaim Plaintiffs and Third-Party Plaintiffs, | : | |
| v. | : | |
| AGF FLOATING RATE INCOME FUND, et al., | : | |
| Third-Party Defendants. | : | |

**EXPERT REPORT OF MARTI P. MURRAY**

**March 16, 2023**

# Table of contents

I. Executive Summary ....................................................................................................................................1

  I.A. Qualifications ....................................................................................................................................1

  I.B. Scope of Engagement and Materials Considered ............................................................................3

  I.C. Summary of Opinions ......................................................................................................................5

      I.C.1. To a Market Participant, an Open Market Purchase Would Generally Be Understood to Mean a Purchase of Bank Debt Typically for Cash in the Secondary Bank Debt Market, Conducted at Arm's-Length at or Close to the Prevailing Market Price. ....................................................5

      I.C.2. The Transaction Was Not an Open Market Purchase, as That Term Would Be Understood by a Market Participant. It Was a Privately Negotiated Debt Exchange and Financing...........................6

II. Background ...............................................................................................................................................7

  II.A. Background on Serta ........................................................................................................................7

  II.B. The Term Loan Agreement .............................................................................................................7

  II.C. Brief History of Serta's Financial Distress ......................................................................................8

  II.D. The Transaction .............................................................................................................................9

  II.E. Serta's Bankruptcy Filing ..............................................................................................................14

  II.F. The Bank Debt Market ..................................................................................................................15

  II.G. Open Market Purchase Provisions in Loan Agreements ...............................................................19

  II.H. Lenders Had Commercially Sensible Reasons for Agreeing to Permit a Borrower to Make Open Market Purchases ...........................................................................................................20

      II.H.1. Mathematical Illustration of How an Open Market Purchase Can be Credit Enhancing to Lenders ........................................................................................................................................21

III. Opinion #1: To a Market Participant, an Open Market Purchase Would Generally Be Understood to Mean a Purchase of Bank Debt Typically for Cash in the Secondary Bank Debt Market, Conducted at Arm's-Length at or Close to the Prevailing Market Price. ..................................................................23

      III.A.1. The Open Market Referred to in "Open Market Purchases" is the Secondary Bank Debt Market ........................................................................................................................................24

      III.A.2. An Open Market Purchase Is a Transaction Typically for Cash in the Secondary Bank Debt Market at or Close to the Prevailing Market Price Without Special Conditions ...............................26

      III.A.3. An Open Market Purchase Would Not Typically Cause the Price of the Bank Debt to Fall.........28

      III.A.4. In an Open Market Purchase, Borrowers Purchase Their Debt for Cash in the Market at a Discount to Face Value ...............................................................................................................28

      III.A.5. While the Term "Open Market" Would Be Well Understood by a Market Participant in the Bank Debt Market, the Term Is Also Used in Other Contexts...........................................................29

IV. Opinion #2: The Transaction Was Not an Open Market Purchase, as That Term would Be Understood by a Market Participant. It Was a Privately Negotiated Debt Exchange and Financing. ....................................35

  IV.A. The Solicitation of Debt Restructuring Proposals from Lenders Does Not Constitute an Open Market Purchase........................................................................................................................35

  IV.B. An Open Market Purchase Is Based on the Prevailing Market Price That Captures the Then Current Discount, Not a Price "Agreed To" by Serta and the Participating Majority Lenders................37

  IV.C. The Transaction Bears the Hallmarks of a Traditional Debt Exchange and Financing ......................40

  IV.D. I Have Seen No Evidence that Serta Took the Steps a Bank Debt Buyer Would Typically Take When Transacting in the Secondary Bank Debt Market ........................................................................44

  IV.E. The Transaction Caused the Trading Price of the Legacy Serta Debt to Decline, Contrary to What Would Be Expected as a Result of an Open Market Purchase................................................................44

  IV.F. Serta Did Not Reduce Its Indebtedness by the Amount of Debt It Claims to Have Purchased, Which One Would Have Expected to See as a Result of an Open Market Purchase............................45

V. Conclusion.................................................................................................................48

Appendix A. Curriculum Vitae of Marti P. Murray.............................................................A-1

Appendix B. Materials Considered...................................................................................B-1

Appendix C. Serta's Term Loan Agreements...................................................................C-9

# List of figures

Figure 1: Typical Characteristics of an Open Market Purchase by a Borrower .......................................................6

Figure 2: Before and After the Transaction ............................................................................................................11

Figure 3: Example of the Credit Enhancing Effect of an Open Market Purchase...................................................22

Figure 4: Historical Serta Loan Prices and Serta Exchange Ratio (74% of Par)....................................................45

Figure 5: Comparison of Loan Amounts that Would have been Outstanding in a True Open Market Purchase Compared to Actual Loan Amounts Outstanding as a Result of the Transaction..................................................47

# I. Executive Summary

## I.A. Qualifications

(1)   I am a Partner in the Finance Practice at Bates White, LLC, an economic consulting firm based in Washington, DC, that specializes in advanced financial, economic, and data analysis, among other things. At Bates White, I lead teams of professionals on a variety of financial advisory and litigation support engagements.

(2)   Prior to joining Bates White in January 2022, I was a Principal at The Brattle Group from 2019 to 2021. Prior to Brattle, I founded and served as the President of Murray Analytics, Inc. ("Murray Analytics") from 2015 to 2019. Murray Analytics provided consulting services and specialized in corporate restructuring, financial advisory, complex valuation services, fiduciary roles, and litigation support. Immediately prior to founding Murray Analytics, from 2012 until early 2015, I served as the Senior Managing Director of Goldin Associates, LLC ("Goldin Associates").

(3)   I have had a career of over 40 years in finance, including work experience as a lender, a distressed debt hedge fund manager, a restructuring financial advisor, and a testifying/consulting expert. Immediately prior to becoming a financial advisor and testifying/consulting expert, I worked directly in the distressed debt investing field for approximately 23 years. During that time, I held a series of positions requiring an increasing amount of responsibility, including serving as the Founder, President, and Portfolio Manager of Murray Capital Management. In my career as a distressed debt investor, I was an active participant in the bank loan market. I am knowledgeable about and have practitioner experience with bank loans, as well as terminology, and custom and practice in the bank debt market. During this 23-year period, I was also an active participant in debt restructurings and bankruptcies, including serving on many ad hoc and official creditor committees.

(4)   I began my career in finance in 1982 at Bank of America, where I completed a formal credit training program and ultimately managed the bank's relationships with Fortune 500 corporate borrowers in the consumer and industrial products segment, some of which were highly leveraged or in financial distress. My responsibilities at Bank of America included, among other things, performing credit analysis on corporate bank clients, seeking credit approval for the extension of credit to them, and negotiating loan agreements. In 1986, I received an MBA in Finance from the NYU Stern School of Business, having been sponsored by Bank of America for the Executive MBA program. After graduation, I worked for First New York Capital, a boutique investment bank serving the needs of middle market companies pursuing financings or M&A transactions.

(5)    In 1987, I joined Oppenheimer & Co. ("Oppenheimer"), a broker-dealer and investment adviser, to work for a portfolio manager for the Oppenheimer Horizon Fund—one of the first hedge funds specifically established to invest in the debt, equity securities, and other claims of distressed and bankrupt companies. I worked at Oppenheimer as an investment analyst, evaluating potential investments for the fund, making buy/sell recommendations to the portfolio manager, and subsequently monitoring investments for which I was responsible.

(6)    In 1990, I joined Furman Selz Incorporated ("Furman"), a broker-dealer and investment adviser owned by Xerox at the time, to oversee its distressed debt department. As a Senior Managing Director and department head, my responsibilities included investing capital in the distressed debt, bank debt, and high yield asset classes on the firm's behalf and for Xerox. I was also responsible for developing a money management business around the distressed debt investing specialty, and I launched a number of investment vehicles—both domestic and offshore.

(7)    In 1995, I founded Murray Capital Management ("Murray Capital"), a US Securities and Exchange Commission ("SEC")-registered investment adviser specializing in distressed debt investing. I served as President and Portfolio Manager of Murray Capital for 14 years, from the firm's inception until 2008, when the business was acquired by Babson Capital, the money management division of MassMutual Financial Group. Murray Capital specialized in investing in distressed and bankrupt companies, taking positions at all levels in the capital structure, from senior secured bank loans and first mortgages, to secured and unsecured bonds, trade claims, preferred stock, common stock, and various forms of derivatives. Peak client capital under management at Murray Capital grew to approximately $750 million, and the client base consisted of pension funds, university endowments, funds of funds, family offices, and high net worth individuals. I had ultimate responsibility for all aspects of the firm's business, including as they related to fund formation, client service, fund operations, research, portfolio management, trading, and compliance.

(8)    In 2009, I retired from portfolio management and commenced providing financial advisory and litigation support services. In this capacity, I have been retained to work on a variety of matters relating to, among other things, bankruptcy and restructuring; distressed companies; industry custom and practice in the market for distressed assets, including as it relates to bank debt, bonds, and trade claims; business, securities, and collateral valuation; asset tracing; and damages. Selected cases in which I have served as a consulting or testifying expert include *In re Sears Holding Corporation, et al.; In re Altaba, Inc., In re WeWork Litigation, In re The Financial Oversight and Management Board for Puerto Rico,* and *In re Neiman Marcus Group Ltd LLC, et al.*

(9)    In addition to my professional responsibilities, over the years I have served as an Adjunct Professor at the NYU Stern School of Business. Between 2001 and 2013, I taught graduate-level courses in bankruptcy and distressed debt investing, as well as in valuation/equity analysis.

(10)   I have served on the Board of Directors of Edcon, a distressed retailer and the holding company for two of South Africa's largest retailers, Edgars and Jet, selling a wide variety of clothing and consumer products. I served as a member of Edcon's Audit and Risk Committee. I have also served on the Board of Directors of California Coastal Communities, a public homebuilder in Southern California, where I also was a member of the Audit Committee. I was also elected to serve on the Board of two PIMCO closed end funds—PIMCO Income Strategy Fund I and II—after having been nominated by Brigade Capital Management and recommended by Institutional Shareholder Services.

(11)   I hold the designation of Certified Valuation Analyst ("CVA"), awarded by the National Association of Certified Valuators and Analysts ("NACVA"). I regularly attend training on a variety of valuation topics and obtain CPE ("Continuing Professional Education") credit necessary to maintain the CVA credential. I also hold the designation of Certified Fraud Examiner, awarded by the Association of Certified Fraud Examiners. Over the course of my employment at Oppenheimer and Furman, I also held Series 7 (registered representative) and Series 63 (uniform securities agent) licenses.

(12)   I have also taught advanced valuation topics to legal professionals for Continuing Legal Education credit. I have presented at numerous conferences, including, among others, Valcon Conferences, sponsored by the American Bankruptcy Institute, on the topic of rights offerings, a financing mechanism used by companies emerging from bankruptcy to raise capital, and on the topic of collateral diminution in value claims in bankruptcy.

(13)   I currently serve on the Board of Directors of the Turnaround Management Association's New York Chapter and I am the Treasurer-Elect. I have previously served as the Chairman of the Audit Committee and the Vice-Chairman of the Academic Relations Committee.

(14)   I received a BA from Colgate University in 1981 with a major in World Affairs and Chinese and an MBA in Finance from the NYU Stern School of Business in 1986. As a result of my career, including my formal training, teaching experience, and my education, I am well versed in matters relating to industry custom and practice for the bank loan market and for debt restructurings.

(15)   A copy of my CV is attached hereto as Appendix A. Bates White is being compensated for my work at the rate of $1,350 per hour. Staff at Bates White have assisted me by performing work at my direction. Bates White's compensation is not affected by the nature of the opinions that I form or the outcome of this case.

## I.B. Scope of Engagement and Materials Considered

(16)   I have been retained by Friedman Kaplan Seiler Adelman & Robbins LLP ("Friedman Kaplan" or "Counsel") in its capacity as counsel to the Ad Hoc Group of First Lien Lenders to Serta Simmons Bedding, LLC ("Serta") which are defendants and counterclaim/third-party plaintiffs in the action-

captioned *Serta Simmons Bedding, LLC et al. v. AG Centre Street Partnership L.P. et al.*, Adv. Proc. No. 23-09001 (DRJ) (Bankr. S.D. Tex.)[1] to opine on (1) what a market participant in the bank debt market would understand the term "open market purchase" ("Open Market Purchase") to mean in the context of Serta's First Lien Term Loan Agreement[2] (the "Term Loan Agreement") and the Second Lien Loan Term Agreement[3] and (2) whether the transaction that Serta undertook in June 2020, in which it exchanged debt, re-ordered the priorities of the lenders, and received new financing[4] (the "Transaction") included or constituted an Open Market Purchase as that term would be understood by a market participant.[5]

(17)     I understand that, in connection with the Transaction, Serta and a group of lenders (the "Participating Majority Lenders") that held a majority of the first lien and second lien term loans (the "First Lien Term Loans" and the "Second Term Loans") are relying on the "open market purchase exception" set forth in Section 9.05(g) of the Term Loan Agreement.[6] Under Section 9.05(g), a lender may "assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) **through open market purchases**[.]"[7]

(18)     Section I.C of this report contains a summary of my opinions. Section II provides relevant background information. Sections III and IV contain a detailed discussion of my opinions, which are based on my experience outlined above and my knowledge of industry custom and practice. Section V contains a conclusion.

---

1   Defendants and counterclaim/third-party plaintiffs include the following entities: AG Centre Street Partnership L.P., AG Credit Solutions Non-ECI Master Fund, L.P., AG Super Fund Master, L.P., AG SF Master (L), L.P., Silver Oak Capital, L.L.C., Ascribe III Investments, LLC, Columbia Cent CLO 21 Limited, Columbia Cent CLO 27 Limited, Columbia Floating Rate Fund, a series of Columbia Funds Series Trust II, Columbia Strategic Income Fund, a series of Columbia Funds Series Trust I, Contrarian Capital Fund I, L.P., Contrarian Distressed Debt Fund, L.P., Contrarian Centre Street Partnership, L.P., Gamut Capital SSB, LLC, LCM XXII LTD., LCM XXIII LTD., LCM XXIV LTD., LCM XXV LTD., LCM 26 LTD., LCM 27 LTD., LCM 28 LTD., North Star Debt Holdings, L.P., Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., Shackleton 2017-XI CLO, Ltd., Z Capital Credit Partners CLO 2018-1 Ltd., and Z Capital Credit Partners CLO 2019-1 Ltd.

2   First Lien Term Loan Agreement, November 8, 2016.

3   Second Lien Term Loan Agreement, November 8, 2016 (SSB_ADVERSARY00016300 – SSB_ADVERSARY00016735).

4   Open Market Purchase and Cashless Exchange Agreement, June 22, 2020 [hereinafter "Exchange Agreement"]. Super-Priority Term Loan Agreement, June 22, 2020 (SSB_ADVERSARY00002024 – SSB_ADVERSARY00002581) [hereinafter "Super-Priority Term Loan Agreement"].

5   I offer industry custom and practice opinion and not legal opinion. My opinion relates to how the term Open Market Purchase would be understood by a market participant. I assume the market participant is a reasonable and sophisticated market participant in the bank debt market and is a lender and/or an actual market participant that buys and sells bank debt.

6   "Amended Complaint," *Serta Simmons Bedding, LLC v. AG Centre Street Partnership L.P.* (ECF No. 38), February 14, 2023, 5. ("Specifically, Section 9.05(g) of the Non-PTL Term Loan Agreement unambiguously permits debt-for-debt exchange on a non-pro rata basis as part of an open market transaction.")

7   Term Loan Agreement, § 9.05(g) (emphasis added). *See also* Second Lien Loan Term Agreement, § 9.05(g). Affiliated Lender is defined on page 3 of the Term Loan Agreement and page 3 of the Second Lien Loan Term Agreement. "'Affiliated Lender' means any Non-Debt Fund Affiliate, Holdings, the Top Borrower and/or any subsidiary of the Top Borrower." It would include Serta, the Top Borrower.

(19)    The opinions I express herein are based on the materials I have considered to date, as detailed in
        Appendix B. I may seek to amend my findings if new information becomes available.

## I.C. Summary of Opinions

### I.C.1. To a Market Participant, an Open Market Purchase Would Generally Be Understood to Mean a Purchase of Bank Debt Typically for Cash in the Secondary Bank Debt Market, Conducted at Arm's-Length at or Close to the Prevailing Market Price.

(20)    Figure 1 below includes a checklist of the characteristics that I would expect to see, based on my
        experiences as a practitioner, and the research I have conducted in connection with this engagement, if a
        borrower were implementing an Open Market Purchase. Figure 1 demonstrates that, based on the
        evidence I have reviewed to date, the Transaction had none of these elements, save for the execution of a
        Master Assignment and Acceptance Agreement that was executed on June 22, 2020—after litigation over
        the Transaction had already commenced.

**Figure 1: Typical Characteristics of an Open Market Purchase by a Borrower**

| Characteristic Number | Characteristics of an Open Market Purchase | Satisfied in the Transaction? |
|---|---|---|
| 1 | Documented internal decision to execute an Open Market Purchase | No |
| 2 | Identification of dealer or dealers to assist in effectuating an Open Market Purchase | No |
| 3 | Engagement in secondary bank debt market price discovery | No |
| 4 | Agreement to trade through a dealer | No |
| 5 | Execution of trade at or near the prevailing market price | No |
| 6 | Execution of trade for cash consideration | No |
| 7 | No special conditions attached to the trade, other than usual and customary conditions for bank debt trades in the secondary bank debt market | No |
| 8 | Internal documentation that a trade had occurred | No |
| 9 | Execution of a trade confirmation (typically one of the standard varieties, as described) | No |
| 10 | Negotiation and execution of a Purchase and Sale Agreement or similar agreement[8] | Yes, after litigation commenced[9] |
| 11 | The Open Market Purchase would have no detrimental effect on pre-existing *pari-passu*[10] debt | No |
| 12 | To the extent required to retire debt purchased in an Open Market Purchase, then pro-forma for the Open Market Purchase and all else being equal, the borrower's debt level should decline by the face amount of the debt purchased | No |

## I.C.2. The Transaction Was Not an Open Market Purchase, as That Term Would Be Understood by a Market Participant. It Was a Privately Negotiated Debt Exchange and Financing.

---

[8]   A Purchase and Sale Agreement or a similar agreement was executed after litigation over the Transaction commenced on June 11, 2020. On June 22, 2020, Serta signed a Master Assignment and Acceptance Agreement based on the Term Loan Agreement in connection with executing the Transaction. "Master Assignment and Acceptance," Serta Simmons Bedding, LLC, June 22, 2020 (SSB_ADVERSARY00001279 – SSB_ADVERSARY00001359) [hereinafter "Master Assignment and Acceptance"].

[9]   "Complaint and Summons," *North Star Debt Holdings, L.P., v. Serta Simmons Bedding, LLC* (NYSCEF No. 1), June 11, 2020 [hereinafter "Complaint and Summons"].

[10]   Pari-passu means "ranking equally and without preference." Corporate Finance Institute, "What is Pari-Passu?" accessed March 13, 2023, https://corporatefinanceinstitute.com/resources/commercial-lending/pari-passu/.

# II. Background

## II.A. Background on Serta

(21)   Serta Simmons Bedding, LLC, headquartered in Doraville, Georgia, is one of North America's largest bedding manufacturers, operating 21 bedding manufacturing facilities across the United States and Canada.[11] It has approximately 3,600 employees.[12] For the fiscal year ending June 2022, Serta had revenues of approximately $2.4 billion and accounted for approximately 19% of annual US bedding sales.[13]

(22)   In 2010, Serta, Inc. and Simmons Bedding Company, LLC, two bedding companies, merged into one entity, Serta.[14] Today, Serta owns several bedding brands, including Serta, Simmons, Beautyrest, and mattress-in-a-box brand Tuft & Needle.[15]

(23)   Advent International ("Advent") became Serta's majority owner in 2012, when it acquired an interest from Ares Capital Management LLC and Ontario Teachers' Pension Plan.[16]

## II.B. The Term Loan Agreement

(24)   On November 8, 2016, Serta entered into three credit facilities consisting of a $1.95 billion First Lien Term Loan Agreement (the "First Lien Term Loans"), a $450 million Second Lien Credit Agreement (the "Second Lien Term Loans"), and a $225 million asset-based revolving credit facility (the "ABL").[17]

---

[11]   Serta Simmons Bedding, LLC, et al, Disclosure Statement, January 23, 2023, *In re Serta Simmons Bedding, LLC*, No. 4:23-BK-90020 (DRJ) (Bankr. S.D. Tex.) (ECF No. 29) [hereinafter "January Disclosure Statement].

[12]   Serta Simmons Bedding, LLC, et al, Disclosure Statement, March 7, 2023, *In re Serta Simmons Bedding, LLC*, No. 4:23-BK-90020 (DRJ) (Bankr. S.D. Tex.) (ECF No. 427) [hereinafter "March Disclosure Statement].

[13]   March Disclosure Statement, 9. ("Today, SSB is a significant player in the North American mattress industry, with $2.4 billion in sales for the twelve (12) months ending June 2022 and accounting for approximately 19% of U.S. bedding sales.")

[14]   March Disclosure Statement, 7. ("The Company's main operating entity, SSB, was formed in 2010 following the combination of two highly recognizable brands in bedding: Serta® and Simmons®.")

[15]   Declaration of John Linker in Support of Debtors' Chapter 11 Petitions and First Day Relief, January 23, 2023, *In re Serta Simmons Bedding, LLC*, No. 4:23-BK-90020 (DRJ) (Bankr. S.D. Tex.) (ECF No. 26) [hereinafter "Declaration of John Linker"], ¶ 15. ("Today, Serta Simmons Bedding employs over 3,600 employees and accounts for approximately 19% of the annual bedding sales in the United States through a diverse portfolio of brands, including the premium Simmons® Beautyrest® line, Serta®, the value-oriented Simmons®, and most recently mattress-in-a-box brand Tuft & Needle®, acquired in 2018.")

[16]   March Disclosure Statement, 8-9. ("In 2010, in connection with its chapter 11 cases, Simmons was acquired by Ares Capital Management, LLC ('Ares') and the Ontario Teacher's Pension Plan ('OTPP') … In 2012, Ares and OTPP sold their majority stake in SBB to Advent.")

[17]   First Lien Term Loan Agreement, 1. Second Lien Term Loan Agreement at 1 (SSB_ADVERSARY00016300 – SSB_ADVERSARY00016735).

(25)   The Term Loan Agreement facilitated a $670 million dividend to Serta's shareholders and refinanced its existing $1.8 billion in debt.[18]

## II.C. Brief History of Serta's Financial Distress

(26)   In the 2018-2019 time period, prior to the onset of the COVID-19 pandemic, Serta had been experiencing deteriorating financial performance and had been subject to multiple credit rating downgrades because of increased competition, declining operating performance, and its leveraged capital structure.[19] S&P Global ("S&P") downgraded Serta's credit rating multiple times during 2018 and 2019, including from B to B- on March 20, 2018; B- to CCC+ on March 28, 2019; and CCC+ to CCC on December 4, 2019.[20] Similarly, Moody's downgraded Serta's credit rating from B3 with a stable outlook to B3 negative outlook on October 8, 2018, then from B3 to Caa1 on April 25, 2019, and again from Caa1 to Caa3 on March 24, 2020.[21]

(27)   The COVID-19 pandemic further adversely affected the US bedding industry, including because of significant inflation in raw material costs and supply chain disruptions.[22]

(28)   Between April 2020 and early June 2020, Serta entered into discussions with approximately 70% of the holders of its First and Second Lien Term Loans regarding a potential financing and/or debt exchange

---

[18]   "Advent-Backed Serta Takes on Debt to Issue a $670 Million Dividend," *Wall Street Journal,* October 7, 2016. "Serta Simmons Bedding LLC's 'B' Corporate Credit Rating Affirmed; Term Loans Assigned 'B' And 'CCC+' Issue-Level Ratings," S&P Global Ratings, October 7, 2016, https://www.wsj.com/articles/advent-backed-serta-takes-on-debt-to-issue-a-670-million-dividend-1475878821. ("Proceeds from the new facilities, along with about $140 million in cash from the balance sheet, will be used to refinance the company's outstanding $1.8 billion term loan B and senior notes, pay $670 million in extraordinary dividends to shareholders.")

[19]   "Serta Simmons Bedding LLC Downgraded to 'CCC' Due to Weak Performance, Unsustainable Capital Structure; Outlook Negative," S&P Global Ratings, December 4, 2019, https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2352377. S&P outlines more competition in the industry as well as Serta's weak operating performance and leveraged capital structure.

[20]   "Serta Simmons Bedding LLC Ratings Lowered on Weak Operating Results and 2018 Outlook; Outlook Negative," S&P Global Ratings, March 20, 2018, https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2310543. "Serta Simmons Bedding LLC Downgraded to 'CCC+' From 'B-' Due to Underperformance and High Leverage; Outlook Negative," S&P Global Ratings, March 28, 2019, https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2187467. "Serta Simmons Bedding LLC Downgraded to 'CCC' Due to Weak Performance, Unsustainable Capital Structure; Outlook Negative," S&P Global Ratings, December 4, 2019, https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2352377. From March 20, 2018, through December 4, 2019, S&P downgraded Serta's credit rating from B to CCC.

[21]   "Moody's Revises Serta Simmons' Outlook to Negative; Affirms B3 CFR," Moody's Investors Service, October 8, 2018, https://www.moodys.com/research/Moodys-revises-Serta-Simmons-outlook-to-negative-affirms-B3-CFR—PR_390016. "Moody's Downgrades Serta Simmons' CFR to Caa1; Outlook Stable," Moody's Investors Service, April 25, 2019, https://www.moodys.com/research/Moodys-downgrades-Serta-Simmons-CFR-to-Caa1-outlook-stable—PR_399250. "Moody's Downgrades Serta Simmons' CFR to Caa3; Outlook Negative," Moody's Investors Service, March 24, 2020, https://www.moodys.com/research/Moodys-downgrades-Serta-Simmons-CFR-to-Caa3-outlook-negative—PR_420426.

