**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| SERTA SIMMONS BEDDING, LLC, et al., | Case No. 23-90020 (DRJ) (Jointly Administered) |
| Debtors, | |
| SERTA SIMMONS BEDDING, LLC, et al., | |
| Plaintiffs and Counterclaim Defendants, | Adversary Proc. No. 23-09001 (DRJ) |
| v. | |
| AG CENTRE STREET PARTNERSHIP L.P., et al., | |
| Defendants, Counterclaim Plaintiffs and Third-Party Plaintiffs, | |
| v. | |
| AGF FLOATING RATE INCOME FUND, et al., | |
| Third-Party Defendants. | |

**EXPERT DECLARATION OF SARAH M. WARD**

Pursuant to 28 U.S.C. § 1746, SARAH M. WARD declares as follows:

## I.  INTRODUCTION

### A.  Assignment and Summary of Opinions

1.      I have been retained by Friedman Kaplan Seiler Adelman & Robbins LLP
("Friedman Kaplan"), which is counsel to the Ad Hoc Group of First Lien Lenders to Serta
Simmons Bedding, LLC ("Serta"), to render opinions regarding the origin, purpose, and market
understanding of certain provisions of the First Lien Term Loan Agreement, dated as of
November 8, 2016 (the "Term Loan Agreement"), by and among Dawn Intermediate, Inc., a
Delaware corporation ("Holdings"), Serta, the other borrowers party thereto, the lenders from
time to time party thereto, and UBS AG, Stamford Branch, in its capacities as administrative
agent and collateral agent for the lenders (in such capacities and together with its successors and
assigns, the "Administrative Agent").  In particular, I have been asked to form an opinion, as a
knowledgeable financial industry participant, drawing on my participation in the leveraged
finance market as a legal professional, as to the market understanding of the term "open market
purchases."

2.      In doing so, I reviewed and analyzed the relevant loan documents in much in the
same way I have reviewed and analyzed such documents throughout my career as a leveraged
finance and corporate restructuring lawyer.  I am not offering any legal conclusions, which I
understand are exclusively for the Court, but rather my perspectives on market practices and
understandings based on a 32+ year career in the field of finance.

3.      Based on both my professional experience and my analysis of this issue, I have
reached the following opinions:

i.    <u>Market Understanding of An Open Market Purchase</u>

4.    In my opinion, loan market participants would understand the term "open market purchases" in Section 9.05(g) of the Term Loan Agreement to mean purchases of loans typically for cash through a broker or an agent at or close to the prevailing market price. Open market purchases are simple trades of debt that allow the borrower to capture discount quickly and cost-effectively. They are not linked to a broader transaction. There is a well-developed secondary market in which leveraged loans of the kind at issue here are routinely traded based on standard documentation.

5.    Open market purchases in the high yield bond context are generally conducted through broker-dealers (typically investment banks) which serve as market makers. The parties to the transaction normally are not aware of one another's identity. The trades clear through DTC.

6.    By contrast, an issuer may repurchase bonds through a privately negotiated transaction where the buyer (acting directly or through an agent) approaches individuals or groups of bondholders (usually sophisticated, institutional sellers) that own substantial percentages of the issuer's debt securities and purchases the debt securities for a negotiated price, often at a premium that may be paid in cash and/or securities.

7.    Because bonds are securities, repurchases of bonds are subject to tender offer rules promulgated under the securities laws. If a bond repurchase is characterized as a tender offer, it is not an open market purchase. Based on guidance from the Securities and Exchange Commission and case law, purchasers avoid characterization of purchases as tender offers by limiting solicitations to a small group of holders and a limited percentage of the issuer's securities, making offers at or close to the prevailing market price with little to no premium and avoiding exerting pressure on the offerees to sell their securities.

8.     Because the concept of open market purchases evolved from and was imported into credit agreements from the high yield bond market as a result of the convergence of the two markets, the term "open market purchases" in a credit agreement should be interpreted consistently with the understanding of that term in the securities context.

ii.     <u>Applying the Common Market Understanding of "Open Market Purchase," the Transaction Was Not An Open Market Purchase</u>

9.     Based on these principles, Serta's 2020 debt restructuring (the "Transaction") was not an open market purchase:

10.     <u>First</u>, it was not a simple trade of debt for cash through a broker or an agent at or close to the prevailing market price.  To the contrary, the Transaction was a complicated, privately negotiated transaction that required the sellers to (i) tender their first and second lien loans, (ii) vote in favor of complicated amendments to existing loan documents to permit, among other things, the incurrence of super-priority term loans and a new intercreditor agreement that subordinated the rights to payment of lenders holding a significant portion of previously pari-passu debt, (iii) exchange their loans for new loans with highly negotiated terms, (iv) provide $200 million of new money pursuant to a separately negotiated credit agreement and (v) enter into a suite of agreements alongside numerous other lenders to effectuate a restructuring and recapitalization transaction.

11.     <u>Second</u>, the Transaction was structured on terms and conditions that would have resulted in a determination of a tender offer (not an open market purchase) if securities were involved: (i) Serta conducted an active and widespread solicitation of holders, (ii) the solicitation involved a substantial percentage of the borrower's outstanding loans, (iii) the offer to purchase was made at a premium over the prevailing market price, and (iv) the offerees were subject to pressure to sell their loans.  While the loans at issue in this case would not be considered

securities, the principles developed in the securities context inform how market participants think about the term "open market purchase" given that the term was imported into credit agreements from the high yield bond market.

12.     <u>Third</u>, the view urged by Serta and plaintiffs Invesco Senior Secured Management, Inc., Credit Suisse Asset Management, LLC, Boston Management and Research, Eaton Vance Management (such lenders, together with the other non-plaintiff lenders who participated in the Transaction, the "Participating Majority Lenders") that the Transaction is an open market purchase would totally eviscerate the pro rata sharing provisions of the Term Loan Agreement and makes no sense from a commercial perspective.  The absurdity of this interpretation becomes evident when one understands the history of the open market purchase provision and other provisions governing the credit agreement as well as market practice and understanding.  In particular, it is significant, in my view, that the sole exceptions to pro rata sharing under the Term Loan Agreement are the open market purchase provision and the enumerated Dutch Auction procedures.  Both exceptions are designed to ensure that no lender or group of lenders obtains benefits from the borrower or its affiliates at the expense of other lenders.  To interpret the open market purchase provision to cover the Transaction would allow the exception to swallow the general rule that all lenders are to be treated ratably.

13.     Other evidence I have considered, including other aspects of the Term Loan Agreement as well as statements and publications by knowledgeable finance industry participants, further corroborates my analysis.

**B.     Qualifications**

14.     I have 32 years of experience in finance, approximately 25 of which relate to leveraged financing transactions and corporate restructurings.  My areas of expertise include, among other things, credit agreements, indentures, intercreditor agreements, security agreements

and other loan documents as well as structuring credit transactions and due diligence.  I routinely structured and negotiated credit agreements, many of which contain open market purchase provisions, on behalf of borrowers and lenders.  Over the course of my career, I have also worked on dozens of in-court and out-of-court restructurings representing both lenders and borrowers.

15.     I practiced law for more than 35 years at Skadden, Arps, Slate, Meagher & Flom LLP, where I was a New York-based partner in the firm's Banking Group for over 27 years and co-chair of its Legal Opinion Oversight Committee for over a decade.  I also served as Global Co-Head of the Banking Group from 2009-2014.  I have authored numerous articles related to my areas of practice and have lectured extensively on banking-related topics.  I retired from the firm in December 2021.

16.     I hold a Bachelor of Arts (BA) degree in Politics from Princeton University and a Juris Doctor (JD) degree from Fordham University School of Law.

17.     Appendix A is a true and complete copy of my curriculum vitae.  I have not testified as an expert at a deposition or trial or submitted an expert report in the last four years.

**C.     Compensation**

18.     Friedman Kaplan has been billed on an hourly basis for my work.  My hourly rate for analysis and testimony is $1,250.  My compensation is not affected by the nature of the opinions that I form or the outcome of the case.

