# EXHIBIT A





# Private Equity Alert

**March 2009**

**Weil News**

- The 2009 Edition of *Best Lawyers in America* named our following partners in the areas of Leveraged Buyouts, Private Equity Law or Private Funds Law: Christopher Aidun, David Duffell, Shukie Grossman, David Kreisler, Steven Peck, Charles Robins, Jay Tabor, Jeffrey Tabak, Doug Warner, Glenn West, James Westra and Barry Wolf
- Weil Gotshal advised Lehman Brothers Holdings Inc. in connection with the sale of Lehman Brothers Venture Partners to management and HarbourVest Partners
- Weil Gotshal advised Goldman Sachs Credit Partners, JPMorgan Securities, Bank of America Securities, Barclays Capital and Citigroup in connection with the $26.5 billion credit facilities to fund Pfizer's acquisition of Wyeth
- Weil Gotshal advised Aleris International Inc. (a portfolio company of TPG Capital) in connection with its chapter 11 filing and related $1.075 billion debtor-in-possession financing
- Weil Gotshal advised The Brock Group (a Lindsay Goldberg portfolio company) in connection with its acquisition of Master Medical Insulation, Inc.

## De-Levering Portfolio Companies Through Debt Buybacks – US and UK Perspectives

*By: Glenn D. West (gdwest@weil.com), Jacky A. Kelly (jacky.kelly@weil.com), Lucas E. Spivey (lucas.spivey@weil.com) and Danek A. Freeman (danek.freeman@weil.com)*

Because debt is trading at below par prices, the current market can present attractive de-levering opportunities for portfolio companies. Taking advantage of these opportunities through a debt buyback, however, requires a careful review of the specific agreements governing a portfolio company's debt and the tax and accounting issues implicated by any discounted purchase or retirement of that debt. Although there are issues common to both bank loan buybacks and bond buybacks, the issues implicated by bank loan buybacks differ in many respects from the issues presented by bond buybacks. In most cases, the issues arising from a debt buyback in the US and the UK are similar in terms of necessary document review, but differ in terms of the tax and securities law concerns.

### Discounted Purchases or Prepayments of Portfolio Company Bank Loans

**Transaction Alternatives**

Two transaction alternatives are currently being used to effect a portfolio company's de-levering through a bank loan buyback: (a) direct discounted purchases of the debt (or purchases of participation interests in debt), and (b) discounted voluntary prepayments.

If the bank loan buyback is to be effected through a discounted voluntary prepayment, lenders' consent will usually be required. Under this alternative, the borrower normally seeks an amendment of the voluntary prepayment provisions of the credit agreement to allow for a non-pro-rata prepayment at below par prices. Assuming the affected provisions can be amended by a typical "required" lender threshold (*i.e.*, 50.1%), solicitations for discounted prepayments are typically structured as a modified Dutch auction. Under a modified Dutch auction, the purchaser of the bank debt would submit an offer (solicitation) to all bank debt holders to purchase a certain amount of debt within a given price range. After the bank debt holders submit bids, the purchaser accepts those bids within the given price range that cover the desired amount of debt, pro rata, at the lowest price necessary to acquire that desired debt amount (and all loans are paid at the applicable clearing price).

If the debt buyback is to be effected by purchasing the discounted debt directly or by acquiring participations in that discounted debt, consent may or may not be required depending on the specific terms of the credit documents. Accordingly,

special attention must be paid not only to the assignment and participation provisions of the credit documents, but also to all of the negative covenants.

**Assignment and Participation Provisions**

Although each deal is different, syndicated bank loans generally allow lenders to assign loans or sell participations in loans, subject to, in the case of an assignment, the purchasing entity (a) qualifying as an eligible assignee under the credit documents, and (b) obtaining the consent of the administrative agent. When a purchasing entity receives an assignment of the bank loans (*i.e.*, purchases a direct interest in the loan), the purchasing entity becomes a lender under the credit agreement and will have all the rights and obligations of a lender under the relevant credit documents. Conversely, when a purchasing entity acquires a participation interest in a bank loan, the purchasing entity is only acquiring a contract right to "participate in" the selling lender's receipt of payment and obligations to fund under the relevant credit facility, while the selling lender still "owns" the loan and retains all of the other rights and obligations related to the underlying bank loan.

In order to accomplish the intended de-levering objective, the entity acquiring the loan or participation is often the borrower, a consolidated parent or subsidiary of the borrower or a newly-formed entity affiliated with the borrower that is consolidated. If the sponsor or an affiliate is the initial acquirer, the acquisition is typically followed by a contribution of the acquired debt or participation to the borrower or a subsidiary of the borrower. In any event, a threshold issue in any debt buyback is whether the entity ultimately intended to acquire the debt or participation is a permitted assignee or transferee of that debt or participation under the credit agreement.

