# EXHIBIT J

Case 23-09001   Document 91-24   Filed in TXSB on 03/17/23   Page 2 of 31

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

North Star Debt Holdings, L.P., Silver Oak Capital, L.L.C., AG Credit Solutions Non-ECI Master Fund, AG Centre Street Partnership L.P., AG Super Fund Master, L.P., and Gamut Capital SSB, LLC,

*Plaintiffs*,

v.

Serta Simmons Bedding, LLC, Advent International Corporation, Eaton Vance Corp., Invesco Ltd., Credit Suisse Group AG, Barings LLC, and Does 1-50,

*Defendants*.

Index No. _____

**SUMMONS**

**TO THE ABOVE NAMED DEFENDANTS:**

YOU ARE HEREBY SUMMONED and required to serve upon Plaintiffs' attorneys an answer to the Complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York.  Should you fail to answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is C.P.L.R. § 501 as the parties contractually agreed to venue in this County, and CPLR § 503 because Plaintiffs reside in New York County and because a substantial part of the events or omission giving rise to the claim occurred in New York County.

Dated:   New York, New York
         June 11, 2020

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

By:  /s/ Andrew J. Ehrlich_____
Lewis R. Clayton

1

Andrew J. Ehrlich
Robert N. Kravitz
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.:                        (212) 373-3000
Fax:                         (212) 757-3990
*lclayton@paulweiss.com*
*aehrlich@paulweiss.com*
*rkravitz@paulweiss.com*

*North Star Debt Holdings, L.P., Silver Oak Capital,
L.L.C., AG Credit Solutions Non-ECI Master Fund,
AG Centre Street Partnership, L.P., AG Super Fund
Master, L.P. and Gamut Capital SSB, LLC, only
with regard to claims asserted against Serta and
Advent*

 - and –

FRIEDMAN KAPLAN
  SEILER & ADELMAN LLP

Eric Seiler
Andrew W. Goldwater
Anne E. Beaumont
Danielle E. Tepper
7 Times Square
New York, NY  10036-6516
212-833-1100 (Phone)
eseiler@fklaw.com
agoldwater@fklaw.com
abeaumont@fklaw.com
dtepper@fklaw.com

2

Case 23-09001 Document 91-24 Filed in TXSB on 03/17/23 Page 4 of 31

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| North Star Debt Holdings, L.P., Silver Oak Capital, L.L.C., AG Credit Solutions Non-ECI Master Fund, AG Centre Street Partnership L.P., AG Super Fund Master, L.P., and Gamut Capital SSB, LLC, | Index No. _____ |
| *Plaintiffs*, | Date Filed: June __, 2020 |
| v. | **COMPLAINT** |
| Serta Simmons Bedding, LLC, Advent International Corporation, Eaton Vance Corp., Invesco Ltd., Credit Suisse Group AG, Barings LLC, and Does 1-50, | |
| *Defendants*. | |

Plaintiffs North Star Debt Holdings, L.P. ("Apollo"), Silver Oak Capital, L.L.C.,

AG Credit Solutions Non-ECI Master Fund, AG Centre Street Partnership L.P., and AG Super

Fund Master, L.P. (collectively "Angelo Gordon"), and Gamut Capital SSB, LLC ("Gamut")

(collectively, "Plaintiffs"), by and through their undersigned attorneys, for their Complaint

against defendants Serta Simmons Bedding, LLC ("Serta" or the "Company"), Advent

International Corporation ("Advent"), Eaton Vance Corp., Invesco Ltd., Credit Suisse Group

AG, Barings LLC, and Does 1-50 (collectively, "Defendants"), allege as follows:

**Nature of the Action**

1.     This Action challenges Defendants' unlawful scheme to rob certain of

Serta's lenders, including Plaintiffs, of their bargained-for rights to security for their loans under

a credit agreement while protecting and providing special benefits to a group of favored lenders

who agreed to participate in the scheme.

2.     Plaintiffs are First Lien Lenders who collectively own approximately $600

million in loans under a First Lien Term Loan Agreement with Serta. Under that agreement,

Case 23-09001   Document 91-24   Filed in TXSB on 03/17/23   Page 5 of 31

"First Lien" means what it says: the lenders thereunder, including Plaintiffs, have rights to collateral that are contractually superior to all others and, as is routinely provided for, cannot be weakened without their consent. Defendants' unlawful scheme proposes to strip Plaintiffs of those first lien rights without even seeking—much less obtaining—their approval, by subordinating their loans beneath more than $1 billion in new loans from a favored group of lenders who will be given "super-priority" rights.

3.      Such a brazen violation of standard contractual protections afforded to first lien lenders is unprecedented. If permitted to stand, it will not only strip Plaintiffs of the collateral protecting their loans, but will cause havoc in the corporate loan market. If majority lenders can conspire with borrowers to subordinate the minority, there are billions of dollars of loans that are at risk of having value stripped away in an instant. It should be enjoined.

4.      Serta, the well-known bedding company that markets brands such as Simmons® and Beautyrest®, faces significant financial distress, both because of and independent from the COVID-19 pandemic. Advent, Serta's private equity owner, is seeking to avoid potentially massive losses by instigating and directing Serta to undertake a transaction that indisputably and blatantly violates the rights of its existing lenders, including Plaintiffs.

5.      There are approximately $2 billion in loans currently outstanding under Serta's First Lien Term Loan Agreement (the "Credit Agreement"), including Plaintiffs' loans, all of which are secured by Serta's assets as collateral. A critical and standard protection for the lenders under that agreement (the "First Lien Lenders") is a provision entitling them, upon a default, to a *pro rata* share of available proceeds of that collateral, based on the face amount of loans that each First Lien Lender owns. In short, no First Lien Lender may receive more than any other on a *pro rata* basis, proportionate to its holdings.

