# EXHIBIT U



# DEAL LAWYERS

*Vol. 3, No. 5*                                                                                                         September-October 2009

## Convertible Debt Exchange Offers: Considerations for Distressed Issuers

*By James Moloney, Glenn Pollner and Matthew Shaw of Gibson, Dunn & Crutcher LLP[1]*

Convertible debt securities have been a popular capital-raising tool in recent years. Convertible debt securities give investors the option to convert their debt securities into equity of the issuer, thereby providing them with upside equity participation in the issuer while retaining downside protection through the debt feature of the security. In addition, the equity conversion feature of convertible debt securities can allow an issuer to lower its cost of borrowing while avoiding dilution to its current equity value by setting the conversion price at an above-market price.

However, for many issuers of convertible debt a day of reckoning is approaching. Much of the convertible debt issued earlier this decade will soon mature, either because the instrument had a short maturity or, as is common for longer-maturity convertible debt securities, bondholders were given the right to put the convertible securities back to the issuer on specified dates over the life of the security. Given that the stock price of many of these issuers has declined significantly due to deteriorating conditions in the financial markets and the worldwide economy over the last year, many of the convertible debt securities are now deeply "underwater" (*i.e.*, have a conversion price significantly above the current stock price).

This makes it unlikely that investors will convert their convertible debt securities prior to maturity or an upcoming put date. Unfortunately, many of the issuers of these bonds do not have the cash resources or access to capital to repay their maturing bonds and, due to continued weakness in the capital markets, refinancing options for these issuers with third parties can be extremely limited or non-existent. The amount of convertible debt currently considered "distressed" has been estimated by some to be almost $60 billion.[2] This article provides an overview of some of the issues and associated challenges with restructuring convertible debt securities in light of current Securities and Exchange Commission ("SEC") regulations.

Since deeply "out-of-the-money" convertible debt securities of issuers with perceived default risk will often trade well below par value, the most attractive solutions for such issuers may be to repurchase their

---

[1] © 2009 Gibson, Dunn & Crutcher LLP. James J. Moloney is Co-Chair of Gibson, Dunn & Crutcher LLP's Securities Regulation and Corporate Governance Practice Group and is a Partner in the Corporate Transactions Group in Gibson, Dunn & Crutcher LLP's Orange County office. Glenn R. Pollner is a Partner and Matthew S. Shaw is an Associate in the Corporate Transactions Group in Gibson, Dunn & Crutcher LLP's New York office. The authors would like to thank Dhiya El-Saden, Co-Chair of Gibson, Dunn & Crutcher LLP's Financial Institutions Practice Group and a Partner in the Corporate Transactions Group in Gibson, Dunn & Crutcher LLP's Los Angeles office, for his significant insights and contributions in connection with the preparation of this article.

[2] *Distressed Universe*, GLC Advisors & Co. (Aug. 24, 2009).

---

### TABLE OF CONTENTS

- Convertible Debt Exchange Offers: Considerations for Distressed Issuers . . . . . . . . . . . . . . .  1
- Negotiating Value and Dilution Risk in Stock-for-Stock Mergers . . . . . . . . . . . . . . . . . . . . . 10
- Caveat Everybody: Changes in Control as Assignments of Contract Rights . . . . . . . . . . . . 17
- Substituting Tort for Contract: Tortious Interference Claims Against M&A Affiliates . . . . . . 20

© 2009 Executive Press, Inc.

DealLawyers.com • P.O. Box 21639 • Concord, CA 94521-0639 • (925) 685-5111 • Fax (925) 930-9284 • info@DealLawyers.com
ISSN 1944-7590

outstanding convertible securities at a discount on the open market, in privately negotiated transactions or through a cash tender offer before the debt reaches maturity. However, issuers without sufficient cash on hand or other access to liquidity may not be able to avail themselves of these options. Additionally, an issuer may be unable, due to contractual restrictions, or unwilling, for liquidity reasons, to use cash to repurchase the outstanding securities. For example, if a company has convertible debt with a put or maturity in the relatively near term and repurchases some securities for cash, it may not be able to obtain cash to repurchase the remainder of the convertible debt when it becomes due, and the repurchase could render the company insolvent. If the company subsequently files for bankruptcy within 90 days, this repurchase could be subject to avoidance as a preference under federal bankruptcy laws; additionally, in some cases, fraudulent transfer laws might be implicated.

