# EXHIBIT V

**European Leveraged Finance and Capital Markets Group**

# Client Alert

**Debt Repurchases in the Open Market and Privately Negotiated Transactions**

24 March 2020

**Key Contacts**

Apostolos Gkoutzinis
Partner
+44 207 615 3074
agkoutzinis@milbank.com

Rebecca Marques
Partner
+44 207 615 3099
rmarques@milbank.com

**Debt Repurchases in the Open Market and Privately Negotiated Transactions**

If a corporate or sovereign issuer of outstanding debt securities (or, in the case of a corporate issuer, the broader consolidated corporate group of which the issuer is part) has excess cash from operating revenues, fresh borrowings or the sale of assets and wishes to reduce the principal amount (and debt service obligations) of its outstanding indebtedness, it could purchase the subject debt securities from the holders thereof, either directly or through a subsidiary or affiliate.

If at the time of the repurchase by the issuer (or its affiliate) the relevant debt securities are trading in the open market at a price lower than the nominal value of the principal amount of such securities or if the privately negotiated price agreed with the seller of the securities is lower than the nominal value of the principal amount of the securities subject to the sale ("below par"), the repurchase of those securities at the then current market price would lead to a greater reduction of the issuer's consolidated indebtedness than the reduction that the issuer would otherwise achieve with the same amount of cash through the partial redemption of the relevant debt securities at their nominal par value.

This type of debt repurchase by the issuers (or their affiliates) is a popular method of debt liability management by corporate groups and sovereign issuers at times of financial stress when the market price of the relevant subject securities has declined considerably due to concerns over the solvency or liquidity of the relevant issuer. The issuer may also wish to retire debt securities with inappropriate or problematic covenants.

The repurchase of outstanding debt securities by the issuer (or an affiliate of the issuer), in whole or in part, can be completed in a single, privately negotiated, transaction between the seller and the purchaser of the debt securities. Alternatively, the issuer (or an affiliate of the issuer) may initiate a series of repurchases of outstanding debt securities in the open market with the assistance of a broker or dealer that will solicit or procure interested sellers of the relevant securities. There are significant legal, regulatory and disclosure issues relating to a series of related repurchases of debt securities in the open market (as opposed to a single, privately negotiated, purchase of debt securities from a single holder of those debt securities).

There are four possible transaction structures available to issuers considering a repurchase of their own debt securities:

(i)  a repurchase of the subject securities by the issuer of those securities;
(ii)  a repurchase of the subject securities by a parent company of the issuer;
(iii)  a repurchase of the subject securities by a subsidiary of the issuer; and
(iv)  a repurchase of the subject securities by a person (other than a parent company or a subsidiary of the issuer) that is an affiliate[1] of the issuer.

### *Avoiding the Application of the U.S. Tender Offer Rules to Debt Repurchases*

If the purchase of debt securities in the open market or in privately negotiated transactions, in a single transaction or a series of related transactions, is deemed to constitute a "tender offer", it will be subject to the U.S. Tender Offer Rules and the transaction, among other requirements, will be required to remain open for at least 20 business days[2] and will be subject to other restrictions.

It is therefore common and, often, desirable to structure the repurchase program without triggering the application of the U.S. tender offer rules (or the mandatory tender offer rules of any other jurisdiction).

The eight-factor Wellman test (named after the leading U.S. case that established the rules) listed eight factors or conditions that may indicate the existence of a tender offer that is subject to the anti-fraud U.S. Tender Offer Rules: (i) an active and widespread solicitation of public security holders for the securities of an issuer; (i) a solicitation made for a substantial percentage of the issuer's securities; (iii) an offer to purchase made at a premium over the prevailing market price; (iv) the terms of the offer being firm rather than negotiable; (v) the offer being contingent on the tender of a fixed number of securities, often subject to a fixed maximum number or amount of securities to be purchased; (vi) the offer being open to holders of securities only for a limited time and expiring thereafter; (vii) the offeree being subject to pressure to sell the relevant securities; and (viii) rapid accumulation of large amount of target's securities, preceded by a public announcement of purchases of such securities. The courts have applied these eight factors flexibly, sometimes finding tender offers even if a number of factors are not satisfied, and giving greater or lesser weight to different factors, depending on the circumstances. The alternative Hanson test does not examine any specific factors but takes into account the totality of circumstances and more specifically if there appears to be a likelihood that, unless the procedural and substantive protections of the U.S. Tender Offer Rules are followed, there will be a substantial risk that investors being solicited will lack information needed to make a carefully considered appraisal of the proposal put before them. In SEC v. Carter Hawley Hale Stores, Inc.,[3] the court applied the eight-factor Wellman test and reached the conclusion that the repurchase by the company of its own ordinary shares was not a tender offer subject to the U.S. Tender Offer Rules. Because the repurchase plan involved the purchase of ordinary shares at available market prices,

---

[1] An *affiliate* of, or a person affiliated with, the issuer of the securities, is a person that directly, or indirectly through one or more intermediaries controls or is controlled by, or is under common control with, the issuer. The term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. See Rule 405 under the U.S. Securities Act of 1933, as amended, 15 U.S. Code, Secs. 77a-77aa, as amended (hereinafter, the "Securities Act").

