# EXHIBIT W


Unable to login? Try resetting your password or using your Paul Weiss email address as the username.

Bloomberg Law

Log In

Bankruptcy Law
May 29, 2020, 4:01 AM

# INSIGHT: Out-of-Court Restructuring Alternatives for Distressed Bonds

By Maximilian P. Kirchner, Paul V. Possinger, and Maja Zerjal

Companies are facing an unprecedented rate of downgrades in the bond markets during the pandemic. Proskauer attorneys look at liability management tools companies may use to restructure distressed bonds out of court, including the repurchasing of bonds on the open market, consent solicitations, and debt exchange offers.

In the Covid-19-stricken bond markets, companies are facing a near unprecedented rate of downgrades—including companies whose debt was investment-grade just weeks ago. With no certainty regarding the overall damage to the economy, many companies have been forced not only to consider liquidity lifelines, but also to address looming defaults under their bond documents.

Many companies have used the liability management tools described below to restructure their distressed bonds out of court.

**Repurchases of Bonds in Open Market**

A company can repurchase a portion of its bonds (likely trading at a discount) directly, through a broker-dealer, or with the help of a limited number of banks that make market inquiries on behalf of the company, as open-market repurchases or privately-negotiated transactions. Bond repurchases can be fast and help reduce a company's outstanding debt.

Because companies looking to repurchase their bonds are subject to anti-fraud rules under the U.S. securities laws, they should ensure that they have no material, non-public information prior to engaging in debt repurchases (including potentially the impact of Covid-19 on the company's business).

In some cases, companies conduct the offer during an open window period. Depending on a number of factors, the company may have to disclose in advance its intention to purchase bonds, although such a disclosure, if necessary, can contribute to a conclusion that it is engaged in a "tender offer."

While repurchases can be accomplished fairly quickly, there is always a risk that they could constitute a "creeping tender offer" that would require compliance with SEC tender offer rules. To avoid that, companies typically limit the number of bondholders approached or repurchase less than 20% of the aggregate principal amount of the bonds (or a higher percentage if other factors are present), avoid publicity particularly about a single offering price, and try to buy at varying market prices.

If the company's efforts are found to meet the definition of "tender offer," it must have complied with Section 14(e) of the Securities Exchange Act of 1934, which among other things prohibits fraudulent and manipulative activity and requires the offer be kept open for at least 20 business days, which can be reduced to 5 business days if certain conditions are met.

Companies can structure the tender offer with an "early tender premium," thereby incentivizing bondholders to tender early (typically in the first 10 business days).

**Consent Solicitations**

A company can secure amendments to bond terms and covenant relief by obtaining the consent of the required proportion of bond debt. Recent consent solicitations on a stand-alone basis have been used, for example, to provide debt and lien capacity for additional financing to help companies operate while in distress, and to loosen or eliminate certain covenants.

Most bond indentures allow amendments to restrictive covenants with the consent of the holders of a majority of the principal amount of the outstanding bonds. However, any changes to economic terms of the bonds (principal, interest, maturity, currency, ranking of notes) must usually be approved by each affected holder (i.e., unanimous consent) in U.S. deals, and at least 90% of holders in European deals.

Collateral securing the bonds can often be released with the consent of holders of 66.67% of the bonds in U.S. deals. To maximize bondholder participation in the consent solicitation, holders are often paid a fee in exchange for their consent. Consent solicitations on a stand-alone basis are usually open for 5 to 20 business days and can be completed quickly with limited requirements.

**Debt Exchange Offers**

Unlike debt repurchases, which require cash to repurchase the bonds, debt exchange offers do not require cash (except for transaction costs). Accordingly, they are an effective liability management tool for companies with liquidity issues. Companies can use an exchange offer to change the economic terms of the participating bonds by exchanging existing bonds for new debt, for example, with extended maturity and changes in interest rate.

Exchange offers involve an offering of new securities, which means the offer must be registered with the SEC or structured to qualify for an exemption. Exchange offers are therefore typically conducted as a private placement that (where possible) is limited to institutional investors and non-U.S. persons to avoid registration with the SEC.

Exchange offers are subject to the tender offer rules of the Exchange Act, including the requirement that the offer remains open for 20 business days, which can be reduced to five business days if certain conditions are met. Exchange offers often involve an offer document that will include, among other things, a description of the offered securities and risk factors on the company's business, and is subject to the SEC anti-fraud and tender offer rules.

Exchange offers are often conditioned upon acceptance by holders of a significant portion of existing bond debt, to minimize the amount of remaining bonds the issuer must pay according to their original terms. To incentivize bondholders to participate in the offer, exchange offers are often structured to include "carrots" and "sticks." These are known as coercive exchange offers.

A company can, for example, increase participation by offering a "carrot" in the form of new bonds having better terms. Since bondholders are increasingly willing to trade principal for security, a company may offer to exchange new secured bonds having a smaller outstanding principal amount for the original unsecured bonds. To minimize holdouts and coerce participation, "sticks" are also used. Specifically, accepting bondholders are typically required to give "exit consents" to remove restrictive covenants and other protections under the existing bonds, which may include guarantees. Thus, if the participation exceeds a certain threshold, each bondholder refusing the exchange offer is left with bonds having less protection.

Such stripping of fundamental protections has been challenged by holdouts as a violation of section 316(b) of the Trust Indenture Act, which provides that the right of any bondholder "to receive payment of the principal of and interest" will not be impaired without such holder's consent.

Similar language is included in many bonds even if they are not subject to the Trust Indenture Act. This litigation has focused on the meaning of the "right to receive payment." Certain courts have interpreted it broadly to include actions that inhibited the bondholders' practical ability to receive payment, including the stripping of parent guarantees.

In 2017, however, the Second Circuit determined in *Marblegate Asset Mgmt. LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1 (2d Cir. 2017) that section 316(b) only prohibits non-consensual amendments to an indenture's core payment terms, i.e. the legal right to payment of contractual debt service, and does not protect noteholders' practical ability to receive payment.

Accordingly, issuers have significant leeway to design an amendment through the "exit consent" that does not require unanimous consent without violating the Trust Indenture Act or similar provisions incorporated into bond indentures that are not subject to the Trust Indenture Act.

Given the current landscape of the markets, we are likely to see many companies pursuing these liability management options to help extend their runway. Their success, however, will largely depend on whether the bondholders are willing to accept the new economic terms. In these distressed times, many holders may lower their threshold of what is acceptable.

*This column does not necessarily reflect the opinion of The Bureau of National Affairs, Inc. or its owners.*

**Author Information**

*Maximilian P. Kirchner is a partner in Proskauer's Corporate Department and a member of the Capital Markets and Finance Group. His practice focuses on the representation of private equity sponsors, multi-national companies, investment banks and investment funds in capital markets and leveraged finance transactions*

*Paul V. Possinger is a partner in Proskauer's Business Solutions, Governance, Restructuring & Bankruptcy Group who focuses his practice on corporate reorganization, creditors' rights and bankruptcy matters.*

*Maja Zerjal is a partner in Proskauer's Business Solutions, Governance, Restructuring & Bankruptcy Group. Her practice focuses on the representation of debtors, creditors' committees, creditors and equity holders in in-court and out-of-court restructurings.*

**Documents**

- Write for Us: Author Guidelines
- For additional legal resources, visit Bloomberg Law In Focus: Coronavirus

© 2023 Bloomberg Industry Group, Inc.   All Rights Reserved

**Browse More Stories in Bankruptcy Law**

Sign Up For Newsletter