# EXHIBIT X

# U.S. Regulation of the International Securities and Derivatives Markets, § 9.01, INTRODUCTION

U.S. Regulation of the International Securities and Derivatives Markets

1 Edward F. Greene, Alan L. Beller, Edward J. Rosen, Leslie N. Silverman, Daniel A. Braverman, Sebastian R. Sperber, Nicolas Grabar & Adam E. Fleisher, U.S. Regulation of the International Securities and Derivatives Markets § 9.01 (11th and 12th Editions 2014-2017)

11th and 12th Editions

 Click to open document in a browser 

p. 9-5

This chapter discusses a variety of issues relating to the acquisition of significant interests in companies whose securities trade in the United States or that conduct business in the United States—by investors, by acquirors and by companies themselves (of their own securities). [1]

Section 9.02 discusses what constitutes a tender offer and sets forth the rules applicable to tender offers generally. While the term "tender offer" is not defined in the Exchange Act or any rule thereunder, the SEC has developed a list of eight factors, discussed in this section and known as the "Wellman factors," to be taken into account in determining whether a tender offer for securities exists. If a course of conduct related to the acquisition of securities rises to the level of a tender offer, § 14(e) of the Exchange Act and Regulation 14E thereunder will apply—regardless of whether the relevant security is classified as equity or debt and regardless of whether it (or any other security of the relevant issuer) is registered under § 12 of the Exchange Act [2]—and govern disclosure, timing and other procedural requirements and prohibit certain types of activities.

Section 9.03 addresses issuer repurchases of its own equity securities, both through open market repurchase programs and issuer tender offers. It begins with a discussion of insider trading considerations and how the possession of material nonpublic information affects the timing and procedures (including with respect to the use of Rule 10b5-1 plans and accelerated share repurchase ("ASR") transactions) for an issuer's repurchase of its own equity securities. The section then discusses how issuers can minimize the risk that their equity security repurchases will not be challenged as involving manipulative practices, including through reliance on the nonexclusive safe harbor from liability for manipulation provided by Rule 10b-18 under the Exchange Act. Lastly, this section discusses when an issuer's repurchase of its own equity securities, registered under § 12 of the Exchange Act, is subject to regulation as a tender offer under § 13(e) of the Exchange Act and Rules 13e-4 and 13e-3 thereunder (the latter insofar as an issuer tender offer may result in an issuer "going private"), which set forth the disclosure, filing and other procedural requirements applicable to those issuer self-tenders.

Section 9.04 discusses liability management, which broadly encompasses the tools issuers use to manage their ongoing contractual obligations with respect to their debt securities, including consent solicitations (modification and amendment of the terms of debt securities with the consent of a specified

p. 9-5
p. 9-6

percentage of the holders), open market repurchases of debt securities, privately negotiated buy-back programs for debt securities and debt tender and exchange offers. A liability management transaction will be most extensively regulated if it involves the issuance of a new security, in which case the registration requirements of the Securities Act will apply, or a tender offer, in which case certain of the Exchange Act provisions regulating tender offers (excluding those applicable only to equity securities) will apply, as discussed in this section.

Section 9.05 covers the regulation of tender and exchange offers for equity securities by third-party bidders under the U.S. securities laws. Any person that makes a tender or exchange offer (a tender offer involving the issuance of bidder securities) and, after consummation, would be the direct or indirect beneficial owner of more than 5% of any class of equity securities registered under § 12 (whether or not entitled to vote), must comply with the procedural and disclosure requirements of § 14(d) of the Exchange Act and the rules adopted by the

SEC thereunder. Unlike the laws of many countries, the Exchange Act does not contain a "mandatory bid" requirement—an obligation to make a tender offer to all shareholders once a specific ownership level is reached. This section also addresses the registration requirements, proxy solicitation rules (which do not apply to foreign private issuers [3]) and limitations on communications applicable to business combinations—where an acquisition or merger is effected through a statutory transaction involving a shareholder vote, instead of a tender or exchange offer.

The U.S. tender offer rules, absent an exemption, generally apply to tender and exchange offers by bidders for the securities of foreign target companies if the target securities are registered under the Exchange Act. Even if the securities are not registered under the Exchange Act, some of the U.S. tender offer rules apply absent an exemption if the offer is made to holders who are U.S. residents. These rules thus differ from the rules of many other countries, the application of which turns not on the residence of the investor but rather on the jurisdiction of incorporation (or sometimes the jurisdiction of listing) of the target company. This difference reflects the fundamental goal of the U.S. securities laws, which is protection of U.S. investors regardless of the nationality of the bidder or the target or of the investor protections afforded by their regulators in their home markets. As a consequence of the SEC's approach, there are often conflicts between its rules and the rules imposed on a bidder by the target's jurisdiction of incorporation or listing.

The SEC has adopted a number of rules to mitigate these conflicts when the target's U.S. shareholder base is less significant. The SEC's rules (i) exempt from its tender offer regulation tender and exchange offers for the securities of foreign targets if U.S. ownership of the target is 10% or less, (ii) provide limited relief from certain provisions of the tender offer rules in such tender or exchange offers if U.S. ownership is 40% or less and (iii) exempt from Securities Act registration the securities issued in such exchange offers if U.S. ownership of the target is 10% or less. The exemption from Securities Act registration is also available for business combinations requiring a shareholder vote involving foreign issuer target companies with U.S. ownership of 10% or less. In each case, ownership levels must be determined in accordance with SEC rules.

In addition, the Exchange Act contains margin regulations that regulate the use of credit in financing positions in securities, including for purposes of tender offers. These regulations are also discussed in § 9.05.

Chapter 9 then covers two other important statutes (and related rules) applicable to the acquisition of substantial stock positions or entire businesses. Section 9.06 discusses the antitrust reporting requirements under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"). These rules apply even to acquisitions by one foreign company of an interest in another foreign company if certain tests relating to the companies' U.S. revenues or assets are satisfied. Section 9.07 discusses the reporting and review requirements applicable to acquisitions of U.S. businesses by foreign persons that may affect U.S. national security under the Exon-Florio provision of the Defense Production Act of 1950. [4]

The chapter concludes with a brief examination of U.S. country- and person-specific sanctions regimes in § 9.08. Although the scope of sanctions such as those administered by the Office of Foreign Assets Control and imposed pursuant to the Iran Sanctions Act encompasses much more than business combinations and similar transactions, violation of these sanctions can carry substantial penalties, making it crucial for persons contemplating such transactions involving sanctioned countries or persons, or companies doing business in such countries, to consider their exposure to the sanctions in advance.

## Footnotes

1   Chapter 6 separately addresses the disclosure requirements applicable to investors' ownership, post-acquisition and on a continuing basis, of significant equity interests in companies that are public in the United States.

2   There is one exception, Rule 14e-5, which applies only to tender offers for equity securities and is discussed in § 9.05.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                536
All rights reserved.

3   The U.S. proxy solicitation rules, applicable to shareholder votes to approve business combinations, do not apply to foreign private issuers, regardless of whether their shares are registered under the Exchange Act. Rule 3a12-3 under the Exchange Act.

4   Additional industry-specific approval or reporting requirements apply to certain significant acquisitions of securities or assets (including acquisitions taking the form of business combinations). These most typically arise in regulated industries, such as telecommunications, television, radio, railroad, airline, banking and insurance. These industry-specific requirements are beyond the scope of this book.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

# U.S. Regulation of the International Securities and Derivatives Markets, § 9.02, EXCHANGE ACT REGULATION OF TENDER OFFERS

U.S. Regulation of the International Securities and Derivatives Markets
1 Edward F. Greene, Alan L. Beller, Edward J. Rosen, Leslie N. Silverman, Daniel A. Braverman, Sebastian R. Sperber, Nicolas Grabar & Adam E. Fleisher, U.S. Regulation of the International Securities and Derivatives Markets § 9.02 (11th and 12th Editions 2014-2017)
11th and 12th Editions

 Click to open document in a browser 

p. 9-8

## [1] What Is a Tender Offer?

The Williams Act, [5] adopted in 1968, amended the Exchange Act to add provisions regulating the accumulation of securities. [6] Key provisions of the Williams Act apply only to accumulations that constitute "tender offers" within the meaning of the Williams Act.

The term "tender offer" is, however, not defined in the Exchange Act or any rule thereunder. While the SEC has declined to promulgate a definition of "tender offer," [7] it has developed a list of eight factors to be taken into account in determining whether a course of conduct related to the acquisition of securities rises to the level of a tender offer under the Williams Act. These factors are generally known as "*Wellman* factors," after the U.S. district court decision in which they were first discussed. [8] The *Wellman* factors are:

- active and widespread solicitation of public shareholders;

- solicitation for a substantial percentage of the target's outstanding stock;

- an offer price representing a premium over prevailing market price;

- firm rather than negotiable terms;

- solicitation contingent on a minimum number of shares or subject to a fixed maximum;

- an offer open for a limited period of time;

- pressure on public shareholders to sell; and

- public announcements preceding or accompanying purchases. [9]

Although the SEC has indicated that the *Wellman* factors are relevant to determining whether acquisitions constitute a tender offer, it has not specified how to

p. 9-8
p. 9-9

weigh the respective factors or how many factors must be satisfied to constitute a tender offer.

Courts have generally considered the *Wellman* factors relevant to the analysis of whether a tender offer is present; at the same time, however, they have emphasized that the Williams Act was intended to protect the public from undue pressure, and accordingly, should not ordinarily be applied to purchases in the open market or in privately negotiated transactions with sophisticated investors. [10] In *SEC v. Carter Hawley Hale Stores, Inc.*, for example, the court affirmed a lower court decision holding that an issuer that repurchased approximately 55% of its shares in the open market had not made a tender offer when only the first two of the eight factors were present. [11] In *Hanson Trust PLC v. SCM Corp.*, the defendant bought 25% of the stock of the issuer through one open market purchase and five privately negotiated transactions—four with institutional holders and one with a professional individual investor. [12] The defendant had previously made a tender offer for the issuer's stock, but had withdrawn its offer hours before commencing the private and open market purchases. [13] The

court in *Hanson* held that because the five private sellers were highly sophisticated professionals, knowledgeable in the marketplace and informed of the facts necessary to exercise their professional skills and appraise the offer, the protection of the tender offer regulations was not necessary. Additional factors influencing the

p. 9-9
p. 9-10

court's decision included: (i) there was no active or widespread advance publicity or public solicitation for shares, (ii) the price at which the defendant bought was not a premium over market price, and (iii) the defendant was obligated to buy the shares once agreement was reached with each individual seller, and the purchases were not contingent on the defendant's acquisition of a fixed number of shares. [14]

As previously noted, [15] the leading cases on determining whether acquisitions constitute a tender offer involve equity securities, [16] and the application in the context of debt securities of the standards that have been developed in those cases remains unelaborated.

## [2] Provisions Applicable to Tender Offers for Any Type of Security

Section 14(e) of the Exchange Act and, with one exception, Regulation 14E thereunder apply to tender offers for any security [17] by any person, including the issuer (but excluding sovereign issuers as discussed below in this paragraph), regardless of whether the relevant security is classified as equity or debt and whether it (or any other security of the relevant issuer) is registered under § 12 of the Exchange Act. Rule 3a12-3(a) under the Exchange Act provides an exemption from § 14 of the Exchange Act for sovereign issuers.

Section 14(e) of the Exchange Act, a broadly worded antifraud provision, makes it unlawful for any person "to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive or manipulative acts or practices, in connection with any tender offer." Thus, even if specific disclosure requirements [18] do not apply to a particular tender offer, all of the facts and circumstances relating to the proposed tender offer should be examined against the general standard of § 14(e) to determine what disclosures should be made in the offering documents. There also is a specific insider trading rule under § 14(e) applicable in connection with tender offers. [19]

p. 9-10
p. 9-11

Regulation 14E under the Exchange Act largely shapes the timing of all tender offers in the United States. Under Rule 14e-1, the bidder must hold the tender offer open for (i) at least 20 business days from the date when the tender offer is first published or sent or given to securityholders and (ii) at least ten business days from the date when the notice of an increase or decrease in the percentage of the class of securities being sought or the consideration offered is first published or sent or given to securityholders. [20] In addition, according to the SEC's announced interpretation of the rule, the tender offer must remain open for at least five to ten business days (depending on the level of materiality) from the date of any other material change in the terms of the offer or waiver of any material conditions of the offer. [21] For example, the SEC has interpreted the waiver or reduction of a minimum tender condition as a material change to an offer that could require an extension of the tender offer such that the offer must remain open for five U.S. business days following the date of the announcement of the waiver or reduction. [22]

In tender offers subject to a financing condition, the SEC has stated that "when an offer is not financed, or when a bidder's ability to obtain financing is uncertain, a material change will occur in the information previously disclosed when the offer becomes fully financed," [23] requiring an amendment to the bidder's disclosure filing on Schedule TO (if applicable) [24] and extension of the offer for an additional five U.S. business days. [25] The SEC takes the view that such a condition to the offer exists (the satisfaction of which is a material change) even where bidders have obtained commitments from third-party financing sources

p. 9-11
p. 9-12

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

and any resulting conditions to the offer relate only to the eventual funding of such committed financing. [26]

The bidder must pay the consideration offered or return the securities deposited by or on behalf of securityholders "promptly" after the termination or withdrawal of the tender offer. [27] The SEC has confirmed that prompt payment in U.S. offers is generally understood to mean payment within three business days of expiration of the offer. [28] In the event that the tender offer is extended, the bidder must issue a notice of such extension (including disclosure of the approximate number of securities deposited to date) by the earlier of (i) 9:00 A.M. Eastern time on the next business day after the scheduled expiration date of the offer, and (ii) if the class of securities is registered on one or more national securities exchanges, the first opening of any one of such exchanges. [29]

The target company is also required to publish certain information, including a recommendation to its securityholders to accept or reject the bid or an expression of its neutrality and the reasons for that recommendation or neutrality, within ten business days following commencement of the offer. [30]

Rule 14e-4 provides that, in a tender offer for less than all of the securities of a given class (a partial tender), short tenders ( i.e., tenders by persons who do not own the subject security) are prohibited.

p. 9-12
------------------------------------------------------------------------------------------------
p. 9-13

Finally, Rule 14e-8 prohibits a bidder from announcing an offer without an intention to commence and complete it, as a means to manipulate stock prices, or without a reasonable belief that it will have the means to purchase the subject securities in order to consummate the offer. [31]

Beyond the specifically enumerated requirements of the Williams Act and the rules thereunder, the SEC has developed doctrines regarding permissible practices in tender offers that should also be borne in mind in structuring a tender offer, including the illusory offer doctrine and the prohibition on conditions subsequent.

Under the illusory offer doctrine, a bidder's offer must have clear terms and conditions such that an outside observer at the expiration date can determine, based on objective facts that are not within the bidder's control, whether the offer is successful or not. As a corollary, the conditions to a tender offer must be objective conditions that are outside the control of the bidder.

The prohibition on conditions subsequent means that all conditions to tender must be satisfied or waived at expiration (with limited exceptions, including for regulatory approvals).

Additional restrictions apply to (a) third-party tender offers in respect of equity securities that are registered under § 12 of the Exchange Act and (b) issuer tender offers in respect of equity securities if the relevant issuer has registered any class of its equity securities under § 12 of the Exchange Act (whether or not the class being tendered for is so registered). These include requirements regarding the filing of disclosure for the tender offer (covering specifically enumerated items) with the SEC, the provision of withdrawal rights to tendering holders, [32] extension of the tender offer to all holders of the subject class of securities, payment of the same price for all purchases of the security that is the subject of the tender offer, and a prohibition on purchases of the subject security outside the tender offer, as discussed in § 9.03[2] and § 9.05.

## Footnotes

5   Williams Act of 1968, Pub. L. No. 90-439, 82 Stat. 454.

6   The Williams Act added provisions to §§ 13 and 14 of the Exchange Act related to beneficial ownership disclosure requirements, and the regulation of tender offers and changes in control. The beneficial ownership disclosure requirements are discussed in Chapter 6.

7   In 1979, the SEC proposed a definition of "tender offer," see SEC Release No. 33-6159 (Nov. 29, 1979), but no definition of the term was ever adopted.

8   Wellman v. Dickinson, 475 F. Supp. 783 (S.D.N.Y. 1979), aff'd, 682 F.2d 355 (2d Cir. 1982), cert. denied, 460 U.S. 1069 (1983).

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

9   *See Wellman v. Dickinson*, 475 F. Supp. 783 (S.D.N.Y. 1979), *aff'd*, 682 F.2d 355 (2d Cir. 1982), *cert. denied*, 460 U.S. 1069 (1983).

10  *See Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2d Cir. 1985); *SEC v. Carter Hawley Hale Stores, Inc.*, 760 F.2d 945 (9th Cir. 1985); *Stromfeld v. The Great Atlantic & Pacific Tea Co.*, 484 F. Supp. 1264 (S.D.N.Y. 1980); *see also Clearfield Bank & Trust Company v. Omega Financial Corp.*, 65 F. Supp. 2d 325 (W.D. Penn. 1999); *Anago Inc. v. Tecnol Medical Products, Inc.*, 792 F. Supp. 514 (N.D. Tex. 1992).

In the cross-border context, one court has noted in *dictum* that "[c]aution in finding that an unconventional tender offer has occurred is particularly necessary 'in the context of cross-border buying programs, where a foreign buyer may be acting in compliance with the laws of its own jurisdiction and the home jurisdiction of the issuer and unwittingly run afoul of a broadly interpreted tender offer rule in [the United States].'" *E.ON AG v. Acciona, S.A.*, No. 06 Civ. 8720 (DLC), 2007 WL 316874, at *12 (S.D.N.Y. Feb. 5, 2007) (citing *E.ON AG v. Acciona, S.A.*, 468 F. Supp. 2d. 559 (S.D.N.Y. 2007)).

It should also be noted that the eight-factor test was developed by the SEC to determine whether there has been a creeping tender offer in the context of common stock, and all of the court decisions regarding creeping tender offers have been in that context. Because the market for debt securities generally is more institutional in nature than the market for common stock, courts may well be even more reluctant to find that substantial open market purchases of debt securities constitute creeping tender offers.

11  *SEC v. Carter Hawley Hale Stores, Inc.*, 760 F.2d 945, 953 (9th Cir. 1985).

12  *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2d Cir. 1985).

13  Purchases of large blocks of stock accumulated by arbitrageurs and other investors during the pendency of a bid are commonly known as "street sweeps." The use of state takeover statutes and modern poison pill rights plans has largely eliminated street sweeps for common stock. *See* § 9.05[12][a] and § 9.05[12][b] for a detailed discussion of these takeover defenses.

14  *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 57–59 (2d Cir. 1985).

15  *See supra* Note 10.

16  Including *Wellman v. Dickinson*, 475 F. Supp. 783 (S.D.N.Y. 1979), *aff'd*, 682 F.2d 355 (2d Cir. 1982), *cert. denied*, 460 U.S. 1069 (1983). *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2d Cir. 1985); and *SEC v. Carter Hawley Hale Stores, Inc.*, 760 F.2d 945 (9th Cir. 1985).

17  Rule 14e-5 applies solely to equity securities. *See* § 9.05[2][a].

18  In particular, those applicable to equity tender offers that are subject to disclosure requirements under the Williams Act ( *See* § 9.03[2] and § 9.05) and to exchange offers that are registered under the Securities Act.

19  Rule 14e-3 under the Exchange Act; *see* § 11.06[4]. These rules are in addition to the more generally applicable insider trading prohibitions of Rule 10b-5 under the Exchange Act, which are discussed in §§ 11.05[2] and 4.10[1].

20  Rules 14e-1(a) and 14e-1(b) under the Exchange Act. For discussion of relief the SEC has granted from these minimum time periods, *see* § 9.04 (discussing relief in the context of tender offers for debt securities) and § 9.03[2] (discussing relief in the context of tender offers for equity securities).

21  Although Rules 14d-4(d)(2) and 13e-4(e)(3) under the Exchange Act, establishing a five business day requirement for dissemination of material changes, apply by their terms only to equity securities, the SEC views the five to ten business day dissemination requirement described in the sentence above as applying to all tender offers, including those subject only to Regulation 14E. *See* SEC Release No. 34-24296 (Apr. 3, 1987) and SEC Release No. 33-7760 (Oct. 22, 1999).

22  *See* SEC Release No. 34-24296 (Apr. 3, 1987).

23  P.F. Chang's China Bistro, Inc., CIK # 0001039889, SEC Comment Letter, dated May 21, 2012, Re: P.F. Chang's China Bistro, Inc. Schedule TO-T filed May 15, 2012 by Wok Acquisition Corp., Wok Parent LLC, Wok Holdings Inc., and Centerbridge Capital Partners II, L.P., SEC File No. 005-54977.

24  Rule 14d-3(b)(1) under the Exchange Act.

25    *See*, *e.g.*, A.C. Moore Arts & Crafts, Inc., CIK # 0001042809, SEC Comment Letter, dated October 21, 2011 Re: A.C. Moore Arts & Crafts, Inc. Schedule TO-T filed October 18, 2011 by Nicole Crafts LLC, Sbar's Acquisition Corporation and Adolfo Piperno, SEC File No. 005-53645.

26    *See*, *e.g.*, MModal, Inc., CIK # 0001441567, SEC Comment Letter, dated July 21, 2012 Re: MModal, Inc. Schedule TO-T filed by One Equity Partners V, L.P., *et al.* filed on July 17, 2012, and Schedule TO-T/A filings submitted by One Equity Partners V, L.P., *et al.* filed on July 24 and July 25, 2012, SEC File No. 005-86102.

27    Rule 14e-1(c) under the Exchange Act. *See* § 9.05[9][b] with respect to an exception to this requirement under the Tier II rules in connection with certain foreign offers made in accordance with home country requirements.

28    SEC Release No. 33-8917 (May 6, 2008), 73 Fed. Reg. 26,876, 26,890 n.143 (May 9, 2008) (citing SEC Release No. 34-43069 (July 24, 2000)). *But see infra* Notes 128-132 and accompanying text for cross-border requirements. The SEC has proposed an amendment to Rule 15c6-1(a) under the Exchange Act that would shorten the standard settlement cycle in the United States for most securities transactions from three business days after the trade date (T+3) to two business days (T+2). SEC Release No. 34-78962 (Sept. 28, 2016). If adopted, this rule change would be suggestive, by analogy, that prompt settlement within the meaning of Rule 14e-1(c) might be read to require an equivalently shortened settlement cycle for tender offers.

29    Rule 14e-1(d) under the Exchange Act. In the context of foreign offers made in accordance with home country requirements, the SEC has granted relief from the extension announcement requirements where there is a conflict between SEC regulations and the securities laws of another nation. *See VimpelCom Ltd.* (avail. Feb. 5, 2010) (Russia); *EGS Acquisition Co. LLC* (avail. Nov. 5, 2008) (Philippines).

30    Rule 14e-2 under the Exchange Act. The SEC will not generally enforce Rule 14e-2 against a foreign target company unless the company has a separate obligation, as a result of the Exchange Act registration of the target securities, to take a position regarding the tender offer. *See* the discussion of Rule 14d-9 under the Exchange Act in the text accompanying *infra* Notes 118-120.

31    In practice, Rule 14e-8 tends to be enforced only in egregious situations. *See, e.g., SEC v. Weintraub*, 2011 WL 6935280 (S.D. Fla. Dec. 30, 2011).

32    Although withdrawal rights are not generally required in "Regulation 14E-only" exchange offers, in order to commence an exchange offer that is registered under the Securities Act prior to effectiveness of the related registration statement, the offeror must provide withdrawal rights to the same extent as would be required if the exchange offer were subject to the requirements of Rule 13e-4 or Rules 14d-1 through 14d-11 even if those rules do not apply by their terms. *See* Rule 162 under the Securities Act.

# U.S. Regulation of the International Securities and Derivatives Markets, § 9.03, REPURCHASES OF EQUITY SECURITIES

U.S. Regulation of the International Securities and Derivatives Markets
1 Edward F. Greene, Alan L. Beller, Edward J. Rosen, Leslie N. Silverman, Daniel A. Braverman, Sebastian R. Sperber, Nicolas Grabar & Adam E. Fleisher, U.S. Regulation of the International Securities and Derivatives Markets § 9.03 (11th and 12th Editions 2014-2017)
11th and 12th Editions

 Click to open document in a browser

p. 9-14

## [1] Open Market Repurchase Programs for Equity Securities

## [a] Insider Trading Considerations

Purchases of equity securities by an issuer are subject to the general prohibitions against insider trading contained in the U.S. federal securities laws, particularly Rule 10b-5 under the Exchange Act. [33] An issuer may be, or may be alleged to be, in violation of these prohibitions if it purchases any equity securities (either as part of an established program (other than a 10b5-1 plan as described below in § 9.03[1][b][iii]) or in an isolated transaction) prior to the public announcement of information about the issuer that might reasonably be expected to have a positive effect on the price of such securities. Accordingly, an issuer should either (i) disclose any such nonpublic information before initiating a repurchase program or (ii) refrain from repurchasing securities (other than with respect to purchases made by an agent on its behalf in accordance with an established 10b5-1 plan) when corporate developments (for example, developments regarding litigation matters, major new clients, acquisitions or divestitures) have occurred that may be reasonably likely to cause the price of the securities to increase but have not yet been announced to the public. There are four measures many issuers take to reduce the risk that repurchases of securities may be claimed to violate the prohibition against insider trading.

## [b] Reducing the Risk of Violating Prohibitions on Insider Trading

### [i] *Verification Procedures*

Many issuers establish an internal procedure under which an officer or committee is expressly charged with monitoring when repurchases may be conducted or when they should be suspended, for example due to an emerging, but as of yet undisclosed, development. Practices in this respect vary widely and should be tailored to an issuer's other internal procedures for compliance and risk management.

### [ii] *Window Periods*

Many issuers limit repurchases to regular "window periods" tied to the release of interim and annual earnings reports and other material information and the public filing of such information with the SEC and any relevant securities

p. 9-14
p. 9-15

exchange. This approach is not mandatory under U.S. securities law, but it is widely used. An issuer that takes a more ad hoc approach should be sure that it has robust verification procedures. Typically a window period begins when two full trading days (or in some cases, one full trading day) have passed after the release of earnings (or other material information), in order to ensure that the information has effectively reached the market. Practices vary more widely as to when the window period closes, but typically an issuer will cease repurchases at some point before the release of earnings each quarter when it has begun to develop knowledge

of its performance for the period. In any case, an issuer will immediately close a window period and cease repurchasing upon acquiring any material nonpublic information.

## [iii] *10b5-1 Plans*

Rule 10b5-1 under the Exchange Act provides an affirmative defense against insider trading liability for transactions conducted under a "contract, instruction or plan" that meet certain conditions designed to ensure that the transactions are not made on the basis of material nonpublic information. [34] Issuers often establish a Rule 10b5-1 trading plan to better shield repurchases, including repurchases intended to comply with Rule 10b-18 under the Exchange Act (described below), from potential insider trading liability and to permit repurchase programs to continue following the close of window periods.

In a typical 10b5-1 repurchase plan, the issuer gives instructions to a broker, at a time when it has no material nonpublic information, to conduct repurchases pursuant to specific parameters, and the broker then conducts repurchases pursuant to those instructions without any further issuer involvement.

## [iv] *Accelerated Share Repurchase Transactions*

Accelerated share repurchase ("ASR") transactions vary in their details and complexity, depending on an issuer's objectives. Under a simple ASR, the issuer enters into a contract with a bank, under which the bank delivers shares to the issuer at inception in exchange for payment by the issuer of the amount the issuer wants to spend to effect repurchases. At final settlement, the bank may deliver additional shares to the issuer or the issuer may deliver shares or cash to the bank, with the amount of the delivery generally determined by comparing the number of shares the bank originally delivered to a number of shares equal to the amount initially paid by the issuer divided by the average market price of the issuer's shares during the contract term.

p. 9-15
p. 9-16

The bank would typically borrow shares from lenders for the initial delivery to the issuer, and during the contract term, the bank would typically purchase shares in the open market to return to securities lenders and for any further delivery to the issuer at settlement.

An ASR has the advantage of allowing the issuer to retire the shares it receives at the inception of the transaction. However, it also requires an upfront cash outlay, and depending on the structure, an issuer may be required to return shares or pay an additional amount at settlement. In addition, it is difficult to suspend once launched.

ASRs are typically structured to qualify as 10b5-1 plans on the basis that market purchase decisions are made by the bank without the involvement of the issuer. [35] Although the issuer's repurchases under an ASR and the bank's related market activity are not eligible for the Rule 10b-18 safe harbor (discussed in § 9.03[1][d]) [36], ASRs are often structured consistent with many of the safe harbor's requirements.

## [c] Disclosure

## [i] *Form 20-F Issuer Repurchase Disclosure Requirements*

The SEC requires that periodic and annual reports, including Form 20-F, disclose information on issuer repurchases in a tabular format. [37] This disclosure requirement covers all repurchases of equity securities registered under § 12 of the Exchange Act for the relevant period, generally including the total number of securities purchased (reported on a monthly basis), the average price paid per security, the total number of securities purchased as part of a publicly announced repurchase plan or program and the maximum number (or approximate dollar value) of securities that could yet be purchased under such plans or programs. [38]

## [ii] *Exchange Requirements*

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

An issuer with securities listed on the NYSE is required to notify the NYSE in connection with its repurchase or disposal of issued and listed securities within

ten days after the close of the fiscal quarter in which the repurchases occur. [39] The notice must state the total amount of shares repurchased during that quarter and the balance held by the issuer at the end of the quarter. If there are both repurchases and dispositions of securities during a quarter, both the total amount reacquired and the total amount disposed of should be disclosed. However, the NYSE has indicated that foreign issuers with listed ADRs will not separately need to furnish notification of repurchases of their ADRs. If securities that were previously repurchased are subsequently resold, an issuer is required to provide notice to NYSE of its plans to increase the outstanding amount of listed securities. [40]

Nasdaq does not have a similar notification obligation in connection with repurchases of securities. However, it would typically require pre-notification in the event that an issuer determined to issue a press release or make an SEC filing regarding a repurchase program, [41] and might separately require notification (no later than ten days after the occurrence) of any aggregate decrease of any class of securities listed on Nasdaq that exceeds 5% of the amount of securities of the class outstanding. [42]

## [d] Market Manipulation Considerations and Rule 10b-18

If an issuer repurchases its equity securities on the open market, it must ensure that such purchases do not involve fraudulent or manipulative practices. Rule 10b-18 under the Exchange Act [43] provides a nonexclusive, limited safe harbor from liability for manipulation under §§ 9(a)(2) and 10(b) of the Exchange Act [44] in connection with purchases of common equity securities in the market

by or for issuers or affiliated purchasers [45] so long as they adhere to the following requirements of Rule 10b-18: [46]

*Manner*: On any given day, all bids and repurchases by the issuer and its affiliated purchasers must be made through only one broker or dealer. The single broker or dealer restriction does not, however, apply to repurchases that were not solicited by or on behalf of the issuer or its affiliated purchasers.

*Timing*: On any given day, repurchases by the issuer and its affiliated purchasers must not: (a) constitute the opening transaction, (b) for a security that has an ADTV [47] of at least $1 million and a public float value of at least $150 million, be made during the 10 minutes before the scheduled close of the primary trading session in the security's principal market, and during the 10 minutes before the scheduled close of the primary trading session in the market where the purchase is made, and (c) for all other securities, be made during the 30 minutes before the scheduled close of the primary trading session in the security's principal market, and the 30 minutes before the scheduled close of the primary trading session in the market where the purchase is made. This timing provision does not apply for a certain period following a market-wide trading suspension.

*Volume*: On any given day, the total volume of repurchases by the issuer and its affiliated purchasers must not exceed 25% of the purchased security's ADTV. However, once every calendar week, in lieu of purchasing under 25% of

the ADTV limit for that day, the issuer or an affiliated purchaser is permitted to effect one "block" [48] purchase, provided that no other purchases under Rule 10b-18 are effected that day and the block purchase is not included when calculating the security's four-week ADTV. During the trading session following a market-wide trading suspension, this volume provision is modified to permit repurchases not exceeding 100% of the ADTV for the security.

*Price*: The issuer and its affiliated purchasers must not repurchase securities at a price that exceeds the highest

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

independent bid or the last independent transaction price (whichever is higher) quoted or reported in the consolidated system at the time the purchase is made.

A failure to meet any one of the four conditions by the issuer and any affiliated purchasers on any day will result in the loss of the safe harbor for all repurchases made on that day.

Rule 10b-18's safe harbor is unavailable for issuer repurchases effected (i) during the restricted period under Regulation M [49], (ii) as a purchase of a fractional interest in a security evidenced by a script certificate, order form, or similar document, (iii) pursuant to Rule 13e-1 during a third-party tender offer [50] or (iv) pursuant to a tender offer subject to Rule 13e-4 (or specifically excepted from Rule 13e-4) under the Exchange Act [51] or § 14(d) of the Exchange Act [52]. In addition, except as described below, Rule 10b-18's safe harbor is unavailable for repurchases during the period from the time of public announcement of a merger, acquisition or similar transaction involving a recapitalization [53] until the earlier of the completion of such transaction or the completion of the vote by target shareholders. In order to allow certain ordinary course repurchases not related to the merger (or other covered transaction) during this period, the exclusion from the Rule 10b-18 safe harbor does not apply to purchases effected after the announcement of a merger (or other covered transaction) so long as the total amount of the issuer's repurchases effected on any single day does not exceed

p. 9-19
p. 9-20

the lesser of 25% of the security's ADTV and the issuer's average daily purchases under Rule 10b-18 during the three full calendar months preceding the date of the announcement of the merger (or other covered transaction) and certain other conditions are met. [54] In addition, the issuer may effect a block purchase pursuant to paragraph (b)(4) of Rule 10b-18, provided that the issuer does not exceed the average size and frequency of block purchases effected during the three full calendar months preceding the date of the announcement of such transaction.

Although Rule 10b-18 is a nonexclusive safe harbor, and in theory there are other ways for an issuer to make nonmanipulative repurchases, issuers may be reluctant to conduct such repurchases without the benefit of Rule 10b-18's protection. It should be noted that the Rule 10b-18 safe harbor applies only to repurchases effected in the United States and not to repurchases effected in markets outside the United States.

## [2] Issuer Tender Offers for Equity Securities

A company, including a foreign company, that repurchases its securities from U.S. residents is subject to regulation under the Williams Act if its repurchases rise to the level of a tender offer. [55] Additionally, disclosure in connection with repurchases of securities is subject both to Rule 10b-5 under the Exchange Act, in terms of completeness and accuracy, and to §§ 9(a)(2) and 10(b) of the Exchange Act, in terms of possible market manipulation. [56]

The Exchange Act provisions that the Williams Act introduced impose special obligations in the context of tender offers for equity securities. [57] These are additional to the requirements that apply to tender offers in general. While § 14(e) and Regulation 14E under the Exchange Act (which include an antifraud provision and various procedural requirements for tender offers) apply to all tender offers, [58] §§ 14(d) and 13(e) of the Exchange Act and the rules promulgated under them apply only to tender offers for equity securities. Section 14(d) and the rules thereunder apply in the context of third-party equity tender offers (which are discussed in § 9.05). Those rules, however, do not apply to issuer self-tenders for equity securities, which are instead governed by § 13(e) and

p. 9-20
p. 9-21

Rule 13e-4 thereunder generally, and Rule 13e-3 insofar as an issuer tender offer may result in the issuer "going private."

Rule 13e-4, which substantially parallels the rules for third-party tenders under § 14(d), applies to any tender or exchange offer by an issuer with a class of equity securities registered under § 12 of the Exchange Act for its

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

own equity securities (whether or not the subject class is itself so registered). [59] Rule 13e-4 imposes substantial filing and disclosure obligations on the issuer. When an issuer that has equity securities registered under the Exchange Act makes a tender offer for any class of its equity securities (whether or not registered under the Exchange Act), it is required by Rule 13e-4(b)(2) to file with the SEC, as soon as practicable on the day that the tender offer commences, a statement on Schedule TO providing disclosure about, *inter alia*, the terms of the offer, the issuer, the securities sought, the source of the funds used to purchase the securities, the purpose of the offer and, if material, the financial condition and results of the issuer. The issuer must also disseminate certain information to the holders of the securities for which the offer is made and comply with certain procedural rules relating to the timing of the offer, withdrawal of tendered securities by their holders, pro rata acceptances of tendered securities and payment of the best price to all tendering holders. [60] In addition, before an issuer may purchase, by way of tender offer or otherwise, any of its equity securities (whether or not registered under the Exchange Act) while a third-party's tender offer for equity securities of the issuer that are registered under the Exchange Act is outstanding, the issuer must file certain additional information with the SEC. [61]

Rule 13e-3 under the Exchange Act imposes additional requirements, beyond those set out in Rule 13e-4, on certain issuer self-tenders for equity securities (generally referred to as "going private transactions"). Under Rule 13e-3, any issuer that has registered a class of equity securities under the Exchange Act and that purchases or makes a tender offer for any of its equity securities (and any affiliate of such an issuer that makes such purchase or offer) will be subject to additional restrictions if that purchase or tender offer has a reasonable likelihood of causing, or is intended to cause, (i) the class of equity securities to cease to be registered under the Exchange Act, (ii) such issuer's periodic reporting

p. 9-21
p. 9-22

obligations under the Exchange Act to be suspended or terminated or (iii) the class of equity securities, if listed on a national securities exchange, to cease to be so listed. [62] The issuer (or affiliate) must file with the SEC a statement on Schedule 13E-3, which requires disclosure about, *inter alia*, the terms of the offer, the issuer or affiliate, the subject company, the securities sought, the source of funds used to purchase the securities, the purpose of the offer, alternatives to the transaction and the fairness of the transaction. The issuer (or affiliate) must also include most of the Schedule 13E-3 information in any related registration statement or tender offer disclosure document distributed to holders of the securities. [63] These requirements do not apply to certain transactions (i) by a person that became an affiliate of the issuer as a result of a tender offer within the prior year or (ii) involving an exchange of equivalent securities. [64]

One area in which the SEC staff has approved significant relief from Williams Act provisions governing issuer self-tenders relates to the use of a formula to price a tender offer. An issuer is generally required to specify a fixed price for the subject securities over the 20-business day period during which a tender offer must remain open under the Williams Act, [65] and to hold the offer open for at least 10 business days following any change in the consideration offered or the percentage of the subject class that is sought for purchase. [66] In a series of no-action letters over the years, the SEC staff has permitted the use of formula pricing mechanisms based on average trading data over a specified period of time to determine offer consideration. The SEC staff first permitted formula pricing to be used for equity tender offers in the context of third-party exchange offers for equity securities, pursuant to the no-action letter it issued *Lazard Freres & Co.* (avail. Aug 11, 1995). [67] This relief was subsequently extended to issuer cash offers in a letter for *TXU Corp.* (avail. Sept. 13, 2004), where the staff granted no-action relief relating to Rules 13e-4(d)(l), 13e-4(f)(l)(ii) and 14e-1(b) when TXU used a pricing formula to determine the purchase price it offered for its outstanding equity-linked securities and convertible notes. [68]

p. 9-22
p. 9-23

Conditions to reliance on the no-action letters permitting formula pricing for issuer self-tenders for equity securities generally include that: (1) the offer document discloses the pricing mechanism for determining the final consideration; [69] (2) the trading price of the subject securities is closely correlated to the trading price of the

reference common stock; [70] (3) the issuer's common stock is listed on a national securities exchange; (4) the formula is fixed throughout the offer period and tied to the volume weighted average trading prices of the relevant common stock over a specified period; (5) the offer materials disclose a minimum and maximum offer price; (6) if there is a change in the formula or in the minimum and maximum price, the offer will remain open for at least 10 business days; (7) the daily indicative calculated purchase prices per subject security are published on a webpage and a toll-free number is provided for securityholders to obtain pricing related information; (8) printed materials for withdrawal are made available and procedures for withdrawal are disclosed in the offering materials; and (9) the final price is published on the offer webpage and in a press release at the time specified.

Historically, the SEC staff has held the view that there should be a two-day window between determination of the final price (through application of the pricing formula announced at the launch of the offer) and the expiration of the offer, so that the final price would be required to be determined no later than the 18th business day of a 20-business day tender offer. [71] The staff has also favored an averaging period of no less than 10 trading days for determining the reference price used in the pricing formula. [72] The SEC staff has become more flexible on these parameters over time, issuing no-action relief in respect of structures in which the final price is determined on the expiration date for the tender offer [73]

p. 9-23
p. 9-24

and structures utilizing a three trading day averaging period to determine the reference price used in the pricing formula. [74]

Other notable relief has been granted in the context of issuer self-tenders relating to employee compensation. The SEC has issued an exemptive order regarding employee stock option exchanges that permits issuers to make such exchange offers in order to reprice outstanding employee stock options without complying with the rules requiring tender offers to be extended to all securityholders of a class at the same price. The order contains conditions designed to ensure that this relief is only given in the context of compensatory offers and that adequate disclosure is provided to employees. [75] Similar relief has been extended on a case-by-case basis to issuer tender offers for compensatory purposes, such as where the issuer seeks to repurchase "out of the money" employee stock options that are not expected to regain value. [76] The SEC staff has provided relief from prompt payment requirements in such offers where consideration included a deferred right to cash payment contingent on continued employment. [77]

## Footnotes

33   *See* §§ 11.05[2][a] and 4.10[1].

34   *See* §§ 5.05[7] and 11.05[2][a][i].

35   If the ASR provides the issuer an option the exercise of which might affect the bank's market activity, the bank may require the issuer to represent it has no material nonpublic information as a condition to exercising that option.

36   SEC, Division of Market Regulation, Answers to Frequently Asked Questions Concerning Rule 10b-18 ("Safe Harbor" for Issuer Repurchases) (Nov. 17, 2004), Question 13.

37   There is no U.S. federal securities law requirement to disclose issuer share repurchases on a more current basis. However, many issuers routinely disclose the adoption of programs for repurchase of their shares in press releases in the interest of informing the market of their share repurchase plans.

38   Item 16E of Form 20-F.

39   NYSE LISTED COMPANY MANUAL § 204.25.

40   NYSE LISTED COMPANY MANUAL § 204.20.

41   NASDAQ Marketplace Rules, Rule 5250, NASDAQ Manual.

42   NASDAQ Marketplace Rules, Rule 5250(e), NASDAQ Manual

43   17 C.F.R. § 240.10b-18. *See also* Securities Exchange Act Release No. 19244 (Nov. 17, 1982), 47 Fed.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

Reg. 53,333, 53,334 (Nov. 26, 1982).

44    Some repurchase activity that meets the safe harbor conditions may still violate the antifraud and anti-manipulation provisions of the Exchange Act. "[R]egardless of whether an issuer's repurchases technically satisfy the conditions of the Rule, the safe harbor is not available if the repurchases are fraudulent or manipulative, when viewed in the totality of the facts and circumstances surrounding the repurchases ( *i.e.*, facts and circumstances in addition to the volume, price, time, and manner of the repurchases)." *See* SEC Release No. 34-48766 (Nov. 10, 2003), 68 Fed. Reg. 64,952, 64,953 n.5 (Nov. 17, 2003). *See also SEC v. Wachovia Corp.*, SEC Litigation Release No. 18958 (Nov. 4, 2004). In connection with First Union Corp.'s stock-for-stock friendly bid for Wachovia Corp. in 2001, both First Union Corp. and Wachovia Corp. carried out significant purchases of First Union Corp. stock during May and June 2001, including, in particular, following the making of a competing hostile offer by SunTrust Banks Inc. Neither First Union nor Wachovia disclosed the repurchases until after the shareholders voted on the merger, when Wachovia disclosed the repurchases in its second quarter Form 10-Q. On November 4, 2004, without admitting or denying any allegations in the SEC's complaint, Wachovia consented to entry of a judgment alleging violations of §§ 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-13 and 14a-9 thereunder, enjoining Wachovia from future violations of the federal securities laws and requiring Wachovia to pay a $37 million penalty. In discussing the judgment, the SEC cited its 2003 Rule 10b-18 release. The SEC argued that Wachovia knew that its First Union purchases could have had the effect of supporting the price of First Union common stock and making the offer appear more attractive to Wachovia shareholders.

For a discussion of §§ 9(a)(2) and 10(b) of the Exchange Act in the context of market manipulation, *see* § 11.05[3].

45    Rule 10b-18(a)(3). An affiliated purchaser is a person acting, directly or indirectly, in concert with an issuer for the purpose of acquiring the issuer's securities or an affiliate of the issuer who, directly or indirectly, controls the issuer's purchases or whose purchases are controlled by or under common control with those of the issuer. However, an affiliated purchaser does not include (i) any broker, dealer or other person solely by reason of its effecting purchases on behalf of the issuer or for its account, or (ii) an issuer's officer or director solely by reason of such person's participation in the decision to authorize purchases by or on behalf of the issuer.

46    Rule 10b-18(b)(1)–(4). Purchases pursuant to Rule 10b-18 do not include purchases effected by or for an issuer plan by an agent independent of the issuer (as defined in Rule 100(b) of Regulation M) and, as a result, do not need to be taken into account for compliance with these requirements. If an issuer plan will be making purchases in the market, it is important for the issuer to determine whether or not the person directing those purchases would be considered an agent independent of the issuer for purposes of both Rule 10b-18 and Regulation M. *See* § 3.02[9][a].

47    "ADTV" is defined in Rule 10b-18(a)(1) as the average daily trading volume reported for the securities during the four calendar weeks preceding the week in which the purchase under Rule 10b-18 is to be effected.

48    "Block" is defined in Rule 10b-18(a)(5) and, in general, (i) has a purchase price of U.S. $200,000 or more, (ii) is at least 5,000 shares and has a purchase price of at least U.S. $50,000, or (iii) is at least 20 "round lots" of the security and totals 150 percent or more of the trading volume of the security, or, in the event that trading volume data is unavailable, is at least 20 "round lots" of the security and totals at least one-tenth of one percent of the outstanding shares of the security, exclusive of any shares owned by an affiliate.

49    *See* § 3.02[9] for a discussion of Regulation M under the Exchange Act generally.

50    *See* § 9.05[2][b].

51    *See* § 9.03[2].

52    *See* § 9.05[1].

53    This exclusion does not apply to repurchases during a merger, acquisition or recapitalization in which the consideration is solely cash and there is no valuation period. Rule 10b-18(a)(13)(iv)(A) under the Exchange Act.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.          549
All rights reserved.

54  Rule 10b-18(a)(13)(iv)(B) under the Exchange Act.

55  Significant relief from the rules referenced in this paragraph as applied to cross-border tender offers (embodied in the 2008 Cross-Border Amendments) is discussed in § 9.05[9].

56  *See* § 9.03[1].

57  Convertible debt securities are equity securities for purposes of the Exchange Act pursuant to § 3(a)(11), and tender offers for them will thus be subject to the additional provisions of the Williams Act that apply to equity securities.

58  Excepting Rule 14e-5, which applies solely to tender offers for equity securities. Section 14(e) and Regulation 14E are discussed in § 9.02[2].

59  Thus, for example, a tender offer for convertible bonds originally sold on an exempt basis under Regulation S and Rule 144A under the Securities Act would nevertheless be subject to Rule 13e-4 if the issuer of those bonds has a class of equity securities registered under the Exchange Act (as convertible bonds constitute "equity securities" within the meaning of § 3(a)(11) of the Exchange Act), even though the bonds themselves are not so registered.

An affiliate that makes a tender offer for a class of the issuer's registered equity securities will be subject to the provisions of § 14(d) of the Exchange Act and Regulation 14D thereunder rather than the rules for issuer self-tenders. *See* the discussion of those provisions in § 9.05[1].

60  Rule 13e-4(f) under the Exchange Act.

61  Rule 13e-1 under the Exchange Act.

62  Rule 13e-3(a)(3) under the Exchange Act. *See* the discussion of termination of Exchange Act registration under Rule 12h-6 in § 5.05[9].

63  Rule 13e-3(e) under the Exchange Act.

64  Rule 13e-3(g) under the Exchange Act. Even if an issuer satisfies these going private requirements of the Exchange Act (and, if applicable, the self-tender rules), it would have to comply with exchange requirements to delist shares from an exchange. *See* § 4.11.

65  Rules 13e-4(d)(1), 13e-4(f)(1)(i) and 14e-1(a) under the Exchange Act.

66  Rules 13e-4(f)(1)(ii) and Rule 14e-1(b).

67  *See also* staff letters for *AB Volvo* (avail. May 16, 1997) and *Epicor Software Corporation* (avail. May 13, 2004).

68  *See also* staff letters for issuer cash tender offers to purchase convertible notes in *GenCorp Inc.* (avail. Dec. 19, 2014), *Group 1 Automotive* (avail. May 16, 2014), *CNO Financial Group, Inc.* (avail. Feb. 11, 2013), *Textron, Inc.* (avail. Oct. 7, 2011), and for combined cash and common stock offers for convertible notes in *Sonic Automotive, Inc.* (avail. July 24, 2012) and *American Equity Investment Life Holding Company* (avail. Aug. 23, 2013).

Note that while the line of staff letters pertaining to pricing formulas for setting exchange ratios often involve common stock, those pertaining to issuer cash tender offers relate only to convertible debt.

69  In the case of cash tenders, the offer document typically also includes an illustrative table showing calculations of the purchase price.

70  Use of a third party's common stock as a reference for formula pricing (rather than the issuer's own common stock) has been approved under appropriate circumstances. *See, e.g., The Procter & Gamble Company Exchange Offer* (avail. Sept. 1, 2016) and *Lockheed Martin Corporation* (avail. July 11, 2016) (using proxy pricing based on the common stock of other party to merger agreement).

71  The structure was first given relief in *Lazard Freres & Co.* (avail. Aug. 11, 1995).

72  *Lazard Freres & Co.* (avail. Aug. 11, 1995). *See also BBVA Privanza International (Gibraltar) Limited* (avail. Dec. 23, 2005), *TXU Corporation* (avail. Sept. 13, 2004), *Epicor Software Corp.* (avail. May 13, 2004) and *AB Volvo* (avail. May 16, 1997).

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

U.S. Regulation of the International Securities and Derivatives Markets, §
9.03, REPURCHASES OF…

73  First seen in no-action letters for *McDonald's Corporation* (avail. Sept. 27, 2006) and *Weyerhaeuser Company* (avail. Feb. 23, 2007). For more recent use, *see The Dow Chemical Company* (avail. Sept. 2, 2015), *PHH Corporation* (avail. June 12, 2015), and *Weyerhaeuser Company* (avail. June 26, 2014).

74  *See, e.g.*, *The Procter & Gamble Company Exchange Offer* (avail. Sept. 1, 2016), *Lockheed Martin Corporation* (avail. July 11, 2016), *Weyerhaeuser Company* (avail. Feb. 23, 2007), and *Kraft Foods Inc.* (avail. July 1, 2008); *see also McDonald's Corporation* (avail. Sept. 27, 2006) (using a two-day averaging period).

75  *See* SEC, Division of Corporation Finance, Issuer Exchange Offers Conducted for Compensatory Purposes (Mar. 21, 2001).

76  *See, e.g.*, *Microsoft Corp.* (avail. Oct. 14, 2003), *Martha Stewart Living Omnimedia, Inc.* (avail. Nov. 7, 2003) and *Comcast Corp.* (avail. Oct. 7, 2004).

77  *See, e.g.*, *Microsoft Corp., Martha Stewart Living* and *Microtune, Inc.* (avail. Sept. 13, 2007); *see also CNET Networks, Inc.* (avail. Feb. 28, 2007) (cash payment deferred to avoid potential adverse tax consequences).

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.                                        551

Case 23-09001   Document 91-38   Filed in TXSB on 03/17/23   Page 19 of 102
U.S. Regulation of the International Securities and Derivatives Markets, §
9.04, LIABILITY…

# U.S. Regulation of the International Securities and Derivatives Markets, § 9.04, LIABILITY MANAGEMENT

U.S. Regulation of the International Securities and Derivatives Markets
1 Edward F. Greene, Alan L. Beller, Edward J. Rosen, Leslie N. Silverman, Daniel A. Braverman, Sebastian R. Sperber, Nicolas Grabar & Adam E. Fleisher, U.S. Regulation of the International Securities and Derivatives Markets § 9.04 (11th and 12th Editions 2014-2017)
11th and 12th Editions

 Click to open document in a browser

## [1] Introduction

Liability management is an umbrella term describing a family of transactional tools used to manage the ongoing contractual obligations of an issuer with respect to its existing debt securities. These tools include consent solicitations, open market purchase programs, cash tender offers and exchange offers.

The degree to which a given liability management transaction is regulated depends largely on whether it (1) involves the issuance of a new security and thus requires compliance with, or exemption from, the registration requirements of the Securities Act, [78] and (2) is a "tender offer" under the Williams Act. As discussed above in § 9.02, the Williams Act imposes significant restrictions on transactions that qualify as "tender offers" under that act, with certain provisions

p. 9-25

(including the act's general antifraud provision and regulations relating to the duration of offers) applying to all tender offers and other provisions (including provisions requiring the filing of disclosure on Schedule TO) applying only to certain tender offers in respect of equity securities.

## [2] Consent Solicitations

The terms of most debt securities allow modification and amendment with the consent of the holders of a specified percentage of those securities. The customary way to obtain consents in respect of widely held debt securities is through a consent solicitation. The issuer generally prepares a consent solicitation statement, outlining the provisions to be modified, and circulates it to the holders. In most cases, the holders are offered a consent fee in exchange for agreeing to the proposed modification. A consent solicitation may be combined with a cash tender offer (creating an "exit tender") or with an exchange offer (creating an "exit exchange").

Consent solicitations are generally lightly regulated, although they may be subject to common law requirements of good faith and fair dealing as well as state antifraud provisions. [79] In two prominent decisions, the Delaware Court of Chancery (construing New York law) indicated in dictum that failure to extend a consent solicitation related to an exit tender to all holders, thereby giving all interested holders the ability to receive the related fee, could violate the covenant of good faith and fair dealing that is implied under New York law. [80] A subsequent decision of that court, however, held that such payments are permissible (at least under the circumstances presented in that case). [81] The English High Court, in contrast, has construed analogous common law principles as applied under English law to prohibit exit tenders whose terms have coercive effect. [82] While contemporary English cases have no precedential effect for U.S. purposes, this decision could nonetheless have persuasive value for future U.S. plaintiffs challenging the terms of particularly aggressive exit tenders.

p. 9-25<br>p. 9-26

Additional considerations affecting the structuring of a consent solicitation arise in the context of debt securities issued under an indenture that has been qualified under the Trust Indenture Act (or that contains a contractual provision equivalent to the provision of the Trust Indenture Act described below, as is common in debt offerings in the Rule 144A market). In *Marblegate Asset Management v. Education Management Corp.*, [83] the U.S.

District Court for the Southern District of New York gave an expansive interpretation to the prohibition within §
316(b) of the Trust Indenture Act against "impairment," without the consent of all affected holders, of the holders'
right "to receive payment of the principal of and interest on [a qualified] indenture security, … or to institute suit
for the enforcement of any such payment." Marblegate involved a debt restructuring outside bankruptcy in which
a majority of holders tendered their existing notes with an exit consent to modifications including release of the
collateral for the subject class of securities, substantially reducing the likelihood, as a factual matter, that
securities of the subject class that were not exchanged would ultimately be repaid. [83.1] Although no term
explicitly governing the right of the holders to receive interest or principal on a certain date was modified, the
court nonetheless held that the restructuring had violated § 316(b) by effectively undercutting the protections that
would make such payment occur in practice. In response to the *Marblegate* decision and another Southern
District decision applying similar analysis, [84] 28 law firms issued an opinion white paper noting that the cases
"contain language that suggests a significant departure from the widely understood meaning of Trust Indenture
Act § 316(b) that has prevailed among practitioners for decades" and laying out guidelines for rendering legal
opinions in light of that development. [85] On January 17, 2017, the Second Circuit Court of Appeals (the "Second
Circuit") overturned the *Marblegate* decision.

Consideration of the so-called new security doctrine also may affect the structuring of a consent solicitation. If
the modifications sought in a consent solicitation would be so fundamental as to effectively create a new
"security" for purposes of the Securities Act, the transaction will be regulated as a deemed exchange offer rather
than being subject only to the light regulatory regime applicable to consent solicitations. [86] Treatment of a
consent solicitation as a deemed offer to exchange (x) the security as modified by the proposed amendments for

p. 9-26
p. 9-27

(y) the outstanding security in its existing form results in the need for registration under, or exemption from, the
Securities Act and compliance with the Trust Indenture Act. Additionally, if the existing security is widely held, a
consent solicitation that is treated as a deemed exchange offer would generally become subject to regulation as
a tender offer under the Williams Act. Existing guidance on the new security doctrine is limited and does not
establish a bright line for what changes transform a consent solicitation into a deemed exchange offer. In
general, however, amending covenants that do not affect basic financial terms (such as the principal amount,
interest rate, redemption premium and maturity) should not create a deemed exchange, while amendments to
the basic financial terms generally should. [87]

## [3] Open Market Purchase and Privately Negotiated Buy-Back Programs for Debt Securities

Purchases of debt securities in open market transactions or privately negotiated buy-back programs can be used
to accumulate substantial positions in a debt security (or to retire a substantial portion of the amount
outstanding, in the case of purchases by the issuer) without triggering the tender offer provisions of the Williams
Act so long as the purchases are made in accordance with appropriate procedures. Open market purchase
programs are typically implemented by the acquiring party (most commonly the issuer) giving instructions to a
broker-dealer to purchase a limited amount of debt securities at prevailing market prices in accordance with
stipulated procedures and limits. The broker will typically post bids on a screen based trading system, but to limit
the risk that an open market purchase program will be treated as a "creeping," or de facto, tender offer, the
program will include a limitation on the percentage of the subject securities to be purchased, limitation of the bid
price to within the prevailing bid and ask spread and the exclusion of publicity and of cross conditioning of
purchases. Other than posting bids, the broker's role in an open market program is necessarily passive and such
programs typically result in relatively small purchases (less than 25%) of the outstanding debt of the target
series. Privately negotiated buy-back programs include a more active role by the broker, generally including
direct calls to a small number of holders. Due to the active inquiries by the broker, additional limitations are
typically imposed to prevent the occurrence of a tender offer. The calls are limited to a small number of holders
having great sophistication (such as qualified institutional buyers within the meaning of Rule 144A under the

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                    553
All rights reserved.

Securities Act), a limit on the percentage of a

p. 9-27
p. 9-28

series that may be purchased and exclusion of publicity and of cross conditioning of purchases. Because, as discussed above, the SEC has not defined the term "tender offer" and evaluation of whether a tender offer is present is based on facts and circumstances, [88] the procedures applied to an individual open market purchase program or buy-back program require specific analysis based on the relevant facts.

## [4] Cash Tender Offers for Debt Securities

As discussed above, a cash tender offer for nonconvertible debt securities is subject to regulation under Regulation 14E under the Exchange Act, imposing requirements (modified as described below) including a minimum 20 business day duration and the requirement that the offer remain open for at least 10 business days following any change in the consideration offered or the percentage of the subject class that is sought for purchase. [89] A cash tender offer does not, however, require procedures limiting execution of the kind necessary for buy-back programs (described in § 9.04[3]). Cash tender offers for nonconvertible debt securities are typically made to all holders (although making the offer to all holders is not required unless relying on relief that is conditioned on an offer to all holders or tendering for a security the terms of which require that any offer be made to all holders).

Given the dynamics of market pricing of debt securities (which generally trade on the basis of a constantly changing reference rate, such as a benchmark U.S. Treasury security rate or LIBOR, plus a spread to reflect credit quality), it is difficult, as a practical matter, to hold an offer to purchase debt securities open for 20 business days at a given price, extending as necessary to ensure the offer remains open for at least 10 business days after any change in the price offered. To respond to this difficulty, beginning in 1990 the SEC staff issued a series of no-action letters allowing "short-dated" tenders for debt securities, executed on a shorter time frame and with floating pricing. On January 23, 2015 the SEC staff issued a no-action letter (the "short-dated tender offer relief letter") revising and harmonizing its previous guidance and indicated that previous no-action letters regarding short-dated tenders were superseded. [90] The short-dated tender offer relief letter allows issuers, and in some cases their affiliates, to hold a tender offer for the issuer's debt securities open for only five business days rather than

p. 9-28
p. 9-29

the 20 business days specified by Rule 14e-1 under the Exchange Act and to base the consideration offered on a fixed spread to a benchmark rate. Conditions to the relief, which applies only to tender offers for debt securities made by the issuer or an affiliate that qualifies under the letter's terms, include immediate widespread dissemination of the offer on a timely basis, tender for any-and-all outstanding subject securities ( *i.e.*, without any limit on who may participate or the maximum amount to be accepted), provision of required withdrawal rights, no use of early or rolling settlement, no use of a contemporaneous consent solicitation (a so-called exit consent), the lack of an existing default, event of default or bankruptcy or restructuring event, timely announcement of changes to the offer and the offer consideration, provision of a "guaranteed delivery" mechanism that allows a certifying holder to deliver a notice during the offer period and deliver the subject securities by the close of business on the second business day after expiration of the offer, and no use of indebtedness that is effectively senior to the subject securities (whether as a result of ranking, structural subordination or shorter weighted average life to maturity) to finance the offer. Additionally, if the issuer is a reporting company, it must furnish the press release announcing the offer on a Form 8-K with the SEC prior to noon, Eastern time, on the first business day of the offer. Although filing obligations of reporting foreign private issuers are not addressed in the incoming letter to the SEC staff, the SEC staff has subsequently clarified that those issuers should furnish announcement press releases on Form 6-K within the foregoing time frame. [91] Cash tender offers pursuant to the short-dated tender offer relief letter must be made to all record and beneficial holders in order to qualify for relief under the short-dated tender offer relief letter.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

The conditions enumerated in the short-dated tender offer relief letter limit the circumstances under which it may be relied upon. In particular, tender offers that include a consent solicitation, are made to less than all holders or for less than the full outstanding amount of the subject securities, or that are made by third parties that are not a qualifying affiliate of the issuer do not benefit from the letter.

One alternative approach to tender offers for debt securities that would not fall within the short-dated tender offer relief letter that effectively shortens the period of market risk for the issuer involves the use of an early tender fee. Because Regulation 14E does not require that all holders that accept a tender offer receive the same price for their securities, [92] the bidder can offer holders that accept a tender offer prior to a set time preceding the expiration of the offer an

p. 9-29
p. 9-30

"early tender premium." By encouraging early participation, an early tender fee effectively shortens the time a bidder must wait for meaningful evidence of the level of participation in the offer (and thus of the potential need to amend) and limits the period during which market prices might undercut the offer's success. Given the requirement that a tender offer must be open for at least 10 business days following any change in the consideration offered, tender offers that provide for an early tender fee customarily set the deadline for tenders eligible to receive that fee at the 10th business day of a 20-business day offer (this is sometimes referred to as a 10/10 structure). In a similar vein, tender offers with an exit consent often include a deadline (also generally the 10th business day of a 20-business day offer) by which tenders must be received in order to be eligible to receive a consent fee (subject to extension if the requisite consents necessary to approve the proposed amendments are not received prior to the initial deadline).

Another alternative approach to tender offers for debt securities that would not fall within the short-dated tender offer relief letter that involves a shorter period of market risk for the issuer is a tender offer that is open for 20 business days, during which time the price floats for the first 18 business days and is fixed for the last two business days (that is, expressed as a fixed spread over U.S. treasuries to be set after the close on the 18th day). Although this structure does not comply with the requirements of Rule 14e-1, the staff has approved this structure on a case-by-case basis following an informal review process. This structure was first used by the Times Mirror Company and was memorialized in a no-action letter. [93] In the past, in order to receive informal approval to use this structure, issuers have approached the staff with a written request prior to commencing the tender offer, among other things, describing the structure and making certain representations about the trading characteristics of the securities compared to U.S. treasury trading, the number of market makers who make an active market in the securities and the types of investors holding the securities. This structure has now become sufficiently common that prior staff approval should no longer be necessary so long as the representations that would have been made to the staff are applicable. [94] It remains, however, significantly less common than the early tender fee structure described in the preceding paragraph.

Additionally, because Regulation 14E does not require mandatory withdrawal rights in tender offers, [95] in tender offers for debt securities the bidder can purchase the subject securities as they are tendered rather than waiting until the

p. 9-30
p. 9-31

offer expires (unless relying on relief that excludes rolling settlement of purchases, including the short-dated tender offer relief letter and Rule 162 under the Securities Act (which permits early commencement of registered tender offers)).

# [5] Debt Exchange Offers

In an exchange offer, the bidder offers to purchase outstanding securities in exchange for another security rather than in exchange for cash. From a regulatory perspective, every exchange offer has embedded within it an offering of new securities (with associated Securities Act issues) and a potential tender offer (with associated Williams Act issues).

© Cleary Gottlieb Steen & Hamilton LLP, 2019.        555
All rights reserved.

## [a] Williams Act Considerations

The fact that the consideration offered in an exchange offer consists of securities rather than cash does not materially affect the analysis as to whether the exchange offer is a tender offer under the Williams Act. An exchange offer will generally qualify as a tender offer unless appropriate procedures limiting the scope and manner of the exchange offer are put in place (comparable to those described for buy-back programs in § 9.04[3]).

If an exchange offer for debt securities is classified as a tender offer, it may qualify for relief from Williams Act requirements under the short-dated tender offer relief letter so long as it meets the requirements described in that letter (outlined in § 9.04[4]) and two additional requirements. The first requirement is that the consideration offered in the exchange offer must consist of "qualified debt securities" as defined in the letter and, if desired, cash. "Qualified debt securities" means debt securities that (a) are identical to the subject securities in all material respects other than maturity date, interest payment and record dates, redemption provisions and interest rate, (b) pay interest solely in cash (no payment in kind) and (c) have a weighted average life to maturity that is longer than the subject securities. The second requirement is the debt exchange offer must be limited to qualified institutional buyers (within the meaning of Rule 144A under the Securities Act), non-U.S. persons (within the meaning of Regulation S under the Securities Act) or both, and all excluded holders must be given a concurrent option to receive cash in a fixed amount determined by the bidder, in its reasonable judgment, to approximate the value of the qualified debt securities offered in the exchange offer.

## [b] Securities Act Considerations

An exchange offer may be registered under the Securities Act or it may be structured to be exempt from registration under § 4(a)(2) of the Securities Act,

p. 9-31
<hr/>
p. 9-32

Regulation S under the Securities Act or § 3(a)(9) of the Securities Act. Because they involve an offer and sale of securities, exchange offers are subject to the antifraud prohibitions in Rule 10b-5 under the Exchange Act and, in the case of registered exchange offers, §§ 11 and 12 of the Securities Act and, in the case of § 3(a)(9) exempt exchange offers, § 12 of the Securities Act.

## [i] *Registered Exchange Offers*

In a registered exchange offer, the bidder prepares and files with the SEC a registration statement on Form F-4 or S-4. Like a registered offering for cash, a registered exchange offer triggers Exchange Act reporting obligations for the bidder.

## [ii] *Private/Offshore Exchange Offers*

If registration is impractical or undesirable, an exchange offer can be structured to be exempt from registration under § 4(a)(2) of the Securities Act (a private exchange offer) or Regulation S under the Securities Act (an offshore exchange offer). While it is possible to include accredited investors (as defined in Rule 501 of Regulation D under the Securities Act) in a private offering, private exchange offers for debt securities are generally limited to qualified institutional buyers (within the meaning of Rule 144A under the Securities Act).

As a first step for a private/offshore exchange offer, issuers generally issue a press release regarding the potential for a transaction and send a letter of inquiry (sometimes referred to as a "pathfinder letter") to all holders of the subject securities to determine which holders are eligible to participate. The press release and the pathfinder letter should be carefully drafted to avoid rising to the level of an "offer" for purposes of § 5 of the Securities Act. Only after a holder has established its eligibility to participate by return of a completed pathfinder letter (or the making of representations equivalent to those in a pathfinder letter electronically) does that holder receive documentation for the exchange offer.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

Advantages of a private/offshore exchange offer over a registered exchange offer are that a private/offshore exchange offer does not trigger Exchange Act reporting requirements, is more lightly regulated, is subject to less stringent disclosure liability and is usually possible to execute more quickly. Advantages of a private/offshore exchange offer over a § 3(a)(9) exchange offer are that there are no limitations on the services that a financial advisor or investment bank may provide and that the issuer of the new securities need not be the same as the issuer of the subject securities. Disadvantages of a private/offshore exchange offer are that a private offer will not reach ineligible holders and will result in the new securities being subject to transfer restrictions that may not be required for a § 3(a)(9) exchange offer.

## [iii] *Section 3(a)(9) Exchange Offers*

p. 9-32
p. 9-33

Section 3(a)(9) of the Securities Act provides that an offer of "any security exchanged by the issuer with its existing securityholders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange" is exempt from the registration requirements of the Securities Act. The SEC staff has confirmed that an issuer and its employees may solicit and recommend exchanges in a § 3(a)(9) offer of securities without rendering the offer ineligible for the exemption, provided that the employees do not receive special compensation for their efforts and that the issuer does not hire extra employees for solicitation purposes. [96]

If a financial advisor or investment bank is engaged to assist in a § 3(a)(9) exchange offer, that party will be limited in the compensation it may receive and in the activities it may perform. In a series of no-action letters, the SEC staff has indicated that financial advisors or investment banks assisting in § 3(a)(9) exempt transactions may generally receive compensation that is fixed as a flat fee (and not contingent on the consummation of the transaction or the amount of securities tendered in the exchange) without affecting availability of the § 3(a)(9) exemption. [97] Although compensation should not be structured as a success-based fee or tied to the amount of securities exchanged, it may be based on the number of holders targeted or contacted in the transaction. [98] Financial advisors or investment banks assisting in § 3(a)(9) exempt transactions may also be reimbursed for their reasonable out-of-pocket expenses, including fees for legal counsel, and compensation may be paid on a fixed date or in fixed monthly fees. [99] The no-action letters also provide specific examples of activities that financial advisors or investment banks can perform without rendering the transaction ineligible for the § 3(a)(9) exemption. [100]

Although § 3(a)(9) provides an exemption from registration under the Securities Act, it does not exempt an exchange offer from Trust Indenture Act qualification requirements, including the filing of a Form T-3 (which is used to qualify a debt indenture under the Trust Indenture Act in the context of an

p. 9-33
p. 9-34

unregistered offering). [101] Where Trust Indenture Act qualification is required, § 306(c) of the Trust Indenture Act prohibits offers until the appropriate application for qualification has been filed with the SEC.

## Footnotes

78   *See* § 1.02.

79   *Katz v. Oak Industries, Inc.*, 508 A.2d 873 (Del. Ch. 1986); *Kass v. Eastern Air Lines, Inc.*, 12 Del. J. Corp. L. 1074 (Del. Ch. 1986); *cf. GPC XLI L.L.C., et al. v. Loral Space & Communications Inc.*, *et al.*, C.A. No. 3022-VCS (Del. Ch. 2008).

80   *Katz v. Oak Industries, Inc.*, 508 A.2d 873 (Del. Ch. 1986); *Kass v. Eastern Air Lines, Inc.*, 12 Del. J. Corp. L. 1074 (Del. Ch. 1986).

81   *GPC XLI L.L.C., et al. v. Loral Space & Communications Inc.*, *et al.*, C.A. No. 3022-VCS (Del. Ch. 2008) (finding payment of an exit consent fee only to consenting holders permissible where the parties to the

relevant indenture had specifically considered, and rejected, a contractual provision that would have required that consent fees be paid to all holders).

82  *Assénagon Asset Management SA v Irish Bank Resolution Corporation Limited* [2012] EWHC (Ch) 2090 (Eng.).

83  *Marblegate Asset Management v. Education Management Corp.*, 111 F. Supp. 3d 542 (S.D.N.Y. 2015).

83.1  *Marblegate Asset Management v. Education Management Corp.*, 846 F.3d 1 (2d Cir. 2017).

84  *BOKF, N.A. v. Caesars Entertainment Corp.*, 144 F. Supp. 3d 459 (S.D.N.Y. 2015).

85  Opinion White Paper dated Apr. 25, 2016.

86  *See* Bryant B. Edwards & Jon J. Bancone, *Modifying Debt Securities: The Search for the Elusive "New Security" Doctrine*, 47 BUS. LAW. 571 (1992).

87  *See, e.g.*, *Abrahamson v. Fleschner*, 568 F.2d 862 (2d Cir. 1977), *cert. denied*, 436 U.S. 905 (1978); *Rathborne v. Rathborne*, 683 F.2d 914 (5th Cir. 1982); *Sheraton Corp.* (avail. Nov. 24, 1978); and *Allied-Carson Corporation* (avail. Mar. 12, 1976).

88  *See* § 9.02[1].

89  Excluding a *de minimis* (representing up to 2% of the subject securities outstanding) increase in the percentage of securities accepted for purchase. *See* § 9.02[2].

90  The short-dated tender offer relief letter notes that it supersedes the letters issued to *Goldman, Sachs & Co.* (avail. Mar. 26, 1986), *Salomon Brothers Inc* (avail. Mar. 12, 1986) and *Salomon Brothers Inc* (avail. Oct. 1, 1990), as well as "any similar letters relating to abbreviated offering periods in non-convertible debt tender offers."

91  *See* SEC Division of Corporation Finance, Compliance and Disclosure Interpretations, Tender Offers and Schedules Sections, § 162.01 (Nov. 18, 2016).

92  In contrast, Regulations 13E and 14D require that a single "best price" be paid to all holders that accept a tender offer in respect of equity securities to which those regulations apply. *See* § 9.03[2] and § 9.05[1].

93  *See The Times Mirror Company* (avail. Nov. 15, 1994) (the no-action letter provides for pricing one business day prior to expiration, but the staff now requires two business days).

94  *See also UBS AG* (avail. July 29, 2009).

95  In contrast, Regulations 13E and 14D require withdrawal rights in tender offers for equity securities to which they apply. *See* § 9.03[2] and § 9.05[1].

96  *See, e.g.*, *Pepsi-Gemex, S.A. de C.V.* (avail. June 1, 2001).

97  *See, e.g.*, *SunTrust Banks, Inc.* (avail. July 16, 1999); *Dean Witter & Co., Inc.* (avail. Dec. 23, 1974); *Klabin S.A.* (avail. July 14, 2014).

98  *See Mortgage Investors of Washington* (avail. Oct. 8, 1980) and *Petroleum Geo-Services* (avail. June 8, 1999).

99  *See, e.g.*, *Klabin S.A.* (avail. July 14, 2014).

100  *See, e.g.*, *SunTrust Banks, Inc.* (avail. July 16, 1999); *Seaman Furniture Co., Inc.* (avail. Oct. 10, 1989); *Exxon Mobil Corp.* (avail. June 28, 2002).

101  The exemptions to Trust Indenture Act qualification requirements set forth in § 304 of the Trust Indenture Act include offerings exempt from Securities Act registration pursuant to § 4(a)(2) of the Securities Act and Rule 144A under the Securities Act, but do not include offerings exempt from Securities Act registration pursuant to § 3(a)(9) of the Securities Act.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

# U.S. Regulation of the International Securities and Derivatives Markets, § 9.05, TENDER AND EXCHANGE OFFERS FOR EQUITY SECURITIES; BUSINESS COMBINATION TRANSACTIONS

U.S. Regulation of the International Securities and Derivatives Markets
1 Edward F. Greene, Alan L. Beller, Edward J. Rosen, Leslie N. Silverman, Daniel A. Braverman, Sebastian R. Sperber, Nicolas Grabar & Adam E. Fleisher, U.S. Regulation of the International Securities and Derivatives Markets § 9.05 (11th and 12th Editions 2014-2017)
11th and 12th Editions

 Click to open document in a browser 

## [1] Tender Offers for Registered Equity Securities

A tender offer where the bidder, after consummation of the offer, would be the direct or indirect beneficial owner of more than 5% of any class [102] of equity securities (whether or not entitled to vote) registered under § 12 of the Exchange Act is subject to the tender offer provisions of § 14(d) of the Exchange Act and Regulation 14D thereunder, as well as the provisions of § 14(e) and Regulation 14E, as discussed in § 9.02 above and § 9.05[2] below. [103] A tender offer formally commences on the date on which the bidder first publishes, sends or gives securityholders the means to tender (normally called a "letter of transmittal"). [104] A bidder can express an intention to launch an offer, but there is no prescribed time period by which the offer must commence following the announcement. [105] All communications to securityholders by bidders and by targets are permitted prior to formal commencement of the tender offer. All pre-commencement written communications [106] by bidders or targets must be filed with the SEC on the

p. 9-35

date of first use [107] and must include a prominent legend advising shareholder to read the tender offer statement when it becomes available because it will contain important information. [108]

A bidder is prohibited from announcing an offer without an intention to commence and complete it, as a means to manipulate stock prices, or without a reasonable belief that it will have the necessary cash to consummate the offer. [109] Normally, a commitment letter should be sufficient to satisfy this last requirement, although even that is not always required. [110]

The bidder must also file with the SEC, as soon as practicable on the day its tender offer formally commences, a statement on Schedule TO making detailed disclosure as to, *inter alia*:

- the identity of the target and the securities sought in the offer;
- the identity of the bidder, and its management, directors and controlling entities;
- the source and amount of funds to be used to purchase securities in the tender offer, including the specific sources of financing, all conditions to the financing and the bidder's ability to finance the offer if the primary source of financing falls through;

p. 9-35
p. 9-36

- the purpose of the offer, including any plans or proposals of the bidder for any major corporate transaction affecting control of the target;
- the background of the offer, including a description of any discussions between the parties with respect to any extraordinary transaction during the current year or the two previous years;
- the amount and percentage of target securities held by the bidder and details about transactions in such securities during the 60 days prior to commencement of the offer; and

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

- if material to a selling shareholder, current and adequate financial information concerning the bidder.

In addition, in a negotiated two-step transaction (a first-step cash tender offer for less than 100% of the outstanding target shares, to be followed by a second-step statutory merger), if the acquisition will be "significant" to the bidder at or above the 20% level, *pro forma* financial information must be included in the first-step tender offer materials. [111]

The bidder in a cash tender offer is not required to provide financial statements if (i) there is no financing or funding condition to the tender offer *and* (ii) either (a) the bidder files reports with the SEC under § 13(a) or § 15(d) of the Exchange Act *or* (b) the offer is for all outstanding target shares. If financial statements are required, only two years' statements need be provided. [112]

In a cash tender offer, the bidder must also provide a so-called "Offer to Purchase," which must begin on the first or second page of the offer document. The Offer to Purchase must include a bullet-point, cross-referenced "plain English" summary term sheet highlighting the most important aspects of the transaction. [113] The Offer to Purchase also sets forth the information expressly called for by Schedule TO, as well as all material conditions to the offer and various procedural and timing provisions ( *e.g.*, a description of withdrawal rights and the bidder's right to extend or amend the offer.) The Offer to Purchase also generally includes a summary of any material nonpublic information about the target (such as target management's projections) that were furnished by the target to the bidder. [114] An Offer to Purchase is *not* required in a stock-for-stock tender offer ( "exchange offer"), but its offer document is required to be in plain English. [115]

Generally, a bidder has great flexibility in setting conditions on its obligation to consummate the tender offer. However, these conditions must be based on objective criteria and not be within the bidder's control. [116]

Any material change in the information previously disclosed to securityholders must be promptly disclosed in additional tender offer materials, filed as amendments to the bidder's Schedule TO. [117]

Management of the target company is required to notify its shareholders and file with the SEC a Schedule 14D-9 pursuant to which it must state whether or not it has taken a position with respect to the bid, and if so, what that position is and the reasons for that position (or the reasons for not taking a position). [118] Management must also disclose generally what steps it plans to take in response to the bid and any conflicts that management or the target's board of directors may have (including by reason of employment or severance agreements). [119] The Schedule 14D-9 must be filed on the date, on or after the formal commencement of the offer, that the target first publishes its recommendation, which must be within ten business days of such commencement. [120]

p. 9-37
------------------------------------------------------------------------
p. 9-38

Holders of equity securities registered under the Exchange Act also benefit from certain significant procedural rights under Regulation 14D, as well as those that apply to all tender offers under Regulation 14E. All tender offers, [121] including tender offers for registered equity securities, must be kept open for at least 20 business days and, under certain circumstances, must be extended from time to time, as discussed in § 9.02. [122] In the case of a tender offer for registered

p. 9-38
------------------------------------------------------------------------
p. 9-39

equity securities, any person who has tendered may withdraw his or her tendered shares at any time prior to the expiration of the offer and, accordingly, tendered shares may not be purchased before the offer expires. [123]

A tender offer must be open to all holders of the class of registered equity securities sought in the offer (the so-called "all-holders rule") and the same price must be paid in respect of all equity securities of that class that are purchased (the so-called "best-price rule"). [124] Tender offers can be made for less than 100% of the outstanding shares. [125] In such an offer, if more of the securities of the specified class are tendered than the bidder has offered to purchase, the securities must be accepted by the bidder on a *pro rata* basis. [126]

A bidder in a tender or exchange offer for all outstanding shares will sometimes want to extend the offer to allow for the tender of additional shares even after all conditions of the offer have been satisfied. This is particularly

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                    560
All rights reserved.

common

p. 9-39
p. 9-40

where the bidder seeks to reach the 90% threshold of ownership required in most states to effect a short-form merger (a merger not requiring a shareholder meeting or shareholder vote). [127] To facilitate achieving this goal, a bidder conducting a tender or exchange offer for 100% of the outstanding shares of a class of equity securities registered under § 12 of the Exchange Act is permitted to allow shareholders to tender shares during a "subsequent offering period" [128] that *follows* the expiration of the initial offer (as it may have been extended) if the bidder concurrently accepts and promptly pays for all shares tendered during the initial offering period. [129] With respect to tender offers for the shares of non-U.S. companies whose shares trade in their home markets and are also registered under § 12 of the Exchange Act, a bidder may launch a subsequent offering period if it accepts and pays for all shares tendered during the subsequent offering period within 20 business days of the date of tender if payment may not be made on a more expedited basis under the home jurisdiction law or practice. [130] Withdrawal

p. 9-40
p. 9-41

rights are not available during the subsequent offering period. [131] Tendered shares must promptly be accepted and purchased for the same form and amount of consideration as was offered in the initial offering period, except in tender offers for non-U.S. companies whose shares trade in their home markets and are also registered under § 12 of the Exchange Act, where separate offset and proration pools are permitted for securities tendered during the initial and subsequent offering periods. [132]

## [2] Tender Offers for Any Equity Security

## [a] Rule 14e-5

In addition to the provisions of § 14(e) and Regulation 14E discussed in § 9.02 above, a tender offer for any equity security (regardless of whether it is registered under the Exchange Act) is also subject to Rule 14e-5. Under Rule 14e-5, a bidder who makes such a tender offer is prohibited from directly or indirectly purchasing (or arranging to purchase) any of the equity securities for which the tender offer is being made, or any "related securities," except pursuant to the offer. [133] The prohibition extends from the first public announcement of the

p. 9-41
p. 9-42

offer until the offer has expired. [134] Because of the "directly or indirectly" language, the rule is generally interpreted to apply to purchases by the bidder's dealer-manager or other financial advisor unless an exemption is available. [135]

Exceptions to Rule 14e-5 include the following:

- purchases pursuant to the exercise of previously owned options or convertible securities;

- certain purchases by employee benefit plans of the bidder;

- purchases in connection with certain "basket" transactions;

- purchases pursuant to unconditional contractual obligations entered into before the public announcement of the tender offer;

- unsolicited agency or riskless principal [136] purchases by or through the bidder's dealer-manager or affiliates of the dealer-manager made in the ordinary course of business; [137]

- purchases made by certain affiliates of the dealer-manager [138] that have appropriate firewalls in place to prevent the sharing of nonpublic information with

p. 9-42
p. 9-43

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

the dealer-manager and that are not made for the purpose of facilitating the tender offer (this exception is most relevant for the investment management affiliates of the dealer-manager);

- certain purchases by U.K. market makers; [139]

- purchases in cross-border tender offers qualifying as Tier I offerings; [140]

- purchases of securities of a foreign private issuer pursuant to a foreign tender offer made in accordance with home country requirements where there are separate, concurrent or substantially concurrent U.S. and non-U.S. offers; [141] and

- in the case of a tender offer that the bidder reasonably expects to meet the conditions for reliance on the Tier II exemption, [142] purchases of securities of a foreign private issuer by an offeror or its affiliates or by an affiliate of a

p. 9-43
p. 9-44

financial advisor [143] outside a tender offer, and conducted in accordance with the foreign private issuer's home jurisdiction laws. [144]

p. 9-44
p. 9-45

If no exemption applies, Rule 14e-5's restrictions can be unduly burdensome to transaction participants as a result of their extraterritorial reach. The rule applies to tender offers containing a U.S. component even when neither the bidder nor the target are registered under the Exchange Act or maintain ADR programs, despite the fact that such bids would otherwise be fully regulated by non-U.S. law. French law, for example, permits a number of trading activities by the

p. 9-45
p. 9-46

financial advisors to a bidder that would be impermissible under Rule 14e-5. [145] In a bid by one French company for another where the bidder decides to include U.S. shareholders (even limiting participation to qualified institutional buyers) in order to avoid discrimination against them and to encourage maximum acceptance of the offer, Rule 14e-5 would cover the trading activities of such advisors in France. The relief that might otherwise be afforded by virtue of the Tier I exemption is often unavailable with respect to French targets, because of the difficulty of determining beneficial ownership under the Tier I rules within the French ownership system.

## [b] Rule 13e-1

Under Rule 13e-1, before an issuer may purchase, by way of tender offer or otherwise, any of its equity securities (whether or not registered under the Exchange Act) while a third-party's tender offer for equity securities of the issuer that are registered under the Exchange Act is outstanding, the issuer must file certain additional information with the SEC. The additional information includes, among other things, the title and number of securities to be purchased, the names of the persons from whom the securities will be purchased, the purpose of the purchase, the source and amount of consideration to be used, and whether the issuer will retire the purchased securities, hold them in its treasury or dispose of them. [146]

## [3] Business Combination Transactions and Exchange Offers

## [a] Introduction

In many jurisdictions, a business combination can be effected through a statutory transaction involving a shareholder vote, instead of utilizing a tender offer or an exchange offer. In general, such a "business combination transaction" involves a combination of companies, effected pursuant to the requirements of local law, in which the shares of the acquired company are cancelled as a matter of law and then represent only the

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

U.S. Regulation of the International Securities and Derivatives Markets, §
9.05, TENDER AND…

right to receive the specified consideration—whether stock, cash or a mix of stock and cash—or to exercise
dissenters' appraisal rights, if provided for by such law. Examples of business combination transactions include
mergers under U.S. and German law, amalgamations and plans of arrangement under Canadian law and
schemes of arrangement under English law. A business combination generally requires approval by both

p. 9-46
p. 9-47

constituent companies' boards of directors and shareholders (and may also require regulatory or court approval,
as do schemes of arrangement in the United Kingdom and plans of arrangement in Canada). In the United
States, the required vote is established by the corporate law of the state of the company's incorporation unless
the company's certificate of incorporation requires a higher vote. Under Delaware corporate law (and the law of
most other states), a merger requires board approval and the affirmative vote of a majority of the outstanding
shares. [147] The tender offer provisions of the Exchange Act are not applicable to mergers or other business
combination transactions because no purchase offer is being made directly to individual shareholders.

In the United States, a merger may be structured in various ways: for example, as a "direct" merger of the target
into the acquiror (which is generally not feasible for foreign acquirors of U.S. companies), a "forward subsidiary
merger" in which the target is merged into a new wholly owned subsidiary of the acquiror, or a "reverse
subsidiary merger" in which a new wholly owned subsidiary of the acquiror merges into the target (with the
target's outstanding shares being cancelled in exchange for the specified consideration, even though the target
is the "surviving" company in the merger). Both subsidiary merger structures can be utilized by foreign acquirors
through the establishment of a U.S. subsidiary. As discussed below, in most cases the shareholders of a U.S.
target must vote to approve a merger; whether the acquiror needs shareholder approval will generally be a
question of its home country law and stock exchange rules, and may depend on the structure of the transaction
and the size of the acquisition compared to the acquiror's size. In many cases, if the acquiror is a U.S. company,
it will not need shareholder approval for a merger. [148] The selection of a merger structure is generally
determined based on tax considerations and the terms of existing target (and sometimes acquiror) contracts and
licenses.

## [b] One-Step Mergers and Two-Step Tender Offer and Short-Form Mergers

Mergers of the types described above are often referred to as one-step mergers. But mergers are also often
utilized as the second step following a

p. 9-47
p. 9-48

successful cash tender offer or exchange offer for a U.S. target to acquire any shares not tendered. [149] This is
because an acquiror generally finds it undesirable to leave even a small minority of target shares outstanding
after a tender offer due to the fiduciary duties to minority shareholders imposed on the target's board.
Furthermore, in a friendly acquisition, the parties' merger agreement generally obligates the acquiror to
effectuate a second-step merger after completion of a tender or exchange offer and specifies that the merger
consideration will be equivalent to the consideration offered in the tender or exchange offer. If the remaining
shares represent a sufficiently small percentage of the outstanding shares of each class (usually less than 10%),
the second-step merger can often be accomplished as a "short-form" merger without a shareholder vote.

Under Delaware law, the affirmative vote of the holders of a simple majority of the target's outstanding shares is
required to approve a merger. [150] Prior to 2013 amendments to the Delaware General Corporation Law (the
"DGCL"), acquirors that acquired a simple majority but less than 90% of the target's outstanding shares in a
tender offer were required to go through the process of holding a shareholder vote to approve the second-step
merger, even though the result of the vote was assured.

To simplify this process, in 2014, Delaware adopted a new § 251(h) of the DGCL ( "DGCL § 251(h)") that,
subject to certain exceptions, allows the parties to an acquisition agreement to forgo the vote of the target's
shareholders to approve a "short-form" merger if the following conditions are met:

- The target's shares are listed on a U.S. national securities exchange or held of record by more than 2,000 holders immediately prior to the execution of the acquisition agreement;

- The target's certificate of incorporation does not expressly require a shareholder vote in order to approve a "short-form" merger;

- The acquisition agreement expressly permits or requires the "short-form" merger to be effected under DGCL § 251(h) and shall be effected as soon as practicable following the consummation of the tender offer if such merger is effected under DGCL § 251(h);

- The acquiror consummates the applicable tender or exchange offer for any and all of the outstanding stock of the target that, but for DGCL § 251(h),

p. 9-48
p. 9-49

  would otherwise be entitled to vote on the adoption or rejection of the merger, which offer may exclude outstanding stock of the target that, at the commencement of such tender or exchange offer, is owned by (i) the target, (ii) the acquiror, (iii) any person or parent entity that directly or indirectly owns all of the outstanding stock of the acquiror, or (iv) any direct or indirect wholly owned subsidiary of any of the foregoing;

- Following the consummation of the tender or exchange offer, the stock irrevocably accepted for purchase or exchange pursuant to such offer and received by the depository appointed to facilitate consummation of the offer prior to such offer's expiration, plus the stock otherwise owned by the acquiror equals at least such percentage of the stock, and of each class or series thereof, in the target that would otherwise be required to approve the merger pursuant to Delaware law and the target's certificate of incorporation;

- The acquiror merges with or into the target pursuant to the acquisition agreement; and

- Each outstanding share of each class or series of stock of the target that is the subject of but not irrevocably accepted for purchase or exchange in the tender or exchange offer is to be converted into the same amount and kind of consideration to be paid for the shares of such class or series of stock of the target irrevocably accepted for purchase or exchange in the tender or exchange offer. [151]

The overall effect of DGCL § 251(h) is to reduce the minimum number of shares required to be purchased in a tender offer in order for an acquiror of a Delaware corporation to avail itself of a statutory "short-form" merger (thereby avoiding the time delay of a shareholder vote to approve the second-step merger) from 90% of the target's outstanding shares to a simple majority.

As a general matter, the tender offer and "short-form" merger structure has the advantage of speed as compared to the one-step merger. Since the second-step merger can be accomplished very quickly after the consummation of the tender offer, acquirors can plan on an interim period between signing of the acquisition agreement and closing of the acquisition of approximately five to six weeks, [152] whereas a one-step merger can only be completed after a shareholder

p. 9-49
p. 9-50

vote. [153] Both parties to a merger are likely to favor the timing advantages that a two-step transaction structure can provide since the acquiror benefits by reducing the period during which the deal is subject to interloper risk, while the target reduces market risk and the period during which it could suffer a material adverse effect. [154]

DGCL § 251(h) also makes the tender offer and short-form merger structure more attractive to acquirors that finance the purchase price of the acquisition with third-party financing secured by the target's stock and assets. Before DGCL § 251(h), acquirors did not have sufficient certainty that they would receive the minimum number of shares in the tender offer to permit a short-form merger. As a result, there was a substantial risk that the acquiror would have voting control but not sole ownership of the target. As sole ownership of the target would be

required for an acquiror to obtain secured third-party financing, the acquiror using third-party financing risked having to obtain unsecured bridge financing in order to purchase the shares, thereby increasing the cost of borrowing to the acquiror. Such bridge financing would remain in place until the target could hold a shareholder vote and close the acquisition. As DGCL § 251(h) makes it easier for an acquiror to purchase sufficient shares to force a statutory short-form merger with the target, the risk of third-party lenders not providing permanent, secured financing at the closing of the tender offer is in turn reduced. [155]

p. 9-50
p. 9-51

However, the SEC still takes the view that a financing condition to the offer exists even if such condition to the offer relates to the eventual funding of an otherwise committed financing. Thus, acquirors are required to provide five business days' notice of the funding of the financing before closing the offer. [156] Acquirors either have to require their potential lenders to fund into escrow five business days prior to the closing of the offer or waive the funding condition five business days in advance of the offer's expiration and accept the risk of the financing not being available to close the transaction even though the conditions to the offer were satisfied.

## [c] Exchange Offers

Substantially all negotiated acquisitions in the United States in which Company A acquires the shares of Company B in exchange for shares of Company A have been accomplished through statutory mergers, not exchange offers in which a bidder's securities are directly offered in exchange for those of a target. Exchange offers have generally been used only in the relatively rare hostile stock-for-stock bids. As a result of changes to the SEC rules to facilitate and accelerate exchange offers, and the elimination of pooling of interest accounting under U.S. GAAP in 2001, [157] it was expected that exchange offers would begin to be used more often in negotiated stock-for-stock acquisitions. Such a trend, however, has not materialized, and exchange offers in negotiated transactions involving U.S. companies remain rare.

Exchange offers for U.S. target companies or non-U.S. target companies with U.S. shareholders are extensively regulated under both the tender offer rules described above [158] and the registration requirements for offerings of securities described below. [159]

## [4] Registration of Securities in Business Combination Transactions and Exchange Offers

## [a] Introduction

A business combination or exchange offer involving the issuance of acquiror securities to the target's shareholders constitutes an offer and sale of

p. 9-51
p. 9-52

those securities and is subject to the registration requirements of the Securities Act unless an exemption is available. [160]

The same exemptions from registration under the Securities Act available generally are also available for business combinations and exchange offers. For example, in the context of a closely held target whose shares are not publicly traded, the private placement exemption under § 4(a)(2) of the Securities Act or Regulation D thereunder may be available. [161] Similarly, the exemption under Regulation S may be available if the target shareholders receiving acquiror securities are outside the United States. [162]

In addition, as discussed below, Rule 802 under the Securities Act provides an exemption from the registration requirements for securities issued in business combinations or exchange offers to shareholders of non-U.S. companies where U.S. ownership is 10% or less (computed in accordance with the SEC's rules). [163]

Section 3(a)(10) of the Securities Act provides an exemption from the registration requirements of the Securities

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

Act for an exchange of securities approved by a court after a hearing on the fairness of the exchange open to all parties to whom securities will be issued in the exchange. This exemption would be available, for example, for shares issued in a scheme of arrangement under U.K. company law, as well as under similar mechanisms in other countries. [164]

p. 9-52
p. 9-53

Finally, a vendor placement may be possible with respect to U.S. target shareholders. [165]

Because of the cost of registration and the delay inherent in the registration process, Securities Act registration would, in many circumstances, be burdensome if not wholly impracticable for a foreign company that was not already registered and reporting under the Exchange Act [166] or substantially ready to

p. 9-53
p. 9-54

register. [167] Thus, in many cases it will not be feasible for such a foreign company to use stock consideration in an acquisition of a U.S. company or, unless an exemption is available or U.S. shareholders are excluded, [168] of a non-U.S. company with shares registered under the Exchange Act.

If registration is required in connection with a business combination transaction or exchange offer, typically the registration statement must be publicly filed [169] and is subject to SEC review. [170] However, the Jumpstart Our Business Startups Act (the "JOBS Act") may entitle the acquiror to confidential treatment of a registration statement in certain limited circumstances. In guidance relating to the application of the JOBS Act to mergers and exchange offers, the SEC staff acknowledges that emerging growth companies (or "EGCs") may use the confidential submission process set forth in § 6(e) of the Securities Act to submit draft registration statements for an exchange offer or merger that is its initial public offering of common equity securities. [171] Still, even when using the confidential treatment process, the registration statement must eventually be made publicly available. [172]

Once the registration statement becomes effective, the prospectus (in the case of an exchange offer) or proxy statement/prospectus (in the case of a business combination transaction), which is the principal part of the registration

p. 9-54
p. 9-55

statement, is mailed to the target's shareholders. [173] In most mergers, this must be done at least 20 business days prior to the shareholder meeting at which shareholders vote on the transaction. [174]

## [b] Registration of Securities of Foreign Issuers

Securities of foreign issuers offered in connection with the acquisition of a U.S. publicly traded company must be registered on Form F-4. [175] The key information that must be provided in the registration statement on Form F-4 [176] includes a business description of both companies, a description of the securities offered by the acquiror (and a comparison of the rights of holders of those securities with the securities of the target) and audited financial statements of the acquiror (reconciled to U.S. GAAP, except that such reconciliation is not required in the case of financial statements prepared in accordance with International Financial Reporting Standards ("IFRS"), as issued by the International Accounting Standards Board ("IASB") [177] [178] and, in most cases, the target, in

p. 9-55
p. 9-56

each case for the three most recent fiscal years. [179] If either the acquiror or the target company qualifies to use short-form registration statements (Form F-3 or, for domestic issuers, Form S-3), which permit incorporation of information by reference to previously filed documents, [180] the Form F-4 may likewise incorporate by reference with respect to the qualifying company. Otherwise, all required information must be set forth in the registration statement. In the context of a hostile exchange offer, the SEC is generally accommodating with respect to information on the target's business (even if incorporation by reference is not

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

p. 9-56
p. 9-57

available) and the requirement (if otherwise applicable) that a reconciliation be provided of target financials to U.S. GAAP. If financial statements for the target are required, a *pro forma* income statement of the acquiror for the most recent fiscal year (and for any interim period for which the acquiror is required to include financial statements), [181] giving effect to the acquisition, must also be included, together with a *pro forma* balance sheet as of the year end (and the end of any such interim period). [182]

An exchange offer subject to Regulation 14D under the Exchange Act may be commenced upon the filing of the registration statement (or such later time as selected by the acquiror). [183] In order to so commence prior to the effectiveness of the registration statement, the preliminary prospectus must include all material information, including pricing information (which can be formula pricing), and must be disseminated to all shareholders. The acquiror is not permitted actually to purchase any shares until the registration statement is declared effective. The SEC has committed that the staff will review registration statements on an expedited basis during the pendency of an exchange offer, but the staff notes that offerings involving novel or unusually complex issues may result in a somewhat longer review period. In certain circumstances, there will be a need to supplement the prospectus and extend the offer. [184]

The SEC takes the view that a merger or acquisition transaction is a continuous offering requiring the acquiror to update its (and the target's) financial

p. 9-57
p. 9-58

statements until shareholder approval has occurred. [185] However, if the acquiror or target, as the case may be, is a reporting company eligible for full incorporation by reference on Form F-3 or Form S-3, the Form F-4 or Form S-4 can state that it incorporates in advance future filings. In that event, the updating requirement can be satisfied by the relevant company filing the new financial statements on a Form 10-K, Form 10-Q or Form 8-K (for domestic companies) or a Form 20-F or Form 6-K (for foreign private issuers). [186] Normally no additional mailing will be required.

In the case of a merger transaction in which the target's shareholders have a right to elect between forms of consideration ( *e.g.*, the right to elect shares or cash subject to an overall limit), the parties should not have to update their proxy statement/prospectus following the shareholder vote even if the election period has not expired (which may be months later, after all regulatory approvals have been received); however, the SEC has not given any specific guidance on this issue and the matter is not free from doubt. [187]

Lock-up agreements given by major target shareholders to the acquiror committing to vote in favor of a merger (or other business combination) and entered into prior to the registration of the securities to be issued in the merger may raise issues under § 5 of the Securities Act because such shareholders have arguably made their investment decisions regarding the merger prior to registration. Despite this general presumption, and recognizing the legitimate business reasons for seeking lock-up agreements in the course of business combination

p. 9-58
p. 9-59

transactions, the SEC staff has indicated that so long as the lock-up agreements (i) involve executive officers, directors, affiliates, founders or their family members, or shareholders owning 5% or more of the target shares, (ii) the shares subject to the lock-up agreements do not represent in the aggregate 100% of the outstanding target shares, and (iii) votes will be solicited from holders of the securities who are not locked up, the staff will not view such lock-up commitments as "gun jumping" and will allow the acquiror securities to be issued to such shareholders to be included in the subsequently filed registration statement. [188] However, where such shareholders also delivered written consents at the time of the lock-up agreements, approving the merger or other business combination transaction, the SEC staff has objected to the subsequent registration on Form S-4 or F-4 of the securities to be issued because the staff takes the position that offers and sales have already commenced privately, and thus the exchange must end privately. [189]

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

## [c] Proxy Solicitation Rules

p. 9-59
p. 9-60

As noted above, an acquisition of a publicly traded U.S. target corporation through a merger will require a vote of the shareholders of the target. The SEC's proxy solicitation rules will apply if the U.S. target's shares are registered under the Exchange Act. (A foreign target company with shares registered under the Exchange Act that does not qualify as a foreign private issuer [190] is also subject to the proxy rules in connection with a business combination.)

Pursuant to Regulation 14A under the Exchange Act, if the U.S. target company's shares are registered under § 12 of the Exchange Act and the target is soliciting proxies, it may not begin actual solicitation [191] of proxies until it mails shareholders a written proxy statement containing specified types of information. [192] This requirement applies to mergers in which target shareholders will receive acquiror shares or other securities for their shares (where the Securities Act registration requirements will apply), as well as to mergers where target shareholders will receive only cash (where such registration requirements will not apply).

The proxy statement must be filed with the SEC by the target company in advance of its use and is subject to prior SEC review, and generally must be mailed to target shareholders at least 20 business days prior to the shareholder meeting. [193] In an all-cash merger, very little information concerning the acquiror is required in the proxy statement; acquiror financial statements are required only if such information "is material to an informed voting decision," such as where the acquiror's financing is not assured. [194] By contrast, in a merger involving the acquiror issuing stock or other securities, the acquiror must file a registration statement under the Securities Act, and the same document will constitute both the target's proxy statement and the acquiror's prospectus.

p. 9-60
p. 9-61

In both all-cash and mergers involving stock (or other securities) as some or all of the consideration, detailed financial and business information about the target company is required to be disclosed to the shareholders of the target company voting on the transaction, but substantially all of this disclosure can often be incorporated by reference from existing annual and quarterly reports rather than repeated in the proxy statement. As in the case of cash tender offers, proxy statements for cash mergers must include a summary term sheet in plain English, [195] and as in the case of exchange offers, proxy statements for stock-for-stock mergers need not include such a term sheet but must be in plain English. [196]

The proxy statement must also describe the background of the negotiations, the terms of the merger agreement and any related agreement, [197] reasons for the target board of directors' recommendation of the merger, a description of

p. 9-61
p. 9-62

any severance, employment or similar arrangements that will affect the target's executive officers or directors in connection with the merger, a description of any fairness opinion obtained by the target board of directors from its investment bankers (including a detailed description of the underlying analysis), [198] a description of dissenters' appraisal rights (if any), a description of any required regulatory approvals, and a description of the tax consequences to shareholders resulting from the merger. [199] If, in the course of negotiations of the merger, the target furnished material projections or similar nonpublic information to the acquiror, the SEC staff will often take the position that such projections must be summarized, even if the acquiror chose not to rely on them. [200]

## [5] Communications Issues

p. 9-62
p. 9-63

## [a] Gun Jumping and Proxy Solicitation Safe Harbors

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

When companies announce a business combination or exchange offer there has historically been a significant tension between the desire to avoid "gun jumping" [201] violations of § 5 of the Securities Act (in stock-for-stock mergers and in exchange offers) and to avoid premature solicitation of proxies in violation of the proxy rules (in mergers or other business combinations subject to the proxy rules [202]), on the one hand, and the need promptly to explain an important and potentially complex transaction to the market and to both companies' existing shareholders, on the other hand. [203]

p. 9-63
p. 9-64

The SEC has provided a safe harbor under the Securities Act and under the Exchange Act's proxy rules to permit free communications in the context of exchange offers and business combinations *before* the filing of a registration statement or proxy statement that exempts such communications from "gun jumping" and premature proxy solicitation restrictions. [204] This safe harbor applies to both oral and written communications. All written communications [205] relating to the transaction, however, must be filed on the day first used [206] in order to assure equality of information to all investors. [207] Investor slides and electronic, computer and video communications generally must also be filed. [208] This filing requirement applies from the first public announcement of the proposed

p. 9-64
p. 9-65

transaction [209] and continues at least until the vote is taken or the exchange offer is consummated or terminated. [210]

Under the JOBS Act, new Securities Act § 5(d) allows an acquiror to make confidential "test-the-waters" communications to "qualified institutional buyers" or institutional accredited investors prior to the filing of the registration statement in connection with an exchange offer or merger. However, the acquiror must make any required filings under the Exchange Act for any written communications made in connection with or relating to the exchange offer or merger. [211]

Written materials must contain a prominent legend urging recipients to read the full proxy statement or exchange offer circular when available. [212] New

p. 9-65
p. 9-66

materials that are substantially identical to prior materials need not be filed. These same filing and legending requirements apply after the registration statement is filed and after it is declared effective. [213]

In the context of mergers involving acquiror securities and exchange offers, the written materials filed are considered pre-filing prospectuses subject to § 12(a)(2) liability. Such written communications will not be subject to § 11 liability because they are not required to be incorporated by reference in the subsequent registration statement. [214] The SEC staff sometimes insists, however, that potentially material information ( *e.g.*, figures relating to synergies and other projections) included in a pre-filing prospectus also be included (or incorporated by reference) in the registration statement before the registration statement is declared effective. [215]

Notwithstanding the safe harbor for free communications, in the context of a merger involving a target shareholder vote, a proxy card (by which shareholders can vote) cannot be furnished to shareholders prior to delivery of the definitive proxy statement. [216] In addition, in the context of mergers, if the proxy statement incorporates by reference other SEC filings, [217] there is a 20-business day minimum solicitation period. [218] Moreover, unlike exchange offers for equity securities, which generally can be commenced prior to SEC review, [219] the minimum time period for a proxy solicitation for a stock-for-stock merger subject to the proxy rules cannot begin until the registration statement is declared effective.

## [b] Non-GAAP Financial Measures in the Business Combination Context

p. 9-66
p. 9-67

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

The Sarbanes-Oxley Act directed the SEC to adopt rules covering the disclosure of "*pro forma*" financial information by public companies. [220] Despite the wording of this mandate, the legislative history of the act indicated that the provision aims to cure the use of misleading non-GAAP information and not the use of *pro forma* GAAP financial information in a business combination context. [221] Accordingly, the SEC's final rules on the use of non-GAAP financial measures exclude presentations of financial measures where they are subject to the SEC's communications rules on business combinations. [222] These rules cover communications such as certain public announcements made in a merger context, as well as disclosure relating to independent appraisals and fairness opinions received by issuers in self-tender offers. Without such protection, acquirors would be prevented from presenting measures that assume cost savings or other synergies that cannot be calculated in accordance with GAAP in any meaningful way. Acquirors also would be unable to use historical non-GAAP measures to argue that target management is underperforming, an ability that can be particularly important in the hostile tender context.

## [6] Regulation M Issues

Acquirors in an exchange offer or business combination in which securities will be offered in the United States are subject to the antimanipulation provisions of <u>Regulation M</u> under the Exchange Act. [223] Whereas Rule 14e-5 under the Exchange Act generally prohibits bidders in a tender or exchange offer from purchasing securities of the *target* outside the offer, Rules 101 and 102 of <u>Regulation M</u> are designed to prevent interested parties from engaging in activities that could raise artificially the price of the securities of the *acquiror* (the "subject securities") proposed to be distributed to target shareholders in an exchange

offer or business combination. Under Rule 102, it is unlawful for issuers and "affiliated purchasers" [224] to engage in any activities involving, directly or indirectly, bidding for, purchasing or inducing others to bid for or purchase any subject security or any other covered security [225] during the applicable restricted period. [226]

In the context of business combinations or exchange offers, there can be two restricted periods. The first restricted period begins on the day of mailing of the proxy solicitation materials or the formal commencement of the exchange offer and continues through the end of the period in which the target shareholders can vote on the merger or tender their shares for exchange. [227] There will be a separate second restricted period during any time period in which (i) the market price of the acquiror's security is used to determine the consideration to be paid to securityholders in connection with the merger or exchange offer ( *e.g.*, each target share is to be exchanged for acquiror stock having a market value of $20, as so determined) or (ii) target shareholders in a business combination may make an election as to the consideration to be received ( *e.g.*, the right to elect to receive cash or shares, whether or not subject to an overall limit, and *pro rata* or other allocation procedures). The prohibitions of <u>Regulation M</u> begin to apply one or five [228] business days prior to the commencement of each restricted period. [229]

Rule 102 should not be construed to prohibit an acquiror's shareholder communications in the ordinary course of business (such as normal quarterly earnings calls or routine presentations to investors consistent with past practice) or its communications with target shareholders. However, nonordinary course presentations to the acquiror's existing shareholders or other investors (for example, to try to prop up a falling share price) could be subject to this prohibition. [230] In addition, programs implemented prior to closing to facilitate expected flowback of shares issued to target shareholders to the issuer's home market should be feasible, but consultation with the SEC staff may be advisable. Violations of <u>Regulation M</u> could delay the timing of the proposed transaction or require violating issuers to supplement their proxy solicitation materials or prospectus to reflect the information disseminated in violation of <u>Regulation M</u> and distribute the supplement to the shareholders.

The parties' financial advisors are also subject to the provisions of <u>Regulation M</u>. Unlike the acquirors (and their affiliated purchasers), however, who are subject to Rule 102, financial advisors should be eligible for the

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.                          570

Case 23-09001   Document 91-38   Filed in TXSB on 03/17/23   Page 38 of 102

U.S. Regulation of the International Securities and Derivatives Markets, §
9.05, TENDER AND...

exemptions [231] in Rule 101 from the restrictions of <u>Regulation M</u> applicable to distribution participants. [232]

# [7] Exempt Offshore Transactions

p. 9-69
p. 9-70

## [a] Introduction

As discussed above, tender offers or exchange offers made to U.S. holders of a foreign target generally must comply with the U.S. rules, even if those rules are different from or conflict with the rules applied to the bidder by the foreign target's regulators. Although bidders in friendly or agreed bids have negotiated compromises with the SEC to minimize or eliminate such conflicts, [233] bidders in hostile bids have tended to structure offers so that they cannot be accepted from the United States, thereby effectively excluding U.S. holders. [234] Despite the initial acquiescence of the courts and the SEC in this practice, the SEC subsequently expressed concern about the effects of this exclusion on the large number

p. 9-70
p. 9-71

of U.S. shareholders who own shares in foreign targets. In 1999, the SEC adopted a number of exemptions to the tender offer rules and registration requirements of the U.S. securities laws to encourage bidders to extend their tender and exchange offers and offers of securities in connection with business combinations to the U.S. securityholders of non-U.S. companies. This section discusses how bids have been structured in the past (and continue to be structured when these exemptions are not available or are considered inadequate) to exclude U.S. holders; the subsequent section discusses the 2008 Cross-Border Amendments [235] and related rules.

## [b] Historical Context

Because the most active takeover market outside the United States is in the United Kingdom, efforts by U.K. bidders to arrange bids for U.K. targets with U.S. shareholders so that the U.S. rules would not apply have provided the backdrop for development of much of the law in this area. The theory that U.K. bidders have relied on is that the registration requirements of the Securities Act and the tender offer rules under the Exchange Act should not apply if the bidder avoids, to the extent possible, making use of U.S. jurisdictional means. This avoidance is accomplished by not making the offer documentation relating to the offer available in the United States, rejecting acceptances mailed from the United States and minimizing any other direct communication of the offer into the United States. [236]

p. 9-71
p. 9-72

In the bid by the General Electric Company plc ( "GEC") in 1985 for the Plessey Company plc ( "Plessey"), a U.S. District Court held that the bidder did not have to comply with the tender offer rules under the Exchange Act. [237] That case involved a request by Plessey for a preliminary injunction to require GEC to comply with Regulations 14D and 14E under the Exchange Act. The court noted that 98.4% of Plessey's shares were held outside the United States. However, Plessey had 1.2 million ADRs held by approximately 3,000 persons in the United States that traded on the NYSE. The offer by GEC was made to all holders of Plessey ordinary shares but certain restrictions were imposed to avoid the application of U.S. rules. The court found it doubtful that GEC had used U.S. jurisdictional means to make its tender offer and noted that to find use of jurisdictional means would raise serious questions of comity. The court concluded

p. 9-72
p. 9-73

that "it would be a perversion of the principles of the [Exchange] Act to delay the processes of a quintessentially British takeover when American investors and interests are but barely touched." [238]

In 1986, when it adopted a rule requiring equal treatment of shareholders, [239] the SEC commented on the *Plessey* case as follows:

> As a result of the decision in *The Plessey Company plc v. The General Electric Company plc*, a decision with which the [SEC] concurs, the [SEC] believes the law is clear with respect to the application of § 14(d) of the Exchange Act to tender offers by bidders who are not citizens or residents of the United States and who do not employ the jurisdictional means of the United States. Accordingly, the [SEC] reiterates its position that the all-holders requirement is not intended to affect tender offers not otherwise subject to the [Exchange] Act…. [240]

In an unsuccessful bid by Hoylake Investments Ltd. ( "Hoylake") in 1989 for B.A.T. Industries plc ( "B.A.T."), the bid was made only for B.A.T.'s ordinary shares, and not for its ADRs; the offer documents were not made available in the United States; the bid could not be accepted by anyone from the United States; and the cash and securities offered in the bid would not be sent into the United States. In order to avoid the registration requirements of § 5 of the Securities Act, restrictions also would have been imposed on subsequent transfers into the United States of the securities being offered ( "flowback") for a six-month period running from the last date shares were issued in the offer. [241]

p. 9-73
p. 9-74

The SEC asked the U.K. Panel on Takeovers and Mergers whether the effective exclusion of U.S. shareholders was consistent with the requirement of the U.K. City Code on Takeovers and Mergers that the offer be made to all shareholders, and was given assurances that the offer was in compliance. Subsequently, questions were raised by the U.S. Congress as to whether the U.S. rules were applicable, and David Ruder, then-Chairman of the SEC, sent a letter to the Congress to the effect that the structure of the bid was such that the U.S. rules could not be applied on behalf of the U.S. holders.

Subsequently, the SEC issued a concept release (the "Concept Release") concerning the conflicts involved in tender offers with a multijurisdictional dimension. [242] In the Concept Release, the SEC took the position that use of jurisdictional means occurs whenever it is reasonably foreseeable that U.S. shareholders of a foreign issuer that have been excluded from an offshore offer will sell their shares into the secondary market in response to that offer. Clearly, the SEC's position in the Concept Release, confirmed by statements made by the SEC staff subsequently, was inconsistent with the statements made in former Chairman Ruder's letter and the SEC's prior statements regarding the *Plessey* case cited above. Notwithstanding the SEC's position in the Concept Release, if an offer for equity securities that are not registered under the Exchange Act is made on the basis of the restrictions imposed in the Hoylake bid [243] and that offer is challenged by the target company, its shareholders, holders of its ADRs or the SEC, a U.S. court would likely hold that the registration requirements of the Securities Act and the rules under the Exchange Act are not applicable because of insufficient use of jurisdictional means.

The Adopting Release for the 2008 Cross-Border Amendments provides additional guidance on how acquirors in cross-border business combination transactions legitimately may avoid the application of U.S. registration and tender offer rules. Whether U.S. tender offer rules apply in the context of a cross-border tender offer depends on whether the bidder uses U.S. jurisdictional means in making a tender offer. The SEC has provided guidance on measures acquirors may take to avoid using U.S. jurisdictional means through previously issued

p. 9-74
p. 9-75

releases. [244] The SEC reiterated that a legend or disclaimer stating that the offer is not being made into the United States, or that the offer materials may not be distributed there, is not likely to be sufficient in itself, because if the acquiror wants to support a claim that the offer has no jurisdictional connection to the United States, it also will need to take special precautions to prevent sales to or tenders from U.S. target holders.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                         572
All rights reserved.

The SEC also pointed out that bidders may require a representation or certification from tendering holders that they are not U.S. holders to avoid application of U.S. law. The SEC recognized the possibility that target securityholders could misrepresent their status in order to be permitted to tender into an exclusionary offer. The SEC has previously stated that where this occurs, bidders will not be viewed as having targeted U.S. investors, thereby invoking U.S. jurisdictional means. However, the SEC clarified that this position is premised on the bidder's having taken adequate measures reasonably designed to guard against purchases from and sales to U.S. holders. It is also premised on the absence of indicia, such as payment drawn on a U.S. bank or provision of a U.S. taxpayer identification number that would or should put the bidder on notice that the tendering holder is a U.S. investor.

## [c] The Problem of Flowback

Where, as discussed above, a foreign acquiror offers to exchange its securities for target shares in an exchange offer or business combination not subject to Securities Act registration in reliance on Regulation S, [245] the question can arise as to when those target shareholders may resell the acquiror securities into the United States. The principal issue is whether, in making these resales, target shareholders are entitled to rely on the registration exemption in § 4(a)(1) of the Securities Act for transactions "by any person other than an issuer, underwriter or dealer." [246] The only uncertainty regarding the availability of the exemption for target shareholders (assuming they are not securities dealers) is whether, having received the acquiror securities directly from the acquiror, the target shareholders should be treated as underwriters and thus not eligible to rely on § 4(a)(1).

Target shareholders that are neither securities dealers nor affiliates of the acquiror should be able to rely on § 4(a)(1) of the Securities Act for resales in the United States of acquiror securities received in Regulation S exchange offers

or business combinations. [247] For Category 1 and Category 2 offers, [248] the Regulation S safe harbor provides an exemption from Securities Act registration of the exchange offer without imposing resale restrictions on investors receiving securities in the offer, [249] so long as the issuer (and its affiliates and distributors, if any) conduct the exchange offer through "offshore transactions" without "directed selling efforts" in the United States. [250] The additional Category 2 offering restrictions, 40-day distribution compliance period and notice requirements do not apply to resales of securities received by such investors unless the recipient is deemed to be a distributor (or an affiliate of either the issuer or a distributor). [251] In the exchange offer or business combination context, there is often no party, other than the issuer, acting as a distributor of the securities. In cases where an investment bank or other agent acts to solicit acceptances, such an agent of the issuer should generally be treated as a distributor, in which case it should not sell into the United States or to U.S. persons any securities it receives from the issuer pursuant to the exchange offer and it should observe the Category 2 offering restrictions and notice requirements during the 40-day distribution compliance period (measured, in this context, from the close of the exchange offer or business combination) with respect to any securities issued in the offer. [252]

In contrast, Category 3 offerings under Regulation S, including, among others, [253] all offers of U.S. equity securities, do not permit subsequent unrestricted resales by recipients of securities because the Category 3 resale restrictions [254] apply to all investors during the applicable distribution compliance period. [255] As a result, except in the case of exchange offers and business combinations qualifying for an exemption under Rule 802 under the Securities Act, U.S. issuers of equity securities and other Category 3 issuers are effectively forced to file with the SEC a registration statement covering either the initial exchange offer or the possible flowback into the United States of the securities issued in the offer or business combination. [256]

A flowback registration statement [257] would theoretically offer a considerable advantage over registering the

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

initial exchange offer or business combination because it may be filed on Form S-3 or Form F-3 rather than on Form S-4 or Form F-4, and, as a result, in most cases information with respect to the target would not be required. [258] The SEC, however, has to date been unwilling to accept a flowback registration statement in this context unless each selling securityholder is listed in the prospectus, which is not likely to be practical.

## [d] Compulsory Acquisition

p. 9-77
p. 9-78

In the United Kingdom, if the bidder receives acceptances in respect of 90% of the shares that are the subject of the tender offer, it can acquire the balance of the shares that are the subject of the offer in a compulsory acquisition pursuant to which the shares are acquired without the consent of the holders. The bidder should not be required to register under the Securities Act the securities issued as part of the compulsory acquisition. [259]

## [8] Resales of Securities Acquired in an Exchange Offer or Business Combination

The resale of securities received in an exchange offer or business combination is (like the offer and sale of any securities) subject to the registration requirements of the Securities Act unless an exemption is available.

## [a] Resales by Recipients of Registered Securities

In a registered exchange offer or business combination, unless the recipient of the acquiror securities is an affiliate of the acquiror, the recipient receives freely tradable securities ( i.e., those eligible for resale under the exemptions from Securities Act registration provided by § 4(a)(1) or § 4(a)(3) of the Securities

p. 9-78
p. 9-79

Act), even if it was an affiliate of the target or held restricted securities in the target prior to the transaction.

## [b] Resales by Recipients of Unregistered Securities

If the target is closely held and the issuance of acquiror securities pursuant to the business combination transaction is structured as a private placement exempt from registration under § 4(a)(2) of the Securities Act or Regulation D thereunder, the recipient will receive restricted securities that it may resell only pursuant to another exemption. [260] In negotiating the transaction, the shareholders of a closely held target will often request resale registration rights that obligate the acquiror to register such securities for resale. [261]

## [c] Resales by Affiliates of the Acquiror

In any exchange offer or business combination, if the recipient of the acquiror securities is an affiliate [262] of the acquiror, or becomes an affiliate of the acquiror in connection with the exchange offer or business combination, the acquiror securities held by the recipient will be "control securities" subject to the resale restrictions of Rule 144. [263]

## [d] Resales of Securities Received in Exempt Offshore Transactions and the Problem of Flowback

For a discussion of the resale into the United States of acquiror securities received by target shareholders in an exchange offer or business combination not subject to Securities Act registration in reliance on Regulation S, see § 9.05[7][c].

## [e] Registration Rights Agreements in the Business Combination Context

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

p. 9-79
p. 9-80

If the acquiror securities issued in an exchange offer or business combination are unregistered, substantial shareholders of the target sometimes negotiate in order to obtain specific contractual rights with respect to registration of the shareholders' securities in order to permit their public sale. Such registration rights may take the form of the issuer's commitment either to register the shares within a specified period, upon demand (generally referred to as "demand rights"), or to include the shareholder's shares as one portion of any contemplated sale involving the filing of a registration statement within a specified period. The latter category is usually referred to as "piggyback rights" because the shareholder's offering is, in a sense, carried along as part of the primary offering contemplated by the issuer.

## [9] Exemptions for Certain Tender and Exchange Offers and Business Combinations

As noted above, in late 2008 the SEC adopted amendments to the tender offer and Securities Act exemptive rules adopted in 1999 for cross-border tender offers, business combinations and rights offerings (the "1999 Rules"). [264] The 1999 Rules established two tiers of exemptions. As described below, Tier I provides an exemption from most SEC tender offer rules, while Tier II provides limited relief from certain provisions that may be inconsistent with rules or practices outside the United States. [265]

## [a] Tier I Exemption for Tender Offers

The "Tier I exemption" [266] provides that tender offers for the securities of foreign private issuers, [267] whatever the consideration, are exempt from the U.S. tender offer rules (other than general antifraud rules) if 10% or less of the class of securities subject to the tender offer is owned by U.S. persons and certain conditions are satisfied. In making this computation, the securities held by the

p. 9-80
p. 9-81

bidder are excluded from the outstanding securities of the class ( *i.e.*, such securities are excluded from both the numerator and the denominator). [268]

In determining U.S. ownership, the bidder is required to "look through" the record ownership of certain brokers, dealers, banks or nominees appearing on the books of the issuer or transfer agents, depositaries or others acting on the issuer's behalf. [269] Securities underlying ADRs must be included in determining the amount of securities outstanding of the class subject to the offer. [270] However, other types of securities that are convertible into or exchangeable for subject securities, such as warrants, options and convertible securities, should not be taken into account in calculating U.S. ownership. The bidder's calculation of U.S. ownership must generally be made as of a date no more than 60 days before and no later than 30 days after the "public announcement" [271] of the transaction. [272]

If an acquiror is "unable to conduct" the look-through analysis described above, the SEC rules provide an alternative eligibility test based in part on a comparison of the ADTV of the subject securities in the United States to the worldwide ADTV. [273] The SEC does not define what "unable to conduct" entails,

p. 9-81
p. 9-82

leaving such inability to be assessed based on the facts and circumstances of the particular transaction. The SEC has noted, however, that the need to dedicate time and resources to the look-through process would be an insufficient reason, and stated that concerns about completeness or accuracy of available information would not be sufficient reasons without additional hindering circumstances. In each instance, the acquiror must make a good faith effort to conduct a reasonable inquiry into ascertaining the level of U.S. beneficial ownership.

The alternate eligibility test consists of three prongs. First, ADTV for the subject securities in the United States over a 12-month period ending no more than 60 days before the announcement of the transaction must be no

more than 10% (or 40% for Tier II) of ADTV on a worldwide basis. [274] In the case of negotiated transactions, there also must be a "primary trading market" for the subject securities in order for the acquiror to rely on the alternate test. [275] "Primary trading market" means that at least 55% of the trading volume in the subject securities takes place in a single foreign jurisdiction, or no more than two foreign jurisdictions, during a 12-month period ending no more than 60 days before the announcement of the transaction. [276] In addition, if the trading of the subject securities occurs in two foreign markets, the trading in at least one of the two must be larger than the trading in the United States for that class of securities. [277]

Second, the acquiror must consider information about U.S. ownership levels that appears in the most recent annual report or other annual information filed by the issuer with the SEC or with the regulator in its home jurisdiction [278] or any jurisdiction in which the subject securities trade before the public announcement of the offer. [279] If those reports indicate U.S. ownership in excess of the allowed limits, the cross-border exemption may not be permitted.

Third, if the acquiror "knows or has reason to know" that U.S. beneficial ownership exceeds the permitted percentages, the exemption is unavailable, even where all other elements of the alternate test are met. An acquiror is deemed to have reason to know information about U.S. ownership of the subject class that

p. 9-82
p. 9-83

appears in any filing [280] with the SEC or any regulatory authority in the issuer's home country or (if different) the jurisdiction in which its primary trading market is located. [281] If the acquiror and the target enter into an agreement pursuant to which the acquiror has the right to obtain information from the target, including information about U.S. ownership, it will be deemed to know any such information known to the target. [282] An acquiror is required to take into account only that information it has reason to know before public announcement of the transaction. Knowledge or reason to know acquired after public announcement will not disqualify the acquiror from relying on the exemption.

To level the playing field for competing offers, if a subsequent bidder commences a tender or exchange offer during an ongoing offer for securities of the same class, the subsequent bidder will be eligible to use the same exemption as the first bidder (Tier I, or as described below, Tier II or Rule 802) even if U.S. ownership thresholds are exceeded at the time of the subsequent bid. [283] The subsequent bidder will not, however, be entitled to rely on any exemption not also relied upon by the first bidder unless all conditions of such exemption are satisfied.

If, but for the Tier I exemption, the tender offer would have been subject to Regulation 14D under the Exchange Act, in order to utilize the exemption the bidder must submit to the SEC an English translation of the offering materials on Form CB. [284] Form CB, which consists of a cover page, the attached offering

p. 9-83
p. 9-84

materials and exhibits containing any information provided to the home jurisdiction or incorporated by reference in the home jurisdiction documents, must be received by the SEC no later than the first business day after the publication or dissemination of such informational document by the bidder in the home jurisdiction. Any subsequent offering materials must be similarly filed. If the acquiror is a foreign company, it must also appoint a process agent in the United States on Form F-X for six years from the date of filing. Form F-X requires the non-U.S. acquiror to appoint an agent upon whom process, pleadings, subpoenas or other papers can be served in connection with any SEC investigation or administrative proceeding (whether or not arising out of the offering) and any civil action predicated on an offering of securities covered by Form CB. [285]

In any Tier I offer, offering materials must be disseminated to U.S. holders, in English, on a comparable basis to that provided to shareholders in the issuer's home jurisdiction and in a manner reasonably calculated to inform U.S. holders of the offer. [286] The offering materials disseminated to U.S. holders must include all of the information included in the materials disseminated to holders in the issuer's home jurisdiction, including responsibility statements, such as "lead manager statements" setting forth representations about due diligence, even though such statements are usually excluded from U.S. offering documents in the context of conventional

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.                    576

equity offerings.

The bidder in a Tier I-exempt tender offer is required to give U.S. holders the right to participate on terms at least as favorable as those offered non-U.S. holders of the same class, [287] subject to the following exceptions for exchange offers:

- bidders may offer cash in the United States while offering securities offshore without violating the equal treatment requirements so long as they have a reasonable basis to believe that the cash being offered to U.S. securities holders is substantially equivalent to the value of the consideration being offered to non-U.S. holders; [288]

-----------------------------------------------------------------------
p. 9-84
p. 9-85

- with respect to U.S. holders residing in a state where "blue sky" laws do not provide an exemption from registration requirements, [289] a bidder may offer a cash alternative or, if it does not offer a pure cash alternative in any other jurisdiction, exclude such holders; [290] and

- a bidder is not required to offer U.S. holders "loan notes" offered to non-U.S. holders in jurisdictions where those securities afford certain tax advantages under non-U.S. tax laws and the loan notes are not listed on an organized securities market or registered under the Securities Act. [291]

The SEC's specific tender offer disclosure requirements and the numerous U.S. procedural rules (relating principally to timing, withdrawal rights and, in the case of partial offers, pro-rationing) do not apply to a tender offer qualifying for the Tier I exemption. Moreover, subject to certain conditions, Rule 14e-5 under the Exchange Act does not apply. Rule 14e-5 prohibits, in connection with a tender offer for equity securities, a covered person from purchasing or arranging to purchase any subject securities or any related securities except as part of the tender offer. [292] The conditions to the exemption from Rule 14e-5 [293] include that:

- the offering documents furnished to U.S. holders prominently disclose the possibility that purchases or arrangements to purchase may be made outside the tender offer;

- the offering documents disclose the manner in which any information about any such purchases or arrangements to purchase will be disclosed;

-----------------------------------------------------------------------
p. 9-85
p. 9-86

- the purchases or arrangements to purchase are disclosed in the United States in the same manner as in the target's home country; and

- the rules of the target's home country permit such purchases.

The SEC has not exempted Tier I transactions (or transactions qualifying for the Tier II exemption or exemptions under Rule 802) from Regulation M under the Exchange Act. [294] Regulation M restricts certain bids and purchases and solicitations of offers to purchase a security that is the subject of a distribution. The SEC has stated that it will continue to evaluate the need for exemptions from Regulation M in these transactions, having received very few requests for such relief in the past. [295]

## [b] Tier II Exemption for Tender Offers

The "Tier II exemption" [296] provides more limited relief from the U.S. tender offer rules than that provided by the Tier I exemption, to accommodate practices outside the United States. The Tier II exemption applies in circumstances where the target company is a foreign private issuer and 40% or less of the class of securities subject to the tender is owned by U.S. holders. [297] Although the Tier II exemption is not available where U.S. ownership exceeds 40% of the target, the SEC has expressed its willingness to consider on a case-by-case basis applications for exemption from the tender offer rules where there is a direct conflict between U.S. and foreign laws or practice. [298] By delegating this authority to the

-----------------------------------------------------------------------
p. 9-86

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

p. 9-87

Directors of the Divisions of Corporation Finance and Trading and Markets, the SEC has also provided for more expedited review of such cases.

The 2008 Cross-Border Amendments codify certain exemptions that were provided through no-action letters under the 1999 Rules. The amendments provide for "multiple" rather than "dual" offers, as were provided for in the 1999 Rules. [299] This allows multiple offers in multiple jurisdictions and for securityholders located both in the United States and outside the United States, as well as to offer "loan notes" or similar securities to non-U.S. holders only. [300] The 2008 Cross-Border Amendments also codify the commonly used structure of (i) an offer to securityholders resident in the United States and to all holders of ADRs, wherever resident, and (ii) a simultaneous offer to securityholders outside the United States. Some multiple offers are structured to allow U.S. holders to tender in both the U.S. offer and the non-U.S. offer in order to comply with home jurisdiction rules prohibiting the exclusion of U.S. holders from the non-U.S. offer. [301]

The rules continue to allow the announcement of an extension of an offer in accordance with home-country practice rather than the U.S. rules, [302] allow a bidder to provide a subsequent offering period, if the bidder announces the results of the offer and pays for the tendered securities in accordance with the requirements of home country law or practice, and provide a relaxation of the prompt payment rules to permit a bidder to pay for securities in accordance with the requirements of the target's home country. [303]

p. 9-87
p. 9-88

In addition to the exemptions codified in Rule 14d-1(d), in the adopting release for the 1999 Rules, the SEC stated that it would allow a bidder meeting the requirements of the Tier II exemption to reduce or waive the minimum tender condition "without extending withdrawal rights during the remainder of the offer" if certain disclosure, procedural and timing requirements are met. [304] In the 2008 Cross-Border Amendments, the SEC limited this interpretation further noting that there must exist "a requirement of law or practice in the home country justifying a bidder's inability to extend the offer after a waiver or reduction in the minimum offer condition" as long as the minimum offer condition is not reduced beyond a majority or percentage threshold required for control in the home jurisdiction. [305]

Bidders relying on the Tier II exemption in offers for equity securities registered under § 12 of the Exchange Act remain subject to the SEC's disclosure and filing obligations, certain other procedural obligations and, if applicable, the "going-private" disclosure and procedural requirements of Rule 13e-3 under the Exchange Act. [306] For example, such bidders are still required to keep an offer

p. 9-88
p. 9-89

open for 20 business days; to file a Schedule TO; to disseminate the offering documents; and to provide holders withdrawal rights until the offer becomes wholly unconditional, except in certain situations. [307] So-called "back-end" withdrawal rights, [308] however, may be suspended while tendered securities are counted where (i) the Tier II exemption is available, (ii) there is an offering period, which includes withdrawal rights, of at least 20 U.S. business days, (iii) all offer conditions have been suspended when the withdrawal rights are suspended, and (iv) withdrawal rights are only suspended during the necessary counting process period and are reinstated immediately thereafter, to the extent they are not terminated by the acceptance of tendered securities. [309]

## [c] Securities Act Exemption for Exchange Offers and Business Combinations

Rule 802 provides an exemption from Securities Act registration for securities issued in cross-border exchange offers or business combinations ( *e.g.*, mergers, amalgamations, schemes of arrangement and consolidations) to holders

p. 9-89
p. 9-90

of securities in foreign private issuers with limited U.S. ownership. [310] This Rule 802 exemption may be relied on by any acquiror, whether a U.S. or a non-U.S. issuer. [311]

© Cleary Gottlieb Steen & Hamilton LLP, 2019.          578
All rights reserved.

Under Rule 802, the securities issued in an exchange offer or business combination are exempt from registration under the Securities Act if 10% or less of the target securities are owned by U.S. holders, calculated as described above with respect to the Tier I exemption from the tender offer rules. [312] The offer must generally be made available to U.S. holders on the same basis as to other securityholders, except that the acquiror may offer a cash alternative. If it does not offer a cash alternative in any other jurisdiction, an acquiror may exclude U.S. holders in a state where the "blue sky" laws do not provide a corresponding exemption from registration. [313] If the target securities are "restricted securities" within the meaning of Rule 144 under the Securities Act in the hands of a U.S. investor ( e.g., because they were acquired in a private placement), then the securities acquired by that investor in the Rule 802 transaction are restricted securities; otherwise, they are freely tradable. [314]

Rule 802 does not require that any specific disclosure be sent to U.S. holders, except that they must be provided contemporaneously the same information that is made available to non-U.S. holders (translated into English). [315] If the issuer (acquiror) disseminates information solely by publication in its home

p. 9-90
p. 9-91

country, publication of the exchange offer or business combination is also sufficient in the United States if the information is published in a manner reasonably calculated to inform U.S. holders of the offer. [316] In addition, an issuer (acquiror) is required to provide the disclosure documents to the SEC on Form CB and, if it is a foreign company, to appoint an agent for service of process in the United States on Form F-X. [317] A legend must be included in the U.S. offer document advising U.S. offerees that the offer is being conducted in accordance with foreign disclosure and accounting requirements, that those requirements may differ from requirements applicable in the United States and that investors may have difficulties enforcing rights against the issuer and its officers and directors. [318]

The securities issued under Rule 802 may be debt or equity securities, convertible or nonconvertible. In the case of debt securities, the SEC adopted a corresponding exemption from the provisions of the Trust Indenture Act of 1939, which requires that, absent an exemption, debt securities sold to U.S. holders be issued pursuant to a trust indenture qualified under that Act. [319]

Rule 802 greatly simplified the requirements for all qualifying exchange offers and business combination transactions, but its efficacy in promoting inclusion of U.S. shareholders in acquisitions of foreign targets has been limited by the difficulty in determining the beneficial ownership of those shareholders in the manner required by the Rule. The exemption, if applicable, applies to all offers of securities, whether inside or outside the United States, so long as there are at least some U.S. shareholders of the target company and U.S. shareholders are not excluded. [320] Such offers inside the United States would therefore not need to comply with the requirement that the acquiror file a registration statement on Form S-4 (or Form F-4 in the case of a foreign acquiror) or obtain financial information about the target company reconciled to U.S. GAAP. Such offers outside the United States also would not need to comply with the requirements of Regulation S under the Securities Act, which imposes burdensome restrictions upon the ability of U.S. issuers to offer equity securities outside the United States consistent with the Regulation, including the treatment of those securities as "restricted securities." [321]

p. 9-91
p. 9-92

Despite its many advantages, acquirors contemplating reliance on Rule 802 to purchase Exchange Act-registered securities of a target using securities that are not so registered should note that they will be required to succeed to the target's Exchange Act registration obligations (including compliance with the Sarbanes-Oxley Act) unless (i) the acquiror securities are (a) exempt from registration other than pursuant to Rule 12g3-2 (which provides certain exemptions from Exchange Act registration) or (b) held of record by fewer than 300 persons or (ii) the successor issuer is a Canadian corporation meeting certain additional requirements. [322] Despite the requirement that an acquiror succeed to the target's Exchange Act registration obligations, the successor issuer may benefit from the de-registration rules applicable to foreign private issuers. A foreign private issuer is permitted under Rule 12h-6(d)(2) under the Exchange Act to take into account the reporting history of the issuer

whose reporting obligations it assumed pursuant to Rule 12g-3 for purposes of determining whether it is eligible to deregister pursuant to Rule 12h-6(a) under the Exchange Act. [323]

# [10] The Internet

The SEC has articulated certain guidance regarding disclosure over the Internet of information about tender and exchange offers conducted outside, and not including or directed to any persons resident in, the United States without triggering U.S. tender offer and securities registration requirements. [324] The SEC provided this guidance to increase the information available to U.S. investors about offshore offerings, as U.S. securityholders may benefit from timely and reliable information about foreign corporate activities even if they are not able to participate in the transactions.

The SEC has expressed concern that, in tender and exchange offers, U.S. holders of the securities subject to the offer are likely to be familiar with the issuer in question and are apt to be alerted to internet disclosure relating to such offer. In addition, the SEC has indicated that U.S. investors in such cases have a particular incentive to find indirect means to participate in the offer, even if the offer is not being made in the United States. Consequently, the SEC has advised bidders using a website to publicize a tender or exchange offer or rights offering otherwise conducted outside the United States to take "special care" that the site is not used as a means to induce indirect participation by U.S. holders of subject securities.

p. 9-92
p. 9-93

The SEC has noted two (nonexclusive) ways in which a bidder may take such "special care." First, in responding to inquiries and processing letters of transmittal, bidders may seek to obtain adequate information to determine whether the holder is a person in the United States or a U.S. person. Second, bidders may obtain representations by the investor, or anyone tendering or exchanging on the investor's behalf, that the investor is not a person in the United States or a U.S. person. In addition, in disseminating the cash or securities consideration to tendering or exchanging investors, bidders should avoid mailing such consideration into the United States. Furthermore, even with these precautions, bidders should take care that the web page is not clearly designed to induce U.S. investors to find an indirect means to participate in the offer through offshore nominees or by other means.

In the context of an offshore exchange offer over the Internet concurrent with an exempt private offering in the United States, the SEC has given additional specific guidance. In such cases, special precautions should be instituted to ensure that the internet offering is not used as general solicitation [325] to find qualified investors in the private offering. [326] The nonexclusive list of recommended measures includes:

- not including U.S. investors who respond to the offshore internet offering in the U.S. private offering;

- extending the U.S. offer only to U.S. investors who were solicited before, or independently from, the posting of offering materials on the Internet;

- using separate contact persons for the Internet solicitation and the U.S. offering; and

- not referring to the private U.S. offering in the website materials, except to the extent mandated by foreign law. [327]

# [11] Federal Margin Regulations

p. 9-93
p. 9-94

If a tender offer (or other proposed acquisition of stock of a U.S. publicly traded company) is financed through borrowings, the loan transactions [327.1] may be subject to the margin regulations promulgated by the Federal Reserve Board under the Exchange Act. The margin regulations are designed to restrict the use of credit in financing positions in securities.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.          580
All rights reserved.

There are three margin regulations, Regulations T, U and X. [328] Regulation T applies to U.S. broker-dealers. [329] Regulation U applies to U.S. banks (including U.S. agencies or branches of foreign banks) and U.S. lenders [330] other than

banks and broker-dealers. Regulation X applies to borrowers that are U.S. persons or foreign persons controlled by or acting on behalf of or in conjunction with U.S. persons. Regulation X precludes the borrower from obtaining financing outside the United States for the acquisition of a U.S. company if the financing would violate the Federal Reserve Board's margin rules were it obtained within the United States. Unless covered by Regulation X, foreign persons that obtain financing outside the United States are not themselves subject to the margin regulations but their lenders may be.

Regulation U limits the amount of loans that are (i) used for the purpose of purchasing or carrying any margin stock (which includes most equity securities publicly traded in the United States [331]) and (ii) directly or indirectly secured by margin stock. [332] These loans are permissible only if the loan value of the collateral is not less than the amount of the loan at the time the loan is made. Because the loan value of margin stock is limited to 50% of its market value, lenders in transactions subject to Regulation U generally may not finance more than 50% of the cost of an acquisition unless they do so on an unsecured basis or on the basis of sufficient [333] additional collateral other than the margin stock, such as the operating assets or the stock of wholly owned subsidiaries of the acquiring company.

A loan is directly secured by margin stock, and therefore subject to Regulation U, if a security interest is granted to the lender. However, even if a security interest is not granted to the lender, a loan may be indirectly secured by margin stock, and thus subject to Regulation U, if, as a legal or practical matter, the margin stock assets of the borrower are more readily available to the lender than to the borrower's other creditors or if the borrower's right to dispose of the margin stock assets is restricted during the term of the loan, for example through a standard negative pledge clause. Moreover, in 1986, the Federal Reserve Board adopted an interpretation of Regulation U stating that a nominally unsecured loan made to a shell company that is used to finance the shell company's acquisition of margin stock is presumed to be indirectly secured by the acquired margin

stock, with the result that such a loan is subject to Regulation U. [334] The scope of this interpretation is somewhat unclear. The interpretation addressed a shell company that had substantially no assets other than margin stock and no significant business function other than the holding of such stock. At least one subsequent staff opinion suggests that whether the presumption of indirect security applies may depend not only on the amount of the borrower's assets in addition to margin stock and on the extent of the borrower's other business operations, but also on whether such assets and operations can reasonably support the loan in light of the borrower's other liabilities and its financial condition. [335] Consistent with this view, the Federal Reserve Board's interpretation regarding loans to shell companies provides that such loans are generally not presumed to be indirectly secured where the lenders could in good faith rely on assets other than the margin stock as collateral ( e.g., where there is a guaranty from the shell company's parent or another company with substantial non-margin stock assets or cash flow) or where lenders could rely on the assets of the target because the merger will take place promptly ( e.g., where the loans are contingent on the acquisition of sufficient shares to effect a merger without the approval of the target's shareholders or directors or where the loans are contingent on the existence of a binding merger agreement with the target and the tender of a sufficient number of shares to guarantee approval of the second-step merger). [336]

# [12] Interaction of Federal and State Law

# [a] State Takeover Statutes

If the target of a bid is a foreign corporation with U.S. shareholders, the only relevant U.S. laws will normally be

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                581
All rights reserved.

the federal securities laws and SEC rules discussed above. [337] However, if the target is a U.S. corporation, the bidder will have to contend with federal and state law, and the uneasy tension that exists between the two. [338] As indicated in the discussion above, the federal rules affecting takeover bids are limited principally to procedural and disclosure rules that the SEC believes are designed neither to encourage nor discourage bids but to

enhance shareholder protection. The SEC characterizes its policy as one of neutrality. The U.S. courts have, however, held that the federal system, as embodied in the Exchange Act and the tender offer rules adopted under it (the "Federal Rules"), does not preempt state activity, even if that activity seeks to inhibit hostile offers, so long as there is no material interference with a bidder's ability to comply with the Federal Rules. Thus, states are free to amend their corporate statutes to correct any perceived imperfections in the federal system, subject to certain constitutional considerations. [339] Some of these statutes are discussed below.

Hostile takeovers were quite rare prior to the late 1970s. In the latter part of that decade and the early 1980s, however, bidders began to be more aggressive in attempting to exploit the gap between the "private market" value of a target and the public trading price for its securities. In an effort to capture as much of this "value gap" for themselves as possible, bidders sought to acquire control of targets as rapidly as possible. Bidders often tried to stampede shareholders into accepting hostile offers by, among other techniques, leaving offers open for a very short period of time, making partial offers with a very limited proration period and limiting withdrawal rights to the maximum extent possible. By the middle of the decade, however, most of these practices had been limited by SEC rules designed to give all shareholders an adequate opportunity to evaluate and, if desired, to participate in tender offers. [340]

The Federal Rules, even as amended, do not, however, place any substantive limits on takeovers, and at the end of the 1980s, there were an increasing number of leveraged takeovers by financial bidders whose goal was to break up the target and sell it in pieces in order to fund acquisition costs. These bids, often launched before financing was even in place, [341] put well-known and respected companies "in play," and led to new outcries at the state and, to a lesser extent,

the federal level. There were different and conflicting responses to this activity. The U.S. Congress was unable to agree about any change to the federal structure despite the introduction of numerous legislative alternatives. The SEC continued to take the position that its role was to promote neutrality, not to frustrate hostile activity, whatever the results of that hostile activity might be for certain companies. The action the SEC did take in the form of new rules or amendments to existing rules was justified as necessary for shareholder protection and informed shareholder choice in the corporate control market. [342] Its primary thrust was to achieve fair and equal treatment of shareholders and to provide a measured time for shareholders to respond.

State legislatures were not altogether comfortable with the response of the Congress or the SEC, and felt compelled to respond to the fears expressed by local corporations, which often were significant employers in the states involved. Thus, state legislation was enacted, both restricting bidder action and investing directors with broader discretion to fight unwanted suitors. The primary types of statutes that developed as a result of these efforts were "control share statutes" and "business combination statutes." Approximately 40 states (including Delaware and New York) have adopted one or both types of statutes. [343] Most of these statutes apply to any corporation incorporated under the laws of such state. Some of these statutes, however, do not apply unless the corporation chooses to "opt in" to their coverage, while others apply unless and until the corporation chooses to "opt out" of their coverage.

The typical control share statute allows a target company that meets the statute's jurisdictional nexus requirements to deny voting rights to certain of its shares that are classified as "control shares," unless such voting rights are "restored" by the vote of a majority of disinterested shares. "Control shares" are generally defined as shares owned by an acquiring person, which exceed specified percentage thresholds, usually 20%,

33% or 50%. These statutes, intended to help targets, arguably benefit bidders more because, in an era where most public companies have adopted or can adopt a poison pill (discussed below), the statute gives the bidder the ability to force a shareholder vote that target management will likely lose, thereby increasing the pressure on the target board of directors to negotiate with the bidder or put the target up for sale to the highest bidder. Accordingly, if relevant state law permits, a company resisting a hostile takeover will often "opt out" of such statutes.

p. 9-98
p. 9-99

Business combination statutes restrict mergers and other "business combinations" (usually defined extremely broadly) with a person who has made a substantial (usually 10%, 15% or 20%) share acquisition without prior board approval. If a hostile bidder does not get such approval, it is typically forced to wait for three to five years before it can engage in a second-step merger, other business combination with the target company or certain other types of transactions. Also, following the expiration of the specified waiting period, many business combination statutes require the acquiror to comply with complex "fair price" provisions when engaging in a cash-out merger.

In addition to these types of statutes, about 30 states have also adopted provisions permitting directors to consider various factors and constituencies in addition to shareholders in making takeover-related decisions. These provisions are typically referred to as "expanded constituency" statutes. Although the substance of these statutes varies somewhat from state to state, all are primarily designed to provide added protection for corporate directors who choose to oppose a takeover.

Most of these statutes authorize directors making takeover-related decisions (and in some states, other types of decisions) to consider both the long-term and short-term interests of the corporation and its shareholders, including the benefits from long-term plans and the possibility that these interests may best be served by the corporation's continued independence. Most of these statutes also contain a list of constituencies (in addition to shareholders) that directors may consider the interests of, or the effects of actions on, in evaluating a potential change in control of the corporation. The constituencies listed in many of these statutes include current employees, retired employees, suppliers, the corporation's customers, and the communities in which the corporation is located. Corporate statutes also were amended to permit corporations to eliminate director liability to disgruntled shareholders frustrated in their attempts to realize the highest price for their shares, unless the directors are found to have breached their duty of loyalty.

Statutes have also been adopted in Pennsylvania, South Dakota and Maine requiring persons acquiring 20% (a simple majority in the case of South Dakota, 25% in the case of Maine) or more of the voting power of a target corporation to offer to purchase the remaining shares for the "fair value" of those shares as determined by a court. [344] There is substantial question about the validity of these statutes under the U.S. Constitution, but there have been no court decisions to date addressing their constitutionality. Ohio and Pennsylvania have also adopted "profit recapture" statutes, which permit the target company to recover profits

p. 9-99
p. 9-100

from a bidder who makes an acquisition offer and then disposes of its holdings within a specified time. [345]

## [b] Poison Pills

During the 1980s, management was not content to rely entirely upon state action. Most members of management view hostile bids for their companies as anathema. They and their advisors also do not view compliance with the Federal Rules as a deterrent to a bidder. Thus, management was constantly looking for defensive measures that could either block unwelcome bidders outright or force bidders to deal directly with them. Shareholder rights plans (or so-called "poison pills") are an effective mechanism to achieve these objectives.

Poison pills are, in effect, warrants or rights that are issued as a dividend on existing shares and that trade as a

unit with the shares. In the absence of a takeover attempt, the rights have no economic significance. Typical poison pills are designed to penalize severely (and thereby, as a practical matter, prevent) bidders acquiring more than a specified percentage of the issuer's shares without target board approval. They provide that, upon the acquisition of beneficial ownership of a specified percentage of an issuer's stock, all shareholders (other than the acquiror and its affiliates and transferees) receive the right to purchase additional shares of the issuer's stock at half the market price. This would significantly dilute both the acquiror's percentage ownership and the value of the investment. Over time, issuers have become increasingly aggressive at setting the percentage of ownership that will cause the rights to "flip-in"; and while the first "flip-in" pills had triggers of 50%, now most rights plans have triggers in the range of 10 to 15%. [346] In addition, it has become common for rights plans to define "beneficial ownership" more broadly than the definition under § 13(d) of the Exchange Act, [347] so as to effectively prevent multiple activists from teaming up and potentially obtaining at least negative control. [348]

For many years, a significant majority of major public companies had poison pills in effect. However, in recent years, because of criticism by institutional investors, proxy voting services and governance professionals, most companies

p. 9-100
p. 9-101

have terminated their poison pills or allowed them to expire. [349] In most cases, however, a company can adopt a poison pill quickly by board action, without shareholder approval, if and when faced with a takeover attempt that the board of directors considers coercive or at an inadequate price.

Once a poison pill has been implemented, a takeover is, as a practical matter, impossible without board approval. As a result, unless the board is removed after a proxy solicitation by the bidder [350] or a court orders the redemption of the rights (which they are generally unwilling to do), the board can "just say no" to an unsolicited offer. [351] Accordingly, the usual tactic of bidders to get around a poison pill is to run a proxy contest to replace the target's board of directors. If the target has a staggered board, with only one-third of the directors up for election each year and directors not being removable in the absence of good "cause" (which is extremely difficult to demonstrate), a proxy contest can generally only change one-third of the directors in a given year.

## [c] Litigation

The desire by both management and state legislators to curb hostile takeovers placed the courts in a difficult dilemma. One of the characteristics of the U.S. system is the involvement of the courts in takeovers. Confronted with both parties claiming numerous violations of law in order to obtain a tactical advantage, courts had a choice: take a hands-off approach and let the market and shareholders discipline the participants, or intervene and set certain ground rules.

In the early days of hostile takeovers, courts usually dismissed claims that defensive actions by targets in hostile takeovers violated the target directors'

p. 9-101
p. 9-102

fiduciary duties. Courts generally viewed defensive tactics as a normal exercise of directors' business judgment and thus refused to hear claims challenging such tactics unless an absence of good faith could be established. [352]

This somewhat cavalier approach was rejected in 1985 by the Delaware Supreme Court. [353] Under its decision in the *Unocal* case, a board of directors' adoption of defensive measures will be protected only if the board can establish that it has reasonable grounds for believing that a danger or a threat to corporate policy and effectiveness exists, and that the defensive measures adopted were reasonable in relation to the threat posed. [354] This is generally the test that boards try to meet today in responding to bids. Despite this shift in the burden of proof, however, the key point remains that directors continue to enjoy considerable discretion to adopt poison pills and implement other structural defenses against hostile takeovers, including "lock-up" provisions, "break-up" fees and "no-shop" clauses in agreements with successful bidders. [355] However, any lock-up or similar provision

must not preclude other bids and must be reasonable. [356] Furthermore, in approving an acquisition of the company in which shareholders receive cash for all or many of their shares (or receive stock of a company that has a

p. 9-102
p. 9-103

controlling shareholder [357]), the board of directors has additional duties under *Revlon*, a 1986 Delaware Supreme Court case. Once a takeover becomes inevitable, Revlon requires directors to take steps reasonably designed to attempt to maximize short-term shareholder value. [358]

## [13] Vendor Placements

Another method of using securities of a foreign company to purchase a U.S. company is a so-called "vendor placement." In a vendor placement, the bidder typically employs a third party to sell in offshore transactions the securities to which tendering U.S. target holders would be entitled in the offer. The bidder or third party then remits the proceeds of the resale to the U.S. target holders. In several no-action letters, the staff of the SEC took the position that if a foreign company offers and issues to U.S. persons securities that are immediately resold outside the United States for the account of the U.S. person, no offer or sale (as those terms are defined in the Securities Act) to the U.S. person occurs. [359] Accordingly, the securities issued to and sold on behalf of the U.S. persons need not be registered under the Securities Act.

The no-action letters and other guidance provided by the SEC include a number of factors that the SEC looks to in deciding whether a vendor placement structure triggers the registration requirements under the Securities Act. These factors include:

- the level of U.S. ownership in the target company;

- the number of bidder securities to be issued in the business combination transaction as a whole compared to the amount of bidder securities outstanding before the offer;

p. 9-103
p. 9-104

- the amount of bidder securities to be issued to tendering U.S. holders and subject to the vendor placement, compared to the amount of bidder securities outstanding before the offer;

- the liquidity and general trading market of the bidder's securities;

- the likelihood that the vendor placement can be effected within a very short period of time ( *i.e.*, within a few business days) after the termination of the offer and the bidder's acceptance of shares tendered in the offer;

- the likelihood that the bidder plans to disclose material information, such as earnings results, forecasts or other financial or operating information, around the time of the vendor placement sales; and

- the process used to effect the vendor placement sales, such as whether the vendor placement involves special selling efforts by brokers or others acting on behalf of the bidder.

The SEC has indicated that it will no longer issue no-action letters for vendor placements, but reiterated that vendor placements may be used, provided bidders follow the guidance in previous no-action letters. [360] The SEC indicated that the two most important factors in the analysis are the liquidity of the market for the securities and the relative amount of securities going to U.S. holders. [361]

**Footnotes**

102   For purposes of calculating beneficial ownership of securities to determine whether the tender rules are applicable, ADRs are not considered a separate class of equity securities. SEC Release No. 33-6894 (May 23, 1991).

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

103  Tender offers by an issuer with a class of equity securities registered under § 12 of the Exchange Act for its own equity securities are separately regulated. *See* § 9.03.

104  Rule 14d-2 under the Exchange Act. The bidder must deliver to the target, and any other bidder, a copy of the first such communication. Rule 14d-3(a) under the Exchange Act.

105  In contrast with the U.S. approach, a U.K. offer document must be mailed to target shareholders within 28 days of the public announcement of a firm intention to make an offer. (However, the U.K. Panel on Takeovers and Mergers may grant extensions to this period, which are sometimes required to accommodate the needs of bidders registering securities under the Securities Act.) *See* U.K. City Code on Takeovers and Mergers, Rules 24.1 and 30.2.

106  "Written communications" include all information disseminated other than orally, including electronic communications and other future applications of changing technology. For example, video, audio and other electronic presentations made available for replay on a website, through a dial-in telephone number or otherwise constitute written communications and must be filed with the SEC by means of a transcript. Newspaper articles about a transaction that are disseminated by one of the parties ( *e.g.*, on a company website) or arranged or paid for by one of the parties must also be filed with the SEC. In addition, a script for a speech about the transaction that is disseminated publicly ( *e.g.*, given to an audience or attached to a press release) or widely distributed throughout the company so that the speech can be given many times (analogous to a "proxy solicitation script") must also be filed with the SEC. *See* SEC Release No. 33-7760 (Oct. 22, 1999), 64 Fed. Reg. 61,408, 61,412 n.37 (Nov. 10, 1999); SEC, Division of Corporation Finance, Manual of Publicly Available Telephone Interpretations, Third Supplement (July 2001) (hereinafter, " Regulation M-A and Cross-Border Release Interpretations"); and § 9.05[5][a] for further discussion of this issue.

107  Rules 14d-2(b)(2) and 14d-9(a)(2) under the Exchange Act. These filings are made on Schedules TO and 14D-9, respectively, on which the "preliminary communications" box is checked. When used for pre-commencement communications, however, only the cover page of the respective schedule is filed with the attached communication; the complete schedules are filed only on (in the case of Schedule TO) or after (in the case of Schedule 14D-9) formal commencement of the offer as described below. "Stop-look-and-listen" communications, which are communications by the target board to its shareholders that merely identify the bidder, state that the tender offer is under consideration, state that the board will advise the shareholders of its recommendation regarding the offer and request that shareholders defer their decision to accept or reject the tender offer until the board publishes its recommendation, do not have to be filed or include a legend. Rule 14d-9(f) under the Exchange Act.

108  Instruction 3 to Rule 14d-2(b)(2) and Instruction 3 to Rule 14d-9(a)(2) under the Exchange Act.

109  Rule 14e-8 under the Exchange Act; *see also* § 9.02[2].

110  By contrast with the SEC, the U.K. Panel on Takeovers and Mergers and the takeover regulators in each other European Economic Area state require that a bidder should only announce a firm intention to make an offer once it has arranged its financing. *See* U.K. City Code on Takeovers and Mergers, General Principle 5 and Rule 2.7; the EU's Directive of the European Parliament and of the Council on Takeover Bids of Apr. 21, 2004 (Directive 2004/25/EC), Art. 3(1)(e).

111  *See* Schedule TO, Instruction 5 to Item 10; *see also* § 9.05[3][b] for a discussion of second-step mergers and § 4.05[5][a] for a discussion of significance tests, which reflect the "significance" of an acquired business by comparing to the acquiror's most recent audited financial statements (i) the amount of the acquiror's proposed investment in the business to be acquired, (ii) the total assets of the business to be acquired and (iii) the pre-tax income of the business to be acquired. This *pro forma* information must be included because the effective investment decision is being made at the time shareholders decide whether to tender or to wait for the second-step merger and remain as shareholders in the combined business. This requirement does not apply to hostile two-step transactions. The stated reason for its inapplicability in hostile transactions is that the bidder may not have adequate access to target information to prepare reliable *pro forma* financial statements. *See* SEC Release No. 33-7760 (Oct. 22, 1999). Nonetheless,

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                                                      586
All rights reserved.

Case 23-09001   Document 91-38   Filed in TXSB on 03/17/23   Page 54 of 102

U.S. Regulation of the International Securities and Derivatives Markets, §
9.05, TENDER AND...

subject to Rule 409 under the Securities Act, which provides that a registrant need only include information in its registration statement insofar as it is known or reasonably available to the registrant, the SEC has long required *pro forma* financial statements in hostile exchange offers, and bidders have managed to prepare them.

112   Such financial information may be included or, if the bidder is eligible, incorporated by reference in Schedule TO; if, however, the financial information is incorporated by reference, at least summarized financial information must be disseminated to securityholders. *See* Schedule TO, Instruction 6 to Item 10; <u>Regulation M-A</u> and Cross-Border Release Interpretations, Question I.H.7.

113   *See* Item 1001 of <u>Regulation M-A</u> under the Securities Act.

114   In the context of reviewing a Schedule TO (utilized in the context of an offer for registered equity securities), the SEC staff is likely to inquire as to whether target management provided its projections to the bidder and, if so, require them to be disclosed. *See infra* Note 200 and accompanying text.

115   *See* SEC Release No. 33-7760 (Oct. 22, 1999). The plain English requirement also applies to proxy statements/prospectuses for stock-for-stock mergers.

116   *See* SEC Release No. 34-43069 (July 24, 2000). If the conditions are not objective or are within the bidder's control ( *e.g.*, the offer may be terminated for any reason or may be extended indefinitely), in the SEC's view, the offer would be illusory and may constitute a "fraudulent, deceptive or manipulative" practice within the meaning of § 14(e) of the Exchange Act.

117   Rule 14d-3(b) under the Exchange Act.

118   Rules 14e-2 and 14d-9 under the Exchange Act; Schedule 14D-9, Item 4.

119   Rules 14e-2 and 14d-9 under the Exchange Act; Schedule 14D-9, Items 3 and 7.

120   Rules 14e-2 and 14d-9 under the Exchange Act; Schedule 14D-9. Prior to the time when a full Schedule 14D-9 is filed, all management's pre-commencement communications must generally be filed on Schedule 14D-9 no later than the date of their first use, except "stop-look-and-listen" communications, which are exempt from filing. *See supra* Note 107.

121   *See* § 9.02 for a description of procedural rules applicable to all tender offers.

122   Rule 14e-1 under the Exchange Act. The SEC interprets Rule 14d-4(d)(2) under the Exchange Act, which sets forth minimum time periods necessary for dissemination of material changes in a registered securities offer ( *i.e.*, a tender offer in which the consideration consists solely or partially of securities registered under the Securities Act) that commences early, as applying to all tender offers, including those subject only to <u>Regulation 14E</u>. *See* SEC Release No. 33-7760 (Oct. 22, 1999). The SEC has stated that if a bidder intends to reduce the offer price by any cash or other distributions to securityholders by the target, the bidder should disclose this prospective offer price reduction in its description of the offer price and that if a distribution occurs and the offer price is reduced, the bidder must extend the tender offer, if required under Rule 14e-1(b), so that the offer remains open for at least ten business days following the date of the notice of the change in the offer price. *See* SEC Release No. 34-43069 (July 24, 2000).

Prior to the 2008 Cross-Border Amendments, the staff of the SEC granted exemptive relief from Rule 14e-1(b) to permit a material change to the offer to be made by the bidder even if the offer would not remain open for at least ten business days from the date that notice of such change was first published, sent or given to securityholders. For example, in January 2006, the SEC staff issued exemptive relief from Rule 14e-1(b) in a cross-border offer for a Danish company, listed on the NYSE with securities registered under § 12 of the Exchange Act, to permit the offer price to potentially decrease as a result of a dividend payment or other distribution made by the target without the tender offer remaining open for at least ten days from the date of notice of any such potential decrease. *See Nordic Telephone Company ApS* (avail. Jan. 3, 2006); *see also Axel Springer AG* (avail. Sept. 12, 2005) and *BCP Crystal Acquisition GmbH & Co.* (avail. Feb. 3, 2004), in which the SEC granted relief from Rule 14e-1(b) to allow the bidders to extend the initial offering period for only the maximum two-week period required under German law in the event of a material change to the terms of the offer during the last two weeks of the offer; and *Bayer Entities* (avail. June 29,

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

2006), in which the SEC granted relief from Rule 14e-1(b) to allow the bidder to rely on a mandatory two-week subsequent offering period rather than extend the offer if market purchases at a price higher than the offer price resulted in a mandatory increase of the offer price under German law. The offer in *Nordic Telephone* was eligible for the Tier II exemption; the offer in *Axel Springer* could have been eligible for the Tier II exemption but for the fact that the target was not a foreign private issuer; and the offer in *BCP Crystal* was not eligible for the Tier II exemption. *See* § 9.05[9][b] for a discussion of the Tier II exemption.

The SEC has also provided no-action relief from Rule 14e-1(b) to permit an increase in the offer price in the event a certain percentage of target securities are tendered as an incentive to target securityholders. *See STATS ChipPAC Ltd.* (avail. Mar. 15, 2007) (permitting an incentive payment if 90% tender threshold was reached if, among other things, a subsequent offering period is provided or extended so that the offer including the subsequent offering period remains open for ten U.S. business days after the announcement of the increase in the offer consideration); *Alcan, Inc.* (avail. Oct. 7, 2003) (permitting an incentive payment if 95% tender threshold was reached without an extension of the offering period or a subsequent offering period).

The SEC has also granted no-action relief from Rule 14e-1(b) where the exact number of shares and the offer price were not disclosed in the tender offer, but the terms of a pricing methodology to determine the number of shares and offer price were fully disclosed at the time of the commencement, despite the fluctuation in share price that could result from using a pricing methodology rather than a set offer price. *See Lloyds Banking Group plc* (avail. May 28, 2010); *see also Towers Watson & Co.* (avail. May 17, 2010).

123  Rule 14d-7 under the Exchange Act. For these purposes, a "subsequent offering period," described below, is not an extension of the expiration of the offer and is disregarded. Thus, shares tendered during the original offer can, and (subject to the offer's conditions) must, be purchased at the end of the main offer and prior to the commencement of a "subsequent offering period."

124  Rule 14d-10 under the Exchange Act. Following its adoption in 1986, the best-price rule required that "the consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder during the tender offer." SEC Release No. 34-23421 (July 17, 1986), 51 Fed. Reg. 25,873, 25,878 (July 17, 1986). This language resulted in a significant number of shareholder class actions, claiming that amounts paid to target executives as retention bonuses or pursuant to golden parachutes or similar arrangements actually constituted additional payments for the executive's shares, to which all of the target company's public shareholders were entitled. In 2006, the SEC unanimously approved amendments that modified the basic language of the best-price rule to require that "[t]he consideration paid to any security holder *for securities tendered in* the tender offer is the highest consideration paid to any other security holder *for securities tendered in* the tender offer." Rule 14d-10 under the Exchange Act (emphasis added). By eliminating the previous references to consideration paid "pursuant to the tender offer" and "during the tender offer," the SEC clarified that the best-price rule applies only with respect to the consideration offered and paid for securities tendered in a tender offer. SEC Release No. 34-54684 (Nov. 1, 2006), 71 Fed. Reg. 65,393, 65,407 (Nov. 8, 2006). The adopting release also explicitly confirmed the SEC's view that the best-price rule is not applicable to arrangements between a bidder (or the target) and target shareholders where the shareholders do not tender their shares in the tender offer. SEC Release No. 34-54684 (Nov. 1, 2006).

125  A bidder for ADRs or the underlying shares will be required under the all-holder provision of Rule 14d-10 under the Exchange Act to make a tender offer for both the ADRs and the underlying shares, unless the SEC provides exemptive relief.

126  Rule 14d-8 under the Exchange Act. The SEC staff has granted relief from this requirement where certain non-pro rata purchases are required under local law. *See Advanced Semiconductor Engineering, Inc.* (avail. Dec. 28, 2015) (granting relief where Taiwanese law required the tender offer to include an odd-lot provision).

127  *See* § 9.05[3][b].

128  Rule 14d-11 under the Exchange Act. Prior to the 2008 Cross-Border Amendments, the subsequent

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

offering period was between 3 and 20 business days. The amendments now permit the period to be longer than 20 business days.

129   Rule 14d-11 under the Exchange Act. Following the effectiveness of Rule 14d-11, the SEC staff initially took the position that a decision to have a subsequent offering period is itself a material change requiring disclosure five business days before expiration of the initial offering period. The result was that most bidders chose not to use a subsequent offering period because announcing this intention five business days before the close of the initial offering period created a risk of holdouts to the initial offer. In 2001, the SEC staff stated that a subsequent offering period does not require the five-business day advance notice if the bidder announces in its initial offer (or during the course of the offer but at least five business days before the expiration) that it may include a subsequent offering period, explains what a subsequent offering period is and announces the commencement of the subsequent offering period in the required notice announcing the results of the initial offer (by 9:00 A.M. Eastern time on the business day after the expiration date). Rule 14d-11(d) under the Exchange Act; Regulation M-A and Cross-Border Release Interpretations, Question I.J.1.

130   Rule 14d-1(d)(2)(iv) under the Exchange Act. In particular, the SEC staff has granted exemptions from Rule 14d-11(d) under the Exchange Act where such a tender offer is not a Tier II offer (and thus ineligible for the codified relief under the 2008 Cross-Border Amendments) but applicable laws in the home jurisdiction would allow the bidder to delay the commencement of the subsequent offering period. *See China National Chemical Corporation and CNAC Saturn (NL) B.V.* (avail. Mar. 21, 2016) (granting no-action relief where Swiss law permitted bidders to pay for shares tendered in the subsequent offering period after the expiration of that period, even if more than 20 business days after the date of tender); *Acorda Therapeutics, Inc.* (avail. Mar. 8, 2016) (granting no-action relief where, in accordance with customary Finnish market practice, bidders were permitted to accept shares tendered in the subsequent offering period on a periodic basis (approximately every week) and make payment for such shares up to five Finnish banking days after acceptance); *Oak Leaf B.V., Acorn B.V and Acorn Holdings B.V.* (avail. May 21, 2013) (granting no-action relief where Dutch law permitted bidders to determine within three Dutch trading days whether to declare the conditions to the tender offer satisfied or to instead commence a subsequent offering period); and *Echo Pharma Acquisition Limited* (avail. May 1, 2013) (granting no-action relief where Irish law permitted bidders to pay for shares tendered within 14 calendar days from the end of the initial offering period or from the date of tender in the subsequent offering period).

131   Rule 14d-7(a)(2) under the Exchange Act. Even before the introduction of subsequent offering periods in the United States, the SEC had allowed withdrawal rights to be terminated in tender offers for non-U.S. companies whose shares trade in their home markets and are also registered under § 12 of the Exchange Act in order to allow compliance with U.K. rules. The SEC has codified its practice of granting exemptions from the withdrawal rights provisions of Rule 14d-7 in connection with certain tender offers for foreign private issuer targets. *See* § 9.05[9].

132   Exchange Act Rule 14d-1(d)(2)(viii) under the Exchange Act. Prior to the 2008 Cross-Border Amendments, the staff of the SEC had granted exemptions from Rule 14d-11(f) in the cross-border context where Brazilian law required an incremental interest payment for shares tendered during the subsequent offering period (also granting relief from the requirement in Rule 14e-1(b) under the Exchange Act that an offer be extended in the event of an increase in the offer price). *See Telemar Participações S.A.* (avail. Oct. 9, 2007). After the adoption of the 2008 Cross-Border Amendments, the staff of the SEC has continued to grant exemptions from compliance with Rule 14d-11(f) on a case-by-case basis where the tender offer in question is not a Tier II offer (and thus ineligible for the codified relief) but where the conflict between foreign law and U.S. tender offer rules still remains. *See Empresa Brasileira de Telecommunicacoes* (avail. Oct. 15, 2010) and *GTIS Partners LP and GP Capital Partners IV, L.P.* (avail. Mar. 27, 2015). *See also Kraft Foods, Inc.* (avail. Dec. 9, 2009) (granting no-action relief where U.K. law required a "mix and match facility" allowing shareholders to receive either additional shares or a cash payment in Kraft's tender offer for Cadbury). *See also Alamos Gold Inc.* (avail. Mar. 7, 2013) (granting no-action relief where Canadian law required that the bidder be permitted to use a proration mechanism during its subsequent offering period).

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

133   The term "related securities" is defined as "securities that are immediately convertible into, exchangeable for, or exercisable for" securities of the same class as securities for which the tender offer is being made. Rule 14e-5(c)(6) under the Exchange Act.

134   Rule 14e-5 under the Exchange Act. The prohibition does not apply to purchases or arrangements to purchase during a subsequent offering period as provided in Exchange Act Rule 14d-11 so long as the form and amount of consideration for such purchases are the same as that offered in the tender offer. For a discussion of subsequent offering periods, *see supra* Note 123.

135   In the context of a friendly offer, the SEC has clarified that the target company is considered to be "acting in concert" with the bidder and, accordingly, is a "covered person" falling within the Rule 14e-5 prohibition on purchases outside a tender offer. *See* SEC Release No. 33-7760 (Oct. 22, 1999). Because the definition of "covered person" includes "any person acting, directly or indirectly, in concert with any … other covered persons," SEC Release No. 33-7760 (Oct. 22, 1999), 64 Fed. Reg. 61,408, 61,431 at n.242 (Nov. 10, 1999), Rule 14e-5 may also extend to the target company's financial advisors in this context.

136   The exemption does not apply to all riskless principal purchases, but rather only to purchases "[a]s principal for its own account if the dealer-manager or its affiliate is not a market maker, and the purchase is made to offset a contemporaneous sale after having received an unsolicited order to buy from a customer who is not a covered person." Rule 14e-5(b)(4)(ii) under the Exchange Act.

137   Rule 14e-5 applies to any financial advisor to a bidder if the advisor's compensation is dependent on completion of the offer, even if it is not acting as dealer-manager for the tender offer. However, as drafted, this exception is only available to the dealer-manager. Nonetheless, the SEC staff has informally indicated that it is willing to read the term "dealer-manager" broadly to pick up entities performing similar functions but denominated "financial advisors" or the like.

138   As drafted, this exemption does not cover affiliates of a financial advisor not acting as dealer-manager. Rule 14e-5(b)(8) under the Exchange Act. *But see supra* Note 135. Although Rule 14e-5(b)(8) provides a potentially broad exemption for purchases made by certain affiliates of the dealer-manager that have appropriate firewalls in place to prevent the sharing of nonpublic information with the dealer-manager and that are not made for the purpose of facilitating the tender offer, this exemption has proved of limited use in cross-border tender offers, because the staff of the SEC has interpreted the requirements of this exemption to mean that the dealer-manager relying on the exemption must be an SEC-registered broker-dealer, a requirement that many non-U.S. financial advisors do not meet, and that all dealer-managers in the transaction or persons performing similar roles be broker-dealers registered under § 15 of the Exchange Act. *See* Regulation M-A and Cross-Border Release Interpretations, Question I.L.7; § 9.05[9][a].

139   Rule 14e-5(b)(9) exempts purchases or arrangements to purchase if (i) the tender offer is for the securities of a foreign private issuer, (ii) the tender offer is subject to the U.K. City Code on Takeovers and Mergers, (iii) the purchases or arrangements to purchase are effected by a connected exempt market maker or a connected exempt principal trader (as those terms are used in the City Code), (iv) such market maker or trader complies with the applicable provisions of the City Code and (v) certain required disclosure is included in the tender offer documents.

140   *See* Rule 14e-5(b)(10) under the Exchange Act. *See* § 9.05[9][a] for a discussion of the Tier I exemption.

141   *See* Rule 14e-5(b)(11) under the Exchange Act, codifying the class-wide no-action relief granted to Mittal in its acquisition of Arcelor. *See Mittal Steel* (avail. June 22, 2006). *See* § 9.05[9][b] for a discussion of the Tier II exemption. For exemption under Rule 14e-5(b)(11), (i) the tender offer must qualify as a Tier II tender offer under Rule 14d-1(d), (ii) the economic terms and consideration in the U.S. tender offer and foreign tender offer(s) must be the same, provided that any cash consideration to be paid to U.S. securityholders may be converted from the currency to be paid in the foreign tender offer(s) to U.S. dollars at an exchange rate disclosed in the U.S. offering documents, (iii) the procedural terms of the U.S. tender offer must be at least as favorable as the terms of the foreign tender offer(s), (iv) the intention of the offeror to make purchases pursuant to the foreign tender offer(s) must be disclosed in the U.S. offering documents, and (v) purchases must be made solely pursuant to the foreign tender offer(s) and not pursuant to an open

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

market transaction(s), a private transaction(s) or other transaction(s). The SEC has issued no-action letters granting exemptive relief for tender offers under Rules 14e-5(b)(11) and (12) despite the nonavailability of Tier II exemptive relief. *See America Movil* (avail. Apr. 23, 2010); *VimpelCom Ltd.* (avail. Feb. 5, 2010). In both cases, Tier II exemptive relief was unavailable solely because the percentage of outstanding shares held by U.S. residents was greater than 40%. *See also Enersis Americas S.A. and Endesa Americas S.A.* (avail. Aug. 24, 2016) (granting relief for the solicitation of shareholder approval for a merger involving a target company, the shares of which were then subject to a pending tender offer).

142  *See* § 9.05[9][b] for a discussion of the Tier II exemption.

143  For purchases by an affiliate of a financial advisor, (i) the financial advisor and the affiliate must maintain and enforce written policies and procedures reasonably designed to prevent the transfer of information between the financial advisor and affiliate that might result in a violation of U.S. federal securities laws and regulations through the establishment of information barriers, (ii) the financial advisor must have an affiliate that is registered as a broker or dealer under § 15(a) of the Exchange Act, (iii) the affiliate must have no officers (or persons performing similar functions) or employees (other than clerical, ministerial or support personnel) in common with the financial advisor that direct, effect or recommend transactions in the subject securities or related securities who also will be involved in providing the offeror or subject company with financial advisory services or dealer-manager services, and (iv) the purchases or arrangements to purchase must not be made to facilitate the tender offer.

The SEC acknowledged in the Adopting Release for the 2008 Cross-Border Amendments that the level of normal business activity may fluctuate once a tender offer is announced, but noted that if purchasing activity after the announcement of a tender offer far exceeds the usual or expected level of activity, it could potentially be a red flag of improper facilitation. In so noting, it acknowledged potential implications of a focus in the 2008 Cross-Border Amendments on the level of activity rather than the nature of activity, where the prior focus was on the nature of the activity. *See* Adopting Release for the 2008 Cross-Border Amendments, Section II.C.7.b, 73 Fed. Reg. 60,050, 60,069 (Oct. 9, 2008).

Prior to the 2008 Cross-Border Amendments and the adoption of Rule 14e-5(b)(12), the SEC staff informally indicated that it did not view the then-available exemptive relief covering trading activities of financial advisors and their affiliates as encompassing risk arbitrage activities, and the SEC's initial proposal for the 2008 Cross-Border Amendments included specific language to expressly exclude risk arbitrage from Rule 14e-5(b)(12)'s scope. *See* SEC Release No. 33-8917 (May 6, 1998). Although this language was not included in the final version of the rules, the SEC stated directly in the Adopting Release for the 2008 Cross-Border Amendments that purchasing activity by an affiliate of a financial advisor, including risk arbitrage, made to facilitate the tender offer will not be eligible for the exception. *See* Adopting Release for the 2008 Cross-Border Amendments, Section II.C.7.b, 73 Fed. Reg. 60,050, 60,069 (Oct. 9, 2008). Regarding the exemptive relief available prior to the 2008 Cross-Border Amendments, *see the Cleary Gottlieb Letter* ( *see infra* Note 144).

Financial advisors to the bidder or target may be subject to Rule 14e-5 under the Exchange Act because they are acting in the capacity of "dealer-manager" to the bidder, because their compensation is dependent on the completion of the offer or because they are considered to be acting directly or indirectly in concert with a covered person ( *e.g.*, the target in a friendly transaction). The exemptions described above are meant to allow a financial advisor's ordinary course trading activities to continue notwithstanding the restrictions imposed by Rule 14e-5 under the Exchange Act during a tender offer in which the financial advisor is involved.

The SEC staff has previously provided relief where the bidder, target or an affiliate of the bidder or target is in the banking or financial services sector to permit trading activities involving target securities by such entities on both a proprietary basis and on behalf of their customers, notwithstanding the fact that the rule would otherwise preclude such trading activities. *See, e.g.*, *Barclays PLC and ABN Amro Holdings N.V.* (avail. Apr. 24, 2007).

144  *See* Rule 14e-5(b)(12) under the Exchange Act, codifying the class-wide relief granted to Sulzer AG in its

acquisition of Bodycote International plc and to Goldman Sachs International and similarly situated financial advisors (and their affiliates and separately identifiable departments). *See Sulzer AG* (avail. Mar. 2, 2007); *see also the Cleary Gottlieb Letter*.

For this exemption to be available, (i) the covered person must reasonably expect that the tender offer meets the conditions for reliance on the Tier II cross-border exemptions of Rule 14d-1(d) ( *see* paragraph 3 and 4 of this Note for further discussion), (ii) no purchases or arrangements to purchase outside the tender offer may be made in the United States, (iii) the U.S. offering materials must prominently disclose the possibility of, or the intention to make, purchases or arrangements to purchase subject securities or related securities outside the tender offer, and if there will be public disclosure of purchases of subject or related securities, the manner in which information regarding such purchases will be disseminated, and (iv) there is public disclosure made in the United States, to the extent that such information is made public in the subject company's home jurisdiction, of information regarding all purchases of subject securities and related securities otherwise than pursuant to the tender offer from the time of public announcement of the tender offer until the tender offer expires. For purchases by an offeror or its affiliates, there is a requirement that the tender offer price will be increased to match any consideration paid outside the tender offer that is greater than the tender offer price. This condition is satisfied if the laws of the relevant home jurisdiction or the terms of the tender offer provide for matching the higher consideration and the offeror complies with such provision. *See* Adopting Release for the 2008 Cross-Border Amendments, Section II.C.7.b, 73 Fed. Reg. 60,050, 60,069 (Oct. 9, 2008).

*See* § 9.05[9][b] for a discussion of the Tier II exemption. The SEC, since the 2008 Cross-Border Amendments went into effect, has granted no-action letters for companies that have complied with all the conditions of Rule 14e-5(b)(12)(i) except for the requirement that the financial advisor reasonably expects the tender offer to meet the requirements of the Tier II cross-border exemption. In these cases, the SEC has granted no-action relief, subject to a number of trading restrictions and disclosure requirements. *See Braas Monier Building Group* (avail. Oct. 25, 2016); *Songbird Estates PLC* (avail. Dec. 19, 2014); *VimpelCom Ltd.* (avail. Feb. 5, 2010); *Kraft Foods, Inc.* (avail. Dec. 9, 2009).

Prior to the 2008 Cross-Border Amendments and the changes to Rule 14d-1 under the Exchange Act, a letter from Cleary Gottlieb included the following note regarding the financial advisors' reasonable belief that an offering would be Tier II eligible: "[I]n many jurisdictions it may be difficult or impossible to 'look through' record ownership to determine beneficial ownership or to 'look back' to determine ownership percentages as of the date 30 days before the commencement of the tender offer, tests contained in Rule 14d-1 to ascertain the availability of the Tier II exemption. … Financial [a]dvisors and other transaction participants will make a determination of the percentage of the target held by U.S. shareholders … based upon information to the extent known or which can be obtained without unreasonable effort or expense, and will exclude the bidder and greater than 10% holders from such calculations as prescribed in the instructions to Rule 14d-1, notwithstanding the lack of literal compliance with the counting rules of Rule 14d-1 to ascertain Tier II eligibility." *Cleary Gottlieb Steen & Hamilton LLP* (avail. Apr. 4, 2007) (the "*Cleary Gottlieb Letter*"). This may serve as useful guidance in assessing whether the requirements of Rule 14e-5(b)(12) are satisfied, though the rule has been modified, as discussed. Note that the reference to 10% holders no longer applies, as such holders no longer must be excluded from calculations of U.S. ownership.

145  A separate issue is whether the non-U.S. financial advisor is acting in the same capacity as a "dealer-manager," the term used in Rule 14e-5(b)(8).

146  Rule 13e-1 under the Exchange Act.

147  *See* DEL. CODE ANN. tit. 8 § 251 (2016).

148  Generally in an acquisition for cash, a U.S. acquiror does not need shareholder approval. In an acquisition for stock, a U.S. acquiror will need shareholder approval if it lacks sufficient authorized-but-unissued shares under its certificate of incorporation or if such approval is required by applicable stock exchange requirements. Both Nasdaq and NYSE-listed U.S. companies generally need shareholder approval to issue more than 20% of their outstanding shares in connection with an acquisition. Both Nasdaq and NYSE,

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

however, generally waive the requirement for foreign private issuers. *See* § 5.05[6] for a discussion of the NYSE's corporate governance requirements and waiver policy and § 5.05 for a discussion of Nasdaq's requirements and policies.

149   As a general matter, U.S. corporate law does not have a compulsory acquisition provision following a successful tender offer. However, as discussed in greater detail below, an acquiror may be required to consummate a second-step merger following successful completion of a tender offer effected pursuant to an acquisition agreement that contemplated such a merger under § 251(h) of the Delaware General Corporation Law.

150   *See* DEL. CODE ANN. tit. 8 § 251(c) (2014).

151   *See* DEL. CODE ANN. tit. 8 § 251 (Supp. 2016).

152   This estimated timing between signing and closing assumes that the tender offer will be launched within one to two weeks after signing the acquisition agreement and that all regulatory approvals and conditions to closing in the merger agreement can be achieved while the tender offer remains outstanding. If consummation of the transaction will be subject to regulatory approval that is not likely to be received prior to the consummation of the tender offer ( *e.g.*, under applicable antitrust or competition laws), acquirors will typically prefer the one-step merger as the timing advantage afforded by a two-step tender offer and statutory merger cannot be realized and receipt of the shareholder approval required in a one-step merger may serve to deter interlopers during the period following the shareholder vote when the required clearances remain pending.

153   For U.S. public company targets, a shareholder vote requires preparing a proxy statement, filing it with the SEC and circulating it to shareholders, which process typically takes two to three months or longer if the SEC determines to review the "preliminary" proxy statement initially filed.

154   DCGL § 251(h) also eliminates the need for work-arounds developed by practitioners in the United States to manage the risk of failing to receive 90% of the target's shares in the tender offer. For example, in a typical non-§ 251(h) tender offer and second-step merger, the target will issue to the acquiror a "top-up option" to purchase the amount of the target's authorized but unissued shares that results in the acquiror owning one share more than 90% of the target's outstanding shares, which option is exercisable if the acquiror receives in the tender offer the minimum number of shares required to approve the transaction in a shareholder vote. However, the feasibility of using a top-up option depends on both the number of shares acquired in the tender offer and the number of authorized and unissued shares available for issuance upon exercise of the top-up option.

155   It should be noted, however, that in timing the tender offer and short-form merger, parties must take care to structure the transaction to avoid violating the Federal Reserve Board's margin rules that limit a lender's ability to lend money where such obligation is secured by margin stock, which includes any U.S. publicly traded equity security. Generally, the margin rules limit the amount of borrowing against margin stock to 50% of the value of such stock. Thus, parties must either limit the amount of debt financing used for the purchase or structure the transaction in such a way so that the debt financing is never secured, directly or indirectly, by margin stock. The margin rules are discussed in greater detail in § 9.05[11].

156   *See* § 9.02[2].

157   Pooling of interest accounting treatment for mergers under U.S. GAAP was eliminated in 2001 pursuant to the Financial Accounting Standards Board's Statement 141, Business Combinations. Since that time, mergers accounted for under U.S. GAAP must use purchase accounting treatment.

158   *See* § 9.02, § 9.05[1] and § 9.05[2].

159   *See* § 9.05[4].

160   *See* Rule 145 under the Securities Act with respect to Securities Act registration requirements in the context of a shareholder vote regarding a business combination and § 9.05[7][c] and § 9.05[8] with respect to Securities Act registration requirements relating to the resale of securities received originally in an offer exempt from registration; *see also* § 3.04[10], Note 81 (discussing Exchange Act current reporting

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

obligations in the context of transactions, including business combinations, in which a shell company reporting under the Exchange Act ceases to be a shell company).

161   *See* § 7.02[1] and [2] for a discussion of § 4(a)(2) of the Securities Act and Regulation D thereunder.

162   *See* § 8.02 for a discussion of Regulation S under the Securities Act. The use of the Regulation S exemption by acquirors that are U.S. issuers in this context may not be practical, however,  as equity securities of U.S. issuers acquired pursuant to a Regulation S offering are "restricted securities" under Rule 144(a)(3) under the Securities Act. *See* § 7.03[2] for a discussion of restricted securities and Rule 144 under the Securities Act.

163   *See* § 9.05[9][c].

164   *See, e.g.*, *Flamel Technologies S.A.* (avail. July 14, 2016) (Ireland); *Nabi Biopharmaceuticals/Biota Holdings Limited* (avail. June 20, 2012) (Australia); *AngloGold Limited* (avail. Jan. 15, 2004) (Ghana); *Constellation Brands, Inc.* (avail. Jan. 29, 2003) (Australia); *Gilat Satellite Networks Ltd.* (avail. Dec. 19, 2002) (Israel); *Ashanti Goldfields Company Limited* (avail. June 19, 2002) (Cayman Islands); *Xyratex Group Limited* (avail. May 29, 2002) (England and Wales); *ICICI Bank Limited* (avail. Dec. 13, 2001) (India); *John Wood Group PLC* (avail. Mar. 1, 2001) (Scotland); *Galen Holdings PLC* (avail. Aug. 7, 2000) (Ireland); *The Development Bank of Singapore Ltd.* (avail. Aug. 12, 1999) (Singapore); *Source Media, Inc.* (avail. Dec. 3, 1996) (Ontario, Canada); *National-Oilwell, Inc.* (avail. July 30, 1997) (Alberta, Canada); *Buffelsfontein Gold Mining Co. Limited* (avail. Apr. 9, 1996) (South Africa). However,  compulsory acquisition provisions that (as in the case of § 974 of the U.K. Companies Act 2006) only allow access to a court by a disgruntled minority holder would not satisfy the requirement  of § 3(a)(10) of the Securities Act that a court rule on the fairness of the exchange. If an issuer submits a no-action request very close to the fairness hearing date, the Division of Corporation Finance may not have adequate time to consider the issues presented and respond before the hearing.

The SEC staff has issued guidance on the application of § 3(a)(10), clarifying a number of key practical and interpretive  issues, including the following:

- The SEC's Division of Corporation Finance will not issue no-action relief after a § 3(a)(10) fairness hearing has been held.

- Although an issuer's solicitation of votes by securityholders on a transaction prior to a fairness hearing constitutes an offering, this should not prevent § 3(a)(10) from being available, so long as the issuer submits to the court or relevant government  entity the disclosure materials pursuant to which the securities are offered before sending them to the offerees.

- When options, warrants or other convertible securities are issued in a § 3(a)(10) transaction, § 3(a)(10) does not exempt their later exercise or conversion.

- Following the amendments to § 18 of the Securities Act (*exempting* certain securities from state registration or qualification laws) effected by the Securities Litigation Uniform Standards Act of 1998 excluding securities issued in a § 3(a)(10) transaction from the coverage  of the § 18 *exemption*, fairness hearings conducted under state securities law may now be relied upon for § 3(a)(10) purposes. (Conversely,  securities issued in a § 3(a)(10) transaction are no longer exempt from state registration or qualification requirements.)

- Hearings held in foreign courts may suffice for § 3(a)(10) purposes, provided that they satisfy all the requirements  applicable to exchanges approved  by U.S. courts and the issuer provides the SEC's Division of Corporation  Finance with an opinion of counsel licensed to practice in the relevant foreign jurisdiction stating that before the court can give its approval of the transaction, it must consider its fairness to the persons receiving the securities.

- Holders reselling securities received in § 3(a)(10) transactions must resell them in the manner permitted by clauses (c) and (d) of Rule 145 under the Securities Act (governing  the sale of securities in connection with reclassifications of securities, mergers, consolidations and asset acquisitions). *See* § 9.05[8] and § 9.05[7][c]. Following amendments to Rule 145(c), which

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

eliminated the presumptive underwriter provision except in transactions involving a shell company, securities received in a Rule 145(a) transaction not involving a shell company and meeting the § 3(a)(10) exemption may generally be resold without regard to Rule 144 under the Securities Act if the sellers are (i) not affiliates of the issuer of the § 3(a)(10) securities and (ii) have not been affiliates within 90 days of the date of the exempt transaction.

*See* SEC, Division of Corporation Finance, Staff Legal Bulletin No. 3A (CF) (June 18, 2008), Fed. Sec. L. Rep. (CCH) ¶60,003.

165   *See* § 9.05[13] for a discussion of vendor placements.

166   Even if the acquiror is registered and reporting under the Exchange Act, if financial statements complying with Item 18 of Form 20-F have not been filed, it would be difficult to avoid delay. *See* § 4.07[11] for a discussion of Item 18 financial statements. In addition, financial information would have to be included for the target unless certain conditions are met. *See infra* Note 179; *see also* Rule 3-05(b)(2) of <u>Regulation S -X</u>.

167   Of course, in a friendly context, the target company may be willing to allow the bidder sufficient time to complete the registration process. For example, in Stora Enso Oyj's acquisition of Consolidated Paper, Inc. in 2000, Stora Enso's registration statement on Form F-4 also served as its initial U.S. public offering document.

168   For a discussion of the exclusion of U.S. shareholders, *see* § 9.05[7].

169   It is likely, however, that the SEC would be willing to afford a foreign issuer's Form F-4 registration statement confidential treatment if it contains the issuer's initial public offering prospectus.

170   *See* § 3.02[3] for a general discussion of the timing of the registration process.

171   SEC, Division of Corporate Finance, Generally Applicable Questions on Title I of the JOBS Act, Question 43 (Dec. 21, 2015).

172   In the context of an exchange offer, if an EGC uses the confidential submission process to submit a draft registration statement and does not commence its exchange offer before the effectiveness of the registration statement, it must publicly file the registration statement (including the initial confidential submission and all amendments) at least 15 days before the earlier of the road show, if any, or the anticipated date of effectiveness of the registration statement. An EGC that commences its exchange offer before the effectiveness of the registration statement pursuant to Rule 162 under the Securities Act must publicly file the registration statement (including the initial confidential submission and all amendments thereto) at least 15 days before the earlier of the road show, if any, or the anticipated date of effectiveness, but in no event later than the date of commencement of the exchange offer. SEC, Division of Corporate Finance, Generally Applicable Questions on Title I of the JOBS Act, Question 44 (Dec. 21, 2015).

173   In a merger involving the acquiror issuing stock or other securities, the target's proxy statement also constitutes the prospectus that is part of the acquiror's registration statement under the Securities Act. Issuers that file proxy statements for business combination transactions are no longer permitted to do so on a confidential basis, unless the participants do not avail themselves of the free communications safe harbor discussed in § 9.05[5][a] and disclose *only* the very limited information permitted by Rule 135 under the Securities Act. This Rule 135 standard applies even for cash merger proxy statements.

174   *See* Form F-4, General Instruction A.2. This 20-business day requirement only applies if the proxy statement is incorporating other SEC filings by reference, as is generally the case. The requirement is designed to afford the securityholders time to retrieve the information incorporated by reference. In cases where this option is not chosen by the registrant, the timing requirements in respect of delivering proxy statements are governed purely by state law, the registrant's charter and bylaws and applicable stock exchange requirements. *See, e.g.,* NYSE Listed Company Manual § 401.03, which recommends that a minimum of 30 days be allowed between the record date and meeting date for a shareholders' meeting to give ample time for the solicitation of proxies.

175   In rare circumstances, registration may also be required under applicable state securities (or "blue sky")

laws in connection with a merger. *See* § 3.02[8] for a discussion of "blue sky" laws. Section 18 of the Securities Act contains an exclusion for "covered securities," which include securities traded on a major U.S. securities exchange. Also, many states' "blue sky" laws provide that registration of a merger is not required if the shareholders have voted as a class to approve the merger because a "sale" for purposes of such laws has not occurred or it is a merger transaction exempt from registration.

176 Additional information is required to be included in order to comply, in the case of an exchange offer, with the tender offer rules described in § 9.02 and § 9.05[1] and, in the case of a business combination, with the proxy solicitation rules described in § 9.05[4][c].

177 For a discussion concerning IFRS relief, *see* § 4.05[1].

178 Registrants that do not report financial statements in accordance with U.S. GAAP (or IFRS, as issued by the IASB) may use the "pooling of interest" (or "merger") method of accounting for business combinations in circumstances where it would not be permitted under U.S. GAAP (or IFRS, as issued by the IASB), provided that its use is permitted by the accounting principles under which the registrant's financial statements are prepared and certain other conditions are met. SEC Release No. 33-7119 (Dec. 13, 1994).

179 Form F-4 requires that financial information be included for the target unless the *acquiror's* shareholders are not voting on the transaction, the target is not significant to the acquiror at the 20% level and the target is not a reporting issuer. Form F-4, Item 17(b)(5). For a discussion of the significance tests, *see* § 4.05[5][a]. Form F-4 also provides that the target company's financial statements for the latest fiscal year need be audited only to the extent practicable and that the financial statements for the fiscal years before the latest fiscal year need not be audited if they were not previously audited. *See* Form F-4, Item 17(b) and Instruction 1 to Item 17(b)(6). The target's financial statements generally must be reconciled to U.S. GAAP unless they are IASB IFRS financial statements or unobtainable without unreasonable cost or expense and, at a minimum, a narrative description of all material differences between U.S. GAAP and the relevant non-U.S. GAAP (other than IASB IFRS) is disclosed. If the target is a nonreporting company and the acquiror's shareholders are not voting on the transaction, only the most recent fiscal year financial statements need be provided. It is likely to be impossible to obtain the consent of a hostile target's auditors to the use of their audit opinion, but such consent need not be obtained if it is impracticable to do so and application to this effect is made to the SEC pursuant to Rule 437 under the Securities Act.

Although the SEC considers the inclusion of reconciled financial information of the target to be necessary to allow target shareholders to compare what they get in an exchange offer to what they give up, this requirement is onerous if the target is not a U.S. company, and it has led to U.S. holders being excluded from some offers to avoid registration of those offers. Nevertheless, the requirement that financials be included and reconciled as to nonreporting issuers only when the target is significant at the 20% level or the acquiror's shareholders are voting on the transaction is an improvement over the prior rule requiring inclusion and reconciliation irrespective of the target's materiality with respect to the acquiror. Where the target does not report in the United States, however, 20% may still be too low a significance threshold, leading, we suggest, to the unnecessary exclusion of U.S. holders in some offers. *See* § 9.05[7].

The disclosure requirements for a registered exchange offer are more onerous than the disclosure requirements applicable to registered securities offerings for cash to finance an acquisition, particularly with respect to the provision of target company financial information. For example, no financial statements of the target are required in a registration statement for an offering to raise cash to finance an acquisition of that target unless the acquisition is material to the acquiror at the 50% significance level, not the 20% significance level applicable to a registered exchange offer. Rule 3-05(b)(4) of Regulation S -X. Similarly, if the acquiror's shares are issued privately to shareholders of the target, and the acquiror registers such shares on Form F-3 for resale by such selling shareholders, no financial statements of the target are necessary unless the acquisition is material to the acquiror at the 50% significance level.

180 For a discussion of short-form registration statements, *see* § 3.02[1][b].

181 *See* § 4.05[2] for a discussion of requirements for interim period financial statements.

182 Such *pro forma* financial information must be reconciled to U.S. GAAP (unless prepared in accordance with

© Cleary Gottlieb Steen & Hamilton LLP, 2019.     596
All rights reserved.

IFRS, as issued by the IASB) whether or not the target's financials are so reconciled. *See supra* Note 179 as to when target financial statements are not required and thus *pro forma* information is not required. In such circumstances, the staff also will not object to the omission of comparative per share information and financial and related information required under certain Items of Regulation S -K. *See* Regulation M-A and Cross-Border Release Interpretations, Question I.H.2.

183   Rule 162(a) under the Securities Act. Such early commencement is also available in the context of an issuer tender offer under Rule 13e-4. In Rule 13e-3 "going-private" transactions and roll-up transactions, the offer cannot commence until the registration statement is declared effective by the SEC. "Going-private" transactions are transactions in which the public shareholders are being asked to (or forced to) exchange their shares for something other than full-voting common shares, instituted by controlling shareholders of a public company with the aim of eliminating its outstanding equity and thereby returning it to private ownership. A roll-up transaction is a transaction involving the combination of one or more partnerships in which some or all of the partners receive new securities or securities in another entity. *See* § 9.03[2] for a discussion of Rules 13e-3 and 13e-4 under the Exchange Act.

184   Rule 14d-4(d) under the Exchange Act. Following effectiveness, a comprehensive final prospectus reflecting all supplements must be filed. However, unless the preliminary prospectus was materially deficient, a comprehensive final prospectus does not need to be delivered to shareholders so long as a preliminary prospectus and prospectus supplements have been delivered in accordance with Rule 14d-4(b) under the Exchange Act. *See* Rule 162(b) under the Securities Act, which provides an exemption from the prospectus delivery requirements of § 5(b)(2) of the Securities Act.

185   *See* SEC, Division of Corporation Finance, Financial Reporting Manual, Topic 6230.1 (Mar. 17, 2016). For a discussion of delayed and continuous offerings, *see* § 3.02[2].

186   The JOBS Act also provides some additional relief to EGC acquirors in presenting financial statements of the acquiror and the target. If the acquiror is an EGC that is not a shell company and has presented only two years of financial statements in its registration statement for the exchange offer or merger, the SEC has indicated that it would not object if such an acquiror includes only two years of financial statements for the target company in the registration statement. *See* SEC, Division of Corporate Finance, Generally Applicable Questions on Title I of the JOBS Act, Question 45 (Dec. 21, 2015).

187   Following the shareholder vote, such updating should no longer be necessary, as there should be no "sale" triggering the applicability of the Securities Act's registration requirements, even where shareholders later make an election with respect to whether they will receive acquiror shares, cash or a combination of both. The SEC staff has taken the position, in the related context of the application of the registration requirements of the Securities Act to stock/cash dividend elections and dividend reinvestment and bonus plans providing for a dividend payable at the option of the shareholder in securities or cash, that no registration is required. This is because such election does not involve the surrender of "value," which, under § 2(3) of the Securities Act, is the principal characteristic of a "sale." *See, e.g., JDN Realty Corporation* (avail. Oct. 26, 1999); *Greencore Group plc* (avail. July 3, 1996); *Medeva plc* (avail. Jan. 31, 1995); *Burns, Philp & Company Limited* (avail. Sept. 2, 1994). The same analysis should apply in the case of elections by target shareholders to receive merger consideration in the form of cash, acquiror shares or a combination of both, though there is no SEC guidance directly on point. If the companies qualify for incorporation by reference (and thus benefit from forward incorporation), however, this updating question often may not be significant.

188   *See* SEC Division of Corporation Finance, Compliance and Disclosure Interpretations, Securities Act Sections, § 239.13 (Nov. 26, 2008).

189   *See* SEC Division of Corporation Finance, Compliance and Disclosure Interpretations, Securities Act Sections, § 239.13 (Nov. 26, 2008). Acquirors should consider carefully whether to obtain such written consents from the target shareholders given the interplay between disclosure requirements under the Exchange Act and existing Delaware case law. In *OmniCare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del. 2003), the Delaware Supreme Court held that where shareholders holding the requisite number of

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                     597
All rights reserved.

shares needed to approve a deal have irrevocably committed to vote to approve such deal, the board may not agree to other restrictions that prevent it from considering a superior proposal from another potential acquiror. There, the Delaware Supreme Court found that irrevocable consents obtained from target shareholders, when taken together with provisions in the acquisition agreement that prohibited the board from discussing superior proposals with other potential acquirors and that required the target to hold a shareholder vote (regardless of whether the board changed its recommendation to shareholders to approve the transaction) absolutely precluded other potential acquirors from coming forward with a superior proposal. In the court's view, consents that would absolutely "lock up" a transaction are therefore impermissible under Delaware law. *Omnicare*, 818 A.2d 914, 934–938. *See also* § 9.05[12][c] for a discussion of Delaware case law regarding defensive measures.

Despite the holding in *Omnicare*, in certain instances, it is still possible to effectively "lock up" a transaction by obtaining the requisite number of written consents from shareholders immediately after the board of directors approves the transaction. Since *Omnicare*, Delaware courts have held that there is no required minimum period of time between obtaining board approval for a transaction and the shareholder vote. *See Optima International v. WCI Steel*, C.A. No. 3833-VCL (Del. Ch. June 27, 2008). By obtaining the shareholder approval at essentially the same time as the approval of the board of directors and closing the acquisition shortly thereafter, the period of time during which a superior proposal may emerge (and therefore the period of time during which the target's board of directors must be free to consider a superior proposal per *Omnicare*) is effectively eliminated.

190  *See* § 3.01[1], Note 1 for a discussion of the definition of a foreign private issuer.

191  The concept of solicitation is very broad and includes any oral or written statement intended to lead to the grant of a proxy. However, as discussed in § 9.05[5][a], SEC rules permit free communications to be made prior to the furnishing of a proxy statement, provided that a proxy card is not furnished and certain other requirements are met.

192  If fewer than ten shareholders hold the necessary number of votes to assure approval of the merger and the solicitation of proxies is done by the acquiror (not the target), a written proxy statement may not be necessary. Rule 14a-2(b)(2) under the Exchange Act. In those circumstances, however, Regulation 14C requires delivery of an "information statement" to any shareholders from whom proxies are not solicited at least 20 days prior to consummation of the merger. Rule 14c-2(b) under the Exchange Act. The information statement requires substantially the same information as a proxy statement and, in a stock-for-stock merger, can also constitute the acquiror's prospectus included in its registration statement.

193  Schedule 14A, Note D.3 (Rule 14a-101 under the Exchange Act); *see supra* Note 174 in respect of the 20-business day requirement.

194  Schedule 14A, Instruction 2.a. to Item 14.

195  *See* Item 1001 of Regulation M-A under the Securities Act; § 9.05[1].

196  *See* SEC Release No. 33-7760 (Oct. 22, 1999); § 9.05[1].

197  When describing the terms of a merger agreement or any related agreement in a disclosure document (or including such an agreement as an exhibit to a disclosure document), an issuer must consider whether additional disclosure is necessary to put into context the information contained in, or otherwise incorporated by reference into, the document so that the information is not false or misleading.

In 2005, in connection with settling a separate enforcement action against The Titan Corporation alleging violations of the Foreign Corrupt Practices Act of 1977 (the "FCPA"), the SEC issued a Report of Investigation on potential liability under §§ 10(b) and 14(a) of the Exchange Act. In Titan's proxy statement for its (subsequently abandoned) merger with Lockheed Martin Corporation, Titan had disclosed that the merger agreement contained representations and warranties by Titan expiring on completion of the merger "as to, among other things … Titan's compliance with the [FCPA]," and the merger agreement containing the unqualified FCPA representation was appended to the proxy statement filed with the SEC and distributed to Titan's shareholders. Although the report does not allege that Titan violated Rules 10b-5 and 14a-9 under the Exchange Act in respect of its merger proxy statement, the report highlights for issuers

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                     598
All rights reserved.

their responsibility to ensure the accuracy of disclosure of material contractual provisions, such as representations and covenants, contained in agreements disclosed in or appended to public filings, whether or not the agreements containing such provisions were themselves prepared as disclosure documents or the issuer intended public shareholders to rely on such provisions. *See* SEC Release No. 34-51283 (Mar. 1, 2005).

In 2010, Bank of America Corporation settled charges brought by the SEC that the proxy materials in connection with Bank of America's acquisition of Merrill Lynch & Co. represented that Merrill Lynch had agreed it would not pay bonuses to its executives prior to the closing of the merger without Bank of America's consent. The SEC's complaint alleged that the disclosure on bonuses was rendered materially false and misleading by the omission of disclosure of an exception permitting payments of certain bonuses that was reflected in a confidential disclosure schedule to the merger agreement, and that Bank of America was in violation of § 14(a) of the Exchange Act and Rule 14a-9 thereunder. In connection with the settlement, Bank of America acknowledged that an evidentiary basis existed for certain factual matters underlying the SEC's complaint but did not ultimately admit or deny any alleged wrongdoing. *SEC v. Bank of America Corp.*, SEC Litigation Release No. 21407 (Feb. 4, 2010).

Issuers filing agreements as exhibits to public SEC filings should consider including disclosure in their filings to the effect that (i) the representations and warranties in such agreements (a) were made solely for the benefit of the parties thereto, (b) may have been used for the purpose of allocating risk between the parties, rather than establishing matters of fact, and (c) may have been qualified by disclosure contained in separate disclosure schedules (which, in accordance with Item 601(b)(2) of Regulation S-K, may be omitted from the filing in the case of merger and similar agreements) or by materiality standards that differ from what may be viewed as material for securities law purposes, (ii) certain representations may have been made as of a specified date and may no longer continue to be true as of a later date, and (iii) the agreement is not intended to provide any other factual or financial information about the issuer other than the terms of such agreement and should be read in conjunction with the other information contained in the issuer's other SEC filings. At the same time, issuers should be sensitive to the need to disclose any material information about the transaction, including any condition that reasonably could be anticipated to be difficult to satisfy.

198  In 2008, the SEC approved a proposal by FINRA to adopt a rule on fairness opinion disclosures. SEC Release No. 34-58643 (Sept. 25, 2008); FINRA Rules, Rule 5150, FINRA MANUAL. The rule requires FINRA members, when rendering a fairness opinion that the member knows or has reason to know, at the time it issues the fairness opinion, will be provided or described to public shareholders, to make certain specified disclosures in the fairness opinion, including (i) whether the member has acted as a financial advisor to any party to the transaction and whether any compensation that the advisor will receive, for rendering the fairness opinion or serving as an advisor, is contingent upon the successful completion of the transaction, (ii) whether the member will receive any other significant payment or compensation contingent upon the successful completion of the transaction, (iii) any material relationship that existed between the advisor and any party to the transaction during the past two years or is mutually understood to be contemplated in which any compensation was received or intended to be received, (iv) any information that formed a substantial basis for the fairness opinion that was supplied to the member by the company requesting the opinion and whether any such information has been independently verified by the member, (v) whether or not the fairness opinion was approved or issued by a fairness committee and (vi) whether or not the fairness opinion expresses an opinion about the fairness of the amount or nature of the compensation to any of the company's officers, directors or employees, or a class of such persons, relative to the compensation to the public shareholders of the company. In addition, the rule requires a FINRA member to adopt and maintain written procedures with respect to the composition of its fairness committee and the circumstances in which the member will use a fairness committee and a process to determine the appropriateness of the valuation analyses used FINRA Rules, Rule 5150, FINRA MANUAL.

199  *See* Schedule 14A, Item 14.

200  The Delaware courts as part of their review of a target board's compliance with Delaware judicial "full

disclosure" requirements also appear to be moving toward requiring more disclosure of projections provided to the acquiror or a target's investment banks and valuation methods used by the target's investment banks in preparing a fairness opinion where those methods are key to understanding the value of the target company; note, however, that this is a highly fact-specific inquiry. *See Koehler v. NetSpend Holdings, Inc.*, C.A. No. 8373-VCG, 2013 WL 2181518 (Del. Ch. May 21, 2013) (noting that where a board of directors elects to engage in a single-bidder process, the court will more closely scrutinize the quality of an investment bank's fairness opinion in order to determine whether the board engaged in "a process reasonably designed to maximize price" despite the absence of an external market check); *Maric Capital Master Fund, Ltd. v. PLATO Learning, Inc.*, 11 A.3d 1175 (Del. Ch. 2010) (holding that exclusion of free cash flow estimates provided to the advisory investment bank by the target constituted a material omission because, in the context of a cash-out merger, the "value of stock should be premised on the expected future cash flows"); *In re Netsmart Technologies, Inc. Shareholders Litigation*, 924 A.2d 171 (Del. Ch. 2007) (failing to disclose projections used by financial advisors to perform a discounted cash flow evaluation establishes a probability that disclosure is materially incomplete). *But see In re BioClinica, Inc. Shareholder Litigation*, Consol. C.A. No. 8272-VCG, 2013 WL 5631233 (Del. Ch. Oct. 16, 2013) (holding that shareholders are entitled to "a 'fair summary' of the inputs and procedures used to construct the fairness opinion [but] are not entitled to the granular details of why certain inputs were selected or rejected"); *In re Micromet, Inc. Shareholders Litigation*, C.A. No. 7197-VCP, 2012 WL 681785 (Del. Ch. Feb. 29, 2012) (noting that a target is not obligated to disclose speculative information "which would tend to confuse shareholders or inundate them with an overload of information"); *In re Checkfree Corporation Shareholders Litigation*, C.A. No. 3193-CC, 2007 WL 3262188 (Del. Ch. Nov. 1, 2007) (noting that even in a cash-out merger, a company is not required to provide all estimates of future results); *In re PNB Holding Co. Shareholders Litigation*, No. Civ. A. 28 N, 2006 WL 2403999 (Del. Ch. Aug. 18, 2006) (same).

201  "Gun jumping" involves offers made prior to the filing of a registration statement, and written offers (other than by means of a preliminary prospectus) made after filing but before the registration statement is effective. *See* § 3.02[3].

202  Foreign private issuers are exempt from the proxy rules. Rule 3a12-3 under the Exchange Act. However, as discussed in § 9.05[4][c], if a U.S. issuer (or a foreign company that does not qualify as a foreign private issuer) is being acquired in a merger (or other business combination requiring shareholder approval), the proxy rules will be applicable.

203  For further discussion of communications issues arising in the merger context, *see* §§ 4.07[7] (discussing disclosure of preliminary merger negotiations) and 4.10 (discussing communications with financial analysts).

204  *See* Rules 165 and 425 under the Securities Act and Rule 14a-12 under the Exchange Act.

205  *See supra* Note 106.

206  Although communications released after 5:30 P.M. Eastern time can be filed on the next business day as early as practicable, the filing requirement creates difficulties for press releases issued late in the afternoon. Unintentional or immaterial delays will not, however, preclude reliance on the exemption.

207  Even if the acquiror were to limit its public statements to what is permitted under Rule 135 under the Securities Act as not constituting an offer, a copy of the Rule 135 notice must be filed under Rule 425 under the Securities Act. Rule 425(b) under the Securities Act. Domestic issuers disclosing information relating to the business combination transaction on a Form 8-K may use the Form 8-K simultaneously to satisfy their reporting obligations under Rule 425, provided that the Form 8-K filing meets all the substantive requirements of Rule 425 (other than Rule 425(c)) and the issuer checks the appropriate box on the cover sheet of the Form 8-K. Information voluntarily filed on a Form 8-K by a domestic issuer or on a Form 6-K by a foreign private issuer does need to be filed under Rule 425 even if it relates to the business combination. *See* Regulation M-A and Cross-Border Release Interpretations, Question I.B.13.

Information that is required to be disclosed in an annual or other Exchange Act report need not be filed under Rule 425, so long as the information is being disclosed solely to satisfy the requirements of the

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

report. The SEC staff has also clarified that "business information that is factual in nature and relates solely to ordinary business matters, and not the pending transaction, does not need to be filed." SEC Release No. 33-7760 (Oct. 22, 1999), 64 Fed. Reg. 61,408, 61,412 (Nov. 10, 1999). It also explained that it expected "that filing persons [would] apply traditional legal principles in determining whether a particular written communication is made in connection with or relating to a proposed business combination transaction." SEC Release No. 33-7760 (Oct. 22, 1999), 64 Fed. Reg. 61,408, 61,412 (Nov. 10, 1999); see also Regulation M-A and Cross-Border Release Interpretations, Question I.D.1.

208  Transcripts of oral presentations also need to be filed if the presentations are made available through audio or visual recordings after their initial live presentation, e.g., through a website or a call-in telephone number. Similarly, scripts for presentations need to be filed if they were distributed to investors or widely distributed throughout the company so that the speech can be given many times. See Regulation M-A and Cross-Border Release Interpretations, Questions I.B.2-4; see also supra Note 106 and accompanying text.

209  Thus it appears that press releases announcing "bear hugs" or similar offers to a target board involving the proposed issuance of acquiror securities, and subsequent press releases by the potential acquiror, need to be filed even if no exchange offer is threatened or contemplated. See Regulation M-A and Cross-Border Release Interpretations, Question I.A.2. (A bear hug involves an offer to the target board that the potential acquiror publicly announces in order to put pressure on the target board to negotiate.)

210  The SEC Release adopting Rule 165 states that filings are required until "the close of the proposed transaction." SEC Release No. 33-7760 (Oct. 22, 1999), 64 Fed. Reg. 61,408, 61,413 (Nov. 10, 1999). This would be illogical in the context of a transaction subject to regulatory or other delays. Once shareholders have made their investment decision by voting, filings generally should not be required between the date of the meeting and receipt of regulatory approvals. The SEC staff has indicated that it agrees with this position, as evidenced by its statement that communications required by Rule 165 under the Securities Act must be filed only "until the offering period is over." See Regulation M-A and Cross-Border Release Interpretations, Question I.B.17.

211  See SEC, Division of Corporate Finance, Generally Applicable Questions on Title I of the JOBS Act, Question 42 (Dec. 21, 2015).

212  The SEC has provided guidance regarding the requirement of a legend for electronic communications made through platforms that limit the number of characters or amount of text that can be included in such communication, such as those made available through certain social media websites. The SEC has stated that it will not object to the use of an active hyperlink to a legend to satisfy the requirements of Rules 134(b) or 134(d) under the Securities Act in the following limited circumstances:

- The electronic communication is distributed through a platform that has technological limitations on the number of characters or amount of text that may be included in the communication;

- Including the required statements in their entirety, together with the other information, would cause the communication to exceed the limit on the number of characters or amount of text; and

- The communication contains an active hyperlink to the required statements and prominently conveys, through introductory language or otherwise, that important or required information is provided through the hyperlink.

Where an electronic communication is capable of including the required statements, along with the other information, without exceeding the applicable limit on the number of characters or amount of text, the use of a hyperlink is inappropriate. See SEC Division of Corporate Finance, Compliance and Disclosure Interpretations, Securities Act Rules, § 110.01 (Apr. 21, 2014).

In addition, where an electronic communication platform permits the user to re-transmit a posting or message received from another party, such re-transmission is not attributable to the issuer so long as the transmitting party is neither an offering participant nor acting on behalf of the issuer or an offering participant and the issuer has no involvement in the transmitting party's transmission beyond having initially prepared and distributed the communication in compliance with either Rules 134 or 433 under the

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

Securities Act. *See* SEC Division of Corporation Finance, Compliance and Disclosure Interpretations, Securities Act Rules, § 110.02 (Apr. 21, 2014).

213   *See* Rules 165 and 425 under the Securities Act and Rule 14a-6(b) under the Exchange Act; <u>Regulation M-A</u> and Cross-Border Release Interpretations, Question I.D.4.

214   Section 11 of the Securities Act imposes absolute liability on the registrant for materially misleading written disclosure in a registration statement at the time it becomes effective. Section 12 (a)(2) of the Securities Act incorporates a negligence standard to impose liability for materially misleading written or oral communications in connection with the public sale of a security. *See* § 11.03[1] and [2] for a detailed discussion of §§ 11 and 12(a)(2) of the Securities Act.

215   *See* SEC Release No. 33-7760 (Oct. 22, 1999), 64 Fed. Reg. 61,408, 61,413 n.57 (Nov. 10, 1999).

216   Rule 14a-12(a)(2) under the Exchange Act.

217   Material may generally be incorporated by reference in a proxy statement if (i) it is contained in an annual report or a previously filed statement and (ii) (a) that statement is delivered to securityholders with the proxy statement or (b) the proxy statement identifies the information incorporated by reference and the information is not otherwise required to be included in the proxy statement.

218   *See supra* Note 194.

219   Exchange offers for equity securities that are not registered under the Exchange Act may not commence prior to SEC review, unlike exchange offers for equity securities registered under the Exchange Act. *See* Rule 14d-4(b) under the Exchange Act; § 9.05[4][b].

220   § 401(b) of the Sarbanes-Oxley Act; *see* § 3.06[1] for a discussion of these rules.

221   *See* S. REP. NO. 107-205, at 28–29 (2002).

222   *See* SEC Release No. 33-8176 (Jan. 22, 2003). The business combination disclosure rules identified by the release are Rules 165 and 425 under the Securities Act and Item 1015 of <u>Regulation M-A</u> under the Securities Act and Rules 14a-12 and 14d-2(b)(2) under the Exchange Act. The SEC noted in a subsequent Compliance & Disclosure Interpretation that Rule 14d-9(a)(2) was also intended to be included therein. *See* SEC, Division of Corporation Finance, Compliance and Disclosure Interpretations, Non-GAAP Financial Measures, Question 101.01 (Jan. 11, 2010). *See also* § 4.09.

223   *See* § 3.02[9] for a discussion of <u>Regulation M</u> under the Exchange Act generally. However, if the exchange offer or business combination involves only Rule 144A-eligible securities and is open only to qualified institutional buyers, then there is an exemption from <u>Regulation M</u>. Rule 102(b)(7) of <u>Regulation M</u> under the Exchange Act.

224   *See* Rule 100 of <u>Regulation M</u> under the Exchange Act for the definition of "affiliated purchasers." The staff has stated that once a merger agreement has been signed between an acquiror and a target, the target should be viewed as an "affiliated purchaser" in connection with purchases of acquiror securities for purposes of applying Rule 102. SEC, Division of Market Regulation (now, Division of Trading and Markets), Staff Legal Bulletin No. 9, Fed. Sec. L. Rep. (CCH) ¶60,009 (Oct. 27, 1999); SEC, Division of Market Regulation, FAQ About <u>Regulation M</u> (Sept. 10, 2010) ( "Staff Bulletin No. 9").

225   A covered security is any security that is the subject of a distribution (the "subject security") and any security into which a subject security may be converted, exchanged or exercised (whether immediately or not), or which, under the terms of the subject security, may in whole or significant part determine the value of the subject security. Rule 100 of <u>Regulation M</u> under the Exchange Act.

226   The staff has clarified the application of these restrictions in the context of concurrent distributions of the same securities by an issuer, *e.g.*, an offering of common stock for cash and an exchange offer for the shares of another company. Absent additional factors, *bona fide* offers to sell or the solicitation of offers to buy the securities being distributed in one distribution should not constitute impermissible inducements with respect to a concurrent distribution. Staff Bulletin No. 9.

227   Rule 100 of <u>Regulation M</u> under the Exchange Act; Staff Bulletin No. 9.

228   The restricted period commences one business day prior to pricing or such time that a person becomes a

distribution participant if the subject security has an average daily trading volume of at least $100,000 and the issuer had a public float value of at least $25 million. In all other cases, the restricted period commences five business days prior to pricing, unless the distribution involves a merger, acquisition or exchange offer, in which case the period commences on the day proxy solicitation or offering materials are first disseminated to securityholders. *See* Rule 100 of <u>Regulation M</u> under the Exchange Act.

229 Staff Bulletin No. 9. The SEC staff has updated Staff Bulletin No. 9 to clarify that when a third party seeking also to acquire a target company for its stock solicits proxies in opposition to the target's preferred merger, a restricted period may be triggered. Assuming that the third-party alternative bid is sufficiently specific so as to constitute an "offer" for purposes of the Securities Act, then a restricted period in respect of the third party's distribution would commence at the time its proxy materials are distributed and continue until the third party's bid is voted on or abandoned.

Target companies should exercise caution in connection with purchasing acquiror securities in the context of a friendly merger, even in advance of the commencement of applicable <u>Regulation M</u> restricted periods. *See supra* Note 44 and accompanying text.

230 Similarly, where a target has become an "affiliated purchaser" for purposes of <u>Regulation M</u> following the signing of a merger agreement with the acquiror, its ordinary course communications should not be prohibited ( *see supra* Note 224). As is the case with the acquiror, however, nonordinary course communications by the target in the context of a falling acquiror stock price could raise questions under <u>Regulation M</u>.

231 *See* § 3.02[9] for a discussion of these exemptions, including the significant exemption applicable in the case of securities with an average daily trading volume at or above a specified level.

232 A financial advisor's ability to rely on these exemptions would depend on its being classified as a "distribution participant" within the meaning of Rule 100 of <u>Regulation M</u>. The term "distribution participant" includes "an underwriter, prospective underwriter, broker, dealer, or other person who has agreed to participate or is participating in a distribution." Financial advisors generally should be viewed as distribution participants eligible for the exemptions in Rule 101 rather than being subject to the more restrictive Rule 102 as affiliated purchasers (defined to include "a person acting, directly or indirectly, in concert with a distribution participant, issuer, or selling securityholder"), particularly when the financial advisor is participating in a proxy solicitation effort or is acting as a dealer-manager in an exchange offer.

In the context of an acquiror with an affiliated purchaser that is a broker-dealer, but not a distribution participant, the SEC has granted no-action relief allowing the affiliated purchaser to continue certain of its brokerage and related activities, subject to a number of restrictions. In connection with the merger of UBS AG ( "UBS") with PaineWebber Group, Inc., the staff permitted UBS's brokerage arm, UBS Warburg ( "Warburg"), to continue, among other activities, making a market in UBS shares on the Swiss Stock Exchange and elsewhere outside the United States, as well as to engage in certain market making and hedging activities in derivatives linked to UBS shares. In granting relief, the staff noted, among other things, the significance of UBS shares and derivatives to the Swiss market and the role of Warburg as the principal market maker in these shares and derivatives; the operation of Warburg behind a "Chinese wall" and the compliance of its activities with Swiss law; the harm that could befall the Swiss and U.S. markets in respect of the liquidity and volatility of UBS shares by the cessation of Warburg's activities during a restricted period of approximately eight to ten weeks; that UBS's U.S. brokerage activities were conducted by a separate U.S. subsidiary, registered as a broker-dealer with the SEC and a member of the NASD (now known as FINRA), which would engage only in unsolicited brokerage activities in the normal course of its business with customers; and that the merger consideration was fixed and not dependent on the market price of UBS shares. *UBS AG* (avail. Sept. 22, 2000); *see also Lloyds Banking Group plc* (avail. Nov. 2, 2009).

233 *See, e.g.*, SEC Release No. 34-38030 (Dec. 9, 1996) (relating to tender offers undertaken to combine the U.K. cable television and telecommunications businesses of Cable & Wireless plc, NYNEX Corporation and Bell Canada International Inc.); SEC Release No. 34-27425 (Nov. 7, 1989) (Exemption Order regarding Ford Motor Company's agreed offer for Jaguar plc); SEC Release No. 34-27671 (Feb. 2, 1990) (Exemption

Order relating to exchange and cash tender offers by Procordia Aktiebolag and Aktiebolaget Volvo for the securities of Pharmacia Aktiebolag).

234   In the business combination context, non-U.S. offerors may also structure their offers to preclude U.S. target shareholders from voting on a proposed merger, thereby attempting to avoid the burdens of complying with U.S. securities laws. Because the SEC has taken the view that the issuance of securities in short-form mergers— *i.e.*, mergers not requiring the consent or vote of the recipients of the securities—also would constitute an "offer," "offer to sell," "offer for sale" or "sale" within the meaning of § 2(3) of the Securities Act, thereby triggering an obligation to register such securities under the Securities Act or to find an exemption from registration, SEC Release No. 33-5316 (Oct. 6, 1972), it is not clear whether this attempt would be successful.

In the 1999 release adopting exemptions from registration in the cross-border business combination context, however, the SEC stated:

> Business combinations present different issues from tender or exchange offers because participation by U.S. holders is not voluntary. In order to attempt to avoid U.S. jurisdiction, offerors often do not provide U.S. investors an opportunity to vote on the transaction. It is neither practicable nor desirable to treat U.S. holders differently from other securityholders when their company is merged out of existence. No special precautions should be taken to prevent U.S. holders from receiving the merger consideration in a business combination involving a foreign company merely because the proxy statement/prospectus was posted on a web site available in the United States.

SEC Release No. 33-7759 (Oct. 22, 1999), 64 Fed. Reg. 61,382, 61,395 (Nov. 10, 1999).

Accordingly, in the context of a business combination involving the distribution of securities to U.S. shareholders of a non-U.S. target that have been precluded from voting, it should be reasonable for the acquiror to conclude that it need not register its securities under the Securities Act. *See also infra* Note 259; § 9.05[9][c]; Regulation M-A and Cross-Border Release Interpretations, Question II.F.1.

235   SEC Release No. 33-8957 (Sept. 19, 2008), referred to herein as the "2008 Cross-Border Amendments" or, in reference to the guidance provided therein, the "Adopting Release for the 2008 Cross-Border Amendments."

236   In a U.K. takeover offer, in order for the bidder to ensure that it can invoke statutory compulsory acquisition (or "squeeze-out") rights under § 974 of the U.K. Companies Act 2006, the bidder must make a takeover offer to all shareholders on the same terms. However, the bidder may modify its offer to take account of issues created by the existence of foreign shareholders if it qualifies for certain exemptions under both the U.K. Companies Act 2006 and the U.K. City Code on Takeovers and Mergers.

Under the squeeze-out provisions, the bidder may exclude a particular territory or country outside the United Kingdom if it is able to conclude that the exclusion was made in order "not to contravene" the laws of that territory or country. Although not a formal pre-condition to the exercise of compulsory acquisition rights, the requirements of the U.K. City Code on Takeovers and Mergers as to documents being made available to shareholders must be complied with as a matter of law. Under these requirements, a bidder must send offer documentation to all shareholders of the target company, including those located in other jurisdictions, unless there is "sufficient objective justification" for not doing so. The U.K. Panel on Takeovers and Mergers will not normally allow a bidder to avoid the requirement to post the offer documentation to a European Economic Area jurisdiction. However, it will permit the bidder to avoid the posting requirement in respect of a non-European Economic Area jurisdiction if, at the date of posting, less than 3% of the shares of the target are held by shareholders located in that jurisdiction and there is a significant risk of civil, regulatory or

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

criminal exposure if the documentation is sent to shareholders in that jurisdiction. (It is expected that U.S. registration requirements would meet this test.) If more than 3% of the target company shareholders are located in a particular non-European Economic Area jurisdiction, the U.K. Panel on Takeovers and Mergers has discretion to waive the posting requirement in respect of that jurisdiction (having regard to, for example, the cost involved, any potential delays to the transaction timetable and the number of target shareholders in that jurisdiction). *See* U.K. City Code on Takeovers and Mergers, Rule 30.4 and the note therein.

In addition, the compulsory acquisition provisions in the U.K. Companies Act 2006 also recognize the difficulties that bidders may face in making certain forms of non-cash consideration available to overseas shareholders ( *e.g.*, because of foreign registration requirements relating to the distribution or admission to trading of non-cash consideration). The variation of an offer to exclude certain shareholders from participating in non-cash consideration alternatives on the grounds that it may be unduly onerous to make such alternatives available does not prevent a takeover offer from benefiting from the U.K. squeeze-out provisions. This is not explicitly recognized in the City Code on Takeovers and Mergers, although it is longstanding market practice and, as such, is tolerated by the U.K. Panel on Takeovers and Mergers despite being inconsistent with the fundamental requirement for equal treatment of shareholders.

As a technical matter, U.K. offers are made to all shareholders, including U.S. persons. However, because the offer precludes acceptance from the United States in order to avoid jurisdictional means, U.S. holders as a practical matter cannot accept the offer unless they arrange for an advisor in London to act on their behalf. *See* text accompanying *infra* Note 241.

237  *Plessey Co. plc v. General Electric Co. plc*, 628 F. Supp. 477 (D. Del. 1986).

238  *Plessey Co. plc v. General Electric Co. plc*, 628 F. Supp. 477, 497 (D. Del. 1986).

239  Rule 14d-10 under the Exchange Act.

240  SEC Release No. 33-6653 (July 11, 1986), 51 Fed. Reg. 25,873, 25,877–78 (July 17, 1986). The *Plessey* case did not involve a claim for breach of the antifraud provisions of the U.S. securities laws. It is generally thought that fewer contacts with the United States are required for a court to assert jurisdiction under the antifraud provisions, and there is always a risk that a claim will be made that an offer document is fraudulent in certain respects.

For example, Consolidated Gold Fields PLC sued Minorco S.A. in 1988 in a U.S. District Court on the basis that Minorco's offer violated the U.S. antitrust laws and the antifraud provisions of the U.S. securities laws. On the antifraud claim, the SEC, in an amicus brief, took the position that the court had subject matter jurisdiction over the dispute but nevertheless argued that the court should refuse to grant an injunction for reasons of international comity. The key factor influencing the SEC's position that U.S. jurisdictional means were used seemed to be that Minorco sent offering documents to U.K. nominees notwithstanding that "it was surely foreseeable" that the nominees would forward the offering documents to their U.S. principals. Brief for the SEC as *Amicus Curiae*, *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252 (2d Cir.), *cert. denied*, 492 U.S. 939 (1989).

241  For a further discussion of "flowback" restrictions, *see* § 9.05[7][c].

242  SEC Release No. 33-6866 (June 6, 1990).

243  It may not be necessary for all the restrictions imposed in the Hoylake bid to be applied. For example, the SEC issued a no-action letter to Reuters in 1990 making it clear that representatives of the U.S. press need not be excluded from press conferences abroad during which a bid is announced in a manner customary in the market. *Reuters Holding PLC* (avail. Mar. 6, 1990). In addition, the result should be the same if the restrictions to prevent flowback are modified as discussed in § 9.05[7][c]. Although the court might not apply the procedural requirements for tender offers in <u>Regulation 14E</u> under the Exchange Act, it might nevertheless be willing to review any claims alleging fraud. *See supra* Note 241 and accompanying text.

With respect to U.K. companies, the U.K. City Code on Takeovers and Mergers restricts target companies from taking any action that may result in an offer being frustrated (including instituting litigation) without the approval of a majority of the target shareholders in a general meeting.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

244 *See generally* Statement of the SEC Regarding Use of Internet Web Sites to Offer Securities, Solicit Securities Transactions or Advertise Investment Securities Offshore, SEC Release No. 33-7516 (Mar. 23, 1998); SEC Release No. 33-7759 (Oct. 22, 1999) (adopting the 1999 Rules (as defined below)).

245 For a detailed discussion of Regulation S under the Securities Act, *see* § 8.02.

246 For a discussion of § 4(a)(1) of the Securities Act, *see* § 7.02.

247 A target affiliate that is, or becomes, an acquiror affiliate on completion of the exchange offer cannot rely on § 4(a)(1) or § 4(a)(3).

Although Regulation S contemplates distributions of securities through underwriting syndicates, practitioners believe its safe harbor should be available for exchange offers if the requirements of Regulation S are followed.

248 Category 1 offerings include offerings by a foreign issuer if there is no "substantial U.S. market interest" in the type of security being offered. Category 2 offerings consist of all debt offerings of foreign issuers that do not fall into Category 1, all non-Category 1 equity offerings of foreign issuers that are subject to the periodic reporting requirements of the Exchange Act, and most debt offerings of U.S. issuers subject to the periodic reporting requirements of the Exchange Act. *See* § 8.02[1][c][i] and [ii] for detailed descriptions of Category 1 and Category 2 offerings.

249 Although Regulation S imposes no restrictions on resales by recipient investors, their ability to resell into the United States will effectively be limited by the unavailability of the dealer exemption in § 4(a)(3) of the Securities Act for the 40-day period following commencement of the exchange offer. To facilitate market compliance with this 40-day restriction, issuers with public ADR programs generally prohibit deposits into those programs during this 40-day period or require certification by depositors during this period that the securities being deposited were not issued in the exchange offer, or in the case of a business combination, proxy solicitation. *See* §§ 7.02 and 8.03[1] for further discussion of § 4(a)(3) of the Securities Act.

250 *See* Rules 902(g) and 903 under the Securities Act.

251 In the context of Regulation S, a "distributor" is defined as any underwriter, dealer or other person who participates, pursuant to a contractual arrangement, in the distribution of securities offered or sold in reliance on Regulation S. Rule 902(d) under the Securities Act. Recipients of securities in exchange offers should not, without more, be deemed to be "distributors" under Regulation S.

252 If other outstanding securities of the issuer are fungible with those issued in the exchange offer, a distributor may sell the fungible securities into the United States or to U.S. persons so long as the securities being distributed in connection with the exchange offer are held in a segregated identifiable account and the fungible securities are not borrowed from and will not be replaced by the securities being distributed in the exchange offer. *See* SEC Release No. 33-6863 (Apr. 24, 1990); § 8.02[1][c][ii].

253 In addition to U.S. equity securities, Category 3 offerings include (i) equity offerings by foreign issuers not subject to the periodic reporting requirements of the Exchange Act if there is a "substantial U.S. market interest" for the class of securities being offered and (ii) debt offerings by U.S. issuers not subject to such periodic reporting requirements. *See* Rule 903(b)(3) under the Securities Act.

254 For a detailed description of the Category 3 requirements, *see* § 8.02[1][c][iii].

255 In Category 3 offerings, debt securities are subject to a 40-day distribution compliance period and equity securities are subject to a one-year distribution compliance period (or a six-month distribution compliance period if the issuer is a reporting issuer). *See* Rule 903(b)(3) under the Securities Act; § 8.02[1][c][iii]. In addition, U.S. equity securities sold under Regulation S are designated "restricted securities" under Rule 144 and may only be sold in the United States in accordance with Rule 144 requirements until the end of a one-year restricted period (or until the end of a six-month restricted period for securities of reporting issuers). *See* § 7.04[2] for a discussion of Rule 144.

256 *See* § 9.05[9][c].

257 The registration statement would have to be effective for one year, in the case of U.S. equity securities and Category 3 foreign equity securities, and 40 days, in the case of Category 3 debt securities.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

258 For a discussion of Securities Act registration procedures for the initial exchange offer, including problems that can arise in hostile offers, *see* § 9.05[4]. For a discussion of when target financial statements are required in a registration statement in connection with an offering being used to raise cash to finance an acquisition, *see supra* Note 179.

259 *See supra* Note 234, which discusses analogous circumstances in the cross-border business combination context in which an acquiror should not be required to register under the Securities Act the securities issued as part of the business combination to target shareholders in the United States that have been precluded from voting on the transaction. In November 1979, Thorn Electrical Industries Ltd., a U.K. company ("Thorn"), offered to exchange its ordinary shares ("Thorn Ordinary Shares") and convertible preference shares ("Thorn Preference Shares") for outstanding ordinary stock units ("EMI Shares") of EMI Ltd., another U.K. company. ADRs representing EMI Shares ("EMI ADRs") were not subject to the offer, and U.S. holders of EMI Shares were not permitted to accept the offer. The Thorn Ordinary Shares and Thorn Preference Shares were not registered under the Securities Act. An investment bank, on behalf of Thorn, offered to acquire Thorn Ordinary Shares (but not Thorn Preference Shares) for cash for a limited period during the offer, thus providing a partial cash alternative. In January 1980, Thorn announced that the holders of more than 90% of the EMI Shares had accepted its offer and that it intended to compulsorily acquire the remaining EMI Shares pursuant to the applicable U.K. statutory procedure. In a no-action letter, the SEC permitted Thorn and the depositary for the EMI ADRs to make arrangements for the withdrawal of EMI Shares from the ADR program, the delivery of withdrawn EMI Shares to Thorn and the subsequent delivery of cash or Thorn Ordinary Shares plus Thorn Preference Shares to former holders of EMI ADRs. The SEC permitted these arrangements without registration of the Thorn Ordinary Shares or Thorn Preference Shares under the Securities Act, and despite the fact that U.S. holders of EMI ADRs would receive unregistered Thorn shares, in large part because the acquisition procedure was compulsory under U.K. law. *EMI Ltd.* (avail. Apr. 21, 1980).

260 For a discussion of the principal exemptions from registration for the resale of restricted securities, *see* § 8.02 for a discussion of Regulation S under the Securities Act, §§ 7.04[3] and [4] for a discussion of the private resale exemptions, § 4(a)(7) of the Securities Act and "Section 4(1 ½)," and § 7.04[2] for a discussion of the public resale exemption, Rule 144 under the Securities Act.

261 *See* § 9.05[8][e] for a discussion of registration rights.

262 For purposes of Rule 144, the term "affiliate" means "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with" the issuer. The term "control" is defined broadly as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." The SEC staff has also indicated that a person is generally presumed to "control" an issuer if such person is an executive officer or director or owns more than 10% of the voting securities of the issuer, but this presumption is not absolute and can be rebutted. Rule 405 under the Securities Act; *American Standard* (avail. Oct. 11, 1972).

263 *See* § 7.04[2].

264 For the 1999 Rules, *see* SEC Release No. 33-7759 (Oct. 22, 1999).

265 The Tier I exemption and the Tier II exemption are codified as part of Regulation 14D under the Exchange Act. The 2008 Cross-Border Amendments clarify that the exemptions also apply to offers subject only to § 14(e) of the Exchange Act and Regulation 14E thereunder.

266 Rule 14d-1(c) under the Exchange Act.

267 *See* § 3.01, Note 1 for a discussion of the definition of a foreign private issuer.

268 The various calculation rules discussed in this section apply to all the exemptions discussed in this § 9.05[9].

269 These "look through" requirements apply only to securities held of record (i) in the United States, (ii) in the issuer's home jurisdiction and (iii) in the primary trading market for the issuer's securities if different from the issuer's home jurisdiction. If after reasonable inquiry the bidder is unable to obtain information, the bidder

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

may presume that the customer accounts are held in the nominee's principal place of business. It is also clear that, especially if there is a large number of nominees in such jurisdictions, a bidder need not look through every last nominee, so long as it has conducted a diligent investigation at a minimum of all institutions believed reasonably likely to hold shares on behalf of U.S. persons.

As originally proposed, the SEC had based the exemption threshold calculations on the number of "U.S. record holders." The adopted approach, which grounds such calculations instead on the concept of "U.S. ownership" requiring bidders to "look through" to beneficial owners of shares, more closely reflects the approach adopted by the SEC in the current definition of a "foreign private issuer." SEC Release No. 34-41936 (Sept. 28, 1999). The SEC recognized that focusing on beneficial ownership rather than record ownership limits the applicability of the exemptions.

270   The SEC did not adopt a proposed rebuttable presumption that persons holding through ADR facilities are U.S. holders.

271   The SEC generally considers the "public announcement" to be any oral or written communication by the acquiror or any party acting on its behalf, which is reasonably designed to inform or has the effect of informing the public or securityholders in general about the transaction. *See generally* Instruction 5 to Rules 13e-4(c) and 14d-2(b)(2) under the Exchange Act.

272   *See* Rule 800(h) under the Securities Act. If an acquiror in a business combination is unable to accomplish the look-through analysis as of a date between 60 days prior to and 30 days after announcement, a date no more than 120 days before the public announcement may be used. *See* Instructions to Rules 14d-1(c) and 13e-4(h)(8) under the Exchange Act; *see also* <u>Regulation M-A</u> and Cross-Border Release Interpretations, Question I.L.2.

273   Rule 800(h)(7) under the Securities Act.

274   *See* Rule 800(h)(7)(i) under the Securities Act, Instruction 3.1 to Rules 13e-4(h)(8) and (i) under the Exchange Act and Instruction 3.1 to Rule 14d-1(c) and (d) under the Exchange Act.

275   The SEC considers the primary trading market important because it ensures there is a primary foreign regulator with oversight over the transaction.

276   *See* Rule 12h-6(f)(5)(i) under the Exchange Act.

277   *See* Rule 12h-6(f)(5)(ii) under the Exchange Act.

278   "Home jurisdiction" is defined as both the jurisdiction of the target company's organization and the principal foreign market where the target company's securities are listed or quoted. Rule 800(f) under the Securities Act.

279   *See* Rule 800(h)(7)(ii) under the Securities Act, Instruction 3.ii to Rule 13e-4(h)(8) and (i) under the Exchange Act and Instruction 3.ii to Rule 14d-1(c) and (d) under the Exchange Act.

280   This includes not only filings of the issuer, but also filings by third parties, such as beneficial ownership reports. It also picks up information "readily available" through other sources, such as advisors or third-party information providers that can provide the information at no or limited cost. The rule, however, does not require that the bidder or target engage third parties in order to qualify for eligibility.

281   *See* Rule 800(h)(7)(iii) under the Securities Act and Instruction 3.iii to Rules 14d-1(c) and (d) under the Exchange Act.

282   *See* Rule 800(h)(7)(iii) under the Securities Act and Instruction 3.iii to Rules 14d-1(c) and (d) under the Exchange Act. *See also* Rules 13e-4(h)(8) and (i) under the Exchange Act.

283   In the context of a two-step transaction ( *e.g.*, a tender offer followed by a merger), the U.S. ownership calculation may be made for the first step only so long as (i) the disclosure document discloses the intent to conduct the second-step merger and (ii) the second step is completed within a reasonable time after the first step. *See* <u>Regulation M-A</u> and Cross-Border Release Interpretations, Question II.E.9.

284   The SEC staff has stated that a late filing of Form CB may result in a loss of a bidder's ability to seek relief under the Tier I exemption. Because Form CB is furnished to, rather than filed with, the SEC, the bidder has no potential liability for the offering materials under § 18 of the Exchange Act (although the bidder is

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

potentially liable under the other antifraud provisions of the U.S. securities laws, including §§ 10(b) and 14(e) of the Exchange Act, and must comply with the informational requirements of Rule 12b-20 under the Exchange Act, which requires disclosure of any material information necessary to make the information expressly required to be included in the report, in the light of the circumstances under which it is made, not misleading).

285  Rule 14d-1(c)(3)(iii) under the Exchange Act.

286  Rule 14d-1(c)(3)(i) and (ii) under the Exchange Act; Form CB.

287  Rule 14d-1(c)(2) under the Exchange Act. Equal treatment requires not only equal consideration, but also that the procedural terms of the tender offer, such as duration, pro-rationing and withdrawal rights, be the same for all holders. SEC Release No. 33-7759 (Oct. 22, 1999).

288  Rule 14d-1(c)(2)(iii) under the Exchange Act. The determination of whether the cash consideration is "substantially equivalent" to consideration offered offshore should be made as of the commencement of the offer. The SEC has stated that the amount of cash consideration must be adjusted during the term of the offer only if the bidder no longer has a reasonable basis to believe the cash is substantially equivalent to the value of the consideration offered to non-U.S. holders, such as if the bidder increases the offer price to non-U.S. holders. SEC Release No. 33-7759 (Oct. 22, 1999), 64 Fed. Reg. 61,382, 61,385 n.26 (Nov. 10, 1999).

If the offered security is not a "margin security" within the meaning of Regulation T promulgated by the Board of Governors of the Federal Reserve System (the "Federal Reserve Board") under the Exchange Act, the bidder must provide upon the request of the SEC or a U.S. securityholder an opinion from an independent expert stating that the cash-only consideration is substantially equivalent to the consideration offered outside the United States. The opinion must address the relative value of consideration offered to U.S. and non-U.S. securityholders, but does not need to address the fairness of either form of consideration in relation to the value of the subject securities. See Rule 14d-1(c)(2)(iii)(B) under the Exchange Act.

289  In addition to the U.S. federal securities laws, which regulate U.S. securities offerings at the national level, "blue sky" laws regulate U.S. securities offerings at the state level. Under many such state laws, the registration procedure for a securities offering can be as onerous and time consuming as that under the Securities Act at the federal level. See § 3.02[8] for a detailed discussion of state "blue sky" laws.

290  Rule 14d-1(c)(2)(i) under the Exchange Act.

291  Rule 14d-1(c)(2)(iv) under the Exchange Act.

292  See § 9.05[2] for a detailed discussion of Rule 14e-5 under the Exchange Act.

293  Rule 14e-5(b)(10) under the Exchange Act.

294  See § 3.02[9] for further discussion of Regulation M under the Exchange Act.

295  See § 9.05[6] for a further discussion of Regulation M in the context of exchange offers and business combinations.

296  Rule 14d-1(d) under the Exchange Act.

297  See § 9.05[9][a] for a discussion of the method of calculating U.S. ownership.

298  See SEC Release No. 33-7759 (Oct. 22, 1999), 64 Fed. Reg. 61,382, 61,387 n.41 (Nov. 10, 1999). The staff has granted relief in a number of cases where the Tier II exemption was not available where U.S. ownership either exceeded 40% or was not calculable. See, e.g., Acorda Therapeutics, Inc. (avail. Mar. 8, 2016); Songbird Estates PLC (avail. Dec. 19, 2014); Gemalto S.A., Wavecom S.A. (avail. Nov. 7, 2008); AstraZeneca PLC (avail. May 23, 2006); Harmony Gold Mining Company Limited (avail. Nov. 19, 2004). In addition to granting relief where U.S. ownership exceeds 40%, the staff may in some circumstances be willing to grant relief from the U.S. tender offer rules where the Tier II exemption is not available solely because the target is a foreign issuer that does not qualify as a "foreign private issuer" as defined in Rule 3b-4(c) under the Exchange Act. See Axel Springer AG (avail. Sept. 12, 2005) (extending Tier II-type relief from Rules 14e-1(b), (c) and (d) under the Exchange Act where the target, ProSiebenSat.1 Media AG, failed to qualify as a "foreign private issuer" because its controlling shareholders were several private equity

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                                609
All rights reserved.

investors resident in the United States, although its operations were located in Germany, its securities were not registered under the Exchange Act or listed on a U.S. exchange and it did not file reports with the SEC under §§ 13(a) or 15(d) of, or furnish information to the SEC pursuant to Rule 12g3-2(b) under, the Exchange Act); *see also TMX Group Inc.* (avail. June 14, 2011); *Chemoil Energy Limited* (avail. Dec. 14, 2009).

299  Rules 13e-4(i)(2)(ii) and 14d-1(d)(2)(i) and (ii) under the Exchange Act.

300  Rules 13e-4(i)(2)(ii) and 14d-1(d)(2)(i) and (ii) under the Exchange Act provide that ADRs and underlying securities are treated as a single class for purposes of the tender offer, and a U.S. offer can be made to U.S. holders of the subject securities and all holders of ADRs, including foreign holders. However, unlike the Tier I exemption, the Tier II exemption does not grant relief to bidders seeking to offer cash-only alternatives to U.S. holders. Requests for such relief are treated on a case-by-case basis.

Under the 1999 Rules, the SEC resolved the mismatch between the exemption and the practical needs of issuers making dual offers by routinely granting no-action relief from the application of the all holders rule set forth in Rule 14d-10(a)(1) under the Exchange Act to permit dual offers structured in this way rather than as set forth in the Tier II exemption (including when bidders cannot demonstrate that the U.S. ownership levels are within the limits set forth in the Tier II exemption). *See, e.g.*, *Harmony Gold Mining Company Limited* (avail. Nov. 19, 2004); *Sanofi-Synthelabo S.A.* (avail. June 10, 2004); *Alcan, Inc.* (avail. Oct. 8, 2003); *Serono S.A.* (avail. Sept. 12, 2002); *Saipem SpA* (avail. July 29, 2002).

301  Rules 13e-4(i)(2)(ii) and 14d-1(d)(2)(ii) under the Exchange Act. Prior to the 2008 Cross-Border Amendments, the SEC routinely granted no-action relief from Rule 14d-10(a)(1) under the Exchange Act to permit this structure. *See, e.g.*, *CANTV* (avail. Apr. 6, 2007) (Venezuela); *E.ON Aktiengesellschaft* (avail. Dec. 6, 2006) (Spain); *Gas Natural SDG, S.A.* (avail. Mar. 2, 2006) (Spain); *Koninklijke Ahold N.V.* (avail. Sept. 10, 2002) (Chile); *Telefonica S.A.* (avail. June 5, 2000) (Brazil and Peru).

302  Rule 14d-1(d)(2)(iii) under the Exchange Act.

303  Rule 14d-1(d)(2)(iv) and (v) under the Exchange Act; *see supra* Notes 128 to 132 and accompanying text.

304  SEC Release No. 33-7759 (Oct. 22, 1999), 64 Fed. Reg. 61,382, 61,387 (Nov. 10, 1999). As discussed above, *see supra* Note 122, the SEC interprets Rule 14d-4(d)(2) under the Exchange Act, which sets forth minimum time periods necessary for dissemination of material changes in a registered securities offer ( *i.e.*, a tender offer in which the consideration consists solely or partially of securities registered under the Securities Act) that commences early, as applying to all tender offers, including those subject only to Regulation 14E under the Exchange Act. Thus, in tender offers for U.S. registered equity securities and those for non-U.S. registered equity securities, bidders are required to extend the offer in the event of a material change to the offer. The SEC considers the reduction or waiver of a minimum tender condition to be a material change for purposes of the dissemination requirements of Rule 14d-4(d)(2). SEC Release No. 34-24296 (Apr. 3, 1987). Thus, unless the bidder qualifies for the exception to this rule, if the bidder waives or reduces a minimum tender condition it must hold the offer open for a minimum of five U.S. business days following announcement of the reduction or waiver, or, if there are fewer than five U.S. business days remaining prior to expiration of the offer, the bidder must extend the offering period. Bidders will be required to disclose fully and discuss all implications of waiver or reduction in the offering materials.

However, under the interpretation of the 2008 Cross-Border Amendments set forth in the Adopting Release for the 2008 Cross-Border Amendments, certain changes to the minimum acceptance condition may be made without providing withdrawal rights in the time remaining for the tender offer. Section II.C.5 of the Adopting Release for the 2008 Cross-Border Amendments, 73 Fed. Reg. 60,050, 60,066 (Oct. 9, 2008). This relief requires that the bidder undertake not to waive or reduce the minimum acceptance condition below a majority or such percentage threshold required to control the target company under applicable foreign law, and the relief is limited to circumstances under the home jurisdiction law that justify the bidder's inability to extend the offer or afford withdrawal rights. This relief does not apply to extensions under U.S. law due to changes in offer consideration, the amount of securities sought in the offer or the dealer's soliciting fee.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

305 Rule 14d-1(d)(2)(viii) under the Exchange Act; 2008 Cross-Border Amendments.

306 *See* § 9.03[2]. If the offer were subject only to § 14(e) of the Exchange Act and <u>Regulation 14E</u> thereunder, a bidder relying on the Tier II exemption would only need to comply with the requirements of <u>Regulation 14E</u> not modified by Tier II, since the disclosure and other requirements of <u>Regulation 14D</u> and Rule 13e-3 would not be applicable. *See supra* Note 265.

307 Rule 14d-7 under the Exchange Act requires that withdrawal rights be provided to tendering holders as long as the offer remains open, and § 14(d)(5) of the Exchange Act provides that securities tendered may be withdrawn at any time after 60 days from the date of the original offer. We understand that the staff of the SEC takes the position that all conditions to an offer must be satisfied or waived prior to the expiration date of the offer and the offer must be declared wholly unconditional before a bidder can terminate the withdrawal rights of tendering securityholders. *See* <u>Regulation M-A</u> and Cross-Border Release Interpretations, Question II.A.1. Thus, an offer that remains subject to a post-expiration condition may be deemed to remain open and securityholders may be entitled to withdrawal rights under Rule 14d-7. Prior to the 2008 Cross-Border Amendments, the staff of the SEC had granted no-action relief from Rule 14d-7 under the Exchange Act and § 14(d)(5) of the Exchange Act to allow termination of withdrawal rights prior to receipt of regulatory approval. *See Bayer AG* (avail. Apr. 28, 2006). In addition, non-U.S. jurisdictions do not always provide for the extended withdrawal periods that may result from § 14(d)(5) and Rule 14d-7. In some jurisdictions, withdrawals are prohibited after the expiration date of the tender offer. In addition, permitting withdrawals during the period specified by local law for tabulating the results of the offer might conflict with local tender offer procedures, as well as potentially frustrate any minimum tender condition. No-action relief must be sought in such cases. *See, e.g., Grand Chip Investment GmbH* (avail. Aug. 17, 2016); *Top Alpha Capital S.M. Ltd.* (avail. Feb. 16, 2016); *Pepsi-Cola (Bermuda) Ltd.* (avail. Mar. 18, 2011); *Barclays PLC* (avail. Aug. 7, 2007); *Serono S.A.* (avail. Sept. 12, 2002); *TotalFina* (avail. Oct. 15, 1999).

308 Rule 13e-4(f)(2)(ii) under the Exchange Act and § 14(d)(5) of the Exchange Act require bidders to provide "back-end" withdrawal rights if tendered securities have not been accepted for payment within a certain date after the commencement of a tender offer (40 business days following commencement in the case of an issuer tender offer subject to Rule 13e-4 under the Exchange Act and 60 days following commencement in the case of a third-party tender offer subject to § 14(d)(5) of the Exchange Act).

309 § 14(d)(5) of the Exchange Act and Rules 13e-4(i)(2)(v) and 14d-1(d)(2)(viii) thereunder.

310 Even if the Rule 802 exemption is not available, a transaction approved as a scheme of arrangement in the United Kingdom would be exempt from Securities Act registration under § 3(a)(10) thereof. *See supra* Note 164 and accompanying text.

311 None of the exemptions from the tender offer rules and registration requirements is available for any securities transaction that technically qualifies under the rules but is part of a plan or scheme to evade the registration requirements of the Securities Act or the tender offer rules under the Exchange Act. An example of a sham, according to the SEC, would be if an initial offer were commenced solely as a pretext for making a subsequent offer automatically eligible for the exemptions. SEC Release No. 33-7759 (Oct. 22, 1999), 64 Fed. Reg. 61,382, 61,389 n.51 (Nov. 10, 1999).

312 *See* § 9.05[9][a] for a discussion of the method of calculating U.S. ownership.

313 *See* Rule 802(a)(2) under the Securities Act. "Blue sky" laws generally provide an exemption from registration for offers to certain qualified institutions and generally exempt offers of securities (and securities senior to them) listed on a U.S. national securities exchange. "Blue sky" laws do not, however, include general exemptions from state registration requirements analogous to Rule 802. Consequently, to avoid registration requirements at the state level, tender offers and business combinations exempt from registration at the federal level under Rule 802 must qualify for alternative state law exemptions. As a result, an issuer may be forced to offer shares only to certain qualified institutional investors and exclude or offer cash alternatives to other holders in certain states to avoid registration under "blue sky" laws.

314 General Note 8 to Rules 800, 801 and 802 under the Securities Act.

315 Rule 802(a)(3)(ii) under the Securities Act. In certain cases it may be possible to distribute an equivalent

English-language document, such as a Form 20-F, instead of a translation of a home country document, such as an annual report, so long as the documents provide similar information in all material aspects.

316 Rule 802(a)(3)(iii) under the Securities Act.

317 Rule 802(a)(3)(i) under the Securities Act.

318 Rule 802(b) under the Securities Act.

319 SEC Release No. 33-7759 (Oct. 22, 1999); *see* § 3.05[4] for a discussion of the Trust Indenture Act of 1939.

320 Regulation M-A and Cross-Border Release Interpretations, Question II.C.1.

321 *See* § 8.02[1][c][iii] for a discussion of Category 3 restrictions under <u>Regulation S</u> and the restrictions applicable to an offering of equity securities by a U.S. issuer, and § 9.05[7][c] for a discussion of the resale of securities offered pursuant to Category 3.

322 *See* Rule 12g-3 under the Exchange Act; § 4.02[3].

323 *See* § 4.11[2] for a discussion of the de-registration rules applicable to successor issuers.

324 Generally, with respect to offshore tender and exchange offers, the SEC has indicated that the guidance in its 1998 release relating to the Internet is applicable. *See* SEC Release No. 33-7516 (Mar. 23, 1998); SEC Release No. 33-7759 (Oct. 22, 1999).

325 *See* § 7.02[4] for a discussion of the prohibition on "general solicitation and general advertising" in private placements.

326 The SEC has stated that no special precautions need be taken to prevent U.S. holders from receiving the merger consideration in a business combination (other than a tender or exchange offer) involving a foreign company merely because the proxy statement/prospectus was posted on a website available in the United States. Because shareholder participation in business combinations is not voluntary, general solicitation restrictions that give rise to the need for special precautions in the private placement context generally are less relevant. *See supra* Note 234. Accordingly, in the context of a business combination, the ability to establish a private placement exemption should not depend on taking the kind of special precautions described above for private placements generally. SEC Release No. 33-7759 (Oct. 22, 1999); <u>Regulation M-A</u> and Cross-Border Release Interpretations, Question II.F.1.

327 *See* § 7.02[5].

327.1 The margin regulations would not apply to an acquisition financed by the issuance of debt securities in a *bona fide* public offering, including under <u>Regulation S</u>, though they may apply to privately offered debt securities. *See* Fed. Res. Serv. ¶5-606.56 (staff opinion, Dec. 20, 1993) (the Board and its staff does not regard the purchase of debt securities offered in a public offering as an extension of credit subject to the margin regulations, with the caveat that the public offering must not be structured "so that the sale in actual practice resembles a private placement"), *see also* 51 Fed. Reg. 1771, 1775 (Jan. 15, 1986) (describing a particular registered offering of debt securities with minimum denominations of $2.5 million as resembling a private placement). The Board and its staff have provided interpretive guidance that facilitates issuances of debt securities pursuant to Rule 144A in compliance with the margin regulations, including characterizing a broker-dealer's purchase of an unregistered debt security for resale under Rule 144A as "arranging" rather than extending credit, *see* Fed. Res. Reg. Serv. ¶5-470.1 (Board interp., July 16, 1990), and by providing some relief from the registration requirements of Regulation U that would otherwise be applicable to purchasers of Rule 144A securities that are secured by margin stock. *See* Fed. Res. Reg. Serv. ¶5-942.69 (staff opinion, Aug. 30, 1996). *See* §7.06 for a more detailed discussion of the application of Regulation T to broker-dealer intermediation of Rule 144A offerings. The extent to which regulations otherwise apply to private securities offerings (and public securities offerings that are subject to the margin regulations because the offering in actual practice resembles a private placement) are generally described in this §9.05[11].

328 12 C.F.R. Parts 220, 221 and 224.

329 Because of Regulation T and applicable regulatory capital requirements, broker-dealers generally do not

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

serve as a source of financing for acquisition transactions, although they may, in an investment banking capacity, arrange for such financing, including from affiliates that are not broker-dealers and thus may be subject to Regulation U. For a general description of the restrictions applicable to broker-dealers under Regulation T, *see* § 14.07[6] and § 7.06[1].

330 For this purpose, a U.S. lender is one that has a principal office in a Federal Reserve District. *See* Fed. Res. Reg. Serv. ¶5-942.65 (staff opinion, Mar. 24, 1989) (Regulation G, which is now incorporated into Regulation U, "does not apply unless the lender has a principal place of business in a Federal Reserve District"); *Metro-Goldwyn-Mayer, Inc. v. Transamerica Corp.*, 303 F. Supp. 1354 (S.D.N.Y. 1969). Federal Reserve Districts cover the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, American Samoa, Guam and the Commonwealth of the Northern Mariana Islands. Regulation U requires U.S. lenders other than broker-dealers and banks that have a principal office in a Federal Reserve District to register with the Federal Reserve Board if they extend or maintain credit secured, directly or indirectly, by any margin stock in the ordinary course of business and the amount of credit meets certain monetary thresholds. 12 C.F.R. § 221.3(b)(1).

331 "Margin stock" is (i) any equity security listed or traded on a U.S. securities exchange, (ii) any security underlying American Depositary Shares listed on a U.S. securities exchange, (iii) any debt security convertible into, or carrying warrants or rights to subscribe to or purchase, margin stock, (iv) any warrant or right to subscribe to or purchase margin stock and (v) shares in most U.S. mutual funds and other companies registered under the Investment Company Act. 12 C.F.R. § 221.2; Fed. Res. Reg. Serv. ¶5-919.14 (staff opinion, Mar. 18, 1998).

332 Regulation U thus permits a loan used for the purpose of purchasing or carrying margin stock so long as the loan is not directly or indirectly secured by margin stock.

333 The loan value for collateral that is not margin stock (and not puts, calls, or combinations of puts and calls) is the collateral's "good faith" value, which is the amount (not exceeding 100 percent) of the current market value of the collateral that the lender, exercising sound credit judgment, would lend to a customer, without regard to the customer's other assets held as collateral in connection with unrelated transactions. 12 C.F.R. § 221.2.

334 Fed. Res. Reg. Serv. ¶5-805.1, 72 Fed. Res. Bull. 195 (1986).

335 Fed. Res. Reg. Serv. ¶5-917.192 (staff opinion, Dec. 23, 1988).

336 Fed. Res. Reg. Serv. ¶5-805.1, 72 Fed. Res. Bull. 195 (1986).

337 Of course, U.S. antitrust laws and foreign investment laws may be applicable. *See* § 9.06 and § 9.07. If the target is in a regulated industry (such as banking, aviation and television/radio), federal or (in the case of insurance) state regulatory approval will generally be required.

338 The discussion in this § 9.05[12] is based on Edward F. Greene, *Regulatory and Legislative Responses to Takeover Activity in the 1980s: The United States and Europe*, 69 TEX. L. REV. 1539 (1991).

339 *See Edgar v. Mite Corp.*, 457 U.S. 624 (1982).

340 The SEC adopted (i) Rule 14e-1(a) under the Exchange Act in 1979, requiring tender offers to remain open for at least 20 business days, SEC Release No. 34-16384 (Nov. 29, 1979); (ii) Rule 14d-8 under the Exchange Act in 1982, requiring that all partial offers be prorated over the entire period the offer was open, thus eliminating any incentive to tender early in the offering period, SEC Release No. 34-19446 (Dec. 15, 1982); (iii) Rule 14d-7 under the Exchange Act in 1986, requiring withdrawal rights to be available during the entire period an offer was open, SEC Release No. 34-23421 (July 11, 1986); and (iv) Rules 14d-10 and 13e-4 under the Exchange Act in 1986, requiring that a bidder's or issuer's tender offer be open to all holders of the class of securities subject to the tender offer and that each securityholder be paid the highest consideration paid to any other securityholder during the tender offer, SEC Release No. 34-23421 (July 11, 1986).

341 Whereas the SEC permits a bidder to launch a bid that is subject to the condition that adequate financing be obtained, requiring only that there be a reasonable basis for the bidder to believe that there will be

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                    613
All rights reserved.

financing available, the U.K. Panel on Takeovers and Mergers does not permit financing conditions in U.K. takeover bids (although, if the bidder is likely to require a significantly long period ( *e.g.*, more than 12 months) to obtain a necessary, material regulatory clearance, the U.K. Panel on Takeovers and Mergers may permit a financing condition if it would be unreasonable for the bidder to maintain committed financing throughout the period). *See* U.K. City Code on Takeovers and Mergers, Rule 13.4; Rule 14e-8(c) under the Exchange Act; *see also supra* Note 110.

342  *See supra* Note 340.

343  *See*, *e.g.*, N.Y. BUS. CORP. LAW § 912 (McKinney 2003); DEL. CODE ANN. tit. 8 § 203 (2012).

344  15 PA. CONS. STAT. ANN. §§ 2541–2548; S .D. CODIFIED LAWS §§ 47-33-8 to 47-33-16; ME. REV. STAT. ANN. tit. 13-C, § 1110.

345  OHIO REV. CODE ANN. § 1707.043; 15 PA. CONS. STAT. ANN. §§ 2571–2576.

346  The Delaware Supreme Court has upheld a board's reduction of a pill trigger to 4.99%, and its subsequent implementation of a dilutive exchange provision under such pill, in a circumstance in which the pill was designed to preserve the availability of the company's net operating loss carryforwards. *See Selectica, Inc. v. Versata, Inc.*, C.A. No. 4241-VCN, 2010 WL 703062 (Del. Ch. Feb. 26, 2010), *aff'd*, 5 A.3d 586 (Del. 2010). *But see Yucaipa American Alliance Fund II, L.P. v. Riggio*, 1 A.3d 310 (Del. Ch. 2010), *aff'd*, 15 A.3d 218 (Del. 2011) (expressing concern about net operating loss pills with triggers of 4.99% and interpreting "preclusive" in a broader manner than *Selectica*).

347  *See* Rule 13d-3(d) under the Exchange Act.

348  *See generally Third Point LLC v. Ruprecht, et al.*, 2014 WL 1922029 (Del. Ch. 2014).

349  Institutional investors generally dislike poison pills, particularly because they are adopted without shareholder approval. Accordingly, they sometimes put informal pressure on boards to redeem them. Each year a number of companies also face shareholder resolutions (which are generally nonbinding) requesting the board to redeem the poison pill, which often receive a majority of support of the shares actually voted.

350  Poison pills cannot, in Delaware, contain provisions to prevent or delay newly elected directors from redeeming the poison pill. *See Quickturn Design Systems v. Shapiro*, 721 A.2d 1281 (Del. 1998); *Carmody v. Toll Brothers*, 723 A.2d 1180 (Del. Ch. 1998). In some other states, however, the courts have upheld such "dead hand" provisions. *See Invacare Corp. v. Healthdyne Technologies*, 968 F. Supp. 1578 (N.D. Ga. 1997); *AMP Inc. v. Allied Signal*, 1998 U.S. Dist. LEXIS 15617 (E.D. Pa. Oct. 8, 1998), *rev'd on other grounds*, 168 F.3d 649 (3d Cir. 1999).

351  The Delaware courts confirmed this principle in *Air Products & Chemicals, Inc. v. Airgas, Inc.*, 16 A.3d 48 (Del. Ch. 2011). There, the board of the target (Airgas, Inc.) elected to keep the company's poison pill in place in the face of a tender offer by Air Products, despite several price increases and extensions of the offer. The *Air Products* court noted that, while a target board cannot blindly refuse to consider a tender offer for the company, if the board is properly informed and is found to be acting in good faith, it may reject such an offer in its business judgment, assuming that the defensive measures adopted by the board are found to be reasonable in relation to the threat posed by a hostile offer to purchase the company at an inadequate price.

352  This view was clearly expressed by the Seventh Circuit in *Panter v. Marshall Field & Co.*, 646 F.2d 271 (7th Cir.), *cert. denied*, 454 U.S. 1092 (1981). In *Panter*, the court considered a challenge to defensive tactics adopted by directors of Marshall Field in response to a hostile offer by Carter Hawley Hale. The court affirmed the district court's directed verdict in favor of Marshall Field, finding that "[i]n the absence of fraud, bad faith, gross overreaching or abuse of discretion" the courts should not interfere with directors' judgment. *Panter v. Marshall Field & Co.*, 486 F. Supp. 1168, 1194 (N.D. Ill. 1980).

353  *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985); *see also Unitrin, Inc. v. American General Corp.*, 651 A.2d 1361 (Del. 1995). Delaware law is important because many large U.S. companies are Delaware corporations, and because much of the law concerning directors' obligations has been determined in proceedings in the Delaware courts.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

354   The first part of the test can be satisfied by directors demonstrating that they acted in good faith and with reasonable investigation.

355   "Lock-ups" are options granted to a bidder on target securities or assets that become exercisable if another bidder acquires the target at a higher price. "Break-up" fees are fees payable to the original bidder in the event another bidder acquires the target at a higher price. "No-shop" clauses are covenants that restrict a target from soliciting or accepting other offers to acquire the company.

356   *See OmniCare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del. 2003). *But see Orman v. Cullman*, Civ. Act. No. 18039, 2004 Del. Ch. LEXIS 150 (Del. Ch. Oct. 20, 2004) (declining to apply the *Omnicare* decision to a case in which the shareholders that approved the merger were fully informed and the deal protection mechanisms at issue (principally an 18-month lock-up agreement with the majority shareholders requiring them to not sell their shares and to vote against any alternative transaction) were not tantamount to *a fait accompli* because the merger agreement provided the target's board with a meaningful and effective fiduciary out and required approval of a majority of the minority shareholders before the merger could be consummated).

357   If, following the acquisition, the combined company has a controlling shareholder, the target shareholders will have given up their opportunity to obtain a control premium.

358   *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986); *see also Paramount Communications, Inc. v. QVC Network Inc.*, 637 A.2d 34 (Del. 1994); *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270 (Del. 1994), *aff'd*, 678 A.2d 533 (Del. 1996). *Lyondell Chemical Co. v. Ryan*, 970 A.2d 235, 242 (Del. 2009) ( *Revlon* duties are triggered when a company "embarks on a transaction … that will result in a change in control" not merely when the company is "in play.").

359   *See* the definitions of the terms "offer" and "sale" in § 2(3) of the Securities Act. For examples of vendor placement no-action letters, *see*, *e.g.*, *Singapore Telecommunications Limited* (avail. May 15, 2001), *Airline Industry Revitalization Co. Inc.* (avail. Sept. 9, 1999), *TABCORP Holdings Ltd.* (avail. Aug. 27, 1999), *Durban Roodepoort Deep, Ltd.* (avail. June 22, 1999), *AMP Ltd.* (avail. Sept. 17, 1998), *Oldcastle, Inc.* (avail. July 3, 1986), *Hudson Bay Mining and Smelting Co., Ltd.* (avail. June 19, 1985) and *Electrocomponents PLC* (avail. Sept. 23, 1982).

360   2008 Cross-Border Amendments.

361   2008 Cross-Border Amendments, 73 Fed. Reg. 60,050, 60,078 (Oct. 9, 2008) ( "Unless the market for the bidder's securities to be sold through the vendor placement process is highly liquid and robust and the number of bidder securities to be issued for the benefit of U.S. target holders relatively small compared to the total number of bidder securities outstanding, a vendor placement arrangement in a cross-border exchange offer would in our view be subject to Securities Act registration under Section 5.") A vendor placement may be subject to the equal treatment provisions of Rules 13e-4(f)(8) and 14d-10 under the Exchange Act; however, the SEC has stated that it generally believes cross-border tender offers eligible to be conducted under the Tier I exemption, and therefore not subject to the equal treatment rules, are the appropriate situation for vendor placements. SEC Release No. 33-8957 (Sept. 19, 2008). In light of the SEC's position, if U.S. ownership exceeds the limits of the Tier I exemption, it would be advisable to approach the SEC staff for a no-action letter before proceeding with a vendor placement. *See TABCORP Holding Ltd.* (avail. Aug. 20, 1999) (granting no-action relief from the equal treatment provisions for an offer by an Australian company, approximately 17% of the ordinary shares of which was beneficially owned by U.S. holders).

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

# U.S. Regulation of the International Securities and Derivatives Markets, § 9.06, REPORTING REQUIREMENTS UNDER THE HART-SCOTT-RODINO ANTITRUST IMPROVEMENTS ACT

U.S. Regulation of the International Securities and Derivatives Markets
1 Edward F. Greene, Alan L. Beller, Edward J. Rosen, Leslie N. Silverman, Daniel A. Braverman, Sebastian R. Sperber, Nicolas Grabar & Adam E. Fleisher, U.S. Regulation of the International Securities and Derivatives Markets § 9.06 (11th and 12th Editions 2014-2017)
11th and 12th Editions

  Click to open document in a browser

p. 9-105

The HSR Act [362] and the rules promulgated under it (the "HSR Rules") [363] require parties contemplating most large mergers and acquisitions with a significant U.S. connection to notify the Federal Trade Commission (the "FTC") and the Department of Justice (the "DOJ") and to observe a waiting period before closing. [364] The purpose of the HSR Act is to enable the FTC and the DOJ to review transactions for antitrust issues before closing and, where necessary, to seek a federal court injunction to prevent them from closing. [365]

## [1] Jurisdictional Tests

p. 9-105
p. 9-106

Acquisitions of assets, voting securities, and non-corporate interests, as well as mergers, tender offers, or the formation of joint ventures are all potentially reportable if the value of any party's acquisition exceeds $78.2 million (as adjusted). [366] Acquisitions valued at $78.2 million or less are not reportable under the HSR Act under any circumstances, [367] although the DOJ or FTC can still challenge such a transaction on substantive grounds under § 7 of the Clayton Act. [368] Acquisitions of debt instruments or other securities that do not carry voting rights are also never reportable.

The value of a transaction for HSR Act purposes is generally the greatest of the stated acquisition price, the market price of any traded voting securities to be acquired, and the fair market value of the assets or any untraded voting securities to be acquired. [369] The acquiring person must generally aggregate all voting securities or non-corporate interests of the target company that it will hold after

p. 9-106
p. 9-107

the transaction, including holdings from previous purchases (unless those previous purchases were reported under the HSR Act in the last five years and the acquiring person is not crossing a higher notification threshold), and it must generally aggregate any assets of the target that it has purchased (or has signed an agreement or letter of intent to purchase) within 180 days of the execution of the present transaction agreement (unless those previous acquisitions were reported under the HSR Act). [370]

Unlike the European Commission's Merger Regulation, an acquisition of voting securities may be reportable under the HSR Act if valued at more than $78.2 million even where the transaction would not confer control of the issuer of the voting securities. [371] Moreover, an acquisition of additional voting securities of the same issuer may require an additional HSR Act filing if the subsequent acquisition would cause the acquiring person's holdings to meet or exceed one of the following notification thresholds (as adjusted at the time of the subsequent acquisition): (i) $78.2 million, (ii) $156.3 million, (iii) $781.5 million, (iv) 25% of the issuer's outstanding voting securities if valued greater than $1.563 billion and (v) 50% of the issuer's outstanding voting securities. [372]

After the HSR Act waiting period expires, an acquiring person has one year from the date of expiration to consummate an acquisition at the reported notification threshold. If the acquiring person's holdings of the target's

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                    616
All rights reserved.

voting securities do not meet or exceed the notification threshold reported within that one-year period, then any further acquisition will again be subject to the HSR Act. [373] However, once the acquiring person does meet or exceed the reported notification threshold within a year of the date that the initial waiting period expired, it may then acquire additional voting securities of the target until five years after that initial expiration date—provided that it does not meet or exceed a higher notification threshold. [374] Any acquisitions following the end of this five-year period, even an acquisition of one additional share of the target's voting securities, may trigger a new notification requirement. [375]

Reportable acquisitions are subject to a multi-tiered filing fee structure. Acquisitions valued at more than $78.2 million but less than $156.3 million have a filing fee of $45,000. For transactions valued at $156.3 million or more but less

p. 9-107
---------------------------------------------------------------
p. 9-108

than $781.5 million, the filing fee is $125,000. For transactions valued at $781.5 million or more, the filing fee is $280,000. The waiting period does not begin to run until the filing fee has been received, typically by wire transfer. [376]

# [2] Exemptions

The HSR Act and HSR Rules exempt a number of transactions that satisfy the jurisdictional tests. Several exemptions apply to acquisitions involving assets outside the United States or involving non-U.S. persons or issuers. [377] (These exemptions do not apply to acquisitions of voting securities of a U.S. issuer or assets located in the United States regardless of the nationality of the acquiring person.) The following categories of transactions involving non-U.S. parties or assets are exempt:

- acquisitions of assets located outside the United States (regardless of the nationality of the acquiring person), unless those assets generated more than $78.2 million of sales into the United States during the seller's most recent fiscal year; [378]

- acquisitions by a non-U.S. acquiring person of voting securities of a non-U.S. issuer, unless the acquisition confers control of the issuer *and* the issuer (including all entities controlled by the issuer) either holds assets located in the United States with a total value of more than $78.2 million or it had sales in or into the United States of more than $78.2 million in its most recent fiscal year; [379]

- acquisitions by a U.S. acquiring person of voting securities of a non-U.S. issuer, unless the issuer (including all entities controlled by the issuer) either holds assets located in the United States with a total value of more than $78.2

p. 9-108
---------------------------------------------------------------
p. 9-109

million or it had sales in or into the United States of more than $78.2 million in its most recent fiscal year; [380] and

- acquisitions involving an entity controlled by a foreign state, foreign government or agency thereof, provided that the acquisition is of (i) assets located within that foreign state or (ii) voting securities of an issuer organized under the laws of that state. [381]

There are a number of other exemptions under the HSR Rules that do not focus on the connection with the United States. [382] For example, a person's acquisition of goods or realty in the ordinary course of business—such as an airline's acquisition of an aircraft—is exempt. [383] Similarly, acquisitions of voting securities by an underwriter (including a broker-dealer) for the purpose of resale in the ordinary course of the underwriter's business are also exempt. [384] In addition, acquisitions in foreclosure or upon default (or in connection with a lease financing) are exempt if they result from a transaction that was made for the purpose of providing credit in the ordinary course of the creditor's business. [385] Another financing exemption applies to acquisitions of control of a new or existing unincorporated entity. This exemption applies if the acquiring person contributes only cash

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                    617
All rights reserved.

to the unincorporated entity for the purpose of providing financing and the terms of the financing agreement are such that the acquiring person will no longer control the entity after it realizes its preferred return. [386]

There is also a broad exemption for transactions involving entities that are controlled by the same ultimate parent entity known as the "intra-person" exemption. [387] This exemption may also apply to certain acquisitions of voting securities or certain acquisitions of a controlling interest in an unincorporated entity that are made in exchange for a contribution of assets. [388] This exemption further

--------------------------------------------------------------------------------
p. 9-109
p. 9-110

applies to the buyout of one 50-50 joint venture partner by the other partner, since both partners are considered ultimate parent entities of the venture. [389]

Institutional investors, such as savings banks, trust companies, insurance companies and finance companies, may be exempt from HSR notification requirements provided that the acquisition of voting securities is: (1) made directly by the institutional investor; (2) made in the ordinary course of business; (3) made solely for the purpose of investment (meaning the investment is passive) and (4) the institutional investor does not hold more than 15% of the issuer's outstanding voting securities. [390]

Transactions involving "investment rental property assets" may also be exempt under HSR Rule § 802.5. However, in 2015 the FTC announced its repudiation of its previous informal interpretations of the exemption, which had "expanded the rule's application well beyond the original intent." [391] The FTC's narrower interpretation moving forward emphasizes the requirement "that the property [must] be held solely for rental or investment purposes." [392] In determining whether a transaction falls into this category, the FTC analyzes whether the buyer is acting as a landlord that solely intends to profit from the investment in the real estate and is therefore exempt, or whether the buyer is participating in the business conducted on the property and intends to profit from the business activity, in which case the exemption under § 802.5 does not apply.

Currently, the Premerger Notification Office ("PNO") at the FTC exempts a broad range of acquisitions by real estate investment trusts ("REITs") of real property or other REITs from the HSR Act under the theory that they are "in the ordinary course of business," even if they would not otherwise be exempt. [393] To be exempt a REIT must act in conformity with a REIT's special tax status under the IRS rules and regulations. Recent public statements by PNO officials, however, suggest that the exemption may soon be revised and likely narrowed. At an American Bar Association event in January 2016, a PNO official stated that a REIT holding an operating company is "perhaps not in the ordinary course" of

--------------------------------------------------------------------------------
p. 9-110
p. 9-111

business and that the office was reevaluating the scope of this exemption, but provided no details about the timing of any official action. [394]

Finally, the HSR Act creates an exemption for acquisitions of less than 10 percent of a company's outstanding voting securities if that acquisition is made "solely for the purpose of investment." [395] This is known as the "investment-only exemption." The FTC narrowly construes the investment purpose required to fall within the exemption, emphasizing that the acquiring person's sole purpose in making the acquisition must be passive investment. There must be "no intention of participating in the formulation, determination, or direction of the basic business decisions of the issuer." [396]

Recent enforcement actions by the DOJ and the FTC under the investment-only exemption have tested what activity counts as "participation" in the issuer's business decisions. On July 12, 2016 ValueAct Capital ("ValueAct"), an activist hedge fund, agreed to settle a civil antitrust lawsuit brought by the DOJ for improperly relying on the investment-only exemption when it acquired approximately $2.5 billion in shares of Baker Hughes Inc. and Halliburton Co. in 2014 and 2015 shortly after the companies announced their plan to merge. The DOJ claimed that ValueAct had intended to influence the issuers' business decisions by pressuring directors and officers of each company to take certain actions during the antitrust review of the Baker Hughes/Halliburton transaction. As part of the settlement, ValueAct agreed to pay a record $11 million fine under the HSR Act.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                  618
All rights reserved.

ValueAct had a history of alleged failures to make required HSR Act notifications. [397]

To prove ValueAct's intentions to influence the companies' business decisions, the DOJ relied on communications between the fund and senior executives at Halliburton and Baker Hughes as well as the fund's marketing and advertising materials. The complaint focused on the numerous steps ValueAct allegedly took to pressure directors and officers of each company to adopt a course of action during the difficult antitrust review process. The DOJ also placed particular significance on ValueAct's website and advertising materials, which promoted its strategy of "active, constructive involvement," and explained, "[t]he goal in each investment is to work constructively with management and/or the company's board to implement a strategy or strategies that maximize returns for all shareholders." [398]

p. 9-111
p. 9-112

In an earlier enforcement action, the DOJ (acting on behalf of the FTC) filed suit against another activist fund, Third Point LLC, for wrongfully avoiding HSR premerger reporting requirements through its reliance on the investment-only exemption. [399] In its civil complaint in 2015, the FTC alleged that Third Point was acquiring Yahoo shares while simultaneously trying to influence Yahoo's business decisions, specifically taking concrete steps to change the composition of Yahoo's senior management and board. The FTC described some of ValueAct's actions that were inconsistent with the intent of a passive investor:

- contacted certain individuals to gauge their interest and willingness to become the CEO of Yahoo or a potential board candidate of Yahoo;

- assembled an alternative slate for the Yahoo Board;

- drafted correspondence to Yahoo announcing that Third Point was prepared to join the Yahoo Board;

- internally discussed the possible launch of a proxy battle for directors of Yahoo; and

- stated publicly that it was prepared to propose a slate of directors at Yahoo's next annual meeting. [400]

Because this was Third Point's first violation, the FTC only sought injunctive relief. [401] Shortly after the suit, Third Point came into compliance by filing the required HSR notification and on August 24, 2015, it settled the charges.

The high profile ValueAct and Third Point cases generated a series of questions about the scope of the investment-only exemption, the direction of enforcement actions, and its implications for activist funds and other investors. The recent enforcement actions may hinder activist funds by impeding their ability to buy shares "under the radar" and consequently increasing their upfront investment costs. Another key implication is that behavior once considered commonplace for investors who relied on the investment-only exemption, such as conveying opinions about governance reforms or other strategic courses of

p. 9-112
p. 9-113

action, may be treading into territory that requires HSR notification. The ValueAct case also provides a lesson on how a fund's self-promotion may later serve as evidence of non-passive intent. Still, in the aftermath of these two cases, several ambiguities remain as to what qualifies as non-passive intent.

In an effort to clarify the scope of the investment-only exemption, the FTC director of the Bureau of Competition, Debbie Feinstein, and her staff, published a blog post titled "'*Investment-only*' *means just that.*" In it, the FTC firmly asserts that the investment-only exemption is a "narrow" one and lists conduct it considers "inconsistent" with the intent to be a passive investor such as: "nominating a candidate for the board of directors, holding a board seat or being an officer, proposing corporate action that requires shareholding approval, soliciting proxies, or being a competitor of the issuer." [402] This list, which was derived from the rule's Statement of Basis and Purpose, is by no means exhaustive. The FTC's announcement ends with a broad warning: "[A]ny investor who is considering engaging with management or any person considering taking a board seat should proceed with caution when relying on the investment-only exemption." [403] As to CEOs, board members, and other managing members of companies, the FTC believes these actors should "be aware of the requirements of the HSR Act,

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.
619

should take steps to determine the applicability of the Act to their transactions, and should conduct routine compliance audits as necessary." [404]

## [3] Notification and Report Form

Whenever a transaction is reportable, the acquiring person and acquired person must each file an HSR Act Notification and Report Form ("HSR Form") with the DOJ and FTC. The HSR Form requires detailed information about the party's revenues from U.S. operations, the party's subsidiaries and minority stock holdings and copies of certain documents. The buyer must provide information on the basis of its ultimate parent entity, all controlled entities and any "associates" (generally any other entity under common management). On the other hand, the seller must provide certain information only with respect to the entities or assets that will be sold. [405]

p. 9-113
p. 9-114

In particular, each party must submit all documents prepared by or for any officer or director (of the ultimate parent entity or any entity it controls) for the purpose of evaluating or analyzing the acquisition with respect to market shares, competition, competitors, markets, potential for sales growth or expansion into product or geographic markets, synergies or efficiencies. [406] Parties must supply these documents even when they were created by unsolicited third parties, such as investment banks, and must submit all confidential information memoranda, regardless of content. These documents are called for by Items 4(c) and 4(d) of the HSR Form. These documents often have information directly related to competition and the parties' view of the relevant markets, so they are often the most important aspect of the HSR Form. [407]

The DOJ and FTC maintain in strict confidentiality all information in an HSR Form and the accompanying documents, none of which is subject to disclosure under the Freedom of Information Act. [408] Such materials may not be revealed except in response to a request from the U.S. Congress or as evidence in an administrative or judicial proceeding relating to the underlying transaction. [409] (As discussed below, also note that if the parties request early termination of the waiting period and the request is granted, the FTC will disclose the names of the ultimate parent entities, the acquired entity, and the fact that early termination has been granted.)

An HSR Act filing can be withdrawn voluntarily by written notification to the DOJ and the FTC. If a filing with the SEC under the Exchange Act [410] publicly announces the expiration, termination or withdrawal of a tender offer or the termination of an agreement or letter of intent, then the acquiring person or acquired person must send a letter to the FTC and the DOJ notifying them of the SEC filing, and that letter serves as a withdrawal of the HSR Act filing. [411] Subject to certain conditions, a notification may be resubmitted with no additional filing fee after a withdrawal, resetting the waiting period. [412] This tactic is commonly known as "pull and re-filing" and is typically done in an effort to avoid an in-depth investigation. [413]

In 2016, the FTC and DOJ announced new instructions for submitting HSR filings to clarify language and allow for the use of DVD filings. Although the FTC classified these changes (which were published in the Federal Register) as

p. 9-114
p. 9-115

merely procedural and non-substantive—in order to avoid the need for notice and comment under the Administrative Procedure Act—a comparison with the previous instructions reveals some changes may be substantive after all. [414] For example, under Item 3(b) the FTC now requires the acquiring person produce "agreements not to compete *and other agreements between the parties*." Under the previous instructions acquirors provided documents that "constituted the agreement and non-competes." Under the new rule it remains unclear what "other agreements" may be required, though there is suspicion that the new language was intended to capture the use of privileged "side letters" between parties allocating the risk of an antitrust challenge. The new HSR filing form also creates additional requirements for withholding or redacting privileged materials. If the filing person withholds or redacts portions of any document responsive to Items 4(c) or 4(d), a "privilege log" must explain the reasons for noncompliance and also state the factual basis with enough detail to

© Cleary Gottlieb Steen & Hamilton LLP, 2019.          620
All rights reserved.

support the claim and to be evaluated for its validity. The HSR form also creates a new item, 7(c)(iv)(c), which adds several new industries (furniture, electronics, recreational vehicle parks and camps, rooming and boarding houses, and personal and household good repair and maintenance) for which filers must provide the state, or portion thereof, in which the person filing the notification conducts such operations.

## [4] Waiting Periods

As discussed above, the HSR Act requires that parties to a reportable acquisition observe a waiting period before closing the transaction. For tender offers (and other acquisitions of voting securities, such as open market purchases, from a holder that is not included within the same ultimate parent entity as the issuer), the waiting period begins once the acquiring person alone completes its filing (including the payment of the applicable fee) with the FTC and the DOJ. [415] The acquired person is then required to make its filing no later than the fifteenth (or, in the case of a cash tender offer, the tenth) day following the notification by the acquiring person. [416] For acquisitions for which there is a

signed agreement between the acquiring person and the acquired person, the initial waiting period begins to run only after both have filed their respective HSR Forms with the FTC and the DOJ and paid the appropriate fee. [417]

The length of the waiting period varies depending on the form of the transaction and the course of the reviewing agency's investigation. For cash tender offers [418] and acquisitions out of bankruptcy subject to 11 U.S.C. § 363(b), the initial waiting period is 15 days. [419] For other transactions, the initial waiting period is 30 days. The parties may request early termination of the initial waiting period, which is often granted in cases raising no significant competitive issues. In the event that early termination is granted, notice is published in the Federal Register and on the FTC's website identifying the ultimate parent entities, the acquired entity and the fact that early termination was granted. [420] If any waiting period would otherwise end on a Saturday, Sunday or holiday, the waiting period is automatically extended to the next business day. [421]

Before the initial waiting period expires, the FTC or the DOJ can request additional information and documentary material concerning the proposed transaction. [422] Such requests for additional information are commonly referred to as "second requests." A second request is essentially a civil subpoena requiring the recipient to collect and submit a wide range of documents and data. When a second request is issued, the waiting period is extended until each of the parties (or, in the case of a tender offer, the acquiring person) substantially complies with the second request and an additional waiting period has expired. [423] For cash tender offers and acquisitions out of bankruptcy subject to 11 U.S.C. § 363(b), this additional waiting period is ten days; for all other transactions, the additional waiting period is 30 days. [424] Alternatively, at any time before the parties substantially comply with the second request, the reviewing agency may end the waiting period by granting early termination, i.e., if it concludes that the competitive issues it was investigating will not be a problem, or the parties and the reviewing agency may enter into a consent decree requiring a remedy to resolve the reviewing agency's competitive concerns.

The reviewing agency may, at any time prior to the consummation of the transaction, seek a preliminary injunction blocking the transaction in federal court. The standards for obtaining such an injunction differ for the DOJ and the

FTC. Whereas the DOJ seeks a preliminary injunction under the same standards as other litigants, the FTC must demonstrate that a preliminary injunction is in the public interest (albeit considering the equities and the likelihood of success). [425] Courts have traditionally treated the DOJ and FTC similarly in practice, notwithstanding some decisions that suggest the FTC's standard may be less onerous. [426] In either case, the likelihood of the agency's success on the merits is judged under § 7 of the Clayton Act because it would substantially lessen competition or tend to create a monopoly in a line of commerce. [427] However, the DOJ

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                      621
All rights reserved.

Case 23-09001   Document 91-38   Filed in TXSB on 03/17/23   Page 89 of 102

U.S. Regulation of the International Securities and Derivatives Markets, §
9.06, REPORTING...

presents its merits case in the same federal court in which it seeks its preliminary injunction, while the FTC presents its merits case before an internal administrative tribunal.

Because the parties are free to consummate the transaction at any time after the waiting period expires, the reviewing agency often requests additional time from the parties to make its decision on whether to challenge the transaction in court. Parties often find it is in their interest to grant such requests, as this can give the parties more time to demonstrate that the transaction is not anticompetitive or enable the parties and the reviewing agency to negotiate a mutually acceptable settlement of the case such as a divestiture.

## [5] Gun Jumping

The parties to a transaction must maintain their separate and independent existence until the HSR Act waiting period expires and the transaction closes. When parties fail to observe these requirements, they are said to engage in "gun jumping." Gun jumping may violate the HSR Act (if the parties effectively transfer beneficial ownership to the buyer before the HSR Act waiting period expires) or § 1 of the Sherman Act (if the parties coordinate their competitive behavior before closing). Enforcement actions by the DOJ and FTC have generally focused on three types of gun jumping behavior: (i) implementing integration plans or asserting management control over the company to be acquired, (ii) sharing competitively sensitive information or coordinating competitive behavior, and (iii) transferring to the buyer an excessive amount of the economic risk associated with the company to be acquired. Although gun-jumping analysis is slightly different under the HSR Act than the Sherman Act, enforcement

p. 9-117
p. 9-118

actions based on either statute have generally been brought only in the most flagrant cases, where it was obvious that the parties simply "acted as if the merger had already occurred." [428]

## [6] Penalties

Failure to comply with the HSR Act may result in civil penalties. Violation of the HSR Act may subject any person, or any officer, director, or partner of such person, to a civil penalty of up to $40,000 per day from the day of closing to the day the party complies. [429] Such penalties have been imposed for failing to file, submitting incomplete or inaccurate files [430] and engaging in gun jumping while the waiting period is running. [431] The HSR Act also authorizes federal courts to order compliance, grant other discretionary equitable relief and extend the statutory waiting periods until there has been substantial compliance, [432] although these procedures have seldom been used.

---

**Footnotes**

362  Hart-Scott-Rodino Antitrust Improvements Act, Pub. L. No. 94-435, tit. II, § 201, 90 Stat. 1383 (1976) (codified as amended at 15 U.S.C. § 18a). The HSR Act was most recently amended in December 2000. District of Columbia Appropriations Act, 2001, Pub. L. No. 106-553, § 630, 114 Stat. 2762 (2000). References in this section to the HSR Act are to the statute as most recently amended.

363  The HSR Rules are codified at 16 C.F.R. § 801–03.

364  Proper application of the HSR Rules requires an understanding of a few key terms. "Person" is defined by reference to an "ultimate parent entity," meaning an individual or a legal entity not controlled by an individual or any other entity. *See* HSR Rules § 801.1(a)(3). An acquiring person includes all the entities controlled by the ultimate parent entity. *See* HSR Rules § 801.1(a)(1). "Control" means: (i) holding 50% or more of the outstanding voting securities of an issuer, (ii) having the contractual power presently to designate 50% or more of the directors of a corporation, or in the case of trusts, the trustee of such trust or (iii) in the case of an unincorporated entity, having the right to 50% or more of the profits of the entity (or, on dissolution, the right to 50% or more of the assets of the entity). HSR Rules § 801.1(b). "Voting security" means any security that presently or upon conversion gives its holder the ability to vote for the election of

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

directors of the issuer of the security or an entity in the same person as the issuer. HSR Rules §
801.1(f)(1)(i).  "Non-corporate interest" means an interest in any unincorporated entity that gives the holder
the right to any profits of the entity or the right to any assets of the entity in the event of the dissolution of
that entity. HSR Rules § 801.1(f)(ii).

365   H.R. Rep. No. 94-1373, at 8 (1976). The HSR Act is strictly procedural and does not affect the FTC's or
DOJ's jurisdiction to challenge any transaction, even those that are not reportable under the HSR Act or
those for which the HSR Act waiting period has expired. Nonetheless, companies generally interpret
expiration of the HSR Act waiting period as an indication that the FTC and DOJ will not challenge a
transaction. In 2003, however, the FTC obtained an order from an FTC Administrative Law Judge requiring
Chicago Bridge & Iron Works Co. to divest assets it acquired from Pitt-Des Moines Inc. in a reported
transaction that had closed over two years before the ruling. The FTC commissioners then reviewed the
case, issuing an opinion in 2004 that largely upheld the administrative law judge's findings and also
required a divestiture (although a slightly modified one) as a remedy. This appears to be the first challenge
of a consummated transaction after expiration of the waiting period (there was no indication that the parties'
HSR Act filings did not give the FTC the intended opportunity to assess potential competitive harm). It is
worth noting, however, that the FTC began investigating before the acquisition closed, giving the parties
notice of a possible challenge despite the expiration of the HSR Act waiting period. In light of this case,
companies should not necessarily interpret expiration of the HSR Act waiting period as a guarantee that the
FTC or DOJ will not challenge their transaction, especially where the reviewing agency launches an
investigation after the waiting period has expired but before the parties have consummated their
transaction. *See In the Matter of Chicago Bridge & Iron Company, N.V.*, 2004 FTC LEXIS 250 (Dec. 21,
2004).

366   The HSR Act reporting thresholds are adjusted annually based on the change in U.S. gross national
product. The reporting threshold increased from $76.3 million for 2015 to $78.2 million for 2016. *See*
Revised Jurisdictional Thresholds For Section 7A of the Clayton Act, 81 Fed. Reg.16, 4299 (Jan. 26, 2016).

367   This threshold is known as the "size-of-transaction" test. For transactions valued at more than $78.2 million
(as adjusted) but not more than $312.6 million (as adjusted), an additional jurisdictional threshold—called
the "size-of-person" threshold—must be met for the transaction to be reportable. Specifically, such a
transaction is not reportable unless one of the following three conditions is satisfied: (i) voting securities or
assets of a person engaged in manufacturing with annual net sales or total assets of $15.6 million (as
adjusted) or more will be acquired by a person with total assets or annual net sales of $156.3 million (as
adjusted) or more, (ii) voting securities or assets of a person not engaged in manufacturing with total assets
of $15.6 million (as adjusted) or more, will be acquired by a person with total assets or annual net sales of
$156.3 million (as adjusted) or more; or (iii) voting securities or assets of a person with annual net sales or
total assets of $156.3 million (as adjusted) or more will be acquired by a person with total assets or annual
net sales of $15.6 million (as adjusted) or more. HSR Act § 18a(a)(2)(B). Annual net sales and total assets
must include all net sales and assets, whether foreign or domestic, of the "ultimate parent entity" (and all
entities it controls).

368   Clayton Act, ch. 223, § 7, 38 Stat. 730 (1914) (codified as amended at 15 U.S.C. § 18); FTC Act, Act of
September 26, 1914, ch. 311, § 5, 38 Stat. 717, 719 (codified as amended at 15 U.S.C. §§ 41–58). On
January 10, 2013, the DOJ filed lawsuit in the U.S. District Court for the Northern District of California
seeking to unwind Bazaarvoice's June 2012 acquisition of PowerReviews. The transaction was not
reportable under the HSR Act, but the DOJ challenged the merger on the grounds that it allegedly
eliminated Bazaarvoice's only significant rival, in violation of § 7 of the Clayton Act. The DOJ began its
investigation shortly after the transaction closed. The trial was held in September 2013, and in January
2014, the U.S. District Court for the Northern District of California ruled in favor of the DOJ, finding that the
transaction violated § 7 of the Clayton Act. *United States v. Bazaarvoice, Inc.*, Trade Cas. (CCH) ¶78,641
(N.D. Cal. Jan. 8, 2014).

369   HSR Rules § 801.10.

370   HSR Rules § 801.13.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

371  HSR Rules § 801.1(h). On the other hand, the formation of an unincorporated entity or the acquisition of noncorporate interests is only reportable if the acquiring person would control the entity as a result of the transaction. HSR Rules § 801.50, § 801.2(f).

372  HSR Rules § 801.1(h).

373  HSR Rules § 803.7.

374  HSR Rules § 802.21.

375  However, another notification requirement may only be triggered by another acquisition. *See* HSR Act § 18a(a). An increase in the market price of voting securities such that the value held by the acquiring person would exceed a notification threshold (or a higher notification threshold than previously reported during the five-year period) does not require notification under the HSR Act.

376  HSR Rules § 803.10(b)(2) (although there is no specific rule regarding receipt of the filing fee, the FTC will consider a notification "deficient" until the filing fee is received).

377  A non-U.S. person or issuer is one that (i) is not incorporated in the United States, (ii) is not organized under the laws of the United States, (iii) does not have its principal offices within the United States and (iv) in the case of an individual, is neither a citizen nor resident of the United States. HSR Rules § 801.1(e)(2)(i)–(ii). Conversely, a U.S. person or issuer is one that (i) is incorporated in the United States, (ii) is organized under the laws of the United States, (iii) has its principal offices within the United States, or (iv) in the case of an individual, is a citizen or resident of the United States. HSR Rules § 801.1(e)(1)(i)–(ii).

378  HSR Rules § 802.50.

379  HSR Rules § 802.51(b). If controlling interests in multiple foreign entities are being acquired, the sales and assets of all the non-U.S. entities are aggregated to determine whether either of the $78.2 million thresholds is met. Even if these thresholds are exceeded, the acquisition will still be exempt if it is valued at $312.6 million or less and the parties' combined U.S. assets and combined sales in or into the United States in their most recent fiscal years are both less than $171.9 million.

380  HSR Rules § 802.51(a). If voting securities of multiple foreign issuers are being acquired, the sales and assets of all the non-U.S. issuers (and the sales and assets of any unincorporated foreign entities in which a controlling interest is being acquired) are aggregated to determine whether either of the $78.2 million thresholds is met.

381  HSR Rules § 802.52.

382  *See* 15 U.S.C. § 18a(c); HSR Rules § 802 (listing various exemptions). The full range of HSR Act exemptions is beyond the scope of this treatise. Parties to potentially reportable transactions should review the available exemptions carefully to determine if an exemption applies to the particular transaction.

383  15 U.S.C. § 18a(c)(1); HSR Rules § 802.1.

384  HSR Rules § 802.60.

385  HSR Rules § 802.63.

386  HSR Rules § 802.65.

387  HSR § 18a(c)(3); HSR Rules § 802.30.

388  *See* HSR Rules § 802.30(c), and related examples, discussing the interaction of the exemption in HSR Rules § 802.4 and the intra-person exemption.

389  *See* HSR Rules § 802.30(a), example 1.

390  HSR Rules § 802.64.

391  Premerger Notification Staff, Bureau of Competition, Federal Trade Commission, *HSR Rule 802.5: The Investment Rental Property Exemption*, FTC Blogs (July 20, 2015, 10:56 AM), https://www.ftc.gov/news-events/blogs/competition-matters/2015/07/hsr-rule-8025-investment-rental-property-exemption.

392  Premerger Notification Staff, Bureau of Competition, Federal Trade Commission, *HSR Rule 802.5: The Investment Rental Property Exemption*, FTC Blogs (July 20, 2015, 10:56 AM), https://www.ftc.gov/news-

events/blogs/competition-matters/2015/07/hsr-rule-8025-investment-rental-property-exemption.

393   American Bar Association, Premerger Notification Practice Manual #105 (5th ed. 2015);  *see* 15 U.S.C. §
      18a(c)(1);  HSR Rules §§ 802.1, 802.4, 802.5.

394   Kathryn E. Walsh, Deputy Assistant Director in Hart-Scott-Rodino:  Back to Basics," American Bar
      Association webinar.  Presented on January 14, 2016.

395   15 U.S.C. § 18a(c)(9).

396   HSR Rule § 801.1(i)(1).

397   *See United States v. ValueAct Capital Partners, L.P.*, No. 1:07-cv-02267  (D.D.C. Dec. 19, 2007).

398   Complaint, 2-4, *United States v. VA Partners I, LLC*, No. 3:16-cv-01672  (N.D. Cal. Apr. 4, 2016).

399   *See* Complaint,  *United States v. Third Point Offshore Fund, Ltd.*, No. 15-cv-01366  (D.D.C. Aug. 2015).

400   Debbie Feinstein, Ken Libby and Jennifer Lee, Federal Trade Commission, *"Investment-only" means just
      that*, FTC Blogs (Aug. 24, 2015), https://www.ftc.gov/news-events/blogs/competition-
      matters/2015/08/investment-only-means-just.

401   The FTC has the authority to impose civil penalties of $40,000 per day that the offending party is in
      violation.  HSR Act § 18a(g)(1);  16 C.F.R. § 1.98(a); *See* Adjustments of Civil Monetary Penalty Amounts,
      Interim Final Rule, 81 Fed. Reg. 126, 42476 (June 30, 2016) (increasing the maximum civil penalty amount
      under the Hart-Scott-Rodino  Act from $16,000 to $40,000).

402   Debbie Feinstein, Ken Libby and Jennifer Lee, Federal Trade Commission, *"Investment-only" means just
      that*, FTC Blogs (Aug. 24, 2015), https://www.ftc.gov/news-events/blogs/competition-
      matters/2015/08/investment-only-means-just.

403   Debbie Feinstein, Ken Libby and Jennifer Lee, Federal Trade Commission, *"Investment-only" means just
      that*, FTC Blogs (Aug. 24, 2015), https://www.ftc.gov/news-events/blogs/competition-
      matters/2015/08/investment-only-means-just.

404   Debbie Feinstein, Ken Libby and Jennifer Lee, Federal Trade Commission, *"Investment-only" means just
      that*, FTC Blogs (Aug. 24, 2015), https://www.ftc.gov/news-events/blogs/competition-
      matters/2015/08/investment-only-means-just.

405   HSR Rules § 803.2(b)(1)(ii)–(iii).

406   *See* HSR Form Instructions for Items 4(c) and 4(d).

407   The FTC and DOJ have imposed substantial penalties for failing to submit all such documents. *See infra*
      Note 417; HSR Act § 18a(h).

408   HSR Act § 18a(h).

409   HSR Act § 18a(h).

410   15 U.S.C. 78a *et seq.*

411   HSR Rules § 803.12 (effective  as of Aug. 9, 2013).

412   HSR Rules § 803.12 (effective  as of Aug. 9, 2013).

413   *See* § 9.06[4] the next section for additional  detail.

414   Premerger Notification; Reporting and Waiting Period Requirements,  Final Rule, 81 Fed. Reg. 170, 60257-
      170, 60258 (Sept. 1, 2016) ( "These changes are not substantive  in nature, and involve  formatting,
      clarification, and simplification, as well as the deletion of immaterial language, with the goal of eliminating
      confusion  for filing parties.")

415   HSR Rules § 803.10(a).

416   Failure of the acquired person to file in such situations does not, however,  affect the running of the waiting
      period. HSR Rules § 803.10.

417   HSR Rules § 803.10(b)–(c).

418   A cash tender offer is defined as a tender offer in which cash is the only consideration offered  to the holders

of the voting securities to be acquired. HSR Rules § 801.1(g)(2).

419  HSR Act § 18a(b)(1)(B);  HSR Rules § 803.10(b).

420  HSR Act § 18a(b)(2).

421  HSR Act § 18a(k).

422  HSR Act § 18a(e).

423  HSR Rules § 803.20(c).

424  HSR Act § 18a(e)(2);  HSR Rules § 803.10(b).

425  15 U.S.C. § 53(a).

426  *See, e.g., FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008) (reaffirming that the FTC need only show "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation").

427  *See* 15 U.S.C. § 18. If the FTC rather than the DOJ files the lawsuit, the FTC would also allege that the transaction violates § 5 of the FTC Act, 15 U.S.C. § 45(b), for the same reason.

428  William Blumenthal, General Counsel, FTC, Remarks before the Association of Corporate Counsel, Annual Antitrust Seminar of Greater New York Chapter: The Rhetoric of Gun Jumping, at 7 (Nov. 10, 2005).

429  HSR Act § 18a(g)(1);  16 C.F.R. § 1.98.

430  *See, e.g., United States v. Hearst Corp.*, Trade Cas. (CCH) ¶73,451, Final Judgment (D.D.C. Oct. 15, 2001) (Hearst paid $4 million to settle charges that it failed to produce certain 4(c) documents in connection with its acquisition of Medi-Span); *United States v. Automatic Data Processing, Inc.*, Trade Cas. (CCH) ¶71,361 (D.D.C. Apr. 10, 1996) (ADP paid a $2.97 million fine, the maximum allowed under the circumstances, to settle charges that it failed to include 4(c) documents with its HSR filing regarding its acquisition of Autoinfo, Inc.).

431  *See, e.g., United States v. Gemstar-TV Guide International, Inc.*, Trade Cas. (CCH) ¶74,082, Final Judgment (D.D.C. July 11, 2003) (parties agreed to $5.676 million penalty to settle charges they implemented integration plans and coordinated competitive behavior).

432  HSR Act § 18a(g)(2).

# U.S. Regulation of the International Securities and Derivatives Markets, § 9.07, REPORTING REQUIREMENTS AND NATIONAL SECURITY REVIEW UNDER THE EXON-FLORIO AMENDMENT

U.S. Regulation of the International Securities and Derivatives Markets
1 Edward F. Greene, Alan L. Beller, Edward J. Rosen, Leslie N. Silverman, Daniel A. Braverman, Sebastian R. Sperber, Nicolas Grabar & Adam E. Fleisher, U.S. Regulation of the International Securities and Derivatives Markets § 9.07 (11th and 12th Editions 2014-2017)
11th and 12th Editions

 Click to open document in a browser

Foreign investors in U.S. companies must also consider the potential applicability of the Exon-Florio Amendment to the Defense Production Act of 1950 (the "Exon-Florio Amendment") [433] and the regime it establishes to review foreign investment in U.S. companies from a national security perspective. The

p. 9-119

Exon-Florio Amendment grants the President the authority to suspend or prohibit [434] acquisitions, mergers or takeovers by foreign persons [435] of U.S. businesses [436] that threaten to impair the national security of the United States. [437] To exercise this authority, the President must find that (i) there is credible evidence that the foreign interest exercising control [438] "might take action that threatens to impair the national security" and (ii) other laws do not, in the President's judgment, provide "adequate and appropriate authority" to protect the national security. [439] Both "control" and "national security" are interpreted expansively and give CFIUS considerable discretion to review transactions of interest.

The Exon-Florio Amendment establishes CFIUS to review transactions. [440] CFIUS is a committee comprised of representatives from various government agencies and offices, including the heads of the Departments of Defense, Justice, State, Commerce, Energy and Homeland Security and of the Offices of the U.S. Trade Representative and Science and Technology Policy, and it is chaired by the Secretary of the Treasury. The Exon-Florio Amendment sets forth a procedure under which parties to a transaction wishing to obtain assurances regarding the absence of national security issues can file a voluntary notification, which is confidential, that triggers a national security review. [441] If CFIUS determines at the conclusion of an initial 30-day review period (following a pre-notification review and acceptance of the filing) that the transaction raises no national security concerns or does not fall within the statute, no further investigation will occur. If CFIUS decides that a full investigation is necessary, it has 45 days to conduct the investigation. At the end of the investigation period, CFIUS can clear the transaction or clear it with conditions (including so-called "mitigation agreements" imposing future obligations on the acquiror, described below). If CFIUS finds that the transaction should be blocked or it cannot come to a conclusion about the transaction, CFIUS submits a report to the President, [442] who has 15 days thereafter to announce a decision. [443]

p. 9-120
p. 9-121

Parties to an acquisition are presented with a difficult decision: notification to CFIUS is voluntary in the absence of a government-initiated review, the statutory standards for evaluating threats to "national security" are vague and the process is unpredictable and subject to political risk. On the one hand, if the transaction is notified to CFIUS, while the parties are technically free to proceed while CFIUS review is underway, as a practical matter, an ongoing review is likely to impede consummation of the transaction. The timing of reviews, particularly the pre-notification and acceptance periods, is becoming more uncertain. Moreover, notification may draw attention to a transaction of marginal interest that otherwise might pass unaffected, may impose burdensome requirements on parties to provide additional information to CFIUS, and may lead to pressure from U.S. government agencies to make changes in the transaction that might not be made in the absence of a request for clearance. On the other hand, if no notice is given, the parties may be at some disadvantage if the government

initiates its own review, and the parties will be exposed to the fairly remote but indefinite risk that CFIUS might in the future review the transaction and the President impose conditions or order divestiture. The parties may also be more vulnerable to political criticism of the transaction and subject to the timing risk that the target, a rival bidder or another interested party may seek to generate controversy and demands for a CFIUS review at a late stage.

## [1] Acquisitions by Entities Controlled by Foreign Governments

If a transaction that would result in control of a U.S. person by "a foreign government or an entity controlled by or acting on behalf of a foreign government" is notified, a second-stage 45-day investigation is presumptively required. [444] The 45-day investigation may, however, be waived if the Treasury Department and the agency leading the review make a specific determination at a senior level (Deputy Secretary or Secretary) that the transaction will not impair national security.

## [2] Approvals Conditioned on Mitigation Agreements

CFIUS may enter into or impose (and enforce) "any agreement or condition" with any party to a transaction in order to mitigate any national security threat that arises in connection with the transaction, and CFIUS may refuse to

p. 9-121
p. 9-122

approve a transaction until a satisfactory agreement is in place. [445] Mitigation agreements have become increasingly prevalent in CFIUS reviews, particularly for transactions involving classified contracts or "critical infrastructure" sectors such as energy, telecommunications and transportation. Typical agreements might require a security plan, restrictions on foreign personnel, restrictions on locating assets outside the United States, reserving certain matters to U.S. management and reporting or cooperation obligations. In more difficult cases, a sensitive business may have to be segregated in a subsidiary with an independent board.

Senior officials of the CFIUS agencies may unilaterally reopen a transaction that had previously been approved if any party to the transaction or entity resulting from the deal "intentionally materially breaches a mitigation agreement or condition." [446] Such a breach must be certified by the lead agency monitoring the mitigation arrangement, and CFIUS must determine that there are "no other remedies or enforcement tools" available to address it. The agreements may also provide monetary penalties for breach.

## [3] Exempted Transactions

Certain types of transactions are exempted from CFIUS review. The regulations specifically exempt from CFIUS review acquisitions of 10% or less of the outstanding voting interest in a U.S. business (regardless of the dollar value of the interest so acquired) if the transaction is "solely for the purpose of passive investment." [447] A transaction meets the passive criterion if the investor "does not plan or intend to exercise control, does not possess or develop any purpose other than passive investment, and does not take any action inconsistent with holding or acquiring [the interest] solely for purposes of passive investment." [448] It is important to note that this exemption does *not* create a "safe harbor" for investments of 10% or less–the key element for applying the exemption is passivity. Equally, exceeding the 10% benchmark does not create a presumption that an acquisition of control has taken place, although in controversial cases the likelihood of review increases significantly.

Also exempt from CFIUS review is the acquisition of assets in the United States that do not constitute a business in the United States at the time of the acquisition. [449] Thus, a foreign person will not be deemed to have acquired a U.S.

p. 9-122
p. 9-123

business if it acquires from separate and distinct U.S. persons the individual elements of a business such as

© Cleary Gottlieb Steen & Hamilton LLP, 2019.                    628
All rights reserved.

inventory, real estate, production equipment or a license to manufacture a particular product. [450]

A lending transaction generally is exempt from CFIUS review because it is not considered a "transaction" except where "the foreign person acquires economic or governance rights in the U.S. business characteristic of an equity investment, but not of a loan." [451] Absent such a finding, typical loan covenants giving the lender negative rights over certain decisions of the borrower do not implicate CFIUS jurisdiction. However, a loan or other financing arrangement whereby the lender acquires an interest in profits, a right to appoint directors or other financial or governance rights characteristic of equity investments may constitute a covered transaction potentially subject to review. [452] Furthermore, a secured lending transaction may create a notifiable acquisition if the lender forecloses on collateral. The acquisition of collateral may only be notified for review when default is imminent, not at the time of the initial secured loan. [453]

Finally, an acquisition by the same foreign person of an additional interest in a U.S. business, where the foreign person's prior acquisition of an interest in the same entity was a covered transaction that underwent a complete CFIUS review following notification, is not a new covered transaction subject to review. [454] In other words, if an earlier transaction was found to be an acquisition of "control" and cleared, subsequent transactions need not be notified; however, if (as sometimes happens) a minority investment were found *not* to be an acquisition of control, future transactions would still be potentially subject to CFIUS review.

---

**Footnotes**

433   50 U.S.C. app. § 2170. The Exon-Florio Amendment was most recently amended by the Foreign Investment and National Security Act of 2007, Pub. L. No. 110-49, 121 Stat. 246 (hereinafter "FINSA"). In 2008, the Department of the Treasury extensively revised its regulations under the Exon-Florio Amendment to implement FINSA, 31 C.F.R. pt. 800, and issued guidance describing certain factors that the Committee on Foreign Investment in the United States ( "CFIUS"), established under the Exon-Florio Amendment (and more fully described below), considers in assessing potential national security concerns. U.S. Department of the Treasury, Office of Investment Security; Guidance Concerning the National Security Review Conducted by the Committee on Foreign Investment in the United States, 73 Fed. Reg. 74,567 (Dec. 8, 2008).

Additional industry-specific reporting requirements apply to certain significant acquisitions of securities or assets (including acquisitions taking the form of business combinations). These most typically arise in regulated industries, such as telecommunications, television, radio, railroad, airline, banking and insurance. The particular requirements are beyond the scope of this book.

434   In addition, completed transactions not submitted to the voluntary review process described below are subject to divestiture following a post-closing review. 50 U.S.C. app. § 2170(d)(3).

435   A "foreign person" is defined to mean "any foreign national, foreign government or foreign entity" or "any entity over which control is exercised or exercisable by a foreign national, foreign government, or foreign entity." 31 C.F.R. § 800.216. As discussed below, "control" is a very broad concept.

436   A "U.S. business" is defined to include "any entity engaged in interstate commerce in the United States [regardless of the nationality of the persons that control it], but only to the extent of its activities in interstate commerce." 31 C.F.R. § 800.226. The definition thus includes not only U.S.-owned or -controlled corporations but also branches, subsidiaries, offices or operations owned by foreign interests doing business in the United States. A foreign entity that is owned by a U.S. entity and does not have a branch office, subsidiary or fixed place of business in the United States is not a U.S. business, even if it exports to the United States. However, a foreign corporation that is owned by foreign nationals and has a branch or subsidiary in the United States that engages in business in the United States would be, to the extent of its U.S. operations, a "U.S. business" for purposes of the Exon-Florio Amendment. Thus, mergers and acquisitions by non-U.S. entities taking place outside the United States are potentially subject to the Exon-Florio Amendment if either party has operations in the United States. In theory, as described below, a sale of assets ( *e.g.*, licensing or sale of technology with no production facility) may not constitute a "business";

Case 23-09001   Document 91-38   Filed in TXSB on 03/17/23   Page 97 of 102

U.S. Regulation of the International Securities and Derivatives Markets, §
9.07, REPORTING...

in practice, CFIUS has considerable discretion to make that determination.

437   The regulations implementing the Exon-Florio Amendment deliberately do not define "national security," allowing for considerable discretion in its interpretation. However, FINSA specifically clarified that homeland security, including its application to "critical infrastructure," is part of "national security," 50 U.S.C. app. § 2170(a)(5), with the regulations further defining critical infrastructure as "a system or asset, whether physical or virtual, so vital to the United States" that its incapacity or destruction "would have a debilitating impact on national security." 31 C.F.R. § 800.208. CFIUS engages in a two-stage assessment: "whether a foreign person has the capability or intention to exploit or cause harm ( *i.e.*, whether there is a threat) and whether the nature of the U.S. business, or its relationship to a weakness or shortcoming in a system, entity, or structure, creates susceptibility to impairment of U.S. national security ( *i.e.*, whether there is a vulnerability)." U.S. Department of the Treasury, Office of Investment Security; Guidance Concerning the National Security Review Conducted by the Committee on Foreign Investment in the United States, 73 Fed. Reg. 74,567, 74,569 (Dec 8, 2008). Many recent reviews have focused on transactions in industries deemed "critical infrastructure," including energy, telecommunications and transportation.

438   There is no bright line test for "control"; rather, it is evaluated on a case-by-case basis, considering the level of ownership interest, extent of rights and restrictions on them, and other circumstances, and it is defined in general terms as the power, direct or indirect, whether or not exercised, through a majority or dominant minority voting interest or other means, "to determine, direct, or decide important matters affecting an entity." 31 C.F.R. § 800.204(a). However, in practice CFIUS's analysis of "control" does not require anything close to *de jure* control and may be understood informally as "substantial influence." As a formal matter, the regulations identify a number of decision-making rights beyond equity ownership that factor into the analysis of control. 31 C.F.R. § 800.204(a). On the other hand, the regulations list certain minority shareholder protections that are not in themselves deemed to confer control and state that other minority shareholder protections will be considered on a case-by-case basis. 31 C.F.R. § 800.204(c)–(d). Where a number of different foreign persons hold an interest in a U.S. person (even if, taken together, they hold the majority of the stock), the question of whether any one foreign person or group controls the entity will be examined using factors such as whether the foreign persons are related or whether they act in concert. 31 C.F.R. § 800.204(b).

439   50 U.S.C. app. § 2170(d)(4).

440   50 U.S.C. app. § 2170(k)(1).

441   50 U.S.C. app. § 2170(b)(1). Voluntary notices can be withdrawn with the consent of CFIUS, but the relevant transactions are monitored and may be subject to "interim measures" imposed by CFIUS pending resubmission. 50 U.S.C. app. § 2170(b)(1)(C)(ii), (l)(2). CFIUS also retains the right to review in the future any acquisition not notified to it, and has in fact reviewed a number of non-notified transactions post-closing. 50 U.S.C. app. § 2170(b)(1)(D).

442   31 C.F.R. § 800.506(b).

443   50 U.S.C. app. § 2170(d)(2).

444   50 U.S.C. app. § 2170(b)(2)(B)(i)(II) (mandating an investigation); 50 U.S.C. app. § 2170(a)(4) (defining "foreign government-controlled transaction").

445   50 U.S.C. app. § 2170(l)(1)(A). The lead agency is charged with negotiating, modifying, monitoring and enforcing the mitigation agreement, and it must also report on any material modifications.

446   50 U.S.C. app. § 2170(b)(1)(D)(iii).

447   31 C.F.R. § 800.302(b).

448   31 C.F.R. § 800.223.

449   31 C.F.R. § 800.302(c).

450   Such investments in assets are distinguished from the acquisition of assets that are or could readily be operated as businesses ( *e.g.*, branches or operational warehouse facilities that are not separate legal entities at the time of the acquisition)—such acquisitions can be subject to CFIUS review. 31 C.F.R. §

U.S. Regulation of the International Securities and Derivatives Markets, §
9.07, REPORTING…

800.301(c).

451  73 Fed. Reg. 70,702, 70,710 (Nov. 21, 2008) (discussing 31 C.F.R. § 800.303(a)).

452  31 C.F.R. § 800.303(b).

453  31 C.F.R. § 800.303(a).

454  31 C.F.R. § 800.204(e).

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

# U.S. Regulation of the International Securities and Derivatives Markets, § 9.08, COUNTRY- AND PERSON-SPECIFIC INVESTMENT SANCTIONS

U.S. Regulation of the International Securities and Derivatives Markets
1 Edward F. Greene, Alan L. Beller, Edward J. Rosen, Leslie N. Silverman, Daniel A. Braverman, Sebastian R. Sperber, Nicolas Grabar & Adam E. Fleisher, U.S. Regulation of the International Securities and Derivatives Markets § 9.08 (11th and 12th Editions 2014-2017)
11th and 12th Editions

 Click to open document in a browser

## [1] Office of Foreign Assets Control Sanctions

While foreign investors in U.S. companies must consider the application of the Exon-Florio Amendment to such investments, all parties with a relationship to the United States must determine the relevance to their transactions and operations (including those located outside the United States) of U.S. economic

p. 9-124

sanctions administered by the Office of Foreign Assets Control ( "OFAC") of the U.S. Department of the Treasury. [455] Through regulations (the "OFAC Regulations") issued under authority of the International Emergency Economic Powers Act [456] and other statutes, OFAC administers a range of complex sanctions programs that generally restrict persons acting within U.S. jurisdiction—including U.S. citizens and residents, entities formed under U.S. law (including their non-U.S. branches and, in some cases, non-U.S. entities controlled by such persons), any individual or entity located in the United States, and, importantly, foreign persons taking or causing actions within U.S. jurisdiction (including the supply of U.S. origin services, including U.S. dollar payment clearing)—from some or all dealings with: (i) governments (including government-controlled entities) of, or persons in, sanctioned countries or areas, [457] and (ii) certain individuals and entities ( "*sanctioned persons*") specifically designated by OFAC as sanctions targets (as well as entities 50% or more owned by sanctioned persons in the aggregate). [458] While neither SEC registration nor operations in the United States (through a subsidiary or otherwise) require a non-U.S. company to comply globally with OFAC Regulations, as a practical matter they may both make it more likely that U.S. jurisdictional contact may exist (for example, services provided by a U.S. subsidiary that directly support potentially sanctioned activities) and make it more likely as a practical matter that any sanctions violations will come to the attention of the U.S. authorities and result in enforcement action.

In general, the broader OFAC Regulations restrict not only exports to and imports from sanctioned countries, but also equity investments in, business combinations with, sales of securities to and other financial transactions with any

p. 9-124
p. 9-125

government of, or person or entity based in, or controlled from, such a country. [459] Violation of OFAC regulations may result in substantial civil and criminal penalties, including imprisonment.

Of particular interest to non-U.S. SEC-reporting companies is the potential obligation to disclose business activities involving countries and persons subject to OFAC sanctions. In 2001, then-Acting SEC Chairman Laura Unger, confirming the SEC's policy requiring SEC reporting companies to disclose their material business activities involving sanctioned countries and persons, stated in a letter to a U.S. Congressman that "[t]he fact that a foreign company is doing material business with a country, government, or entity on OFAC's … sanctions list is, in the SEC staff's view, substantially likely to be significant to a reasonable investor's decision about whether to invest in that company." [460]

More recently, § 13(r) of the Exchange Act added a requirement for all companies issuing annual or quarterly reports under the Exchange Act to specifically disclose certain Iran-related dealings either by the issuer or by

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

any of the issuer's affiliates. [461] Most important, the issuer must disclose any dealings by it or any of its affiliates with any entity controlled by the Iranian government or any entity subject to U.S. sanctions in connection with terrorism or weapons of mass destruction (which includes many major Iranian institutions), as well as certain activities subject to secondary sanctions (see below). Any disclosable activity must be described in detail, including the nature and extent of the activity, gross revenues and net profits associated with the activity, and whether the issuer intends to continue the activity.

## [2] Sectoral Sanctions

p. 9-125
p. 9-126

OFAC also administers targeted financial and economic sanctions on designated entities in the Russian financial, energy and defense sectors, known as sectoral sanctions. The U.S. Treasury Department issued four directives on July 16, 2014 and September 12, 2014 that identified the Russian financial, energy and defense sectors for sanctions pursuant to Executive Order 13662. [462] Pursuant to sectoral sanctions, specifically designated entities within the identified sectors (not all entities) are subject to limited sanctions that do not prohibit all dealings with the listed entities ( "SSIL Targets") but instead target certain new equity, long-term debt, and oil development transactions.

As with other U.S.-sanctioned persons, all entities 50% or more owned by SSIL Targets are SSIL Targets themselves and are subject to the same restrictions applicable to their parent entities. Principles of aggregation and attribution of ownership interests likewise apply. The SEC has not taken a public position regarding whether material dealings that would be prohibited by sectoral sanctions were they conducted within U.S. jurisdiction should be disclosed, but issuers may wish to consider the possibility.

## [3] Secondary Sanctions

In recent years, the United States has increasingly used sanctions regimes that may be triggered by acts entirely outside U.S. jurisdiction. These "secondary sanctions" do not technically involve violations of U.S. law; rather, the United States has authority to impose U.S. economic sanctions on persons (domestic or foreign) that engage in the targeted activities.

Under most of these secondary sanctions, which are administered primarily by the State Department and, to a lesser extent, by the Treasury Department, the United States has the authority to impose a variety of sanctions on persons engaging in the targeted conduct, ranging from fairly minor (such as disqualification from U.S. export assistance) to severe (designation as a blocked person, or "SDN," subject to full U.S. sanctions freezing all property and barring all transactions within U.S. jurisdiction). Secondary sanctions do not apply automatically once sanctionable conduct becomes known; further administrative action to designate the relevant parties is required, and as a practical matter the decision to impose sanctions is more political than enforcement of OFAC sanctions.

p. 9-126
p. 9-127

The full range of targeted conduct and the corresponding sanctions available is extensive and complex, and a full inventory is beyond the scope of this chapter. To summarize briefly, prior to "Implementation Day" of the Joint Comprehensive Plan of Action ( "JCPOA") between Iran and the P5+1 powers, secondary sanctions targeted a wide range of dealings with Iran, focusing particularly on the energy and financial sectors. [463] However, as a result of the JCPOA, the majority of U.S. secondary sanctions against Iran were lifted, other than those targeting dealings with the remaining U.S.-designated SDNs, nuclear proliferation, and terrorism. [464] Secondary sanctions also continue to apply to "deceptive transactions" with Iran or Syria designed to conceal the interest of U.S. sanctioned persons as well as to transactions linked to ongoing human rights violations in Iran and Syria, "trafficking" in expropriated Cuban property to which a U.S. person has a claim, financial transactions with Hizballah, persons violating U.S. sanctions but evading prosecution, and a variety of arms

proliferation activities. [465] There are secondary sanctions that target persons involved in the destabilization of Ukraine, but the United States has indicated that it does not currently intend to enforce them. [466]

## Footnotes

455  31 C.F.R. pts. 500–599. At present, the OFAC regime prohibits U.S. persons from certain dealings (to a greater or lesser extent) related to: (i) Cuba, (ii) Iran, (iii) Sudan, (iv) Syria, (v) Burma (Myanmar) and (vi) North Korea, as well as specified individuals and organizations (and entities 50% or more owned or, in some cases, controlled by sanctioned persons in other jurisdictions (including, but not limited to, Belarus, Russia and Ukraine, and Zimbabwe) or with no fixed jurisdiction).

456  International Emergency Economic Powers Act, Pub. L. No. 95–223, 91 Stat. 1625 (1977) (codified as amended at 50 U.S.C. §§ 1701-07).

457  *See, e.g.*, 31 C.F.R. § 515.201(d) (prohibiting persons subject to the jurisdiction of the United States from dealing with Cuba). As of the date of publication, the countries subject to territorial restrictions include Crimea, Cuba, Iran, North Korea, Sudan and Syria.

458  The lists of sanctioned persons change frequently and may be found on the OFAC website at https://sanctionssearch.ofac.treas.gov. The lists are often referred to as the "SDN List" (for the list of specially designated nationals and blocked persons, or "SDNs"), though technically there are now several lists subject to varying restrictions. The persons designated are not necessarily located in or even related to countries that are the subject of OFAC sanctions programs. For example, the lists include individuals and entities designated under various activity-based OFAC programs as, *inter alia*, "specially designated global terrorists," "foreign terrorist organizations," "specially designated narcotics traffickers" and proliferators of weapons of mass destruction.

459  *See, e.g.*, 31 C.F.R. § 515.570. The full range of the sanctions regimes described in this § 9.08 is beyond the scope of this book. Given the substantial penalties that may be imposed under them, however, U.S. persons contemplating investments, business combinations or other transactions in or involving nationals of any sanctioned country or area, or any sanctioned person (whether designated under a country- or activity-based program), should carefully evaluate their potential applicability in advance.

460  Letter from Laura Unger, Acting SEC Chairman, to Rep. Frank Wolf (May 8, 2001). In 2007, the SEC briefly implemented a "web tool" that would allow investors to directly pull information about a public company's dealings with certain sanctioned countries from its SEC disclosures. Press Release, SEC, SEC Adds Software Tool for Investors Seeking Information on Companies' Activities in Countries Known to Sponsor Terrorism (June 25, 2007). After criticism regarding, among other issues, the tool's lack of access to updated information, the SEC temporarily suspended the tool and issued a concept release requesting comment on how best to provide investors access to information about companies' dealings with sanctioned countries. Press Release, SEC, Statement by SEC Chairman Christopher Cox Concerning Companies' Activities in Countries Known to Sponsor Terrorism (July 20, 2007); SEC Release No. 33–8860 (Nov. 16, 2007).

461  15 U.S.C. § 78m(r).

462  The Sectoral Sanctions Identifications List can be accessed on OFAC's website at: https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/ssi_list.aspx., and the directives are *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Pages/ukraine.aspx.

463  *See* U.S. Dept. of the Treasury, *JCPOA Implementation*, *available at* https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/jcpoa_implementation.aspx. The P5+1 consists of the United States, China, Russia, France, Germany, and the United Kingdom, together with the EU.

464  *See* U.S. Dept. of the Treasury, *JCPOA Implementation*, *available at* https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/jcpoa_implementation.aspx. The P5+1 consists of the United States, China, Russia, France, Germany, and the United Kingdom, together with the EU.

465  Executive Order 13608; Executive Order 13606; Cuban Liberty and Democratic Solidarity Act of 1996, Pub.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.

U.S. Regulation of the International Securities and Derivatives Markets, §
9.08, COUNTRY- AND...

L. No. 104-114, 110 Stat. 785 (1996) (codified at 22 U.S.C. §§ 6021–6091); 31 C.F.R. 566.201(a); Iran, North Korea, and Syria Non-Proliferation Act, codified at 50 U.S.C. § 1701 note/Arms Export Control Act, 22 U.S.C. § 2798; Export Administration Act 50 U.S.C. App § 2410c; Chemical and Biological Weapons Control and Warfare Elimination Act, 22 U.S.C. §§ 5604–5605; Executive Order 13382, 70 Fed. Reg. 38,567 (July 1, 2005).

466   Ukraine Freedom Support Act of 2014, Pub. L. No. 113-272; "Statement by the President on the Ukraine Freedom Support Act," Press Release (issued on Dec. 18, 2014), *available at* http://www.whitehouse.gov/the-press-office/2014/12/18/statement-president-ukraine-freedom-support-act. The sanctions target persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against persons operating in the arms or related materiel sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

© Cleary Gottlieb Steen & Hamilton LLP, 2019.
All rights reserved.