# EXHIBIT Y

# INSIGHTS

## Deleveraging and Capital-Raising Alternatives in a Turbulent Market

NOVEMBER 2008  |  COMMENTARY

The unprecedented turmoil in the capital markets and what many believe will be a shortage of debt financing for the foreseeable future have caused many companies to re-examine deleveraging strategies. However, as a result of the current market conditions, capital raising has become more daunting, and creative and less standardized approaches have necessarily come to the fore. As issuers search for avenues to raise additional capital, whether to refinance indebtedness, fund general corporate purposes or current liquidity needs, pursue a well-priced acquisition opportunity, or establish a "rainy day" fund, the current market conditions have led issuers to consider alternative sources and methods to obtain the sought-after capital, and capital-raising structures that had historically been less utilized are now becoming more common. The structures briefly described below may be useful in the pursuit of additional capital or the refinancing of indebtedness, because each provides a window into a sector of the financial markets that might not have been considered in a more traditional market environment.

**PIPEs and Registered Direct Offerings**

While the public equity and debt markets continue to be closed or expensive to companies, the PIPE (private investment in public equity) and registered direct market may offer opportunities to raise capital, particularly from private equity investors and hedge funds. A PIPE is the private placement of securities by a publicly traded issuer to a small number of institutional investors, often involving the efforts of a placement agent, that includes the granting of registration rights to allow them to resell their securities freely. There are many varieties of PIPEs, including transactions involving common stock, preferred stock, debt, warrants, and combinations of these securities. A registered direct offering is similar to a PIPE transaction, except that the offering is registered under the Securities Act at the time of its initial placement. In a registered direct offering, the issuer often engages an investment bank to work as an agent and introduce the issuer to a small group of investors. Generally, companies that have existing shelf registration statements filed with the SEC will benefit most from this strategy because the

transactions can be completed quickly with no advance announcement to the public, while companies that do not have shelf registration statements on file will generally benefit from the timing advantages offered by a PIPE.

**Common Stock.** A common stock PIPE or registered direct offering is the simplest option and generally offers investors the stock at a discount to its current market price. These transactions provide fewer provisions to negotiate and generally can be closed the fastest compared to the alternatives. A potential disadvantage of such an approach is that the company will likely face the greatest dilution to existing shareholders. Also, investors go long on the stock, rather than having a conversion option in an equity-linked instrument, thus subjecting themselves to the related market and bankruptcy risks of that long position and often increasing the need for a larger discount. In addition, as described below, national stock exchanges require a shareholder vote if the company issues 20 percent or more of its outstanding common stock at a discount.

**Preferred Stock.** Preferred stock offers investors the advantage of being senior in the capital structure compared to common equity. Private equity firms have traditionally used, and are expected to continue to use, preferred stock as an effective way to make minority investments in public companies. Structured features can include valuation and structured returns offered to investors, conversion rights, redemption rights, voting rights, paid-in-kind dividends, business and financial covenants, board seats, and antidilution protections. Note, however, that if the preferred stock is convertible into common stock, the 20 percent rule discussed above still applies, so issuers need to be cognizant of provisions, such as paid-in-kind dividends and antidilution protections, if they could result in 20 percent or more of the outstanding common stock at the time of the offering being deemed issued at a discount. Generally speaking, preferred stock investments usually take longer and are more expensive to execute than common stock transactions because of the larger number of terms and greater complexity of the documents.

**Debt.** Debt structures offer similar advantages and disadvantages to preferred stock, except that they are the most senior investment in the capital structure, usually have the most extensive covenants, and can be secured. In addition, nonconvertible debt structures do not involve any of the shareholder vote requirements of the national stock exchanges.

**Warrants.** Often, PIPEs and registered direct offerings will include warrants to purchase common stock, which will provide an additional incentive for investors to participate in the offering.

**Considerations.** In considering a PIPE and/or registered direct offering, there are a number of business and legal issues that a company should keep in mind:

**Dilution.** An offering of common stock or equity-linked securities can result in substantial dilution to the company's existing equity holders.

**Market Overhang.** The granting of registration rights in connection with a PIPE transaction can result in market overhang because the exercise of registration rights will significantly increase the number of shares of the company's common stock that can be sold into the market in a short period of time. This can result in downward pressure on the trading price of a company's common stock.

**Preemptive Rights.** If investors are granted preemptive rights in a PIPE transaction, those rights can make subsequent rounds of financing more challenging and difficult to execute.

