# EXHIBIT Z

# LevFin Quarterly

**Weil**

## Editors' Welcome

Welcome to the latest edition of LevFin Quarterly! 2015 was an interesting year in leveraged finance, with decreased volume in loans and high yield, financing structures migrating from the traditional syndicated distribution model to a number of deals including a "bought deal" component from non-bank lenders (particularly as a result of the implementation of the Leveraged Lending Guidelines) and increased market volatility stemming from investor concerns regarding geo-political instability, distressed market sectors, and increased regulatory scrutiny.

As we head into 2016, we face uncertainty as to what will happen in the loan and high yield markets in the face of continuing market volatility and we are starting to see increased scrutiny of deal terms, higher pricing, lower leverage and more bespoke negotiations. Highly leveraged issuers are facing refinancing challenges in the current market environment, irrespective of the credit fundamentals of the particular company, which may lead to more restructuring situations. Notwithstanding what initially appears to be a decline in available M&A opportunities and a slow leveraged finance market, we remain optimistic that confidence will return to the markets, resulting in a robust year with more innovative financing structures.

In this issue, we discuss the key considerations that leveraged companies should be evaluating before buying back their own debt and new bail-in powers for European regulators. As always, we would be happy to discuss these topics and other developments in leveraged finance with you.

Best regards,

Heather L. Emmel
Danek A. Freeman
Allison R. Liff

### In This Issue

1. **Editors' Welcome**
1. **Key Issues in Debt Buybacks**
4. **New Bail-in Powers for European Regulators**
5. **Weil Named Best Law Firm in Finance: Bank Lending Category at the *Legal 500 US* 2015 Awards**
5. **Weil's U.S., U.K. and Hong Kong Finance Practices and Partners Recognized in *IFLR1000* 2016**
5. **Weil Elects Faiza Rahman to Partner**

## Key Issues in Debt Buybacks

An increasing number of bank loans and high yield bonds are trading below par in the current market, presenting attractive de-levering opportunities for leveraged companies able to buy back their own debt. Companies may purchase their own bank loans pursuant to the buyback provisions typically contained in credit agreements. A company's ability to buy back its own bonds is typically not prohibited by the applicable indenture; however, such buybacks may trigger tender offer and/or securities law implications and may be restricted by the senior credit agreement. In addition, refinancing facilities or debt may be incurred to retire the existing loans and bonds if allowed pursuant to the underlying debt instrument. Whatever strategy is chosen, companies should consider the tax issues implicated by such buybacks or refinancing facilities.

### Buybacks of Bank Loans

***Types of Discounted Buybacks.*** Credit agreements typically provide for the ability of the borrower to buy back its term loans (but typically not revolvers) through "Dutch Auctions" open to all lenders on a pro-rata basis and/or through open market purchases on a non-pro rata basis.

- Under most Dutch Auctions, the potential purchaser of the loan submits an offer to all lenders to purchase

a certain amount of debt within a given price range (usually expressed as a discount to par). After the lenders who wish to participate submit their bids, a clearing price is determined by the auction agent (usually the Administrative Agent) equal to the lowest price within such price range that would enable the purchaser to acquire the desired debt amount. The loans are then purchased at that clearing price, although some credit agreements provide that the loans may be purchased at different prices from each lender at a price equal to the lower of that clearing price and the price bid by such lender.

- Many newer credit agreements also allow a company to buy back its term loans directly from lenders in the secondary market on a non-pro rata basis. This feature allows a borrower to avoid using a potentially more costly and slower Dutch Auction procedure to buy back its loans.

In addition, credit agreements include "affiliated lender" provisions that permit the financial sponsor of a portfolio company borrower to buy back the borrower's debt either for investment purposes or to de-lever the borrower by contributing the debt to the borrower for cancellation. Whether the buyback is affected through a Dutch Auction, an open market purchase or through the purchase and contribution by the sponsor, the borrower is generally required to cancel and extinguish any bank loans that are ultimately held by it, ensuring that the borrower has no lender rights and that the transaction is de-levering.

*Financing Discounted Buybacks.* The borrower may use cash on hand to fund the discounted buyback and, to the extent it does, it can usually reduce the amount of its annual excess cash flow sweep in an amount equal to what the borrower actually pays to buy back the debt (not the par amount of such debt). The borrower may also incur debt to finance the discounted buyback, although doing so will typically not reduce its excess cash flow sweep.

