**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| | § | |
| In re: | § | |
| | § | **Chapter 11** |
| **SERTA SIMMONS BEDDING, LLC, et al.,** | § | |
| | § | **Case No. 23-90020 (DRJ)** |
| Debtors.[1] | § | |
| | § | **(Jointly Administered)** |

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

| | | |
|---|---|---|
| SERTA SIMMONS BEDDING, LLC, INVESCO SENIOR SECURED MANAGEMENT, INC., CREDIT SUISSE ASSET MANAGEMENT, LLC, BOSTON MANAGEMENT AND RESEARCH, EATON VANCE MANAGEMENT, AND BARINGS LLC, | § § § § § § § | |
| | § | Adversary No. 23-09001 |
| Plaintiffs, | § § | |
| | § | |
| v. | § | |
| | § | |
| AG CENTRE STREET PARTNERSHIP L.P., AG CREDIT SOLUTIONS NON-ECI MASTER FUND, L.P., AG SF MASTER (L), L.P., AG SUPER FUND MASTER, L.P., SILVER OAK CAPITAL, L.L.C., ASCRIBE III INVESTMENTS, LLC, COLUMBIA CENT CLO 21 LIMITED, COLUMBIA CENT CLO 27 LIMITED, COLUMBIA FLOATING RATE INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST II, COLUMBIA STRATEGIC INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST I, CONTRARIAN CAPITAL FUND I, L.P., CONTRARIAN CENTRE STREET PARTNERSHIP, L.P., CONTRARIAN DISTRESSED DEBT FUND, L.P., GAMUT CAPITAL SSB, LLC, LCM XXII LTD., LCM XXIII LTD., LCM XXIV LTD., LCM XXV LTD., LCM 26 LTD., LCM 27 LTD., LCM 28 LTD., NORTH STAR DEBT HOLDINGS, L.P., SHACKLETON 2013- III CLO, LTD., SHACKLETON 2013-IV-R CLO, LTD., SHACKLETON 2014-V-R CLO, LTD., SHACKLETON 2015-VII-R CLO, LTD., SHACKLETON 2017-XI CLO, LTD., Z CAPITAL CREDIT PARTNERS CLO 2018-1 LTD., AND Z CAPITAL CREDIT PARTNERS CLO 2019-1 LTD. | § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

## SERTA SIMMONS BEDDING, LLC'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ...................................................................1

II.  ARGUMENT .............................................................................................4

    A.  The Term Loan Agreement Permitted the Transaction ...........................4

        1.  The Term "Open Market Purchase" Is Clear and Unambiguous and the Undisputed Evidence Shows the Transaction Was an Open Market Purchase..................................................................4

        2.  Defendants *Pro Rata* Rights Are Not Absolute .......................................12

        3.  The Alternative Transaction and Attempts to Join the Transaction Provide Further Support for the Permissibility of the Transaction............15

        4.  No Collateral or Value of the Loan Guarantees Were Released and Defendants' Pro Rata Rights Remain in Place .........................................16

    B.  Defendants' Self-Serving, Made-for-Litigation Definitions of Open Market Purchase Are Extrinsic Evidence that Does Not Aid this Court .........................................................................................17

        1.  The Court Should Disregard Defendants' Improper Extrinsic Evidence........................................................................17

        2.  In Addition to Being Unnecessary, Defendants' Expert Testimony Is Improper ...........................................................19

        3.  Even if the Court Were to Consider Defendants' Self-Serving Definitions of Open Market Purchase Derived by the Defendants, the Transaction Still Meets Those Definitions.........................................21

    C.  No Additional Discovery Is Needed as the Term "Open Market Purchase" Is Unambiguous and, in Any Event, the Parties Have Already Completed Significant Document Discovery .........................................24

    D.  The Transaction Was Expressly Permitted by the Term Loan Agreement and Therefore the Implied Covenant of Good Faith and Fair Dealing Was Not Breached ..............................................................26

    E.  North Star Was a Disqualified Institution at the Time it Sought to Purchase First Lien Term Loans ..................................................................29

III.  CONCLUSION.........................................................................................30

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*,
    634 F.3d 112 (2d Cir. 2011)..................................................................6, 9

*Ability Ins. Co. v. ST Paper, LLC*,
    2022 WL 912927 (S.D.N.Y. Mar. 29, 2022) ............................................5

*AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*,
    2023 WL 2394680 (N.Y. App. Div. 1st Dep't Mar. 7, 2023)....................9

*AG Centre St. P'Ship, et al. v. Serta Simmons Bedding, LLC, et al.*,
    No. 654181/2022 (Sup. Ct. N.Y. Cnty. Nov. 16, 2022), Dkt. 11 ...........23

*Akasa Holdings, LLC v. 214 Lafayette House, LLC*,
    177 A.D.3d 103 (N.Y. App. Div. 1st Dep't 2019)....................................8

*Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*,
    2021 WL 3619753 (N.Y. Sup. Ct. Aug. 16, 2021) .................................13

*Bayside Cap. Inc. v. TPC Grp., Inc. (In re TPC Grp., Inc.)*,
    2022 WL 2498751 (Bankr. D. Del. July 6, 2022)...................................14

*BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*,
    112 A.D.3d 509 (N.Y. App. Div. 1st Dep't 2013)..................................13

*Bloom v. Rock*,
    2010 WL 2267468 (S.D.N.Y. May 27, 2010) ........................................24

*Cap. Ventures Int'l v. Argentina*,
    652 F.3d 266 (2d Cir. 2011)...................................................................11

*Cities Serv. Co. v. United States*,
    522 F.2d 1281 (2d Cir. 1974).................................................................11

*D.S. 53-16-F Assocs. v Groff Studios Corp.*,
    168 A.D.3d 611 (N.Y. App. Div. 1st Dep't 2019)..................................25

*Excess Ins. Co. v. Factory Mut. Ins. Co.*,
    2 A.D.3d 150 (N.Y. App. Div. 1st Dep't. 2003)....................................17

*Exp.-Imp. Bank of the U.S. v. Agricola del Mar BCS, S.A. de C.V.*,
    536 F. Supp. 2d 345 (S.D.N.Y. 2008).....................................................6

*Feinman v. Dean Witter Reynolds, Inc.*,
    84 F.3d 539 (2d Cir. 1996)............................................................................10

*Fesseha v. TD Waterhouse Inv. Servs., Inc.*,
    305 A.D.2d 268 (N.Y. App. Div. 1st Dep't. 2003)..................................26

*Hine v. Manhattan R. Co.*,
    132 N.Y. 477 (1892)......................................................................................11

*Hovey v. Elliot*,
    118 N.Y. 124 (1890)......................................................................................11

*Law Debenture Tr. Co. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010).........................................................................18

*LCM v. Serta Simmons Bedding, LLC*,
    2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ......................................... *passim*

*LCM XXII Ltd., et al. v. Serta Simmons Bedding, LLC*,
    No. 21-cv-3987 (S.D.N.Y. May 4, 2021), ECF 1 ..................................28

*LCM XXII Ltd., et al. v. Serta Simmons Bedding, LLC*,
    No. 21-cv-3987 (S.D.N.Y. July 9, 2021), ECF 26-8 ......................24, 28

*Madison Ave. Baptist Church v. Baptist Church in Oliver St.*,
    46 N.Y. 131 (1871) .........................................................................................8

*Marin v. Const. Realty, LLC*,
    128 A.D.3d 505 (N.Y. App. Div. 1st Dep't 2015)....................................17

*Mercury Partners LLC v. Pacific Med. Bldgs., L.P.*,
    2007 WL 2197830 (S.D.N.Y. July 31, 2007) .........................................13

*Mid-State Indus., Ltd. v. State*,
    117 A.D.3d 1255 (N.Y. App. Div. 3d Dep't 2014) ..........................12, 17

*Mill Fin. LLC v. Gillet*,
    122 A.D.3d 98 (N.Y. App. Div. 1st Dep't 2014)......................................28

*Musicland Holding Corp. v. Wachovia Bank, N.A.*,
    386 B.R. 428 (S.D.N.Y. 2008)......................................................................7

*Mut. Redevelopment Houses, Inc. v. Roth*,
    307 A.D.2d 422 (N.Y. App. Div. 3d Dep't 2003) ....................................9

*NML Cap., Ltd. v. Republic of Argentina*,
    699 F.3d 246 (2d Cir. 2012)..........................................................................18

*North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC,*
2020 WL 3411267 (N.Y. Sup. Ct. June 19, 2020)....................................................................5

