## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** | § | **Case No. 23-90020 (DRJ)** |
| *et al.*, | § | |
| | § | |
| Debtors.[1] | § | **(Joint Administration Requested)** |
| | § | |
| ------------------------------------------------------- | § | |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** | § | **Adversary Proc. No. 23-09001** |
| *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| **AG CENTRE STREET PARTNERSHIP** | § | |
| **L.P.,** *et al.*, | § | |
| | § | |
| Defendants. | § | |
| ------------------------------------------------------- | § | |

## REPLY MEMORANDUM IN FURTHER SUPPORT OF LENDER PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); Serta Simmons Bedding Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); Serta Simmons Bedding Hospitality, LLC (2016); Serta Simmons Bedding Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); Serta Simmons Bedding Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................5

I.    Plaintiffs Are Entitled To A Declaration That The Transaction Complied With The Non-PTL Term Loan Agreement. ................................................................5

    A.    The 2020 Transaction Was a Permitted Open Market Purchase. ..........................5

        i.    The Unambiguous Text of the Agreement Is Dispositive. .........................5

        ii.    Industry Custom and Practice Confirm Open Market Purchases May Be Negotiated "One-On-One" With Lenders..................................................16

        iii.    The 1L Amendment And Open Market Purchase Agreement Confirm That The 2020 Transaction Was A Permitted Open Market Purchase. .............21

    B.    The 2020 Transaction Did Not Release Any Collateral Or The Value Of The Guarantees. ..................................................................................24

II.    Plaintiffs Are Entitled To A Declaration That They Did Not Violate The Implied Covenant Of Good Faith And Fair Dealing........................................................27

    A.    The Non-PTL Lenders' Implied Covenant Claim Seeks To Impose Obligations Inconsistent With The Parties' Agreement And Is Duplicative Of Their Breach Of Contract Claim........................................................27

    B.    The Non-PTL Lenders' Implied Covenant Claim Fails On The Merits Based On The Undisputed Evidence Before The Court. ......................................31

CONCLUSION....................................................................................................37

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2138747 Ontario, Inc. v. Samsung C&T Corp.*,
  31 N.Y.3d 372 (N.Y. 2018) ......................................................................................9

*AEA Middle Market v. Marblegate Mgmt., LLC*,
  2023 WL 2394680 (N.Y. App. Div. Mar. 7, 2023) ..............................................30

*AG Centre St. P'ship v. Serta Simmons Bedding, LLC*,
  Index No. 654181/2022, Dkt. No. 57 (N.Y. Cnty. Sup. Ct. Jan. 9, 2023).............23

*Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*,
  70 A.D.3d 423 (N.Y. App. Div. 2010) ..................................................................29

*In re Ampal-Am. Israel Corp.*,
  2023 WL 1094593 (Bankr. S.D.N.Y. Jan. 27, 2023).............................................23

*Apex Custom Lease Corp. v. State Tax Assessor*,
  677 A.2d 530 (Me. 1996)........................................................................................12

*In re Apex Oil*,
  975 F.2d 1365 (8th Cir. 1992) ................................................................................15

*Apogee Handcraft, Inc. v. Verragio, Ltd.*,
  155 A.D.3d 494 (N.Y. App. Div. 2017) ................................................................30

*Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*,
  72 Misc.3d 1218(A) (N.Y. Cnty. Sup. Ct. Aug. 16, 2021)...............................24, 29

*CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*,
  2010 WL 3239416 (S.D.N.Y. Aug. 16, 2010)........................................................10

*Centurion Bulk Pte Ltd. v. NuStar Energy Servs., Inc.*,
  2020 WL 8368320 (S.D. Tex. Sept. 25, 2020) ......................................................35

*Cities Service Co. v. United States*,
  522 F.2d 1281 (2d Cir. 1974)....................................................................................7

*Conage v. United States*,
  346 So. 3d 594 (Fla. 2022)................................................................................4, 11

*Credit Agricole Corp. v. BDC Fin., LLC*,
  135 A.D.3d 561 (N.Y. App. Div. 2016) ................................................................31

*Cyan, Inc. v. Beaver Cnty. Emp. Retirement Fund*,
  138 S. Ct. 1061 (2018)..............................................................................................7

*D&L Holdings v. Goldman Co.*,
  287 A.D.2d 65 (N.Y. App. Div. 2001) ................................................................28

*Dalton v. Educ. Testing Serv.*,
  87 N.Y.2d 384 (N.Y. 1995) ..............................................................................35

*In re Decade, S.A.C., LLC*,
  612 B.R. 24 (Bankr. D. Del. 2020) .....................................................................6

*Donohue v. Cuomo*,
  38 N.Y.3d 1 (N.Y. 2022) ....................................................................................8

*Eastman Kodak Co. v. Altek Corp.*,
  936 F. Supp. 2d 342 (S.D.N.Y. 2013).................................................................8

*Evans v. Famous Music Corp.*,
  1 N.Y.3d 452 (N.Y. 2004) ................................................................................16

*Fair Housing Rights Ctr. in Se. Pa. v. Post Goldtrex GP, LLC*,
  823 F.3d 209 (3d Cir. 2016)................................................................................7

*Grumman All. Indus., Inc. v. Rohr Indus., Inc.*,
  784 F.2d 729 (2d Cir. 1984)................................................................................6

*Highbridge Development BR, LLC v. Diamond Development, LLC*,
  67 A.D.3d 1112 (N.Y. App. Div. 2009) ............................................................35

*Hine v. Manhattan R. Co.*,
  132 N.Y. 477 (N.Y. 1892) ..................................................................................7

*Hovey v. Elliott*,
  118 N.Y. 124 (N.Y. 1890) ..................................................................................7

*ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*,
  2022 WL 10085886 (N.Y. Cnty. Sup. Ct. Oct. 17, 2022) ......................................33

*J.P. Morgan Inv. Mgmt. Inc. v. AmCash Grp., LLC*,
  106 A.D.3d 559 (N.Y. App. Div. 2013) ............................................................37

*JN Contemp. Art LLC v. Phillips Auctioneers LLC*,
  507 F. Supp. 3d 490 (S.D.N.Y. 2020), *aff'd*, 29 F.4th 118 (2d Cir. 2022)............28

*In re Lapp's Will*,
  3 A.D.2d 55 (N.Y. App. Div. 1956) ...................................................................12

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
  2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) .........................................15, 23, 25

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018)................................................................35

*In re Light Squared Inc.*,
511 B.R. 253 (Bankr. S.D.N.Y. 2014) ................................................................31

*Lykins v. IMPCO Techs., Inc*.,
2018 WL 3231542 (S.D.N.Y. Mar. 6, 2018) .................................................27, 34

*In re Lyondell Chem. Co.*,
567 B.R. 55 (Bankr. S.D.N.Y. 2017) ................................................................17

*Macy's, Inc. v. J.C. Penney Corp*.,
45 Misc.3d 274 (N.Y. Cnty. Sup. Ct. 2014) ....................................................32

*Madison Avenue Baptist Church v. Baptist Church in Oliver Street*,
46 N.Y. 131 (N.Y. 1871) ....................................................................................12

*Malacara v. Garber*,
353 F.3d 393 (5th Cir. 2003) .............................................................................35

*Marin v. Constitution Realty, LLC*,
128 A.D.3d 505 (N.Y. App. Div. 2015) ............................................................10

*Mill Fin., LLC v. Gillet*,
122 A.D.3d 98 (N.Y. App. Div. 2014) .........................................................28, 30

*Morlee Sales Corp. v. Mfrs. Tr. Co.*,
9 N.Y.2d 16 (N.Y. 1961) ......................................................................................9

*Murphy v. Am. Home Prods. Corp.*,
58 N.Y.2d 293 (N.Y. 1983) .................................................................................28

*In re Murray Energy Holdings Co.*,
616 B.R. 84 (Bankr. S.D. Ohio 2020) ...............................................................26

*North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*,
2020 WL 3411267 (Sup. Ct. N.Y. Cnty. June 19, 2020) ...........................14, 25, 33

*Octagon Credit Investors, LLC v. NYDJ Apparel LLC*,
Case No. 656677/2017, Dkt. No. 91 (N.Y. Cnty. Sup. Ct. Feb. 6, 2018) ..............33

*In re Opus East, LLC*,
528 B.R. 30 (Bankr. D. Del. 2015) ....................................................................17

*In re PCH Assocs.*,
804 F.2d 193 (2d Cir. 1986) ...............................................................................26

*In re Peaslee*,
13 N.Y.3d 75 (N.Y. 2009) ...................................................................................11

*People v. Keyes*,
141 A.D.2d 227 (N.Y. App. Div. 1988) .............................................................14

*Quadrant Structured Prods. Co. v. Vertin*,
    23 N.Y.3d 549 (2014) ........................................................................12

*Renfroe v. Parker*,
    974 F.3d 594 (5th Cir. 2020) ............................................................10

*Richards v. Direct Energy Servs., LLC*,
    915 F.3d 88 (2d Cir. 2019) ................................................................10

*Richbell Information Services v. Jupiter Partners*,
    309 A.D.2d 288 (N.Y. App. Div. 2003) ......................................31, 32

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
    60 A.D.3d 61 (N.Y. App. Div. 2008) ..................................................9

*RLI Ins. Co. v. Athan Contracting Corp.*,
    667 F. Supp. 2d 229 (E.D.N.Y. 2009) ..............................................23

*In re Sackman Mortg. Corp.*,
    158 B.R. 926 (Bankr. S.D.N.Y. 1993) .........................................25, 26

*Sebastian Holdings, Inc. v. Deutsche Bank, AG.*,
    108 A.D.3d 433 (N.Y. App. Div. 2013) ............................................29

*Shatz v. Chertok*,
    180 A.D.3d 609 (N.Y. App. Div. 2020) ............................................32

*Silva v. GVF Cannery, Inc.*,
    188 B.R. 651 (Bankr. N.D. Cal. 1995) ..............................................26

*State by & through Pub. Welfare Comm'n v. Bonnett*,
    201 P.2d 939 (Utah 1949) .................................................................12

*Tekelec, Inc. v. Verint Systems, Inc.*,
    708 F.3d 658 (5th Cir. 2013) ............................................................16

*Thompson v. Advanced Armament Corp.*,
    614 F. App'x 523 (2d Cir. 2015) ......................................................31

*In re TPC Grp. Inc.*,
    2022 WL 2498751 (Bankr. D. Del. July 6, 2022) .............................26

*Trimboli v. Kinkel*,
    266 N.Y. 147 (N.Y. 1919) ................................................................12

*U.S. Bank Nat'l Ass'n v. DLJ Mortgage Capital, Inc.*,
    38 N.Y.3d 169 (N.Y. 2022) ..............................................................25

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) .............................................................7

*United States v. Buluc*,
    930 F.3d 383 (5th Cir. 2019) ................................................................13

*United States v. Lauderdale Cnty., Miss.*,
    914 F.3d 960 (5th Cir. 2019) ................................................................13

*Wagner v. JP Morgan Chase Bank*,
    2011 WL 856262 (S.D.N.Y. Mar. 9, 2011) ............................................32

*Whitney Bank v. SMI Cos. Global, Inc.*,
    949 F.3d 196 (5th Cir. 2020) ................................................................10

*Yates v. United States*,
    574 U.S. 528 (2015)..............................................................................13

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)...............................................7, 11

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 4478.4
    (3d ed.) ................................................................................................15

Oxford English Dictionary (3d ed. 2004) .................................................7

Practical Law Finance, *What's Market: 2016 Year-End Trends in Large Cap and
    Middle Market Loan Terms* (Feb. 28, 2017).............................................6

Restatement (Second) of Contracts (1981) ...............................................10

S&P Global, *Changing Times Have Led To New Trends In Amendments To U.S.
    Middle-Market Credit Agreements* (Aug. 24, 2020),
    https://www.spglobal.com/ratings/en/research/articles/200824-changing-
    times-have-led-to-new-trends-in-amendments-to-u-s-middle-market-credit-
    agreements-11614628 ..........................................................................21

S&P Global, *Leveraged Loan Primer* 10 (2020),
    https://www.spglobal.com/marketintelligence/en/documents/lcd-primer-
    leveraged-loans_ltr.pdf .........................................................................21

Steven J. Lubben, *Corporate Finance* 391 (3d ed. 2020)...........................21

**Rules**

Fed. R. Evid. 702(a) ..............................................................................10

## INTRODUCTION

1.       The 2020 Transaction was unambiguously permitted under the plain language of the Non-PTL Term Loan Agreement.[1]  The result of arm's length negotiations between the Company and many different lenders and lender groups, the 2020 Transaction maintained the Non-PTL Lenders' collateral and did not alter the waterfall or pro rata sharing provisions.  And, because the Transaction was effectuated through an open market purchase, it also fell squarely within the express carve-outs to the Agreement's sacred rights provision.  In any event, "open market purchase" could be waived, amended, or modified by the Borrower and Required Lenders and, to the extent necessary, the Borrower and Required Lenders did so in documents executed as part of the 2020 Transaction.

2.       Notwithstanding a combined 95 pages of briefing, three expert reports, eight additional declarations, and dozens of exhibits—all patently intended to conjure the specter of complexity—the LCM Defendants ("LCM") and the ad hoc group of Non-PTL Lenders (the "Non-PTL Ad Hoc Group" and, together with LCM, the "Non-PTL Lenders" or "Defendants") have failed to identify a single material factual dispute that would preclude summary judgment in Plaintiffs' favor.  The Non-PTL Ad Hoc Group's contention that Plaintiffs fail to "venture a definition" of "open-market purchase," ECF No. 87 at 2, is not only contradicted by LCM's brief, which challenges "Plaintiffs' definition" throughout, *see* ECF No. 79 ¶¶ 30, 34, 35, 38, 48, 54, 61, 65, 68; it is also incorrect.  Lender Plaintiffs' opening brief explained that an "open market purchase" of the Company's issued debt is "any arm's length transaction" between a willing buyer and a willing seller.  ECF No. 73 at ¶ 44; *see also id.* ¶¶ 34, 43.  That's it.  It's a flexible option the parties to the Non-PTL Term Loan Agreement agreed to give the Borrower to go into the market, negotiate with lenders, and acquire its loans on a non-pro rata basis.  The parties to the Non-PTL

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed in the First Day Declaration and/or in the Lender Plaintiffs' opening brief.

Term Loan Agreement are sophisticated parties; had they wanted to constrain the Borrower's purchasing flexibility (limiting it to cash, requiring the use of a broker-dealer, mandating transactions offered to all lenders), they could have readily added any conditions they wanted—as they did in great detail for Dutch Auctions. For open market purchases, they left it broad and flexible. In the context of credit agreements—and especially credit agreements entered into in the borrower-friendly climate of 2016—there is no question that sophisticated lenders understood the risk that, without an anti-subordination provision, the Company could issue new super-priority debt and use that debt like any other issued debt.

3.     Much as the Non-PTL Lenders try to distract from this basic principle, it is that straightforward. Even if the Court felt the need to look to industry usage, the Loan Syndications and Trading Association's (LSTA) *Complete Credit Agreement Guide* likewise explains that "non-pro rata" "open market purchases"—precisely the phrase used in the Non-PTL Term Loan Agreement, *see* ECF No. 1-1 § 9.05(g)—are a "buyback methodolog[y]" whereby "a borrower is allowed to negotiate one-on-one with individual lenders to repurchase loans." ECF No. 73, Ex. 12. Both LCM and the Non-PTL Ad Hoc Group agree that the LSTA is an authority on the U.S. syndicated loan market, *see* ECF No. 79 at 7 n.3; ECF No. 87 at 32, yet they ignore the LSTA definition cited in the Lender Plaintiffs' opening brief.

4.     The phrase "open market purchase" unambiguously encompasses the 2020 Transaction—which was consummated only after multiple lenders made offers to sell their loans to the Company on different sets of terms, and the Company, as a participant in the open market acting in its own economic self-interest, negotiated vigorously with each lender group until it determined the Lender Plaintiffs' proposal was the most advantageous for the Company. And, in any event, the Borrower and Required Lenders entered into the Open Market Purchase And Cashless Exchange Agreement ("Open Market Purchase Agreement"), whereby they expressly agreed that the 2020 Transaction was consistent with the Non-PTL Term Loan Agreement,

effectively waiving, amending, or modifying the Non-PTL Term Loan Agreement to the extent necessary to make it clear that the debt-for-debt purchase qualified as an open market purchase under Section 9.05(g). *See* ECF No. 1-3 §§ 2.1(f), 2.2; *see also* ECF No. 1-2 §§ 4, 14.

5.     In opposition to the Plaintiffs' straightforward interpretation of an unambiguous term, the Non-PTL Ad Hoc Group offers a laundry list of features it asserts are actually "typical" features of an open market purchase. But they offer no support beyond the say-so of their paid experts in after-the-fact made-for-litigation declarations. Setting aside that there is no provision in the Non-PTL Term Loan Agreement that limits "open market purchases" to "typical" ones, the Non-PTL Ad Hoc Group's own proposed competing transaction—which it self-evidently believed at the time would have been permitted by the Non-PTL Term Loan Agreement's "open market purchase" provision—did not have all of those features. Nor did it have to—in this Agreement, "open market purchase" provided a flexible buyback mechanism with no procedural requirements, which was therefore potentially faster and involved lower transaction costs than the broader and more formalized buyback alternative of the Dutch Auction. The plain meaning of "non-pro rata" "open market purchase"—as understood in context in the Agreement and more generally in the syndicated loan industry—unambiguously permits non-pro rata debt purchases by the Borrower, with no limitation as to the consideration paid or requirement as to how many lenders participate, like the 2020 Transaction.

6.     Apparently recognizing the weakness in Defendants' now-familiar arguments as to the meaning of "open market," LCM takes a new tack in leading with the argument that the 2020 Transaction was not an "open market purchase" because it was *not a "purchase" at all* as it involved non-cash consideration. ECF No. 79 ¶¶ 26–29. That argument is absurd. No common sense definition or understanding of the phrase "purchase," as in the phrase "I'm going to purchase a new house," limits the purchaser to paying with cash alone rather than with some other consideration. The fact that the Company bought its old debt in part with new debt does not make

3

the 2020 Transaction any less of a "purchase."  Indeed, LCM's own authorities are directly at odds with its contention that a debt-for-debt purchase somehow does not qualify as a purchase.  *See, e.g.*, *Conage v. United States*, 346 So. 3d 594, 599 (Fla. 2022) ("purchase" means "[t]o obtain *in exchange* for money *or its equivalent*") (parenthetical text cited in ECF No. 79 ¶ 28 n.5) (emphasis added); ECF No. 84 ¶¶ 10, 35 (stating that an "open market purchase" involves the purchase of a loan for any "universal criterion of value *such as* dollars") (emphasis added).  Even the Non-PTL Ad Hoc Group's expert cannot bring himself to support LCM's extreme argument, only going so far as to say open market purchases are "typically" settled "for cash consideration."  ECF No. 102 ¶ 130; *see also id.* at pp. 5, 23, 26.

7.      Meanwhile, the cases and dictionary definitions Defendants cite referencing an "open market" do so in wholly different contexts than that of a borrower-friendly credit agreement.  While the broad scope of "open market purchase" is unambiguous on its face in the Non-PTL Term Loan Agreement and fully consistent with a "free market" purchase, if the Court were inclined to consider industry custom and usage, the Court should look to objective contemporaneous indicia of the term and not paid-for litigation experts.  Tellingly, Defendants essentially ignore Plaintiffs' evidence of contemporaneous industry custom and practice.  The Non-PTL Ad Hoc Group does not engage with *any* of the law firm memoranda or treatises cited by the Lender Plaintiffs, nor with the LSTA's *Complete Credit Agreement Guide*, a definitive industry source on credit agreements, *see* ECF No. 87 at 32, instead citing inadmissible extrinsic evidence:  the post hoc, made-for-litigation definitions of their paid experts.  Meanwhile, LCM attempts to distinguish the Lender Plaintiffs' industry authorities on the basis of its meritless argument that an "debt exchange" could never be a "purchase."  ECF No. 79 ¶ 66.

8.      Finally, seeking to downplay the benefits of the Transaction to the Debtor and the importance of reaffirming it in order for the Debtor to cleanly and expeditiously emerge from chapter 11, Defendants resort to sky-is-falling assertions that the Transaction "unsettled the market

for secured corporate loans," ECF No. 79 ¶ 15, or that a decision in Plaintiffs' favor would "create significant uncertainty in the secondary markets for loans with 'open market purchase' provisions," ECF No. 87 at 5.  Nonsense.  The sophisticated players in the syndicated loan market have always been, and will remain, free to agree to whatever contractual "sacred rights" terms they wish, including anti-subordination provisions, restrictions on borrower buybacks of debt, or prohibitions on the exchange of more than a certain amount of existing debt.  Both the PTL and the Non-PTL Lenders here bore the risk of failing to bargain for any such provisions in the Non-PTL Term Loan Agreement, which were intended to provide flexibility to the Company.  The Non-PTL Lenders, who presented their own competing proposal to the Company, cannot claim surprise when the Company chose to use its flexibility, and Plaintiffs' actions, which are consistent with the agreed upon allocation of risk, certainly did not deprive Defendants in bad faith of the benefit of their bargain.

9.      Enough is enough.   Nearly three years ago, the Non-PTL Lenders tried unsuccessfully to stop the 2020 Transaction from moving forward.  Their breach of contract and implied covenant claims are as meritless today as they were then.  Resolving those claims once and for all in the Company and the Lender Plaintiffs' favor is imperative to enforce the plain terms of the parties' agreements and permit the Company to move forward out of chapter 11 with a fresh start.

## ARGUMENT

**I.    Plaintiffs Are Entitled To A Declaration That The Transaction Complied With The Non-PTL Term Loan Agreement.**

**A.      The 2020 Transaction Was a Permitted Open Market Purchase.**

**i.      The Unambiguous Text of the Agreement Is Dispositive.**

10.     The meaning of the phrase "open market purchase" in Section 9.05(g) of the Non-PTL Term Loan Agreement is straightforward and compels summary judgment in Plaintiffs' favor. As set forth in the Lender Plaintiffs' opening brief, open market purchases are one debt purchase

method, involving an arm's length transaction between a willing buyer and a willing non-issuer seller. *E.g.*, ECF 73 ¶¶ 15, 43, 44, 47. A non-pro rata open market purchase for a company's loans, unlike an open market purchase on a public stock exchange, necessarily requires private negotiations between a buyer and a seller—that is, the buyer directly or indirectly approaches one or more lenders (without any obligation on the borrower's part to solicit *all* lenders). And Section 9.05(g) of the Non-PTL Term Loan Agreement underscored the flexibility associated with "open market purchases" by specifying that Dutch Auctions must be "open to all Lenders," while deliberately not imposing the same requirement for open market purchases.

11.     Defendants are sophisticated players in the syndicated loan industry. They understood the flexibility this term gave the Company in 2016 when they entered into the Non-PTL Term Loan Agreement. And they understood it in 2020 when they tendered their own rival restructuring proposal, which would also have relied on Section 9.05(g)'s open market purchase carve-out and would also have excluded non-participating lenders.

