IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


| | | |
|---|---|---|
| SERTA SIMMONS BEDDING, LLC, ET AL | § | CASE NO. 23-09001-ADV |
| | § | |
| | § | HOUSTON, TEXAS |
| VERSUS | § | TUESDAY, |
| | § | MARCH 28, 2023 |
| AG CENTRE STREET PARTNERSHIP, | § | |
| ET AL | § | 9:00 A.M. TO 12:28 P.M. |

<u>**MOTION HEARING**</u>

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:                          SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER:         ALBERT ALONZO


<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES:

FOR THE DEBTORS:                        WEIL GOTSHAL & MANGES, LLC
                                        Ray Schrock, Esq.
                                        David Lender, Esq.
                                        Luna Barrington, Esq.
                                        Alexander Welch, Esq.
                                        Taylor Dougherty, Esq.
                                        700 Louisiana, Ste. 1700
                                        Houston, TX  77002
                                        713-546-5000

FOR EXCLUDED LENDERS OTHER
THAN LCM:                               FRIEDMAN & KAPLAN
                                        Eric Seiler, Esq.
                                        7 Times Square
                                        New York, NY  10036-6516
                                        212-833-1103

                                        PORTER HEDGES, LLP
                                        John F. Higgins, Esq.
                                        1000 Main St., 36th Fl.
                                        Houston, TX  77002
                                        713-226-6000

FOR LCM:                                HOLWELL SHUSTER & GOLDBERG, LLP
                                        Vincent Levy, Esq.
                                        425 Lexington Ave.
                                        New York, NY  10017
                                        646-837-5120

FOR PTL LENDERS:                        GIBSON DUNN
                                        Gregg J. Costa, Esq.
                                        811 Main Street, Ste. 3000
                                        Houston, TX  77002-6117
                                        346-718-6649

(Please also see Electronic Appearances.)

1             **HOUSTON, TEXAS; TUESDAY, MARCH 28, 2023; 9:00 A.M.**

2         THE COURT:  All right.  Officially, everyone, good

3 morning, everyone.  The time is 9:00 o'clock Central.  Today

4 is March 28, 2023.  This is the Docket for Houston, Texas.

5         On the 9:00 o'clock Docket, we have Adversary

6 No. 23-9001, Serta, et al versus AG Centre Street Partnership,

7 et al.

8         Folks, if we can ask you to make your appearances in

9 the Serta main case because there's so many folks, and I'll

10 simply -- we'll move it over into the adversary.

11         The first time that you speak, if you would, please

12 state your name and who you represent.  That really does help

13 the court reporters in the event that a transcript request is

14 made, and I fully anticipate there'll be one.

15         We are recording this morning using CourtSpeak.

16 We'll have the audio up on the Docket shortly after the

17 conclusion of the hearing.

18         We also have, just for the younger members of the

19 team because they're the ones who get saddled with it, I have

20 had a request to try and figure out how to make both Judge

21 Lopez' calendar and my calendar more accessible.

22         And so we have figured out a way to send a link

23 every morning at 5:00 o'clock to a defined group of email

24 addresses.  So if you have anybody from any of the firms who

25 would like to get that email, and you can try it for awhile

1   and then say, no, this is really gumming up my mailbox, happy
2   to do that.
3          But just shoot those email addresses to Mr. Alonzo.
4   We'll get you added as we try this out.
5          And with that, I have activated the hand-raising
6   feature. so those of you who are on the line, if you wish to
7   speak, I will need five star from you since there was a fair
8   amount of background noise.
9          Mr. Schrock, good morning.
10          MR. SCHROCK:  Good morning, Your Honor, Ray Schrock,
11   Weil, Gotschal, Manges, counsel for the Debtors.
12          We have two matters on for this morning, the first
13   being, we'd like to take the summary judgment matter first,
14   and then I believe there's a discovery issue with *LCM*, that we
15   can take after that, if it's okay with the Court?
16          THE COURT:  Let me ask -- let's see, Mr. Barasino,
17   or I'm sorry, whoever's taking lead on that issue.
18          MR. LEVY:  Yes, Your Honor, Mr. Vincent Levy, from
19   the Holwell firm.
20          THE COURT:  Ah, thank you.
21          Mr. Levy, does that work for you?  I didn't
22   understand the need.  In other words, was it pertinent to
23   today's argument?  Was it just something you were trying --
24   that you wanted to see?  I didn't understand the importance of
25   the document.

1          MR. LEVY:  There's one exhibit to our motion --

2          THE COURT:  Okay.

3          MR. LEVY:  -- and it was clawed back by Serta.

4          THE COURT:  All right.

5          MR. LEVY:  And under the protective order, we then

6     conferred with them, and we were obligated to make the

7     challenge --

8          THE COURT:  Sure.

9          MR. LEVY:  -- which is why we raised that.  And it

10    is --

11         THE COURT:  And I am so sorry.  There are 70 people

12    who are watching.  They can't see you or hear you when you're

13    standing there.  My apologies.

14         So this is important to the argument that you want

15    to make this morning?

16         MR. LEVY:  It is an exhibit to the summary judgment

17    papers.

18         THE COURT:  Yes, sir.

19         MR. LEVY:  So that's why we felt we had to raise it

20    in advance of the hearing today, and so we filed a motion.

21    And I understand from Serta that they will be responding here.

22    We hadn't seen a response.

23         THE COURT:  No, I got all that.  What I was trying

24    to figure out was do we need to resolve that before you make

25    your arguments this morning, or is it something that we just

1    need to get resolved today?

2             MR. LEVY:  It was their clawback, so if they're

3    happy to proceed to have it resolved after the summary

4    judgment --

5             MR. SCHROCK:  We are.

6             THE COURT:  You agree with that?  Just want to make

7    sure.

8             MR. SCHROCK:  Yes.

9             THE COURT:  All right.  Thank you, sir.

10            All right.  Mr. Schrock?

11            MR. SCHROCK:  Thanks, Your Honor.  So appearing with

12   me today, and be handling the argument is my litigation

13   partner, David Lender, along with Luna Barrington, who'll be

14   handling the discovery issue.  Alex Welch and I are handling

15   the restructuring.

16            THE COURT:  All right.  Thank you.

17            MR. SCHROCK:  Thank you.

18            THE COURT:  All right.  Mr. Lender, good morning.

19            MR. LENDER:  Morning.  Good morning, David Lender,

20   for the Debtor, Serta Simmons Bedding.

21            The transaction at issue was the result of a

22   competitive process whereby Serta's agent, Evercore, solicited

23   proposals from different groups of lenders representing more

24   than 70 percent of the company's debt holders in order to

25   explore alternatives to raise liquidity and reduce Serta's

1    debt and issuance expense.

2           The transaction selected provided for a new

3    superpriority term loans with two tranches.  First was a

4    $200 million new money tranche issued as incremental

5    equivalent debt.

6           Defendants do not dispute that the credit agreement

7    explicitly allowed us to incur new incremental debt under

8    Section 6.01(Z) of the credit agreement.  They admit that in

9    their counterclaim, ECF 66, at paragraph 269.  So

10   subordination of Defendants' debt was clearly permitted under

11   the credit agreement.

12          The second part of the transaction, which Defendants

13   do challenge, involve the issuance of $850 million of priority

14   term loans which Serta used as consideration for the purchase

15   of $1.2 billion of pre-existing debt, reducing Serta's debt by

16   approximately $400 million and its interest expense as well.

17          The new loans rank senior in right of payment but

18   are *pari passu* with respect to the security.  In fact, Serta

19   added new collateral for the benefit of both the new debt and

20   the pre-existing debt, again on a *pari passu* basis.

21          So Defendants' claim that the transaction released

22   collateral or guarantees is actually not correct.  Now the

23   credit agreement provides for a number of ways that Serta

24   could have sought to address its pre-existing debt.

25          One option would have been to add a new class of

1    debt under its pre-existing credit agreement, pursuant to

2    Section 2.22.  And if we had done that, the credit agreement

3    said that the new debt may rank *pari passu* with the existing

4    term loans.

5            Another option would have been a refinancing under

6    Section 9.02(C).  And here again the credit agreement states

7    that if we had done that, the refinance loans may be

8    *pari passu* with the existing debt.

9            It appears that the Defendants would have preferred

10   that Serta use one of those options instead of the path that

11   we actually used.  But we chose another option, which was

12   clearly provided for under the credit agreement, which allowed

13   us to reduce our debt load as part of an open market purchase

14   under Section 9.05(G).

15           Now Defendants complain that they were not permitted

16   to participate in the transaction, and that their consent was

17   not sought.  But Defendants do not have those rights under the

18   credit agreement.

19           Specifically, Section 9.05(G) of the credit

20   agreement expressly permits open market purchases to be made

21   on a non-pro rata basis.  And this is different from a Dutch

22   Auction that under the terms of the agreement must be open to

23   all lenders.

24           Open market purchases also do not require unanimous

25   consent under the credit agreement.  The amendment provision

1    in Section 9.02(B) expressly carves out open market purchases

2    under Section 9.05(G), and states clearly that such

3    transactions do not require the consent of all lenders.

4            So given that, it appears undisputed that the credit

5    agreement allows for open market purchases, what Defendants

6    are arguing that what we did does not qualify as an open

7    market purchase, but Defendants are wrong, at least certainly

8    in our view.

9            The credit agreement entered into by sophisticated

10   parties does not limit the scope of open market purchases

11   other than the transaction needs to be done on the open market

12   between any lender and any affiliated lender, which includes

13   the borrower, which is exactly what happened here.

14           This makes sense because in the context of a loan

15   purchase, the term "open market purchase" means in price that

16   a willing buyer and a willing seller are able to obtain in an

17   arm's-length transaction.

18           The loans here are not public securities.  There are

19   only a select number of known potential sellers out there who

20   hold Serta's debt, and in order to consummate an open market

21   purchase of debt, Serta's agent approached individual lenders

22   and negotiated the terms of the repurchase.

23           This makes the situation entirely different from the

24   cases cited by *LCM*, at their brief at 13 to 14, where you had

25   a registered trade on a public stock exchange where you

1    purchased stock from unknown investors.

2            Here Serta entered into a robust competitive process

3    with multiple lending groups on the open market to obtain the

4    best price possible.  The price of soliciting proposals on the

5    open market and negotiating the best terms possible is the

6    epitome of an open market, arm's-length transaction.

7            Now Defendants offer a few arguments to try to claim

8    why they contend this is an open market transaction, open

9    market purchase, and I'd like to go through some of those.

10   One of the Defendants, *LCM*, claims that the transaction was

11   not an open market purchase because the consideration was

12   debt, not cash.  That's at *LCM*'s brief at 10, and 15.

13           As an aside, the non-PTL Lenders state that open

14   market transactions are typically for cash.  So the Defendants

15   can't even get their arguments lined up here.

16           But once again, nothing in the credit agreement

17   requires that the consideration be cash, nor does it make

18   sense that Serta had to first buy the debt for cash and then

19   resell them new debt to get to the exact same place.

20           The cases cited by *LCM*, that open market purchase

21   must be for a sum of money are in apposite, and show that

22   they're just cherry-picking cases.  And I'll give you just one

23   example, Your Honor.

24           *LCM* Defendants cite a case from 1871, a decision

25   from Madison Avenue Baptist Church, 46 New York 131.  That's

1   at *LCM* brief at 11.  And they state that the case holds that a

2   sale is an agreement by which one man gives a thing for a

3   price in current money.

4          But if you read the decision, the court actually

5   rejected that narrow definition, and what they construed sale

6   to mean was to embrace every transfer for a valuable

7   consideration, whether paid in cash or other property.  That's

8   at page 140, of that decision.

9          There's also no merit to Defendant's argument that

10  Section 9.05(G) doesn't apply because it covers only debt

11  retirement purchases because that's exactly what happened

12  here.

13         The transaction allowed Serta to repurchase existing

14  debt, retire or cancel that debt for new debt, thereby

15  reducing its total debt by $400 million.  This also undermines

16  their argument that the new debt was issued at a substantial

17  premium because when they make that argument, they fail to

18  account for the reduction of the $400 million of debt.

19         Defendants offer three expert declarations as to the

20  purported meaning of open market purchase.  This is extrinsic

21  evidence which is irrelevant to determining the meaning of

22  open market purchase if the Court concludes that the term is

23  unambiguous.

24         We cited a number of cases for that, including

25  *Excess Insurance Company*, New York Appellate Division, at 280

1    Third 150, where the court held, quote, "The expert affidavit

2    submitted by Defendant regarding industry custom is extrinsic

3    evidence which should not be considered in interpreting this

4    clear and unambiguous document."

5         However, Your Honor, if you look at the expert

6    declarations, it becomes self-evident that they're actually

7    not even evidence of industry custom.  They're entirely

8    inconsistent with each other, and appear more like what they

9    did is they looked at the facts, and then they made arguments

10   as to what an open market purchase was, so they could argue

11   that the facts didn't meet that.

12        And I'm just going to give you some of the examples,

13   Your Honor, and I'll give you cites to the affidavits so you

14   can see how inconsistent these two, these three experts are.

15        Well, I mentioned the first one already.  *LCM* and

16   its expert claimed that open market purchases must be for

17   cash.  That's the *LCM* brief at 12, and Buccola declaration at

18   10, paragraph 10.  But the non-PTL experts say that it's

19   typically for cash.  That's Ward (phonetic) declaration,

20   paragraph four, Murray, paragraph 72.

21        *LCM*'s experts say that an open market purchase must

22   approach the universe of potential sellers, although you

23   apparently don't need to solicit all the lenders

24   simultaneously.  That's Buccola declaration, paragraph 10

25   and 38.

1          But the non-PTL Lenders' expert says just the

2     opposite.  He says that an open market purchase are one-off

3     transactions.  That's Ward paragraph 71.  So basically *LCM*'s

4     expert is arguing that we didn't offer the deal to enough

5     lenders, where as the PTL Lender's expert is saying we offered

6     it to too many.

7          *LCM*'s expert admits that an open market purchase may

8     also characterize some form of decentralized direct

9     solicitation but only if it supplements a dealer mediated

10    system.  That's Buccola at paragraph 37.

11         So he essentially admits we could do what we did,

12    but only if we also use a dealer mediated system at the same

13    time.  And then *LCM* says that open market purchases can only

14    retire debt when there are beneficial market conditions, but

15    not when you're suffering a liquidity crisis.  That's *LCM*

16    brief at 23, paragraph 59.

17         So I guess according to them, the reason you do an

18    open market purchase defines what an open market purchase is.

19    And finally, I guess my personal favorite is the PTL Lender's

20    expert who transmografies the three-word "open market

21    purchase" into a 12-step requirement including the requirement

22    that you have a record that you sought authorization from the

23    finance committee for an open market purchase program.  That's

24    Murray declaration 77.  Of course, the 12-step program is not

25    included in *LCM*'s declaration.

1          And if all these steps were really required, 12

2     different steps, they would have put it into the contract.

3          The Dutch Auction has a four-page appendix that lays

4     out all these requirements you have to do, noticeably absent

5     for the term open market purchase.  So these inconsistencies

6     show that these experts are just advocates, not providing

7     definitive objective proffers of industry custom if Your Honor

8     were to consider that this was ambiguous, which we would

9     submit it was not.

10          So in sum, Plaintiff's claim that this was an open

11     market -- that it was not an open market transaction fails

12     under the plain language of the agreement.  Defendants, what

13     they do is they simply seek to add conditions that don't

14     appear anywhere into the contract, which is not permitted

15     under New York law when you're interpreting an unambiguous

16     contract.

17          Let me just address a few of the other issues, Your

18     Honor.  Defendants separately argued that the transaction

19     practically amended the payment waterfall, and therefore

20     required their consent, but we submit that's not the case

21     either.

22          The new PTL debt that we issued was done pursuant to

23     a separate credit agreement with a separate inter-creditor

24     agreement so it's a different facility.  And under

25     Section 2.18(A), Defendants only have a right to pro rata

1    payment among existing lenders holding the same class of debt

2    as them.

3         The waterfall provision here did not change, and

4    does not apply to a new and entirely different facility barred

5    under and governed by an entirely different agreement.

6    Second, the credit agreement expressly contemplates and

7    permits a new inter-creditor agreement.

8         The waterfall provision in Section 2.18(B), which

9    applies only in the event of default, is expressly subject in

10   all respects to the provisions of each inter-creditor

11   agreement.

12        Thus, even prior to the amendments, Plaintiff's pro

13   rata rights under the waterfall provision were not absolute or

14   were conditioned on inter-creditor agreements without any

15   perceptible limitation on the entry of new inter-creditor

16   agreements.

17        Third, there are clear exceptions where pro rata

18   sharing is not required, including an assignment of loan under

19   9.05(G).  It's clearly an exception if you look at 2.1(8)(C).

20   And finally if the intent was to prohibit subordination

21   entirely, the credit agreement would have included an express

22   anti-subordination language, which it does not.

23        The non-PTL Lenders bemoan that if the transaction

24   is held to qualify as an open market transaction, then, quote,

25   "Any lender that participates in an leveraged loan transaction

1    will be at the mercy of a borrower," but that's not so.

2    Lenders can protect themselves through inclusion of an anti-

3    subordination provision in the credit agreement.

4            THE COURT:  They could just redefine what the term

5    means, could they not?  They could just redefine what the term

6    means within the credit agreement, could they not?

7            MR. LENDER:  As long as -- I mean the amendments are

8    permitted as long as you have 50 percent.

9            THE COURT:  I mean going in, I mean --

10           MR. LENDER:  Absolutely.

11           THE COURT:  Parties can absolutely define terms as

12   was done extensively here.

13           MR. LENDER:  Correct.

14           THE COURT:  There's nothing that prohibits going

15   through that process, right?

16           MR. LENDER:  That's right.

17           THE COURT:  Okay.

18           MR. LENDER:  That's right.  And in fact, that's what

19   the court found in *TBC Group*, the Delaware bankruptcy court.

20   The court basically said -- and it's one of my -- I think it's

21   great language.  It says, "There's nothing in the law that

22   requires holders of syndicated debt to behave as musketeers.

23   If you want the protections that you look for, get those in

24   the credit agreement."

25           Last thing I just want to mention is the amendments

1    that were made to effectuate the transaction.  There's no

2    dispute that the only provisions we amended to effectuate the

3    transaction required only 50 percent approval, which is what

4    we had.

5         And again if you look at 9.02(B), which is the

6    amendment provision, there's a clear carveout for 9.05(G),

7    which is how the transaction was done here.  And there's no

8    question that we did not touch 2.18(B), or 2.18(C), which are

9    the ones that are the sacred rights that can't be amended.

10        So Your Honor, our position is that the credit

11   agreement clearly permitted the transaction.  Open market

12   transaction is not an ambiguous term.  We were allowed to do

13   it, and therefore, we ask, Your Honor, that you grant summary

14   judgment, holding that the transaction complied with the

15   credit agreement.

16             THE COURT:  So if I could --

17             MR. LENDER:  Yes.

18             THE COURT:  -- we'll work backwards for just a

19   couple of seconds.  And I'm sorry, I have to get in front of a

20   microphone.

21        With respect to the amendments, the amendments were

22   all done after the fact, right?

23             MR. LENDER:  They were actually done at the same

24   time of the transaction, right.  They were done to effectuate

25   the transaction itself.

1          THE COURT:  But your view is you didn't need the

2     amendments in order to do it, right?

3          MR. LENDER:  Well, we needed -- the one thing we

4     needed the amendments to do was so that the PTL loans had

5     superpriority status in terms of payback.  The amendments were

6     required to effectuate the superpriority of payment.

7          THE COURT:  Right.  And with respect to -- so let's

8     walk through.  So as I told you, I've told everybody before

9     that it is a difficult argument for me to get my hands around.

10    The term open market purchase is an ambiguous term.

11         It can certainly mean different things depending

12    upon what you're dealing with.  I mean, that's a given.  But

13    this is not something that is new to the industry.  I mean,

14    you know, I haven't practiced for 12 years, and I understand

15    what the term means.

16         So I mean, the argument that somehow there's an

17    ambiguity is -- that's going to take a lot of persuasive

18    argument to get me there.  But so assume for a second that the

19    term open market purchase is not ambiguous, and while I

20    haven't said what I think it means, let's just assume that

21    there is a meaning that I find to be commonly used and

22    accepted.

23         And let's step one further step forward, and that my

24    definition includes what was done.  At that point, does

25    everything else just sort of fall out, or is there an

1       additional step that you think that I have to take to meet

2       what you're asking for because it wasn't clear to me, if that

3       makes sense.

4              Everyone's argued and everyone argued very

5       eloquently about what does open market purchase mean.  Is it

6       ambiguous, is it not ambiguous.  But nobody really talked

7       about the impact.

8              Everyone just sort of jumps to the next step, and I

9       got the arguments about good faith and fair dealing, and if it

10      ties to a breach of contract.  All those arguments I got.  But

11      what I'm really -- what I really want to understand is if I

12      make that finding, does everything else flow naturally out of

13      that, or is there something more?

14             MR. LENDER:  Your Honor, I think if you reach that

15      holding on the breach of contract claim, I think everything

16      flows from there because I don't think anybody on their side,

17      I guess with one proviso, I'll say with one proviso.

18             I don't think anyone on their side disputes that the

19      amendments we made, or permitted with more than 50 percent of

20      the vote, I don't think they can, because there's no question

21      that we did not amend 2.18(B), and 2.18(C).

22             So if you find it's an open market transaction, the

23      amendments that we -- the amendments were permitted under the

24      contract.  I'll put implied covenant claims to the side

25      because what you just said is exactly what our argument is.

1    It's this legal question.

2         The one argument that may fit in the middle is the

3    argument that we effectively amended the waterfall, right,

4    which again, we did not -- and it's not clear to me, entirely

5    clear to me whether that's an implied covenant claim or a

6    breach of contract claim because we did not amend the

7    waterfall.

8         But that walks into the issue of those provisions

9    are clearly -- if you look at them, they're clearly about the

10   specific class, and there's nothing that limited our ability

11   to enter into a new class, or to enter into new inter-

12   creditor.

13        But that's the only argument that I think their side

14   may say still exists outside of the just pure open market

15   transaction.

