**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| SERTA SIMMONS BEDDING, LLC, et al., | Case No. 23-90020 (DRJ) |
| Debtors. | (Jointly Administered) |
| SERTA SIMMONS BEDDING, LLC, INVESCO SENIOR SECURED MANAGEMENT, INC., CREDIT SUISSE ASSET MANAGEMENT, LLC, BOSTON MANAGEMENT AND RESEARCH, EATON VANCE MANAGEMENT, AND BARINGS LLC, | |
| Plaintiffs and Counterclaim Defendants, | Adversary Proc. No. 23-09001 (DRJ) |
| v. | |
| AG CENTRE STREET PARTNERSHIP L.P., AG CREDIT SOLUTIONS NON-ECI MASTER FUND, L.P., AG SF MASTER (L), L.P., AG SUPER FUND MASTER, L.P., SILVER OAK CAPITAL, L.L.C., ASCRIBE III INVESTMENTS, LLC, COLUMBIA CENT CLO 21 LIMITED, COLUMBIA CENT CLO 27 LIMITED, COLUMBIA FLOATING RATE INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST II, COLUMBIA STRATEGIC INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST I, CONTRARIAN CAPITAL FUND I, L.P., CONTRARIAN CENTRE STREET PARTNERSHIP, L.P., CONTRARIAN DISTRESSED DEBT FUND, L.P., GAMUT CAPITAL SSB, LLC, LCM XXII LTD., LCM XXIII LTD., LCM XXIV LTD., LCM XXV LTD., LCM 26 LTD., LCM 27 LTD., LCM 28 LTD., NORTH STAR DEBT HOLDINGS, L.P., SHACKLETON 2013- III CLO, LTD., SHACKLETON 2013-IV-R CLO, LTD., SHACKLETON 2014-V-R CLO, LTD., SHACKLETON 2015-VII-R CLO, LTD., SHACKLETON 2017-XI CLO, LTD., Z CAPITAL CREDIT PARTNERS CLO 2018-1 LTD., AND Z CAPITAL CREDIT PARTNERS CLO 2019-1 LTD., | |
| Defendants, Counterclaim Plaintiffs and Third-Party Plaintiffs | |

**LCM DEFENDANTS' ANSWER TO THE**
**AMENDED ADVERSARY COMPLAINT AND COUNTERCLAIMS**

Defendants LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM

26 Ltd., LCM 27 Ltd. and LCM 28 Ltd.. (collectively, the "LCM Defendants"), upon knowledge

with respect to themselves and their own acts and upon information and belief with respect to all

other matters, answer the Amended Adversary Complaint dated February 14, 2023, filed by Serta

Simmons Bedding, LLC ("Serta" or the "Company"), Invesco Senior Secured Management, Inc.

("Invesco"), Credit Suisse Asset Management, LLC ("Credit Suisse"), Boston Management and

Research ("Boston Management"), Eaton Vance Management ("Eaton Vance"), and Barings LLC

("Barings") (Invesco, Credit Suisse, Boston Management, Eaton Vance, and Barings, collectively,

the "PTL Lender Plaintiffs") as follows:

## STATEMENT PURSUANT TO LOCAL RULE 7012-1

In submitting this Answer, the LCM Defendants do not consent to the entry of final orders

or judgments by the Court.

## ANSWER TO THE AMENDED ADVERSARY COMPLAINT

## INTRODUCTION[1]

1.      **This adversary proceeding seeks to enforce a financing and debt exchange**

**transaction (the "Transaction") that provided Serta Simmons Bedding with much-needed**

**liquidity during the depths of the COVID-19 pandemic. Without this recapitalization**

**during the summer of 2020, Serta Simmons Bedding likely would have been forced to seek**

---

[1] All text in bold type in this section is from the Amended Adversary Complaint.  By including headings and footnotes for ease of reference, the LCM Defendants do not admit or agree with any characterizations or allegations therein, and to the extent a response is required, all such headings and footnotes in the Amended Adversary Complaint are denied.  Similarly, the LCM Defendants' responses use certain of the defined terms used in the Adversary Complaint for ease of reference only.

a restructuring much earlier than today. **The Transaction reduced the company's debt by roughly $400 million, lowered its all-in interest expense, and increased its cash position to $300 million. The pre-existing first-lien lenders who entered into the deal—Plaintiff PTL Lenders—had held a majority of Serta Simmons Bedding's debt. In exchange for the substantial reduction in that debt, the PTL Lenders obtained super priority status on the new debt they issued. The recapitalization also added collateral that would benefit all lenders.**

<u>Response to Paragraph No. 1</u>: The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations of the first, second, and third sentences of paragraph 1, except admit that Serta and the PTL Lender Plaintiffs purport to bring this action to enforce the validity of a financing and debt exchange transaction. The LCM Defendants admit the allegations of the fourth sentence of paragraph 1 to the extent the PTL Lender Plaintiffs were among those lenders who entered into the deal. The LCM Defendants otherwise deny the allegations of paragraph 1.

2.      **The PTL Lenders' successful proposal was not the only one presented to Serta Simmons Bedding. A proposal by other lenders, including Defendants Angelo Gordon, Gamut, and North Star, would have siphoned off a large portion of collateral— including Serta Simmons Bedding's crown-jewel intellectual property—away from the first-lien lenders and into a newly formed subsidiary to benefit those participating lenders alone. After an extensive review process that involved outside advisors and the creation of an independent finance committee, the independent directors rejected that much-less favorable proposal and accepted the PTL Lenders' proposal.**

Response to Paragraph 2: The LCM Defendants deny the allegations of paragraph 2, except admit upon information and belief that (1) Serta considered alternative transactions to the PTL Lenders' proposal, including proposals offered by Charlesbank, Blue Torch Capital, Oaktree, Barings, Sixth Street Partners, and certain of the defendants in this action; and (2) outside advisors and independent directors were involved in evaluating the proposals. The LCM Defendants further admit that Serta accepted the PTL Lenders' proposal.

3. **The lenders with the losing proposal then sought to achieve in litigation what they could not achieve in negotiation. But their litigation has proven just as unsuccessful. They first sued in New York state court to try to block the Transaction before it closed, arguing that the Transaction unlawfully subordinated their debt under the Non-PTL Term Loan Agreement. The New York court rejected that request and allowed the Transaction to close. Undeterred, Defendants have spent the last two and a half years asking both state and federal courts in New York to undo the 2020 refinancing Transaction. No court has done so.**

Response to Paragraph 3: The LCM Defendants deny all allegations in paragraph 3, except to the extent that they admit that the New York court denied the motion for a preliminary injunction sought by Defendants North Star Debt Holdings, L.P., Silver Oak Capital, L.L.C., AG Credit Solutions Non-ECI Master Fund, AG Centre Street Partnership L.P., AG Super Fund Master, L.P., and Gamut Capital SSB, LLC.

4. **Defendants' lack of success in litigation is not surprising. Although they contend that Serta Simmons Bedding's Non-PTL Term Loan Agreement could not be amended to give the new loans senior priority payment, the Non-PTL Term Loan Agreement contains no anti- subordination clause. Anti-subordination clauses, found in**

**many credit agreements but absent here, require the consent of all lenders to subordinate existing obligations to new indebtedness. The Non-PTL Term Loan Agreement, by contrast, allows most provisions to be amended by a majority of lenders.  That majority approval is all that was required for Serta Simmons Bedding to permit the incurrence of incremental equivalent debt.**

<u>Response to Paragraph 4</u>: The LCM Defendants deny the allegations of paragraph 4, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

5.    **The Non-PTL Term Loan Agreement thus gave Serta Simmons Bedding the flexibility to refinance and incur additional priority indebtedness with the approval of only a majority of lenders.**

<u>Response to Paragraph 5</u>: The LCM Defendants deny the allegations of paragraph 5, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

6.    **Specifically, Section 9.05(g) of the Non-PTL Term Loan Agreement unambiguously permits debt-for-debt exchange on a non-pro rata basis as part of an open market transaction.  In order to evade this plain language in the contract, Defendants have argued that the Transaction was not an open market purchase because it was not open to all lenders.  But the Non-PTL Term Loan Agreement is clear—only a Dutch Auction is required under the agreement to be "open to all Lenders," not an open market purchase. Nor can Defendants plausibly contend there is anything unfair or impermissible about Serta Simmons Bedding dealing directly with a subset of lenders, as Defendants' own proposal would have required Serta Simmons Bedding to do the same thing.**

Response to Paragraph 6: The LCM Defendants deny the allegations of paragraph 6, except admit that they contend that the Transaction was not an open market purchase. The LCM Defendants further deny sentence 4 of paragraph 6 insofar as they made no "proposal" to Serta, nor were they given the opportunity to make such a "proposal," and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

7.     **A ruling in this bankruptcy is necessary to finally resolve this issue, enforce the plain terms of the Non-PTL Term Loan Agreement, and recognize the opportunity to refinance that Serta Simmons Bedding bargained for.  Because this adversary proceeding will determine the priority status of a number of lenders, its resolution is critical to the development of the Chapter 11 plan of reorganization.  Plaintiffs therefore seek a declaratory judgment that the Transaction fully complied with the terms of the Non-PTL Term Loan Agreement and that Plaintiffs did not violate the covenant of good faith and fair dealing by entering into the Transaction.**

Response to Paragraph 7: The LCM Defendants deny the allegations of paragraph 7, except admit that Serta and the PTL Lender Plaintiffs seek a declaratory judgment against them.

## PARTIES

8.     **Plaintiff Serta Simmons Bedding, LLC is a Delaware limited liability company with its principal place of business at 2451 Industry Avenue, Doraville, GA, 30360.**

Response to Paragraph 8: The LCM Defendants admit, upon information and belief, the allegations of paragraph 8.

9.     **Plaintiff Barings LLC is a Delaware limited liability company with its principal place of business at 300 South Tryon Street, Suite 2500, Charlotte, NC 28202.**

<u>Response to Paragraph 9</u>: The LCM Defendants admit, upon information and belief, the allegations of paragraph 9.

10.    **Plaintiff Boston Management and Research's principal place of business is located at Two International Place, Boston, MA 02110.**

<u>Response to Paragraph 10</u>: The LCM Defendants admit, upon information and belief, the allegations of paragraph 10.

11.    **Plaintiff Credit Suisse Asset Management, LLC is a Delaware limited liability company with its principal place of business at 11 Madison Avenue, New York, NY 10010.**

<u>Response to Paragraph 11</u>: The LCM Defendants admit, upon information and belief, the allegations of paragraph 11.

12.    **Plaintiff Eaton Vance Management's principal place of business is located at Two International Place, Boston, MA 02110.**

<u>Response to Paragraph 12</u>: The LCM Defendants admit, upon information and belief, the allegations of paragraph 12.

13.    **Plaintiff Invesco Senior Secured Management, Inc. is a Delaware corporation with its principal place of business at 1166 Avenue of the Americas, 26th Floor, New York, NY 10036.**

<u>Response to Paragraph 13:</u> The LCM Defendants admit, upon information and belief, the allegations of paragraph 13.

14.    **Upon information and belief, defendants AG Centre Street Partnership, L.P., AG Credit Solutions Non-ECI Master Fund, L.P., and Silver Oak Capital, L.L.C., affiliates of Angelo, Gordon & Co., L.P., are Delaware limited liability companies and/or limited**

partnerships with their principal place of business at 245 Park Avenue, New York, NY 10167.

Response to Paragraph 14: The LCM Defendants admit, upon information and belief, the allegations of paragraph 14.

15.     Upon information and belief, defendants AG SF Master (L), L.P. and AG Super Fund Master, L.P., affiliates of Angelo, Gordon & Co., L.P., are Cayman Islands limited partnerships with their principal place of business at 245 Park Avenue, New York, NY 10167.

Response to Paragraph 15: The LCM Defendants admit, upon information and belief, the allegations of paragraph 15.

16.     Upon information and belief, defendant Ascribe III Investments, LLC, an affiliate of AS Birch Grove LP, is a limited liability company with its principal place of business at 590 Madison Avenue, 38th Floor, New York, NY 10022.

Response to Paragraph 16: The LCM Defendants admit, upon information and belief, the allegations of paragraph 16.

17.     Upon information and belief, defendants Columbia Cent CLO 21 Limited and Columbia Cent CLO 27 Limited are Cayman Islands exempted companies with their principal place of business at 1099 Ameriprise Financial Center, Minneapolis, MN 55474.

Response to Paragraph 17: The LCM Defendants admit, upon information and belief, the allegations of paragraph 17.

