**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| SERTA SIMMONS BEDDING, LLC, et al., | Case No. 23-90020 (DRJ) |
| Debtors. | (Jointly Administered) |
| SERTA SIMMONS BEDDING, LLC, INVESCO SENIOR SECURED MANAGEMENT, INC., CREDIT SUISSE ASSET MANAGEMENT, LLC, BOSTON MANAGEMENT AND RESEARCH, EATON VANCE MANAGEMENT, AND BARINGS LLC, | |
| Plaintiffs and Counterclaim Defendant, | Adversary Proc. No. 23-09001 (DRJ) |
| v. | |
| AG CENTRE STREET PARTNERSHIP L.P., AG CREDIT SOLUTIONS NON-ECI MASTER FUND, L.P., AG SF MASTER (L), L.P., AG SUPER FUND MASTER, L.P., SILVER OAK CAPITAL, L.L.C., ASCRIBE III INVESTMENTS, LLC, COLUMBIA CENT CLO 21 LIMITED, COLUMBIA CENT CLO 27 LIMITED, COLUMBIA FLOATING RATE INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST II, COLUMBIA STRATEGIC INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST I, CONTRARIAN CAPITAL FUND I, L.P., CONTRARIAN CENTRE STREET PARTNERSHIP, L.P., CONTRARIAN DISTRESSED DEBT FUND, L.P., GAMUT CAPITAL SSB, LLC, LCM XXII LTD., LCM XXIII LTD., LCM XXIV LTD., LCM XXV LTD., LCM 26 LTD., LCM 27 LTD., LCM 28 LTD., NORTH STAR DEBT HOLDINGS, L.P., SHACKLETON 2013-III CLO, LTD., SHACKLETON 2013-IV-R CLO, LTD., SHACKLETON 2014-V-R CLO, LTD., SHACKLETON 2015-VII-R CLO, LTD., SHACKLETON 2017-XI CLO, LTD., Z CAPITAL CREDIT PARTNERS CLO 2018-1 LTD., AND Z CAPITAL CREDIT PARTNERS CLO 2019-1 LTD., | |
| Defendants, Counterclaim Plaintiffs and Third-Party Plaintiffs, | |

|  | : |
| v. | : |
|  | : |

AGF FLOATING RATE INCOME FUND,
BRIGHTHOUSE FUNDS TRUST I -
BRIGHTHOUSE/EATON VANCE FLOATING RATE
PORTFOLIO, CALVERT MANAGEMENT SERIES -
CALVERT FLOATING-RATE ADVANTAGE FUND,
EATON VANCE CLO 2013-1 LTD., EATON VANCE
CLO 2014-1R LTD., EATON VANCE CLO 2015-1 LTD.,
EATON VANCE CLO 2018-1 LTD., EATON VANCE
CLO 2019-1 LTD., EATON VANCE LOAN HOLDING
LIMITED, EATON VANCE FLOATING-RATE
INCOME PLUS FUND, EATON VANCE FLOATING-
RATE 2022 TARGET TERM TRUST, EATON VANCE
SENIOR FLOATING-RATE TRUST, EATON VANCE
FLOATING-RATE INCOME TRUST, EATON VANCE
INTERNATIONAL (CAYMAN ISLANDS) FLOATING-
RATE INCOME PORTFOLIO, EATON VANCE SENIOR
INCOME TRUST, EATON VANCE SHORT DURATION
DIVERSIFIED INCOME FUND, EATON VANCE
INSTITUTIONAL SENIOR LOAN FUND, EATON
VANCE INSTITUTIONAL SENIOR LOAN PLUS
FUND, EATON VANCE LIMITED DURATION
INCOME FUND, EATON VANCE FLOATING RATE
PORTFOLIO, SENIOR DEBT PORTFOLIO, EATON
VANCE VT FLOATING RATE INCOME FUND,
BENTHAM SYNDICATED LOAN FUND, DAVINCI
REINSURANCE LTD., RENAISSANCE INVESTMENT
HOLDINGS LTD., CALIFORNIA STATE TEACHERS'
RETIREMENT SYSTEM, DOLLAR SENIOR LOAN
FUND, LTD., DOLLAR SENIOR LOAN MASTER
FUND II, LTD., BA/CSCREDIT 1 LLC, PK-SSL
INVESTMENT FUND LIMITED PARTNERSHIP,
COPPERHILL LOAN FUND I, LLC, THE EATON
CORPORATION MASTER RETIREMENT TRUST,
ERIE INDEMNITY COMPANY, MADISON
FLINTHOLM SENIOR LOAN FUND I DAC, PHILLIPS
66 RETIREMENT PLAN TRUST, WIND RIVER FUND
LLC, BLUE SHIELD OF CALIFORNIA, ERIE
INSURANCE EXCHANGE, THE CITY OF NEW YORK
GROUP TRUST, MARYLAND STATE RETIREMENT
AND PENSION SYSTEM, CREDIT SUISSE FLOATING
RATE TRUST, CREDIT SUISSE FLOATING RATE
HIGH INCOME FUND, CREDIT SUISSE STRATEGIC
INCOME FUND, COMMONWEALTH OF
PENNSYLVANIA TREASURY DEPARTMENT, STATE

OF NEW MEXICO STATE INVESTMENT COUNCIL,          :
CREDIT SUISSE NOVA (LUX), KP FIXED INCOME          :
FUND, BENTHAM STRATEGIC LOAN FUND,                :
TELSTRA SUPERANNUATION SCHEME, WESPATH          :
FUNDS TRUST, INFLATION PROTECTION FUND-I          :
SERIES, MADISON PARK FUNDING X, LTD.,            :
MADISON PARK FUNDING XI, LTD., MADISON           :
PARK FUNDING XII, LTD., MADISON PARK             :
FUNDING XIII, LTD., MADISON PARK FUNDING          :
XIV, LTD., MADISON PARK FUNDING XV, LTD.,         :
MADISON PARK FUNDING XVI, LTD., MADISON          :
PARK FUNDING XVII, LTD., MADISON PARK            :
FUNDING XVIII, LTD., MADISON PARK FUNDING         :
XIX, LTD., MADISON PARK FUNDING XX, LTD.,         :
MADISON PARK FUNDING XXI, LTD., MADISON           :
PARK FUNDING XXII, LTD., MADISON PARK            :
FUNDING XXIII, LTD., MADISON PARK FUNDING         :
XXIV, LTD., MADISON PARK FUNDING XXV, LTD.,       :
MADISON PARK FUNDING XXVI, LTD., MADISON          :
PARK FUNDING XXVII, LTD., MADISON PARK           :
FUNDING XXVIII, LTD., MADISON PARK FUNDING        :
XXIX, LTD., MADISON PARK FUNDING XXX, LTD.,       :
MADISON PARK FUNDING XXXI, LTD., MADISON          :
PARK FUNDING XXXII, LTD., MADISON PARK           :
FUNDING XXXIV, LTD., MADISON PARK FUNDING         :
XXXV, LTD., MADISON PARK FUNDING XXXVII,          :
LTD., MADISON PARK FUNDING XL, LTD.,             :
MADISON PARK FUNDING XLI, LTD., MADISON           :
PARK FUNDING XLII, LTD., MADISON PARK            :
FUNDING XLIII, LTD., MADISON PARK FUNDING         :
XLIV, LTD., ONE ELEVEN FUNDING I, LTD., ONE        :
ELEVEN FUNDING II, LTD., BARINGS GLOBAL           :
LOAN LIMITED, BARINGS GLOBAL SPECIAL             :
SITUATIONS CREDIT 3 S.A.R.L., BARINGS GLOBAL      :
HIGH YIELD CREDIT STRATEGIES LIMITED,           :
BARINGS U.S. LOAN LIMITED, BARINGS CLO LTD.       :
2018-III, BARINGS CLO LTD. 2017-I, BARINGS CLO     :
LTD. 2019-II, BARINGS CLO LTD. 2016-I, BARINGS     :
CLO LTD. 2015-I, BARINGS CLO LTD. 2016-II,         :
BARINGS CLO LTD. 2018-I, BARINGS CLO LTD.         :
2015-II, BARINGS CLO LTD. 2013-I, BARINGS CLO     :
LTD. 2018-IV, BALOISE SENIOR SECURED LOAN        :
FUND, BAYVK R2-FONDS SEGMENT BAYVK R2            :
BARINGS, CROWN MANAGED ACCOUNTS SPC -           :
CROWN/BA 2 SP, BABSON CLO LTD. 2014-I, G.A.S.     :
(CAYMAN) LIMITED, SERENGETI (LOAN FUND), A        :

3

SERIES TRUST OF THE MULTI STRATEGY :
UMBRELLA FUND CAYMAN, BARINGS GLOBAL :
MULTI-CREDIT STRATEGY 1 LIMITED, BARINGS :
GLOBAL MULTI-CREDIT STRATEGY 2 LIMITED, :
BARINGS GLOBAL MULTI-CREDIT STRATEGY 3 :
LIMITED, BARINGS GLOBAL MULTI-CREDIT :
STRATEGY 4 LIMITED, BARINGS BDC SENIOR :
FUNDING I, LLC, BARINGS GLOBAL FLOATING :
RATE FUND, A SERIES OF BARINGS FUND TRUST, :
BARINGS SEGREGATED LOANS 3 S.A R.L, BARINGS:
BDC, INC., BARINGS GLOBAL LOAN AND HIGH :
YIELD BOND LIMITED, BARINGS GLOBAL CREDIT :
INCOME OPPORTUNITIES FUND, ARROWOOD :
INDEMNITY COMPANY, ARROWOOD INDEMNITY :
AS ADMINISTRATOR OF THE PENSION PLAN OF :
ARROWOOD INDEMNITY, JOCASSEE PARTNERS :
LLC, FIRST EAGLE BANK LOAN SELECT MASTER :
FUND, FIRST EAGLE SENIOR LOAN FUND (FSLF), :
KVK CLO 2013-1 LTD., KVK CLO 2016-1 LTD., KVK :
CLO 2018-1 LTD., RUSSELL ABSOLUTE RETURN :
FIXED INCOME FUND, RUSSELL FLOATING RATE :
FUND, RUSSELL GLOBAL UNCONSTRAINED BOND :
POOL, RUSSELL MULTI-ASSET CORE PLUS FUND, :
RUSSELL UNCONSTRAINED TOTAL RETURN :
FUND, STANIFORD STREET CLO LTD., STICHTING :
PENSIOENFONDS HOOGOVENS, WIND RIVER 2012- :
1 CLO LTD., WIND RIVER 2013-1 CLO LTD., WIND :
RIVER 2013-2 CLO LTD., WIND RIVER 2014-1 CLO :
LTD., WIND RIVER 2014-2 CLO LTD., WIND RIVER :
2014-3 CLO LTD., WIND RIVER 2014-3K CLO LTD., :
WIND RIVER 2015-1 CLO LTD., WIND RIVER 2015-2 :
CLO LTD., WIND RIVER 2016-1 CLO LTD., WIND :
RIVER 2016-2 CLO LTD., WIND RIVER 2017-1 CLO :
LTD., WIND RIVER 2017-4 CLO LTD., WIND RIVER :
2018-3 CLO LTD., WIND RIVER 2019-3 CLO LTD., :
ANNISA CLO, LTD., BETONY CLO 2, LTD., BOC :
PENSION INVESTMENT FUND, CARBONE CLO, :
LTD., DIVERSIFIED CREDIT PORTFOLIO LTD., :
INVESCO BL FUND, LTD., INVESCO DYNAMIC :
CREDIT OPPORTUNITIES FUND, INVESCO :
FLOATING RATE FUND, INVESCO FLOATING RATE :
INCOME FUND, INVESCO GEMINI US LOAN FUND :
LLC, INVESCO OPPENHEIMER MASTER LOAN :
FUND, INVESCO OPPENHEIMER SENIOR FLOATING:
RATE FUND, INVESCO OPPENHEIMER SENIOR :
FLOATING RATE PLUS FUND, INVESCO SENIOR :

4

INCOME TRUST, INVESCO SENIOR LOAN FUND,          :
INVESCO SSL FUND LLC, INVESCO ZODIAC FUNDS :
- INVESCO US SENIOR LOAN ESG FUND, INVESCO :
ZODIAC FUNDS - INVESCO US SENIOR LOAN            :
FUND, KAISER PERMANENTE GROUP TRUST,            :
KAPITALFORENINGEN INVESTIN PRO, US                 :
LEVERAGED LOANS I, MILOS CLO, LTD., RECETTE :
CLO, LTD., RISERVA CLO, LTD., SENTRY               :
INSURANCE COMPANY, UPLAND CLO, LTD.,            :
HARBOURVIEW CLO VII-R, LTD., INVESCO             :
OPPENHEIMER FUNDAMENTAL ALTERNATIVES :
FUND, OAKTREE OPPORTUNITIES FUND XB             :
HOLDINGS (DELAWARE), LP, OAKTREE OPPS X        :
HOLDCO LTD., OAKTREE OPPORTUNITIES FUND X :
HOLDINGS (DELAWARE) LP, DRYDEN XXV SENIOR:
LOAN FUND, DRYDEN XXVI SENIOR LOAN FUND, :
DRYDEN XXVIII SENIOR LOAN FUND, DRYDEN 30 :
SENIOR LOAN FUND, DRYDEN 33 SENIOR LOAN     :
FUND, DRYDEN 36 SENIOR LOAN FUND, DRYDEN    :
37 SENIOR LOAN FUND, DRYDEN 38 SENIOR LOAN :
FUND, DRYDEN 40 SENIOR LOAN FUND, DRYDEN    :
41 SENIOR LOAN FUND, DRYDEN 42 SENIOR LOAN :
FUND, DRYDEN 43 SENIOR LOAN FUND, DRYDEN    :
45 SENIOR LOAN FUND, DRYDEN 47 SENIOR LOAN :
FUND, DRYDEN 49 SENIOR LOAN FUND, DRYDEN    :
50 SENIOR LOAN FUND, DRYDEN 54 SENIOR LOAN :
FUND, DRYDEN 53 CLO, LTD., DRYDEN 55 CLO,       :
LTD., DRYDEN 57 CLO, LTD., DRYDEN 58 CLO,        :
LTD., DRYDEN 60 CLO, LTD., DRYDEN 61 CLO,        :
LTD., DRYDEN 64 CLO, LTD., DRYDEN 65 CLO,        :
LTD., DRYDEN 70 CLO, LTD., DRYDEN 75 CLO,        :
LTD., NEWARK BSL CLO 1, LTD., NEWARK BSL       :
CLO 2, LTD., VENTURE XXV CLO, LIMITED,            :
VENTURE 31 CLO, LIMITED, VENTURE 32 CLO,        :
LIMITED, VENTURE 33 CLO, LIMITED, VENTURE 35 :
CLO, LIMITED, VENTURE XVII CLO LIMITED,          :
VENTURE XXII CLO, LIMITED, VENTURE XXIX        :
CLO, LIMITED, VENTURE XXVII CLO, LIMITED,      :
VENTURE 28A CLO, LIMITED, VENTURE XII CLO,     :
LIMITED, VENTURE XIII CLO, LIMITED, VENTURE   :
XIV CLO, LIMITED, VENTURE XIX CLO, LIMITED,    :
VENTURE XV CLO, LIMITED, VENTURE XVI CLO,     :
LIMITED, VENTURE XVIII CLO, LIMITED, VENTURE:
XX CLO, LIMITED, VENTURE XXI CLO, LIMITED,      :
VENTURE XXIII CLO, LIMITED, VENTURE XXIV       :
CLO, LIMITED, VENTURE XXVIII CLO, LIMITED,      :

3718365.1

VENTURE XXX CLO, LIMITED, BSG FUND          :
MANAGEMENT B.V., FIXED INCOME               :
OPPORTUNITIES NERO, LLC, BLACKROCK          :
LIMITED DURATION INCOME TRUST, BLACKROCK    :
GLOBAL INVESTMENT SERIES: INCOME            :
STRATEGIES PORTFOLIO, BLACKROCK CREDIT      :
STRATEGIES INCOME FUND OF BLACKROCK         :
FUNDS V, BLACKROCK SENIOR FLOATING RATE     :
PORTFOLIO, BLACKROCK FLOATING RATE          :
INCOME STRATEGIES FUND, INC., BLACKROCK     :
MULTI-ASSET INCOME PORTFOLIO OF             :
BLACKROCK FUNDS II, BLACKROCK DEBT          :
STRATEGIES FUND, INC., BLACKROCK FLOATING   :
RATE INCOME TRUST, JPMBI RE BLACKROCK       :
BANKLOAN FUND, BLACKROCK FLOATING RATE      :
INCOME PORTFOLIO OF BLACKROCK FUNDS V,      :
ABR REINSURANCE LTD., NC GARNET FUND, LP,   :
MAGNETITE XC, LIMITED, MAGNETITE XV,        :
LIMITED, MAGNETITE XIV-R, LIMITED,          :
MAGNETITE XVI, LIMITED, MAGNETITE VIII,     :
LIMITED, MAGNETITE XVIII, LIMITED,          :
MAGNETITE XIX, LIMITED, MAGNETITE XX,       :
LIMITED, MAGNETITE XVII, LIMITED, MAGNETITE :
VII, LIMITED, MAGNETITE XII, LIMITED, NUVEEN :
DIVERSIFIED DIVIDEND AND INCOME FUND,       :
NUVEEN FLOATING RATE INCOME FUND, NUVEEN:
FLOATING RATE INCOME OPPORTUNITY FUND,      :
NUVEEN SENIOR INCOME FUND, NUVEEN SHORT     :
DURATION CREDIT OPPORTUNITIES FUND,         :
NUVEEN SYMPHONY FLOATING RATE INCOME        :
FUND, PRINCIPAL FUNDS, INC - DIVERSIFIED REAL:
ASSET FUND, SYMPHONY CLO XX LTD.,           :
SYMPHONY CLO XVII, LTD., SYMPHONY CLO XIX   :
LTD., SYMPHONY CLO XVII, LTD., SYMPHONY CLO:
XV, LTD., SYMPHONY CLO XIV, LTD., SYMPHONY  :
CLO XVI, LTD., TCI-SYMPHONY 2017-1 LTD., TCI-:
SYMPHONY 2016-1 LTD., SYMPHONY FLOATING     :
RATE SENIOR LOAN FUND, SCOF-2 LTD., BAYCITY :
ALTERNATIVE INVESTMENT FUNDS SICAV-SIF -    :
BAYCITY US SENIOR LOAN FUND, BAYCITY        :
SENIOR LOAN MASTER FUND LTD.,               :
PENSIONDANMARK                              :
PENSIONFORSIKRINGSAKTIESELSKAB, MENARD,     :
INC., MUNICIPAL EMPLOYEES ANNUITY &         :
BENEFIT FUND OF CHICAGO, PRINCIPAL          :
DIVERSIFIED REAL ASSET CIT, CALIFORNIA      :

6

STREET CLO IX LIMITED PARTNERSHIP,                    :
CALIFORNIA STREET CLO XII, LTD., TAO FUND,            :
LLC, MP CLO III LTD., MP CLO IV LTD., MP CLO VII      :
LTD., MP CLO VIII LTD., MARBLE POINT CLO X            :
LTD., MARBLE POINT CLO XI LTD., MARBLE POINT          :
CLO XII LTD., MPLF FUNDING LTD., MPSFR                :
FINANCING 1 LTD., MARATHON CLO V LTD.,                :
MARATHON CLO VII LTD., MARATHON CLO VIII              :
LTD., MARATHON CLO IX LTD., MARATHON CLO X            :
LTD., MARATHON CLO XI LTD., BOWERY                    :
FUNDING ULC, WOODBINE FUNDING ULC,                    :
ELEVATION CLO 2013-1, LTD., ELEVATION CLO             :
2014-2, LTD., ELEVATION CLO 2015-4, LTD.,             :
ELEVATION CLO 2016-5, LTD., ELEVATION CLO             :
2017-6, LTD., ELEVATION CLO 2017-7, LTD.,             :
ELEVATION CLO 2017-8 LTD., ELEVATION CLO              :
2018-9, LTD., ELEVATION CLO 2018-10, LTD., and        :
PEAKS CLO 3, LTD.,                                    :
                                                      :
        Third-Party Defendants.                       :
                                                      :
                                                      :
                                                      :

## AMENDED ANSWERING DEFENDANTS' ANSWER TO THE AMENDED ADVERSARY COMPLAINT, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Defendants AG Centre Street Partnership L.P., AG Credit Solutions Non-ECI

Master Fund, L.P., AG Super Fund Master, L.P., AG SF Master (L), L.P., Silver Oak Capital,

L.L.C., Ascribe III Investments, LLC, Columbia Cent CLO 21 Limited, Columbia Cent CLO 27

Limited, Columbia Floating Rate Income Fund, a series of Columbia Funds Series Trust II,

Columbia Strategic Income Fund, a series of Columbia Funds Series Trust I, Contrarian Capital

Fund I, L.P., Contrarian Distressed Debt Fund, L.P., Contrarian Centre Street Partnership, L.P.,

Gamut Capital SSB, LLC, Z Capital Credit Partners CLO 2018-1 Ltd., Z Capital Credit Partners

CLO 2019-1 Ltd., Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton

2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., Shackleton 2017-XI CLO, Ltd., and

North Star Debt Holdings, L.P. (collectively, the "Answering Defendants" or the "Excluded

Lenders"), upon knowledge with respect to themselves and their own acts and upon information

7

and belief with respect to all other matters, answer the Adversary Complaint dated January 24, 2023 filed by Serta Simmons Bedding, LLC ("Serta" or the "Company"), Invesco Senior Secured Management, Inc. ("Invesco"), Credit Suisse Asset Management, LLC ("Credit Suisse"), Boston Management and Research ("Boston Management"), Eaton Vance Management ("Eaton Vance"), and Barings LLC ("Barings") (Invesco, Credit Suisse, Boston Management, Eaton Vance, and Barings, collectively, the "Favored Lenders"), as follows:

## STATEMENT PURSUANT TO LOCAL RULE 7012-1

In submitting this Answer, the Excluded Lenders do not consent to the entry of final orders or judgments by the Court.

## ANSWER TO THE AMENDED ADVERSARY COMPLAINT

### INTRODUCTION[1]

1.        **This adversary proceeding seeks to enforce a financing and debt exchange transaction (the "Transaction") that provided Serta Simmons Bedding with much-needed liquidity during the depths of the COVID-19 pandemic. Without this recapitalization during the summer of 2020, Serta Simmons Bedding likely would have been forced to seek a restructuring much earlier than today. The Transaction reduced the company's debt by roughly $400 million, lowered its all-in interest expense, and increased its cash position to $300 million. The pre- existing first-lien lenders who entered into the deal—Plaintiff PTL Lenders—had held a majority of Serta Simmons Bedding's debt. In**

---

[1]  All text in bold type in this section is from the Adversary Complaint.  By including headings and footnotes for ease of reference, the Excluded Lenders do not admit or agree with any characterizations or allegations therein, and to the extent a response is required, all such headings and footnotes in the Adversary Complaint are denied.  Similarly, the Excluded Lenders' responses use certain of the defined terms used in the Adversary Complaint for ease of reference only.

**exchange for the substantial reduction in that debt, the PTL Lenders obtained super priority status on the new debt they issued. The recapitalization also added collateral that would benefit all lenders.**

Response to Paragraph No. 1: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of the first, second, and third sentences of paragraph 1, except admit that Serta and the Favored Lenders purport to bring this action to enforce a financing and debt exchange transaction. The Excluded Lenders admit the allegations of the fourth sentence of paragraph 1. The Excluded Lenders otherwise deny the allegations of paragraph 1.

2.     **The PTL Lenders' successful proposal was not the only one presented to Serta Simmons Bedding. A proposal by other lenders, including Defendants Angelo Gordon, Gamut, and North Star, would have siphoned off a large portion of collateral—including Serta Simmons Bedding's crown-jewel intellectual property—away from the first-lien lenders and into a newly formed subsidiary to benefit those participating lenders alone. After an extensive review process that involved outside advisors and the creation of an independent finance committee, the independent directors rejected that much-less favorable proposal and accepted the PTL Lenders' proposal.**

Response to Paragraph 2: The Excluded Lenders deny the allegations of paragraph 2, except admit upon information and belief that Serta considered alternative transactions to the PTL Lenders' proposal and admit that Serta accepted the PTL Lenders' proposal.

3.     **The lenders with the losing proposal then sought to achieve in litigation what they could not achieve in negotiation. But their litigation has proven just as**

3718365.1

**unsuccessful.  They first sued in New York state court to try to block the Transaction before it closed, arguing that the Transaction unlawfully subordinated their debt under the Non-PTL Term Loan Agreement.  The New York court rejected that request and allowed the Transaction to close.  Undeterred, Defendants have spent the last two and a half years asking both state and federal courts in New York to undo the 2020 refinancing Transaction.  No court has done so.**

Response to Paragraph 3: The Excluded Lenders deny the allegations of the first and second sentences of paragraph 3.  The Excluded Lenders admit the allegations in the third sentence of paragraph 3.  The Excluded Lenders deny the allegations of the fourth sentence of paragraph 3, except admit that the New York court denied the Excluded Lenders' motion for a preliminary injunction. The Excluded Lenders otherwise deny the allegations of paragraph 3.

