**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SERTA SIMMONS BEDDING, LLC, et al., | : | Case No. 23-90020 |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | | |
| SERTA SIMMONS BEDDING, LLC, INVESCO SENIOR SECURED MANAGEMENT, INC., CREDIT SUISSE ASSET MANAGEMENT, LLC, BOSTON MANAGEMENT AND RESEARCH, EATON VANCE MANAGEMENT, AND BARINGS LLC, | : : : : : : | Adversary Proc. No. 23-09001 (DRJ) |
| Plaintiffs and Counterclaim Defendants, | : : | |
| v. | : : : | |
| AG CENTRE STREET PARTNERSHIP L.P., AG CREDIT SOLUTIONS NON-ECI MASTER FUND, L.P., AG SF MASTER (L), L.P., AG SUPER FUND MASTER, L.P., SILVER OAK CAPITAL, L.L.C., ASCRIBE III INVESTMENTS, LLC, COLUMBIA CENT CLO 21 LIMITED, COLUMBIA CENT CLO 27 LIMITED, COLUMBIA FLOATING RATE INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST II, COLUMBIA STRATEGIC INCOME FUND, A SERIES OF COLUMBIA FUNDS SERIES TRUST I, CONTRARIAN CAPITAL FUND I, L.P., CONTRARIAN CENTRE STREET PARTNERSHIP, L.P., CONTRARIAN DISTRESSED DEBT FUND, L.P., GAMUT CAPITAL SSB, LLC, LCM XXII LTD., LCM XXIII LTD., LCM XXIV LTD., LCM XXV LTD., LCM 26 LTD., LCM 27 LTD., LCM 28 LTD., NORTH STAR : DEBT HOLDINGS, L.P., SHACKLETON 2013- III CLO, LTD., SHACKLETON 2013-IV-R CLO, LTD., SHACKLETON 2014-V-R CLO, LTD., SHACKLETON 2015-VII-R CLO, LTD., SHACKLETON 2017-XI CLO, LTD., Z CAPITAL CREDIT PARTNERS CLO 2018-1 LTD., AND Z CAPITAL CREDIT PARTNERS CLO 2019-1 LTD., | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | |
| Defendants, Counterclaim Plaintiffs and Third-Party Plaintiffs | | |

1

## PTL LENDERS' ANSWER TO THE LCM DEFENDANTS' COUNTERCLAIMS

Invesco Senior Secured Management, Inc. ("Invesco"), Credit Suisse Asset Management, LLC ("Credit Suisse"), Boston Management and Research ("Boston Management"), Eaton Vance Management ("Eaton Vance"), and Barings LLC ("Barings") (collectively, the "PTL Lenders"), by and through their undersigned counsel, hereby respond to the Counterclaims filed against them on April 7, 2023 by Defendants LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd. and LCM 28 Ltd. (collectively, "LCM" or the "Counterclaim Plaintiffs") as follows (the "Answer"). The PTL Lenders deny any and all liability to LCM or any other party arising out of the circumstances described in the Counterclaims and, except as specifically admitted, deny the allegations therein. A number of allegations in the Counterclaims merely state legal conclusions that do not require a response; to the extent a response is required, the PTL Lenders deny such allegations. Further, although certain section headings and defined terms are carried over from the Counterclaims for ease of reference, the PTL Lenders deny each and every allegation contained in or suggested by those section headings or defined terms, and do not adopt any definitions or accept it as true.

In submitting this Answer, the PTL Lenders expressly reserve and do not waive any and all applicable rights, defenses, and objections. The PTL Lenders also expressly reserve the right to amend this Answer and its affirmative defenses based on, *inter alia*, discovery, factual developments, and the PTL Lenders' ongoing investigation of LCM's claims. No incidental or implied admissions are intended by this Answer. Unless expressly stated herein, nothing in this Answer should be construed as an admission regarding the existence of any facts set forth in the Counterclaims. The PTL Lenders make no representations, concessions, or admissions regarding the relevance or appropriateness of any facts set forth in the Counterclaims.

The PTL Lenders further respond to the specific allegations contained in the Complaint as follows:

**91. Defendants LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd. and LCM 28 Ltd. (collectively, the "LCM Defendants,"), upon knowledge with respect to themselves and their own acts and upon information and belief with respect to all other matters, hereby assert the following counterclaims against Plaintiffs Serta Simmons Bedding, LLC ("Serta" or the "Company"), and Invesco Senior Secured Management, Inc. ("Invesco"), Credit Suisse Asset Management, LLC ("Credit Suisse"), Boston Management and Research ("Boston Management"), Eaton Vance Management ("Eaton Vance"), and Barings LLC ("Barings") (collectively, the "PTL Lenders"), as follows below.**

Response to Paragraph No. 91:  The allegations contained in Paragraph 91 characterize LCM's claims to which no response is required.  To the extent a response is required, the PTL Lenders deny the allegations in Paragraph 91.

## PRELIMINARY STATEMENT

**92. The June 2020 financing and debt exchange transaction (the "Exchange Transaction") that Plaintiffs seek to enforce in this proceeding was unlawfully engineered to manipulate the waterfall of first-lien lenders' rights by elevating the priority of the PTL Lenders debt over the LCM Defendants' debt. In the Exchange Transaction, the Plaintiffs, Serta, the PTL Lenders and other lenders that are not parties to this action[1] (collectively with the PTL Lenders, the "Handpicked Lenders"), orchestrated an exchange of existing first-lien**

---

[1] **The Handpicked Lenders that are not parties to this action are the third-party defendants sued by the Non-LCM Defendants and named in their counterclaims to Serta's amended complaint, or asset management firms acting on behalf of those third-party defendants. See Dkt. No. 68 at 48-53.**

and second-lien holdings for new "super-priority" debt—some $1 billion in all—that was placed *above* the "first-lien" debt that the minority was left with. In doing so, Serta and the PTL Lenders entirely deprived the Defendants of their bargained-for first-lien, priority, *pro rata* rights.

Response to Paragraph No. 92:  The PTL Lenders deny the allegations in Paragraph 92, except admit that they participated in a financing and debt purchase transaction with the Company that closed in June 2020 (the "Transaction").

93. **The Exchange Transaction was effectuated through a complex web of contractual maneuvers, each of which was conducted in bad faith on the part of both Serta and the PTL Lenders in a manner that eviscerated the very purpose of the lender protections at the heart of the original First Lien Agreement, on which the Defendants relied to extend loans to Serta.**

Response to Paragraph No. 93:  The PTL Lenders deny the allegations in Paragraph 93, and further deny that the allegations in Paragraph 93 present a fair, accurate, or complete description of Non-PTL Term Loan Agreement (together with all amendments, "Non-PTL Term Loan Agreement") referenced in Paragraph 93, and respectfully refer the Court to that Agreement for a complete and accurate statement of its contents.

94. *First,* **leaving no doubt as to Serta's and the PTL Lenders' awareness of wrongdoing, they negotiated the Exchange Transactions entirely in secret, the transaction was announced publicly by Serta only two weeks before closing, and Serta and the PTL Lenders neither sought nor obtained contractually required consents from minority lenders to the adverse changes to their *pro-rata* rights of payment, the most central of lender sacred rights.**

Response to Paragraph No. 94:  The PTL Lenders deny the allegations in Paragraph 94, except admit that the Company announced the Transaction prior to the date the Transaction closed.  The PTL Lenders further deny that the allegations in Paragraph 94 present a fair, accurate, or complete description of Non-PTL Term Loan Agreement, and respectfully refer the Court to that Agreement for a complete and accurate statement of its contents.

