**<u>Exhibit B</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| SERTA SIMMONS BEDDING, LLC, et al., | Case No. 23-90020 (DRJ) (Jointly Administered) |
| Debtors, | |

| | |
|---|---|
| SERTA SIMMONS BEDDING, LLC, et al., | |
| Plaintiffs and Counterclaim Defendants, | Adversary Proc. No. 23-09001 (DRJ) |
| v. | |
| AG CENTRE STREET PARTNERSHIP L.P., et al., | |
| Defendants, Counterclaim Plaintiffs and Third-Party Plaintiffs, | |
| v. | |
| AGF FLOATING RATE INCOME FUND, et al., | |
| Third-Party Defendants. | |

**EXPERT DECLARATION OF SARAH M. WARD**

Pursuant to 28 U.S.C. § 1746, SARAH M. WARD declares as follows:

# I.    INTRODUCTION

### A.    Assignment

1.    I have been retained by Friedman Kaplan Seiler Adelman & Robbins LLP ("Friedman Kaplan"), which is counsel to the Ad Hoc Group of First Lien Lenders ("First Lien Lender Defendants") to Serta Simmons Bedding, LLC ("Serta"), to render opinions regarding the origin, purpose, and market understanding of certain provisions of the First Lien Term Loan Agreement, dated as of November 8, 2016 (the "Term Loan Agreement"), by and among Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), Serta, the other borrowers party thereto, the lenders from time to time party thereto, and UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the lenders (in such capacities and together with its successors and assigns, the "Administrative Agent").  In particular, I have been asked to give my opinion, as a knowledgeable financial industry participant, drawing on my participation in the leveraged loan market as a legal professional, as to the First Lien Lender Defendants' reasonable expectations regarding the kinds of transactions that would be permissible under the pro rata treatment provisions in the Term Loan Agreement and the limited exceptions thereto.  I conclude that the First Lien Lender Defendants could not have reasonably expected that the Serta 2020 debt restructuring (the "Transaction") would be permitted under the terms of the Term Loan Agreement.

### B.    Qualifications

2.    I have 32 years of experience in finance, approximately 25 of which relate to leveraged financing transactions and corporate restructurings. My areas of expertise include, among other things, credit agreements, indentures, intercreditor agreements, security agreements and other loan documents as well as structuring credit transactions and due diligence. I routinely

structured and negotiated credit agreements, including syndicated credit agreements, many of which contain open market purchase provisions, on behalf of borrowers and lenders. Over the course of my career, I have also worked on dozens of in-court and out-of-court restructurings representing both lenders and borrowers.

3.      I practiced law for more than 35 years at Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), where I was a New York-based partner in the firm's Banking Group for over 27 years and co-chair of its Legal Opinion Oversight Committee ("Skadden Opinion Committee") for over a decade. I also served as Global Co-Head of the Banking Group from 2009-2014. I have authored numerous articles related to my areas of practice and have lectured extensively on banking-related topics. I retired from the firm in December 2021.  As a banking partner at Skadden, I routinely drafted and negotiated all types of credit agreements, including syndicated credit agreements, for almost three decades. For over ten years as Co-Head of the Skadden Opinion Committee, I reviewed and approved opinions related to syndicated credit agreements on a regular basis. During the ten years prior to my retirement, I have been involved in hundreds of financing transactions involving leveraged loans.

4.      I hold a Bachelor of Arts (BA) degree in Politics from Princeton University and a Juris Doctor (JD) degree from Fordham University School of Law.

5.      A true and complete copy of my curriculum vitae is attached hereto as Appendix A. I have not testified as an expert at a deposition or trial or submitted an expert report in the last four years, other than my expert declaration submitted in this matter on March 16, 2023.

### C.      Compensation

6.      Friedman Kaplan has been billed on an hourly basis for my work. My hourly rate for analysis and testimony is $1,250. My compensation is not affected by the nature of the opinions that I form or the outcome of the case.

### D.      Documents and Information Considered

7.      In the course of my analysis, I considered various documents, pleadings and other information of a type reasonably relied upon in a matter like this by experts in my field. This information includes, but is not limited to, transaction documents, complaints, motions and other pleadings, and research of publicly available information. I have also drawn on my extensive experience as a leveraged finance and corporate restructuring lawyer. Appendix B, attached hereto, sets forth the materials I have considered in forming the opinions discussed in this declaration.

## II.      SUMMARY OF CONCLUSIONS

8.      One of the most fundamental provisions in credit agreements is that the lenders within the same tranche are to be treated on a ratable basis. Historically, credit agreements prohibited lenders from assigning their loans to the borrower or its affiliates. After the 2008 financial crisis, credit agreements in the syndicated leveraged loan market evolved to permit borrowers and their affiliates to repurchase term loans at a discount on a non-pro rata basis through Dutch Auctions open to all lenders or open market purchases. These exceptions to the pro rata sharing rule benefitted all parties while retaining the equal treatment among lenders in the same tranche. To my knowledge, based on public information, prior to 2020, no borrower party to a credit agreement that included "sacred rights" protections for the pro rata sharing and collateral waterfall provisions had engaged in a discriminatory uptier transaction like the Transaction that favored majority lenders of a particular tranche at the expense of excluded minority lenders of that same tranche. Before this court ruled on the summary judgment motions of Serta and plaintiffs Invesco Senior Secured Management, Inc., Credit Suisse Asset Management, LLC, Boston Management and Research, Eaton Vance Management (the "PTL Lenders"), no court had ruled that the "open market purchase" exception in a leveraged loan

credit agreement unambiguously permitted a discriminatory uptier transaction like the Transaction. The First Lien Lender Defendants reasonably expected that they would receive equal treatment under the Term Loan Agreement in accordance with their sacred right protections of the pro rata treatment provisions.

9.      Based on my professional experience, my review of the relevant materials, and my analysis of the relevant loan documents, I have reached the following opinions:

## III.   ANALYSIS

### A.      History of Pro Rata Sharing Provisions

10.      Historically, the lender syndicate in a term loan financing was a relatively discrete group of banks that had a relationship with the borrower, and the arranger held a substantial portion of the loans. The credit agreements governing these term loans required that lenders be treated on a ratable basis.[1] Lenders made loans "ratably" in accordance with their commitments in a particular tranche and were paid principal and interest on a pro rata basis in accordance with the outstanding amounts of that tranche.[2]

11.      Traditional loan agreements prohibited lenders from assigning their loans to the borrower or its affiliates. If a lender did assign its interest in a term loan to the borrower or its affiliates, the pro rata sharing provision expressly required that the assigning lender share any proceeds received pro rata with the other lenders of that tranche. Moreover, traditional loan agreements included a payment waterfall requiring all proceeds of collateral to be applied pro

---

[1] Lee M. Shaiman & Bridget K. Marsh, *The Handbook of Loan Syndications and Trading*, Chapt. 10, 2nd Ed., McGraw Hill, New York, NY (2022); Bellucci, Michael, and Jerome McCluskey, *The LSTA's Complete Credit Agreement Guide*, Chapt. 10, 2nd Ed., McGraw Hill, New York, NY (2016).

