Exhibit B

Page 1

```
 1      IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  HOUSTON DIVISION

 3    ------------------------------------------

      SERTA SIMMONS BEDDING, LLC, et al.,
 4
                         Debtors.
 5
      Chapter 11 Case No. 23-90020 (DRJ)
 6    ------------------------------------------
 7    SERTA SIMMONS BEDDING, LLC, INVESCO
      SENIOR SECURED MANAGEMENT, INC., CREDIT
 8    SUISSE ASSET MANAGEMENT, LLC, BOSTON
      MANAGEMENT AND RESEARCH, EATON
 9    VANCE MANAGEMENT, AND BARINGS LLC,
10                         Plaintiffs,
                    -against-
11
      AG CENTRE STREET PARTNERSHIP L.P., AG
12    CREDIT SOLUTIONS NON-ECI MASTER FUND,
      L.P., AG SF MASTER (L), L.P., AG SUPER
13    FUND MASTER, L.P., SILVER OAK CAPITAL,
      L.L.C., ASCRIBE III INVESTMENTS, LLC,
14    COLUMBIA CENT CLO 21 LIMITED, COLUMBIA
      CENT CLO 27 LIMITED, COLUMBIA FLOATING
15    RATE INCOME FUND, A SERIES OF COLUMBIA
      FUNDS SERIES TRUST II, COLUMBIA STRATEGIC
16    INCOME FUND, A SERIES OF COLUMBIA FUNDS
      SERIES TRUST I, CONTRARIAN CAPITAL FUND I,
17    L.P., CONTRARIAN CENTRE STREET
      PARTNERSHIP, L.P., CONTRARIAN DISTRESSED
18    DEBT FUND, L.P., GAMUT CAPITAL SSB, LLC,
      LCM XXII LTD., LCM XXIII LTD., LCM XXIV
19    LTD., LCM XXV LTD., LCM 26 LTD., LCM 27
      LTD., LCM 28 LTD., NORTH STAR DEBT
20    HOLDINGS, L.P., SHACKLETON 2013- III
      CLO, LTD., SHACKLETON 2013-IV-R CLO, LTD.,
21    SHACKLETON 2014-V-R CLO, LTD., SHACKLETON
      2015-VII-R CLO, LTD., SHACKLETON 2017-XI
22    CLO, LTD., Z CAPITAL CREDIT PARTNERS CLO
      2018-1 LTD., AND Z CAPITAL CREDIT PARTNERS
23    CLO 2019-1 LTD.,
                         Defendants.
24
      Adversary Proceeding No. 3-09001 (DRJ)
25    ------------------------------------------
```

Page 2

1

May 8, 2023

2                          8:46 a.m.

3

4

5

6           DEPOSITION of SARAH WARD,

7   held at the offices of PAUL, WEISS,

8   RIFKIND, WHARTON & GARRISON LLP, 1285

9   Avenue of the Americas, New York, New

10  York before Wayne Hock, a Notary Public

11  of the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1    A P P E A R A N C E S:
 2
        WEIL GOTSHAL & MANGES LLP
 3      Attorneys for SERTA SIMMONS BEDDING, LLC
                767 Fifth Avenue
 4              New York, New York 10153
 5      BY:     ELAINA AQUILA, ESQ.
                elaina.aquila@weil.com
 6
 7      GIBSON, DUNN & CRUTCHER LLP
        Attorneys for INVESCO SENIOR SECURED
 8      MANAGEMENT, INC.
        BARINGS, LLC
 9      BOSTON MANAGEMENT AND RESEARCH
        EATON VANCE MANAGEMENT
10      CREDIT SUISSE ASSET MANAGEMENT, LLC
                811 Main Street
11              Houston, Texas 77002
12      BY:     C. LEE WILSON, ESQ.
                clwilson@gibsondunn.com
13              ALEXANDRA PERLOFF-GILES, ESQ.
                aperloff-giles@gibsondunn.com
14              ALEX XIAO, ESQ.
                axiao@gibsondunn.com
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   A P P E A R A N C E S: (Continued)
 2
 3       FRIEDMAN KAPLAN SEILER ADELMAN &
         ROBBINS LLP
 4       Attorneys for First Lien Lender
         Defendants
 5               Seven Times Square
                 New York, New York 10036
 6
         BY:     ELIZABETH BIERUT, ESQ.
 7               ebierut@fklaw.com
 8
 9       ALSO PRESENT:
10
                 THOMAS DEVINE, Videographer
11               CARLOS SARDINA
                 (via videoconference)
12               MIMRA ASLAOUI
                 (via videoconference)
13
14
                     *       *       *
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1           THE VIDEOGRAPHER: Good

