# DEFENDANTS'
# EXHIBIT 331
# Part 1 of 3

# EXHIBIT 1

**Exhibit**
**Chopra 0010**

**EXECUTION VERSION**

Deal CUSIP:  81753HAA9
Facility CUSIP: 81753HAB7

FIRST LIEN TERM LOAN AGREEMENT
Dated as of November 8, 2016

among

DAWN INTERMEDIATE, INC.,
as Holdings,

SERTA SIMMONS BEDDING, LLC,
as the Top Borrower,

THE OTHER BORROWERS PARTY HERETO,

THE FINANCIAL INSTITUTIONS PARTY HERETO,
as Lenders,

UBS AG, STAMFORD BRANCH
as Administrative Agent

and

UBS SECURITIES LLC,
GOLDMAN SACHS BANK USA,
BARCLAYS BANK PLC,
DEUTSCHE BANK SECURITIES, INC.,
JEFFERIES FINANCE LLC,
JPMORGAN CHASE BANK N.A.,
MORGAN STANLEY SENIOR FUNDING, INC.,
RBC CAPITAL MARKETS,
and
WELLS FARGO SECURITIES, LLC
as Joint Lead Arrangers and Joint Bookrunners

# TABLE OF CONTENTS

Page

### ARTICLE 1

### DEFINITIONS

| | | |
|---|---|---|
| Section 1.01. | Defined Terms | 1 |
| Section 1.02. | Classification of Loans and Borrowings | 55 |
| Section 1.03. | Terms Generally | 55 |
| Section 1.04. | Accounting Terms; GAAP | 56 |
| Section 1.05. | Effectuation of Transactions | 57 |
| Section 1.06. | Timing of Payment of Performance | 57 |
| Section 1.07. | Times of Day | 57 |
| Section 1.08. | Currency Equivalents Generally | 57 |
| Section 1.09. | Cashless Rollovers | 58 |
| Section 1.10. | Certain Calculations and Tests | 58 |
| Section 1.11. | Guarantees and Collateral | 60 |

### ARTICLE 2

### THE CREDITS

| | | |
|---|---|---|
| Section 2.01. | Commitments | 60 |
| Section 2.02. | Loans and Borrowings | 60 |
| Section 2.03. | Requests for Borrowings | 61 |
| Section 2.04. | [Reserved] | 62 |
| Section 2.05. | [Reserved] | 62 |
| Section 2.06. | [Reserved] | 62 |
| Section 2.07. | Funding of Borrowings | 62 |
| Section 2.08. | Type; Interest Elections | 62 |
| Section 2.09. | Termination and Reduction of Commitments | 63 |
| Section 2.10. | Repayment of Loans; Evidence of Debt | 63 |
| Section 2.11. | Prepayment of Loans | 64 |
| Section 2.12. | Fees | 69 |
| Section 2.13. | Interest | 70 |
| Section 2.14. | Alternate Rate of Interest | 71 |
| Section 2.15. | Increased Costs | 71 |
| Section 2.16. | Break Funding Payments | 72 |
| Section 2.17. | Taxes | 72 |
| Section 2.18. | Payments Generally; Allocation of Proceeds; Sharing of Payments | 76 |
| Section 2.19. | Mitigation Obligations; Replacement of Lenders | 77 |
| Section 2.20. | Illegality | 78 |
| Section 2.21. | Defaulting Lenders | 79 |
| Section 2.22. | Incremental Credit Extensions | 80 |
| Section 2.23. | Extensions of Loans and Additional Revolving Commitments | 83 |

i

# ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

Section 3.01. Organization; Powers.................................................................................................. 86
Section 3.02. Authorization; Enforceability ...................................................................................... 86
Section 3.03. Governmental Approvals; No Conflicts ...................................................................... 86
Section 3.04. Financial Condition; No Material Adverse Effect ...................................................... 87
Section 3.05. Properties .................................................................................................................... 87
Section 3.06. Litigation and Environmental Matters ........................................................................ 87
Section 3.07. Compliance with Laws ............................................................................................... 88
Section 3.08. Investment Company Status ....................................................................................... 88
Section 3.09. Taxes............................................................................................................................ 88
Section 3.10. ERISA.......................................................................................................................... 88
Section 3.11. Disclosure ................................................................................................................... 88
Section 3.12. Solvency ...................................................................................................................... 88
Section 3.13. Subsidiaries.................................................................................................................. 89
Section 3.14. Security Interest in Collateral ..................................................................................... 89
Section 3.15. Labor Disputes............................................................................................................. 89
Section 3.16. Federal Reserve Regulations ....................................................................................... 89
Section 3.17. OFAC; PATRIOT ACT and FCPA ............................................................................ 89

# ARTICLE 4

## CONDITIONS

Section 4.01. Closing Date ............................................................................................................... 90

# ARTICLE 5

## AFFIRMATIVE COVENANTS

Section 5.01. Financial Statements and Other Reports..................................................................... 93
Section 5.02. Existence...................................................................................................................... 95
Section 5.03. Payment of Taxes........................................................................................................ 95
Section 5.04. Maintenance of Properties .......................................................................................... 96
Section 5.05. Insurance...................................................................................................................... 96
Section 5.06. Inspections ................................................................................................................... 96
Section 5.07. Maintenance of Book and Records.............................................................................. 97
Section 5.08. Compliance with Laws ................................................................................................ 97
Section 5.09. Environmental.............................................................................................................. 97
Section 5.10. Designation of Subsidiaries ........................................................................................ 97
Section 5.11. Use of Proceeds ........................................................................................................... 98
Section 5.12. Covenant to Guarantee Obligations and Provide Security.......................................... 98
Section 5.13. Maintenance of Ratings ............................................................................................. 100
Section 5.14. Further Assurances .................................................................................................... 100
Section 5.15. Post-Closing Covenant .............................................................................................. 100

# ARTICLE 6

## NEGATIVE COVENANTS

Section 6.01. Indebtedness .............................................................................................................. 101

ii

| | | |
|---|---|---|
| Section 6.02. | Liens | 106 |
| Section 6.03. | [Reserved] | 110 |
| Section 6.04. | Restricted Payments; Restricted Debt Payments | 110 |
| Section 6.05. | Burdensome Agreements | 114 |
| Section 6.06. | Investments | 115 |
| Section 6.07. | Fundamental Changes; Disposition of Assets | 119 |
| Section 6.08. | Sale and Lease-Back Transactions | 122 |
| Section 6.09. | Transactions with Affiliates | 122 |
| Section 6.10. | Conduct of Business | 124 |
| Section 6.11. | Amendments or Waivers of Organizational Documents | 124 |
| Section 6.12. | Amendments of or Waivers with Respect to Restricted Debt | 124 |
| Section 6.13. | Fiscal Year | 125 |
| Section 6.14. | Permitted Activities of Holdings | 125 |

ARTICLE 7

EVENTS OF DEFAULT

| | | |
|---|---|---|
| Section 7.01. | Events of Default | 125 |

ARTICLE 8

THE ADMINISTRATIVE AGENT

ARTICLE 9

MISCELLANEOUS

| | | |
|---|---|---|
| Section 9.01. | Notices | 134 |
| Section 9.02. | Waivers; Amendments | 136 |
| Section 9.03. | Expenses; Indemnity | 142 |
| Section 9.04. | Waiver of Claim | 143 |
| Section 9.05. | Successors and Assigns | 144 |
| Section 9.06. | Survival | 152 |
| Section 9.07. | Counterparts; Integration; Effectiveness | 152 |
| Section 9.08. | Severability | 152 |
| Section 9.09. | Right of Setoff | 152 |
| Section 9.10. | Governing Law; Jurisdiction; Consent to Service of Process | 152 |
| Section 9.11. | Waiver of Jury Trial | 153 |
| Section 9.12. | Headings | 154 |
| Section 9.13. | Confidentiality | 154 |
| Section 9.14. | No Fiduciary Duty | 155 |
| Section 9.15. | Several Obligations | 155 |
| Section 9.16. | USA PATRIOT Act | 155 |
| Section 9.17. | Disclosure of Agent Conflicts | 155 |
| Section 9.18. | Appointment for Perfection | 155 |
| Section 9.19. | Interest Rate Limitation | 156 |
| Section 9.20. | Intercreditor Agreement | 156 |
| Section 9.21. | Conflicts | 156 |
| Section 9.22. | Release of Guarantors | 156 |
| Section 9.23. | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 157 |
| Section 9.24. | Joint and Several Liability | 157 |
| Section 9.25. | Top Borrower | 157 |

SCHEDULES:

Schedule 1.01(a)     –     Commitment Schedule
Schedule 1.01(b)     –     Dutch Auction
Schedule 1.01(c)     –     Mortgages
Schedule 3.05         –     Fee Owned Real Estate Assets
Schedule 3.13         –     Subsidiaries
Schedule 4.01(b)     –     Local Counsel Opinions
Schedule 5.10         –     Unrestricted Subsidiaries
Schedule 5.15         –     Post-Closing Obligations
Schedule 6.01         –     Existing Indebtedness
Schedule 6.02         –     Existing Liens
Schedule 6.06         –     Existing Investments
Schedule 9.01         –     Borrower's Website Address for Electronic Delivery

EXHIBITS:

Exhibit A-1     –     Form of Affiliated Lender Assignment and Assumption
Exhibit A-2     –     Form of Assignment and Assumption
Exhibit B       –     Form of Borrowing Request
Exhibit C       –     Form of Intellectual Property Security Agreement
Exhibit D       –     Form of Compliance Certificate
Exhibit E       –     Reserved
Exhibit F       –     Form of Intercompany Note
Exhibit G-1     –     Form of ABL Intercreditor Agreement
Exhibit G-2     –     Form of First/Second Lien Intercreditor Agreement
Exhibit G-3     –     Form of First Lien Intercreditor Agreement
Exhibit H       –     Form of Interest Election Request
Exhibit I       –     Form of First Lien Term Loan Guaranty Agreement
Exhibit J       –     Form of Perfection Certificate
Exhibit K       –     Form of Joinder Agreement
Exhibit L       –     Form of Promissory Note
Exhibit M       –     Form of First Lien Term Loan Pledge and Security Agreement
Exhibit N       –     Reserved
Exhibit O-1     –     Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit O-2     –     Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit O-3     –     Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit O-4     –     Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit P       –     Form of Solvency Certificate

WEIL:\95874775\19\74339.0001

# FIRST LIEN TERM LOAN AGREEMENT

FIRST LIEN TERM LOAN AGREEMENT, dated as of November 8, 2016 (this "Agreement"), by and among Dawn Intermediate, Inc., a Delaware corporation ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party hereto, UBS AG, Stamford Branch ("UBS"), in its capacities as administrative agent and collateral agent for the Lenders (in such capacities and together with its successors and assigns, the "Administrative Agent").

## RECITALS

A.      The Borrowers (a) have requested that the Lenders extend credit under this Agreement in the form of Initial Term Loans in an aggregate principal amount equal to $1,950,000,000, (ii) intend to borrow term loans in an aggregate principal amount equal to $450,000,000 under the Second Lien Credit Agreement and (iii) intend to establish an asset-based revolving credit facility with commitments of $225,000,000 under the ABL Credit Agreement.

B.      The proceeds of the Initial Term Loans and the loans under the Second Lien Facility will be applied to (i) repay in full amounts owing under the Term Loan Credit Agreement, dated as of October 1, 2012, by and among, *inter alios,* Dawn Intermediate, as holdings, SSB and the other borrowers party thereto, the lenders party thereto and Morgan Stanley Senior Funding, Inc., as administrative agent, (ii) redeem, defease or otherwise discharge amounts owing under the Indenture, dated as of October 1, 2012, among SSB, as issuer, the subsidiaries of SSB party thereto, as guarantors, and Wilmington Trust, National Association, as trustee (the transactions described in clause (i) and this clause (ii), the "Refinancing Transactions"), and (iii) finance the payment of a dividend, distribution or other payment (the "Specified Dividend") in an amount up to $670,000,000, to the direct or indirect holders of its Capital Stock.

C.      The Lenders are willing to extend such credit to the Borrowers on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.01.      <u>Defined Terms</u>.  As used in this Agreement, the following terms have the meanings specified below:

"ABL Credit Agreement" means the ABL Credit Agreement, dated as of the Closing Date, among, *inter alios*, Holdings, the Borrowers, UBS, as administrative agent and collateral agent, and the lenders from time to time party thereto.

"ABL Credit Agreement Collateral Agent" has the meaning set forth in the ABL Intercreditor Agreement.

"ABL Facility" means the credit facility pursuant to the ABL Credit Agreement and one or more debt facilities or other financing arrangements (including indentures) providing for loans and/or commitments or other long-term indebtedness that replace or refinance such credit facility, including any such replacement or refinancing facility (including any indenture) that increases or decreases the amount permitted to be borrowed thereunder or alters the maturity thereof and whether by the same or any other agent, trustee, lender or group of lenders, and any amendments, supplements, modifications, extensions, renewals, restatements, amendments and restatements or refundings thereof or any such credit facilities or other debt facilities (including under indentures) that replace or refinance such credit facility or other Indebtedness.

WEIL:\95874775\19\74339.0001

"ABL Incremental Debt" has the meaning given to "Incremental Revolving Loans" in the ABL Credit Agreement (or any equivalent term under any ABL Facility).

"ABL Intercreditor Agreement" means the ABL Intercreditor Agreement substantially in the form of Exhibit G-1, dated as of the Closing Date, among, *inter alios*, the ABL Credit Agreement Collateral Agent, as agent for the ABL Claimholders referred to therein, the Administrative Agent, as agent for the First Lien Claimholders referred to therein, the Second Lien Collateral Agent, as agent for the Second Lien Claimholders referred to therein and the Loan Parties from time to time party thereto.

"ABL Priority Collateral" has the meaning set forth in the ABL Intercreditor Agreement.

"ABR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Intercreditor Agreement" means:

(a)	with respect to any Indebtedness that is secured on a pari passu basis with the Initial Term Loans, a First Lien Intercreditor Agreement;

(b)	with respect to any Indebtedness that is secured on a *pari passu* basis with the Liens securing the ABL Facility, (i) if any ABL Facility is outstanding on the relevant date of determination, the ABL Intercreditor Agreement or (ii) if an ABL Facility is not outstanding on the relevant date of determination, an intercreditor agreement substantially in the form of the ABL Credit Agreement, with any changes thereto as the Top Borrower and the Administrative Agent may agree in their respective reasonable discretion;

(c)	with respect to any Indebtedness that is junior to the Initial Term Loans in right of security (other than, for the avoidance of doubt, any ABL Facility), (i) if any Second Lien Facility is outstanding on the relevant date of determination, the First/Second Lien Intercreditor Agreement or (ii) if a Second Lien Facility is not outstanding on the relevant date of determination, an intercreditor agreement substantially in the form of the First/Second Lien Intercreditor Agreement, with any changes thereto as the Top Borrower and the Administrative Agent may agree in their respective reasonable discretion; and/or

(d)	with respect to any Indebtedness, any other intercreditor or subordination agreement or arrangement (which may take the form of a "waterfall" or similar provision), as applicable, the terms of which are (i) consistent with market terms (as determined by the Top Borrower and the Administrative Agent in good faith) governing arrangements for the sharing and/or subordination of liens and/or arrangements relating to the distribution of payments, as applicable, at the time the relevant intercreditor agreement is proposed to be established in light of the type of Indebtedness subject thereto and/or (ii) reasonably acceptable to the Top Borrower and the Administrative Agent.

"ACH" means automated clearing house transfers.

"Additional Agreement" has the meaning assigned to such term in Article 8.

"Additional Commitment" means any commitment hereunder added pursuant to Sections 2.22, 2.23 and/or 9.02(c).

"Additional Loans" means any Additional Revolving Loans and any Additional Term Loans.

"Additional Revolving Credit Commitments" means any revolving credit commitment added pursuant to Sections 2.22, 2.23 and/or 9.02(c)(ii).

WEIL:\95874775\19\74339.0001

"Additional Revolving Credit Exposure" means, with respect to any Lender at any time, the aggregate outstanding principal amount at such time of all Additional Revolving Loans of such Lender attributable to its Additional Revolving Credit Commitment.

"Additional Revolving Facility" means any Incremental Revolving Facility, any Extended Revolving Facility and/or any Replacement Revolving Facility.

"Additional Revolving Lender" means any Lender with an Additional Revolving Credit Commitment or any Additional Revolving Credit Exposure.

"Additional Revolving Loans" means any revolving loan added hereunder pursuant to Section 2.22, 2.23 and/or 9.02(c)(ii).

"Additional Term Lender" means any Lender with an Additional Term Loan Commitment or an outstanding Additional Term Loan.

"Additional Term Loan Commitment" means any term commitment added pursuant to Sections 2.22, 2.23 and/or 9.02(c)(i).

"Additional Term Loans" means any term loan added pursuant to Section 2.22, 2.23 and/or 9.02(c)(i).

"Administrative Agent" has the meaning assigned to such term in the preamble to this Agreement.

"Administrative Questionnaire" means a customary administrative questionnaire in the form provided by the Administrative Agent.

"Advent" means Advent International Corporation.

"Adverse Proceeding" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings, the Top Borrower or any of its Restricted Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claim), whether pending or, to the knowledge of Holdings, the Top Borrower or any of its Restricted Subsidiaries, threatened in writing, against or affecting Holdings, the Top Borrower or any of its Restricted Subsidiaries or any property of Holdings, the Top Borrower or any of its Restricted Subsidiaries.

"Affiliate" means, as applied to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with, that Person. No Person shall be an "Affiliate" solely because it is an unrelated portfolio company of the Sponsor and none of the Administrative Agent, the Arrangers, any Lender (other than any Affiliated Lender or any Debt Fund Affiliate) or any of their respective Affiliates shall be considered an Affiliate of Holdings or any subsidiary thereof.

"Affiliated Lender" means any Non-Debt Fund Affiliate, Holdings, the Top Borrower and/or any subsidiary of the Top Borrower.

"Affiliated Lender Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Affiliated Lender (with the consent of any party whose consent is required by Section 9.05) and accepted by the Administrative Agent in the form of Exhibit A-1 or any other form approved by the Administrative Agent and the Top Borrower.

"Affiliated Lender Cap" has the meaning assigned to such term in Section 9.05(g)(iv).

"Agreement" has the meaning assigned to such term in the preamble to this First Lien Term Loan Credit Agreement.

"Alternate Base Rate" means, for any day, a rate per annum equal to the highest of (a) the Federal Funds Effective Rate in effect on such day plus 0.50%, (b) to the extent ascertainable, the Published LIBO Rate (which rate shall be calculated based upon an Interest Period of one month and shall be determined on a daily basis and, for the avoidance of doubt, the Published LIBO Rate for any day shall be based on the rate determined on such day at 11:00 a.m. (London time)) plus 1.00%, (c) the Prime Rate and (d) solely with respect to Initial Term Loans, 2.00%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Published LIBO Rate, as the case may be, shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Published LIBO Rate, as the case may be.

"Applicable Administrative Agent" means (i) with respect to ABL Priority Collateral, the ABL Credit Agreement Collateral Agent (or other analogous term in another Acceptable Intercreditor Agreement, as applicable), (ii) with respect to Term Loan Priority Collateral, the First Lien Credit Agreement Collateral Agent (as defined in the First Lien/Second Lien Intercreditor Agreement) (or other analogous term in another Acceptable Intercreditor Agreement, as applicable) or (iii) if at any time there is no ABL Intercreditor Agreement, First Lien/Second Lien Intercreditor Agreement or other intercreditor agreement as described in the definition of Acceptable Intercreditor Agreement then in effect, the Administrative Agent.

"Applicable Percentage" means, (a) with respect to any Term Lender of any Class, a percentage equal to a fraction the numerator of which is the aggregate outstanding principal amount of the Term Loans and unused Additional Term Loan Commitments of such Term Lender under the applicable Class and the denominator of which is the aggregate outstanding principal amount of the Term Loans and unused Term Commitments of all Term Lenders under the applicable Class and (b) with respect to any Additional Revolving Lender of any Class, the percentage of the aggregate amount of the Additional Revolving Credit Commitments of such Class represented by such Additional Revolving Lender's Additional Revolving Credit Commitment of such Class; provided that for purposes of Section 2.21 and otherwise herein (except with respect to the optional prepayment of any Additional Revolving Loans), when there is a Defaulting Lender, such Defaulting Lender's Additional Revolving Credit Commitment shall be disregarded for any relevant calculation. In the case of clause (b), in the event that the Additional Revolving Credit Commitments of any Class have expired or been terminated, the Applicable Percentage of Additional Revolving Lender of such Class shall be determined on the basis of the Additional Revolving Credit Exposure of such Additional Revolving Lender attributable to its Additional Revolving Credit Commitment of such Class, giving effect to any assignment thereof.

"Applicable Rate" means, for any day, with respect to any LIBO Rate Loan, 3.50% per annum, and with respect to any ABR Loan, 2.50% per annum.

"Approved Fund" means, with respect to any Lender, any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and is administered, advised or managed by (a) such Lender, (b) any Affiliate of such Lender or (c) any entity or any Affiliate of any entity that administers, advises or manages such Lender.

"Arrangers" means UBS Securities LLC, Goldman Sachs Bank USA, Barclays Bank PLC, Deutsche Bank Securities Inc., Jefferies Finance LLC, JPMorgan Chase Bank N.A., Morgan Stanley Senior Funding, Inc., RBC Capital Markets, and Wells Fargo Securities, LLC.

"Ares" means Ares Management LLC.

"<u>Assignment Agreement</u>" means, collectively, each Assignment and Assumption and each Affiliated Lender Assignment and Assumption.

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by <u>Section 9.05</u>), and accepted by the Administrative Agent in the form of <u>Exhibit A-2</u> or any other form approved by the Administrative Agent and the Top Borrower.

"<u>Available Amount</u>" means, at any time, an amount equal to, without duplication:

    (a)    the sum of:

        (i)    the greater of $100,000,000 and 2.5% of Consolidated Total Assets as of the end of the most recently ended Test Period; plus

        (ii)    the Retained Excess Cash Flow Amount (<u>provided</u> that the Retained Excess Cash Flow Amount shall not be available for (A) any Restricted Payment pursuant to <u>Section 6.04(a)(iii)(A)</u> unless no Event of Default exists at the time of declaration of such Restricted Payment or (B) any Restricted Debt Payment pursuant to <u>Section 6.04(b)(vi)(A)</u> unless no Event of Default under <u>Sections 7.01(a)</u>, <u>(f)</u> or <u>(g)</u> exists at the time of delivery of irrevocable notice with respect to such Restricted Debt Payment); plus

        (iii)    the amount of any capital contribution in respect of Qualified Capital Stock or the proceeds of any issuance of Qualified Capital Stock after the Closing Date (other than any amounts (x) constituting a Cure Amount or an Available Excluded Contribution Amount, (y) received from the Top Borrower or any Restricted Subsidiary or (z) consisting of the proceeds of any loan or advance made pursuant to <u>Section 6.06(h)(ii)</u>) received as Cash equity by the Top Borrower or any of its Restricted Subsidiaries, plus the fair market value, as reasonably determined by the Top Borrower, of Cash Equivalents, marketable securities or other property received by the Top Borrower or any Restricted Subsidiary as a capital contribution in respect of Qualified Capital Stock or in return for any issuance of Qualified Capital Stock (other than any amounts (x) constituting a Cure Amount or an Available Excluded Contribution Amount or (y) received from the Top Borrower or any Restricted Subsidiary), in each case, during the period from and including the day immediately following the Closing Date through and including such time; plus

        (iv)    the aggregate principal amount of any Indebtedness (including any Disqualified Capital Stock) of the Top Borrower or any Restricted Subsidiary issued after the Closing Date (other than Indebtedness or such Disqualified Capital Stock issued to the Top Borrower or any Restricted Subsidiary), which has been converted into or exchanged for Capital Stock of the Top Borrower, any Restricted Subsidiary or any Parent Company that does not constitute Disqualified Capital Stock, together with the fair market value of any Cash Equivalents and the fair market value (as reasonably determined by the Top Borrower) of any assets received by the Top Borrower or such Restricted Subsidiary upon such exchange or conversion, in each case, during the period from and including the day immediately following the Closing Date through and including such time; plus

        (v)    the net proceeds received by the Top Borrower or any Restricted Subsidiary during the period from and including the day immediately following the Closing Date through and including such time in connection with the Disposition to any Person (other than the Top Borrower or any Restricted Subsidiary) of any Investment made pursuant to <u>Section 6.06(r)(i)</u>; plus

WEIL:\95874775\19\74339.0001

(vi)    to the extent not already reflected as a return of capital with respect to such Investment for purposes of determining the amount of such Investment (pursuant to the definition thereof), the proceeds received by the Top Borrower or any Restricted Subsidiary during the period from and including the day immediately following the Closing Date through and including such time in connection with cash returns, cash profits, cash distributions and similar cash amounts, including cash principal repayments and interest payments of loans, in each case received in respect of any Investment made after the Closing Date pursuant to Section 6.06(r)(i); plus

(vii)    an amount equal to the sum of (A) the amount of any Investments by the Top Borrower or any Restricted Subsidiary pursuant to Section 6.06(r)(i) in any Unrestricted Subsidiary (in an amount not to exceed the original amount of such Investment) that has been re-designated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or is liquidated, wound up or dissolved into, the Top Borrower or any Restricted Subsidiary and (B) the fair market value (as reasonably determined by the Top Borrower) of the assets of any Unrestricted Subsidiary that have been transferred, conveyed or otherwise distributed (in an amount not to exceed the original amount of the Investment in such Unrestricted Subsidiary) to the Top Borrower or any Restricted Subsidiary, in each case, during the period from and including the day immediately following the Closing Date through and including such time; plus

(viii)    to the extent not otherwise applied to prepay term loans outstanding under the Second Lien Facility in accordance with the terms thereof, the amount of any Declined Proceeds; minus

(b)    an amount equal to the sum of (i) Restricted Payments made pursuant to Section 6.04(a)(iii)(A), plus (ii) Restricted Debt Payments made pursuant to Section 6.04(b)(vi)(A), plus (iii) Investments made pursuant to Section 6.06(r)(i), in each case, after the Closing Date and prior to such time or contemporaneously therewith.

"Available Excluded Contribution Amount" means the aggregate amount of Cash or Cash Equivalents or the fair market value of other assets (as reasonably determined by the Top Borrower, but excluding any Cure Amount) received by the Top Borrower or any of its Restricted Subsidiaries after the Closing Date from:

(a)    contributions in respect of Qualified Capital Stock of the Top Borrower (other than any amounts received from any Restricted Subsidiary of the Top Borrower), and

(b)    the sale of Qualified Capital Stock of the Top Borrower (other than (x) to any Restricted Subsidiary of the Top Borrower, (y) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or (z) with the proceeds of any loan or advance made pursuant to Section 6.06(h)(ii)),

in each case, designated as an Available Excluded Contribution Amount pursuant to a certificate of a Responsible Officer on or promptly after the date on which the relevant capital contribution is made or the relevant proceeds are received, as the case may be, and which are excluded from the calculation of the Available Amount.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the

implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Banking Services" means each and any of the following bank services:  commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with Cash management and Deposit Accounts.

"Banking Services Obligations" means any and all obligations of any Loan Party, whether absolute or contingent and however and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under any arrangement in connection with Banking Services that is (a) in effect on the Closing Date between any Loan Party and a counterparty that is (or is an Affiliate of) the Administrative Agent, any Lender or any Arranger as of the Closing Date or (b) entered into after the Closing Date by any Loan Party with any counterparty that is (or is an Affiliate of) the Administrative Agent, any Lender or any Arranger at the time such arrangement is entered into, in each case, that have been designated to the Administrative Agent in writing by the Top Borrower as being Banking Services Obligations for the purposes of the Loan Documents, it being understood that each counterparty thereto shall be deemed (A) to appoint the Administrative Agent as its agent under the applicable Loan Documents and (B) to agree to be bound by the provisions of Article 8, Section 9.03 and Section 9.10 and each Intercreditor Agreement as if it were a Lender.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. § 101 *et seq*.), as it has been, or may be, amended, from time to time.

"Bona Fide Debt Fund" means any debt fund, investment vehicle, regulated bank entity or unregulated lending entity that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business for financial investment purposes which is managed, sponsored or advised by any Person controlling, controlled by or under common control with (a) any competitor of the Top Borrower and/or any of its subsidiaries or (b) any Affiliate of such competitor, but, in each case, with respect to which no personnel involved with any investment in such Person or the management, control or operation of such Person (i) directly or indirectly makes, has the right to make or participates with others in making any investment decisions, or otherwise causing the direction of the investment policies, with respect to such debt fund, investment vehicle, regulated bank entity or unregulated entity or (ii) has access to any information (other than information that is publicly available) relating to Holdings, the Top Borrower or its subsidiaries or any entity that forms a part of any of their respective businesses; it being understood and agreed that the term "Bona Fide Debt Fund" shall not include any Person that is a Disqualified Lending Institution.

"Borrowers" means, collectively, SSB, National Bedding and SSB Manufacturing.

"Borrower Materials" has the meaning assigned to such term in Section 9.01(d).

"Borrowing" means any Loans of the same Type and Class made, converted or continued on the same date and, in the case of LIBO Rate Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by any Borrower for a Borrowing in accordance with Section 2.03 and substantially in the form attached hereto as Exhibit B or such other form that is reasonably acceptable to the Administrative Agent and such Borrower.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that when used in

connection with a LIBO Rate Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"Calculation Period" means an Excess Cash Flow Period or an Excess Cash Flow Interim Period, as applicable.

"Capital Expenditures" means, with respect to the Top Borrower and its Restricted Subsidiaries for any period, the aggregate amount, without duplication, of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) that would, in accordance with GAAP, are, or are required to be included as, capital expenditures on the consolidated statement of cash flows for the Top Borrower and its Restricted Subsidiaries for such period.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person; provided, that for the avoidance of doubt, the amount of obligations attributable to any Capital Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, but excluding for the avoidance of doubt any Indebtedness convertible into or exchangeable for any of the foregoing.

"Captive Insurance Subsidiary" means any Restricted Subsidiary of the Top Borrower that is subject to regulation as an insurance company (or any Restricted Subsidiary thereof).

"Cash" means money, currency or a credit balance in any Deposit Account, in each case determined in accordance with GAAP.

"Cash Equivalents" means, as at any date of determination, (a) readily marketable securities (i) issued or directly and unconditionally guaranteed or insured as to interest and principal by the U.S. government or (ii) issued by any agency or instrumentality of the U.S. the obligations of which are backed by the full faith and credit of the U.S., in each case maturing within one year after such date and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (b) readily marketable direct obligations issued by any state of the U.S. or any political subdivision of any such state or any public instrumentality thereof or by any foreign government, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (c) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency); (d) deposits, money market deposits, time deposit accounts, certificates of deposit or bankers' acceptances (or similar instruments) maturing within one year after such date and issued or accepted by any Lender or by any bank organized under, or authorized to operate as a bank under, the laws of the U.S., any state thereof or the District of Columbia or any political subdivision thereof or any foreign bank or its branches or agencies and that has capital and surplus of not less than $100,000,000 and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (e) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank having capital and surplus of not less than $100,000,000; (f) shares of any money market mutual fund that has (i) substantially all of its assets invested in the types of investments referred to in clauses (a) through (e) above, (ii) net assets of not less than $250,000,000 and (iii) a rating of at least A-2 from S&P or at least P-2 from

Moody's; and (g) solely with respect to any Captive Insurance Subsidiary, any investment that such Captive Insurance Subsidiary is not prohibited to make in accordance with applicable law.

"Cash Equivalents" shall also include (x) Investments of the type and maturity described in <u>clauses (a)</u> through <u>(g)</u> above of foreign obligors, which Investments or obligors (or the parent companies thereof) have the ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (y) other short-term Investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in Investments that are analogous to the Investments described in <u>clauses (a)</u> through <u>(g)</u> and in this paragraph.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"CFC Holdco" means any direct or indirect Domestic Subsidiary that has no material assets other than the Capital Stock or Indebtedness of one or more CFCs or CFC Holdcos.

"Change in Law" means (a) the adoption of any law, treaty, rule or regulation after the Closing Date, (b) any change in any law, treaty, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of <u>Section 2.15(b)</u>, by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date (other than any such request, guideline or directive to comply with any law, rule or regulation that was in effect on the Closing Date). For purposes of this definition and <u>Section 2.15</u>, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or US regulatory authorities, in each case pursuant to Basel III, shall in each case described in <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u> above, be deemed to be a Change in Law, regardless of the date enacted, adopted, issued or implemented.

"Change of Control" means the earliest to occur of:

(a)    at any time prior to a Qualifying IPO, the Permitted Holders ceasing to beneficially own, either directly or indirectly (within the meaning of Rule 13d-3 and Rule 13d-5 under the Exchange Act), Capital Stock representing more than 50% of the total voting power of all of the outstanding voting stock of Holdings;

(b)    at any time on or after a Qualifying IPO, the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) (including any group acting for the purpose of acquiring, holding or disposing of Securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), but excluding (i) any employee benefit plan and/or Person acting as the trustee, agent or other fiduciary or administrator therefor, (ii) one or more Permitted Holders and (iii) any underwriter in connection with any Qualifying IPO), of Capital Stock representing more than the greater of (x) 35% of the total voting power of all of the outstanding voting stock of Holdings and (y) the percentage of the total voting power of all of the outstanding voting stock of Holdings owned, directly or indirectly, beneficially by the Permitted Holders; and

(c)    the Top Borrower ceasing to be a direct or indirect Wholly-Owned Subsidiary of Holdings.

"Charge" means any fee, loss, charge, expense, cost, accrual or reserve of any kind.

"Charged Amounts" has the meaning assigned to such term in <u>Section 9.19</u>.

"Class", when used with respect to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Initial Term Loans, Additional Term Loans of any series established as a separate "Class" pursuant to Section 2.22, 2.23 and/or 9.02(c)(i), or an Additional Revolving Loans of any series established as a separate "Class" pursuant to Section 2.22, 2.23 and/or 9.02(c)(ii), (b) any Commitment, refers to whether such Commitment is an Initial Term Commitment, an Additional Term Loan Commitment of any series established as a separate "Class" pursuant to Section 2.22, 2.23 and/or 9.02(c)(i), or an Additional Revolving Credit Commitment of any series established as a separate "Class" pursuant to Section 2.22, 2.23 and/or 9.02(c)(ii), (c) any Lender, refers to whether such Lender has a Loan or Commitment of a particular Class and (d) any Additional Revolving Credit Exposure, refers to whether such Additional Revolving Credit Exposure is attributable to an Incremental Revolving Commitment of a particular Class.

"Closing Date" means November 8, 2016, the date on which the conditions specified in Section 4.01 were satisfied (or waived in accordance with Section 9.02).

"Code" means the Internal Revenue Code of 1986.

"Collateral" means any and all property of any Loan Party subject (or purported to be subject) to a Lien under any Collateral Document and any and all other property of any Loan Party, now existing or hereafter acquired, that is or becomes subject (or purported to be subject) to a Lien pursuant to any Collateral Document to secure the Secured Obligations. For the avoidance of doubt, in no event shall "Collateral" include any Excluded Asset..

"Collateral and Guarantee Requirement" means, at any time, subject to (x) the applicable limitations set forth in this Agreement and/or any other Loan Document and (y) the time periods (and extensions thereof) set forth in Section 5.12, the requirement that:

    (a)    the Administrative Agent shall have received in the case of any Restricted Subsidiary that is required to become a Loan Party after the Closing Date (including by ceasing to be an Excluded Subsidiary) or otherwise becomes a Loan Party after the Closing Date:

        (i)    (A) a Joinder Agreement, (B) if the respective Restricted Subsidiary required to comply with the requirements set forth in this definition pursuant to Section 5.12 owns registrations of or applications for U.S. Patents, Trademarks and/or Copyrights that constitute Collateral, an Intellectual Property Security Agreement, (C) a completed Perfection Certificate, (D) Uniform Commercial Code financing statements in appropriate form for filing in such jurisdictions as the Administrative Agent may reasonably request, (E) an executed joinder to each Initial Intercreditor Agreement in substantially the form attached as an exhibit thereto and (F) a joinder to the Intercompany Note; and

        (ii)    each item of Collateral that such Restricted Subsidiary is required to deliver under Section 4.02 of the Security Agreement (which, for the avoidance of doubt, shall be delivered within the time periods set forth in Section 5.12(a)); and

    (b)    the Administrative Agent shall have received with respect to any Material Real Estate Assets acquired after the Closing Date, a Mortgage and any necessary UCC fixture filing in respect thereof, in each case together with, to the extent customary and appropriate (as reasonably determined by the Administrative Agent and the Top Borrower)):

        (i)    evidence that (A) counterparts of such Mortgage have been duly executed, acknowledged and delivered and such Mortgage and any corresponding UCC or equivalent fixture filing are in form suitable for filing or recording in all filing or recording offices that the Administrative Agent may deem reasonably necessary in order to create a valid and subsisting Lien on such Material Real Estate Asset in favor of the Administrative Agent for

the benefit of the Secured Parties, (B) such Mortgage and any corresponding UCC or equivalent fixture filings have been duly recorded or filed, as applicable, and (C) all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent;

(ii)      one or more fully paid policies of title insurance (the "Mortgage Policies") in an amount reasonably acceptable to the Administrative Agent (not to exceed the fair market value of the Material Real Estate Asset covered thereby (as reasonably determined by the Top Borrower)) issued by a nationally recognized title insurance company in the applicable jurisdiction that is reasonably acceptable to the Administrative Agent, insuring the relevant Mortgage as having created a valid subsisting Lien on the real property described therein with the ranking or the priority which it is expressed to have in such Mortgage, subject only to Permitted Liens, together with such endorsements, coinsurance and reinsurance as the Administrative Agent may reasonably request to the extent the same are available in the applicable jurisdiction;

(iii)      customary legal opinions of local counsel for the relevant Loan Party in the jurisdiction in which such Material Real Estate Asset is located, and if applicable, in the jurisdiction of formation of the relevant Loan Party, in each case as the Administrative Agent may reasonably request; and

(iv)      surveys and appraisals (if required under the Financial Institutions Reform Recovery and Enforcement Act of 1989, as amended) and "Life-of-Loan" flood certifications and any required borrower notices under Regulation H (together with evidence of federal flood insurance for any such Flood Hazard Property located in a flood hazard area); provided that the Administrative Agent may in its reasonable discretion accept any such existing certificate, appraisal or survey so long as such existing certificate or appraisal satisfies any applicable local law requirements.

Notwithstanding any provision of any Loan Document to the contrary, if any mortgage tax or similar tax or charge is owed on the entire amount of the Obligations evidenced hereby, then, to the extent permitted by, and in accordance with, applicable Requirements of Law, the amount of such mortgage tax or similar tax or charge shall be calculated based on the lesser of (x) the amount of the Obligations allocated to the applicable Material Real Estate Assets and (y) the fair market value of the applicable Material Real Estate Assets at the time the Mortgage is entered into and determined in a manner reasonably acceptable to Administrative Agent and the Top Borrower, which in the case of clause (y) will result in a limitation of the Obligations secured by the Mortgage to such amount.

"Collateral Documents" means, collectively, (i) the Security Agreement, (ii) each Mortgage, (iii) each Intellectual Property Security Agreement, (iv) any supplement to any of the foregoing delivered to the Administrative Agent pursuant to the definition of "Collateral and Guarantee Requirement", (v) any Perfection Certificate and (vi) each of the other instruments and documents pursuant to which any Loan Party grants (or purports to grant) a Lien on any Collateral as security for payment of the Secured Obligations.

"Commercial Tort Claim" has the meaning set forth in Article 9 of the UCC.

"Commitment" means, with respect to each Lender, such Lender's Initial Term Loan Commitment and Additional Commitment, as applicable, in effect as of such time.

"Commitment Schedule" means the Schedule attached hereto as Schedule 1.01(a).

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Company Competitor" means any competitor of the Top Borrower and/or any of its subsidiaries.

"Compliance Certificate" means a Compliance Certificate substantially in the form of Exhibit D.

"Confidential Information" has the meaning assigned to such term in Section 9.13.

"Consolidated Adjusted EBITDA" means, with respect to any Person on a consolidated basis for any period, the sum of:

(a)     Consolidated Net Income for such period; plus

(b)     to the extent not otherwise included in the determination of Consolidated Net Income for such period, the amount of any proceeds of any business interruption insurance policy in an amount representing the earnings for the applicable period that such proceeds are intended to replace (whether or not then received so long as such Person in good faith expects to receive such proceeds within the next four Fiscal Quarters (it being understood that to the extent such proceeds are not actually received within such Fiscal Quarters, such proceeds shall be deducted in calculating Consolidated Adjusted EBITDA for such Fiscal Quarters)); plus

(c)     without duplication, those amounts which, in the determination of Consolidated Net Income for such period, have been deducted for:

(i)     Consolidated Interest Expense;

(ii)    Charges related to any de novo facility, including any construction, pre-opening and start-up period prior to opening, until such facility has been open and operating for a period of 18 consecutive months;

(iii)   Taxes paid and any provision for Taxes, including income, capital, state, franchise and similar Taxes, property Taxes, foreign withholding Taxes and foreign unreimbursed value added Taxes (including penalties and interest related to any such Tax or arising from any Tax examination, and including pursuant to any Tax sharing arrangement or as a result of any intercompany distribution) of such Person paid or accrued during such period;

(iv)    (A) all depreciation, amortization (including, without limitation, amortization of goodwill, software and other intangible assets), (B) all impairment Charges and (C) all asset write-offs and/or write-downs;

(v)     any earn-out and contingent consideration obligations (including to the extent accounted for as bonuses, compensation or otherwise) incurred in connection with any acquisition and/or other Investment permitted under Section 6.06 which is paid or accrued during such period and in connection with any similar acquisition or other Investment completed prior to the Closing Date and, in each case, adjustments thereof;

(vi)    any non-cash Charge, including the excess of GAAP rent expense over actual cash rent paid during such period due to the use of straight line rent for GAAP purposes (provided that to the extent that any such non-cash Charge represents an accrual or reserve for any potential cash item in any future period, (A) such Person may elect not to add back such non-cash Charge in the current period and (B) to the extent such Person elects to add back such non-cash Charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated Adjusted EBITDA to such extent);

(vii)    any non-cash compensation Charge and/or any other non-cash Charge arising from the granting of any stock option or similar arrangement (including any profits interest), the granting of any stock appreciation right and/or similar arrangement (including any repricing, amendment, modification, substitution or change of any such stock option, stock appreciation right, profits interest or similar arrangement);

(viii)    (A) Transaction Costs, (B) Charges incurred (1) in connection with any transaction (in each case, regardless of whether consummated, and whether or not permitted under this Agreement), including any incurrence or issuance of Indebtedness and/or any issuance and/or offering of Capital Stock (including, in each case, by any Parent Company), any Investment (including any acquisition), any Disposition, any recapitalization, any merger, consolidation or amalgamation, any option buyout or any repayment, redemption, refinancing, amendment or modification of Indebtedness (including any amortization or write-off of debt issuance or deferred financing costs, premiums and prepayment penalties) or any similar transaction, and/or (2) in connection with any Qualifying IPO, (C) the amount of any Charge that is actually reimbursed or reimbursable by third parties pursuant to indemnification or reimbursement provisions or similar agreements or insurance; provided that in respect of any Charge that is added back in reliance on clause (C) above, the relevant Person in good faith expects to receive reimbursement for such fee, cost, expense or reserve within the next four Fiscal Quarters (it being understood that to the extent any reimbursement amount is not actually received within such Fiscal Quarters, such reimbursement amount shall be deducted in calculating Consolidated Adjusted EBITDA for such Fiscal Quarters) and/or (D) Public Company Costs;

(ix)    any Charge or deduction that is associated with any Restricted Subsidiary and attributable to any non-controlling interest and/or minority interest of any third party;

(x)    without duplication of any amount referred to in clause (b) above, the amount of (A) any Charge to the extent that a corresponding amount is received in cash by such Person from a Person other than such Person or any Restricted Subsidiary of such Person under any agreement providing for reimbursement of such Charge or (B) any Charge with respect to any liability or casualty event, business interruption or any product recall, (i) so long as such Person has submitted in good faith, and reasonably expects to receive payment in connection with, a claim for reimbursement of such amounts under its relevant insurance policy (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within the next four Fiscal Quarters) or (ii) without duplication of amounts included in a prior period under clause (B)(i) above, to the extent such Charge is covered by insurance proceeds received in cash during such period (it being understood that if the amount received in cash under any such agreement in any period exceeds the amount of Charge paid during such period such excess amounts received may be carried forward and applied against any Charge in any future period);

(xi)    the amount of management, monitoring, consulting, transaction and advisory fees and related indemnities and expenses (including reimbursements) pursuant to any sponsor management agreement and payments made to any Investor (and/or its Affiliates or management companies) for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities and payments to outside directors of a Parent Company, the Top Borrower or any of its Restricted Subsidiaries actually paid by or on behalf of, or accrued by, such Person or any of its subsidiaries; provided that such payment is permitted under this Agreement;

(xii)    any Charge attributable to the undertaking and/or implementation of new initiatives, business optimization activities, cost savings initiatives, cost rationalization

programs, operating expense reductions and/or synergies and/or similar initiatives and/or programs (including in connection with any integration, restructuring or transition, any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternative uses, any facility opening and/or pre-opening, any inventory optimization program and/or any curtailment), any business optimization Charge, any restructuring Charge (including any Charge relating to any tax restructuring), any Charge relating to the closure or consolidation of any facility (including severance, rent termination costs, moving costs and legal costs), any systems implementation Charge, any severance Charge, any Charge relating to entry into a new market, any Charge relating to any strategic initiative, any signing Charge, any retention or completion bonus, any expansion and/or relocation Charge, any Charge associated with any modification to any pension and post-retirement employee benefit plan, any software development Charge, any Charge associated with new systems design, any implementation Charge, any project startup Charge, any Charge in connection with new operations, any Charge in connection with unused warehouse space or manufacturing facilities, any Charge relating to a new contract, any consulting Charge and/or any corporate development Charge; _provided_, that the amount of Charges added back in reliance on this clause (c)(xii) in any period may not exceed (x) 25.0% of Consolidated Adjusted EBITDA for such period (calculated (A) before giving effect to such add-back or adjustments pursuant to this <u>clause (c)(xii)</u> and (B) without giving effect to any cap applicable to <u>clause (e)</u> below) <u>plus</u> (y) Charges incurred in connection with the integration of the "Serta" and "Simmons" businesses; <u>plus</u>

(xiii)     any Charge incurred or accrued in connection with any single or one-time event, including in connection with (A) any acquisition or similar Investment consummated after the Closing Date and/or (B) the closing, consolidation or reconfiguration of any facility during such period; <u>plus</u>

(d)     to the extent not included in Consolidated Net Income for such period, cash actually received (or any netting arrangement resulting in reduced cash expenditures) during such period so long as the non-cash income or gain was deducted in the calculation of Consolidated Adjusted EBITDA (including any component definition) pursuant to <u>clause (f)</u> below for such period or any previous period and not added back; <u>plus</u>

(e)     the full pro forma "run rate" cost savings, operating expense reductions, operational improvements and synergies (collectively, "<u>Expected Cost Savings</u>") (net of actual amounts realized) that are reasonably identifiable and factually supportable (in the good faith determination of such Person, as certified by a Responsible Officer of such Person in the Compliance Certificate required by <u>Section 5.01(c)</u> to be delivered in connection with the financial statements for such period) related to (A) the Transactions, (B) the integration of the "Serta" and "Simmons" businesses and (C) any Investment, Disposition, operating improvement, restructuring, cost savings initiative, any similar initiative (including the renegotiation of any contract and/or other arrangement) and/or specified transaction (any such operating improvement, restructuring, cost savings initiative and/or similar initiative or specified transaction, a "<u>Cost Saving Initiative</u>"), in each case, prior to, on or after the Closing Date; provided, that with respect to Cost Saving Initiatives under this <u>sub-clause (C)</u> of this <u>clause (e)</u>, (1) substantial steps toward the action necessary to realize any such cost savings, operating expense reduction, operating improvement and/or synergy added back in reliance on this <u>sub-clause (C)</u> with respect to any Investment, Disposition, operating improvement, restructuring, cost savings initiative, any similar initiative (including the renegotiation of any contract and/or other arrangement) and/or specified transaction are expected to be taken within 18 months following the date on which the relevant Person determines to take such action and (2) the amount of such Cost Saving Initiatives added back in reliance on sub-clause (C) in any period shall not exceed an amount equal to (x) 25.0% of Consolidated Adjusted EBITDA for such period (calculated (x) before giving effect to such add-back or adjustments pursuant to this <u>sub-clause (C)</u>, (y) without giving effect to any cap applicable to

WEIL:\95874775\19\74339.0001

clause (c)(xii) above and (z) after giving effect to all other permitted pro forma adjustments) plus (y) the amount of any pro forma adjustment that is consistent with Regulation S-X under the Securities Act; plus

(f)        [reserved]; minus

(g)        any amount which, in the determination of Consolidated Net Income for such period, has been added for any non-cash income or non-cash gain, all as determined in accordance with GAAP (provided that if any non-cash income or non-cash gain represents an accrual or deferred income in respect of potential cash items in any future period, such Person may determine not to deduct the relevant non-cash gain or income in the then-current period); minus

(h)        the amount of any cash payment made during such period in respect of any noncash accrual, reserve or other non-cash Charge that is accounted for in a prior period which was added to Consolidated Net Income to determine Consolidated Adjusted EBITDA for such prior period and which does not otherwise reduce Consolidated Net Income for the current period.

Notwithstanding anything to the contrary herein, it is agreed that for the purpose of calculating the Total Leverage Ratio, the Total Lien Leverage Ratio, the Secured Leverage Ratio and the Interest Coverage Ratio for any period that includes the Fiscal Quarters ended on or about June 30, 2016, March 31, 2016, December 31, 2015 or September 30, 2015, (i) Consolidated Adjusted EBITDA for the Fiscal Quarter ended on or about June 30, 2016 shall be deemed to be $112,507,000, (ii) Consolidated Adjusted EBITDA for the Fiscal Quarter ended on or about March 31, 2016 shall be deemed to be $91,059,000, (iii) Consolidated Adjusted EBITDA for the Fiscal Quarter ended on or about December 31, 2015 shall be deemed to be $98,831,000 and (iv) Consolidated Adjusted EBITDA for the Fiscal Quarter ended on or about September 30, 2015 shall be deemed to be $117,701,000 in each case, as adjusted on a Pro Forma Basis, as applicable.

"Consolidated First Lien Debt" means, as to any Person at any date of determination, the aggregate principal amount of Consolidated Total Debt outstanding on such date that is secured by a first priority Lien on the Collateral.

"Consolidated Interest Expense" means, with respect to any Person for any period, the sum of (a) consolidated total interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued and whether or not capitalized, (including, without limitation (and without duplication), amortization of any debt issuance cost and/or original issue discount, any premium paid to obtain payment, financial assurance or similar bonds, any interest capitalized during construction, any non-cash interest payment, the interest component of any deferred payment obligation, the interest component of any payment under any Capital Lease (regardless of whether accounted for as interest expense under GAAP), any commission, discount and/or other fee or charge owed with respect to any letter of credit and/or bankers' acceptance, any fee and/or expense paid to the Administrative Agent in connection with its services hereunder, any other bank, administrative agency (or trustee) and/or financing fee and any cost associated with any surety bond in connection with financing activities (whether amortized or immediately expensed)) plus (b) any cash dividend paid or payable in respect of Disqualified Capital Stock during such period other than to such Person or any Loan Party, plus (c) any net losses or obligations arising from any Hedge Agreement and/or other derivative financial instrument issued by such Person for the benefit of such Person or its subsidiaries, in each case determined on a consolidated basis for such period.  For purposes of this definition, interest in respect of any Capital Lease shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capital Lease in accordance with GAAP.

"Consolidated Net Income" means, in respect of any period and as determined for any Person (the "Subject Person") on a consolidated basis, an amount equal to the sum of net income, determined in accordance with GAAP, but excluding:

(a)     the income (or loss) of any Person (other than a Restricted Subsidiary of the Subject Person) accounted for by the equity method of accounting and Unrestricted Subsidiaries, except to the extent of dividends or distributions or other payments that are actually paid in Cash or Cash Equivalents to the Subject Person or a Restricted Subsidiary thereof (or subsequently converted into Cash or Cash Equivalents), whether paid in respect of income, return of capital or dividend for such period or any prior periods,

(b)     any gain or Charge attributable to any asset Disposition (including asset retirement costs and including any abandonments of assets) or of returned surplus assets outside the ordinary course of business,

(c)     (i) any gain or Charge from (A) any extraordinary item (as determined in good faith by such Person) and/or (B) any nonrecurring or unusual item (as determined in good faith by such Person) and/or (ii) any Charge associated with and/or payment of any actual or prospective legal settlement, fine, judgment or order,

(d)     any net gain or Charge with respect to (i) any disposed, abandoned, divested and/or discontinued asset, property or operation (other than, at the option of the Top Borrower, any asset, property or operation pending the disposal, abandonment, divestiture and/or termination thereof), (ii) any disposal, abandonment, divestiture and/or discontinuation of any asset, property or operation (other than, at the option of such Person, relating to assets or properties held for sale or pending the divestiture or termination thereof) and/or (iii) any facility that has been closed during such period,

(e)     any net income or write-off or amortization made of any deferred financing cost and/or premium paid or other Charge, in each case attributable to the early extinguishment of Indebtedness (and the termination of any associated Hedge Agreement),

(f)     (i) any Charge incurred pursuant to any management equity plan, profits interest or stock option plan or any other management or employee benefit plan or agreement, any pension plan (including any post-employment benefit scheme which has been agreed with the relevant pension trustee), any stock subscription or shareholder agreement, any employee benefit trust, any employment benefit scheme or any similar equity plan or agreement (including any deferred compensation arrangement), (ii) any Charge incurred in connection with the rollover, acceleration or payout of Capital Stock held by management of Holdings (or any other Parent Company), the Top Borrower and/or any Restricted Subsidiary, in each case, to the extent that any cash Charge is funded with net cash proceeds contributed to relevant Person as a capital contribution or as a result of the sale or issuance of Qualified Capital Stock and (iii) any Charge consisting of a cost or expense incurred in connection with all or any portion of the Specified Dividend,

(g)     any Charge that is established, adjusted and/or incurred, as applicable, (i) within 12 months after the Closing Date that is required to be established, adjusted or incurred, as applicable, as a result of the Transactions in accordance with GAAP, (ii) within 12 months after the closing of any other acquisition that is required to be established, adjusted or incurred, as applicable, as a result of such acquisition in accordance with GAAP or (iii) as a result of any change in, or the adoption or modification of, accounting principles and/or policies in accordance with GAAP,

(h)     (i) the effects of adjustments (including the effects of such adjustments pushed down to the relevant Person and its subsidiaries) in component amounts required or permitted by GAAP (including in the inventory, property and equipment, lease, rights fee arrangements, software, goodwill, intangible asset, in-process research and development, deferred revenue, advanced billing and debt line items thereof), resulting from the application of purchase accounting in relation to the Transactions or any consummated acquisition or recapitalization accounting or the amortization or write-off of any amounts thereof, net of Taxes, and (ii) the cumulative effect of changes (effected

16

through cumulative effect adjustment or retroactive application) in, or the adoption or modification of, accounting principles or policies made in such period in accordance with GAAP which affect Consolidated Net Income (except that, if the Top Borrower determines in good faith that the cumulative effects thereof are not material to the interests of the Lenders, the effects of any change, adoption or modification of any such principles or policies may be included in any subsequent period after the Fiscal Quarter in which such change, adoption or modification was made),

    (i)    [Reserved],

    (j)    solely for the purpose of calculating Excess Cash Flow, the income or loss of any Person accrued prior to the date on which such Person becomes a Restricted Subsidiary of such Person or is merged into or consolidated with such Person or any Restricted Subsidiary of such Person or the date that such other Person's assets are acquired by such Person or any Restricted Subsidiary of such Person,

    (k)    (i) any realized or unrealized gain or loss in respect of (A) any obligation under any Hedge Agreement as determined in accordance with GAAP and/or (B) any other derivative instrument pursuant to, in the case of this clause (B), Financial Accounting Standards Board's Accounting Standards Codification No. 815-Derivatives and Hedging, (ii) any realized or unrealized foreign currency exchange gain or loss (including any currency re-measurement of Indebtedness, any net gain or loss resulting from Hedge Agreements for currency exchange risk resulting from any intercompany Indebtedness, any foreign currency translation or transaction or any other currency-related risk); provided, that notwithstanding anything to the contrary herein, any realized gain or loss in respect of any Designated Operational FX Hedge shall be included in the calculation of Consolidated Net Income, and

    (l)    any deferred Tax expense associated with any tax deduction or net operating loss arising as a result of the Transactions, or the release of any valuation allowance related to any such item.

"Consolidated Secured Debt" means, as to any Person at any date of determination, the aggregate principal amount of Consolidated Total Debt outstanding on such date that is secured by a Lien on the Collateral.

"Consolidated Total Assets" means, at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption) on a consolidated balance sheet of the applicable Person at such date.

"Consolidated Total Debt" means, as to any Person at any date of determination, the aggregate principal amount of all third party debt for borrowed money (including LC Disbursements (as defined in the ABL Credit Agreement) that have not been reimbursed within three Business Days and the outstanding principal balance of all Indebtedness of such Person represented by notes, bonds and similar instruments and excluding, for the avoidance of doubt, undrawn letters of credit) and Capital Leases and purchase money Indebtedness, as such amount may be adjusted to reflect the effect (as determined by the Top Borrower in good faith) of any Debt FX Hedge; provided that "Consolidated Total Debt" shall be calculated (i) net of the Unrestricted Cash Amount, and (ii) excluding any obligation, liability or indebtedness of such Person if, upon or prior to the maturity thereof, such Person has irrevocably deposited with the proper Person in trust or escrow the necessary funds (or evidences of indebtedness) for the payment, redemption or satisfaction of such obligation, liability or indebtedness, and thereafter such funds and evidences of such obligation, liability or indebtedness or other security so deposited are not included in the calculation of the Unrestricted Cash Amount.

17

"<u>Consolidated Working Capital</u>" means, as at any date of determination, the excess of Current Assets over Current Liabilities.

"<u>Contractual Obligation</u>" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Copyright</u>" means the following: (a) all copyrights, rights and interests in copyrights, works protectable by copyright whether published or unpublished, copyright registrations and copyright applications; (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing.

"<u>Cost Saving Initiative</u>" has the meaning assigned to such term in the definition of "Consolidated Adjusted EBITDA".

"<u>Credit Facilities</u>" means any Term Facility and/or any Additional Revolving Facility.

"<u>Cure Amount</u>" has the meaning assigned to such term in the ABL Credit Agreement (or any other document governing any ABL Facility.

"<u>Current Assets</u>" means, at any date, all assets of the Top Borrower and its Restricted Subsidiaries which under GAAP would be classified as current assets (excluding any (i) cash or Cash Equivalents (including cash and Cash Equivalents held on deposit for third parties by the Top Borrower and/or any Restricted Subsidiary), (ii) permitted loans to third parties, (iii) deferred bank fees and derivative financial instruments related to Indebtedness, (iv) the current portion of current and deferred Taxes and (v) management fees receivables.

"<u>Current Liabilities</u>" means, at any date, all liabilities of the Top Borrower and its Restricted Subsidiaries which under GAAP would be classified as current liabilities, other than (i) current maturities of long term debt, (ii) outstanding revolving loans and letter of credit exposure, (iii) accruals of Consolidated Interest Expense (excluding Consolidated Interest Expense that is due and unpaid), (iv) obligations in respect of derivative financial instruments related to Indebtedness, (v) the current portion of current and deferred Taxes, (vi) liabilities in respect of unpaid earnouts or unpaid acquisition, disposition or refinancing related expenses and deferred purchase price holdbacks, (vii) accruals relating to restructuring reserves, (viii) liabilities in respect of funds of third parties on deposit with the Top Borrower and/or any Restricted Subsidiary, (ix) management fees payables, (x) the current portion of any Capital Lease Obligation, (xi) the current portion of any other long term liability for Indebtedness, (xii) accrued settlement costs, (xiii) non-cash compensation costs and expenses and (xiv) any other liabilities that are not Indebtedness and will not be settled in Cash or Cash Equivalents during the next succeeding twelve month period after such date.

"<u>Customary Bridge Loans</u>" means customary bridge loans with a maturity date of not longer than one year; <u>provided</u> that (a) the Weighted Average Life to Maturity of any loan, note, security or other Indebtedness which is exchanged for or otherwise replaces such bridge loans is not shorter than the Weighted Average Life to Maturity of any Class of then-existing Term Loans and (b) the final maturity date of any loan, note, security or other Indebtedness which is exchanged for or otherwise replaces such bridge loans is not earlier than the Latest Term Loan Maturity Date on the date of the issuance or incurrence thereof.

"<u>Dawn Intermediate</u>" has the meaning assigned to such term in the preamble.

"<u>Debt Fund Affiliate</u>" means any Affiliate of any of Advent, Ares and/or OTPP (other than a natural Person) that is a bona fide debt fund or investment vehicle (in each case with one or more bona fide investors to whom its managers owe fiduciary duties independent of their fiduciary duties to Advent, Ares and/or OTPP, as applicable) that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course.

"<u>Debt FX Hedge</u>" means any Hedge Agreement entered into for the purpose of hedging currency-related risks in respect of any Indebtedness of the type described in the definition of "Consolidated Total Debt".

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code of the U.S., and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the U.S. or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"<u>Declined Proceeds</u>" has the meaning assigned to such term in <u>Section 2.11(b)(v)</u>.

"<u>Default</u>" means any event or condition which upon notice, lapse of time or both would become an Event of Default.

"<u>Defaulting Lender</u>" means any Person that has (a) defaulted in (or is otherwise unable to perform) its obligations under this Agreement, including to make a Loan within two Business Days of the date required to be made by it hereunder, (b) notified the Administrative Agent or the Top Borrower in writing that it does not intend to satisfy or perform any such obligation or has made a public statement to the effect that it does not intend to comply with its funding or other obligations under this Agreement or under agreements in which it commits to extend credit generally (unless such writing indicates that such position is based on such Person's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Loan cannot be satisfied), (c) failed, within two Business Days after the request of the Administrative Agent or the Top Borrower, to confirm in writing that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans; <u>provided</u> that such Person shall cease to be a Defaulting Lender pursuant to this <u>clause (c)</u> upon receipt of such written confirmation by the Administrative Agent, (d) become (or any parent company thereof has become) insolvent or been determined by any Governmental Authority having regulatory authority over such Person or its assets, to be insolvent, or the assets or management of which has been taken over by any Governmental Authority or (e)(i) become (or any parent company thereof has become) the subject of (A) a bankruptcy or insolvency proceeding or (B) a Bail-In Action, (ii) has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or (iii) has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in, any such proceeding or appointment, unless in the case of any Person subject to this <u>clause (e)</u>, the Top Borrower and the Administrative Agent have each determined that such Person intends, and has all approvals required to enable it (in form and substance satisfactory to the Top Borrower and the Administrative Agent), to continue to perform its obligations hereunder; <u>provided</u> that no Person shall be deemed to be a Defaulting Lender solely by virtue of the ownership or acquisition of any Capital Stock in such Lender or its parent by any Governmental Authority; <u>provided</u> that such action does not result in or provide such Lender with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contract or agreement to which such Person is a party.

"Deposit Account" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"Derivative Transaction" means (a) any interest-rate transaction, including any interest-rate swap, basis swap, forward rate agreement, interest rate option (including a cap, collar or floor), and any other instrument linked to interest rates that gives rise to similar credit risks (including when-issued securities and forward deposits accepted), (b) any exchange-rate transaction, including any cross-currency interest-rate swap, any forward foreign-exchange contract, any currency option, and any other instrument linked to exchange rates that gives rise to similar credit risks, (c) any equity derivative transaction, including any equity-linked swap, any equity-linked option, any forward equity-linked contract, and any other instrument linked to equities that gives rise to similar credit risk and (d) any commodity (including precious metal) derivative transaction, including any commodity-linked swap, any commodity-linked option, any forward commodity-linked contract, and any other instrument linked to commodities that gives rise to similar credit risks; provided, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees, members of management, managers or consultants of the Top Borrower or its subsidiaries shall be a Derivative Transaction.

"Designated Non-Cash Consideration" means the fair market value (as determined by the Top Borrower in good faith) of non-Cash consideration received by the Top Borrower or any Restricted Subsidiary in connection with any Disposition pursuant to Section 6.07(h) and/or Section 6.08 that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Top Borrower, setting forth the basis of such valuation (which amount will be reduced by the amount of Cash or Cash Equivalents received in connection with a subsequent sale or conversion of such Designated Non-Cash Consideration to Cash or Cash Equivalents).

"Designated Operational FX Hedge" means any Hedge Agreement entered into for the purpose of hedging currency-related risks in respect of the revenues, cash flows or other balance sheet items of the Top Borrower, any of its subsidiaries and designated at the time entered into (or on or prior to the Closing Date, with respect to any Hedge Agreement entered into on or prior to the Closing Date) as a Designated Operational FX Hedge by the Top Borrower in a writing delivered to the Administrative Agent.

"Designated Sale and Lease-Back Transaction" means a sale and leaseback transaction relating to the property owned by National Bedding located at 2600 Forbs Avenue, Hoffman Estates, Illinois 60192.

"Disposition" or "Dispose" means the sale, lease, sublease, or other disposition of any property of any Person.

"Disqualified Capital Stock" means any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than for Qualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than for Qualified Capital Stock), in whole or in part, on or prior to 91 days following the Latest Maturity Date at the time such Capital Stock is issued (it being understood that if any such redemption is in part, only such part coming into effect prior to 91 days following the Latest Maturity Date shall constitute Disqualified Capital Stock), (b) is or becomes convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock that would constitute Disqualified Capital Stock, in each case at any time on or prior to 91 days following the Latest Maturity Date at the time such Capital Stock is issued, (c) contains any mandatory repurchase obligation or any other repurchase obligation at the option of the holder thereof (other than for Qualified Capital Stock), in whole or in part, which may come into effect prior to 91 days following the Latest Maturity Date at the time such Capital Stock is issued (it being understood that if any such repurchase obligation is in part, only such part coming into effect prior to 91 days following the Latest Maturity Date shall constitute Disqualified Capital

Stock) or (d) provides for the scheduled payments of dividends in Cash on or prior to 91 days following the Latest Maturity Date at the time such Capital Stock is issued; <u>provided</u> that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Capital Stock is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Capital Stock upon the occurrence of any change of control, Qualifying IPO or any Disposition occurring prior to 91 days following the Latest Maturity Date at the time such Capital Stock is issued shall not constitute Disqualified Capital Stock if such Capital Stock provides that the issuer thereof will not redeem any such Capital Stock pursuant to such provisions prior to the Termination Date.

Notwithstanding the preceding sentence, (A) if such Capital Stock is issued pursuant to any plan for the benefit of directors, officers, employees, members of management, managers or consultants or by any such plan to such directors, officers, employees, members of management, managers or consultants, in each case in the ordinary course of business of Holdings, the Top Borrower or any Restricted Subsidiary, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by the issuer thereof in order to satisfy applicable statutory or regulatory obligations, and (B) no Capital Stock held by any future, present or former employee, director, officer, manager, member of management or consultant (or their respective Affiliates or Immediate Family Members) of the Top Borrower (or any Parent Company or any subsidiary) shall be considered Disqualified Capital Stock because such stock is redeemable or subject to repurchase pursuant to any management equity subscription agreement, stock option, stock appreciation right or other stock award agreement, stock ownership plan, put agreement, stockholder agreement or similar agreement that may be in effect from time to time.

"<u>Disqualified Institution</u>" means:

(a) (i) any Person identified in writing to the Left Lead Arranger on or prior October 6, 2016, (ii) any Person identified in writing (and reasonably acceptable) to the Left Lead Arranger after October 6, 2015 and on or prior to the Closing Date (iii) any Affiliate of any Person described in <u>clause (i)</u> or <u>(ii)</u> above that is reasonably identifiable as an Affiliate of such Person on the basis of such Affiliate's name and (iv) any other Affiliate of any Person described in <u>clauses (i)</u>, <u>(ii)</u> or <u>(iii)</u> above that is identified in a written notice to the Left Lead Arranger (if prior to the Closing Date) or the Administrative Agent (if after the Closing Date) (each such person, a "<u>Disqualified Lending Institution</u>"),

(b) any Affiliate of any Arranger (or director (or equivalent manager), officer or employee of any Arranger or any Affiliate thereof) that is engaged as a principal primarily in private equity, mezzanine financing or venture capital, or

(c) (i) any Person that is or becomes a Company Competitor and is identified as such in writing to the Left Lead Arranger (if prior to the Closing Date) or the Administrative Agent (if after the Closing Date), (ii) any Affiliate of any Person described in <u>clause (i)</u> above (other than any Affiliate that is a Bona Fide Debt Fund) that is reasonably identifiable as an Affiliate of such person on the basis of such Affiliate's name and (iii) any other Affiliate of any Person described in <u>clauses (i)</u> and/or <u>(ii)</u> above that is identified in a written notice to the Left Lead Arranger (if prior to the Closing Date) or to the Administrative Agent (if after the Closing Date) (it being understood and agreed that no Bona Fide Debt Fund may be designated as Disqualified Institution pursuant to this <u>clause (iii)</u>),

it being understood and agreed that no written notice delivered pursuant to <u>clause (a)(ii)</u>, <u>(a)(iv)</u>, <u>(c)(i)</u> and/or <u>(c)(iii)</u> above shall apply retroactively to disqualify any Person that has previously acquired an assignment or participation interest in any Loan.

"<u>Disqualified Lending Institution</u>" has the meaning assigned to such term in the definition of "Disqualified Institution".

"Disqualified Person" has the meaning assigned to such term in Section 9.05(f)(ii).

"Dollars" or "$" refers to lawful money of the U.S.

"Domestic Subsidiary" means any Restricted Subsidiary incorporated or organized under the laws of the U.S., any state thereof or the District of Columbia.

"Dutch Auction" has the meaning assigned to such term on Schedule 1.01(b).

"ECF Prepayment Amount" has the meaning assigned to such term in Section 2.11(b)(i).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Yield" means, as to any Indebtedness, the effective yield applicable thereto calculated by the Administrative Agent in consultation with the Top Borrower in a manner consistent with generally accepted financial practices, taking into account (a) interest rate margins, (b) interest rate floors (subject to the proviso set forth below), (c) any amendment to the relevant interest rate margins and interest rate floors prior to the applicable date of determination and (d) original issue discount and upfront or similar fees (based on an assumed four-year average life to maturity or lesser remaining average life to maturity), but excluding (i) any arrangement, commitment, structuring, underwriting, ticking, unused line fees and/or amendment fees (regardless of whether any such fees are paid to or shared in whole or in part with any lender) and (ii) any other fee that is not paid directly by any Borrower generally to all relevant lenders ratably; provided, however, that (A) to the extent the Published LIBO Rate (with an Interest Period of three months) or Alternate Base Rate (without giving effect to any floor specified in the definition thereof) is less than any floor applicable to the Term Loans in respect of which the Effective Yield is being calculated on the date on which the Effective Yield is determined, the amount of the resulting difference will be deemed added to the interest rate margin applicable to the relevant Indebtedness for purposes of calculating the Effective Yield and (B) to the extent that the Published LIBO Rate (for a period of three months) or Alternate Base Rate (without giving effect to any floor specified in the definition thereof) is greater than any applicable floor on the date on which the Effective Yield is determined, the floor will be disregarded in calculating the Effective Yield.

"Eligible Assignee" means (a) any Lender, (b) any commercial bank, insurance company, or finance company, financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), (c) any Affiliate of any Lender, (d) any Approved Fund of any Lender and (e) to the extent permitted under Section 9.05(g), any Affiliated Lender or any Debt Fund Affiliate; provided that in any event, "Eligible Assignee" shall not include (i) any natural person, (ii) any Disqualified Institution or (iii) except as permitted under Section 9.05(g), the Top Borrower or any of its Affiliates.

"Environment" means ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata & natural resources such as wetlands, flora and fauna.

"Environmental Claim" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm to the Environment.

"Environmental Laws" means any and all current or future applicable foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other applicable requirements of Governmental Authorities and the common law relating to (a) environmental matters, including those relating to any Hazardous Materials Activity; or (b) the generation, use, storage, transportation or disposal of or exposure to Hazardous Materials, in any manner applicable to the Top Borrower or any of its Restricted Subsidiaries or any Facility.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is under common control with the Top Borrower or any Restricted Subsidiary and is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations at any facility of the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate as described in Section 4062(e) of ERISA, in each case, resulting in liability pursuant to Section 4063 of ERISA; (c) a complete or partial withdrawal by the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate from a Multiemployer Plan resulting in the imposition of Withdrawal Liability on the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate, notification of the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is "insolvent" within the meaning of Section 4245 of ERISA or is in "reorganization" within the meaning of Section 4241 of ERISA; (d) the filing of a notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, the treatment of a Pension Plan amendment as a termination under Section 4041(c) of ERISA, the commencement of proceedings by the PBGC to terminate a Pension Plan or the receipt by the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate of notice of the treatment of a Multiemployer Plan amendment as a termination under Section 4041A of ERISA or of notice of the commencement of proceedings by the PBGC to terminate a Multiemployer Plan; (e) the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate, with respect to the termination of any Pension Plan; or (g) the conditions for imposition of a Lien under Section 303(k) of ERISA have been met with respect to any Pension Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Article 7.

"Excess Cash Flow" means, for any Calculation Period, any amount (if positive) equal to:

(a)     Consolidated Adjusted EBITDA for such Calculation Period (without giving effect to clauses (b), (e) and (g) of the definition thereof, the amounts added back in reliance on which shall be deducted in determining Excess Cash Flow); plus

(b)     any extraordinary, unusual or non-recurring cash gain during such Calculation Period (whether or not accrued in such Calculation Period) to the extent not otherwise included in Consolidated Adjusted EBITDA (including any component definition used therein); plus

(c)     any foreign currency exchange gain actually realized and received in cash in U.S. Dollars (including any currency re-measurement of Indebtedness, any net gain or loss resulting from Hedge Agreements for currency exchange risk resulting from any intercompany Indebtedness, any foreign currency translation or transaction or any other currency-related risk), net of any loss from foreign currency translation; plus

(d)     reserved; plus

(e)     an amount equal to all Cash received for such period on account of any net non-Cash gain or income from any Investment deducted in a previous period pursuant to clause (s)(ii) of this definition; plus

(f)     the decrease, if any, in Consolidated Working Capital from the first day to the last day of such Calculation Period (or, in the case of any Excess Cash Flow Interim Period, from the first day of such Excess Cash Flow Interim Period to the last day of the most recently ended Test Period), but excluding any such decrease in Consolidated Working Capital arising from (i) the acquisition or Disposition of any Person by the Top Borrower or any Restricted Subsidiary, (ii) the reclassification during such period of current assets to long term assets and current liabilities to long term liabilities, (iii) the application of purchase and/or recapitalization accounting and/or (iv) the effect of any fluctuation in the amount of accrued and contingent obligations under any Hedge Agreement; minus

(g)     the amount, if any, which, in the determination of Consolidated Adjusted EBITDA (including any component definitions used therein) for such Calculation Period, has been included in respect of income or gain from any Disposition outside of the ordinary course of business (including Dispositions constituting covered losses or taking of assets referred to in the definition of "Net Insurance/Condemnation Proceeds") of the Top Borrower and/or any Restricted Subsidiary; minus

(h)     cash payments actually made in respect of the following (without duplication):

(i)     any Investment permitted by Section 6.06 (other than Investments (i) in Cash or Cash Equivalents, (ii) in any Loan Party or (iii) made pursuant to Section 6.06(r)(i)) and/or any Restricted Payment permitted by Section 6.04(a) (other than pursuant to Section 6.04(a)(iii)(A)) and actually made in cash during such Calculation Period or, at the option of the Top Borrower, made prior to the date the Top Borrower is required to make a payment of Excess Cash Flow in respect of such Excess Cash Flow Period, (A) except to the extent the relevant Investment and/or Restricted Payment is financed with the proceeds of long term funded Indebtedness (other than revolving Indebtedness) and (B) without duplication of any amounts deducted from Excess Cash Flow for a prior Calculation Period;

(ii)     any realized foreign currency exchange losses actually paid or payable in cash (including any currency re-measurement of Indebtedness, any net gain or loss resulting

from Hedge Agreements for currency exchange risk resulting from any intercompany Indebtedness, any foreign currency translation or transaction or any other currency-related risk);

(iii)    the aggregate amount of any extraordinary, unusual or non-recurring cash Charge (whether or not incurred in such Calculation Period) excluded in calculating Consolidated Adjusted EBITDA (including any component definitions used therein);

(iv)    consolidated Capital Expenditures actually made in cash during such Calculation Period or, at the option of the Top Borrower, in the case of any Excess Cash Flow Period, made prior to the date the Top Borrower is required to make a payment of Excess Cash Flow in respect of such Excess Cash Flow Period, (A) except to the extent financed with the proceeds of long term funded Indebtedness (other than revolving Indebtedness) and (B) without duplication of any amounts deducted from Excess Cash Flow for a prior Calculation Period;

(v)    any long-term liability, excluding the current portion of any such liability (other than Indebtedness) of the Top Borrower and/or any Restricted Subsidiary;

(vi)    any cash Charge added back in calculating Consolidated Adjusted EBITDA pursuant to clause (c) of the definition thereof or excluded from the calculation of Consolidated Net Income in accordance with the definition thereof;

(vii)    the aggregate amount of expenditures actually made by the Top Borrower and/or any Restricted Subsidiary during such Fiscal Year (including any expenditure for the payment of financing fees) to the extent that such expenditures are not expensed; minus

(i)    the aggregate principal amount of (i) all optional prepayments of Indebtedness (other than any optional prepayment of (A) Indebtedness under the Loan Documents, any loan under the Second Lien Facility (including any Additional Loan (as defined in the Second Lien Credit Agreement or any other document governing any Second Lien Facility)) prepaid pursuant to Section 2.11(a) of the Second Lien Credit Agreement (or any equivalent provision under any other document governing any Second Lien Facility) prior to such date (to the extent the relevant voluntary prepayment is permitted by the terms of this Agreement) and/or any Incremental Equivalent Debt and/or Replacement Debt that is prepaid, repurchased, redeemed or otherwise retired prior to such date, in each case, that is deducted in calculating the amount of any Excess Cash Flow payment in accordance with Section 2.11(b)(i) or (B) revolving Indebtedness except to the extent any related commitment is permanently reduced in connection with such repayment), (ii) all mandatory prepayments and scheduled repayments of Indebtedness during such Calculation Period and (iii) the aggregate amount of any premium, make-whole or penalty payment actually paid in cash by the Top Borrower and/or any Restricted Subsidiary during such period that are required to be made in connection with any prepayment of Indebtedness; minus

(j)    Consolidated Interest Expense actually paid or payable in cash by the Top Borrower and/or any Restricted Subsidiary during such Calculation Period; minus

(k)    Taxes (inclusive of Taxes paid or payable under tax sharing agreements or arrangements and/or in connection with any intercompany distribution) paid or payable by Borrower and/or any Restricted Subsidiary with respect to such Calculation Period; minus

(l)    the increase, if any, in Consolidated Working Capital from the first day to the last day of such Calculation Period (or, in the case of any Excess Cash Flow Interim Period, from the first day of such Excess Cash Flow Interim Period to the last day of the most recently ended Test Period),

but excluding any such increase in Consolidated Working Capital arising from (i) the acquisition or Disposition of any Person by the Top Borrower or any Restricted Subsidiary, (ii) the reclassification during such period of current assets to long term assets and current liabilities to long term liabilities, (iii) the application of purchase and/or recapitalization accounting and/or (iv) the effect of any fluctuation in the amount of accrued and contingent obligations under any Hedge Agreement; <u>minus</u>

(m)     the amount of any Tax obligation of the Top Borrower and/or any Restricted Subsidiary that is estimated in good faith by the Top Borrower as due and payable (but is not currently due and payable) by the Top Borrower and/or any Restricted Subsidiary as a result of the repatriation of any dividend or similar distribution of net income of any Foreign Subsidiary to the Top Borrower or any Restricted Subsidiary; <u>minus</u>

(n)     without duplication of amounts deducted from Excess Cash Flow in respect of a prior period, at the option of the Top Borrower, the aggregate consideration (i) required to be paid in Cash by the Top Borrower or its Restricted Subsidiaries pursuant to binding contracts entered into prior to or during such period relating to Capital Expenditures, acquisitions or Investments and Restricted Payments described in <u>clause (h)(i)</u> above and/or (ii) otherwise committed or budgeted to be made in connection with Capital Expenditures, acquisitions or Investments and/or Restricted Payments described in <u>clause (h)(i)</u> above (<u>clauses (i)</u> and <u>(ii)</u>, the "<u>Scheduled Consideration</u>") (other than Investments in (A) Cash and Cash Equivalents and (B) the Top Borrower or any of its Restricted Subsidiaries) to be consummated or made during the period of four consecutive Fiscal Quarters of the Top Borrower following the end of such period (except, in each case, to the extent financed with long term funded Indebtedness (other than revolving Indebtedness)); <u>provided</u> that to the extent the aggregate amount actually utilized to finance such Capital Expenditures, acquisitions or Investments or Restricted Payments during such subsequent period of four consecutive Fiscal Quarters is less than the Scheduled Consideration, the amount of the resulting shortfall shall be added to the calculation of Excess Cash Flow at the end of such subsequent period of four consecutive Fiscal Quarters; <u>minus</u>

(o)     amounts added to Consolidated Net Income, in each case to the extent paid in cash, under <u>clauses (h)</u> of the definition of "Consolidated Adjusted EBITDA"; <u>minus</u>

(p)     cash payments (other than in respect of Taxes, which are governed by <u>clause (k)</u> above) made during such Calculation Period for any liability the accrual of which in a prior Calculation Period resulted in an increase in Excess Cash Flow in such prior period (<u>provided</u> that there was no other deduction to Consolidated Adjusted EBITDA or Excess Cash Flow related to such payment), except to the extent financed with long term funded Indebtedness (other than revolving Indebtedness); <u>minus</u>

(q)     cash expenditures made in respect of any Hedge Agreement during such period to the extent (i) not otherwise deducted in the calculation of Consolidated Net Income or Consolidated Adjusted EBITDA and (ii) not financed with long term funded Indebtedness (other than revolving Indebtedness); <u>minus</u>

(r)     amounts paid in Cash (except to the extent financed with long term funded Indebtedness (other than revolving Indebtedness)) during such period on account of (i) items that were accounted for as non-Cash reductions of Consolidated Net Income or Consolidated Adjusted EBITDA in a prior period and (ii) reserves or amounts established in purchase accounting to the extent such reserves or amounts are added back to, or not deducted from, Consolidated Net Income; <u>minus</u>

(s)     an amount equal to the sum of (i) the aggregate net non-cash loss on any non-ordinary course Disposition by the Top Borrower, any Restricted Subsidiary during such period (other than any Disposition among the Top Borrower, any Restricted Subsidiaries during such period) to the extent included in arriving at Consolidated Net Income and (ii) the aggregate net non-Cash gain or

WEIL:\95874775\19\74339.0001

income from any non-ordinary course Investment to the extent included in arriving at Consolidated Adjusted EBITDA.

"Excess Cash Flow Interim Period" means, (a) during any Excess Cash Flow Period, any one, two or three Fiscal Quarter period (i) commencing at the end of the immediately preceding Excess Cash Flow Period and (ii) ending on the last day of the most recently ended Fiscal Quarter (other than the last day of the Fiscal Year) during such Excess Cash Flow Period for which financial statements have been delivered pursuant to Section 5.01(a) or (b), as applicable, and (b) during the period from the Closing Date until the beginning of the first Excess Cash Flow Period, any period commencing on the first day of the Fiscal Quarter in which the Closing Date occurs and ending on the last day of the most recently ended Fiscal Quarter for which financial statements have been delivered pursuant to Section 5.01(a) or (b), as applicable.

"Excess Cash Flow Period" means each Fiscal Year of the Top Borrower, commencing with the Fiscal Year of the Top Borrower ending on or about December 31, 2017.

"Exchange Act" means the Securities Exchange Act of 1934 and the rules and regulations of the SEC promulgated thereunder.

"Excluded Assets" means each of the following:

(a)      any asset the grant or perfection of a security interest in which would (i) be prohibited by enforceable anti-assignment provisions set forth in any contract that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than assets subject to Capital Leases and purchase money financings), (ii) violate (after giving effect to applicable anti-assignment provisions of the UCC or other applicable Requirements of Law) the terms of any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than in the case of Capital Leases and purchase money financings), or (iii) trigger termination of any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement pursuant to any "change of control" or similar provision (to the extent such contract  is binding on such asset at the time of its acquisition and not incurred in contemplation thereof); it being understood that the term "Excluded Asset" shall not include proceeds or receivables arising out of any contract described in this clause (a) to the extent that the assignment of such proceeds or receivables is expressly deemed to be effective under the UCC or other applicable Requirements of Law notwithstanding the relevant prohibition, violation or termination right,

(b)      the Capital Stock of any (i) Captive Insurance Subsidiary, (ii) Unrestricted Subsidiary, (iii) not-for-profit subsidiary and/or (iv) special purpose entity used for any permitted securitization facility,

(c)      any intent-to-use (or similar) Trademark application prior to the filing and acceptance of a "Statement of Use", "Declaration of Use", "Amendment to Allege Use" or similar filing with respect thereto, only to the extent, if any, that, and solely during the period if any, in which, the grant of a security interest therein may impair the validity or enforceability of such intent-to-use (or similar) Trademark application under applicable federal Law,

(d)      any asset (including Capital Stock), the grant or perfection of a security interest in which would (i) be prohibited under applicable Requirements of Law (including rules and regulations of any Governmental Authority) or (ii) require any governmental or regulatory consent, approval, license or authorization, except to the extent such requirement or prohibition would be rendered ineffective under the UCC or other applicable Requirements of Law notwithstanding such requirement or prohibition; it being understood that the term "Excluded Asset" shall not include proceeds or

receivables arising out of any asset described in clauses (d)(i) or (d)(ii) to the extent that the assignment of such proceeds or receivables is effective under the UCC or other applicable Requirements of Law notwithstanding the relevant requirement or prohibition or (iii) result in material adverse tax consequences to any Loan Party as reasonably determined by the Top Borrower and specified in a written notice to the Administrative Agent,

       (e)      (i) any leasehold Real Estate Asset, (ii) except to the extent a security interest therein can be perfected by the filing of a UCC-1 financing statement, any other leasehold interests and (iii) any owned Real Estate Asset that is not a Material Real Estate Asset,

       (f)      the Capital Stock of any Person that is not a Wholly-Owned Subsidiary,

       (g)      any Margin Stock,

       (h)      the Capital Stock of (i) any Foreign Subsidiary and (ii) any CFC Holdco, in each case (x) in excess of 65% of the issued and outstanding Capital Stock of any such Person or (y) to the extent such Foreign Subsidiary or CFC Holdco is not a first-tier Subsidiary of a Loan Party,

       (i)      any Commercial Tort Claim with a value (as reasonably estimated by the Top Borrower) of less than $10,000,000,

       (j)      any Tax and Trust Funds,

       (k)      any lease, license or agreement, or any property subject to a purchase money security interest, Capital Lease obligations or similar arrangement, in each case, that is permitted or otherwise not prohibited by the terms of this Agreement and to the extent the grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money or similar arrangement or create a right of termination in favor of any other party thereto (other than Holdings, the Top Borrower or any Subsidiary of the Top Borrower) after giving effect to the applicable anti-assignment provisions of the UCC or other applicable Requirements of Law; it being understood that the term "Excluded Asset" shall not include proceeds or receivables arising out of any asset described in this clause (k) to the extent that the assignment of such proceeds or receivables is expressly deemed to be effective under the UCC or other applicable Requirements of Law notwithstanding the relevant violation or invalidation,

       (l)      any asset with respect to which the Administrative Agent and the Top Borrower have reasonably determined in writing that the cost, burden, difficulty or consequence (including any effect on the ability of the Top Borrower and its subsidiaries to conduct their operations and business in the ordinary course of business and including the cost of title insurance, surveys or flood insurance (if necessary)) of obtaining or perfecting a security interest therein outweighs, or is excessive in light of, the practical benefit of a security interest to the relevant Secured Parties afforded thereby, and

       (m)      the real property located at 3774 Interstate Park Road North, West Palm Beach, Florida 33404 (which, for the avoidance of doubt, shall not be pledged to secure any ABL Facility or any Second Lien Facility).

"Excluded Subsidiary" means:

       (a)      any Restricted Subsidiary that is not a Wholly-Owned Subsidiary,

       (b)      any Immaterial Subsidiary,

(c)      any Restricted Subsidiary (i) that is prohibited or restricted from providing a Loan Guaranty by (A) any Requirement of Law or (B) any Contractual Obligation that exists on the Closing Date or at the time such Restricted Subsidiary becomes a subsidiary (which Contractual Obligation was not entered into in contemplation of such Restricted Subsidiary becoming a subsidiary (including pursuant to assumed Indebtedness)), (ii) that would require a governmental (including regulatory) or third party consent, approval, license or authorization (including any regulatory consent, approval, license or authorization) to provide a Loan Guaranty (in each case, at the time such Restricted Subsidiary became a Subsidiary) or (iii) with respect to which the provision of a Loan Guaranty would result in material adverse tax consequences as reasonably determined by the Top Borrower, where the Top Borrower notifies the Administrative Agent in writing of such determination,

(d)      any not-for-profit subsidiary,

(e)      any Captive Insurance Subsidiary,

(f)      any special purpose entity used for any permitted securitization or receivables facility or financing,

(g)      any Foreign Subsidiary,

(h)      (i) any CFC Holdco and/or (ii) any Domestic Subsidiary that is a direct or indirect subsidiary of any Foreign Subsidiary that is a CFC,

(i)      any Unrestricted Subsidiary,

(j)      any Restricted Subsidiary acquired by the Top Borrower that, at the time of the relevant acquisition, is an obligor in respect of assumed Indebtedness permitted by Section 6.01 to the extent (and for so long as) the documentation governing the applicable assumed Indebtedness prohibits such subsidiary from providing a Loan Guaranty (which prohibition was not implemented in contemplation of such Restricted Subsidiary becoming a subsidiary in order to avoid the requirement of providing a Loan Guaranty), and/or

(k)      any other Restricted Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent and the Top Borrower, the burden or cost of providing a Loan Guaranty outweighs, or would be excessive in light of, the practical benefits afforded thereby.

"Excluded Swap Obligation" means, with respect to any Loan Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Loan Guaranty of such Loan Guarantor of, or the grant by such Loan Guarantor of a security interest to secure, such Swap Obligation (or any Loan Guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) (a) by virtue of such Loan Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder (determined after giving effect to Section 3.20 of the Loan Guaranty and any other "keepwell," support or other agreement for the benefit of such Loan Guarantor) at the time the Loan Guaranty of such Loan Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation or (b) in the case of any Swap Obligation that is subject to a clearing requirement pursuant to section 2(h) of the Commodity Exchange Act, because such Loan Guarantor is a "financial entity," as defined in section 2(h)(7)(C) of the Commodity Exchange Act, at the time the guarantee provided by (or grant of such security interest by, as applicable) such Loan Guarantor becomes or would become effective with respect to such Swap Obligation.  If any Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Loan Guaranty or security interest is or becomes illegal.

WEIL:\95874775\19\74339.0001

"<u>Excluded Taxes</u>" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document, (a) any Taxes imposed on (or measured by) such recipient's net or overall gross income or franchise Taxes, (i) imposed as a result of such recipient being organized or having its principal office located in or, in the case of any Lender, having its applicable lending office located in, the taxing jurisdiction or (ii) that are Other Connection Taxes, (b) any branch profits Taxes imposed under Section 884(a) of the Code, or any similar Tax, imposed by any jurisdiction described in <u>clause (a)</u>, (c) any U.S. federal withholding Tax that is imposed on amounts payable to or for the account of such Lender (other than a Lender that became a Lender pursuant to an assignment under <u>Section 2.19</u>) with respect to an applicable interest in a Loan or Commitment pursuant to a Requirement of Law in effect on the date on which such Lender (i) acquires such interest in the applicable Commitment or, if such Lender did not fund the applicable Loan pursuant to a prior Commitment, on the date such Lender acquires its interest in such Loan or (ii) designates a new lending office, except in each case to the extent that, pursuant to <u>Section 2.17</u>, amounts with respect to such Tax were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it designated a new lending office, (d) any Tax imposed as a result of a failure by the Administrative Agent, such Lender to comply with <u>Section 2.17(f)</u> and (e) any U.S. federal withholding Tax under FATCA.

"<u>Expected Cost Savings</u>" has the meaning assigned to such term in the definition of "Consolidated Adjusted EBITDA".

"<u>Extended Revolving Credit Commitment</u>" has the meaning assigned to such term in <u>Section 2.23(a)(i)</u>.

"<u>Extended Revolving Facility</u>" has the meaning assigned to such term in <u>Section 2.23(a)(i)</u>.

"<u>Extended Revolving Loans</u>" has the meaning assigned to such term in <u>Section 2.23(a)(i)</u>.

"<u>Extended Term Loans</u>" has the meaning assigned to such term in <u>Section 2.23(a)(ii)</u>.

"<u>Extension</u>" has the meaning assigned to such term in <u>Section 2.23(a)</u>.

"<u>Extension Amendment</u>" means an amendment to this Agreement that is reasonably satisfactory to the Administrative Agent (to the extent required by <u>Section 2.23</u>) and the Top Borrower executed by each of (a) Holdings, the Top Borrower and the Subsidiary Guarantors, (b) the Administrative Agent and (c) each Lender that has accepted the applicable Extension Offer pursuant hereto and in accordance with <u>Section 2.23</u>.

"<u>Extension Offer</u>" has the meaning assigned to such term in <u>Section 2.23(a)</u>.

"<u>Facility</u>" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or, except with respect to <u>Articles 5</u> and <u>6</u>, hereof owned, leased, operated or used by the Top Borrower or any of its Restricted Subsidiaries or any of their respective predecessors or Affiliates.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above) and any intergovernmental agreements implementing any of the foregoing.

"<u>FCPA</u>" has the meaning assigned to such term in <u>Section 3.17(c)</u>.

"<u>Federal Funds Effective Rate</u>" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding

Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means Section 3 of that certain Engagement Letter, dated as of October 6, 2016 (as supplemented prior to the date hereof), by and among the Borrowers and the Arrangers.

"First Lien Intercreditor Agreement" means an intercreditor agreement substantially in the form of Exhibit G-3 hereto, with any changes thereto as the Top Borrower and the Administrative Agent may agree in their respective reasonable discretion.

"First Lien Leverage Ratio" means the ratio, as of any date of determination, of (a) Consolidated First Lien Debt as of the last day of the most recently ended Test Period to (b) Consolidated Adjusted EBITDA for the Test Period then most recently ended, in each case of the Top Borrower and its Restricted Subsidiaries on a consolidated basis.

"First Lien/Second Lien Intercreditor Agreement" means the First Lien/Second Lien Intercreditor Agreement substantially in the form of Exhibit G-2, dated as of the Closing Date, among, *inter alios*, the Second Lien Collateral Agent, as agent for the Second Lien Claimholders referred to therein, the Administrative Agent, as agent for the First Lien Claimholders referred to therein, and the Loan Parties from time to time party thereto.

"First Priority" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that, subject to any applicable Intercreditor Agreement, such Lien is senior in priority to any other Lien to which such Collateral is subject, other than any Permitted Lien (other than Permitted Liens under Section 6.02(t) to the extent securing Indebtedness under Section 6.01(x)(i) and (ii)).

"Fiscal Quarter" means a fiscal quarter of any Fiscal Year.

"Fiscal Year" means the fiscal year of the Top Borrower ending on the last Saturday of each calendar year.

"Fixed Amounts" has the meaning assigned to such term in Section 1.10(c).

"Flood Hazard Property" means any parcel of any Material Real Estate Asset subject to a Mortgage located in the U.S. in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"Foreign Lender" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Foreign Subsidiary" means any Restricted Subsidiary that is not a Domestic Subsidiary.

"FRB" means the Board of Governors of the Federal Reserve System of the U.S.

"GAAP" means generally accepted accounting principles in the U.S. in effect and applicable to the accounting period in respect of which reference to GAAP is made.

"Governmental Authority" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with the U.S., a foreign government or any political subdivision thereof.

"Governmental Authorization" means any permit, license, authorization, approval, plan, directive, consent order or consent decree of or from any Governmental Authority.

"Granting Lender" has the meaning assigned to such term in Section 9.05(e).

"Guarantee" of or by any Person (the "Guarantor") means any obligation, contingent or otherwise, of the Guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation of any other Person (the "Primary Obligor") in any manner and including any obligation of the Guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other monetary obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the Primary Obligor so as to enable the Primary Obligor to pay such Indebtedness or other monetary obligation, (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or monetary obligation, (e) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (f) secured by any Lien on any assets of such Guarantor securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Guarantor (or any right, contingent or otherwise, of any holder of such Indebtedness or other monetary obligation to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition, Disposition or other transaction permitted under this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"Hazardous Materials" means any chemical, material, substance or waste, or any constituent thereof, which is prohibited, limited or regulated under any Environmental Law or by any Governmental Authority or which poses a hazard to the Environment or to human health and safety, including without limitation, petroleum and petroleum by-products, asbestos and asbestos-containing materials, polychlorinated biphenyls, medical waste and pharmaceutical waste.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Material, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Material, and any corrective action or response action with respect to any of the foregoing.

"Hedge Agreement" means any agreement with respect to any Derivative Transaction between any Loan Party or any Restricted Subsidiary and any other Person.

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under any Hedge Agreement.

"Holdings" has the meaning assigned to such term in the preamble to this Agreement and shall, for the avoidance of doubt, include any Successor Holdings.

"IFRS" means international accounting standards within the meaning of the IAS Regulation 1606/2002, as in effect from time to time (subject to the provisions of Section 1.04), to the extent applicable to the relevant financial statements.

"Immaterial Subsidiary" means, as of any date, any Restricted Subsidiary of the Top Borrower; the assets of which, when taken together with the assets of all other Restricted Subsidiaries that are Immaterial Subsidiaries, do not exceed 5.00% of Consolidated Total Assets of the Top Borrower and its Restricted Subsidiaries and the contribution to Consolidated Adjusted EBITDA of which, when taken together with the contribution to Consolidated Adjusted EBITDA of all other Immaterial Subsidiaries, does not exceed 5.00% of Consolidated Adjusted EBITDA of the Top Borrower and its Restricted Subsidiaries, in each case, as of the last day of the most recently ended Test Period; provided further that, at all times prior to the first delivery of financial statements pursuant to Section 5.01(a) or (b), this definition shall be applied based on the pro forma consolidated financial statements of the Top Borrower delivered pursuant to Section 4.01.

"Immediate Family Member" means, with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, domestic partner, former domestic partner, sibling, mother-in-law, father-in-law, son-in-law and/or daughter-in-law and/or (including any adoptive relationship), any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals, such individual's estate (or an executor or administrator acting on its behalf), heirs or legatees or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"Incremental Cap" means:

(a)     the Shared Incremental Amount, plus

(b)     in the case of any Incremental Facility that effectively extends the Maturity Date with respect to any Class of Loans and/or Commitments hereunder, an amount equal to the portion of the relevant Class of Loans or Commitments that will be replaced by such Incremental Facility, plus

(c)     in the case of any Incremental Facility that effectively replaces any Additional Revolving Credit Commitment terminated in accordance with Section 2.19 hereof, an amount equal to the relevant terminated Revolving Credit Commitment, plus

(d)     (i) the amount of any optional prepayment of any Loan in accordance with Section 2.11(a) and/or the amount of any permanent reduction of any Additional Revolving Commitment and/or the amount of any permanent prepayment of Incremental Equivalent Debt, (ii) the amount of any optional prepayment, redemption or repurchase of any Replacement Term Loan or Loans under any Replacement Revolving Facility (to the extent accompanied by a permanent reduction in commitments) or any Class, tranche or series of Replacement Debt previously applied to the permanent prepayment of any Loans hereunder, so long as such prepayment was not previously included in clause (d)(i) above, and (iii) the amount paid in Cash in respect of any reduction in the outstanding amount of any Term Loan resulting from any assignment of such Term Loan to (or purchase of such Term Loan by) Holdings, the Top Borrower and/or any Restricted Subsidiary; provided that, for each of clauses (i), (ii) and (iii), the relevant prepayment, redemption, repurchase or assignment and/or purchase was not funded with the proceeds of any long-term Indebtedness (other than revolving Indebtedness), plus

(e)     an unlimited amount so long as, in the case of this clause (e), after giving effect to the relevant Incremental Facility, (i) if such Incremental Facility is secured by a lien on the Collateral that is pari passu with the Lien securing the Secured Obligations that are secured on a first lien basis with the Term Loan Priority Collateral, the First Lien Leverage Ratio does not exceed the greater of (A) 4.65:1.00 and (B) the First Lien Leverage Ratio as of the end of the most recently ended Test Period, (ii) if such Incremental Facility is secured by a lien on the Term Loan Priority Collateral that is junior to the lien securing the Secured Obligations that are secured on a first lien basis with the Term Loan Priority Collateral, the Secured Leverage Ratio does not exceed the greater of (A) 5.80:1.00 and (B) the Secured Leverage Ratio as of the last day of the most recently ended Test Period or (iii) if such

WEIL:\95874775\19\74339.0001

Incremental Facility is unsecured, either (A) the Total Leverage Ratio does not exceed the greater of (1) 6.05:1.00 and (2) the Total Leverage Ratio as of the last day of the most recently ended Test Period or (B) the Interest Coverage Ratio is not less than the greater of (1) 2.00:1.00 and (2) the Interest Coverage Ratio as of the last day of the most recently ended Test Period, in each case described in this clause (e), calculated on a Pro Forma Basis, including the application of the proceeds thereof (in the case of each of clause (i), (ii) and (iii) without "netting" the cash proceeds of the applicable Incremental Facility on the consolidated balance sheet of the Top Borrower), and in the case of any Incremental Revolving Facility then being incurred or established, assuming a full drawing of such Incremental Revolving Facility;

provided that:

(i)    any Incremental Facility and/or Incremental Equivalent Debt may be incurred under one or more of clauses (a) through (e) of this definition as selected by the Top Borrower in its sole discretion,

(ii)    if any Incremental Facility or Incremental Equivalent Debt is intended to be incurred under clause (e) of this definition and any other clause of this definition in a single transaction or series of related transaction, (A) the incurrence of the portion of such Incremental Facility or Incremental Equivalent Debt to be incurred or implemented under clause (e) of this definition shall first be calculated without giving effect to any Incremental Facilities or Incremental Equivalent Debt to be incurred under any other clause of this definition, but giving full *pro forma* effect to the use of proceeds of the entire amount of such Incremental Facility or Incremental Equivalent Debt and the related transactions, and (B) the incurrence of the portion of such Incremental Facility or Incremental Equivalent Debt to be incurred or implemented under the other applicable clauses of this definition shall be calculated thereafter, and

(iii)    any portion of any Incremental Facility or Incremental Equivalent Debt that is incurred under clauses (a) through (e) of this definition will be automatically reclassified as having been incurred under clause (e) of this definition if, at any time after the incurrence thereof, such portion of such Incremental Facility or Incremental Equivalent Debt would, using the figures reflected in the financial statements most recently delivered pursuant to Section 5.01(a) or (b) or, if available earlier, the financial statements that are internally available for the then most recently ended Test Period, be permitted under the First Lien Leverage Ratio, Secured Leverage Ratio, Total Leverage Ratio test or Interest Coverage Ratio test, as applicable, set forth in clause (e) of this definition; it being understood and agreed that once such Incremental Facility or Incremental Equivalent Debt is reclassified in accordance with the preceding sentence, it shall not further be reclassified as having been incurred under the provision of this definition in reliance on which such Incremental Facility or Incremental Equivalent Debt was originally incurred.

"Incremental Commitment" means any commitment made by a lender to provide all or any portion of any Incremental Facility or Incremental Loan.

"Incremental Equivalent Debt" means Indebtedness in the form of *pari passu* senior secured or unsecured notes or loans or junior secured or unsecured notes or loans and/or commitments in respect of any of the foregoing issued, incurred or implemented in lieu of loans under an Incremental Facility; provided, that:

(a)    the aggregate outstanding principal amount thereof shall not exceed the Incremental Cap (as in effect at the time of determination, including giving effect to any reclassification on or prior to such date of determination),

(b)     except as otherwise agreed by the lenders or holders providing such notes or loans, no Event of Default exists immediately prior to or after giving effect to such notes or loans,

(c)     the Weighted Average Life to Maturity applicable to such notes or loans (other than Customary Bridge Loans) is no shorter than the Weighted Average Life to Maturity of the then-existing Term Loans (without giving effect to any prepayment thereof),

(d)     the final maturity date with respect to such notes or loans (other than Customary Bridge Loans) is no earlier than the Latest Term Loan Maturity Date on the date of the issuance or incurrence, as applicable, thereof,

(e)     subject to clauses (c) and (d), such Indebtedness may otherwise have an amortization schedule as determined by the Top Borrower and the lenders providing such Incremental Equivalent Debt,

(f)     in the case of any such Indebtedness that is in the form of secured term loans that are *pari passu* with the Initial Term Loans in right of payment and with respect to the Term Loan Priority Collateral (other than Customary Bridge Loans), the Effective Yield applicable thereto will not be more than 0.50% per annum higher than the Effective Yield in respect of the Initial Term Loans unless the Applicable Rate (and/or, as provided in the proviso below, the Alternate Base Rate floor or LIBO Rate floor) with respect to the Initial Term Loans is adjusted such that the Effective Yield applicable to any Initial Term Loan is not more than 0.50% per annum less than the Effective Yield with respect to such Indebtedness; provided, that any increase in Effective Yield applicable to any Initial Term Loan due to the application or imposition of an Alternate Base Rate floor or LIBO Rate floor on any such Indebtedness may, at the election of the Top Borrower (in its sole discretion), be effected solely through an increase in any Alternate Base Rate floor or LIBO Rate floor applicable to such Initial Term Loan,

(g)     [Reserved],

(h)     if such Indebtedness is (i) secured on a *pari passu* basis with the Secured Obligations that are secured on a first lien basis, (ii) secured on a junior basis as compared to the Secured Obligations that are secured on a first lien basis or (iii) unsecured and subordinated to the Obligations, then the holders of such Indebtedness shall be party to an Acceptable Intercreditor Agreement, and

(i)     no such Indebtedness may be (i) guaranteed by any subsidiary of the Top Borrower which is not a Loan Party or (ii) secured by any assets other than the Collateral.

"Incremental Facilities" has the meaning assigned to such term in Section 2.22(a).

"Incremental Facility Amendment" means an amendment to this Agreement that is reasonably satisfactory to the Administrative Agent (solely for purposes of giving effect to Section 2.22) and the Top Borrower executed by each of (a) Holdings and each relevant Borrower, (b) the Administrative Agent and (c) each Lender that agrees to provide all or any portion of the Incremental Facility being incurred pursuant thereto and in accordance with Section 2.22.

"Incremental Lender" has the meaning assigned to such term in Section 2.22(b).

"Incremental Loans" has the meaning assigned to such term in Section 2.22(a).

"Incremental Revolving Commitment" means any commitment made by a lender to provide all or any portion of any Incremental Revolving Facility.

"Incremental Revolving Facility" has the meaning assigned to such term in Section 2.22(a).

"Incremental Revolving Facility Lender" means, with respect to any Incremental Revolving Facility, each Additional Revolving Lender providing any portion of such Incremental Revolving Facility.

"Incremental Revolving Loans" has the meaning assigned to such term in Section 2.22(a).

"Incremental Term Facility" has the meaning assigned to such term in Section 2.22(a).

"Incremental Term Loans" has the meaning assigned to such term in Section 2.22(a).

"Incurrence-Based Amounts" has the meaning assigned to such term in Section 1.10(c).

"Indebtedness" as applied to any Person means, without duplication:

      (a)      all indebtedness for borrowed money;

      (b)      that portion of obligations with respect to Capital Leases to the extent recorded as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

      (c)      all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

      (d)      any obligation of such Person owed for all or any part of the deferred purchase price of property or services (excluding (i) any earn out obligation or purchase price adjustment until such obligation (A) becomes a liability on the statement of financial position or balance sheet (excluding the footnotes thereto) in accordance with GAAP and (B) has not been paid within 30 days after becoming due and payable, (ii) any such obligations incurred under ERISA, (iii) accrued expenses and trade accounts payable in the ordinary course of business (including on an inter-company basis) and (iv) liabilities associated with customer prepayments and deposits), which purchase price is (A) due more than six months from the date of incurrence of the obligation in respect thereof or (B) evidenced by a note or similar written instrument);

      (e)      all Indebtedness of others secured by any Lien on any asset owned or held by such Person regardless of whether the Indebtedness secured thereby have been assumed by such Person or is non-recourse to the credit of such Person;

      (f)      the face amount of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for reimbursement of drawings;

      (g)      the Guarantee by such Person of the Indebtedness of another;

      (h)      all obligations of such Person in respect of any Disqualified Capital Stock; and

      (i)      all net obligations of such Person in respect of any Derivative Transaction, including any Hedge Agreement, whether or not entered into for hedging or speculative purposes;

provided that (i) in no event shall obligations under any Derivative Transaction be deemed "Indebtedness" for any calculation of the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio, the Interest Coverage Ratio or any other financial ratio under this Agreement, (ii) the amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (A) the aggregate unpaid

amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith and (iii) the term "Indebtedness", as it applies to the Top Borrower and its Restricted Subsidiaries, shall exclude intercompany Indebtedness so long as (A) such intercompany Indebtedness has a term not exceeding 364 days (inclusive of any roll-over or extension of terms) and (B) in the case of any Indebtedness owed by any Loan Party to any Restricted Subsidiary that is not a Loan Party, such Indebtedness is unsecured and subordinated to the Obligations and evidenced by the Intercompany Note.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any third person (including any partnership in which such Person is a general partner and any unincorporated joint venture in which such Person is a joint venture) to the extent such Person would be liable therefor under applicable Requirements of Law or any agreement or instrument by virtue of such Person's ownership interest in such Person, (A) except to the extent the terms of such Indebtedness provided that such Person is not liable therefor and (B) only to the extent the relevant Indebtedness is of the type that would be included in the calculation of Consolidated Total Debt; provided that notwithstanding anything herein to the contrary, the term "Indebtedness" shall not include, and shall be calculated without giving effect to, (x) the effects of Accounting Standards Codification Topic 815 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose hereunder as a result of accounting for any embedded derivatives created by the terms of such Indebtedness (it being understood that any such amounts that would have constituted Indebtedness hereunder but for the application of this proviso shall not be deemed an incurrence of Indebtedness hereunder) and (y) the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivative created by the terms of such Indebtedness (it being understood that any such amounts that would have constituted Indebtedness under this Agreement but for the application of this sentence shall not be deemed to be an incurrence of Indebtedness under this Agreement).

"Indemnified Taxes" means all Taxes, other than Excluded Taxes or Other Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Information Memorandum" means the Confidential Information Memorandum dated October 2016, relating to the Top Borrower and its subsidiaries and the Transactions.

"Initial Intercreditor Agreements" means the ABL Intercreditor Agreement and the First/Second Lien Intercreditor Agreement.

"Initial Lenders" means the Arrangers and the affiliates of the Arrangers who are party to this Agreement as Lenders on the Closing Date.

"Initial Term Lender" means any Lender with an Initial Term Loan Commitment or an outstanding Initial Term Loan.

"Initial Term Loan Commitment" means, with respect to each Term Lender, the commitment of such Term Lender to make Initial Term Loans hereunder in an aggregate amount not to exceed the amount set forth opposite such Term Lender's name on the Commitment Schedule, as the same may be (a) reduced from time to time pursuant to Section 2.09 and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Term Lender pursuant to Section 9.05 or (ii) increased from time to time pursuant to Section 2.22. The aggregate amount of the Term Lenders' Initial Term Loan Commitments on the Closing Date is $1,950,000,000.

"Initial Term Loan Maturity Date" means the date that is seven years after the Closing Date.

"<u>Initial Term Loans</u>" means the term loans made by the Initial Term Lenders to the Top Borrower pursuant to <u>Section 2.01(a)(i)</u>.

"<u>Intellectual Property Security Agreement</u>" means any agreement, or a supplement thereto, executed on or after the Closing Date confirming or effecting the grant of any Lien on IP Rights owned by any Loan Party to the Administrative Agent, for the benefit of the Secured Parties, in accordance with this Agreement and the Security Agreement, including an Intellectual Property Security Agreement substantially in the form of <u>Exhibit C</u>.

"<u>Intercompany Note</u>" means a promissory note substantially in the form of <u>Exhibit F</u>.

"<u>Intercreditor Agreements</u>" means the ABL Intercreditor Agreement, the First Lien/Second Lien Intercreditor Agreement and any Acceptable Intercreditor Agreement.

"<u>Interest Election Request</u>" means a request by the relevant Borrower in the form of <u>Exhibit H</u> or another form reasonably acceptable to the Administrative Agent to convert or continue a Borrowing in accordance with <u>Section 2.08</u>.

"<u>Interest Coverage Ratio</u>" means, as of any date of determination, the ratio of (a) Consolidated Adjusted EBITDA for the most recently ended Test Period to (b) Ratio Interest Expense for such Test Period, in each case of the Top Borrower and its Restricted Subsidiaries on a consolidated basis.

"<u>Interest Payment Date</u>" means (a) with respect to any ABR Loan, the first Business Day of each January, April, July and October (commencing April 3, 2017) and the maturity date applicable to such ABR Loan and (b) with respect to any LIBO Rate Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a LIBO Rate Loan with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing.

"<u>Interest Period</u>" means with respect to any LIBO Rate Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, to the extent available to all relevant affected Lenders, twelve months or a shorter period) thereafter, as the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) may elect; <u>provided</u> that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"<u>Interpolated Rate</u>" shall mean, in relation to any LIBO Rate Loan, the rate per annum determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the applicable Published LIBO Rate for the longest period (for which the applicable Published LIBO Rate is available) that is shorter than the Interest Period of that Published LIBO Rate Loan and (b) the applicable Published LIBO Rate for the shortest period (for which such Published LIBO Rate is available) that exceeds the Interest Period of that LIBO Rate Loan, in each case, as of 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period.

"<u>Investment</u>" means (a) any purchase or other acquisition by the Top Borrower or any of its Restricted Subsidiaries of any of the Securities of any other Person (other than any Loan Party), (b) the acquisition by

purchase or otherwise (other than any purchase or other acquisition of inventory, materials, supplies and/or equipment in the ordinary course of business) of all or a substantial portion of the business, property or fixed assets of any other Person or any division or line of business or other business unit of any other Person and (c) any loan, advance (other than any advance to any current or former employee, officer, director, member of management, manager, consultant or independent contractor of the Top Borrower, any Restricted Subsidiary, or any Parent Company for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution by the Top Borrower or any of its Restricted Subsidiaries to any other Person (in each case, excluding any intercompany loan, advance or Indebtedness among the Top Borrower and its Restricted Subsidiaries so long as (A) such loan, advance or Indebtedness has a term not exceeding 364 days (inclusive of any roll-over or extension of terms) and (B) in the case of any such loan, advance or Indebtedness owed by any Loan Party to any Restricted Subsidiary that is not a Loan Party, such loan, advance or Indebtedness is unsecured and subordinated to the Obligations and evidenced by the Intercompany Note). Subject to Section 5.10, the amount of any Investment shall be the original cost of such Investment, plus the cost of any addition thereto that otherwise constitutes an Investment, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect thereto, but giving effect to any repayments of principal in the case of any Investment in the form of a loan and any return of capital or return on Investment in the case of any equity Investment (whether as a distribution, dividend, redemption or sale but not in excess of the amount of the relevant initial Investment).

"Investors" means (a) the Sponsors, (b) the Management Investors and (c) other investors that, directly or indirectly, beneficially own Capital Stock in Holdings on the Closing Date.

"Information" has the meaning assigned to such term in Section 3.11(a).

"IP Rights" has the meaning assigned to such term in Section 3.05(c).

"IRS" means the U.S. Internal Revenue Service.

"Joinder Agreement" means a Joinder Agreement substantially in the form of Exhibit K or such other form that is reasonably satisfactory to the Administrative Agent and the Top Borrower.

"Junior Indebtedness" means any Indebtedness (other than Indebtedness among Holdings, the Top Borrower and/or its subsidiaries) of the Top Borrower or any of its Restricted Subsidiaries that is expressly subordinated in right of payment to the Obligations with an individual outstanding principal amount in excess of the Threshold Amount.

"Junior Lien Indebtedness" means any Indebtedness (other than Indebtedness among Holdings, the Top Borrower and/or its subsidiaries) that is secured by a security interest on the Term Loan Priority Collateral that is expressly junior or subordinated to the Lien securing the Credit Facilities with respect to the Term Loan Priority Collateral, with an individual outstanding principal amount in excess of the Threshold Amount. For the avoidance of doubt, Indebtedness outstanding under the ABL Credit Agreement shall not constitute Junior Lien Indebtedness for any purpose under this Agreement or the other Loan Documents.

"Left Lead Arranger" means UBS Securities LLC.

"Latest Maturity Date" means, as of any date of determination, the latest maturity or expiration date applicable to any Loan or commitment hereunder at such time, including the latest maturity or expiration date of any Term Loan, Term Commitment, Incremental Revolving Loan or any Incremental Revolving Commitment.

"Latest Revolving Credit Maturity Date" means, as of any date of determination, the latest maturity or expiration date applicable to any Incremental Revolving Loan or Incremental Revolving Commitment hereunder at such time.

"Latest Term Loan Maturity Date" means, as of any date of determination, the latest maturity or expiration date applicable to any Term Loan hereunder at such time.

"Legal Reservations" means the application of relevant Debtor Relief Laws, general principles of equity and/or principles of good faith and fair dealing.

"Lenders" means the Term Lenders, any lender with an Additional Commitment or an outstanding Additional Loan and any other Person that becomes a party hereto pursuant to an Assignment Agreement, other than any such Person that ceases to be a party hereto pursuant to an Assignment Agreement.

"LIBO Rate" means, the Published LIBO Rate, as adjusted to reflect applicable statutory reserves prescribed by governmental authorities; provided that, solely with respect to the Initial Term Loans, in no event shall the LIBO Rate be less than 1.00% per annum.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; provided that in no event shall an operating lease in and of itself be deemed to constitute a Lien.

"Loan Documents" means this Agreement, any Promissory Note, the Loan Guaranty, the Collateral Documents, the ABL Intercreditor Agreement, the First Lien/Second Lien Intercreditor Agreement, each other Intercreditor Agreement to which the Borrowers are a party, each Refinancing Amendment, each Incremental Facility Amendment, each Extension Amendment and any other document or instrument designated by the Top Borrower and the Administrative Agent as a "Loan Document." Any reference in this Agreement or any other Loan Document to any Loan Document shall include all appendices, exhibits or schedules thereto.

"Loan Guarantor" means (a) Holdings, (b) any Subsidiary Guarantor and (c) each Borrower (but only with respect to the Obligations of each other Borrower in connection with Secured Hedging Agreements and Banking Services Obligations).

"Loan Guaranty" means the First Lien Term Loan Guaranty Agreement, substantially in the form of Exhibit I, executed by each Loan Guarantor and the Administrative Agent for the benefit of the Secured Parties, as supplemented in accordance with the terms of Section 5.12.

"Loan Installment Date" has the meaning assigned to such term in Section 2.10(a).

"Loan Parties" means Holdings, each Borrower and each Subsidiary Guarantor.

"Loans" means any Initial Term Loan, any Additional Term Loan and/or any Additional Revolving Loan.

"Management Investors" means the officers, directors, managers, employees and members of management of the Top Borrower, any Parent Company and/or any subsidiary of the Top Borrower.

"Margin Stock" has the meaning assigned to such term in Regulation U.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, financial condition or results of operations, in each case, of the Top Borrower and its Restricted Subsidiaries, taken as a whole, (b) the rights and remedies (taken as a whole) of the Administrative Agent under the applicable Loan Documents or (c) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the applicable Loan Documents.

"Material Debt Instrument" means any physical instrument evidencing any Indebtedness for borrowed money which is required to be pledged and delivered to the Administrative Agent (or its bailee) pursuant to the Security Agreement.

"Material Real Estate Asset" means (a) on the Closing Date, each Real Estate Asset listed on Schedule 1.01(c) and (b) any "fee-owned" Real Estate Asset acquired by any Loan Party after the Closing Date having a fair market value (as reasonably determined by the Top Borrower after taking into account any liabilities with respect thereto that impact such fair market value) in excess of $15,000,000 as of the date of acquisition thereof.

"Maturity Date" means (a) with respect to the Initial Term Loans, the Initial Term Loan Maturity Date, (b) with respect to any Replacement Term Loans or Replacement Revolving Facility, the final maturity date for such Replacement Term Loans, or Replacement Revolving Facility, as the case may be, as set forth in the applicable Refinancing Amendment, (c) with respect to any Incremental Facility, the final maturity date set forth in the applicable Incremental Facility Amendment, and (d) with respect to any Extended Revolving Credit Commitment or Extended Term Loans, the final maturity date set forth in the applicable Extension Amendment.

"Maximum Rate" has the meaning assigned to such term in Section 9.19.

"Minimum Extension Condition" has the meaning assigned to such term in Section 2.23(b).

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Administrative Agent, for the benefit of the Administrative Agent and the relevant Secured Parties, on any Material Real Estate Asset constituting Collateral, which shall contain such terms as may be necessary under applicable local Requirements of Law to perfect a Lien on the applicable Material Real Estate Asset.

"Mortgage Policies" has the meaning assigned to such term in the definition of "Collateral and Guarantee Requirement".

"Multiemployer Plan" means any employee benefit plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA that is subject to the provisions of Title IV of ERISA, and in respect of which the Top Borrower or any of its Restricted Subsidiaries, or any of their respective ERISA Affiliates, makes or is obligated to make contributions or with respect to which any of them has any ongoing obligation or liability, contingent or otherwise.

"National Bedding" has the meaning assigned to such term in the preamble.

"Net Insurance/Condemnation Proceeds" means an amount equal to: (a) any Cash payments or proceeds (including Cash Equivalents) received by the Top Borrower or any of its Restricted Subsidiaries (i) under any casualty insurance policy in respect of a covered loss thereunder of any assets of the Top Borrower or any of its Restricted Subsidiaries or (ii) as a result of the taking of any assets of the Top Borrower or any of its Restricted Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (b) (i) any actual out-of-pocket costs and expenses incurred by the Top Borrower or any of its Restricted Subsidiaries in connection with the adjustment, settlement or collection of any claims of the Top Borrower or the relevant Restricted Subsidiary in respect thereof, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest and other amounts on any Indebtedness (excluding the Loans, Indebtedness under any Second Lien Facility, any Indebtedness under the ABL Facility and any Indebtedness secured by a Lien on the Term Loan Priority Collateral that is *pari passu* with or expressly subordinated to the

Lien on the Term Loan Priority Collateral securing any Secured Obligation) that is secured by a Lien on the assets in question and that is required to be repaid or otherwise comes due or would be in default under the terms thereof as a result of such loss, taking or sale, (iii) in the case of a taking, the reasonable out-of-pocket costs of putting any affected property in a safe and secure position, (iv) any selling costs and out-of-pocket expenses (including reasonable broker's fees or commissions, legal fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith transfer and similar Taxes and the Top Borrower's good faith estimate of income Taxes paid or payable (including pursuant to Tax sharing arrangements or any intercompany distribution)) in connection with any sale or taking of such assets as described in clause (a) of this definition, (v) any amounts provided as a reserve in accordance with GAAP against any liabilities under any indemnification obligation or purchase price adjustments associated with any sale or taking of such assets as referred to in clause (a) of this definition (provided that to the extent any such amounts are released from such reserve, such amounts shall constitute Net Insurance/Condemnation Proceeds) and (vi) in the case of any covered loss or taking from any non-Wholly-Owned Subsidiary, the pro rata portion thereof (calculated without regard to this clause (vi)) attributable to minority interests and not available for distribution to or for the account of the Top Borrower or a Wholly-Owned Subsidiary as a result thereof.

"Net Proceeds" means (a) with respect to any Disposition (including any Prepayment Asset Sale), the Cash proceeds (including Cash Equivalents and Cash proceeds subsequently received (as and when received) in respect of non-cash consideration initially received), net of (i) selling costs and out-of-pocket expenses (including reasonable broker's fees or commissions, legal fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith and transfer and similar Taxes and the Top Borrower's good faith estimate of income Taxes paid or payable (including pursuant to Tax sharing arrangement and/or any intercompany distribution) in connection with such Disposition), (ii) amounts provided as a reserve in accordance with GAAP against any liabilities under any indemnification obligation or purchase price adjustment associated with such Disposition (provided that to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Proceeds), (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness (excluding the Loans, Indebtedness under any Second Lien Facility, Indebtedness under any ABL Facility and any other Indebtedness secured by a Lien on the Term Loan Priority Collateral that is *pari passu* with or expressly subordinated to the Lien on the Term Loan Priority Collateral securing any Secured Obligation) which is secured by the asset sold in such Disposition and which is required to be repaid or otherwise comes due or would be in default and is repaid (other than any such Indebtedness that is assumed by the purchaser of such asset), (iv) Cash escrows (until released from escrow to the Top Borrower or any of its Restricted Subsidiaries) from the sale price for such Disposition and (v) in the case of any Disposition by any non-Wholly-Owned Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this clause (v)) attributable to any minority interest and not available for distribution to or for the account of the Top Borrower or a Wholly-Owned Subsidiary as a result thereof; and (b) with respect to any issuance or incurrence of Indebtedness or Capital Stock, the Cash proceeds thereof, net of all Taxes and customary fees, commissions, costs, underwriting discounts and other fees and expenses incurred in connection therewith.

"Non-Loan Party Debt Cap" has the meaning assigned to such term in Section 6.01(w).

"Non-Debt Fund Affiliate" means any Investor (which is an Affiliate of the Top Borrower) and any Affiliate of any such Investor, other than any Debt Fund Affiliate.

"Obligations" means all unpaid principal of and accrued and unpaid interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, all accrued and unpaid fees and all expenses (including fees and expenses accruing during the pendency of any bankruptcy, insolvency,

receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), reimbursements, indemnities and all other advances to, debts, liabilities and obligations of any Loan Party to the Lenders or to any Lender, the Administrative Agent or any indemnified party arising under the Loan Documents in respect of any Loan, whether direct or indirect (including those acquired by assumption), absolute, contingent, due or to become due, now existing or hereafter arising.

"Obligations Derivative Instrument" has the meaning assigned to such term in Section 9.05(d)(ii).

"OFAC" has the meaning assigned to such term in Section 3.17(a).

"Organizational Documents" means (a) with respect to any corporation, its certificate or articles of incorporation or organization and its by-laws, (b) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (c) with respect to any general partnership, its partnership agreement, (d) with respect to any limited liability company, its articles of organization or certificate of formation, and its operating agreement, and (e) with respect to any other form of entity, such other organizational documents required by local Requirements of Law or customary under such jurisdiction to document the formation and governance principles of such type of entity. In the event that any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Applicable Indebtedness" has the meaning assigned to such term in Section 2.11(b)(ii).

"Other Connection Taxes" means, with respect to any Lender or the Administrative Agent, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or other excise or property Taxes arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document, but excluding (i) any Excluded Taxes, and (ii) any such Taxes that are Other Connection Taxes imposed with respect to an assignment or participation (other than an assignment made pursuant to Section 2.19).

"OTPP" means Ontario Teachers' Pension Plan Board.

"Parent Company" means (a) Holdings and (b) any other Person of which the Top Borrower is an indirect Wholly-Owned Subsidiary.

"Participant" has the meaning assigned to such term in Section 9.05(c).

"Participant Register" has the meaning assigned to such term in Section 9.05(c).

"Patent" means the following: (a) any and all patents and patent applications; (b) all inventions described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions and continuations in part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any employee pension benefit plan, as defined in Section 3(2) of ERISA (other than a Multiemployer Plan), that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, which the Top Borrower or any of its Restricted Subsidiaries, or any of their respective ERISA Affiliates, maintains or contributes to or has an obligation to contribute to, or otherwise has any liability, contingent or otherwise.

"Perfection Certificate" means a certificate substantially in the form of Exhibit J.

"Perfection Requirements" means the filing of appropriate financing statements with the office of the Secretary of State or other appropriate office of the location (as determined by Section 9-307 of the UCC) of each Loan Party, the filing of Intellectual Property Security Agreements or other appropriate instruments or notices with the U.S. Patent and Trademark Office and the U.S. Copyright Office, the proper recording or filing, as applicable, of Mortgages and fixture filings with respect to any Material Real Estate Asset constituting Collateral, in each case in favor of the Administrative Agent for the benefit of the Secured Parties and the delivery to the Administrative Agent of any stock certificate, instrument, tangible chattel paper or promissory note, together with instruments of transfer executed in blank, in each case, to the extent required by the applicable Loan Documents.

"Permitted Acquisition" means any acquisition made by the Top Borrower or any of its Restricted Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the assets of, or any business line, unit or division or product line (including research and development and related assets in respect of any product) of, any Person or of a majority of the outstanding Capital Stock of any Person who is engaged in a Similar Business (and, in any event, including any Investment in (x) any Restricted Subsidiary the effect of which is to increase the Top Borrower's or any Restricted Subsidiary's equity ownership in such Restricted Subsidiary or (y) any joint venture for the purpose of increasing the Top Borrower's or its relevant Restricted Subsidiary's ownership interest in such joint venture) if (A) such Person becomes a Restricted Subsidiary or (B) such Person, in one transaction or a series of related transaction, is amalgamated, merged or consolidated with or into, or transfers or conveys substantially all of its assets (or such division, business unit or product line) to, or is liquidated into, the Top Borrower or any Restricted Subsidiary as a result of such Investment.

"Permitted Holders" means (a) the Investors and (b) any Person with which one or more Investors form a "group" (within the meaning of Section 14(d) of the Exchange Act) so long as, in the case of this clause (b), the relevant Investors beneficially own more than 50% of the relevant voting stock beneficially owned by the group.

"Permitted Liens" means Liens permitted pursuant to Section 6.02.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or any other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) maintained by the Top Borrower and/or any Restricted Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of its ERISA Affiliates, other than any Multiemployer Plan.

"Platform" has the meaning assigned to such term in Section 5.01.

"Prepayment Asset Sale" means any Disposition by the Top Borrower or its Restricted Subsidiaries made pursuant to Section 6.07(h).

"Primary Obligor" has the meaning assigned to such term in the definition of "Guarantee".

"Prime Rate" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as reasonably determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as reasonably determined by the Administrative Agent).

"Pro Forma Basis" or "pro forma effect" means, with respect to any determination of the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio, the Interest Coverage Ratio, Consolidated Adjusted EBITDA or Consolidated Total Assets (including component definitions thereof), that:

       (a)       (i) in the case of (A) any Disposition of all or substantially all of the Capital Stock of any Restricted Subsidiary or any division and/or product line of the Top Borrower, any Restricted Subsidiary, (B) any designation of a Restricted Subsidiary as an Unrestricted Subsidiary or (C) the implementation of any Cost Saving Initiative, income statement items (whether positive or negative and including any Expected Cost Savings) attributable to the property or Person subject to such Subject Transaction, shall be excluded as of the first day of the applicable Test Period with respect to any test or covenant for which the relevant determination is being made and (ii) in the case of any Permitted Acquisition, Investment and/or designation of an Unrestricted Subsidiary as a Restricted Subsidiary described in the definition of the term "Subject Transaction", income statement items (whether positive or negative) attributable to the property or Person subject to such Subject Transaction shall be included as of the first day of the applicable Test Period with respect to any test or covenant for which the relevant determination is being made,

       (b)       any retirement or repayment of Indebtedness shall be deemed to have occurred as of the first day of the applicable Test Period with respect to any test or covenant for which the relevant determination is being made,

       (c)       any Indebtedness incurred by the Top Borrower or any of its Restricted Subsidiaries in connection therewith shall be deemed to have occurred as of the first day of the applicable Test Period with respect to any test or covenant for which the relevant determination is being made; provided that, (x) if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable Test Period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness at the relevant date of determination (taking into account any interest hedging arrangements applicable to such Indebtedness), (y) interest on any obligation with respect to any Capital Lease shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Top Borrower to be the rate of interest implicit in such obligation in accordance with GAAP and (z) interest on any Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen by the Top Borrower,

       (d)       the acquisition of any asset included in calculating Consolidated Total Assets (including the amount Cash or Cash Equivalents), whether pursuant to any Subject Transaction or any Person becoming a subsidiary or merging, amalgamating or consolidating with or into the Top Borrower or any of its subsidiaries, or the Disposition of any asset included in calculating Consolidated Total Assets described in the definition of "Subject Transaction" shall be deemed to have occurred as of the last day of the applicable Test Period with respect to any test or covenant for which such calculation is being made; and

WEIL:\95874775\19\74339.0001

(e)     each other Subject Transaction shall be deemed to have occurred as of the first day of the applicable Test Period (or, in the case of Consolidated Total Assets, as of the last day of such Test Period) with respect to any test or covenant for which such calculation is being made.

"Projections" means the financial projections and pro forma financial statements of the Top Borrower and its subsidiaries included in the Information Memorandum (or a supplement thereto).

"Promissory Note" means a promissory note of the Borrowers payable to any Lender or its registered assigns, in substantially the form of Exhibit L, evidencing the aggregate outstanding principal amount of Loans of the Borrowers to such Lender resulting from the Loans made by such Lender.

"Public Company Costs" means Charges associated with, or in anticipation of, or preparation for, compliance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith and Charges relating to compliance with the provisions of the Securities Act and the Exchange Act (and, in each case, similar Requirements of Law under other jurisdictions), as applicable to companies with equity or debt securities held by the public, the rules of national securities exchange companies with listed equity or debt securities, directors' or managers' compensation, fees and expense reimbursement, Charges relating to investor relations, shareholder meetings and reports to shareholders or debtholders, directors' and officers' insurance and other executive costs, legal and other professional fees (including auditors' and accounts' fees), listing fees and filing fees associated with being a public company.

"Public Lender" has the meaning assigned to such term in Section 9.01(d).

"Published LIBO Rate" means, with respect to any Interest Period when used in reference to any Loan or Borrowing, (a) the rate of interest appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to such service as determined by Administrative Agent) as the London interbank offered rate for deposits in Dollars for a term comparable to such Interest Period, at approximately 11:00 a.m. (London time) on the date which is two Business Days prior to the commencement of such Interest Period (but if more than one rate is specified on such page, the rate will be an arithmetic average of all such rates) and (b) if such rate is not available at such time for any reason, then the "Published LIBO Rate" for such Interest Period shall be the Interpolated Rate.

"Qualified Capital Stock" of any Person means any Capital Stock of such Person that is not Disqualified Capital Stock.

"Qualifying IPO" means the issuance and sale by the Top Borrower or any Parent Company of its common Capital Stock in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"Ratio Interest Expense" means, with respect to any Person for any period, (a) the sum of consolidated total interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued and whether or not capitalized, (i) including (A) the interest component of any payment under any Capital Lease (regardless of whether accounted for as interest expense under GAAP), (B) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (C) any commission, discount and/or other fee or charge owed with respect to any letter of credit and/or bankers' acceptance and (D) any net payment arising under any interest rate Hedge Agreement with respect to Indebtedness and (ii) excluding (A) amortization of deferred financing fees, debt issuance costs, discounted liabilities, commissions, fees and expenses, (B) any expense arising from any bridge, commitment and/or other financing fee (including fees and expenses associated with the Transactions and annual agency fees), (C) any expense resulting from the discounting of Indebtedness in connection with the application of recapitalization accounting or, if applicable, acquisition accounting, (D) any fee or expense associated with any Disposition, acquisition, Investment,

issuance of Capital Stock or Indebtedness (in each case, whether or not consummated), (E) any cost associated with obtaining, or breakage costs in respect of, any Hedge Agreement or other derivative instrument other than any interest rate Hedge Agreement or interest rate derivative instrument with respect to Indebtedness, (F) any penalty and/or interest relating to Taxes and (G) for the avoidance of doubt, any non-cash interest expense attributable to any movement in the mark to market valuation of any obligation under any Hedge Agreement or any other derivative instrument and/or any payment obligation arising under any Hedge Agreement or derivative instrument other than any interest rate Hedge Agreement or interest rate derivative instrument with respect to Indebtedness <u>minus</u> (b) interest income for such period. For purposes of this definition, interest in respect of any Capital Lease shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capital Lease in accordance with GAAP.

Notwithstanding anything to the contrary, it is agreed that for the purpose of calculating the Interest Coverage Ratio for any period ending prior to December 31, 2016, (i) for the four fiscal quarters ending on or about December 31, 2017, Ratio Interest Expense of the Top Borrower and its Restricted Subsidiaries shall be annualized for the period starting with the Closing Date and ending on or about December 31, 2016, on the basis of a 365 day year for the actual days elapsed, (ii) for the four fiscal quarters ending or about March 31, 2017, Ratio Interest Expense of the Top Borrower and its Restricted Subsidiaries shall be annualized for the period starting with the Closing Date and ending on or about March 31, 2017, on the basis of a 365 day year for the actual days elapsed, (iii) for the four fiscal quarters ending on or about June 30, 2017, Ratio Interest Expense of the Top Borrower and its Restricted Subsidiaries shall be annualized for the period starting with the Closing Date and ending on or about June 30, 2017, on the basis of a 365 day year for the actual days elapsed and (iv) for the four fiscal quarters ending on or about September 30, 2017, Ratio Interest Expense of the Top Borrower and its Restricted Subsidiaries shall be annualized for the period starting with the Closing Date and ending on or about September 30, 2017, on the basis of a 365 day year for the actual days elapsed.

"<u>Real Estate Asset</u>" means, at any time of determination, all right, title and interest (fee, leasehold or otherwise) of any Loan Party in and to real property (including, but not limited to, land, improvements and fixtures thereon).

"<u>Refinancing Amendment</u>" means an amendment to this Agreement that is reasonably satisfactory to the Administrative Agent and the Top Borrower executed by (a) Holdings and each relevant Borrower, (b) the Administrative Agent and (c) each Lender that agrees to provide all or any portion of the Replacement Term Loans or the Replacement Revolving Facility, as applicable, being incurred pursuant thereto and in accordance with <u>Section 9.02(c)</u>.

"<u>Refinancing Indebtedness</u>" has the meaning assigned to such term in <u>Section 6.01(p)</u>.

"<u>Refinancing Transactions</u>" has the meaning assigned to such term in the Recitals.

"<u>Refunding Capital Stock</u>" has the meaning assigned to such term in <u>Section 6.04(a)(viii)</u>.

"<u>Register</u>" has the meaning assigned to such term in <u>Section 9.05(b)</u>.

"<u>Regulation D</u>" means Regulation D of the FRB as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"<u>Regulation H</u>" means Regulation H of the FRB as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"<u>Regulation U</u>" means Regulation U of the FRB as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Funds" means with respect to any Lender that is an Approved Fund, any other Approved Fund that is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, managers, officers, trustees, employees, partners, agents, advisors and other representatives of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the Environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"Replaced Revolving Facility" has the meaning assigned to such term in Section 9.02(c)(ii).

"Replaced Term Loans" has the meaning assigned to such term in Section 9.02(c)(i).

"Replacement Debt" means any Refinancing Indebtedness (whether borrowed in the form of secured or unsecured loans, issued in a public offering, Rule 144A under the Securities Act or other private placement or bridge financing in lieu of the foregoing or otherwise) incurred in respect of Indebtedness permitted under Section 6.01(a) (and any subsequent refinancing of such Replacement Debt).

"Replacement Revolving Facility" has the meaning assigned to such term in Section 9.02(c)(ii).

"Replacement Term Loans" has the meaning assigned to such term in Section 9.02(c)(i).

"Reportable Event" means, with respect to any Pension Plan or Multiemployer Plan, any of the events described in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period is waived under PBGC Reg. Section 4043.

"Representatives" has the meaning assigned to such term in Section 9.13.

"Repricing Transaction" means each of (a) the prepayment, repayment, refinancing, substitution or replacement of all or a portion of the Initial Term Loans substantially concurrently with the incurrence by any Loan Party of any secured term loans (including any Replacement Term Loans) having an Effective Yield that is less than the Effective Yield applicable to the Initial Term Loans so prepaid, repaid, refinanced, substituted or replaced and (b) any amendment, waiver or other modification to this Agreement that would have the effect of reducing the Effective Yield applicable to the Initial Term Loans; provided that the primary purpose of such prepayment, repayment, refinancing, substitution, replacement, amendment, waiver or other modification was to reduce the Effective Yield applicable to the Initial Term Loans; provided, further, that in no event shall any such prepayment, repayment, refinancing, substitution, replacement, amendment, waiver or other modification in connection with a Change of Control, Qualifying IPO or material acquisition for which the aggregate consideration is equal to or greater than $150,000,000 or similar material Investment (including any material Investment in a Similar Business) for which the aggregate consideration is equal to or greater than $150,000,000, dividend recapitalization or enterprise transformative event constitute a Repricing Transaction. Any determination by the Administrative Agent of the Effective Yield for purposes of the definition shall be conclusive and binding on all Lenders, and the Administrative Agent shall have no liability to any Person with respect to such determination absent bad faith, gross negligence or willful misconduct.

"Required Asset Sale Percentage" means, as of the date on which the Borrower or any Restricted Subsidiary receives (a) Net Proceeds in respect of any Prepayment Asset Sale or (b) Net Insurance/Condemnation Proceeds, (i) if the First Lien Leverage Ratio is greater than 4.15:1.00, 100%, (ii) if

the First Lien Leverage Ratio is less than or equal to 4.15:1.00 and greater than 3.65:1.00, 50% and (iii) if the First Lien Leverage Ratio is less than or equal to 3.65:1.00, 0%.

"Required Excess Cash Flow Percentage" means, as of any date of determination, (a) if the First Lien Leverage Ratio is greater than 4.15:1.00, 50%, (b) if the First Lien Leverage Ratio is less than or equal to 4.15:1.00 and greater than 3.65:1.00, 25% and (c) if the First Lien Leverage Ratio is less than or equal to 3.65:1.00, 0%; it being understood and agreed that, for purposes of this definition as it applies to the determination of the amount of Excess Cash Flow that is required to be applied to prepay the Term Loans under Section 2.11(b)(i) for any Excess Cash Flow Period, the First Lien Leverage Ratio shall be determined on the scheduled date of prepayment.

"Required Lenders" means, at any time, Lenders having Loans or unused Commitments representing more than 50% of the sum of the total Loans and such unused commitments at such time.

"Requirements of Law" means, with respect to any Person, collectively, the common law and all federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" means, with respect to any Person, the chief executive officer, the president, the chief financial officer, the treasurer, any assistant treasurer, any executive vice president, any senior vice president, any vice president or the chief operating officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement, and, as to any document delivered on the Closing Date, shall include any secretary or assistant secretary or any other individual or similar official thereof with substantially equivalent responsibilities of a Loan Party and, solely for purposes of notices given pursuant to Article II, any other officer of the applicable Loan Party so designated in writing by the Top Borrower to the Administrative Agent. Any document delivered hereunder that is signed by a Responsible Officer of any Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party, and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Responsible Officer Certification" means, with respect to the financial statements for which such certification is required, the certification of a Responsible Officer of the Top Borrower that such financial statements fairly present, in all material respects, in accordance with GAAP, the consolidated financial condition of the Top Borrower as at the dates indicated and its consolidated income and cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"Restricted Amount" has the meaning set forth in Section 2.11(b)(iv).

"Restricted Debt" means any Junior Indebtedness and any Junior Lien Indebtedness.

"Restricted Debt Payments" has the meaning set forth in Section 6.04(b).

"Restricted Payment" means (a) any dividend or other distribution on account of any shares of any class of the Capital Stock of the Top Borrower, except a dividend payable solely in shares of Qualified Capital Stock to the holders of such class; (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of any shares of any class of the Capital Stock of the Top Borrower and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of the Capital Stock of the Top Borrower now or hereafter outstanding.

"<u>Restricted Subsidiary</u>" means, as to any Person, any subsidiary of such Person that is not an Unrestricted Subsidiary.  Unless otherwise specified, "Restricted Subsidiary" shall mean any Restricted Subsidiary of the Top Borrower.

"<u>Retained Excess Cash Flow Amount</u>" means, at any date of determination, an amount, determined on a cumulative basis, that is equal to (a) the aggregate cumulative sum of the Excess Cash Flow that is not required to be applied as a mandatory prepayment under <u>Section 2.11(b)(i)</u> for all Excess Cash Flow Periods ending after the Closing Date and prior to such date <u>plus</u> (b) for each Excess Cash Flow Interim Period ended prior to such date but as to which the corresponding Excess Cash Flow Period has not ended (or no Excess Cash Flow Period has then ended), an amount equal to the Retained Excess Cash Flow Percentage of Excess Cash Flow of the Borrower and its Restricted Subsidiaries, for such Excess Cash Flow Interim Period; <u>provided</u> that such amount shall not be less than zero for any Excess Cash Flow Period or Interim Excess Cash Flow Period.

"<u>Retained Excess Cash Flow Percentage</u>" means, with respect to any Excess Cash Flow Interim Period, (a) 100% <u>minus</u> (b) the Required Excess Cash Flow Percentage with respect to such Excess Cash Flow Interim Period.

"<u>S&P</u>" means Standard & Poor's Financial Services LLC, a subsidiary of the McGraw-Hill Companies, Inc.

"<u>Sale and Lease-Back Transaction</u>" has the meaning assigned to such term in <u>Section 6.08</u>.

"<u>Scheduled Consideration</u>" has the meaning assigned to such term in the definition of "Excess Cash Flow".

"<u>SEC</u>" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of its functions.

"<u>Second Lien Collateral Agent</u>" has the meaning set forth in the First Lien/Second Lien Intercreditor Agreement.

"<u>Second Lien Credit Agreement</u>" means the Second Lien Term Loan Agreement, dated as of the Closing Date, among, <i>inter alios</i>, Holdings, the Borrowers, Goldman Sachs Bank USA, as administrative agent and collateral agent and the lenders from time to time party thereto.

"<u>Second Lien Facility</u>" means the credit facility governed by the Second Lien Credit Agreement and one or more debt facilities or other financing arrangements (including indentures) providing for loans and/or commitments or other long-term indebtedness that replace or refinance such credit facility, including any such replacement or refinancing facility (including any indenture) that increases or decreases the amount permitted to be borrowed thereunder or alters the maturity thereof and whether by the same or any other agent, trustee, lender or group of lenders, and any amendments, supplements, modifications, extensions, renewals, restatements, amendments and restatements or refundings thereof or any such credit facilities or other debt facilities (including under indentures) that replace or refinance such credit facility or other Indebtedness (or any subsequent replacement thereof).

"<u>Second Lien Incremental Debt</u>" means any "Incremental Loans" and "Incremental Equivalent Debt", each as defined in the Second Lien Credit Agreement (or any equivalent term under any Second Lien Facility).

"<u>Secured Hedging Obligations</u>" means all Hedging Obligations (other than any Excluded Swap Obligations) under each Hedge Agreement that (a) is in effect on the Closing Date between any Loan Party and a counterparty that is (or is an Affiliate of) the Administrative Agent, a Lender or an Arranger as of the Closing Date or (b) is entered into after the Closing Date between any Loan Party and any counterparty that is

(or is an Affiliate of) the Administrative Agent, a Lender or an Arranger at the time such Hedge Agreement is entered into, in each case for which such Loan Party agrees to provide security and in each case that has been designated to the Administrative Agent in writing by the Top Borrower as being a Secured Hedging Obligation for purposes of the Loan Documents, it being understood that each counterparty thereto shall be deemed (A) to appoint the Administrative Agent as its agent under the applicable Loan Documents and (B) to agree to be bound by the provisions of Article 8, Section 9.03 and Section 9.10 and any Intercreditor Agreement as if it were a Lender.

"Secured Leverage Ratio" means the ratio, as of any date of determination, of (a) Consolidated Secured Debt as of the last day of the most recently ended Test Period to (b) Consolidated Adjusted EBITDA for the Test Period then most recently ended, in each case of the Top Borrower, its Restricted Subsidiaries on a consolidated basis.

"Secured Obligations" means all Obligations, together with (a) all Banking Services Obligations and (b) all Secured Hedging Obligations.

"Secured Parties" means (i) the Lenders, (ii) the Administrative Agent, (iii) each counterparty to a Hedge Agreement with a Loan Party the obligations under which constitute Secured Hedging Obligations, (iv) each provider of Banking Services to any Loan Party the obligations under which constitute Banking Services Obligations and (v) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document.

"Securities" means any stock, shares, units, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing; provided that the term "Securities" shall not include any earn-out agreement or obligation or any employee bonus or other incentive compensation plan or agreement.

"Securities Act" means the Securities Act of 1933 and the rules and regulations of the SEC promulgated thereunder.

"Security Agreement" means the First Lien Pledge and Security Agreement, substantially in the form of Exhibit M, among the Loan Parties and the Administrative Agent for the benefit of the Secured Parties.

"Shared Incremental Amount" means (a) the greater of (i) $400,000,000 and (ii) 100% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period minus (b) (i) the aggregate outstanding principal amount of all Incremental Facilities and/or Incremental Equivalent Debt incurred or issued in reliance on the Shared Incremental Amount and (ii) the aggregate principal amount of "Incremental Loans" and "Incremental Equivalent Debt" (each as defined in the Second Lien Credit Agreement or any equivalent term under any documentation governing any Second Lien Facility) incurred or issued in reliance on the Shared Incremental Amount, in each case after giving effect to any reclassification of such Incremental Facilities, Incremental Equivalent Debt, "Incremental Loans" or "Incremental Equivalent Debt" (as defined pursuant to the above parenthetical) as having been incurred under clause (e) of the definition of "Incremental Cap" hereunder or clause (e) of the definition of "Incremental Cap" (as defined in the Second Lien Credit Agreement or any equivalent term under any documentation governing any Second Lien Facility); it being understood and agreed that, unless the Top Borrower otherwise notifies the Administrative Agent, if all or any portion of any Second Lien Incremental Debt would be permitted under any "incurrence-based" capacity to incur Second Lien Incremental Debt under the documentation governing any Second Lien Facility on the applicable date of determination, such Second Lien Incremental Debt (or the relevant portion thereof) shall be deemed to have been incurred in reliance on such "incurrence-based" capacity prior to the utilization of the Shared Incremental Amount.

"<u>Similar Business</u>" means any Person the majority of the revenues of which are derived from a business that would be permitted by <u>Section 6.10</u> if the references to "Restricted Subsidiaries" in <u>Section 6.10</u> were read to refer to such Person.

"<u>SPC</u>" has the meaning assigned to such term in <u>Section 9.05(e)</u>.

"<u>Specified Dividend</u>" has the meaning assigned to such term in the preamble.

"<u>Sponsor</u>" means collectively, (i) Advent, its controlled Affiliates and funds managed or advised by any of them or any of their respective controlled Affiliates, (ii) Ares, its controlled Affiliates and funds managed or advised by any of them or any of their respective controlled Affiliates and (iii) OTPP, its controlled Affiliates and funds managed or advised by any of them or any of their respective controlled Affiliates.

"<u>SSB</u>" has the meaning assigned to such term in the preamble.

"<u>SSB Manufacturing</u>" has the meaning assigned to such term in the preamble.

"<u>Subject Loans</u>" has the meaning assigned to such term in <u>Section 2.11(b)(ii)</u>.

"<u>Subject Person</u>" has the meaning assigned to such term in the definition of "Consolidated Net Income".

"<u>Subject Proceeds</u>" has the meaning assigned to such term in <u>Section 2.11(b)(ii)</u>.

"<u>Subject Transaction</u>" means, with respect to any Test Period, (a) the Transactions, (b) any Permitted Acquisition or any other acquisition or similar Investment, whether by purchase, merger or otherwise, of all or substantially all of the assets of, or any business line, unit or division of, any Person or of a majority of the outstanding Capital Stock of any Person (and, in any event, including any Investment in (x) any Restricted Subsidiary the effect of which is to increase the Top Borrower's or any Restricted Subsidiary's respective equity ownership in such Restricted Subsidiary or (y) any joint venture for the purpose of increasing the Top Borrower's or its relevant Restricted Subsidiary's ownership interest in such joint venture), in each case that is permitted by this Agreement, (c) any Disposition of all or substantially all of the assets or Capital Stock of any subsidiary (or any business unit, line of business or division of the Top Borrower or a Restricted Subsidiary) not prohibited by this Agreement, (d) the designation of a Restricted Subsidiary as an Unrestricted Subsidiary or an Unrestricted Subsidiary as a Restricted Subsidiary in accordance with <u>Section 5.10</u>, (e) any incurrence of Indebtedness (other than revolving Indebtedness), (f) any repayment of Indebtedness, (g) any capital contribution in respect of Qualified Capital Stock or any issuance of Qualified Capital Stock (other than any amount constituting a Cure Amount), (h) the implementation of any Cost Saving Initiative and/or (i) any other event that by the terms of the Loan Documents requires pro forma compliance with a test or covenant hereunder or requires such test or covenant to be calculated on a pro forma basis.

"<u>subsidiary</u>" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof, in each case to the extent the relevant entity's financial results are required to be included in such Person's consolidated financial statements under GAAP; <u>provided</u> that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interests in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.  Unless otherwise specified, "subsidiary" shall mean any subsidiary of the Top Borrower.

"Subsidiary Guarantor" means (a) on the Closing Date, each subsidiary of the Top Borrower that is not a Borrower (other than any such subsidiary that is an Excluded Subsidiary on the Closing Date) and (b) thereafter, each subsidiary of the Top Borrower that becomes a guarantor of the Secured Obligations pursuant to the terms of this Agreement, in each case, until such time as the relevant subsidiary is released from its obligations under the Loan Guaranty in accordance with the terms and provisions hereof. Notwithstanding the foregoing, the Top Borrower may, in its sole discretion, elect to cause any Restricted Subsidiary that is not otherwise required to be a Subsidiary Guarantor to provide a Loan Guaranty by causing such Restricted Subsidiary to execute a Joinder Agreement, and any such Restricted Subsidiary shall be a Loan Party and Subsidiary Guarantor for all purposes hereunder.

"Successor Holdings" has the meaning assigned to such term in Section 6.14(c).

"Successor Borrower" has the meaning assigned to such term in Section 6.07(a).

"Swap Obligations" means, with respect to any Loan Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Tax and Trust Funds" means Cash, Cash Equivalents or other assets that are comprised solely of (a) funds used for payroll and payroll Taxes and other employee benefit payments to or for the benefit of the employees of Holdings, the Top Borrower and/or any subsidiary, (b) Taxes required to be collected, remitted or withheld (including, federal and state withholding taxes (including the employer's share thereof)) and (c) other funds which any Loan Party holds in trust or as an escrow or fiduciary for another person which is not a Loan Party in the ordinary course of business.

"Taxes" means all present and future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" has the meaning assigned to such term in the lead-in to Article 5.

"Term Commitment" means any Initial Term Commitment and any Additional Term Loan Commitment.

"Term Facility" means the Term Loans provided to or for the benefit of the Borrowers pursuant to the terms of this Agreement.

"Term Lender" means any Initial Term Lender and any Additional Term Lender.

"Term Loan" means the Initial Term Loans and, if applicable, any Additional Term Loans.

"Term Loan Priority Collateral" has the meaning set forth in the ABL Intercreditor Agreement.

"Test Period" means, as of any date, the period of four consecutive Fiscal Quarters then most recently ended for which financial statements of the type described in Section 5.01(a) or Section 5.01(b), as applicable, have been delivered (or are required to have been delivered) or, if earlier, are internally available.

"Threshold Amount" means $80,000,000.

"Top Borrower" has the meaning assigned to such term in the preamble.

"Total Leverage Ratio" means the ratio, as of any date of determination, of (a) Consolidated Total Debt outstanding as of the last day of the most recently ended Test Period to (b) Consolidated Adjusted

EBITDA for the Test Period then most recently ended, in each case of the Top Borrower and its Restricted Subsidiaries on a consolidated basis.

"Trademark" means the following: (a) all trademarks (including service marks), common law marks, trade names, trade dress, and logos, slogans and other indicia of origin under the Requirements of Law of any jurisdiction in the world, and the registrations and applications for registration thereof and the goodwill of the business symbolized by the foregoing; (b) all renewals of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof; (d) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (e) all domestic rights corresponding to any of the foregoing.

"Transaction Costs" means fees, premiums, expenses and other transaction costs (including original issue discount or upfront fees) payable or otherwise borne by any Parent Company and/or its subsidiaries in connection with the Transactions and the transactions contemplated thereby.

"Transactions" means, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the Borrowing of Loans hereunder on the Closing Date, (b) the execution, delivery and performance by the Loan Parties of the Loan Documents (as defined in each of the Second Lien Credit Agreement and the ABL Credit Agreement) to which they are a party and the incurrence of Indebtedness under the Second Lien Credit Agreement and, if applicable, the ABL Credit Agreement on the Closing Date, (c) the Refinancing Transactions, (d) the Specified Dividend and (e) the payment of Transaction Costs.

"Treasury Capital Stock" has the meaning assigned to such term in Section 6.04(a)(viii).

"Treasury Regulations" means the U.S. federal income tax regulations promulgated under the Code.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the LIBO Rate or the Alternate Base Rate.

"UBS" has the meaning assigned to such term in the preamble.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the creation or perfection of security interests.

"Unrestricted Cash Amount" means, as to any Person on any date of determination, the amount of (a) unrestricted Cash and Cash Equivalents of such Person and (b) Cash and Cash Equivalents of such Person that are restricted in favor of the Credit Facilities, the Second Lien Facility and/or the ABL Facility and/or other permitted *pari passu* or junior secured Indebtedness (which may also include Cash and Cash Equivalents securing other Indebtedness that is secured by a Lien on Collateral along with the Credit Facilities, the Second Lien Facility, the ABL Facility and/or other permitted *pari passu* or junior secured indebtedness).

"Unrestricted Subsidiary" means any subsidiary of the Top Borrower that is listed on Schedule 5.10 hereto or designated by the Top Borrower as an Unrestricted Subsidiary after the Closing Date pursuant to Section 5.10 and any subsidiary of any Unrestricted Subsidiary.

"U.S." means the United States of America.

"U.S. Lender" means any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"USA PATRIOT Act" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(f).

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness; provided that the effect of any prepayment made in respect of such Indebtedness shall be disregarded in making such calculation.

"Wholly-Owned Subsidiary" of any Person means a subsidiary of such Person, 100% of the Capital Stock of which (other than directors' qualifying shares or shares required by Requirements of Law to be owned by a resident of the relevant jurisdiction) shall be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

"Withdrawal Liability" means the liability to any Multiemployer Plan as the result of a "complete" or "partial" withdrawal by the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02. Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Term Loan") or by Type (e.g., a "LIBO Rate Loan") or by Class and Type (e.g., a "LIBO Rate Term Loan"). Borrowings also may be classified and referred to by Class (e.g., a "Term Loan Borrowing") or by Type (e.g., a "LIBO Rate Borrowing") or by Class and Type (e.g., a "LIBO Rate Term Loan Borrowing").

Section 1.03. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein or in any Loan Document (including any Loan Document and the Second Lien Credit Agreement) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified or extended, replaced or refinanced (subject to any restrictions or qualifications on such amendments, restatements, amendment and restatements, supplements or modifications or extensions, replacements or refinancings set forth herein), (b) any reference to any Requirement of Law in any Loan Document shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Requirement of Law, (c) any reference herein or in any Loan Document to any Person shall be construed to include such Person's successors and permitted assigns, (d) the words "herein," "hereof" and "hereunder," and words of similar import, when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision hereof, (e) all references herein or in any Loan Document to Articles, Sections, clauses, paragraphs, Exhibits and Schedules shall be construed to refer to Articles, Sections, clauses and paragraphs of, and Exhibits and Schedules to, such Loan Document, (f) in the computation of periods of time in any Loan Document from a specified date to a

later specified date, the word "from" means "from and including", the words "to" and "until" mean "to but excluding" and the word "through" means "to and including" and (g) the words "asset" and "property", when used in any Loan Document, shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including Cash, securities, accounts and contract rights. For purposes of determining compliance at any time with Sections 6.01, 6.02, 6.04, 6.05, 6.06, 6.07 and 6.09, in the event that any Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Investment, Disposition or Affiliate Transaction, as applicable, meets the criteria of more than one of the categories of transactions or items permitted pursuant to any clause of such Sections 6.01 (other than Sections 6.01(a), (x) and (z)), 6.02 (other than Sections 6.02(a) and (t)), 6.04, 6.05, 6.06, 6.07 and 6.09, the Top Borrower, in its sole discretion, may, from time to time, classify or reclassify such transaction or item (or portion thereof) under one or more clauses of each such Section and will only be required to include the amount and type of such transaction (or portion thereof) in any one category; provided that, upon delivery of any financial statements pursuant to Section 5.01(a) or (b) following the initial incurrence of any portion of any Indebtedness incurred under Section 6.01(a) through (gg) (other than Section 6.01(a) or (x)) (such portion of such Indebtedness, the "Subject Indebtedness"), if any such Subject Indebtedness could, based on such financial statements, have been incurred in reliance on Section 6.01(w), such Subject Indebtedness shall automatically be reclassified as having been incurred under the applicable provisions of Section 6.01(w) (in each case, subject to any other applicable provision of Section 6.01(w) and, in the case of any Subject Indebtedness incurred by any Restricted Subsidiary that is not a Loan Party, to availability under the Non-Loan Party Debt Cap); provided further that any transaction or item (or portion thereof) originally permitted by reference to one or more clauses in Section 6.04(a) may not be reclassified across or between other Sections but, for the avoidance of doubt, may be reclassified within Section 6.04(a). It is understood and agreed that any Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Burdensome Agreement, Investment, Disposition and/or Affiliate transaction need not be permitted solely by reference to one category of permitted Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Burdensome Agreement, Investment, Disposition and/or Affiliate transaction under Sections 6.01, 6.02, 6.04, 6.05, 6.06, 6.07 or 6.09, respectively, but may instead be permitted in part under any combination thereof

Section 1.04.  Accounting Terms; GAAP.

(a)  All financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and, except as otherwise expressly provided herein, all terms of an accounting nature that are used in calculating the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio, the Interest Coverage Ratio, Consolidated Adjusted EBITDA or Consolidated Total Assets shall be construed and interpreted in accordance with GAAP, as in effect from time to time; provided that if the Top Borrower notifies the Administrative Agent that the Top Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date of delivery of the financial statements described in Section 3.04(a) in GAAP or in the application thereof (including the conversion to IFRS as described below) on the operation of such provision (or if the Administrative Agent notifies the Top Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change becomes effective until such notice have been withdrawn or such provision amended in accordance herewith; provided, further, that if such an amendment is requested by the Top Borrower or the Required Lenders, then the Top Borrower and the Administrative Agent shall negotiate in good faith to enter into an amendment of the relevant affected provisions (without the payment of any amendment or similar fee to the Lenders) to preserve the original intent thereof in light of such change in GAAP or the application thereof; provided, further, that all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Top Borrower or any subsidiary at "fair value," as defined therein and (ii) any treatment of Indebtedness

in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof. If the Top Borrower notifies the Administrative Agent that the Top Borrower (or its applicable Parent Company) is required to report under IFRS or has elected to do so through an early adoption policy, "GAAP" shall mean international financial reporting standards pursuant to IFRS (provided that after such conversion, the Top Borrower cannot elect to report under GAAP).

(b)     Notwithstanding anything to the contrary herein, but subject to Section 1.10 hereof, all financial ratios and tests (including the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio, the Interest Coverage Ratio and the amount of Consolidated Total Assets and Consolidated Adjusted EBITDA) contained in this Agreement that are calculated with respect to any Test Period during which any Subject Transaction occurs shall be calculated with respect to such Test Period and such Subject Transaction on a Pro Forma Basis. Further, if since the beginning of any such Test Period and on or prior to the date of any required calculation of any financial ratio or test (x) any Subject Transaction has occurred or (y) any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Top Borrower or any of its Restricted Subsidiaries or any joint venture since the beginning of such Test Period has consummated any Subject Transaction, then, in each case, any applicable financial ratio or test shall be calculated on a Pro Forma Basis for such Test Period as if such Subject Transaction had occurred at the beginning of the applicable Test Period.

(c)     Notwithstanding anything to the contrary contained in paragraph (a) above or in the definition of "Capital Lease," in the event of an accounting change requiring all leases to be capitalized, only those leases (assuming for purposes hereof that such leases were in existence on the date hereof) that would constitute Capital Leases in conformity with GAAP on the date hereof shall be considered Capital Leases, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

Section 1.05.     Effectuation of Transactions. Each of the representations and warranties contained in this Agreement (and all corresponding definitions) is made after giving effect to the Transactions, unless the context otherwise requires.

Section 1.06.     Timing of Payment of Performance. When payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

Section 1.07.     Times of Day. Unless otherwise specified herein, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

Section 1.08.     Currency Equivalents Generally.

(a)     For purposes of any determination under Article 5, Article 6 (other than the calculation of compliance with any financial ratio for purposes of taking any action hereunder) or Article 7 with respect to the amount of any Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Investment, Disposition, Sale and Lease-Back Transaction, affiliate transaction or other transaction, event or circumstance, or any determination under any other provision of this Agreement, (any of the foregoing, a "specified transaction"), in a currency other than Dollars, (i) the Dollar equivalent amount of a specified transaction in a currency other than Dollars shall be calculated based on the rate of exchange quoted by the Bloomberg Foreign Exchange Rates & World Currencies Page (or any successor page thereto, or in the event such rate does not appear on any Bloomberg Page, by reference to such other publicly available service for displaying exchange rates as

may be agreed upon by the Administrative Agent and the Top Borrower) for such foreign currency, as in effect at 11:00 a.m. (London time) on the date of such specified transaction (which, in the case of any Restricted Payment, shall be deemed to be the date of the declaration thereof and, in the case of the incurrence of Indebtedness, shall be deemed to be on the date first committed); provided, that if any Indebtedness is incurred (and, if applicable, associated Lien granted) to refinance or replace other Indebtedness denominated in a currency other than Dollars, and the relevant refinancing or replacement would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing or replacement, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing or replacement Indebtedness (and, if applicable, associated Lien granted) does not exceed an amount sufficient to repay the principal amount of such Indebtedness being refinanced or replaced, except by an amount equal to (x) unpaid accrued interest and premiums (including tender premiums) thereon plus other reasonable and customary fees and expenses (including upfront fees and original issue discount) incurred in connection with such refinancing or replacement, (y) any existing commitments unutilized thereunder and (z) additional amounts permitted to be incurred under Section 6.01 and (ii) for the avoidance of doubt, no Default or Event of Default shall be deemed to have occurred solely as a result of a change in the rate of currency exchange occurring after the time of any specified transaction so long as such specified transaction was permitted at the time incurred, made, acquired, committed, entered or declared as set forth in clause (i). For purposes of calculating compliance with any financial ratio for purposes of taking any action hereunder, on any relevant date of determination, amounts denominated in currencies other than Dollars shall be translated into Dollars at the applicable currency exchange rate used in preparing the financial statements delivered pursuant to Sections 5.01(a) or (b) (or, prior to the first such delivery, the financial statements referred to in Section 3.04), as applicable, for the relevant Test Period and will, with respect to any Indebtedness, reflect the currency translation effects, determined in accordance with GAAP, of any Hedge Agreement permitted hereunder in respect of currency exchange risks with respect to the applicable currency in effect on the date of determination for the Dollar equivalent amount of such Indebtedness; provided that the amount of any Indebtedness that is subject to a Debt FX Hedge shall be determined in accordance with the definition of "Consolidated Total Debt".

(b)     Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Top Borrower's consent to appropriately reflect a change in currency of any country and any relevant market convention or practice relating to such change in currency.

Section 1.09.    Cashless Rollovers.  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, to the extent that any Lender extends the maturity date of, or replaces, renews or refinances, any of its then-existing Loans with Incremental Loans, Replacement Term Loans, Loans in connection with any Replacement Revolving Facility, Extended Term Loans, Extended Revolving Loans or loans incurred under a new credit facility, in each case, to the extent such extension, replacement, renewal or refinancing is effected by means of a "cashless roll" by such Lender, such extension, replacement, renewal or refinancing shall be deemed to comply with any requirement hereunder or any other Loan Document that such payment be made "in Dollars", "in immediately available funds", "in Cash" or any other similar requirement.

Section 1.10.    Certain Calculations and Tests.

(a)     Notwithstanding anything to the contrary herein, to the extent that the terms of this Agreement require (i) compliance with any financial ratio or test (including any First Lien Leverage Ratio test, any Secured Leverage Ratio test, any Total Leverage Ratio test and any Interest Coverage Ratio test) and/or any cap expressed as a percentage of Consolidated Adjusted EBITDA or Consolidated Total Assets and/or (ii) the absence of a Default or Event of Default (or any type of Default or Event of Default) as a condition to (A) the consummation of any transaction in connection with any acquisition or similar Investment (including the assumption or incurrence of Indebtedness), (B) the making of any Restricted Payment and/or (C) the making of any Restricted Debt Payment, the determination of whether the relevant condition is satisfied may be made, at

the election of the Top Borrower, (1) in the case of any acquisition or similar Investment (including with respect to any Indebtedness contemplated or incurred in connection therewith), at the time of (or on the basis of the financial statements for the most recently ended Test Period at the time of) either (x) the execution of the definitive agreement with respect to such acquisition or Investment or (y) the consummation of such acquisition or Investment, (2) in the case of any Restricted Payment (including with respect to any Indebtedness contemplated or incurred in connection therewith), at the time of (or on the basis of the financial statements for the most recently ended Test Period at the time of) (x) the declaration of such Restricted Payment or (y) the making of such Restricted Payment and (3) in the case of any Restricted Debt Payment (including with respect to any Indebtedness contemplated or incurred in connection therewith), at the time of (or on the basis of the financial statements for the most recently ended Test Period at the time of) (x) delivery of irrevocable (which may be conditional) notice with respect to such Restricted Debt Payment or (y) the making of such Restricted Debt Payment, in each case, after giving effect, on a Pro Forma Basis, to (I) the relevant acquisition, Investment, Restricted Payment, Restricted Debt Payment and/or any related Indebtedness (including the intended use of proceeds thereof) and (II) to the extent definitive documents in respect thereof have been executed or the declaration of any Restricted Payment or delivery of notice with respect to a Restricted Debt Payment (which definitive documents, declaration or notice has not terminated or expired without the consummation thereof), any additional acquisition, Investment, Restricted Payment, Restricted Debt Payment and/or any related Indebtedness (including the intended use of proceeds thereof) that the Top Borrower has elected to be determined as set forth in this <u>clause (a)</u>.

(b)       For purposes of determining the permissibility of any action, change, transaction or event that requires a calculation of any financial ratio or test (including, without limitation, any First Lien Leverage Ratio test, any Secured Leverage Ratio test, any Total Leverage Ratio test and/or any Interest Coverage Ratio test and/or the amount of Consolidated Adjusted EBITDA or Consolidated Total Assets), such financial ratio or test shall be calculated at the time such action is taken (subject to <u>clause (a)</u> above), such change is made, such transaction is consummated or such event occurs, as the case may be, and no Default or Event of Default shall be deemed to have occurred solely as a result of a change in such financial ratio or test occurring after such calculation.

(c)       Notwithstanding anything to the contrary herein, with respect to any amount incurred or transaction entered into (or consummated) in reliance on a provision of this Agreement (including <u>Section 6.01(x)</u>, as it relates to the incurrence of any "fixed" or similar amount available under any ABL Facility and/or any Second Lien Facility) that does not require compliance with a financial ratio or test (including, without limitation, any First Lien Leverage Ratio test, any Secured Leverage Ratio test, any Total Leverage Ratio test and/or any Interest Coverage Ratio or fixed charge coverage ratio test) (any such amount, a "<u>Fixed Amount</u>") substantially concurrently with any amount incurred or transaction entered into (or consummated) in reliance on a provision of this Agreement (including <u>Section 6.01(x)</u>, as it relates to the incurrence of any "incurrence-based" or similar amount available under any ABL Facility and/or Second Lien Facility) that requires compliance with a financial ratio or test (including any First Lien Leverage Ratio test, any Secured Leverage Ratio test, any Total Leverage Ratio test and/or any Interest Coverage Ratio or fixed charge coverage ratio test) (any such amount, an "<u>Incurrence-Based Amount</u>"), it is understood and agreed that any Fixed Amount shall be disregarded in the calculation of the financial ratio or test applicable to the relevant Incurrence-Based Amount.

(d)       The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Top Borrower dated such date prepared in accordance with GAAP.

(e)       The increase in any amount secured by any Lien by virtue of the accrual of interest, the accretion of accreted value, the payment of interest or a dividend in the form of additional Indebtedness, amortization of original issue discount and/or any increase in the amount of Indebtedness outstanding solely as a result of any fluctuation in the exchange rate of any applicable currency will not be deemed to be the granting of a Lien for purposes of <u>Section 6.02</u>.

(f)     Whenever a financial ratio or test is to be calculated on a *pro forma* basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which internal financial statements of the Top Borrower are available (as determined in good faith by the Borrower).

Section 1.11.     Guarantees and Collateral.  Notwithstanding any provision of any Loan Document to the contrary:

(a)     For purposes of any determination relating to the ABL Priority Collateral as to which the Administrative Agent is granted discretion hereunder or under any other Loan Document (including any determination with respect to any waiver or extension or any opportunity to request that is permitted or required under the definition of "Collateral and Guarantee Requirement," under this Agreement or under any other Loan Document), the Administrative Agent shall be deemed to have agreed and accepted any determination in respect thereof by the Applicable Administrative Agent; and

(b)     For purposes of any determination relating to the Term Loan Priority Collateral as to which the Administrative Agent is granted discretion hereunder or under any other Loan Document (including any determination with respect to any waiver or extension or any opportunity to request that is permitted or required under the definition of "Collateral and Guarantee Requirement," under this Agreement or under any other Loan Document), the Administrative Agent shall be deemed to have agreed and accepted any determination in respect thereof by the Applicable Administrative Agent; it being understood and agreed that as of the Closing Date, the Administrative Agent is the Applicable Administrative Agent with respect to the Term Loan Priority Collateral.

ARTICLE 2

THE CREDITS

Section 2.01.     Commitments.

(a)     Subject to the terms and conditions set forth herein, each Initial Term Lender severally, and not jointly, agrees to make Initial Term Loans to the Borrowers on the Closing Date in Dollars in a principal amount not to exceed its Initial Term Loan Commitment.  Amounts paid or prepaid in respect of the Initial Term Loans may not be re-borrowed.

(b)     Subject to the terms and conditions of this Agreement and any applicable Refinancing Amendment or Incremental Facility Amendment, each Lender with an Additional Commitment of a given Class, severally and not jointly, agrees to make Additional Loans of such Class to the relevant Borrowers, which Loans shall not exceed for any such Lender at the time of any incurrence thereof the Additional Commitment of such Class of such Lender as set forth in the applicable Refinancing Amendment or Incremental Facility Amendment.

Section 2.02.     Loans and Borrowings.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class.

(b)     Subject to Section 2.14, each Borrowing shall be comprised entirely of ABR Loans or LIBO Rate Loans as any Borrower (or the Top Borrower on behalf of any Borrower) may request in accordance herewith.  Each Lender at its option may make any LIBO Rate Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that (i) any exercise of such option shall not affect the obligation of any Borrower to repay such Loan in accordance with the terms of this Agreement, (ii) such LIBO Rate Loan shall be deemed to have been made and held by such Lender, and the obligation of such

Borrower to repay such LIBO Rate Loan shall nevertheless be to such Lender for the account of such domestic or foreign branch or Affiliate of such Lender and (iii) in exercising such option, such Lender shall use reasonable efforts to minimize increased costs to any Borrower resulting therefrom (which obligation of such Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it otherwise determines would be disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.15 shall apply); provided, further, that no such domestic or foreign branch or Affiliate of such Lender shall be entitled to any greater indemnification under Section 2.17 in respect of any U.S. federal withholding tax with respect to such LIBO Rate Loan than that to which the applicable Lender was entitled on the date on which such Loan was made (except in connection with any indemnification entitlement arising as a result of any Change in Law after the date on which such Loan was made).

(c)     At the commencement of each Interest Period for any LIBO Rate Borrowing, such LIBO Rate Borrowing shall comprise an aggregate principal amount that is an integral multiple of $50,000 and not less than $250,000. Each ABR Borrowing when made shall be in a minimum principal amount of $50,000. Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than a total of 10 different Interest Periods in effect for LIBO Rate Borrowings at any time outstanding (or such greater number of different Interest Periods as the Administrative Agent may agree from time to time).

(d)     Notwithstanding any other provision of this Agreement, the Top Borrower shall not, nor shall it be entitled to, request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date applicable to the relevant Loans.

Section 2.03.    Requests for Borrowings.  Each Term Loan Borrowing, each conversion of Term Loans from one Type to the other, and each continuation of LIBO Rate Loans shall be made upon irrevocable notice by the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) to the Administrative Agent (provided that notices in respect of Term Loan Borrowings (x) to be made on the Closing Date may be conditioned on the closing of the Refinancing Transactions and (y) to be made in connection with any acquisition, investment or irrevocable repayment or redemption of Indebtedness may be conditioned on the closing of such Permitted Acquisition, permitted Investment or permitted irrevocable repayment or redemption of Indebtedness).  Each such notice must be in the form of a written Borrowing Request, appropriately completed and signed by a Responsible Officer of the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) or by telephone (and promptly confirmed by delivery of a written Borrowing Request, appropriately completed and signed by a Responsible Officer of the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower)) and must be received by the Administrative Agent (by hand delivery, fax or other electronic transmission (including ".pdf" or ".tif")) not later than (i) 1:00 p.m. three Business Days prior to the requested day of any Borrowing of, conversion to or continuation of LIBO Rate Loans (or one Business Day in the case of any Borrowing of LIBO Rate Loans to be made on the Closing Date) and (ii) 9:00 a.m. on the requested date of any Borrowing of or conversion to ABR Loans (or, in each case, such later time as is reasonably acceptable to the Administrative Agent); provided, however, that if the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) wishes to request LIBO Rate Loans having an Interest Period of other than one, two, three or six months in duration as provided in the definition of "Interest Period," (A) the applicable notice from the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) must be received by the Administrative Agent not later than 1:00 p.m. four Business Days prior to the requested date of the relevant Borrowing (or such later time as is reasonably acceptable to the Administrative Agent), conversion or continuation, whereupon the Administrative Agent shall give prompt notice to the appropriate Lenders of such request and determine whether the requested Interest Period is available to them and (B) not later than 12:00 p.m. three Business Days before the requested date of the relevant Borrowing, conversion or continuation, the Administrative Agent shall notify the relevant Borrower (or the Top Borrower as agent for the relevant Borrower) whether or not the requested Interest Period is available to the appropriate Lenders.

WEIL:\95874775\19\74339.0001

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested LIBO Rate Borrowing, then the relevant Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall advise each Lender of the details and amount of any Loan to be made as part of the relevant requested Borrowing (x) in the case of any ABR Borrowing, on the same Business Day of receipt of a Borrowing Request in accordance with this Section or (y) in the case of any LIBO Rate Borrowing, no later than one Business Day following receipt of a Borrowing Request in accordance with this Section.

Section 2.04.    [Reserved].

Section 2.05.    [Reserved].

Section 2.06.    [Reserved].

Section 2.07.    Funding of Borrowings.

(a)    Each Lender shall make each Loan to be made by it hereunder not later than (i) 1:00 p.m., in the case of LIBO Rate Loans, and (ii) 2:00 p.m., in the case of ABR Loans, in each case on the Business Day specified in the applicable Borrowing Request by wire transfer of immediately available funds to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders in an amount equal to such Lender's respective Applicable Percentage. The Administrative Agent will make such Loans available to the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) by promptly crediting the amounts so received on the same Business Day, in like funds, to the account designated in the relevant Borrowing Request or as otherwise directed by the Top Borrower.

(b)    Unless the Administrative Agent has received notice from any Lender that such Lender will not make available to the Administrative Agent such Lender's share of any Borrowing prior to the proposed date of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the relevant Borrower (or the Top Borrower as agent for the relevant Borrower) a corresponding amount. In such event, if any Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the relevant Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of any Borrower, the interest rate applicable to Loans comprising such Borrowing at such time. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing and the obligation of the relevant Borrower to repay the Administrative Agent such corresponding amount pursuant to this Section 2.07(b) shall cease. If any Borrower pays such amount to the Administrative Agent, the amount so paid shall constitute a repayment of such Borrowing by such amount. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Top Borrower or any other Loan Party may have against any Lender as a result of any default by such Lender hereunder.

Section 2.08.    Type; Interest Elections.

(a)    Each Borrowing shall initially be of the Type specified in the applicable Borrowing Request and, in the case of any LIBO Rate Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) may elect to convert any Borrowing to a Borrowing of a different Type or to continue such Borrowing and, in the case of a LIBO Rate Borrowing, may elect Interest Periods therefor, all as provided in

this Section. The relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders based upon their Applicable Percentages and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)      To make an election pursuant to this Section, the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) shall deliver an Interest Election Request, appropriately completed and signed by a Responsible Officer of the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) of the applicable election to the Administrative Agent.

If any such Interest Election Request requests a LIBO Rate Borrowing but does not specify an Interest Period, then the Top Borrower shall be deemed to have selected an Interest Period of one month's duration.

(c)      Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each applicable Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(d)      If the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) fails to deliver a timely Interest Election Request with respect to a LIBO Rate Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, such Borrowing shall be converted at the end of such Interest Period to an ABR Borrowing. Notwithstanding anything to the contrary herein, if an Event of Default exists and the Administrative Agent, at the request of the Required Lenders, so notifies the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower), then, so long as such Event of Default exists (i) no outstanding Borrowing may be converted to or continued as a LIBO Rate Borrowing and (ii) unless repaid, each LIBO Rate Borrowing shall be converted to an ABR Borrowing at the end of the then-current Interest Period applicable thereto.

Section 2.09.      Termination and Reduction of Commitments.  Unless previously terminated, (i) the Initial Term Commitments on the Closing Date shall automatically terminate upon the making of the Initial Term Loans on the Closing Date, (ii) the Additional Term Loan Commitments of any Class shall automatically terminate upon the making of the Additional Term Loans of such Class and, if any such Additional Term Loan Commitment is not drawn on the date that such Additional Term Loan Commitment is required to be drawn pursuant to the applicable Incremental Facility Amendment, Extension Amendment or Refinancing Amendment, as applicable, the undrawn amount thereof shall automatically terminate and (iii) the Additional Revolving Credit Commitments of any Class shall automatically terminate on the Maturity Date specified therefor in the applicable Incremental Facility Amendment, Extension Amendment or Refinancing Amendment, as applicable.

Section 2.10.      Repayment of Loans; Evidence of Debt.

(a)      (i) The Borrowers hereby jointly and severally unconditionally promise to repay the outstanding principal amount of the Initial Term Loans to the Administrative Agent for the account of each Term Lender (i) commencing April 3, 2017, on the first Business Day of each January, April, July and October prior to the Initial Term Loan Maturity Date (each such date being referred to as a "Loan Installment Date"), in each case in an amount equal to 0.25% of the original principal amount of the Initial Term Loans (as such payments may be reduced from time to time as a result of the application of prepayments in accordance with Section 2.11 and repurchases and assignments in accordance with Section 9.05(g) or increased as a result of any increase in the amount of such Initial Term Loans pursuant to Section 2.22(a)), and (ii) on the Initial Term Loan Maturity Date, in an amount equal to the remainder of the principal amount of the Initial Term Loans outstanding on such date, together in each case with accrued and unpaid interest on the principal amount to be paid to but excluding the date of such payment.

(ii)      The relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) shall repay the Additional Term Loans of any Class in such scheduled amortization installments and

on such date or dates as shall be specified therefor in the applicable Refinancing Amendment, Incremental Facility Amendment or Extension Amendment (as such payments may be reduced from time to time as a result of the application of prepayments in accordance with Section 2.11 or repurchases in accordance with Section 9.05(g) or increased as a result of any increase in the amount of such Additional Term Loans of such Class pursuant to Section 2.22(a)).

(b)    [Reserved].

(c)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder and the Class and Type thereof and the Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from each Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the accounts of the Lenders and each Lender's share thereof.

(e)    The entries made in the accounts maintained pursuant to paragraphs (c) or (d) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein (absent manifest error); provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any manifest error therein shall not in any manner affect the obligation of any Borrower to repay the Loans in accordance with the terms of this Agreement; provided, further, that in the event of any inconsistency between the accounts maintained by the Administrative Agent pursuant to paragraph (d) of this Section and any Lender's records, the accounts of the Administrative Agent shall govern.

(f)    Any Lender may request that any Loan made by it be evidenced by a Promissory Note.  In such event, the relevant Borrower shall prepare, execute and deliver a Promissory Note to such Lender payable to such Lender and its registered permitted assigns; it being understood and agreed that such Lender (and/or its applicable permitted assign) shall be required to return such Promissory Note to the Top Borrower in accordance with Section 9.05(b)(iii) and upon the occurrence of the Termination Date (or as promptly thereafter as practicable).  If any Lender loses the original copy of its Promissory Note, it shall execute an affidavit of loss containing an indemnification provision reasonably satisfactory to the Top Borrower.

Section 2.11.    Prepayment of Loans.

(a)    Optional Prepayments.

(i)    Upon prior notice in accordance with paragraph (a)(iii) of this Section 2.11, any Borrower (or the Top Borrower on behalf of any Borrower) shall have the right at any time and from time to time to prepay any Borrowing of Term Loans of any Class in whole or in part without premium or penalty (but subject (A) in the case of Borrowings of Initial Term Loans only, to Section 2.12(c) and (B) if applicable, to Section 2.16).  Each such prepayment shall be paid to the Lenders in accordance with their respective Applicable Percentages of the relevant Class.

(ii)    [Reserved].

(iii)    The relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) shall notify the Administrative Agent in writing of any prepayment under this Section 2.11(a) (i) in the case of any prepayment of a LIBO Rate Borrowing, not later than 1:00 p.m. three Business Days before the date of prepayment or (ii) in the case of any prepayment of an ABR Borrowing, not later than 11:00 a.m. on the day of prepayment (or, in each case, such later time as to which the Administrative Agent may reasonably agree).  Each such notice shall be irrevocable (except as set

forth in the proviso to this sentence) and shall specify the prepayment date and the principal amount of each Borrowing or portion or each relevant Class to be prepaid; <u>provided</u> that any notice of prepayment delivered by the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) may be conditioned upon the effectiveness of other transactions, in which case such notice may be revoked by the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Promptly following receipt of any such notice relating to any Borrowing, the Administrative Agent shall advise the applicable Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount at least equal to the amount that would be permitted in the case of a Borrowing of the same Type and Class as provided in <u>Section 2.02(c)</u>, or such lesser amount that is then outstanding with respect to such Borrowing being repaid (and in increments of $100,000 in excess thereof or such lesser incremental amount that is then outstanding with respect to such Borrowing being repaid). Each prepayment of Term Loans shall be applied to the Class or Classes of Term Loans specified in the applicable prepayment notice, and each prepayment of Term Loans of such Class or Classes made pursuant to this <u>Section 2.11(a)</u> shall be applied against the remaining scheduled installments of principal due in respect of the Term Loans of such Class or Classes in the manner specified by the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) or, in the absence of any such specification on or prior to the date of the relevant optional prepayment, in direct order of maturity.

(b)     <u>Mandatory Prepayments</u>.

(i)     No later than the fifth Business Day after the date on which the financial statements with respect to each Fiscal Year of the Top Borrower are required to be delivered pursuant to <u>Section 5.01(b)</u>, commencing with the Fiscal Year ending on or about December 31, 2017, the Top Borrower shall prepay the outstanding principal amount of Initial Term Loans and Additional Term Loans then subject to ratable prepayment requirements in accordance with <u>clause (vi)</u> of this <u>Section 2.11(b)</u> below in an aggregate principal amount (the "<u>ECF Prepayment Amount</u>") equal to (A) the Required Excess Cash Flow Percentage of Excess Cash Flow of the Top Borrower and its Restricted Subsidiaries for the Excess Cash Flow Period then ended, <u>minus</u> (B) at the option of the Top Borrower, (w) the aggregate principal amount of (I) any Loans prepaid pursuant to <u>Section 2.11(a)</u> prior to such date (including, in the case of the prepayment of any Additional Revolving Loans, to the extent accompanied by a permanent reduction in the relevant commitment) and (II) any Incremental Equivalent Debt and/or Replacement Debt optionally prepaid or redeemed prior to such date, (x) the aggregate principal amount of (I) any loans under the Second Lien Facility (including any Additional Loans (as defined in the Second Lien Credit Agreement or any other document governing any Second Lien Facility)) prepaid pursuant to Section 2.11(a) of the Second Lien Credit Agreement (or equivalent provision under any other document governing any Second Lien Facility) and (II) any Incremental Equivalent Debt (as defined in the Second Lien Credit Agreement or any other document governing any Second Lien Facility) and Replacement Debt (as defined in the Second Lien Credit Agreement or any other document governing any Second Lien Facility) optionally prepaid or redeemed, in each case, prior to such date (to the extent the relevant voluntary prepayment is permitted by the terms of this Agreement), (y) the aggregate principal amount of any Revolving Loans (as defined in the ABL Credit Agreement) prepaid pursuant to <u>Section 2.11(a)</u> of the ABL Credit Agreement (or equivalent provision under any other document governing any ABL Facility) prior to such date (to the extent accompanied by a permanent reduction in the relevant commitment) and (z)(1) the amount of any reduction in the outstanding amount of (I) any Term Loans resulting from any purchase or assignment made in accordance with <u>Section 9.05(g)</u> (including in connection with any Dutch Auction) and (II) any Incremental Equivalent Debt and/or Replacement Debt resulting from any purchase or assignment made by an Affiliated Lender or any Loan Party, as applicable, and/or (2) to the extent the relevant Restricted Debt Payment is permitted by the terms of this Agreement, the amount of any reduction in the outstanding amount of (I) any loans under any Second Lien Facility resulting from any purchase or assignment made in accordance with Section 9.05(g) of the Second

Lien Credit Agreement (or equivalent provision under any other document governing any Second Lien Facility) (including in connection with any Dutch Auction (as defined in the Second Lien Credit Agreement)) and (II) any Incremental Equivalent Debt (as defined in the Second Lien Credit Agreement or any other document governing any Second Lien Facility) and Replacement Debt (as defined in the Second Lien Credit Agreement or any other document governing any Second Lien Facility) resulting from any purchase or assignment made by an Affiliated Lender or any Loan Party, as applicable, in each case, prior to such date and, in each case under this clause (z), based upon the actual amount of cash paid in connection with the relevant purchase or assignment, in each case (I) excluding any such optional prepayment made during such Fiscal Year that reduced the amount required to be prepaid pursuant to this Section 2.11(b)(i) in the prior Fiscal Year and (II) to the extent that the relevant prepayments were not financed with the proceeds of other Indebtedness (other than revolving Indebtedness) of the Top Borrower or its Restricted Subsidiaries); provided that no prepayment under this Section 2.11(b) shall be required unless and to the extent the amount thereof would exceed $15,000,000; provided, further, that if at the time that any such prepayment would be required, the Borrower (or any Restricted Subsidiary of the Borrower) is also required to prepay any Indebtedness that is secured on a pari passu basis with any Secured Obligation that is secured on a first lien basis pursuant to the terms of the documentation governing such Indebtedness (such Indebtedness required to be so prepaid or offered to be so repurchased, "Other Applicable Indebtedness") with any portion of the ECF Prepayment Amount, then the Borrower may apply such portion of the ECF Prepayment Amount on a pro rata basis (determined on the basis of the aggregate outstanding principal amount of the Term Loans and the relevant Other Applicable Indebtedness at such time; provided, that the portion of such ECF Prepayment Amount allocated to the Other Applicable Indebtedness shall not exceed the amount of such ECF Prepayment Amount required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such ECF Prepayment Amount shall be allocated to the Term Loans in accordance with the terms hereof) to the prepayment of the Term Loans and to the prepayment of the relevant Other Applicable Indebtedness, and the amount of prepayment of the Term Loans that would have otherwise been required pursuant to this Section 2.11(b)(i) shall be reduced accordingly; provided, further, that to the extent the holders of Other Applicable Indebtedness decline to have such indebtedness prepaid, the declined amount shall promptly (and in any event within ten Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof.

(ii)     No later than the fifth Business Day following the receipt of Net Proceeds in respect of any Prepayment Asset Sale or Net Insurance/Condemnation Proceeds, in each case, in excess of $20,000,000 in any Fiscal Year, the Top Borrower shall apply an amount equal to the Required Asset Sale Percentage of the Net Proceeds or Net Insurance/Condemnation Proceeds received with respect thereto in excess of such threshold (collectively, the "Subject Proceeds") to prepay the outstanding principal amount of Initial Term Loans and Additional Term Loans then subject to ratable prepayment requirements (the "Subject Loans") in accordance with clause (vi) below; provided that (A) if prior to the date any such prepayment is required to be made, the Top Borrower notifies the Administrative Agent of its intention to reinvest the Subject Proceeds in the business (other than Cash or Cash Equivalents) of the Top Borrower or any of its subsidiaries, then so long as no Event of Default then exists, the Top Borrower shall not be required to make a mandatory prepayment under this clause (ii) in respect of the Subject Proceeds to the extent (x) the Subject Proceeds are so reinvested within 365 days following receipt thereof, or (y) the Top Borrower or any of its subsidiaries has committed to so reinvest the Subject Proceeds during such 365-day period and the Subject Proceeds are so reinvested within 180 days after the expiration of such 365-day period; it being understood that if the Subject Proceeds have not been so reinvested prior to the expiration of the applicable period, the Top Borrower shall promptly prepay the Subject Loans with the amount of Subject Proceeds not so reinvested as set forth above (without regard to the immediately preceding proviso) and (B) if, at the time that any such prepayment would be required hereunder, the Top Borrower or any of its Restricted Subsidiaries is required to repay or repurchase any Other Applicable Indebtedness (or offer to

repurchase such Other Applicable Indebtedness), then the relevant Person may apply the Subject Proceeds on a pro rata basis to the prepayment of the Subject Loans and to the repurchase or repayment of the Other Applicable Indebtedness (determined on the basis of the aggregate outstanding principal amount of the Subject Loans and the Other Applicable Indebtedness (or accreted amount if such Other Applicable Indebtedness is issued with original issue discount) at such time); it being understood that (1) the portion of the Subject Proceeds allocated to the Other Applicable Indebtedness shall not exceed the amount of the Subject Proceeds required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, (and the remaining amount, if any, of the Subject Proceeds shall be allocated to the Subject Loans in accordance with the terms hereof), and the amount of the prepayment of the Subject Loans that would have otherwise been required pursuant to this Section 2.11(b)(ii) shall be reduced accordingly and (2) to the extent the holders of the Other Applicable Indebtedness decline to have such Indebtedness prepaid or repurchased, the declined amount shall promptly (and in any event within ten Business Days after the date of such rejection) be applied to prepay the Subject Loans in accordance with the terms hereof.

(iii)    In the event that the Top Borrower or any of its Restricted Subsidiaries receives Net Proceeds from the issuance or incurrence of Indebtedness by the Top Borrower or any of its Restricted Subsidiaries (other than Indebtedness that is permitted to be incurred under Section 6.01, except to the extent the relevant Indebtedness constitutes (A) Refinancing Indebtedness (including Replacement Debt) incurred to refinance all or a portion of any Class of Term Loans pursuant to Section 6.01(p), (B) Incremental Loans incurred to refinance all or a portion of any Class of Term Loans pursuant to Section 2.22, (C) Replacement Term Loans incurred to refinance all or any portion of any Class of Term Loans in accordance with the requirements of Section 9.02(c) and/or (D) Incremental Equivalent Debt incurred to finance all or a portion of the Loans in accordance with the requirements of Section 6.01(z), in each case to the extent required by the terms thereof to prepay or offer to prepay such Indebtedness), the Top Borrower shall, promptly upon (and in any event not later than two Business Days thereafter) the receipt thereof of such Net Proceeds by the Top Borrower or its applicable Restricted Subsidiary, apply an amount equal to 100% of such Net Proceeds to prepay the outstanding principal amount of the relevant Class or Classes of Term Loans in accordance with clause (vi) below.

(iv)    Notwithstanding anything in this Section 2.11(b) to the contrary:

(A)    the Borrowers shall not be required to prepay any amount that would otherwise be required to be paid pursuant to Sections 2.11(b)(i) or (ii) above to the extent that if the Top Borrower determines in good faith the relevant Excess Cash Flow is generated by any Foreign Subsidiary, the relevant Prepayment Asset Sale is consummated by any Foreign Subsidiary or the relevant Net Insurance/Condemnation Proceeds are received by any Foreign Subsidiary, as the case may be, for so long as the repatriation to the Borrowers of any such amount would be, in the good faith determination of the Top Borrower, prohibited or delayed under any Requirement of Law or conflict with the fiduciary duties of such Foreign Subsidiary's directors, or result in, or could reasonably be expected to result in, a material risk of personal or criminal liability for any officer, director, employee, manager, member of management or consultant of such Foreign Subsidiary (it being understood and agreed that (i) solely within 365 days following the end of the applicable Excess Cash Flow Period or the event giving rise to the relevant Subject Proceeds, the Borrowers shall take all commercially reasonable actions required by applicable Requirements of Law to permit such repatriation and (ii) if the repatriation of the relevant affected Excess Cash Flow or Subject Proceeds, as the case may be, is permitted under the applicable Requirement of Law and, to the extent applicable, would no longer conflict with the fiduciary duties of such director, or result in, or be reasonably expected to result in, a material risk of personal or criminal liability for the Persons described above, in either case, within 365 days following the end of the applicable Excess Cash Flow Period or the event giving rise to the relevant Subject Proceeds, the

WEIL:\95874775\19\74339.0001

relevant Foreign Subsidiary will promptly repatriate the relevant Excess Cash Flow or Subject Proceeds, as the case may be, and the repatriated Excess Cash Flow or Subject Proceeds, as the case may be, will be promptly (and in any event not later than two Business Days after such repatriation) applied (net of additional Taxes payable or reserved against such Excess Cash Flow or such Subject Proceeds as a result thereof) to the repayment of the Term Loans pursuant to this Section 2.11(b) to the extent required herein (without regard to this clause (iv))),

(B)     the Borrowers shall not be required to prepay any amount that would otherwise be required to be paid pursuant to Sections 2.11(b)(i) or (ii) to the extent that the relevant Excess Cash Flow is generated by any joint venture or the relevant Subject Proceeds are received by any joint venture, in each case, for so long as the distribution to the Top Borrower of such Excess Cash Flow or Subject Proceeds would, in the good faith determination of the Top Borrower, be prohibited under the Organizational Documents governing such joint venture; it being understood that if the relevant prohibition ceases to exist within the 365-day period following the end of the applicable Excess Cash Flow Period or the event giving rise to the relevant Subject Proceeds, the relevant joint venture will promptly distribute the relevant Excess Cash Flow or the relevant Subject Proceeds, as the case may be, and the distributed Excess Cash Flow or Subject Proceeds, as the case may be, will be promptly (and in any event not later than two Business Days after such distribution) applied to the repayment of the Term Loans pursuant to this Section 2.11(b) to the extent required herein (without regard to this clause (iv)), and

(C)     if the Top Borrower determines in good faith that the repatriation (or other intercompany distribution) to the Top Borrower, directly or indirectly, from a Foreign Subsidiary as a distribution or dividend of any amounts required to mandatorily prepay the Term Loans pursuant to Sections 2.11(b)(i) or (ii) above would result in the Top Borrower or any Restricted Subsidiary incurring a material and adverse Tax liability (including any withholding Tax) (such amount, a "Restricted Amount"), the amount that the Borrowers shall be required to mandatorily prepay pursuant to Sections 2.11(b)(i) or (ii) above, as applicable, shall be reduced by the Restricted Amount; provided that to the extent that the repatriation (or other intercompany distribution) of the relevant Subject Proceeds or Excess Cash Flow, directly or indirectly, from the relevant Foreign Subsidiary would no longer have a material adverse tax consequence within the 365-day period following the event giving rise to the relevant Subject Proceeds or the end of the applicable Excess Cash Flow Period, as the case may be, an amount equal to the Subject Proceeds or Excess Cash Flow, as applicable and to the extent available, not previously applied pursuant to this clause (C), shall be promptly applied to the repayment of the Term Loans pursuant to Section 2.11(b) as otherwise required above;

(v)     Any Term Lender may elect, by notice to the Administrative Agent at or prior to the time and in the manner specified by the Administrative Agent, prior to any prepayment of Term Loans required to be made by the Borrowers pursuant to this Section 2.11(b), to decline all (but not a portion) of its Applicable Percentage of such prepayment (such declined amounts, the "Declined Proceeds"), in which case such Declined Proceeds shall first be applied to any mandatory prepayment required under Section 2.11(b) of the Second Lien Credit Agreement (or equivalent provision under any other document governing any Second Lien Facility) and any mandatory prepayment required with respect to any "Incremental Term Loan", "Extended Term Loan" and/or "Replaced Term Loan" (in each case, as defined under the Second Lien Credit Agreement or any equivalent term under any Second Lien Facility); provided that (A) in the event that any lender under the Second Lien Facility elects to decline (or otherwise waives) receipt of such Declined Proceeds in accordance with the terms of the Second Lien Credit Agreement, the remaining amount thereof may be retained by the Borrowers and (B) for the avoidance of doubt, no Lender may reject any prepayment made under

<u>Section 2.11(b)(iii)</u> above to the extent that such prepayment is made with the Net Proceeds of (w) Refinancing Indebtedness (including Replacement Debt) incurred to refinance all or a portion of the Term Loans pursuant to <u>Section 6.01(p)</u>, (x) Incremental Loans incurred to refinance all or a portion of the Term Loans pursuant to <u>Section 2.22</u>, (y) Replacement Term Loans incurred to refinance all or any portion of the Term Loans in accordance with the requirements of <u>Section 9.02(c)</u> and/or (z) Incremental Equivalent Debt incurred to finance all or a portion of the Loans in accordance with the requirements of <u>Section 6.01(z)</u>. If any Lender fails to deliver a notice to the Administrative Agent of its election to decline receipt of its Applicable Percentage of any mandatory prepayment within the time frame specified by the Administrative Agent, such failure will be deemed to constitute an acceptance of such Lender's Applicable Percentage of the total amount of such mandatory prepayment of Term Loans.

(vi)     Except as otherwise contemplated by this Agreement or provided in, or intended with respect to, any Refinancing Amendment, any Incremental Facility Amendment, any Extension Amendment or any issuance of Replacement Debt (<u>provided</u>, that such Refinancing Amendment, Incremental Facility Amendment or Extension Amendment may not provide that the applicable Class of Term Loans receive a greater than pro rata portion of mandatory prepayments of Term Loans pursuant to <u>Section 2.11(b)</u> than would otherwise be permitted by this Agreement), in each case effectuated or issued in a manner consistent with this Agreement, each prepayment of Term Loans pursuant to <u>Section 2.11(b)</u> shall be applied ratably to each Class of Term Loans then outstanding which is *pari passu* with the Initial Term Loans in right of payment and with respect to security (<u>provided</u> that any prepayment of Term Loans with the Net Proceeds of any Refinancing Indebtedness, Incremental Term Facility or Replacement Term Loans shall be applied to the applicable Class of Term Loans being refinanced or replaced). With respect to each relevant Class of Term Loans, all accepted prepayments under this <u>Section 2.11(b)</u> shall be applied against the remaining scheduled installments of principal due in respect of such Term Loans as directed by the Top Borrower (or, in the absence of direction from the Top Borrower, to the remaining scheduled amortization payments in respect of such Term Loans in direct order of maturity), and each such prepayment shall be paid to the Term Lenders in accordance with their respective Applicable Percentage of the applicable Class. If no Lenders exercise the right to waive a prepayment of the Term Loans pursuant to <u>Section 2.11(b)(v)</u>, the amount of such mandatory prepayments shall be applied first to the then outstanding Term Loans that are ABR Loans to the full extent thereof and then to the then outstanding Term Loans that are LIBO Rate Loans in a manner that minimizes the amount of any payments required to be made by the Top Borrower pursuant to <u>Section 2.16</u>.

(vii)     Prepayments made under this <u>Section 2.11(b)</u> shall be (A) accompanied by accrued interest as required by <u>Section 2.13</u>, (B) subject to <u>Section 2.16</u> and (C) in the case of prepayments of Initial Term Loans under <u>clause (iii)</u> above as part of a Repricing Transaction, subject to <u>Section 2.12(c)</u>, but shall otherwise be without premium or penalty.

Section 2.12.     <u>Fees</u>.

(a)     The Top Borrower agrees to pay to the Administrative Agent, for its own account, the annual administration fee described in the Fee Letter.

(b)     All fees payable hereunder shall be paid on the dates due, in Dollars and in immediately available funds, to the Administrative Agent. Fees paid shall not be refundable under any circumstances except as otherwise provided in the Fee Letter. Fees payable hereunder shall accrue through and including the last day of the month immediately preceding the applicable fee payment date.

(c)     In the event that, on or prior to the date that is six months after the Closing Date, the Top Borrower (A) prepays, repays, refinances, substitutes or replaces any Initial Term Loans in connection with a Repricing Transaction (including, for the avoidance of doubt, any prepayment made pursuant to

Section 2.11(b)(iii) that constitutes a Repricing Transaction), or (B) effects any amendment, modification or waiver of, or consent under, this Agreement resulting in a Repricing Transaction, the Borrowers shall pay to the Administrative Agent, for the ratable account of each of the applicable Initial Term Lenders, (I) in the case of clause (A), a premium of 1.00% of the aggregate principal amount of the Initial Term Loans so prepaid, repaid, refinanced, substituted or replaced and (II) in the case of clause (B), a fee equal to 1.00% of the aggregate principal amount of the Initial Term Loans that are the subject of such Repricing Transaction outstanding immediately prior to such amendment.  If, on or prior to the date that is six months after the Closing Date, all or any portion of the Initial Term Loans held by any Term Lender are prepaid, repaid, refinanced, substituted or replaced pursuant to Section 2.19(b)(iv) as a result of, or in connection with, such Term Lender not agreeing or otherwise consenting to any waiver, consent, modification or amendment referred to in clause (B) above (or otherwise in connection with a Repricing Transaction), such prepayment, repayment, refinancing, substitution or replacement will be made at 101% of the principal amount so prepaid, repaid, refinanced, substituted or replaced.  All such amounts shall be due and payable on the date of effectiveness of such Repricing Transaction.

(d)     Unless otherwise indicated herein, all computations of fees shall be made on the basis of a 360-day year and shall be payable for the actual days elapsed (including the first day but excluding the last day).  The determination by the Administrative Agent of the amount of any fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.13.     Interest.

(a)     The Term Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)     The Term Loans comprising each LIBO Rate Borrowing shall bear interest at the LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)     [Reserved].

(d)     Notwithstanding the foregoing but in all cases subject to Section 9.05(f), if any principal of or interest on any Term Loan or any fee payable by any Borrower hereunder is not, in each case, paid when due, whether at stated maturity, upon acceleration or otherwise, the relevant overdue amount shall bear interest, to the fullest extent permitted by applicable Requirements of Law, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal or interest of any Term Loan, 2.00% plus the rate otherwise applicable to such Term Loan as provided in the preceding paragraphs of this Section 2.13 or (ii) in the case of any other amount, 2.00% plus the rate applicable to Term Loans that are ABR Loans as provided in clause (a) of this Section 2.13; provided that no amount shall accrue pursuant to this Section 2.13(c) on any overdue amount or other amount that is payable to any Defaulting Lender so long as such Lender is a Defaulting Lender.

(e)     Accrued interest on each Term Loan shall be payable in arrears on each Interest Payment Date for such Term Loan and on the Maturity Date applicable to such Term Loan; provided that (A) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand and (B) in the event of any repayment or prepayment of any Term Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(f)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.  Interest shall accrue on each Loan for the day on

which the Loan is made and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall bear interest for one day.

Section 2.14.    Alternate Rate of Interest.  If at least two Business Days prior to the commencement of any Interest Period for a LIBO Rate Borrowing:

(a)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the LIBO Rate for such Interest Period; or

(b)    the Administrative Agent is advised by the Required Lenders that the LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall promptly give notice thereof to the Top Borrower and the Lenders by telephone or facsimile as promptly as practicable thereafter and, until the Administrative Agent notifies the Top Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, which the Administrative Agent agrees promptly to do, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a LIBO Rate Borrowing shall be ineffective and such Borrowing shall be converted to an ABR Borrowing on the last day of the Interest Period applicable thereto, and (ii) if any Borrowing Request requests a LIBO Rate Borrowing, such Borrowing shall be made as an ABR Borrowing.

Section 2.15.    Increased Costs.

(a)    If any Change in Law:

(i)    imposes, modifies or deems applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the LIBO Rate);

(ii)    subject any Lender to any Taxes (other than (A) Indemnified Taxes and Other Taxes indemnifiable under Section 2.17 and (B) Excluded Taxes) on or with respect to its loans, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    imposes on any Lender or the London interbank market any other condition (other than Taxes) affecting this Agreement or LIBO Rate Loans made by any Lender;

and the result of any of the foregoing is to increase the cost to the relevant Lender of making or maintaining any LIBO Rate Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or otherwise) in respect of any LIBO Rate Loan in an amount deemed by such Lender to be material, then, within 30 days after the Top Borrower's receipt of the certificate contemplated by paragraph (c) of this Section, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender, for such additional costs incurred or reduction suffered; provided that the Top Borrower shall not be liable for such compensation if (x) the relevant Change in Law occurs on a date prior to the date such Lender becomes a party hereto, (y) such Lender invokes Section 2.20 or (z) in the case of any request for reimbursement under clause (iii) above resulting from a market disruption, (A) the relevant circumstances do not generally affect the banking market or (B) the applicable request has not been made by Lenders constituting Required Lenders.

71

(b)        If any Lender determines that any Change in Law regarding liquidity or capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law other than due to Taxes (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then within 30 days of receipt by the Top Borrower of the certificate contemplated by paragraph (c) of this Section 2.15 the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)        Any Lender requesting compensation under this Section 2.15 shall be required to deliver a certificate to the Top Borrower that (i) sets forth the amount or amounts necessary to compensate such Lender or the holding company thereof, as applicable, as specified in paragraph (a) of this Section 2.15, (ii) sets forth, in reasonable detail, the manner in which such amount or amounts were determined and (iii) certifies that such Lender is generally charging such amounts to similarly situated borrowers, which certificate shall be conclusive absent manifest error.

(d)        Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, however that the Borrowers shall not be required to compensate any Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16.        Break Funding Payments.        Subject to Section 9.05(f), in the event of (a) the conversion or prepayment of any principal of any LIBO Rate Loan other than on the last day of an Interest Period applicable thereto (whether voluntary, mandatory, automatic, by reason of acceleration or otherwise), (b) the failure to borrow, convert, continue or prepay any LIBO Rate Loan on the date or in the amount specified in any notice delivered pursuant hereto or (c) the assignment of any LIBO Rate Loan of any Lender other than on the last day of the Interest Period applicable thereto as a result of a request by the Top Borrower pursuant to Section 2.19, then, in any such event, the Borrowers shall compensate each Lender for the actual amount of any actual out-of-pocket loss, expense and/or liability (including any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund or maintain LIBO Rate Loans, but excluding loss of anticipated profit) that such Lender may incur or sustain as a result of such event.  Any Lender requesting compensation under this Section 2.16 shall be required to deliver a certificate to the Top Borrower that (A) sets forth any amount or amounts that such Lender is entitled to receive pursuant to this Section, the basis therefor and, in reasonable detail, the manner in which such amount or amounts were determined and (B) certifies that such Lender is generally charging the relevant amounts to similarly situated borrowers, which certificate shall be conclusive absent manifest error. The Top Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

Section 2.17.        Taxes.

(a)        Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable Requirements of Law.  If any applicable Requirement of Law requires the deduction or withholding of any Tax from any such payment, then (i) if such Tax is an Indemnified Tax and/or Other Tax, the amount payable by the applicable Loan Party shall be increased as necessary so that after all required deductions or withholdings have been made (including deductions or withholdings applicable to additional sums payable under this Section 2.17) each Lender (or, in the case of any payment made to the Administrative

Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent shall be entitled to make such deductions or withholdings  and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)    In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)    The Borrowers shall jointly and severally indemnify the Administrative Agent and each Lender within 30 days after receipt of the certificate described in the succeeding sentence, for the full amount of any Indemnified Taxes or Other Taxes payable or paid by the Administrative Agent or such Lender, as applicable (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17), other than any penalties determined by a final and non-appealable judgment of a court of competent jurisdiction (or documented in any settlement agreement) to have resulted from the gross negligence, bad faith or willful misconduct of the Administrative Agent or such Lender, and, in each case, any reasonable expenses arising therefrom or with respect thereto, whether or not correctly or legally imposed or asserted; provided that if the Top Borrower reasonably believes that such Taxes were not correctly or legally asserted, the Administrative Agent or such Lender, as applicable, will use reasonable efforts to cooperate with the Top Borrower to obtain a refund of such Taxes (which shall be repaid to the Top Borrower in accordance with Section 2.17(g)) so long as such efforts would not, in the sole determination of the Administrative Agent or such Lender, result in any additional out-of-pocket costs or expenses not reimbursed by such Loan Party or be otherwise materially disadvantageous to the Administrative Agent or such Lender, as applicable.  In connection with any request for reimbursement under this Section 2.17(c), the relevant Lender or the Administrative Agent, as applicable, shall deliver a certificate to the Top Borrower setting forth, in reasonable detail, the basis and calculation of the amount of the relevant payment or liability.  Notwithstanding anything to the contrary contained in this Section 2.17, no Borrower shall be required to indemnify the Administrative Agent or any Lender pursuant to this Section 2.17 for any amount to the extent the Administrative Agent or such Lender fails to notify the Top Borrower of such possible indemnification claim within 180 days after the Administrative Agent or such Lender receives written notice from the applicable taxing authority of the specific tax assessment giving rise to such indemnification claim.

(d)    [Reserved].

(e)    As soon as practicable after any payment of any Taxes pursuant to this Section 2.17 by any Loan Party to a Governmental Authority, the Top Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued, if any, by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment that is reasonably satisfactory to the Administrative Agent.

(f)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of any withholding Tax with respect to any payments made under any Loan Document shall deliver to the Top Borrower and the Administrative Agent, at the time or times reasonably requested by the Top Borrower or the Administrative Agent, such properly completed and executed documentation as the Top Borrower or the Administrative Agent may reasonably request to permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Top Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Top Borrower or the Administrative Agent as will enable the Top Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Each Lender hereby authorizes the Administrative Agent to deliver to the Top Borrower and to any successor

Administrative Agent any documentation provided to the Administrative Agent pursuant to this <u>Section 2.17(f)</u>.

(ii)     Without limiting the generality of the foregoing,

(A)     each U.S. Lender shall deliver to the Top Borrower and the Administrative Agent on or prior to the date on which such U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Top Borrower or the Administrative Agent), two executed original copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding;

(B)     each Foreign Lender shall deliver to the Top Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Top Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of any Foreign Lender claiming the benefits of an income tax treaty to which the U.S. is a party, two executed original copies of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing any available exemption from, or reduction of, U.S. federal withholding Tax;

(2)     two executed original copies of IRS Form W-8ECI or W-EXP (or any successor forms);

(3)     in the case of any Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or 881(c) of the Code, (x) two executed original copies of a certificate substantially in the form of <u>Exhibit O-1</u> to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Top Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments payable to such Lender are effectively connected with the conduct of a U.S. trade or business (a "U.S. Tax Compliance Certificate") and (y) two executed original copies of IRS Form W-8BEN or W-8BEN-E, as applicable (or any successor forms); or

(4)     to the extent any Foreign Lender is not the beneficial owner (*e.g.*, where the Foreign Lender is a partnership), two executed original copies of IRS Form W-8IMY (or any successor forms), accompanied by IRS Form W-8ECI, IRS Form W-8EXP, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit O-2</u> or <u>Exhibit O-4</u>, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; <u>provided</u> that if such Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit O-3</u> on behalf of each such direct or indirect partner(s);

(C)     each Foreign Lender shall deliver to the Top Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Top Borrower or the Administrative Agent), two executed original copies of any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary

documentation as may be prescribed by applicable Requirements of Law to permit the Top Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to any Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Top Borrower and the Administrative Agent at the time or times prescribed by applicable Requirements of Law and at such time or times reasonably requested by the Top Borrower or the Administrative Agent such documentation as is prescribed by applicable Requirements of Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and may be necessary for the Top Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

For the avoidance of doubt, if a Lender is an entity disregarded from its owner for U.S. federal income tax purposes, references to the foregoing documentation are intended to refer to documentation with respect to such Lender's owner and, as applicable, such Lender.

Each Lender agrees that if any documentation (including any specific documentation required above in this Section 2.17(f)) it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall deliver to the Top Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Top Borrower or the Administrative Agent) or promptly notify the Top Borrower and the Administrative Agent in writing of its legal ineligibility to do so.

Notwithstanding anything to the contrary in this Section 2.17(f), no Lender shall be required to provide any documentation that such Lender is not legally eligible to deliver.

(g) If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund (whether received in cash or applied as a credit against any cash taxes payable) of any Indemnified Taxes or Other Taxes as to which it has been indemnified by any Borrower or with respect to which any Borrower has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to the Top Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the relevant Borrower under this Section 2.17 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Top Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the Administrative Agent or any Lender be required to pay any amount to the Top Borrower pursuant to this paragraph (g) to the extent that the payment thereof would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the position that the Administrative Agent or such Lender would have been in if the Tax subject to indemnification had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid. This Section 2.17 shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the relevant Loan Party or any other Person.

(h)     Survival.  Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.18.     Payments Generally; Allocation of Proceeds; Sharing of Payments.

(a)     Unless otherwise specified, the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 2.15, 2.16 or 2.17, or otherwise) prior to 3:00 p.m. on the date when due, in immediately available funds, without set-off or counterclaim.  Any amount received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  Each such payment shall be made to the Administrative Agent to the applicable account designated by the Administrative Agent to the Top Borrower, except that any payment made pursuant to Sections 2.15, 2.16, 2.17 or 9.03 shall be made directly to the Person or Persons entitled thereto.  The Administrative Agent shall distribute any such payment received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  Except as provided in Sections 2.19(b) and 2.20, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest in respect of the Loans of a given Class and each conversion of any Borrowing to, or continuation of any Borrowing as, a Borrowing of any Type (and of the same Class) shall be allocated pro rata among the Lenders in accordance with their respective Applicable Percentages of the applicable Class.  Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.  All payments hereunder shall be made in Dollars.  Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)     Subject in all respects to the provisions of each applicable Intercreditor Agreement, all proceeds of Collateral received by the Administrative Agent while an Event of Default exists and all or any portion of the Loans have been accelerated hereunder pursuant to Section 7.01, shall be applied, first, to the payment of all costs and expenses then due incurred by the Administrative Agent in connection with any collection, sale or realization on Collateral or otherwise in connection with this Agreement, any other Loan Document or any of the Secured Obligations, including all court costs and the fees and expenses of agents and legal counsel, the repayment of all advances made by the Administrative Agent hereunder or under any other Loan Document on behalf of any Loan Party and any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document, second, on a pro rata basis, to pay any fees, indemnities or expense reimbursements then due to the Administrative Agent (other than those covered in clause first above) from the Top Borrower constituting Secured Obligations, third, on a pro rata basis in accordance with the amounts of the Secured Obligations (other than contingent indemnification obligations for which no claim has yet been made) owed to the Secured Parties on the date of any such distribution, to the payment in full of the Secured Obligations, fourth, as provided in each applicable Intercreditor Agreement, and fifth, to, or at the direction of, the Top Borrower or as a court of competent jurisdiction may otherwise direct.

(c)     If any Lender obtains payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with Loans of such Class, then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans of other Lenders of such Class at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such Class ratably in accordance with the aggregate

amount of principal of and accrued interest on their respective Loans of such Class; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not apply to (A) any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with Sections 2.22, 2.23, 9.02(c) and/or Section 9.05. Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise rights of set-off and counterclaim against such Borrower with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.18(c) and will, in each case, notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.18(c) shall, from and after the date of such purchase, have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased. For purposes of subclause (c) of the definition of "Excluded Taxes", any Lender that acquires a participation pursuant to this Section 2.18(c) shall be treated as having acquired such participation on the earlier date(s) on which such Lender acquired the applicable interest(s) in the Commitment(s) and/or Loan(s) to which such participation relates.

(d)     Unless the Administrative Agent has received notice from the Top Borrower prior to the date on which any payment is due to the Administrative Agent for the account of any Lender hereunder that the Top Borrower will not make such payment, the Administrative Agent may assume that the Top Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lender the amount due. In such event, if the Top Borrower has not in fact made such payment, then each Lender severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender fails to make any payment required to be made by it pursuant to Section 2.07(b) or Section 2.18(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.19.     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.15 or determines it can no longer make or maintain LIBO Rate Loans pursuant to Section 2.20, or any Loan Party is required to pay any additional amount to or indemnify any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder, or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as applicable, in the future or mitigate the impact of Section 2.20, as the case may be, and (ii) would not subject such Lender to any unreimbursed out-of-pocket cost or expense and would not otherwise be disadvantageous to such Lender in any material respect. The Top Borrower hereby agrees to pay all reasonable out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)      If (i) any Lender requests compensation under Section 2.15 or determines it can no longer make or maintain LIBO Rate Loans pursuant to Section 2.20, (ii) any Loan Party is required to pay any additional amount to or indemnify any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, (iii) any Lender is a Defaulting Lender or (iv) in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" or "each Lender directly affected thereby" (or any other Class or group of Lenders other than the Required Lenders) with respect to which Required Lender consent (or the consent of Lenders holding loans or commitments of such Class or lesser group representing more than 50% of the sum of the total loans and unused commitments of such Class or lesser group at such time) has been obtained, as applicable, any Lender is a non-consenting Lender, then the Top Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, (x) terminate the applicable Commitments of such Lender, and repay all Obligations of the relevant Borrower owing to such Lender relating to the applicable Loans and participations held by such Lender as of such termination date or (y) replace such Lender by requiring such Lender to assign and delegate (and such Lender shall be obligated to assign and delegate), without recourse (in accordance with and subject to the restrictions contained in Section 9.05), all of its interests, rights and obligations (other than its existing rights to payments pursuant to Section 2.15 or Section 2.17) under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if any Lender accepts such assignment); provided that (A) such Lender has received payment of an amount equal to the outstanding principal amount of its Loans of such Class of Loans and/or Commitments, accrued interest thereon, accrued fees and all other amounts payable to it under any Loan Document with respect to such Class of Loans and/or Commitments, (B) in the case of any assignment resulting from a claim for compensation under Section 2.15 or payment required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payment and (C) such assignment does not conflict with applicable Requirements of Law.  No Lender (other than a Defaulting Lender) shall be required to make any such assignment and delegation, and the Top Borrower may not repay the Obligations of such Lender or terminate its Commitments, in each case, if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Top Borrower to require such assignment and delegation cease to apply.  Each Lender agrees that if it is replaced pursuant to this Section 2.19, it shall execute and deliver to the Administrative Agent an Assignment Agreement to evidence such sale and purchase and deliver to the Administrative Agent any Promissory Note (if the assigning Lender's Loans are evidenced by one or more Promissory Notes) subject to such Assignment Agreement (provided that the failure of any Lender replaced pursuant to this Section 2.19 to execute an Assignment Agreement or deliver any such Promissory Note shall not render such sale and purchase (and the corresponding assignment) invalid), such assignment shall be recorded in the Register and any such Promissory Note shall be deemed cancelled.  Each Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Lender's attorney-in-fact, with full authority in the place and stead of such Lender and in the name of such Lender, from time to time in the Administrative Agent's discretion, with prior written notice to such Lender, to take any action and to execute any such Assignment Agreement or other instrument that the Administrative Agent may deem reasonably necessary to carry out the provisions of this clause (b).  To the extent that any Lender is replaced pursuant to Section 2.19(b)(iv) in connection with a Repricing Transaction requiring payment of a fee pursuant to Section 2.12(c), the Top Borrower shall pay to each Lender being replaced as a result of such Repricing Transaction the fee set forth in Section 2.12(c).

Section 2.20.      Illegality.  If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted after the Closing Date that it is unlawful, for such Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to the Published LIBO Rate, or to determine or charge interest rates based upon the Published LIBO Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of Dollars in the applicable interbank market, then, on notice thereof by such Lender to the Top Borrower through the Administrative Agent, (i) any obligation of such Lender to make or continue LIBO Rate Loans or to convert ABR Loans to LIBO Rate Loans shall be suspended and (ii) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Published LIBO Rate component of the Alternate Base Rate, the interest rate on

which ABR Loans of such Lender, shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Published LIBO Rate component of the Alternate Base Rate, in each case until such Lender notifies the Administrative Agent and the Top Borrower that the circumstances giving rise to such determination no longer exist (which notice such Lender agrees to give promptly). Upon receipt of such notice, (x) the Top Borrower shall, upon demand from the relevant Lender (with a copy to the Administrative Agent), prepay or convert all of such Lender's LIBO Rate Loans to ABR Loans (the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Published LIBO Rate component of the Alternate Base Rate) either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBO Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBO Rate Loans (in which case the Top Borrower shall not be required to make payments pursuant to Section 2.16 in connection with such payment) and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Published LIBO Rate, the Administrative Agent shall during the period of such suspension compute the Alternate Base Rate applicable to such Lender without reference to the Published LIBO Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Published LIBO Rate. Upon any such prepayment or conversion, the Top Borrower shall also pay accrued interest on the amount so prepaid or converted. Each Lender agrees to designate a different lending office if such designation will avoid the need for such notice and will not, in the determination of such Lender, otherwise be materially disadvantageous to such Lender.

Section 2.21. <u>Defaulting Lenders</u>. Notwithstanding any provision of this Agreement to the contrary, if any Person becomes a Defaulting Lender, then the following provisions shall apply for so long as such Person is a Defaulting Lender:

(a) [Reserved].

(b) The Loans and Commitments of such Defaulting Lender shall not be included in determining whether all Lenders, each affected Lender, the Required Lenders or such other number of Lenders as may be required hereby or under any other Loan Document have taken or may take any action hereunder (including any consent to any waiver, amendment or modification pursuant to Section 9.02); <u>provided</u> that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately and adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

(c) Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 2.11, Section 2.15, Section 2.16, Section 2.17, Section 2.18, Article 7, Section 9.05 or otherwise, and including any amounts made available to the Administrative Agent by such Defaulting Lender pursuant to Section 9.09), shall be applied at such time or times as may be determined by the Administrative Agent and, where relevant, the Top Borrower as follows: <u>first</u>, to the payment of any amount owing by such Defaulting Lender to the Administrative Agent hereunder; <u>second</u>, so long as no Default or Event of Default exists, as the Top Borrower may request, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; <u>third</u>, as the Administrative Agent or the Top Borrower may elect, to be held in a deposit account and released in order to satisfy obligations of such Defaulting Lender to fund Loans under this Agreement; <u>fourth</u>, to the payment of any amount owing to the non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any non-Defaulting Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; <u>fifth</u>, to the payment of any amount owing to any Borrower as a result of any judgment of a court of competent jurisdiction obtained by such Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and <u>sixth</u>, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction. Any payments, prepayments or other amounts paid or payable to any Defaulting Lender that are applied (or held) to pay amounts owed by

any Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

Section 2.22.    Incremental Credit Extensions.

(a)    Any Borrower may, at any time, on one or more occasions pursuant to an Incremental Facility Amendment (i) add one or more new Classes of term facilities and/or increase the principal amount of the Term Loans of any existing Class by requesting new commitments to provide such Term Loans (any such new Class or increase, an "Incremental Term Facility" and any loans made pursuant to an Incremental Term Facility, "Incremental Term Loans") and/or (ii) add one or more new Classes of Incremental Revolving Commitments and/or increase the aggregate amount of the Incremental Revolving Commitments of any existing Class (any such new Class or increase, an "Incremental Revolving Facility" and, together with any Incremental Term Facility, "Incremental Facilities"; and the loans thereunder, "Incremental Revolving Loans" and any Incremental Revolving Loans, together with any Incremental Term Loans, "Incremental Loans") in an aggregate outstanding principal amount not to exceed the Incremental Cap; provided that:

(i)    no Incremental Commitment in respect of any Incremental Term Facility may be in an amount that is less than $5,000,000 (or such lesser amount to which the Administrative Agent may reasonably agree),

(ii)    except as the relevant Borrower and any Lender may separately agree, no Lender shall be obligated to provide any Incremental Commitment, and the determination to provide any Incremental Commitment shall be within the sole and absolute discretion of such Lender (it being agreed that the Top Borrower shall not be obligated to offer the opportunity to any Lender to participate in any Incremental Facility),

(iii)    no Incremental Facility or Incremental Loan (nor the creation, provision or implementation thereof) shall require the approval of any existing Lender other than in its capacity, if any, as a lender providing all or part of any Incremental Commitment or Incremental Loan,

(iv)    except as otherwise permitted herein (including with respect to margin, pricing, maturity and fees), the terms of any Incremental Term Facility, may not be materially more favorable (taken as a whole) to the relevant Incremental Lenders than the terms of the Initial Term Loans unless such terms are reasonably acceptable to the Administrative Agent (it being agreed that any terms contained in such Incremental Term Facility that are (x) applicable only after the then-existing Latest Term Loan Maturity Date and/or (y) more favorable to the lenders or the agent of such Incremental Term Facility than those contained in the Loan Documents and are then conformed (or added) to the Loan Documents for the benefit of the Term Lenders or the Administrative Agent, as applicable, pursuant to the applicable Incremental Facility Amendment shall be deemed acceptable to the Administrative Agent),

(v)    the Effective Yield (and the components thereof) applicable to any Incremental Facility shall be determined by the relevant Borrower and the lender or lenders providing such Incremental Facility; provided that the Effective Yield applicable to any Incremental Term Facility that is pari passu with the Initial Term Loans in right of payment and with respect to the Term Loan Priority Collateral (other than Customary Bridge Loans) may not be more than 0.50% higher than the Effective Yield applicable to the Initial Term Loans unless the Applicable Rate (and/or, as provided in the proviso below, the Alternate Base Rate floor or LIBO Rate floor) with respect to the Initial Term Loans is adjusted such that the Effective Yield on the Initial Term Loans is not more than 0.50% per annum less than the Effective Yield with respect to such Incremental Facility; provided, further, that any increase in Effective Yield applicable to any Initial Term Loan due to the application or imposition of an Alternate Base Rate floor or LIBO Rate floor on any Incremental Term Loan may, at

the election of the Top Borrower, be effected through an increase in the Alternate Base Rate floor or LIBO Rate floor applicable to such Initial Term Loan,

(vi)     the final maturity date with respect to any Incremental Term Loans shall be no earlier than the Latest Term Loan Maturity Date,

(vii)     the Weighted Average Life to Maturity of any Incremental Term Facility shall be no shorter than the remaining Weighted Average Life to Maturity of any then-existing Class of Term Loans (without giving effect to any prepayment thereof),

(viii)     subject to clauses (vi) and (vii) above, any Incremental Term Facility may otherwise have an amortization schedule as determined by the Top Borrower and the lenders providing such Incremental Term Facility,

(ix)     subject to clause (v) above, to the extent applicable, any fees payable in connection with any Incremental Facility shall be determined by the Top Borrower and the arrangers and/or lenders providing such Incremental Facility,

(x)     (A) any Incremental Term Facility or Incremental Revolving Facility may rank *pari passu* with or junior to any then-existing Class of Term Loans or Incremental Revolving Loans, as applicable, in right of payment and/or security (it being understood that any Incremental Facility that is junior to the Initial Term Loans with respect to security over the Term Loan Priority Collateral shall be pari passu with, or junior to, the Second Lien Facility) or may be unsecured (and to the extent the relevant Incremental Facility is secured, it shall be subject to an Acceptable Intercreditor Agreement) and (B) no Incremental Facility may be (x) guaranteed by any subsidiary of the Top Borrower which is not a Loan Party or (y) secured by any assets other than the Collateral,

(xi)     any Incremental Term Facility may participate (A) in any voluntary prepayment of Term Loans as set forth in Section 2.11(a)(i) and (B) in any mandatory prepayment of Term Loans as set forth in Section 2.11(b)(vi), in each case, to the extent provided in such Sections,

(xii)     except as otherwise agreed by the lenders providing the relevant Incremental Facility in connection with an acquisition or similar Investment permitted under this Agreement, no Event of Default shall exist immediately prior to or after giving effect to such Incremental Facility,

(xiii)     the proceeds of any Incremental Facility may be used for working capital and/or other general corporate purposes (including capital expenditures, acquisitions, Investments, Restricted Payments and Restricted Debt Payments and related fees and expenses) and any other use not prohibited by this Agreement, and

(xiv)     on the date of the Borrowing of any Incremental Term Loans that will be of the same Class as any then-existing Class of Term Loans, and notwithstanding anything to the contrary set forth in Sections 2.08 or 2.13 above, such Incremental Term Loans shall be added to (and constitute a part of, be of the same Type as and, at the election of the Top Borrower, have the same Interest Period as) each Borrowing of outstanding Term Loans of such Class on a pro rata basis (based on the relative sizes of such Borrowings), so that each Term Lender providing such Incremental Term Loans will participate proportionately in each then-outstanding Borrowing of Term Loans of such Class; it being acknowledged that the application of this clause (a)(xiv) may result in new Incremental Term Loans having Interest Periods (the duration of which may be less than one month) that begin during an Interest Period then applicable to outstanding LIBO Rate Loans of the relevant Class and which end on the last day of such Interest Period.

(b)        Incremental Commitments may be provided by any existing Lender, or by any other Eligible Assignee (any such other lender being called an "Incremental Lender"); provided that the Administrative Agent shall have a right to consent (such consent not to be unreasonably withheld or delayed) to the relevant Incremental Lender's provision of Incremental Commitments if such consent would be required under Section 9.05(b) for an assignment of Loans to such Incremental Lender; provided, further, that any Incremental Lender that is an Affiliated Lender shall be subject to the provisions of Section 9.05(g), *mutatis mutandis*, to the same extent as if the relevant Incremental Commitments and related Obligations had been acquired by such Lender by way of assignment.

(c)        Each Lender or Incremental Lender providing a portion of any Incremental Commitment shall execute and deliver to the Administrative Agent and the Top Borrower all such documentation (including the relevant Incremental Facility Amendment) as may be reasonably required by the Administrative Agent to evidence and effectuate such Incremental Commitment.   On the effective date of such Incremental Commitment, each Incremental Lender shall become a Lender for all purposes in connection with this Agreement.

(d)        As conditions precedent to the effectiveness of any Incremental Facility or the making of any Incremental Loans, (i) upon its request, the Administrative Agent shall be entitled to receive customary written opinions of counsel, as well as such reaffirmation agreements, supplements and/or amendments as it shall reasonably require, (ii) the Administrative Agent shall be entitled to receive, from each Incremental Lender, an Administrative Questionnaire and such other documents as it shall reasonably require from such Incremental Lender, (iii) the Administrative Agent shall have received, on behalf of the Incremental Lenders, the amount of any fees payable to the Incremental Lenders in respect of such Incremental Facility or Incremental Loans, (iv) subject to Section 2.22(g), the Administrative Agent shall have received a Borrowing Request as if the relevant Incremental Loans were subject to Section 2.03 or another written request the form of which is reasonably acceptable to the Administrative Agent (it being understood and agreed that the requirement to deliver a Borrowing Request shall not result in the imposition of any additional condition precedent to the availability of the relevant Incremental Loans) and (v) the Administrative Agent shall be entitled to receive a certificate of the Top Borrower signed by a Responsible Officer thereof:

(A)        certifying and attaching a copy of the resolutions adopted by the governing body of the relevant Borrower approving or consenting to such Incremental Facility or Incremental Loans, and

(B)        to the extent applicable, certifying that the condition set forth in clause (a)(xii) above has been satisfied.

(e)        Upon the implementation of any Incremental Revolving Facility pursuant to this Section 2.22:

(i)        if such Incremental Revolving Facility establishes Incremental Revolving Commitments of the same Class as any then-existing Class of Incremental Revolving Commitments, (i) each Additional Revolving Lender immediately prior to such increase will automatically and without further act be deemed to have assigned to each relevant new Incremental Revolving Facility Lender, and each relevant new Incremental Revolving Facility Lender will automatically and without further act be deemed to have assumed a portion of such existing Additional Revolving Lender's participations in outstanding letters of credit and swingline loans (to the extent applicable) such that, after giving effect to each deemed assignment and assumption of participations, all of the Additional Revolving Lenders' (including each new Incremental Revolving Facility Lender's) (A) participations in letters of credit and (B) participations in swingline loans shall be held ratably on the basis of their respective Additional Revolving Credit Commitments (after giving effect to any increase in the Additional Revolving Credit Commitment pursuant to this Section 2.22) and (ii) the existing Additional Revolving Lenders of the applicable Class shall assign Revolving Loans to certain other Additional Revolving Lenders of such Class (including the new Incremental Revolving Facility

Lenders providing the relevant Incremental Revolving Facility), and such other Additional Revolving Lenders (including the new Incremental Revolving Facility Lenders providing the relevant Incremental Revolving Facility) shall purchase such Additional Revolving Loans, in each case to the extent necessary so that all of the Additional Revolving Lenders of such Class participate in each outstanding Borrowing of Additional Revolving Loans of such Class pro rata on the basis of their respective Additional Revolving Credit Commitments of such Class (after giving effect to any increase in the Additional Revolving Credit Commitment pursuant to this Section 2.22); it being understood and agreed that the minimum borrowing, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to this clause (i); and

(ii) if such Incremental Revolving Facility establishes Incremental Revolving Commitments of a Class in addition to any existing Additional Revolving Credit Commitment, then (A) the borrowing and repayment (except (x) payments of interest and fees at different rates on the Additional Revolving Facilities (and related outstandings), (y) repayments required on the Maturity Date of any Additional Revolving Facility and (z) as provided in clause (C) below) of Additional Revolving Loans with respect to any then-existing Additional Revolving Facility after the effective date of such Incremental Revolving Facility shall be made on a pro rata basis with all other Additional Revolving Facilities, (B) all swingline loans and letters of credit shall be participated on a pro rata basis by all Additional Revolving Lenders of the applicable Class and (C) no permanent repayment of Additional Revolving Loans with respect to, and reduction and termination of Additional Revolving Credit Commitments under, any Incremental Revolving Facility after the effective date of such new Incremental Revolving Facility shall be made on a greater than pro rata basis with all other then-existing Additional Revolving Facilities.

(f) The Lenders hereby irrevocably authorize the Administrative Agent to enter into any Incremental Facility Amendment and/or any amendment to any other Loan Document as may be necessary in order to establish new Classes or sub-Classes in respect of Loans or commitments pursuant to this Section 2.22 and such technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Top Borrower in connection with the establishment of such new Classes or sub-Classes, in each case on terms consistent with this Section 2.22.

(g) Notwithstanding anything to the contrary in this Section 2.22 or in any other provision of any Loan Document, if the proceeds of any Incremental Facility are intended to be applied to finance an acquisition or other Investment and the lenders providing such Incremental Facility so agree, the availability thereof shall be subject to customary "SunGard" or "certain funds" conditionality.

(h) This Section 2.22 shall supersede any provision in Sections 2.18 or 9.02 to the contrary.

Section 2.23. Extensions of Loans and Additional Revolving Commitments.

(a) Notwithstanding anything to the contrary in this Agreement, pursuant to one or more offers (each, an "Extension Offer") made from time to time by the Top Borrower to all Lenders holding Loans of any Class or Commitments of any Class, in each case on a pro rata basis (based on the aggregate outstanding principal amount of the respective Loans or Commitments of such Class) and on the same terms to each such Lender, the Borrowers are hereby permitted to consummate a transaction with any individual Lender who accepts the terms contained in the relevant Extension Offer to extend the Maturity Date of all or a portion of such Lender's Loans and/or Commitments of such Class and otherwise modify the terms of all or a portion of such Loans and/or Commitments pursuant to the terms of the relevant Extension Offer (including by increasing the interest rate or fees payable in respect of such Loans and/or Commitments (and related outstandings) and/or modifying the amortization schedule, if any, in respect of such Loans) (each, an "Extension"); it being understood that any Extended Term Loans shall constitute a separate Class of Loans from the Class of Loans from which they were converted and any Extended Revolving Credit Commitments

shall constitute a separate Class of Additional Revolving Credit Commitments from the Class of Additional Revolving Credit Commitments from which they were converted), so long as the following terms are satisfied:

(i) except as to (A) interest rates, fees and final maturity (which shall, subject to immediately succeeding clause (iii), be determined by the Top Borrower and any Additional Revolving Lender who agrees to an Extension of its Additional Revolving Credit Commitments and set forth in the relevant Extension Offer), (B) terms applicable to such Extended Revolving Credit Commitments or Extended Revolving Loans (each as defined below) that are more favorable to the lenders or the agent of such Extended Revolving Credit Commitments or Extended Revolving Loans than those contained in the Loan Documents and are then conformed (or added) to the Loan Documents for the benefit of the relevant existing Additional Revolving Lenders or, as applicable, the Administrative Agent (*i.e.*, by conforming or adding a term to the Class of Additional Revolving Credit Commitments subject to the relevant Extension Offer pursuant to the applicable Extension Amendment) and (C) covenants or other provisions applicable only to periods after the Latest Maturity Date, the Additional Revolving Credit Commitment of any Lender who agrees to an extension with respect to such Incremental Revolving (an "Extended Revolving Credit Commitment"; the Loans thereunder, "Extended Revolving Loans"; and each Class of Extended Revolving Credit Commitments, an "Extended Revolving Facility")), and the related outstandings, shall constitute a revolving commitment (or related outstandings, as the case may be) with the substantially consistent terms (or terms not less favorable (taken as a whole) to existing Lenders) as the Class of Additional Revolving Credit Commitments subject to the relevant Extension Offer (and related outstandings) provided hereunder; provided that to the extent more than one Additional Revolving Facility exists after giving effect to any such Extension, (x) the borrowing and repayment (except for (1) payments of interest and fees at different rates on the Additional Revolving Facilities (and related outstandings), (2) repayments required upon the Maturity Date of any Additional Revolving Facility and (3) as provided in clause (z) below) of Additional Revolving Loans with respect to any Additional Revolving Facility after the effective date of such Extended Revolving Credit Commitments shall be made on a pro rata basis with all other Additional Revolving Facilities, (y) all swingline loans and letters of credit shall be participated on a pro rata basis by all Additional Revolving Lenders of the applicable Class and (z) no permanent repayment of Additional Revolving Loans with respect to, and reduction and termination of Additional Revolving Credit Commitments under, any Additional Revolving Facility after the effective date of such Extended Revolving Credit Commitment shall be made on a greater than pro rata basis with the other then-existing Additional Revolving Facilities, except to the extent such Additional Revolving Facility has a Maturity Date earlier than the Maturity Date of such other Additional Revolving Facilities;

(ii) except as to (A) interest rates, fees, amortization, final maturity date, premiums, required prepayment dates and participation in prepayments (which shall, subject to immediately succeeding clauses (iii), (iv) and (v), be determined by the relevant Borrower and any Lender who agrees to an Extension of its Term Loans and set forth in the relevant Extension Offer), (B) terms applicable to such Extended Term Loans (as defined below) that are more favorable to the lenders or the agent of such Extended Term Loans than those contained in the Loan Documents and are then conformed (or added) to the Loan Documents for the benefit of the Term Lenders or, as applicable, the Administrative Agent pursuant to the applicable Extension Amendment and (C) any covenants or other provisions applicable only to periods after the Latest Term Loan Maturity Date (in each case, as of the date of such Extension), the Term Loans of any Lender extended pursuant to any Extension (any such extended Term Loans, the "Extended Term Loans") shall have substantially consistent terms (or terms not less favorable to existing Lenders) as the tranche of Term Loans subject to the relevant Extension Offer;

(iii) (x) the final maturity date of any Extended Term Loans may be no earlier than the then applicable Latest Term Loan Maturity Date at the time of Extension and (y) no Extended

Revolving Credit Commitments or Extended Revolving Loans may have a final maturity date earlier than (or require commitment reductions prior to) the Latest Revolving Credit Maturity Date;

(iv)     the Weighted Average Life to Maturity of any Extended Term Loans shall be no shorter than the remaining Weighted Average Life to Maturity of any then-existing Term Loans;

(v)     subject to clauses (iii) and (iv) above, any Extended Term Loans may otherwise have an amortization schedule as determined by the Top Borrower and the Lenders providing such Extended Term Loans,

(vi)     any Class of Extended Term Loans may participate (A) in any voluntary prepayment of Term Loans as set forth in Section 2.11(a)(i) and (B) in any mandatory prepayment of Term Loans as set forth in Section 2.11(b)(vi), in each case, to the extent provided in such Sections;

(vii)     if the aggregate principal amount of Loans or Commitments, as the case may be, in respect of which Lenders have accepted the relevant Extension Offer exceed the maximum aggregate principal amount of Loans or Commitments, as the case may be, offered to be extended by the Top Borrower pursuant to such Extension Offer, then the Loans or Commitments, as the case may be, of such Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed the applicable Lender's actual holdings of record) with respect to which such Lenders have accepted such Extension Offer;

(viii)     unless the Administrative Agent otherwise agrees, any Extension must be in a minimum amount of $5,000,000;

(ix)     any applicable Minimum Extension Condition must be satisfied or waived by the Top Borrower; and

(x)     any documentation in respect of any Extension shall be consistent with the foregoing.

(b)     (i) No Extension consummated in reliance on this Section 2.23 shall constitute a voluntary or mandatory prepayment for purposes of Section 2.11, (ii) the scheduled amortization payments (insofar as such schedule affects payments due to Lenders participating in the relevant Class) set forth in Section 2.10 shall be adjusted to give effect to any Extension of any Class of Loans and/or Commitments and (iii) except as set forth in clause (a)(viii) above, no Extension Offer is required to be in any minimum amount or any minimum increment; provided that the Top Borrower may at its election specify as a condition (a "Minimum Extension Condition") to the consummation of any Extension that a minimum amount (to be specified in the relevant Extension Offer in the Top Borrower's sole discretion) of Loans or Commitments (as applicable) of any or all applicable tranches be tendered; it being understood that the Top Borrower may, in its sole discretion, waive any such Minimum Extension Condition.  The Administrative Agent and the Lenders hereby consent to the transactions contemplated by this Section 2.23 (including, for the avoidance of doubt, the payment of any interest, fees or premium in respect of any Extended Term Loans and/or Extended Revolving Credit Commitments on such terms as may be set forth in the relevant Extension Offer) and hereby waive the requirements of any provision of this Agreement (including Sections 2.10, 2.11 and/or 2.18) or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section.

(c)     Subject to any consent required under Section 2.23(a)(xi), no consent of any Lender or the Administrative Agent shall be required to effectuate any Extension, other than the consent of each Lender agreeing to such Extension with respect to one or more of its Loans and/or Commitments of any Class (or a portion thereof).  All Extended Term Loans and Extended Revolving Credit Commitments and all obligations in respect thereof shall constitute Secured Obligations under this Agreement and the other Loan Documents that are secured by the Collateral and guaranteed on a *pari passu* basis with all other applicable Secured

WEIL:\95874775\19\74339.0001

Obligations under this Agreement and the other Loan Documents. The Lenders hereby irrevocably authorize the Administrative Agent to enter into any Extension Amendment and any amendments to any of the other Loan Documents with the Loan Parties as may be necessary in order to establish new Classes or sub-Classes in respect of Loans or Commitments so extended and such technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Top Borrower in connection with the establishment of such new Classes or sub-Classes, in each case on terms consistent with this <u>Section 2.23</u>.

(d)     In connection with any Extension, the Top Borrower shall provide the Administrative Agent at least five Business Days' (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and shall agree to such procedures (including regarding timing, rounding and other adjustments and to ensure reasonable administrative management of the credit facilities hereunder after such Extension), if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably to accomplish the purposes of this <u>Section 2.23</u>.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES

On the Closing Date, Holdings (solely with respect to <u>Sections 3.01</u>, <u>3.02</u>, <u>3.03</u>, <u>3.07</u>, <u>3.08</u>, <u>3.09</u>, <u>3.13</u>, <u>3.14</u>, <u>3.16</u> and <u>3.17</u>) and the Borrowers hereby represent and warrant to the Lenders that:

Section 3.01.     <u>Organization; Powers</u>.   Holdings, the Top Borrower and each of its Restricted Subsidiaries (a) is (i) duly organized and validly existing and (ii) in good standing (to the extent such concept exists in the relevant jurisdiction) under the Requirements of Law of its jurisdiction of organization, (b) has all requisite organizational power and authority to own its assets and to carry on its business as now conducted and (c) is qualified to do business in, and is in good standing (to the extent such concept exists in the relevant jurisdiction) in, every jurisdiction where the ownership, lease or operation of its properties or conduct of its business requires such qualification, except, in each case referred to in this <u>Section 3.01</u> (other than <u>clause (a)(i)</u> and <u>clause (b)</u>, in each case, with respect to the Top Borrower) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.02.     <u>Authorization; Enforceability</u>.   The execution, delivery and performance by each Loan Party of each Loan Document to which it is a party are within such Loan Party's corporate or other organizational power and have been duly authorized by all necessary corporate or other organizational action of such Loan Party. Each Loan Document to which any Loan Party is a party has been duly executed and delivered by such Loan Party and is a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to the Legal Reservations.

Section 3.03.     <u>Governmental Approvals; No Conflicts</u>.   The execution and delivery of each Loan Document by each Loan Party thereto and the performance by such Loan Party thereof (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) in connection with the Perfection Requirements and (iii) such consents, approvals, registrations, filings, or other actions the failure to obtain or make which could not be reasonably expected to have a Material Adverse Effect, (b) will not violate any (i) of such Loan Party's Organizational Documents or (ii) Requirement of Law applicable to such Loan Party which violation, in the case of this <u>clause (b)(ii)</u>, could reasonably be expected to have a Material Adverse Effect and (c) will not violate or result in a default under (i) the ABL Credit Agreement or the Second Lien Credit Agreement or (ii) any other material Contractual Obligation to which such Loan Party is a party which violation, in the case of this <u>clause (c)</u>, could reasonably be expected to result in a Material Adverse Effect.

WEIL:\95874775\19\74339.0001

Section 3.04.     Financial Condition; No Material Adverse Effect.

(a)     The financial statements (i) provided pursuant to Section 4.01(c)(i) and (ii) after the Closing Date, most recently provided pursuant to Section 5.01(a) or (b), as applicable, present fairly, in all material respects, the financial condition and results of operations and cash flows of the Top Borrower on a consolidated basis as of such dates and for such periods in accordance with GAAP, (x) except as otherwise expressly noted therein and/or (y) subject, in the case of quarterly financial statements, to the absence of footnotes and normal year-end adjustments.

(b)     Since the Closing Date, there have been no events, developments or circumstances that have had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.05.     Properties.

(a)     As of the Closing Date, Schedule 3.05 sets forth the address of each Real Estate Asset (or each set of such assets that collectively comprise one operating property) that is owned in fee simple by any Loan Party.

(b)     The Top Borrower and each of its Restricted Subsidiaries have good and valid fee simple title to or rights to purchase, or valid leasehold interests in, or easements or other limited property interests in, all of their respective Real Estate Assets and have good title to their personal property and assets, in each case, except (i) for defects in title that do not materially interfere with their ability to conduct their business as currently conducted or to utilize such properties and assets for their intended purposes or (ii) where the failure to have such title would not reasonably be expected to have a Material Adverse Effect.

(c)     The Top Borrower and its Restricted Subsidiaries own or otherwise have a license or right to use all rights in Patents, Trademarks, Copyrights and other rights in works of authorship (including all copyrights embodied in software) and all other intellectual property rights ("IP Rights") used to conduct their respective businesses as presently conducted without, to the knowledge of the Top Borrower, any infringement or misappropriation of the IP Rights of third parties, except to the extent the failure to own or license or have rights to use would not, or where such infringement or misappropriation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.06.     Litigation and Environmental Matters.

(a)     There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Top Borrower, threatened in writing against or affecting the Top Borrower or any of its Restricted Subsidiaries which would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)     Except for any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, (i) neither the Top Borrower nor any of its Restricted Subsidiaries is subject to or has received notice of any Environmental Claim or Environmental Liability or knows of any basis for any Environmental Liability or Environmental Claim of the Top Borrower or any of its Restricted Subsidiaries and (ii) neither the Top Borrower nor any of its Restricted Subsidiaries has failed to comply with any Environmental Law or to obtain, maintain or comply with any Governmental Authorization, permit, license or other approval required under any Environmental Law.

(c)     Neither the Top Borrower nor any of its Restricted Subsidiaries has treated, stored, transported or Released any Hazardous Materials on, at, under or from any currently or formerly owned, leased or operated real estate or facility in a manner that would reasonably be expected to have a Material Adverse Effect.

Section 3.07.    <u>Compliance with Laws</u>.  Each of Holdings, the Top Borrower and each of its Restricted Subsidiaries is in compliance with all Requirements of Law applicable to it or its property, except, in each case where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; it being understood and agreed that this <u>Section 3.07</u> shall not apply to the Requirements of Law covered by <u>Section 3.17</u> below.

Section 3.08.    <u>Investment Company Status</u>.  No Loan Party is an "investment company" as defined in, or is required to be registered under, the Investment Company Act of 1940.

Section 3.09.    <u>Taxes</u>.  Each of Holdings, the Top Borrower and each of its Restricted Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it that are due and payable (including in its capacity as a withholding agent), except (a) Taxes (or any requirement to file Tax returns with respect thereto) that are being contested in good faith by appropriate proceedings and for which the Top Borrower or such Restricted Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent that the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.10.    <u>ERISA</u>.

(a)    Each Plan is in compliance in form and operation with its terms and with ERISA and the Code and all other applicable Requirements of Law, except where any failure to comply would not reasonably be expected to result in a Material Adverse Effect.

(b)    In the five-year period prior to the date on which this representation is made or deemed made, no ERISA Event has occurred and is continuing or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect.

Section 3.11.    <u>Disclosure</u>.

(a)    As of the Closing Date, with respect to information relating to the Target and its subsidiaries, to the knowledge of the Top Borrower, all written information (other than the Projections, financial estimates, other forward-looking information and/or projected information and information of a general economic or industry-specific nature) concerning Holdings, the Top Borrower and its subsidiaries that was included in the Information Memorandum or otherwise prepared by or on behalf of Holdings, the Top Borrower or its subsidiaries or their respective representatives and made available to any Initial Lender or the Administrative Agent in connection with the Transactions on or before the Closing Date (the "<u>Information</u>"), when taken as a whole, did not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto from time to time).

(b)    The Projections have been prepared in good faith based upon assumptions believed by the Top Borrower to be reasonable at the time furnished (it being recognized that such Projections are not to be viewed as facts and are subject to significant uncertainties and contingencies many of which are beyond the Top Borrower's control, that no assurance can be given that any particular financial projections will be realized, that actual results may differ from projected results and that such differences may be material).

Section 3.12.    <u>Solvency</u>.  As of the Closing Date and after giving effect to the Transactions and the incurrence of the Indebtedness and obligations being incurred in connection with this Agreement and the Transactions, (i) the sum of the debt (including contingent liabilities) of the Top Borrower and its subsidiaries, taken as a whole, does not exceed the fair value of the assets of the Top Borrower and its subsidiaries, taken as

a whole, (ii) the present fair saleable value of the assets (on a going concern basis) of the Top Borrower and its subsidiaries, taken as a whole, is not less than the amount that will be required to pay the probable liabilities of the Top Borrower and its subsidiaries, taken as a whole, on their debts as they become absolute and matured in accordance with their terms; (iii) the capital of the Top Borrower and its subsidiaries, taken as a whole, is not unreasonably small in relation to the business of the Top Borrower and its subsidiaries, taken as a whole, contemplated as of the Closing Date; and (iv) the Top Borrower and its subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations and contingent liabilities) beyond their ability to pay such debt as they mature in accordance with their terms.

Section 3.13.    <u>Subsidiaries</u>.    <u>Schedule 3.13</u> sets forth, in each case as of the Closing Date, (a) a correct and complete list of the name of each subsidiary of Holdings and the ownership interest therein held by Holdings or its applicable subsidiary, and (b) the type of entity of Holdings and each of its subsidiaries.

Section 3.14.    <u>Security Interest in Collateral</u>.    Subject to the Legal Reservations, the Perfection Requirements and the provisions, limitations and/or exceptions set forth in this Agreement and/or any other Loan Document, the Collateral Documents create legal, valid and enforceable Liens on all of the Collateral in favor of the Administrative Agent, for the benefit of itself and the other Secured Parties, and upon the satisfaction of the applicable Perfection Requirements, such Liens constitute perfected Liens (with the priority that such Liens are expressed to have under the relevant Collateral Documents, unless otherwise permitted hereunder or under any Collateral Document) on the Collateral (to the extent such Liens are required to be perfected under the terms of the Loan Documents) securing the Secured Obligations, in each case as and to the extent set forth therein.

For the avoidance of doubt, notwithstanding anything herein or in any other Loan Document to the contrary, neither the Top Borrower nor any other Loan Party makes any representation or warranty as to (A) the effect of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Capital Stock of any Foreign Subsidiary, or as to the rights and remedies of the Administrative Agent or any Lender with respect thereto, under foreign Requirements of Law, (B) the enforcement of any security interest, or right or remedy with respect to any Collateral that may be limited or restricted by, or require any consent, authorization approval or license under, any Requirement of Law or (C) on the Closing Date and until required pursuant to <u>Section 5.12</u>, the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or enforceability of any pledge or security interest to the extent the same is not required on the Closing Date pursuant to the terms hereof.

Section 3.15.    <u>Labor Disputes</u>.    Except as individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect, (a) there are no strikes, lockouts or slowdowns against the Top Borrower or any of its Restricted Subsidiaries pending or, to the knowledge of the Top Borrower or any of its Restricted Subsidiaries, threatened and (b) the hours worked by and payments made to employees of the Top Borrower and its Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirements of Law dealing with such matters.

Section 3.16.    <u>Federal Reserve Regulations</u>.    No part of the proceeds of any Loan has been used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that results in a violation of the provisions of Regulation U.

Section 3.17.    <u>OFAC; PATRIOT ACT and FCPA</u>.

(a)    (i) None of Holdings, the Top Borrower nor any of its Restricted Subsidiaries nor, to the knowledge of the Top Borrower, any director, officer or employee of any of the foregoing is subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("<u>OFAC</u>"); and (ii) the Top Borrower will not directly or, to its knowledge, indirectly, use the proceeds of the Loans or Letters of Credit or otherwise make available such proceeds to any Person for the purpose of financing the activities of any Person that is subject to any U.S. sanction administered by OFAC, except to the

WEIL:\95874775\19\74339.0001

extent licensed or otherwise approved by OFAC or in compliance with applicable exemptions licenses or other approvals.

(b)      To the extent applicable, each Loan Party is in compliance, in all material respects, with the USA PATRIOT Act.

(c)      Except to the extent that the relevant violation could not reasonably be expected to have a Material Adverse Effect, (i) neither the Top Borrower nor any of its Restricted Subsidiaries nor, to the knowledge of the Top Borrower, any director, officer, agent (solely to the extent acting in its capacity as an agent for Holdings or any of its subsidiaries) or employee of the Top Borrower or any Restricted Subsidiary, has taken any action, directly or indirectly, that would result in a material violation by any such Person of the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), including, without limitation, making any offer, payment, promise to pay or authorization or approval of the payment of any money, or other property, gift, promise to give or authorization of the giving of anything of value, directly or indirectly, to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in each case in contravention of the FCPA and any applicable anti-corruption Requirement of Law of any Governmental Authority; and (ii) the Top Borrower has not directly or, to its knowledge, indirectly, used the proceeds of the Loans or Letters of Credit or otherwise made available such proceeds to any governmental official or employee, political party, official of a political party, candidate for public office or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage in violation of the FCPA.

The representations and warranties set forth in Section 3.17 above made by or on behalf of any Foreign Subsidiary are subject to and limited by any Requirement of Law applicable to such Foreign Subsidiary; it being understood and agreed that to the extent that any Foreign Subsidiary is unable to make any representation or warranty set forth in Section 3.17 as a result of the application of this sentence, such Foreign Subsidiary shall be deemed to have represented and warranted that it is in compliance, in all material respects, with any equivalent Requirement of Law relating to anti-terrorism, anti-corruption or anti-money laundering that is applicable to such Foreign Subsidiary in its relevant local jurisdiction of organization.

ARTICLE 4

CONDITIONS

Section 4.01.      Closing Date.  The obligations of each Lender to make Loans shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)      Credit Agreement and Loan Documents.  The Administrative Agent (or its counsel) shall have received from each Loan Party, to the extent party thereto, (i) a counterpart signed by such Loan Party (or written evidence reasonably satisfactory to the Administrative Agent (which may include a copy transmitted by facsimile or other electronic method) that such party has signed a counterpart) of (A) this Agreement, (B) the Security Agreement, (C) any Intellectual Property Security Agreement, (D) the Loan Guaranty, (E) the Initial Intercreditor Agreements and (F) each Promissory Note requested by a Lender at least three Business Days prior to the Closing Date and (ii) a Borrowing Request as required by Section 2.03.

(b)      Legal Opinions.  The Administrative Agent (or its counsel) shall have received, on behalf of itself, the Lenders on the Closing Date, (i) a customary written opinion of Weil, Gotshal & Manges LLP, in its capacity as special counsel for the Loan Parties and (ii) customary written opinions of local counsel to the Loan Parties organized in the jurisdictions set forth on Schedule 4.01(b), each dated the Closing Date and addressed to the Administrative Agent and the Lenders.

(c)  _Financial Statements and Pro Forma Financial Statements_.  The Administrative Agent shall have received:

(i)  (A) the audited consolidated balance sheets of the Top Borrower as of the Fiscal Year ended on or about December 31, 2015 and the audited consolidated statements of income, stockholders' equity and cash flows of the Top Borrower for the Fiscal Year then ended and (B) the unaudited balance sheets of the Top Borrower as of the Fiscal Quarters ended on or about March 31, 2016  and June 30, 2016 and the unaudited consolidated statements of income and cash flows of the Top Borrower for the Fiscal Quarters then ended; and

(ii)  a pro forma consolidated balance sheet of the Top Borrower as of June 25, 2016 (based on the balance sheet as of June 25, 2016 described in clause (c)(i)(B) above) and a related consolidated statement of income for the period of four Fiscal Quarters ending on such date (based on the statement of income for the period ended June 25, 2016 described in clause (c)(i)(B) above), in each case, prepared in good faith after giving effect to the Transactions as if the Transactions had occurred as of June 25, 2016, in the case of such balance sheet, or June 26, 2016, in the case of the statement of income;

(d)  _Secretary's Certificate and Good Standing Certificates_.  The Administrative Agent (or its counsel) shall have received (i) a certificate of each Loan Party, dated the Closing Date and executed by a secretary, assistant secretary or other Responsible Officer thereof, which shall (A) certify that (w) attached thereto is a true and complete copy of the certificate or articles of incorporation, formation or organization of such Loan Party, certified by the relevant authority of its jurisdiction of organization, (x) the certificate or articles of incorporation, formation or organization of such Loan Party attached thereto has not been amended (except as attached thereto) since the date reflected thereon, (y) attached thereto is a true and correct copy of the by-laws or operating, management, partnership or similar agreement of such Loan Party, together with all amendments thereto as of the Closing Date and such by-laws or operating, management, partnership or similar agreement are in full force and effect and (z) attached thereto is a true and complete copy of the resolutions or written consent, as applicable, of its board of directors, board of managers, sole member or other applicable governing body authorizing the execution and delivery of the Loan Documents, which resolutions or consent have not been modified, rescinded or amended (other than as attached thereto) and are in full force and effect, and (B) identify by name and title and bear the signatures of the officers, managers, directors or other authorized signatories of such Loan Party who are authorized to sign the Loan Documents to which such Loan Party is a party on the Closing Date and (ii) a good standing (or equivalent) certificate for such Loan Party from the relevant authority of its jurisdiction of organization, dated as of a recent date.

(e)  _Representations and Warranties_.  The representations and warranties of the Loan Parties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date; _provided_ that to the extent that any representation and warranty specifically refers to a given date or period, such representation and warranty shall be true and correct in all material respects as of such date or for such period.

(f)  _Fees_.  Prior to or substantially concurrently with the funding of the Initial Term Loans hereunder, the Administrative Agent shall have received (i) all fees required to be paid by the Top Borrower on the Closing Date pursuant to the Fee Letter and (ii) all expenses required to be paid by the Top Borrower for which invoices have been presented at least three Business Days prior to the Closing Date or such later date to which the Top Borrower may agree (including the reasonable fees and expenses of legal counsel required to be paid), in each case on or before the Closing Date, which amounts may be offset against the proceeds of the Loans.

(g)  _ABL Credit Agreement and Second Lien Credit Agreement_. (i) The "Loan Documents" (as defined in the Second Lien Credit Agreement) required by the terms of the Second Lien Credit Agreement to be executed on the Closing Date shall have been, or substantially concurrently with the making of the Initial

Term Loans hereunder on the Closing Date shall be, duly executed and delivered by each Loan Party that is party thereto, (ii) term loans under the Second Lien Credit Agreement shall have been, or substantially concurrently with the making of the Loans hereunder on the Closing Date will be, funded and (iii) the "Loan Documents" (as defined in the ABL Credit Agreement) required by the terms of the ABL Credit Agreement to be executed on the Closing Date shall have been, or substantially concurrently with the making of the Loans hereunder on the Closing Date shall be, duly executed and delivered by each Loan Party that is party thereto.

(h)      Refinancing.  Prior to or substantially concurrently with the initial funding of the Loans hereunder, the Refinancing Transactions shall be consummated.

(i)      Solvency.  The Administrative Agent (or its counsel) shall have received a certificate in substantially the form of Exhibit P from the chief financial officer (or other officer with reasonably equivalent responsibilities) of the Top Borrower dated as of the Closing Date and certifying as to the matters set forth therein.

(j)      Perfection Certificate.  The Administrative Agent (or its counsel) shall have received a completed Perfection Certificate dated the Closing Date and signed by a Responsible Officer of each Loan Party, together with all attachments contemplated thereby.

(k)      Pledged Stock and Pledged Notes.  The Administrative Agent (or its counsel) shall have received (i) the certificates representing the Capital Stock required to be pledged pursuant to the Security Agreement, together with an undated stock power or similar instrument of transfer for each such certificate endorsed in blank by a duly authorized officer of the pledgor thereof, and (ii) each Material Debt Instrument (if any) endorsed (without recourse) in blank (or accompanied by an transfer form endorsed in blank) by the pledgor thereof.

(l)      Filings, Registrations and Recordings.  Each document (including any UCC (or similar) financing statement) required by any Collateral Document or under applicable Requirements of Law to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral required to be delivered on the Closing Date pursuant to such Collateral Document, shall be in proper form for filing, registration or recordation.

(m)      USA PATRIOT Act.  No later than three Business Days in advance of the Closing Date, the Administrative Agent shall have received all documentation and other information reasonably requested with respect to Holdings or any Loan Party in writing by any Initial Lender at least ten Business Days in advance of the Closing Date, which documentation or other information is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(n)      No Default.  On the Closing Date and immediately after giving effect to the Transactions, no Event of Default exists.

(o)      Officer's Certificate. The Administrative Agent shall have received a certificate from a Responsible Officer of the Borrower certifying satisfaction of the conditions precedent set forth in Sections 4.01(e) and (n).

For purposes of determining whether the conditions specified in this Section 4.01 have been satisfied on the Closing Date, by funding the Loans hereunder, the Administrative Agent and each Lender shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to the Administrative Agent or such Lender, as the case may be.

ARTICLE 5

AFFIRMATIVE COVENANTS

From the Closing Date until the date on which all Commitments have expired or terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable under any Loan Document (other than contingent indemnification obligations for which no claim or demand has been made) have been paid in full in Cash (such date, the "Termination Date"), Holdings (solely with respect to Sections 5.02, 5.03 and 5.12) and each Borrower hereby covenant and agree with the Lenders that:

Section 5.01.    Financial Statements and Other Reports.    The Top Borrower will deliver to the Administrative Agent for delivery by the Administrative Agent, subject to Section 9.05(f), to each Lender:

(a)    Quarterly Financial Statements.    As soon as available, and in any event within 60 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, commencing with the Fiscal Quarter ending on or about September 30, 2016, the consolidated balance sheet of the Top Borrower as at the end of such Fiscal Quarter and the related consolidated statements of income and cash flows of the Top Borrower for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, and setting forth, in reasonable detail, in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail, together with a Responsible Officer Certification (which may be included in the applicable Compliance Certificate) with respect thereto;

(b)    Annual Financial Statements.    As soon as available, and in any event within 120 days after the end of each Fiscal Year ending after the Closing Date, (i) the consolidated balance sheet of the Top Borrower as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of the Top Borrower for such Fiscal Year and setting forth, in reasonable detail, in comparative form the corresponding figures for the previous Fiscal Year and (ii) with respect to such consolidated financial statements, a report thereon of an independent certified public accountant of recognized national standing (which report shall not be subject to a "going concern" explanatory paragraph or like statement (except as resulting from (A) the impending maturity of any Indebtedness within the four full Fiscal Quarter period following the relevant audit date and/or (B) any breach or anticipated breach of any financial covenant)), and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Top Borrower as at the dates indicated and its income and cash flows for the periods indicated in conformity with GAAP;

(c)    Compliance Certificate.    Together with each delivery of financial statements of the Top Borrower pursuant to Sections 5.01(a) and (b), (i) a duly executed and completed Compliance Certificate and (ii) a summary of the pro forma adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such financial statements;

(d)    [Reserved];

(e)    Notice of Default.    Promptly upon any Responsible Officer of the Top Borrower obtaining knowledge of (i) any Default or Event of Default or (ii) the occurrence of any event or change that has caused or evidences or would reasonably be expected to cause or evidence, either individually or in the aggregate, a Material Adverse Effect, a reasonably-detailed notice specifying the nature and period of existence of such condition, event or change and what action the Top Borrower has taken, is taking and proposes to take with respect thereto;

(f)    Notice of Litigation.    Promptly upon any Responsible Officer of the Top Borrower obtaining knowledge of (i) the institution of, or threat of, any Adverse Proceeding not previously disclosed in writing by the Top Borrower to the Administrative Agent, or (ii) any material development in any Adverse Proceeding that, in the case of either of clauses (i) or (ii), could reasonably be expected to have a Material Adverse Effect,

written notice thereof from the Top Borrower together with such other non-privileged information as may be reasonably available to the Loan Parties to enable the Lenders to evaluate such matters;

(g)     ERISA.  Promptly upon any Responsible Officer of the Top Borrower becoming aware of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof;

(h)     Financial Plan.  As soon as available and in any event no later than 90 days after the beginning of each Fiscal Year, commencing with the Fiscal Year ending on or about December 31, 2017, an annual budget prepared by management of the Top Borrower, consisting of a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of the Top Borrower for such Fiscal Year;

(i)     Information Regarding Collateral.  Prompt (and, in any event, within 90 days of the relevant change) written notice of any change (i) in any Loan Party's legal name, (ii) in any Loan Party's type of organization, (iii) in any Loan Party's jurisdiction of organization or (iv) in any Loan Party's organizational identification number, in each case to the extent such information is necessary to enable the Administrative Agent to perfect or maintain the perfection and priority of its security interest in the Collateral of the relevant Loan Party, together with a certified copy of the applicable Organizational Document reflecting the relevant change;

(j)     [Reserved.]

(k)     Certain Reports.  Promptly upon their becoming available and without duplication of any obligations with respect to any such information that is otherwise required to be delivered under the provisions of any Loan Document, copies of (i) following a Qualifying IPO, all financial statements, reports, notices and proxy statements sent or made available generally by Holdings or its applicable Parent Company to its security holders acting in such capacity and (ii) all regular and periodic reports and all registration statements (other than on Form S-8 or a similar form) and prospectuses, if any, filed by Holdings or its applicable Parent Company with any securities exchange or with the SEC or any analogous Governmental Authority or private regulatory authority with jurisdiction over matters relating to securities; and

(l)     Other Information.  Such other certificates, reports and information (financial or otherwise) as the Administrative Agent may reasonably request from time to time regarding the financial condition or business of the Top Borrower and its Restricted Subsidiaries; provided, however, that none of Holdings, the Top Borrower nor any Restricted Subsidiary shall be required to disclose or provide any information (a) that constitutes non-financial trade secrets or non-financial proprietary information of Holdings, the Top Borrower or any of its subsidiaries or any of their respective customers and/or suppliers, (b) in respect of which disclosure to the Administrative Agent or any Lender (or any of their respective representatives) is prohibited by applicable Requirements of Law, (c) that is subject to attorney-client or similar privilege or constitutes attorney work product or (d) in respect of which Holdings, the Top Borrower or any Restricted Subsidiary owes confidentiality obligations to any third party (provided such confidentiality obligations were not entered into in contemplation of the requirements of this Section 5.01(l)).

Documents required to be delivered pursuant to this Section 5.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Top Borrower (or a representative thereof) (x) posts such documents or (y) provides a link thereto at the website address listed on Schedule 9.01; provided that, other than with respect to items required to be delivered pursuant to Section 5.01(k) above, the Top Borrower shall promptly notify (which notice may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents at the website address listed on Schedule 9.01 and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents; (ii) on which such documents are delivered by the Top Borrower to the Administrative Agent for posting on behalf of the Top Borrower on IntraLinks/SyndTrak or another relevant website (the "Platform"), if

any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); (iii) on which such documents are faxed to the Administrative Agent (or electronically mailed to an address provided by the Administrative Agent); or (iv) in respect of the items required to be delivered pursuant to Section 5.01(k) above with respect to information filed by Holdings or its applicable Parent Company with any securities exchange or with the SEC or any analogous governmental or private regulatory authority with jurisdiction over matters relating to securities (other than Form 10-Q Reports and Form 10-K reports described in Sections 5.01(a) and (b), respectively), on which such items have been made available on the SEC website or the website of the relevant analogous governmental or private regulatory authority or securities exchange.

Notwithstanding the foregoing, the obligations in paragraphs (a), (b) and (h) of this Section 5.01 may instead be satisfied with respect to any financial statements of the Top Borrower by furnishing (A) the applicable financial statements of any Parent Company or (B) any Parent Company's Form 10-K or 10-Q, as applicable, filed with the SEC or any securities exchange, in each case, within the time periods specified in such paragraphs and without any requirement to provide notice of such filing to the Administrative Agent or any Lender; provided that, with respect to each of clauses (A) and (B), (i) to the extent (1) such financial statements relate to any Parent Company and (2) either (I) such Parent Company (or any other Parent Company that is a subsidiary of such Parent Company) has any material third party Indebtedness and/or material operations (as determined by the Top Borrower in good faith and other than any operations that are attributable solely to such Parent Company's ownership of the Top Borrower and its subsidiaries) or (II) there are material differences between the financial statements of such Parent Company and its consolidated subsidiaries, on the one hand, and the Top Borrower and its consolidated subsidiaries, on the other hand, such financial statements or Form 10-K or Form 10-Q, as applicable, shall be accompanied by unaudited consolidating information that summarizes in reasonable detail the differences between the information relating to such Parent Company and its consolidated subsidiaries, on the one hand, and the information relating to the Top Borrower and its consolidated subsidiaries on a stand-alone basis, on the other hand, which consolidating information shall be certified by a Responsible Officer of the Top Borrower as having been fairly presented in all material respects and (ii) to the extent such statements are in lieu of statements required to be provided under Section 5.01(b), such statements shall be accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall satisfy the applicable requirements set forth in Section 5.01(b).

No financial statement required to be delivered pursuant to Section 5.01(a) or (b) shall be required to include acquisition accounting adjustments relating to any Permitted Acquisition or other Investment to the extent it is not practicable to include any such adjustments in such financial statement.

Section 5.02.    Existence.  Except as otherwise permitted under Section 6.07, Holdings and the Top Borrower will, and the Top Borrower will cause each of its Restricted Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights, franchises, licenses and permits material to its business except, other than with respect to the preservation of the existence of the Top Borrower, to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect; provided that neither Holdings nor the Top Borrower nor any of the Top Borrower's Restricted Subsidiaries shall be required to preserve any such existence (other than with respect to the preservation of existence of the Top Borrower), right, franchise, license or permit if a Responsible Officer of such Person or such Person's board of directors (or similar governing body) determines that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to the Lenders (taken as a whole).

Section 5.03.    Payment of Taxes.  Holdings and the Top Borrower will, and the Top Borrower will cause each of its Restricted Subsidiaries to, pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income or businesses or franchises before any penalty or fine accrues thereon; provided, however, that no such Tax need be paid if (a) it is being contested in good faith by appropriate proceedings, so long as (i) adequate reserves or other appropriate provisions, as are required in conformity with GAAP, have

WEIL:\95874775\19\74339.0001

been made therefor and (ii) in the case of a Tax which has resulted or may result in the creation of a Lien on any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or (b) failure to pay or discharge the same could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.04.    <u>Maintenance of Properties</u>.  The Top Borrower will, and will cause each of its Restricted Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear and casualty and condemnation excepted, all property reasonably necessary to the normal conduct of business of the Top Borrower and its Restricted Subsidiaries and from time to time will make or cause to be made all needed and appropriate repairs, renewals and replacements thereof except as expressly permitted by this Agreement or where the failure to maintain such properties or make such repairs, renewals or replacements could not reasonably be expected to have a Material Adverse Effect.

Section 5.05.    <u>Insurance</u>.  Except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, the Top Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, such insurance coverage with respect to liability, loss or damage in respect of the assets, properties and businesses of the Top Borrower and its Restricted Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons, including flood insurance with respect to each Flood Hazard Property, in each case in compliance with the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973 (where applicable).  Each such policy of insurance shall, subject to <u>Section 5.15</u> hereof, (i) name the Administrative Agent on behalf of the Secured Parties as an additional insured thereunder as its interests may appear and (ii) (A) to the extent available from the relevant insurance carrier  in the case of each casualty insurance policy (excluding any business interruption insurance policy), contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties as the loss payee thereunder and (B) to the extent available from the relevant insurance carrier after submission of a request by the applicable Loan Party to obtain the same, provide for at least 30 days' prior written notice to the Administrative Agent of any modification or cancellation of such policy (or 10 days' prior written notice in the case of the failure to pay any premiums thereunder).

Section 5.06.    <u>Inspections</u>.    The Top Borrower will, and will cause each of its Restricted Subsidiaries to, permit any authorized representative designated by the Administrative Agent to visit and inspect any of the properties of the Top Borrower and any of its Restricted Subsidiaries at which the principal financial records and executive officers of the applicable Person are located, to inspect, copy and take extracts from its and their respective financial and accounting records, and to discuss its and their respective affairs, finances and accounts with its and their Responsible Officers and independent public accountants (<u>provided</u> that the Top Borrower (or any of its subsidiaries) may, if it so chooses, be present at or participate in any such discussion) at the expense of the Top Borrower, all upon reasonable notice and at reasonable times during normal business hours; <u>provided</u> that (a) only the Administrative Agent on behalf of the Lenders may exercise the rights of the Administrative Agent and the Lenders under this <u>Section 5.06</u>, (b) except as expressly set forth in <u>clause (c)</u> below during the continuance of an Event of Default, the Administrative Agent shall not exercise such rights more often than one time during any calendar year, (c) when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Top Borrower at any time during normal business hours and upon reasonable advance notice and (d) notwithstanding anything to the contrary herein, neither the Top Borrower nor any Restricted Subsidiary shall be required to disclose, permit the inspection, examination or making of copies of or taking abstracts from, or discuss any document, information, or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information of the Top Borrower and its subsidiaries and/or any of its customers and/or suppliers, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or any of their respective representatives or contractors) is prohibited by applicable Requirements of Law, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) in respect of

which Holdings, the Top Borrower or any Restricted Subsidiary owes confidentiality obligations to any third party (provided that such confidentiality obligations were not entered into in contemplation of the requirements of this Section 5.06).

Section 5.07. <u>Maintenance of Book and Records</u>. The Top Borrower will, and will cause its Restricted Subsidiaries to, maintain proper books of record and account containing entries of all material financial transactions and matters involving the assets and business of the Top Borrower and its Restricted Subsidiaries that are full, true and correct in all material respects and permit the preparation of consolidated financial statements in accordance with GAAP.

Section 5.08. <u>Compliance with Laws</u>. The Top Borrower will comply, and will cause each of its Restricted Subsidiaries to comply, with the requirements of all applicable Requirements of Law (including applicable ERISA and all Environmental Laws, OFAC, the USA PATRIOT Act and the FCPA), except to the extent the failure of the Top Borrower or the relevant Restricted Subsidiary to comply could not reasonably be expected to have a Material Adverse Effect; provided that the requirements set forth in this Section 5.08, as they pertain to compliance by any Foreign Subsidiary with OFAC, the USA PATRIOT ACT and the FCPA are subject to and limited by any Requirement of Law applicable to such Foreign Subsidiary in its relevant local jurisdiction.

Section 5.09. <u>Environmental</u>.

(a) <u>Environmental Disclosure</u>. The Top Borrower will deliver to the Administrative Agent as soon as practicable following the sending or receipt thereof by the Top Borrower or any of its Restricted Subsidiaries, a copy of any and all written communications with respect to (A) any Environmental Claim that, individually or in the aggregate, has a reasonable possibility of giving rise to a Material Adverse Effect, (B) any Release required to be reported by the Top Borrower or any of its Restricted Subsidiaries to any federal, state or local governmental or regulatory agency or other Governmental Authority that reasonably could be expected to have a Material Adverse Effect, (C) any request made to the Top Borrower or any of its Restricted Subsidiaries for information from any governmental agency that suggests such agency is investigating whether the Top Borrower or any of its Restricted Subsidiaries may be potentially responsible for any Hazardous Materials Activity which is reasonably expected to have a Material Adverse Effect and (D) subject to the limitations set forth in the proviso to Section 5.01(l), such other documents and information as from time to time may be reasonably requested by the Administrative Agent in relation to any matters disclosed pursuant to this Section 5.09(a);

(b) <u>Hazardous Materials Activities, Etc</u>. The Top Borrower shall promptly take, and shall cause each of its Restricted Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by the Top Borrower or its Restricted Subsidiaries, and address any appropriate corrective or remedial action any Release or threatened Release of Hazardous Materials at or from any Facility, in each case, that could reasonably be expected to have a Material Adverse Effect and (ii) make an appropriate response to any Environmental Claim against the Top Borrower or any of its Restricted Subsidiaries and discharge any obligations it may have to any Person thereunder, in each case, where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.10. <u>Designation of Subsidiaries</u>. The Top Borrower may at any time after the Closing Date designate (or redesignate) any subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; provided that (a) after giving effect to such designation, no Event of Default exists (including after giving effect to the reclassification of Investments in, Indebtedness of and Liens on the assets of, the applicable Restricted Subsidiary or Unrestricted Subsidiary) and (b) no subsidiary may be designated as an Unrestricted Subsidiary if it is a "Restricted Subsidiary" for purposes of the ABL Credit Agreement (or any other ABL Facility) or the Second Lien Credit Agreement (or any other Second Lien Facility). The designation of any subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Top Borrower (or its applicable Restricted Subsidiary) therein at the date of designation in an amount equal to the

portion of the fair market value of the net assets of such subsidiary attributable to the Top Borrower's (or its applicable Restricted Subsidiary's) equity interest therein as reasonably estimated by the Top Borrower (and such designation shall only be permitted to the extent such Investment is permitted under Section 6.06). The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the making, incurrence or granting, as applicable, at the time of designation of any then-existing Investment, Indebtedness or Lien of such subsidiary, as applicable; provided that upon any re-designation of any Unrestricted Subsidiary as a Restricted Subsidiary, the Top Borrower shall be deemed to continue to have an Investment in the resulting Restricted Subsidiary in an amount (if positive) equal to (a) the Top Borrower's "Investment" in such Restricted Subsidiary at the time of such re-designation, less (b) the portion of the fair market value of the net assets of such Restricted Subsidiary attributable to the Top Borrower's equity therein at the time of such re-designation. For the avoidance of doubt, no Borrower may be designated as (or become) an Unrestricted Subsidiary.

Section 5.11.    Use of Proceeds.  The Borrowers shall use the proceeds of the Initial Term Loans solely to finance a portion of the Transactions (including working capital and the payment of Transaction Costs).

Section 5.12.    Covenant to Guarantee Obligations and Provide Security.

(a)    Upon (i) the formation or acquisition after the Closing Date of any Restricted Subsidiary that is a Domestic Subsidiary, (ii) the designation of any Unrestricted Subsidiary that is a Domestic Subsidiary as a Restricted Subsidiary, (iii) any Restricted Subsidiary that is a Domestic Subsidiary ceasing to be an Immaterial Subsidiary or (iv) any Restricted Subsidiary that was an Excluded Subsidiary ceasing to be an Excluded Subsidiary, (x) if the event giving rise to the obligation under this Section 5.12(a) occurs during the first three Fiscal Quarters of any Fiscal Year, on or before the date on which financial statements are required to be delivered pursuant to Section 5.01(a) for the Fiscal Quarter in which the relevant formation, acquisition, designation or cessation occurred or (y) if the event giving rise to the obligation under this Section 5.12(a) occurs during the fourth Fiscal Quarter of any Fiscal Year, on or before the date that is 60 days after the end of such Fiscal Quarter (or, in the cases of clauses (x) and (y), such longer period as the Administrative Agent may reasonably agree), the Top Borrower shall (A) cause such Restricted Subsidiary (other than any Excluded Subsidiary) to comply with the requirements set forth in clause (a) of the definition of "Collateral and Guarantee Requirement" and (B) upon the reasonable request of the Administrative Agent, cause the relevant Restricted Subsidiary (other than any Excluded Subsidiary) to deliver to the Administrative Agent a signed copy of a customary opinion of counsel for such Restricted Subsidiary, addressed to the Administrative Agent and the other relevant Secured Parties.

(b)    Within 90 days after the acquisition by any Loan Party of any Material Real Estate Asset other than any Excluded Asset (or such longer period as the Administrative Agent may reasonably agree), the Top Borrower shall cause such Loan Party to comply with the requirements set forth in clause (b) of the definition of "Collateral and Guarantee Requirement"; it being understood and agreed that, with respect to any Material Real Estate Asset owned by any Restricted Subsidiary at the time such Restricted Subsidiary is required to become a Loan Party under Section 5.12(a) above, such Material Real Estate Asset shall be deemed to have been acquired by such Restricted Subsidiary on the first day of the time period within which such Restricted Subsidiary is required to become a Loan Party under Section 5.12(a).

(c)    Notwithstanding anything to the contrary herein or in any other Loan Document, it is understood and agreed that:

(i)    the Administrative Agent may grant extensions of time (including after the expiration of any relevant period, which may apply retroactively) for the creation and perfection of security interests in, or obtaining of title insurance, legal opinions, surveys or other deliverables with respect to, particular assets or the provision of any Loan Guaranty by any Restricted Subsidiary (in connection

with assets acquired, or Restricted Subsidiaries formed or acquired, after the Closing Date), and each Lender hereby consents to any such extension of time,

(ii)     any Lien required to be granted from time to time pursuant to the definition of "Collateral and Guarantee Requirement" shall be subject to the exceptions and limitations set forth in the Collateral Documents,

(iii)    perfection by control shall not be required with respect to assets requiring perfection through control agreements or other control arrangements (other than control of pledged Capital Stock and/or Material Debt Instruments, in each case to the extent the same otherwise constitute Collateral),

(iv)    no Loan Party shall be required to seek any landlord lien waiver, bailee letter, estoppel, warehouseman waiver or other collateral access or similar letter or agreement;

(v)     no Loan Party will be required to (A) take any action outside of the U.S. in order to create or perfect any security interest in any asset located outside of the U.S., (B) execute any foreign law security agreement, pledge agreement, mortgage, deed or charge or (C) make any foreign intellectual property filing, conduct any foreign intellectual property search or prepare any foreign intellectual property schedule, in each case other than with respect to a Foreign Subsidiary designated as a Subsidiary Guarantor pursuant to the last sentence of the definition of "Subsidiary Guarantor";

(vi)    in no event will the Collateral include any Excluded Asset and in no event will the Top Borrower or any of its subsidiaries be required to make any Excluded Subsidiary become a Subsidiary Guarantor,

(vii)   no action shall be required to perfect any Lien with respect to (1) any vehicle or other asset subject to a certificate of title, (2) Letter-of-Credit Rights, (3) the Capital Stock of any Immaterial Subsidiary and/or (4) the Capital Stock of any Person that is not a subsidiary, which Person, if a subsidiary, would constitute an Immaterial Subsidiary, in each case except to the extent that a security interest therein can be perfected by filing a Form UCC-1 (or similar) financing statement under the UCC,

(viii)  no action shall be required to perfect a Lien in any asset in respect of which the perfection of a security interest therein would (1) be prohibited by enforceable anti-assignment provisions set forth in any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than in the case of capital leases, purchase money and similar financings), (2) violate the terms of any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than in the case of capital leases, purchase money and similar financings), in each case, after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law or (3) trigger termination of any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than in the case of capital leases, purchase money and similar financings) pursuant to any "change of control" or similar provision; it being understood that the Collateral shall include any proceeds and/or receivables arising out of any contract described in this clause to the extent the assignment of such proceeds or receivables is expressly deemed effective under the UCC or other applicable law notwithstanding the relevant prohibition, violation or termination right,

(ix)    no Loan Party shall be required to perfect a security interest in any asset to the extent the perfection of a security interest in such asset would be prohibited under any applicable Requirement of Law,

WEIL:\95874775\19\74339.0001

(x)     any joinder or supplement to any Loan Guaranty, any Collateral Document and/or any other Loan Document executed by any Restricted Subsidiary that is required to become (or otherwise becomes) a Loan Party pursuant to Section 5.12(a) above (including any Joinder Agreement) may, with the consent of the Administrative Agent (not to be unreasonably withheld or delayed), include such schedules (or updates to schedules) as may be necessary to qualify any representation or warranty set forth in any Loan Document to the extent necessary to ensure that such representation or warranty is true and correct to the extent required thereby or by the terms of any other Loan Document, and

(xi)    the Administrative Agent shall not require the taking of a Lien on, or require the perfection of any Lien granted in, those assets as to which the cost of obtaining or perfecting such Lien (including any mortgage, stamp, intangibles or other tax or expenses relating to such Lien) is excessive in relation to the benefit to the Lenders of the security afforded thereby as reasonably determined in writing by the Top Borrower and the Administrative Agent.

Section 5.13.    Maintenance of Ratings.  The Top Borrower shall use commercially reasonable efforts to maintain public corporate credit facility and public corporate family ratings from each of S&P and Moody's; provided that in no event shall the Top Borrower be required to maintain any specific rating with any such agency.

Section 5.14.    Further Assurances.  Promptly upon request of the Administrative Agent and subject to the limitations described in Section 5.12:

(a)     Holdings and the Top Borrower will, and will cause each other Loan Party to, execute and deliver any and all further documents, financing statements, agreements, instruments, certificates, notices and acknowledgments and take all such further actions (including the filing and recordation of financing statements, fixture filings, Mortgages, Intellectual Property Security Agreements and/or amendments thereto and other documents), that may be required under any applicable Requirements of Law and which the Administrative Agent may reasonably request to ensure the creation, perfection and priority of the Liens created or intended to be created under the Collateral Documents, all at the expense of the relevant Loan Parties.

(b)     Holdings and the Top Borrower will, and will cause each other Loan Party to, (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts (including notices to third parties), deeds, certificates, assurances and other instruments as the Administrative Agent may reasonably request from time to time in order to ensure the creation, perfection and priority of the Liens created or intended to be created under the Collateral Documents.

Section 5.15.    Post-Closing Covenant.  The Top Borrower will satisfy its obligations described on Schedule 5.15, in each case, within the time periods set forth therein with respect to the relevant obligation (or such longer period as the Administrative Agent may reasonably agree).

ARTICLE 6

NEGATIVE COVENANTS

From the Closing Date and until the Termination Date, Holdings (solely with respect to Section 6.14) and the Top Borrower covenant and agree with the Lenders that:

Section 6.01.  <u>Indebtedness</u>.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or otherwise become or remain liable with respect to any Indebtedness, except:

(a)  the Secured Obligations (including any Additional Term Loans and any Additional Revolving Loans);

(b)  Indebtedness of the Top Borrower to Holdings and/or any Restricted Subsidiary and/or of any Restricted Subsidiary to Holdings, the Top Borrower and/or any other Restricted Subsidiary; <u>provided</u> that in the case of any Indebtedness of any Restricted Subsidiary that is not a Loan Party owing to any Restricted Subsidiary that is a Loan Party, such Indebtedness shall be permitted as an Investment under <u>Section 6.06</u>; <u>provided</u>, <u>further</u>, that any Indebtedness of any Loan Party to any Restricted Subsidiary that is not a Loan Party must be unsecured and expressly subordinated to the Obligations of such Loan Party on terms that are reasonably acceptable to the Administrative Agent (including pursuant to an Intercompany Note);

(c)  [Reserved];

(d)  Indebtedness arising from any agreement providing for indemnification, adjustment of purchase price or similar obligations (including contingent earn-out obligations) incurred in connection with any Disposition permitted hereunder, any acquisition permitted hereunder or consummated prior to the Closing Date or any other purchase of assets or Capital Stock, and Indebtedness arising from guaranties, letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments securing the performance of the Top Borrower or any such Restricted Subsidiary pursuant to any such agreement;

(e)  Indebtedness of the Top Borrower and/or any Restricted Subsidiary (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)  Indebtedness of the Top Borrower and/or any Restricted Subsidiary in respect of Banking Services and/or otherwise in connection with Cash management and Deposit Accounts, including Banking Services Obligations and incentive, supplier finance or similar programs;

(g)  (i) guaranties by the Top Borrower and/or any Restricted Subsidiary of the obligations of suppliers, customers and licensees in the ordinary course of business, (ii) Indebtedness incurred in the ordinary course of business in respect of obligations of the Top Borrower and/or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (iii) Indebtedness in respect of letters of credit, bankers' acceptances, bank guaranties or similar instruments supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business;

(h)  Guarantees by the Top Borrower and/or any Restricted Subsidiary of Indebtedness or other obligations of the Top Borrower, any Restricted Subsidiary and/or any joint venture with respect to Indebtedness otherwise permitted to be incurred pursuant to this <u>Section 6.01</u> or other obligations not prohibited by this Agreement; <u>provided</u> that in the case of any Guarantee by any Loan Party of the obligations of any non-Loan Party, the related Investment is permitted under <u>Section 6.06</u>;

(i)  Indebtedness of the Top Borrower and/or any Restricted Subsidiary existing, or pursuant to commitments existing, on the Closing Date and described on <u>Schedule 6.01</u>;

(j)      Indebtedness of Restricted Subsidiaries that are not Loan Parties; provided that the aggregate outstanding principal amount of such Indebtedness shall not exceed the greater of $125,000,000 and 3.0% of Consolidated Total Assets as of the last day of the most recently ended Test Period;

(k)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary consisting of obligations owing under incentive (including dealer incentive), supply, license or similar agreements entered into in the ordinary course of business;

(l)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary consisting of (i) the financing of insurance premiums, (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and/or (iii) obligations to reacquire assets or inventory in connection with customer financing arrangements in the ordinary course of business;

(m)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary with respect to Capital Leases and purchase money Indebtedness in an aggregate outstanding principal amount not to exceed the greater of $125,000,000 and 3.0% of Consolidated Total Assets as of the last day of the most recently ended Test Period;

(n)      Indebtedness of any Person that becomes a Restricted Subsidiary or Indebtedness assumed in connection with an acquisition or similar Investment permitted hereunder after the Closing Date; provided that (i) such Indebtedness (A) existed at the time such Person became a Restricted Subsidiary or the assets subject to such Indebtedness were acquired and (B) was not created or incurred in anticipation thereof and (ii) either (A)(I) no Event of Default under Section 7.01(a), (f) or (g) exists and (II) the Top Borrower is in compliance with the leverage or interest coverage, as applicable, test that would have applied to the incurrence of such Indebtedness under Section 6.01(q) if such Indebtedness was incurred to finance the relevant acquisition or similar Investment or (B) such Indebtedness is in an aggregate principal amount outstanding not to exceed the greater of $50,000,000 and 1.25% of Consolidated Total Assets as of the last day of the most recently ended Test Period;

(o)      Indebtedness consisting of promissory notes issued by the Top Borrower or any Restricted Subsidiary to any stockholder of any Parent Company or any current or former director, officer, employee, member of management, manager or consultant of any Parent Company, the Top Borrower or any subsidiary (or their respective Immediate Family Members) to finance the purchase or redemption of Capital Stock of any Parent Company permitted by Section 6.04(a);

(p)      Indebtedness refinancing, refunding or replacing any Indebtedness permitted under clauses (a), (i), (j), (m), (n), (q), (r), (u), (w), (y), and (z) of this Section 6.01 (in any case, including any refinancing Indebtedness incurred in respect thereof, "Refinancing Indebtedness") and any subsequent Refinancing Indebtedness in respect thereof; provided that:

(i)      the principal amount of such Indebtedness does not exceed the principal amount of the Indebtedness being refinanced, refunded or replaced, except by (A) an amount equal to unpaid accrued interest, penalties and premiums (including tender premiums) thereon plus underwriting discounts, other reasonable and customary fees, commissions and expenses (including upfront fees, original issue discount or initial yield payments) incurred in connection with the relevant refinancing, refunding or replacement and the related refinancing transaction, (B) an amount equal to any existing commitments unutilized thereunder and (C) additional amounts permitted to be incurred pursuant to this Section 6.01 (provided that (1) any additional Indebtedness referenced in this clause (C) satisfies the other applicable requirements of this definition (with additional amounts incurred in reliance on this clause (C) constituting a utilization of the relevant basket or exception pursuant to which such additional amount is permitted) and (2) if such additional Indebtedness is secured, the Lien securing such Indebtedness satisfies the applicable requirements of Section 6.02),

WEIL:\95874775\19\74339.0001

(ii)     other than in the case of Refinancing Indebtedness with respect to <u>clauses (i)</u>, <u>(j)</u>, <u>(m)</u>, <u>(n)</u>, <u>(u)</u> and/or <u>(y)</u> (other than Customary Bridge Loans), such Indebtedness has (A) a final maturity equal to or later than (and, in the case of revolving Indebtedness, does not require mandatory commitment reductions, if any, prior to) the earlier of (x) the Latest Term Loan Maturity Date and (y) the final maturity of the Indebtedness being refinanced, refunded or replaced and (B) other than with respect to revolving Indebtedness, such Indebtedness (x) has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being refinanced, refunded or replaced (without giving effect to any prepayment thereof) or (y) a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of the outstanding Term Loans at such time,

(iii)     the terms of any Refinancing Indebtedness with an original principal amount in excess of the Threshold Amount (excluding, to the extent applicable, pricing, fees, premiums, rate floors, optional prepayment, redemption terms or subordination terms and, with respect to Refinancing Indebtedness incurred in respect of Indebtedness permitted under <u>clause (a)</u> above, security), are not, taken as a whole (as reasonably determined by the Top Borrower), more favorable to the lenders providing such Indebtedness than those applicable to the Indebtedness being refinanced, refunded or replaced (other than (A) any covenants or other provisions applicable only to periods after the applicable maturity date of the debt then-being refinanced as of such date, (B) any covenants or provisions which are then-current market terms for the applicable type of Indebtedness or (C) any covenant or other provision which is conformed (or added) to the Loan Documents for the benefit of the Lenders or, as applicable, the Administrative Agent pursuant to an amendment to this Agreement effectuated in reliance on <u>Section 9.02(d)(ii)</u>),

(iv)     in the case of Refinancing Indebtedness with respect to Indebtedness permitted under <u>clauses (j)</u>, <u>(m)</u>, <u>(n)</u>, <u>(q)</u>, <u>(r)</u>, <u>(u)</u>, <u>(w)</u> (solely as it relates to the Non-Loan Party Debt Cap), <u>(y)</u> and <u>(z)</u> (solely as it relates to the Shared Incremental Amount) of this <u>Section 6.01</u>, the incurrence thereof shall be without duplication of any amounts outstanding in reliance on the relevant clause such that the amount available under the relevant clause shall be reduced by the amount of the applicable Refinancing Indebtedness,

(v)     except in the case of Refinancing Indebtedness incurred in respect of Indebtedness permitted under <u>clause (a)</u> of this <u>Section 6.01</u>, (A) such Indebtedness, if secured, is secured only by Permitted Liens at the time of such refinancing, refunding or replacement (it being understood that secured Indebtedness may be refinanced with unsecured Indebtedness), and if the Liens securing such Indebtedness were originally contractually subordinated to the Liens on the Collateral securing the Initial Term Loans, the Liens securing such Indebtedness are subordinated to the Liens on the Collateral securing the Initial Term Loans on terms not materially less favorable (as reasonably determined by the Top Borrower), taken as a whole, to the Lenders than those (1) applicable to the Liens securing the Indebtedness being refinanced, refunded or replaced, taken as a whole, or (2) set forth in the Initial Intercreditor Agreements, (B) such Indebtedness is incurred by the obligor or obligors in respect of the Indebtedness being refinanced, refunded or replaced, except to the extent otherwise permitted pursuant to <u>Section 6.01</u> (it being understood that (1) Holdings may not be the primary obligor in respect of the applicable Refinancing Indebtedness if Holdings was not the primary obligor in respect of the relevant refinanced Indebtedness and (2) any entity that was a guarantor in respect of the relevant refinanced Indebtedness may be the primary obligor in respect of the refinancing Indebtedness, and any entity that was the primary obligor in respect of the relevant refinanced Indebtedness may be a guarantor in respect of the refinancing Indebtedness), (C) if the Indebtedness being refinanced, refunded or replaced was expressly contractually subordinated to the Obligations in right of payment, (1) such Indebtedness is contractually subordinated to the Obligations in right of payment, or (2) if not contractually subordinated to the Obligations in right of payment, the purchase, defeasance, redemption, repurchase, repayment, refinancing or other acquisition or retirement of such Indebtedness is permitted under <u>Section 6.04(b)</u> (other than <u>Section 6.04(b)(i)</u>), and

(D) as of the date of the incurrence of such Indebtedness and after giving effect thereto, no Event of Default exists, and

(vi)     in the case of Replacement Debt, (A) such Indebtedness is *pari passu* or junior in right of payment and secured by the Collateral on a *pari passu* or junior basis with respect to the remaining Obligations hereunder (it being understood that any such Refinancing Indebtedness that is junior with respect to the Term Loan Priority Collateral shall be *pari passu* with, or junior to, the Second Lien Facility with respect to such Term Loan Priority Collateral), or is unsecured; provided that any such Refinancing Indebtedness that is *pari passu* or junior with respect to the Collateral shall be subject to an Acceptable Intercreditor Agreement, (B) if the Indebtedness being refinanced, refunded or replaced is secured, it is not secured by any assets other than the Collateral, (C) if the Indebtedness being refinanced, refunded or replaced is Guaranteed, it shall not be Guaranteed by any subsidiary of the Top Borrower other than one or more Loan Parties and (D) such Refinancing Indebtedness is incurred under (and pursuant to) documentation other than this Agreement; it being understood and agreed that any such Refinancing Indebtedness that is *pari passu* with the Initial Term Loans hereunder in right of payment and secured by the Term Loan Priority Collateral on a *pari passu* basis with respect to the Secured Obligations hereunder that are secured on a first lien basis with respect to the Term Loan Priority Collateral may participate (x) in any voluntary prepayment of Term Loans as set forth in Section 2.11(a)(i) and (y) in any mandatory prepayment of Term Loans as set forth in Section 2.11(b)(vi);

(q)     Indebtedness incurred to finance any acquisition permitted hereunder after the Closing Date; provided that (i) before and after giving effect to such acquisition on a Pro Forma Basis, no Event of Default under Section 7.01(a), (f) or (g) exists and (ii) after giving effect to such acquisition on a Pro Forma Basis (in each case, without "netting" the cash proceeds of the applicable Indebtedness being incurred) (1) if such Indebtedness is secured by a Lien on the Term Loan Priority Collateral that is *pari passu* with the Lien on the Term Loan Priority Collateral securing the Secured Obligations that are secured on a first lien basis, the First Lien Leverage Ratio does not exceed the greater of (x) 4.65:1.00 and (y) the First Lien Leverage Ratio as of the last day of the most recently ended Test Period, (2) if such Indebtedness is secured by a Lien on the Term Loan Priority Collateral that is junior to the Lien on the Term Loan Priority Collateral securing the Secured Obligations that are secured on a first lien basis, the Secured Leverage Ratio does not exceed the greater of (x) 5.80:1.00 and (y) the Secured Leverage Ratio as of the last day of the most recently ended Test Period or (3) if such Indebtedness is secured by a Lien on any asset that does not constitute Collateral or is unsecured, at the election of the Top Borrower, either (x) the Total Leverage Ratio does not exceed the greater of (I) 6.05:1.00 and (II) the Total Leverage Ratio as of the last day of the most recently ended Test Period or (y) the Interest Coverage Ratio is not less than the lesser of (I) 1.75:1.00 and (II) the Interest Coverage Ratio as of the last day of the most recently ended Test Period;

(r)     Indebtedness of the Top Borrower and/or any Restricted Subsidiary in an aggregate outstanding principal amount not to exceed 100% of the amount of Net Proceeds received by the Top Borrower from (i) the issuance or sale of Qualified Capital Stock or (ii) any cash contribution to its common equity with the Net Proceeds from the issuance and sale by any Parent Company of its Qualified Capital Stock or a contribution to the common equity of any Parent Company, in each case, (A) other than any Net Proceeds received from the sale of Capital Stock to, or contributions from, the Top Borrower or any of its Restricted Subsidiaries, (B) to the extent the relevant Net Proceeds have not otherwise been applied to make Investments, Restricted Payments or Restricted Debt Payments hereunder and (C) other than Cure Amounts;

(s)     Indebtedness of the Top Borrower and/or any Restricted Subsidiary under any Derivative Transaction not entered into for speculative purposes;

(t)     Indebtedness of the Top Borrower and/or any Restricted Subsidiary representing (i) deferred compensation to current or former directors, officers, employees, members of management, managers, and consultants of any Parent Company, the Top Borrower and/or any Restricted Subsidiary in the ordinary course

of business and (ii) deferred compensation or other similar arrangements in connection with the Transactions, any Permitted Acquisition or any other Investment permitted hereby;

(u)     Indebtedness of the Top Borrower and/or any Restricted Subsidiary in an aggregate outstanding principal amount not to exceed the greater of $160,000,000 and 4.0% of Consolidated Total Assets as of the last day of the most recently ended Test Period;

(v)     Reserved;

(w)     Indebtedness of the Top Borrower and/or any Restricted Subsidiary so long as, after giving effect thereto, including the application of the proceeds thereof (in each case, without "netting" the cash proceeds of the applicable Indebtedness being incurred), (i) if such Indebtedness is secured by a Lien on the Term Loan Priority Collateral that is *pari passu* with the Lien on the Term Loan Priority Collateral securing the Secured Obligations that are secured on a first lien basis, the First Lien Leverage Ratio does not exceed 4.65:1.00, (ii) if such Indebtedness is secured by a Lien on the Term Loan Priority Collateral that is junior to the Lien on the Term Loan Priority Collateral securing the Secured Obligations that are secured on a first lien basis, the Secured Leverage Ratio does not exceed 5.80:1.00 and (iii) if such Indebtedness is secured by a Lien on any asset that does not constitute Collateral or is unsecured, at the election of the Top Borrower, either (A) the Total Leverage Ratio does not exceed 6.05:1.00 or (B) the Interest Coverage Ratio is not less than 2.00:1.00; provided, however, that the aggregate outstanding principal amount of Indebtedness incurred in reliance on this Section 6.01(w) by Restricted Subsidiaries that are not Loan Parties shall not, at any time, exceed the greater of $140,000,000 and 3.33% of Consolidated Total Assets as of the last day of the most recently ended Test Period (the "Non-Loan Party Debt Cap");

(x)     Indebtedness of the Top Borrower and/or any Restricted Subsidiary incurred in respect of:

(i)     any Second Lien Facility and any Second Lien Incremental Debt in an aggregate outstanding principal amount that does not exceed (A) $450,000,000 plus (B) the aggregate principal amount of such Second Lien Incremental Debt so long as the sum of the aggregate outstanding principal amount of any such Second Lien Incremental Debt does not exceed the Incremental Cap (as defined in the Second Lien Credit Agreement as in effect on the Closing Date),

(ii)     any refinancing of any Second Lien Facility or any Second Lien Incremental Debt after the Closing Date so long as (A) the aggregate principal amount of such Indebtedness does not exceed, without duplication, the amount permitted to be incurred under preceding clause (i), plus (1) an amount equal to unpaid accrued interest and premiums (including tender premiums) thereon, (2) the amount of any underwriting discounts, other reasonable and customary fees, commissions and expenses (including upfront fees, original issue discount or initial yield payments) incurred in connection with the relevant refinancing, (3) an amount equal to any existing commitments unutilized thereunder and (4) any additional amounts permitted to be incurred pursuant to this Section 6.01 (with additional amounts incurred in reliance on this clause (4) constituting a utilization of the relevant basket or exception pursuant to which such additional amount is permitted) and (B) such Indebtedness, if secured, is secured by Liens permitted under Section 6.02,

(iii)     any ABL Facility and any ABL Incremental Debt in an aggregate outstanding principal amount that does not exceed the greater of (A) (1) $225,000,000 plus (2) the aggregate principal amount of such ABL Incremental Debt so long as the sum of the aggregate outstanding principal amount of any such ABL Incremental Debt does not exceed the Incremental Cap (as defined in the ABL Credit Agreement as in effect on the Closing Date) and (B) the sum of (1) 90% of the aggregate amount of  gross trade receivables, (2) 90% of gross credit card receivables, (3) 85% of the aggregate amount of gross inventory and (4) 100% of "qualified cash", in each case, of the Loan Parties,

(iv)      any refinancing of any ABL Facility or any ABL Incremental Debt after the Closing Date so long as (A) the aggregate commitments do not exceed, without duplication, the amount permitted to be incurred under preceding <u>clause (iii)</u>, <u>plus</u> (1) the amount of any underwriting discounts, other reasonable and customary fees, commissions and expenses (including upfront fees) incurred in connection with the relevant refinancing, (2) an amount equal to any existing commitments unutilized thereunder and (3) any additional amounts permitted to be incurred pursuant to this <u>Section 6.01</u> (with additional amounts incurred in reliance on this <u>clause (3)</u> constituting a utilization of the relevant basket or exception pursuant to which such additional amount is permitted) and (B) such Indebtedness, if secured, is secured by Liens permitted under <u>Section 6.02</u>, and

(v)      "Banking Services Obligations" and "Secured Hedging Obligations" (each as defined in the ABL Credit Agreement (or any equivalent term in any document governing any ABL Facility) and/or Second Lien Credit Agreement (or any equivalent term in any document governing any Second Lien Facility), as applicable);

(y)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary incurred in connection with Sale and Lease-Back Transactions permitted pursuant to <u>Section 6.08</u>;

(z)      Incremental Equivalent Debt;

(aa)      Indebtedness (including obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness) incurred by the Top Borrower and/or any Restricted Subsidiary in respect of workers compensation claims, unemployment insurance (including premiums related thereto), other types of social security, pension obligations, vacation pay, health, disability or other employee benefits;

(bb)      [reserved];

(cc)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary in respect of any letter of credit or bank guarantee issued in favor of any issuing bank or the swingline lender to support any defaulting lender's participation in letters of credit issued, or swingline loans made under any ABL Facility;

(dd)      Indebtedness of the Top Borrower or any Restricted Subsidiary supported by any letter of credit issued under any ABL Facility or Additional Revolving Facility;

(ee)      unfunded pension fund and other employee benefit plan obligations and liabilities incurred by the Top Borrower and/or any Restricted Subsidiary in the ordinary course of business to the extent that the unfunded amounts would not otherwise cause an Event of Default under <u>Section 7.01(i)</u>;

(ff)      customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business; and

(gg)      without duplication of any other Indebtedness, all premiums (if any), interest (including post-petition interest and payment in kind interest), accretion or amortization of original issue discount, fees, expenses and charges with respect to Indebtedness of the Top Borrower and/or any Restricted Subsidiary hereunder.

Section 6.02.    <u>Liens</u>.    The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, create, incur, assume or permit or suffer to exist any Lien on or with respect to any property of any kind owned by it, whether now owned or hereafter acquired, or any income or profits therefrom, except:

(a)      Liens securing the Secured Obligations created pursuant to the Loan Documents;

106

(b)      Liens for Taxes which (i) are not then due, (ii) if due, are not at such time required to be paid pursuant to Section 5.03 or (iii) are being contested in accordance with Section 5.03;

(c)      statutory Liens (and rights of set-off) of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by applicable Requirements of Law, in each case incurred in the ordinary course of business (i) for amounts not yet overdue by more than 30 days, (ii) for amounts that are overdue by more than 30 days and that are being contested in good faith by appropriate proceedings, so long as any reserves or other appropriate provisions required by GAAP have been made for any such contested amounts or (iii) with respect to which the failure to make payment could not reasonably be expected to have a Material Adverse Effect;

(d)      Liens incurred (i) in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security laws and regulations, (ii) in the ordinary course of business to secure the performance of tenders, statutory obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money), (iii) pursuant to pledges and deposits of Cash or Cash Equivalents in the ordinary course of business securing (x) any liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty, liability or other insurance to Holdings, the Top Borrower and its subsidiaries or (y) leases or licenses of property otherwise permitted by this Agreement and (iv) to secure obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments posted with respect to the items described in clauses (i) through (iii) above;

(e)      Liens consisting of easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not, in the aggregate, materially interfere with the ordinary conduct of the business of the Top Borrower and/or its Restricted Subsidiaries, taken as a whole, or the use of the affected property for its intended purpose;

(f)      Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate permitted hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii);

(g)      Liens (i) solely on any Cash earnest money deposits (including as part of any escrow arrangement) made by the Top Borrower and/or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement with respect to any Investment permitted hereunder and (ii) consisting of (A) an agreement to Dispose of any property in a Disposition permitted under Section 6.07 (other than Section 6.07(g)(x)) and/or (B) the pledge of Cash as part of an escrow arrangement required in any Disposition permitted under Section 6.07 (other than Section 6.07(g)(x));

(h)      (i) purported Liens evidenced by the filing of UCC financing statements relating solely to operating leases or consignment or bailee arrangements entered into in the ordinary course of business, and (ii) Liens arising from precautionary UCC financing statements or similar filings;

(i)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)      Liens in connection with any zoning, building or similar Requirement of Law or right reserved to or vested in any Governmental Authority to control or regulate the use of any or dimensions of real property or the structure thereon, including Liens in connection with any condemnation or eminent domain proceeding or compulsory purchase order;

(k)       Liens securing Indebtedness permitted pursuant to <u>Section 6.01(p)</u> (solely with respect to the permitted refinancing of (x) Indebtedness permitted pursuant to <u>Sections 6.01(a)</u>, <u>(i)</u>, <u>(j)</u>, <u>(m)</u>, <u>(n)</u>, <u>(q)</u>, <u>(u)</u>, <u>(w)</u>, <u>(y)</u> and <u>(z)</u>) and (y) Indebtedness that is secured in reliance on <u>Section 6.02(u)</u> (<u>provided</u> that the granting of the relevant Lien shall be without duplication of any Lien outstanding under <u>Section 6.02(u)</u> such that the amount available under <u>Section 6.02(u)</u> shall be reduced by the amount of the applicable Lien granted in reliance on this <u>clause (y)</u>)); <u>provided</u> that (i) no such Lien extends to any asset not covered by the Lien securing the Indebtedness that is being refinanced (it being understood that individual financings of the type permitted under <u>Section 6.01(m)</u> provided by any lender may be cross-collateralized to other financings of such type provided by such lender or its affiliates) and (ii) if the Lien securing the Indebtedness being refinanced was subject to intercreditor arrangements, then (A) the Lien securing any refinancing Indebtedness in respect thereof shall be subject to intercreditor arrangements that are not materially less favorable to the Secured Parties, taken as a whole, than the intercreditor arrangements governing the Lien securing the Indebtedness that is refinanced or (B) the intercreditor arrangements governing the Lien securing the relevant refinancing Indebtedness shall be set forth in an Acceptable Intercreditor Agreement;

(l)       Liens described on <u>Schedule 6.02</u> and any modification, replacement, refinancing, renewal or extension thereof; <u>provided</u> that (i) no such Lien extends to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under <u>Section 6.01</u> and (B) proceeds and products thereof, replacements, accessions or additions thereto and improvements thereon (it being understood that individual financings of the type permitted under <u>Section 6.01(m)</u> provided by any lender may be cross-collateralized to other financings of such type provided by such lender or its affiliates) and (ii) any such modification, replacement, refinancing, renewal or extension of the obligations secured or benefited by such Liens, if constituting Indebtedness, is permitted by <u>Section 6.01</u>;

(m)       Liens arising out of Sale and Lease-Back Transactions permitted under <u>Section 6.08</u>;

(n)       Liens securing Indebtedness permitted pursuant to <u>Section 6.01(m)</u>; <u>provided</u> that any such Lien shall encumber only the asset acquired with the proceeds of such Indebtedness and proceeds and products thereof, replacements, accessions or additions thereto and improvements thereon (it being understood that individual financings of the type permitted under <u>Section 6.01(m)</u> provided by any lender may be cross-collateralized to other financings of such type provided by such lender or its affiliates);

(o)       (i) Liens securing Indebtedness permitted pursuant to <u>Section 6.01(n)</u> on the relevant acquired assets or on the Capital Stock and assets of the relevant newly acquired Restricted Subsidiary; <u>provided</u> that no such Lien (x) extends to or covers any other assets (other than the proceeds or products thereof, replacements, accessions or additions thereto and improvements thereon (it being understood that individual financings of the type permitted under <u>Section 6.01(m)</u> provided by any lender may be cross collateralized to other financings of such type provided by such lender or its affiliates) or (y) was created in contemplation of the applicable acquisition of assets or Capital Stock, and (ii) Liens securing Indebtedness incurred pursuant to, and subject to the provisions set forth in, <u>Section 6.01(q)</u>; <u>provided</u>, that any Lien on the Collateral that is granted in reliance on this <u>clause (o)(ii)</u> and is senior to (with respect to ABL Priority Collateral only), pari passu with or junior to the Lien securing the Secured Obligations shall be subject to an Acceptable Intercreditor Agreement;

(p)       (i) Liens that are contractual rights of setoff or netting relating to (A) the establishment of depositary relations with banks not granted in connection with the issuance of Indebtedness, (B) pooled deposit or sweep accounts of the Top Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Top Borrower or any Restricted Subsidiary, (C) purchase orders and other agreements entered into with customers of the Top Borrower or any Restricted Subsidiary in the ordinary course of business and (D) commodity trading or other brokerage accounts incurred in the ordinary course of business, (ii) Liens encumbering reasonable customary initial deposits and margin deposits, (iii) bankers Liens and rights and remedies as to Deposit Accounts, (iv) Liens of a collection bank arising under Section 4-208 of the UCC on items in the ordinary course of business, (v) Liens

WEIL:\95874775\19\74339.0001

in favor of banking or other financial institutions arising as a matter of law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions and (vi) Liens on the proceeds of any Indebtedness incurred in connection with any transaction permitted hereunder, which proceeds have been deposited into an escrow account on customary terms to secure such Indebtedness pending the application of such proceeds to finance such transaction;

(q)      Liens on assets and Capital Stock of Restricted Subsidiaries that are not Loan Parties (including Capital Stock owned by such Persons) securing Indebtedness of Restricted Subsidiaries that are not Loan Parties permitted pursuant to Section 6.01;

(r)      Liens securing obligations (other than obligations representing Indebtedness for borrowed money) under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Top Borrower and/or its Restricted Subsidiaries;

(s)      Liens securing Indebtedness incurred in reliance on, and subject to the provisions set forth in, Section 6.01(w) or (z); provided, that any Lien that is granted in reliance on this clause (s) on the Collateral shall be subject to an Acceptable Intercreditor Agreement;

(t)      Liens securing Indebtedness incurred pursuant to Sections 6.01(x), subject to the applicable Initial Intercreditor Agreement;

(u)      Liens on assets securing Indebtedness or other obligations in an aggregate principal amount at any time outstanding not to exceed the greater of $160,000,000 and 4.0% of Consolidated Total Assets as of the last day of the most recently ended Test Period; provided, that any Lien that is granted in reliance on this clause (u) on the Collateral shall be subject to an Acceptable Intercreditor Agreement;

(v)      (i) Liens on assets securing judgments, awards, attachments and/or decrees and notices of *lis pendens* and associated rights relating to litigation being contested in good faith not constituting an Event of Default under Section 7.01(h) and (ii) any pledge and/or deposit securing any settlement of litigation;

(w)      leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not secure any Indebtedness;

(x)      Liens on Securities that are the subject of repurchase agreements constituting Investments permitted under Section 6.06 arising out of such repurchase transaction;

(y)      Liens securing obligations in respect letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments permitted under Sections 6.01(d), (e), (g), (aa) and (cc);

(z)      Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any asset in the ordinary course of business and permitted by this Agreement or (ii) by operation of law under Article 2 of the UCC (or similar Requirement of Law under any jurisdiction);

(aa)      Liens (i) in favor of any Loan Party and/or (ii) granted by any non-Loan Party in favor of any Restricted Subsidiary that is not a Loan Party, in the case of clauses (i) and (ii), securing intercompany Indebtedness permitted (or not restricted) under Section 6.01 or Section 6.09;

(bb)      Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

109

(cc)     Liens on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(dd)     Liens securing (i) obligations of the type described in Section 6.01(f) and/or (ii) obligations of the type described in Section 6.01(s);

(ee)     (i) Liens on Capital Stock of joint ventures or Unrestricted Subsidiaries securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Wholly-Owned Subsidiaries;

(ff)     Liens on cash or Cash Equivalents arising in connection with the defeasance, discharge or redemption of Indebtedness;

(gg)     Liens consisting of the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business; and

(hh)     Liens with respect to Material Real Estate Assets disclosed in any Mortgage Policy delivered pursuant to Section 5.12 with respect to any Material Real Estate Asset and any replacement, extension or renewal thereof; provided that no such replacement, extension or renewal Lien shall cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal (and additions thereto, improvements thereon and the proceeds thereof).

Section 6.03.     [Reserved].

Section 6.04.     Restricted Payments; Restricted Debt Payments.

(a)     The Top Borrower shall not pay or make, directly or indirectly, any Restricted Payment, except that:

(i)     the Top Borrower may make Restricted Payments to the extent necessary to permit any Parent Company:

(A)     to pay general administrative costs and expenses (including corporate overhead, legal or similar expenses and customary salary, bonus and other benefits payable to directors, officers, employees, members of management, managers and/or consultants of any Parent Company) and franchise Taxes, and similar fees and expenses, required to maintain the organizational existence of such Parent Company, in each case, which are reasonable and customary and incurred in the ordinary course of business, plus any reasonable and customary indemnification claims made by directors, officers, members of management, managers, employees or consultants of any Parent Company, in each case, to the extent attributable to the ownership or operations of any Parent Company (but excluding, for the avoidance of doubt, the portion of any such amount, if any, that is attributable to the ownership or operations of any subsidiary of any Parent Company other than the Top Borrower and/or its subsidiaries), and/or its subsidiaries;

(B)     (x) for any taxable period for which the Top Borrower is a member of a consolidated, combined, unitary or similar tax group for U.S. federal and/or applicable state or local tax purposes of which such Parent Company is the common parent, to discharge the consolidated, combined, unitary or similar Tax liabilities of such Parent Company and its subsidiaries when and as due, to the extent such liabilities are attributable to the income of the Top Borrower and/or any subsidiary; provided that the amount of such payments in respect of

any taxable year do not exceed the amount of such Tax liabilities that the Top Borrower and/or its applicable subsidiaries would have paid had such Tax liabilities been paid as standalone companies or as a standalone group and (y) for any taxable period for which the Top Borrower is a partnership or disregarded entity for U.S. federal income tax purposes that is wholly-owned (directly or indirectly) by a C corporation for U.S. federal and/or applicable state or local tax purposes, distributions to any direct or indirect parent of the Top Borrower in an amount not to exceed the amount of any Tax that the Top Borrower and/or its applicable subsidiaries would have paid had such Tax been paid as standalone companies or as a standalone group (and assuming for purposes of such calculation that the Top Borrower is classified as a domestic corporation for U.S. federal income tax purposes);

(C)     to pay audit and other accounting and reporting expenses of any Parent Company to the extent such expenses are attributable to such Parent Company (but excluding, for the avoidance of doubt, the portion of any such expenses, if any, attributable to the ownership or operations of any subsidiary of any Parent Company other than the Top Borrower and/or its subsidiaries), the Top Borrower and its subsidiaries;

(D)     for the payment of any insurance premiums that is payable by or attributable to any Parent Company (but excluding, for the avoidance of doubt, the portion of any such premiums, if any, attributable to the ownership or operations of any subsidiary of any Parent Company other than the Top Borrower and/or its subsidiaries), the Top Borrower and its subsidiaries;

(E)     to pay (x) any fee and/or expense related to any debt or equity offering, investment or acquisition (whether or not consummated) and/or any expenses of, or indemnification obligations in favor of any trustee, agent, arranger, underwriter or similar role, and (y) after the consummation of an initial public offering or the issuance of public debt Securities, Public Company Costs;

(F)     to finance any Investment permitted under <u>Section 6.06</u> (<u>provided</u> that (x) any Restricted Payment under this <u>clause (a)(i)(F)</u> shall be made substantially concurrently with the closing of such Investment and (y) the relevant Parent Company shall, promptly following the closing thereof, cause (I) all property acquired to be contributed to the Top Borrower or one or more of its Restricted Subsidiaries, or (II) the merger, consolidation or amalgamation of the Person formed or acquired into the Top Borrower or one or more of its Restricted Subsidiaries, in order to consummate such Investment in compliance with the applicable requirements of <u>Section 6.06</u> as if undertaken as a direct Investment by the Top Borrower or the relevant Restricted Subsidiary); and

(G)     to pay customary salary, bonus, severance and other benefits payable to current or former directors, officers, members of management, managers, employees or consultants of any Parent Company (or any Immediate Family Member of any of the foregoing) to the extent such salary, bonuses and other benefits are attributable and reasonably allocated to the operations of the Top Borrower and/or its subsidiaries, in each case, so long as such Parent Company applies the amount of any such Restricted Payment for such purpose;

(ii)     the Top Borrower may pay (or make Restricted Payments to allow any Parent Company) to repurchase, redeem, retire or otherwise acquire or retire for value the Capital Stock of any Parent Company or any subsidiary held by any future, present or former employee, director, member of management, officer, manager or consultant (or any Affiliate or Immediate Family Member thereof) of any Parent Company, the Top Borrower or any subsidiary:

       (A)     with Cash and Cash Equivalents (and including, to the extent constituting a Restricted Payment, amounts paid in respect of promissory notes issued to evidence any obligation to repurchase, redeem, retire or otherwise acquire or retire for value the Capital Stock of any Parent Company or any subsidiary held by any future, present or former employee, director, member of management, officer, manager or consultant (or any Affiliate or Immediate Family Member thereof) of any Parent Company, the Top Borrower or any subsidiary) in an amount not to exceed, in any Fiscal Year, the greater of $50,000,000 and 1.25% of Consolidated Total Assets as of the last day of the most recently ended Test Period, which, if not used in such Fiscal Year, shall be carried forward to succeeding Fiscal Years;

       (B)     with the proceeds of any sale or issuance of, or any capital contribution in respect of, the Capital Stock of the Top Borrower or any Parent Company (to the extent such proceeds are contributed in respect of Qualified Capital Stock to the Top Borrower or any Restricted Subsidiary); or

       (C)     with the net proceeds of any key-man life insurance policies;

       (iii)     the Top Borrower may make Restricted Payments in an amount not to exceed (A) the portion, if any, of the Available Amount on such date that the Top Borrower elects to apply to this clause (iii)(A) and/or (B) the portion, if any, of the Available Excluded Contribution Amount on such date that the Top Borrower elects to apply to this clause (iii)(B);

       (iv)     the Top Borrower may make Restricted Payments (i) to any Parent Company to enable such Parent Company to make Cash payments in lieu of the issuance of fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock of such Parent Company and (ii) consisting of (A) payments made or expected to be made in respect of withholding or similar Taxes payable by any future, present or former officers, directors, employees, members of management, managers or consultants of the Top Borrower, any Restricted Subsidiary or any Parent Company or any of their respective Immediate Family Members and/or (B) repurchases of Capital Stock in consideration of the payments described in subclause (A) above, including demand repurchases in connection with the exercise of stock options;

       (v)     the Top Borrower may repurchase (or make Restricted Payments to any Parent Company to enable it to repurchase) Capital Stock upon the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock if such Capital Stock represents all or a portion of the exercise price of, or tax withholdings with respect to, such warrants, options or other securities convertible into or exchangeable for Capital Stock;

       (vi)     the Top Borrower may make (A) the Specified Dividend and (B) other Restricted Payments, in the case of this clause (B) the proceeds of which are applied on the Closing Date, solely to effect the consummation of the other Transactions;

       (vii)     so long as no Event of Default exists at the time of declaration of such Restricted Payment, following the consummation of the first Qualifying IPO, the Top Borrower may (or may make Restricted Payments to any Parent Company to enable it to) make Restricted Payments with respect to any Capital Stock in an amount not to exceed 6.00% per annum of the net Cash proceeds received by or contributed to the Top Borrower from any Qualifying IPO;

       (viii)     the Top Borrower may make Restricted Payments to (i) redeem, repurchase, retire or otherwise acquire any (A) Capital Stock ("Treasury Capital Stock") of the Top Borrower and/or any Restricted Subsidiary or (B) Capital Stock of any Parent Company, in the case of each of subclauses (A) and (B), in exchange for, or out of the proceeds of the substantially concurrent sale (other than to the Top Borrower and/or any Restricted Subsidiary) of, Qualified Capital Stock of the Top Borrower

WEIL:\95874775\19\74339.0001

or any Parent Company to the extent any such proceeds are contributed to the capital of the Top Borrower and/or any Restricted Subsidiary in respect of Qualified Capital Stock ("Refunding Capital Stock") and (ii) declare and pay dividends on any Treasury Capital Stock out of the proceeds of the substantially concurrent sale (other than to the Top Borrower or a Restricted Subsidiary) of any Refunding Capital Stock;

(ix)      to the extent constituting a Restricted Payment, the Top Borrower may consummate any transaction permitted by Section 6.06 (other than Sections 6.06(j) and (t)), Section 6.07 (other than Section 6.07(g)) and Section 6.09 (other than Sections 6.09(d) and (j));

(x)      the Top Borrower may make Restricted Payments in an aggregate amount not to exceed the greater of $75,000,000 and 2.0% of Consolidated Total Assets as of the last day of the most recently ended Test Period;

(xi)      the Top Borrower may make Restricted Payments so long as (i) no Event of Default exists at the time of the declaration of such Restricted Payment and (ii) the Secured Leverage Ratio, calculated on a Pro Forma Basis, would not exceed 4.80:1.00; and/or

(xii)      the Top Borrower may declare and make dividend payments or other Restricted Payments payable solely in the Capital Stock of the Top Borrower or of any Parent Company.

(b)      The Top Borrower shall not, nor shall it permit any Restricted Subsidiary to, make any prepayment in Cash in respect of principal of or interest on (x) any Junior Lien Indebtedness or (y) any Junior Indebtedness (the Indebtedness described in clauses (x) and (y), the "Restricted Debt"), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Restricted Debt more than one year prior to the scheduled maturity date thereof (collectively, "Restricted Debt Payments"), except:

(i)      with respect to any purchase, defeasance, redemption, repurchase, repayment or other acquisition or retirement thereof made by exchange for, or out of the proceeds of, Refinancing Indebtedness permitted by Section 6.01 and/or refinancing Indebtedness permitted by Section 6.01(x);

(ii)      as part of an applicable high yield discount obligation catch-up payment;

(iii)      payments of regularly scheduled interest (including any penalty interest, if applicable) and payments of fees, expenses and indemnification obligations as and when due (other than payments with respect to Junior Indebtedness that are prohibited by the subordination provisions thereof);

(iv)      Restricted Debt Payments in an aggregate amount not to exceed (A) so long as no Event of Default under Section 7.01(a), (f) or (g) exists, the greater of $100,000,000 and 2.5% of Consolidated Total Assets as of the last day of the most recently ended Test Period, plus (B) at the election of the Top Borrower, the amount of any Restricted Payments then permitted to be made by the Top Borrower in reliance on Section 6.04(a)(x) (it being understood that any amount utilized under this clause (B) to make a Restricted Debt Payment shall result in a reduction in availability under Section 6.04(a)(x));

(v)      (A) Restricted Debt Payments in exchange for, or with proceeds of any issuance of, Qualified Capital Stock of the Top Borrower and/or any capital contribution in respect of Qualified Capital Stock of the Top Borrower, (B) Restricted Debt Payments as a result of the conversion of all or any portion of any Restricted Debt into Qualified Capital Stock of the Top Borrower and (C) to the extent constituting a Restricted Debt Payment, payment-in-kind interest with respect to any Restricted Debt that is permitted under Section 6.01;

113

(vi)    Restricted Debt Payments in an aggregate amount not to exceed (A) the portion, if any, of the Available Amount on such date that the Top Borrower elects to apply to this <u>clause (vi)(A)</u> and/or (B) the portion, if any, of the Available Excluded Contribution Amount on such date that the Top Borrower elects to apply to this <u>clause (vi)(B)</u>;

(vii)    Restricted Debt Payments in an unlimited amount; <u>provided</u> that (A) no Event of Default exists at the time of delivery of irrevocable notice of such Restricted Debt Payment and (B) the Secured Leverage Ratio, calculated on a Pro Forma Basis, would not exceed 5.05:1.00;

(viii)    (A) mandatory prepayments of Restricted Debt (and related payments of interest) made with Declined Proceeds (it being understood that any Declined Proceeds applied to make Restricted Debt Payments in reliance on this <u>Section 6.04(b)(viii)</u> shall not increase the amount available under <u>clause (a)(viii)</u> of the definition of "Available Amount" to the extent so applied) and (B) without duplication of <u>clause (A)</u> above, any mandatory prepayments of any Second Lien Facility with respect to which the corresponding prepayment obligation under this Agreement has been waived or declined in accordance with the terms hereof; and

(ix)    to the extent constituting a Restricted Debt Payment, the consummation of the Refinancing Transactions.

Section 6.05.    <u>Burdensome Agreements</u>.    Except as provided herein or in any other Loan Document, the ABL Credit Agreement, the Second Lien Credit Agreement, any document with respect to any Incremental Equivalent Debt (as defined herein and in (x) the ABL Credit Agreement or any equivalent term under any ABL Facility or (y) the Second Lien Credit Agreement or any equivalent term under any Second Lien Facility) and/or in any agreement with respect to any refinancing, renewal or replacement of such Indebtedness that is permitted by <u>Section 6.01</u>, the Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, enter into or cause to exist any agreement restricting the ability of (x) any Restricted Subsidiary of the Top Borrower that is not a Loan Party to pay dividends or other distributions to the Top Borrower or any Loan Party, (y) any Restricted Subsidiary that is not a Loan Party to make cash loans or advances to the Top Borrower or any Loan Party or (z) any Loan Party to create, permit or grant a Lien on any of its properties or assets to secure the Secured Obligations, except restrictions:

(a)    set forth in any agreement evidencing (i) Indebtedness of a Restricted Subsidiary that is not a Loan Party permitted by <u>Section 6.01</u>, (ii) Indebtedness permitted by <u>Section 6.01</u> that is secured by a Permitted Lien if the relevant restriction applies only to the Person obligated under such Indebtedness and its Restricted Subsidiaries or the assets intended to secure such Indebtedness and (iii) Indebtedness permitted pursuant to <u>clauses (j)</u>, <u>(m)</u>, <u>(p)</u> (as it relates to Indebtedness in respect of <u>clauses (a)</u>, <u>(m)</u>, <u>(q)</u>, <u>(r)</u>, <u>(u)</u>, <u>(w)</u> and/or <u>(y)</u> of <u>Section 6.01</u>), <u>(q)</u>, <u>(r)</u>, <u>(u)</u>, <u>(w)</u> and/or <u>(y)</u> of <u>Section 6.01</u>;

(b)    arising under customary provisions restricting assignments, subletting or other transfers (including the granting of any Lien) contained in leases, subleases, licenses, sublicenses, joint venture agreements and other agreements entered into in the ordinary course of business;

(c)    that are or were created by virtue of any Lien granted upon, transfer of, agreement to transfer or grant of, any option or right with respect to any assets or Capital Stock not otherwise prohibited under this Agreement;

(d)    that are assumed in connection with any acquisition of property or the Capital Stock of any Person, so long as the relevant encumbrance or restriction relates solely to the Person and its subsidiaries (including the Capital Stock of the relevant Person or Persons) and/or property so acquired and was not created in connection with or in anticipation of such acquisition;

114

(e)     set forth in any agreement for any Disposition of any Restricted Subsidiary (or all or substantially all of the assets thereof) that restricts the payment of dividends or other distributions or the making of cash loans or advances by such Restricted Subsidiary pending such Disposition;

(f)     set forth in provisions in agreements or instruments which prohibit the payment of dividends or the making of other distributions with respect to any class of Capital Stock of a Person other than on a pro rata basis;

(g)     imposed by customary provisions in partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar agreements;

(h)     on Cash, other deposits or net worth or similar restrictions imposed by any Person under any contract entered into in the ordinary course of business or for whose benefit such Cash, other deposits or net worth or similar restrictions exist;

(i)     set forth in documents which exist on the Closing Date and were not created in contemplation thereof;

(j)     arising pursuant to an agreement or instrument relating to any Indebtedness permitted to be incurred after the Closing Date if the relevant restrictions, taken as a whole, are not materially less favorable to the Lenders than the restrictions contained in this Agreement, taken as a whole (as determined in good faith by the Top Borrower);

(k)     arising under or as a result of applicable Requirements of Law or the terms of any license, authorization, concession or permit;

(l)     arising in any Hedge Agreement and/or any agreement or arrangement relating to any Banking Services;

(m)     relating to any asset (or all of the assets) of and/or the Capital Stock of the Top Borrower and/or any Restricted Subsidiary which is imposed pursuant to an agreement entered into in connection with any Disposition of such asset (or assets) and/or all or a portion of the Capital Stock of the relevant Person that is permitted or not restricted by this Agreement;

(n)     set forth in any agreement relating to any Permitted Lien that limit the right of the Top Borrower or any Restricted Subsidiary to Dispose of or encumber the assets subject thereto; and/or

(o)     imposed by any amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing of any contract, instrument or obligation referred to in clauses (a) through (n) above; provided that no such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing is, in the good faith judgment of the Top Borrower, more restrictive with respect to such restrictions, taken as a whole, than those in existence prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

Section 6.06.     Investments.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, make or own any Investment in any other Person except:

(a)     Cash or Investments that were Cash Equivalents at the time made;

(b)     (i) Investments existing on the Closing Date in the Top Borrower or in any subsidiary, (ii) Investments made after the Closing Date among the Top Borrower and/or one or more Restricted Subsidiaries that are Loan Parties, (iii) Investments made after the Closing Date by any Loan Party in any Restricted Subsidiary that is not a Loan Party; provided that the aggregate outstanding amount of any such Investment

that is not made in ordinary course shall not exceed the greater of $150,000,000 and 3.75% of Consolidated Total Assets as of the last day of the most recently ended Test Period, (iv) Investments made by any Restricted Subsidiary that is not a Loan Party in any Loan Party and/or any other Restricted Subsidiary that is not a Loan Party and (v) Investments made by any Loan Party and/or any Restricted Subsidiary that is not a Loan Party in the form of any contribution or Disposition of the Capital Stock of any Person that is not a Loan Party;

(c)      Investments (i) constituting deposits, prepayments and/or other credits to suppliers, (ii) made in connection with obtaining, maintaining or renewing client and customer contracts and/or (iii) in the form of advances made to distributors, suppliers, licensors and licensees, in each case, in the ordinary course of business or, in the case of <u>clause (iii)</u>, to the extent necessary to maintain the ordinary course of supplies to the Top Borrower or any Restricted Subsidiary;

(d)      Investments in any Unrestricted Subsidiary and/or any Similar Business (including any joint venture) in an aggregate outstanding amount not to exceed the greater of $100,000,000 and 2.5% of Consolidated Total Assets as of the last day of the most recently ended Test Period;

(e)      (i) Permitted Acquisitions and (ii) any Investment in any Restricted Subsidiary that is not a Loan Party in an amount required to permit such Restricted Subsidiary to consummate a Permitted Acquisition (in compliance, if applicable, with any cap on Investments in non-Loan Parties that is set forth in the relevant carve-out from this <u>Section 6.06</u>), which amount is actually applied by such Restricted Subsidiary to consummate such Permitted Acquisition;

(f)      Investments (i) existing on, or contractually committed to or contemplated as of, the Closing Date and described on <u>Schedule 6.06</u> and (ii) any modification, replacement, renewal or extension of any Investment described in <u>clause (i)</u> above so long as no such modification, renewal or extension increases the amount of such Investment except by the terms thereof or as otherwise permitted by this <u>Section 6.06</u>;

(g)      Investments received in lieu of Cash in connection with any Disposition permitted by <u>Section 6.07</u> or any other disposition of assets not constituting a Disposition;

(h)      loans or advances to present or former employees, directors, members of management, officers, managers or consultants or independent contractors (or their respective Immediate Family Members) of any Parent Company, the Top Borrower, its subsidiaries and/or any joint venture to the extent permitted by Requirements of Law, in connection with such Person's purchase of Capital Stock of any Parent Company, either (i) in an aggregate principal amount not to exceed $1,000,000 at any one time outstanding or (ii) so long as the proceeds of such loan or advance are substantially contemporaneously contributed to the Top Borrower for the purchase of such Capital Stock;

(i)      (i) Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business and (ii) any Investment in any Person that is a retailer of "Simmons" or "Serta"-branded products so long as (A) such Person is experiencing financial difficulty and (B) the aggregate outstanding amount of any Investment made in reliance on this <u>clause (i)(ii)</u> does not exceed the greater of $10,000,000 and 0.25% of Consolidated Total Assets as of the last day of the most recently ended Test Period;

(j)      Investments consisting of (or resulting from) Indebtedness permitted under <u>Section 6.01</u> (other than Indebtedness permitted under <u>Sections 6.01(b)</u> and <u>(h)</u>), Permitted Liens, Restricted Payments permitted under <u>Section 6.04</u> (other than <u>Section 6.04(a)(ix)</u>), Restricted Debt Payments permitted by <u>Section 6.04</u> and mergers, consolidations, amalgamations, liquidations, windings up, dissolutions or Dispositions permitted by <u>Section 6.07</u> (other than <u>Section 6.07(a)</u> (if made in reliance on <u>subclause (ii)(y)</u> of the proviso thereto), <u>Section 6.07(b)</u> (if made in reliance on <u>clause (ii)</u> therein), <u>Section 6.07(c)(ii)</u> (if made in reliance on <u>clause (B)</u> therein) and <u>Section 6.07(g)</u>);

(k)     Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers;

(l)     Investments (including debt obligations and Capital Stock) received (i) in connection with the bankruptcy or reorganization of any Person, (ii) in settlement of delinquent obligations of, or other disputes with, customers, suppliers and other account debtors arising in the ordinary course of business, (iii) upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment and/or (iv) as a result of the settlement, compromise, resolution of litigation, arbitration or other disputes;

(m)     loans and advances of payroll payments or other compensation to present or former employees, directors, members of management, officers, managers or consultants of any Parent Company (to the extent such payments or other compensation relate to services provided to such Parent Company (but excluding, for the avoidance of doubt, the portion of any such amount, if any, attributable to the ownership or operations of any subsidiary of any Parent Company other than the Top Borrower and/or its subsidiaries)), the Top Borrower and/or any subsidiary in the ordinary course of business;

(n)     Investments to the extent that payment therefor is made solely with Capital Stock of any Parent Company or Qualified Capital Stock of the Top Borrower or any Restricted Subsidiary, in each case, to the extent not resulting in a Change of Control;

(o)     (i) Investments of any Restricted Subsidiary acquired after the Closing Date, or of any Person acquired by, or merged into or consolidated or amalgamated with, the Top Borrower or any Restricted Subsidiary after the Closing Date, in each case as part of an Investment otherwise permitted by this Section 6.06 to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of the relevant acquisition, merger, amalgamation or consolidation and (ii) any modification, replacement, renewal or extension of any Investment permitted under clause (i) of this Section 6.06(o) so long as no such modification, replacement, renewal or extension thereof increases the original amount of such Investment except as otherwise permitted by this Section 6.06;

(p)     Investments made in connection with the Transactions;

(q)     Investments made after the Closing Date by the Top Borrower and/or any of its Restricted Subsidiaries in an aggregate amount at any time outstanding not to exceed:

(i)     (A) the greater of $150,000,000 and 3.75% of Consolidated Total Assets as of the last day of the most recently ended Test Period, plus (B) at the election of the Top Borrower, the amount of Restricted Payments then permitted to be made by the Top Borrower or any Restricted Subsidiary in reliance on Section 6.04(a)(x) (it being understood that any amount utilized under this clause (B) to make an Investment shall result in a reduction in availability under Section 6.04(a)(x)), plus (C) at the election of the Top Borrower, the amount of Restricted Debt Payments then permitted to be made by the Top Borrower or any Restricted Subsidiary in reliance on Section 6.04(b)(iv)(A) (it being understood that any amount utilized under this clause (C) to make an Investment shall result in a reduction in availability under Section 6.04(b)(iv)(A)), plus

(ii)     in the event that (A) the Top Borrower or any of its Restricted Subsidiaries makes any Investment after the Closing Date in any Person that is not a Restricted Subsidiary and (B) such Person subsequently becomes a Restricted Subsidiary, an amount equal to 100.0% of the fair market value of such Investment as of the date on which such Person becomes a Restricted Subsidiary;

(r)     Investments made after the Closing Date by the Top Borrower and/or any of its Restricted Subsidiaries in an aggregate outstanding amount not to exceed (i) the portion, if any, of the Available Amount

WEIL:\95874775\19\74339.0001

on such date that the Top Borrower elects to apply to this <u>clause (r)(i)</u> and/or (ii) the portion, if any, of the Available Excluded Contribution Amount on such date that the Top Borrower elects to apply to this <u>clause (r)(ii)</u>;

(s)  (i) Guarantees of leases (other than Capital Leases) or of other obligations not constituting Indebtedness and (ii) Guarantees of the lease obligations of suppliers, customers, franchisees and licensees of the Top Borrower and/or its Restricted Subsidiaries, in each case, in the ordinary course of business;

(t)  Investments in any Parent Company in amounts and for purposes for which Restricted Payments to such Parent Company are permitted under <u>Section 6.04(a)</u>; <u>provided</u> that any Investment made as provided above in lieu of any such Restricted Payment shall reduce availability under the applicable Restricted Payment basket under <u>Section 6.04(a)</u>;

(u)  Investments made by any Restricted Subsidiary that is not a Loan Party with the proceeds received by such Restricted Subsidiary from an Investment made by any Loan Party in such Restricted Subsidiary pursuant to this <u>Section 6.06</u> (other than Investments made pursuant to <u>Section 6.06(e)(ii)</u>);

(v)  Investments in subsidiaries in connection with internal reorganizations and/or restructurings and activities related to tax planning; <u>provided</u> that, after giving effect to any such reorganization, restructuring or activity, neither the Loan Guaranty, taken as a whole, nor the security interest of the Administrative Agent in the Collateral, taken as a whole, is materially impaired;

(w)  Investments under any Derivative Transaction of the type permitted under <u>Section 6.01(s)</u>;

(x)  Investments consisting of the Disposition of inventory from any Loan Party to any Restricted Subsidiary that is not a Loan Party and which is organized under the laws of Canada in the ordinary course of business in an amount not to exceed in any Fiscal Year the greater of $20,000,000 and 0.50% of Consolidated Total Assets as of the last day of the most recently ended Test Period;

(y)  Investments made in joint ventures as required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture agreements and similar binding arrangements entered into in the ordinary course of business;

(z)  Investments made in connection with any nonqualified deferred compensation plan or arrangement for any present or former employee, director, member of management, officer, manager or consultant or independent contractor (or any Immediate Family Member thereof) of any Parent Company, the Top Borrower, its subsidiaries and/or any joint venture;

(aa)  Investments in the Top Borrower, any Restricted Subsidiary and/or joint venture in connection with intercompany cash management arrangements and related activities in the ordinary course of business;

(bb)  Investments so long as (i) after giving effect thereto on a Pro Forma Basis, the Secured Leverage Ratio does not exceed 5.30:1.00, and (ii) no Event of Default under <u>Section 7.01(a)</u>, <u>(f)</u> or <u>(g)</u> exists after giving effect thereto;

(cc)  any Investment made by any Unrestricted Subsidiary prior to the date on which such Unrestricted Subsidiary is designated as a Restricted Subsidiary so long as the relevant Investment was not made in contemplation of the designation of such Unrestricted Subsidiary as a Restricted Subsidiary;

(dd)  Investments consisting of the licensing or contribution of IP Rights pursuant to joint marketing arrangements with other Persons; and

(ee)    loans and advances to any Parent Company not in excess of the amount of (after giving effect to any other loan, advance or Restricted Payment in respect thereof) Restricted Payments that are permitted to be made to such Parent Company in accordance with Section 6.04(a)(i), such Investment being treated for purposes of the applicable provision of Section 6.04(a), including any limitation, as a Restricted Payment made pursuant to such clause.

Section 6.07.    Fundamental Changes; Disposition of Assets.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, enter into any transaction of merger, consolidation or amalgamation, or liquidate, wind up or dissolve themselves (or suffer any liquidation or dissolution), or make any Disposition of any assets having a fair market value in excess of $15,000,000 in a single transaction or a series of related transactions, except:

(a)    any Restricted Subsidiary may be merged, consolidated or amalgamated with or into the Top Borrower or any other Restricted Subsidiary; provided that (i) in the case of any such merger, consolidation or amalgamation with or into the Top Borrower, (A) the Top Borrower shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, consolidation or amalgamation is not the Top Borrower (any such Person, the "Successor Borrower"), (x) the Successor Borrower shall be an entity organized or existing under the law of the U.S., any state thereof or the District of Columbia, (y) the Successor Borrower shall expressly assume the Obligations of the Top Borrower in a manner reasonably satisfactory to the Administrative Agent and (z) except as the Administrative Agent may otherwise agree, each Guarantor, unless it is the other party to such merger, consolidation or amalgamation, shall have executed and delivered a reaffirmation agreement with respect to its obligations under the Loan Guaranty and the other Loan Documents; it being understood and agreed that if the foregoing conditions under clauses (x) through (z) are satisfied, the Successor Borrower will succeed to, and be substituted for, the Top Borrower under this Agreement and the other Loan Documents, and (ii) in the case of any such merger, consolidation or amalgamation with or into any Borrower and/or any Subsidiary Guarantor, either (A) a Borrower or a Subsidiary Guarantor shall be the continuing or surviving Person or the continuing or surviving Person (or, in the case of an amalgamation, the Person formed as a result thereof) shall expressly assume the obligations of the relevant Borrower or Subsidiary Guarantor in a manner reasonably satisfactory to the Administrative Agent or (B) the relevant transaction shall be treated as an Investment and shall comply with Section 6.06;

(b)    Dispositions (including of Capital Stock) among the Top Borrower and/or any Restricted Subsidiary (upon voluntary liquidation or otherwise); provided that any such Disposition made by any Loan Party to any Person that is not a Loan Party shall be (i) for fair market value (as reasonably determined by such Person) with at least 75% of the consideration for such Disposition consisting of Cash or Cash Equivalents at the time of such Disposition or (ii) treated as an Investment and otherwise made in compliance with Section 6.06 (other than in reliance on clause (j) thereof);

(c)    (i) the liquidation or dissolution of any Restricted Subsidiary if the Top Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Top Borrower, is not materially disadvantageous to the Lenders (taken as a whole) and the Top Borrower or any Restricted Subsidiary receives the assets (if any) of the relevant dissolved or liquidated Restricted Subsidiary; provided that in the case of any liquidation or dissolution of any Loan Party that results in a distribution of assets to any Restricted Subsidiary that is not a Loan Party, such distribution shall be treated as an Investment and shall comply with Section 6.06 (other than in reliance on clause (j) thereof); (ii) any merger, amalgamation, dissolution, liquidation or consolidation, the purpose of which is to effect (A) any Disposition otherwise permitted under this Section 6.07 (other than clause (a), clause (b) or this clause (c)) or (B) any Investment permitted under Section 6.06; and (iii) the conversion of the Top Borrower or any Restricted Subsidiary into another form of entity, so long as such conversion does not adversely affect the value of the Loan Guaranty or Collateral, if any;

(d)     (i) Dispositions of inventory or equipment or immaterial assets in the ordinary course of business (including on an intercompany basis) and (ii) the leasing or subleasing of real property in the ordinary course of business;

(e)     Dispositions of surplus, obsolete, used or worn out property or other property that, in the reasonable judgment of the Top Borrower, is (A) no longer useful in its business (or in the business of any Restricted Subsidiary of the Top Borrower) or (B) otherwise economically impracticable to maintain;

(f)     Dispositions of Cash and/or Cash Equivalents and/or other assets that were Cash Equivalents when the relevant original Investment was made;

(g)     Dispositions, mergers, amalgamations, consolidations or conveyances that constitute (w) Investments permitted pursuant to Section 6.06 (other than Section 6.06(j)), (x) Permitted Liens, (y) Restricted Payments permitted by Section 6.04(a) (other than Section 6.04(a)(ix)) and (z) Sale and Lease-Back Transactions permitted by Section 6.08;

(h)     Dispositions for fair market value; provided that with respect to any such Disposition with a purchase price in excess of the greater of $50,000,000 and 1.25% of Consolidated Total Assets as of the last day of the most recently ended Test Period, at least 75% of the consideration for such Disposition shall consist of Cash or Cash Equivalents (provided that for purposes of the 75% Cash consideration requirement, (i) the amount of any Indebtedness or other liabilities (other than Indebtedness or other liabilities that are subordinated to the Obligations or that are owed to the Top Borrower or any Restricted Subsidiary) of the Top Borrower or any Restricted Subsidiary (as shown on such Person's most recent balance sheet or statement of financial position (or in the notes thereto) that are assumed by the transferee of any such assets (or that are otherwise terminated or cancelled in connection with the transaction with such transferee) and for which the Top Borrower and/or its applicable Restricted Subsidiary have been validly released by all relevant creditors in writing, (ii) the amount of any trade-in value applied to the purchase price of any replacement assets acquired in connection with such Disposition, (iii) any Security received by the Top Borrower or any Restricted Subsidiary from such transferee that is converted by such Person into Cash or Cash Equivalents (to the extent of the Cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition and (iv) any Designated Non-Cash Consideration received in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (z) and Section 6.08(B)(1) that is at that time outstanding, not in excess of the greater of $100,000,000 and 2.50% of Consolidated Total Assets as of the last day of the most recently ended Test Period, in each case, shall be deemed to be Cash); provided, further, that (A) immediately prior to and after giving effect to such Disposition, as determined on the date on which the agreement governing such Disposition is executed, no Event of Default exists and (B) the Net Proceeds of such Disposition shall be applied and/or reinvested as (and to the extent) required by Section 2.11(b)(ii);

(i)     to the extent that (i) the relevant property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of the relevant Disposition are promptly applied to the purchase price of such replacement property;

(j)     Dispositions of Investments in joint ventures to the extent required by, or made pursuant to, buy/sell arrangements between joint venture or similar parties set forth in the relevant joint venture arrangements and/or similar binding arrangements;

(k)     Dispositions of notes receivable or accounts receivable in the ordinary course of business (including any discount and/or forgiveness thereof) or in connection with the collection or compromise thereof;

(l)     Dispositions and/or terminations of leases, subleases, licenses or sublicenses (including the provision of software under any open source license), (i) the Disposition or termination of which will not

materially interfere with the business of the Top Borrower and its Restricted Subsidiaries or (ii) which relate to closed facilities or the discontinuation of any product line;

(m)     (i) any termination of any lease in the ordinary course of business, (ii) any expiration of any option agreement in respect of real or personal property and (iii) any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or litigation claims (including in tort) in the ordinary course of business;

(n)     Dispositions of property subject to foreclosure, casualty, eminent domain or condemnation proceedings (including in lieu thereof or any similar proceeding);

(o)     Dispositions or consignments of equipment, inventory or other assets (including leasehold interests in real property) with respect to facilities that are temporarily not in use, held for sale or closed;

(p)     to the extent constituting a Disposition, the consummation of the Transaction;

(q)     Dispositions of non-core assets acquired in connection with any acquisition permitted hereunder and sales of Real Estate Assets acquired in any acquisition permitted hereunder which, within 90 days of the date of such acquisition, are designated in writing to the Administrative Agent as being held for sale and not for the continued operation of the Top Borrower or any of its Restricted Subsidiaries or any of their respective businesses; provided that no Event of Default exists on the date on which the definitive agreement governing the relevant Disposition is executed;

(r)     exchanges or swaps, including transactions covered by Section 1031 of the Code (or any comparable provision of any foreign jurisdiction), of assets so long as any such exchange or swap is made for fair value (as reasonably determined by the Top Borrower) for like assets; provided that upon the consummation of any such exchange or swap by any Loan Party, to the extent the assets received do not constitute an Excluded Asset, the Administrative Agent has a perfected Lien with the same priority as the Lien held on the Real Estate Assets so exchanged or swapped;

(s)     Dispositions of assets that do not constitute Collateral for fair market value; provided that the Net Proceeds of such Disposition shall be applied and/or reinvested as (and to the extent) required by Section 2.11(b)(ii);

(t)     (i) licensing and cross-licensing arrangements involving any technology, intellectual property or IP Rights of the Top Borrower or any Restricted Subsidiary in the ordinary course of business and (ii) Dispositions, abandonments, cancellations or lapses of IP Rights, or issuances or registrations, or applications for issuances or registrations, of IP Rights, which, in the reasonable good faith determination of the Top Borrower, are not material to the conduct of the business of the Top Borrower or its Restricted Subsidiaries, or are no longer economical to maintain in light of its use;

(u)     Dispositions in connection with the terminations or unwinds of Derivative Transactions;

(v)     Dispositions of Capital Stock of, or sales of Indebtedness or other Securities of, Unrestricted Subsidiaries;

(w)     Dispositions of Real Estate Assets and related assets in the ordinary course of business in connection with relocation activities for directors, officers, employees, members of management, managers or consultants of any Parent Company, the Top Borrower and/or any Restricted Subsidiary;

(x)     Dispositions made to comply with any order of any Governmental Authority or any applicable Requirement of Law;

121

(y)        any merger, consolidation, Disposition or conveyance the sole purpose of which is to reincorporate or reorganize (i) any Domestic Subsidiary in another jurisdiction in the U.S. and/or (ii) any Foreign Subsidiary in the U.S. or any other jurisdiction;

(z)        any sale of motor vehicles and information technology equipment purchased at the end of an operating lease and resold thereafter; and/or

(aa)       Dispositions involving assets having a fair market value (as reasonably determined by the Top Borrower at the time of the relevant Disposition) of not more than the greater of $35,000,000 and 1.0% of Consolidated Total Assets as of the last day of the most recently ended Fiscal Year in any Fiscal Year, which, if not used in such Fiscal Year, shall be carried forward to succeeding Fiscal Years.

To the extent that any Collateral is Disposed of as expressly permitted by this Section 6.07 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, which Liens shall be automatically released upon the consummation of such Disposition; it being understood and agreed that the Administrative Agent shall be authorized to take, and shall take, any actions reasonably requested by the Top Borrower in order to effect the foregoing in accordance with Article 8 hereof.

Section 6.08.        Sale and Lease-Back Transactions.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which the Top Borrower or the relevant Restricted Subsidiary (a) has sold or transferred or is to sell or to transfer to any other Person (other than the Top Borrower or any of its Restricted Subsidiaries) and (b) intends to use for substantially the same purpose as the property which has been or is to be sold or transferred by the Top Borrower or such Restricted Subsidiary to any Person (other than the Top Borrower or any of its Restricted Subsidiaries) in connection with such lease (such a transaction, a "Sale and Lease-Back Transaction"); provided that any Sale and Lease-Back Transaction shall be permitted so long as (A) such Sale and Lease-Back Transaction constitutes a Designated Sale and Lease-Back Transaction or (B) the Net Proceeds of such Disposition are applied and/or reinvested as (and to the extent) required by Section 2.11(b)(ii) and either in the case of this clause (B) (I) the resulting Indebtedness is permitted by Section 6.01 or (II) (1) the relevant Sale and Lease-Back Transaction is consummated in exchange for cash consideration (provided that for purposes of the foregoing cash consideration requirement, (w) the amount of any Indebtedness or other liabilities (other than Indebtedness or other liabilities that are subordinated to the Obligations or that are owed to the Top Borrower or any Restricted Subsidiary) of the Top Borrower or any Restricted Subsidiary (as shown on such Person's most recent balance sheet or statement of financial position (or in the notes thereto) that are assumed by the transferee of any such assets and for which the Top Borrower and/or its applicable Restricted Subsidiary have been validly released by all relevant creditors in writing, (x) the amount of any trade-in value applied to the purchase price of any replacement assets acquired in connection with such Disposition, (y) any Securities received by the Top Borrower or any Restricted Subsidiary from such transferee that are converted by such Person into Cash or Cash Equivalents (to the extent of the Cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition and (z) any Designated Non-Cash Consideration received in respect of the relevant Sale and Lease-Back Transaction having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (z) and Section 6.07(h)(z) that is at that time outstanding, not in excess of the greater of $100,000,000 and 2.5% of Consolidated Total Assets as of the last day of the most recently ended Test Period, in each case, shall be deemed to be Cash), (2) the Top Borrower or its applicable Restricted Subsidiary would otherwise be permitted to enter into, and remain liable under, the applicable underlying lease and (3) the aggregate fair market value of the assets sold subject to all Sale and Lease-Back Transactions under this clause (B) shall not exceed the greater of $50,000,000 and 1.25% of Consolidated Total Assets as of the last day of the most recently ended Test Period.

Section 6.09.        Transactions with Affiliates.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, enter into any transaction (including the purchase, sale, lease or exchange of any

property or the rendering of any service) involving payments by the Top Borrower or its Restricted Subsidiaries in excess of $20,000,000 with any of their respective Affiliates on terms that are less favorable to the Top Borrower or such Restricted Subsidiary, as the case may be (as reasonably determined by the Top Borrower), than those that might be obtained at the time in a comparable arm's-length transaction from a Person who is not an Affiliate; provided that the foregoing restriction shall not apply to:

(a)    any transaction between or among the Top Borrower and/or one or more Restricted Subsidiaries (or any entity that becomes a Restricted Subsidiary as a result of such transaction) to the extent permitted or not restricted by this Agreement;

(b)    any issuance, sale or grant of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of employment arrangements, stock options and stock ownership plans approved by the board of directors (or equivalent governing body) of any Parent Company or of the Top Borrower or any Restricted Subsidiary;

(c)    (i) any collective bargaining, employment or severance agreement or compensatory (including profit sharing) arrangement entered into by the Top Borrower or any of its Restricted Subsidiaries with their respective current or former officers, directors, members of management, managers, employees, consultants or independent contractors or those of any Parent Company, (ii) any subscription agreement or similar agreement pertaining to the repurchase of Capital Stock pursuant to put/call rights or similar rights with current or former officers, directors, members of management, managers, employees, consultants or independent contractors and (iii) transactions pursuant to any employee compensation, benefit plan, stock option plan or arrangement, any health, disability or similar insurance plan which covers current or former officers, directors, members of management, managers, employees, consultants or independent contractors or any employment contract or arrangement;

(d)    (i) transactions permitted by Sections 6.01(d), (o) and (ee), 6.04 and 6.06(h), (m), (o), (t), (v), (y), (z) and (aa) and (ii) issuances of Capital Stock and issuances and incurrences of Indebtedness not restricted by this Agreement;

(e)    transactions in existence on the Closing Date and any amendment, modification or extension thereof to the extent such amendment, modification or extension, taken as a whole, is not (i) materially adverse to the Lenders or (ii) more disadvantageous to the Lenders than the relevant transaction in existence on the Closing Date;

(f)    (i) so long as no Event of Default under Sections 7.01(a), 7.01(f) or 7.01(g) then exists or would result therefrom, the payment of management, monitoring, consulting, advisory and similar fees to any Investor in an amount not to exceed the greater of $2,000,000 and 0.05% of Consolidated Total Assets per Fiscal Year and (ii) the payment or reimbursement of all indemnification obligations and expenses owed to any Investor and any of their respective directors, officers, members of management, managers, employees and consultants, in each case of clauses (i) and (ii) whether currently due or paid in respect of accruals from prior periods;

(g)    the Transactions, including the payment of the Specified Dividend and the payment of Transaction Costs;

(h)    ordinary course compensation to Affiliates in connection with financial advisory, financing, underwriting or placement services or in respect of other investment banking activities and other transaction fees, which payments are approved by the majority of the members of the board of directors (or similar governing body) or a majority of the disinterested members of the board of directors (or similar governing body) of the Top Borrower in good faith;

(i)    Guarantees permitted by Section 6.01 or Section 6.06;

(j)     transactions among Holdings, the Top Borrower and its Restricted Subsidiaries that are otherwise permitted (or not restricted) under this Article 6;

(k)     the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the board of directors (or similar governing body), officers, employees, members of management, managers, consultants and independent contractors of the Top Borrower and/or any of its Restricted Subsidiaries in the ordinary course of business and, in the case of payments to such Person in such capacity on behalf of any Parent Company, to the extent attributable to the operations of the Top Borrower or its subsidiaries;

(l)     transactions with customers, clients, suppliers, joint ventures, purchasers or sellers of goods or services or providers of employees or other labor entered into in the ordinary course of business, which are (i) fair to the Top Borrower and/or its applicable Restricted Subsidiary in the good faith determination of the board of directors (or similar governing body) of the Top Borrower or the senior management thereof or (ii) on terms at least as favorable as might reasonably be obtained from a Person other than an Affiliate;

(m)     the payment of reasonable out-of-pocket costs and expenses related to registration rights and customary indemnities provided to shareholders under any shareholder agreement;

(n)     (i) any purchase by Holdings of the Capital Stock of (or contribution to the equity capital of) the Top Borrower and (ii) any intercompany loans made by Holdings to the Top Borrower or any Restricted Subsidiary; and/or

(o)     any transaction in respect of which the Top Borrower delivers to the Administrative Agent a letter addressed to the board of directors (or equivalent governing body) of the Top Borrower from an accounting, appraisal or investment banking firm of nationally recognized standing stating that such transaction is on terms that are no less favorable to the Top Borrower or the applicable Restricted Subsidiary than might be obtained at the time in a comparable arm's length transaction from a Person who is not an Affiliate.

Section 6.10.     Conduct of Business.  From and after the Closing Date, the Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, engage in any material line of business other than (a) the businesses engaged in by the Top Borrower or any Restricted Subsidiary on the Closing Date and similar, incidental, complementary, ancillary or related businesses and (b) such other lines of business to which the Administrative Agent may consent.

Section 6.11.     Amendments or Waivers of Organizational Documents.  The Top Borrower shall not, nor shall it permit any Subsidiary Guarantor to, amend or modify their respective Organizational Documents, in each case in a manner that is materially adverse to the Lenders (in their capacities as such), taken as a whole, without obtaining the prior written consent of the Administrative Agent; provided that, for purposes of clarity, it is understood and agreed that the Top Borrower and/or any Subsidiary Guarantor may effect a change to its organizational form and/or consummate any other transaction that is permitted under Section 6.07.

Section 6.12.     Amendments of or Waivers with Respect to Restricted Debt.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, amend or otherwise modify the terms of any Restricted Debt (or the documentation governing any Restricted Debt) (a) if the effect of such amendment or modification, together with all other amendments or modifications made, is materially adverse to the interests of the Lenders (in their capacities as such) or (b) in violation of the Initial Intercreditor Agreements, any Acceptable Intercreditor Agreement or the subordination terms set forth in the definitive documentation governing any Restricted Debt; provided that, for purposes of clarity, it is understood and agreed that the foregoing limitation shall not otherwise prohibit any Refinancing Indebtedness or any other replacement, refinancing, amendment, supplement, modification, extension, renewal, restatement or refunding of any Restricted Debt, in each case, that is permitted under this Agreement in respect thereof.

Section 6.13. <u>Fiscal Year</u>. The Top Borrower shall not change its Fiscal Year-end to a date other than December 31; <u>provided</u> that the Top Borrower may, upon written notice to the Administrative Agent, change the Fiscal Year-end of the Top Borrower to another date, in which case the Top Borrower and the Administrative Agent will, and are hereby authorized to, make any adjustments to this Agreement that are necessary to reflect such change in Fiscal Year.

Section 6.14. <u>Permitted Activities of Holdings</u>. Holdings shall not:

(a) incur any third party Indebtedness for borrowed money other than (i) the Indebtedness permitted to be incurred by Holdings under the Loan Documents, any ABL Facility and/or any Second Lien Facility or otherwise in connection with the Transactions and (ii) Guarantees of Indebtedness or other obligations of the Top Borrower and/or any Restricted Subsidiary, which Indebtedness or other obligations are otherwise permitted hereunder;

(b) create or suffer to exist any Lien on any asset now owned or hereafter acquired by it other than (i) the Liens created under the Collateral Documents and, subject to the Intercreditor Agreements, the collateral documents relating to any Second Lien Facility and/or ABL Facility, as applicable, in each case, to which it is a party, (ii) any other Lien created in connection with the Transactions, (iii) Permitted Liens on (x) the Term Loan Priority Collateral that are secured on a *pari passu* or junior basis with the Secured Obligations with respect to the Term Loan Priority Collateral and/or (y) the ABL Priority Collateral that are secured on a senior basis with the Secured Obligations with respect to the ABL Priority Collateral, so long as such Permitted Liens secure Guarantees permitted under <u>clause (a)(ii)</u> above and the underlying Indebtedness subject to such Guarantee is permitted to be secured on the same basis pursuant to <u>Section 6.02</u> and (iv) Liens of the type permitted under <u>Section 6.02</u> (other than in respect of debt for borrowed money); or

(c) consolidate or amalgamate with, or merge with or into, or convey, sell or otherwise transfer all or substantially all of its assets to, any Person; <u>provided</u> that, so long as no Default or Event of Default exists or would result therefrom, (A) Holdings may consolidate or amalgamate with, or merge with or into, any other Person (other than the Top Borrower and any of its subsidiaries) so long as (i) Holdings is the continuing or surviving Person or (ii) if the Person formed by or surviving any such consolidation, amalgamation or merger is not Holdings (x) the successor Person (such successor Person, "<u>Successor Holdings</u>") expressly assumes all obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto and/or thereto in a form reasonably satisfactory to the Administrative Agent and (y) the Top Borrower delivers a certificate of a Responsible Officer with respect to the satisfaction of the conditions set forth in <u>clause (x)</u> of this <u>clause (A)</u> and (B) Holdings may otherwise convey, sell or otherwise transfer all or substantially all of its assets to any other Person (other than the Top Borrower and any of its subsidiaries) so long as (x) no Change of Control results therefrom, (y) the Person acquiring such assets expressly assumes all of the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto and/or thereto in a form reasonably satisfactory to the Administrative Agent and (z) the Top Borrower delivers a certificate of a Responsible Officer with respect to the satisfaction of the conditions under <u>clause (x)</u> set forth in this <u>clause (B)</u>; <u>provided</u>, <u>further</u>, that (1) if the conditions set forth in the preceding proviso are satisfied, Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement and (2) it is understood and agreed that Holdings may convert into another form of entity so long as such conversion does not adversely affect the value of the Loan Guaranty or the Collateral.

ARTICLE 7

EVENTS OF DEFAULT

Section 7.01. <u>Events of Default</u>. If any of the following events (each, an "<u>Event of Default</u>") shall occur:

WEIL:\95874775\19\74339.0001

(a)  <u>Failure To Make Payments When Due</u>.  Failure by any Borrower to pay (i) any installment of principal of any Loan when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any Loan or any fee or any other amount due hereunder within five Business Days after the date due; or

(b)  <u>Default in Other Agreements</u>.  (i) Failure by the Top Borrower or any of its Restricted Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in <u>clause (a)</u> above) with an aggregate outstanding principal amount exceeding the Threshold Amount, in each case beyond the grace period, if any, provided therefor; or (ii) breach or default by the Top Borrower or any of its Restricted Subsidiaries with respect to any other term of (A) one or more items of Indebtedness with an aggregate outstanding principal amount exceeding the Threshold Amount or (B) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness (other than, for the avoidance of doubt, with respect to Indebtedness consisting of Hedging Obligations, termination events or equivalent events pursuant to the terms of the relevant Hedge Agreement which are not the result of any default thereunder by any Loan Party or any Restricted Subsidiary), in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, such Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; <u>provided</u> that <u>clause (ii)</u> of this <u>paragraph (b)</u> shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness if such sale or transfer is permitted hereunder; <u>provided</u>, <u>further</u>, that with respect to any default, event or condition referred to in <u>clause (i)</u> or <u>(ii)</u> above with respect to (A) any financial covenant under the ABL Credit Agreement or the documentation governing any ABL Facility or any other revolving credit facility, such default, event or condition shall only constitute an Event of Default if such default, event or condition results in the holders of such Indebtedness demanding repayment thereof or otherwise accelerating such Indebtedness (and terminating the commitments thereunder), which demand or acceleration has not been rescinded and (B) any default, event or condition other than as described in the immediately preceding <u>Clause (A)</u>, such default, event or condition is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to this <u>Article 7</u>; or

(c)  <u>Breach of Certain Covenants</u>.  Failure of any Loan Party, as required by the relevant provision, to perform or comply with any term or condition contained in <u>Section 5.01(e)(i)</u> (<u>provided</u> that, the delivery of a notice of Default or Event of Default at any time will cure any Default or Event of Default arising from the failure to timely deliver such notice of Default or Event of Default, as applicable), <u>Section 5.02</u> (as it applies to the preservation of the existence of the Top Borrower) or <u>Article 6</u>; or

(d)  <u>Breach of Representations, Etc</u>.  Any representation, warranty or certification made or deemed made by any Loan Party in any Loan Document or in any certificate required to be delivered in connection herewith or therewith (including, for the avoidance of doubt, any Perfection Certificate) being untrue in any material respect as of the date made or deemed made; it being understood and agreed that any breach of any representation, warranty or certification resulting from the failure of the Administrative Agent to file any Uniform Commercial Code continuation statement shall not result in an Event of Default under this <u>Section 7.01(d)</u> or any other provision of any Loan Document; or

(e)  <u>Other Defaults Under Loan Documents</u>.  Default by any Loan Party in the performance of or compliance with any term contained herein or any of the other Loan Documents, other than any such term referred to in any other Section of this <u>Article 7</u>, which default has not been remedied or waived within 30 days after receipt by the Top Borrower of written notice thereof from the Administrative Agent; or

(f)  <u>Involuntary Bankruptcy; Appointment of Receiver, Etc</u>.  (i) The entry by a court of competent jurisdiction of a decree or order for relief in respect of Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) in an involuntary case under any Debtor Relief Law now

or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal, state or local Requirements of Law, which relief is not stayed; or (ii) the commencement of an involuntary case against Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) under any Debtor Relief Law; the entry by a court having jurisdiction in the premises of a decree or order for the appointment of a receiver, receiver and manager, (preliminary) insolvency receiver, liquidator, sequestrator, trustee, administrator, custodian or other officer having similar powers over Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary), or over all or a material part of its property; or the involuntary appointment of an interim receiver, trustee or other custodian of Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) for all or a material part of its property, which remains, in any case under this <u>clause (f)</u>, undismissed, unvacated, unbounded or unstayed pending appeal for 60 consecutive days; or

(g) <u>Voluntary Bankruptcy; Appointment of Receiver, Etc</u>.  (i) The entry against Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) of an order for relief, the commencement by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) of a voluntary case under any Debtor Relief Law, or the consent by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) to the entry of an order for relief in an involuntary case or to the conversion of an involuntary case to a voluntary case, under any Debtor Relief Law, or the consent by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) to the appointment of or taking possession by a receiver, receiver and manager, insolvency receiver, liquidator, sequestrator, trustee, administrator, custodian or other like official for or in respect of itself or for all or a material part of its property; (ii) the making by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) of a general assignment for the benefit of creditors; or (iii) the admission by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) in writing of their inability to pay their respective debts as such debts become due; or

(h) <u>Judgments and Attachments</u>.  The entry or filing of one or more final money judgments, writs or warrants of attachment or similar process against Holdings, the Top Borrower or any of its Restricted Subsidiaries or any of their respective assets involving in the aggregate at any time an amount in excess of the Threshold Amount (in either case to the extent not adequately covered by indemnity from a third party, by self-insurance (if applicable) or by insurance as to which the relevant third party insurance company has been notified and not denied coverage), which judgment, writ, warrant or similar process remains unpaid, undischarged, unvacated, unbonded or unstayed pending appeal for a period of 60 consecutive days; or

(i) <u>Employee Benefit Plans</u>.  The occurrence of one or more ERISA Events, which individually or in the aggregate result in liability of Holdings, the Top Borrower or any of its Restricted Subsidiaries in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect; or

(j) <u>Change of Control</u>.  The occurrence of a Change of Control; or

(k) <u>Guaranties, Collateral Documents and Other Loan Documents</u>.  At any time after the execution and delivery thereof, (i) any material Loan Guaranty for any reason, other than the occurrence of the Termination Date, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared, by a court of competent jurisdiction, to be null and void or any Loan Guarantor shall repudiate in writing its obligations thereunder (in each case, other than as a result of the discharge of such Loan Guarantor in accordance with the terms thereof and other than as a result of any act or omission by the Administrative Agent or any Lender), (ii) this Agreement or any material Collateral Document ceases to be in full force and effect or shall be declared, by a court of competent jurisdiction, to be null and void or any Lien on Collateral created under any Collateral Document ceases to be perfected with respect to a material portion of the Collateral (other than (A) Collateral consisting of Material Real Estate Assets to the extent that the relevant losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (B) solely by reason of (w) such perfection not being required pursuant to the Collateral and Guarantee Requirement, the

Collateral Documents, this Agreement or otherwise, (x) the failure of the Administrative Agent to maintain possession of any Collateral actually delivered to it or the failure of the Administrative Agent to file Uniform Commercial Code continuation statements, (y) a release of Collateral in accordance with the terms hereof or thereof or (z) the occurrence of the Termination Date or any other termination of such Collateral Document in accordance with the terms thereof) or (iii) other than in any bona fide, good faith dispute as to the scope of Collateral or whether any Lien has been, or is required to be released, any Loan Party shall contest in writing, the validity or enforceability of any material provision of any Loan Document (or any Lien purported to be created by the Collateral Documents or any Loan Guaranty) or deny in writing that it has any further liability (other than by reason of the occurrence of the Termination Date or any other termination of any other Loan Document in accordance with the terms thereof), including with respect to future advances by the Lenders, under any Loan Document to which it is a party; it being understood and agreed that the failure of the Administrative Agent to file any Uniform Commercial Code continuation statement and/or maintain possession of any physical Collateral shall not result in an Event of Default under this Section 7.01(k) or any other provision of any Loan Document; or

(l)      Subordination.  The Obligations ceasing or the assertion in writing by any Loan Party that the Obligations cease to constitute senior indebtedness under the subordination provisions of any document or instrument evidencing any Junior Lien Indebtedness in excess of the Threshold Amount or any such subordination provision being invalidated by a court of competent jurisdiction in a final non-appealable order, or otherwise ceasing, for any reason, to be valid, binding and enforceable obligations of the parties thereto;

then, and in every such event (other than an event with respect to any Borrower described in clause (f) or (g) of this Article 7), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Top Borrower, take any of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon such Commitments shall terminate immediately and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower; provided that upon the occurrence of an event with respect to any Borrower described in clauses (f) or (g) of this Article 7, any such Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of any Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower without further action of the Administrative Agent or any Lender.  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and at the request of the Required Lenders shall, exercise any rights and remedies provided to the Administrative Agent under the Loan Documents or at law or equity, including all remedies provided under the UCC.

ARTICLE 8

THE ADMINISTRATIVE AGENT

Each of the Lenders hereby irrevocably appoints UBS (or any successor appointed pursuant hereto) as Administrative Agent and authorizes the Administrative Agent to take such actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

Any Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, unless the context

otherwise requires or unless such Person is in fact not a Lender, include each Person serving as Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or any subsidiary of any Loan Party or other Affiliate thereof as if it were not the Administrative Agent hereunder. The Lenders acknowledge that, pursuant to such activities, the Administrative Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall not be under any obligation to provide such information to them.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default exists, and the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Requirements of Law; it being understood that such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary power, except discretionary rights and powers that are expressly contemplated by the Loan Documents and which the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the relevant circumstances as provided in Section 9.02); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Requirements of Law, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdings or any of its subsidiaries that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable to the Lenders or any other Secured Party for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as is necessary, or as the Administrative Agent believes in good faith shall be necessary, under the relevant circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein. The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to the Administrative Agent by the Top Borrower or any Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any covenant, agreement or other term or condition set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of any Lien on the Collateral or the existence, value or sufficiency of the Collateral or to assure that the Liens granted to the Administrative Agent pursuant to any Loan Document have been or will continue to be properly or sufficiently or lawfully created, perfected or enforced or are entitled to any particular priority, (vi) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or (vii) any property, book or record of any Loan Party or any Affiliate thereof.

Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, the Borrowers, the Administrative Agent and each Secured Party agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Loan Guaranty; it being understood that any right to realize upon the Collateral or enforce any Loan Guaranty against any Loan Party pursuant hereto or pursuant to any other Loan Document may be exercised solely by the Administrative Agent on behalf

of the Secured Parties in accordance with the terms hereof or thereof , and (ii) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or in the event of any other Disposition (including pursuant to Section 363 of the Bankruptcy Code), (A) the Administrative Agent, as agent for and representative of the Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or other Disposition, to use and apply all or any portion of the Obligations as a credit on account of the purchase price for any Collateral payable by the Administrative Agent at such sale or other Disposition and (B) the Administrative Agent or any Lender may be the purchaser or licensor of all or any portion of such Collateral at any such Disposition.

No holder of any Secured Hedging Obligation or Banking Services Obligation in its respective capacity as such shall have any rights in connection with the management or release of any Collateral or of the obligations of any Loan Party under this Agreement.

Each Secured Party agrees that the Administrative Agent may in its sole discretion, but is under no obligation to credit bid any part of the Secured Obligations or to purchase or retain or acquire any portion of the Collateral.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) that it believes to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent has received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Top Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. The Administrative Agent and any such sub-agent may perform any and all of their respective duties and exercise their respective rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent.

The Administrative Agent may resign at any time by giving ten days' written notice to the Lenders and the Top Borrower; provided that if no successor agent is appointed in accordance with the terms set forth below within such 10-day period, the Administrative Agent's resignation shall not be effective until the earlier to occur of (x) the date of the appointment of the successor agent or (y) the date that is twenty (20) days after the last day of such 10-day period. If the Administrative Agent is a Defaulting Lender or an Affiliate of a Defaulting Lender, either the Required Lenders or the Top Borrower may, upon ten days' notice, remove the Administrative Agent; provided that if no successor agent is appointed in accordance with the terms set forth below within such 10-day period, the Administrative Agent's removal shall, at the option of the Top Borrower, not be effective until the earlier to occur of (x) the date of the appointment of the successor agent or (y) the date that is twenty (20) days after the last day of such 10-day period. Upon receipt of any such notice of resignation or delivery of any such notice of removal, the Required Lenders shall have the right, with the consent of the Top Borrower (not to be unreasonably withheld or delayed), to appoint a successor Administrative Agent which shall be a commercial bank or trust company with offices in the US having combined capital and surplus in excess of $1,000,000,000; provided that during the existence and continuation

of an Event of Default under <u>Section 7.01(a)</u> or, with respect to any Borrower, <u>Sections 7.01(f)</u> or <u>(g)</u>, no consent of the Top Borrower shall be required. If no successor has been appointed as provided above and accepted such appointment within ten days after the retiring Administrative Agent gives notice of its resignation or the Administrative Agent receives notice of removal, then (a) in the case of a retirement, the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above (including, for the avoidance of doubt, the consent of the Top Borrower) or (b) in the case of a removal, the Top Borrower may, after consulting with the Required Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; <u>provided</u> that (x) in the case of a retirement, if the Administrative Agent notifies the Top Borrower and the Lenders that no qualifying Person has accepted such appointment or (y) in the case of a removal, the Top Borrower notifies the Required Lenders that no qualifying Person has accepted such appointment, then, in each case, such resignation or removal shall nonetheless become effective in accordance with the provisos to the first two sentences in this paragraph and (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent in its capacity as collateral agent for the Secured Parties for purposes of maintaining the perfection of the Lien on the Collateral securing the Secured Obligations, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) all payments, communications and determinations required to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly (and each Lender will cooperate with the Top Borrower to enable the Top Borrower to take such actions), until such time as the Required Lenders or the Top Borrower, as applicable, appoint a successor Administrative Agent, as provided above in this <u>Article 8</u>. Upon the acceptance of its appointment as Administrative Agent hereunder as a successor Administrative Agent, the successor Administrative Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder (other than its obligations under <u>Section 9.13</u> hereof). The fees payable by the Borrowers to any successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Top Borrower and such successor Administrative Agent. After the Administrative Agent's resignation or removal hereunder, the provisions of this Article and <u>Section 9.03</u> shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any action taken or omitted to be taken by any of them while the relevant Person was acting as Administrative Agent (including for this purpose holding any collateral security following the retirement or removal of the Administrative Agent). Notwithstanding anything to the contrary herein, no Disqualified Institution (nor any Affiliate thereof) may be appointed as a successor Administrative Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their respective Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of the Administrative Agent or any of its Related Parties.

Notwithstanding anything to the contrary herein, the Arrangers shall not have any right, power, obligation, liability, responsibility or duty under this Agreement, except in their respective capacities as the Administrative Agent or a Lender hereunder, as applicable.

Each Secured Party irrevocably authorizes and instructs the Administrative Agent to, and the Administrative Agent shall:

(a)      release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon the occurrence of the Termination Date, (ii) that is sold or to be sold or transferred as part of or in connection with any Disposition permitted under the Loan Documents to a Person that is not a Loan Party, (iii) that does not constitute (or ceases to constitute) Collateral, (iv) if the property subject to such Lien is owned by a Subsidiary Guarantor, upon the release of such Subsidiary Guarantor from its Loan Guaranty otherwise in accordance with the Loan Documents, (v) as required under clause (d) below or (vi) if approved, authorized or ratified in writing by the Required Lenders in accordance with Section 9.02;

(b)      subject to Section 9.22, release any Subsidiary Guarantor from its obligations under the Loan Guaranty if such Person ceases to be a Restricted Subsidiary (or becomes an Excluded Subsidiary as a result of a single transaction or series of related transactions permitted hereunder and the Top Borrower has requested such Excluded Subsidiary cease to be a Subsidiary Guarantor);

(c)      subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Sections 6.02(d), 6.02(e), 6.02(g)(i), 6.02(l), 6.02(m), 6.02(n), 6.02(o)(i) (other than any Lien on the Capital Stock of any Subsidiary Guarantor), 6.02(q), 6.02(r), 6.02(s) (to the extent the relevant Lien is of the type to which the Lien of the Administrative Agent is otherwise required to be subordinated under this clause (c) pursuant to any of the other exceptions to Section 6.02 that are expressly included in this clause (c)), 6.02(u) (to the extent the relevant Lien is of the type to which the Lien of the Administrative Agent is otherwise required to be subordinated under this clause (c) pursuant to any of the other exceptions to Section 6.02 (i.e., the exceptions other than Section 6.02(u)) that are expressly included in this clause (c)), 6.02(x), 6.02(y), 6.02(z)(i), 6.02(bb), 6.02(cc), 6.02(dd) (in the case of clause (ii), to the extent the relevant Lien covers Cash or Cash Equivalents posted to secure the relevant obligation), 6.02(ee), 6.02(ff), 6.02(gg) and/or 6.02(hh) (and any Refinancing Indebtedness in respect of any thereof to the extent such Refinancing Indebtedness is permitted to be secured under Section 6.02(k)); provided, that the subordination of any Lien on any property granted to or held by the Administrative Agent shall only be required with respect to any Lien on such property that is permitted by Sections 6.02(l), 6.02(o), 6.02(q), 6.02(r), 6.02(u), 6.02(bb) and/or 6.02(hh) to the extent that the Lien of the Administrative Agent with respect to such property is required to be subordinated to the relevant Permitted Lien in accordance with the documentation governing the Indebtedness that is secured by such Permitted Lien; and

(d)      enter into subordination, intercreditor, collateral trust and/or similar agreements with respect to Indebtedness (including the Initial Intercreditor Agreements and any other Acceptable Intercreditor Agreement and/or any amendment to the Initial Intercreditor Agreements and/or any Acceptable Intercreditor Agreement) that is (i) required or permitted to be subordinated hereunder and/or (ii) secured by Liens permitted hereunder, and with respect to which Indebtedness, this Agreement contemplates an intercreditor, subordination, collateral trust or similar agreement.

Upon the request of the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under the Loan Guaranty or its Lien on any Collateral pursuant to this Article 8. In each case as specified in this Article 8, the Administrative Agent will (and each Lender hereby authorizes the Administrative Agent to), at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents, to subordinate its interest therein, or to release such Loan Party from its obligations under the Loan Guaranty, in each case in accordance with the terms of the Loan Documents and this Article 8; provided, that upon the request of the Administrative Agent, the Top Borrower shall deliver a certificate of a Responsible

132

Officer certifying that the relevant transaction has been consummated in compliance with the terms of this Agreement.

The Administrative Agent is authorized by the Lenders and each other Secured Party to enter into the Initial Intercreditor Agreements, any other Acceptable Intercreditor Agreement and any other intercreditor, subordination, collateral trust or similar agreement contemplated hereby with respect to any (a) Indebtedness (i) that is (A) required or permitted hereunder to be subordinated in right of payment or with respect to security and/or (B) secured by any Lien and (ii) which contemplates an intercreditor, subordination, collateral trust or similar agreement and/or (b) Secured Hedging Obligations and/or Banking Services Obligations, whether or not constituting Indebtedness (any such other intercreditor, subordination, collateral trust and/or similar agreement an "Additional Agreement"), and the Secured Parties party hereto acknowledge that the Initial Intercreditor Agreements, any Acceptable Intercreditor Agreement and any other Additional Agreement is binding upon them. Each Lender and each other Secured Party hereto hereby (a) agrees that they will be bound by, and will not take any action contrary to, the provisions of the Initial Intercreditor Agreements, any Acceptable Intercreditor Agreement or any other Additional Agreement and (b) authorizes and instructs the Administrative Agent to enter into the Initial Intercreditor Agreements, any Acceptable Intercreditor Agreement and/or any other Additional Agreement and to subject the Liens on the Collateral securing the Secured Obligations to the provisions thereof. The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrowers, and the Secured Parties are intended third-party beneficiaries of such provisions and the provisions of the Initial Intercreditor Agreements, any Acceptable Intercreditor Agreement and/or any other Additional Agreement.

To the extent that the Administrative Agent (or any Affiliate thereof) is not reimbursed and indemnified by the Top Borrower in accordance with and to the extent required by Section 9.03(b) hereof, the Lenders will reimburse and indemnify the Administrative Agent (and any Affiliate thereof) in proportion to their respective Applicable Percentages (determined as if there were no Defaulting Lenders) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any Affiliate thereof) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

To the extent required by any applicable Requirement of Law (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender under any Loan Document an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 2.17, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within ten days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph. The agreements in this paragraph shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

ARTICLE 9

MISCELLANEOUS

Section 9.01.    Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email, as follows:

(i)    if to any Loan Party, to such Loan Party in the care of the Top Borrower at:

Serta Simmons Bedding, LLC
3560 Lenox Rd., Suite 1100
Atlanta, GA 30326
Attention:  D. Paul Dascoli
Email:  pdascoli@sertasimmons.com
Facsimile:  (770) 206-2669

with copies to (which shall not constitute notice to any Loan Party):

Serta Simmons Bedding, LLC
3560 Lenox Rd., Suite 1100
Atlanta, GA 30326
Attention:  Kristen McGuffey
Email:  kmcguffey@sertasimmons.com
Facsimile:  (770) 206-2669

and

Advent International Corporation
75 State Street, 2nd floor
Boston, 02109 MA
Attention:  Jefferson Case
Email:  jcase@adventinternational.com
Facsimile:  (617) 951-0566

and

Advent International Corporation
12 E. 49th Street, 45th Floor
New York, New York 10152
Attention:  Ken Prince
Email:  kprince@AdventInternational.com

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:  Allison R. Liff

134

Email:  allison.liff@weil.com
Facsimile:  (212) 310-8007

(ii)    if to the Administrative Agent, at:

UBS AG, Stamford Branch
Attention: Structured Finance Processing
600 Washington Blvd., 9th Floor
Stamford, Connecticut 06901
Facsimile: (203) 719-3888
Telephone: (203) 719-4319
Email: Agency-UBSAmericas@ubs.com

(iii)    if to any Lender, to it at its address or facsimile number set forth in its Administrative Questionnaire.

All such notices and other communications (A) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof or three Business Days after dispatch if sent by certified or registered mail, in each case, delivered, sent or mailed (properly addressed) to the relevant party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01 or (B) sent by facsimile shall be deemed to have been given when sent and when receipt has been confirmed by telephone; provided that notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notices or other communications shall be deemed to have been given at the opening of business on the next Business Day for the recipient).    Notices and other communications delivered through electronic communications to the extent provided in clause (b) below shall be effective as provided in such clause (b).

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including e-mail and Internet or intranet websites) pursuant to procedures set forth herein or otherwise approved by the Administrative Agent.  The Administrative Agent or the Top Borrower (on behalf of any Loan Party) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures set forth herein or otherwise approved by it; provided that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that any such notice or communication not given during the normal business hours of the recipient shall be deemed to have been given at the opening of business on the next Business Day for the recipient or (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    Any party hereto may change its address or facsimile number or other notice information hereunder by notice to the other parties hereto; it being understood and agreed that the Top Borrower may provide any such notice to the Administrative Agent as recipient on behalf of itself and each Lender.

(d)    Each of Holdings and the Top Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by, or on behalf of, Holdings or the Top Borrower hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on the Platform and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material nonpublic information within the meaning of the United States federal securities laws with respect to Holdings, the Top Borrower or their respective securities) (each, a "Public Lender").  At the request

of the Administrative Agent, each of Holdings and the Top Borrower hereby agrees that (i) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC", (ii) by marking Borrower Materials "PUBLIC," Holdings and the Top Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as information of a type that would (A) customarily be made publicly available, as determined in good faith by the Top Borrower, if Holdings or the Top Borrower were to become public reporting companies or (B) would not be material with respect to Holdings, the Top Borrower, their respective subsidiaries, any of their respective securities or the Transactions as determined in good faith by the Top Borrower for purposes of the United States federal securities laws and (iii) the Administrative Agent shall be required to treat Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "PUBLIC," unless the Top Borrower notifies the Administrative Agent promptly that any such document contains material nonpublic information (it being understood that the Top Borrower shall have a reasonable opportunity to review the same prior to distribution and comply with SEC or other applicable disclosure obligations): (1) the Loan Documents and (2) any information delivered pursuant to Section 5.01(a) or (b).

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Top Borrower or its securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS ON, OR THE ADEQUACY OF, THE PLATFORM, AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN ANY SUCH COMMUNICATION. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL ANY PARTY HERETO OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY OTHER PARTY HERETO OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OR MATERIAL BREACH OF THIS AGREEMENT.

Section 9.02.    Waivers; Amendments.

(a)    No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof except as provided herein or in any Loan Document, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or

consent to any departure by any party hereto therefrom shall in any event be effective unless the same is permitted by this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which it is given. Without limiting the generality of the foregoing, to the extent permitted by applicable Requirements of Law, the making of any Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time.

(b)        Subject to this Section 9.02(b) and Sections 9.02(c) and (d) below and to Section 9.05(f), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Top Borrower and the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) or (ii) in the case of any other Loan Document (other than any waiver, amendment or modification to effectuate any modification thereto expressly contemplated by the terms of such other Loan Document), pursuant to an agreement or agreements in writing entered into by the Administrative Agent and each Loan Party that is party thereto, with the consent of the Required Lenders; provided that, notwithstanding the foregoing:

(A)        the consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders) shall be required for any waiver, amendment or modification that:

(1)        increases the Commitment of such Lender (other than with respect to any Incremental Facility pursuant to Section 2.22 or any Extended Revolving Facility or Extended Term Loans pursuant to Section 2.23 in respect of which such Lender has agreed to be an Additional Lender); it being understood that no amendment, modification or waiver of, or consent to departure from, any condition precedent, representation, warranty, covenant, Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall constitute an increase of any Commitment of such Lender;

(2)        reduces the principal amount of any Loan owed to such Lender or any amount due to such Lender on any Loan Installment Date;

(3)        (x) extends the scheduled final maturity of any Loan or (y) postpones any Loan Installment Date or any Interest Payment Date with respect to any Loan held by such Lender or the date of any scheduled payment of any fee or premium payable to such Lender hereunder (in each case, other than any extension for administrative reasons agreed by the Administrative Agent);

(4)        reduces the rate of interest (other than to waive any Default or Event of Default or obligation of the Borrowers to pay interest to such Lender at the default rate of interest under Section 2.13(d), which shall only require the consent of the Required Lenders) or the amount of any fee or premium owed to such Lender; it being understood that no change in the definition of "First Lien Leverage Ratio" or any other ratio used in the calculation of the Applicable Rate or in the calculation of any other interest, fee or premium due hereunder (including any component definition thereof) shall constitute a reduction in any rate of interest or fee hereunder;

(5)        extends the expiry date of such Lender's Commitment; it being understood that no amendment, modification or waiver of, or consent to departure from, any condition precedent, representation, warranty, covenant, Default, Event of Default, mandatory prepayment or mandatory reduction of any Commitment shall constitute an extension of any Commitment of any Lender; and

(6)     waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby (except in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c) and/or 9.05(g) or as otherwise provided in this Section 9.02);

(B)     no such agreement shall:

(1)     change any of the provisions of Section 9.02(a) or Section 9.02(b) or the definition of "Required Lenders" to reduce any voting percentage required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, without the prior written consent of each Lender;

(2)     release all or substantially all of the Collateral from the Lien granted pursuant to the Loan Documents (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Article 8 or Section 9.22 hereof), without the prior written consent of each Lender; or

(3)     release all or substantially all of the value of the Guarantees under the Loan Guaranty (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Section 9.22 hereof), without the prior written consent of each Lender;

(C)     no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent.

(c)     Notwithstanding the foregoing, this Agreement may be amended:

(i)     with the written consent of the relevant Borrower and the Lenders providing the relevant Replacement Term Loans to permit the refinancing or replacement of all or any portion of the outstanding Term Loans under the applicable Class (any such loans being refinanced or replaced, the "Replaced Term Loans") with one or more replacement term loans hereunder ("Replacement Term Loans") pursuant to a Refinancing Amendment; provided that

(A)     the aggregate principal amount of any Class of Replacement Term Loans shall not exceed the aggregate principal amount of the relevant Replaced Term Loans (plus (1) any additional amount permitted to be incurred under Section 6.01 (other than Section 6.01(a)) and, to the extent any such additional amount is secured, the related Lien is permitted under Section 6.02 (other than Section 6.02(a)) and plus (2) the amount of any accrued interest, penalty and/or premium (including any tender premium) thereon, any committed but undrawn amount, and/or any underwriting discount, fees (including any upfront fee and/or original issue discount), commission and/or expense associated therewith),

(B)     any Class of Replacement Term Loans (other than Customary Bridge Loans) must have a final maturity date that is equal to or later than the final maturity date of, and have a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the applicable Replaced Term Loans at the time of the relevant refinancing,

(C)     any Class of Replacement Term Loans may be pari passu with or junior to any then-existing Class of Term Loans in right of payment and may be pari passu with or junior to such Class of Term Loans with respect to the Collateral or unsecured (it being

138

understood that any Replacement Term Loans that are junior to the Initial Term Loans with respect to security shall be pari passu with, or junior to, the Second Lien Facility); provided that any Class of Replacement Term Loans that is pari passu with or junior to any then-existing Class of Term Loan shall be subject to an Acceptable Intercreditor Agreement and may be, at the option of the Administrative Agent and the Top Borrower, documented in a separate agreement or agreements,

(D)      any Class of Replacement Term Loans that is secured may not be secured by any asset other than the Collateral,

(E)      any Class of Replacement Term Loans that is guaranteed may not be guaranteed by any subsidiary of the Top Borrower other than one or more Loan Parties,

(F)      no Class of Replacement Term Loans that is pari passu with the Initial Term Loans in right of payment and security may participate (A) in any voluntary prepayment of Term Loans as set forth in Section 2.11(a)(i) and (B) in any mandatory prepayment of Term Loans as set forth in Section 2.11(b)(vi),

(G)      any Class of Replacement Term Loans may have pricing (including interest, fees and premiums), subject to preceding clause (F), optional prepayment and redemption terms and, subject to clause (B), an amortization schedule as the relevant Borrower and the lenders providing such Class of Replacement Term Loans may agree and

(H)      the other terms and conditions of any Class of Replacement Term Loans (excluding as set forth above) are (1) substantially identical to, or (taken as a whole) no more favorable (as reasonably determined by the Top Borrower) to the lenders providing such Replacement Term Loans than those applicable to the Replaced Term Loans (other than covenants or other provisions applicable only to periods after the latest Maturity Date of such Replaced Term Loans (in each case, as of the date of incurrence of such Replacement Term Loans)), (2) on then-current market terms (as reasonably determined by the Top Borrower) for the applicable type of Indebtedness or (3) reasonably acceptable to the Administrative Agent (it being agreed that terms and conditions of any Replacement Term Loans that are more favorable to the lenders or the agent of such Replacement Term Loans than those contained in the Loan Documents and are then conformed (or added) to the Loan Documents pursuant to the applicable Refinancing Amendment shall be deemed satisfactory to the Administrative Agent), and

(ii)      with the written consent of the relevant Borrower and the Lenders providing the relevant Replacement Revolving Facility to permit the refinancing or replacement of all or any portion of any Incremental Revolving Commitment of any Class (any such Incremental Revolving Commitment being refinanced or replaced, a "Replaced Revolving Facility") with a replacement revolving facility hereunder (a "Replacement Revolving Facility") pursuant to a Refinancing Amendment; provided that:

(A)      the aggregate maximum amount of any Replacement Revolving Facility shall not exceed the aggregate maximum amount of the relevant Replaced Revolving Facility (plus (x) any additional amount permitted to be incurred under Section 6.01 (other than Section 6.01(a)) and, to the extent any such additional amount is secured, the related Lien is permitted under Section 6.02 (other than Section 6.02(a)) and plus (y) the amount of accrued interest and premium thereon, any committed but undrawn amounts and underwriting discounts, fees (including upfront fees), commissions and expenses associated therewith),

139

(B)      no Replacement Revolving Facility may have a final maturity date (or require commitment reductions) prior to the final maturity date of the relevant Replaced Revolving Facility at the time of such refinancing,

(C)      any Replacement Revolving Facility may be *pari passu* with or junior to any then-existing Incremental Revolving Commitment in right of payment and *pari passu* with or junior to any then-existing Incremental Revolving Commitment with respect to the Collateral (it being understood that any Replacement Revolving Facility that is junior to any then-existing Revolving Commitment with respect to security shall be *pari passu* with, or junior to, the Second Lien Facility) or may be unsecured; provided that any Replacement Revolving Facility that is *pari passu* with or junior to the Revolving Credit Commitment shall be subject to an Acceptable Intercreditor Agreement and may be, at the option of the Administrative Agent and the Top Borrower, documented in a separate agreement or agreements,

(D)      any Replacement Revolving Facility that is secured may not be secured by any assets other than the Collateral,

(E)      any Replacement Revolving Facility that is guaranteed may not be guaranteed by any subsidiary of the Top Borrower other than one or more Loan Parties,

(F)      any Replacement Revolving Facility shall be subject to the "ratability" provisions applicable to Extended Revolving Credit Commitments and Extended Revolving Loans set forth in the proviso to clause (i) of Section 2.23(a), mutatis mutandis, to the same extent as if fully set forth in this Section 9.02(c)(ii),

(G)      any Replacement Revolving Facility may have pricing (including interest, fees and premiums) and, subject to preceding clause (F), optional prepayment and redemption terms as the Top Borrower and the lenders providing such Replacement Revolving Facility may agree, and

(H)      other terms and conditions of any Replacement Revolving Facility (excluding as set forth above) are (1) substantially identical to, or (taken as a whole) no more favorable (as reasonably determined by the Top Borrower) to the lenders providing such Replacement Revolving Facility than those applicable to the Replaced Revolving Facility (other than covenants or other provisions applicable only to periods after the latest Maturity Date of such Replaced Revolving Facility (in each case, as of the date of incurrence of such Replacement Revolving Facility)), (2) then-current market terms (as reasonably determined by the Top Borrower) for the applicable type of Indebtedness or (3) reasonably acceptable to the Administrative Agent (it being agreed that terms and conditions of any Replacement Revolving Facility that are more favorable to the lenders or the agent of such Replacement Revolving Facility than those contained in the Loan Documents and are then conformed (or added) to the Loan Documents pursuant to the applicable Refinancing Amendment shall be deemed satisfactory to the Administrative Agent),

(I)      the commitments in respect of the relevant Replaced Revolving Facility shall be terminated, and all loans outstanding thereunder and all fees then due and payable in connection therewith shall be paid in full, in each case on the date any Replacement Revolving Facility is implemented;

provided, further, that, in respect of each of sub-clauses (i) and (ii) of this clause (c), any Non-Debt Fund Affiliate and Debt Fund Affiliate shall (x) be permitted without the consent of the Administrative Agent to provide any Class of Replacement Term Loans, it being understood that in connection therewith, the relevant Non-Debt Fund Affiliate or Debt Fund Affiliate, as applicable, shall be subject to the restrictions applicable to

WEIL:\95874775\19\74339.0001

such Person under Section 9.05 and (y) any Debt Fund Affiliate (but not any Non-Debt Fund Affiliate) may provide any Replacement Revolving Facility.

Each party hereto hereby agrees that this Agreement may be amended by the relevant Borrower, the Administrative Agent and the lenders providing the relevant Class of Replacement Term Loans or the Replacement Revolving Facility, as applicable, to the extent (but only to the extent) necessary to reflect the existence and terms of such Class of Replacement Term Loans or Replacement Revolving Facility, incurred or implemented pursuant thereto (including any amendment necessary to treat the loans and commitments subject thereto as a separate "tranche" and "Class" of Loans and/or commitments hereunder).  It is understood that any Lender approached to provide all or a portion of any Class of Replacement Term Loans or any Replacement Revolving Facility, may elect or decline, in its sole discretion, to provide such Class of Replacement Term Loans or Replacement Revolving Facility.

(d)     Notwithstanding anything to the contrary contained in this Section 9.02 or any other provision of this Agreement or any provision of any other Loan Document:

(i)     the Top Borrower and the Administrative Agent may, without the input or consent of any Lender, amend, supplement and/or waive any guaranty, collateral security agreement, pledge agreement and/or related document (if any) executed in connection with this Agreement to (A) comply with any Requirement of Law or the advice of counsel or (B) cause any such guaranty, collateral security agreement, pledge agreement or other document to be consistent with this Agreement and/or the relevant other Loan Documents,

(ii)     the Top Borrower and the Administrative Agent may, without the input or consent of any other Lender (other than the relevant Lenders providing Loans under such Sections), effect amendments to this Agreement and the other Loan Documents as may be necessary in the reasonable opinion of the Top Borrower and the Administrative Agent to (1) effect the provisions of Sections 2.22, 2.23, 5.12, Section 6.13 and/or 9.02(c), or any other provision specifying that any waiver, amendment or modification may be made with the consent or approval of the Administrative Agent, (2) in connection with any Additional Revolving Credit Commitment, in case of the addition of any financial covenant for the benefit of the relevant Additional Revolving Lenders, amend Section 7.01 to add a customary "standstill" provision, such that no breach of such financial covenant will constitute a default or event of default for purposes of the Term Facility unless the applicable Additional Revolving Lenders have accelerated the loans under such Additional Revolving Facility and terminated the Additional Revolving Credit Commitments as a result of such breach and/or (3) to add terms (including representations and warranties, conditions, prepayments, covenants or events of default), in connection with the addition of any Loan or Commitment hereunder, that are favorable to the then-existing Lenders, as reasonably determined by the Administrative Agent,

(iii)     if the Administrative Agent and the Top Borrower have jointly identified any ambiguity, mistake, defect, inconsistency, obvious error or any error or omission of a technical nature or any necessary or desirable technical change, in each case, in any provision of any Loan Document, then the Administrative Agent and the Top Borrower shall be permitted to amend such provision solely to address such matter as reasonably determined by them acting jointly,

(iv)     the Administrative Agent and the Top Borrower may amend, restate, amend and restate or otherwise modify the Initial Intercreditor Agreements, any Acceptable Intercreditor Agreement and/or any other Additional Agreement as provided therein,

(v)     the Administrative Agent may amend the Commitment Schedule to reflect assignments entered into pursuant to Section 9.05, Commitment reductions or terminations pursuant to Section 2.09, implementations of Additional Commitments or incurrences of Additional Loans

WEIL:\95874775\19\74339.0001

pursuant to Sections 2.22, 2.23 or 9.02(c) and reductions or terminations of any such Additional Commitments or Additional Loans,

(vi)    no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except as permitted pursuant to Section 2.21(b) and except that the Commitment of any Defaulting Lender may not be increased without the consent of such Defaulting Lender (it being understood that any Commitment or Loan held or deemed held by any Defaulting Lender shall be excluded from any vote hereunder that requires the consent of any Lender, except as expressly provided in Section 2.21(b)),

(vii)    this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Top Borrower (i) to add one or more additional credit facilities to this Agreement and to permit any extension of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the relevant benefits of this Agreement and the other Loan Documents and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion, and

(viii)    any amendment, wavier or modification of any term or provision that directly affects Lenders under one or more Classes and does not directly affect Lenders under one or more other Classes may be effected with the consent of Lenders owning 50% of the aggregate commitments or Loans of such directly affected Class in lieu of the consent of the Required Lenders.

Section 9.03.    Expenses; Indemnity.

(a)    Subject to Section 9.05(f), the Borrowers shall jointly and severally pay (i) all reasonable and documented out-of-pocket expenses incurred by each Arranger, the Administrative Agent and their respective Affiliates (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one firm of outside counsel to all such Persons taken as a whole and, if necessary, of one local counsel in any relevant jurisdiction to all such Persons, taken as a whole in connection with the syndication and distribution (including via the Internet or through a service such as Intralinks) of the Credit Facilities, the preparation, execution, delivery and administration of the Loan Documents and any related documentation, including in connection with any amendment, modification or waiver of any provision of any Loan Document (whether or not the transactions contemplated thereby are consummated, but only to the extent the preparation of any such amendment, modification or waiver was requested by the Top Borrower and except as otherwise provided in a separate writing between the Top Borrower, the relevant Arranger and/or the Administrative Agent) and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Arrangers and the Lenders or any of their respective Affiliates (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one firm of outside counsel to all such Persons taken as a whole and, if necessary, of one local counsel in any relevant jurisdiction to all such Persons, taken as a whole) in connection with the enforcement, collection or protection of their respective rights in connection with the Loan Documents, including their respective rights under this Section, or in connection with the Loans made hereunder.  Except to the extent required to be paid on the Closing Date, all amounts due under this paragraph (a) shall be payable by any Borrower within 30 days of receipt by the Top Borrower of an invoice setting forth such expenses in reasonable detail, together with backup documentation supporting the relevant reimbursement request.

(b)    The Borrowers shall jointly and severally indemnify each Arranger, the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages and liabilities (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if

reasonably necessary, one local counsel in any relevant jurisdiction to all Indemnitees, taken as a whole and solely in the case of an actual or perceived conflict of interest, (x) one additional counsel to all affected Indemnitees, taken as a whole, and (y) one additional local counsel to all affected Indemnitees, taken as a whole), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby or thereby and/or the enforcement of the Loan Documents, (ii) the use of the proceeds of the Loan, (iii) any actual or alleged Release or presence of Hazardous Materials on, at, under or from any property currently or formerly owned or operated by the Top Borrower, any of its Restricted Subsidiaries or any other Loan Party or any Environmental Liability related to the Top Borrower, any of its Restricted Subsidiaries or any other Loan Party and/or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by the Top Borrower, any other Loan Party or any of their respective Affiliates); <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that any such loss, claim, damage, or liability (i) is determined by a final and non-appealable judgment of a court of competent jurisdiction (or documented in any settlement agreement referred to below) to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or, to the extent such judgment finds (or any such settlement agreement acknowledges) that any such loss, claim, damage, or liability has resulted from such Person's material breach of the Loan Documents or (ii) arises out of any claim, litigation, investigation or proceeding brought by such Indemnitee against another Indemnitee (other than any claim, litigation, investigation or proceeding that is brought by or against the Administrative Agent or any Arranger, acting in its capacity as the Administrative Agent or as an Arranger) that does not involve any act or omission of Holdings, the Top Borrower or any of its subsidiaries. Each Indemnitee shall be obligated to refund or return any and all amounts paid by any Borrower pursuant to this <u>Section 9.03(b)</u> to such Indemnitee for any fees, expenses, or damages to the extent such Indemnitee is not entitled to payment thereof in accordance with the terms hereof. All amounts due under this <u>paragraph (b)</u> shall be payable by any Borrower within 30 days (x) after receipt by the Top Borrower of a written demand therefor, in the case of any indemnification obligations and (y) in the case of reimbursement of costs and expenses, after receipt by the Top Borrower of an invoice setting forth such costs and expenses in reasonable detail, together with backup documentation supporting the relevant reimbursement request. This <u>Section 9.03(b)</u> shall not apply to Taxes other than any Taxes that represent losses, claims, damages or liabilities in respect of a non-Tax claim.

(c)     The Top Borrower shall not be liable for any settlement of any proceeding effected without the written consent of the Top Borrower (which consent shall not be unreasonably withheld, delayed or conditioned), but if any proceeding is settled with the written consent of the Top Borrower, or if there is a final judgment against any Indemnitee in any such proceeding, the Borrowers agree to indemnify and hold harmless each Indemnitee to the extent and in the manner set forth above. The Top Borrower shall not, without the prior written consent of the affected Indemnitee (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened proceeding in respect of which indemnity could have been sought hereunder by such Indemnitee unless (i) such settlement includes an unconditional release of such Indemnitee from all liability or claims that are the subject matter of such proceeding and (ii) such settlement does not include any statement as to any admission of fault or culpability.

Section 9.04.     <u>Waiver of Claim</u>.  To the extent permitted by applicable Requirements of Law, no party to this Agreement nor any Secured Party shall assert, and each hereby waives, any claim against any other party hereto, any Loan Party and/or any Related Party of any thereof, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof, except, in the case of any claim by any Indemnitee against any Borrower, to the extent such damages would otherwise be subject to indemnification pursuant to, and in accordance with, the terms of <u>Section 9.03</u>.

WEIL:\95874775\19\74339.0001

Section 9.05.     Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that (i) except as provided under Section 6.07, the Top Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Top Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with the terms of this Section (any attempted assignment or transfer not complying with the terms of this Section shall be null and void and, with respect to any attempted assignment or transfer to any Disqualified Institution, subject to Section 9.05(f)).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and permitted assigns, to the extent provided in paragraph (e) of this Section, Participants and, to the extent expressly contemplated hereby, the Related Parties of each of the Arrangers, the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of any Loan or Additional Commitment added pursuant to Sections 2.22, 2.23 or 9.02(c) at the time owing to it) with the prior written consent of:

(A)     the Top Borrower (such consent not to be unreasonably withheld, conditioned or delayed); provided, that (x) the Top Borrower shall be deemed to have consented to any assignment of Term Loans (other than any such assignment to a Disqualified Institution or a natural Person) unless it has objected thereto by written notice to the Administrative Agent within 15 Business Days after receipt of written notice thereof, (y) the consent of the Top Borrower shall not be required for any assignment of Term Loans or Term Commitments (1) to any Term Lender or any Affiliate of any Term Lender or an Approved Fund or (2) at any time when an Event of Default under Section 7.01(a) or Sections 7.01(f) or (g) (with respect to the Top Borrower) exists and (z) the Top Borrower may withhold its consent to any assignment to any Person (other than a Bona Fide Debt Fund) that is not a Disqualified Institution but is known by the Top Borrower to be an Affiliate of a Disqualified Institution regardless of whether such person is identifiable as an Affiliate of a Disqualified Institution on the basis of such Affiliate's name; and

(B)     the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed); provided, that no consent of the Administrative Agent shall be required for any assignment to another Lender, any Affiliate of a Lender or any Approved Fund; and

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of any assignment to another Lender, any Affiliate of any Lender or any Approved Fund or any assignment of the entire remaining amount of the relevant assigning Lender's Loans or Commitments of any Class, the principal amount of Loans or Commitments of the assigning Lender subject to the relevant assignment (determined as of the date on which the Assignment Agreement with respect to such assignment is delivered to the Administrative Agent and determined on an aggregate basis in the event of concurrent assignments to Related Funds or by Related Funds) shall not be less than (x) $1,000,000, unless the Top Borrower and the Administrative Agent otherwise consent;

(B)    any partial assignment shall be made as an assignment of a proportionate part of all the relevant assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment Agreement via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); and

(D)    the relevant Eligible Assignee, if it is not a Lender, shall deliver on or prior to the effective date of such assignment, to the Administrative Agent (1) an Administrative Questionnaire and (2) any Internal Revenue Service form required under Section 2.17.

(iii)    Subject to the acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in any Assignment Agreement, the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned pursuant to such Assignment Agreement, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment Agreement, be released from its obligations under this Agreement (and, in the case of an Assignment Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be (A) entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03 with respect to facts and circumstances occurring on or prior to the effective date of such assignment and (B) subject to its obligations thereunder and under Section 9.13). If any assignment by any Lender holding any Promissory Note is made after the issuance of such Promissory Note, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender such Promissory Note to the Administrative Agent for cancellation, and, following such cancellation, if requested by either the assignee or the assigning Lender, the Borrowers shall issue and deliver a new Promissory Note to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices in the United States a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders and their respective successors and assigns, and the commitment of, and principal amount of and interest on the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Top Borrower and each Lender (but only as to its own holdings), at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment Agreement executed by an assigning Lender and an Eligible Assignee, the Eligible Assignee's completed Administrative Questionnaire and any tax certification required by Section 9.05(b)(ii)(D)(2) (unless the assignee is already a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section, if applicable, and any written consent to the relevant assignment required by paragraph (b) of this Section, the Administrative Agent shall promptly accept such Assignment Agreement and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)     By executing and delivering an Assignment Agreement, the assigning Lender and the Eligible Assignee thereunder shall be deemed to confirm and agree with each other and the other parties hereto as follows: (A) the assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that the amount of its commitments, and the outstanding balances of its Loans, in each case without giving effect to any assignment thereof which has not become effective, are as set forth in such Assignment Agreement, (B) except as set forth in clause (A) above, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statement, warranty or representation made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Top Borrower or any Restricted Subsidiary or the performance or observance by the Top Borrower or any Restricted Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (C) the assignee represents and warrants that it is an Eligible Assignee and that it is not a Disqualified Institution, legally authorized to enter into such Assignment Agreement; (D) the assignee confirms that it has received a copy of this Agreement and each applicable Intercreditor Agreement, together with copies of the financial statements referred to in Section 4.01(c) or the most recent financial statements delivered pursuant to Section 5.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment Agreement; (E) the assignee will independently and without reliance upon the Administrative Agent, the assigning Lender or any other Lender and based on such documents and information as it deems appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (F) the assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent, by the terms hereof, together with such powers as are reasonably incidental thereto; and (G) the assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(c)     (i) Any Lender may, without the consent of the Top Borrower, the Administrative Agent or any other Lender, sell participations to any bank or other entity (other than to any Disqualified Institution, any natural Person or, other than with respect to any participation to any Debt Fund Affiliate (any such participations to a Debt Fund Affiliate being subject to the limitation set forth in the first proviso of the penultimate paragraph set forth in Section 9.05(g), as if the limitation applied to such participations), the Top Borrower or any of its Affiliates) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible for the other parties hereto for the performance of such obligations and (C) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which any Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the relevant Participant, agree to any amendment, modification or waiver described in (x) clause (A) of the first proviso to Section 9.02(b) that directly and adversely affects the Loans or commitments in which such Participant has an interest and (y) clauses (B)(1), (2) or (3) of the first proviso to Section 9.02(b).  Subject to paragraph (c)(ii) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the limitations and requirements of such Sections and Section 2.19) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section and it being understood that the documentation required under Section 2.17(f) shall be delivered to the participating Lender, and if additional amounts are required to be paid pursuant to Section 2.17(a) or Section 2.17(c), to the Top Borrower and the Administrative Agent).  To the extent permitted by applicable

Requirements of Law, each Participant also shall be entitled to the benefits of <u>Section 9.09</u> as though it were a Lender; <u>provided</u> that such Participant shall be subject to <u>Section 2.18(c)</u> as though it were a Lender.

(ii)     No Participant shall be entitled to receive any greater payment under <u>Section 2.15</u>, <u>2.16</u> or <u>2.17</u> than the participating Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Top Borrower's prior written consent (in its sole discretion), expressly acknowledging that such Participant's entitlement to benefits under <u>Sections 2.15</u>, <u>2.16</u> and <u>2.17</u> is not limited to what the participating Lender would have been entitled to receive absent the participation.

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and their respective successors and registered assigns, and the principal and interest amounts of each Participant's interest in the Loans or other obligations under the Loan Documents (a "<u>Participant Register</u>"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of any Participant Register (including the identity of any Participant or any information relating to any Participant's interest in any Commitment, Loan or any other obligation under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and each Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     (i) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (other than to any Disqualified Institution or any natural person) to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to any Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this <u>Section 9.05</u> shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest shall release any Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(ii)     No Lender, acting in its capacity as a Lender (or any Affiliate or other Person acting on such Lender's behalf) may at any time enter into a total return swap, total rate of return swap, credit default swap or other derivative instrument under which any Secured Obligation is a sole reference obligation (or a reference obligation constituting at least 5% of the weight in any bucket of such derivative instruments) (any such swap or other derivative instrument, an "<u>Obligations Derivative Instrument</u>") with any counterparty that is a Disqualified Institution; <u>provided</u> that, for the avoidance of doubt, nothing in this clause shall prohibit the activities of a Lender (or any Affiliate or other Person acting on such Lender's behalf) that occur on the public side of an information barrier unless such Person is acting in its capacity as a Lender or on behalf of any Person which is acting in its capacity as Lender or on behalf of a Lender; <u>provided</u> <u>further</u> that, (x) notwithstanding the foregoing, in no event shall Confidential Information be shared with any counterparty to an Obligations Derivatives Instrument that is a Disqualified Institution and each Lender shall be required to comply with the provisions of <u>Section 9.13</u> in connection with any transactions involving Obligations Derivative Instruments and (y) in the event of any Obligations Derivative Instrument in violation of the foregoing, the Top Borrower has the right to require the unwind of the applicable Obligations Derivative Instrument at the sole cost and expense of the applicable Lender.

(e)     Notwithstanding anything to the contrary contained herein, any Lender (a "<u>Granting Lender</u>") may grant to a special purpose funding vehicle (an "<u>SPC</u>"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Top Borrower, the option to provide to any Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to such Borrower

pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of any Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of such Borrower under this Agreement (including its obligations under Section 2.15, 2.16 or 2.17) and no SPC shall be entitled to any greater amount under Section 2.15, 2.16 or 2.17 or any other provision of this Agreement or any other Loan Document that the Granting Lender would have been entitled to receive, unless the grant to such SPC is made with the prior written consent of the Top Borrower (in its sole discretion), expressly acknowledging that such SPC's entitlement to benefits under Sections 2.15, 2.16 and 2.17 is not limited to what the Granting Lender would have been entitled to receive absent the grant to the SPC, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender) and (iii) the Granting Lender shall for all purposes including approval of any amendment, waiver or other modification of any provision of the Loan Documents, remain the Lender of record hereunder. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the Requirements of Law of the U.S. or any State thereof; provided that (i) such SPC's Granting Lender is in compliance in all material respects with its obligations to the Borrowers hereunder and (ii) each Lender designating any SPC hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such SPC during such period of forbearance. In addition, notwithstanding anything to the contrary contained in this Section 9.05, any SPC may (i) with notice to, but without the prior written consent of, any Borrower or the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guaranty or credit or liquidity enhancement to such SPC.

(f)        (i) Any assignment or participation or entry into an Obligations Derivative Instrument by a Lender (A) to or with any Disqualified Institution or (B) without the Top Borrower's consent to the extent the Top Borrower's consent is required under this Section 9.05 (and not deemed to have been given pursuant to Section 9.05(b)(i)(A)), in each case, to any Person shall be null and void, and the Top Borrower shall be entitled to seek specific performance to unwind any such assignment or participation  and/or specifically enforce this Section 9.05(f) in addition to injunctive relief (without posting a bond or presenting evidence of irreparable harm) or any other remedy available to any Borrower at law or in equity; it being understood and agreed that Holdings, the Top Borrower and its subsidiaries will suffer irreparable harm if any Lender breaches any obligation under this Section 9.05 as it relates to any assignment, participation or pledge of any Loan or Commitment to any Person to whom the Top Borrower's consent is required but not obtained. Nothing in this Section 9.05(f) shall be deemed to prejudice any right or remedy that Holdings or the Top Borrower may otherwise have at law or equity. Upon the request of any Lender, the Administrative Agent shall make the list of Disqualified Institutions available to such Lender, and such Lender may provide the list of Disqualified Institutions to any potential assignee or participant or counterparty to any Obligations Derivative Instrument on a confidential basis in accordance with Section 9.13 solely for the purpose of permitting such Person to verify whether such Person (or any Affiliate thereof) constitutes a Disqualified Institution.

(ii)        If any assignment or participation under this Section 9.05 is made to any Disqualified Institution and/or any Affiliate of any Disqualified Institution (other than any Bona Fide Debt Fund) without the Top Borrower's prior written consent (any such person, a "Disqualified Person"), then the Top Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Person and the Administrative Agent, (A) terminate any Commitment of such Disqualified Person and repay

all obligations of each Borrower owing to such Disqualified Person, (B) in the case of any outstanding Term Loans, held by such Disqualified Person, purchase such Term Loans by paying the lesser of (x) par and (y) the amount that such Disqualified Person paid to acquire such Term Loans, <u>plus</u> accrued interest thereon, accrued fees and all other amounts payable to it hereunder and/or (C) require such Disqualified Person to assign, without recourse (in accordance with and subject to the restrictions contained in this <u>Section 9.05</u>), all of its interests, rights and obligations under this Agreement to one or more Eligible Assignees; <u>provided</u> that (I) in the case of <u>clause (B)</u>, the applicable Disqualified Person has received payment of an amount equal to the lesser of (1) par and (2) the amount that such Disqualified Person paid for the applicable Loans, <u>plus</u> accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from any Borrower, (II) in the case of <u>clauses (A)</u> and <u>(B)</u>, the relevant Borrower shall be liable to the relevant Disqualified Person under <u>Section 2.16</u> if any LIBO Rate Loan owing to such Disqualified Person is repaid or purchased other than on the last day of the Interest Period relating thereto, (III) in the case of <u>clause (C)</u>, the relevant assignment shall otherwise comply with this <u>Section 9.05</u> (except that (x) no registration and processing fee required under this <u>Section 9.05</u> shall be required with any assignment pursuant to this paragraph and (y) any Term Loan acquired by any Affiliated Lender pursuant to this paragraph will not be included in calculating compliance with the Affiliated Lender Cap for a period of 90 days following such transfer; <u>provided</u> that, to the extent the aggregate principal amount of Term Loans held by Affiliated Lenders exceeds the Affiliated Lender Cap on the 91st day following such transfer, then such excess amount shall either be (x) contributed (or distributed, as applicable) to Holdings, the Top Borrower or any of its subsidiaries and retired and cancelled immediately upon such contribution or (y) automatically cancelled)) and (IV) in no event shall such Disqualified Person be entitled to receive amounts set forth in <u>Section 2.13(d)</u>. Further, any Disqualified Person identified by the Top Borrower to the Administrative Agent (A) shall not be permitted to (x) receive information or reporting provided by any Loan Party, the Administrative Agent or any Lender and/or (y) attend and/or participate in conference calls or meetings attended solely by the Lenders and the Administrative Agent, (B) (x) shall not for purposes of determining whether the Required Lenders, the majority of Lenders under any Class, each Lender or each affected Lender have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, have a right to consent (or not consent), otherwise act or direct or require the Administrative Agent or any Lender to take (or refrain from taking) any such action; it being understood that all Loans held by any Disqualified Person shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders, majority Lenders under any Class, each Lender or each affected Lender have taken any action, and (y) shall be deemed to vote in the same proportion as Lenders that are not Disqualified Persons in any proceeding under any Debtor Relief Law commenced by or against the Top Borrower or any other Loan Party and (C) shall not be entitled to receive the benefits of <u>Section 9.03</u>. For the sake of clarity, the provisions in this <u>Section 9.05(f)</u> shall not apply to any Person that is an assignee of any Disqualified Person, if such assignee is not a Disqualified Person.

(iii)     Notwithstanding anything to the contrary herein, each of Holdings, each other Loan Party and the Lenders acknowledges and agrees that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Person and the Administrative Agent shall have no liabilities with respect to any assignment or participation made to a Disqualified Person.

(g)     Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases, in each case with respect to <u>clauses (A)</u> and <u>(B)</u>, without the consent of the Administrative Agent; <u>provided</u> that:

(i)      any Term Loans acquired by Holdings, the Top Borrower or any of its Restricted Subsidiaries shall, to the extent permitted by applicable Requirements of Law, be retired and cancelled immediately upon the acquisition thereof; provided that upon any such retirement and cancellation, the aggregate outstanding principal amount of the Term Loans shall be deemed reduced by the full par value of the aggregate principal amount of the Term Loans so retired and cancelled, and each principal repayment installment with respect to the Term Loans pursuant to Section 2.10(a) shall be reduced on a pro rata basis by the full par value of the aggregate principal amount of Term Loans so cancelled;

(ii)      any Term Loans acquired by any Non-Debt Fund Affiliate may (but shall not be required to) be contributed (or distributed, as applicable) to the Top Borrower or any of its subsidiaries (it being understood that any such Term Loans shall, to the extent permitted by applicable Requirements of Law, be retired and cancelled promptly upon such contribution); provided that upon any such cancellation, the aggregate outstanding principal amount of the Term Loans shall be deemed reduced, as of the date of such contribution, by the full par value of the aggregate principal amount of the Term Loans so contributed and cancelled, and each principal repayment installment with respect to the Term Loans pursuant to Section 2.10(a) shall be reduced pro rata by the full par value of the aggregate principal amount of Initial Term Loans so contributed and cancelled;

(iii)      the relevant Affiliated Lender and assigning Lender shall have executed an Affiliated Lender Assignment and Assumption;

(iv)      after giving effect to the relevant assignment and to all other assignments to all Affiliated Lenders, the aggregate principal amount of all Term Loans then held by all Affiliated Lenders shall not exceed 30% of the aggregate principal amount of the Term Loans then outstanding (after giving effect to any substantially simultaneous cancellations thereof) (the "Affiliated Lender Cap"); provided that each party hereto acknowledges and agrees that the Administrative Agent shall not be liable for any losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever incurred or suffered by any Person in connection with any compliance or non-compliance with this clause (g)(iv) or any purported assignment exceeding the Affiliated Lender Cap (it being understood and agreed that the Affiliated Lender Cap is intended to apply to any Loans made available to Affiliated Lenders by means other than formal assignment (e.g., as a result of an acquisition of another Lender (other than any Debt Fund Affiliate) by any Affiliated Lender or the provision of Additional Term Loans by any Affiliated Lender); provided, further, that to the extent that any assignment to any Affiliated Lender would result in the aggregate principal amount of Term Loans held by Affiliated Lenders exceeding the Affiliated Lender Cap (after giving effect to any substantially simultaneous cancellation thereof), the assignment of the relevant excess amount shall be null and void;

(v)      in connection with any assignment effected pursuant to a Dutch Auction and/or open market purchase conducted by Holdings, the Top Borrower or any of its Restricted Subsidiaries, (A) the relevant Person may not use the proceeds of any ABL Facility or any Additional Revolving Loan to fund such assignment and (B) no Event of Default exists at the time of acceptance of bids for the Dutch Auction or the confirmation of such open market purchase, as applicable; and

(vi)      by its acquisition of Term Loans, each relevant Affiliated Lender shall be deemed to have acknowledged and agreed that:

(A)      subject to clause (iv) above, the Term Loans held by such Affiliated Lender shall be disregarded in both the numerator and denominator in the calculation of any Required Lender or other Lender vote; provided that such Affiliated Lender shall have the right to vote (and the Term Loans held by such Affiliated Lender shall not be so disregarded) with respect to any amendment, modification, waiver, consent or other action that requires the vote of all Lenders or all Lenders directly and adversely affected thereby, as the case may be, and

WEIL:\95874775\19\74339.0001

(y) no amendment, modification, waiver, consent or other action shall (1) disproportionately affect such Affiliated Lender in its capacity as a Lender as compared to other Lenders of the same Class that are not Affiliated Lenders or (2) deprive any Affiliated Lender of its share of any payments which the Lenders are entitled to share on a pro rata basis hereunder, in each case without the consent of such Affiliated Lender; and

(B)      such Affiliated Lender, solely in its capacity as an Affiliated Lender, will not be entitled to (i) attend (including by telephone) or participate in any meeting or discussion (or portion thereof) among the Administrative Agent or any Lender or among Lenders to which the Loan Parties or their representatives are not invited or (ii) receive any information or material prepared by the Administrative Agent or any Lender or any communication by or among the Administrative Agent and one or more Lenders, except to the extent such information or materials have been made available by the Administrative Agent or any Lender to any Loan Party or its representatives (and in any case, other than the right to receive notices of Borrowings, prepayments and other administrative notices in respect of its Term Loans required to be delivered to Lenders pursuant to Article 2);

(vii)      no Affiliated Lender shall be required to represent or warrant that it is not in possession of material non-public information with respect to Holdings, the Top Borrower and/or any subsidiary thereof and/or their respective securities in connection with any assignment permitted by this Section 9.05(g); and

(viii)      in any proceeding under any Debtor Relief Law, the interest of any Affiliated Lender in any Term Loan will be deemed to be voted in the same proportion as the vote of Lenders that are not Affiliated Lenders on the relevant matter; provided that each Affiliated Lender will be entitled to vote its interest in any Term Loan to the extent that any plan of reorganization or other arrangement with respect to which the relevant vote is sought proposes to treat the interest of such Affiliated Lender in such Term Loan in a manner that is less favorable to such Affiliated Lender than the proposed treatment of Term Loans held by other Term Lenders.

Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Loans and/or Commitments to any Debt Fund Affiliate, and any Debt Fund Affiliate may, from time to time, purchase Loans and/or Commitments (x) on a non-pro rata basis through Dutch Auctions open to all applicable Lenders or (y) on a non-pro rata basis through open market purchases without the consent of the Administrative Agent, in each case, notwithstanding the requirements set forth in subclauses (i) through (vii) of this clause (g); provided that the Loans and Commitments held by all Debt Fund Affiliates shall not account for more than 49.9% of the amounts included in determining whether the Required Lenders have (A) consented to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (B) otherwise acted on any matter related to any Loan Document or (C) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document; it being understood and agreed that the portion of the Loan and/or Commitments that accounts for more than 49.9% of the relevant Required Lender action shall be deemed to be voted pro rata along with other Lenders that are not Debt Fund Affiliates.  Any Loans acquired by any Debt Fund Affiliate may (but shall not be required to) be contributed to the Top Borrower or any of its subsidiaries for purposes of cancelling such Indebtedness (it being understood that any Loans so contributed shall be retired and cancelled immediately upon thereof); provided that upon any such cancellation, the aggregate outstanding principal amount of the relevant Class of Loans shall be deemed reduced, as of the date of such contribution, by the full par value of the aggregate principal amount of the Loans so contributed and cancelled, and each principal repayment installment with respect to the Term Loans pursuant to Section 2.10(a) shall be reduced pro rata by the full par value of the aggregate principal amount of any applicable Term Loans so contributed and cancelled.

Section 9.06.  <u>Survival</u>.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loan regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until the Termination Date.  The provisions of <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u>, <u>9.03</u> and <u>9.13</u> and <u>Article 8</u> shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the occurrence of the Termination Date or the termination of this Agreement or any provision hereof but in each case, subject to the limitations set forth in this Agreement.

Section 9.07.  <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents, each Intercreditor Agreement and the Fee Letter constitute the entire agreement among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it has been executed by Holdings, the Borrowers and the Administrative Agent and when the Administrative Agent has received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.08.  <u>Severability</u>.  To the extent permitted by applicable Requirements of Law, any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.09.  <u>Right of Setoff</u>.  At any time when an Event of Default exists, upon the written consent of the Administrative Agent, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (in any currency) at any time owing by the Administrative Agent or such Lender to or for the credit or the account of any Loan Party against any and all of the Secured Obligations held by the Administrative Agent or such Lender, irrespective of whether or not the Administrative Agent or such Lender shall have made any demand under the Loan Documents and although such obligations may be contingent or unmatured or are owed to a branch or office of such Lender different than the branch or office holding such deposit or obligation on such Indebtedness.  Any applicable Lender shall promptly notify the Top Borrower and the Administrative Agent of such set-off or application; <u>provided</u> that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section.  The rights of each Lender and the Administrative Agent under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender or the Administrative Agent may have.

Section 9.10.  <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN ANY OTHER LOAN DOCUMENT) AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN ANY OTHER LOAN DOCUMENT),

152

SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)     EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK (OR ANY APPELLATE COURT THEREFROM) OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL (EXCEPT AS PERMITTED BELOW) BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, FEDERAL COURT. EACH PARTY HERETO AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY REGISTERED MAIL ADDRESSED TO SUCH PERSON SHALL BE EFFECTIVE SERVICE OF PROCESS AGAINST SUCH PERSON FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT. EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE REQUIREMENTS OF LAW. EACH PARTY HERETO AGREES THAT THE ADMINISTRATIVE AGENT RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION SOLELY IN CONNECTION WITH THE EXERCISE OF ITS RIGHTS UNDER ANY COLLATERAL DOCUMENT.

(c)     EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY CLAIM OR DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION, SUIT OR PROCEEDING IN ANY SUCH COURT.

(d)     TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL) DIRECTED TO IT AT ITS ADDRESS FOR NOTICES AS PROVIDED FOR IN SECTION 9.01. EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY LOAN DOCUMENT THAT SERVICE OF PROCESS WAS INVALID AND INEFFECTIVE. NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE REQUIREMENTS OF LAW.

Section 9.11.     Waiver of Jury Trial.     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH

153

OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.12.　Headings.　Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.13.　Confidentiality.　Each of the Administrative Agent, each Lender and each Arranger agrees (and each Lender agrees to cause its SPC, if any) to maintain the confidentiality of the Confidential Information (as defined below), except that Confidential Information may be disclosed (a) to its and its Affiliates' directors, officers, managers, employees, independent auditors, or other experts and advisors, including accountants, legal counsel and other advisors (collectively, the "Representatives") on a "need to know" basis solely in connection with the transactions contemplated hereby and who are informed of the confidential nature of the Confidential Information and are or have been advised of their obligation to keep the Confidential Information of this type confidential; provided that such Person shall be responsible for its Affiliates' and their Representatives' compliance with this paragraph; provided, further, that unless the Top Borrower otherwise consents, no such disclosure shall be made by the Administrative Agent, any Arranger, any Lender or any Affiliate or Representative thereof to any Affiliate or Representative of the Administrative Agent, any Arranger, or any Lender that is a Disqualified Institution, (b) to the extent compelled by legal process in, or reasonably necessary to, the defense of such legal, judicial or administrative proceeding, in any legal, judicial or administrative proceeding or otherwise as required by applicable Requirements of Law (in which case such Person shall (i) to the extent permitted by applicable Requirements of Law, inform the Top Borrower promptly in advance thereof and (ii) use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (c) upon the demand or request of any regulatory or governmental authority (including any self-regulatory body) purporting to have jurisdiction over such Person or its Affiliates (in which case such Person shall, except with respect to any audit or examination conducted by bank accountants or any Governmental Authority or regulatory or self-regulatory authority exercising examination or regulatory authority, to the extent permitted by applicable Requirements of Law, (i) inform the Top Borrower promptly in advance thereof and (ii) use commercially reasonable efforts to ensure that any information so disclosed is accorded confidential treatment), (d) to any other party to this Agreement, (e) subject to an acknowledgment and agreement by the relevant recipient that the Confidential Information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as otherwise reasonably acceptable to the Top Borrower and the Administrative Agent, including as set forth in the Information Memorandum) in accordance with the standard syndication process of the Arrangers or market standards for dissemination of the relevant type of information, which shall in any event require "click through" or other affirmative action on the part of the recipient to access the Confidential Information and acknowledge its confidentiality obligations in respect thereof, to (i) any Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or prospective Participant in, any of its rights or obligations under this Agreement, including any SPC (in each case other than a Disqualified Institution), (ii) any pledgee referred to in Section 9.05, (iii) any actual or prospective, direct or indirect contractual counterparty (or its advisors) to any Derivative Transaction (including any credit default swap) or similar derivative product to which any Loan Party is a party and (iv) subject to the Top Borrower's prior approval of the information to be disclosed, (x) to Moody's or S&P on a confidential basis in connection with obtaining or maintaining ratings as required under Section 5.13 or (y) to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the facilities or, on a confidential basis, market data collectors and service providers to the Administrative Agent in connection with the administration and management of this Agreement and the Loan Documents, (f) with the prior written consent of the Top Borrower and (g) to the extent the Confidential Information becomes publicly available other than as a result of a breach of this Section by such Person, its Affiliates or their respective Representatives. For purposes of this Section, "Confidential Information" means all information relating to Holdings, the Top Borrower and/or any of its subsidiaries and their respective businesses or the Transactions (including any information obtained by the Administrative

Agent, any Lender or any Arranger, or any of their respective Affiliates or Representatives, based on a review of any books and records relating to Holdings, the Top Borrower and/or any of its subsidiaries and their respective Affiliates from time to time, including prior to the date hereof) other than any such information that is publicly available to the Administrative Agent or any Arranger or Lender on a non-confidential basis prior to disclosure by Holdings, the Top Borrower or any of its subsidiaries.  For the avoidance of doubt, in no event shall any disclosure of any Confidential Information be made to Person that is a Disqualified Institution at the time of disclosure.

Section 9.14.    No Fiduciary Duty.  Each of the Administrative Agent, the Arrangers, each Lender and their respective Affiliates (collectively, solely for purposes of this paragraph, the "Lenders"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their respective affiliates.  Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its respective stockholders or its respective affiliates, on the other.  Each Loan Party acknowledges and agrees that:  (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender, in its capacity as such, has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its respective stockholders or its respective affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its respective stockholders or its respective Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender, in its capacity as such, is acting solely as principal and not as the agent or fiduciary of such Loan Party, its respective management, stockholders, creditors or any other Person.  Each Loan Party acknowledges and agrees that such Loan Party has consulted its own legal, tax and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.

Section 9.15.    Several Obligations.  The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.

Section 9.16.    USA PATRIOT Act.  Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

Section 9.17.    Disclosure of Agent Conflicts.  Each Loan Party and each Lender hereby acknowledge and agree that the Administrative Agent and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

Section 9.18.    Appointment for Perfection.  Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens for the benefit of the Administrative Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable Requirement of Law can be perfected only by possession.  If any Lender (other than the Administrative Agent) obtains possession of any Collateral, such Lender shall notify the Administrative Agent thereof and, promptly upon the Administrative Agent's request therefor shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

Section 9.19.    <u>Interest Rate Limitation</u>.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Requirements of Law (collectively the "<u>Charged Amounts</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Requirements of Law, the rate of interest payable in respect of such Loan hereunder, together with all Charged Amounts payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charged Amounts that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charged Amounts payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, have been received by such Lender.

Section 9.20.    <u>Intercreditor Agreement</u>.  REFERENCE IS MADE TO EACH INTERCREDITOR AGREEMENT.  EACH LENDER HEREUNDER AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF ANY INTERCREDITOR AGREEMENT AND AUTHORIZES AND INSTRUCTS THE ADMINISTRATIVE AGENT TO ENTER INTO EACH INTERCREDITOR AGREEMENT AS "FIRST LIEN AGENT", "TERM LOAN AGENT" (OR OTHER APPLICABLE TITLE) AND ON BEHALF OF SUCH LENDER.  THE PROVISIONS OF THIS <u>SECTION 9.20</u> ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF ANY INTERCREDITOR AGREEMENT.  REFERENCE MUST BE MADE TO EACH APPLICABLE INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF.  EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF EACH INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN ANY INTERCREDITOR AGREEMENT.  THIS <u>SECTION 9.20</u> IS INTENDED AS AN INDUCEMENT TO THE LENDERS UNDER THE SECOND LIEN CREDIT AGREEMENT AND THE ABL CREDIT AGREEMENT AND THE HOLDERS OF ANY OTHER INDEBTEDNESS SUBJECT TO ANY APPLICABLE INTERCREDITOR AGREEMENT TO EXTEND CREDIT IN CONNECTION THEREWITH AND SUCH LENDERS ARE INTENDED THIRD PARTY BENEFICIARIES OF SUCH PROVISIONS AND THE PROVISIONS OF EACH INTERCREDITOR AGREEMENT.

Section 9.21.    <u>Conflicts</u>.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, in the event of any conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall govern and control; <u>provided</u> that in the case of any conflict or inconsistency between any Intercreditor Agreement and any Loan Document, the terms of such Intercreditor Agreement shall govern and control.

Section 9.22.    <u>Release of Guarantors</u>.  Notwithstanding anything in <u>Section 9.02(b)</u> to the contrary, (a) any Subsidiary Guarantor shall automatically be released from its obligations hereunder (and its Loan Guaranty and the Liens granted pursuant to the Collateral Documents shall be automatically released) (i) upon the consummation of any permitted transaction or series of related transactions if as a result thereof such Subsidiary Guarantor ceases to be a Restricted Subsidiary (or becomes an Excluded Subsidiary as a result of a single transaction or series of related transactions permitted hereunder) and/or (ii) upon the occurrence of the Termination Date and (b) any Subsidiary Guarantor that meets the definition of an "Excluded Subsidiary" shall be released by the Administrative Agent promptly following the request therefor by the Top Borrower.  In connection with any such release, the Administrative Agent shall promptly execute and deliver to the relevant Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence termination or release; <u>provided</u>, that upon the request of the Administrative Agent, the Top Borrower shall deliver a certificate of a Responsible Officer certifying that the relevant transaction has been consummated in compliance with the terms of this Agreement.  Any execution and delivery of any document

pursuant to the preceding sentence of this Section 9.22 shall be without recourse to or warranty by the Administrative Agent (other than as to the Administrative Agent's authority to execute and deliver such documents).

Section 9.23. <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding of the parties hereto, each such party acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b) the effects of any Bail-in Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

Section 9.24. <u>Joint and Several Liability</u>. Each Borrower is jointly and severally liable for the Obligations as a primary obligor in respect thereof. The Obligations of each Borrower are independent of the Obligations of each other Borrower, and a separate action or actions may be brought and prosecuted against any Borrower to enforce this Agreement, irrespective of whether any action has been brought against any other Borrower or whether any other Borrower is joined in any such action.

Section 9.25. <u>Top Borrower</u>. Each Borrower hereby designates SSB, in its capacity as the Top Borrower, to act as its agent hereunder. The Top Borrower may act as agent on behalf of any Borrower for purposes of delivering Borrowing Requests and notices of conversion/continuation pursuant to Section 2.08 or similar notices, giving instructions with respect to the disbursement of the proceeds of Loans, selecting interest rate options, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or the Borrowers under the Loan Documents. SSB hereby accepts such appointment. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by the Top Borrower shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

DAWN INTERMEDIATE, INC., as Holdings

By: _____
Name:  Kristen McGuffey
Title:   Executive Vice President, General Counsel
and Secretary

SERTA SIMMONS BEDDING, LLC, as the Top Borrower

By: _____
Name:  Kristen McGuffey
Title:   Executive Vice President, General Counsel
and Secretary

NATIONAL BEDDING COMPANY L.L.C., as a Borrower

By: _____
Name:  Kristen McGuffey
Title:   General Counsel and Secretary

SSB MANUFACTURING COMPANY, as a Borrower

By: _____
Name:  Kristen McGuffey
Title:   Executive Vice President, General Counsel
and Secretary

UBS AG, STAMFORD BRANCH, individually, as
Administrative Agent and Lender

By: _____

Name: Houssem Daly
Title: Associate Director

By: _____

Name: Darlene Arias
Title: Director

**SCHEDULE 1.01(a)**

COMMITMENT SCHEDULE

| Name of Lender | Term Loan Commitment |
|---|---|
| UBS AG, STAMFORD BRANCH | ███████ |
| BEAZLEY FURLONGE LIMITED | ████ |
| HIGHBRIDGE LOAN MANAGEMENT 2013-2, LTD. | █████ |
| HIGHBRIDGE LOAN MANAGEMENT 3-2014 LTD. | █████ |
| HIGHBRIDGE LOAN MANAGEMENT 4-2014, LTD. | ██████ |
| HIGHBRIDGE LOAN MANAGEMENT 5-2015, LTD. | █████ |
| HIGHBRIDGE LOAN MANAGEMENT 7-2015, LTD. | █████ |
| AMJ BANK LOAN FUND A SERIES TRUST OF MULTI MANAGER GLOBAL INVESTMENT TRUST | █████ |
| AMJ BANK LOAN FUND SERIES 2 A SERIES TRUST OF MULTI MANAGER GLOBAL INVESTMENT TRUST | █████ |
| AMJ BANK LOAN FUND SERIES 3 A SERIES TRUST OF MULTI MANAGER GLOBAL INVESTMENT TRUST | █████ |
| FLATIRON CLO 2012-1 LTD. | █████ |
| DRYDEN 33 SENIOR LOAN FUND | ████ |
| DRYDEN 34 SENIOR LOAN FUND | ████ |
| DRYDEN 37 SENIOR LOAN FUND | ████ |
| DRYDEN 38 SENIOR LOAN FUND | ████ |
| DRYDEN 40 SENIOR LOAN FUND | █████ |
| DRYDEN 41 SENIOR LOAN FUND | ████ |
| DRYDEN 45 SENIOR LOAN FUND | █████ |
| **Total:** | ██████ |

## SCHEDULE 1.01(b)

### DUTCH AUCTION

"<u>Auction Agent</u>" means (a) the Administrative Agent or any of its Affiliates or (b) any other financial institution or advisor engaged by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Dutch Auction; provided, that the Top Borrower shall not designate the Administrative Agent as the Auction Agent without the prior written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent); <u>provided</u>, <u>further</u>, that neither Holdings nor any of its subsidiaries may act as the Auction Agent.

"<u>Dutch Auction</u>" means an auction (an "<u>Auction</u>") conducted by any Affiliated Lender or any Debt Fund Affiliate (any such Person, the "<u>Auction Party</u>") in order to purchase Term Loans, in accordance with the following procedures; <u>provided</u> that no Auction Party shall initiate any Auction unless (I) at least five Business Days have passed since the consummation of the most recent purchase of Term Loans pursuant to an Auction conducted hereunder; or (II) at least three Business Days have passed since the date of the last Failed Auction which was withdrawn pursuant to <u>clause (c)(i)</u> below:

(a)     <u>Notice Procedures</u>.  In connection with any Auction, the Auction Party will provide notification to the Auction Agent (as defined below) (for distribution to the relevant Lenders) of the Term Loans that will be the subject of the Auction (an "<u>Auction Notice</u>").  Each Auction Notice shall be in a form reasonably acceptable to the Auction Agent and shall (i) specify the maximum aggregate principal amount of the Term Loans subject to the Auction, in a minimum amount of $10,000,000 and whole increments of $1,000,000 in excess thereof (or, in any case, such lesser amount of such Term Loans then outstanding or which is otherwise reasonably acceptable to the Auction Agent and the Administrative Agent (if different from the Auction Agent)) (the "<u>Auction Amount</u>"), (ii) specify the discount to par (which may be a range (the "<u>Discount Range</u>") of percentages of the par principal amount of the Term Loans subject to such Auction), that represents the range of purchase prices that the Auction Party would be willing to accept in the Auction, (iii) be extended, at the sole discretion of the Auction Party, to (x) each Lender and/or (y) each Lender with respect to any Term Loan on an individual Class basis and (iv) remain outstanding through the Auction Response Date.  The Auction Agent will promptly provide each appropriate Lender with a copy of the Auction Notice and a form of the Return Bid to be submitted by a responding Lender to the Auction Agent (or its delegate) by no later than 5:00 p.m. on the date specified in the Auction Notice (or such later date as the Auction Party may agree with the reasonable consent of the Auction Agent) (the "<u>Auction Response Date</u>").

(b)     <u>Reply Procedures</u>.  In connection with any Auction, each Lender holding the relevant Term Loans subject to such Auction may, in its sole discretion, participate in such Auction and may provide the Auction Agent with a notice of participation (the "<u>Return Bid</u>") which shall be in a form reasonably acceptable to the Auction Agent, and shall specify (i) a discount to par (that must be expressed as a price at which it is willing to sell all or any portion of such Term Loans) (the "<u>Reply Price</u>"), which (when expressed as a percentage of the par principal amount of such Term Loans) must be within the Discount Range, and (ii) a principal amount of such Term Loans, which must be in whole increments of $1,000,000 (or, in any case, such lesser amount of such Term Loans of such Lender then outstanding or which is otherwise reasonably acceptable to the Auction Agent) (the "<u>Reply Amount</u>").  Lenders may only submit one Return Bid per Auction, but each Return Bid may contain up to three bids only one of which may result in a Qualifying Bid. In addition to the Return Bid, the participating Lender must execute and deliver, to be held in escrow by the Auction Agent, an Assignment and Assumption with the dollar amount of the Term Loans to be assigned to be left in blank, which amount shall be completed by the Auction Agent (but in no such event shall the amount be in excess of the principal amount of Term Loans such Lender has indicated it is willing to sell) in accordance

with the final determination of such Lender's Qualifying Bid pursuant to clause (c) below. Any Lender whose Return Bid is not received by the Auction Agent by the Auction Response Date shall be deemed to have declined to participate in the relevant Auction with respect to all of its Term Loans.

(c) <u>Acceptance Procedures</u>. Based on the Reply Prices and Reply Amounts received by the Auction Agent prior to the applicable Auction Response Date, the Auction Agent, in consultation with the Auction Party, will determine the applicable price (the "<u>Applicable Price</u>") for the Auction, which will be the lowest Reply Price for which the Auction Party can complete the Auction at the Auction Amount; <u>provided</u> that, in the event that the Reply Amounts are insufficient to allow the Auction Party to complete a purchase of the entire Auction Amount (any such Auction, a "<u>Failed Auction</u>"), the Auction Party shall either, at its election, (i) withdraw the Auction or (ii) complete the Auction at an Applicable Price equal to the highest Reply Price. The Auction Party shall purchase the relevant Term Loans (or the respective portions thereof) from each Lender with a Reply Price that is equal to or lower than the Applicable Price ("<u>Qualifying Bids</u>") at the Applicable Price; <u>provided</u> that if the aggregate proceeds required to purchase all Term Loans subject to Qualifying Bids would exceed the Auction Amount for such Auction, the Auction Party shall purchase such Term Loans at the Applicable Price ratably based on the principal amounts of such Qualifying Bids (subject to rounding requirements specified by the Auction Agent in its discretion). If a Lender has submitted a Return Bid containing multiple bids at different Reply Prices, only the bid with the lowest Reply Price that is equal to or less than the Applicable Price will be deemed to be the Qualifying Bid of such Lender (e.g., a Reply Price of $100 with a discount to par of 2%, when compared to an Applicable Price of $100 with a 1% discount to par, will not be deemed to be a Qualifying Bid, while, however, a Reply Price of $100 with a discount to par of 2.50% would be deemed to be a Qualifying Bid). The Auction Agent shall promptly, and in any case within five Business Days following the Auction Response Date with respect to an Auction, notify (I) the Top Borrower of the respective Lenders' responses to such solicitation, the effective date of the purchase of Term Loans pursuant to such Auction, the Applicable Price, and the aggregate principal amount of the Term Loans and the tranches thereof to be purchased pursuant to such Auction, (II) each participating Lender of the effective date of the purchase of Term Loans pursuant to such Auction, the Applicable Price, and the aggregate principal amount and the tranches of Term Loans to be purchased at the Applicable Price on such date, (III) each participating Lender of the aggregate principal amount and the tranches of the Term Loans of such Lender to be purchased at the Applicable Price on such date and (IV) if applicable, each participating Lender of any rounding and/or proration pursuant to the second preceding sentence. Each determination by the Auction Agent of the amounts stated in the foregoing notices to the Top Borrower and Lenders shall be conclusive and binding for all purposes absent manifest error.

(d) Additional Procedures.

(i) Once initiated by an Auction Notice, the Auction Party may not withdraw an Auction other than a Failed Auction. Furthermore, in connection with any Auction, upon submission by a Lender of a Qualifying Bid, such Lender (each, a "<u>Qualifying Lender</u>") will be obligated to sell the entirety or its allocable portion of the Reply Amount, as the case may be, at the Applicable Price.

(ii) To the extent not expressly provided for herein, each purchase of Term Loans pursuant to an Auction shall be consummated pursuant to procedures consistent with the provisions in this definition, established by the Auction Agent acting in its reasonable discretion and as reasonably agreed by the Top Borrower.

(iii) In connection with any Auction, the Borrowers and the Lenders acknowledge and agree that the Auction Agent may require as a condition to any Auction, the payment of customary fees and expenses by the Auction Party in connection therewith as agreed between the Auction Party and the Auction Agent.

(iv) Notwithstanding anything in any Loan Document to the contrary, for purposes of this definition, each notice or other communication required to be delivered or otherwise provided to the

Auction Agent (or its delegate) shall be deemed to have been given upon the Auction Agent's (or its delegate's) actual receipt during normal business hours of such notice or communication; <u>provided</u> that any notice or communication actually received outside of normal business hours shall be deemed to have been given as of the opening of business on the next Business Day.

(v)     The Borrowers and the Lenders acknowledge and agree that the Auction Agent may perform any and all of its duties under this definition by itself or through any Affiliate of the Auction Agent and expressly consent to any such delegation of duties by the Auction Agent to such Affiliate and the performance of such delegated duties by such Affiliate.  The exculpatory provisions pursuant to this Agreement shall apply to each Affiliate of the Auction Agent and its respective activities in connection with any purchase of Term Loans provided for in this definition as well as activities of the Auction Agent.

4

**SCHEDULE 1.01(c)**

<u>MORTGAGES</u>

1.  23532 Brodiaea Avenue, Moreno Valley, California 92553, owned by SSB Manufacturing Company.

## SCHEDULE 3.05

### FEE OWNED REAL ESTATE ASSETS

| | **Loan Party** | **Address** |
|---|---|---|
| 1. | The Simmons Manufacturing Co., LLC | 1809 Adel Street<br>Janesville, WI |
| 2. | The Simmons Manufacturing Co., LLC | 1925 Cleveland Street<br>Janesville, WI |
| 3. | National Bedding Company L.L.C. | 10950 W. Northview Avenue<br>Glendale, AZ |
| 4. | SSB Manufacturing Company | 23532 Brodiaea Avenue<br>Moreno Valley, CA |
| 5. | National Bedding Company L.L.C. | 15800 East 40th Avenue<br>Aurora, CO |
| 6. | SSB Manufacturing Company | 3774 Interstate Park Road North<br>Riviera Beach, FL |
| 7. | National Bedding Company L.L.C. | 701 Horizon South Industrial Parkway<br>Grovetown, GA |
| 8. | National Bedding Company L.L.C. | 500 South 17th Street<br>Clear Lake, IA |
| 9. | National Bedding Company L.L.C. | 61 Leona Drive<br>Middleborough, MA |
| 10. | National Bedding Company L.L.C. | 260 Highway 35 N.<br>Batesville, MS |
| 11. | National Bedding Company L.L.C. | 6540 Judge Adams Road<br>Whitsett, NC |
| 12. | National Bedding Company L.L.C. | 18 Prestige Lane<br>Lancaster, PA |
| 13. | National Bedding Company L.L.C. | 10710 Telge Road<br>Houston, TX |
| 14. | National Bedding Company L.L.C. | 403 North Levee Road<br>Puyallup, WA |
| 15. | National Bedding Company L.L.C. | 1500 Lee Lane<br>Beloit, WI |
| 16. | National Bedding Company L.L.C. | 2600 Forbs Ave.<br>Hoffman Estates, IL |
| 17. | National Bedding Company L.L.C. | 1212 26th Street Southwest<br>Cullman, AL |

**SCHEDULE 3.13**

<u>SUBSIDIARIES</u>

| Subsidiary | Type of Entity | Equity Holder | Ownership Interest |
|---|---|---|---|
| Serta Simmons Bedding, LLC | Limited Liability Company | Dawn Intermediate, Inc. | 100% |
| SSB Manufacturing Company | Corporation | Serta Simmons Bedding, LLC | 100% |
| The Simmons Manufacturing Co., LLC | Limited Liability Company | SSB Manufacturing Company | 100% |
| Simmons Caribbean Bedding, Inc. | Foreign Corporation | SSB Manufacturing Company | 100% |
| World of Sleep Outlets, LLC | Limited Liability Company | SSB Manufacturing Company | 100% |
| Simmons Contract Sales, LLC | Limited Liability Company | SSB Manufacturing Company | 100% |
| Dreamwell, Ltd. | Limited Liability Company | SSB Manufacturing Company | 100% |
| SSB Logistics, LLC | Limited Liability Company | SSB Manufacturing Company | 100% |
| Simmons Bedding Company, LLC | Limited Liability Company | Serta Simmons Bedding, LLC | 100% |
| SSB NYC, LLC | Limited Liability Company | Serta Simmons Bedding, LLC | 100% |
| SSH Canada Holding Co., LLC | Limited Liability Company | Serta Simmons Bedding, LLC | 100% |
| SSH Bedding Canada, Co. | Foreign Corporation | SSH Canada Holding Co., LLC | 100% |
| Serta International Holdco, LLC | Limited Liability Company | Serta Simmons Bedding, LLC | 100% |
| National Bedding Company L.L.C. | Limited Liability Company | Serta International Holdco, LLC | 100% |
| Serta, Inc. | Corporation | National Bedding Company L.L.C. | 82.4% |
| Serta Canada Ltd. | Foreign Corporation | Serta, Inc. | 100% |

WEIL:\95928017\2\74339.0038

**SCHEDULE 4.01(b)**

<u>LOCAL COUNSEL</u>

1.   Quarles & Brady LLP (Illinois)

**SCHEDULE 5.10**

<u>UNRESTRICTED SUBSIDIARIES</u>

None.