# DEFENDANTS'
# EXHIBIT 331
# Part 3 of 3

(c)     each existing First Lien Collateral Agent and Second Lien Collateral Agent shall promptly enter into such documents and agreements (including amendments, restatements, amendments and restatements, supplements or other modifications to this Agreement) as any existing First Lien Collateral Agent or existing Second Lien Collateral Agent (but no other First Lien Claimholder or Second Lien Claimholder) or the Additional Lien Obligations Agent may reasonably request in order to provide to it the rights, remedies and powers and authorities contemplated hereby, in each case consistent in all respects with the terms of this Agreement; provided that, for the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, it is understood and agreed that any such amendment, restatement, amendment and restatement, supplement or other modification to this Agreement requested pursuant to this clause (c) may be entered into by the existing First Lien Collateral Agents and the existing Second Lien Collateral Agents without the consent of any other First Lien Claimholder or Second Lien Claimholder to effect the provisions of this Section 8.21 and may contain additional intercreditor terms applicable solely to the holders of such Additional Lien Obligations *vis-à-vis* the holders of the relevant obligations hereunder or the holders of such Additional Lien Obligations *vis-à-vis* the Directing First Lien Collateral Agent and the First Lien Claimholders or the Directing Second Lien Collateral Agent and the Second Lien Claimholders, as applicable.

Notwithstanding the foregoing, nothing in this Agreement will be construed to allow any Obligor to incur additional Indebtedness unless otherwise permitted by the terms of each applicable First Lien Financing Document, Second Lien Document and each then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement.

8.22     Additional Intercreditor Agreements.

(a)     Subject to Section 8.1(b) of this Agreement, each party hereto agrees that the First Lien Claimholders (as among themselves) and the Second Lien Claimholders (as among themselves) may each enter into intercreditor agreements (or similar arrangements) with the applicable First Lien Collateral Agents or Second Lien Collateral Agents, as the case may be, governing the rights, benefits and privileges as among the First Lien Claimholders in respect of any or all of the First Lien Collateral, this Agreement and the First Lien Collateral Documents or as among the Second Lien Claimholders in respect of any or all of the Second Lien Collateral, this Agreement or the Second Lien Collateral Documents, as the case may be, including as to the application of proceeds of any Collateral, voting rights, control of any Collateral and waivers with respect to any Collateral, in each case so long as the terms thereof do not violate or conflict with the terms of this Agreement or the First Lien Documents or the Second Lien Documents, as applicable.  In any event, if a respective intercreditor agreement (or similar arrangement) exists, the provisions thereof shall not be (or be construed to be) an amendment, modification or other change to this Agreement or any other First Lien Document or Second Lien Document, and the provisions of this Agreement and the other First Lien Documents and Second Lien Documents shall remain in full force and effect in accordance with the terms hereof and thereof (as such provisions may be amended, modified or otherwise supplemented from time to time in accordance with the terms thereof, including to give effect to any intercreditor agreement (or similar arrangement)).

(b)     In addition, in the event that the Top Borrower or any of its subsidiaries incurs any obligations in respect of Indebtedness that is permitted by the First Lien Documents and the Second Lien Documents to be secured by a Lien on any Collateral that is junior to the Liens thereon securing all First Lien Obligations and all Second Lien Obligations and such obligations are not designated by the Top Borrower as Second Lien Obligations, then the First Lien Collateral Agents and/or the Second Lien Collateral Agents shall upon the request of the Top Borrower enter into an Acceptable Intercreditor Agreement (as defined in the First Lien Credit Agreement and the Second Lien Credit Agreement on the date hereof and/or, in each case, any similar term in any First Lien Document and/or any Second Lien

Document, as applicable) or another intercreditor agreement that is reasonably satisfactory to the First Lien Collateral Agents and the Second Lien Collateral Agents with the holders of such other obligations (or their agent, trustee or other representative) to reflect the relative Lien priorities of such parties with respect to the Collateral (or the relevant portion thereof) and governing the relative rights, benefits and privileges as among such parties in respect of such Collateral, including as to application of the proceeds of such Collateral, voting rights, control of such Collateral and waivers with respect to such Collateral, in each case, so long as such secured obligations are not prohibited by, and the terms of such intercreditor agreement do not violate or conflict with, the provisions of this Agreement or any of the First Lien Documents or Second Lien Documents, as the case may be. If any such intercreditor agreement (or similar arrangement) is entered into, the provisions thereof shall not be (or be construed to be) an amendment, modification or other change to this Agreement or any First Lien Documents or Second Lien Documents, and the provisions of this Agreement, the First Lien Documents and the Second Lien Documents shall remain in full force and effect in accordance with the terms hereof and thereof (as such provisions may be amended, modified or otherwise supplemented from time to time in accordance with the respective terms thereof, including to give effect to any intercreditor agreement (or similar arrangement)) and in the event of any conflict between the terms of this Agreement and the terms of such other intercreditor agreement as it relates to the First Lien Claimholders on the one hand and the Second Lien Claimholders on the other hand, the provisions of this Agreement shall govern and control.

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**UBS AG, STAMFORD BRANCH**,
as First Lien Credit Agreement Collateral Agent

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Address for Notices:
Attention:
Tel.:
Email:

[Signature Page to Intercreditor Agreement]

**GOLDMAN SACHS BANK USA**,
as Second Lien Credit Agreement Collateral Agent


By: _____
     Name:
     Title:


Address for Notices:
Attention:
Tel.:
Email:

Acknowledged and Agreed to by:

Holdings

DAWN INTERMEDIATE, INC.,

By: _____
     Name:
     Title:

Borrowers

SERTA SIMMONS BEDDING, LLC,

By: _____
     Name:
     Title:

NATIONAL BEDDING COMPANY L.L.C.,

By: _____
     Name:
     Title:

SSB MANUFACTURING COMPANY,

By: _____
     Name:
     Title:

Other Obligors

[                    ]

By: _____
      Name:
      Title:

Address for Notices to Obligors:
Tel.:
Fax:
Attn:
Email:

[Signature Page to Intercreditor Agreement]

EXHIBIT A

**FORM OF INTERCREDITOR JOINDER AGREEMENT – ADDITIONAL OBLIGORS**

Reference is made to the First Lien/Second Lien Intercreditor Agreement dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the **"Intercreditor Agreement"**), among UBS AG, STAMFORD BRANCH, in its capacity as the First Lien Credit Agreement Collateral Agent and GOLDMAN SACHS BANK USA as the Second Lien Credit Agreement Collateral Agent (in each case, as defined therein), each other FIRST LIEN COLLATERAL AGENT that is from time to time party thereto and each other SECOND LIEN COLLATERAL AGENT that is from time to time party thereto and acknowledged and agreed to by DAWN INTERMEDIATE, INC., a Delaware corporation, SERTA SIMMONS BEDDING, LLC, a Delaware limited liability company, NATIONAL BEDDING COMPANY L.L.C., an Illinois limited liability company, SSB MANUFACTURING COMPANY, a Delaware corporation and the other OBLIGORS (as defined therein) from time to time party thereto. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

This Intercreditor Joinder Agreement, dated as of [●] [●], 20[●] (this "**Joinder Agreement**"), is being delivered pursuant to requirements of the Intercreditor Agreement.

1.    Joinder.  The undersigned, [●], a [●], hereby agrees to become party to the Intercreditor Agreement as an Obligor thereunder for all purposes thereof on the terms set forth therein, and to be bound by the terms, conditions and provisions of the Intercreditor Agreement as fully as if the undersigned had executed and delivered the Intercreditor Agreement as of the date thereof.

2.    Agreements.  The undersigned Obligor hereby agrees, for the enforceable benefit of all existing and future First Lien Claimholders and all existing and future Second Lien Claimholders that the undersigned is bound by the terms, conditions and provisions of the Intercreditor Agreement to the extent set forth therein.

3.    Counterparts.  This Joinder Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and all of which, when taken together, shall constitute one contract.  Delivery of an executed signature page to this Joinder Agreement by facsimile transmission or other electronic transmission (including ".pdf", ".tiff" or similar format) shall be effective as delivery of a manually executed counterpart of this Joinder Agreement.

4.    Governing Law.  THIS JOINDER AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS JOINDER AGREEMENT, WHETHER IN TORT, CONTRACT (AT LAW OR IN EQUITY) OR OTHERWISE, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

6.    Miscellaneous.  The provisions of Section 8 of the Intercreditor Agreement shall apply with like effect to this Joinder Agreement.

[Signature pages follow]

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed by its authorized representative, and each Collateral Agent has caused the same to be accepted by its authorized representative, as of the date first written above.

**[NAME OF OBLIGOR]**,
as an Obligor

By: _____
      Name:
      Title:

**Acknowledged and Agreed to by:**

**UBS AG, STAMFORD BRANCH,**
as First Lien Credit Agreement Collateral Agent,

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**GOLDMAN SACHS BANK USA,**
as Second Lien Credit Agreement Collateral Agent,

By: _____
      Name:
      Title:

EXHIBIT B

**FORM OF INTERCREDITOR JOINDER AGREEMENT – ADDITIONAL INDEBTEDNESS**

Reference is made to the First Lien/Second Lien Intercreditor Agreement dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the **"Intercreditor Agreement"**), among UBS AG, STAMFORD BRANCH, in its capacity as the First Lien Credit Agreement Collateral Agent and GOLDMAN SACHS BANK USA as the Second Lien Credit Agreement Collateral Agent (in each case, as defined therein), each other FIRST LIEN COLLATERAL AGENT that is from time to time party thereto and each other SECOND LIEN COLLATERAL AGENT that is from time to time party thereto and acknowledged and agreed to by DAWN INTERMEDIATE, INC., a Delaware corporation, SERTA SIMMONS BEDDING, LLC, a Delaware limited liability company, NATIONAL BEDDING COMPANY L.L.C., an Illinois limited liability company, SSB MANUFACTURING COMPANY, a Delaware corporation and the other OBLIGORS (as defined therein) from time to time party thereto.  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

This Intercreditor Joinder Agreement, dated as of [●] [●], 20[●] (this "**Joinder Agreement**"), is being delivered pursuant to requirements of the Intercreditor Agreement.

The undersigned Additional [First/Second] Lien Obligations Agent (the "**New Collateral Agent**") is executing this Joinder Agreement in accordance with the requirements of the Intercreditor Agreement.

1.	Joinder.  In accordance with Section 8.21 of the Intercreditor Agreement, the New Collateral Agent by its signature below becomes a [First/Second] Lien Collateral Agent, under, and it and the related [First/Second] Lien Claimholders represented by it hereby become subject to and bound by, the Intercreditor Agreement with the same force and effect as if the New Collateral Agent had originally been named therein as a [First/Second] Lien Collateral Agent, and the New Collateral Agent, on behalf of itself and each other [First/Second] Lien Claimholder represented by it, hereby agrees to all the terms and provisions of the Intercreditor Agreement.  Each reference to a "Collateral Agent" or "[First/Second] Lien Collateral Agent" in the Intercreditor Agreement shall be deemed to include the New Collateral Agent and each reference to "[First/Second] Lien Claimholders" shall include the [First/Second] Lien Claimholders represented by such New Collateral Agent.  The Intercreditor Agreement is hereby incorporated herein by reference.

2.	Representations and Warranties.  The New Collateral Agent represents and warrants to the other Collateral Agents and Claimholders that (i) it has full power and authority to enter into this Joinder Agreement, in its capacity as [agent][trustee], (ii) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms and the terms of the Intercreditor Agreement and (iii) the [First/Second] Lien Obligations Agreements relating to such Additional [First/Second] Lien Obligations provide that, upon the New Collateral Agent's entry into this Agreement, the [First/Second] Lien Claimholders in respect of such Additional [First/Second] Lien Obligations will be subject to and bound by the provisions of the Intercreditor Agreement as [First/Second] Lien Claimholders.

3.	Counterparts.  This Joinder Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and all of which, when taken together, shall constitute one contract.  Delivery of an executed signature page to this Joinder Agreement by facsimile transmission or other electronic transmission (including ".pdf", ".tiff" or

US-DOCS\72672063.7

similar format) shall be effective as delivery of a manually executed counterpart of this Joinder Agreement.

4. <u>Governing Law</u>.  THIS JOINDER AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS JOINDER AGREEMENT, WHETHER IN TORT, CONTRACT (AT LAW OR IN EQUITY) OR OTHERWISE, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

6. <u>Miscellaneous</u>.  The provisions of <u>Section 8</u> of the Intercreditor Agreement shall apply with like effect to this Joinder Agreement.

[Signature pages follow]

A-2

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed by its authorized representative, and each Collateral Agent has caused the same to be accepted by its authorized representative, as of the date first written above.

**[NAME OF NEW COLLATERAL AGENT]**,
as a [First/Second] Lien Collateral Agent

By: _____
    Name:
    Title:

Address for notices:

_____

_____

Attention of:_____

Telecopy:_____

**Acknowledged by:**

**UBS AG, STAMFORD BRANCH,**
as First Lien Credit Agreement Collateral Agent,

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**GOLDMAN SACHS BANK USA,**
as Second Lien Credit Agreement Collateral Agent,

By: _____
    Name:
    Title:

A-3

**Acknowledged by:**

Holdings:

**DAWN INTERMEDIATE, INC.**,

By: _____
     Name:
     Title:

Borrowers

**SERTA SIMMONS BEDDING, LLC**,

By: _____
     Name:
     Title:

**NATIONAL BEDDING COMPANY L.L.C.**,

By: _____
     Name:
     Title:

**SSB MANUFACTURING COMPANY**,

By: _____
     Name:
     Title:

Other Obligors

[           ]

By: _____
     Name:
     Title:

[FORM OF]
FORM OF FIRST LIEN INTERCREDITOR AGREEMENT

[See attached.]

EXHIBIT G-3

FORM OF

FIRST LIEN INTERCREDITOR AGREEMENT

Among

DAWN INTERMEDIATE, INC.,
as Holdings,

SERTA SIMMONS BEDDING, LLC,
as the Top Borrower,

the other Grantors party hereto,

UBS AG, STAMFORD BRANCH,
as First Lien Credit Agreement Collateral Agent for the First Lien
Credit Agreement Secured Parties,

[        ]

as the Initial Additional First Lien Collateral Agent,

[        ]

as the Initial Additional Authorized Representative,

and

each additional Authorized Representative and additional Collateral Agent from time to time party hereto

dated as of [_____], 201_

FIRST LIEN INTERCREDITOR AGREEMENT, dated as of [____], 201___] (as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time, this "Agreement"), among Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), the other Grantors (as defined below) from time to time party hereto, UBS AG, STAMFORD BRANCH ("UBS"), as collateral agent for the First Lien Credit Agreement Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "First Lien Credit Agreement Collateral Agent"), [  ], as collateral agent for the Initial Additional First Lien Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "Initial Additional First Lien Collateral Agent"), [  ], as Authorized Representative for the Initial Additional First Lien Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "Initial Additional Authorized Representative") and each additional Authorized Representative and additional Collateral Agent from time to time party hereto for the other Additional First Lien Secured Parties of the Series (as each such term is defined below) with respect to which it is acting in such capacity.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the First Lien Credit Agreement Collateral Agent (for itself and on behalf of the First Lien Credit Agreement Secured Parties) and the Initial Additional Authorized Representative (for itself and on behalf of the Initial Additional First Lien Secured Parties) and each additional Authorized Representative (for itself and on behalf of the Additional First Lien Secured Parties of the applicable Series) agree as follows:

<div align="center">ARTICLE I</div>

<div align="center">Definitions</div>

SECTION 1.01 Certain Defined Terms.  Capitalized terms used but not otherwise defined herein have the meanings set forth in the First Lien Credit Agreement (as defined below) or, if defined in the New York UCC, the meanings specified therein.  As used in this Agreement, the following terms have the meanings specified below:

"Additional First Lien Collateral Agent" means (a) in the case of the Initial Additional First Lien Obligations, the Initial Additional First Lien Collateral Agent and (b) in the case of any other Series of Additional First Lien Obligations that becomes subject to this Agreement after the date hereof, the Additional Senior Class Debt Collateral Agent for such Series named in the applicable Joinder Agreement.

"Additional First Lien Documents" means, with respect to the Initial Additional First Lien Obligations or any Series of Additional Senior Class Debt, the notes, indentures, credit agreements, collateral agreements, security documents, guarantees and other operative agreements evidencing or governing such Indebtedness and the Liens securing such Indebtedness, including the Initial Additional First Lien Documents and the Additional First Lien Security Documents and each other agreement entered into for the purpose of securing the Initial Additional First Lien Obligations or any Series of Additional Senior Class Debt; provided that, in each case, the Indebtedness thereunder (other than the Additional First Lien Obligations) has been designated as Additional Senior Class Debt pursuant to Section 5.13 hereto.

"Additional First Lien Obligations" means collectively (1) the Initial Additional First Lien Obligations and (2) all amounts owing pursuant to the terms of any Series of Additional Senior Class Debt designated as Additional First Lien Obligations pursuant to Section 5.13 after the date hereof, including, without limitation, the obligation (including guarantee obligations) to pay principal, premium, interest, fees, expenses (including interest, fees and expenses that accrue after the commencement of a Bankruptcy Case, regardless of whether such interest, fees and expenses are an allowed claim under such Bankruptcy Case), letter of credit commissions, reimbursement obligations, charges, attorneys costs, indemnities, penalties, reimbursements, damages and other amounts payable by a Grantor under any Additional First Lien Document (including guarantees of the foregoing).

"Additional First Lien Secured Party" means the holders of any Additional First Lien Obligations and any Authorized Representative and Additional First Lien Collateral Agent with respect thereto and the beneficiaries of each indemnification obligation undertaken by each Borrower and the other Grantors under any related Additional First Lien Document, and shall include the Initial Additional First Lien Secured Parties and the Additional Senior Class Debt Parties.

"Additional First Lien Security Document" means any collateral agreement, security agreement or any other document now existing or entered into after the date hereof that creates or purports to create, Liens on any assets or properties of any Grantor to secure any of the Additional First Lien Obligations.

"Additional Senior Class Debt" has the meaning assigned to such term in Section 5.13.

"Additional Senior Class Debt Collateral Agent" has the meaning assigned to such term in Section 5.13.

"Additional Senior Class Debt Parties" has the meaning assigned to such term in Section 5.13.

"Additional Senior Class Debt Representative" has the meaning assigned to such term in Section 5.13.

"Agreement" has the meaning assigned to such term in the introductory paragraph of hereto.

"Applicable Authorized Representative" means, with respect to any Shared Collateral, (i) until the earlier of (x) the Discharge of First Lien Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the First Lien Credit Agreement Administrative Agent and (ii) from and after the earlier of (x) the Discharge of First Lien Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Major Non-Controlling Authorized Representative.

"Authorized Representative" means, at any time, (i) in the case of any First Lien Credit Agreement Obligations or the First Lien Credit Agreement Secured Parties, the First Lien Credit Agreement Administrative Agent, (ii) in the case of the Initial Additional First Lien Obligations or the Initial Additional First Lien Secured Parties, the Initial Additional Authorized Representative, and (iii) in the case of any other Series of Additional First Lien Obligations or Additional First Lien Secured Parties that become subject to this Agreement after the date hereof, the Additional Senior Class Debt Representative for such Series named in the applicable Joinder Agreement.

"Bankruptcy Case" has the meaning assigned to such term in Section 2.05(b).

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Borrowers" means collectively, SSB, National Bedding and SSB Manufacturing.

"Closing Date" means November 8, 2016.

"Collateral" means all assets and properties subject to, or purported to be subject to, Liens created pursuant to any First Lien Security Document to secure one or more Series of First Lien Obligations.

"Collateral Agent" means (i) in the case of any First Lien Credit Agreement Obligations, the First Lien Credit Agreement Collateral Agent, (ii) in the case of the Initial Additional First Lien Obligations, the Initial Additional First Lien Collateral Agent and (iii) in the case of any other Series of Additional First Lien Obligations that become subject to this Agreement after the date hereof, the Additional Senior Class Debt Collateral Agent for such Series named in the applicable Joinder Agreement.

"Contingent First Lien Obligation" means, at any time, First Lien Obligations for taxes, costs, indemnifications, reimbursements, damages and other contingent liabilities (excluding (a) the principal of, and

interest and premium (if any) on, and fees and expenses relating to, any First Lien Obligation and (b) contingent reimbursement obligations in respect of amounts that may be drawn under outstanding letters of credit) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of First Lien Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"Controlling Collateral Agent" means, with respect to any Shared Collateral, (i) until the earlier of (x) the Discharge of First Lien Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date with respect to such Shared Collateral, the First Lien Credit Agreement Collateral Agent and (ii) from and after the earlier of (x) the Discharge of First Lien Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date with respect to such Shared Collateral, the Additional First Lien Collateral Agent for the Series of Additional First Lien Obligations represented by the Major Non-Controlling Authorized Representative.

"Controlling Secured Parties" means, with respect to any Shared Collateral, (i) at any time when the First Lien Credit Agreement Collateral Agent is the Controlling Collateral Agent with respect to such Shared Collateral, the First Lien Credit Agreement Secured Parties and (ii) at any other time, the Series of First Lien Secured Parties whose Authorized Representative is the Applicable Authorized Representative for such Shared Collateral.

"DIP Financing" has the meaning assigned to such term in Section 2.05(b).

"DIP Financing Liens" has the meaning assigned to such term in Section 2.05(b).

"DIP Lenders" has the meaning assigned to such term in Section 2.05(b).

"Discharge" means, with respect to any Shared Collateral and any Series of First Lien Obligations, the date on which (i) such Series of First Lien Obligations have been paid in full in cash (other than any Contingent First Lien Obligations) and are no longer secured and no longer required to be secured by such Shared Collateral pursuant to the terms of the documentation governing such Series of First Lien Obligations or, with respect to any obligations and liabilities under Secured Hedge Agreements or Treasury Services Agreements secured by the Collateral Documents for such Series of First Lien Obligations, any of (x) such obligations and liabilities under Secured Hedge Agreements and Treasury Services Agreements have been paid in full in cash (other than obligations and liabilities under Treasury Services Agreements and Secured Hedge Agreements not due and payable), (y) such obligations and liabilities under Secured Hedge Agreements and Treasury Services Agreements shall have been cash collateralized on terms satisfactory to each applicable counterparty (or other arrangements satisfactory to the applicable counterparty shall have been made) (other than obligations and liabilities under Treasury Services Agreements and Secured Hedge Agreements not due and payable) or (z) such obligations and liabilities under Secured Hedge Agreements and Treasury Services Agreements are no longer secured and no longer required to be secured by such Shared Collateral pursuant to the terms of the documentation governing such Series of First Lien Obligations (other than obligations and liabilities under Treasury Services Agreements and Secured Hedge Agreements not due and payable), (ii) any letters of credit issued pursuant to documentation governing such Series of First Lien Obligations shall either have expired or have been terminated (other than letters of credit that are cash collateralized or back-stopped or deemed reissued under another facility, in each case, in the amount and form required under the applicable Series of First Lien Obligations) and (iii) all commitments under such Series of First Lien Obligations have terminated. The term "Discharged" shall have a corresponding meaning.

"Discharge of First Lien Credit Agreement Obligations" means, with respect to any Shared Collateral, the Discharge of the First Lien Credit Agreement Obligations with respect to such Shared Collateral; provided that the Discharge of First Lien Credit Agreement Obligations shall not be deemed to have occurred in connection with a Refinancing of such First Lien Credit Agreement Obligations with Additional First Lien Obligations secured by such Shared Collateral under an Additional First Lien Document which has been designated in writing by the First Lien Credit Agreement Administrative Agent (under the First Lien Credit

Agreement so Refinanced) to the Additional First Lien Collateral Agents and each other Authorized Representative as the "First Lien Credit Agreement" for purposes of this Agreement.

