DEFENDANTS' EXHIBIT 332
Part 3 of 11

levered and in need of additional liquidity to fund its operations. Despite what I understand was an exhaustive marketing process and outreach to third parties, the most compelling terms came from certain of the Company's existing lenders, who were willing to provide new money financing on a super-priority basis. When the 2020 Transaction closed in June 2020, the Company received an infusion of $200 million in new money, providing it with the breathing space necessary to avoid an unplanned restructuring process that would not have maximized enterprise value. However, given the Company's substantial debt burden, I understand that it remained in need of a comprehensive solution to right-size its balance sheet.

52. The COVID-19 pandemic exacerbated this reality. I understand that supply chain disruptions and reduced consumer demand resulted in a significant contraction of the Company's business, and while the Debtors were able to weather the difficulties in 2020 and 2021, in April 2022, the Debtors, through Evercore, initiated outreach to approximately twenty (20) potential third-party financing parties seeking proposals to refinance its existing capital structure. Ultimately, however, I understand that the Debtors did not receive any proposals through this competitive financing process and, as a result, shifted their focus to engagement with their current lenders regarding the terms of a comprehensive restructuring.

53. In September 2022, the Company and Advisors began actively engaging in discussions and negotiations regarding restructuring alternatives with (i) an ad hoc group of PTL Lenders (the "**PTL Lender Group**"), represented by Gibson, Dunn & Crutcher LLP, as legal counsel, and Centerview Partners LLC, as investment banker (the "**PTL Advisors**"), (ii) an ad hoc group of Non-PTL Lenders under the Non-PTL Term Loan Facility (the "**Non-PTL Term Loan Lender Group**") represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, as legal counsel, and PJT Partners, Inc., as investment banker (the "**Non-PTL Advisors**" and, together with the

25

PTL Advisors, the "**Lender Group Advisors**"). In October 2022, the Lender Group Advisors executed non-disclosure agreements and received access to a virtual data room maintained by the Company containing over 19,000 pages for the purpose of assessing a potential restructuring transaction.

54. Shortly thereafter, in November 2022, the Non-PTL Term Loan Lender Group filed a complaint commencing renewed litigation against Serta Simmons Bedding and the PTL Lender Group with respect to the 2020 Transaction—*i.e.*, the Non-PTL State Court Litigation—and, on the same day, sent a restructuring proposal to the Company and the PTL Lender Group that the Company and the PTL Lender Group ultimately deemed was unactionable and out of proportion with the Non-PTL Lenders' rights. In light of the Non-PTL State Court Litigation, the Company revoked data room access for the Non-PTL Advisors.

55. With the 2020 Transaction Litigation in the background, the Debtors continued to have constructive discussions with the PTL Lender Group. In November 2022, certain members of the PTL Lender Group executed non-disclosure agreements (the "**PTL Holder NDAs**") and attended in-person meetings in New York with the Debtors' management team to discuss the Debtors' financial performance and go-forward business plan. Such discussions ultimately led to the exchange of term sheets between the Debtors and PTL Lender Group setting forth indicative terms of a potential restructuring transaction, including potential treatment of the Non-PTL Claims. In December 2022, four (4) members of the Non-PTL Term Loan Lender Group signed non-disclosure agreements with the Company to receive diligence in connection with settlement discussions. In subsequent meetings among the Advisors, PTL Advisors, Non-PTL Advisors, and certain principals from the PTL Lender Group and the Non-PTL Term Loan Lender Group, the parties negotiated further and exchanged multiple settlement proposals.

26

56. The Company's business-plan diligence with the PTL Advisors and PTL Lender Group continued for nearly five (5) months, from September 2022 through January 2023. The Debtor held several diligence sessions with the PTL Lender Group and PTL Advisors to elaborate on, among other topics: (i) expected views of the bedding market in 2023-24, (ii) the Company's 2023 budget and long-range business plan, (iii) pricing, product mix, and channel engagement strategies, (iv) ongoing and planned cost-saving actions, and (v) value-accretive capital expenditure projects. The Company and its Advisors also comprehensively addressed over one hundred (100) diligence questions by the PTL Lender Group and PTL Advisors in an effort to instruct them on various aspects of the Debtors' financial performance and go-forward business plan.

