# DEFENDANTS' EXHIBIT 332
# Part 4 of 11

78. Lastly, the Debtors seek authority to pay all amounts owed to the Minority Licensees on account of the domestic and international royalties, whether arising pre-petition or postpetition, pursuant to the governing agreements. Specifically, the Debtors make annual payments to the Minority Licensees in the amount of approximately 18% of international royalties net of international licensing costs, fees, and expenses, while approximately 18% of gross domestic royalties are typically remitted quarterly to the Minority Licensees.

79. Based upon the foregoing, I believe that the relief requested is essential, appropriate and in the best interests of the Debtors, their creditors and all parties in interest.

E. **Customer Related Programs Motion**

80. In the ordinary course of their business, the Debtors engage in certain customary activities to develop and sustain positive relationships with their Customers. To that end, the Debtors have implemented various customer-related programs designed to ensure their satisfaction and loyalty, increase sales, respond to competitive pressures, improve profitability, and generate goodwill for the Debtors and their products. These programs, are necessary to ensure Customer and consumer satisfaction, increased sales, responsiveness to competitive pressures, maintenance of Customer loyalty, improved profitability, and goodwill for the Debtors and their products. The Customer Related Programs are also integral to the Debtors' efforts to stabilize their businesses, promote the continuity and continued vitality of the Debtors' businesses, and ultimately deliver the most value to all stakeholders in the chapter 11 cases.

81. Accordingly, the Debtors seek authority to continue the Customer Related Programs in the ordinary course of business and to perform and honor their prepetition obligations thereunder. Many of the Customer Related Programs are standard practice in the bedding industry and the Customers have come to expect these types of programs to be offered. The Debtors'

inability to honor their Customer Related Programs would place them at a severe disadvantage relative to their competitors. Moreover, the Debtors must continue the Customer Related Programs in order to reassure their customers of the ongoing viability of the Debtors, preserve goodwill, and to maintain critical business relationships.

82. I believe that continuing the Customer Related Programs in the ordinary course of the Debtors' business and performing and honoring prepetition obligations arising under such Customer Related Programs is in the best interests of the Debtors, their estates, and their creditors.

## F.  Insurance and Surety Bond Motion

83. Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bond Program, and (B) Pay Certain Obligations with Respect Thereto; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief* filed contemporaneously herewith (the "**Insurance and Surety Bond Motion**") the Debtors request entry of interim and final orders (i) authorizing, but not directing them to (a) continue to maintain and renew, amend, supplement, place, or extend (if necessary) their Insurance Programs and Surety Bond Program in accordance with their applicable insurance policies and indemnity and reimbursement agreements and to continue to perform their obligations with respect thereto during these chapter 11 cases, and (b) pay certain prepetition obligations arising under the Insurance Programs or Surety Bond Program; (ii) modifying the automatic stay to the limited extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program (as defined below); and (iii) granting related relief.

38

84. In the ordinary course of their operations, I understand that the Debtors maintain workers' compensation, third-party liability, property, and other insurance programs (the "**Insurance Programs**") and incur obligations to pay premiums and other obligations related thereto, including, but not limited to, any broker, advisor or third-party administrator fees, taxes, other fees, collateral, and deductibles, in accordance with, or relating to, their respective insurance policies through several insurance carriers (each, an "**Insurance Carrier**"), including those listed on Exhibit A annexed to the Insurance and Surety Bond Motion.

85. The Debtors are obligated to make premium payments related to General Insurance Programs based upon a fixed rate established and billed by each Insurance Carrier (collectively, the "**Insurance Premiums**"). The Debtors pay approximately $8.0 million in General Insurance Premiums each year, incidental taxes and fees.

86. The Debtors' Insurance Programs include: (i) coverage of workers' compensation and employer's liability (the "**Workers' Compensation Program**"); (ii) coverage of potential third-party liability in connection with the Debtors' business; (iii) coverage of the Debtors' vehicles and related third-party liability; (iv) coverage for property losses; (v) coverage for risks and damages arising from data breaches and other data losses; (vi) coverage for losses arising from acts of terrorism; (vii) coverage of management and directors' and officers' liability; (viii) excess coverage for various Insurance Policies (items (ii) through (viii), the "**General Insurance Programs**"). The Debtors also retain the services of various insurance service providers in connection with maintaining the Debtors' Insurance Programs. Each of these is described more fully in the Insurance and Surety Bond Motion.

