# DEFENDANTS' EXHIBIT 332
# Part 6 of 11

(w) "**Dawn**" has the meaning set forth in the preamble to this Agreement.

(x) "**Definitive Documents**" means all of the definitive documents implementing the Restructuring, including, without limitation: (i) the Plan and the Plan Supplement, (ii) the Disclosure Statement and the Solicitation Materials, (iii) the Disclosure Statement Approval Order, (iv) the Confirmation Order, (v) the DIP Credit Agreement; (vi) the DIP Orders; (vii) the DIP Loan Documents; (viii) the Exit ABL Commitment Letter; (ix) the Exit ABL Facility Credit Agreement; (x) the New Term Loan Credit Facility Agreement; (xi) the Adversary Complaint, Scheduling Motion, and Scheduling Order; (xii) New Corporate Governance Documents; (xiii) the New Corporate Governance Documents of Reorganized Parent; (xiv) any Management Incentive Plan allocation and related documents, if applicable; (xv) the New Intercreditor Agreement; (xvi) the Takeback Debt Terms; and (xvii) the First Day Orders; and in each case, any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable).

(y) "**DIP Credit Agreement**" means the senior secured super-priority debtor-in-possession ABL credit agreement attached hereto as **Exhibit F**.

(z) "**DIP Financing**" means the financing by the use of cash collateral and a postpetition senior secured superpriority debtor-in-possession credit facility to the Company Parties on the terms and conditions consistent with the DIP Credit Agreement.

(aa) "**DIP Loan Documents**" has the meaning set forth in the DIP Orders.

(bb) "**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

(cc) "**Disclosure Statement**" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code, substantially in the form attached hereto as **Exhibit C**.

(dd) "**Disclosure Statement Approval Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures in connection thereto.

(ee) "**Evercore**" means Evercore Group, L.L.C.

(ff) "**Exit ABL Commitment Letter**" means the commitment letter attached hereto as **Exhibit G** setting forth the terms and conditions of the Exit ABL Facility.

(gg) "**Exit ABL Facility**" has the meaning set forth in the Plan.

(hh) "**Exit ABL Facility Credit Agreement**" has the meaning set forth in the Plan.

(ii) "**Fiduciary Out**" has the meaning set forth in Section 7.03(f).

4

(jj) **"Final DIP Order"** means the final order entered in the Chapter 11 Cases authorizing the Company's entry into the DIP Financing.

(kk) **"First Day Orders"** means any interim or final orders of the Bankruptcy Court granting the relief requested in the first-day pleadings that the Company Parties determine are necessary or desirable to file in the Chapter 11 Cases.

(ll) **"First Lien Intercreditor Agreement"** means that certain *First Lien Intercreditor Agreement*, dated June 22, 2020, by and among, *inter alios*, the PTL Agent, the Non-PTL Loan Agent, and acknowledged and agreed to by Dawn Intermediate, Serta Simmons Bedding, LLC, a Delaware limited liability company, the other borrowers party thereto and each of the other obligors party thereto.

(mm) **"Initial Consenting PTL Lenders"** has the meaning set forth in the preamble to this Agreement.

(nn) **"Interim DIP Order"** means the interim order entered in the Chapter 11 Cases authorizing the Company's entering into the DIP Financing.

(oo) **"Joinder Agreement"** has the meaning set forth in Section 4.03.

(pp) **"LCM Action"** means that certain action commenced by LCM XXII LTD., LCM XXIII LTD., et al. in the United States District Court for the Southern District of New York, Civil Action No. 1:21-cv-03987.

(qq) **"Management Incentive Plan"** has the meaning set forth in the Plan.

(rr) **"Milestones"** means the "Milestones" set out in **Exhibit E**.

(ss) **"New Corporate Governance Documents"** means the certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement or other similar organizational or formation documents, as applicable, of the Reorganized Debtors.

(tt) **"New Intercreditor Agreement"** has the meaning set forth in the Plan.

(uu) **"New Term Loan Credit Facility Agreement"** has the meaning set forth in the Plan.

(vv) **"Outside Date"** has the meaning set forth in **Exhibit E**.

(ww) **"Outside Petition Date"** has the meaning set forth in **Exhibit E**.

(xx) **"Party"** or **"Parties"** has the meaning set forth in the preamble to this Agreement.

(yy) **"Permitted Transferee"** has the meaning set forth in Section 4.03.

