DEFENDANTS' EXHIBIT 333
Part 2 of 27

- Holders of Allowed Non-PTL Term Loan Claims shall receive, in full and final satisfaction of such Claim, with a carve out from the collateral (or the value of such collateral) securing the FLSO Claims:

    1. **If Class 5 votes to accept the Plan**: such holder's Pro Rata share of 4% of New Common Interests issued on the Effective Date, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan.

    2. **If Class 5 votes to reject the Plan**: such holder's Pro Rata share of 1% of New Common Interests issued on the Effective Date, subject to dilution by any New Common Interests distributed pursuant to the Management Incentive Plan.

    If a holder of a Non-PTL Term Loan Claims vote to accept the Plan, such holder of a Class 5 Non-PTL Claim will receive its Pro Rata share of 4% of the New Common Interests, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan. This potential recovery, which is greater than the recovery contemplated if Class 5 votes to reject the Plan, is being provided as a carve out from the collateral (or the value of such collateral) securing the FLSO Claims to encourage holders of Non-PTL Term Loan Claims to vote to accept the Plan and provide the releases as set forth in the Plan, which is fundamental consideration for the increased recovery to holders of Non-PTL Term Loan Claims.

- If a holder of an Allowed Ongoing General Unsecured Claim executes a trade agreement providing for the continuation of goods or services on the same or better terms as existed as most favorable terms provided to the Debtors in the six (6) months prior to the Petition Date, the form of which is attached to the Disclosure Statement Approval Order (as defined herein) as Schedule 9 (a "**6A Trade Agreement**"), such holder of an Allowed Ongoing General Unsecured Claim shall receive, with a carve out from the collateral (or the value of such collateral) securing the FLSO Claims, no more than four (4) Cash installments over a period of no more than 365 days from the Effective Date, which payments shall result in full payment in the Allowed amount of such Ongoing General Unsecured Claim on no better terms than payment in the ordinary course of business. For the avoidance of doubt, a holder of Ongoing General Unsecured Claims that is a counterparty to (i) an executory contract or unexpired lease assumed pursuant to Article VIII of the Plan or (ii) an existing trade agreement executed by the Debtors under the Vendor Order (as defined herein) (a "**CV Trade Agreement**") (provided that such CV Trade Agreement is in effect as of the Effective Date) shall not be required to execute a 6A Trade Agreement to receive a distribution under Class 6A under the Plan. **Additional information regarding the procedures and requirements for execution of the 6A Trade Agreement is included in Article II of this Disclosure Statement.**

- Holders of an Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, with a carve out from the collateral (or the value of such collateral) securing the FLSO Claims, its Pro Rata Share of the Other General Unsecured Claims Recovery Pool as set forth in the GUC Recovery Allocation Table (each as defined in the Plan). The GUC Recovery Allocation Table is based on the Debtors' current estimate of the Class 6B Other General Unsecured Claims pool as of the date of this Disclosure Statement, and is subject to change in consultation with the Committee (as defined herein).

- Holders of Allowed Intercompany Claims and Allowed Intercompany Interests will be either impaired or unimpaired under the Plan and therefore presumed to either accept or reject the Plan.

- Holders of Other Intercompany Interests shall receive the treatment afforded in the Restructuring Transactions Exhibit.

3

- Holders of Intermediate Equity Interests shall receive the treatment afforded in the Restructuring Transactions Exhibit.

The Plan also provides for a global settlement and waiver of the Consenting Equity Holders' claims or interests. This global settlement and waiver provides for certain treatment and consideration in exchange for the Consenting Equity Holders' support for the Restructuring: if the Restructuring Transactions Exhibit includes the Redemption (as defined herein), the Debtors will pay the Consenting Equity Holders Cash in the amount of $1.7 million, including the Consenting Equity Holder Fees and Expenses, subject to the terms of the Restructuring Support Agreement; *provided*, that if the Debtors do not pursue the Redemption, the Debtors will only be obligated to pay the Consenting Equity Holder Fees and Expenses subject to the terms of the Restructuring Support Agreement.

