# DEFENDANTS' EXHIBIT 333
# Part 20 of 27

[OMITTED]

## Exhibit G

**Exit ABL Facility Commitment Letter**

*Execution Version*

# ECLIPSE BUSINESS CAPITAL LLC

**CONFIDENTIAL**

January 23, 2023

Serta Simmons Bedding, LLC
One Concourse Parkway
Atlanta, Georgia 30328
Attention:  Lisa Wyn

<u>$125 Million Senior Secured Revolving Exit Facility</u>
<u>Commitment Letter</u>

Ladies and Gentlemen:

Eclipse Business Capital LLC ("***Eclipse***" or the "***Commitment Party***", "***we***" or "***us***") understands that Dawn Intermediate, LLC, a Delaware limited liability company ("***Holdings***") and certain of its subsidiaries, including Serta Simmons Bedding, LLC, a Delaware limited liability company (the "***Top Borrower***" and together with Holdings, "***you***"; and together with Holdings and such subsidiaries, the "***Debtors***") anticipate filing voluntary petitions to commence cases (the "***Chapter 11 Cases***") under Title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") in order to implement a restructuring of the Debtors (collectively, the "***Transactions***").

In connection therewith, you have requested that we commit to provide a senior secured, asset-based revolving credit exit facility (the "***Exit Facility***") on substantially the terms described in, and subject to the conditions precedent set forth in, the Exit Facility Term Sheet attached hereto as <u>Exhibit A</u> (the "***Exit Facility Term Sheet***"; and the credit agreement evidencing the Exit Facility, the "***Exit Facility Credit Agreement***") in an aggregate principal amount of $125 million.

Capitalized terms used but not defined herein are used with the meanings assigned to them in the Exit Facility Term Sheet.

1.       Commitments and Undertakings

In connection with the Transactions, subject to the terms and conditions set forth in this Commitment Letter (this "***Commitment Letter***"), the Commitment Party is pleased to advise you of its commitment to provide the entire principal amount of the Exit Facility.

2.       Titles and Roles

It is agreed that Eclipse will act as lead arranger and bookrunner for the Exit Facility (acting in such capacities, the "***Lead Arranger***") and as administrative agent and collateral agent for the Exit Facility.  You further agree that the Lead Arranger shall not have any other responsibilities except as otherwise mutually agreed.  You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by the Exit Facility Credit Agreement) will be paid in connection with the Exit Facility unless you and we shall so reasonably agree.

3.       Information

You hereby represent that (a) all written information concerning the Top Borrower and its subsidiaries (other than (i) financial projections, financial estimates, other forward-looking and/or projected information (the

"*Projections*"), (ii) information of a general economic or industry-specific nature ("*Economic and Industry Information*") and/or (iii) third party reports and/or memoranda ("*Third Party Materials*"; it being understood that Third Party Materials shall not be deemed to include written information (other than Projections and Economic and Industry Information) on which such Third Party Materials are based) that has been or will be made available to us by the Top Borrower or any of their representatives on your behalf in connection with the Transactions contemplated hereby (collectively, and excluding, for the avoidance of doubt, the Projections, Economic and Industry Information and the Third Party Materials, the "*Information*"), when taken as a whole, does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto from time to time) and (b) the Projections have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished (it being recognized by Eclipse that such Projections are not to be viewed as facts and are subject to significant uncertainties and contingencies many of which are beyond your control, that no assurance can be given that any particular financial projections will be realized, that actual results may differ from projected results and that such differences may be material). You agree that if, at any time during the term of this letter, you become aware that any of the representations in the preceding sentence would be incorrect in any material respect if the Information or the Projections were being furnished and such representations were being made at such time, you will promptly supplement the Information and the Projections so that the representations in the preceding sentence remain true in all material respects; <u>provided</u>, that any such supplementation shall cure any breach of such representations. You understand that in arranging the Exit Facility, we may use and rely on the Information and Projections without independent verification thereof and we do not assume responsibility for the accuracy and completeness of the Information or the Projections.

