# DEFENDANTS' EXHIBIT 333
## Part 22 of 27

ABL Agent) in connection with all assignments.

The Exit ABL Lenders shall also have the right to sell participations in their Exit ABL Loans to other persons (other than to any Disqualified Institutions).  Participants shall have the same benefits as the Exit ABL Lenders with respect to yield protection and increased cost provisions subject to customary limitations and restrictions.  Voting rights of participants shall be limited to those matters with respect to which the affirmative vote of each Exit ABL Lender or each Exit ABL Lender directly and adversely affected thereby, as applicable, is required.

Pledges of Exit ABL Loans in accordance with applicable law shall be permitted without restriction other than to Disqualified Institutions.

The Exit ABL Agent shall be permitted to make the list of Disqualified Institutions available to any Lender who specifically requests a copy thereof.  The Exit ABL Agent shall not have any liability for assignments or participations made to Disqualified Institutions or affiliated Lenders (regardless of whether the consent of the Exit ABL Agent is required thereto), and none of the Top Borrower, any Exit ABL Lender nor any of their respective affiliates will bring any claim to such effect but, for the avoidance of doubt, the Exit ABL Agent shall not be (i) obligated to ascertain, monitor or inquire as to whether any lender is a Disqualified Institution or (ii) have any liability with respect to any assignment of Exit ABL Loans to any Disqualified Institution (other than for gross negligence or willful misconduct if the Top Borrower has not consented in writing to an assignment to a Disqualified Institution).

| | |
|---|---|
| Expenses and Indemnification: | The Exit ABL Credit Documents will contain expense reimbursement and indemnification provisions customary for facilities of this size, type and purpose and substantially similar to the DIP ABL Facility. |
| Governing Law and Forum: | New York |
| Counsel to the Exit ABL Agent: | Choate, Hall & Stewart LLP. |

Annex I to Exit ABL Facility Term Sheet

INTEREST AND CERTAIN FEES

Interest Rates:

The Exit ABL Loans comprising each borrowing shall bear interest at a rate per annum equal to the Adjusted Term SOFR Rate (as defined below) plus the Applicable Margin (as defined below), subject to limited circumstances (to be set forth in the Exit ABL Credit Documents) in which the Exit ABL Loans comprising each borrowing shall bear interest at a fallback rate per annum equal to the ABR (as defined below) plus the Applicable Margin. Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, at the election of the Exit ABL Agent or the Required Exit ABL Lenders, the Exit ABL Loans comprising each borrowing shall bear interest at a rate per annum equal to the ABR (as defined below) plus the Applicable Margin.

For purposes of computing interest on the Exit ABL Loans, and solely to the extent a Cash Dominion Period is then continuing, all payments and collections shall be deemed applied by the Exit ABL Agent 1 business day after the Exit ABL Agent's receipt of advice of deposit thereof at the Exit ABL Agent's bank.

As used herein:

"ABR" means the highest of (a) the rate announced by Wells Fargo Bank, National Association, at its principal office in San Francisco, as its "prime rate", (b) the federal funds rate plus 50 basis points, (c) the Adjusted Term SOFR Rate plus 1.00% and (d) 2.00%.

"ABR Loans" means Exit ABL Loans bearing interest based upon the ABR. ABR Loans will be made available on same day notice.

"Adjusted Term SOFR Rate" means the higher of (a) the Term SOFR Rate plus the Term SOFR Adjustment and (b) 1.00% per annum.

"Term SOFR Adjustment" means 0.11448%.

"Term SOFR Rate" means, for any calendar month, the Term SOFR Reference Rate for a tenor of one month at approximately 5:00 p.m., New York time, two U.S. government securities business days prior to the commencement of such calendar month, as such rate is published by the CME Term SOFR Administrator.

"Term SOFR Rate Loans" means Exit ABL Loans bearing interest based upon the Adjusted Term SOFR Rate. Term SOFR Rate Loans will be made available on same day notice.

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the CME Term SOFR Administrator.

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Exit ABL Agent in its reasonable discretion).

