**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SERTA SIMMONS BEDDING, LLC, et al., | : | Case No. 23-90020 (DRJ) |
| | : | (Jointly Administered) |
| Debtors, | : | |
| | : | |
| | : | |
| SERTA SIMMONS BEDDING, LLC, et al., | : | |
| | : | |
| Plaintiffs and Counterclaim Defendant, | : | Adv. Proc. No. 23-09001 |
| | : | (DRJ) |
| v. | : | |
| | : | |
| AG CENTRE STREET PARTNERSHIP L.P., et al., | : | |
| | : | |
| Defendants and Counterclaim Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| AGF FLOATING RATE INCOME FUND, et al., | : | |
| | : | |
| Additional Counterclaim Defendants. | : | |
| | : | |
| | : | |

## EXCLUDED LENDERS' PRE-TRIAL MEMORANDUM OF LAW

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
7 Times Square
New York, NY 10036
(212) 833-1100

*Attorneys for the Excluded Lenders*

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, TX 77002
(713) 226-6000

*Attorneys for the Excluded Lenders with respect to Plaintiffs' Claims and Counterclaims Only*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 3

I.    SERTA AND THE FAVORED LENDERS BREACHED THE IMPLIED COVENANT
      OF GOOD FAITH AND FAIR DEALING IN THE 2016 CREDIT AGREEMENT ........ 3

      A.    Under New York Law, the 2016 Credit Agreement
            Contains an Implied Covenant of Good Faith and Fair Dealing ............................ 4

      B.    The Trial Evidence Will Show Serta and the
            Favored Lenders Breached the Implied Covenant of
            Good Faith and Fair Dealing in the 2016 Credit Agreement ................................. 11

            1.    The Unlawful Exchange Transaction Deprived the Excluded
                  Lenders of Their Fundamental Right to *Pro Rata* Treatment .................... 11

            2.    The Unlawful Exchange Transaction Was Unprecedented and
                  Contrary to the Expectations of the Market and the Parties ..................... 13

            3.    Serta and the Favored Lenders Acted with Improper Motives
                  in Entering into the Unlawful Exchange Transaction ............................... 15

            4.    Advent Handpicked First and Second Lien
                  Lenders to Reach the 50.1% Minimum and
                  Fill the Remaining Exchange Capacity ....................................................... 18

            5.    Serta and the Favored Lenders' Attempt to Insulate
                  Themselves from the Consequences of Their Wrongful Conduct
                  Demonstrates Their Lack of Good Faith ..................................................... 20

            6.    Serta and the Favored Lenders' Purported Justifications
                  for the Unlawful Exchange Transaction Are Not a Defense .................... 21

II.   NORTH STAR DEBT HOLDINGS, L.P. HAS A VALID ASSIGNMENT OF $192
      MILLION IN FACE AMOUNT OF SERTA'S FIRST LIEN TERM LOANS ............... 22

      A.    The 2016 Credit Agreement's "Disqualified Institution" Provisions .................... 23

      B.    Advent Removed Apollo from the DQ List in 2016
            and Apollo Traded Serta Loans Over the Next Two Years ................................. 24

      C.    When Apollo Attempted to Purchase Serta Loans in 2020,  Serta Incorrectly
            Claimed Apollo Was on the DQ List .................................................................. 25

i

D.      As Serta's Agent, Advent Had Authority to
        Remove Apollo from the DQ List, and It Did ........................................27

E.      Serta Ratified Advent's Removal of Apollo from the DQ List ............................29

F.      Apollo Reasonably Relied on UBS's Statements
        That Apollo Was Not on the DQ List ....................................................30

III.    THIS COURT LACKS JURISDICTION TO ENTER
        A FINAL ORDER ON THE EXCLUDED LENDERS'
        COUNTERCLAIMS AGAINST THE FAVORED LENDERS ......................................31

CONCLUSION..................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*159 MP Corp. v. Redbridge Bedford, LLC,*
33 N.Y.3d 353 (2019) ........................................................................................................11

*36 Convent Ave. HDFC v. Fishman,*
2004 WL 1048213 (S.D.N.Y. May 7, 2004) ......................................................................29

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.,*
98 N.Y.2d 144 (2002) ........................................................................................................4

*AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC,*
2023 WL 2394680 (N.Y. App. Div. (1st Dep't) Mar. 7, 2023) ............................................ 9

*Bank of China v. Chan,*
937 F.2d 780 (2d Cir. 1991) ..............................................................................................5

*Carvel Corp. v. Baker,*
79 F. Supp. 2d 53 (D. Conn. 1997) ........................................................................6, 11, 13

*CBS Corp. v. Eaton Corp.,*
2010 WL 1375169 (S.D.N.Y. Mar. 30, 2010) ...................................................................21

*Chase Manhattan Bank v. Keystone Distribs., Inc.,*
873 F. Supp. 808 (S.D.N.Y. 1994) .....................................................................................4

*Cohen v. Utica First Ins. Co.,*
436 F. Supp. 2d 517 (E.D.N.Y. 2006) ..........................................................................20, 28

*Credit Agricole Corp. v. BDC Fin., LLC,*
135 A.D.3d 561 (N.Y. App. Div. (1st Dep't) 2016) .............................................................10

*CSI Inv. Partners II, L.P. v. Cendant Corp.,*
507 F. Supp. 2d 384 (S.D.N.Y. 2007) .................................................................................4

*In re Delta Produce, L.P.,*
845 F.3d 609 (5th Cir. 2016) ............................................................................................32

*Dreni v. PrinterOn Am. Corp.,*
486 F. Supp. 3d 712 (S.D.N.Y. 2020) ...........................................................................6, 19

*E. Ramapo Cent. Sch. Dist. v. N.Y. Sch. Ins. Reciprocal,*
199 A.D.3d 881 (N.Y. App. Div. (2d Dep't) 2021) ...............................................................4

*Ellison v. Island Def Jam Music Grp.,*
79 A.D.3d 458 (N.Y. App. Div. (1st Dep't) 2010) ...........................................................6, 11

iii

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*,
   680 F. Supp. 2d 625 (S.D.N.Y. 2010)......................................................................5

*In re Galaz*,
   765 F.3d 426 (5th Cir. 2014) ........................................................................31, 32

*Gray & Assocs., LLC v. Speltz & Weis LLC*,
   2009 WL 416138 (N.Y. Sup. Ct. (N.Y. Cnty.) 2009)........................................6, 11

*Highland Cap. Mgmt. LP* v. *Schneider*,
   607 F.3d 322 (2d Cir. 2010)....................................................................................28

*ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*,
   2022 WL 10085886 (N.Y. Sup. Ct. (N.Y. Cnty.) Oct. 17, 2022)............................9

*In re KSRP, Ltd.*,
   2011 WL 13096691 (Bankr. S.D. Tex. Aug. 17, 2011 .........................................33

*LCM XII Ltd. v. Serta Simmons Bedding, LLC*,
   2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ......................................................8, 9

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018).....................................................................5

*Macy's, Inc. v. J.C. Penney Corp.*,
   989 N.Y.S.2d 238 (N.Y. Sup. Ct. (N.Y. Cnty.) 2014).......................................7, 21

*Medacist Sols. Grp., LLC v. CareFusion Sols., LLC*,
   2021 WL 293568 (S.D.N.Y. Jan. 28, 2021) ...........................................................5

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
   716 F. Supp. 1504 (S.D.N.Y. 1989).......................................................................5

*Murphy v. Am. Home Prod. Corp.*,
   58 N.Y.2d 293 (1983) .............................................................................................6

*New Media Holding Co., LLC v. Kagalovsky*,
   2012 WL 3636517 (N.Y. Sup. Ct. (N.Y. Cnty.) Aug. 10, 2012)............................8

*Octagon Credit Invs., LLC v. NYDJ Apparel LLC*,
   Index No. 656677/2017 (N.Y. Sup. Ct. (N.Y. Cnty.) Jan. 9, 2018) .......................10

*Riccelli Enterprises, Inc.* v. *New York State Dep't of Env't Conserv.*,
   30 Misc. 3d 573 (N.Y. Sup. Ct. (Onondaga Cnty.) 2010) .....................................28

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,
   309 A.D.2d 288 (N.Y. App. Div. (1st Dep't) 2003) ................................................7

iv

*Rus, Inc. v. Bay Indus., Inc.*,
 322 F. Supp. 2d 302 (S.D.N.Y. 2003)................................................................................7

*Ryan* v. *Prescott*,
 2013 WL 1150216 (N.Y. Sup. Ct. (Albany Cnty.) 2013)..................................................29

*Stern v. Marshall*,
 564 U.S. 462 (2011).............................................................................................31, 32, 33

