**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SERTA SIMMONS BEDDING, LLC, et al. | : | Case No. 23-90020 (DRJ) |
| | : | |
| | : | (Jointly Administered) |
| SERTA SIMMONS BEDDING, LLC, INVESCO | : | |
| SENIOR SECURED MANAGEMENT, INC., | : | Adversary Proc. No. 23-09001 (DRJ) |
| CREDIT SUISSE ASSET MANAGEMENT, LLC, | : | |
| and BARINGS LLC, | : | |
| | : | |
| *Plaintiffs and Counterclaim-Defendants,* | : | |
| | : | |
| - against – | : | |
| | : | |
| AG CENTRE STREET PARTNERSHIP L.P., AG | : | |
| CREDIT SOLUTIONS NON-ECI MASTER | : | |
| FUND, L.P., AG SF MASTER (L), L.P., AG | : | |
| SUPER FUND MASTER, L.P., SILVER OAK | : | |
| CAPITAL, L.L.C., ASCRIBE III | : | |
| INVESTMENTS, LLC, COLUMBIA CENT CLO | : | |
| 21 LIMITED, COLUMBIA CENT CLO 27 | : | |
| LIMITED, COLUMBIA FLOATING RATE | : | |
| INCOME FUND, A SERIES OF COLUMBIA | : | |
| FUNDS SERIES TRUST II, COLUMBIA | : | |
| STRATEGIC INCOME FUND, A SERIES OF | : | |
| COLUMBIA FUNDS SERIES TRUST I, | : | |
| CONTRARIAN CAPITAL FUND I, L.P., | : | |
| CONTRARIAN CENTRE STREET | : | |
| PARTNERSHIP, L.P., CONTRARIAN | : | |
| DISTRESSED DEBT FUND, L.P., GAMUT | : | |
| CAPITAL SSB, LLC, LCM XXII LTD., LCM | : | |
| XXIII LTD., LCM XXIV LTD., LCM XXV LTD., | : | |
| LCM 26 LTD., LCM 27 LTD., LCM 28 LTD., | : | |
| NORTH STAR DEBT HOLDINGS, L.P., | : | |
| SHACKLETON 2013- III CLO, LTD., | : | |
| SHACKLETON 2013-IV-R CLO, LTD., | : | |
| SHACKLETON 2014-V-R CLO, LTD., | : | |
| SHACKLETON 2015-VII-R CLO, LTD., | : | |
| SHACKLETON 2017-XI CLO, LTD., Z | : | |
| CAPITAL CREDIT PARTNERS CLO 2018-1 | : | |
| LTD., AND Z CAPITAL CREDIT PARTNERS | : | |
| CLO 2019-1 LTD., | : | |
| *Defendants and Counterclaim-Plaintiffs.* | : | |

## LCM DEFENDANTS' PRE-TRIAL BRIEF[*]

HOLWELL SHUSTER & GOLDBERG
425 Lexington Ave., 14th Floor
New York, New York 10017
Tel: 646.837.5151

MCKOOL SMITH P.C.
600 Travis Street, Suite 7000
Houston, Texas 77002
Tel. 713.485.7300

*Counsel for the LCM Defendants*

---

[*] The LCM Defendants are LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd. and LCM 28 Ltd.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

STATEMENT OF FACTS ................................................................................................. 1

    A.  Serta and the PTL Lenders Negotiate and Consummate the Exchange Transaction ..... 1

    B.  The Mechanics of the Exchange Transaction................................................................. 4

PROCEDURAL HISTORY................................................................................................ 8

ARGUMENT ................................................................................................................... 10

    I.   THE COURT SHOULD ENTER A REPORT AND RECOMMENDATION ................. 10

    II.  THE FACTS AT TRIAL WILL ESTABLISH A BREACH OF CONTRACT ............... 13

    III.  THE FACTS AT TRIAL WILL ESTABLISH A VIOLATION OF THE
COVENANT OF GOOD FAITH AND FAIR DEALING ................................................ 18

    A.  Getting Paid To Amend, And Amending, The Agreement On The Way Out. ............ 20

    B.  Stripping LCM's Priority Rights................................................................................. 24

CONCLUSION................................................................................................................. 26

# **TABLE OF AUTHORITIES**

**Cases**

*AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*,
185 N.Y.S.3d 73 (N.Y. App. Div. 1st Dep't 2023) ............................................................... 31, 32

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
175 F. Supp. 3d 44 (S.D.N.Y. 2016) ........................................................................................ 14

*Anexia, Inc. v. Horizon Data Sols. Ctr., LLC*,
2022 WL 1195436 (N.Y. Sup. Ct. (N.Y. Cnty.) Apr. 21, 2022) ............................................... 26

*Atwater & Co. v. Panama R.R. Co.*,
246 N.Y. 519 (1927) ................................................................................................................. 17

*Barton v. Ne. Transp., Inc.*,
2022 WL 203593 (S.D.N.Y. Jan. 24, 2022) ............................................................................. 13

*Bethel v. New York City Transit Auth.*,
92 N.Y.2d (1998) ...................................................................................................................... 24

*Broad v. Rockwell Int'l Corp.*,
642 F.2d 929 (5th Cir. 1981) (en banc) .............................................................................. 16, 20

*Cole v. Macklowe*, 99 A.D.3d 595
(N.Y. App. Div. 1st Dep't 2012) ............................................................................................... 20

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
232 F.3d 153 (2d Cir. 2000) ..................................................................................................... 17

*Dalton v. Educ. Testing Serv.*,
87 N.Y.2d 384, 389 (1995) ....................................................................................................... 22

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*,
680 F. Supp. 2d 625 (S.D.N.Y. 2010) ...................................................................................... 23

*Fleischman v Furgueson*,
223 N.Y. 235 (1918) ................................................................................................................. 20

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) .......................................................................... 14

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989) .................................................................................................................... 14

*ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, 2022 WL 10085886 (N.Y. Sup. Ct. (N.Y. Cnty.) Oct. 17, 2022) ...................................................................................................................... 26

*In re Base Holdings, LLC*,
2014 WL 895403 (N.D. Tex. Mar. 5, 2014) ............................................................................. 15

*In re BP RE, L.P.*,
735 F.3d 279, 283 (5th Cir. 2013) ........................................................................... 13

*In re Charter Commc'ns*,
419 B.R. 221, 238 (Bankr. S.D.N.Y. 2009) ........................................................... 21

*In re Cole*,
2015 WL 13822175 (Bankr. W.D. Tenn. May 22, 2015) ........................................ 15

*In re Frazin*,
732 F.3d 313 (5th Cir. 2013) .......................................................................... 11, 12, 14

*In re Freeway Foods of Greensboro, Inc.*,
466 B.R. 750 (Bankr. M.D.N.C. 2012) .................................................................... 12

*In re Genon Energy*,
2019 WL 13192461 (Bankr. S.D. Tex. Aug. 14, 2019) .......................................... 12

