# DEFENDANTS' EXHIBIT 304 Part 4 of 5

**EXCHANGING EXISTING LENDER**

BayCity Senior Loan Master Fund Ltd.,
as Lender

By: _____
Name: James Kim
Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

Municipal Employees Annuity & Benefit Fund of Chicago, as Lender

By: _____

Name: James Kim
Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

Principal Diversified Real Asset CIT,
as Lender

By: _____

Name: James Kim
Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

Symphony CLO XVII, LTD.,
as Lender

By: _____
Name: James Kim
Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

TCI-Symphony 2016-1 Ltd,
as Lender

By: _____

Name: James Kim
Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

Symphony CLO XV, Ltd.,
as Lender

By: _____
    Name: James Kim
    Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

TCI-Symphony 2017-1 Ltd,
as Lender

By: _____

Name: James Kim
Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

Symphony Floating Rate Senior Loan Fund,
as Lender

By: _____

Name: James Kim
Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

SCOF-2 LTD.,
as Lender

By: _____
Name: James Kim
Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

California Street CLO IX Limited Partnership,
as Lender

By: _____

ame: James Kim

Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

California Street CLO XII, LTD.,
as Lender

By: _____
   Name: James Kim
   Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

Symphony CLO XIV, Ltd.,
as Lender

By: _____
Name: James Kim
Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

Symphony CLO XVI, LTD.,
as Lender

By: _____

Name: James Kim

Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDER**

Nuveen Credit Strategies Income Fund, as Lender

By: _____

Name: James Kim
Title: Co-Head of Investments, Head of Research

**EXCHANGING EXISTING LENDERS**

TAO FUND, LLC, as Lender

By: _____
　　Name: Joshua Peck
　　Title:　Vice President

TOP FUND IV, LLC, as Lender

By: _____
　　Name: Joshua Peck
　　Title:　Vice President

**MP CLO III LTD.,**

By: MP CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**MP CLO IV LTD.,**

By: MP CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**MP CLO VII LTD.,**

By: MP CLO Management LLC, its Collatera  Manager
Name: Thomas Shandell
Title:   CEO

**MP CLO VIII LTD.,**

By: MP CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**MARBLE POINT CLO X LTD.,**

By: Marble Point CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**MARBLE POINT CLO XI LTD.,**

By: Marble Point CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**MARBLE POINT CLO XII LTD.,**

By: Marble Point CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title: CEO

**MARBLE POINT CLO XIV LTD.,**

By: Marble Point CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**MPLF FUNDING LTD.,**

By: Marble Point Credit Management LLC  Is Collateral Manager
Name: Thomas Shandell
Title:  CEO

**MPSFR FINANCING 1 LTD.,**

By: Marble Point Credit Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**Marathon CLO V Ltd.,**

By Marathon Asset Management L.P.
Its Portfolio Manager

By: _____
Name: Andrew Brady
Title: Authorized Signatory

[Signature Page to Super-Priority Term Loan Agreement]

**Marathon CLO VII Ltd.,**

By Marathon Asset Management L.P.
Its Portfolio Manager

By: _____
Name: Andrew Brady
Title: Authorized Signatory

**Marathon CLO VIII Ltd.,**

By Marathon Asset Management L.P.
Its Portfolio Manager

By: _____
Name: Andrew Brady
Title: Authorized Signatory

**Marathon CLO IX Ltd.,**

By Marathon Asset Management L.P.
Its Portfolio Manager

By: _____
Name: Andrew Brady
Title: Authorized Signatory

**Marathon CLO X Ltd.,**

By Marathon Asset Management L.P.
Its Portfolio Manager

By: _____
Name: Andrew Brady
Title: Authorized Signatory

**Marathon CLO XI Ltd.,**

By Marathon Asset Management L.P.
Its Collateral Manager

By:
Name: Andrew Brady
Title: Authorized Signatory

**BOWERY FUNDING ULC,**

By: _____

Name:   Mobasharul Islam
        Authorized Signatory

Title:

[Signature Page to Super-Priority Term Loan Agreement]

**WOODBINE FUNDING ULC,**

By: _____
Name: Mobasharul Islam
Authorized Signatory
Title:

Elevation CLO 2013-1, Ltd.
Elevation CLO 2014-2, Ltd.
Elevation CLO 2015-4, Ltd.
Elevation CLO 2016-5, Ltd.
Elevation CLO 2017-6, Ltd.
Elevation CLO 2017-7, Ltd.
Elevation CLO 2017-8, Ltd.
Elevation CLO 2018-9, Ltd.
Elevation CLO 2018-10, Ltd.
Peaks CLO 3, Ltd.


By: _____

Name: Sanjai Bhonsle
Title: Partner, Portfolio Manager

[Signature Page to Super-Priority Term Loan Agreement]

**MP CLO III LTD.,**

By: MP CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**MP CLO IV LTD.,**

By: MP CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**MP CLO VII LTD.,**

By: MP CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**MP CLO VIII LTD.,**

By: MP CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:  CEO

**MARBLE POINT CLO X.,**

By: Marble Point CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title: CEO

**MARBLE POINT CLO XI LTD.,**

By: Mable Point CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**MARBLE POINT CLO XII LTD.,**

By: Marble Point CLO Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**MPLF FUNDING LTD.,**

By: Marble Point Credit Management LLC, its Collateral Manager
Name: Thomas Shandell
Title:   CEO

**Monarch Master Funding Ltd,**

By:  Monarch Alternative Capital LP, as adviser

By:
Name:   Michael Weinstock
Title:   Authorized Person

**Venor Capital Master Fund Ltd.,**

_____

By: Venor Capital Management L.P.
    Its Investment Manager
Name: Michael Wartell
Title: Co-CIO

Elevation CLO 2013-1, Ltd.
Elevation CLO 2014-2, Ltd.
Elevation CLO 2015-4, Ltd.
Elevation CLO 2016-5, Ltd.
Elevation CLO 2017-6, Ltd.
Elevation CLO 2017-7, Ltd.
Elevation CLO 2017-8, Ltd.
Elevation CLO 2018-9, Ltd.
Peaks CLO 1, Ltd.
Peaks CLO 2, Ltd.


By:
Name: Sanjai Bhonsle
Title: Partner, Portfolio Manager

**SCHEDULE 1.01**

<u>COMMITMENT SCHEDULE</u>

| Lender | New Money Term Loans |
|--------|----------------------|
| UBS AG, Stamford Branch | ███████ |

Schedule 1.01 - Commitment Schedule (Con't)

| Lender<br>Manager & Sub Funds | Initial Exchange Term Loans |
|---|---|
| **Eaton Vance** | |
| AGF Floating Rate Income Fund | |
| Brighthouse Funds Trust I - Brighthouse/Eaton Vance Floating Rate Portfolio | |
| Eaton Vance CLO 2013-1 LTD. | |
| Eaton Vance CLO 2014-1R, Ltd. | |
| Eaton Vance CLO 2015-1, Ltd. | |
| Eaton Vance CLO 2018-1, Ltd. | |
| Eaton Vance CLO 2019-1, Ltd. | |
| Eaton Vance Floating Rate Income Trust | |
| Eaton Vance Floating Rate Portfolio | |
| Eaton Vance Floating-Rate 2022 Target Term Trust | |
| Eaton Vance Floating-Rate Income Plus Fund | |
| Eaton Vance Institutional Senior Loan Fund | |
| Eaton Vance Institutional Senior Loan Plus Fund | |
| Eaton Vance International (Cayman Islands) Floating-Rate Income Portfolio | |
| Eaton Vance Limited Duration Income Fund | |
| Eaton Vance Loan Holding Limited | |
| Eaton Vance Senior Floating-Rate Trust | |
| Eaton Vance Senior Income Trust | |
| Eaton Vance Short Duration Diversified Income Fund | |
| Eaton Vance VT Floating-Rate Income Fund | |
| Senior Debt Portfolio | |
| Calvert Management Series - Calvert Floating-Rate Advantage Fund | |
| **CSAM** | |
| BA/CSCredit 1 LLC - CS | |
| Bentham Strategic Loan Fund | |
| Bentham Syndicated Loan Fund | |
| Blue Shield Of California - Credit Suisse | |
| CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM | |
| CITY OF NEW YORK GROUP TRUST | |
| Commonwealth of Pennsylvania Treasury Department - CSAM | |
| Copperhill Loan Fund I, LLC | |
| CREDIT SUISSE ASSET MANAGEMENT INCOME FUND, INC. | |
| Credit Suisse Floating Rate High Income Fund | |
| Credit Suisse Floating Rate Trust | |
| CREDIT SUISSE HIGH YIELD BOND FUND | |
| CREDIT SUISSE NOVA (LUX) - GLOBAL SENIOR LOAN FUND | |
| CREDIT SUISSE OPPORTUNITY FUNDS - CREDIT SUISSE FLOATING RATE HIGH INCOME FUND | |
| Credit Suisse Strategic Income Fund | |
| DaVinci Reinsurance Ltd. - CSAM | |
| DOLLAR SENIOR LOAN FUND, LTD. | |
| DOLLAR SENIOR LOAN MASTER FUND II, LTD. | |
| EATON CORPORATION MASTER RETIREMENT TRUST | |
| ERIE INDEMNITY COMPANY | |
| ERIE INSURANCE EXCHANGE | |
| FIDANTE PARTNERS LIMITED AS TRUSTEE FOR BENTHAM STRATEGIC LOAN FUND | |
| FIDANTE PARTNERS SERVICES LIMITED AS RESPONSIBLE ENTITY FOR BENTHAM HIGH YIELD FUND | |
| FIDANTE PARTNERS SERVICES LIMITED AS RESPONSIBLE ENTITY FOR BENTHAM SYNDICATED LOAN FUND | |
| Inflation Protection Fund-I Series, a series of the Wespath Funds Trust | |
| KP Fixed Income Fund | |
| MADISON FLINTHOLM SENIOR LOAN FUND I DESIGNATED ACTIVITY COMPANY | |
| MADISON PARK FUNDING X, LTD. | |
| MADISON PARK FUNDING XI, LTD. | |
| Madison Park Funding XII, Ltd. | |

| Lender<br>Manager & Sub Funds | Initial Exchange Term Loans |
|---|---|
| Madison Park Funding XIII, Ltd. | ■ |
| MADISON PARK FUNDING XIV, LTD. | ■ |
| MADISON PARK FUNDING XIX, LTD. | ■ |
| MADISON PARK FUNDING XL LTD | ■ |
| MADISON PARK FUNDING XLI, LTD | ■ |
| MADISON PARK FUNDING XLII, LTD. | ■ |
| Madison Park Funding XLIII, Ltd. | ■ |
| Madison Park Funding XLIV, Ltd. | ■ |
| Madison Park Funding XV, Ltd. | ■ |
| MADISON PARK FUNDING XVI, LTD. | ■ |
| MADISON PARK FUNDING XVII, LTD. | ■ |
| MADISON PARK FUNDING XVIII, LTD. | ■ |
| MADISON PARK FUNDING XX, LTD. | ■ |
| MADISON PARK FUNDING XXI, LTD. | ■ |
| MADISON PARK FUNDING XXII, LTD. | ■ |
| MADISON PARK FUNDING XXIII, LTD. | ■ |
| MADISON PARK FUNDING XXIV, LTD. | ■ |
| Madison Park Funding XXIX, Ltd. | ■ |
| MADISON PARK FUNDING XXV LTD | ■ |
| MADISON PARK FUNDING XXVI, LTD. | ■ |
| Madison Park Funding XXVII, Ltd. | ■ |
| MADISON PARK FUNDING XXVIII LTD | ■ |
| Madison Park Funding XXX, Ltd. | ■ |
| Madison Park Funding XXXI, Ltd. | ■ |
| Madison Park Funding XXXII, Ltd. | ■ |
| Madison Park Funding XXXIV, Ltd. | ■ |
| Madison Park Funding XXXV, Ltd. | ■ |
| Madison Park Funding XXXVII, Ltd. | ■ |
| Maryland State Retirement And Pension System - CS | ■ |
| NEW MEXICO STATE INVESTMENT COUNCIL | ■ |
| ONE ELEVEN FUNDING I LTD | ■ |
| One Eleven Funding II, Ltd. | ■ |
| PHILLIPS 66 RETIREMENT PLAN TRUST | ■ |
| PK-SSL Investment Fund Limited Partnership | ■ |
| Renaissance Investment Holdings Ltd. - CSAM | ■ |
| State of New Mexico State Investment Council - CS | ■ |
| TELSTRA SUPER PTY LTD AS TRUSTEE FOR TELSTRA SUPERANNUATION SCHEME | ■ |
| Telstra Superannuation Scheme - CSAM | ■ |
| The Eaton Corporation Master Retirement Trust | ■ |
| Wespath Funds Trust - CSAM | ■ |
| Wind River Fund, LLC | ■ |
| **Barings** | ■ |
| Arrowood Indemnity Company | |
| Arrowood Indemnity Company, As Administrator Of The Pension Plan Of Arrowood Indemnity Company - Barings | ■ |
| AUSTRALIANSUPER, AUSTRALIANSUPER PTY LTD, TTEE | ■ |
| Babson CLO LTD. 2014-I | ■ |
| Baloise Senior Secured Loan Fund I | ■ |
| Barings BDC Senior Funding I, LLC | ■ |
| Barings BDC, Inc. | ■ |
| BARINGS CLO LTD 2017-I | ■ |
| BARINGS CLO LTD 2018-III | ■ |
| BARINGS CLO LTD. 2013-I | ■ |
| BARINGS CLO LTD. 2015-I | ■ |
| BARINGS CLO LTD. 2015-II | ■ |
| Barings CLO Ltd. 2016-I | ■ |

Schedule 1.01 - Commitment Schedule (Con't)

| Lender<br>Manager & Sub Funds | Initial Exchange Term Loans |
|---|---|
| BARINGS CLO LTD. 2016-II | ▬ |
| Barings CLO Ltd. 2017-I | ▬ |
| Barings CLO Ltd. 2018-I | ▬ |
| Barings CLO Ltd. 2018-III | ▬ |
| Barings CLO Ltd. 2018-IV | ▬ |
| Barings CLO Ltd. 2019-II | ▬ |
| BARINGS FUNDS TRUST - BARINGS GLOBAL FLOATING RATE FUND | ▬ |
| BARINGS FUNDS TRUST-BARINGS GLOBAL CREDIT INCOME OPPORTUNITIES FUND | ▬ |
| Barings Global Credit Income Opportunities Fund | ▬ |
| Barings Global Floating Rate Fund | ▬ |
| BARINGS GLOBAL HIGH YIELD CREDIT STRATEGIES LIMITED | ▬ |
| Barings Global Loan and High Yield Bond Limited | ▬ |
| BARINGS GLOBAL LOAN LIMITED | ▬ |
| BARINGS GLOBAL MULTI-CREDIT STRATEGY 1 LIMITED | ▬ |
| BARINGS GLOBAL MULTI-CREDIT STRATEGY 2 LIMITED | ▬ |
| BARINGS GLOBAL MULTI-CREDIT STRATEGY 3 LIMITED | ▬ |
| BARINGS GLOBAL MULTI-CREDIT STRATEGY 4 LIMITED | ▬ |
| BARINGS GLOBAL SHORT DURATION HIGH YIELD FUND | ▬ |
| BARINGS GLOBAL SPECIAL SITUATIONS CREDIT 3 S.A R.L. | ▬ |
| Barings Segregated Loans 3 S.a.r.l | ▬ |
| Barings U.S. Loan Limited | ▬ |
| BEL-AIR LOAN FUND LLC | ▬ |
| CITY OF NEW YORK GROUP TRUST | ▬ |
| CROWN MANAGED ACCOUNTS SPC-CROWN/BA 2 SEGREGATED PORTFOLIO | ▬ |
| Jocassee Partners LLC | ▬ |
| PENSION PLAN OF ARROWOOD INDEMNITY COMPANY (THE) | ▬ |
| Serengeti (Loan Fund), a series trust of the Multi Strategy Umbrella Fund Cayman | ▬ |
| Universal-Investment GmbH w/BAYVK R2-Fonds Segment BAYVK R2 Barings | ▬ |
| **First Eagle** | ▬ |
| First Eagle Bank Loan Select Master Fund | ▬ |
| First Eagle Senior Loan Fund | ▬ |
| KVK CLO 2013-1, Ltd. | ▬ |
| KVK CLO 2016-1 Ltd. | ▬ |
| KVK CLO 2018-1 Ltd. | ▬ |
| Russell Investment Company Unconstrained Total Return Fund - First Eagle | ▬ |
| Russell Investments Global Unconstrained Bond Pool | ▬ |
| Russell Investments Institutional Funds LLC Absolute Return Fixed Income Fund | ▬ |
| Russell Investments Institutional Funds, LLC Multi-Asset Core Plus Fund | ▬ |
| Russell Investments Qualifying Investor Alternative Funds plc | ▬ |
| Stichting Blue Sky Active Fixed Income US Leveraged Loan Fund - First Eagle | ▬ |
| Stichting Pensioenfonds Hoogovens - First Eagle | ▬ |
| Wind River 2012-1 CLO Ltd. | ▬ |
| Wind River 2013-1 CLO Ltd. | ▬ |
| Wind River 2013-2 CLO Ltd. | ▬ |
| Wind River 2014-1 CLO Ltd. | ▬ |
| Wind River 2014-2 CLO Ltd. | ▬ |
| Wind River 2014-3 CLO Ltd. | ▬ |
| Wind River 2014-3K CLO Ltd. | ▬ |
| Wind River 2015-1 CLO Ltd. | ▬ |
| Wind River 2015-2 CLO Ltd. | ▬ |
| Wind River 2016-1 CLO Ltd. | ▬ |
| Wind River 2016-2 CLO Ltd. | ▬ |
| Wind River 2017-1 CLO Ltd. | ▬ |
| Wind River 2017-4 CLO Ltd. | ▬ |
| Wind River 2018-3 CLO Ltd. | ▬ |
| Wind River 2019-3 CLO Ltd. | ▬ |

Schedule 1.01 - Commitment Schedule (Con't)

| Lender<br>Manager & Sub Funds | Initial Exchange Term Loans |
|---|---|
| Staniford Street CLO, Ltd. | ▮ |
| **Invesco** | ▮ |
| Annisa CLO, Ltd. | ▮ |
| Betony CLO 2, LTD. | ▮ |
| BOC Pension Investment Fund | ▮ |
| Carbone CLO, Ltd. | ▮ |
| CITY OF NEW YORK GROUP TRUST | ▮ |
| DIVERSIFIED CREDIT PORTFOLIO LTD | ▮ |
| HarbourView CLO VII-R, Ltd. | ▮ |
| INVESCO BL FUND, LTD. | ▮ |
| INVESCO DYNAMIC CREDIT OPPORTUNITIES FUND | ▮ |
| Invesco Floating Rate Fund | ▮ |
| INVESCO FLOATING RATE INCOME FUND | ▮ |
| Invesco Gemini US Loan Fund LLC (1) | ▮ |
| Invesco Oppenheimer Fundamental Alternatives Fund | ▮ |
| Invesco Oppenheimer Master Loan Fund | ▮ |
| Invesco Oppenheimer Senior Floating Rate Fund | ▮ |
| Invesco Oppenheimer Senior Floating Rate Plus Fund | ▮ |
| INVESCO SENIOR INCOME TRUST | ▮ |
| INVESCO SENIOR LOAN FUND | ▮ |
| INVESCO SSL FUND LLC | ▮ |
| INVESCO ZODIAC FUNDS - INVESCO US SENIOR LOAN ESG FUND | ▮ |
| INVESCO ZODIAC FUNDS - INVESCO US SENIOR LOAN FUND | ▮ |
| KAISER PERMANENTE GROUP TRUST | ▮ |
| KAPITALFORENINGEN INVESTIN PRO - US LEVERAGED LOANS I | ▮ |
| Milos CLO, Ltd. | ▮ |
| Recette CLO, Ltd. | ▮ |
| Riserva CLO Ltd. | ▮ |
| SENTRY INSURANCE A MUTUAL COMPANY | ▮ |
| The City of New York Group Trust - Invesco | ▮ |
| Upland CLO, Ltd. | ▮ |
| **Oaktree** | ▮ |
| Oaktree Opportunities Fund X Holdings (Delaware), L.P. | ▮ |
| Oaktree Opportunities Fund Xb Holdings (Delaware), L.P. | ▮ |
| Oaktree Opps X Holdco Ltd. | ▮ |
| **PGIM** | ▮ |
| Dryden 49 Senior Loan Fund | ▮ |
| Dryden 50 Senior Loan Fund | ▮ |
| Dryden 55 CLO, Ltd. | ▮ |
| Dryden 58 CLO, Ltd. | ▮ |
| Dryden 60 CLO, Ltd. | ▮ |
| Dryden 64 CLO, Ltd. | ▮ |
| Dryden 75 CLO, Ltd. | ▮ |
| Newark BSL CLO 1, Ltd. | ▮ |
| Newark BSL CLO 2, Ltd. | ▮ |
| Dryden 30 Senior Loan Fund | ▮ |
| Dryden 33 Senior Loan Fund | ▮ |
| Dryden 36 Senior Loan Fund | ▮ |
| Dryden 37 Senior Loan Fund | ▮ |
| Dryden 38 Senior Loan Fund | ▮ |
| Dryden 40 Senior Loan Fund | ▮ |
| Dryden 41 Senior Loan Fund | ▮ |
| Dryden 42 Senior Loan Fund | ▮ |
| Dryden 43 Senior Loan Fund | ▮ |
| Dryden 45 Senior Loan Fund | ▮ |
| Dryden 47 Senior Loan Fund | ▮ |

Schedule 1.01 - Commitment Schedule (Con't)

| Lender<br>Manager & Sub Funds | Initial Exchange Term Loans |
|---|---|
| Dryden 53 CLO, Ltd. | ▉ |
| Dryden 54 Senior Loan Fund | ▉ |
| Dryden 57 CLO, Ltd. | ▉ |
| Dryden 61 CLO, Ltd. | ▉ |
| Dryden 65 CLO, Ltd. | ▉ |
| Dryden 70 CLO, Ltd. | ▉ |
| Dryden XXV Senior Loan Fund | ▉ |
| Dryden XXVI Senior Loan Fund | ▉ |
| Dryden XXVIII Senior Loan Fund | ▉ |
| **MJX** | ▉ |
| Venture XIX CLO, Limited | ▉ |
| Venture 28A CLO, Limited | ▉ |
| Venture 31 CLO, Limited | ▉ |
| Venture 32 CLO, Limited | ▉ |
| Venture 33 CLO, Limited | ▉ |
| Venture 35 CLO, Limited | ▉ |
| Venture XII CLO, Limited | ▉ |
| Venture XIII CLO, Limited | ▉ |
| Venture XIV CLO, Limited | ▉ |
| Venture XV CLO, Limited | ▉ |
| Venture XVI CLO, Limited | ▉ |
| Venture XVII CLO, Limited | ▉ |
| Venture XVIII CLO, Limited | ▉ |
| Venture XX CLO, Limited | ▉ |
| Venture XXI CLO, Limited | ▉ |
| Venture XXII CLO, Limited | ▉ |
| Venture XXIII CLO, Limited | ▉ |
| Venture XXIV CLO, Limited | ▉ |
| Venture XXIX CLO, Limited | ▉ |
| Venture XXV CLO, Limited | ▉ |
| Venture XXVII CLO, Limited | ▉ |
| Venture XXVIII CLO, Limited | ▉ |
| Venture XXX CLO, Limited | ▉ |
| **BlackRock** | ▉ |
| ABR Reinsurance LTD | ▉ |
| BlackRock Credit Strategies Income Fund of BlackRock Funds V | ▉ |
| BLACKROCK DEBT STRATEGIES FUND, INC. | ▉ |
| BlackRock Floating Rate Income Portfolio of BlackRock Funds V | ▉ |
| Blackrock Floating Rate Income Strategies Fund, Inc | ▉ |
| BLACKROCK FLOATING RATE INCOME STRATEGIES FUND, INC. | ▉ |
| BLACKROCK FLOATING RATE INCOME TRUST | ▉ |
| BLACKROCK FUNDS II - BLACKROCK MULTI-ASSET INCOME PORTFOLIO | ▉ |
| BLACKROCK FUNDS V - BLACKROCK INCOME FUND | ▉ |
| BLACKROCK FUNDS V-BLACKROCK FLOATING RATE INCOME PORTFOLIO | ▉ |
| Blackrock Global Investment Series: Income Strategies Portfolio | ▉ |
| BLACKROCK LIMITED DURATION INCOME TRUST | ▉ |
| BLACKROCK SENIOR FLOATING RATE PORTFOLIO | ▉ |
| BLACKROCK SPECIALIST STRATEGIES FUNDS - BLACKROCK BANKLOAN FUND | ▉ |
| FIXED INCOME OPPORTUNITIES NERO, LLC | ▉ |
| JPMBI Re Blackrock Bankloan Fund | ▉ |
| MAGNETITE VII, LIMITED | ▉ |
| MAGNETITE VIII, LIMITED | ▉ |
| Magnetite XII, Limited | ▉ |
| MAGNETITE XIV-R, LIMITED | ▉ |
| Magnetite XIX, Limited | ▉ |