[22]   *See* March Disclosure Statement, 16.

transaction.[23] Serta was assisted by both legal and financial advisors.[24] By May 2020, Serta had fallen into technical default under the Term Loan Agreement due to the delayed release of its financial statements and its failure to file a compliance certificate.[25]

## II.D. The Transaction

(29)   On June 8, 2020, Serta issued a press release (the "June 2020 Press Release") announcing that it had entered into a transaction support agreement with the Participating Majority Lenders. The June 2020 Press Release, which refers to the Transaction as a "recapitalization," does not use the term Open Market Purchase or refer to an Open Market Purchase. The June 2020 Press Release states that, as part of the Transaction, new debt would be issued in "exchange" for legacy debt. [26] According to the June 2020 Press Release, the Transaction would permit, among other things:

1.   $200 million of new money super-priority "first out" debt, which would rank ahead of the existing First Lien Term Loans (the "New Money Tranche");

2.   $875 million of super-priority "second out" debt, issued in exchange for First and Second Lien Term Loans (defined below) held by the Participating Majority Lenders, which would still rank ahead of the existing First and Second Lien Term Loans (the "Priority Term Loans" or "Exchange Tranche")[27];

3.   An unspecified amount of super-priority "third out" debt that could be used for future "exchanges," which would also rank ahead of the existing First and Second Lien Term Loans (the "Third Out Tranche").[28]

---

[23]   "Serta's Motion for Summary Judgment," *Serta Simmons Bedding, LLC, et al. v. AG Centre Street Partnership L.P., et al.* (ECF No. 69)*,* February 24, 2023, 4. ("…it is undisputed that the Company engaged in a competitive process to repurchase its debt. It is undisputed that the Company—through its advisors—negotiated with over 70% of its existing Lenders holding approximately $1.719 billion of the $2.314 billion debt and other outside investors before determining—through an independent finance committee—that the PTL Lenders' offer was the best deal for the Company.")

[24]   *See* "Serta's Motion for Summary Judgment," *Serta Simmons Bedding, LLC, et al. v. AG Centre Street Partnership L.P., et al.* (ECF No. 69), February 24, 2023, 4. ("…it is undisputed that the Company engaged in a competitive process to repurchase its debt. It is undisputed that the Company—through its advisors—negotiated with over 70% of its existing Lenders holding approximately $1.719 billion of the $2.314 billion debt and other outside investors before determining— through an independent finance committee—that the PTL Lenders' offer was the best deal for the Company.")

[25]   "Serta Simmons Slumbers into Technical Default," Debtwire, May 28, 2020, https://www.debtwire.com/intelligence/view/intelcms-j2hfg2?searchTerm=Serta s. ("Under the company's credit agreement, the borrower is required to file financials within a 60-day period after 28 March. Serta plans to file 1Q20 earnings by the end of this week, said one of the sources.")

[26]   Serta Simmons Bedding, LLC, "Serta Simmons Bedding Enters into Agreement with Majority of Lenders on Deleveraging and Liquidity Enhancing Transaction," June 8, 2020, (SSB_ADVERSARY00005635 – SSB_ADVERSARY00005636).

[27]   The "Exchange Tranche" is referred to as the "Priority Term Loans" in the Amended Complaint. *See* Amended Complaint, ¶ 4. The First Lien Term Loans held by the Participating Majority Lenders ($992,292,703.97) were exchanged at a 74% exchange ratio for $734,296,600.94 of Exchange Tranche debt, and the Second Lien Term Loans held by the Participating Majority Lenders ($299,027,231.08) were exchanged at a 39% exchange ratio for $116,620,620.12 of Exchange Tranche debt. In total, $850,917,221.06 in Exchange Tranche debt was issued under the Transaction. *See also* Exchange Agreement at 4 and Super-Priority Term Loan Agreement at 1 (SSB_ADVERSARY00002024 – SSB_ADVERSARY00002581).

[28]   Serta Simmons Bedding, LLC, "Serta Simmons Bedding Enters into Agreement with Majority of Lenders on Deleveraging

(30)     The June 2020 Press Release did not specify the intended maturity date for either the New Money
Tranche or the Exchange Tranche.[29] The maturity date for both was ultimately set for August 2023—
approximately three years from issuance and prior to the maturity date for the First and Second Lien Term
Loans.[30]

(31)     I understand that Serta made no offers to certain minority lenders (the "Non-Participating Minority
Lenders") to exchange their First and Second Lien Term Loans for the "super-priority" loans granted to
the Participating Majority Lenders, nor did Serta seek the Non-Participating Minority Lenders' consent to
amend or modify the terms of the Term Loan Agreement.

(32)     I further understand that one effect of the Transaction was that the rights of payment from collateral
proceeds were reordered such that $200 million of New Money Tranche and $851 million of Exchange
Tranche loans would have payment priority over the Non-Participating Minority Lenders' First Lien and
Second Lien Term Loans. As a result of the Transaction, the level of Serta's indebtedness, pro forma for
the debt exchange and the funding of the New Money Tranche, declined by $240 million, from $2.314
billion, to $2.074 billion. Before considering the New Money Tranche, Serta's legacy indebtedness
declined by $440 million.[31] Figure 2 below illustrates Serta's debt structure before and after the
Transaction, after giving effect to the full funding of the New Money Tranche and the debt exchange.

---

and Liquidity Enhancing Transaction," June 8, 2020, (SSB_ADVERSARY00005635 – SSB_ADVERSARY00005636).
Serta described a "Deleveraging and Liquidity Enhancing Transaction" involving "New Money Tranche: $200 million of
newly funded super-priority 'first out' debt," "Exchange Tranche: $875 million of super-priority 'second out' debt," and "an
additional basket for super-priority 'third out' debt that would rank ahead of Existing First Lien Term Loans that can be used
for future exchanges of Existing First Lien Term Loans and Existing Second Lien Term Loans."

[29]     *See* Serta Simmons Bedding, LLC, "Serta Simmons Bedding Enters into Agreement with Majority of Lenders on
Deleveraging and Liquidity Enhancing Transaction," June 8, 2020 (SSB_ADVERSARY00005635 –
SSB_ADVERSARY00005636).

[30]     Super-Priority Term Loan Agreement at 35 (SSB_ADVERSARY00002024 – SSB_ADVERSARY00002581). The "Maturity
Date" is defined as August 10, 2023. *See* First Lien Term Loan Agreement at 37 and Second Lien Term Loan Agreement at
37 (SSB_ADVERSARY00016300 – SSB_ADVERSARY00016735). The First Lien Term Loans were set to mature in
November 2023 and the Second Lien Term Loans in November 2024, respectively.

[31]     Before consideration of any revolver/ABL outstanding.

**Figure 2: Before and After the Transaction[32]**



Sources: Exchange Agreement, 4; Super-Priority Term Loan Agreement at 1, 91 (SSB_ADVERSARY00002024 – SSB_ADVERSARY00002581).

(33)   On June 9, 2020, the day after the announcement of the Transaction, S&P downgraded Serta from CCC- to CC, stating: "We view the proposed transaction, if completed, as distressed and tantamount to a selective default (SD) because the proposed transaction involves debt exchange at a discount, whereby existing lenders would receive less than they were originally promised, as well as a shift in priority debt, resulting in a less favorable position for certain existing lenders."[33]

(34)   On June 11, 2020, three days after the announcement of the Transaction, Moody's Investor Service downgraded the original First and Second Lien Term Loans from Caa3 to Ca and from Ca to C, respectively.[34] Moody's stated that the downgrade reflected the increased risk of the original debt due to its payment priority subordination to the new tranches formed by the Transaction. Prior to the exchange, Serta's loan payments would be shared pro rata among all lenders, as specified in Section 2.18 of the Term Loan Agreement.[35] After the exchange, the Non-Participating Minority Lenders' First and Second

---

[32]   Totals throughout may not appear to sum due to rounding.

[33]   "Serta Simmons Bedding LLC Rating Lowered to 'CC' on Distres[s]ed Debt Exchange Announcement; Outlook Negative," S&P Global Ratings, June 9, 2020, https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2458275.

[34]   "Moody's Views Serta Simmons' Transaction as Distressed Exchange, Downgrades Existing First and Second Lien Term Loans; Outlook Negative," Moody's Investors Service, June 11, 2020, https://www.moodys.com/research/Moodys-views-Serta-Simmons-transaction-as-distressed-exchange-downgrades-exist—g--PR_426243. *See also* S&P Global Ratings, "Serta Simmons Bedding LLC Downgraded to 'SD' from 'CC' On Completion of Distressed Debt Exchange," June 23, 2020, https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2467049. S&P Global Ratings also downgraded the existing First Lien Term Loan to "D" from "CC" and Second Lien Term Loan to "D" from "C."

[35]   First Lien Term Loan Agreement, §2.18(a). ("…each payment or prepayment of principal of any Borrowing, each payment of

Lien Term Loans were de-prioritized in the loan payment waterfall with $200 million in the New Money Tranche and $851 million in the Exchange Tranche now ranking above them.[36] As Moody's noted, "Moody's believes that term loan lenders who did not consent to the transaction could potentially be left with little or no remaining collateral coverage in Serta Simmons, as well as in a position that is subordinated in payment priority – though equal in lien priority – to the new term loans."[37]

(35)    On June 11, 2020, litigation commenced regarding the Transaction. North Star Debt Holdings, L.P., (an affiliate of funds managed by Apollo Global Management, Inc.), Silver Oak Capital, LLC, AG Credit Solutions Non-ECI Master Fund, AG Centre Street Partnership L.P., AG Super Fund Master, L.P. (affiliates of Angelo, Gordon & Co., L.P.), and Gamut Capital SSB, LLC (an affiliate of funds managed by Gamut Capital Management, LP) (collectively "TRO Plaintiffs") filed a complaint and sought a temporary restraining order against Serta in the Supreme Court of the State of New York alleging that the Transaction was unlawful.[38] On June 16, 2020, Serta filed an opposition to the TRO Plaintiffs' claims, contending that it had undertaken an Open Market Transaction.[39]

(36)    As part of the litigation in the Supreme Court of the State of New York, Plaintiffs had sought a preliminary injunction to block the transaction, which was ultimately denied.[40] The Transaction closed on June 22, 2020, at which time Serta executed the Open Market Purchase and Cashless Exchange Agreement, Amendment No. 1 to First Lien Term Loan Agreement, Super-Priority Term Loan Agreement, First Lien Intercreditor Agreement, and Master Assignment and Acceptance Agreement.[41]

---

interest in respect of the Loans of a given Class and each conversion of any Borrowing to, or continuation of any Borrowing as, a Borrowing of any Type (and of the same Class) shall be allocated pro rata among the Lenders in accordance with their respective Applicable Percentages of the applicable Class.") First Lien Term Loan Agreement, §2.18(b), which contains the loan payment waterfall, and the First Lien Term Loan Agreement, §2.18(c), which contains the pro-rata sharing provision.

[36]    "Moody's Assigns Ratings to Serta Simmons' New Term Loans; Affirms Caa3 CFR," Moody's Investors Service, July 8, 2020, https://www.moodys.com/research/Moodys-assigns-ratings-to-Serta-Simmons-new-term-loans-affi---s--PR_427554. ("Specifically, the transaction put in place a new $200 million super-priority first lien "first-out" tranche (FLFO) ranking ahead in payment priority from the existing first lien term loan. Additionally, the company exchanged a portion of its existing first lien term loan and existing second lien term loan into a new super-priority tranche of $851 million that is a first lien "second-out" tranche (FLSO) in payment priority following the FLFO tranche.")

[37]    "Moody's Assigns Ratings to Serta Simmons' New Term Loans; Affirms Caa3 CFR," Moody's Investors Service, July 8, 2020, https://www.moodys.com/research/Moodys-assigns-ratings-to-Serta-Simmons-new-term-loans-affi---s--PR_427554.

[38]    "Complaint and Summons", 1, in which North Star Debt Holdings, L.P. is defined as "Apollo" and states that this complaint was filed in the Supreme Court of the State of New York, County of New York; 3, in which Serta's actions in the Transaction are characterized as "unlawful."; 8-9, in which the TRO plaintiffs are listed and the relationship between North Star and Apollo is outlined. "Plaintiff North Star Debt Holdings, L.P., an affiliate of funds managed by Apollo Global Management, Inc., is a Delaware limited partnership with its principal place of business at 9 West 57th Street, New York, NY 10019."

[39]    "Serta Simmons Bedding, LLC'S Memorandum of Law in Opposition to Plaintiffs' Application for a Temporary Restraining Order, a Preliminary Injunction, and Expedited Discovery," *North Star Debt Holdings, L.P., et al. v. Serta Simmons Bedding, LLC, June 16, 2020* (NYSCEF No. 22), 10. ("Moreover, the Credit Agreement expressly permits the $1.2 billion debt-to-debt exchange on a non-pro rata basis as part of an **open market transaction**.") (Emphasis added).

[40]    Complaint and Summons, 7. ("Preliminary injunctive relief to enjoin the Proposed Transaction pending a prompt trial on the merits is necessary to safeguard Plaintiffs' rights under the Credit Agreement.") "Decision and Order on Motion," *North Star Debt Holdings, L.P., et al. v. Serta Simmons Bedding, LLC* (NYSCEF No. 88), June 22, 2020. North Star (Apollo)'s temporary restraining order and preliminary injunction is denied.

[41]    Exchange Agreement. *See* Amendment No. 1 to the First Lien Term Loan Agreement, June 22, 2020. *See also* Super-Priority

(37)     By June 22, 2020, the price of Serta's legacy First Lien Term Loans had dropped to 26 (a 17-point drop
         from the price of 43 at the time of the June 2020 Press Release), representing a 40% decline in value from
         prior to the announcement of the Transaction.[42]

(38)     In July 2020, LCM Asset Management LLC ("LCM") and certain funds under management sued Serta
         and a group of the Participating Majority Lenders in the Southern District of New York over the
         Transaction. As with this case, LCM was a Non-Participating Minority Lender which was adversely
         impacted by the Transaction.[43] On March 9, 2021, Judge Daniels dismissed the case due to lack of subject
         matter jurisdiction.[44] LCM filed another suit on May 4, 2021 but only listed Serta as the defendant.[45] Serta
         filed motions to dismiss on July 9, 2021 and August 23, 2021, but Judge Failla denied the motion to
         dismiss on March 29, 2022, noting the following:

> On a plain reading of the term, the Transaction depicted in the Complaint did not take
> place in what is conventionally understood as an "open market." Significantly, the
> Transaction was closed to a swath of possible participants (i.e., those lenders who did not
> participate in the Transaction), and rather than agreeing on a price set by market forces,
> Defendant and the Priority lenders are alleged to have engaged in secretive discussions to
> arrive at a price for the loan repurchases that necessitated both intricate amendments to
> the Agreement and additional agreements, the terms of which were withheld from
> Plaintiffs until they were publicly announced.[46]

---

Term Loan Agreement (SSB_ADVERSARY00002024 – SSB_ADVERSARY00002581). *See also* First Lien Intercreditor
Agreement, June 22, 2020. *See also* Master Assignment and Acceptance (SSB_ADVERSARY00001279 –
SSB_ADVERSARY00001359).

[42]   Bloomberg series BL226994 Corp, accessed March 16, 2023 ("Bloomberg First Lien Term Loan Prices"). Prices are quoted
       using "PX_LAST".

[43]   "Complaint," *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, No. 20-cv-5090 (S.D.N.Y July 2, 2020) 1-4.

[44]   "Memorandum Decision and Order," *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, No. 20-cv-5090 (S.D.N.Y
       March 9, 2021) 1.

[45]   "Complaint, " *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, No. 21-cv-3987 (S.D.N.Y May 4, 2021) 1.

[46]   "Opinion and Order Denying Motion to Dismiss," *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, No. 21-cv-03987-
       KPF (S.D.N.Y. March 29, 2022), 18.

(39)   On November 3, 2022, the Transaction was challenged again in the Supreme Court of the State of New York by funds managed by AG Centre Street and others.[47] This litigation is pending in the Supreme Court of the State of New York; however, it has been stayed as a result of Serta's bankruptcy filing.[48,49]

## II.E. Serta's Bankruptcy Filing

(40)   On January 23, 2023, Serta and 13 US affiliates petitioned to initiate a "voluntary pre-arranged court-supervised process under Chapter 11 of the U.S. Bankruptcy Code" in the Southern District of Texas.[50] According to the "first day" pleadings, Serta's Chief Financial Officer made note of several key events that led to the bankruptcy filing, including the general decline of the mattress industry, rising inflation, and the significant amount of Serta's debt set to mature in 2023, which was comprised of the New Money Tranche and the Exchange Tranche that had been issued in the Transaction and mature in August 2023, and the original First and Second Lien Term Loans which mature in November 2023.[51] The Chapter 11 bankruptcy was filed to "implement a comprehensive financial restructuring that will result in a reduction of the Company's funded debt by approximately $1.59 billion and allow it to continue operating as a going concern with a substantially healthier balance sheet."[52]

(41)   On March 7, 2023, Serta filed a proposed plan of reorganization (the "March 2023 Plan").[53] Pursuant to the terms of the March 2023 Plan, the First Out Debt would receive, in satisfaction of its claims, new term

---

[47]   Plaintiffs in the New York state case include the following entities: AG Centre Street Partnership L.P., AG Credit Solutions Non-ECI Master Fund, L.P., AG Super Fund Master, L.P., AG SF Master (L), L.P., Contrarian Capital Fund I, L.P., Contrarian Distressed Debt Fund, L.P., Contrarian Centre Street Partnership, L.P., Gamut Capital SSB, LLC, North Star Debt Holdings, L.P., Silver Oak Capital, L.L.C., Shackleton 2013-III CLO, Ltd., Shackleton 2013IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., Shackleton 2017-XI CLO, Ltd., Z Capital Credit Partners CLO 2018-1 Ltd., Z Capital Credit Partners CLO 2019-1 Ltd., Ascribe III Investments, LLC, Cent CLO 21 Limited, Columbia Cent CLO 27 Limited, Columbia Floating Rate Income Fund, a series of Columbia Funds Series Trust II, and Columbia Strategic Income Fund, a series of Columbia Funds Series Trust I. *See* Amended Complaint, 1-2.

[48]   March Disclosure Statement, 15.

[49]   As informed by Counsel, on January 23, 2023, the plaintiffs in this action removed certain of their claims against the defendants other than Serta to the United States District Court for the Southern District of New York ("SDNY").

[50]   "Serta Simmons Bedding Takes Decisive Actions to Strengthen Financial Position and Drive Long-Term Growth," Businesswire, January 23, 2023, https://www.businesswire.com/news/home/20230123005830/en/Serta-Simmons-Bedding-Takes-Decisive-Actions-to-Strengthen-Financial-Position-and-Drive-Long-Term-Growth. *See* March Disclosure Statement 1.

[51]   *See* Declaration of John Linker, ¶ 50. ("…[T]he Debtors face financial challenges as a result of the downturn of the mattress industry generally. The U.S. bedding industry has been subject to significant disruptions recently, including a decline in industry demand beginning in 2022 as a result of slower economic growth caused by recent geopolitical and macroeconomic uncertainty, as well as reduced consumer spending as a result of higher interest rates. Prior to the demand headwinds, the industry faced significant inflation in raw materials costs, supply chain disruptions, and the adverse market effects created by the COVID-19 pandemic. While the fundamentals of the Debtors' business remain strong, the Debtors are facing significant debt maturities in 2023.") *See also* First Lien Term Loan Agreement, 37. The initial term loan maturity date of Serta's original First and Second Lien Term Loan debt is November 2023. ("'Initial Term Loan Maturity Date' means the date that is seven years after the Closing Date.") *See also* Super-Priority Term Loan Agreement at 35 (SSB_ADVERSARY00002024 – SSB_ADVERSARY00002581). The "Maturity Date" for the New Money Tranche and the Exchange Tranche debt is August 10, 2023.

[52]   Declaration of John Linker, ¶ 50.

[53]   "Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and its Affiliated Debtors," Serta Simmons Bedding, LLC, March 7, 2023 [hereinafter "March 2023 Plan"].

loans in a face amount equal to the full amount of the claims, which are estimated at no less than $197,658,283.[54] The Second Out Debt, with estimated claims of no less than $832,012,999, would receive all of the reorganized common stock of Serta, less the amount given to the legacy First Lien Term Loans (referred to under the plan as the "Non-PTL Claims").[55] The First Lien Term Loans would be classified as Class 5 Non-PTL Claims.[56] The Class 5 Non-PTL Claims would share in a distribution of 1%–4% of the reorganized equity of Serta—1% if Class 5 rejects the plan and 4% if it accepts the plan. The equity distributed under the plan would be subject to dilution for a management incentive plan under which at least 8% of the reorganized Serta's equity would be reserved for Serta management.[57] In the March Disclosure Statement, Serta estimated that the recovery for the Second Out Debt would be between 73.8-75.7% of claim, while the recovery on the Non-PTL Term Loan Claims would be between 0.6-2.4% of claim.[58]

## II.F. The Bank Debt Market

(42)   The bank debt market can be divided into a primary market, in which loans are initially issued and distributed (the "Primary Bank Debt Market"), and a secondary market, in which previously issued loans trade (the "Secondary Bank Debt Market").[59] The loans in the bank debt market are typically syndicated bank loans, meaning there are two or more lenders, and the loans are issued in a face amount more than $100 million.[60]

---

[54]   March 2023 Plan, §4.3(b). ("The FLFO Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code in the aggregate amount of no less than $197,658,283.32. Holders of FLFO Claims and the PTL Agent shall not be required to file proofs of Claim on account of their FLFO Claims." March 2023 Plan, §1.64. FLFO claims are defined as "any Claim arising from, derived from, or in connection to first lien first out term loans held under the PTL Credit Agreement, including any accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto, and all Claims or Causes of Action relating thereto.")

[55]   March 2023 Plan §4.4(b), which states, "The FLSO Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code in the aggregate amount of no less than $832,012,999," and §1.86, which defines Non-PTL Claims as "any Claim arising from or in connection to principal obligations under the Non-PTL Term Loan Agreement, including all accrued and unpaid interest, fees, and other amounts payable pursuant to, and all claims or Causes of Action arising under or in connection with."

[56]   March 2023 Plan, §4.5(a). ("Classification: Class 5 consists of Non-PTL Claims.")

[57]   March 2023 Plan, §4.5(b). ("(i) If Class 5 votes to accept the Plan: Its Pro Rata share of 4% of New Common Interests issued on the Effective Date, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan. (ii) If Class 5 votes to reject the Plan: Its Pro Rata share of 1% of the New Common Interests issued on the Effective Date, subject to dilution by any New Common Interests distributed pursuant to the Management Incentive Plan." Section 1.77 defines "Management Incentive Plan" as "a post-emergence equity-based management incentive plan under which up to eight percent (8%) (or such higher amount as mutually agreed between the Debtors and the Requisite Consenting Creditors on or before the Plan Supplement Date) of the New Common Interests outstanding on a fully diluted basis issued on the Effective Date may be issued to members of the Reorganized Debtors' management on the terms described in Section 5.12 of the Plan.")

[58]   March Disclosure Statement, Summary of Plan Treatment 4-5. The debtor's estimated recovery percentages are based on the mid-point equity value set forth in a valuation analysis attached to the March Disclosure Statement as Exhibit F.

[59]   "Trading on the primary and secondary markets," Vanguard, accessed March 13, 2023, https://investor.vanguard.com/investor-resources-education/online-trading/primary-secondary-market.

[60]   Lee M. Shaiman and Bridget K. Marsh, *The Handbook of Loan Syndications and Trading*, 2nd ed. (New York: McGraw Hill, 2022), 34. Pitchbook, "Leverage Commentary & Data (LCD): Leveraged Loan Primer," published August 24, 2022,

(43)    Leveraged loans are a subset of the bank debt market. They are a type of syndicated loan made to companies with a credit rating below investment grade (i.e., a rating below BBB- or Baa3).[61] Borrowers may issue leveraged loans for "general corporate purposes, [to] refinance an existing loan, [as] part of a recapitalization, finance a leveraged buyout, etc."[62]

(44)    Term loans and revolving facilities are two common financing mechanisms in the leveraged loan market. Term loans provide funds to borrowers at origination and are repaid over the term of the loan. Revolving facilities make funds available to a borrower to draw down and can be repaid and then reborrowed so long as the company stays in compliance with the revolving credit agreement.[63]

(45)    The Primary Bank Debt Market began to develop during the late 1980s during a wave of M&A transactions, particularly leveraged buyouts, which required larger loans than banks had historically underwritten.[64] The Secondary Bank Debt Market had its origins close to 35 years ago, as investment funds, including hedge funds, were formed to invest in distressed companies.[65] These funds pursued investments in the bank debt of distressed borrowers when that debt could be acquired at a discount to its face amount.[66] Certain traditional lenders began to consider selling distressed loans as a means of getting them off the bank's books, rather than working them out and managing them internally, as was done in the past. This period in the late 1980s and into the 1990s marked the beginning of the open market for bank debt trading, and when market conventions in the Secondary Bank Debt Market began to develop.

(46)    Since that time, the Secondary Bank Debt Market has grown significantly, with numerous banks and broker-dealers making markets in Bank Debt (the "Dealers"). Investment vehicles, such as collateralized loan obligations[67] ("CLOs") and floating rate mutual funds, among others, were formed that invested in

---

https://pitchbook.com/news/reports/2022-leveraged-commentary-data-lcd-leveraged-loan-primer at 1.

[61]   SIFMA, "Leveraged Loans Fact Sheet," June 25, 2021, https://www.sifma.org/resources/research/leveraged-loans-fact-sheet/.

[62]   SIFMA, "Leveraged Loans Fact Sheet," June 25, 2021, https://www.sifma.org/resources/research/leveraged-loans-fact-sheet/.

[63]   SIFMA, "Leveraged Loans Fact Sheet," June 25, 2021, https://www.sifma.org/resources/research/leveraged-loans-fact-sheet/.