**D.     Documents and Information Considered**

19.     In the course of my analysis, I considered various documents, pleadings and other information of a type reasonably relied upon in a matter like this by experts in my field.  This information includes, but is not limited to, transaction documents, complaints, motions and other pleadings, and research of publicly available information.  I have also drawn on my extensive

experience as a leveraged finance and corporate restructuring lawyer.  Appendix B, attached

hereto, sets forth the materials I have considered in forming the opinions discussed in this

declaration.

### E.    Background

#### i.    Background on Serta

20.    Serta is North America's largest bedding manufacturer.  Serta today is the

successor to two well-known American brands, Serta and Simmons, which were combined in

2010 when an investor group that already owned the parent of Serta purchased Simmons, as

Simmons emerged from a Chapter 11 reorganization.

#### ii.    The Term Loan Agreement

21.    In 2016, Serta entered into three credit facilities dated as of November 8, 2016,

each of which was executed by Serta and various affiliates and counterparties.  The executed

agreements include: (1) the Term Loan Agreement, which provided for $1.95 billion in term

loans (the "First Lien Term Loans"); (2) a second lien credit agreement, which provided for $450

million in term loans (the "Second Lien Term Loans"); and (3) a $225 million asset-based

revolving credit facility (the "ABL").

22.    The Term Loan Agreement includes several pro rata distribution and sharing

provisions central to the parties' bargain and, in my experience, quite typical of term loan credit

agreements.  First, Section 2.18(b) of the Term Loan Agreement sets forth the payment waterfall

for the allocation of collateral proceeds upon an event of default, which includes a bankruptcy

and the acceleration of the loans.[1]  The waterfall requires that, following a default, after payment

of certain expenses, the proceeds of any collateral be divided among the lenders who participated

---

[1] Term Loan Agreement § 2.18(b).

in the First Lien Term Loans (the "First Lien Lenders") "on a pro rata basis in accordance with the amounts of the Secured Obligations" to the First Lien Lenders.[2]  Each First Lien Lender, therefore, has an equal right to payment of collateral, proportionate to the percentage share of the total outstanding principal amount of loans that it owns.

23.     Second, Section 2.18(c) of the Term Loan Agreement requires that all payments of principal and interest must be allocated to First Lien Lenders on a pro rata basis, and any First Lien Lender that receives more than its pro rata share must pay the excess ratably to the other First Lien Lenders, which is known as "pro rata sharing."  Specifically, Section 2.18(c) provides:

> If any Lender obtains payment . . . in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with Loans of such Class, **then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans of other Lenders of such Class at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such Class ratably** in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class . . . .[3]

24.     The waterfall in Section 2.18(b) and the pro rata sharing provision in Section 2.18(c) are among what is known as the Term Loan Agreement's "sacred rights," meaning that they may be amended only with "the consent of each Lender directly and adversely affected thereby," *i.e.*, all First Lien Lenders.[4]  While most of the Term Loan Agreement's provisions may be amended by the "Required Lenders," meaning any combination of lenders representing

---

[2] *Id.*

[3] *Id.* § 2.18(c) (emphasis added).

[4] *Id.* § 9.02(b)(A).

more than 50% of the face value of the loans, the most important provisions of the agreement require unanimous consent of all affected lenders.  This unanimity requirement is critical to protecting the rights of lenders – especially the minority lenders – to be repaid on the terms upon which they purchased their loans.

25.     Specifically, Section 9.02(b)(A)(6) provides that each affected lender – that is, all lenders – must approve any agreement that "waives, amends or modifies Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby (except in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c), and/or 9.05(g) or as otherwise provided in this section 9.02)."  As such, the proceeds waterfall and pro rata sharing of proceeds may not be modified absent consent of *all* adversely affected lenders unless one of these four exceptions applies.  I understand that Serta and the Participating Majority Lenders are relying on the "open market purchase" exception set forth in Section 9.05(g) to justify Serta's restructuring of its debt as part of the much larger integrated Transaction.  Under Section 9.05(g) of the Term Loan Agreement, a lender may "assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) *through open market purchases*[.]"[5]

iii.     Events Leading to the Transaction

26.     Prior to the COVID-19 pandemic, Serta had been struggling financially.  Indeed, in early March 2020, Serta's First Lien Term Loans were trading at less than fifty cents on the dollar, and its Second Lien Term Loans were trading at less than twenty cents.

---

[5] *Id.* § 9.05(g) (emphasis added).

27.     In April 2020, Serta and a group of first lien lenders comprised of Apollo, Angelo Gordon, Gamut discussed a transaction to try to alleviate Serta's liquidity issues.  That transaction never materialized because Serta ended the discussions on June 5, 2020.

      iv.   <u>The Transaction</u>

28.     On June 8, 2020, Serta announced in a press release that it had entered into a transaction support agreement with the Participating Majority Lenders – holders of a majority of its First Lien and Second Lien Term Loans.  The press release said that the Transaction was designed to "recapitalize the company," and made no reference to "open market purchases." According to the press release, the Transaction would include:

    (a)    $200 million of new money super-priority "first out" debt, funded by the Participating Majority Lenders, which would rank ahead of the existing First Lien Term Loans;

    (b)    Up to $875 million of super-priority "second out" debt, issued in exchange for First Lien Term Loans and Second Lien Term Loans held by the Participating Majority Lenders, which also would rank ahead of the existing First Lien Term Loans; and

    (c)    An unspecified amount of capacity to incur still more super-priority debt, which would be "third out" and also would rank ahead of the existing First Lien Term Loans.[6]

29.     I understand that Serta declined to offer a subset of lenders (the "Non-Participating Minority Lenders")[7] the opportunity to exchange their First Lien Term Loans for

---

[6] "Serta Simmons Bedding Enters Into Agreement with Majority of Lenders on Deleveraging and Liquidity Enhancing Transaction," Serta Simmons Bedding, LLC, dated June 8, 2020, *available at* https://sertasimmons.com/news/serta-simmons-bedding-enters-into-agreement-with-majority-of-lenders-on-deleveraging-and-liquidity-enhancing-transaction/.

[7] The Non-Participating Minority Lenders include defendants/counter-claim plaintiffs AG Centre Street Partnership L.P., AG Credit Solutions Non-ECI Master Fund, L.P., AG Super Fund Master, L.P., AG SF Master (L), L.P., Silver Oak Capital, L.L.C., Ascribe III Investments, LLC, Cent CLO 21 Limited, Columbia Cent CLO 27 Limited, Columbia Floating Rate Fund, a series of Columbia Funds Series Trust II, Columbia Strategic Income Fund, a series of Columbia Funds Series Trust I, Contrarian Capital Fund I, L.P., Contrarian Distressed Debt Fund, L.P., Contrarian

the "super-priority" loans granted to the Participating Majority Lenders or to seek the consent of all Non-Participating Minority Lenders to amend or modify the terms of the Term Loan Agreement.

30.     The effect of the Transaction was that $1.075 billion in super-priority loans would have to be paid in full before the Non-Participating Minority Lenders' First Lien Term Loans could be paid under the Term Loan Agreement.

31.     To effectuate the Transaction, the Participating Majority Lenders agreed to (i) amendments to the Term Loan Agreement ("Amendment No. 1") and Serta's Second Lien Term Loan Agreement, (ii) a Super-Priority Term Loan Agreement (the "PTL Agreement"), (ii) an Open Market Purchase and Cashless Exchange Agreement (the "Exchange Agreement"), and (iv) a new intercreditor agreement providing for payment subordination of the First Lien Term Loans to the new Priority Term Loans (the "Priority Intercreditor Agreement").

32.     Through Amendment No. 1, the Participating Majority Lenders declared that they "acknowledge[d] and agree[d] that the borrowing and/or incurrence of the Priority Term Loans under the PTL Credit Agreement and the other transactions . . . shall be and are permitted under the provisions of the Amended Term Loan Agreement and each other Loan Document."[8]  The Participating Majority Lenders then "instruct[ed] the Administrative Agent to . . . take . . . any

---

Centre Street Partnership, L.P., Gamut Capital SSB, LLC, North Star Debt Holdings, L.P., Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., Shackleton 2017-XI CLO, Ltd., Z Capital Credit Partners CLO 2018-1 Ltd., and Z Capital Credit Partners CLO 2019-1 Ltd.  The Non-Participating Minority Lenders also include the third-party defendants.  *See* ECF No. 68, Answer, Counterclaims & Third-Party Claims ¶ 96.