In many cases in the US, the portfolio company borrower and its private equity sponsor are specifically excluded from the definition of "eligible assignees" for the purposes of the assignment provisions of the credit agreement. In other cases, the

> **The current state of the debt markets provides both borrowers and affiliates with opportunities to purchase a portfolio company's debt to achieve covenant relief and/or capital structure improvements.**

definition of "eligible assignee" does not specifically exclude the borrower and its affiliates, but does limit "eligible assignees" to banks or financial institutions. In contrast, most English law facility documents historically did not contain express prohibitions on the borrower or any affiliate purchasing an interest in loans advanced to it/them under the facility documents. Instead, the Loan Market Association (LMA) Standard Agreement provides that a permitted transferee or assignee should be a bank or financial institution or trust or fund or other person which is regularly engaged in, or established for the purpose of, making, purchasing or investing in loans, securities or other financial assets. Thus, depending on the nature of the borrower's (or one of the members of the borrowing group's) business, the borrower (or the applicable member of the borrowing group) may or may not qualify as an ultimate permitted assignee or transferee under most English facility documents. In September 2008, however, the LMA moved to address this perceived gap in the documentation by including optional provisions in the LMA

Standard Agreement either prohibiting the purchase of debt by the borrower or members of the borrowing group or, if it was to be permitted, providing mechanisms through which the borrower or members of the borrowing group may offer to purchase debt at a discount from the syndicate generally.

Depending on the specific agreement, therefore, neither the portfolio company nor any of its affiliates may be able to take an assignment of a direct interest in the loan from a lender without amending the agreement. And, if the borrower or a member of the borrowing group cannot acquire the debt and thereby treat the debt as discharged, the de-levering benefit may not be achievable. It is not uncommon, however, to find that participations are less restricted than assignments. In other words, even where a borrower or its affiliates are prohibited from becoming a lender by buying the debt directly, the credit agreement or facility may well permit the borrower or a member of the borrowing group to acquire a participation in the debt. But, it is important that the accounting and legal professionals be consulted to confirm that a participation will accomplish the same de-levering benefit as an acquisition of the loan itself.

**Pro-Rata Prepayment and Sharing Provisions**

Most loan agreements specifically require that all "payments" on account of any loan be made pro rata to all the lenders so that no individual lender gets paid disproportionately more than any other lender. There are also similar provisions requiring the lenders to share any collections or recoveries they receive on account of any loans pro rata. If the debt is "extinguished" through the purchase of a specific loan from a lender, the remaining syndicate banks may argue that the debt has *de facto* been prepaid and that such

prepayment is in breach of the prepayment provisions of the loan agreement that mandate pro-rata payments. Similarly, the remaining syndicate banks may also suggest that the selling bank is obligated to share the proceeds it received from the sale of its loan on the basis that such proceeds constitute a recovery on the selling lender's loan that, in accordance with the pro-rata sharing provisions, must be distributed ratably among the other syndicate members. While some loan documents specifically deal with these issues by excluding the proceeds derived from the sale of loans or participations from the application of these provisions, or by limiting the application of these provisions to receipts by the lenders of prepayments made by or recoveries received from the borrower only (so that a structural alternative may be available to buy back the loan through another related entity), many do not. And the purchase of a participation may or may not implicate these provisions in the same way as a purchase of the loan, depending on the specific provisions of the loan agreement. As a result, the specific language of each agreement and legal counsel's view of the potential efficacy of either of these arguments must be weighed against the benefit of the transaction, particularly if an amendment would not otherwise be required.

**Effect of the Debt Buyback on Restrictive Covenants**

Depending on the purchaser of the bank loans and the credit agreement governing the underlying bank loans, some common issues that may arise include:

**Effect on Financial Covenants and Excess Cash Flow:** Because financial definitions in credit agreements do not always mirror GAAP, the borrower must make sure the debt buyback actually results in a reduction of leverage in the borrower's capital structure. Also, the borrower must contemplate the effect that a prepayment, subsequent extinguishment of debt with extraordinary gains and various tax implications will have on the financial definitions in a portfolio company's credit documents (and thus financial covenants). Finally, while voluntary prepayments normally reduce the "Excess Cash Flow" or "Available Amount" mandatory prepayment sweeps, funds used for a debt buyback might not receive the same beneficial treatment.

**Effect on Other Restrictive Covenants:** It is important that counsel review every step of the proposed transaction for its possible impact on the negative covenants. Even if the credit agreement specifically allows the borrower to be a lender under the assignment provision, this does not mean that the debt buyback (or one of the transactional steps required to effectuate the debt buyback) will not otherwise violate another specific loan covenant. For example, depending on the terms of the credit agreement, the borrower's debt buyback may be considered a "Restricted Payment," a "Restricted Investment" or a prohibited "Acquisition," "Affiliate Transaction" or "Fundamental Change." To the extent the debt repurchase implicates these provisions, but is nevertheless permitted subject to a "basket," the borrower should be aware that any basket amounts used to effect the debt buyback will subtract from the borrower's later use of those basket amounts for other transactions.