2

Case 23-09001   Document 91-24   Filed in TXSB on 03/17/23   Page 6 of 31

6.      This priority and equal treatment of First Lien Lenders through the *pro rata* distribution of collateral proceeds is a hallmark of the Credit Agreement.  Indeed, it is so important that the Credit Agreement provides it may not be amended without the consent of *100% of the adversely affected lenders*, while a simple majority is all that is necessary to amend most other provisions of the Agreement.  The Credit Agreement is thus crystal clear both that value is to be distributed *pro rata* among First Lien Lenders, and that all affected Lenders must approve any other arrangement.

7.      On June 8, 2020, however, Serta announced a recapitalization transaction (the "Proposed Transaction") that eviscerates these protections.  The Proposed Transaction disregards the Credit Agreement's *pro rata* distribution requirement and replaces it with a new, multi-tier "waterfall" in which more than $1 billion in collateral would be paid first to a new set of lenders before a single penny is paid to Plaintiffs and other First Lien Lenders.  And, despite the Credit Agreement's ironclad guarantee that all adversely affected lenders must consent to any such change, Serta has neither obtained nor even sought the requisite consent of *any* First Lien Lenders other than Defendants, who are the beneficiaries of the new super-priority status in the new waterfall.

8.      Serta devised the Proposed Transaction with a group of lenders purportedly representing a bare majority of the face amount of the outstanding loans under the Credit Agreement (the "Favored Lenders").  The Favored Lenders agreed to replace their loans under the Credit Agreement with new loans to Serta, in exchange for Serta unilaterally purporting to subordinate the liens of all First Lien Lenders.

9.      According to Serta's news release announcing the Proposed Transaction, Serta will establish three new tranches of more than $1 billion in so-called "super-priority" loans

3

with repayment rights and security superior to those of the First Lien Lenders. Before Plaintiffs and the other First Lien Lenders receive a penny in the event of any default, the Defendants, as new "super priority" lenders, would be entitled to leap-frog the other existing lenders and receive full payment from the collateral proceeds that the Credit Agreement requires to be shared *pro rata* among the First Lien Lenders. This would transform Plaintiffs into "First Lien Lenders" in name only, and subordinated and potentially unsecured lenders in fact.

10.     The Credit Agreement does not permit this brazen collateral grab. Section 9.02(b) of the Agreement expressly requires the "consent of each Lender directly and adversely affected" by any transaction that "waives, amends or modifies the [*pro rata* payment provision] in a manner that would by its terms alter the *pro rata* sharing of payments required thereby," except in connection with transactions permitted by certain provisions of the Credit Agreements that certainly do not permit a transaction of this kind.

11.     Perhaps recognizing there is no justification for the Proposed Transaction, Defendants have refused to reveal to Plaintiffs or to explain to the market the specific details of how they purport to consummate it without violating the Credit Agreement. In fact, it cannot be done. Indeed, it would make no sense—and would render the unanimous-consent provisions a nullity—if Defendants could work a crude end-run to circumvent them.

12.     Plaintiffs ask this Court to enjoin the Proposed Transaction because it will grievously and irreparably injure them. For one, the transaction would effectively strip Plaintiffs of their liens; if the Proposed Transaction were consummated, Plaintiffs' loans would be subordinated to more than $1 billion in loans that have leap-frogged into super-priority claims on the collateral ahead of Plaintiffs' claims. There is no way to compensate Plaintiffs adequately with money damages for such a deprivation of more than half of the collateral securing their

4

loans, the subordination of those loans, the resulting decreased quality of the loans' credit, and increased risk of default.

13. What is more, Plaintiffs' loans—having been wrongfully deprived of a significant portion of their collateral—will be vastly reduced in value should the Proposed Transaction be consummated. Of course, this is precisely Defendants' plan: by subordinating Plaintiffs' loans, Defendants drive down their value, hoping to create an opportunity to buy them back at an even greater discount than the market today provides, and to sideline Plaintiffs in any further restructuring discussions. The Proposed Transaction would reduce, if not eliminate, Plaintiffs' ability to influence any future restructuring, as they will become the functional equivalent of unsecured—or severely under-secured—creditors. And such future restructurings are not hypothetical. Given the current state of Serta's business, which even after announcement of the Proposed Transaction saw its credit rating downgraded, further restructuring is likely, if not certain.

14. This is the paradigmatic case where money damages would be both inadequate and impracticable. At the conclusion of this litigation, following a judgment for Plaintiffs, it would not be possible to calculate the full value of Plaintiffs' injury or the full value of the restoration of the First Lien Loans to their rightful priority. Preliminary injunctive relief to enjoin the Proposed Transaction pending a prompt trial on the merits is necessary to safeguard Plaintiffs' rights under the Credit Agreement.

15. It is clear, moreover, that Serta and its private equity sponsor Advent are acting in bad faith. Serta's announcement of the illegitimate Proposed Transaction comes on the heels of Advent's improper efforts to impede the settlement of a legitimate, open-market purchase of loans made under the Credit Agreement by Apollo.

5

Case 23-09001   Document 91-24   Filed in TXSB on 03/17/23   Page 9 of 31

16.     Under the Credit Agreement, any lender may assign its loans to any party

other than what is described as a "Disqualified Institution."  In March 2020, when Apollo

purchased loans under the Credit Agreement, it sought and received confirmation from UBS AG,

Stamford Branch ("UBS"), administrative agent for the Credit Agreement, that Apollo was not

on the applicable list of Disqualified Institutions (the "DQ List"), meaning that it could be

assigned loans under the First Lien Agreement.