Given these difficulties and/or a reluctance to repurchase outstanding convertible debt using cash, issuers will often look to utilize other means to restructure or refinance these securities. In many cases, a small number of sophisticated investors will hold a significant amount of the outstanding convertible debt securities and it may be feasible to restructure a sizable portion of the convertible debt through one or more privately negotiated exchanges. In structuring private exchange transactions, an understanding of the potential tender offer issues is critical. Particularly when a maturity is imminent and the perceived risk of having the transactions deemed to be a tender offer is great, an issuer may conclude that individually negotiated exchanges are not a viable option. Where successive transactions are a possibility, consideration should be given to whether the multiple transactions might be integrated and deemed a "creeping tender."[3]

## Tender Offer Characteristics

There is no fixed definition of "tender offer" in the SEC's regulations, nor is there a bright-line between privately negotiated purchases and tender offers set forth in case law. In the leading case *Wellman v. Dickinson*,[4] the court, in analyzing whether a particular purchase program was a tender offer, identified the following eight characteristics of a tender offer:

- active and widespread solicitation;
- solicitation made for a substantial percentage of the class of the issuer's securities;
- offer to purchase made at a premium over the prevailing market price;
- terms of the offer are firm rather than negotiable;
- offer contingent on the tender of a fixed amount of securities, often subject to a fixed maximum number or amount to be purchased;
- offer open only for a limited period of time;
- offerees subjected to pressure to sell securities; and
- a public announcement of a purchasing program preceded or accompanied by a rapid accumulation of large amounts of the issuer's securities.

This test is not meant to be a definitive checklist; rather, in applying these eight factors in *Wellman*, the court noted that because a particular aspect of the test may be more compelling or determinative than another, not all the criteria necessarily need to be met. In fact, in *Hanson v. SCM*[5] the Second Circuit, in discussing the *Wellman* test, cautioned against making the test a "mandatory 'litmus test,'"[6] because some of the factors may be absent though the solicitation may still be a tender offer, and, likewise even where many factors may be present, the solicitation may not amount to a tender offer if the missing factors outweigh those present.

---

[3] In addition, where an issuer is obligated to make a put offer in the near future pursuant to the terms of the convertible debt securities, issuers should be cognizant of the fact that the put offer itself is generally considered by the SEC to be a tender offer. This later transaction could also, conceivably, be integrated with prior exchange or repurchase transactions.

[4] *Wellman v. Dickinson*, 475 F. Supp. 783 (S.D.N.Y. 1979).

[5] *Hanson Trust PLC v. SCM Corporation*, 774 F. 2d 47 (2d Cir. NY 1985).

[6] *Id.*

Many privately negotiated transactions involve a smaller number and percentage of securityholders than a public deal, involve less publicity, and involve sophisticated investors more likely to be knowledgeable about the company's business. As a result, the offeree is often less likely to be pressured or ill-informed than the offeree in a typical public equity tender offer. In *Hanson*, a potential acquirer of SCM Corporation, Hanson Trust PLC, announced a tender offer for shares of SCM, which SCM management had advised its shareholders against. A bidding war commenced between Hanson and Merrill Lynch Capital Markets (which SCM management viewed as a "white knight"), resulting in a leveraged buyout agreement between SCM and Merrill.

This agreement provided for an asset lock-up in the form of below-market value sales of certain profitable businesses of SCM to Merrill if any party other than Merrill acquired more than one-third of SCM's outstanding shares. In light of this development, Hanson abandoned its tender offer, but realized that they could block the SCM-Merrill merger proposal if Hanson could acquire slightly less than one-third of SCM's outstanding shares. That same day, within a period of two hours, Hanson purchased 25% of SCM Corporation's outstanding shares via five private purchases and one open market purchase. The number of holders solicited (six) was miniscule compared to the market of 22,800 SCM shareholders, at least five of the six sellers were highly sophisticated, the sellers were not pressured to sell, there was no publicity, no premium was paid, the offer was not contingent on a minimum tender percentage, and there was no time limit imposed.

These factors were considered significant in *Hanson*, as the Second Circuit reversed the lower court's finding that there was a likelihood of success on the merits in the contention that Hanson had engaged in a tender offer. The court reasoned that, since the purpose of the tender offer rules codified in § 14(d) of the Securities Exchange Act of 1934, as amended, (the "Exchange Act") is to protect the ill-informed solicitee, the true test of the existence of a tender offer is whether, in viewing the transaction as a whole, there appears to be a likelihood that unless the tender offer rules are followed there will be "a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them."[7] While it is the overall combination of factors that is relevant, some courts have declined to find the existence of a tender offer when the sellers are sophisticated and well informed, since a certain purchase may not "come within the scope of transactions and sellers the [tender offer rules were] intended to protect."[8]

*Creeping Tender Offers*

In structuring open market or privately negotiated transactions, particularly where successive transactions are contemplated or are a possibility, it is important to realize that multiple open market or privately negotiated transactions could be aggregated and deemed by the SEC or a court to be a tender offer— generally, this is referred to as a "creeping tender offer." Whether a series of transactions should be aggregated and found to be a tender offer should generally be analyzed using the same criteria outlined by the courts in *Wellman* and *Hanson* and described above.