[2] The SEC has carved out an exception to the minimum tender offer period in a no-action letter related to tenders offers for cash, for non-convertible debt securities, open for at least five business days, subject to certain conditions, including that the tender offer is made for any and all securities of a particular class or series of non-convertible debt securities.  See *Abbreviated Tender or Exchange Offers for Non-Convertible Debt Securities*, SEC No-Action Letter (January 23, 2015).

[3] See *S.E.C. v. Carter Hawley Hale Stores, Inc.*, 760 F.2d 945 (9th Cir. 1985).

without any premium, and set no firm deadline for the holders of the shares to respond, the court concluded that the holders experienced only market pressure, not any form of coercion by the offeror, which the Williams Act was not designed to prohibit.

In light of all of the factors considered above, purchases of debt securities in the open market by the issuer (or an affiliate of the issuer) are not usually found to be tender offers within the meaning of the term under the provisions of the Williams Act. Courts and legal practitioners reach this conclusion under both the eight-factor *Wellman* test and the "totality of circumstances" *Hanson* test.[4]

A purchase of debt securities in the open market, directly by the purchaser or through a dealer, is probably not a solicitation of the relevant securities, certainly not an active and widespread solicitation, if there are no fixed terms, no premium involved, no conditionality on acquiring a certain amount of securities, no limited time period, no pressure to sell and no publicity of the offer. For debt securities offered and sold in the institutional debt markets (to QIBs or other types of sophisticated investors), the sophistication of the likely sellers of those securities, especially for securities issued and traded in the high-yield market, precludes the finding that the holders of the relevant securities are likely to require the protections of the U.S. Tender Offer Rules in making an informed selling decision.

Thus, the conclusion that open-market purchases of debt or other securities are not tender offers applies to purchases that result in the accumulation of a large percentage of the relevant outstanding amount of the securities,[5] purchases representing a large portion of the daily trading volume of the relevant class of securities,[6] purchases at a premium to the then current market price,[7] purchases following a public announcement,[8] purchases made after the offeror formed the intention to make a tender offer,[9] purchases by one competing tender offeror during a tender offer by another competing tender offeror,[10] purchases from market makers or on the securities exchange's floor.[11]

---

[4] See, for example, *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 56 (2d Cir. 1985); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 286 (7th Cir. 1981); *City Investing Co. v. Simcox*, 633 F.2d 56, 61 (7th Cir. 1980); *E.ON AG v. Acciona, S.A.*, 468 F. Supp. 2d 559, 581(S.D. N.Y. 2007); *In re General Motors Class E Stock Buyout Securities Litigation*, 694 F. Supp. 1119, 1129 (D. Del. 1988); *Energy Ventures, Inc. v. Appalachian Co.,* 587 F. Supp. 734, 739, 740–42 (D. Del. 1984); *Liberty Nat. Ins. Holding Co. v. Charter Co.* (N.D. Ala. 1982), aff'd, 734 F.2d 545 (11th Cir. 1984), aff'd, 734 F.2d 545 (11th Cir. 1984); *Ludlow Corp. v. Tyco Laboratories, Inc.*, 529 F. Supp. 62, 67 (D. Mass. 1981); *Freedom Nat. Bank of New York v. Daniels & Bell, Inc.*, 528 F. Supp. 680, 683 (S.D. N.Y. 1981); *LTV Corp. v. Grumman Corp.*, 526 F. Supp. 106, 1094 (E.D. N.Y. 1981) (Jan. 18, 1967).

[5] See S.*E.C. v. Carter Hawley Hale Stores, Inc*., 760 F.2d 945, 952 (9th Cir. 1985) (over 50%); Exchange Act Release No. 24976, § I. (Oct. 1, 1987).

[6] See *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 449 F. Supp. 951, 961 (S.D. N.Y. 1978), judgment aff'd in part, rev'd in part, 584 F.2d 1195 (2d Cir. 1978), judgment aff'd in part, rev'd in part, 584 F.2d 1195 (2d Cir. 1978) (on 17 of 43 trading days, exceeded 50% of volume).

[7] See *Mid-Continent Bancshares. Inc. v. O'Brien*, 1981 WL 1404 (E.D. Mo. 1981). Contra, Exchange Act Release No. 16385, § A. (Nov. 29, 1979) (proposed, but never adopted, rule).