**Restrictive Covenants.** Restrictive covenants in preferred stock and debt offerings can impose significant operating limitations on a company. A company should work closely with counsel to ensure that restrictive covenants are adequately flexible to allow the company to operate its business and expand in accordance with its current business model.

**Stock Exchange Requirements.** A PIPE or registered direct offering that results in the issuance of 20 percent or more of an issuer's outstanding common stock or that could potentially result in the issuance of a significant amount of common stock (upon conversion or otherwise) at a discount to market should be evaluated early in light of certain national stock exchange requirements. For example, if the transaction would or could (as a result of so-called "price protection" antidilution provisions) result in the issuance of 20 percent or more of the outstanding common stock or result in a change of control, a company's stock exchange will generally require shareholder approval of the transaction. Generally, "price protection" refers to antidilution protection based on future offerings at a price below the then-current market price of the stock or below the then-applicable conversion or exercise price of the security issued. There is a variety of provisions that can be relied upon to avoid a shareholder vote, and counsel and the relevant stock exchange should be consulted early in the structuring process. Shareholder approval can be avoided if, at the time of the issuance of the convertible security itself, the conversion price is above market and not subject to any downward adjustment (other than in connection with stock splits, recapitalizations, and other similar events).

**SEC Requirements.** The SEC has taken the position that, in the case of a company registering a significant number of shares of common stock (including shares underlying convertible securities, warrants, and options) for resale, generally viewed as issuances involving more than 30 percent of the company's public float, such registration should be treated as a primary issuance of common stock by the company. As a result of this "extreme convertible" position, companies that are not eligible for registration of primary sales of securities on Form S-3 or F-3 should consult with counsel about appropriate structuring alternatives in the event that the SEC

3/15/23, 4:50 PM
Deleveraging and Capital-Raising Alternatives in a Turbulent Market | Insights | Jones Day
Case 23-09001    Document 91-39    Filed in TXSB on 03/17/23    Page 5 of 13

staff takes such a position with respect to the company's registration following the PIPE offering.

**Regulation FD and Insider Trading.** Because the fact of a potential PIPE or registered direct offering would constitute material, nonpublic information, potential investors who are approached about the proposed offering should enter into a confidentiality agreement with the issuer as a preliminary step.

**Impact of Existing Agreements and Provisions.** In evaluating various capital-raising options, a company should consider whether there are any restrictions or impediments on the proposed transaction, as would normally be done. Common restrictions or impediments to investigate include existing agreements governing equity and equity-linked securities, such as there being sufficient authorized and unissued shares of common stock, the effect of any antitakeover provisions (such as poison pills), preemptive rights, or rights of first refusal that may affect current investors' negotiations and potentially conflicting registration rights and limitations on the incurrence of debt, among others.

## Rights Offerings

Historically, rights offerings have been routinely conducted by companies organized in jurisdictions outside the United States and viewed with disfavor by domestic issuers. Recently, the perception of rights offerings by U.S. issuers seems to be changing. Rights offerings are increasingly being considered by a number of domestic companies as an effective means of raising additional equity capital. A rights offering typically involves the issuance to each existing shareholder of a right to participate ratably in an offering of new equity. The exercise price for the newly issued shares that may be purchased by exercising the rights is typically set at a discount to the recent trading price of the company's stock. The rights offering is typically open for a period of 15 to 30 days. By utilizing rights to raise equity capital, the issuer is able to allow all existing shareholders the opportunity to participate in the offering, thereby providing shareholders with the opportunity to avoid dilution that might result from an offering to third-party investors at a discount to current market prices. In some rights offerings, the rights are transferable and trade during the offering period on the same stock exchange as the underlying common stock. The transferability feature allows a current shareholder that is not interested in participating in the rights offering the opportunity to sell the right to a third party and realize some of the value attributable to a right to buy equity at a discount.

Rights offerings may include a backstop agreement, whereby a backstop purchaser would agree, prior to the commencement of the rights offering, to buy any shares underlying rights that are not exercised in the rights offering. A backstop arrangement adds certainty that the needed capital will be obtained while still offering existing shareholders the opportunity to

participate in the offering. Rights offerings are generally exempt from the shareholder voting requirements imposed by national securities exchanges for stock issuances of 20 percent or more of the outstanding stock at a discount to current market value. As a result, it is possible to issue a significant number of shares (and raise additional capital) while avoiding the need to address shareholder approval issues that can arise in the nonpublic offering structures discussed above.