*Material Non-Public Information:* Many credit agreements contain "big-boy" clauses where the lenders agree that a borrower that buys back its own bank loans is not required to make any representation to the selling lender that it is (or not) in possession

of material non-public information with respect to the parent company, the borrower or its subsidiaries or any of their securities. However, prior to making any such purchases, borrowers should consider whether such a purchase is appropriate at the time in light of any material information about the company, its subsidiaries or its business of which the company may be aware that has not otherwise been disclosed to (private side) lenders. In addition, if the borrower is a public reporting company, a buyback of its loan may itself be considered material non-public information and trigger disclosure requirements under Regulation FD (as further described below).

### Buybacks of Bonds

*Tender Offer Considerations:* Depending on how it is structured, a bond buyback could constitute a tender offer and if so, would be subject to certain SEC requirements. Among other requirements, a tender offer must remain open for at least 20 business days. Whether a bond buyback constitutes a tender offer is based on a number of factors. The key factors that courts have used in making this determination are the scope of public dissemination of the offer to repurchase, the amount of premium paid by the issuer, the ability of the parties to meaningfully negotiate the price and terms, whether the offer was contingent on a minimum or maximum amount of bonds being purchased, how long the offer was open, whether the recipients were under pressure to accept the offer and whether the public announcements of the repurchase program were followed by large amounts of bonds. Should an issuer undertake a non-compliant tender offer, it could be subject to sanctions, including damages, injunctive relief and certain enforcement actions by the SEC. It is therefore important to structure privately negotiated purchases in the secondary market in a manner that would not constitute a tender offer.

*Material Non-Public Information:* In addition to the Regulation FD considerations discussed below, an issuer or affiliated purchaser should also determine whether it possesses any material non-public information prior to repurchasing any of the company's outstanding bonds. Rule 10b-5 has been held to impose certain disclosure obligations on

purchasers of securities possessing material non-public information. As such, a company or affiliated purchaser may have to wait until such information is released to the public before the buyback can occur. Additionally, as discussed above, the very fact that a company or affiliated purchaser is initiating a bond buyback may in and of itself be considered material non-public information. For this reason, many companies include disclosure in the liquidity section of the Management's Discussion and Analysis of Financial Condition and Results of Operations section of their periodic reports to bondholders to the effect that the company and its affiliates may repurchase the company's debt from time to time.

***Indenture Obligations:*** While most indentures governing bonds will not prohibit repurchases of bonds issued under that indenture, a repurchase of subordinated debt typically constitutes a restricted payment under bond indentures governing senior notes. An issuer should carefully analyze its restricted payments covenant to ensure that the bond buyback is permitted. In addition, other debt agreements, such as the senior credit agreement, may limit the repurchase of bonds and should be carefully reviewed.

## Regulation FD Compliance

Companies that are SEC-reporting companies must comply with Regulation FD in connection with private purchases of its outstanding loans and bonds. Regulation FD generally requires all publicly traded companies to disclose material information to all investors at the same time (unless a confidentiality agreement is in place in connection with such selective disclosure). As discussed above, the fact that that a company is seeking to repurchase its outstanding loans or bonds may in and of itself be considered material non-public information that would necessitate public disclosure.

## Tax Issues

The tax effect on any discounted buyback should be considered prior to any such buyback. A company's repurchase of its own debt at a discount generally results in income to the company in the form of cancellation of indebtedness debt income ("CODI") unless the company is insolvent or in bankruptcy. The

amount of the CODI generally is the excess of the adjusted issue price of the debt to the company over the buy back price. The adjusted issue price to the company is the original issue price of the debt, less any issuance costs and plus the amount of any accrued original issue discount and any amortized issuance costs. Most credit agreements and high yield indentures exclude CODI (calculated in accordance with GAAP) for purposes of EBITDA calculations used for financial covenant compliance and incurrence tests.

The same result occurs if the debt is purchased by a person related to the borrower. Very generally, the debt purchaser and the borrower are considered related if the same persons own (directly or by application of attribution rules) more than 50% of each of the borrower and the purchaser of the debt. In the case of a related party purchase, the purchased debt is generally treated as having been acquired by the borrower for the price paid by the related party and reissued to the related party for the same amount. The deemed reissuance of the debt at a discount (of more than a de minimis amount) results in the "new" debt being issued with original issue discount (or OID). In the event deemed reissued debt with OID is resold by the related party into the market, such debt likely will not be fungible with debt of the same class that had remained outstanding in the market.