*Novartis Pharma AG v. Amgen Inc.,*
2020 WL 3056490 (S.D.N.Y. June 9, 2020) ............................................................................7

*Old Colony Tr. Co. v. City of Omaha,*
230 U.S. 100 (1913)..............................................................................................................24

*Patterson v. Comm'r of Internal Review,*
42 F.2d 148 (2d Cir. 1930)....................................................................................................11

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC,*
568 F.3d 374 (2d Cir. 2009) ..................................................................................................10

*Renfroe v. Parker,*
974 F.3d 594 (5th Cir. 2020) ................................................................................................19

*SEC v. Tex. Gulf Sulphur Co.,*
401 F.2d 833 (2d Cir. 1968)..................................................................................................11

*Teachers Ins. & Annuity Ass'n of Am. v. Ocwen Fin. Corp.,*
2002 WL 237836 (S.D.N.Y Feb. 19, 2002)...........................................................................24

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,*
369 F.3d 34 (2d Cir. 2004)....................................................................................................24

*United States v. Mulheren,*
938 F.2d 364 (2d Cir. 1991)..................................................................................................11

*Valencia v. Davis,*
836 F. App'x 292 (5th Cir. 2020) ..........................................................................................19

*Vanderbilt Mortg. & Fin., Inc. v. Flores,*
2010 WL 4595592 (S.D. Tex. Nov. 1, 2010) ........................................................................19

*Weaver v. Barden,*
49 N.Y. 286 (1872) .................................................................................................................8

*Wells Fargo Bank, N.A. v. Wright Mill Holdings, LLC,*
127 F. Supp. 3d 156 (S.D.N.Y. 2015)......................................................................................9

**Other Authorities**

*Fair Market Value*, Black's Law Dictionary (11th ed. 2019)....................................................5, 6

Fed. R. Civ. P. 30.....................................................................................................................26

Fed. R. Civ. P. 56 ............................................................................................................ *passim*

iv

Norton Bankr. L. & Prac. 3d Dict. of Bankr. Terms § S230 ...........................................................15

Private Equity Alert: De-leveraging Portfolio Companies Through Debt Buy-
   backs, Mar. 2009, at 3,
   https://www.weil.com/~/media/files/pdfs/Private_Equity_Alert_March_2009.
   pdf ...................................................................................................................................10

*Pro Rata*, Black's Law Dictionary (11th ed. 2019) .....................................................................15

Restatement (Second) of Contracts § 202.....................................................................................25

## I.   **PRELIMINARY STATEMENT**

In its opening brief, the Company[2] explained that the term "open market purchase" as used in the Term Loan Agreement is unambiguous and, consistent with New York law, offered a clear and straightforward definition based on its plain meaning:   "[A]n arms-length . . . transaction between buyers and sellers in the debt market."  Mot. at 20.  No one disputes that if that definition is correct, then the Transaction was permitted under the Term Loan Agreement.   Defendants instead argue that their numerous different, inconsistent definitions are the right ones and should control.  But Defendants' scattershot approach has left them far from the mark.

The problem for Defendants is that "open market purchase" was unambiguously intended to be a broad term designed to provide the Company with a flexible option to repurchase debt. One of Defendants' own "experts" correctly characterizes the phrase as "open textured" and "flexible."  Indeed, that inherent flexibility perhaps explains why Defendants have offered at least three conflicting definitions of the term that all, somewhat remarkably, still comfortably cover the mechanics of this Transaction.  They've defined it as (1) "a purchase effected via a non-auction process that is calibrated to match buyers and sellers according to their willingness to buy and sell the loan, respectively, as determined by a universal criterion of value such as dollars"; (2) "purchases of loans typically for cash through a broker or an agent at or close to the prevailing market price"; and (3) "typically [] a cash purchase at or around the prevailing market price with no special conditions."  Even if the Court were to accept these definitions, the Transaction passes each with flying colors.

---

[2]  Capitalized terms have the same meaning as defined in Serta Simmons Bedding, LLC's Motion for Summary Judgment, ECF 69, or as the context otherwise requires.

Despite proffering these undeniably broad definitions, Defendants then go down the rabbit hole layering on a checklist of detailed requirements found nowhere in the Term Loan Agreement to artificially constrict the term "open market purchase."  But the Defendants cannot even get their checklists straight, offering contradictory views as to what is required for a transaction to constitute an open market purchase.  It wasn't a "purchase" because the Company did not pay in cash, but then they also argue it's only "typically" in cash.  It wasn't consummated over the counter on the secondary debt market, but then they argue it can involve direct solicitation if it supplements a dealer mediated system.  It can't be exclusionary and should have been offered to all of the Lenders but then, perplexingly, they argue it was offered to *too many* lenders because open market purchases are of course just one-off transactions.  Along the way, they also conflate the understanding of "open market purchase" in the very different, highly-regulated securities market. But it goes without saying that loans are not securities and that the rules for securities that impact the understanding of "open market purchase" in that particular market have no force in the loan market or the Term Loan Agreement.

Defendants also try to manufacture ambiguity by turning to industry custom and usage, using purported, made-for-litigation expert definitions to define the term for this Court. Defendants have it backwards though.  Under New York law, the Court looks to the meaning apparent from the words and context of the contract and then applies the facts of the case to see if the conduct meets the definition.  You do not, as Defendants attempt to do here, define a disputed term around the facts of the case so you can argue the facts do not meet the manufactured definition.  Such a tactic directly contradicts the fundamental rules of contract construction under New York law.  Indeed, no extrinsic evidence is necessary because the Court may resolve the dispute by reading the unambiguous terms of the Term Loan Agreement.

Defendants also try to latch onto other provisions in the Term Loan Agreement that they say govern exchanges directly.  But these provisions are irrelevant, as the Transaction did not need to, nor did it, use these other provisions.  Similarly, unpleased with the caveat that Dutch Auctions must be open to all lenders, Defendants argue that Plaintiffs' definition of an open market purchase would swallow the Dutch Auction provision and make it superfluous, but Dutch Auctions are an entirely different process and by definition cannot be a negotiated transaction.  At bottom, Defendants seek to undo the Transaction by adding restrictions that the parties did not include to the Company's "open market purchase" option in the Term Loan Agreement.  The Term Loan Agreement is plain on its face, provided a flexible option to the Company, which readily encompassed the Transaction and its accompanying amendments.

Since the Transaction was plainly permitted under the Term Loan Agreement, the Company could not have breached the implied covenant of good faith and fair dealing.  Moreover, the undisputed evidence demonstrates North Star was a Disqualified Institution (or, at minimum, an Affiliate of a Disqualified Institution) and therefore not permitted to hold First Lien Term Loans.

Accordingly, the Court should grant Plaintiff's motion and declare that the Transaction was valid, that the Company did not violate the implied covenant of good faith and fair dealing by entering into the Transaction, and that North Star is a Disqualified Institution.  And, by doing so, also deny Defendants' request for summary judgment under Fed. R. Civ. P. 56(f).

## II.   ARGUMENT

### A.   The Term Loan Agreement Permitted the Transaction

#### 1.   The Term "Open Market Purchase" Is Clear and Unambiguous and the Undisputed Evidence Shows the Transaction Was an Open Market Purchase

There is one thing that all parties agree on:  if the Company entered into open market purchases under section 9.05(g) to effectuate the Transaction, then this case is over.  Excluded Lenders' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment, ECF 87 (the "Drop-Down Brief"), at 22–23; LCM Defendants' Memorandum of Law in Opposition to Plaintiffs' Motions for Summary Judgment, ECF 79 (the "LCM Brief"), at 9–10. Section 9.05(g) permits a lender to sell back its debt ("assign all or a portion of its rights and obligations") "to any Affiliated Lender on a non-pro rata basis," including the Company, through "open market purchases" or through "Dutch Auctions open to all Lenders."  ECF 1-1 § 9.05(g). The section provides two critical exceptions to Defendants' "sacred right" to *pro rata* treatment: (i) it allows the Company to repurchase debt on a *non pro rata* basis and (ii) it allows the Company to do so without consent of the First Lien Term Loan Lenders.  *See* ECF 1-1 § 9.02(b)(A)(6) (requiring unanimous consent that would "alter the pro rata sharing of payments" unless it is a "transaction permitted . . . under § 9.05(g)").