12.     The risk that the Company would use the Non-PTL Term Loan Agreement's flexibility, including its amendment provisions, was priced into the 2016 Agreement that Serta was willing to offer and that Defendants and Plaintiffs were willing to accept. "Particularly where the two sides are sophisticated, their allocation of risk and potential benefit is properly treated as supreme to any conflicting understanding [courts] may have." *Grumman All. Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 734 (2d Cir. 1984) (applying New York law). "[B]usiness people who routinely negotiate multi-million-dollar contracts . . . are decidedly sophisticated parties." *In re Decade, S.A.C., LLC*, 612 B.R. 24, 40 (Bankr. D. Del. 2020) (applying New York and California law). Apparently regretting the deal they entered into in the "borrower-friendly" climate of 2016, *e.g.*, Practical Law Finance, *What's Market: 2016 Year-End Trends in Large Cap and Middle Market Loan Terms* (Feb. 28, 2017), Defendants now seek to rewrite the plain terms of the Non-PTL Term Loan Agreement. That effort should be rejected for several reasons.

13.    ***First***, Defendants improperly split the term "open market purchase" in two, rather than considering the phrase as a whole, as it appears in credit agreements like the Non-PTL Term Loan Agreement.  Dividing the phrase "open market purchase" into individual terms violates the rule that words used in a "concise and 'integrated'" phrase should not be analyzed in isolation. *Cyan, Inc. v. Beaver Cnty. Emp. Retirement Fund*, 138 S. Ct. 1061, 1077 (2018).  Defendants' citation to general-purpose dictionaries considering the terms "open market," "market," or "purchase," but not the phrase "open market purchase" as it appears in Section 9.05(g), are thus little help.  *See* ECF No. 87 at 23 (quoting *Open Market*, Black's Law Dictionary (11th ed. 2019) and *Open Market*, Oxford English Dictionary (3d ed. 2004)); *see also* ECF No. 79 ¶ 31.  Those definitions  do not speak to the disputed aspects of the terms at issue.  *See Fair Housing Rights Ctr. in Se. Pa. v. Post Goldtrex GP, LLC*, 823 F.3d 209, 215 (3d Cir. 2016) ("definitions are not helpful" where "[n]o distinction is made" on the relevant question).

14.    The case law upon which Defendants rely—much of which predates the commercialization of the light bulb—suffers from similar defects, discussing the phrase "open market" or "purchase" separately but not the phrase "open market purchase" as used in the context of a syndicated loan credit agreement, let alone the phrase "open market purchase" modified by the phrase "non-pro rata" as in the Non-PTL Term Loan Agreement.  *See, e.g.*, *Hine v. Manhattan R. Co.*, 132 N.Y. 477, 479–80 (N.Y. 1892) (cited in ECF No. 79 ¶ 32); *Hovey v. Elliott*, 118 N.Y. 124, 147 (N.Y. 1890) (same).  And cases like *Cities Service Co. v. United States*, 522 F.2d 1281 (2d Cir. 1974) (cited in ECF No. 79 ¶ 32 n.6 and ECF No. 87 at 25), which discussed evidence of the market value of debentures in the context of a tax refund action, or *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) (cited in ECF No. 79 ¶ 33), which addressed in passing the phrase "open market" with respect to a purchase of highly regulated publicly traded stock, have no bearing on this case involving corporate debt instruments that are not subject to the regulatory regime applicable to securities.

7

15.     **Second**, even if one were to improperly parse the term, Defendants' own definitions of "open market" are consistent with Plaintiffs' flexible understanding of an "open market purchase."  According to Defendants' definition, an "open market" is a market in which buyers and sellers "may trade freely, and where prices are determined by supply and demand" or, put differently, "by free competition."  ECF No. 87 at 23; *accord* ECF No. 79 ¶ 31 ("On an 'open market,' the price of the commodity is set through bids and asks by buyers and sellers.").  Here, consistent with that core principle of free trade between a willing buyer and willing sellers, the undisputed evidence shows that the Company negotiated at arm's length with various lender groups, soliciting bids and ultimately selecting the proposal most economically advantageous to the Company.

16.     The case on which the Non-PTL Ad Hoc Group relies most heavily, *Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342 (S.D.N.Y. 2013) (cited in ECF No. 87 at 2, 23, 25), in fact favors Plaintiffs' position.  There, the parties disputed the meaning of "open market price" in a patent licensing agreement.  *Id.* at 351–52.  The court criticized the defendant for applying "an unduly narrow definition of open market," rejected the defendant's argument that "all sales of digital cameras made below 50% of the price Altek ordinarily receives . . . are of necessity non-arms length," and held that a transaction "in which the price received is below the open market price" was still negotiated at arm's length and therefore was an "open market price" transaction. *Id.* at 352–54.  So too here—the 2020 Transaction was negotiated at arm's length, in the "open market."

17.     **Third**, Defendants may not read in requirements that appear nowhere in the Non-PTL Term Loan Agreement.  Under New York law, "where a contract was negotiated between sophisticated, counseled business people negotiating at arm's length, courts should be especially reluctant to interpret an agreement as impliedly stating something which the parties specifically did not include."  *Donohue v. Cuomo*, 38 N.Y.3d 1, 12 (N.Y. 2022) (quoting *2138747 Ontario,*

*Inc. v. Samsung C&T Corp.*, 31 N.Y.3d 372, 381 (N.Y. 2018)) (cleaned up).  "A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties."  *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 66 (N.Y. App. Div. 2008) (citing *Morlee Sales Corp. v. Mfrs. Tr. Co.*, 9 N.Y.2d 16, 19 (N.Y. 1961)).  That is precisely what Defendants ask this Court to do.

18.    Citing their own paid, post-litigation experts, Defendants argue that the term "open market purchase" incorporates various specific requirements not reflected anywhere in the contract itself or, for that matter, in industry practice.  The Non-PTL Ad Hoc Group contends, for example, that an open market purchase must be "conducted on the secondary debt market," ECF No. 87 at 25, 31, 35, or be effectuated through a broker-dealer, *id.* at 31, 32, 35, 37, 38—requirements that appear nowhere in the Agreement itself and that are at odds with the flexible scope of open market purchases reflected in their own definitions and the broad, unqualified language of the Non-PTL Term Loan Agreement.

19.    The Non-PTL Ad Hoc Group also argues that the 2020 Transaction was not an open market purchase because it purportedly involved loans purchased "at a substantial premium" to "market prices."  ECF No. 87 at 11; *see also id.* at 3, 25, 27, 33.  That argument simply assumes without evidence that the new super-priority loans the Company issued were worth 100 cents on the dollar.  Further, when larger amounts of debt are purchased, such debt typically, and unsurprisingly, trades at less of a price discount than smaller volumes of debt; sellers of large amounts of debt have more leverage in threatening to withhold their positions from sale and thereby deprive the Company of the ability to capture *any* discount from these positions.  Indeed, as discussed in the Company's reply brief, the Non-PTL Ad Hoc Group's proposed discounts for the purchase of their group's debt in their competing proposal were *less* than the discounts in the PTL Lenders' proposal.  ECF 110 at 7–8.  Most importantly, again, the Non-PTL Term Loan Agreement says nothing about "open market purchases" being required to capture any particular

discount.  In an open market purchase, a borrower buying back debt may not reach as broad a swath of lenders as in a Dutch Auction, where a more formal process is contemplated, but through an open market purchase, the borrower can also move quickly and efficiently to negotiate a beneficial transaction with more flexibility.

20.    Notably, the Non-PTL Ad Hoc Group and its experts even admit that the features they point to as required for an "open market purchase," such as a broker-dealer intermediary in the secondary debt market or a market price are only "typically" or "generally"—i.e., not *necessarily*—associated with open market purchases.  *E.g.*, ECF No. 87 at 3, 27, 32, 33, 34, 38 n.6; ECF No. 89 ¶ 5; ECF No. 102 ¶ 76.[2]

21.    LCM also seeks to import restrictions on "open market purchase" that are entirely absent from the text of the Agreement, focusing for its part on the extratextual purported requirement that the term "purchase" only includes purchases for cash.  ECF No. 79 ¶¶ 26–29. LCM cites no authority for the proposition that the term "purchase" prohibits parties to a contract from engaging in a purchase for non-cash consideration.  *Id.* ¶ 25.  That is unsurprising, since

---

[2] Defendants' expert reports would be inadmissible at trial and therefore should not be considered on summary judgment under Federal Rule of Civil Procedure 56(c)(2).  Because the Non-PTL Term Loan Agreement is unambiguous on its face, Defendants' expert reports cannot "help the trier of fact," Fed. R. Evid. 702(a), and should be disregarded.  *See, e.g.*, *Marin v. Constitution Realty, LLC*, 128 A.D.3d 505, 509 (N.Y. App. Div. 2015) (refusing to consider expert evidence setting forth "general practice and custom in the industry" because to accept it would be "to admit extrinsic evidence to an admittedly unambiguous contract which is prohibited by long-standing precedent"); *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, 2010 WL 3239416, at *4 (S.D.N.Y. Aug. 16, 2010) (declining to consult proffered expert declaration because the contract was "sufficiently clear and unambiguous"); *Whitney Bank v. SMI Cos. Global, Inc.*, 949 F.3d 196, 205 n.8 (5th Cir. 2020) (noting error by magistrate judge in admitting "expert testimony to aid in interpreting the unambiguous contract").  Moreover, the experts' opinions on legal issues the Court itself will decide—for example, Professor Buccola's bald statement that "the 2020 Transaction cannot have involved open market purchases," ECF No. 84 ¶ 11; *see also* ECF No. 89 ¶ 73; ECF No. 102 ¶ 100—are wholly improper.  *See Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020); *see also Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 98 (2d Cir. 2019) ("[T]he construction of unambiguous contract terms is strictly a judicial function.").  And, as discussed in the Company's reply brief, each of the experts also lacks the qualifications or adequate methodology necessary to provide opinions related to the syndicated loan market.  *See generally* ECF No. 110 at 19–21.

consumers "purchase" property, cars, durable goods, and even other forms of debt every day using non-cash consideration. *See In re Peaslee*, 13 N.Y.3d 75, 82 (N.Y. 2009) (explaining that outstanding debt on a trade-in vehicle allows "the debtor to purchase, or acquire rights in, the vehicle" (cleaned up)); Restatement (Second) of Contracts § 71 (1981) ("consideration" is any "exchange" of performances that may include "an act," "a forbearance," or "the creation, modification, or destruction of a legal relation"). The Non-PTL Ad Hoc Group acknowledges as much. *See* ECF No. 87 at 3, 31, 32 (purchases are "typically," but not always, "settled for cash consideration"). And it is telling that LCM cites Black's Law Dictionary in support of its argument as to the meaning of "open market," *e.g.*, ECF No. 79 ¶ 31, but not as to the meaning of "purchase"—"The acquisition of an interest in real or personal property *by sale, discount, negotiation, mortgage, pledge, lien, reissue, gift, or any other voluntary transaction*." Black's Law Dictionary (11th ed. 2019) (emphasis added).

22.    The sources that LCM does cite are actually squarely at odds with its bogus argument. Every dictionary definition and case it cites for the proposition that a purchase requires "money" adds "or its equivalent" immediately after. *See* ECF No. 79 ¶¶ 27, 28 n.5, 29. In one of those cases, *United States v. Conage*, the Florida Supreme Court, in deciding the meaning of "purchase" in Florida's drug trafficking law, held that "[a]s a matter of ordinary meaning . . . a purchase entails both giving consideration for and obtaining the good being purchased," and, far from limiting the meaning of consideration to cash, it cautioned *against* a too "literal[]" definition that "focuses only on the payment aspect of a purchase." 346 So. 3d at 599–600. LCM's other cases similarly allow for a purchase or sale to be made on non-cash terms. Just after the language LCM selectively quoted in *Madison Avenue Baptist Church v. Baptist Church in Oliver Street*, the New York Court of Appeals went on to hold that "[a] sale . . . is a transmutation of property from

one man to another, in consideration of *some price or recompense in value*."  46 N.Y. 131, 139 (N.Y. 1871) (quoting 2 Blackstone's Commentaries 446) (emphasis added).[3]

23.     Reading the Non-PTL Term Loan Agreement as a whole underscores the impropriety of Defendants' efforts to read in a host of highly specific requirements for an open market purchase that appear nowhere in the text.  *See generally* Restatement (Second) of Contracts § 202(2) (1981) ("A writing is interpreted as a whole").  When the parties wanted to impose specific requirements, they did so explicitly—as they did in a separate schedule setting forth detailed Notice Procedures, Reply Procedures, and Acceptance Procedures for Dutch Auctions. *See* ECF No. 1-1 Schedule 1.01.  No such comparable specifications attach to the "open market purchase" provision, consistent with the flexible nature of the provision.

24.     **Fourth,** Defendants misapply the canons of construction.  As Plaintiffs explained in their opening briefs, the *expressio unius* principle of contract interpretation instructs that the parties' inclusion of the qualifier "open to all Lenders" in the Dutch Auction provision of Section 9.05(g)(A) but *not* in the "open market purchase" provision of Section 9.05(g)(B) should be read as intentional.  ECF No. 73 ¶ 36 (citing, *inter alia*, *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014)).  The Non-PTL Term Loan Agreement restricted the Dutch Auction exception with the clause "open to all Lenders" but did not so restrict the "open market purchase"

---

[3] The remaining authorities in LCM's brief are even farther afield.  *See, e.g.*, *Apex Custom Lease Corp. v. State Tax Assessor*, 677 A.2d 530 (Me. 1996) (interpreting "retail sale" and "purchase" as used in a Maine-specific tax law); *State by & through Pub. Welfare Comm'n v. Bonnett*, 201 P.2d 939 (Utah 1949) (deciding whether option to purchase land was validly exercised using "money *or its equivalent*") (emphasis added); *Trimboli v. Kinkel*, 266 N.Y. 147 (N.Y. 1919) (deciding whether flaw in record title frustrated sale of land and should have been disclosed by attorney); *In re Lapp's Will*, 3 A.D.2d 55 (N.Y. App. Div. 1956) (deciding whether annuity contracts had been "purchased or obtained" during testator's life).  Further, insofar as Defendants argue that New York law distinguishes between a "sale" in the sense of a transfer for money and an "exchange" in the sense of a barter, that is irrelevant as the term "sale" is not used in Section 9.05(g).  Moreover, the cases upon which they rely, largely from the mid-1800s through 1919, *see* ECF No. 79 ¶¶ 27, 29, are hardly probative of the meaning of those terms at the time the Non-PTL Term Loan Agreement was signed.

exception.  *See* ECF No. 1-1 § 9.05(g) ("Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign . . . its rights and obligations . . . on a non-pro rata basis (A) through Dutch Auctions open to all Lenders . . . or (B) through open market purchases, in each case with respect to clauses (A) and (B), without the consent of the Administrative Agent.").  Certainly, if the parties meant for a phrase to cover both the Dutch Auction and "open market purchase" exceptions, they knew how to draft it, as they did in the same sentence when they provided "in each case with respect to clauses (A) [i.e., Dutch Auction] and (B) [i.e., open market purchase], without the consent of the Administrative Agent." ECF No. 2-3 § 9.05(g).  They did not apply the "open to all" restriction to both Section 9.05(g) carve-outs, which according to the *expressio unius* canon must be understood as intentional.

25.      Even as the Non-PTL Ad Hoc Group tries to dismiss this hornbook canon, averring that "Latin maxims are not thunderbolts from on high," ECF No. 87 at 26, Defendants misapply their own chosen canons.  In particular, Defendants invoke *noscitur a sociis* to argue that the Dutch Auction exception in Section 9.05(g)(A) cabins the meaning of the "open market purchase" exception in Section 9.05(g)(B).  ECF No. 87 at 27–28; *see also* ECF No. 79 ¶¶ 52–53.  But *noscitur* applies to "words grouped in a list." *United States v. Buluc*, 930 F.3d 383, 390 (5th Cir. 2019) (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012)); *see, e.g.*, *Yates v. United States*, 574 U.S. 528, 544 (2015) ("alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any *record, document, or tangible object*" (emphasis added)). Section 9.05(g) does not contain any such "list"; it sets out two ways in which loans may be assigned "on a non-pro rata basis."  Courts have cautioned against misapplying *noscitur a sociis* in this situation time and time again.  *See Buluc*, 930 F.3d at 390–91 (declining to apply *noscitur* where the subsection "lack[ed] the 'string of . . . terms' necessary to invoke the canon" and its application "would unjustifiably rob that broad phrase of its independent and ordinary significance") (cleaned up); *United States v. Lauderdale Cnty., Miss.*, 914 F.3d 960, 967 (5th Cir.

2019) (holding that *noscitur a sociis* does not apply where text "contains two independent clauses separated by a disjunctive 'or'"); *People v. Keyes*, 141 A.D.2d 227, 230 (N.Y. App. Div. 1988) (rejecting application of *noscitur a sociis*).

26.     Defendants also argue that Plaintiffs' interpretation of "open market purchase" would render the Dutch Auction exception surplusage, on the theory that Dutch Auctions are a form of open market purchase between consenting arms-length buyers. ECF No. 79 ¶ 54; *see also* ECF No. 87 at 28. But Plaintiffs' reading does not create surplusage. As defined in the Non-PTL Term Loan Agreement, Dutch Auctions require the borrower to follow a detailed process if the borrower chooses that buyback method. Borrowers must invest certain resources up-front, for example, to engage an Auction Agent, and to comply with agreed upon, specific procedures that impose transaction costs. *See* ECF No. 1-1 Schedule 1.01(b). In a Dutch Auction, the borrower is required to open the process to all lenders and may obtain broader participation or a favorable purchase price because the transaction is "open to all Lenders," but it will take time and requires the borrower to comply with the precisely specified terms of the Agreement. *See* ECF No. 73 ¶ 43 & Ex. 8. By contrast, "open market purchases" are flexible, do not reference any specific list of requirements, and involve voluntary negotiations between the borrower and lenders in the market; they can be more efficient, flexible, and generate fewer transaction costs. *See id.* ¶ 43. The Company, which at the time of the 2020 Transaction also required a cash infusion to weather the financial headwinds prompted in part by the COVID-19 pandemic, *see id.* ¶¶ 3, 67; *N. Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*, 2020 WL 3411267, at *6 (Sup. Ct. N.Y. Cnty. June 19, 2020), opted for the more flexible open market purchase option that would allow it to negotiate a transaction that both provided it with new money and permitted it to capture a discount in repurchasing existing debt. The Company went to the open market, negotiated with over 70% of its lenders on various options, and ultimately chose the transaction that provided the best terms for the Company.

27.     Finally, LCM argues that, under the principle that the specific governs the general, "open market purchase" must be limited to an exchange for cash consideration because the Non-PTL Term Loan Agreement elsewhere contains provisions governing the "exchange" of debt.  ECF No. 79 ¶¶ 39–40; *see* ECF No. 1-1 §§ 2.22(a)(x), 9.02(c).  But Section 2.22(a)(x), which LCM claims is the "specific provision[] governing exchange transactions," *see* ECF No. 79 ¶ 43, does not even use the word "exchange," much less purport to describe with specificity the only path by which exchanges may take place.  Regardless, Section 9.05(g) introduces the "open market purchase" and Dutch Auction exceptions with the phrase "[n]otwithstanding anything to the contrary contained herein . . ."  ECF No. 1-1 § 9.05(g).[4]

28.     In short, Lender Plaintiffs and Defendants alike—sophisticated parties all, with a combined billions of dollars of corporate debt and decades of experience participating in the corporate debt market—negotiated an agreement with the Company that allowed the Required Lenders to amend all but a few carefully-delineated sacred rights.  Defendants cannot avoid the consequences of the risks they assumed by adding additional restrictions to the Non-PTL Term Loan Agreement that were never paid for or negotiated.  Defendants are bound by the plain

---

[4] LCM argues that the Court should defer to Judge Failla's interpretation of the Non-PTL Term Loan Agreement.  *See* ECF No. 79 ¶¶ 69–72.  But, as this Court has already acknowledged, it need not do so.  *See* Mar. 13, 2023 Tr. of Hr'g at 54 ("You know, I'm not bound by [Judge Failla's decision], I don't think.  At least I've come to that conclusion."); *see generally, e.g.*, *In re Apex Oil*, 975 F.2d 1365, 1369 n.1 (8th Cir. 1992) (holding that a court ought not to defer to the prior decision of another federal court on questions of law decided *de novo*); Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 4478.4 (3d ed.) ("A decision to describe deference to another court . . . does not command obedience.").  Judge Failla, who recognized in a footnote the fact "[t]hat the provision specifies that Dutch Auctions must be open to all Lenders, but does not do so for open market purchases, may indicate the parties' conscious choice to exclude such a requirement from loan purchases pursued in the open market," did not take this hornbook principle of contract interpretation to its logical conclusion.  *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *8 n.12 (S.D.N.Y. Mar. 29, 2022).  In any event, Judge Failla reached her decision based only on LCM's pleadings; she did not consider any evidence, nor was she presented with PTL Lenders' argument that, to the extent "open market purchase" was ambiguous (and it is not), the Borrower and Required Lenders amended it to cover the 2020 Transaction, as discussed further below.

language of the terms to which they agreed, and Plaintiffs are entitled to summary judgment that the 2020 Transaction was an "open market purchase" under Section 9.05(g).[5]

### ii.    Industry Custom and Practice Confirm Open Market Purchases May Be Negotiated "One-On-One" With Lenders.

29.     This dispute can be decided on the four corners of the Non-PTL Term Loan Agreement.  But should the Court deem it necessary to consult industry custom and usage evidence to determine the plain meaning of that term, that evidence unequivocally establishes that "open market purchase" as the phrase is understood in the syndicated loan market encompasses any arms-length transaction between a willing buyer and a willing seller of already issued debt.

30.     As an initial matter, the LCM Defendants assert that any finding of ambiguity "precludes summary judgment."  ECF No. 79 ¶ 64.  That is incorrect.[6]  Under New York law, courts can and do grant summary judgment after relying on extrinsic evidence to resolve an ambiguity in a contractual term.  *See, e.g.*, *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 459–60 (N.Y. 2004) (granting summary judgment despite initially finding ambiguity where the evidence of industry custom and practice favored the defendant).

31.     Defendants fail to meaningfully engage with Plaintiffs' industry custom and usage evidence, preferring instead to muddle the record with improper and inadmissible expert reports.

---

[5] Needless to say, Defendants' passing request for summary judgment pursuant to Rule 56(f) should be rejected.  Defendants were well aware of and signed off on the schedule ordered by this Court for summary judgment briefs and could have filed one when due.  They did not.  Plaintiffs have not had "notice and a reasonable time to respond," as required for the Court to grant summary judgment to a nonmovant.  More fundamentally, Defendants fall far short of establishing that the 2020 Transaction violated the Non-PTL Term Loan Agreement; to the contrary, the Non-PTL Term Loan Agreement unambiguously *permitted* it, *see supra* Section I(A)(i)-(ii).