16        THE COURT:  Right.  So far, I've taken you exactly

17   where I wanted you to go.  Thus, pat myself on the back.  All

18   right.  So let's go one step further.  So let's assume that we

19   have the definition, it's unambiguous, that the transaction

20   fits within my belief of what the definition holds, okay?

21        MR. LENDER:  Yeah.

22        THE COURT:  And so then we've got this -- and I

23   agree with you, I don't know what an effective change to the

24   waterfall means.  Is that now a fact issue?  Is it -- so did

25   it change, did it not change?  You think it didn't change.

1             MR. LENDER:  I mean it --

2             THE COURT:  Because it's class limited.

3             MR. LENDER:  Class limited, yeah, and that's a pure

4    legal issue for you to determine is the language of 2.18.

5    There's no fact issue that we amended those clauses.  Those

6    clauses were kept as-is.  And then it's really just a legal

7    question for you to decide if they're class limited.

8             THE COURT:  So again to go back.  So one, you are

9    asking me to define whether or not what occurred was an open

10   market purchase under 9.05(G)?

11            MR. LENDER:  Correct.

12            THE COURT:  And you're also asking me to find and

13   fill in the blank?

14            MR. LENDER:  Well, I mean the simplest thing is

15   we're asking you to find that the sale of debt, or just that

16   the transaction complied with the credit agreement.  That's

17   what the summary judgment holding is.

18            THE COURT:  Right.

19            MR. LENDER:  But --

20            THE COURT:  But I want to work through that because

21   I always --

22            MR. LENDER:  Yeah.

23            THE COURT:  -- get worried when someone --

24            MR. LENDER:  Understood.

25            THE COURT:  -- asks me to say bless the

1    transactions, and I've only heard argument on a part of the

2    transaction.

3            MR. LENDER:  I think there were three -- basically

4    there were three issues -- as far as I can tell from now, is

5    that there are three issues.

6            THE COURT:  Okay.

7            MR. LENDER:  One is, is this a open market purchase

8    or not, right?  And then really the second is whether the

9    amendments we made were permitted under the credit agreement.

10   And the reason why I say there's three issues, although it can

11   be defined as two is the amendment issue really goes to what

12   the second and the third issue.

13           They challenged the amendments generally because

14   they didn't -- we didn't get their consent.  But the

15   amendments, we weighed only required 50 percent.  We did

16   not --

17           THE COURT:  Yeah, that's just a voting issue, right?

18           MR. LENDER:  It's a voting issue.

19           THE COURT:  From your view?

20           MR. LENDER:  Right.

21           THE COURT:  Okay.

22           MR. LENDER:  And then the waterfall question is this

23   effective amendment so in many ways, you can narrow it down to

24   two.  It's just in their brief, they sort of broke out the

25   amendments more generally, and then the waterfall as a subpart

1    of that.  But those are really the two issues from our
2    perspective.
3              THE COURT:  Okay.  Thank you.
4              MR. LENDER:  Okay.  Do you want to hear any argument
5    about the implied covenant claim, or do you -- I mean, I'm
6    happy to just --
7              THE COURT:  I want you to make whatever arguments
8    you think --
9              MR. LENDER:  Okay.
10             THE COURT:  -- you should make.
11             MR. LENDER:  I'll be very fast on the implied
12   covenant claim because our argument on the implied covenant
13   claim is really just a legal issue, a legal argument.  Our
14   argument is that the implied covenant claim fails because it
15   arises out of the same operative facts as the breach of
16   contract claim, and asserts the same damages as the breach of
17   contract claim.
18             We cited the case *Mill Financial* for that.  And *Mill*
19   *Financial* is a helpful case.  It's helpful because ironically,
20   they cite the lower court decision in their brief, but they
21   didn't actually cite the Appellate Division, which is --
22   decision which is more important because it actually reversed
23   the District Court and dismissed the implied covenant claim.
24             But what *Mill Financial* said is that the conduct
25   alleged in the two causes of action need not be identical in

1      every respect.  It is enough that they arise from the same

2      operative facts.  That's *Mill Financial*, 122 AD3rd 98, at 104

3      and 105.

4                  THE COURT:  All right.  So let me ask you.  I'm not

5      aware of a case that actually says if you comply with the

6      express terms of an agreement, that you can then be held

7      liable for an implied --

8                  MR. LENDER:  Right.

9                  THE COURT:  -- cause of action.  Are you aware of

10     any sorts of thing?

11                 MR. LENDER:  You comply with the contract -- the

12     only exception that I know of is a pure discretionary right

13     and you exercise it in some way to --

14                 THE COURT:  But that's not really compliance.  If I

15     give you the choice to choose A or B on an agreement --

16                 MR. LENDER:  Correct.

17                 THE COURT:  -- if you choose B, because you're

18     trying to hurt somebody, that's a totally different issue.

19                 MR. LENDER:  The New York law is clear that there's

20     no breach of the implied covenant if you were just exercising

21     a right that's afforded to you under the agreement.  There's

22     no question.

23                 THE COURT:  Okay.  Just wanted to make sure I --

24                 MR. LENDER:  And so by the way, they don't dispute

25     that an implied covenant claim can only survive if it's based

1    on facts that are distinct from the breach of contract claim.

2    They said at the -- I don't know exactly what they called it.

3         There's like seven different monikers in this case.

4    We'll call them the non-PTL Lender brief.  At page 47, they

5    say that, but if you look at their counterclaim in their

6    brief, it's very clear that what they're complaining about is

7    that their debt was subordinated which is exactly the basis of

8    their breach of contract claim.

9         So there's no question that their implied covenant

10   claim, as alleged in their brief -- and by the way, as pled in

11   their counterclaim, that it's based on this claim that they

12   weren't allowed to be subordinated, and so it ties directly

13   into the breach of contract claim.

14        And if there's any question about whether they're

15   seeking the same damages, *LCM*'s brief answered that because

16   they said they're seeking a single recovery to both claims.

17   So if they're admitting that they arise out of the same

18   operative acts, they're admitting that it's seeking the same

19   damages, and therefore that's standard New York law.

20        You dismiss the implied covenant claim, and then as

21   the argument you just mentioned that if you're just exercising

22   a right that you're allowed to under the contract, that can't

23   form the basis of an implied covenant claim.

24        So that's all -- I just wanted to put that on the

25   Record.

1          Your Honor, we have the DQ issue.  I wasn't going to

2     address the DQ issue unless you had questions about it, and if

3     you did, that's Ms. Barrington.  That's more of the details,

4     but I think we can probably move past that at this point.

5          THE COURT:  All right.

6          MR. LENDER:  Thank you so much, appreciate it.

7          THE COURT:  All right.  Who is going first, or I'm

8     sorry --

9          MR. COSTA:  Gregg Costa.

10         THE COURT:  I forgot -- did not mean to forget

11    Mr. Costa.  Go ahead.  I'll take note of this, that Mr. Costa

12    was in the courtroom and I overlooked him.

13         (Laughter.)

14         MR. COSTA:  Good morning, Your Honor, Gregg Costa

15    for the PTL Lenders.

16         In 2016, Serta entered into a credit agreement that

17    gave the company a great deal of flexibility to restructure

18    its debt down the road.

19         As part of that flexibility, the agreement provided

20    two avenues for the company to buy back its debt on a non-pro

21    rata basis.  It could do through either a Dutch Auction or

22    through an open market purchase.

23         For the Dutch Auction, the agreement listed a number

24    of requirements.  It had to be open to all.  And an entire

25    four-page schedule attached to the agreement outlined specific

1    procedures that had to be followed.

2           In sharp contrast, the agreement did not attach

3    conditions to the open market purchase option.  Nothing says

4    it has to be open to all.  Nothing imposes any other

5    procedures on the open market purchase.

6           The open market purchase option gave Serta an

7    efficient way to deleverage in the event of financial

8    challenges.  The wisdom of bargaining for that flexibility

9    became apparent when the pandemic hit in 2020.

10          In that difficult economic environment, the company

11   faced an over-leveraged balance sheet, and the need to shore

12   up its liquidity.  It sought to use the open market purchase

13   option.

14          It first solicited an offer from Apollo.  That

15   proposal would have allowed Serta to repurchase its debt at a

16   discount, and it also would have stripped collateral, the

17   highly valuable intellectual property rights that would belong

18   as collateral to all lenders.

19          Serta later received an offer from our clients.  And

20   after an independent finance committee reviewed the offers,

21   Serta chose the offer and proposal from our clients.  In an

22   open market purchase, it bought back the debt at a significant

23   discount, and that reduction in debt fortified the company

24   during the depths of the pandemic.

25          I want to make three points today about why that

1   2020 transaction was lawful.  The first is the textual

2   analysis that should be the beginning and end of this case.

3   But the second is an alternative argument that if there is any

4   ambiguity, then the 2020 transaction itself was an amendment

5   modification for waiver of any requirements that did exist for

6   the open market purchase.

7          The required lenders are able to amend, modify or

8   waive any provisions except for the specifically listed sacred

9   rights.  And that's exactly what happened when required

10  lenders consented to this transaction.

11         And the third issue I'll discuss is the claim for

12  under the implied covenant of good faith and fair dealing.  So

13  first the text.  As counsel for the Debtor just explained, the

14  text of the credit agreement unambiguously allowed this

15  transaction.

16         Everyone's focused on the term open market purchase.

17  The Defendants are trying to break that term up into isolated

18  words, but I think there's another mistake they're making

19  that's being overlooked.

20         It's the term that comes before open market

21  purchase.  It has to be a non-pro rata purchase.  And they're

22  conveniently overlooking that because it really dooms their

23  claim.

24         A non-pro rata purchase doesn't contemplate

25  something that's available to all.  And of course, we also

1    know that it doesn't have to open to all because the venerable

2    cannon of construction that when parties use a term in one

3    place, and don't use that term someplace else, that difference

4    needs to be given significance.

5          And here that cannon is particularly powerful

6    because Dutch Auction and open market purchase appear in the

7    exact same sentence.  It's akin to receiving wedding

8    invitations in the same exact envelope.  For one party, it

9    says this is open to all.  And the other invitation doesn't

10   list that.  You would logically conclude that for the one

11   that's open to all, you could bring friends and other guests.

12   And for the one that doesn't have open to all language, you

13   would believe that you didn't have to -- it wasn't open to

14   everyone, and that only the guests on the invitation were

15   invited.

16         It's the same logic here.  The Dutch Auction has to

17   be open to all.  There's no such requirement for the open

18   market purchase.  And this gives independent meaning to the

19   two different provisions.

20         Dutch Auction, while it might generally be viewed as

21   an open market purchase, the parties wanted to carve it out

22   specifically to impose these requirements, of open to all and

23   the four-page list of procedures that attach to a Dutch

24   Auction.

25         And in response to this simple, plain text,

1    straightforward argument, the Defendants offer up a convoluted

2    maze with a 12-point checklist.  And even after all that, I'm

3    not sure what their definition is.

4           But the simple definition of a transaction between a

5    willing buyer and a willing seller is what an open market

6    purchase means, and that's exactly what happened here.  The

7    Defendants are trying to inject into the contract requirements

8    such as the consideration has to be in cash, that there has to

9    be a broker dealer involved.

10           They're importing these concepts from the securities

11    market, and it's an apples and oranges comparison.  I'll just

12    give you one example that I think shows how inapt the

13    securities market procedures are for this syndicated debt

14    market.

15           And that's their argument that there should be a

16    dealer broker involved in the transaction.  And while that can

17    happen in a syndicated debt transaction, it's not required.

18    It's not even typical.

19           And that's because these syndicated loans, they're

20    in a registry.  The sponsor knows who holds the loans.  It's

21    not a situation of the bond market where you might need a

22    broker dealer to go out there and find out who actually holds

23    the bonds.

24           A sponsor can look in the registry, see who owns the

25    loans and place a phone call to start negotiating to buy back

1   those loans.  That's what happens all the time.  This Court

2   often sees these ad hoc lender groups that basically do just

3   that.

4           They're negotiating with the borrower, one on one,

5   without an intermediary necessarily involved.  So the

6   Defendants are trying to deprive the credit agreement of the

7   flexibility and optionality that it gives Serta to buy back

8   its debt.

9           The text of the agreement does not impose these

10  requirements the Defendants want you to read into the

11  agreement.  In contract cases, it's common for lawyers to talk

12  about sophisticated parties.

13          But here these parties are as sophisticated as it

14  gets.  They know what they need to do if they want certain

15  requirements in the contract.  It wasn't done here.  And so as

16  a result, the credit agreement unambiguously allowed this open

17  market purchase of debt from the PTL Lenders, and that alone

18  should be game over for the claims in this case.

19          But if there's any doubt the PTL Lenders have an

20  alternative argument, that by entering into the 2020

21  transaction and the amendments, the required lenders consented

22  to the open market purchase.

23          And if there are any requirements that weren't

24  followed, the 1-L amendment and the open market purchase

25  agreement were the necessary amendments, modifications or

1       waivers that the contract allows

2               Except for the specifically listed sacred rights,

3       all it takes is the required lenders agreeing with the

4       borrower to change any terms of the agreement.  These are

5       living, breathing readily amendable documents.

6               The required lenders exercise a great deal of

7       control.  Required lenders can change and excuse a default for

8       example.  And it's no different here that they consent to this

9       as an open market purchase.

10              I'd note this argument wasn't made before the court

11      in the Southern District of New York, when it found at the

12      pleading stage, there was some ambiguity, and to the extent

13      there's any view of ambiguity here, that the indemnity

14      amendment is a modification that allowed this transaction

15      because the required lenders agreed to it.

16              Finally, Your Honor, I'll address the good faith and

17      fair dealing claim.  As you've already indicated, when a

18      contract expressly authorizes conduct, there's no place for

19      reading implied covenants into the agreement.

20              That would override the parties' agreement, what

21      they bargained for, their expectations, and again that is

22      particularly inappropriate in a case like this with highly

23      sophisticated lenders.

24              But even if there is some implied covenant under

25      this situation, there's no evidence of bad faith here.  The

1    company had two business justifications for entering into this
2    agreement, a cash infusion and deleveraging.
3            Our clients made our proposal as a defensive
4    maneuver after another group tried to strip all the collateral
5    with the proposal.  And we made a defensive measure that kept
6    the collateral for all lenders.
7            So there's no bad faith.  All the parties to this
8    transaction were acting for valid business justifications.
9    And that also defeats a claim for a violation of the covenant
10   of good faith and fair dealing.
11           THE COURT:  First, if I were to go down that path, I
12   mean that's a factual issue, correct?  I mean I would have to
13   hear someone give me the reasons, have someone test that
14   through cross-examination, not a summary judgment issue, would
15   you agree?
16           MR. COSTA:  I wouldn't agree, Your Honor.  But first
17   of all, we would say that the covenant has no place here
18   because the express terms of the agreement authorize it.  But
19   even if you go --
20           THE COURT:  Right.
21           MR. COSTA:  -- past that, there's evidence before
22   this Court, and that evidence shows valid business
23   justifications.  It shows that Apollo was also making the same
24   proposal.  How could it be bad faith when various lender
25   groups are making the same proposals?

1          And Serta, acting with an independent finance

2     committee, decided our proposal was the best for the company.

3     So the New York law is that valid business justifications are

4     not evidence of bad faith.

5          And I see no evidence in the Record.  They've

6     produced a pile of evidence.  There's evidence before the

7     Court in summary judgment, so I think it would be the typical

8     summary judgment question of is there any evidence in the

9     Record that creates a fact issue on bad faith, and I don't see

10    any.

11         So the Court could, as with any summary judgment,

12    rule that there's no disputed fact, and it's as a matter of

13    law, there was business justification that supported this

14    transaction.

15         THE COURT:  So it's your belief that there is the

16    presumption of good faith, and that there has to be evidence

17    of bad faith, or does there have to be evidence of

18    justification for the action that was taken because certainly

19    we've never ever seen two commercial parties trying to get the

20    best of one another in a transaction, right?

21         MR. COSTA:  Right.  And as long as they're acting in

22    their own business justification and not purely to hurt or

23    injure the other side, it's lawful to do that.  That's what

24    happens every day.  And so ultimately they bear the burden as

25    with any claim.  They bear the burden.

1          We have produced evidence of the justification.

2    That's in the Record, and so the ultimate burden lies with the

3    Defendants here to come forward with evidence of bad faith to

4    support their claim, and I don't see any in the Record.

5          THE COURT:  Got it.  Could you get someone to

6    identify that place for me because I just don't remember what

7    you're referring to.

8          MR. COSTA:  In terms of the business justification?

9          THE COURT:  Uh-huh.

10         MR. COSTA:  Well, one place, there's the decks in

11   attachments to the lender's summary judgment motion -- I'm

12   sorry, the Debtors' summary judgment motion.  So I know for

13   example, Exhibit 8 is the deck that reviews the Apollo offer.

14   I believe it's Exhibit 6 --

15         THE COURT:  Right.

16         MR. COSTA:  -- that also has decks with our

17   proposal.  And I get more specific record cites, but there are

18   the various proposals and the finance committee's review and

19   approval of our proposal in the Record.

20         THE COURT:  But you'll be back up.  If you can just

21   have somebody locate for me the best reference.

22         MR. COSTA:  Right.  We'll do that, Your Honor.

23         I do want to address one question you asked about

24   this effect of this transaction on the waterfall.  And I would

25   note that here, the agreement again, holding parties to the

1    words they used in their agreement, doesn't have effect of

2    language.

3            It says there's only a violation of that sacred

4    right when a transaction actually alters the waterfall

5    provision.  And there are transactions.  I think *Trimark*, it

6    was one where the agreement said you can't enter into a

7    transaction that has the effect of doing something.

8            Here that effect of language is absent so again that

9    must be given significance.  They didn't bargain for that

10   protection against something has the effect of.  The only

11   limitations are you can't actually alter the rights, and that

12   didn't happen here.

13           THE COURT:  So let go back and ask you the same

14   question that I asked Debtor's counsel.

15           If I determine that number one, open market purchase

16   is not ambiguous, and that the transaction that was engaged in

17   constituted, or falls within the definition, my definition of

18   open market purchase, everything else just flow from that, or

19   is there something else that you're asking me to do?

20           MR. COSTA:  I think that would be game over, Your

21   Honor.  On the contract claim, that would mean it's

22   unambiguous, and the transaction is allowed.  And on the good

23   faith and fair dealing claim, that would mean the contract

24   expressly authorized this transaction which New York law says

25   prevents a claim for an implied covenant because this is what

1    the parties agreed to and allowed, and you can't upset the

2    contract through some implied theories.

3             THE COURT:  Okay.  All right.  Thank you.

4             MR. COSTA:  Thank you, Your Honor.

5             THE COURT:  Good morning.

6             MR. SEILER:  Good morning, Your Honor.  My name is

7    Eric Seiler, from the firm of Friedman & Kaplan.  I'm co-

8    counsel with Mr. Higgins and Paul Weiss for the excluded

9    lenders other than *LCM*.

10             MR. HIGGINS:  I think Mr. Levy is going to --

11             MR. SEILER:  Talk for *LCM* when I'm done.

12             THE COURT:  Okay.

13             MR. SEILER:  And that's our plan.  I've never been

14    before Your Honor, so let me first of all -- I'm introducing

15    myself for the first time, and I realized from your comments I

16    have an uphill battle to convince you of my position, but I

17    hope to try.

18             THE COURT:  You shouldn't take that at all.  I'm

19    sure Higgins told you, I will poke and prod just because I

20    want to see parties' convictions.  And the fact that I make

21    certain statements shouldn't lead you in any particular

22    direction.  My goal in this is to get it right.

23             You know, I've been pretty clear about the fact that

24    I don't think that the term is ambiguous, just given my

25    experience, my knowledge of common usage, but I've never told

1     anybody, and I've been very careful not to what I think it

2     means.  I've just said that I don't think that it is

3     ambiguous.

4                 MR. SEILER:  I know, that's all true, and

5     Mr. Higgins told me, the other thing he told me is that you

6     read everything very carefully --

7                 THE COURT:  I try.

8                 MR. SEILER:  -- before argument, and so I appreciate

9     all of that.  And so I want to -- I have a slide deck that --

10                THE COURT:  Sure.

11                MR. SEILER:  -- we can share, and I'm going to hope

12    that --

13                THE COURT:  I need to give that person control.

14                MR. SEILER:  Right,  just to (indiscernible).

15                THE COURT:  All right.  I got you.  Hold on.

16                MR. SEILER:  The test will be if you can put up the

17    first slide, and then we'll see if everyone can see it.  If

18    that fails then --

19                THE COURT:  He's got this.

20                MR. SEILER:  Okay.  Let's take off that stuff on the

21    left if we can, so they can just see the slide.

22                THE COURT:  There we go.

23                MR. SEILER:  Oh, it's good.  Okay.  I just see --

24    perfect, now I see it, excellent.  So before --

25                THE COURT:  Let me see, I can make your screen less

1    busy if you would like.  I can also get rid of the parties, or

2    make them smaller if that's helpful to you.

3              MR. SEILER:  Only if it's helpful to you, Your

4    Honor.

5              THE COURT:  I've lived with this for three, four

6    years.

7              MR. SEILER:  This Court is very proficient with this

8    in the post-COVID environment.

9              Before I start talking about the slides though, I

10   want to address a question that you asked in terms of the

11   things you have to do.

12             THE COURT:  Right.

13             MR. SEILER:  Because I am going to argue, and I

14   don't want it to get lost at the end that the -- you can leave

15   up the slide, that's fine.  The good faith and fair dealing,

16   the issue for you as a matter of law is it duplicative so that

17   you don't have to decide it.

18             If you decide that that's not the case, and I'm

19   going to point to cases that say even where there's technical

20   compliance with the contract, there's still an implied

21   covenant of good faith and fair dealing that goes to the

22   fruits of the engagement.

23             And you can win that case.  And we have cases in

24   this very credit arena that I'm going to point you to

25   including one that came down after they filed their initial

1   briefs.

2           At the first department where all five judges saying

3   that's the law.  So that's a legal question for you.  But once

4   you decide that legal question against them if you do, this --

5   as you said at the very first meeting in this case, it is then

6   a question of fact.

7           There are competing facts about whether there's good

8   faith and fair dealing.  And we've made a -- I'm going to come

9   forward and show you facts that show that they have not acted

10   in good faith.

11          But we're entitled to have actual discovery about

12   that before it's decided.  And there have been documents

13   turned over in the *LCM* case where the lenders aren't even a

14   party.  But we have some of their documents.