18.     Upon information and belief, defendant Columbia Floating Rate Income Fund is a series of Columbia Funds Series Trust II, a Massachusetts business trust with its principal place of business at 290 Congress St., Boston, MA 02210.

Response to Paragraph 18: The LCM Defendants admit, upon information and belief, the allegations of paragraph 18.

19.     **Upon information and belief, defendant Columbia Strategic Income Fund is a series of Columbia Funds Series Trust I, a Massachusetts business trust with its principal place of business at 290 Congress St., Boston, MA 02210.**

Response to Paragraph 19: The LCM Defendants admit, upon information and belief, the allegations of paragraph 19.

20.     **Upon information and belief, defendants Contrarian Capital Fund I, L.P., Contrarian Distressed Debt Fund, L.P., and Contrarian Centre Street Partnership, L.P., affiliates of Contrarian Capital Management L.L.C., are Delaware limited partnerships with their principal place of business at 411 West Putnam Avenue, Greenwich, CT 06830.**

Response to Paragraph 20: The LCM Defendants admit, upon information and belief, the allegations of paragraph 20.

21.     **Upon information and belief, defendant Gamut Capital Serta Simmons Bedding, LLC, an affiliate of funds managed by Gamut Capital Management, LP, is a Delaware limited liability company with its principal place of business at 250 West 55th Street, New York, NY 10019.**

Response to Paragraph 21: The LCM Defendants admit, upon information and belief, the allegations of paragraph 21.

22.     **Upon information and belief, defendants LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd., and LCM 28 Ltd., affiliates of LCM Asset Management LLC, are exempted companies incorporated under the laws of the Cayman Islands whose principal place of business is in New York.**

9

Response to Paragraph 22: The LCM Defendants admit that they are exempted companies incorporated under the laws of the Cayman Islands. The LCM Defendants deny that their principal place of business is in New York, but admit that the Southern District of New York held as much in *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 20-cv-5090 (GBD), 2021 WL 918705 (S.D.N.Y. Mar. 10, 2021).

23.     **Upon information and belief, defendant North Star Debt Holdings, L.P., an affiliate of funds managed by Apollo Global Management, Inc., is a Delaware limited partnership with its principal place of business at 9 West 57th Street, New York, NY 10019.**

Response to Paragraph 23: The LCM Defendants admit, upon information and belief, the allegations of paragraph 23.

24.     **Upon information and belief, defendants Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015- VII-R CLO, Ltd., and Shackleton 2017-XI CLO, Ltd., affiliates of Alcentra NY, LLC, are Cayman Islands limited liability companies with their principal place of business at 9 West 57th Street, Suite 4920, New York, NY 10019.**

Response to Paragraph 24: The LCM Defendants admit, upon information and belief, the allegations of paragraph 24.

25.     **Upon information and belief, defendants Z Capital Credit Partners CLO 2018-1 Ltd. and Z Capital Credit Partners CLO 2019-1 Ltd., affiliates of Z Capital Group L.L.C., are exempted companies incorporated with limited liability under the laws of the Cayman Islands with their principal place of business at 1330 Avenue of the Americas, 16th Floor, New York, NY 10019.**

Response to Paragraph 25: The LCM Defendants admit, upon information and belief, the allegations of paragraph 25.

## JURISDICTION AND VENUE

26.     **The Court has jurisdiction to consider this matter under 28 U.S.C.§ 1334.**

Response to Paragraph 26: The LCM Defendants admit the allegations of paragraph 26.

27.     **This is a core proceeding under 28 U.S.C. § 157(b).  The claims concern the allowance or disallowance of certain claims against the estate and determinations of the validity, extent, or priority of liens against the Debtor.** *See, e.g.*, **28 U.S.C. § 157(b)(2)(B), (K). Specifically, Defendants have challenged the priority of their liens vis-à-vis those of the PTL Lenders in a series of state and federal actions.  The first state court and first federal actions were each dismissed.  Two later-filed actions, one in New York state court and one in the Southern District of New York, remain pending.**

Response to Paragraph 27: The LCM Defendants deny the allegations of paragraph 27, except that they admit that there are two lawsuits in which the other defendants in this adversary proceeding have challenged the validity of the Transaction pending in the Supreme Court of the State of New York and the Southern District of New York that are presently stayed, and a lawsuit in which the LCM Defendants have challenged the validity of the Transaction in the Southern District of New York that is presently stayed.

28.     **Under Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), Plaintiffs consent to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined**

11

that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

Response to Paragraph 28: The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28.

29.     **Venue is proper under 28 U.S.C. § 1409.  This proceeding arises in or relates to the Chapter 11 case pending in this District.**

Response to Paragraph 29: The LCM Defendants deny the allegations of paragraph 29 to the extent that the PTL Lender Plaintiffs agreed to a forum selection clause in Section 9.10(b) of the Non-PTL Term Loan Agreement, which provides that "each party hereto hereby irrevocably and unconditionally submits for itself and its property, to the exclusive jurisdiction of any U.S. federal or New York state court siting in the borough of Manhattan, in the City of New York (or any appellate court therefrom) over any suit, action or proceeding arising out of or relating to any loan document and agrees that all claims in respect of any such action or proceeding shall (except as permitted below) be heard and determined in such New York state or, to the extent permitted by applicable requirements of law, federal court." The LCM Defendants deny having knowledge or information sufficient to form a belief as to whether venue is proper in this District for the Chapter 11 proceeding.

## IV.  FACTUAL BACKGROUND

**1.  Serta Simmons Bedding Enters into the Non-PTL Term Loan Agreement in 2016**

30.     **Serta Simmons Bedding is one of the largest manufacturers and distributors of mattresses in North America.  It owns and manages some of the best-selling bedding brands in the mattress industry: Serta®, Beautyrest®, Simmons®, and Tuft & Needle®.**

Response to Paragraph 30: The LCM Defendants admit, upon information and belief, the allegations of paragraph 30.

31.    **Serta Simmons Bedding manufactures, sells, and distributes its bedding products to retailers and to individual consumers through a number of channels. Serta Simmons Bedding primarily sells its products in the United States through a diverse base of dealers, predominantly through one or more specialty sleep shops, as well as furniture stores, department stores, furniture rental stores, mass merchandisers, and juvenile specialty stores.  Serta Simmons Bedding also sells its products (i) to hospitality customers, such as hotels, casinos and resort properties; (ii) to third party resellers, who purchase overstock and discontinued models; and (iii) direct to consumers through their e- commerce platforms and retail stores.**

Response to Paragraph 31: The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 31.

32.    **Before the Transaction, Serta Simmons Bedding was a party to three separate Non- PTL Term Loan Agreements: (1) the Non-PTL Term Loan Agreement[2] that provided for $1.95 billion in first lien term loans ("First Lien Term Loans"); (2) a second lien term loan agreement, dated November 8, 2016[3] that provided for $450 million in**

---

[2] **The Non-PTL Term Loan Agreement (*See*, Ex. 1) was amended by that certain Amendment No. 1 to First Lien Term Loan Agreement, dated June 22, 2020 (the "Amended Non-PTL Term Loan Agreement"). *See* Ex. 2. The Amended Non-PTL Term Loan Agreement includes a redline to the original Non-PTL Term Loan Agreement. Additions are marked in blue double underlined text and deletions are marked with struck red text.**
[3] **The second lien term loan agreement was amended by that certain Amendment No. 1 to Second Lien Term Loan Agreement, dated June 22, 2020.**

second lien term loans ("Second Lien Term Loans"); and (3) a $225 million asset-based revolving credit facility, dated November 8, 2016.

Response to Paragraph 32: The LCM Defendants admit that Serta is a party to the agreements referenced in paragraph 32 but otherwise deny the allegations in the footnotes regarding the amendments to the Non-PTL Term Loan Agreement and the second lien term loan agreement.

33.    At the time of the Transaction, the PTL Lenders and Non-PTL Term Loan Lenders (except for North Star)[4] both held first lien and second lien Serta Simmons Bedding debt.

Response to Paragraph 33: The LCM Defendants deny the allegations of paragraph 33, except admit that at the time of the Transaction, the PTL Lenders and certain Non-PTL Term Loan Lenders held first-lien and second-lien debt in Serta Simmons Bedding. The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegation that North Star did not hold first-lien or second-lien debt in Serta Simmons Bedding or any of the allegations related to North Star in the footnote.

**2.  Serta Simmons Bedding Explores Potential Transactions and Engaged in a Competitive Process**

34.    In late 2019, Serta Simmons Bedding faced economic headwinds stemming from the restructuring of its largest retail partner and competition from new direct-to-

---

[4] Although North Star attempted to purchase First Lien Term Loans on the secondary market in March 2020, North Star's parent entity, Apollo, was or was [sic] affiliated with a Disqualified Institution, as defined under the Non-PTL Term Loan Agreement, and therefore the purchase was rejected.  North Star also failed to obtain the requisite consent of both Serta Simmons Bedding and the administrative agent to effectuate the purchase. North Star's trades did not settle and North Star did not—and does not—hold any of Serta Simmons Bedding's debt and is not a party to the Non-PTL Term Loan Agreement.

consumer businesses.  Although Serta Simmons Bedding took steps to, and did, improve its financial condition in early 2020, the spread of COVID-19 beginning in March 2020 severely impacted Serta Simmons Bedding's financial position.  Serta Simmons Bedding experienced a significant contraction in sales as both retailers of Serta Simmons Bedding products and Serta Simmons Bedding's manufacturing facilities were subject to government closures, which materially impacted Serta Simmons Bedding's liquidity.

Response to Paragraph 34: The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 34.

35.     In response, Serta Simmons Bedding began to explore various re-financing alternatives, seeking to raise liquidity and reduce its debt and interest expense. In March 2020, Serta Simmons Bedding's Board of Directors (the "Board") established an independent finance committee (the "Finance Committee") to evaluate and consider strategic alternatives for Serta Simmons Bedding.  The Board appointed two independent directors as members of the Finance Committee.

Response to Paragraph 35: The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 35, except admit, on information and belief, that Dawn Intermediate LLC appointed two independent directors to a Finance Committee of its Board in March 2020.

36.     In the spring of 2020, Serta Simmons Bedding, advised by its outside professionals, solicited proposals for potential liability managements transactions from both existing holders of Serta Simmons Bedding's debt and new lenders.  Various lender groups, including the PTL Lenders and a group comprised defendants of Angelo Gordon, Gamut, North Star, and Silver Oak (the "North Star Lenders"), submitted proposals for

**Serta Simmons Bedding's consideration.  As such, Serta Simmons Bedding negotiated with**
**more than 70% of its lenders before proceeding with the Transaction with the PTL**
**Lenders.**

Response to Paragraph 36: The LCM Defendants admit, upon information and belief, the
allegations in the first and second sentences of paragraph 36. The LCM Defendants deny having
knowledge or information sufficient to form a belief as to the truth of the allegations of the third
sentence of paragraph 36.

37.    **The North Star Lenders sought to obtain unfettered control over Serta**
**Simmons Bedding.  Specifically, the North Star Lenders' proposal included $200 million in**
**new money and an exchange of approximately $630 million of existing First and Second**
**Lien loans into approximately $470 million of new debt.  This proposal not only would have**
**increased Serta Simmons Bedding's total debt by $38 million, it also would have increased**
**its total interest payments by approximately $37 million.**

Response to Paragraph 37: The LCM Defendants deny having knowledge or information
sufficient to form a belief as to the truth of the allegations of paragraph 37.

38.    **Moreover, the North Star Lenders' proposal would have stripped valuable**
**collateral from Serta Simmons Bedding's other existing first and second lien lenders.  The**
**proposal would have required Serta Simmons Bedding to transfer substantial, existing**
**collateral from the First Lien Term Loans (which included significant intellectual property**
**assets, as well as royalty streams associated with third-party intellectual property licenses**
**worth millions of dollars) to newly created Serta Simmons Bedding subsidiaries that would**
**have served as borrowers and/or guarantors of the new debt, thereby stripping $465-590**
**million in collateral away from other lenders.  The North Star Lenders' proposal also**

**contemplated adding new collateral to these newly created subsidiaries, including real estate assets and a pledge of the stock of Serta, Inc.**

Response to Paragraph 38: The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 38.