4.      **Defendants' lack of success in litigation is not surprising.  Although they contend that Serta Simmons Bedding's Non-PTL Term Loan Agreement could not be amended to give the new loans senior priority payment, the Non-PTL Term Loan Agreement contains no anti- subordination clause.  Anti-subordination clauses, found in many credit agreements but absent here, require the consent of all lenders to subordinate existing obligations to new indebtedness. The Non-PTL Term Loan Agreement, by contrast, allows most provisions to be amended by a majority of lenders.  That majority approval is all that was required for Serta Simmons Bedding to permit the incurrence of incremental equivalent debt.**

Response to Paragraph 4: The Excluded Lenders deny the allegations of paragraph 4, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

5.      **The Non-PTL Term Loan Agreement thus gave Serta Simmons Bedding the flexibility to refinance and incur additional priority indebtedness with the approval of only a majority of lenders.**

Response to Paragraph 5: The Excluded Lenders deny the allegations of paragraph 5, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

6.      **Specifically, Section 9.05(g) of the Non-PTL Term Loan Agreement unambiguously permits debt-for-debt exchange on a non-pro rata basis as part of an open market transaction.  In order to evade this plain language in the contract, Defendants have argued that the Transaction was not an open market purchase because it was not open to all lenders.  But the Non-PTL Term Loan Agreement is clear—only a Dutch Auction is required under the agreement to be "open to all Lenders," not an open market purchase. Nor can Defendants plausibly contend there is anything unfair or impermissible about Serta Simmons Bedding dealing directly with a subset of lenders, as Defendants' own proposal would have required Serta Simmons Bedding to do the same thing.**

Response to Paragraph 6: The Excluded Lenders deny the allegations of paragraph 6, except admit that the Excluded Lenders contend that the Transaction was not an open market purchase, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

7.      **A ruling in this bankruptcy is necessary to finally resolve this issue, enforce the plain terms of the Non-PTL Term Loan Agreement, and recognize the opportunity to refinance that Serta Simmons Bedding bargained for.  Because this adversary proceeding will determine the priority status of a number of lenders, its**

resolution is critical to the development of the Chapter 11 plan of reorganization. **Plaintiffs therefore seek a declaratory judgment that the Transaction fully complied with the terms of the Non-PTL Term Loan Agreement and that Plaintiffs did not violate the covenant of good faith and fair dealing by entering into the Transaction.**

Response to Paragraph 7: The Excluded Lenders deny the allegations of paragraph 7, except admit that Serta and the Favored Lenders seek a declaratory judgment against them.

## PARTIES

8.   **Plaintiff Serta Simmons Bedding, LLC is a Delaware limited liability company with its principal place of business at 2451 Industry Avenue, Doraville, GA, 30360.**

Response to Paragraph 8: The Excluded Lenders admit, upon information and belief, the allegations of paragraph 8.

9.   **Plaintiff Barings LLC is a Delaware limited liability company with its principal place of business at 300 South Tryon Street, Suite 2500, Charlotte, NC 28202.**

Response to Paragraph 9: The Excluded Lenders admit, upon information and belief, the allegations of paragraph 9.

10.   **Plaintiff Boston Management and Research's principal place of business is located at Two International Place, Boston, MA 02110.**

Response to Paragraph 10: The Excluded Lenders admit, upon information and belief, the allegations of paragraph 10.

11. **Plaintiff Credit Suisse Asset Management, LLC is a Delaware limited liability company with its principal place of business at 11 Madison Avenue, New York, NY 10010.**

Response to Paragraph 10: The Excluded Lenders admit, upon information and belief, the allegations of paragraph 11.

12. **Plaintiff Eaton Vance Management's principal place of business is located at Two International Place, Boston, MA 02110.**

Response to Paragraph 12: The Excluded Lenders admit, upon information and belief, the allegations of paragraph 12.

13. **Plaintiff Invesco Senior Secured Management, Inc. is a Delaware corporation with its principal place of business at 1166 Avenue of the Americas, 26th Floor, New York, NY 10036.**

Response to Paragraph 13: The Excluded Lenders admit, upon information and belief, the allegations of paragraph 13.

14. **Upon information and belief, defendants AG Centre Street Partnership, L.P., AG Credit Solutions Non-ECI Master Fund, L.P., and Silver Oak Capital, L.L.C., affiliates of Angelo, Gordon & Co., L.P., are Delaware limited liability companies and/or limited partnerships with their principal place of business at 245 Park Avenue, New York, NY 10167.**

Response to Paragraph 14: The Excluded Lenders admit the allegations of paragraph 14.

15. **Upon information and belief, defendants AG SF Master (L), L.P. and AG Super Fund Master, L.P., affiliates of Angelo, Gordon & Co., L.P., are Cayman Islands**

3718365.1

**limited partnerships with their principal place of business at 245 Park Avenue, New York, NY 10167**.

Response to Paragraph 15: The Excluded Lenders admit the allegations of paragraph 15.

16.     **Upon information and belief, defendant Ascribe III Investments, LLC, an affiliate of AS Birch Grove LP, is a limited liability company with its principal place of business at 590 Madison Avenue, 38th Floor, New York, NY 10022**.

Response to Paragraph 16: The Excluded Lenders admit the allegations of paragraph 16.

17.     **Upon information and belief, defendants Columbia Cent CLO 21 Limited and Columbia Cent CLO 27 Limited are Cayman Islands exempted companies with their principal place of business at 1099 Ameriprise Financial Center, Minneapolis, MN 55474**.

Response to Paragraph 17: The Excluded Lenders admit the allegations of paragraph 17.

18.     **Upon information and belief, defendant Columbia Floating Rate Income Fund is a series of Columbia Funds Series Trust II, a Massachusetts business trust with its principal place of business at 290 Congress St., Boston, MA 02210**.

Response to Paragraph 18: The Excluded Lenders admit the allegations of paragraph 18.

19.     **Upon information and belief, defendant Columbia Strategic Income Fund is a series of Columbia Funds Series Trust I, a Massachusetts business trust with its principal place of business at 290 Congress St., Boston, MA 02210**.

Response to Paragraph 19: The Excluded Lenders admit the allegations of paragraph 19.

20.     **Upon information and belief, defendants Contrarian Capital Fund I, L.P., Contrarian Distressed Debt Fund, L.P., and Contrarian Centre Street Partnership, L.P., affiliates of Contrarian Capital Management L.L.C., are Delaware limited partnerships with their principal place of business at 411 West Putnam Avenue, Greenwich, CT 06830**.

Response to Paragraph 20: The Excluded Lenders admit the allegations of paragraph 20.

21.     **Upon information and belief, defendant Gamut Capital Serta Simmons Bedding, LLC, an affiliate of funds managed by Gamut Capital Management, LP, is a Delaware limited liability company with its principal place of business at 250 West 55th Street, New York, NY 10019**.

Response to Paragraph 21: The Excluded Lenders admit the allegations of paragraph 21.

22.     **Upon information and belief, defendants LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd.., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd., and LCM 28 Ltd., affiliates of LCM Asset Management LLC, are exempted companies incorporated under the laws of the Cayman Islands whose principal place of business is in New York**.

Response to Paragraph 22: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 22.

23.     **Upon information and belief, defendant North Star Debt Holdings, L.P., an affiliate of funds managed by Apollo Global Management, Inc., is a Delaware**

**limited partnership with its principal place of business at 9 West 57th Street, New York, NY 10019**.

Response to Paragraph 23: The Excluded Lenders admit the allegations of paragraph 23.

24. **Upon information and belief, defendants Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., and Shackleton 2017-XI CLO, Ltd., affiliates of Alcentra NY, LLC, are Cayman Islands limited liability companies with their principal place of business at 9 West 57th Street, Suite 4920, New York, NY 10019**.

Response to Paragraph 24: The Excluded Lenders admit the allegations of paragraph 24.

25. **Upon information and belief, defendants Z Capital Credit Partners CLO 2018-1 Ltd. and Z Capital Credit Partners CLO 2019-1 Ltd., affiliates of Z Capital Group L.L.C., are exempted companies incorporated with limited liability under the laws of the Cayman Islands with their principal place of business at 1330 Avenue of the Americas, 16th Floor, New York, NY 10019**.

Response to Paragraph 25: The Excluded Lenders admit the allegations of paragraph 25.

## JURISDICTION AND VENUE

26. **The Court has jurisdiction to consider this matter under 28 U.S.C. § 1334**.

Response to Paragraph 26: The Excluded Lenders admit the allegations of paragraph 26.

3718365.1

27.     **This is a core proceeding under 28 U.S.C. § 157(b). The claims concern the allowance or disallowance of certain claims against the estate and determinations of the validity, extent, or priority of liens against the Debtor.** *See, e.g.*, **28 U.S.C. § 157(b)(2)(B), (K). Specifically, Defendants have challenged the priority of their liens vis-à-vis those of the PTL Lenders in a series of state and federal actions. The first state court and first federal actions were each dismissed. Two later-filed actions, one in New York state court and one in the Southern District of New York, remain pending**.

Response to Paragraph 27: The Excluded Lenders deny the allegations of paragraph 27, except admit that there are lawsuits in which they challenge the validity of the Transaction pending in the Supreme Court of the State of New York and the Southern District of New York.

28.     **Under Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), Plaintiffs consent to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution**.

Response to Paragraph 28: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28.

29.     **Venue is proper under 28 U.S.C. § 1409. This proceeding arises in or relates to the Chapter 11 case pending in this District**.

Response to Paragraph 29: The Excluded Lenders deny the allegations of paragraph 29 and state that venue is not appropriate in this District, because Serta and the

3718365.1

Favored Lenders agreed to a forum selection clause in Section 9.10(b) of the Non-PTL Term Loan Agreement, which provides that "each party hereto hereby irrevocably and unconditionally submits for itself and its property, to the exclusive jurisdiction of any U.S. federal or New York state court siting in the borough of Manhattan, in the City of New York (or any appellate court therefrom) over any suit, action or proceeding arising out of or relating to any loan document and agrees that all claims in respect of any such action or proceeding shall (except as permitted below) be heard and determined in such New York state or, to the extent permitted by applicable requirements of law, federal court." The Excluded Lenders also deny having knowledge or information sufficient to form a belief as to whether venue is proper in this District for the Chapter 11 proceeding.

## FACTUAL BACKGROUND

**Serta Simmons Bedding Enters into the Non-PTL Term Loan Agreement in 2016**

30. **Serta Simmons Bedding is one of the largest manufacturers and distributors of mattresses in North America. It owns and manages some of the best-selling bedding brands in the mattress industry: Serta®, Beautyrest®, Simmons®, and Tuft & Needle®.**

Response to Paragraph 30: The Excluded Lenders admit the allegations of paragraph 30.

31. **Serta Simmons Bedding manufactures, sells, and distributes its bedding products to retailers and to individual consumers through a number of channels. Serta Simmons Bedding primarily sells its products in the United States through a diverse base of dealers, predominantly through one or more specialty sleep shops, as well as furniture stores, department stores, furniture rental stores, mass merchandisers, and**

**juvenile specialty stores.  Serta Simmons Bedding also sells its products (i) to hospitality customers, such as hotels, casinos and resort properties; (ii) to third party resellers, who purchase overstock and discontinued models; and (iii) direct to consumers through their e-commerce platforms and retail stores**.

Response to Paragraph 31: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 31.

32. **Before the Transaction, Serta Simmons Bedding was a party to three separate Non- PTL Term Loan Agreements: (1) the Non-PTL Term Loan Agreement[2] that provided for $1.95 billion in first lien term loans ("First Lien Term Loans"); (2) a second lien term loan agreement, dated November 8, 2016[3] that provided for $450 million in second lien term loans ("Second Lien Term Loans"); and (3) a $225 million asset-based revolving credit facility, dated November 8, 2016**.

Response to Paragraph 32: The Excluded Lenders deny the allegations of paragraph 32, except admit that Serta is a party to the agreements referenced therein, and respectfully refer the Court to those agreements for their complete and accurate contents.

---

**[2]  The Non-PTL Term Loan Agreement (See, Ex. 1) was amended by that certain Amendment No. 1 to First Lien Term Loan Agreement, dated June 22, 2020 (the "Amended Non-PTL Term Loan Agreement"). See Ex. 2. The Amended Non-PTL Term Loan Agreement includes a redline to the original Non-PTL Term Loan Agreement. Additions are marked in blue double underlined text and deletions are marked with struck red text.**

**[3]  The second lien term loan agreement was amended by that certain Amendment No. 1 to Second Lien Term Loan Agreement, dated June 22, 2020.**

3718365.1

33. **At the time of the Transaction, the PTL Lenders and Non-PTL Term Loan Lenders (except for North Star)[4] both held first lien and second lien Serta Simmons Bedding debt**.

Response to Paragraph 33: The Excluded Lenders deny the allegations of paragraph 33, except admit that at the time of the Transaction, the PTL Lenders and Non-PTL Lenders, including North Star, held first-lien and second-lien debt in Serta Simmons Bedding.

**Serta Simmons Bedding Explores Potential Transactions and Engaged in a Competitive Process**

34. **In late 2019, Serta Simmons Bedding faced economic headwinds stemming from the restructuring of its largest retail partner and competition from new direct-to-consumer businesses. Although Serta Simmons Bedding took steps to, and did, improve its financial condition in early 2020, the spread of COVID-19 beginning in March 2020 severely impacted Serta Simmons Bedding's financial position. Serta Simmons Bedding experienced a significant contraction in sales as both retailers of Serta Simmons Bedding products and Serta Simmons Bedding's manufacturing facilities were subject to government closures, which materially impacted Serta Simmons Bedding's liquidity**.

Response to Paragraph 34: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 34.

---

**[4] Although North Star attempted to purchase First Lien Term Loans on the secondary market in March 2020, North Star's parent entity, Apollo, was or was affiliated with a Disqualified Institution, as defined under the Non-PTL Term Loan Agreement, and therefore the purchase was rejected. North Star also failed to obtain the requisite consent of both Serta Simmons Bedding and the administrative agent to effectuate the purchase. North Star's trades did not settle and North Star did not—and does not—hold any of Serta Simmons Bedding's debt and is not a party to the Non-PTL Term Loan Agreement.**

3718365.1

35.     **In response, Serta Simmons Bedding began to explore various re-financing alternatives, seeking to raise liquidity and reduce its debt and interest expense. In March 2020, Serta Simmons Bedding's Board of Directors (the "Board") established an independent finance committee (the "Finance Committee") to evaluate and consider strategic alternatives for Serta Simmons Bedding.  The Board appointed two independent directors as members of the Finance Committee**.

Response to Paragraph 35: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 35.

36.     **In the spring of 2020, Serta Simmons Bedding, advised by its outside professionals, solicited proposals for potential liability managements transactions from both existing holders of Serta Simmons Bedding's debt and new lenders.  Various lender groups, including the PTL Lenders and a group comprised defendants of Angelo Gordon, Gamut, North Star, and Silver Oak (the "North Star Lenders"), submitted proposals for Serta Simmons Bedding's consideration.  As such, Serta Simmons Bedding negotiated with more than 70% of its lenders before proceeding with the Transaction with the PTL Lenders**.

Response to Paragraph 36: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 36, except admit that the North Star Lenders submitted a lending proposal to Serta in early 2020.

37.     **The North Star Lenders sought to obtain unfettered control over Serta Simmons Bedding.  Specifically, the North Star Lenders' proposal included $200 million in new money and an exchange of approximately $630 million of existing First and Second Lien loans into approximately $470 million of new debt.  This proposal not only**

21

**would have increased Serta Simmons Bedding's total debt by $38 million, it also would**

**have increased its total interest payments by approximately $37 million**.

Response to Paragraph 37: The Excluded Lenders deny the allegations of

paragraph 37.

38. **Moreover, the North Star Lenders' proposal would have stripped**

**valuable collateral from Serta Simmons Bedding's other existing first and second lien**

**lenders. The proposal would have required Serta Simmons Bedding to transfer substantial,**

**existing collateral from the First Lien Term Loans (which included significant intellectual**

**property assets, as well as royalty streams associated with third-party intellectual property**

**licenses worth millions of dollars) to newly created Serta Simmons Bedding subsidiaries**

**that would have served as borrowers and/or guarantors of the new debt, thereby**

**stripping $465-590 million in collateral away from other lenders. The North Star**

**Lenders' proposal also contemplated adding new collateral to these newly created**

**subsidiaries, including real estate assets and a pledge of the stock of Serta, Inc**.

Response to Paragraph 38: The Excluded Lenders deny the allegations of

paragraph 38.

39. **In contrast, the PTL Lenders' proposal provided Serta Simmons**

**Bedding with better terms that did not require Serta Simmons Bedding to strip valuable**

**collateral away from the First Lien Term Loans. In fact, more collateral was added that was**

**shared *pari passu* with all other existing lenders. The PTL Lenders' proposal included $200**

**million in new money loans and the repurchase of more than $1 billion in existing debt in**

**exchange for the issuance of $850 million in new priority term loans. This proposal thus**

**allowed Serta Simmons Bedding to raise liquidity through new money financing, to capture approximately $400 million in debt discounts, and to lower its overall interest expense**.

Response to Paragraph 39: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 39, except deny that the North Star Lenders' proposal required Serta Simmons Bedding to strip valuable collateral away from the First Lien Term Loans.

40.     **Following a robust, competitive evaluation process, in early June 2020, the Finance Committee determined that the PTL Lenders' proposal was the best option for Serta Simmons Bedding on a going forward basis.  The Transaction allowed Serta Simmons Bedding to both raise liquidity with new money financing and capture debt discount through an open market purchase of the PTL Lenders' existing Serta Simmons Bedding debt on a non-pro rata basis, as permitted under the Non-PTL Term Loan Agreement.  The Finance Committee approved Serta Simmons Bedding proceeding with the Transaction.[5]**

Response to Paragraph 40: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of the first and last sentences of paragraph 40, and otherwise deny the allegations of paragraph 40.

41.     **The Transaction provided for a new super-priority term loan facility with two tranches: (i) a $200 million new money tranche and (ii) a debt-for-debt exchange tranche, pursuant to which approximately $850 million of priority terms loans were issued as consideration for the open market purchase of over $1 billion of First and Second Lien Term Loans (collectively, the "PTL Loans")**.

---

**[5] On June 3, 2020, the Board delegated full decision-making authority to the Finance Committee to approve, negotiate, and implement a re-financing transaction for Serta Simmons Bedding.**

Response to Paragraph 41: The Excluded Lenders deny the allegations of paragraph 41, and respectfully refer the Court to the PTL Loan documents for their complete and accurate contents.

42. **To effectuate the Transaction, Serta Simmons Bedding entered into certain amendments to the Non-PTL Term Loan Agreement (discussed *infra*) and also entered into a separate Super-Priority Term Loan Agreement, dated June 22, 2020 (the "PTL Credit Agreement"), an Open Market Purchase and Cashless Exchange Agreement, dated June 22, 2020 (the "Exchange Agreement"), and a First Lien Intercreditor Agreement, dated June 22, 2020 (the "PTL Intercreditor Agreement"), pursuant to which the PTL Loans rank senior in right of payment, but *pari passu* with respect to security, to the First Lien Loans under the Non-PTL Term Loan Agreement**.

Response to Paragraph 42: The Excluded Lenders deny the allegations of paragraph 42, and respectfully refer the Court to the agreements referenced therein for their complete and accurate contents.

43. **Ultimately, the Transaction reduced Serta Simmons Bedding's debt by approximately $400 million, lowered Serta Simmons Bedding's all-in interest expense, created new collateral for the benefit of all Lenders (including Defendants), and increased Serta Simmons Bedding's cash position to $300 million.  Absent the Transaction, which allowed Serta Simmons Bedding to deleverage its balance sheet, Serta Simmons Bedding would likely have been on the path to restructuring far sooner**.

Response to Paragraph 43: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 43.

44.    **Serta Simmons Bedding issued a press release on June 8, 2020 announcing the Transaction**.

Response to Paragraph 44: The Excluded Lenders admit the allegations of paragraph 44.

**The Transaction Complies with the Non-PTL Term Loan Agreement**

**The Non-PTL Term Loan Agreement Permits the Transaction**

45.    **Many credit agreements contain anti-subordination clauses, requiring the consent of all lenders to subordinate the obligations under the agreement to any other indebtedness. The Non-PTL Term Loan Agreement here does not contain an anti-subordination provision; the sophisticated parties here agreed to allow the Company the flexibility to incur additional priority indebtedness under this Non-PTL Term Loan Agreement**.

Response to Paragraph 45: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of paragraph 45.  The Excluded Lenders deny the allegations in the second sentence of paragraph 45, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

46.    **The plain terms of the Non-PTL Term Loan Agreement permit the incurrence of incremental equivalent debt and the repurchase of existing loans on the open market on a non-pro rata basis**.

Response to Paragraph 46: The Excluded Lenders deny the allegations of paragraph 46, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

3718365.1

47.     The Non-PTL Term Loan Agreement permits Serta Simmons Bedding to incur the additional $200 million in new money in the form of incremental equivalent debt.  Section 6.01(z) of the Non-PTL Term Loan Agreement provides "[t]he Top Borrower [defined as Serta Simmons Bedding] shall not . . . directly . . . incur . . . any Indebtedness, except . . . Incremental Equivalent Debt."  Ex. 1 § 6.01(z); *see also id.* at §1.01 (defining Incremental Equivalent Debt).  Serta Simmons Bedding incurred the $200 million new financing under this provision.

Response to Paragraph 47: The Excluded Lenders deny the allegations of paragraph 47, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

48.     The Non-PTL Term Loan Agreement also allows Serta Simmons Bedding to repurchase First Lien Loans from its existing lenders on a non-pro rata basis through an open market transaction.  Specifically, § 9.05(g) of the Non-PTL Term Loan Agreements provides, in relevant part, that:

> Notwithstanding anything to the contrary contained herein, any Lender may, at any time assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender[6] *on a non-pro rata basis* (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases, in each case with respect to <u>clauses (A)</u> and <u>(B),</u> without the consent of the Administrative Agent.

Ex. 1, § 9.05(g) (emphasis added).

---

[6] The Non-PTL Term Loan Agreement defines Affiliated Lender to include "any Non-Debt Fund Affiliate, Holdings, the Top Borrower and/or any subsidiary of the Top Borrower."  *Id.* at § 1.01.  Serta Simmons Bedding is the Top Borrower.

Response to Paragraph 48: The Excluded Lenders deny the allegations of paragraph 48, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

49.    **In the context of a loan repurchase, "open market" means the price that a willing buyer and a willing seller are able to obtain in an arms-length negotiation— in other words, the price that Serta Simmons Bedding and any lender agreed to in the "open market."[7]  Here, Serta Simmons Bedding negotiated with, and entered into, arms-length transactions in the "open market" with the PTL Lenders, which held a majority of Serta Simmons Bedding's debt, to repurchase their debt in exchange for the issuance of PTL Loans.  Serta Simmons Bedding also negotiated on the open market with the North Star Lenders, but the PTL Lenders offered better terms.  Neither Section 9.05(g) nor any other provision required Serta Simmons Bedding to offer the Transaction to all its existing lenders.  Section 9.05(g) expressly provides that an open market transaction may occur on a "non-pro rata basis."  Ex. 1, § 9.05(g).  Notably, the remainder of Section 9.05(g), which alternatively allows an exchange transaction through a Dutch auction, specifically provides that, unlike an open market purchase, a Dutch Auction must be "open to all Lenders."**

Response to Paragraph 49: The Excluded Lenders deny the allegations of the first, second, and third sentences of paragraph 49.  The Excluded Lenders deny the allegations of the remainder of paragraph 49, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

---

[7] *See Fair Market Value*, BLACK'S LAW DICTIONARY (11th ed. 2019).

3718365.1

**The Non-PTL Term Loan Agreement Permits the Amendments**

50.     **To effectuate the Transaction, Serta Simmons Bedding and the PTL Lenders, who held more than 50% of the outstanding loans under the Non-PTL Term Loan Agreement (the "Required Lenders" under the Non-PTL Term Loan Agreement), first entered into certain permitted amendments to the Non-PTL Term Loan Agreement to allow the PTL Loans to have senior payment priority**.

Response to Paragraph 50: The Excluded Lenders deny the allegations of paragraph 50, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

51.     **The Non-PTL Term Loan Agreement provides that all provisions, except a small number of provisions involving "sacred rights," may be amended with the consent of a simple majority of the First Lien Lenders.  Section 9.02(b) provides, in relevant part, that:**

> **[N]either this Agreement nor any other Loan Document or any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by [Serta Simmons Bedding] and the Required Lenders.**

*See* **Ex. 1 §9.02(b).  "Required Lenders" is defined to include "Lenders having Loans or unused Commitments representing more than 50% of the sum of the total Loans and such unused commitments at such time."  *See* Ex. 1 §1.01.**

Response to Paragraph 51: The Excluded Lenders deny the allegations of paragraph 51, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

52.     **In contrast to the simple majority requirement for most amendments, an amendment of any specifically enumerated "sacred right" provision requires the consent**

28

of each lender directly or adversely affected by the amendment.  But even for the "sacred right" requiring such heightened approval to amend, the Non-PTL Term Loan Agreement contains an express carve out for non- pro rata open market purchases.  Section 9.02(b)(A)(6) requires the consent of each lender directly and adversely effected by an amendment that

> waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby *(except in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c), and/or 9.05(g) or as otherwise provided in this Section 9.02).*

Ex. 1, § 9.02(b)(A)(6) (emphasis added).  This express carveout directly applies because the Transaction was a non-pro rata open market purchase as permitted under section 9.05(g) of the Non-PTL Term Loan Agreement; even for the handful of "sacred rights" which required such heightened approval to amend, the Non-PTL Term Loan Agreement contains an express carve out for non-pro rata open market purchases under § 9.05(g).

Response to Paragraph 52: The Excluded Lenders admit the allegations of the first sentence of paragraph 52.  The Excluded Lenders otherwise deny the allegations of paragraph 52, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

53.     Defendants have also argued that the Transaction violated another "sacred right"— Section 9.02(b)(B), which prohibits Serta Simmons Bedding and the Required Lenders from entering into an agreement that would "release all or substantially all of the Collateral from the Lien granted pursuant to the Loan Documents" or to "release all or substantially all of the value of the Guarantees under the Loan Guaranty," "except as otherwise permitted herein or in the other Loan Documents," "without the prior written

consent of each Lender." Ex. 1 § 9.02(b)(B)(2)-(3). However, the Transaction did not release the collateral or the value of the loan guarantees. The Non-PTL Term Loan Lenders' loans are secured by the same lien, and guaranteed by the same guarantees, as the day the Non-PTL Term Loan Agreement was executed.