95. ***Second,*** **Plaintiffs and their advisors unlawfully cherry-picked certain of Serta's first-lien lenders to participate in the Exchange Transaction while excluding others. On information and belief based on the Non-LCM Defendants' opposition brief to Serta and the PTL Lenders' motions for summary judgment and their supporting declarations in this proceeding, three days before Serta announced the Exchange Transaction, it abruptly ended discussions with certain of the Non-LCM Defendants regarding alternative financing structures that would not have required amendments to the credit agreement.** *See* **Dkt. No. 87 (sealed) at 51-52. These lenders were not invited to participate in the Exchange Transaction.** *Id.* **Nor were the LCM Defendants, who were even more removed from Serta's financing efforts because they had not been engaging in any restructuring negotiations with Serta.** *Id.* **at 51. Instead, Serta, the Handpicked Lenders and their advisors invited a carefully selected group of lenders to participate in the Exchange Transaction in order to achieve the bare majority of 50-51% consent necessary to amend the First Lien Agreement pursuant to its terms. The Defendants here, including the LCM Defendants, were not solicited to participate. This unequal treatment of lenders in service of altering the priority waterfall is directly at odds with the fundamental precept of** *pro rata* **sharing that pervades all aspects of the First Lien Credit Agreement.**

Response to Paragraph No. 95:  The PTL Lenders lack knowledge or information

sufficient to form a belief as to the truth or falsity of the allegations in the second, third, fourth, and sixth sentences in Paragraph 95, and on that basis deny them.  The PTL Lenders otherwise deny the allegations in Paragraph 95, except admit that the amendments to the Non-PTL Term Loan Agreement involved in the Transaction required only the consent of a majority of the lenders that were party to that Agreement.

96. **_Third,_ as part of the Exchange Transaction, Serta and the Handpicked Lenders unlawfully exercised their bare majority to amend various provisions in the First Lien Term Loan Agreement (the "<u>First Lien Agreement</u>") not for the benefit of all lenders as the agreement contemplates, but rather to permit the PTL Lenders to _withdraw_ from the very agreement they were amending so that they could inflate and ensure the value of their collateral at the minority lenders' expense. Specifically, the PTL Lenders executed the amendment so that they could simultaneously retire their first-lien debt for a newly created category of super-priority debt—under a new credit agreement—that primed the first-lien debt of the Defendants. This unilateral "amend to exit and prime" approach reflects bad faith on the part of the Plaintiffs to wield their majority to amend the agreement in a manner that forced the non-amending, minority lenders to live under an agreement to which they themselves were no longer subject.**

<u>Response to Paragraph No. 96</u>:  The PTL Lenders deny the allegations in Paragraph 96, except admit that the amendments to the Non-PTL Term Loan Agreement involved in the Transaction required only the consent of a majority of the lenders that were party to that Agreement.

97. **_Fourth,_ the contractual gymnastics required to effectuate the Exchange Transaction further evince a bad faith intent on the part of Serta and the PTL Lenders. Serta could**

**have achieved its stated objectives of bringing in new money and deleveraging by conducting a straightforward debt exchange that was open to *all* first-lien holders and did not require amending numerous provisions of the First Lien Agreement in a surgical manner and issuing a new class of priming debt under a new credit agreement as took place. And Serta could have obtained new financing without engaging in a debt exchange and undertaking the same amendments. That Serta and the PTL Lenders chose to proceed as they did when other, compliant alternatives under the existing First Lien Agreement were available to achieve the same economic objectives indicates a lack of good faith.**

Response to Paragraph No. 97:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second and third sentences in Paragraph 97, and on that basis deny them.  The PTL Lenders otherwise deny the allegations in Paragraph 97.

## THE PARTIES

**98. The LCM Defendants are exempted companies incorporated under the laws of the Cayman Islands. Although they allege that their principal place of business is also the Cayman Islands, by order dated March 9, 2021, the Southern District of New York held that "[their] primary activities and principal place of business are in New York." *See LCM AYH Ltd. v. Serta Simmons Bedding, LLC*, No. 20-cv-5090 (GBD), 2021 WL 918705 (S.D.N.Y. Mar. 10, 2021).**

Response to Paragraph No. 98:  The Lender Plaintiffs lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 98, except refers the Court to referenced order of the District Court for the Southern District of New York—

*LCM AYH Ltd. v. Serta Simmons Bedding, LLC*, No. 20 Civ. 5090 (GBD), 2021 WL 918705

(S.D.N.Y. Mar. 10, 2021)—for a complete and accurate statement of its contents.

99. **Upon information and belief, Plaintiff Serta Simmons Bedding, LLC is a Delaware**
**limited liability company with its principal place of business at 2451 Industry Avenue,**
**Doraville, GA 30360. Its sole member is Dawn Intermediate LLC, whose sole member is**
**Dawn Holdings, Inc., a Delaware corporation with a principal place of business in**
**Georgia.**

Response to Paragraph No. 99:  The PTL Lenders lack knowledge or information

sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 99, except

admit that Plaintiff Serta Simmons Bedding, LLC is a Delaware limited liability company with

its principal place of business at 2451 Industry Avenue, Doraville, GA 30360.

100.   **Upon information and belief, Plaintiff Barings LLC is a Delaware limited liability**
**company with its principal place of business at 300 South Tryon Street, Suite 2500,**
**Charlotte, NC 28202.**

Response to Paragraph No. 100:  The PTL Lenders admit the allegations in Paragraph

100.

101.   **Upon information and belief, Plaintiff Boston Management and Research's principal**
**place of business is located at Two International Place, Boston, MA 02110.**

Response to Paragraph No. 101:  The PTL Lenders admit the allegations in Paragraph

101.

102.   **Upon information and belief, Plaintiff Credit Suisse Asset Management, LLC is a**
**Delaware limited liability company with its principal place of business at 11 Madison**
**Avenue, New York, NY 10010.**

Response to Paragraph No. 102:  The PTL Lenders admit the allegations in Paragraph 102.

**103.     Upon information and belief, Plaintiff Eaton Vance Management's principal place of business is located at Two International Place, Boston, MA 02110.**

Response to Paragraph No. 103:  The PTL Lenders admit the allegations in Paragraph 103.

**104.     Upon information and belief, Plaintiff Invesco Senior Secured Management, Inc. is a Delaware corporation with its principal place of business at 1166 Avenue of the Americas, 26th Floor, New York, NY 10036.**

Response to Paragraph No. 104:  The PTL Lenders admit that Invesco Senior Secured Management, Inc. is a Delaware corporation but denies the remaining allegations in Paragraph 104 and states that Invesco Senior Secured Management, Inc. has its principal place of business at 225 Liberty Street, New York, NY 10281.

## JURISDICTION AND VENUE

**105.     The Court has subject-matter jurisdiction to consider these Counterclaims under 28 U.S.C. § 1334.**

Response to Paragraph No. 105:  The allegations contained in Paragraph 105 constitute legal contentions and/or conclusions to which no response is required.

**106.     Venue is proper in the United States Bankruptcy Court for the Southern District of Texas under 28 U.S.C. §1409 because this proceeding arises in or relates to the above-captioned Chapter 11 case pending in this District. *See* Case No. 23-90020 (DRJ) (Bankr. S.D. Tex.). This assertion is made without waiver of or prejudice to the LCM Defendants' position that this action should properly be heard in New York, where three actions**

related to the underlying transaction and conduct at issue in the instant action—two in the Southern District of New York and one in New York state court—remain pending. *See LCM XXII Ltd. et al. v. Serta Simmons Bedding, LLC,* 21-cv-3987 (KPF) (S.D.N.Y.); *AG Centre Street Partnership L.P., et al. v. Eaton Vance Management, et al.,* 23-cv-587 (KPF) (S.D.N.Y.); *AG Centre Street Partnership L.P., et al. v. Serta Simmons Bedding, LLC,* Index No. 654181/2022 (N.Y. Sup. Ct. N.Y. Cnty.).

Response to Paragraph No. 106:  The PTL Lenders admit that venue is proper in the United States Bankruptcy Court for the Southern District of Texas.  The PTL Lenders further admit that actions concerning the Transaction are currently pending and stayed in New York state court and the District Court for the Southern District of New York.  The PTL Lenders otherwise deny the allegations in Paragraph 106 and deny that this action should be heard in any other court.

**107.   This is a non-core proceeding under 28 U.S.C. § 157.**

Response to Paragraph No. 107:  The PTL Lenders deny the allegations in Paragraph 107.

**108.   Pursuant to Bankruptcy Rule 7008, the LCM Defendants do not consent to the entry of any final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.**

Response to Paragraph No. 108:  The allegations contained in Paragraph 108 constitute legal contentions and/or conclusions to which no response is required.  To the extent that a response is required, the PTL Lenders assert that this Court can enter final orders or judgments consistent with Article III of the United States Constitution because this is a core proceeding.