[2] Lee M. Shaiman & Bridget K. Marsh, *The Handbook of Loan Syndications and Trading*, Chapt. 10, 2nd Ed., McGraw Hill, New York, NY (2022); Michael Belluci and Jerome McCluskey, *The LSTA's Complete Credit Agreement Guide*, Chapt. 10, 2nd Ed., McGraw Hill, New York, NY (2016).

rata to lenders in a particular tranche upon an acceleration of loans following an event of a default.[3]

12.     These pro rata sharing and collateral waterfall provisions were protected by the amendment provisions. Although the general rule in all credit agreements is that no amendment, modification, or waiver is effective without the consent of the majority or the required lenders, credit agreements typically included a limited number of exceptions called "sacred rights," which require unanimous or affected lender consent. "Sacred rights" included reductions in principal amounts and/or interest rates, reductions in amortization and extensions of the maturity date.[4] Notably, amendments to the pro rata sharing provisions and collateral waterfall were typically included as sacred rights.[5] The purpose of these sacred rights was to protect minority lenders from having their critical rights, including their rights to lien and payment priority, subordinated by the majority.

13.     During the credit boom of 2005-2007, the syndicated term loan market changed dramatically. Term loans issued by non-investment grade companies (known as "leveraged loans" or "term loan B financings") were no longer made on a lend-and-hold basis where the original syndicate of lenders retained exposure to and close relationships with the borrower. Instead, arranging banks originated and syndicated term loans to institutional investors (CLOs,

---

[3] Lee M. Shaiman & Bridget K. Marsh, *The Handbook of Loan Syndications and Trading*, Chapt. 10, 2nd Ed., McGraw Hill, New York, NY (2022).

[4] "Pro Rata Sharing Provisions in Credit Agreements: What Lenders and Loan Investors Need to Know," Chapman and Cutler LLP (July 25, 2017), https://www.chapman.com/publication-Pro-Rata-Sharing-Provisions-Credit-Agreements

[5] Eric Wise, "Open Market Purchases, Past and Future", N.Y. Law Journal (Sept. 16, 2022), https://www.law.com/newyorklawjournal/2022/09/16/open-market-purchases-past-and-future/; "Unhappy Lenders Challenge Aggressive Debt Exchanges," Skadden, Arps, Slate, Meagher & Flom LLP (Jan. 19, 2022), https://www.skadden.com/insights/publications/2022/01/2022-insights/corporate/unhappy-lenders-challenge-aggressive-debt-exchanges

loan mutual funds, private credit funds, etc.) with no expectation that the arranging banks would hold any amount of the loans for any period of time.[6]

14.     As lending syndicates in leveraged loan financings became ever larger and less relationship-oriented and renegotiation of credit terms became more time-consuming and expensive, covenants on borrowers loosened substantially. For example, in most leveraged loan credit agreements, financial maintenance covenants, which require the borrower to maintain compliance with specified financial tests (e.g. leverage ratio) that are tested quarterly, were replaced with high-yield type incurrence covenants that only take effect if the borrower is taking a specified action (e.g. leverage ratio tested only in the event the borrower incurs debt).[7]

15.     Following the 2008 financial crisis, borrowers and lenders in large syndicated leveraged loan financings agreed to limited exceptions to the pro rata sharing provisions that were not detrimental to non-participating lenders. For example, extensions or increases of commitments under incremental facilities as well as extension of the maturity of existing loans were permitted to be made by electing lenders on a non-ratable basis (i.e., less than all) so long as the incremental or extended loans were pari passu with – i.e., have no greater right to receive collateral proceeds – or junior to the existing loans (and, in the case of any extended loan, offered to each lender on the same terms, and made available on a pro rata basis).[8]   As more

---

[6] Lee M. Shaiman & Bridget K. Marsh, *The Handbook of Loan Syndications and Trading*, Chapts. 1, 2, 2nd Ed., McGraw Hill, New York, NY (2022); Brian V. Breheny, et al., "Skadden's 2012 Insights, January 2012: Capital Markets," Skadden, Arps, Slate, Meagher & Flom LLP (Jan. 12, 2012), https://www.jdsupra.com/legalnews/skaddens-2012-insights-january-2012-21949/

[7] Eric Wise, "Open Market Purchases, Past and Future", N.Y. Law Journal (Sept. 16, 2022), https://www.law.com/newyorklawjournal/2022/09/16/open-market-purchases-past-and-future/; Brian V. Breheny, et al., "Skadden's 2012 Insights, January 2012: Capital Markets," Skadden, Arps, Slate, Meagher & Flom LLP (Jan. 12, 2012), https://www.jdsupra.com/legalnews/skaddens-2012-insights-january-2012-21949/

[8] Brian V. Breheny, et al., "Skadden's 2012 Insights, January 2012: Capital Markets," Skadden, Arps, Slate, Meagher & Flom LLP (Jan. 12, 2012), https://www.jdsupra.com/legalnews/skaddens-2012-insights-january-2012-21949/

fully described in paragraphs 22 through 25 below, some borrowers and lenders also negotiated limited exceptions to the pro rata sharing provisions to allow borrowers and their affiliates to repurchase loans trading at a discount through non-pro rata Dutch Auctions open to all lenders and open market purchases.

16.     Amendment provisions that historically protected minority lenders were also materially weakened in some instances. For example, some credit agreements provided that the consent of only a majority of the lenders adversely affected by an amendment to the pro rata sharing provisions and collateral waterfall provisions were required.[9]  The Term Loan Agreement, by contrast, requires unanimous or affected lender consent for any amendment to the pro rata sharing or payment waterfall provisions.

**B.     The Term Loan Agreement Included Traditional Pro Rata Sharing Provisions**

17.     As noted, the Term Loan Agreement retains traditional credit agreement protections that prohibit borrowers from diverting value to some but not all lenders of the same tranche. For example, Section 2.18(c) of the Term Loan Agreement requires any first lien lender that receives payments for any reason (including by right of set off) in excess of its pro rata share to pay the excess ratably to the other first lien lenders.  Section 2.18(b) of the Term Loan Agreement also requires that collateral proceeds be shared on a pro rata basis among the first lien lenders.

18.     The Term Loan Agreement also retains the amendment provisions that protect the pro rata sharing and collateral waterfall provisions in Section 2.18. Section 9.02(b)(A)(6) provides that the consent of each lender directly and adversely affected thereby (but not the

---

[9] First Lien Credit Agreement, NYDJ Apparel, LLC, dated Jan. 6, 2014 (as amended).

majority or required lenders) is required for any waiver, amendment or modification that "waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby (except in connection with any transaction permitted under … Section 9.05(g))." Section 9.05(g) permits any lender to assign all or a portion of its rights and obligations under the Term Loan Agreement in respect of its term loans to the borrower or its affiliates on a non-pro rata basis (A) through Dutch Auctions open to all lenders holding the relevant term loans on a pro rata basis or (B) through open market purchases.