2      morning.  We're going on the record

3      at approximately 8:46 p.m. [sic] on

4      May 8, 2023.

5           Please note that the

6      microphones are sensitive and may

7      pick up whispering and private

8      conversations.

9           Please mute your phones at

10     this time.

11          Audio and video recording

12     will continue to take place, unless

13     all parties agree to go off the

14     record.

15          This is media unit one of the

16     video recorded deposition of Sarah

17     Ward in the matter of Serta Simmons

18     Bedding, LLC, et al., case number

19     23-90020, and Serta Simmons

20     Bedding, LLC V. AG Centre Street

21     Partnership, LP, et al., number

22     23-09001 (DRJ), both in the United

23     States Bankruptcy Court for the

24     Southern District of Texas Houston

25     Division.

Page 6

1          This deposition is being held

2     at 1285 Sixth Avenue, New York, New

3     York.

4          My name is Tom Devine

5     representing Veritext New York, and

6     I am the videographer.

7          The court reporter is Wayne

8     Hock, also with Veritext New York.

9          I'm not authorized to

10     administer an oath, I'm not related

11     to any party in this action, nor am

12     I financially interested in the

13     outcome.

14          If there are any objections

15     to proceeding, please state them

16     now.

17          Appearances will be noted on

18     the stenographic record.

19          Will the court reporter

20     please in the swear, and then

21     counsel may proceed.

22          (CONTINUED ON NEXT PAGE)

23

24

25

Page 7

1   S A R A H    W A R D, having

2        been first duly sworn by a

3        Notary Public of the State of

4        New York, upon being examined,

5        testified as follows:

6   EXAMINATION BY

7   MR. WILSON:

8        Q.    Good morning, Ms. Ward.

9        A.    Good morning.

10       Q.    Have you ever been deposed

11  before?

12       A.    No.

13       Q.    I apologize, my voice is kind

14  of weird today, so hopefully you can

15  hear me even though I don't talk very

16  loudly.

17       A.    The only -- I did a very

18  short deposition in a Reliant case.  I

19  was a fact witness in December, 2021.

20       Q.    You say a Reliant case.

21       A.    Reliant was the name of the

22  company.  It had to do with a leveraged

23  lease transaction.

24       Q.    Who did you --

25       A.    I was not party to the

Page 22

```
 1   transaction does not qualify as an open
 2   market purchase?
 3             MS. BIERUT: I object to form.
 4             THE WITNESS:  I have not been
 5       retained to do that.
 6       Q.    If you believed that the
 7   June, 2020 transaction clearly
 8   qualified as an open market purchase
 9   under the first lien credit agreement,
10   would your opinion change as to whether
11   the first lien lender defendants would
12   have reasonably expected Serta to
13   repurchase a substantial amount of
14   loans nonratably?
15             MS. BIERUT: I object to the
16       form.
17             THE WITNESS:  It's
18       irrelevant.
19       Q.    Why?
20       A.    Because it doesn't matter
21   what my opinion is with respect to the
22   open market purchase transaction.  I'm
23   here to give my opinion with respect to
24   market participants' expectations and
25   market practice.
```