"Event of Default" means an "Event of Default" (or similarly defined term) as defined in any Secured Credit Document.

"First Lien Credit Agreement Administrative Agent" means the "Administrative Agent" as defined in the First Lien Credit Agreement and shall include any successor administrative agent (including as a result of any Refinancing or other modification of the First Lien Credit Agreement permitted by Section 2.15 thereof).

"First Lien Credit Agreement Collateral Agent" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"First Lien Credit Agreement" means the First Lien Term Loan Agreement, dated as of the Closing Date, among, *inter alios*, Holdings, the Borrowers, UBS, as First Lien Credit Agreement Administrative Agent and each lender from time to time party thereto, as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"First Lien Credit Agreement Collateral Documents" means the First Lien Security Agreement, the other "Collateral Documents" (or similarly defined term) as defined in the First Lien Credit Agreement and each other agreement entered into in favor of the First Lien Credit Agreement Collateral Agent for the purpose of securing and/or perfecting any First Lien Credit Agreement Obligations.

"First Lien Credit Agreement Obligations" means all "Secured Obligations" (or similarly defined term) as defined in the First Lien Credit Agreement.

"First Lien Credit Agreement Secured Parties" means the "Secured Parties" (or similarly defined term) as defined in the First Lien Credit Agreement.

"First Lien Obligations" means, collectively, (i) the First Lien Credit Agreement Obligations and (ii) each Series of Additional First Lien Obligations.

"First Lien Secured Parties" means (i) the First Lien Credit Agreement Secured Parties and (ii) the Additional First Lien Secured Parties with respect to each Series of Additional First Lien Obligations.

"First Lien Security Agreement" means the "Security Agreement" (or similarly defined term) as defined in the First Lien Credit Agreement.

"First Lien Security Documents" means, collectively, (i) the First Lien Credit Agreement Collateral Documents and (ii) the Additional First Lien Security Documents.

"Grantors" means Holdings, the Borrowers and each of the Subsidiary Guarantors (as defined in the First Lien Credit Agreement) and each other parent entity or subsidiary of the Top Borrower which has granted a security interest pursuant to any First Lien Security Document to secure any Series of First Lien Obligations (including any such Person which becomes a party to this Agreement as contemplated by Section 5.16). The Grantors existing on the date hereof are set forth in Annex I hereto.

"Holdings" has the meaning assigned to such term in the introductory paragraph hereto.

"Impairment" has the meaning assigned to such term in Section 1.03.

"Initial Additional Authorized Representative" has the meaning assigned to such term in the introductory paragraph hereto.

"Initial Additional First Lien Agreement" mean that certain [Indenture] [Other Agreement], dated as of [_____], among the relevant Borrower, [the Subsidiary Guarantors identified therein,] and [   ], as [trustee], as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

-4-

"<u>Initial Additional First Lien Collateral Agent</u>" has the meaning assigned to such term in the introductory paragraph hereto.

"<u>Initial Additional First Lien Documents</u>" means the Initial Additional First Lien Agreement, the [debt securities issued] [loans made] thereunder, the Initial Additional First Lien Security Agreement and any collateral agreements, security documents, guarantees and other operative agreements evidencing or governing the Indebtedness thereunder, and the Liens securing or purporting to secure, such Indebtedness.

"<u>Initial Additional First Lien Obligations</u>" means the [Obligations] as such term is defined in the Initial Additional First Lien [Agreement] [Security Agreement].

"<u>Initial Additional First Lien Secured Parties</u>" means the Initial Additional First Lien Collateral Agent, the Initial Additional Authorized Representative and the holders of the Initial Additional First Lien Obligations issued pursuant to the Initial Additional First Lien Agreement.

"<u>Initial Additional First Lien Security Agreement</u>" means the security agreement, dated as of the date hereof, among the relevant Borrowers, the Initial Additional First Lien Collateral Agent and the other parties thereto, as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"<u>Insolvency or Liquidation Proceeding</u>" means:

(1)     any case commenced by or against any Borrower or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of any Borrower or any other Grantor, any receivership or assignment for the benefit of creditors relating to any Borrower or any other Grantor or any similar case or proceeding (including any such proceeding under applicable corporate law) relative to any Borrower or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(2)     any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to any Borrower or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)     any other proceeding of any type or nature in which substantially all claims of creditors of any Borrower or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"<u>Intervening Creditor</u>" has the meaning assigned to such term in <u>Section 2.01(a)</u>.

"<u>Joinder Agreement</u>" means a joinder to this Agreement substantially in the form of Annex II hereto or such other form as shall be approved by the Controlling Collateral Agent.

"<u>Lien</u>" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); <u>provided</u> that in no event shall an operating lease in and of itself be deemed to be a Lien.

"<u>Major Non-Controlling Authorized Representative</u>" means, with respect to any Shared Collateral, the Authorized Representative of the Series of Additional First Lien Obligations that constitutes the largest outstanding principal amount of any then outstanding Series of Additional First Lien Obligations with respect to such Shared Collateral; <u>provided</u>, <u>however</u>, that if there are two outstanding Series of Additional First Lien Obligations which have an equal outstanding principal amount, the Series of Additional First Lien Obligations with the earlier maturity date shall be considered to have the larger outstanding principal amount for purposes of this definition.

"National Bedding" has the meaning assigned to such term in the introductory paragraph hereto.

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Non-Controlling Authorized Representative" means, at any time with respect to any Shared Collateral, any Authorized Representative that is not the Applicable Authorized Representative at such time with respect to such Shared Collateral.

"Non-Controlling Authorized Representative Enforcement Date" means, with respect to any Non-Controlling Authorized Representative, the date which is 180 days (throughout which 180 day period such Non-Controlling Authorized Representative was the Major Non-Controlling Authorized Representative) after the occurrence of both (i) an Event of Default (under and as defined in the Additional First Lien Document under which such Non-Controlling Authorized Representative is the Authorized Representative) and (ii) each Collateral Agent's and each other Authorized Representative's receipt of written notice from such Non-Controlling Authorized Representative certifying that (x) such Non-Controlling Authorized Representative is the Major Non-Controlling Authorized Representative and that an Event of Default (under and as defined in the Additional First Lien Document under which such Non-Controlling Authorized Representative is the Authorized Representative) has occurred and is continuing and (y) the Additional First Lien Obligations of the Series with respect to which such Non-Controlling Authorized Representative is the Authorized Representative are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Additional First Lien Document; provided that the Non-Controlling Authorized Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to the Shared Collateral (1) at any time the First Lien Credit Agreement Collateral Agent, the Applicable Authorized Representative or the Controlling Collateral Agent has commenced and is diligently pursuing any enforcement action with respect to the Shared Collateral or a material portion thereof or (2) at any time any Grantor which has granted a security interest in any Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"Non-Controlling Secured Parties" means, with respect to any Shared Collateral, the First Lien Secured Parties which are not Controlling Secured Parties with respect to such Shared Collateral.

"Possessory Collateral" means any Shared Collateral in the possession and/or control of any Collateral Agent (or its agents or bailees), to the extent that possession and/or control thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction. Possessory Collateral includes, without limitation, any Certificated Securities, Promissory Notes, Instruments, and Chattel Paper, in each case, delivered to or in the possession of and/or under the control of any Collateral Agent under the terms of the First Lien Security Documents.

"Proceeds" has the meaning assigned to such term in Section 2.01(a).

"Refinance" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay such indebtedness, or to issue other indebtedness or enter into alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "Refinanced" and "Refinancing" have correlative meanings.

"Secured Credit Document" means (i) the First Lien Credit Agreement and each Loan Document (or similarly defined term) (as defined in the First Lien Credit Agreement), (ii) each Initial Additional First Lien Document, and (iii) each Additional First Lien Document for Additional First Lien Obligations incurred after the date hereof.

"Secured Hedge Agreement" means any Hedge Agreement evidencing Secured Hedging Obligations (or equivalent term under any Additional First Lien Document).

"Series" means (a) with respect to the First Lien Secured Parties, each of (i) the First Lien Credit Agreement Secured Parties (in their capacities as such), (ii) the Initial Additional First Lien Secured Parties (in their capacities as such), and (iii) the Additional First Lien Secured Parties (in their capacities as such) that become subject to this Agreement after the date hereof that are represented by a common Authorized Representative (in its capacity as such for such Additional First Lien Secured Parties) and (b) with respect to any First Lien Obligations, each of (i) the First Lien Credit Agreement Obligations, (ii) the Initial Additional First Lien Obligations, and (iii) the Additional First Lien Obligations incurred after the date hereof pursuant to any Additional First Lien Document, the holders of which, pursuant to any Joinder Agreement, are to be represented hereunder by a common Authorized Representative (in its capacity as such for such Additional First Lien Obligations).

"Shared Collateral" means, at any time, Collateral in which the holders of two or more Series of First Lien Obligations (or their respective Authorized Representatives or Collateral Agents on behalf of such holders) hold or purport to hold a valid security interest at such time. If more than two Series of First Lien Obligations are outstanding at any time and the holders of less than all Series of First Lien Obligations hold or purport to hold a valid security interest in any Collateral at such time, then such Collateral shall constitute Shared Collateral for those Series of First Lien Obligations that hold or purport to hold a valid security interest in such Collateral at such time and shall not constitute Shared Collateral for any Series which does not have or purport to have a valid security interest in such Collateral at such time.

"SSB" has the meaning assigned to such term in the introductory paragraph hereto.

"SSB Manufacturing" has the meaning assigned to such term in the introductory paragraph hereto.

"Top Borrower" has the meaning assigned to such term in the introductory paragraph hereto.

"Treasury Services Agreement" means any agreement that evidences Banking Services Obligations (or equivalent term under any Additional First Lien Document).

"UBS" has the meaning assigned to such term in the introductory paragraph hereto.

SECTION 1.02 Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "hereto", "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

SECTION 1.03 Impairments.  It is the intention of the First Lien Secured Parties of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Secured Parties of any other Series) bear the risk of (i) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations

(other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have a valid and perfected security interest in any of the Collateral securing any other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations) on a basis ranking prior to the security interest of such Series of First Lien Obligations but junior to the security interest of any other Series of First Lien Obligations or (ii) the existence of any Collateral for any other Series of First Lien Obligations that is not Shared Collateral for such Series (any such condition referred to in the foregoing clauses (i) or (ii) with respect to any Series of First Lien Obligations, an "Impairment" of such Series); provided that the existence of a maximum claim with respect to any Material Real Estate Asset (as defined in the First Lien Credit Agreement) subject to a mortgage that applies to all First Lien Obligations shall not be deemed to be an Impairment of any Series of First Lien Obligations.  In the event of any Impairment with respect to any Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including, without limitation, the right to receive distributions in respect of such Series of First Lien Obligations pursuant to Section 2.01) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment.  Additionally, in the event the First Lien Obligations of any Series are modified pursuant to applicable law (including, without limitation, pursuant to Section 1129 of the Bankruptcy Code or any other provision of any Bankruptcy Law), any reference to such First Lien Obligations or the First Lien Security Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

ARTICLE II

Priorities and Agreements with Respect to Shared Collateral

SECTION 2.01  Priority of Claims.

(a)       Anything contained herein or in any of the Secured Credit Documents to the contrary notwithstanding (but subject to Section 1.03), if an Event of Default has occurred and is continuing, and the Controlling Collateral Agent or any First Lien Secured Party is taking action to enforce rights in respect of any Shared Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of any Borrower or any other Grantor or any First Lien Secured Party receives any payment pursuant to any intercreditor agreement (other than this Agreement) with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any such Shared Collateral by the Controlling Collateral Agent or any other First Lien Secured Party on account of such enforcement of rights or remedies or distribution in respect thereof in any Bankruptcy Case or any payment received by the Controlling Collateral Agent or any other First Lien Secured Party pursuant to any such intercreditor agreement (other than this Agreement) with respect to such Shared Collateral (subject, in the case of any such payment or distribution, to the sentence immediately following) (all proceeds of any sale, collection or other liquidation of any Collateral and all proceeds of any such payment or distribution being collectively referred to as "Proceeds"), shall be applied (i) FIRST, to the payment in full in cash of all amounts owing to each Collateral Agent (in its capacity as such and, in the case of the First Lien Credit Agreement Collateral Agent, in its capacity as First Lien Credit Agreement Administrative Agent) pursuant to the terms of any Secured Credit Document, (ii) SECOND, subject to Section 1.03, to the payment in full in cash of the First Lien Obligations of each Series on a ratable basis, with such Proceeds to be applied to the First Lien Obligations of a given Series in accordance with the terms of the applicable Secured Credit Documents and (iii) THIRD after Discharge of all First Lien Obligations, to the Borrowers and the other Grantors or their successors or assigns, as their interests may appear, or to whomsoever may be lawfully entitled to receive the same, or as a court of competent jurisdiction may direct. If, despite the provisions of this Section 2.01(a), any First Lien Secured Party shall receive any payment or other recovery in excess of its portion of payments on account of the First Lien Obligations to which it is then entitled in accordance with this Section 2.01(a), such First Lien Secured Party shall hold such payment or recovery in trust for the benefit of all First Lien Secured Parties in accordance with Section 2.03(b) for distribution in accordance with this Section 2.01(a).  Notwithstanding the foregoing, with respect to any Shared Collateral for which a third party (other than a First Lien Secured Party) has a lien or security interest

that is junior in priority to the security interest of any Series of First Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of any other Series of First Lien Obligations (such third party, an "Intervening Creditor"), the value of any Shared Collateral or Proceeds allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral or Proceeds to be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.

(b)　　Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing any Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Secured Credit Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of any Series or any other circumstance whatsoever (but, in each case, subject to Section 1.03), each First Lien Secured Party hereby agrees that the Liens securing each Series of First Lien Obligations on any Shared Collateral shall be of equal priority.

SECTION 2.02　Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.

(a)　　Only the Controlling Collateral Agent shall act or refrain from acting with respect to any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral). At any time when the First Lien Credit Agreement Collateral Agent is the Controlling Collateral Agent, no Additional First Lien Secured Party shall or shall instruct any Collateral Agent to, and no Collateral Agent that is not the Controlling Collateral Agent shall, commence any judicial or non-judicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any Additional First Lien Security Document, applicable law or otherwise, it being agreed that only the First Lien Credit Agreement Collateral Agent, acting in accordance with the First Lien Credit Agreement Collateral Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral at such time.

(b)　　With respect to any Shared Collateral at any time when the First Lien Credit Agreement Collateral Agent is not the Controlling Collateral Agent, (i) the Controlling Collateral Agent shall act only on the instructions of the Applicable Authorized Representative, (ii) the Controlling Collateral Agent shall not follow any instructions with respect to such Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral) from any Non-Controlling Authorized Representative (or any other First Lien Secured Party other than the Applicable Authorized Representative) and (iii) no Non-Controlling Authorized Representative or other First Lien Secured Party (other than the Applicable Authorized Representative) shall or shall instruct the Controlling Collateral Agent to, commence any judicial or non-judicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any First Lien Security Document, applicable law or otherwise, it being agreed that only the Controlling Collateral Agent, acting on the instructions of the Applicable Authorized Representative and in accordance with the applicable Additional First Lien Security Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral.

(c)　　Notwithstanding the equal priority of the Liens securing each Series of First Lien Obligations with respect to any Shared Collateral, the Controlling Collateral Agent may deal with the Shared Collateral as if such Controlling Collateral Agent had a senior and exclusive Lien on such Shared Collateral.  No Non-Controlling Authorized Representative or Non-Controlling Secured Party will contest, protest or object (or support any other Person in contesting, protesting or objecting) to any foreclosure proceeding or action brought

by the Controlling Collateral Agent, the Applicable Authorized Representative or any Controlling Secured Party or any other exercise by the Controlling Collateral Agent, the Applicable Authorized Representative or any Controlling Secured Party of any rights and remedies relating to the Shared Collateral, or to cause the Controlling Collateral Agent to do so. The foregoing shall not be construed to limit the rights and priorities of any First Lien Secured Party, the Controlling Collateral Agent or any Authorized Representative with respect to any Collateral not constituting Shared Collateral.

(d) Each of the First Lien Secured Parties agrees that it will not (and hereby waives any right to) question or contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity, attachment or enforceability of a Lien held by or on behalf of any of the First Lien Secured Parties in all or any part of the Collateral, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Collateral Agent or any Authorized Representative to enforce this Agreement.

SECTION 2.03 No Interference; Payment Over.

(a) Each First Lien Secured Party agrees that (i) it will not challenge or question in any proceeding the validity or enforceability of any First Lien Obligations of any Series or any First Lien Security Document or the validity, attachment, perfection or priority of any Lien under any First Lien Security Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Shared Collateral by the Controlling Collateral Agent, (iii) except as provided in Section 2.02, it shall have no right to (A) direct the Controlling Collateral Agent or any other First Lien Secured Party to exercise, and shall not exercise, any right, remedy or power with respect to any Shared Collateral (including pursuant to any intercreditor agreement) or (B) consent to the exercise by the Controlling Collateral Agent or any other First Lien Secured Party of any right, remedy or power with respect to any Shared Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Controlling Collateral Agent or any other First Lien Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Shared Collateral, and none of the Controlling Collateral Agent, any Applicable Authorized Representative or any other First Lien Secured Party shall be liable for any action taken or omitted to be taken by the Controlling Collateral Agent, such Applicable Authorized Representative or other First Lien Secured Party with respect to any Shared Collateral in accordance with the provisions of this Agreement, (v) if not the Controlling Collateral Agent, it will not seek, and hereby waives any right, to have any Shared Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Controlling Collateral Agent or any other First Lien Secured Party to enforce this Agreement.

(b) Each First Lien Secured Party hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any such Shared Collateral, pursuant to any First Lien Security Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Secured Parties and promptly transfer such Shared Collateral, proceeds or payment, as the case may be, to the Controlling Collateral Agent, to be distributed in accordance with the provisions of Section 2.01 hereof.

SECTION 2.04 Release of Liens; Power of Attorney.

(a) If, at any time the Controlling Collateral Agent forecloses upon or otherwise exercises remedies against any Shared Collateral resulting in a sale or disposition thereof, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of each other Collateral Agent

-10-

for the benefit of each Series of First Lien Secured Parties upon such Shared Collateral will automatically be released and discharged as and when, but only to the extent, such Liens of the Controlling Collateral Agent on such Shared Collateral are released and discharged; provided that (i) the Liens in favor of each Collateral Agent for the benefit of each related Series of First Lien Secured Parties secured by such Shared Collateral attach to any such Proceeds of such sale or disposition with the same priority vis-à-vis all the other First Lien Secured Parties as existed prior to the commencement of such sale or other disposition, and any such Liens shall remain subject to the terms of this Agreement until application thereof pursuant to Section 2.01 and (ii) any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.01.

(b)     Each Collateral Agent and Authorized Representative agrees to execute and deliver (at the sole costs and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Controlling Collateral Agent to evidence and confirm any release of Shared Collateral provided for in this Section.

(c)     Each Non-Controlling Authorized Representative and Collateral Agent that is not the Controlling Collateral Agent, for itself and on behalf of the First Lien Secured Parties of the Series for whom it is acting, hereby irrevocably appoints the Controlling Collateral Agent and any officer or agent of the Controlling Collateral Agent, which appointment is coupled with an interest with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Non-Controlling Authorized Representative, Collateral Agent or First Lien Secured Party, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Agreement, including the exercise of any and all remedies under each First Lien Security Document with respect to Shared Collateral and to evidence and confirm any release of Shared Collateral provided for in this Section 2.04.

SECTION 2.05 Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)     This Agreement shall continue in full force and effect notwithstanding the commencement of any Insolvency or Liquidation Proceeding.  The parties hereto acknowledge that the provisions of this Agreement are intended to be enforceable as contemplated by Section 510(a) of the Bankruptcy Code.  All references herein to any Grantor shall include such Grantor as a debtor-in-possession and any receiver or trustee for such Grantor.

(b)     If any Borrower and/or any other Grantor shall become subject to a case or proceeding (a "Bankruptcy Case") under the Bankruptcy Code or any other Bankruptcy Law and shall, as debtor(s)-in-possession, move for approval of financing ("DIP Financing") to be provided by one or more lenders (the "DIP Lenders") to such Borrower or such Grantor under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law or the use of cash collateral under Section 363 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, each First Lien Secured Party (other than any Controlling Secured Party or the Authorized Representative of any Controlling Secured Party) agrees that it will not raise, join or support any objection to any such financing or to the Liens on the Shared Collateral securing the same ("DIP Financing Liens") or to any use of cash collateral that constitutes Shared Collateral, unless the Controlling Collateral Agent (acting on the instructions of the Applicable Authorized Representative) shall then oppose or object (or join in or support any objection) to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First Lien Secured Parties of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-à-vis all the

-11-

other First Lien Secured Parties (other than any Liens of the First Lien Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Secured Parties of each Series are granted Liens on any additional collateral pledged to any First Lien Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-à-vis the First Lien Secured Parties (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens) as set forth in this Agreement, (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.01, and (D) if any First Lien Secured Parties are granted adequate protection, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.01; provided that this Agreement shall not limit the right of the First Lien Secured Parties of each Series to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Secured Parties of such Series or its Authorized Representative that shall not constitute Shared Collateral; and provided, further, that the First Lien Secured Parties receiving adequate protection shall not object to any other First Lien Secured Party receiving adequate protection comparable to any adequate protection granted to such First Lien Secured Parties in connection with a DIP Financing or use of cash collateral.

SECTION 2.06 Reinstatement.  In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference or other avoidance action under the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash.

SECTION 2.07 Insurance.  As between the First Lien Secured Parties, the Controlling Collateral Agent (acting at the direction of the Applicable Authorized Representative) shall have the right to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation, expropriation or similar proceeding affecting the Shared Collateral.

SECTION 2.08 Refinancings, etc.  The First Lien Obligations of any Series may, subject to the limitations set forth in the then extant Secured Credit Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced (in whole or in part) or otherwise amended or modified from time to time, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the Refinancing transaction under any Secured Credit Document) of any First Lien Secured Party of any other Series, all without affecting the priorities provided for in Section 2.01(a) or the other provisions hereof; provided that the Authorized Representative and Collateral Agent of the holders of any such Refinancing indebtedness shall have executed a Joinder Agreement on behalf of the holders of any such Refinancing indebtedness.

SECTION 2.09 Possessory Collateral Agent as Gratuitous Bailee and Agent for Perfection.

(a)    The Possessory Collateral shall be delivered to the Controlling Collateral Agent and the Controlling Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee and non-fiduciary agent for the benefit of each other First Lien Secured Party for which such Possessory Collateral is Shared Collateral and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09; provided that at any time the existing Controlling Collateral Agent ceases to be the Controlling Collateral Agent hereunder, the outgoing Controlling Collateral Agent shall (at the sole cost and expense of the Grantors), at the request of the Additional First Lien Collateral Agent that is the new Controlling Collateral Agent, promptly deliver all Possessory Collateral to such Additional First Lien Collateral Agent together with any necessary endorsements (or otherwise allow such Additional First Lien Collateral Agent to obtain control of such Possessory Collateral).   Each Borrower and the other Grantors shall

take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify each Collateral Agent for loss or damage suffered by such Collateral Agent as a result of such transfer except for loss or damage suffered by such Collateral Agent as a result of its own willful misconduct, gross negligence or bad faith (as determined by a court of competent jurisdiction in a final, non-appealable judgment).

(b)      The Controlling Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral, from time to time in its possession, as gratuitous bailee and non-fiduciary agent for the benefit of each other First Lien Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09.

(c)      The duties or responsibilities of the Controlling Collateral Agent and each other Collateral Agent under this Section 2.09 shall be limited solely to holding any Shared Collateral constituting Possessory Collateral as gratuitous bailee and non-fiduciary agent for the benefit of each other First Lien Secured Party for purposes of perfecting the Lien held by such First Lien Secured Parties thereon.