C.  **Restructuring Support Agreement and Plan**

57. On January 23, 2023, following months of extensive, arm's-length negotiations, the Debtors reached an agreement with certain members of the PTL Lender Group on the Restructuring Support Agreement, including the Plan, pursuant to which the Consenting Creditors (representing approximately 78% of the PTL Facility) and the Consenting Equity Holders have agreed to support the Restructuring as set forth in the Plan, which will result in a reduction of the Company's funded indebtedness by approximately $1.59 billion. The Plan and the Restructuring Support Agreement are the culmination of the Company's years-long effort to right-size its balance sheet for the go-forward health of the Company. The reduced debt burden and exit financing anticipated under the Plan will provide the Debtors with sufficient liquidity, not only to continue funding their operations, but to make the necessary capital expenditures and investments to ensure that the Company will remain an industry leader in mattresses and other sleep products.

58. While discussions with the Non-PTL Term Loan Lender Group have not yet resulted in a consensual settlement (as of the Petition Date), the Debtors and the PTL Lender Group intend to continue constructive discussions with the Non-PTL Lenders during these chapter 11 cases. Ultimately, the Debtors and Advisors view the 2020 Transaction Litigation as the sole remaining impediment to a comprehensive restructuring of the Company's balance sheet, and accordingly intend to resolve such litigation during the pendency of these chapter 11 cases so that the Debtors and their management can re-focus their efforts on the operation of their business.

**D.    DIP to Exit Financing**

59. To fund operations during these chapter 11 cases, pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Claims with Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**DIP Motion**"), the Debtors have secured postpetition financing (the "**DIP Financing**") in the form of a superpriority senior secured debtor-in-possession asset-based loan ("**ABL**") credit facility in an aggregate principal amount of $125,000,000 (the "**DIP Facility**"), to be provided by Eclipse Business Capital, LLC, as administrative agent (in such capacity, the "**DIP Agent**"), and the lenders from time to time party thereto (the "**DIP Lenders**" and each a "**DIP Lender**").o be led by Eclipse Business Capital, LLC.

60. As set forth more fully in the *Declaration of Brent T. Banks in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Claims with Superpriority Administrative Expense Status, (B) Adequate Protection to Certain*

28

*Prepetition Lenders, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, the Debtors determined to enter into the DIP Facility following an extensive prepetition marketing process during which Evercore contacted existing lenders, traditional lenders, and alternative lenders. In total, Evercore contacted twenty-two (22) parties, of which eleven (11) parties executed non-disclosure agreements. Ultimately, the DIP Lenders provided the most favorable terms, and on the Effective Date, claims under the DIP Facility will be indefeasibly paid in full in Cash upon the Effective Date, and all letters of credit issued under the DIP Credit Agreement shall be cash collateralized in accordance with the terms of the DIP Credit Agreement, unless otherwise agreed to by the Debtors, DIP Agent, and DIP Lenders.

## IV. The First Day Motions

61. The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession. I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in the success of these chapter 11 cases, and best serves the Debtors' estates and creditors' interests. The facts set forth in each First Day Motion are incorporated herein by reference. Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motions. Below is an overview of each of the First Day Motions.

A. **Joint Administration Motion**

62. Pursuant to the *Emergency Motion of Debtors Pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1 for Order Directing Joint Administration of Chapter 11 Cases* filed concurrently herewith, the Debtors request entry of an order directing consolidation of these chapter 11 cases for procedural purposes only. The Debtors are all under common

29

ownership under Dawn Intermediate. I believe joint administration of the Debtors' chapter 11 cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders. Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. The United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") and other parties in interest would similarly benefit from joint administration of these cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

63. I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes. It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

B. **Scheduling Motion**

64. Pursuant to the terms of the Restructuring Support Agreement, the Consenting Creditors have agreed to support the Plan, provided that certain terms, conditions and milestones are satisfied, including that the Confirmation Hearing commence no later than May 22, 2023 and that the order confirming the Plan be entered no later than June 5, 2023. To ensure that the Plan is timely confirmed, the Debtors seek to resolve a number of outstanding litigation issues related to the 2020 Transaction pursuant to the Adversary Proceeding. I understand that the outcome of the Adversary Proceeding will dictate how distributions under the Plan are made and is therefore central to confirmation of the Plan. Accordingly, to confirm the Plan on the four-month timeline set forth in the Restructuring Support Agreement, with the

Scheduling Motion, the Debtors are requesting that the Court enter an order scheduling certain dates in connection with the confirmation of the Plan and the Adversary Proceeding, including:

    i. a hearing on March 23, 2023 to consider approval of the Disclosure Statement and certain deadlines related thereto;

    ii. a hearing on May 8, 2023 to consider confirmation of the Plan;

    iii. certain dates and deadlines in connection with the Confirmation Hearing and all related discovery; and

    iv. scheduling certain dates and deadlines in connection with the Adversary Proceeding.