87. I understand that, in the ordinary course of business, the Debtors maintain the Workers' Compensation Program for claims arising from, or related to, employment by the

39

Debtors (the "**Workers' Compensation Claims**"). Sedgwick Claims Management Services serves as the claims administrator under the Workers' Compensation Program. It is my understanding that all jurisdictions in which the Debtors operate require that the Debtors maintain the Workers' Compensation Program. The Workers' Compensation Program covers, among other things, statutory workers' compensation and employer liability claims generally arising from accidents, death, or disease sustained by employees in the course of their employment with the Debtors. Obligations under the Workers' Compensation Program are collateralized by a commercial letter of credit in the amount of approximately $21.7 million. These letters of credit serve as collateral in the event that the Debtors default on their obligations under the Workers' Compensation Programs and the casualty-type (i.e., general liability and automobile) General Insurance Programs.

88. It is my understanding that, under applicable workers' compensation laws, the Debtors may be obligated to pay all or part of a Workers' Compensation Claim directly to an employee, his or her medical providers, or his or her heirs or legal representatives. Accordingly, the Debtors seek to waive both the automatic stay as it relates to Workers' Compensation Claims, the corresponding notice requirements under Bankruptcy Rule 4001(d), and authorization, as necessary, and to the extent required by law or under the Workers' Compensation Program, to pay all or part of a claim related thereto directly to an employee, any of his or her medical providers, or any of his or her heirs or legal representatives, as set forth in the applicable law or policy.

89. In the ordinary course of business, as part of standard import practices, the Debtors are required to post certain surety bonds to the U.S. Customs and Border Protection Agency ("**CBPA**") to secure the Debtors' payment or performance of obligations in connection with its customs bonds (i.e., contracts between the Debtors (as importer), a surety, and the CBPA)

40

(the "**Surety Bond Program**"). Customs bonds govern importer compliance with CBPA regulations, guarantees that the CBPA receives payment of any potential duties, taxes and fees that may accrue, and allows the CBPA to clear a shipment without having to wait for additional payments. The Debtors have two continuous customs bonds with the CBPA.

90. The premiums for the surety bonds (the "**Surety Premiums**" and, together with the Indemnity Obligations, the "**Surety Bond Obligations**") are generally determined on an annual basis. Payment is remitted by the Debtors when the bonds are issued and annually upon each renewal. In the twelve months preceding the Petition Date, the Surety Premiums totaled approximately $2,750. As of the Petition Date, the Debtors have $1.5 million in outstanding surety bonds, which obligations are partially collateralized by (i) letters of credit in the approximate amount of $250,000 issued for the benefit of Avalon Risk Management Insurance Agency; and (ii) a letter of credit in the approximate amount of $500,000 issued for the benefit of Avalon Risk Management Insurance Agency.

91. I understand that the Debtors maintain the Insurance Programs and Surety Bond Program to help manage and limit the various risks associated with operating their business, which is essential to the preservation of the value of the Debtors' business and properties. I believe it essential that the Debtors maintain the Insurance Programs and the Surety Bond Program, and that they obtain authority to pay certain obligations related thereto, including payments to the insurance service providers. Furthermore, I understand that the Debtors must maintain most or all of the Insurance Programs and the Surety Bond Program to comply with the UST Operating Guidelines, applicable state and federal laws, and other prepetition contracts. Based on the foregoing, I believe that the relief requested in the Insurance and Surety Bond Motion is in the best

41

interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**G.     Wages Motion**

92.     Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefits Programs and Pay Related Obligations, and (C) Pay Prepetition Employment Expenses, and (II) Granting Related Relief* filed concurrently herewith (the "**Wages and Benefits Motion**"), the Debtors request entry of an order (i) authorizing but not directing them to (a) pay all Employee Compensation Obligations and Employee Benefit Obligations and related fees, costs, and expenses incident to the foregoing, including amounts owed to third-party service providers and administrators and taxing authorities, and (b) maintain, and continue to honor and pay amounts with respect to, the Debtors' business practices, programs, and policies for their employees as such were in effect prior to the Petition Date and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and (ii) granting related relief.