(zz) **"Petition Date"** has the meaning set forth in **Exhibit E**.

5

(aaa) "**Plan**" has the meaning set forth in the recitals to this Agreement.

(bbb) "**Plan Effective Date**" means the date on which the conditions to effectiveness of the Plan have been satisfied or waived in accordance with its terms and the Restructuring is consummated.

(ccc) "**Plan Supplement**" has the meaning set forth in the Plan.

(ddd) "**PTL Credit Agreement**" has the meaning set forth in the Plan.

(eee) "**PTL Group**" has the meaning set forth in the Plan.

(fff) "**PTL Group Counsel**" has the meaning set forth in the Plan.

(ggg) "**PTL Group Advisors**" has the meaning set forth in the Plan.

(hhh) "**PTL Lenders**" has the meaning set forth in the Plan.

(iii) "**PTL Loan Documents**" means the "Loan Documents" as defined in the PTL Credit Agreement.

(jjj) "**PTL Obligations**" has the meaning set forth in the Plan.

(kkk) "**Qualified Marketmaker**" has the meaning set forth in Section 4.03.

(lll) "**Qualified Marketmaker Joinder Date**" has the meaning set forth in Section 4.03.

(mmm) "**Redemption Transaction**" means a distribution of cash and/or other property by Serta Simmons Bedding in complete redemption of its equity interests held by Dawn Intermediate, as set forth in the Restructuring Transactions Exhibit, if applicable.

(nnn) "**Reorganized Debtors**" has the meaning set forth in the Plan.

(ooo) "**Reorganized Parent**" has the meaning set forth in the Plan.

(ppp) "**Requisite Consenting Creditors**" means, as of the date of determination, Consenting Creditors holding over 50% in aggregate outstanding principal amount of the PTL Obligations.

(qqq) "**Restructuring Fees and Expenses**" means (i) the Consenting Equity Holder Fees and Expenses; and (ii) all reasonable and documented fees, costs and expenses of each of the PTL Group Advisors, in each case, (A) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of this Agreement, the Plan, and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and, to the extent applicable, and (B)(1) consistent with any engagement letters or fee reimbursement letters entered into between the Company, on the one

6

hand, and the applicable PTL Group Advisors, on the other hand (as supplemented and/or modified by this Agreement), or (2) as provided in the DIP Orders and/or the Confirmation Order.

(rrr) "**Restructuring**" or "**Restructuring Transactions**" has the meaning set forth in the Plan.

(sss) "**Restructuring Transactions Exhibit**" has the meaning set forth in the Plan.

(ttt) "**Scheduling Motion**" means a motion requesting a schedule for the conduct of the Adversary Proceeding.

(uuu) "**Scheduling Order**" means the order entered by the Bankruptcy Court approving the schedule requested by the Company in relation to the schedule for the Adversary Proceeding.

(vvv) "**Securities Act**" means the U.S. Securities Act of 1933, as amended and any rules and regulations promulgated thereby.

(www) "**Solicitation Materials**" m has the meaning set forth in the Plan.

(xxx) "**Support Effective Date**" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company and (ii) Initial Consenting PTL Lenders holding at least 66⅔% of the aggregate outstanding principal of PTL Obligations.

(yyy) "**Support Period**" means the period commencing on the Support Effective Date and ending on the Termination Date.

(zzz) "**Takeback Debt Terms**" means the term sheet setting forth indicative terms of the New Term Loan attached hereto as **Exhibit H**.

(aaaa) "**Termination Date**" means the date on which termination of this Agreement is effective as to a Party in accordance with Section 7.01, Section 7.02, Section 7.03, or Section 7.04 of this Agreement.

(bbbb) "**Transfer**" has the meaning set forth in Section 4.03.

(cccc) "**Voting Deadline**" has the meaning set forth in the Plan.

(dddd) "**Weil**" means Weil, Gotshal & Manges LLP, as legal advisors to the Company Parties.

2. **Passage of Time**

With respect to any Milestone or other reference of time herein, if the last day of such period falls on a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure, such Milestone or other reference of time shall be

7

extended to the next such day that is not a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure; *provided*, for the avoidance of doubt, that any Milestone with respect to a hearing date shall be subject to the Bankruptcy Court's availability.

3. **Restructuring.**

Section 3.01 Plan and Restructuring Transactions.