Cash on the balance sheet of the reorganized Debtors as reorganized from the Effective Date (the "**Reorganized Debtors**") and, to the extent necessary, the proceeds issued or deemed issued under the Exit ABL Facility shall be used to (i) pay the Professional Fee Claims, in full in accordance with Section 2.2 of the Plan, (ii) fund other distributions, costs, and expenses contemplated by the Plan, and (iii) fund general working capital and for general corporate purposes of the Reorganized Debtors.

There are five (5) creditor groups whose votes for acceptance of the Plan are being solicited: (i) holders of FLFO Claims, (ii) holders of FLSO Claims, (iii) holders of Non-PTL Term Loan Claims, (iv) holders of Ongoing General Unsecured Claims, and (v) holders of Other General Unsecured Claims. An overview of the voting procedures and related requirements are attached hereto as **Exhibit I**.

Section II hereof contains a summary of the treatment of various creditor groups under the Plan.

**WHO IS ENTITLED TO VOTE:** Under the Bankruptcy Code, only "impaired" holders of Claims or Interests are entitled to vote on the Plan (unless, for reasons discussed in more detail below such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is deemed to be "impaired" under the Plan unless: (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), and reinstates the maturity of such claim or interest as it existed before the default.

## II.
## SUMMARY OF PLAN TREATMENT

A. **Summary of Plan Treatment**

The following table summarizes: (i) the treatment of Claims and Interests under the Plan; (ii) which Classes are impaired by the Plan; (iii) which Classes are entitled to vote on the Plan; and (iv) the estimated recoveries for holders of Claims and Interests.[5] The table is qualified in its entirety by reference to the full text of the Plan. A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the Valuation attached hereto as **Exhibit F**.

---

[5] Any Claim or Interest in a Class that is considered vacant under Section 3.5 of the Plan will receive no distribution under the Plan.

4

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, in consultation with the Requisite Consenting Creditors, (i) each such holder shall receive payment in Cash in an amount equal to such Claim, (ii) such holder's Allowed Other Secured Claim shall be Reinstated, or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | No – Presumed to Accept | **100%** |
| 2 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the option of the Debtors or the Reorganized Debtors, in consultation with the Requisite Consenting Creditors, (i) each such holder shall receive payment in Cash in an amount equal to such Claim, (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated, or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | No – Presumed to Accept | **100%** |
| 3 | FLFO Claims | Except to the extent that a holder of an Allowed FLFO Claim agrees to a less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim and in accordance with Section 5.5 of the Plan, on the Effective Date or as soon as reasonably practicable thereafter, such holder's Pro Rata share of New Term Loans equal in amount to the aggregate amount of their Allowed FLFO Claims. | Impaired | Yes – Entitled to Vote | **100%** |
| 4 | FLSO Claims | Except to the extent that a holder of an Allowed FLSO Claim agrees to a less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim and in accordance with Section 5.5 of the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, such holder's Pro Rata share of (i) one hundred percent (100%) of the New Common Interests issued on the Effective Date, less any New Common Interests distributed to holders of Class 5 | Impaired | Yes – Entitled to Vote | **73.7% - 75.6%**[6] |

---

[6] The projected recovery is calculated based on the mid-point equity value set forth in the Valuation attached as **Exhibit F** in this Disclosure Statement.

5

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | | Non-PTL Claims under the Plan and subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan, and (ii) the aggregate amount of New Term Loans less amounts distributed on account of Class 3. Receipt of such consideration shall be effected as described in the Restructuring Transactions Exhibit. | | | |
| 5 | Non-PTL Term Loan Claims | On the Effective Date, all Non-PTL Term Loan Claims will be cancelled, released, and extinguished and will be of no further force and effect. Each Holder of such Allowed Non-PTL Term Loan Claims will receive, with a carve out from the collateral (or the value of such collateral) securing the FLSO Claims:<br><br>1. **If Class 5 votes to accept the Plan**: Its Pro Rata share of 4% of New Common Interests issued on the Effective Date, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan.<br><br>2. **If Class 5 votes to reject the Plan**: Its Pro Rata share of 1% of New Common Interests issued on the Effective Date, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan. | Impaired | Yes – Entitled to Vote | **0.6% - 2.4%**[7] |
| 6A | Ongoing General Unsecured Claims[8] | Except to the extent that a holder of an Allowed Ongoing General Unsecured Claim agrees to less favorable treatment, if a holder of an Allowed Ongoing General Unsecured Claim executes a 6A Trade Agreement, on and after the Effective Date, or as soon as reasonably practical thereafter, such holder of an Allowed Ongoing General Unsecured Claim shall receive, with a carve out from the collateral (or the value of such collateral) securing the FLSO Claims, no more than four (4) Cash installments over a period of no more than 365 days from the Effective Date, which payments shall result in full payment in the Allowed amount of such Ongoing General Unsecured Claim on no better terms than payment in the ordinary course of | Impaired | Yes – Entitled to Vote | **100%** |