4.      Conditions

        The Commitment Party's commitment and agreements hereunder are subject to the conditions set forth in the Exit Facility Term Sheet under the heading "Conditions to Exit ABL Facility Closing Date", it being understood and agreed that there are no conditions (implied or otherwise) to the commitments hereunder, including compliance with the terms of this Commitment Letter, other than those expressly stated in this <u>Section 4</u>.

5.      Indemnification and Expenses

        You agree (a) to indemnify and hold harmless the Commitment Party, the Lead Arranger and any other arrangers or agents in respect of the Exit Facility appointed pursuant to this Commitment Letter, their affiliates and their respective directors, officers, employees, advisors, agents and other representatives (each, an "*indemnified person*") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Exit Facility, the use of the proceeds thereof, the use of the proceeds thereof, or the Transactions or any claim, litigation, investigation or proceeding relating to any of the foregoing (including in relation to enforcing the terms of this paragraph) (each, a "*Proceeding*"), regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon written demand for any reasonable and documented out-of-pocket legal or other documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (limited, in the case of counsel, to the reasonable and documented out-of-pocket fees, disbursements and other charges of a single firm of outside counsel to the indemnified persons and, if necessary, one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction) to each group of similarly situated affected indemnified persons), provided that the foregoing indemnity will not, as to any indemnified person, apply (i) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from the willful misconduct, bad faith or gross negligence of such indemnified person or its controlled affiliates, directors, officers or employees, advisors or agents (collectively, the "*Related Parties*"), (ii) to losses, claims, damages, liabilities or related

2

expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from a material breach of the obligations of such indemnified person or control affiliate of such indemnified person under this Commitment Letter or (iii) to the extent arising from any dispute solely among indemnified persons (other than a Proceeding against any indemnified person in its capacity or in fulfilling its role as the Lead Arranger, administrative agent, collateral agent, bookrunner, lender, letter of credit issuer or any other similar role in connection with this Commitment Letter, the Exit Facility, or the use of the proceeds thereof) not arising out of any act or omission on the part of you or your affiliates; and (b) regardless of whether the Exit ABL Facility Closing Date occurs, to reimburse the Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses (including, without limitation, due diligence expenses, syndication expenses, financial advisor's fees, consultant's fees, travel expenses, and the fees, charges and disbursements of counsel) incurred in connection with the Exit Facility and any related documentation (including this Commitment Letter, and the definitive financing documentation in connection with the Exit Facility) or the administration, amendment, modification or waiver thereof (limited, in the case of counsel, to the reasonable and documented out-of-pocket fees, disbursements and other charges of a single firm of outside counsel to the indemnified persons and, if necessary, one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction) to each group of similarly situated affected indemnified persons). No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, including an Electronic Platform or otherwise via the internet, or for any special, indirect, consequential or punitive damages in connection with the Exit Facility or in connection with its activities related to the Exit Facility and you agree, to the extent permitted by applicable law, not to assert any claims against any indemnified person with respect to the foregoing. None of the indemnified persons or you or any of your or their respective Related Parties of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Exit Facility, or the transactions contemplated hereby, *provided* that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this <u>Section 5</u>.

You shall not, without the prior written consent of an indemnified person (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such indemnified person unless (a) such settlement includes an unconditional release of such indemnified person in form and substance reasonably satisfactory to such indemnified person from all liability on claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any indemnified person or any injunctive relief or other non-monetary remedy. You acknowledge that any failure to comply with your obligations under the preceding sentence may cause irreparable harm to Eclipse and the other indemnified persons.