"Applicable Margin" shall be (i) until the nine-month anniversary of the Exit ABL Facility Closing Date (x) with respect to Term SOFR Rate Loans, 4.50% and (y) with respect to ABR Loans, 3.50% and (ii) thereafter, as set forth in the pricing grid below.

| Level | Fixed Charge Coverage Ratio ("FCCR") and Availability | Applicable Margin for Term SOFR Rate Loans | Applicable Margin for ABR Loans |
|---|---|---|---|
| I | FCCR: ≥ 2.00x and Availability: ≥ 30% | 4.00% | 3.00% |
| II | FCCR: ≥ 1.50x and < 2.00x and Availability: ≥ 20% *or* FCCR: ≥ 2.00x and Availability: ≥ 20% and < 30% | 4.25% | 3.25% |
| III | FCCR: < 1.50x *or* Availability: < 20% | 4.50% | 3.50% |

Fixed Charge Coverage Ratio (to be defined in a manner to be mutually agreed) and Availability will be determined based on the most recent compliance certificate delivered after the Exit ABL Facility Closing Date.

Interest Payment Date:    The first day of each calendar month.

Minimum Interest:    For purposes of computing interest on the Exit ABL Loans on any day, if the aggregate principal amount of Exit ABL Loans actually outstanding on such day is less than the result (the "Minimum Borrowing Amount") of (i) $20 million minus (ii) the aggregate amount (not to exceed $10 million) of Exit ABL Letters of Credit then outstanding, then such interest shall be computing as if Exit ABL Loans were outstanding in such Minimum Borrowing Amount.

ABL Facility Commitment Fee:    The Top Borrower shall pay a commitment fee (the "Exit ABL Facility Commitment Fee") calculated at a rate per annum equal to 0.50% on the actual daily unused portion of the Exit ABL Commitments of non-defaulting Exit ABL Lenders, payable monthly in arrears. For purposes of the commitment fee calculations, the Total Exit ABL Outstandings shall

be deemed to be a utilization of the Exit ABL Facility.

**Letter of Credit Fees:**

The Top Borrower shall pay a fee on all outstanding Exit ABL Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Term SOFR Rate Loans under the Exit ABL Facility on the face amount of each such Exit ABL Letter of Credit. Such fee shall be shared ratably among the Exit ABL Lenders and shall be payable monthly in arrears.

A fronting fee in an amount equal to 0.25% per annum on the then-available face amount of each Exit ABL Letter of Credit shall be payable monthly in arrears to the Exit ABL Issuing Lender for its own account. In addition, the Top Borrower shall pay customary issuance and administration fees to the Exit ABL Issuing Lender.

**Collateral Monitoring Fee:**

The Top Borrower shall pay a collateral monitoring fee, for the sole benefit of the Exit ABL Agent, equal to 0.05% of the average daily used portion of the Exit ABL Commitments. Such fee shall be fully earned as it accrues and due and payable in arrears on the first day of each calendar month.

**Early Termination Fee:**

If, before the Exit ABL Termination Date, the Exit ABL Commitments are terminated for any reason (including any voluntary, mandatory or automatic termination, regardless of whether an Event of Default has occurred and is continuing, and including by reason of acceleration, automatic acceleration or otherwise), then the Top Borrower shall pay a fee (the "<u>Early Termination Fee</u>"), as liquidated damages and compensation for the cost of the Exit ABL Lenders being prepared to make funds available under the Exit ABL Commitments during the scheduled term of the Exit ABL Facility, in an amount equal to the applicable percentage set forth below of the amount of the Exit ABL Commitments so terminated:

(i) 2.0% if on or before the first anniversary of the Exit ABL Facility Closing Date;

(ii) 1.5% if after the first anniversary of the Exit ABL Facility Closing Date and on or before the second anniversary of the Exit ABL Facility Closing Date;

(iii) 1.0% if after the second anniversary of the Exit ABL Facility Closing Date and on or before the third anniversary of the Exit ABL Facility Closing Date; and

(iv) 0.5% if after the third anniversary of the Exit ABL Facility Closing Date; and

<u>provided</u>, that no Early Termination Fee shall be due and payable with respect to any voluntary termination of all of the Exit ABL Commitments by the Top Borrower on or after the date that is 60 days prior to the Exit ABL Termination Date, so long as the Top Borrower has given Exit ABL Agent written notice of such termination at least 90 days prior to the date

of such termination.