*Topps Co. v. Cadbury Stani S.A.I.C.*,
 380 F. Supp. 2d 250 (S.D.N.Y. 2005).........................................................................10, 22

*Travellers International, A.G. v. Trans World Airlines, Inc.*,
 41 F.3d 1570 (2d Cir. 1994)...................................................................................7, 8, 15

*Vista Outdoor Inc. v. Reeves Fam. Tr.*,
 725 F. App'x 17 (2d Cir. 2018) ..........................................................................................5

## **Statutes**

28 U.S.C. § 157(b) .....................................................................................................31, 33

28 U.S.C. § 157(b)(2)(c)...................................................................................................32

28 U.S.C. § 157(c)(1)........................................................................................................33

Defendants and counterclaim plaintiffs AG Centre Street Partnership L.P., AG Credit Solutions Non-ECI Master Fund, L.P., AG Super Fund Master, L.P., AG SF Master (L), L.P., Silver Oak Capital, L.L.C., Ascribe III Investments, LLC, Columbia Cent CLO 21 Limited, Columbia Cent CLO 27 Limited, Columbia Floating Rate Fund, a series of Columbia Funds Series Trust II, Columbia Strategic Income Fund, a series of Columbia Funds Series Trust I, Contrarian Capital Fund I, L.P., Contrarian Distressed Debt Fund, L.P., Contrarian Centre Street Partnership, L.P., Gamut Capital SSB, LLC, North Star Debt Holdings, L.P., Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., Shackleton 2017-XI CLO, Ltd., Z Capital Credit Partners CLO 2018-1 Ltd., and Z Capital Credit Partners CLO 2019-1 Ltd. (collectively, the "Excluded Lenders") respectfully submit this trial memorandum of law in connection with the trial of this action which is to commence on May 15, 2023 (the "Adversary Proceeding Trial").

## **INTRODUCTION**

At the Adversary Proceeding Trial, the Court will adjudicate two claims asserted by the Excluded Lenders and one claim asserted by Serta and the Favored Lenders. The Excluded Lenders' claims are (a) against Serta and the Favored Lenders for their respective breaches of the implied covenant of good faith and fair dealing in the 2016 Credit Agreement, and (b) against Serta for a declaratory judgment concerning the validity of Apollo's purchases in 2020 of Serta's First Lien Term Loans. Serta and the Favored Lenders assert a claim for a declaratory judgment validating the Unlawful Exchange Transaction.

The trial evidence, much of it uncontradicted, will establish that Serta and the Favored Lenders breached the implied covenant of good faith and fair dealing in the 2016 Credit Agreement. Well-settled New York law, which governs the 2016 Credit Agreement, provides that the implied covenant is breached when a contracting party deprives another party of the

"fruits" of the parties' contractual bargain.  There is no dispute that through the Unlawful Exchange Transaction, Serta and the Favored Lenders intentionally destroyed the Excluded Lenders' core contractual right to *pro rata* treatment under the 2016 Credit Agreement.  The trial evidence will demonstrate the multiple ways in which, even if (giving effect to the Court's ruling on summary judgment), they might be said to have technically complied with certain aspects of that agreement, Serta and the Favored Lenders accomplished that unlawful result.

Serta used a subset of the Excluded Lenders, which included Apollo, as a stalking horse to induce the Favored Lenders into participating in what ultimately became the Unlawful Exchange Transaction.  Rather than simply entertain competing bids, Serta led the Excluded Lenders to believe the company was seeking a "drop-down" transaction, which they pursued for months at Serta's insistence.  Serta's sponsor Advent, however, never had any intention of allowing a transaction in which Apollo was involved.  Instead, Serta, through Evercore, leaked word to the Favored Lenders that Apollo and others were in advanced discussions on a drop-down transaction (a structure that the company invited, and that was still under negotiation). Until then, the Favored Lenders had been advocating a solely new money transaction that, by design, would have been open to all of Serta's lenders, yet Serta had inexplicably (it seemed) been ignoring their attempts to engage.  Upon hearing of the drop-down transaction, the Favored Lenders pivoted to a predatory transaction that would not only exclude the group of lenders pursuing the drop-down, as well as nearly a dozen other lenders, but fundamentally, punitively, and opportunistically alter the bargain set forth in the 2016 Credit Agreement to which all the lenders were parties.  It was the epitome of a breach of the implied covenant of good faith.  For that reason, the Excluded Lenders are entitled to judgment in their favor on both their claim for

breach of the implied covenant, and on the mirror-image claims of Serta and the Favored

Lenders seeking validation of the Unlawful Exchange Transaction.

Second, the trial evidence will show that Apollo holds valid assignments of

Serta's First Lien Term Loans.  Serta has sought to block or invalidate those assignments on the

basis that Apollo and, in particular, its affiliate North Star Debt Holdings L.P., which purchased

the loans, are on a list of "Disqualified Institutions" (the so-called "DQ List") which may not

trade Serta's loans.  Discovery has shown, and the trial evidence will establish, that this is not the

case, and that Apollo's assignments are valid.  The uncontroverted evidence will show that the

Administrative Agent for the 2016 Credit Agreement, UBS, was instructed in no uncertain terms

to remove Apollo from the Serta DQ List in the fall of 2016.  Serta now attempts to dismiss that

instruction as unauthorized even though it came from Serta's majority equity owner and private

equity sponsor, Advent, who regularly directed UBS—including by providing it with the DQ

List in the first instance.  The evidence at trial that the instruction was effective will be

substantial—including that Apollo affiliates purchased and sold Serta loans over the ensuing

years with Advent's knowledge and without objection.

## **ARGUMENT**

### I.
### **SERTA AND THE FAVORED LENDERS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN THE 2016 CREDIT AGREEMENT**

New York law is clear that a party to a contract breaches the implied covenant of

good faith and fair dealing where it acts in a manner that has the effect of destroying the other

party's right to receive the benefit of its bargain.  The trial evidence will show that, in entering

into the Unlawful Exchange Transaction, Serta and the Favored Lenders committed a textbook

violation of the implied covenant, by eviscerating the Excluded Lenders' rights to *pro rata*

payments, proceeds of collateral and sharing, which undisputedly were fundamental to the parties' bargain under the 2016 Credit Agreement.

## A.    Under New York Law, the 2016 Credit Agreement Contains an Implied Covenant of Good Faith and Fair Dealing

Under New York law, "all contracts imply a covenant of good faith and fair dealing in the course of performance," *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y. 2d 144, 153 (2002), which constitutes a "pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract, *even if the terms of the contract do not explicitly prohibit such conduct*." *E. Ramapo Cent. Sch. Dist. v. N.Y. Sch. Ins. Reciprocal*, 199 A.D.3d 881, 884 (N.Y. App. Div. (2d Dep't) 2021) (emphasis added); *accord CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007) (a claim for breach of the implied covenant may be brought "where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain"); *Chase Manhattan Bank v. Keystone Distribs., Inc.*, 873 F. Supp. 808, 815 (S.D.N.Y. 1994) ("[A] party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations.").[1]

The implied covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the relevant

---

[1] The Court already has determined that the Unlawful Exchange Transaction was not a breach of the 2016 Credit Agreement because it constituted an "open market purchase" within the meaning of § 9.05(g) of the Credit Agreement. As the foregoing case law makes clear, however, a party may be in breach of the implied covenant even if it is not in breach of its express contractual obligations. Indeed, the Court seemed to appreciate this distinction in its bench ruling at the March 27 summary judgment hearing, when it denied Plaintiffs' motions as to breach of the implied covenant because "the argument is fairly persuasive that there could be something else." *See* ECF No. 133.

3724460.1

contract.  *See Medacist Sols. Grp., LLC v. CareFusion Sols., LLC*, 2021 WL 293568, at *12 (S.D.N.Y. Jan. 28, 2021) (citation and quotation marks omitted) (denying summary judgment on implied covenant claim where reasonable jury could conclude plaintiff was deprived of the benefit of its bargain).  "The relevant inquiry called for by the implied covenant is objective, not subjective: we consider 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'"  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 605 (S.D.N.Y. 2018) (quoting *Dalton*, 87 N.Y.2d at 387).

Accordingly, to determine whether the implied covenant of good faith and fair dealing has been breached, "[t]he appropriate analysis … is first to examine the [relevant contract] to determine the fruits of the agreement between the parties, and then to decide whether those fruits have been spoiled."  *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1518 (S.D.N.Y. 1989) (implied covenant applies "where, while the express terms may not have been technically breached, one party has nonetheless effectively deprived the other of those express, explicitly bargained-for benefits").