*In re Healthcare Real Estate Partners, LLC*,
639 B.R. 294 (Bankr. D. Del. 2022) ........................................................................ 13

*In re LightSquared Inc.*,
511 B.R. 253 (Bankr. S.D.N.Y. 2014) .................................................................... 23

*In re Murray Energy Holdings Co.*,
616 B.R. 84 (Bankr. S.D. Ohio 2020) ............................................................... 19, 20

*Kass v. Eastern Air Lines, Inc.*,
1986 WL 13008 (Del. Ch. Nov. 14, 1986) ......................................................... 27, 28

*Katz v. Oak Indus. Inc.*,
508 A.2d 873 (Del. Ch. 1986) ............................................................................ 24, 28

*Keybank N.A. v. Franklin Advisers, Inc.*,
616 B.R. 14 (Bankr. S.D.N.Y. 2020) .................................................................. 29, 30

*Kirk La Shelle Co. v. Armstrong Co.*,
263 N.Y. 79 (1933) .................................................................................................. 23

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
2022 WL 953109  (S.D.N.Y. Mar. 29, 2022) .......................................................... 30

*North Star Debt Holdings, L.P., et al. v. Serta Simmons Bedding, LLC, et al.*,
Index No. 652243/2020 (N.Y. Sup. Ct. 2020) .......................................................... 3

*Northern Pipeline v. Marathon Pipeline Co.*,
458 U.S. 50 (1982) ................................................................................ 11, 13, 15, 16

*Nw., Inc. v. Ginsberg*,
572 U.S. 273 (2014) ................................................................................................ 13

*Octagon Credit Investors, LLC v. NYDJ Apparel, LLC*,
Index No. 656677/2017 (N.Y. Sup. (N.Y Cty.)) ...................................................... 28

*Richbell Info. Servs. v. Jupiter Partners*,
   309 A.D.2d 288 (N.Y. App. Div. 1st Dep't 2003) ................................................... 26

*Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*,
   13 N.Y.3d 398 (2009) ........................................................................................... 17

*Rowe v. Great Atl. & Pac. Tea Co.*,
   46 N.Y.2d 62 (1978) ........................................................................................ 23, 24

*Semper v. New York Methodist Hosp.*,
   786 F. Supp. 2d 566, 572 (E.D.N.Y. 2011) ........................................................... 14

*Shatz v. Chertok*,
   180 A.D.3d 609, 610 (N.Y. App. Div. 1st Dep't 2020) ......................................... 25

*Starr Indem. & Liab. Co. v. Water Quality Ins. Syndicate*,
   320 F. Supp. 3d 549 (S.D.N.Y. 2018) ................................................................... 16

*Stern v. Marshall*,
   564 U.S. 462 (2011) ..................................................................................... *passim*

*Villegas v. Schmidt*,
   788 F.3d 156 (5th Cir. 2015) ................................................................................ 11

## Other Authorities

Antonin G. Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*
   (2012) ..................................................................................................................... 17

James H. Millar, *Revisiting Good Faith And Fair Dealing Challenges By Non-Participating
   Holders To Indenture Amendments Effectuated Through Use Of Exit Consents*, Faegre Drinker
   Publications (Nov. 1, 2017) ................................................................................... 22

**STATEMENT OF FACTS**

A.      **Serta and the PTL Lenders Negotiate and Consummate the Exchange Transaction**

1.      As the Court is aware, on November 8, 2016, Serta Simmons Bedding, LLC ("**Serta**") raised capital by entering into a First Lien Term Loan Agreement (the "**Credit Agreement**" or "**Agreement**") with a number of lenders (the "**First Lien Lenders**"). That Agreement specifies in Section 2.18 that any payment by Serta on account of the loans would be made *pro rata* to all First Lien Lenders based on the face amount of ownership—meaning no First Lien Lender would receive better treatment in payment priority (the "**First Lien Loans**"). *See* Agreement, PX-5 at 82.[1]

2.      In early 2020, and certainly by March 2020, in the face of liquidity concerns occasioned by a weakening financial performance and the substantial impact of the COVID-19 pandemic, Serta began to search for refinancing alternatives that would infuse new money into the company and prevent it from defaulting on the Agreement.

3.      Serta, acting with and through its advisors at Evercore Group L.L.C. and Weil Gotshal & Manges LLP, and largely directed by its private-equity sponsor, Advent International ("**Advent**"), engaged in negotiations with a substantial number of financial institutions—including Oaktree, Barings, Sixth Street, Fortress, Blue Torch Capital, Charlesbank, and an ad hoc group of lenders (hereafter, the "**Apollo Group**") affiliated with Apollo Global Management, Angelo Gordon, and Gamut Capital. These firms proposed to infuse new money into the business through what is colloquially known as a "drop-down" transaction, whereby an infusion of new capital would be collateralized by the transfer of assets into a so-called unrestricted subsidiary. ▬

---

[1] All references to "PX-" are to the exhibit numbers in the Debtors' Witness List and Joint Exhibit List for Hearing Beginning on May 15, 2023 (Dkt. 253).

████████████████████████. In such a transaction, there is no subordination (rather, there is a change to the pool of collateral securing the first lien loans), and the first lien loans remain first lien.

4.      In parallel, Serta and its advisors explored a different kind of transaction with an ad hoc group of existing first- and second-lien lenders represented by Gibson Dunn & Crutcher LLP and Centerview Partners LLC (hereafter, the "**PTL Lenders**"). Initially, the PTL Lenders were contemplating a transaction to infuse approximately $200 million in new money in exchange for loans with priority over Serta's existing first-lien debt. As the engagement lead from Centerview explained, ████████████████████████████

████████████████████████████████

Karn Chopra Dep. 25:9–14. ████████████████████████

████████████████████████████████

████████████████████████ *Id.* 35:20–25 (emphasis added).

5.      At some later point, however, the PTL Lenders' advisors ████████████████

████████████████████████████ *Id.* 38:13–14 (emphasis added). As a result, the PTL Lenders and Serta began to discuss (and subsequently discussed) ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████ *See, e.g., id.* 27:23–28:15. As is undisputed, this deal encompassing both the new money and exchange tranches (hereafter, the "**Exchange Transaction**") required amendments to the Agreement.

6.      Although the factual record demonstrates that Serta continued to negotiate with the

Apollo Group, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ *See* Ken

Prince Dep. 187:16–188:25. Then, on Monday, June 8, 2020, Serta publicly announced the

Exchange Transaction, which it characterized as "a transaction support agreement with a majority

of its First Lien and Second Lien Term Loan Holders to recapitalize the Company." PX-218 at 1.

7.      It is undisputed that ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ *See* Roopesh Shah Dep. 273:1–

23; Phillip Yarrow Dep. 223:21–225:9; Harvey Tepner Dep. 222:7–223:9; Barry Canipe Dep.