Schedule 1.01 - Commitment Schedule (Con't)

| Lender Manager & Sub Funds | Initial Exchange Term Loans |
|---|---|
| MAGNETITE XV, LIMITED | ▇ |
| MAGNETITE XVI, LIMITED | ▇ |
| MAGNETITE XVII, LIMITED | ▇ |
| MAGNETITE XVIII, LIMITED | ▇ |
| Magnetite XX, Limited | ▇ |
| NC GARNET FUND, L.P. | ▇ |
| **Symphony** | ▇ |
| BAYCITY ALTERNATIVE INVESTMENT FUNDS SICAV-SIF - BAYCITY US SENIOR LOAN FUND | ▇ |
| BAYCITY SENIOR LOAN MASTER FUND LTD. | ▇ |
| CALIFORNIA STREET CLO IX LIMITED PARTNERSHIP | ▇ |
| California Street CLO XII, Ltd. | ▇ |
| MENARD, INC | ▇ |
| MUNICIPAL EMPLOYEES' ANNUITY AND BENEFIT FUND OF CHICAGO | ▇ |
| NUVEEN CREDIT STRATEGIES INCOME FUND | ▇ |
| Nuveen Diversified Dividend And Income Fund | ▇ |
| NUVEEN FLOATING RATE INCOME FUND | ▇ |
| NUVEEN FLOATING RATE INCOME OPPORTUNITY FUND | ▇ |
| NUVEEN INVESTMENT TRUST III- NUVEEN SYMPHONY FLOATING RATE INCOME FUND | ▇ |
| NUVEEN SENIOR INCOME FUND | ▇ |
| Nuveen Short Duration Credit Opportunities Fund | ▇ |
| Nuveen Symphony Floating Rate Income Fund | ▇ |
| PENSIONDANMARK PENSIONSFORSIKRINGSAKTIESELSKAB | ▇ |
| PRINCIPAL DIVERSIFIED REAL ASSET CIT | ▇ |
| PRINCIPAL FUNDS, INC. - DIVERSIFIED REAL ASSET FUND | ▇ |
| SCOF-2 LTD. | ▇ |
| Symphony CLO XIV, Ltd. | ▇ |
| Symphony CLO XIX, Ltd. | ▇ |
| Symphony CLO XV, Ltd. | ▇ |
| SYMPHONY CLO XVI, LTD. | ▇ |
| SYMPHONY CLO XVII, LTD. | ▇ |
| Symphony CLO XVIII, Ltd. | ▇ |
| Symphony CLO XX, Ltd. | ▇ |
| Symphony Floating Rate Senior Loan Fund | ▇ |
| TCI-SYMPHONY CLO 2016-1 LTD. | ▇ |
| TCI-SYMPHONY CLO 2017-1 LTD. | ▇ |
| **TPG** | ▇ |
| TOP FUND IV LLC | ▇ |
| TAO Fund, LLC | ▇ |
| **Monarch Alternative Capital** | ▇ |
| Monarch Master Funding Ltd | ▇ |
| **ArrowMark Partners** | ▇ |
| ELEVATION CLO 2013-1, LTD. | ▇ |
| ELEVATION CLO 2014-2, LTD. | ▇ |
| ELEVATION CLO 2015-4, LTD | ▇ |
| PEAKS CLO 1, LTD. | ▇ |
| ELEVATION CLO 2016-5, LTD. | ▇ |
| ELEVATION CLO 2017-6, LTD. | ▇ |
| PEAKS CLO 2 LTD | ▇ |
| ELEVATION CLO 2017-7 LTD | ▇ |
| ELEVATION CLO 2017-8, LTD | ▇ |
| ELEVATION CLO 2018-9 LTD | ▇ |
| Elevation CLO 2018-10, Ltd. | ▇ |
| Peaks CLO 3, Ltd. | ▇ |

Schedule 1.01 - Commitment Schedule (Con't)

| Lender Manager & Sub Funds | Initial Exchange Term Loans |
|---|---|
| **Marble Point Credit Management** | ▇ |
| MP CLO VII, LTD. | ▇ |
| MP CLO III, LTD. | ▇ |
| MP CLO IV, LTD. | ▇ |
| MP CLO VIII, LTD. | ▇ |
| MARBLE POINT CLO X LTD | ▇ |
| MARBLE POINT CLO XI LTD | ▇ |
| MARBLE POINT CLO XII LTD | ▇ |
| MPLF FUNDING LIMITED | ▇ |
| MPSFR Financing 1 Ltd. | ▇ |
| MP CLO XIV, Ltd. | ▇ |
| MP CLO XII, Ltd. | ▇ |
| MP CLO X, Ltd. | ▇ |
| MP CLO XI, Ltd. | ▇ |
| **Marathon Asset Management** | ▇ |
| Bowery Funding ULC | ▇ |
| Marathon CLO IX Ltd. | ▇ |
| Marathon CLO V Ltd. | ▇ |
| Marathon CLO VII Ltd. | ▇ |
| Marathon CLO VIII Ltd. | ▇ |
| Marathon CLO X Ltd. | ▇ |
| Marathon CLO XI Ltd. | ▇ |
| Woodbine Funding ULC | ▇ |
| **Venor Capital** | ▇ |
| VENOR CAPITAL MASTER FUND LTD. | ▇ |
| **Total** | ▇ |

## SCHEDULE 3.05

### FEE OWNED REAL ESTATE ASSETS

| Loan Party | Address |
|---|---|
| The Simmons Manufacturing Co., LLC | 1809 Adel Street, Janesville, WI |
| The Simmons Manufacturing Co., LLC | 3450 Simmons Drive, Waycross, GA |
| The Simmons Manufacturing Co., LLC | 7910 Hedge Lane Terrace, Shawnee Mission, KS |
| SSB Manufacturing Company | 15 Houghtaling Road, West Coxsackie, NY |
| SSB Manufacturing Company | 3774 Interstate Park Road North, Rivers Beach, FL |
| SSB Manufacturing Company | 6010 Horizon West Parkway, Grovetown, GA |
| SSB Manufacturing Company | 500 South 17th Street, Clear Lake, IA |
| SSB Manufacturing Company | 2375 Parkway Drive, Jamestown, NY |
| SSB Manufacturing Company | 1500 Lee Lane, Beloit, WI |
| SSB Manufacturing Company | 1212 26th Street Southwest, Cullman, AL |

## SCHEDULE 3.13

### SUBSIDIARIES

| Subsidiary | Type of Entity | Equity Holder | Ownership Interest |
|---|---|---|---|
| Serta Simmons Bedding, LLC | Limited Liability Company | Dawn Intermediate, LLC | 100% |
| SSB Manufacturing Company | Corporation | Serta Simmons Bedding, LLC | 100% |
| The Simmons Manufacturing Co., LLC | Limited Liability Company | SSB Manufacturing Company | 100% |
| Simmons Caribbean Bedding, Inc. | Corporation | SSB Manufacturing Company | 100% |
| SSB Hospitality, LLC | Limited Liability Company | SSB Manufacturing Company | 100% |
| Dreamwell, Ltd. | Limited Liability Company | SSB Manufacturing Company | 100% |
| SSB Logistics, LLC | Limited Liability Company | SSB Manufacturing Company | 100% |
| Simmons Bedding Company, LLC | Limited Liability Company | Serta Simmons Bedding, LLC | 100% |
| Tomorrow Sleep LLC | Limited Liability Company | Serta Simmons Bedding, LLC | 100% |
| SSH Canada Holding Co., LLC | Limited Liability Company | Serta Simmons Bedding, LLC | 100% |
| SSH Bedding Canada Co. | Unlimited Liability Company | SSH Canada Holding Co., LLC | 100% |
| Serta International Holdco, LLC | Limited Liability Company | Serta Simmons Bedding, LLC | 100% |
| National Bedding Company L.L.C. | Limited Liability Company | Serta International Holdco, LLC | 100% |
| Serta, Inc. | Corporation | National Bedding Company L.L.C. | 82.4% |
| Serta Canada Ltd. | Limited Company | Serta, Inc. | 100% |
| SSB Retail, LLC | Limited Liability Company | Serta Simmons Bedding, LLC | 100% |
| Tuft & Needle, LLC | Limited Liability Company | Serta Simmons Bedding, LLC | 100% |
| World of Sleep Outlets, LLC | Limited Liability Company | SSB Retail, LLC | 100% |

**SCHEDULE 4.01(b)**

<u>LOCAL COUNSEL</u>

1. Quarles & Brady LLP (Illinois)

**SCHEDULE 5.10**

UNRESTRICTED SUBSIDIARIES

None.

## SCHEDULE 5.15

### POST-CLOSING OBLIGATIONS

1.  Within ten (10) days after the Closing Date (or such longer period as the Administrative Agent (at the Direction of the Required Lenders) may reasonably agree)), the Top Borrower shall deliver, or cause to be delivered, to the Administrative Agent the certificate representing the Capital Stock of Serta, Inc. owned by National Bedding Company L.L.C., accompanied by undated stock powers or other appropriate instruments of transfer executed in blank.

2.  Within ten (10) days after the Closing Date (or such longer period as the Administrative Agent (at the Direction of the Required Lenders) may reasonably agree)), the Top Borrower shall deliver, or cause to be delivered, to the Administrative Agent each Instrument that it is required to deliver pursuant to Section 4.02(a) of the Security Agreement.

3.  Within twenty (20) days after the Closing Date (or such longer period as the Administrative Agent (at the Direction of the Required Lenders) may reasonably agree)), the Top Borrower shall deliver, or cause to be delivered, to the Administrative Agent all insurance certificates necessary to satisfy the requirements of Section 5.05 of the Agreement.

4.  Within twenty (20) days after the Closing Date (or such longer period as the Administrative Agent (at the Direction of the Required Lenders) may reasonably agree)), the Top Borrower shall deliver, or cause to be delivered, to the Administrative Agent all insurance endorsements necessary to satisfy the requirements of Section 5.05 of the Agreement.

## SCHEDULE 6.01

### EXISTING INDEBTEDNESS

1. Indebtedness in respect of the Lease dated as of February 24, 2015, by and between Park North 4 LLC and SSB Manufacturing Company, under which there is, as of the Closing Date, approximately $14,380,314 outstanding.

2. Indebtedness in respect of the Lease dated as of June 16, 2017, by and between HP Assembly I, LLC and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $48,317,955 outstanding.

3. Indebtedness in respect of the Sublease dated as of August 28, 2014, by and between Turner Construction Company and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $56,226, outstanding.

4. Indebtedness in respect of the Lease dated as of May 11, 2020, by and between Presidio Technology Capital, LLC and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $980,956 outstanding.

5. Indebtedness in respect of the Lease dated as of January 1, 2019, by and between Presidio Technology Capital, LLC and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $1,332,641 outstanding.,

6. Indebtedness in respect of the Lease dated as of January 1, 2019, by and between Presidio Technology Capital, LLC and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $754,267 outstanding.

7. Indebtedness in respect of the Lease dated as of January 24, 2019, by and between Cisco Systems Capital Corporation and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $547,175 outstanding.

8. Indebtedness in respect of the Lease dated as of September 6, 2018, by and between Cisco Systems Capital Corporation and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $178,659 outstanding.

9. Indebtedness in respect of the Lease dated as of November 29, 2018, by and between Canon Solutions America, Inc. and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $112,982 outstanding.

10. Indebtedness in respect of the Lease dated as of February 21, 2019, by and between Canon Solutions America, Inc. and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $89,892 outstanding.

11. Indebtedness in respect of the Lease dated as of March, 26, 2018, by and between Canon Solutions America, Inc. and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $116,670 outstanding.

12. Indebtedness in respect of the Lease dated as of November 20, 2015, by and between IAC Port 167 LLC and SSB Manufacturing Company, under which there is, as of the Closing Date, approximately $16,287,152 outstanding.

13. Indebtedness in respect of the Leases, by and between Wells Fargo Vendor Financial Services, CIT Bank, N.A., and Tuft & Needle, LLC (successor by merger to Fosbrooke, Inc.) under which there is, as of the Closing Date, approximately $206,000 outstanding.

14. Letter of Credit in the amount of $674,680 issued to New Jersey Department of Environmental Remediation for SSB Manufacturing Company to meet statutory requirements for funding of ongoing environmental remediation.

15. Indebtedness in respect of the Promissory Note, dated as of February, 2018, by and between SSB Manufacturing Company, a Delaware corporation, as the applicant, and the State of Connecticut, acting by and through its Department of Economic and Community Development, as the holder, in the principal amount of $5,000,000.

16. Indebtedness in connection with the Liens listed on <u>Schedule 6.02</u>.

## SCHEDULE 6.02

### EXISTING LIENS

1. Liens in respect of the real property owned by Simmons Caribbean Bedding, Inc. and located at Las Cuevas Industrial Park, Trujillo Alto, Puerto Rico and arising in connection with the Deed of Mortgage, dated as of December 12, 1997, by and between Simmons Caribbean Bedding, Inc. and Banco Santander Puerto Rico.

2. Liens in respect of the real property owned by SSH Bedding Canada Co. (successor in interest by amalgamation of Simmons Canada Inc.) and located at 3636 11A Street, Southeast, Calgary, Alberta and arising in connection with (i) the Memorandum of Agreement, dated as of December 10, 1965, between Simmons Canada Inc. (as successor-in-interest to Simmons Limited) and the City of Calgary, as amended, and (ii) the Transfer of Land Instrument, dated February 22, 1966, between Simmons Canada Inc. (as successor-in-interest to Simmons Limited) and the City of Calgary.

3. Liens in respect of the real property owned by The Simmons Manufacturing Co., LLC, and located at 7910 Hedge Lane Terrace, Shawnee Mission, Kansas and arising in connection with the $5,000,000 Private Activity Revenue Bonds, Series 1996 (Simmons Company Project), of the City of Shawnee, Kansas and the documentation relating thereto.

4. Liens on funds on deposit in account number 2572006778 maintained at US Bank in an amount not to exceed $100,000 but only to the extent that funds on deposit in such account secure obligations arising under the Remediation Trust Agreement, dated as of September 29, 2003, by and between SSB Manufacturing Company (as successor to Simmons Bedding Company) and Wachovia Bank, N.A., as trustee.

5. On October 28, 1998, UBS AG, Stamford Branch ("UBS") was granted a security interest against the "Greenwich" trademark (registration number 1988658), among others (the "98 UBS Lien"). The 98 UBS Lien was released with respect to trademark registrations (and the underlying indebtedness was repaid), but it is believed that the applicable release documentation neglected (in error) to include the aforementioned "Greenwich" mark.

6. As recorded on April 15, 1996, Chemical Bank (now Chase Manhattan Bank) was granted a security interest in the "S Simmons (Stylized) and Design" trademark (registration number 2219191), among others (the "Chemical Bank Lien"). The security interest was released and terminated (and the underlying indebtedness was repaid), but the release recorded at 1820/0060 neglected (in error) to include the aforementioned "S Simmons (Stylized) and Design" trademark (registration number 2219191).

7. On March 22, 1996, Simmons Acquisition Corporation granted a security interest to Chemical Bank in the copyright registration titled "Dropping the ball" (registration number TX0004093428), among others (the "CB Lien"). Although, the CB Lien was released with respect to copyright registrations (and the underlying indebtedness was repaid), it is believed that (in error) no release documentation was executed regarding the aforementioned "Dropping the ball" copyright.

8. Liens consisting of cash collateral deposited in connection with (i) the Trust Agreement for Payment Agreement Obligations, effective as of January 8, 2010, among SSB Manufacturing Company (as successor to Simmons Bedding Company), as trustor, Wells Fargo Bank, N.A., as trustee, and National Union Fire Insurance Company of Pittsburgh, PA, on behalf of itself and its affiliates, as beneficiary,

until the release thereof following the replacement thereof with a Letter of Credit issued under the Revolving Facility and (ii) the Trust Agreement for Payment Agreement Obligations, effective as of August 5, 2010, among National Bedding Company L.L.C., as trustor, Wells Fargo Bank, N.A., as trustee, and National Union Fire Insurance Company of Pittsburgh, PA, as beneficiary, as amended by Addendum #1 to Trust Agreement for Payment Agreement Obligations, effective as of August 5, 2010.

9. Liens in connection with the following filings:

| Jurisdiction | Debtor(s) | Secured Party(s) | Filing Info | Collateral |
|---|---|---|---|---|
| Delaware SOS | Fosbrooke, Inc.[1] | CHTD Company | 2018 0562112 1/24/2018 | Equipment/Blanket Lien |
| Delaware SOS | Fosbrooke, Inc.[2] Serta Simmons Bedding, LLC | Financial Agent Services | 2019 5257030 7/30/2019 | Equipment/Blanket Lien |
| Delaware SOS | Serta Simmons Bedding, LLC Fosbrooke, Inc.[3] | CIT Bank NA | 2019 6016609 8/29/2019 | Equipment/Blanket Lien |
| Delaware SOS | Fosbrooke, Inc.[4] | Wells Fargo Vendor Financial Services, LLC | 2019 6378231 9/13/2019 | All Equipment, described herein or otherwise, leased to or financed for the Debtor by Secured Party under that certain Master Financing Agreement No. 450-0002468-000 |
| Illinois SOS | National Bedding Company L.L.C. Serta Mattress | Northstar Recycling Company, Inc. | 016406449 7/1/2011 | Equipment |
| Illinois SOS | National Bedding Company L.L.C. | U.S. Bancorp Equipment Finance, Inc. | 016474258 7/27/2011 | Equipment |
| Illinois SOS | National Bedding Company, L.L.C. Serta Mattress Company | Monterey Receivables Funding, LLC | 18328259 06/10/2013 | All of Debtor's rights, titles and interests in accounts, accounts receivables, chattel paper, contracts rights, rights to payment, letters of credit, documents, money and instruments, and notes and other obligations owed to Debtor; however evidenced, purchased by Monterey Receivables Funding, LLC from January 18, 2013 forward. |

---

[1] UCC-1 was not amended to reflect the change in Debtor name from Fosbrooke Inc. to Tuft & Needle, LLC

[2] UCC-1 was not amended to reflect the change in Debtor name from Fosbrooke, Inc. to Tuft & Needle, LLC

[3] UCC-1 was not amended to reflect the change in Debtor name from Fosbrooke, Inc. to Tuft & Needle, LLC

[4] UCC-1 was not amended to reflect the change in Debtor name from Fosbrooke, Inc. to Tuft & Needle, LLC

| Jurisdiction | Debtor(s) | Secured Party(s) | Filing Info | Collateral |
|---|---|---|---|---|
| Illinois SOS | National Bedding Company, LLC<br>Serta Mattress Company | Monterey Financial Services, Inc. | 18419041<br>07/11/2013 | All of Debtor's rights, titles and interests in accounts, accounts receivables, chattel paper, contracts rights, rights to payment, letters of credit, documents, money and instruments, and notes and other obligations owed to Debtor; however evidenced, purchased by Monterey Financial Services, Inc. from January 18, 2013 forward. |
| Illinois SOS | National Bedding Company, LLC<br>Serta Mattress Company | Monterey Financial Services, Inc., Profit Sharing Plan and Trust | 18419068<br>07/11/2013 | All of Debtor's rights, titles and interests in accounts, accounts receivables, chattel paper, contracts rights, rights to payment, letters of credit, documents, money and instruments, and notes and other obligations owed to Debtor; however evidenced, purchased by Monterey Financial Services, Inc. from January 18, 2013 forward. |
| Illinois SOS | National Bedding Company L.L.C. | Wells Fargo Bank, N.A. | 20991011<br>12/31/2015 | Equipment |
| Delaware SOS | Serta Simmons Bedding, LLC | Presidio Technology Capital, LLC<br>Prime Alliance Bank, Inc.<br>Wells Fargo Equipment Finance, Inc. | 2016 1311818<br>3/04/2016 | Equipment |
| Delaware SOS | Serta Simmons Bedding, LLC | Presidio Technology Capital, LLC | 2016 1311933<br>3/04/2016 | Equipment |
| Delaware SOS | SSB Manufacturing Company | Crown Equipment Corporation | 2016 5315711<br>8/31/2016 | Equipment |
| Delaware SOS | Serta Simmons Bedding, LLC | Northstar Pulp & Paper Co., Inc. | 2017 1517520<br>3/07/2017 | Equipment |
| Delaware SOS | Serta Simmons Bedding, LLC | Wells Fargo Vendor Financial Services, LLC | 2017 8357214<br>12/18/2017 | Equipment |

| Jurisdiction | Debtor(s) | Secured Party(s) | Filing Info | Collateral |
|---|---|---|---|---|
| Delaware SOS | Serta Simmons Bedding, LLC | CISCO Systems Capital Corporation | 2018 6250498 9/11/2018 | All Debtors rights, title and interest in all Equipment |
| Delaware SOS | Serta Simmons Bedding, LLC | Canon Financial Services, Inc. | 2018 8842987 12/19/2018 | All Debtors rights, title and interest in all Equipment |
| Delaware SOS | SSB Manufacturing Company | Crown Equipment Corporation | 2010 0516215 2/17/2010 | Equipment |
| Delaware SOS | SSB Manufacturing Company | Crown Equipment Corporation | 2016 5313711 8/31/2016 | Equipment |

## SCHEDULE 6.06

### EXISTING INVESTMENTS

1.  Investments in subsidiaries listed on Schedule 3.13 and existing on the Closing Date.

2.  Investments arising under the Promissory Note, dated as of August 31, 2005, made by SSH Bedding Canada Co. as successor by amalgamation to Star Bedding Products Company (as successor by merger to 3104394 Nova Scotia Company) in favor of Serta International Holdco, LLC (previously named AOT Bedding Holdings, LLC and, prior to assuming such name, AOT Bedding Holdings Corporation) under which there is, as of the Closing Date, approximately $13,160,250 outstanding (the "2005 SBPC Note").[5]

3.  Investments arising under the Promissory Note, dated as of June 11, 2007, made by SSH Bedding Canada Co. as successor by amalgamation to Star Bedding Products Company (as successor by merger to Serta Montreal, Inc.) in favor of National Bedding Company L.L.C., under which there is, as of the Closing Date, approximately $2,261,415 outstanding (the "2007 SBPC Note").[6]

4.  Investments arising under the Purchase Money Promissory Note, dated as of June 2, 2018, made by Serta Simmons Bedding, LLC in favor of Louisville Bedding Company under which there is, as of the Closing Date, approximately $1,250,000 outstanding.