[64]   Lee M. Shaiman and Bridget K. Marsh, *The Handbook of Loan Syndications and Trading*, 2nd ed. (New York: McGraw Hill, 2022), 408.

[65]   Lee M. Shaiman and Bridget K. Marsh, *The Handbook of Loan Syndications and Trading*, 2nd ed. (New York: McGraw Hill, 2022), 408-409. Mark Campbell and Christoph Weaver, *Syndicated Lending: Practice & Documentation*, 7th ed. (Petersfield, Hampshire: Harriman House, 2019), 19-22.

[66]   For example, one of the first bank debt investments that I recall being involved with was the purchase of Wheeling-Pittsburgh bank debt, which was a distressed steel company that had filed for bankruptcy in 1985. *See* Robert Kearns, "Wheeling-Pittsburgh Steel Files for Chapter 11," *Chicago Tribune*, April 17, 1985. Allison Taylor and Alicia Sansone, *The Handbook of Loan Syndications & Trading: An Introduction to the U.S. Secondary Loan Market*, (New York: McGraw Hill, 2007), 395. ("Since the early 1990s, secondary loan trading has grown at an exponential rate in both the par and the distressed areas, the two main categories of loan trading. While there are several definitions, for the purpose of this introduction, *par trading* is the purchase or sale of loans at or above 90 cents on the dollar; *distressed trading* is the purchase or sale of loans at below 90 cents on the dollar. As Exhibit 6.1 illustrates, trading activity has grown dramatically since the early 1990s, and the types of loans traded have changed over time. In the early 1990's, the little trading that did occur was mostly in distressed loans, reflecting banks' attempts to sell loans that had deteriorated during the downturn.")

[67]   Code of Federal Regulations regarding Open Market CLOs (24 CFR §267.9). ("CLO means a special purpose entity that: (i)

the performing bank debt of mostly highly leveraged companies.[68] The development of these types of investment vehicles added to the breadth and depth of the Bank Debt Market because there were more market participants, more names trading, and greater volume. In 2020, the amount of leveraged loans outstanding was at least $1.2 trillion.[69]

(47)   Unlike the market for publicly traded common stock, the Secondary Bank Debt Market is an over-the-counter ("OTC") market that is dominated by Dealers. OTC trading is done in decentralized markets through dealer networks and executed outside of formal exchanges.[70] In this regard, it is like the market for high yield bonds, which is also largely an OTC market. In recent years, a nascent electronic trading platform has also developed for Bank Debt.[71]

(48)   Today, the Secondary Bank Debt Market is an active market, serving the needs of banks, hedge funds, CLOs, mutual funds, and other parties that invest in and trade bank debt. The daily collective activity of buyers, sellers, and Dealers is what makes the market. The Secondary Bank Debt Market is where investors routinely go to buy or sell Bank Debt in the normal course, and have done so for decades, usually through Dealers.

(49)   Bank Debt Market industry trade associations have grown up around the market including, for example, the Loan Syndications and Trading Association (the "LSTA"). The LSTA was founded in 1995 as the Bank Debt Market grew; its stated mission as it relates to the "open market" for bank debt is to "promote a fair, orderly, efficient, and growing corporate loan market while advancing and balancing the interests of all market participants."[72] Members in the LSTA include market participants such as buyers, sellers,

---

issues debt and equity interests, and (ii) whose assets consist primarily of loans that are securitized assets and servicing assets." )

[68]   National Association of Insurance Commissioners, "Leveraged Bank Loans Primer," accessed March 14, 2023, https://content.naic.org/sites/default/files/capital-markets-primer-leveraged-bank-loans.pdf.

[69]   "US leveraged loans gain 1.35% in December 2020, 3.12% in 2020 after Q4 rebound," S&P Global Market Intelligence, accessed March 16, 2023, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/us-leveraged-loans-gain-1-35-in-december-2020-3-12-in-2020-after-q4-rebound-61949686.

[70]   Meeyeon Park, "Over-The-Counter (OTC)," Corporate Finance Institute, February 23, 2023, https://corporatefinanceinstitute.com/resources/capital-markets/over-the-counter-otc/.

[71]   There is also an electronic trading market for bank debt, although it is less developed, and most trades take place through Dealers. Octaura is an electronic trading platform that announced the completion of their first syndicated loan trade on February 1, 2023. *See* Businesswire, "Octaura Completes First Fully Electronic Syndicated Loan Trades," February 1, 2023, https://www.businesswire.com/news/home/20230201005314/en/Octaura-Completes-First-Fully-Electronic-Syndicated-Loan-Trades. *See also* Catherine Leffert, "Fintech Backed by Citi, BofA Takes on 'Antiquated' Syndicated Loan Trading," American Banker, February 21, 2023, https://www.americanbanker.com/news/fintech-backed-by-citi-bofa-takes-on-antiquated-syndicated-loan-trading. *See also* Bank of America, "Instinct® Loans: A Trading Solution for Syndicated Loans," accessed March 13, 2023, https://business.bofa.com/en-us/content/instinct-loans.html.

[72]   *See* "About," Loan Syndications and Trading Association, accessed March 13, 2023, https://www.lsta.org/about/. ("Thanks to its members, who include a who's who of thought leaders from major firms industry-wide—including buy-side, sell-side, and supporting services (legal, accounting, consulting, technology, analytics, clearing, and settlement)—the LSTA has remained singularly focused on its core mission: to promote a fair, orderly, efficient, and growing corporate loan market while advancing and balancing the interests of all market participants.")

Case 23-09001    Document 88    Filed in TXSB on 03/16/23    Page 24 of 82

and Dealer intermediaries offering to buy and sell on their own behalf (as principal) or on behalf of their clients (as agent).[73] These Dealer intermediaries together form a network of market-makers.

(50)    Typically, every trading day, and oftentimes multiple times a day, a Dealer in the Bank Debt Market sends communications to clients about what bank debt that Dealer is making a market in, what the bid and ask is for the debt, and whether the Dealer has a firm bid or offer or just an indicated level.[74]

(51)    Bank Debt Market practices, including how bank debt trades are documented, have become increasingly standardized. The LSTA provides guidance on bank debt trading documentation and general standards for trading procedures and conduct for market participants.[75] LSTA has developed industry standard trade confirmations for both par bank debt ("Par Bank Debt") and distressed bank debt ("Distressed Bank Debt") that have become part of the fabric of the Bank Debt Market.[76] Among other things, the standard trade confirmations for both Par and Distressed Bank Debt trades provide that bank debt trades settle for cash. The "Purchase Amount" as defined in the Standard Trade Confirmations specifies that the Buyer will pay the Seller an amount in "$" (i.e., US dollars), or an amount based on the currency of the funded principal (in the case of multi-currency commitments).[77] There is no provision in the LSTA Standard Trade Confirmations for payment in anything other than cash. There are also no separate forms or separate conditions for trades directly between lenders and borrowers.

(52)    The Secondary Bank Debt Market is sufficiently developed such that there is an index measuring the performance of the leveraged loan subset of the market, referred to as the LSTA/S&P Leveraged Loan Index. This index tracks the returns that would be earned on a portfolio of leveraged loans.[78]

---

[73]   LSTA, "Members," accessed March 7, 2023, https://www.lsta.org/members/. The LSTA includes over 600 members, including 37 brokers, dealers, or underwriters. Among the full members are Barclays Capital, Deutsche Bank AG, Goldman, Sachs & Co., Jefferies, LLC, PNC Capital Markets, LLC, Santander NA, TD Securities LLC, Wells Fargo, Bank of America Merrill Lynch, Citigroup, Inc., JP Morgan Chase & Co., Morgan Stanley, Scotiabank and Truist Bank.

[74]   This is commonly referred to as communicating what the dealer is "Axed" in, and such communications are commonly called "Axe Sheets." *See* Lee M. Shaiman and Bridget K. Marsh, *The Handbook of Loan Syndications and Trading*, 2nd ed. (New York: McGraw Hill, 2022), 411.

[75]   LSTA, "Legal & Documentation," accessed March 1, 2023, https://www.lsta.org/content/?_industry_sector=legal-documentation.

[76]   *See* LSTA, "Standard Terms and Conditions for Par/Near Par Trade Confirmations," Loan Syndications and Trading Association, Inc., December 1, 2021; LSTA, "LSTA PAR/NEAR PAR TRADE CONFIRMATION," December 1, 2021; LSTA, "Standard Terms and Conditions for Distressed Trade Confirmations," Published by the Loan Syndications and Trading Association, Inc. as of December 1, 2021; LSTA, "LSTA Distressed Trade Confirmation," December 1, 2021 ("Standard Trade Confirmations").

[77]   *See* Standard Trade Confirmations.

[78]   LSTA, "Morningstar LSTA Leveraged Loan Index Analysis," accessed on March 6, 2023, https://www.lsta.org/content/?_industry_sector=morningstar-lsta-leveraged-loan-index-analysis. ("Created by the Leveraged Commentary & Data (LCD) team at S&P Capital IQ, the LSTA provides an overview of the Senior Secured, Floating Rate Leveraged Loan market as well as an expansive review of the S&P Leveraged Loan Index (LLI) and sub-indexes including daily pricing on the S&P/LSTA LLI 100.")

Page 18

## II.G. Open Market Purchase Provisions in Loan Agreements

(53)    Open Market Purchase provisions in loan agreements provide that a borrower may purchase its bank debt in the open market under certain circumstances.[79] The availability and use of Open Market Purchase provisions in loan agreements rose to the forefront during, and in the aftermath of, the 2008 financial crisis, when price levels on syndicated loans in the Secondary Bank Debt Market fell, together with trading levels for financial assets more generally.[80]

(54)    Borrowers sought to opportunistically take advantage of depressed trading prices to retire their debt at a discount to its face amount.[81] These transactions, in which borrowers purchased their own debt, also had the effect of enhancing market liquidity for lenders because they introduced an additional potential buyer into the market—the issuer and/or its private equity sponsor.[82]

(55)    After the financial crisis, while bank loans largely recovered in price, borrowers, and in some cases their private equity sponsor firms, sought to maintain the optionality of being able to opportunistically conduct Open Market Purchases in the future.[83]

(56)    In 2020, certain distressed borrowers, including Serta, Trimark, and Boardriders, took the position that their debt exchange/restructuring transactions were permitted under their loan documents because the transactions were accomplished via Open Market Purchases.[84] Each of these transactions has been challenged in court on the basis that these debt exchange/restructurings/recapitalizations did not constitute Open Market Purchases. The Trimark litigation was ultimately mediated to a settlement after a Motion to

---

[79]    "What's Market: Loan Buybacks USA," Thomson Reuters Practical Law, published December 31, 2021, https://uk.practicallaw.thomsonreuters.com/1-385-9682?transitionType=Default&contextData=(sc.Default)&firstPage=true, 1. ("A discussion of loan buybacks including links to loan buyback provisions in large corporate and middle market credit agreements.") Open Market Purchases are sometimes referred to as "Loan Buybacks."

[80]    *See* "What's Market: Loan Buybacks USA," Thomson Reuters Practical Law, published December 31, 2021, https://uk.practicallaw.thomsonreuters.com/1-385-9682?transitionType=Default&contextData=(sc.Default)&firstPage=true, 1. ("In the initial stages of the financial crisis, loan buybacks became prevalent because syndicated loans were trading at a substantial discount on the secondary market.") *See also,* "Debt Buyback and Liability Management Considerations in a Volatile Market," Shearman & Sterling, accessed March 10, 2023, https://www.shearman.com/en/perspectives/2022/11/debt-buyback-and-liability-management-considerations-in-a-volatile-market.

[81]    Yesha Yadav, "Dismantling Bondholder Rights" (Vanderbilt Law Research Paper No. 19-37, October 21, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3473212, 3-4.

[82]    Lee M. Shaiman and Bridget K. Marsh, *The Handbook of Loan Syndications and Trading*, 2nd ed. (New York: McGraw Hill, 2022), 541-542.

[83]    "What's Market: Loan Buybacks USA," Thomson Reuters Practical Law, published December 31, 2021, https://uk.practicallaw.thomsonreuters.com/1-385-9682?transitionType=Default&contextData=(sc.Default)&firstPage=true, Loan Buybacks After the Financial Crisis, 1. ("As the financial crisis has abated and loan prices no longer trade at such a steep discount to par, loan buybacks have become less prevalent. However, borrowers and sponsors still want the flexibility to conduct loan buybacks should future market conditions warrant it.")

[84]    *See* Seth E. Jacobson et al., "Unhappy Lenders Challenge Aggressive Debt Exchanges," Skadden, January 19, 2022, https://www.skadden.com/insights/publications/2022/01/2022-insights/corporate/unhappy-lenders-challenge-aggressive-debt-exchanges.

Dismiss the plaintiff's claims were largely denied.[85] As with Trimark, Boardriders also moved to have the case against it dismissed, but its motion to dismiss was denied in part in October 2022.[86]

## II.H. Lenders Had Commercially Sensible Reasons for Agreeing to Permit a Borrower to Make Open Market Purchases

(57)    An Open Market Purchase provision in a credit agreement provides a borrower with the option to opportunistically capitalize on a circumstance in which its debt is trading at a discounted price relative to its face claim. For example, where $20 million of a company's bank debt is trading at 50 cents on the dollar, it can purchase that debt at a cost of $10 million and retire the full $20 million.

(58)    Although discounted debt prices do not always mean the borrower is in distress, equity owners of companies in financial distress, such as, for example, a private equity fund holding the equity of the distressed company may decide to inject cash into the borrower so that it can capture the discount at which its bank debt is trading in the market.[87]

(59)    It could be commercially reasonable for a lender to agree in advance in a credit agreement that a company could purchase its debt back at a discount in the open market to the extent it had the available cash to do so if it would not otherwise cause the borrower to breach other provisions of the credit agreement. Among other potential reasons, such opportunistic purchases of debt in the open market at a discount could be credit enhancing for the lenders, as explained below. A lender might also be prepared to agree in advance that a borrower could have the ability to make Open Market Purchases because it could give the lender the opportunity to be a seller in an Open Market Purchase transaction if it wished to sell its position.[88]

(60)    Below, I describe the credit enhancing effects that can be realized for all lenders in a facility, on a *pari-passu* basis, through an Open Market Purchase at a discount.

---

[85]   As part of the Trimark settlement, the legacy first lien debt was exchanged on a dollar-for-dollar basis into the new Tranche B loans that has been issued as part of the company's new Super Senior Credit Agreement. *See* PR Newswire, "TriMark USA Announces Resolution of Litigation With Its Lenders," January 7, 2022, https://www.prnewswire.com/news-releases/trimark-usa-announces-resolution-of-litigation-with-its-lenders-301456561.html. *See also* "Order on Motion to Dismiss," *Audax Credit Opportunities Offshore Ltd., et al. v. TMK Hawk Parent, Corp., et al.,* (Case No. 2021-50794 Supreme Court of New York, August 16, 2021, at 27.

[86]   "Order on Motion to Dismiss," *ICG Global Loan Fund 1 DAC, et al. v. Boardriders, Inc. et al*., October 18, 2022, 25-26.

[87]   *See, e.g.,* Edith S. Hotchkiss, David C. Smith, and Per Stromberg, "Private Equity and the Resolution of Financial Distress" (EGCI Finance Working Paper, July 2021).

[88]   *See* Pitchbook, "Leverage Commentary & Data (LCD): Leveraged Loan Primer," published August 24, 2022, https://pitchbook.com/news/reports/2022-leveraged-commentary-data-lcd-leveraged-loan-primer, at 21. ("Another technique for addressing the issue of distressed debt is the sub-par loan buy-back. This technique grew out of the bear market that began in 2007. Performing paper fell to prices not seen before in the loan market—with many trading south of 70. This created an opportunity for issuers with the financial wherewithal and the covenant room to repurchase loans via a tender, or in the open market, at prices below par.")

### II.H.1. Mathematical Illustration of How an Open Market Purchase Can be Credit Enhancing to Lenders

(61)    To illustrate the credit-enhancing effects to a secured term loan that could result from a typical Open Market Purchase, suppose that Company A has $100 million in a secured term loan and $100 million of assets, at current values ($25 million in cash and $75 million in non-cash assets). Furthermore, suppose that $40 million of Company A's $100 million secured term loan was available for sale in the Bank Loan Market at a price of 50 cents on the dollar.[89]

(62)    The cost to acquire $40 million in term loans at a price of 50 cents on the dollar would be $20 million. As shown in Figure 3 below, if Company A were to use $20 million of its cash to execute an Open Market Purchase of $40 million face amount of debt, then the lenders' loan to value ratio ("LTV") would go from 100% to 75%. LTV is a widely used credit metric.[90] A lower LTV equates to a less risky credit because there is a greater cushion before the loan is impaired.[91]

(63)    Prior to the Open Market Purchase, there is no excess value to cushion the lenders from losses. After the Open Market Purchase there is a $20 million cushion. That means that prior to the Open Market Purchase, any diminution in value of the borrower's assets would lead to an impairment of the credit. After the Open Market Purchase, the value of the assets could decline by $20 million before the lenders would suffer any impairment. Therefore, the bank lenders would collectively be better off by virtue of the company's Open Market Purchases.

(64)    It could be commercially reasonable for lenders to agree to such a provision in advance so that borrowers could opportunistically take advantage of market conditions. This was the case during the period surrounding the 2008 financial crisis, which is when, as discussed, provisions permitting Open Market Purchases became more pervasive.[92]

---

[89]    A price of 50 means the debt is trading at 50 cents on the dollar of the face amount of debt.

[90]    See "Glossary: Loan to Value (LTV)," Thomson Reuters Practical Law, 2023, https://uk.practicallaw.thomsonreuters.com/w-000-6242?transitionType=Default&contextData=(sc.Default)&firstPage=true#:~:text=A%20financial%20term%20commonly%20used,the%20riskiness%20of%20a%20loan. LTV is described as "A financial term commonly used by lenders to describe the ratio of the outstanding principal balance of a loan to the appraised value of the project."

[91]    See "Glossary: Loan to Value (LTV)," Thomson Reuters Practical Law, 2023, https://uk.practicallaw.thomsonreuters.com/w-000-6242?transitionType=Default&contextData=(sc.Default)&firstPage=true#:~:text=A%20financial%20term%20commonly%20used,the%20riskiness%20of%20a%20loan. ("The loan to value is usually expressed as a percentage. Calculating the loan to value helps the lender determine the riskiness of a loan. Loans with a higher loan to value are considered riskier because the borrower has less equity in the project.")

[92]    Seth E. Jacobson et al., "Unhappy Lenders Challenge Aggressive Debt Exchanges," Skadden, January 19, 2022, https://www.skadden.com/insights/publications/2022/01/2022-insights/corporate/unhappy-lenders-challenge-aggressive-debt-exchanges at 1. ("Loan agreement provisions allowing borrowers to repurchase their loans to take advantage of steep debt discounts and restructure their debt became popular in the wake of the financial crisis." Pitchbook, "Leverage Commentary & Data (LCD): Leveraged Loan Primer," published August 24, 2022, https://pitchbook.com/news/reports/2022-leveraged-commentary-data-lcd-leveraged-loan-primer, at 21. "Another technique for addressing the issue of distressed debt is the sub-

**Figure 3: Example of the Credit Enhancing Effect of an Open Market Purchase**

| Asset/Debt | Amount ($ million) | |
|---|---|---|
| | Before Open Market Purchase | After Open Market Purchase |
| Cash | $25 | $5 |
| Non-cash assets | $75 | $75 |
| Total assets | $100 | $80 |
| Total debt | $100 | $60 |
| **LTV ratio** | **100%** | **75%** |

par loan buy-back. This technique grew out of the bear market that began in 2007. Performing paper fell to prices not seen before in the loan market—with many trading south of 70. This created an opportunity for issuers with the financial wherewithal and the covenant room to repurchase loans via a tender, or in the open market, at prices below par. Sub-par buybacks have deep roots in the bond market. Loans didn't suffer the price declines before 2007 to make such tenders attractive, however.")

## III. Opinion #1: To a Market Participant, an Open Market Purchase Would Generally Be Understood to Mean a Purchase of Bank Debt Typically for Cash in the Secondary Bank Debt Market, Conducted at Arm's-Length at or Close to the Prevailing Market Price.[93]

(65)   In this case, Serta contends that the Transaction, which it has characterized as a ███████████ ████████████████████████████████████████ was an Open Market Purchase under the Term Loan Agreement and was therefore permitted.[95] The Participating Majority Lenders similarly argue that the Transaction was permitted under the Open Market Purchase provision but have also referred to the Transaction as a "restructuring."[96]

---

[93]   Unless specifically defined or otherwise specified.

[94]   Dawn Intermediate, LLC, Final Minutes of the Finance Committee of the Board of Managers of Dawn Intermediate, LLC, June 5, 2020, 88425 (SSB_ADVERSARY00088420 – SSB_ADVERSARY00088453). ███████████████████████ ████████████████████████████████████████████████████████████████████████████████████████████
Serta Simmons Bedding, LLC, "Serta Simmons Bedding Enters into Agreement with Majority of Lenders on Deleveraging and Liquidity Enhancing Transaction," June 8, 2020, 5635 (SSB_ADVERSARY00005635 – SSB_ADVERSARY00005636). ("Serta Simmons Bedding, LLC ('SSB' or the 'Company'), the largest manufacturer and distributor of mattresses in North America, today entered into a transaction support agreement with a majority of its First Lien and Second Lien Term Loan Holders to recapitalize the Company.") "Serta Simmons Bedding, LLC's Statement of Uncontroverted Facts in Support of Their Motion For Summary Judgment," *Serta Simmons Bedding, LLC, et al. v. AG Centre Street Partnership L.P., et al.*, February 24, 2023, ¶ 14. ("The Independent Finance Committee voted to approve the recapitalization transaction proposed by the PTL Lenders (the 'Transaction') because it offered the best holistic financing solution for the Company.")

[95]   Serta contends that "…Section 9.05(g) of the Non-PTL Term Loan Agreement unambiguously permits debt-for-debt exchange on a non-pro rata basis as part of an open market transaction." *See* "Adversary Complaint," *Serta Simmons Bedding, LLC, et al. v. AG Centre Street Partnership L.P., et al.,* January 24, 2023, ¶ 6. *See also* "Serta's Motion for Summary Judgment," *Serta Simmons Bedding, LLC et al. v. AG Centre Street Partnership L.P. et al.*, Adv. Proc. No. 23-09001 (DRJ) (Bankr. S.D. Tex.), February 24, 2023 (ECF No. 69), 4-5, 19. Serta further argues the following on pages 4-5: "First, the Term Loan Agreement expressly allows the Company to repurchase debt through either a Dutch Auction or an open market purchase. The Term Loan Agreement is clear that the repurchase of debt facilitated through a Dutch Auction requires that it be open to all lenders, but an open market purchase does not. Here, it is undisputed that the Company engaged in a competitive process to repurchase its debt. It is undisputed that the Company—through its advisors—negotiated with over 70% of its existing Lenders holding approximately $1.719 billion of the $2.314 billion debt and other outside investors before determining—through an independent finance committee—that the PTL Lenders' offer was the best deal for the Company. Such a competitively negotiated process is the definition of an open market purchase under the Term Loan Agreement... the debt-for-debt exchange was effectuated through an open market purchase under the terms of the Term Loan Agreement." On page 19, Serta states that, "In order for the Company to repurchase its debt through an open market purchase, it has to approach individual existing lenders in the open market and negotiate the terms of a repurchase, as it did here."

[96]   Lender Plaintiffs' Motion for Summary Judgment, February 24, 2023 (ECF No. 73), 6. ("The 2020 Transaction—which was the result of arm's length negotiations the Company undertook with both the PTL Lenders and Non-PTL Lenders to obtain the most favorable **restructuring arrangement**—was structured as an open market purchase.") (Emphasis added)

(66)     While the term "open market purchase" appears in the Term Loan Agreement, it is not defined.[97] I have been asked to opine on what a market participant would understand by the term "open market purchase" as it is used in the context of the Term Loan Agreement.[98]

(67)     The "open market purchases" provision in the Term Loan Agreement appears in Section 9.05(g), which states:

> Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) **through open market purchases**, in each case with respect to clauses (A) and (B), without the consent of the Administrative Agent; provided that: (i) any term loans acquired by Holdings, the Top Borrower or any of its Restricted Subsidiaries shall, to the extent permitted by applicable Requirements of Law, be retired and cancelled immediately upon the acquisition thereof; provided that upon any such retirement and cancellation, the aggregate outstanding principal amount of the Term Loans shall be deemed reduced by the full par value of the aggregate principal amount of the Term Loans so retired and cancelled.[99]

(68)     Based on my experiences as a practitioner, and the research I have conducted in connection with this engagement, a debt exchange and financing privately negotiated with certain lenders to the exclusion of others, such as what Serta undertook, would not qualify or be characterized by a market participant as an Open Market Purchase.

## III.A.1. The Open Market Referred to in "Open Market Purchases" is the Secondary Bank Debt Market

(69)     I will first describe what a market participant would understand by the term "open market," a component of the term Open Market Purchase. A market participant would know that there is an "open market" for bank debt. They would understand that the Secondary Bank Debt Market is the "open market" for bank

---

[97]   *See* First Lien Term Loan Agreement at 149-151 and Second Lien Term Loan Agreement at 144-146 (SSB_ADVERSARY00016300 – SSB_ADVERSARY00016735). The term "open market purchase" is used in Section 9.05(g) with respect to Open Market Purchases; however, the term "open market purchase" is uncapitalized and undefined in the First and Second Lien Term Loan Agreements.

[98]   As stated, I offer an industry custom and practice opinion and not a legal opinion. My opinion relates to how the term would be understood by a market participant. I assume the market participant is a reasonable and sophisticated market participant in the bank debt market and is a lender and/or an actual market participant that buys and sells bank debt.