[8] Amendment No. 1 § 4.

and all actions . . . necessary, advisable or desirable in carrying out, effectuating or otherwise in furtherance of the transactions related to or in connection with" the Amendment No. 1.[9]

33.     Among other things, the amendments approved by the Participating Majority Lenders (but not by other First Lien Lenders, including the Non-Participating Minority Lenders) allowed Serta to incur incremental equivalent debt that is senior in right of payment to the First Lien Loans, rather than junior or pari passu in right of payment as originally required under the Term Loan Agreement.  The definition of Incremental Equivalent Debt was amended as follows:

> Indebtedness ~~in the form of pari passu senior secured or unsecured notes or loans or junior secured or unsecured notes or loans and/or commitments in respect of any of the foregoing~~ issued, incurred or implemented in lieu of loans under an Incremental Facility in the form of notes or loans and/or commitments in respect of the foregoing (including Indebtedness issued under the PTL Credit Agreement (including the Priority New Money Term Loans and the Priority Exchange Term Loans)) in each case, which may be senior, pari passu or junior in right of payment and/or with respect to security with the Obligations hereunder . . . .[10]

Notably, such amendments effectively allow unlimited additional debt to come in on a "super senior" basis relative to the First Lien Term Loans.

34.     The amendments also altered Section 8.08 of the Term Loan Agreement to authorize the Administrative Agent to enter into a separate intercreditor agreement establishing senior payment priority for the priority term loans:

> Each Secured Party irrevocably authorizes and instructs the Administrative Agent to, and the Administrative Agent shall . . . (d) enter into subordination, intercreditor, collateral trust and/or similar agreements with respect to Indebtedness (including the Initial

---

[9] *Id.* § 14(a).

[10] *Id.* § 1.01.  Amendments are set forth in blue underline and ~~red strike-through~~.  *See also id.* § 6.01(z) (allowing Serta to incur Incremental Equivalent Debt).

Intercreditor Agreement, the PTL First Lien Intercreditor Agreement
and any other Acceptable Intercreditor Agreement . . .) that is
(i) required or permitted to be senior, pari passu or subordinated
hereunder. . . . [11]

35.     Furthermore, Serta and the Participating Majority Lenders deleted Section 7.01(l),

which designates "subordination" of the First Lien Term Loans as an "event of default."[12]

36.     Though there were over two dozen amendments to the Term Loan Agreement, a

final notable amendment is the addition of a new subpart to Section 2.11(b), the section

regarding mandatory prepayment of the First Lien Term Loans, to affirm that the priority term

loans had rights of payment senior to that of the First Lien Lenders.[13]

37.     Similarly, through the new Priority Intercreditor Agreement, the Participating

Majority Lenders were granted priority rights to "payments" and "realization on Shared

Collateral" ahead of the Non-Participating Minority Lenders.[14]

38.     Finally, Serta and the Participating Majority Lenders entered into the Exchange

Agreement, which purported to ratify the Transaction and labeled it as a "purchase on the open

market . . . pursuant to Section 9.05(g) of the First Lien Credit Agreement."[15]

---

[11] *Id.* § 8.08(d).  Amendments are set forth in blue underline.

[12] *See id.* § 7.01(l).

[13] *See id.* § 2.11(b)(vii).

[14] *See* Priority Intercreditor Agreement § 2.01.  The Priority Term Loans issued in exchange for
the First Lien Term Loans of the Participating Majority Lenders also bear interest at a rate 4.00%
per annum higher, or a margin that is more than 100% greater, than the First Lien Term Loans.
*See* Priority Term Loan Agreement § 1.01.

[15] *See* Exchange Agreement, Preamble.

II.     **ANALYSIS**

A.      **Definition of Open Market Purchases of Loans**

39.     Loan participants would understand the term "open market purchases" in Section 9.05(g) of the Term Loan Agreement to mean purchases of loans that typically are accomplished through a broker or agent and require the purchaser to pay a price at or close to the prevailing market price in cash.

40.     As discussed more fully below, the concept of open market purchases was imported into credit agreements from the high yield bond market as a result of the convergence of the two markets.  Therefore, the term "open market purchases" in leveraged loan credit agreements should be interpreted consistently with the understanding of that term in the securities context.

41.     In an open market purchase of securities, a company can repurchase equity or debt on an exchange or on the over-the-counter ("OTC") market.  Unlike stocks, most corporate bonds issued by private and public corporations are traded OTC rather than on exchanges.  OTC trades generally are conducted through broker-dealers (typically large investment banks) which serve as market makers.  These market makers quote prices to buy and sell a security at any time.

42.     Open market purchases of securities are universally viewed as simple trades pursuant to which the seller delivers securities in exchange for the consideration paid by the purchaser (typically cash).  An open market transaction is not conditioned upon the consummation of other transactions.

43.     By contrast, in a privately negotiated repurchase, the buyer (either directly or through an agent) approaches individual or groups of bondholders (usually sophisticated, institutional sellers) that own large percentages of the issuer's securities and purchases the debt securities for a negotiated price, often at a premium paid in cash and/or securities.

44.     Similar to repurchases of bonds in the open market, open market purchases of syndicated term loans typically are traded in a secondary market with dealer desks at large underwriting banks.  Purchases of the loan interests are structured as assignments, in which the assignee becomes the lender of record.  The transfer is effected through an assignment and assumption agreement and settles through a settlement platform.  Each loan transfer is governed by standardized documentation in the form of (i) a trade ticket, (ii) a trade confirmation, (iii) an assignment and assumption agreement (substantially in the form of an exhibit attached to the credit agreement), and (iv) a funding memorandum.  A specific form of assignment and assumption agreement applicable to loan repurchases by the borrower or its affiliates is also typically attached as a credit agreement exhibit.  (The Term Loan Agreement included such an exhibit.)  These standard forms do not provide that trades can be settled in anything other than cash.

45.     These loan assignment and assumption agreements provide that the seller transfers to the purchaser, and the purchaser assumes from the seller, all the rights and obligations of the seller in its capacity as a lender under the credit agreement.

46.     Open market purchases consist of a single trade – the seller transfers its interest in the securities or loans to the purchaser and the purchaser pays the prevailing market price (typically in cash).  Therefore, a complex, multi-part transaction that involves a myriad of amendments to existing loan documents, the entering into of a new credit agreement, new security agreements and a new intercreditor agreement and the provision of new money financing would not be viewed as an open market purchase.

**B.      Origin of the "Open Market Purchases" Exception in Credit Agreements**

47.     In this section of my declaration, I discuss the historical inclusion of bond-style covenants in leveraged loans to help explain the origin and meaning of the term "open market purchases" in credit agreements.

        i.      <u>History and Convergence of Leveraged Loan and High Yield Bond Markets</u>

48.     Historically, the commercial bank market and the high yield bond markets were very different.

49.     In the commercial bank market, credit was extended in the form of loans governed by a credit agreement.  Term loans were rapidly amortizing, had relatively short maturities (usually 3 years) and contained financial maintenance covenants.  Typically, the lender syndicate was a relatively discrete group of banks that had a relationship with the borrower, and the arranger held a substantial portion of the loans.  Term loans generally required pro rata repayments to lenders and did not permit the borrowers to purchase their own loans.

50.     In the high yield bond market, bonds, which are governed by indentures, were issued by companies with a credit rating below investment grade.  High yield bonds had longer maturities (usually 7 years) and had a no amortization or financial maintenance covenants.  High yield bonds were widely distributed to a large group of bondholders.  Indentures permitted (and still permit) issuers to repurchase their bonds.