**Effect on Inter-Creditor Arrangements:** Where there is a first lien/second lien situation, the terms of the inter-creditor agreement must be reviewed carefully in addition to the covenants contained in each of the loan documents governing the first and second lien loans. Sometimes the prohibitions restricting acquisitions of the second lien loan in favor of the first lien banks are contained in the inter-creditor agreement – so do not limit your document review to just the credit or facility agreement.

**Securities Laws Concerns**

Although bank loans have not traditionally been viewed as securities for US securities law purposes, the means and manner in which bank loans trade today have caused some to question whether that traditional view remains valid. Legal counsel should be consulted to obtain a current view with respect to this issue when structuring any bank loan buyback.

## Discounted Purchases of Debt Securities (Bonds) Issued by Portfolio Companies

**Transaction Alternatives**

While the optimal type of bond buyback transaction will depend on the relevant indenture documents and, if applicable, credit documents, bond market participants are currently using three transaction alternatives: (a) a tender offer, (b) an open market purchase and (c) a privately negotiated purchase. The formal tender offer for debt securities must be made pursuant to Section 14(e) of the Exchange Act and involves several procedural and substantive requirements (although far fewer than are applicable to tender offers for equity). While it allows a larger purchase of the debt securities than the other transaction alternatives, it also generally involves a premium over market payment and takes a longer period of time to complete. An open market purchase is accomplished through a broker or agent and requires the purchaser to pay a set market price. Normally, the parties involved in an

open market purchase are not aware of one another's identity. Conversely, in a privately negotiated purchase, the buyer (acting directly or through an agent) would approach individuals or groups (usually sophisticated, institutional sellers) that own large percentages of the portfolio company's debt securities and purchase the debt securities for a negotiated price. Both open market purchases and privately-negotiated purchases allow debt buybacks to occur in a discrete manner without significant transaction costs, and oftentimes can be conducted to achieve lower purchase prices. Before deciding on any transaction alternative, a borrower or affiliate should consult counsel.

**Contractual Restrictions**

The borrower or affiliate considering the debt buyback plan must first consider whether the indenture prohibits or restricts the borrower or affiliate from purchasing the debt securities. If the indenture does not contain any such restrictions (and it would be somewhat unusual if it did), the borrower or affiliate must then look to the credit agreement and other instruments, if applicable, associated with the portfolio company's bank loans and other debt to determine whether those agreements contain any restrictions on the borrower's or affiliate's ability to purchase the borrower's bonds (these agreements will most often present hurdles when the bonds to be repurchased are subordinated debt). Finally, just as with a bank loan buyback, the borrower or affiliate must consider any restrictions contained in the inter-creditor agreement, if applicable, that may restrict the borrower or affiliate from purchasing debt securities.

**Securities Laws Concerns**

Unlike bank loan buybacks, where the law is less clear, purchases of debt securities (bonds) definitely give rise to US securities law concerns. Under 10b-5 of the Exchange Act, it is unlawful to trade in securities on the basis of material, non-public information. Accordingly, if the purchaser determines that it has material, non-public information, the purchaser must either disclose such information to the seller (or to the public generally) or refrain from making the purchase of debt securities. In addition to 10b-5 requirements, Regulation FD, which provides that public reporting companies are required to disclose material information to all investors equally unless a confidentiality agreement is in place, should also be addressed when purchasing debt securities. In the case of a tender offer, the borrower tendering for the debt securities must comply with substantive and procedural rules to ensure the borrower does not face sanctions from the SEC for conducting an improper tender offer. Similarly, care must be taken to avoid the application of US tender offer rules to non-tender offer transactions, *i.e.*, avoiding "creeping tenders." Because similar issues arise in the UK with respect to the use of information which is not in the public domain when trading listed debt securities, particularly under the market abuse regime, it is important to consult UK counsel prior to any purchase.

## Common Issues Related to Purchasing Bank Loans and Debt Securities (Bonds) of Portfolio Companies

**Tax Issues**

Before entering into any US debt buyback plan, the borrower or affiliate should consult a tax attorney to determine the tax consequences that may result from the debt buyback plan. In general, the purchase at a discount of a solvent borrower's debt, by either the borrower or a person related to the borrower, outside of bankruptcy generates taxable income for the borrower in the form of cancellation of indebtedness ("COD") income. Such COD income generally equals the excess of the amount owed on the purchased debt over the price paid for such debt by the borrower or the related person. Moreover, the purchase of debt by a person related to the borrower generally creates original issue discount ("OID") in an equivalent amount: such OID is taxable to the holder over the remaining term of the debt and causes such debt not to be fungible with other outstanding debt of the same class. The debt purchaser and the borrower often are considered "related" if the same persons own, actually or by application of attribution rules, more than 50% of each of the borrower and the purchaser of the debt. Although the borrower may be able to defer the recognition of COD income generated in buybacks occurring in 2009 and 2010 under the recently passed stimulus bill, the application of these rules is complex and must be fully appreciated before implementing a debt buyback.