17.     Advent and Serta nonetheless have delayed and interfered with Apollo's

efforts to close its loan purchases.  Advent and Serta have provided shifting and contradictory

explanations for Serta's refusal—at Advent's direction—to recognize the assignment of the loans

that Apollo validly purchased.  Advent itself told Apollo that it would direct Serta to recognize

the assignment to Apollo if Apollo agreed to Serta's proposed terms for new capital—a brazen

attempt to manufacture leverage out of thin air by violating the terms of the Credit Agreement.

Advent has refused to permit UBS even to provide Apollo's counterparty with the DQ List—

even though the counterparty is an existing lender with a contractual right to obtain it.  As a

result of Advent and Serta's misconduct, Apollo is now in limbo, saddled with $192 million in

Serta loans that it can neither close nor dispose of.  This misconduct, too, must be remedied.

## Parties

18.     Plaintiffs Silver Oak Capital, L.L.C., AG Credit Solutions Non-ECI

Master Fund, and AG Centre Street Partnership L.P., affiliates of Angelo, Gordon & Co., L.P.,

are Delaware limited liability companies and/or limited partnerships with their principal place of

business at 245 Park Avenue, New York, NY 10167.

19.     Plaintiff AG Super Fund Master, L.P., an affiliate of Angelo, Gordon &

Co., L.P., is a Cayman Islands limited partnership with its principal place of business at 245 Park

Avenue, New York, NY 10167.

Case 23-09001   Document 91-24   Filed in TxSB on 03/17/23   Page 10 of 31

20.     Plaintiff North Star Debt Holdings, L.P., an affiliate of funds managed by Apollo Global Management, Inc., is a Delaware limited partnership with its principal place of business at 9 West 57th Street, New York, NY 10019.

21.     Plaintiff Gamut Capital SSB, LLC, an affiliate of funds managed by Gamut Capital Management, LP, is a Delaware limited liability company with its principal place of business at 250 West 55th Street, New York, NY 10019.

22.     Upon information and belief, defendant Serta Simmons Bedding, LLC is a Delaware limited liability company with its principal place of business at 2451 Industry Avenue, Doraville, GA 30360.

23.     Upon information and belief, defendant Advent International Corporation is a Delaware corporation with a principal place of business at Prudential Tower, 800 Boylston Street, Boston, MA 02199.

24.     Upon information and belief, funds managed by defendant Eaton Vance Corp. (together with Eaton Vance Corp., "Eaton Vance") have entered into the transaction support agreements described by the Company in its press release dated June 8, 2020, and are participating in the Proposed Transaction.  Eaton Vance Corp. is a Maryland corporation with its principal place of business at Two International Place, Boston, MA 02110.

25.     Upon information and belief, funds managed by defendant Invesco Ltd. (together with Invesco Ltd., "Invesco") have entered into the transaction support agreements described by the Company in its press release dated June 8, 2020, and are participating in the Proposed Transaction.  Invesco Ltd. is a Bermuda [corporation] with its principal place of business at 1555 Peachtree Street, N.E., Suite 1800, Atlanta, GA 30309.

7

Case 23-09001   Document 91-24   Filed in TXSB on 03/17/23   Page 11 of 31

26.     Upon information and belief, funds managed by defendant Credit Suisse Group AG (together with Credit Suisse Group AG, "Credit Suisse") have entered into the transaction support agreements described by the Company in its press release dated June 8, 2020, and are participating in the Proposed Transaction.   Credit Suisse Group AG is a Switzerland corporation with its principal place of business in Zurich, Switzerland.

27.     Upon information and belief, funds managed by defendant Barings LLC (together with Barings LLC, "Barings") have entered into the transaction support agreements described by the Company in its press release dated June 8, 2020, and are participating in the Proposed Transaction.   Barings LLC is a Delaware limited liability company with its principal place of business at 300 South Tryon Street, Suite 2500, Charlotte, NC 28202.

28.     Doe 1-50 are those other Lenders unknown to Plaintiffs who have entered into the transaction support agreements described by the Company in its press release dated June 8, 2020, and are participating in the Proposed Transaction.

### Jurisdiction and Venue

29.     This Court has jurisdiction over Serta pursuant to CPLR § 301 because, upon information and belief, Serta regularly does business in the State of New York, pursuant to CPLR § 302 because Serta transacts business in the State of New York, and/or pursuant to Section 9.10(b) of the Credit Agreement, under which Serta irrevocably and unconditionally consented to the jurisdiction of this Court for any civil action relating to the Credit Agreement.

30.     This Court has jurisdiction over Advent pursuant to CPLR § 301 because, upon information and belief, Advent regularly does business in the State of New York and pursuant to CPLR § 302 because Advent transacts business in the State of New York and maintains an office at 12 East 49th Street, 45th Floor, New York, NY 10017.

8

Case 23-09001   Document 91-24   Filed in TXSB on 03/17/23   Page 12 of 31

31.     This Court has jurisdiction over Eaton Vance pursuant to CPLR § 301 because, upon information and belief, Eaton Vance regularly does business in the State of New York, pursuant to CPLR § 302 because Eaton Vance transacts business in the State of New York, and/or pursuant to Section 9.10(b) of the Credit Agreement, under which Eaton Vance irrevocably and unconditionally consented to the jurisdiction of this Court for any civil action relating to the Credit Agreement.

32.     This Court has jurisdiction over Invesco pursuant to CPLR § 301 because, upon information and belief, Invesco regularly does business in the State of New York, pursuant to CPLR § 302 because Invesco transacts business in the State of New York and maintains an office at 1166 Avenue of the Americas, 26th Floor, New York, NY 10036, and/or pursuant to Section 9.10(b) of the Credit Agreement, under which Invesco irrevocably and unconditionally consented to the jurisdiction of this Court for any civil action relating to the Credit Agreement.