The potential for creeping tender offer risk presents additional challenges when planning a convertible debt restructuring. If the issuer's purchases or exchanges amount to a creeping tender offer, the issuer could potentially be subject to SEC enforcement action and private claims by security holders. For instance, if a series of private purchases was deemed a tender offer, holders that were not approached to sell their securities could claim that they were not included in the offer, thus violating the "all-holders" rule, or, if another seller received more consideration for their securities, a seller might claim that the "best-price" rule was violated.[9]

As *Wellman* and *Hanson* show, there is no clear standard for what constitutes a tender offer.[10] Although there is an understandable reluctance on an issuer's part to aggressively test the definition of a "tender

---

[7] *Id.*

[8] *In re General Motors Class E Stock Buyout Securities Litigation,* 694 F. Supp 1119 (D. Del. 1988).

[9] See the discussion in *"All-Holders/Best-Price Requirements" infra*.

[10] In 1979, following *Wellman,* the SEC considered adopting specific criteria for tender offers, consisting of offers (i) during any 45-day period, to more than 10 persons and seeking the acquisition of more than 5% of the class of securities (subject to certain exclusions), or (ii) that are not otherwise a tender offer, but which (A) are disseminated in a widespread manner, (B) provide for a price which represents a premium in excess of the greater of 5% of or $2 above the current market price and (C) do not provide for a meaningful opportunity to negotiate the price and terms. Such criteria were never adopted by the SEC. *See* Proposed Amendments to Tender Offer Rules, Release No. IC-10959, Fed. Sec. L. Rep. (CCH) ¶ 82,374 (Nov. 29, 1979). *See also* Tender Offers, Release No. IC-11336, Fed. Sec. L. Rep. (CCH) ¶ 82,646 (Sept. 4, 1980).

offer" *Hanson* illustrates that if, the issuer is approaching institutional investors, a transaction or series of transactions may not, depending on the specific facts and circumstances, rise to the level of a tender offer even if it involves a significant percentage of the class of securities sought.[11] Because of the fact intensive nature of the analysis and the lack of clear standards, it is important for issuers and their advisors to carefully undertake the tender offer analysis in light of all of the pertinent facts and circumstances.

Whether a transaction or series of transactions is deemed a tender offer can be critical, since transactions that are not tender offers will allow an issuer far greater structuring flexibility. However, a proposed transaction that is later deemed a tender offer could lead to potential liability for the issuer and, if the risk of such transaction being deemed a tender offer is considered too great, an issuer may have no choice but to comply with the equity self-tender rules.

### Registered Exchange Offers

Depending on the facts and its tolerance for risk on the tender offer issue, an issuer may ultimately decide to make a formal exchange offer to all holders of the class or series of outstanding convertible debt securities in order to restructure the securities. In most cases, once it reaches this conclusion, an issuer will find itself facing the prospect of registering the new securities to be issued in exchange under the Securities Act of 1933, as amended (the "Securities Act"), on Form S-4 (assuming a domestic issuer), and, since convertible debt securities are viewed as equity securities by the SEC, this will also necessitate compliance with the SEC's issuer equity tender offer (or self-tender offer) rules (Rule 13e-4, Regulation 14E and Regulation M-A under the Exchange Act and, depending on the circumstances, possibly Rule 13e-3).[12] Regardless of how deeply out-of-the-money a convertible security may be and whether or not the convertible debt security is a net share settled instrument,[13] we understand that the SEC still takes the view that these convertible securities should be treated as equity securities for the purposes of the equity self-tender offer rules.[14]

The treatment of convertible debt securities as equity securities is significant because the equity self-tender offer rules are substantially more burdensome than the rules applicable to straight debt securities. The rules applicable to straight debt securities, Regulation 14E, allow far more latitude to structure transactions as a result of their not being subject to the more onerous requirements of Rule 13e-4.[15] Accordingly, it is much more difficult to successfully execute a restructuring of convertible debt securities than of straight debt.

---

[11] One self-imposed benchmark sometimes cited by investment bankers and other market participants is that an issuer should generally consult with legal counsel concerning the possibility of a creeping tender offer before engaging in one or more transactions that would result in the acquisition of more than 25% of a series of securities in a quarter or more than 50% of a series in a year. While the genesis for this rough rule of thumb is unclear and it has not been endorsed by the SEC staff, we believe, based in part on recent conversations with the staff, that, absent other *Wellman* factors and depending upon the facts and circumstances, an issuer may be able to solicit as many as ten sophisticated investors with as much as 70 to 80% of a series without the repurchases or exchanges constituting a tender offer. However, the tender offer determination is highly fact-specific, and there could be transactions that fall within the foregoing guidelines that nonetheless constitute a tender offer, just as there could be others that do not fall within the foregoing guidelines yet still do not constitute a tender offer. (*e.g.*, it would be difficult to argue that a purchase of 100% of a series from one sophisticated investor constitutes a tender offer.) All of this underscores the importance of issuers consulting with their legal advisors early on in the exchange process.