[8] See S.*E.C. v. Carter Hawley Hale Stores, Inc.*, fn 5 above.

[9] Ibid, at 948–53.

[10] See *Luptak v. Central Cartage Co.*, 1979 WL 1280 (E.D. Mich. 1979).

[11] See *Water & Wall Associates, Inc. v. American Consumer Industries, Inc*., 1973 WL 383 (D.N.J. 1973); *Chromalloy American Corp. v. Sun Chemical Corp.*, 474 F. Supp. 1341, 1346–347 (E.D. Mo. 1979), judgment aff'd, 611 F.2d 240 (8th Cir. 1979), judgment aff'd, 611 F.2d 240 (8th Cir. 1979); *Nachman Corp. v. Halfred, Inc.*, 1973 WL 457 (N.D. Ill. 1973).

A typical privately negotiated purchase of debt securities is also not usually a tender offer.[12] When a potential purchaser of debt securities approaches one or more potential buyers of debt securities in view of negotiating a purchase or series of related purchases, there is usually no active and widespread solicitation and no premium is offered; the terms are not fixed and firm, but negotiable; the purchases are not conditional on the acquisition of a set amount of securities; no time limit is imposed; no publicity surrounds the transaction; and the sellers are likely to be well-informed and sophisticated.[13]

As a result of both of the *Wellman* and *Hanson* tests, companies repurchase large amounts of equity and debt securities through open market and privately negotiated purchases conducted outside the scope of the Williams Act and the U.S. Tender Offer Rules. To our knowledge, there is no case law addressing the specific issue of repurchases of debt securities in the open market or in privately negotiated transactions. Given the nature of debt securities and the sophisticated investor base of the international bond markets, debt repurchases should be deemed to constitute tender offers only in limited circumstances where the facts and the policy rationale of the Williams Act require regulatory protection.

Companies are generally advised to keep both open market and privately negotiated purchases from falling into the trap of becoming subject to the U.S. Tender Offer Rules. To achieve this objective, it is important to ensure that

(i) the repurchase transactions should be made over an extended period without publishing a firm deadline for completion;
(ii) the direct offers to repurchase securities should be made to a limited number of potential sellers;
(iii) each negotiation is independent of any other;
(iv) the potential sellers are sophisticated institutional investors;
(v) no attempt is made to impose the same terms on all sellers or to set any fixed deadline for responding (a record of negotiation is helpful) but the repurchase should be at different prices and on different terms, preferably negotiated individually with each seller; and
(vi) the offerees should not be coerced (e.g. telling the debt security holder that the security will subsequently become very illiquid).

---

[12] See *Pin v. Texaco, Inc.*, 793 F.2d 1448, 1454–455 (5th Cir. 1986); *In re General Motors Class E Stock Buyout Securities Litigation*, 694 F. Supp. 1119, 1129 (D. Del. 1988); *Rand v. Anaconda-Ericsson, Inc.*, 623 F. Supp. 176, 187–88, Bus. Disp. Guide (CCH) 6173 (E.D. N.Y. 1985), judgment aff'd, 794 F.2d 843, R.I.C.O. Bus. Disp. Guide (CCH) ¶6303, 1986-1 Trade Cas. (CCH) 67183 (2d Cir. 1986).

[13] See *In re General Motors Class E Stock Buyout Securities Litigation*, 694 F. Supp. 1119, 1130 (D. Del. 1988); *Beaumont v. American Can Co.*, 621 F. Supp. 484, 502 (S.D. N.Y. 1985), opinion aff'd, 797 F.2d 79 (2d Cir. 1986), opinion aff'd, 797 F.2d 79 (2d Cir. 1986); *Astronics Corp. v. Protective Closures Co.*, Inc., 561 F. Supp. 329, 335 (W.D. N.Y. 1983); *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 449 F. Supp. 951, 961 (S.D. N.Y. 1978), judgment aff'd in part, rev'd in part, 584 F.2d 1195 (2d Cir. 1978), judgment aff'd in part, rev'd in part, 584 F.2d 1195 (2d Cir. 1978); *Financial General Bankshares, Inc. v. Lance*, 1978 WL 1082 (D.D.C. 1978), on reconsideration,1978 WL 1102 (D.D.C. 1978), on reconsideration, 1978 WL 1102 (D.D.C. 1978); *D-Z Inv. Co. v. Holloway*, 1974 WL 440 (S.D. N.Y. 1974); *Nachman Corp. v. Halfred, Inc.*, 1973 WL 457 (N.D. Ill. 1973) (small and powerful group of investors). Sophistication is relevant because sophisticated sellers are less likely to be pressured); *Stromfeld v. Great Atlantic & Pac. Tea Co., Inc.*, 484 F. Supp. 1264, 1273 (S.D. N.Y. 1980), aff'd, 646 F.2d 563 (2d Cir. 1980), aff'd, 646 F.2d 563 (2d Cir. 1980).