**At-the-Market Offerings**

An at-the-market offering is a registered offering by a publicly traded issuer of its listed equity securities directly into the market at other than fixed prices. At-the-market offerings are conducted pursuant to Rule 415(a)(1)(x) under the Securities Act, and only a company that is "primarily eligible" to use Form S-3 or Form F-3 for an offering of securities for cash on its own behalf (*e.g.*, the company has a public float of at least $75 million) can conduct an at-the-market offering.

In a typical at-the-market offering, an issuer engages a broker-dealer to act as a placement agent and sells its common stock directly into the market through the broker-dealer over a period of time. An at-the-market offering allows a company to issue shares at its discretion, at intervals over an extended period of time, rather than having to announce a large secondary issue and be obligated to sell all of the shares at once, minimizing arbitrage opportunities. The issuer determines the timing of any issuance, the amount of issuance, a floor price, and the duration of the selling period by giving notice to the placement agent, and the issuer generally may stop or start an issuance at any time. The broker-dealer earns a commission on the shares sold, usually in the range of 1 percent to 3 percent, which is below the typical commission for an underwritten offering.

Because the placement agent is considered an "underwriter" under the Securities Act, the placement agent will require the customary diligence protections afforded underwriters in firm commitment public offerings, such as legal opinions and comfort letters. Customarily, legal opinions and comfort letters are required when the issuer initially enters into an agency relationship with the placement agent, as well as when the issuer requests the placement agent to sell common stock into the market. Accordingly, issuers should be aware that there are cost and timing considerations involved with at-the-market offerings, particularly when doing multiple sales throughout the term of the arrangement.

Prior to the effectiveness of the Securities Offering Reform in December 2005, at-the-market offerings were uncommon because the SEC required any placement agent to be named in the registration statement (as opposed to being named in a prospectus supplement). An issuer with an existing shelf registration statement desiring to conduct an at-the-market offering

would have had to file a post-effective amendment to name the placement agent. Now, however, a placement agent can simply be named in a prospectus supplement. The Securities Offering Reform also eliminated a volume limitation that was imposed on at-the-market offerings.

**Reduction of Outstanding Debt**

A company can buy back its own debt securities by one or more of several methods.

**Tender Offers.** A tender offer, in contrast to privately negotiated or open market purchases, allows a company to purchase its outstanding debt securities from all holders in an orderly process. Tender offers or exchange offers, which are discussed below, are frequently necessary or appropriate where a company seeks to purchase a substantial percentage of an issue of debt securities. A tender offer or exchange offer may be coupled with a consent solicitation to amend or strip restrictive covenants that, if successful, may facilitate the accomplishment of the offer and reduce the issuer's obligations under the debt securities that remain outstanding following the completion of the offer. Tender offers are generally subject to regulation under the Securities Exchange Act.

A tender offer (1) allows a company to canvass the entire market and seek tenders of securities from all holders with the help of an investment bank's product specialists and sales force, (2) ensures equal treatment of all investors (extending the offer to all holders is more fair to investors compared to a series of privately negotiated transactions with selected investors), (3) is most efficient in circumstances where a significant percentage of an issue is sought from a broad group of holders, (4) may have the effect of reducing the negotiation on price compared to privately negotiated transactions, and (5) allows structuring as to price and conditions, including with the use of a related consent solicitation to amend the terms of the securities. However, tender offers also (1) are subject to certain SEC tender offer rules, (2) may take more time to complete than privately negotiated or open market purchases (tender offers generally must remain open for at least 20 business days, although tender offers for investment-grade debt securities can be completed in seven to 10 calendar days under certain circumstances), (3) may be more costly because all holders must be paid the same consideration and some holders may be prepared to sell at a lower price than that offered, and (4) will have greater transaction costs.

**Privately Negotiated or Open Market Purchases.** Privately negotiated or open market purchases are frequently appropriate when a company wants to purchase a small percentage of a series of securities or an issue of securities is concentrated among very few holders.

Privately negotiated or open market purchases (1) allow greater negotiation with investors and different prices and conditions to the purchaser and (2) may be accomplished more quickly than many tender offers and exchange offers. However, these transactions (1) must be tailored (such as in relatively small, one-off transactions) to avoid the "creeping tender" problem discussed below, (2) may be very difficult and/or time-consuming to acquire a significant percentage of an issue of securities, (3) may be complicated by difficulty in identifying investors willing to sell, (4) treat investors differently, which may lead to investor relations problems, a particularly significant issue if the company can foresee a new securities offering in the future, and (5) may raise potential disclosure issues, particularly where the issuer has not indicated publicly that it may seek to purchase the securities.