## New Bail-in Powers for European Regulators

Effective as of January 1, 2016, all EEA countries (the EU member states, Iceland, Liechenstein and Norway) were required to implement the Bank Resolution and Recovery Directive (the "BRRD") into national legislation. Such legislation gives the local EEA regulators the power to "bail-in" struggling financial institutions outside of an insolvency scenario by imposing losses on bondholders or other creditors (which in certain circumstances may include borrowers), with the aim of minimizing the need for tax-payer "bail-outs" of banks and investment firms. The bail-in powers apply to regulated financial institutions established within the EEA and their branches (but not their separate subsidiaries) in other

LevFin Quarterly

jurisdictions. European branches of US banks, which are not established as separate firms, are not subject to the legislation. Where an EEA regulated financial institution is the borrower or issuer, its obligations will be subject to the regulators' powers to unilaterally cancel, write down or amend them as part as part of the bail-in (except to the extent that such obligations are secured).

### Obligation to recognize bail-in powers in contracts

Under Article 55 of the BBRD, EEA financial institutions must now include in every contract governed by a non-EEA law a contractual term pursuant to which all parties acknowledge that the EEA financial institution's obligations under that contract are subject to the bail-in powers ("bail-in recognition language"). There is no need to include such a term in contracts governed by the law of an EEA country as the bail-in powers form part of that law. The BRRD does not specify a prescribed form for bail-in recognition language but the European Banking Authority has published a set of technical standards specifying the matters which must be covered. The Loan Syndications & Trading Association ("LSTA") and its European counterpart, the Loan Marketing Association (the "LMA"), have both produced a suggested form of rider which complies with those technical standards.

### Which agreements are covered?

The Article 55 obligation applies to the following contracts:

- New agreements entered into on or after January 1, 2016;

- Existing agreements which are "materially amended" on or after January 1, 2016;

- Existing agreements under which the EEA financial institution incurs new obligations on or after 2016.

What constitutes a new obligation is very broad, and as such there is a lot of uncertainty around how EEA regulated entities will comply with the requirement to include the bail-in recognition language in their contracts.

### Implications for the syndicated loan markets

The definition of "obligations" under the BRRD is very comprehensive and as such encompasses the obligations of financial institutions acting as lenders under finance documents. It includes their obligations to advance undrawn commitments to the borrower, as well as the indemnities, turnover, set-off and administrative obligations they owe to agents and other lenders. Therefore, in order for an EEA financial institution to participate (at the outset or in future) in a syndicated facility which is entered into on or after January 1, 2016, the documents must include a form of bail-in recognition language. Where a facility is "materially amended" on or after January 1, 2016, the bail-in recognition language must be added.

Probably the most challenging aspect of the requirement from a loan markets perspective is that, in the recently communicated view of the LSTA and the LMA, the obligation to include bail-in recognition language may be triggered when an EEA financial institution buys into a deal on or after January 1, 2016, because that constitutes the incurrence of new obligations by such institution. In this situation, the EEA financial institution assignee could not accede to a credit agreement unless the underlying credit documentation was amended to include bail-in recognition language. However, the trading counterparties would be unable to unilaterally effectuate such an amendment.

### Consequences of non-compliance

An EEA financial institution which signs up to a contract without bail-in recognition language after January 1, 2016 in contravention of Article 55 will be subject to local regulatory sanctions in its home jurisdiction, which may include public censure and/or a fine. The fact that an agreement does not contain bail-in recognition language does not mean that the obligations of an EEA financial institution thereunder are exempt from bail-in; however, it does raise potential issues with respect to enforceability in the non-EEA jurisdiction and creates another hurdle for the local EEA regulator to overcome in persuading the courts of the non-EEA jurisdiction whose laws govern the agreement to recognize its bail-in powers.

LevFin Quarterly

### Areas of Concern/Flux

- revolvers and unfunded commitments

- issuances of Letters of Credit counting as new obligations

- comfort with commitments for "certain funds"/ acquisition related financings

- impact on market liquidity if borrowers seek to limit exposure to EEA regulated entities by prohibiting participation in deals or refusing to consent to transfers – possibility that TLB market liquidity will not be significantly impacted unless looked to raise euros

- EEA regulated financial institutions as borrowers

### Stay tuned…

The impact of the new bail-in powers continues to evolve. We will include further discussion of these issues in subsequent editions of Lev Fin Quarterly.