The Term Loan Agreement does not expressly define the term open market purchase, nor does it limit the scope of or mandate any requirements in order for transactions to qualify as an open market purchase.  Rather, the Term Loan Agreement uses a broad, general term in order to provide the Company with maximum flexibility.  *See* ECF 1-1 § 9.05(g).  The Drop-Down Group argues that the Company never offered its own definition of an "open market purchase," but the Company has made clear that in the context of a loan repurchase as provided in the Term Loan Agreement, the term open market can only mean the price that a willing buyer and a willing seller

are able to obtain in an arms-length negotiation.  In other words, the price that the Company and the PTL Lenders agreed to in the "open market."  *See Fair Market Value*, Black's Law Dictionary (11th ed. 2019).

And that's exactly what happened here—the Company entered into an arms-length negotiated transaction in the "open market" with an existing group of Lenders holding a majority of the Company's debt to repurchase their debt in exchange for the issuance of priority term loans. *See Ability Ins. Co. v. ST Paper, LLC*, 2022 WL 912927, at *13–19 (S.D.N.Y. Mar. 29, 2022) (granting summary judgment for defendant where alleged act of breach did not violate the plain language of the contract).

Defendants nevertheless contend that the Transaction was not an open market purchase because it was not actually "open" to all Lenders who wished to participate, Drop-Down Br. at 24, and that an "open market purchase" cannot "include a backroom deal," LCM Br. at 13.  First, that ignores what actually happened here.  As the undisputed evidence makes clear, the Company engaged in a robust, competitive process with multiple lender groups to obtain the best terms possible.  *See* SUF ¶¶ 6–17; *North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*, 2020 WL 3411267, at *2 (N.Y. Sup. Ct. June 19, 2020).  The Company solicited proposals from both outside parties and existing Lender groups before narrowing the potential sellers to two groups. *See* SUF ¶¶ 10–13; *North Star*, 2020 WL 3411267, at *2.  After "months of negotiations"—with over 70% of the then existing Lenders—the Company ultimately accepted the PTL Lenders' deal, which provided the Company with "more liquidity, less debt and flexibility for additional decreases in debt."  *North Star*, 2020 WL 3411267, at *2, *6, *14; SUF ¶ 13.  This process—of soliciting proposals on the open market and then negotiating a final deal—is the epitome of an

arms-length, open market transaction between a buyer and sellers.  *See Fair Market Value*, Black's Law Dictionary.

More importantly, however, the open market purchase provision omits any requirement that the Company offer the Transaction to all Lenders who wish to participate.  *See* ECF 1-1 § 9.05(g).  Indeed, if Plaintiffs were required to make open market offers to all Lenders, the Term Loan Agreement would have said so explicitly, as it did for Dutch Auctions in the same provision.[3] *See, e.g., Exp.-Imp. Bank of the U.S. v. Agricola del Mar BCS, S.A. de C.V.*, 536 F. Supp. 2d 345, 353 (S.D.N.Y. 2008) (where the parties "knew how to provide for" a certain requirement "and did not so provide for [it]," the requirement "is not available under the plain language of" the agreement), *aff'd*, 334 F. App'x 353 (2d Cir. 2009); *see also 10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 125 (2d Cir. 2011) ("[C]ourts may not by construction add or excise terms . . . under the guise of interpreting the writing.").  Nevertheless, Defendants urge the Court to read "Dutch Auction" and "open-market purchase" "*in harmony*" to honor their right to *pro rata* distribution.  Drop-Down Br. at 27; *see also* LCM Br. at 20.  But that is nonsensical because, as they concede, the Dutch Auction and open market purchase are "exceptions" to their right to *pro rata* treatment.  LCM Br. at 20; Drop-Down Br. at 22.  And, as Defendants point out, the parties to the Term Loan Agreement took great care to craft a highly detailed Dutch Auction procedure.  Drop-Down Br. at 28; *see also* LCM Br. at 20.  Had the parties decided to dictate that "open market purchase" be "open to all," or that it be purchased with a "sum of money," or include any of the other requirements now proffered in litigation by Defendants, it

---

[3] Defendants ignore the plain language of the Term Loan Agreement, which defines "Dutch Auction," *see* ECF 1-1 § 1.01, Schedule 1.01(b), in favor of case law construing Louisiana civil law.  *See* LCM Br. at 21 n.7 (citing *La. Stadium & Exposition Dist. v. Fin. Guar. Ins. Co.*, 701 F.3d 39, 43 (2d Cir. 2012)); Drop-Down Br. at 28 n.3 (same).

could have expressly written those requirements into the Term Loan Agreement. *See Musicland Holding Corp. v. Wachovia Bank, N.A.*, 386 B.R. 428, 438 (S.D.N.Y. 2008) (affirming motion to dismiss for breach of contract action where "Appellants could have, and perhaps should have, included language specifically restricting Wachovia's ability to incorporate a term loan into the Revolving Credit Agreement by amendment, [but] 'courts may not by construction add . . . terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing'") quoting *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2008))); *Novartis Pharma AG v. Amgen Inc.*, 2020 WL 3056490, at *7 (S.D.N.Y. June 9, 2020) (declining to interpret a contract at the summary judgment on the pleading stage to add language not included in the express terms where "[t]he parties easily could have included [this] language" but "elected not to do so" and "[t]he contracts at issue were negotiated at arm's length by well-resourced parties represented by sophisticated counsel").

The Drop-Down Group also argues that the Transaction was not an open market purchase because the loans "were not purchased at or near market value but instead were exchanged at a substantial premium to market prices." Drop-Down Br. at 25. But of course, the Drop-Down Group conveniently ignores that the PTL Lenders also provided $200 million in new money financing to the Company as part of the Transaction. They also conveniently ignore that the Transaction resulted in the reduction of the Company's debt by $400 million. But in any event, the "prevailing market prices" that the Drop-Down Group cite in their brief are not the right benchmarks here. This Transaction was a deal where the Company sought to buy-back over a *billion dollars* of their debt, and negotiated with over 70% of its Lenders, which is the market. The alternative transaction with the Drop-Down Group, on the best terms it offered, sought to exchange the First Lien Term Loans at a *higher price* ███████████████ and the Second Lien

Term Loans at a nearly equivalent price ██████████████████.  *See* ECF 72-5, 72-6.  As such,

since 70% of the then existing Lenders—with whom the Company negotiated prior to entering

into the Transaction—priced the exchange for First and Second Lien Term Loans at approximately

the same price, that was the prevailing market price for the purchase of First and Second Lien

Term Loans in the Transaction.

LCM's remaining arguments fare no better.  LCM argues that the Transaction does not

qualify as an open market purchase because the Company did not repurchase the debt with "a sum

of money."  LCM Br. at 10–11.  But the plain terms of the Term Loan Agreement required no such

thing, nor should the term "purchase" in the Term Loan Agreement be read so narrowly as to only

include "a sum of money."[4]  Rather, New York law only requires that a purchase be made with

consideration.  That is, all that is required is for a party to "have parted with something of value."

*Weaver v. Barden*, 49 N.Y. 286, 291–92 (1872); *see also Akasa Holdings, LLC v. 214 Lafayette*

*House, LLC*, 177 A.D.3d 103, 104–05 (N.Y. App. Div. 1st Dep't 2019) ("A bona fide purchaser

of real property [is] one who purchases land in good faith and for a valuable consideration.").  For

example, New York tax law "defines 'sale,' 'selling' or 'purchase' as: 'Any transfer of title or

possession or both, *exchange or barter*, rental, lease or license to use or consume . . .[] conditional

or otherwise, in any manner or by any means whatsoever *for a consideration*, or any agreement

---

[4] The Drop-Down Group and its purported expert apparently disagree, arguing only that "open market purchases *typically* are settled for cash consideration."  Drop-Down Br. at 32 (emphasis added) (citing Declaration of Marti P. Murray, ECF 102 ¶¶ 72–73 (the "**Murray Decl.**"); Expert Declaration of Sarah M. Ward, ECF 89 ¶¶ 42, 46 (the "**Ward Decl.**")).  Likewise, in a case used to support their argument, LCM Br. at 11 (citing *Madison Ave. Baptist Church v. Baptist Church in Oliver St.*, 46 N.Y. 131, 139–40 (1871)), the New York Court of Appeals actually rejected that a sale needed to be for money and instead adopted an alternative definition that "would embrace every transfer for a valuable consideration, whether paid in cash or other property."  *Madison*, 46 N.Y. at 139–40.

therefor, including the rendering of any service, taxable under this article, for a consideration or any agreement therefor.'" *Mut. Redevelopment Houses, Inc. v. Roth*, 307 A.D.2d 422, 424 (N.Y. App. Div. 3d Dep't 2003) (citing N.Y. Tax Law § 1101(b)(5)) (emphasis added). Indeed, a New York appellate court recently explained that a "purchase" of assets can be made with consideration other than cash. In *AEA* (which the Drop-Down Group also relies on), the appellate court held that a secured creditor can "'bid' the amount of its secured debt, *as consideration for the purchase of the assets over which it holds security* . . . . and to take ownership of those assets without necessarily having to pay any cash for the purchase." *AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*, 2023 WL 2394680, at *1 n.4 (N.Y. App. Div. 1st Dep't Mar. 7, 2023) (emphasis added).