[6] LCM cites *Tekelec, Inc. v. Verint Systems, Inc.*, 708 F.3d 658 (5th Cir. 2013), for the proposition that ambiguous contract terms preclude summary judgment.  *See* ECF No. 79 ¶ 64.  But there, the Fifth Circuit consulted no evidence of industry custom and relied only on the words of the contract. *See Tekelec*, 708 F.3d at 665.  The Circuit thus did not consider whether summary judgment is appropriate if evidence of contemporaneous industry custom and usage could resolve a contractual ambiguity.  In any event, for the reasons above, the Non-PTL Term Loan Agreement is not even ambiguous.

The Court has already said that experts are "not going to be particularly instructive or helpful" on the meaning of "open market purchase."  Mar. 13, 2023 Tr. of Hr'g at 54.  Indeed, as a general matter, "made-for-litigation" reports deserve minimal weight, *In re Lyondell Chem. Co.*, 567 B.R. 55, 113 (Bankr. S.D.N.Y. 2017), and are often rejected by courts in favor of evidence "contemporaneous" with the contract's formation, *see id.*; *In re Opus East, LLC*, 528 B.R. 30, 55 (Bankr. D. Del. 2015).

32.    Only Plaintiffs have offered industry usage evidence that is contemporaneous with the formation of the Non-PTL Term Loan Agreement.  The LSTA's *Complete Credit Agreement Guide*, cited by Plaintiffs, states that "non-pro rata open market purchases" are a "buyback methodolog[y]" whereby "a borrower is allowed to negotiate one-on-one with individual lenders to repurchase loans."  ECF No. 73 ¶ 47.  Although Defendants ignore LSTA's definition of "open market purchase," elsewhere in their briefs they praise LSTA as "the leading advocate for the U.S. syndicated loan market," ECF No. 79 ¶ 15 n.3, and tout it as an authoritative source, *see* ECF No. 87 at 32–33.  And the LSTA's definition of "open market purchase" confirms the permissibility of the 2020 Transaction, as well as the broad, flexible understanding of the rights that a non-pro rata "open market purchase" provision in a credit agreement provides a borrower.  Nowhere does the LSTA suggest that an "open market purchase" provision inherently includes, *e.g.*, the 12-point checklist of characteristics that the Non-PTL Ad Hoc Group's expert suggests are "typical."  ECF No. 102 at 6.

33.    Defendants also fail to meaningfully rebut Plaintiffs' other industry sources. Reports from multiple law firms with expertise in syndicated loan markets confirm the industry consensus that "open market purchase" does not imply or require a solicitation to all lenders.  *See* ECF No. 73 ¶¶ 43–46.  And the Davis Polk publication emphasizes that borrowers can use "open market purchases" in the term loan market to "maximise flexibility to manage [their] capital structure," and that flexibility for borrowers comes at the peril of lenders, who accept "less

flexibility" in exchange for their participation. *See* ECF No. 73, Ex. 10 at 2. The Non-PTL Ad Hoc Group does not even attempt to distinguish each of the law firm memoranda, *see* ECF No. 87 at 44, while LCM does so on the basis of its unsupported contention that a "purchase" must be for cash only, *see* ECF No. 79 ¶ 66.

34.     In addition, Lender Plaintiffs cited another transaction, described in industry sources as an "open market purchase," which mirrored the 2020 Transaction insofar as the borrower purchased loans from only a subset of lenders. *See* ECF 73 ¶¶ 49–50. The Non-PTL Ad Hoc Group's attempt to distance itself from this transaction—with Envision Healthcare—is disingenuous. This transaction is perhaps most telling of industry custom and practice because it shows that certain of the Non-PTL Ad Hoc Group members understood open market purchase provisions to permit transactions like the 2020 Transaction.

35.     Angelo Gordon participated in this integrated transaction with Envision, and it would not have been able to provide any new money to the Envision unrestricted subsidiary—as it concededly did, loaning, together with another party, $1.1 billion, with a $200 million delayed draw component, *see* ECF 87 at 39—without a subset of Envision's lenders agreeing to perform a non-pro rata open market purchase identical to the 2020 Transaction. Without this open market purchase component and the discount capture the company obtained, Envision would not have undertaken that integrated transaction. And Angelo Gordon relied upon the open market purchase's validity in making its new money loans as part of the integrated transaction. The Envision transaction was identical in this respect to the 2020 Transaction and has been described by commentators as using an "open market purchase" mechanism.

36.     Similarly, Apollo participated in a transaction with the company Mitel, where the lenders, including Apollo, provided the company with new super-priority debt and then exchanged, on a non-pro rata basis and at a premium to the market price, certain of their existing first lien and second lien debt for new debt in the super-priority facility via a provision in the existing credit

agreement permitting the company to purchase debt from lenders.  *See* Ex. A ¶¶ 12, 13, 14, 116, 122.  It is clear that these Non-PTL Ad Hoc Group Lenders would not have participated in transactions (involving many millions and even billions of dollars) premised on the use of an open market purchase in a manner very similar to the 2020 Transaction if they thought such use somehow inappropriate or impermissible.

37.    These prior actions are the clearest reflection of the true views of the Non-PTL Ad Hoc Group Lenders on industry custom and practice.  As this Court recognized, "history has to mean something, right? There are consequences for everything we do" and "the history just simply reflects the true intent."  Mar. 13, 2023 Tr. of Hr'g at 45.

38.    Unable to discredit Plaintiff's industry sources, Defendants prefer to ignore them and focus on their made-for-litigation expert reports.  But those reports and Defendants' other sources fail to establish that the sophisticated parties entering into the Non-PTL Term Loan Agreement understood the "non-pro rata" "open market purchase" provision therein as anything other than a flexible option whereby the Company could negotiate debt buybacks with one or more lenders, on an arm's length basis, to manage its capital structure.  None of Defendants' proffered industry sources even offers a definition of open market purchase as the term is used in the syndicated loan market.  The LCM Defendants' own parentheticals admit that the cited Cleary Gottlieb and Mayer Brown alerts discuss open market purchases as options to purchase *securities*. *See* ECF No. 79 ¶ 66 n.9.  So too the law firm publications cited by the Non-PTL Ad Hoc Group. The Milbank and Jones Day client alerts are also limited to "securities," *see* ECF No. 87 at 37 n.5, 38 n.6, and the Proskauer Rose article is about the "Repurchases of *Bonds* in [the] Open Market," *see* ECF No. 91, Ex. W at 1 (emphasis added).  Indeed, only one of the Defendants' secondary sources describes the syndicated loan market specifically.  That publication offers no definition of "open market purchase."  *See* ECF No. 87 at 38 & n.7.  And it confirms that many credit agreements allow a borrower "to buy back its term loans directly from lenders in the secondary

market on a non-pro rata basis"—a buyback mechanism that permits the "borrower to avoid using a potentially more costly and slower Dutch auction procedure"—precisely as Plaintiffs argue. ECF No. 91, Ex. Z at 2. Thus, contrary to Defendants' contention that Plaintiffs' definition would "read out the Dutch auction exception," ECF No. 87 at 35, this source clarifies that the Dutch Auction remains a viable option for borrowers—just one with ramifications that they may sometimes choose to avoid in favor of the flexible open market purchase option they negotiated to include in a credit agreement.

39.    Defendants also incorrectly rely on client alerts by Weil Gotshal and Gibson Dunn. As Plaintiffs have previously pointed out, those documents are inapposite. For one thing, neither attempts to define "open market purchase." The 2009 Weil alert merely lists "open market purchase" as a type of bond buy back transaction and emphasizes that "the optimal type" for a particular entity "will depend on the relevant indenture documents." ECF No. 91, Ex. A at 3. Likewise, the Gibson Dunn article notes that "issuers without sufficient cash on hand or other access to liquidity may not be able to avail themselves" of multiple options to "repurchase their outstanding convertible securities." ECF No. 91, Ex. U at 2. Moreover, to the extent those articles do discuss "open market purchase," they do so in relation to the securities markets. Securities markets, subject to an entirely separate regulatory regime, are materially different from the market for term loans. Plaintiffs do not dispute that "the term 'open market purchase' describes a transaction understood to be distinct from a tender offer, which is regulated by SEC rules" or that "[u]nlike an open market purchase, a tender offer for securities is subject to substantial disclosure and procedural requirements." ECF No. 87 at 34. But the syndicated loan market is not governed by SEC rules, and works in notably different ways from securities markets. Secondary sources focused on the securities market are therefore of no relevance.

40.    In sum, industry custom and usage underscores that Plaintiffs' interpretation of "open market purchase" is correct. Defendants do not meaningfully engage with that

contemporaneous evidence and, in the face of the industry consensus in 2020 that an open market purchase "contain[ed] no" requirement that a borrower solicit all lenders, or was anything other than a flexible option that allowed a borrower to engage in arms-length purchases with selling lenders, Defendants' protests ring hollow.[7]  *Id.* at 4.  Defendants' expert reports are post-hoc evidence manufactured to support their own erroneous interpretation.

### iii.      The 1L Amendment And Open Market Purchase Agreement Confirm That The 2020 Transaction Was A Permitted Open Market Purchase.

41.      Even though the original terms of the Non-PTL Term Loan Agreement unambiguously authorized the 2020 Transaction as discussed above, another  key feature of credit agreements in the syndicated loan market is that they are living documents that may be amended readily   post-closing.    *See*   S&P   Global,   *Leveraged   Loan   Primer*   10   (2020), https://www.spglobal.com/marketintelligence/en/documents/lcd-primer-leveraged-loans_ltr.pdf ("The loan market is unique in that it can flex, bend, shape and warp itself on the fly to match the needs of borrowers with the requirements of lenders . . . . During syndication *and after the loan has closed*, all of the terms of a loan are subject to negotiation."); Steven J. Lubben, *Corporate Finance* 391 (3d ed. 2020) ("[S]yndicated term loans offer borrowers greater flexibility in their initial terms *and in post-closing amendments*.") (emphasis added); *see also, e.g.*, S&P Global, *Changing Times Have Led To New Trends In Amendments To U.S. Middle-Market Credit Agreements*   (Aug.   24,   2020),   https://www.spglobal.com/ratings/en/research/articles/200824-changing-times-have-led-to-new-trends-in-amendments-to-u-s-middle-market-credit-

---

[7] LCM cites an email from counsel to a PTL Lender that supposedly contradicts Plaintiffs' argument that the "open market purchase" provision in the Non-PTL Term Loan Agreement permitted non-cash purchases.  *See* ECF No. 79 ¶ 67.  In that email, the sender acknowledged that he could be "missing something obvious" given the time exigencies.  *See* Lieberman Decl., Ex. 4 ECF No. 82, Ex. 4 at 2.  He was.  As later explained to him, the Agreement nowhere prohibited non-cash open market purchases like the 2020 Transaction.  And even the sender recognized that the borrower and required lenders could readily amend 9.05(g) to make clear that open market purchases included non-cash exchanges if need be—which they in fact did, *see infra* Section I(A)(iii).

agreements-11614628 (describing themes in approximately one hundred amendments to credit agreements during the COVID-19 era).

42.     The Non-PTL Term Loan Agreement is no exception.  The parties understood and anticipated that it would be freely waived, amended, or modified with the consent of the Required Lenders.  When the Lenders or Agent wanted to ensure that a particular provision or term could not be freely waived, amended, or modified, they made sure it was included in the sacred rights provisions—as indeed they did with, for example, Section 2.18(b) (the waterfall provision covering payments in the event of default) and the definition of the term Required Lenders.  *See* ECF No. 1-1 § 9.02(b)(B)(1).  The Non-PTL Term Loan Agreement contains no such prohibition on waiving, amending, or modifying Section 9.05(g), let alone the term "open market purchase." This is another form of flexibility that the Borrower negotiated for (and the Lenders accepted) in the Non-PTL Term Loan Agreement that allowed it to make almost any modifications it desired to the agreement with the consent of Required Lenders alone.

43.     Because of this additional flexibility, if there were any doubt as to whether the Non-PTL Term Loan Agreement in its original form permitted the 2020 Transaction—which there is not—the language of the 1L Amendment and Open Market Purchase Agreement, both of which involved renegotiation of the loan terms with the consent of the Required Lenders, authorizes the 2020 Transaction as an open market purchase.  *See* ECF No. 73 ¶¶ 53–56 (detailing how the language of the 1L Amendment and the Open Market Purchase Agreement served as an effective amendment to "open market purchase" and 9.05(g) to the extent necessary to permit the 2020 Transaction).

44.     LCM argues that this amendment to the Non-PTL Term Loan Agreement "makes no sense" and could not have "ratified" the 2020 Transaction because the Non-PTL Lenders did not approve of it—but this is nonsensical.  LCM claims that, because the definition of "ratification" requires knowing approval of otherwise unauthorized acts, and neither LCM nor the Non-PTL Ad

Hoc Group recognized or approved of the amendments, the amendments were never validly ratified.  ECF No. 79 ¶¶ 60, 61.  This again fails to understand that Defendants' recognition and approval was unnecessary under the terms of the Non-PTL Term Loan Agreement.[8]  Under the Non-PTL Term Loan Agreement, waivers, amendments, and modifications that do not alter an expressly identified sacred right require the approval of only Required Lenders, namely lenders representing more than 50% of the outstanding face amount of the loans.  *See* ECF No. 1-1 § 9.02(b)(A).  Neither the 1L Amendment nor the Open Market Purchase Agreement altered pro rata sharing under the waterfall, much less the pro rata allocation within the same class.  *See id.* §§ 2.18(a), (c); *LCM XXII*, 2022 WL 953109, at *10 ("[T]he Amendments left untouched the *pro rata* rights of first-lien lenders vis-à-vis other first-lien lenders").  Thus, the waiver, amendment, or modification of Section 9.05(g) and "open market purchase" inherent (as needed) in the 1L Amendment and Open Market Purchase Agreement did not require Defendants' approval under the terms of the agreement they were bound by.

45.     The Non-PTL Ad Hoc Group contends that, because the 1L Amendment does not explicitly define "open market purchase," it somehow cannot be read as amending the Non-PTL Term Loan Agreement to permit the 2020 Transaction as an "open market purchase."  *See* ECF No. 87 at 39.  They also decline to grapple with the language of the Open Market Purchase Agreement at all.[9]

---

[8] LCM's cited cases deal with ratification in the context of agency law.  *See In re Ampal-Am. Israel Corp.*, 2023 WL 1094593, at *5 (Bankr. S.D.N.Y. Jan. 27, 2023); *RLI Ins. Co. v. Athan Contracting Corp.*, 667 F. Supp. 2d 229, 234 (E.D.N.Y. 2009).  There is obviously no fiduciary relationship between the parties here, and the cases say nothing about amendments to a credit agreement or indeed to any other kind of contract where amendments are governed by the terms agreed upon in those contracts

[9] The Non-PTL Ad Hoc Group also incorrectly claims that the Lender Plaintiffs' arguments as to these documents is "new"—as if that somehow makes the arguments less credible.  *See id.* at 40.  They apparently failed to read the Lender Plaintiffs' motion to dismiss their November 2022 complaint, which presented this same argument.  *See AG Centre St. P'ship v. Serta Simmons Bedding, LLC*, Index No. 654181/2022, Dkt. No. 57, at 12–13 (N.Y. Cnty. Sup. Ct. Jan. 9, 2023).

46.     Although neither the 1L Amendment nor the Open Market Purchase Agreement expressly amends "open market purchase" as such, there was no need for either agreement to do so to enact the relevant waiver, amendment, or modification.   The Open Market Purchase Agreement, which is executed by the Borrower and Required Lenders, explicitly states that the 2020 Transaction is an "open market purchase of the Existing Term Loans" and directs the Borrower to purchase loans "on the open market" pursuant to Section 9.05(g) of the Non-PTL Term Loan Agreement.  *See* ECF No. 1-3 at 1, 2.  The Borrower and Required Lenders used the language "open market purchase" to describe the transaction because it *was* one, a fact also expressly stated in the 1L Amendment, which provides that the Borrower and each Required Lender "acknowledge[] and agree[] that the borrowing and/or incurrence" of the super-priority loans and all "step[s] necessary to effectuate" the 2020 Transaction "*shall be and are permitted*." ECF No. 1-2 (1L Amendment) § 4 (emphasis added).[10]   As discussed in the Lender Plaintiffs' opening brief, that is more than sufficient to accomplish a waiver, amendment, or modification under the terms of the Non-PTL Term Loan Agreement.  ECF No. 73 ¶¶ 53–54, 56.

**B.     The 2020 Transaction Did Not Release Any Collateral Or The Value Of The Guarantees.**

47.     Defendants' second breach of contract theory is that the 2020 Transaction violated the sacred rights in Sections 9.02(b)(B)(2) and (3) of the Non-PTL Term Loan Agreement.  Not

---

And the only reason the Lender Plaintiffs have not raised these arguments sooner is that they have not needed to; they won before the New York Supreme Court and the Southern District of New York, and LCM and the Non-PTL Ad Hoc Group dropped all claims against the PTL Lenders for an extended period of time.  In any event, the fact that this argument was not made to Judge Failla underscores why this Court should reach its own decision on these issues.

[10] The Non-PTL Ad Hoc Group once again raises the futile argument that because Defendants did not approve the 2020 Transaction it cannot be considered proper, citing to *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, 72 Misc.3d 1218(A) (N.Y. Cnty. Sup. Ct. Aug. 16, 2021).  ECF No. 87 at 40.  This is an apples-to-oranges comparison because the credit agreement in *Audax* explicitly required the consent of all lenders for any amendment that would "alter the order of application of proceeds"—a requirement absent from the Credit Agreement here.  *Audax*, 72 Misc.3d 1218(A), at *11.

so.   Those provisions provide that the consent of each lender is required to "release all or substantially all of the Collateral" and to "release all or substantially all of the value of the Guarantees under the Loan Guaranty." ECF No. 1-1 § 9.02(b)(B)(2)-(3). As both judges that have considered the question have recognized, "no feature of the Transaction released the collateral or the value of the loan guarantees." *LCM XXII*, 2022 WL 953109, at *12; *accord North Star*, 2020 WL 3411267, at *4.

48.     Recognizing the futility of the argument, LCM does not even try to argue that Plaintiffs breached Sections 9.02(b)(B)(2) and (3) of the Non-PTL Term Loan Agreement, admitting that the "Transaction did not literally strip the [Non-PTL] Lenders' liens" and that the Non-PTL Lenders "retain *pari passu* rights in the collateral." ECF No. 79 ¶ 84.

49.     The Non-PTL Ad Hoc Group for its part similarly concedes the 2020 Transaction did not *actually* release any collateral, but contends that the Court should look to the "practical effect" and that the 2020 Transaction was a "*de facto* 'release' of the collateral's value" because it subordinated their debt. ECF No. 87 at 44 (emphasis added). Such "'substance over form' argument[s]" are, as Judge Failla recognized, "incompatible with the plain text of the Agreement" and with hornbook principles of contract interpretation. *LCM XXII*, 2022 WL 953109, at *12.[11] Under New York law, "'freedom of contract prevails in an arm's length transaction between sophisticated parties' such that courts generally may not 'relieve them of the consequences of their bargain.'" *U.S. Bank Nat'l Ass'n v. DLJ Mortgage Capital, Inc.*, 38 N.Y.3d 169, 177–78 (N.Y. 2022) (citations omitted). "Thus, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *Id.* at 178 (internal

---

[11] The Non-PTL Ad Hoc Group perplexingly asserts that "courts should not elevate substance over form," and then immediately cites a case for the proposition that bankruptcy courts allegedly "may look through form to substance when determining the true nature of a transaction." ECF No. 87 at 45 (citing *In re Sackman Mortg. Corp.*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993)). Whether one looks to form or substance, however, the result is the same: The 2020 Transaction did not result in the release of any collateral or in the release of the value of the guarantees.

quotations and citations omitted).  The 2020 Transaction, which Defendants admit did not strip away any liens, complied with the terms to which these highly sophisticated, counseled parties agreed.

50.    The Non-PTL Ad Hoc Group urges the Court to look to "economic realities" rather than "the labels applied by the parties."  ECF No. 87 at 45 (quoting *In re PCH Assocs.*, 804 F.2d 193, 198 (2d Cir. 1986)); *see In re Sackman Mortg. Corp.*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993) ("Labels cannot change the true nature of the underlying transaction.").  Here, the "economic realities" are indisputably that the collateral remained untouched as a result of the 2020 Transaction.  Subordination is not release.  *See In re Murray Energy Holdings Co.*, 616 B.R. 84, 98 (Bankr. S.D. Ohio 2020) ("The . . . Amendment . . . resulted in a *subordination* of the Term Loan Lenders' interest in collateral, not a *release* of its collateral. And subordination and release are different concepts.") (emphasis in original); *Silva v. GVF Cannery, Inc.*, 188 B.R. 651, 658 (Bankr. N.D. Cal. 1995), *aff'd in part, rev'd in part sub nom. Silva v. Wells Fargo Bank, N.A.*, 202 B.R. 140 (N.D. Cal. 1996) ("Substantively, the act of release and the act of subordination perform different functions and have different results: release discharges a lien and removes it from the collateral . . . ; subordination merely reorders the priority of liens upon collateral without removing the subordinated lien.").  Had the parties wanted to include an anti-subordination provision, they could readily have done so.  *See In re TPC Grp. Inc.*, 2022 WL 2498751, at *11 (Bankr. D. Del. July 6, 2022) (recognizing that "express anti-subordination clauses are sufficiently commonplace" in credit agreements).

51.    Both the plain terms of the Non-PTL Term Loan Agreement and the "economic realities" compel summary judgment in Plaintiffs' favor on the question of whether the 2020 Transaction breached Section 9.02.

## II.     Plaintiffs Are Entitled To A Declaration That They Did Not Violate The Implied Covenant Of Good Faith And Fair Dealing.

52.     Recognizing the weakness of their breach of contract claim, Defendants ask the Court to re-write the Credit Agreement under the guise of the implied covenant of good faith and fair dealing.  But this is plainly prohibited under New York law.  Sophisticated, counseled parties like Defendants cannot evade the express terms of the contract to which they agreed by restyling their basic breach of contract argument—that they were "deprived of . . . bargained-for rights and protections"—as an implied covenant claim.  ECF No. 87 at 49.  Because their claim is duplicative and because, in any event, Defendants have not identified any facts to support their theory that Defendants acted in bad faith, the Lender Plaintiffs are entitled to summary judgment on the implied covenant claim.[12]

### A.     The Non-PTL Lenders' Implied Covenant Claim Seeks To Impose Obligations Inconsistent With The Parties' Agreement And Is Duplicative Of Their Breach Of Contract Claim.

53.     Defendants impermissibly seek to use the implied covenant to augment the agreed terms of the Non-PTL Term Loan Agreement.  ECF No. 79 ¶¶ 74-76; ECF No. 87 at 48–49.  New York law forbids them from doing so.

54.     Under New York law, "a party who asserts the existence of an implied-in-fact covenant bears a heavy burden, [because] it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists."  *Lykins v. IMPCO Techs., Inc.*, 2018 WL 3231542, at *7 (S.D.N.Y. Mar. 6, 2018); *see also JN Contemp. Art LLC v. Phillips Auctioneers*

---

[12]  In its opposition, the Non-PTL Ad Hoc Group argues, without citing any authority, that "plaintiffs' attack on the implied covenant claim is premature" because the more than 300 third-party defendants they recently named in their third-party complaint have not yet appeared.  ECF No. 87 at 46; *see also* ECF No. 68.  This argument misses the point.  The Lender Plaintiffs sought declaratory judgment against Defendants on the implied breach claim—because the same claim had been raised by Defendants repeatedly in the prior pending litigations and therefore was ripe for declaratory judgment here.  That Defendants have yet again filed additional implied covenant claims does not alter the fact that the Lender Plaintiffs' declaratory judgment claim, filed on January 24, 2023, is ripe for decision.  ECF No. 1.