15          But there have been no depositions, not of the

16   lenders themselves, who we have sued in the answer and

17   counterclaim, not in their advisor, Centerview, not of

18   Centerview talking to Evercore, all the normal discovery that

19   would have gotten done before the Court was presented with the

20   question of whether they lived up to the implied covenant of

21   good faith and fair dealing.

22          Rule 56(D) lets you order that.  It can be done

23   expeditiously.  And I'll make one other point so I don't

24   forget it.  Unlike 9.05(G), which Your Honor stated on the 105

25   motion needed to get decided for the transaction to be okay,

1    so it wasn't just against the lenders.  It also really was a

2    Serta issue.

3         The good faith and fair dealing issue isn't

4    necessarily the same for the lenders in Serta.  You could

5    imagine a world where Serta are trying to raise money in the

6    transaction I'm about to go through acted in good faith but

7    that the lenders didn't.

8         And that the lenders deprived our clients of the

9    pro rata sharing that's in the agreement in a way that injured

10   them at the time, hurt them and that they're uniquely

11   violative of the implied covenant of good faith and fair

12   dealing even if Serta isn't.

13        Now it's possible they both were.  We're arguing

14   they both were, but you don't have the same, I don't think,

15   with respect to the affirmative obligation to judge the

16   lender's conduct.

17        Now you have the case here, but you said at the very

18   end of the 105, maybe if I think about things more, I might

19   revisit that.  And I just wanted to flag the idea that if what

20   survives is the good faith and fair dealing, it doesn't

21   necessarily have to get adjudicated before the bankruptcy is

22   determined because you don't have that affirmative obligation.

23        And that could be resolved here, it could be

24   resolved back in New York.  And I just wanted to say that

25   because like I said, 40 minutes from now, I might forget to

1    say it, so I wanted to say it upfront.

2         So if we could go to the beginning.  I wanted -- I'm

3    not going to try and convince you that the words are

4    ambiguous.  I'm going to try and convince you that the words

5    in the context of this industry and this transaction don't

6    constitute an open market purchase.

7         I think we've all agreed that they need them to be

8    an open market purchase or the transaction doesn't work.  I do

9    think the lenders are saying even if we lose that, our

10   amendment fixes it, so I'll address that.  I don't think that

11   works.  The Debtors not saying that, but the lenders, I think,

12   are.

13        So I look at -- the first slide we're looking at the

14   press release announcing the deal.  And the deal is more than

15   just an open market purchase if it is one.

16        It's an overall integrated transaction.  Why?

17   Because Serta needed to raise money, raises $200 million.  It

18   wants to have -- it's going to treat that as superpriority

19   debt.  It wants to retire some debt, and it does that by

20   exchanging new debt that's just below the 200, for the -- a

21   lot of 1-L, and 2-L debt.

22        And so it's really an open market sale if you think

23   about it.  They're selling new debt for money, and they're

24   doing an exchange.  And it might be that that's going to

25   qualify as 9.05(G), but we should not get confused.

1          This is not a classic open market purchase all by

2     itself.  It's a recapitalization of the company.  And we know

3     that because that's what they say in their press release.  And

4     this is at Docket 91-2.  They are recapitalizing the company.

5          We go to the next slide.  They even say it in their

6     brief.  This is a clip of the very beginning of Serta's moving

7     brief here, where they describe it as a recapitalization

8     transaction that the company entered into in 2020.

9          Now they say it's legitimate because they think they

10    qualify under 9.05(G).  But this what they call.  And if you

11    look at the documents that are in evidence, the board and they

12    have this independent financial committee that considered

13    things, and I think that's at Exhibit 72-4 and 72-5.

14         They never described this as an open market purchase

15    when they're approving it.  They describe it as a financing

16    and an exchange transaction.  And that's because that's what

17    it is.  They raised new money.  They retired some debt.

18         They didn't buy the old debt with cash because they

19    had no extra cash.  This is not a classic, oh, our debt is

20    trading cheap, our loans are trading cheap.  Let's buy them up

21    and retire them.

22         They would have loved to do that, but they didn't

23    have the cash to do that.  And so we have this -- if we go to

24    the next slide, this is a chart that I can't take any credit

25    for designing, but I think it actually illustrates exactly

1      what happened very neatly.

2           So you have on the left what did the capital

3      structure like before, and the favored lender and the excluded

4      lenders were all part of the 1-L debt together.  And then

5      there's 2-L debt below us where also favored lenders and

6      excluded lenders are included.

7           And then what happens is in this transaction, they

8      sell the new super majority.  That debt ends up as Class III

9      in the bankruptcy plan that's before you.  And then they have

10     both 2-L lenders and favored 1-L lenders jump into the new

11     superpriority second act debt.  That's in Class IV.

12          And then our guys, the 1-L's, and then below us the

13     old 2-L's, they're in Class V.  And of course, the Court knows

14     in the plan that we get four cents if we vote yes, we get

15     one cent if we vote no.

16          The Court inquired why are they giving us any cents

17     at all because we're no longer in the same class.  This

18     transaction takes people who were in the same class, the green

19     class, and it separates them, and maybe they're allowed to do

20     it because of the language in the agreement.  But we shouldn't

21     lose track of what it does.

22          THE COURT:  Sure.  That wasn't why I asked the

23     question.

24          MR. SEILER:  Okay.

25          THE COURT:  I asked the question because why give

1    you anything if you're not entitled to anything, and create a

2    confirmation issue.  That's why I asked the question.

3            MR. SEILER:  My lack of -- that makes sense to me

4    now in the bankruptcy world.  But I think the point of it is,

5    if what they've done works, they were not obligated to make

6    the offer.  They chose I guess for their whatever reasons to

7    make the offer.

8            But what this shows, I think, is that the -- it

9    shows what the economic reality of the transaction is, and I

10   don't -- so I think when we talk about whether it works or

11   not, we shouldn't do it in the abstract, and we shouldn't just

12   think about the one piece which is the exchange.

13           Now my colleague is going to argue that exchanges

14   don't work.  It needs to be for cash.  And I don't think

15   that's wrong.  If we say typically we think that's correct.

16   But it is part of this overall restructuring of the agreement.

17           If we just go to the next slide quickly.

18           THE COURT:  Can I ask one question --

19           MR. SEILER:  Sure.

20           THE COURT:  -- before you move on.  With looking at

21   the right side that's titled unlawful exchange transaction --

22           MR. SEILER:  Go back --

23           THE COURT:  Could we go back?

24           MR. SEILER:  -- please.

25           MR. ELONZO:  Go back one, all right.  Yeah,

1    there's --

2              MR. SEILER:  The delay.

3              THE COURT:  So that's okay, got it.  So in looking

4    at the priority of that stack, is there anything wrong with

5    the priority, or is it just the process by which you've got

6    there, that you're complaining about?

7              MR. SEILER:  Well, if they're not allowed to do the

8    purchase portion because it's not an open market purchase --

9              THE COURT:  Right.

10             MR. SEILER:  -- then they wouldn't have gotten the

11   votes to amend, to allow the priority.

12             THE COURT:  I asked a bad question.  So that's a

13   process in my mind.  So let me ask a better question.  So is

14   the stack that you've represented, is that exactly what the

15   transaction was intended to do?

16             MR. SEILER:  Can't speak to what -- well, so by who,

17   I think by the company maybe, by the lenders, I'm not so sure.

18             THE COURT:  Okay.  And what --

19             MR. SEILER:  Well, part of it was, so I think what

20   the company wanted was new money, retire some debt at a

21   reasonable price because it's not as good a price as they

22   could have gotten if they were just buying the loans in the

23   market.  I'm going to come to that in a minute.

24             THE COURT:  Okay.

25             MR. SEILER:  They paid 74 cents on the dollar phase

1     where it was trading at 43.

2               THE COURT:  Okay.

3               MR. SEILER:  The lenders were not going to give them

4     new money unless they got something really valuable, which is

5     as much new -- the superpriority debt as they could plus

6     priority.  And they were not doing this deal unless they could

7     jump out of our class.

8               So the lender's obligations, and more importantly,

9     and not let anybody else in, because if everybody can come in,

10    it doesn't give them priority, right?  Then the green and

11    orange would all be orange.

12              THE COURT:  Yeah, it just reshuffles, but it's

13    the --

14              MR. SEILER:  That's right.

15              THE COURT:  -- same issue.

16              MR. SEILER:  So they weren't -- so it's different --

17    I think there are different motives, and that's why I also

18    think the good faith and fair dealing argument is different as

19    between the lenders and the company because the lenders -- and

20    at the end we've got all this evidence where other lenders,

21    not the ones who were working on the drop down transaction.

22    But some of my clients were not involved in anything, and they

23    weren't allowed in either.

24              I'm going to come to -- I don't think it matters

25    that we were working on a different kind of transaction which

1      might have been subject to criticism if it got done.

2              THE COURT:  Yeah, I -- well, I'll help you there.  I

3      don't care.

4              MR. SEILER:  I was -- Mr. Higgins told me that, too.

5              THE COURT:  So but let me -- I want to come back to

6      the stack if you will.  And so -- and again, I think you're

7      complaining about the process by which the stack occurred, not

8      that the stack itself is problematic.  Is that --

9              MR. SEILER:  I don't --

10             THE COURT:  -- not right?

11             MR. SEILER:  -- want to --

12             THE COURT:  All right.  I want to understand.

13             MR. SEILER:  Well, first -- if the stack was not

14     properly created through a process, then I'm complaining about

15     the result of the process.  That's just that.

16             THE COURT:  No, I got that.  But if you had to

17     sever -- so the -- let me try it this way.  The breach of

18     contract claim is the process by which the stack got created,

19     do you agree with that?

20             MR. SEILER:  Because I think the transaction

21     breached the contract, so I will say it certainly does that.

22     I can't say that --

23             THE COURT:  And then is the stack itself the breach

24     of good faith and fair dealing, or is it the process that's

25     the breach of good faith --

49

1                    MR. SEILER:  Well, so the --

2                    THE COURT:  -- and fair dealing?

3                    MR. SEILER:  -- good -- so the -- there's two

4      quintessential elements of good faith and fair dealing.  One

5      is losing the fruits of the deal you had, and so the new stack

6      destroys the fruits.

7                    THE COURT:  Right.

8                    MR. SEILER:  So I think the new stack itself is the

9      proof of the -- that was there a violation of good faith and

10     fair dealing.  And the second is in -- oh, my -- well,

11     actually I think doesn't -- I think they address submission.

12                   The stack itself is the result of the good faith and

13     fair dealing.  So it's one of the elements I'd have to prove

14     to prove that that happened because if I don't -- if I didn't

15     lose -- for example, if all they had done was the

16     superpriority, first 200 million, they actually needed an

17     amendment to do that.

18                   And if I thought, well, you can't do that, but they

19     got fair value for it, I still am where I was, you know, the

20     company has new money, but they got new debt, I wouldn't have

21     destroyed the fruits of my deal argument.

22                   So I might still think there was a technical

23     violation of not having done it appropriately, but I wouldn't

24     have an argument that there was a implied covenant.  And the

25     cases, and you'll -- we'll talk about them, but the ones in

1    the industry, and the ones more generally, the whole point is
2    destroyed.
3              And the point was we were all in the same class and
4    we would get protected in the event of bankruptcy equally.
5    And the money that came in would be shared with us pro rata,
6    and that has been eliminated.  And done for reasons to exclude
7    us that are bad faith.  And I think that's the --
8              THE COURT:  Got it.  Is there an agreement that I
9    haven't seen that says you would be treated the same way in a
10   bankruptcy case by the company?
11             MR. SEILER:  No.  I think it's the priority.  If we
12   were in the same class --
13             THE COURT:  Okay.  You're just making --
14             MR. SEILER:  -- the priority rules.
15             THE COURT:  -- the argument that that's evidence of.
16   It's not that there -- you're not saying --
17             MR. SEILER:  There's no separate agreement.  I think
18   it's just --
19             THE COURT:  Okay.
20             MR. SEILER:  -- the rules of priority in bankruptcy.
21   I brought Mr. Herman with me in case there was a bankruptcy
22   question but I think that's the answer to that.
23             THE COURT:  No, I got it.  I'm just trying to
24   understand where -- if you haven't figured this out, I'll make
25   it very transparent for you.  I want to understand where the

1     source of the claims is coming from.  That's the whole reason

2     I'm walking you through this and I have to get it straight in

3     my mind.  And so that's why we're having this conversation.

4     And I tried a couple different really poor --

5             MR. SEILER:  No, I'm not -- I realize I haven't --

6     you keep asking the question, so I must not have given a

7     satisfactory answer, but I kind of -- I think it's a

8     combination of the process and the outcome, and that relates

9     differently to my core technical contract claim and my implied

10    covenant claim, which I think has more context to it because

11    you have to show where you ended up.  But I -- so let me --I

12    may not -- we go now to the next slide.

13            But just briefly the rating agency is both Moody's

14    and S&P saw this transaction for what it was, and they

15    understood how it was going to affect my clients.  And if we

16    go to the slide right after that, because that's really the

17    illustration of it.  This is the pricing that -- there we go.

18    So the 1-L debt was trading in the 40s, right up until the

19    transaction, and then when the transaction got announced, it

20    started to trade in the 20s.  You see that little green dot,

21    that's the 74 that they got, cents on the dollar, in the

22    exchange.  And so the math is actually interesting.

23            The average price for the 1-L debt before the

24    transaction was 43, they get new 1-L debt and it's phased at

25    74 and it has a better coupon.  The 2-L debt was trading

around 8, it's not on my chart -- and they got new 39.  So in
each case they got a 31-point bump over where the market was.
And that becomes important because in an open market purchase
-- I take their point that if you're buying a lot, you might
not be able to buy at all where the market is -- but this is
31 points higher, because it was a negotiated price.  And it
was all done together -- and we'll talk about all the elements
that are required.  But this was a big difference.

And they point out to me and I think this was a
correct criticism in the lender's brief.  Well how do you know
where the 74 face new priority debt was trading?  And the
answer is same source of evidence, but it is evidence that is
copyrighted.  But it was just below 100, it was around 92.
And so if you apply 92 times 74, it's 68.  And so before the
transaction, we're all in the same class, we all have 1-L debt
that's worth 43 in the open market, where people can buy and
sell it, including the company.

Afterwards, the new 1-L super debt is trading
effectively in the high 60s and we're trading the 20s.  And so
that's what the effect of the transaction is and we shouldn't
lose sight of that effect.

And so the question becomes, were they allowed to do
it.  And I'll go to the next slide.  And I think, Your Honor,
I am sure has looked at the operative paragraph, but I'll put
them up just to see them.

1          There's 218(C), which is the provision that is the

2     -- if a lender gets too much it's not pro rata it has to share

3     it with the other lenders to make it pro rata.  And the

4     exception you see at the bottom is Section 905.  So if they

5     fall into 905, then that solves the problem for them.

6          And you go to the next slide, slide 7.

7          If you're going to change that, you need to have

8     everyone's consent.  That's in 902(B)(a) and the exception

9     again is 905(g).  So I think they agree with me that if the

10    905(g) exception doesn't work, then what they've done is

11    required unanimous consent.  Except the lenders have their

12    amendment argument, which I'll come to.  But I think the

13    Debtor agrees with me.  That they need 905(g) to be the

14    exception that solves the problem.

15         So let's turn to 905(g) which is the next slide,

16    Slide 8.  And I -- okay.  It must be being sent somewhere up

17    in space and coming back down to our.  I'll have to have

18    Elon Musk do a faster transmission from the satellite.

19         So this 905(g), I'm sure Your Honor has looked at it

20    and this is what you have to construe for the purpose of

21    deciding is it unambiguous and then more importantly, if it

22    is, what does it mean.  And so I think -- let me just spend a

23    couple of minutes talking about contract construction

24    methodology that I think is important here.

25         We all agree that you're supposed to give meaning to

1    all the terms, and so a definition of through open market

2    purchases that have subsumed the Dutch Auction exception,

3    should be disfavored, right?  Because we have this as a

4    provision that says we have pro rata sharing, there's an

5    exception, so this is a definition of an exception, and we

6    have two examples of the exception.  So if we come up with the

7    definition of open market purchases that is so broad that you

8    don't need A any more, that makes you suspect that, that's the

9    wrong definition.  And here, of course, the definition they

10   urge is any transaction between the company and someone who

11   has the loans, as long as they agree on a price.

12           Well that would be a Dutch Auction.  A Dutch Auction

13   is doing it with lots of people.  It would be a Dutch Auction

14   open to all the lenders.  It would be a Dutch Auction open to

15   only some of the lenders.  It would be an action that's not a

16   Dutch Auction.  I don't know if, Your Honor, remembers, but

17   the treasury market has Dutch Auctions now.  But they didn't

18   use to.  Before 1992 they had multi-price auctions and so you

19   could pick off the best price from everybody who you were

20   selling to.  This is actually a reverse Dutch Auction which

21   are fine.  But so it would cover a non-Dutch Auction, multi-

22   price auctions, because any transaction, any purchase, meets

23   their definition.

24           And I'm going to try to urge to you in a minute,

25   well, that's too broad, because we have to give some meaning

to the words open market, because it doesn't just say purchase
and we shouldn't do it in a way that completely undermines the
pro rata concept.  Because why have the pro rata concept in
the contract at all if you can do anything you want.

And so I -- I will -- or we've tried to say explain
this and we show the criteria and I'm going to come to that in
a second, but what is the definition of an open market
purchase that is consistent with this?  And I would say it's a
purchase by a borrower, from a lender, of outstanding loans,
at prices reflecting where the loans are available for
purchase in the open market.  And it doesn't require
extraneous new purchases of debt.  It doesn't require amended
loan docs.  It doesn't require a new inter-creditor agreement.
It doesn't require indemnification.  If you're going to
transact in the open market, you buy something.

And whether they're right that you could buy it with
something other than cash, it's a simple transaction where you
get something that someone else has, as opposed to a
recapitalization, which is what this transaction was.  So when
we're trying to decide what the words mean, I think we need to
make sure we don't violate those principles of contract
construction.  And I'm not arguing by the way that it has to
be open to everyone immediately because -- and their argument,
well, we didn't say that in A.  A says open to all lenders, so
B means it doesn't have to be.  This fails for reasons that

1        don't turn on whether it was open to everyone.  It turns on
2        that it was an open market the way the market understands it.
3                 And that I think takes me to the next slide and I
4        think maybe the most important point I want to make about the
5        contract construction.
6                 And this comes from the lenders on brief, at page 18
7        of their initial brief.  And they say, "Courts may consider
8        industry custom and usage where necessary to understand the
9        context in which the parties use specified terms."  They said
10       the Debtor didn't say that, but the lenders did.  And that's
11       right.  They cited case law for that.  And I think Your Honor
12       even said well open market purchase can mean something in
13       other context, but here what does it mean in this context?
14       And so let's call the context the loan market.
15                And then the question is, well, how do we form an
16       understanding of what open market purchase means in the loan
17       market.  In this loan market in 2016.  And we thought it was
18       helpful to introduce evidence from participants in the loan
19       market.  An expert who was a trader term consultant that's
20       Murray.  A lawyer who had been drafting documents that's all
21       she did, Sarah Ward.  And my friend Mr. Levy introduced a
22       professor who studies this at NYU.
23                And not to prove that their views on the case were
24       right, but to give context to the Court to understand how
25       people understood this term in the loan market.  And then we

1       both cite -- and I'm going to come to it -- there's this trade

2       association, the LSTA, and what how they think of it because

3       that's the context that has to apply when you're deciding I

4       can -- these are unambiguous terms, I'm going to apply them in

5       this context to this transaction.  The question is, is this

6       transaction in or out?

7               And you need to I think bring that context.  And

8       what they say in response to me is, well, they're paid

9       experts.  Well, yes, all experts get paid.  There are no free

10      experts that you can consult and bring to the Court's

11      attention.  And instead they say well we have letters that law

12      firms have written.  Well, they're paid, too.  Maybe not by --

13      for writing that letter, but by their clients.  And they are

14      all -- they are on both sides.  I'm going to go through them

15      quickly in a second.

16              And then they say -- and this was important -- well,

17      in 2016, this was a friendly time for borrowers and so this

18      language should be treated broadly.  And I say to you -- but

19      the history shows this was language that got put in right

20      after the financial crisis -- started to get put into 2009 and

21      '10, it doesn't change.  And their proof that 2016 means it

22      should be very flexible and friendly, well, that proof is just

23      signed in the Gibson Dunn brief.  There's no evidence of

24      anything.  It's a lawyer being paid, telling the Court what

25      they think the market was.

1          Now we all agree the market was less troubled in

2     2016 than in 2010 or today, but in a way that meant that

3     pro rata is obliterated?  I don't know.  No proof.  And so I

4     don't think that saying it helps you.

5          But in any event I now have in a couple of slides,

6     I'm going to show you what -- sorry, here in Slide 9, the

7     history of how this developed.  It was first in the secured

8     bond market, and it carries over because the investors in the

9     two markets are the same.  And there were -- the goal was to

10    have pro rata, but to allow some exceptions.  Why?  To let

11    companies buy back the debt when it's trading very low, why?

12    Because -- and both experts say this -- that's not only good

13    for the company, it's good for the other lenders.  Because if

14    you can take a debt that's 100 and buy it back at 50, with

15    only 50 in cash, then everybody is better off, because there

16    is more -- the underlying value of the company is more to

17    support them than if they left the debt outstanding.  And

18    that's why they want the debt retired and that's typically

19    what happens.

20          And I think we can skip ahead to the next slide.

21          I've listed the things that are observed to be in

22    the market typically in understanding what happens.  And

23    typically, it's done through a broker dealer.  Why?  Because

24    it's anonymous.  And the company says I would like to buy back

25    some of my debt, it's trading cheap.  Well how much do you

1    want to buy back?  Oh about this much.  At what price?  About

2    this much.  The broker goes out and finds people.

3             And yes, they don't look in the phone book, they

4    look in the list of people who they know have debt who they

5    have relationships with.  But nobody wants to tell someone

6    that they're looking to sell.  They want it secret so the

7    broker creates anonymity.  Sometimes they even trade in a

8    matched principle way where the lender sells to the broker and

9    the broker sells to the company and it's not name give up at

10   all.  Because then people don't know what other people are

11   doing and that's the role of the broker.