39.    **In contrast, the PTL Lenders' proposal provided Serta Simmons Bedding with better terms that did not require Serta Simmons Bedding to strip valuable collateral away from the First Lien Term Loans. In fact, more collateral was added that was shared *pari passu* with all other existing lenders. The PTL Lenders' proposal included $200 million in new money loans and the repurchase of more than $1 billion in existing debt in exchange for the issuance of $850 million in new priority term loans.  This proposal thus allowed Serta Simmons Bedding to raise liquidity through new money financing, to capture approximately $400 million in debt discounts, and to lower its overall interest expense.**

Response to Paragraph 39: The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 39, except admit, upon information and belief, that the PTL Lenders' proposal included $200 million in new money loans and the repurchase of more than $1 billion in existing debt in exchange for the issuance of $850 million in new priority term loans.

40.    **Following a robust, competitive evaluation process, in early June 2020, the Finance Committee determined that the PTL Lenders' proposal was the best option for Serta Simmons Bedding on a going forward basis.  The Transaction allowed Serta Simmons Bedding to both raise liquidity with new money financing and capture debt discount through an open market purchase of the PTL Lenders' existing Serta Simmons Bedding**

debt on a non-pro rata basis, as permitted under the Non-PTL Term Loan Agreement. The Finance Committee approved Serta Simmons Bedding proceeding with the Transaction.[5]

Response to Paragraph 40: The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations of the first or third sentences of paragraph 40, including the footnote at the end of the third sentence. The LCM Defendants deny the allegations in the second sentence of paragraph 40.

41.     **The Transaction provided for a new super-priority term loan facility with two tranches: (i) a $200 million new money tranche and (ii) a debt-for-debt exchange tranche, pursuant to which approximately $850 million of priority terms loans were issued as consideration for the open market purchase of over $1 billion of First and Second Lien Term Loans (collectively, the "PTL Loans").**

Response to Paragraph 41: The LCM Defendants deny the allegations of paragraph 41, and respectfully refer the Court to the PTL Loan documents for their complete and accurate contents.

42.     **To effectuate the Transaction, Serta Simmons Bedding entered into certain amendments to the Non-PTL Term Loan Agreement (discussed *infra*) and also entered into a separate Super-Priority Term Loan Agreement, dated June 22, 2020 (the "PTL Credit Agreement"), an Open Market Purchase and Cashless Exchange Agreement, dated June 22, 2020 (the "Exchange Agreement"), and a First Lien Intercreditor Agreement, dated June 22, 2020 (the "PTL Intercreditor Agreement"), pursuant to which the PTL Loans rank senior in right of payment, but *pari passu* with respect to security, to the First Lien Loans under the Non-PTL Term Loan Agreement.**

---

[5] **On June 3, 2020, the Board delegated full decision-making authority to the Finance Committee to approve, negotiate and implement a re-financing transaction for Serta Simmons Bedding.**

Response to Paragraph 42: The LCM Defendants deny the allegations of paragraph 42, and respectfully refer the Court to the agreements referenced therein for their complete and accurate contents.

43.    **Ultimately, the Transaction reduced Serta Simmons Bedding's debt by approximately $400 million, lowered Serta Simmons Bedding's all-in interest expense, created new collateral for the benefit of all Lenders (including Defendants), and increased Serta Simmons Bedding's cash position to $300 million. Absent the Transaction, which allowed Serta Simmons Bedding to deleverage its balance sheet, Serta Simmons Bedding would likely have been on the path to restructuring far sooner.**

Response to Paragraph 43: The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 43.

44.    **Serta Simmons Bedding issued a press release on June 8, 2020 announcing the Transaction.**

Response to Paragraph 44: The LCM Defendants admit the allegations of paragraph 44.

**3.    The Transaction Complies with the Non-PTL Term Loan Agreement**

   **a.    The Non-PTL Term Loan Agreement Permits the Transaction**

45.    **Many credit agreements contain anti-subordination clauses, requiring the consent of all lenders to subordinate the obligations under the agreement to any other indebtedness. The Non-PTL Term Loan Agreement here does not contain an anti-subordination provision; the sophisticated parties here agreed to allow the Company the flexibility to incur additional priority indebtedness under this Non-PTL Term Loan Agreement.**

Response to Paragraph 45: The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of paragraph 45.

The LCM Defendants deny the allegations in the second sentence of paragraph 45, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

46. **The plain terms of the Non-PTL Term Loan Agreement permit the incurrence of incremental equivalent debt and the repurchase of existing loans on the open market on a non-pro rata basis.**

Response to Paragraph 46: The LCM Defendants deny the allegations of paragraph 46, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

47. **The Non-PTL Term Loan Agreement permits Serta Simmons Bedding to incur the additional $200 million in new money in the form of incremental equivalent debt. Section 6.01(z) of the Non-PTL Term Loan Agreement provides "[t]he Top Borrower [defined as Serta Simmons Bedding] shall not . . . directly . . . incur . . . any Indebtedness, except . . . Incremental Equivalent Debt." Ex. 1 § 6.01(z); *see also id.* at § 1.01 (defining Incremental Equivalent Debt). Serta Simmons Bedding incurred the $200 million new financing under this provision.**

Response to Paragraph 47: The LCM Defendants deny the allegations of paragraph 47, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

48. **The Non-PTL Term Loan Agreement also allows Serta Simmons Bedding to repurchase First Lien Loans from its existing lenders on a non-pro rata basis through an open market transaction. Specifically, § 9.05(g) of the Non-PTL Term Loan Agreements provides, in relevant part, that:**

> **Notwithstanding anything to the contrary contained herein, any Lender may, at any time assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender[6] *on a non-pro rata basis* (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases, in each case with respect to <u>clauses (A)</u> and <u>(B),</u> without the consent of the Administrative Agent.**

**Ex. 1, § 9.05(g) (emphasis added).**

<u>Response to Paragraph 48</u>: The LCM Defendants deny the allegation in the first sentence of paragraph 48, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

49.     **In the context of a loan repurchase, "open market" means the price that a willing buyer and a willing seller are able to obtain in an arms-length negotiation— in other words, the price that Serta Simmons Bedding and any lender agreed to in the "open market."[7]  Here, Serta Simmons Bedding negotiated with, and entered into, arms-length transactions in the "open market" with the PTL Lenders, which held a majority of Serta Simmons Bedding's debt, to repurchase their debt in exchange for the issuance of PTL Loans.  Serta Simmons Bedding also negotiated on the open market with the North Star Lenders, but the PTL Lenders offered better terms.  Neither Section 9.05(g) nor any other provision required Serta Simmons Bedding to offer the Transaction to all its existing lenders.  Section 9.05(g) expressly provides that an open market transaction may occur on a "non-pro rata basis."  Ex. 1, § 9.05(g).  Notably, the remainder of Section 9.05(g), which**

---

[6] **The Non-PTL Term Loan Agreement defines Affiliated Lender to include "any Non-Debt Fund Affiliate, Holdings, the Top Borrower and/or any subsidiary of the Top Borrower."** *Id.* **at § 1.01.  Serta Simmons Bedding is the Top Borrower.**

[7] *See Fair Market Value***, BLACK'S LAW DICTIONARY (11th ed. 2019).**

alternatively allows an exchange transaction through a Dutch auction, specifically provides that, unlike an open market purchase, a Dutch Auction must be "open to all Lenders."

Response to Paragraph 49: The LCM Defendants deny the allegations of the first, second, and third sentences of paragraph 49. The LCM Defendants deny the allegations of the remainder of paragraph 49, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

**b. The Non-PTL Term Loan Agreement Permits the Amendments**

50.     To effectuate the Transaction, Serta Simmons Bedding and the PTL Lenders, who held more than 50% of the outstanding loans under the Non-PTL Term Loan Agreement (the "Required Lenders" under the Non-PTL Term Loan Agreement), first entered into certain permitted amendments to the Non-PTL Term Loan Agreement to allow the PTL Loans to have senior payment priority.

Response to Paragraph 50: The LCM Defendants deny the allegations of paragraph 50, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

51.     The Non-PTL Term Loan Agreement provides that all provisions, except a small number of provisions involving "sacred rights," may be amended with the consent of a simple majority of the First Lien Lenders. Section 9.02(b) provides, in relevant part, that:

> [N]either this Agreement nor any other Loan Document or any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by [Serta Simmons Bedding] and the Required Lenders.

*See* Ex. 1 §9.02(b). "Required Lenders" is defined to include "Lenders having Loans or unused Commitments representing more than 50% of the sum of the total Loans and such unused commitments at such time." *See* Ex. 1 § 1.01.

<u>Response to Paragraph 51</u>: The LCM Defendants deny the allegations of paragraph 51, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

52.     **In contrast to the simple majority requirement for most amendments, an amendment of any specifically enumerated "sacred right" provision requires the consent of each lender directly or adversely affected by the amendment.  But even for the "sacred right" requiring such heightened approval to amend, the Non-PTL Term Loan Agreement contains an express carve out for non- pro rata open market purchases.  Section 9.02(b)(A)(6) requires the consent of each lender directly and adversely effected by an amendment that**

> **waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby *(except in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c), and/or 9.05(g) or as otherwise provided in this Section 9.02).***

**Ex. 1, § 9.02(b)(A)(6) (emphasis added).  This express carveout directly applies because the Transaction was a non-pro rata open market purchase as permitted under section 9.05(g) of the Non-PTL Term Loan Agreement; even for the handful of "sacred rights" which required such heightened approval to amend, the Non-PTL Term Loan Agreement contains an express carve out for non-pro rata open market purchases under § 9.05(g).**

<u>Response to Paragraph 52</u>: The LCM Defendants admit the allegations of the first sentence of paragraph 52.   The LCM Defendants otherwise deny the allegations of paragraph 52, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

53.     **Defendants have also argued that the Transaction violated another "sacred right"— Section 9.02(b)(B), which prohibits Serta Simmons Bedding and the Required**

Lenders from entering into an agreement that would "release all or substantially all of the Collateral from the Lien granted pursuant to the Loan Documents" or to "release all or substantially all of the value of the Guarantees under the Loan Guaranty," "except as otherwise permitted herein or in the other Loan Documents," "without the prior written consent of each Lender."  Ex. 1 § 9.02(b)(B)(2)-(3). However, the Transaction did not release the collateral or the value of the loan guarantees.  The Non-PTL Term Loan Lenders' loans are secured by the same lien, and guaranteed by the same guarantees, as the day the Non-PTL Term Loan Agreement was executed.

Response to Paragraph 53: The LCM Defendants deny the allegations of the first sentence of paragraph 53, except admit that they contend the Transaction violates Section 9.02(b)(B) of the Non-PTL Term Loan Agreement, and respectfully refer the Court to that agreement for its complete and accurate contents.  The LCM Defendants otherwise deny the allegations of paragraph 53.

54.    The Transaction also did not interfere with the Non-PTL Term Loan Lenders' sacred right to receive pro rata payment in the event of a default.  Section 2.18(b) and (c), the waterfall provision, states

> (b) . . . [A]ll proceeds of Collateral received by the Administrative Agent while an Event of Default exists and all or any portion of the Loans have been accelerated hereunder pursuant to Section 7.01, shall be applied, **first**, to the payment of all costs and expenses then due incurred by the Administrative Agent . . . **second**, on a pro rata basis, to pay any fees, indemnities or expense reimbursements then due to the Administrative Agent . . . **third**, on a pro rata basis in accordance with the amounts of the Secured Obligations . . . owed to the Secured Parties on the date of any such distribution, to the payment in full of the Secured Obligations, **fourth**, as provided in each applicable Intercreditor Agreement, and **fifth**, to, or at the direction of, the Top Borrower or as a court of competent jurisdiction may otherwise direct.
>
> (c) If any Lender obtains payment . . . in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving

**payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with Loans of such Class, then the Lender receiving such greater proportion shall purchase . . . participations in the Loans of other Lenders of such Class at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such Class ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class;** *provided that . . . (ii) the provisions of this paragraph shall not apply to (A) any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with Sections 2.22, 2.23, 9.02(c) and/or Section 9.05.*

**Ex. 1, § 2.18(b), (c) (emphasis added).**

Response to Paragraph 54: The LCM Defendants deny the allegations of paragraph 54, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

55.     **No amendments were made to Section 2.18(b) or (c), which govern the payment waterfall in the event of default and the pro rating sharing provisions, respectively.**

Response to Paragraph 55: The LCM Defendants deny the allegations of paragraph 55, and respectfully refer the Court to the amended Non-PTL Term Loan Agreement for its complete and accurate contents.