       Response to Paragraph 53: The Excluded Lenders deny the allegations of the first sentence of paragraph 53, except admit that they contend the Transaction violates Section 9.02(b)(B) of the Non-PTL Term Loan Agreement, and respectfully refer the Court to that agreement for its complete and accurate contents. The Excluded Lenders otherwise deny the allegations of paragraph 53.

       54.    **The Transaction also did not interfere with the Non-PTL Term Loan Lenders' sacred right to receive pro rata payment in the event of a default. Section 2.18(b) and (c), the waterfall provision, states**

> **(b) . . . [A]ll proceeds of Collateral received by the Administrative Agent while an Event of Default exists and all or any portion of the Loans have been accelerated hereunder pursuant to Section 7.01, shall be applied, <u>first</u>, to the payment of all costs and expenses then due incurred by the Administrative Agent . . . <u>second</u>, on a pro rata basis, to pay any fees, indemnities or expense reimbursements then due to the Administrative Agent . . . <u>third</u>, on a pro rata basis in accordance with the amounts of the Secured Obligations . . . owed to the Secured Parties on the date of any such distribution, to the payment in full of the Secured Obligations, <u>fourth</u>, as provided in each applicable Intercreditor Agreement, and <u>fifth</u>, to, or at the direction of, the Top Borrower or as a court of competent jurisdiction may otherwise direct.**
>
> **(c) If any Lender obtains payment . . . in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with Loans of such Class, then the Lender receiving such greater proportion shall purchase . . . participations in the Loans of other Lenders of such Class at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such Class ratably in**

3718365.1

> **accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class;** *provided that . . . (ii) the provisions of this paragraph shall not apply to (A) any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with Sections 2.22, 2.23, 9.02(c) and/or Section 9.05.*

**Ex. 1, § 2.18(b), (c) (emphasis added).**

Response to Exhibit 54: The Excluded Lenders deny the allegations of paragraph 54, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

55. **No amendments were made to Section 2.18(b) or (c), which govern the payment waterfall in the event of default and the pro rating sharing provisions, respectively**.

Response to Paragraph 55: The Excluded Lenders deny the allegations of paragraph 55, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

56. **In any event, Section 2.18(c) provides for payments obtained to "be shared by the Lenders** *of such Class* **ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans** *of such Class.*" *Id.* **§ 2.18(c) (emphasis added). Accordingly, the first-lien lenders' rights to pro rata payments under Section 2.18 only applies to debt within the same "Class"—that is, among first-lien lenders. The PTL Loans are not in the same "Class" as the first-lien term loans**.

31

Response to Paragraph 56: The Excluded Lenders deny the allegations of paragraph 56, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

57.     **Further, by Section 2.18(b)'s plain language, its waterfall provision is expressly "[s]ubject, in all respects, to the provisions of each applicable Intercreditor Agreement."  Ex. 1, § 2.18(b)**.

Response to Paragraph 57: The Excluded Lenders deny the allegations of paragraph 57, and respectfully refer the Court to the Non-PTL Term Loan Agreement for its complete and accurate contents.

58.     **The Non-PTL Term Loan Agreement was amended to allow Serta Simmons Bedding to incur incremental equivalent debt that is senior in right of payment to the First Lien Loans.  The definition of Incremental Equivalent Debt was amended to read as follows:**

> **Indebtedness issued, incurred or implemented in lieu of loans under an Incremental Facility in the form of notes or loans and/or commitments in respect of the foregoing (*including Indebtedness issued under the PTL Credit Agreement* (including the Priority New Money Term Loans and the Priority Exchange Term Loans)) in each case, *which may be senior*, *pari passu* or junior *in right of payment* and/or with respect to security with the Obligations hereunder . . . .**

**See Ex. 2 § 1.01 (emphasis added).  As this amendment did not amend, modify, or waive a "sacred right," it required only the consent of the Required Lenders.**

Response to Paragraph 58: The Excluded Lenders deny the allegations of the first and second sentences of paragraph 58, except admit that the Transaction unlawfully purported to amend the definition of Incremental Equivalent Debt in the Non-PTL Term Loan Agreement,

and respectfully refer the Court to the amended Non-PTL Term Loan Agreement for its complete and accurate contents.  The Excluded Lenders otherwise deny the allegations of paragraph 58.

59.  **Section 8.08 of the Non-PTL Term Loan Agreement was also amended to authorize the administrative agent to enter into a separate intercreditor agreement to establish senior payment priority for the new loans.  As amended, Section 8.08 provides:**

> **Each Secured Party irrevocably authorizes and instructs the Administrative Agent to, and the Administrative Agent shall . . . (d) enter into subordination, intercreditor, collateral trust and/or similar agreements with respect to Indebtedness (including the Initial Intercreditor Agreement, the PTL First Lien Intercreditor Agreement and any other Acceptable Intercreditor Agreement . . . ) that is (i) required or permitted to be senior, pari passu or subordinated hereunder . . . .**

**See Ex. 2 § 8.08(d).  Again, as this amendment did not amend, modify, or waive a "sacred right," it required only consent of the "Required Lenders."**

Response to Paragraph 59: The Excluded Lenders deny the allegations of the first and second sentences of paragraph 59, except admit that the Transaction unlawfully purported to amend Section 8.08 of the Non-PTL Term Loan Agreement, and respectfully refer the Court to the amended Non-PTL Term Loan Agreement for its complete and accurate terms.  The Excluded Lenders otherwise deny the allegations of paragraph 59.

60.  **Serta Simmons Bedding and the PTL Lenders also made clear in the amended Non- PTL Term Loan Agreement that the Transaction, as documented, was a permissible "open market purchase" to which the PTL Lenders consented.  Specifically, Amendment No. 1 to the Non-PTL Term Loan Agreement provides that each Required Lender "acknowledges and agrees that the borrowing and/or incurrence" of the super-priority loans and all "step[s] necessary to effectuate" the Transaction "shall be and are permitted," Ex. 2, § 4, and that each Required Lender "consent[s], request[s] and instruct[s]**

33

the Administrative Agent" to take "any and all actions . . . necessary, advisable or desirable in carrying out, effectuating or otherwise in furtherance of the transactions related to or in connection with" the amendment, *id.* § 14(a). As there is no sacred right relating to the definition of "open market purchase," the consent of the PTL Lenders, who represent more than 50% of the First Lien Term Loan holders, was all that was required to amend the Non-PTL Term Loan Agreement in this manner. *See* Ex. 1 §9.02(b)(A).

Response to Paragraph 60: The Excluded Lenders deny the allegations of the first sentence of paragraph 60. The Excluded Lenders deny the allegations of the second sentence of paragraph 60, and respectfully refer the Court to the amended Non-PTL Term Loan Agreement for its complete and accurate contents. The Excluded Lenders otherwise deny the allegations of paragraph 60.

61. **The Exchange Agreement entered into by Serta Simmons Bedding and the PTL Lenders in connection with the Transaction similarly provides that "pursuant to Section 9.05(g) of the First Lien [Non-PTL Term Loan] Agreement, the Specified Borrowers will purchase on the open market from such Specified Lender all of its Existing First Lien Term Loans," that "[e]ach of the Specified Lenders . . . instruct[] each Bank Agent to take any and all actions . . . necessary, advisable or desirable . . . [to] effectuat[e]" the debt purchase transaction, and that each Specified Lender agreed that all conditions precedent to the transaction were satisfied. Ex. 3, Preamble, § 2.1(f). Like Amendment No. 1 to the Non-PTL Term Loan Agreement, then, the Exchange Agreement confirms that the Required Lenders understood the Transaction to be an open market purchase and consented to the Transaction.**

Response to Paragraph 61: The Excluded Lenders deny the allegations of the first sentence of paragraph 61, and respectfully refer the Court to the Exchange Agreement for its complete and accurate contents.  The Excluded Lenders otherwise deny the allegations of paragraph 61.

**The North Star Lenders Seek, and Fail, to Block the Transaction and the Transaction Closes on June 22, 2020**

62.     **After Serta Simmons Bedding announced its intent to proceed with the Transaction, the North Star Lenders were evidently upset that Serta Simmons Bedding had selected the PTL Lenders' proposal rather than their own, which, again, would have stripped collateral from other lenders and resulted in more debt and interests owed by Serta Simmons Bedding. On June 11, 2020, the North Star Lenders filed a complaint in New York State court against Serta Simmons Bedding and the PTL Lenders (the "North Star Lenders Action")[8] and sought a preliminary injunction to enjoin the Transaction from closing. The North Star Lenders claimed that the proposed Transaction would create new superpriority loans that would effectively subordinate their First Lien Loans purportedly in violation of the Non-PTL Term Loan Agreement.[9]**

Response to Paragraph 62: The Excluded Lenders deny the allegations of the first sentence of paragraph 62.  The Excluded Lenders admit the allegations of the second and third sentence of paragraph 62, and respectfully refer the Court to the complaint referenced in paragraph 62 for its complete and accurate contents.

---

[8] **LCM sought to intervene in the North Star Action, which was denied.  *North Star Debt Holdings, L.P., et al., v. Serta Simmons Bedding, LLC et al.*, No. 652243/2020 (N.Y. Sup. Ct. N.Y. Cnty.), Dkt. 61.**

[9] ***North Star***, No. 652243/2020, Dkt. 1.

3718365.1

63.     **On June 19, 2020, the New York state court denied the North Star Lenders' request for a preliminary injunction.  The court concluded that the North Star Lenders were not likely to succeed on the merits of their breach of contract and breach of the implied covenant of good faith and fair dealing claims.**[10]  **As to the breach of contract claim, the court held that that the "[Non- PTL Term Loan Agreement] seems to permit[] the debt-to-debt exchange on a non-pro rata basis as part of an open market transaction" and that "[s]ince the amendments do not affect plaintiffs['] so-called 'sacred rights' under the [Non-PTL Term Loan Agreement], plaintiffs' consent does not appear to be required."**[11]  **The New York court further concluded that the good faith and fair dealing claim was unlikely to succeed because it was "identical to its breach of contract claim."**[12]  **In denying the motion, the court recognized that the Transaction was "the culmination of months of negotiation" and that the COVID-19 pandemic had "impacted Serta's liquidity."**[13]

Response to Paragraph 63: The Excluded Lenders admit the allegations of the first sentence of paragraph 63.  The Excluded Lenders otherwise deny that the allegations of paragraph 63 provide an accurate and comprehensive description of the matters addressed therein, and respectfully refer to the Court to the decision referenced in paragraph 63 for its complete and accurate contents.

64.     **The Transaction closed on June 22, 2020**.

---

[10] *See North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC,* No. 652243/2020, 2020 WL 3411267, at *4 (N.Y. Sup. Ct. N.Y. Cnty. June 19, 2020).

[11] *Id.*

[12] *Id.* at *5.

[13] *Id*. at *2.

Response to Paragraph 64: The Excluded Lenders admit, upon information and belief, the allegations of paragraph 64.

65.     **Since the Transaction closed, Serta Simmons Bedding continued to pay its debt as it came due both under the PTL Credit Agreement and the Non-PTL Term Loan Agreement**.

Response to Paragraph 65: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 65.

66.     **The Non-PTL Term Loan Lenders and PTL Lenders' loans have continued to trade on the market since the Transaction closed, with all parties (including non-parties to this adversary proceeding) relying on the validity and finality of the Transaction**.

Response to Paragraph 66: The Excluded Lenders deny the allegations of paragraph 66, except admit that the Non-PTL Term Loan Lenders' and PTL Lenders' loans have continued to trade on the market since the Transaction closed.

**The North Star Lenders Withdraw Their State Court Action, Only To Refile Two Years Later**

67.     **Following the denial of their motion for a preliminary injunction, the North Star Lenders voluntarily discontinued the North Star Action over Serta Simmons Bedding and the PTL Lenders' vigorous objection.[14]  The New York state court granted the motion to voluntarily discontinue the North Star Action on November 30, 2020 over Defendants' objection.[15]**

---

[14] *North Star*, Index No. 652243/2020, Dkt. 170.

[15] *North Star*, Index No. 652243/2020, Dkt. 212.

Response to Paragraph 67: The Excluded Lenders admit the allegations of paragraph 67.

68.     **In November 2022, two years after voluntarily dismissing the North Star Action, the North Star Lenders and other Non-PTL Term Loan Lenders filed a renewed complaint against Serta Simmons Bedding and the PTL Lenders in New York state court.  This complaint alleges near identical claims to those in the complaint the North Star Lenders voluntarily withdrew in November 2020: they allege the Transaction breached the waterfall and pro rata sharing provisions of the Non-PTL Term Loan Agreement, and that the Transaction breached the implied covenant of good faith and fair dealing by stripping them of the value of their guarantees and altering the proceeds waterfall and pro rata provisions without their consent.  The Plaintiffs in the New York state court action also allege the Transaction released all or substantially all of the collateral and value of the guarantees without the non-participating lender' consent.  However, the Plaintiffs in the New York state court action concede that under the Non-PTL Term Loan Agreement, Serta Simmons Bedding can subordinate their debt without their consent because the incurrence of $200 million in new debt from the Transaction "could be given priority without a unanimous vote."[16]  The complaint also asserts a related, but distinct, claim for a declaratory judgement that Serta Simmons Bedding breached the Non-PTL Term Loan Agreement by failing to perfect the assignment of Apollo's first lien loans.  As described in detail below, the North Star Lenders chose to file its litigation shortly before Serta Simmons Bedding's filing for Chapter 11**.

---

[16] *AG Centre Street Partnership L.P., et al. v. Serta Simmons Bedding, LLC, et al.*, No. 654181/2022, Dkt. 11, at 23.

Response to Paragraph 68: The Excluded Lenders admit the allegations of the first sentence of paragraph 68.  The Excluded Lenders deny that the allegations of the second, third, fourth, and fifth sentences of paragraph 68 provide an accurate and comprehensive description of the matters addressed therein, and respectfully refer the Court to the complaint referenced in paragraph 68 for its complete and accurate contents.  The Excluded Lenders otherwise deny the allegations of paragraph 68.

69.     **On January 9, 2023, Serta Simmons Bedding and the PTL Lenders both moved to dismiss the case.[17]**

Response to Paragraph 69: The Excluded Lenders admit the allegations of paragraph 69.

**LCM Litigation**

70.     **Following the New York State court's denial of the preliminary injunction, LCM, which held approximately $7.4 million in First Lien Debt, filed successive suits in federal court challenging the Transaction and alleging similar causes of action as the North Star Lenders.  LCM first sued Serta Simmons Bedding in New York state court in June 2020, but withdrew the action shortly thereafter.[18] LCM then sued Serta Simmons Bedding and the PTL Lenders in the Southern District of New York in July 2020.  The Southern District of New York granted Serta Simmons Bedding and the PTL Lenders'**

---

[17] *AG Centre*, No. 654181/2022, Dkts. 47, 55, 57.

[18] *LCM Asset Management, LLC v. Serta Simmons Bedding, LLC, et al.*, No. 652555/2020 (N.Y. Sup. Ct. N.Y. Cnty.), Dkt. 14.

**motions to dismiss the complaint for lack of subject matter jurisdiction because there was incomplete diversity between LCM and the PTL Lenders.[19]**

Response to Paragraph 70: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 70, except admit upon information and belief that LCM filed suit in New York state and federal court challenging the Transaction, and respectfully refer the Court to the filings and decision referenced in paragraph 70 for their complete and accurate contents.

71.     **LCM then filed a new action in the Southern District of New York against Serta Simmons Bedding alone, which remains pending (the "LCM Action").  In the complaint, LCM alleges the Transaction did not constitute an open market purchase under Section 9.05(g) of the Non-PTL Term Loan Agreement as it was negotiated in private and not offered to all existing lenders.  LCM further argued that the amendments to the Non-PTL Term Loan Agreement implicated their sacred rights under the Non-PTL Term Loan Agreement (specifically, their right to *pro rata* payment) and thus required 100% lender consent, rather than a simple majority.  LCM further argues that the Transaction "effectively" released all or substantially all of the collateral securing the First Lien Loans due to the PTL Loans receiving higher priority than the First Lien Loans.[20]**

Response to Paragraph 71: The Excluded Lenders admit the allegations of the first sentence of paragraph 71.  The Excluded Lenders otherwise deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 71, and

---

[19] *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 20-cv-05090, 2021 WL 918705, at *5 (S.D.N.Y. Mar. 10, 2021).

[20] *LCM XXI Ltd. v. Serta Simmons Bedding, LLC*, No. 21 Civ. 3987 (KPF) (S.D.N.Y), Dkt. 1, at 12.

respectfully refer to the Court to the complaint referenced therein for its complete and accurate contents.

72.    **Serta Simmons Bedding moved to dismiss the claims in July 2021, and the Southern District of New York court rejected nearly all of LCM's contentions that Serta Simmons Bedding breached the Non-PTL Term Loan Agreement through the Transaction. The Southern District of New York held that the Non-PTL Term Loan Agreement permitted the amendments in the Transaction as they did not affect the "*pro rata* rights of first-lien lenders vis-à-vis other first-lien lenders."[21]  The Southern District of New York also concluded that the Transaction did not violate the waterfall provisions of the Non-PTL Term Loan Agreement because the Non-PTL Term Loan Agreement permitted Serta Simmons Bedding to enter into the First Lien Intercreditor Agreement and no collateral or value of the loan guarantees were released in the Transaction.[22]  However, the Southern District of New York ultimately denied Serta Simmons Bedding's motion to dismiss the breach of contract claim in part because it concluded that the term "open market purchase" as used in Section 9.05(g) was ambiguous and discovery on that issue should proceed.[23] Nevertheless, in so holding, the Southern District of New York recognized that the open-market provision may contemplate loan-repurchase transactions "that involve *fewer than all lenders in any given class of debt*" (emphasis added), and observed "[t]hat the provision**

---

[21] *LCM XXI Ltd. v. Serta Simmons Bedding, LLC*, No. 21 Civ. 3987 (KPF), 2022 WL 953109, at *10 (S.D.N.Y. Mar. 29, 2022) ("anti-subordination is not a sacred right protected by § 9.02(b)(A)(6), or any other provision of § 9.02 . . ., the [Non-PTL Term Loan] Agreement permitted such changes to be made with the consent of the majority of lenders").

[22] *Id.* at *11-12.

[23] *Id.* at *6-*9.  The Southern District of New York also permitted the claim for breach of the implied covenant of good faith and fair dealing to proceed.  *Id.* at *14-*16.

3718365.1

specifies that Dutch Auctions must be open to all lenders, but does not do so for open-market purchases, may indicate the parties' conscious choice to exclude such a requirement from loan repurchases pursued in the open market."[24]  The Southern District of New York also noted that the mere existence of other mechanisms for debt exchanges in the Non-PTL Term Loan Agreement did not preclude Serta Simmons Bedding's use of the open market provision for the Transaction.[25]

Response to Paragraph 72: The Excluded Lenders deny that the allegations of paragraph 72 provide an accurate and comprehensive description of the matters addressed therein, except admit that the Southern District of New York court denied Serta's motion to dismiss, and respectfully refer the Court to the opinion and order denying Serta's motion to dismiss referenced in paragraph 72 for its complete and accurate contents.

73.    **LCM and Serta Simmons Bedding substantially completed their document productions in the LCM Action on August 19, 2022.  To date, no depositions have occurred and expert discovery has not begun**.

Response to Paragraph 73: The Excluded Lenders deny having knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 73.

**Serta Simmons Bedding filed for Chapter 11 Protection**

74.    **As is described more fully in the Declaration of John Linker in Support of Debtors' Chapter 11 Petitions and First Day Relief, due to continuing poor market conditions, Serta Simmons Bedding and 13 of its affiliates commenced the above-captioned Chapter 11 cases on January 23, 2023 (the "Petition Date").**

---

[24] *See id.* at *8.

[25] *Id.* at *8-9.

42

Response to Paragraph 74: The Excluded Lenders deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 74, except admit that Serta commenced a Chapter 11 bankruptcy proceeding on January 23, 2023.

75.     **Both the LCM Action and the North Star Lenders' Action[26] are subject to the automatic stay.** *See* **11 U.S.C. § 362(a) (the Automatic Stay operates as a stay, applicable to all entities, of "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [chapter 11]")**.

Response to Paragraph 75: The Excluded Lenders deny the allegations of paragraph 75.

76.     **Whether the Transaction was valid under the Non-PTL Term Loan Agreement is a core issue that goes to the heart of Serta Simmons Bedding's efforts to reorganize its capital structure pursuant to the Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors (the "Plan").  This issue must be resolved for Serta Simmons Bedding to successfully emerge from Chapter 11**.

Response to Paragraph 76: The Excluded Lenders deny the allegations of paragraph 76.

## CAUSES OF ACTION

### COUNT 1 – DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

77.     **Serta Simmons Bedding and the PTL Lenders incorporate by reference the allegations in Paragraphs 1-74 as if set forth fully herein**.

---

[26] **Serta Simmons Bedding intends to file a motion to extend the automatic stay to the entirety of the North Star Action (including those claims against the PTL Lenders).**

Response to Paragraph 77: The Excluded Lenders repeat and reallege their responses to paragraphs 1 through 76 as set forth above as if fully set forth herein.

78.     **Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a).  Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments**.

Response to Paragraph 78: The Excluded Lenders admit the allegations of paragraph 78.

79.     **Courts possess jurisdiction to issue declaratory relief when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007)**.

Response to Paragraph 79: The Excluded Lenders deny the allegations of paragraph 79, and respectfully refer the Court to the case cited therein for its complete and accurate contents.

80.     **There is a substantial controversy between Serta Simmons Bedding and the PTL Lenders and the Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  Without resolution of this controversy, Serta Simmons Bedding anticipates the Defendants will continue to assert their priority status in Serta Simmons Bedding's capital structure vis-à-vis the PTL Lenders.  Such claims would prevent Serta Simmons Bedding from successfully obtaining confirmation of its Plan and**

**preclude Serta Simmons Bedding from emerging from chapter 11, to the detriment of its estate and its creditors**.

Response to Paragraph 80: The Excluded Lenders deny the allegations of paragraph 80.

81.     **There is also a substantial controversy concerning whether Serta Simmons Bedding breached the Non-PTL Term Loan Agreement by failing to perfect the assignment of Apollo's first lien loans.  Without resolution of this controversy, Apollo may continue to assert it holds additional amounts of Serta Simmons Bedding's first lien loans, which could similarly impact Serta Simmons Bedding's ability to successfully obtaining confirmation of its Plan and preclude Serta Simmons Bedding from emerging from chapter 11, to the detriment of its estate and its creditors**.

Response to Paragraph 81: The Excluded Lenders deny the allegations of paragraph 81, except admit the first sentence of paragraph 81.

82.     **Serta Simmons Bedding and the PTL Lenders seek a declaratory judgment confirming that (1) the Transaction was permitted under the Non-PTL Term Loan Agreement and (2) Plaintiffs did not violate the covenant of good faith and fair dealing by entering into the Transaction**.

Response to Paragraph 82: The Excluded Lenders deny the allegations of paragraph 82, except admit that Serta and the Favored Lenders purport to seek the relief set forth in paragraph 82.

3718365.1

## PRAYER FOR RELIEF

83.     The Excluded Lenders deny that Serta and the Favored Lenders are entitled to any of the relief requested in subparagraphs a-e on page 27 of the Complaint or as otherwise requested in the Complaint.

## GENERAL DENIAL

84.     The Excluded Lenders deny each and every allegation, statement, and matter not expressed admitted or qualified herein.  Any allegations made in the headings contained in the Complaint are denied.  The prayer for relief is denied.

## AFFIRMATIVE DEFENSES

85.     The Excluded Lenders state the following affirmative defenses and hereby reserve their rights to assert other and additional defenses, cross-claims, counterclaims, and third-party claims not asserted herein of which they become aware through discovery or other investigation as may be appropriate at a later time.  In asserting these affirmative defenses, the Excluded Lenders do not assume any burden of proof, persuasion, or production with respect to any issue where the applicable law places the burden upon another party.

## FIRST AFFIRMATIVE DEFENSE

86.     The Complaint fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

87.     Serta and the Favored Lenders' claims are barred, in whole or in part, by equitable estoppel, waiver, unclean hands, in *pari delicto*, and/or other equitable doctrines.

## THIRD AFFIRMATIVE DEFENSE

88.     Serta and the Favored Lenders are barred from maintaining this action, and declaratory relief may not be granted, because not all persons or entities who are interested in or may be affected by the declaratory relief sought are parties to this action.

## FOURTH AFFIRMATIVE DEFENSE

89.     Venue does not properly lie in this District because Serta and the Favored Lenders agreed to a forum selection clause providing for exclusive venue in the federal or state court in the Borough of Manhattan in New York City.  Specifically, in Section 9.10(b) of the Non-PTL Term Loan Agreement states that "each party hereto hereby irrevocably and unconditionally submits for itself and its property, to the exclusive jurisdiction of any U.S. federal or New York state court siting in the borough of Manhattan, in the City of New York (or any appellate court therefrom) over any suit, action or proceeding arising out of or relating to any loan document and agrees that all claims in respect of any such action or proceeding shall (except as permitted below) be heard and determined in such New York state or, to the extent permitted by applicable requirements of law, federal court."

## FIFTH AFFIRMATIVE DEFENSE

90.     The Court should exercise its discretion to deny declaratory relief because this action represents an improper use of the declaratory judgment mechanism to gain a procedural advantage over the Excluded Lenders, and preempt or thwart the Excluded Lenders from vindicating their rights by pursuing their pending claims in the Southern District of New York in the action captioned *A.G. Centre Street Partnership L.P. et al. v. Eaton Vance Management, et al.*, 23-cv-0587 (Failla, J.).