## FACTUAL BACKGROUND

109. **The LCM Defendants are issuers of collateralized loan obligations that have consistently held first-lien loans issued by Serta since October 2016. Since then, the LCM Defendants, collectively, have purchased and sold additional loans, and they currently hold approximately $7.4 million in first-lien Serta loans, most of which were purchased over two years ago at or near par value.**

Response to Paragraph No. 109:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 109 and on that basis deny the allegations in Paragraph 109.

110. **A key aspect of the LCM Defendants' business is selecting which assets to include in the collateral pools that form the respective CLOs. Critical to this analysis is the associated risks of investing in any given issuance, including the structural seniority of the loans.**

Response to Paragraph No. 110:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 110 and on that basis deny the allegations in Paragraph 110.

111. **Investors typically pay a premium to secure top structural seniority because it affords the greatest protection in the event of a debtor's default by providing a claim to the debtor's assets that supersedes other creditors' claims. If an issuer can change the structural seniority and subordinate the rights of minority debtholders by negotiating in private with a majority of the lenders and offering them an incentive to subordinate the minority—as Serta purported to do here—it would substantially and adversely affect not just the LCM Defendants' holdings in Serta debt, but their business more generally.**

11

**Indeed, before this deal, the LCM Defendants had never seen anyone seek to engage in the sort of transaction being challenged here.**

Response to Paragraph No. 111:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first and third sentences of Paragraph 111, and on that basis deny them.  The PTL Lenders otherwise deny the remaining allegations in Paragraph 111.

112.    **Serta is North America's largest bedding manufacturer. Based in Atlanta, Serta owns and manages various mattress brands, which are distributed through national, hospitality, and regional and independent retail channels throughout North America, as well as directly to consumers.**

Response to Paragraph No. 112:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 112 and on that basis deny the allegations in Paragraph 112, except admits that Plaintiff Serta Simmons Bedding, LLC has its principal place of business near Atlanta in Doraville, GA.

*The First Lien Agreement*

113.    **Serta entered into three credit facility agreements dated as of November 8, 2016, each of which was executed by Serta and various affiliates and counterparties. The executed agreements include: (1) a first-lien term-loan agreement *(i.e.,* the First Lien Agreement at issue here) originally providing for $1.95 billion in first-lien term loans (the "<u>First Lien Loans</u>"); (2) a second-lien term-loan agreement originally providing for $450 million in second-lien term loans (the "<u>Second Lien Loans</u>"); and (3) a $225 million asset-based revolving-credit facility (the "ABL").**

Response to Paragraph No. 113:  The PTL Lenders admit the existence of three separate Non-PTL Term Loan Agreements entered into by the Company and certain lenders in 2016: (1)

the Non-PTL Term Loan Agreement; (2) a second lien term loan agreement; and (3) an asset-based revolving credit facility.  The PTL Lenders otherwise deny that the allegations in Paragraph 113 represent a complete and accurate description of the agreements referenced in Paragraph 113 and respectfully refer the Court to those agreements for complete and accurate statements of their contents.

**114.    The First Lien Agreement includes a waterfall providing for the allocation of proceeds in the case of an event of default or if the loans are accelerated.**

Response to Paragraph No. 114:  The PTL Lenders deny that the allegations in Paragraph 114 present a fair or complete description of Non-PTL Term Loan Agreement, and respectfully refer the Court to that Agreement for a complete and accurate statement of its contents.

**115.    From a lender's perspective, the waterfall is among the most critical sections in credit agreements, as it specifies how collateral will be allocated and divided among lenders if the loans become due as the result of an event of default or bankruptcy.**

Response to Paragraph No. 115:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning any particular lender's perspectives as alleged in Paragraph 115 and on that basis deny them.  The PTL Lenders otherwise deny the allegations in Paragraph 115, except admit that a "waterfall" provision in a credit agreement may govern how distributions are made upon the occurrence of certain events depending on the credit agreement's terms.

**116.    In this case, Section 2.18(b) of the First Lien Agreement specified the relevant payment waterfall for First Lien Lenders. It provided that, after certain expenses are paid, the proceeds of collateral would be divided *pro rata* among all First Lien Lenders, based on the face amount of their ownership of loans. This means that all First Lien**

**Lenders would share ratably in the available value based on the percentage of their loans, and that no First Lien Lender would have a superior right to the collateral over any other. Indeed, the *pro rata* sharing of collateral proceeds is so fundamental that Section 2.18(c) of the First Lien Agreement requires any First Lien Lender that receives payment on account of its loans—including a distribution of collateral proceeds—that is greater than its *pro rata* share to pay the excess ratably to the other First Lien Lenders.**

Response to Paragraph No. 116:  The PTL Lenders admit that the Non-PTL Term Loan Agreement contains Section 2.18(b), but deny that the allegations in Paragraph 116 present a fair, accurate, or complete description of Section 2.18(b) and respectfully refer the Court to that provision for a complete and accurate statement of its contents.  The PTL Lenders otherwise deny the remaining allegations in Paragraph 116.

117.    **The centrality of the provisions requiring *pro rata* distribution is further underscored by the First Lien Agreement's amendment provisions. Many provisions in the First Lien Agreement may be amended by approval of the "Required Lenders," defined as lenders representing more than 50% of the outstanding face amount of the loans. But a handful of provisions in the First Lien Agreement (sometimes called "sacred rights") may only be amended by securing "the consent of *each Lender* directly and adversely affected thereby."[2] This unanimity requirement is reserved for the waiver or amendment of the First Lien Agreement's most important provisions, including changes to the interest rate, the maturity date, and other provisions that are core of the lender's repayment rights. The *pro rata* distribution rights set forth in Sections 2.18 are among the First Lien**

---

[2]  The First Lien Agreement and the Subordination Amendment are incorporated by reference herein.

**Agreement's provisions requiring the consent of "each Lender directly and adversely affected thereby"—i.e., *everyone.***

Response to Paragraph No. 117:  The PTL Lenders admit that many provisions in the Non-PTL Term Loan Agreement may be amended by approval of the "Required Lenders" as defined that Agreement.  The PTL Lenders deny that the allegations in Paragraph 117 otherwise present a fair, accurate, or complete description of the Non-PTL Term Loan Agreement and respectfully refer the Court to that Agreement for a complete and accurate statement of its contents.  The PTL Lenders otherwise deny the remaining allegations in Paragraph 117.

**118.    Specifically, Section 9.02(b)(A)(6) provides that each affected lender must approve any agreement that "waives, amends or modifies <u>Sections 2.18(b)</u> or (c) of this Agreement in a manner that would by its terms alter the *pro rata* sharing of payments required thereby (except in connection with any transaction permitted under <u>Sections 2.22</u>, <u>2.23</u>, <u>9.02(c)</u>, and/or <u>9.05(g)</u> or as otherwise provided in this <u>Section 9.02</u>)." As such, unless one of these four enumerated exceptions applies (and, as demonstrated below, they do not in this case), the LCM Defendants' *pro rata* rights could not be changed without their consent.**

Response to Paragraph No. 118:  The PTL Lenders admit that the Non-PTL Term Loan Agreement contains 9.02(b)(A)(6), but deny that the allegations in Paragraph 116 present a fair, accurate, or complete description of 9.02(b)(A)(6) and respectfully refer the Court to that provision for a complete and accurate statement of its contents.  The PTL Lenders also state that the allegation in the second sentence of Paragraph 118 contradicts the summary judgment decision issued by this Court on March 28, 2023.  The PTL Lenders otherwise deny the remaining allegations in Paragraph 118.

15

119.    **The First Lien Agreement also prevented any effort to end-run these provisions by protecting the amendment provisions themselves. Thus, the First Lien Agreement stated that no agreement between Serta and the Required Lenders (meaning a mere majority of the First Lien Lenders) could "change any of the provisions of <u>Section 9.02(a)</u> or <u>Section 9.02(b)</u> or the definition of 'Required Lenders' to reduce any voting percentage required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, without the prior written consent of each Lender." § 9.02(b)(B)(1). In other words, any amendment to the process for amending the First Lien Agreement's *pro rata* sharing provision required the consent of all First Lien Lenders.**

Response to Paragraph No. 119:  The PTL Lenders deny that the allegations in Paragraph 119 present a fair, accurate, or complete description of the Non-PTL Term Loan Agreement and respectfully refer the Court to that Agreement for a complete and accurate statement of its contents.  The PTL Lenders otherwise deny the remaining allegations in Paragraph 119.