19.     Because the first lien lenders under the Term Loan Agreement negotiated the traditional pro rata payment and collateral waterfall protections, it was reasonable for the First Lien Lender Defendants to expect to receive scheduled amortization, prepayments, proceeds of collateral and other payments that correspond to their percentage share of the first lien loan facility. The First Lien Lender Defendants would have reasonably expected that the only relevant exceptions (i.e., open market purchases and Dutch Auctions) were narrow and not harmful to non-participating lenders.  Moreover, the fact that the Term Loan Agreement required the vote of all affected lenders, rather than a simple majority, to amend the pro rata sharing and collateral waterfall provisions indicates that the First Lien Lender Defendants expected that they had negotiated minority protections against lien and payment subordination by other first lien lenders.[10]

20.     Serta argues that the absence of an express anti-subordination provision in the Term Loan Agreement shows that the parties did not intend to preclude a discriminatory uptier

---

[10] I understand that as a result of the Transaction, the First Lien Lender Defendants' position was also subordinated to certain second lien lenders who participated in the Transaction.

transaction like the Transaction.[11] To the contrary, based on my experience, lenders would not see a need for an express anti-subordination provision to bar a transaction like Serta's because the pro rata sharing provisions, with exceptions only for Dutch Auctions open to all lenders and open market purchases, already preclude Serta from engaging in a discriminatory uptier transaction that subordinates the payment rights of the First Lien Lender Defendants to the rights of the PTL Lenders, who are in the same tranche or even junior to the First Lien Lender Defendants.

21.     As explained in paragraphs 22 through 25 below, at the time the Term Loan Agreement was executed in 2016, the first lien lenders could not have reasonably expected the limited exceptions to the pro rata sharing provisions, in the form of Dutch Auctions open to all lenders and open market purchases, to permit the borrower to engage in loan repurchases that favored the PTL Lenders to the detriment of the First Lien Lender Defendants.  The parties to the Term Loan Agreement would have reasonably expected that a debt-for-debt exchange in which a majority of first lien lenders swapped their loans for new super priority loans under a new credit facility and amended the existing credit agreement to accommodate the transaction was not considered permissible.[12]  Thus, an anti-subordination provision would have been superfluous.[13]

---

[11] Serta's Reply Memorandum of Law in Further Support of its Motion for Summary Judgment, at 14, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Adv. Pro. No. 23-09007 (Bankr. S.D. Tx. Mar. 24, 2023) (ECF No. 111).

[12] "Debt Buyback and Liability Management Considerations in a Volatile Market," Shearman & Sterling, (Nov. 10, 2022), https://www.shearman.com/en/perspectives/2022/11/debt-buyback-and-liability-management-considerations-in-a-volatile-market; *see also* supra n.23.

[13] *See also* "Priming Debt and Inside-Maturity Debt Allowed Under US Credit Agreements," Covenant Review (Mar. 31, 2020) (noting that as of March 2020, only 6% of credit agreements contained anti-subordination provisions).

**C.**    **Market Participants Understood the Non-Pro Rata Repurchase Exceptions to the Pro Rata Sharing Provisions to be Narrow**

22.    Prior to the 2008 financial crisis, syndicated credit agreements in the leveraged loan market generally prohibited non-pro rata loan repurchases by the borrower and its affiliates. As a result, when price levels of syndicated loans fell dramatically in 2008/2009, borrowers and their affiliates were unable to take advantage of the depressed loan prices to retire debt at a discount.[14]

23.    Once the market reopened after the credit crisis around 2010/2011, borrowers and sponsors began to negotiate for the ability to opportunistically buy back loans through limited exceptions to the pro rata payment provisions. Syndicated credit agreements increasingly began to include provisions allowing the borrower and/or its affiliates to purchase term loans, on a non-pro rata basis either through a Dutch Auction process open to all lenders or open market purchases.[15]

24.    Sponsors requested the inclusion of these exceptions to the pro rata sharing provisions to allow for the capture of discount and de-levering, and arrangers and institutional investors agreed, recognizing the benefits to all parties of de-levering and understanding that the exceptions were limited.

25.    Since their inception, the open market purchase and Dutch Auction provisions functioned as narrow exceptions to the pro rata sharing provisions consistent with the other negotiated exceptions referenced in paragraph 15 above.

[14] Eric Wise, "Open Market Purchases, Past and Future", N.Y. Law Journal (Sept. 16, 2022), https://www.law.com/newyorklawjournal/2022/09/16/open-market-purchases-past-and-future/

[15] Eric Wise, "Open Market Purchases, Past and Future", N.Y. Law Journal (Sept. 16, 2022), https://www.law.com/newyorklawjournal/2022/09/16/open-market-purchases-past-and-future/;

26.     When the Term Loan Agreement was executed in 2016, loan market participants reasonably expected an open market purchase to mean a simple trade on the secondary market to which the seller transfers its interest to the purchaser and the purchaser pays the prevailing market price. Its purpose was to permit one-off purchases of term loans on a non-pro rata basis on a quick, cost-effective manner.[16] Because the amount of the loans that could be purchased in this manner would be constrained by normal trading volume, open market purchases were not viewed as detrimental to non-participating lenders.

27.     The Dutch Auction procedures, on the other hand, permitted a borrower to prepay at a discount to par a substantial portion of its term loans in excess of the normal trading volume.[17] Significantly, Dutch Auction repurchases were required to be open to all lenders holding the relevant tranche, preventing the borrower from engaging in substantial loan repurchases that favored some lenders to the detriment of other lenders in the same tranche.

28.     The Transaction was not consistent with the prevailing market view of an open market transaction, i.e., a simple trade on the secondary market at prevailing market prices. Rather, it was a complex, privately negotiated transaction that involved numerous amendments to existing loan documents, the entering into of a new credit agreement, intercreditor agreement and numerous other loan documents and the provision of $200 million of new money financing.

29.     Moreover, the use of the open market purchase provision to effectuate a debt-for-debt exchange that deeply subordinated the interests of the non-participating lenders causing

---

[16] "Debt Buyback and Liability Management Considerations in a Volatile Market," Shearman & Sterling, (Nov. 10, 2022), https://www.shearman.com/en/perspectives/2022/11/debt-buyback-and-liability-management-considerations-in-a-volatile-market

[17] Debt Buyback and Liability Management Considerations in a Volatile Market," Shearman & Sterling, (Nov. 10, 2022), https://www.shearman.com/en/perspectives/2022/11/debt-buyback-and-liability-management-considerations-in-a-volatile-market

them substantial economic harm was unknown to loan market participants in 2016, because, historically, open market purchases were not expected to adversely affect non-participating lenders.[18]

30.     Interpreting the term "open market purchase" to mean any arm's length transaction at "market prices," as Serta and the PTL Lenders advocate, would render the pro rata sharing provision meaningless.

31.     Moreover, if any arm's length transaction at market prices constituted an open market purchase, the Dutch Auction provisions would become irrelevant. No borrower would elect to repurchase loans through the costly and time-consuming enumerated Dutch Auction procedures if it had carte blanche to engage in any arm's length transaction at market prices under the open market purchase provision.

**D.     When the Term Loan Agreement Was Negotiated in 2016, the First Lien Lender Defendants Would Not Have Reasonably Expected that the Transaction Would be Allowed under the Term Loan Agreement**

32.     A comparison between in court and out-of-court restructurings, like the Transaction, may be informative.  In a Chapter 11 restructuring, a debtor is permitted to issue priming debt while in bankruptcy or under the terms of a plan of reorganization. The Bankruptcy Code, however, provides significant protections to the lenders whose liens are being primed. For example, if a debtor seeks to prime existing liens with debtor-in-possession financing, it must obtain the consent of the lenders being primed or demonstrate that the interests of such lenders in the collateral are adequately protected against diminution in value resulting from the priming. Adequate protection, which can take the form of cash collateral or additional or replacement liens, requires court approval.