Page 26

```
 1   market purchases, as I defined them,
 2   the market participants would have
 3   assumed the only other option to
 4   repurchase loans was under the Dutch
 5   auction exception.
 6       Q.    So is it fair to say that
 7   paragraph forty-one should read, "while
 8   Serta argues that the open market
 9   purchase exception of pro rata sharing
10   justifies the transaction, market
11   participants would have reasonably
12   expected the Dutch auction exception"?
13            MS. BIERUT: Objection to
14       form.
15            THE WITNESS:  I've caveated
16       my entire report as to the scope of
17       my retention.  The scope of my
18       retention is to speak to market
19       practice, market practice and
20       understanding.  Anything in this
21       report goes to market practice and
22       understanding.
23       Q.    So even when you say in
24   definitive terms that the Dutch auction
25   exception was the only exception that
```

```
                                    Page 53
 1   agreement and the limited exceptions
 2   thereto matters to the outcome of the
 3   litigation?
 4            MS. BIERUT: Objection to
 5        form.
 6            THE WITNESS:  I'm just
 7        talking about market expectations
 8        and understanding.
 9        Q.    Are you opining on whether
10   the June, 2020 Serta transaction
11   breached the implied covenant of good
12   faith and fair dealing?
13        A.    That would be a legal
14   conclusion.  That's not my assignment.
15        Q.    So your answer's no?
16        A.    Correct.
17        Q.    Are you opining that there
18   were implied terms in the first lien
19   credit agreement that were actually not
20   written down by the parties?
21        A.    I am just not giving any
22   legal opinion.  My opinion is with
23   respect to market practice and
24   understanding, not with respect to
25   implied terms or not.
```

1  covenant of good faith and fair

2  dealing?

3      A.    I'm aware.

4      Q.    I know we covered this.

5            Just to be sure, you're not

6  opining on whether Serta or the lender

7  plaintiffs breached the implied

8  covenant of good faith and fair

9  dealing; correct?

10           MS. BIERUT: Objection to

11      form.

12           THE WITNESS:  That's correct,

13      I'm not giving any legal opinions.

14      Q.    And you're not offering any

15  opinion here on the scope of the

16  implied covenant of good faith and fair

17  dealing; correct?

18           MS. BIERUT: Objection to

19      form.

20           THE WITNESS:  That's correct.

21      Q.    And you're not offering an

22  opinion that anything that you're

23  testifying to would be relevant to

24  determining whether the transaction

25  breached the implied covenant of good

1  faith and fair dealing; correct?

2          MS. BIERUT: Objection to

3      form.

4          THE WITNESS:  I'm opining as

5      to market practice and

6      understanding, that's what I'm

7      doing.

8      Q.    Has a client ever asked you

9  to analyze whether a particular

10 transaction was permitted under a

11 credit agreement?

12         MS. BIERUT: Objection to the

13     extent it calls for privileged

14     information.

15         THE WITNESS:  Yes.

16     Q.    Had you did you go about

17 doing that analysis, at a high level?

18         MS. BIERUT: Objection to

19     form.

20         THE WITNESS:  It really

21     depends on what the transaction is.

22     Q.    Did you read the credit

23 agreement?

24     A.    I likely read the credit

25 agreement many times.

1  anticipated would have been permitted

2  under the open market purchase

3  provision and what you think the open

4  market purchase provision permits?

5           MS. BIERUT: Objection to

6      form.

7           THE WITNESS:  You know, my

8      opinion as to what the -- what

9      market participants would have

10     anticipated open market purchases

11     to permit is based on my

12     experience, my thirty-something

13     years doing finance transactions,

14     as well as all of the materials

15     that I've listed and all the

16     publications, industry publications

17     and materials that I've read over

18     the course of my career, as well as

19     the ones that I've listed as --

20     I've listed in the back of my

21     report in terms of materials

22     reviewed.  So whether my opinion

23     differs from, I think it's not

24     really relevant, because I'm here

25     to really say what market

Page 277

1    participants' expectations were

2    based on all of that that I just

3    went through.

4        Q.    That's what also leads you to

5    your legal conclusion about what the

6    open market purchase provision in the

7    agreement legally permits; correct?

8             MS. BIERUT: Objection to

9        form.

10            THE WITNESS:  I'm not here to

11       give my legal opinion.

12       Q.    Okay.

13       A.    I've not been retained to do

14    that.

15       Q.    Have you ever advised clients

16    on the scope of the open market

17    purchase provision in credit

18    agreements?

19       A.    Not directly, it has not come

20    up for me to have the occasion to

21    discuss it directly with a client.

22       Q.    Are you aware of any clients

23    of yours ever using an open market

24    purchase provision in a credit

25    agreement to effectuate a transaction?