SECTION 2.10 Amendments to Security Documents.

(a)      Without the prior written consent of the First Lien Credit Agreement Collateral Agent, each Additional First Lien Secured Party agrees that no Additional First Lien Security Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Additional First Lien Security Document would be prohibited by any of the terms of this Agreement.

(b)      Without the prior written consent of the Additional First Lien Collateral Agents, the First Lien Credit Agreement Collateral Agent agrees that no First Lien Credit Agreement Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new First Lien Credit Agreement Collateral Document would be prohibited by any of the terms of this Agreement.

(c)      In making determinations required by this Section 2.10, each Collateral Agent may conclusively rely on a certificate of a Responsible Officer of the Top Borrower stating that such amendment is permitted by Sections 2.10(a) or (b) as the case may be.

ARTICLE III

Existence and Amounts of Liens and Obligations


SECTION 3.01 Determinations with Respect to Amounts of Liens and Obligations.  Whenever a Collateral Agent or any Authorized Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of any Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of any Series, it may request that such information be furnished to it in writing by each other Authorized Representative or Collateral Agent and shall be entitled to make such determination or not make any determination on the basis of the information so furnished; provided, however, that if an Authorized Representative or a Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Collateral Agent or Authorized Representative shall be entitled to make any such determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Top Borrower.  Each Collateral Agent and each Authorized Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Secured Party or any other person as a result of such determination.

# ARTICLE IV

## The Controlling Collateral Agent

SECTION 4.01 <u>Authority</u>.

(a)     Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on any Controlling Collateral Agent to any Non-Controlling Secured Party or any other Person, regardless of whether an Event of Default has occurred or is continuing, or give any Non-Controlling Secured Party the right to direct any Controlling Collateral Agent, except that each Controlling Collateral Agent shall be obligated to distribute proceeds of any Shared Collateral in accordance with <u>Section 2.01</u> hereof.

(b)     In furtherance of the foregoing, each Non-Controlling Secured Party acknowledges and agrees that the Controlling Collateral Agent shall be entitled, for the benefit of the First Lien Secured Parties, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Security Documents, as applicable, pursuant to which the Controlling Collateral Agent is the collateral agent and/or administrative agent for such Shared Collateral, without regard to any rights to which the Non-Controlling Secured Parties would otherwise be entitled as a result of the First Lien Obligations held by such Non-Controlling Secured Parties.  Without limiting the foregoing, each Non-Controlling Secured Party agrees that none of the Controlling Collateral Agent, the Applicable Authorized Representative or any other First Lien Secured Party shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Non-Controlling Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured Parties from such realization, sale, disposition or liquidation. Except with respect to any actions expressly prohibited or required to be taken by this Agreement, each of the First Lien Secured Parties waives any claim it may now or hereafter have against any Collateral Agent or the Authorized Representative of any other Series of First Lien Obligations or any other First Lien Secured Party of any other Series arising out of (i) any actions which any Collateral Agent, Authorized Representative or the First Lien Secured Parties take or omit to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Security Documents or any other agreement related thereto or to the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations, (ii) any election by any Applicable Authorized Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to <u>Section 2.05</u>, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, by the Loan Parties or any of their subsidiaries, as debtor-in-possession. Notwithstanding any other provision of this Agreement, the Controlling Collateral Agent shall not accept any Shared Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the Uniform Commercial Code of any jurisdiction, without the consent of each Authorized Representative representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral.

SECTION 4.02 <u>Rights as a First Lien Secured Party</u>.  The Person serving as the Controlling Collateral Agent hereunder shall have the same rights and powers in its capacity as a First Lien Secured Party under any Series of First Lien Obligations that it holds as any other First Lien Secured Party of such Series and may exercise the same as though it were not the Controlling Collateral Agent and the term "First Lien Secured Party" or "First Lien Secured Parties" or (as applicable) "First Lien Credit Agreement Secured Party", "First Lien Credit Agreement Secured Parties", "Additional First Lien Secured Party", "Additional First Lien Secured Parties", "Initial Additional First Lien Secured Party" or "Initial Additional First Lien Secured

-14-

Parties" shall, if applicable and unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Controlling Collateral Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Borrower or any subsidiary or other Affiliate thereof as if such Person were not the Controlling Collateral Agent hereunder and without any duty to account therefor to any other First Lien Secured Party.

SECTION 4.03 Exculpatory Provisions.

(a)     The Controlling Collateral Agent shall not have any duties or obligations except those expressly set forth herein and in the other First Lien Security Documents to which it is a party. Without limiting the generality of the foregoing, the Controlling Collateral Agent:

(i)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other First Lien Security Documents that the Controlling Collateral Agent is required to exercise as directed in writing by the Applicable Authorized Representative; provided that the Controlling Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Controlling Collateral Agent to liability or that is contrary to any First Lien Security Document or applicable law;

(ii)     shall not, except as expressly set forth herein and in the other First Lien Security Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Controlling Collateral Agent or any of its Affiliates in any capacity;

(iii)     shall not be liable for any action taken or not taken by it (A) with the consent or at the request of the Applicable Authorized Representative or (B) in the absence of the willful misconduct, gross negligence, bad faith or material breach of this Agreement by the Controlling Collateral Agent or any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of the Controlling Collateral Agent (in each case, as determined by a court of competent jurisdiction in a final, non-appealable judgment) or (C) in reliance on a certificate of a Responsible Officer of the Top Borrower stating that such action is permitted by the terms of this Agreement (it being understood and agreed that the Controlling Collateral Agent shall be deemed not to have knowledge of any Event of Default under any Series of First Lien Obligations unless and until notice describing such Event of Default is given to the Controlling Collateral Agent by the Authorized Representative of such First Lien Obligations or the Top Borrower); shall not be responsible for or have any duty to ascertain or inquire into (A) any statement, warranty or representation made in or in connection with this Agreement or any other First Lien Security Document, (B) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any default, (D) the validity, enforceability, effectiveness or genuineness of this Agreement, any other First Lien Security Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the First Lien Security Documents, (E) the existence, value or the sufficiency of any Collateral for any Series of First Lien Obligations, or (F) the satisfaction of any condition set forth in any Secured Credit Document, other than to confirm receipt of items expressly required to be delivered to the Controlling Collateral Agent; and

(iv)     with respect to the First Lien Credit Agreement or any Additional First Lien Document, may conclusively assume that the Grantors have complied with all of their obligations thereunder unless advised in writing by the Authorized Representative thereunder to the contrary specifically setting forth the alleged violation.

(b)     Each First Lien Secured Party acknowledges that, in addition to acting as the initial Controlling Collateral Agent, UBS also serves as Administrative Agent (under, and as defined in, the First Lien Credit Agreement), and each First Lien Secured Party hereby waives any right to make any objection or claim against UBS (or any successor Controlling Collateral Agent or any of their respective counsel) based on

any alleged conflict of interest or breach of duties arising from the Controlling Collateral Agent also serving as the First Lien Credit Agreement Collateral Agent.

SECTION 4.04 <u>Reliance by Controlling Collateral Agent</u>.  The Controlling Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Controlling Collateral Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  The Controlling Collateral Agent may consult with legal counsel (who may include, but shall not be limited to, counsel for any Grantor or counsel for the Applicable Authorized Representative), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 4.05 <u>Delegation of Duties</u>.  The Controlling Collateral Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other First Lien Security Document by or through any one or more sub-agents appointed by the Controlling Collateral Agent.  The Controlling Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Affiliates of the Controlling Collateral Agent and any such sub-agent.

SECTION 4.06 <u>Non Reliance on Controlling Collateral Agent and Other First Lien Secured Parties</u>.  Each First Lien Secured Party acknowledges that it has, independently and without reliance upon the Controlling Collateral Agent, any Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the other Secured Credit Documents.  Each First Lien Secured Party also acknowledges that it will, independently and without reliance upon the Controlling Collateral Agent, any Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Secured Credit Document or any related agreement or any document furnished hereunder or thereunder.

ARTICLE V

Miscellaneous

SECTION 5.01 <u>Notices</u>.  All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a) if to the First Lien Credit Agreement Collateral Agent or to the Authorized Representative for the First Lien Credit Agreement Secured Parties, to it at UBS AG, Stamford Branch, Attention: Structured Finance Processing, 600 Washington Blvd., 9th Floor, Stamford, Connecticut 06901 (Fax No. (203) 719-3888; E-mail: Agency-UBSAmericas@ubs.com);

(b) if to the Initial Additional First Lien Collateral Agent or the Initial Additional Authorized Representative, to it at [_____], Attention of [      ] (Fax No. [   ]);

(c) if to any other additional Authorized Representative, to it at the address set forth in the applicable Joinder Agreement.

Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and, may be personally served, telecopied, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or upon receipt via U.S. mail (registered or

certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth above or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties party hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by telecopy or on the date three Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 5.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 5.01. To the extent agreed to in writing among each Collateral Agent and each Authorized Representative from time to time and upon notification to the Top Borrower, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

SECTION 5.02 Waivers; Amendment; Joinder Agreements.

(a)        No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by Section 5.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)        Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified (other than pursuant to any Joinder Agreement or any Supplement contemplated by Section 5.16) except pursuant to an agreement or agreements in writing entered into by each Authorized Representative and each Collateral Agent (and with respect to any such termination, waiver, amendment or modification which by the terms of this Agreement requires any Borrower's consent or which increases the obligations or reduces the rights of or otherwise materially adversely affects any Borrower or any other Grantor, with the consent of the Top Borrower).

(c)        Notwithstanding the foregoing, without the consent of any First Lien Secured Party, any Authorized Representative may become a party hereto by execution and delivery of a Joinder Agreement in accordance with Section 5.13 and upon such execution and delivery, such Authorized Representative and the Additional First Lien Secured Parties and Additional First Lien Obligations of the Series for which such Authorized Representative is acting hereunder agree to be bound by, and shall be subject to, the terms hereof.

(d)        Notwithstanding the foregoing, in connection with any Refinancing of First Lien Obligations of any Series, or the incurrence of Additional First Lien Obligations of any Series, the Collateral Agents and the Authorized Representatives then party hereto shall enter (and are hereby authorized to enter without the consent of any other First Lien Secured Party or any Loan Party), at the request of any Collateral Agent, any Authorized Representative or the Top Borrower, into such amendments or modifications of this Agreement as are reasonably necessary to reflect such Refinancing or such incurrence in compliance with the Secured Credit Documents and are reasonably satisfactory to each such Collateral Agent and each such Authorized Representative, provided that any Collateral Agent or Authorized Representative may condition its execution and delivery of any such amendment or modification on a receipt of a certificate from a Responsible Officer of the Top Borrower to the effect that such Refinancing or incurrence is permitted by the then existing Secured Credit Documents.

-17-

SECTION 5.03 <u>Parties in Interest</u>.   This Agreement shall be binding upon and inure to the benefit of the First Lien Secured Parties hereto and their respective successors and permitted assigns, as well as the other First Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement. Except as specifically set forth in <u>Section 5.02(b)</u> and <u>Section 5.12</u>, no other person, including the Borrowers, Grantors or any other creditors thereof shall have or be entitled to assert rights or benefits hereunder.

SECTION 5.04 <u>Survival of Agreement</u>.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 5.05 <u>Counterparts</u>.   This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile, pdf. or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

SECTION 5.06 <u>Severability</u>.  Any provision of this Agreement that is held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality or enforceability of the remaining provisions hereof, and the invalidity in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.   The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.07 <u>GOVERNING LAW</u>.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 5.08 <u>Submission to Jurisdiction Waivers; Consent to Service of Process</u>.  Each party hereto (and in the case of Collateral Agent and each Authorized Representative, on behalf of itself and the First Lien Secured Parties of the Series for whom it is acting) irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding relating to this Agreement and the First Lien Security Documents, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York in the City of New York, Borough of Manhattan, the courts of the United States for the Southern District of New York, and, in each case, appellate courts from any thereof;

(b)     consents and agrees that any such action or proceeding shall be brought in such courts and irrevocably waives (to the extent permitted by applicable law) any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Authorized Representative) at the address set forth in <u>Section 5.01</u>;

(d)     agrees that nothing herein shall affect the right of any other party hereto (or any First Lien Secured Party) to effect service of process in any other manner permitted by law; and

-18-

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Section 5.08</u> any special, exemplary, punitive or consequential damages.

SECTION 5.09  <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 5.09 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

SECTION 5.10  <u>Headings</u>.  Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 5.11  <u>Conflicts</u>.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any of the First Lien Security Documents or any of the other Secured Credit Documents, the provisions of this Agreement shall control to the extent of the conflict or inconsistency.

SECTION 5.12  <u>Provisions Solely to Define Relative Rights</u>.   The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Secured Parties in relation to one another.   None of the Borrowers, any other Grantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement (provided that nothing in this Agreement (other than <u>Section 2.04</u>, <u>2.05</u>, <u>2.08</u>, <u>2.09</u> or <u>Article V</u>) is intended to or will amend, waive or otherwise modify the provisions of the First Lien Credit Agreement or any Additional First Lien Documents), and none of the Borrowers or any other Grantor may rely on the terms hereof (other than <u>Sections 2.04</u>, <u>2.05</u>, <u>2.08</u>, <u>2.09</u> and <u>Article V</u>).   Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.

SECTION 5.13  <u>Additional Senior Debt</u>.   To the extent, but only to the extent permitted by the provisions of each of the then-extant Secured Credit Documents, any Borrower may incur additional indebtedness after the date hereof that is secured on an equal and ratable basis by the Liens securing the First Lien Obligations on a first lien basis (such indebtedness referred to as "<u>Additional Senior Class Debt</u>").  Any such Additional Senior Class Debt may be secured by a Lien and may be Guaranteed by the Grantors on a senior basis (which Lien shall rank on a *pari passu* basis with the Liens on the Shared Collateral securing all other First Lien Obligations that are secured on a first lien basis), in each case under and pursuant to the Additional First Lien Documents, if and subject to the condition that the Authorized Representative of any such Additional Senior Class Debt (each, an "<u>Additional Senior Class Debt Representative</u>"), acting on behalf of the holders of such Additional Senior Class Debt and the collateral agent for the holders of such Additional Senior Class Debt (each, an "<u>Additional Senior Class Debt Collateral Agent</u>") (such Additional Senior Class Debt Representative, Additional Senior Class Debt Collateral Agent and holders in respect of any Additional Senior Class Debt being referred to as the "<u>Additional Senior Class Debt Parties</u>"), becomes a party to this Agreement as an Authorized Representative and Collateral Agent, as applicable, by satisfying the conditions set forth in clauses (i) through (iv) of the immediately succeeding paragraph.

-19-

In order for an Additional Senior Class Debt Representative and Additional Senior Class Debt Collateral Agent to become a party to this Agreement as an Authorized Representative and Collateral Agent, as applicable,

(i)     such Additional Senior Class Debt Representative, such Additional Senior Class Debt Collateral Agent, each Collateral Agent, each Authorized Representative and each Grantor shall have executed and delivered a Joinder Agreement (with such changes as may be reasonably approved by the Controlling Collateral Agent and Additional Senior Class Debt Representative) pursuant to which such Additional Senior Class Debt Representative becomes an Authorized Representative hereunder, such Additional Senior Class Debt Collateral Agent becomes a Collateral Agent hereunder and the Additional Senior Class Debt in respect of which such Additional Senior Class Debt Representative is the Authorized Representative constitutes Additional First Lien Obligations and the related Additional Senior Class Debt Parties become subject hereto and bound hereby as Additional First Lien Secured Parties;

(ii)    the Borrowers shall have (x) delivered to each Authorized Representative and each Collateral Agent true and complete copies of each of the Additional First Lien Documents relating to such Additional Senior Class Debt, certified as being true and correct by a Responsible Officer of the Top Borrower and (y) identified in a certificate of a Responsible Officer the obligations to be designated as Additional First Lien Obligations and the initial aggregate principal amount or face amount thereof and certified that such obligations are permitted to be incurred and secured on a *pari passu* basis with the then-extant First Lien Obligations and by the terms of the then extant Secured Credit Documents;

(iii)    all filings, recordations and/or amendments or supplements to the First Lien Security Documents necessary or desirable in the reasonable judgment of such Additional Senior Class Debt Collateral Agent to confirm and perfect the Liens securing the relevant obligations relating to such Additional Senior Class Debt shall have been made, executed and/or delivered (or, with respect to any such filings or recordations, acceptable provisions to perform such filings or recordations shall have been taken in the reasonable judgment of such Additional Senior Class Debt Collateral Agent), and all fees and taxes in connection therewith shall have been paid (or acceptable provisions to make such payments have been taken in the reasonable judgment of such Additional Senior Class Debt Collateral Agent); and

(iv)    the Additional First Lien Documents, as applicable, relating to such Additional Senior Class Debt shall provide, in a manner reasonably satisfactory to each Collateral Agent, that each Additional Senior Class Debt Party with respect to such Additional Senior Class Debt will be subject to and bound by the provisions of this Agreement in its capacity as a holder of such Additional Senior Class Debt.

SECTION 5.14 <u>Agent Capacities</u>.  Except as expressly provided herein or in the First Lien Credit Agreement Collateral Documents, UBS is acting in the capacities of First Lien Credit Agreement Administrative Agent and First Lien Credit Agreement Collateral Agent solely for the First Lien Credit Agreement Secured Parties.  Except as expressly provided herein or in the Initial Additional First Lien Security Documents, [   ] is acting in the capacity of Initial Additional First Lien Collateral Agent solely for the Initial Additional First Lien Secured Parties.  Except as expressly set forth herein, none of the First Lien Credit Agreement Administrative Agent, the First Lien Credit Agreement Collateral Agent or any Additional First Lien Collateral Agent shall have any duties or obligations in respect of any of the Collateral, all of such duties and obligations, if any, being subject to and governed by the applicable Secured Credit Documents.

SECTION 5.15 <u>Integration</u>.  This Agreement together with the other Secured Credit Documents and the First Lien Security Documents represents the agreement of each of the Grantors and the First Lien Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by any Grantor, the First Lien Credit Agreement Collateral Agent, or any other First Lien Secured

-20-

Party relative to the subject matter hereof not expressly set forth or referred to herein or in the other Secured Credit Documents.

SECTION 5.16 <u>Additional Grantors</u>. The Top Borrower agrees that, if any subsidiary shall become a Grantor after the date hereof, they will promptly cause such subsidiary to become party hereto by executing and delivering an instrument in the form of Annex III. Upon such execution and delivery, such subsidiary will become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein. The parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a Grantor at any time (and any security granted by any such Person) shall be subject to the provisions hereof as fully as if same constituted a Grantor party hereto and had complied with the requirements of the immediately preceding sentence. The execution and delivery of such instrument shall not require the consent of any other party hereunder, and will be acknowledged by the First Lien Credit Agreement Collateral Agent, the Initial Additional Authorized Representative and each additional Authorized Representative. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

-21-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

UBS AG, STAMFORD BRANCH,
as First Lien Credit Agreement Collateral Agent


By: _____
    Name:
    Title:


[    ],
as Initial Additional First Lien Collateral Agent and as Initial Additional Authorized Representative
By: _____
    Name:
    Title:

DAWN INTERMEDIATE, INC.

By: _____
    Name:
    Title:

SERTA SIMMONS BEDDING, LLC

By: _____
    Name:
    Title:

NATIONAL BEDDING COMPANY L.L.C.

By: _____
    Name:
    Title:

SSB MANUFACTURING COMPANY

By: _____
    Name:
    Title:

ANNEX I

Grantors

[●]

[FORM OF] JOINDER NO. [  ] dated as of [ _], 201_ to the FIRST LIEN INTERCREDITOR AGREEMENT dated as of [  ], 20[ ] (the "First Lien Intercreditor Agreement"), among Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), Serta Simmons Bedding, LLC, a  Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), and certain subsidiaries and affiliates of the Top Borrower (each, a "Grantor"), UBS AG, STAMFORD BRANCH, as First Lien Credit Agreement Collateral Agent for the First Lien Credit Agreement Secured Parties under the First Lien Security Documents (in such capacity, the "First Lien Credit Agreement Collateral Agent"), [  ] as Authorized Representative, and the additional Authorized Representatives and Collateral Agents from time to time a party thereto.[1]

A.      Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Intercreditor Agreement.

B.      As a condition to the ability of the Borrowers to incur Additional First Lien Obligations and to secure such Additional Senior Class Debt with the liens and security interests created by the Additional First Lien Security Documents relating thereto, the Additional Senior Class Debt Representative in respect of such Additional Senior Class Debt is required to become an Authorized Representative, the Additional Senior Class Debt Collateral Agent is respect of such Additional Senior Class Debt is required to become a Collateral Agent, and such Additional Senior Class Debt and the Additional Senior Class Debt Parties in respect thereof are required to become subject to and bound by, the First Lien Intercreditor Agreement.  Section 5.13 of the First Lien Intercreditor Agreement provides that such Additional Senior Class Debt Representative may become an Authorized Representative, such Additional Senior Class Debt Collateral Agent may become a Collateral Agent and such Additional Senior Class Debt and such Additional Senior Class Debt Parties may become subject to and bound by the First Lien Intercreditor Agreement as Additional First Lien Obligations and Additional First Lien Secured Parties, respectively, upon the execution and delivery by the Additional Senior Class Debt Representative and the Additional Senior Class Debt Collateral Agent of an instrument in the form of this Joinder Agreement and the satisfaction of the other conditions set forth in Section 5.13 of the First Lien Intercreditor Agreement.   The undersigned Additional Senior Class Debt Representative (the "New Representative") and Additional Senior Class Debt Collateral Agent (the "New Collateral Agent") is executing this Joinder Agreement in accordance with the requirements of the First Lien Intercreditor Agreement and the First Lien Security Documents.

Accordingly, each Collateral Agent, each Authorized Representative and the New Representative and the New Collateral Agent agree as follows:

SECTION 1.      In accordance with Section 5.13 of the First Lien Intercreditor Agreement, the New Representative by its signature below becomes an Authorized Representative under, the New Collateral Agent by its signature below becomes a Collateral Agent under, and the related Additional Senior Class Debt and Additional Senior Class Debt Parties become subject to and bound by, the First Lien Intercreditor Agreement as Additional First Lien Obligations and Additional First Lien Secured Parties, with the same force and effect as if the New Representative had originally been named therein as an Authorized Representative and the New Collateral Agent had originally been named therein as Collateral Agent, and each of the New Representative and the New Collateral Agent, on its behalf and on behalf of such Additional Senior Class Debt Parties, hereby agrees to all the terms and provisions of the First Lien Intercreditor Agreement applicable to it as Authorized Representative or Collateral Agent, as applicable and to the Additional Senior Class Debt Parties that it represents as Additional First Lien Secured Parties.  Each reference to an "Authorized Representative" in the First Lien Intercreditor Agreement shall be deemed to include the New Representative.  Each reference to a

---

[1]      In the event of the Refinancing of the First Lien Credit Agreement Obligations, revise to reflect joinder by a new First Lien Credit Agreement Collateral Agent

"Collateral Agent" in the First Lien Intercreditor Agreement shall be deemed to include the New Collateral Agent. The First Lien Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.    Each of the New Representative and the New Collateral Agent represents and warrants to each Collateral Agent, each Authorized Representative and the other First Lien Secured Parties, individually, that (i) it has full power and authority to enter into this Joinder, in its capacity as [trustee/administrative agent and collateral agent] under [describe new facility], (ii) this Joinder has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability and (iii) the Additional First Lien Documents relating to such Additional Senior Class Debt provide that, upon the New Representative's entry into this Agreement, the Additional Senior Class Debt Parties in respect of such Additional Senior Class Debt will be subject to and bound by the provisions of the First Lien Intercreditor Agreement as Additional First Lien Secured Parties.