65. I believe that the delay associated with an unnecessarily extended discovery and confirmation schedule would risk erosion of business value and that an efficient schedule is in the best interest of all stakeholders. Based on the foregoing, I believe that the relief requested in the Scheduling Motion is reasonable under the circumstances, is in the best interests of the Debtors, their estates, and all other parties in interest, and should be granted in all respects.

## C. Cash Management Motion

66. Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue their Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, (C) Continue Intercompany Transactions, and (D) Continue Utilizing Employee Credit Cards and P-Card Programs; and (II) Granting Related Relief* filed contemporaneously herewith (the "**Cash Management Motion**"), the Debtors request authority to: (i) continue participating in the Debtors' existing cash management system (the "**Cash Management System**"), including, without limitation, to continue to maintain the Debtors' existing bank accounts and business forms; (ii) implement changes to the Cash Management System in the ordinary course of business insofar as such changes relate to the Debtors' participation in or control of the Cash Management System,

31

including, without limitation, opening new or closing existing bank accounts owned by the Debtors; (iii) continue utilizing the Amex Employee Credit Cards and Amex P-Cards (as defined below) and pay all obligations related thereto; (iv) continue to perform under and honor intercompany transactions in the ordinary course of business, and make certain payments on behalf of certain non-debtor affiliates; (v) provide administrative expense priority for postpetition intercompany claims against the Debtors; and (vi) honor and pay all prepetition and postpetition Bank Fees (as defined below) payable by the Debtors. The Debtors are also requesting that the Court authorize the Banks to continue to charge bank fees, if any, and to charge back returned items to the bank accounts, whether such items are dated before, on, or after the commencement of these chapter 11 cases.

67. As described more fully in the Cash Management Motion, in the ordinary course of their business, the Debtors have historically used the Cash Management System to collect receipts and to fund their operations, as well as the operations of certain non-debtor affiliates. It is my understanding that the Cash Management System is tailored to meet the Debtors' needs. The Cash Management System allows the Debtors to efficiently collect and transfer the cash generated by their business and pay their financial and other obligations. It also enables the Debtors to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of the Debtors' approximately 21 bank accounts (together with any other bank accounts the Debtors may open in the ordinary course of their business, the "**Bank Accounts**") owned by the Debtors and maintained with multiple banks (each a "**Bank**" and collectively, the "**Banks**"). All of the Bank Accounts are maintained with authorized depositories under the Operating Guidelines and Reporting Requirements for Debtors in Possession and

32

Trustees (the "**UST Operating Guidelines**") published by the Office of the United States Trustee for Region 7.

68. The Debtors' primary Bank is Wells Fargo Bank, N.A. ("**Wells Fargo**"), where the Debtors maintain 17 of the 21 Bank Accounts. The Debtors also maintain Bank Accounts with 3 other Banks in addition to Wells Fargo: Citibank, N.A. ("**Citibank**"), JPMorgan Chase Bank, N.A. ("**JPMorgan**"), and BMO Harris Bank, N.A. ("**BMO Harris**"), as listed on Schedule 1 annexed to the Cash Management Motion.

69. As described more fully in the Cash Management Motion, the Debtors engage in intercompany transactions with each other and with certain of their Non-Debtor Affiliates in the ordinary course of their business (collectively, the "**Intercompany Transactions**" and each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "**Intercompany Claim**"). The Intercompany Transactions are documented and the Debtors can ascertain, trace, and account for the transactions at all times. Because there may be Intercompany Claims as a result of these transactions, and in order to ensure that each Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors have requested that all postpetition Intercompany Transactions occurring in the ordinary course of business be accorded administrative expense status. As a result of such administrative expense status, each entity utilizing the funds flowing through the Cash Management System will continue to bear ultimate repayment responsibility for these ordinary course transactions.

70. The Debtors are further requesting that the Court authorize the Banks to receive, process, honor, and pay, at the Debtors' direction and to the extent of funds on deposit, any and all checks drawn or electronic funds transfers requested or to be requested by the Debtors

33

relating to the relief sought in the First Day Motions. Without the ability to transfer funds through banks and financial institutions, the Debtors will not be able to operate or reorganize.

71. I believe that any disruption to the Debtors' Cash Management System would have a severe and adverse impact upon the Debtors' reorganization efforts. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and all parties in interest and should be granted.