93.     As described more fully in the Wages and Benefits Motion, the Debtors' employ approximately 3,600 employees in the United States (each, an "**Employee**"). The Employees perform a number of critical functions, including sales, customer service, plant operations, legal, financial, human resources, and other services necessary to operate the enterprise effectively. Certain of the Debtors' Employees are represented by unions and covered by collective bargaining agreements. Without the Employees' continued, uninterrupted services, an effective reorganization of the Debtors will not be possible. In the ordinary course of their operations, the Debtors incur a number of obligations to, or on account of their Employees,

including relating to compensation (the "**Employee Compensation Obligations**"), and benefits ("**Employee Benefits Obligations**", and, together with the Employee Compensation Obligations, the "**Employee Obligations**").

94. The Debtors' Employees are among the most important parts of their business. I believe that any delay in paying or failure to pay prepetition Employee Obligations could irreparably impair the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial. Failure to pay the Employee Obligations could also inflict a significant financial hardship on the families of the Employees. The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees at risk of such hardship. Without the relief requested in the Wages and Benefits Motion, otherwise-loyal Employees may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise. Payment of these obligations in the ordinary course of business would enable the Debtors to focus on completing a successful reorganization, which would benefit all parties in interest.

95. In the ordinary course of business, the Debtors incur and pay obligations relating to salaries, wages and other compensation owed to Employees, independent contractors, and staffing firms that provide the Debtors with contingent workers. Additionally, Employees are entitled to reimbursement of certain reasonable and necessary expenses incurred while performing their employment duties, including job related travel and other business related expenses (the "**Expenses**"). I believe that payment of prepetition Expenses is necessary because any other treatment of Employees would be highly inequitable and risk alienation of the Debtors' workforce. Employees who have incurred reimbursable Expenses should not be forced personally to bear the cost of the Expenses, especially because those Employees incurred such Expenses for the Debtors'

benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

96. In the ordinary course of business, the Debtors are required by law to deduct from Employees' gross pay including without limitation, garnishments, child support, spousal support, service charges, and other similar deductions and other pre- and after tax deductions payable pursuant to certain employee benefits plans discussed in the Wages and Benefits Motion (collectively, the "**Deductions**"). In addition to the Deductions, certain laws require the Debtors to withhold amounts from the Employees' gross pay related to federal, state, and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "**Withholdings**"), which the Debtors must match, from their own funds, amounts for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively with the Withholdings, the "**Payroll Taxes**"). I believe that disbursement of the Deductions and payment of the Payroll Taxes would not prejudice other creditors because I have been informed by counsel that such obligations generally give rise to priority claims under section 507(a) of the Bankruptcy Code.

97. As a part of their Employee Compensation Obligations, the Debtors also maintain, in the ordinary course, a variety of employee bonus programs (the "**Employee Bonus Programs**") and have a general practice of paying severance to certain non-insider Employees (the "**Employee Severance Obligations**"). The Employee Bonus Programs and the Employee Severance Obligations are necessary for maintaining positive Employee morale and loyalty, and failure to honor obligations under these programs could cause severe hardship to the Debtors' workforce in a critical time; the programs are integral and necessary for maintaining a stable

44

workforce and the ultimate successful operation of the Debtors' business. While the Debtors do not seek to pay any prepetition Employee Severance Obligations, the Debtors do seek relief to continue the Employee Severance Obligations on a postpetition basis. The Debtors are not seeking authority to pay or honor any prepetition obligations on account of any severance payments or any severance payments to insiders.

98. The Debtors also make employee benefits available to eligible Employees. The benefits fall within the following categories: (i) employee leave benefits, including personal time off and holidays; (ii) medical, dental, vision, and prescription drug benefits, life insurance, accidental death and dismemberment insurance, disability insurance, and health savings accounts; (iii) retirement savings plans including three 401(k) plans, and (iv) certain other benefits (collectively, the "**Employee Benefits**"). I believe that maintaining the Employee Benefits are critical for maintaining Employee morale during these chapter 11 cases, and to prevent Employees from seeking employment from other companies that offer similar benefits.