(a) Confirmation of the Plan. Subject to the terms of this Agreement, the Company Parties will use commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable after the Petition Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement. Each Consenting Creditor shall use commercially reasonable efforts to cooperate fully and coordinate amongst each other and with the Company in connection therewith. Further, each of the Parties shall take such action (including executing and delivering any other agreements) as may be reasonably necessary or as may be required by order of the Bankruptcy Court, to carry out the purpose and intent of this Agreement (including, without limitation, to provide any information reasonably necessary, or information requested from federal, state, or local regulators, to obtain required regulatory approvals necessary for confirmation of the Plan or consummation of the Restructuring).

(b) Redemption Transaction. If the Restructuring is effectuated pursuant to the Redemption Transaction, the Debtors agree to make a distribution of Cash in the aggregate amount of $1,500,000 to the Consenting Equity Holders and any other holders of Interests in Dawn Holdings, Inc. pursuant to the Plan and in accordance with, and as set forth in, the Restructuring Transactions Exhibit.

Section 3.02 Definitive Documents.

(a) Each of the Definitive Documents and related motions and orders remain subject to negotiation and completion and shall contain terms and conditions consistent in all material respects with this Agreement and the Plan. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall reflect and contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including the exhibits and annexes hereto), as they may be modified, amended, or supplemented in accordance with Section 11.

(b) The following Definitive Documents shall otherwise be in form and substance acceptable to the Requisite Consenting Creditors and the Company: (a) the Plan; (b) the Restructuring Transactions Exhibit; (c) the Confirmation Order; (d) the Exit ABL Commitment Letter; (e) the Exit ABL Facility Credit Agreement; (f) the New Term Loan Credit Facility Agreement; (g) the Takeback Debt Terms; (h) the Disclosure Statement Approval Order; (i) the New Corporate Governance Documents; (j) the New Corporate Governance Documents of Reorganized Parent; (k) the Scheduling Order; (l) the New Intercreditor Agreement; (m) the Schedule of Retained Causes of Action; (n) any Management Incentive Plan allocation and related documents, if applicable; and in each case, any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable).

8

The Definitive Documents other than those referenced in the preceding sentence shall contain terms and conditions consistent in all material respects with this Agreement and the Plan and shall otherwise be in form and substance reasonably acceptable to the Requisite Consenting Creditors and the Company.

(c) The following Definitive Documents shall be consistent with the settlement contemplated herein with respect to the Consenting Equity Holders and the Redemption Transaction (if applicable) and otherwise in form and substance acceptable to the Requisite Consenting Creditors, the Company, and Consenting Equity Holders (but as to the Consenting Equity Holders, only insofar as they relate to the treatment or release of the Consenting Equity Holders thereunder): (a) the Plan; (b) the Restructuring Transactions Exhibit; (c) the Confirmation Order; and in each case, any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable).

4. **Agreements of the Consenting Creditors.**

Section 4.01 <u>Support</u>. Each Consenting Creditor, with respect to each of its respective Consenting Claims, hereby covenants and agrees, severally and not jointly, during the Support Period, that it shall:

(a) cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the Company Parties and to use commercially reasonable efforts to support and consummate the Restructuring, including, for the avoidance of doubt, using commercially reasonable efforts to obtain any necessary federal, state, and local regulatory approvals required to obtain confirmation of the Plan or consummate the Plan and the Restructuring contemplated thereby and herein by the Outside Date, on a timeline consistent with the Milestones;

(b) timely vote or cause to be voted, consistent with the Solicitation Materials, all of its Claims (or Claims under its control), including all Claims that are impaired under the Plan, to accept the Plan and not change or withdraw (or cause to be changed or withdrawn) any such vote; *provided* that each Consenting Creditor may change or withdraw its vote following termination of this Agreement;

(c) grant and, if applicable, not opt-out of the release of third-party claims pursuant to the Plan and Confirmation Order;

(d) not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, DIP Financing, or acceptance, confirmation, implementation of the Plan, or the Restructuring Transactions, (ii) propose, support, vote for, encourage, seek, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any entity regarding, any Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, or making or supporting any press release, press report or comparable public statement, or filing with respect to any Alternative Restructuring, or (iii) otherwise take any action that would interfere with, delay or postpone the consummation of the Restructuring; *provided* that, the Consenting Creditors shall not be required to give any notice, order, instruction, or direction to any administrative agent, or collateral agent (as applicable) or other such agent or

9

trustee, if the Consenting Creditors are required to incur any out-of-pocket costs or provide any indemnity in connection therewith;