---

[7] The projected recovery range is based on the equity interests received by Class 5 depending on if Class 5 votes to accept or reject the Plan.

[8] Any Allowed Ongoing General Unsecured Claim that is a party to an executory contract or unexpired lease that is assumed by the Debtors pursuant to the Plan will be paid in full promptly, or otherwise as soon as practicable, upon the assumption (or assumption and assignment) of the executory contract or unexpired lease in accordance with the Plan and the Contract Assumption and Rejection Procedures attached hereto as **Exhibit J**.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | | business. For the avoidance of doubt, a holder of Ongoing General Unsecured Claims that is a counterparty to (i) an executory contract or unexpired lease assumed pursuant to Article VIII of the Plan or (ii) an existing CV Trade Agreement (provided that such CV Trade Agreement is in effect as of the Effective Date) shall not be required to execute a 6A Trade Agreement to receive a distribution under Class 6A under the Plan. | | | |
| 6B | Other General Unsecured Claims | Except to the extent that a holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, with a carve out from the collateral (or the value of such collateral) securing the FLSO Claims, its Pro Rata Share of the Other General Unsecured Claims Recovery Pool as set forth in the GUC Recovery Allocation Table. | Impaired | Yes – Entitled to Vote | 0% - 3.3% |
| 7 | Intercompany Claims | Except as provided for in Section 5.4 of this Plan, on the Effective Date, or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, Reinstated, or discharged (each without any distribution) to the extent reasonably determined to be appropriate by the Debtors or Reorganized Debtors and the Requisite Consenting Creditors, as applicable. | Either Unimpaired or Impaired | No – Either: Presumed to Accept Deemed to Reject | N/A |
| 8 | Intercompany Interests | Except as provided for in Section 5.4 of the Plan, on the Effective Date, and without the need for any further corporate or limited liability company action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, all Intercompany Interests shall be unaffected by the Plan and continue in place following the Effective Date, solely for the administrative convenience of maintaining the existing corporate structure of the Debtors. | Either Unimpaired or Impaired | No – Either: Presumed to Accept Deemed to Reject | N/A |
| 9 | Other Intercompany Interests | On the Effective Date, Other Intercompany Interests shall receive the treatment afforded in the Restructuring Transactions Exhibit. | Impaired | No – Deemed to Reject | N/A |
| 10 | Intermediate Equity Interests | On the Effective Date, Intermediate Equity Interests shall receive the treatment afforded in the Restructuring Transactions Exhibit. | Impaired | No – Deemed to Reject | N/A |

B. **Additional Considerations**

1. **Treatment of Allowed Class 6A**

Holders of Ongoing General Unsecured Claims must execute a Class 6A Trade Agreement to receive a distribution pursuant to Section 4.6(b) of the Plan, *provided* that holders of Ongoing General Unsecured Claims that are counterparties to (i) an executory contract or unexpired lease assumed pursuant to Article VIII of the Plan, or (ii) an existing CV Trade Agreement (provided that such CV Trade Agreement is in effect as of the Effective Date) are not required to execute a 6A Trade Agreement to receive a distribution under the Plan.[9] The Debtors will mail proposed 6A Trade Agreements to holders of Ongoing General Unsecured Claims through the Debtors' solicitation agent, Epiq Corporate Restructuring, LLC ("**Epiq**"), which will be prepopulated with the amount of such holder's prepetition Ongoing General Unsecured Claim based on the Debtors records (and as set forth in Schedule F of the Schedule of Assets and Liabilities of the applicable Debtor (the "**Schedules**")). If there are discrepancies between the Schedules and the applicable Proof of Claim filed by such holder, FTI (as defined herein) will contact such holder to attempt to resolve such discrepancy using the contact information provided in the applicable Proof of Claim. The 6A Trade Agreement will be mailed separately from the solicitation materials by no later than the Solicitation Mailing Deadline, or as soon as reasonably practicable thereafter.