6.      Sharing of Information, Affiliate Activities, Absence of Fiduciary Relationship.

You acknowledge that the Commitment Party and its affiliates may be providing debt financing, equity capital or other services to other companies with which you may have conflicting interests. You acknowledge that the Commitment Party and its affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or other persons. The Commitment Party may have economic interests that conflict with your economic interests. You acknowledge and agree that (a)(i) the arrangement and other services described herein regarding the Transactions are arm's-length commercial transactions between you and your affiliates, on the one hand, and the Commitment Party, on the other hand, that do not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of the Commitment Party, (ii) the Commitment Party has not provided any legal, accounting, regulatory or tax advice to you with respect to any of the Transactions and you are not relying on the Commitment Party for such advice, (iii) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate and you are not relying on the Commitment Party for such advice and (iv) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby; and (b) in connection with the transactions contemplated hereby, (i) the Commitment Party

has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you or any of your affiliates and (ii) the Commitment Party has no obligation to you or your affiliates, except those obligations expressly set forth in this Commitment Letter and any other agreement with you or any of your affiliates.

7.      Confidentiality

        This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of its terms or substance shall be disclosed by you, directly or indirectly, to any other person, except (a) to you and your subsidiaries and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, in each case on a confidential and need-to-know basis, (b) as may be required by or in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental or regulatory authority (in which case you agree, (i) to the extent practicable and to the extent permitted by law, to inform us promptly in advance thereof and (ii) to use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (c) if the Commitment Party consents in writing to such proposed disclosure, (d) in connection with the enforcement of your rights hereunder, (e) this Commitment Letter, including the existence and contents thereof may be disclosed to any rating agency or (f) this Commitment Letter and the existence and contents hereof may be disclosed to the parties to the Restructuring Support Agreement filed in the Chapter 11 Cases on the date hereof and any other party required by the Bankruptcy Court.  Notwithstanding anything to the contrary in the foregoing, you shall be permitted to file this Commitment Letter with the Bankruptcy Court under seal in form and substance reasonably satisfactory to Eclipse or in a redacted manner in form and substance reasonably satisfactory to Eclipse and provide an unredacted copy of this Commitment Letter to the Bankruptcy Court, the Office of the United States Trustee for the Southern District of Texas and any other party required by the Bankruptcy Court and advisors to any official committee appointed in the Chapter 11 Cases.

        The Commitment Party shall use all information received by it in connection with the Exit Facility and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; *provided*, *however*, that nothing herein shall prevent the Commitment Party from disclosing any such information (a) to any Lenders or participants or prospective Lenders or participants, (b) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case the Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (c) upon the request or demand of any regulatory authority (including any self-regulatory authority) or other governmental authority purporting to have jurisdiction over the Commitment Party or any of its affiliates (in which case such person agrees (except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law or regulation, to inform you promptly thereof prior to disclosure), (d) to the employees, legal counsel, independent auditors, professionals and other experts or agents of the Commitment Party (collectively, "*Representatives*") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (e) to any of its affiliates (*provided* that any such affiliate is advised of its obligation to retain such information as confidential, and the Commitment Party shall be responsible for its respective affiliates' compliance with this paragraph) solely in connection with the Transactions, (f) to the extent any such information becomes publicly available other than by reason of disclosure by the Commitment Party, its affiliates or Representatives in breach of this Commitment Letter, (g) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Commitment Letter or the Exit Facility and (h) pursuant to customary disclosure about the terms of the financing contemplated hereby in the ordinary course of business to market data collectors and similar service providers to the loan industry for league table purposes; *provided* that the disclosure of any such information to any Lenders or prospective Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of the Commitment Party or customary market standards for dissemination of such type of information.

The provisions of this paragraph shall automatically terminate on the earlier of (a) the Exit ABL Facility Closing Date and (b) two years following the date of this Commitment Letter.

8.   Assignments

This Commitment Letter shall not be assignable by you without the prior written consent of the Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein.

From the date hereof until the Exit Facility Expiration Date (as defined below), the Commitment Party agrees not to assign the commitments and agreements hereunder, in whole or in part, without the prior written consent of the Top Borrower; provided, that, to the extent the Top Borrower consents to any assignment, the proposed new Commitment Party shall execute a joinder agreement in form and substance acceptable to the Top Borrower.