Default Rate: At any time when an event of default under the Exit ABL Facility exists, at the election of the Exit ABL Agent or the direction the Required Exit ABL Lenders, all overdue amounts shall bear interest, to the fullest extent permitted by law, at (i) in the case of principal or interest, 2.00% per annum above the rate then borne by (in the case of principal) such borrowings or (in the case of interest) the borrowings to which such interest relates or (ii) in the case of all other overdue amounts, 2.00% per annum in excess of the rate otherwise applicable to Exit ABL Loans maintained as ABR Loans from time to time.

Rate and Fee Basis: All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest payable on which is then based on the prime rate) for actual days elapsed.

**Exhibit H**

**Takeback Debt Terms**

[OMITTED]

**EXHIBIT C**

New Term Loan Credit Facility Agreement Term Sheet

# DAWN INTERMEDIATE, LLC
## AMENDED NEW TERM LOAN TERM SHEET[1]

## March 22, 2023

| Term | Description |
|---|---|
| **Type** | • Senior Secured Term Loans |
| **Principal Amount** | • $315,000,000 (including original issue discount, if any) |
| **Maturity Date** | • 5 years after the effective date of the Plan |
| **Security** | • Second priority lien on all assets of the Reorganized Debtors that would constitute ABL Priority Collateral (as defined in the ABL Intercreditor Agreement)<br>• A first priority lien on all assets of the Reorganized Debtors that would constitute Term Priority Collateral (as defined in the ABL Intercreditor Agreement) |
| **Interest Rate** | • SOFR + 750bps<br>• SOFR floor of 1.00% |
| **Amortization** | • No amortization in 2023 or 2024<br>• 1.0% per annum beginning in 2025 |
| **Call Protection** | • 102, 101, par, which shall also be payable upon maturity, acceleration, termination, conversion, payment, prepayment, or repayment (excluding certain mandatory prepayments) and to include bankruptcy protections |
| **Financial Covenants** | • Minimum liquidity of $25mm tested monthly |

---

[1] Capitalized terms used herein and not defined herein shall have the meanings set forth in the Restructuring Support Agreement (including in any annexes or exhibits thereto) or the Amendment, as applicable, to which this term sheet is attached.

| | |
|---|---|
| **Other Terms** | • The New Term Loan Credit Facility Agreement shall be based on the same precedent as the Exit ABL Credit Agreement and provide for other affirmative and negative covenants, representations, warranties, mandatory prepayments, events of default and other terms that shall be based on the corresponding provisions set forth in the Prepetition ABL Facility , but to include changes to reflect a term loan facility rather than an ABL facility, baskets and exceptions and other modifications, acceptable to the Requisite Consenting Creditors and Company, including (without limitation):<br><br>    o Limitations on incurrence of indebtedness and liens, restricted payments, investments, asset sales, restrictive agreements, fundamental changes and affiliate transactions;<br><br>    o Affirmative covenant to use commercially reasonable efforts to maintain public corporate credit rating and public corporate family rating; and<br><br>    o Elevated voting thresholds for subordination of the New Term Loan in right of payment or lien priority, J. Crew protection and Chewy protection. |

**EXHIBIT D**

Organizational Chart



**Organizational Chart**

Dawn Holdings, Inc.
(Delaware)

Dawn Intermediate, LLC
(Delaware)

Serta Simmons
Bedding, LLC
(Delaware)

Serta International
Holdco, LLC
(Delaware)

SSH Canada Holding Co.,
LLC
(Delaware)

SSB Manufacturing
Company
(Delaware)

Simmons Bedding
Company, LLC
(Delaware)

Tuft & Needle, LLC
(Delaware)

Tomorrow Sleep LLC
(Delaware)

SSB Retail, LLC
(Delaware)

National Bedding Company
L.L.C.
(Illinois)

SSH Bedding Canada Co.
(Canada)

The Simmons
Manufacturing Co., LLC
(Delaware)

Simmons Caribbean
Bedding, Inc.
(Puerto Rico)

Dreamwell, Ltd.
(Nevada)

SSB Hospitality, LLC
(Delaware)

SSB Logistics, LLC
(Delaware)

World of Sleep Outlets,
LLC
(Delaware)

~82%

Serta, Inc.
(Delaware)

~18%

Minority
Shareholders

Serta Canada Ltd.
(Canada)