Courts look to the language and purpose of a contract to ascertain what its "fruits" are.  *See Vista Outdoor Inc. v. Reeves Fam. Tr.*, 725 F. App'x 17, 21-22 (2d Cir. 2018) (finding breach of the implied covenant where defendants had contrived to trigger an earnout payment because "[t]he goal of the earn-out was to reflect the full value of [the business] at the time of acquisition and to compensate the Sellers if the business was more valuable than it was anticipated to be at the time of acquisition"); *see also Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991) (bank implicitly promised to pay on letters of credit when proper documentation was presented because such promises were "necessary to effectuate the purposes of the contract"); *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp.

3724460.1

2d 625, 631-32 (S.D.N.Y. 2010) (where loan agreement gave debtor right to veto assignments of loan, lender's agreement granting 90% participation in loan "purposely undercut what … the assignment veto was designed to prevent," thus depriving debtor of "fruits" of the contract), *aff'd*, 381 F. App'x 117 (2d Cir. 2010).  The contracting parties' historic practice also may demonstrate their reasonable expectations of what is permitted under their contract.  *See, e.g., Carvel Corp. v. Baker*, 79 F. Supp. 2d 53, 62 (D. Conn. 1997) (adjudicating implied covenant claim under New York law and concluding based on parties' historic practice that they did not reasonably expect contract permitted franchisor to sell directly to supermarkets at wholesale prices); *accord Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 731 (S.D.N.Y. 2020) ("[A] breach of the duty of good faith can be inferred from evidence that the defendant's conduct was arbitrary or contrary to reasonable expectations.") (internal quotation marks and citation omitted).

Although the implied covenant does not create obligations that are "inconsistent with other terms of the contractual relationship," *Murphy v. Am. Home Prod. Corp.*, 58 N.Y.2d 293, 304 (1983), the doctrine frequently is applied to prevent the exercise of an express contractual right "as part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruit of its bargain."  *Gray & Assocs., LLC v. Speltz & Weis LLC*, 2009 WL 416138, at *10 (N.Y. Sup. Ct. (N.Y. Cnty.) 2009) (denying motion to dismiss good faith and fair dealing claim where plaintiff alleged "a bad faith scheme on the part of [defendant] to realize improper economic gains for itself in a variety of ways while purporting to act pursuant to contractual rights either granted to it, or not explicitly precluded by, the Management Agreement, and ultimately depriving [hospital] of what it ultimately sought from the parties' contractual arrangement"); *see also Ellison v. Island Def Jam Music Grp.*, 79 A.D.3d 458, 458-

59 (N.Y. App. Div. (1st Dep't) 2010) (claim stated for breach of implied covenant where plaintiff alleged record label that had contractual right to work with plaintiff's recording artist attempted to use that right to eliminate plaintiff as middleman).

Courts have identified various types of conduct that may be held to contravene the parties' reasonable expectations under a contract in the context of implied covenant claims. For example, a party's self-serving change of position on a material issue may indicate a lack of good faith. *See, e.g., Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 293 (N.Y. App. Div. (1st Dep't) 2003) (sustaining breach of implied covenant claim where defendant had "expressly stated that an IPO was in [the parties'] best interests" and then subsequently vetoed the IPO); *Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 315 (S.D.N.Y. 2003) (defendant's initially expressed view that environmental remediation could be deferred until after transaction closed suggested its eventual reliance on those same environmental issues to avoid the transaction was in bad faith). And in a case involving a tortious interference claim, a New York trial court found that a defendant's indemnification of its co-defendant—as Serta provided to the Favored Lenders here—demonstrated the indemnitee's "certainty" or "substantial certainty" that it was causing the indemnitor to breach its agreement with plaintiff. *See Macy's, Inc. v. J.C. Penney Corp.*, 989 N.Y.S.2d 238, 262-63 (N.Y. Sup. Ct. (N.Y. Cnty.) 2014), *aff'd as modified*, *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 127 A.D.3d 48 (N.Y. App. Div. (1st Dep't) 2015).

*Travellers International, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570 (2d Cir. 1994), is particularly relevant. After a bench trial, the District Court found in favor of the plaintiff on a claim for breach of the implied covenant of good faith and fair dealing. The District Court concluded, and the Second Circuit affirmed, that the evidence supported a finding

7

of breach of the implied covenant where the defendant intentionally acted to deprive the plaintiff

of the benefit of the parties' deal in order to maximize its own profits:

> TWA was not trying to maximize the profits from the Getaway joint
> venture; rather, TWA was trying to maximize its profits by eliminating
> Travellers as the middleman. In the Spring of 1987, TWA determined that
> it no longer needed Travellers to fill its designated tour passenger seats.
> TWA further determined that they could substantially increase their
> margins on Getaway tours by bringing Getaway 'in house'. Consequently,
> [TWA CEO Carl] Icahn first offered to purchase Travellers and, when that
> offer was refused, Icahn threatened Travellers, citing their 'vulnerable'
> position, and then directed TWA to terminate the joint venture agreement
> with Travellers. The district court found, and the record fully supports,
> that the promotional efforts of TWA were not guided by valid, good faith
> business judgments, but were rather based on the improper motive of
> attempting to eliminate Travellers.

*Id.* at 1575.  As discussed below, just as TWA did in *Travellers*, the Favored Lenders here have

deprived the Excluded Lenders of the benefit of their bargain under the 2016 Credit Agreement

in order to maximize their own financial position, in violation of the implied covenant.  *See also*

*New Media Holding Co., LLC v. Kagalovsky*, 2012 WL 3636517 (N.Y. Sup. Ct. (N.Y. Cnty.)

Aug. 10, 2012) (finding after trial that plaintiff "established that the dilution and transfer of the

Partnership's ownership interest in TVi … frustrated the entire purpose of the Partnership

Agreement, and injured and destroyed [plaintiff]'s right to receive the fruits of the Partnership

Agreement, all in breach of the implied covenant of good faith and fair dealing," where "[t]he

Partnership Agreement was executed for the sole purpose of owning and operating TVi"), *aff'd*

*as modified*, 118 A.D.3d 68 (N.Y. App. Div. (1st Dep't )2014).

　　　The implied covenant of good faith and fair dealing repeatedly has been found

applicable in intercreditor disputes—including the very dispute that is before the Court in this

trial.  In *LCM XII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109 (S.D.N.Y. Mar. 29,

2022), the District Court declined to dismiss a claim by a group of First Lien Term Lenders

against the debtor here, Serta, for breach of the implied covenant—claims substantially identical to the Excluded Lenders' claims here.  The court found plausible the plaintiffs' allegations that their first-lien rights under the 2016 Credit Agreement "were subverted by [Serta's] creation of a new tranche of debt with priority rights senior to those held by [p]laintiffs."  *LCM*, 2022 WL 953109, at *15.  The court further held that even if the "letter of the Agreement permitted" certain actions by the majority lenders, it was plausible those actions breached the implied covenant where Serta "colluded with a bare majority of lenders to abuse its power to amend the Agreement to create a new class of debt," and "systematically combed through the Agreement tweaking every provision that seemingly prevented it from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one."  *Id.* at *15-16.

Similarly, in *AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*, 2023 WL 2394680 (N.Y. App. Div. (1st Dep't) Mar. 7, 2023), the plaintiffs—a group of first lien lenders under another credit agreement—alleged that a group of favored lenders had "secretly designed the Restructuring Transaction so as to defeat [p]laintiffs' contractual expectations of pro rata treatment, concealed the transaction from [p]laintiffs until it could be revealed as a *fait accompli*, [and] withheld information from [p]laintiffs necessary for them to effectively participate in the restructuring process."  *Id.* at *12.  The court held these allegations stated a claim for "bad faith conduct in conspiring to manufacture a restructuring process that deprived plaintiffs of the benefit of their bargain under the terms of the Credit Agreement."  *Id.*

Other claims for breach of the implied covenant in the context of intercreditor disputes similarly have been found meritorious.  *See, e.g., ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, 2022 WL 10085886, at *9 (N.Y. Sup. Ct. (N.Y. Cnty.) Oct. 17, 2022)

(denying dismissal of plaintiffs' claim for breach of the implied covenant where they alleged "majority lenders" effectuated transaction by "abus[ing] their ability to amend the Credit Agreement" and "worked in concert and in secret to deprive plaintiffs of the benefit of their bargain"); *Credit Agricole Corp. v. BDC Fin., LLC,* 135 A.D.3d 561, 561 (N.Y. App. Div. (1st Dep't )2016) (claims for breach of contract and breach of implied covenant not duplicative where plaintiffs alleged defendants failed to share collateral ratably and deliberately manipulated and depressed bids so as to deprive plaintiffs of benefit of their bargain); *Octagon Credit Invs., LLC v. NYDJ Apparel LLC*, Index No. 656677/2017 (N.Y. Sup. Ct. (N.Y. Cnty.) Jan. 9, 2018) (NYSCEF Doc. No. 91) (declining to dismiss claim for breach of implied covenant even though credit agreement's express terms arguably allowed lender majority to adopt amendment disadvantaging the minority without notifying all lenders).[2]