105–106; Chopra Dep. 189:22–190:22; Michael Searles Dep. 229:3–232:12.

8.      On Thursday, June 11, 2020, the Apollo Group initiated a lawsuit to restrain Serta

and the PTL Lenders from consummating the Exchange Transaction. *North Star Debt Holdings,*

*L.P., et al. v. Serta Simmons Bedding, LLC, et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. 2020).

On Friday, June 12, Justice Andrea Masley of New York State Supreme Court entered a temporary

restraining order enjoining consummation of the transaction, *see id.* Dkt. 48, but on the next

Friday, June 19, Justice Masley dissolved the TRO and denied the Apollo Group's request for a

preliminary injunction, *see id.* Dkt. 88.[2] Serta and the PTL Lenders closed the deal first thing in

the morning on Monday, June 22. Following that closing, there were now four classes of Serta

---

[2] The LCM Defendants' Collateral Manager, LCM Asset Management LLC, sought to intervene in that case, but,
after the transaction closed and Serta objected to the Collateral Manager's intervention, the Collateral Manager
withdrew its motion, and a new action was filed in the SDNY.

debt: the new money (or "FLFO") tranche; the exchange (or "FLSO") tranche; the legacy first-lien debt, which now ranked *third* in priority; and the legacy second-lien debt, which now ranked *fourth*.

### B.    The Mechanics of the Exchange Transaction

9.    The parties to the Exchange Transaction extensively negotiated two key variables: (1) the "participation rate"—*i.e.*, the percentage of existing first- and second-lien lenders who would be permitted to exchange their existing debt for new debt, and (2) the discount-to-par value at which the exchanging lenders would tender their existing loans in return for new ones. From an economic standpoint, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, Canipe Dep. 109:4–8; 109:17–18. The PTL Lenders, by contrast, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ *See, e.g.*, Yarrow Dep. 113:20–115:24; Sveen Dep. 213:2–215:19; Chopra Dep. 76:6–13.

10.    The magic participation rate was 50.1%. Indeed, to make the transaction work, all understood that the Agreement would need to be amended. As a baseline, and subject to certain exceptions, the Agreement stated in Section 9.02(b) that it could be amended with the approval of the "Required Lenders," and the Agreement in Section 1.01 defined the term "Required Lenders" to mean "Lenders having Loans . . . representing more than 50% of the sum of the total Loans." PX-5 at 55. The PTL Lenders who negotiated the deal with Serta ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, Yarrow Dep. 226:12–227:2; Tepner Dep. 216:9–218:18.

4

11.     In that light, the PTL Lenders and Serta decided 

*See* Prince Dep. 154:14-15

Tepner Dep. 217:2–4

. It is undisputed that

12.     Thus, across a series of term sheets exchanged between Serta and the PTL Lenders, the PTL Lenders demonstrated a willingness to negotiate on the discount to par, but not on the participation rate. Serta attempted at times to modestly increase the participation rate, but the PTL Lenders always struck back to 50.1%.[3] And they also refused to seek the approval of all lenders or otherwise to offer the deal to all lenders. The discount to par undoubtedly mattered, but clearing the 50.1% threshold—and ideally no more—was the lodestar. The participation of a bare majority would maximize the value of the newly acquired priming liens *to* that bare majority because so much more debt would now sit behind it.

13.     And that is exactly how the Exchange Transaction was effectuated. A bare majority of existing first- and second-lien lenders agreed to amend the relevant credit agreements on their way out, to permit the incurrence of so-called super-priority debt, at exactly the same moment those very same lenders were *exchanging* their existing debt for the new super-priority debt.

---

[3] The one exception to this pattern was the participation rate offered by the PTL Lenders for second-lien lenders, which they originally pegged at a mere 25%. Presumably, upon realizing that they would need to employ the services of the Required Lenders to amend the Second Lien Term Loan Agreement and avoid an event of default on that agreement as well, the PTL Lenders acquiesced in the necessary 50.1% participation rate as well.

14.     Among other things, the PTL Lenders and Serta amended Section 1.01 of the Agreement to change the definition of "Incremental Equivalent Debt" to include new money priority term loans that could be senior in right of payment (to account for the new money tranche); and they excised Section 7.01(*l*) from the Agreement, which had previously defined any subordination of the first lien loans as an event of default (to prevent the issuance of the new loans from creating an event of default that would have accelerated repayment). *See* Amendment No. 1 to First Lien Term Loan Agreement (the "**Amendment**"), PX-250 at 158, 258.

15.     The PTL Lenders executed these amendments on the condition that they would no longer be parties to the Agreement, as they contemporaneously exchanged their existing debt for new, super-priority debt. Thus, the "Open Market Purchase and Cashless Exchange Agreement" (*see* PX-251), by which the PTL Lenders exchanged their existing loans for super-priority debt, and the Amendment (*see* PX-250), by which the PTL Lenders ratified Serta's incurrence of super-priority debt, were executed by the PTL Lenders at precisely the same time, and became effective contemporaneously. In other words, the PTL Lenders (and only the PTL Lenders) became holders of Serta's super-priority debt, and they did so at the exact moment they agreed to amend the Agreement to *allow* Serta to *incur* such debt, and thus to subordinate the First Lien Lenders who remained behind, including the LCM Defendants.

16.     There can be no real dispute on this point, as the separate agreements comprising the Exchange Transaction all worked in tandem and were contingent upon each other. The Super-Priority Term Loan Agreement (the "**PTL Agreement**") makes clear that ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

███████████████████████████████████████ PX-252 at 7. The

Open Market Purchase and Cashless Exchange Agreement, in turn, recites that ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████ PX-251 at 4. Section 6 of the First Amendment then

states that "[i]mmediately following" the execution of the amendment "the PTL Credit Agreement

shall become effective and . . . the PTL New Money Term Loans shall be funded and the Initial

PTL Exchange Transactions shall be consummated." PX-250 at 4. And, as is undisputed, all these

agreements were executed by exactly the same parties at exactly the same time—the morning of

June 22, 2020—and all were effective that day.

17.     As the PTL Lenders conceded—and as economic realities dictate—████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ *See, e.g.,* Sveen Dep. 241:2–16; Yarrow Dep. 226:12–227:2.

18.     The PTL Lenders' focus on limiting participation is easily explained. Pursuant to

Serta's First Amended Plan (Case No. 23-90020, Dkt. 796), the FLFO tranche of $200 million

now stands to receive satisfaction of their claims in the form of approximately $197 million in new

loans, and the FLSO tranche stands to receive up to *99%* of the equity in the reorganized company.

The lenders left behind in the Exchange Transaction, by contrast, stand to receive 1% of the equity

in the reorganized entity. That result was made possible by endeavoring to cap the participation

rate at 50.1%.