5.  Investment in AI Dream 1, pursuant to the Shareholders Agreement by Serta, Inc., a majority-owned subsidiary of National Bedding Company, which results in an approximately 26% equity interest and 1% preferred share in certain sales of AI Dream 1, and any increase or decrease in the amount of such investment deemed to occur each year as a result of the valuation and treatment of such investment in accordance with GAAP. This investment balance was approximately $17,600,000 as of the Closing Date.

---

[5] Promissory Note is actually denominated in Canadian dollars ($18,129,814) translated as of May 30, 2020.
[6] Promissory Note is actually denominated in Canadian dollars ($3,115,368) translated as of May 30, 2020.

## SCHEDULE 9.01

### BORROWER'S WEBSITE FOR ELECTRONIC DELIVERY

None.

[FORM OF]
ASSIGNMENT AGREEMENT

This Assignment Agreement (the "Assignment Agreement") is dated as of the Effective Date set forth below and is entered into by and between **[Insert name of Assignor]** (the "Assignor") and **[Insert name of Assignee]** (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Super-Priority Term Loan Agreement identified below (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Super-Priority Term Loan Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex I attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment Agreement as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Super-Priority Term Loan Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Super-Priority Term Loan Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any letters of credit included in such facilities) and (ii) to the extent permitted to be assigned under applicable Requirements of Law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Super-Priority Term Loan Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). In the case where the Assigned Interest covers all of the Assignor's rights and obligations under the Super-Priority Term Loan Agreement, the Assignor shall cease to be a party thereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03 of the Super-Priority Term Loan Agreement with respect to events occurring on or prior to the Effective Date and subject to its obligations hereunder and under Section 9.13 of the Super-Priority Term Loan Agreement. Such sale and assignment is (i) subject to acceptance and recording thereof in the Register by the Administrative Agent pursuant to Section 9.05(b)(v) of the Super-Priority Term Loan Agreement, (ii) without recourse to the Assignor and (iii) except as expressly provided in this Assignment Agreement, without representation or warranty by the Assignor.

1.    Assignor:        [●]

2.    Assignee:        [●]
      **[and is an Affiliate/Approved Fund of [identify Lender]**[1]**]**

3.    Borrowers: Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing").

4.    Administrative Agent: UBS AG, Stamford Branch, as administrative agent under the Super-Priority Term Loan Agreement

5.    Super-Priority Term Loan Agreement:  That certain Super-Priority Term Loan Agreement, dated as of June [●], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified, the

---

[1]        Select as applicable.

"Super-Priority Term Loan Agreement"), by and among, *inter alios*, SSB, National Bedding and SSB Manufacturing, as borrowers, Dawn Intermediate, LLC, a Delaware limited liability company ("Holdings"), the Lenders from time to time party thereto and UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders.

6.      Assigned Interest:

| Aggregate Amount of Commitment/Loans | Class of Loans Assigned | Amount of Commitment/Loans Assigned[2] | Percentage Assigned of Commitment/Loans under Relevant Class[3] | CUSIP Number |
|---|---|---|---|---|
| $ | | $ | % | |
| $ | | $ | % | |
| $ | | $ | % | |

Effective Date:  [●] [●], 20[●] **[TO BE INSERTED BY THE ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR].**

7.      **THE PARTIES HERETO ACKNOWLEDGE THAT ANY ASSIGNMENT TO ANY DISQUALIFIED INSTITUTION WITHOUT OBTAINING THE REQUIRED CONSENT OF THE TOP BORROWER OR, TO THE EXTENT THE TOP BORROWER'S CONSENT IS REQUIRED UNDER SECTION 9.05 OF THE SUPER-PRIORITY TERM LOAN AGREEMENT, TO ANY OTHER PERSON, SHALL BE NULL AND VOID, AND, IN THE EVENT OF ANY SUCH ASSIGNMENT (AND ANY ASSIGNMENT TO ANY AFFILIATE OF ANY DISQUALIFIED INSTITUTION (OTHER THAN A BONA FIDE DEBT FUND)), THE TOP BORROWER SHALL BE ENTITLED TO PURSUE THE REMEDIES DESCRIBED IN SECTION 9.05 OF THE SUPER-PRIORITY TERM LOAN AGREEMENT.**

[Signature Page Follows]

---

[2]      Not to be less than $1,000,000 unless the Top Borrower and the Administrative Agent otherwise consent.

[3]      Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

A-2

The terms set forth in this Assignment Agreement are hereby agreed to:

ASSIGNOR

**[NAME OF ASSIGNOR]**

By: _____

     Name:
     Title:

A-3

☐ **ASSIGNEE HAS EXAMINED THE LIST OF DISQUALIFIED INSTITUTIONS AND (I) REPRESENTS AND WARRANTS THAT (A) IT IS NOT IDENTIFIED ON SUCH LIST AND (B) IT IS NOT AN AFFILIATE OF ANY INSTITUTION IDENTIFIED ON SUCH LIST [(OTHER THAN, IN THE CASE OF THIS CLAUSE (B), A BONA FIDE DEBT FUND)][4] AND (II) ACKNOWLEDGES THAT ANY ASSIGNMENT MADE TO AN AFFILIATE OF A DISQUALIFIED INSTITUTION (OTHER THAN A BONA FIDE DEBT FUND) SHALL BE SUBJECT TO <u>SECTION 9.05</u> OF THE SUPER-PRIORITY TERM LOAN AGREEMENT.[5]**

**ASSIGNEE**

**[NAME OF ASSIGNEE]**

By: _____
      Name:
      Title:

Consented to and Accepted:

UBS AG, STAMFORD BRANCH
as Administrative Agent[6]

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**Consented to:][7]**

SERTA SIMMONS BEDDING, LLC,
as the Top Borrower

By: _____
      Name:
      Title:

---

[4]     Insert bracketed language if Assignee is a Bona Fide Debt Fund.

[5]     To be completed by Assignee.

[6]     To be added only if the consent of the Administrative Agent is required.

[7]     To be added only if the consent of the Top Borrower is required by <u>Section 9.05(b)(i)(A)</u> of the Super-Priority Term Loan Agreement.

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AGREEMENT

1.     *Representations and Warranties*.

1.1     *Assignor*.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) its Commitment, and the outstanding balances of its Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth herein and (iv) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby; and (b) makes no representation or warranty and assumes no responsibility with respect to (i) any statement, warranty or representation made in or in connection with the Super-Priority Term Loan Agreement, any other Loan Document or any other instrument or document furnished pursuant thereto (other than this Assignment Agreement) or any collateral thereunder, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Top Borrower, any of its Restricted Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by Holdings, the Top Borrower, any of its Restricted Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2     *Assignee*.  The Assignee (a) represents and warrants that (i) it is an Eligible Assignee and has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby and to become a Lender under the Super-Priority Term Loan Agreement, (ii) it satisfies the requirements, if any, specified in the Super-Priority Term Loan Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Super-Priority Term Loan Agreement and the other Loan Documents as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder and (iv) it has received a copy of the Super-Priority Term Loan Agreement and the Intercreditor Agreement, together with copies of the most recent financial statements referred to in Section 4.01(c) or the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, (v) it has examined the list of Disqualified Institutions and it is not (A) a Disqualified Institution or (B) an Affiliate of a Disqualified Institution [(other than, in the case of this Clause (B), a Bona Fide Debt Fund)][8] and (vi) attached to the Assignment Agreement is any documentation required to be delivered by it pursuant to Section 2.17 of the Super-Priority Term Loan Agreement, duly completed and executed by the Assignee and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it deems appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, (ii) it appoints and authorizes the Administrative Agent to take such action on its behalf and to exercise such powers and discretion under the Super-Priority Term Loan Agreement, the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto, and (iii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.     *Payments*.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts)

---

[8]     Insert bracketed language if Assignee is a Bona Fide Debt Fund and not otherwise identified on the list of Disqualified Institutions.

to the Assignor for amounts which have accrued up to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.     ***General Provisions***.  This Assignment Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns.  This Assignment Agreement may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment Agreement by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Assignment Agreement.  This Assignment Agreement shall be construed in accordance with and governed by the laws of the State of New York.

[FORM OF]
BORROWING REQUEST

UBS AG, Stamford Branch
as Administrative Agent for the Lenders referred to below
Attention: Structured Finance Processing
600 Washington Blvd., 9th Floor
Stamford, Connecticut 06901
Facsimile:  (203) 719-3888
Telephone: (203) 719-4319
Email: Agency-UBSAmericas@ubs.com

[●] [●], 20[●][9]

Ladies and Gentlemen:

Reference is hereby made to that certain Super-Priority Term Loan Agreement, dated as of June [__], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified, the "Super-Priority Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, LLC, a Delaware limited liability company ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party thereto, UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders.  Terms defined in the Super-Priority Term Loan Agreement are used herein with the same meanings unless otherwise defined herein.

The undersigned hereby gives you notice pursuant to Section 2.03 of the Super-Priority Term Loan Agreement that it requests the Borrowings under the Super-Priority Term Loan Agreement to be made on [●] [●], 20[●], and in that connection sets forth below the terms on which the Borrowings are requested to be made:

(A)     Borrower [**Serta Simmons Bedding, LLC**] [**National Bedding Company L.L.C.**] [**SSB Manufacturing Company**]

(B)     Date of Borrowing (which shall be a Business Day)          [●]

(C)     Aggregate Amount of Borrowing[10]                          $[●]

(D)     Type of Borrowing[11]                                      [●]

---

[9]     The Administrative Agent must be notified in the form of a written Borrowing Request, appropriately completed and signed by a Responsible Officer of the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) or by telephone (with such telephonic notification to be promptly confirmed in writing by a Borrowing Request, appropriately completed and signed by a Responsible Officer of the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower)), and must be received by the Administrative Agent (by hand delivery, fax or other electronic transmission (including ".pdf" or ".tif")) not later than (i) 1:00 p.m. three Business Days prior to the requested day of any Borrowing of LIBO Rate Loans (or one Business Day in the case of any Borrowing of LIBO Rate Loans to be made on the Closing Date) and (ii) 9:00 a.m. on the requested date of any Borrowing of ABR Loans (or, in each case, such later time as is acceptable to the Administrative Agent).

[10]    Subject to Section 2.02(c) of Super-Priority Term Loan Agreement.

[11]    State whether a LIBO Rate Borrowing or ABR Borrowing.  If no Type of Borrowing is specified, then the requested

(E)   Class of Borrowing                                          [•]

(F)   Interest Period[12] (in the case                           [•]
      of a LIBO Rate Borrowing)

(G)   Amount, Account Number and Location

| Wire Transfer Instructions: | |
|---|---|
| Amount | $[•] |
| Bank: | [•] |
| ABA No.: | [•] |
| Account No.: | [•] |
| Account Name: | [•] |

[The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Borrowing at the time of and immediately after giving effect to the Borrowing, no Default or Event of Default exists.][13]

[Signature Page Follows]

---

Borrowing shall be an ABR Borrowing.

[12]   Must be a period contemplated by the definition of "Interest Period". If no Interest Period is specified, then the Interest Period shall be of one-month's duration.

[13]   Include bracketed language only for Borrowings under any Incremental Facility other than Incremental Term Loans made in connection with any Permitted Acquisition or other similar Investment permitted under the Super-Priority Term Loan Agreement to the extent agreed by the lenders providing such Incremental Term Loans.

B-2

**[SERTA SIMMONS BEDDING, LLC]**
**[NATIONAL BEDDING COMPANY L.L.C.]**
**[SSB MANUFACTURING COMPANY]**

By: _____
    Name:
    Title:

EXHIBIT C

[FORM OF]
**SUPER-PRIORITY TERM LOAN INTELLECTUAL PROPERTY SECURITY AGREEMENT**

      This **SUPER-PRIORITY TERM LOAN INTELLECTUAL PROPERTY SECURITY AGREEMENT** is entered into as of [●] [●], 20[●], (this "Agreement"), by [●] (["each, a]"[the] "Grantor") in favor of UBS AG, Stamford Branch ("UBS"), as administrative agent and collateral agent for the Secured Parties (in such capacities, the "Administrative Agent").

      Reference is made to that certain Super-Priority Pledge and Security Agreement, dated as of June [●], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"), among the Grantors party thereto and the Administrative Agent. The Super-Priority Lenders (as defined below) have extended credit to the Top Borrower (as defined in the Super-Priority Term Loan Agreement (as defined below)) subject to the terms and conditions set forth in that certain Super-Priority Term Loan Agreement, dated as of June [__], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Super-Priority Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, LLC, a Delaware limited liability company ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party thereto (the "Lenders"), UBS, in its capacities as administrative agent and collateral agent for the Lenders. Consistent with the requirements set forth in Sections 4.01 and 5.12 of the Super-Priority Term Loan Agreement and Section 4.03(c) of the Security Agreement, the parties hereto agree as follows:

      **SECTION 1.** *Terms*. Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the Security Agreement (including any terms defined therein by reference).

      **SECTION 2.** *Grant of Security Interest*. As security for the prompt and complete payment or performance, as the case may be, in full of the Secured Obligations, [**each**][**the**] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign, mortgage, transfer and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the ratable benefit of the Secured Parties, a continuing security interest in all of its right, title or interest in, to or under all of the following assets, whether now owned or at any time hereafter acquired by or arising in favor of [**such**][**the**] Grantor, and regardless of where located (collectively, the "IP Collateral"):

      A.      all Trademarks, including the Trademark registrations and pending applications for registration in the United States Patent and Trademark Office listed on Schedule I hereto;

      B.      all Patents, including the issued Patents and pending Patent applications in the United States Patent and Trademark Office listed on Schedule II hereto

      C.      all Copyrights, including the Copyright registrations and pending applications for registration in the United States Copyright Office listed on Schedule III; and

      D.      all Proceeds of the foregoing;

in each case to the extent the foregoing items constitute Collateral.

      **SECTION 3.** *Security Agreement*. The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement. [**Each**][**The**] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the IP Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully

set forth herein.  In the event of any conflict between the terms of this Agreement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.  ***Governing Law***.  This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

SECTION 5.  ***Counterparts***.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or by email as a ".pdf" or ".tif" attachment or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

[●]

By: _____
    Name:    [●]
    Title:    [●]

C-3

## SCHEDULE I

TRADEMARK REGISTRATIONS

| REGISTERED OWNER | REGISTRATION NUMBER | TRADEMARK |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

TRADEMARK APPLICATIONS

| APPLICANT | SERIAL NUMBER | TRADEMARK |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Schedule I to Exhibit C

WEIL:\97618555\40\MB000.3

## SCHEDULE II

PATENTS

| REGISTERED OWNER | PATENT NUMBER | TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

PATENT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Schedule II to Exhibit C

# SCHEDULE III

COPYRIGHT REGISTRATIONS

| REGISTERED OWNER | REGISTRATION NUMBER | TITLE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

COPYRIGHT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | TITLE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Schedule III to Exhibit C

**EXHIBIT A**

[FORM OF]
SUPER-PRIORITY TERM LOAN INTELLECTUAL PROPERTY SECURITY AGREEMENT
SUPPLEMENT

        This SUPER-PRIORITY TERM LOAN INTELLECTUAL PROPERTY SECURITY AGREEMENT
SUPPLEMENT is entered into as of [●] [●], 20[●] (this "IP Security Agreement Supplement"), by [●] ([**each,
a**][**the**] "**Grantor**") in favor of UBS AG, Stamford Branch ("UBS"), as administrative agent and collateral
agent for the Secured Parties (in such capacities, the "Administrative Agent").

        Reference is made to that certain Super-Priority Pledge and Security Agreement, dated as of June [●],
2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the
"Security Agreement"), among the Grantors party thereto and the Administrative Agent.  The Super-Priority
Lenders (as defined below) have extended credit to the Borrowers (as defined in Super-Priority Term Loan
Agreement (as defined below)) subject to the terms and conditions set forth in that certain Super-Priority Term Loan
Agreement, dated as of June [__], 2020 (as amended, restated, amended and restated, supplemented or
otherwise modified from time to time, the "Super-Priority Term Loan Agreement"), by and among, *inter alios*,
Dawn Intermediate, LLC, a Delaware limited liability company ("Dawn Intermediate" or "Holdings"), Serta
Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National
Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing
Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party
thereto (the "Super-Priority Lenders") and UBS, in its capacities as administrative agent and collateral agent
for the Lenders.  Consistent with the requirements set forth in Sections 4.01 and 5.12 of the Super-Priority
Term Loan Agreement, the [**Grantor**][**Grantors**] and the Administrative Agent have entered into that certain
Super-Priority Term Loan Intellectual Property Security Agreement, dated as of [●] (as amended, restated,
amended and restated, supplemented or otherwise modified from time to time) [**which was recorded at the
United States Patent and Trademark Office on [●] at Reel/Frame No. [●], and at the United States
Copyright Office on [●] at Volume/Page No. [●]**][14].  Under the terms of the Security Agreement, the Grantor
has granted to the Administrative Agent for the benefit of the Secured Parties a security interest in the
Additional IP Collateral (as defined below) and have agreed, consistent with the requirements of
Section 4.03(c) of the Security Agreement, to execute this IP Security Agreement Supplement.  Now,
therefore, the parties hereto agree as follows:

        SECTION 1.  ***Terms***.  Capitalized terms used in this IP Security Agreement Supplement and not
otherwise defined herein have the meanings specified in the Security Agreement (including any terms defined
therein by reference).

        SECTION 2*.  **Grant of Security Interest***.  As security for the prompt and complete payment or
performance, as the case may be, in full of the Secured Obligations, [**each**][**the**] Grantor, pursuant to the
Security Agreement, did and hereby does pledge, collaterally assign, mortgage, transfer and grant to the
Administrative Agent, its successors and permitted assigns, on behalf of and for the ratable benefit of the
Secured Parties, a continuing security interest in all of its right, title or interest in, to or under all of the
following assets, whether now owned or at any time hereafter acquired by or arising in favor of the [**such**][**the**]
Grantor, and regardless of where located (collectively, the "Additional IP Collateral"):

        A.        the Trademark registrations and pending applications for registration in the
United States Patent and Trademark Office listed on Schedule I hereto;

---

[14] Included bracketed information to the extent then available.

B.      the issued Patents and pending Patent applications in the United States Patent and Trademark Office listed on <u>Schedule II</u> hereto

C.      the Copyright registrations and pending applications for registration in the United States Copyright Office listed on <u>Schedule III</u>; and

D.      all Proceeds of the foregoing;

in each case to the extent the foregoing items constitute Collateral.

SECTION 3.  *Security Agreement*.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement.  **[Each][The]** Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Additional IP Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this IP Security Agreement Supplement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.  *Governing Law*.  This IP Security Agreement Supplement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

SECTION 5.  *Counterparts*.  This IP Security Agreement Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this IP Security Agreement Supplement by facsimile or by email as a ".pdf" or ".tif" attachment or other electronic transmission shall be effective as delivery of a manually executed counterpart of this IP Security Agreement Supplement. The words "execution," "signed," "signature," and words of like import in this IP Security Agreement Supplement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

[Signature Pages Follow]

Exhibit A-2 to Exhibit C

IN WITNESS WHEREOF, the parties hereto have duly executed this IP Security Agreement Supplement as of the day and year first above written.

[●]

By: _____

    Name:    [●]

    Title:    [●]

Exhibit A-3 to Exhibit C

## SCHEDULE I

TRADEMARK REGISTRATIONS

| REGISTERED OWNER | REGISTRATION NUMBER | TRADEMARK |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

TRADEMARK APPLICATIONS

| APPLICANT | SERIAL NUMBER | TRADEMARK |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

\WEIL\97509555\404\60001 \

## SCHEDULE II

PATENTS

| REGISTERED OWNER | PATENT NUMBER | TITLE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

PATENT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | TITLE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Schedule II to Exhibit A to Exhibit C

WEIL:\97509599\4\04404.0003

EXHIBIT C

## SCHEDULE III

COPYRIGHT REGISTRATIONS

| REGISTERED OWNER | REGISTRATION NUMBER | TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

COPYRIGHT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

WEIL:\97609559\4\64468.0003

[FORM OF]
COMPLIANCE CERTIFICATE

[●] [●], 20[●]

To:     The Administrative Agent and each of the Lenders parties to the
        Super-Priority Term Loan Agreement described below

This Compliance Certificate is furnished pursuant to Section 5.01(c) of that certain Super-Priority Term Loan Agreement, dated as of June [__], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified, the "Super-Priority Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, LLC, a Delaware limited liability company ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party thereto, UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders. Unless otherwise defined herein, capitalized terms used in this Compliance Certificate have the meanings ascribed thereto in the Super-Priority Term Loan Agreement.

THE UNDERSIGNED HEREBY CERTIFIES, AS A RESPONSIBLE OFFICER OF THE TOP BORROWER, IN SUCH CAPACITY AND NOT IN AN INDIVIDUAL CAPACITY, THAT:

1.      I am the duly elected [●] of the Top Borrower and a Responsible Officer of the Top Borrower;

2.      I have reviewed the terms of the Super-Priority Term Loan Agreement and I have made, or have caused to be made under my supervision, a review in reasonable detail of the transactions and conditions of the Top Borrower and its Restricted Subsidiaries, on a consolidated basis, during the **[Fiscal Quarter][Fiscal Year]** covered by the attached financial statements;

3.      Any pro forma "run rate" cost saving, operating expense reduction, operational improvement and/or synergy added back in calculating Consolidated Adjusted EBITDA in reliance on clause (e) of the definition of "Consolidated Adjusted EBITDA" during the Fiscal Quarter covered by the attached financial statements is, in my good faith determination, reasonably identifiable and factually supportable.

4.      **[The attached financial statements fairly present, in all material respects, in accordance with GAAP, the consolidated financial condition of the Top Borrower as at the dates indicated and its income and cash flows for the periods indicated, subject to the absence of footnotes and changes resulting from audit and normal year-end adjustments.]**[15]

5.      **[Except as described in the disclosure set forth below, the][The] examinations described in paragraph 2 did not disclose, and I have no knowledge of the existence of any condition or event which constitutes a Default or Event of Default that exists as of the date of this Compliance Certificate [and the disclosure set forth below specifies, in reasonable detail, the nature of any such condition or event and any action taken or proposed to be taken with respect thereto.]**

---

[15]     Include to the extent the relevant Compliance Certificate is delivered in connection with unaudited quarterly financials.

D-1

6.     [Attached as <u>Schedule 2</u> hereto is a summary of the pro forma adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries from the attached financial statements.][16]

7.     [Attached as <u>Schedule 3</u> hereto is consolidating financial information summarizing in reasonable detail the information regarding the Parent Company to which the attached financial statements relate, on the one hand, and the information relating to the Top Borrower, on the other hand.][17]

8.     [Attached as <u>Schedule 4</u> hereto is a list of the Unrestricted Subsidiaries of the Top Borrower as of the date hereof.][18] [There is no change in the list of Unrestricted Subsidiaries since the later of the Closing Date and the date of the last Compliance Certificate.]

[Signature Page Follows]

---

[16]     Only required if a subsidiary of the Top Borrower is or has been designated as an Unrestricted Subsidiary at the time of delivery of the applicable Compliance Certificate.

[17]     Only required to the extent required by the last paragraph of <u>Section 5.01</u> of the Super-Priority Term Loan Agreement.

[18]     Only required if a subsidiary has been designated as an Unrestricted Subsidiary since later of the delivery of the last Compliance Certificate and the Closing Date.

D-2

The foregoing certifications, together with the information set forth in the Schedules hereto and the financial statements delivered with this Compliance Certificate in support hereof, are made and delivered as of the date first written above. [19]

SERTA SIMMONS BEDDING, LLC

By: _____

Name:

Title:

---

Please note the deadlines for satisfaction of the following requirements correspond with the delivery of each Compliance Certificate (unless otherwise indicated):

1. The delivery of documents and deliverables required under Section 4.02(a) of the Security Agreement relating to any (i) certificated Securities and/or (ii) Instruments having a face amount in excess of $2,000,000, in each case acquired during the Fiscal Quarter covered by the attached financial statements. **NOTE:** If any Loan Party acquires (i) certificated Securities and/or (ii) Instruments having a face amount in excess of $2,000,000 during the fourth Fiscal Quarter of any Fiscal Year, the documents and deliverables required under Section 4.02(a) of the Security Agreement must be delivered within 60 days after the end of such Fiscal Quarter (or in each case such longer period as the Administrative Agent may reasonably agree).