[99]   First Lien Term Loan Agreement at 149-150 and Second Lien Term Loan Agreement at 144 (SSB_ADVERSARY00016300 – SSB_ADVERSARY00016735). Both the First and Second Lien Term Loan Agreements contain the Open Market Purchase provision in Section 9.05. *See* Appendix C for further detail of the Open Market Purchase provisions contained in the First and Second Lien Term Loan Agreements. (Emphasis added.)

debt being referred to in the phrase "open market purchases" (the "Open Market").[100],[101] The Secondary Bank Debt Market is where bank debt is traded. It is where a market participant would go to ascertain pricing levels and/or seek to transact in bank debt.

(70)    Much of the development of the Secondary Bank Debt Market occurred over the course of my career as a distressed debt hedge fund manager, and I was an active participant in the Secondary Bank Debt Market. I conducted countless bank debt trades in this market on behalf of the funds and accounts that I managed.

(71)    If I were interested in buying bank debt, the firm's traders and/or I would survey the Secondary Bank Debt Market to determine which Dealers were making the best markets in the bank debt I was interested in on any given day. The firm's traders and/or I would observe market conditions and price levels in a variety of ways. Dealers would send us Axe Sheets,[102] typically in electronic form, to notify us what they were actively trading and what markets they were merely indicating (meaning they did not have a firm bid or offer but were indicating a level where a bid or offer was likely to be), including how much face amount of debt was bid for or offered. We would also directly inquire of the Dealers as to what could be traded on a given day. I might give a Dealer an indication or a firm bid (also referred to as an order) for bank debt. If a Dealer responded with an offering, I might negotiate to obtain the best price, or I might agree to purchase at the offered price, which is referred to as "lifting" an offering. In all cases, the objective was simple: to buy or sell bank debt, at the best possible price, and to settle the bank debt trade for cash without undue complication and subject to a customary settlement period.

---

[100]   "What's Market: Loan Buybacks USA," Thomson Reuters Practical Law, published December 31, 2021, https://uk.practicallaw.thomsonreuters.com/1-385-9682?transitionType=Default&contextData=(sc.Default), 1. ("Loan buybacks refer to a borrower or its affiliate (including a sponsor) buying back part of the borrower's loan from less than all the lenders in a loan syndicate at less than par value. In the initial stages of the financial crisis, loan buybacks became prevalent because **syndicated loans were trading at a substantial discount on the secondary market**. For example, in the first quarter of 2009, some borrowers could buy back their loans on the secondary market for as little as 65-70 cent on the dollar. This provided a way for the borrower to reduce its debt by paying much less money for the debt that it originally borrowed and to improve its performance under its financial covenants.") (Emphasis added.) *See* "What's Market: Loan Buybacks USA," Thomson Reuters Practical Law, published December 31, 2021, https://uk.practicallaw.thomsonreuters.com/1-385-9682?transitionType=Default&contextData=(sc.Default), 2. ("Unlike Dutch auctions and similar procedures which are offered to the entire lending group, **open market loan buybacks are negotiated directly with one or more individual lenders on the secondary market and carried out through an assignment of loans to the sponsor and/or its affiliates.**") (Emphasis added).

[101]   "Leveraged loans are sold in the secondary market after the primary loan syndication is closed and the credit has been allocated. At that point investors are free to trade the paper. Loan sales are structured as either assignments or participations, with investors usually trading through dealer desks at the large underwriting banks. Dealer-to-dealer trading is almost always conducted through a 'street' broker." Pitchbook, "Leveraged Commentary & Data (LCD): Leveraged Loan Primer," published August 24, 2022, https://pitchbook.com/news/reports/2022-leveraged-commentary-data-lcd-leveraged-loan-primer, at 19. Allison Taylor and Alicia Sansone *The Handbook of Loan Syndications & Trading: An Introduction to the U.S. Secondary Loan Market,* (New York: McGraw Hill, 2007*)*, 395. ("One of the most profound and influential changes in the syndicated loan market over the past years has been the emergence of a true secondary loan trading market. Its development has both supported and spurred the growth of the nonbank lender community, the rise of active portfolio management, and the increase in market participants' ability to sell loans in a downturn, thus allowing banks to clean up their balance sheets far more quickly and efficiently than ever before.")

[102]   This is commonly referred to as communicating what the dealer is "Axed" in, and such communications are commonly called "Axe Sheets." *See* Lee M. Shaiman and Bridget K. Marsh, *The Handbook of Loan Syndications and Trading*, 2nd ed. (New York: McGraw Hill, 2022), 411.

### III.A.2. An Open Market Purchase Is a Transaction Typically for Cash in the Secondary Bank Debt Market at or Close to the Prevailing Market Price Without Special Conditions

(72)    To a market participant, an Open Market Purchase of bank debt occurs when a bank debt purchaser goes to the Secondary Bank Debt Market and makes a purchase.[103] An Open Market Purchase will typically be a cash purchase[104] at or around the prevailing market price with no special conditions.

(73)    As a general rule, a market participant would understand that an Open Market Purchase would be settled for cash—not for new debt or securities issued in exchange. Exchanging bank debt for new securities would be understood to be a debt exchange, not an Open Market Purchase. To the extent there was any exception to this cash for debt protocol, then I would expect to see a provision permitting open market purchases to be consummated with something other than cash described in the relevant loan agreement. I do not see any such provision in the Term Loan Agreement.[105]

(74)    In connection with an Open Market Purchase by a borrower, there would be no additional conditions demanded of either the borrower or the seller. An Open Market Purchase would not be a "but-for" transaction that the borrower would be unwilling to consummate "but for" some other anticipated action or concession on the part of the seller. In addition, in an Open Market Purchase, the borrower would also likely be agnostic about who the seller was, because the only objective in an Open Market Purchase would be to buy back its debt at the largest discount possible and then retire that debt, as would typically be required, the identity of the seller would not matter.

(75)    In general, the price at which the bank debt would trade in an Open Market Purchase among a borrower, the Dealer, and the seller would reflect current market conditions in the Secondary Bank Debt Market. When conducting an Open Market Purchase, it is conceivable that a borrower may have to pay somewhat more for the debt than the prevailing market price of the debt because of the size of the trade and/or because of the availability of bank debt at that time. However, since the point of an Open Market Purchase is for the borrower to capture as much market discount relative to the face amount of the debt as

---

[103]  I do not provide a legal opinion. When I refer to market practitioners here, I am referring to market participants who are the actual buyers and sellers of bank debt. In certain other cases, industry practitioners may also include restructuring financial advisors.

[104]  Allison Taylor and Alicia Sansone *The Handbook of Loan Syndications & Trading: An Introduction to the U.S. Secondary Loan Market,* (New York: McGraw Hill, 2007*)*, 433. ("After the relevant documentation is completed, the parties are ready to close. At this time, the actual purchase and transfer of money for the asset are agreed upon.")

[105]  Shana A. Elberg, Evan A. Hill, and Catrina A.Shea, "Uptier Exchange Transactions Remain in Vogue, Notwithstanding Litigation Risk," Skadden, February 2, 2021, https://www.skadden.com/insights/publications/2021/02/uptier-exchange-transactions. ("Some credit agreements also expressly permit cashless open market purchase transactions… In an uptier exchange transaction, the borrower takes assignment of the participating lenders' existing loans and then issues new superpriority loans to the participating lenders in exchange. The amendment entered into to permit the incurrence of superpriority loans and the subordination of existing loans may also include changes to the open market purchase provision to more clearly permit the contemplated roll-up transaction (e.g., to expressly permit open market purchases below or above par, and for consideration other than cash).")

possible, the more the price paid in the trade starts to diverge from the prevailing market price, the less the transaction will look like an Open Market Purchase. Among other reasons, a substantial premium in the price paid relative to the market price would raise questions about why the borrower was paying such a premium and if there was some "quid pro quo" or special condition associated with the premium being paid.[106]

### III.A.2.a. Mechanical Steps of an Open Market Purchase

(76)    There are several mechanical steps that occur in an Open Market Purchase. An Open Market Purchase would typically include giving a Dealer a bid to buy bank debt or negotiating to buy bank debt that has been offered through a Dealer. In an Open Market Purchase, once a deal on terms to trade the bank debt has been struck, the Dealer will send out a trade confirmation that will be executed by both buyer and seller. The trade confirmation will describe the date of the trade, the debt to be traded, the amount, and the cash price to be paid in settlement, and other terms specific to the trade. As noted, the LSTA has issued Standard Trade Confirmation forms for par and distressed bank debt trades. Those standard forms do not provide for trades to be settled in anything other than cash.[107] In an Open Market Purchase, other than representations and warranties and details about how the trade will settle, there are no other special conditions that would tend to disadvantage other holders of the same instrument or rearrange the priorities of the instrument in the company's capital structure.

(77)    In an Open Market Purchase undertaken by a borrower, one would expect to see a record that the borrower had obtained any internal authorizations that were required for an Open Market Purchase program and documented same. It would be unlikely that reasonable employees of the borrower company would transact in the company's bank debt in the Secondary Bank Debt Market in the absence of documented internal authorization to do so. One also would expect to see a record that the borrower had (1) evaluated the highest price it would be willing to pay; (2) ascertained current market trading prices; (3) identified which of the Dealers would be most likely to be helpful in sourcing the amount of bank debt the borrower wished to obtain through one or more Open Market Purchases; (4) entered an order with a Dealer to buy; (5) taken steps to negotiate the best price; (6) executed an industry standard trade confirmation;[108] (7) negotiated and executed definitive documentation for the trade, which would take the form of a purchase and sale agreement or similar agreement, for which there are also industry standards (a "PSA");[109] and (8) paid cash for the debt.

---

[106]  The dictionary definition of a quid pro quo is "something given or received for something else." Merriam-Webster, s.v. "quid pro quo.," accessed March 11, 2023, https://www.merriam-webster.com/dictionary/quid%20pro%20quo. In a case where a borrower is paying well above market consideration for its bank debt in an open market purchase, the question would be whether the borrower had an expectation of some other additional benefit in addition to simply capturing the discount in its debt.

[107]  *See* Standard Trade Confirmations.

[108]  It would be industry custom and practice to enter a trade confirmation, among other reasons, because the seller would want assurances that it had a trade.

[109]  Lee M. Shaiman and Bridget K. Marsh, The Handbook of Loan Syndications and Trading, 2nd ed. (New York: McGraw Hill,

### III.A.3. An Open Market Purchase Would Not Typically Cause the Price of the Bank Debt to Fall

(78) An Open Market Purchase typically would not cause the price of the debt being purchased to fall. If anything, it would tend to have a positive effect on trading levels because it could be credit enhancing to the borrower, or it could reflect that a private equity sponsor was supporting one of its portfolio companies by infusing the cash used to effectuate the Open Market Purchase.

(79) Nor would an Open Market Purchase alter the pre-existing priorities of debt in a company's capital structure. It would not involve amendments to existing loan documents, the execution of an additional credit facility, or a new intercreditor agreement. It would not cause other holders of the same debt that was previously *pari-passu* to be subordinated in its rights to recovery.[110]

### III.A.4. In an Open Market Purchase, Borrowers Purchase Their Debt for Cash in the Market at a Discount to Face Value

(80) When a borrower makes an Open Market Purchase, it purchases its outstanding debt in the Secondary Bank Debt Market. In 2021, after the Transaction had occurred, Serta reported that it repurchased its First and Second Lien Term Loans at discounts to the face amount of the debt.

(81)

---

2022), 468. ("The most important of the distressed settlement documents is the LSTA's Purchase and Sale Agreement.") Serta signed a Master Assignment and Acceptance Agreement based on the 2016 Credit Agreement in executing the Serta Transaction.

[110] Moody's, "Rating Action: Moody's Views Serta Simmons' Transaction as Distressed Exchange, Downgrades Existing First and Second Lien Term Loans; Outlook Negative," June 11, 2020, https://www.moodys.com/research/Moodys-views-Serta-Simmons-transaction-as-distressed-exchange-downgrades-existing—PR_426243. ("Moody's beleives [sic] that term loan lenders who do not consent to the transaction will potentially be left with little or no remaining collateral coverage in Serta Simmons, as well as in a position that is subordinated to new, higher priority debt.")

[111] Serta Simmons Bedding Report for the three months ending March 27, 2021, at 11 (SSB_ADVERSARY00058983).

[112] Serta Simmons Bedding Report for the three and six months ending June 26, 2021, at 11-12 (SSB_ADVERSARY00060919).

████████████████████████████████████████████████

### III.A.5. While the Term "Open Market" Would Be Well Understood by a Market Participant in the Bank Debt Market, the Term Is Also Used in Other Contexts

#### III.A.5.a. The Meaning and Use of the Term "Open Market" in Various Contexts

(82)    A market participant's understanding as to what the term Open Market Purchase means would be informed by how that term is used in the Bank Loan Market specifically. It would also be informed more generally by how the terms "open market" and "open market purchase" are defined and used across different contexts, including its English dictionary definition, in the financial markets generally, and in the context of business and securities valuation.

(83)    The Oxford English Dictionary defines an open market as "an **unrestricted market** in which **any buyer or seller may trade freely**, and where **prices are determined by supply and demand**."[114] The Oxford definition makes clear that an open market refers to an Open Market for trading assets—which in this case would be the Secondary Bank Debt Market.

(84)    With respect to the Secondary Bank Debt Market specifically, the LSTA describes an Open Market Purchase by a borrower as one that occurs on an open market basis to capture the trading discount in bank debt. LSTA states that:

> [p]rovisions permitting open market purchases were designed to **allow the borrower to delever on an open market basis** and to **take advantage of depressed secondary prices**.[115]

---

[113]   Serta Simmons Bedding Report for the three months ending March 27, 2021, at 5 and 11 (SSB_ADVERSARY00058983). ███████████████████████████████████████████ Serta also recorded a gain associated with the repurchases. Serta Simmons Bedding Report for the three and six months ending June 26, 2021 at 5, 11-12 (SSB_ADVERSARY00060919) ████████████████████████████████████████████████████████████████████████████████████████████████████████████

[114]   Oxford English Dictionary, "Open market," 3rd Edition, 2004. (Emphasis added).

[115]   LSTA, "Liability Management Transactions: Part 2," November 19, 2020, https://www.lsta.org/news-resources/liability-management-transactions-part-2/. (Emphasis added).

(85)   Open Market Purchases are also discussed in the publication Leveraged Commentary & Data ("LCD"), an information resource for market participants in the Secondary Bank Debt Market. In a 2020 publication, LCD stated that:

> Another technique for addressing the issue of distressed debt is the sub-par loan buy-back. This technique grew out of the bear market that began in 2007. Performing paper fell to prices not seen before in the loan market—with many trading south of 70. This **created an opportunity for issuers with the financial wherewithal** and the covenant room to repurchase loans via a tender, **or in the open market**, at prices below par.[116]

(86)   Numerous law firms have issued publications that provide greater context for understanding what a market participant would understand is meant by the term Open Market Purchase. For instance, in the context of discounted purchases of debt securities issued by portfolio companies, Weil, Gotshal & Manges LLP ("Weil") has written:

> An **open market purchase is accomplished through a broker or agent and requires the purchaser to pay a set market price**. Normally, the parties involved in an open market purchase are **not aware of one another's identity**. Conversely, in a privately negotiated purchase, the buyer (acting directly or through an agent) would approach individuals or groups (usually sophisticated, institutional sellers) that own large percentages of the portfolio company's debt securities and purchase the debt securities for a negotiated price.[117]

(87)   This definition of open market purchase highlights that an open market transaction in the loan market takes place through a dealer, is typically anonymous, and is performed on market terms on an arms-length basis without special conditions.[118]

---

[116]   Pitchbook, "Leveraged Commentary & Data (LCD): Leveraged Loan Primer," published August 24, 2022, https://pitchbook.com/news/reports/2022-leveraged-commentary-data-lcd-leveraged-loan-primer. *See* Pitchbook, "About Company," accessed March 2, 2023, https://pitchbook.com/about. *See also* Pitchbook, "About LCD," accessed March 2, 2023, https://pitchbook.com/leveraged-commentary-data. (Emphasis added).

[117]   Weil, "Private Equity Alert: De-Levering Portfolio Companies Through Debt Buybacks—US and UK Perspectives," March 2009, https://www.weil.com/~/media/files/pdfs/Private_Equity_Alert_March_2009.pdf#:~:text=Because%20debt%20is%20trading%20at%20below%20par%20prices%2C,terms%20of%20the%20tax%20and%20securities%20law%20concerns._at 3-4. (Emphasis added).

[118]   For a definition of arms-length, *See* Accounting Tools, "Arm's Length Transaction Definition," December 24, 2022, https://www.accountingtools.com/articles/arms-length-transaction#:~:text=An%20arm%27s%20length%20transaction%20is%20a%20negotiation%20between,differ%20from%20those%20currently%20accepted%20in%20the%20market. An arm's-length transaction is generally understood to mean "…a negotiation between two parties where the parties are not related… there is no undue influence on either party to accept terms that differ from those currently accepted in the market... Since each party is presumed to be acting to maximize its own self-interest, the result should be a price that reflects the market rate." AICPA, "AU-C Section 550 Related Parties," December 15, 2012, 793. ("The preparation and fair presentation of the financial statements requires management to substantiate an assertion included in financial statements that a related party transaction was conducted on terms equivalent to those prevailing in an arm's length transaction… Management's support for the assertion may include the following:

(88)    Other relevant literature also supports the notion that, in an open market transaction, the seller is typically not aware of the buyer's identity. In "Bond Repurchase Objectives and the Repurchase Method Choice" by Hagit Levy and Ron Shalev, published in the Journal of Accounting and Economics, the authors describe the differences between a tender offer and an open market repurchase of bonds as follows: "… a repurchase on the open market is not pre-announced and **bondholders are unaware that the issuing firm is the counterparty** to the transaction"[119]

(89)    The Federal Reserve, which is the central bank of the United States (the "Fed"), issues guidance for open market purchases to establish performance standards for a transparent, active, and competitive market for dealers and their counterparties.[120] The St. Louis Federal Reserve, which is a branch of the Fed serving the Eighth Federal Reserve District (including Arkansas and portions of Illinois, Indiana, Kentucky, Mississippi, Missouri and Tennessee) has provided a definition of the open market highlighting that an open market is one in which dealers freely compete against one another based on price by submitting bids and offers to the Fed.[121] The St. Louis Fed states:

> The term "open market" refers to the fact that the Fed doesn't buy securities directly from the U.S. Treasury. Instead, **securities dealers compete on the open market based on price**, submitting bids or offers to the Trading Desk of the New York Fed through an electronic auction system.[122]

(90)    NASDAQ also provides a definition of "open market" in the context of stock repurchases, highlighting that open market purchases occur at current market prices in the market in competition with other

---

• Comparing the terms of the related party transaction to those of an identical or similar transaction with one or more unrelated parties

• Engaging an external specialist to determine a market value and confirm market terms and conditions for the transaction

• Comparing the terms of the transaction to known market terms for broadly similar transactions on an open market.")

[119] Hagit Levy and Ron Shalev, "Bond Repurchase Objectives and the Repurchase Method Choice," *Journal of Accounting and Economics* 63 (2017): 1. Describing the differences between a tender offer and an open market repurchase: "… a repurchase on the open market is not pre-announced, and bondholders are unaware that the issuing firm is the counterparty to the transaction." (Emphasis added.)

[120] *See* Board of Governors of the Federal Reserve System, "About the Fed," February 21, 2023, https://www.federalreserve.gov/aboutthefed.htm. Cheryl L. Edwards, "Open Market Operations in the 1990s," *Federal Reserve Bulletin* (November 1997): 864, https://www.federalreserve.gov/pubs/bulletin/1997/199711lead.pdf. ("As it always has, the Federal Reserve does require that primary dealers be active and competitive participants in open market operations and that they be consistent and meaningful participants in Treasury auctions. It also requires that primary dealers meet the capital standards of their primary regulators rather than a standard set by the Federal Reserve. In addition, primary dealers must freely and candidly supply the Desk with information on market activity.")

[121] *See* Federal Reserve Bank of St. Louis, "About the Federal Reserve Bank of St. Louis", accessed March 12, 2023, https://www.stlouisfed.org/about-us.

[122] Laura Hopper, "What Are Open Market Operations? Monetary Policy Tools, Explained," Federal Reserve Bank of St. Louis, August 21, 2019, https://www.stlouisfed.org/open-vault/2019/august/open-market-operations-monetary-policy-tools-explained. (Emphasis added.)

investors.[123] With respect to stock repurchases, NASDAQ defines an "open market purchase operation" as follows:

> A systematic program of repurchasing shares of stock in **market transactions at current market prices, in competition** with other prospective investors[124]

(91)   In the paper *Share Repurchases*, author Theo Vermaelen discusses open market repurchases as the most common way for a company to buy back its own stock. Mr. Vermaelen states that:

> There are essentially five ways by which a corporation can repurchase its own shares: (1) Fixed price tender offer, (2) Dutch auction tender offer, (3) **Repurchase in the open market**, (4) Negotiated repurchase from private investors, (5) Repurchase involving derivatives, and,
>
> **The most common way to buy back stock is through an open market share repurchase program**. **In this case, the company instructs a broker to buy some shares on the open market**.[125]

(92)   The SEC has also provided guidance on Open Market Purchases in the context of share repurchases. In this context, the SEC differentiates between Open Market Purchases and off-market transactions. In "Issuer Repurchases: Rule 10b-18 FAQs," the SEC states that:

> [a]n issuer may effect privately negotiated repurchases (which are outside the safe harbor) without jeopardizing the availability of the safe harbor for its **open market repurchases**… Accelerated share repurchase plans and forward contracts are **private (off-market) transactions**. Therefore, they are not eligible for the Rule 10b-18 safe harbor, which applies only to open market purchases.[126]

---

[123]   NASDAQ, Glossary of Stock Market Terms, accessed on March 15, 2023, https://www.nasdaq.com/glossary. ("About the Glossary: Whether you're a new investor or a seasoned pro, it helps to have a solid glossary at your fingertips to provide quick clarification on a particular term or to expand your overall stock market vocabulary. The Nasdaq.com Glossary of financial and investing terms allows you search by term or browse by letter more than 8,000 terms and definitions related to the stock market. It's powered by the Hyper-textual Finance Glossary by Campbell R. Harvey of Duke University.")

[124]   NASDAQ, Glossary, "Open Market Purchase Operation," accessed March 6, 2023, https://www.nasdaq.com/glossary/o/open-market-purchase-operation. (Emphasis added).

[125]   Theo Vermaelen, "Share Repurchases," *Foundations and Trends in Finance*, 1, no. 3 (2005): 5, 10. (Emphasis added). INSEAD: The Business School For The World, "Theo Vermaelen," accessed March 16, 2023, https://www.insead.edu/faculty-research/faculty/theo-vermaelen. ("Theo Vermaelen is a Professor of Finance, the UBS Chair in Investment Banking, endowed in honour of Henry Grunfeld, and the chair of the Finance Area at INSEAD.")

[126]   SEC, "Division of Trading and Markets: Answers to Frequently Asked Questions Concerning Rule 10b-18 ('Safe Harbor' for Issuer Repurchases)," December 2, 2016, https://www.sec.gov/divisions/marketreg/r10b18faq0504.htm. (Emphasis added).

(93)    In describing stock buybacks, the Corporate Finance Institute, an online education platform for finance and investment professionals,[127] differentiates between open market operations and direct negotiations with shareholders. It states that:

> Generally, a **stock buyback can be undertaken using open market operations**, a fixed price tender offer, a Dutch auction tender offer, **or direct negotiation with shareholders**.[128]

### III.A.5.b. The Open Market in a Valuation Context

(94)    The concept of an open market transaction is also widely referenced in valuation literature. It is relevant in the context of performing business and securities valuations because the goal in most valuation engagements is to determine fair market value of an asset ("Fair Market Value"). An open market is a commonly cited component of the definition of Fair Market Value, which is "the most commonly used standard of value" in valuation.[129]

(95)    The standard definition of "Fair Market Value" in the International Glossary of Business Valuation Terms[130] is:

> The price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, **acting at arm's length in an open and unrestricted market**, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.[131]

---

[127]  Clients include Citi, HSBC, Credit Suisse, BlackRock, Deutsche Bank AG, and J.P. Morgan, among others. Corporate Finance Institute, "Homepage," accessed March 13, 2023, https://corporatefinanceinstitute.com/about-cfi/.

[128]  Corporate Finance Institute, "Stock Buyback Methods," December 14, 2022, https://corporatefinanceinstitute.com/resources/management/stock-buyback-methods/. (Emphasis added).

[129]  Gary R. Trugman, *Understanding Business Valuation*, 6th ed. (Portland, OR: Business Valuation Resources, 2022), 107-108. Trugman states, "Probably the most commonly used standard of value is fair market value." According to Trugman, definitions of fair market value contain a component of "exposure for sale on the open market."

[130]  The International Glossary of Business Terms is a glossary of terms developed "[t]o provide guidance to business valuation practitioners by further memorializing the body of knowledge that constitutes the competent and careful determination of value and, more particularly, the communication of how that value was determined." The following organizations have adopted the glossary of terms, among others: American Institute of Certified Public Accountants, American Society of Appraisers, Canadian Institute of Chartered Business Valuators, National Association of Certified Valuators and Analysis ("NACVA"), and the Institute of Business Appraisers. *See* NACVA, "International Glossary of Business Valuation Terms," June 8, 2001, https://www.nacva.com/glossary. *See also* IRS Revenue Ruling discussion of "fair market value", including a measure of valuation which "…may be found in the prices at which the stocks of companies engaged in the same or a similar line of business are selling in a free and open market," IRS Revenue Ruling 59-60, 1959-1 CB 237 — IRC Sec. 2031.

[131]  NACVA, "International Glossary of Business Valuation Terms," published June 8, 2001, https://www.nacva.com/glossary. *See also* Jay E. Fisherman, Shannon P. Pratt, and William J. Morrison, *Standards of Value*, 2nd ed. (New York: John Wiley & Sons, Inc., 2013), 22. (Emphasis added).