51.     Over the past decade or so, the terms of loans issued by non-investment grade companies (known as "leveraged loans") have shifted from maintenance covenants to a bond-style incurrence covenant package.  While maintenance covenants tested operating performance (*e.g.*, an interest coverage ratio to ensure a company had sufficient earnings to cover interest

payments), incurrence covenants provide that an issuer may take certain actions such as incurring

debt, paying dividends or making investments only if it meets certain specified tests.

52.     This shift to incurrence-based covenants in the leverage loan market can be

explained by several reasons.  First, the investor base in the leveraged loan market and the high

yield bond market has converged.  The same institutional investors (mutual funds, insurance

companies and collateralized loan obligations (CLOs)) that dominate the high yield bond market

have come to dominate the US leveraged finance market.  When these institutional investors

invest in leveraged loans, they demand the same incurrence-based covenant package that they get

in high yield bonds.

53.     Second, the loans are no longer made on a lend-and-hold basis where lenders

retain exposure to and a close relationship with the borrower.  Instead arranging banks originate

and syndicate term loans to institutional investors with no expectation that the arranging banks

will hold any amount of the loans for any period of time.  Lastly, private equity sponsors have

considerable capital to deploy, giving them increasing leverage over arrangers and investors.

These private equity sponsors raise capital in both the leveraged loan market and the high yield

bond market.  They typically push for alignment in the terms governing leveraged loans and high

yield bonds.

54.     As a result of this convergence trend, "term loan B" financings emerged.  These

"term loan B" financings had terms similar to high yield bonds, such as longer maturities (5

years) than traditional commercial loans and limited amortization (1% per year).  Like high yield

bonds, these term loans had no financial maintenance covenants (only incurrence covenants) and

included builder baskets (which are baskets that can increase based on retained excess cash flow

or a percentage of consolidated net income) for restricted payments and investments and

accordion features allowing the borrowers to increase the amount of the loan without lender

consent.  These so-called "covenant-lite" loans currently represent over 90% of the commercial

bank market.[16]

55.     Despite the increasing similarities between leveraged loans and high yield bonds,

there remained key differences.  Significantly, leveraged loans are not considered securities,

whereas high yield bonds are widely accepted as securities for purposes of the federal securities

laws.  As a result, high yield bonds are subject to tender offer rules and leveraged loans are not.

56.     High yield bond indentures do not limit the ability of an issuer to buy back bonds

from some but not all holders.  An issuer can repurchase bonds from individual lenders so long

as it does not violate the tender offer rules promulgated under the federal securities laws.

57.     By contrast, in most credit agreements, lenders have been required to be treated

on a ratable basis.  They make loans "ratably" in accordance with their commitments of a

particular tranche and are paid principal and interest on a pro rata basis in accordance with the

outstanding amounts of that tranche.  Some credit agreements, like the Term Loan Agreement at

issue here, include even stronger pro rata protections for lenders: If a lender receives a payment

for any reason (including by right of setoff) in excess of its pro rata share, such lender is required

to purchase (for cash at face value) participations in the loans and/or other obligations of the

other lenders so that the benefit of all such payments is shared by the lenders ratably in

accordance with the aggregate principal amount of and accrued interest on their respective loans.

For example, a lender that participated in a debt-for-debt exchange with the borrower would owe

---

[16] Wise, Eric, "Open Market Purchases, Past and Future", N.Y. Law Journal, Sept. 16, 2022, *available at* https://www.law.com/newyorklawjournal/2022/09/16/open-market-purchases-past-and-future/

a cash payment to other lenders to effect pro rata sharing. Similarly, credit agreements typically contain a waterfall provision which requires that, following an event of default, the proceeds of any collateral be divided among lenders of a class on a pro rata basis in accordance with their secured obligations.

58.     The amendment provisions in credit agreements protect these pro rata sharing provisions. The general rule was and remains that amendments, modifications and waivers require the consent of a majority in principal amount of outstanding loans and commitments ("Required Lenders"). However, the amendment provisions typically include a list of provisions, commonly referred to as "sacred rights," which can be modified only by the vote of all lenders. The purpose of these sacred rights is to protect a minority of lenders from having their critical rights, including their lien and payment priority, altered by a majority. The pro rata sharing and waterfall provisions typically are included in the list of sacred rights requiring affected lender consent. As here, the amendment provisions in most instances prohibit an amendment to the specific section containing the pro rata sharing provision (*e.g.*, "the consent of each affected lender shall be required to amend Section 2.18").

59.     During the 2008/2009 credit crisis, price levels of syndicated loans fell dramatically, and companies sought to take advantage of depressed trading prices to retire their debt at a discount. While it was possible to purchase bonds in a tender offer or private transaction, typical bank loans did not provide that flexibility due to the restrictions in credit agreements on non-pro rata loan repurchases.

60.     Once the market reopened after the credit crisis, borrowers and sponsors negotiated the ability to opportunistically buy back loans through limited exceptions to the pro rata payment provisions. Syndicated credit agreements, particularly in the term loan B market,

increasingly began to include provisions allowing the borrower and/or its affiliates to purchase loans, usually term loans, on a non-pro rata basis either through open market purchases or through a "Dutch Auction" process.

61.     Sponsors requested the inclusion of these exceptions to the pro rata sharing provisions to allow the capture of discount and de-levering, and arrangers and institutional investors agreed, recognizing the benefits to all parties of de-levering and understanding that the exceptions were limited.  Because all those parties – sponsors, institutional investors and banks – typically were participants in the equity and bond markets, they clearly understood the meaning of the term "open market purchases" when they agreed to include the term in credit agreements.

62.     At the time the parties entered into the Term Loan Agreement in 2016, the open market purchase provision in credit agreements was understood to be a narrow exception to the general rule that all lenders are to be treated ratably.  Its purpose was to permit one-off purchases of term loans on a non-pro rata basis in a quick, cost-efficient manner.  Open market purchases were not viewed as detrimental to non-participating lenders for numerous reasons.  First, open market purchases generally were made through a broker or agent at or close to the prevailing market prices so participating lenders would not receive a windfall not available to any non-participating lender.  Second, the amount of term loans that could be purchased in this manner would be constrained by normal trading volume.  Third, in open market purchases, the rights of non-participating lenders with respect to payment priority or lien priority are not altered.  Lastly, as discussed more fully below, the term "open market purchase" was familiar to investors in the leveraged loan market because of its use in the equity and bond markets and has been understood in credit agreements to have the same meaning ascribed to that term in the securities context.

C.   **Open Market Purchases Are Distinct From Tender Offers in the Securities Context**

63.     Because they are securities, open market purchases and privately negotiated repurchases of high yield bonds are subject to tender offer rules.

64.     The term "tender offer" is not defined in US securities law and there is no bright-line test to determine what constitutes a tender offer.  What is certain, however, is that a tender offer is not an open market purchase, and vice-versa.[17]  The characteristics of a tender offer (and, conversely, of what is not a tender offer) make that clear.  The SEC has advised, and courts have cited, eight factors as relevant in determining the existence of a tender offers involving equities. No single factor is determinative.  Among them are the following:

   (a)   Active and widespread solicitation of shareholders or bondholders (a widespread solicitation indicating a tender offer);

   (b)   Solicitation for a substantial percentage of the outstanding stock or bonds (the greater the percentage, the more likely to be a tender offer);

   (c)   The offer is made at a premium over the prevailing market price (the presence of a premium indicating a tender offer);

   (d)   The terms are firm rather than negotiable (firm terms indicating a tender offer);

   (e)   The offer is contingent on the tender of a fixed number of shares or bonds;

   (f)   The offer is open for a limited time;

   (g)   The offeree is subject to pressure to sell their shares or bonds; and

   (h)   There is a public announcement of the solicitation.[18]

65.     Applying the relevant SEC guidance and caselaw, any repurchase of securities should constitute a tender offer (and not an open market purchase) if it involves an active and

---

[17] *D-Z Inv. Co. v. Holloway*, No. 74 CIV. 2379, 1974 WL 440 (S.D.N.Y. Aug. 23, 1974).