Where a UK company acquires its own debt at a discount to the carried value of that debt in its accounts, it would generally be expected to realize a taxable gain in respect of the difference between the book carrying costs of the debt and the acquisition price. Although historically it was in some cases possible to avoid this tax charge through the purchase of debt using an affiliate company, pursuant to the rules set out in paragraph 4(A) Schedule 9 FA 1996, a comparable tax charge would apply where the debt is purchased not by the borrower, but by a person treated as connected with the borrower for the purposes of UK taxation.

## Summary

The current state of the debt markets provides both borrowers and affiliates with opportunities to purchase a portfolio company's debt to achieve covenant relief and/or capital structure

improvements. While the opportunity is certainly available, we recommend that any borrower or affiliate considering a debt buyback plan seek the advice of counsel to navigate the complex issues that may arise with respect thereto.

**Back Issues of Private Equity Alert are available online at www.weil.com**

**Recent Articles:**

Deleveraging the Portfolio Company – Stimulus Legislation Provides Tax Relief

The Hedge Fund Transparency Act: More Than It Seems

Too Clubby?

Fear and Greed

European Regulatory Initiatives Affecting Private Equity Sponsors and Hedge Funds

Buying Assets out of Bankruptcy in the US and the UK

Breaking Up Is Hard To Do – and Must Be Done Carefully

Round Up the Usual Suspects

A Modest Proposal by the Fed

Knee-Deepening Insolvency

Happy Birthday Mr. Borrower

China's Private Equity Landscape

In the PIPEline

SPACs – Exit Opportunities for Private Equity Sponsors?

District Court Dismisses Antitrust Suit Against Private Equity Bidders

Ignorance of the FCPA Is No Excuse

PBGC Ruling Extends Control Group Liability to Private Equity Fund

Private Equity Market – The Good, the Bad and the ?

Private Equity Alert is published by the Private Equity Group of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, +1-212-310-8000. The Private Equity Group's practice includes the formation of private equity funds and the execution of domestic and cross-border acquisition and investment transactions. Our fund formation practice includes the representation of private equity fund sponsors in organizing a wide variety of private equity funds, including buyout, venture capital, distressed debt and real estate opportunity funds, and the representation of large institutional investors making investments in those funds. Our transaction execution practice includes the representation of private equity fund sponsors and their portfolio companies in a broad range of transactions, including leveraged buyouts, merger and acquisition transactions, strategic investments, recapitalizations, minority equity investments, distressed investments, venture capital investments and restructurings.

Editor: Doug Warner (doug.warner@weil.com), +1-212-310-8751

Deputy Editor: Michael Weisser (michael.weisser@weil.com), +1-212-310-8249

©2009. All rights reserved. Quotation with attribution is permitted. This publication provides general information and should not be used or taken as legal advice for specific situations that depend on the evaluation of precise factual circumstances. The views expressed in these articles reflect those of the authors and not necessarily the views of Weil, Gotshal & Manges LLP. If you would like to add a colleague to our mailing list or if you need to change or remove your name from our mailing list, please log on to http://www.weil.com/weil/subscribe.html or e-mail subscriptions@weil.com.

**Beijing**
Steven Xiang
+86-10-8515-0558

**Boston**
James Westra
+1-617-772-8377

**Budapest**
David Dederick
+1-361-302-9100

**Dallas**
Glenn West
+1-214-746-7780

**Frankfurt**
Gerhard Schmidt
+49-69-21659-700

**Hong Kong**
Akiko Mikumo
+852-3476-9008

Peter Feist
+852-3476-9100

**London**
Michael Francies
+44-20-7903-1170

Marco Compagnoni
+44-20-7903-1547

**Munich**
Gerhard Schmidt
+49-89-242430

**New York**
Thomas Roberts
+1-212-310-8479

Barry Wolf
+1-212-310-8209

Doug Warner
+1-212-310-8751

**Paris**
David Aknin
+331-44-21-9797

**Prague**
Karel Muzikar
+420-2-2140-7300

**Providence**
David Duffell
+1-401-278-4700

**Shanghai**
Steven Xiang
+86-21-6288-1855

**Silicon Valley**
Craig Adas
+1-650-802-3020

**Warsaw**
Pawel Rymarz
+48-22-520-4000

**Washington, DC**
Robert Odle
+1-202-682-7180

**Wilmington**
E. Norman Veasey
+1-302-656-6600

**www.weil.com**