33.     This Court has jurisdiction over Credit Suisse pursuant to CPLR § 301 because, upon information and belief, Credit Suisse regularly does business in the State of New York, pursuant to CPLR § 302 because Credit Suisse transacts business in the State of New York and maintains an office at Eleven Madison Avenue, New York, NY 10010, and/or pursuant to Section 9.10(b) of the Credit Agreement, under which Credit Suisse irrevocably and unconditionally consented to the jurisdiction of this Court for any civil action relating to the Credit Agreement.

34.     This Court has jurisdiction over Barings pursuant to CPLR § 301 because, upon information and belief, Barings regularly does business in the State of New York, pursuant to CPLR § 302 because Barings transacts business in the State of New York and maintains an office at 340 Madison Avenue, 18th Floor, New York, NY 10173, and/or pursuant to Section

9

Case 23-09001   Document 91-24   Filed in TXSB on 03/17/23   Page 13 of 31

9.10(b) of the Credit Agreement, under which Barings irrevocably and unconditionally consented to the jurisdiction of this Court for any civil action relating to the Credit Agreement.

35.     This Court has jurisdiction over Does 1-50 pursuant to CPLR § 301 because, upon information and belief, the Favored Lenders regularly do business in the State of New York, pursuant to CPLR § 302 because the Favored Lenders transact business in the State of New York, and/or pursuant to Section 9.10(b) of the Credit Agreement, under which any Lender irrevocably and unconditionally consented to the jurisdiction of this Court for any civil action relating to the Credit Agreement.

36.     Venue properly lies in New York County pursuant to CPLR § 503 because Plaintiffs reside in New York County and because a substantial part of the events or omission giving rise to the claim occurred in New York County, and because pursuant to Section 9.10(b) of the Credit Agreement, Serta and the Lenders consented to venue in New York County.

### Factual Background

37.     Serta is North America's largest bedding manufacturer.  Based in Atlanta, Serta owns and manages the Serta® and Beautyrest® mattress brands.  Serta today is the successor to two well-known American brands, Serta and Simmons, which were combined in 2010 when an investor group that already owned the parent of Serta purchased Simmons, as Simmons emerged from a Chapter 11 restructuring.  The company's various brands, which also include the online retailer Tuft & Needle, are distributed through national, hospitality, and regional and independent retail channels throughout North America, as well as directly to consumers.  Serta operates 28 plants in the United States and Canada.

38.     Advent acquired a majority interest in Serta in October 2012 from funds managed by Ares Management LLC and the Ontario Teachers' Pension Plan.  Although the terms of the deal were not publicly disclosed, it was reported that the transaction valued the

company at about $3 billion, net of the Company's debt.  Since Advent acquired the company, it undertook what it has billed as a strategic transformation, merging the two historically distinct Serta and Simmons manufacturing, sales, and marketing organizations.

***The Credit Agreement Requires Pro Rata Distribution of Collateral Proceeds,
Which May Be Modified Only with the Consent of All Affected Lenders***

39.     Under Advent's ownership, Serta entered into three credit facilities dated as of November 8, 2016, each of which was executed by Serta and various affiliates and counterparties.  The executed agreements include: (1) a first lien term loan agreement (i.e., the Credit Agreement at issue here) providing for $1.95 billion in first lien term loans (the "First Lien Term Loans"); (2) a second lien term loan agreement providing for $450 million in second lien term loans (the "Second Lien Term Loans"); and (3) a $225 million asset-based revolving credit facility (the "ABL").

40.     The Credit Agreement includes a waterfall providing for the allocation of proceeds in the case of an event of default or if the loans become otherwise accelerated.  From a lender's perspective, this is among the most critical sections of the Credit Agreement, as it provides for how the proceeds of the collateral are divided among the Lenders if the loans become due as the result of an event of default or bankruptcy.

41.     Section 2.18(b), which contains the actual payment waterfall, provides that after certain expenses are paid, the proceeds of collateral are to be divided *pro rata* among the First Lien Lenders, based on the face amount of their ownership of loans.  This means that all First Lien Lenders share ratably in the available value based on the percentage of the loans that they own.  No First Lien Lender has a superior right to the collateral over any other.  Indeed, the *pro rata* sharing of collateral proceeds is so fundamental that Section 2.18(c) of the Credit Agreement requires any First Lien Lender that receives payment on account of its loans—

11

Case 23-09001   Document 91-24   Filed in TXSB on 03/17/23   Page 15 of 31

including a distribution of collateral proceeds—that is greater than its *pro rata* share to pay the excess ratably to the other First Lien Lenders.

42.     The centrality of *pro rata* distribution is further underscored by the Credit Agreement's amendment provisions.  Most provisions in the Credit Agreement may be amended by "Required Lenders," defined as lenders representing more than 50% of the outstanding face amount of the loans.  However, a handful of provisions in the Credit Agreement, often called "sacred rights," may only be amended by securing "the consent of each Lender directly and adversely affected thereby."  Section 9.02(b)(A).  This unanimity requirement is reserved for the waiver or amendment of the most important provisions of the agreement, including changes to the interest rate and the maturity date and other provisions that are core to protecting a lender's right to be repaid on the terms upon which it made the original loans.  The *pro rata* distribution set forth in Sections 2.18(b) and (c) is among the Credit Agreement's sacred rights, whose amendment requires consent of "each Lender directly and adversely affected thereby"—that is, all of the First Lien Lenders.

43.     Specifically, Section 9.02(b)(A)(6) provides that each affected lender must approve any agreement that "waives, amends or modifies Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the *pro rata* sharing of payments required thereby (except in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c), and/or 9.05(g) or as otherwise provided in this section 9.02)."  As such, absent these four enumerated exceptions (which as demonstrated below, do not permit this type of transaction), the *pro rata* sharing of proceeds may not be modified absent consent of *all* affected Lenders—that is, in this case, unanimously.