[12] *See* 17 C.F.R. § 240.13e-4; 17 C.F.R. §§ 240.14e-1-14-f1; 17 C.F.R. §§ 229.1000-1016; 17 C.F.R. § 204.13e-3. (Rule 13e-3 of the Exchange Act is applicable in "going private" transactions—generally, transactions causing the number of record holders to fall below 300 allowing for termination of Exchange Act registration and/or reporting, or causing the delisting of the securities at issue from a national securities exchange.)

[13] A net share settled convertible bond typically provides that, upon conversion, the investor will receive, per $1,000 principal amount of convertible bonds, up to the first $1,000 of conversion value in cash with the remainder of the conversion value payable in stock. Where the conversion value of such a bond is below $1,000, a converting bondholder typically would only receive cash upon conversion (in an amount equal to the conversion value) and would have no entitlement to receive shares. In some cases, a convertible bond may provide the issuer with the right to settle conversions in cash, common stock, or a combination thereof at the issuer's option.

[14] Interestingly, the SEC staff has taken the position that a third party tender offer for convertible debt securities that are not registered under Section 12 of the Exchange Act is not subject to the requirements of Section 14(d) of the Exchange Act and Regulation 14D, despite the fact that the securities are convertible into common stock of a class registered under the Exchange Act. Although the conversion feature renders the securities "equity securities" within the meaning of Section 3(a)(11) of the Exchange Act and Rule 3a11-1, the staff reasoned that the convertible debt is a class of equity securities not registered under the Exchange Act and, therefore, a third party tender offer for that debt is not subject to Section 14(d). SEC Division of Corporation Finance, Manual of Publicly Available Telephone Interpretations, Tender Offer Rules and Schedules (July 1997) (Interpretation Q1), *available at* http://www.sec.gov/interps/telephone/cftelinterps_tender.pdf.

[15] *See* 17 C.F.R. §§ 240.14e-1-14-f1; 17 C.F.R. § 240.13e-4.

Key issues that a company must tackle in order to successfully execute a registered exchange offer to restructure outstanding convertible debt securities include:

- potential "gun jumping" and similar issues under the Securities Act and tender offer communication filing requirements under Rule 13e-4 and Regulation M-A when seeking to engage in a dialogue with key bondholders to identify a transaction structure that presents a high likelihood of success;[16]

- the "all-holders" and "best-price" requirements of Rule 13e-4, which render unavailable certain techniques frequently used in tender offers for straight debt to incentivize early tenders by holders (*e.g.*, early tender fees);[17]

- the requirement to provide withdrawal rights throughout the offer, which also limits structuring flexibility to incentivize early tenders while providing bondholders with an ability to walk away from a negotiated transaction;[18] and

- the inability to obtain lock-ups from key bondholders prior to launching the exchange offer as a means to ensure a successful transaction.[19]

*Pre-Launch Communications with Existing Bondholders*

By their nature, restructurings effected by means of an exchange offer, like any other type of restructuring, are consensual transactions that benefit from an active dialogue and negotiation among the participants—in this case, the issuer and its bondholders. In exchanges that qualify for an exemption from registration under the Securities Act and that do not rise to the level of a tender offer subject to the full panoply of equity self-tender rules, issuers have a significant degree of latitude in communicating both verbally and in writing with the participating bondholders in order to reach a consensus on transaction structure prior to commencement of the transaction.[20] This contrasts significantly with an exchange offer registered under the Securities Act and required to comply with the equity self-tender rules.

Under the Securities Act, offers to sell securities are generally prohibited by Section 5 unless a registration statement is on file with respect to the securities.[21] In addition, Section 5 of the Securities Act generally restricts written offers of securities unless made pursuant to a prospectus that complies with the statutory requirements. With respect to the Exchange Act, Rule 13e-4 generally requires that any written communications made by the issuer (or others acting on its behalf) relating to a tender offer, as well as any

---

[16] *See* 17 C.F.R. § 240.13e-4; 17 C.F.R. §§ 229.1000-1016.

[17] *See* 17 C.F.R. § 240.13e-4.

[18] *See* 17 C.F.R. 240.13e-4(f)(2).