**Disclosure Requirements in Connection with Purchases of Debt Securities**

*The U.S. anti-fraud rules*

Purchases as well as sales of debt securities by the issuer of the securities (or an affiliate of the issuer) are subject to the disclosure and anti-fraud rules of Rule 10b-5 under the Securities Exchange Act. While the rule has many different applications, its most important function in connection with the purchases of debt securities is the proscription of such purchasers while the purchaser (whether an insider or an outsider) is in possession of *material non-public information*.[14]

Rule 10b-5 patterned closely after Section 17(a) of the Securities Act, prohibits use of any means of interstate commerce to (i) employ any device, scheme or artifice to defraud, (ii) make material misstatements or omissions, or (iii) engage in any course of business that operates as a fraud against any person, *in connection with the purchase or sale* of any security or securities-based swap agreement.

In connection with purchasing securities while in possession of material non-public information, the rule is clear. It is unlawful for an insider, such as an officer, director, majority shareholder or the issuer of the securities, to purchase the securities from existing holders of such securities without disclosing material facts affecting the value of the securities, known to the purchaser of such securities by virtue of his inside position but not nothing to the existing holders of the securities and the general public, which information would have affected the judgment of the sellers.[15] Judge Leahy in the leading *Transamerica* insider trading case had the following to say against the purchase of securities by persons while in possession of material non-public information:

> "The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed [holders]. It is an attempt to provide some degree of equalization of bargaining position in order that the [holders] may exercise an informed judgment in any such transaction. One of the primary purposes of the Securities Exchange Act was to outlaw the use of inside information by corporate officers and principal stockholders for their own financial advantage to the detriment of uninformed public security holders".[16]

In general, a cause of action under Rule 10b-5 includes the following elements: (i) a false statement or an omission of a material fact; (ii) with scienter i.e. intentional fraud or recklessness; (iii) in connection with the purchase or sale of a security; (iv) upon which the plaintiff justifiably relied; and (v) which proximately caused the plaintiff's economic loss.

---

[14] Indeed, Rule 10b-5 was adopted as a random response in a fraudulent series of purchases of securities. This is the account given by one of the writers of Rule 10b-5, Milton V. Freeman, of the creation of the rule: "*It was one day in the year 1942, I was sitting in my office in the SEC building in Philadelphia and I received a call from Jim Treanor who was then the Director of the Trading and Exchange Division. He said, "I have just been on the telephone with Paul Rowen,", who was then the SEC Regional Administration in Boston, "and he has told me about the president of some company in Boston who is going around buying up the stock of his company from his own shareholders at $4 a share, and he has been telling them that the company is doing very badly, whereas, in fact, the earnings are going to be quadrupled and will be $2 a share for this coming year. Is there anything we can do about it?" So he came upstairs and I called in my secretary and I looked at Section 10(b) and I looked at Section 17, and I put them together, and the only discussion we had there was where "in connection with the purchase or sale" should be, and we decided it should be at the end.*" See ABA Section of Corporate, Banking and Business Law, *Conference on Codification of the Federal Securities* Laws, 22 Business Lawyer 793, 921-923 (1967).

[15] See *Speed v. Transamerica Corp.*, 71 F. Supp. 457 (D.Del.1947).

[16] Ibid, at 99 F.Supp. at 828-829; see also *Kolher v. Kolher Co.*, 319 F.2d 634, 638 (7th Cir. 1963).

Rule 10b-5 limits liability to material omission of facts or misrepresentation. The leading case on materiality is *TSC Industries, Inc. v. Northway, Inc.*, which defined a material fact as one to which there is a substantial likelihood that a reasonable investor would attach importance in making a decision because the fact would significantly alter the "total mix" of available information. Generally, a finding of materiality will be based on the total mix of information available to investors. This is an important concept. Relying on this "total mix" concept, for example, courts have held that omissions of fact are not material as long as the market possessed the correct information from other sources; and cautionary language in offering documents was sufficient to render alleged omissions not material. Information that is generally circulated through the media or other publicly available information will be considered in its entirety in assessing the total mix of information available to potential investors in connection with the purchase or sale of a security. The test of materiality is whether a reasonable investor would have considered the matter significant; it is not sufficient to show that a bondholder or shareholder might have found the information to be of interest.