A "creeping tender offer" refers to privately negotiated or open market purchases of securities that should have been structured as a conventional tender offer, by preparing and distributing an offer-to-purchase document and following the SEC's tender offer rules. There is no bright-line test for whether, or under what conditions, privately negotiated or open market purchases of securities constitute a tender offer. In general, courts have relied on the *Wellman* eight-factor test[1] to evaluate whether such privately negotiated or open market purchases are conventional tender offers.

**Exchange Offers.** Exchange offers may be appropriate where a company does not have cash available to fund a tender offer or privately negotiated or open market purchases, or where a company wishes to effect amendments to the terms of outstanding securities and the changes are so significant that the amended securities would constitute a new issue of securities (*e.g.*, changes to interest rate, maturity, subordination, optional redemption provisions, or arrangements related to collateral).

An exchange offer (1) allows a company to acquire securities without using available cash or engaging in a new cash fundraising, (2) allows a company to canvass the entire market and seek securities from all holders as in a tender offer, (3) ensures equal treatment of all investors (extending the offer to all holders is more fair to investors compared to a series of privately negotiated transactions with selected investors), (4) may be efficient in circumstances where a significant percentage of an issue of securities is sought, (5) allows negotiation on terms of the exchange to be reduced compared to privately negotiated transactions, and (6) allows structuring as to price and conditions, including with the use of a related consent solicitation to amend the terms of the securities. However, exchange offers (1) are subject to SEC tender offer rules and must be registered under the Securities Act unless an exemption is available, which may be unattractive due to the time and cost involved in preparing a registration statement and which may subject the company to the reporting requirements of the U.S. federal securities laws, if it is not already subject to these requirements, (2) take more time to complete than

privately negotiated or open market purchases, and certain cash tender offers must have an effective registration statement and exchange offers must remain open for at least 20 business days, (3) may take longer because of the time required to prepare the offering document, (4) present greater risk of liability arising on the basis of claims of inadequate or inaccurate disclosure in the offering document, (5) may be more costly because all holders must be paid the same consideration, and some holders may be prepared to sell at a lower price than that offered, and (6) will have greater transaction costs.

**Considerations.** As a company considers various structuring alternatives to reduce its outstanding debt, there are a number of business and legal issues it should keep in mind:

***Redemption and Voluntary Prepayment Provisions.*** A company should be aware of the optional redemption provisions of its debt securities and the voluntary prepayment provisions of its credit agreements. As a general matter, these provisions tend to be expensive to the company (for debt securities) or restrictive (for loans). Nevertheless, they often set the benchmark against which other forms of repurchase are analyzed.

***Filing and Disclosure Obligations.*** A company should also consider whether any SEC filing obligations will be triggered as a result of the transaction, including under a current report on Form 8-K. In addition, the general antifraud provisions of Rule 10b-5 of the Securities Exchange Act apply to tender offers and private purchases. As a result, a company should work with counsel to identify any specific disclosure obligations that arise as a result of purchases of its own securities. For example, a company should consider whether it is in possession of material nonpublic information that should be disclosed to holders prior to repurchasing their securities (such as an anticipated transaction that would trigger a change-in-control put right). In addition, if the repurchases would have a material adverse effect on the liquidity of the securities or a company's financial position, the company should consider public disclosure of the repurchases in a periodic report (such as in its MD&A section) or a press release. Finally, a company should consider whether any obligations under Regulation FD, which prohibits selective disclosure, will arise as a result of its communication with holders as part of the repurchases.

***Possible Tax Consequences.*** It is important that a company give early consideration to tax issues that may affect tendering security holders and the company. These potential tax issues include:

> *COD Income.* Under certain circumstances, the purchase by an issuer (or by its affiliates) of its outstanding debt securities can give rise to cancellation of debt income to the issuer if the issue price (as specially defined for tax purposes) of the securities surrendered is

greater than the issue price of the consideration received by a holder. Any attempt to retire debt at a discount should be carefully examined by the issuer's tax advisors.

> *Tax on Exchanging Holders.* Persons who hold debt securities as capital assets (other than dealers) will generally recognize capital gain or loss equal to the difference between the amount of that consideration (other than interest and some consent payments) and the holder's adjusted tax basis in the securities.

> *Consent Payment.* Consent payments are, depending on the circumstances, treated as either (1) additional consideration in exchange for the tendered securities, which means that the consent payments will be taken into account in determining the gain or loss on the exchange, or (2) separate consideration for consenting to the proposed amendments.