### Weil Named Best Law Firm in Finance: Bank Lending Category at the *Legal 500 US* 2015 Awards

Weil's Banking & Finance practice was distinguished for its "very well-established reputation for both borrower and lender work." The *Legal 500 United States* noted the strong team handling sponsor-led financings and, in particular, singled out the Firm's representation of American Securities on its $855 million financing for its acquisition of Emerald Performance Materials. On the lender side, the publication highlighted the Firm's work in "several major cross-border deals," including JPMorgan Chase's €7.6 billion financing to D.E Master Blenders for its coffee joint venture with Mondelēz International, Barclays and Goldman Sachs' $7.2 billion bridge facility to Exelon Corporation to finance its acquisition of Pepco Holdings, and Morgan Stanley and JP Morgan's $8.5 billion bridge facility to Tyson Foods to finance its acquisition of The Hillshire Brands Company.

### Weil's U.S., U.K. and Hong Kong Finance Practices and Partners Recognized in *IFLR1000* 2016

*IFLR1000*, an annual guide to the world's leading financial and corporate law firms, recently released its 2016 United States, United Kingdom and Asia-Pacific rankings. Weil's Banking and Capital Markets practices and its partners received numerous recommendations in the United States, United Kingdom and Hong Kong. With a total of 53 "Leading Lawyers" and "Rising Stars," Weil had more U.S.-based lawyers ranked than any other law firm for the third consecutive year:

In the U.S., Weil's Finance practice included nine lawyers named "Leading Lawyers" and six named "Rising Stars."

***Leading Lawyers:*** Morgan Bale, Jennifer Bensch, Todd Chandler, Corey Chivers, Andrew Colao, Daniel Dokos, David Lefkowitz, Alex Lynch and Douglas Urquhart

***Rising Stars:*** Barbra Broudy, Heather Emmel, Danek Freeman, Gabriel Gregson, Allison Liff and Andrew Yoon

### Weil Elects Faiza Rahman to Partner



Faiza Rahman was elected Partner in Weil's Capital Markets practice as of January 1, 2016. Faiza is based in New York. She advises underwriters, issuers and private equity sponsors in a diverse range of debt and equity capital markets transactions, including high yield debt, initial public offerings, investment grade debt offerings, and tender and exchange offers. She also advises issuers on SEC filings, reporting and governance requirements.

For more information on Weil's new partner and counsel promotions, please click here.

LevFin Quarterly

## Recent Weil Representations

| | | | | |
|---|---|---|---|---|
| CCMP Capital Advisors <br>  | Citi <br>  | Snow Phipps Group <br>  | Antares Capital <br>  | The Sterling Group and Dexter Axle <br>  |
| Guggenheim Corporate Funding <br>  | American Securities <br>  | Genstar Capital <br>  | Macquarie <br>  | The Jordan Company <br>  |
| Mubadala <br>  | Snow Phipps Group <br>  | OMERS Private Equity <br>  | Centerbridge Partners <br>  | Providence Strategic Growth Partners <br>  |
| Altas Partners <br>  | The Sterling Group <br>  | American Securities <br>  | Barclays <br>  | EQT Infrastructure <br>  |

*LevFin Quarterly* provides updates on current topics and trends in leveraged finance and is published by the Finance practice of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, +1 212 310 8000.  www.weil.com.

If you would like more information about the contents of this issue, or about Weil's leveraged finance practice, please speak to your regular contact at Weil, or to any of the authors:

Heather L. Emmel (Capital Markets)          heather.emmel@weil.com          +1 212 310 8849
Danek A. Freeman (Banking & Finance)        danek.freeman@weil.com          +1 212 310 8646
Allison R. Liff (Banking & Finance)         allison.liff@weil.com           +1 212 310 8118

© 2016 Weil, Gotshal & Manges LLP. All rights reserved. Quotation with attribution is permitted. This publication provides general information and should not be used or taken as legal advice for specific situations that depends on the evaluation of precise factual circumstances. The views expressed in these articles reflect those of the authors and not necessarily the views of Weil, Gotshal & Manges LLP.