And that is precisely what happened here. As consideration for the repurchase of approximately $992 million in First Lien Term Loans, the Company issued new super-priority debt. None of the Defendants argue that the Company was prohibited from issuing super-priority debt. And nothing in the Term Loan Agreement precluded the Company from using debt as consideration for the purchase of debt. Nor does it make sense why the Transaction needed to occur indirectly—with the Company first paying cash for the PTL Lenders' First and Second Lien Term Loans and then selling them new debt—as opposed to doing it directly as part of an exchange. *See Wells Fargo Bank, N.A. v. Wright Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173–74 (S.D.N.Y. 2015) ("It is black-letter law that courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical."). Defendants cannot read terms into the Term Loan Agreement that do not exist. *See 10 Ellicott Square*, 634 F.3d at 125.[5]

---

[5] Notwithstanding, there is no dispute that the PTL Lenders provided the Company with $200 million of new money, which was indisputably proper under the Term Loan Agreement. SUF ¶ 18; ECF 66 ¶¶ 100, 265, 269 (admitting that the new money was permissible under the Term Loan

LCM also argues that the purchase price needs to be set by anonymous buyers and sellers in order to qualify as an open market purchase. LCM Br. at 15. LCM, however, conflates a market purchase in the context of a registered trade on a regulated, public stock exchange with the open market purchase of a private company's existing loans. By definition, an open market purchase for a private company's loans can only be consummated by those lenders who own those loans. *See* ECF 1-1 § 9.05(g) (permitting open market purchases for "rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender"). Here, the Company approached individual existing Lenders (including some of the Defendants in this case) in the open market to negotiate the potential terms of a repurchase of loans. *See* SUF ¶¶ 6–17. For this reason, the definition of "open market" cited by LCM in Black's Law Dictionary is irrelevant because the open market purchase here could not, by definition, be consummated by "any buyer or seller." Similarly, the twelve-year-old Weil industry alert that Defendants cite actually says that the "optimal type of bond buyback transaction will depend on the relevant indenture documents and, ***if applicable, the credit documents***."[6] Here, the Term Loan Agreement unambiguously permitted the Company to engage in open market purchases with its existing Lenders. As a result, LCM's citations to inapposite—and century-old—cases, which primarily relate to the market for *public stock*, are simply not applicable,[7] nor is LCM's claim that the Company's actions are akin to criminal securities fraud involving *public stock*. LCM Br. at 14.

---

Agreement). Therefore, even assuming as true that a purchase requires a cash payment as LCM contends, the Transaction did involve the exchange of a "sum of money."

[6] Private Equity Alert: De-leveraging Portfolio Companies Through Debt Buy-backs, Mar. 2009, at 3, https://www.weil.com/~/media/files/pdfs/Private_Equity_Alert_March_2009.pdf.

[7] *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC*, 568 F.3d 374 (2d Cir. 2009) (distinguishing stock purchases with private transactions of securities not traded on open market); *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539 (2d Cir. 1996) (discussing

Finally, LCM contends that, because the Term Loan Agreement had "specific provisions governing exchange transactions," the "open market purchase" provision cannot permit exchanges. *See* LCM Br. at 16–19 (citing §§ 9.02(c), 2.22(a)(x)). But sections 2.22 and 9.02(c) are irrelevant because the Company did not incur new debt under those sections, nor are they the only provisions that permit incurring new debt. While LCM may have preferred that the Company incur the new debt under sections 2.22 or 9.02, nothing required the Company to do so.[8] As the federal court in New York held, "the existence of these provisions d[id] not curtail [the Company's] ability to invoke the separate provisions of the [Term Loan Agreement] providing express permission to retire existing loans via the open market and to incur additional debt." *LCM v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *9 (S.D.N.Y. Mar. 29, 2022).[9]

---

presumption of reliance for misrepresentations in open-market securities transactions); *United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991) (discussing open-market transactions in context of information provided by floor broker with respect to common stock trades); *Cities Serv. Co. v. United States*, 522 F.2d 1281 (2d Cir. 1974) (discussing open market as metric for calculating debt discount); *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 858 (2d Cir. 1968) (citing congressional testimony regarding promotion of a "free and open public securities market" that "protect[s] the investing public from suffering inequities in trading" due to false or misleading information); *Patterson v. Comm'r of Internal Review*, 42 F.2d 148 (2d Cir. 1930) (discussing open market in the context of tax valuation); *Hine v. Manhattan R. Co.*, 132 N.Y. 477 (1892) (discussing open market in the context of property value); *Hovey v. Elliot*, 118 N.Y. 124 (1890) (citing dissent, discussing traceability of a bond sale on the open market). And even the Drop-Down Group's expert agrees that "the loans at issue in this case would not be considered securities." Ward Decl. ¶ 11.

[8] Even if it had, however, sections 2.22 and 9.02 provide only that the replacement loans "*may* be" or "*may* rank" *pari passu* to existing debt.

[9] *Cap. Ventures Int'l v. Argentina*, 652 F.3d 266 (2d Cir. 2011), relied upon by LCM (LCM Br. at 18) underscores this point. In that case, the Second Circuit held that a specific provision "governs the circumstance to which it is directed, even in the face of a more general provision." *Id.* at 271. Here, the Company followed section 9.05(g), a specific provision that allowed for open market purchases.

11

### 2.  Defendants *Pro Rata* Rights Are Not Absolute

The Drop-Down Group urges the Court to consider the term "open market purchase" in the context of their "sacred right" to *pro rata* treatment.  Drop-Down Br. at 27.  At the same time, they acknowledge that an open market purchase made pursuant to section 9.05(g) is a clear exception to the *pro rata* requirement.  Drop-Down Br. at 22; LCM Br. at 20.  And of course, they ignore that under section 2.18, their rights to *pro rata* treatment are "[s]ubject in all respects to the provisions of each applicable Intercreditor Agreement . . . ."  ECF 1-1 § 2.18(b).  Section 2.18 also makes clear that their rights are subject to each "Class" of debt.  *Id.* § 2.18(a), (c).  Thus, under section 2.18, Defendants only have a right to *pro rata* payment among existing lenders holding the same class of debt as them.  There is no dispute that Defendants' right to receive *pro rata* treatment within their own Class of loans—*i.e.*, First Lien Term Loan Loans—remains entirely untouched.

Defendants concede that the "parties' rights may have been subject to applicable intercreditor agreements," but argue that it was "improper to use intercreditor agreements to leapfrog certain loans in priority to others, in violation of the amendment process."  Drop-Down Br. at 29.  Other than their own self-serving statement, Defendants point to nothing in the Term Loan Agreement to support their argument. Rather, and as discussed *infra*, the Term Loan Agreement, as amended, allows the parties to direct the agent to enter into new intrecreditor agreements.  ECF 1-2 § 8.08 ("Each Secured Party irrevocably authorizes and instructs the Agent to, and the Agent shall: . . . (d) enter into subordination, intercreditor, collateral trust and/or similar agreements with respect to Indebtedness"); *LCM*, 2022 WL 953109, at *11 ("Section 8.08 of the Agreement, as amended, authorized the Administrative Agent to enter a new intercreditor agreement, specifically the PTL Intercreditor Agreement."); *Mid-State Indus., Ltd. v. State*, 117 A.D.3d 1255, 1256 (N.Y. App. Div. 3d Dep't 2014) ("[I]f the contract is not ambiguous, it must be enforced according to the plain meaning of its terms.").