*LLC*, 507 F. Supp. 3d 490, 505 (S.D.N.Y. 2020), *aff'd*, 29 F.4th 118 (2d Cir. 2022) ("It cannot be a breach of the implied covenant of good faith and fair dealing to do what a contract explicitly authorizes a party to do."); ECF No. 73 at 58 (citing *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (N.Y. 1983)).

55.     The crux of Defendants' argument is that "plaintiffs abused the Credit Agreement's voting rights provision" to gain financial benefit.  ECF No. 87 at 48-49.  But the Non-PTL Term Loan Agreement expressly permitted the Transaction.  *See supra* Section I(A)(i).  The Non-PTL Term Loan Agreement—which was negotiated and agreed to by sophisticated parties—must be enforced as written, and the implied covenant cannot be used to grant the Defendants rights that they never bargained for.  *See D&L Holdings v. Goldman Co.*, 287 A.D.2d 65, 73 (N.Y. App. Div. 2001) (the implied covenant cannot be used to alter the terms of a contract," especially to "a commercial contract between two sophisticated commercial parties represented by counsel").  If the Borrower and Lenders had wanted to ensure that Required Lenders could not take any action that they did not view as being for the benefit of all Lenders equally, they could have included a provision to that effect.  They did not.

56.     Further, Defendants' implied covenant claim is impermissibly duplicative of their breach of contract claim.  ECF No. 73 at 25–26.  To be duplicative, an implied covenant claim need not be based on identical allegations, but must only either arise from the same operative facts *or* seek the same damages.  *See Mill Fin., LLC v. Gillet*, 122 A.D.3d 98, 104 (N.Y. App. Div. 2014).  Both criteria are met here.  As confirmed by the Non-PTL Ad Hoc Group's counterclaims, Defendants' implied covenant and breach of contract theories are premised on the same facts that their perceived rights under the waterfall and pro rata treatment provisions of the Non-PTL Term Agreement were undermined.  *Compare* ECF No. 68 ¶ 340 (alleging the 2020 Transaction breached the implied covenant by "altering the proceeds waterfall and *pro rata* treatment provisions of the Credit Agreement without their consent") *with id.* ¶ 334 (alleging the 2020

28

Transaction "breached the express terms of the Credit Agreement by entering into the Unlawful Exchange Transaction, which breaches the proceeds waterfall and *pro rata* sharing provisions of Section 2.18").[13]   The damages sought are also the same.  *Compare id.* ¶ 335 ("the loans held by the Excluded Lenders have lost significant value and the Excluded Lenders therefore have been damaged.") *with id.* ¶ 342 (alleging damages for breach of implied covenant because "[t]he loans that the Excluded Lenders hold have lost significant value").

57.    LCM concedes that the claims are duplicative, but states that the implied covenant claim is only pled in the alternative and that they admittedly "s[eek] a single recovery," ECF No. 79 ¶ 86.  LCM argues that, because they have pled these claims in the alternative, the implied covenant claim must be allowed to proceed if the breach of contract claim is dismissed because it would no longer be duplicative.  *Id.* ¶¶ 85, 86.  This argument does not hold water.

58.    New York courts routinely dismiss implied covenant claims as redundant of breach of contract claims, even where the breach of contract claim is also dismissed.  *See, e.g.*, *Apogee Handcraft, Inc. v. Verragio, Ltd.*, 155 A.D.3d 494, 495–96 (N.Y. App. Div. 2017); *Sebastian Holdings, Inc. v. Deutsche Bank, AG.*, 108 A.D.3d 433, 434 (N.Y. App. Div. 2013) (affirming dismissal of implied covenant claim as duplicative of dismissed breach of contract claim); *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70 A.D.3d 423, 426 (N.Y. App. Div. 2010) (affirming dismissal of implied covenant claim as duplicative of contract claim while holding contract claim should also be dismissed).  In *Apogee Handcraft*, for example, the First Department affirmed the lower court's dismissal of the breach of contract claim, but reversed the decision to allow a duplicative implied covenant claim to proceed, holding that the claim "for breach of the

---

[13] Defendants' own case, *Audax*, dismissed a breach of implied covenant claim where the claim rested on the assertion that the challenged transaction breached the terms of the original transaction, emphasizing that if the challenged transaction was permitted under the credit agreement, "that is the end of the story" and "the implied covenant cannot be used to impose obligations or restrictions going beyond what is set forth in the contract."  *Audax*, 72 Misc.3d 1218(A), at *13 (cited in ECF No. 87 at 29–30, 40).

implied covenant of good faith and fair dealing[] should similarly have been dismissed as redundant, as it was intrinsically tied to the damages allegedly resulting from a breach of the contract." 155 A.D.3d at 495–96.

59.    Indeed, the *Mill Financial* case cited by the Non-PTL Ad Hoc Group, ECF No. 87 at 50 n.12, was later overturned by the First Department in a decision that confirms that Defendants' implied covenant claim should be rejected as duplicative.  In *Mill Financial,* the implied covenant claim was dismissed on appeal as duplicative of the breach of contract claim because the First Department (contrary to the lower court case the Non-PTL Ad Hoc Group chose to cite) found that the implied covenant claim "arises from the same facts and seeks the same damages" as the contract claim.  *See Mill Fin.*, 122 A.D.3d at 104–05.  The same is true here. Despite summarily contending that the "implied covenant claim here is based on a different theory and different facts from their breach of contract claim," ECF No. 87 at 48, Defendants' implied covenant claim arises from the same facts underlying their breach of contract claim and is merely a thinly veiled request for the Court to alter the terms of the Non-PTL Term Loan Agreement.

60.    Defendants' cited cases permitting implied covenant claims to proceed did so under very different factual circumstances from those present here.  For example, in *AEA Middle Market v. Marblegate Management, LLC*, the plaintiffs, who were creditors of the debtors, alleged that they were fully precluded from bidding at the foreclosure sale of the debtors' assets as a result of the bad faith of, *inter alia*, the borrower and borrower's agent, which subsequently resulted in a "commercially unreasonable foreclosure auction process" because "there were no other bids proffered" apart from the defendants' bid.  2023 WL 2394680, at *12 (N.Y. App. Div. Mar. 7, 2023).  Here, by contrast, Defendants were encouraged by Serta to (and did) make their own proposal—one that would have actually removed assets from the lenders' shared collateral pool on terms much less favorable to the Company and non-participating creditors, leading Serta to choose the PTL Lenders' proposal.

61.     Similarly, in *Richbell Information Services v. Jupiter Partners*, a stockholder singlehandedly used its veto power in bad faith to block the plaintiff from raising or borrowing much-needed cash from outside parties; the plaintiff was instead forced into a one-sided borrowing agreement, at a "steep price," with a lender that participated in the stockholder's intentional scheme to induce a default of the loan and foreclose on the plaintiff's stock.  309 A.D.2d 288, 293–94 (N.Y. App. Div. 2003).  Unlike the plaintiff in *Richbell* who was forced to accept an extremely unfair borrowing agreement in lieu of seeking other proposals from the market, the Company here solicited and received lending proposals from multiple lender groups and chose the proposal most favorable from its perspective.  The other cases cited by Defendants are even further afield.  *See, e.g.*, *Credit Agricole Corp. v. BDC Fin., LLC*, 135 A.D.3d 561, 561 (N.Y. App. Div. 2016) (finding that the implied covenant claim should not be dismissed based on allegations that the defendants were "deliberately manipulating and depressing the bids of other bidders during the auction of the debtor's assets."); *In re Light Squared Inc.*, 511 B.R. 253, 317–39 (Bankr. S.D.N.Y. 2014) (allegations that chairman of the board of directors of competitor company created entity to disguise himself and purchase competitor's debt in order to manipulate price).

> **B.**     **The Non-PTL Lenders' Implied Covenant Claim Fails On The Merits Based On The Undisputed Evidence Before The Court.**

62.     Even if Defendants' implied covenant claim were consistent with the obligations imposed by the Credit Agreement and not duplicative, the claim fails on the merits based on the undisputed evidence before the Court.  Defendants hinge their implied covenant argument on the assertion that the Borrower and Lender Plaintiffs acted in bad faith, but they cannot establish bad faith under New York law.

63.     Bad faith requires acting with an intent to cheat or deprive the opposing party of their bargained-for benefits.  *See, e.g.*, *Thompson v. Advanced Armament Corp.*, 614 F. App'x 523, 525 (2d Cir. 2015) ("intentional acts done without the purpose of cheating the plaintiff" insufficient to establish bad faith) (citation omitted); *Wagner v. JP Morgan Chase Bank*, 2011 WL 856262, at

*4 (S.D.N.Y. Mar. 9, 2011) (granting summary judgment to defendant on implied covenant claim because "Plaintiffs have presented no evidence that any of Defendant's management decisions were undertaken for the purpose of depriving Plaintiffs of their earn-outs").

64.     Given this high bar, it is not surprising that the only case the Non-PTL Ad Hoc Group cites for its bad faith argument does not even mention bad faith.  *See* ECF No. 87 at 52 (citing *Macy's, Inc. v. J.C. Penney Corp.*, 45 Misc.3d 274, 307–08 (N.Y. Cnty. Sup. Ct. 2014), *aff'd as modified sub nom.*, *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48 (N.Y. App. Div. 2015)).  The *Shatz* and *Richbell* cases cited by LCM are also irrelevant.  *See* ECF No. 79 ¶ 77.  In those cases, the defendants were either officers or shareholders of the plaintiffs that were alleged to have engaged in self-dealing schemes despite being duty-bound as fiduciaries and contractually obliged to act in the best interests of plaintiffs.  *See Shatz v. Chertok*, 180 A.D.3d 609, 609 (N.Y. App. Div. 2020) (implied covenant claim could survive motion to dismiss based on allegations that officers of LLC acted against contractual and fiduciary obligations to make investments in the best interest of the LLC by intentionally diverting investment opportunities to another fund controlled by them); *Richbell*, 309 A.D.2d at 303 (plaintiff sufficiently alleged implied covenant claim where shareholder used veto power to force plaintiff to enter borrowing agreement with shareholder's company on unfavorable terms to plaintiff).  The Lender Plaintiffs had no such fiduciary obligations to the other Defendants here.

65.     The Non-PTL Ad Hoc Group also purports to rely on Justice Masley's decision in *Boardriders*, *see* ECF No. 87 at 50 n.11, but, as set forth in the Lender Plaintiffs' opening brief, the stark contrast between the facts here and there only underscores the absence of any bad faith here.[14]  ECF No. 73 n.15.  In *Boardriders*, Justice Masley rested her decision in large part on allegations that the majority lenders and the company "abused their ability to amend the

---

[14] LCM evidently understood that *Boardriders* only supports Plaintiffs' position and did not cite it anywhere in its brief.

agreement," including by "going so far as to amend the no-action provisions to hinder plaintiffs' ability to sue and eliminating every affirmative and negative covenant[]," and that the plaintiffs, who did not have an opportunity to submit a competing proposal, were not even informed of the transaction until after it closed and was publicly announced. *ICG Glob. Loan Fund 1 DAC v. Boardriders, Inc*., 2022 WL 10085886, at *9 (N.Y. Cnty. Sup. Ct. Oct. 17, 2022). Here, of course, the evidence establishes that the Non-PTL Ad Hoc Group submitted its own competing proposal, on terms far less favorable to the Company, and that the proposed 2020 Transaction was disclosed to the market two weeks before closing, allowing the Non-PTL Ad Hoc Group and LCM to rush into New York Supreme Court to try to stop it—unsuccessfully of course, because Justice Masley said they had not established a likelihood of success of the merits. *North Star*, 2020 WL 3411267, at *4. And it is telling that Justice Masley did not even discuss that earlier *North Star* decision in *Boardriders*; she evidently thought what was alleged in *Boardriders* was categorically different from the Non-PTL Ad Hoc Group's allegations supporting their implied covenant claim, which she had previously found unlikely to succeed on the merits.[15]

66.     Faced with the reality that the documents already exchanged in discovery do not establish bad faith, Defendants contend that bad faith cannot be decided now because discovery is not complete. ECF No. 79 at ¶¶ 95-99; ECF No. 87 at 51-52. The Non-PTL Ad Hoc Group even goes so far as to contend that "[t]here has been virtually no discovery in this matter." ECF No. 87

---

[15] The Non-PTL Ad Hoc Group also cites *Octagon Credit Investors, LLC v. NYDJ Apparel LLC*, Case No. 656677/2017, Dkt. No. 91 (N.Y. Cnty. Sup. Ct. Feb. 6, 2018). Although that case settled before the court could issue a written decision explaining its reasons for denying the defendants' motion to dismiss, it is plainly distinguishable on its facts. First, the defendants there allegedly modified the waterfall and introduced punitive provisions into the amendments engineered to deter the excluded lenders from mounting a legal challenge, which Plaintiffs here did not do. Second, as in *Boardriders*, the defendants in *Octagon Credit* entered into the amendments without giving any notice to any other lenders, who did not learn of the amendments until after they were executed.

at 51. Even LCM does not agree with this patently false assertion, acknowledging that "voluminous documentary evidence" has already been exchanged. *See* ECF No. 79 ¶ 94.

67.     Despite the voluminous amounts of discovery provided, the Non-PTL Ad Hoc Group cites no evidence to establish bad faith. And, while LCM cites to documentary evidence, LCM admits that—at best—this discovery merely shows that the Borrower's advisors and the Lenders were communicating about how to best complete the group of lenders that would participate in the 2020 Transaction; the evidence shows the Company considered a variety of factors that borrowers and their advisors regularly consider in deciding with whom to engage in circumstances where, as in the Non-PTL Term Loan Agreement, there are no restrictions on how a group of lenders can come together. ECF No. 97 at ¶¶ 89-92. *See, e.g.*, Lieberman Decl., ECF 82, Ex. 10 at -3929; *id.*, Ex. 19 at -4651. Even if the LCM Defendants call these "arbitrary considerations," ECF No. 79 at 35, that does not make it so or evidence bad faith. It is well-established under New York law that where a defendant has "a genuine and colorable business justification for its decision, then its actions will not have been arbitrary, and thus will not have violated the implied covenant of good faith." *Lykins*, 2018 WL 3231542, at *7.

68.     Most fundamentally, the Company clearly had genuine justifications for selecting the most favorable proposal presented to it. Moreover, the Lender Plaintiffs, who—like the Non-PTL Ad Hoc Group—recognized that there was a lot of bargained-for room in the Non-PTL Term Loan Agreement, had a genuine business justification to make an offer that would allow the Company and Required Lenders to use the flexibility to put the PTL Lenders in a super-priority position while best addressing the Company's financial needs. Notably, Defendants Gamut Capital SSB, LLC, North Star Debt Holdings, L.P., and the entities affiliated with Angelo Gordon admitted in response to requests for admission that they believed their competing proposal to Serta was made in good faith, despite the fact that their proposal would have resulted in a much more

negative impact on the lenders not included in its group (including, ironically, on LCM). *See* ECF No. 110-1 at 10; ECF No. 110-2 at 10; ECF No. 110-3 at 10.

## III.    No Further Discovery Is Required To Resolve The Disputed Issues.

69.     "To survive summary judgment, the nonmovant must submit or identify evidence in the record to show the existence of a genuine issue of material fact as to each element of the cause of action." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). Neither LCM nor the Non-PTL Ad Hoc Group identifies any disputed material fact as to which further discovery is required.

70.     LCM concedes that "[d]ocument discovery in the LCM Action [was] substantially complete," ECF No. 79 ¶ 96, though nitpicks about the discovery cut-off date applied by one of the PTL Lenders and an assertion of privilege. LCM fails, however, to articulate a single disputed factual issue as to which additional document discovery is warranted. LCM fares no better in articulating why deposition testimony is necessary. It argues that such testimony "would bear directly on why [Plaintiffs' advisors] believed they were acting in good faith when they . . . elected to pursue [the] transaction." ECF No. 79 ¶ 97. But under New York law, "[t]he relevant inquiry called for by the implied covenant is objective, not subjective." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 605 (S.D.N.Y. 2018) (citing *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (N.Y. 1995)). Testimony about Plaintiffs' advisors intentions have no bearing on that objective inquiry.[16]

---

[16] Defendants' cases are wholly inapposite. In some, discovery is not even at issue. For example, in *Highbridge Development BR, LLC v. Diamond Development, LLC* (cited at ECF No. 79 ¶ 98), the court reversed the grant of summary judgment on breach of contract based on what it specified was "an issue of law"; the decision does not address discovery or the need for fact-finding. 67 A.D.3d 1112, 1114 (N.Y. App. Div. 2009). In others, the need for discovery was predicated on types of factual issues not present here. For example, in *Centurion Bulk Pte Ltd. v. NuStar Energy Services, Inc.*, the court denied a motion for summary judgment by the defendant whose motion relied on an employee's unsworn declaration when the plaintiff had not had an opportunity to depose the individual. 2020 WL 8368320, at *2 (S.D. Tex. Sept. 25, 2020). Here, Plaintiffs have not introduced any declarations and, to the contrary, contend that summary judgment can be

71.     The Ad Hoc Group of Non-PTL Lenders' arguments fare no better.   First, they argue:

> [D]iscovery is needed concerning plaintiffs' own use of the term 'open market purchase,' including, *inter alia*, how Serta and the [PTL] Lenders have applied the term 'open market purchases' in their other transactions of Serta's First Lien Term Loans, because there is good reason to believe that they have conducted *bona fide* 'open market purchases' of Serta's first-lien debt both before and after the [2020] Transaction that bear little or no resemblance to the [2020] Transaction.

ECF No. 87 at 42.   Even assuming the PTL Lenders and/or Serta have engaged in other open market transactions that were structured similarly or differently, that proves nothing about whether the 2020 Transaction also involved an open market purchase.   As discussed above, the whole point of the "open market purchase" provision was to provide flexibility to the Borrower.   Second, the Ad Hoc Group of Non-PTL Lenders argues that "to rebut plaintiffs' claim that they undertook the . . . Transaction in good faith, discovery is needed concerning plaintiffs' intentions with respect to the Transaction." *Id.* at 42-43.   Again, plaintiffs' subjective intentions are irrelevant as a matter of New York law.  *See In re LIBOR*, 299 F. Supp. 3d at 605.[17]   Finally, the Ad Hoc Group of Non-PTL Lenders argues that summary judgment based on industry custom and practice evidence is "appropriate *only* where . . . there is no question that the intention of the parties was to follow, rather than depart from, the particular industry custom at issue" and therefore discovery is needed into whether the parties intended "to follow, rather than depart from, the particular industry custom at issue." ECF No. 87 at 43.   But Defendants' cited authority *granted* summary judgment based on extrinsic evidence of industry custom and usage, holding that any "reasonable party in the investment industry" would understand what the phrase "listed on an organized securities market" would mean, without resort to any factual evidence about whether the parties intended that industry

---

resolved on the four corners of the Non-PTL Term Loan Agreement combined with basic facts about the 2020 Transaction that no one disputes.

[17] The Non-PTL Ad Hoc Group also argues that discovery is needed to support its contention that Apollo was not a disqualified institution, ECF No. 87 at 43—an issue addressed in the Company's motion.

meaning or not. *J.P. Morgan Inv. Mgmt. Inc. v. AmCash Grp., LLC*, 106 A.D.3d 559, 559–60 (N.Y. App. Div. 2013). Nor do the Ad Hoc Group of Non-PTL Lenders provide any examples of credit agreements in the syndicated loan market where the parties intended not to adopt industry custom and usage despite using standard industry terminology—frankly, that concept makes no sense.

## CONCLUSION

72.   For the reasons set forth above and in the Lenders Plaintiffs' opening brief, as well as in the Company's briefs in support of their motion for summary judgment, the Lender Plaintiffs respectfully request that the Court enter judgment declaring that (1) the 2020 Transaction was permitted under the Non-PTL Term Loan Agreement and (2) the Company and the PTL Lenders did not violate the covenant of good faith and fair dealing by entering into the 2020 Transaction, and dismissing Defendants' and Third-Party Plaintiffs' mirror-image claims and counterclaims.

Dated:  March 24, 2023
        Houston, Texas

/s/ Gregg Costa

GIBSON, DUNN & CRUTCHER LLP
Gregg Costa (24028160)
811 Main Street, Suite 3000
Houston, TX 77002
Telephone: (346) 718-6600
Facsimile: (346) 718-6620
gcosta@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Scott Greenberg (admitted *pro hac vice*)
Orin Snyder (admitted *pro hac vice*)
C. Lee Wilson (admitted *pro hac vice*)
Akiva Shapiro (*pro hac vice* pending)
Amanda M. Aycock (admitted *pro hac vice*)
Alexandra Perloff-Giles (*pro hac vice* pending)
200 Park Avenue
New York, NY 10166
Tel:    (212) 351-4000
Fax:    (212) 351-4035
Email: sgreenberg@gibsondunn.com
        osnyder@gibsondunn.com
        clwilson@gibsondunn.com
        ashapiro@gibsondunn.com
        aaycock@gibsondunn.com
        aperloff-giles@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Helgi C. Walker (*pro hac vice* pending)
1050 Connecticut Avenue N.W.
Washington, DC 20036
Tel:    (202) 955-8500
Fax:    (202) 467-0539
Email: hwalker@gibsondunn.com

*Counsel for Plaintiffs Invesco Senior Secured Management, Inc., Boston Management and Research, Credit Suisse Asset Management, LLC, Eaton Vance Management, and Barings, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.