12            And typically it's for cash.  And the trades settle

13   one on one, in a bilateral way and the borrower doesn't care

14   who they're getting it from -- company, because they're just

15   trying to reduce their debt.  And the LSTA standard

16   documentation is used.  And it wasn't used here.

17            Here we have an amendment of the credit agreement,

18   amendment of the inter-creditor agreement, indemnification,

19   not standard documentation.  And the pricing is near the

20   market price, and there's no purchases here near the market

21   price.  And even crediting their point that, well, if you buy

22   a lot the price might go up, they didn't do it that way.  They

23   let everybody join together.  Because the lenders weren't

24   willing to do it unless they ended up with 51 percent so they

25   could amend the agreements and get the superpriority.  And the

1    experts say there's no separate agreements required and no

2    special conditions imposed on buyers and sellers.

3             So this is different than what people were doing for

4    open market purchases up until this transaction.  And if you

5    read these -- the law letters, they talk about the Serta

6    transaction.  This was something new that didn't exist before.

7             And I think I can skip over slide 11, because I

8    think it says the same thing.

9             And so we do have the law firm letters -- and this

10   will take us to slide 12.

11            And of course we enjoy pointing out that one of the

12   law firm letters that we like was from Weil Gotshal -- where

13   they distinguish between open market purchase on the one hand

14   and then they privately negotiated a purchase on the other.

15   And that's of course that's what this is, it's a privately

16   negotiated bespoke recapitalization transaction.

17            And Gibson Dunn says the same thing that is they

18   identify both as being possible things you could do.  And so

19   -- and then there are law firm letters that don't make that

20   distinguishing characteristic.

21            If you go to slide 13, there are law firm letters

22   that say both.  But there are many that distinguish between

23   privately negotiated and open market.  And my view is none of

24   them are trying to explain what's before your Court here, Your

25   Honor.  They're just writing descriptive treatment to their

1       clients, so that the clients know to use them for future

2       things that they do.  They don't tell you as much about what

3       the market is than an academic who studies it, the *LCM* expert.

4       Or people who participated in doing these transactions as a

5       principle, that's Murray, and then as a consulting agent after

6       she sold her business.

7              So and now I want to -- so I think that in thinking

8       about it in context you should take into account how people

9       were doing things before the Serta transaction.

10             And then I want to focus particularly at the LSTA

11      regime, and that's Slide 14.  Because I think it's actually

12      important -- we'll wait for it to come up.  I'll take a breath

13      because I'm talking too fast.

14             THE COURT:  No.  That's -- so for next time -- and I

15      don't know how your folks did it today.  It's often better to

16      bring your own WiFi, because you share the WiFi connection

17      with everybody on the floor, so.

18             MR. SEILER:  Send them all home.  I'm just kidding.

19             So twice in the favored lenders reply brief, the

20      Gibson Dunn brief, they quote from the LSTA complete credit

21      agreement and use the sentence that says, "A buyback

22      methodology whereby a borrower is allowed to negotiate one on

23      one with individual lenders to repurchase loans."  To say well

24      that's what we did so the LSTA says it's okay.

25             But when you actually look at the full document,

1    they left out, up to a pre-agreed dollar amount.  And that's

2    embodying -- this is the LSTA explaining, this is right after

3    they have an explanation of Dutch Auction, and that's because

4    they're explaining what this usually is.

5            The company decides they want to buy a certain

6    amount of money -- a certain amount of loans back at a certain

7    price level or price range.  They tell their agent, or they

8    can quote them directly if they want to, but they don't

9    usually do it that way.  And they tell the broker dealer,

10   okay, that's how much I want to buy, up to the agreed amount

11   they want at the agreed price, and then they try to make the

12   trades and do the purchases.  Typically with money pre-agreed

13   dollar amount.

14           It is not saying -- the LSTA is not telling anybody

15   that the Serta type transaction where there's going to be a

16   recapitalization, and new superpriority debt, amending credit

17   agreements, that's what happens.  The LSTA documentation

18   doesn't have any of that in it.  They didn't use the LSTA

19   documentation because it was inapplicable.

20           And by the way they make a point that, well,

21   Evercore is a broker dealer.  Well. they do have a broker

22   dealer business, but those weren't the Evercore people who

23   worked on this transaction.  It was their investment bankers.

24   And I think in their Disclosure Statement here, they explained

25   that the broker dealer is walled off from the work they're

1    doing here.  So that's not what happened here.  And again,

2    it's for you to decide what it means, but if you're putting it

3    into the context of what it usually means, what it means to

4    people on the market, this is different.  And I think that

5    that is critical for the analysis.

6          And we summarize it all on the next slide, on

7    Slide 15, where we list each of the -- each of the typical

8    characteristics of what the market thinks is an open market

9    purchase and what they did.  And I've been through some of

10   this, so I don't want to spend tons of the Court's time, but

11   in every important respect, it's different.  It's not at the

12   -- I mean, we just go down the list.  It wasn't through a true

13   broker dealer, they talked to -- they needed 50 percent, if

14   you're doing open market purchases, you talk to however many

15   people you need to buy the amount you want to buy.  And our

16   expert explains that it's not reaching everyone.  And part of

17   the reason is because it starts to sound like a tinder offer.

18         Now it's not a public tinder offer, because it's not

19   securities rules don't apply.  But it would and this grew out

20   of the same market history for secured bonds, and so you don't

21   talk to everybody.  And by the way, I should say this here.

22   The fact that they talk to my clients about a drop down

23   transaction, doesn't mean they talk to my clients about this

24   transaction.  This transaction was designed to be 50.1 and no

25   more because that was what was advantageous to the lenders and

1   that's what they were -- the favored lenders -- and that's

2   what they're insisting on.

3           And so it was bespoke.  It was debt for debt, they

4   had no cash.  It had the requirement that they buy the new

5   debt for $200 million and that's not typically on an open

6   market purchase.  There's no, you have to buy something else,

7   no tied purchase requirements.  And then it did affect us

8   negatively.

9           And typically in a regular open market purchase,

10  it's either irrelevant or good for the people who don't sell,

11  because the company is buying back their debt cheap.  And here

12  you saw the chart, it was really bad for the people who

13  weren't a part of it.

14          So I think I've talked about that and we have the --

15  again, we can skip over the next slide and go to Slide 17.

16          And I do want to remind the Court -- I'll wait for

17  it to come up.  They knew had to do regular open market

18  purchases because they did them and they did them after this

19  transaction.  And they gave us this information under the con

20  fee, so we filed it under seal.  The seal -- the Docket number

21  that I think you can look at it is 102.  I don't know why they

22  think the purchase prices they paid subsequently for 2-L and

23  1-L debt are not something that could be in the public record.

24  But they bought -- so I won't say the numbers, but they bought

25  millions and millions of dollars of second term loans at

1    around half of their face value.  In 2021 did it in the first
2    quarter, did it in the second quarter, and they bought a
3    little bit of 1-L loans as well.
4          And so with cash, retiring the debt, classic open
5    market purchase.  And not so they did that, they knew what it
6    was and that's how they did it.
7          So I think I'm going to come to the amendment point
8    now.  But my pitch to the Court, my argument to the Court, is
9    yes, it's unambiguous, but yes, they're right, market context,
10   we have evidence of market context.  And you might decide that
11   you've heard enough of that evidence.  You might decide they
12   should have a chance to put in market context evidence beyond
13   the law firm letters.  You might think that's a fact question
14   that would aid your decision or you might not, but I don't
15   think you can decide as a matter of law that this is an open
16   market purchase as this agreement contemplate.
17         I guess I should -- I should address here, well, if
18   you really wanted to make it clear, you could have spelled out
19   all those things in the contract that existed in 2016.  And
20   the answer is, well, sure, you could have, but where there's a
21   market convention that's understood, you don't need to.  If
22   the term really is unambiguous and understood, then using that
23   term is sufficient.  And I'll come back to, if you use that
24   term in a way that obliterates the entirety of the pro rata
25   treatment, why was there a pro rata requirement of sharing

1    with the lenders?

2            And I would say -- and I'll just give a -- I'll try

3    a hypothetical that's their case, but slightly clearer.  Make

4    believe that they -- instead of getting 74 cents on the new

5    debt and capturing some of the discount, they said, we'll sell

6    it at 98.  The new debt, the superpriority debt is going to be

7    face 98, you trade in your 100 for 98 and we want some new

8    money, let's make believe it's $5 million of new money.

9            What we want, though, is why are we doing that,

10   because Advent, the private equity sponsor, we're worried

11   about this credit, but we really like this group of lenders

12   who have supported us on this debt originally and we might

13   have other deals with other companies in the future and we

14   want to help them jump over -- jump out of their class and be

15   priority over the people who are excluded.  And that would

16   meet their definition.

17           They didn't do that.  That would have been even

18   worse.  For the company it would have been less beneficial,

19   but it would have been -- on their definition completely

20   legitimate, because any purchase or exchange of debt allows

21   them to have the ability to vote to make it 50.1 percent, and

22   it's an open market purchase.  And that definition should be

23   disfavored.  A definition -- even if it's not spelled out with

24   all the bells and whistles.

25           And by the way if tomorrow after -- if you rule

1    against us and you say this worked, and you would be the first

2    Court -- we had two courts that said it was ambiguous.  One in

3    this case and one with an open market purchase in now this

4    language.  No one has said what it means, yet.  This Court

5    will be the first.

6           Then in the future, people might say, "Well, we

7    better have protections that you redefine it in more detail or

8    have other provisions that protect people."  But there's

9    trillions of dollars of debt out there with these -- this

10   language.  And this is what people can do.  It's maybe not the

11   Court's responsibility to worry about that, but right now, in

12   the credit market, you have to worry about the credit of the

13   company that you borrowed -- that borrowed from you.  And that

14   changes over time.  And that's not the easiest thing, but

15   there are smart people, some of them are in this room, who

16   worry about that everyday and that's why market trades where

17   it does.  But if this works, we have a whole new risk.

18          And the risk is, is there going to be a team of

19   50.1 percent, and am I going to get to be on that team?  Or is

20   it all going to happen and I'm going to find out about it

21   later?  So now I have a new risk.  It's the risk of the

22   recapitalization restructuring masquerading as an open market

23   purchase risk that's been blessed.  And, oh, that makes my --

24   that's a risk so that makes the value of holding that debt

25   lower, because it's a risk that is there.  I'm not sure how

1          you could price it.  But if that actually affects the market,

2          then it's going to hurt the companies, too.

3                    Because the ability to get credit -- we were

4          watching this today in the bank context.  When people get

5          nervous about the ability to get credit, it disrupts the

6          economy in a pretty big way.  And I don't mean to put that --

7          shift that burden to this Court.  But this -- the reason that

8          there are all these people watching, is because this is the

9          first case and it will have consequence.

10                   And right now there's a big question mark against

11         this kind of behavior, right?  Because Judge Vela said it's

12         ambiguous, Judge Masley in the State Court, the same language

13         said it's ambiguous.  So if someone's planning to do it, well,

14         their worry, well, it's ambiguous; will it work or not?  And

15         if it's found to be both unambiguous and applicable to this

16         transaction in this way, they can do my example.  And that's

17         going to effect the people who participate in this market and

18         I think it's something that we shouldn't lose sight of.  Now I

19         recognize you know, to be one case, but it would be one of

20         one.

21                   THE COURT:  It could be one of three, right?

22                   MR. SEILER:  Well the other ones haven't been --

23         well, the Judge Vela's case is stayed so it's not going to get

24         finally decided.  And Judge Maisley's case -- I don't know

25         what will happen in the *Boardrider* case, so that could be one

1        of two -- but it hasn't been decided and so it's not without

2        -- and again, you know, it may not be this Court's job to

3        worry about that, but it's part of the reality of the

4        economics.

5                  THE COURT:  Which I worry about everything.

6                  MR. SEILER:  So.

7                  THE COURT:  But let me go back to the fundamental

8        question.  You said that if there is something that has common

9        meaning or an industry definition that we have to give

10       credence to it.  Those are my words, not your words.  But the

11       same concept with Dutch Auction, right?  Everybody who has had

12       a first-year business school course understands what a Dutch

13       Auction is, and yet we created a whole scheme as to what

14       constitutes a Dutch Auction in this particular transaction,

15       didn't we?

16                 MR. SEILER:  So I think, in fact, there are flavors

17       of Dutch Auction that exist in the world, so if you want to --

18                 THE COURT:  Now I've got to be careful about that,

19       so there can different flavors of open market transactions,

20       right?

21                 MR. SEILER:  Sure.  But I'm saying that this one

22       isn't -- and that's why I say typically for cash.  That's why

23       I say -- I mean, I and our experts say typically you reach out

24       through a broker dealer.  But could you if you knew that, you

25       know, lender X in advance has a lot of debt, could the company

1    just call them up directly?  Not typically.  But maybe.  And

2    then so if that's all that happened and someone claims, well,

3    you didn't use a broker dealer, I think it --

4              THE COURT:  Well you're just -- aren't you just

5    arguing that the type of security matters?

6              MR. SEILER:  I think the context, the type of

7    security does matter.  I think why this fails is that it's so

8    different from what -- if you take the concept that open

9    market purchase has some flexibility because it's not a

10   defined term, it's not spelled out --

11             THE COURT:  Right.

12             MR. SEILER:  -- and it's in the thing about vin

13   diagram, it's over here.  You can't do something that's way

14   completely different in every respect.  And that's why I gave

15   you my definition which is informed by market prices, and not

16   with extraneous agreements, because that's never what happens

17   in an open market purchase.

18             So whether the consideration could be cash and

19   something else, I don't know what asset they would have to --

20   can take.  But maybe that's okay, because it's not defined.

21   But if it's something that's completely different and is

22   really a recapitalization, and is really a privately

23   negotiated restructuring of the company, then -- and my job,

24   with all respect, is not to answer every case where someone

25   could do something, whether it's good or not, it's whether

1    this case counts.

2          THE COURT:  Right.

3          MR. SEILER:  And I think that's the Court's job.

4    But I think this is so different that it's outside of that

5    like undefined small o, small m, small p, open market purchase

6    term.  And the fact that we have one that's more carefully

7    defined doesn't mean that this could mean anything.  I mean

8    that's where their position.  This means it's just a purchase,

9    right?  Open end market have no real meaning, because the

10   purchase is just from someone who has it and someone who wants

11   to buy it.  That's every purchase.

12         THE COURT:  Right.  So let me -- because you said

13   this a couple of times, and I let it go the first couple of

14   times.  I mean, I don't think that, that's what they've done

15   at all.  I think that what they've said is that we have a

16   defined market that required people to react to what you were

17   presented with.  I mean, if your market's three people, that's

18   a very different market and you're going to behave very

19   differently within that market, than if it's unlimited or two

20   million or five million different participants, right?

21         MR. SEILER:  That's certainly true.  Can't argue

22   with that.

23         THE COURT:  No, no, no.  I mean, I'm just trying to

24   see where we agree and where we disagree and so I don't think

25   that they just said we can do whatever.

1          MR. SEILER:  Could we go back to Slide 8 so we're

2     looking at the language in the 905(g)?  So this is a lender

3     transacting with an affiliated lender.

4          THE COURT:  Right.

5          MR. SEILER:  And affiliated lender is defined to

6     include the company.  Right?  So we've already defined, before

7     we come to what the exceptions are, that we're limiting it to

8     the market of people who want to buy, the company, and people

9     who own it, the lender.

10          THE COURT:  Right.

11          MR. SEILER:  Right?  So -- and then -- so they say

12     that's one of their elements that it's between those two

13     people.  And I'll say of course it's between those two people,

14     they are the only people who could do the transaction.  And so

15     -- and it's a purchase, right?  The lender is selling its

16     existing debt to the company, the affiliated lender, so it's a

17     purchase.  So how does that make it an open market purchase?

18     Why not just say purchase?

19          And the why I think market means something is,

20     because the way it's usually done, there is this secondary

21     market where the debt trades.  We shouldn't forget about that.

22     And it trades, not everyday, it trades over the counter, and

23     it trades at a price that gets reported by these agencies

24     including market and Bloomberg.  And in a normal open market

25     purchase, as the company did in 2021, they go out and they buy

1      some at or about the market price.  And here they bought it

2      31 points higher than the market price --

3              THE COURT:  Right.

4              MR. SEILER:  -- and they gave them superpriority in

5      a side deal and they sold them something new, $200 million of

6      debt.  That's not typically what happens in an open market

7      purchase, and that's not what the industry understands it to

8      be.  And that's -- because it's totally -- it's totally

9      different.

10             THE COURT:  Right.  And so in your mind is open

11     market purchase -- because those words have to mean something,

12     right?

13             MR. SEILER:  As a phrase.

14             THE COURT:  In your mind open market purchase

15     encompasses everything that was done in the entire

16     transaction?

17             MR. SEILER:  I think you have to -- I think, yes,

18     because the transaction is an integrated transaction.  And

19     they will tell you -- we had testimony, no one was telling --

20     no one was giving $200 million for new debt stand alone.

21             THE COURT:  Right.

22             MR. SEILER:  And nobody was trading 100 face for 74

23     unless they got the priority, why would you do that?  So those

24     two, and those two things, the company wasn't doing one

25     without the other.

1          THE COURT:  And so again, I just want to make sure I

2     understand the argument.  Your argument is, is that when I

3     look at open market purchase, I, by definition, have to

4     include anything that may have precipitated it, as well as

5     anything that may subsequently occur after because the

6     purchase happened.

7          MR. SEILER:  I don't know that I quite go that far.

8     You don't have to anticipate the bankrutpcy.

9          THE COURT:  I'm just trying to see --

10          MR. SEILER:  I think you have to look at --

11          THE COURT:  I'm just trying to see how far you will

12     go.

13          MR. SEILER:  I think you have to go look at things

14     that happened at the same time.

15          THE COURT:  Okay.

16          MR. SEILER:  That's how far I would go.  Whether you

17     -- I think for good faith and fair dealing, you might look at

18     the rationale of what they were trying to do, but for the

19     transaction itself, whether it counts as an open market

20     purchase, you look at what happened at the transaction which

21     is an integrated transaction.  It's not in separate pieces.

22     It's not economically in separate pieces, and it wasn't

23     actually technically in separate pieces.  That's why they

24     needed all the documentation to do it.

25          THE COURT:  And so why is it not called an open

1    market transaction as opposed to an open market purchase?

2              MR. SEILER:  Well a purchase is a kind of

3    transaction.

4              THE COURT:  I agree that a purchase is a

5    transaction, but not all transactions are purchases, right?

6              MR. SEILER:  Yeah.  But okay, but the terms of the

7    purchase included getting the priority and buying some new

8    debt.  That was all part of the purchase of the -- if the

9    company.  So I would like to buy -- I would like your old

10   debt, I will give you 74 for a 100 --

11             THE COURT:  Buying some new debt, do you mean

12   getting by making the loan and receiving the note in exchange

13   for that?  That's not really buying new debt, right?  Or am I

14   missing something?

15             MR. SEILER:  The lenders are buying the new debt,

16   the company is selling it.  The company is getting

17   $200 million, the lenders are getting a new piece of paper.

18             THE COURT:  So if you -- if you're a bank and I come

19   to you and I say I would like to borrow money for a car,

20   you're selling me a loan, is that?  I just want to understand

21   the vernacular that you're using.

22             MR. SEILER:  I would probably not say, sell, I would

23   say providing you a loan.

24             THE COURT:  Well, why is it any different in this

25   case?  If they were providing $200 million in additional

1  financing, but you want to call it a sale.

2        MR. SEILER:  So if it was a car dealer who I owed

3  money to and I want to restructure it --

4        THE COURT:  Well you don't owe money to until you

5  actually get the new money.

6        MR. SEILER:  No, but here the company owes money to

7  these lenders already.

8        THE COURT:  But they didn't owe the $200 million --

9        MR. SEILER:  Correct.

10        THE COURT:  -- until they got $200 million.

11        MR. SEILER:  That's right.  But they tied the two

12  things --

13        THE COURT:  So why is one a sale, and why is one

14  providing you a service.  I'm just trying to understand why

15  you use the term differently.  If I borrow money from a bank

16  to buy a car, your definition, bank is providing a loan.

17        If I -- evidently if I borrow $200 million that the

18  person who gave me that $200 million is somehow selling me a

19  loan.  That's what I'm having trouble with.  Your words, not

20  mine.

21        MR. SEILER:  No, no, I'm not sure I was trying to

22  say that.  The lenders are providing money to the company --

23        THE COURT:  Okay.

24        MR. SEILER:  -- $200 million, and the company is

25  giving them an instrument that reflects that.

1             THE COURT:  But until right now you have said that

2     the lenders were -- that they were being sold -- that there

3     was a sale of this loan going on of $200 million.  It's

4     factored into every portion of your argument that you've made

5     since you stood up.

6             MR. SEILER:  Yes.  Because they were not going to

7     get what they wanted which was priority unless they --

8             THE COURT:  That is totally irrelevant.  I ask you

9     just one little bifurcated thing, what was the $200 million?

10    There was an exchange.

11            MR. SEILER:  New money for a new debt.

12            THE COURT:  Exactly.  There was no sale of anything.

13    Do you agree with that?  In that small little bifurcated

14    portion of the transaction, it's just a new loan.

15            MR. SEILER:  It's a new loan, I agree with that.

16            THE COURT:  Okay.  I'm just trying to figure out why

17    you keep --

18            MR. SEILER:  But it don't think it changes -- I

19    don't think it changes what I'm saying.

20            THE COURT:  I'm just trying to understand you.

21    You've never argued in front of me before and you kept -- you

22    pick your words very carefully, and I admire that, and I keep

23    wondering why you kept using the word sale, every time you

24    talked about the $200 million.  I'm just trying to understand

25    you.

1          MR. SEILER:  So I suppose a better word would be

2     issuing, right? for them selling, the company is issuing new

3     debt --

4               THE COURT:  Yeah.

5               MR. SEILER:  -- and getting money.

6               THE COURT:  Yeah.

7               MR. SEILER:  I adopt that -- I appreciate you --

8               THE COURT:  So you didn't mean anything by it --

9               MR. SEILER:  -- said I used my words so carefully.

10              THE COURT:  -- is what your telling me?

11              MR. SEILER:  Not to distinguish from what I just

12    said, no.