56.     **In any event, Section 2.18(c) provides for payments obtained to "be shared by the Lenders** *of such* **Class ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans** *of such Class.***"** *Id.* **§ 2.18(c) (emphasis added). Accordingly, the first-lien lenders' rights to pro rata payments under Section 2.18 only applies to debt within the same "Class"—that is, among first-lien lenders. The PTL Loans are not in the same "Class" as the first-lien term loans.**

Response to Paragraph 56: The LCM Defendants deny the allegations of paragraph 56, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

57.     **Further, by Section 2.18(b)'s plain language, its waterfall provision is expressly "[s]ubject, in all respects, to the provisions of each applicable Intercreditor Agreement."  Ex. 1, § 2.18(b).**

Response to Paragraph 57: The LCM Defendants deny the allegations of paragraph 57, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

58.     **The Non-PTL Term Loan Agreement was amended to allow Serta Simmons Bedding to incur incremental equivalent debt that is senior in right of payment to the First Lien Loans.  The definition of Incremental Equivalent Debt was amended to read as follows:**

> **Indebtedness issued, incurred or implemented in lieu of loans under an Incremental Facility in the form of notes or loans and/or commitments in respect of the foregoing (*including Indebtedness issued under the PTL Credit Agreement* (including the Priority New Money Term Loans and the Priority Exchange Term Loans)) in each case, *which may be senior*, *pari passu* or junior *in right of payment* and/or with respect to security with the Obligations hereunder . . . .**

*See* **Ex. 2 § 1.01 (emphasis added).  As this amendment did not amend, modify, or waive a "sacred right," it required only the consent of the Required Lenders.**

Response to Paragraph 58: The LCM Defendants deny the allegations of the first and second sentences of paragraph 58, except admit that the Transaction unlawfully purported to amend the definition of Incremental Equivalent Debt in the Non-PTL Term Loan Agreement, and

respectfully refer the Court to the amended Non-PTL Term Loan Agreement for its complete and accurate contents.  The LCM Defendants otherwise deny the allegations of paragraph 58.

59.     **Section 8.08 of the Non-PTL Term Loan Agreement was also amended to authorize the administrative agent to enter into a separate intercreditor agreement to establish senior payment priority for the new loans.  As amended, Section 8.08 provides:**

> **Each Secured Party irrevocably authorizes and instructs the Administrative Agent to, and the Administrative Agent shall . . .(d) enter into subordination, intercreditor, collateral trust and/or similar agreements with respect to Indebtedness (including the Initial Intercreditor Agreement, the PTL First Lien Intercreditor Agreement and any other Acceptable Intercreditor Agreement . . . ) that is (i) required  or permitted to be senior, pari passu or subordinated hereunder . . . .**

**See Ex. 2 § 8.08(d).  Again, as this amendment did not amend, modify, or waive a "sacred right," it required only consent of the "Required Lenders."**

Response to Paragraph 59: The LCM Defendants deny the allegations of the first and second sentences of paragraph 59, except admit that the Transaction unlawfully purported to amend Section 8.08 of the Non-PTL Term Loan Agreement, and respectfully refer the Court to the amended Non-PTL Term Loan Agreement for its complete and accurate terms.  The LCM Defendants otherwise deny the allegations of paragraph 59.

60.     **Serta Simmons Bedding and the PTL Lenders also made clear in the amended Non- PTL Term Loan Agreement that the Transaction, as documented, was a permissible "open market purchase" to which the PTL Lenders consented.  Specifically, Amendment No. 1 to the Non-PTL Term Loan Agreement provides that each Required Lender "acknowledges and agrees that the borrowing and/or incurrence" of the super-priority loans and all "step[s] necessary to effectuate" the Transaction "shall be and are permitted," Ex. 2, § 4, and that each Required Lender "consent[s], request[s] and instruct[s] the Administrative Agent" to take "any and all actions . . . necessary, advisable or desirable**

in carrying out, effectuating or otherwise in furtherance of the transactions related to or in connection with" the amendment, *id.* § 14(a).  As there is no sacred right relating to the definition of "open market purchase," the consent of the PTL Lenders, who represent more than 50% of the First Lien Term Loan holders, was all that was required to amend the Non-PTL Term Loan Agreement in this manner.  *See* Ex. 1 §9.02(b)(A).

Response to Paragraph 60: The LCM Defendants deny the allegations of the first sentence of paragraph 60.  The LCM Defendants deny the allegations of the second sentence of paragraph 60, and respectfully refer the Court to the amended Non-PTL Term Loan Agreement for its complete and accurate contents.  The LCM Defendants otherwise deny the allegations of paragraph 60.

61.     **The Exchange Agreement entered into by Serta Simmons Bedding and the PTL Lenders in connection with the Transaction similarly provides that "pursuant to Section 9.05(g) of the First Lien [Non-PTL Term Loan] Agreement, the Specified Borrowers will purchase on the open market from such Specified Lender all of its Existing First Lien Term Loans," that "[e]ach of the Specified Lenders . . . instruct[] each Bank Agent to take any and all actions . . . necessary, advisable or desirable . . . [to] effectuat[e]" the debt purchase transaction, and that each Specified Lender agreed that all conditions precedent to the transaction were satisfied.  Ex. 3, Preamble, § 2.1(f).  Like Amendment No. 1 to the Non-PTL Term Loan Agreement, then, the Exchange Agreement confirms that the Required Lenders understood the Transaction to be an open market purchase and consented to the Transaction.**

Response to Paragraph 61: The LCM Defendants deny the allegations of the first sentence of paragraph 61, and respectfully refer the Court to the Exchange Agreement for its complete and accurate contents.  The LCM Defendants otherwise deny the allegations of paragraph 61.

**4.  The North Star Lenders Seek, and Fail, to Block the Transaction and the Transaction Closes on June 22, 2020**

62.     **After Serta Simmons Bedding announced its intent to proceed with the Transaction, the North Star Lenders were evidently upset that Serta Simmons Bedding had selected the PTL Lenders' proposal rather than their own, which, again, would have stripped collateral from other lenders and resulted in more debt and interests owed by Serta Simmons Bedding. On June 11, 2020, the North Star Lenders filed a complaint in New York State court against Serta Simmons Bedding and the PTL Lenders (the "North Star Lenders Action")[8] and sought a preliminary injunction to enjoin the Transaction from closing. The North Star Lenders claimed that the proposed Transaction would create new superpriority loans that would effectively subordinate their First Lien Loans purportedly in violation of the Non-PTL Term Loan Agreement.[9]**

Response to Paragraph 62: The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 62.  The LCM Defendants admit the allegations of the second and third sentence of paragraph 62, except to the extent that LCM Asset Management LLC's motion to intervene in the North Star Lenders Action was not denied, but withdrawn by permission of the court. *See North Star Debt Holdings, L.P., et al., v. Serta Simmons Bedding, LLC et al.,* No. 652243/2020 (N.Y. Sup. Ct. N.Y. Cnty.), Dkt. 139. The

---

[8] **LCM sought to intervene in the North Star Action, which was denied.  *North Star Debt Holdings, L.P., et al., v. Serta Simmons Bedding, LLC et al.*, No. 652243/2020 (N.Y. Sup. Ct. N.Y. Cnty.), Dkt. 61.**

[9] ***North Star*, No. 652243/2020, Dkt. 1.**

LCM Defendants otherwise respectfully refer the Court to the complaint referenced in paragraph 62 for its complete and accurate contents.

63. **On June 19, 2020, the New York state court denied the North Star Lenders' request for a preliminary injunction. The court concluded that the North Star Lenders were not likely to succeed on the merits of their breach of contract and breach of the implied covenant of good faith and fair dealing claims.[10] As to the breach of contract claim, the court held that that the "[Non- PTL Term Loan Agreement] seems to permit[] the debt-to-debt exchange on a non-pro rata basis as part of an open market transaction" and that "[s]ince the amendments do not affect plaintiffs['] so-called 'sacred rights' under the [Non-PTL Term Loan Agreement], plaintiffs' consent does not appear to be required."[11] The New York court further concluded that the good faith and fair dealing claim was unlikely to succeed because it was "identical to its breach of contract claim."[12] In denying the motion, the court recognized that the Transaction was "the culmination of months of negotiation" and that the COVID-19 pandemic had "impacted Serta's liquidity."[13]**

Response to Paragraph 63: The LCM Defendants admit the allegations of the first sentence of paragraph 63. The LCM Defendants otherwise deny that the allegations of paragraph 63 provide an accurate and comprehensive description of the matters addressed therein, and

---

[10] *See North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC,* No. 652243/2020, 2020 WL 3411267, at *4 (N.Y. Sup. Ct. N.Y. Cnty. June 19, 2020).

[11] *Id.*

[12] *Id.* at *5.

[13] *Id.* at *2.

respectfully refer to the Court to the decision referenced in paragraph 63 for its complete and accurate contents.

64.     **The Transaction closed on June 22, 2020.**

Response to Paragraph 64: The LCM Defendants admit, upon information and belief, the allegations of paragraph 64.

65.     **Since the Transaction closed, Serta Simmons Bedding continued to pay its debt as it came due both under the PTL Credit Agreement and the Non-PTL Term Loan Agreement.**

Response to Paragraph 65: The LCM Defendants admit the allegations of paragraph 65 with respect to the Non-PTL Term Loan Agreement but deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 65 regarding the PTL Credit Agreement, as they are not parties thereto.

66.     **The Non-PTL Term Loan Lenders and PTL Lenders' loans have continued to trade on the market since the Transaction closed, with all parties (including non-parties to this adversary proceeding) relying on the validity and finality of the Transaction.**

Response to Paragraph 66: The LCM Defendants deny the allegations of paragraph 66, except admit, upon information and belief, that the Non-PTL Term Loan Lenders' and PTL Lenders' loans have continued to trade on the market since the Transaction closed.

**5.  The North Star Lenders Withdraw Their State Court Action, Only To Refile Two Years Later**

67.     **Following the denial of their motion for a preliminary injunction, the North Star Lenders voluntarily discontinued the North Star Action over Serta Simmons Bedding**

and the PTL Lenders' vigorous objection.[14]  The New York state court granted the motion to voluntarily discontinue the North Star Action on November 30, 2020 over Defendants' objection.[15]

Response to Paragraph 67: The LCM Defendants admit the allegations of paragraph 67.

68.    In November 2022, two years after voluntarily dismissing the North Star Action, the North Star Lenders and other Non-PTL Term Loan Lenders filed a renewed complaint against Serta Simmons Bedding and the PTL Lenders in New York state court. This complaint alleges near identical claims to those in the complaint the North Star Lenders voluntarily withdrew in November 2020: they allege the Transaction breached the waterfall and pro rata sharing provisions of the Non-PTL Term Loan Agreement, and that the Transaction breached the implied covenant of good faith and fair dealing by stripping them of the value of their guarantees and altering the proceeds waterfall and pro rata provisions without their consent.  The Plaintiffs in the New York state court action  also allege the Transaction released all or substantially all of the collateral and value of the guarantees without the non-participating lender' consent.  However, the Plaintiffs in the New York state court action concede that under the Non-PTL Term Loan Agreement, Serta Simmons Bedding can subordinate their debt without their consent because the incurrence of $200 million in new debt from the Transaction "could be given priority without a unanimous vote."[16]  The complaint also asserts a related, but distinct, claim for a declaratory judgement that Serta Simmons Bedding breached the Non-PTL Term Loan

---

[14] *North Star*, Index No. 652243/2020, Dkt. 170.

[15] *North Star*, Index No. 652243/2020, Dkt. 212.

[16] *AG Centre Street Partnership L.P., et al. v. Serta Simmons Bedding, LLC, et al.*, No. 654181/2022, Dkt. 11, at 23.

Agreement by failing to perfect the assignment of Apollo's first lien loans. As described in detail below, the North Star Lenders chose to file its litigation shortly before Serta Simmons Bedding's filing for Chapter 11.

Response to Paragraph 68: The LCM Defendants deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 68, except to the extent that they admit that the North Star Lenders filed a renewed action against Serta and the PTL Lenders in November 2022 and respectfully refer the Court to the pleadings referenced in paragraph 68 for their complete and accurate contents.

69.    **On January 9, 2023, Serta Simmons Bedding and the PTL Lenders both moved to dismiss the case.[17]**

Response to Paragraph 69: The LCM Defendants admit, upon information and belief, the allegations of paragraph 69.

**6.  LCM Litigation**

70.    **Following the New York State court's denial of the preliminary injunction, LCM, which held approximately $7.4 million in First Lien Debt, filed successive suits in federal court challenging the Transaction and alleging similar causes of action as the North Star Lenders. LCM first sued Serta Simmons Bedding in New York state court in June 2020, but withdrew the action shortly thereafter.[18] LCM then sued Serta Simmons Bedding and the PTL Lenders in the Southern District of New York in July 2020. The Southern District of New York granted Serta Simmons Bedding and the PTL Lenders' motions to**

---

[17] *AG Centre*, No. 654181/2022, Dkts. 47, 55, 57.