## SIXTH AFFIRMATIVE DEFENSE

91.     Defendants reserve their right to contest venue concerning the underlying Chapter 11 proceeding, pending their receipt of information from the Debtors concerning the propriety of venue in this District.

**ANSWERING DEFENDANTS' AMENDED COUNTERCLAIMS AND**
**THIRD-PARTY CLAIMS AGAINST SERTA AND FAVORED LENDERS**

92.     Counterclaim/Third-Party Plaintiffs AG Centre Street Partnership L.P., AG Credit Solutions Non-ECI Master Fund, L.P., AG SF Master (L), L.P., AG Super Fund Master, L.P., and Silver Oak Capital, L.L.C., (collectively, "Angelo Gordon") Ascribe III Investments, LLC ("Ascribe"), Cent CLO 21 Limited, Columbia Cent CLO 27 Limited, Columbia Floating Rate Fund, a series of Columbia Funds Series Trust II, and Columbia Strategic Income Fund, a series of Columbia Funds Series Trust I (collectively, "Columbia"), Contrarian Capital Fund I, L.P., Contrarian Centre Street Partnership, L.P., and Contrarian Distressed Debt Fund, L.P. ("collectively, "Contrarian"), Gamut Capital SSB, LLC ("Gamut"), North Star Debt Holdings, L.P. ("Apollo"), Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., and Shackleton 2017-XI CLO, Ltd. (collectively, "Alcentra"), Z Capital Credit Partners CLO 2018-1 Ltd., and Z Capital Credit Partners CLO 2019-1 Ltd. (collectively, "Z Capital") (Angelo Gordon, Ascribe, Columbia, Contrarian, Gamut, Apollo, Alcentra, and Z Capital, collectively, the "Excluded Lenders"), by and through their undersigned counsel, hereby assert the following amended counterclaims (the "Amended Counterclaims") and amended third-party claims (the "Amended Third-Party Claims") subject to and without prejudice to or waiver of their position that venue is not proper in this District and that this action should be transferred to the United States District Court for the Southern District of New York, where a prior action concerning the same transaction and the same issues already is pending.

93.     The Excluded Lenders assert the following Amended Counterclaims against Serta Simmons Bedding, LLC ("Serta" or the "Company") and Amended Third-Party Claims against AGF Floating Rate Income Fund, Brighthouse Funds Trust I - Brighthouse/Eaton

48

Vance Floating Rate Portfolio, Calvert Management Series - Calvert Floating-Rate Advantage Fund, Eaton Vance CLO 2013-1 Ltd., Eaton Vance CLO 2014-1 Ltd., Eaton Vance CLO 2015-1 Ltd., Eaton Vance CLO 2018-1 Ltd., Eaton Vance CLO 2019-1 Ltd., Eaton Vance Loan Holding Limited, Eaton Vance Floating-Rate Income Plus Fund, Eaton Vance Floating-Rate 2022 Target Term Trust, Eaton Vance Senior Floating-Rate Trust, Eaton Vance Floating-Rate Income Trust, Eaton Vance International (Cayman Islands) Floating-Rate Income Portfolio, Eaton Vance Senior Income Trust, Eaton Vance Short Duration Diversified Income Fund, Eaton Vance Institutional Senior Loan Fund, Eaton Vance Institutional Senior Loan Plus Fund, Eaton Vance Limited Duration Income Fund, Eaton Vance Floating Rate Portfolio, Senior Debt Portfolio, Eaton Vance VT Floating Rate Income Fund, Bentham Syndicated Loan Fund, DaVinci Reinsurance Ltd., Renaissance Investment Holdings Ltd., California State Teachers' Retirement System, Dollar Senior Loan Fund, Ltd., Dollar Senior Loan Master Fund I, Ltd., BA/Cscredit 1 LLC, PK-SSL Investment Fund Limited Partnership, Copperhill Loan Fund I, LLC, The Eaton Corporation Master Retirement Trust, Erie Indemnity Company, Madison Flintholm Senior Loan Fund I DAC, Phillips 66 Retirement Plan Trust, Wind River Fund LLC, Blue Shield Of California, Erie Insurance Exchange, The City Of New York Group Trust, Maryland State Retirement and Pension System, Credit Suisse Floating Rate Trust, Credit Suisse Floating Rate High Income Fund, Credit Suisse Strategic Income Fund, Commonwealth of Pennsylvania Treasury Department, State Of New Mexico State Investment Council, Credit Suisse Nova (Lux), KP Fixed Income Fund, Bentham Strategic Loan Fund, Telstra Superannuation Scheme, Wespath Funds Trust, Inflation Protection Fund-I Series, Madison Park Funding X, Ltd., Madison Park Funding XI, Ltd., Madison Park Funding XII, Ltd., Madison Park Funding XIII, Ltd., Madison Park Funding XIV, Ltd., Madison Park Funding XV, Ltd., Madison Park Funding

XVI, Ltd., Madison Park Funding XVII, Ltd., Madison Park Funding XVIII, Ltd., Madison Park

Funding XIX, Ltd., Madison Park Funding XX, Ltd., Madison Park Funding XXI, Ltd., Madison

Park Funding XXII, Ltd., Madison Park Funding XXIII, Ltd., Madison Park Funding XXIV,

Ltd., Madison Park Funding XXV, Ltd., Madison Park Funding XXVI, Ltd., Madison Park

Funding XXVII, Ltd., Madison Park Funding XXVIII, Ltd., Madison Park Funding XXIX, Ltd.,

Madison Park Funding XXX, Ltd., Madison Park Funding XXXI, Ltd., Madison Park Funding

XXXII, Ltd., Madison Park Funding XXXIV, Ltd., Madison Park Funding XXXV, Ltd.,

Madison Park Funding XXXVII, Ltd., Madison Park Funding XL, Ltd., Madison Park Funding

XLI, Ltd., Madison Park Funding XLII, Ltd., Madison Park Funding XLIII, Ltd., Madison Park

Funding XLIV, Ltd., One Eleven Funding I, Ltd., One Eleven Funding II, Ltd., Barings Global

Loan Limited, Barings Global Special Situations Credit 3 S.A.R.L., Barings Global High Yield

Credit Strategies Limited, Barings U.S. Loan Limited, Barings CLO Ltd. 2018-III, Barings CLO

Ltd. 2017-I, Barings CLO Ltd. 2019-II, Barings CLO Ltd. 2016-I, Barings CLO Ltd. 2015-I,

Barings CLO Ltd. 2016-II, Barings CLO Ltd. 2018-I, Barings CLO Ltd. 2015-II, Barings CLO

Ltd. 2013-I, Barings CLO Ltd. 2018-IV, Baloise Senior Secured Loan Fund, Bayvk R2-Fonds

Segment Bayvk R2 Barings, Crown Managed Accounts SPC - Crown/Ba 2 SP, Babson CLO

Ltd. 2014-I, G.A.S. (Cayman) Limited, Serengeti (Loan Fund), a Series Trust of the Multi

Strategy Umbrella Fund Cayman, Barings Global Multi-Credit Strategy 1 Limited, Barings

Global Multi-Credit Strategy 2 Limited, Barings Global Multi-Credit Strategy 3 Limited,

Barings Global Multi-Credit Strategy 4 Limited, Barings BDC Senior Funding I, LLC, Barings

Global Floating Rate Fund, a Series of Barings Fund Trust, Barings Segregated Loans 3 S.A R.L.,

Barings BDC, Inc., Barings Global Loan and High Yield Bond Limited, Barings Global Credit

Income Opportunities Fund, Arrowood Indemnity Company, Arrowood Indemnity as

Administrator of the Pension Plan of Arrowood Indemnity, Jocassee Partners LLC, First Eagle

Bank Loan Select Master Fund, First Eagle Senior Loan Fund (FSLF), KVK CLO 2013-1 Ltd.,

KVK CLO 2016-1 Ltd., KVK CLO 2018-1 Ltd., Russell Absolute Return Fixed Income Fund,

Russell Floating Rate Fund, Russell Global Unconstrained Bond Pool, Russell Multi-Asset Core

Plus Fund, Russell Unconstrained Total Return Fund, Staniford Street CLO Ltd., Stichting

Pensioenfonds Hoogovens, Wind River 2012-1 CLO Ltd., Wind River 2013-1 CLO Ltd., Wind

River 2013-2 CLO Ltd., Wind River 2014-1 CLO Ltd., Wind River 2014-2 CLO Ltd., Wind

River 2014-3 CLO Ltd., Wind River 2014-3K CLO Ltd., Wind River 2015-1 CLO Ltd., Wind

River 2015-2 CLO Ltd., Wind River 2016-1 CLO Ltd., Wind River 2016-2 CLO Ltd., Wind

River 2017-1 CLO Ltd., Wind River 2017-4 CLO Ltd., Wind River 2018-3 CLO Ltd., Wind

River 2019-3 CLO Ltd., Annisa CLO, Ltd., Betony CLO 2, Ltd., BOC Pension Investment Fund,

Carbone CLO, Ltd., Diversified Credit Portfolio Ltd., Invesco Bl Fund, Ltd., Invesco Dynamic

Credit Opportunities Fund, Invesco Floating Rate Fund, Invesco Floating Rate Income Fund,

Invesco Gemini Us Loan Fund LLC, Invesco Oppenheimer Master Loan Fund, Invesco

Oppenheimer Senior Floating Rate Fund, Invesco Oppenheimer Senior Floating Rate Plus Fund,

Invesco Senior Income Trust, Invesco Senior Loan Fund, Invesco SSL Fund LLC, Invesco

Zodiac Funds - Invesco Us Senior Loan ESG Fund, Invesco Zodiac Funds - Invesco Us Senior

Loan Fund, Kaiser Permanente Group Trust, Kapitalforeningen Investin Pro, US Leveraged

Loans I, Milos CLO, Ltd., Recette CLO, Ltd., Riserva CLO, Ltd., Sentry Insurance Company,

Upland CLO, Ltd., Harbourview CLO VII-R, Ltd., Invesco Oppenheimer Fundamental

Alternatives Fund, Oaktree Opportunities Fund Xb Holdings (Delaware), LP, Oaktree Opps X

Holdco Ltd., Oaktree Opportunities Fund X Holdings (Delaware) LP, Dryden XXV Senior Loan

Fund, Dryden XXVI Senior Loan Fund, Dryden XXVIII Senior Loan Fund, Dryden 30 Senior

Loan Fund, Dryden 33 Senior Loan Fund, Dryden 36 Senior Loan Fund, Dryden 37 Senior Loan

Fund, Dryden 38 Senior Loan Fund, Dryden 40 Senior Loan Fund, Dryden 41 Senior Loan Fund,

Dryden 42 Senior Loan Fund, Dryden 43 Senior Loan Fund, Dryden 45 Senior Loan Fund,

Dryden 47 Senior Loan Fund, Dryden 49 Senior Loan Fund, Dryden 50 Senior Loan Fund,

Dryden 54 Senior Loan Fund, Dryden 53 CLO, Ltd., Dryden 55 CLO, Ltd., Dryden 57 CLO,

Ltd., Dryden 58 CLO, Ltd., Dryden 60 CLO, Ltd., Dryden 61 CLO, Ltd., Dryden 64 CLO, Ltd.,

Dryden 65 CLO, Ltd., Dryden 70 CLO, Ltd., Dryden 75 CLO, Ltd., Newark BSL CLO 1, Ltd.,

Newark BSL CLO 2, Ltd., Venture XXV CLO, Limited, Venture 31 CLO, Limited, Venture 32

CLO, Limited, Venture 33 CLO, Limited, Venture 35 CLO, Limited, Venture XVII CLO

Limited, Venture XXII CLO, Limited, Venture XXIX CLO, Limited, Venture XXVII CLO,

Limited, Venture 28a CLO, Limited, Venture XII CLO, Limited, Venture XIII CLO, Limited,

Venture XIV CLO, Limited, Venture XIX CLO, Limited, Venture XV CLO, Limited, Venture

XVI CLO, Limited, Venture XVIII CLO, Limited, Venture XX CLO, Limited, Venture XXI

CLO, Limited, Venture XXIII CLO, Limited, Venture XXIV CLO, Limited, Venture XXVIII

CLO, Limited, Venture XXX CLO, Limited, BSG Fund Management B.V., Fixed Income

Opportunities Nero, LLC, Blackrock Limited Duration Income Trust, Blackrock Global

Investment Series: Income Strategies Portfolio, Blackrock Credit Strategies Income Fund of

Blackrock Funds V, Blackrock Senior Floating Rate Portfolio, Blackrock Floating Rate Income

Strategies Fund, Inc., Blackrock Multi-Asset Income Portfolio of Blackrock Funds II, Blackrock

Debt Strategies Fund, Inc., Blackrock Floating Rate Income Trust, JPMBI Re Blackrock

Bankloan Fund, Blackrock Floating Rate Income Portfolio of Blackrock Funds V, ABR

Reinsurance Ltd., NC Garnet Fund, LP, Magnetite XC, Limited, Magnetite XV, Limited,

Magnetite XIV-R, Limited, Magnetite XVI, Limited, Magnetite VIII, Limited, Magnetite XVIII,

Limited, Magnetite XIX, Limited, Magnetite XX, Limited, Magnetite XVII, Limited, Magnetite VII, Limited, Magnetite XII, Limited, Nuveen Diversified Dividend and Income Fund, Nuveen Floating Rate Income Fund, Nuveen Floating Rate Income Opportunity Fund, Nuveen Senior Income Fund, Nuveen Short Duration Credit Opportunities Fund, Nuveen Symphony Floating Rate Income Fund, Principal Funds, Inc - Diversified Real Asset Fund, Symphony CLO XX Ltd., Symphony CLO XVII, Ltd., Symphony CLO XIX Ltd., Symphony CLO XVII, Ltd., Symphony CLO XV, Ltd., Symphony CLO XIV, Ltd., Symphony CLO XVI, Ltd., TCI-Symphony 2017-1 Ltd., TCI-Symphony 2016-1 Ltd., Symphony Floating Rate Senior Loan Fund, SCOF-2 Ltd., BayCity Alternative Investment Funds SICAV-SIF - BayCity US Senior Loan Fund, BayCity Senior Loan Master Fund Ltd., Pensiondanmark Pensionforsikringsaktieselskab, Menard, Inc., Municipal Employees Annuity & Benefit Fund of Chicago, Principal Diversified Real Asset CIT, California Street CLO IX Limited Partnership, California Street CLO XII, Ltd., Tao Fund, LLC, MP CLO III Ltd., MP CLO IV Ltd., MP CLO VII Ltd., MP CLO VIII Ltd., Marble Point CLO X Ltd., Marble Point CLO XI Ltd., Marble Point CLO XII Ltd., MPLF Funding Ltd., MPSFR Financing 1 Ltd., Marathon CLO V Ltd., Marathon CLO VII Ltd., Marathon CLO VIII Ltd., Marathon CLO IX Ltd., Marathon CLO X Ltd., Marathon CLO XI Ltd., Bowery Funding ULC, Woodbine Funding ULC, Elevation CLO 2013-1, Ltd., Elevation CLO 2014-2, Ltd., Elevation CLO 2015-4, Ltd., Elevation CLO 2016-5, Ltd., Elevation CLO 2017-6, Ltd., Elevation CLO 2017-7, Ltd., Elevation CLO 2017-8 Ltd., Elevation CLO 2018-9, Ltd., Elevation CLO 2018-10, Ltd., and Peaks CLO 3, Ltd. (collectively, the "Favored Lenders") and allege as follows, upon knowledge as to themselves and their own acts and upon information and belief as to all other matters:

## NATURE OF THE CLAIMS

94.     The Excluded Lenders' Amended Counterclaims and Amended Third Party Claims challenge the unlawful scheme entered into by Serta and the Favored Lenders to rob certain of Serta's lenders, including the Excluded Lenders, of their bargained-for rights under a credit agreement while providing special benefits to a group of favored lenders who agreed to participate and assist in the scheme.  The consequence has been to transform the Excluded Lenders from secured first lien lenders to effectively unsecured creditors in a highly distressed company.

95.     Serta, a manufacturer of bedding products, was in financial distress even before the COVID-19 pandemic.  The pandemic simply exacerbated the Company's problems, which now have culminated in a declaration of bankruptcy, for which Serta filed on January 11, 2023.  In June 2020, with the possibility of bankruptcy then looming, Serta undertook a so-called liability management transaction that indisputably and blatantly violated the rights of a significant minority of its existing first lien lenders (the "First Lien Lenders"), including the Excluded Lenders.

96.     The Excluded Lenders are First Lien Lenders who collectively own over $690 million of the $1.9 billion in loans (the "First Lien Term Loans") that were outstanding in June 2020 under Serta's First Lien Term Loan Agreement (the "Credit Agreement").  Under the Credit Agreement, "First Lien" meant what it said:  if there is an event of default, the lenders under that agreement, including the Excluded Lenders, had rights to collateral that were contractually superior to all others.  In addition, a bedrock principle of the Credit Agreement is that the First Lien Lenders share ratably in all payments of principal or interest on their First Lien Term Loans.  Indeed, the proceeds waterfall and pro rata sharing are "sacred rights" that are

so fundamental that, under the Credit Agreement, the provisions governing these issues cannot be amended without the consent of 100% of the adversely affected lenders, while a simple majority is all that is necessary to amend most other provisions of the agreement.

97.     On June 8, 2020, Serta announced a recapitalization transaction (the "Unlawful Exchange Transaction") that brazenly upended the priorities under the proceeds waterfall and violated the requirement of *pro rata* sharing.  In the transaction, the Favored Lenders, who comprised bare majorities of Serta's first and second lien lenders, exchanged their loans for special benefits.  The Favored Lenders received more than $850 million in new "super-priority" term loans (the "Priority Term Loans") in exchange for their existing First Lien Term Loans, without Serta paying (or even offering) the same consideration to the other lenders (including the Excluded Lenders).  Nor did the Favored Lenders offer to share these benefits ratably with the Excluded Lenders, despite their obligation to do so under the Credit Agreement. Due to their new "super-priority" position, the Favored Lenders now claim the right to be paid in full before the Excluded Lenders and the other First Lien Lenders can receive a penny.  The mechanics of the Unlawful Exchange Transaction were complex, and involved not only numerous amendments to the Credit Agreement, but the execution of a new intercreditor agreement which allegedly binds the Excluded Lenders without their consent.

98.     The following diagram illustrates the sweeping changes to Serta's capital structure produced by the Unlawful Exchange Transaction:



99.     The consequence of the Unlawful Exchange Transaction is nothing less than the stripping of the Excluded Lenders' collateral and right to ratable repayment, for the sole benefit of the Favored Lenders.  Soon after the transaction, and as a result of it, Moody's Investors Service downgraded the credit rating of the First Lien Term Loans from Caa3 to Ca, Moody's second lowest rating, indicating that Moody's believed the First Lien Term Loans to be "highly speculative and with likelihood of being near or in default."  Moody's also noted that the Excluded Lenders "will potentially be left with little or no remaining collateral coverage in Serta Simmons, as well as in a position that is subordinated to new, higher priority debt."  Moody's also said that Serta's *pro forma* capital structure "is not sustainable, and as a result, there is a continued high risk of additional distressed debt exchanges and/or a more comprehensive debt

restructuring." That prophecy now has become reality, and the Excluded Lenders, having been reduced to unsecured lenders to a bankrupt company, are "First Lien Lenders" in name only.

100.     To justify their blatant violations of the Credit Agreement, Serta and the Favored Lenders claim to rely on a limited exception to the provisions protecting the Excluded Lenders' "sacred rights" that permits Serta to make "open market purchases" of First Lien Term Loans on a non-*pro rata* basis. But the Unlawful Exchange Transaction was not an "open market purchase." It was a wholly private, exclusionary transaction—an exchange, at a substantial premium to market prices, in which Serta handpicked a group of its lenders (excluding the remainder), paid for their counsel and negotiated a complex, bespoke transaction memorialized in multiple agreements running many hundreds of pages.

101.     Indeed, in a case in federal court in which another excluded lender (which is not one of the Excluded Lenders here) is challenging the Unlawful Exchange Transaction, the District Court denied Serta's motion to dismiss the claims, and noted that, "[o]n a plain reading of the term, the Transaction . . . did not take place in what is conventionally understood as an 'open market.'" *LCM XII Ltd.* v. *Serta Simmons Bedding, LLC*, 2022 WL 953109, at \*8 (S.D.N.Y. Mar. 29, 2022).

102.     As suggested by the District Court's decision in the *LCM* action against Serta, the Unlawful Exchange Transaction was not an "open market" transaction under any plain-English interpretation of that term. One need look no further than a client memorandum published by counsel for Serta, the Weil Gotshal firm, which has opined that an "open market" transaction "requir[es] the purchaser to pay a set market price," and "normally, the parties involved . . . are not aware of one another's identity." Similarly, the Gibson Dunn firm (which was counsel to nearly all of the Favored Lenders in related litigation) notes that an issuer must

make a "cash outlay . . . to effect [an open market] purchase," and cautions that "issuers without sufficient cash on hand may not be able to" do so.  In planning and implementing their transactions, Serta and the Favored Lenders ignored the published views of their own counsel.

103.    To characterize the Unlawful Exchange Transaction as an "open market purchase" would make a mockery of the term, and render meaningless the requirement that all affected lenders approve changes to the *pro rata* treatment provisions of the Credit Agreement. Indeed, if *this* is an open market purchase, then nearly *any* transaction would be, and the *pro rata* protections of the Credit Agreement are effectively meaningless.  But that is neither a logical reading of the term "open market" nor a permissible interpretation of the contract.

104.    Moreover, under the terms of the Credit Agreement, even a true open market purchase—which is not present here—cannot be used to reorder Serta's entire capital structure and strip contractual protections from the Excluded Lenders and the other First Lien Lenders that did not participate in the Unlawful Exchange Transaction.  As set forth below, the Credit Agreement contains numerous protections against the subordination of the loans held by the First Lien Lenders in the way Serta and the Favored Lenders did it here.  Among them, an agreement to release all or substantially all of the Collateral (except under limited circumstances that do not apply in this context) requires the prior written consent of each Lender, as does an agreement to release all or substantially all of the value of the guarantees of the borrower's obligations under the Credit Agreement.  Although the Unlawful Exchange Transaction *did* reorder the capital structure and strip existing lenders of their protections, Serta did not seek the requisite consent of each affected lender.  Instead, Serta obtained only the consent of the Favored Lenders—by offering them consideration the Excluded Lenders did not receive.

105.     Majority lenders cannot be permitted to conspire with borrowers to bypass critical minority-lender protections which are expressly insulated from majority rule by requiring consent of *all* affected lenders; otherwise, those protections, which appear in innumerable agreements, are worthless.  Permitting such a transaction would upend the lending markets and make it impossible for lenders to price the risk of first lien debt which could at any time be "primed" by previously *pari passu* debt owned by a mere majority of lenders under the guise of an "open market purchase."  The Excluded Lenders therefore bring this action to require the Favored Lenders to share all the benefits of the Unlawful Exchange Transaction ratably with them, as required by the Credit Agreement; to obtain a declaration that the Unlawful Exchange Transaction and the agreements purporting to implement it are invalid; and to recover damages for the huge injury they have suffered as a result of Serta and the Favored Lenders' Unlawful Exchange Transaction.

106.     In addition to robbing the Excluded Lenders of value through the Unlawful Exchange Transaction, Serta deprived Apollo of its rights as the purchaser of $192 million of First Lien Term Loans from a third-party lender.  In March 2020, when Apollo purchased these loans under the Credit Agreement, it obtained confirmation from UBS AG, Stamford Branch ("UBS"), administrative agent for the Credit Agreement, that Apollo was not on the applicable list of Disqualified Institutions (the "DQ List" or the "List"), meaning that it could be assigned loans.  Serta nonetheless has delayed and interfered with Apollo's efforts to close these loan purchases.  As a result of Serta's misconduct, Apollo is now in limbo, saddled with $192 million in First Lien Term Loans that it can neither close on nor dispose of.  Accordingly, Apollo seeks a declaration that it is entitled to assignment of its properly and validly purchased loans.

## PARTIES

### *The Counterclaim/Third-Party Plaintiffs*

107.    Counterclaim/third-party plaintiffs Silver Oak Capital, L.L.C., AG Credit Solutions Non-ECI Master Fund, L.P., and AG Centre Street Partnership, L.P., affiliates of Angelo, Gordon & Co., L.P., are Delaware limited liability companies and/or limited partnerships with their principal place of business at 245 Park Avenue, New York, NY 10167.

108.    Counterclaim/third-party plaintiffs AG Super Fund Master, L.P. and AG SF Master (L), L.P., affiliates of Angelo, Gordon & Co., L.P., are Cayman Islands limited partnerships with their principal place of business at 245 Park Avenue, New York, NY 10167.

109.    Counterclaim/third-party plaintiffs Contrarian Capital Fund I, L.P., Contrarian Distressed Debt Fund, L.P., and Contrarian Centre Street Partnership, L.P., affiliates of Contrarian Capital Management L.L.C., are Delaware limited partnerships with their principal place of business at 411 West Putnam Avenue, Greenwich, CT 06830.

110.    Counterclaim/third-party plaintiff North Star Debt Holdings, L.P., an affiliate of funds managed by Apollo Global Management, Inc., is a Delaware limited partnership with its principal place of business at 9 West 57th Street, New York, NY 10019.

111.    Counterclaim/third-party plaintiff Gamut Capital SSB, LLC, an affiliate of funds managed by Gamut Capital Management, LP, is a Delaware limited liability company with its principal place of business at 250 West 55th Street, New York, NY 10019.