120.    **As noted, the First Lien Agreement carved out four types of transactions from the unanimity requirement. *First,* Serta could invoke Section 2.22 to issue incremental additional loans (subject to the requirement that any additional loans be *pari passu* or junior to the First Lien Loans). *Second,* Serta could invoke Section 2.23 to extend the maturity on existing First Lien Loans (subject to the same non-subordination requirement). *Third,* Serta could invoke Section 9.02(c)(i) to enter into certain transactions to refinance or replace *(i.e.,* exchange) existing First Lien Loans (again, subject to the same non-subordination requirement). And *finally,* Section 9.05(g) allowed First Lien Lenders to assign to a Borrower (like Serta) their loans on a non-pro *rata* basis**

16

**in certain limited circumstances—i.e., through either a Dutch Auction or an "open market" transaction to retire First Lien Loans.**

Response to Paragraph No. 120:  The PTL Lenders admit that the Non-PTL Term Loan Agreement contains Sections 2.22, 2.23, 9.02(c)(i), and 9.05(g), but deny that the allegations in Paragraph 120 present a fair, accurate, or complete description of those provisions and respectfully refer the Court to the Non-PTL Term Loan Agreement for a complete and accurate statement of its contents.  The PTL Lenders otherwise deny the remaining allegations in Paragraph 120.

*The Exchange Transaction*

121.    **As the LCM Defendants learned when Serta issued its June 2020 press release, in April 2020, Serta began having private discussions with certain individual lenders to negotiate the possibility of restructuring Serta's debt. The LCM Defendants were never invited to participate in those discussions, were never consulted, and, before the press release, had no knowledge whatsoever of Serta's private plans to restructure its debt. The LCM Defendants engaged in no conversations with Serta about that matter, and their consent was never sought or obtained.**

Response to Paragraph No. 121:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 121 and on that basis deny the allegations in Paragraph 121.

122.    **On June 8, 2020, as noted above, Serta announced to the market that it planned to enter into the Exchange Transaction. Under the Exchange Transaction, Serta would obtain $200 million of new money financing, and the Handpicked Lenders would trade all their existing first-and second-lien loans for "super-priority" loans with rights of payment ahead of the erstwhile "first lien" holders. Despite the unanimous-consent**

provisions, the Exchange Transaction was not subject to the consent of the LCM Defendants and the other Defendants.

Response to Paragraph No. 122: The PTL Lenders admit that the Company publicly announced the Transaction on June 8, 2020, and that the Transaction provided for a new super-priority term loan facility with two tranches: a $200 million new money tranche and a debt-for-debt purchase tranche. The PTL Lenders deny the remaining allegations in Paragraph 122.

**123.    On June 22, 2020, Serta closed the Exchange Transaction.**

Response to Paragraph No. 123: The PTL Lenders admit that the Transaction closed on June 22, 2020.

**124.    The Exchange Transaction purported to create, among other things, the following tranches of super-priority debt (together, the "Super-Priority Loans"):**

> **a.    $200 million of newly funded super-priority "first out" debt, which would rank ahead of the existing First Lien Loans;**

> **b.    $875 million of super-priority "second out" debt, which also would rank ahead of existing First Lien Loans, and which was created through an "exchange" of the Handpicked Lenders' first- and second-lien loans; and**

> **c.    An unspecified amount of capacity for Serta to incur still more super-priority debt through further exchanges, which would be "third out" and would also rank ahead of the existing First Lien Loans.**

Response to Paragraph No. 124: The PTL Lenders admit that the Transaction provided for a new super-priority term loan facility with two tranches: (i) a $200 million new money tranche and (ii) a debt-for-debt purchase tranche, pursuant to which the Company purchased

approximately $1.2 billion par value of existing First and Second Lien Term Loans (collectively, the "PTL Loans") on the open market for approximately $875 million par value of priority term loans, but otherwise deny that the allegations in Paragraph 124 present a fair, accurate, or complete description of the Transaction, and respectfully refer the Court to the Super-Priority Term Loan Agreement and Transaction agreements for a complete and accurate statement of their contents.

125.    **The LCM Defendants were never offered the opportunity to exchange *their* holdings, and were also never offered an opportunity to participate in the new super-priority $200 million financing.**

Response to Paragraph No. 125:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 125 and on that basis deny the allegations in Paragraph 125.

126.    **As a result of the Exchange Transaction, there is now at least $1.075 billion in Super-Priority Loans with priority liens on the collateral that currently secures the First Lien Loans, ahead of the $814 million remaining First Lien Loans owned by the CLOs and the other Excluded Lenders.**

Response to Paragraph No. 126:  The PTL Lenders deny the allegations in Paragraph 126, except admit that, as a result of the Transaction, the Company issued at least $1.075 billion par value in first out and second out priority debt and respectfully refer the Court to the Transaction agreements for a complete and accurate statement of their contents.

127.    **In the case of an event of default, more than $1 billion in debt would be paid in full before the LCM Defendants could receive even a single penny, notwithstanding that they purchased "first lien" debt at or near par value, and that the First Lien Agreement**

**precluded any changes to the waterfall absent Defendants' consent (which the LCM Defendants and the other Defendants in this adversary proceeding never provided). The fact that Serta's previous "first-lien" holders now stand to receive as little as 1% of their *pro rata* equity in the reorganized entity—while the Handpicked Lenders will get either payment in full or up to 99% of their *pro rata* equity in the reorganized entity— demonstrates how meaningless it was for the Exchange Transaction to have nominally retained the excluded lenders' *pari passu* status in the collateral.**

Response to Paragraph No. 127:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 127 concerning LCM's holdings, and on that basis deny the allegations in Paragraph 127.  The remaining claims in Paragraph 127 constitute characterizations of LCM's claims to which no response is required. To the extent that a response is required, the Company denies the allegations in Paragraph 127.

***The Subordination Amendment and Plaintiffs' Breach of the First Lien Agreement***

**128.    The Exchange Transaction was effectuated by amending the First Lien Agreement through the Subordination Amendment. By its terms, the Subordination Amendment altered the LCM Defendants' rights to the *pro rata* sharing of payments as erstwhile "first-lien" lenders.**

Response to Paragraph No. 128:  The PTL Lenders deny the allegations in Paragraph 128, except admit that the Non-PTL Term Loan Agreement was amended in connection with the Transaction and respectfully refer the Court to the Transaction agreements for a complete and accurate statement of their contents.

**129.    The Subordination Amendment altered the *pro rata* rights of the Defendants as follows, among other things:**

a.    **Serta added an entirely new provision to Section 2.11 of the First Lien Agreement, making express and clear that the newly issued Super-Priority Loans would have a right of payment that is not *pro-rata* but rather senior to the right of the remaining First-Lien Lenders.**

b.    **Serta entered into to a new inter-creditor agreement placing the rights of certain lenders ahead of the minority of First-Lien Lenders left behind. The exchange transaction that placed the Handpicked Lenders in the pole- position of priority Lenders was expressly made a "condition subsequent" to the amendments to the First-Lien Credit Agreement.**

Response to Paragraph No. 129:  The PTL Lenders deny the allegations in Paragraph 128, except admit that, in connection with the Transaction, the Non-PTL Term Loan Agreement was amended and the Company entered into a new intercreditor agreement and respectfully refer the Court to the Transaction agreements for a complete and accurate statement of their contents.