---

[18] See supra at n.12; see infra at n.22.

33.     In an out-of-court restructuring, a distressed company seeking to borrow on a priming basis typically sought lender consent by extending lenders an equal opportunity to participate and offering inducements to lenders on a pro rata basis.

34.     One of the earliest examples of a discriminatory uptier transaction was the 2017 NYDJ transaction. In that case, the specialty clothing company proposed a transaction similar in some respects to the Transaction. In response to complaints from the minority lenders that they were being unfairly excluded and to comments from the court expressing disapproval of the process,[19] the company ultimately changed course and invited all lenders to participate in a new loan facility on a pro rata basis.[20] It should be noted that the minority lenders were given an equal opportunity to participate even though the applicable NYDJ credit agreement, unlike the Term Loan Agreement, did not include the pro rata sharing and collateral waterfall provisions as "sacred rights" (i.e., they could be amended with a simple majority).

35.     Since the introduction of the open market purchase provision in leveraged loan credit agreements more than 10 years ago, I have been involved in hundreds of financing transactions involving leveraged loans, including acquisition financings, out-of-court restructurings, and debtor-in-possession financings. I have not been involved in any transaction in which the borrower sought to utilize an open market purchase provision to "recapitalize the company." To the contrary, to my knowledge, for more than a decade after it was adopted, the open market purchase provision was utilized by borrowers and their affiliates solely to

---

[19] Transcript of Proceedings, at 21:12-17, *Octagon Credit Investors LLC v. NYDJ Apparel, LLC*, No. 656677/2017 (N.Y. Sup. Ct. Feb. 6, 2018) (Ramos, J.: "[I]t looks like the reasonable commercial expectations of the lenders participating in this arrangement is being undermined by some of the lenders getting together and saying look, if we don't tell the other guys what we're doing, we can cut them out of the picture.  It doesn't seem very fair.")

[20] Affirmation, Ex. B, *Octagon Credit Investors LLC v. NYDJ Apparel, LLC*, No. 656677/2017 (N.Y. Sup. Ct. Mar. 13, 2018).

repurchase loans in one-off transactions at prevailing market prices to capture discount and de-lever.[21]

36.     Only after the Term Loan Agreement was adopted in 2016, in connection with a handful of transactions, has the open market purchase provision been used by distressed borrowers to permit a discriminatory uptier transaction involving a debt-for-debt-exchange with a majority of participating lenders that subordinates rights of non-participating minority lenders.[22] Such a recapitalization transaction could not have been reasonably anticipated by the First Lien Lender Defendants when they entered into the Term Loan Agreement.[23]

37.     The Transaction was unique because of its discriminatory nature. Contrary to market practice and expectations, Serta did not open the offer to repurchase to all first lien lenders. Instead, Serta negotiated in secret with a majority of first lien lenders, concealing the terms from the First Lien Lender Defendants until the Transaction was publicly announced. As a result, the First Lien Lender Defendants suffered a substantial diminution in the value of their loans relative to the value received by participating first lien lenders.

---

[21] "Debt Buyback and Liability Management Considerations in a Volatile Market," Shearman & Sterling, (Nov. 10, 2022), https://www.shearman.com/en/perspectives/2022/11/debt-buyback-and-liability-management-considerations-in-a-volatile-market.

[22] Eric Wise, "Open Market Purchases, Past and Future", N.Y. Law Journal (Sept. 16, 2022), https://www.law.com/newyorklawjournal/2022/09/16/open-market-purchases-past-and-future/

[23] See, e.g., Sujeet Indap, "$50bn Credit Fund Caught on Both Sides of Distressed Debt Dispute," Financial Times, (Feb. 15, 2023) (describing the Serta transaction as a "novel uptier transaction" that "has proven even more controversial than drop-downs."); Kyle J. Tum Suden, Aaron Gavant & Sean T. Scott, "Southern District of New York Allows Challenge to Serta Simmons' June 2020 Uptier Transaction to Proceed to Discovery," Mondaq (June 27, 2022) (the Serta case is a "bellwether for how claims relating to [non-pro rata uptier exchange] transactions may withstand summary judgment or be resolved at trial."); Eric Wise, "Open Market Purchases, Past and Future", N.Y. Law Journal (Sept. 16, 2022), https://www.law.com/newyorklawjournal/2022/09/16/open-market-purchases-past-and-future/

**E.**     **The First Lien Lender Defendants May Have Reasonably Expected Serta to Repurchase a Substantial Amount of Loans Non-Ratably if Serta Used the Dutch Auction Procedures, but Serta Chose Instead to Conduct a Discriminatory Uptier Transaction That Does Not Qualify as an Open Market Purchase**

38.     As mentioned above, the open market purchase exception to the pro rata sharing provision permitted one-off repurchases of term loans in the secondary market at prevailing market prices. The amount of loans that could be repurchased in this manner would be constrained by normal trading volume so there would be no adverse effect on non-participating lenders.

39.     The Dutch Auction provision, which allowed a borrower to repurchase a substantial portion of its loans in excess of the normal trading volume, required that offers be made pursuant to enumerated procedures open to all lenders and not conducted in a secretive manner.

40.     In April 2021, Serta itself used the Dutch Auction mechanism to repurchase approximately $90 million in outstanding second lien term loans for 60 cents on the dollar.  After the Dutch Auction, approximately $10.6 million in second lien term loans remained outstanding.[24]

---

[24] "Bulletin: Serta Simmons Bedding LLC Issuer Credit Rating Remains 'SD' on Expected Debt Restructuring," S&P Global Ratings (Apr. 26, 2021), https://www.alacrastore.com/s-and-p-credit-research/Research-Update-Serta-Simmons-Bedding-LLC-Downgraded-To-SD-From-CC-On-Distressed-Exchange-Debt-Rating-Lowered-To-D-2631129; Jack Pitcher, "DISTRESSED DAILY: Serta Simmons Wants to Put Old Debt to Bed," Bloomberg (April 7, 2021), https://news.bloomberglaw.com/bankruptcy-law/distressed-daily-serta-simmons-wants-to-put-old-debt-to-bed

41.     While Serta argues that the open market purchase exception to pro rata sharing justifies the Transaction, the Dutch Auction exception was the only exception that would have allowed Serta to repurchase substantial amounts of loans on a non-pro rata basis.  However, the Dutch Auction provision also would have required that all lenders of a tranche be given the opportunity to participate.

42.     Serta did not open the offer to repurchase to all lenders and instead negotiated the Transaction in secret with the PTL Lenders, concealing the terms from the First Lien Lender Defendants until it was publicly announced, which resulted in substantial diminution of the First Lien Lender Defendants' interests compared to the potential recovery of the PTL Lenders.

43.     Accordingly, the characterization of the Transaction as an open market purchase contravenes market practice and understanding at the time the Term Loan Agreement was executed.

Executed on May 3, 2023.