Page 303

1    ruling on the motions for summary

2    judgment begins.

3              I'd ask you to turn to turn

4    to page one hundred thirty-four.

5              So starting at line twelve,

6    Judge Jones says, "in looking at the

7    words and given the common meaning and

8    then looking at the transaction that

9    engaged in, it is very clear to me that

10   the process that was engaged in fit

11   with 9.05(G).  There's just no question

12   in my mind".

13        A.    Uh-huh.

14        Q.    Is your opinion that market

15   participants reasonably expected that

16   the June, 2020 Serta transaction was

17   impermissible contrary to Judge Jones'

18   ruling that "it is very clear to me

19   that the process was engaged in fit

20   within 9.05(G)"?

21             MS. BIERUT: Objection to

22        form.

23             THE WITNESS:  I'm not here to

24        opine on the court's decision.

25        That would be a legal decision and

Page 304

1       I'm not here to give any legal
2       decisions, as I've mentioned
3       numerous times today.
4            In terms of market
5       participants' expectations, I don't
6       -- my view is market participants
7       would not have expected that a
8       credit agreement with pro rata
9       sharing provisions and sacred
10      rights protection for those
11      provisions, they would not have
12      expected a debt-for-debt exchange
13      that subordinates their debt to the
14      debt of other lenders within the
15      same tranche would be permitted.
16      Q.    So to the extent that Judge
17   Jones found that that was permitted
18   under the credit agreement, that's
19   contrary to your opinion of what market
20   participants would have expected?
21            MS. BIERUT: Objection to
22      form.
23            THE WITNESS:  I've stated
24      what market participants would have
25      expected.  I don't think I need to

1     go through it again.

2     Q.     In paragraph thirty-four of

3   your report you say that one of the

4   earliest examples of a discriminatory

5   uptier transaction was the 2017 NYDJ

6   transaction.

7             Do you see that?

8     A.     Yes.

9     Q.     Are you aware of any earlier

10  uptier transactions?

11            MS. BIERUT: Objection to

12     form.

13            THE WITNESS:  I can't think

14     of any.

15     Q.     What prompted you to

16  reference NYDJ in this report?

17     A.     It came up in a bunch of -- I

18  mean, number one it was -- it's been

19  written about quite a bit.  And I think

20  it's an interesting transaction even

21  though there's differences in terms of

22  that credit agreement and the Serta

23  credit agreement because that credit

24  agreement permitted sacred rights to be

25  -- pro rata sharing provisions to be

Page 321

```
 1      respect to market participants'
 2      expectations.
 3      Q.    Are you opining that either
 4   Serta or the PTL lenders acted in bad
 5   faith in entering into the June, 2020
 6   transaction?
 7            MS. BIERUT: Objection to the
 8      form.
 9            THE WITNESS:  I have not been
10      retained to make any determinations
11      as to bad faith.
12      Q.    So you're not opining as to
13   bad faith?
14      A.    Correct.  No, I'm not.
15      Q.    Are you opining that Serta or
16   the PTL lenders acted with malice in
17   entering into the June, 2020 Serta
18   transaction?
19            MS. BIERUT: Objection.
20            THE WITNESS:  No, I'm not.
21      Q.    Are you opining as to whether
22   or not Serta or the PTL lenders'
23   actions were fraudulent in any way in
24   entering into the June, 2020
25   transaction?
```

```
                                              Page 322

 1              MS. BIERUT: Objection.

 2              THE WITNESS:  No, I'm not.

 3      That's beyond the scope of my role.

 4      Q.    Are you opining in any way

 5   that the PTL lenders and Serta's

 6   actions from malevolent with regard to

 7   the June, 2020 transaction?

 8      A.    No.

 9              MS. BIERUT: Objection to the

10      form.

11              MR. WILSON: That's all I

12      have.

13              Thank you very much.

14              THE WITNESS:  Thank you.

15      4:28.

16              THE VIDEOGRAPHER: May I close

17      out the deposition for today?

18              MR. WILSON: You may.

19              (CONTINUED ON NEXT PAGE)

20

21

22

23

24

25
```

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.