SECTION 3.    This Joinder may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.   This Joinder shall become effective when each Collateral Agent shall have received a counterpart of this Joinder that bears the signatures of the New Representative and the New Collateral Agent.   Delivery of an executed signature page to this Joinder by telecopy, .pdf or other electronic imaging means shall be effective as delivery of a manually signed counterpart of this Joinder.

SECTION 4.    Except as expressly supplemented hereby, the First Lien Intercreditor Agreement shall remain in full force and effect.

SECTION 5.    THIS JOINDER AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 6.    In case any one or more of the provisions contained in this Joinder should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the First Lien Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the First Lien Intercreditor Agreement.  All communications and notices hereunder to the New Representative or the New Collateral Agent shall be given to it at its address set forth below its signature hereto.

SECTION 8.    Each Borrower agrees to reimburse each Collateral Agent and each Authorized Representative for its reasonable out-of-pocket expenses in connection with this Joinder, including the reasonable fees, other charges and disbursements of counsel, in each case as required by the applicable Secured Credit Documents.

IN WITNESS WHEREOF, the New Representative has duly executed this Joinder to the First Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE], as
[    ] for the holders of
[    ],

By:   _____
           Name:
           Title:


Address for notices:


_____
_____
attention of:   _____
Telecopy:   _____


[NAME OF NEW COLLATERAL AGENT], as
collateral agent for the holders of
[    ],

By:   _____
           Name:
           Title:


Address for notices:


_____
_____
attention of:   _____
Telecopy:   _____

ANNEX II-3

Acknowledged by:

UBS AG, STAMFORD BRANCH,
as the First Lien Credit Agreement Collateral Agent,

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

[    ],
as Authorized Representative,

By: _____
       Name:
       Title:

[OTHER AUTHORIZED REPRESENTATIVES]

ANNEX II-4

DAWN INTERMEDIATE, INC., as Holdings

By: _____
      Name:
      Title:

SERTA SIMMONS BEDDING, LLC, as the Top Borrower

By: _____
      Name:
      Title:

NATIONAL BEDDING COMPANY L.L.C., as a Borrower

By: _____
      Name:
      Title:

SSB MANUFACTURING COMPANY, as a Borrower

By: _____
      Name:
      Title:

THE OTHER GRANTORS

[●]

By: _____
      Name:
      Title:

SUPPLEMENT NO. [ ] dated as of [   ], 20[ ], to the FIRST LIEN INTERCREDITOR AGREEMENT dated as of [   ], (the "First Lien Intercreditor Agreement"), among Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), and certain subsidiaries and affiliates of the Top Borrower (each, a "Grantor"), UBS AG, STAMFORD BRANCH, as collateral agent under the First Lien Credit Agreement, [   ], as Authorized Representative, and the additional Authorized Representatives and Collateral Agents from time to time party thereto.

A.    Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Intercreditor Agreement.

B.    The Grantors have entered into the First Lien Intercreditor Agreement.  Pursuant to the First Lien Credit Agreement and certain Additional First Lien Documents, certain newly acquired or organized subsidiaries of the Top Borrower are required to enter into the First Lien Intercreditor Agreement.  Section 5.16 of the First Lien Intercreditor Agreement provides that such subsidiaries may become party to the First Lien Intercreditor Agreement by execution and delivery of an instrument in the form of this Supplement.   The undersigned subsidiary (the "New Grantor") is executing this Supplement in accordance with the requirements of the First Lien Credit Agreement and the Additional First Lien Documents.

Accordingly, each Authorized Representative and the New Subsidiary Grantor agree as follows:

SECTION 1.    In accordance with Section 5.16 of the First Lien Intercreditor Agreement, the New Grantor by its signature below becomes a Grantor under the First Lien Intercreditor Agreement with the same force and effect as if originally named therein as a Grantor, and the New Grantor hereby agrees to all the terms and provisions of the First Lien Intercreditor Agreement applicable to it as a Grantor thereunder.   Each reference to a "Grantor" in the First Lien Intercreditor Agreement shall be deemed to include the New Grantor. The First Lien Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.    The New Grantor represents and warrants to each Authorized Representative and the other First Lien Secured Parties that (i) it has the full power and authority to enter into this Supplement and (ii) this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by Bankruptcy Law and by general principles of equity.

SECTION 3.    This Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.   This Supplement shall become effective when each Authorized Representative shall have received a counterpart of this Supplement that bears the signature of the New Grantor.  Delivery of an executed signature page to this Supplement by facsimile transmission or other electronic method shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4.    Except as expressly supplemented hereby, the First Lien Intercreditor Agreement shall remain in full force and effect.

SECTION 5.    THIS SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 6.    In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the First Lien Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to

replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the First Lien Intercreditor Agreement.  All communications and notices hereunder to the New Grantor shall be given to it in care of the Top Borrower as specified in the First Lien Intercreditor Agreement.

SECTION 8.    The Top Borrower agrees to reimburse each Authorized Representative for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable fees, other charges and disbursements of counsel for each Authorized Representative as required by the applicable Secured Credit Documents.

IN WITNESS WHEREOF, the New Grantor, and each Authorized Representative have duly executed this Supplement to the First Lien Intercreditor Agreement as of the day and year first above written.

<div style="margin-left:40%">

[NAME OF NEW SUBSIDIARY GRANTOR]

By: _____
    Name:
    Title:

</div>

Acknowledged by:

UBS AG, STAMFORD BRANCH,
as the First Lien Credit Agreement Collateral Agent and Authorized Representative,

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[          ],
as the Initial Additional Authorized Representative [and the Initial Additional First Lien Collateral Agent and],

By: _____
    Name:
    Title:

[OTHER AUTHORIZED REPRESENTATIVES]

[FORM OF]
INTEREST ELECTION REQUEST

UBS AG, Stamford Branch
as Administrative Agent for the Lenders referred to below
Attention: Structured Finance Processing
600 Washington Blvd., 9th Floor
Stamford, Connecticut 06901
Facsimile:  (203) 719-3888
Telephone: (203) 719-4319
Email: Agency-UBSAmericas@ubs.com

[●] [●], 20[●][26]

Ladies and Gentlemen:

Reference is hereby made to that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "First Lien Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, Inc., a Delaware corporation ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party thereto, UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders.  Terms defined in the First Lien Term Loan Agreement are used herein with the same meanings unless otherwise defined herein.

The undersigned hereby gives you notice pursuant to Section 2.08 of the First Lien Term Loan Agreement of an interest rate election, and in that connection sets forth below the terms thereof:

(A)      [on **[insert applicable date]** (which is a Business Day), the undersigned will convert $[●][27] of the aggregate outstanding principal amount of the [**Term**][**Additional Revolving**] Loans, bearing interest at the [**ABR**][**LIBO**] Rate, into a [**LIBO Rate**][**ABR**]

---

[26]    The Administrative Agent must be notified of the applicable election in writing in the form of an Interest Election Request, appropriately completed and signed by a Responsible Officer of the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) to the Administrative Agent or by telephone (with such telephonic notification to be promptly confirmed in writing by an Interest Election Request), which must be received by the Administrative Agent (by hand delivery, fax or other electronic transmission (including ".pdf" or ".tif")) not later than (i) 1:00 p.m. three Business Days prior to the requested day of any conversion or continuation of LIBO Rate Loans (or one Business Day in the case of any conversion or continuation of LIBO Rate Loans on the Closing Date) and (ii) 9:00 a.m. on the requested date of any conversion of any Borrowing to ABR Loans (or, in each case, such later time as is reasonably acceptable to the Administrative Agent); provided, however, that if the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) wishes to request a conversion or continuation of LIBO Rate Loans with an Interest Period of other than one, two, three or six months in duration as provided in the definition of "Interest Period," (A) the applicable notice from the relevant Borrower (or from the Top Borrower on behalf of the relevant Borrower) must be received by the Administrative Agent not later than 1:00 p.m. four Business Days prior to the requested date of such conversion or continuation (or such later time as is reasonably acceptable to the Administrative Agent), whereupon the Administrative Agent shall give prompt notice to the appropriate Lenders of such request and determine whether the requested Interest Period is available to them and (B) not later than 12:00 p.m. three Business Days before the requested date of such conversion or continuation, the Administrative Agent shall notify the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) whether or not the requested Interest Period is available to the appropriate Lenders.

[27]    Subject to Section 2.02(c) of the First Lien Term Loan Agreement.

Loan **[and, in the case of a LIBO Rate Loan, having an Interest Period of [●] month(s)]**[28][; and][.]]

(B)     [on **[insert applicable date]** (which is a Business Day), the undersigned will continue $[●] of the aggregate outstanding principal amount of the **[Term][Additional Revolving]** Loans bearing interest at the LIBO Rate, as LIBO Rate Loans having an Interest Period of [●] month(s)[29].]

[Signature Page Follows]

---

[28]     Must be a period contemplated by the definition of "Interest Period."

[29]     Must be a period contemplated by the definition of "Interest Period."

WEIL:\95919473\9\74339.0038

**[SERTA SIMMONS BEDDING, LLC]**
**[NATIONAL BEDDING COMPANY L.L.C.]**
**[SSB MANUFACTURING COMPANY]**

By: _____
    Name:
    Title:

EXHIBIT I

[FORM OF]
FIRST LIEN TERM LOAN GUARANTY AGREEMENT

[See attached.]

FIRST LIEN TERM LOAN GUARANTY AGREEMENT

THIS FIRST LIEN TERM LOAN GUARANTY AGREEMENT (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Loan Guaranty") is entered into as of November 8, 2016, by and among Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), the Borrowers referred to below and the Subsidiary Guarantors (as defined in the Credit Agreement) from time to time party hereto (Holdings, the Borrowers and the Subsidiary Guarantors, collectively, the "Loan Guarantors") and UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent for the lenders party to the Credit Agreement referred to below (in such capacities, the "Administrative Agent").

PRELIMINARY STATEMENT

Reference is hereby made to that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among, *inter alios*, Holdings, Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing" and, together with SSB and National Bedding, the "Borrowers"), the Lenders from time to time party thereto and the Administrative Agent.

The Loan Guarantors are entering into this Loan Guaranty in order to induce the Lenders to enter into and extend credit to the Borrowers under the Credit Agreement and to guarantee the Secured Obligations.

Each Loan Guarantor will obtain benefits from the incurrence of Loans by the Borrowers for the accounts of the Borrowers and their respective subsidiaries and the incurrence by the Loan Parties of Secured Hedging Obligations and Banking Services Obligations.

ACCORDINGLY, the parties hereto agree as follows:

ARTICLE 1
Definitions

SECTION 1.01     Definitions of Certain Terms Used Herein.  As used in this Loan Guaranty, in addition to the terms defined in the preamble and Preliminary Statement above, the following terms shall have the following meanings:

"Accommodation Payments" has the meaning assigned to such term in Section 2.09.

"Administrative Agent" has the meaning assigned to such term in the preamble.

"Article" means a numbered article of this Loan Guaranty, unless another document is specifically referenced.

"Borrower Primary Obligations" means the Obligations of each Borrower under the Credit Agreement.

"Borrowers" has the meaning assigned to such term in the preliminary statement.

"Credit Agreement" has the meaning assigned to such term in the preliminary statement.

"Exhibit" refers to a specific exhibit to this Loan Guaranty, unless another document is specifically referenced.

"Guaranteed Obligations" means (a) with respect to any Borrower, the Other Guaranteed Obligations of each Borrower other than such Borrower and (b) with respect to any Loan Guarantor other than any Borrower, the Borrower Primary Obligations and the Other Guaranteed Obligations of each other Loan Guarantor, including in the case of both (a) and (b) amounts that would become due but for the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a) (excluding, for the avoidance of doubt, any Excluded Swap Obligation) together with any expenses which may be incurred by the Administrative Agent in collecting any of the Guaranteed Obligations that are reimbursable in accordance with Section 9.03 of the Credit Agreement and excluding, in any event, any Excluded Swap Obligation.

"Guarantor Percentage" has the meaning assigned to such term in Section 2.01.

"Holdings" has the meaning assigned to such term in the preamble.

"Loan Guarantors" has the meaning assigned to such term in the preamble.

"Loan Guaranty" has the meaning assigned to such term in the preamble.

"Maximum Liability" has the meaning assigned to such term in Section 2.09.

"National Bedding" has the meaning assigned to such term in the preliminary statement.

"Non-ECP Guarantor" means each Loan Guarantor other than a Qualified ECP Guarantor.

"Non-Paying Guarantor" has the meaning assigned to such term in Section 2.09.

"Obligated Party" has the meaning assigned to such term in Section 2.02.

"Other Guaranteed Obligations" means, with respect to the Loan Guaranty provided by any Loan Party, any Banking Services Obligations and/or any Secured Hedging Obligation of any other Loan Party.

"Paying Guarantor" has the meaning assigned to such term in Section 2.09.

"Qualified ECP Guarantor" means in respect of any Swap Obligation, each Loan Party that, at the time the relevant guarantee (or grant of the relevant security interest, as applicable) becomes or would become effective with respect to such Swap Obligation, has total assets exceeding $10,000,000 or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and which may cause another person to qualify as an "eligible contract participant" with respect to such Swap Obligation at such time by entering into a keepwell pursuant to section 1a(18)(A)(v)(II) of the Commodity Exchange Act (or any successor provision thereto).

"Section" means a numbered section of this Loan Guaranty, unless another document is specifically referenced.

"SSB" has the meaning assigned to such term in the preliminary statement.

"SSB Manufacturing" has the meaning assigned to such term in the preliminary statement.

"Top Borrower" has the meaning assigned to such term in the preliminary statement.

"UFCA" has the meaning assigned to such term in Section 2.09(a).

"UFTA" has the meaning assigned to such term in Section 2.09(a).

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms. Capitalized terms used in this Loan Guaranty and not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

ARTICLE 2
LOAN GUARANTY

SECTION 2.01    Guaranty.    Except as otherwise provided for herein (including under Section 3.15), each Loan Guarantor hereby agrees that it is jointly and severally liable for, and, as primary obligor and not merely as surety, and absolutely and unconditionally and irrevocably guarantees to the Administrative Agent (acting as agent for the Secured Parties, pursuant to Article 8 of the Credit Agreement) for the ratable benefit of the Secured Parties, the full and prompt payment, when and as the same become due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Guaranteed Obligations. Each Loan Guarantor further agrees that the Guaranteed Obligations may be increased, extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. In addition, if any or all of the Guaranteed Obligations become due and payable hereunder, each Loan Guarantor, unconditionally and irrevocably, promises to pay such Guaranteed Obligations to the Administrative Agent for the benefit of the Secured Parties, on demand. Each Loan Guarantor unconditionally and irrevocably guarantees the payment of any and all of the Guaranteed Obligations whether or not due or payable by the Borrowers upon the occurrence of any of the Events of Default specified in Sections 7.01(f) or 7.01(g) of the Credit Agreement and thereafter irrevocably and unconditionally promises to pay such Guaranteed Obligations to the Administrative Agent for the benefit of the Secured Parties. This Loan Guaranty is a continuing one and shall remain in full force and effect until the Termination Date, and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon.

SECTION 2.02    Guaranty of Payment.    This Loan Guaranty is a guaranty of payment and not of collection. Each Loan Guarantor waives any right to require the Administrative Agent or any Lender to sue the Borrowers, any Loan Guarantor, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (the Borrowers, each Loan Guarantor, each other guarantor or such other Person, an "Obligated Party"), or otherwise to enforce its rights in respect of any Collateral securing all or any part of the Guaranteed Obligations. The Administrative Agent may enforce this Loan Guaranty at any time when an Event of Default has occurred and is continuing.

SECTION 2.03    No Discharge or Diminishment of Loan Guaranty.

(a)    Except as otherwise provided for herein (including under Section 3.15), the obligations of each Loan Guarantor hereunder are unconditional, irrevocable and absolute and not subject to any reduction, limitation, impairment or termination for any reason, including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Obligated Party; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any other Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; (iv) the

existence of any claim, setoff or other right which any Loan Guarantor may have at any time against any Obligated Party, the Administrative Agent, any Lender or any other Person, whether in connection herewith or in any unrelated transaction; (v) any direction as to application of payments by the Borrowers or by any other party; (vi) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Guaranteed Obligations; (vii) any payment on or in reduction of any such other guaranty or undertaking; (viii) any dissolution, termination or increase, decrease or change in personnel by the Borrowers or (ix) any payment made to any Secured Party on the Guaranteed Obligations which any such Secured Party repays to the Borrowers pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Loan Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding.

(b)     Except for termination of a Loan Guarantor's obligations hereunder or as expressly permitted by Section 3.15, the obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any Requirements of Law purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)     Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Administrative Agent to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrowers for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other Person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Administrative Agent with respect to any Collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity, in each case other than as set forth in Section 3.15.

SECTION 2.04     Defenses Waived.  To the fullest extent permitted by applicable Requirements of Law, and except for termination of a Loan Guarantor's obligations hereunder or as otherwise provided for herein (including under Section 3.15), each Loan Guarantor hereby waives any defense based on or arising out of any defense of the Borrowers or any other Loan Guarantor or arising out of the disability of the Borrowers or any other Loan Guarantor or any other party or the unenforceability of all or any part of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrowers or any other Loan Guarantor.  Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by applicable Requirements of Law, any notice not provided for herein or in any other Loan Document, including any notice of nonperformance, notice of protest, notice of dishonor, notice of acceptance of this Loan Guaranty, and any notice of the existence, creation or incurring of new or additional Guaranteed Obligations, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person, including any right (except as may be required by applicable Requirements of Law and to the extent the relevant requirement cannot be waived) to require the Administrative Agent to (i) proceed against the Borrowers, any other guarantor or any other party, (ii) proceed against or exhaust any security held from the Borrowers, any other Loan Guarantor or any other party or (iii) pursue any other remedy in the Administrative Agent's power whatsoever.  The

Administrative Agent may, at its election and in accordance with the terms of the applicable Loan Documents, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent permitted by applicable Requirements of Law), accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any Collateral securing all or a part of the Guaranteed Obligations, and the Administrative Agent may, at its election, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, or any security, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guaranty, except as otherwise provided in Section 3.15. To the fullest extent permitted by applicable Requirements of Law, each Loan Guarantor waives any defense arising out of any such election even though such election may operate, pursuant to applicable Requirements of Law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

SECTION 2.05    Authorization.  Each Loan Guarantor authorizes the Administrative Agent without notice or demand (except as may be required by applicable Requirements of Law and to the extent the relevant requirement cannot be waived), and without affecting or impairing its liability hereunder (except as set forth in Section 3.15), from time to time, subject to each applicable Intercreditor Agreement and the terms of the referenced Loan Documents, to:

(a)    change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Loan Guaranty shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

(b)    take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(c)    exercise or refrain from exercising any rights against the Borrowers, any other Loan Party or others or otherwise act or refrain from acting;

(d)    release or substitute any endorser, any guarantor, the Borrowers, any other Loan Party and/or any other obligor;

(e)    settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrowers to its creditors other than the Secured Parties;

(f)    apply any sum by whomsoever paid or howsoever realized to any liability or liabilities of the Borrowers to the Secured Parties regardless of what liability or liabilities of the Borrowers remain unpaid;

(g)    consent to or waive any breach of, or any act, omission or default under, this Loan Guaranty, the Credit Agreement, any other Loan Document, any agreement relating to Banking Services Obligations, any Hedge Agreement with respect to any Secured Hedging

Obligation or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Loan Guaranty, the Credit Agreement, any other Loan Document, any agreement relating to Banking Services Obligations, any Hedge Agreement with respect to any Secured Hedging Obligation or any of such other instruments or agreements; and/or

(h)     take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of the Loan Guarantors from their respective liabilities under this Loan Guaranty.

SECTION 2.06     Rights of Subrogation.  No Loan Guarantor will assert any right, claim or cause of action, including any claim of subrogation, contribution or indemnification that it has against any Loan Party in respect of this Loan Guaranty until the occurrence of the Termination Date; provided that if any amount is paid to such Loan Guarantor on account of such subrogation rights at any time prior to the Termination Date, then unless such Loan Guarantor has already discharged its liabilities under this Loan Guaranty in an amount equal to such Loan Guarantor's Maximum Liability as of such date, such amount shall be held by the recipient Loan Guarantor in trust for the benefit of the Secured Parties and shall forthwith be paid by the recipient Loan Guarantor to the Administrative Agent (for the benefit of the Secured Parties) to be credited and applied to the Guaranteed Obligations, whether matured or unmatured, in accordance with Section 2.18(b) of the Credit Agreement.

SECTION 2.07     Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of a Borrower or otherwise, each Loan Guarantor's obligations under this Loan Guaranty with respect to such payment shall be reinstated at such time as though the payment had not been made.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of a Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the other Loan Guarantors forthwith on demand by the Administrative Agent.

SECTION 2.08     Information.  Each Loan Guarantor assumes all responsibility for being and keeping itself informed of each Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that none of the Administrative Agent, any Lender or any other Secured Party shall have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

SECTION 2.09     Contribution; Subordination; Maximum Liability.

(a)     In the event that any Loan Guarantor (a "Paying Guarantor") makes any payment or payments under this Loan Guaranty or suffers any loss as a result of any realization upon any Collateral granted by it to secure its obligations under this Loan Guaranty (each such payment or loss, an "Accommodation Payment"), each other Loan Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Guarantor Percentage" of such Accommodation Payment by such Paying Guarantor.  For purposes of this Article 2, each Non-Paying Guarantor's "Guarantor Percentage" with respect to any Accommodation Payment by a Paying Guarantor shall be determined as of the date on which such Accommodation Payment was made by reference to the ratio of (a) such Non-Paying Guarantor's Maximum Liability (as defined below) as of such date to (b) the aggregate Maximum Liability of all Loan Guarantors hereunder (including such Paying Guarantor) as of such date.  As of any date of determination, the "Maximum Liability" of each Loan Guarantor shall be equal to the maximum amount of liability which could be asserted against such

Loan Guarantor hereunder and under the Credit Agreement without (i) rendering such Loan Guarantor "insolvent" within the meaning of Section 101(32) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraud Conveyance Act ("UFCA"), (ii) leaving such Loan Guarantor with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA or Section 5 of the UFCA, or (iii) leaving such Loan Guarantor unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA or Section 5 of the UFCA. Nothing in this provision shall affect any Loan Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Loan Guarantor's Maximum Liability). Each of the Loan Guarantors covenants and agrees that its right to receive any contribution under this Loan Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the Secured Obligations until the Termination Date. If, prior to the Termination Date, any such contribution payment is received by a Paying Guarantor at any time when an Event of Default has occurred and is continuing, such contribution payment shall be collected, enforced and received by such Loan Guarantor as trustee for the Secured Parties and be paid over to the Administrative Agent on account of the Secured Obligations, but without affecting or impairing in any manner the liability of such Loan Guarantor under the other provisions of this Loan Guaranty. This provision is for the benefit of the Administrative Agent, the Lenders and the other Secured Parties.

(b)     It is the desire and intent of the Loan Guarantors and the Secured Parties that this Loan Guaranty shall be enforced against the Loan Guarantors to the fullest extent permissible under the Requirements of Law and public policies applied in each jurisdiction in which enforcement is sought. The provisions of this Loan Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, Federal or foreign bankruptcy, insolvency, reorganization or other Requirements of Law affecting the rights of creditors generally, if the obligations of any Loan Guarantor under this Loan Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Loan Guarantor's liability under this Loan Guaranty, then, notwithstanding any other provision of this Loan Guaranty to the contrary, the amount of such liability shall, without any further action by the Loan Guarantors or the Secured Parties, be automatically limited and reduced to such Loan Guarantor's Maximum Liability. Each Loan Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of such Loan Guarantor without impairing this Loan Guaranty or affecting the rights and remedies of the Administrative Agent hereunder; provided that nothing in this sentence shall be construed to increase any Loan Guarantor's obligations hereunder beyond its Maximum Liability.