**D.  Vendor Motion**

72. Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay (A) Critical Vendor Claims, (B) Lien Claims, (C) 503(B)(9) Claims, and (D) Certain Royalties; and (II) Granting Related Relief* filed contemporaneously herewith (the "**Vendor Motion**"), the Debtors are requesting (i) authority, but not direction, to pay in the ordinary course of business, based on their sound business judgment, (a) prepetition amounts owed to (1) Critical Vendors (as defined below), (2) Lien Claimants (as defined below), and (3) certain vendors that have delivered goods to the Debtors in the ordinary course of business within twenty (20) days before the Petition Date and whose prepetition claims are thus entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claimants**", and such 503(b)(9) Claimants' prepetition claims, the "**503(b)(9) Claims**") and (b) certain royalties that are payable to the Minority Licensees (as defined below) of Serta, Inc. ("**Serta Royalties**") and (ii) related relief.

73. The Debtors' senior management and financial advisors undertook a thorough analysis using certain criteria described more fully in the motion to determine which of the Debtors' vendors are critical to their ability to continue manufacturing and distributing bedding

34

products (the "**Critical Vendors**", and such Critical Vendors' prepetition claims, the "**Critical Vendor Claims**"). Based on this criteria, the Debtors identified the Critical Vendors, which include, but are not limited to: (a) raw material suppliers, (b) marketing and advertising providers, and (c) providers of certain essential services such as information technology and fire, safety, and security.

74. Because the Debtors' employ a "just-in-time" manufacturing process whereby they manufacture and ship the majority of their bedding products within several days of their receipt of an order and the Debtors typically maintain only minimal levels of raw materials needed to manufacture their finished products, it is crucial that the Debtors have continued and uninterrupted access to the goods, materials and services provided by the Critical Vendors.

75. While the Debtors seek authority to pay their Critical Vendors, the Debtors do not propose to pay all amounts outstanding immediately. Instead, the Debtors propose to determine, in the exercise of their business judgment and based upon the liquidity available to them at the time such determination is made, which Critical Vendor Claims, and in what amounts, will be paid, and the schedule for any such payments. I believe that payment of the Critical Vendor Claims will not create an imbalance in the Debtors' cash flow because payment of these claims will allow the Debtors to continue manufacturing and selling their products, which, in turn, will generate additional revenues from which the Debtors and their creditors will benefit.

76. In addition to payment of the Critical Vendor Claims, the Debtors seek authority to pay certain third parties, including warehousemen, transporters, shippers, and other vendors (collectively, the "**Lien Claimants**" and the Lien Claimants' prepetition claims, the "**Lien Claims**") that the Debtors believe have created, or could give rise to, a lien against the Debtors' property, regardless of whether the particular Lien Claimant has already perfected its interests.

The Lien Claimants provide a number of key goods and services for the Debtors in the maintenance and operation of their manufacturing facilities, including manufacturing, transportation services, construction services, inventory management, and other services that are vital to the Debtors' enterprise. I believe that payment of the Lien Claims will not create an imbalance in the Debtors' cash flow because payment of these claims will allow the Debtors to continue to fully operate their businesses and maintain their business operations as they transition into chapter 11, without the risk of such claimants asserting statutory liens against the Debtors' equipment and/or materials in their possession.

77. Furthermore, the Debtors seek authority to grant administrative expense status to all undisputed 503(b)(9) Claims. In the ordinary course of the Debtors' business, numerous vendors and suppliers, including the Critical Vendors, provide the Debtors with materials that are necessary to operate their business. The Debtors may have outstanding orders with these vendors for goods ordered prepetition but not yet delivered or performed. As a result of the chapter 11 cases, these vendors may be concerned that postpetition delivery of goods pursuant to a prepetition outstanding order will render the vendor a general unsecured creditor and may, therefore, refuse to ship or deliver materials to the Debtors. In order to avoid disruption in the delivery of goods, the Debtors seek (a) authorization to grant such 503(b)(9) Claims administrative expense status under section 503(b) of the Bankruptcy Code for undisputed obligations arising from the postpetition delivery or performance of outstanding orders, and (b) out of an abundance of caution, authorization to satisfy such undisputed obligations to vendors in the ordinary course of business under section 363(c) of the Bankruptcy Code. Absent such relief, the Debtors may be required to expend substantial time and effort reissuing or reaffirming the Outstanding Orders to provide the vendors with assurance of administrative priority.