99. As described in the Wages and benefits Motion, the Debtors pay fees to third-party administrators and servicers of Employee Compensation Obligations and Employee Benefits Obligations. Third-party administrators assist the Debtors with, among other things, administering of the Employee Benefits, and also assist with payroll servicing and payroll transfer administration in connection with Employee Obligations. I believe that continued payment to third-party administrators is necessary, and without the continued service of these administrators, the Debtors will be unable to continue honoring their obligations to Employees in an efficient and cost-effective manner.

100. The Debtors are not seeking relief to pay prepetition Employee Obligations to any individual Employee or Contractor in excess of the $15,150 cap imposed by section

507(a)(4) of the Bankruptcy Code. I believe that the total amount sought to be paid by the Wages and Benefits Motion is modest compared to the magnitude of the Debtors' overall business. Furthermore, the Debtors have sufficient funds to pay the Employee Obligations in the ordinary course using cash maintained by the Debtors and cash generated through operations. Accordingly, I believe the relief requested in the Wages and Benefits Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

### H.    Taxes Motion

101.    Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments Owed to Taxing Authorities and (II) Granting Related Relief* (the "**Taxes Motion**") filed concurrently herewith, the Debtors request entry of an order (i) authorizing, but not directing, the Debtors to satisfy all Taxes (as defined below) due and owing to various federal, state, and local taxing and regulatory authorities (collectively, the "**Taxing and Regulatory Authorities**") that arose prior to the Petition Date, including all Taxes subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date, and to pay any postpetition amounts that become due and owing to the Taxing and Regulatory Authorities in the ordinary course during these cases.

102.    I understand that the taxes and regulatory assessments the Debtors typically incur generally fall into the following categories: Sales and Use Taxes, Property Taxes, Income Taxes, Franchise and Other Taxes, and Regulatory Assessments (each as defined in the Taxes Motion and, collectively, the "**Taxes**"). I understand that approximately $3,102,000 in Taxes relating to periods prior to the Petition Date will come due and owing to the Taxing and Regulatory Authorities after the Petition Date.

103. As more fully described in the Taxes Motion, I understand that failure to pay the Taxes and the Regulatory Assessments, as applicable, may cause the Taxing and Regulatory Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the ordinary course in the applicable jurisdictions in which they operate, and potentially holding directors and officers personally liable, all of which would disrupt the Debtors' day-to-day business operations, potentially impose significant costs of the Debtors' estates and their creditors, and hinder the Debtors' efforts to successfully reorganize. Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors, their estates, and all parties in interest and should be approved.

I. **Utilities Motion**

104. Pursuant to the *Emergency Motion of Debtors for an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* filed concurrently herewith (the "**Utilities Motion**"), the Debtors request entry of an order (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies, (ii) establishing procedures for resolving objections by the Utility Companies relating to the adequacy of the Debtors' proposed adequate assurance, (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of these chapter 11 cases or outstanding prepetition invoices, and (iv) granting related relief.

105. As more fully described in the Utilities Motion, in the ordinary course of business, the Debtors incur expenses for, among other things, electricity, telecommunications, natural gas, water, waste disposal, and other similar services. I believe that preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations.

106. Based on their monthly average for the twelve months prior to the Petition Date, the Debtors estimate that on average, they spend approximately $1,000,000 per month on utility services. To provide additional assurance of payment, the Debtors propose to deposit cash into a segregated account in an amount equal to approximately two weeks' cost of utility services (less any amounts guaranteed pursuant to a letter of credit issued in favor of any such Utility Company that have not been applied to outstanding prepetition amounts), (the "**Adequate Assurance Deposit**"), calculated, where practicable, using the historical average for such payments during the twelve months prior to the Petition Date. The Debtors estimate that the Adequate Assurance Deposit would total approximately $491,000. Such Adequate Assurance Deposit will further assure the Utility Companies of payment for postpetition services.

107. Furthermore, I believe the Adequate Assurance Procedures are necessary for the Debtors to effectuate their chapter 11 strategy without unnecessary and costly disruptions on account of discontinued utility services. If the Adequate Assurance Procedures are not approved, the Debtors likely will be confronted with and forced to address numerous requests by their utility providers at a critical time for their business. I understand that the Debtors' utility providers could unilaterally decide that they are not adequately protected and, therefore, may make exorbitant demands for payment to continue providing service or discontinue providing service to the Debtors altogether. Such an outcome could seriously jeopardize the Debtors' operations and their ability to maximize the value of their estates.