(e) (i) not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, and (ii) if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, such Consenting Creditor will use its commercially reasonable efforts to direct such administrative agent or collateral agent (A) to cease, desist, and refrain from taking any such action, and (B) to take such action as may be necessary to effect the Restructuring, including, but not limited to, enforcement of the First Lien Intercreditor Agreement, and joining and supporting the Debtors in enforcing the First Lien Intercreditor Agreement should the Debtors determine that it is necessary to do so to implement the Restructuring;

(f) complete, enter into, and effectuate the agreed Definitive Documents (as applicable) within the timeframes contemplated herein;

(g) promptly inform, subject to its confidentiality obligations or applicable law, Weil in writing (email being sufficient) as soon as reasonably practicable after becoming aware (and in any event within three (3) Business Days after becoming so aware) of the threat or commencement of any material lawsuit, investigation, hearing or enforcement action from or by any person or entity in respect of any Company Party or any subsidiary or affiliate of a Company Party;

(h) timely vote (or cause to be voted) its Claims against any Alternative Restructuring;

(i) act in good faith with regard to the Restructuring consistent with this Agreement;

(j) to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, which additional or alternative provisions shall be reasonably acceptable to the Requisite Consenting Creditors; *provided* that the recoveries and economic outcome for such Consenting Creditor and other material terms of this Agreement are preserved in any such provisions; and

(k) refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement or interfere with the Restructuring (including encouraging another person to undertake any action prohibited by this Agreement).

Section 4.02 <u>Additional Provisions Regarding the Consenting Creditors Agreements.</u>

(a) Nothing in this Agreement shall: (i) affect the ability of any Consenting Creditor to consult with any other Consenting Creditor, the Company Parties, or any other party in interest, subject to applicable confidentiality obligations; (ii) impair or waive the rights of any Consenting Creditor to assert or raise any objection not prohibited under this Agreement or any

10

Definitive Document in connection with the Restructuring Transactions; (iii) prevent any Consenting Creditor from (A) enforcing this Agreement or any Definitive Documents, (B) contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Documents, or (C) exercising any rights or remedies under this Agreement or any Definitive Documents, except as provided by Section 4.01 hereof; (iv) limit the rights of a Consenting Creditor under the Chapter 11 Cases (if any), including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is not inconsistent with such Consenting Creditor's obligations hereunder or under applicable Law; (vi) constitute a waiver or amendment of any term or provision of the First Lien Credit Agreement, except as provided by this Agreement and the Definitive Documents; (vii) require any Consenting Creditor to incur, assume, or become liable for any financial or other liability or obligation other than as expressly described in this Agreement; (viii) prevent any Consenting Creditor from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, and priority of its claims against or interests in the Company Party or any lien securing any such claims or interests (including the filing of proofs of claim); or (ix) affect any rights or obligations of the PTL Agent and the DIP Agent (as defined in the DIP Loan Documents), each in their capacities as such under the respective credit facility for which they are agent; or (x) require that any Consenting Creditor give any notice, order, instruction, or direction to any administrative agent or collateral agent (as applicable) or other such agent if the Consenting Creditors are required to incur any out-of-pocket costs or provide any additional indemnity in connection therewith. For the avoidance of doubt, if there if there is ambiguity between any First Day Orders and the consultation rights set out herein, this document shall control.

Section 4.03 <u>Transfers</u>. Each Consenting Creditor agrees that during the Support Period, it shall not sell, assign, transfer, or otherwise dispose of ("**Transfer**"), directly or indirectly, any Claims, option thereon, or right or interest therein or any other Claims against in the Company Parties (including by granting any proxies, depositing any Claims into a voting trust or entering into a voting agreement with respect to such Claims), and any purported Transfer shall be void and without effect unless the transferee thereof:

(a) is a Consenting Creditor;

(b) before such Transfer, agrees in writing for the benefit of the Parties to become, effective prior to or upon the consummation of such Transfer, a Consenting Creditor for all purposes hereunder and to be bound by all of the terms of this Agreement applicable to a Consenting Creditor (including with respect to any and all Claims it already may hold before such Transfer) by executing a joinder agreement in the form attached hereto as **Exhibit D** (a "**Joinder Agreement**") and delivering an executed copy of such Joinder Agreement to Weil and the PTL Group Counsel as promptly as practicable, but in no event later than three (3) Business Days following, consummation of such Transfer.

Each Consenting Creditor agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

11