To the extent that the Debtors assume an executory contract or unexpired lease with a holder of an Allowed Ongoing General Unsecured Claim, and the Debtors are required to cure a monetary default in accordance with the terms of such executory contract or unexpired lease, such payment shall be made in accordance with the requirements of section 365(b)(1)(A) of the Bankruptcy Code and in accordance with the Plan. Additional information regarding the procedures relating to the assumption and rejection of executory contracts or unexpired leases is set forth in **Exhibit J**, including information regarding the cure notices.

If a holder of a Claim entitled to vote in Class 6A is subsequently either (i) unable to agree to a 6A Trade Agreement, or (ii) the Debtors reject such holder's executory contract or unexpired lease after the Voting Record Date, such holder will receive distributions in accordance with Section 4.7(b) of the Plan (Other General Unsecured Claims). In addition, if a holder of a Class 6A Ongoing General Unsecured Claim enters into a 6A Trade Agreement, and then transfers the underlying Claim before the Distribution Record Date, such holder waives any recovery on account of the transferred Claim and voids the 6A Trade Agreement. Subsequently, it is in the Debtors' discretion whether to seek to enter into a 6A Trade Agreement with the transferee of the claim.

Any questions regarding the 6A Trade Agreement should be submitted via e-mail to Epiq at SertaSimmons6ATA@epiqglobal.com by no later than April 21, 2023. For the 6A Trade Agreement to be valid, a copy of the fully executed 6A Trade Agreement must be submitted to Epiq by e-mail at SertaSimmons6ATA@epiqglobal.com by the Effective Date (or such later date as agreed to by the Debtors).

2. **Claims Subject to Automatic Disallowance**

Claims against the Debtors, including Ongoing General Unsecured Claims and Other General Unsecured Claims, may be subject to automatic disallowance under section 502(d) of the Bankruptcy Code. Pursuant to section 7.5 of the Plan, any Claims held by entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any

---

[9] Additional information regarding contract assumption and rejection procedures is set forth in **Exhibit J**.

8

distributions on account of such Claims until such time as such Causes of Action against that entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that entity have been turned over or paid to the Debtors or the Reorganized Debtors.

3. **Assumption or Rejection of Executory Contracts**

Information regarding the procedures for the assumption or rejection of executory contracts or unexpired leases pursuant to Article VIII of the Plan is set forth in **Exhibit J**, including information regarding the Cure Notice.

Executory contracts or unexpired leases that are not listed on any of the Schedule of Rejected Contracts, the Schedule of Assumed Contracts, or any Cure Notice will be assumed as of the Effective Date with a deemed cure amount of $0. Counterparties to such unscheduled executory contracts or unexpired leases that believe they are entitled to more than $0 in Cure, should contact the Solicitation Agent at SertaSimmons6ATA@epiqglobal.com prior to May 1, 2023, to identify such contract or unexpired lease and the asserted Cure amount. To the extent the Debtors and the counterparty cannot agree on the Cure amount, such counterparty may be required to file an objection relating to assumption or assumption and assignment in order to assert a Cure amount greater than $0 by May 1, 2023.

4. **Setoffs and Recoupment of Claims**

The Debtors and the Reorganized Debtors, as applicable, may, but shall not be required to, set off or recoup against any Claim pursuant to a timely filed Proof of Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy law; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by a Debtor or a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

5. **Collective Bargaining Agreements**

For the avoidance of doubt, the Restructuring contemplates that the Debtors' obligations under their collective bargaining agreements are to be assumed and/or otherwise unimpaired.