9.   Miscellaneous

The Commitment Party reserves the right to employ the services of its affiliates in providing services contemplated hereby and to allocate, in whole or in part, to its affiliates certain fees payable to the Commitment Party in such manner as the Commitment Party and its affiliates may agree in its sole discretion. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and the Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter is the only agreement that has been entered into among us and you with respect to the Exit Facility and sets forth the entire understanding of the parties with respect thereto. This Commitment Letter and any claim or controversy arising hereunder or related hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court or any other Federal court having jurisdiction over the Chapter 11 Cases, and, to the extent that the Bankruptcy Court or Federal court do not have jurisdiction, any state or Federal court sitting in the Borough of Manhattan in the City of New York, over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby or this Commitment Letter or the performance of services hereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions or this Commitment Letter or the performance of services hereunder.

The Commitment Party hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "***PATRIOT Act***"), it is required to obtain, verify and record information that identifies each Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify each Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Party and each Lender.

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

The indemnification, expense, jurisdiction, information, governing law and confidentiality provisions contained herein shall remain in full force and effect regardless of whether definitive financing documentation for the Exit Facility shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; *provided* that your obligations under this Commitment Letter (other than your obligations with respect to confidentiality) shall automatically terminate and be superseded, to the extent comparable, by the provisions of the Exit Facility Credit Agreement upon the occurrence of the effectiveness thereof.

This Commitment Letter shall become effective as of the date each of the parties hereto shall have duly executed this Commitment Letter, concurrently with (and subject to) the effectiveness of the DIP ABL Credit Agreement (as defined in the Term Sheet) pursuant to Section 4.01 thereof.  Thereafter, the commitments hereunder with respect to the Exit Facility shall automatically terminate on the Exit Facility Expiration Date (as defined below) unless the Commitment Party shall, in its discretion, agree to an extension.  You may terminate this Commitment Letter with respect to the Exit Facility hereunder at any time subject to the provisions of the preceding sentence and payment of the applicable Exit Fee (as defined in the DIP ABL Credit Agreement).

For purposes of this Commitment Letter, "***Exit Facility Expiration Date***" means the date upon which either of the following occurs:  (i) the termination of the DIP ABL Credit Agreement pursuant to Section 4.01 thereof or (ii) the maturity or termination of the DIP ABL Facility (as defined in the Term Sheet) prior to the Exit ABL Facility Closing Date.

[*Signature Pages Follow*]

[SIGNATURE PAGES OMITTED]

CONFIDENTIAL

SERTA SIMMONS BEDDING, LLC
$125 MILLION EXIT ABL FACILITY
SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

This term sheet (the "Term Sheet") sets forth a summary of the principal terms and conditions for the Exit ABL Facility (as defined below). Unless specifically defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in (i) that certain ABL Credit Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "Prepetition ABL Facility"), by and among, *inter alios*, Holdings, the Borrowers, the lenders from time to time party thereto and UBS AG, Stamford Branch, as administrative agent, or (ii) the Commitment Letter to which this Exhibit A is attached, as applicable.