Debtor Entities

**Notes:**
(a)   All ownership percentages 100% unless otherwise noted

**EXHIBIT E**

Liquidation Analysis

# LIQUIDATION ANALYSIS

## I.    Overview

For a chapter 11 plan to be confirmed, the bankruptcy court must find that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan.  The "best interests" test requires a bankruptcy court to find either (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

## II.    Underlying Assumptions and Disclaimer

This liquidation analysis (the "Liquidation Analysis") was prepared in connection with the development of the *Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "**Plan**")[13] and Disclosure Statement to which this Liquidation Analysis is attached as an exhibit.  The Debtors have prepared this Liquidation Analysis based on a hypothetical liquidation under chapter 7 of the Bankruptcy Code.  The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors.  Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation.

This Liquidation Analysis presents the Debtors' determination of hypothetical liquidation value of their business if a chapter 7 trustee were appointed and charged with winding down the estates.  Under a chapter 7 liquidation, it is assumed that the trustee would sell all of the Debtors' major assets or surrender them to the respective lien holders, and the cash proceeds, net of liquidation related costs, would then be distributed to holders of Claims in accordance with relevant law.

The Debtors filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on January 23, 2023 (the "Petition Date").  The Liquidation Analysis assumes conversion of the Debtors' chapter 11 cases to chapter 7 liquidation cases on May 8, 2023 (the "Conversion Date").  On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the estates.  As a baseline, the Liquidation Analysis used each of the Debtors' unaudited assets and liabilities as of December 31, 2022, and then, as set forth herein, (i) the Debtors' forecasted balance of cash and cash equivalents was adjusted to take into account the projected cash flows between December 31, 2022 and the Conversion Date and (ii) the book values of certain assets and liabilities were adjusted, where appropriate, when more recent and accurate valuation information was available (in particular, the balances of the Debtors' cash, accounts receivable, inventory and accounts payable).  The Liquidation Analysis is prepared on a debtor-by-debtor basis.  The lenders under the FLFO Term Loans, FLSO Term Loans, the Non-PTL Term Loans, and the DIP Facility have a security interest in the same collateral (*i.e.*, the collateral that the DIP Facility has a first lien on, the PTL-Lenders and Non-PTL Lenders have a second lien on, and the collateral that the PTL Lenders and Non-PTL Lenders have a first lien on,

---

[13]    Capitalized terms used but not defined herein have the meanings ascribed to them in the disclosure statement to which this exhibit is attached (the "**Disclosure Statement**") or in the Plan, as applicable.

the DIP Lenders have a second lien on). Each of the Debtors are either borrowers or guarantors under the PTL Facility, the Non-PTL Term Loan Facility, and the DIP Facility. The relative rights and priorities of the (i) PTL Lenders and Non-PTL Lenders, including with respect to the priority of interests in collateral, are governed by the First Lien Intercreditor Agreement, and (ii) PTL Lenders, Non-PTL Lenders, and DIP Lenders are governed by the ABL Intercreditor Agreement.

The Debtors' owned real property (land, land improvements, buildings and building improvements) is unencumbered and the net proceeds from the liquidation of these assets would first be available to the chapter 11 administrative claims. The recovery for the administrative claimants is also prepared on a debtor-by-debtor basis.

The Liquidation Analysis assumes that the Trustee does not possess the operational expertise or capability to continue to operate the Debtors' businesses efficiently for the extended period required to conduct a going-concern sale process. As a result, the Liquidation Analysis assumes the Trustee would manage the liquidation in two stages. The first stage is to operate for a 60-day period to produce/convert inventory to fill orders while running the plants at current levels followed by a second phase where the Trustee winds down the remaining operations/liquidates the remaining assets after that two-month period on an expedited basis, while still looking for value maximizing transactions where feasible. The orderly liquidation is assumed to occur over approximately a six-month period.