Importantly, a breaching party's economic justification for a breach does not constitute a defense to a contract claim, whether for breach of an express term or the implied covenant. To the contrary, the concept of "efficient breach" dictates that where a contracting party determines it is in its economic interest to breach an agreement, that party must pay the cost of its breach in the form of damages. *See Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 262 n.12 (S.D.N.Y. 2005) ("In fact, the law presumes that parties to contracts are rational: they choose to breach contracts because it is more efficient to breach and pay compensatory damages than to perform. If so, efficiency is promoted by allowing parties to break their promise, provided that they compensate the non-breaching party for actual losses."); *see also* 3 E. Farnsworth, Contracts § 12.8, at 194-195 (2d ed. 1990) ("Most courts have not infringed on the freedom to keep or break a contract traditionally afforded a party by the

---

[2] The *Octagon* decision is attached as Exhibit A.

common law and endorsed by the notion of efficient breach."); *159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 369 (2019) (Wilson, J., dissenting) ("If the breaching party can put its goods or services to a (societally) higher use than what the contract requires even after fully compensating the nonbreaching party, that is a socially beneficial result:  the nonbreaching party receives the full value of its bargain, the breaching party earns more, and society benefits in the process because the property is put to a higher use.").  Indeed, even the defense that a course of action "is totally necessary if [an implied covenant defendant] is to survive . . .,' is not conclusive of a finding of good faith."  *Carvel Corp. v. Baker*, 79 F. Supp. 2d 53, 63 (D. Conn. 1997) ("Distribution to supermarkets may in fact be necessary, but the terms and conditions of the supermarket program, as they relate to the defendants, are not.") (applying New York law and denying summary judgment on implied covenant claim).

B.   **The Trial Evidence Will Show Serta and the Favored Lenders Breached the Implied Covenant of Good Faith and Fair Dealing in the 2016 Credit Agreement**

At trial, the Excluded Lenders will prove by a preponderance of the evidence that the Favored Lenders breached the implied covenant of good faith and fair dealing in the 2016 Credit Agreement.

1.   **The Unlawful Exchange Transaction Deprived the Excluded Lenders of Their Fundamental Right to *Pro Rata* Treatment**

The implied covenant prohibits any "scheme to realize gains that the contract implicitly denies or to deprive the other party of the fruit of its bargain."  *Gray*, 2009 WL 416138, at *10; *see also Ellison*, 79 A.D.3d at 458-59 ("If successful, defendants' scheme to eliminate plaintiffs, the middlemen in the transaction, would have deprived plaintiffs of the benefit of their bargain.").  The trial evidence will demonstrate that the First Lien Term Lenders' rights to *pro rata* distribution of payments and collateral proceeds and *pro rata* sharing of

11

payments among those lenders are essential "fruits" of the bargain under the 2016 Credit Agreement, which the Unlawful Exchange Transaction destroyed.

Section 2.18(a) of the 2016 Credit Agreement mandates that each payment of principal or interest in respect of the loans of a given class "shall be allocated pro rata among the Lenders" in accordance with their respective percentage ownership of loans in that class. Section 2.18(b) provides that, upon an event of default (including bankruptcy and acceleration of the loans), the proceeds of any collateral, after payment of certain expenses, must be divided among the First Lien Lenders on a *pro rata* basis. Section 2.18(c) provides that if any First Lien Lender somehow receives any payment "in respect of any principal or interest" in excess of its proportional share, it must pay that excess ratably to all other First Lien Lenders. Because these provisions were essential elements of the parties' bargain, Sections 2.18(a)-(c) may be amended only with "the consent of *each* Lender directly and adversely affected thereby," 2016 Credit Agreement § 9.02(b)(A), whereas most of the other provisions of the 2016 Credit Agreement may be amended merely by a favorable vote of the "Required Lenders" – defined as lenders representing more than 50% of the face value of the loans.

Testimony from both the Excluded Lenders and the Favored Lenders, as well as the Favored Lenders' financial adviser, Centerview, will confirm that rights that cannot be amended without the consent of all lenders are considered "sacred," and that lenders consider sacred rights provisions to be fundamental to the bargain in credit agreements. The testimony further will show that the *pro rata* provisions of Section 2.18 were considered by both the Favored Lenders and the Excluded Lenders to be fundamental to the Credit Agreement.

There is no serious dispute that the Unlawful Exchange Transaction destroyed the Excluded Lenders' right to *pro rata* treatment under the 2016 Credit Agreement. As a result of

the Unlawful Exchange Transaction, the Excluded Lenders now are deeply subordinated

creditors, standing in line behind roughly $1 billion in debt owned by the Favored Lenders,

holding First Lien Term Loans that have no significant value.  A total of $200 million of new

money super-priority "first out" debt, funded by the Favored Lenders, now ranks ahead of the

Excluded Lenders' existing First Lien Term Loans, as does up to $875 million of super-priority

"second out" debt, issued in exchange for First Lien Term Loans and Second Lien Term Loans

held by the Favored Lenders, and an unspecified amount of capacity to incur still more super-

priority "third-out" debt.

   The market's immediate reaction to the Unlawful Exchange Transaction further

confirms that the Transaction deprived the Excluded Lenders of the benefit of their bargain.  The

market price of the First Lien Term Loans, which had been trading at about 43 cents, plunged to

31 cents as soon as the deal was announced.  And within days of the announcement, Moody's

Investors Service downgraded its rating of the First Lien Term Loans from Caa3 to Ca, reflecting

Moody's belief that "term loan lenders who do not consent to the transaction will potentially be

left with little or no remaining collateral coverage in Serta Simmons, as well as in a position that

is subordinated to new, higher priority debt."

  **2.**  **The Unlawful Exchange Transaction Was Unprecedented and**
     **Contrary to the Expectations of the Market and the Parties**

   The implied covenant is violated where it was "reasonable that the parties

expected," based on past dealings and industry expectations, that the contract would yield a

benefit, and that benefit was improperly withheld.  *Carvel*, 79 F. Supp. 2d at 62.  That is exactly

what happened here.  The evidence will show that at the time the 2016 Credit Agreement was

executed, and even as late as 2020, the credit industry did not expect that a transaction like the

Unlawful Exchange Transaction could occur.

13

Witnesses will testify that the purpose of the "open market purchase" provision in the 2016 Credit Agreement was solely to allow the repurchase of loans in one-off transactions typically at or close to the prevailing market prices to capture discount and de-lever the borrower's businesses.  The use of an "open market purchase" provision to effectuate an uptier transaction like the Unlawful Exchange Transaction was not contemplated.  Indeed, testimony from many witnesses — including Ken Prince of Advent, Karn Chopra of Centerview (advisor to the Favored Lenders), Andrew Sveen of Favored Lender Eaton Vance, and Roopesh Shah of Evercore, Serta's financial advisor on the Unlawful Exchange Transaction — will confirm that a transaction of this kind—a priming facility with a debt repurchase at a discount—that resulted in selected First Lien Lenders leapfrogging over the rest of the lienholders in their class, had never been done before.

Evidence of the parties' subjective expectations concerning the 2016 Credit Agreement reflects that their views mirrored those of the credit market at-large.  As members of the Excluded Lenders will testify, they never expected that the *pro rata* sharing rights in the 2016 Credit Agreement could be undermined by a transaction like the Unlawful Exchange Transaction.  And one need look no further than the initial financing proposal submitted by the Favored Lenders on April 24, 2020, in the early stages of Serta's search for liquidity financing, to see that they, too, did not contemplate an uptier transaction like the Unlawful Exchange Transaction.  At that time, and as testimony from Mr. Chopra and Mr. Sveen will confirm, the Favored Lenders contemplated a financing transaction that would be available to all First Lien Lenders.

Serta and the Favored Lenders will no doubt try to turn the tables by pointing to a transaction that the Excluded Lenders were negotiating with Serta in the spring of 2020 as

3724460.1

evidence that expectations were otherwise.  The evidence at trial will show that this argument does not hold water.  As a preliminary matter, that transaction—the structure of which was invited by the company—was under negotiation and was never completed.  Even as it was last posited, the drop-down transaction: (1) did not disturb the *pro rata* rights to payment on the collateral securing the 2016 Credit Agreement, (2) did not require amendment of that agreement, and (3) employed permitted mechanisms under the agreement to establish certain subsidiaries, against which the company could borrow money.  Nothing about the contemplated transaction undercuts the fundamental conclusion that no reasonable market participant would expect one class of First Lien Lenders to leapfrog another in rights to payment from their shared collateral.