## PROCEDURAL HISTORY

19.    On January 24, 2023, hours after filing for Chapter 11 protection, Serta Simmons, LLC ("**Serta**") and certain of its so-called priority term loan lenders (Invesco Senior Secured Management, Inc., Barings LLC, and Credit Suisse Asset Management LLC) initiated this adversary proceeding against, *inter alios*, the LCM Defendants, seeking a declaratory judgment that (1) the 2020 Exchange Transaction complied with the Agreement; (2) the Exchange Transaction did not violate the implied covenant of good faith and fair dealing; and (3) North Star Debt Holdings, L.P. was disqualified from holding Serta loans. Dkt. 1. Only the first two declaratory-judgment claims were made against and are relevant to the LCM Defendants. On February 14, Plaintiffs amended their complaint to add two additional priority term loan lenders, Eaton Vance Management and Boston Management and Research, as plaintiffs (together, with the aforementioned priority term loan lenders, the "**Lender Plaintiffs**"). Dkt. 38.

20.    On February 24, 2023, the non-LCM Defendants (the "**Ad Hoc Group of Excluded Lender Defendants**" or "**Excluded Lender Defendants**") answered the amended complaint, filed counterclaims for breach of contract and the implied covenant of good faith and fair dealing against Serta and the Lender Plaintiffs, and filed identical third-party claims against each of the hundreds of individual funds (rather than their asset managers) (the "**Fund Defendants**") that participated in the Exchange Transaction. Dkt. 66.[4]

21.    On February 24, 2023, Serta and the Lender Plaintiffs each moved for summary judgment. On March 16, 2023, all defendants opposed summary judgment. On March 24, 2023, Plaintiffs replied, and on March 28, the Court heard oral argument on the motions.

---

[4] On May 5, 2023, the Excluded Lender Defendants filed an unopposed motion to correct the caption to style their claims against the individual participating funds as counterclaims, rather than third-party claims, (Dkt. 213), which motion was granted on May 12, 2013 (Dkt. 235).

22.     Ruling from the bench on the motion for summary judgment, the Court held that the Exchange Transaction unambiguously qualified as an "open market purchase" under Section 9.05(g) of the Agreement and granted summary judgment solely to that extent—expressly leaving open the broader implications of that ruling as to whether the Exchange Transaction was permitted by contract. *See* Dkt. 133 (March 28, 2023 Summary Judgment Hearing Transcript ("Tr.")), at 135:4–6 ("What I'm not prepared to find [is] that in all aspects the Credit Agreement was complied with, I don't have that evidence before me."). The Court denied summary judgment on the implied-covenant claim and the North Star disqualification claim.

23.     The Court's bench ruling was memorialized in an April 6, 2023 order, which also certified for direct appeal to the United States Court of Appeals for the Fifth Circuit so much of the Court's ruling that granted plaintiffs' motion for summary judgment. Dkt. 142. Defendants moved for an expedited appeal to the Fifth Circuit; Plaintiffs consented to the direct appeal but opposed expedition. On April 26, the Fifth Circuit granted so much of the motion as sought a direct appeal but denied expedition. *See* No. 23-90012, Dkt. 60-2 (5th Cir.).

24.     On April 7, 2023, the LCM Defendants answered Plaintiffs' amended complaint (*see* Dkt. 146) and asserted counterclaims against Serta and the Lender Plaintiffs for (1) breach of contract (in the interest of preserving their rights on appeal, and in light of the fact that the Court's order did not grant summary judgment in full to Plaintiffs on their contract claims) and (2) breach of the implied covenant of good faith and fair dealing. That same day, the Excluded Lender Defendants filed an amended answer and counterclaims. Dkt. 148, 149. On April 21, Serta answered the Excluded Lenders' amended counterclaims (Dkt. 180), and on April 28, the Lender Plaintiffs answered the LCM Defendants' counterclaims (Dkt. 191). On May 8, certain of the Fund Defendants answered the Excluded Lender Defendants' amended counterclaims. Dkt. 217.

## ARGUMENT

### I.   THE COURT SHOULD ENTER A REPORT AND RECOMMENDATION

25.    First, under *Stern v. Marshall* and its progeny, the Court should enter a report and recommendation as it lacks authority to enter a final judgment on the contract and implied-covenant claims. "When a suit is made of 'the stuff of the traditional actions at common law' . . . and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts." *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quoting *Northern Pipeline v. Marathon Pipeline Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring in judgment)). Common-law claims that the PTL Lenders breached the Agreement and also its covenant of good faith and fair dealing are precisely the sort of claims that, per *Stern v. Marshall*, must be resolved in an Article III court; the LCM Defendants do not consent to waive their constitutional rights in that regard; and the LCM Defendants respectfully request entry of a report and recommendation regarding the disposition of those claims.

26.    In *Stern*, the Court "held that bankruptcy courts lack constitutional authority to enter final judgment on state-law counterclaims unless they 'stem from the bankruptcy itself or would necessarily be resolved in the claims allowance process.'" *Villegas v. Schmidt*, 788 F.3d 156, 158 (5th Cir. 2015) (quoting *Stern*, 564 U.S. at 499) (alteration omitted). Thus, as the Fifth Circuit has instructed, *Stern* stands for the proposition that it "is unconstitutional [for] bankruptcy courts to enter final judgments in state-law counterclaims that would not necessarily be resolved in the process of ruling on a creditor's proof of claim." *In re Frazin*, 732 F.3d 313, 318 (5th Cir. 2013). It does not matter whether the state-law claim is considered "core" or not; "*Stern*'s holding [is] that bankruptcy courts cannot enter final judgments in one type of core proceeding, namely, state-law counterclaims that are not necessarily resolved in the claims-allowance process." *Id*.

27.     A claim alleging "breach of the covenant of good faith and fair dealing . . . does not satisfy [*Stern*] because it is a state law . . . claim and does not stem from the Bankruptcy Code." *In re Freeway Foods of Greensboro, Inc.*, 466 B.R. 750, 781–82 (Bankr. M.D.N.C. 2012) (permitting claim anyway because parties consented to jurisdiction); *see also In re Genon Energy*, 2019 WL 13192461, at *3 (Bankr. S.D. Tex. Aug. 14, 2019) (Jones, J.) (holding that, whether or not New York state law claims for breach of contract and the implied covenant of good faith and fair dealing were non-core, "the Court has significant concerns regarding its constitutional authority to enter a final judgment" between two non-debtors under *Stern* and recommending withdrawal of the reference)*, aff'd,* 2020 WL 429880 (S.D. Tex. Jan. 28, 2020).