2. The delivery of documents and deliverables required under Section 4.03(c) of the Security Agreement relating to any registration (or any application for registration of) any Patent, Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, filed or acquired during the Fiscal Quarter covered by the attached financial statements. **NOTE:** If any Loan Party acquires any registration (or files any application for registration) of any Patent, Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, during the fourth Fiscal Quarter of any Fiscal Year, the documents and deliverables required under Section 4.03(c) of the Security Agreement must be delivered within 60 days after the end of such Fiscal Quarter (or in each case such longer period as the Administrative Agent may reasonably agree).

3. The delivery of the documents required under Section 4.04 of the Security Agreement relating to any Commercial Tort Claim with an individual value (as reasonably estimated by the Top Borrower) in excess of $1,000,000 acquired after the Closing Date. **NOTE:** If any Loan Party acquires any Commercial Tort Claim with an individual value (as reasonably estimated by the Top Borrower) in excess of $1,000,000 during the fourth Fiscal Quarter of any Fiscal Year, the documents and deliverables required under Section 4.04 of the Security Agreement must be delivered within 60 days after the end of such Fiscal Quarter (or in each case such longer period as the Administrative Agent may reasonably agree).

4. The delivery of the documents required to be delivered under Section 5.12(a) of the Super-Priority Term Loan Agreement as a result of (i) the formation or acquisition after the Closing Date of any Restricted Subsidiary that is a Domestic Subsidiary (other than an Excluded Subsidiary), (ii) the designation of any Unrestricted Subsidiary as a Restricted Subsidiary (other than an Excluded Subsidiary), (iii) any Restricted Subsidiary that is a Domestic Subsidiary ceasing to be an Immaterial Subsidiary and/or (iv) any Restricted Subsidiary that was an Excluded Subsidiary ceasing to be an Excluded Subsidiary, in each case during the Fiscal Quarter covered by the attached financial statements. **NOTE**: upon the taking of any action or the occurrence of any event described in clauses (i) through (iv) during the fourth Fiscal Quarter of any Fiscal Year, the documents required to be delivered under Section 5.12(a) of the Super-Priority Term Loan Agreement must be delivered within 60 days after the end of such Fiscal Quarter (or in each case such longer period as the Administrative Agent may reasonably agree).

D-3

Summary of Pro Forma Adjustments for Unrestricted Subsidiaries

Schedule 2 to Exhibit D

Consolidating Financial Information

Schedule 3 to Exhibit D

Unrestricted Subsidiaries

[Reserved.]

[FORM OF]
INTERCOMPANY NOTE

[Date]

FOR VALUE RECEIVED, each of the undersigned, to the extent a borrower from time to time from any other entity listed on a signature page hereto (each, in such capacity, a "Payor"), hereby promises to pay on demand to such other entity listed below (each, in such capacity, a "Payee"), in lawful money of the United States of America, or in such other currency as agreed to by such Payor and such Payee, in immediately available funds, at such location as a Payee shall from time to time designate, the unpaid principal amount of all loans and advances constituting a loan made by such Payee to such Payor in reliance on clause (B) of the definition of "Investment" or indebtedness borrowed by such Payor from such Payee in reliance on clause (B) of the proviso to the definition of "Indebtedness". Each Payor promises also to pay interest, if any, on the unpaid principal amount of all such loans and advances in like money at said location from the date of such loans and advances until paid at such rate per annum as shall be agreed upon from time to time by such Payor and such Payee.

Reference is made to (i) that certain Super-Priority Term Loan Agreement, dated as of June [__], 2020 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Super-Priority Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, LLC, a Delaware limited liability company ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing" and together with SSB and National Bedding, the "Borrowers"), the lenders from time to time party thereto (the "Super-Priority Term Loan Lenders"), UBS AG, Stamford Branch ("UBS"), in its capacities as administrative agent and collateral agent for the Super-Priority Term Loan Lenders (the "Super-Priority Agent"), and the Super-Priority Term Loan Lenders and other parties from time to time party thereto, (ii) that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "First Lien Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, LLC, a Delaware limited liability company Holdings, the Borrowers, the lenders from time to time party thereto (the "First Lien Term Loan Lenders"), UBS, in its capacities as administrative agent and collateral agent for the First Lien Term Loan Lenders (the "First Lien Agent"), (iii) that certain Second Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Second Lien Term Loan Agreement"), by and among, *inter alios*, Holdings, the Borrowers, the Lenders from time to time party thereto (the "Second Lien Term Loan Lenders"), Goldman Sachs Bank USA, in its capacities as administrative agent and collateral agent for the Second Lien Term Loan Lenders (the "Second Lien Agent") and (iv) that certain ABL Credit Agreement, dated as of November 8, 2016 (as amended, restated, supplemented or otherwise modified in writing from time to time, the "ABL Credit Agreement" and, together with the Super-Priority Term Loan Agreement, the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement, the "Credit Agreements"), by and among, *inter alios*, Holdings, the Borrowers, the Lenders from time to time party thereto (the "ABL Lenders"), UBS, in its capacities as administrative agent and collateral agent for the ABL Lenders (the "ABL Agent" and together with Super-Priority Agent, First Lien Agent and the Second Lien Agent, the "Agents")). Each Payee hereby acknowledges and agrees that the applicable Agent may exercise all rights provided in the Loan Documents, as applicable, with respect to this Note. Capitalized terms used in this Intercompany Note (this "Note") but not otherwise defined herein shall have the meanings given to them in the Credit Agreements, as applicable. This Note is the Intercompany Note referred to in Credit Agreements.

Notwithstanding anything to the contrary contained in this Note, each Payee understands and agrees that no Payor shall be required to make, and shall not make, any payment of principal, interest or other amounts on this Note to the extent that such payment is prohibited by, or would give rise to a default or an event of default under, the terms of any Senior Indebtedness (as defined below) (each a "Credit Agreement

F-1

Default"). The failure to make such payment because such payment would result in any Credit Agreement Default shall not constitute a default hereunder.

Anything in this Note to the contrary notwithstanding, the Indebtedness evidenced by this Note owed by any Payor that is a Loan Party to any Payee that is not a Loan Party shall be subordinated and junior in right of payment, to the extent and in the manner hereinafter set forth, to all of the Secured Obligations of such Payor; *provided* that each Payor may make payments to the applicable Payee so long as no Event of Default under and as defined in the applicable Credit Agreement shall have occurred and be continuing (such Secured Obligations and, in each case, other indebtedness and obligations in connection with any renewal, refunding, restructuring or refinancing thereof, including interest, fees and expenses thereon accruing after the commencement of any proceedings referred to in clause (i) below, whether or not such interest, fees and expenses is an allowed claim in such proceeding, being hereinafter collectively referred to as "Senior Indebtedness"):

(i)      In the event of any insolvency or bankruptcy proceedings, and any receivership, liquidation, reorganization or other similar proceedings in connection therewith, relative to any Payor that is a Loan Party (each such Payor, an "Affected Payor") or to its property, and in the event of any proceedings for voluntary liquidation, dissolution or other winding up of such Affected Payor (except as expressly permitted by the Loan Documents), whether or not involving insolvency or bankruptcy, if an Event of Default has occurred and is continuing (x) the holders of Senior Indebtedness shall be paid in full in cash in respect of all amounts constituting Senior Indebtedness (including, without limitation, post-petition interest at the rate provided in the documentation with respect to the Senior Indebtedness, whether or not such post-petition interest is an allowed claim against the debtor in any bankruptcy or similar proceeding) (other than (A) contingent indemnification obligations as to which no claim has been asserted and (B) Banking Services Obligations and Secured Hedging Obligations) and no Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit related thereto has been cash collateralized or back-stopped or otherwise in a manner reasonably satisfactory to the applicable Issuing Bank and the ABL Agent and in a face amount to be reasonably determined by the applicable Borrower and the applicable Issuing Bank (but not less than 100% of the Outstanding Amount of the applicable Letter of Credit), or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank and the ABL Agent) before any Payee that is not a Loan Party (each such Payee, an "Affected Payee") is entitled to receive (whether directly or indirectly), or make any demands for, any payment on account of this Note and (y) until the holders of Senior Indebtedness are paid in full in cash in respect of all amounts constituting Senior Indebtedness (including, without limitation, post-petition interest at the rate provided in the documentation with respect to the Senior Indebtedness, whether or not such post-petition interest is an allowed claim against the debtor in any bankruptcy or similar proceeding) (other than (A) contingent indemnification obligations as to which no claim has been asserted and (B) Banking Services Obligations and Secured Hedging Obligations) and no Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit related thereto has been cash collateralized or back-stopped by a letter of credit or otherwise in a manner reasonably satisfactory to the applicable Issuing Bank and the ABL Agent and in a face amount to be reasonably determined by the applicable Borrower and the applicable Issuing Bank (but not less than 100% of the Outstanding Amount of the applicable Letter of Credit), or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank and the ABL Agent), any payment or distribution to which such Affected Payee would otherwise be entitled (other than equity or debt securities of such Affected Payor that are subordinated, to at least the same extent as this Note, to the payment of all Senior Indebtedness then outstanding (such securities being hereinafter referred to as "Restructured Securities")) shall be made to the holders of Senior Indebtedness;

(ii)      (x) if any Event of Default under Sections 7.01(a), 7.01(f) or 7.01(g) of any Credit Agreement occurs and is continuing and (y) subject to the Intercreditor Agreements, either any Agent delivers notice to the Borrowers instructing the Borrowers that the applicable Agent is thereby

WEIL:\97509555\6\40416.0003

exercising its rights pursuant to this clause (ii) (provided that no such notice shall be required to be given in the case of any Event of Default arising under Sections 7.01(f) or 7.01(g) of the Credit Agreements, as applicable), then, unless otherwise agreed in writing by the applicable Agent in its reasonable discretion, no payment or distribution of any kind or character shall be made by or on behalf of any Affected Payor or any other Person on its behalf, and no payment or distribution of any kind or character shall be received by or on behalf of any Affected Payee or any other Person on its behalf, with respect to this Note until (x) the applicable Senior Indebtedness shall have been paid in full in cash (other than (A) contingent indemnification obligations as to which no claim has been asserted, (B) Banking Services Obligations and Secured Hedging Obligations and (C) the Outstanding Amount of any Letter of Credit that has been cash collateralized or back-stopped or otherwise in a manner reasonably satisfactory to the applicable Issuing Bank and the Super-Priority Agent and in a face amount to be reasonably determined by the relevant Borrowers and the applicable Issuing Bank (but not less than 100% of the Outstanding Amount of the applicable Letter of Credit), or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank and the Super-Priority Agent) or (y) such Event of Default shall have been cured or waived;

(iii)   if any payment or distribution of any character, whether in cash, securities or other property (other than Restructured Securities), in respect of this Note shall (despite these subordination provisions) be received by any Affected Payee in violation of the foregoing clause (i) or (ii), such payment or distribution shall be held in trust for the benefit of, and shall be paid over or delivered in accordance with the relevant Collateral Documents, the applicable Agent, on behalf of the applicable Secured Parties, subject to the terms of the Intercreditor Agreements; and

(iv)   Each Affected Payee agrees to file all claims against each relevant Affected Payor in any bankruptcy or other proceeding in which the filing of claims is required by law in respect of any Senior Indebtedness and the Agents shall be entitled to all of such Affected Payee's rights thereunder. If for any reason an Affected Payee fails to file such claim at least ten (10) days prior to the last date on which such claim should be filed, such Affected Payee hereby irrevocably appoints each Agent as its true and lawful attorney-in-fact and each Agent is hereby authorized to act as attorney-in-fact in such Affected Payee's name to file such claim or, in such Agent's discretion, to assign such claim to and cause proof of claim to be filed in the name of such Agent or its nominee. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to the applicable Agent the full amount payable on the claim in the proceeding, and, to the full extent necessary for that purpose, each Affected Payee hereby assigns to each of the Agents all of such Affected Payee's rights to any payments or distributions to which such Affected Payee otherwise would be entitled. If the amount so paid is greater than such Affected Payor's liability hereunder, the Agents shall pay the excess amount to the party entitled thereto under the applicable Intercreditor Agreement and applicable law. In addition, upon the occurrence and during the continuance of an Event of Default, each Affected Payee hereby irrevocably appoints each Agent as its attorney-in-fact to exercise all of such Affected Payee's voting rights in connection with any bankruptcy proceeding or any plan for the reorganization of each relevant Affected Payor.

Except as otherwise set forth in clauses (i) and (ii) above, any Payor is permitted to pay, and any Payee is entitled to receive, any payment or prepayment of principal and interest on the Indebtedness evidenced by this Note.

To the fullest extent permitted by applicable Requirements of Law, no present or future holder of Senior Indebtedness shall at any time or in any way be prejudiced or impaired in its right to enforce the subordination of this Note by any act or failure to act on the part of any Affected Payor or Affected Payee or by any act or failure to act on the part of such holder or any trustee or agent for such holder, or by any noncompliance by the Payor with the terms and provisions of the Note, regardless or any knowledge thereof which any such holder may have or be otherwise charged with. Each Affected Payee and each Affected Payor

F-3

hereby agrees that the subordination of this Note is for the benefit of each Agent and the other Secured Parties. Each Agent and the other Secured Parties are obligees under this Note to the same extent as if their names were written herein as such and each Agent (or other applicable Representative) may, on behalf of itself, and the applicable Secured Parties, proceed to enforce the subordination provisions herein, in each case, subject to the terms of the Intercreditor Agreements.

The holders of the Senior Indebtedness may, without in any way affecting the obligations of the holder of the Note with respect hereto, at any time or from time to time and in their absolute discretion, change the manner, place or terms of payment of, change or extend the time of payment of, or renew or alter, any Senior Indebtedness or amend, modify or supplement any agreement or instrument governing or evidencing such Senior Indebtedness or any other document referred to therein, or exercise or refrain from exercising any other of their rights under the Senior Indebtedness including, without limitation, the waiver of default thereunder and the release of any collateral securing such Senior Indebtedness, all without notice to or assent from any Payor or Payee.

Nothing contained in the subordination provisions set forth above is intended to or will impair, as between each Payor and each Payee, the obligations of such Payor, which are absolute and unconditional, to pay to such Payee the principal of and interest on this Note as and when due and payable in accordance with its terms, or is intended to or will affect the relative rights of such Payee and other creditors of such Payor other than the holders of Senior Indebtedness.

Each Payee is hereby authorized (but not required) to record all loans and advances made by it to any Payor (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting *prima facie* evidence of the accuracy of the information contained therein. For the avoidance of doubt, this Note shall not in any way replace, or affect the principal amount of, any intercompany loan outstanding between any Payor and any Payee prior to the execution hereof, and to the extent permitted by applicable law, from and after the date hereof, each such intercompany loan shall be deemed to incorporate the terms set forth in this Note to the extent applicable and shall be deemed to be evidenced by this Note together with any documents and instruments executed prior to the date hereof in connection with such intercompany Indebtedness.

Each Payor hereby waives presentment, demand, protest or notice of any kind in connection with this Note. Except to the extent of any taxes required by law to be withheld, all payments under this Note shall be made without offset, counterclaim or deduction of any kind.

This Note shall be binding upon each Payor and its successors and assigns, and the terms and provisions of this Note shall inure to the benefit of each Payee and their respective successors and assigns, including subsequent holders hereof.

If, at any time, all or part of any payment with respect to Senior Indebtedness theretofore made by the Payor or any other Person or entity is rescinded or must otherwise be returned by the holders of the Senior Indebtedness for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of the Payor or such other Person or entity), the subordination provisions set forth herein shall continue to be effective or be reinstated, as the case may be, all as though such payment had not been made.

If any Payee shall acquire by indemnification, subrogation or otherwise, any lien, estate, right or other interest in any of the assets or properties of any Payor, that lien, estate, right or other interest shall be subordinate in right of payment to the Senior Indebtedness and the lien of the Senior Indebtedness as provided herein, and each Payee hereby waives any and all rights it may acquire by subrogation or otherwise to any lien of the Senior Indebtedness or any portion thereof until such time as all Senior Indebtedness has been indefeasibly repaid in full in cash.

From time to time after the date hereof, additional Subsidiaries of the Top Borrower may become parties hereto (as Payor and/or Payee, as the case may be) by executing a counterpart signature page hereto, which shall be automatically incorporated into this Note (each additional Subsidiary, an "Additional Party"). Upon delivery of such counterpart signature page to the Payees, notice of which is hereby waived by the other Payors, each Additional Party shall be a Payor and/or a Payee, as the case may be, and shall be as fully a party hereto as if such Additional Party were an original signatory hereof. Each Payor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Payor or Payee hereunder. This Note shall be fully effective as to any Payor or Payee that is or becomes a party hereto regardless of whether any other person becomes or fails to become or ceases to be a Payor or Payee hereunder.

Indebtedness governed by this Note shall be maintained in "registered form" within the meaning of Section 163(f) of the Internal Revenue Code of 1986, as amended. The Payor or its designee (which shall be the Applicable Administrative Agent) shall record the transfer of the right to payments of principal and interest on the Indebtedness governed by this Note to holders of the Senior Indebtedness in a register (the "Register"), and no such transfer shall be effective until entered in the Register.

Any Payor shall be automatically released from this Note in the event that such Payor ceases to be a Loan Party pursuant to Article 8 or Section 9.22 of the Credit Agreements. Any Payee shall be automatically released from this Note in the event that such Payee ceases to be a wholly-owned Restricted Subsidiary of the Top Borrower pursuant to a transaction permitted by the Credit Agreements.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

*[Signature Pages Follow]*

F-5

[●], as Payee[20]


By:_____
　　　Name:
　　　Title:



[●], as Payor[21]


By:_____
　　　Name:
　　　Title:

---

[20] To be executed by Restricted Subsidiaries that are not Loan Parties to the extent required in accordance with the provisions of the applicable Credit Agreement.

[21] To be executed by Loan Parties to the extent required in accordance with the provisions of the applicable Credit Agreement.

*Signature Page to Intercompany Note*

[FORM OF]
ABL INTERCREDITOR AGREEMENT

[See attached.]

EXECUTION VERSION

ABL INTERCREDITOR AGREEMENT


dated as of November 8, 2016,

among

UBS AG, STAMFORD BRANCH,
as ABL Credit Agreement Collateral Agent;

UBS AG, STAMFORD BRANCH,
as First Lien Credit Agreement Collateral Agent;

GOLDMAN SACHS BANK USA
as Second Lien Credit Agreement Collateral Agent,

and

EACH OTHER COLLATERAL AGENT PARTY HERETO


and acknowledged and agreed to by

DAWN INTERMEDIATE, INC.,

as Holdings,

SERTA SIMMONS BEDDING, LLC

as Top Borrower,

THE OTHER BORROWERS PARTY HERETO,

and

EACH OF THE OTHER OBLIGORS PARTY HERETO,

# TABLE OF CONTENTS

**Page**

**SECTION 1.   DEFINITIONS** .................................................................................................. **3**

    1.1    Defined Terms ............................................................................................... 3
    1.2    Terms Generally ........................................................................................... 25
    1.3    DIP Cap Amounts ........................................................................................ 26

**SECTION 2.   LIEN PRIORITIES** ........................................................................................ **26**

    2.1    Relative Priorities ........................................................................................ 26
    2.2    Prohibition on Contesting Liens .................................................................. 27
    2.3    No New Liens ............................................................................................... 28
    2.4    Similar Liens and Agreements ..................................................................... 28
    2.5    Nature of Obligations .................................................................................. 28
    2.6    Certain Cash Collateral ................................................................................ 29
    2.7    [Reserved] .................................................................................................... 29
    2.8    Tracing of Proceeds ..................................................................................... 29

**SECTION 3.   ENFORCEMENT** ........................................................................................... **29**

    3.1    Exercise of Remedies................................................................................... 29
    3.2    Actions Upon Breach; Specific Performance .............................................. 34

**SECTION 4.   PAYMENTS** ................................................................................................... **34**

    4.1    Application of Proceeds ............................................................................... 34
    4.2    Payments Over ............................................................................................. 34
    4.3    Mixed Collateral Proceeds ........................................................................... 35

**SECTION 5.   OTHER AGREEMENTS** ............................................................................... **36**

    5.1    Releases ........................................................................................................ 36
    5.2    Insurance and Condemnation Awards ......................................................... 37
    5.3    Amendments to Financing Documents ........................................................ 38
    5.4    Confirmation of Subordination in Collateral Documents ............................ 39
    5.5    Gratuitous Bailee/Agent for Perfection ...................................................... 40
    5.6    When Discharge of Senior Obligations Deemed to Not Have Occurred ...... 41
    5.7    [Reserved] .................................................................................................... 41
    5.8    Consent to License to Use Intellectual Property ......................................... 41
    5.9    Access to Information .................................................................................. 42
    5.10   Access to Property to Process and Sell Inventory ....................................... 42
    5.11   Obligor Consent .......................................................................................... 44

**SECTION 6.   INSOLVENCY OR LIQUIDATION PROCEEDINGS** ............................... **44**

    6.1    Finance and Sale Issues ............................................................................... 44
    6.2    Relief from the Automatic Stay ................................................................... 46
    6.3    Adequate Protection..................................................................................... 47

| | | |
|---|---|---|
| 6.4 | No Waiver | 49 |
| 6.5 | Reinstatement | 49 |
| 6.6 | Reorganization Securities | 49 |
| 6.7 | Post-Petition Interest | 49 |
| 6.8 | Waivers | 50 |
| 6.9 | Separate Grants of Security and Separate Classification | 50 |
| 6.10 | Effectiveness in Insolvency or Liquidation Proceedings | 51 |

**SECTION 7.   RELIANCE; WAIVERS; ETC.** ................................................................ 51

| | | |
|---|---|---|
| 7.1 | Reliance | 51 |
| 7.2 | No Warranties or Liability | 51 |
| 7.3 | No Waiver of Lien Priorities | 52 |
| 7.4 | Waiver of Liability | 53 |
| 7.5 | Obligations Unconditional | 54 |

**SECTION 8.   MISCELLANEOUS** .................................................................................. 55

| | | |
|---|---|---|
| 8.1 | Conflicts | 55 |
| 8.2 | Effectiveness; Continuing Nature of this Agreement; Severability | 55 |
| 8.3 | Amendments; Waivers | 56 |
| 8.4 | Information Concerning Financial Condition of the Obligors and their Subsidiaries | 56 |
| 8.5 | Subrogation | 57 |
| 8.6 | Application of Payments | 57 |
| 8.7 | SUBMISSION TO JURISDICTION; WAIVERS | 57 |
| 8.8 | Notices | 59 |
| 8.9 | Further Assurances | 59 |
| 8.10 | CHOICE OF LAW | 59 |
| 8.11 | Binding on Successors and Assigns | 59 |
| 8.12 | Headings | 59 |
| 8.13 | Counterparts | 59 |
| 8.14 | Authorization; Binding Effect on Claimholders | 60 |
| 8.15 | [Reserved] | **Error! Bookmark not defined.** |
| 8.16 | No Third Party Beneficiaries; Provisions Solely to Define Relative Rights | 61 |
| 8.17 | No Indirect Actions | 61 |
| 8.18 | Obligors; Additional Obligors | 61 |
| 8.19 | Right of Collateral Agent to Continue | 62 |
| 8.20 | Claimholders | 62 |
| 8.21 | Additional Lien Obligations | 62 |
| 8.22 | Additional Intercreditor Agreements | 63 |

## ABL INTERCREDITOR AGREEMENT

This **ABL INTERCREDITOR AGREEMENT** (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, this "**Agreement**") is dated as of November 8, 2016, and entered into by and among UBS AG, STAMFORD BRANCH, in its capacity as collateral agent under the ABL Credit Agreement and the ABL Collateral Documents relating thereto (in each case as defined below) (in such capacity and together with its successors and assigns in such capacity, the "**ABL Credit Agreement Collateral Agent**"), UBS AG, STAMFORD BRANCH, in its capacity as collateral agent under the First Lien Credit Agreement and the First Lien Collateral Documents relating thereto (in each case, as defined below) (in such capacity and together with its successors and assigns in such capacity, the "**First Lien Credit Agreement Collateral Agent**"), GOLDMAN SACHS BANK USA in its capacity as collateral agent under the Second Lien Credit Agreement and the Second Lien Collateral Documents relating thereto (in each case, as defined below) (in such capacity and together with its successors and assigns in such capacity, the "**Second Lien Credit Agreement Collateral Agent**"), each other FIRST LIEN COLLATERAL AGENT that is from time to time party hereto and each other SECOND LIEN COLLATERAL AGENT that is from time to time party hereto and acknowledged and agreed to by DAWN INTERMEDIATE, INC., a Delaware corporation ("**Holdings**"), SERTA SIMMONS BEDDING, LLC, a Delaware limited liability company (the "**Top Borrower**"), NATIONAL BEDDING COMPANY L.L.C., an Illinois limited liability company ("**National Bedding**"), SSB MANUFACTURING COMPANY, a Delaware corporation ("**SSB Manufacturing**" and, together with the Top Borrower and National Bedding, the "**Borrowers**") and the other OBLIGORS (as defined below) from time to time party hereto.