(96)  In this context, an "open market" is the place where buyers can assess whether, for any given offer level, another (equally desirable) asset can be substituted for the same level of risk. Under the principle of substitution, in an open market, a buyer would not be willing to pay more for the same bank debt when it could purchase another seller's bank debt at a lower price.[132]

(97)  It is also important to note that a Fair Market Value determination is based on the price that would result in a transaction between a hypothetical buyer and seller, as distinct from a particular buyer, as, for example, in this case, a buyer that has an interest in obtaining amendments to its loan agreements.[133] In the context of valuation, a Fair Market Value determination assumes an open market, meaning there are numerous market participants, as opposed to there being only one buyer.[134] The concept of open market terms is also based on the price that would result in a trade conducted in the open market on an arm's-length basis, where each party is independent of the other.[135]

(98)  In performing a Fair Market Value assessment of a bank loan, the open market would be the Secondary Bank Debt Market, and a hypothetical buyer and seller in an arms-length transaction would trade at a price approximating Fair Market Value for that instrument as of the time of the trade.

(99)  When considered together, these authorities inform what a market participant would understand an Open Market Purchase to be, in addition to the plain meaning of the words. A recapitalization or debt exchange and refinancing transaction is not an Open Market Purchase, as that term would be understood by a reasonable market participant.

---

[132] In the context of the bank debt market, an "equally desirable substitute" could be synonymous with an asset's level of risk. *See* Gary R. Trugman, *Understanding Business Valuation*, 6th ed. (Portland, OR: Business Valuation Resources, 2022), 105-106 and 109. ("The valuation analyst also assumes that a number of similar properties are available in the open market under the principle of substitution. This principle, as previously discussed, is based on the theory that no person will pay more for a property than he or she would have to pay for an equally desirable substitute." "[P]rudent individuals will not pay more for something than they would pay for an equally desirable substitute.")

[133] Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, 6th ed. (New York: McGraw-Hill, 2022), 29. ("Both the buyer and seller are hypothetical parties. Therefore, specific individuals or parties who might have a particular interest in the subject of the appraisal are not considered as potential buyers or sellers. This eliminates elements of emotion or specific tangible benefit (i.e., unique synergies) from being considered in the appraisal. The buyer and the seller are assumed to have an arm's-length relationship, both with respect to each other and the subject interest. In addition, the buyer is generally assumed to be motivated by the profit opportunity implicit in the subject on a stand-alone basis, without considering possible synergistic benefits arising from the combination of the subject with existing or future holdings.")

[134] *See* Gary R. Trugman, *Understanding Business Valuation*, 6th ed. (Portland, OR: Business Valuation Resources, 2022), 108-109.

[135] "Re: Notice of Proposed Rulemaking, Credit Risk Retention," Loan Syndications and Trading Association, September 2, 2011, https://www.federalreserve.gov/SECRS/2011/September/20110919/R-1411/R-1411_090211_87667_533194746754_1.pdf, 4.

# IV. Opinion #2: The Transaction Was Not an Open Market Purchase, as That Term would Be Understood by a Market Participant. It Was a Privately Negotiated Debt Exchange and Financing.

(100)    The Transaction was not an Open Market Purchase as that term would be understood by a market participant. While the actions Serta took may have been the result of a negotiation, that does not make what Serta did an Open Market Purchase.

## IV.A. The Solicitation of Debt Restructuring Proposals from Lenders Does Not Constitute an Open Market Purchase

(101)    In its Brief in Support of its Motion for Summary Judgment, Serta has described why it believes that the Transaction constituted an Open Market Purchase. Serta states that:

> …it is undisputed that the Company engaged in a competitive process to repurchase its debt. It is undisputed that the Company—through its advisors—negotiated with over 70% of its existing Lenders holding approximately $1.719 billion of the $2.314 billion debt and other outside investors before determining—through an independent finance committee —that the PTL Lenders' offer was the best deal for the Company. **Such a competitively negotiated process is the definition of an open market purchase under the Term Loan Agreement**.[136]

(102)    I first note that, despite Serta's chosen nomenclature, in which it describes what it did as a "repurchase [of] its debt," in substance, Serta did not repurchase its debt.[137] I have seen no evidence that Serta purchased any debt—I have seen no proposal made to the company's Finance Committee for a debt repurchase program, no internal Serta authorization for a debt repurchase program, no evidence of engagement with any Dealer, no trade confirmation evidencing a trade at the market price, and no cash payment to settle a purchase. Serta's June 2020 Press Release announcing the Transaction did not describe it as a repurchase of debt.[138]

---

[136] "Serta Simmons Bedding LLC's Motion for Summary Judgment," *Serta Simmons Bedding, LLC, et al. v. AG Centre Street Partnership L.P., et al.*, February 24, 2023, 4, 19. ("In order for the Company to repurchase its debt through an open market purchase, it has to approach individual existing lenders in the open market and negotiate the terms of a repurchase, as it did here.") (Emphasis added).

[137] "Serta Simmons Bedding LLC's Motion for Summary Judgment," *Serta Simmons Bedding, LLC, et al. v. AG Centre Street Partnership L.P., et al.*, February 24, 2023, at 4. ("Here, it is undisputed that the Company engaged in a competitive process to repurchase its debt.")

[138] *See* Serta Simmons Bedding, LLC, "Serta Simmons Bedding Enters into Agreement with Majority of Lenders on Deleveraging and Liquidity Enhancing Transaction," June 8, 2020 (SSB_ADVERSARY00005635 –

(103)   Instead, Serta restructured its balance sheet by exchanging old debt for new debt of a different type and face amount, and with different terms. Specifically, Serta exchanged First Lien Term Loans and Second Lien Term Loans in a combined face amount of approximately $1.291 billion for a $851 million face amount of the Exchange Tranche. Among other differences, the Exchange Tranche had a shorter maturity date[139] and a 4% higher coupon than the First Lien Term Loans.[140]

(104)   A market participant would not only recognize what an Open Market Purchase is but would also recognize what it is not. In the excerpt quoted above, Serta states that "…a competitively negotiated process is the definition of an open market purchase." Contrary to Serta's assertion, the "open market" for debt restructuring proposals is not the equivalent of an Open Market Purchase.[141]

(105)   There is nothing in my experience as a practitioner that would support the notion that a debt exchange and/or financing transaction could properly be characterized as an Open Market Purchase. Nor am I aware of any authorities or publications in connection with my research for this engagement that would suggest that, at the time the Term Loan Agreement was entered in 2016, market participants would have thought the Open Market referred to in Open Market Purchases could refer to the "open market" for debt exchange or financing proposals.[142]

(106)   While the process that Serta is describing in the excerpt above may include the word "market," it was not an Open Market Purchase.[143] Serta also notes that it engaged in a competitive market process prior to

---

SSB_ADVERSARY00005636).

[139]  Super-Priority Term Loan Agreement at 35 (SSB_ADVERSARY00002024 – SSB_ADVERSARY00002581). ("'Maturity Date' means (a) August 10, 2023." First Lien Term Loan Agreement at 37. "'Initial Term Loan Maturity Date' means the date that is seven years after the Closing Date.") Second Lien Term Loan Agreement at 37 (SSB_ADVERSARY00016300 – SSB_ADVERSARY00016735). ("'Initial Term Loan Maturity Date' means the date that is eight years after the Closing Date.") The First Lien Term Loans were set to mature in November 2023 and the Second Lien Term Loans in November 2024, respectively.

[140]  Super-Priority Term Loan Agreement at 4 (SSB_ADVERSARY00002024 – SSB_ADVERSARY00002581). ("'Applicable Rate' means, for any day, with respect to any LIBO Rate Loan, 7.50% per annum, and with respect to any ABR Loan, 6.50% per annum.") First Lien Term Loan Agreement at 4. ("'Applicable Rate' means, for any day, with respect to any LIBO Rate Loan, 3.50% per annum, and with respect to any ABR Loan, 2.50% per annum.") There is a 4% difference for both the LIBO and ABR rates between the Super-Priority Term Loan Agreement and the First Lien Term Loan Agreement.

[141]  *See* Apostolos Ath. Gkoutzinis, *Law and Practice of Liability Management* (Cambridge: Cambridge University Press, 2014), 60-61, 196. Open market purchases are described separately and have different common trends, including more negotiability of private transactions. *See* related concept in the context of share repurchases in PIMCO, Corporate & Income Strategy Fund: Prospectus Supplement, December 27, 2022. ("If the Common Shares were to trade at a substantial discount to NAV for an extended period of time, the Board of Trustees may consider the repurchase of its Common Shares **on the open market or in private transactions**, the making of a tender offer for such shares or the conversion of the Fund to an open-end investment company.") (Emphasis added).

[142]  As part of my research, I investigated whether any industry expert has previously rendered an opinion that is in the public domain relating to how a market participant would understand the term Open Market Purchase in the context of a loan agreement. I am aware of none.

[143]  What Serta is describing is that it conducted a "market test" for a debt restructuring and capital infusion, by entering into discussions with multiple parties (a "Market Test"). In the context of bankruptcy, Title 11 Bankruptcy code section 363(b) sales provide for expedited bankruptcy filings and sales. The following fall 2010 paper proposes additional safeguards in form of a market test for these expedited sales. *See* Gennady Zilberman, "Bankruptcy Section 363(b) Sales: Market Test Procedures and Heightened Scrutiny of Expedited Sales May Prevent Abuses and Safeguard Creditors without Limiting the Power of the Courts," *Brooklyn Journal of Corporate, Financial & Commercial Law* 5, no. 1 (Fall 2010): 242-243.

finalizing the terms of the Transaction.[144] Debt restructurings and financings for distressed companies can require various types of negotiations, and those negotiations can be ongoing and competitive with multiple parties simultaneously. That does not make a debt restructuring and financing an Open Market Purchase.

## IV.B. An Open Market Purchase Is Based on the Prevailing Market Price That Captures the Then Current Discount, Not a Price "Agreed To" by Serta and the Participating Majority Lenders

(107)    In its Amended Adversary Complaint, filed on February 14, 2023, Serta provides a variation on its definition of "open market." Serta states that:

> In the context of a loan repurchase, "open market" means the price that a willing buyer and a willing seller are able to obtain in an arms-length negotiation—in other words, the price that Serta Simmons Bedding and any lender agreed to in the "open market."[145]

(108)    Serta's purported definition of "open market" in the excerpt above is inconsistent with how a market participant would understand that term, and it is misleading. To begin, Serta says that the "open market" is a price.[146] An "open market" is not a price, it is a market—in this context, it is the Secondary Bank Debt Market.

---

Zilberman states, "This note proposes a robust market test for § 363(b) sales that requires: 1) disclosure of sales terms; 2) adequate time for market players to bid on the asset; and 3) centralized review of competing bids." *See also* Dominik Skauradszun, "Restructuring Companies During and After the Covid-19 Pandemic: A Law & Economics Approach," *Nottingham Insolvency and Business Law e-Journal* 9, (2019): 20. ("The prospects of satisfaction of the parties affected by the restructuring in the event of a sale as a going concern can be reliably assessed as an alternative scenario especially if the market has been asked to submit an offer (market test). Therefore, in principle, the market is to be consulted, whereby a selection of suitable purchasers may be approached confidentially, and an offer requested.") *See also* Marti P. Murray, "Assessing the Reasonableness of Rights Offerings Raising Exit Financing in the Context of a Chapter 11 Bankruptcy Proceeding," *Expert Guide, Bankruptcy & Restructuring* (New York: The Brattle Group, 2019), https://www.brattle.com/wp-content/uploads/2021/05/16777_assessing_the_reasonableness_of_rights_offerings_raising_exit_financing_in_the_context_o f_a_chapter_11_bankruptcy_proceeding.pdf. ("Did the Debtor Conduct a Market Test: Did the debtor go out into the market and evaluate other options to emerge from bankruptcy, including potentially engaging in any M&A processes that might have established a range of valuations, or did the debtor explore an alternative capital raise or rights offering proposal from a qualified alternative backstop party? A debtor who performs a market test and makes disclosures to parties in interest is providing more transparency to the parties so that they can assess the reasonableness of the rights offering terms before them. In approximately 50% of the rights offerings observed, debtors did not explicitly disclose whether any type of market test was conducted.")
A Market Test occurs when a party exposes something, including, for example, an asset, a company, or the terms for a deal, to the market. Serta is attempting to equate the concept of performing a Market Test to secure the best possible deal for a debt restructuring agreement and a capital infusion with an Open Market Purchase of bank debt. A Market Test is a different concept than an Open Market Purchase, as that term would be understood by a market participant.

[144] "Amended Adversary Complaint," *Serta Simmons et al. v. AG Centre Street Partnership L.P., et al.* (ECF No. 38), February 14, 2023 [hereinafter "Amended Adversary Complaint"], at ¶ 38.

[145] Amended Adversary Complaint at ¶ 49.

[146] Amended Adversary Complaint at ¶ 49.

(109) Serta's understanding of "open market" in the excerpt above also appears to borrow certain terms from valuation literature relating to the determination of Fair Market Value. For instance, in its explanation as to why the Transaction qualifies as an Open Market Purchase, Serta references terms including (1) the open market; (2) a willing buyer and willing seller; and (3) an arms-length transaction.[147] These are concepts that appear in widely accepted definitions of Fair Market Value, as previously discussed.

(110) The price that Serta would have agreed to if it were truly making an Open Market Purchase would have been the price that would have captured the market discount (relative to the face amount of the debt) without a premium to the then current trading level, which was around 43 cents on the dollar for the First Lien Term Loans on June 8, 2020, and 21 cents on the dollar for the Second Lien Term Loans on May 11, 2020.[148] Capturing as much discount in the debt as possible would be consistent with the purpose of an Open Market Purchase and would typically have a credit enhancing effect on *pari-passu* lenders.

(111) But Serta did not purchase the First Lien or Second Lien Debt at or around prevailing market prices. In addition to the fact that Serta did not purchase, did not do a trade and did not pay cash, it *exchanged* the Participating Majority Lenders' First Lien Term Loans for new Exchange Tranche debt at a rate of 74 cents on the dollar for each dollar of legacy debt,[149] which does not appear to bear any type of expected relationship to the open market price that Serta is apparently referring to in the excerpt above. Prior to the Transaction, Serta's Second Lien Term Loans had been trading near 21 cents on the dollar.[150] Serta exchanged the Participating Majority Lenders' Second Lien Term Loans for Exchange Tranche debt at a rate of 39 cents on the dollar for each dollar of Second Lien Term Loans,[151] which also does not appear to bear any type of expected relationship to the open market price at the time. The Transaction also had a negative credit effect for the Non-Participating Minority Lenders, as illustrated by the fact that immediately following the announcement of the Transaction, both S&P and Moody's downgraded Serta's existing First and Second Lien Loans that were subject to the Term Loan Agreement.[152] Similarly, the

---

[147] Amended Adversary Complaint, ¶ 49. "In the context of a loan repurchase, 'open market' means the price that a willing buyer and a willing seller are able to obtain in an arms-length negotiation—in other words, the price that Serta Simmons Bedding and any lender agreed to in the 'open market.'"

[148] Bloomberg First Lien Term Loan Prices. Prices are quoted using "PX_LAST". Dawn Intermediate, LLC, Final Minutes of the Finance Committee of the Board of Managers of Dawn Intermediate, LLC, June 9, 2020 (SSB_ADVERSARY00088417) ██████████████████████████████████████████████████████████

[149] Exchange Agreement, 4. *See* footnote 148. Similarly, Serta's Second Lien Debt was trading at prices in the low 20s immediately prior to the Transaction but did not pay that price either; Serta allowed the Participating Majority Lenders to exchange their existing Second Lien Debt for new priority debt at a rate of 39 cents on the dollar.

[150] Dawn Intermediate, LLC, Final Minutes of the Finance Committee of the Board of Managers of Dawn Intermediate, LLC, June 9, 2020 (SSB_ADVERSARY00088417) ████████████████████████████████████████ ████████████████████████████

[151] Exchange Agreement, 4.

[152] S&P Global Ratings, "Serta Simmons Bedding LLC Downgraded To 'SD' From 'CC' On Completion of Distressed Debt Exchange," June 23, 2020, https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2467049. Moody's, "Rating Action: Moody's views Serta Simmons' transaction as distressed exchange, downgrades existing first and second lien term loans; outlook negative," June 11, 2020, https://www.moodys.com/research/Moodys-views-Serta-Simmons-transaction-as-distressed-exchange-downgrades-exist—g--PR_426243. Specifically, S&P Global Ratings downgraded the existing First Lien Loan to "D" from "CC", and Second Lien Loan "D" from "C". Moody's downgraded the existing First

market responded to the credit-impairing nature of the Transaction, as reflected in the existing First Lien Loan price—by the date of the Transaction closing on June 22, 2020, the First Lien Loan price dropped by over 17 points, from 43 to 26, representing a 40% decline in value.[153]

(112)    In the excerpt above of Serta's description of open market, Serta makes reference to the term "arms-length" but fails to specify what it means by the term. In the valuation context, arm's-length terms means "…a negotiation between two parties where the parties are not related… there is no undue influence on either party to accept terms that differ from those currently accepted in the market.... Since each party is presumed to be acting to maximize its own self-interest, the result should be a price that reflects the market rate."[154] There are no other special conditions attached in connection with a transaction conducted at arm's length.[155]

(113)    Serta's willingness to pay more than the market price for the debt indicates that the Transaction was not an arm's-length transaction. It suggests that Serta was willing to enter into the transaction because it was receiving added benefits in the transaction, among other things, in the form of additional financing.[156]

---

Lien Loan to "Ca" from "Caa3", and Second Lien Loan to "C" from "Ca".

[153]   Blomberg First Lien Term Loan Prices. Prices are quoted using "PX_LAST".

[154]   Accounting Tools, "Arm's Length Transaction Definition," December 24, 2022, https://www.accountingtools.com/articles/arms-length-transaction#:~:text=An%20arm%27s%20length%20transaction%20is%20a%20negotiation%20between,differ%20from%20those%20currently%20accepted%20in%20the%20market. *See also* AICPA, AU-C Section 550 Related Parties, December 15, 2012, 793. The AICPA states, "The preparation and fair presentation of the financial statements requires management to substantiate an assertion included in financial statements that a related party transaction was conducted on terms equivalent to those prevailing in an arm's length transaction… Management's support for the assertion may include the following:
• Comparing the terms of the related party transaction to those of an identical or similar transaction with one or more unrelated parties
• Engaging an external specialist to determine a market value and confirm market terms and conditions for the transaction
• Comparing the terms of the transaction to known market terms for broadly similar transactions on an open market."

[155]   Corporate Finance Institute, "Arm's Length Transaction," December 13, 2022, https://corporatefinanceinstitute.com/resources/valuation/arms-length-transaction/. ("Due to both parties acting independently and in their self-interest, an arm's length transaction is a transaction that closely matches the fair market value of the consideration.")

[156]   Adversary Complaint, ¶ 48. "To effectuate the Transaction, Serta Simmons Bedding and the PTL Lenders, who held more than 50% of the outstanding loans under the Non-PTL Term Loan Agreement (the 'Required Lenders' under the Non-PTL Term Loan Agreement), first entered into certain permitted amendments to the Non-PTL Term Loan Agreement to allow the PTL Loans to have senior payment priority." "Serta Simmons Bedding LLC's Motion for Summary Judgment," *Serta Simmons Bedding, LLC, et al. v. AG Centre Street Partnership L.P., et al.*, February 24, 2023, 8. ("On the other hand, the Transaction provided for a new super-priority term loan facility with two tranches: (i) a $200 million new money tranche and (ii) a debt-for-debt exchange tranche, pursuant to which approximately $875 million of priority terms loans were issued as consideration for the open market purchase of approximately $1.2 billion of First and Second Lien Term Loans. … The Transaction reduced the Company's debt by approximately $400 million, lowered the Company's all-in interest expense, created new collateral for the benefit of all Lenders including Defendants, and increased the Company's cash position to $300 million.")

## IV.C. The Transaction Bears the Hallmarks of a Traditional Debt Exchange and Financing

(114)    As described by Serta, the Transaction bears the hallmarks of a privately negotiated debt exchange and financing, as opposed to an Open Market Purchase. In pursuing a privately negotiated debt exchange and financing, Serta (1) engaged restructuring advisers (Evercore) and counsel (Weil); (2) solicited and negotiated proposals with multiple parties;[157] (3) prepared and negotiated term sheets with different groups to restructure its balance sheet and obtain additional funding;[158] (4) entered into a "transaction support agreement"[159]; (5) issued a press release describing the Transaction as one to "recapitalize" the company via an exchange of debt, and the provision of new capital[160]; and (6) documented and closed a complex restructuring transaction that included a debt exchange, a new financing, and the re-ordering of priorities in the capital structure.[161]

(115)    Based on my review of the evidence, I have seen nothing to indicate that Serta referred to what it was doing as an Open Market Purchase, at least not prior to the onset of this litigation.[162] Instead, the evidence

---

[157]    *See* "Serta Simmons Bedding LLC's Motion for Summary Judgment," *Serta Simmons Bedding, LLC, et al. v. AG Centre Street Partnership L.P., et al.*, February 24, 2023, 4 ("…it is undisputed that the Company engaged in a competitive process to repurchase its debt. It is undisputed that the Company—through its advisors—negotiated with over 70% of its existing Lenders holding approximately $1.719 billion of the $2.314 billion debt and other outside investors before determining—through an independent finance committee —that the PTL Lenders' offer was the best deal for the Company.") *See also* "Serta Simmons Bedding LLC's Statement of Uncontroverted Facts in Support of Their Motion for Summary Judgement," *Serta Simmons Bedding, LLC, et al., v. AG Centre Street Partnership L.P.*, February 24, 2023, ¶ 11. ("Evercore also solicited proposals from and negotiated with lenders outside of the Company's capital structure, as well as with other of the Company's existing lenders, including Barings LLC ('Barings'), Oaktree Capital Management ('Oaktree'), and Sixth Street Partners ('Sixth Street').")

[158]    "Serta Simmons Bedding LLC's Motion for Summary Judgment," *Serta Simmons Bedding, LLC, et al. v. AG Centre Street Partnership L.P., et al.,* February 24, 2023, 8 ("The Company's advisors presented the two competing offers to a newly-formed Independent Finance Committee appointed by the Board to consider, evaluate, and ultimately approve a restructuring transaction for the Company.")

[159]    Footnote 158. *See* Exchange Agreement; First Lien Intercreditor Agreement; Super-Priority Term Loan Agreement.

[160]    Serta Simmons Bedding, LLC, "Serta Simmons Bedding Enters into Agreement with Majority of Lenders on Deleveraging and Liquidity Enhancing Transaction," June 8, 2020 (SSB_ADVERSARY00005635 – SSB_ADVERSARY00005636). ("Serta Simmons Bedding, LLC ('SSB' or the 'Company'), the largest manufacturer and distributor of mattresses in North America, today entered into a transaction support agreement with a majority of its First Lien and Second Lien Term Loan Holders to recapitalize the Company.")

[161]    *See* Exchange Agreement. *See also* Master Assignment and Acceptance (SSB_ADVERSARY00001279 – SSB_ADVERSARY00001359). Serta also signed a Master Assignment and Acceptance Agreement based on the Term Loan Agreement in executing the Transaction.

[162]    The first reference in the materials I have reviewed that Serta makes to "open market" in context of the Transaction is on June 16, 2020, after litigation commenced on June 11, 2020. Notably, Serta did not use the term "open market purchase" on June 16, 2020, rather referenced Section 9.05(g), which contains the "open market purchase" provision: "Moreover, the Credit Agreement expressly permits the $1.2 billion debt-to-debt exchange on a non-pro rata basis as part of an **open market transaction.** *See* Ex 1, Section 9.05(g) ("[A]ny Lender may, at any time assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender [defined to include SSB] on a non-pro rata basis. . .through **open market purchases**. . .without the consent of the Administrative Agent.")." "Serta Simmons Bedding, LLC's Memorandum of Law in Opposition to Plaintiffs' Application for a Temporary Restraining Order, a Preliminary Injunction, and Expedited Discovery," *North Star Debt Holdings, L.P., et al. v. Serta Simmons Bedding, LLC,* June 16, 2020, 10 (Emphasis added). The first time I see Serta use the term "open market purchase" is in a June 19, 2020 board meeting presentation in which Serta adopts resolutions to execute the Transaction: ████████████████████████████████████████████ Final Minutes of the Finance Committee of the Board of

demonstrates that Serta contemporaneously referred to what it was doing as ████████████████ ████████████████████████████████████████████████

(116)   Serta's advisors, who were both sophisticated and experienced in advising distressed companies, used the same terminology █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

(117)   I have reviewed term sheets and presentations prepared by Evercore and Weil, and communications from Serta in connection with the Transaction, dated between March 20, 2020, and June 9, 2020, to assess whether the parties considered themselves to be negotiating an Open Market Purchase.[165] The evidence that I have reviewed to date shows that, prior to June 11, 2020, or the date litigation related to the Transaction commenced, Serta, Evercore, and Weil did **not** refer to what they were doing as an Open Market Purchase.[166] I would assume that if the parties contemporaneously thought that an Open Market Purchase would figure into what Serta was doing, then that would have been reflected in the presentations and communications by the parties at that time.

(118)   I conducted a search of the documents I have reviewed to date, for certain terms. The terms "open market," "open market purchase," "open market transaction" and "dealer" do not appear in any of the term sheets, internal presentations, or communications about the Transaction, prior to June 11, 2020, the date litigation related to the Transaction commence ███ Conversely, terms characterizing the transaction as a debt exchange (e.g., ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

---

Managers of Dawn Intermediate, LLC, June 9, 2020, at 10 (SSB_ADVERSARY00088397– SSB ADVERSARY00088346).