[18] *Wellman v. Dickinson*, 475 F. Supp. 783 (S.D.N.Y. 1979).

widespread solicitation of a substantial number of holders to purchase a substantial percentage of the issuer's securities at a premium over the prevailing market price.[19]

66.     If bond repurchases are characterized as a tender offer, the purchaser becomes subject to substantial disclosure and procedural requirements.  To avoid characterization of a bond repurchase as a tender offer and instead qualify as an open market purchase, purchasers typically solicit a limited number of holders and a limited percentage of the issuer's outstanding securities by face amount and minimize any premium over the prevailing market price, among other factors.

67.     If the Transaction had involved securities instead of loans, it undoubtedly would have been considered a tender offer, not an open market purchase, because the solicitation involved a large number of lenders holding a substantial percentage of the outstanding loans and the consideration involved a substantial premium over the prevailing market price, among other factors.

**D.     The Open Market Purchase Exception to Pro Rata Treatment Must Be Read in the Context of the Pro Rata Treatment Principle Underlying the Entire Term Loan Agreement**

68.     As noted above, pro rata treatment is a hallmark of the Term Loan Agreement, as is typical of loan agreements of this kind.

69.     The Dutch Auction exception provides an alternative to the open market purchase provision by allowing the borrower or its affiliates to engage in an active and widespread

---

[19] *See* "Tender Offer," Securities & Exchange Commission Office of Investor Education and Advocacy, Glossary, *available at* https://www.investor.gov/introduction-investing/investing-basics/glossary/tender-offer#:~:text=A%20tender%20offer%20is%20typically,percentage%20of%20the%20company%27s%20securities.

solicitation of holders with respect to a substantial portion of its term loans at a premium over the prevailing market price. The requirement that a Dutch Auction be open to all lenders makes sense in the context of the pro rata sharing provisions: no lender should receive a premium not offered to others or be excluded from an offering involving numerous investors holding a substantial percentage of the outstanding loans. Indeed, Dutch Auctions in credit agreements are governed by procedures similar to those governing tender offers of securities. For example, under the Dutch Auction provisions in credit agreements, the borrower ordinarily is required to make the offer to repurchase to all lenders for a specified maximum principal amount of term loans at a specific price or price range and that offer is required to be open for a specified period of time (subject to extension).

70.     To interpret the open market purchase provision to permit a privately negotiated loan repurchase with a large number of lenders holding a substantial percentage of the outstanding loans at a price well above the prevailing market price would not only obliterate the pro rata sharing provision, it would also render meaningless the Dutch Auction exception. No borrower would elect to repurchase loans through the costly and time-consuming enumerated Dutch Auction procedures, if it had carte blanche to engage in open market repurchases at above-market purchase prices with a large group of lenders holding a substantial portion of the outstanding loans. Thus, Dutch Auctions are required to be open to all lenders to provide flexibility to borrowers and sponsors to repurchase loans from a large number of lenders in amounts and at prices not permitted by the much more limited open market provision.

71.     Since the introduction of the open market purchase provision in credit agreements more than 10 years ago, I have been involved in hundreds of financing transactions involving leveraged loans, including acquisition financings, out-of-court restructurings and DIP financings.

I have not been involved in any transaction where a borrower sought to utilize that provision to conduct a debt-for-debt exchange to "recapitalize the company."[20]  To the contrary, for more than a decade after it was adopted, the open market purchase provision was utilized by borrowers and their affiliates solely to repurchase loans in one-off transactions typically at or close to the prevailing market prices to capture discount and de-lever.  Only recently, in connection with a handful of transactions, has this provision been re-interpreted by distressed borrowers to allegedly permit a debt-for-debt exchange with a majority of participating lenders that subordinates rights to priority payments of non-participating minority lenders.  Such a recapitalization transaction would not constitute an open market purchase in the securities context and was certainly not contemplated when the provision was adopted from the high yield bond market into credit agreements with pro rata sharing provisions.

72.     In sum, the open market purchase exception to the pro rata sharing provisions in credit agreements was intended to be interpreted narrowly.  A broad interpretation of the exception would swallow the general rule that all lenders are to be treated ratably.

**E.     The Transaction Was Not an Open Market Purchase**

73.     Serta's privately negotiated debt-for-debt exchange was not an open market purchase for several important reasons: First, the Transaction did not involve a simple trade of debt for cash through a broker or agent at or close to the prevailing market price.  Quite to the contrary, it was a privately negotiated repurchase on bespoke terms at above-market prices that was part of a larger comprehensive debt restructuring.  Second, analyzing the exchange through

---

[20] "Serta Simmons Bedding Enters Into Agreement with Majority of Lenders on Deleveraging and Liquidity Enhancing Transaction," Serta Simmons Bedding, LLC, dated June 8, 2020, *available at* https://sertasimmons.com/news/serta-simmons-bedding-enters-into-agreement-with-majority-of-lenders-on-deleveraging-and-liquidity-enhancing-transaction/.

the lens of the tender offer rules, the Transaction would not constitute an open market purchase because it involved an active and widespread solicitation of a large number of lenders holding substantial percentage of the borrower's outstanding loans, the offer to purchase was at a premium over the prevailing market price and the offerees were subject to pressure to sell their loans.

74.    A critical characteristic of the Transaction that supports the conclusion that it did not involve open market purchases is that the participating lenders received a substantial premium over the prevailing market price for their existing First Lien Term Loans.[21]   Open market purchases are typically accomplished through a broker or agent at agreed market prices. The premium paid by Serta to the Participating Majority Lenders in the Transaction is clear: immediately prior to the debt-for-debt exchange the trading price of the First lien Term Loans was at or around 43 cents on the dollar; the exchange price for the First Lien Loans was 74 cents on the dollar.  The resulting premium on the exchange of the First Lien Term Loans was therefore 70.4%.  Moreover, within a week after the exchange was consummated, the First Lien Loans held by the Non-Participating Minority Lenders were trading at or around 31 cents on the dollar.  In addition, the new super-priority term loans received by the Participating Majority Lenders had an interest rate of 4.00% per annum higher, or a margin that is more than 100% greater, than the margin of the First Lien Term Loans.[22]   Since the Transaction involved a substantial premium paid to the Participating Majority Lenders and was of such a magnitude that it immediately depressed the value of the loans held by the Non-Participating Lenders, it cannot

---

[21] An above-market purchase price was also paid for the Second Lien Loans involved in the exchange as the trading price as of the previous close was at or around 8 cents on the dollar and the exchange price was 39 cents on the dollar, resulting in a 362% premium.

[22] Priority Term Loan Agreement § 1.01.

qualify as an open market purchase.  An open market purchase would not have such a materially

negative effect on the market value of the First Lien Term Loans, as was the case here.

75.     The Transaction also fails as an open market purchase because, in addition to the

above-market pricing, the other terms of the repurchase were not generally accepted in the

market for loan repurchases. Well-established market terms require that open market purchases

settle as one or more individual trades involving a designated amount of securities which are

typically purchased in cash at or close to prevailing market prices.  The seller is only required to

deliver the agreed securities in exchange for the agreed consideration.  In the Transaction, Serta

agreed to issue the new priority term loans only if the participating (selling) lenders (i) tendered

their existing first and second lien loans, (ii) voted to amend the Term Loan Agreement to permit

bespoke amendments, including permitting the incurrence of the new super priority loans and the

execution of a new intercreditor agreement that subordinated existing pari passu debt in right of

payment to the new super priority loans, and (iii) provided $200 million of new money

financing—all with the effect of subordinating non-participating first lien lenders.  Those terms

and conditions have no relation to standard market terms and practice for open market purchases.

Accordingly, the Transaction is properly viewed as a comprehensive debt restructuring that was

privately negotiated with dozens of handpicked lenders, rather than an open market purchase.