44.     The Credit Agreement buttresses the inviolability of the sacred rights provisions, including the *pro rata* sharing requirement, by also protecting the amendment provisions themselves.  Thus, the Credit Agreement states that no agreement by the Required Lenders (meaning a mere majority of the First Lien Lenders) may "change any of the provisions of Section 9.02(a) or Section 9.02(b) or the definition of "Required Lenders" to reduce any voting percentage required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, *without the prior written consent of each Lender*."  Section 9.02(b)(B)(1) (emphasis added).  In other words, to prevent an end-run around the sacred rights provisions, any amendment of the process for amending the sacred rights— including the *pro rata* sharing provision—requires the consent of *all* First Lien Lenders.

45.     The Credit Agreement recognizes that four types of amendments are permissible without unanimous consent, and expressly carves these amendments out of the sacred rights provisions.  First, Section 2.22 provides for the issuance of incremental additional loans, and Section 2.23 provides for the extension of maturity of existing loans.  Each section, however, provides that the incremental or extended loans must be either *pari passu*—i.e., have no greater right to receive the collateral proceeds—or junior to the existing loans.  Section 2.23 requires that any extended loan be offered to each of the First Lien Lenders on the same terms, and made available on a *pro rata* basis.  Third, section 9.02(c) permits refinancing or replacement of existing loans.  Like Sections 2.22 and 2.23, it requires that any replacement loans be *pari passu* with or junior to existing loans.  Finally, Section 9.05(g) allows a First Lien Lender to assign its loans on a non- *pro rata* basis in certain limited circumstances through either a Dutch Auction or an open market purchase.  None of these provisions permits an amendment that provides for a loan with a priority superior to that of the First Lien Lenders.

13

***The Proposed Transaction Creates More Than $1 Billion in
Illegitimate "Super-Priority" First Lien Debt***

46.     Serta has been struggling financially for some time, even before the

COVID-19 pandemic.  Indeed, in early March of this year, before the pandemic's economic

effects were felt, Serta's First Lien Loans were trading at less than fifty cents on the dollar, and

its Second Lien Loans were trading at less than twenty cents on the dollar.  Its issuer credit rating

by S&P is CC, deep into the territory of "junk."  Serta is regularly featured on its own page of

the industry publication *Reorg Research*, which focuses on companies in distress.  The pandemic

only exacerbated the Company's already difficult circumstances.

47.     In light of this situation, in April 2020, Plaintiffs entered into discussions

with Serta regarding the possibility of providing additional loans and restructuring their existing

loans to reduce Serta's indebtedness and interest expense.  On or about April 30, 2020, Plaintiffs

entered into non-disclosure agreements ("NDAs") with Serta in order to allow them to receive

non-public information about the Company to be able to evaluate and negotiate a potential

transaction.  The NDAs restricted Plaintiffs from trading in Serta securities.  They expired on

May 29, 2020.

48.     While Serta provided certain business level information, all principal level

negotiations regarding the transaction were conducted with the Company's private equity

sponsor, Advent.  Notably, the transaction discussed with Plaintiffs involved financing of certain

of Serta's assets that do not constitute collateral under the Credit Agreement.  It was never

contemplated or discussed that a transaction would include any amendments of the Credit

Agreement, much less of its sacred rights provisions.

49.     On June 5, 2020, Serta and Advent abruptly ended the parties'

negotiations.  Plaintiffs subsequently learned that, while they were engaged in good-faith

negotiations with the Company, Serta and Advent had been negotiating a separate agreement with a different group of First Lien Lenders.

50.     Soon thereafter, on the evening of June 8, 2020, Serta announced in a press release that it had entered into a transaction support agreement with a group of Favored Lenders—holders of the majority of its First Lien and Second Lien Term Loans to "recapitalize the company."  The Proposed Transaction purports to create, among other things, the following (together, the "Super-Priority Loans"):

(a)     $200 million of newly funded super-priority "first out" debt, which would rank ahead of the existing First Lien Term Loans;

(b)     $875 million of super-priority "second out" debt, which also would rank ahead of existing First Lien Term Loans; and

(c)     An unspecified amount of capacity to incur still more super-priority debt, which would be "third out" and would also rank ahead of the existing First Lien Term Loans.

The opportunity to fund the "first out" new debt, and exchange into the "second out" debt is offered to only the Favored Lenders.

51.     If the Proposed Transaction were permitted to be consummated, there would be a minimum of $1.075 billion of Super-Priority Loans (and one day, likely more, given the potential "third out" capacity) that would be given priority liens on the collateral that secures the Credit Agreement, *ahead* of the $814 million remaining First Lien Term Loans owned by the Plaintiffs and others.  The remaining (former) "First Lien" Lenders will be left out in the cold. They will effectively become third lien, or potentially even fourth lien, lenders.  Given the condition of Serta's business, this is tantamount to transforming these First Lien Lenders into

unsecured lenders, while allowing other lenders—including current Second Lien Lenders—to leap-frog into a new super-priority position. In the case of an event of default, more than $1 billion in debt ahead of Plaintiffs' debt would be paid in full before the Plaintiffs could receive even a single penny, notwithstanding their status as "first lien" lenders. What is more, by creating a third out tranche of Super-Priority Loans, the Company has indicated it may yet undertake additional improper exchanges to further subordinate and prejudice Plaintiffs.