[19] Two important additional issues, among others, to consider are (i) stockholder approval requirements of the stock market on which the issuer's common stock is listed and (ii) the credit rating implications of the transaction. With regard to stockholder approval requirements, New York Stock Exchange ("NYSE") Rule 312.03 requires stockholder approval for issuances by a NYSE listed company of common stock, securities convertible into common stock, warrants and certain other equity linked securities if the number of shares or voting power of the common stock subject to the issuance equals or exceeds 20% of the number of shares or voting power outstanding before the issuance, subject to certain exceptions. While one of the exceptions relates to public offerings, this exception is only applicable to public offerings for cash and therefore is inapplicable to exchange offers; additionally, NYSE's rules require stockholder approval for transactions involving a "change of control." NASDAQ has similar requirements for companies listed on NASDAQ. *See* NASDAQ, Inc., NASDAQ Listing Rules § 5635. Additional NYSE or NASDAQ stockholder approval triggers or other rules may also be implicated, depending on the circumstances. Issuers whose stock is listed on other stock exchanges should review their requirements. With regard to the effect of an exchange offer on the credit ratings of an issuer, each of Standard & Poor's Ratings Services and Moody's Investors Service released guidance in 2009 addressing the potential implications on credit ratings of exchange offers occurring in the context of a "distressed" transaction. Issuers should carefully consider the effect of any planned exchange offer on its credit ratings and any resulting effects on the issuer's contractual arrangements. *See* Moody's Approach to Evaluating Distressed Exchanges, Moody's Global Credit Policy, Mar. 2009 and Standard & Poor's - General Criteria: Rating Implications of Exchange Offers and Similar Restructurings, Jan. 28, 2009.

[20] Exchange offers can be exempt from registration under the Securities Act if they qualify as a private placement under Section 4(2) or if they qualify for an exemption such as that available under Section 3(a)(9) of the Securities Act. Each of these exemptions has certain restrictions that may make them unavailable or undesirable. In the case of Section 4(2), as is the case with any other private placement, there are prohibitions against general solicitation and limitations on non-accredited investor participation. In the case of Section 3(a)(9), the exemption prohibits compensation for soliciting exchanges and imposes a "same issuer" requirement. It is important to note that a transaction may qualify for an exemption from registration pursuant to Section 4(2) or Section 3(a)(9) but still constitute a tender offer subject to compliance with the Exchange Act's self-tender offer rules. *See* 15 U.S.C. § 77d; 15 U.S.C. § 77c(a)(9).

[21] There are certain limited exceptions, such as those available to "well known seasoned issuers" pursuant to Rule 163 under the Securities Act and those available in connection with "business combination transactions" under Rule 165 and Rule 166 under the Securities Act. *See* 17 C.F.R. §§ 230.163, 230.164, 230.165.

material changes, be filed with the SEC.[22] As a result of these restrictions, any desired communications with existing bondholders prior to the filing of an S-4 registration statement relating to an exchange offer present the risk of gun-jumping and similar prohibitions, not to mention the fact that written communications could be deemed illegal prospectuses and/or could violate the tender offer filing requirements.

While Rules 165 and 166 under the Securities Act provide exemptions for certain oral and written communications in connection with a "business combination transaction," these exemptions are not available for transactions deemed to be a "capital raising transaction."[23] An issuer exchange offer falls within the definition of "business combination transaction" for purposes of these rules.[24] However, under certain circumstances an issuer exchange offer might be viewed as similar to a sale of new securities for cash by the issuer with the proceeds being used to repurchase the outstanding securities, or as a contemporaneous capital raising transaction.

As such, there may be some uncertainty regarding the availability of Rules 165 and Rule 166 to facilitate transaction structuring communications with key bondholders.[25] The availability of these rules is an area where more guidance from the SEC would be helpful, since without an ability to engage in pre-launch communications with its most significant convertible debt holders, an issuer may be precluded from effectively structuring a transaction that has a high probability of success and from discussing significant related issues, such as the possibility of bankruptcy in the absence of a restructuring and other potential restructuring solutions, with key bondholders. Issuers are understandably reluctant to commence an exchange offer absent confidence in the offer's likelihood of success, for the reason that a failed exchange offer can result in reduced investor confidence in the issuer, a weakened stock price and negative publicity, leaving the issuer in a worse position than if it had it not undertaken the exchange offer at all.

*All-Holders/Best-Price Requirements*

Rule 13e-4 of the Exchange Act provides that a tender offer for equity securities must be open to all holders of the class of securities and that the consideration paid to any security holder for securities tendered in the tender offer must be equal to the highest consideration paid to any other security holder for the securities tendered.[26] This considerably reduces the amount of flexibility in structuring a tender offer for convertible debt compared to straight debt securities.