Based on existing case law, the following list includes, without limitation, facts that, if omitted, will likely be considered material to investors in debt securities in connection with the purchase of debt securities by the issuer, an affiliate of the issuer or a corporate insider from an unsuspecting and uninformed holder of those securities: a new contract to sell the company's assets at a very attractive price;[17] a severalfold increase in the value of the company's inventory or assets;[18] the discovery of a rich mineral reserve or resource;[19] substantial undisclosed increase in earnings; substantial understatement of revenue; disclosures relating to corporate control and changes to the board of directors; for example, failure to disclose the existence of a group of investors or executive officers that could exercise control over the company; failure to disclose a pending public offering or a probable acquisition or disposition of a significant asset; failure to disclose an upgrade of the company's credit rating; failure to disclose that the company had been awarded a substantial contract;[20] failure to disclose improved sales, earnings and productive capacity, and projection of very favourable effect of additional capital;[21] failure to disclose an offer or likely offer from a third person to pay a higher price.[22] Information need not be market moving in order to be material. Material non-public information can include information regarding negotiations leading to financial restructuring, potential mergers and acquisitions or other significant transactions, projections, business plans or other information about business performance that has not yet been publicly released.

There is no doubt that the general rule of disclosure under Rule 10b-5 applies in the event of purchase of debt securities by the issuer or an affiliate of the issuer: the issuer should not purchase such securities if the issuer possesses material information that a reasonable investor would attach importance in making an investment decision in the debt securities, which material information is not publicly available. The issuer must disclose all material non-public information prior to purchasing the debt securities or should otherwise refrain from engaging in the relevant transaction. Any information that is "material" information within the meaning of Rule 10b-5 should be disclosed in connection with the repurchases of the relevant debt securities prior to the occurrence of such repurchases.

It is possible that there is a conflict between the Rule 10b-5 duty to disclose the material non-public information and some other duty that the company or the corporate insider may have, under the terms of a non-disclosure agreement or otherwise, to keep the relevant information

---

[17] See *Kardon v. National Gypsum Co.*, 73 F. Supp. 798, 800 (E.D. Pa. 1947).
[18] See *Transamerica*, above fn 15.
[19] See *SEC v. Texas Gulf Sulphur Corp.*, 401 F.2d 833 (2nd Cir. 1968).
[20] See *Lerner & Co.*, Sec. Ex. Act. Rel. 7721 (1965).
[21] See *Van Alstyne, Noel & Co.*, 43 SEC 1080 (1969).
[22] See *SEC v. Fruit of the Loom, Inc.*, Litig. Rels. 1923, 1938 (S.D.N.Y. 1961).

confidential. In that case, the issuer or the relevant corporate insider has no viable alternative but to abstain from purchasing the relevant securities.[23] As it was aptly put in *Cady, Roberts & Co.*, if disclosure prior to effecting a purchase or sale would be improper or unrealistic under the circumstances, the alternative is to forego the transaction.[24] The principle is clear: in connection with the purchase of any securities, Rule 10b-5 overrides any conflicting duty of silence and requires anyone in possession of material non-public information to either disclose it to the investing public or, if he is disabled from disclosing it in order to protect a corporate confidence, or he chooses to do so, abstain from trading.[25]

In *United States v. Royer*, the Supreme Court construed the term *public* for trading purposes to mean "readily available, broadly disseminated information, or the like".[26] The time required for the market to digest the relevant information so that the information is considered readily available and broadly disseminated varies with the circumstances. Before insiders may act upon material information, such information must have been effectively disclosed in a manner sufficient to ensure its availability to the investing public.

*MAR in the European Legal Framework and Purchases of Debt Securities*

In the European Union, the Market Abuse Directive provides comparable protection from fraudulent behaviour in connection with the purchase of debt securities by the issuer or an affiliate of the issuer.

The Market Abuse Directive prohibits three types of activities:[27] any primary insider or any secondary insider acquiring or disposing or attempting to acquire or dispose of financial instruments on the basis of *inside information*; any primary insider or secondary insider disclosing inside information to any other person unless such disclosure is made in the normal course of the exercise of his employment, profession or duties; and any primary insider or secondary insider recommending or inducing another person, on the basis of inside information, to acquire or dispose of financial instruments to which that information relates.

For purposes of the prohibitions introduced by the Market Abuse Directive, *inside information* means (i) information of a precise nature, (ii) which has not been made public, (iii) relating, directly or indirectly, to one or more issuers of financial instruments or to one or more financial instruments and (iv) which, if it were made public, would be likely to have a significant effect on the prices of those financial instruments or on the price of related derivative financial instruments.[28]

The Market Abuse Directive does not contain a precise definition of what is non-public information. It is generally accepted that information that has been disclosed to the public is no longer non-public information. Other information based on publicly available information, including research, projections and analysis, should also not be regarded as non-public information. Information relating to the issuer of a security or to one or more series of securities includes information on the operations and financial results of the issuer, recent developments, composition of the board of directors or shareholders, corporate policy, dividend policy, litigation, potential mergers or acquisitions, development of new technologies and other facts and developments relating to operations, financial profile, corporate structure or personnel. Information that directly relates to one or more series of securities includes decisions regarding the status and marketability of the