> *Consequences to Nontendering U.S. Holders.* In addition to tax implications for the company, holders not participating in the transaction may also be affected by certain tax issues, and consideration should be given by counsel as to the appropriate disclosure to be provided to holders.

**Securities Exchange Requirements.** A company should check whether the subject securities are listed on a national securities exchange and, if so, what substantive and filing requirements apply to the transaction and the related offer documents.

**Lawyer Contacts**

This *Commentary* is intended to constitute a nontechnical summary of some complex legal requirements, and in an effort to achieve relative simplicity, a number of details and refinements have been omitted. For further information, please contact your principal Firm representative or one of the lawyers listed below. General email messages may be sent using our "Contact Us" form, which can be found at www.jonesday.com.

**Lora D. Blum**

1.415.875.5814

lblum@jonesday.com

**Alexander A. Gendzier**

1.212.326.7821

agendzier@jonesday.com

**Nora L. Gibson**

1.415.875.5876

ngibson@jonesday.com

**Christopher M. Kelly**

1.216.586.1238/

1.212.326.3438

ckelly@jonesday.com

**Timothy J. Melton**

1.312.269.4154

tjmelton@jonesday.com

**Michael J. Solecki**

1.216.586.7103

mjsolecki@jonesday.com

Jones Day publications should not be construed as legal advice on any specific facts or circumstances. The contents are intended for general information purposes only and may not be quoted or referred to in any other publication or proceeding without the prior written consent of the Firm, to be given or withheld at our discretion. To request reprint permission for any of our publications, please use our "Contact Us" form, which can be found on our web site at www.jonesday.com. The mailing of this publication is not intended to create, and receipt of it does not constitute, an attorney-client relationship. The views set forth herein are the personal views of the author and do not necessarily reflect those of the Firm.

---

[1] *See Wellman v. Dickinson*, 475 F. Supp. 783, 818-26 (S.D.N.Y. 1979), *aff'd on other grounds*, 682 F.2d 355 (2d Cir. 1982), *cert. denied*, 460 U.S. 1069 (1983); and *see, e.g.*, *SEC v. Carter-Hawley Hale Stores, Inc.*, 760 F.2d 945, 950-53 (9th Cir. 1985); *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47 (2d Cir. 1985); and *DeBartolo Group, L.P. v. Jacobs Group, Inc.*, 186 F.3d 157 (2d Cir. 1999). In general, the eight factors are: an active and widespread solicitation is made of public shareholders for the securities of the issuer; a solicitation is made for a substantial percentage of the outstanding securities; the offer to purchase is at a premium over the current market value of the securities; the terms of the offer are firm rather than negotiable, meaning on a transaction-by-transaction or other basis; the offer is contingent on the tender of a fixed minimum number of shares, subject to a fixed maximum number of securities to be purchased; the offer is open for only a limited period of time; the offerees are subjected to pressure to sell the securities; and a public announcement of a purchase program precedes or accompanies a rapid accumulation of the securities.

**Attachments   Deleveraging Alternatives**

3/15/23, 4:50 PM
Deleveraging and Capital-Raising Alternatives in a Turbulent Market | Insights | Jones Day
Case 23-09001    Document 91-39    Filed in TXSB on 03/17/23    Page 12 of 13

### CHRISTOPHER M. KELLY

Partner

New York  |  + 1.212.326.3438

ckelly@jonesday.com

Practice:   Financial Markets

### TIMOTHY J. MELTON

Partner

Detroit  |  + 1.313.230.7969

tmelton@jonesday.com

Practice:   Financial Markets

### MICHAEL J. SOLECKI

Partner

Cleveland  |  + 1.216.586.7103

mjsolecki@jonesday.com

Practice:   Financial Markets

## YOU MAY ALSO BE INTERESTED IN

**FEBRUARY 2023  |  NEWSLETTERS**

Vital Signs Digital Health Law Update | Winter 2023

**FEBRUARY 2023  |  COMMENTARY**

Sequana: Directors' Duties in a Distressed Landscape

**JANUARY 2023  |  COMMENTARY**

New Law Exempts M&A Brokers from SEC Registration

**JANUARY 2023  |  COMMENTARY**

Interim Guidance from the Treasury Department on the 1% Corporate Stock Buyback Tax

## PRACTICES

Private Equity

Financial Markets



3/15/23, 4:50 PM
Case 23-09001    Document 91-39    Filed in TXSB on 03/17/23    Page 13 of 13
Deleveraging and Capital-Raising Alternatives in a Turbulent Market | Insights | Jones Day