Defendants argue that their sacred rights were subject to a certain Class of debt (which is a non-starter) because, prior to the breach, the Drop-Down Group was "in exactly the same class as the" PTL Lenders and "[o]nly by virtue of the Transaction were separate classes created." Drop-Down Br. at 30. But again, they point to nothing in the Term Loan Agreement that precluded the Company from creating a new class of debt, nor do they dispute that the Company was permitted—with majority consent—to amend the Term Loan Agreement to allow for that class of debt to rank senior in right of payment to the First Lien Term Loans. ECF 1-1 § 9.02(b)(A)(6); *LCM,* 2022 WL 953109, at *10 ("Despite [LCM's] protestations, anti-subordination is not a sacred right protected by Section 9.02(b)(A)(6), or any other provision of Section 9.02. Thus, the Agreement permitted [the incurrence of a new class of debt] with the consent of only a majority of lenders.").[10]

The New York federal court presiding over the LCM action agreed. In determining that the Transaction did not violate the Term Loan Agreement's waterfall provision, the New York court recognized that the Term Loan Agreement "expressly permitted [the Company] and the [PTL Lenders] to enter into a separate intercreditor agreement that governed the payment priority of creditors in the event of a default." *LCM*, 2022 WL 953109, at *11. Moreover, the court also determined that "[t]he plain terms of Section 2.18 of the [Term Loan] Agreement make clear that

---

[10] The cases Defendants cite to support this proposition are inapposite. *See Mercury Partners LLC v. Pacific Med. Bldgs., L.P.*, 2007 WL 2197830, at *14–*15 (S.D.N.Y. July 31, 2007) (finding that the meaning of "property-related financing" in an agreement meant a subset of mortgage financing and not discussing credit agreements or debt exchanges); *BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, 112 A.D.3d 509, 510 (N.Y. App. Div. 1st Dep't 2013) (voiding amendment to the definition of a term where the agreement explicitly provided that no amendment could have the effect of amending the definition without unanimous consent*); Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, 2021 WL 3619753, at *4, *11 (N.Y. Sup. Ct. Aug. 16, 2021) (denying a motion to dismiss because the issued "super senior" debt potentially "alter[ed] the order of application of proceeds," which required consent under the credit agreement at issue).

the first-lien lenders' rights to *pro rata* payments apply only to debt within the same 'Class,' *viz.*, among first-lien lenders." *Id.* at *10.

Fundamentally, Defendants are upset that the Company issued a new class of debt that was senior in right of payment to their First Lien Term Loans.  Defendants argue the Company breached the Term Loan Agreement because the "practical effect" of the Transaction was to "waive [their] *pro rata* payment rights relative to the other First Lien Lenders" and "modify" the waterfall provision by allowing the PTL Lenders to subordinate the Drop-Down Group.  Drop-Down Br. at 29.  But they do not challenge the fact that the Company was permitted under the Term Loan Agreement to incur new debt pursuant to section 6.01(z) as Incremental Equivalent Debt.  *See* ECF 1-2 §§ 1.01 (definition of Incremental Equivalent Debt), 6.01(z).  Nor do they dispute that the Company was permitted to amend the definition of Incremental Equivalent Debt to allow it to rank senior in right of payment to the First Lien Term Loans, or that the Term Loan Agreement permitted the parties to direct the agent to enter into new intercreditor agreements.  ECF 1-2 §§ 1.01, 8.08, 9.02(b).  Thus, the Defendants concede that payment subordination is allowed under the Term Loan Agreement.

Unlike certain other credit agreements, the Term Loan Agreement does not contain an anti-subordination provision.  *See LCM*, 2022 WL 953109, at *10 ("Despite [LCM's] protestations, anti-subordination is not a sacred right protected by Section 9.02(b)(A)(6), or any other provision of Section 9.02."); *see also Bayside Cap. Inc. v. TPC Grp., Inc. (In re TPC Grp., Inc.)*, 2022 WL 2498751, at *12 (Bankr. D. Del. July 6, 2022) ("There is nothing in the law that requires holders of syndicated debt to behave as Muskateers.  To the extent such holders want to be protected against self-interested actions by borrowers and other holders, they must include such protections in the terms of the agreement.").

At bottom, Defendants conflate their right to *pro rata treatment* with anti-subordination. Drop-Down Br. at 29–30; LCM Br. at 3–4, 16. These are two distinct points. *Pro rata* refers to how loans in the same class must be treated, *i.e.*, proportionately; according to an exact rate, measure, or interest. *See Pro Rata*, Black's Law Dictionary (11th ed. 2019). Here, there is no question that the First Lien Term Loan Lenders' right to *pro rata* payments within the same Class, that is, among First Lien Term Loan Lenders, remains unaffected. Subordination, on the other hand, is placing a different class of loans ahead of the then existing class. *See* Norton Bankr. L. & Prac. 3d Dict. of Bankr. Terms § S230 ("Case law and practice have effectively defined the terms [subordination and subordinate] to mean the reduction of the priority for the distribution to which a claim would otherwise be entitled."). Nothing in the Term Loan Agreement precluded the Company from subordinating the payment of First Lien Term Loans to the payment of the PTL Loans. *Accord LCM*, 2022 WL 953109, at *10. That should be the end of this case.

### 3. The Alternative Transaction and Attempts to Join the Transaction Provide Further Support for the Permissibility of the Transaction

The Defendants' own conduct confirms that the Transaction was an open market purchase. To start, it is no secret that some of the Defendants were negotiating a separate alternative transaction with the Company. SUF ¶¶ 22–25. And, it should come as no surprise to this Court that the alternative transaction would have utilized an open market purchase to exchange debt. *See* Ex. 28, North Star Debt Holdings, L.P.'s Responses and Objections to Plaintiffs' Requests for Admission, at 7–8; Ex. 29, Angelo Gordon's Objections and Responses to Plaintiffs' Joint First Set of Requests for Admission, at 7–8; Ex. 30, Gamut Capital SSB Capital, LLC's Responses and Objections to Plaintiffs' Requests for Admission, at 7–8. In responding to discovery requests issued by the Company, all of the Defendants involved in the alternative transaction admitted that the alternative transaction, at least up until the end of the negotiations on June 5, 2020, had not

"involved utilization of the Dutch Auction as that term is defined in the [Term Loan Agreement]," and "may have relied on section 9.05(g) of the [Term Loan Agreement] and/or section 9.05(g) of the Second Lien Term Loan Agreement." *Id.*  Since there are only two options under section 9.05(g), the highly specified Dutch Auction open to all lenders or the broad, flexible open market purchase, the alternative transaction would have had to utilize an open market purchase.  As such, at least those Defendants admit that an exchange, such as the one utilized to effectuate the Transaction, was permissible as an open market purchase under section 9.05(g).

Furthermore, other Defendants, once hearing about the Transaction in June 2020, attempted to join the deal, but could not do so.  *See, e.g.*, ECF 99 ██████████████████

███████████████████████████████████████████████████

███████████  ECF 103 ████████████████████████████████████

██████████████████████████████  The debt-for-debt purchase portion of the Transaction was publicly known at that point.  *See* SUF ¶ 18.  Thus, these Defendants implicitly accepted the legality of the debt-for-debt purchase component at that time.  It was only after they were unable to participate that they sought legal recourse against the Plaintiffs, deciding that the Transaction they would have been happy to join was in fact invalid.

### 4.  No Collateral or Value of the Loan Guarantees Were Released and Defendants' Pro Rata Rights Remain in Place

The Transaction also did not release any collateral or the loan guarantee values.  As explained in the Company's moving brief, the Transaction actually added collateral.  Mot. at 25; *LCM*, 2022 WL 953109, at *12 ("[N]o feature of the Transaction released the collateral or the value of the loan guarantees.").  Instead, the Drop-Down Group cites an entirely unrelated section of Judge Failla's opinion, where she states an obvious fact—that if the Transaction had altered Defendants' rights to receive pro rata treatment, then the Transaction would have violated the Term

Loan Agreement.  Drop-Down Br. at 44–45.  But there is no dispute that section 2.18, which governs Defendants' *pro rata* rights remains unchanged.  Mot. at 24.  In fact, LCM, recognizing that this argument is futile, concedes that the "Transaction did not literally strip the [Defendants] liens" and that Defendants "retain *pari passu* rights in the collateral."  LCM Br. at 33–34.