<u>*/s/ Bruce Ruzinsky*</u>
Bruce Ruzinsky

# Exhibit A

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 48 of 113

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| Ocean Trails CLO VII; Boston Patriot Milk St LLC; 400 Capital Credit Opportunities Master Fund Ltd.; 400 Capital TX COF I LP; Harbor Point 2019-1 Ltd.; AIC COP Facility 2, LLC; AIC Investments (LHR), Ltd.; BlueMountain CLO 2014-2 Ltd.; BlueMountain CLO 2015-3 Ltd.; BlueMountain CLO 2015-4 Ltd.; BlueMountain CLO 2016-2 Ltd.; Blue-Mountain CLO 2016-3 Ltd.; BlueMountain CLO 2018-1 Ltd.; BlueMountain CLO 2018-2 Ltd.; BlueMountain CLO 2018-3 Ltd.; BlueMountain CLO XXII Ltd.; Blue-Mountain CLO XXIII Ltd., BlueMountain CLO XXIV Ltd.; BlueMountain CLO XXIX Ltd.; BlueMountain CLO XXV Ltd.; BlueMountain CLO XXVI Ltd.; Blue-Mountain CLO XXVIII Ltd.; BlueMountain CLO XXX Ltd.; BlueMountain CLO XXXI Ltd.; BlueMountain CLO XXXII Ltd.; BlueMountain CLO XXXIII Ltd.; Blue-Mountain CLO XXXIV Ltd.; BlueMountain CLO XXXV Ltd.; BlueMountain CLO 2013-2 Ltd.; BlueMountain Fuji US CLO I Ltd.; BlueMountain Fuji US CLO II Ltd.; BlueMountain Fuji US CLO III Ltd.; ACM ASOF VIII Secondary-C LP; Halcyon Loan Advisors Funding 2015-1 Ltd.; Halcyon Loan Advisors Funding 2015-2 Ltd.; Halcyon Loan Advisors Funding 2015-3 Ltd.; SEI Institutional Investments Trust - High Yield Bond Fund; SEI Institutional Managed Trust - High Yield Bond Fund; U.S. High Yield Bond Fund; DoubleLine Income | Index No. _____  **COMPLAINT** |

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 49 of 113

Solutions Fund; DoubleLine Opportunistic Credit Fund; Ellington CLO I, Ltd., Ellington CLO II, Ltd.; Ellington CLO III, Ltd.; Ellington CLO IV, Ltd.; Blair Funding LLC; Mariner Atlantic Multi-Strategy Master Fund, Ltd.; Venture 18 CLO Ltd.; Venture 19 CLO Ltd.; Venture 22 CLO Ltd.; Venture 24 CLO Ltd.; Venture 27 CLO Ltd.; Venture 28A CLO Ltd.; Venture 29 CLO Ltd.; Venture 30 CLO Ltd.; Venture 31 CLO Ltd.; Venture 34 CLO Ltd.; Venture 36 CLO Ltd.; Venture 37 CLO Ltd.; Venture 38 CLO Ltd.; Venture 41 CLO Ltd.; Nassau 2018-I Ltd.; Nassau 2018-II Ltd.; Nassau 2019-I Ltd.; Palmer Square BDC Funding I LLC; Palmer Square CLO 2014-1, Ltd.; Palmer Square CLO 2015-1, Ltd.; Palmer Square CLO 2015-2, Ltd.; Palmer Square CLO 2018-1, Ltd.; Palmer Square CLO 2018-2, Ltd.; Palmer Square CLO 2018-3, Ltd.; Palmer Square CLO 2019-1, Ltd.; Saranac CLO III Ltd.; Saranac CLO VI Ltd.; Saranac CLO VII Ltd.; Steele Creek CLO 2014-1R, Ltd.; Steele Creek CLO 2016-1 Ltd.; Steele Creek CLO 2017-1 Ltd.; Steele Creek CLO 2018-1 Ltd.; Steele Creek CLO 2018-2 Ltd.; Steele Creek CLO 2019-1 Ltd.; Steele Creek CLO 2019-2 Ltd.; Steele Creek Loan Funding I, LP; Wellfleet CLO 2016-1, Ltd.; Wellfleet CLO 2016-2, Ltd.; Wellfleet CLO 2017-1, Ltd.; Wellfleet CLO 2017-2, Ltd.; Wellfleet CLO 2017-3, Ltd.; Wellfleet CLO 2018-1, Ltd.; Wellfleet CLO 2018-2, Ltd.; Wellfleet CLO 2018-3, Ltd.; Wellfleet CLO 2019-1, Ltd.; Wellfleet CLO 2020-1, Ltd.; Wellfleet CLO 2020-2, Ltd.; Wellfleet CLO 2021-1, Ltd.; Wellfleet CLO X, Ltd.,

*Plaintiffs,*

2

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 50 of 113

v.

MLN TopCo Ltd.; Mitel Networks (International) Ltd. (f/k/a MLN UK HoldCo Ltd.); MLN US TopCo Inc.; MLN US HoldCo LLC; Searchlight Capital Partners, LP; Credit Suisse AG, Cayman Islands Branch; John Doe affiliate of Credit Suisse AG, Cayman Islands Branch; Anchorage Capital Group, LLC; John Doe funds 1–100 issued, sponsored, or managed by Anchorage Capital Group, LLC; Apollo Global Management Ltd.; John Doe funds issued, sponsored, or managed by Apollo Global Management Ltd.; Invesco Ltd.; John Doe funds 1–100 issued, sponsored, or managed by Invesco Ltd.; Nuveen Asset Management, LLC; John Doe funds 1–100 issued, sponsored, or managed by Nuveen Asset Management, LLC; Octagon Credit Investors, LLC; John Doe funds 1–100 issued, sponsored, or managed by Octagon Credit Investors, LLC; PGIM, Inc.; John Doe funds 1–100 issued, sponsored, or managed by PGIM, Inc.; Sound Point Capital Management, LP; John Doe funds 1–100 issued, sponsored, or managed by Sound Point Capital Management, LP; John Does 1–100,

*Defendants.*

Plaintiffs are collateralized loan obligations ("CLOs"), CLO portfolios, proprietary funds, and third-party funds issued, sponsored, or managed by Five Arrows Managers North America LLC, 400 Capital Management LLC, Angel Island Capital Management LLC, Assured Investment Management LLC, Blue Mountain Fuji

3

Management LLC, Atalaya Capital Management LP, Bardin Hill Loan Management LLC, Benefit Street Partners LLC, DoubleLine Capital LP, Ellington CLO Management LLC, FS Credit Opportunities Corp., Mariner Investment Group, LLC; MJX Asset Management LLC, MJX Venture Management II LLC, MJX Venture Management III LLC, NCC CLO Manager LLC, Palmer Square Capital Management LLC, Palmer Square BDC Advisor LLC, Saranac CLO Management, LLC, Steele Creek Investment Management LLC, Wellfleet Credit Partners, LLC, as listed in the annexed Schedule 1 (collectively, "Plaintiffs"). Defendants are MLN TopCo Ltd., Mitel Networks (International) Limited (f/k/a MLN UK HoldCo Limited), MLN US TopCo Inc., and MLN US HoldCo LLC (collectively, "Mitel"); Searchlight Capital Partners, LP ("Searchlight"); Credit Suisse AG, Cayman Islands Branch and John Doe affiliates of Credit Suisse AG, Cayman Islands Branch (together, "Credit Suisse"); Anchorage Capital Group, LLC and John Doe CLOs, CLO portfolios, proprietary funds, and third-party funds issued, sponsored, or managed by Anchorage Capital Group, LLC (collectively, "Anchorage"); Apollo Global Management Ltd. and John Doe CLOs, CLO portfolios, proprietary funds, and third-party funds issued, sponsored, or managed by Apollo Global Management Ltd. (collectively, "Apollo"); Invesco Ltd. and John Doe CLOs, CLO portfolios, proprietary funds, and third-party funds issued, sponsored, or managed by Invesco Ltd. (collectively, "Invesco"); Nuveen Asset Management, LLC and John Doe CLOs, CLO portfolios, proprietary funds, and third-party funds issued, sponsored, or managed by Nuveen Asset Management, LLC (collectively, "Nuveen"); Octagon Credit Investors, LLC and John Doe CLOs, CLO portfolios, proprietary

funds, and third-party funds issued, sponsored, or managed by Octagon Credit Inves-

tors, LLC (collectively "Octagon"); PGIM, Inc. and John Doe CLOs, CLO portfolios,

proprietary funds, and third-party funds issued, sponsored, or managed by PGIM,

Inc. (collectively, "PGIM"); Sound Point Capital Management, LP and John Doe

CLOs, CLO portfolios, proprietary funds, and third-party funds issued, sponsored, or

managed by Sound Point Capital Management, LP (collectively, "Sound Point"); and

other unidentified participating lenders John Does 1–100 (collectively, "Defend-

ants").[1] Plaintiffs, through their  attorneys Selendy Gay Elsberg PLLC, allege as fol-

lows:

## **NATURE OF ACTION**

1.    Mitel, Searchlight, and Credit Suisse, together with funds or CLOs man-

aged by Anchorage, Apollo, Invesco, Octagon, Nuveen, PGIM, Sound Point, and John

Does 1–100 (collectively, the "Defendant Lenders" and together with Mitel, Search-

light, and Credit Suisse, the "Defendants"), breached the clear terms of their lending

agreements and the New York Uniform Voidable Transfer Act by purporting to

amend those agreements, exchange Defendant Lenders loans at a premium above

market value, and subordinate Plaintiffs' loans behind hundreds of millions of dollars

---

[1] The funds issued, sponsored, or managed by the affiliates of PGIM, Invesco, Apollo, Anchorage, Sound Point, Octagon, and Nuveen (including CLOs, CLO portfolios, proprietary funds, and third-party) are parties to the subject contracts and therefore proper defendants. Due to the secrecy of the transaction at dispute and Defendants refusal to disclose the identities of participating lenders, Plaintiffs are unable to identify these funds at the time of filing, despite multiple requests to Defendants and/or their agents. Plaintiffs are serving herewith discovery requests aimed at identifying the participating lenders and the complete terms of the Scheme.

5

in new loans issued to Defendant Lenders to hinder Plaintiffs' recovery in any future insolvency. This Court should declare the amendments void, rule the transaction invalid, and award damages, costs, and attorneys' fees for breach of contract, tortious interference, and voidable transactions.

2.      In 2018, Searchlight, a private equity firm, bought Mitel, a communications company, in a leveraged buyout. As often happens in such buyouts, Searchlight financed its acquisition by having Mitel take out leveraged loans in two tranches secured by Mitel's assets—a first-lien term loan of $1.02 billion (the "<u>First Lien Debt</u>") and a second-lien term loan of $360 million (the "<u>Second Lien Debt</u>") (together, the "<u>Leveraged Loans</u>"). Mitel took out these loans from Credit Suisse (a bank that also served as the Administrative Agent), and other "arranger" banks, which then promptly sold ("syndicated") the loans to multiple investors who became lenders to Mitel ("<u>Lenders</u>").

3.      Around the same time, Mitel took out a $90 million revolving credit line (a credit line that remains available over time even if the borrower pays the full balance) from a group of lenders that, upon information and belief, included Credit Suisse ("<u>Original Revolver</u>"). The Original Revolver ranked *pari passu* ("with equal step") with the First Lien Debt for repayment.

4.      The Leveraged Loans were governed by a First Lien Credit Agreement (the "<u>Original First Lien Agreement</u>") and Second Lien Credit Agreement (the "<u>Original Second Lien Agreement</u>" and, together with the Original First Lien Agreement, the "<u>Original Agreements</u>"), which provide that the lenders would share *pro rata* in

each of the loans' benefits and losses. These contracts limited Mitel's ability to issue new debt or incur new liens, prohibited it from placing new permitted debt in each tranche ahead of the existing loans, and prevented it from amending these key protections unless all lenders affected by the amendments consented. The Leveraged Loans were also subject to an intercreditor agreement which provided that the First Lien Debt and Original Revolver had priority: In a default, Mitel had to pay the First Lien Lenders and holders of the Original Revolver in full before it paid the Second Lien Lenders anything.

5.      In November 2021, Searchlight directed Mitel to enter into a strategic partnership with RingCentral, Inc. ("RingCentral"), a provider of cloud-based unified communications, that would allow Mitel to fund another acquisition and pay down its debt ahead of schedule. As part of this transaction, Mitel sold some of its intellectual property to RingCentral for $650 million: $300 million in cash, $300 million in RingCentral stock, and $50 million in earnout payments. As part of the deal, a Searchlight investor group invested $200 million in equity in RingCentral.

6.      At the same time, Mitel and RingCentral also entered a long-term partnership for Mitel to migrate its cloud-based customers to RingCentral in exchange for "Migration Payments." Mitel would no longer invest in its own cloud-based unified communication services, focusing instead on its on-site customers.

7.      Mitel intended to use the proceeds from the RingCentral partnership in at least two ways. First, it planned to acquire French unified communications provider Unify. Second, as Mitel repeatedly explained, the proceeds would pay down its

debt. For example, in its third quarter 2021 presentation, Mitel announced that it expected "approximately $450 million of debt paydown from the Sale Consideration" (excluding Migration Payments), and to use a "substantial portion of the proceeds" from the Migration Payments "to pay down debt," starting in the second half of 2022. In its fourth quarter 2021 presentation, Mitel declared that it expected "the consideration from the sale of intellectual property to RingCentral, the associated earn-out consideration, ongoing migration payments from RingCentral[,] plus levered free cash flow through 2025 to *significantly exceed* the Company's total current indebtedness." As late as May 2022, Searchlight similarly told Lenders that the debt would be paid in full, ahead of schedule.

8.      But Searchlight's plan dramatically failed. Due to Searchlight and Mitel's inexplicable failure to hedge Mitel's exposure to RingCentral stock price fluctuations, Mitel was unable to keep its promise to use proceeds of the RingCentral transaction to reduce its debt. In 2022, RingCentral stock plummeted and, by October 2022, was down 80% year over year.

9.      Searchlight (which wanted to save face with its favored lenders) and Credit Suisse (which wanted its own piece of the Original Revolver to be paid down early as promised by Mitel) worked in secret and bad faith to devise a scheme to amend the credit agreements and gut Plaintiffs of their bargained-for lender protections, allowing Defendant Lenders to exchange their existing debt for new more senior debt.

10.     Searchlight could have financed this additional spending by investing more of its own money in Mitel. Or it could have raised the funds in ways that complied with the Original Agreements, including by offering all holders of First Lien Debt ("First Lien Lenders") and Second Lien Debt ("Second Lien Lenders") the chance to participate in a new round of financing. Instead, Searchlight, Mitel, and Credit Suisse decided to cheat one group of syndicated lenders to induce their favored group to lend more capital in exchange for a lucrative value transfer—all in breach of the First and Second Lien Credit Agreements.

11.     Searchlight and Credit Suisse's scheme (the "Scheme") worked as follows.

12.     *First*, Mitel and the hand-picked Defendant Lenders purported to amend the Original Agreements to authorize Mitel to issue new debt and subordinate some Lenders, without their consent, to others (the "Amended Agreements").

13.     *Second*, Mitel issued new "super senior" loans (the "Super Senior Debt"), purportedly senior to the existing First Lien and Second Lien Debt, secured by the same collateral securing the First Lien and Second Lien Debt. Even though these new loans were purportedly less risky than the old loans (being ahead in line for repayment), Mitel issued them at a higher interest rate suitable for more risky loans.

14.     *Third*, Mitel exchanged Defendant Lenders' old First Lien and Second Lien Debt for this new Super Senior Debt at a premium to the market price—a payoff to Defendant Lenders for agreeing to the purported amendments. Defendant Lenders

9

now held Super Senior Debt that ranked ahead of (and thus was more valuable than) the First Lien and Second Lien Debt held by excluded Lenders.

15.    *Fourth*, Mitel paid off the funds it had borrowed under the Original Revolver, which on information and belief was at least partially funded by Credit Suisse, that now ranked behind the new Super Senior Debt. It took out a new revolving credit line, called the Superpriority Revolving Credit Facility (the "Superpriority Revolver"), which on information and belief ranks *pari pass*u with the most senior new loans.

16.    As a result, Defendant Lenders got more money and less risk (from exchanging old loans for new, more senior loans with a higher interest rate at a premium price) and Credit Suisse got paid in full on the Original Revolver (which otherwise would have been far back in line for repayment).

17.    Excluded Lenders, including Plaintiffs, were gutted. The remaining First Lien Lenders, who had been *first* in line to be repaid, now sat behind $857 million of new debt. The remaining Second Lien Lenders now sat behind $1.186 billion in total debt, an increase of $254 million. They were suddenly first and second liens in name only. The market value of their loans tanked.

18.    Defendants' Scheme was brazen. Defendants breached their obligations and lacerated Plaintiffs' rights because they thought they could get away with it. Searchlight and Mitel botched their deal with RingCentral and disappointed the expectations of their lenders who had been promised an early pay-down of their loans. As an equity sponsor, Searchlight is a repeat player in the leveraged loan market and could not afford to lose the confidence of certain favored lenders who it looked to, and

would look to in the future, to consummate transactions, including by having them finance its leveraged buyouts. On information and belief, it was for this reason that Searchlight hand-picked the Mitel lenders with which it wanted to shore up relations. For its part, on information and belief, Credit Suisse's participation was led by an ambitious banker, Gianni Rusello, who had promised his colleagues an early recovery on the bank's participation in the Mitel revolver. On information and belief, Rusello urged Searchlight to execute the scheme and offered his assistance without disclosing the potential conflict of interest for Credit Suisse to his colleagues, in exchange for favorable treatment of the Original Revolver.

19.    In addition, Searchlight and Mitel intentionally excluded a large number of lenders, each with relatively small loans, in hopes that these lenders would be unable to challenge the transaction because of, among other things, the legal fees and difficulty of organizing to challenge a transaction cloaked in secrecy. Indeed, while it is customary in the industry for documentation relating to a leveraged loans to be posted to all lenders on a secure site by the borrower, Mitel and its agents refused for months to share documentation relating to the Scheme with the excluded lenders, despite the material impact the transaction has had on the value of their loans, only releasing redacted versions of some of the documents on March 1, 2023.

20.    Unfortunately for Defendants, their Scheme fails: Not only are the purported amendments invalid and the Amended Agreements void, but the Scheme violates even the Amended Agreements.

11

21.     Even if the amendments made by Mitel, Credit Suisse, and Defendant Lenders were permitted (they were not, as set forth below), their Scheme breached several provisions in the Amended Agreements. Section 2.18(c) of the Amended Agreements prevents any lenders from "receiving payment of a greater portion … than the proportion received by any other Lender entitled to receive the same proportion." Defendants breached this provision by exchanging Defendant Lenders' old loans for new super senior loans worth much more than their *pro rata* shares—giving Defendant Lenders a share "of a greater proportion" than the proportion received by Plaintiffs. The Scheme also breached Section 9.04(b) of the Amended Agreements, which restricts assigning debt to the Borrower, by purporting to assign the Defendant Lenders' debt to Mitel (the Borrower) without complying with Section 9.04(i). The Scheme also breached Section 2.21 of the Amended Agreement by issuing new debt that did not rank equal or junior to existing First Lien and Second Lien Debt and by refinancing with loans secured by liens senior to those securing existing loans.

22.     The purported amendments to the Original Agreements by Mitel and the Defendant Lenders are also invalid under the controlling terms of the contracts not subject to amendments without Plaintiffs' consent. Section 9.08(b) of those contracts—the so-called "sacred rights" provision—required the written consent of each lender "directly adversely affected" by an "agreement or agreements" that "decrease[s] or forgive[s] the principal amount of … any Loan" or "amend[s] the provisions of Sections 2.18(c) and 7.02 with respect to the pro rata application of payments required thereby in a manner that by its terms modifies the application of payments

12

required thereby to be on a less than pro rata basis." This meant that Plaintiffs had to consent in order for the Amended Agreements to comply with the Original Agreements: The Scheme was an agreement that directly adversely affected Plaintiffs by decreasing the value of their loans; it decreased the principal amount of Defendant Lenders' First Lien and Second Lien Debt to zero; and it amended Section 7.02 by adopting and incorporating by reference a new intercreditor agreement with a payment waterfall that put Defendant Lenders (including both First Lien and Second Lien Lenders) ahead of all other term lenders. Because Excluded Lenders did not consent, the Amended Agreements are void.

23.     With the Amended Agreements invalid, the Original Agreements govern. The Scheme violates those contracts in at least five ways: (a) it violates Section 2.18(c) for the same reason as under the Amended Agreements; (b) it violates Section 6.01 by purporting to issue new super priority debt outside of specific, allowed categories; (c) it violates Section 6.02 by incurring new liens that were not "Permitted Liens"; (d) it violates Section 9.04(b) by assigning debt to Mitel, the Borrower; (e) it violates Section 2.21 by issuing new debt that did not rank equal or junior to existing First and Second Lien Debt; and (e) it violates Section 2.21 by refinancing with loans secured by liens senior to those securing existing loans.

24.     Even if the Scheme did not breach the Original Agreement's sacred rights (it does), it would breach the implied covenant of good faith and fair dealing. It has been the understanding and practice of the leveraged loan market for decades that lenders within a class of loans share *pro rata* in the proceeds of those loans unless

they agree otherwise. This *pro rata* sharing principle ensures that all loans in a class are worth the same, allowing easy buying and selling in the secondary market. By effectively declaring that some loans in a class are suddenly worth less—much less—than others, Defendants violated this longstanding principle and deprived Plaintiffs the clear fruits of the Original Agreements. Even worse, Defendants cooked up their Scheme in secret, deliberately favoring one group of similarly situated lenders over another, depriving the latter of the very benefit of their bargain when it could have raised money in contractually valid and more economical ways.

25. The inevitable result of this flagrant disregard of lender rights will be to threaten the entire leveraged loan market. No rational lender would purchase first lien debt, at a price reflecting its first lien priority, if that priority can be changed at any moment and without warning. To compensate for this added risk, lenders will rightly demand higher interest rates—increasing borrowing costs for companies and depriving the economy of needed investment.

26. Plaintiffs ask this Court to declare the Amended Agreements void, find that Mitel, Credit Suisse, and the Defendant Lenders breached the Original or Amended Agreements, avoid the debt and liens purportedly incurred as part of the Scheme, and either require Mitel and Defendant Lenders to specifically perform under those contracts or pay money damages.

## THE PARTIES

### A.    Plaintiffs

27. Plaintiff Ocean Trails CLO VII ( "Five Arrows Lender") is a Cayman Islands investment fund that holds First Lien Debt, held such debt at the time of the

Scheme, and is an assignee of and successor in interest to parties to the Original Agreements or, if valid, the Amended Agreements. It is a CLO[2] or CLO portfolio issued, sponsored, or managed by Five Arrows Managers North America LLC, a Delaware limited liability company with its principal place of business in California.

28.     Plaintiff 400 Capital Credit Opportunities Master Fund Ltd. is a Cayman Islands limited private corporation. Plaintiff Boston Patriot Milk St LLC is a Massachusetts limited liability corporation. Plaintiff 400 Capital TX COF I LP is a Delaware limited partnership. These entities (collectively, the "400 Capital Lenders") hold First Lien and Second Lien Debt, held such debt at the time of the Scheme, and are assignees of and successors in interest to parties to the Original Agreements or, if valid, the Amended Agreements. They are sponsored or managed by 400 Capital Management LLC, a Delaware limited liability company with its principal place of business in New York.

29.     Plaintiff Harbor Point 2019-1 Ltd. is a Cayman Islands limited corporation. Plaintiff AIC COP Facility 2, LLC is a Delaware limited liability corporation. Plaintiff AIC Investments (LHR), Ltd. is a Cayman Islands limited private corporation. These entities (collectively, the "Angel Island Lenders") hold First Lien and Second Lien Debt, held such debt at the time of the Scheme, and are assignees of and successors in interest to parties to the Original Agreements or, if valid, the Amended Agreements. They are holding companies, proprietary funds or third-party funds

---

[2] Collateralized loan obligations (CLOs) are a structured financial product where payments from multiple middle-sized and large corporate loans are pooled together or "securitized" and sold to different classes of owners in various tranches.

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 63 of 113

sponsored or managed by Angel Island Capital Management LLC, a Delaware limited liability company with its principal place of business in California.