13              THE COURT:  Okay.

14              MR. SEILER:  Not to say --

15              THE COURT:  Okay.  Okay.

16              MR. SEILER:  And I try to be careful with my words,

17    but I'm not sure I succeed quite as much as you just gave me

18    credit for.

19          But let me -- let me go back to where I was, because

20    I've obviously taken a lot of time, but I do want to talk

21    about the amendment, and then good faith and fair dealing.

22              THE COURT:  Okay.

23              MR. SEILER:  So I think -- and I think this will

24    take us to Slide 18.

25          And I think my point here is that the amendment --

1     it's necessary to -- they can't issue the new debt without the

2     amendment, but if this is not an open market purchase, saying

3     that it is, which is what their amendment does.   Their

4     amendment isn't as bad as *TriMark*, it's different than

5     *TriMark*.   In *TriMark* they actually changed the definitions.

6          Here, they say we don't have to change the

7     definitions, we just declare that this what we just did is an

8     open market purchase.   And saying it and putting it in an

9     amendment document, if it's not right, doesn't fix it.   And

10    under *TriMark* if -- *TriMark,* you can't actually amend the

11    definitions to make it work.   Just announcing it and labeling

12    it doesn't work.   I think that's my point.   I think Serta

13    doesn't actually take a different position, I think the

14    lenders do and I think -- in fact in their reply brief it's a

15    big portion of their reply brief.   I just think it's wrong

16    that you don't get to fix it by saying so.   Anymore when they

17    call us, whatever the drop down Defendants.   No.   We're the --

18    the label doesn't matter, it's the content.

19          THE COURT:   Right.   I tend to agree with you that I

20    think all of the parties in the beginning could have defined

21    what an open market, an open market purchase was for purpose

22    of a credit agreement.   But I agree with you that you can't go

23    back and simply, by majority vote, make something okay.   I

24    tend to agree with that argument.   And it also makes me wonder

25    why.

1          MR. SEILER:  Why any -- no so -- and I'll say

2     something about that and then I'll go to good faith and fair

3     dealing.  Why do you need indemnity if you know you're okay?

4          THE COURT:  Because we're all lawyers in this room.

5     (Laughter.)

6          MR. SEILER:  I was in the *JC Penny, Macy, Martha*

7     *Stewart* case, which we cite.  I was Martha Stewart's lawyer,

8     *JC Penny* from Texas and they indemnified us.  And the judges

9     thought that, that proved that the transaction was

10    problematic.  And I tried to argue against it.  But typically

11    you worry that's why you seek indemnity.

12         And here when people tried to get into the case

13    after it gets announced when there were some lenders who said

14    include me, include me, too, and they get excluded, there was

15    concerns about whether it worked or not.  And there was a

16    question about whether they should offer it to them or not,

17    and I can't get into documents that are -- I'm not going to

18    get into documents that are subject to this fight about

19    privilege, but you do -- you have to think it's at least a

20    fair question that we could be fighting about in good faith

21    about what it means here.  And why that's important is it's

22    the second reason that Judge Vela said good faith and fair

23    dealing stays in the case.

24         But first she said it was not duplicative.  But then

25    she says, well, if it's a fair question, then you get to bring

1    your good faith and fair dealing also.  And they actually

2    cited that in their moving papers, the lenders, as being

3    another place where you would have to do good faith and fair

4    dealing.  And then I think, as I said before, it's a question

5    of facts.

6           So let me come just to the cases, I told you would

7    do that.  We can skip over and go to Slide 20.

8           And these cases are all cited.  But they all say the

9    same thing.  A technical compliance isn't enough.  It's true

10   in *Rama plus Central School*.  It's true in *Nexia* say it and

11   that's 2022.  But the case law I want to focus the Court's

12   attention on is what's called -- I call it *Marble Gate*.  But

13   it's *AEA Middle Market Debt Funding vs Marble Gate Asset*

14   *Management*.  It was decided on March 7thin the Appellate

15   Division of the Supreme Court of New York.

16          The Court's probably familiar of the three-step

17   process.  So that's the court that hears appeals from the New

18   York County Court, it's right below the highest court, which

19   is the Court of Appeals.  A five/nothing decision in that case

20   came down after their briefing, so they didn't cite it in

21   their moving brief, but they don't really talk about it in the

22   reply.  It's an inter-creditor dispute just like this one.

23          The difference was it was a credit bid that the

24   majority lenders used the administrative agent to win and then

25   take all the assets away to the detriment of the minority

1      lenders.  So a different violation of a pro rata than this

2      one, but a violation of pro rata, with a credit bid, contract

3      claim, and separately a claim for implied covenant of good

4      faith and fair dealing.  And it's like to all the cases that

5      everyone's been talking about in the briefs here and all the

6      doctrines and it says -- and I think we actually put it in a

7      bullet if we go to the next slide in 21 --

8               THE COURT:  Got it.  While he's doing that, is there

9      a difference in your mind between a contract not expressly

10     prohibiting certain conduct and a contract that permits the

11     conduct?  Is there a difference in your mind for purposes of

12     good faith and fair dealing?

13              MR. SEILER:  So even if -- no, I think the short

14     answer is no.  A contract that has a technical list of things

15     you have to do to be in compliance can still have a violation

16     -- and you do those things -- you could still violate the

17     implied covenant of good faith and fair dealing if you act in

18     a way that obliterates the core fruits, is a term the Court's

19     keep using, of the contract.  Yes.

20              And I think if you think about it, it wouldn't be

21     the doctrine in very many cases, right?  If you just have

22     prove lack of compliance, you win the contract case.  If you

23     can't prove lack of compliance with the contract

24     prescriptions, you lose the contract case, you would never get

25     to the implied covenant.

1          And we have in this case, which is I think totally

2     analogous because it's an inter-creditor dispute about

3     pro rata and there's the separate cause of action which

4     survives.  And they point to -- and I put the language up --

5     in violation of the duty acting in willful bad faith Marble --

6     this is the allegation in the amended complaint -- and *Marble*

7     *Gate* designed the restructuring transaction so as to defeat

8     contractual expectations of pro rata treatment.  They

9     concealed it.  They revealed it as a fait accompli, and that's

10    what we say here.

11         THE COURT:  Well that can't be exactly the same,

12    right?  I mean, everybody knew what was going on in the

13    market.  Your clients were making proposals, these guys were

14    making proposals, I mean there wasn't -- there wasn't any sort

15    of surreptitious in the shadows, you know, activities, were

16    there?  I mean.

17         MR. SEILER:  No.  There were.  Yes and no, I would

18    say.  Because --

19         THE COURT:  Yes and no.  Okay.

20         MR. SEILER:  Because we knew the company needed

21    money.  We knew the company wanted to find a transaction that

22    works.

23         THE COURT:  Right.

24         MR. SEILER:  -- we were working -- some of my

25    clients were working on a drop down transaction and others

1    were blissfully ignorant --

2              THE COURT:  Okay.

3              MR. SEILER:  -- of what was going on.  And this

4    transaction the up tier, they stopped talking to my clients on

5    June 5th --

6              THE COURT:  Right.

7              MR. SEILER:  -- and on June 8th they announced the

8    up tier transaction with none of the documentation.  Paul, my

9    co-counsel, went to court to try and enjoin it, they didn't

10   get the injunction.  Only after that litigation are all the

11   documents disclosed.

12             So I would say that knowing the company is in

13   trouble and they're talking to you about something completely

14   different in structure, isn't the same thing as what they did

15   and the key thing about their transaction was it had to

16   exclude people.

17             THE COURT:  Right.

18             MR. SEILER:  This could only work --

19             THE COURT:  But I'm assuming that your folks told

20   all the other members of the lender group that they were

21   engaged -- that they were negotiating a transaction, right?

22             MR. SEILER:  Well my -- I don't know -- I think they

23   told some people, but not everyone.  But that again, Your

24   Honor, that's the -- maybe if we had done everything and

25   excluded people, and not let them in, and afterwards not tried

1    to negotiate it, and relied on this, maybe we would have

2    gotten sued for violating the implied covenant of good faith

3    and fair dealing.  And maybe if the company went into

4    bankruptcy you would have the case and if it didn't it would

5    have been heard in New York, and maybe we would have lost, but

6    that doesn't make what they did okay.

7              THE COURT:  Totally agree.  I'm just trying to

8    understand your conviction in making that argument.

9              MR. SEILER:  My conviction is if we would have done

10   it, too, we would have to deal with it, too.

11             THE COURT:  Okay.  Fair enough.

12             MR. SEILER:  So and then I guess I've talked about

13   this a lot.  So let me skip to Judge Vela's decision in this

14   case for *LCM* and that's Slide 24.  I think I've --

15             Oh, I'm sorry I want to address one other argument,

16   then they can reply, and then will come to Slide 24.

17             THE COURT:  Okay.

18             MR. SEILER:  In the lender's arguments they say,

19   well -- they cite this LIBOR antitrust litigation for the

20   proposition that subjective intent doesn't matter.  So just so

21   when the Court looks at that, that case was the class action

22   certification -- Judge Wipwols (phonetic) decision is like

23   400 pages long, dealing with all of the *Dauber* challenges to

24   the experts and all of that.

25             And the Defendants were saying, well, we're going to

1    have a separate trial for every counterparties' intent as to

2    what LIBOR trades meant.  And he says, no, it's a reasonable

3    man standard.  The reasonable man's interpretation of what

4    would be required, not each individual Plaintiff.

5          And here it's not about what we the Plaintiffs think

6    at all.  The question is whether the conduct that we would

7    have to prove that the Defendants and their advisors went

8    through, whether that violated the implied covenant of good

9    faith and fair dealing.  So there is not -- it's not -- their

10   intent and their objectives matter in that somewhat.  But

11   their actions matter more, and we need to have discovery of

12   all of that, because we've had none, except some documents

13   that have been turned over.  But typically in discovery you

14   get to take depositions and ask interrogatories, and they've

15   said well after this decision, we'll talk to you about that.

16   And so that case doesn't stand for the proposition, but what

17   we're asking to find is not enough.

18         And so Judge, so I'll go to Slide 24 and Judge Vela

19   in this case on this credit with this agreement for *LCM* with

20   the contract dispute, she says, "Even if the -- assuming the

21   transaction qualifies as a permissible open market purchase" -

22   - that's the technical answer to your question, that's 905(g)

23   -- "Plaintiff's argue the Defendant colluded with the bare

24   majority of lenders to abuse the power to amend the agreement

25   to create a new class of debt, which maneuver was barred by

1    the previous terms of the agreement.  To the extent Plaintiffs

2    seek to pursue their claim for breach of implied covenant of

3    good faith and fair dealing on this theory it may proceed."

4          And I would say to you we're at the same stage.

5    That was a motion to dismiss.  But as to this issue, we're at

6    the same stage, we have now had access.  We actually got the

7    documents from the lenders an hour before we filed our papers

8    on March whatever day it was.  So we've actually started to

9    look at them.  There is stuff there that is useful, we've put

10   some of it in our declarations.

11         And I'll go to the next slide to show that to you,

12   Slide 25.

13         And that's the Maller (phonetic) declaration mostly

14   where he talks about Advent's outreach efforts.  His efforts

15   to talk to them.  The fact that they were playing favorites.

16   That they were ultimately maybe going to let Angelo Gordon

17   into this deal, although -- but not Apollo and not Dammit

18   (phonetic) which are three of my clients together.  And then

19   our other clients were never offered it.

20         There's evidence in the record where people tried to

21   get in, and they were first told, well, okay maybe, and then

22   they were told no.  And all of that would be part of a robust

23   -- not the hardest record in the whole world to put together,

24   but a robust record where you could decide or the New York

25   Court could decide if you changed your mind about that whether

1    good faith and fair dealings was met or not.  And so I think
2    under 56(d) that's the obligation to do that.
3            I understand why the Court wanted as a -- to front
4    the question of open market purchase because if you decided, I
5    hope, that it's unambiguous and their transaction doesn't
6    work, they would want to start over or appeal.  And if they
7    fight against us, we might make a -- we would make I think a
8    54(b) application to get it resolved.  But this claim, I think
9    decides separately.
10           And so, Your Honor, one other thing I do need to
11   talk about, even though they chose not to, unless you don't
12   want me to which is the disqualification of Apollo --
13           THE COURT:  Sure.
14           MR. SEILER:  -- that's against us.  And I will try
15   and do that expeditiously.  But the short answer is it's a
16   factual question.  They were not on the disqualified list at
17   the relevant times.  The proof that they've come forward with
18   is insufficient.  But I'll give you the slightly longer --
19   hopefully only slightly -- answer.  Because they are asking
20   you to decide as a matter of law that they were properly on
21   the disqualified list and I don't think you can on the Record
22   that exists before you.
23           So in 2016, Apollo bought debt in the first issuance
24   of this loans, and they were not on the disqualified list
25   then.  We have an affidavit for a declaration from Theo Quan

1    (phonetic) who is a partner at Apollo that says that he bought

2    debt in the original 2006 lending transaction, 70 million

3    face.  That's at Docket 100 paragraphs 4 and 5.  They bought

4    debt subsequently, that's also in the same affidavit in the

5    same paragraphs.

6          So in March 2020, Apollo tries to buy more first

7    lien debt from Barclays (phonetic).  We've put in evidence

8    that they were told at the time they were not on the

9    disqualified list, that's paragraph 7 and 8 of Document 100.

10   That UBS, the administrative agent, told Rachel Dwyer

11   (phonetic) that they were not on the list on March 13th.  On

12   March 17th the IHS market, which is the party that was

13   assisting UBS to do its administrative duties under the credit

14   agreement, confirmed that Apollo is not a disqualified

15   institution.

16         In mid April, UBS personnel confirmed in multiple

17   conversations with Apollo that they were not on the DQ list.

18   On April 23rd, same thing, paragraph 13 in the Quan

19   declaration.  And then on April 28th, UBS put the trade

20   through and hours later rescinded the trade the same day.

21         And why were they acting this way at UBS, because

22   they had gotten an email, and it's at Docket 87-1 back on

23   October 18th, 2016, it was given to us as confidential, so I'm

24   not going to put it on the screen, but it says, Apollo off DQ

25   list for SSB -- SSB being Serta Simmons.  So we're off the

1    list.  And it was unqualified directive, it was what UBS

2    relied upon.

3              And in fact they told us in May -- in May after they

4    wouldn't do the transaction with us, they wrote and they said

5    that Mr. Prince, who was the advent principal, had modified

6    the original list, where they were listed, to say an email

7    telling us Apollo was no longer on the list.  So they viewed

8    the 2016 email as taking Apollo off the list at all times.

9              And now what they've come forward with now to say

10   is, well we had this mark up, that I assume the lawyers made,

11   that said we were only taking some of the Apollo entities off,

12   not the ones that could use loans to try and negotiate.  And

13   who did they send that to?  Not UBS, they sent it to Serta --

14   or Serta sent it to Apollo -- or I mean, to Advent.  And that

15   doesn't count.

16             What counts is what the arranger knew it to be and

17   we don't even have a declaration from Mr. Prince here saying

18   what he did or what he didn't do.  And so I don't see -- and I

19   realize this is a small issue, so I've now spent this much

20   time as I should, but I don't think you can grant summary

21   judgement on this Record at all.  There needs to be some

22   limited discovery to make sure we each have what other people

23   did, and you can decide whether they're on the DQ list or not,

24   and whether they get to stand as creditors today in Class 5 or

25   whether they're just participating from the people at

1    Barclay's who still have the debt.  So I think you can't grant
2    that --
3              And then I am sure that Mr. Levy is annoyed with me
4    for talking so much.  So unless you have more questions of me,
5    I will sit down.
6              THE COURT:  No.  I don't.  But I appreciate the
7    engagement.  Thank you.
8              MR. SEILER:  Thank you.
9              THE COURT:  Good morning.
10             MR. LEVY:  Good morning, Your Honor.  Vincent Levy
11   for *LCM*.  I will try to be brief and not to repeat what has
12   been said.  But I did want to focus on a few points --
13             THE COURT:  Okay.
14             MR. LEVY:  -- in the contract.
15             And to discuss first the open market purchase term.
16   We agree that, that is the determinative issue on the contract
17   claim, briefly address the amendment point that's been made by
18   the lenders, and touch on the duty for good faith and fair
19   dealing again briefly.  Just bear in mind what has been said
20   just by virtue of me not repeating doesn't mean I don't agree
21   with it.
22             THE COURT:  No.  I totally got that.  Do you believe
23   that the term is ambiguous?  Or do you now adopt the position
24   that it's not ambiguous?
25             MR. LEVY:  I think in our brief we said it was

1          unambiguous in our favor.  So I understand Judge Vela said it

2          was ambiguous and it's admitted of our interpretation, and we

3          take that position as a back up argument.  Our primary

4          argument is that it is unambiguous in our favor.  Based on the

5          cannons and constructions, which I'll walk through.  I think

6          the parties --

7                    THE COURT:  So let me take a step back.  Then you

8          get to go second, so I'm not going to be as quiet.  So I want

9          to -- didn't ask you if in whose favor you think it ran.  Are

10         you now taking the position that you believe the term to be

11         unambiguous despite prior arguments, representations,

12         briefing, findings that may have occurred.

13                   Is it now your position that the term is

14         unambiguous?

15                   MR. LEVY:  We've always argued that it was

16         unambiguous in our favor.  Judge Vela --

17                   THE COURT:  So we're going to start again and I'm

18         going to urge you to really listen to my question.  Because I

19         promise you there is a switch inside me and it can change in

20         just a flat second.  Simple question.  Regardless of any

21         opinion that may have issued previously, regardless of any

22         findings, arguments, anything that may have occurred, is it

23         your position standing here before me today that the term is

24         unambiguous, yes or no?

25                   MR. LEVY:  That is our primary argument, yes.  Yes.

1          THE COURT:  It's a yes or no question.  Yes or no,

2     is it unambiguous?

3          MR. LEVY:  Yes, sir.

4          THE COURT:  Yes.  It is unambiguous?

5          MR. LEVY:  That's right.

6          THE COURT:  I don't want there to be ambiguity about

7     that.  Okay.  Not starting well, so let's keep going.

8          MR. LEVY:  So our argument is based on the text of

9     the contract, applying cannons of construction, that the text

10    is unambiguous and does not cover the transaction that

11    occurred here.  It is common ground that New York -- that

12    under New York law, words in a contract are to be read

13    according to their plain meaning in the context, and you have

14    to look at all the words in their context.

15         Everybody says this, I think we abide by that

16    cannon, I don't think that Serta and the lenders do, and I

17    want to take the words in sequence and look at the context.

18         THE COURT:  Okay.

19         MR. LEVY:  As Your Honor, rightly pointed out, not

20    all transactions are purchases.  And so we start with the word

21    purchases.  And Serta and the lenders would like, I think, to

22    conflate the word purchase to mean transactions.  And from

23    time to time they will use the words interchangeably, but they

24    are not.  New York law does define and dictionaries do define

25    a purchase to mean a transaction for an acquisition for cash

1          or its equivalent.  It is a caricature of our position to say

2          that it's only for cash, because we said always for its

3          equivalent.  And on page 15 of our brief, the constraint that

4          we impose is that the condition -- the consideration has to be

5          of a nature that every single market participant could offer

6          and cannot be of such a nature that only Serta could offer.

7          And that's what we have here and that is a very simple reason

8          as to why this is not a purchase.  It is an exchange.  And it

9          is not an open market purchase.

10                 So purchase under dictionary definitions under the

11         cases denotes an acquisition or cash or its equivalent.

12                 And the point remains as I said that a purchase is

13         not an exchange, we say that a few times in our brief, and

14         then the reply today there was no response to that point.

15         There was instead a conflation of the concept to say an open

16         market purchase is an acquisition of loans between a willing

17         buyer and a willing seller.

18                 New York law is clear that an exchange is not a

19         purchase.  Those are different things, and the contract in

20         different places emphasizes the same point.  The word

21         purchase, of course, has to be read as modified by the words

22         open market, which according to dictionary definitions does

23         imply anonymity in setting the market price, and it's

24         determined by free competition, and the cases in the Whilmo

25         (phonetic) memo that was referred to earlier and various

1      sources, do distinguish between an open market transaction and
2      a privately negotiated transaction.
3              THE COURT:  Right, so does -- you said that open
4      modified purchase.  Does open modified purchase, or does open
5      modified market?
6              MR. LEVY:  If I misspoke, I apologize.
7              Open modifies market and the phrase, open market,
8      modifies purchase.  It's an open market purchase.  Perhaps
9      there should be an hyphen between the open and the market.
10             THE COURT:  Okay.
11             MR. LEVY:  As we read it, the word "open" modifies
12     "market."
13             THE COURT:  Okay.
14             MR. LEVY:  It is not an open purchase, it's an open
15     market purchase.
16             There are cases that refer to the concept in the
17     securities context as -- to be distinguished from vender
18     offers, private negotiations.  We understand, of course, that
19     these instruments are not regulated by the securities laws,
20     but that the context in which other debt instruments, other
21     securities, other financial products are exchanged, or are
22     traded or acquired, does bring meaning that the Court should
23     consider in interpreting the words of this contract.  It is,
24     after all, a financial instrument that we are considering.
25             So together as we say down in page 15 of our brief,

1    the words capture an acquisition on a secondary market for

2    cash or its equivalent at a prevailing price.  It is not an

3    exchange and the consideration cannot be of a nature that

4    other market participants cannot offer; otherwise, that is not

5    an open market purchase.

6         Now, they say that an open market purchase is

7    effectively any transaction between a buyer and a seller.  I

8    don't want to repeat what Mr. Seiler said, but I don't know

9    where that definition really comes from.  It doesn't mean of

10   limiting principles and it leaves very little by the way of

11   office for the words open market or even for the word

12   purchase.

13        If it's true that this transaction counts as an open

14   market purchase, it's hard to see what does not.  And that

15   brings us to, I think, the context in which the words appear.

16   The words appear, as Your Honor just saw, in Section 9.05(G),

17   which says that the company may acquire loans, either through

18   a Dutch Auction --

19        THE COURT:  Can we put -- did you give back control?

20        (Pause in the proceedings.)

21        THE COURT:  And I'm really sorry.  I forgot your

22   name.