[18] *LCM Asset Management, LLC v. Serta Simmons Bedding, LLC, et al.*, No. 652555/2020 (N.Y. Sup. Ct. N.Y. Cnty.), Dkt. 14.

dismiss the complaint for lack of subject matter jurisdiction because there was incomplete diversity between LCM and the PTL Lenders.[19]

Response to Paragraph 70: The LCM Defendants deny the allegations of paragraph 70, except admit that LCM Asset Management LLC filed suit in New York state court, and the LCM Defendants filed suits in federal court challenging the Transaction, and respectfully refer the Court to the filings and decision referenced in paragraph 70 for their complete and accurate contents.

71.     **LCM then filed a new action in the Southern District of New York against Serta Simmons Bedding alone, which remains pending (the "LCM Action").  In the complaint, LCM alleges the Transaction did not constitute an open market purchase under Section 9.05(g) of the Non-PTL Term Loan Agreement as it was negotiated in private and not offered to all existing lenders.  LCM further argued that the amendments to the Non-PTL Term Loan Agreement implicated their sacred rights under the Non-PTL Term Loan Agreement (specifically, their right to *pro rata* payment) and thus required 100% lender consent, rather than a simple majority.  LCM further argues that the Transaction "effectively" released all or substantially all of the collateral securing the First Lien Loans due to the PTL Loans receiving higher priority than the First Lien Loans.[20]**

Response to Paragraph 71: The LCM Defendants admit the allegations of the first sentence of paragraph 71.  The LCM Defendants deny that the remaining allegations of paragraph 71 provide an accurate and comprehensive description of the matters therein, and respectfully refer to the Court to the complaint referenced therein for its complete and accurate contents.

---

[19] *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 20-cv-05090, 2021 WL 918705, at *5 (S.D.N.Y. Mar. 10, 2021).

[20] *LCM XXI Ltd. v. Serta Simmons Bedding, LLC*, No. 21 Civ. 3987 (KPF) (S.D.N.Y), Dkt. 1, at 12.

72.     Serta Simmons Bedding moved to dismiss the claims in July 2021, and the Southern District of New York court rejected nearly all of LCM's contentions that Serta Simmons Bedding breached the Non-PTL Term Loan Agreement through the Transaction. The Southern District of New York held that the Non-PTL Term Loan Agreement permitted the amendments in the Transaction as they did not affect the "*pro rata* rights of first-lien lenders vis-à-vis other first-lien lenders.[21]  The Southern District of New York also concluded that the Transaction did not violate the waterfall provisions of the Non-PTL Term Loan Agreement because the Non-PTL Term Loan Agreement permitted Serta Simmons Bedding to enter into the First Lien Intercreditor Agreement and no collateral or value of the loan guarantees were released in the Transaction.[22]  However, the Southern District of New York ultimately denied Serta Simmons Bedding's motion to dismiss the breach of contract claim in part because it concluded that the term "open market purchase" as used in Section 9.05(g) was ambiguous and discovery on that issue should proceed.[23] Nevertheless, in so holding, the Southern District of New York recognized that the open-market provision may contemplate loan-repurchase transactions "that involve *fewer than all lenders in any given class of debt*" (emphasis added), and observed "[t]hat the provision specifies that Dutch Auctions must be open to all lenders, but does not do so for open-market purchases, may indicate the parties' conscious choice to exclude such a

---

[21] *LCM XXI Ltd. v. Serta Simmons Bedding, LLC*, No. 21 Civ. 3987 (KPF), 2022 WL 953109, at *10 (S.D.N.Y. Mar. 29, 2022) ("anti-subordination is not a sacred right protected by § 9.02(b)(A)(6), or any other provision of § 9.02 . . ., the [Non-PTL Term Loan] Agreement permitted such changes to be made with the consent of the majority of lenders").

[22] *Id.* at *11-12.

[23] *Id.* at *6-*9. The Southern District of New York also permitted the claim for breach of the implied covenant of good faith and fair dealing to proceed. *Id.* at *14-*16.

requirement from loan repurchases pursued in the open market."[24]  The Southern District of New York also noted that the mere existence of other mechanisms for debt exchanges in the Non-PTL Term Loan Agreement did not preclude Serta Simmons Bedding's use of the open market provision for the Transaction.[25]

Response to Paragraph 72: The LCM Defendants deny that the allegations of paragraph 72 provide an accurate and comprehensive description of the matters addressed therein, except admit that the Southern District of New York denied Serta's motion to dismiss, and respectfully refer the Court to the opinion and order denying Serta's motion to dismiss referenced in paragraph 72 for its complete and accurate contents.

73.     **LCM and Serta Simmons Bedding substantially completed their document productions in the LCM Action on August 19, 2022.  To date, no depositions have occurred and expert discovery has not begun.**

Response to Paragraph 73: The LCM Defendants admit the allegations in paragraph 73.

**7.  Serta Simmons Bedding filed for Chapter 11 Protection**

74.     **As is described more fully in the Declaration of John Linker in Support of Debtors' Chapter 11 Petitions and First Day Relief, due to continuing poor market conditions, Serta Simmons Bedding and 13 of its affiliates commenced the above-captioned Chapter 11 cases on January 23, 2023 (the "Petition Date").**

Response to Paragraph 74: The LCM Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 74, except admit that Serta commenced a Chapter 11 bankruptcy proceeding on January 23, 2023.

---

[24] *See id.* **at \*8.**

[25] *Id.* **at \*8-9.**

75.     **Both the LCM Action and the North Star Lenders' Action[26] are subject to the automatic stay.** *See* **11 U.S.C. § 362(a) (the Automatic Stay operates as a stay, applicable to all entities, of "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [chapter 11]").**

Response to Paragraph 75: The LCM Defendants admit that the LCM Action and the North Star Lenders Action—insofar as it asserts claims against Serta—are subject to the automatic stay. The LCM Defendants otherwise deny the allegations of paragraph 75.

76.     **Whether the Transaction was valid under the Non-PTL Term Loan Agreement is a core issue that goes to the heart of Serta Simmons Bedding's efforts to reorganize its capital structure pursuant to the Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors (the "Plan"). This issue must be resolved for Serta Simmons Bedding to successfully emerge from Chapter 11.**

Response to Paragraph 76: The LCM Defendants deny the allegations of paragraph 76.

## V.  CAUSES OF ACTION

### COUNT 1 – DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

77.     **Serta Simmons Bedding and the PTL Lenders incorporate by reference the allegations in Paragraphs 1-76 as if set forth fully herein.**

Response to Paragraph 77: The LCM Defendants repeat and reallege their responses to paragraphs 1 through 76 as set forth above as if fully set forth herein.

78.     **Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and**

---

[26] **Serta Simmons Bedding intends to file a motion to extend the automatic stay to the entirety of the North Star Action (including those claims against the PTL Lenders).**

other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a).  Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments.

Response to Paragraph 78: The LCM Defendants admit the allegations of paragraph 78.

79.    **Courts possess jurisdiction to issue declaratory relief when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."** *MedImmune, Inc. v. Genetech, Inc.*, **549 U.S. 118, 127 (2007).**

Response to Paragraph 79: The LCM Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 79, and respectfully refer the Court to the case cited therein for its complete and accurate contents.

80.    **There is a substantial controversy between Serta Simmons Bedding and the PTL Lenders and the Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  Without resolution of this controversy, Serta Simmons Bedding anticipates the Defendants will continue to assert their priority status in Serta Simmons Bedding's capital structure vis-à-vis the PTL Lenders.  Such claims would prevent Serta Simmons Bedding from successfully obtaining confirmation of its Plan and preclude Serta Simmons Bedding from emerging from chapter 11, to the detriment of its estate and its creditors.**

Response to Paragraph 80: The LCM Defendants deny the allegations of paragraph 80.

81.    **There is also a substantial controversy concerning whether Serta Simmons Bedding breached the Non-PTL Term Loan Agreement by failing to perfect the assignment of Apollo's first lien loans.  Without resolution of this controversy, Apollo may continue to**

assert it holds additional amounts of Serta Simmons Bedding's first lien loans, which could similarly impact Serta Simmons Bedding's ability to successfully obtaining confirmation of its Plan and preclude Serta Simmons Bedding from emerging from chapter 11, to the detriment of its estate and its creditors.

Response to Paragraph 81: The LCM Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 81.

82.    **Serta Simmons Bedding and the PTL Lenders seek a declaratory judgment confirming that (1) the Transaction was permitted under the Non-PTL Term Loan Agreement and (2) Plaintiffs did not violate the covenant of good faith and fair dealing by entering into the Transaction.**

Response to Paragraph 82: The LCM Defendants deny the allegations of paragraph 82, except admit that Serta and the PTL Lender Plaintiffs purport to seek the relief set forth in paragraph 82.

## VI.  PRAYER FOR RELIEF

83.    The LCM Defendants deny that Serta or the PTL Lender Plaintiffs are entitled to any of the relief requested in subparagraphs a-e on page 27 of the Amended Complaint or as otherwise requested in the Amended Complaint.

## GENERAL DENIAL

84.    The LCM Defendants deny each and every allegation, statement, and matter not expressly admitted or qualified herein.  Any allegations made in the headings contained in the Complaint are denied.  The prayer for relief is denied.

## AFFIRMATIVE DEFENSES

85.    The LCM Defendants state the following affirmative defenses and hereby reserve their rights to assert other and additional defenses, cross-claims, counterclaims, and third-party

claims not asserted herein of which they become aware through discovery or other investigation as may be appropriate at a later time.  In asserting these affirmative defenses, the LCM Defendants do not assume any burden of proof, persuasion, or production with respect to any issue where the applicable law places the burden upon another party.

### FIRST AFFIRMATIVE DEFENSE

86.     The Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

87.     Serta and the PTL Lender Plaintiffs' claims are barred, in whole or in part, by equitable estoppel, waiver, unclean hands, *in pari delicto*, and/or other equitable doctrines.

### THIRD AFFIRMATIVE DEFENSE

88.     Venue does not properly lie in this District as to the claims between the PTL Lender Plaintiffs and the LCM Defendants because the PTL Lender Plaintiffs agreed to a forum selection clause providing for exclusive venue in the federal or state court in the Borough of Manhattan in New York City.  Specifically, Section 9.10(b) of the Non-PTL Term Loan Agreement states that "each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any U.S. federal or New York state court siting in the borough of Manhattan, in the City of New York (or any appellate court therefrom) over any suit, action or proceeding arising out of or relating to any loan document and agrees that all claims in respect of any such action or proceeding shall  (except as permitted below) be heard and determined in such New York state or, to the extent permitted by applicable requirements of law, federal court."

### FOURTH AFFIRMATIVE DEFENSE

89.     The Court should exercise its discretion to deny declaratory relief because this action represents an improper use of the declaratory judgment mechanism to gain a procedural advantage over the LCM Defendants, and preempt or thwart the LCM Defendants from vindicating

their rights by pursuing their live claims against the PTL Lender Plaintiffs in the forum contractually designated for the resolution of such claims.

## <u>FIFTH AFFIRMATIVE DEFENSE</u>

90.     The LCM Defendants reserve their right to contest venue concerning the underlying Chapter 11 proceeding, pending their receipt of information from the Debtors concerning the propriety of venue in this District.

*[Remainder of page intentionally left blank.]*

## LCM DEFENDANTS' COUNTERCLAIMS

91.     Defendants LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd. and LCM 28 Ltd.. (collectively, the "LCM Defendants,"), upon knowledge with respect to themselves and their own acts and upon information and belief with respect to all other matters, hereby assert the following counterclaims against Plaintiffs Serta Simmons Bedding, LLC ("Serta" or the "Company"), and Invesco Senior Secured Management, Inc. ("Invesco"), Credit Suisse Asset Management, LLC ("Credit Suisse"), Boston Management and Research ("Boston Management"), Eaton Vance Management ("Eaton Vance"), and Barings LLC ("Barings") (collectively, the "PTL Lenders"), as follows below.