112.    Counterclaim/third-party plaintiffs Z Capital Credit Partners CLO 2018-1 Ltd. and Z Capital Credit Partners CLO 2019-1 Ltd., affiliates of Z Capital Group L.L.C., are exempted companies incorporated with limited liability under the laws of the Cayman Islands

3718365.1

with their principal place of business at 1330 Avenue of the Americas, 16th Floor, New York, NY 10019.

113.    Counterclaim/third-party plaintiffs Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., and Shackleton 2017-XI CLO, Ltd., affiliates of Alcentra NY, LLC, are Cayman Islands limited liability companies with their principal place of business at 9 West 57th Street, Suite 4920, New York, NY 10019.

114.    Counterclaim/third-party plaintiff Ascribe III Investments, LLC, an affiliate of AS Birch Grove LP, is a limited liability company with its principal place of business at 590 Madison Avenue, 38th Floor, New York, NY 10022.

115.    Counterclaim/third-party plaintiffs Columbia Cent CLO 21 Limited and Columbia Cent CLO 27 Limited are Cayman Islands exempted companies with their principal place of business at 1099 Ameriprise Financial Center, Minneapolis, MN 55474.

116.    Counterclaim/third-party plaintiff Columbia Floating Rate Income Fund is a series of Columbia Funds Series Trust II, a Massachusetts business trust with its principal place of business at 290 Congress St., Boston, MA 02210.

117.    Counterclaim/third-party plaintiff Columbia Strategic Income Fund is a series of Columbia Funds Series Trust I, a Massachusetts business trust with its principal place of business at 290 Congress St., Boston, MA 02210.

***The Counterclaim Defendant***

118.    Defendant Serta Simmons Bedding, LLC is a Delaware limited liability company with its principal place of business at 2451 Industry Avenue, Doraville, GA 30360.

61

*The Third-Party Defendants*

119.    Third-party defendant AGF Floating Rate Income Fund participated in the Unlawful Exchange Transaction.  AGF Floating Rate Income Fund is a Canadian fund with its principal place of business in Toronto, Canada.

120.    Third-party defendant Brighthouse Funds Trust I - Brighthouse/Eaton Vance Floating Rate Portfolio participated in the Unlawful Exchange Transaction.  Brighthouse Funds Trust I - Brighthouse/Eaton Vance Floating Rate Portfolio is a Delaware statutory trust with its principal place of business in Boston, MA.

121.    Third-party defendant Calvert Management Series - Calvert Floating-Rate Advantage Fund participated in the Unlawful Exchange Transaction.  Calvert Management Series - Calvert Floating-Rate Advantage Fund is a Massachusetts fund with its principal place of business in Washington, D.C.

122.    Third-party defendants Eaton Vance CLO 2013-1 Ltd, Eaton Vance CLO 2014-1R Ltd, Eaton Vance CLO 2015-1 Ltd, Eaton Vance CLO 2018-1 Ltd, and Eaton Vance CLO 2019-1 Ltd (the "Eaton Vance CLOs") participated in the Unlawful Exchange Transaction. The Eaton Vance CLOs are Cayman Islands exempted companies with their principal place of business in Boston, MA.

123.    Third-party defendant Eaton Vance Loan Holding Limited participated in the Unlawful Exchange Transaction.  Eaton Vance Loan Holding Limited is a private company limited by shares with its principal place of business in Dublin, Ireland.

124.    Third-party defendant Eaton Vance Floating-Rate Income Plus Fund participated in the Unlawful Exchange Transaction.  Eaton Vance Floating-Rate Income Plus Fund is a Massachusetts fund with its principal place of business in Boston, MA.

3718365.1

125.     Third-party defendant Eaton Vance Floating-Rate 2022 Target Term Trust participated in the Unlawful Exchange Transaction.  Eaton Vance Floating-Rate 2022 Target Term Trust is a Massachusetts business trust with its principal place of business in Boston, MA.

126.     Third-party defendant Eaton Vance Senior Floating-Rate Trust participated in the Unlawful Exchange Transaction.  Eaton Vance Senior Floating-Rate Trust is a Massachusetts business trust with its principal place of business in Boston, MA.

127.     Third-party defendant Eaton Vance Floating-Rate Income Trust participated in the Unlawful Exchange Transaction.  Eaton Vance Floating-Rate Income Trust is a Massachusetts business trust with its principal place of business in Boston, MA.

128.     Third-party defendant Eaton Vance International (Cayman Islands) Floating-Rate Income Portfolio participated in the Unlawful Exchange Transaction.  Eaton Vance International (Cayman Islands) Floating-Rate Income Portfolio is a Cayman Islands exempted company with its principal place of business in Boston, MA.

129.     Third-party defendant Eaton Vance Senior Income Trust participated in the Unlawful Exchange Transaction.  Eaton Vance Senior Income Trust is a Massachusetts business trust with its principal place of business in Boston, MA.

130.     Third-party defendant Eaton Vance Short Duration Diversified Income Fund participated in the Unlawful Exchange Transaction.  Eaton Vance Short Duration Diversified Income Fund is a Massachusetts business trust with its principal place of business in Boston, MA.

131.     Third-party defendant Eaton Vance Institutional Senior Loan Fund participated in the Unlawful Exchange Transaction.  Eaton Vance Institutional Senior Loan Fund is a Cayman Islands exempted company with its principal place of business in Boston, MA.

132.     Third-party defendant Eaton Vance Institutional Senior Loan Plus Fund participated in the Unlawful Exchange Transaction.  Eaton Vance Institutional Senior Loan Plus Fund is a Cayman Islands exempted company with its principal place of business in Boston, MA.

133.     Third-party defendant Eaton Vance Limited Duration Income Fund participated in the Unlawful Exchange Transaction.  Eaton Vance Limited Duration Income Fund is a Massachusetts business trust with its principal place of business in Boston, MA.

134.     Third-party defendant Eaton Vance Floating Rate Portfolio participated in the Unlawful Exchange Transaction.  Eaton Vance Floating Rate Portfolio is a Massachusetts business trust with its principal place of business in Boston, MA.

135.     Third-party defendant Senior Debt Portfolio participated in the Unlawful Exchange Transaction.  Senior Debt Portfolio is a Massachusetts business trust with its principal place of business in Boston, MA.

136.     Third-party defendant Eaton Vance VT Floating Rate Income Fund participated in the Unlawful Exchange Transaction.  Eaton Vance VT Floating Rate Income Fund is a Massachusetts business trust with its principal place of business in Boston, MA.

137.     Third-party defendant Bentham Syndicated Loan Fund participated in the Unlawful Exchange Transaction.  Bentham Syndicated Loan Fund is an Australian fund with its principal place of business in Sydney, Australia.

138.     Third-party defendant DaVinci Reinsurance Ltd. participated in the Unlawful Exchange Transaction.  DaVinci Reinsurance Ltd. is a Bermuda exempted company with its principal place of business in Bermuda.

139.     Third-party defendant Renaissance Investment Holdings Ltd. participated in the Unlawful Exchange Transaction.  Renaissance Investment Holdings Ltd. is a Bermuda exempted company with its principal place of business in Bermuda.

140.     Third-party defendant California State Teachers' Retirement System participated in the Unlawful Exchange Transaction.  California State Teachers' Retirement System is a component unit of the State of California with its principal place of business in West Sacramento, CA.

141.     Third-party defendants Dollar Senior Loan Fund, Ltd. and Dollar Senior Loan Master Fund II, Ltd. participated in the Unlawful Exchange Transaction.  Dollar Senior Loan Fund, Ltd. and Dollar Senior Loan Master Fund II, Ltd. are Cayman Islands exempted companies with their principal place of business in New York, NY.

142.     Third-party defendant BA/Cscredit 1 LLC participated in the Unlawful Exchange Transaction.  BA/Cscredit 1 LLC is a Delaware limited liability company with its principal place of business in New York, NY.

143.     Third-party defendant PK-SSL Investment Fund Limited Partnership participated in the Unlawful Exchange Transaction.  PK-SSL Investment Fund Limited Partnership is a Guernsey limited partnership with its principal place of business in New York, NY.

144.     Third-party defendant Copperhill Loan Fund I, LLC participated in the Unlawful Exchange Transaction.  Copperhill Loan Fund I, LLC is a Delaware limited liability company with its principal place of business in New York, NY.

145.     Third-party defendant The Eaton Corporation Master Retirement Trust participated in the Unlawful Exchange Transaction.  The Eaton Corporation Master Retirement Trust is an Ohio corporate pension with its principal place of business in Cleveland, OH.

146.     Third-party defendant Erie Indemnity Company participated in the Unlawful Exchange Transaction.  Erie Indemnity Company is a Pennsylvania corporation with its principal place of business in Erie, PA.

147.     Third-party defendant Madison Flintholm Senior Loan Fund I DAC participated in the Unlawful Exchange Transaction.  Madison Flintholm Senior Loan Fund I DAC is an Ireland designated activity company with its principal place of business in Dublin, Ireland.

148.     Third-party defendant Phillips 66 Retirement Plan Trust participated in the Unlawful Exchange Transaction.  Phillips 66 Retirement Plan Trust is a Texas fund with its principal place of business in Houston, TX.

149.     Third-party defendant Wind River Fund LLC participated in the Unlawful Exchange Transaction.  Wind River Fund LLC is a Wyoming limited liability company with its principal place of business in New York, NY.

150.     Third-party defendant Blue Shield of California participated in the Unlawful Exchange Transaction.  Blue Shield of California is a California corporation with its principal place of business in Oakland, CA.

151.     Third-party defendant Erie Insurance Exchange participated in the Unlawful Exchange Transaction.  Erie Insurance Exchange is a Pennsylvania reciprocal insurer with its principal place of business in Erie, PA.

3718365.1

152.     Third-party defendant The City of New York Group Trust participated in the Unlawful Exchange Transaction.  The City of New York Group Trust is a New York fund with its principal place of business in New York, NY.

153.     Third-party defendant Maryland State Retirement and Pension System participated in the Unlawful Exchange Transaction.  Maryland State Retirement and Pension System is a pension trust fund of the State of Maryland with its principal place of business in Baltimore, MD.

154.     Third-party defendants Credit Suisse Floating Rate Trust, Credit Suisse Floating Rate High Income Fund, and Credit Suisse Strategic Income Fund participated in the Unlawful Exchange Transaction.  Credit Suisse Floating Rate Trust, Credit Suisse Floating Rate High Income Fund, and Credit Suisse Strategic Income Fund are Delaware funds with their principal place of business in New York, NY.

155.     Third-party defendant Commonwealth of Pennsylvania Treasury Department participated in the Unlawful Exchange Transaction.  Commonwealth of Pennsylvania Treasury Department is a component unit of the State of Pennsylvania with its principal place of business in Harrisburg, PA.

156.     Third-party defendant State of New Mexico State Investment Council participated in the Unlawful Exchange Transaction.  State of New Mexico State Investment Council is a New Mexico sovereign wealth fund with its principal place of business in Santa Fe, NM.

157.     Third-party defendant Credit Suisse Nova (Lux) participated in the Unlawful Exchange Transaction.  Credit Suisse Nova (Lux) is a Luxembourg investment company with variable capital with its principal place of business in Luxembourg.

67

158.    Third-party defendant KP Fixed Income Fund participated in the Unlawful Exchange Transaction.  KP Fixed Income Fund is a Massachusetts statutory trust with its principal place of business in Oaks, PA.

159.    Third-party defendant Bentham Strategic Loan Fund participated in the Unlawful Exchange Transaction.  Bentham Strategic Loan Fund is an Australian fund with its principal place of business in Sydney, Australia.

160.    Third-party defendant Telstra Superannuation Scheme participated in the Unlawful Exchange Transaction.  Telstra Superannuation Scheme is an Australian superannuation fund with its principal place of business in Melbourne, Australia.

161.    Third-party defendant Wespath Funds Trust participated in the Unlawful Exchange Transaction.  Wespath Funds Trust is a Delaware statutory trust with its principal place of business in Glenview, IL.

162.    Third-party defendant Inflation Protection Fund-I Series participated in the Unlawful Exchange Transaction.  Inflation Protection Fund-I Series is a Maryland fund with its principal place of business in Glenville, IL.

163.    Third-party defendants Madison Park Funding X, Ltd., Madison Park Funding XI, Ltd., Madison Park Funding XII, Ltd., Madison Park Funding XIII, Ltd., Madison Park Funding XIV, Ltd., Madison Park Funding XV, Ltd., Madison Park Funding XVI, Ltd., Madison Park Funding XVII, Ltd., Madison Park Funding XVIII, Ltd., Madison Park Funding XIX, Ltd., Madison Park Funding XX, Ltd., Madison Park Funding XXI, Ltd., Madison Park Funding XXII, Ltd., Madison Park Funding XXIII, Ltd., Madison Park Funding XXIV, Ltd., Madison Park Funding XXV, Ltd., Madison Park Funding XXVI, Ltd., Madison Park Funding XXVII, Ltd., Madison Park Funding XXVIII, Ltd., Madison Park Funding XXIX, Ltd., Madison

Park Funding XXX, Ltd., Madison Park Funding XXXI, Ltd., Madison Park Funding XXXII, Ltd., Madison Park Funding XXXIV, Ltd., Madison Park Funding XXXV, Ltd., Madison Park Funding XXXVII, Ltd., Madison Park Funding XL, Ltd., Madison Park Funding XLI, Ltd., Madison Park Funding XLII, Ltd., Madison Park Funding XLIII, Ltd., Madison Park Funding XLIV, Ltd., One Eleven Funding I, Ltd., and One Eleven Funding II, Ltd. (collectively, the "Madison Park Funds") participated in the Unlawful Exchange Transaction. The Madison Park Funds are Cayman Islands limited companies with their principal place of business in New York, NY.

164. Third-party defendant Barings Global Loan Limited participated in the Unlawful Exchange Transaction. Barings Global Loan Limited is a private limited liability company formed in Ireland with its principal place of business in Charlotte, NC.

165. Third-party defendant Barings Global Special Situations Credit 3 S.A.R.L. participated in the Unlawful Exchange Transaction. Barings Global Special Situations Credit 3 S.A.R.L. is a Luxembourg limited company with its principal place of business in Boston, MA.

166. Third-party defendant Barings Global High Yield Credit Strategies Limited participated in the Unlawful Exchange Transaction. Barings Global High Yield Credit Strategies Limited is a private limited liability company formed in Ireland with its principal place of business in Charlotte, NC.

167. Third-party defendant Barings U.S Loan Limited participated in the Unlawful Exchange Transaction. Barings U.S Loan Limited is a private limited liability company formed in Ireland with its principal place of business in Charlotte, NC.

168. Third-party defendants Barings CLO Ltd. 2018-III, Barings CLO Ltd. 2017-I, Barings CLO Ltd. 2019-II, Barings CLO Ltd. 2016-I, Barings CLO Ltd. 2015-I, Barings

CLO Ltd. 2016-II, Barings CLO Ltd. 2018-I, Barings CLO Ltd. 2015-II, Barings CLO Ltd. 2013-I, and Barings CLO Ltd. 2018-IV (collectively, the "Barings CLOs") participated in the Unlawful Exchange Transaction.  The Barings CLOs are Cayman Islands exempted companies with their principal place of business in Charlotte, NC.

169.    Third-party defendant Baloise Senior Secured Loan Fund participated in the Unlawful Exchange Transaction.  Baloise Senior Secured Loan Fund is a Luxembourg fund with its principal place of business in Luxembourg City, Luxembourg.

170.    Third-party defendant Bayvk R2-Fonds Segment Bayvk R2 Barings participated in the Unlawful Exchange Transaction.  Bayvk R2-Fonds Segment Bayvk R2 Barings is a Germany fund with its principal place of business in Frankfurt, Germany.

171.    Third-party defendant Crown Managed Accounts SPC - Crown/BA 2 SP participated in the Unlawful Exchange Transaction.  Crown Managed Accounts SPC – Crown/BA 2 SP is a Cayman Islands segregated portfolio company with its principal place of business in Vaduz, Liechtenstein.

172.    Third-party defendant Babson CLO Ltd. 2014-1 participated in the Unlawful Exchange Transaction.  Babson CLO Ltd. 2014-1 is a Cayman Islands limited company with its principal place of business in Charlotte, NC.

173.    Third-party defendant G.A.S. (Cayman) Limited participated in the Unlawful Exchange Transaction.  G.A.S. (Cayman) Limited is a Cayman Islands limited company with its principal place of business in Dublin, Ireland.

174.    Third-party defendant Serengeti (Loan Fund), a series trust of the Multi Strategy Umbrella Fund Cayman participated in the Unlawful Exchange Transaction.  Serengeti

(Loan Fund), a series trust of the Multi Strategy Umbrella Fund Cayman is a Cayman Islands fund with its principal place of business in Dublin, Ireland.

175.    Third-party defendants Barings Global Multi-Credit Strategy 1 Limited, Barings Global Multi-Credit Strategy 2 Limited, Barings Global Multi-Credit Strategy 3 Limited, and Barings Global Multi-Credit Strategy 4 Limited (collectively, the "Barings Global Multi-Credit Strategy Funds") participated in the Unlawful Exchange Transaction.  The Barings Global Multi-Credit Strategy Funds are private limited companies formed in Ireland with their principal place of business in Dublin, Ireland.

176.    Third-party defendant Barings BDC Senior Funding I, LLC participated in the Unlawful Exchange Transaction.  Barings BDC Senior Funding I, LLC is a Delaware limited liability company with its principal place of business in Charlotte, NC.

177.    Third-party Defendant Barings Global Floating Rate Fund, a series of Barings Funds Trust participated in the Unlawful Exchange Transaction.  Barings Global Floating Rate Fund, a series of Barings Funds Trust is a Massachusetts business trust with its principal place of business in Charlotte, NC.

178.    Third-party defendant Barings Segregated Loans 3 S.A R.L. participated in the Unlawful Exchange Transaction.  Barings Segregated Loans 3 S.A R.L. is a Luxembourg limited liability company with its principal place of business in London, United Kingdom.

179.    Third-party defendant Barings BDC, Inc. participated in the Unlawful Exchange Transaction.  Barings BDC, Inc. is a Maryland stock corporation with its principal place of business in Charlotte, NC.

180.    Third-party defendant Barings Global Loan and High Yield Bond Limited participated in the Unlawful Exchange Transaction.  Barings Global Loan and High Yield Bond

Limited is a private limited liability company formed in Ireland with its principal place of business in Charlotte, NC.

181.    Third-party defendant Barings Global Credit Income Opportunities Fund participated in the Unlawful Exchange Transaction.  Barings Global Credit Income Opportunities Fund is a Massachusetts business trust with its principal place of business in Charlotte, NC.

182.    Third-party defendants Arrowood Indemnity and Arrowood Indemnity as Administrator of the Pension Plan of Arrowood Indemnity participated in the Unlawful Exchange Transaction.  Arrowood Indemnity is a Delaware corporation with its principal place of business in Charlotte, NC.

183.    Third-party defendant Jocassee Partners LLC participated in the Unlawful Exchange Transaction.  Jocassee Partners LLC is a Delaware limited liability company with its principal place of business in Charlotte, NC.

184.    Third-party defendant First Eagle Bank Loan Select Master Fund participated in the Unlawful Exchange Transaction.  First Eagle Bank Loan Select Master Fund is a Cayman Islands business trust with its principal place of business in Chicago, IL.

185.    Third-party defendant First Eagle Senior Loan Fund (FSLF) participated in the Unlawful Exchange Transaction.  First Eagle Senior Loan Fund (FSLF) is a Delaware statutory trust with its principal place of business in Chicago, IL.

186.    Third-party defendants KVK CLO 2013-1 Ltd., KVK CLO 2016-1 Ltd., and KVK CLO 2018-1 Ltd. (collectively, the "KVK CLOs") participated in the Unlawful Exchange Transaction.  The KVK CLOs are Cayman Islands exempted companies with their principal place of business in Chicago, IL.

187.     Third-party defendants Russell Absolute Return Fixed Income Fund, Russell Floating Rate Fund, Russell Global Unconstrained Bond Pool, Russell Multi-Asset Core Plus Fund, and Russell Unconstrained Total Return Fund participated in the Unlawful Exchange Transaction.  Russell Absolute Return Fixed Income Fund is a Delaware fund with its principal place of business in Seattle, WA.  Russell Floating Rate Fund is an Ireland fund with its principal place of business in Dublin, Ireland.  Russell Global Unconstrained Bond Pool is a Canadian fund with its principal place of business in Toronto, Canada.  Russell Multi-Asset Core Plus Fund is a Delaware fund with its principal place of business in Seattle, WA.  Russell Unconstrained Total Return Fund is a Massachusetts fund with its principal place of business in Seattle, WA.

188.     Third-party defendant Staniford Street CLO Ltd. participated in the Unlawful Exchange Transaction.  Staniford Street CLO Ltd. is a Cayman Islands limited company with its principal place of business in Boston, MA.

189.     Third-party defendant Stichting Pensioenfonds Hoogovens participated in the Unlawful Exchange Transaction.  Stichting Pensioenfonds Hoogovens is a Netherlands stichting with its principal place of business in the Netherlands.

190.     Third-party defendants Wind River 2012-1 CLO Ltd., Wind River 2013-1 CLO Ltd., Wind River 2013-2 CLO Ltd., Wind River 2014-1 CLO Ltd., Wind River 2014-2 CLO Ltd., Wind River 2014-3 CLO Ltd., Wind River 2014-3K CLO Ltd., Wind River 2015-1 CLO Ltd., Wind River 2015-2 CLO Ltd., Wind River 2016-1 CLO Ltd., Wind River 2016-2 CLO Ltd., Wind River 2017-1 CLO Ltd., Wind River 2017-4 CLO Ltd., Wind River 2018-3 CLO Ltd., and Wind River 2019-3 CLO Ltd. (collectively, the "Wind River CLOs") participated

in the Unlawful Exchange Transaction.  The Wind River CLOs are Cayman Islands exempted companies with their principal place of business in Boston, MA.

191.    Third-party defendant Annisa CLO, Ltd. participated in the Unlawful Exchange Transaction.  Annisa CLO, Ltd. is a Cayman Islands limited company with its principal place of business in New York, NY.

192.    Third-party defendant Betony CLO 2, Ltd. participated in the Unlawful Exchange Transaction.  Betony CLO 2, Ltd. is a Cayman Islands exempted company with its principal place of business in New York, NY.

193.    Third-party defendant BOC Pension Investment Fund participated in the Unlawful Exchange Transaction.  BOC Pension Investment Fund is a United Kingdom fund with its principal place of business in Guildford, United Kingdom.

194.    Third-party defendant Carbone CLO, Ltd. participated in the Unlawful Exchange Transaction.  Carbone CLO, Ltd. is a Cayman Islands exempted company with its principal place of business in New York, NY.

195.    Third-party defendant Diversified Credit Portfolio Ltd. participated in the Unlawful Exchange Transaction.  Diversified Credit Portfolio Ltd. is a Cayman Islands exempted company with its principal place of business in New York, NY.

196.    Third-party defendants Invesco BL Fund, Ltd., Invesco Dynamic Credit Opportunities Fund, Invesco Floating Rate Fund, Invesco Floating Rate Income Fund, Invesco Gemini US Loan Fund LLC, Invesco Oppenheimer Master Loan Fund, Invesco Oppenheimer Senior Floating Rate Fund, Invesco Oppenheimer Senior Floating Rate Plus Fund, Invesco Senior Income Trust, Invesco Senior Loan Fund, Invesco SSL Fund LLC, Invesco Zodiac Funds - Invesco US Senior Loan ESG Fund, and Invesco Zodiac Funds - Invesco US Senior Loan Fund

(collectively, the "Invesco Funds") participated in the Unlawful Exchange Transaction. Invesco BL Fund, Ltd. is a Cayman Islands exempted company with its principal place of business in Luxembourg City, Luxembourg. Invesco Dynamic Credit Opportunities Fund is a Delaware fund with its principal place of business in Atlanta, GA. Invesco Floating Rate Income Fund is a Canadian fund with its principal place of business in Toronto, Canada. Invesco Oppenheimer Master Loan Fund, Invesco Floating Rate Fund, Invesco Oppenheimer Senior Floating Rate Fund, Invesco Oppenheimer Senior Floating Rate Plus Fund, and Invesco Senior Income Trust are Delaware funds with their principal place of business in Atlanta, GA. Invesco Senior Loan Fund is a Delaware statutory trust with its principal place of business in Atlanta, GA. Invesco Gemini US Loan Fund LLC and Invesco SSL Fund LLC are Delaware limited liability companies with their principal place of business in Atlanta, GA. Invesco Zodiac Funds - Invesco US Senior Loan ESG Fund and Invesco Zodiac Funds - Invesco US Senior Loan Fund are Luxembourg funds with their principal place of business in Luxembourg City, Luxembourg.

197.    Third-party defendant Kaiser Permanente Group Trust participated in the Unlawful Exchange Transaction. Kaiser Permanente Group Trust is a California corporate pension with its principal place of business in Oakland, CA.

198.    Third-party defendant Kapitalforeningen Investin Pro, US Leveraged Loans I participated in the Unlawful Exchange Transaction. Kapitalforeningen Investin Pro, US Leveraged Loans I is a Denmark fund with its principal place of business in Copenhagen, Denmark.

199.    Third-party defendant Milos CLO, Ltd. participated in the Unlawful Exchange Transaction. Milos CLO, Ltd. is a Cayman Islands limited company with its principal place of business in New York, NY.

3718365.1

200.    Third-party defendant Recette CLO, Ltd. participated in the Unlawful Exchange Transaction.  Recette CLO, Ltd. is a Cayman Islands limited company with its principal place of business in Atlanta, GA.