130.    **On March 28, 2023, this Court ruled on Serta and the PTL Lender Plaintiffs' motions for summary judgment that Serta's decision to proceed without the approval of all affected Lenders through the "open market purchase" exception to the unanimity requirement in Section 9.05(g) of the First Lien Agreement was permissible under that provision. *See* Dkt. Nos. 141, 142 (April 6, 2023 order memorializing bench ruling). Mindful of the Court's ruling, the LCM Defendants assert the following allegations in paragraphs 131-136 that Plaintiffs breached the First Lien Agreement to preserve their arguments on appeal.**

Response to Paragraph No. 130:  The PTL Lenders admit that the Court issued a ruling

on Serta and the PTL Lender Plaintiffs' motions for summary judgment on March 28, 2023, as well as a subsequent Order on April 6, 2023, and respectfully refer the Court to those rulings for a complete statement of their contents. The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 127 concerning LCM's intent in asserting the allegations in Paragraphs 131–136, and on that basis deny the allegations in Paragraph 130.

131.    **The Subordination Amendment violated the amendment provisions of the First Lien Agreement. Indeed, as set forth in Section 9.02(b) of the First Lien Agreement, all affected Lenders—not just a bare majority of Lenders—must approve any amendment that "amends or modifies the provisions of Sections 2.18(b) or (c) of [the Credit] Agreement in a manner that would by its terms alter the *pro rata* sharing of payments required thereby." The Subordination Amendment constitutes such an amendment. But, at Serta's direction, it was not approved by all affected Lenders.**

Response to Paragraph No. 131:  The PTL Lenders deny the allegations in Paragraph 131, except admit that the Non-PTL Term Loan Agreement contains Section 9.02(b) and respectfully refer the Court to the Non-PTL Term Loan Agreement for a complete and accurate statement of its contents.

132.    **Serta has sought to justify its decision to proceed without the approval of all affected Lenders by invoking one of the exceptions to the unanimity requirement—namely, the exception in Section 9.05(g). But that exception does not apply. Most fundamentally, if Serta could evade the unanimity requirement through the expedient of structuring the transaction as a debt exchange and labeling it an "open market" exchange, the unanimity requirement would be rendered toothless.**

Response to Paragraph No. 132:  The PTL Lenders deny the allegations in Paragraph 132 and respectfully refer the Court to the Non-PTL Term Loan Agreement for a complete and accurate statement of its contents.  The PTL Lenders also state that the allegations in the second and third sentences of Paragraph 132 contradict the summary judgment decision issued by this Court on March 28, 2023.

133.    **The plain text of Section 9.05(g) makes clear that it does not apply. Indeed, Section 9.05(g) applies only to debt-retirement transactions, not to restructurings or exchanges.**

Response to Paragraph No. 133:  The PTL Lenders deny the allegations in Paragraph 133, and respectfully refer the Court to the Non-PTL Term Loan Agreement for a complete and accurate statement of its contents.  The PTL Lenders also state that the allegations in Paragraph 133 contradict the summary judgment decision issued by this Court on March 28, 2023.

134.    **Section 9.05(g) also requires "open market" or certain "Dutch Auction" transactions, and this transaction was neither. The First Lien Agreement indeed makes express that "Dutch Auction" transactions have to be open to everyone (with the consideration set by the lenders who participate), while the plain meaning of Section 9.05(g) makes clear that "open market" transactions have to be set by *open* markets. By contrast, the Exchange Transaction was negotiated in private by Serta and consisted of a structured debt exchange that was not open to everyone and did not reflect terms set by the market.**

Response to Paragraph No. 134:  The PTL Lenders deny the allegations in Paragraph 134, except admit that Section 9.05(g) of the Non-PTL Term Loan Agreement permits open market purchases, and respectfully refer the Court to the Non-PTL Term Loan Agreement for a complete and accurate statement of its contents.  The PTL Lenders also state that the allegations in Paragraph 134 contradict the summary judgment decision issued by this Court on March 28,

2023.

**135.    If there were any doubt that Section 9.05(g) was not an available path to complete this transaction without unanimous approval, the structure of the First Lien Agreement dispels it. Indeed, the First Lien Agreement devotes an entirely different section (Section 9.02(c)) to refinancing and debt-exchange transactions of the type at issue here. But Serta did not attempt to structure the Exchange Transaction under Section 9.02(c), because Section 9.02(c) required that any new debt *be junior to or pari passu* to the paper held by the First Lien Lenders. And, of course, the whole point of this transaction was to evade that requirement.**

Response to Paragraph No. 135:  The PTL Lenders deny the allegations in Paragraph 135 and respectfully refer the Court to the Non-PTL Term Loan Agreement for a complete and accurate statement of its contents.  The PTL Lenders also state that the allegations in Paragraph 135 contradict the summary judgment decision issued by this Court on March 28, 2023.

**136.    The Subordination Amendment violated the First Lien Agreement in another important way. Under Sections 9.02(b)(B)(2) and 9.02(b)(B)(3) of the First Lien Agreement, an agreement to release all or substantially all of the Collateral generally requires the prior written consent of each Lender, as does an agreement to release all or substantially all of the value of the guarantees of the borrowers' obligations under the First Lien Agreement. The Subordination Amendment did both of these things: It effectively released all or substantially all of the First Lien collateral from the current first-priority ranking lien by modifying the ranking of the loans, and also released all or substantially all of the value of the guarantees that protect the First Lien Lenders, because those guarantees are now effectively worthless.**

Response to Paragraph No. 136:  The PTL Lenders deny the allegations in Paragraph 136, except admit that the Non-PTL Term Loan Agreement contains Sections 9.02(b)(B)(2) and 9.02(b)(B)(3) and respectfully refer the Court to the Non-PTL Term Loan Agreement for a complete and accurate statement of their contents.

**The Plaintiffs' Bad Faith Efforts to Subordinate the Defendant Lenders**

137.   **At the March 28, 2023 summary judgment hearing, the Court held that Defendants may plead counterclaims concerning the implied covenant of good faith and fair dealing provided they do not target the merits of the transaction under the terms of Section 9.05(g). SJ Hearing Tr. at 135:21-136:4.[3]**

Response to Paragraph No. 137:  The PTL Lenders admit that at a March 28, 2023, the Court issued a ruling on Plaintiffs' motions for summary judgment.  The PTL Lenders assert that the Court's ruling speaks for itself and respectfully refers the Court to the transcript of the March 28, 2023 hearing and the Court's April 6, 2023 order (Dkt. 142) for a complete and accurate statement of that ruling.

138.   **The LCM Defendants do so here. The LCM Defendants' allegations that follow in paragraphs 139-156 target the *intent and process* by which Serta and the PTL Lenders orchestrated the "amend to exit and prime" approach that eviscerated the bargained-for value of the Defendants' first-lien debt.**

Response to Paragraph No. 138:  The PTL Lenders deny the allegations in Paragraph 138.

---

[3]  "I also think it's just plain fair that with knowing that this [summary judgment] ruling now exists that the reliance upon the inappropriate—the alleged inappropriateness of the transaction as being violative of 9.05(g), that doesn't factor in anymore—at least I've made my decision to the extent that there still exists a claim for the breach of—a breach of any duty having to do with how people acted under the contract, I'm certainly going to give the Defendants an opportunity to put that in writing."

139.    **Discovery to date in the action before Judge Failla in the Southern District of New York, as reproduced in the instant action by Serta and the LCM Defendants, has borne out that Serta, its principal sponsor Advent International Corp., the PTL Lenders, and their respective financial and legal advisors, acted with specific, bad-faith intent to deprive the excluded lenders, including the LCM Defendants, of the benefit of their originally agreed-to bargain.**

Response to Paragraph No. 139:  The PTL Lenders deny the allegations in Paragraph 139.

140.    **Documentary evidence suggests that the PTL Lenders, acting through their agents at Centerview Partners LLC and Gibson Dunn & Crutcher LLP, originally conceived of what came to be the Exchange Transaction as a DIP facility (or a restructuring that would have the qualities of a DIP facility, whether or not Serta actually intended to file for Chapter 11).  For example, all of the precedent transactions discussed by Gibson "Dunn and Centerview on which they would come to base their Serta proposal involved companies that had either filed for bankruptcy or had implemented restructurings that obtained unanimous consent from their then first-lien lenders.**

Response to Paragraph No. 140:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning "all of the precedent transactions discussed by Gibson Dunn and Centerview," but otherwise deny the allegations in Paragraph 140, and respectfully refer the Court to the referenced documents, should LCM identify them, for a complete and accurate statement of their contents.