SARAH M. WARD

# Appendix A

**Sarah M. Ward**
Independent Board Director
Former Head of Banking Group at Skadden, Arps, Slate, Meagher & Flom LLP
7108 SE Golfhouse Drive
Hobe Sound, FL 33455
Phone: 917-860-3886
sarahmaryward@icloud.com

**Summary**

Sarah M. Ward is an Independent Board Director at CI Financial and former Head of the Banking Group at Skadden, Arps, Slate, Meagher & Flom LLP.  Ms. Ward also served as co-chair of Skadden's Legal Opinion Oversight Committee and was a member of the firm's Policy Committee, its governing body.

During Ms. Ward's thirty-five years at Skadden, she represented borrowers and lenders in acquisitions and other leveraged financings, as well as corporate restructurings and workouts.

**Education**

A.B., Princeton University, 1981
J.D., Fordham University School of Law, 1986

**Professional Experience**

*Independent Board Member*, CI Financial, Feb. 2022 – Present

*Partner*, Skadden, Arps, Slate, Meagher & Flom LLP, Nov. 1986 – Dec. 2021
    Global Co-Head, Banking Group, 2009 – 2014
    Co-Chair, Legal Opinion Oversight Committee, 2009 – 2021
    Member, Banking Group, 1994 – 2021

**Honors and Awards**

Banking and Finance Award, Americas Euromoney Women in Business Law Awards, 2015

Out-of-Court Restructuring Deal of the Year, *M&A Advisor*, 2013
- Recognized for Travelport's financial restructuring, which involved $3.8 billion of debt issued by U.S., Bermuda, Cayman Islands, U.K. and other European entities

U.S. Innovative Lawyers, *Financial Times*, 2013
- Recognized for AMR Corporation, the parent company of American

Airlines, Inc., in AMR's $11 billion merger with US Airways Group, Inc., as part of AMR's Chapter 11 reorganization

Consumer Services Deal of the Year, M&A Advisor, 2012
- Recognized for Travelport's financial restructuring, which involved $3.8 billion of debt issued by U.S., Bermuda, Cayman Islands, U.K. and other European entities

Deal Financing of the Year, M&A Advisor, 2012
- Recognized for Barclays Bank PLC's $1.45 billion DIP credit facility for Residential Capital, in connection with ResCap's Chapter 11 bankruptcy filing

U.S. Restructuring of the Year, *International Finance Review*, 2012
- Recognized for Barclays Bank PLC's $1.45 billion DIP credit facility for Residential Capital, in connection with ResCap's Chapter 11 bankruptcy filing

U.S. Innovative Lawyers, *Financial Times*, 2012
- Recognized for AMR Corporation, the parent company of American Airlines, Inc., in AMR's $11 billion merger with US Airways Group, Inc., as part of AMR's Chapter 11 reorganization

Private Equity Deal of the Year, *The Deal*, 2011
- Recognized for Travelport's financial restructuring, which involved $3.8 billion of debt issued by U.S., Bermuda, Cayman Islands, U.K. and other European entities

**Other Recognition**

*The Secured Lender*, Women in Secured Finance, 2020
*Chambers Global: The World's Leading Lawyers for Business*, 2012 - 2021
*Chambers USA: America's Leading Lawyers for Business*, 2005 - 2021
*Best Lawyers in America*, 2016 - 2021
*IFLR1000*, 2007 - 2021
*Legal 500 U.S.*, 2006 - 2016
*The International Who's Who of Banking Lawyers*, 2014 - 2023

**Representative Deals**

**American Express Global Business Travel (Amex GBT)**, in connection with a $1 billion term loan financing related to its de-SPAC transaction with Apollo Strategic Growth Capital (2021)

**AXA Equitable Holdings, Inc.,** a financial services company, in connection

with a $8.9 billion bank financing in anticipation of its proposed initial public offering in 2018, which financing consisted of delayed-draw term loan, revolving credit and letter of credit facilities, including eight bilateral letter of credit facilities (2018)

**Barclays Bank PLC (Ditech Financial)** in connection with the 2019 Chapter 11 cases of Ditech Holding Corp. and certain of its subsidiaries, including Ditech Financial LLC and Reverse Mortgage Solutions, Inc., two of the largest mortgage servicers in the United States, with Barclays acting as agent and lender under a $1.9 billion debtor-in-possession financing comprised of multiple repurchase agreements and bankruptcy-remote financings, a unique structure in the context of Chapter 11 bankruptcy cases (2019)

**Barclays Bank PLC (Verso)** in connection with the Chapter 11 cases filed in 2016 by Verso Corp., NewPage Investment Company LLC, and their debtor affiliates, including (i) as arranger and agent for debtor-in-possession financing provided to NewPage, consisting of a $325 million ABL facility, a $175 million new-money term loan facility, and a $175 million roll-up of prepetition term loans, and (ii) as arranger and agent for Verso's ABL and term loan exit facilities (2016)

**Barclays Bank PLC** and **Deutsche Bank Securities Inc. (Patriot Coal)** in connection with restructuring transactions by Patriot Coal Corporation, a producer and marketer of coal in the eastern United States, including (i) $545 million of senior secured exit facilities provided to Patriot Coal in 2013, consisting of a $200 million "first out" L/C facility, a $250 million "second out" term loan facility, and a $95 million ABL facility, and (ii) subsequently representing Barclays as agent under the L/C facility during Patriot Coal's second Chapter 11 proceeding commenced in 2015 (2013, 2015)

**Blackstone Group, Carlyle Group, Permira Funds**, and **Texas Pacific Group** in the $4.25 billion leveraged financing related to the group's $17.6 billion going-private leveraged buyout of Freescale Semiconductor Inc. At the time, it was the third largest leveraged buyout ever and the largest ever in the technology sector. (2006)

**CIT Group Inc.**, a commercial and consumer finance company, in its prepackaged Chapter 11 reorganization in the U.S. Bankruptcy Court for the Southern District of New York. CIT emerged from bankruptcy 40 days after filing, reducing its debt by $10.5 billion. CIT was also a borrower of a $3 billion term loan from Barclays Bank PLC for its recapitalization and a $4.5 billion term loan facility from Bank of America, N.A (2009)

**JPMorgan Chase Bank, N.A.** in connection with $450 million initial senior secured credit facilities for Greensky Holdings, LLC and a subsequent upsize and repricing transaction (2017)

**Leucadia National Corporation** and **Jefferies LLC** as lenders and investors to FXCM Inc. (n/k/a Global Brokerage Inc.) in connection with (i) an emergency $300 million capital infusion to FXCM Inc., a novel transaction that was structured to effectively give Leucadia a share of the company's cash flow, after the loan is repaid, until there is a sale of the company, and (ii) related restructuring transactions, both out-of-court and in the company's subsequent Chapter 11 case (2015)

**LNR Property LLC**, a real estate investment, finance, management and development company, in the refinancing of existing senior credit facilities with $365 million of new senior secured credit facilities comprised of a $325 million five-year term loan and a $40 million three-year revolving credit facility (2011)

**Martin Marietta Materials, Inc.**, a producer of construction aggregates and chemicals, in:
- the refinancing of existing credit facilities with a new $600 million credit agreement comprised of a $250 million senior unsecured term loan and a $350 million five-year senior unsecured revolving facility; (2013)
- its $4.7 billion proposed business combination with Vulcan Materials Company via an exchange offer (2011); and
- the refinancing of existing credit facilities with a new $600 million credit agreement comprised of a $350 million four-year unsecured revolving facility and a $250 million senior unsecured term loan (2011)