SECTION 2.10     Representations and Warranties. As, when (including on the date hereof) and to the extent required in accordance with the terms of the Credit Agreement, each Loan Guarantor hereby makes each applicable representation and warranty made in the Loan Documents by the Top Borrower with respect to such Loan Guarantor and each Loan Guarantor hereby further acknowledges and agrees that such Loan Guarantor has, independently and without reliance upon any Secured Party and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Loan Guaranty and each other Loan Document to which it is or is to be a party, and such Loan Guarantor has established adequate means of obtaining from each other Loan Guarantor on a continuing basis information pertaining to the business, condition (financial or otherwise), operations, performance, properties and prospects of each other Loan Guarantor.

SECTION 2.11     Covenants. Each Loan Guarantor covenants and agrees that, until the Termination Date, such Loan Guarantor will perform and observe, and cause each of its subsidiaries that constitutes a Restricted Subsidiary to perform and observe, all of the terms, covenants and agreements set forth in the Loan Documents that the Top Borrower has agreed to cause such Loan Guarantor or such subsidiary to perform or observe. Until the Termination Date, no Guarantor shall, without the prior

written consent of the Administrative Agent, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding against a Borrower or any Guarantor (it being understood and agreed, for the avoidance of doubt, that nothing in this <u>Section 2.11</u> shall prohibit any Guarantor from commencing or joining with the Borrowers or Guarantor as a co-debtor in any bankruptcy, reorganization or insolvency case or proceeding).

<div align="center">

ARTICLE 3
GENERAL PROVISIONS

</div>

SECTION 3.01    <u>Liability Cumulative</u>.  The liability of each Loan Guarantor under this Loan Guaranty is in addition to and shall be cumulative with all liabilities of such Loan Guarantor to the Administrative Agent and the Lenders under the Credit Agreement and the other Loan Documents to which such Loan Guarantor is a party or in respect of any obligations or liabilities of the other Loan Guarantors, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

SECTION 3.02    <u>No Waiver; Amendments</u>.  No delay or omission of the Administrative Agent in exercising any right or remedy granted under this Loan Guaranty shall impair such right or remedy or be construed to be a waiver of any Default or Event of Default or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy.  No waiver, amendment or other variation of the terms, conditions or provisions of this Loan Guaranty whatsoever shall be valid unless in writing signed by the Loan Guarantors and the Administrative Agent in accordance with <u>Section 9.02</u> of the Credit Agreement and then only to the extent specifically set forth in such writing.

SECTION 3.03    <u>Severability of Provisions</u>.    To the extent permitted by applicable Requirements of Law, any provision of this Loan Guaranty that is held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions of this Loan Guaranty; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 3.04    <u>Additional Subsidiaries</u>.  Restricted Subsidiaries of the Top Borrower may be required to enter into this Loan Guaranty as Subsidiary Guarantors pursuant to and in accordance with <u>Section 5.12</u> of the Credit Agreement.  Upon execution and delivery by any such Restricted Subsidiary of a Joinder Agreement, such Restricted Subsidiary shall become a Subsidiary Guarantor hereunder with the same force and effect as if originally named as a Subsidiary Guarantor herein.  The execution and delivery of any such instrument shall not require the consent of any other Loan Guarantor hereunder or any other Person.  The rights and obligations of each Loan Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any new Loan Guarantor as a party to this Loan Guaranty.

SECTION 3.05    <u>Headings</u>.  The titles of and section headings in this Loan Guaranty are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Loan Guaranty.

SECTION 3.06    <u>Entire Agreement</u>.  This Loan Guaranty and the other Loan Documents constitute the entire agreement among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

SECTION 3.07    <u>CHOICE OF LAW</u>.  THIS LOAN GUARANTY AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS LOAN GUARANTY

SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 3.08     CONSENT TO JURISDICTION; CONSENT TO SERVICE OF PROCESS.

(a)     EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK (OR ANY APPELLATE COURT THEREFROM) OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN GUARANTY AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL (EXCEPT AS PERMITTED BELOW) BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, FEDERAL COURT.    EACH PARTY HERETO AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY REGISTERED MAIL ADDRESSED TO SUCH PERSON SHALL BE EFFECTIVE SERVICE OF PROCESS AGAINST SUCH PERSON FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT. EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON SUCH JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE REQUIREMENTS OF LAW.

(b)     EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN GUARANTY AND BROUGHT IN ANY COURT REFERRED TO IN PARAGRAPH (a) OF THIS SECTION.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY CLAIM OR DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION, SUIT OR PROCEEDING IN ANY SUCH COURT.

(c)     TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL) DIRECTED TO IT AT ITS ADDRESS FOR NOTICES PROVIDED IN SECTION 9.01 OF THE CREDIT AGREEMENT. EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER THAT SERVICE OF PROCESS WAS INVALID AND INEFFECTIVE.  NOTHING IN THIS LOAN GUARANTY WILL AFFECT THE RIGHT OF ANY PARTY TO THIS LOAN GUARANTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

SECTION 3.09     WAIVER OF JURY TRIAL.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR

9

ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS LOAN GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS LOAN GUARANTY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

   SECTION 3.10 <u>Indemnity</u>. Each Loan Guarantor hereby agrees to indemnify the Administrative Agent and the other Indemnitees, as set forth in <u>Section 9.03</u> of the Credit Agreement.

   SECTION 3.11 <u>Counterparts</u>. This Loan Guaranty may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Loan Guaranty by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Loan Guaranty.

   SECTION 3.12 <u>INTERCREDITOR AGREEMENTS GOVERN</u>. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE GUARANTEE OF THE GUARANTEED OBLIGATIONS GRANTED TO THE ADMINISTRATIVE AGENT, FOR THE BENEFIT OF THE SECURED PARTIES, PURSUANT TO THIS LOAN GUARANTY AND THE EXERCISE OF ANY RIGHT OR REMEDY BY THE ADMINISTRATIVE AGENT ARE SUBJECT TO THE PROVISIONS OF EACH APPLICABLE INTERCREDITOR AGREEMENT. IN THE EVENT OF ANY CONFLICT BETWEEN THE PROVISIONS OF THE RELEVANT INTERCREDITOR AGREEMENT AND THIS LOAN GUARANTY, THE PROVISIONS OF THE RELEVANT INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL.

   SECTION 3.13 <u>Successors and Assigns</u>. Whenever in this Loan Guaranty any party hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party; and all covenants, promises and agreements by or on behalf of any Loan Guarantor or the Administrative Agent that are contained in this Loan Guaranty shall bind and inure to the benefit of their respective successors and permitted assigns. Except in a transaction permitted (or not restricted) under the Credit Agreement, no Loan Guarantor may assign any of its rights or obligations hereunder without the written consent of the Administrative Agent.

   SECTION 3.14 <u>Survival of Agreement</u>. Without limitation of any provision of the Credit Agreement or <u>Section 3.10</u> hereof, all covenants, agreements, indemnities, representations and warranties made by the Loan Guarantors in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Loan Guaranty or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the execution and delivery of the Loan Documents and the making of any Loan, regardless of any investigation made by any such Lender or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect until the Termination Date, or with respect to any individual Loan Guarantor until such Loan Guarantor is otherwise released from its obligations under this Loan Guaranty in accordance with <u>Section 3.15</u>.

   SECTION 3.15 <u>Release of Loan Guarantors</u>. A Subsidiary Guarantor shall automatically be released from its obligations hereunder and its Loan Guaranty shall be automatically released in the circumstances described in <u>Article 8</u> and <u>Section 9.22</u> of the Credit Agreement. In connection with any

such release, the Administrative Agent shall promptly execute and deliver to any Loan Guarantor, at such Loan Guarantor's expense, all documents that such Loan Guarantor shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to the preceding sentence of this Section 3.15 shall be without recourse to or warranty by the Administrative Agent (other than as to the Administrative Agent's authority to execute and deliver such documents).

SECTION 3.16    Payments.  All payments made by any Loan Guarantor hereunder will be made without setoff, counterclaim or other defense and on the same basis as payments are made by the Borrowers under Sections 2.18 and 2.19 of the Credit Agreement.

SECTION 3.17    Notice, etc.  All notices and other communications provided for hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email, as follows:

(a)    if to any Loan Guarantor, addressed to it in care of the Top Borrower at its address specified in Section 9.01 of the Credit Agreement;

(b)    if to the Administrative Agent or any Lender, at its address specified in Section 9.01 of the Credit Agreement;

(c)    if to any Secured Party in respect of any Secured Hedging Obligations, at its address specified in the Hedge Agreement to which it is a party; or

(d)    if to any Secured Party in respect of any Banking Services Obligations, at its address specified in the relevant documentation to which it is a party.

SECTION 3.18    Set Off.  In addition to any right now or hereafter granted under applicable Requirements of Law and not by way of limitation of any such right, while an Event of Default has occurred and is continuing, the Administrative Agent, each Lender, each Issuing Bank and each of their respective Affiliates shall be entitled to rights of setoff to the extent provided in Section 9.09 of the Credit Agreement.

SECTION 3.19    Waiver of Consequential Damages, Etc.  To the extent permitted by applicable Requirements of Law, none of the Loan Guarantors nor the Secured Parties shall assert, and each hereby waives, any claim against each other or any Related Party thereof, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Loan Guaranty or any agreement or instrument contemplated hereby, except, in the case of any claim by any Indemnitee against any of the Loan Guarantors, to the extent such damages would otherwise be subject to indemnification pursuant to the terms of Section 3.10.

SECTION 3.20    Keepwell.  Each Qualified ECP Guarantor hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each Non-ECP Guarantor to honor all of its obligations under this Loan Guaranty in respect of Swap Obligations that would otherwise be Excluded Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 3.20 for the maximum amount of such liability that can be hereby incurred, and otherwise subject to the limitations on the obligations of Loan Guarantors contained in this Loan Guaranty, without rendering its obligations under this Section 3.20, or otherwise under this Loan Guaranty, voidable under applicable Requirements of Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  This Section

WEIL:\95918995\6\74339.0038

3.20 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each Non-ECP Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

[SIGNATURE PAGE FOLLOWS]

12

IN WITNESS WHEREOF, each Loan Guarantor and the Administrative Agent have executed this Loan Guaranty as of the date first above written.

Holdings:

DAWN INTERMEDIATE, INC.

By: _____
     Name:     Kristen McGuffey
     Title:      Executive Vice President, General
                  Counsel and Secretary

Borrowers:

SERTA SIMMONS BEDDING, LLC
SSB MANUFACTURING COMPANY

By: _____
     Name:     Kristen McGuffey
     Title:      Executive Vice President, General
                  Counsel and Secretary

NATIONAL BEDDING COMPANY L.L.C.

By: _____
     Name:     Kristen McGuffey
     Title:      General Counsel and Secretary

*Signature Page to First Lien Term Loan Guaranty Agreement*

Subsidiary Guarantors:

SIMMONS BEDDING COMPANY, LLC
SSB LOGISTICS, LLC
SSB NYC, LLC
THE SIMMONS MANUFACTURING CO., LLC

By: _____
     Name:     Kristen McGuffey
     Title:      Executive Vice President, General
                    Counsel and Secretary

WORLD OF SLEEP OUTLETS, LLC
SIMMONS CONTRACT SALES, LLC

By: _____
     Name:     Kristen McGuffey
     Title:      Vice President, General Counsel and
                    Secretary

DREAMWELL, LTD.

By: _____
     Name:     Kristen McGuffey
     Title:      Vice President and Secretary

SERTA INTERNATIONAL HOLDCO, LLC

By: _____
     Name:     Kristen McGuffey
     Title:      Authorized Person

*Signature Page to First Lien Term Loan Guaranty Agreement*

UBS AG, STAMFORD BRANCH,
as Administrative Agent

By: _____

    Name:

    Title:

*Signature Page to First Lien Term Loan Guaranty Agreement*

**EXHIBIT A**
**SUBSIDIARY GUARANTORS**

1.      Serta Simmons Bedding, LLC

2.      SSB Logistics, LLC

3.      SSB NYC, LLC

4.      The Simmons Manufacturing Co., LLC

5.      Word of Sleep Outlets, LLC

6.      Simmons Contract Sales, LLC

7.      Dreamwell, Ltd.

8.      Serta International Holdco, LLC

WEIL:\95918995\6\74339.0038

[FORM OF]
PERFECTION CERTIFICATE

[●] [●], 20[●]

Reference is hereby made to (i) that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "First Lien Term Loan Agreement"), by and among, *inter alios,* Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company (the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding") and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing", together with National Bedding and Top Borrower, the "Borrowers"), the lenders from time to time party thereto, UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the lenders party thereto (the "First Lien Administrative Agent"), (ii) that certain First Lien Pledge and Security Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "First Lien Security Agreement"), by and among the Loan Parties from time to time party thereto and the First Lien Administrative Agent, (iii) that certain Second Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "Second Lien Term Loan Agreement" and, together with the First Lien Term Loan Agreement, each, a "Credit Agreement" and, collectively, the "Credit Agreements"), by and among, *inter alios,* Holdings, the Borrowers, the lenders from time to time party thereto, Goldman Sachs Bank USA, in its capacities as administrative agent and collateral agent for the lenders party thereto (the "Second Lien Administrative Agent" and, together with the First Lien Administrative Agent, each, an "Administrative Agent" and collectively, the "Administrative Agents") and (iv) that certain Second Lien Pledge and Security Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "Second Lien Security Agreement" and, together with the First Lien Security Agreement, each, a "Security Agreement" and collectively, the "Security Agreements"), by and among the Loan Parties from time to time party thereto and the Second Lien Administrative Agent. Capitalized terms used but not defined herein have the meanings assigned to such terms in the relevant Security Agreement.

As used herein, the term "Company" means [**each**][**the**] signatory hereto.

As of the date hereof, the undersigned hereby represents and warrants to each Administrative Agent as follows:

      1.    Names.  (a) The exact legal name of [**each**][**the**] Company, as such name appears in its [**respective**] Organizational Documents filed with the Secretary of State of [**such**][**the**] Company's jurisdiction of organization is set forth in Schedule 1(a). [**Each**][**The**] Company is the type of entity disclosed next to its name in Schedule 1(a). Also set forth in Schedule 1(a) is the organizational identification number, if any, of [**each**][**the**] Company, the Federal Taxpayer Identification Number of [**each**][**the**] Company and the jurisdiction of organization of [**each**][**the**] Company.

      (b)    Except as otherwise disclosed in Schedule 1(c) or Schedule 1(d), set forth in Schedule 1(b) hereto is any other legal name that [**any**][**the**] Company has had, together with the date of the relevant change in the past five years.

      (c)    Set forth in Schedule 1(c) is a list of the information required by Section 1(a) of this certificate for any other Person (i) to which [**any**][**the**] Company became the successor by merger, consolidation or acquisition or (ii) that has been liquidated into, or transferred all or substantially all of its assets to, [**any**][**the**] Company, at any time within the past five years.

(d)    Except as set forth in Schedule 1(d), or as otherwise disclosed in Schedule 1(c), [**no Company has**][**the Company has not**] changed its jurisdiction of organization or form of entity at any time during the past four months.

2.    Locations.  The chief executive office of [**each**][**the**] Company is currently located at the address set forth in Schedule 2 hereto.

3.    Stock Ownership and Other Equity Interests.  Attached hereto as Schedule 3 is a true and correct list of all of the issued and outstanding stock, partnership interests, limited liability company membership interests or other equity interests owned by [**any**][**the**] Company other than Excluded Assets, the beneficial owners of such stock, partnership interests, membership interests or other equity interests and the percentage of the total issued and outstanding stock, partnership interests, membership interests or other equity interests of the relevant issuer represented thereby.

4.    Instruments and Tangible Chattel Paper.  Attached hereto as Schedule 4 is a true and correct list of all Instruments (other than checks to be deposited in the ordinary course of business) and Tangible Chattel Paper, in each case, having a face amount exceeding $10,000,000, held by [**any**][**the**] Company as of the date hereof, including the names of the obligors, the amounts owing and the due dates.

5.    Intellectual Property.  (a) Attached hereto as Schedule 5(a) is a schedule setting forth all of [**each**][**the**] Company's United States Patents and United States Trademarks registered with and published by (or applied for in) the United States Patent and Trademark Office (excluding, for the avoidance of doubt, any United States Patent or United States Trademark that has expired or been abandoned, but including United States Trademarks that would constitute Collateral upon the filing of a "Statement of Use" or an "Amendment to Allege Use" with respect thereto), including the name of the registered owner and the registration or publication number (or, if applicable, the applicant and the application number) of each such United States Patent and United States Trademark.

(b)    Attached hereto as Schedule 5(b) is a schedule setting forth all of [**each**][**the**] Company's Copyrights registered with (or applied for in) the United States Copyright Office (excluding, for the avoidance of doubt, any Copyright that has expired or been abandoned), including the name of the registered owner and the registration number (or, if applicable, the applicant and the application number) of each such Copyright.

6.    Commercial Tort Claims.  Attached hereto as Schedule 6 is a true and correct list of all Commercial Tort Claims with an individual value of at least $10,000,000 (as reasonably determined by the Top Borrower), held by [**any**][**the**] Company, including a brief description thereof.

[Signature Page Follows]

J-2

IN WITNESS WHEREOF, the undersigned has hereunto signed this Perfection Certificate as of the date first written of above.

[●]

By: _____
     Name:    [●]
     Title:     [●]

**SCHEDULE 1(A)**

LEGAL NAMES

| Legal Name | Jurisdiction | Type | Organizational Number | Federal Taxpayer Identification Number |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Schedule 1(A) to Exhibit J

**SCHEDULE 1(B)**

PRIOR ORGANIZATIONAL NAMES

| Company | Prior Legal Name | Date of Change |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

WEIL:\95919473\9\74339.0038

**SCHEDULE 1(C)**

PREDECESSOR ENTITIES

| Company | Action | Legal Name of Predecessor Entity | Jurisdiction of Organization of Predecessor Entity | Date |
|---------|--------|----------------------------------|----------------------------------------------------|------|
|         |        |                                  |                                                    |      |
|         |        |                                  |                                                    |      |
|         |        |                                  |                                                    |      |
|         |        |                                  |                                                    |      |
|         |        |                                  |                                                    |      |

WEIL:\95919473\9\74339.0038

## SCHEDULE 1(D)

CHANGES IN JURISDICTION OR FORM

| Company | Current Jurisdiction of Organization/Form | Prior Jurisdiction of Organization/Form | Date of Change |
|---------|---------|---------|---------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**SCHEDULE 2**

CHIEF EXECUTIVE OFFICE ADDRESSES

| Company | Address |
|---------|---------|
|         |         |
|         |         |
|         |         |
|         |         |
|         |         |

WEIL:\95919473\9\74339.0038

**SCHEDULE 3**

PLEDGED STOCK

| Issuer | Holder | Certificate No. | No. Shares/Interest | % of Issued and Outstanding Shares |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Schedule 3 to Exhibit J

## **SCHEDULE 4**

INSTRUMENTS

1.      Promissory Notes/Instruments:

| Obligee | Obligor | Principal Amount | Maturity |
|---------|---------|------------------|----------|
|         |         |                  |          |
|         |         |                  |          |
|         |         |                  |          |
|         |         |                  |          |

2.      Tangible Chattel Paper:

Schedule 4 to Exhibit J

**SCHEDULE 5(A)**

PATENTS AND TRADEMARKS

PATENTS

| REGISTERED OWNER | SERIAL NUMBER | DESCRIPTION |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

PATENT APPLICATIONS

| APPLICANT | APPLICATION NO. | DESCRIPTION |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

TRADEMARKS

| REGISTERED OWNER | REGISTRATION NUMBER | TRADEMARK |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

TRADEMARK APPLICATIONS

| APPLICANT | APPLICATION NO. | TRADEMARK |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Schedule 5(A) to Exhibit J

**SCHEDULE 5(B)**

COPYRIGHTS

COPYRIGHTS

| REGISTERED OWNER | REGISTRATION NUMBER | TITLE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

COPYRIGHT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | TITLE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

WEIL:\95919473\9\74339.0038

## SCHEDULE 6

COMMERCIAL TORT CLAIMS

WEIL:\95919473\9\74339.0038

[FORM OF] JOINDER AGREEMENT

A.        SUPPLEMENT NO. [●] dated as of [●] (this "<u>Supplement</u>"), to (a) the First Lien Term Loan Pledge and Security Agreement dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Security Agreement</u>"), by and among Dawn Intermediate, Inc., a Delaware corporation ("<u>Holdings</u>"), Serta Simmons Bedding, LLC, a Delaware limited liability company (the "<u>Top Borrower</u>"), National Bedding Company L.L.C., an Illinois limited liability company ("<u>National Bedding</u>") and SSB Manufacturing Company, a Delaware corporation ("<u>SSB Manufacturing</u>", together with National Bedding and Top Borrower, the "<u>Borrowers</u>"), the Subsidiary Guarantors (as defined in the First Lien Term Loan Agreement referenced below) from time to time party thereto (the foregoing, collectively, the "<u>Grantors</u>") and UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent for the Secured Parties (in such capacities, the "<u>Administrative Agent</u>") and (b) the First Lien Term Loan Guaranty Agreement dated as of dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Loan Guaranty</u>"), by and among Holdings, the Borrowers, the Subsidiary Guarantors from time to time party thereto and the Administrative Agent.

B.        Reference is made to the First Lien Term Loan Agreement dated as of dated as of November 8, 2016, (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>First Lien Term Loan Agreement</u>"), by and among, *inter alios*, Holdings, the Borrowers, the lenders from time to time party thereto and the Administrative Agent.

C.        Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Term Loan Agreement, the Security Agreement or the Loan Guaranty, as applicable.

D.        The Loan Parties have entered into the Security Agreement and the Loan Guaranty in order to induce the Lenders to make Loans.  <u>Section 7.10</u> of the Security Agreement, <u>Section 3.04</u> of the Loan Guaranty and <u>Section 5.12</u> of the First Lien Term Loan Agreement provide that additional subsidiaries of the Top Borrower may become Subsidiary Guarantors under the Security Agreement and the Loan Guaranty by executing and delivering an instrument in the form of this Supplement.  [**The**] [**Each**] undersigned Restricted Subsidiary (the "<u>New Subsidiary</u>") is executing this Supplement in accordance with the requirements of the First Lien Term Loan Agreement to become a Grantor under the Security Agreement and a Subsidiary Guarantor under the Loan Guaranty in order to induce the Lenders to make additional Loans and as consideration for Loans previously made and to Guaranty and secure the Secured Obligations, including [**its**] [**their**] obligations under the Loan Guaranty, each Hedge Agreement the obligations under which constitute Secured Hedging Obligations and agreements relating to Banking Services the obligations under which constitute Banking Services Obligations.

Accordingly, [**the**] [**each**] New Subsidiary agrees as follows:

SECTION 1.        In accordance with <u>Section 7.10</u> of the Security Agreement, [**the**] [**each**] New Subsidiary by its signature below becomes a Subsidiary Guarantor and a Grantor under the Security Agreement with the same force and effect as if originally named therein as a Grantor, and [**the**] [**each**] New Subsidiary hereby (a) agrees to all the terms and provisions of the Security Agreement applicable to it as a Grantor thereunder and (b) makes the representations and warranties applicable to it as a Grantor under the Security Agreement[**, subject to <u>Schedule A</u> hereto,**] on and as of the date hereof; it being understood and agreed that any representation or warranty that expressly relates to an earlier date shall be deemed to refer to the date hereof.  In furtherance of the foregoing, [**the**] [**each**] New Subsidiary, as security for the payment and performance in full of the Secured Obligations, does hereby create and grant to the Administrative Agent, its successors and permitted assigns, for the benefit of the Secured Parties, their successors and permitted assigns, a security interest in and Lien on all of [**the**] [**each**] New Subsidiary's right, title and interest in and to the Collateral of [**the**] [**each**] New Subsidiary.  Upon the effectiveness of this Supplement, each reference to a

"Grantor" and "Subsidiary Guarantor" in the Security Agreement shall be deemed to include [**the**] [**each**] New Subsidiary. The Security Agreement is hereby incorporated herein by reference.