### III.
### OVERVIEW OF THE DEBTORS' OPERATIONS

A. **Overview of the Debtors' Business**

The Company is a leading manufacturer and marketer of bedding products. Together with their non-debtor affiliates, the Debtors operate twenty-one (21) bedding manufacturing facilities across the United States and Canada. The Debtors and its non-debtor affiliates have a portfolio of iconic brands including Simmons Bedding Company (together with its affiliates, "**Simmons**"), Serta, Inc., and Tuft & Needle, LLC.

The Debtors manufacture, sell and distribute their bedding products to retailers and to individual consumers through a number of channels. The Debtors primarily sell their products in the United States through dealers which, in 2022, included approximately 2,200 authorized individual retailers in the United States, including one or more mattress specialty stores, as well as furniture stores, department stores, furniture rental stores, mass merchandisers, and juvenile specialty stores. The Debtors also sell their products (i) to hospitality customers, such as hotels, casinos and resort properties, through SSB Hospitality, LLC; (ii) to third party

9

resellers, who purchase overstock and discontinued models through four (4) warehouses operated by World of Sleep Outlets, LLC; and (iii) directly to consumers through their e-commerce platforms and retail stores.

The Debtors also license their intellectual property for use by third party manufacturers of bedding products. Debtor Dreamwell, Ltd. licenses the Beautyrest®, Simmons®, and other trademarks for the manufacture of mattresses and foundations both within the United States for use on Beautyrest® and Simmons® branded bedding-related products and home textiles and outside of the United States to licensees who manufacture Beautyrest® and Simmons® branded mattress and bedding related products. Serta, Inc., a non-Debtor entity, licenses the Serta® trademarks for the manufacture of mattresses and foundations in the United States to the Minority Licensees (as defined herein), who also hold minority equity stakes in Serta, Inc., as well as to licensees who manufacture bedding-related products and home textiles in the United States and to licensees outside of the United States who manufacture Serta® branded mattress and bedding-related products.

### B. History and Corporate Structure

The Company's main operating entity, SSB, was formed in 2010 following the combination of two highly recognizable brands in bedding: Serta® and Simmons®. Today, SSB employs approximately 3,600 employees and accounts for approximately 19% of the annual bedding sales in the United States through a diverse portfolio of brands, including the premium Simmons® Beautyrest® line, the tech-forward Arctic® and iComfort® lines by Serta®, the value-oriented Simmons®, and most recently mattress-in-a-box brand Tuft & Needle®, acquired in 2018.

#### 1. Simmons

The Company that would become Simmons was founded in 1870 when Zalmon G. Simmons began manufacturing wooden cheese boxes and telegraph insulators in a factory on the shores of Lake Michigan in Kenosha, Wisconsin. In 1876, Zalmon G. Simmons acquired the patent to automate the process for the manufacture of coil spring mattresses that were both more comfortable and less expensive to purchase. Over the ensuing century, Simmons pioneered a number of innovations in bedding, including an individually-wrapped coil spring unit, called the Pocketed Coil® spring, that would lead to the development of the iconic Beautyrest mattress in the 1920s.

In the ensuing years, Simmons had expanded its operations worldwide and domestically to new businesses such as hospital beds and furniture. By the 1990's, it disposed of most of its foreign and non-bedding domestic operations and, in connection with such sales, entered into licensing arrangements with third parties who now produce and distribute Simmons-branded products within certain designated territories internationally. Simmons also entered into licensing arrangements domestically, pursuant to which third parties manufacture and distribute juvenile furniture, crib mattresses, sheets, pillows, and other bedding-related products and home textiles under the Simmons brand. In 2010, in connection with its chapter 11 cases, Simmons was acquired by Ares Capital Management, LLC ("**Ares**") and the Ontario Teacher's Pension Plan ("**OTPP**").

#### 2. Serta, Inc.

Serta, Inc. was formed in 1931 by a group of independent mattress manufacturers that wanted to sell throughout in the United States under the Serta® brand, each of which became a licensee and stockholder of Serta, Inc. In 2003, one such licensee, Debtor NBC, acquired a majority of the outstanding common stock of Serta, Inc. through a series of acquisitions of other Serta Inc. licensees and stockholders. In 2005, NBC was acquired by Ares and OTPP, and NBC was combined with Simmons in 2010 under ultimate parent SSB. Today, NBC owns approximately 82% of the outstanding common stock of Serta, Inc.,

10