| | |
|---|---|
| Holdings: | Dawn Intermediate, LLC, a Delaware limited liability company or the parent entity of the Top Borrower to be mutually agreed by the Borrowers and the Exit ABL Agent ("Holdings"). |
| Borrowers: | Serta Simmons Bedding, LLC, a Delaware limited liability company (the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing" and together with National Bedding and the Top Borrower, the "Borrowers"). |
| Guarantors: | The Borrowers' obligations under the Exit ABL Facility (the "Exit ABL Obligations"), will be guaranteed (the "Guaranty") on a joint and several basis by (x) Holdings' existing and (y) each of the Top Borrower's existing and subsequently acquired or organized wholly-owned domestic restricted subsidiaries other than any Borrower (collectively, the "Subsidiary Guarantors"; and the Subsidiary Guarantors, together with Holdings, the "Guarantors"; and the Guarantors, together with the Borrowers, the "Loan Parties"); provided, that certain subsidiaries (including Excluded Subsidiaries) will not be required to be Subsidiary Guarantors consistent with the Documentation Principles. |
| Exit ABL Lenders: | On the Exit ABL Facility Closing Date (as defined below), the debtor-in-possession asset-based revolving credit facility (the "DIP ABL Facility") contemplated under the Senior Secured Super-Priority Debtor-in-Possession ABL Credit Agreement (the "DIP ABL Credit Agreement") dated as of the date of the Commitment Letter by and between, *inter alios*, the Borrowers and Eclipse Business Capital LLC ("Eclipse") will, subject to the terms and conditions set forth herein, be refinanced with a senior secured, asset-based revolving credit facility subject to a Borrowing Base (as defined below) and with commitments in an aggregate principal amount of $125 million from Eclipse or its affiliates. The lenders making commitments under the Exit ABL Facility are collectively referred to as "Exit ABL Lenders" and, together with the Exit ABL Agent and the Exit ABL Issuing Lender (each as defined below), the "Exit ABL Secured Parties"). |

| Exit Administrative Agent and Exit Collateral Agent: | Eclipse will act as the sole and exclusive administrative agent and collateral agent for the Exit ABL Lenders (in such capacities, the "<u>Exit ABL Agent</u>") and will perform the duties customarily associated with such roles. |

## SENIOR SECURED ASSET-BASED REVOLVING LOAN FACILITY

| Type and Amount: | A senior secured, asset-based revolving credit facility (the "<u>Exit ABL Facility</u>"), made available to the Borrowers in an initial aggregate principal amount of $125 million (the "<u>Exit ABL Commitments</u>" and loans thereunder, the "<u>Exit ABL Loans</u>"). The Total Exit ABL Outstandings (as defined below) shall exceed $20 million at all times, provided that Exit ABL Loans shall exceed $10 million at all times. |

| Availability: | The Exit ABL Facility shall be available on a revolving basis during the period commencing on the Exit ABL Facility Closing Date, subject to the limitations set forth under "Use of Proceeds" below and ending on the Exit ABL Termination Date (as defined below); <u>provided</u> that the aggregate amount of the Exit ABL Loans, unreimbursed Exit ABL Letter of Credit (as defined below) drawings and Exit ABL Letters of Credit outstanding under the Exit ABL Facility at any time (collectively, the "<u>Total Exit ABL Outstandings</u>") shall not in total exceed an amount equal to the lesser of (a) the Exit ABL Commitments and (b) the then applicable Borrowing Base (such lesser amount, the "<u>Line Cap</u>" and the amount by which the Line Cap at any time exceeds the Total Exit ABL Outstandings, the "<u>Availability</u>"). |

| Borrowing Base: | The "<u>Borrowing Base</u>" shall, at any time, equal the sum of the following as set forth in the most recently delivered Borrowing Base Certificate (as defined below):[1] |

      (a)      90% of the Loan Parties' Eligible Trade Receivables (as described below) (provided, that if dilution exceeds 5%, the Exit ABL Agent may, at its option in its Permitted Discretion, (i) reduce such advance rate by the number of full or partial percentage points comprising such excess or (ii) establish a reserve on account of such excess); <u>plus</u>

      (b)      (i) prior to the establishment of the net recovery percentage, the lesser of (A) $15 million and (B) 15% of the lower of cost (determined on a FIFO basis) or market value of the Loan Parties' Eligible Inventory (as described below) and Eligible In-Transit Inventory (as described below); or

             (ii) after the establishment of the net recovery percentage, the lesser of (A) $30 million and (B) the lower of (x) 65% of the lower of cost (determined on a FIFO basis) or market value of

---

[1] Canadian Borrowing Base option (and Canadian Loan Parties) to be determined, subject to business and legal diligence.