The Debtors have majority ownership interests in several non-Debtor subsidiaries, which are not borrowers or guarantors under the PTL Facility, Non-PTL Term Loan Facility, nor the DIP Facility. Given the significant support that the Debtors provide these non-Debtors subsidiaries, it is assumed that the assets of these non-Debtor subsidiaries will be liquidated concurrently with the Debtors' assets, as opposed to trying to sell the non-Debtor subsidiaries as going-concern entities. The proceeds from the liquidation of the assets of the non-Debtor subsidiaries first go to satisfy the creditors of the non-Debtor subsidiaries (including payables the non-Debtor subsidiaries owe to the Debtors) and any remaining proceeds after satisfying the creditors would then be available on account of the non-Debtor subsidiaries' equity interests. If the asset proceeds generated by the non-Debtor subsidiaries are not enough to satisfy their creditors, then the creditors will receive a pro-rata share of the net proceeds, with no recovery to the Debtors on account of their ownership interest. The Debtors' own 100 percent of the equity of their non-Debtor subsidiaries except for Serta, Inc., where the Debtors own approximately 82.7 percent of the equity.

THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE THAN EXPLAINED ABOVE. THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING-CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED IN AN ACTUAL LIQUIDATION. THIS ANALYSIS ASSUMES "LIQUIDATION VALUES" BASED ON THE DEBTORS' BUSINESS JUDGEMENT IN CONSULTATION WITH THE DEBTORS' ADVISORS. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM GOING CONCERN SALE(S) OF THE DEBTORS' ASSETS OR BUSINESS UNITS WOULD BE MORE THAN HYPOTHETICAL LIQUIDATION VALUE, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER OF THE DEBTORS' BUSINESS. THE UNDERLYING FINANCIAL INFORMATION IN THE LIQUIDATION ANALYSIS WAS NOT COMPILED OR EXAMINED BY ANY INDEPENDENT ACCOUNTANTS. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION NOR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

III.     **Summary Notes to this Liquidation Analysis**

(i)  The Liquidation Analysis Depends on Estimates and Assumptions.  The determination of the hypothetical proceeds from, and costs of, the liquidation of the Debtors' assets, is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business and economic uncertainties and contingencies beyond the control of the Debtors.  Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation.  The Debtors prepared the Liquidation Analysis for the sole purpose of establishing a reasonable good-faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants.  Accordingly, while deemed reasonable based on the facts currently available, neither the Debtors nor their advisors make any representations or warranties that the actual results would or would not approximate the estimates and assumptions set forth in this Liquidation Analysis.

(ii)  Estimate of Gross Proceeds.  The Liquidation Analysis assumes a liquidation of all the Debtors' assets (described in more detail below).  The Liquidation Analysis assumes that the Trustee does not possess the operational expertise or capability to continue to operate the Debtors' global businesses efficiently for the extended period required to conduct a going-concern sale process.  The Liquidation Analysis estimates gross proceeds on a debtor-by-debtor basis.

(iii)  Cash and Cash Equivalents.  The cash balance at the Conversion Date is based on the Debtors' cash flow forecast.  The cash balance is rolled forward from the Conversion Date for two months of operations as discussed in the Section II laying out the Underlying Assumptions and Disclaimers.  In both high and low Liquidation Analysis scenarios, cash and cash equivalents are assumed to be entirely available for use to pay creditors/fund wind-down costs.

The Liquidation Analysis estimates that the Debtors' will have $191.6 million of cash and cash equivalents post Conversion Date operations.

*a.  Accounts Receivable*

The accounts receivable at the Conversion Date are based on the amounts assumed in the Debtors' cash flow forecast.  After the Conversion Date, the accounts receivables are rolled forward based on two months of operations as discussed in Section II describing the Underlying Assumptions and Disclaimers.  Most of the Debtors receivables are with large dealers/retailers/hoteliers, which have reliable payment histories and while accounts receivables are typically more difficult to collect when an entity is liquidating, the Debtors have assumed that the collections will range from 75% on the low-end to 90% on the high-end.

The Liquidation Analysis assumes that the Debtors' contractual customer liabilities are netted against their accounts receivable collections consistent with the ordinary course of business prior to the Debtors filing chapter 11.  It also assumes that receivables from royalties and other receivables are also collected at the same percentages as accounts receivable.  Vendor deposits, which are categorized in accounts receivables in the Debtors' trial balances are assumed to be offset by the vendors against amounts owed them from the Debtors.

The Liquidation Analysis assumes the Debtors will have $125.2 million of receivables on a net book value basis after two months of operation post-Conversion Date, which will result in $93.3 to $112.0 million in collections.

3