**3.      Serta and the Favored Lenders Acted with Improper Motives in Entering into the Unlawful Exchange Transaction**

Actions guided by the improper motive of depriving a party of the benefit of its bargain violate the implied covenant of good faith and fair dealing.  *TWA*, 41 F.3d at 1575.  The evidence at trial will show that, while Serta could have arranged for liquidity financing and debt recapture consistent with the parties' reasonable expectations concerning the *pro rata* sharing provisions of the 2016 Credit Agreement, it instead — as urged by its private equity sponsor and majority shareholder, Advent — manipulated the process to invite a transaction that destroyed those expectations entirely.

As witnesses from Serta, Advent, and Evercore will testify, in April 2020, Serta was facing a near-term liquidity crunch, and access to liquidity was the company's primary objective**.**  At that time, the company was soliciting proposals for a "drop-down" transaction structure, which would have involved a new loan to an unrestricted subsidiary of Serta secured by certain of Serta's intellectual property, as well as a debt exchange.  Serta received proposals for this type of transaction from, among others, a group of three of the Excluded Lenders —

15

Apollo, Angelo Gordon, and Gamut (collectively, the "First Lien Lender Group") — as well as Barings, who Serta ultimately invited to participate in the Unlawful Exchange Transaction.  As representatives of both Advent and the First Lien Lender Group will testify, such a transaction would rely on existing provisions of the 2016 Credit Agreement and would not have required any amendments to that agreement.

Around the same time, Serta also received a proposal from the Favored Lenders for a priming facility of $200 million in new money that, as Mr. Chopra and others will testify, would be available to all First Lien Lenders on a *pro rata* basis.  Mr. Chopra will testify that under this proposal, the Favored Lenders were willing to provide Serta with new money without exchanging first-lien debt at a discount.

Yet Advent had no intention of doing a deal that involved Apollo, a rival private equity firm.  Indeed, while Serta was engaging with the First Lien Lender Group on the drop-down proposal, Advent actively was trying to block Apollo's purchases of First Lien Term Loans throughout March and April 2020.  *See* Section II, *infra*.  The evidence will show that Advent intended to transact with the Favored Lenders all along, despite the fact that the First Lien Lender Group's drop-down proposal would have provided Serta with the liquidity and deleveraging that the company desired.  Mr. Prince will admit that Serta sought proposals for the drop-down to create negotiating leverage with the Favored Lenders.  As Mr. Shah will testify, Serta believed that the Favored Lenders would not be interested in participating in a drop-down transaction, and Serta did not solicit or attempt to engage the Favored Lenders in negotiating a competing drop-down proposal.

To induce them to propose an alternative transaction, Serta, through Evercore, told the Favored Lenders that the company was interested in debt recapture and that they had

received proposals for a drop-down transaction.  As Mr. Chopra and Mr. Sveen will admit, upon

hearing this development, the Favored Lenders abandoned their initial *pro rata* proposal and

went on the offensive in stunning, punitive fashion.

Rather than negotiate fairly for the opportunity to provide financing and debt

recapture to Serta, which would have inured to the company's benefit, the Favored Lenders

sought intentionally to subvert the 2016 Credit Agreement's *pro rata* sharing provisions by

limiting the percentage of First Lien Lenders who could participate in the deal, to increase their

recovery in the likely event of Serta's bankruptcy.  As Mr. Chopra will testify, the proposal that

ultimately would become the Unlawful Exchange Transaction was modeled on the assumption

that Serta would file for bankruptcy as early as the end of 2021—a mere 18 months away.  As

Messrs. Chopra, Shah and others will explain, the Unlawful Exchange Transaction could not be

completed without the participation of at least 50.1% of all First Lien Lenders, because that was

the minimum needed to vote through the purported amendments to the 2016 Credit Agreement

that the deal required.  Although participation by a greater percentage of First Lien Lenders was

possible, the Favored Lenders insisted that participation be kept at or around that minimum,

because, as Mr. Chopra will admit, all things equal, the fewer the number of participants in the

exchange, the better the chances of recovery for the Favored Lenders.

Allowing more First Lien Lenders into the deal was not only possible but also

preferable from the company's perspective, because Serta would have reduced its leverage by a

greater amount if a larger percentage of existing First Lien Lenders were permitted to participate.

Testimony from Messrs. Chopra, Shah and Prince will establish that during negotiations, Serta

pushed to increase the participation level to 55% of First Lien Lenders to enable the company to

capture more discount, but the Favored Lenders refused to agree to anything more than a small

17

basket of additional exchange capacity in the "second out" super-priority tranche.  As Messrs. Prince and Shah will testify, because the Unlawful Exchange Transaction was predicated on limiting the size of the deal to make it attractive to the Favored Lenders, Serta did not solicit the Excluded Lenders to participate, or even disclose to them that Serta was negotiating such a transaction.

Trial evidence will show that Serta and the Favored Lenders knew full well that the Unlawful Exchange Transaction would harm the non-participating lenders.  As witnesses from Serta, Advent, and the Favored Lenders will admit, Serta and the Favored Lenders knew that the first-lien debt of the lenders who were excluded from the deal would be subordinated to the Favored Lenders' new super-priority debt.

Serta's purported commercial goals of raising cash and de-levering its balance sheet did not need to be achieved in a manner that destroyed the Excluded Lenders' fruits of the bargain.  At trial, Mr. Prince will admit that the transactions proposed to Serta by both the First Lien Lender Group and the Favored Lenders would have provided Serta with the liquidity and deleveraging that the company desired.  And Messrs. Shah and Chopra will admit that Serta could have obtained enough cash to satisfy its near-term liquidity needs while also repurchasing its debt through a transaction that treated its First Lien Lenders equally.  For example, Serta could have set its desired participation limit of 55% for a debt exchange and allowed all the First Lien Lenders to bid for the discount level at which they would participate, and the company could have chosen the participating lenders based on who would take the lowest discounts, with such lenders contributing their pro rata share of the $200 million in new money the company was seeking.  The best way to achieve the company's stated goals—of raising new money and

recapturing debt—would have been to open the deal to all First Lien Lenders and let them bid on the exchange price, allowing into the deal the lenders who bid the lowest.

### 4. Advent Handpicked First and Second Lien Lenders to Reach the 50.1% Minimum and Fill the Remaining Exchange Capacity

A breach of the implied covenant "can be inferred from evidence that the defendant's conduct was arbitrary or contrary to reasonable expectations." *Dreni*, 486 F. Supp. at 731. The trial evidence will show that the Unlawful Exchange Transaction was the consummate "club deal," in which participating First and Second Lien Lenders were selected to participate based on their relationships with Advent. As Mr. Prince will explain, the group of Favored Lenders represented by Gibson Dunn who initially proposed what would become the Unlawful Exchange Transaction constituted 39% of the 50.1% majority needed to amend the 2016 Credit Agreement. To fill the gap, Advent recruited Barings and Oaktree to join the deal. Mr. Prince will admit that these lenders were selected because the size of their holdings would allow the Favored Lenders to reach the 50.1% threshold with the fewest number of additional participants and, in the case of Barings, because the relationship was important to Advent.

As testimony from Messrs. Sveen, Shah, and others will establish, Advent also had primary responsibility for determining which First and Second Lien Lenders would fill the basket of additional exchange capacity in the "second out" super-priority tranche that Serta negotiated with the Favored Lenders. Mr. Prince will testify that he provided input to Serta's Finance Committee on which lenders should be included or excluded from participating, and that he told certain lenders that they would be included in the basket without obtaining approval from Serta, because he felt confident that if Advent recommended their inclusion, Serta would agree. Testimony from Mr. Tepner, a member of Serta's Board of Managers, will confirm that the company did not get involved in deciding which lenders would be included or excluded.

19

Testimony from several witnesses will confirm that many of Serta's lenders attempted to get into the deal but were rejected.  Mr. Prince will admit that he recommended for inclusion in the basket those lenders with whom Advent had a preexisting relationship. Conversely, Advent excluded lenders that it did not like, as evidenced by, among other things, offering to include Angelo Gordon in the Transaction but not Apollo or Gamut, the other two members of the First Lien Lender Group.

5.     **Plaintiffs' Attempt to Insulate Themselves from the Consequences of Their Wrongful Conduct Demonstrates Their Lack of Good Faith**

That Serta and the Favored Lenders knowingly made an end-run around the purpose and intent of the 2016 Credit Agreement, if not its express terms, is further evidenced by several highly unusual steps they took to implement the Unlawful Exchange Transaction and, later, to make sure the Transaction was enforced as part of Serta's Chapter 11 Plan.