28.     There can be little dispute that the claims at issue here may not be finally resolved as part of the bankruptcy process. The declaratory-judgment claims and related counterclaims concern solely whether the Debtor and the PTL Lenders violated the Agreement and its covenant of good faith and fair dealing under New York state law. "Although claims that go to the debtor-creditor relationship—and thus affect the federal bankruptcy power—may be a matter of public rights, state-created rights—such as contract or tort claims—are private rights concerning 'the liability of one individual to another under the law.'" *In re BP RE, L.P.*, 735 F.3d 279, 283 (5th Cir. 2013) (quoting *Northern Pipeline*, 458 U.S. at 71–72 (plurality) (internal citation omitted)); *see id.* at 285 (applying *Stern* to hold that the bankruptcy court was not constitutionally authorized to enter final judgment on a debtor's contract claim); *see also, e.g., In re Healthcare Real Estate Partners, LLC*, 639 B.R. 294, 303 (Bankr. D. Del. 2022) (declining to exercise jurisdiction over "state-law claims . . . for breach of contract and the implied covenant of fair dealing all involv[ing] prepetition dealings between the parties"). Contract claims and claims for breach of the implied covenant are creatures of state law implicating private rights—particularly when, as here, they are

11

asserted as between non-debtors. *See Barton v. Ne. Transp., Inc.,* 2022 WL 203593, at *5 (S.D.N.Y. Jan. 24, 2022) ("[B]reach of the implied covenant of good faith and fair dealing [is] a claim sounding in state common law."); *cf. Nw., Inc. v. Ginsberg*, 572 U.S. 273, 281 (2014) (describing "the implied covenant of good faith and fair dealing" as a "common-law rule").[5]

29.     The claims at issue here do not resemble the sort of "public rights" claim that, per *Stern*, can be finally adjudicated in Article I courts consistent with the Constitution. *See Stern*, 564 U.S. at 493 ("Vickie's counterclaim does not fall within . . . the public rights exception"); *compare Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 65 (1989) (Scalia, J., concurring in part and concurring in judgment) ("[A] matter of public rights . . . must at a minimum arise between the government and others.").

30.     Moreover, *Stern*'s other exception—for state-law claims that must "necessarily be resolved in the process of ruling on a creditor's proof of claim"—does not obtain in this case. *In re Frazin*, 732 F.3d at 318. The claims for breach of contract and of the implied covenant are asserted, *inter alia*, against the PTL Lenders. A claim against a third-party must not "necessarily be resolved" in ruling on a proof of claim, particularly where, as here, the LCM Defendants have ***already consented to the treatment of their claims under Serta's proposed restructuring plan*** without waiver of their rights to seek damages from the PTL Lenders.

31.     And the claims at issue here are not "derived from or dependent upon bankruptcy law." *Stern*, 564 U.S. at 499. Consider further that the remedy sought from the PTL Lenders

---

[5] Indeed, that a claim for the breach of the covenant of good faith and fair dealing is a claim arising under state law is critical in other jurisdictional contexts. *See e.g., FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425, at *1 (S.D.N.Y. Aug. 18, 2017) (bifurcating claims pertaining to a federal question from the plaintiffs' state "common law claims of . . . breach of implied covenants of good faith and fair dealing." ); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 61 (S.D.N.Y. 2016) ("In addition to their [federal] antitrust claim, Plaintiffs allege state-law claims . . . for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and tortious interference with contract."); *Semper v. New York Methodist Hosp.*, 786 F. Supp. 2d 566, 572 (E.D.N.Y. 2011) (referring to "state-law claims of . . . breach of the implied covenant of good faith" as different from causes of action arising from federal statutes).

consists of **damages**, and not an equitable remedy such as recission. *In re Base Holdings, LLC*, 2014 WL 895403, at \*4 (N.D. Tex. Mar. 5, 2014) (vacating bankruptcy court's judgment and distinguishing between remedies of recission and damages in *Stern* analysis). Thus, a claim "for damages for breach of the covenant of good faith [is] . . . one which requires the exercise of the judicial power of the United States because it is a matter of private rather than public right." *In re Cole*, 2015 WL 13822175, at \*2 (Bankr. W.D. Tenn. May 22, 2015).

*     *     *

32.     The claims pressed in this Adversary Proceeding fit squarely within *Stern*'s jurisdictional bar. Justice Rehnquist's concurrence in *Northern Pipeline*, vindicated in *Stern*, rings true here: "No method of adjudication is hinted, other than the traditional common-law mode of judge and jury. The lawsuit is before the Bankruptcy Court only because the plaintiff . . . filed a petition for reorganization in that court." *Northern Pipeline*, 458 U.S. at 90 (Rehnquist, J., concurring in judgment). Consistent with *Stern v. Marshall*, this Court should enter a report and recommendation regarding the disposition of this case.

## II.     THE FACTS AT TRIAL WILL ESTABLISH A BREACH OF CONTRACT

33.     The undisputed facts adduced at trial will establish that Plaintiffs breached the Agreement by effectuating the Transaction, in particular, by failing to abide by Section 9.02(b)'s requirement that the Agreement be amended only by "Required Lenders," which the Agreement defines as lenders that, "at the time" of the amendment, "represent[] more than 50% of the sum of the total" loans outstanding.[6] Having agreed to exchange their first lien loans, the PTL Lenders were not first lien lenders at the time of the amendment and therefore were not "Required Lenders."

---

[6] The Court held at summary judgment that Plaintiffs complied with Section 9.05(g) of the Agreement, and, although the LCM Defendants are appealing that determination and reserve all their rights in that respect, will argue at trial that Plaintiffs breached the Agreement regardless of the determination of that question on appeal.  In that regard, the LCM Defendants note that the Court expressly left open whether Plaintiffs otherwise complied with the

13

34.     Under New York law, "as a matter of contract interpretation . . . the Court begins with the plain text of the term at issue." *Starr Indem. & Liab. Co. v. Water Quality Ins. Syndicate*, 320 F. Supp. 3d 549, 569 (S.D.N.Y. 2018). Courts "must give the words and phrases employed in the contract their plain meaning." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 948 (5th Cir. 1981) (en banc) (applying New York law). Importantly, "particular words [in a contract] should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (quoting *Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524 (1927)). Whether a provision is unambiguous is a question of law for the Court. *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir. 2000).

35.     Section 9 of the Agreement sets forth the requirements for amending it. As a general rule, and subject to certain exceptions, any amendment required the consent of the "Required Lenders" under Section 9.02(b): "neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified, except . . . pursuant to an agreement or agreements in writing entered into by the Top Borrower and the Required Lenders[.]" In turn, the Agreement defined the term "Required Lenders" in Section 1.01 to mean "at any time, Lenders having Loans or unused Commitments representing more than 50% of the sum of the total Loans and such unused commitments at such time." PX-5 at 143.

36.     The Amendment itself recognizes that Section 9.02(b) must be complied with and purported to adhere to its requirements; thus, it states in the recitals that "in accordance with

---

Agreement in all respects—which is the declaration they seek by way of this Adversary Proceeding. *See* Tr. at 135:4-9 ("What I'm not prepared to find that in all aspects that the Credit Agreement was complied with, I don't have that evidence before me. What I was asked to determine -- at least the way that I read it -- was whether or not that the commercial transaction that was engaged in fit within 9.05(g) and I find that it does.").