## <u>RECITALS</u>

Holdings, the Borrowers, the financial institutions party thereto from time to time, UBS AG, Stamford Branch ("**UBS**"), as administrative agent (in such capacity and together with its successors and assigns in such capacity, the "**ABL Administrative Agent**"), the ABL Credit Agreement Collateral Agent, letter of credit issuer and swingline lender, have entered into that certain ABL Credit Agreement, dated as of November 8, 2016 (as amended, amended and restated, supplemented, modified or Refinanced from time to time, the "**ABL Credit Agreement**");

Holdings, Borrowers, the financial institutions party thereto from time to time, UBS, as administrative agent (in such capacity and together with its successors and assigns in such capacity, the "**First Lien Administrative Agent**") and the First Lien Credit Agreement Collateral Agent, have entered into that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, amended and restated, supplemented, modified or Refinanced from time to time, the "**First Lien Credit Agreement**");

Holdings, the Borrowers, the financial institutions party thereto from time to time, Goldman Sachs Bank USA ("**GS**"), as administrative agent (in such capacity, the "**Second Lien Administrative Agent**") and Second Lien Term Loan Agreement Collateral Agent, have entered into that certain Second Lien Term Loan Credit Agreement, dated as of November 8, 2016 (as amended, amended and restated, supplemented, modified or Refinanced from time to time, the "**Second Lien Credit Agreement**");

Pursuant to (i) the ABL Credit Agreement, (A) the Borrowers may incur loans and ABL Letters of Credit may be issued and (B) the relevant ABL Obligors have agreed to guarantee the ABL Obligations, (ii) the First Lien Credit Agreement, (A) the Borrowers will incur loans and (B) the relevant First Lien Obligors have agreed to guarantee the First Lien Obligations, and (iii) the Second Lien Credit

Agreement, (A) the Borrowers will incur loans and (B) the relevant Second Lien Obligors have agreed to guarantee the Second Lien Obligations;

The obligations of each ABL Obligor under (i) the ABL Financing Documents, (ii) any ABL Hedge Agreements and (iii) any ABL Banking Services Agreements will be secured on (x) a first priority basis by Liens on the ABL Priority Collateral of such ABL Obligor and (y) a third priority basis by Liens on the Term Loan Priority Collateral of such ABL Obligor, in each case pursuant to the terms of the ABL Collateral Documents;

The obligations of each First Lien Obligor under (i) the First Lien Financing Documents, (ii) any First Lien Hedge Agreements and (iii) any First Lien Banking Services Agreements will be secured on (x) a first priority basis by Liens on the Term Loan Priority Collateral of such First Lien Obligor and (y) a second priority basis by Liens on the ABL Priority Collateral of such First Lien Obligor, in each case pursuant to the terms of the First Lien Collateral Documents;

The obligations of each Second Lien Obligor under (i) the Second Lien Financing Documents, (ii) any Second Lien Hedge Agreements and (iii) any Second Lien Banking Services Agreements will be secured on (x) a second priority basis by Liens on the Term Loan Priority Collateral of such Second Lien Obligor and (y) a third priority basis by Liens on the ABL Priority Collateral of such Second Lien Obligor, in each case pursuant to the terms of the Second Lien Collateral Documents;

The ABL Credit Agreement, the First Lien Credit Agreement and the Second Lien Credit Agreement require, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral;

The Obligors may, from time to time, to the extent permitted by this Agreement, the ABL Financing Documents, the First Lien Financing Documents and the Second Lien Financing Documents, incur additional secured debt which the Obligors and the debtholders thereunder may elect, subject to the terms and conditions hereof, of the ABL Financing Documents, the First Lien Financing Documents and of the Second Lien Financing Documents, to be secured by the Collateral;

In order to induce the ABL Credit Agreement Collateral Agent and the other ABL Claimholders to consent to the Obligors incurring the First Lien Obligations and the Second Lien Obligations and to induce the ABL Claimholders to extend credit and other financial accommodations and lend monies to or for the benefit of the ABL Obligors, each First Lien Collateral Agent, each Second Lien Collateral Agent and each Additional Lien Obligations Agent, on behalf of itself and its respective Claimholders, and each First Lien Claimholder, each Second Lien Claimholder and each Additional Lien Obligations Claimholder, by its acceptance of the benefits of the First Lien Collateral Documents, the Second Lien Collateral Documents or the Additional Lien Obligations Agreements, as applicable, has agreed to the intercreditor and other provisions set forth in this Agreement;

In order to induce each First Lien Collateral Agent and the other First Lien Claimholders to consent to the Obligors incurring the ABL Obligations and the Second Lien Obligations and to induce the First Lien Claimholders to extend credit and other financial accommodations and lend monies to or for the benefit of the First Lien Obligors, the ABL Credit Agreement Collateral Agent, each Second Lien Collateral Agent and each Additional Lien Obligations Agent, on behalf of itself and its respective Claimholders, and each ABL Claimholder, each Second Lien Claimholder and each Additional Lien Obligations Claimholder, by its acceptance of the benefits of the ABL Collateral Documents, the Second Lien Collateral Documents or the Additional Lien Obligations Agreements, as applicable, has agreed to the intercreditor and other provisions set forth in this Agreement; and

-2-

In order to induce each Second Lien Collateral Agent and the other Second Lien Claimholders to consent to the Obligors incurring the ABL Obligations and the First Lien Obligations and to induce the Second Lien Claimholders to extend credit and other financial accommodations and lend monies to or for the benefit of the Second Lien Obligors, the ABL Credit Agreement Collateral Agent, each First Lien Collateral Agent and each Additional Lien Obligations Agent, on behalf of itself and its respective Claimholders and each ABL Claimholder, each First Lien Claimholder and each Additional Lien Obligations Claimholder, by its acceptance of the benefits of ABL Collateral Documents, the First Lien Collateral Documents or the Additional Lien Obligations Agreements, as applicable, has agreed to the intercreditor and other provisions set forth in this Agreement.

## AGREEMENT

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1.** **Definitions**.

1.1 <u>Defined Terms</u>. The following terms which are defined in the UCC are used herein as so defined: Account, Chattel Paper, Deposit Account, Document, Equipment, Fixture, General Intangible, Good, Instrument (as defined in Article 9 thereof), Inventory, Investment Property, Letter-of-Credit Right, Money, Securities, Securities Account, Security Entitlement and Supporting Obligation. As used in this Agreement, the following terms shall have the following meanings:

"**ABL Administrative Agent**" has the meaning set forth in the Recitals to this Agreement.

"**ABL Banking Services**" means any of the following services provided to any ABL Obligor or any of its "subsidiaries" as defined in the ABL Credit Agreement: commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash management and deposit accounts.

"**ABL Banking Services Agreement**" means any documentation with an ABL Claimholder governing any ABL Banking Services Obligations.

"**ABL Banking Services Obligations**" means any and all obligations of any ABL Obligor or any of its "subsidiaries" as defined in the ABL Credit Agreement (or any similar term in any other ABL Document), whether absolute or contingent and however and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), in connection with ABL Banking Services, in each case, that constitute ABL Obligations; provided that in no event shall any obligations constitute ABL Banking Services Obligations to the extent such obligations constitute First Lien Banking Services Obligations or Second Lien Banking Services Obligations.

"**ABL Claimholders**" means, at any relevant time, the holders of ABL Obligations at that time, including the ABL Lenders, the ABL Administrative Agent, the ABL Credit Agreement Collateral Agent and the other agents under the ABL Credit Agreement.

"**ABL Collateral**" means (i) the "Collateral" (as defined in the ABL Credit Agreement) and (ii) any other assets and property of any Obligor, whether real, personal or mixed, with respect to which a Lien is granted or purported to be granted as security for any ABL Obligations or that is otherwise subject to a Lien securing any ABL Obligations.

"**ABL Collateral Documents**" means the "Collateral Documents" as defined in the ABL Credit Agreement and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing any ABL Obligations or under which rights or remedies with respect to such Liens are governed.

"**ABL Credit Agreement**" has the meaning set forth in the Recitals to this Agreement.

"**ABL Credit Agreement Collateral Agent**" has the meaning set forth in the Preamble to this Agreement.

"**ABL DIP Cap Amount**" means 115% of the sum of (a) the maximum principal amount of all Indebtedness consisting of ABL Obligations that are permitted to be incurred under the First Lien Credit Agreement as in effect on the date hereof and (b) any accrued and unpaid interest (including interest accruing at the default rate specified in the applicable ABL Financing Document and any Post-Petition Interest) and premiums (including tender premiums and prepayment premiums) payable on account of any ABL Obligations and any underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities paid or payable by any Obligor in connection with incurrence or issuance of any ABL Obligation or any Refinancing of any ABL Obligation in accordance with the terms of this Agreement.

"**ABL DIP Financing**" has the meaning set forth in Section 6.1(b).

"**ABL Documents**" means (i) the ABL Financing Documents, (ii) the ABL Hedge Agreements governing ABL Secured Hedging Obligations and (iii) the ABL Banking Services Agreements, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**ABL Financing Documents**" means the ABL Credit Agreement, the ABL Collateral Documents, the other "Loan Documents" as defined in the ABL Credit Agreement and each of the other agreements, documents and instruments providing for or evidencing any other ABL Obligation (other than any ABL Other Obligation), and any other document or instrument executed or delivered at any time in connection with any ABL Obligations (other than any ABL Other Obligations), including any intercreditor or joinder agreement among any ABL Claimholders, to the extent such are effective at the relevant time, as each may be Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**ABL Hedge Agreement**" means any agreement with respect to any Derivative Transaction between any ABL Obligor or any "subsidiary" as defined in the ABL Credit Agreement (or any similar term in any other ABL Document) and any ABL Claimholder.

"**ABL Hedging Obligations**" means, with respect to any ABL Obligor or any "subsidiary" as defined in the ABL Credit Agreement (or any similar term in any other ABL Document), the obligations of such Person under any ABL Hedge Agreement.

"**ABL Issuing Bank**" means each issuing bank in respect of an ABL Letter of Credit.

-4-

"**ABL Lenders**" means the "Lenders" (or any similar term) as defined in the ABL Credit Agreement and also shall include all ABL Issuing Banks.

"**ABL Letters of Credit**" means any letters of credit issued (or deemed issued) from time to time under any ABL Financing Document.

"**ABL Liens**" means the Liens on the Collateral in favor of the ABL Claimholders under ABL Collateral Documents.

"**ABL Obligations**" means all "Secured Obligations" (or any similar term) as defined in the ABL Credit Agreement and all "Secured Obligations" (or any similar term) in any other ABL Financing Document. To the extent any payment with respect to any ABL Obligation (whether by or on behalf of any ABL Obligor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Term Loan Claimholder, receiver or other Person, then the obligation or part thereof originally intended to be satisfied shall, for all purposes of this Agreement and the rights and obligations of the ABL Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred. In the event that any interest, fees, expenses or other amounts (including any interest accruing at the default rate or any Post-Petition Interest) to be paid by a ABL Obligor pursuant to the ABL Financing Documents, the ABL Hedge Agreements governing ABL Secured Hedging Obligations or the ABL Banking Services Agreements are disallowed by order of any court of competent jurisdiction, including by order of a court presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and other amounts (including default interest and Post-Petition Interest) shall, as between the Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "ABL Obligations."

"**ABL Obligors**" means, collectively, the "Loan Parties" (or any similar term) as defined in the ABL Credit Agreement and the "Loan Parties" (or any similar term) as defined in any other ABL Document.

"**ABL Other Obligations**" means the ABL Banking Services Obligations and the ABL Secured Hedging Obligations.

"**ABL Priority Collateral**" means all interests of each Obligor in the following Collateral, in each case whether now owned or existing or hereafter acquired or arising and wherever located, including (a) all rights of each Obligor to receive moneys due and to become due under or pursuant to the following, (b) all rights of each Obligor to receive return of any premiums for or Proceeds of any insurance, indemnity, warranty or guaranty with respect to the following or to receive condemnation Proceeds with respect to the following, (c) all claims of each Obligor for damages arising out of or for breach of or default under any of the following, and (d) all rights of each Obligor to terminate, amend, supplement, modify or waive performance under any of the following, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder:

       (i)       all Accounts, but for purposes of this clause (i) excluding rights to payment for any property which specifically constitutes Term Loan Priority Collateral which has been or is to be sold, leased, licensed, assigned or otherwise disposed of; provided, however, that, for the avoidance of doubt, all rights to payment arising from any sale or lease of Inventory, Goods or merchandise (other than Fixtures or Equipment) or the provision of services shall constitute ABL Priority Collateral;

       (ii)      all Chattel Paper;

(iii)    all Deposit Accounts, Securities Accounts and all other demand, deposit, time, savings, cash management, passbook and similar accounts maintained with any bank or other financial institution and all cash, money, securities, Instruments and other investments deposited or required to be deposited in any of the foregoing (in each case, other than a Term Proceeds Account, all monies, securities, Instruments and other investments held in a Term Proceeds Account or credited to a Term Proceeds Account which constitute Term Loan Priority Collateral, all identifiable Proceeds of any Term Loan Priority Collateral and any accounts containing cash constituting Tax and Trust Funds);

(iv)    all Inventory, including any Inventory incorporating any Intellectual Property, and all rights to receive payments, indebtedness and other obligations which arise as a result of the sale or lease of Inventory, Goods or merchandise (in each case other than Fixtures or Equipment) or provision of services, including the right to payment of interest or finance charges;

(v)    all cash, Money and Cash Equivalents (other than (i) identifiable Proceeds of the Term Loan Priority Collateral, (ii) cash collateral subject to a Permitted Lien (other than the Lien in favor of any ABL Claimholder or Term Loan Claimholder) or (iii) identifiable Tax and Trust Funds);

(vi)    [reserved];

(vii)    to the extent evidencing or governing any of the items referred to in the preceding clauses (i) through (vi), all General Intangibles (excluding capital stock and any Intellectual Property to the extent such Intellectual Property is not attached to or necessary to sell any item of Inventory), letters of credit (whether or not the respective letter of credit is evidenced by a writing), Letter-of-Credit Rights, Instruments and Documents; provided that to the extent any of the foregoing also relates to Term Loan Priority Collateral, only that portion related to the items referred to in the preceding clauses (i) through (vi) as being included in the ABL Priority Collateral shall be included in the ABL Priority Collateral;

(viii)    to the extent relating to any of the items referred to in the preceding clauses (i) through (vii), all insurance; provided that to the extent any of the foregoing also relates to Term Loan Priority Collateral only that portion related to the items referred to in the preceding clauses (i) through (vii) as being included in the ABL Priority Collateral shall be included in the ABL Priority Collateral;

(ix)    to the extent relating to any of the items referred to in the preceding clauses (i) through (viii), all Supporting Obligations; provided that to the extent any of the foregoing also relates to Term Loan Priority Collateral only that portion related to the items referred to in the preceding clauses (i) through (viii) as being included in the ABL Priority Collateral shall be included in the ABL Priority Collateral;

(x)    to the extent relating to any of the items referred to in the preceding clauses (i) through (ix), all Commercial Tort Claims; provided that to the extent any of the foregoing also relates to Term Loan Priority Collateral only that portion related to the items referred to in the preceding clauses (i) through (viii) as being included in the ABL Priority Collateral shall be included in the ABL Priority Collateral;

(xi)    all books and records, including all books, databases, customer lists and records related thereto; and

-6-

(xii) all cash Proceeds and, solely to the extent not constituting Term Loan Priority Collateral, non-cash Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (including all insurance proceeds) and all collateral security, guarantees and other collateral support given by any Person with respect to any of the foregoing.

"**ABL Secured Hedging Obligations**" means all ABL Hedging Obligations of the ABL Obligors, whether absolute, or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions or modifications thereof and substitutions therefor), in each case, that constitute ABL Obligations.

"**Additional First Lien Obligations**" means obligations with respect to Indebtedness of the Borrowers or any other Obligor (other than, for the avoidance of doubt, First Lien Credit Agreement Obligations) issued or guaranteed following the date of this Agreement and documented in an agreement other than any agreement governing any then existing First Lien Obligations; provided that (a) such Indebtedness is permitted by the terms of each of the ABL Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement and each then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement to be secured by Liens on the Collateral ranking *pari passu* with the Liens securing the First Lien Obligations, (b) the Obligors have granted or purport to have granted Liens on the Collateral to secure the obligations in respect of such Indebtedness on a *pari passu* basis with the other First Lien Obligations, (c) the applicable Additional First Lien Obligations Agent, for itself and on behalf of the holders of such Indebtedness and obligations in respect of such Indebtedness, has entered into a Joinder Agreement pursuant to <u>Section 8.21(b)</u> acknowledging that such Indebtedness, obligations and Liens shall be subject to, and such Additional First Lien Obligations Agent and such holders shall be bound by, and shall have the rights and obligations provided under, the terms of this Agreement applicable to the First Lien Collateral Agent and the other First Lien Claimholders, respectively and (d) an amendment to or other modification of this Agreement shall have been entered into pursuant to <u>Section 8.3</u> to the extent contemplated and requested pursuant to <u>Section 8.21(c)</u>.

"**Additional First Lien Obligations Agent**" means any Person appointed to act as trustee, agent or similar representative for the holders of Additional First Lien Obligations pursuant to any Additional First Lien Obligations Agreement (including, in the case of any bilateral arrangement, the actual holder of the relevant Additional First Lien Obligations unless such holder has otherwise appointed a trustee, agent or similar representative acting on its behalf) and has been designated as such in the applicable Joinder Agreement, and any successor thereto.

"**Additional First Lien Obligations Agreements**" means (i) the indenture, credit agreement, guarantee or other agreement evidencing or governing any Additional First Lien Obligations that are designated as Additional First Lien Obligations pursuant to <u>Section 8.21</u> and (ii) any other "Loan Documents," or "Financing Documents" (or similar term as may be defined in the foregoing or referred to in the foregoing), in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Additional First Lien Obligations Claimholders**" means, at any relevant time, the lenders, creditors and secured parties under any Additional First Lien Obligations Agreements, any Additional First Lien Obligations Agent and the other agents under such Additional First Lien Obligations Agreements, in each case, in their capacities as such.

"**Additional Lien Obligations**" means, collectively, the Additional First Lien Obligations and the Additional Second Lien Obligations.

"**Additional Lien Obligations Agent**" means the Additional First Lien Obligations Agent and/or the Additional Second Lien Obligations Agent, as applicable.

"**Additional Lien Obligations Agreements**" means, collectively, the Additional First Lien Obligations Agreements and the Additional Second Lien Obligations Agreements.

"**Additional Lien Obligations Claimholders**" means, collectively, the Additional First Lien Obligations Claimholders and the Additional Second Lien Obligations Claimholders.

"**Additional Second Lien Obligations**" means obligations with respect to Indebtedness of the Borrowers or any other Obligor (other than, for the avoidance of doubt, Second Lien Credit Agreement Obligations) issued or guaranteed following the date of this Agreement and documented in an agreement other than any agreement governing any then existing Second Lien Obligations, provided that (a) such Indebtedness is permitted by the terms of each of the ABL Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement and any then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement to be secured by Liens on the Collateral ranking *pari passu* with the Liens securing the Second Lien Obligations, (b) the Obligors have granted or purport to have granted Liens on the Collateral to secure the obligations in respect of such Indebtedness on a *pari passu* basis with the other Second Lien Obligations, (c) the applicable Additional Second Lien Obligations Agent, for itself and on behalf of the holders of such Indebtedness and obligations in respect of such Indebtedness, has entered into a Joinder Agreement pursuant to Section 8.21(b) acknowledging that such Indebtedness, obligations and Liens shall be subject to, and such Additional Second Lien Obligations Agent and such holders shall be bound by, and shall have rights and obligations provided under, the terms of this Agreement applicable to the Second Lien Collateral Agent and the other Second Lien Claimholders, respectively and (d) an amendment to or other modification of this Agreement shall have been entered into pursuant to Section 8.3 to the extent contemplated and requested pursuant to Section 8.21(c).

"**Additional Second Lien Obligations Agent**" means any Person appointed to act as trustee, agent or similar representative for the holders of Additional Second Lien Obligations pursuant to any Additional Second Lien Obligations Agreement (including, in the case of any bilateral arrangement, the actual holder of the relevant Additional Second Lien Obligations unless such holder has otherwise appointed a trustee, agent or similar representative acting on its behalf) and has been designated as such in the applicable Joinder Agreement, and any successor thereto.

"**Additional Second Lien Obligations Agreements**" means (i) the indenture, credit agreement, guarantee or other agreement evidencing or governing any Additional Second Lien Obligations that are designated as Additional Second Lien Obligations pursuant to Section 8.21 and (ii) any other "Loan Documents" or "Financing Documents" (or similar term as may be defined in the foregoing or referred to in the foregoing), in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Additional Second Lien Obligations Claimholders**" means, at any relevant time, the lenders, creditors and secured parties under any Additional Second Lien Obligations Agreements, any Additional Second Lien Obligations Agent and the other agents under such Additional Second Lien Obligations Agreements, in each case, in their capacities as such.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with, that Person.

"**Agreement**" has the meaning set forth in the Preamble to this Agreement.

-8-

"**Banking Services**" means the ABL Banking Services, the First Lien Banking Services and the Second Lien Banking Services.

"**Banking Services Obligations**" means the ABL Banking Services Obligations, the First Lien Banking Services Obligations and the Second Lien Banking Services Obligations.

"**Bankruptcy Code**" means Title 11 of the United States Code (11. U.S.C. § 101 et seq.).

"**Borrowers**" has the meaning set forth in the Preamble to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or is required to be accounted for as a capital lease on the balance sheet of that Person.

"**Cash Collateral**" has the meaning set forth in Section 6.1(a).

"**Claimholders**" means each of the ABL Claimholders, the First Lien Claimholders and the Second Lien Claimholders.

"**Collateral**" means all of the assets and property of any Obligor, whether real, personal or mixed, that constitute or are required to constitute (including pursuant to this Agreement) both ABL Collateral and Term Loan Collateral, including any property subject to Liens granted pursuant to Section 6 to secure both ABL Obligations and Term Loan Obligations.

"**Collateral Agent**" means the ABL Credit Agreement Collateral Agent, any First Lien Collateral Agent and/or any Second Lien Collateral Agent, as applicable.

"**Collateral Documents**" means the ABL Collateral Documents and the Term Loan Collateral Documents.