[163] Serta Simmons Bedding, "Serta Simmons Bedding Enters into Agreement with Majority of Lenders on Deleveraging and Liquidity Enhancing Transaction," June 8, 2020 (SSB_ADVERSARY00005635 – SSB_ADVERSARY00005636). ("Serta Simmons Bedding, LLC ('SSB' or the 'Company'), the largest manufacturer and distributor of mattresses in North America, today entered into a transaction support agreement with a majority of its First Lien and Second Lien Term Loan Holders to **recapitalize** the Company.") (Emphasis added.) Dawn Intermediate, LLC, Final Minutes of the Finance Committee of the Board of Managers of Dawn Intermediate, LLC, June 9, 2020 (SSB_ADVERSARY00088397 – SSB_ADVERSARY00088419) ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Dawn Intermediate, LLC, Final Minutes of the Finance Committee of the Board of Managers of Dawn Intermediate, LLC, June 5, 2020 (SSB_ADVERSARY00088425). ████████████████████████████████████████████████████████ Dunn Group.") (Emphasis added).

[164] Dawn Intermediate, LLC, Final Minutes of the Finance Committee of the Board of Managers of Dawn Intermediate, LLC, June 5, 2020 (SSB_ADVERSARY00088425). ██████████████████████████████████████████████ ████████████████████████████████████████

[165] Go to Appendix B.2.a for the full list of documents reviewed.
[166] Go to Appendix B.2.a for the full list of documents reviewed.
[167] Go to Appendix B.2.a for the full list of documents reviewed.
[168] Go to Appendix B.2.a for the full list of documents reviewed.

(119)    I note that the evidence I have reviewed to date indicates that the Finance Committee of the Board of Directors was required to approve the Transaction before it could proceed.[169] I have seen no evidence of a presentation to the Finance Committee, prior to June 11, 2020, the date litigation related to the Transaction commenced, that described the transaction as an Open Market Purchase. To the contrary, as is evident from the word search and review that I performed, the Transaction was referred to by Serta, Weil, and Evercore, as a ███████████████████████████' which is a reasonable characterization because that is what the Transaction was.[170]

(120)    Nor did the ratings agencies view the Transaction as including an Open Market Purchase. S&P and Moody's both characterized the Transaction as a "distressed debt exchange" or "distressed exchange" in press releases following the announcement of the Transaction. On June 11, 2020, three days after the announcement of the Transaction, Moody's announced that "Moody's views Serta Simmons' transaction as distressed exchange, downgrades existing first and second lien loans."[171] On June 23, 2020, one day after the Transaction was executed, S&P similarly announced that "Serta Simmons Bedding LLC Downgraded To 'SD' From 'CC' On Completion Of Distressed Debt Exchange."[172] S&P and Moody's

---

[169]  Dawn Intermediate, LLC, "Final Minutes of the Finance Committee of the Board of Managers of Dawn Intermediate, LLC," June 5, 2020 (SSB_ADVERSARY00088425). ████████████████████████████████████████████████████████████████████████████████ "Serta Simmons Bedding, LLC's Statement of Uncontroverted Facts in Support of Their Motion For Summary Judgment," *Serta Simmons Bedding, LLC, et al. v. AG Centre Street Partnership L.P., et al.,* February 24, 2023, ¶8-9. ████████████████████████████████████████████████████████████████

[170]  Dawn Intermediate, LLC, "Final Minutes of the Finance Committee of the Board of Managers of Dawn Intermediate, LLC", June 5, 2020 (SSB_ADVERSARY00088425). ████████████████████████████████████████████████████████████████

[171]  "Moody's Views Serta Simmons' Transaction as Distressed Exchange, Downgrades Existing First and Second Lien Term Loans; Outlook Remains Negative," Moody's Investors Service, June 11, 2020, https://www.moodys.com/research/Moodys-views-Serta-Simmons-transaction-as-distressed-exchange-downgrades-existing--PR_426243. Wording stating that loans were exchanged "at a significant discount to par" is explicitly mentioned in a later press release by Moody's on July 8. "Moody's Assigns Ratings to Serta Simmons' New Term Loans; Affirms Caa3 CFR," Moody's Investors Service, July 8, 2020, https://www.moodys.com/research/Moodys-assigns-ratings-to-Serta-Simmons-new-term-loans-affirms--PR_427554. ("As noted in our June 11 press release, Moody's views the transactions as a distressed exchange default given the exchange of a material amount of debt into new term loans at a significant discount to par.") Neither of these press releases refer to this exchange as, or even mention an "open market purchase."

[172]  "Serta Simmons Bedding LLC Downgraded to 'SD' from 'CC' on Completion of Distressed Debt Exchange," S&P Global Ratings, June 23, 2020, https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2467049. "S&P Global Ratings views the transaction as a distressed exchange because of the company's weak performance, existing lenders are receiving less than they were originally promised, and the unexchanged debt will be placed in a less-favorable payment position." This article does not mention anything about the "open market."

continued to refer to the Transaction as a "distressed debt exchange" or a "debt exchange" in later write-ups and did not refer to it as containing any element of an Open Market Purchase.[173],[174]

(121)    Both Moody's and S&P contemporaneously noted that, in the scheme of Serta's debt structure, existing lenders not consenting to the Transaction (Non-Participating Minority Lenders) would have a compromised position. On June 11, 2020, Moody's noted that term loan lenders that did not participate in the Transaction would have very little collateral coverage in Serta and would have a subordinated position compared to the new loans.[175] On July 8, 2020, Moody's added that Non-Participating Minority Lenders would be "in a position that is subordinated in payment priority—though equal in lien priority—to the new term loans."[176] Similarly, on June 23, 2020, S&P noted that lenders holding unexchanged debt would be faced with a "less-favorable payment position."[177]

(122)    Similarly, Serta's June 2020 Press Release, issued in connection with the Transaction, made no reference to Serta having undertaken Open Market Purchases, nor did it mention that it had any intention of doing so. Instead, the June 2020 Press Release described the Transaction as a transaction undertaken to

---

[173]   "Serta Simmons Bedding LLC Rating Lowered to 'CCC-' on Near-Term Debt Maturities; Outlook Negative," S&P Global Ratings, August 31, 2022, https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2886863. ("SSB has a track record of restructuring transactions. In June 2020, SSB completed a recapitalization that allowed for new money super-priority debt and a debt exchange. We viewed the transactions as tantamount to a selective default because they involved debt exchange at a discount, whereby existing lenders received less than originally promised, as well as a shift in priority debt, resulting in a less favorable position for certain existing lenders.")
        "Moody's Assigns Ratings to Serta Simmons' New Term Loans; Affirms Caa3 CFR," Moody's Investors Service, July 8, 2020, https://www.moodys.com/research/Moodys-assigns-ratings-to-Serta-Simmons-new-term-loans-affirms--PR_427554. "Moody's views the transactions as a distressed exchange default given the exchange of a material amount of debt into new term loans at a significant discount to par."

[174]   Moody's deems an exchange to be distressed if it implies an economic loss to lenders when compared with the original agreement, or if the exchange appears to be carried out to avoid the borrower going into default or bankruptcy. See "Ratings Agencies Clarify Distressed Exchange Criteria," Practical Law Company Corporate & Securities and Practical Law Company Finance, March 27, 2009. ("Moody's will assign a 'distressed' or default event rating to an exchange offer if 'it implies an economic loss to creditors compared to the original agreement,' and if it is 'being carried to avoid a payment default or bankruptcy filing.'"). S&P characterizes a distressed exchange as an event in which lenders are willing to take less than what they agreed to originally because they do not think the borrower will be able to pay them back in full. See "Ratings Agencies Clarify Distressed Exchange Criteria," Practical Law Company Corporate & Securities and Practical Law Company Finance, March 27, 2009. ("According to the S&P, distressed exchanges are defined as events where 'debt holders accept less than what was originally promised because they doubt the issuer will fulfill its obligations.'")

[175]   "Moody's Views Serta Simmons' Transaction as Distressed Exchange, Downgrades Existing First and Second Lien Term Loans; Outlook Negative," Moody's Investors Service, June 11, 2020, https://www.moodys.com/research/Moodys-views-Serta-Simmons-transaction-as-distressed-exchange-downgrades-existing--PR_426243. "Additionally, Moody's believes that term loan lenders who do not consent to the transaction will potentially be left with little or no remaining collateral coverage in Serta Simmons, as well as in a position that is subordinated to new, higher priority debt."

[176]   "Moody's Assigns Ratings to Serta Simmons' New Term Loans; Affirms Caa3 CFR," Moody's Investors Service, July 8, 2020, https://www.moodys.com/research/Moodys-assigns-ratings-to-Serta-Simmons-new-term-loans-affirms--PR_427554. "Additionally, Moody's believes that term loan lenders who did not consent to the transaction could potentially be left with little or no remaining collateral coverage in Serta Simmons, as well as in a position that is subordinated in payment priority - though equal in lien priority- to the new term loans."

[177]   "Serta Simmons Bedding LLC Downgraded to 'SD' from 'CC' on Completion of Distressed Debt Exchange," S&P Global Ratings, June 23, 2020, https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2467049. "Lenders are receiving less than par and the unexchanged debt will have a less-favorable payment position."

"recapitalize the Company."[178] Had the recapitalization involved Open Market Purchases, then I would have expected to see that noted in the June 2020 Press Release.

(123)   Serta did not undertake an Open Market Purchase, as a reasonable market participant would understand the term. Instead, Serta exchanged legacy debt into new debt with different terms and a different face amount and raised financing.

## IV.D. I Have Seen No Evidence that Serta Took the Steps a Bank Debt Buyer Would Typically Take When Transacting in the Secondary Bank Debt Market

(124)   Based on my review of the evidence, Serta did not do the things that would be consistent with what a borrower would do if that borrower were truly making an Open Market Purchase. From the evidence I have reviewed to date, Serta (1) did not seek or obtain authorization from its Finance Committee for an Open Market Purchase program; (2) did not engage with a Dealer to inquire where its bank debt was offered; (3) did not purchase the bank debt at a price informed by prevailing market prices, which would typically approximate Fair Market Value; (4) did not pay cash for its bank debt as it typically would have in an Open Market Purchase; (5) did not participate in an anonymous transaction; (6) did not negotiate or sign a trade confirmation,[179] nor did any trading counterparty; and (7) did not reduce its overall debt by the face amount of the debt repurchased, as discussed further below.

## IV.E. The Transaction Caused the Trading Price of the Legacy Serta Debt to Decline, Contrary to What Would Be Expected as a Result of an Open Market Purchase

(125)   As stated, an Open Market Purchase would not typically cause the price of the debt being traded to decline. To the contrary, it is more likely that the trading price would be stable or improve. Here, the Transaction resulted in a material price drop for the debt that Serta contends was the subject of the Open Market Purchase.

(126)   As shown in Figure 4 below, after the Transaction was announced on June 8, 2020, the First Lien Term Loan price dropped from 43 cents on the dollar to 26 cents on the dollar by June 22, 2020, the date the

---

[178]   Serta Simmons Bedding, "Serta Simmons Bedding Enters into Agreement with Majority of Lenders on Deleveraging and Liquidity Enhancing Transaction," June 8, 2020 (SSB_ADVERSARY00005635 – SSB_ADVERSARY00005636).

[179]   Serta signed a Master Assignment and Acceptance Agreement based on the Term Loan Agreement in executing the Transaction. *See* Master Assignment and Acceptance (SSB_ADVERSARY00001279 – SSB_ADVERSARY00001359).

Transaction was executed, representing a decline of 40%.[180] Figure 4 below shows the drop in the price of Serta's First Lien Term Loan, from April 1, 2020, to August 31, 2020, as a result of the Transaction.

**Figure 4: Historical Serta Loan Prices and Serta Exchange Ratio (74% of Par)[181]**



Source: Bloomberg First Lien Term Loan Prices.

## IV.F. Serta Did Not Reduce Its Indebtedness by the Amount of Debt It Claims to Have Purchased, Which One Would Have Expected to See as a Result of an Open Market Purchase

(127)   In an Open Market Purchase conducted by a borrower, the face amount of any debt purchased would typically be retired. As a result, all else being equal, the borrower would have less debt outstanding after the Open Market Purchase, in an amount equal to the face amount of the debt acquired through the Open Market Purchase. Under the terms of the Term Loan Agreement, any debt that Serta acquired through an Open Market Purchase was required to be retired.[182]

---

[180]   Bloomberg First Lien Term Loan Prices. Prices are quoted using "PX_LAST".

[181]   Prices are quoted using "PX_LAST".

[182]   First Lien Term Loan Agreement, 9.05(g)(i). "Any Term Loans acquired by Holdings, the Top Borrower or any of its

(128)    Here, prior to the Transaction, Serta had $2.314 billion in First and Second Lien Term Loan debt. Serta has represented that it "purchased" $992 million of First Lien Term Loan debt and $299 million of Second Lien Term Loan debt for a combined total of $1.291 billion in debt. As a result, before considering the $200 million New Money Tranche, Serta ought to have had $1.291 billion less in face amount of debt obligations[183] after the Transaction than it had before. Serta's total debt pro forma for the Transaction should have been $1.023 billion.[184] But the Transaction did not reduce Serta's overall debt level by $1.291 billion, the amount that was purportedly acquired pursuant to the Open Market Purchase provision. Instead, not counting the additional $200 million in new debt that Serta incurred for liquidity purposes, Serta reduced its total debt from $2.314 billion to $1.874 billion, which represents a reduction of only $440 million. This $440 million in debt reduction is $851 million short of the $1.291 billion debt reduction that one would have expected to see if the transaction had been an Open Market Purchase.

(129)    Figure 5 below shows what I would have expected to see if Serta made an Open Market Purchase of $1.291 billion in debt, as compared to what occurred.

---

Restricted Subsidiaries shall, to the extent permitted by applicable Requirements of Law, be retired and cancelled immediately upon the acquisition thereof; provided that upon any such retirement and cancellation, the aggregate outstanding principal amount of the Term Loans shall be deemed reduced by the full par value of the aggregate principal amount of the Term Loans so retired and cancelled, and each principal repayment installment with respect to the Term Loans pursuant to Section 2.10(a) shall be reduced on a pro rata basis by the full par value of the aggregate principal amount of Term Loans so cancelled." Second Lien Term Loan Agreement, 9.05(g)(i) (SSB_ADVERSARY00016448). ("Any Term Loans acquired by Holdings, the Top Borrower or any of its Restricted Subsidiaries shall, to the extent permitted by applicable Requirements of Law, be retired and cancelled immediately upon the acquisition thereof; provided that upon any such retirement and cancellation, the aggregate outstanding principal amount of the Term Loans shall be deemed reduced by the full par value of the aggregate principal amount of the Term Loans so retired and cancelled.")

[183] By face amount.

[184] Before considering the $200 million in New Money Tranche debt.

**Figure 5: Comparison of Loan Amounts that Would have been Outstanding in a True Open Market Purchase Compared to Actual Loan Amounts Outstanding as a Result of the Transaction[185]**

| Loan Amounts before the Transaction | | Expected Loan Amounts after Open Market Purchase | | Actual Loan Amounts after the Transaction | |
|---|---|---|---|---|---|
| Loan Tier | Loan Amount ($ million) | Loan Tier | Loan Amount ($ million) | Loan Tier | Loan Amount ($ million) |
| First Lien Term Loans (Participating Majority Lenders) | $992 | First Lien Term Loans (Participating Majority Lenders) | -- | Exchange Tranche | $851 |
| Second Lien Term Loans (Participating Majority Lenders) | $299 | Second Lien Term Loans (Participating Majority Lenders) | -- | Third Out Tranche | N/A |
| First Lien Term Loans (Non-Participating Minority Lenders) | $894 | First Lien Term Loans (Non-Participating Minority Lenders) | $894 | First Lien Term Loans (Non-Participating Minority Lenders) | $894 |
| Second Lien Term Loans (Non-Participating Minority Lenders) | $128 | Second Lien Term Loans (Non-Participating Minority Lenders) | $128 | Second Lien Term Loans (Non-Participating Minority Lenders) | $128 |
| **A. Total Debt** | **$2,314** | **B. Total Debt** | **$1,023** | **C. Total Debt** | **$1,874** |
| **Expected Debt Reduction vs. Actual Debt Reduction** | | **Expected Debt Reduction (A. – B.)** | **$1,291** | **Actual Debt Reduction (A. – C.)** | **$440** |
| **Shortfall in Expected Debt Reduction** | | | | | **$851** |

Source: Exchange Agreement at 4; Super-Priority Term Loan Agreement (SSB_ADVERSARY00002024 – SSB_ADVERSARY00002581) at 1, 91.

---

[185]  Totals throughout may not appear to sum due to rounding.

# V. Conclusion

(130)   A market participant in the Secondary Bank Debt Market would understand that an Open Market Purchase by a borrower would typically involve a documented internal decision to enter into an open market debt repurchase program, followed by engagement with the Dealer-dominated Secondary Bank Loan market to ascertain market prices, followed by the execution of a bank debt purchase in the market at or around the prevailing market price, typically for cash consideration. The agreement to the trade would typically be followed by the execution of a trade confirmation by both the buyer and the seller, and then the negotiation and execution of final deal documentation.

(131)   To the extent that a borrower was required to retire the debt it purchased through an Open Market Purchase, then a market participant would also expect to see the borrower's debt level decline by the amount of debt purchased in the Open Market Purchase. There would be no detrimental effect on non-participating otherwise *pari-passu* lenders. The transaction would be described in the public domain in a manner that would make it clear that the borrower had purchased its debt in the open market.

(132)   The Transaction did not involve an Open Market Purchase of Serta's bank debt. Even if there was support for the contention that Serta solicited different debt restructuring proposals from lenders, that would have no bearing on whether the Transaction was an Open Market Purchase under the provisions of the Term Loan Agreement, based on how a market participant would understand that term.


_____          March 16, 2023
Marti P. Murray                          _____
                                         Date

# Appendix A. Curriculum Vitae of Marti P. Murray

## A.1. Summary of Experience

Marti P. Murray is a Partner in the Finance Practice of Bates White Economic Consulting. She is a leading expert in complex financial transactions. She has more than 35 years of experience that includes bankruptcy and restructuring advisory, distressed debt trading and investing, investment advisory, and commercial and Securities and Exchange Commission (SEC)-related litigation support. Ms. Murray has served as a testifying expert on numerous high-stakes matters involving corporate financial litigation, and she regularly advises financial companies on issues including financial distress, business and securities valuation, solvency, fraud, and industry custom and practice for investment advisers.

Earlier in her career, Ms. Murray was the Founder, President, and Portfolio Manager of Murray Capital Management, Inc., an SEC-registered distressed debt hedge fund firm, the business of which was ultimately acquired by Babson Capital. She has also served on numerous boards of directors and has acted as a court-appointed SEC Receiver for an investment adviser accused of fraud.

Ms. Murray also served as an adjunct professor at the NYU Stern School of Business from 2001 to 2013, teaching bankruptcy, distressed debt investing, and equity analysis/valuation courses. While at NYU Stern, she received awards for excellence in teaching, including Teacher of the Year.

She holds the Certified Valuation Analyst credential and is a Certified Fraud Examiner, with expertise in fraud prevention, detection, and deterrence.

## A.2. Education

- MBA, Finance, New York University Stern School of Business
- BA, World Affairs, Chinese, Colgate University

## A.3. Professional experience

- Partner, Bates White Economic Consulting, 2022–present
- Principal, The Brattle Group, 2019–2021
- Founder and President, Murray Analytics, Inc., 2015–2019

- Adjunct Professor, New York University Stern School of Business, 2001–2013

- Senior Managing Director, Goldin Associates, LLC, 2012–2015

- Managing Member, Murray & Burnaman, LLC, 2009–2012

- Managing Director, Babson Capital Management (Mass Mutual), 2008–2009

- Founder and President, Murray Capital Management, Inc., 1995–2008

- Senior Managing Director, Furman Selz Incorporated, 1990–1995

- Senior Vice President, Oppenheimer & Co., Inc., 1987–1990

- Associate, First NY Capital, 1986–1987

- Assistant Vice President, Bank of America, N.T. & S.A., 1982–1986

- City of New York Department of Housing Preservation & Development, 1981–1982

## A.4. Testimony

- Engaged as an expert in connection with damages calculations stemming from defamation claims. Issued expert report and provided deposition testimony.

- *SEC v. Ambassador Advisors, LLC, Bernard Bostwick, Robert E. Kauffman, and Adrian E. Young* (US District Court for the Eastern District of Pennsylvania)—Retained as an expert by the Securities and Exchange Commission in an enforcement action. Issues included industry custom and practice in the investment advisory industry regarding conflicts of interest, disclosures, and best execution. Submitted affirmative and rebuttal reports and testified at trial. (Case No. 5:20-cv-02274) (March 2022)

- *In re The Financial Oversight and Management Board for Puerto Rico* (US District Court District of Puerto Rico)—Engaged by the Financial Oversight and Management Board for Puerto Rico in connection with the confirmation of the proposed Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico. Issued expert report and provided deposition testimony; testified at confirmation hearing for the Title III Joint Plan of Adjustment. (September 2021)

- *SEC v. Paul Alar, West Mountain, LLC* (US District Court Northern District of Georgia Atlanta Division)—Retained by the Securities and Exchange Commission in an enforcement action against a fund manager. (Case No. 20-03265) (August 2021)

- Engaged as an expert in a commercial arbitration relating to disclosures made by an investment adviser with respect to investment strategy and performance. Issued multiple expert reports and testified at hearing. (JAMS Commercial Arbitration Tribunal) (July 2021)

■ Engaged as an expert in a litigation over fees purportedly due to an alternative investment management placement agent. Issued expert report and provided deposition testimony. (June 2021)

■ *In re Altaba, Inc.* (State of Delaware Court of Chancery)—Retained as an expert regarding the amount of funds that should be conservatively held back as security for claims not yet known to Altaba or that may arise subsequent to Altaba's dissolution. Issued two expert reports, provided deposition, and trial testimony. (Case No. 20-0413) (February 2021)

■ *In re WeWork Litigation* (State of Delaware Court of Chancery)—Retained as an expert in a dispute regarding industry best practices in the context of industry expectations regarding reasonable best efforts to finalize transaction agreements and the economic and financial considerations relating to the completion of those transactions. Issued affirmative and rebuttal reports and provided deposition testimony. (Case No. 20-0258) (February 2021)

■ *SEC v. Dean Patrick McDermott and McDermott Investment Advisors, LLC* (US District Court for the Eastern District of Pennsylvania)—Retained as an expert by the Securities and Exchange Commission in an enforcement action. Issues included industry custom and practice in the investment advisory industry regarding conflicts of interest, disclosures, and best execution. Issued affirmative and rebuttal reports and provided deposition and trial testimony. (Case No. 19-04228) (February 2021)

■ *SEC v. Westport Capital Markets, LLC and Christopher E. McClure* (US District Court District of Connecticut)—Retained as an expert by the Securities and Exchange Commission with respect to alleged conflicted transactions of an investment adviser. Issued expert report and provided deposition and trial testimony. (Case No. 17-02064) (March 2020)

■ *D.E. Shaw Composite Holdings LLC and Madison Dearborn Capital Partners IV LP v. TerraForm Power LLC and TerraForm Power, Inc.* (Supreme Court of the State of New York)—Retained as an expert on the methodologies used to value earnout consideration, financial guarantees, and private equity/hedge fund industry custom and practice for the valuation of illiquid investment positions. Issued affirmative and rebuttal expert reports and testified at deposition. (Case No. 16-651752) (December 2019)

■ *Kentucky Retirement Systems v. BHEP GP I, LLC, et al.* (US District Court for the Commonwealth of Kentucky)—Retained as an expert in litigation relating to a dispute between the manager of a private equity fund and a public retirement system, which sought remedies related to alleged mismanagement of the funds. Issued expert report and testified at hearing. (Case No. 18-00377) (October 2019)

■ Retained as an expert relating to a dispute regarding a seed capital arrangement entered into between two hedge fund firms. Issued expert report and testified at arbitration hearing. (September 2019)

■ *In re Sears Holding Corporation, et al.* (US Bankruptcy Court for the Southern District of New York)—Retained as an expert relating to claims for diminution in value of collateral and alleged 506(c) surcharges relating to positions held by certain second lien debt holders of the Sears

Bankruptcy. Issued expert report and provided deposition and trial testimony. (Case No. 18-23538) (July 2019)

■ *Brown Jordan International, Inc., et al. v. Christopher Carmicle* (US District Court for the Southern District of Florida)—Retained as an expert by Brown Jordan. Issued expert report and provided deposition testimony. (Case No. 14-61415) (August 2015)

■ *PICCIRC, LLC et al. v. Commissioner of Internal Revenue Service* (US Tax Court)—Retained as an expert by the Internal Revenue Service with respect to an investment in a trade claim against Encol during its bankruptcy. Issued expert report and testified at trial. (Case No. 12-04308) (March 2015)

■ *In re GSC Group, Inc., et al.* (US Bankruptcy Court for the Southern District of New York)— Litigation in the GSC bankruptcy over assumed management contracts for CLOs, private equity, and ABS CDOs, affiliate transfers, and investments made in hedge funds and CLOs. Issued multiple expert reports, was deposed, and testified. (Case No. 10-14653) (February 2015)

■ *Green v. KeyCorp.* (US District Court for the Western District of Texas)—Expert witness with respect to Austin Capital Management, a hedge fund-of- funds firm. Issued expert report and was deposed twice. (Case No. 12-01048) (August 2014)

■ *In re The Dolan Company* (US Bankruptcy Court for the District of Delaware)—Financial advisor and testifying valuation expert for the Official Committee of Equity Security Holders in the Dolan bankruptcy. Issued expert report and was deposed three times on a wide range of issues relating to business valuation, and industry custom and practice with respect to bank loan amendment fees. (Case No. 14-10614) (May 2014)

■ *Deephaven Distressed Opportunities Trading, et al. v. Imperial Capital, LLC*—FINRA arbitration over liability for damages related to a failed trade of a distressed trade claim against a bankrupt company. Issued expert report and testified at arbitration. (Case No. 11-01891) (July 2012)

■ *Riad Tawfiq Al Sadik v. Investcorp Bank BSC, et al.*—Litigation over major losses suffered in 2008. Issued three expert reports and testified at trial in the Grand Court of the Cayman Islands. (February 2012)

■ *J.P. Morgan Securities, Inc. v. Jason Ader, et al.* (Supreme Court of the State of New York)— Litigation over financial arrangements between a hedge fund and a seed capital provider. Issued multiple expert reports and was deposed twice. (Case No. 09-650005) (December 2011)

■ *In re SW Boston Hotel Venture LLC, et.al.* (US Bankruptcy Court for the District of Massachusetts)— Litigation over bankruptcy plan feasibility, solvency, financial projections, claim amount, diminution in value of collateral, and cram-down rate of interest. Issued expert report and provided deposition and trial testimony. (Case No. 10-14535) (June 2011)

- *SPCP Group, LLC v. UBS AG* (Supreme Court of the State of New York)—Litigation over a failed trade of distressed bank debt. Issued expert report and provided deposition testimony. (Case No. 08-602418) (August 2010)

## A.5. Selected litigation and consulting experience

- Engaged as an expert in in a bankruptcy dispute related to a debt restructuring agreement involving an "uptiering" liability management transaction, which prioritized certain lenders' interests over others.