76.     Given this longstanding market understanding of the "open market purchase"

exception to pro rata sharing, Serta attempts to justify the Transaction by arguing that it was an

open market purchase because it solicited proposals from, and negotiated with, numerous lenders

that accounted for over 70% of the aggregate principal amount of First and Second Lien Term

Loans.[23]   Serta misses the point.   Just because Serta solicited different lender groups in an effort to obtain the most advantageous liability management structure does not mean the Transaction was an "open market purchase" of First Lien Loans.   Perhaps there was competition for a comprehensive liability management transaction, but that is something entirely different from an "open market purchase" in the leveraged loan market, as that term has been understood as an exception to pro rata sharing.

77.   In order to raise new money on the most advantageous terms, Serta engaged in a highly negotiated debt-for-debt exchange of existing term loans for new super priority term loans with a majority of First Lien Lenders at a premium above prevailing market prices.   Part of the consideration that the Participating Majority Lenders received was priority rights to payment to the exclusion of non-participating lenders.   That privately negotiated bespoke transaction with a large group of institutional investors does not qualify as an open market purchase.

78.   Finally, viewing the Transaction through the lens of the tender offer rules further reinforces this conclusion. Had the Transaction involved securities, it undoubtedly would have been characterized as a tender offer, not an open market purchase, for numerous reasons. First, Serta engaged in active and widespread solicitation of a substantial number of lenders. Second, it solicited a substantial percentage of the outstanding loans (*i.e.*, more than 50%). Third, it offered to repurchase the loans at a substantial premium over the prevailing market price.   Fourth, the Transaction was coercive. The participating lenders were pressured to exchange their loans.   If those lenders elected not to accept the proposed transaction (*i.e.*, tender their loans, vote in favor of the proposed amendments and provide the new money), they would

---

[23] Serta Simmons Bedding, LLC'S Motion for Summary Judgment, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Case No. 23-09001 (Bankr. S.D. Tx. Feb. 24, 2023) (ECF No. 69), at 20.

have been subordinated in right of payment to lenders that were willing to participate.  That is precisely the type of coercive transaction that the tender offer rules were enacted to prevent.

79.     The Transaction was not an open market purchase of loans but rather a complex, multi-part debt restructuring privately negotiated among Serta and the Participating Marjority Lenders through a well-known restructuring firm, Centerview.

**F.      The Absence of an Anti-Subordination Provision Does Not Show That the Parties Intended the "Open Market Purchase" Provision to Cover the Transaction**

80.     Serta argues that the absence of an express anti-subordination provision in the Term Loan Agreement shows that the parties did not intend to preclude a transaction like the Transaction that subordinates the payment rights of non-participating lenders.  To the contrary, based on my experience, parties would not see a need for an express anti-subordination provision to bar a transaction like Serta's because the pro rata sharing provision, with exceptions only for a Dutch Auction open to all lenders and open market purchases, already precludes Serta from engaging in this type of transaction with a limited set of participating First Lien Lenders that disadvantages other non-participating First Lien Lenders.

81.     As mentioned above, at the time the Term Loan Agreement was executed in 2016, the limited exceptions to the pro rata sharing provisions in the form of open market purchases or Dutch Auctions open to all were not intended to permit the borrower to engage in loan repurchases that favored some lenders to the detriment of others.  The parties to the Term Loan Agreement understood that a debt-for-debt exchange in which the majority lenders swapped their loans for new super priority loans under a new credit facility while amending the existing credit agreement to accommodate the transaction was not considered permissible, and there would be no need to add an anti-subordination provision to prevent such a transaction.

82.     For all these reasons, it would have been unnecessary to include 100% lender or "affected lender" consent for amendments to credit facilities that subordinate the obligations thereunder to a separate debt instrument because the interests of the majority were aligned with the interests of the minority. The extent of the market understanding is highlighted by the fact that 94% of the existing leveraged loan credit agreements do not contain anti-subordination clauses.[24] As such, if the Transaction is deemed permissible, the substantial number of existing loan agreements with similar open market purchase provisions will be turned on their heads, upending expectations in the leveraged loan market.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 16, 2023.

_Sarah M Ward_
SARAH M. WARD

---

[24] *See* "Priming Debt and Inside-Maturity Debt Allowed Under US Credit Agreements," Covenant Review (Mar. 31, 2020).

# Appendix A

**Sarah M. Ward**
Independent Board Director
Former Head of Banking Group at Skadden, Arps, Slate, Meagher & Flom LLP
7108 SE Golfhouse Drive
Hobe Sound, FL 33455
Phone: 917-860-3886
sarahmaryward@icloud.com

## Summary

Sarah M. Ward is an Independent Board Director at CI Financial and former Head of the Banking Group at Skadden, Arps, Slate, Meagher & Flom LLP. Ms. Ward also served as co-chair of Skadden's Legal Opinion Oversight Committee and was a member of the firm's Policy Committee, its governing body.

During Ms. Ward's thirty-five years at Skadden, she represented borrowers and lenders in acquisitions and other leveraged financings, as well as corporate restructurings and workouts.

## Education

A.B., Princeton University, 1981
J.D., Fordham University School of Law, 1986

## Professional Experience

*Independent Board Member*, CI Financial, Feb. 2022 – Present

*Partner*, Skadden, Arps, Slate, Meagher & Flom LLP, Nov. 1986 – Dec. 2021
    Global Co-Head, Banking Group, 2009 – 2014
    Co-Chair, Legal Opinion Oversight Committee, 2009 – 2021
    Member, Banking Group, 1994 – 2021

## Honors and Awards

Banking and Finance Award, Americas Euromoney Women in Business Law Awards, 2015

Out-of-Court Restructuring Deal of the Year, *M&A Advisor*, 2013
- Recognized for Travelport's financial restructuring, which involved $3.8 billion of debt issued by U.S., Bermuda, Cayman Islands, U.K. and other European entities

U.S. Innovative Lawyers, *Financial Times*, 2013
- Recognized for AMR Corporation, the parent company of American

Airlines, Inc., in AMR's $11 billion merger with US Airways Group, Inc., as part of AMR's Chapter 11 reorganization

Consumer Services Deal of the Year, M&A Advisor, 2012
- Recognized for Travelport's financial restructuring, which involved $3.8 billion of debt issued by U.S., Bermuda, Cayman Islands, U.K. and other European entities

Deal Financing of the Year, M&A Advisor, 2012
- Recognized for Barclays Bank PLC's $1.45 billion DIP credit facility for Residential Capital, in connection with ResCap's Chapter 11 bankruptcy filing

U.S. Restructuring of the Year, *International Finance Review*, 2012
- Recognized for Barclays Bank PLC's $1.45 billion DIP credit facility for Residential Capital, in connection with ResCap's Chapter 11 bankruptcy filing

U.S. Innovative Lawyers, *Financial Times*, 2012
- Recognized for AMR Corporation, the parent company of American Airlines, Inc., in AMR's $11 billion merger with US Airways Group, Inc., as part of AMR's Chapter 11 reorganization

Private Equity Deal of the Year, *The Deal*, 2011
- Recognized for Travelport's financial restructuring, which involved $3.8 billion of debt issued by U.S., Bermuda, Cayman Islands, U.K. and other European entities

## Other Recognition

*The Secured Lender*, Women in Secured Finance, 2020
*Chambers Global: The World's Leading Lawyers for Business*, 2012 - 2021
*Chambers USA: America's Leading Lawyers for Business*, 2005 - 2021
*Best Lawyers in America*, 2016 - 2021
*IFLR1000*, 2007 - 2021
*Legal 500 U.S.*, 2006 - 2016
*The International Who's Who of Banking Lawyers*, 2014 - 2023

## Representative Deals

**AXA Equitable Holdings, Inc.,** a financial services company, in connection with a $8.9 billion bank financing in anticipation of its proposed initial public offering in 2018, which financing consisted of delayed-draw term loan, revolving credit and letter of credit facilities, including eight bilateral letter of credit facilities (2018)

**Barclays Bank PLC (Ditech Financial)** in connection with the 2019 Chapter 11 cases of Ditech Holding Corp. and certain of its subsidiaries, including Ditech Financial LLC and Reverse Mortgage Solutions, Inc., two of the largest mortgage servicers in the United States, with Barclays acting as agent and lender under a $1.9 billion debtor-in-possession financing comprised of multiple repurchase agreements and bankruptcy-remote financings, a unique structure in the context of Chapter 11 bankruptcy cases (2019)