52. The following diagram demonstrates the current capital structure, and the new one contemplated by the Proposed Transaction:



***The Proposed Transaction Violates the Pro Rata Sharing Provisions of the Credit Agreement***

53. The Proposed Transaction plainly violates the Plaintiffs' sacred rights under the *pro rata* sharing and amendment provisions of the Credit Agreement. While the

Company has not disclosed the precise mechanics of the Proposed Transaction, this much is clear:  if consummated, the Transaction would have the effect of amending Section 2.18(b)'s waterfall provision in a way that alters the *pro rata* sharing of payments it requires.  If the Proposed Transaction closes, then under Section 2.18(b), the proceeds of any liquidation of collateral would go first to pay certain administrative expenses, then to holders of the Super-Priority Loans, and only then to holders of the "First Lien" Term Loans.

54.      As set forth in Section 9.02(b), *all* affected Lenders—not just a bare majority of Lenders—must approve any amendment that "amends or modifies the provisions of Sections 2.18(b) or (c) of [the Credit] Agreement in a manner that would by its terms alter the *pro rata* sharing of payments required thereby."  The Proposed Transaction entails such an amendment.  And it was not approved by all affected Lenders.  It therefore violates the Credit Agreement.

55.      Furthermore, the Proposed Transaction would have the effect of effectively releasing all or substantially all of the First Lien collateral from the current first-priority ranking lien that benefits the First Lien Lenders by modifying the ranking of the loans. It would further have the effect of releasing all or substantially all of the value of the guarantees that protect the First Lien Lenders, because the guarantees of the existing loans, which would now be subordinated, would be worthless.  In each case, this violates Sections 9.02(b)(B)(2) and 9.02(b)(B)(3) because the consent of the Plaintiffs have not been provided (or requested).  An agreement to release all or substantially all of the Collateral (except under limited circumstances that do not apply in this context) requires the prior written consent of each Lender, as does an agreement to release all or substantially of the value of the guarantees of the borrower's obligations under the Credit Agreement under Section 9.02(b)(B)(3).

56.     The Proposed Transaction therefore would also violate Sections 9.02(b)(B)(2) and 9.02(b)(B)(3).  Indeed, even absent consummation of the Proposed Transaction, the transaction support agreement that Serta announced with certain of the defendants to effect the Proposed Transaction itself violates the Credit Agreement's restrictions on any collateral-releasing or guarantee-releasing "agreement."

***Advent Improperly Interfered with Apollo's Purchase of First Lien Term Loans***

57.     Serta's announcement of the Proposed Transaction comes on the heels of Serta's and Advent's improper interference in Apollo's open-market purchases of First Lien Term Loans beginning in March 2020.

58.     Section 9.05 of the Credit Agreement grants each of the First Lien Lenders the right to transfer their rights and obligations under the Credit Agreement to "Eligible Assignees," broadly defined to include any fund that invests in loans, such as Apollo.

59.     Transfers may occur either as assignments, whereby a purchaser becomes a First Lien Lender of record and is entitled to full rights under the Credit Agreement (including voting and economic rights), or as participations, whereby a purchaser does not become a Lender of record but acquires the economic rights and limited voting rights indirectly through an existing First Lien Lender, which remains a First Lien Lender of record.

60.     The Credit Agreement restricts a First Lien Lender's ability to transfer its rights and obligations to a Disqualified Institution.  Disqualified Institutions include entities named as such in writing by Serta prior to closing (and placed on a so-called "DQ List").

61.     The DQ List is largely fixed as of the closing date.  An entity may be added in only limited instances, including where they are affiliates of entities already on the DQ

18

Case 23-09001   Document 91-24   Filed in TXSB on 03/17/23   Page 22 of 31

List, competitors of Serta, or affiliates of competitors of Serta.  Serta must provide the DQ List to a Lender upon request, which may be shared with a proposed assignee.

62.     When an interest in loans under the Credit Agreement is assigned, the process begins with the execution of a trade confirmation between the assignor and the assignee. Once completed, the parties execute an assignment agreement and deliver a copy to UBS, as administrative agent.  UBS then seeks Serta's consent to the assignment, which, as is common, may not unreasonably withhold, condition, or delay.  Serta is deemed to have consented to the assignment if it does not object in writing within 15 business days.  The only valid ground for refusing to consent to an assignment is that the assignment violates the Credit Agreement—for example, because the proposed assignee is on the DQ List.

63.     Once in receipt of an executed assignment agreement and Serta's consent, among other things, UBS must then promptly accept the assignment agreement and records the assignment in its register of Lenders and their assignees.  The assignment then becomes effective.

64.     Apollo originally purchased First Lien Loans under the Credit Agreement at the time the Credit Agreement closed in 2016.  Apollo continued to hold its loans until May 23, 2018.

65.     On March 12, 2020, Apollo executed trade confirmations with Barclays Bank PLC ("Barclays") to purchase First Lien Loans.  Although Apollo had previously owned First Lien Loans under the Credit Agreement, Apollo nevertheless sought confirmation from UBS that it was not on the DQ List.  UBS twice confirmed that Apollo did not appear on the DQ List—once verbally on March 13, 2020, and again in writing on March 17, 2020.  Notably,

Apollo is not an affiliate of entities already on the DQ List, nor is it a competitor of Serta, nor an affiliate of competitors of Serta

66.     On March 20, 2020, Apollo submitted executed assignment agreements with Barclays to UBS.  UBS promptly requested Serta's consent to the assignment.  Serta did not object by April 14, and pursuant to the Credit Agreement consent was deemed effective as of that date—but the trade did not settle.

67.     Apollo and its counterparties repeatedly contacted UBS to inquire why the trades were not settling, despite the satisfaction of all requirements for an assignment under the Credit Agreement.  UBS told Apollo that it had followed up with Serta on several occasions, but received no response as to when Serta would indicate its position on the assignments.  UBS also confirmed to Apollo several times in mid-April that it was not on the DQ List.

68.     On April 24, 2020, Serta represented to UBS that the reason for its delay in providing borrower's consent was difficulty in obtaining the necessary signatures due to the effects of the COVID-19 pandemic.  Serta further represented to UBS that it would approve the transactions, and UBS relayed these representations to Apollo.