For instance, many tender offers for non-convertible debt provide an early tender premium for holders that tender within an initial timeframe (*e.g.*, the first 10 days of the offer). This incentivizes holders to act quickly and may permit an issuer to offer an exchange on terms that are more favorable to the issuer. Similarly, if participation in the offer at the end of the early tender period is not strong, it can be a signal to the issuer that the terms of its offer need to be improved. There are a number of alternative transaction structures entailing the use of "kickers" or "sweeteners" that could be used to incentivize holders to exchange their outstanding convertible debt, such as cash payments for early tenders as discussed above, a limited opportunity to move up within the issuer's capital structure, the provision of security (collateral) for the early exchanging holders or the issuance of additional equity securities (*e.g.*, warrants) for early tenders. These types of incentives may not be permissible in circumstances where an issuer is required to comply with the all-holders/best-price requirements, as is the case with equity self-tender offers subject

---

[22] *See* 17 C.F.R § 240.13e-4.

[23] Rule 165 provides an exemption from Section 5(c) of the Securities Act for offers from the time of first public announcement of a business combination transaction until the filing of a registration statement and from Section 5(b)(1) of the Securities Act for offers after the filing of a registration statement in connection with business combination transactions, so long as written communications made pursuant to the rule (other than non-public communications among transaction participants) are filed with the SEC and the other requirements of the rule are met. *See* 17 C.F.R. § 230.165. Rule 166 provides that certain communications prior to public announcement of offerings in connection with business combination transactions will not constitute offers under Section 5(c) of the Securities Act so long as the requirements of the rule are met, including that reasonable steps are taken to prevent further distribution or publication of the communication until public announcement of the transaction or the filing of the registration statement, whichever comes first. *See* 17 C.F.R. § 230.166. *But see* note 25 *infra*.

[24] Rule 165(f) provides that a "business combination transaction" means "any transaction specified in Securities Act Rule 145(a) or exchange offer." 17 C.F.R § 230.165. Rule 145(a) applies to reclassifications, mergers, consolidations, and transfers of assets submitted to a stockholder vote. *See* 17 C.F.R. § 230.145(a).

[25] *See* SEC Division of Corporation Finance, Manual of Publicly Available Telephone Interpretations, Third Supplement July 2001 (Interpretation C1), *available at* http://sec.gov/interps/telephone/phonesupplement3.htm.

[26] *See* 17 C.F.R. 240.13e-4(f).

to Rule 13e-4. By limiting flexibility in structuring a tender offer, an issuer is forced to go to market with an offer that it hopes will entice all bondholders to participate (perhaps offering overly generous terms in order to ensure setting a market clearing price), making the transaction more costly and limiting the issuers' options for incentivizing holders to tender.

*Withdrawal Rights*

An additional complexity that arises in connection with tenders for convertible debt securities is the requirement to provide withdrawal rights for securities that are tendered during the entire tender offer period and, if not yet accepted for payment, after the expiration of 40 business days from commencement of the tender offer.[27] This rule affects the exchange offer process in a manner similar to the all-holders/best-price rule; it limits the flexibility of how exchange offers in this context may be structured. Early-tender structures simply do not work when these withdrawal rights must be provided, as an early-tendering holder could later change its mind and withdraw its tender. In effect, the right to withdraw is the functional equivalent of a statutorily guaranteed ability to re-trade (*i.e.,* renegotiate) the transaction.

*Inability to Enter into Pre-Commencement Lock-ups*

Withdrawal rights, limitations on pre-commencement communications and the prohibition on sales of securities prior to effectiveness of a registration statement effectively prevent an issuer from entering into agreements with its key bondholders prior to commencing the exchange offer. This is a significant difference from what is permissible in a private exchange transaction or a cash tender offer for straight debt securities.[28] The ability to agree on transaction structure and the consideration offered with one or more key bondholders and have such holders agree to exchange their bonds on the agreed upon terms (*i.e.*, a "lock-up") would provide several significant benefits to issuers. First, such a lock-up agreement would be helpful in potentially setting market-clearing terms for the transaction by letting other bondholders know that one or more large, sophisticated holders with greater bargaining power are amenable to such terms. Second, lock-up agreements would provide certainty to issuers and minimize transaction execution risk when structuring a transaction that is expensive, time consuming, and otherwise without any guaranteed outcome.

The ability to enter into such lock-up agreements, which the SEC permits under certain circumstances in connection with certain business combination transactions,[29] would be particularly useful in exchange offers for convertible debt, due to the fact that, quite often, a large portion of the issuance is held by a small number of sophisticated holders and given that the nature of the transaction is one that requires consensus with key bondholders. It would also reduce greatly the risk that, due to withdrawal rights, the bondholders would be able to renegotiate deal terms for the life of the exchange offer, thus precluding an offer from closing by necessitating repeated extensions.