---

[23] See *Oliver v. Oliver*, 45 S.E. 232, 234 (Ga. 1903).
[24] 40 SEC 907, 911 (1961).
[25] See *Texas Guld Sulphur*, above fn 19.
[26] 549 F.3d 886, 897 (2d Cir. 2008).
[27] Market Abuse Directive, Articles 1-3.
[28] See Market Abuse Directive, Article 1(1).

financial instruments of an issuer, decisions and information relating to purchases, offers to purchase, repurchases, redemptions or repayments of securities, which directly affect relevant financial instruments. For the purposes of applying the prohibition of the Market Abuse Directive, information shall be deemed to be of a precise nature if it indicates a set of circumstances which exists or may reasonably be expected to come into existence or an event which has occurred or may reasonably be expected to do so and if it is specific enough to enable a conclusion to be drawn as to the possible effect of that set of circumstances or event on the prices of financial instruments or related derivative financial instruments.

Inside information is only *price-sensitive information*. Price-sensitive information is information which, if it were made public, would be likely to have a significant effect on the prices of those financial instruments or on the price of related derivative financial instruments. In other words, information is price-sensitive if a reasonable investor would be likely to use it as part of the basis of his investment decisions. In its guidance to the markets, CESR clarifies that market participants have to be able to assess beforehand whether the information is price sensitive, in order to be able to act accordingly, regarding the duties of confidentiality, prompt disclosure and prohibition to enter into transactions.[29] This means that this assessment has to take into consideration the market impact, which would be foreseeable at the moment when the information has not yet been disclosed and the market impact is not yet measurable. Therefore ex-ante factors have to be found in order to guide market participants in their decisions. In order to perform this ex-ante analysis, any (relevant) information available at the time has to be taken into account. A piece of information could be considered as likely to have a significant effect on prices of financial instruments even though, when the piece of information is published, this doesn't actually produce any effect. The ex-ante evaluation of the possibility of a price moving effect can be regarded as a question of determining the degree of probability with which at that point in time an effect on the price (due to the information) could reasonably have been expected. Assuming this, the mere possibility is not enough, as on the other hand a degree of probability close to certainty is not necessary either.

*Special Disclosure Issues in Repurchases of Debt Securities*

A slightly different question is whether the fact that the issuer or the affiliate of the issuer is preparing to repurchase debt securities is itself material non-public information that should be disclosed in advance of commencement of the relevant transactions. For a holder selling its debt securities for cash, the identity of the purchaser of the securities (whether it is the issuer of the securities itself, an affiliate of the issuer or a third party) should not be deemed to be material information for purposes of Rule 10b-5.

The repurchase of the debt securities may, however, cause adverse or positive effects on the results of operations, financial condition and liquidity of the issuer. These effects can be, depending on the facts and circumstances, material information for the holders of the debt securities and other persons seeking to purchase the debt securities in the open market. For example, the potential reduction in the issuer's cash, coupled with the reduction of the outstanding amount of indebtedness, may represent an improvement in the financial condition of the issuer such that holders of the debt securities (including the seller of the securities) may argue that they would not have sold at the relevant price or at all if they had known that the financial condition of the business would have so improved. Furthermore, the reduction of the debt by the issuer may

---

[29] See generally Committee of European Securities Regulators ("CESR"), Advice on Level 2 Implementing Measures for the proposed Market Abuse Directive, p. 15, December 2002, available at http://www.esma.europa.eu/system/files/02_089d.pdf .

cause taxable income and trigger material tax liabilities. Other aspects of the debt repurchase program may also be material. The materiality of the repurchase transactions must also be assessed by reference to the impact it may have on the trading market and general liquidity of the debt securities that will remain outstanding following the completion of the repurchases. For example, the amount of the securities to be repurchased may constitute a substantial part of the entire outstanding principal amount of the securities and, following the completion of the transaction, the remaining outstanding principal amount may be too small to support any meaningful trading activity. Whether the repurchase amount is such that requires disclosure will not only depend on the size of the transaction but on the overall profile of the debt securities that will remain outstanding after the completion of the repurchase transactions. The repurchase of 30% of the principal amount of a USD 150 million debt issue will have very different impact on the liquidity of the remaining outstanding principal amount compared to the repurchase of 30% of the principal amount of a USD 900 million debt issue. If the remaining outstanding principal amount is still sufficient from a trading liquidity perspective (as is obviously the case in our second example of a USD 900 million issue that goes down to USD 600 million following the completion of the debt repurchase program), then the debt repurchase program shall not be deemed to be itself material non-public information to be disclosed to the market. It goes without saying that each case is different and the relevant determination will always be highly fact-specific.