### B.   Defendants' Self-Serving, Made-for-Litigation Definitions of Open Market Purchase Are Extrinsic Evidence that Does Not Aid this Court

#### 1.   The Court Should Disregard Defendants' Improper Extrinsic Evidence

Even though the term "open market purchase" is clear and unambiguous, Defendants nevertheless urge the Court to consider purported industry custom and practice evidence proffered by their three paid "experts" to determine whether the Transaction qualifies as an open market purchase.  LCM Br. at 22–24; Drop-Down Br. at 31–39.  All three "experts," to no surprise, opine that the Transaction does not qualify as an open market purchase.  Defendants suggest that this evidence can be considered to "provid[e] [the Court] guidelines" in defining the term, Drop-Down Br. at 31, LCM Br. at 22–23, but their opinions clearly constitute extrinsic evidence.  *See Excess Ins. Co. v. Factory Mut. Ins. Co.*, 2 A.D.3d 150, 151 (N.Y. App. Div. 1st Dep't. 2003) (finding that "the expert affidavit submitted by defendant regarding industry custom is extrinsic evidence which should not be considered in interpreting [the] clear and unambiguous document"), *aff'd*, 3 N.Y.3d 577 (2004).  Because the term "open market purchase" is clear and unambiguous, the Court should disregard the experts' opinions.  *See Marin v. Const. Realty, LLC*, 128 A.D.3d 505, 509 (N.Y. App. Div. 1st Dep't 2015) (refusing to consider expert evidence setting forth "general practice and custom in the industry" because to accept it would be "to admit extrinsic evidence to an admittedly unambiguous contract which is prohibited by long-standing precedent"), *aff'd as modified*, 28 N.Y.3d 666 (2017); *Mid-State Indus.*, 117 A.D.3d at 1256 ("[I]f the contract is not ambiguous, it must be enforced according to the plain meaning of its terms.").

Even if the Court were to consider industry usage and custom to define an otherwise unambiguous term, "[t]he trade usage must be 'so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto.'" *Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal citations omitted).  Clearly, Defendants' definitions, proferred by three experts that do not themselves align on a clear definition, cannot meet such a high standard. *Compare* Murray Decl. ¶ 72 ("To a market participant, an Open Market Purchase of bank debt occurs when a bank debt purchaser goes to the Secondary Bank Debt Market and makes a purchase. An Open Market Purchase will typically be a cash purchase at or around the prevailing market price with no special conditions."), *with* Declaration of Professor Vincent Buccola In Support of the LCM Defendants' Opposition to Summary Judgment, ECF 84 ¶ 35 (the "**Buccola Decl.**") ("[A]n open market purchase is best understood as a purchase effected via a non-auction process that is calibrated to match buyers and sellers according to their willingness to buy and sell the loan, respectively, as determined by a universal criterion of value such as dollars.") *and* Ward Decl. ¶ 4 ("[L]oan market participants would understand the term 'open market purchases' in Section 9.05(g) of the Term Loan Agreement to mean purchases of loans typically for cash through a broker or an agent at or close to the prevailing market price.").  Therefore, the Court should ignore Defendants' proposed definitions based on purported industry custom and usage.  *See NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246, 258 (2d Cir. 2012) (rejecting the proposed construction of a clause in the sovereign debt context because differences between reports and other sources showed that the proposed interpretation of the clause was "neither well settled nor uniformly acted upon").

### 2. In Addition to Being Unnecessary, Defendants' Expert Testimony Is Improper

The Court should further disregard the experts' definitions because all three of Defendants' experts offer impermissible opinions on legal issues. It is well-established that experts may not opine on conclusions of law or provide opinions on legal issues. *Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020); *see also Valencia v. Davis*, 836 F. App'x 292, 299–300 (5th Cir. 2020) (affirming the exclusion of an expert report filed in support of a summary judgment opposition because it rendered a conclusion of law).[11] This common-sense rule, which respects the role of the judge in determining issues of law, has special force in contract cases, where it is improper for an expert to interpret the terms or legal effect of a contract. *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 2010 WL 4595592, at *4 (S.D. Tex. Nov. 1, 2010). Since each of the experts is opining on the meaning of the term "open market purchase" in the Term Loan Agreement, their opinions are improper, would not be admissible, and should not be considered. *See* Fed. R. Civ. P. 56(c)(2), (4).

Although each of the experts try to conceal their legal conclusions as trade usage, none of them are really offering custom and usage opinions. This is apparent on the face of their reports, which also undercut their alleged expertise on the loan market. For example, LCM's expert Buccola, a law professor, is transparently offering his own invented standard. Indeed, he repeatedly qualifies his expert opinion as "The standard I offer." Buccola Decl. ¶¶ 36-38. That's not surprising because he has never worked in the relevant industry and has only ever been a lawyer or law professor, and has no practical experience in the relevant field. And even his work as a law

---

[11] Two of the experts implicitly recognize this limitation by claiming, implausibly, that they are not offering a legal opinion or legal conclusions. *See, e.g.*, Murray Decl. ¶ 16 n.5; Ward Decl. ¶ 2.

professor suggests only a limited insight into the relevant issues. Although he has written on the loan markets recently, he only started doing so last year, well after the dispute arose between the parties in 2020.[12] His opinions cannot be considered under Fed. R. Civ. P. 56 for this reason as well.

One of the Drop-Down Group's experts, Ward, a former banking partner at Skadden, formed her opinion by "drawing on my participation in the leveraged finance market *as a legal professional*" and her "experience as a leveraged finance and corporate restructuring *lawyer*." Ward Decl. ¶¶ 1, 19 (emphasis added). Although she was a banking lawyer, she offers no concrete examples of her expertise in the syndicated loan market. None of the matters she discloses on her resume appear to be relevant to this dispute. And her own description of her expertise does not suggest a practical understanding of how the term "open market purchase" is understood in the loan market. Indeed, although she "routinely structured and negotiated credit agreements," *id.* ¶ 14, her alleged expertise in this field is limited to the bare fact that those credit agreements sometimes contained open market purchase provisions. *Id.* In other words, she offers no reason to accept her understanding of "open market purchases" as authoritative or reflecting the market's understanding in general.

---

[12] Buccola tries to justify his expertise by pointing to his "methodology" of studying a "representative corpus of approximately 500 publicly available leveraged loan agreements originated between 2011 and November 2016." Buccola Decl. ¶ 4. But this study only confirms what is undisputed: that many loan agreements have similar terms intended to provide flexibility to borrowers. There is no description at all of the specifics of the terms used, and those specifics likely matter, because as he admits, the "figures are almost certainly higher for loans to non-public borrowers, such as Serta: non-public borrowers are more likely to be sponsor-backed, and sponsor-backed borrowers are more likely to have a repurchase exception." *Id.* ¶ 23.

More confounding is that, despite claiming to have expertise in "loan documents" and "structuring credit transactions and due diligence," *id.* ¶ 14, most of her declaration is based on the "historical inclusion of bond-style covenants in leveraged loans to help explain the origin and meaning of the term 'open market purchases' in credit agreements." *Id.* ¶¶ 47–61. But she has no disclosed expertise in the history and development of the loan markets or the bond markets for that matter. In fact, she does not even list an expertise in the high yield bond market, *id.* ¶ 14, and her resume only highlights one deal concerning a bond. Likewise, her opinions cannot be considered under Fed. R. Civ. P. 56 for these reasons as well.

Finally, the Drop-Down Group's other expert, Murray, although having a past career in finance, became a consultant in 2009 around the time when she says that open market purchases were just making their way into loan agreements. Murray Decl. ¶ 53; *see also* Buccola Decl. ¶ 22 ("Two exceptions, in particular, became prevalent beginning in the early 2010s"); Ward Decl. ¶ 60 ("Once the market reopened after the credit crisis, borrowers and sponsors negotiated the ability to opportunistically buy back loans through limited exceptions to the pro rata payment provisions."). It is not surprising then that despite testifying as an expert on many other issues, this appears to be the first time she has ever offered an opinion on the loan market or provisions in credit agreements. Again, her opinions cannot be considered under Fed. R. Civ. P. 56 for this reason as well.

### 3. Even if the Court Were to Consider Defendants' Self-Serving Definitions of Open Market Purchase Derived by the Defendants, the Transaction Still Meets Those Definitions

Despite offering three experts to define open market purchase based on purported industry custom and usage, Defendants still fail to provide a cohesive and singular definition. For instance,

even within their own briefs, the Drop-Down Group says that an open market purchase cannot be exclusionary, Drop-Down Br. at 28, but later says that it can be non-*pro rata*.  *Id.* at 33.[13]

Moreover, each expert provides their own definition, which as it turns out, the Transaction actually meets.  Starting with the proposed definition of LCM's expert: "[A]n open market purchase is best understood as a purchase effected via a non-auction process that is calibrated to match buyers and sellers according to their willingness to buy and sell the loan, respectively, as determined by a universal criterion of value such as dollars."  Buccola Decl. ¶ 35.  This is precisely how the Transaction was effectuated.  The Company, through its advisors, approached various Lenders, who then agreed on specific terms for the Transaction.  SUF ¶¶ 10–17.