30.     Plaintiffs BlueMountain CLO 2014-2 Ltd., BlueMountain CLO 2015-3 Ltd., BlueMountain CLO 2015-4 Ltd., BlueMountain CLO 2016-2 Ltd., Blue-Mountain CLO 2016-3 Ltd., BlueMountain CLO 2018-1 Ltd., BlueMountain CLO 2018-2 Ltd., BlueMountain CLO 2018-3 Ltd., BlueMountain CLO XXII Ltd., Blue-Mountain CLO XXIII Ltd., BlueMountain CLO XXIV Ltd., BlueMountain CLO XXIX Ltd., BlueMountain CLO XXV Ltd., BlueMountain CLO XXVI Ltd., BlueMountain CLO XXVIII Ltd., BlueMountain CLO XXX Ltd., BlueMountain CLO XXXI Ltd., BlueMountain CLO XXXII Ltd., BlueMountain CLO XXXIII Ltd., BlueMountain CLO XXXIV Ltd., and BlueMountain CLO XXXV Ltd., are Cayman Islands private limited companies. These entities (collectively, the "AIM Lenders") hold First Lien and Second Lien Debt, held such Debt at the time of the Scheme, and are assignees of and successors in interest to parties to the Original Agreements or, if valid, the Amended Agreements.  They are CLOs or CLO portfolios issued, sponsored, or managed by Assured Investment Management LLC, a New York limited liability company with its principal place of business in New York.

31.     Plaintiffs BlueMountain CLO 2013-2 Ltd., BlueMountain Fuji US CLO I Ltd., BlueMountain Fuji US CLO II Ltd. and BlueMountain Fuji US CLO III Ltd. are Cayman Islands private limited companies. These entities (collectively, the "Fuji Lenders" and together with the AIM Lenders, the "Assured Lenders") hold First Lien and Second Lien Debt, held such Debt at the time of the Scheme, and are assignees

16

of and successors in interest to parties to the Original Agreements or, if valid, the Amended Agreements. They are CLOs or CLO portfolios issued, sponsored, or managed by BlueMountain Fuji Management LLC, a Delaware limited liability company with its principal place of business in New York.

32. Plaintiff ACM ASOF VIII Secondary-C LP (the "Atalaya Lender") is a Cayman Islands limited partnership that holds hold First Lien Debt and is an assignee of and successor in interest to parties to the Original Agreements or, if valid, the Amended Agreements. It is a holding company sponsored or managed by Atalaya Capital Management LP, a Delaware limited partnership with its principal place of business in New York.

33. Plaintiffs Halcyon Loan Advisors Funding 2015-1 Ltd., Halcyon Loan Advisors Funding 2015-2 Ltd., and Halcyon Loan Advisors Funding 2015-3 Ltd. are Cayman Islands private limited companies. These entities (collectively, the "Bardin Hill Lenders") hold First Lien Debt, held such debt at the time of the Scheme, and are assignees of and successors in interest to parties to the Original Agreements or, if valid, the Amended Agreements. They are holding companies sponsored or managed by Bardin Hill Loan Management LLC, a Delaware limited liability company with its principal place of business in New York.

34. Plaintiffs SEI Institutional Investments Trust - High Yield Bond Fund and SEI Institutional Managed Trust - High Yield Bond Fund are Pennsylvania trust funds. Plaintiff U.S. High Yield Bond Fund is a Canadian investment fund registered in Ontario. These entities (collectively, the "Benefit Street Lenders") hold First Lien

17

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 65 of 113

Debt, held such debt at the time of the Scheme, and are assignees of and successors in interest to parties to the Original Agreements or, if valid, the Amended Agreements. They are proprietary funds or third-party funds sponsored or managed by Benefit Street Partners LLC, a Delaware limited liability company with its principal place of business in New York.

35.     Plaintiffs DoubleLine Opportunistic Credit Fund and DoubleLine Income Solutions Fund are Massachusetts business trusts. These entities (collectively, the "DoubleLine Lenders") hold Second Lien Debt, held such debt at the time of the Scheme, and are assignees of and successors in interest to parties to the Original Agreements or, if valid, the Amended Agreements. They are sponsored or managed by DoubleLine Capital LP, a Delaware limited partnership with its principal place of business in Florida.

36.     Plaintiffs Ellington CLO I, Ltd., Ellington CLO II, Ltd., Ellington CLO III, Ltd., and Ellington CLO IV, Ltd. are Cayman Island limited private companies. These entities (collectively, the "Ellington Lenders") hold First Lien Debt, held such debt at the time of the Scheme, and are assignees of and successors in interest to parties to the Original Agreements or, if valid, the Amended Agreements. They are CLOs or CLO portfolios issued, sponsored, or managed by Ellington CLO Management LLC, a Delaware limited liability company with its principal place of business in Connecticut.

37.     Plaintiff Blair Funding LLC (the "FSCO Lender") is a Delaware limited liability company that holds First Lien and Second Lien Debt, held such debt at the

18

Case 23-09001 Document 114 Filed in TXSB on 03/24/23 Page 66 of 113

time of the Scheme, and is an assignee of and successor in interest to parties to the Original Agreements or, if valid, the Amended Agreements. It is a holding company sponsored or managed by FS Credit Opportunities Corp., a Maryland corporation with its principal place of business in New York.

38. Plaintiff Mariner Atlantic Multi-Strategy Master Fund, Ltd. (the "Mariner Lender") is a Cayman Islands limited liability corporation that holds Second Lien Debt, held such debt at the time of the Scheme, and is an assignee of and successor in interest to parties to the Original Agreements or, if valid, the Amended Agreements. It is a holding company sponsored or managed by Mariner Investment Group, LLC, a Delaware limited partnership with its principal place of business in New York.

39. Plaintiffs Venture 18 CLO Ltd., Venture 19 CLO Ltd., Venture 22 CLO Ltd., Venture 24 CLO Ltd., Venture 27 CLO Ltd., Venture 28A CLO Ltd., Venture 29 CLO Ltd., Venture 30 CLO Ltd., Venture 31 CLO Ltd., Venture 34 CLO Ltd., Venture 36 CLO Ltd., Venture 37 CLO Ltd., Venture 38 CLO Ltd., Venture 41 CLO Ltd. are Cayman Islands limited private companies. These entities (collectively, the "MJX Lenders") hold First Lien Debt, held such debt at the time of the Scheme, and are assignees of and successors in interest to parties to the Original Agreements or, if valid, the Amended Agreements. They are CLOs or CLO portfolios issued, sponsored, or managed by MJX Asset Management LLC, MJX Venture Management II LLC, and MJX Venture Management III LLC, all Delaware limited liability companies with their principal place of business in New York.

19

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 67 of 113

40.     Plaintiffs Nassau 2018-I Ltd., Nassau 2018-II Ltd., and Nassau 2019-I Ltd. are Cayman Islands private limited companies. These entities (collectively, the "Nassau Lenders") hold First Lien Debt, held such debt at the time of the Scheme, and are assignees of and successors in interest to parties to the Original Agreements or, if valid, the Amended Agreements. They are holding companies sponsored or managed by NCC CLO Manager LLC, a Delaware limited liability company with its principal place of business in Connecticut.

41.     Plaintiffs Palmer Square CLO 2014-1, Ltd., Palmer Square CLO 2015-1, Ltd., Palmer Square CLO 2015-2, Ltd., Palmer Square CLO 2018-1, Ltd., Palmer Square CLO 2018-2, Ltd., Palmer Square CLO 2018-3, Ltd., and Palmer Square CLO 2019-1, Ltd. are Cayman Islands private limited companies. Plaintiff Palmer Square BDC Funding I LLC is a Delaware limited liability corporation. These entities (collectively, the "Palmer Square Lenders") hold First Lien Debt, held such debt at the time of the Scheme, and are assignees of and successors in interest to parties to the Original Agreements or, if valid, the Amended Agreements. They are holding companies, CLOs, or CLO portfolios issued, sponsored, or managed by Palmer Square Capital Management LLC and Palmer Square BDC Advisor LLC, each Delaware limited liability companies with their principal places of business in Kansas.

42.     Plaintiffs Saranac CLO III Ltd., Saranac CLO VI Ltd., and Saranac CLO VII Ltd. are Jersey limited private companies. These entities (collectively, the "Saranac Lenders") hold First Lien Debt, held such debt at the time of the Scheme, and are assignees of and successors in interest to parties to the Original Agreements or, if

Case 23-09001 Document 114 Filed in TXSB on 03/24/23 Page 68 of 113

valid, the Amended Agreements. They are CLOs, or CLO portfolios issued, sponsored, or managed by Saranac CLO Management, LLC, a Delaware limited liability company with its principal place of business in New York.

43. Plaintiffs Steele Creek CLO 2014-1R, Ltd., Steele Creek CLO 2016-1 Ltd., Steele Creek CLO 2017-1 Ltd., Steele Creek CLO 2018-1 Ltd., Steele Creek CLO 2018-2 Ltd., Steele Creek CLO 2019-1 Ltd., and Steele Creek CLO 2019-2 Ltd. are Cayman Islands private limited companies. Plaintiff Steele Creek Loan Funding I, LP is a Delaware limited partnership. These entities (collectively, the "Steele Creek Lenders") hold First Lien Debt, held such debt at the time of the Scheme, and are assignees of and successors in interest to parties the Original Agreements or, if valid, the Amended Agreements. They are proprietary funds, third-party funds, CLOs or CLO portfolios issued, sponsored, or managed by Steele Creek Investment Management LLC, a Delaware limited liability company with its principal place of business in North Carolina.

44. Plaintiffs Wellfleet CLO 2016-1, Ltd., Wellfleet CLO 2016-2, Ltd., Wellfleet CLO 2017-1, Ltd., Wellfleet CLO 2017-2, Ltd., Wellfleet CLO 2017-3, Ltd., Wellfleet CLO 2018-1, Ltd., Wellfleet CLO 2018-2, Ltd., Wellfleet CLO 2018-3, Ltd., Wellfleet CLO 2019-1, Ltd., Wellfleet CLO 2020-1, Ltd., Wellfleet CLO 2020-2, Ltd., Wellfleet CLO 2021-1, Ltd., Wellfleet CLO X, Ltd. are Cayman Islands limited private companies. These entities (collectively, the "Wellfleet Lenders") hold First Lien Debt, held such debt at the time of the Scheme, and are assignees of and successors in interest to parties to the Original Agreements or, if valid, the Amended Agreements.

21

They are CLOs or CLO portfolios issued, sponsored, or managed by Wellfleet Credit Partners, LLC, a Delaware limited liability company with its principal place of business in Connecticut.

### B.    Defendants

45.    Defendant MLN TopCo Ltd. is limited liability company incorporated under the laws of the Cayman Islands. Defendant Mitel Networks (International) Limited (f/k/a MLN UK HoldCo Limited) is a private limited liability company formed under the laws of England and Wales and wholly and directly owns Mitel Networks Corporation, a leading telecommunications company incorporated under the laws of Canada, as its subsidiary. Defendant MLN US TopCo Inc. is a Delaware corporation and direct subsidiary of Mitel Networks Corporation. Defendant MLN US HoldCo LLC is a Delaware limited liability company. Each Mitel Defendant entered into the Original Agreements with Plaintiffs.

46.    Defendant Searchlight Capital Partners, LP is a Delaware limited partnership with its principal place of business in New York. Searchlight is a private equity management company that purchased and managed Mitel on behalf of one or more Searchlight-sponsored private equity funds. Searchlight is the controlling owner of Mitel and served as a Sponsor of the Original Agreements and the Amended Agreements, although is not a party to those agreements.

47.    Defendant Credit Suisse AG, Cayman Islands Branch is a branch of Credit Suisse AG, a joint stock company organized under the laws of Switzerland with its principal place of business in Zurich, Switzerland. Credit Suisse AG, Cayman Islands Branch is the administrative agent and collateral agent of the Original

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 70 of 113

Agreements and the Amended Agreements. On information and belief, Defendant John Doe is an affiliate of Credit Suisse AG, Cayman Islands Branch and is a party to the Original Revolver Agreement.

48.     Defendant Anchorage Capital Group, LLC is a Delaware limited liability company with its principal place of business in New York. On information and belief, Anchorage or John Doe funds managed by Anchorage are a party or parties to the Original Agreements or, if valid, the Amended Agreements.

49.     Defendant Apollo Global Management Ltd. is a Delaware limited liability company with its principal place of business in New York. On information and belief, Apollo or John Doe funds managed by Apollo are a party or parties to Original Agreements or, if valid, the Amended Agreements.

50.     Defendant Invesco Ltd. is a Bermuda limited liability company with its principal place of business in Georgia. On information and belief, Invesco or John Doe funds managed by Invesco are a party or parties to Original Agreements or, if valid, the Amended Agreements.

51.     Defendant Nuveen Asset Management, LLC is a Delaware limited liability company with its principal place of business in Illinois. On information and belief, Nuveen or John Doe funds managed by Nuveen are a party or parties to the Original Agreements or, if valid, the Amended Agreements.

52.     Defendant Octagon Credit Investors, LLC is a Delaware limited liability company with its principal place of business in New York. On information and belief,

23

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 71 of 113

Octagon or John Doe funds managed by Octagon are a party or parties to the Original Agreements or, if valid, the Amended Agreements.

53.     Defendant PGIM, Inc. is a New Jersey corporation with its principal place of business in New Jersey. On information and belief, PGIM or John Doe funds managed by PGIM are a party or parties to the Original Agreements or, if valid, the Amended Agreements.

54.     Defendant Sound Point Capital Management, LP is a Delaware limited partnership with its principal place of business in New York. On information and belief, Sound Point or John Doe funds managed by Sound Point are a party or parties to the Original Agreements or, if valid, the Amended Agreements.

55.     On information and belief, Defendants John Does 1–100 are parties to the Original Agreements and agreed to participate in the Scheme by executing the Amended Agreements, but whose identify is unknown to Plaintiffs due to the secrecy of the transaction.

## JURISDICTION

56.     This Court has jurisdiction over Defendants pursuant to CPLR 301 because Defendants regularly do business in the State of New York, and pursuant to CPLR 302 because Defendants transact business in the State of New York.

57.     This Court also has jurisdiction over Mitel, Credit Suisse, Searchlight, and Defendant Lenders pursuant to Section 9.15(a) of the Original and Amended Agreements, and Section 8.7 of the First Lien/Second Lien Intercreditor Agreement, under which they irrevocably and unconditionally submitted to the jurisdiction of this

Court for any action related to the Original and Amended Agreements and the Inter-creditor Agreement or the related transactions.

58.     This Court also has jurisdiction over Searchlight and Credit Suisse pursuant to CPLR 302 because it committed a tortious act in the State of New York and/or committed a tortious act causing injury to person or property in the State of New York.

## VENUE

59.     Venue properly lies in New York County pursuant to Section 9.15(b) of the Amended and Original Agreements, under which Mitel, Credit Suisse, Defendant Lenders, and Plaintiffs, or their predecessors in interest, consented to venue in New York County.

60.     Venue properly lies in New York County pursuant to CPLR 503 because a substantial part of the events or omissions giving rise to the claims occurred in New York County.

## FACTUAL ALLEGATIONS

## I.     Leveraged Buyouts and Syndicated Loans

61.     Private equity allows private companies to raise capital and allows investors to invest in private companies. Typically, a private equity firm creates a private equity fund that raises money from investors through a limited partnership. That fund buys either an existing private company or a public company that it takes private. Once acquired, the target company is known as "portfolio company." The firm manages the portfolio company and then sells it or takes it public, ideally making a

25

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 73 of 113

profit for its investors. Along the way the private equity firm or equity sponsor receives management fees and a share of the profits.

62.     Private equity firms often acquire their portfolio companies through leveraged buyouts ("LBOs"). In an LBO, a private equity firm buys a target company. It pays for a small portion of the acquisition cost (usually 10%) with its own assets and causes the portfolio company to borrow money to finance the rest (usually 90%), using the target's assets as collateral and servicing the debt with the cash flow from the target's business operations.

63.     If the private equity firm makes the portfolio company more profitable, it can pay down the debt and sell it or take it public. The proceeds of any sale or initial public offering go to the firm for distribution to its investors—this is the firm's return on its investment. In this way, the firm can "leverage" its 10% investment to control, and realize a substantial return on the value of, the entire portfolio company.

64.     Debts issued by target companies in LBOs are often called "leveraged loans" or "syndicated loans." They are riskier than traditional commercial loans because they are usually made to borrowers with lower credit ratings. Typically, no single lender would loan hundreds of millions of dollars to a below-investment-grade company. Private equity firms and their portfolio companies instead work with banks to structure, arrange, and sell ("syndicate") leveraged loan interests to multiple investors, spreading the risk.

65.     The fairness and orderly functioning of this lending market are crucial to providing capital to smaller companies.

26

66.    Indeed, there is an active secondary market for syndicated loans, currently estimated at $1.3 trillion. This market provides liquidity, allowing borrowers to trade their loans for cash. This liquidity encourages more investors to purchase syndicated loans, increasing the pool of funds available for investment in LBOs.

67.    Syndicated loans are often structured in multiple tranches, ranked by priority of payment and, when secured, access to collateral. The loans are generally governed by three types of agreements: (a) credit agreements for each tranche of the syndicated loan; (b) a security agreement, which defines the collateral; and (c) an intercreditor agreement, which, among other things, defines the priority of payments among the tranches.

68.    Credit agreements generally include provisions that protect lender rights, including (a) *pro rata* sharing, which ensures that payments of interest and principal and any proceeds from a sale of collateral are distributed ratably; (b) negative covenants, which restrict the borrower's ability to incur new debt and issue new liens; and (c) affirmative covenants, which, for example, require the debtor to include all lenders in any restructuring offers.

69.    These protections are key to the loans' market value. As with all loans, the value of a syndicated loan is based primarily on the risk of repayment. At issuance, the debtor offers an interest rate that reflects the company's ability to pay the promised principal and interest and the lender's position in line to be paid (first lien, second lien, etc.). After issuance, lenders trade loans in the secondary market at prices that generally reflect the risk that the borrower will pay what it owes: The

27

higher the risk, the lower the price. If debtors could incur new debt or subordinate some lenders' existing debt at will, the likelihood that lenders would not be repaid in full would greatly increase and lenders would demand higher interest rates at the outset to compensate them for those ongoing risks. By preventing such conduct, lender protections reduce the interest rates that lenders require for syndicated loans, make those loans less expensive, and increase the market capital available for LBOs.

## II.  The Syndicated Loans and Defendants' Scheme

### A.  Searchlight Buys Mitel with Over $1.3 Billion in Leveraged Loans

70.   Mitel is a Canadian telecommunications company. It provides "unified communications," which combines every element of business communications—from phone systems to instant messaging to conferencing—in a single product. In 2018, Mitel offered two types of unified communications services: (a) on-site systems, generally run at the customer's own data center; and (b) cloud-based systems, maintained by Mitel on the cloud. At that time, Mitel had over $1.3 billion in revenue and was the number one global provider of cloud-based unified communications.

71.   On April 24, 2018, an investor group led by affiliates of the private equity firm Searchlight bought Mitel in an LBO for $2.035 billion. Searchlight financed this LBO through the Leveraged Loans. The Leveraged Loans were initially provided by Credit Suisse (who also served as the Lead Arranger and Administrative Agent), BMO Capital Markets Corp., and TD Securities Inc. as joint bookrunners, each of which then syndicated the loans to the Lenders.

28

72.     The Leveraged Loans consisted of $1.02 billion in First Lien Debt and $360 million in Second Lien Debt, which are both secured by the same collateral. Around the same time, Mitel took out a $90 million first-lien revolving credit facility—the Original Revolver. On information and belief, some of Mitel's debt under the Original Revolver was held by Credit Suisse. The First Lien Debt and Original Revolver had priority: In a default, Mitel had to pay the First Lien Lenders and holders of the Original Revolver in full before it paid the Second Lien Lenders anything.

73.     The Lenders' rights were defined in the Original Agreements, entered among Mitel, the issuing banks, and Credit Suisse as the Administrative Agent and Collateral Agent.

74.     With narrow exceptions inapplicable here, the Original Agreements guaranteed that no additional first lien or second lien debt could be incurred unless it was junior or *pari passu* with the existing tranche and that all Lenders within each class would share the risks and benefits of the Leveraged Loans proportionally. Section 2.18(c) prevented any lenders from "receiving payment of a greater portion … than the proportion received by any other Lender entitled to receive the same proportion." Section 7.02 provided that, following an event of default or acceleration of payments, any payments would be made ratably in accordance with the Intercreditor Agreement, which provided that First Lien lenders would be paid first, followed by Second Lien lenders.

75.     The Original Agreements also included dozens of pages of affirmative and negative covenants preventing Mitel from harming the First Lien and Second

29

Lien Lenders. The First Lien Credit Agreement included covenants that prohibited Mitel from repaying junior debt before the First Lien Debt and barred it from amending junior financing agreements to be materially adverse to the First Lien Lenders (Section 6.09(b)). The Original Agreements also, among other things, (a) restricted Mitel's use of proceeds and distribution of dividends (Section 6.06); (b) bound Mitel not to incur additional liabilities and indebtedness (Section 6.01); (c) bound Mitel not to modify its corporate documents, including the articles of incorporation, "in any manner materially adverse to the Lenders" (Section 6.09(a)); (d) restricted Mitel's ability to make payments on or modify other debt (Section 6.09(b)); and (e) limited its ability to make certain investments (Section 6.04). The Original Agreements also restricted Mitel's ability to assign loans to itself except under stringent circumstances, ensuring that debt assigned to the Borrower (Mitel) would be cancelled (Section 9.04(b)(ii)(D)).

76. The Original Agreements also prohibited Mitel from amending those contracts to favor some Lenders over others. Section 9.08(b) gave the Lenders sacred rights that barred Mitel from modifying key portions of the Original Agreements without the "the prior written consent of *each* Lender directly adversely affected thereby"—not just a simple majority. Section 9.08(b)(i) prohibited Mitel from entering agreements that "decreas[ed] or forg[ave] the principal amount of … any Loan … without the prior written consent of *each* Lender directly affected thereby." And Section 9.08(b)(iv) prohibited Mitel from entering agreements that amended either Section 2.18(c) (guaranteeing ratable payment or repayment) or Section 7.02

(guaranteeing ratable distribution of collateral proceeds after default) "with respect to the <u>pro rata</u> application of payments required thereby in a manner that by its terms modifie[d] the application of such payments required thereby to be on a less than pro rata basis, without the prior written consent of *each* Lender adversely affected thereby."

### B.   Mitel Enters a "Strategic Partnership" With RingCentral And Assures Lenders It Does Not Need More Liquidity

77.   On November 9, 2021, Mitel announced a strategic partnership with RingCentral, a provider of cloud-based unified communications. Mitel sold some of its intellectual property to RingCentral for $650 million: $300 million in cash, $300 million in RingCentral stock, and $50 million in earnout payments. As part of the deal, a Searchlight investor group invested an additional $200 million in equity in RingCentral.

78.   Mitel and RingCentral also entered a long-term partnership for Mitel to migrate its cloud-based customers to RingCentral in exchange for "Migration Payments." Mitel would no longer invest in its own cloud-based unified communication services, focusing instead on its on-site customers.