23        Ah, you've still got control.  Okay, terrific.

24        Can you put up 9.05(G), just slide the header on it.

25

1           MALE SPEAKER:  Yes.  That slide --

2           THE COURT:  It had some highlighting on it.

3           MALE SPEAKER:  -- is Slide 8.

4           THE COURT:  There we go.  Thank you.

5

6           MR. LEVY:  Thank you, Your Honor.

7           THE COURT:  Uh-huh.

8           MR. LEVY:  So this is the context in which the words

9     appear.  I should add, however, that 9.05(G) is an exception

10    that appears in a list that begins in 9.05(a) which itself

11    prohibits the acquisition of loans by Serta, except subject to

12    what follows.

13          So this is an exception to a general prohibition.

14    So the allowance for an open market purchase must be read in

15    that light and cannot be read as a matter of newer

16    construction, or really contract and statutory construction

17    everywhere, to swallow the prohibition on the acquisition of

18    loans.  It has to be read ordinarily.

19          It also should be read next to and in harmony with

20    the allowance of Dutch Auctions.

21          Your Honor has heard already a number of arguments

22    about the schedule to the Dutch Auction mechanism and why it

23    was necessary to prescribe that.  I think the point does

24    remain that if you adopt the broad definition of the word

25    "open market purchase" that Serta and the Lenders are

1    proposing, it will swallow the rule and it will make -- I'm

2    sorry, it will make the Dutch Auction mechanism a complete

3    circle such becuase it will capture not only the Dutch Auction

4    that is specified in the agreement, but also others that do

5    not adhere to the schedule that is set forth in some detail.

6    And I think the point is actually made in the Lender's reply

7    brief at paragraph 26 where they discuss these concepts.

8            THE COURT:  So is it your belief that what occurred

9    constituted a Dutch Auction?

10           MR. LEVY:  No, Your Honor.

11           THE COURT:  Okay.

12           MR. LEVY:  But if the definition of -- if this is

13   okay becuase the definition of an open market purchase is

14   broad enough to capture every transaction between a willing

15   buyer and a willing seller, which is the definition they've

16   given, then that would also capture -- that definition would

17   also capture Dutch Auctions.

18           THE COURT:  Right, okay.  I agree.

19           MR. LEVY:  Right.  So Serta and the Lenders have yet

20   to give a definition that would give -- allow their

21   transaction to go through, bearing in mind what I said before

22   about the meaning of the word purchase and open market, while

23   leaving meaning to the concept of Dutch Auction that's not

24   subsumed by the open market purchase definition that they

25   propose.

1           The other contextual point I want to make really

2      starts with 2.18(b), which I think was one of your slides.

3           MALE SPEAKER:  No, it's not a slide.

4           MR. LEVY:  It's not a slide.  That's okay.

5           So 2.18(b) is the *pari passau* provision, which says

6      that distributions will be granted pro rata, except for

7      certain exceptions and it lists four exceptions.  I think

8      there was a prior said it did list those exceptions maybe in

9      the context of the amendment.

10          And the ones that are listed in 2.18 and in 9.02(b),

11     which is the amendment provision, identifies four exceptions.

12     The exceptions are 2.22, 2.23, 9.02(c), and 9.05(G).  9.05(G),

13     of course, is the provision we've just been looking at, which

14     concerns open market purchases and Dutch Auctions.

15          2.22 is the provision that permits incremental

16     credit facilities provided that they are *pari passau*, or

17     junior to the first lien loans.

18          2.23 permits Defendants to engage in extensions of

19     loan maturities, subject to certain restrictions, which are

20     that they be open to all in *pari passau*.

21          9.02(c) provides for replacement loans, so long as

22     they are junior or *pari passau* to the one -- to the first

23     liens

24          And then we have 9.05(G), which concerns buy-backs

25     of loans either through the prescribed Dutch Auction

1    mechanism, or through the undefined open market purchase

2    concepts.  And again, if the definition of open market

3    purchase is as they say, if it's broad enough to capture this

4    exchange, then surely it would capture, as well, the exchanges

5    and transactions that are set forth as the other exceptions in

6    2.18(b) to the pro rata sharing, and it leaves those

7    exceptions no independent office and it puts the restrictions

8    on exchanges being *pari passau* or junior without any force or

9    effect.

10           Our reading of the words open market purchase leaves

11   room for all these concepts, reads the contract in harmony,

12   allows for the company to exchange -- to engage in exchanges

13   for debt that is *pari passau* or junior.  Theirs does not.

14           So under New York law, the answer is clear that

15   applying these kind of construction, looking at the words

16   according to their dictionary definition in the context of

17   9.05(G), 9.05 more generally 2.18, the transaction was

18   prohibited.  It was not an open market purchase.

19           Unless Your Honor has questions on this, I wanted to

20   turn to the amendment issue becuase I don't want to repeat

21   what Mr. Seiler so eloquently said on the subject of the

22   contract breach, but in our minds the contract is clear and

23   resolves the issue and we do say in our brief, I understand

24   that if the Court does not accept this interpretation that at

25   best it is ambiguous because these same kinds of

1   constructions, clues in the contracts and the market and

2   industry evidence point to an interpretation that at least

3   fairly subsumes ours.

4          And in the context of industry and market

5   expectation, I do want to point the Court to Exhibit 2 to our

6   submission, which is under seal, so I don't want to disclose

7   what it says in open court.  It is an email that sets forth

8   LSTA's view or a representative of LSTA's view at the time in

9   2020.

10         THE COURT:  Got it.  And just for the Record, where

11   is that located?

12         MR. LEVY:  It's Exhibit 2 to the Lieberman Exhibit -

13   - or Lieberman Affidavit, which I believe is Document 82-2.

14         THE COURT:  82-2, all right.

15         MR. LEVY:  And the passage that I'm referring to is

16   at the bottom of the first substantive page with Bates stamps

17   ending with 668.

18         THE COURT:  Got it.  Let me just take a second.

19      (Pause in the proceedings.)

20         THE COURT:  All right.  I've read it.  Tell me the

21   import again in your mind.

22         MR. LEVY:  I'm sorry?

23         THE COURT:  I've read the email.  I've actually read

24   all of the back-and-forths.  Tell me again the import in your

25   mind.

1          MR. LEVY:  I think there was some back-and-forth

2     that you had in a colloquy with Mr. Seiler about the market

3     expectations at the time and the industry expectations at the

4     time.  I think this is relevant to that question and it's a

5     contemporaneous document by a market participant about the

6     industry's understanding of what happened and whether it was

7     foreseeable or not.

8          I think we referred to it also in our brief, if I'm

9     mindful of the ceiling.

10          THE COURT:  Okay.  I got it.

11          MR. LEVY:  So I'm, again, mindful not to repeat what

12     has been said.  I do want to touch briefly on the amendment

13     argument.  I take it that Your Honor is not so much convinced

14     that anyone could ratify after the fact, but I did just want

15     to point to a couple of provisions in the agreement that

16     dispell the notion that the Lenders -- a subset of the Lenders

17     could change -- could ratify this transaction by amendment and

18     it starts with 9.02(b)(a)(6), which is the provision that I

19     think Mr. Seiler put up about the requirement for unanimity to

20     modify the pro rata right provision, subject again to the same

21     exceptions I discussed earlier, 2.22, 2.23, 9.02(c), 9.05(G).

22          There's a separate provision in the agreement which

23     is just a couple of lines down, which is 9.02(b)(B)(1), which

24     states that unanimous Lender consent is required to amend the

25     amendment provisions, which makes sense.  You don't want to

1    have an amendment undo the requirements, and the position is

2    just that that being the case and the agreement barring

3    amendments to the prohibition on pro rata, you cannot -- there

4    is no -- it is not a fair interpretation of the contract to

5    permit an amendment to the exceptions by less than unanimity,

6    which is what effectively is being said here and there's a

7    case that also supports that point of view, which is the *Ukipa*

8    (phonetic) case, which I think is cited in Mr. Seiler's brief.

9          On the duty of Good Faith and Fair Dealing, we do

10    think that Judge Vela got it right on whether the claim was

11    duplicative or not and whether there is such a claim and

12    whether it is stated.  The only way I think the claim could be

13    duplicative is if the Court grants summary judgment for us on

14    the open market purchase and grant and rules that the contract

15    bars what they did.  If it allows what they did, then there is

16    an implied covenant claim that is not duplicative at this

17    point when the meaning of the contract is in dispute.

18          That's what Judge Vela explains.  She cites New York

19    law and that is black letter law, and there is a fact issue as

20    to whether the Defendants acted in good faith.  It is on this

21    motion their burden to demonstrate the absence of a genuine

22    issue of material fact.  I don't think they come close to that

23    with their opening papers.  We put in additional information

24    with our opposition papers to try to explain some of the

25    contours of the claim, but it is their burden and they don't

1    meet it.

2         And we do think that to the extent it poses --

3    there's a question on the point, we ought to have -- and the

4    Court does think they did meet it, which again we don't think

5    so, we ought to have the ability to conduct discovery so that

6    we can oppose their showing by explaining what they did and

7    why we think it breaches the Covenant of Good Faith and Fair

8    Dealing.

9         *LCM* was not approached in it by Serta and the

10   Lenders.  *LCM* did not propose an alternative drop down or any

11   other sort of transaction.  It had these instruments and it

12   learned of the transaction publicly in June of 2020.  And it

13   does not know exactly what happened, there are many documents

14   that appear to have been withheld on privilege grounds, one of

15   which is subject to a clawback motion.  And we've had no

16   opportunity to depose the participants in the transaction to

17   understand what they did, but Judge Vela -- at least where we

18   are as a matter of effectively pleading -- got it exactly

19   right that this case should -- the claim should proceed to

20   discovery.

21            THE COURT:  Okay.  Thank you.

22            MR. LEVY:  Thank you, Your Honor.

23            THE COURT:  All right.  Any response?

24            MR. LENDER:  Thank you, Your Honor.  David Lender

25   again for the Debtor.

1          I'm just going to respond to a few points.  First,

2     I'll start with the $200 million superpriority incremental

3     facility, the debt.  So there's no dispute, I'll just say we

4     agree with you that was a new loan, but I thought it was

5     telling that despite my getting up here and saying they don't

6     claim that we couldn't do that and that they admitted it in

7     the Complaint, nobody disputed we could do it, which means,

8     Judge, if we could add $200 million of incremental equivalent

9     debt on top, that means the contract does not prohibit

10    subordination.

11         It also means that the amendments are allowed

12    because we had to actually amend certain provisions to allow

13    us to give those superpriority and payment status.

14         So that $200 million concession really undermines a

15    lot of the arguments they've made about amendments and things

16    like that.

17         In terms of the pricing issue that my colleague,

18    Mr. Seiler, talked about, he said, well, it could be higher

19    because we were buying a big slug of debt.  And then he also

20    talked about a negotiated price, which I thought was

21    interesting becuase that's effectively -- we agreed that would

22    be an open market purchase.

23         It is telling, Judge, that in the Record and it's at

24    Exhibit 8 and 88406, Exhibit 8 at page 88406, it indicates

25    what the price was that their team was offering for their

1    competing bid, which was actually higher than our bid and the

2    one we accepted.

3            So it's just -- again, we were out there negotiating

4    with 70 percent of market and took the best price we could

5    get.

6            Obviously open market doesn't subsume Dutch

7    Auctions.  Dutch Auctions are a very unique process.  Your

8    Honor knows about that, that's one of the specific

9    requirements in the contract.

10            In terms of usage and custom, I think the law is

11    pretty clear, you can only consider that if there is an

12    ambiguity and it's really only there if it needs to be

13    considered, if it's needed to understand the term and that,

14    again, only if there is an ambiguity and then it has to be

15    definitive.

16            I didn't hear any rebuttal to the point I made about

17    all the inconsistencies between the different experts and

18    whether it's a 12-point requirement or Mr. Seiler put up an 8-

19    point version, he put up an 11-point version, in the brief

20    there's a 12-point version.  The fact is none of that is in

21    the contract like the Dutch Auction that has all those

22    specific requirements.

23            I know they love the Weil letter by my old partner,

24    which is clearly extrinsic evidence, but I do find it

25    interesting that they always fail to read what the letter

1    actually says.  Becuase what the letter says is that it's

2    discussed in the context of a bond or a securities buy-back,

3    conducted by a broker or agent, and they're not talking about

4    the purchase under an existing credit agreement.  In fact, the

5    article says explicitly that the optional -- the optimal type

6    of bond buy-back transaction will depend on the relevant

7    indenture documents and if applicable, the credit documents,

8    which is obviously exactly our point.

9        My colleague said that Judge Mazie's decision in

10   *Board Riders* had the same language.  I think he may have

11   misspoke.  In *Board Riders*, the sacred rights provision did

12   not have a carveout exception for open market purchase like we

13   have here.  So it's a different provision.

14       The last thing I want to discuss is the implied

15   covenant issue, then I'm going to turn it over to

16   Ms. Barrington to briefly discuss the DQ issue.

17       THE COURT:  All right.

18       MR. LENDER:  They cite *Board Riders, Marblegate,* and

19   Judge Vela's decision in *LCM.*

20       Well, all three of those decisions.  All three of

21   those cases held that an implied covenant claim should be

22   dismissed as duplicative of a contract claim if both claims

23   arise from the same facts and seek identical damages for each

24   alleged breach, and I'll give you the cites.

25       *Board Riders,* 2022 Westlaw 10085886 at Star 9.

1          *Marblegate*, 2023 Westlaw 2394680 at Star 11.

2          And *LCM,* 2022 Westlaw 953109 at Star 15.

3          All three of those cases recognize the principle

4  that we're arguing here for legally why the implied covenant

5  claim should be dismissed.  In those cases the implied

6  covenant claims were not dismissed because the Plaintiffs had

7  alleged facts that were distinct from the contract claim.

8          I mentioned earlier here -- and it wasn't disputed -

9  - that they plead the exact same operative facts.  Look at

10  their brief, the non-PTL brief at 49, look at the -- and look

11  at their counterclaim at 312, look at *LCM's* brief at 34.  What

12  were the different facts, just so I have them, so they're in

13  the Record?

14          For *Board Riders,* they allege that the transaction

15  was carried out in secret and they amended the no action

16  clause to try to hinder the Plaintiff's ability to sue, and

17  they also eliminated every affirmative and negative covenant.

18  That was the basis of the implied covenant claim as pled.

19  Here, of course, it wasn't in secret, we went to 70 percent of

20  the market as Your Honor knows.

21          *Marblegate*, the contract claim challenged the credit

22  which resulted in different treatment among Lenders alleged in

23  violation of pro rata provision.  What was the implied

24  covenant claim?  The implied covenant claim was based on the

25  minority Lenders alleging that the secured Lenders bid unduly

1    high to trump any cash bid by third parties, which may have

2    been more favorable to the minority Lenders.  That's at page

3    12, different facts.

4         And even if you look at Judge Vela's decision, she

5    alleged that there were furtive negotiations going on that

6    harmed a subset of Lenders, and she said in her decision at

7    page 8, that she could not consider the competitive process on

8    a motion to dismiss because it wasn't alleged in *LCM's*

9    Complaint.

10        Well, here the evidence before the Court is that we

11   went to 70 percent of the market and did engage in a

12   competitive process.  And that's why, Your Honor, the implied

13   covenant claim should be dismissed because legally they're

14   duplicative and they plead the same damages.

15        And with that, unless Your Honor has a question for

16   me, I'm going to turn it over to Ms. Barrington to just

17   briefly cover the DQ issue.

18             THE COURT:  All right.  Thank you.

19             MR. LENDER:  Thank you.

20             MS. BARRINGTON:  Your Honor, for the Record, Luna

21   Barrington on behalf of the Debtors.

22             THE COURT:  Good morning.

23             MS. BARRINGTON:  Good morning.  I'd like to just

24   briefly address the DQ issue, if I may?  The question here is

25   whether in March 2020 Apollo was on the DQ list, not in 2016

1    or 2018 when Mr. Prince sent that email.  There is

2    contemporaneous evidence in the Record from the company that

3    in April 2020 it showed that Apollo was on the DQ list.

4              This is under seal, but I'd refer the Court to

5    Exhibit 31.  This is an email from the company and attaches

6    both the redline of the DQ list and the original DQ list.

7    Apollo is listed on both of those versions.  So Your Honor, we

8    submit that Apollo was on the DQ list at the time in March

9    2020 when they tried to execute these trades; therefore, they

10   were a disqualified institution and those trades were deemed

11   null and void.

12             THE COURT:  So hold on just a second.  I pulled up

13   the wrong exhibit.

14        (Pause in the proceedings.)

15             THE COURT:  You said 31, right?

16             MS. BARRINGTON:  Correct, yes, from our opening

17   brief, Your Honor.

18        (Pause in the proceedings.)

19             THE COURT:  All right.  Got it.  Thank you.

20             MS. BARRINGTON:  Thank you, Your Honor.

21             THE COURT:  Mr. Costa?

22             MR. COSTA:  Not going to forget me this time, Judge?

23             THE COURT:  No, sir.  That Mountain Dew has kicked

24   in, I'm all good.

25        (Laughter.)

1          MR. COSTA:  A few points, Your Honor:  After the

2     lengthy argument from able Counsel on the other side, I'm left

3     with the impression that this transaction meets their

4     definition.  Really when you asked them for the concise

5     definition, all he added to our willing buyer and willing

6     seller definition is that it's close to a market price.

7          And that's what we have her.  70 percent of the

8     Lenders were solicited to make bids.  We came in at 74 cents.

9     The Angelo Gordon bid came in just a little bit higher.  That

10    is by definition the market price when you have 70 percent of

11    the Lenders offering to sell at that price.

12          But it can't be the case that it has to match the

13    42 cents that some were available on the market for.  The

14    parties couldn't have intended that any open market purchase

15    would be subject to litigation where you have to have expert

16    to say how close is close enough?

17          So we stand by the plain definition that an open

18    market purchase is a transaction between a willing buyer and a

19    willing seller.

20          On the text, a few points:  First of all, they're

21    still not grappling with the fact that this is a non-pro rata

22    open market purchase -- heard nothing about that.

23          *LCM* is continuing to push this cash or equivalent

24    requirement.  That's inconsistent with the plain language.  If

25    I said I purchased a car last week, it wouldn't matter if I

1    paid it all in cash, bought it with a loan, or paid for it

2    with a trade-in, with an exchange of cars.  It would still be

3    a normal, common, everyday understanding of purchase to say I

4    purchased a new car last week.

5         The other thing about their argument on

6    consideration is that it would impose an unnecessary formality

7    that lacks economic distinction when they say that the

8    consideration has to be something that every market

9    participant can provide.

10        For example, Serta could have issued new loans to

11   our clients for cash and then immediately used that cash that

12   Serta obtained to buy the loans back.  That would be something

13   that any market participant could provide.  It'd be

14   economically equivalent, so it makes no sense to impose those

15   formalities -- certainly nothing in the contract limits the

16   type of consideration that an open market purchase might

17   involve.

18        On this whole point about whether the Dutch Auction

19   provision is superfluous, our argument is actually the one,

20   our understanding of open market purchase is the one that

21   gives meaning to Dutch Auction because, yes, normally Dutch

22   Auction would be a subset of open market purchase, but the

23   sophisticated parties decided that for that example of a Dutch

24   Auctino, you needed a number of requirements.  That's why they

25   set forth a different provision for Dutch Auction and it gives

meaning to both provisions.

Under their definition, Dutch Auction would be irrelevant because it would be subsumed under open market purchase.

It's telling they repeatedly used the word "typical." Typical is not what is required. And certainly open market purchase for all the reasons we've said is this transaction.

I want to briefly address that email that -- the under seal email, all it says is that someone didn't like the transaction. It didn't say it wasn't allowed. And if one person not liking a transaction means it's not authorized, nothing would ever get done in the market.

Another brief point to address, the indemnity. They said that somehow shows we knew there was a problem with that transaction. They sued to prevent the transaction from closing. It made perfect sense to bargain for that indemnity provision.

I want to briefly talk about the amendment argument. Your Honor doesn't need to reach it. The plain language argument showing that this transaction, unambiguously was consistent with the 2016 Credit Agreement. That ends the case.

But I do want to note that the amending and modification and waiver provisions in these syndicated loan

agreements are critical to how they operate.  It's well
accepted that required Lenders agreeing with the company can
amend these agreements.  They are living documents that are
repeatedly changed during the course of the parties'
relationship and only sacred rights are exempt.

They could have included open market purchase or
defined it or listed that as an exempt sacred right.  Required
Lenders, for example, no amendment or modification can change
the definition of required Lenders.  So it would be the same
for open market purchase if that's what the parties wanted to
do.  They didn't want to do that, so the agreement shouldn't
be rewritten.

Finally, the claim for the Covenant of Good Faith
and Fair Dealing, first of all in response to Your Honor's
question, the case law as I read it does say that there is a
difference between gap filling when a contract is silent on
something and that maybe there's a limited role for an implied
covenant when there is a gap to fill.  But when, like here,
there is an express authorization in the contract, then the
implied covenant cannot override that.

Here, there's an express authorization for an open
market purchase that need not be open to all Lenders.  And to
them limit that by this implied covenant claim would be
overriding the sophisticated parties' bargain.

And in hearing the argument from the non-PTO

1    Lenders, when they had the new stack of priority and they're

2    basically arguing the new stack denies them the fruits of

3    their priority and that's the place where the implied covenant

4    claim -- they're basically trying to get anti-subordination

5    protection through this claim, but they didn't bargain for it

6    and allowing it through an implied covenant claim would undo

7    the parties' negotiation.

8           In response to Your Honor's question the last time I

9    was up here, and we have cites for a couple of documents that

10   show why Serta chose our proposal over the Angelo Gordon bid,

11   in Document 72-5, Exhibit 6 -- and I'm not going to discuss

12   the contents because they're under seal, but it's Bates

13   No. 88437.  It's a slide from a deck that shows the advantages

14   of the PTO Lender proposal that was accepted and it explains

15   exactly why that was chosen over the Angelo Gordon bid.

16          And then 72-6, Exhibit 8, Bates No. 88406 is a side-

17   by-side comparison of the terms of the Angelo Gordon bid and

18   the PTL Lender's bid that was accepted.  So it shows all those

19   differences.  It shows why ours was more advantageous for the

20   company.

21          And again, when you have something that's authorized

22   by contract and when you have something that the company is

23   doing for its own economic self-interest, it would completely

24   upset contractual expectations and the negotiations to imply

25   limits on that negotiation.