## PRELIMINARY STATEMENT

92.     The June 2020 financing and debt exchange transaction (the "Exchange Transaction") that Plaintiffs seek to enforce in this proceeding was unlawfully engineered to manipulate the waterfall of first-lien lenders' rights by elevating the priority of the PTL Lenders debt over the LCM Defendants' debt. In the Exchange Transaction, the Plaintiffs, Serta, the PTL Lenders and other lenders that are not parties to this action[27] (collectively with the PTL Lenders, the "Handpicked Lenders"), orchestrated an exchange of existing first-lien and second-lien holdings for new "super-priority" debt—some $1 billion in all—that was placed *above* the "first-lien" debt that the minority was left with.  In doing so, Serta and the PTL Lenders entirely deprived the Defendants of their bargained-for first-lien, priority, *pro rata* rights.

---

[27] The Handpicked Lenders that are not parties to this action are the third-party defendants sued by the Non-LCM Defendants and named in their counterclaims to Serta's amended complaint, or asset management firms acting on behalf of those third-party defendants. *See* Dkt. No. 68 at 48–53.

93.     The Exchange Transaction was effectuated through a complex web of contractual maneuvers, each of which was conducted in bad faith on the part of both Serta and the PTL Lenders in a manner that eviscerated the very purpose of the lender protections at the heart of the original First Lien Agreement, on which the Defendants relied to extend loans to Serta.

94.     *First*, leaving no doubt as to Serta's and the PTL Lenders' awareness of wrongdoing, they negotiated the Exchange Transactions entirely in secret, the transaction was announced publicly by Serta only two weeks before closing, and Serta and the PTL Lenders neither sought nor obtained contractually required consents from minority lenders to the adverse changes to their *pro-rata* rights of payment, the most central of lender sacred rights.

95.     *Second*, Plaintiffs and their advisors unlawfully cherry-picked certain of Serta's first-lien lenders to participate in the Exchange Transaction while excluding others. On information and belief based on the Non-LCM Defendants' opposition brief to Serta and the PTL Lenders' motions for summary judgment and their supporting declarations in this proceeding, three days before Serta announced the Exchange Transaction, it abruptly ended discussions with certain of the Non-LCM Defendants regarding alternative financing structures that would not have required amendments to the credit agreement. *See* Dkt. No. 87 (sealed) at 51–52. These lenders were not invited to participate in the Exchange Transaction. *Id.* Nor were the LCM Defendants, who were even more removed from Serta's financing efforts because they had not been engaging in any restructuring negotiations with Serta. *Id.* at 51. Instead, Serta, the Handpicked Lenders and their advisors invited a carefully selected group of lenders to participate in the Exchange Transaction in order to achieve the bare majority of 50–51% consent necessary to amend the First Lien Agreement pursuant to its terms. The Defendants here, including the LCM Defendants, were not solicited to participate. This unequal treatment of lenders in service of altering the priority

waterfall is directly at odds with the fundamental precept of *pro rata* sharing that pervades all aspects of the First Lien Credit Agreement.

96.     *Third*, as part of the Exchange Transaction, Serta and the Handpicked Lenders unlawfully exercised their bare majority to amend various provisions in the First Lien Term Loan Agreement (the "First Lien Agreement") not for the benefit of all lenders as the agreement contemplates, but rather to permit the PTL Lenders to *withdraw* from the very agreement they were amending so that they could inflate and ensure the value of their collateral at the minority lenders' expense. Specifically, the PTL Lenders executed the amendment so that they could simultaneously retire their first-lien debt for a newly created category of super-priority debt— under a new credit agreement—that primed the first-lien debt of the Defendants. This unilateral "amend to exit and prime" approach reflects bad faith on the part of the Plaintiffs to wield their majority to amend the agreement in a manner that forced the non-amending, minority lenders to live under an agreement to which they themselves were no longer subject.

97.     *Fourth*, the contractual gymnastics required to effectuate the Exchange Transaction further evince a bad faith intent on the part of Serta and the PTL Lenders. Serta could have achieved its stated objectives of bringing in new money and deleveraging by conducting a straightforward debt exchange that was open to *all* first-lien holders and did not require amending numerous provisions of the First Lien Agreement in a surgical manner and issuing a new class of priming debt under a new credit agreement as took place. And Serta could have obtained new financing without engaging in a debt exchange and undertaking the same amendments. That Serta and the PTL Lenders chose to proceed as they did when other, compliant alternatives under the existing First Lien Agreement were available to achieve the same economic objectives indicates a lack of good faith.

## THE PARTIES

98.     The LCM Defendants are exempted companies incorporated under the laws of the Cayman Islands.  Although they allege that their principal place of business is also the Cayman Islands, by order dated March 9, 2021, the Southern District of New York held that "[their] primary activities and principal place of business are in New York." *See  LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 20-cv-5090 (GBD), 2021 WL 918705 (S.D.N.Y. Mar. 10, 2021)..

99.     Upon information and belief, Plaintiff Serta Simmons Bedding, LLC is a Delaware limited liability company with its principal place of business at 2451 Industry Avenue, Doraville, GA 30360.  Its sole member is Dawn Intermediate LLC, whose sole member is Dawn Holdings, Inc., a Delaware corporation with a principal place of business in Georgia.

100.     Upon information and belief, Plaintiff Barings LLC is a Delaware limited liability company with its principal place of business at 300 South Tryon Street, Suite 2500, Charlotte, NC 28202.

101.     Upon information and belief, Plaintiff Boston Management and Research's principal place of business is located at Two International Place, Boston, MA 02110.

102.     Upon information and belief, Plaintiff Credit Suisse Asset Management, LLC is a Delaware limited liability company with its principal place of business at 11 Madison Avenue, New York, NY 10010.

103.     Upon information and belief, Plaintiff Eaton Vance Management's principal place of business is located at Two International Place, Boston, MA 02110.

104.     Upon information and belief, Plaintiff Invesco Senior Secured Management, Inc. is a Delaware corporation with its principal place of business at 1166 Avenue of the Americas, 26th Floor, New York, NY 10036.

## JURISDICTION AND VENUE

105.     The Court has subject-matter jurisdiction to consider these Counterclaims under 28 U.S.C. § 1334.

106.     Venue is proper in the United States Bankruptcy Court for the Southern District of Texas under 28 U.S.C. §1409 because this proceeding arises in or relates to the above-captioned Chapter 11 case pending in this District. *See* Case No. 23-90020 (DRJ) (Bankr. S.D. Tex.). This assertion is made without waiver of or prejudice to the LCM Defendants' position that this action should properly be heard in New York, where three actions related to the underlying transaction and conduct at issue in the instant action—two in the Southern District of New York and one in New York state court—remain pending. *See LCM XXII Ltd. et al. v. Serta Simmons Bedding, LLC*, 21-cv-3987 (KPF) (S.D.N.Y.); *AG Centre Street Partnership L.P., et al. v. Eaton Vance Management, et al.*, 23-cv-587 (KPF) (S.D.N.Y.); *AG Centre Street Partnership L.P., et al. v. Serta Simmons Bedding, LLC*, Index No. 654181/2022 (N.Y. Sup. Ct. N.Y. Cnty.).

107.     This is a non-core proceeding under 28 U.S.C. § 157.

108.     Pursuant to Bankruptcy Rule 7008, the LCM Defendants do not consent to the entry of any final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

109.     The LCM Defendants are issuers of collateralized loan obligations that have consistently held first-lien loans issued by Serta since October 2016.  Since then, the LCM Defendants, collectively, have purchased and sold additional loans, and they currently hold approximately $7.4 million in first-lien Serta loans, most of which were purchased over two years ago at or near par value.

110.     A key aspect of the LCM Defendants' business is selecting which assets to include in the collateral pools that form the respective CLOs.  Critical to this analysis is the associated risks of investing in any given issuance, including the structural seniority of the loans.

111.     Investors typically pay a premium to secure top structural seniority because it affords the greatest protection in the event of a debtor's default by providing a claim to the debtor's assets that supersedes other creditors' claims.  If an issuer can change the structural seniority and subordinate the rights of minority debtholders by negotiating in private with a majority of the lenders and offering them an incentive to subordinate the minority—as Serta purported to do here—it would substantially and adversely affect not just the LCM Defendants' holdings in Serta debt, but their business more generally.  Indeed, before this deal, the LCM Defendants had never seen anyone seek to engage in the sort of transaction being challenged here.

112.     Serta is North America's largest bedding manufacturer.  Based in Atlanta, Serta owns and manages various mattress brands, which are distributed through national, hospitality, and regional and independent retail channels throughout North America, as well as directly to consumers.

### The First Lien Agreement

113.     Serta entered into three credit facility agreements dated as of November 8, 2016, each of which was executed by Serta and various affiliates and counterparties.  The executed agreements include: (1) a first-lien term-loan agreement (*i.e.*, the First Lien Agreement at issue here) originally providing for $1.95 billion in first-lien term loans (the "First Lien Loans"); (2) a second-lien term-loan agreement originally providing for $450 million in second-lien term loans (the "Second Lien Loans"); and (3) a $225 million asset-based revolving-credit facility (the "ABL").

114.    The First Lien Agreement includes a waterfall providing for the allocation of proceeds in the case of an event of default or if the loans are accelerated.

115.    From a lender's perspective, the waterfall is among the most critical sections in credit agreements, as it specifies how collateral will be allocated and divided among lenders if the loans become due as the result of an event of default or bankruptcy.

116.    In this case, Section 2.18(b) of the First Lien Agreement specified the relevant payment waterfall for First Lien Lenders.  It provided that, after certain expenses are paid, the proceeds of collateral would be divided *pro rata* among all First Lien Lenders, based on the face amount of their ownership of loans.  This means that all First Lien Lenders would share ratably in the available value based on the percentage of their loans, and that no First Lien Lender would have a superior right to the collateral over any other.  Indeed, the *pro rata* sharing of collateral proceeds is so fundamental that Section 2.18(c) of the First Lien Agreement requires any First Lien Lender that receives payment on account of its loans—including a distribution of collateral proceeds—that is greater than its *pro rata* share to pay the excess ratably to the other First Lien Lenders.

117.    The centrality of the provisions requiring *pro rata* distribution is further underscored by the First Lien Agreement's amendment provisions.  Many provisions in the First Lien Agreement may be amended by approval of the "Required Lenders," defined as lenders representing more than 50% of the outstanding face amount of the loans.  But a handful of provisions in the First Lien Agreement (sometimes called "sacred rights") may only be amended by securing "the consent of ***each Lender*** directly and adversely affected thereby."[28]  This

---

[28] The First Lien Agreement and the Subordination Amendment are incorporated by reference herein.

48

unanimity requirement is reserved for the waiver or amendment of the First Lien Agreement's most important provisions, including changes to the interest rate, the maturity date, and other provisions that are core of the lender's repayment rights. The *pro rata* distribution rights set forth in Sections 2.18 are among the First Lien Agreement's provisions requiring the consent of "each Lender directly and adversely affected thereby"—i.e., ***everyone***.

118.     Specifically, Section 9.02(b)(A)(6) provides that each affected lender must approve any agreement that "waives, amends or modifies <u>Sections 2.18(b)</u> or <u>(c)</u> of this Agreement in a manner that would by its terms alter the *pro rata* sharing of payments required thereby (except in connection with any transaction permitted under <u>Sections 2.22</u>, <u>2.23</u>, <u>9.02(c)</u>, and/or <u>9.05(g)</u> or as otherwise provided in this <u>Section 9.02</u>)." As such, unless one of these four enumerated exceptions applies (and, as demonstrated below, they do not in this case), the LCM Defendants' *pro rata* rights could not be changed without their consent.

119.     The First Lien Agreement also prevented any effort to end-run these provisions by protecting the amendment provisions themselves. Thus, the First Lien Agreement stated that no agreement between Serta and the Required Lenders (meaning a mere majority of the First Lien Lenders) could "change any of the provisions of <u>Section 9.02(a)</u> or <u>Section 9.02(b)</u> or the definition of 'Required Lenders' to reduce any voting percentage required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, without the prior written consent of each Lender." § 9.02(b)(B)(1). In other words, any amendment to the process for amending the First Lien Agreement's *pro rata* sharing provision required the consent of all First Lien Lenders.

120.     As noted, the First Lien Agreement carved out four types of transactions from the unanimity requirement. *First*, Serta could invoke Section 2.22 to issue incremental additional

49

loans (subject to the requirement that any additional loans be *pari passu* or junior to the First Lien Loans). *Second*, Serta could invoke Section 2.23 to extend the maturity on existing First Lien Loans (subject to the same non-subordination requirement). *Third*, Serta could invoke Section 9.02(c)(i) to enter into certain transactions to refinance or replace (*i.e.*, exchange) existing First Lien Loans (again, subject to the same non-subordination requirement). And *finally*, Section 9.05(g) allowed First Lien Lenders to assign to a Borrower (like Serta) their loans on a non-*pro rata* basis in certain limited circumstances—*i.e.*, through either a Dutch Auction or an "open market" transaction to retire First Lien Loans.