201.    Third-party defendant Riserva CLO, Ltd. participated in the Unlawful Exchange Transaction.  Riserva CLO, Ltd. is a Cayman Islands exempted company with its principal place of business in New York, NY.

202.    Third-party defendant Sentry Insurance Company participated in the Unlawful Exchange Transaction.  Sentry Insurance Company is a Wisconsin mutual holding company with its principal place of business in Stevens Point, WI.

203.    Third-party defendant Upland CLO, Ltd. participated in the Unlawful Exchange Transaction.  Upland CLO, Ltd. is a Cayman Islands limited company with its principal place of business in Atlanta, GA.

204.    Third-party defendant HarbourView CLO VII-R, Ltd. participated in the Unlawful Exchange Transaction.  HarbourView CLO VII-R, Ltd. is Delaware limited liability company with its principal place of business in New York, NY.

205.    Third-party defendant Invesco Oppenheimer Fundamental Alternatives Fund participated in the Unlawful Exchange Transaction.  Invesco Oppenheimer Fundamental Alternatives Fund is a Delaware statutory trust with its principal place of business in Atlanta, GA.

206.    Third-party defendant Oaktree Opportunities Fund Xb Holdings (Delaware), LP participated in the Unlawful Exchange Transaction.  Oaktree Opportunities Fund Xb Holdings (Delaware), LP is a Delaware limited partnership with its principal place of business in Los Angeles, CA.

207.    Third-party defendant Oaktree Opps X Holdco Ltd. participated in the Unlawful Exchange Transaction.  Oaktree Opps X Holdco Ltd. is a Cayman Islands exempted company with its principal place of business in Los Angeles, CA.

208.    Third-party defendant Oaktree Opportunities Fund X Holdings (Delaware) LP participated in the Unlawful Exchange Transaction.  Oaktree Opportunities Fund X Holdings (Delaware) LP is a Delaware limited partnership with its principal place of business in Los Angeles, CA.

209.    Third-party defendants Dryden XXV Senior Loan Fund, Dryden XXVI Senior Loan Fund, Dryden XXVIII Senior Loan Fund, Dryden 30 Senior Loan Fund, Dryden 33 Senior Loan Fund, Dryden 36 Senior Loan Fund, Dryden 37 Senior Loan Fund, Dryden 38 Senior Loan Fund, Dryden 40 Senior Loan Fund, Dryden 41 Senior Loan Fund, Dryden 42 Senior Loan Fund, Dryden 43 Senior Loan Fund, Dryden 45 Senior Loan Fund, Dryden 47 Senior Loan Fund, Dryden 49 Senior Loan Fund, Dryden 50 Senior Loan Fund, Dryden 54 Senior Loan Fund, Dryden 53 CLO, Ltd., Dryden 55 CLO, Ltd., Dryden 57 CLO, Ltd., Dryden 58 CLO, Ltd., Dryden 60 CLO, Ltd., Dryden 61 CLO, Ltd., Dryden 64 CLO, Ltd., Dryden 65 CLO, Ltd., Dryden 70 CLO, Ltd., Dryden 75 CLO, Ltd., Newark BSL CLO 1, Ltd., and Newark BSL CLO 2, Ltd. (collectively, the "PGIM Funds") participated in the Unlawful Exchange Transaction.  The PGIM Funds are Cayman Islands exempted companies with their principal place of business in Newark, NJ.

210.    Third-party defendants Venture XXV CLO, Limited, Venture 31 CLO, Limited, Venture 32 CLO, Limited, Venture 33 CLO, Limited, Venture 35 CLO, Limited, Venture XVII CLO Limited, Venture XXII CLO, Limited, Venture XXIX CLO, Limited, Venture XXVII CLO, Limited, Venture 28A CLO, Limited, Venture XII CLO, Limited, Venture

XIII CLO, Limited, Venture XIV CLO, Limited, Venture XIX CLO, Limited, Venture XV CLO, Limited, Venture XVI CLO, Limited, Venture XVIII CLO, Limited, Venture XX CLO, Limited, Venture XXI CLO, Limited, Venture XXIII CLO, Limited, Venture XXIV CLO, Limited, Venture XXVIII CLO, Limited, and Venture XXX CLO, Limited (collectively, the "Venture CLOs") participated in the Unlawful Exchange Transaction.  The Venture CLOs are Cayman Islands exempted companies with their principal place of business in New York, NY.

211.    Third-party defendant BSG Fund Management B.V. participated in the Unlawful Exchange Transaction.  BSG Fund Management B.V. is a Netherlands limited liability company with its principal place of business in the Netherlands.

212.    Third-party defendant Fixed Income Opportunities Nero, LLC participated in the Unlawful Exchange Transaction.  Fixed Income Opportunities Nero, LLC is a New York limited liability company with its principal place of business in New York, NY.

213.    Third-party defendants BlackRock Limited Duration Income Trust, BlackRock Global Investment Series: Income Strategies Portfolio, BlackRock Credit Strategies Income Fund of BlackRock Funds V, BlackRock Senior Floating Rate Portfolio, BlackRock Floating Rate Income Strategies Fund, Inc., BlackRock Multi-Asset Income Portfolio of BlackRock Funds II, BlackRock Debt Strategies Fund, Inc., BlackRock Floating Rate Income Trust, JPMBI re BlackRock BankLoan Fund, and BlackRock Floating Rate Income Portfolio of BlackRock Funds V participated in the Unlawful Exchange Transaction.  BlackRock Limited Duration Income Trust, BlackRock Credit Strategies Income Fund of BlackRock Funds V, and BlackRock Floating Rate Income Trust are Delaware statutory trusts with their principal place of business in Wilmington, DE.  BlackRock Floating Rate Income Strategies Fund, Inc. is a Maryland corporation with its principal place of business in Lutherville-Timonium, MD.

BlackRock Global Investment Series: Income Strategies Portfolio is a Luxembourg investment company with variable capital with its principal place of business in Luxembourg City, Luxembourg.  BlackRock BankLoan Fund is an Ireland fund with its principal place of business in Dublin, Ireland.  BlackRock Senior Floating Rate Portfolio is a Cayman Islands limited company with its principal place of business in New York, NY.  BlackRock Debt Strategies Fund, Inc. is a Maryland corporation with its principal place of business in New York, NY. BlackRock Floating Rate Income Portfolio of BlackRock Funds V and BlackRock Multi-Asset Income Portfolio of BlackRock Funds II are Massachusetts business trusts with their principal place of business in Wilmington, DE.

214.    Third-party defendant ABR Reinsurance Ltd. participated in the Unlawful Exchange Transaction.  ABR Reinsurance Ltd. is a Bermuda exempted company with its principal place of business in Hamilton, Bermuda.

215.    Third-party defendant NC Garnet Fund, LP participated in the Unlawful Exchange Transaction.  NC Garnet Fund, LP is a Delaware limited partnership with its principal place of business in New York, NY.

216.    Third-party defendants Magnetite XC, Limited, Magnetite XV, Limited, Magnetite XIV-R, Limited, Magnetite XVI, Limited, Magnetite VIII, Limited, Magnetite XVIII, Limited, Magnetite XIX, Limited, Magnetite XX, Limited, Magnetite XVII, Limited, Magnetite VII, Limited, and Magnetite XII, Limited (the "Magnetite Entities") participated in the Unlawful Exchange Transaction.  The Magnetite Entities are Cayman Islands limited companies with their principal place of business in New York, NY.

217.    Third-party defendants Nuveen Diversified Dividend and Income Fund, Nuveen Floating Rate Income Fund, Nuveen Floating Rate Income Opportunity Fund, Nuveen

Senior Income Fund, Nuveen Short Duration Credit Opportunities Fund, and Nuveen Symphony Floating Rate Income Fund (collectively, the "Nuveen Funds") participated in the Unlawful Exchange Transaction.  The Nuveen Funds are Massachusetts business trusts with their principal place of business in Chicago, IL.

218.    Third-party defendant Principal Funds, Inc - Diversified Real Asset Fund participated in the Unlawful Exchange Transaction.  Principal Funds, Inc - Diversified Real Asset Fund is a Maryland corporation with its principal place of business in Des Moines, IA.

219.    Third-party defendants Symphony CLO XX Ltd., Symphony CLO XVII, Ltd., Symphony CLO XIX Ltd., Symphony CLO XVII, Ltd., Symphony CLO XV, Ltd., Symphony CLO XIV, Ltd., Symphony CLO XVI, Ltd., TCI-Symphony 2017-1 Ltd., TCI-Symphony 2016-1 Ltd. (collectively, the "Symphony CLOs"), Symphony Floating Rate Senior Loan Fund, and SCOF-2 Ltd. participated in the Unlawful Exchange Transaction.  The Symphony CLOs and SCOF-2 Ltd. are Cayman Islands exempted companies with their principal place of business in San Francisco, CA.  Symphony Floating Rate Senior Loan Fund is a Canadian closed-end investment fund with its principal place of business in Toronto, Canada.

220.    Third-party defendants BayCity Alternative Investment Funds SICAV-SIF - BayCity US Senior Loan Fund and BayCity Senior Loan Master Fund Ltd. participated in the Unlawful Exchange Transaction.  BayCity Alternative Investment Funds SICAV-SIF - BayCity US Senior Loan Fund is a Luxembourg investment company with variable capital and BayCity Senior Loan Master Fund Ltd. is a Cayman Islands exempted company with their principal place of business in San Francisco, CA.

221.    Third-party defendant Pensiondanmark Pensionforsikringsaktieselskab participated in the Unlawful Exchange Transaction.  Pensiondanmark

Pensionforsikringsaktieselskab is a Denmark limited company with its principal place of business in Copenhagen, Denmark.

222.    Third-party defendant Menard, Inc. participated in the Unlawful Exchange Transaction.  Menard, Inc. is a Wisconsin business corporation with its principal place of business in Eau Claire, WI.

223.    Third-party defendant Municipal Employees Annuity & Benefit Fund of Chicago participated in the Unlawful Exchange Transaction.  Municipal Employees Annuity & Benefit Fund of Chicago is an Illinois fund with its principal place of business in Chicago, IL.

224.    Third-party defendant Principal Diversified Real Asset CIT participated in the Unlawful Exchange Transaction.  Principal Diversified Real Asset CIT is an Oregon trust with its principal place of business in Des Moines, IA.

225.    Third-party defendants California Street CLO IX Limited Partnership and California Street CLO XII, Ltd. participated in the Unlawful Exchange Transaction.  California Street CLO IX Limited Partnership is a Cayman Islands limited partnership and California Street CLO XII, Ltd is a Cayman Islands exempted company with their principal place of business in San Francisco, CA.

226.    Third-party defendant TAO Fund, LLC participated in the Unlawful Exchange Transaction.  TAO Fund, LLC is a Delaware limited liability company with its principal place of business in Fort Worth, TX.

227.    Third-party defendants MP CLO III Ltd., MP CLO IV Ltd., MP CLO VII Ltd., MP CLO VIII Ltd., Marble Point CLO X Ltd., Marble Point CLO XI Ltd., Marble Point CLO XII Ltd., (collectively, the "Marble Point CLOs"), MPLF Funding Ltd., and MPSFR Financing 1 Ltd. participated in the Unlawful Exchange Transaction.  The Marble Point CLOs

are Cayman Islands exempted companies with their principal place of business in Greenwich, CT.  MPLF Funding Ltd., and MPSFR Financing 1 Ltd. are Guernsey companies with their principal place of business in Greenwich, CT.

228.    Third-party defendants Marathon CLO V Ltd., Marathon CLO VII Ltd., Marathon CLO VIII Ltd., Marathon CLO IX Ltd., Marathon CLO X Ltd., and Marathon CLO XI Ltd. (collectively, the "Marathon CLOs") participated in the Unlawful Exchange Transaction. The Marathon CLOs are Cayman Islands exempted companies with their principal place of business in New York, NY.

229.    Third-party defendant Bowery Funding ULC participated in the Unlawful Exchange Transaction.  Bowery Funding ULC is a Canadian company with its principal place of business in Toronto, Canada.

230.    Third-party defendant Woodbine Funding ULC participated in the Unlawful Exchange Transaction.  Woodbine Funding ULC is a Canadian company with its principal place of business in Toronto, Canada.

231.    Third-party defendants Elevation CLO 2013-1, Ltd., Elevation CLO 2014-2, Ltd., Elevation CLO 2015-4, Ltd., Elevation CLO 2016-5, Ltd., Elevation CLO 2017-6, Ltd., Elevation CLO 2017-7, Ltd., Elevation CLO 2017-8 Ltd., Elevation CLO 2018-9, Ltd., Elevation CLO 2018-10, Ltd., and Peaks CLO 3, Ltd. (collectively, the "ArrowMark CLOs") participated in the Unlawful Exchange Transaction.  The ArrowMark CLOs are Cayman Islands exempted companies with their principal place of business in Denver, CO.

## JURISDICTION AND VENUE

232.     This Court has jurisdiction to consider the Counterclaims and Third-Party Claims under 28 U.S.C. § 1334.

233.     The Excluded Lenders submit that venue is <u>not</u> proper in this District, and that this action should be transferred to the United States District Court for the Southern District of New York, where a prior action concerning the same transaction and the same issues already is pending, because the parties agreed to exclusive jurisdiction in the federal or state courts in the Borough of Manhattan in New York City, without waiver of or prejudice to that position.

234.     This is a non-core proceeding under 28 U.S.C. § 157.

235.     Pursuant to Bankruptcy Rule 7008, the Excluded Lenders do not consent to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

236.     Serta is North America's largest bedding manufacturer.  Based in Atlanta, Serta owns and manages the Serta® and Beautyrest® mattress brands.  Serta today is the successor to two well-known American brands, Serta and Simmons, which were combined in 2010 when an investor group that already owned the parent of Serta purchased Simmons, as Simmons emerged from a Chapter 11 reorganization.  The company's various brands, which also include the online retailer Tuft & Needle®, are distributed through national, hospitality, and regional and independent retail channels throughout North America, as well as directly to consumers.

3718365.1

***The Credit Agreement Requires*** **Pro Rata** ***Payments to First Lien Lenders,***
***Which May Be Circumvented Only with the Consent of All Affected Lenders***

237.    Serta entered into three credit facilities dated as of November 8, 2016, each of which was executed by Serta and various affiliates and counterparties.  The executed agreements include: (1) the Credit Agreement, which provided for $1.95 billion in First Lien Term Loans; (2) the Second Lien Credit Agreement, which provided for $450 million in Second Lien Term Loans; and (3) a $225 million asset-based revolving credit facility.  The proceeds of these facilities were used, in part, to pay a dividend to Serta's private equity sponsor.

238.    The Credit Agreement includes a waterfall providing for the allocation of collateral proceeds upon an event of default, which includes a bankruptcy, or if the loans are accelerated.  From a lender's perspective, this is among the most critical sections of the Credit Agreement.  Section 2.18(b) of the Credit Agreement, which contains the payment waterfall, provides that after certain expenses are paid, the proceeds of collateral are to be divided *pro rata* among the First Lien Lenders, based on the face amount of their ownership of loans.  This means that all First Lien Lenders share ratably in the available value based on the percentage of the loans that they own.

239.    In addition, all payments of principal and interest must be allocated to First Lien Lenders on a *pro rata* basis, and any First Lien Lender that receives more than its *pro rata* share must pay the excess ratably to the other First Lien Lenders, which is known as "*pro rata* sharing."  Specifically, Section 2.18(c) provides (with emphasis added):

> If any Lender obtains payment . . . in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with Loans of such Class, **then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans of other Lenders of such Class at**

**such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such Class ratably** in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class . . . .

240.    The Credit Agreement's amendment provisions, to which all lenders agreed when they acquired the loans, underscore the centrality of the proceeds waterfall in Section 2.18(b) and the *pro rata* sharing provision in Section 2.18(c).  Most provisions in the Credit Agreement may be amended by "Required Lenders," defined as lenders representing more than 50% of the outstanding face amount of the loans.  However, a handful of provisions in the Credit Agreement, often called "sacred rights," may be amended only by securing "the consent of each Lender directly and adversely affected thereby."  Section 9.02(b)(A).  This unanimity requirement is reserved for the waiver or amendment of the most important provisions of the agreement, including changes to the interest rate, the maturity date, and other provisions that are core to protecting a lender's right to be repaid on the terms upon which it made the original loans.  The proceeds waterfall and *pro rata* distribution and sharing set forth in Sections 2.18(b) and (c) are among the Credit Agreement's sacred rights, whose amendment requires consent of "each Lender directly and adversely affected thereby"—that is, all of the First Lien Lenders.

241.    Specifically, Section 9.02(b)(A)(6) provides that each affected lender must approve any agreement that "waives, amends or modifies Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the *pro rata* sharing of payments required thereby (except in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c), and/or 9.05(g) or as otherwise provided in this section 9.02)."  As such, absent these four enumerated exceptions (which as demonstrated below, do not permit this type of transaction), the proceeds waterfall and *pro rata* sharing of proceeds may not be modified absent consent of *all* adversely affected Lenders.

3718365.1

242.     The Credit Agreement buttresses the inviolability of the sacred rights provisions, including the proceeds waterfall and *pro rata* sharing requirement, by also protecting the amendment provisions themselves.  Thus, the Credit Agreement states that no agreement by the Required Lenders (meaning a mere majority of the First Lien Lenders) may "change any of the provisions of Section 9.02(a) or Section 9.02(b) or the definition of 'Required Lenders' to reduce any voting percentage required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, *without the prior written consent of each Lender*."  Section 9.02(b)(B)(1) (emphasis added).  In other words, to prevent an end-run around the sacred rights provisions, any amendment of the provisions for amending the sacred rights— including the proceeds waterfall and *pro rata* sharing provisions—also requires the consent of *all* First Lien Lenders.

243.     Section 9.02 also protects the First Lien Lenders by providing that, without the prior written consent of each of them, no agreement shall "release all or substantially all of the Collateral from the Lien granted pursuant to the Loan Documents (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Article 8 or Section 9.22 hereof)" or  "release all or substantially all of the value of the Guarantees under the Loan Guaranty (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Section 9.22 hereof)."  Section 9.02(b)(B)(3).  These provisions protect the First Lien Lenders' collateral from being stripped of its value, which backstops both the loans and the First Lien Term Loan Guaranty Agreement.

***Serta Negotiates the Unlawful Exchange Transaction with the Favored Lenders***

244.     Even before the COVID-19 pandemic, Serta had been struggling financially for some time.  Indeed, in early March 2020, before the most serious effects of the

pandemic began to impact the economy, Serta's First Lien Term Loans were trading at less than fifty cents on the dollar, and its Second Lien Term Loans were trading at less than twenty cents. Its issuer credit rating by S&P was CC, deep into the territory of "junk."  Serta was regularly featured on its own page of the industry publication *Reorg Research*, which focuses on companies in distress.  Then came COVID-19, which exacerbated the Company's already difficult circumstances.

245.    In early 2020, Serta and certain of the Excluded Lenders began discussing providing additional loans and restructuring their First Lien Term Loans to reduce Serta's indebtedness and interest expense.  On or about April 30, 2020, those parties entered into non-disclosure agreements ("NDAs") with Serta in order to allow them to receive non-public information about the Company so that they could evaluate and negotiate a potential transaction. The NDAs, which expired on May 29, 2020, also restricted certain of the Excluded Lenders from open-market trading in Serta loans.

246.    Serta and certain of the Excluded Lenders discussed a transaction whereby those Excluded Lenders would lend against certain of Serta's non-collateral assets, which transaction would clearly be permitted by the terms of the Credit Agreement without requiring any amendment.  Neither Serta nor any of the Excluded Lenders proposed or discussed a transaction involving an amendment to the Credit Agreement that would have violated the sacred *pro rata* payment rights of the First Lien Term Loans or any other provision of the Credit Agreement.  On June 5, 2020, Serta abruptly ended the parties' negotiations.

247.    On the evening of June 8, 2020, Serta announced in a press release that it had entered into a transaction support agreement with a group of Favored Lenders—holders of a majority of its First Lien and Second Lien Term Loans.  The press release said that the

transaction was designed to "*recapitalize* the company" (emphasis added), and made no reference to "open market purchases."  The press release disclosed that Serta and the Favored Lenders were preparing documentation for a transaction that would create:

> (a)    $200 million of new money super-priority "first out" debt, funded by the Favored Lenders, which would rank ahead of the existing First Lien Term Loans;

> (b)    Up to $875 million of super-priority "second out" debt, issued in exchange for First Lien Term Loans and Second Lien Term Loans (defined below) held by the Favored Lenders, which also would rank ahead of the existing First Lien Term Loans; and

> (c)    An unspecified amount of capacity to incur still more super-priority debt, which would be "third out" and also would rank ahead of the existing First Lien Term Loans.

248.    The press release did not explain how Serta and the Favored Lenders planned to implement the Unlawful Exchange Transaction.  As the Excluded Lenders later learned, the Favored Lenders approved amendments to the Credit Agreement and Serta's Second Lien Term Loan Agreement (the "Second Lien Credit Agreement") that (i) authorized the Priority Term Loan Agreement, (ii) ratified the Unlawful Exchange Transaction, and (iii) instructed the administrative agent for the Credit Agreement to enter into a new intercreditor agreement providing for payment subordination of the First Lien Term Loans to the new Priority Term Loans.

249.    Among other things, the amendments approved by the Favored Lenders (but not by other First Lien Lenders, including the Excluded Lenders) modified the definition of

"Incremental Equivalent Debt" permissible under the Agreement to include "Indebtedness issued under the PTL [Priority Term Loan] Credit Agreement . . . which may be senior, *pari passu* or junior in right of payment and/or with respect to security with the Obligations hereunder[.]" Agreement § 1.01; *see also id*., § 6.01(z) (allowing Serta to incur Incremental Equivalent Debt). Notably, such amendments effectively allow *unlimited* additional debt to come in on a "super senior" basis to the First Lien Term Loans.  The amendments also altered Section 8.08 of the Agreement to authorize the Administrative Agent to enter into a separate intercreditor agreement establishing senior payment priority for the PTL Loans.  Agreement § 8.08(d).  Furthermore, the amendments added a new subpart to Section 2.11(b), which outlines the circumstances triggering mandatory prepayment of the First Lien Term Loans, and which affirmed that the PTL Loans had rights of payment senior to that of the First Lien Lenders.  Agreement § 2.11(b)(vii).  In addition, the amendments excised Credit Agreement Section 7.01(l), which designates any subordination of the First Lien Term Loans as an event of default.  Agreement § 7.01(l).

250.     Serta and the Favored Lenders also excluded the proceeds of the sale of "AI Dream," a joint venture between Serta and King Koil that is one of the "largest players in China's premium mattress market," from the definition of "Prepayment Asset Sale" (which feeds into the mandatory prepayment requirements of the Credit Agreement).  Agreement § 1.01. Accordingly, though Serta disposed of its stake in AI Dream in August 2021, it purportedly is no longer required to apply the substantial net cash proceeds received from that sale to satisfy the Excluded Lenders' First Lien Term Loans, a direct consequence of the Unlawful Exchange Transaction.

251.     In total, Serta and the Favored Lenders amended no fewer than two dozen provisions of the Credit Agreement to effect their unlawful scheme.

252.    As Serta and the Favored Lenders knew and intended, given the condition of Serta's business, this was tantamount to transforming the Excluded Lenders from First Lien Lenders into subordinated unsecured lenders, while allowing other lenders—including Second Lien Lenders—improperly to leapfrog into a new, purportedly "super-priority" position.  Under the new intercreditor agreement, the Priority Term Loan Lenders took over priority rights to repayment from Serta, including with respect to the collateral.  Adding insult to injury, in addition to their "super-senior" priority, the Priority Term Loans issued in exchange for the First Lien Term Loans of the Favored Lenders bear interest at a rate 4.00% per annum higher, or a margin that is more than 100% greater, than the First Lien Term Loans.

***Certain of the Excluded Lenders Initiate Litigation, and Serta Refuses to Provide Information About the Unlawful Exchange Transaction Prior to Closing***

253.    Certain of the Excluded Lenders filed a Complaint in New York state court on June 11, 2020, seeking to enjoin the proposed transaction, under the caption *North Star Debt Holdings, L.P.* v. *Serta Simmons Bedding, LLC*, Index No. 652243/2020.  The court entered an Order to Show Cause providing for a temporary restraining order on June 12, 2020, and held a preliminary injunction hearing on June 16, 2020.

254.    On June 19, 2020, the New York state court denied the motion for a preliminary injunction.  The court ruled that those Excluded Lenders had not shown a likelihood of success on their claims at that juncture based on the available information, and had not established irreparable harm because money damages were available.  Following the court's denial of the motion, the Excluded Lenders filed a motion to voluntarily dismiss the action without prejudice, which was granted in December 2020.

255.    The Unlawful Exchange Transaction closed on June 22, 2020.  Only after it closed did Serta provide the Excluded Lenders that had sued with certain of the transaction

3718365.1

documents, which demonstrated the mechanics of the transaction, including the new Priority

Term Loan Agreement, as well as the amendments to the existing Credit Agreement and the new

intercreditor agreement.

256.    Pursuant to these agreements, the Favored Lenders exchanged $992

million of First Lien Term Loans for $734 million of new Priority Term Loans (reflecting an

exchange rate of 74%) and $299 million of loans under the Second Lien Credit Agreement (the

"Second Lien Term Loans") for $116 million of new Priority Term Loans (reflecting an

exchange rate of 39%).  Upon an event of default, there now are at least $850 million in new

Priority Term Loans in line ahead of the First Lien Lenders asserting rights to collateral that is

supposed to be distributed *pro rata*.

257.    This does not even take into account the fact that Serta and the Favored

Lenders amended the Credit Agreement, to which the Favored Lenders no longer are parties, to

permit an unlimited amount of additional loans to jump ahead of the Excluded Lenders' loans.