141.    **Over time, however, this proposal transmogrified into the Exchange Transaction, whereby Serta would avoid having to file for Chapter 11 protection *or* having to seek the**

**consent of all affected lenders for a restructuring. Through the mechanism of the Exchange Transaction, a bare majority of 50.1% of first- and second-lien lenders simultaneously executed (1) amendments to the First Lien and Second Lien Term Loan Agreements that would strip those agreements of their *pro rata* right of payment and (2) a so-called Priority Term Loan Agreement and an Open Market and Cashless Exchange Agreement, by which that bare majority would instantly exchange its commitments under the First and Second Lien Agreements for new debt that was senior in right of payment.**

Response to Paragraph No. 141:  The PTL Lenders deny the allegations in Paragraph 141, except admit that the Transaction, as permitted by the Non-PTL Term Loan Agreement, was effectuated by a majority of lenders and involved a debt-for-debt purchase tranche and respectfully refer the Court to the Transaction agreements for a complete and accurate statement of their contents.

142.   **When the Exchange Transaction was announced in principle on June 8, 2020, Serta and the PTL Lenders did not actually have the requisite majority vote of outstanding first- and second-lien term loan holders they needed to effectuate it. For the economics of the transaction to work, they needed to try to obtain a bare majority and nothing greater because the value to the PTL Lenders of the exchange tranche of the transaction would be inversely proportional to the number of lenders that participated. Because Serta was selling the *pro rata* rights of the lenders who would not be permitted to participate in the Exchange Transaction as consideration for the new debt and the discount on the old debt, it was necessary to the transaction that certain lenders be excluded.**

Response to Paragraph No. 142:  The PTL Lenders deny the allegations in Paragraph

142, except admit that the Transaction was announced on June 8, 2020, that some lenders
decided to participate in the Transaction after it was announced on June 8, 2020 and that not all
lenders participated in the Transaction.

143.   **The process by which Serta and the PTL Lenders arrived at the bare majority they
achieved was a product of arbitrary and hypocritical motivations and considerations. For
example, documentary evidence suggests that Barings, Oaktree, and Sixth Street
Partners were allowed into the deal because they had each previously proposed a "drop-
down" style transaction analogous to the one that Serta and the PTL Lenders (among
whom *is* Barings) now decry as having been predatory and a bad deal for Serta.**

Response to Paragraph No. 143:  The PTL Lenders deny the allegations in Paragraph
143, and respectfully refer the Court to the referenced "documentary evidence," should LCM
identify it, for a complete and accurate statement of its contents.

144.   **During the gap between the announcement of the transaction and its close, Kenneth
Prince, Head of Capital Markets at Advent International Corp., Serta's private equity
sponsor, took a particularly heavy hand in deciding who was "in" and who was "out"
based on certain lenders' preexisting relationships with Advent and its portfolio
companies. In at least two instances, Mr. Prince conceded that allowing certain lenders
to participate would be economically unfavorable to Serta (because it had the potential
to push the participating lenders beyond the bare majority required), but told those
lenders they would be permitted to participate purely because of their good relationship
with Advent.**

Response to Paragraph No. 144:  The PTL Lenders lack knowledge or information
sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 144, and on that

basis deny the allegations in Paragraph 144.

145.     **Conflicting information was given to existing lenders who had not been invited to the deal before it was announced but reached out pre-close to one of Advent, Serta, Centerview, Evercore, Gibson Dunn, Weil, or UBS (in its capacity as administrative agent for the term loans). Depending on who a given lender approached (and whether the party they approached was amenable to that lender's inclusion) they may have been told that Advent, Serta, or Evercore were calling the shots or that Centerview and the existing Handpicked Lenders were. This lack of clarity was a useful pretext for keeping interested lenders out simply by confusing them as to who had the decision-making authority. Indeed, in at least one instance, a particular lender was told by *both* the Serta/Evercore/Advent side *and* the Centerview/Gibson Dunn side that their hands were tied because the *opposite* side was setting the participation levels.**

     <u>Response to Paragraph No. 145</u>:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 145, and on that basis deny the allegations in Paragraph 145.

146.     **Based on the documentary evidence provided to date, the reality of who was calling the shots appears to have rested somewhere in the middle: the Serta/Evercore/Advent side and the Centerview/Gibson Dunn side were each allocated a certain amount of room left in the deal to reach the necessary majorities and had the latitude to make decisions about who would be allowed in.**

     <u>Response to Paragraph No. 146</u>:  The PTL Lenders deny the allegations in Paragraph 143, and respectfully refer the Court to the referenced "documentary evidence," should LCM identify it, for a complete and accurate statement of its contents.

**147.    Neither Serta nor the PTL Lenders nor any of their agents ever solicited the participation of the LCM Defendants in the Exchange Transaction.**

Response to Paragraph No. 147:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 147, and on that basis deny the allegations in Paragraph 147.

**148.    Once the principal parties were nearly certain that they had reached bare majorities of the first- and second-lien loan holders, they were required to functionally disassemble the existing First Lien Credit Agreement so as to permit the incurrence of the new super-priority debt that Serta was set to issue without explicitly modifying those provisions of the agreement that would affect creditors' sacred rights. But perhaps the most striking aspect of the amendment process was that it was designed to take place in a unified, collapsed transaction alongside the open market "purchase" and debt-for-debt exchange.**

Response to Paragraph No. 148:  The PTL Lenders deny the allegations in Paragraph 148, except admit that the Transaction did not modify the provisions of the Non-PTL Term Loan Agreement that would affect creditors' sacred rights and involved a debt-for-debt purchase effectuated through open market purchases between the Company and the participating lenders as permitted by Section 9.05(g) of the Non-PTL Term Loan Agreement.

**149.    The Handpicked Lenders assented to the amendments on the exclusive understanding that they would not have to live under them because, immediately upon their execution, the amendments permitted Serta to purportedly "purchase" those very lenders' existing debt and exchange it for new super-priority debt. In other words, the Handpicked Lenders voted in favor of what would otherwise be an extraordinarily bad deal *because* Serta would be imminently extricating them from the population of lenders affected by**

the deal. **For a lender to use its vote to destroy the fruits of a contract with the knowledge that its vote would simultaneously extract it from that contract is at the very heart of bad faith.**

Response to Paragraph No. 149:  The PTL Lenders deny the allegations in Paragraph 149.

150. **The above chronology depicts a complicated negotiation history in which Serta and the PTL Lenders engaged in four primary types of bad faith conduct that undermined the animating *pro rata* principles embedded in the First Lien Agreement.**

Response to Paragraph No. 150:  The PTL Lenders deny the allegations in Paragraph 150.

151. ***First*, the fact that Serta and the PTL Lenders negotiated the Exchange Transaction in private, without informing other lenders, is significantly probative of bad faith. Open market purchase transactions are typically conducted at arm's length through a dealer-mediated exchange such as Bloomberg's electronic trading platform, with offers to buy or sell published widely through mass distributions from investment banks, open to all willing market participants. The Plaintiffs pursued a contrary path. The documentary record reveals that Serta tasked its financial advisors, and the Handpicked Lenders' advisors, to privately cobble together a group of first-lien lenders to participate in the Exchange Transaction that in the aggregate comprised the bare majority required to amend the First Lien Agreement. On information and belief, the LCM Defendants' holdings were too *de minimis* to garner attention by the architects of the Exchange Transaction. This economic reality not only barred the LCM Defendants from an**

extremely lucrative debt exchange and issuance opportunity, it also actively crushed the value and magnified the risk of the LCM Defendants' holdings in Serta debt.

Response to Paragraph No. 151:  The PTL Lenders deny the allegations in Paragraph 151.

152.   *Second,* Serta's systematic inclusion of certain lenders to reach a bare majority and exclusion of other lenders, including Defendants, that did not move the quantitative needle evinces a deliberate favoritism anathema to the First Lien Agreement's principle of equal treatment. As discussed above, the Handpicked Lenders' advisors, as well as the controlling shareholder Advent, solicited the participation of individual lenders with the goal of obtaining a bare majority to participate in the Exchange Transaction. The LCM Defendants did not learn of the Exchange Transaction until it was announced publicly by Serta. The Plaintiffs deliberately shielded nonparticipating lenders from the negotiations going on behind closed doors.