**Morgan Stanley**, as senior lender and financial advisor to Global Business Travel Holdings Limited, a wholly-owned subsidiary of GBT B.V., a Netherlands-based tour company, in connection with the leveraged financing related to its acquisition of Hogg Robinson Group (2018)

**Party City Holdco Inc.**, in its bond exchange and new money financing. Party City executed a transaction support agreement with a substantial number of its bondholders, whereby these bondholders agreed to participate in a transaction expected to deleverage the company's balance sheet by $450 million. Certain bondholders and other parties also agreed to backstop the Party City's new money offering to raise $100 million in capital to increase its financial strength (2020)

**SunEdison, Inc.**, a renewable energy project developer, and certain of its domestic and international subsidiaries in their Chapter 11 cases and successful emergence from bankruptcy, including (i) related exit financing, (ii) a $300 million new-money debtor-in-possession financing and complex roll-up of certain prepetition first and second lien debt, including a letter of credit facility, with cross-border collateral and guarantee arrangements provided by various debtor and non-debtor subsidiaries, and (iii) a comprehensive settlement of claims with diverse constituent groups and various 363 asset sales, including the acquisition by Brookfield Asset Management, Inc. of TerraForm Global, Inc. and a controlling interest in TerraForm Power, Inc. (2016)

**Travelport Limited**, in numerous leveraged financings for Travelport Limited, including (i) a $2.98 billion senior secured credit facility in 2014 and (ii) a $2.4 billion senior secured credit facility in 2018.  (2014, 2018)

## Publications

"The International Comparative Legal Guide to Lending & Secured Finance 2020 Edition (A Comparison of Key Provisions in U.S. and European Leveraged Loan Agreements)," *ICLG: Lending & Secured Finance 2020 Edition*

"The International Comparative Legal Guide to Lending & Secured Finance 2019 Edition (A Comparison of Key Provisions in U.S. and European Leveraged Loan Agreements)," *ICLG: Lending & Secured Finance 2019 Edition*

"The International Comparative Legal Guide to Lending & Secured Finance 2017 Edition (A Comparison of Key Provisions in U.S. and European Leveraged Loan Agreements)," *ICLG: Lending & Secured Finance 2017 Edition*

"The International Comparative Legal Guide to Lending & Secured Finance 2015 Edition (A Comparison of Key Provisions in U.S. and European Leveraged Loan Agreements)," *ICLG: Lending & Secured Finance 2015 Edition*

"The International Comparative Legal Guide to Lending & Secured Finance 2014 Edition (A Comparison of Key Provisions in U.S. and European Leveraged Loan Agreements)," *ICLG: Lending & Secured Finance 2014 Edition* (2nd Edition), Apr. 2014

"Cross-Border Banking and Finance Guide: New York," LexisNexis, 2014

United States Section, Banking & Finance Annual Review, *Financier Worldwide*, June 2013

"What's Market: Experts' View," *Practical Law The Journal*, Feb. 2013

"Encouraging Signs for Leveraged Loans in 2013," *Law360*, Jan. 28, 2013

## Associations

Member, Board of Directors, Settlement Housing Fund, 1994 - Present
Working Group on Legal Opinions, 2014 - 2021

## Bar Admissions

New York

# Appendix B

## Documents Considered List

**Legal Documents**

Summons and Complaint, *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. June 11, 2020) (NYSCEF No. 1)

Plaintiffs' Memorandum of Law in Support of Temporary Restraining Order, *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. June 11, 2020) (NYSCEF No. 3)

Serta's Opposition to Plaintiffs' Application for a Temporary Restraining Order, *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. June 16, 2020) (NYSCEF No. 22)

Defendant Lenders' Opposition to Plaintiffs' Application for a Temporary Restraining Order, *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. June 16, 2020) (NYSCEF No. 29)

Plaintiffs' Reply Memorandum of Law in Support of Temporary Restraining Order, *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. June 18, 2020) (NYSCEF No. 62)

Decision & Order Denying Temporary Restraining Order, *North Star Debt Holdings, L.P. et al. v. Serta Simmons Bedding, LLC et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. June 22, 2020) (NYSCEF No. 88)

Amended Complaint, *AG Centre Street Partnership, L.P. v. Serta Simmons Bedding, LLC*, Index No. 654191/2022 (N.Y. Sup. Ct. Nov. 16, 2022) (NYSCEF No. 11)

Complaint (with exhibits), *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.,* Adv. Pro. No. 23-09001 (Bankr. S.D. Tx. Jan. 24, 2023) (ECF No. 1)

Amended Complaint, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Adv. Pro. No. 23-09001 (Bankr. S.D. Tx. Feb. 14, 2023) (ECF No. 38)

Serta's Motion for Summary Judgment, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Case No. 23-09001 (Bankr. S.D. Tx. Feb. 24, 2023) (ECF No. 69)

Serta's Statement of Uncontroverted Facts In Support of Motion for Summary Judgment, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Case No. 23-09001, (Bankr. S.D. Tx. Feb. 24, 2023) (ECF No. 70)

       Exhibits 1-27 (ECF Nos. 70-1 through 70-27)

Lender Plaintiffs' Motion for Summary Judgment, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Case No. 23-09001, (Bankr. S.D. Tx. Feb. 24, 2023) (ECF No. 73)

Excluded Lenders' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Adv. Pro. No. 23-09001 (Bankr. S.D. Tx. Mar. 16, 2023) (ECF. No. 87)

Exhibit AA (ECF No. 91-41)

Declaration of Ryan Mollett, dated Mar. 16, 2023 (ECF No. 101)

Excluded Lenders' Hearing Slides, dated Mar. 28, 2023

Transcript, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Adv. Pro. No. 23-09001 (Bankr. S.D. Tx. Mar. 28, 2023)

Excluded Lenders' Petition for Permission to Appeal (Direct Appeal from Bankruptcy Court, 28 U.S.C. § 158(d)), *Serta Simmons Bedding, LLC, et al., v. AG Centre Street Partnership, et al.*, Case No. 23-90012 (5th Cir. Apr. 13, 2023) (Doc. No. 3)

Serta's Reply Memorandum of Law in Further Support of its Motion for Summary Judgment, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Adv. Pro. No. 23-09001 (Bankr. S.D. Tx. Mar. 24, 2023) (ECF No. 111)

Lender Plaintiffs' Reply Memorandum of Law in Further Support of its Motion for Summary Judgment, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Adv. Pro. No. 23-09001 (Bankr. S.D. Tx. Mar. 24, 2023) (ECF No. 114)

Amended Answering Defendants' Answer to the Amended Adversary Complaint, Counterclaims and Third-Party Claims, *Serta Simmons Bedding LLC, et al. v. AG Centre Street Partnership, et. al.*, Adv. Pro. No. 23-09001 (Bankr. S.D. Tx. Apr. 7, 2023) (ECF No. 148)

Serta's Memorandum of Law in Support of Motion to Dismiss, *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, Case No. 21-cv-3987 (S.D.N.Y. July 9, 2021) (ECF No. 25)