SECTION 2.    [**Each**] [**The**] New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, [**each**] [**the**] New Subsidiary will be deemed to be a Loan Guarantor under the Loan Guaranty and a Loan Guarantor for all purposes of the Credit Agreement and shall have all of the rights, benefits, duties and obligations of a Loan Guarantor thereunder as if it had executed the Loan Guaranty. [**Each**] [**The**] New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Loan Guaranty. Without limiting the generality of the foregoing terms of this <u>paragraph 1</u>, [**each**] [**the**] New Subsidiary hereby absolutely and unconditionally guarantees, jointly and severally with the other Loan Guarantors, to the Administrative Agent and the Secured Parties, the prompt payment of the Guaranteed Obligations in full when due (whether at stated maturity, upon acceleration or otherwise) to the extent of and in accordance with the Loan Guaranty. [**Each**] [**The**] New Subsidiary hereby waives acceptance by the Administrative Agent and the Secured Parties of the guaranty by the New Subsidiary upon the execution of this Agreement by [**each**] [**the**] New Subsidiary. [**Each**] [**The**] New Subsidiary hereby (x) makes, as of the date hereof, the representation and warranty set forth in Section 2.10 of the Loan Guaranty[**, except as set forth on <u>Schedule A</u> hereto,**][30] and (y) agrees to perform and observe, and to cause each of its Restricted Subsidiaries to perform and observe, the covenant set forth in <u>Section 2.11</u> of the Loan Guaranty.

SECTION 3.    [**The**] [**Each**] New Subsidiary represents and warrants to the Administrative Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to the Legal Reservations.

SECTION 4.    This Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Supplement shall become effective when the Administrative Agent shall have received a counterpart of this Supplement that bears the signature of [**the**] [**each**] New Subsidiary and the Administrative Agent has executed a counterpart hereof. Delivery of an executed signature page to this Supplement by facsimile transmission or by email as a ".pdf" or ".tif" attachment shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 5.    Attached hereto is a duly prepared, completed and executed Perfection Certificate, which includes information with respect to [**the**] [**each**] New Subsidiary, and [**the**] [**each**] New Subsidiary hereby represents and warrants that the information set forth therein with respect to itself is correct and complete in all material respects as of the date hereof.

SECTION 6.    Except as expressly supplemented hereby, the Loan Guaranty and the Security Agreement shall remain in full force and effect.

SECTION 7.    THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 8.    In case any one or more of the provisions contained in this Supplement is invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and in the Security Agreement shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). Each Borrower and the Administrative Agent shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid

---

[30] Subject to <u>Section 5.12(c)(x)</u> of the Credit Agreement.

provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.        All communications and notices hereunder shall be in writing and given as provided in <u>Section 9.01</u> of the First Lien Term Loan Agreement.

SECTION 10.        [**The**] [**Each**] New Subsidiary agrees to reimburse the Administrative Agent for its expenses in connection with this Supplement, including the fees, other charges and disbursements of counsel in accordance with <u>Section 9.03(a)</u> of the Credit Agreement.

SECTION 11.    This Supplement shall constitute a Loan Document, under and as defined in, the First Lien Term Loan Agreement.

[Signature pages follow]

WEIL:\95919473\9\74339.0038

IN WITNESS WHEREOF, [**each**] [**the**] New Subsidiary has duly executed this Joinder Agreement as of the day and year first above written.

[NAME OF NEW SUBSIDIARY]

By: _____
      Name:
      Title:

[SCHEDULE A
CERTAIN EXCEPTIONS]

Schedule A to Exhibit K

EXHIBIT L

[FORM OF]
PROMISSORY NOTE

$[●]                                                                                    New York, New York
                                                                                      [●] [●], 20[●]

FOR VALUE RECEIVED, the undersigned Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing" and, together with SSB and National Bedding, the "Borrowers"), hereby jointly and severally promise to pay on demand to [●] (the "Lender") or its registered permitted assign, at the office of UBS AG, Stamford Branch ("UBS") at [●], [**Term**] [**Additional Revolving**] Loans in the principal amount of $[●] or such lesser amount as is outstanding from time to time, on the dates and in the amounts set forth in the First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "First Lien Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, Inc., a Delaware corporation ("Dawn Intermediate" or "Holdings"), the Borrowers, the Lenders from time to time party thereto, UBS, in its capacities as administrative agent and collateral agent for the Lenders. Each Borrower also promises to pay interest from the date of such Loans on the principal amount thereof from time to time outstanding, in like Dollars, at such office, in each case, in the manner and at the rate or rates per annum and payable on the dates provided in the First Lien Term Loan Agreement. Terms used but not defined herein shall have the meanings assigned to such terms in the First Lien Term Loan Agreement.

Each Borrower promises to pay interest on any overdue principal and, to the extent permitted by applicable Requirements of Law, overdue interest from the relevant due dates, in each case, in the manner, at the rate or rates and under the circumstances provided in the First Lien Term Loan Agreement.

Each Borrower hereby waives diligence, presentment, demand, protest and notice of any kind to the extent possible under any applicable Requirements of Law. The non-exercise by the holder hereof of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

All Borrowings evidenced by this promissory note and all payments and prepayments of the principal hereof and interest hereon and the respective dates thereof shall be endorsed by the holder hereof on the schedules attached hereto and made a part hereof or on a continuation thereof which shall be attached hereto and made a part hereof, or otherwise recorded by such holder in its internal records; provided, however, that the failure of the holder hereof to make such a notation or any error in such notation shall not affect the obligations of each Borrower under this Note.

This promissory note is one of the promissory notes referred to in the First Lien Term Loan Agreement that, among other things, contains provisions for the acceleration of the maturity hereof upon the happening of certain events, for optional and mandatory prepayment of the principal hereof prior to the maturity hereof and for the amendment or waiver of certain provisions of the First Lien Term Loan Agreement, all upon the terms and conditions therein specified. This promissory note is entitled to the benefit of the First Lien Term Loan Agreement, and the obligations hereunder are guaranteed and secured as provided therein and in the other Loan Documents referred to in the First Lien Term Loan Agreement.

If any assignment by the Lender holding this promissory note occurs after the date of the issuance hereof, the Lender agrees that it shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender this promissory note to the Administrative Agent for cancellation.

THE ASSIGNMENT OF THIS PROMISSORY NOTE AND ANY RIGHTS WITH RESPECT THERETO ARE SUBJECT TO THE PROVISIONS OF THE FIRST LIEN TERM LOAN AGREEMENT, INCLUDING THE PROVISIONS GOVERNING THE REGISTER AND THE PARTICIPANT REGISTER.

THIS PROMISSORY NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

[Remainder of Page Intentionally Left Blank]

WEIL:\95919473\9\74339.0038

SERTA SIMMONS BEDDING, LLC

By: _____
   Name:
   Title:

NATIONAL BEDDING COMPANY L.L.C.

By: _____
   Name:
   Title:

SSB MANUFACTURING COMPANY

By: _____
   Name:
   Title:

LOANS, CONVERSIONS AND REPAYMENTS OF ABR LOANS

| Date | Amount of ABR Loans | Amount Converted to ABR Loans | Amount of Principal of ABR Loans Repaid | Amount of ABR Loans Converted to LIBO Rate Loans | Unpaid Principal Balance of ABR Loans | Notation Made By |
|------|------|------|------|------|------|------|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

Schedule A to Exhibit L

## LOANS, CONTINUATIONS, CONVERSIONS AND REPAYMENTS OF LIBO RATE LOANS

| Date | Amount of LIBO Rate Loans | Amount Converted to LIBO Rate Loans | Interest Period and LIBO Rate with Respect Thereto | Amount of Principal of LIBO Rate Loans Repaid | Amount of LIBO Rate Loans Converted to ABR Loans | Unpaid Principal Balance of LIBO Rate Loans | Notation Made By |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Schedule B to Exhibit L

[FORM OF]
FIRST LIEN TERM LOAN PLEDGE AND SECURITY AGREEMENT

[See attached.]

FIRST LIEN TERM LOAN PLEDGE AND SECURITY AGREEMENT

THIS FIRST LIEN TERM LOAN PLEDGE AND SECURITY AGREEMENT (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Security Agreement") is entered into as of November 8, 2016, by and among Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing" and, together with SSB and National Bedding, the "Borrowers"), Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), the Subsidiary Guarantors (as defined in the Credit Agreement) from time to time party hereto (the foregoing, collectively, the "Grantors") and UBS AG, Stamford Branch ("UBS"), in its capacity as administrative agent and collateral agent for the Secured Parties (as defined below) (in such capacities, the "Administrative Agent").

**PRELIMINARY STATEMENT**

Holdings, the Borrowers, the Lenders party thereto, the Administrative Agent and others are entering into that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). The Grantors are entering into this Security Agreement in order to induce the Lenders to enter into and extend credit to the Borrowers under the Credit Agreement and to secure the Secured Obligations, including their obligations under the Loan Guaranty, each Hedge Agreement, the obligations under which constitute Secured Hedging Obligations, and each agreement relating to Banking Services, the obligations under which constitute Banking Services Obligations.

ACCORDINGLY, the parties hereto agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.     *Terms Defined in Credit Agreement*.  All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

Section 1.02.     *Terms Defined in UCC*.  Terms defined in the UCC that are not otherwise defined in this Security Agreement or the Credit Agreement are used herein as defined in Articles 8 or 9 of the UCC, as the context may require (including without limitation, as if such terms were capitalized in Article 8 or 9 of the UCC, as the context may require, the following terms: "Account," "Commodities Account,", "Deposit Account," "Chattel Paper," "Commercial Tort Claim," "Document," "Electronic Chattel Paper," "Equipment," "Fixture," "General Intangible," "Goods," "Instruments," "Inventory," "Investment Property," "Letter-of-Credit Right," "Securities Account," "Securities Entitlement," "Supporting Obligation" and "Tangible Chattel Paper").

Section 1.03.     *Definitions of Certain Terms Used Herein*.  As used in this Security Agreement, in addition to the terms defined in the preamble and Preliminary Statement above, the following terms shall have the following meanings:

"Administrative Agent" has the meaning set forth in the preamble.

"Article" means a numbered article of this Security Agreement, unless another document is specifically referenced.

"Borrowers" has the meaning specified in the preamble.

"Collateral" has the meaning set forth in Article 2.

"Contract Rights" means all rights of any Grantor under any Contract, including, without limitation, (i) any and all rights to receive and demand payments under such Contract, (ii) any and all rights to receive and compel performance under such Contract and (iii) any and all other rights, interests and claims now existing or in the future arising in connection with such Contract.

"Contracts" means all contracts between any Grantor and one or more additional parties (including, without limitation, any Hedge Agreement, licensing agreement and any partnership agreement, joint venture agreement and/or limited liability company agreement).

"Control" has the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"Credit Agreement" has the meaning set forth in the Preliminary Statement.

"Cumulative Perfection Certificate" means the Perfection Certificate delivered pursuant to Section 4.01(k) of the Credit Agreement and any Perfection Certificate delivered pursuant to Section 5.12(a) of the Credit Agreement.

"Domain Names" means all Internet domain names and associated URL addresses in or to which any Grantor now or hereafter has any right, title or interest.

"Exhibit" refers to a specific exhibit to this Security Agreement, unless another document is specifically referenced.

"Grantors" has the meaning set forth in the preamble.

"Holdings" has the meaning set forth in the preamble.

"Intellectual Property Collateral" means, collectively, all Copyrights, Patents, Trademarks, Trade Secrets, Domain Names, Licenses and Software.

"Intellectual Property Security Agreement Supplement" means an Intellectual Property Security Agreement Supplement substantially in the form of Exhibit A to the Intellectual Property Security Agreement.

"Licenses" means, with respect to any Grantor, all of such Grantor's right, title, and interest in and to (a) any and all licensing agreements or similar arrangements, whether as licensor or licensee, in (1) Patents, (2) Copyrights, (3) Trademarks, (4) Trade Secrets or (5) Software, (b) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future breaches thereof, and (c) all rights to sue for past, present, and future breaches thereof.

"Money" has the meaning set forth in Article 1 of the UCC.

"National Bedding" has the meaning set forth in the preamble.

"Permits" shall mean, all licenses, permits, rights, orders, variances, franchises or authorizations of or from any Governmental Authority or agency.

-2-

"<u>Pledged Collateral</u>" means all Pledged Stock, including all stock certificates, options or rights of any nature whatsoever in respect of the Pledged Stock that may be issued or granted to, or held by, any Grantor, all Instruments owned by any Grantor, whether or not physically delivered to the Administrative Agent pursuant to this Security Agreement, whether now owned or hereafter acquired by such Grantor and any and all Proceeds thereof.

"<u>Pledged Stock</u>" means, with respect to any Grantor, the shares of Capital Stock held by such Grantor, including Capital Stock described in <u>Schedule 3</u> to the Cumulative Perfection Certificate as held by such Grantor, together with any other shares of Capital Stock as are hereafter acquired by such Grantor.

"<u>Proceeds</u>" has the meaning assigned in Article 9 of the UCC and, in any event, shall also include but not be limited to (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Administrative Agent or any Grantor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to any Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority, (iii) any and all Stock Rights and (iv) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"<u>Receivables</u>" means any Account, Chattel Paper, Document, Instrument and/or any General Intangible, in each case, that is a right or claim to receive money (whether or not earned by performance).

"<u>Section</u>" means a numbered section of this Security Agreement, unless another document is specifically referenced.

"<u>Security Agreement</u>" has the meaning set forth in the preamble.

"<u>Software</u>" means computer programs, source code, object code and supporting documentation including "software" as such term is defined in Article 9 of the UCC, as well as computer programs that may be construed as included in the definition of Goods.

"<u>SSB</u>" has the meaning set forth in the preamble.

"<u>SSB Manufacturing</u>" has the meaning set forth in the preamble.

"<u>Stock Rights</u>" means all dividends, options, warrants, instruments or other distributions and any other right or property which any Grantor shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any Capital Stock constituting Collateral, any right to receive any Capital Stock constituting Collateral and any right to receive earnings, in which such Grantor now has or hereafter acquires any right, issued by an issuer of such Capital Stock.

"<u>Top Borrower</u>" has the meaning set forth in the preamble.

"<u>Trade Secrets</u>" means, with respect to any Grantor, all of such Grantor's right, title and interest in and to the following: (a) confidential and proprietary information, including unpatented inventions, invention disclosures, engineering or other data, information, production procedures, know-how, financial data, customer lists, supplier lists, business and marketing plans, processes, schematics, algorithms, techniques, analyses, proposals, source code, data, databases and data collections; (b) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims and payments for past and future misappropriations or infringements thereof; (c) all rights to sue for past, present and future infringements of the foregoing, including the right to settle

suits involving claims and demands for royalties owing; and (d) all rights corresponding to any of the foregoing.

"UBS" has the meaning set forth in the preamble.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

ARTICLE 2
GRANT OF SECURITY INTEREST

Section 2.01. *Grant of Security Interest.*

(a) As security for the prompt and complete payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby pledges, collaterally assigns, mortgages, transfers and grants to the Administrative Agent, its successors and permitted assigns, on behalf of and for the ratable benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Grantor, and regardless of where located (all of which are collectively referred to as the "Collateral"):

(i) all Accounts;

(ii) all Chattel Paper (including, without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper);

(iii) all Intellectual Property Collateral;

(iv) all Documents;

(v) all Equipment;

(vi) all Fixtures;

(vii) all General Intangibles;

(viii) all Goods;

(ix) all Instruments;

(x) all Inventory;

(xi) all Investment Property, Pledged Stock and other Pledged Collateral;

(xii) all letters of credit and Letter-of-Credit Rights;

(xiii) all Commercial Tort Claims described on Schedule 6 to the Cumulative Perfection Certificate (including any supplements to such Schedule 6 delivered pursuant to Section 4.04);

(xiv) all Permits;

-4-

(xv)     all Software and all recorded data of any kind or nature, regardless of the medium of recording;

(xvi)     all Contracts, together with all Contract Rights arising thereunder;

(xvii)     all Money, Cash and Cash Equivalents;

(xviii)     all Deposit Accounts, Securities Accounts, Commodities Accounts and all other demand, deposit, time, savings, cash management, passbook and similar accounts maintained by such Grantor with any bank or other financial institution and all monies, securities, Instruments deposited or required to be deposited in any of the foregoing;

(xix)     all Securities Entitlements in any or all of the foregoing;

(xx)     all other personal property not otherwise described in clauses (i) through (xix) above;

(xxi)     all Supporting Obligations; and

(xxii)     all accessions to, substitutions and replacements for and Proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

(b)     Notwithstanding the foregoing, the term "Collateral" (and any component definition thereof) shall not include any Excluded Asset.  Notwithstanding anything to the contrary contained herein, immediately upon the ineffectiveness, lapse or termination of any restriction or condition set forth in the definition of "Excluded Assets" in the Credit Agreement that prevented the grant of a security interest in any right, interest or other asset that would have, but for such restriction or condition, constituted Collateral, the Collateral shall include, and the relevant Grantor shall be deemed to have automatically granted a security interest in, such previously restricted or conditioned right, interest or other asset, as the case may be, as if such restriction or condition had never been in effect.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

The Grantors, jointly and severally, represent and warrant to the Administrative Agent as and when required under the Credit Agreement, for the benefit of the Secured Parties, that:

Section 3.01.     *Title, Perfection and Priority; Filing Collateral*.  Subject to the Legal Reservations, this Security Agreement is effective to create a legal, valid and enforceable Lien on and security interest in the Collateral in favor of the Administrative Agent for the benefit of the Secured Parties and, subject to the terms of the last paragraph of Section 4.01 of the Credit Agreement and the satisfaction of the Perfection Requirements, the Administrative Agent will have a fully perfected Lien (with the priority set forth in the Intercreditor Agreements and subject to Permitted Liens) on such Collateral securing the Secured Obligations to the extent perfection can be achieved by the Perfection Requirements.

Section 3.02.     *Intellectual Property*.  As of the date hereof, no Grantor has actual knowledge of (i) any third-party claim (A) that any of its owned Patent, Trademark or Copyright registrations or

applications is invalid or unenforceable, or (B) challenging such Grantor's rights to such registrations and applications or (ii) any basis for such claims, other than, in each case, to the extent any such third-party claim would not reasonably be expected to have a Material Adverse Effect.

Section 3.03.     *Pledged Collateral.*  (i) All Pledged Stock has been duly authorized and validly issued (to the extent such concepts are relevant with respect to such Pledged Stock) by the issuer thereof and is fully paid and non-assessable, (ii) each Grantor is the direct owner, beneficially and of record, of the Pledged Stock described in <u>Schedule 3</u> to the Cumulative Perfection Certificate as held by such Grantor and (iii) each Grantor holds the Pledged Stock described in <u>Schedule 3</u> to the Cumulative Perfection Certificate as held by such Grantor free and clear of all Liens (other than Permitted Liens).

<div align="center">

ARTICLE 4
COVENANTS

</div>

From the date hereof, and thereafter until the Termination Date:

Section 4.01.     *General*.

(a)     *Authorization to File Financing Statements; Ratification.*  Each Grantor hereby (i) authorizes the Administrative Agent to file (A) all financing statements (including fixture filings) and amendments thereto with respect to the Collateral naming such Grantor as debtor and the Administrative Agent as secured party, in form appropriate for filing under the UCC of the relevant jurisdiction and (B) filings with the United States Patent and Trademark Office and the United States Copyright Office (including any Intellectual Property Security Agreement) for the purpose of perfecting, enforcing, maintaining or protecting the Lien of the Administrative Agent in United States issued, registered and applied for Patents, Trademarks and Copyrights (in each case, to the extent constituting Collateral) and naming such Grantor as debtor and the Administrative Agent as secured party and, (ii) subject to the terms of the Loan Documents agrees to take such other actions, in each case as may from time to time be necessary and reasonably requested by the Administrative Agent (and authorizes the Administrative Agent to take any such other actions, which it has no obligation to take) in order to establish and maintain a valid, enforceable (subject to the Legal Reservations) and perfected security interest with the priority set forth in the Intercreditor Agreements (subject to Permitted Liens) in and subject, in the case of Pledged Collateral, to <u>Section 4.02</u> hereof, Control of, the Collateral.  Each Grantor shall pay any applicable filing fees, recordation fees and related expenses relating to its Collateral in accordance with <u>Section 9.03(a)</u> of the Credit Agreement.  Any financing statement filed by the Administrative Agent may (i) indicate the Collateral (A) as "all assets" of the applicable Grantor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such jurisdiction, or (B) by any other description which reasonably approximates the description contained in this Security Agreement and (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (A) in each case to the extent applicable, whether the Grantor is an organization, the type of organization and any organization identification number issued to the Grantor and (B) in the case of a financing statement filed as a fixture filing, a sufficient description of the relevant real property to which the Collateral relates. Each Grantor agrees to furnish any such information to the Administrative Agent promptly upon request.

(b)     *Further Assurances.*  Each Grantor agrees, at its own expense, to take any and all actions reasonably necessary to defend title to the Collateral against all Persons (other than Persons holding Permitted Liens on such Collateral that have priority over the Administrative Agent's Lien) and to defend the security interest of the Administrative Agent in the Collateral and the priority thereof against any Lien that is not a Permitted Lien.

(c)      *Limitations on Actions*.   Notwithstanding anything to the contrary in this Security Agreement, no Grantor shall be required to take any action in connection with Collateral pledged hereunder (and no security interest in such Collateral shall be required to be perfected) except to the extent consistent with Sections 5.12(c) and 5.14 of the Credit Agreement and the Perfection Requirements or expressly required hereunder and except in accordance with Requirements of Law.

Section 4.02.      *Pledged Collateral*.

(a)      *Delivery of Certificated Securities, Tangible Chattel Paper, Instruments and Documents*. Each Grantor will, after the Closing Date, hold in trust for the Administrative Agent upon receipt and, (x) if the event giving rise to the obligation under this Section 4.02(a) occurs during the first three Fiscal Quarters of any Fiscal Year, on or before the date on which financial statements are required to be delivered pursuant to Section 5.01(a) of the Credit Agreement for the Fiscal Quarter in which the relevant event occurred or (y) if the event giving rise to the obligation under this Section 4.02(a) occurs during the fourth Fiscal Quarter of any Fiscal Year, on or before the date that is 60 days after the end of such Fiscal Quarter (or, in each of the cases of clauses (x) and (y), such longer period as the Administrative Agent may reasonably agree), deliver to the Administrative Agent for the benefit of the Secured Parties any (1) certificated Security representing or evidencing Pledged Collateral and (2) Instrument (A) in each case under this clause (2), having an outstanding balance in excess of $10,000,000 and (B) in each case under clauses (1) and (2), constituting Collateral received after the date hereof, accompanied by undated instruments of transfer or assignment duly executed in blank.   Notwithstanding anything to the contrary in this Security Agreement or any other Loan Document, the Grantors are not required to deliver any Tangible Chattel Paper or Document to the Administrative Agent or for the benefit of any Secured Party.