*First*, in a blatant attempt to sanction their misconduct, Serta and the Favored Lenders purported to "ratify" the Unlawful Exchange Transaction in an agreement that stated merely that Serta and the Favored Lenders agree that the Transaction was permitted.

*Second*, knowing that the payment waterfall provided by Section 2.18(b) of the 2016 Credit Agreement was a "sacred right" that could not be amended without the unanimous consent of all First Lien Lenders, Serta and the Favored Lenders entered into a new intercreditor agreement that allowed them to alter the payment priority structure without having to amend the waterfall provision, which would have required unanimous consent of all First Lien Lenders. Using an amendment to the intercreditor agreement as an end-run around the requirement of unanimity to amend the waterfall in the 2016 Credit Agreement is another example of the Plaintiffs' lack of good faith.

*Third,* and perhaps most insidiously, the Favored Lenders negotiated a non-standard indemnity provision in the Super-Priority Term Loan Agreement that purports to insulate them from liability for gross negligence, bad faith, willful misconduct or material breach of the 2016 Credit Agreement in connection with the Unlawful Exchange Transaction.  This provision is in marked contrast to its counterpart in the 2016 Credit Agreement, which contains the standard carveouts for liability from gross negligence, bad faith, willful misconduct, or material breaches of loan documents.  Such carveouts are standard because, under New York law, "contracts that would indemnify a party for intentional or fraudulent conduct are void as against public policy."  *CBS Corp. v. Eaton Corp.*, 2010 WL 1375169, at *2 (S.D.N.Y. Mar. 30, 2010).  The (likely unenforceable) indemnification provision in the Super-Priority Term Loan Agreement demonstrates that Serta and the Favored Lenders knew that the Unlawful Exchange Transaction was irregular at best and likely improper.  *See Macy's*, 989 N.Y.S.2d at 262-63 (considering co-defendant's indemnification of other co-defendant as evidence that co-defendant had "certainty" or "substantial certainty" that it was causing other co-defendant to commit a breach of the latter's agreement with plaintiff).  The Favored Lenders sought further to insulate themselves from their misconduct by requiring Serta, as part of the Plan, to indemnify them from claims regarding the Unlawful Exchange Transaction.  The parties purportedly agreed that Serta's purported indemnification obligation may not be discharged or impaired, is given priority above the proceeds waterfall, and survives the company's emergence from bankruptcy.

6.     **Serta and the Favored Lenders' Purported Justifications for the Unlawful Exchange Transaction Are Not a Defense**

Serta and the Favored Lenders have attempted to justify the Unlawful Exchange Transaction by arguing that Serta had two business reasons for entering into the Transaction:  to obtain a cash infusion, and to de-lever the Company.  As already noted, the testimony of

21

3724460.1

Plaintiffs' own witnesses will establish that the company could have achieved these goals in a way that did not destroy the Excluded Lenders' fruits under the 2016 Credit Agreement. Moreover, Plaintiffs' purported justifications are not a defense to a claim for breach of the implied covenant, which does not ask whether a party had a good commercial reason to act as it did, but rather, whether its actions had the effect of destroying or injuring the right of the other party to receive the fruits of the contract, as happened here.  Even to the extent Plaintiffs may establish that the Unlawful Exchange Transaction was the best way for Serta to achieve its stated business objectives, the law contemplates that Serta and the Favored Lenders *must* pay the cost of their "efficient breach" in the form of damages owing to the Excluded Lenders.  *See Topps Co.*, 380 F. Supp. 2d at 262 n.12.

To the extent the Favored Lenders have sought to rationalize the Unlawful Exchange Transaction as a "defensive" measure necessitated by the drop-down transaction being negotiated with the First Lien Lender Group, the trial testimony of Plaintiffs' witnesses will undermine this defense.  For example, as Mr. Shah will testify, negotiations on the drop-down transaction did not reach a stage of finality, so there is no way of knowing what the ultimate terms of such a proposed transaction would have been.

## II.
## NORTH STAR DEBT HOLDINGS, L.P. HAS A VALID ASSIGNMENT OF $192 MILLION IN FACE AMOUNT OF SERTA'S FIRST LIEN TERM LOANS

In this adversary proceeding, Plaintiffs seek a declaration that North Star, as an affiliate of Apollo, is a "Disqualified Institution" under Section 9.05(a) of the 2016 Credit Agreement, thus rendering it ineligible to hold First Lien Term Loans and nullifying its purchase of $192 million worth of Serta debt.  Yet, as the evidence at trial will show, Apollo was not on

Serta's DQ List at the time it purchased the debt, and North Star is therefore entitled to judgment in its favor on this issue.

**A.**    **The 2016 Credit Agreement's "Disqualified Institution" Provisions**

The 2016 Credit Agreement permits Serta to bar an institution from holding First Lien Term Loans by designating it a "Disqualified Institution," defined as:

> (a)(i) [A]ny Person identified in writing to the Left Lead Arranger on or prior October 6, 2016, (ii) any Person identified in writing (and reasonably acceptable) to the Left Lead Arranger after October 6, 2015 and on or prior to the Closing Date (iii) any Affiliate of any Person described in clause (i) or (ii) above that is reasonably identifiable as an Affiliate of such Person on the basis of such Affiliate's name and (iv) any other Affiliate of any Person described in clauses (i), (ii) or (iii) above that is identified in a written notice to the Left Lead Arranger (if prior to the Closing Date) or the Administrative Agent (if after the Closing Date) (each such person, a "Disqualified Lending Institution") …. it being understood and agreed that no written notice delivered pursuant to clause (a)(ii) [and/or] (a)(iv) … shall apply retroactively to disqualify any Person that has previously acquired an assignment or participation interest in any Loan.

(2016 Credit Agreement, Art. 1, Definitions.)

Pursuant to this provision, Serta was required to provide its list of disqualified institutions (the "DQ List") to the relevant personnel at UBS, in its capacity as Left Lead Arranger for Serta during the initial syndication of the loans in 2016, and subsequently as Administrative Agent.  Any assignment of First Lien Term Loans to a Disqualified Institution is deemed null and void pursuant to Section 9.05(f)(i).  Additionally, Section 9.05(f)(i) requires Serta to consent to any assignment, subject to the caveat that Serta "shall be deemed to have consented to any assignment … (other than any such assignment to a Disqualified Institution . . .) unless it has objected thereto by written notice to the Administrative Agent within 15 Business Days after receipt of written notice thereof … ."  2016 Credit Agreement § 9.05(b)(i)(A).

**B.      Advent Removed Apollo from the DQ List in 2016 and**
**        Apollo Traded Serta Loans Over the Next Two Years**

            The evidence at trial will show that Apollo and its affiliates were not on the DQ

List for Serta's First Lien Term Loans when North Star Debt Holdings L.P., an Apollo affiliate,

sought to buy such loans in the secondary market in Spring 2020.

            On October 4, 2016, ████████ of Advent instructed Weil Gotshal & Manges

LLP ("Weil") to send to UBS, the Administrative Agent for the First Lien Term Loans, ████████

████████████  That list included numerous Apollo-affiliated entities—many with names that

clearly indicated their affiliation with Apollo (████████████████████████████████

████████████████████████), as well as many with names that did not overtly

indicate such an affiliation (████████████████████████████████████

████████████████████).

            No officer or director of Serta was included in this email exchange when the DQ

List was first distributed to UBS.  There was no confusion, however, about ████████████

authority.  Advent was the controlling shareholder of Serta, and UBS took instructions from

████, who was UBS's point of contact with Advent.  Thus, as Luke Bartolone of UBS will

testify, UBS viewed Advent as the "conduit" through which Serta sent the DQ List.  UBS further

understood that Weil, who transmitted the DQ List at ████████ direction, was Serta's counsel,

not Advent's.  And nothing about this would have seemed unusual:  it is typical in the industry

for the financial sponsor, as a representative of the borrower, to provide a disqualified institution

list to an administrative agent.

            Two weeks later, on October 18, 2016, ████████ sent another email to individuals at

UBS with the subject line "████████" writing simply and without qualification: "████████████

████"  UBS reasonably interpreted this unambiguous directive from Advent to mean what it said,

and thus deemed all "Apollo" entities not to be on Serta's DQ List going forward.  As ████████

will testify, he took this action on behalf of Advent because Apollo received an assignment of

Serta's First Lien Term Loans in the initial syndication in 2016.

Over the course of 2016–2018, various Apollo funds, primarily CLOs, bought and

sold Serta debt numerous times without incident.  In December 2016, as Apollo was engaging in

this trading, UBS's counsel at Latham & Watkins sought ████████████████████████

████████████████████████.  In response, Weil sent an updated version of the

DQ List that included the same Apollo entities as the original list ████████ had sent to UBS in

October 2016, but with the addition of ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

However, there is no evidence that Latham & Watkins ever sent this list to UBS, which UBS

does not have in its records.