Section 9.02(b) of the Existing Term Loan Agreement, the Top Borrower has requested that the Lenders (as defined in the Existing Term Loan Agreement) party hereto (which collectively constitute the Required Lenders under and as defined in the Existing Term Loan Agreement) . . . agree to make certain amendments to the Existing Term Loan Agreement as set forth herein." PX-250 at 2.

37.     But, in fact, the Amendment did not comply with Section 9.02(b)'s requirement that lenders holding more than "50% of the sum of the total Loans . . . *at such time*" approve any such amendment. In fact, "at such time" of the Amendment, the voting lenders—*i.e.*, the PTL Lenders—were *exiting* the Agreement and had agreed to amend it only because it would apply to the First Lien Lenders that were remaining behind, and never to them. Indeed, the Amendment was made effective and the exchange was consummated simultaneously—meaning there was no moment in time that both (i) the PTL Lenders the PTL Lenders held loans under the original Agreement  and (ii) agreed to amend the agreement while still holding such debt. Moreover, the amendment and exit were each contingent on the other, and the PTL Lenders agreed to amend the Agreement only because the amendments would redound to their benefit while disadvantaging those left behind.

38.     In other words, Plaintiffs did not meet the basic definition of "Required Lenders" under any ordinary reading of that provision. This is apparent from the face of the documents alone. *See, e.g.*, PX-250 (Amendment), Recitals Section C ("On the First Amendment Effective Date [*i.e.*, June 22, 2020—the date of the Amendment], the Borrowers will enter into the PTL Credit Agreement and in connection therewith, the Borrowers will consummate the Initial PTL Exchange Transactions."); *id.* Section 6 ("Immediately following the transactions contemplated under this First Amendment the Initial PTL Exchange Transactions shall be consummated."); *see*

*also* PX-252 (PTL Credit Agreement), █████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████

39.      *In re Murray Energy Holdings Co.*, 616 B.R. 84 (Bankr. S.D. Ohio 2020) is instructive. There, lenders who had been left behind by new "super-priority lenders" argued that the debtor failed to achieve the required threshold of lenders for amendment to a credit agreement because the superpriority lenders "had already committed to sell their loans back" to the debtor at the time they agreed to amend the credit agreement. *Id*. at 97–98. The court rejected this argument, stating that it could not be that a "commitment to sell notes . . . itself effectuated a sale of the notes." *Id*. at 98. But the facts of this case lead to just the opposite conclusion: here, the PTL Lenders had not just "committed" to exchange their notes, they in fact exchanged their notes at the same time they purported to vote to amend the Agreement, and each was contingent on the other. *Compare id*. ("Committing to do something is not, of course, the same thing as doing it."); *see also id*. ("[T]he Third Amendment was entered into before the Specified Auction was conducted.").

40.      Considering the Agreement's broader context further supports this conclusion. Under New York law, "the entire contract must be considered," and "that interpretation is favored which will make every part of the contract effective." *Broad*, 642 F.2d at 947; Antonin G. Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("Context is the primary determinant of meaning. A legal instrument typically contains many interrelated parts [and] [t]he entirety of the document thus provides the context for each of its parts."). Moreover,

courts in New York reject contractual readings that "produce an absurd result, [or] one that is commercially unreasonable." *See Cole v. Macklowe*, 99 A.D.3d 595, 596 (N.Y. App. Div. 1st Dep't 2012); *Fleischman v Furgueson*, 223 N.Y. 235, 241 (1918) ("It is a well-established canon of interpretation that in seeking for the intent of the parties the fact that a construction contended for would make the contract unreasonable may be properly taken into consideration.").

41. Interpreting Section 9.02(b) and the definition of "Required Lenders" to allow for exiting lenders to amend the contract—in such a fashion that the amendments will never apply to them but will actively injure the interests of the remaining parties to the Agreement, such as the LCM Defendants, who did not agree and would not agree to the Amendment—leads to a commercially unsustainable interpretation. Majority-vote requirements are designed to be protective of lenders *who are in the contract*; the point is to ensure that a change affecting the lenders is approved by a majority of them. *Cf. In re Charter Commc'ns*, 419 B.R. 221, 238 (Bankr. S.D.N.Y. 2009) ("[O]rdinary voting power . . . is exercised by means of shareholder votes for directors who in turn govern the management of CCI and its subsidiaries[.]"). Reading the Agreement to permit exiting lenders to amend and, at the same time, exit, undermines that context and leads to an absurd result.[7]

42. Rather than provide a mechanism for protecting Serta's lenders by ensuring that a majority of the lenders agree to an amendment that will affect the lenders' rights, the reading sponsored by the PTL Lenders turns it into a mechanism to permit Serta to effectively pay off a

---

[7] There is further contextual support for an interpretation of "Required Lenders" that excludes the PTL Lenders. Section 9.05(g)(vi)(A) instructs that if an "Affiliated Lender" acquires loans in the open market but is not automatically required to retire and cancel those loans pursuant to Section 9.05(g)(i), "the Term Loans held by such Affiliated Lender shall be disregarded in both the numerator and denominator in the calculation of any Required Lender or other Lender vote[.]" PX-5 at 156. This clause further reflects the contracting parties' intent to prevent voting by lenders whose interests are aligned with the borrower rather than their co-lenders—just as the PTL Lenders' interests were aligned with those of Serta vis-à-vis the excluded lenders in the Exchange Transaction.

select number of lenders and treat them preferentially if all agree to go along with a plan to disadvantage lenders who have no voice at all in the amendment. This makes no sense.

43.     The Court should also consider the exceptions set forth in the Agreement for amending it, as these also make clear that the Required Lenders must actually be affected by an amendment in order to be permitted contractually to make it. Thus, the Agreement states that to amend certain of the provisions in the Agreement, including the *pro rata* sharing provision, then Serta would need to obtain the consent not just of 50.1% of the lenders, but instead the approval of *everyone* who is "directly and adversely affected" by the amendment. In the event a lender is stripped of a right to receive *pro rata* payment, then that lender must agree.

44.     It makes no sense to conclude—as the Court must conclude to give Plaintiffs a clean bill of health—that, for the amendments requiring approval by the Required Lenders, *not a single lender* who is directly and adversely affected by an amendment must approve. The Required Lenders must actually be Serta lenders at the time of the amendment, and must actually be affected by it. That ensures approval by representatives of all lenders.

45.     In this case, the amendments were not approved by a single one of the lenders actually adversely affected by them. This is a completely perverse result, one that ignores the plain words of the Agreement and cannot possibly comply with the reasonable expectations of the parties to the Agreement or with commercial reality.