"**Comparable Junior Collateral Document**" means, in relation to any Collateral subject to any Senior Lien created or purported to be created under any Senior Collateral Document, the Junior Collateral Document that creates or purports to create a Junior Lien on the same Collateral, granted by the same Obligor.

"**Contract Rights**" means all rights of any Obligor under each Contract, including (i) any and all rights to receive and demand payments under any or all Contracts, (ii) any and all rights to receive and compel performance under any or all Contracts and (iii) any and all other rights, interests and claims now existing or in the future arising in connection with any or all Contracts.

"**Contracts**" means all contracts between any Obligor and one or more additional parties (including any Hedge Agreements or contracts for Banking Services, licensing agreements and any partnership agreements, joint venture agreements and limited liability company agreements).

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" have meanings correlative thereto.

-9-

"**Copyright**" means any and all copyrights throughout the world, including the following: (a) all rights and interests in copyrights, works protectable by copyright whether published or unpublished, copyright registrations, copyright applications and other rights in works of authorship (including all copyrights embodied in software); (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including damages or payments for past or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing.

"**Debtor Relief Laws**" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or any state or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Derivative Transaction**" means (a) any interest-rate transaction, including any interest-rate swap, basis swap, forward rate agreement, interest rate option (including a cap, collar or floor), and any other instrument linked to interest rates that gives rise to similar credit risks (including when-issued securities and forward deposits accepted), (b) any exchange-rate transaction, including any cross-currency interest-rate swap, any forward foreign-exchange contract, any currency option, and any other instrument linked to exchange rates that gives rise to similar credit risks, (c) any equity derivative transaction, including any equity-linked swap, any equity-linked option, any forward equity-linked contract, and any other instrument linked to equities that gives rise to similar credit risk and (d) any commodity (including precious metal) derivative transaction, including any commodity-linked swap, any commodity-linked option, any forward commodity-linked contract, and any other instrument linked to commodities that gives rise to similar credit risks; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees, members of management, managers or consultants of Holdings or its subsidiaries shall constitute a Derivative Transaction.

"**DIP Financing**" means an ABL DIP Financing or a Team Loan DIP Financing.

"**Directing First Lien Collateral Agent**" means, at any time of determination (a) if there is only one Series of First Lien Obligations with respect to which the Discharge of such First Lien Obligations has not occurred, the First Lien Collateral Agent for such Series and (b) if clause (a) does not apply, the First Lien Collateral Agent designated as the "Controlling Collateral Agent" (or any similar term) pursuant to the applicable intercreditor arrangements among the Series of First Lien Obligations at such time. For purposes of this definition, no Discharge of any Series of First Lien Obligations shall be deemed to have occurred if the Borrowers or any other First Lien Obligor enters into any Refinancing of the First Lien Obligations of such Series with the proceeds of new First Lien Obligations.

"**Directing Junior Collateral Agent**" means (a) with respect to ABL Priority Collateral, the Directing Term Loan Collateral Agent and (b) with respect to the Term Loan Priority Collateral, the ABL Credit Agreement Collateral Agent.

"**Directing Second Lien Collateral Agent**" means, at any time of determination (a) if there is only one Series of Second Lien Obligations with respect to which the Discharge of such Second Lien Obligations has not occurred, the Second Lien Collateral Agent for such Series and (b) if clause (a) does not apply, the Second Lien Collateral Agent designated as the "Controlling Collateral Agent" (or any similar term) pursuant to the applicable intercreditor arrangements among the Series of Second Lien Obligations at such time. For purposes of this definition, no Discharge of any Series of Second Lien Obligations shall be deemed to have occurred if the Borrowers or any other Second Lien Obligor enters

into any Refinancing of the Second Lien Obligations of such Series with the proceeds of a new Second Lien Obligations.

"**Directing Senior Collateral Agent**" means (a) with respect to ABL Priority Collateral, the ABL Credit Agreement Collateral Agent and (b) with respect to the Term Loan Priority Collateral, the Directing Term Loan Collateral Agent.

"**Directing Term Loan Collateral Agent**" means (a) until the Discharge of First Lien Obligations, the Directing First Lien Collateral Agent and (b) thereafter, the Directing Second Lien Collateral Agent.

"**Discharge**" means, with respect to any Series, notwithstanding any discharge of such Series under any Debtor Relief Laws or in connection with any Insolvency or Liquidation Proceeding, except to the extent otherwise expressly provided in Section 5.6:

(a)    payment in full in cash of the principal of and interest (including Post-Petition Interest), and premium, if any, on all Indebtedness outstanding under the Financing Documents and constituting Obligations of such Series (other than any Other Obligations);

(b)    termination or expiration of all commitments, if any, to extend credit that would constitute Obligations of such Series;

(c)    termination or cash collateralization or backstopping (in an amount and manner reasonably satisfactory to the applicable issuing bank, but in no event greater than 105%) of the aggregate undrawn face amount of any letter of credit obligations constituting Obligations of such Series.

(d)    payment in full in cash of all other Obligations of such Series (or, in the case of any Other Obligations of such Series, the cash collateralization or backstopping of such Other Obligations on terms reasonably satisfactory to the applicable lender or counterparty, as applicable) that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (including Post-Petition Interest, but other than any indemnification or expense reimbursement obligations or any other obligations that by the terms of any Financing Document expressly survive termination of such Financing Document, in each case, for which no claim or demand for payment, whether oral or written, has been made at such time); and

(e)    adequate provision has been made for any contingent or unliquidated Obligations of such Series related to claims, causes of action or liabilities that have been asserted against the Claimholders of such Series for which indemnification is required under the Financing Documents of such Series.

provided that the Discharge of any Series of First Lien Obligations, Second Lien Obligations or ABL Obligations shall not be deemed to have occurred if such payments are made with the proceeds of (i) in the case of First Lien Obligations, other First Lien Obligations, (ii) in the case of Second Lien Obligations, other Second Lien Obligations or (iii) in the case of ABL Obligations, other ABL Obligations, in each case, that constitute an exchange or replacement for or a Refinancing of such Series of Obligations. Upon the satisfaction of the conditions set forth in clauses (a) through (e) with respect to the Obligations of any Series, the Collateral Agent of such Series agrees to promptly deliver to each other Collateral Agent written notice of the same.

-11-

"**Discharge of ABL Obligations**" means the Discharge of the ABL Credit Agreement Obligations.

"**Discharge of First Lien Obligations**" means the Discharge of the First Lien Credit Agreement Obligations and the Discharge of each Series of Additional First Lien Obligations.

"**Discharge of Second Lien Obligations**" means the Discharge of the Second Lien Credit Agreement Obligations and the Discharge of each Series of Additional Second Lien Obligations.

"**Discharge of Senior Obligations**" means (a) with respect to the ABL Priority Collateral, the Discharge of ABL Obligations and (b) with respect to the Term Loan Priority Collateral, the Discharge of Term Loan Obligations.

"**Discharge of Term Loan Obligations**" means, collectively, both the Discharge of First Lien Obligations and the Discharge of Second Lien Obligations.

"**Disposition**" has the meaning set forth in Section 5.1(b). "**Dispose**" has a meaning correlative thereto.

"**Domain Names**" means all Internet domain names and associated URL addresses in or to which any Obligor now or hereafter has any right, title or interest.

"**Enforcement Action**" means:

(a)        any action to foreclose, execute, levy or collect on, take possession or control of (other than for purposes of perfection), sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise Dispose of (whether publicly or privately), any Collateral or otherwise exercise or enforce remedial rights with respect to any of the Collateral under the ABL Documents, the First Lien Documents or the Second Lien Documents (including by way of setoff, recoupment, notification of a public or private sale or other Disposition pursuant to the UCC or other applicable law, notification to account debtors, notification to depositary banks under deposit account control agreements, or exercise of rights under landlord consents, if applicable);

(b)        any action to solicit bids from third Persons, or approve bid procedures for, any proposed Disposition of any of the Collateral or conduct any Disposition of any Collateral;

(c)        any action to receive a transfer of any portion of the Collateral in satisfaction of Indebtedness or any other Obligation secured thereby;

(d)        any action to otherwise enforce a security interest or exercise another right or remedy, as a secured creditor or otherwise, pertaining to any Collateral, whether at law, in equity or pursuant to the ABL Documents, the First Lien Documents or the Second Lien Documents (including the commencement of applicable legal proceedings or other actions with respect to any Collateral to facilitate the actions described in the preceding clauses, and exercising voting rights in respect of equity interests comprising any Collateral); or

(e)        the Disposition of any Collateral by any Obligor after the occurrence and during the continuation of an "event of default" under the ABL Documents, the First Lien Documents or the Second Lien Documents with the consent of the ABL Credit Agreement Collateral Agent, the

-12-

First Lien Collateral Agents or the Second Lien Collateral Agents, as applicable (in any case, to the extent that such consent is required).

"**Financing Documents**" means the ABL Financing Documents, the First Lien Financing Documents and the Second Lien Financing Documents.

"**First Lien Administrative Agent**" has the meaning set forth in the Recitals to this Agreement.

"**First Lien Banking Services**" means any of the following services provided to any First Lien Obligor or any of its "subsidiaries" as defined in the First Lien Credit Agreement (or any similar term in any other First Lien Document):  commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash management and deposit accounts.

"**First Lien Banking Services Agreement**" means any documentation with a First Lien Claimholder governing any First Lien Banking Services Obligations.

"**First Lien Banking Services Obligations**" means any and all obligations of any First Lien Obligor or any of its "subsidiaries" as defined in the First Lien Credit Agreement (or any similar term in any other First Lien Document), whether absolute or contingent and however and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), in connection with First Lien Banking Services, in each case, that constitute First Lien Obligations; underlined provided that in no event shall any obligations constitute First Lien Banking Services Obligations to the extent such obligations constitute ABL Banking Services Obligations or Second Lien Banking Services Obligations.

"**First Lien Claimholders**" means, at any relevant time, the holders of First Lien Obligations at that time, including the First Lien Lenders, the First Lien Administrative Agent, the First Lien Collateral Agent, the other agents under the First Lien Credit Agreement and any Additional First Lien Obligations Claimholders.

"**First Lien Collateral**" means (i) the "Collateral" as defined in the First Lien Credit Agreement and (ii) any other assets and property of any Obligor, whether real, personal or mixed, with respect to which a Lien is granted or purported to be granted as security for any First Lien Obligations or that is otherwise subject to a Lien securing any First Lien Obligations.

"**First Lien Collateral Agent**" means the First Lien Credit Agreement Collateral Agent and any Additional First Lien Obligations Agent.

"**First Lien Collateral Documents**" means the "Collateral Documents" as defined in the First Lien Credit Agreement and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing any First Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**First Lien Credit Agreement**" has the meaning set forth in the Recitals to this Agreement.

-13-

"**First Lien Credit Agreement Collateral Agent**" has the meaning set forth in the Preamble to this Agreement.

"**First Lien Credit Agreement Obligations**" means all "Secured Obligations" (or any similar term) as defined in the First Lien Credit Agreement.

"**First Lien Documents**" means (i) the First Lien Financing Documents, (ii) the First Lien Hedge Agreements governing First Lien Secured Hedging Obligations and (iii) the First Lien Banking Services Agreements, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**First Lien Financing Documents**" means the First Lien Credit Agreement, the First Lien Collateral Documents, the other "Loan Documents" as defined in the First Lien Credit Agreement, any Additional First Lien Obligations Agreement and each of the other agreements, documents and instruments providing for or evidencing any other First Lien Obligation (other than any First Lien Other Obligation), and any other document or instrument executed or delivered at any time in connection with any First Lien Obligations (other than any First Lien Other Obligations), including any intercreditor or joinder agreement among any First Lien Claimholders (including, without limitation, the First Lien/Second Lien Intercreditor Agreement), to the extent such are effective at the relevant time, as each may be Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**First Lien Hedge Agreement**" means any agreement with respect to any Derivative Transaction between any First Lien Obligor or any "subsidiary" as defined in the First Lien Credit Agreement (or any similar term in any other First Lien Document) and any First Lien Claimholder.

"**First Lien Hedging Obligations**" means, with respect to any First Lien Obligor or any "subsidiary" as defined in the First Lien Credit Agreement (or any similar term in any other First Lien Document), the obligations of such Person under any First Lien Hedge Agreement.

"**First Lien Issuing Bank**" means each issuing bank in respect of a First Lien Letter of Credit.

"**First Lien Lenders**" means the "Lenders" (or any similar term) as defined in the First Lien Credit Agreement and the "Lenders" (or any similar term) as defined in any Additional First Lien Obligations Agreement and also shall include all First Lien Issuing Banks.

"**First Lien Letters of Credit**"  means any letters of credit issued (or deemed issued) from time to time under any First Lien Financing Document.

"**First Lien Obligations**" means the First Lien Credit Agreement Obligations and all "Secured Obligations" (or any similar term) as defined in any other First Lien Financing Document.  To the extent any payment with respect to any First Lien Obligation (whether by or on behalf of any First Lien Obligor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any ABL Claimholder, Second Lien Claimholder, receiver or other Person, then the obligation or part thereof originally intended to be satisfied shall, for all purposes of this Agreement and the rights and obligations of the First Lien Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  In the event that any interest, fees, expenses or other amounts (including any interest accruing at the default rate or any Post-Petition Interest) to be paid by a First Lien Obligor pursuant to the First Lien Financing Documents, the First Lien Hedge Agreements governing First Lien

-14-

Secured Hedging Obligations or the First Lien Banking Services Agreements are disallowed by order of any court of competent jurisdiction, including by order of a court presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and other amounts (including default interest and Post-Petition Interest) shall, as between the Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "First Lien Obligations."

"**First Lien Obligors**" means, collectively, the "Loan Parties" (or any similar term) as defined in the First Lien Credit Agreement and the "Loan Parties" (or any similar term) as defined in any other First Lien Document.

"**First Lien Other Obligations**" means the First Lien Banking Services Obligations and the First Lien Secured Hedging Obligations.

"**First Lien/Second Lien Intercreditor Agreement**" means the First Lien/Second Lien Intercreditor Agreement dated as of the date hereof, among, *inter alios*, the First Lien Credit Agreement Collateral Agent, the Second Lien Credit Agreement Collateral Agent and the Obligors from time to time party thereto.

"**First Lien Secured Hedging Obligations**" means all First Lien Hedging Obligations of the First Lien Obligors, whether absolute, or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions or modifications thereof and substitutions therefor), in each case, that constitute First Lien Obligations.

"**GAAP**" means generally accepted accounting principles in the United States in effect and applicable to the accounting period in respect of which reference to GAAP is being made.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state or locality of the United States, the United States, or a foreign government.

"**GS**" has the meaning set forth in the Recitals to this Agreement.

"**Hedge Agreements**" means the ABL Hedge Agreements, the First Lien Hedge Agreements and the Second Lien Hedge Agreements.

"**Hedging Obligations**" means the ABL Hedging Obligations, the First Lien Hedging Obligations and the Second Lien Hedging Obligations.

"**Holdings**" has the meaning set forth in the Preamble to this Agreement.

"**Indebtedness**" means "Indebtedness" within the meaning of the ABL Credit Agreement, the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable. For the avoidance of doubt, "Indebtedness" shall not include Hedging Obligations or Banking Services Obligations.

"**Insolvency or Liquidation Proceeding**" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other Debtor Relief Laws with respect to any Obligor, (b) the appointment of or taking possession by a receiver, interim receiver, receiver and manager, (preliminary) insolvency receiver, liquidator, sequestrator, trustee or other custodian for all or a

US-DOCS\72672018.6

substantial part of the property of any Obligor, (c) except as would not result in an "event of default" under any Financing Document, any liquidation, administration (or appointment of an administrator), dissolution, reorganization or winding up of any Obligor, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or (d) any general assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Obligor.

"**Intellectual Property**" means any and all Licenses, Patents, Copyrights, Trademarks and Trade Secrets constituting Collateral.

"**Joinder Agreement**" means a supplement to this Agreement in the form of (i) in the case of any joining additional Obligor, Exhibit A hereto and (ii) in the case of any joining Additional Lien Obligations Agent, Exhibit B hereto.

"**Junior ABL Agent**" has the meaning set forth in Section 8.3.

"**Junior ABL Obligations**" has the meaning set forth in Section 8.3.

"**Junior Claimholders**" means (a) with respect to the ABL Priority Collateral, the Term Loan Claimholders and (b) with respect to the Term Loan Priority Collateral, the ABL Claimholders.

"**Junior Collateral Agent**" means (a) with respect to the ABL Priority Collateral, the Term Loan Collateral Agents and (b) with respect to the Term Loan Priority Collateral, the ABL Credit Agreement Collateral Agent.

"**Junior Collateral Documents**" means (a) with respect to the ABL Priority Collateral, the Term Loan Collateral Documents and (b) with respect to the Term Loan Priority Collateral, the ABL Collateral Documents.

"**Junior Financing Documents**" means (a) with respect to the ABL Priority Collateral, the Term Loan Financing Documents and (b) with respect to the Term Loan Priority Collateral, the ABL Financing Documents.

"**Junior Liens**" means (a) with respect to the ABL Priority Collateral, the Term Loan Liens and (b) with respect to the Term Loan Priority Collateral, the ABL Liens.

"**Junior Obligations**" means (a) with respect to the ABL Priority Collateral, the Term Loan Obligations and (b) with respect to the Term Loan Priority Collateral, the ABL Obligations.

"**Licenses**" means, with respect to any Obligor, all of such Obligor's right, title, and interest in and to (a) any and all licensing agreements or similar arrangements, whether as licensor or licensee, in (1) Patents, (2) Copyrights, (3) Trademarks, (4) Trade Secrets, (5) Software or (6) Domain Names, (b) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future breaches thereof and (c) all rights to sue for past, present, and future breaches thereof.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case in the nature of security; provided that in no event shall an operating lease in and of itself be deemed a Lien.

-16-

"**Loan Guaranty**" has the meaning assigned to "Loan Guaranty" in the ABL Credit Agreement.

"**New Senior Agent**" has the meaning set forth in <u>Section 5.6</u>.

"**Obligations**" means the ABL Obligations, the First Lien Obligations and/or the Second Lien Obligations, as the context may require.

"**Obligors**" means each ABL Obligor, each First Lien Obligor and each Second Lien Obligor and each other Person that has executed and delivered, or may from time to time hereafter execute and deliver, an ABL Collateral Document, a First Lien Collateral Document or a Second Lien Collateral Document as a "grantor" or "pledgor" (or the equivalent thereof).

"**Other Obligations**" means any ABL Other Obligations, First Lien Other Obligations or Second Lien Other Obligations.

"**Patent**" means the following: (a) any and all patents and patent applications throughout the world; (b) all inventions described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions and continuations in part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including damages and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or any other entity.

"**Pledged Assets**" means all Pledged Stock, including all stock certificates, options or rights of any nature whatsoever in respect of the Pledged Stock that may be issued or granted to, or held by, any Obligor, all Instruments, Securities and other Investment Property owned by any Obligor, whether or not physically delivered to the applicable Collateral Agent pursuant to any of the Collateral Documents, whether now owned or hereafter acquired by such Obligor and any and all Proceeds thereof, but, in each case, excluding any items specifically excluded from the definition of Collateral.

"**Pledged Collateral**" has the meaning set forth in <u>Section 5.5(a)</u>.

"**Pledged Stock**" shall mean, with respect to any Obligor, the shares of capital stock required to be pledged by such Obligor pursuant to any of Collateral Documents.

"**Post-Petition Interest**" means interest (including interest accruing at the default rate specified in the applicable ABL Documents, the applicable First Lien Documents or the applicable Second Lien Documents, as the case may be), fees, expenses and other amounts that pursuant to the ABL Documents, the First Lien Documents or the Second Lien Documents, as the case may be, continue to accrue or become due after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other amounts are allowed or allowable, voided or subordinated under any Debtor Relief Law or other applicable law or in any such Insolvency or Liquidation Proceeding.

"**Proceeds**" shall have the meaning assigned in Article 9 of the UCC and, in any event, shall also include, but not be limited to, (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to any Collateral Agent or any Obligor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to any Obligor

-17-

from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any Person acting under color of governmental authority) and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"**Recovery**" has the meaning set forth in <u>Section 6.5</u>.

"**Refinance**" means, in respect of any Indebtedness and any agreement governing any such Indebtedness, to refinance, extend, increase, renew, defease, amend, restate, amend and restate, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for or refinancing of, such Indebtedness in whole or in part, including by adding or replacing lenders, creditors, agents, obligors and/or guarantors, and including, in each case, but not limited to, after the original instrument giving rise to such Indebtedness has been terminated. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Related Claimholders**" means (a) with respect to the ABL Credit Agreement Collateral Agent, the ABL Claimholders, (b) with respect to any First Lien Collateral Agent, its Related First Lien Claimholders or (c) with respect to any Second Lien Collateral Agent, its Related Second Lien Claimholders.

"**Related First Lien Claimholders**" means, with respect to any First Lien Collateral Agent, the First Lien Claimholders for which such First Lien Collateral Agent acts as the "collateral agent" (or other agent or similar representative) under the applicable First Lien Documents.

"**Related Second Lien Claimholders**" means, with respect to any Second Lien Collateral Agent, the Second Lien Claimholders for which such Second Lien Collateral Agent acts as the "collateral agent" (or other agent or similar representative) under the applicable Second Lien Documents.

"**Required ABL Claimholders**" means (a) at all times prior to the occurrence of the Discharge of ABL Obligations (other than the ABL Other Obligations), the ABL Claimholders holding more than 50% of the sum of (i) the aggregate outstanding principal amount of ABL Obligations (including participations in the face amount of the ABL Letters of Credit and any disbursements thereunder that have not been reimbursed, but excluding the ABL Other Obligations) <u>plus</u> (ii) the aggregate unfunded commitments to extend credit which, when funded, would constitute ABL Obligations (other than the ABL Other Obligations), and (b) at all times following the occurrence of the Discharge of ABL Obligations (other than the ABL Other Obligations), the ABL Claimholders holding more than 50% of the sum of (i) the then outstanding ABL Secured Hedging Obligations <u>plus</u> (ii) the then outstanding ABL Banking Services Obligations; <u>provided</u> that, in the case of both clauses (a) and (b) above, in the event there are separate intercreditor arrangements between the holders of the ABL Obligations (or their agents), the Required ABL Claimholders will mean the "Required ABL Claimholders" (or any similar term) or "Controlling Secured Parties" (or any similar term) as defined in the documentation providing such such separate intercreditor arrangements.

"**Required First Lien Claimholders**" means (a) at all times prior to the occurrence of the Discharge of First Lien Obligations (other than the First Lien Other Obligations), the First Lien Claimholders holding more than 50% of the sum of (i) the aggregate outstanding principal amount of First Lien Obligations (including participations in the face amount of the First Lien Letters of Credit and any disbursements thereunder that have not been reimbursed, but excluding the First Lien Other Obligations) <u>plus</u> (ii) the aggregate unfunded commitments to extend credit which, when funded, would constitute First Lien Obligations (other than the First Lien Other Obligations); and (b) at all times following the occurrence of the Discharge of First Lien Obligations (other than the First Lien Other

-18-

Obligations), the First Lien Claimholders holding more than 50% of the sum of (i) the then outstanding First Lien Secured Hedging Obligations plus (ii) the then outstanding First Lien Banking Services Obligations; provided that, in the case of both clauses (a) and (b) above, in the event there are separate intercreditor arrangements among the holders of the First Lien Obligations (or their agents), the Required First Lien Claimholders will mean the "Required First Lien Claimholders" (or any similar term) or "Controlling Secured Parties" (or any similar term) as defined in the documentation providing such such separate intercreditor arrangements.