- Engaged as an expert in connection with a dispute between an investment manager and seed capital provider over investments in sub-Saharan Africa.

- Engaged as an expert in connection with the termination of an investment management professional and allegations relating to the misappropriation of the firm's intellectual property.

- Engaged as a valuation expert in connection with the transfer of an investment in a related party transaction.

- Engaged as an expert in connection with a dispute involving second lien financing transactions.

- Engaged as an expert to perform asset tracing in connection with a bankruptcy proceeding.

- Engaged as an expert in connection with a trade dispute relating to a claim against a bankrupt entity.

- *SPI Investment Fund SPC*—Engaged on behalf of the replacement board of directors of an investment fund to investigate the fund's investment strategy and implementation, including, among other things, evaluating and tracing the ultimate use of investor funds. (January 2022)

- Engaged as an expert in an investment adviser labor dispute alleging damages resulting from client poaching.

- Engaged as an expert in connection with a liability management transaction undertaken by a leveraged borrower.

- Engaged as an expert by an investor in private equity fund over a dispute related to the management of the fund, including with respect to conflicted transactions.

- Engaged by the Plaintiffs' Executive Committee as an expert in a multidistrict litigation. Issues focused on various claims of fraudulent transfer.

- Engaged as a consulting expert relating to defamation damages analysis.

- Engaged as an expert to assess the reasonableness of placement agent fees in connection with capital raises and M&A transactions. Issued expert report.

- *In re Chesapeake Energy Corporation*—Engaged as financial advisor to the second lien noteholders of Chesapeake Energy in connection with Chesapeake's proposed plan of reorganization, including with respect to the terms of a proposed rights offering. (October 2020)

- Engaged as a consulting valuation expert in connection with the bankruptcy of CBL & Associates Properties.

- Engaged as an expert to opine on damages resulting from a failed sale of broadcasting stations.

- Engaged as an expert to calculate COVID-19–related business interruption damages incurred by insured parties under property-casualty insurance policies.

- *In re Neiman Marcus Group Ltd LLC, et al.* (US District Court for the Southern District of Texas)— Engaged on behalf of Marble Ridge Master Fund LP as expert in an adversary proceeding arising in the bankruptcy of Neiman Marcus Issues included alleged damages incurred by the bankrupt estate and unsecured creditors resulting from certain conduct of a member of the official unsecured creditors' committee, who was pursuing an investment opportunity. Issued expert report. (July 2020)

- Engaged as a consultant to calculate bankruptcy claims for a creditor class of a large luxury retailer.

- Engaged as an expert in a litigation relating to the valuation of a leading specialty retailer. Issued rebuttal report.

- Engaged as a consulting expert in connection with the valuation of a bankrupt company.

- Engaged to support a litigation funder in conducting due diligence for prospective new investments.

- *SEC v. James Thomas Bramlette* (US District Court District of Utah–Central Division)—Engaged as an expert by the Securities and Exchange Commission regarding issues related to solvency and standard of care for a fund manager in the capital raising, operation and management of a fund. Issued expert report and declaration. (December 2018)

- *Douglas A. Kelley, in his capacity as the court-appointed Chapter 11 Trustee of Debtors Petters Company, Inc. and PL Ltd., Inc., vs. Westford Special Situations Master Fund, L.P. et al.* (US Bankruptcy Court District of Minnesota)—Engaged as an expert in litigation relating to claw-back claims stemming from the Petters Ponzi scheme. Issues included fraud, Ponzi schemes, solvency, asset tracing, and hedge fund industry custom and practice, including the calculation of management and performance fees. Issued affirmative and rebuttal reports. (May 2018)

- *In re VSS Fund Management LLC*—Engaged as an expert by the Securities and Exchange Commission in an administrative proceeding concerning registered investment adviser Veronis Suhler Stevenson (VSS) for failure to provide the limited partners of a private equity fund it advised with material information relating to a change in the vehicle's valuation in connection with an offer by the owner and managing partner of VSS to purchase the limited partnership interests. (SEC Administrative Proceeding) (March 2018)

- Engaged to provide a valuation of a privately held lodging and leisure company in connection with a major international fraud scheme. Report included the valuation of a $100+ million litigation claim arising from an alleged breach of contract. Issued valuation report.

- Engaged to provide a valuation of an investor's interest in a commodities-focused private equity fund. Issued valuation report.

- Engaged as an expert by US government agencies in various matters covering issues including market manipulation, distressed debt investing, trading and valuation, complex asset tracing, industry custom and practice with respect to investment advisers, fiduciary duty, valuation, fees and expenses, fund buyouts, trade allocations and conflicts of interest.

- *Tatiana Brunetti v. Dmitry Sergeev* (Supreme Court of the State of New York)—Engaged as an expert in defense of claims of misappropriation of assets and as expert consultant for breach of contract and breach of fiduciary duty claims relating to restaurant investments. (November 2017)

- Engaged as an expert in a litigation arising from a failed debt restructuring.

- Engaged to perform a tracing analysis for a family office to determine and quantify misappropriation.

- *Parmwood Assignment et al v. Ginza 3 LLC, et al* (Supreme Court of the State of New York)— Engaged as an expert in connection with claims of misappropriation of assets regarding hospitality financing and management. (August 2017)

- Engaged by counsel, on behalf of an investor, to analyze a fraudulent scheme relating to margin loans.

- Engaged by counsel to assist in the defense of a fund administrator in a potential Securities and Exchange Commission enforcement action.

- Engaged to assist counsel defend hedge fund in a Securities and Exchange Commission enforcement action relating to fund valuation.

- *Public Sector Pension Investment Board v. Saba Capital Management, L.P.*—Engaged as an expert for the defendant in litigation brought by a former investor. Issues included industry custom and practice with respect to marketing illiquid investments for sale, including the use of bids-wanted-in-competition, industry custom and practice with respect to valuing illiquid investment positions, hedge fund ecosystems, and fair value measurements. Issued expert report. (Supreme Court of the State of New York) (June 2016)

- Engaged as an expert in connection with a federal income tax case concerning a major multinational chemical company.

- Engaged as an expert in connection with a distressed debt-oriented tax strategy.

- *Ramius Private Select Ltd., et al. v. Sacha Lainovic, et al.*—Engaged as an expert in a dispute between redeeming investors in a hedge fund focused on the for-profit education sector. Issues

included valuation, solvency, fraudulent conveyance, Ponzi schemes, and industry custom and practice in the investment management industry. Issued expert report. (March 2016)

- *In re Lynn Tilton, Patriarch Partners, LLC et al.*—Engaged as an expert for the defendant in a Securities and Exchange Commission administrative proceeding involving three structured credit products that invested in distressed companies. Issued expert report. (March 2015)

- Engaged in a gaming industry matter, retained as consulting expert with respect to valuation, solvency, and fraudulent conveyance relating to one of the world's largest diversified casino companies.

- *In re Clean Energy Capital, LLC and Scott A. Brittenham*—Engaged as an expert in an administrative proceeding brought against a private equity fund. Issues related to fees and expenses charged to the fund, the valuation of portfolio investments, and the calculation of carried interest. Issued expert report. SEC Administrative Proceeding) (June 2014)

- Engaged in a case involving an asset-based lending hedge fund as a fraudulent conveyance and solvency expert in connection with the fund's restructuring.

- *In re Fletcher International Ltd.* (Bankruptcy Court for the Southern District of New York)—Engaged as Special Consultant to the bankruptcy trustee, assisting in his overall investigation of the business of Fletcher Asset Management, a registered investment adviser, and Richcourt, a fund of funds. Issues included industry custom and practice with respect to investment fund management, valuation of complex esoteric investments, investment fees, solvency, red flags, Ponzi schemes, and industry custom and practice with respect to fund managers and third-party service providers. Supported Trustee in the issuance of the November 2013 Trustee's Report and Disclosure Statement. (November 2013)

- *Sumitomo Mitsui Banking Corp. v. Credit Suisse, et al.* (Supreme Court of the State of New York)—Engaged as an expert by counsel to Credit Suisse in a litigation over rights of a bank debt participation holder in a debt restructuring. Issued expert report. (September 2013)

- *SEC v. Aletheia Research and Management, Inc. and Peter J. Eichler, Jr.* (US District Court for the Central District of California)—Engaged as an expert for the Securities and Exchange Commission in an enforcement action. Issues included industry custom and practice in the hedge fund industry regarding allocation of trades among accounts. Issued expert report. (August 2013)

- *William Seibold v. Camulos Partners, et al.*—Engaged as an expert by counsel to Camulos Partners in a compensation dispute arbitration. Issued expert report. (April 2013)

- *Deephaven Distressed Opportunities Trading, Ltd. v. 3V Capital Master Fund Ltd., et al.* (Supreme Court of the State of New York)—Engaged as an expert by 3V. (July 2012)

- Engaged as financial advisor to Pulse Electronics in connection with its liquidity management and balance sheet restructuring. (2012)

- Engaged as financial advisor to Component Hardware Group, Inc. in connection with its balance sheet restructuring. (2010)

## A.6. Publications

- "Assessing the Reasonableness of Rights Offerings: Raising Exit Financing in a Chapter 11 Proceeding," *AIRA Journal* 32, no. 3 (2019).

- "Assessing the Reasonableness of Rights Offerings: Raising Exit Financing in the Context of a Chapter 11 Bankruptcy Proceeding." In *Bankruptcy & Restructuring 2019: Expert Guide*, 33–37. Corporate LiveWire, 2019.

- "Notes from the Road—The Bankruptcy Cases Everyone Is Talking About and the Issues That Make Them Controversial," *ABI Young and New Members Committee Newsletter* 9, no. 3 (June 2011).

- "Risk Management for a Distressed Securities Portfolio." In *Managing Hedge Fund Risk: from the Seat of the Practitioner: Views from Investors, Counterparties, Hedge Funds and Consultants,* 1st ed., edited by Virginia Reynolds Parker. London: Risk Books, 2000.

- *Money Jobs! Training Programs Run by Banking, Accounting, Insurance, and Brokerage Firms–And How to Get into Them* (with S. Peter Valiunus). New York: Crown Publishing Company, 1984.

## A.7. Recent presentations and panels

- Invited to speak at numerous hedge fund and distressed debt industry conferences, including GAIM, 100 Women in Hedge Funds, Infovest, AIRA and VALCON, sponsored by the American Bankruptcy Institute

- "Challenges to Valuation," Seminar leader, Brown Rudnick Advanced Valuation Seminar "2013/2014 Finance and Restructuring Training," for CLE Credit (2014)

- "Rights Offerings," Panelist, 2018 Valcon Conference, sponsored by the American Bankruptcy Institute

- "Net-Short Activism and Manufactured Defaults," Panelist, AIRA Panel, sponsored by the Association of Insolvency and Restructuring Advisors

- "Diminution in Value Claims," Moderator and panelist, 2020 Valcon Conference

- "Post Covid-19 Economy," Panelist, 2020 TMA Talks by Leading Restructuring and Turnaround Professionals Webinar

- "Marti Murray on Best Practices of a Securities and Financial Services Expert Witness," 2020 IMS Insights Podcast

- "Marti Murray on Threats and Opportunities to Private Equity from COVID-19," 2020 IMS Insights Podcast

## A.8. Professional affiliations/certifications

- Certified Valuation Analyst (CVA)
- Certified Fraud Examiner (CFE)
- EliteXpert, IMS ExpertServices
- Turnaround Management Association (TMA)
- Board of Directors, NY Chapter
- Vice-Chair, Audit Committee
- American Bankruptcy Institute (ABI)
- Association of Insolvency and Restructuring Advisors (AIRA)
- Full member, National Association of Federal Equity Receivers (NAFER)

## A.9. Fiduciary roles/board memberships

- Atlantic Asset Management, LLC—Receiver
  - Appointed by Hon. William H. Pauley III, US District Court, S.D.N.Y. as temporary Independent Monitor and subsequently as Receiver
- Edcon—Director
  - Member of the Audit and Risk Committee
- Private For-Profit Education Company—Interim Advisor
- PIMCO Income Strategy Fund, PIMCO Income Strategy Fund II—Director
- ReCap International (BVI), Ltd.—Director
- California Coastal Communities—Director
  - Member of Audit Committee and Compensation Committee
- Asphalt Green—Trustee
- Kent Place School—Trustee

# Appendix B. Materials Considered

Below is a list of materials that I considered in reaching my opinions. Should I identify any additional materials that were omitted from this list, I will supplement accordingly. In considering the documents listed below, a review was performed of those portions of documents that were relevant to Bates White's analysis and evaluation of the issues addressed in the report.

## B.1. Court Documents

### B.1.a. *In re Serta Simmons Bedding, LLC, et al.*, Case No. 23-90020 (Bankr. S.D. Tex.)

- Emergency Motion of Debtors Pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1 For Order Directing Joint Administration of Chapter 11 Cases, January 23, 2023 (ECF No. 2).

- Declaration of John Linker in Support of Debtors' Chapter 11 Petitions and First Day Relief, January 24, 2023 (ECF No. 26).

- Disclosure Statement for Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors, January 23, 2023 (ECF No. 29).

- Disclosure Statement for Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors, March 7, 2023 (ECF No. 427).

- Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and its Affiliated Debtors, January 23, 2023 (ECF No. 28).

- Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and its Affiliated Debtors, March 7, 2023 (ECF No. 425).

### B.1.b. *Serta Simmons Bedding, LLC, et al., v. AG Centre Street Partnership L.P.*, Adv. Pro. No. Case No. 23-09001 (Bankr. S.D. Tex.)

- Complaint, January 24, 2023 (ECF No. 1).

- Amended Complaint, February 14, 2023 (ECF No. 38).

- Serta's Motion for Summary Judgment, February 24, 2023 (ECF No. 69).

- Serta's Statement of Undisputed Material Facts in Support of Summary Judgment (ECF No. 70).

  o Exhibits 1-27 (ECF Nos. 70-1 through 70-27).

■   Plaintiffs' Lender Motion for Summary Judgment, February 24, 2023 (ECF No. 73).

**B.1.c. *Serta Simmons Bedding, LLC, et al., v. AG Centre Street Partnership L.P.*, Adv. Pro. No. 23-03007 (Bankr. S.D. Tex.)**

■   Complaint, January 24, 2023 (ECF No. 1).

**B.1.d. *AG Centre Street Partnership L.P. v. Serta Simmons Bedding, LLC*, Case No. 22-654181 (N.Y. Sup. Ct., N.Y. Cnty.)**

■   Amended Complaint, November 16, 2022 (NYSCEF No. 11).

**B.1.e. *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Case No. 20-652243 (N.Y. Sup. Ct., N.Y. Cnty.)**

■   Complaint and Summons, June 11, 2020 (NYSCEF No. 1).

■   Plaintiffs' Memorandum of Law in Support of a Temporary Protective Order, June 11, 2020 (NYSCEF No. 3).

■   Serta's Opposition to Plaintiffs' Application for a Temporary Protective Order, June 16, 2020 (NYSCEF No. 22).

■   Defendant Lenders' Opposition to Plaintiffs' Application for a Temporary Protective Order, June 16, 2020 (NYSCEF No. 29).

■   Plaintiffs' Reply Memorandum of Law in Support of a Temporary Protective Order, June 18, 2020 (NYSCEF No. 62).

■   Decision and Order on Motion, June 22, 2020(NYSCEF No. 88).

**B.1.f. *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, Case No. 20-cv-5090 (S.D.N.Y.)**

■   Complaint, July 2, 2020 (ECF No. 1).

■   Serta's Memorandum of Law in Support of its Motion to Dismiss, July 9, 2021 (ECF No. 25).

■   LCM's Opposition to Serta's Motion to Dismiss, Aug. 9, 2021(ECF No. 31).

■   Serta's Reply Memorandum of Law in Support of its Motion to Dismiss, August 23, 2021 (ECF No. 32).

■   Memorandum Decision and Order, March 9, 2021.

■ Opinion and Order Denying Motion to Dismiss, March 29, 2022 (ECF No. 34).

### B.1.g. *ICG Global Loan Fund 1 DAC, et al. v. Boardriders, Inc. et al.*, Case No. 655175-20 (N.Y. Sup. Ct., N.Y. Cnty.)

■ Boardriders' Memorandum of Law In Support of its Motion to Dismiss, December 7, 2020 (NYSCEF No. 46).

■ Defendant Lenders' Memorandum of Law in Support of their Motion to Dismiss, December 7, 2020.

■ Plaintiff Lenders' Opposition to Motions to Dismiss, January 28, 2021 (NYSCEF No. 77).

■ Plaintiffs Lenders' Supplemental Memorandum of Law on Motions to Dismiss, Addressing *Trimark*, September 17, 2021 (NYSCEF No. 132).

■ Defendants' Supplemental Memorandum of Law on Motion to Dismiss, Addressing Trimark, September 17, 2021 (NYSCEF No. 133).

■ Order on Motion to Dismiss, October 18, 2022 (NYSCEF No. 159).

### B.1.h. *Audax Credit Opportunities Offshore Ltd., et al. v. TMK Hawk Parent, Corp., et al.*, Case No. 2021-50794 (N.Y. Sup. Ct., N.Y. Cnty.)

■ Order on Motion to Dismiss, August 16, 2021 (NYSCEF No. 171).

## B.2. Party Documents

■ First Lien Term Loan Agreement, November 8, 2016.

■ First Lien Intercreditor Agreement, June 22, 2020.

■ Amendment No. 1 to the First Lien Term Loan Agreement, June 22, 2020.

■ Open Market Purchase and Cashless Exchange Agreement, June 22, 2020.

| | |
|---|---|
| ■ SSB_ADVERSARY00001279 | ■ SSB_ADVERSARY00087742 |
| ■ SSB_ADVERSARY00002024 | ■ SSB_ADVERSARY00088402 |
| ■ SSB_ADVERSARY00016300 | ■ SSB_ADVERSARY00088937 |
| ■ SSB_ADVERSARY00016300 | ■ SSB_ADVERSARY00089542 |
| ■ SSB_ADVERSARY00016736 | ■ SSB_ADVERSARY00239858 |
| ■ SSB_ADVERSARY00058983 | ■ SSB_ADVERSARY00088364 |
| ■ SSB_ADVERSARY00060919 | ■ SSB_ADVERSARY00088347 |

- SSB_ADVERSARY00087946

## B.2.a. Party Documents Used in Analysis

- SSB_ADVERSARY00005635
- SSB_ADVERSARY00027969
- SSB_ADVERSARY00034634
- SSB_ADVERSARY00062340
- SSB_ADVERSARY00087548
- SSB_ADVERSARY00087778
- SSB_ADVERSARY00088397
- SSB_ADVERSARY00088420
- SSB_ADVERSARY00088454
- SSB_ADVERSARY00088512
- SSB_ADVERSARY00088608
- SSB_ADVERSARY00088676
- SSB_ADVERSARY00088744

- SSB_ADVERSARY00088766
- SSB_ADVERSARY00088797
- SSB_ADVERSARY00088815
- SSB_ADVERSARY00088857
- SSB_ADVERSARY00088909
- SSB_ADVERSARY00088931
- SSB_ADVERSARY00088946
- SSB_ADVERSARY00088959
- SSB_ADVERSARY00088988
- SSB_ADVERSARY00089013
- SSB_ADVERSARY00089057
- SSB_ADVERSARY00401057

# B.3. Publicly Available Documents

## B.3.a. Data

- Bloomberg series BL2269944. Accessed February 22, 2023.

## B.3.b. Academic Books and Papers

- Campbell, Mark and Christoph Weaver. *Syndicated Lending: Practice & Documentation*. 7th Edition. United Kingdom: Harriman House, 2019.
- Fisherman, Jay E., Shannon P. Pratt, and William J. Morrison. *Standards of Value*. 2nd Edition. New York: John Wiley & Sons, Inc. 2013.
- Gkoutzinis, Apostolos Ath. *Law and Practice of Liability Management*. Cambridge: Cambridge University Press, 2014.

- Hotchkiss, Edith S., David C. Smith, and Per Stromberg. "Private Equity and the Resolution of Financial Distress." EGCI Finance Working Paper, July 2021.

- Levy, Hagit and Ron Shalev. "Bond Repurchase Objectives and the Repurchase Method Choice." *Journal of Accounting and Economics* 63 (2017).

- Pratt, Shannon P. *Valuing a Business: The Analysis and Appraisal of Closely Held Companies.* 6th Edition. New York: McGraw Hill, 2022.

- Shaiman, Lee M. and Bridget K. Marsh. *The Handbook of Loan Syndications and Trading.* 2nd Edition. New York: McGraw Hill, 2022.

- Skauradszun, Dominik. "Restructuring Companies During and After the Covid-19 Pandemic: A Law & Economics Approach." *Nottingham Insolvency and Business Law e-Journal* 9 (2019). https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3844530.

- Taylor, Allison and Alicia Sansone. *The Handbook of Loan Syndications & Trading: An Introduction to the U.S. Secondary Loan Market.* (New York: McGraw Hill, 2007).

- Trugman, Gary R. *Understanding Business Valuation.* 6th ed. Portland, Oregon: BVR, 2022.

- Vermaelen, Theo. "Share Repurchases." *Foundations and Trends in Finance*, 1, no. 3 (2005).

- Yadav, Yesha. "Dismantling Bondholder Rights." *Vanderbilt Law Research Paper No. 19-37* (October 21, 2019). https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3473212.

- Zilberman, Gennady. "Bankruptcy Section 363(b) Sales: Market Test Procedures and Heightened Scrutiny of Expedited Sales May Prevent Abuses and Safeguard Creditors without Limiting the Power of the Courts." *Brooklyn Journal of Corporate, Financial & Commercial Law* 5, no. 1 (Fall 2010).

## B.3.c. Industry Articles and Reports

- Accounting Tools. "Arm's Length Transaction Definition." December 24, 2022. https://www.accountingtools.com/articles/arms-length-transaction#:~:text=An%20arm%27s%20length%20transaction%20is%20a%20negotiation%20between,differ%20from%20those%20currently%20accepted%20in%20the%20market.

- AICPA. "AU-C Section 550 Related Parties." December 15, 2012.

- Corporate Finance Institute. "Arm's Length Transaction." Corporate Finance Institute. Published December 13, 2022. https://corporatefinanceinstitute.com/resources/valuation/arms-length-transaction/.

- Corporate Finance Institute. "Homepage." Accessed March 13, 2023. https://corporatefinanceinstitute.com/about-cfi/.

- Corporate Finance Institute. "Over-the-Counter (OTC)." Corporate Finance Institute. Updated February 23, 2023. https://corporatefinanceinstitute.com/resources/capital-markets/over-the-counter-otc/.

- Corporate Finance Institute. "Stock Buyback Methods." Corporate Finance Institute. Published December 14, 2022. https://corporatefinanceinstitute.com/resources/management/stock-buyback-methods/.

- Corporate Finance Institute. "What is Pari-Passu?" accessed March 13, 2023. https://corporatefinanceinstitute.com/resources/commercial-lending/pari-passu/.

- INSEAD: The Business School For The World, "Theo Vermaelen," Accessed March 16, 2023. https://www.insead.edu/faculty-research/faculty/theo-vermaelen.

- LSTA. "About." LSTA. Accessed March 13, 2023. https://www.lsta.org/about/.

- LSTA. "Legal & Documentation." LSTA. Accessed March 1, 2023. https://www.lsta.org/content/?_industry_sector=legal-documentation.

- LSTA. "Liability Management Transactions: Part 2." LSTA. Published November 19, 2020. https://www.lsta.org/news-resources/liability-management-transactions-part-2/.

- LSTA. "LSTA Distressed Trade Confirmation." LSTA. Published December 1, 2021. https://www.lsta.org/content/distressed-confirm-dec-2021/.

- LSTA. "LSTA Par/Near Par Trade Confirmation." LSTA. Published December 1, 2021. https://www.lsta.org/content/par-confirm-dec-2021/.

- LSTA. "Members." LSTA. Accessed March 7, 2023. https://www.lsta.org/members/.

- LSTA, "Morningstar LSTA Leveraged Loan Index Analysis," accessed on March 6, 2023, https://www.lsta.org/content/?_industry_sector=morningstar-lsta-leveraged-loan-index-analysis.

- LSTA. "Re: Notice of Proposed Rulemaking, Credit Risk Retention." LSTA. Published September 2, 2011. https://www.sec.gov/comments/s7-14-11/s71411-309.pdf.

- LSTA. "Standard Terms and Conditions for Distressed Trade Confirmations." LSTA. Published December 1, 2021. https://www.lsta.org/content/distressed-confirm-stcs-dec-2021/.

- LSTA. "Standard Terms and Conditions for Par/Near Par Trade Confirmations." LSTA. Published December 1, 2021. https://www.lsta.org/content/participation-agreement-for-par-near-par-trades-stcs-dec-2021/.

- Moody's Investors Service. "Moody's assigns ratings to Serta Simmons' new term loans; affirms Caa3 CFR." Moody's Investors Service. Published July 8, 2020. https://www.moodys.com/research/Moodys-assigns-ratings-to-Serta-Simmons-new-term-loans-affirms--PR_427554.