**Barclays Bank PLC (Verso)** in connection with the Chapter 11 cases filed in 2016 by Verso Corp., NewPage Investment Company LLC, and their debtor affiliates, including (i) as arranger and agent for debtor-in-possession financing provided to NewPage, consisting of a $325 million ABL facility, a $175 million new-money term loan facility, and a $175 million roll-up of prepetition term loans, and (ii) as arranger and agent for Verso's ABL and term loan exit facilities (2016)

**Barclays Bank PLC** and **Deutsche Bank Securities Inc. (Patriot Coal)** in connection with restructuring transactions by Patriot Coal Corporation, a producer and marketer of coal in the eastern United States, including (i) $545 million of senior secured exit facilities provided to Patriot Coal in 2013, consisting of a $200 million "first out" L/C facility, a $250 million "second out" term loan facility and a $95 million ABL facility, and (ii) subsequently representing Barclays as agent under the L/C facility during Patriot Coal's second Chapter 11 proceeding commenced in 2015. (2013, 2015)

**CIT Group Inc.**, a commercial and consumer finance company, in its prepackaged Chapter 11 reorganization in the U.S. Bankruptcy Court for the Southern District of New York. CIT emerged from bankruptcy 40 days after filing, reducing its debt by $10.5 billion. CIT was also a borrower of a $3 billion term loan from Barclays Bank PLC for its recapitalization and a $4.5 billion term loan facility from Bank of America, N.A (2009)

**JPMorgan Chase Bank, N.A.** in connection with $450 million initial senior secured credit facilities for Greensky Holdings, LLC and a subsequent upsize and repricing transaction (2017)

**Leucadia National Corporation** and **Jefferies LLC** as lenders and investors to FXCM Inc. (n/k/a Global Brokerage Inc.) in connection with (i) an emergency $300 million capital infusion to FXCM Inc., a novel transaction that was structured to effectively give Leucadia a share of the company's cash flow, after the loan is repaid, until there is a sale of the company, and (ii) related restructuring transactions, both out-of-court and in the company's subsequent Chapter 11 case (2015)

**LNR Property LLC**, a real estate investment, finance, management and

3

development company, in the refinancing of existing senior credit facilities with $365 million of new senior secured credit facilities comprised of a $325 million five-year term loan and a $40 million three-year revolving credit facility (2011)

**Martin Marietta Materials, Inc.**, a producer of construction aggregates and chemicals, in:

- the refinancing of existing credit facilities with a new $600 million credit agreement comprised of a $250 million senior unsecured term loan and a $350 million five-year senior unsecured revolving facility;  (2013)
- its $4.7 billion proposed business combination with Vulcan Materials Company via an exchange offer (2011); and
- the refinancing of existing credit facilities with a new $600 million credit agreement comprised of a $350 million four-year unsecured revolving facility and a $250 million senior unsecured term loan (2011)

**Party City Holdco Inc.**, in its bond exchange and new money financing. Party City executed a transaction support agreement with a substantial number of its bondholders, whereby these bondholders agreed to participate in a transaction expected to deleverage the company's balance sheet by $450 million. Certain bondholders and other parties also agreed to backstop the Party City's new money offering to raise $100 million in capital to increase its financial strength (2020)

**SunEdison, Inc.**, a renewable energy project developer, and certain of its domestic and international subsidiaries in their Chapter 11 cases and successful emergence from bankruptcy, including (i) related exit financing, (ii) a $300 million new-money debtor-in-possession financing and complex roll-up of certain prepetition first and second lien debt, including a letter of credit facility, with cross-border collateral and guarantee arrangements provided by various debtor and non-debtor subsidiaries, and (iii) a comprehensive settlement of claims with diverse constituent groups and various 363 asset sales, including the acquisition by Brookfield Asset Management, Inc. of TerraForm Global, Inc. and a controlling interest in TerraForm Power, Inc. (2016)

## Publications

"The International Comparative Legal Guide to Lending & Secured Finance 2020 Edition (A Comparison of Key Provisions in U.S. and European Leveraged Loan Agreements)," *ICLG: Lending & Secured Finance 2020 Edition*

"The International Comparative Legal Guide to Lending & Secured Finance 2019 Edition (A Comparison of Key Provisions in U.S. and European Leveraged Loan Agreements)," *ICLG: Lending & Secured Finance 2019 Edition*

"The International Comparative Legal Guide to Lending & Secured Finance 2017 Edition (A Comparison of Key Provisions in U.S. and European Leveraged Loan Agreements)," *ICLG: Lending & Secured Finance 2017 Edition*

"The International Comparative Legal Guide to Lending & Secured Finance 2015 Edition (A Comparison of Key Provisions in U.S. and European Leveraged Loan Agreements)," *ICLG: Lending & Secured Finance 2015 Edition*

"The International Comparative Legal Guide to Lending & Secured Finance 2014 Edition (A Comparison of Key Provisions in U.S. and European Leveraged Loan Agreements)," *ICLG: Lending & Secured Finance 2014 Edition* (2nd Edition), Apr. 2014

"Cross-Border Banking and Finance Guide: New York," LexisNexis, 2014

United States Section, Banking & Finance Annual Review, *Financier Worldwide*, June 2013

"What's Market: Experts' View," *Practical Law The Journal*, Feb. 2013

"Encouraging Signs for Leveraged Loans in 2013," *Law360*, Jan. 28, 2013

**Associations**

Member, Board of Directors, Settlement Housing Fund, 1994 - Present
Working Group on Legal Opinions, 2014 - 2021

**Bar Admissions**

New York

# Appendix B

## Documents Considered List

**Legal Documents**

Summons and Complaint, *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. June 11, 2020) (NYSCEF No. 1)

Plaintiffs' Memorandum of Law in Support of Temporary Restraining Order, *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. June 11, 2020) (NYSCEF No. 3)

Serta's Opposition to Plaintiffs' Application for a Temporary Restraining Order, *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. June 16, 2020) (NYSCEF No. 22)

Defendant Lenders' Opposition to Plaintiffs' Application for a Temporary Restraining Order, *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. June 16, 2020) (NYSCEF No. 29)

Plaintiffs' Reply Memorandum of Law in Support of Temporary Restraining Order, *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. June 18, 2020) (NYSCEF No. 62)

Decision & Order Denying Temporary Restraining Order, *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. June 22, 2020) (NYSCEF No. 88)

Amended Complaint, *AG Centre Street Partnership, L.P. v. Serta Simmons Bedding, LLC*, Index No. 654191/2022 (N.Y. Sup. Ct. Nov. 16, 2022) (NYSCEF No. 11)

Complaint (with exhibits), *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.,* Adv. Pro. No. 23-09001 (Bankr. S.D. Tx. Jan. 24, 2023) (ECF No. 1)

Amended Complaint, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Adv. Pro. No. 23-09001 (Bankr. S.D. Tx. Feb. 14, 2023) (ECF No. 38)

Complaint, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Adv. Pro. No. 23-09007 (Bankr. S.D. Tx. Jan. 24, 2023) (ECF No. 1)

Serta's Memorandum of Law in Support of Motion to Dismiss, *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, Case No. 21-cv-3987 (S.D.N.Y. July 9, 2021) (ECF No. 25)

LCM's Opposition to Serta's Motion to Dismiss, *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, Case No. 21-cv-3987 (S.D.N.Y. Aug. 9, 2021) (ECF No. 31)

Serta Reply Memorandum of Law in Support of Motion to Dismiss, *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, Case No. 21-cv-3987 (S.D.N.Y. Aug. 23, 2021) (ECF No. 32)

Opinion & Order Denying Motion to Dismiss, *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, Case No. 21-cv-3987 (S.D.N.Y. Mar. 29, 2022) (ECF No. 34)

Boardrider's Memorandum of Law in Support of Motion to Dismiss, *ICG Global Loan Fund 1 DAC, et. al. v. Boardriders, Inc. et al.*, Index No. 655175/2020 (N.Y. Sup. Ct. Dec. 7, 2020) (NYSCEF No. 46)