69.     A few days later, UBS executed the assignment agreements.  The same day, however, UBS retracted the executions as having occurred "in error."  UBS provided no further explanation of the alleged "error" that caused the execution of the assignment agreements.

70.     On April 30, 2020, as set forth above, Apollo agreed to an NDA and one-month restriction period to explore providing new money and liability management solutions to Serta.  Serta acknowledged Apollo's loan holdings by countersigning the NDA, which referenced Apollo's $192 million position.

Case 23-09001   Document 91-24   Filed in TXSB on 03/17/23   Page 24 of 31

71.     The next day, Serta dropped the pretext that its delays were due to COVID-19 and purported to *reject* Apollo's trades.  Demonstrating that it is in fact Advent directing Serta's activities, a representative of Advent told Apollo that Serta would consent to Apollo's trades only *if* Apollo made a new money investment to Serta.

72.     Advent and Serta lack any lawful reason to delay or withhold Serta's consent to the Apollo assignment or otherwise not to recognize them as valid.  Moreover, consent was deemed to have been given as of April 14, 2020; UBS had confirmed that Apollo was not on the DQ List; and Serta had confirmed just days before that it would approve the trades, without raising any basis for objecting to the trades (and there is none).

73.     Later in May 2020, Barclays, as an existing Lender seeking to assign its interests to Apollo, asked for a copy of the DQ List to determine whether UBS had erred when it told Apollo that it was not on the DQ List.  UBS declined to provide the list to either Apollo or Barclays—an existing lender with a contractual right to review its contents.

74.     Indeed, UBS acknowledged that it was obligated to provide Barclays with the DQ List, but that Advent and Serta did not agree with its contents and UBS was "working on it" with them.  Advent was attempting to manufacture a reason for Serta to withhold consent to the Apollo assignment when none existed.

75.     As a result of Advent's wrongful interference with its trades, Apollo has been unable to settle approximately $192 million in face amount of trades for Serta loans.  Given the current trading price of First Lien Loans—which will only become further depressed due to the illegitimate Proposed Transaction, which subordinates existing First Lien Loans—Apollo will be unable to exit its positions without significant losses, which have been caused by Advent and Serta's willful misconduct.

Case 23-09001   Document 91-24   Filed in TXSB on 03/17/23   Page 25 of 31

### FIRST CAUSE OF ACTION
#### (Breach of Contract – Against Serta and Favored Lenders)

76.    Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 75 above as if fully set forth herein.

77.    Serta, the Favored Lenders, and Plaintiffs are parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

78.    Plaintiffs performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

79.    Defendants, by contrast, have breached the express terms of the Credit Agreement by (a) entering into the transaction support agreement, which violates the Credit Agreement's restrictions on any collateral-releasing "agreement"; and (b) entering into an agreement that purports to alter the *pro rata* distribution provisions of Sections 2.18(b) and 2.18(c) without obtaining the consent of all affected Lenders as required by Section 9.02.

80.    As a consequence of Defendants' material breaches, Plaintiffs have been deprived of their bargain as First Lien Lenders, namely, the right to receive a *pro rata* share of collateral proceeds.

81.    Plaintiffs have no adequate remedy at law and will be irreparably injured if the Proposed Transaction is consummated or if the pro rata distribution provisions of Sections 2.18(b) and 2.18(c) of the Credit Agreement are changed without the approval of all affected Lenders as required by Section 9.02.

82.    Consummation of the Proposed Transaction and of any change in the pro rata distribution provisions of Sections 2.18(b) and 2.18(c) of the Credit Agreement are changed without the approval of all affected Lenders should be enjoined, and if not, the Favored Lenders

should be restrained from further conveying or assigning their First Lien Loans, and Plaintiffs

should be awarded damages in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and
### Fair Dealing – Against Serta and Favored Lenders)

83.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1

through 82 above as if fully set forth herein

84.     If consummated, the Proposed Transaction will destroy Plaintiffs' rights to

receive the fruits of the Credit Agreement by stripping them of collateral and altering the

provisions for payment in an Event of Default without their consent, in violation of the implied

covenant of good faith and fair dealing.

85.     Serta's and the Favored Lenders' actions in pursuing the Proposed

Transaction have disregarded Plaintiffs' rights and have not been in good faith.

86.     Plaintiffs have no adequate remedy at law and will be irreparably injured

if the Proposed Transaction is consummated.

87.     Consummation of the Proposed Transaction and of any change in the pro

rata distribution provisions of Sections 2.18(b) and 2.18(c) of the Credit Agreement are changed

without the approval of all affected Lenders should be enjoined, and if not, the Favored Lenders

should be restrained from further conveying or assigning their First Lien Loans, and Plaintiffs

should be awarded damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### (Tortious Interference with Contract – Against Advent)

88.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1

through 87 above as if fully set forth herein.

Case 23-09001   Document 91-24   Filed in TXSB on 03/17/23   Page 27 of 31

89.     Serta, the Favored Lenders, and Plaintiffs are parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

90.     Advent, as the principal equity owner of Serta since the Credit Agreement was entered into, was aware of the Credit Agreement and all of its provisions, including the waterfall provisions and the related *pro rata* sharing requirements and the requirements to amend such provisions.

91.     As the equity owner of Serta, Advent has been driving the restructuring negotiations that led to the Proposed Transaction, and thus caused the breach alleged herein.  Its conduct was both intentional and improper, as it maliciously and in bad faith caused Serta to pursue the Proposed Transaction with the knowledge that it violated Plaintiffs' rights under the Credit Agreement.

92.     As a consequence of Advent's tortious interference with the Credit Agreement, Plaintiffs have been deprived of their bargain as First Lien Lenders, namely, the right to receive a *pro rata* share of proceeds along with all other First Lien Lenders in the event the proceeds of collateral are distributed.