Issuers invest a great deal of effort and incur significant expense trying to structure a successful transaction, and the risk of having to restructure or renegotiate deal terms presents a significant deterrent to issuers considering registered exchange offers. Further, because of this risk, issuers have an incentive to try to structure transactions as privately negotiated or exempt transactions that will not implicate the equity self-tender offer rules. Often, this can lead to the exclusion of bondholders from the opportunity to participate in a transaction they might find desirable, solely to reduce the risk of triggering the equity self-tender offer rules.

**Regulatory Relief**

As evidenced by the discussion above, the potential applicability of the Rule 13e-4 equity self-tender offer rules to convertible debt exchanges poses numerous challenges to issuers beyond those faced in a restructuring involving straight debt securities. While privately negotiated transactions may provide the

---

[27] *See* 17 C.F.R. 240.13e-4(f)(2).

[28] While a lock-up agreement after the registration statement is declared effective would be permissible under the Securities Act, the existence of mandatory Exchange Act withdrawal rights and the anti-waiver provisions of the federal securities laws raise potential issues with respect to the enforceability of such lock-up agreements.

[29] *See* SEC Division of Corporation Finance, Compliance and Disclosure Interpretations, Securities Act Forms (Interpretation #225.10) (Nov. 26, 2008), *available at* http://www.sec.gov/divisions/corpfin/guidance/safinterp.htm.

most flexibility and the quickest path to a restructuring, issuers should be aware that the SEC does have statutory flexibility to make accommodations to facilitate registered convertible debt exchange offers and other convertible debt restructurings by issuers. Among other things, the SEC has general authority under both the Securities Act[30] and the Exchange Act[31] to provide exemptions from regulations, such as the equity self-tender offer rules. The SEC's exemptive authority has been used, albeit rarely, to provide limited exemptive relief from the requirements of Rule 13e-4.[32] A recent example of this arose in connection with General Motors Corporation's reorganization.[33]

General Motors requested—and was granted—limited exemptive relief from the Rule 13e-4 withdrawal rights requirements in connection with an exchange offer for four series of convertible debt.[34] In both the case of General Motors and the precedents it relied upon[35], a primary factor in the SEC's granting exemptive relief was whether the types of abuses for which Rule 13e-4 was enacted were apparent in the situation at hand. The SEC's goal in adopting Rule 13e-4 was to prevent "fraudulent, deceptive or manipulative acts and practices" in connection with tender offers.[36] Rule 13e-4(f) provides for a withdrawal period so that tendering security holders have "an opportunity to reconsider their investment decision, and to protect such holders from being pressured into accepting the tender offer prior to the time all material facts relating to the tender offer are fully disclosed and disseminated."[37]

In General Motors' case, the SEC granted limited relief from the requirement to provide full withdrawal rights based upon the issuer's argument that the concerns for which Rule 13e-4(f)(2) was established would not be undermined because (a) the holders of the convertible debt received extensive disclosure that conformed with the other requirements of Rule 13e-4 and the Securities Act; (b) holders were provided a withdrawal period – albeit, for a period that could provide for a shorter withdrawal period than that required under Rule 13e-4;[38] (c) the convertible debt was so significantly underwater that it was, in effect, no different than straight debt; and (d) there was little likelihood of a competing offer for the convertible debt.[39]

While the impact of the General Motors reorganization on the national economy is extraordinary, the circumstances that are described in the General Motors No-Action Letter are potentially applicable to many issuers of convertible debt. The size of an issuer should not be determinative of the regulatory relief it will receive. In fact, smaller issuers often have fewer options available to them than larger issuers. In many cases, regardless of the size of the issuer, a large percentage of an issuer's convertible debt is often held by a small number of institutional investors that qualify as "qualified institutional buyers" within the meaning of Rule 144A under the Securities Act.[40] These investors are typically sophisticated, have the ability to fend for themselves and are less in need of the protections afforded by Rule 13e-4. As a result, coupled with the fact that convertible bonds are not typically widely held directly by retail investors, convertible debt exchange offer transactions may be very well suited for exemptive relief from the SEC.

---

[30] See 15 U.S.C. § 77z-3.

[31] *See* 15 U.S.C. § 78mm.