If disclosure of a debt repurchase program is required, the issuer may issue a press release announcing the launch of the open market debt repurchase program. Companies are well advised to include a statement in their annual and interim reports to investors that they may from time to time seek to retire their outstanding debt securities through purchases of such securities in the open market, in privately negotiated transactions or otherwise.

A related question that may affect the disclosure obligations of the issuer or the affiliate of the issuer is what the specific plan is with respect to the debt securities that will remain outstanding after the completion of the debt repurchase. If, for example, the issuer or an affiliate of the issuer considers the repurchase of the debt securities to be the first step of a series of transactions that will ultimately lead to the retirement of the entire issue (for example, by launching a tender offer for or effecting a mandatory redemption of the securities not purchased on the open market or in privately negotiated transactions), then potential disclosure questions will have to be addressed.

*Regulation FD*

Private discussions or negotiations between the issuer or an affiliate of the issuer and the holders of the issuer's debt securities may trigger disclosure or other obligations under Regulation F under the Securities Exchange Act ("Regulation FD"). Regulation FD provides that when an issuer, or person acting on its behalf, discloses material non-public information to certain enumerated persons (in general, securities market professionals and holders of the issuer's securities who may well trade on the basis of the information), it must make public disclosure of that information.[30] The timing of the required public disclosure depends on whether the selective disclosure was intentional or non-intentional; for an intentional selective disclosure, the issuer must make public disclosure simultaneously; for a non-intentional disclosure, the issuer must make public disclosure promptly. Under the regulation, the required public disclosure may be made by filing or furnishing the relevant information with the SEC, or by another method or combination of methods that is reasonably designed to effect broad, non-exclusionary distribution of the information to the public. In the case of private negotiations between the issuer or an affiliate of the issuer and the holders of the issuer's debt securities, the fact that the discussions are taking place may be considered

---

[30] Regulation FD, Rule 100 (a).

material non-public information in and of itself. Or the discussions may be conducted within the overall framework of a restructuring of the issuer's debt obligations. Although such discussions are commonly accompanied by the disclosure of material information about the issuer's financial condition, issuers usually avoid the obligation to disclose such information to the market because the person receiving the information is either under a duty of confidentiality or expressly agrees to keep the information confidential by means of a confidentiality agreement.

*Regulation M*

Regulation M under the Securities Exchange Act ("Regulation M") was adopted by the SEC in 1996 and was intended to preclude manipulative conduct by persons with an interest in the outcome of an offering. Rule 102 of Regulation M covers activities by issuers and selling security holders during a distribution of securities. Rule 102 makes unlawful, in connection with a distribution of securities effected by or on behalf of an issuer or a selling security holder, for such person or any affiliated purchaser of such person, directly or indirectly, to bid for, purchase or attempt to induce any person to bid for or purchase a "covered security" during the applicable restricted period. Thus, if an issuer engages in a distribution of securities while at the same time completing repurchases of its debt securities, the issuer will be subject to Regulation M and must ensure compliance with its requirements. Investment grade non-convertible debt securities and asset-backed securities are excepted securities and not subject to the limitations of Regulation M. Also, if the distribution of the securities complies with the requirements of Rule 144A under the Securities Act, then the simultaneous repurchases will not be prohibited by Regulation M. The prohibition applies to "covered securities", ie any security that is the subject of a distribution or any reference security (ie any security into which a security that is the subject of a distribution may be converted, exchanged, or exercised or which under the terms of the subject security may in whole or in significant part determine the value of the subject security).

**Transaction Structures of Repurchases of Debt Securities**

Purchases of debt securities in the open market are accomplished through a broker, dealer or agent and require the purchaser to pay a market price. The parties involved in an open market purchase are not aware of one another's identity. In a privately negotiated transaction, the buyer (acting either directly or indirectly through an agent) approaches holders of the debt securities and negotiates a specified purchase price. Both types of transactions do not carry significant documentation or transaction costs.

The issuer of the debt securities or the affiliate of the issuer considering the repurchase of the debt securities should also consider covenant and other contractual restrictions in the relevant documentation governing the debt securities or other documentation (including intercreditor arrangements) that may contain limitations on the ability of the issuer or its affiliates to repurchase their own (or their affiliates') debt securities. All the necessary credit agreements, indentures, intercreditor agreements and deeds must be carefully reviewed to ensure that these agreements do not contain any restrictions on the issuer's or the affiliate's ability to purchase the issuer's debt securities. Generally, it would be unlikely for a typical New York law governed indenture or English trust deed to prohibit repurchases of debt securities issued under that instrument but there are always exceptions to the rule and the position must be thoroughly checked by counsel. Senior credit facilities and other senior financing documents may often contain limitations on the ability of the borrower group to repurchase debt obligations in the absence of special baskets and similar provisions that can be used for that purpose. If the debt securities in question are subordinated in right of payment to other senior debt securities issued by the same issuer (or the parent company or a subsidiary of the same issuer), then the repurchase of the relevant "subordinated"