As for the Drop-Down Group's definition, their experts provide broad definitions, from which the Drop-Down Group creates an eleven point checklist.  *See* Drop-Down Br. at 35–36; Ward Decl. ¶ 4 ("[L]oan market participants would understand the term 'open market purchases' in Section 9.05(g) of the Term Loan Agreement to mean purchases of loans typically for cash through a broker or an agent at or close to the prevailing market price."); Murray Decl. ¶ 72 ("To a market participant, an Open Market Purchase of bank debt occurs when a bank debt purchaser goes to the Secondary Bank Debt Market and makes a purchase. An Open Market Purchase will typically be a cash purchase at or around the prevailing market price with no special conditions.").

---

[13] The Drop-Down Group also say that "open market purchase provisions in credit agreements are intended to permit one-off purchases of term loans on a non-*pro rata* basis in a quick, cost-efficient manner in ways that do not resemble tender offers."  Drop-Down Br. at 34.  Defendants set arbitrary lines throughout their brief, such as this one which suggests that an offer to one or two lenders would be appropriate, but not 50% of the lender group.  Such a definition is not sustainable.

The Transaction is also consistent with many of the seemingly arbitrary checklist criteria created by the Drop-Down Group for the purposes of this litigation (but notably not included anywhere in the Term Loan Agreement):

| Certain Criteria from Drop-Down Brief at 35-36 | Transaction Facts |
|---|---|
| Conducted on the secondary debt market through a broker-dealer intermediary | The Company utilized Evercore to solicit various potential offers for the Company. SUF ¶ 10. |
| Limited number of loan holders solicited | In addition to this position being contrary to the definition argued by the Drop-Down Group previously, Am. Compl. ¶ 7, *AG Centre St. P'Ship, et al. v. Serta Simmons Bedding, LLC, et al.*, No. 654181/2022 (Sup. Ct. N.Y. Cnty. Nov. 16, 2022), Dkt. 11, the Company negotiated with approximately 70% of the existing loan holders. SUF ¶ 12. |
| Transaction settled as a single trade between buyer and seller | The Transaction was overall a singular transaction occurring on the same day, even though it included execution of multiple agreements. |
| Cash consideration exchanged for bank debt | The Transaction included $200 million in new money. SUF ¶ 18. |
| Debt purchased at or near prevailing market price | The Drop-Down Brief fails to consider the new money portion of the Transaction, and the reduction of overall debt, which lowers the overall premium received as part of the Transaction. *See* Section II.A.1. The Drop-Down Brief also fails to consider the undisputed evidence of market price that resulted from the Company's marketing efforts. *See id.* The Drop-Down Brief also fails to evaluate how the market evaluated the value of the PTL Loans the Company paid for the existing First and Second Lien Term Loans in the Transaction. |
| No detrimental effect on pre-existing *pari-passu* debt | There was no change to any Lenders' *pari passu* status. The Defendants were payment subordinated, which the Term Loan Agreement expressly permitted. *See* Section II.A.2. |
| No decline in trading price of legacy debt | The legacy debt actually skyrocketed in value within a year of the Transaction. *See* |

| Certain Criteria from Drop-Down Brief at 35-36 | Transaction Facts |
|---|---|
| | Memorandum of Law in Support of Defendant's Motion to Dismiss, Ex. D, *LCM XXII Ltd., et al. v. Serta Simmons Bedding, LLC*, No. 21-cv-3987 (S.D.N.Y. July 9, 2021), ECF 26-8. |

Thus, even using the Defendants' own experts' litigation-created definitions of open market purchase, the Transaction still would qualify as an open market purchase. The reality of these varying definitions is quite clear; Defendants tried to, but failed, to find ways to define "open market purchase" that would make the Transaction non-compliant. Moreover, Defendants got the process wrong. You need to define the term and then see if the facts meet the definition, you do not define the term based on the facts of the case so you can argue it doesn't meet your manufactured definition. *See Bloom v. Rock*, 2010 WL 2267468, at *5 (S.D.N.Y. May 27, 2010) (holding that "unsupported and self-serving assertions [by a party or their expert] do not provide a basis to depart from the plain meaning"); *see also U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 59 (2d Cir. 2004) (rejecting an interpretation that was "nothing more than a strained and self-serving interpretation of the relevant language").

**C.     No Additional Discovery Is Needed as the Term "Open Market Purchase" Is Unambiguous and, in Any Event, the Parties Have Already Completed Significant Document Discovery**

As discussed *supra*, the Court need not consider extrinsic evidence of the parties' intent as the meaning of the term "open market purchase" is unambiguous. Even if the term "open market purchase" were ambiguous (which it is not) it is well-established under New York law that course of performance evidence can be used to resolve any ambiguity. *See, e.g., Teachers Ins. & Annuity Ass'n of Am. v. Ocwen Fin. Corp.*, 2002 WL 237836, at *8 (S.D.N.Y Feb. 19, 2002); *Old Colony Tr. Co. v. City of Omaha*, 230 U.S. 100, 118 (1913) (stating that, in an ambiguous contract, the practical interpretation of the contract "is deemed of great, if not controlling, influence"); *D.S. 53-*

*16-F Assocs. v Groff Studios Corp.*, 168 A.D.3d 611, 611 (N.Y. App. Div. 1st Dep't 2019) ("Where the parties' agreement contains an ambiguous provision, their course of conduct with regard thereto is the 'most persuasive evidence' of their agreed intention."); *see also* Restatement (Second) of Contracts § 202 cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.").  As discussed *supra*, it is clear from the parties' course of performance that they understood the term "open market purchase" to encompass the debt-for-debt purchase in the Transaction.  Indeed, the Drop-Down Group's claims to the contrary stretch the imagination; the Drop-Down Group acknowledges that they may have relied on the open market provision of section 9.05(g) to effectuate the debt-for-debt purchase portion of the alternative transaction they proposed (which was structurally the same as the debt-for-debt purchase in the Transaction).  *See supra* Section II.A.3; Ex. 28 at 7–8; Ex. 29 at 7–8; Ex. 30 at 7–8.

Further, although discovery is unnecessary to grant summary judgment in Plaintiffs' favor, Defendants' representations as to the limited scope of discovery in this action are wholly inaccurate.  The Company produced over 57,000 documents in this action, including all documents it produced in the  New York federal court action with LCM (the "**LCM Action**"), as well as those documents third-party subpoena recipients produced in the LCM Action who consented to the Company's production of those documents here.  This included documents produced in response to subpoenas served on the PTL Lenders in this action and the Plaintiffs' respective outside financial advisors who advised on the Transaction, among others.[14]  The Company also timely

_____

[14] The Company requested and obtained permission to produce these documents, which were designated as confidential material, as required by the Stipulated Protective Order entered in the LCM Action.  The Company understands LCM sought and received permission to produce in this action the documents UBS produced in response to a subpoena in the LCM Action.

responded to all written discovery requests from the Drop-Down Group in this action, and has timely responded to all informal inquiries concerning the discovery produced to date.  Such extensive document discovery flatly contradicts the Drop-Down Group's claims that there has been "virtually no opportunity for the parties to gather" evidence concerning the parties' intent behind the meaning of the term "open market purchase."  Drop-Down Br. at 41.  LCM's claims of an inability to pursue additional fact discovery similarly fall flat, particularly given that LCM had the opportunity to pursue fact discovery on identical issues in the LCM Action for over nine months; they failed to do so.[15]  Indeed, one need look only to the fact that some 30 plus exhibits to the Defendants' oppositions are documents the Company produced on its own behalf or the PTL Lenders' behalf in this action.

> **D.**    **The Transaction Was Expressly Permitted by the Term Loan Agreement and Therefore the Implied Covenant of Good Faith and Fair Dealing Was Not Breached**

It is well-established that where a party performs in a contractually permitted manner, any implied covenant claim must also fail as a matter of law.  *See Fesseha v. TD Waterhouse Inv. Servs., Inc.*, 305 A.D.2d 268, 268 (N.Y. App. Div. 1st Dep't. 2003) ("While the covenant of good faith and fair dealing is implicit in every contract, it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights.").  The Drop-Down Group and LCM's attempts to suggest otherwise are unavailing.