79.   Mitel exalted the deal as benefiting its Lenders. In its third quarter 2021 presentation, Mitel claimed that it expected "approximately $450 million of debt pay down from the Sale Consideration" (excluding Migration Payments), and to use a "substantial portion of the proceeds" from the Migration Payments "to pay down debt," starting in the second half of 2022. In its fourth quarter 2021 presentation, Mitel declared that it expected "the consideration from the sale of intellectual

31

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 79 of 113

property to RingCentral, the associated earn-out consideration, ongoing migration payments from RingCentral[,] plus levered free cash flow through 2025 to *significantly exceed* the Company's total current indebtedness." As late as May 2022, Searchlight similarly told Lenders that the debt would be paid in full, ahead of schedule.

80.     Inexplicably, Searchlight and Mitel chose not to hedge Mitel's $300 million position in RingCentral stock. This proved disastrous. RingCentral's share price plummeted from $269.40 at the time of the deal to $34.30 on October 18, 2022—wiping out more than 80% of the value that Mitel held in RingCentral stock in under a year.

81.     On August 22, 2022, as the RingCentral stock price continued to decline, Mitel gave notice that it had designated three subsidiaries as unrestricted subsidiaries under the Original Agreements. This signaled that Mitel might pursue a "dropdown" financing transaction to raise new money for the company within the limits established by the Original Agreements for new debt. In such a dropdown transaction, Mitel would transfer some assets to unrestricted subsidiaries, which would then issue new debt secured by those assets.

82.     In the face of the drop in RingCentral's stock price and the unrestricted subsidiaries notification, Mitel continued to reassure Plaintiff Lenders that it had no immediate liquidity needs. On August 29, 2022, Mitel told Lenders that the RingCentral partnership was "ramping"—with $24 million in migration revenue in the second quarter and "continued bookings growth" expected in the second half of 2022.

It claimed Non-GAAP revenue growth of 6% year-over-year and total liquidity of $75 million as of June 30, 2022. Mitel also said, unambiguously, that it had no immediate plan to use the unrestricted subsidiaries for financing.

83.     Nevertheless, some Plaintiff Lenders reached out directly to Mitel, as well as to Searchlight, Credit Suisse, and Searchlight's financial advisor PJT Partners, Inc., for more information about Mitel's finances and to provide offers to help in case additional financing was needed or wanted. Some received no response. Mitel or Searchlight reassured others that Mitel had no immediate financing needs but provided no further details. Some Plaintiff Lenders heard rumors of a potential transaction and reached out to Searchlight to offer to participate in providing Mitel with additional liquidity, but Searchlight refused.

84.     On September 7, 2022, Debtwire reported that a "large lender in Mitel" had retained Davis Polk & Wardwell LLP ("Davis Polk") as legal counsel.

### C.     In Secret, Defendants Execute an Uptiering Scheme to Enrich Their Favored Lenders at Plaintiffs' Expense

85.     Upon information and belief, Mitel had intended to use the RingCentral deal to finance an acquisition of Unify, a French unified communications provider. Mitel's plans were upended by its disastrous decision not to hedge its position in the RingCentral stock. When the price of RingCentral shares plummeted, Mitel could not rely on its RingCentral stock to fund its spending spree. The drop in RingCentral's stock price also upended Mitel's plans to pay down debt, including the Original Revolver (of which Credit Suisse held at least a piece). Lenders' expectations were disappointed.

33

86.     Mitel had non-breaching mechanisms under the Original Agreements to raise money for its acquisition of Unify, including offers from Plaintiff Lenders willing to participate in additional permitted financing or an equity investment by Searchlight. Instead, Mitel, Searchlight, and Credit Suisse cooked up a scheme to raise the funds from their favored Lenders on a sweetheart basis (benefitting Defendant Lenders) and pay down the Original Revolver (benefiting Credit Suisse)—at Plaintiff Lenders' expense.

87.     On October 20, 2022, Mitel blindsided Plaintiffs by announcing that it had executed the uptiering Scheme two days before.

88.     Searchlight and/or Credit Suisse hand-selected which Lenders would participate—including PGIM, Invesco, Apollo, Anchorage, Sound Point, Octagon, and Nuveen. (Defendants refuse to disclose who participated and have even withheld the signature pages of the Amended Agreements from Plaintiff Lenders.) Searchlight, founded by a former Apollo partner, hand-picked Apollo over Plaintiff Lenders with far larger holdings of First Lien and Second Lien Debt. Plaintiff Lenders were left out in the cold.

89.     The Scheme was a single integrated transaction that consisted of interlocking transaction executed in six steps with a number of related agreements.

90.     *First*, Mitel, Credit Suisse, and Defendant Lenders purported to amend the Original Agreements to gut most protections for the First Lien and Second Lien Lenders, including most restraints on Mitel's ability to create new liens.

34

91.     *Second*, now purportedly unrestrained, Mitel issued $156 million in "New Money Superpriority Debt," secured by the same collateral that secured the existing $1.144 billion in outstanding First Lien and Second Lien Debt. When consenting to the amendments, Defendant Lenders had already agreed that as part of the Scheme they would exit the stripped-down Original Agreements and enter new agreements that afford them the very lender protections they eliminated for Plaintiffs.

92.     *Third*, Mitel issued new Second Out Debt and new Third Out Debt, both also backed by the same collateral that secures the First Lien and Second Lien Debt.

93.     *Fourth*, Defendant Lenders exchanged $603 million of their existing First Lien Debt for $576 million in new Second Out Debt and $152 million of their existing Second Lien Debt for $125 million in new Third Out Debt. On information and belief, Mitel also offered Defendant Lenders the opportunity to participate in the New Money Superpriority Debt.

94.     *Fifth*, Mitel entered a new Omnibus Intercreditor Agreement that included a new payment waterfall. The New Money Superpriority Debt now purportedly ranked first, followed by the New Second Out Debt, then the New Third Out Debt. The existing First Lien and Second Lien Debt now purportedly ranked fourth and fifth, respectively.

95.     *Sixth*, on November 18, 2022, Mitel used the proceeds to fully repay and exchange the Original Revolver (of which, on information and belief, Credit Suisse held a part) for the new Superpriority Revolver. On information and belief, the New

35

Superpriority Revolver now ranks first for repayment, *pari passu* with the New Money Superpriority Debt.[3]

96.    The Scheme thus put excluded First Lien Lenders behind $857 million in new debt and excluded Second Lien Lenders behind an additional $254 million in new debt, in addition to any amount drawn down under the new Superpriority Revolver, all secured by the same collateral.



97.    The Scheme enriched Defendant Lenders. Mitel gave Defendant Lenders a sweetheart deal, swapping their debt at a dramatic premium compared to its trading value at the time. On information and belief, Defendant Lenders exchanged their First Lien Debt for the New Second Out Facility at approximately *95.5%* of its

---

[3] Defendants have not provided the agreement for the New Superpriority Revolver.

36

stated value (even though its trading value at the time was only *62.5%*), and their existing Second Lien Debt for the New Third Out Facility at approximately *82.2%* of its stated value (even though its trading value at the time was only *41.2%*). Defendant Lenders also received a significant interest premium—an increase of 220 basis points for the new Second Out Debt and an increase of 50 basis points for the new Third Out Debt. The Scheme also enriched holders of the Original Revolver, including Credit Suisse, who now rank ahead of the existing First Lien and Second Lien Debt.

98.     The Scheme lacerated Plaintiff Lenders. The interest rate of a loan, and the market value of a syndicated loan, are based on the likelihood that the borrower will pay it back. After the Scheme, First Lien and Second Lien Lenders are now effectively fourth and fifth lien lenders but being paid at interest rates suitable for loans first and second in line for repayment. The market understood: From October 20 to November 7, 2022, the trading value of the First Lien Debt plummeted from 62.5 cents to 35.2 cents on the dollar. As of March 13, 2023, the value of the First Lien Debt is only 29.4 cents on the dollar.

99.     Mitel did not need more liquidity to keep operating or avoid bankruptcy. To the contrary, a few months after implementing the Scheme, Mitel announced that it would acquire Unify for €77 million—with an upfront cash payment of €50 million *entirely from its balance sheet*.

100.     At the same time, Mitel restructured its partnership with RingCentral to provide "lower near-term migration revenues" but "higher long-term migration revenues." As a company with ample cash to spend, and no need of increased short-term

revenue, Mitel had plenty of liquidity. It chose to breach the credit agreements and subordinate Plaintiff Lenders for purely opportunistic reasons while cloaking their actions in secrecy in an effort to block a large group of smaller lenders, primarily CLO managers, from seeking redress.

## III. Defendants' Scheme Breached the Original and Amended Agreements

### A. Defendants Effectively Concede that the Scheme Violates the Original Agreements by Amending Key Provisions

101.   Defendants effectively conceded that the Original Agreements did not permit their Scheme when they gutted critical provisions of those contracts that stood in their way.

102.   In the Amended Agreements, Defendants purported to erase several lender protections altogether. For example, they purported to delete Section 6.01, in which Mitel covenanted not to incur new debt unless it complied with Section 2.21 (or fell into other specified baskets not relevant here). Section 2.21 in turn required that Mitel could incur new debt only if that debt ranked equal with or lower than existing debt in priority of payment and security. Defendants also purported to delete Section 6.02, in which Mitel covenanted not to incur new liens on its collateral (with limited, inapplicable exceptions). Defendants thus purportedly destroyed Plaintiffs' bargained-for right to priority repayment.

103.   The protections that Defendants purportedly eliminated include:

| Section | Original Agreements | Amended Agreements |
|---------|--------------------|--------------------|
| 6.01 | Restricted Mitel's ability to incur debt and issue equity. | DELETED |

| Section | Original Agreements | Amended Agreements |
|---------|---------------------|---------------------|
| 6.02 | Restricted Mitel's ability to incur new liens. | DELETED |
| 6.03 | Restricting Mitel's ability to enter into sale and lease-back transactions. | DELETED |
| 6.04 | Restricted Mitel's ability to make investments, loans, advances, and guarantees. | DELETED |
| 6.05 | Restricted Mitel's ability to merge or consolidate, or to sell all or any part of its assets | DELETED |
| 6.06 | Restricted Mitel's ability to pay dividends or other distribution payments with respect to equity interests or payments. | DELETED |
| 6.07 | Restricted Mitel's ability to sell, lease, or otherwise transfer property or assets to any of its affiliates. | DELETED |
| 6.09 | Restricted Mitel's ability to make payments on or modify other debt or modify its certificate of incorporation or other corporate documents in a manner materially adverse to lenders. | DELETED |

104.   Defendants knew the value of these affirmative and negative covenants: They made sure to include every covenant they stripped from the Original Agreements in the credit agreements for the New Money Superpriority Debt, Second Out Debt, and Third Out Debt.

105.   Defendant Lenders were richly rewarded for their participation in the Scheme. They traded their existing First Lien and Second Lien Debt for new Second Out and Third Out Debt and access to the New Money Superpriority Debt. They thus

39

received an above-market value for their old debt. Because, as part of the Scheme, Defendant Lenders ceased to be First Lien and Second Lien Lenders, they had no problem agreeing to destroy protections for the First Lien and Second Lien Lenders that they left behind. Defendant Lenders were specifically motivated to ensure that their loans had greater priority than Plaintiffs' loans given market conditions in the Fall of 2020, with interest rates rising, inflation at decades-high levels, and serious concerns about a potential recession. By purporting to jump Defendant Lenders ahead of Plaintiffs', Defendant intended to hinder Plaintiffs' recovery in the event that Mitel did face liquidity issues in the future.

### B.  The Amended Agreements Are Invalid and Unenforceable

106.    Unfortunately for Defendants, Defendant Lenders' consent was insufficient to validly amend the Original Agreements.

107.    Section 9.08(b) of the Original Agreements requires the written consent of each Lender "directly adversely affected" by an "agreement or agreements" that "decrease[s] or forgive[s] the principal amount of … any Loan" or "amend[s] the provisions of Sections 2.18(c) and 7.02 with respect to the <u>pro rata</u> application of payments required thereby in a manner that by its terms modifies the application of payments required thereby to be on a less than pro rata basis."

108.    The consent of the Excluded Lenders was required here.

109.    *First*, the interrelated Amendment Agreements that were part of the Scheme constituted an "agreement or agreements" that directly adversely affected Plaintiffs by reducing the value of their debt.

40

110.    *Second*, the Scheme "decrease[d] … the principal amount" of Defendant Lenders' loans to zero.

111.    *Third*, the Scheme amended Section 7.02 to make payments due to Plaintiffs less than *pro rata*. Section 7.02 established a waterfall for payments on the Loans, "[s]ubject to the terms of any applicable Intercreditor Agreement." The waterfall protected the First Lien and Second Lien Lenders' priority and secondary positions with respect to the collateral and ensured ratable distribution within each class. Defendants purported to adopt a new Omnibus Intercreditor Agreement that dropped Plaintiffs' debt below Defendant Lenders' Super Senior Debt.[4] Because Section 7.02 expressly incorporates the term "Intercreditor Agreement," entering a new Intercreditor Agreement purportedly amended Section 7.02 by changing the meaning of Intercreditor Agreement. This purported amendment made the payments due to Plaintiffs less than *pro rata* because Defendant Lenders, previously on *pari passu* terms with all Plaintiffs under the Original Agreements, would now receive payment in full before Plaintiffs received a penny.

112.    Plaintiffs' consent was thus required for the Amended Agreements to be effective. Because Plaintiffs did not consent, those Agreements are void.

---

[4] Section 2.1 of the Omnibus Intercreditor Agreement provides that the Super Senior Debt "shall have priority over and be and remain senior in all respects and prior to" the First Lien and Second Lien Debt.

41

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 89 of 113

### C.     Defendants' Scheme Breached the Original Agreements

113.     Because Defendants' ploy to amend the Original Agreements is invalid, the Original Agreements are still operative, and the Scheme breached those Agreements in multiple ways.

114.     <u>Breach of Section 2.18(c)</u>. Section 2.18(c) of the Original Agreements requires that any Lender who "obtain[s] payment in respect of any principal of, or interest on, any of its Term Loans" that is greater than its *pro rata* share "shall purchase (for cash at face value) participations in the Term Loans … of such other Lenders to the extent necessary so that the benefit of all such payments shall be shared by all such Lenders entitled thereto ratably."

115.     The Scheme provided Defendant Lenders value in respect of their Term Loans that was greater than their *pro rata* shares because Plaintiffs, who also held Term Loans, received no Super Senior Debt in the Scheme. Defendant Lenders were thus required to purchase participations in Plaintiffs' Term Loans to the extent necessary to ensure that the benefit of the Scheme was shared ratably. But Defendant Lenders did not purchase any participation in Plaintiffs' Term Loans. This breached Section 2.18(c).

116.     <u>Breach of Section 9.04(b)(ii)(D)</u>. Section 9.04(b)(ii)(D) of the Original Agreements provides that "the Assignee shall not be the Borrower … except in accordance with Section 9.04(i) or Section 9.21." Defendant Lenders purported to assign their First Lien and Second Lien Debt to Mitel, the Borrower. Defendants did not invoke the exception of Section 9.21. They attempted to invoke Section 9.04(i), but that exception does not apply. *See* ¶ 122. This breached Section 9.04(b)(ii)(D).

42

117. <u>Breach of Section 2.21</u>. Section 2.21(b)(ii) of the Original Agreements prohibits Mitel from incurring term loans with terms different from the First Lien and Second Lien Debt unless they "rank equally and ratably or, at the option of the Borrower, junior in right of security" to the existing Loans or are "unsecured." It further prohibits Mitel from refinancing any Loans under the Original Agreements if the refinancing debt is "secured by Liens that are senior to the Liens" securing the existing Loans. Section 2.21(j)(vi). Yet Mitel issued Super Priority Debt that is purportedly senior to the First Lien and Second Lien Debt and secured by Liens purportedly senior to the Liens securing the First Lien and Second Lien Debt. This breached Section 2.21(b)(ii) and (j)(vi).

118. <u>Breach of Section 6.01</u>. Section 6.01 of the Original Agreements prohibits Mitel from "[i]ncur[ring], creat[ing], assum[ing] or permit[ting] to exist any Indebtedness" except for specific enumerated categories of Indebtedness. Yet Mitel issued Super Priority Debt is Indebtedness that does not fall into any of the enumerated categories of permitted Indebtedness. This breached Section 6.01.

119. <u>Breach of Section 6.02</u>. Section 6.02 of the Original Agreements prohibits Mitel from "[c]reat[ing], incur[ring], assum[ing] or permit[ting] to exist any Lien on any property or assets" except for certain liens defined as "Permitted Liens." Yet Mitel purportedly secured Super Priority Debt with Liens that are not Permitted Liens. This breached Section 6.02.

**D.    Defendants' Scheme Breached the Amended Agreements**

120. Even if the Amended Agreements were valid (they are not), Defendants breached several provisions of those contracts.

43

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 91 of 113

121.   Defendant Lenders breached Section 2.18(c). As discussed *supra*, that section, which is protected as a sacred right, prevents any Lenders from "receiving payment of a greater proportion … than the proportion received by any other Lender entitled to receive the same proportion." In exchanging Defendant Lenders' First Lien Debt and Second Lien Debt for Super Senior Debt, the Scheme gave Defendant Lenders value for their Term Loans greater than their *pro rata* shares—violating Section 2.18(c).

122.   Defendants tried to get around this obvious breach by asserting in the Amended Agreements that the exchange was done "pursuant to Section 9.04(i)," a narrow exception to Section 2.18(c) for "Permitted Loan Purchase[s]" that contemplated that Mitel may exchange (and then cancel) loans under specific, stringently defined circumstances. Section 9.04(i) did not permit the exchange. That provision states that "[n]otwithstanding anything to the contrary in this Agreement, including Section 2.18(c)," Mitel "may *purchase* by way of assignment and become an Assignee with respect to Term Loans." Mitel purchased nothing. Rather, it had its existing debt "Refinanced"—a separately defined term that means "any Indebtedness issued in *exchange* for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund" other debt. Because Mitel did not, in fact, purchase and cancel the debt, but rather exchanged and replaced it, Section 9.04(i) did not apply. Defendants effectively conceded as much, defining the purported exchanges in the Amended Agreements as the "First Lien *Exchange*" and "Second Lien *Exchange*" and the Super

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 92 of 113

Senior Debt as the "*Exchanged* First Lien Loans" and "*Exchanged* Second Lien Loans."

123.    Mitel also breached the Amended Agreements by purporting to assign Defendant Lenders' First Lien and Second Lien Debt to the Borrower without any valid basis to do so under the Amended Agreements. Section 9.04(b)(ii)(D) of the Amended Agreements provides that "the Assignee shall not be the Borrower … except in accordance with Section 9.04(i) or Section 9.21." Defendant Lenders' purported assignment to Mitel (the Borrower) was not authorized by either Section 9.04(i)—as noted above—or Section 9.21.

124.    Defendants also breached Section 2.21 of the Amended Agreements (which Defendants did not amend from the Original Agreements). As discussed *supra*, Section 2.21(b)(ii) prohibits Mitel from incurring secured term loans senior to the First Lien and Second Lien Debt with terms different from the First Lien and Second Lien Debt, and Section 2.21(j)(vi) also prohibits Mitel from refinancing any loans if the refinancing is secured by liens that are senior than the liens securing the existing loans. Because Mitel issued Super Priority Debt that is purportedly senior to the First Lien and Second Lien Debt and secured by Liens purportedly senior to the Liens securing the First Lien and Second Lien Debt, the Scheme violated Section 2.21 of the Amended Agreement.

## IV.    Defendants Stonewall Plaintiffs

125.    Since the Scheme was implemented, several Plaintiff Lenders have reached out to Searchlight and its financial advisors, Credit Suisse, and Davis Polk for information, including the credit agreements for the hundreds of millions of

45

dollars in new debt that purportedly sits on top of their existing Loans and the signature pages to the Amended Agreements (to which the Plaintiffs are purportedly parties). Searchlight and its financial advisors, Credit Suisse, and Davis Polk have stonewalled for months.

### FIRST CAUSE OF ACTION
### Declaratory Judgment
### (All Plaintiffs Against Mitel, Credit Suisse, and Defendant Lenders)

126.    Plaintiffs incorporate the preceding paragraphs.

127.    Plaintiffs Mitel, Credit Suisse, and Defendant Lenders are parties to, or assignees and successors in interest to, the Original Agreements.

128.    The Original Agreements are valid and enforceable contracts.

129.    Plaintiffs performed all their obligations under the Original Agreements.

130.    Section 9.08(b) requires the written consent of each Lender "directly adversely affected" by an "agreement or agreements" that reduces the principal amount of any Loan or amends the provisions of Sections 2.18(c) or 7.02 with respect to the *pro rata* application of payments in a manner that, by its terms, modifies the application of payments to be on a less than *pro rata* basis.

131.    The Amended Agreements constituted an integrated agreement (or, alternatively, integrated agreements). The same parties executed the Amended Agreements and other documents that were part of the Scheme on the same date for the same purpose. In the amendments to the Original Agreements, Defendant Lenders, Credit Suisse, and Mitel expressly committed to the purported exchange. These contracts expressly cross-reference each other. (For example, in the contract purportedly

46

Case 23-09001 Document 114 Filed in TXSB on 03/24/23 Page 94 of 113

adopting the Amended Agreements, Defendant Lenders "acknowledge[d] and con-sent[ed] to the borrowing and/or incurrence of the Initial Term Loans (as defined in the Priority Lien Credit Agreement) under the Priority Lien Credit Agreement and the other transactions contemplated by or occurring pursuant to the Priority Lien Credit Agreement."). On information and belief, Defendant Lenders would not have consented to the Amended Agreements, which stripped the First Lien and Second Lien Lenders of protective covenants, had they not contemporaneously agreed to re-duce the amount of their First Lien and Second Lien Debt to zero and exchange their debt for new Super Priority Loans.

132.  The Scheme directly adversely affected Plaintiffs. This Scheme subordi-nated Plaintiffs' First Lien and Second Lien Debt to Defendant Lenders' purported Super Priority Debt. This significantly increased the risk of loss on the First Lien and Second Lien Debt, as there is a substantial risk that Mitel will not be able to repay much, if any, of the subordinated debt. This increased risk of loss substantially re-duced the market value of Plaintiffs' First Lien and Second Lien Debt.

133.  The Scheme purported to reduce the principal amount of Defendant Lenders' First Lien and Second Lien Debt to zero by retiring and cancelling that Debt immediately upon assignment to Mitel.

134.  The Scheme also purported to amend the provisions of Section 7.02 with respect to the *pro rata* application of payments in a manner that, by its terms, modi-fied the application of payments to be on a less than *pro rata* basis. As part of the

47

Scheme, Defendants executed a new "Intercreditor Agreement," providing Defendant Lenders with a purportedly senior, non-*pro rata* right to payment over Plaintiffs.

135.    Under Section 9.08(b) of the Original Agreements, the Scheme's amendments to the Original Agreements—contained in the Amended Agreements—could not be valid unless excluded lenders provided written consent. They did not, and the Amended Agreements are thus invalid.