1          On the good faith and fair dealing claim, I also

2     heard for the first time they tried to separate the arguments

3     and said, well, maybe Serta might not be liable for that, but

4     maybe the PTL Lenders are.

5          We're both necessary parties to the agreement.  I

6     know of no case law that says you would separate it out,

7     segregate it like this.  The same business justifications

8     apply to the agreement itself and in addition, we have the

9     business justification of enacting a defensive measure after

10     the Angelo Gordon bid that would have stripped -- the bids

11     that would have stripped collateral worth hundreds of millions

12     of dollars from all Lenders, including ours.

13          They made an argument that the sky is falling if you

14     somehow uphold this transaction.  It's going to disrupt the

15     markets.  First of all, this was initially challenged in New

16     York State Court before it closed.  The Court refused to

17     enjoin the closing of the transaction, the markets three years

18     later are still standing.

19          But the bigger points, Your Honor, is that there are

20     ways to negotiate to provide the protection that they failed

21     to negotiate for in this contract.

22          First of all, you can require a higher percentage

23     for required Lenders.  It could be 80 percent, it could be

24     85 percent.  You could include anti-subordination language.

25     You could define open market purchase.  You could say it has

1    to be for cash.  You could say there has to be a

2    broker/dealer.  All these things they want can be negotiated

3    in these deals.

4           That's what these syndicated debt market is.  It's a

5    place where sophisticated parties can negotiate with the

6    regulations of the securities market, and what they negotiate

7    should stand.  So the bargained-for flexibility of this

8    agreement should be upheld.

9           And I'll close by just agreeing with one thing

10   Counsel on the other side said, which is that the issue before

11   this Court is this particular transaction and it's this

12   particular credit agreement.  In looking at it way, this

13   particular credit agreement had a broad flexible option for

14   open market purchases.  That's exactly what happened here.

15          And on the good faith and fair dealing claim, if

16   there is any room for that, this particular transaction was

17   one that was not negotiated in the dark, bids were solicited

18   from 70 percent of the Lenders and with an independent finance

19   committee reviewing it, they selected our bid and that bid

20   both infused cash and delevered the company and it prevents

21   all Lenders from having their collateral stripped.

22          So this agreement, this transaction, certainly

23   lawful and the Court should grant summary judgment upholding

24   the lawfulness of it.

25          THE COURT:  All right.

1              MR. COSTA:  Thank you, Your Honor.

2              MR. SEILER:  Would it be permissible at this point?

3              THE COURT:  Of course, of course.

4              MR. SEILER:  Thank you, Your Honor.  I want to make

5    four points.  Two of them are just so the Record is clear and

6    two of them are substantive.

7              So in the $200 million of new money, what was

8    required was the amendment that 50.1 percent.  We haven't

9    challenged that because we weren't hurt by it.  But they

10   needed 100 percent for, unless they went on 905(g) for

11   making/creating the priority that jumping out of our class

12   ahead of us.  So they needed that to be an open market

13   purchase or they would lose, or it's a violation of good faith

14   and fair dealing.

15             So I don't think our acknowledging that we're not

16   trying to stop that new money is an acknowledgment of anything

17   else.  We just didn't -- that's the first point.

18             Second, on the Apollo disqualification, there's no

19   evidence that Exhibit 31 was ever sent to UBS and the

20   disqualification institution definition, which is Section 101

21   of the Credit Agreement, it's any person identified in writing

22   to the left lead arranger and that was UBS.  So they didn't

23   get it, or at least there's no proof that they did.  And the

24   proof that they didn't is Exhibit 84 -- I think it's 84-2 or

25   87-2 -- I apologize, 87-2, where after April and May, UBS says

1    they're not on the list.  We took them off the list because

2    you told us back in 2016.

3         So I think as a factual matter, can't grant summary

4    judgment on this Record on that issue.  It's disputed and

5    Mr. Prince, we need to hear from him.  He's the one who says -

6    - I think if you write a letter to yourself that says

7    something, that doesn't count.  So -- and I'm not -- I don't

8    want to represent that I know what happened.  I don't.

9         THE COURT:  No, I got it.

10        MR. SEILER:  So point 3:  The good faith and fair

11   dealing.  So it was in the dark, the uptier transaction was in

12   the dark to us.  We were not talking about one.  We didn't

13   know about one.  We had NDAs.  We couldn't tell other people

14   what we were doing on the drop down.  They probably couldn't

15   either, but let's not pretend it was fully disclosed because

16   it wasn't.

17        And then on the -- remember the context this comes

18   up.  Remember, they started an adversary proceeding that five

19   Lenders -- originally there were three when they filed it on

20   the 24th of February.  Two more added in, they amended it.

21        Those were all affiliates of the banks that actually

22   were the Lenders who we think breached their applied covenant

23   of good faith and fair dealing.  They are seeking a

24   declaratory judgment that everything that happened was fine,

25   including that the implied covenant doesn't apply because it

1    duplicates.

2            And after all that happened, we answered.  We

3    counterclaimed and we brought third-party claims against all

4    the Debtors -- I'm sorry, all the Lenders who we think

5    violated the implied Covenant of Good Faith of Fair Dealing.

6    They've not answered.  They've not moved and they're using

7    this motion to make that not count.

8            And I would say to you -- and we haven't.  I don't

9    think they've disputed this, but in their depositions we've

10   had some documents.

11           THE COURT:  Right.

12           MR. SEILER:  If my pleading -- and I put forward in

13   our brief affidavits where we actually have specific facts

14   that we say relate to good faith and fair dealing that are

15   separate from just the 905(g) wasn't satisfied.  But I'm short

16   of that in my pleading, I should get an opportunity to amend

17   that pleading.

18           THE COURT:  That's exactly the question I wanted to

19   ask you.  So here's the question:  If you were pleading a good

20   faith and fair dealing case separate and apart from a breach

21   of contract case, would your pleadings be different?

22           MR. SEILER:  I would put in -- I've learned some

23   facts since the adversary was filed because I've gotten the

24   documents that they've produced to us that we hadn't gotten.

25           THE COURT:  Uh-huh.

1          MR. SEILER:  I would add that in, I would explain

2     more about how I was damaged differently because the thing

3     about the kinds of damages, one damage is they should have

4     shared with me the consideration they got on a pro rata *pari*

5     *passau* basis, but the other damage is, when you did this to

6     me, the market told me how much I was hurt.  That was that

7     chart that goes like this, and I would argue that the economic

8     damage to me from the bad faith not being included in the

9     transaction is measurable in that drop.

10          And they may come back and say, well, that that was

11     other causes or they got the money back, but that is not a

12     necessarily co-incidence of damages and I'll say again, it's

13     not logically the same.  They both could have violated the

14     implied Covenant of Good Faith and Fair Dealing, but they both

15     could have done it in different ways or one could lose and one

16     could win.

17          And I would, if given the opportunity, put

18     everything I know in the Complaint, take discovery, and then

19     when they move for summary judgment on it, if they still did,

20     I would have all these arguments that I could make.

21          And I just remembered, I'm new to this Court, new

22     before you and I watched the first hearing on the video like

23     everybody is today, and it was said, I think it's not

24     ambiguous.  I realize Judge Vela said what she did, but I

25     think I can decide the words, but good faith and fair dealing,

1      that's a factual inquiry.  And you did not invite anybody to

2      move for summary judgment on good faith and fair dealing.

3             They did, and I think it's premature and I think you

4      should give us the opportunity to prove that case.  Or -- and

5      I'll send it to New York, just against the Lenders 'cause --

6      and confirm the Plan and off we go.  I've got Mr. Herman who

7      will claim the significance about that because I don't know

8      enough about that.  But that's my third point.

9             And my final point, this, "We would have had a

10     better definition," cuts both ways, right?

11            THE COURT:  Uh-huh.

12            MR. SEILER:  And so we could have had 100 things you

13     can't do and they could have put in the 100 things you can do.

14     We have three words.  So I don't think we lose ground becasue

15     we didn't do it and all that's in the Dutch Auction, the

16     timing.  It's not defining the nature of it.  It's like the

17     mechanics.

18            THE COURT:  Oh, no.  It just shows that people knew

19     how to craft a definition when they wanted to.

20            MR. SEILER:  Of that.  And here, they have this term

21     that they've unfortunately left to me to argue about and you

22     to decide of how it's -- and as an unambiguous term because

23     the words are words that have meaning, how it applies to this

24     transaction.

25            That I think in fairness -- and I'll stop right here

1    -- is this is different than a lot of what went on before and

2    what went on after and that's what we're fighting about.

3              THE COURT:  Oh, got it.

4              MR. SEILER:  Thank you so much, Your Honor.  I

5    appreciate it.

6              THE COURT:  I appreciate the argument.  Thank you.

7              Mr. Levy?

8              MR. LEVY:  I'll try to just be brief.  I know we've

9    been going for a while.

10             One, just to reiterate the point, *LCM* was not a part

11   of this so-called creditor process.  I think I said that

12   before.  We keep getting lumped in.  I'm sure it was

13   inadvertent, but just to be clear --

14             THE COURT:  I'm sure it probably wasn't.

15             MR. LEVY:  Yes.

16        (Laughter.)

17             MR. LEVY:  Well, maybe it was, I don't know.  But we

18   were not, just to avoid any doubt on the question, we were not

19   around.  We were not involved and we have not, by the way,

20   filed an answer or a counterclaim yet, so there is no pleading

21   on an implied covenant claim that we would assert based on the

22   discovery we've learned since Judge Vela ruled on the motion

23   to dismiss.  We should have that opportunity.

24             Lenders say they could have issued that non-cash and

25   bought back some loans and how is that any different?  There's

1    a lot of difference, one of which is this is a structured --

2    the main one of which -- I'm sorry -- is this was a structured

3    transaction where each piece was contingent on all the other

4    pieces.

5         The transfer of the 1-L and 2-L loans back to Serta

6    was contingent on the amendments going forward and the

7    contingent of the amendments going into effect once and only

8    after the Lenders were no longer 1-L and 2-L loans.  In other

9    words, it was going to be an amendment that would apply to us

10   and not to them, and that is, in effect, a key part of our

11   good faith and fair dealing claim.  Tying those two together

12   and effectively voting, but contingent on being out of the

13   deal.

14        Without -- unless Your Honor has questions, I'll

15   leave it at that.

16        THE COURT:  No, the last 30 seconds was really

17   helpful.  Thank you.

18        Mr. Schrock, let me ask you a couple of quick

19   questions if I could?

20        MR. SCHROCK:  Yes.

21        THE COURT:  So walk me through where we are

22   timeline-wise going forward.

23        MR. SCHROCK:  Well, Your Honor, we've got -- you

24   know,  we're beginning solicitation on the Plan.  We've got

25   confirmation set for May.

1          THE COURT:  That's the date I couldn't remember.  It

2     was May the --

3          MR. SCHROCK:  May 8th, Your Honor.

4          THE COURT:  -- May the 8th, okay, got it.

5          So let me ask the parties because obviously someone

6     is going to be unhappy today.  In terms of timing -- and

7     again, this doesn't bother me at all.  The goal is just to get

8     it right and I always expect review of any decision that I

9     make that is substantive, is the concept that whoever believes

10    they lost today would want to seek immediate review -- or seek

11    a direct appeal to the Circuit, is that the thought?  Or

12    again, just trying to talk through this because it's timing.

13    I don't want to moot anybody's rights and I don't want --

14    quite frankly I don't want to hear that argument.  I want

15    things to be decided on substance and we get the right answer.

16         So the concept is that if you have an adverse

17    decision that you want the ability to go straight to the

18    Circuit so you get finality sooner?  Is that the thought?

19         Obviously they have the right to either take it or

20    not take it.

21         MR. SCHROCK:  I think from the Debtors' perspective,

22    Your Honor, if we were, you know -- if we were to lose on

23    summary judgment, we would frankly just move forward and

24    prepare for trial for confirmation.

25         THE COURT:  Okay.

1          MR. SCHROCK:  You know, if Your Honor were to rule
2    against us and say as a matter of law it was unambiguous that
3    this was not an open market purchase, I think we would have to
4    evaluate that and certainly we'd have to evaluate moving
5    forward with the Plan on the current timeline.
6          THE COURT:  I got that.  That's really helpful.
7          MR. SCHROCK:  Sure.
8          MR. SEILER:  I think -- if I'm wrong, though, the
9    people who stand up and yell --
10         THE COURT:  No, of course.
11         MR. SEILER:  -- I think that if you ruled completely
12   against us, so this was a final judgment, it would be
13   appealable.  If you ruled on open market purchase but retain
14   good faith and fair dealing or in the Apollo issue, we would
15   ask you for a 54(b) approval.
16         As to whether we would seek to go to the District
17   Court or direct to the Court of Appeals, we've been talking
18   about that, but we haven't decided what we would seek to do.
19         We share the Court's concern.  We're not trying --
20   as you know, we are saying you don't need to bring us here in
21   Texas, but we would not try to slow things down, depending on
22   what you do, and we would -- if the case needed to be tried
23   here, we would do everything really, really quickly.
24         THE COURT:  So here's what I'm trying to run
25   through, and in my head is ordinarily something like this, I

1    would take time to issue something in writing.  Just given

2    everything else that I have going on, that could eat up a

3    significant period of time between now and the beginning of

4    May.

5              And my thought is, again, just trying -- because I

6    want to be helpful to the process, is -- and again, not

7    something I would normally do and I could easily be criticized

8    by either a reviewing District Court or a reviewing Circuit

9    Court -- is just to make my Findings and Conclusions, which

10   obviously will not be as thoughtful or eloquent, or I hope as

11   they would be if I had the time to put it down on paper, is

12   just to make them on the Record pursuant to 7052 and that way,

13   again, whoever the perceived loser is could then immediately

14   begin the path to seek review.

15             And so I'd like your thoughts on that.  Just, you

16   know,  again, I want to be helpful to the process and I also,

17   you know,  I also want to make sure -- I mean, I have that

18   right, irrespective of whether or not the parties agree, but I

19   would like input on that.  Again, just so that we can move the

20   process forward because I want to do my part on that.

21             MR. SCHROCK:  Your Honor, I think certainly taking

22   whatever time you need is --

23             THE COURT:  Let me step back.  I have the answer in

24   my head right now.

25             MR. SCHROCK:  Understood, Your Honor.

1          THE COURT:  The question is how it comes out.

2          MR. SCHROCK:  Yeah.  I mean, one way to do it, Your

3     Honor, first of all it's, of course, up to the Court.  But

4     sometimes, you know, we've seen with important issues like

5     this and the context of confirmation and issues leading up to

6     confirmation, an initial bench ruling with a written opinion

7     to follow is sometimes, you know, a way that I've certainly

8     seen that done.

9          THE COURT:  But here's the thing.  If you're going

10    directly to the Circuit, that's going to be a problem.

11         MR. SCHROCK:  Uh-huh.

12         THE COURT:  And so, and again, you know, I'll -- if

13    the parties say, look, time is really important, then I'll do

14    my best to make the appropriate Record, as I do a lot under

15    7052.

16         MR. SCHROCK:  Yes.

17         THE COURT:  And the other issue, too, that I'm not

18    insensitive to, is that I don't believe the policy arguments

19    because it'll be just like everything.  I mean, when I issued

20    the opinion that I did in *Chesapeake* regarding covenants that

21    run with the land, you know, everyone was, oh, this is a C

22    change.  No, it isn't.  It's just really smart lawyers just

23    got super busy and they went back and started modifying

24    documents and you know,  actually paying attention to, you

25    know,  what the differences were between covenant and a

1    contract.

2           So I'm not really worried about that, but I also

3    understand, you know, being able to run around with a piece of

4    paper is different than saying, you know, I have this ruling

5    from this guy down in Texas and here's a copy of the

6    transcript, if you want to read it.

7           You know, it's been my experience, you know, most

8    will just say no, I don't want to.  Thank you.

9        (Laughter.)

10          THE COURT:  So I got that, too, but again, my goal

11   is to get it right and number two is to provide a path forward

12   that isn't limited by Court's calendar or Court's time or that

13   sort of thing.

14          MR. SCHROCK:  I think, you know, certainly given the

15   -- we do think speed is important, you know, from --

16          THE COURT:  You've been consistent from day one

17   about that.

18          MR. SCHROCK:  Yeah, and you know, getting a ruling

19   from the Court, we think is extremely important for parties to

20   know, I think, in terms of voting on the Plan, you know, for

21   how parties want to -- certainly I think for even the non-

22   participating Lenders how they want to proceed in terms of the

23   vote, given that they have a choice under the Plan.

24          And so certainly, Your Honor, knowing how busy your

25   calendar is, I think a bench ruling would certainlyl make

1     sense in our view.

2              And I did -- you didn't ask about this, but I note,

3     I'm sure the Court is sensitive to, of course, when we're

4     talking about implied Covenant of Good Faith and Fair Dealing,

5     at

6     Confirmation we do have to prove up 1129(a)(3), of course, you

7     know, and everybody is going to have the right to certainly be

8     heard on that point.  Whether or not it'll be precluded on

9     this specific issue, I think is a matter for the Court, but we

10    certainly understand that that's going to be a requirement at

11    confirmation.

12             THE COURT:  I got it.  I reached in my own mind that

13    could very easily be different and so -- but I do understand

14    that.  I got it.

15             Okay.  Thoughts now that you've had a chance to talk

16    with your bankruptcy team?

17             MR. SEILER:  What I learned was that I didn't have

18    authority to give you guidance on what the Court should do.  I

19    understand that you can decide either way.

20             I could talk to them some more.  I know this, the

21    other question on the discovery motion that is still on your

22    Agenda for today.  So we might be able to tell you that, but I

23    have nothing I could add to what the Court just said.

24             THE COURT:  I got it.  So there's only a limited

25    amount of space in my brain.  So I want to -- before I lose

1    that, I want to get it out on the Record, if you don't have

2    thoughts about it.

3              MR. SEILER:  Could you give me one more second?

4              THE COURT:  Of course.  Let me ask --

5              MR. SEILER:  Could you even have a five-minute break

6    so I can talk to them?  Would that be okay?

7              THE COURT:  Of course, of course.  Why don't we do

8    this?  It is 11:50.  Why don't we come back at noon.  That

9    should give everybody an opportunity to walk around, get a

10   drink of water or whatever it might be.  All right?

11             MR. SEILER:  Thank you very much, Your Honor.

12             THE COURT:  We'll be adjourned until noon.

13             THE CLERK:  All rise.

14        (Recess taken from 11:50 a.m. to 12:00 p.m.)

15                          AFTER RECESS

16             THE COURT:  All right.  We are back on the Record in

17   Adversary No. 23-9001.

18             Mr. Schrock, do you have any additional comments?

19             MR. SCHROCK:  Yes, just one additional thought or

20   clarification having had an opportunity to talk in the

21   hallway.

22             THE COURT:  Sure.

23             MR. SCHROCK:  I think, Your Honor, if you're giving

24   us a choice between the bench ruling or, you know, a much

25   later written opinion, we would certainly prefer the bench

1      ruling.  I think that, you know, if there's -- if the written

2      opinion wasn't going to come too long after the bench ruling,

3      we think a bench ruling followed by a written opinion would be

4      -- that's our first choice.  We're not saying that one wasn't

5      even a choice, but to the extent you're asking the Debtors'

6      preferences, that's where we would put it, Your Honor.

7              THE COURT:  Sure, and just to be clear, I halfway

8      anticipate that if it did leave that I may very well get

9      instructed to make written Findings and Conclusions, which

10     obviously a reviewing court has the right to do.  The object

11     was, was to try to get you in a position so the parties got

12     finality and I recognized I'm not the final word on this and

13     I'm just trying to get there.

14             MR. SCHROCK:  Understood, Your Honor.  Thank you.

15             THE COURT:  All right.  Thank you.

16             Yes, sir.

17             MR. SEILER:  Having spoken with at least the

18     excluded Lenders I could speak to, we want to do nothing that

19     delays in any way the administration of justice in the

20     decision in this case.

21             THE COURT:  All right.

22             MR. SEILER:  And I'm mindful there's a Doctrine of

23     Equitable Mootness, and we don't want to do anything that

24     would contribute to that, whether or not it applies.

25             THE COURT:  Yeah, fairly weak in the Fifth Circuit,

1    but you know.

2              MR. SEILER:  Whatever it is, we don't want to be

3    pointed to there's a cause, so the Court obviously decides

4    what to do, but we don't want to slow anything down.

5              THE COURT:  Got it.  All right.  Thank you.

6              Anyone else want to weigh in?

7              MALE SPEAKER:  Your Honor, we concur with that.

8              THE COURT:  All right.  Thank you.

9              All right.  I have before me two motions for summary

10   judgment that have been filed, as well as various responses

11   and replies.  I've also had argument here today and I very

12   much appreciate the quality of the arguments.  It really made

13   me think.  To some degree it also makes my job easier.

14             I do find that I have jurisdiction over both

15   motions, pursuant to 28 USC Section 1334.  I do find the

16   matters constitute a core proceeding under 28 USC Section 157.

17   I further find that I have the requisite constitutional

18   authority to the extent that I enter a Final Order to make

19   that entry.

20             The parties don't disagree as to the appropriate

21   standard to be employed, so I'm not going to repeat it on the

22   Record.  That shouldn't be a topic of conversation.

23             In working my way through the agreement -- and I

24   appreciate the arguments, but I've also spent a lot of time

25   with the Credit Agreement.  When I get to Section 9.05(G),

1    there simply is no ambiguity in my mind.  And I appreciate

2    that perhaps a different court reached a different conclusion,

3    but again, I sit in with these matters every single day and

4    again, there is just no -- there is no doubt in my mind that

5    the parties knew exactly what they say.

6          In fact, I think as I said in the *Chesapeake*

7    decision that I referenced earlier, parties' words matter.

8    And sophisticated parties know how to choose the words that

9    they choose.  They're represented by the best.  They do these

10   transactions every single day.  Their survival depends upon

11   them.

12         In looking at the words and given the common meaning

13   and then looking at the transaction that engaged in, it is

14   very clear to me that the process that was engaged in, fit

15   within 9.05(G).  There's just no question in my mind.

16         And to the extent that parties want to argue that

17   this was somehow an extension or that this is somehow you have

18   to look at a much larger transaction, this is very easy for

19   me.  In looking at what occurred, it's very clear to me that

20   this is what was intended by the agreements.  It's what's

21   intended by a concept of an open market purchase.