### The Exchange Transaction

121.    As the LCM Defendants learned when Serta issued its June 2020 press release, in April 2020, Serta began having private discussions with certain individual lenders to negotiate the possibility of restructuring Serta's debt. The LCM Defendants were never invited to participate in those discussions, were never consulted, and, before the press release, had no knowledge whatsoever of Serta's private plans to restructure its debt. The LCM Defendants engaged in no conversations with Serta about that matter, and their consent was never sought or obtained.

122.    On June 8, 2020, as noted above, Serta announced to the market that it planned to enter into the Exchange Transaction. Under the Exchange Transaction, Serta would obtain $200 million of new money financing, and the Handpicked Lenders would trade all their existing first- and second-lien loans for "super-priority" loans with rights of payment ahead of the erstwhile "first lien" holders. Despite the unanimous-consent provisions, the Exchange Transaction was not subject to the consent of the LCM Defendants and the other Defendants.

123.    On June 22, 2020, Serta closed the Exchange Transaction.

124.    The Exchange Transaction purported to create, among other things, the following tranches of super-priority debt (together, the "Super-Priority Loans"):

    a.    $200 million of newly funded super-priority "first out" debt, which would rank ahead of the existing First Lien Loans;

    b.    $875 million of super-priority "second out" debt, which also would rank ahead of existing First Lien Loans, and which was created through an "exchange" of the Handpicked Lenders' first- and second-lien loans; and

    c.    An unspecified amount of capacity for Serta to incur still more super-priority debt through further exchanges, which would be "third out" and would also rank ahead of the existing First Lien Loans.

125.    The LCM Defendants were never offered the opportunity to exchange *their* holdings, and were also never offered an opportunity to participate in the new super-priority $200 million financing.

126.    As a result of the Exchange Transaction, there is now at least $1.075 billion  in Super-Priority Loans with priority liens on the collateral that currently secures the First Lien Loans, ahead of the $814 million remaining First Lien Loans owned by the CLOs and the other Excluded Lenders.

127.    In the case of an event of default, more than $1 billion in debt would be paid in full before the LCM Defendants could receive even a single penny, notwithstanding that they purchased "first lien" debt at or near par value, and that the First Lien Agreement precluded any changes to the waterfall absent Defendants' consent (which the LCM Defendants and the other Defendants in this adversary proceeding never provided).  The fact that Serta's previous "first-

lien" holders now stand to receive as little as 1% of their *pro rata* equity in the reorganized entity—while the Handpicked Lenders will get either payment in full or up to 99% of their *pro rata* equity in the reorganized entity—demonstrates how meaningless it was for the Exchange Transaction to have nominally retained the excluded lenders' *pari passu* status in the collateral.

***The Subordination Amendment and Plaintiffs' Breach of the First Lien Agreement***

128.    The Exchange Transaction was effectuated by amending the First Lien Agreement through the Subordination Amendment.  By its terms, the Subordination Amendment altered the LCM Defendants' rights to the *pro rata* sharing of payments as erstwhile "first-lien" lenders.

129.    The Subordination Amendment altered the *pro rata* rights of the Defendants as follows, among other things:

a.     Serta added an entirely new provision to Section 2.11 of the First Lien Agreement, making express and clear that the newly issued Super-Priority Loans would have a right of payment that is not *pro-rata* but rather senior to the right of the remaining First-Lien Lenders.

b.     Serta entered into to a new inter-creditor agreement placing the rights of certain lenders ahead of the minority of First-Lien Lenders left behind.  The exchange transaction that placed the Handpicked Lenders in the pole- position of priority Lenders was expressly made a "condition subsequent" to the amendments to the First-Lien Credit Agreement.

130.    On March 28, 2023, this Court ruled on Serta and the PTL Lender Plaintiffs' motions for summary judgment that Serta's decision to proceed without the approval of all affected Lenders through the "open market purchase" exception to the unanimity requirement in Section

9.05(g) of the First Lien Agreement was permissible under that provision. *See* Dkt. Nos. 141, 142 (April 6, 2023 order memorializing bench ruling). Mindful of the Court's ruling, the LCM Defendants assert the following allegations in paragraphs 131–136 that Plaintiffs breached the First Lien Agreement to preserve their arguments on appeal.

131.    The Subordination Amendment violated the amendment provisions of the First Lien Agreement. Indeed, as set forth in Section 9.02(b) of the First Lien Agreement, all affected Lenders—not just a bare majority of Lenders—must approve any amendment that "amends or modifies the provisions of Sections 2.18(b) or (c) of [the Credit] Agreement in a manner that would by its terms alter the *pro rata* sharing of payments required thereby." The Subordination Amendment constitutes such an amendment. But, at Serta's direction, it was not approved by all affected Lenders.

132.    Serta has sought to justify its decision to proceed without the approval of all affected Lenders by invoking one of the exceptions to the unanimity requirement—namely, the exception in Section 9.05(g). But that exception does not apply. Most fundamentally, if Serta could evade the unanimity requirement through the expedient of structuring the transaction as a debt exchange and labeling it an "open market" exchange, the unanimity requirement would be rendered toothless.

133.    The plain text of Section 9.05(g) makes clear that it does not apply. Indeed, Section 9.05(g) applies only to debt-retirement transactions, not to restructurings or exchanges.

134.    Section 9.05(g) also requires "open market" or certain "Dutch Auction" transactions, and this transaction was neither. The First Lien Agreement indeed makes express that "Dutch Auction" transactions have to be open to everyone (with the consideration set by the lenders who participate), while the plain meaning of Section 9.05(g) makes clear that "open

market" transactions have to be set by *open* markets.  By contrast, the Exchange Transaction was negotiated in private by Serta and consisted of a structured debt exchange that was not open to everyone and did not reflect terms set by the market.

135.    If there were any doubt that Section 9.05(g) was not an available path to complete this transaction without unanimous approval, the structure of the First Lien Agreement dispels it. Indeed, the First Lien Agreement devotes an entirely different section (Section 9.02(c)) to refinancing and debt-exchange transactions of the type at issue here.  But Serta did not attempt to structure the Exchange Transaction under Section 9.02(c), because Section 9.02(c) required that any new debt ***be junior to or pari passu*** to the paper held by the First Lien Lenders.  And, of course, the whole point of this transaction was to evade that requirement.

136.    The Subordination Amendment violated the First Lien Agreement in another important way. Under Sections 9.02(b)(B)(2) and 9.02(b)(B)(3) of the First Lien Agreement, an agreement to release all or substantially all of the Collateral generally requires the prior written consent of each Lender, as does an agreement to release all or substantially all of the value of the guarantees of the borrowers' obligations under the First Lien Agreement.  The Subordination Amendment did both of these things:  It effectively released all or substantially all of the First Lien collateral from the current first-priority ranking lien by modifying the ranking of the loans, and also released all or substantially all of the value of the guarantees that protect the First Lien Lenders, because those guarantees are now effectively worthless.

***The Plaintiffs' Bad Faith Efforts to Subordinate the Defendant Lenders***

137.    At the March 28, 2023 summary judgment hearing, the Court held that Defendants may plead counterclaims concerning the implied covenant of good faith and fair dealing provided they do not target the merits of the transaction under the terms of Section 9.05(g). SJ Hearing Tr. at 135:21–136:4.[29]

138.    The LCM Defendants do so here. The LCM Defendants' allegations that follow in paragraphs 139–156 target the *intent and process* by which Serta and the PTL Lenders orchestrated the "amend to exit and prime" approach that eviscerated the bargained-for value of the Defendants' first-lien debt.

139.    Discovery to date in the action before Judge Failla in the Southern District of New York, as reproduced in the instant action by Serta and the LCM Defendants, has borne out that Serta, its principal sponsor Advent International Corp., the PTL Lenders, and their respective financial and legal advisors, acted with specific, bad-faith intent to deprive the excluded lenders, including the LCM Defendants, of the benefit of their originally agreed-to bargain.

140.    Documentary evidence suggests that the PTL Lenders, acting through their agents at Centerview Partners LLC and Gibson Dunn & Crutcher LLP, originally conceived of what came to be the Exchange Transaction as a DIP facility (or a restructuring that would have the qualities of a DIP facility, whether or not Serta actually intended to file for Chapter 11). For example, all of the precedent transactions discussed by Gibson Dunn and Centerview on which they would come

---

[29] "I also think it's just plain fair that with knowing that this [summary judgment] ruling now exists that the reliance upon the inappropriate—the alleged inappropriateness of the transaction as being violative of 9.05(g), that doesn't factor in anymore—at least I've made my decision to the extent that there still exists a claim for the breach of—a breach of any duty having to do with how people acted under the contract, I'm certainly going to give the Defendants an opportunity to put that in writing."

to base their Serta proposal involved companies that had either filed for bankruptcy or had implemented restructurings that obtained unanimous consent from their then first-lien lenders.

141.    Over time, however, this proposal transmogrified into the Exchange Transaction, whereby Serta would avoid having to file for Chapter 11 protection *or* having to seek the consent of all affected lenders for a restructuring. Through the mechanism of the Exchange Transaction, a bare majority of 50.1% of first- and second-lien lenders simultaneously executed (1) amendments to the First Lien and Second Lien Term Loan Agreements that would strip those agreements of their *pro rata* right of payment and (2) a so-called Priority Term Loan Agreement and an Open Market and Cashless Exchange Agreement, by which that bare majority would instantly exchange its commitments under the First and Second Lien Agreements for new debt that was senior in right of payment.

142.    When the Exchange Transaction was announced in principle on June 8, 2020, Serta and the PTL Lenders did not actually have the requisite majority vote of outstanding first- and second-lien term loan holders they needed to effectuate it. For the economics of the transaction to work, they needed to try to obtain a bare majority and nothing greater because the value to the PTL Lenders of the exchange tranche of the transaction would be inversely proportional to the number of lenders that participated. Because Serta was selling the *pro rata* rights of the lenders who would not be permitted to participate in the Exchange Transaction as consideration for the new debt and the discount on the old debt, it was necessary to the transaction that certain lenders be excluded.

143.    The process by which Serta and the PTL Lenders arrived at the bare majority they achieved was a product of arbitrary and hypocritical motivations and considerations. For example, documentary evidence suggests that Barings, Oaktree, and Sixth Street Partners were allowed into the deal because they had each previously proposed a "drop-down" style transaction analogous to

the one that Serta and the PTL Lenders (among whom *is* Barings) now decry as having been predatory and a bad deal for Serta.

144.    During the gap between the announcement of the transaction and its close, Kenneth Prince, Head of Capital Markets at Advent International Corp., Serta's private equity sponsor, took a particularly heavy hand in deciding who was "in" and who was "out" based on certain lenders' preexisting relationships with Advent and its portfolio companies. In at least two instances, Mr. Prince conceded that allowing certain lenders to participate would be economically unfavorable to Serta (because it had the potential to push the participating lenders beyond the bare majority required), but told those lenders they would be permitted to participate purely because of their good relationship with Advent.

145.    Conflicting information was given to existing lenders who had not been invited to the deal before it was announced but reached out pre-close to one of Advent, Serta, Centerview, Evercore, Gibson Dunn, Weil, or UBS (in its capacity as administrative agent for the term loans). Depending on who a given lender approached (and whether the party they approached was amenable to that lender's inclusion) they may have been told that Advent, Serta, or Evercore were calling the shots or that Centerview and the existing Handpicked Lenders were. This lack of clarity was a useful pretext for keeping interested lenders out simply by confusing them as to who had the decision-making authority. Indeed, in at least one instance, a particular lender was told by *both* the Serta/Evercore/Advent side *and* the Centerview/Gibson Dunn side that their hands were tied because the *opposite* side was setting the participation levels.

146.    Based on the documentary evidence provided to date, the reality of who was calling the shots appears to have rested somewhere in the middle: the Serta/Evercore/Advent side and the Centerview/Gibson Dunn side were each allocated a certain amount of room left in the deal to

reach the necessary majorities and had the latitude to make decisions about who would be allowed in.

147.    Neither Serta nor the PTL Lenders nor any of their agents ever solicited the participation of the LCM Defendants in the Exchange Transaction.