Consequently, the Excluded Lenders, which had been first-lien and first-priority lenders, are now

unsecured lenders in Serta's bankruptcy, while other lenders—including current Second Lien

Lenders—have leapfrogged into a new super-priority position.

258.    Moreover, in a transparently punitive measure, as part of the Unlawful

Exchange Transaction, Serta added counterclaim/third-party plaintiffs Apollo, Angelo Gordon,

and Gamut to the DQ List not only for the amended Credit Agreement but also for the PTL

Credit Facility, barring them from acquiring any interests in those loans.

259.    Shortly after the New York state court's denial of the motion for a

preliminary injunction, investment funds managed by affiliates of LCM Asset Management LLC

("LCM") initiated an action challenging the Unlawful Exchange Transaction in the United States

District Court for the Southern District of New York.  After their initial complaint, which named as defendants both Serta and the Favored Lenders, was dismissed for lack of federal subject matter jurisdiction (due to an absence of complete diversity), LCM re-filed its case against Serta alone (the "LCM Action").  On March 29, 2022, United States District Judge Katherine Polk Failla, who was assigned to the LCM Action, denied Serta's motion to dismiss LCM's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  *See LCM XII Ltd.* v. *Serta Simmons Bedding, LLC*, 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022).

260.    On October 17, 2022, the New York state court that previously had denied the Excluded Lenders' motion for a preliminary injunction issued a decision in another case involving a similar credit agreement and transaction structure.  In that case, the court ruled that the term "open market purchase" was ambiguous and therefore denied the defendants' motions to dismiss claims alleging that a privately negotiated uptier exchange with a group of favored lenders did not qualify as an "open market purchase."  *See ICG Global Loan Fund I DAC v. Boardriders Inc.*, Index No. 655175/2020, 2022 WL 10085886, at *9 (Sup. Ct. N.Y. Cnty. Oct. 17, 2022).

261.    The court's decision prompted the Excluded Lenders to initiate a new action against Serta and the Favored Lenders, on November 3, 2022.  The Excluded Lenders asserted, *inter alia*, claims against Serta and the Favored Lenders seeking money damages for breach of contract with respect to the waterfall and *pro rata* sharing provisions of Section 2.18 of the Credit Agreement, breach of the implied covenant of good faith and fair dealing for depriving the Excluded Lenders of their right to receive the fruits of the Credit Agreement, and breach of contract with respect to the amendment procedures set forth in Sections 9.02(b)(B)(2) and (3) of the Credit Agreement.

262.     Serta and the Favored Lenders moved to dismiss the New York state complaint on January 9, 2023.  Three weeks later, on January 23, 2023, Serta filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas.  As a result of Serta's chapter 11 filing, the Excluded Lenders' claims against Serta were stayed pursuant to the automatic stay provisions of Section 362(a) of the Bankruptcy Code.  For the same reason, the LCM Action against Serta also was stayed.  *See LCM XII Ltd. v. Serta Simmons Bedding*, 21-cv-3987, Dkt 61.

263.     Following Serta's chapter 11 filing, the Excluded Lenders removed their claims for money damages against the Favored Lenders only to the Southern District of New York.  The case was assigned to Judge Failla as related to the LCM Action.  *See AG Centre Street Partnership, L.P. et al. v. Eaton Vance Management et al.,* 23-cv-0587 (S.D.N.Y.).  That case has been stayed temporarily by this Court until March 13, 2023.

***The Unlawful Exchange Transaction Does Not Satisfy the "Open Market Purchases"
Exception to the*** Pro Rata ***Sharing Requirement of the Credit Agreement***

264.     Serta and the Favored Lenders have argued that the Unlawful Exchange Transaction complied with the Credit Agreement because it was accomplished through "open market purchases," as purportedly permitted under Section 9.05(g).  This assertion makes a mockery of the notion of "open market purchases."

265.     The Credit Agreement, prior to the Unlawful Exchange Transaction, recognized that four types of amendments are permissible without unanimous consent, and expressly carved such amendments out of the limitations on amendments to the "sacred rights" provisions:

(a)     Section 2.22 provides for the **issuance of incremental additional loans** and Section 2.23 provides for the **extension of the maturity of existing loans**.  Both

sections, however, provide that the incremental or extended loans (as the case may be) must be either *pari passu* with—*i.e.*, have no greater right to receive the collateral proceeds—or junior to the existing loans.  Section 2.23 also requires that any extended loan be offered to each of the First Lien Lenders on the same terms, and be made available on a *pro rata* basis.

(b)      Section 9.02(c) permits **refinancing or replacement of existing loans**.  Like Sections 2.22 and 2.23, this provision, too, requires that any replacement loans be *pari passu* with or junior to existing loans.

(c)      Finally, Section 9.05(g) allows a First Lien Lender to assign its loans on a non-*pro rata* basis in certain limited circumstances through either a **Dutch Auction or an open market purchase**.

266.      In the litigation that has occurred to date, Serta and the Favored Lenders have not purported to justify the Unlawful Exchange Transaction under any of the first three provisions, and have asserted only that the transaction constitutes "open market purchases" which would be permitted under Section 9.05(g).

267.      The Unlawful Exchange Transaction, however, does not remotely resemble an open market purchase.  Rather, Serta dealt directly and in private with a bare majority of its existing first and second lien lenders (excluding the remainder) who participated in an exchange that required the execution of voluminous documentation—including (1) a new Priority Term Loan Agreement, which is over 400 pages long; (2) amendments to the Credit Agreement and Second Lien Term Loan Agreement, each of which is over 200 pages long; and (3) a new intercreditor agreement with the agent for the Priority Term Loan Agreement that subordinated other lenders holding *pari passu* loans.

268.     To interpret the Unlawful Exchange Transaction as an open market purchase would allow nearly *any* transaction to be considered an open market purchase, capable of circumventing the stringent *pro rata* payment requirements and the associated "sacred rights" protections.  Indeed, in Serta's own words, the Unlawful Exchange Transaction constituted a "*recapitaliz[ation]* of the company."  Permitting a wholesale recapitalization of the company (with participation only open to a majority of the Lenders, and excluding the remainder) to qualify as a purported open market purchase would allow the limited exception to swallow the rule entirely.

269.     Serta and the Favored Lenders cannot point to a *single* comparable precedent transaction that has qualified as an "open market purchase."  In the litigation that has occurred to date, Serta and the Favored Lenders have cited a handful of transactions as purportedly adopting their contorted view of "open market purchases," but such transactions involved *solely new money* loans.  The Excluded Lenders do not dispute that the new money aspect of the Unlawful Exchange Transaction was permitted, since new money loans could be given priority without a unanimous vote.  The non-*pro rata* payment of the Favored Lenders' First Lien Term Loans using new Priority Term Loans violated the Credit Agreement's requirement that all First Lien Term Loans share ratably in payments.  None of the so-called precedent transactions cited by Serta and the Favored Lenders included an exchange of existing loans on a non-*pro rata* basis.

270.     Notably, in denying Serta's motion to dismiss the LCM Action, Judge Failla rejected the company's view that, on its face, the Unlawful Exchange Transaction involved an "open market purchase" that would be an exception to the *pro rata* sharing requirement.  She held that "at a minimum," the term "open market purchase" is "ambiguous in

this context." *LCM*, 2022 WL 953109, at *7.  Judge Failla went on to conclude that "[o]n a plain

reading of the term, the [Unlawful Exchange] Transaction depicted in the Complaint did not take

place in what is conventionally understood as an 'open market.'" *Id.* at *8.  For this reason,

among others, she denied Serta's motion to dismiss LCM's claims challenging the non-*pro rata*

treatment of First Lien Lenders other than the Favored Lenders.  *Id.*

### The Unlawful Exchange Transaction Violates the Payment Waterfall and Pro Rata Sharing Provision

271.    Beyond the fact that the Unlawful Exchange Transaction was not a

permitted open market purchase, the Credit Agreement does not permit an amendment that

would prioritize repayment of the First Lien Term Loans held by some lenders over those of

others.  However, by authorizing a new Priority Intercreditor Agreement that granted the

Favored Lenders "super-priority" status with respect to loans issued in exchange for their First

Lien Term Loans, the Favored Lenders used their position as majority lenders to illegally usurp

the sacred rights held by *each* lender.

272.    It is fundamental that a party may not lawfully do indirectly that which is

unlawful to be done directly under a contract.  Section 2.18(b) of the Credit Agreement, which

contains the payment waterfall, provides that after certain expenses are paid, the proceeds of

collateral are to be divided *pro rata* among the First Lien Lenders, based on the face amount of

their loans and other obligations.  This means that all First Lien Lenders share ratably in the

available value based on the percentage of the loans that they own, and no First Lien Lender (or

group of such lenders) has a superior right to the collateral over any other(s).  Thus, Section

2.18(b) provides:

> Subject in all respects to the provisions of each applicable Intercreditor
> Agreement, all proceeds of Collateral received by the Administrative
> Agent while an Event of Default exists and all or any portion of the Loans

have been accelerated hereunder pursuant to Section 7.01, shall be applied, first, to the payment of all costs and expenses then due incurred by the Administrative Agent in connection with any collection, sale or realization on Collateral or otherwise in connection with this Agreement, any other Loan Document or any of the Secured Obligations, including all court costs and the fees and expenses of agents and legal counsel, the repayment of all advances made by the Administrative Agent hereunder or under any other Loan Document on behalf of any Loan Party and any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document, second, on a pro rata basis, to pay any fees, indemnities or expense reimbursements then due to the Administrative Agent (other than those covered in clause first above) from the Top Borrower constituting Secured Obligations, ***third, on a pro rata basis in accordance with the amounts of the Secured Obligations (other than contingent indemnification obligations for which no claim has yet been made) owed to the Secured Parties on the date of any such distribution, to the payment in full of the Secured Obligations***, fourth, as provided in each applicable Intercreditor Agreement, and fifth, to, or at the direction of, the Top Borrower or as a court of competent jurisdiction may otherwise direct.  (emphasis added)

273.    As with the *pro rata* sharing provision, Section 2.18(b) of the Credit Agreement is treated as a "sacred" right, and may not be amended absent the consent of all adversely affected First Lien Lenders.

274.    To carry out the Unlawful Exchange Transaction, however, the Favored Lenders, by a mere majority vote, amended the Credit Agreement to permit Priority Term Loans pursuant to a new Priority Intercreditor Agreement that was never before contemplated.  This agreement threw out the Credit Agreement's *pro rata* distribution requirement and replaced it with a new, multi-tier "waterfall" in which, in the event of a default, more than $850 million would be paid to holders of the Priority Term Loans issued in exchange for First Lien Term Loans before a single penny is paid to the Excluded Lenders and the other First Lien Lenders on account of the same First Lien Term Loans.

275.    While Serta has protested that the payment waterfall found in Section 2.18 was not formally amended by elevating the First Lien Term Loans of the Favored Lenders ahead

of all others through a new "super-priority" term loan, as a practical matter, the Unlawful Exchange Transaction has effected just such an amendment and, in so doing, radically reordered the waterfall.  It is axiomatic that contracts entered into at the same time, in the context of the same transaction, should be read together as one instrument, and here, these contract amendments, read together, entirely vitiate the Excluded Lenders' sacred rights to *pro rata* treatment.

276.     Serta neither obtained nor even sought the requisite consent of any First Lien Lenders other than the Favored Lenders, who all are beneficiaries of the new super-priority status in the new waterfall.  Serta and the Favored Lenders thus clearly have done indirectly what they were not permitted to do directly under the Credit Agreement—namely, provide for the payment of the First Lien Term Loans previously held by the Favored Lenders ahead of all other First Lien Lenders.

277.     The Favored Lenders also violated the *pro rata* sharing provision by failing to share *pro rata* with the Excluded Lenders the benefits they received through the Unlawful Exchange Transaction, as required by Section 2.18(c) of the Credit Agreement.

***The Unlawful Exchange Transaction Violates the Credit
Agreement by Stripping the Excluded Lenders' Loans of Their Collateral and Value***

278.   The Unlawful Exchange Transaction also violates the Credit Agreement because it improperly strips the Excluded Lenders' loans of their collateral and value.  Sections 9.02(b)(B)(2) and (3) of the Credit Agreement provide that no amendment to the Credit Agreement shall "release all or substantially all of the Collateral from the Lien granted pursuant to the Loan Documents," or "release all or substantially all of *the value of* the Guarantees, without the prior written consent of each" First Lien Lender.

279.   By placing over $1 billion in Priority Term Loans ahead of the guarantees of the First Lien Term Loans, the Unlawful Exchange Transaction released all or substantially all of the collateral and of *the value of* the guarantees that protected the First Lien Lenders.  The notion that Serta – a bankrupt company – can make good on the $1 billion in Priority Term Loans and also settle its debts to the Excluded Lenders is fanciful.  Thus, the collateral and guarantees of the First Lien Term Loans no longer have any value.  Because Serta and the Favored Lenders did not obtain—or even request—the Excluded Lenders' consent before releasing the value of such guarantees, they violated Sections 9.02(b)(B)(2) and (3) of the Credit Agreement.

***Serta Improperly Interfered with Apollo's Purchase of First Lien Term Loans***

280.   The Unlawful Exchange Transaction also came on the heels of Serta's improper interference with Apollo's legitimate purchases of First Lien Term Loans beginning in March 2020.  As set forth in more detail below, Serta improperly and unjustifiably blocked the assignment of loans to Apollo in further support of its strategy to deprive the Excluded Lenders of their lawful entitlements under the Credit Agreement.

281.     Section 9.05 of the Credit Agreement grants each of the First Lien Lenders the right to transfer its rights and obligations under the Credit Agreement to "Eligible Assignees," broadly defined to include any fund that invests in loans, such as Apollo.

282.     Such a transfer could occur either as an assignment, whereby a purchaser becomes a First Lien Lender of record and is entitled to full rights under the Credit Agreement (including voting and economic rights), or as a participation, whereby a purchaser does not become a First Lien Lender of record but acquires economic rights and limited voting rights indirectly through an existing First Lien Lender, which remains the First Lien Lender of record.

283.     The Credit Agreement restricted a First Lien Lender's ability to transfer its rights and obligations to a specified list of Disqualified Institutions.  Disqualified Institutions included entities named as such in writing by Serta prior to closing and placed on a so-called "DQ List."

284.     The DQ List is largely fixed as of the closing date.  An entity may be added to the DQ List only in limited instances, including where it is an affiliate of an entity already on the DQ List, a competitor of Serta, or an affiliate of a competitor of Serta.  Upon request, Serta must provide the DQ List to a Lender, who may share it with a proposed assignee.

285.     When an interest in loans under the Credit Agreement is assigned, the process begins with the execution of a trade confirmation between the assignor and the assignee. The parties then execute an assignment agreement and deliver a copy to UBS, as administrative agent.  UBS then seeks Serta's consent to the assignment, which, as is common, may not be unreasonably withheld, conditioned, or delayed.  Serta is deemed to have consented to an assignment if it does not object in writing within 15 business days.  The only valid ground for

3718365.1

refusing to consent to an assignment is that it violates the Credit Agreement—for example, because the proposed assignee is on the DQ List.

286.     Once in receipt of an executed assignment agreement and Serta's consent, among other things, UBS then must promptly accept the assignment agreement and record the assignment in its register of Lenders and their assignees.  The assignment then becomes effective.

287.     Apollo originally purchased First Lien Term Loans under the Credit Agreement at the time the Credit Agreement closed in 2016.  Apollo continued to hold those loans until May 23, 2018.

288.     On October 18, 2016, Apollo was removed from the DQ List.  Between 2016 and 2018, Apollo bought and sold millions of dollars of Serta First Lien Term Loans.

289.     On March 12, 2020, Apollo executed trade confirmations with Barclays Bank PLC ("Barclays") to purchase additional First Lien Term Loans.  Although Apollo had previously owned First Lien Term Loans under the Credit Agreement, it nevertheless sought the necessary confirmation from UBS that Apollo was not on the DQ List.  UBS twice confirmed that it was not—once orally on March 13, 2020, and again in writing on March 17, 2020. Notably, Apollo is not an affiliate of any entity already on the DQ List, nor is it a competitor or an affiliate of a competitor of Serta.

290.     On March 20, 2020, Apollo submitted executed assignment agreements with Barclays to UBS, which promptly requested Serta's consent.  Serta did not object by April 14, and pursuant to the Credit Agreement consent was deemed effective as of that date.

291.     Yet the trade did not settle.  Apollo and its counterparties repeatedly contacted UBS to inquire why the trades were not settling, despite the satisfaction of all

requirements for an assignment under the Credit Agreement.  UBS told Apollo that it had followed up with Serta on several occasions, but received no response as to when Serta would indicate its position on the assignments.  UBS also confirmed to Apollo several times in mid-April that it was not on the DQ List.

292.    On April 24, 2020, Serta represented to UBS that the reason for its delay in providing borrower's consent was difficulty in obtaining the necessary signatures due to the effects of the COVID-19 pandemic.  Serta further represented to UBS that it would approve the transactions, and UBS relayed that representation to Apollo.

293.    A few days later, UBS executed the assignment agreements.  The same day, however, UBS retracted its executions as having occurred "in error."  UBS provided no further explanation.

294.    On April 30, 2020, as set forth above, Apollo agreed to an NDA and one-month restriction period to explore providing new money and liability management solutions to Serta.  Serta acknowledged Apollo's loan holdings by countersigning the NDA, which referenced Apollo's $192 million position, which included the assignments submitted to UBS on March 20, 2020.

295.    On May 1, 2020, Serta dropped the pretext that its delays were due to COVID-19 and purported to *reject* Apollo's assignments, saying Serta would consent to the assignments *only if* Apollo made a new money investment in Serta.

296.    Serta lacks any lawful reason to withhold its consent to the Apollo assignment or otherwise refuse to recognize it as valid.  Moreover, consent was effectively given as of April 14, 2020; UBS had confirmed that Apollo was not on the DQ List; and Serta had

3718365.1

confirmed just days before that it would approve the trades, without timely raising any basis for objecting to the trades (and there is none).

297.    Later in May 2020, Barclays, as an existing Lender seeking to assign its interests to Apollo, asked for a copy of the DQ List.  UBS declined to provide the list to either Apollo or Barclays—an existing lender with a contractual right to review its contents.

298.    Indeed, UBS acknowledged that it was obligated to provide Barclays with the DQ List, but that Serta did not agree with its contents and UBS was "working on it" with them.  Serta plainly was attempting to manufacture a reason to withhold consent to the Apollo assignments when none existed.

299.    As a result of Serta's interference with its assignments, Apollo has been unable to settle approximately $192 million in face amount of purchases of Serta loans.  Given the Unlawful Exchange Transaction, Apollo will be unable to exit its positions without significant losses, caused by Serta's willful misconduct.

## **CLAIMS FOR RELIEF**

### **FIRST CAUSE OF ACTION[27]**
**(Declaratory Judgment That the Unlawful Exchange Transaction
and All Agreements Purporting to Implement It Are Invalid –
By the Excluded Lenders Against Serta)**

300.    The Excluded Lenders reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

301.    The Excluded Lenders and Serta are parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

---

[27] To the extent the First Cause of Action is based on claims or defenses that were expressly or implicitly rejected by the Court in its March 28, 2023 decision and April 6, 2023 Order, such claims and defenses are reasserted here for purposes of appeal only.

302.     This Court is authorized to issue a declaratory judgment as to the rights and other legal relations of the Excluded Lenders and Serta pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

303.     The proper interpretation and application of the Credit Agreement, including whether the Unlawful Exchange Transaction and the agreements purporting to implement it are permissible and valid, is a justiciable, present, and actual controversy among the parties.

304.     The Unlawful Exchange Transaction and the agreements purporting to implement it violate the express terms of the Credit Agreement as well as the implied covenant of good faith and fair dealing and are therefore invalid and *void ab initio*, or in the alternative are voidable and should be rescinded (or the Excluded Lenders should be awarded rescissionary damages).  The Excluded Lenders retain the rights they had prior to the Unlawful Exchange Transaction, and they are entitled to a declaratory judgment to that effect.

## SECOND CAUSE OF ACTION[28]
### (Breach of Contract, Section 2.18 –
### By the Excluded Lenders Against Serta)

305.     The Excluded Lenders reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

306.     The Excluded Lenders and Serta are parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

---

[28] To the extent the Second Cause of Action is based on claims or defenses that were expressly or implicitly rejected by the Court in its March 28, 2023 decision and April 6, 2023 Order, such claims and defenses are reasserted here for purposes of appeal only.

3718365.1

307.    The Excluded Lenders performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

308.    Serta, by contrast, has breached the express terms of the Credit Agreement by entering into the Unlawful Exchange Transaction, which breaches the proceeds waterfall and *pro rata* sharing provisions of Section 2.18.

309.    As a consequence of Serta's material breaches, the Excluded Lenders have been deprived of their bargain as First Lien Lenders—namely, the right to parity of treatment with loans of the same class.  Moreover, the Unlawful Exchange Transaction will result in the Favored Lenders receiving payment of a greater proportion of the aggregate amount of their loans and accrued interest than the proportion received by the Excluded Lenders and other First Lien Lenders.  As a result, the loans held by the Excluded Lenders have lost significant value and the Excluded Lenders therefore have been damaged in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing –
By the Excluded Lenders Against Serta)**

310.    The Excluded Lenders reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

311.    The Excluded Lenders and Serta are parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

312.    The Excluded Lenders performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

3718365.1

313.     A bedrock principle of the Credit Agreement is that all First Lien Lenders are entitled to share ratably in all payments of principal or interest on their First Lien Term Loans.  The proceeds waterfall and *pro rata* sharing provisions are "sacred rights" that are so fundamental that, under the Credit Agreement, they cannot be amended without the consent of 100% of the adversely affected lenders, subject to limited exceptions.

314.     The Excluded Lenders specifically bargained for the proceeds waterfall and *pro rata* sharing provisions, which are not included as of right in all credit agreements, as well as the prohibition preventing amendment of those provisions without unanimous consent.

315.     The Excluded Lenders reasonably expected that their sacred rights, including the proceeds waterfall and *pro rata* sharing provisions, would be protected, and that their right to parity of treatment with loans of the same class would be honored.

316.     The Unlawful Exchange Transaction destroyed the Excluded Lenders' rights to receive the fruits of the Credit Agreement, including by stripping them of the value of their guarantees and altering the proceeds waterfall and *pro rata* treatment provisions of the Credit Agreement without their consent, in violation of the implied covenant of good faith and fair dealing.

317.     Serta and the Favored Lenders abused the Credit Agreement's voting rights provisions by purportedly making amendments intended to gain financial benefits on non-market terms; deprived the Excluded Lenders of critical, bargained-for rights and protections; and improperly extracted value from the Company that otherwise should have been shared with the Excluded Lenders and the rest of the minority lenders.

318.     The Unlawful Exchange Transaction was designed and implemented in bad faith to deprive the Excluded Lenders of the expected fruits of the Credit Agreement.  Serta

and the Favored Lenders secretly designed the Transaction so as to defeat the Excluded Lenders' contractual expectations of *pro rata* treatment, concealed the Transaction from the Excluded Lenders, deliberately denying them the opportunity to participate until it could be revealed as a *fait accompli*, and withheld information from the Excluded Lenders that would have been necessary for them to participate in the Transaction.

319. Serta did not disclose to any of the Excluded Lenders that the Company was contemplating the Unlawful Exchange Transaction, nor did Serta permit the Excluded Lenders to join the Transaction before or after it was announced.

320. To the contrary, at the same time that Serta, through its private equity sponsor Advent, was negotiating the Unlawful Exchange Transaction, it actively was discussing with three of the Excluded Lenders entirely different potential transaction structures that would reduce Serta's debt loan within the confines of the Credit Agreement. Three days before the Unlawful Exchange Transaction was publicly announced, Advent abruptly ended these negotiations.

321. Indicating its willingness to "play favorites" with Serta's lenders, Advent contacted one of the three Excluded Lenders with whom it was negotiating to expressly invite that lender – but not the other two – to be involved in discussions relating to an unspecified transaction, which the lender declined.

322. To make matters worse, as a transparently punitive measure, and as part of the Unlawful Exchange Transaction, Serta took the unusual step of adding these three Excluded Lenders to its list of "disqualified" lenders, not only for purposes of the amended Credit Agreement but also for purposes of the Priority Term Loan credit facility. Serta thereby barred these Excluded Lenders from acquiring any interests in the new loans in the open market.

323.     Other Excluded Lenders, upon hearing of the June 8, 2020 public announcement of the Unlawful Exchange Transaction, contacted Advent seeking to participate, and more than a dozen entitles were rebuffed.

324.     The Unlawful Exchange Transaction was the consummate "club deal," in which the Favored Lenders were selected to participate based on their relationships with Advent. For example, when one Favored Lender asked to join the deal – noting its status as a "good partner to Advent" – Advent agreed to let them participate "purely based on the long term relationship," and instructed the lender to "keep this tight lipped."  Advent similarly admitted another Favored Lender into the group "solely because of the relationship Advent and [the Favored Lender] have built," and asked the lender to "keep this highly confidential."  As to yet another Favored Lender who sought to be included, Advent instructed Serta's advisor, Evercore, to tell the lender that it could participate "for the relationship with them."

325.     As further evidence of their bad faith, Serta and the Favored Lenders amended the Credit Agreement's restrictive covenants to permit the Favored Lenders to conduct future exchanges of their First Lien and Second Lien Loans in exchange for super-priority debt ahead of the Excluded Lenders.

326.     On February 24, 2023, Serta and the Favored Lenders moved for summary judgment on their claim for declaratory relief in this action, which seeks declarations that, *inter alia*, the Unlawful Exchange Transaction (i) was not a breach of the Credit Agreement, and (ii) was not a breach of the implied covenant of good faith and fair dealing.  In a bench ruling issued on March 28, 2023 and subsequent Order entered on April 6, 2023, this Court partially granted the motions as to breach of contract, determining that the Unlawful Exchange Transaction constituted an "open market purchase" within the meaning of the Credit Agreement.  The parties

proposed an order that allows for the immediate appeal of that portion of the ruling. The Court denied the motions as to breach of the implied covenant, finding that "the argument is fairly persuasive that there could be something else."