Response to Paragraph No. 152:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the third sentence of Paragraph 152 and on that basis deny the allegation in the third sentence of Paragraph 152, and otherwise deny the remaining allegations in Paragraph 152.

153.   *Third,* Plaintiffs impermissibly constructed a transactional structure through which the PTL Lenders would amend the First Lien Agreement and simultaneously sell their first-lien debt to Serta, thereby ending their participation under the very agreement they amended. This contractual maneuver belies the purpose of the majority amendment rule in credit agreements. Such provisions are designed to ensure that lenders' rights evolve in a manner palatable to the majority of lenders. Here, the PTL Lenders destroyed the

value of the minority holders' debt when they effectively held *zero* debt. It makes no sense for a non-party to a contract to amend a contract—and to do so to the detriment of a party to the contract—and yet that is effectively what occurred in the Exchange Transaction. In other words, the PTL Lenders' efforts to simultaneously "amend to exit and prime" strikes at the heart of Defendants' bargain, the essence of bad faith. Indeed, Serta and the PTL Lenders have argued in subsequent litigation that the PTL Lenders are on the one hand first-lien lenders for the purpose of amending the First Lien Agreement, but on the other hand, are no longer first-lien lenders for purposes of the First Lien Agreement's *pro rata* sharing provisions.

Response to Paragraph No. 153:  The PTL Lenders deny the allegations in Paragraph 153.

154. *Fourth,* the method and economics of the Exchange Transaction underscore the breach and the Plaintiffs' lack of good faith. To the first point, in order to evade the unanimous consent provisions protecting the lenders' sacred rights, the Plaintiffs had to concoct and avail themselves of a wholly novel construction of the "open market" exception. That exception is traditionally understood in the industry to mean repurchases in which the debtor enters the secondary marketplace to repurchase its debt at arms' length for monetary consideration, often anonymously, for the fair value that is freely set by lenders participating in the market. Here, though, to paper the Exchange Transaction, the Plaintiffs had to comb through and amend various provisions of the First Lien Agreement. That is, the consideration for the Exchange Transaction was not just money, but contractual surgery.

Response to Paragraph No. 154:  The PTL Lenders deny the allegations in Paragraph

154. The PTL Lenders also state that the allegations in Paragraph 154 contradict the summary judgment decision issued by this Court on March 28, 2023.

**155.    Serta has sought to justify the Exchange Transaction on the basis that it permitted Serta to decrease its leverage and increase liquidity, while leaving its interest expense neutral. But Serta could have accomplished the same result by dealing with all First Lien Lenders on *a pro rata* basis on market terms without amending the First Lien Credit Agreement. Indeed, if Serta had exchanged all First Lien Loans for 65.9 cents on the dollar (the blended exchange rate that allowed Serta to issue $851MM in new super-priority loans as part of its purported exchange), it would have ended up with $1.2 billion of new first-lien loans, $427MM of second-lien loans, and $200MM of new money for a total debt of $2,012MM—which is less than the debt it incurred in the Exchange Transaction ($2,216MM). The interest expense would have been $161MM vs. $142MM if the same rate structure had been maintained, but reducing the spread over LIBOR on this hypothetical *pro rata* basis exchange scenario to 5.9% from the 7.5% applied to the Super-Priority Loans would have achieved cash interest expense neutrality.**

Response to Paragraph No. 155:  The PTL Lenders lack knowledge or information sufficient to form a belief as to the accuracy of the figures and calculations in Paragraph 155 and on that basis deny them, and otherwise deny the allegations in Paragraph 155, except admit that the Transaction permitted Serta to decrease its leverage, increase liquidity, and lower its overall interest expenses.

**156.    But instead of pursuing this route (or any of the other options open to Serta under the First Lien Agreement), Serta chose to deal in private with certain lenders, and violated the protective provisions of the First Lien Agreement.**

Response to Paragraph No. 156:  The PTL Lenders deny the allegations in Paragraph

156.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

**157.    The LCM Defendants reassert and reallege the allegations contained in paragraphs**

**91 through 156 above as if fully set forth herein.**

Response to Paragraph No. 157:  The PTL Lenders repeat and incorporate by reference

its responses to the allegations contained in Paragraphs 91 through 156 as if fully set forth

herein.

**158.    The LCM Defendants assert this claim subject to the Court's order dated April 6**

**2023, *see* Dkt. Nos. 141, 142; the guidance provided at the March 28, 2023 hearing; and**

**the pending appeal thereof.**

Response to Paragraph No. 158:  The allegations contained in Paragraph 158 characterize

LCM's claims to which no response is required.  To the extent a response is required, the PTL

Lenders deny the allegations in Paragraph 158, and respectfully refer the Court to the transcript

of the hearing held on March 28, 2023, as well as the Court's April 6, 2023 order on Plaintiffs'

motions for summary judgment, for a true and accurate description of their contents.

**159.    Plaintiffs and the LCM Defendants were parties to the First Lien Agreement entered**

**into on November 8, 2016, which constitutes a valid and enforceable contract. The LCM**

**Defendants are authorized to exercise any and all remedies under the First Lien**

**Agreement, and Plaintiffs are jointly and severally liable thereunder.**

Response to Paragraph No. 159:  The PTL Lenders deny the allegations in Paragraph

159, except admit that funds managed or advised by the PTL Lenders, the LCM Defendants,

Serta, and others, were parties to the Non-PTL Term Loan Agreement entered into on November

8, 2016, which constitutes a valid and enforceable contract.

**160.    The LCM Defendants performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the First Lien Agreement.**

Response to Paragraph No. 160:  The allegations in Paragraph 160 constitute legal conclusions to which no response is required.  To the extent that a response is required, the PTL Lenders deny the allegations in Paragraph 160.

**161.    Plaintiffs, by contrast, have breached the express terms of the First Lien Agreement violating the First Lien Agreement's restrictions on any collateral- or guarantee-releasing "agreement," and altering the *pro rata* distribution provisions of Sections 2.18(b) and 2.18(c) without obtaining the consent of all affected Lenders as required by Section 9.02. The Plaintiffs further breached the agreement by exchanging loans in a manner not permitted by the First Lien Agreement, because the exchange of loans was not an "open market" purchase.**

Response to Paragraph No. 161:  The PTL Lenders deny the allegations in Paragraph 161.

**162.    As a consequence of Plaintiffs' material breaches, the LCM Defendants have been deprived of their contractual rights, including to receive a *pro rata* share of collateral proceeds on a first-lien basis, and the value of their loans and rights materially declined.**

Response to Paragraph No. 162:  The PTL Lenders deny the allegations in Paragraph 162.

**163.    The LCM Defendants have suffered damages as a result of Plaintiffs' breach, in an amount to be proven at trial.**

Response to Paragraph No. 163:  The PTL Lenders deny the allegations in Paragraph

163.

### SECOND CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

**164.    The LCM Defendants reassert and reallege the allegations contained in paragraphs**

**91 through 163 above as if fully set forth herein.**

Response to Paragraph No. 164:  The PTL Lenders repeat and incorporate by reference

its responses to the allegations contained in Paragraphs 91 through 163 as if fully set forth

herein.

**165.    The Exchange Transaction destroyed the LCM Defendants' rights to receive the**

**fruits of their bargain in violation of the implied covenant of good faith and fair dealing.**

Response to Paragraph No. 165:  The PTL Lenders deny the allegations in Paragraph

165.

**166.    Plaintiffs' actions in pursuing and then consummating the Exchange Transaction**

**disregarded the LCM Defendants' rights and were not taken in good faith because they**

**proceeded in secret, and even after the deal was announced, no clear information was**

**provided about whether or how a particular lender could seek to be included.**

**Notwithstanding Serta and the PTL Lenders' persistence in claiming that they ran a**

**"competitive process" in which they engaged with approximately 70% of those holding**

**Serta's outstanding first-lien debt, that still leaves the 30% of first-lien lenders—like the**

**LCM Defendants—who had no engagement with Serta at all, but very well could have**

**come to the bargaining table in good faith had they been consulted at all. Furthermore,**

**it is a fallacy to describe the process as "competitive" based on the quantum of lenders**

**with whom Serta engaged because the proposal Serta ultimately selected *relied* upon the**

exclusion of 49.9% of the lenders to maximize value to Serta and the PTL Lenders. In other words, even if 70% could be considered some threshold for open and transparent negotiation (and it should not be), the deal selected was one in which over 20% of that 70% would of necessity be excluded.