LCM's Opposition to Serta's Motion to Dismiss, *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, Case No. 21-cv-3987 (S.D.N.Y. Aug. 9, 2021) (ECF No. 31)

Serta Reply Memorandum of Law in Support of Motion to Dismiss, *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, Case No. 21-cv-3987 (S.D.N.Y. Aug. 23, 2021) (ECF No. 32)

Opinion & Order Denying Motion to Dismiss, *LCM XXII LTD et al. v. Serta Simmons Bedding, LLC*, Case No. 21-cv-3987 (S.D.N.Y. Mar. 29, 2022) (ECF No. 34)

Boardrider's Memorandum of Law in Support of Motion to Dismiss, *ICG Global Loan Fund 1 DAC, et. al. v. Boardriders, Inc. et al*., Index No. 655175/2020 (N.Y. Sup. Ct. Dec. 7, 2020) (NYSCEF No. 46)

Defendant Lenders' Memorandum of Law in Support of Motion to Dismiss, *ICG Global Loan Fund 1 DAC, et. al. v. Boardriders, Inc. et al.*, Index No. 655175/2020 (N.Y. Sup. Ct. Dec. 7, 2020) (NYSCEF No. 57)

Plaintiff Lenders' Opposition to Motion to Dismiss, *ICG Global Loan Fund 1 DAC, et. al. v. Boardriders, Inc. et al.*, Index No. 655175/2020 (N.Y. Sup. Ct. Jan. 28, 2021) (NYSCEF No. 77)

Defendants' Joint Reply in Support of Motion to Dismiss, *ICG Global Loan Fund 1 DAC, et. al. v. Boardriders, Inc. et al.*, Index No. 655175/2020 (N.Y. Sup. Ct. Feb. 18, 2021) (NYSCEF No. 102)

Plaintiffs' Supplemental Memorandum of Law in Support of Motion to Dismiss Addressing *Trimark*, *ICG Global Loan Fund 1 DAC, et. al. v. Boardriders, Inc. et al.*, Index No. 655175/2020 (N.Y. Sup. Ct. Sept. 17, 2021) (NYSCEF No. 132)

Decision & Order Denying Motion to Dismiss, *ICG Global Loan Fund 1 DAC, et. al. v. Boardriders, Inc. et al.*, Index No. 655175/2020 (N.Y. Sup. Ct. Oct. 17, 2022) (NYSCEF No. 159)

Decision, *AEA Middle Market Debt Funding LLC, et al., v. Marblegate Asset Management, LLC, et al.*, Case No. 2022-00293 (N.Y. App. Div., 2d Dept. Mar. 9, 2023)

Redacted Complaint, *Octagon Credit Investors LLC v. NYDJ Apparel, LLC*, No. 656677/2017 (N.Y. Sup. Ct. Dec. 22, 2017) (NYSCEF No. 59)

Transcript of Proceedings, *Octagon Credit Investors LLC v. NYDJ Apparel, LLC*, No. 656677/2017 (N.Y. Sup. Ct. Feb. 6, 2018) (NYSCEF No. 91)

Affirmation of Madlyn Gleich Primoff, Ex. B, *Octagon Credit Investors LLC v. NYDJ Apparel, LLC*, No. 656677/2017 (N.Y. Sup. Ct. Mar. 13, 2018) (NYSCEF No. 103)

**Cases**

*D-Z Inv. Co. v. Holloway*, No. 74 CIV. 2379, 1974 WL 440 (S.D.N.Y. Aug. 23, 1974)

*Wellman v. Dickinson*, 475 F. Supp. 783 (S.D.N.Y. 1979)

**Agreements**

First Lien Term Loan Agreement, dated Nov. 8, 2016

First Lien/Second Lien Intercreditor Agreement, dated Nov. 8, 2016

Amendment No. 1 to First Lien Term Loan Agreement, dated June 22, 2020

Open Market Purchase and Cashless Exchange Agreement, dated June 22, 2020

Super-Priority Term Loan Agreement, dated June 22, 2020

Priority Intercreditor Agreement, dated June 22, 2020

Master Assignment and Acceptance, dated June 22, 2020

Amendment No. 1 to Amended and Restated Credit Agreement, JCrew Group Inc., dated July 13, 2017

First Lien Credit Agreement, NYDJ Apparel, LLC, dated Jan. 6, 2014

First Amendment to First Lien Credit Agreement, NYDJ Apparel, LLC, dated May 25, 2017

Second Amendment to First Lien Credit Agreement, NYDJ Apparel, LLC, dated May 25, 2017

Third Amendment to First Lien Credit Agreement, NYDJ Apparel, LLC, dated Mar. 13, 2018

**Party Documents**

Serta Simmons Bedding, LLC, Report for the Three and Six Months Ended Mar. 27, 2021 and Mar. 28, 2020 (SSB_ADVERSARY00058983)

Serta Simmons Bedding, LLC, Report for the Three and Six Months Ended June 26, 2021 and June 27, 2020 (SSB_ADVERARY00060919)

Email from C. Tseng (Latham) to C. O'Muiri (Weil) re: Serta // Closing Call, dated June 22, 2020 (SSB_AVERSARY00054428) with attachment (SSB_ADVERSARY00054432)

Email from A. Li (Evercore) to K. Prince (Advent) re: SSB – Catch-Up, dated June 16, 2020 (SSB_ADVERSARY00140341) with attachment (SSB_ADVERSARY00140344)

**Publicly Available Documents**

"Private Equity Alert: De-Levering Portfolio Companies Through Debt Buybacks—US and UK Perspectives," Weil, Gotshal & Manges LLP, dated Mar. 2009, *available at* https://www.weil.com/~/media/files/pdfs/private_equity_alert_march_2009.pdf

LevFin Quarterly Q4 2015, Weil, Gotshal & Manges LLP, https://privateequity.weil.com/wp-content/uploads/2016/11/LevFin-Quarterly-Q4-2015_WEIL_95618787_2.pdf (last accessed Mar. 15, 2023)

"Debt Repurchasing Considerations in an Uncertain Market," Skadden, Arps, Slate, Meagher & Flom LLP, dated Apr. 8, 2020, *available at* https://www.skadden.com/insights/publications/2020/04/debt-repurchasing-considerations

"Unhappy Lenders Challenge Aggressive Debt Exchanges," Skadden, Arps, Slate, Meagher & Flom LLP, dated Jan. 19, 2022, *available at* https://www.skadden.com/insights/publications/2022/01/2022-insights/corporate/unhappy-lenders-challenge-aggressive-debt-exchanges

Breheny, Brian, et al., "Skadden's 2012 Insights, January 2012: Capital Markets," Skadden, Arps, Slate, Meagher & Flom LLP, dated Jan. 12, 2012, *available at* https://www.jdsupra.com/legalnews/skaddens-2012-insights-january-2012-21949

"Distressed Mergers and Acquisitions," Wachtell, Lipton, Rosen & Katz LLP (2013), https://www.wlrk.com/webdocs/wlrknew/AttorneyPubs/WLRK.22377.13.pdf

"Pro Rata Sharing Provisions in Credit Agreements: What Lenders and Loan Investors Need to Know," Chapman and Cutler LLP, dated July 25, 2017, *available at* https://www.chapman.com/publication-Pro-Rata-Sharing-Provisions-Credit-Agreements