(b)      *Uncertificated Securities and Pledged Collateral*.   With respect to any partnership interest or limited liability company interest owned by any Grantor which is required to be pledged to the Administrative Agent pursuant to the terms hereof (other than a partnership interest or limited liability company interest held by a Clearing Corporation, Securities Intermediary or other financial intermediary of any kind) which is not represented by a certificate and which is not a Security for purposes of the UCC, such Grantor shall not permit any issuer of such partnership interest or limited liability company interest to allow such partnership interest or limited liability company interest (as applicable) to become a Security unless such Grantor causes such interest to be represented by a certificate and complies with the procedures set forth in Section 4.02(a) within the time period prescribed therein.   Each Grantor which is an issuer of any uncertificated Pledged Collateral described in this Section 4.02(b) hereby agrees to comply with all instructions from the Administrative Agent without such Grantor's further consent, in each case subject to the notice requirements set forth in Section 5.01(a)(iv) hereof.

(c)      *Registration in Nominee Name; Denominations*.   The Administrative Agent, on behalf of the Secured Parties, shall hold certificated Pledged Collateral required to be delivered to the Administrative Agent under clause (a) above in the name of the applicable Grantor, endorsed or assigned in blank or in favor of the Administrative Agent, but at any time when an Event of Default has occurred and is continuing, and upon at least three Business Days' notice to the Top Borrower, the Administrative Agent shall have the right (in its sole and absolute discretion, but subject to the last paragraph of Section 7.01 of the Credit Agreement) to hold the Pledged Collateral in its own name as pledgee, or in the name of its nominee (as pledgee or as sub-agent).   At any time when an Event of Default has occurred and is continuing, but subject to the last paragraph of Section 7.01 of the Credit Agreement, the Administrative Agent shall have the right to exchange the certificates representing Pledged Collateral for certificates of smaller or larger denominations for any purpose consistent with this Security Agreement.

(d)      *Exercise of Rights in Pledged Collateral.*  It is agreed that:

(i)      without in any way limiting the foregoing and subject to <u>clause (ii)</u> below, each Grantor shall have the right to exercise all voting rights or other rights relating to the Pledged Collateral for any purpose that does not violate this Security Agreement, the Credit Agreement or any other Loan Document;

(ii)      each Grantor will permit the Administrative Agent or its nominee at any time when an Event of Default has occurred and is continuing to exercise the rights and remedies provided under <u>Section 5.01(a)(iv)</u> (subject to the notice requirements set forth therein); and

(iii)      subject to <u>Section 5.01(a)(iv)</u>, each Grantor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Collateral; <u>provided</u> that any non-cash dividend or other distribution that would constitute Pledged Collateral, whether resulting from a subdivision, combination or reclassification of the outstanding Capital Stock of the issuer of any Pledged Collateral or received in exchange for Pledged Collateral or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall, to the extent constituting Collateral, be and become part of the Pledged Collateral, and, if received by any Grantor, shall be delivered to the Administrative Agent as and to the extent required by <u>clause (a)</u> above.

(e)      *Return of Pledged Collateral.*  The Administrative Agent shall promptly deliver to the applicable Grantor (without recourse and without any representation or warranty) any Pledged Collateral in its possession if requested to be delivered to the issuer or holder thereof in connection with any action or transaction that is permitted or not restricted by the Credit Agreement in accordance with <u>Article 8</u> of the Credit Agreement.

Section 4.03.      *Intellectual Property.*

(a)      At any time when an Event of Default has occurred and is continuing, and upon the written request of the Administrative Agent, each Grantor will (i) use its commercially reasonable efforts to obtain all consents and approvals necessary for the assignment to or for the benefit of the Administrative Agent of any License held by such Grantor in the U.S. to enable the Administrative Agent to enforce the security interests granted hereunder and (ii) to the extent required pursuant to any material License in the U.S. under which such Grantor is the licensee, deliver to the licensor thereunder any notice of the grant of security interest hereunder or such other notices required to be delivered thereunder in order to permit the security interest created or permitted to be created hereunder pursuant to the terms of such License.

(b)      Each Grantor shall notify the Administrative Agent promptly if it knows that any application for or registration of any Patent, Trademark, Domain Name, or Copyright (now or hereafter existing) has been abandoned or dedicated to the public, or of any determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court) abandoning such Grantor's ownership of any such Patent, Trademark or Copyright, its right to register the same, or to keep and maintain the same, except, in each case, to the extent the same is permitted or not restricted by the Credit Agreement or where the same, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(c)     In the event that any Grantor files an application for the registration of any Patent, Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright Office, or acquires any such application or registration by purchase or assignment, in each case, after the Closing Date and to the extent the same constitutes Collateral (and other than as a result of an application that is then subject to an Intellectual Property Security Agreement or Intellectual Property Security Agreement Supplement becoming registered), it shall, (i) if the event giving rise to the obligation under this <u>Section 4.03(c)</u> occurs during the first three Fiscal Quarters of any Fiscal Year, on or before the date on which financial statements are required to be delivered pursuant to <u>Section 5.01(a)</u> of the Credit Agreement for the Fiscal Quarter in which the relevant event occurred or (ii) if the event giving rise to the obligation under this <u>Section 4.03(c)</u> occurs during the fourth Fiscal Quarter of any Fiscal Year, on or before the date that is 60 days after the end of such Fiscal Quarter (or, in the case of each of <u>clauses (i)</u> and <u>(ii)</u>, such longer period as the Administrative Agent may reasonably agree), notify the Administrative Agent and, promptly upon the Administrative Agent's request, execute and deliver to the Administrative Agent, at such Grantor's sole cost and expense, any Intellectual Property Security Agreement or Intellectual Property Security Agreement Supplement, as applicable, or other instrument as the Administrative Agent may reasonably request and require to evidence the Administrative Agent's security interest in such registered Patent, Trademark or Copyright (or application therefor), and the General Intangibles of such Grantor relating thereto or represented thereby.

(d)     Each Grantor shall take all actions reasonably necessary to (i) maintain and pursue each application and to obtain and maintain the registration of each Patent, Trademark, Domain Name and, to the extent consistent with past practices, Copyright included in the Collateral (now or hereafter existing), including by filing applications for renewal, affidavits of use, affidavits of noncontestability and, if reasonably necessary (taking into account the projected cost of such proceedings versus the expected benefit thereof), by initiating opposition and interference and cancellation proceedings against third parties, (ii) maintain and protect the secrecy or confidentiality of its Trade Secrets and (iii) otherwise protect and preserve such Grantor's rights in, and the validity or enforceability of, its Intellectual Property Collateral, in each case except where failure to do so (A) could not reasonably be expected to result in a Material Adverse Effect, or (B) is otherwise permitted under the Credit Agreement.

(e)     Each Grantor shall promptly notify the Agent of any material infringement or misappropriation of such Grantor's Patents, Trademarks, Copyrights or Trade Secrets of which it becomes aware and shall take such actions that, in the Grantors' commercially reasonable business judgment, are reasonable and appropriate under the circumstances to protect such Patent, Trademark, Copyright or Trade Secret, except where such infringement, misappropriation or dilution could not reasonably be expected to cause a Material Adverse Effect.

Section 4.04.     *Commercial Tort Claims*.  After the Closing Date, (i) if the event giving rise to the obligation under this <u>Section 4.04</u> occurs during the first three Fiscal Quarters of any Fiscal Year, on or before the date on which financial statements are required to be delivered pursuant to <u>Section 5.01(a)</u> of the Credit Agreement for the Fiscal Quarter in which the relevant event occurred or (ii) if the event giving rise to the obligation under this <u>Section 4.04</u> occurs during the fourth Fiscal Quarter of any Fiscal Year, on or before the date that is 60 days after the end of such Fiscal Quarter (or, in each of the cases of <u>clauses (i)</u> and <u>(ii)</u>, such longer period as the Administrative Agent may reasonably agree), each relevant Grantor shall notify the Administrative Agent of any Commercial Tort Claim with an individual value (as reasonably estimated by the Top Borrower) in excess of $10,000,000 acquired by it, together with an update to <u>Schedule 6</u> to the Cumulative Perfection Certificate containing a summary description thereof, and such Commercial Tort Claim (and the Proceeds thereof) shall automatically constitute Collateral, all upon the terms of this Security Agreement.

Section 4.05.     [*Reserved*].

Section 4.06.     *Grantors Remain Liable.*

(a)     Each Grantor (rather than the Administrative Agent or any Secured Party) shall remain liable (as between itself and any relevant counterparty) to observe and perform all the conditions and obligations to be observed and performed by it under any Contract relating to the Collateral, all in accordance with the terms and conditions thereof.  Neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any Contract by reason of or arising out of this Security Agreement or the receipt by the Administrative Agent or any other Secured Party of any payment relating to such Contract pursuant hereto, nor shall the Administrative Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Contract, to make any payment, to make any inquiry as to the nature or sufficiency of any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

(b)     Each Grantor assumes all liability and responsibility in connection with the Collateral acquired by it, and the liability of such Grantor to pay the Secured Obligations shall in no way be affected or diminished by reason of the fact that such Collateral may be lost, destroyed, stolen, damaged or for any reason whatsoever unavailable to such Grantor.

(c)     Notwithstanding anything herein to the contrary, each Grantor (rather than the Administrative Agent or any Secured Party) shall remain liable under each of the Accounts to observe and perform all of the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to such Accounts.  Neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Security Agreement or the receipt by the Administrative Agent or any other Secured Party of any payment relating to such Account pursuant hereto, nor shall the Administrative Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by them or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

<div align="center">

ARTICLE 5

REMEDIES

</div>

Section 5.01.     *Remedies*.

(a)     Each Grantor agrees that, at any time when an Event of Default has occurred and is continuing, the Administrative Agent may exercise any or all of the following rights and remedies (in addition to the rights and remedies existing under applicable Requirements of Law):

(i)     the rights and remedies provided in this Security Agreement, the Credit Agreement, or any other Loan Document; provided that this <u>Section 5.01(a)</u> shall not limit any rights available to the Administrative Agent prior to the occurrence of an Event of Default;

(ii)     the rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable Requirements of Law (including, without limitation, any law governing the exercise of a bank's right of setoff or bankers' Lien) when a debtor is in default under a security agreement;

<div align="center">-10-</div>

(iii)    without notice (except as specifically provided in <u>Section 7.01</u> or elsewhere herein), demand or advertisement of any kind to any Grantor or any other Person, but subject to the terms of any applicable lease agreement, personally, or by agents or attorneys, enter the premises of any Grantor where any Collateral is located (through self-help and without judicial process) to collect, receive, assemble, process, appropriate, sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon, the Collateral or any part thereof in one or more parcels at one or more public or private sales (which sales may be adjourned or continued from time to time with or without notice and may take place at such Grantor's premises or elsewhere), for cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as the Administrative Agent may deem commercially reasonable;

(iv)    upon at least three Business Days' written notice to the Top Borrower, (A) transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, and (B) exercise the voting and all other rights as a holder with respect thereto (whereupon the voting and other rights of such Grantor described in <u>Section 4.02(d)(i)</u> above shall immediately cease such that the Administrative Agent shall have the sole right to exercise such voting and other rights while the relevant Event of Default is continuing), to collect and receive all cash dividends, interest, principal and other distributions made thereon (it being understood that all Stock Rights received by any Grantor while the relevant Event of Default is continuing shall be received in trust for the benefit of the Administrative Agent and forthwith paid over to the Administrative Agent in the same form as so received (with any necessary endorsements)) and to otherwise act with respect to the Pledged Collateral as though the Administrative Agent was the outright owner thereof; and

(v)    to take possession of the Collateral or any part thereof, by directing such Grantor in writing to deliver the same to the Administrative Agent at any reasonable place or places designated by the Administrative Agent, in which event such Grantor shall at its own expense forthwith cause the same to be moved to the place or places so designated by the Administrative Agent and there delivered to the Administrative Agent;

(b)    Each Grantor acknowledges and agrees that compliance by the Administrative Agent, on behalf of the Secured Parties, with any applicable state or federal Requirements of Law in connection with a disposition of the Collateral will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(c)    Any Secured Party shall have the right in any public sale and, to the extent permitted by applicable Requirements of Law, in any private sale, to purchase all or any part of the Collateral so sold, free of any right of equity redemption that Grantor is permitted to release and waive pursuant to applicable Requirements of Law, and each Grantor hereby expressly releases such right to equity redemption to the extent permitted by applicable Requirements of Law.

(d)    Until the Administrative Agent is able to effect a sale, lease, transfer or other disposition of any particular Collateral under this <u>Section 5.01</u>, the Administrative Agent shall have the right to hold or use such Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving such Collateral or the value of such Collateral or for any other purpose deemed reasonably appropriate by the Administrative Agent.  At any time when an Event of Default has occurred and is continuing, the Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Administrative Agent and Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment.

(e)     Notwithstanding the foregoing, the Administrative Agent shall not be required to (i) make any demand upon, or pursue or exhaust any of their rights or remedies against, the Grantors, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Secured Obligations or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof, (ii) marshal the Collateral or any guarantee of the Secured Obligations or to resort to the Collateral or any such guarantee in any particular order, or (iii) effect a public sale of any Collateral.

(f)     Each Grantor recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof.  Each Grantor also acknowledges that any private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that no such private sale shall be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private.  The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit any Grantor or the issuer of any Pledged Collateral to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities Requirements of Law, even if any Grantor and the issuer would agree to do so.

(g)     Each of the Administrative Agent and each Secured Party (by its acceptance of the benefits of this Security Agreement) acknowledges and agrees that notwithstanding any other provisions in this Security Agreement or any other Loan Document, the exercise of rights or remedies with respect to certain Collateral and the enforcement of any security interests therein may be limited or restricted by, or require any consent, authorization, approval or license under, any Requirements of Law.

(h)     Notwithstanding the foregoing, any rights and remedies provided in this Section 5.01 shall be subject to each applicable Intercreditor Agreement.

Section 5.02.     *Grantors' Obligations Upon Default*.  Upon the request of the Administrative Agent at any time when an Event of Default has occurred and is continuing, each Grantor will:

(a)     at its own cost and expense (i) assemble and make available to the Administrative Agent, the Collateral and all books and records relating thereto at any place or places reasonably specified by the Administrative Agent, whether at such Grantor's premises or elsewhere, (ii) deliver all tangible evidence of its Accounts and Contract Rights (including, without limitation, all documents evidencing the Accounts and all Contracts) and such books and records to the Administrative Agent or to its representatives (copies of which evidence and books and records may be retained by such Grantor) and (iii) if the Administrative Agent so directs and in a form and in a manner reasonably satisfactory to the Administrative Agent, add a legend to the Accounts and the Contracts, as well as books, records and documents (if any) of such Grantor evidencing or pertaining to such Accounts and Contracts, which legend shall include an appropriate reference to the fact that such Accounts and Contracts have been assigned to the Administrative Agent and that the Administrative Agent has a security interest therein; and

(b)     subject to the terms of any applicable lease agreement, permit the Administrative Agent and/or its representatives and/or agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral or the books and records relating thereto, or both, to remove all or any part of the Collateral or the books and records relating thereto, or both, and to conduct sales of the Collateral, without any obligation to pay any Grantor for such use and occupancy.

Section 5.03.    *Intellectual Property Remedies*.

(a)    For the purpose of enabling the Administrative Agent to exercise the rights and remedies under this <u>Article 5</u> at any time when an Event of Default has occurred and is continuing, and at such time as the Administrative Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Administrative Agent a power of attorney to sign any document which may be required by the United States Patent and Trademark Office, the United States Copyright Office, domain name registrar or similar registrar in order to effect an absolute assignment of all right, title and interest in each registered Patent, Trademark, Domain Name and Copyright and each application for any such registration, and record the same.  At any time when an Event of Default has occurred and is continuing, the Administrative Agent may (i) declare the entire right, title and interest of such Grantor in and to each item of Intellectual Property Collateral to be vested in the Administrative Agent for the benefit of the Secured Parties, in which event such right, title and interest shall immediately vest in the Administrative Agent for the benefit of the Secured Parties, and the Administrative Agent shall be entitled to exercise the power of attorney referred to in this <u>Section 5.03</u> to execute, cause to be acknowledged and notarized and record such absolute assignment with the applicable agency or registrar; (ii) sell any Grantor's Inventory directly to any Person, including without limitation Persons who have previously purchased any Grantor's Inventory from such Grantor and in connection with any such sale or other enforcement of the Administrative Agent's rights under this Security Agreement and subject to any restrictions contained in applicable third party licenses entered into by such Grantor, sell Inventory which bears any Trademark owned by or licensed to any Grantor and any Inventory that is covered by any Intellectual Property Collateral owned by or licensed to any Grantor, and the Administrative Agent may finish any work in process and affix any relevant Trademark Collateral owned by or licensed to such Grantor, and sell such Inventory as provided herein; (iii) direct such Grantor to refrain, in which event such Grantor shall refrain, from using any Intellectual Property Collateral in any manner whatsoever, directly or indirectly; and (iv) assign or sell any Patent, Trademark, Copyright, Domain Name, and/or Trade Secret, in each case to the extent constituting Collateral, as well as the goodwill of such Grantor's business symbolized by any such Trademark and the right to carry on the business and use the assets of such Grantor in connection with which any such Trademark or Domain Name has been used.

(b)    Each Grantor hereby grants to the Administrative Agent an irrevocable (until the Termination Date), nonexclusive, royalty-free, worldwide license to its right to use, license or sublicense any Intellectual Property Collateral now owned or hereafter acquired by such Grantor, wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and (to the extent not prohibited by any applicable license) to all computer software and programs used for compilation or printout thereof.  The use of the license granted to the Administrative Agent pursuant to the preceding sentence may be exercised, at the option of the Administrative Agent, only when an Event of Default has occurred and is continuing; <u>provided</u>, <u>however</u>, that such licenses be granted hereunder with respect to Trademarks shall be subject to, with respect to the goods and/or services on which such Trademarks are used, the maintenance of quality standards that are sufficient to preserve the validity of such Trademarks and are consistent with past practices.

Section 5.04.    *Application of Proceeds*.

(a)    Subject to each applicable Intercreditor Agreement, the Administrative Agent shall apply the proceeds of any collection, sale, foreclosure or other realization of any Collateral as set forth in <u>Section 2.18(b)</u> of the Credit Agreement.

(b)    Except as otherwise provided herein or in any other Loan Document, the Administrative Agent shall have absolute discretion as to the time of application of any such proceeds, money or balance in accordance with this Security Agreement.  Upon any sale of Collateral by the Administrative Agent

WEIL:\95919440\8\74339.0038

(including pursuant to a power of sale granted by statute or under a judicial proceeding), a receipt by the Administrative Agent or of the officer making the sale of such proceeds, moneys or balances shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Administrative Agent or such officer or be answerable in any way for the misapplication thereof. It is understood that the Grantors shall remain jointly and severally liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Secured Obligations.

## ARTICLE 6
### ACCOUNT VERIFICATION; ATTORNEY IN FACT; PROXY

Section 6.01. *Account Verification*. The Administrative Agent may at any time and from time to time when an Event of Default has occurred and is continuing and upon three Business Days' notice to the relevant Grantor, in the Administrative Agent's own name, in the name of a nominee of the Administrative Agent, or in the name of any Grantor, communicate (by mail, telephone, facsimile or otherwise) with the Account Debtors of such Grantor, parties to Contracts with such Grantor and obligors in respect of Instruments of such Grantor to verify with such Persons, to the Administrative Agent's reasonable satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts, Contracts, Instruments, Chattel Paper, payment intangibles and/or other Receivables that constitute Collateral.

Section 6.02. *Authorization for the Administrative Agent to Take Certain Action*.

(a) Each Grantor hereby irrevocably authorizes the Administrative Agent and appoints the Administrative Agent (and all officers, employees or agents designated by the Administrative Agent) as its true and lawful attorney in fact (i) at any time that an Event of Default has occurred and is continuing, in the sole discretion of the Administrative Agent (in the name of such Grantor or otherwise), (A) to contact and enter into one or more agreements with the issuers of uncertificated securities that constitute Pledged Collateral or with securities intermediaries holding Pledged Collateral as may be necessary or advisable to give the Administrative Agent Control over such Pledged Collateral in accordance with the terms hereof, (B) to endorse and collect any cash proceeds of the Collateral and to apply the proceeds of any Collateral received by the Administrative Agent to the Secured Obligations as provided herein or in the Credit Agreement or any other Loan Document, but in any event subject to the terms of any applicable Intercreditor Agreement, (C) to demand payment or enforce payment of any Receivable in the name of the Administrative Agent or such Grantor and to endorse any check, draft and/or any other instrument for the payment of money relating to any such Receivable, (D) to sign such Grantor's name on any invoice or bill of lading relating to any Receivable, any draft against any Account Debtor of such Grantor, and/or any assignment and/or verification of any Receivable, (E) to exercise all of any Grantor's rights and remedies with respect to the collection of any Receivable and any other Collateral, (F) to settle, adjust, compromise, extend or renew any Receivable, (G) to settle, adjust or compromise any legal proceeding brought to collect any Receivable, (H) to prepare, file and sign such Grantor's name on a proof of claim in bankruptcy or similar document against any Account Debtor of such Grantor, (I) to prepare, file and sign such Grantor's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with any Receivable, (J) to change the address for delivery of mail addressed to such Grantor to such address as the Administrative Agent may designate and to receive, open and dispose of all mail addressed to such Grantor (provided copies of such mail are provided to such Grantor), (K) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for Permitted Liens), (L) to make, settle and adjust claims in respect of Collateral under policies of insurance and endorse the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance, (M) to obtain or maintain the policies of insurance of the types

-14-

referred to in Section 5.05 of the Credit Agreement or to pay any premium in whole or in part relating thereto and (N) to do all other acts and things or institute any proceeding which the Administrative Agent may reasonably deem to be necessary (pursuant to this Security Agreement and the other Loan Documents and in accordance with applicable Requirements of Law) to carry out the terms of this Security Agreement and to protect the interests of the Secured Parties; and, when and to the extent required pursuant to Section 9.03(a) of the Credit Agreement, such Grantor agrees to reimburse the Administrative Agent for any payment made in connection with this paragraph or any expense (including reasonable and documented attorneys' fees, court costs and out-of-pocket expenses) and other changes related thereto incurred by the Administrative Agent in connection with any of the foregoing (it being understood that any such sums shall constitute additional Secured Obligations); provided that, this authorization shall not relieve such Grantor of any of its obligations under this Security Agreement or under the Credit Agreement.

(b)     All prior acts of the Administrative Agent (or its attorneys or designees) are hereby ratified and approved by each Grantor.  The powers conferred on the Administrative Agent, for the benefit of the Administrative Agent and Secured Parties, under this Section 6.02 are solely to protect the Administrative Agent's interests in the Collateral and shall not impose any duty upon the Administrative Agent or any Secured Party to exercise any such powers.

Section 6.03.     *PROXY*.     EACH GRANTOR HEREBY IRREVOCABLY (UNTIL THE TERMINATION DATE) CONSTITUTES AND APPOINTS THE ADMINISTRATIVE AGENT AS ITS PROXY AND ATTORNEY-IN-FACT (AS SET FORTH IN SECTION 6.02 ABOVE) WITH RESPECT TO THE PLEDGED COLLATERAL, INCLUDING, DURING THE CONTINUATION OF AN EVENT OF DEFAULT AND SUBJECT TO ANY NOTICE REQUIREMENT AS SET FORTH HEREIN, THE RIGHT TO VOTE SUCH PLEDGED COLLATERAL, WITH FULL POWER OF SUBSTITUTION TO DO SO.  IN ADDITION TO THE RIGHT TO VOTE ANY SUCH PLEDGED COLLATERAL, THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT SHALL INCLUDE THE RIGHT, UPON THE OCCURRENCE AND CONTINUATION OF AN EVENT OF DEFAULT AND SUBJECT TO ANY NOTICE REQUIREMENT AS SET FORTH HEREIN, TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF SUCH PLEDGED COLLATERAL WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF SHAREHOLDERS, CALLING SPECIAL MEETINGS OF SHAREHOLDERS AND VOTING AT SUCH MEETINGS).  SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY SUCH PLEDGED COLLATERAL ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF SUCH PLEDGED COLLATERAL OR ANY OFFICER OR AGENT THEREOF), IN EACH CASE ONLY WHEN AN EVENT OF DEFAULT HAS OCCURRED AND IS CONTINUING AND UPON THREE BUSINESS DAYS' PRIOR WRITTEN NOTICE TO THE TOP BORROWER.