**C.    When Apollo Attempted to Purchase Serta Loans in 2020,**
     **Serta Incorrectly Claimed Apollo Was on the DQ List**

By 2018, Apollo had decided to exit its Serta investment and sold its remaining

Serta debt.  Apollo did not own any Serta debt at the beginning of 2020.  In March 2020, Apollo

decided once again to purchase Serta's First Lien Term Loans.  This time, it would do so through

Defendant North Star Debt Holdings, L.P., which the evidence will show is a special purpose

vehicle owned by an Apollo-managed fund that purchases debt.  North Star never attempted to

hide its affiliation with Apollo when purchasing Serta debt.  It is common for large institutions

like Apollo to trade through affiliate funds, not all of which include "Apollo" in their official

legal name.  But as Theo Kwon of Apollo will testify, regardless of the name of the entity

purchasing the debt, Apollo's traders execute the trades through Apollo emails, phone numbers,

and relationships, and thus it would be clear that Apollo was effecting the trade.  In short, no counterparty dealing with an Apollo trader would have been confused about the identities and affiliations of the traders.

On March 12, 2020, Apollo traders purchased Serta First Lien Term Loans totaling $35.3 million in face value from Barclays.  The next day, March 13, 2020, Rachel Dwyer of Apollo contacted ████████, a salesperson at UBS who covered Apollo.  ████████ checked internally and, based on the email from Mr. Prince instructing UBS to remove Apollo from Serta's DQ List, confirmed to Ms. Dwyer that Apollo was not on the DQ List.

Armed with and in reliance on UBS's representation that Apollo was not on Serta's DQ List, Apollo continued purchasing Serta First Lien Term Loans over the next few weeks, totaling over $191.9 million in face value by the end of April.  However, as the days went by, Serta never provided consent and the trades remained pending.  Apollo began to press UBS for more information, and each time they asked, UBS personnel reassured them that Apollo was not on Serta's DQ List.  Apollo also conveyed to UBS that, under the 2016 Credit Agreement, Serta's consent was deemed given by not having rejected the trades after 15 business days.  UBS personnel rejected this position, stating that they still wanted Serta's consent to close, but noting that they believed the delay in receiving consent to be the result of teams working remotely during the start of the COVID-19 pandemic.  To be clear, regardless of UBS's desire for Serta's consent, the clear language of Section 9.05(b)(i)(A) of the Credit Agreement deems Serta's consent to have been given because it did not object to the trade within 15 business days after receipt of notice, and once that consent was deemed given, the definition of "Disqualified Institution" in Article I prohibits Serta from retroactively amending the DQ List to disqualify Apollo.

3724460.1

On April 28, 2020, Apollo and Barclays received a notice that the first trade with Barclays had closed.  Less than an hour later, after Apollo contacted UBS to obtain the borrower's signature, UBS rescinded the trades because they purportedly had been made in error. UBS did not say that the error had anything to do with Apollo being on Serta's DQ List, and Apollo continued to buy Serta debt the following day.

Three days later, on May 1, 2020, UBS told Apollo that Serta had rejected the assignment.  The reason why Serta rejected the trade, however, was not explained to UBS until May 19, 2020, when representatives from UBS wrote to Serta, explaining that Serta had failed to object to the assignment from Barclays to Apollo during the 15-day consent period, and thus UBS would deem consent to have been given and would process the trade.  For the first time since 2016, Serta told UBS that it Apollo was on Serta's DQ List and that North Star (which Serta admitted was "███████████████" as an Apollo affiliate "███████████████") was thus ineligible to have made the purchase.  Serta thus once again instructed UBS to reject the assignment.

As a result of this refusal, none of Apollo's purchases of Serta debt since March 12, 2020, have been able to close.  These trades have been left unresolved, in legal limbo ever since.

**D.     As Serta's Agent, Advent Had Authority to
Remove Apollo from the DQ List, and It Did**

The express instruction to UBS, unqualified in any way, that Apollo is "████
████" should be the beginning and end of the matter.  It appears, however, that Serta intends to argue (for the first time) that ████████ and Advent were *not* acting as Serta's agent in connection with the DQ List, and that ████████ lacked authority to remove Apollo from the DQ List in his October 18, 2016 email.  This argument fails for three reasons.

27

*First*, if ████████ was not acting as Serta's agent in connection with the DQ List, then he would have had no authority to have caused the DQ List to be transmitted to UBS in 2016.  If Serta is correct, its entire DQ List would be a legal nullity.  Serta cannot have it both ways.  If ████████ was not authorized, there is no DQ List at all; if he was, then Apollo is not on it.

*Second*, Advent, Serta's controlling shareholder, acted as Serta's agent when communicating with UBS.  As ████████ will testify, Advent negotiated the entirety of the 2016 Credit Agreement.  The evidence overwhelmingly supports the conclusion that he was acting as Serta's agent when he caused Weil, Serta's counsel, to transmit Serta's DQ List to UBS on October 4, 2016, and that he was still acting as Serta's agent when he instructed UBS to remove Apollo from Serta's DQ List on October 18, 2016.  *See, e.g.  Riccelli Enters., Inc.* v. *New York State Dep't of Env't Conserv.*, 30 Misc. 3d 573, 580 (N.Y. Sup. Ct. (Onondaga Cnty.) 2010) (defining agency under New York law as one who is permitted to act on behalf of another).

*Third*, even if ████████ did not have *actual* authority to remove Apollo from the DQ List (which he did), he had *apparent* authority to do so.  Under New York law, "[a]pparent authority 'arises when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess.'"  *Cohen v. Utica First Ins. Co.*, 436 F. Supp. 2d 517, 529 (E.D.N.Y. 2006) (internal citations omitted).  For apparent authority to be present, "the principal, rather than the agent, is responsible for the appearance of apparent authority in the agent."  *Id.*  However, the principal is not required to have communicated directly with the affected third-party, provided there are sufficient indicia that the agent has the authority to represent the principal.  *Id.*  Where apparent authority exists, an agent may bind his principal to an agreement.  *Highland Cap. Mgmt. LP v. Schneider*, 607 F.3d 322, 328 (2d Cir. 2010).

28

Here, there is abundant evidence that Advent acted as Serta's agent in negotiating the 2016 transaction, and that Serta approved Advent acting on its behalf with respect to the transaction.  One need look no further than the fact that ███████ directed Weil – *Serta's counsel* – to send the DQ List to UBS.  Weil could not have done so without approval from its client, Serta, thus indicating that ███████ was acting on Serta's behalf.  Accordingly, UBS reasonably believed that ███████ was continuing to act as Serta's agent when he unambiguously instructed UBS that "████" was to be "███████████."

Given ███████ apparent authority to provide this instruction, and the lack of any further communication from Serta until May 2020 informing UBS that Apollo should be on Serta's DQ List, there can be no doubt that Apollo was *not* on Serta's DQ List when it placed its trades in March and April 2020.

**E.**     **Serta Ratified Advent's Removal of Apollo from the DQ List**

███████ email removing Apollo from Serta's DQ List should be the beginning and end of the analysis on this claim.  But, should there be any doubt, the doctrine of ratification provides further support for Apollo's position.

Ratification occurs where "the principal has full knowledge of all material facts and takes some actions to affirm the agent's actions," and can be "inferred from 'knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied on the principal's silence.'"  *36 Convent Ave. HDFC* v. *Fishman*, 2004 WL 1048213, at *5 (S.D.N.Y. May 7, 2004).  "[A] principal cannot close his eyes and avoid investigating information within his possession and control in an effort to obtain the benefits of an unauthorized transaction while being spared its corresponding detriments."  *Ryan* v. *Prescott*, 2013 WL 1150216, at *9 (N.Y. Sup. Ct. (Albany Cnty.) 2013).

29

Even if the Court were to find that ██████████ had no authority, actual or apparent, to remove Apollo from the DQ List in 2016, the fact remains that Serta has ratified Apollo's removal from the DQ List several times over.  Apollo purchased First Lien Term Loans with a face value of $70,000,000 in the original November 2016 syndication, which was undeniably to Serta's benefit.  Then, between October of 2016 and May of 2018, Apollo, through funds managed by its affiliates, engaged in numerous trades of First Lien Term Loans.  It did so openly and routinely without any objection from Serta.  Finally, on April 30, 2020 – before it first stated to UBS that it would not consent to Apollo's trades or that Apollo was purportedly on the DQ List – Serta recognized Apollo's loan holdings in a countersigned non-disclosure agreement with Apollo that referenced Apollo's $192 million position, reflecting the assignments submitted to UBS in March of 2020.  At no point in this sequence of events did Serta suggest to Apollo that it was a Disqualified Institution under the 2016 Credit Agreement.  Thus, regardless of whether ██████████ had authority to remove Apollo from the DQ List, Serta long ago ratified their removal.

**F.     Apollo Reasonably Relied on UBS's Statements That Apollo Was Not on the DQ List**

Serta may argue that ██████████ October 18, 2016, "██████████" email means something other than what it says.  Specifically, Serta may argue that ██████████ meant to remove Apollo's *credit* funds from the DQ List so they could participate in the initial syndication, while leaving Apollo's *private equity* funds on the DQ List.  But even if this had been ██████████ intent, it is not what he communicated to UBS.  His email is unambiguous and clearly instructs UBS to remove "████" from Serta's DQ List.  Apollo should not be penalized for ██████████ clear instruction to UBS, even if it was not what he intended for UBS to do.  If the fault lies with UBS for misunderstanding the instruction, the result should still be in Apollo's

favor.  In this case, Apollo reached out multiple times to a trusted, frequent, and sophisticated business partner for information about the DQ List.  Had UBS told Apollo that it was on Serta's DQ List, then Apollo would have stopped attempting to buy Serta debt after its first trades with Barclays on March 12, 2020 were rejected.  Instead, Apollo purchased approximately $192 million of First Lien Term Loans in reasonable reliance on UBS's assurances that Apollo was not on the DQ List.  Again, Apollo—which acted responsibly throughout, including expressly inquiring whether it was a permitted holder of the loans—should not bear the consequence of any miscommunication between UBS and Advent.

### III.
### THIS COURT LACKS JURISDICTION TO ENTER A FINAL ORDER ON THE EXCLUDED LENDERS' COUNTERCLAIMS AGAINST THE FAVORED LENDERS

A Bankruptcy Court has the power to issue a final judgment on a matter only if it is both (a) a statutorily core matter under Section 157(b) of Title 28 of the United States Code ("Section 157(b)"), and (b) a matter which the Court has constitutional authority to finally adjudicate.  *Stern v. Marshall*, 564 U.S. 462, 469 (2011); *In re Galaz*, 765 F.3d 426, 431 (5th Cir. 2014) ("A bankruptcy court may enter final judgment only if the court has both statutory and constitutional authority to do so.").

The Excluded Lenders respectfully submit that their counterclaims against the Favored Lenders are not statutorily core matters because they are neither (a) matters within any of the express categories set forth in Section 157(b)(2) nor (b) matters arising under title 11, or arising in a case under title 11.  The counterclaims against the Favored Lenders are at most "related to" the Debtor's chapter 11 case and thus cannot be statutorily core matters.  *See Stern v. Marshall*, 564 U.S. at 476 ("Pierce's reading of the statute necessarily assumes that there is a category of core proceedings that neither arise under Title 11 nor arise in a Title 11 case.  The

3724460.1

manner in which the statute delineates the bankruptcy courts' authority, however, makes plain that no such category exists.").

Importantly, even if the counterclaims against the Favored Lenders are statutorily core matters, this Court cannot finally adjudicate them because it lacks the constitutional authority to do so.  *See id.* at 482-84 (finding Article III prohibited Bankruptcy Court from entering final judgment on a claim, despite being statutorily core under the plain text of 28 U.S.C. § 157(b)(2)(c)).  Under *Stern*, a Bankruptcy Court may finally adjudicate a claim against a non-debtor only if (1) the claim arises under the Bankruptcy Code or as a result of the bankruptcy itself or (2) would necessarily be adjudicated as part of adjudication of a claim against the debtor.  *See id.* at 499 ("Congress may not bypass Article III simply because a proceeding may have some bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."); *In re Delta Produce, L.P.*, 845 F.3d 609, 616 (5th Cir. 2016); *In re Galaz*, 765 F.3d at 431.  Satisfaction of the *Stern* test is especially important in determining a Bankruptcy Court's jurisdiction to finally decide state law claims between non-debtors, such as the Excluded Lenders' counterclaims against the Favored Lenders, because such actions are "in no way derived from or dependent upon bankruptcy law" and "exist[] without regard to any bankruptcy proceeding."  *Stern v. Marshall*, 564 U.S. at 499.

Here, the Excluded Lenders' counterclaims against the Favored Lenders do not satisfy the test set forth in *Stern*.  The Excluded Lenders have alleged separate claims against Serta and the Favored Lenders for breach of the implied covenant, and the claim as alleged against the Favored Lenders is not necessarily decided by a final adjudication by this Court of the claim as alleged against Serta, and vice versa.  Each of Serta and the Favored Lenders took

32

separate actions that were uniquely beneficial to them at the expense of the Excluded Lenders. As discussed in Section I.B, *supra*, Serta – under the thumb of Advent, its private equity sponsor and majority shareholder – manipulated the company's search for liquidity financing to stymie a deal favorable to the company that would have involved Apollo, Advent's rival.  And the Favored Lenders, only too happy to step in as an alternative financing source, mandated that participation in the Unlawful Exchange Transaction be limited to at or close to 50.1% of First Lien Lenders, so that they could maximize their recovery in the likely event that Serta would be unable to satisfy its obligations to its creditors.  The Favored Lenders additionally sought from Serta an indemnity of an unparalleled magnitude concerning claims relating to the Unlawful Exchange Transaction, including for any actions taken in bad faith.  The Court's adjudication of the implied covenant claim against Serta does not necessarily decide the claim as against the Favored Lenders, because the actions taken by each in violation of the covenant were different, and neither claim is dependent upon a finding that both Serta and the Favored Lenders violated the covenant.[3]

Thus, this Court lacks the both the statutory authority under Section 157(b) and the constitutional authority under *Stern* that is required for it to issue a final judgment on the Excluded Lenders' counterclaims against the Favored Lenders, and it may issue to the District Court only proposed findings of fact and conclusions of law on such claims, to be reviewed *de novo*.  *See* 28 U.S.C. § 157(c)(1).

---

[3] The existence of an indemnity by the Debtor and its debtor affiliates in favor of the Favored Lenders is not sufficient to render the counterclaims against the Favored Lenders core post-*Stern*. *See In re KSRP, Ltd.*, 2011 WL 13096691 (Bankr. S.D. Tex. Aug. 17, 2011), *report and recommendation adopted sub nom. Collins v. Sidharthan*, 2014 WL 11531796 (S.D. Tex. Sept. 30, 2014), *aff'd sub nom. In re KSRP, Ltd.*, 809 F.3d 263 (5th Cir. 2015) (finding Bankruptcy Court lacked jurisdiction to finally adjudicate claims between two third parties, while finding one of the parties' claims for indemnification against debtor was core).

3724460.1

## CONCLUSION

For the foregoing reasons, the Excluded Lenders respectfully request that the Court (a) enter judgment in their favor on liability[4] on all claims against the Debtor in this Action, (b) issue proposed findings of fact and conclusions of law in their favor on liability on all claims against the Favored Lenders in this Action, and (c) grant such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         May 14, 2023

Respectfully submitted,

FRIEDMAN KAPLAN SEILER
  ADELMAN & ROBBINS LLP

*s/ Eric Seiler*
Lawrence S. Robbins*
Eric Seiler*
Anne E. Beaumont*
Jamuna D. Kelley*
Elizabeth Bierut*
Blair R. Albom*
7 Times Square
New York, NY  10036
(212) 833-1100
lrobbins@fklaw.com
eseiler@fklaw.com
abeaumont@fklaw.com
jkelley@fklaw.com
ebierut@fklaw.com
balbom@fklaw.com

*Attorneys for the Excluded Lenders*

**PAUL, WEISS, RIFKIND, WHARTON &**
  **GARRISON LLP**
Kenneth S. Ziman*

---

[4] The parties to this Adversary Proceeding have stipulated to bifurcate the issue of damages from that of liability in the Adversary Proceeding Trial, such that the Adversary Proceeding Trial will address only the issue of liability.  *See* ECF No. 207.

3724460.1

Brian S. Hermann*
Lewis R. Clayton*
Andrew J. Ehrlich*
Michael J. Colarossi*
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000
kziman@paulweiss.com
bhermann@paulweiss.com
lclayton@paulweiss.com
aehrlich@paulweiss.com
mcolarossi@paulweiss.com

*Attorneys for the Excluded Lenders with respect to
Plaintiffs' Claims and Counterclaims Only*

**PORTER HEDGES LLP**
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan N. Young-John (TX 24088700)
1000 Main Street, 36th Floor
Houston, TX  77002
(713) 226-6000
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com

*admitted pro hac vice

*Attorneys for the Excluded Lenders with respect to
Plaintiffs' Claims and Counterclaims Only*

35