## III.    THE FACTS AT TRIAL WILL ESTABLISH A VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

46.     Even if the Court finds, as a legal matter, that the amendment process followed by Plaintiffs as described *supra* in Part II technically complied with the contract, the evidence at trial will demonstrate that the conduct breached the covenant of good faith and fair dealing.

47.     Under New York law, every contract contains an implied covenant of good faith and fair dealing, according to which "'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (quoting *Kirk La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87 (1933)). Put otherwise, "the undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978); *see also Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 632 (S.D.N.Y. 2010) ("[A]n end-run [around contractual terms], if not a downright sham, is not permissible if, as here, it does away with the 'fruits' of the contract."); *In re LightSquared Inc.*, 511 B.R. 253, 333 (Bankr. S.D.N.Y. 2014) (noting that *Empresas* "found that conduct technically permissible under a credit agreement may nevertheless give rise to a breach of the implied covenant of good faith and fair dealing if it is intended to achieve a result that is prohibited").

48.     Thus, "the appropriate legal test is not difficult to deduce. It is this: is it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter. If the answer to this question is yes, then, . . . a court is justified in concluding that such act constitutes a breach of the implied covenant of good faith." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (applying New York law). The test, of course, is an "objective" one of what the "reasonable person" would have expected. *Bethel v. New York City Transit Auth.,* 92 N.Y.2d 348, 353 (1998); *see also Rowe*, 46 N.Y.2d at 69 (implied covenant judged from the perspective of the "reasonable person in the position of the promisee").

### A.  Getting Paid To Amend, And Amending, The Agreement On The Way Out.

49.     As explained above and as the deal documents show, while the PTL Lenders "consented" to change the Agreement to allow the issuance of super-priority loans and to make other amendments permitting the Transaction to proceed, they did so only on the condition that the changes would *not* apply to them, and only upon receiving consideration not offered to the non-participating lenders (*i.e.*, priming liens). The changes became effective only at the exact moment they entered into the "Open Market Purchase and Cashless Exchange Agreement" (PX-251) and thereby stopped being First Lien Lenders, consummating the Exchange Transaction.

50.     The facts at trial will bear this out. The first-priority status of the First Lien Lenders was ███████████████████████████████████████ *See* Tepner Dep. 186:22–188:2. Indeed, this is indisputable from the face of the Agreement, which provided, *e.g.*, that subordination was an event of default. *See* PX-5 (Agreement) § 7.01(*l*). The amendments permitting the creation of senior liens deprived the First Lien Lenders of this "fundamental" aspect of the deal—*i.e.*, the fruits of the Agreement—in a manner that violates the expectation of good faith and fair dealing that inures in every contract under New York law. In a deliberate scheme to deprive the non-participating first-lien lenders of the fruits of the contract (*i.e.*, their priority status), ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ *See* PX-250 (Amendment); *see also* Tepner Dep. 216:22–217:2–4. The deliberate orchestration of this scheme is apparent in the fact that the participation rate of the PTL lenders was pegged at 50.1% and no more—just enough to amend the agreement, and no more, so that the value of their new debt could be maximized (to the corresponding detriment of the non-participating first-lien lenders). *See supra* ¶¶ 9–18. Mr. Shah admitted that ████████████████████████████████████████

███████ Shah Dep. 277:3–10. There could be no priming without amending the Agreement, and

████████████████████████████████████████████████████████████████████████

████████████████████████ *See, e.g.*, Yarrow Dep. 226:12-17 ██████████████████████

██████████████████████████████████████████████████████████; *id.* at

226:21–227:2.

51.     New York precedents demonstrate that this manipulation of the amendment process violates the implied covenant of good faith and fair dealing. *First*, "explicit[] . . . right[s] cannot be exercised in bad faith so as to deprive the other party of the benefit of the bargain." *Shatz v. Chertok*, 180 A.D.3d 609, 610 (N.Y. App. Div. 1st Dep't 2020). That principle is well illustrated in *Richbell Info. Servs. v. Jupiter Partners*, 309 A.D.2d 288 (N.Y. App. Div. 1st Dep't 2003), in which the Appellate Division held that, notwithstanding the "apparently unfettered" contractual right of the majority partners in a joint venture to veto a particular transaction, "even where one has an apparently unlimited right under the contract, that right may not be exercised *solely for personal gain* in such a way as to deprive the party of the fruits of the contract." *Id.* at 302 (emphasis added); *Anexia, Inc. v. Horizon Data Sols. Ctr., LLC*, 2022 WL 1195436, at *3 (N.Y. Sup. Ct. (N.Y. Cnty.) Apr. 21, 2022) ("[A] party may be in breach of an implied duty of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruit of its bargain."); *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, 2022 WL 10085886, at *9 (N.Y. Sup. Ct. (N.Y. Cnty.) Oct. 17, 2022) (finding allegations that "defendants, who constitute 'majority lenders' under the Credit Agreement, abused their

ability to amend the Credit Agreement to effectuate the Transaction" stated a claim for breach of the implied covenant).[8]

52.     Here, there was undoubtedly a personal gain offered to the PTL Lenders—and only to them—and they plainly approved the amendments needed to effectuate *because* they were receiving this personal gain, consisting of super-priority treatment. That special treatment was not offered to the non-participating lenders, who were deprived of the fruit of their contract, and indeed the Transaction was effective only because the non-participating lenders were being left behind and not allowed to share equally in the benefits that the PTL Lenders would obtain as part of the Transaction. This is, in other words, a classic case involving a breach of the implied covenant.

53.     *Second,* New York law makes clear that, under the implied covenant, all lenders had to be presented with the opportunity to join in the Transaction, such that a party could make an informed choice as to whether it wished to be bound by the new, amended Agreement, or instead preferred (as the PTL Lenders did) to join a new, super-priority agreement.

54.     That is the teaching of *Kass v. Eastern Air Lines, Inc.*, 1986 WL 13008 (Del. Ch. Nov. 14, 1986) (applying New York law), in which then-Chancellor Allen held that the implied covenant was not violated where a supermajority amended an indenture, but critically—and absent here—"[e]ach holder [wa]s offered the opportunity to accept or reject the consideration offered" meaning that "each has an economic incentive . . . to evaluate the question whether any threat to the value of his or her bonds posed by the amendment is more or less valuable than the consideration offered for his or her consent." *Id.* at *5; *see also Katz*, 508 A.2d at 881 (no violation

---

[8] See also James H. Millar, *Revisiting Good Faith And Fair Dealing Challenges By Non-Participating Holders To Indenture Amendments Effectuated Through Use Of Exit Consents*, Faegre Drinker Publications at 153 (Nov. 1, 2017) ("[C]ourts applying New York law have stated that to comply with the implied covenant of good faith and fair dealing, an issuer soliciting exit consents or otherwise paying for consent to an amendment must offer the transaction to all noteholders.").

where "the incentive to consent [wa]s equally available to all members of each class of bondholders").

55.     And indeed, the failure to provide an *opportunity* for all affected lenders to participate in a transaction requiring amendment to the deal documents was precisely why New York's commercial court denied the motion to dismiss a claim for breach of the implied covenant in *Octagon Credit Investors, LLC v. NYDJ Apparel, LLC,* Index No. 656677/2017 (N.Y. Sup. (N.Y Cty.)). As Justice Ramos held, "it looks like the reasonable commercial expectations of the lenders participating in the agreement is being undermined by some of the lenders getting together and saying look, if we don't tell the other guys what we're doing, we can cut them out of the picture. It doesn't seem very fair. . . . I'm offended by the idea that you can obtain consent, the required consent, by only notifying some of the lenders." Dkt. 81-2 (Transcript of Hearing on Jan. 9, 2018) at 21:11–17, 24:25–25:3.

56.     Here, it is undisputed that ███████████████████████████████████ ███████████████████████████████████████████████ *See supra* ¶ 7 (citing deposition testimony). The LCM Defendants' fruits under the 2016 contract—a priority lien— were destroyed by a manipulation of the amendment process, *i.e.*, without their consent—and also without the consent of the majority of first-lien lenders who would actually be affected by the Transaction, as the amendments were approved solely by the PTL Lenders who would no longer be bound by them, and indeed on the condition that it would not apply to them.

57.     By amending the Agreement only on the condition that it would *not* apply to them, the Debtors and PTL Lenders robbed the LCM Defendants of the benefit of their bargain, in breach of the implied covenant of good faith and fair dealing. To put it bluntly, the PTL Lenders effectively sold their consent, and in exchange for their approval of an amendment that would

never apply to them but would subordinate the lenders who remained behind, they obtained a benefit that was not shared equally by all First Lien Lenders (namely, they became super-priority lenders). *See* Shah Dep. 275:14:20 ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

58.     The PTL Lenders no doubt will argue that although the transaction agreements were executed simultaneously, the amendments came into effect a millisecond before the exchange. This is meaningless and would elevate form over substance, because the consent and the exit were contingent on the other, and there was no set of circumstances by which the PTL Lenders would have themselves been left behind and subordinated. And as New York courts have held, "[t]ransactions that lack economic substance or that elevate form over substance, and that merely represent efforts to undermine another party's contract rights, are prime examples of matters that may constitute breaches of the implied covenant of good faith and fair dealing."  *Keybank N.A. v. Franklin Advisers, Inc.*, 616 B.R. 14, 40 (Bankr. S.D.N.Y. 2020) (applying New York law). "Subterfuges and evasions"—like those executed here—"violate the obligation of good faith in performance even though the actor believes his conduct to be justified." *Id.* (quoting Restatement (Second) of Contracts § 205, cmt. d)). That is precisely what happened here.

   **B.     Stripping LCM's Priority Rights.**

59.     Plaintiffs' conduct also violated the implied covenant because, as Judge Failla explained, the LCM Defendants "expressly bargained for 'first-lien, priority, pro rata rights' which rights were subverted by [Debtor's] creation of a new tranche of debt with priority rights senior to those held by" the LCM Defendants. *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *15 (S.D.N.Y. Mar. 29, 2022). As Judge Failla explained, it is entirely reasonable to "ascribe bad faith to the manner in which [Serta and the PTL Lenders] exercised [their] contractual

power to amend the Agreement and engage in debt exchanges because the economic reality of the Transaction suggests an intent to harm a subset of first-lien lenders by subordinating their debt"; Plaintiffs here "systematically combed through the Agreement tweaking every provision that seemingly prevented [them] from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one." *Id*.

60.     The documentary evidence to be admitted at trial showcases this "transform[ation]" that Judge Failla described. *See, e.g.*, PX-250 (Amendment) § 1.01 (altering, *inter alia*, the definitions of Acceptable Intercreditor Agreement and Incremental Equivalent Debt); *id*., § 7.01(l) (removing subordination as an event of default); *id*., § 8.08 (authorizing the Administrative Agent to enter the PTL Intercreditor Agreement)).

61.     Consider  what  Chopra Dep. 25:3–24. Of course, before the Exchange Transaction, the LCM Defendants were first-lien lenders to Serta under the Agreement. They had the same expectation—that there would be Shah Dep. 276:24–277:2. And it is undisputed that, after the Transaction, the LCM Defendants' liens were subordinated to the new super-priority debt and effectively became worthless; as a representative of Moody's commented to Serta in 2020, Dkt. 82-4 (Ex. 5 to Lieberman Decl.) at -8995.

62.     A decision issued just eight weeks ago by the First Department—the intermediate appellate court that oversees (among others) Manhattan's commercial trial courts—illustrates how these activities violate the covenant. In *AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*, 185 N.Y.S.3d 73 (N.Y. App. Div. 1st Dep't 2023), the defendants (like plaintiffs here) argued that the implied-covenant claims on a credit agreement were "nothing more than a claim that defendants failed to share collateral ratably." *Id*. at 90. The court rejected this argument. It upheld a claim for breach of the implied covenant under New York law, where there was "bad faith conduct in conspiring to manufacture a restructuring process that deprived [some lenders] of the benefit of their bargain under the terms of the Credit Agreement," and the favored creditors in that case had "secretly designed [a] Restructuring Transaction so as to defeat [non-participating lenders] contractual expectations of *pro rata* treatment" and "concealed the transaction from [them] until it could be revealed as a *fait accompli*[.]" *Id*.  All of that is true here.

## CONCLUSION

63.     The Court should issue a report recommending that the District Court find that the Exchange Agreement violated the Agreement and New York's implied covenant.

Dated:  May 14, 2023
         Houston, Texas

McKool Smith, PC

/s/ John J. Sparacino
John J. Sparacino (SBN 18873700)
S. Margie Venus (SBN 20545900)
Regan S. Jones (SBN 24110060)
600 Travis Street, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile (713) 485-7344
jsparacino@mckoolsmith.com
mvenus@mckoolsmith.com
rjones@mckoolsmith.com

-and-

Michael Shuster (admitted *pro hac vice*)
Vincent Levy (admitted *pro hac vice*)
Neil R. Lieberman (admitted *pro hac vice*)
Priyanka Timblo (admitted *pro hac vice*)
Brian T. Goldman (admitted *pro hac vice*)
Patrick J. Woods (admitted *pro hac vice*)
Holwell Shuster & Goldberg LLP
425 Lexington Avenue
New York, New York 10017
mshuster@hsgllp.com
vlevy@hsgllp.com
nlieberman@hsgllp.com
amiller@hsgllp.com
bgoldman@hsgllp.com
pwoods@hsgllp.com

*Counsel for the LCM Defendants*

27

## **CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing Pretrial Brief was served by electronic delivery on all persons and entities receiving ECF notice in this adversary proceeding on May 14, 2023.

*/s/ John J. Sparacino*
John J. Sparacino