"**Required Second Lien Claimholders**" means (a) at all times prior to the occurrence of the Discharge of Second Lien Obligations (other than the Second Lien Other Obligations), the Second Lien Claimholders holding more than 50% of the sum of (i) the aggregate outstanding principal amount of Second Lien Obligations plus (ii) the aggregate unfunded commitments to extend credit which, when funded, would constitute Second Lien Obligations (other than the Second Lien Other Obligations), and (b) at all times following the occurrence of the Discharge of Second Lien Obligations (other than the Second Lien Other Obligations), the Second Lien Claimholders holding more than 50% of the sum of (i) the then outstanding Second Lien Secured Hedging Obligations plus (ii) the then outstanding Second Lien Banking Services Obligations; provided that, in the case of both clauses (a) and (b) above, in the event there are separate intercreditor arrangements between the holders of the Second Lien Obligations (or their agents), the Required Second Lien Claimholders will mean the "Required Second Lien Claimholders" (or any similar term) or "Controlling Secured Parties" (or any similar term) as defined in the documentation providing such separate intercreditor arrangements.

"**Required Term Loan Claimholders**" means (a) until the Discharge of First Lien Obligations, the Required First Lien Claimholders and (b) thereafter, the Required Second Lien Claimholders.

"**Responsible Officer**" of any Person means the chief executive officer, the president, the chief financial officer, the treasurer, any assistant treasurer, any executive vice president, any senior vice president, any vice president or the chief operating officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"**Second Lien Administrative Agent**" has the meaning set forth in the Recitals to this Agreement.

"**Second Lien Banking Services**" means any of the following services provided to any Second Lien Obligor or any of its "subsidiaries" as defined in the Second Lien Credit Agreement (or any similar term in any other Second Lien Financing Document) commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash management and deposit accounts.

"**Second Lien Banking Services Agreement**" means any documentation with a Second Lien Claimholder governing any Second Lien Banking Services Obligations.

"**Second Lien Banking Services Obligations**" means any and all obligations of the Second Lien Obligors, whether absolute or contingent and however and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), in connection with Second Lien Banking Services, in each case, that constitute Second Lien

US-DOCS\72672018.6

Obligations; <u>provided</u> that in no event shall any obligations constitute Second Lien Banking Services Obligations to the extent such obligations constitute ABL Banking Services Obligations or First Lien Banking Services Obligations.

"**Second Lien Claimholders**" means, at any relevant time, the holders of Second Lien Obligations at that time, including the Second Lien Lenders, the Second Lien Administrative Agent, the Second Lien Collateral Agent, the other agents under the Second Lien Credit Agreement and any Additional Second Lien Obligations Claimholders.

"**Second Lien Collateral**" means (i) the "Collateral" as defined in the Second Lien Credit Agreement and (ii) any other assets and property of any Obligor, whether real, personal or mixed, with respect to which a Lien is granted or purported to be granted as security for any Second Lien Obligations or that is otherwise subject to a Lien securing any Second Lien Obligations.

"**Second Lien Collateral Agent**" means the Second Lien Credit Agreement Collateral Agent and any Additional Second Lien Obligations Agent.

"**Second Lien Collateral Documents**" means the "Collateral Documents" as defined in the Second Lien Credit Agreement and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing any Second Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**Second Lien Credit Agreement**" has the meaning set forth in the Recitals to this Agreement.

"**Second Lien Credit Agreement Collateral Agent**" has the meaning set forth in the Preamble to this Agreement.

"**Second Lien Credit Agreement Obligations**" means all "Secured Obligations" (or any similar term) as defined in the Second Lien Credit Agreement.

"**Second Lien Documents**" means (i) the Second Lien Financing Documents, (ii) the Second Lien Hedge Agreements governing Second Lien Secured Hedging Obligations and (iii) the Second Lien Banking Services Agreements, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Second Lien Financing Documents**" means the Second Lien Credit Agreement, the Second Lien Collateral Documents, the other "Loan Documents" as defined in the Second Lien Credit Agreement, any Additional Second Lien Obligations Agreement, and each of the other agreements, documents and instruments providing for or evidencing any other Second Lien Obligation (other than any Second Lien Other Obligation), and any other document or instrument executed or delivered at any time in connection with any Second Lien Obligations (other than any Second Lien Other Obligations), including any intercreditor or joinder agreement among any Second Lien Claimholders, to the extent such are effective at the relevant time, as each may be Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Second Lien Hedge Agreement**" means any agreement with respect to any Derivative Transaction between any Second Lien Obligor or any "subsidiary" as defined in the Second Lien Credit Agreement (or any similar term in any other Second Lien Document) and any Second Lien Claimholder.

-20-

"**Second Lien Hedging Obligations**" means, with respect to any Second Lien Obligor or any "Subsidiary" as defined in the Second Lien Credit Agreement (or any similar term in any other Second Lien Document), the obligations of such Person under any Second Lien Hedge Agreement.

"**Second Lien Lenders**" means the "Lenders" (or any similar term) under and as defined in the Second Lien Credit Agreement or any similar term in any Additional Second Lien Obligations Agreement.

"**Second Lien Obligations**" means the Second Lien Credit Agreement Obligations and all "Secured Obligations" (or any similar term) as defined in any other Second Lien Financing Document. To the extent any payment by a Second Lien Obligor with respect to any Second Lien Obligation (whether by or on behalf of any Second Lien Obligor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any ABL Claimholder, any receiver or other Person, then the obligation or part thereof originally intended to be satisfied shall, for all purposes of this Agreement and the rights and obligations of the Second Lien Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  In the event that any interest, fees, expenses or other amounts (including any interest accruing at the default rate or other Post-Petition Interest) to be paid pursuant to the Second Lien Financing Documents, the Second Lien Hedge Agreements governing Second Lien Secured Hedging Obligations or the Second Lien Banking Services Agreements are disallowed by order of any court of competent jurisdiction, including by order of a court presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and other amounts (including default interest and Post-Petition Interest) shall, as between the Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Second Lien Obligations."

"**Second Lien Obligors**" means, collectively, the "Loan Parties" (or any similar term) as defined in the Second Lien Credit Agreement and the "Loan Parties" (or any similar term) as defined in any other Second Lien Document.

"**Second Lien Other Obligations**" means the Second Lien Banking Services Obligations and the Second Lien Secured Hedging Obligations.

"**Second Lien Secured Hedging Obligations**" means all Second Lien Hedging Obligations of the Second Lien Obligors, whether absolute, or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions or modifications thereof and substitutions therefor), in each case, that constitute Second Lien Obligations.

"**Senior Claimholders**" means (a) with respect to the ABL Priority Collateral, the ABL Claimholders and (b) with respect to the Term Loan Priority Collateral, the Term Loan Claimholders.

"**Senior Collateral Agent**" means (a) with respect to the ABL Priority Collateral, the ABL Credit Agreement Collateral Agent and (b) with respect to the Term Loan Priority Collateral, the Term Loan Collateral Agents.

"**Senior Collateral Documents**" means (a) with respect to the ABL Priority Collateral, the ABL Collateral Documents and (b) with respect to the Term Loan Priority Collateral, the Term Loan Collateral Documents.

"**Senior Financing Documents**" means (a) with respect to the ABL Priority Collateral, the ABL Financing Documents and (b) with respect to the Term Loan Priority Collateral, the Term Loan Financing Documents.

"**Senior Liens**" means (a) with respect to the ABL Priority Collateral, the ABL Liens and (b) with respect to the Term Loan Priority Collateral, the Term Loan Liens.

"**Senior Obligations**" means (a) with respect to the ABL Priority Collateral, the ABL Obligations and (b) with respect to the Term Loan Priority Collateral, the Term Loan Obligations.

"**Series**" means, with respect to any Obligations, all Obligations secured by the same Collateral Documents and represented by the same Collateral Agent acting in the same capacity.

"**Shared Collateral Documents**" means any Collateral Document that is each of an ABL Collateral Document, a First Lien Collateral Document and a Second Lien Collateral Document.

"**Standstill Period**" has the meaning set forth in Section 3.1(a)(1).

"**Software**" means computer programs, source code, object code and supporting documentation including "software" as such term is defined in Article 9 of the UCC, as well as computer programs that may be construed as included in the definition of Goods.

"**subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof; provided that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interests in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.  Unless otherwise specified, "subsidiary" shall mean any subsidiary of the Top Borrower.

"**Tax and Trust Funds**" means cash, cash equivalents or other assets that are comprised solely of (a) funds used for payroll and payroll taxes and other employee benefit payments to or for the benefit of any Obligor's employees, (b) taxes required to be collected, remitted or withheld (including federal and state withholding taxes (including the employer's share thereof)) and (c) any other funds which any Obligor holds in trust or as an escrow or fiduciary for the benefit of another Person which is not an Obligor in the ordinary course of business.

"**Term Cash Proceeds Notice**" shall mean a written notice delivered by the Directing Term Loan Collateral Agent to the ABL Credit Agreement Collateral Agent (a) stating that an "Event of Default" has occurred and is continuing under any Term Loan Document and specifying the relevant Event of Default and (b) identifying with reasonable detail any cash proceeds which may be deposited in any Deposit Account or Securities Account constituting Term Loan Priority Collateral.

"**Term Loan Claimholders**" means the First Lien Claimholders and the Second Lien Claimholders.

"**Term Loan Collateral**" means the First Lien Collateral and the Second Lien Collateral.

"**Term Loan Collateral Agent**" means the First Lien Collateral Agents and the Second Lien Collateral Agents.

"**Term Loan Collateral Documents**" means the First Lien Collateral Documents and the Second Lien Collateral Documents.

"**Term Loan DIP Financing**" has the meaning set forth in Section 6.01(a).

"**Term Loan DIP Cap Amount**" means 115% of the sum of (a) the sum of (w) $1,950,000,000, (x) the "Incremental Cap" (as defined in the First Lien Credit Agreement as of the date hereof) as of the applicable date of determination, (y) $450,000,000 and (z) the "Incremental Cap" (as defined in the Second Lien Credit Agreement as of the date hereof) and (b) any accrued and unpaid interest (including interest accruing at the default rate specified in the applicable Term Loan Financing Documents and any Post-Petition Interest) and premiums (including tender premiums and prepayment premiums) payable on account of any Term Loan Obligations and any underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities paid or payable by any Obligor in connection with incurrence or issuance of any Term Loan Obligation or any Refinancing of any Term Loan Obligation in accordance with the terms of this Agreement.

"**Term Loan Documents**" means the First Lien Documents and the Second Lien Documents.

"**Term Loan Financing Documents**" means the First Lien Financing Documents and Second Lien Financing Documents.

"**Term Loan Hedge Agreements**" means the First Lien Hedging Agreements and the Second Lien Hedging Agreements.

"**Term Loan Liens**" means the Liens on the Collateral in favor of the Term Loan Claimholders under Term Loan Collateral Documents.

"**Term Loan Obligations**" means the First Lien Obligations and the Second Lien Obligations.

"**Term Loan Other Obligations**" means First Lien Other Obligations and Second Lien Other Obligations.

"**Term Loan Priority Collateral**" shall mean all interests of each Obligor in the following Collateral, in each case whether now owned or existing or hereafter acquired or arising and wherever located, including (a) all rights of each Obligor to receive moneys due and to become due under or pursuant to the following, (b) all rights of each Obligor to receive return of any premiums for or Proceeds of any insurance, indemnity, warranty or guaranty with respect to the following or to receive condemnation Proceeds with respect to the following, (c) all claims of each Obligor for damages arising out of or for breach of or default under any of the following, and (d) all rights of each Obligor to terminate, amend, supplement, modify or waive performance under any of the following, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder:

> (i)     all Term Proceeds Accounts, and all cash, money, securities, Instruments and other investments deposited therein or credited thereto;

> (ii)    all Equipment;

> (iii)   all Fixtures;

(iv)    all General Intangibles, including Contracts, together with all Contract Rights arising thereunder (in each case other than General Intangibles evidencing or governing ABL Priority Collateral);

(v)    all letters of credit (whether or not the respective letter of credit is evidenced by a writing), Letter-of-Credit Rights, Instruments and Documents (except, in each case, to the extent evidencing or governing or attached or related to (to the extent so attached or related) ABL Priority Collateral);

(vi)    all Intellectual Property (other than Intellectual Property contemplated by <u>clauses (iv)</u> and <u>(vii)</u> of the definition of ABL Priority Collateral);

(vii)    except to the extent constituting or relating to, ABL Priority Collateral, all Commercial Tort Claims;

(viii)    all Pledged Assets and other Investment Property (except Investment Property constituting ABL Priority Collateral pursuant to <u>clause (iii)</u> or <u>(vii)</u> of the definition thereof);

(ix)    all real property (including, if any, leasehold interests) on which the Obligors are required to provide a Lien to the Term Claimholders pursuant to any Term Loan Financing Document and any title insurance with respect to such real property (other than title insurance actually obtained by the ABL Credit Agreement Collateral Agent in respect of such real property) and the Proceeds thereof;

(x)    except to the extent constituting ABL Priority Collateral, all other personal property (whether tangible or intangible) of such Obligor;

(xi)    to the extent constituting or relating to, any of the items referred to in the preceding <u>clauses (i)</u> through <u>(x)</u>, all insurance; <u>provided</u> that to the extent any of the foregoing also relates to ABL Priority Collateral only that portion related to the items referred to in the preceding <u>clauses (i)</u> through <u>(x)</u> as being included in the Term Loan Priority Collateral shall be included in the Term Loan Priority Collateral;

(xii)    to the extent relating to any of the items referred to in the preceding <u>clauses (i)</u> through <u>(xi)</u>, all Supporting Obligations; <u>provided</u> that to the extent any of the foregoing also relates to ABL Priority Collateral only that portion related to the items referred to in the preceding <u>clauses (i)</u> through <u>(xi)</u> as being included in the Term Loan Priority Collateral shall be included in the Term Loan Priority Collateral;

(xiii)    all books and records, including all books, databases, customer lists and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing; <u>provided</u> that to the extent any of such material also relates to ABL Priority Collateral only that portion related to the items referred to in the preceding <u>clauses (i)</u> through <u>(xii)</u> as being included in the Term Loan Priority Collateral shall be included in the Term Loan Priority Collateral; and

(xiv)    all cash Proceeds and, solely to the extent not constituting ABL Priority Collateral, non-cash Proceeds, products, accessions to, substitutions or replacements for, rents and profits of or in respect of any of the foregoing and all collateral security, guarantees and other collateral support given by any Person with respect to any of the foregoing.

US-DOCS\72672018.6

"**Term Proceeds Account**" means any Deposit Account holding solely the Proceeds of Term Loan Priority Collateral.

"**Top Borrower**" has the meaning set forth in the Preamble to this Agreement.

"**Trademark**" means any and all trademarks throughout the world, including the following: (a) all trademarks (including service marks), common law marks, trade names, trade dress, and logos, slogans and other indicia of origin under the Requirements of Law of any jurisdiction in the world, and the registrations and applications for registration thereof and the goodwill of the business symbolized by the foregoing; (b) all renewals of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including damages, claims, and payments for past and future infringements thereof; (d) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (e) all rights corresponding to any of the foregoing.

"**Trade Secrets**" means, with respect to any Obligor, all of such Obligor's right, title and interest in and to the following: (a) any and all confidential and proprietary information, including unpatented inventions, invention disclosures, engineering or other data, information, production procedures, know-how, financial data, customer lists, supplier lists, business and marketing plans, processes, schematics, algorithms, techniques, analyses, proposals, source code, data, databases and data collections; (b) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims and payments for past and future misappropriations or infringements thereof; (c) all rights to sue for past, present and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (d) all rights corresponding to any of the foregoing throughout the world

"**UBS**" has the meaning set forth in the Recitals to this Agreement.

"**UCC**" means the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

1.2   Terms Generally.  The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise:

(a)   any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time permitted to be Refinanced or replaced in accordance with the terms hereof, in each case to the extent so Refinanced or replaced;

(b)   any reference herein to any Person shall be construed to include such Person's permitted successors and assigns;

(c)   the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(d)   all references herein to Sections, clauses or paragraphs shall be construed to refer to Sections, clauses or paragraphs of this Agreement, unless otherwise specified;

(e)     any reference to any law or regulation shall (i) include all statutory and regulatory provisions consolidating, amending, replacing, interpreting or supplementing such law or regulation, and (ii) unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time; and

(f)     the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Notwithstanding anything to the contrary set forth in this Agreement, any reference herein to the ABL Financing Documents, the ABL Documents, the ABL Credit Agreement or any other ABL Document individually "as in effect on the date hereof," "as in effect on the date entered into" or words of similar meaning shall include a reference to any amendment or other modification of any such document that has been made in accordance with, or with respect to any matters that are not prohibited by, Section 5.3(a); provided that any statement herein to the effect that a capitalized term shall have the meaning as defined in an ABL Document "as in effect on the date hereof," "as in effect on the date entered into" (or words of similar meaning) shall not include any changes to such term, if any, contained in any such amendment or modification.  Notwithstanding anything to the contrary set forth in this Agreement, any reference herein to the Term Loan Financing Documents, the Term Loan Documents or any of the Term Loan Credit Agreements or any other Term Loan Document individually "as in effect on the date hereof," "as in effect on the date entered into" or words of similar meaning shall include a reference to any amendment or other modification of any such document that has been made in accordance with, or with respect to any matters that are not prohibited by, Section 5.3(a); provided that any statement herein to the effect that a capitalized term shall have the meaning as defined in a Term Loan Document "as in effect on the date hereof," "as in effect on the date entered into" (or words of similar meaning) shall not include any changes to such term, if any, contained in any such amendment or modification.

1.3     DIP Cap Amounts.  For avoidance of doubt, it is understood and agreed that any increase in the aggregate Indebtedness for borrowed money constituting principal outstanding under the ABL Documents and the Term Loan Documents (in each case, including in any Refinancing thereof) after the date of the original incurrence or issuance of such Indebtedness solely as a result of a fluctuation in the exchange rate of the currency in which such Indebtedness is denominated shall be ignored for purposes of determining compliance with the ABL DIP Cap Amount and the Term DIP Loan Cap Amount, and any such incremental Indebtedness attributable to any such currency fluctuation shall be deemed to be an Obligation or a Term Loan Obligation, as applicable, for all purposes hereof.

## SECTION 2.     Lien Priorities.

2.1     Relative Priorities.  Notwithstanding the date, time, method, manner or order of grant, attachment, recordation or perfection of any Liens on the Collateral securing the ABL Obligations or of any Liens on the Collateral securing the Term Loan Obligations, and notwithstanding any provision of the UCC or any other applicable law, or the ABL Documents or the Term Loan Documents, or any defect or deficiencies in, or failure to perfect or lapse in perfection of, or avoidance as a fraudulent conveyance or otherwise of, the Liens securing any of the Obligations or any other circumstance whatsoever, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Obligor, each Collateral Agent, on behalf of itself and its Related Claimholders, hereby agrees that:

(a)     any Lien on the ABL Priority Collateral securing any ABL Obligations now or hereafter held by or on behalf of the ABL Credit Agreement Collateral Agent, any other ABL Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute (including any judgment lien), operation of law, subrogation or otherwise,

shall be senior in all respects and prior to any Lien on the ABL Priority Collateral securing any of the Term Loan Obligations;

(b)      any Lien on the ABL Priority Collateral securing any Term Loan Obligations now or hereafter held by or on behalf of any Term Loan Collateral Agent, any other Term Loan Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute (including any judgment lien), operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the ABL Priority Collateral securing any of the ABL Obligations;

(c)      all Liens on the ABL Priority Collateral securing any ABL Obligations shall be and remain senior in all respects and prior to all Liens on the ABL Priority Collateral securing any Term Loan Obligations for all purposes, whether or not such Liens securing any ABL Obligations are subordinated to any Lien on the ABL Priority Collateral securing any other obligation of the Obligors or any other Person;

(d)      any Lien on the Term Loan Priority Collateral securing any Term Loan Obligations now or hereafter held by or on behalf of any Term Loan Collateral Agent, any other Term Loan Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute (including any judgment lien), operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Term Loan Priority Collateral securing any of the ABL Obligations;

(e)      any Lien on the Term Loan Priority Collateral securing any ABL Obligations now or hereafter held by or on behalf of the ABL Credit Agreement Collateral Agent, any other ABL Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute (including any judgment lien), operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Term Loan Priority Collateral securing any of the Term Loan Obligations; and

(f)      all Liens on the Term Loan Priority Collateral securing any Term Loan Obligations shall be and remain senior in all respects and prior to all Liens on the Term Loan Priority Collateral securing any ABL Obligations for all purposes, whether or not such Liens securing any Term Loan Obligations are subordinated to any Lien on the Term Loan Priority Collateral securing any other obligation of the Obligors or any other Person.

2.2      <u>Prohibition on Contesting Liens</u>. The ABL Credit Agreement Collateral Agent, for itself and on behalf of its Related Claimholders, and each Term Loan Collateral Agent, for itself and on behalf of its Related Claimholders, agrees that it and its Related Claimholders will not (and each hereby waives any right to) directly or indirectly contest or challenge, or support any other Person in contesting or challenging, in any proceeding (including any Insolvency or Liquidation Proceeding), (i) the validity or enforceability of any ABL Document or any Term Loan Document, or any ABL Obligation or any Term Loan Obligation, (ii) the existence, validity, perfection, priority or enforceability of the Liens securing any ABL Obligations or any Term Loan Obligations or (iii) the relative rights and duties of the ABL Claimholders or the Term Loan Claimholders granted and/or established in this Agreement or any Collateral Document with respect to such Liens; <u>provided</u> that nothing in this Agreement shall be construed to prevent or impair the rights of any Senior Collateral Agent or any other Senior Claimholder to enforce this Agreement or to exercise any of its remedies or rights hereunder, including the provisions of this Agreement relating to the priority of the Liens on the Collateral in which a Senior Claimholder has a Senior Lien securing the Senior Obligations as provided in <u>Sections 2.1</u> and <u>3.1</u>.

2.3     No New Liens.  Subject to Section 2.6 hereof, the parties hereto agree that, so long as neither the Discharge of ABL Obligations nor the Discharge of Term Loan Obligations has occurred, (a) none of the Obligors shall grant or permit any additional Liens on any asset or property of any Obligor to secure any ABL Obligation unless it has granted, or concurrently therewith grants, through documentation in form and substance satisfactory to the Directing Term Loan Collateral Agent, a Lien on such asset or property of such Obligor to secure the Term Loan Obligations; and (b) none of the Obligors shall grant or permit any additional Liens on any asset or property of any Obligor to secure any Term Loan Obligation unless it has granted, or concurrently therewith grants, through documentation in form and substance satisfactory to the ABL Credit Agreement Collateral Agent, a Lien on such asset or property of such Obligor to secure the ABL Obligations. Subject to Section 2.6, so long as neither the Discharge of ABL Obligations nor the Discharge of Term Loan Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the Obligors, the parties hereto agree that if any Claimholder shall acquire or hold any Lien on any assets of any Obligor securing any Obligation which assets are not also subject to the Lien of the other Claimholders under the other Collateral Documents, then, without limiting any other rights and remedies available to any Collateral Agent or the other Claimholders, the applicable Collateral Agent holding such Lien, on behalf of itself and its Related Claimholders, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens so granted shall be subject to Section 4.2.

2.4     Similar Liens and Agreements.  In furtherance of Sections 2.3 and 8.9, the ABL Credit Agreement Collateral Agent, for itself and on behalf of its Related Claimholders, and each Term Loan Collateral Agent, for itself and on behalf of its Related Claimholders, agrees, subject to the other provisions of this Agreement:

(a)     upon request by the ABL Credit Agreement Collateral Agent or the Directing Term Loan Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the ABL Collateral and the Term Loan Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the ABL Documents and the Term Loan Documents; and

(b)     that the documents, agreements or instruments creating or evidencing the ABL Collateral and the Term Loan Collateral and guaranties for the ABL Obligations and the Term Loan Obligations, subject to Section 5.3(c), shall be in all material respects the same forms of documents, agreements or instruments, other than with respect to the priority of the Liens thereunder, the identity of the secured parties that are parties thereto or secured thereby and other matters contemplated by this Agreement.

2.5     Nature of Obligations.  The priorities of the Liens provided in Section 2.1 shall not be altered or otherwise affected by (a) any Refinancing of the Senior Obligations or the Junior Obligations or (b) any action or inaction which any of the Senior Claimholders or the Junior Claimholders may take or fail to take in respect of the Collateral.  Each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, agrees and acknowledges that (i) a portion of the Senior Obligations may be revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, (ii) the terms of the Senior Financing Documents and the Senior Obligations may be amended, supplemented or otherwise modified, and the Senior Obligations, or a portion thereof, may be Refinanced from time to time and (iii) the aggregate amount of the Senior Obligations may be increased, in each case, without notice to or consent by the Junior Collateral Agents or the Junior Claimholders and without affecting the provisions hereof, except as otherwise expressly set forth herein.  As between the Borrowers and the other Obligors and the Junior Claimholders, the foregoing provisions will not limit or otherwise affect the obligations of the Borrowers

-28-

and the Obligors contained in any Junior Financing Document with respect to the incurrence of additional Senior Obligations.

2.6    Certain Cash Collateral.  Notwithstanding anything in this Agreement or any other ABL Document or Term Loan Document to the contrary, collateral consisting of cash and cash equivalents pledged to secure (i) ABL Obligations under any ABL Financing Document consisting of reimbursement obligations in respect of ABL Letters of Credit issued thereunder, (ii) ABL Obligations in respect of ABL Hedge Agreements to the extent permitted by the ABL Documents and the Term Loan Documents, (iii) Term Loan Obligations under any Term Loan Financing Document consisting of reimbursement obligations in respect of letters of credit issued thereunder and (iv) Term Loan Obligations under Term Loan Hedge Agreements to the extent permitted by the ABL Documents and the Term Loan Documents, in each case shall be applied as specified in the relevant ABL Documents, the relevant Term Loan Document, the relevant ABL Hedge Agreement and/or the relevant Term Loan Hedge Agreement, as applicable, and will not constitute Collateral hereunder.

2.7    [Reserved] .

2.8    Tracing of Proceeds.  The ABL Credit Agreement Collateral Agent, for itself and on behalf of the ABL Claimholders, and each Term Loan Collateral Agent for itself and on behalf of its Related Claimholders, agree that prior to an issuance of any notice of any Enforcement Action by such Collateral Agent or any of its Related Claimholders to each other Collateral Agent (unless a bankruptcy or insolvency "Event of Default" then exists under any Financing Document), any proceeds of Collateral, whether or not deposited in Deposit Accounts subject to control agreements, which are used by any Obligor to acquire other property which is Collateral shall not (solely as between the Collateral Agents and the Claimholders) be treated as Proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired. Notwithstanding anything to the contrary contained in this Agreement or any Term Loan Document, unless and until the earliest of (x) the Discharge of ABL Obligations, (y) the commencement of an Insolvency or Liquidation Proceeding with respect to any of the Obligors, or (z) a notice of an Enforcement Action is delivered by the Directing Term Loan Collateral Agent to the ABL Credit Agreement Collateral Agent, the ABL Credit Agreement Collateral Agent is hereby permitted to deem all collections and payments deposited in any Deposit Account or Securities Account (for the avoidance of doubt other than any Term Proceeds Account) to be Proceeds of ABL Priority Collateral and each Term Loan Collateral Agent, on behalf of itself and each other Term Loan Claimholder, consents to the application of such funds to the ABL Obligations, and no such funds credited to such account shall be subject to disgorgement or be deemed to be held in trust by the ABL Credit Agreement Collateral Agent for the benefit of any Term Loan Collateral Agent or any other Term Loan Claimholder; provided that with respect to any such funds that are identifiable proceeds of Term Loan Priority Collateral credited to any such account, with respect to which funds the ABL Credit Agreement Collateral Agent has received a Term Cash Proceeds Notice prior to the application of such funds by the ABL Credit Agreement Collateral Agent to the ABL Obligations, the ABL Credit Agreement Collateral Agent shall turn over any such misdirected proceeds of the Term Loan Priority Collateral to the Directing Term Loan Collateral Agent.

## SECTION 3.    **Enforcement**.

3.1    Exercise of Remedies.

(a)    Until the Discharge of Senior Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the Obligors, each of the Junior Collateral Agents, for itself and on behalf of its Related Claimholders, hereby agrees that it and its Related Claimholders:

(1)     will not exercise or seek to exercise any rights or remedies (including setoff) with respect to any Collateral in which a Junior Claimholder has a Junior Lien or institute or commence, or join with any Person in instituting or commencing, any other Enforcement Action or any other action or proceeding with respect to such rights or remedies (including any action of foreclosure, enforcement, collection or execution and any Insolvency or Liquidation Proceeding); provided that the Directing Junior Collateral Agent may (as between the Term Loan Collateral Agents, subject to the First Lien/Second Lien Intercreditor Agreement) commence an Enforcement Action or otherwise exercise any or all such rights or remedies after the passage of a period of at least 210 days since the Directing Senior Collateral Agent shall have received notice from the Directing Junior Collateral Agent with respect to the acceleration by the Junior Claimholders of any Series of the maturity of all then outstanding Junior Obligations of such Series (and requesting that Enforcement Action be taken with respect to the Collateral in which a Junior Claimholder has a Junior Lien) so long as the applicable "event of default" shall not have been cured or waived (or the applicable acceleration rescinded) (the "**Standstill Period**"); provided, further that notwithstanding anything herein to the contrary, in no event shall the Junior Collateral Agents or any other Junior Claimholders exercise any rights or remedies with respect to any Collateral in which a Junior Claimholder has a Junior Lien or institute or commence, or join with any Person in instituting or commencing, any other Enforcement Action with respect to any Collateral or any other action or proceeding with respect to such rights or remedies, if, notwithstanding the expiration of the Standstill Period, either (A) the Directing Senior Collateral Agent or any other Senior Claimholder shall have commenced and be diligently pursuing (or shall have sought or requested and be diligently pursuing relief from or modification of the automatic stay or any other stay in any Insolvency or Liquidation Proceeding to enable the commencement and the pursuit of) an Enforcement Action or other exercise of their rights or remedies in each case with respect to all or any material portion of the Collateral (with any determination of which such Collateral to proceed against, and in what order, to be made by the Directing Senior Collateral Agent or such Senior Claimholders in their reasonable judgment) or (B) any of the Obligors is then a debtor in any Insolvency or Liquidation Proceeding.

(2)     will not contest, protest or object to any Enforcement Action brought by any Senior Collateral Agent or any other Senior Claimholder or any other exercise by any Senior Collateral Agent or any other Senior Claimholder of any rights and remedies relating to the Collateral in which a Senior Claimholder has a Senior Lien under the Senior Financing Documents or otherwise;

(3)     subject to their rights under clause (a)(1) above, will not object to the forbearance by any Senior Collateral Agent or the other Senior Claimholders from bringing or pursuing any Enforcement Action or any other exercise of any rights or remedies relating to any Collateral in which a Senior Claimholder has a Senior Lien, in each case so long as any proceeds received by the Senior Collateral Agents or other Senior Claimholders with respect to such Collateral in excess of those necessary to achieve a Discharge of Senior Obligations are distributed in accordance with Section 4.1; and

(4)     will not take or receive any Collateral in which a Senior Claimholder has a Senior Lien, or any proceeds of or payment with respect to any such Collateral, in connection with any Enforcement Action or any other exercise of any right or remedy with respect to any such Collateral or any Insolvency or Liquidation Proceeding in its capacity as a creditor or in connection with any insurance policy award or any award in a condemnation or similar proceeding (or deed in lieu of condemnation) with respect to any such Collateral, in each case unless and until the Discharge of Senior Obligations has occurred, except, (x) as between the First Lien Credit Agreement Collateral Agent and the Second Lien Credit Agreement Collateral Agent,

-30-

as expressly permitted by the First Lien/Second Lien Intercreditor Agreement and (y) in connection with any foreclosure expressly permitted by Section 3.1(a)(1) to the extent such Junior Collateral Agent and its Related Claimholders are permitted to retain the proceeds thereof in accordance with Section 4.1.

Without limiting the generality of the foregoing, until the Discharge of Senior Obligations has occurred, except as expressly provided in Sections 3.1(a)(1), 3.1(c) and 6.3(b), the sole right of each Junior Collateral Agent and the other Junior Claimholders with respect to any Collateral in which a Junior Claimholder has a Junior Lien (other than inspection, monitoring, reporting and similar rights provided for in the Junior Financing Documents) is to hold a Lien on such Collateral pursuant to the Junior Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of Senior Obligations has occurred.

For the avoidance of doubt, nothing contained in this Agreement shall prohibit (i) the exercise of rights by the ABL Credit Agreement Collateral Agent or the ABL Administrative Agent during a Cash Dominion Period (as defined in the ABL Credit Agreement), including the notification of depository institutions or any other person to deliver proceeds of ABL Priority Collateral to the ABL Credit Agreement Collateral Agent or the ABL Administrative Agent, (ii) the reduction of advance rates or sub-limits by the ABL Administrative Agent, (iii) the imposition of any Reserve (as defined in the ABL Credit Agreement) by the ABL Administrative Agent, (iv) the cessation of lending pursuant to, and in accordance with, the provisions of the ABL Documents or (v) the consent by the ABL Credit Agreement Collateral Agent to any disposition by any Grantor of any of the ABL Priority Collateral or the Directing Term Loan Collateral Agent to any disposition by any Grantor of any of the Term Loan Priority Collateral.

(b)      Until the Discharge of Senior Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Obligor, subject to Sections 3.1(a)(1), 3.1(c) and 6.3(b), the Senior Collateral Agents and the other Senior Claimholders shall have the exclusive right to commence and maintain an Enforcement Action or otherwise exercise any rights and remedies with respect to the Collateral in which a Senior Claimholder has a Senior Lien (including set-off, recoupment and the right to "credit bid" their debt, except that the Junior Collateral Agents shall have the "credit bid" rights set forth in Section 3.1(c)(6)), and make determinations regarding the release, Disposition, or restrictions with respect to such Collateral, in each case without any consultation with or the consent of any Junior Collateral Agent or any other Junior Claimholder; provided that any proceeds received by any Senior Collateral Agent on account of such Collateral in excess of those necessary to achieve a Discharge of Senior Obligations are distributed in accordance with Section 4.1.  In commencing or maintaining any Enforcement Action or otherwise exercising rights and remedies with respect to any Collateral in which a Senior Claimholder has a Senior Lien, the Senior Collateral Agents and the other Senior Claimholders may enforce the provisions of the Senior Financing Documents and exercise rights and remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion in compliance with any applicable law and without consultation with any Junior Collateral Agent or any other Junior Claimholder and regardless of whether any such exercise is adverse to the interest of any Junior Claimholder.  Such exercise and enforcement shall include the rights of an agent appointed by the Senior Claimholders to sell or otherwise Dispose of Collateral in which a Senior Claimholder has a Senior Lien upon foreclosure, to incur expenses in connection with such sale or other Disposition, and to exercise all the rights and remedies of a secured creditor under the UCC or other applicable law and of a secured creditor under Debtor Relief Laws of any applicable jurisdiction.

(c)     Notwithstanding the foregoing, each Junior Collateral Agent and any other Junior Claimholder may:

(1)     file a claim, proof of claim or statement of interest with respect to the Junior Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against any of the Obligors;

(2)     take any action in order to create, perfect, preserve or protect (but not enforce) its Lien on the Collateral in which a Junior Claimholder has a Junior Lien to the extent (A) not adverse to the priority status of the Liens on such Collateral securing the Senior Obligations, or the rights of any Senior Collateral Agent or the other Senior Claimholders to exercise rights and remedies in respect thereof, and (B) not otherwise inconsistent with the terms of this Agreement, including the automatic release of Liens provided in Section 5.1;

(3)     file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Junior Claimholders, including any claims or Liens secured by the Collateral in which a Junior Claimholder has a Junior Lien, if any, in each case to the extent not inconsistent with the terms of this Agreement;

(4)     vote on any plan of reorganization, arrangement, compromise or liquidation, file any proof of claim, make other filings and make any arguments and motions with respect to the Junior Obligations and the Collateral in which a Junior Claimholder has a Junior Lien that are, in each case, in accordance with the terms of this Agreement; provided that (A) no filing of any claim or vote, or pleading relating to such claim or vote, to accept or reject a disclosure statement, plan of reorganization, arrangement, compromise or liquidation, or any other document, agreement or proposal similar to the foregoing by any Junior Collateral Agent or any other Junior Claimholder in respect of such Collateral may be inconsistent with the terms of this Agreement and (B) neither any Junior Collateral Agent nor any other Junior Claimholder shall propose, vote to accept, or otherwise support a plan of reorganization that is inconsistent with the terms of this Agreement with respect to treatment of such Collateral;

(5)     exercise any of its rights or remedies with respect to the Collateral (after the termination of the Standstill Period to the extent permitted by Section 3.1(a)(1); and

(6)     bid for or purchase any Collateral in which a Junior Claimholder has a Junior Lien at any public, private or judicial foreclosure upon such Collateral initiated by the Senior Collateral Agents or any other Senior Claimholder, or any sale of any such Collateral during an Insolvency or Liquidation Proceeding; provided that any such bid may not include a "credit bid" in respect of any Junior Obligations unless the cash proceeds of such bid are otherwise sufficient to cause the Discharge of Senior Obligations.

(d)     Subject to Sections 3.1(a)(1), 3.1(c) and 6.3(b) each Junior Collateral Agent, for itself and on behalf of its Related Claimholders:

(1)     agrees that it and its Related Claimholders will not take any action that would hinder, delay, limit or prohibit any exercise of rights or remedies under the Senior Financing Documents or is otherwise prohibited hereunder with respect to any Collateral in which a Junior Claimholder has a Junior Lien, including any collection or Disposition of any such Collateral, whether by foreclosure or otherwise, or that would limit, invalidate, avoid or set aside any Lien securing any Senior Obligations or any Senior Collateral Document or subordinate the priority of

-32-

the Senior Obligations to the Junior Obligations with respect to such Collateral or grant the Liens on such Collateral securing the Junior Obligations equal ranking to the Liens securing the Senior Obligations;

(2)     hereby waives any and all rights it or its Related Claimholders may have as a junior Lien creditor or otherwise (whether arising under the UCC or under any other law) to object to the manner in which the Senior Collateral Agents or the other Senior Claimholders seek to enforce or collect the Senior Obligations or the Liens securing the Senior Obligations with respect to the Collateral in which a Junior Claimholder has a Junior Lien, regardless of whether any action or failure to act by or on behalf of any Senior Collateral Agent or any other Senior Claimholders is adverse to the interest of any Junior Claimholders with respect to such Collateral; and

(3)     hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Junior Collateral Documents or any other Junior Financing Document shall be deemed to restrict in any way the rights and remedies of any Senior Collateral Agent or the other Senior Claimholders with respect to the Collateral in which a Junior Claimholder has a Junior Lien as set forth in this Agreement and the Senior Financing Documents.

(e)     The Junior Collateral Agents and the other Junior Claimholders may exercise rights and remedies as unsecured creditors against the Obligors that have guaranteed or granted Liens to secure the Junior Obligations in accordance with the terms of the Junior Financing Documents and applicable law (other than initiating or joining in an involuntary case or proceeding under any Debtor Relief Law with respect to any Obligor, prior to the termination of the Standstill Period; provided that (i) any such exercise shall not be inconsistent with the terms of this Agreement (including Sections 2.2 and 6) and (ii) in the event that any Junior Claimholder becomes a judgment Lien creditor in respect of any Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Junior Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the Senior Obligations) as the other Liens securing the Junior Obligations are subject to this Agreement.  Nothing in this Agreement shall prohibit the receipt by any Junior Collateral Agent or Junior Claimholder of the required payments of principal, premium, interest, fees and other amounts due under the Junior Financing Documents so long as such receipt is not the direct or indirect result of the exercise by a Junior Collateral Agent or other Junior Claimholder of rights or remedies as a secured creditor in respect of Collateral in which a Junior Claimholder has a Junior Lien.

3.2     Agreement among Term Loan Claimholders.  Each Term Loan Collateral Agent, on behalf of itself and its Related Term Loan Claimholders, solely as among themselves in such capacity and solely for their mutual benefit, hereby agrees that the Term Loan Collateral Agent designated as the Directing Term Loan Collateral Agent shall have the sole right and power, as among the Term Loan Collateral Agents and the other Term Loan Claimholders, to take and direct any right or remedy with respect to Term Loan Priority Collateral in accordance with the terms of this Agreement, the relevant Term Loan Collateral Documents and any other intercreditor agreement among the Directing Term Loan Collateral Agent and each other Term Loan Collateral Agent.  The Directing Term Loan Collateral Agent shall be entitled to the benefit of all the exculpatory, indemnity and reimbursement provisions set forth in any Term Loan Document for the benefit of any "collateral agent" (or any other agent or similar representative) with respect to any exercise by the Directing Term Loan Collateral Agent of any of the rights or remedies under this Agreement, including any such exercise of any right or remedy with respect to any Term Loan Priority Collateral, or any other action or inaction by it in its capacity as the Directing Term Loan Collateral Agent.

3.3    Actions Upon Breach; Specific Performance.  If any Junior Claimholder, in contravention of the terms of this Agreement, in any way takes, attempts to or threatens to take any action with respect to the Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement), or fails to take any action required by this Agreement, this Agreement shall create an irrebutable presumption and admission by such Junior Claimholder that relief against such Junior Claimholder by injunction, specific performance and/or other appropriate equitable relief is necessary to prevent irreparable harm to the Senior Claimholders, it being understood and agreed by each Junior Collateral Agent, on behalf of its Related Junior Claimholders, that (i) the Senior Claimholders' damages from actions of any Junior Claimholder may at that time be difficult to ascertain and may be irreparable and (ii) each Junior Claimholder waives any defense that the Obligors and/or the Senior Claimholders cannot demonstrate damage and/or be made whole by the awarding of damages. Each of the Senior Collateral Agents may demand specific performance of this Agreement. Each Junior Collateral Agent, on behalf of itself and its Related Junior Claimholders, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by any Senior Collateral Agent or any other Senior Claimholder.  No provision of this Agreement shall constitute or be deemed to constitute a waiver by any Senior Collateral Agent on behalf of itself and its Related Senior Claimholders of any right to seek damages from any Person in connection with any breach or alleged breach of this Agreement.

**SECTION 4.    Payments**.

4.1    Application of Proceeds.  So long as the Discharge of Senior Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Obligor, any Collateral in which a Senior Claimholder has a Senior Lien or any Proceeds (whether in cash or otherwise) thereof received in connection with any Enforcement Action or other exercise of rights or remedies by any Senior Collateral Agent or the other Senior Claimholders with respect to such Collateral (including any Disposition referred to in Section 5.1) or any Insolvency or Liquidation Proceeding, shall be applied by the Directing Senior Collateral Agent to the Senior Obligations in accordance with the terms of the Senior Financing Documents, including any other intercreditor agreement among the Senior Collateral Agents.  Upon the Discharge of Senior Obligations, the Directing Senior Collateral Agent shall deliver to the Directing Junior Collateral Agent any remaining Collateral in which a Senior Claimholder has a Senior Lien and Proceeds thereof then held by it in the same form as received, with any necessary endorsements (such endorsements shall be without recourse and without representation or warranty) to the Directing Junior Collateral Agent, or as a court of competent jurisdiction may otherwise direct, to be applied by the Junior Collateral Agents to the Junior Obligations in accordance with the terms of the Junior Financing Documents, including any intercreditor agreement among the Junior Collateral Agents.

4.2    Payments Over.

(a)    So long as the Discharge of Senior Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Obligor, any Collateral in which a Senior Claimholder has a Senior Lien or Proceeds thereof (including any assets or proceeds subject to Liens that have been avoided or otherwise invalidated (including as a result of failure to perfect or lack of perfection)), any assets or proceeds subject to Liens referred to in Section 2.3, any amounts referred to in the last sentence of Section 6.3(b) or any other distribution (whether or not expressly characterized as such) in respect of such Collateral (including in connection with any Disposition of any such Collateral) received by any Junior Collateral Agent or any other Junior Claimholders in connection with any Enforcement Action or any Insolvency or Liquidation Proceeding or other exercise of any right or remedy (including set-off or recoupment) relating to such Collateral in contravention of this Agreement or not in accordance with Section 4.1, or received by any Junior Collateral Agent or any other Junior

-34-

Claimholders in connection with any insurance policy claim or any condemnation award (or deed in lieu of condemnation) in respect of such Collateral, in each case, shall be held in trust and forthwith paid over to the Directing Senior Collateral Agent for the benefit of the Senior Claimholders in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.

(b)     Except as otherwise set forth in Section 6.3 (or with respect to any Reorganization Securities which shall be subject to Section 6.6 and not this Section 4.2), so long as the Discharge of Senior Obligations has not occurred, if in any Insolvency or Liquidation Proceeding any Junior Collateral Agent or any other Junior Claimholders shall receive any distribution of money or other property in respect of or on account of the Collateral in which a Junior Claimholder has a Junior Lien (including any assets or proceeds subject to Liens that have been avoided or otherwise invalidated or any amounts referred to in the last sentence of Section 6. 3(b)), such money, other property or amounts shall be held in trust and forthwith paid over to the Directing Senior Collateral Agent for the benefit of the Senior Claimholders in the same form as received, with any necessary endorsements. Any Lien on Collateral in which a Junior Claimholder has a Junior Lien received by any Junior Collateral Agent or any other Junior Claimholders in respect of any of the Junior Obligations in any Insolvency or Liquidation Proceeding shall be subject to the terms of this Agreement.

(c)     Until the Discharge of Senior Obligations occurs, each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, hereby irrevocably constitutes and appoints the Directing Senior Collateral Agent and any officer or agent of the Directing Senior Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Junior Collateral Agent or any such Junior Claimholder or in the Directing Senior Collateral Agent's own name, from time to time in the Directing Senior Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 4.2, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 4.2, including any endorsements or other instruments of transfer or release. This power is coupled with an interest and is irrevocable until the Discharge of Senior Obligations.

4.3     Mixed Collateral Proceeds. Notwithstanding anything to the contrary contained above or in the definition of the ABL Priority Collateral or Term Loan Priority Collateral, in the event that Proceeds of Collateral are received from (or are otherwise attributable to the value of) a sale or other disposition of Collateral that involves a combination of ABL Priority Collateral and Term Loan Priority Collateral, the portion of such Proceeds that shall be allocated as Proceeds of ABL Priority Collateral for purposes of this Agreement shall be an amount equal to the net book value of such ABL Priority Collateral (except in the case of Accounts (as described in clause (i) of the definition of ABL Priority Collateral, and excluding any Accounts to the extent excluded pursuant to said clause (i)) which amount shall be equal to the face amount of such Accounts). In addition, notwithstanding anything to the contrary contained above or in the definition of the ABL Priority Collateral or Term Loan Priority Collateral, to the extent Proceeds of Collateral are Proceeds received from (or are otherwise attributable to the value of) the sale or disposition of all or substantially all of the capital stock of any of the Subsidiaries of Holdings which is an Obligor, or all or substantially all of the assets of any such Subsidiary, and in each case in connection with such sale the ABL Credit Agreement Collateral Agent releases its Liens on the ABL Priority Collateral of such Subsidiary, then such Proceeds shall constitute (1) first, in an amount equal to the face amount of the Accounts (as described in clause (i) of the definition of ABL Priority Collateral, and excluding any Accounts to the extent excluded pursuant to said clause (i)) and the net book value of the Inventory owned by such Subsidiary at the time of such sale, ABL Priority Collateral and (2) second, to the extent in excess of the amounts described in preceding clause (1), Term Loan Priority Collateral.

US-DOCS\72672018.6