- Moody's Investors Service. "Moody's downgrades Serta Simmons' CFR to Caa1; outlook stable." Moody's Investors Service. Published April 25, 2019. https://www.moodys.com/research/Moodys-downgrades-Serta-Simmons-CFR-to-Caa1-outlook-stable--PR_399250.

- Moody's Investors Service. "Moody's downgrades Serta Simmons' CFR to Caa3; outlook negative." Moody's Investors Service. Published March 24, 2020. https://www.moodys.com/research/Moodys-downgrades-Serta-Simmons-CFR-to-Caa3-outlook-negative--PR_420426.

- Moody's Investors Service. "Moody's revises Serta Simmons' outlook to negative; affirms B3 CFR." Moody's Investors Service. Published October 8, 2018. https://www.moodys.com/research/Moodys-revises-Serta-Simmons-outlook-to-negative-affirms-B3-CFR--PR_390016.

- Moody's Investors Service. "Moody's views Serta Simmons' transaction as distressed exchange, downgrades existing first and second lien term loans; outlook negative." Moody's Investors Service. Published June 11, 2020. https://www.moodys.com/research/Moodys-views-Serta-Simmons-transaction-as-distressed-exchange-downgrades-existing--PR_426243.

- NACVA. "International Glossary of Business Valuation Terms." NACVA. Published June 8, 2001. https://www.nacva.com/glossary.

- NACVA. "Professional Standards." NACVA. Published June 5, 2015. https://www.nacva.com/standards.

- National Association of Insurance Commissioners. "Leveraged Bank Loans Primer." Accessed on March 14, 2023. https://content.naic.org/sites/default/files/capital-markets-primer-leveraged-bank-loans.pdf.

- NASDAQ. "Glossary of Stock Market Terms." Accessed March 15, 2023.

- NASDAQ. "Open market purchase operation," Glossary. Accessed March 6, 2023. https://www.nasdaq.com/glossary/o/open-market-purchase-operation.

- PIMCO. "Supplement dated December 27, 2022 to the Fund's Prospectus and Statement of Additional Information dated December 3, 2020, each as supplemented from time to time." Corporate & Income Strategy Fund. Published December 27, 2022. https://www.pimco.com/handlers/displaydocument.ashx?Id=XJwV9yAEq5hUqHFF9SAN1m9MQPj5cfY07okmXlvPnHGdzziJAPCtkh1IaaaxrJVrg3s70XusnPj%2FD6zPDDSTONbWALPwY%2BFP7orqpnYw57LoEEon0k2PoZBS%2BDynJPxm0hYdjChMB29zfvYK2XoRmHvb%2FuaQovkehHX%2BG%2B7vAHu6Lphlhal55DO01Qr2ZHFuUJk2HYo19iSPXu%2Fbg8NwhuYoaKO8%2BxwZS24%2B4JCxP53lphmmyVVYDLWb8vxGGW1%2F.

- Pitchbook. "About." Pitchbook. Accessed on March 2, 2023. https://pitchbook.com/about.

- Pitchbook. "About LCD." Accessed March 2, 2023. https://pitchbook.com/leveraged-commentary-data.

- Pitchbook. "Leveraged Commentary Data." Pitchbook. Accessed on March 6, 2023. https://pitchbook.com/leveraged-commentary-data.

- Pitchbook. "Leveraged Commentary & Data (LCD): Leveraged Loan Primer." Published on August 24, 2022. https://pitchbook.com/news/reports/2022-leveraged-commentary-data-lcd-leveraged-loan-primer.

- S&P Global. "Serta Simmons Bedding LLC's 'B' Corporate Credit Rating Affirmed; Term Loans Assigned 'B' And 'CCC+' Issue-Level Ratings." Ratings. Published October 7, 2016. https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/1732984.

- S&P Global. "Serta Simmons Bedding LLC Downgraded To 'CCC' Due To Weak Performance, Unsustainable Capital Structure; Outlook Negative." Ratings. Published December 4, 2019. https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2352377.

- S&P Global. "Serta Simmons Bedding LLC Downgraded To 'CCC+' From 'B-' Due To Underperformance And High Leverage; Outlook Negative." Ratings. Published March 28, 2019. https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2187467.

- S&P Global. "Serta Simmons Bedding LLC Downgraded To 'SD' From 'CC' On Completion of Distressed Debt Exchange." Ratings. Published June 23, 2020. https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2467049.

- S&P Global. "Serta Simmons Bedding LLC Ratings Lowered On Weak Operating Results and 2018 Outlook; Outlook Negative." Ratings. Published March 20, 2018. https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2310543.

- S&P Global. "Serta Simmons Bedding LLC Rating Lowered To 'CC' On Distres[s]ed Debt Exchange Announcement; Outlook Negative." Ratings. Published June 9, 2020. https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2458275.

- S&P Global. "Serta Simmons Bedding LLC Rating Lowered to 'CCC-' on Near-Term Debt Maturities; Outlook Negative." Ratings. Published August 31, 2022, https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2886863.

- S&P Global. "US leveraged loans gain 1.35% in December 2020, 3.12% in 2020 after Q4 rebound." Published January 4, 2021. https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/us-leveraged-loans-gain-1-35-in-december-2020-3-12-in-2020-after-q4-rebound-61949686.

- SIFMA. "Leveraged Loans Fact Sheet." SIFMA. Published June 2021. https://www.sifma.org/resources/research/leveraged-loans-fact-sheet/.

- US Securities and Exchange Commission. "Division of Trading and Markets: Answers to Frequently Asked Questions Concerning Rule 10b-18 ("Safe Harbor" for Issuer Repurchases)." SEC. Published December 2, 2016. https://www.sec.gov/divisions/marketreg/r10b18faq0504.htm.

### B.3.d. Websites, News Articles, and Other Publicly Available Sources

- Bank of America. "Instinct® Loans: A Trading Solution for Syndicated Loans." Bank of America. Accessed March 13, 2023. https://business.bofa.com/en-us/content/instinct-loans.html.

- Basu, Reshmi. "Serta Simmons slumbers into technical default." Debtwire. Published May 28, 2020. https://www.debtwire.com/intelligence/view/intelcms-j2hfg2?searchTerm=Serta s.

- Board of Governors of the Federal Reserve System, "About the Fed," February 21, 2023, https://www.federalreserve.gov/aboutthefed.htm.

- Businesswire. "Octaura Completes First Fully Electronic Syndicated Loan Trades." Businesswire. Published February 1, 2023. https://www.businesswire.com/news/home/20230201005314/en/Octaura-Completes-First-Fully-Electronic-Syndicated-Loan-Trades.

- Businesswire. "Serta Simmons Bedding Takes Decisive Actions to Strengthen Financial Position and Drive Long-Term Growth." Published January 23, 2023. https://www.businesswire.com/news/home/20230123005830/en/Serta-Simmons-Bedding-Takes-Decisive-Actions-to-Strengthen-Financial-Position-and-Drive-Long-Term-Growth.

- Code of Federal Regulations regarding Open Market CLOs (Collateralized Loan Obligations) (24 CFR §267.9).

- "Debt Buyback and Liability Management Considerations in a Volatile Market," Shearman & Sterling, accessed March 10, 2023, https://www.shearman.com/en/perspectives/2022/11/debt-buyback-and-liability-management-considerations-in-a-volatile-market.

- Edwards, Cheryl L. "Open Market Operations in the 1990s." *Federal Reserve Bulletin* (November 1997). https://www.federalreserve.gov/pubs/bulletin/1997/199711lead.pdf.

- Elberg, Shana A., Evan A. Hill, and Catrina A. Shea. "Uptier Exchange Transactions Remain in Vogue, Notwithstanding Litigation Risk." Skadden, Arps, Slate, Meagher & Flom LLP. Published February 2, 2021. https://www.skadden.com/insights/publications/2021/02/uptier-exchange-transactions.

- Federal Reserve Bank of St. Louis. "About the Federal Reserve Bank of St. Louis." Accessed March 12, 2023. https://www.stlouisfed.org/about-us.

- Hopper, Laura J. "What Are Open Market Operations? Monetary Policy Tools, Explained." Federal Reserve Bank of St. Louis. Published August 21, 2019. https://www.stlouisfed.org/open-vault/2019/august/open-market-operations-monetary-policy-tools-explained?print=true.

- IRS Revenue Ruling 59-60, 1959-1 CB 237 — IRC Sec. 2031.

- Jacobson, Seth E., Ron E. Meisler, Darrin R. Halcomb, Christopher M. Dressel, and Rebecca L. Ritchie. "Unhappy Lenders Challenge Aggressive Debt Exchanges." Skadden, Arps, Slate, Meagher

& Flom LLP. Published January 19, 2022.
https://www.skadden.com/insights/publications/2022/01/2022-insights/corporate/unhappy-lenders-challenge-aggressive-debt-exchanges.

- Jefferies. "Strength in Syndicated Second Lien Term Loans." Jefferies. Accessed March 6, 2023. https://www.jefferies.com/IdeasAndPerspectives/2/2804.

- Kearns, Robert. "Wheeling-Pittsburgh Steel Files for Chapter 11." Chicago Tribune. Published April 17, 1985. https://www.chicagotribune.com/news/ct-xpm-1985-04-17-8501220532-story.html.

- Leffert, Catherine. "Fintech backed by Citi, BofA takes on 'antiquated' syndicated loan trading." American Banker. Published February 21, 2013. https://www.americanbanker.com/news/fintech-backed-by-citi-bofa-takes-on-antiquated-syndicated-loan-trading.

- Merriam-Webster. s.v. "quid pro quo." Accessed March 11, 2023. https://www.merriam-webster.com/dictionary/quid%20pro%20quo.

- Murray, Marti P. "Assessing the Reasonableness of Rights Offerings Raising Exit Financing in the Context of a Chapter 11 Bankruptcy Proceeding." *Expert Guide, Bankruptcy & Restructuring* (New York: The Brattle Group, 2019). https://www.brattle.com/wp-content/uploads/2021/05/16777_assessing_the_reasonableness_of_rights_offerings_raising_exit_financing_in_the_context_of_a_chapter_11_bankruptcy_proceeding.pdf.

- National Archives. "Office of the Federal Register (OFR), About the Code of Federal Regulations." National Archives. Updated August 8, 2018. https://www.archives.gov/federal-register/cfr/about.html.

- *Oxford English Dictionary*. 3rd Edition. Oxford, England: Oxford University Press. 2004.

- PR Newswire. "TriMark USA Announces Resolution of Litigation with Its Lenders." January 7, 2022. TriMark USA Announces Resolution Of Litigation With Its Lenders (prnewswire.com).

- Practical Law Company Corporate & Securities and Practical Law Company Finance. "Ratings Agencies Clarify Distressed Exchange Criteria." March 27, 2009.

- LSTA, "LSTA Distressed Trade Confirmation," December 1, 2021.

- The Wall Street Journal. "Advent-Backed Serta Takes on Debt to Issue a $670 Million Dividend." October 7, 2016.

- Thomson Reuters Practical Law. "What's Market: Loan Buybacks USA." Published December 31, 2021. https://uk.practicallaw.thomsonreuters.com/1-385-9682?transitionType=Default&contextData=(sc.Default).

- Thomson Reuters Practical Law. "Glossary: Loan to Value (LTV)." Thomson Reuters. Accessed March 6, 2023. https://uk.practicallaw.thomsonreuters.com/w-000-

6242?transitionType=Default&contextData=(sc.Default)&firstPage=true#:~:text=A%20financial%20term%20commonly%20used,the%20riskiness%20of%20a%20loan.

- Thomson Reuters Practical Law. "LPC: Refinancing Drags Fees on US Leveraged Loans to 4-Year Low." Thomson Reuters. Published January 6, 2017. https://www.reuters.com/article/loans-fees/lpc-refinancing-drags-fees-on-us-leveraged-loans-to-4-year-low-idUKL1N1EW0SO.

- Thomson Reuters Practical Law. "LPC: US Syndicated Lending Flat in 2016 after Late-Year Spurt." Thomson Reuters. Published December 29, 2016. https://www.reuters.com/article/us-syndicatedlending/lpc-us-syndicated-lending-flat-in-2016-after-late-year-spurt-idINL1N1EO17H.

- Weil. "Private Equity Alert: De-Levering Portfolio Companies Through Debt Buybacks—US and UK Perspectives." March 2009. https://www.weil.com/~/media/files/pdfs/Private_Equity_Alert_March_2009.pdf#:~:text=Because%20debt%20is%20trading%20at%20below%20par%20prices%2C,terms%20of%20the%20tax%20and%20securities%20law%20concerns.

- Vanguard. "Trading on the primary and secondary markets." Vanguard. Accessed March 13, 2023. https://investor.vanguard.com/investor-resources-education/online-trading/primary-secondary-market.

# Appendix C. Serta's Term Loan Agreements

## C.1. Serta's First Lien Term Loan Agreement, Section 9.05(g)

Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases, in each case with respect to clauses (A) and (B), without the consent of the Administrative Agent; provided that:

(i) any Term Loans acquired by Holdings, the Top Borrower or any of its Restricted Subsidiaries shall, to the extent permitted by applicable Requirements of Law, be retired and cancelled immediately upon the acquisition thereof; provided that upon any such retirement and cancellation, the aggregate outstanding principal amount of the Term Loans shall be deemed reduced by the full par value of the aggregate principal amount of the Term Loans so retired and cancelled, and each principal repayment installment with respect to the Term Loans pursuant to Section 2.10(a) shall be reduced on a pro rata basis by the full par value of the aggregate principal amount of Term Loans so cancelled;

(ii) any Term Loans acquired by any Non-Debt Fund Affiliate may (but shall not be required to) be contributed (or distributed, as applicable) to the Top Borrower or any of its subsidiaries (it being understood that any such Term Loans shall, to the extent permitted by applicable Requirements of Law, be retired and cancelled promptly upon such contribution); provided that upon any such cancellation, the aggregate outstanding principal amount of the Term Loans shall be deemed reduced, as of the date of such contribution, by the full par value of the aggregate principal amount of the Term Loans so contributed and cancelled, and each principal repayment installment with respect to the Term Loans pursuant to Section 2.10(a) shall be reduced pro rata by the full par value of the aggregate principal amount of Initial Term Loans so contributed and cancelled;

(iii) the relevant Affiliated Lender and assigning Lender shall have executed an Affiliated Lender Assignment and Assumption;

(iv) after giving effect to the relevant assignment and to all other assignments to all Affiliated Lenders, the aggregate principal amount of all Term Loans then held by all Affiliated Lenders shall not exceed 30% of the aggregate principal amount of the Term Loans then outstanding (after giving effect to any substantially simultaneous cancellations thereof) (the "Affiliated Lender Cap"); provided that each party hereto

acknowledges and agrees that the Administrative Agent shall not be liable for any losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever incurred or suffered by any Person in connection with any compliance or non-compliance with this clause (g)(iv) or any purported assignment exceeding the Affiliated Lender Cap (it being understood and agreed that the Affiliated Lender Cap is intended to apply to any Loans made available to Affiliated Lenders by means other than formal assignment (e.g., as a result of an acquisition of another Lender (other than any Debt Fund Affiliate) by any Affiliated Lender or the provision of Additional Term Loans by any Affiliated Lender); provided, further, that to the extent that any assignment to any Affiliated Lender would result in the aggregate principal amount of Term Loans held by Affiliated Lenders exceeding the Affiliated Lender Cap (after giving effect to any substantially simultaneous cancellation thereof), the assignment of the relevant excess amount shall be null and void;

(v) in connection with any assignment effected pursuant to a Dutch Auction and/or open market purchase conducted by Holdings, the Top Borrower or any of its Restricted Subsidiaries, (A) the relevant Person may not use the proceeds of any ABL Facility or any Additional Revolving Loan to fund such assignment and (B) no Event of Default exists at the time of acceptance of bids for the Dutch Auction or the confirmation of such open market purchase, as applicable; and

(vi) by its acquisition of Term Loans, each relevant Affiliated Lender shall be deemed to have acknowledged and agreed that:

(133)   subject to clause (iv) above, the Term Loans held by such Affiliated Lender shall be disregarded in both the numerator and denominator in the calculation of any Required Lender or other Lender vote; provided that (x) such Affiliated Lender shall have the right to vote (and the Term Loans held by such Affiliated Lender shall not be so disregarded) with respect to any amendment, modification, waiver, consent or other action that requires the vote of all Lenders or all Lenders directly and adversely affected thereby, as the case may be, and (y) no amendment, modification, waiver, consent or other action shall (1) disproportionately affect such Affiliated Lender in its capacity as a Lender as compared to other Lenders of the same Class that are not Affiliated Lenders or (2) deprive any Affiliated Lender of its share of any payments which the Lenders are entitled to share on a pro rata basis hereunder, in each case without the consent of such Affiliated Lender; and

(134)   such Affiliated Lender, solely in its capacity as an Affiliated Lender, will not be entitled to (i) attend (including by telephone) or participate in any meeting or discussion (or portion thereof) among the Administrative Agent or any Lender or among Lenders to which the Loan Parties or their representatives are not invited or (ii) receive any information or material prepared by the Administrative Agent or any Lender or any communication by or among the Administrative Agent and one or more Lenders, except to

the extent such information or materials have been made available by the Administrative Agent or any Lender to any Loan Party or its representatives (and in any case, other than the right to receive notices of Borrowings, prepayments and other administrative notices in respect of its Term Loans required to be delivered to Lenders pursuant to Article 2);

(vii) no Affiliated Lender shall be required to represent or warrant that it is not in possession of material non-public information with respect to Holdings, the Top Borrower and/or any subsidiary thereof and/or their respective securities in connection with any assignment permitted by this Section 9.05(g); and

(viii) in any proceeding under any Debtor Relief Law, the interest of any Affiliated Lender  in any Term Loan will be deemed to be voted in the same proportion as the vote of Lenders that are not Affiliated Lenders on the relevant matter; provided that each Affiliated Lender will be entitled to vote its interest in any Term Loan to the extent that any plan of reorganization or other arrangement with respect to which the relevant vote is sought proposes to treat the interest of such Affiliated Lender in such Term Loan in a manner that is less favorable to such Affiliated Lender than the proposed treatment of Term Loans held by other Term Lenders.

Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Loans and/or Commitments to any Debt Fund Affiliate, and any Debt Fund Affiliate may, from time to time, purchase Loans and/or Commitments (x) on a non-pro rata basis through Dutch Auctions open to all applicable Lenders or (y) on a non-pro rata basis through open market purchases without the consent of the Administrative Agent, in each case, notwithstanding the requirements set forth in subclauses (i) through (vii) of this clause (g); provided that the Loans and Commitments held by all Debt Fund Affiliates shall not account for more than 49.9% of the amounts included in determining whether the Required Lenders have (A) consented to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (B) otherwise acted on any matter related to any Loan Document or (C) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document; it being understood and agreed that the portion of the Loan and/or Commitments that accounts for more than 49.9% of the relevant Required Lender action shall be deemed to be voted pro rata along with other Lenders that are not Debt Fund Affiliates. Any Loans acquired by any Debt Fund Affiliate may (but shall not be required to) be contributed to the Top Borrower or any of its subsidiaries for purposes of cancelling such Indebtedness (it being understood that any Loans so contributed shall be retired and cancelled immediately upon thereof); provided that upon any such

cancellation, the aggregate outstanding principal amount of the relevant Class of Loans shall be deemed reduced, as of the date of such contribution, by the full par value of the aggregate principal amount of the Loans so contributed and cancelled, and each principal repayment installment with respect to the Term Loans pursuant to Section 2.10(a) shall be reduced pro rata by the full par value of the aggregate principal amount of any applicable Term Loans so contributed and cancelled.

## C.2. Serta's Second Lien Loan Term Agreement, Section 9.05(g)

Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Loans to any Affiliated Lender on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Loans on a pro rata basis or (B) through open market purchases, in each case with respect to clauses (A) and (B), without the consent of the Administrative Agent; provided that:

(i) any Loans acquired by Holdings, the Top Borrower or any of its Restricted Subsidiaries shall, to the extent permitted by applicable Requirements of Law, be retired and cancelled immediately upon the acquisition thereof; provided that upon any such retirement and cancellation, the aggregate outstanding principal amount of the Loans shall be deemed reduced by the full par value of the aggregate principal amount of the Loans so retired and cancelled;

(ii) any Loans acquired by any Non-Debt Fund Affiliate may (but shall not be required to) be contributed (or distributed, as applicable) to the Top Borrower or any of its subsidiaries (it being understood that any such Loans shall, to the extent permitted by applicable Requirements of Law, be retired and cancelled promptly upon such contribution); provided that upon any such cancellation, the aggregate outstanding principal amount of the Loans shall be deemed reduced, as of the date of such contribution, by the full par value of the aggregate principal amount of the Loans so contributed and cancelled;

(iii) the relevant Affiliated Lender and assigning Lender shall have executed an Affiliated Lender Assignment and Assumption;

(iv) after giving effect to the relevant assignment and to all other assignments to all Affiliated Lenders, the aggregate principal amount of all Loans then held by all Affiliated Lenders shall not exceed 30% of the aggregate principal amount of the Loans then outstanding (after giving effect to any substantially simultaneous cancellations thereof)

(the "Affiliated Lender Cap"); provided that each party hereto acknowledges and agrees that the Administrative Agent shall not be liable for any losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever incurred or suffered by any Person in connection with any compliance or non-compliance with this clause (g)(iv) or any purported assignment exceeding the Affiliated Lender Cap (it being understood and agreed that the Affiliated Lender Cap is intended to apply to any Loans made available to Affiliated Lenders by means other than formal assignment (e.g.,  as a result of an acquisition of another Lender (other than any Debt Fund Affiliate) by any Affiliated Lender or the provision of Additional Term Loans by any Affiliated Lender); provided, further, that to the extent that any assignment to any Affiliated Lender would result in the aggregate principal amount of Loans held by Affiliated Lenders exceeding the Affiliated Lender Cap (after giving effect to any substantially simultaneous cancellation thereof), the assignment of the relevant excess amount shall be null and void;

(v) in connection with any assignment effected pursuant to a Dutch Auction and/or open market purchase conducted by Holdings, the Top Borrower or any of its Restricted Subsidiaries, (A) the relevant Person may not use the proceeds of any ABL Facility or any Additional Revolving Loan (as defined in the First Lien Credit Agreement (or any equivalent term under any First Lien Facility)) to fund such assignment and (B) no Event of Default exists at the time of acceptance of bids for the Dutch Auction or the confirmation of such open market purchase, as applicable; and

(vi) by its acquisition of Loans, each relevant Affiliated Lender shall be deemed to have acknowledged and agreed that:

(A)

subject to clause (iv) above, the Loans held by such Affiliated Lender shall be disregarded in both the numerator and denominator in the calculation of any Required Lender or other Lender vote; provided that (x) such Affiliated Lender shall have the right to vote (and the Loans held by such Affiliated Lender shall not be so disregarded) with respect to any amendment, modification, waiver, consent or other action that requires the vote of all Lenders or all Lenders directly and adversely affected thereby, as the case may be, and (y) no amendment, modification, waiver, consent or other action shall (1) disproportionately affect such Affiliated Lender in its capacity as a Lender as compared to other Lenders of the same Class that are not Affiliated Lenders or (2) deprive any Affiliated Lender of its share of any payments which the Lenders are entitled to share on a pro rata basis hereunder, in each case without the consent of such Affiliated Lender; and

(B) such Affiliated Lender, solely in its capacity as an Affiliated Lender, will not be entitled to (i) attend (including by telephone) or participate in any meeting or discussion (or portion thereof) among the Administrative Agent or any Lender or among Lenders to which the Loan Parties or their representatives are not invited or (ii) receive any information or material prepared by the Administrative Agent or any Lender or any communication by or among the Administrative Agent and one or more Lenders, except to the extent such information or materials have been made available by the Administrative Agent or any Lender to any Loan Party or its representatives (and in any case, other than the right to receive notices of Borrowings, prepayments and other administrative notices in respect of its Loans required to be delivered to Lenders pursuant to Article 2);

(vii) no Affiliated Lender shall be required to represent or warrant that 1t 1s not in possession of material non-public information with respect to Holdings, the Top Borrower and/or any subsidiary thereof and/or their respective securities in connection with any assignment permitted by this Section 9.05(g); and

(viii) in any proceeding under any Debtor Relief Law, the interest of any Affiliated Lender in any Loan will be deemed to be voted in the same proportion as the vote of Lenders that are not Affiliated Lenders on the relevant matter; provided that each Affiliated Lender will be entitled to vote its interest in any Loan to the extent that any plan of reorganization or other arrangement with respect to which the relevant vote is sought proposes to treat the interest of such Affiliated Lender in such Loan in a manner that is less favorable to such Affiliated Lender than the proposed treatment of Loans held by other Lenders.

Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Loans and/or Commitments to any Debt Fund Affiliate, and any Debt Fund Affiliate may, from time to time, purchase Loans and/or Commitments (x) on a non-pro rata basis through Dutch Auctions open to all applicable Lenders or (y) on a non-pro rata basis through open market purchases without the consent of the Administrative Agent, in each case, notwithstanding the requirements set forth in subclauses (i) through (vii) of this clause (g); provided that the Loans and Commitments held by all Debt Fund Affiliates shall not account for more than 49.9% of the amounts included in determining whether the Required Lenders have (A) consented to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (B) otherwise acted on any matter related to any Loan Document or (C) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any

Loan Document; it being understood and agreed that the portion of the Loan and/or Commitments that accounts for more than 49.9% of the relevant Required Lender action shall be deemed to be voted pro rata along with other Lenders that are not Debt Fund Affiliates. Any Loans acquired by any Debt Fund Affiliate may (but shall not be required to) be contributed to the Top Borrower or any of its subsidiaries for purposes of cancelling such Indebtedness (it being understood that any Loans so contributed shall be retired and cancelled immediately upon thereof); provided that upon any such cancellation, the aggregate outstanding principal amount of the relevant Class of Loans shall be deemed reduced, as of the date of such contribution, by the full par value of the aggregate principal amount of the Loans so contributed and cancelled.