Defendant Lenders' Memorandum of Law in Support of Motion to Dismiss, *ICG Global Loan Fund 1 DAC, et. al. v. Boardriders, Inc. et al.*, Index No. 655175/2020 (N.Y. Sup. Ct. Dec. 7, 2020) (NYSCEF No. 57)

Plaintiff Lenders' Opposition to Motion to Dismiss, *ICG Global Loan Fund 1 DAC, et. al. v. Boardriders, Inc. et al.*, Index No. 655175/2020 (N.Y. Sup. Ct. Jan. 28, 2021) (NYSCEF No. 77)

Defendants' Joint Reply in Support of Motion to Dismiss, *ICG Global Loan Fund 1 DAC, et. al. v. Boardriders, Inc. et al.*, Index No. 655175/2020 (N.Y. Sup. Ct. Feb. 18, 2021) (NYSCEF No. 102)

Plaintiffs' Supplemental Memorandum of Law in Support of Motion to Dismiss Addressing *Trimark*, *ICG Global Loan Fund 1 DAC, et. al. v. Boardriders, Inc. et al.*, Index No. 655175/2020 (N.Y. Sup. Ct. Sept. 17, 2021) (NYSCEF No. 132)

Decision & Order Denying Motion to Dismiss, *ICG Global Loan Fund 1 DAC, et. al. v. Boardriders, Inc. et al.*, Index No. 655175/2020 (N.Y. Sup. Ct. Oct. 17, 2022) (NYSCEF No. 159)

Serta's Motion for Summary Judgment, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Case No. 23-09001 (Bankr. S.D. Tx. Feb. 24, 2023) (ECF No. 69)

Serta's Statement of Uncontroverted Facts In Support of Motion for Summary Judgment, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Case No. 23-09001, (Bankr. S.D. Tx. Feb. 24, 2023) (ECF No. 70)

      Exhibits 1-27 (ECF Nos. 70-1 through 70-27)

Lender Plaintiffs' Motion for Summary Judgment, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Case No. 23-09001, (Bankr. S.D. Tx. Feb. 24, 2023) (ECF No. 73)

Declaration of Ryan Mollett, dated Mar. 16, 2023

**Cases**

*D-Z Inv. Co. v. Holloway*, No. 74 CIV. 2379, 1974 WL 440 (S.D.N.Y. Aug. 23, 1974).

*Wellman v. Dickinson*, 475 F. Supp. 783 (S.D.N.Y. 1979)

**Agreements**

First Lien Term Loan Agreement, dated Nov. 8, 2016

First Lien/Second Lien Intercreditor Agreement, dated Nov. 8, 2016

Amendment No. 1 to First Lien Term Loan Agreement, dated June 22, 2020

Open Market Purchase and Cashless Exchange Agreement, dated June 22, 2020

Super-Priority Term Loan Agreement, dated June 22, 2020

Priority Intercreditor Agreement, dated June 22, 2020

Master Assignment and Acceptance, dated June 22, 2020

Amendment No. 1 to Amended and Restated Credit Agreement, JCrew Group Inc., dated July 13, 2017

First Lien Credit Agreement, NYDJ Apparel, LLC, dated Jan. 6, 2014

First Amendment to First Lien Credit Agreement, NYDJ Apparel, LLC, dated May 25, 2017

Second Amendment to First Lien Credit Agreement, NYDJ Apparel, LLC, dated May 25, 2017

Third Amendment to First Lien Credit Agreement, NYDJ Apparel, LLC, dated Mar. 13, 2018

**Party Documents**

Serta Simmons Bedding, LLC, Report for the Three and Six Months Ended Mar. 27, 2021, and Mar. 28, 2020 (SSB_ADVERSARY00058983)

Serta Simmons Bedding, LLC, Report for the Three and Six Months Ended June 26, 2021 and June 27, 2020 (SSB_ADVERARY00060919)

Email from C. Tseng (Latham) to C. O'Muiri (Weil) re: Serta // Closing Call, dated June 22, 2020 (SSB_AVERSARY00054428) with attachment (SSB_ADVERSARY00054432)

Email from A. Li (Evercore) to K. Prince (Advent) re: SSB – Catch-Up, dated June 16, 2020 (SSB_ADVERSARY00140341) with attachment (SSB_ADVERSARY00140344)

**Publicly Available Documents**

"Private Equity Alert: De-Levering Portfolio Companies Through Debt Buybacks—US and UK Perspectives," Weil, Gotshal & Manges LLP, dated Mar. 2009, *available at* https://www.weil.com/~/media/files/pdfs/private_equity_alert_march_2009.pdf

LevFin Quarterly Q4 2015, Weil, Gotshal & Manges LLP, https://privateequity.weil.com/wp-content/uploads/2016/11/LevFin-Quarterly-Q4-2015_WEIL_95618787_2.pdf (last accessed Mar. 15, 2023)

"Debt Repurchasing Considerations in an Uncertain Market," Skadden, Arps, Slate, Meagher & Flom LLP, dated Apr. 8, 2020, *available at* https://www.skadden.com/insights/publications/2020/04/debt-repurchasing-considerations

Wise, Eric, "Open Market Purchases, Past and Future", N.Y. Law Journal, dated Sept. 16, 2022, *available at* https://www.law.com/newyorklawjournal/2022/09/16/open-market-purchases-past-and-future/

"Priming Debt and Inside-Maturity Debt Allowed Under US Credit Agreements," Fitch Solutions: Covenant Review, dated Mar. 31, 2020

"Covenant Trends: Expanded Sacred Rights Provisions in Recent Credit Agreements Provide Varying, Sometimes Circumventable Protections Against Lien Subordination Amendments," Reorg, dated Feb. 25, 2022, *available at* https://reorg.com/covenant-trends-expanded-sacred-rights-provisions

"Serta Simmons Bedding Enters into Agreement with Majority of Lenders on Deleveraging and Liquidity Enhancing Transaction," Serta Simmons Bedding, LLC, dated June 8, 2020, *available at* https://sertasimmons.com/news/serta-simmons-bedding-enters-into-agreement-with-majority-of-lenders-on-deleveraging-and-liquidity-enhancing-transaction/

"LSTA Distressed Trade Confirmation," LSTA, dated Dec. 1, 2021, *available at* https://www.lsta.org/content/distressed-confirm-dec-2021/

"LSTA Par/Near Par Trade Confirmation," LSTA, dated Dec. 1, 2021, *available at* https://www.lsta.org/content/par-confirm-dec-2021/

"Standard Terms and Conditions for Distressed Trade Confirmations," LSTA, dated Dec. 1, 2021, *available at* https://www.lsta.org/content/distressed-confirm-stcs-dec-2021/

"Standard Terms and Conditions for Par/Near Par Trade Confirmations," LSTA, dated Dec. 1, 2021, *available at* https://www.lsta.org/content/participation-agreement-for-par-near-par-trades-stcs-dec-2021/

"Comment Letter, Re: Notice of Proposed Rulemaking, Credit Risk Retention," LSTA, dated Sept. 2, 2011, *available at* https://www.sec.gov/comments/s7-14-11/s71411-309.pdf

"Division of Trading and Markets: Answers to Frequently Asked Questions Concerning Rule 10b-18 ('Safe Harbor' for Issuer Repurchases)," U.S. Securities and Exchange Commission, dated Dec. 2, 2016, *available at* https://www.sec.gov/divisions/marketreg/r10b18faq0504.htm

"Tender Offer", U.S. Securities and Exchange Commission, https://www.investor.gov/introduction-investing/investing-basics/glossary/tender-offer (last accessed Mar. 16, 2023).

4

**Academic Books and Papers**

Shariman, Lee M. and Bridget K. Marsh, *The Handbook of Loan Syndications and Trading*, 2nd Ed., McGraw Hill, New York, NY (2022)

Bellucci, Michael, and Jerome McCluskey, *The LSTA's Complete Credit Agreement Guide*, 2nd Ed., McGraw Hill, New York, NY (2016)