### FOURTH CAUSE OF ACTION
**(Tortious Interference with Prospective Economic Relations – by Plaintiff North Star Debt Holdings, L.P. against Advent)**

93.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 92 above as if fully set forth herein.

94.     As alleged herein, North Star Debt Holdings ("Apollo") purchased First Lien Loans in legitimate, open market transactions for which they are entitled to assignment of the loans.  All requirements for assignment under the Credit Agreement are satisfied.

95.     Nevertheless, Advent has wrongfully directed its portfolio company, Serta, to wrongfully and unreasonably without its consent and to refuse to recognize the assignment under the Credit Agreement, thereby purporting to prevent its execution.

96.     Advent's conduct constitutes the independent tort of misrepresentation, separate and apart from Serta's wrongful conduct in withholding borrower consent.  Advent has misrepresented that Apollo is a Disqualified Institution when in fact UBS has repeatedly advised Apollo that it is not listed on the DQ List.

97.     Apollo has been damaged by Advent's tortious interference with its acquisition of First Lien Loans, including because Apollo is unable to convey the loans or cancel the transaction, and is instead saddled with loans that are declining in value due to Advent's tortious conduct in connection with the Proposed Transaction.

### FIFTH CAUSE OF ACTION
**(Declaratory Judgment - Transaction)**

98.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 97 above as if fully set forth herein.

99.     As alleged herein, Section 9.02(b) of the Credit Agreement requires consent from all affected Lenders to any amendments to the *pro rata* sharing provisions set forth in Sections 2.18(b) and (c) of the Credit Agreement.

100.    The Proposed Transaction seeks to effect such an amendment by creating Super-Priority Loans that will have priority liens on the collateral that secures the Credit Agreement, ahead of the remaining First Lien Term Loans owned by the Plaintiffs and others.

101.    Nevertheless, the Proposed Transaction has not been consented to by Plaintiffs and, as a result, its consummation would violate the Credit Agreement.

102.    The dispute between the parties is therefore ripe for adjudication by way of declaratory judgment in order to establish the rights and obligations of the parties.

103.    For the foregoing reasons, Plaintiffs are entitled to a declaratory judgment that the Proposed Transaction violates the Credit Agreement.

## SIXTH CAUSE OF ACTION
### (Declaratory Judgment by Plaintiff North Star Debt Holdings, L.P. – Assignment)

104.    Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 103 above as if fully set forth herein.

105.    As alleged herein, Apollo purchased First Lien Loans in legitimate, open market transactions for which they are entitled to assignment of the loans.   All requirements for assignment under the Credit Agreement have been satisfied.

106.    Nevertheless, Advent has wrongfully directed its wholly-owned portfolio company, Serta, to withhold borrower consent under the Credit Agreement, thereby preventing execution of the assignment.  It continues to do so to this day.

107.    The dispute between the parties is therefore ripe for adjudication by way of declaratory judgment in order to establish the rights and obligations of the parties.

108.    For the foregoing reasons, Apollo is entitled to a declaratory judgment that it has a valid assignment of the $192 million in face amount First Lien Loans that it has purchased.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)     That the Court enter an order temporarily, preliminary, and permanently enjoining Consummation of the Proposed Transaction and of any change in the pro rata distribution provisions of Sections 2.18(b) and 2.18(c) of the Credit Agreement

Case 23-09001   Document 91-24   Filed in TxSB on 03/17/23   Page 30 of 31

without the approval of all affected Lenders, or, in the alternative, enjoining the

Favored Lenders from further conveying their First Lien Loans to preserve the

status quo;

(b)     That the Court award damages against Defendants for all economic, monetary,

actual, consequential, and compensatory damages Plaintiffs suffered as a result of

Defendants' conduct, together with pre- and post-judgment interest at the

maximum rate allowable by law;

(c)     That the Court enter a declaratory judgment that the Proposed Transaction

violates the Credit Agreement;

(d)     That the Court enter a declaratory judgment that Apollo has a valid assignment to

the $192 million in face amount of First Lien Loans that it has purchased, but to

which Serta and Advent have failed to give consent to assignment;

(e)     That the Court award Plaintiffs the costs of their suit, including reasonable

attorney' fees and expenses; and

(f)     That the Court award such other and further relief as the Court may deem just and

proper.

Dated:  New York, New York
        June 11, 2020

PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP

By:____/s/Andrew J. Ehrlich_____
     Lewis R. Clayton
     Andrew J. Ehrlich
     Robert N. Kravitz

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
lclayton@paulweiss.com

27

aehrlich@paulweiss.com
rkravitz@paulweiss.com

*Attorneys for Plaintiffs North Star Debt Holdings,*
*L.P., Silver Oak Capital, L.L.C., AG Credit*
*Solutions Non-ECI Master Fund, AG Centre Street*
*Partnership L.P., AG Super Fund Master, L.P., and*
*Gamut Capital SSB, LLC, only with regard to*
*claims asserted against Serta and Advent*

- and -

FRIEDMAN KAPLAN
  SEILER & ADELMAN LLP

Eric Seiler
Andrew W. Goldwater
Anne E. Beaumont
Danielle E. Tepper

7 Times Square
New York, NY 10036-6516
(212) 833-1100
eseiler@fklaw.com
agoldwater@fklaw.com
abeaumont@fklaw.com
dtepper@fklaw.com

*Attorneys for Plaintiffs North Star Debt Holdings,*
*L.P., Silver Oak Capital, L.L.C., AG Credit*
*Solutions Non-ECI Master Fund, AG Centre Street*
*Partnership L.P., AG Super Fund Master, L.P., and*
*Gamut Capital SSB, LLC*

28