[32] *See* BlackRock Advisers LLP, SEC No-Action Letter (October 30, 2008) (granting relief from Rule 13e-4 for a liquidity facility established to repurchase securities from holders and remarket them); *see also* CenterPoint Energy, Inc., SEC No-Action Letter (December 21, 2006) and PMI Group, Inc., SEC No-Action Letter (July 6, 2001) (in each case granting relief to issuers to concurrently engage in two tender offers when one of the tender offers results from a contractual put right of holders); *see also* IDB Bankholding Corporation Limited, SEC No-Action Letter (October 10, 1991) and First Financial Management Corporation, SEC No-Action Letter (January 22, 1991) (in each case granting relief from Rule 13e-4 in light of the satisfaction of the policy objectives of Rule 13e-4 by adequate disclosure to holders).

[33] *See* General Motors Corporation, SEC No-Action Letter (May 15, 2009).

[34] In addition, the restructuring involved an additional 24 series of non-convertible debt to which the equity self tender offer rules were not applicable. *See Id.*

[35] *See* note 32 *supra*.

[36] *See* SEC Release 34-16112 (August 16, 1979).

[37] *Id*.

[38] GM holders were permitted to withdraw tendered securities for 20 business days following commencement of the exchange offer, with such time period to be extended upon an adverse change of the consideration offered to tendering holders or a material adverse change in GM's circumstances that could alter the "total mix" of information held by bondholders. Rule 13e-4 provides for withdrawal periods for the entire time the tender offer stays open and for 40 days following commencement, if the tendered securities have not yet been accepted for payment. *See* 17 C.F.R. 240.13e-4. This relief allowed GM to limit withdrawal rights upon an extension of the expiration date of the offer.

[39] *See* General Motors Corporation, SEC No-Action Letter (May 15, 2009).

[40] *See* 17 C.F.R. 230.144.

For example, the SEC may be agreeable, in certain situations, to providing limited exemptive relief from the withdrawal right requirements (as in the case of General Motors) and might be further agreeable, under certain circumstances, to lock-up agreements from a limited number of sophisticated institutional bondholders to facilitate an issuer's restructuring efforts. However, issuers need to be cognizant that the process for obtaining exemptive relief from the SEC can be very time consuming. Further, an issuer may be unwilling to approach the SEC for relief based on the belief that the risk and negative consequences of an unfavorable ruling from the SEC is too great.

Faced with these risks, an issuer will often decide to structure a transaction that is limited to a few significant bondholders in an effort to avoid the applicability of the self-tender offer rules. This, unfortunately, may result in a case where the issuer might otherwise prefer a transaction that permits all of its convertible debt holders to participate on the same terms. Making it easier for all convertible debt holders to participate in a transaction has obvious benefits and might result in more effective and comprehensive out-of-bankruptcy restructurings. As a result, the SEC may want to consider issuing interpretive guidance, no-action letters, broad based exemptive relief, or compliance and disclosure interpretations, that provide greater clarity and flexibility with regard to the applicability of the issuer tender offer rules to convertible debt exchange offers. Issuers would greatly benefit from such action by the SEC.

### The Bottom Line

The potential applicability of the Rule 13e-4 equity self-tender offer rules to convertible debt exchanges requires issuers to carefully consider a host of legal issues, which necessitates a longer runway for planning and executing a restructuring transaction. The equity self-tender offer rules can significantly limit an issuer's flexibility in structuring the transaction, resulting in bondholders having significant leverage to extract onerous exchange terms and providing bondholders considerable opportunity to renegotiate a transaction subsequent to commencement of the exchange offer. This results in significantly greater transaction execution risk and increased risk that the issuer will be unable to successfully restructure its convertible debt obligations.

While these challenges do not make registered exchange offers for convertible debt impossible, the complexity of the transaction can have a significant deterrent effect, as it requires the issuer and its advisors (all of whom, in light of the circumstances, are typically beset with a host of other challenges) to expend significant time and energy and can result in higher transaction costs. One potential result of seeking to avoid a registered exchange offer, and its associated costs, is the exclusion of bondholders which the issuer might otherwise wish to allow to participate in the transaction. This could lead to a less optimal result than might be achieved through a more comprehensive exchange offer. Moreover, due to the greater transaction execution risk of a registered exchange offer, many issuers are hesitant to announce such a deal; an unsuccessful transaction can leave an issuer in worse condition than if it never pursued the transaction at all. While there is the possibility of obtaining exemptive relief from the equity self-tender rules, pursuing such relief can be time-consuming and may introduce additional transaction execution risks, as there is limited precedent for the SEC granting such relief. As a result, many issuers may be reluctant to pursue this option.

In light of the complexities associated with successfully executing a restructuring of outstanding convertible debt, issuers would be well served to avoid situations in which they are left with a registered exchange offer as their only option. The fewer the options available to an issuer, the greater the leverage bondholders will have in the restructuring negotiations. Advance planning and close coordination with financial advisors and counsel are critical in providing the issuer with effective strategic planning and the greatest number of options to meet the challenges associated with restructuring convertible debt securities in the current environment.