debt securities will probably be deemed for purposes of the indenture or trust deed of the "senior" debt securities to constitute "restricted payments". Intercreditor agreements among the borrower group, senior lenders, senior bondholders, and subordinated bondholders contain similar provisions, thus the ability to repurchase subordinated debt in the open market or in negotiated transactions is commonly subject to restrictions. In this case, the repurchase cannot be completed without the consent of the relevant creditors pursuant to the provisions of the underlying credit documentation. Moreover, if the issuer or the affiliate of the issuer needs to borrow the funds that will finance the repurchase of the securities, it must consider the covenant restrictions in relation to the incurrence of indebtedness.

There are three main alternative structures for the repurchase of debt securities by the issuer or an affiliate of the issuer: a repurchase of the debt securities by the issuer; a repurchase of the debt securities by the parent company of the issuer; and a repurchase of the debt securities by a subsidiary of the issuer.

**Corporate Law Matters Relating to Repurchases of Debt Securities**

The corporate law of the issuer's jurisdiction of incorporation and issuer's constitutional documents (including the articles and memorandum of association) must also be reviewed in respect of potential statutory limitations or restrictions affecting the repurchase by the issuer of the relevant debt securities. Different jurisdictions restrict in various degrees the ability of an issuer of debt securities to repurchase the relevant debt securities with cash when the repurchase would be reasonably expected to impair the issuer's share capital or constitute preferential treatment of one class of creditors against another class of creditors during the issuer's insolvency or "suspect period" prior to insolvency. For example, pursuant to Section 548 of the U.S. Federal Bankruptcy Code, a purchase by an issuer of its securities within one year before the filing of a bankruptcy petition is voidable by the trustee if such purchases were made with actual intent to hinder, delay, or defraud creditors, or the issuer received less than a reasonably equivalent value in exchange and either was insolvent at the time or was rendered insolvent thereby, was left with unreasonably small capital for the transaction of its business, or intended or expected to incur debt beyond its ability to repay. Similar restrictions exist in virtually every other major commercial legal system.

Companies in certain industries (e.g. utilities) are further subject to notification and filing requirements in connection with the purchase by them of their own securities. Other corporate actions required include amendments to constitutional documents to the extent such documents (e.g. the charter or articles of association) restrict the ability of the issuer to effect repurchases of debt securities, shareholder meetings in the event that shareholders must authorize the relevant action. Moreover, the board of directors should consider its general fiduciary obligations to the issuer and its shareholders when determining the price of the relevant repurchases. A derivative shareholder action for waste of corporate assets and breach of fiduciary duty if the price is too high could be successful, especially if the securities are purchased from affiliates of the issuer or any of the directors in the issuer's board of directors.

**Tax Issues Relating to Repurchases of Debt Securities**

The repurchase of debt obligations by the issuer of those obligations or a person related to or affiliated with the issuer is likely to have tax consequences. In the United States, in general, the purchase at a discount of a solvent borrower's debt, by either the borrower or a person relating to the borrower, generates taxable income for the borrower in form of cancellation of indebtedness ("COD") income. This COD income equals the excess of the amount owed on the purchased debt over the price paid for such debt by the issuer or the related person. Other countries have similar

provisions. From time to time, tax laws come into effect that provide temporary relief from the tax effects of the recognition of income due to the cancellation of indebtedness at a discount, especially at times of crisis. For example, the American Recovery and Reinvestment Act of 2009 provided temporary relief from the COD rules, by allowing borrowers to defer the recognition of such taxable income, thus making the refinancing and restructuring of corporate debt liabilities more attractive and efficient from a tax perspective. The same spirit to encourage corporate rescues underlies the provisions of the Finance Act 2010 in the United Kingdom which provides an exemption to the general rule that forgiveness of debt leads to taxable income in the case of a change of ownership associated with the forgiveness of debt if it is reasonable to assume that, but for the change in ownership, the issuer would be subject to insolvency arrangements within a 12-month period.  A detailed review of the relevant tax issues is outside the scope of this work.

**European Leveraged Finance and Capital Markets Group**

Please feel free to discuss any aspects of this Client Alert with your regular Milbank contacts or any of the members of our global European Leveraged Finance or Capital Markets Group.

This Client Alert is a source of general information for clients and friends of Milbank LLP. Its content should not be construed as legal advice, and readers should not act upon the information in this Client Alert without consulting counsel.

© 2020 Milbank LLP

All rights reserved.