---

[15] Although LCM is correct no fact depositions occurred in the LCM Action, this was a circumstance of LCM's own making.  Indeed, LCM did not notice a single party deposition until they issued a Notice of Deposition pursuant to Fed. R. Civ. P. 30(b)(6) on November 10, 2022, and did not serve any notices pursuant to Fed. R. Civ. P. 30(b)(1) until December 10, 2022.  In contrast, the Company served deposition notices pursuant to Fed. R. Civ. P. 30(b)(1) on September 30, 2022 and pursuant to Fed. R. Civ. P. 30(b)(6) on October 11, 2022.

*First,* merely because the Company could have pursued an alternative refinancing transaction to decrease its leverage and increase liquidity does not mean the Company's pursuit and consummation of the Transaction consistent with its rights and obligations under the Term Loan Agreement breached the implied covenant of good faith and fair dealing.  Plaintiffs have not—and cannot—demonstrate that the Transaction ran afoul of the Term Loan Agreement.  *See, supra* Section II.A.

*Second,* contrary to Defendants' argument in opposition, Judge Failla did not find substantively in LCM's favor on their implied covenant claims; rather, she determined solely that LCM had pled plausible allegations for the claim to survive on a motion to dismiss standard; that is not the standard here.[16]

*Third,* both the Drop-Down Group and LCM rely on legal authority supporting denial of motions to dismiss implied covenant claims at the pleading stage.  But unlike in those cases, here, there has already been significant document discovery concerning Plaintiffs' conduct in pursuing, negotiating, and consummating the Transaction, which shows Plaintiffs acted consistent with their obligations under the Term Loan Agreement, and that the Defendants were not deprived of the benefit of their bargain.  *See supra*, Section II.C.  Indeed, a number of the Defendants have admitted in discovery that the alternative transaction they were proposing to the Company was one they pursued in "good faith."  *See* Ex. 28 at 9–10; Ex. 29 at 10; Ex. 30 at 9–10.

---

[16] It must also be noted that LCM's characterization of Judge Failla's opinion is misleading.  LCM Br. at 32.  For example, they say that "she upheld the implied covenant claim," based on, among other reasons, that the Transaction "suggests an intent to harm a subset of first-lien lenders by subordinating their debt."  *Id.*; *see also* LCM Br. at 3 (mischaracterizing another portion of Judge Failla's opinion related to the implied covenant of good faith and fair dealing).  While those words do exist in the opinion, she is characterizing LCM's complaint, not making a determinative conclusion.  *LCM*, 2022 WL 953109, at *15.

*Finally,* Defendants' attempts to cite to negotiations with other existing First Lien Term Loan Lenders post-announcement of the Transaction are unavailing, as the basis of the implied covenant claims against the Company is its conduct in pursuing and consummating the Transaction, not its decision-making concerning potential later transactions with other existing Lenders through additional debt-basket that was available pursuant to the PTL Agreement.  *See* Counterclaims, ECF 68 ¶ 313 ("Serta's actions in pursuing the Unlawful Exchange Transaction have disregarded the Excluded Lenders' rights and have not been in good faith."); Complaint, *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 21-cv-3987 (S.D.N.Y. May 4, 2021), ECF 1 ¶ 53 ("Serta's actions in pursuing and then consummating the Subordination Transaction disregarded the CLOs' rights and were not taken in good faith because they proceeded in secret, did not seek the consent of all debtholders, and did not offer Plaintiffs the opportunity to participate in the Subordination Transaction (and the exchange of debt).").

In addition, since the Drop-Down Group's implied covenant claim, *see* ECF 68 ¶¶ 309– 315 (seeking damages for alleged breach of the implied covenant by stripping the value of the guarantees and altering the waterfall and *pro rata* sharing provisions), requests relief based on the "same facts and seeks the same damages as a breach of contract claim," it should be dismissed. *Mill Fin. LLC v. Gillet*, 122 A.D.3d 98, 104 (N.Y. App. Div. 1st Dep't 2014); ECF 68 ¶¶ 304–308 (seeking damages for contract claim for alleged breach of the waterfall and *pro rata* provisions), 316–320 (seeking damages for contract claim for alleged breach for releasing all or substantially all of the collateral and loan value guarantees).[17]

---

[17] The Drop-Down Group argues that "[P]laintiffs' attack on the implied covenant claim is premature" because third-party defendants recently named in their third-party complaint have yet to appear.  Drop-Down Br. at 46.  This argument has no merit. The declaratory relief sought by the Plaintiffs stem from the litigations aimed at the Company, all of which included claims for

**E.      North Star Was a Disqualified Institution at the Time it Sought to Purchase First Lien Term Loans**

The Drop-Down Group's attempts to muddy the facts surrounding North Star's status as a Disqualified Institution are unsuccessful.  It is undisputed that North Star is an Affiliate of Apollo Investment Corporation.[18]  SUF ¶ 47; Excluded Lenders' Counterstatement of Undisputed Facts, ECF 90 ¶ 47.  The record is also clear that Apollo Investment Corporation was a Disqualified Institution.  SUF ¶ 48.  As North Star was an Affiliate of an entity on the Disqualification List, North Star was a Disqualified Institution, and any attempted assignment of the Company's First Lien Term Loans to North Star was automatically void.  *See* ECF 1-1 §9.05(f)(i).

The emails the Drop-Down Group cite in their opposition are not to the contrary.



ECF 87-2.  Indeed, other contemporaneous emails from spring 2020 surrounding North Star's attempt to hold First Lien Term Loans further establish Apollo Investment Corporation (along with a number of other Apollo funds engaged in loan to own debt holdings) were Disqualified Institutions.  *See* Ex. 31 Such distinction between the inclusion of

---

breach of the implied covenant of good faith and fair dealing.  The mere fact that Defendants have now filed yet another complaint that includes this claim does not change the fact that Plaintiffs' request for declaratory judgment on the good faith and fair dealing is ripe for this Court's decision. ECF 1.

[18] North Star is an Affiliate of Apollo Global Management, Inc., *see* SUF ¶ 47, which is an Affiliate of Apollo Investment Corporation.

Apollo entities focused on "loan to own" holdings as Disqualified Institutions versus Apollo's liquid funds who were *not* deemed Disqualified Institutions clarifies why certain Apollo entities were able to purchase First Lien Term Loans in 2016 and 2018.

As North Star was an Affiliate of a Disqualified Institution, any assignment to North Star was automatically void and it does not hold any First Lien Term Loans.

## III.   <u>CONCLUSION</u>

Accordingly, the Company respectfully requests that this Court grant its Motion and declare that the Transaction was permitted under the Term Loan Agreement, that the Company did not breach the implied covenant of good faith and fair dealing, and that North Star is a Disqualified Institution under the Term Loan Agreement and therefore not allowed to hold First Lien Term Loans.   For the same reasons, the Company also respectfully requests that this Court grant summary judgment in Plaintiffs' favor on Defendants' mirror image counterclaims and to the extent the Court wishes to entertain Defendants' motion under Fed. R. Civ. P. 56(f), the Company respectfully requests that the Court deny Defendants' motion.

Dated: New York, New York
      March 24, 2023

Respectfully submitted,


*/s/ David J. Lender*
David J. Lender

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
David J. Lender (admitted *pro hac vice*)
Alexander W. Welch (admitted *pro hac vice*)
Luna N. Barrington (admitted *pro hac vice*)
Richard D. Gage (admitted *pro hac vice*)
Taylor B. Dougherty (admitted *pro hac vice*)
Joseph R. Rausch (admitted *pro hac vice*)
Michael P. Goodyear (admitted *pro hac vice*)
Nicholas J. Reade  (admitted *pro hac vice*)
767 Fifth Avenue
New York, NY 10153
Tel:    (212) 310-8000
Fax:    (212) 310-8007
Email: Ray.Schrock@weil.com
      David.Lender@weil.com
      Alexander.Welch@weil.com
      Luna.Barrington@weil.com
      Richard.Gage@weil.com
      Taylor.Dougherty@weil.com
      Joseph.Rausch@weil.com
      Michael.Goodyear@weil.com
      Nick.Reade@weil.com


Gabriel A. Morgan
Stephanie N. Morrison
700 Louisiana Street, Suite 1700
Houston, TX 77002
Tel:  (713) 546-5040
Fax: (713) 224-9511
Email:  Gabriel.Morgan@weil.com
      Stephanie.Morrison@weil.com

*Attorneys for Serta Simmons Bedding, LLC,*
*as debtor and debtor-in-possession*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 24, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and administrative agent.

*/s/ Nicholas J. Reade*
Nicholas J. Reade