136.    In consenting to the Amended Agreements, Credit Suisse, as Administrative Agent under the Original Agreements, acted in bad faith by secretly conspiring to benefit itself and its favored Lenders at Plaintiffs' expense. On information and belief, Credit Suisse benefited from the Scheme by ensuring that the Original Revolver, of which it held a part, would be paid in full through the proceeds of the Scheme and replaced with a new Superpriority Revolver.

137.    Plaintiffs seek a declaration that the Amended Agreements are not valid and enforceable contracts and are thus void.

## SECOND CAUSE OF ACTION
### Breach of Contract
### (All Plaintiffs Against Mitel)

138.    Plaintiffs incorporate the preceding paragraphs.

139.    Plaintiffs and Mitel are parties to, or assignees and successors in interest to, the Original Agreements.

140.    The Original Agreements are valid and enforceable contracts.

141.    Plaintiffs performed all their obligations under the Original Agreements.

48

142. Section 6.01 of the Original Agreements prohibits Mitel from "[i]ncur[ring], creat[ing], assum[ing] or permit[ting] to exist any Indebtedness" except for specific enumerated categories of Indebtedness. The Super Priority Debt is Indebtedness that does not fall into any of the enumerated categories of permitted Indebtedness. By incurring, creating, assuming, and permitting to exist the Super Priority Debt, Mitel breached Section 6.01 of the Original Agreements.

143. Section 6.02 of the Original Agreements prohibits Mitel from "[c]reat[ing], incur[ring], assum[ing] or permit[ting] to exist any Lien on any property or assets" except for certain liens defined as "Permitted Liens." The Super Priority Debt is purportedly secured by Liens that are not Permitted Liens. By creating, incurring, assuming, and permitting to exist the Liens securing the Super Priority Debt, Mitel breached Section 6.02 of the Original Agreements.

144. Section 9.04(b)(ii)(D) of the Original Agreements provides that "the Assignee shall not be the Borrower or any of the Borrower's Affiliates or Subsidiaries except in accordance with Section 9.04(i) or Section 9.21." The Scheme purported to assign Defendant Lenders First Lien and Second Lien Debt to Mitel, the Borrower. The purported assignment was not authorized by Section 9.04(i) or Section 9.21. By purporting to "assign" Defendant Lenders First Lien and Second Lien Debt to itself, Mitel breached Section 9.04(b)(ii)(D) of the Original Agreements.

145. Section 2.21(b)(ii) of the Original Agreements prohibits Mitel from incurring term loans with terms different from the First Lien and Second Lien Debt unless they "rank equally and ratably or, at the option of the Borrower, junior in right

49

of security" to the existing Loans or are "unsecured." Section 2.21(j)(vi) further prohibits Mitel from refinancing any Loans under the Original Agreements if the refinancing debt is "secured by Liens that are senior to the Liens" securing the existing Loans. The Super Priority Debt is purportedly senior in right of security relative to the First Lien and Second Lien Debt and secured by Liens that are purportedly senior to the Liens securing the First Lien and Second Lien Debt. By incurring, creating, assuming, and permitting to exist the Super Priority Debt and the Liens securing that Debt, Mitel breached Section 2.21 of the Original Agreements.

146.    Mitel's conduct damaged Plaintiffs.

147.    Plaintiffs seek avoidance of the Super Priority Debt and Liens issued in the Scheme.

148.    Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Breach of Contract**
**(First Lien Plaintiffs Against Mitel)**

149.    Plaintiffs incorporate the preceding paragraphs.

150.    The First Lien Plaintiffs and Mitel are parties to, or assignees and successors in interest to, the Original First Lien Agreement.

151.    The Original First Lien Agreement is a valid and enforceable contract.

152.    The First Lien Plaintiffs performed all their obligations under the Original First Lien Agreement.

50

153. Section 6.09(b)(i) of the Original First Lien Agreement prohibits Mitel from "[m]ak[ing], directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of, or in respect of, any Junior Financing, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination in respect of any Junior Financing" except for certain categories of permitted payments. Junior Financing is defined in Section 1.01 as the Second Lien Debt as well as "any Indebtedness (other than inter-company indebtedness) that is subordinated in right of payment to" the First Lien Debt or "any other Indebtedness secured by Liens on the Collateral that rank junior to the Liens on the Collateral securing" the First Lien Debt.

154. The Second Lien Debt is Junior Financing under the Original First Lien Agreement.

155. In the Scheme, Mitel made distributions in respect of the Second Lien Debt, including on account of the redemption, requirement, acquisition, cancellation, or termination of that Debt. These distributions did not fall into any of the categories of permitted payments and distributions in respect of Junior Financing. By making these distributions, Mitel breached Section 6.09(b)(i).

156. Mitel's conduct damaged the First Lien Plaintiffs.

157. The First Lien Plaintiffs seek avoidance of the Super Priority Debt and Liens issued in the Scheme.

158.     Alternatively, the First Lien Plaintiffs seek damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Breach of Contract
### (All Plaintiffs Against Defendant Lenders)

159.     Plaintiffs and Defendant Lenders are parties to, or assignees and successors in interest to, the Original Agreements.

160.     The Original Agreements are valid and enforceable contracts.

161.     Plaintiffs performed all their obligations under the Original Agreements.

162.     Section 2.18(c) of the Original Agreements requires that any Lender who "obtain[s] payment in respect of any principal of, or interest on, any of its Term Loans" that is greater than its *pro rata* share "shall purchase (for cash at face value) participations in the Term Loans … of such other Lenders to the extent necessary so that the benefit of all such payments shall be shared by all such Lenders entitled thereto ratably." The Scheme provided Defendant Lenders payments in respect of their Term Loans that were greater than their *pro rata* share because Plaintiffs, who also held Term Loans, received no payments in the Scheme. Defendant Lenders did not purchase participations in Plaintiffs' Term Loans to the extent necessary to ensure that the benefits of the overpayments were shared ratably. By failing to do so, Defendant Lenders breached Section 2.18(c).

163.     Defendant Lenders' conduct damaged Plaintiffs.

52

164. Plaintiffs seek specific performance of Section 2.18(c) of the Original Agreements, which requires Defendant Lenders to buy enough of Plaintiffs' First Lien and Second Lien Debt for cash at face value to ensure that all First Lien and Second Lien Lenders receive the benefit of the Scheme to the same extent as Defendant Lenders.

165. Alternatively, Plaintiffs seek avoidance of the Super Priority Debt and Liens issued in the Scheme.

166. Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### Breach of Contract
### (All Plaintiffs Against Mitel)

167. Plaintiffs incorporate the preceding paragraphs.

168. Plaintiffs bring this claim in the alternative to their first four claims, only if Mitel, Credit Suisse, and Defendant Lenders validly amended the Original Agreements and adopted the Amended Agreements.

169. Plaintiffs and Mitel are parties to, or assignees and successors in interest to, the Amended Agreements.

170. The Amended Agreements are valid and enforceable contracts.

171. Section 9.04(b)(ii)(D) of the Amended Agreements provides that "the Assignee shall not be the Borrower or any of the Borrower's Affiliates or Subsidiaries except in accordance with Section 9.04(i) or Section 9.21." The Scheme purported to assign Defendant Lenders First Lien and Second Lien Debt to Mitel, the Borrower.

53

The purported assignment was not authorized by Section 9.04(i) or Section 9.21. By purporting to "assign" Defendant Lenders First Lien and Second Lien Debt to itself, Mitel breached Section 9.04(b)(ii)(D) of the Amended Agreements.

172.    Section 2.21(b)(ii) of the Amended Agreements prohibits Mitel from incurring term loans with terms different from the First Lien and Second Lien Debt unless they "rank equally and ratably or, at the option of the Borrower, junior in right of security" to the existing Loans or are "unsecured." Section 2.21(j)(vi) further prohibits Mitel from refinancing any Loans under the Amended Agreements if the refinancing debt is "secured by Liens that are senior to the Liens" securing the existing Loans. The Super Priority Debt is purportedly senior in right of security relative to the First Lien and Second Lien Debt and secured by Liens that are purportedly senior to the Liens securing the First Lien and Second Lien Debt. By incurring, creating, assuming, and permitting to exist the Super Priority Debt and the Liens securing that Debt, Mitel breached Section 2.21 of the Amended Agreements.

173.    Mitel's conduct damaged Plaintiffs.

174.    Plaintiffs seek avoidance of the Super Priority Debt and Liens issued in the Scheme.

175.    Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
**Breach of Contract**
**(All Plaintiffs Against Defendant Lenders)**

176.    Plaintiffs incorporate the preceding paragraphs.

177.    Plaintiffs bring this claim in the alternative to their first four claims, only if Mitel, Credit Suisse, and Defendant Lenders validly amended the Original Agreements and adopted the Amended Agreements.

178.    Plaintiffs and Mitel are parties to, or assignees and successors in interest to, the Amended Agreements.

179.    The Amended Agreements are valid and enforceable contracts.

180.    Section 2.18(c) of the Amended Agreements requires that that any Lender who "obtain[s] payment in respect of any principal of, or interest on, any of its Term Loans" that is greater than its *pro rata* share "shall purchase (for cash at face value) participations in the Term Loans … of such other Lenders to the extent necessary so that the benefit of all such payments shall be shared by all such Lenders entitled thereto ratably." The Scheme provided Defendant Lenders payments in respect of their Term Loans that were greater than their *pro rata* share because Plaintiffs, who also held Term Loans, received no payments in the Scheme. Defendant Lenders did not purchase participations in Plaintiffs' Term Loans to the extent necessary to ensure that the benefits of the overpayments were shared ratably. By failing to do so, Defendant Lenders breached Section 2.18(c) of the Amended Agreements.

181.    Mitel's conduct damaged Plaintiffs.

182.    Plaintiffs seek specific performance of Section 2.18(c) of the Amended Agreements, which requires Defendant Lenders to buy enough of Plaintiffs' First Lien and Second Lien Debt for cash at face value to ensure that all First Lien and Second

55

Lien Lenders receive the benefit of the Scheme to the same extent as Defendant Lenders.

183. Alternatively, Plaintiffs seek avoidance of the Super Priority Debt and Liens issued in the Scheme.

184. Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(All Plaintiffs Against Mitel, Credit Suisse, and Defendant Lenders)**

185. Plaintiffs incorporate the preceding paragraphs.

186. Plaintiffs bring this claim in the alternative, only if the Original Agreements granted Mitel, Credit Suisse, and Defendant Lenders the discretion to amend those contracts.

187. Every contract contains an implied covenant of good faith and fair dealing, which requires contract parties to refrain from doing anything that will have the effect of destroying or injuring the right of the other parties to receive the fruits of the contract. The conduct of Mitel, Credit Suisse, and Defendant Lenders in adopting the Amended Agreements breached the implied covenant by denying Plaintiffs the fruits of the Original Agreements (or, alternatively, by abusing their purported discretion under the Amended Agreements). The Amended Agreements were part of a Scheme that destroyed Plaintiffs' security, effectively turning their priority debt into junior debt that ranked below new Super Priority Debt and thus gutting the value of their loans. Mitel, Credit Suisse, and Defendant Lenders negotiated the Scheme in secret. They intentionally excluded Plaintiffs from providing additional financing to

56

Mitel, to Defendant Lenders' benefit and to Plaintiffs' detriment. And they executed the Scheme with an intent to harm Plaintiffs. This conduct so violates the standards of reasonable commercial conduct as to breach the implied covenant.

188.  Mitel, Credit Suisse, and Defendant Lenders' conduct damaged Plaintiffs.

189.  Plaintiffs seek avoidance of the Super Senior Debt and Liens issued in the Scheme.

190.  Alternatively, Plaintiffs seek a declaration that the Amended Agreements are not valid and enforceable contracts and are thus void.

191.  Alternatively, Plaintiffs seek damages in an amount to be determined at trial.

### EIGTH CAUSE OF ACTION
### Tortious Interference with Contract
### (On Behalf of All Plaintiffs Against Searchlight and Credit Suisse)

192.  Plaintiffs incorporate the preceding paragraphs.

193.  The Original Agreements are valid and enforceable contracts.

194.  The Original Agreements are multilateral contracts.

195.  Searchlight was not a party to the Original Agreements.

196.  Searchlight knew of the Original Agreements because it served as a Sponsor of the Original Agreements and because it is the controlling owner of Mitel, which executed the Original Agreements.

197.  Credit Suisse was a party to the Original Agreements and, as Administrative Agent, had rights and responsibilities under the Original Agreements that are

separate from the rights and responsibilities that Mitel and Defendant Lenders breached in the Scheme, as alleged above.

198.   Certain of Plaintiffs repeatedly reached out to Mitel and Searchlight to learn more about Mitel's liquidity needs, and in some cases to offer additional loans, yet Mitel and Searchlight consistently stated that the company's liquidity position was strong and that it did not require additional loans.

199.   On information and belief, Searchlight concocted the Scheme, contrary to Mitel's interests, to further Searchlight's economic interests in its other portfolio companies by hand-selecting certain Defendant Lenders for favorable treatment, inducing the Defendant Lenders to enter the Scheme. Searchlight used its control of Mitel to induce it to enter a deal with Searchlight's preferred Lenders that gave them more favorable terms than they would have received in a transaction open to all Lenders. Searchlight did so with no purpose other than to enrich Searchlight and its favored Lenders while harming excluded Lenders. On information and belief, Searchlight was founded by a former Apollo partner, and Searchlight hand-selected Apollo to participate despite its small holdings.

200.   On information and belief, Credit Suisse concocted the Scheme, contrary to Mitel's interests, to further Credit Suisse's economic interests by having its position in the Original Revolver paid down early and by having the Original Revolver purportedly exchanged for the new Superpriority Revolver.

201.    Searchlight and Credit Suisse's conduct was not economically justified, including because competition among all Lenders could have produced terms more favorable to Mitel.

202.    Searchlight and Credit Suisse intentionally and improperly induced Mitel and Defendant Lenders to breach the Original Agreements by entering the Scheme. In doing so, Searchlight and Credit Suisse acted with malice, in bad faith, and without justification.

203.    Stripping Plaintiffs of their priority and *pro rata* sharing rights provided no economic benefit to Mitel. It benefited only Defendant Lenders, Credit Suisse, and Searchlight.

204.    Searchlight and Credit Suisse's conduct damaged Plaintiffs.

205.    Plaintiffs seek damages in an amount to be determined at trial, including punitive damages.

### NINTH CAUSE OF ACTION
**Violation of New York Uniform Voidable Transaction Act §§ 273, 276, 276-a
(All Plaintiffs Against Mitel and Defendant Lenders)**

206.    Plaintiffs incorporate the preceding paragraphs.

207.    Under the Original Agreements, Plaintiffs bargained for and received the right to receive senior priority and *pro rata* payments, like all other First Lien and Second Lien Lenders. In the Scheme, Mitel and Defendant Lenders stripped Plaintiffs of these rights and subordinated Plaintiffs in right of payment and security to the Super Priority Debt.

208. The Scheme transferred property to Defendant Lenders, in the form of Super Priority Liens on Mitel's proceeds and collateral. It also caused Mitel to incur obligations in the form of debt to Defendant Lenders.

209. Searchlight and Defendant Lenders intentionally and without authority interfered with Plaintiffs' right to receive *pro rata* payments and senior priority by causing Mitel to transfer those rights to the Participating Lenders.

210. Mitel made these transfers and incurred these obligations with actual intent to hinder, delay, or defraud Plaintiffs to the benefit of Defendant Lenders.

211. Plaintiffs' rights to senior priority arose prior to the Scheme.

212. The transfers made and obligations incurred by Mitel to the benefit of Defendant Lenders reflect many of the badges of fraud set forth in New York Uniform Voidable Transaction Act § 273(b).

213. Mitel and Defendant Lenders concealed the Scheme from Plaintiffs and did not give them the opportunity to consent to or dissent from the Amended Agreements, or the opportunity to participate in the Super Senior Debt. Mitel repeatedly represented to Plaintiffs and others that it did not face liquidity issues and that it had no near-term plans to seek additional loans.

214. The Scheme marked Mitel's incurrence of a substantial debt. Mitel issued hundreds of millions of dollars of Super Senior Debt, with purportedly senior priority claims to payment and collateral than Plaintiffs' Debt.

215. The transfers made and obligations incurred in the Scheme violate New York Uniform Voidable Transactions Act § 273.

216.  Pursuant to New York Uniform Voidable Transactions Act §§ 273 and 276(a), all transfers made and obligations incurred by Mitel to the benefit of Defendant Lenders are voidable and should be unwound.

217.  Plaintiffs are entitled to an award of their attorney's fees and costs resulting from this violation, including attorney's fees and costs resulting from the filing and prosecution of this action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief as follows:

a)  A declaratory judgment that the Amended Agreements are void;

b)  Avoidance of all transfers made, and debt, liens, and obligations incurred, in the Scheme;

c)  Specific performance of Section 2.18(c) of the Original Agreements and Amended Agreements, requiring Defendant Lenders to buy enough of Plaintiffs' debt to ensure that all First Lien and Second Lien Lenders receive the benefit of the Scheme to the same extent as Defendant Lenders;

d)  Money damages in amounts to be determined at trial, together with pre- and post-judgment interest at the maximum rate allowed by law;

e)  Indemnification from Mitel pursuant to Section 9.05(b) of the Original Agreements and Amended Agreements for costs and expenses, including attorney's fees in an amount to be determined following trial; and

f)  Any other relief the Court deems just and proper.

61

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 109 of 113

Dated:  New York, NY
       March 14, 2023

Respectfully submitted,

SELENDY GAY ELSBERG PLLC

By: _____

Jennifer M. Selendy
Andrew R. Dunlap
Michael Duke
Max Siegel
Mathew Elder
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
jselendy@selendygay.com
adunlap@selendygay.com
mduke@selendygay.com
msiegel@selendygay.com
melder@selendygay.com

*Attorneys for Plaintiffs*

62

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 110 of 113

# Schedule 1
*Plaintiffs*

**Five Arrows Lender**
- Ocean Trails CLO VII

**400 Capital Lenders**
- Boston Patriot Milk St LLC
- 400 Capital Credit Opportunities Maser Fund Ltd.
- 400 Capital TX COF I LP

**Angel Island Lenders**
- Harbor Point 2019-1 Ltd.
- AIC COP Facility 2, LLC
- AIC Investments (LHR), Ltd.

**Assured Lenders**
- **AIM Lenders**
  - BlueMountain CLO 2014-2 Ltd.
  - BlueMountain CLO 2015-3 Ltd.
  - BlueMountain CLO 2015-4 Ltd.
  - BlueMountain CLO 2016-2 Ltd.
  - BlueMountain CLO 2016-3 Ltd.
  - BlueMountain CLO 2018-1 Ltd.
  - BlueMountain CLO 2018-2 Ltd.
  - BlueMountain CLO 2018-3 Ltd.
  - BlueMountain CLO XXII Ltd.
  - BlueMountain CLO XXIII Ltd.
  - BlueMountain CLO XXIV Ltd.
  - BlueMountain CLO XXIX Ltd.
  - BlueMountain CLO XXV Ltd.
  - BlueMountain CLO XXVI Ltd.
  - BlueMountain CLO XXVIII Ltd.
  - BlueMountain CLO XXX Ltd.
  - BlueMountain CLO XXXI Ltd.
  - BlueMountain CLO XXXII Ltd.
  - BlueMountain CLO XXXIII Ltd.
  - BlueMountain CLO XXXIV Ltd.
  - BlueMountain CLO XXXV Ltd.
- **Fuji Lenders**
  - BlueMountain CLO 2013-2 Ltd.
  - BlueMountain Fuji US CLO I Ltd.
  - BlueMountain Fuji US CLO II Ltd.
  - BlueMountain Fuji US CLO III Ltd.

63

**Atalaya Lender**
- ACM ASOF VIII Secondary-C LP

**Bardin Hill Lenders**
- Halcyon Loan Advisors Funding 2015-1 Ltd.
- Halcyon Loan Advisors Funding 2015-2 Ltd.
- Halcyon Loan Advisors Funding 2015-3 Ltd.

**Benefit Street Lenders**
- SEI Institutional Investments Trust - High Yield Bond Fund
- SEI Institutional Managed Trust - High Yield Bond Fund
- U.S. High Yield Bond Fund

**Doubleline Lenders**
- DoubleLine Income Solutions Fund
- DoubleLine Opportunistic Credit Fund

**Ellington Lenders**
- Ellington CLO I, Ltd.
- Ellington CLO II, Ltd.
- Ellington CLO III, Ltd.
- Ellington CLO IV, Ltd.

**FSCO Lender**
- Blair Funding LLC

**Mariner Lender**
- Mariner Atlantic Multi-Strategy Master Fund, Ltd.

**MJX Lenders**
- Venture 18 CLO Ltd.
- Venture 19 CLO Ltd.
- Venture 22 CLO Ltd.
- Venture 24 CLO Ltd.
- Venture 27 CLO Ltd.
- Venture 28A CLO Ltd.
- Venture 29 CLO Ltd.
- Venture 30 CLO Ltd.
- Venture 31 CLO Ltd.
- Venture 34 CLO Ltd.
- Venture 36 CLO Ltd.
- Venture 37 CLO Ltd.
- Venture 38 CLO Ltd.

64

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 112 of 113

- Venture 41 CLO Ltd.

**Nassau Lenders**
- Nassau 2018-I Ltd.
- Nassau 2018-II Ltd.
- Nassau 2019-I Ltd.

**Palmer Square Lenders**
- Palmer Square BDC Funding I LLC
- Palmer Square CLO 2014-1, Ltd.
- Palmer Square CLO 2015-1, Ltd.
- Palmer Square CLO 2015-2, Ltd.
- Palmer Square CLO 2018-1, Ltd.
- Palmer Square CLO 2018-2, Ltd.
- Palmer Square CLO 2018-3, Ltd.
- Palmer Square CLO 2019-1, Ltd.

**Saranac Lenders**
- Saranac CLO III Ltd.
- Saranac CLO VI Ltd.
- Saranac CLO VII Ltd.

**Steele Creek Lenders**
- Steele Creek CLO 2014-1R, Ltd.
- Steele Creek CLO 2016-1 Ltd.
- Steele Creek CLO 2017-1 Ltd.
- Steele Creek CLO 2018-1 Ltd.
- Steele Creek CLO 2018-2 Ltd.
- Steele Creek CLO 2019-1 Ltd.
- Steele Creek CLO 2019-2 Ltd.
- Steele Creek Loan Funding I, LP

**Wellfleet Lenders**
- Wellfleet CLO 2016-1, Ltd.
- Wellfleet CLO 2016-2, Ltd.
- Wellfleet CLO 2017-1, Ltd.
- Wellfleet CLO 2017-2, Ltd.
- Wellfleet CLO 2017-3, Ltd.
- Wellfleet CLO 2018-1, Ltd.
- Wellfleet CLO 2018-2, Ltd.
- Wellfleet CLO 2018-3, Ltd.
- Wellfleet CLO 2019-1, Ltd.
- Wellfleet CLO 2020-1, Ltd.
- Wellfleet CLO 2020-2, Ltd.

Case 23-09001   Document 114   Filed in TXSB on 03/24/23   Page 113 of 113

- Wellfleet CLO 2021-1, Ltd.
- Wellfleet CLO X, Ltd.