22         There is certainly no assertion, no evidence of any

23   coercion or any manipulation or anything of that sort.  This,

24   again, for the nature of what was being transacted, it fits

25   within the definition of an open market purchase.

1        Now I spent a lot of time trying to understand once

2   I made that Finding, what the effect of that was.  And I'm

3   still not sure of the impact of that statement.

4        What I'm not prepared to find that in all aspects

5   that the Credit Agreement was complied with, I don't have that

6   evidence before me.  What I was asked to determine -- at least

7   the way that I read it -- was whether or not that the

8   commercial transaction that was engaged in fit within 9.05(G)

9   and I find that it does.

10       With respect to the issue of good faith and fair

11  dealing, the argument is fairly persuasive that there could be

12  something else.  Now, we aren't at the point where I could

13  say, here is what I think is wrong with it, here's what I

14  think is right with it.  The Circuit has obviously also

15  instructed at the pleading level that unless I conclude there

16  are no set of facts that could be pled which would set forth a

17  viable claim, I'm required to provide an opportunity to amend.

18       I'm certainly going to follow that instruction and

19  while we are at somewhat of a unique stage, it's my view that

20  I can make all of that work.

21       I also think it's just plain fair that with knowing

22  that this ruling now exists that the reliance upon the

23  inappropriate -- the alleged inappropriateness of the

24  transaction as being violative of 9.05(G), that doesn't factor

25  in anymore -- at least I've made that decision and to the

1    extent that there still exists a claim for the breach of -- a

2    breach of any duty having to do with how people acted under

3    the contract, I'm certainly going to give the Defendants an

4    opportunity to put that in writing.

5            How we do that, we need to talk about.  So I'm going

6    to deny the summary judgment as to the claim of -- or the

7    counterclaim for good faith and fair dealing.

8            With respect to the issues regarding NorthStar, I

9    agree.  There's a fact question.  I need to understand how

10   that occurs and so I will deny summary judgment as to the

11   request for the finding against NorthStar.

12           For the Record, those are my Findings and

13   Conclusions  on the Record pursuant to Bankruptcy Rule 7052.

14   I am doing this in part to expedite the review process.  So

15   that the parties to the estent that they wish to seek a review

16   of the decision that I've made, are able to do so in a timely

17   fashion and they can avoid any assertion that justice has been

18   effectively mooted, if you will.

19           So with that -- yes, sir.

20           MR. SEILER:  So as to the issue on which you've

21   granted summary judgment, it's a partial grant.  If I wanted

22   to make a Rule 54(b) motion, should I do that orally?  Would

23   you entertain that now or should I do that in writing?

24           THE COURT:  So what I'm going to give you sort of --

25   I'm going to give you sort of practical advice to get that

1      done.

2              If you-all can jointly request that it be severed

3      and go up, I will sign whatever agreement you come up with,

4      and I'll just tell you from practical experience is that you

5      are more likely to get somebody's attention if it goes up as

6      everyone acknowledges that this is a really important central

7      issue to what happens next.

8              And so I'll let you think through that.  Obviously

9      if you make an oral motion, I'm going to give parties an

10     opportunity to respond to that, and I'm assuming I'm going to

11     get a, "Well, we'd like some time to think about it," but I

12     will just tell you, you're better off if you can get it, to

13     very quickly this afternoon talk.  If you can come up with an

14     agreement to effectively sever it and send that issue up on

15     direct appeal, I'll sign it and you'll be better off.

16             If you can't get that agreement andyou want to file

17     something, I don't like oral motions because it tends to get

18     people in trouble.  But I will tell you this:  If you want to

19     get something on file on an emergency basis, I will act on it

20     very promptly.  Does that make sense?

21             MR. SEILER:  That is very helpful.  And if travel on

22     the way down was any indication, we'll have plenty of hours to

23     work it all out before the plane takes off.

24             (Laughter.)

25             THE COURT:  All right.  And if you can -- you

1    haven't appeared in front of me before, but some of your

2    colleagues know this.  My case manager, Mr. Alonzo, is sitting

3    right in front of you.  He has a Government-issued cell phone

4    that he carries with him.  I like to joke that -- you know,  I

5    call him at 2:00 or 3:00 o'clock in the morning just to see if

6    he'll answer it, and he actually does, unless he recognizes

7    that it's my number, but I've learned how to spoof him.

8            When you know what you're doing, again, to help

9    coordinate, if you would just communicate and you can do that

10   by text or email or with a phone call.  You know what not to

11   talk to him about, so.

12           MR. SEILER:  Either way, this was very helpful, Your

13   Honor.  Appreciate it.

14           THE COURT:  All right.  Thank you.

15           In terms of an Order, I do think we need something

16   very simple.  It just says as stated on the Record, pursuant

17   to Bankruptcy Rule 7052, it's ordered that -- and do the

18   parties want -- and Mr. Schrock, I'm looking at you -- do you

19   want to take a shot of preparing that and circulating it, or

20   how else would you propose we accomplish that?

21           MR. SCHROCK:  Yes, Your Honor.  We'll take the

22   laboring oar on that and circulate it to the parties.

23           THE COURT:  It should really be relatively narrow.

24   I've tried to keep it that way.

25           MR. SCHROCK:  Heard and understood, Your Honor.  I

1    think we can put something togehter.

2            THE COURT:  All right.  I probablyh need to say one

3    other thing:  Because I found that the term was unambiguous,

4    while I did read the affidavits, I have done my best to ignore

5    them.  One was fairly interesting to read.  One not helpful at

6    all.  The others were sort of inbetween.

7            But again, to the extent that they want to explain

8    to me the term, again, I don't need that, nor do I think it's

9    appropriate.  All right?

10           MR. SCHROCK:  Thanks very much, Your Honor.

11           THE COURT:  Anything else we need to talk about

12   today?

13           MR. SCHROCK:  I think we still have the discovery --

14           THE COURT:  No, I know that.  I just want to make

15   sure -- timing-wise, again, I want to make sure that we've

16   got, you know, maximum runway to deal with the issues that we

17   have to deal with.  I think everything is okay for now.

18           Okay.  All right.  Then shall we move on to the

19   discovery dispute?

20           MALE SPEAKER:  Yes.

21           THE COURT:  All right.

22           MALE SPEAKER:  It is our motion.  We put in -- I

23   don't know if Your Honor has read it.

24           THE COURT:  I have.

25           MALE SPEAKER:  Okay.  I don't know what -- it is

1    their burden on a privilege motion to substantiate a

2    privilege.

3              THE COURT:  So you don't really know what the issues

4    are, so in all fairness, why don't we do this?  Again, because

5    I want to make sure that we have a good, clean Record.

6              Give me your argument just as to what you think the

7    issues are.  You'll hear a response.  And I'll give you an

8    opportunity to come back up without any limitations to deal

9    with the issues that you hear for the first time.

10             Is that fair?

11             MALE SPEAKER:  That's fair, yes.

12             THE COURT:  Okay.

13             MALE SPEAKER:  So without -- obviously the email was

14   provided to the Court under seal.  I don't want to describe it

15   more than we did in the motion.

16             THE COURT:  I've read it.

17             MALE SPEAKER:  All right.  In terms of my argument,

18   I think the points are as follows:  Number one, it was

19   exchanged prior to closing between counsel for the Lenders and

20   Serta in a situation when they were -- according to their

21   summary judgment papers, acting at arm's-length, and they're

22   talking about field terms and so point number one, there's no

23   common interest privilege under settled law that they are

24   still at arm's-length and so that's one.

25             Two, there was then a waiver when the communication

1    was shared with one of the investment professionals by the

2    Gibbs & Dunn firm.  It doesn't fit within the exception, given

3    the circumstances of this case.

4         Number three, there was a subsequent waiver by

5    virtue of the fact that it was produced some months ago in the

6    *LCM* case in the possession of Serta.  And then reproduced here

7    in this case four months later by Serta.  There was never an

8    attempt to claw it back until it was put forth as an exhibit

9    to our summary judgment papers.  So a brief highlight, those

10   are our points.

11        Obviously it is harbored under the protective order

12   to make a challenge in the event there's a clawback and

13   re-challenge, it remains Serta's burden in this case to

14   substantiate and assert the privilege under Fifth Circuit law,

15   and to set forth the relevant facts substantiating that

16   privilege.  The privilege should be reviewed and primarily and

17   so that's why I said I thought it made sense to hear from

18   them.

19        THE COURT:  No, I got it.  Let me ask you:  You

20   don't dispute that the document is confidential, do you?

21        MALE SPEAKER:  In the sense that the Court has used

22   for privileged law or?

23        THE COURT:  For purposes of what you do with it if

24   you get it?

25        MALE SPEAKER:  Right.  I think it's not confidential

1      in the sense that it was shared beyond the set of lawyers so

2      there was a waiver in that respect.

3               THE COURT:  Okay.

4               MALE SPEAKER:  I mean, to the extent there was an

5      expectation of confidentiality because it was part of a

6      negotiation, it was then shared with an investment advisor.

7      Obviously it wasn't a public document, but I think it doesn't

8      fit within the need-to-know basis sort of test for purposes of

9      privilege.

10              THE COURT:  Okay.  And again, I don't remember

11     everything the protective order has in it.

12              MALE SPEAKER:  I don't.

13              THE COURT:  I assume that if you get the document,

14     you agree that it's used only for purposes of this case,

15     absent further order, won't be distributed outside, you know,

16     teams, if you will.

17              MALE SPEAKER:  My recollection -- there are

18     restrictions on who can review all documents that are

19     designated confidential.  I believe this was designated on

20     that order as confidential.

21              THE COURT:  Right.  That's why I asked.  I was

22     trying to see if you were contesting that issue or it's just

23     as privileged?

24              MALE SPEAKER:  No.  It's just the privilege claim.

25     And I think in terms of use, it may be other litigations

1    beyond this one, but there are limits there and we agree

2    obviously that there are confidentiality restrictions on us

3    beyond the privilege issue.

4              THE COURT:  Okay.  So if you agree that it's

5    confidential, it'll just be treated in accordance with the

6    protective order, correct?

7              MALE SPEAKER:  Right.  And it was filed under seal

8    in this Court, so it's not a public document.

9              THE COURT:  No, I got it.

10             MALE SPEAKER:  It's just a question of whether it's

11   privileged or not, whether it could be used as a part of the

12   appeal record as well.

13             THE COURT:  That we can figure out.  That's easy.

14             All right.

15             MALE SPEAKER:  Thank you.

16             THE COURT:  Thank you.

17             Good afternoon at this point.

18             MS. DOUGHERTY:  Hi, good afternoon, Your Honor.

19   Taylor Dougherty of Weil Gotshal & Manges on behalf of the

20   Debtors.

21             First, Your Honor, a couple of threshold

22   clarifications about the facts of this email.  Contrary to

23   Counsel for LCM's assertion, this was not an email between

24   deal Counsel for the company and the PCL Lenders.  Rather, it

25   was clearly an email between outside litigation Counsel two

1    days after the New York State Supreme Court's ruling denying

2    the motion for a preliminary injunction, seeking to enjoin the

3    transaction.

4         As noted, since the email is under seal and

5    privileged, I'll not go into the details of it, but by

6    reviewing the email you can see clearly that it's between Luna

7    Barrington, who is outside litigation counsel for the Debtors,

8    and Jennifer Conn who was then of Gibson Dunn, outside

9    litigation counsel for the PTL Lenders, discussing issues

10   related to litigation matters and the upcoming motion to

11   dismiss the underlying complaint in the New York State Court

12   action, as well as discovery issues in that case.

13        Further, the argument that this email was seeking to

14   discuss a deal term is inaccurate.  Also, because of the time

15   that this email was sent, the material terms of the

16   transaction had already been agreed to.  The company had

17   entered into both the transactions for agreement and the

18   standstill agreement and had issued a press release announcing

19   the material terms of the deal.

20        There was also no waiver of the privilege here,

21   either by Gibson Dunn or later the company.  Gibson forwarding

22   these litigation chain to its outside financial advisors does

23   not break the privilege.  There's precedent that finds that

24   financial advisors who are retained for the purpose of

25   providing advice, when that advice relates to legal litigation

1    advice, does not necessarily break the privilege and further,

2    under the Work Product Doctrine, there's a significantly

3    higher bar to argue there's been a waiver of work product.  It

4    requires a showing that disclosure was made in a manner that

5    creates a significant likelihood that at some point an

6    adversary in the litigation will obtain a copy of that

7    communication.

8         Here, Centerview was subject to confidentiality

9    obligations to the PTL Lenders, pursuant to their employment.

10   And Gibson forward this email to members of their financial

11   advisor team, who were subject to such confidentiality

12   obligations, did not create a likelihood that a potential

13   adversary in this case the non-participating Lenders, would

14   obtain the communication.

15        The company has also not waived privilege over this

16   email by reproducing it in this adversary proceeding.  As a

17   threshold matter, as Your Honor is aware, in the LCM action

18   where this email was first produced, it was produced by a

19   third party in response to a third party subpoena.

20        Although not addressed during Mr. Levy's argument,

21   in their brief, the LCM Defendants do suggest that the company

22   could have sought to review Centerview's emails for potential

23   privilege issues.  The company did conduct a privilege review

24   of third party Evercore's documents for privilege concerns

25   because the company retained Evercore as its outside financial

1     advisor.

2              The company had no right to seek to review the

3     documents of Centerview prior to their production, as the

4     company had no agreement with Centerview.

5              Second, the company reproduced this document in this

6     action, along with tens of thousands of other documents that

7     were produced by other third parties pursuant to subpoenas in

8     the LCM action.  Indeed, the company sought to produce these

9     documents expeditiously in response to the Defendant's

10    repeated requests that the company simply push the button and

11    reproduce what was produced in the LCM action here.  And the

12    company did just that.  We produced those documents that third

13    parties had produced in the LCM action after first obtaining

14    permission under the protective order in the LCM action to do

15    so.

16             I would also note that this is distinct from the

17    fact that issue in the *Conceptus* case, cited by the LCM

18    Defendants in their brief.  There, the email at issue had been

19    produced by the Plaintiff itself in two concurrent

20    litigations.  Here, as we've discussed, the email was first

21    produced by a third party, not by the company, and the

22    company's reproduce here was done in response to a request

23    that all documents produced in the LCM action be reproduced

24    here.

25             The company took significant efforts in the LCM

1    action to protect its privilege, conducted a multi-level

2    document review, which included a fulsome separate review for

3    privilege issues, and also produced multiple privilege logs to

4    the LCM Defendants.

5         And to be clear, in the LCM action and reproduced

6    here, the company produced numerous documents in this time

7    frame when it was clearly related to the negotiations going on

8    between the PTL Lenders and the company.

9         A significant portion of the privilege review was

10   parsing the lines between what was the discussion related to

11   litigation issues and the subject of common interest

12   privilege, and what was related to deal negotiations.  A

13   number of junior associates on my team can attest to that

14   fact.

15        Upon learning of this inadvertent disclosure, when

16   LCM cited this email in their opposition, the company

17   immediately contacted Gibson Dunn, who in turn contacted

18   Centerview to raise the issue.

19        Centerview then promptly clawed back the document,

20   pursuant to the protective order and the company then clawed

21   back the reproduced version in this action, pursuant to the

22   stipulated protective order.

23        We would also note the stipulated protective order

24   does include a provision, pursuant to Federal Rule of Evidence

25   502(d) for this very purpose.  The parties agree that

1    inadvertent disclosures such as this one does not constitute a

2    privilege waiver and it's the company's position that that's

3    exactly what took place here.

4                    THE COURT:  All right.  Thank you.

5                    MS. DOUGHERTY:  Thank you.

6                    MR. SCHROCK:  I don't want to spend too much time on

7    a document at issue.

8                    THE COURT:  No, I want you to -- now that you've had

9    the benefit -- and I got it that you're doing it on the fly,

10   but if you need -- if you want to entirely start over, fine by

11   me.  I mean, again, the goal is to get it right.

12                   MR. SCHROCK:  I think our legal arguments stand as

13   stated in our brief.  I do want to -- to the extent I said

14   that the email was among deal counsel, I meant to say it was

15   -- that deal counsel was included.  If I misspoke, I

16   apologize.

17                   But the initial email that is cited in our brief,

18   which is at 550 at the bottom, at the top from Ms. Barrington,

19   is a question about a deal point of foreclosing.  It is one of

20   the recipients is Mr. Greenberg of Gibson Dunn.  It is then

21   forwarded among deal lawyers at Gibson Dunn, so it is a deal

22   communication, although there are litigation aspects to it.

23   Litigants are involved, but it remains a deal communication.

24   As such the privilege claim is not right.

25                   I didn't understand that they had waived -- that

1    they had argued work product.  I don't think the claim gets

2    off the ground for much the same reason, but if so, then we

3    think there is a need to see these and similar documents,

4    given the sorts of claims we have here.  Word product is not

5    as protected as privilege and we would make a more fulsome

6    submission with respect, but I understand Your Honor knows the

7    law on that.

8           THE COURT:  Let me ask:  You've got an email, which

9    is actually a string of emails.  And it does appear to be a

10    slight change in discussion along the way.  I'm trying to be

11    general.

12           And do you believe that the arguments apply equally

13    to every single email in the chain?  And I'm going to ask you

14    the same question.  Or is it do you look at different emails

15    differently that are within the string?

16           MR. SCHROCK:  Well, I think you look at -- to

17    determine whether a particular email within the string is

18    privileged, you look at that email.  But then once it is

19    forwarded, that the rest of the string becomes relevant as

20    well.

21           THE COURT:  No, I agree, but there could be -- for

22    instance, there could -- I'm making something up.  You could

23    be in the middle of an email and we could be talking about

24    your kids.  Obviously probably not privileged.

25           MR. SCHROCK:  Right.

1          THE COURT:  And I don't even know if you have

2     children, so I didn't mean anything by that.

3          MR. SCHROCK:  I do, but --

4          THE COURT:  But we could be talking about your kids

5     and then all of a sudden we could in higher up in the string

6     we could all of a sudden talk about something that might be

7     subject to a privilege and all I was trying to do was to --

8     because the topics do change a little bit.  What I was trying

9     to figure out was do you assert that the argument that you've

10    made applies to the entire string or do you think that there

11    are emails within the string that are stronger or weaker in --

12    you know, it's a question I'm also going to ask the Debtors.

13         MR. SCHROCK:  Well, I think usually the tool for

14    that is redactions and different arguments would apply to

15    different parts of the string.  We haven't gone back to see

16    whether we would want to challenge any of the redactions here

17    based on the communication going to Centerview.

18         THE COURT:  All right.

19         MR. SCHROCK:  On (indiscernible) grounds, but there

20    are different arguments, I think based on different parts of

21    the string to really --

22         THE COURT:  So let's hear what the Debtor has to say

23    about this and see -- I probably should have started -- don't

24    go.  Just I probaby should have started with her on that

25    issue, and I know, come on up, come on up.  Come up.

1          MR. SCHROCK:  I'll just stand aside.

2          THE COURT:  Thank you.

3          MS. DOUGHERTY:  Good afternoon, Your Honor.  It

4   would be the Debtor's position that all of the emails in the

5   chain are privilege with the exception I would note the

6   Debtors are not aware of what is behind the redacted bars for

7   those emails between just Gibson Dunn and Centerview, as we

8   received this copy of this email as it was redacted.

9          The earlier emails in the chain including the email

10  Ms. Barrington sent to Ms. Conn, that the *LCM* Defendants refer

11  to, is discussing a potential course of action in the context

12  of deciding the impact such course of action might have on the

13  upcoming motion to dismiss in the New York State Court action,

14  and the success of that upcoming motion to dismiss, which we

15  would argue is clearly litigation related.

16         THE COURT:  All right.

17         MS. DOUGHERTY:  And for the Record, although

18  Mr. Greenberg is a restructuring attorney, he is in this

19  context providing advice on the ongoing litigation.

20         THE COURT:  No, I know Mr. Greenberg well.

21         MS. DOUGHERTY:  I agree.

22         THE COURT:  Let me ask you this.

23         MS. DOUGHERTY:  Yes, Your Honor.

24         THE COURT:  Have you got a fully unredacted copy?

25         MS. DOUGHERTY:  I do not.  I believe Centerview

1     realy does and I won't speak for Gibson Dunn, but I think that

2     they would have access to that.

3          THE COURT:  What I would like to do is I'd like to

4     see a fully unredacted copy of the email and then what I will

5     do once I see that is I'll then issue an order and you can --

6     to the extent that I say that, you know, you can see parts A,

7     B, and E, you know, I'll make the Record such that you can

8     pick up a copy of A, B, and E, and to the extent that you

9     disagree, you've got the Record so that you can seek review if

10    you want to.

11         Does that make sense?

12         MS. DOUGHERTY:  Yes, Your Honor.

13         THE COURT:  Can you -- just something that you can

14    submit to chambers, you know, in the next couple of days, it's

15    something you can do today?

16         MALE SPEAKER:  We should be able to get it to you

17    later today, Your Honor.

18         THE COURT:  That would be terrific if you could do

19    that, I'll turn that around promptly.  Okay?

20         MS. DOUGHERTY:  Thank you, Your Honor.

21         THE COURT:  All right.  Anything else we need to do

22    today?

23         Mr. Schrock?

24         MR. SCHROCK:  Nothing further, Your Honor.

25         THE COURT:  All right.  So you'll get me an Order,

1    say today is Tuesday, by the end of the week?

2              MR. SCHROCK:  Certainly, Your Honor.

3              THE COURT:  All right.  Thank you.

4              Then with that, again, I really, really appreciate

5    the arguments.

6              Everyone, safe travels home.  Enjoy the weather.

7              MR. SCHROCK:  Thank you very much.

8         (The parties thank the Court.)

9              THE CLERK:  All rise.

10             (Proceedings concluded at 12:28 p.m.)

11                              *  *  *  *  *

12             *I certify that the foregoing is a correct transcript*

13    *to the best of my ability produced from the electronic sound*

14    *recording of the proceedings in the above-entitled matter.*

15       */S./  MARY D. HENRY*

16    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

17    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

18    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

19    *JTT TRANSCRIPT #67024*

20    *DATE FILED:  MARCH 31, 2023*

21

22

23

24

25