148.    Once the principal parties were nearly certain that they had reached bare majorities of the first- and second-lien loan holders, they were required to functionally disassemble the existing First Lien Credit Agreement so as to permit the incurrence of the new super-priority debt that Serta was set to issue without explicitly modifying those provisions of the agreement that would affect creditors' sacred rights. But perhaps the most striking aspect of the amendment process was that it was designed to take place in a unified, collapsed transaction alongside the open market "purchase" and debt-for-debt exchange.

149.    The Handpicked Lenders assented to the amendments on the exclusive understanding that they would not have to live under them because, immediately upon their execution, the amendments permitted Serta to purportedly "purchase" those very lenders' existing debt and exchange it for new super-priority debt. In other words, the Handpicked Lenders voted in favor of what would otherwise be an extraordinarily bad deal *because* Serta would be imminently extricating them from the population of lenders affected by the deal. For a lender to use its vote to destroy the fruits of a contract with the knowledge that its vote would simultaneously extract it from that contract is at the very heart of bad faith.

150.    The above chronology depicts a complicated negotiation history in which Serta and the PTL Lenders engaged in four primary types of bad faith conduct that undermined the animating *pro rata* principles embedded in the First Lien Agreement.

151.   *First*, the fact that Serta and the PTL Lenders negotiated the Exchange Transaction in private, without informing other lenders, is significantly probative of bad faith. Open market purchase transactions are typically conducted at arm's length through a dealer-mediated exchange such as Bloomberg's electronic trading platform, with offers to buy or sell published widely through mass distributions from investment banks, open to all willing market participants. The Plaintiffs pursued a contrary path. The documentary record reveals that Serta tasked its financial advisors, and the Handpicked Lenders' advisors, to privately cobble together a group of first-lien lenders to participate in the Exchange Transaction that in the aggregate comprised the bare majority required to amend the First Lien Agreement. On information and belief, the LCM Defendants' holdings were too *de minimis* to garner attention by the architects of the Exchange Transaction. This economic reality not only barred the LCM Defendants from an extremely lucrative debt exchange and issuance opportunity, it also actively crushed the value and magnified the risk of the LCM Defendants' holdings in Serta debt.

152.   *Second*, Serta's systematic inclusion of certain lenders to reach a bare majority and exclusion of other lenders, including Defendants, that did not move the quantitative needle evinces a deliberate favoritism anathema to the First Lien Agreement's principle of equal treatment. As discussed above, the Handpicked Lenders' advisors, as well as the controlling shareholder Advent, solicited the participation of individual lenders with the goal of obtaining a bare majority to participate in the Exchange Transaction. The LCM Defendants did not learn of the Exchange Transaction until it was announced publicly by Serta. The Plaintiffs deliberately shielded non-participating lenders from the negotiations going on behind closed doors.

153.   *Third*, Plaintiffs impermissibly constructed a transactional structure through which the PTL Lenders would amend the First Lien Agreement and simultaneously sell their first-lien

debt to Serta, thereby ending their participation under the very agreement they amended. This contractual maneuver belies the purpose of the majority amendment rule in credit agreements. Such provisions are designed to ensure that lenders' rights evolve in a manner palatable to the majority of lenders. Here, the PTL Lenders destroyed the value of the minority holders' debt when they effectively held *zero* debt. It makes no sense for a non-party to a contract to amend a contract—and to do so to the detriment of a party to the contract—and yet that is effectively what occurred in the Exchange Transaction. In other words, the PTL Lenders' efforts to simultaneously "amend to exit and prime" strikes at the heart of Defendants' bargain, the essence of bad faith. Indeed, Serta and the PTL Lenders have argued in subsequent litigation that the PTL Lenders are on the one hand first-lien lenders for the purpose of amending the First Lien Agreement, but on the other hand, are no longer first-lien lenders for purposes of the First Lien Agreement's *pro rata* sharing provisions.

154. *Fourth*, the method and economics of the Exchange Transaction underscore the breach and the Plaintiffs' lack of good faith. To the first point, in order to evade the unanimous consent provisions protecting the lenders' sacred rights, the Plaintiffs had to concoct and avail themselves of a wholly novel construction of the "open market" exception. That exception is traditionally understood in the industry to mean repurchases in which the debtor enters the secondary marketplace to repurchase its debt at arms' length for monetary consideration, often anonymously, for the fair value that is freely set by lenders participating in the market. Here, though, to paper the Exchange Transaction, the Plaintiffs had to comb through and amend various provisions of the First Lien Agreement. That is, the consideration for the Exchange Transaction was not just money, but contractual surgery.

155.    Serta has sought to justify the Exchange Transaction on the basis that it permitted Serta to decrease its leverage and increase liquidity, while leaving its interest expense neutral.  But Serta could have accomplished the same result by dealing with all First Lien Lenders on a *pro rata* basis on market terms without amending the First Lien Credit Agreement.  Indeed, if Serta had exchanged all First Lien Loans for 65.9 cents on the dollar (the blended exchange rate that allowed Serta to issue $851MM in new super-priority loans as part of its purported exchange), it would have ended up with $1.2 billion of new first-lien loans, $427MM of second-lien loans, and $200MM of new money for a total debt of $2,012MM—which is less than the debt it incurred in the Exchange Transaction ($2,216MM).  The interest expense would have been $161MM vs. $142MM if the same rate structure had been maintained, but reducing the spread over LIBOR on this hypothetical *pro rata* basis exchange scenario to 5.9% from the 7.5% applied to the Super-Priority Loans would have achieved cash interest expense neutrality.

156.    But instead of pursuing this route (or any of the other options open to Serta under the First Lien Agreement), Serta chose to deal in private with certain lenders, and violated the protective provisions of the First Lien Agreement.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

157.    The LCM Defendants reassert and reallege the allegations contained in paragraphs 91 through 156 above as if fully set forth herein.

158.    The LCM Defendants assert this claim subject to the Court's order dated April 6 2023, *see* Dkt. Nos. 141, 142; the guidance provided at the March 28, 2023 hearing; and the pending appeal thereof.

159.    Plaintiffs and the LCM Defendants were parties to the First Lien Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.  The LCM

Defendants are authorized to exercise any and all remedies under the First Lien Agreement, and Plaintiffs are jointly and severally liable thereunder.

160.    The LCM Defendants performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the First Lien Agreement.

161.    Plaintiffs, by contrast, have breached the express terms of the First Lien Agreement violating the First Lien Agreement's restrictions on any collateral- or guarantee-releasing "agreement," and altering the *pro rata* distribution provisions of Sections 2.18(b) and 2.18(c) without obtaining the consent of all affected Lenders as required by Section 9.02. The Plaintiffs further breached the agreement by exchanging loans in a manner not permitted by the First Lien Agreement, because the exchange of loans was not an "open market" purchase.

162.    As a consequence of Plaintiffs' material breaches, the LCM Defendants have been deprived of their contractual rights, including to receive a *pro rata* share of collateral proceeds on a first-lien basis, and the value of their loans and rights materially declined.

163.    The LCM Defendants have suffered damages as a result of Plaintiffs' breach, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

164.    The LCM Defendants reassert and reallege the allegations contained in paragraphs 91 through 163 above as if fully set forth herein.

165.    The Exchange Transaction destroyed the LCM Defendants' rights to receive the fruits of their bargain in violation of the implied covenant of good faith and fair dealing.

166.    Plaintiffs' actions in pursuing and then consummating the Exchange Transaction disregarded the LCM Defendants' rights and were not taken in good faith because they proceeded

in secret, and even after the deal was announced, no clear information was provided about whether or how a particular lender could seek to be included. Notwithstanding Serta and the PTL Lenders' persistence in claiming that they ran a "competitive process" in which they engaged with approximately 70% of those holding Serta's outstanding first-lien debt, that still leaves the 30% of first-lien lenders—like the LCM Defendants—who had no engagement with Serta at all, but very well could have come to the bargaining table in good faith had they been consulted at all. Furthermore, it is a fallacy to describe the process as "competitive" based on the quantum of lenders with whom Serta engaged because the proposal Serta ultimately selected *relied* upon the exclusion of 49.9% of the lenders to maximize value to Serta and the PTL Lenders. In other words, even if 70% could be considered some threshold for open and transparent negotiation (and it should not be), the deal selected was one in which over 20% of that 70% would of necessity be excluded.

167.    The First Lien Agreement was amended by the "consent" of a group of Handpicked Lenders who gave their votes with the knowledge that they would never be bound by the amendments they agreed to, as the amendments were designed to allow Serta to exchange the Handpicked Lenders' debt for new, super-priority debt. Using a bare majority vote to destroy the benefits of a contract in return for being immediately extricated from that contract—and thereby benefitting from the husk of the contract left behind—is precisely the kind of abuse of discretionary contractual rights that the implied covenant of good faith and fair dealing is meant to police.

168.    The counterparties to the Exchange Transaction selected certain lenders to participate in the Exchange Transaction on the basis of arbitrary and irrational criteria—the most egregious example being whether a particular lender had a good relationship with Advent, a consideration that should not have played any role in determining whether the deal was good for *Serta*, a separate corporate entity with minority shareholders in addition to Advent. They

obfuscated information about which party had ultimate decision-making authority to create confusion among excluded lenders in order to satisfy their individual preferences while keeping participation as close to a bare majority as possible. And they did this because they knew they were trading on the diminution of value to the lenders left behind, such that inclusion in the deal would be a godsend for anyone fortunate enough to be asked to participate. All this behavior smacks of bad faith.

169.     Finally, the Exchange Transaction did not simply require Serta and the Handpicked Lenders to style their action an "open market purchase," it also required an extraordinary number of amendments to the pre-existing First Lien Agreement that would allow Serta to issue the new super-priority debt. Although Serta and the Handpicked Lenders took obvious care not to *explicitly* amend the sacred rights provisions of the agreement, they still had to take a scalpel to the remainder. As Judge Failla concluded in the LCM Action, "one could reasonably conclude from Plaintiffs' allegations that Defendant systematically combed through the Agreement tweaking every provision that seemingly prevented it from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one. *(See, e.g.*, Amendment § 1.01 (altering, *inter alia*, the definitions of Acceptable Intercreditor Agreement and Incremental Equivalent Debt); *id.,* § 7.01(l) (removing subordination as an event of default); *id.*, § 8.08 (authorizing the Administrative Agent to enter the PTL Intercreditor Agreement)). To the extent the letter of the Agreement permitted Defendant to take these actions, Plaintiffs argue that Defendant violated the implied covenant of good faith and fair dealing by offering the PTL Loans to only a subset of first-lien lenders, rather than to all of them on a *pro rata* basis. . . . On these allegations, Plaintiffs have adequately alleged that Defendant deprived them of the benefit of their

bargain in bad faith." *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *15 (S.D.N.Y. Mar. 29, 2022).

170.    The rights of amendment and exchange under the First Lien Agreement were used abusively and for an improper purpose, to injure first-lien lenders.

171.    The LCM Defendants have suffered damages as a result of the Plaintiffs' breach, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, the LCM Defendants demand judgment against Plaintiffs as follows:

(a)    That the Court award damages against the Plaintiffs for all economic, monetary, actual, consequential, and compensatory damages the LCM Defendants suffered as a result of the Plaintiffs' conduct, together with pre- and post-judgment interest at the maximum rate allowable by law;

(b)    That the Court award the LCM Defendants the costs of this adversary proceeding, including reasonable attorney's fees and expenses; and

(c)    That the Court award such other and further relief as the Court may deem just and proper.

Dated: April 7, 2023              Respectfully submitted,
Houston, Texas

*/s/ John J. Sparacino*

**MCKOOL SMITH, PC**
John J. Sparacino (SBN 18873700)
S. Margie Venus (SBN 20545900)
Regan S. Jones (SBN 24110060)
600 Travis Street, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300

Facsimile (713) 485-7344
jsparacino@mckoolsmith.com
mvenus@mckoolsmith.com
rjones@mckoolsmith.com

-and -

Michael Shuster (admitted *pro hac vice*)
Vincent Levy (admitted *pro hac vice*)
Neil R. Lieberman (admitted *pro hac vice*)
Alison B. Miller (admitted *pro hac vice*)
Brian T. Goldman (admitted *pro hac vice*)
Patrick J. Woods (admitted *pro hac vice*)
**HOLWELL SHUSTER & GOLDBERG LLP**
425 Lexington Avenue
New York, New York 10017
mshuster@hsgllp.com
vlevy@hsgllp.com
nlieberman@hsgllp.com
amiller@hsgllp.com
bgoldman@hsgllp.com
pwoods@hsgllp.com

*Counsel for the LCM Defendants*