327.     The Excluded Lenders disagree that the Unlawful Exchange Transaction was an "open market purchase" within the meaning of the Credit Agreement, but even assuming that the Unlawful Exchange Transaction was permitted under the express terms of the contract, it nonetheless violated the implied covenant of good faith and fair dealing, because it wholly deprived the Excluded Lenders of the benefit of their bargain under the Credit Agreement.

328.     The purpose of the "open market purchase" provision in the 2016 Credit Agreement was solely to allow the repurchase of loans in one-off transactions typically at or close to the prevailing market prices to capture discount and de-lever the borrower's businesses. The use of an "open market purchase" provision to effectuate an uptier transaction like the Unlawful Exchange Transaction was not contemplated. Indeed, the concept of an uptier transaction had not yet even come into being as a liability management strategy in the loan market; an article cited by the Favored Lenders in support of their motion for summary judgment cites a 2017 transaction as "one of the earliest examples of an uptier transaction."

329.     Serta and the Favored Lenders were among the first to manipulate the "open market purchase" provision of the Credit Agreement in such a manner, destroying in the process the Excluded Lenders' right to *pro rata* treatment.

330.     That Serta and the Favored Lenders knowingly attempted an end-run around the purpose and intention of the Credit Agreement, if not its express terms, is evidenced by the fact that they took the steps of purportedly ratifying their own transaction in written

amendments to the Credit Agreement, and purportedly indemnifying the Favored Lenders from claims regarding the Unlawful Exchange Transaction.

331.    Moreover, Serta was acutely aware of the damage the deal would inflict upon the Excluded Lenders, expressly recognizing in a June 5, 2020 presentation to its Board of Directors that engaging in the Unlawful Exchange Transaction would harm its relationship with the lenders who were not allowed to participate.

332.    In the LCM Action, Judge Failla denied a motion to dismiss LCM's claim for a violation of the covenant of good faith and fair dealing, holding that even if the Unlawful Exchange Transaction was permitted by the Credit Agreement, the effect of the Transaction is such a departure from the intended purpose of the Credit Agreement as to be a potential violation of the covenant.

333.    Judge Failla concluded that even if the "letter of the Agreement permitted" certain actions by the majority lenders, those actions plausibly were alleged to have breached the implied covenant where Serta "colluded with a bare majority of lenders to abuse its power to amend the Agreement to create a new class of debt," and "systematically combed through the Agreement tweaking every provision that seemingly prevented it from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one."

334.    Serta and the Favored Lenders have attempted to justify the Unlawful Exchange Transaction by arguing that Serta had two business justifications for entering into the Transaction: to obtain a cash infusion, and to de-lever the Company.  Neither is a defense to a claim for breach of the implied covenant, which does not ask whether a party had a good commercial reason to act as it did, but rather, whether its actions had the effect of destroying or injuring the right of the other party to receive the fruits of the contract, as happened here.

335.     Moreover, the value of the deal's structure inured not so much to Serta as it did to the Favored Lenders.  Serta's purported commercial goals of raising cash and de-levering its balance sheet did not need to be achieved in a manner that destroyed the Excluded Lenders' fruits of the bargain.  Yet, the Favored Lenders insisted upon the deep subordination of the Excluded Lenders' First Lien Loans as a non-negotiable condition of the Unlawful Exchange Transaction to increase the benefits of the deal to themselves.

336.     To this day, Serta and the Favored Lenders have continued to act in bad faith to protect their club deal.  On January 23, 2023, Serta and the Favored Lenders entered into a Restructuring Support Agreement, in which they reaffirmed their commitment to the Unlawful Exchange Transaction and sought to enforce it as part of Serta's Chapter 11 Plan.  Under the Plan, the Favored Lenders' super-priority "second out" debt (exchanged for their First Lien Term Loans) are considered Class 4, entitled to receive 100% of the equity in the reorganized Company.  By contrast, the Excluded Lenders' First Lien Term Loans are considered Class 5—entitled to 4 cents on the dollar if they approve the plan, and 1 cent on the dollar if they do not.

337.     Further indicating its bad faith, Serta put the interests of its Favored Lenders ahead of the Company's obligation to ensure that its reorganization plan is fair and equitable by purportedly agreeing, as part of the Plan, to indemnify the Favored Lenders from claims regarding the Unlawful Exchange Transaction.  Serta's purported indemnification obligation may not be discharged or impaired, is given priority above the proceeds waterfall, and survives the Company's emergence from bankruptcy.  Moreover, Serta agreed, in the Restructuring Support Agreement, to refrain from resolving this action and other ongoing litigations with the Excluded Lenders or the LCM Defendants without the Favored Lenders' consent.

338.    The loans that the Excluded Lenders hold have lost significant value as a result of the Favored Lenders' bad faith actions.

339.    After Serta announced the Unlawful Exchange Transaction, the market reacted swiftly.  Prior to the June 8, 2020 announcement of the Unlawful Exchange Transaction, Serta's First Lien Term Loans were trading at or around 43 cents on the dollar.  Within a week after the Unlawful Exchange Transaction was consummated, the trading value of the First Lien Term Loans held by lenders who did not participate in the transaction plunged to approximately 31 cents on the dollar.  The Excluded Lenders are entitled to damages, including the lost market value of their First Lien Term Loans caused by the Unlawful Exchange Transaction.

340.    In the alternative, the Excluded Lenders are entitled to disgorgement by the Favored Lenders of their excess share of the super-priority "second out" debt issued in exchange for their First Lien Term Loans and Second Lien Term Loans.

341.    In the alternative, the Excluded Lenders are entitled to recessionary damages, to restore them to the position they would be in had the Unlawful Exchange Transaction not occurred.  Here, equity mandates that all First Lien Lenders – Favored Lenders and Excluded Lenders alike – receive the same treatment.

**FOURTH CAUSE OF ACTION**[29]
**(Breach of Contract, Section 9.02 –**
**By the Excluded Lenders Against Serta)**

342.    The Excluded Lenders reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

---

[29] To the extent the Fourth Cause of Action is based on claims or defenses that were expressly or implicitly rejected by the Court in its March 28, 2023 decision and April 6, 2023 Order, such claims and defenses are reasserted here for purposes of appeal only.

3718365.1

343.    The Excluded Lenders and Serta are parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

344.    The Excluded Lenders performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

345.    Serta breached the express terms of the Credit Agreement by entering into the Unlawful Exchange Transaction, in violation of Sections 9.02(b)(B)(2) and (3), which, without the First Lien Lenders' consent, releases all or substantially all of the collateral from the lien granted pursuant to the First Lien Lenders and of the value of their guarantees, including under the First Lien Term Loan Guaranty Agreement.

346.    The Excluded Lenders therefore should be awarded damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Declaratory Judgment of Valid Assignment – By Apollo Against Serta)

347.    The Excluded Lenders reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

348.    As alleged herein, Apollo purchased First Lien Term Loans in legitimate transactions for which it is entitled to assignment of the loans.  All requirements for assignment under the Credit Agreement have been satisfied.

349.    Nevertheless, Serta has wrongfully prevented execution of the assignment in contravention of the Credit Agreement.  It continues to do so to this day.

350.    The dispute between the parties is therefore ripe for adjudication by way of declaratory judgment in order to establish the rights and obligations of the parties.

3718365.1

351.    For the foregoing reasons, Apollo is entitled to a declaratory judgment that it has a valid assignment of the $192 million in face amount First Lien Term Loans that it has purchased.

### SIXTH CAUSE OF ACTION[30]
**(Declaratory Judgment That the Unlawful Exchange Transaction and All Agreements Purporting to Implement It Are Invalid – By the Excluded Lenders Against the Favored Lenders)**

352.    The Excluded Lenders reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

353.    The Excluded Lenders and the Favored Lenders are or were parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

354.    This Court is authorized to issue a declaratory judgment as to the rights and other legal relations of the Excluded Lenders and the Favored Lenders pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

355.    The proper interpretation and application of the Credit Agreement, including whether the Unlawful Exchange Transaction and the agreements purporting to implement it are permissible and valid, is a justiciable, present, and actual controversy between the Excluded Lenders and the Favored Lenders.

356.    The Unlawful Exchange Transaction and the agreements purporting to implement it violate the express terms of the Credit Agreement as well as the implied covenant of good faith and fair dealing and are therefore invalid and *void ab initio*, or in the alternative are

---

[30] To the extent the Sixth Cause of Action is based on claims or defenses that were expressly or implicitly rejected by the Court in its March 28, 2023 decision and April 6, 2023 Order, such claims and defenses are reasserted here for purposes of appeal only.

voidable and should be rescinded (or the Excluded Lenders should be awarded rescissionary damages).  The Excluded Lenders retain the rights they had prior to the Unlawful Exchange Transaction, and they are entitled to a declaratory judgment to that effect.

### SEVENTH CAUSE OF ACTION[31]
**(Breach of Contract, Section 2.18 –**
**By the Excluded Lenders against the Favored Lenders)**

357.    The Excluded Lenders reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

358.    The Excluded Lenders and the Favored Lenders are or were parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

359.    The Excluded Lenders performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

360.    The Favored Lenders, by contrast, have breached the express terms of the Credit Agreement by entering into the Unlawful Exchange Transaction, which breaches the proceeds waterfall and *pro rata* sharing provisions of Section 2.18.

361.    As a consequence of the Favored Lenders' material breaches, the Excluded Lenders have been deprived of their bargain as First Lien Lenders—namely, the right to parity of treatment with loans of the same class.  Moreover, the Unlawful Exchange Transaction will result in the Favored Lenders receiving payment of a greater proportion of the aggregate amount of their loans and accrued interest than the proportion received by the

---

[31] To the extent the Seventh Cause of Action is based on claims or defenses that were expressly or implicitly rejected by the Court in its March 28, 2023 decision and April 6, 2023 Order, such claims and defenses are reasserted here for purposes of appeal only.

Excluded Lenders and other First Lien Lenders.  As a result, the loans held by the Excluded

Lenders have lost significant value and the Excluded Lenders therefore have been damaged.

362.    In addition to other relief, the Excluded Lenders are entitled to the

consideration provided by Section 2.18(c) of the Credit Agreement—that is, the Favored Lenders

must be required to purchase (for cash at face value) participations in the First Lien Term Loans

held by the Excluded Lenders and the other holders of First Lien Term Loans so that the benefit

of the Unlawful Exchange Transaction are shared by the lenders ratably in accordance with the

aggregate amount of principal of and accrued interest on their respective loans.  The Excluded

Lenders also should be awarded damages in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing –
By the Excluded Lenders Against the Favored Lenders)**

363.    The Excluded Lenders reassert and reallege the allegations contained in

the foregoing paragraphs above as if fully set forth herein.

364.    The Excluded Lenders and the Favored Lenders are or were parties to the

Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable

contract.

365.    The Excluded Lenders performed all conditions, covenants, and promises

required on their part to be performed in accordance with the terms and conditions of the Credit

Agreement.

366.    A bedrock principle of the Credit Agreement is that all First Lien Lenders

are entitled to share ratably in all payments of principal or interest on their First Lien Term

Loans.  The proceeds waterfall and *pro rata* sharing provisions are "sacred rights" that are so

fundamental that, under the Credit Agreement, they cannot be amended without the consent of 100% of the adversely affected lenders, subject to limited exceptions.

367.     The Excluded Lenders specifically bargained for the proceeds waterfall and *pro rata* sharing provisions, which are not included as of right in all credit agreements, as well as the prohibition preventing amendment of those provisions without unanimous consent.

368.     The Excluded Lenders reasonably expected that their sacred rights, including the proceeds waterfall and *pro rata* sharing provisions, would be protected, and that their right to parity of treatment with loans of the same class would be honored.

369.     The Unlawful Exchange Transaction destroyed the Excluded Lenders' rights to receive the fruits of the Credit Agreement, including by stripping them of the value of their guarantees and altering the proceeds waterfall and *pro rata* treatment provisions of the Credit Agreement without their consent, in violation of the implied covenant of good faith and fair dealing.

370.     Serta and the Favored Lenders abused the Credit Agreement's voting rights provisions by purportedly making amendments intended to gain financial benefits on non-market terms; deprived the Excluded Lenders of critical, bargained-for rights and protections; and improperly extracted value from the Company that otherwise should have been shared with the Excluded Lenders and the rest of the minority lenders.

371.     The Unlawful Exchange Transaction was designed and implemented in bad faith to deprive the Excluded Lenders of the expected fruits of the Credit Agreement. Serta and the Favored Lenders secretly designed the Transaction so as to defeat the Excluded Lenders' contractual expectations of *pro rata* treatment, concealed the Transaction from the Excluded Lenders, deliberately denying them the opportunity to participate until it could be revealed as a

*fait accompli*, and withheld information from the Excluded Lenders that would have been necessary for them to participate in the Transaction.

372.    To make matters worse, as a transparently punitive measure, and as part of the Unlawful Exchange Transaction, Serta took the unusual step of adding these three Excluded Lenders to its list of "disqualified" lenders, not only for purposes of the amended Credit Agreement but also for purposes of the Priority Term Loan credit facility.  Serta thereby barred these Excluded Lenders from acquiring any interests in the new loans in the open market.

373.    Other Excluded Lenders, upon hearing of the June 8, 2020 public announcement of the Unlawful Exchange Transaction, contacted Advent seeking to participate, and more than a dozen entities were rebuffed.

374.    The Unlawful Exchange Transaction was the consummate "club deal," in which the Favored Lenders were selected to participate based on their relationships with Advent. For example, when one Favored Lender asked to join the deal – noting its status as a "good partner to Advent" – Advent agreed to let them participate "purely based on the long term relationship," and instructed the lender to "keep this tight lipped."  Advent similarly admitted another Favored Lender into the group "solely because of the relationship Advent and [the Favored Lender] have built," and asked the lender to "keep this highly confidential."  As to yet another Favored Lender who sought to be included, Advent instructed Serta's advisor, Evercore, to tell the lender that it could participate "for the relationship with them."

375.    On February 24, 2023, Serta and the Favored Lenders moved for summary judgment on their claim for declaratory relief in this action, which seeks declarations that, *inter alia*, the Unlawful Exchange Transaction (i) was not a breach of the Credit Agreement, and (ii) was not a breach of the implied covenant of good faith and fair dealing.  In a bench ruling issued

3718365.1

on March 28, 2023 and subsequent Order entered on April 6, 2023, this Court partially granted the motions as to breach of contract, determining that the Unlawful Exchange Transaction constituted an "open market purchase" within the meaning of the Credit Agreement.  The parties proposed an order that allows for the immediate appeal of that portion of the ruling.  The Court denied the motions as to breach of the implied covenant, finding that "the argument is fairly persuasive that there could be something else."

376.     The Excluded Lenders disagree that the Unlawful Exchange Transaction was an "open market purchase" within the meaning of the Credit Agreement, but even assuming that the Unlawful Exchange Transaction was permitted under the express terms of the contract, it nonetheless violated the implied covenant of good faith and fair dealing, because it wholly deprived the Excluded Lenders of the benefit of their bargain under the Credit Agreement.

377.     The purpose of the "open market purchase" provision in the 2016 Credit Agreement was solely to allow the repurchase of loans in one-off transactions typically at or close to the prevailing market prices to capture discount and de-lever the borrower's businesses. The use of an "open market purchase" provision to effectuate an uptier transaction like the Unlawful Exchange Transaction was not contemplated.  Indeed, the concept of an uptier transaction had not yet even come into being as a liability management strategy in the loan market; an article cited by the Favored Lenders in support of their motion for summary judgment cites a 2017 transaction as "one of the earliest examples of an uptier transaction."

378.     Serta and the Favored Lenders were among the first to manipulate the "open market purchase" provision of the Credit Agreement in such a manner, destroying in the process the Excluded Lenders' right to *pro rata* treatment.

119

379.     That Serta and the Favored Lenders knowingly attempted an end-run around the purpose and intention of the Credit Agreement, if not its express terms, is evidenced by the fact that they took the steps of purportedly ratifying their own transaction in written amendments to the Credit Agreement, and purportedly indemnifying the Favored Lenders from claims regarding the Unlawful Exchange Transaction.

380.     Moreover, Serta was acutely aware of the damage the deal would inflict upon the Excluded Lenders, expressly recognizing in a June 5, 2020 presentation to its Board of Directors that engaging in the Unlawful Exchange Transaction would harm its relationship with the lenders who were not allowed to participate.

381.     In the LCM Action, Judge Failla denied a motion to dismiss LCM's claim for a violation of the covenant of good faith and fair dealing, holding that even if the Unlawful Exchange Transaction was permitted by the Credit Agreement, the effect of the Transaction is such a departure from the intended purpose of the Credit Agreement as to be a potential violation of the covenant.

382.     Judge Failla concluded that even if the "letter of the Agreement permitted" certain actions by the majority lenders, those actions plausibly were alleged to have breached the implied covenant where Serta "colluded with a bare majority of lenders to abuse its power to amend the Agreement to create a new class of debt," and "systematically combed through the Agreement tweaking every provision that seemingly prevented it from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one."

383.     Serta and the Favored Lenders have attempted to justify the Unlawful Exchange Transaction by arguing that Serta had two business justifications for entering into the Transaction: to obtain a cash infusion, and to de-lever the Company.  Neither is a defense to a

120

claim for breach of the implied covenant, which does not ask whether a party had a good commercial reason to act as it did, but rather, whether its actions had the effect of destroying or injuring the right of the other party to receive the fruits of the contract, as happened here.

384.    Moreover, the value of the deal's structure inured not so much to Serta as it did to the Favored Lenders.  Serta's purported commercial goals of raising cash and de-levering its balance sheet did not need to be achieved in a manner that destroyed the Excluded Lenders' fruits of the bargain.  Yet, the Favored Lenders insisted upon the deep subordination of the Excluded Lenders' First Lien Loans as a non-negotiable condition of the Unlawful Exchange Transaction to increase the benefits of the deal to themselves.

385.    To this day, Serta and the Favored Lenders have continued to act in bad faith to protect their club deal.  On January 23, 2023, Serta and the Favored Lenders entered into a Restructuring Support Agreement, in which they reaffirmed their commitment to the Unlawful Exchange Transaction and sought to enforce it as part of Serta's Chapter 11 Plan.  Under the Plan, the Favored Lenders' super-priority "second out" debt (exchanged for their First Lien Term Loans) are considered Class 4, entitled to receive 100% of the equity in the reorganized Company.  By contrast, the Excluded Lenders' First Lien Term Loans are considered Class 5— entitled to 4 cents on the dollar if they approve the plan, and 1 cent on the dollar if they do not.

386.    Moreover, the Favored Lenders put their own interests ahead of the Company's by requiring Serta, as part of the Plan, to indemnify the Favored Lenders from claims regarding the Unlawful Exchange Transaction.  Serta's purported indemnification obligation may not be discharged or impaired, is given priority above the proceeds waterfall, and survives the Company's emergence from bankruptcy.

3718365.1

387.     Further indicating their bad faith – and belying their feigned concern for Serta's successful emergence from bankruptcy – the Favored Lenders discouraged Serta from resolving this action and other ongoing litigations with the Excluded Lenders or the LCM Defendants by making it a condition of the Restructuring Support Agreement that Serta not enter into any settlements of those litigations without the Favored Lenders' consent.

388.     The loans that the Excluded Lenders hold have lost significant value as a result of the Favored Lenders' bad faith actions.

389.     After Serta announced the Unlawful Exchange Transaction, the market reacted swiftly.  Prior to the June 8, 2020 announcement of the Unlawful Exchange Transaction, Serta's First Lien Term Loans were trading at or around 43 cents on the dollar.  Within a week after the Unlawful Exchange Transaction was consummated, the trading value of the First Lien Term Loans held by lenders who did not participate in the transaction plunged to approximately 31 cents on the dollar.  The Excluded Lenders are entitled to damages, including the lost market value of their First Lien Term Loans caused by the Unlawful Exchange Transaction.

390.     In the alternative, the Excluded Lenders are entitled to disgorgement by the Favored Lenders of their excess share of the super-priority "second out" debt issued in exchange for their First Lien Term Loans and Second Lien Term Loans.

391.     In the alternative, the Excluded Lenders are entitled to recessionary damages, to restore them to the position they would be in had the Unlawful Exchange Transaction not occurred.  Here, equity mandates that all First Lien Lenders – Favored Lenders and Excluded Lenders alike – receive the same treatment.

392.     The Excluded Lenders therefore should be awarded damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION[32]
### (Breach of Contract, Section 9.02 –
### By the Excluded Lenders Against the Favored Lenders)

393.    The Excluded Lenders reassert and reallege the allegations contained in the foregoing paragraphs above as if fully set forth herein.

394.    The Excluded Lenders and the Favored Lenders are or were parties to the Credit Agreement entered into on November 8, 2016, which constitutes a valid and enforceable contract.

395.    The Excluded Lenders performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the Credit Agreement.

396.    The Favored Lenders breached the express terms of the Credit Agreement by entering into the Unlawful Exchange Transaction, in violation of Sections 9.02(b)(B)(2) and (3), which, without the First Lien Lenders' consent, releases all or substantially all of the collateral from the lien granted to the First Lien Lenders and of the value of their guarantees, including under the First Lien Term Loan Guaranty Agreement.

397.    The Excluded Lenders therefore should be awarded damages in an amount to be proven at trial.

---

[32] To the extent the Ninth Cause of Action is based on claims or defenses that were expressly or implicitly rejected by the Court in its March 28, 2023 decision and April 6, 2023 Order, such claims and defenses are reasserted here for purposes of appeal only.

3718365.1

## PRAYER FOR RELIEF[33]

WHEREFORE, the Excluded Lenders demand judgment against Serta and the Favored Lenders as follows:

(a)    Requiring the Favored Lenders to specifically perform their obligations under Section 2.18(c) of the Credit Agreement by purchasing (for cash at face value) participations in the First Lien Term Loans held by the Excluded Lenders and the other holders of First Lien Term Loans to the extent necessary so that the benefits of the Unlawful Exchange Transaction are shared by the lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective loans;

(b)    Awarding damages to the Excluded Lenders in an amount to be proven at trial for all economic, monetary, actual, consequential, and compensatory damages that the Excluded Lenders suffered as a result of Serta's breach of contract and other misconduct, together with pre- and post-judgment interest at the maximum rate allowable by law;

(c)    Awarding damages to the Excluded Lenders in an amount to be proven at trial for all economic, monetary, actual, consequential, and compensatory damages that the Excluded Lenders suffered as a result of Serta's breach of the implied covenant of good faith and fair dealing, together with pre- and post-judgment interest at the maximum rate allowable by law;

---

[33] To the extent the Prayer for Relief seeks judgment for the Excluded Lenders based on claims or defenses that were expressly or implicitly rejected by the Court in its March 28, 2023 decision and April 6, 2023 Order, such claims and defenses are reasserted here for purposes of appeal only.

3718365.1

(d)     Awarding damages to the Excluded Lenders in an amount to be proven at trial for all economic, monetary, actual, consequential, and compensatory damages that the Excluded Lenders suffered as a result of the Favored Lenders' breach of contract and other misconduct, together with pre- and post-judgment interest at the maximum rate allowable by law;

(e)     Awarding damages to the Excluded Lenders in an amount to be proven at trial for all economic, monetary, actual, consequential, and compensatory damages that the Excluded Lenders suffered as a result of the Favored Lenders' breach of the implied covenant of good faith and fair dealing, together with pre- and post-judgment interest at the maximum rate allowable by law;

(f)     Declaring that the Unlawful Exchange Transaction and all agreements purporting to implement it are invalid and *void ab initio*, and that the Excluded Lenders retain the absolute and relative rights they had prior to the transaction, or in the alternative that the Excluded Lenders are entitled to rescission or rescissionary damages;

(g)     Declaring that Apollo has a valid assignment of the $192 million in face amount of First Lien Term Loans that it purchased;

(h)     Awarding the Excluded Lenders the costs of their suit, including reasonable attorneys' fees and expenses; and

(i)     Awarding such other and further relief as the Court may deem just and proper.

3718365.1

Dated:  New York, New York
        April 7, 2023

**FRIEDMAN KAPLAN SEILER ADELMAN &
     ROBBINS LLP**

*s/ Eric Seiler*
Lawrence S. Robbins*
Eric Seiler*
Anne E. Beaumont*
Jamuna D. Kelley*
Blair R. Albom*
7 Times Square
New York, NY 11036-6516
(212) 833-1100
lrobbins@fklaw.com
eseiler@fklaw.com
abeaumont@fklaw.com
jkelley@fklaw.com
balbom@fklaw.com

*Attorneys for the Excluded Lenders*

**PORTER HEDGES LLP**
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan N. Young-John (TX 24088700)
1000 Main Street, 36th Floor
Houston, TX  77002
(713) 226-6000
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com

*Attorneys for the Excluded Lenders with respect to
Answer to the Amended Adversary Complaint and
Amended Counterclaims Only*

**PAUL, WEISS, RIFKIND, WHARTON &
     GARRISON LLP**
Kenneth S. Ziman*
Brian S. Hermann*
Lewis R. Clayton*
Andrew J. Ehrlich*
Michael J. Colarossi*
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

kziman@paulweiss.com
bhermann@paulweiss.com
lclayton@paulweiss.com
aehrlich@paulweiss.com
mcolarossi@paulweiss.com

*Attorneys for the Excluded Lenders with respect to
Answer to the Amended Adversary Complaint and
Amended Counterclaims Only*

*\*admitted pro hac vice*