Response to Paragraph No. 166:  The PTL Lenders deny the allegations in Paragraph 166.

167.    The First Lien Agreement was amended by the "consent" of a group of Handpicked Lenders who gave their votes with the knowledge that they would never be bound by the amendments they agreed to, as the amendments were designed to allow Serta to exchange the Handpicked Lenders' debt for new, super-priority debt. Using a bare majority vote to destroy the benefits of a contract in return for being immediately extricated from that contract—and thereby benefitting from the husk of the contract left behind—is precisely the kind of abuse of discretionary contractual rights that the implied covenant of good faith and fair dealing is meant to police.

Response to Paragraph No. 167:  The PTL Lenders deny the allegations in Paragraph 167.

168.    The counterparties to the Exchange Transaction selected certain lenders to participate in the Exchange Transaction on the basis of arbitrary and irrational criteria—the most egregious example being whether a particular lender had a good relationship with Advent, a consideration that should not have played any role in determining whether the deal was good for *Serta,* a separate corporate entity with minority shareholders in addition to Advent. They obfuscated information about which party had ultimate decision-making authority to create confusion among excluded

**lenders in order to satisfy their individual preferences while keeping participation as close to a bare majority as possible. And they did this because they knew they were trading on the diminution of value to the lenders left behind, such that inclusion in the deal would be a godsend for anyone fortunate enough to be asked to participate. All this behavior smacks of bad faith.**

Response to Paragraph No. 168:  The PTL Lenders deny the allegations in Paragraph 168.

169. **Finally, the Exchange Transaction did not simply require Serta and the Handpicked Lenders to style their action an "open market purchase," it also required an extraordinary number of amendments to the pre-existing First Lien Agreement that would allow Serta to issue the new super-priority debt. Although Serta and the Handpicked Lenders took obvious care not to *explicitly* amend the sacred rights provisions of the agreement, they still had to take a scalpel to the remainder. As Judge Failla concluded in the LCM Action, "one could reasonably conclude from Plaintiffs' allegations that Defendant systematically combed through the Agreement tweaking every provision that seemingly prevented it from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one. *(See, e.g.,* Amendment § 1.01 (altering, *inter alia,* the definitions of Acceptable Intercreditor Agreement and Incremental Equivalent Debt); *id., §* 7.01(1) (removing subordination as an event of default); *id., §* 8.08 (authorizing the Administrative Agent to enter the PTL Intercreditor Agreement)). To the extent the letter of the Agreement permitted Defendant to take these actions, Plaintiffs argue that Defendant violated the implied covenant of good faith and fair dealing by offering the PTL Loans to only a subset of**

first-lien lenders, rather than to all of them on a *pro rata* basis. . . . On these allegations, Plaintiffs have adequately alleged that Defendant deprived them of the benefit of their bargain in bad faith." *LCM AA1I Ltd. v. Serta Simmons Bedding, LLC,* 2022 WL 953109, at *15 (S.D.N.Y. Mar. 29, 2022).

Response to Paragraph No. 169: The PTL Lenders deny the allegations in Paragraph 169, except admit that the Transaction was effectuated in part through open market purchases and did not amend the sacred rights provisions of the Non-PTL Term Loan Agreement, and respectfully refer the Court to the referenced decision, Non-PTL Term Loan Agreement, and the referenced amendments to the Non-PTL Term Loan Agreement for full and complete statements of their contents.

170.    **The rights of amendment and exchange under the First Lien Agreement were used abusively and for an improper purpose, to injure first-lien lenders.**

Response to Paragraph No. 170: The PTL Lenders deny the allegations in Paragraph 170.

171.    **The LCM Defendants have suffered damages as a result of the Plaintiffs' breach, in an amount to be proven at trial.**

Response to Paragraph No. 171: The PTL Lenders deny the allegations in Paragraph 171.

## PRAYER FOR RELIEF

The PTL Lenders deny that the LCM Defendants are entitled to any relief in any form whatsoever, including the relief specified in the Counterclaims.

## AFFIRMATIVE DEFENSES

The PTL Lenders assert the following affirmative defenses and hereby reserve their rights to assert other and additional defenses, claims, counterclaims, and third-party claims not asserted herein of which they become aware through discovery or other investigation as may be appropriate at a later time.  In asserting these affirmative defenses, the PTL Lenders do not assume any burden of proof, persuasion, or production with respect to any issue where the applicable law places the burden upon another party.

### FIRST AFFIRMATIVE DEFENSE

LCM fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

LCM's claims are barred, in whole or in part, by equitable estoppel, waiver, unclean hands, laches, and/or other equitable doctrines.

### THIRD AFFIRMATIVE DEFENSE

LCM's claims are barred because they do not have standing to bring claims against the Company or the PTL Lenders, to the extent those claims belong to the estate and the challenge period for LCM to seek standing has expired.  *See generally, In re Revlon, Inc*., 2023 WL 2229352 (Bankr. S.D.N.Y. Feb. 24, 2023).

### FOURTH AFFIRMATIVE DEFENSE

LCM's claims are barred, in whole or in part, because they suffered no damages for the conduct alleged in the Complaint.

### FIFTH AFFIRMATIVE DEFENSE

LCM's damages, if any, are speculative and uncertain, and are impossible to ascertain.

<u>**SIXTH AFFIRMATIVE DEFENSE**</u>

LCM's claims are barred, in whole or in part, on the ground that they failed to mitigate any damages they may have suffered.

<u>**SEVENTH AFFIRMATIVE DEFENSE**</u>

LCM's claims are barred because the PTL Lenders complied with the terms of, and discharged their duties, if any, with respect to, the parties' agreements.

<u>**EIGHTH AFFIRMATIVE DEFENSE**</u>

LCM's claims are barred because the PTL Lenders at all times acted in good faith and without wrongful intent, malice or any other applicable degree of fault.

<u>**NINTH AFFIRMATIVE DEFENSE**</u>

The implied covenant claims are barred because they seek to impose obligations on the PTL Lenders that go beyond the obligations set forth in the contract.

<u>**TENTH AFFIRMATIVE DEFENSE**</u>

The implied covenant claims are barred because they are duplicative of LCM's claims for breach of contract, including those that have now been obviated by the Court's decisions.

<u>**ELEVENTH AFFIRMATIVE DEFENSE**</u>

LCM's claims for damages are barred under the First Lien Term Loan Agreement to the extent that they seek special, indirect, consequential, or punitive damages.

<u>**TWELFTH AFFIRMATIVE DEFENSE**</u>

LCM's claims are barred by the law of the case, res judicata and collateral estoppel in light of the Court's ruling on Plaintiffs' motion for summary judgment and the partial final judgment consented to by LCM.

Dated:  April 28, 2023

Respectfully submitted,

*/s/ C. Lee Wilson*

GIBSON, DUNN & CRUTCHER LLP

Gregg Costa (24028160)
811 Main Street, Suite 3000
Houston, TX 77002
Tel: (346) 718-6600
Fax: (346) 718-6620
Email: gcosta@gibsondunn.com

Scott J. Greenberg (admitted *pro hac vice*)
Jason Goldstein (admitted *pro hac vice*)
C. Lee Wilson (admitted *pro hac vice*)
Akiva Shapiro (admitted *pro hac vice*)
Amanda M. Aycock (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Tel:  (212) 351-4000
Fax: (212) 351-4035
Email: sgreenberg@gibsondunn.com
        jgoldstein@gibsondunn.com
        clwilson@gibsondunn.com
        ashapiro@gibsondunn.com
        aaycock@gibsondunn.com

*Counsel for Invesco Senior Secured*
*Management, Inc., Boston Management and*
*Research, Credit Suisse Asset Management,*
*LLC, Eaton Vance Management, and Barings*
*LLC*