"Locke Lord QuickStudy: Enter Sandman: Serta Sends Senior Lenders Off to Never-Never Land," Locke Lord LLP, dated July 30, 2020, *available at* https://www.lockelord.com/newsandevents/publications/2020/07/locke-lord-quickstudy-enter-sandman

"Debt Buyback and Liability Management Considerations in a Volatile Market," Shearman & Sterling LLP, dated Nov. 10, 2022, *available at* https://www.shearman.com/en/perspectives/2022/11/debt-buyback-and-liability-management-considerations-in-a-volatile-market

"Navigating the Club in Private Credit Deals," Proskauer Rose LLP, dated Dec. 3, 2020, *available at* https://www.proskauer.com/alert/navigating-the-club-in-private-credit-deals

"Lessons for the Loan Market from Recent Liability Management Transactions," IFLR (Summer 2020), https://www.iflr.com/article/2a6459hr8l17lndo7hs74/lessons-for-the-loan-market-from-recent-liability-management-transactions

"How Did They Do It?  J. Crew & The Original Trap Door," King & Spalding presentation, *available at*, https://www.google.com/url?sa=i&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=0CDgQw7AJahcKEwiYotj9-9f-AhUAAAAAHQAAAAAQAw&url=https%3A%2F%2Fwww.kslaw.com%2Fattachments%2F000%2F008%2F521%2Foriginal%2FHow_did_they_do_it_J._Crew.pdf%3F1611586444&psig=AOvVaw1AP7G8coP18rjWQc18Yh8r&ust=1683162743585444 (last visited May 2, 2023)

Wise, Eric, "Open Market Purchases, Past and Future", N.Y. Law Journal, dated Sept. 16, 2022, *available at* https://www.law.com/newyorklawjournal/2022/09/16/open-market-purchases-past-and-future/

"Priming Debt and Inside-Maturity Debt Allowed Under US Credit Agreements," Covenant Review, dated Mar. 31, 2020

"Covenant Trends: Expanded Sacred Rights Provisions in Recent Credit Agreements Provide Varying, Sometimes Circumventable Protections Against Lien Subordination Amendments," Reorg, dated Feb. 25, 2022, *available at* https://reorg.com/covenant-trends-expanded-sacred-rights-provisions

"Covenant Trends: Serta's, Boardriders' Superpriority Uptier Exchanges Can Likely Be Replicated Under Most Existing Credit Facilities; Simple Drafting Changes Could Block Them in Future Facilities," Reorg, dated Sept. 22, 2020, *available at* https://reorg.com/covenants-serta-simmons-covenant-analysis/

Suden, Kyle, et al., "Southern District of New York Allows Challenge to Serta Simmons' June 2020 Uptier Transaction to Proceed to Discovery," Mondaq, dated June 27, 2022, *available at* https://www.realbankruptcyintel.com/2022/06/southern-district-of-new-york-allows-challenge-to-serta-simmonsjune-2020-uptier-exchange-transaction-to-proceed-to-discovery/

"Serta Simmons Bedding Enters into Agreement with Majority of Lenders on Deleveraging and Liquidity Enhancing Transaction," Serta Simmons Bedding, LLC, dated June 8, 2020, *available at* https://sertasimmons.com/news/serta-simmons-bedding-enters-into-agreement-with-majority-of-lenders-on-deleveraging-and-liquidity-enhancing-transaction/

Indap, Sujeet, "$50bn Credit Fund Caught on Both Sides of Distressed Debt Dispute," Financial Times, dated Feb. 15, 2023, *available at* https://www.ft.com/content/86041f8f-b6ad-42d8-96c7-9348134e5e11

"Bulletin: Serta Simmons Bedding LLC Issuer Credit Rating Remains 'SD' on Expected Debt Restructuring," S&P Global Ratings, dated Apr. 26, 2021, *available at* https://www.alacrastore.com/s-and-p-credit-research/Research-Update-Serta-Simmons-Bedding-LLC-Downgraded-To-SD-From-CC-On-Distressed-Exchange-Debt-Rating-Lowered-To-D-2631129

"A Closer Look at How Uptier Priming Loan Exchanges Leave Excluded Lenders Behind," S&P Global Ratings, dated June 15, 2021, *available at* https://www.spglobal.com/ratings/en/research/articles/210615-a-closer-look-at-how-uptier-priming-loan-exchanges-leave-excluded-lenders-behind-11991317

Pitcher, Jack, "DISTRESSED DAILY: Serta Simmons Wants to Put Old Debt to Bed," Bloomberg, dated April 7, 2021, *available at* https://news.bloomberglaw.com/bankruptcy-law/distressed-daily-serta-simmons-wants-to-put-old-debt-to-bed

Buccola, Vincent, et al., "The Loan Market Response to Dropdown and Uptier Transactions," Working Paper, dated June 2022, *available at* https://www.google.com/url?sa=i&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=0CDgQw7AJahcKEwiAyaXjzNf-AhUAAAAAHQAAAAAQAw&url=https%3A%2F%2Fwww.law.nyu.edu%2Fsites%2Fdefault%2Ffiles%2Floan%2520market%2520response%252022%2520june%25202022.pdf&psig=AOvVaw1nUbNRqAFxp2jQ9eYvBXvU&ust=1683150071866106

"LSTA Distressed Trade Confirmation," LSTA, dated Dec. 1, 2021, *available at* https://www.lsta.org/content/distressed-confirm-dec-2021/

 "LSTA Par/Near Par Trade Confirmation," LSTA, dated Dec. 1, 2021, *available at* https://www.lsta.org/content/par-confirm-dec-2021/

"Standard Terms and Conditions for Distressed Trade Confirmations," LSTA, dated Dec. 1, 2021, *available at* https://www.lsta.org/content/distressed-confirm-stcs-dec-2021/

"Standard Terms and Conditions for Par/Near Par Trade Confirmations," LSTA, dated Dec. 1, 2021, *available at* https://www.lsta.org/content/participation-agreement-for-par-near-par-trades-stcs-dec-2021/

"Comment Letter, Re: Notice of Proposed Rulemaking, Credit Risk Retention," LSTA, dated Sept. 2, 2011, *available at* https://www.sec.gov/comments/s7-14-11/s71411-309.pdf

"Liability Management Transactions," LSTA, dated Sept. 30, 2020, *available at* https://www.lsta.org/news-resources/liability-management-transactions/

"Division of Trading and Markets: Answers to Frequently Asked Questions Concerning Rule 10b-18 ('Safe Harbor' for Issuer Repurchases)," U.S. Securities and Exchange Commission, dated Dec. 2, 2016, *available at* https://www.sec.gov/divisions/marketreg/r10b18faq0504.htm

"Tender Offer", U.S. Securities and Exchange Commission, *available at* https://www.investor.gov/introduction-investing/investing-basics/glossary/tender-offer (last accessed Mar. 16, 2023).

**Academic Books and Papers**

Shaiman, Lee M. and Bridget K. Marsh, *The Handbook of Loan Syndications and Trading*, 2nd Ed., McGraw Hill, New York, NY (2022)

Bellucci, Michael, and Jerome McCluskey, *The LSTA's Complete Credit Agreement Guide*, 2nd Ed., McGraw Hill, New York, NY (2016)