Section 6.04.     *NATURE OF APPOINTMENT; LIMITATION OF DUTY*.     THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT IN THIS ARTICLE 6 IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE TERMINATION DATE.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NEITHER THE ADMINISTRATIVE AGENT, NOR ANY SECURED PARTY, NOR ANY OF THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT TO THE EXTENT SUCH DAMAGES ARE ATTRIBUTABLE TO BAD FAITH, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF SUCH PERSON AS FINALLY DETERMINED BY A

COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE DECISION SUBJECT TO <u>SECTION 7.20</u> HEREOF; <u>PROVIDED</u>, THAT THE FOREGOING EXCEPTION SHALL NOT BE CONSTRUED TO OBLIGATE THE ADMINISTRATIVE AGENT TO TAKE OR REFRAIN FROM TAKING ANY ACTION WITH RESPECT TO THE COLLATERAL.

ARTICLE 7
GENERAL PROVISIONS

Section 7.01.    *Waivers*.    To the maximum extent permitted by applicable Requirements of Law, each Grantor hereby waives notice of the time and place of any judicial hearing in connection with the Administrative Agent's taking possession of the Collateral or of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made, including without limitation, any and all prior notice and hearing for any prejudgment remedy or remedies.   To the extent such notice may not be waived under applicable Requirements of Law, any notice made shall be deemed reasonable if sent to any Grantor, addressed as set forth in <u>Article 8</u>, at least 10 days prior to (a) the date of any such public sale or (b) the time after which any such private disposition may be made. To the maximum extent permitted by applicable Requirements of Law, each Grantor waives all claims, damages, and demands against the Administrative Agent arising out of the repossession, retention or sale of the Collateral, except those arising out of bad faith, gross negligence or willful misconduct on the part of the Administrative Agent as determined by a court of competent jurisdiction in a final and non-appealable judgment.   To the extent it may lawfully do so, each Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent, any valuation, stay (other than an automatic stay under any applicable Debtor Relief Law), appraisal, extension, moratorium, redemption or similar law and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Security Agreement, or otherwise.   Except as otherwise specifically provided herein, each Grantor hereby waives presentment, demand, protest, any notice (to the maximum extent permitted by applicable Requirements of Law) of any kind or all other requirements as to the time, place and terms of sale in connection with this Security Agreement or any Collateral.

Section 7.02.    *Limitation on Administrative Agent's Duty with Respect to the Collateral*.   The Administrative Agent shall not have any obligation to clean or otherwise prepare the Collateral for sale. The Administrative Agent shall use reasonable care with respect to the Collateral in its possession; <u>provided</u> that the Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to which it accords its own property. The Administrative Agent shall not have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Administrative Agent, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.   To the extent that applicable Requirements of Law impose duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it would be commercially reasonable for the Administrative Agent, subject to <u>Section 7.06</u>, (a) to elect not to incur expenses to prepare Collateral for disposition or otherwise to transform raw material or work in process into finished goods or other finished products for disposition, (b) to elect not to obtain third party consents for access to Collateral to be disposed of (unless expressly required under any applicable lease agreement), or to obtain or, if not otherwise required by any Requirements of Law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to elect not to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (d) to exercise collection remedies against Account Debtors and other Persons

-16-

obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as any Grantor, for expressions of interest in acquiring all or any portion of such Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (k) to purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss in connection with any collection or disposition of Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of Collateral or (l) to the extent deemed appropriate by the Administrative Agent to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any of the Collateral. Each Grantor acknowledges that the purpose of this Section 7.02 is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent would be commercially reasonable in the Administrative Agent's exercise of remedies with respect to the Collateral and that other actions or omissions by the Administrative Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 7.02. Without limitation upon the foregoing, nothing contained in this Section 7.02 shall be construed to grant any rights to any Grantor or to impose any duties on the Administrative Agent that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this Section 7.02.

Section 7.03.     *Compromises and Collection of Collateral*.   Each Grantor and the Administrative Agent recognize that setoffs, counterclaims, defenses and other claims may be asserted by obligors with respect to certain of the Receivables, that certain of the Receivables may be or become uncollectible in whole or in part and that the expense and probability of success in litigating a disputed Receivable may exceed the amount that reasonably may be expected to be recovered with respect to any Receivable. In view of the foregoing, each Grantor agrees that the Administrative Agent may at any time and from time to time, if an Event of Default has occurred and is continuing and upon three Business Days' notice to the relevant Grantor, compromise with the obligor on any Receivable, accept in full payment of any Receivable such amount as the Administrative Agent in its sole and reasonable discretion shall determine or abandon any Receivable, and any such action by the Administrative Agent shall be commercially reasonable so long as the Administrative Agent acts reasonably in good faith based on information known to it at the time it takes any such action.

Section 7.04.     *Administrative Agent Performance of Debtor Obligations*.   Without having any obligation to do so, the Administrative Agent may, at any time when an Event of Default has occurred and is continuing and upon prior written notice to the Top Borrower, perform or pay any obligation which any Grantor has agreed to perform or pay under this Security Agreement and which obligation is due and unpaid and not being contested by such Grantor in good faith, and such Grantor shall reimburse the Administrative Agent for any amounts paid by the Administrative Agent pursuant to this Section 7.04 as a Secured Obligation payable in accordance with Section 9.03(a) of the Credit Agreement.

Section 7.05.     *No Waiver; Amendments; Cumulative Remedies*.   No delay or omission of the Administrative Agent (subject to the provisions of Section 8.01 of the Credit Agreement) to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any Default or an acquiescence therein, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by the Grantors and the Administrative

Agent with the concurrence or at the direction of the Lenders to the extent required under <u>Section 9.02</u> of the Credit Agreement and then only to the extent in such writing specifically set forth. All rights and remedies contained in this Security Agreement or afforded by law shall be cumulative and all shall be available to the Administrative Agent until the Termination Date.

Section 7.06.  *Limitation by Law; Severability of Provisions*.  All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable Requirements of Law, and all of the provisions of this Security Agreement are intended to be subject to all applicable Requirements of Law that may be controlling and to be limited to the extent necessary so that such provisions do not render this Security Agreement invalid, unenforceable or not entitled to be recorded or registered, in whole or in part.  To the extent permitted by applicable Requirements of Law, any provision of this Security Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions of this Security Agreement; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  If the exercise of rights or remedies with respect to certain Collateral and the enforcement of any security interest therein require any consent, authorization, approval or license under any Requirements of Law, no such action shall be taken unless and until all requisite consents, authorizations approvals or licenses have been obtained.

Section 7.07.  *Security Interest Absolute*.  All rights of the Administrative Agent hereunder, the security interests granted hereunder and all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Loan Document, any agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument relating to the foregoing, (c) any exchange, release or non-perfection of any Lien on any Collateral, or any release or amendment or waiver of or consent under or departure from any guaranty, securing or guaranteeing all or any of the Secured Obligations, (d) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Grantor, (e) any exercise or non-exercise, or any waiver of, any right, remedy, power or privilege under or in respect of this Security Agreement or any other Loan Document or (f) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor in respect of the Secured Obligations or this Security Agreement (other than a termination of any Lien contemplated by <u>Section 7.12</u> or the occurrence of the Termination Date).

Section 7.08.  *Benefit of Security Agreement*.  The terms and provisions of this Security Agreement shall be binding upon and inure to the benefit of each Grantor, the Administrative Agent and the Secured Parties and their respective successors and permitted assigns (including all Persons who become bound as a debtor to this Security Agreement).  No sale of participations, assignments, transfers, or other dispositions of any agreement governing the Secured Obligations or any portion thereof or interest therein shall in any manner impair the Lien granted to the Administrative Agent hereunder for the benefit of the Administrative Agent and the Secured Parties.

Section 7.09.  *Survival of Representations*.  All representations and warranties of each Grantor contained in this Security Agreement shall survive the execution and delivery of this Security Agreement until the Termination Date.

Section 7.10.  *Additional Subsidiaries*.  Upon the execution and delivery by any Restricted Subsidiary of a Joinder Agreement, such Restricted Subsidiary shall become a Grantor hereunder with the

-18-

same force and effect as if such Restricted Subsidiary was originally named as a Grantor herein. The execution and delivery of any such instrument shall not require the consent of any other Grantor or any other Person. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Security Agreement.

Section 7.11. *Headings*. The titles of and section headings in this Security Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Security Agreement.

Section 7.12. *Termination or Release*.

(a)  This Security Agreement shall continue in effect until the Termination Date, and the Liens granted hereunder shall automatically be released in the circumstances described in Article 8 of the Credit Agreement.

(b)  In connection with any termination or release pursuant to paragraph (a) above, the Administrative Agent shall promptly execute (if applicable) and deliver to any Grantor, at such Grantor's expense, all UCC termination statements and similar documents that such Grantor shall reasonably request to evidence and/or effectuate such termination or release and all Pledged Collateral. Any execution and delivery of documents pursuant to this Section 7.12 shall be without recourse to or representation or warranty by the Administrative Agent or any Secured Party. The Borrowers shall reimburse the Administrative Agent for all reasonable and documented costs and out-of-pocket expenses, including the fees and expenses of one outside counsel (and, if necessary, of one local counsel in any relevant jurisdiction), incurred by it in connection with any action contemplated by this Section 7.12 pursuant to and to the extent required by Section 9.03(a) of the Credit Agreement.

(c)  The Administrative Agent shall have no liability whatsoever to any other Secured Party as the result of any release of Collateral by it in accordance with (or which the Administrative Agent in good faith believes to be in accordance with) the terms of this Section 7.12.

Section 7.13. *Entire Agreement*. This Security Agreement, together with the other Loan Documents and each Intercreditor Agreement, embodies the entire agreement and understanding between each Grantor and the Administrative Agent relating to the Collateral and supersedes all prior agreements and understandings between any Grantor and the Administrative Agent relating to the Collateral.

Section 7.14. *CHOICE OF LAW*. **THIS SECURITY AGREEMENT, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS SECURITY AGREEMENT, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

Section 7.15. *CONSENT TO JURISDICTION; CONSENT TO SERVICE OF PROCESS*.

(a)  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK (OR ANY APPELLATE COURT THEREFROM) OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL (EXCEPT AS PERMITTED BELOW) BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, FEDERAL COURT. EACH PARTY HERETO AGREES THAT

SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY REGISTERED MAIL ADDRESSED TO SUCH PERSON SHALL BE EFFECTIVE SERVICE OF PROCESS AGAINST SUCH PERSON FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT. EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE REQUIREMENTS OF LAW. EACH PARTY HERETO AGREES THAT THE ADMINISTRATIVE AGENT RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION SOLELY IN CONNECTION WITH THE EXERCISE OF ITS RIGHTS IN RESPECT OF THE COLLATERAL UNDER THIS SECURITY AGREEMENT.

(b) TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL) DIRECTED TO IT AT ITS ADDRESS FOR NOTICES AS PROVIDED FOR IN SECTION 9.01 OF THE CREDIT AGREEMENT. EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY LOAN DOCUMENT THAT SERVICE OF PROCESS WAS INVALID AND INEFFECTIVE. NOTHING IN THIS SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS SECURITY AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE REQUIREMENTS OF LAW.

Section 7.16. *WAIVER OF JURY TRIAL*. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SECURITY AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 7.17. *Indemnity*. Each Grantor hereby agrees to indemnify the Indemnitees, as, and to the extent, set forth in Section 9.03 of the Credit Agreement.

Section 7.18. *Counterparts*. This Security Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Security Agreement by facsimile or by email as a ".pdf" or ".tif" attachment or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Security Agreement.

Section 7.19. *INTERCREDITOR AGREEMENT GOVERNS*.

Section 7.20.     NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE LIENS AND SECURITY INTERESTS GRANTED TO THE ADMINISTRATIVE AGENT FOR THE BENEFIT OF THE SECURED PARTIES PURSUANT TO THIS SECURITY AGREEMENT AND THE EXERCISE OF ANY RIGHT OR REMEDY BY THE ADMINISTRATIVE AGENT WITH RESPECT TO ANY COLLATERAL HEREUNDER ARE SUBJECT TO THE PROVISIONS OF EACH INTERCREDITOR AGREEMENT.     IN THE EVENT OF ANY CONFLICT BETWEEN THE PROVISIONS OF ANY INTERCREDITOR AGREEMENT AND THIS SECURITY AGREEMENT, THE PROVISIONS OF SUCH INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL. THE REQUIREMENTS OF THIS SECURITY AGREEMENT TO DELIVER PLEDGED COLLATERAL AND ANY CERTIFICATES, INSTRUMENTS OR DOCUMENTS IN RELATION THERETO TO THE AGENT OR ANY OBLIGATION WITH RESPECT TO THE DELIVERY, TRANSFER, CONTROL, NOTATION OR PROVISION OF VOTING RIGHTS WITH RESPECT TO ANY COLLATERAL SHALL BE DEEMED SATISFIED BY THE DELIVERY, TRANSFER, CONTROL, NOTATION OR PROVISION IN FAVOR OF THE PARTY SPECIFIED IN THE APPLICABLE INTERCREDITOR AGREEMENT.

Section 7.21.     *Waiver of Consequential Damages, Etc*.  To the extent permitted by applicable law, none of the Grantors or Secured Parties shall assert, and each hereby waives, any claim against each other or any Related Party thereof, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Security Agreement or any agreement or instrument contemplated hereby, except, in the case of any claim by any Indemnitee against any of the Grantors, to the extent such damages would otherwise be subject to indemnification pursuant to the terms of Section 7.17.

Section 7.22.     *Successors and Assigns.*  Whenever in this Security Agreement any party hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party; and all covenants, promises and agreements by or on behalf of any Grantor or the Administrative Agent in this Security Agreement shall bind and inure to the benefit of their respective successors and permitted assigns.  Except in a transaction expressly permitted under the Credit Agreement, no Grantor may assign any of its rights or obligations hereunder without the written consent of the Administrative Agent.

Section 7.23.     *Survival of Agreement.*     Without limiting any provision of the Credit Agreement or Section 7.17 hereof, all covenants, agreements, indemnities, representations and warranties made by the Grantors in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Security Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such Lender or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect until the Termination Date, or with respect to any individual Grantor until such Grantor is otherwise released from its obligations under this Security Agreement in accordance with the terms hereof.

ARTICLE 8
NOTICES

Section 8.01.     *Sending Notices*.  Any notice required or permitted to be given under this Security Agreement shall be delivered in accordance with Section 9.01 of the Credit Agreement (it being understood and agreed that references in such Section to "herein," "hereunder" and other similar terms shall be deemed to be references to this Security Agreement).

## ARTICLE 9
### THE ADMINISTRATIVE AGENT

UBS has been appointed Administrative Agent for the Lenders hereunder pursuant to Article 8 of the Credit Agreement. It is expressly understood and agreed by the parties to this Security Agreement that any authority conferred upon the Administrative Agent hereunder is subject to the terms of the delegation of authority made by the Lenders to the Administrative Agent pursuant to the Credit Agreement, and that the Administrative Agent has agreed to act (and any successor Administrative Agent shall act) as such hereunder only on the express conditions contained in such Article 8. Any successor Administrative Agent appointed pursuant to Article 8 of the Credit Agreement shall be entitled to all the rights, interests and benefits of the Administrative Agent hereunder.

By accepting the benefits of this Security Agreement and any other Loan Document, each Secured Party expressly acknowledges and agrees that this Security Agreement and each other Loan Document may be enforced only by the action of the Administrative Agent, and that such Secured Party shall not have any right individually to seek to enforce or to enforce this Security Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Administrative Agent for the benefit of the Secured Parties upon the terms of this Security Agreement and the other Loan Documents.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each Grantor and the Administrative Agent have executed this Security Agreement as of the date first above written.

DAWN INTERMEDIATE, INC.
SERTA SIMMONS BEDDING, LLC
SIMMONS BEDDING COMPANY, LLC
SSB LOGISTICS, LLC
SSB MANUFACTURING COMPANY
SSB NYC, LLC
THE SIMMONS MANUFACTURING CO., LLC

By: _____
 Name: Kristen McGuffey
 Title: Executive Vice President, General
   Counsel and Secretary

WORLD OF SLEEP OUTLETS, LLC
SIMMONS CONTRACT SALES, LLC

By: _____
 Name: Kristen McGuffey
 Title: Vice President, General Counsel and
   Secretary

DREAMWELL, LTD.

By: _____
 Name: Kristen McGuffey
 Title: Vice President and Secretary

SERTA INTERNATIONAL HOLDCO, LLC

By: _____
 Name: Kristen McGuffey
 Title: Authorized Person

NATIONAL BEDDING COMPANY L.L.C.

By: _____
 Name: Kristen McGuffey
 Title: General Counsel and Secretary

UBS AG, STAMFORD BRANCH
as the Administrative Agent

By: _____
     Name:
     Title:

[Reserved.]

[FORM OF]
## U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "First Lien Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, Inc., a Delaware corporation ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party thereto, UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders. Unless otherwise defined herein, terms defined in the First Lien Term Loan Agreement and used herein shall have the meanings given to them in the First Lien Term Loan Agreement.

Pursuant to the provisions of Section 2.17(f) of the First Lien Term Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Promissory Notes evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, (iv) it is not a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code and (v) no payments in connection with any Loan Document are effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent and the Top Borrower with a duly executed certificate of its non-U.S. person status on IRS Form W-8BEN or W-8BEN-E (as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstances renders the information on this certificate obsolete, expired or inaccurate in any respect, the undersigned shall promptly so inform each of the Top Borrower and the Administrative Agent in writing and deliver promptly to the Top Borrower and the Administrative Agent an updated certificate or other appropriate documentation (including any new documentation reasonably requested by the Top Borrower or the Administrative Agent) or promptly notify the Top Borrower and the Administrative Agent in writing of its legal ineligibility to do so, and (2) the undersigned shall have at all times furnished each of the Top Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF LENDER]**

By: _____

Name:
Title:

Date: [●] [●], 20[●]

[FORM OF]
U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "First Lien Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, Inc., a Delaware corporation ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party thereto, UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders. Unless otherwise defined herein, terms defined in the First Lien Term Loan Agreement and used herein shall have the meanings given to them in the First Lien Term Loan Agreement.

Pursuant to the provisions of Section 2.17(f) of the First Lien Term Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, (iv) it is not a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code, and (v) no payments in connection with any Loan Document are effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished its participating Lender with a duly executed certificate of its non-U.S. person status on IRS Form W-8BEN or W-8BEN-E (as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstances renders the information on this certificate obsolete, expired or inaccurate in any respect, the undersigned shall promptly so inform such Lender in writing and deliver promptly to such Lender an updated certificate or other appropriate documentation (including any new documentation reasonably requested by such Lender) or promptly notify such Lender in writing of its legal ineligibility to do so, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF PARTICIPANT]**

By: _____
Name:
Title:

Date: [●] [●], 20[●]

[FORM OF]
## U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "First Lien Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, Inc., a Delaware corporation ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party thereto, UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders. Unless otherwise defined herein, terms defined in the First Lien Term Loan Agreement and used herein shall have the meanings given to them in the First Lien Term Loan Agreement.

Pursuant to the provisions of Section 2.17(f) of the First Lien Term Loan Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Promissory Note(s)) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Promissory Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to the First Lien Term Loan Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members claiming the portfolio interest exemption is a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, (v) none of its direct or indirect partners/members claiming the portfolio interest exemption is a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code, and (vi) no payments in connection with any Loan Document are effectively connected with the undersigned's or any of its direct or indirect partners/members' conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent and the Top Borrower with a duly executed IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E (as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstances renders the information on this certificate obsolete, expired or inaccurate in any respect, the undersigned shall promptly so inform the Top Borrower and the Administrative Agent in writing and deliver promptly to the Top Borrower and the Administrative Agent an updated certificate or other appropriate documentation (including any new documentation reasonably requested by the Top Borrower or the Administrative Agent) or promptly notify the Top Borrower and the Administrative Agent in writing of its legal ineligibility to do so, and (2) the undersigned shall have at all times furnished the Top Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[Signature Page Follows]

O-3-1

[NAME OF LENDER]

By: _____

     Name:

     Title:

Date: [●] [●], 20[●]

WEIL:\95919473\9\74339.0038

[FORM OF]
U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "First Lien Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, Inc., a Delaware corporation ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party thereto, UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders. Unless otherwise defined herein, terms defined in the First Lien Term Loan Agreement and used herein shall have the meanings given to them in the First Lien Term Loan Agreement.

Pursuant to the provisions of Section 2.17(f) of the First Lien Term Loan Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members claiming the portfolio interest exemption is a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, (v) none of its direct or indirect partners/members claiming the portfolio interest exemption is a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code, and (vi) no payments in connection with any Loan Document are effectively connected with the undersigned's or any of its direct or indirect partners/members' conduct of a U.S. trade or business.

The undersigned has furnished its participating Lender with a duly executed IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E (as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstances renders the information on this certificate obsolete, expired or inaccurate in any respect, the undersigned shall promptly so inform such Lender in writing and deliver promptly to such Lender an updated certificate or other appropriate documentation (including any new documentation reasonably requested by such Lender) or promptly notify such Lender in writing of its legal ineligibility to do so, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF PARTICIPANT]**

By: _____
　　　Name:
　　　Title:

Date: [●] [●], 20[●]

[FORM OF]
SOLVENCY CERTIFICATE

[●] [●], 20[●]

This Solvency Certificate (this "Solvency Certificate") is being executed and delivered pursuant to Section 4.01(i) of that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "First Lien Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, Inc., a Delaware corporation ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party thereto, UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders.  Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Term Loan Agreement.

I, [●], the **[Chief Financial Officer/equivalent officer]** of the Top Borrower, in such capacity and not in an individual capacity, hereby certify as follows:

(1)     I am generally familiar with the businesses, financial position and assets of the Top Borrower and its subsidiaries, on a consolidated basis, and am duly authorized to execute this Solvency Certificate on behalf of the Top Borrower pursuant to the First Lien Term Loan Agreement; and

(2)     As of the date hereof and after giving effect to the Transactions and the incurrence of the indebtedness and obligations being incurred in connection with the First Lien Term Loan Agreement and the Transactions, that, (i) the sum of the debt (including contingent liabilities) of the Top Borrower and its subsidiaries, taken as a whole, does not exceed the fair value of the assets of the Top Borrower and its subsidiaries, taken as a whole, (ii) the present fair saleable value of the assets (on a going concern basis) of the Top Borrower and its subsidiaries, taken as a whole, is not less than the amount that will be required to pay the probable liabilities of the Top Borrower and its subsidiaries, taken as a whole, on their debts as they become absolute and matured in accordance with their terms; (iii) the capital of the Top Borrower and its subsidiaries, taken as a whole, is not unreasonably small in relation to the business of the Top Borrower and its subsidiaries, taken as a whole, contemplated as of the date hereof; and (iv) the Top Borrower and its subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations and contingent liabilities) beyond their ability to pay such debt as they mature in accordance with their terms.

For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

[Signature Page Follows]

IN WITNESS WHEREOF, I have executed this Solvency Certificate on the date first above written.

SERTA SIMMONS BEDDING, LLC

By: _____
     Name:
     Title: