# DEFENDANTS' EXHIBIT 304
# Part 5 of 5

**SECTION 5.** **Other Agreements**.

5.1 Releases.

(a) In connection with any Enforcement Action by the Directing Senior Collateral Agent or any other exercise by the Directing Senior Collateral Agent of rights or remedies in respect of the Collateral in which a Senior Claimholder has a Senior Lien (including any Disposition of any of such Collateral by any Obligor, with the consent of the Directing Senior Collateral Agent, after the occurrence and during the continuance of an "event of default" under the Senior Financing Documents), in each case, prior to the Discharge of Senior Obligations, the Directing Senior Collateral Agent is irrevocably authorized (at the cost of the Obligors in accordance with the terms of the applicable Senior Financing Document and without any consent, sanction, authority or further confirmation from the Directing Junior Collateral Agent, any other Junior Claimholder or any Obligor): (i) to release any of its Liens on any part of such Collateral or any other claim over such Collateral that is the subject of such Enforcement Action, in which case the Junior Liens or any other claim over the asset that is the subject of such Enforcement Action, if any, of any Junior Collateral Agent, for itself or for the benefit of the other Junior Claimholders, shall be automatically, unconditionally and simultaneously released to the same extent as the Liens or other claims of the Directing Senior Collateral Agent and each other Senior Collateral Agent are so released (and the Directing Senior Collateral Agent is irrevocably authorized to execute and deliver or enter into any release of such Liens or claims that may, in the discretion of the Directing Senior Collateral Agent, be considered necessary or reasonably desirable in connection with such releases); and (ii) if the Collateral that is the subject of such Enforcement Action consists of the equity interests of any Obligor, to release (x) such Obligor and any subsidiary of such Obligor from all or any part of its Senior Obligations, in which case such Obligor and any subsidiary of such Obligor shall be automatically, unconditionally and simultaneously released to the same extent from its Junior Obligations (it being understood that any Proceeds of such Enforcement Action with respect to such equity interests shall be dealt with in a manner consistent with Section 4.3), and (y) any Liens or other claims on any assets of such Obligor and any subsidiary of such Obligor, in which case the Junior Liens or other claims on such assets of each Junior Collateral Agent, for itself or for the benefit of its Related Claimholders, shall be automatically, unconditionally and simultaneously released to the same extent as such Senior Liens of the Directing Senior Collateral Agent and each other Senior Collateral Agent are so released (and the Directing Senior Collateral Agent is irrevocably authorized to execute and deliver or enter into any release of such Liens or claims that may, in the discretion of the Directing Senior Collateral Agent, be considered necessary or reasonably desirable in connection with such releases). Each Junior Collateral Agent, for itself or on behalf of its Related Claimholders, promptly shall execute and deliver to the Directing Senior Collateral Agent or such Obligor such termination statements, releases and other documents as the Directing Senior Collateral Agent or such Obligor may request to effectively confirm the foregoing releases upon delivery to the Junior Collateral Agents of copies of such termination statements, releases and other documents used to effect such releases with respect to the Collateral in which a Senior Claimholder has a Senior Lien securing the Senior Obligations from a Responsible Officer of the requesting party. In the case of any Disposition of any of the Collateral in which a Senior Claimholder has a Senior Lien that is subject to this Section 5.1(a) by the Directing Senior Collateral Agent or by any Obligor with the consent of the Directing Senior Collateral Agent (the party so Disposing of such Collateral being called the "**Disposing Party**"), the Disposing Party shall take reasonable care (as determined in the reasonable credit judgment of the Directing Senior Collateral Agent or the reasonable business judgment of such Obligor, as the case may be) to obtain a fair market price under the prevailing market conditions and with regard to all other relevant circumstances, including the distressed nature of such Disposition, and if the Disposing Party is an Obligor, to conduct such Disposition in a commercially reasonable manner (it being understood that in any case the Disposing Party shall have no obligation to postpone any such Disposition in order to achieve a higher price, and that any Disposition approved by any bankruptcy court in any Insolvency or Liquidation Proceeding shall be conclusively presumed to be

-36-

made at a fair market price and to have been conducted in a commercially reasonable manner). The proceeds of any such Disposition shall be applied in accordance with Section 4.1.

(b)     If in connection with any sale, lease, exchange, transfer or other disposition (collectively, a "**Disposition**") of any Collateral by any Obligor permitted under the terms of both the Senior Financing Documents and the Junior Financing Documents (other than in connection with an Enforcement Action or other exercise of any Collateral Agent's rights or remedies in respect of the Collateral, which shall be governed by Section 5.1(a) above), the Directing Senior Collateral Agent or any other Senior Collateral Agent, for itself or on behalf of any of the other Senior Claimholders, releases any of its Liens on any part of the Collateral in which a Senior Claimholder has a Senior Lien, or releases any Obligor from its obligations under its guaranty of the Senior Obligations, in each case other than in connection with, or following, the Discharge of Senior Obligations, then the Liens, if any, of each Junior Collateral Agent, for itself or for the benefit of its Related Claimholders, on such Collateral, and the obligations of such Obligor under its guaranty of the Junior Obligations, shall be automatically, unconditionally and simultaneously released; provided that such release by such Junior Collateral Agent, for itself or for the benefit of its Related Claimholders, shall not extend to or otherwise affect any of the rights of the Junior Claimholders to the proceeds from any such Disposition. Each Junior Collateral Agent, for itself or on behalf of its Related Claimholders, promptly shall execute and deliver to the Directing Senior Collateral Agent or such Obligor such termination statements, releases and other documents as the Directing Senior Collateral Agent or such Obligor may request to effectively confirm the foregoing releases upon delivery to the Junior Collateral Agents of copies of such termination statements, releases and other documents used to effect such release with respect to the Collateral in which a Senior Claimholder has a Senior Lien securing the Senior Obligations from a Responsible Officer of the Top Borrower or the Directing Senior Collateral Agent and an officer's certificate of a Responsible Officer of the requesting party stating that such disposition has been consummated in compliance with the terms of the Junior Financing Documents.

(c)     Until the Discharge of Senior Obligations occurs, each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, hereby irrevocably constitutes and appoints the Directing Senior Collateral Agent and any officer or agent of the Directing Senior Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Junior Collateral Agent or such Junior Claimholders or in the Directing Senior Collateral Agent's own name, from time to time in the Directing Senior Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release. This power is coupled with an interest and is irrevocable until the Discharge of Senior Obligations.

(d)     Until the Discharge of Senior Obligations occurs, to the extent that any Senior Collateral Agent or the other Senior Claimholders (i) have released any Lien on Collateral in which a Senior Claimholder has a Senior Lien or any Obligor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (ii) obtain any additional guarantees from any Obligor or any Domestic Subsidiary of Holdings, then each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, shall be granted an additional guaranty.

5.2     Insurance and Condemnation Awards.  Until the Discharge of Senior Obligations has occurred, the Directing Senior Collateral Agent shall have the sole and exclusive right, subject to the rights of the Obligors under the Senior Financing Documents, to settle or adjust claims over any insurance policy covering the Collateral in which a Senior Claimholder has a Senior Lien in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting such Collateral.  Until the Discharge of Senior Obligations has occurred,

and subject to the rights of the Obligors under the Senior Financing Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) in respect of the Collateral in which a Senior Claimholder has a Senior Lien shall be paid to the Directing Senior Collateral Agent for the benefit of the Senior Claimholders pursuant to the terms of the Senior Financing Documents, including any other intercreditor agreement among the Senior Collateral Agents (including, without limitation, for purposes of cash collateralization of commitments, Letters of Credit constituting Senior Obligations and obligations under Hedge Agreements governing any First Lien Secured Hedging Obligations constituting Senior Obligations) and thereafter, if the Discharge of Senior Obligations has occurred, and subject to the rights of the Obligors under the Junior Financing Documents, to the Directing Junior Collateral Agent for the benefit of the Junior Claimholders to the extent required under the Junior Collateral Documents, and thereafter, if the Discharge of the Junior Obligations has occurred, to the owner of the subject property, as directed by the Top Borrower or as a court of competent jurisdiction may otherwise direct.  Until the Discharge of Senior Obligations has occurred, if any Junior Collateral Agent or any other Junior Claimholders shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in respect of Collateral in which a Senior Claimholder has a Senior Lien in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such proceeds over to the Directing Senior Collateral Agent in accordance with the terms of <u>Section 4.2</u>. To the extent that an insured loss covers or constitutes both ABL Priority Collateral and Term Loan Priority Collateral, then the ABL Credit Agreement Collateral Agent and the Directing Term Loan Collateral Agent will work jointly and in good faith to collect, adjust or settle (subject to the rights of the relevant Obligors under the ABL Documents and the Term Loan Financing Documents) under the relevant insurance policy, with the proceeds thereof being applied in accordance with the provisions of <u>Section 4.1</u> of this Agreement.

5.3     <u>Amendments to Financing Documents</u>.

(a)     Subject to, in the case of the Term Loan Documents, the First Lien/Second Lien Intercreditor Agreement and any other intercreditor agreement among the Term Loan Claimholders, Financing Documents may be amended, restated, amended and restated, supplemented or otherwise modified in accordance with their terms, and the Financing Documents and any Obligations thereunder may be Refinanced, in each case, without notice to, or the consent of any Collateral Agent or any other Claimholder, all without affecting the Lien subordination or other provisions of this Agreement; <u>provided</u> that the holders of such Refinancing debt bind themselves in a writing addressed to the Collateral Agents and the other Claimholders to the terms of this Agreement or another intercreditor agreement that is reasonably satisfactory to the Collateral Agents, and any such amendment, restatement, amendment and restatement, supplement, modification or Refinancing shall not, contravene the provisions of this Agreement or any other Financing Document.

(b)     In the event that any Senior Collateral Agent enters into any amendment, restatement, amendment and restatement, supplement or other modification in respect of or replaces any of the Senior Collateral Documents for purposes of adding to, or deleting from, or waiving or consenting to any departures from any provisions of any Senior Collateral Document or changing in any manner the rights of the applicable Senior Collateral Agent, the Senior Claimholders, or any Obligor thereunder, in each case in respect of the Collateral in which a Senior Claimholder has a Senior Lien (including the release of any Liens on such Collateral securing the Senior Obligations), then such amendment, restatement, amendment and restatement, supplement or other modification in a manner that is applicable to all Senior Claimholders and all Senior Obligations shall apply automatically to any comparable provisions of each Comparable Junior Collateral Document without the consent of any Junior Collateral Agent, Junior Claimholder or any Obligor; <u>provided</u>, <u>however</u> that (1) such amendment, restatement, amendment and restatement, supplement or other modification does not (A) remove assets subject to any Liens on the Collateral securing any of the Junior Obligations or release any such Liens, except to the

-38-

US-DOCS\72672018.6

extent such release is permitted or required by Section 5.1 and provided there is a concurrent release of the corresponding Liens securing the Senior Obligations, (B) affect the rights or duties of any Junior Collateral Agent without its consent or (C) otherwise materially adversely affect the rights of the applicable Junior Claimholders or the interest of the applicable Junior Claimholders in such Collateral and not the Senior Collateral Agent or the Senior Claimholders that have a Senior Lien on the affected Collateral in a like manner, and (2) written notice of such amendment, restatement, amendment and restatement, supplement or other modification shall have been given to each Junior Collateral Agent within ten (10) Business Days of the effectiveness thereof (it being understood that the failure to deliver such notice shall not impair the effectiveness of any such amendment, restatement, amendment and restatement, supplement or other modification).

   5.4  Confirmation of Subordination in Collateral Documents. (a) Each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, agrees that each Term Loan Collateral Document shall include the following language (or language to similar effect approved by the ABL Credit Agreement Collateral Agent):

   "Notwithstanding anything herein to the contrary, the lien and security interest granted to the Collateral Agent in the Collateral pursuant to this Agreement and the exercise of any right or remedy by the Collateral Agent hereunder are subject to the provisions of the ABL Intercreditor Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "ABL Intercreditor Agreement"), among UBS AG, Stamford Branch, as ABL Credit Agreement Collateral Agent, UBS AG, Stamford Branch, as First Lien Credit Agreement Collateral Agent and Goldman Sachs Bank USA, as Second Lien Credit Agreement Collateral Agent, and certain other Persons party or that may become party thereto from time to time and acknowledged and agreed to by Dawn Intermediate Inc., a Delaware corporation, Serta Simmons Bedding, LLC, a Delaware limited liability company, the other borrowers party thereto and the other obligors party thereto. In the event of any conflict between the terms of the ABL Intercreditor Agreement and this Agreement, the terms of the ABL Intercreditor Agreement shall govern and control."

   (b)  The ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, agrees that each ABL Collateral Document shall include the following language (or language to similar effect approved by the Directing Term Loan Collateral Agent):

   "Notwithstanding anything herein to the contrary, the lien and security interest granted to the Collateral Agent in the Collateral  pursuant to this Agreement and the exercise of any right or remedy by the Collateral Agent hereunder are subject to the provisions of the ABL Intercreditor Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "ABL Intercreditor Agreement"), among UBS AG, Stamford Branch, as ABL Credit Agreement Credit Collateral Agent, UBS AG, Stamford Branch, as First Lien Credit Agreement Collateral Agent and Goldman Sachs Bank USA as Second Lien Credit Agreement Collateral Agent, and certain other Persons party or that may become party thereto from time to time and acknowledged and agreed to by Dawn Intermediate Inc., a Delaware corporation, Serta Simmons Bedding, LLC, a Delaware limited liability company, the other borrowers party thereto and the other obligors party thereto.  In the event of any conflict between the terms of the ABL Intercreditor Agreement and this Agreement, the terms of the ABL Intercreditor Agreement shall govern and control."

5.5     Gratuitous Bailee/Agent for Perfection; Shared Collateral Documents.

(a)     Each Collateral Agent agrees to hold that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC or other applicable law (such Collateral being the "**Pledged Collateral**") as gratuitous bailee on behalf of and for the benefit of each other Collateral Agent (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the UCC) solely for the purpose of perfecting, or improving the priority of, the security interest granted under the Collateral Documents, subject to the terms and conditions of this Section 5.5; provided that, in the case of any such possession or control of Collateral by any Junior Collateral Agent, the foregoing shall not be deemed to be a waiver of any restriction set forth herein on such possession or control or of any breach by such Junior Collateral Agent of any terms of this Agreement in respect of such possession or control.

(b)     Until the Discharge of Senior Obligations has occurred, each Senior Collateral Agent shall be entitled to deal with the Pledged Collateral that constitutes Collateral in which it has a Senior Lien in accordance with the terms of the Senior Financing Documents as if the Liens of any Junior Collateral Agent under the Junior Collateral Documents did not exist.  The rights of each Junior Collateral Agent in Collateral in which it has a Junior Lien shall at all times be subject to the terms of this Agreement and to each Senior Collateral Agent's rights under the Senior Financing Documents.

(c)     No Collateral Agent shall have any obligation whatsoever to any Claimholder to ensure that the Pledged Collateral is genuine or owned by any of the Obligors or to preserve rights or benefits of any Person with respect thereto except as expressly set forth in this Section 5.5 or, in the case of any Junior Collateral Agent, the other provisions hereof (including the turnover provisions set forth in Section 4.2). The duties or responsibilities of each Collateral Agent under this Section 5.5 shall be limited solely to holding the Pledged Collateral as bailee in accordance with this Section 5.5 and, in the case of any Senior Collateral Agent, delivering the Pledged Collateral to the Directing Junior Collateral Agent upon a Discharge of Senior Obligations as provided in paragraph (e) below or, in the case of any Junior Collateral Agent, delivering the Pledged Collateral to the Directing Senior Collateral Agent in accordance with the provisions hereof (including the turnover provisions set forth in Section 4.2).

(d)     Each Collateral Agent, for itself and on behalf of its Related Claimholders, hereby waives and releases each other Collateral Agent and each other Claimholder from all claims and liabilities arising pursuant to any Collateral Agent's role under this Section 5.5 as gratuitous bailee and gratuitous agent with respect to the Pledged Collateral; provided that, in the case of any possession or control of any Pledged Collateral in which a Senior Claimholder has a Senior Lien by any Junior Collateral Agent, the foregoing shall not be deemed to be a waiver of any restriction set forth herein on such possession or control or of any breach by such Junior Collateral Agent of any terms of this Agreement in respect of such possession or control.  None of the Term Loan Collateral Agents or any other Term Loan Claimholders shall have by reason of the Term Loan Collateral Documents, the ABL Collateral Documents, the Shared Collateral Documents, this Agreement or any other document, a fiduciary relationship in respect of the ABL Credit Agreement Collateral Agent or any other ABL Claimholder, and it is understood and agreed that the interests of the Term Loan Collateral Agents and the other Term Loan Claimholders, on the one hand, and the ABL Credit Agreement Collateral Agent and the other ABL Claimholders, on the other hand, may differ and that the Term Loan Collateral Agents and the other Term Loan Claimholders shall be fully entitled to act in their own interest without taking into account the interests of the ABL Credit Agreement Collateral Agent or the other ABL Claimholders. Neither the ABL Credit Agreement Collateral Agent nor any other ABL Claimholders shall have by reason of the ABL Collateral Documents, the Term Loan Collateral Documents, the Shared Collateral Documents, this Agreement or any other document, a fiduciary relationship in respect of any Term Loan

-40-

Collateral Agent or any other Term Loan Claimholder, and it is understood and agreed that the interests of the ABL Credit Agreement Collateral Agent and the other ABL Claimholders, on the one hand, and the Term Loan Collateral Agents and the other Term Loan Claimholders, on the other hand, may differ and that the ABL Credit Agreement Collateral Agent and the other ABL Claimholders shall be fully entitled to act in their own interest without taking into account the interests of the Term Loan Collateral Agents or the other Term Loan Claimholders.

(e)     Upon the Discharge of Senior Obligations, each Senior Collateral Agent shall deliver the remaining Pledged Collateral in its possession or control (if any) (or proceeds thereof) together with any necessary endorsements (such endorsement shall be without recourse and without any representation or warranty), <u>first</u>, to the Directing Junior Collateral Agent, to the extent the Discharge of Junior Obligations has not occurred and <u>second</u>, upon the Discharge of Junior Obligations, to the Obligors to the extent no Obligations remain outstanding (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral) or as a court of competent jurisdiction may otherwise direct.  Following the Discharge of Senior Obligations, each Senior Collateral Agent further agrees to take, at the expense of the Obligors (which expense reimbursement shall be subject to the provisions of the applicable Senior Financing Document), all other actions reasonably requested by the Directing Junior Collateral Agent in connection with the Directing Junior Collateral Agent obtaining a first-priority interest in the Pledged Collateral that is in such Senior Collateral Agent's possession or control.

5.6     <u>When Discharge of Obligations Deemed to Not Have Occurred</u>.  If, substantially concurrently with or after the Discharge of the Obligations of any Series having occurred, any Borrower or any other Obligor enters into any Refinancing of any Financing Document evidencing a Obligation of such Series, which Refinancing is permitted hereby and by the terms of the other Financing Documents, then such Discharge shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any action taken as a result of the occurrence of such Discharge prior to the Refinancing of such Obligations), and the obligations under such Refinancing of such Financing Document shall automatically be treated as Obligations of the Refinanced Series for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the New Senior Agent shall be a Collateral Agent of such Refinanced Series (and, if applicable in accordance with the definition of such term, the Directing Senior Collateral Agent or Directing Junior Collateral Agent) for all purposes of this Agreement.  Upon receipt of a notice from any Borrower or any other Obligor stating that a Borrower or such other Obligor has entered into a Refinancing of any Financing Document (which notice shall include the identity of the new senior collateral agent (such agent, the "**New Senior Agent**")), each Collateral Agent shall promptly (a) enter into such documents and agreements (including amendments or supplements to, or amendment and restatement of, this Agreement) as such Borrower, such other Obligor or the New Senior Agent shall reasonably request in order to provide to the New Senior Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement, and (b) in the case of each Junior Collateral Agent only, deliver to the New Senior Agent (if it is the Directing Senior Collateral Agent) any Pledged Collateral in which the New Senior Agent is to have a Senior Lien held by it together with any necessary endorsements (or otherwise allow the New Senior Agent to obtain control of such Pledged Collateral).  The New Senior Agent shall agree in a writing addressed to the other Collateral Agents and the other Claimholder to be bound by the terms of this Agreement, for itself and on behalf of its Related Senior Claimholders.

5.7     [Reserved].

5.8     <u>Consent to License to Use Intellectual Property</u>.  Each Term Loan Collateral Agent, on behalf of its Respective Claimholders (a) consents (without any representation, warranty or obligation whatsoever) to the grant by any Obligor to the ABL Credit Agreement Collateral Agent of a

-41-

non-exclusive royalty-free license to use, subject to any limitations and restrictions in any relevant ABL Collateral Document, for a period not to exceed 180 days (commencing with the initiation of any enforcement of Liens by any of the Term Loan Collateral Agents (provided, in each case, that the ABL Credit Agreement Collateral Agent has received notice thereof) or the ABL Credit Agreement Collateral Agent) any Patent, Trademark or proprietary information of such Obligor that is subject to a Lien held by any Term Loan Collateral Agent (or any Patent, Trademark or proprietary information acquired by such purchaser, assignee or transferee from any Obligor, as the case may be) and (b) to the extent, if any, it has sufficient rights therein to do so, grants, in its capacity as a secured party (or as a purchaser, assignee or transferee, as the case may be), to the ABL Credit Agreement Collateral Agent a non-exclusive royalty-free license to use for a period not to exceed 180 days (commencing with (x) the initiation of any enforcement of Liens by any Collateral Agent or (y) the purchase, assignment or transfer, as the case may be (provided, in each case, that the ABL Credit Agreement Collateral Agent has received notice thereof)) any Patent, Trademark or proprietary information that is subject to a Lien held by any Term Loan Collateral Agent (or subject to such purchase, assignment or transfer, as the case may be), in each case in connection with the enforcement of any Lien held by the ABL Credit Agreement Collateral Agent upon any Inventory or other ABL Priority Collateral of any Obligor and to the extent the use of such Patent, Trademark or proprietary information is necessary or appropriate, in the good faith opinion of the ABL Credit Agreement Collateral Agent, to process, ship, produce, store, complete, supply, lease, sell or otherwise dispose of any such Inventory in any lawful manner. The 180 day license periods shall be tolled during the pendency of any Insolvency or Liquidation Proceeding of any Obligor pursuant to which the ABL Credit Agreement Collateral Agent is effectively stayed from enforcing its rights and remedies with respect to the ABL Priority Collateral.

5.9     Access to Information.  If any Term Loan Collateral Agent takes actual possession of any documentation of an Obligor (whether such documentation is in the form of a writing or is stored in any data equipment or data record in the physical possession of any Term Loan Collateral Agent), then upon the reasonable request of the ABL Credit Agreement Collateral Agent and reasonable advance notice, the Term Loan Collateral Agents will permit the ABL Credit Agreement Collateral Agent or its representative to inspect and copy such documentation.

5.10     Access to Property to Process and Sell Inventory.  (a)  (i) If the ABL Credit Agreement Collateral Agent commences any action or proceeding with respect to any of its rights or remedies (including any action of foreclosure but excluding any exercise of rights solely in connection with the occurrence and continuation of a Cash Dominion Period, as such term is defined in the ABL Credit Agreement (as in effect on the date hereof)), enforcement, collection or execution with respect to the ABL Priority Collateral ("ABL Priority Collateral Enforcement Actions") or if any Term Loan Collateral Agent commences any action or proceeding with respect to any of its rights or remedies (including any action of foreclosure), enforcement, collection or execution with respect to the Term Loan Priority Collateral, and such Term Loan Collateral Agent (or a purchaser at a foreclosure sale conducted in foreclosure of any Liens of any Term Loan Collateral Agent) takes actual or constructive possession of Term Loan Priority Collateral of any Obligor ("Term Loan Priority Collateral Enforcement Actions"), then the applicable Term Loan Claimholders shall (subject to, in the case of any Term Loan Priority Collateral Enforcement Action, a prior written request by the ABL Credit Agreement Collateral Agent to the applicable Term Loan Collateral Agent (the "Term Loan Priority Collateral Enforcement Action Notice")) (x) cooperate with the ABL Credit Agreement Collateral Agent (and with its officers, employees, representatives and agents) in its efforts to conduct ABL Priority Collateral Enforcement Actions in the ABL Priority Collateral and to finish any work-in-process and process, ship, produce, store, complete, supply, lease, sell or otherwise handle, deal with, assemble or dispose of, in any lawful manner, the ABL Priority Collateral, (y) not hinder or restrict in any respect the ABL Credit Agreement Collateral Agent from conducting ABL Priority Collateral Enforcement Actions in the ABL Priority Collateral or from finishing any work-in-process or processing, shipping, producing, storing, completing,

-42-

supplying, leasing, selling or otherwise handling, dealing with, assembling or disposing of, in any lawful manner, the ABL Priority Collateral, and (z) permit the ABL Credit Agreement Collateral Agent, its employees, agents, advisers and representatives, at the cost and expense of the ABL Claimholders, to enter upon and use the Term Loan Priority Collateral (including equipment, processors, computers and other machinery related to the storage or processing of records, documents or files and intellectual property), for a period commencing on (I) the date of the initial ABL Priority Collateral Enforcement Action or the date of delivery of the Term Loan Priority Collateral Enforcement Action Notice, as the case may be, and (II) ending on the earlier of the date occurring 180 days thereafter and the date on which all ABL Priority Collateral (other than ABL Priority Collateral abandoned by the ABL Credit Agreement Collateral Agent in writing) has been removed from the Term Loan Priority Collateral (such period, the "ABL Priority Collateral Processing and Sale Period"), for purposes of:

> (A)     assembling and storing the ABL Priority Collateral and completing the processing of and turning into finished goods any ABL Priority Collateral consisting of work-in-process;

> (B)     selling any or all of the ABL Priority Collateral located in or on such Term Loan Priority Collateral, whether in bulk, in lots or to customers in the ordinary course of business or otherwise;

> (C)     removing and transporting any or all of the ABL Priority Collateral located in or on such Term Loan Priority Collateral;

> (D)     otherwise processing, shipping, producing, storing, completing, supplying, leasing, selling or otherwise handling, dealing with, assembling or disposing of, in any lawful manner, the ABL Priority Collateral; and/or

> (E)     taking reasonable actions to protect, secure, and otherwise enforce the rights or remedies of the ABL Claimholders and/or the ABL Credit Agreement Collateral Agent (including with respect to any ABL Priority Collateral Enforcement Actions) in and to the ABL Priority Collateral;

provided, however, that nothing contained in this Agreement shall restrict the rights of any Term Loan Collateral Agent from selling, assigning or otherwise transferring any Term Loan Priority Collateral prior to the expiration of such ABL Priority Collateral Processing and Sale Period if the purchaser, assignee or transferee thereof agrees in writing (for the benefit of the ABL Credit Agreement Collateral Agent and the ABL Claimholders) to be bound by the provisions of this Section 5.10.  If any stay or other order prohibiting the exercise of remedies with respect to the ABL Priority Collateral has been entered by a court of competent jurisdiction, such ABL Priority Collateral Processing and Sale Period shall be tolled during the pendency of any such stay or other order.

> (ii)     During the period of actual occupation, use and/or control by the ABL Claimholders and/or the ABL Credit Agreement Collateral Agent (or their respective employees, agents, advisers and representatives) of any Term Loan Priority Collateral, the ABL Claimholders and the ABL Credit Agreement Collateral Agent shall be obligated to repair at their expense any physical damage to such Term Loan Priority Collateral resulting from such occupancy, use or control, and to leave such Term Loan Priority Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted. Notwithstanding the foregoing, in no event shall the ABL Claimholders or the ABL Credit Agreement Collateral Agent have any liability to the Term Loan Claimholders pursuant to this Section 5.10(a) as a result of any condition (including any environmental condition, claim or

-43-

liability) on or with respect to the Term Loan Priority Collateral existing prior to the date of the exercise by the ABL Claimholders of their rights under this Section 5.10(a) and the ABL Claimholders shall have no duty or liability to maintain the Term Loan Priority Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the ABL Claimholders, or for any diminution in the value of the Term Loan Priority Collateral that results from ordinary wear and tear resulting from the use of the Term Loan Priority Collateral by the ABL Claimholders in the manner and for the time periods specified under this Section 5.10(a). Without limiting the rights granted in this Section 5.10(a), the ABL Claimholders shall cooperate with the Term Loan Claimholders in connection with any efforts made by the Term Loan Claimholders to sell the Term Loan Priority Collateral.

(b)     The ABL Claimholders shall (i) use the Term Loan Priority Collateral in accordance with applicable law; (ii) obtain insurance for damage to property and liability to persons, including property and liability insurance, substantially similar to the insurance maintained by the Obligors, naming each of the Term Loan Collateral Agents as mortgagee, loss payee and additional insured, at no cost to the Term Loan Claimholders, but only to the extent such insurance is not otherwise in effect; and (iii) indemnify the Term Loan Claimholders from any claim, loss, damage, cost or liability arising out of any claim asserted by any third party as a result of any acts or omissions by the ABL Credit Agreement Collateral Agent, or any of its agents or representatives, in connection with the exercise by the ABL Claimholders of their rights of access set forth in this Section 5.10. In no event shall any ABL Claimholders have any liability to the Term Loan Claimholders pursuant to this Section 5.10(b) or otherwise as a result of any condition on or with respect to the Term Loan Priority Collateral existing prior to the date of the exercise by the ABL Claimholders of their access rights under this Section 5.10(b), and the ABL Claimholders shall have no duty or liability to maintain the Term Loan Priority Collateral in a condition or manner better than that in which it was maintained prior to the access and/or use thereof by the ABL Claimholders.

(c)     Each of the Term Loan Collateral Agents (x) shall, at the request of the ABL Credit Agreement Collateral Agent, provide reasonable cooperation to the ABL Credit Agreement Collateral Agent in connection with the manufacture, production, completion, handling, removal and sale of any ABL Priority Collateral by the ABL Credit Agreement Collateral Agent as provided above and (y) shall be entitled to receive, from the ABL Credit Agreement Collateral Agent, fair compensation and reimbursement for their reasonable costs and expenses incurred in connection with such cooperation, support and assistance to the ABL Credit Agreement Collateral Agent. Each of the Term Loan Collateral Agents and/or any such purchaser (or its transferee or successor) shall not otherwise be required to manufacture, produce, complete, remove, insure, protect, store, safeguard, sell or deliver any Inventory subject to any Lien held by the ABL Credit Agreement Collateral Agent or to provide any support, assistance or cooperation to the ABL Credit Agreement Collateral Agent in respect thereof.

5.11    Obligor Consent. Each Obligor consents to the performance by each of the Term Loan Collateral Agents of the obligations set forth in Sections 5.8, 5.9 and 5.10 and acknowledges and agrees that no Term Loan Claimholder shall ever be accountable or liable for any action taken or omitted by any ABL Claimholder or its or any of their officers, employees, agents successors or assigns in connection therewith or incidental thereto or in consequence thereof.

### SECTION 6.    Insolvency or Liquidation Proceedings.

6.1    Finance and Sale Issues.

(a)     Until the Discharge of Term Loan Obligations has occurred, if any Obligor shall be subject to any Insolvency or Liquidation Proceeding and the Directing Term Loan Collateral Agent

shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code or any similar Debtor Relief Law) constituting Term Loan Priority Collateral or to permit any Obligor to obtain financing, whether from the Term Loan Claimholders or any other Person, under Section 364 of the Bankruptcy Code or any similar Debtor Relief Law, that is (i) senior or pari passu with the Liens on the Term Loan Priority Collateral securing the Term Loan Obligations and (ii) junior to the Liens on the ABL Priority Collateral securing the ABL Obligations (each a "**Term Loan DIP Financing**"), then the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, agrees that it and its Related Claimholders will raise no objection to, or oppose or contest (or join with or support any third party opposing, objecting or contesting), such Cash Collateral use or Term Loan DIP Financing (including any proposed orders for such Cash Collateral use and/or Term Loan DIP Financing which are acceptable to the Directing Term Loan Collateral Agent) and it and its Related Claimholders will be deemed to have consented to such Cash Collateral use or Term Loan DIP Financing (including such proposed orders), and to the extent the Liens on the Term Loan Priority Collateral securing the Term Loan Obligations are subordinated to or pari passu with such Term Loan DIP Financing, the ABL Credit Agreement Collateral Agent will subordinate its Liens on the Term Loan Priority Collateral to the Liens securing such Term Loan DIP Financing (and all obligations relating thereto and any customary "carve-out" agreed to on behalf of the Term Loan Claimholders by the Directing Term Loan Collateral Agent) and to all adequate protection Liens granted to the Term Loan Claimholders on property of the type constituting Term Loan Priority Collateral on the same basis as the Liens securing the ABL Obligations are subordinated to the Liens on the Term Loan Priority Collateral securing the Term Loan Obligations under this Agreement and will not request adequate protection or any other relief in connection therewith (except as expressly agreed by the Directing Term Loan Collateral Agent or to the extent permitted by Section 6.3); provided that (i) the aggregate principal amount of Indebtedness for borrowed money under such Term Loan DIP Financing plus the aggregate outstanding principal amount of Indebtedness for borrowed money under the Term Loan Financing Documents (which, for the avoidance of doubt, excludes any Term Loan Other Obligations) plus the aggregate face amount of any First Lien Letters of Credit (except any portion thereof that is no longer available for drawing as a result of any disbursement thereunder that has been reimbursed) does not exceed the Term Loan DIP Cap Amount, (ii) the ABL Credit Agreement Collateral Agent and the other ABL Claimholders retain a Lien on the Collateral to secure the ABL Obligations, and, with respect to the ABL Priority Collateral only, with the same priority as existed prior to the commencement of the Insolvency or Liquidation Proceeding, (iii) the foregoing provisions of this Section 6.1(a) shall not prevent the ABL Credit Agreement Collateral Agent and the ABL Claimholders from objecting to any provision in any Term Loan DIP Financing relating to any provision or content of a plan of reorganization or liquidation that are inconsistent with this Agreement and (iv) the terms of such Term Loan DIP Financing or such use of Cash Collateral do not require any Obligor to seek any approval for any plan of reorganization or liquidation that is inconsistent with the terms of this Agreement.

(b)     Until the Discharge of ABL Obligations has occurred, if any Obligor shall be subject to any Insolvency or Liquidation Proceeding and the ABL Credit Agreement Collateral Agent shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code or any similar Debtor Relief Law) constituting ABL Priority Collateral or to permit any Obligor to obtain financing, whether from the ABL Claimholders or any other Person, under Section 364 of the Bankruptcy Code or any similar Debtor Relief Law, that is (i) senior or pari passu with the Liens on the ABL Priority Collateral securing the ABL Obligations and (ii) junior to the Liens on the Term Loan Priority Collateral securing the Term Loan Obligations (each a "**ABL DIP Financing**"), then each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, agrees that it and its Related Claimholders will raise no objection to, or oppose or contest (or join with or support any third party opposing, objecting or contesting), such Cash Collateral use or ABL DIP Financing (including any proposed orders for such Cash Collateral use and/or ABL DIP Financing which are acceptable to the ABL Credit Agreement Collateral Agent) and it and its Related Claimholders will be deemed to have consented

to such Cash Collateral use or ABL DIP Financing (including such proposed orders), and to the extent the Liens on the ABL Priority Collateral securing the ABL Obligations are subordinated to or *pari passu* with such ABL DIP Financing, each Term Loan Collateral Agent will subordinate its Liens on the ABL Priority Collateral to the Liens securing such ABL DIP Financing (and all obligations relating thereto and any customary "carve-out" agreed to on behalf of the ABL Claimholders by the ABL Credit Agreement Collateral Agent) and to all adequate protection Liens granted to the ABL Claimholders on property of the type constituting ABL Priority Collateral on the same basis as the Liens securing the Term Loan Obligations are subordinated to the Liens on the ABL Priority Collateral securing the ABL Obligations under this Agreement and will not request adequate protection or any other relief in connection therewith (except as expressly agreed by the ABL Credit Agreement Collateral Agent or to the extent permitted by Section 6.3); provided that (i) the aggregate principal amount of Indebtedness for borrowed money under such ABL DIP Financing plus the aggregate outstanding principal amount of Indebtedness for borrowed money under the ABL Financing Documents (which, for the avoidance of doubt, excludes any ABL Other Obligations) plus the aggregate face amount of any ABL Letters of Credit (except any portion thereof that is no longer available for drawing as a result of any disbursement thereunder that has been reimbursed) does not exceed the ABL DIP Cap Amount, (ii) each Term Loan Collateral Agent and the other Term Loan Claimholders retain a Lien on the Collateral to secure the Term Loan Obligations, and, with respect to the Term Loan Priority Collateral only, with the same priority as existed prior to the commencement of the Insolvency or Liquidation Proceeding, (iii) the foregoing provisions of this Section 6.1(b) shall not prevent the Term Loan Collateral Agents and the Term Loan Claimholders from objecting to any provision in any ABL DIP Financing relating to any provision or content of a plan of reorganization or liquidation that are inconsistent with this Agreement and (iv) the terms of such ABL DIP Financing or use of Cash Collateral do not require any Obligor to seek any approval for any plan of reorganization or liquidation that is inconsistent with the terms of this Agreement.

        (c)     Each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, agrees that it and its Related Claimholders will not seek consultation rights in connection with, and will raise no objection or oppose or contest (or join with or support any third party objecting, opposing or contesting), a motion to sell, liquidate or otherwise Dispose of Collateral in which the Junior Claimholders have a Junior Lien under Section 363 of the Bankruptcy Code if the requisite Senior Claimholders have consented to such sale, liquidation or other Disposition; provided that (1) to the extent the net cash proceeds of such sale or other Disposition are used to pay the principal amount of Indebtedness for borrowed money constituting Senior Obligations, or to reimburse disbursements under, or cash collateralize the face amount of, the Letters of Credit constituting Senior Obligations, the Liens of the Junior Claimholders shall attach to any remaining proceeds and (2) such motion does not impair the rights of the Junior Claimholders under Section 363(k) of the Bankruptcy Code; and provided, further, however, that the Junior Claimholders may assert any objection with respect to any proposed orders to retain professionals or set bid or related procedures in connection with such sale, liquidation or Disposition that may be raised by an unsecured creditor of the Obligors.

        6.2     Relief from the Automatic Stay.  Until the Discharge of Senior Obligations has occurred, each Junior Collateral Agent, on behalf of itself and its Related Claimholders agrees that none of them shall (a) seek (or support any other Person seeking) relief from or modification of the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of any of the Collateral in which a Junior Claimholder has a Junior Lien, in each case without the prior written consent of the Directing Senior Collateral Agent, or (b) oppose (or support any other Person in opposing) any request by any Senior Collateral Agent for relief from or modification of such stay.

6.3     Adequate Protection.

(a)     The ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, agrees that none of them shall contest (or support any other Person contesting):

(i)     any request by any Term Loan Collateral Agent or the other Term Loan Claimholders for adequate protection with respect to the Term Loan Priority Collateral under any Debtor Relief Law; or

(ii)     any objection by any Term Loan Collateral Agent or the other Term Loan Claimholders to any motion, relief, action or proceeding based on such Term Loan Collateral Agent or the other Term Loan Claimholders claiming a lack of adequate protection with respect to the Term Loan Priority Collateral.

(b)     Notwithstanding the foregoing provisions in Section 6.3(a), in any Insolvency or Liquidation Proceeding:

(i)     if the Term Loan Claimholders (or any subset thereof) are granted adequate protection with respect to the Term Loan Priority Collateral in the form of a Lien on additional or replacement collateral in connection with any use of Cash Collateral or DIP Financing, then the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, may seek or request adequate protection in the form of a Lien on such additional or replacement collateral, which Lien will be subordinated to the Liens securing the Term Loan Obligations and such use of Cash Collateral or DIP Financing (and all obligations relating thereto) on the same basis as the other Liens securing the ABL Obligations are so subordinated to the Liens on the Term Loan Priority Collateral securing the Term Loan Obligations under this Agreement; and

(ii)     the ABL Credit Agreement Collateral Agent and the other ABL Claimholders shall only be permitted to seek adequate protection with respect to their respective rights in the Term Loan Priority Collateral in any Insolvency or Liquidation Proceeding in the form of (A) additional collateral; provided that as adequate protection for the Term Loan Obligations, each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, is also granted a Lien on such additional collateral that is senior to any Lien granted to the ABL Credit Agreement Collateral Agent and the other ABL Claimholders; (B) replacement Liens on the Term Loan Priority Collateral; provided that as adequate protection for the Term Loan Obligations, each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, is also granted replacement Liens on the Term Loan Priority Collateral that are senior to any Lien granted to the ABL Credit Agreement Collateral Agent and the other ABL Claimholders; (C) an administrative expense claim in respect of the Term Loan Priority Collateral; provided that as adequate protection for the Term Loan Obligations, each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, is also granted an administrative expense claim that is senior and prior to the administrative expense claim of the ABL Credit Agreement Collateral Agent and the other ABL Claimholders; (D) cash payments made with Term Loan Priority Collateral with respect to current fees and expenses; provided that (1) as adequate protection for the Term Loan Obligations, each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, is also granted cash payments made with Term Loan Priority Collateral with respect to current fees and expenses and (2) each Term Loan Collateral Agent may object to the amounts of fees and expenses sought by the ABL Credit Agreement Collateral Agent and the other ABL Claimholders; and (E) cash payments made with Term Loan Priority Collateral with respect to interest on the ABL Obligations; provided that (1) as adequate protection for the Term Loan Obligations, each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, is

-47-

also granted cash payments made with Term Loan Priority Collateral with respect to interest on the Term Loan Obligation represented by it, and (2) such cash payments do not exceed an amount equal to the interest accruing on the principal amount of ABL Obligations outstanding on the date such relief is granted at the interest rate under the applicable ABL Documents and accruing from the date the ABL Credit Agreement Collateral Agent is granted such relief.

(c)     Each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, agrees that none of them shall contest (or support any other Person contesting):

(i)     any request by the ABL Credit Agreement Collateral Agent or the other ABL Claimholders for adequate protection with respect to the ABL Priority Collateral under any Debtor Relief Law; or

(ii)     any objection by the ABL Credit Agreement Collateral Agent or the other ABL Claimholders to any motion, relief, action or proceeding based on the ABL Credit Agreement Collateral Agent or the other ABL Claimholders claiming a lack of adequate protection with respect to the ABL Priority Collateral.

(d)     Notwithstanding the foregoing provisions in Section 6.3(c), in any Insolvency or Liquidation Proceeding:

(i)     if the ABL Claimholders (or any subset thereof) are granted adequate protection with respect to the ABL Priority Collateral in the form of a Lien on additional or replacement collateral in connection with any use of Cash Collateral or DIP Financing, then each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, may seek or request adequate protection in the form of a Lien on such additional or replacement collateral, which Lien will be subordinated to the Liens securing the ABL Obligations and such use of Cash Collateral or DIP Financing (and all obligations relating thereto) on the same basis as the other Liens securing the Term Loan Obligations are so subordinated to the Liens on the ABL Priority Collateral securing the ABL Obligations under this Agreement; and

(ii)     each Term Loan Collateral Agent and the other Term Loan Claimholders shall only be permitted to seek adequate protection with respect to their respective rights in the ABL Priority Collateral in any Insolvency or Liquidation Proceeding in the form of (A) additional collateral; provided that as adequate protection for the ABL Obligations, the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, is also granted a Lien on such additional collateral that is senior to any Lien granted to the Term Loan Collateral Agents and the other Term Loan Claimholders; (B) replacement Liens on the ABL Priority Collateral; provided that as adequate protection for the ABL Obligations, the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, is also granted replacement Liens on the ABL Priority Collateral that are senior to any Lien granted to the Term Loan Collateral Agents and the other Term Loan Claimholders; (C) an administrative expense claim in respect of the ABL Priority Collateral; provided that as adequate protection for the ABL Obligations, the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, is also granted an administrative expense claim that is senior and prior to the administrative expense claim of the Term Loan Collateral Agents and the other Term Loan Claimholders; (D) cash payments made with ABL Priority Collateral with respect to current fees and expenses; provided that (1) as adequate protection for the ABL Obligations, the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, is also granted cash payments made with ABL Priority Collateral with respect to current fees and expenses and (2) each ABL Collateral Agent may object to the amounts of fees and expenses sought by the Term

-48-

Loan Collateral Agents and the other Term Loan Claimholders; and (E) cash payments made with ABL Priority Collateral with respect to interest on the Term Loan Obligations; provided that (1) as adequate protection for the ABL Obligations, the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, is also granted cash payments made with ABL Priority Collateral with respect to interest on the ABL Obligation represented by it, and (2) such cash payments do not exceed an amount equal to the interest accruing on the principal amount of Term Loan Obligations outstanding on the date such relief is granted at the interest rate under the applicable Term Loan Documents and accruing from the date the Term Loan Collateral Agents are granted such relief.

6.4     No Waiver.  Subject to Section 6.7(b), nothing contained herein shall prohibit or in any way limit any Senior Collateral Agent or any other Senior Claimholder from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by any Junior Collateral Agent or any other Junior Claimholders, including the seeking by any Junior Collateral Agent or any other Junior Claimholders of adequate protection or the asserting by any Junior Collateral Agent or any other Junior Claimholders of any of its rights and remedies under the Junior Financing Documents or otherwise, in each case in respect of such Junior Claimholder's Liens in respect of the Collateral in which a Junior Claimholder has a Junior Lien.  Without limiting the foregoing, notwithstanding anything herein to the contrary, the Senior Claimholders shall not be deemed to have consented to, and expressly retain their rights to object to, the grant of adequate protection in the form of cash payments to the Junior Claimholders made pursuant to Section 6.3(b) or (d), as applicable.

6.5     Reinstatement.  If any Senior Claimholder of any Series is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of any Obligor any amount paid in respect of its Senior Obligations (a "**Recovery**"), then such Senior Claimholder shall be entitled to a reinstatement of its Senior Obligations with respect to all such recovered amounts on the date of such Recovery, and from and after the date of such reinstatement the Discharge of such Series of Senior Obligations and the Discharge of such Series of Term Loan Obligations or the Discharge of ABL Obligations, as applicable, shall be deemed not to have occurred for all purposes hereunder.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.  Any amounts received by any Junior Collateral Agent or any other Junior Claimholder on account of the Junior Obligations after the termination of this Agreement shall, upon a reinstatement of this Agreement pursuant to this Section 6.5, be held in trust for and paid over to the Directing Senior Collateral Agent for the benefit of the Senior Claimholders, for application to the reinstated Senior Obligations.  This Section 6.5 shall survive termination of this Agreement.

6.6     Reorganization Securities.  If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization, arrangement, compromise or liquidation or similar dispositive restructuring plan, both on account of ABL Obligations and on account of Term Loan Obligations, then, to the extent the debt obligations distributed on account of the ABL Obligations and on account of the Term Loan Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

6.7     Post-Petition Interest.

(a)     Each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, agrees that neither it nor its Related Claimholders shall oppose or seek to challenge (or join with any other

-49-

Person opposing or challenging) any claim by any Senior Collateral Agent or any other Senior Claimholder for allowance in any Insolvency or Liquidation Proceeding of Senior Obligations consisting of Post-Petition Interest to the extent of the value of the Senior Claimholders' Lien on the Collateral in which a Senior Claimholder has a Senior Lien. Regardless of whether any such claim for Post-Petition Interest is allowed or allowable, and without limiting the generality of the other provisions of this Agreement, this Agreement expressly is intended to include, and does include the "rule of explicitness," and is intended to provide the Senior Claimholders with the right to receive payment of all Post-Petition Interest through distributions made pursuant to the provisions of this Agreement on account of the Collateral in which a Senior Claimholder has a Senior Lien even though such Post-Petition Interest may not be not allowed or allowable against the bankruptcy estate of any Borrower or any other Obligor under Section 502(b)(2) or Section 506(b) of the Bankruptcy Code or under any other provision of the Bankruptcy Code or any other Debtor Relief Law.

(b)    Subject to <u>Sections 6.3(b) and (d)</u>, none of any Senior Collateral Agent nor any of its Related Claimholders shall oppose or seek to challenge any claim by any Junior Collateral Agent or any other Junior Claimholder for allowance in any Insolvency or Liquidation Proceeding of Junior Obligations consisting of Post-Petition Interest to the extent of the value of the Lien of any Junior Collateral Agent, on behalf of the Junior Claimholders, on the Junior Claimholders Lien on the Collateral in which a Junior Claimholder has a Junior Lien (after taking into account the amount of the Senior Obligations).

6.8    <u>Waivers</u>.  (a) Each Junior Collateral Agent, for itself and on behalf of its Related Junior Claimholders, waives any claim it or its Related Claimholders may hereafter have against any Senior Claimholder arising out of (a) the election of any Senior Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code with respect to any Collateral in which a Senior Claimholder has a Senior Lien or (b) any cash collateral or financing arrangement, or any grant of a security interest in connection with the Collateral in which a Senior Claimholder has a Senior Lien, in any Insolvency or Liquidation Proceeding so long as such actions are not in express contravention of the terms of this Agreement.

(b)    Each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, agrees that it will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code or any similar provision of any other Debtor Relief Law senior to or on a parity with the Senior Liens on the Collateral in which a Senior Claimholder has a Senior Lien securing the Senior Obligations for costs or expenses of preserving or disposing of any such Collateral.

6.9    <u>Separate Grants of Security and Separate Classification</u>.  Each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, and each Senior Collateral Agent, for itself and on behalf of its Related Claimholders, acknowledges and agrees that:

(a)    the grants of Liens pursuant to the Senior Collateral Documents and the Junior Collateral Documents constitute, and, in the case of the Shared Collateral Documents, are intended to constitute, two separate and distinct grants of Liens; and

(b)    because of, among other things, their differing rights in the Collateral, the Junior Obligations are fundamentally different from the Senior Obligations and must, subject to applicable law, be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding.

To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the Senior Claimholders and the Junior Claimholders in respect of

-50-

any Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then each of the parties hereto hereby acknowledges and agrees that, subject to Sections 2.1 and 4.1, all distributions shall be made as if there were separate classes of senior and junior secured claims against the Obligors in respect of such Collateral with the effect being that, to the extent that the aggregate value of the Collateral in which a Senior Claimholder has a Senior Lien is sufficient (for this purpose ignoring all claims held by the Junior Claimholders), the Senior Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing (or that would be owing if there were such separate classes of senior and junior secured claims) in respect of Post-Petition Interest, including any additional interest payable pursuant to the Senior Financing Documents arising from or related to a default, regardless of whether any such claim is allowed or allowable in any Insolvency or Liquidation Proceeding, before any distribution is made in respect of the claims held by the Junior Claimholders with respect to such Collateral, with each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, hereby acknowledging and agreeing to turn over to the Directing Senior Collateral Agent, for itself and on behalf of the Senior Claimholders, such Collateral or proceeds of such Collateral or any other distribution (whether or not expressly characterized as such) in respect of such Collateral, otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Junior Claimholders.

6.10    Effectiveness in Insolvency or Liquidation Proceedings. The parties acknowledge that this Agreement is a "subordination agreement" under Section 510(a) of the Bankruptcy Code and under comparable provisions of any other applicable Debtor Relief Law, which will be effective before, during and after the commencement of any Insolvency or Liquidation Proceeding. All references in this Agreement to any Obligor will include such Person as a debtor-in-possession and any receiver or trustee for such Person in any Insolvency or Liquidation Proceeding.

## SECTION 7.    Reliance; Waivers; Etc.

7.1    Reliance. Other than any reliance on the terms of this Agreement, each ABL Collateral Agent, on behalf of itself and its Related Claimholders, acknowledges that it and its Related Claimholders have, independently and without reliance on any Term Loan Collateral Agent or any other Term Loan Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the ABL Documents (as applicable) and be bound by the terms of this Agreement, and they will continue to make their own credit decision in taking or not taking any action under the ABL Documents or this Agreement. Each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, acknowledges that it and its Related Claimholders have, independently and without reliance on the ABL Credit Agreement Collateral Agent or any other ABL Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Term Loan Documents and be bound by the terms of this Agreement, and they will continue to make their own credit decision in taking or not taking any action under the Term Loan Documents or this Agreement.

7.2    No Warranties or Liability.

(a)    Each ABL Collateral Agent, on behalf of itself and its Related Claimholders, acknowledges and agrees that, except as set forth in Section 8.14, no Term Loan Collateral Agent or other Term Loan Claimholders have made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the Term Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The Term Loan Claimholders will be entitled to manage and supervise their respective extensions of

US-DOCS\72672018.6

credit under the Term Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.

(b)        Each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, acknowledges and agrees that, except as set forth in Section 8.14, neither the ABL Credit Agreement Collateral Agent nor other ABL Claimholders have made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the ABL Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  The ABL Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the ABL Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.

(c)        The Term Loan Collateral Agents and the other Term Loan Claimholders shall have no duty to the ABL Collateral Agents or any of the other ABL Claimholders, and the ABL Credit Agreement Collateral Agent and the other ABL Claimholders shall have no duty to the Term Loan Collateral Agents or any of the other Term Loan Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with any Obligor (including the ABL Financing Documents and the Term Loan Financing Documents, but in each case other than this Agreement), regardless of any knowledge thereof which they may have or be charged with.

7.3        No Waiver of Lien Priorities.

(a)        No right of the Senior Collateral Agents or any other Senior Claimholders, or any of them, to enforce any provision of this Agreement or of any Senior Financing Document with respect to their Liens on the Collateral in which a Senior Claimholder has a Senior Lien shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Obligor or by any act or failure to act by any Senior Collateral Agent or any other Senior Claimholder, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the Senior Financing Documents or any of the Junior Financing Documents, regardless of any knowledge thereof which the Senior Collateral Agents or the other Senior Claimholders, or any of them, may have or be otherwise charged with.

(b)        Without in any way limiting the generality of the foregoing paragraph (a) (but subject to the rights of the Senior Obligors under the Senior Financing Documents and subject to the provisions of Section 5.3(a)), the Senior Collateral Agents and the other Senior Claimholders, or any of them, may at any time and from time to time in accordance with the Senior Financing Documents and/or applicable law, without the consent of, or notice to, any Junior Collateral Agent or any other Junior Claimholders, without incurring any liabilities to any Junior Collateral Agent or any other Junior Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of any Junior Collateral Agent or any other Junior Claimholders is affected, impaired or extinguished thereby) do any one or more of the following:

(1)        make loans and advances to  any Obligor or issue, provide or obtain Letters of Credit for the account of any Obligor or otherwise extend credit to any Obligor, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing;

(2)        change the manner, place or terms of payment of, or change or extend the time of payment of, or amend, renew, exchange, increase or alter the terms of, any of the Senior

-52-

Obligations or any Lien on any Collateral in which a Senior Claimholder has a Senior Lien or guaranty thereof or any liability of any Obligor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the Senior Obligations, without any restriction as to the tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by any Senior Collateral Agent or any of the other Senior Claimholders, the Senior Obligations or any of the Senior Financing Documents;

(3)     sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Collateral in which a Senior Claimholder has a Senior Lien or any liability of any Obligor to any Senior Collateral Agent or any other Senior Claimholders, or any liability incurred directly or indirectly in respect thereof;

(4)     settle or compromise any Senior Obligation or any other liability of any Obligor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the Senior Obligations) in any manner or order;

(5)     exercise or delay in or refrain from exercising any right or remedy against any Obligor or any security or any other Person or with respect to any security, elect any remedy and otherwise deal freely with any Obligor or any Collateral in which a Senior Claimholder has a Senior Lien and any security and any guarantor or any liability of any Obligor to the Senior Claimholders or any liability incurred directly or indirectly in respect thereof; and

(6)     release or discharge any Senior Obligation or any guaranty thereof or any agreement or obligation of any Obligor or any other Person or entity with respect thereto.

(c)     Until the Discharge of Senior Obligations, each Junior Collateral Agent, on behalf of itself and its Related Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral on which it has a Junior Lien or any other similar rights a junior secured creditor may have under applicable law.

7.4     <u>Waiver of Liability</u>.

(a)     Each Junior Collateral Agent, on behalf of itself and its Related Claimholders, agrees that the Senior Collateral Agents and the other Senior Claimholders shall have no liability to any Junior Collateral Agent or any other Junior Claimholders, and each Junior Collateral Agent, on behalf of itself and its Related Junior Claimholders, hereby waives any claim against any Senior Collateral Agent or any other Senior Claimholder, arising out of any and all actions which any Senior Collateral Agent or any other Senior Claimholders may take or permit or omit to take with respect to:  (i) the Senior Financing Documents (including, without limitation, any failure to perfect or obtain perfected security interests in the Collateral in which a Senior Claimholder has a Senior Lien), (ii) the collection of the Senior Obligations or (iii) the foreclosure upon, or sale, liquidation or other Disposition of, any Collateral in which a Senior Claimholder has a Senior Lien.  Each Junior Collateral Agent, on behalf of itself and its Related Claimholders, also agrees that the Senior Collateral Agents and the other Senior Claimholders have no duty, express or implied, fiduciary or otherwise, to them in respect of the maintenance or preservation of the Collateral in which a Senior Claimholder has a Senior Lien, the Senior Obligations or otherwise.  Neither the Senior Collateral Agents nor any other Senior Claimholder nor any of their respective directors, officers, employees or agents will be liable for failure to demand, collect or realize

upon any of the Collateral in which a Senior Claimholder has a Senior Lien or for any delay in doing so, or will be under any obligation to sell or otherwise Dispose of any such Collateral upon the request of any Obligor or upon the request of any Junior Collateral Agent, any other Junior Claimholder or any other Person or to take any other action whatsoever with regard to such Collateral or any part thereof. Without limiting the foregoing, each Junior Collateral Agent, on behalf of itself and its Related Claimholders, agrees that neither any Senior Collateral Agent nor any other Senior Claimholder (in directing its Senior Collateral Agent to take any action with respect to the Collateral in which a Senior Claimholder has a Senior Lien) shall have any duty or obligation to realize first upon any Collateral in which a Senior Claimholder has a Senior Lien or to sell or otherwise Dispose of all or any portion of such Collateral in any manner, including as a result of the application of the principles of marshaling or otherwise, that would maximize the return to any Senior Claimholders or any Junior Claimholders, notwithstanding that the order and timing of any such realization, sale or other Disposition may affect the amount of proceeds actually received by such Claimholders from such realization, sale or other Disposition.

(b)     With respect to its share of the ABL Obligations, UBS shall have and may exercise the same rights and powers hereunder as, and shall be subject to the same obligations and liabilities as and to the extent set forth herein for, any other ABL Claimholder, all as if UBS were not the ABL Credit Agreement Collateral Agent. With respect to its share of the First Lien Obligations, UBS shall have and may exercise the same rights and powers hereunder as, and shall be subject to the same obligations and liabilities as and to the extent set forth herein for, any other First Lien Claimholder, all as if UBS were not the First Lien Credit Agreement Collateral Agent. With respect to its share of the Second Lien Obligations, GS shall have and may exercise the same rights and powers hereunder as, and shall be subject to the same obligations and liabilities as and to the extent set forth herein for, any other Second Lien Claimholder, all as if GS were not the Second Lien Credit Agreement Collateral Agent. The term "Claimholders" or any similar term shall, unless the context clearly otherwise indicates, include UBS and GS, each in its individual capacity as a Claimholder. UBS, GS and their respective Affiliates may lend money to, and generally engage in any kind of business with, the Obligors or any of their Affiliates as if UBS were not acting as the ABL Credit Agreement Collateral Agent, UBS were not acting as the First Lien Credit Agreement Collateral Agent and GS were not acting as the Second Lien Credit Agreement Collateral Agent and without any duty to account therefor to any other Claimholder.

7.5     <u>Obligations Unconditional</u>.  All rights, interests, agreements and obligations of the ABL Credit Agreement Collateral Agent and the other ABL Claimholders and the Term Loan Collateral Agents and the other Term Loan Claimholders, respectively, hereunder (including the Lien priorities established hereby) shall remain in full force and effect irrespective of:

(a)     any lack of validity or enforceability of any ABL Documents or any Term Loan Documents;

(b)     any change in the time, manner or place of payment of, or, subject to the limitations set forth in <u>Section 5.3</u>, in any other terms of, all or any of the ABL Obligations or Term Loan Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any ABL Document or any Term Loan Document;

(c)     any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the ABL Obligations or Term Loan Obligations or any guaranty thereof;

-54-

(d)     the commencement of any Insolvency or Liquidation Proceeding in respect of any Obligor; or

(e)     any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Obligor in respect of the ABL Credit Agreement Collateral Agent, any other ABL Claimholder, the ABL Obligations, any Term Loan Collateral Agent, any other Term Loan Claimholder or the Term Loan Obligations in respect of this Agreement.

**SECTION 8.**     **Miscellaneous**.

8.1     Conflicts.

(a)     Subject to Section 8.1(b), in the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the ABL Documents or the Term Loan Documents, the provisions of this Agreement shall govern and control.

(b)     The parties hereto acknowledge, authorize and consent to the entry by the Term Loan Collateral Agents into the First Lien/Second Lien Intercreditor Agreement and any other intercreditor agreement solely among the Term Loan Collateral Agents (or any subset of them).  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the First Lien/Second Lien Intercreditor Agreement or such other intercreditor agreement with respect to the rights and obligations of the Term Loan Collateral Agents and the other Term Loan Claimholders (or any subset of them) to each other in respect of the Term Loan Collateral, the provisions of the First Lien/Second Lien Intercreditor Agreement or such other intercreditor agreement shall control.

8.2     Effectiveness; Continuing Nature of this Agreement; Severability.  This Agreement shall become effective when executed and delivered by the parties hereto.  This is a continuing agreement of Lien subordination and each of the ABL Claimholders and the Term Loan Claimholders may continue, at any time and without notice to any Term Loan Collateral Agent or any other Term Loan Claimholder or any ABL Collateral Agent or any other ABL Claimholder, to extend credit and other financial accommodations and lend monies to or for the benefit of any Obligor constituting ABL Obligations and/or Term Loan Obligations in reliance hereon.  Each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  Each ABL Collateral Agent, on behalf of itself and its Related Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to any Obligor shall include such Obligor as debtor and debtor-in-possession and any receiver, trustee or similar Person for any Obligor (as the case may be) in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect:

(a)     with respect to the ABL Credit Agreement Collateral Agent, the other ABL Claimholders and the ABL Obligations, upon the Discharge of ABL Obligations, subject to Section 5.6 and the rights of the ABL Claimholders under Section 6.5; and

(b)     with respect to any Term Loan Collateral Agent, the other Term Loan Claimholders and the Term Loan Obligations of any Series, upon the Discharge of such Series of Term Loan Obligations.

Notwithstanding the foregoing, such termination shall not relieve any such party of its obligations incurred hereunder prior to the date of such termination.

8.3     Amendments; Waivers.  Neither this Agreement nor any provision hereof may be amended, modified or waived except pursuant to an agreement or agreements in writing entered into by the ABL Credit Agreement Collateral Agent and each Term Loan Collateral Agent then party hereto; provided that (a) the ABL Credit Agreement Collateral Agent and the Directing Term Loan Collateral Agent may, at the reasonable expense of the Obligors and without the written consent of any other ABL Claimholder, any other Term Loan Claimholder or any Obligor, agree to any amendment to or other modifications of this Agreement for the purpose of giving effect to Section 8.21 or any Refinancing of any ABL Obligations or Term Loan Obligations, (b) any Additional Lien Obligations Agent may become party hereto by execution and delivery of a Joinder Agreement in the form of Exhibit B hereto in accordance with the provisions of Section 8.21 and (c) additional Obligors may be added as parties hereto upon the execution and delivery of a counterpart of the Intercreditor Joinder Agreement in the form of Exhibit A hereto in accordance with the provisions of Section 8.18.  Each of the ABL Credit Agreement Collateral Agent and the Directing Term Loan Collateral Agent shall execute and deliver an amendment or other modification of this Agreement at the other's request to permit new creditors to become a party hereto as set forth in the proviso to the immediately preceding sentence.  Notwithstanding the provisions of any other ABL Document or Term Loan Document, the ABL Credit Agreement Collateral Agent and the Directing Term Loan Collateral Agent may, with the consent of the Top Borrower, make any amendments, restatements, amendment and restatements, supplements or other modifications to this Agreement to correct any ambiguity, defect or inconsistency contained herein without the consent of any other Person.  Each waiver of the terms of this Agreement, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties owed to such party in any other respect or at any other time.  Notwithstanding the foregoing, no Obligor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except (x) to the extent such Obligor's rights are directly and adversely affected by such amendment, modification or waiver, (y) to the extent reducing the rights or increasing the obligations of such Obligor or (z) any amendment, modification or waiver of the ABL DIP Cap Amount or the Term Loan DIP Cap Amount, if the effect of such amendment, modification or waiver is to reduce the amount thereof from the amount thereof in effect on the date hereof; provided, however, that the Top Borrower shall be given notice of any amendment, modification or waiver of this Agreement promptly after the effectiveness thereof (it being understood that the failure to deliver such notice to the Top Borrower shall in no way impact the effectiveness of any such amendment, modification or waiver).  To the extent permitted by the provisions of the ABL Financing Documents and the Term Loan Documents, the Borrowers may incur additional ABL Obligations under one or more debt facilities junior to the ABL Credit Agreement ("**Junior ABL Obligations**").  In connection with any such incurrence this Agreement shall be amended, at the Borrowers' expense (to the extent provided in the applicable Financing Documents), to join the agent or representative of such Junior ABL Obligations (a "**Junior ABL Agent**") as a party hereto on behalf of itself and the holders of such Junior ABL Obligations and to make other necessary amendments to this Agreement where customary and appropriate.  Such amendments shall provide that upon any such Junior ABL Agent becoming a party hereto, all obligations of such Series of Junior ABL Obligations shall be secured by a Lien on the Collateral in accordance with the terms hereof and the Junior ABL Agent and the holders of such Junior ABL Obligations shall be subject to the terms of this Agreement to the same extent vis-à-vis the Term Loan Claimholders and Term Loan Collateral Agents as the ABL Lenders and ABL Credit Agreement Collateral Agent are bound hereby.

8.4     Information Concerning Financial Condition of the Obligors and their Subsidiaries.  The ABL Credit Agreement Collateral Agent and the other ABL Claimholders, on the one hand, and the Term Loan Collateral Agents and the other Term Loan Claimholders, on the other hand,

shall be responsible for keeping themselves informed of (a) the financial condition of the Obligors and their subsidiaries and all endorsers and/or guarantors of the ABL Obligations or the Term Loan Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the ABL Obligations or the Term Loan Obligations.  The ABL Credit Agreement Collateral Agent, the Term Loan Collateral Agents, the ABL Claimholders and the Term Loan Claimholders shall have no duty to advise any other party of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the ABL Credit Agreement Collateral Agent, any Term Loan Collateral Agents, any ABL Claimholders or any Term Loan Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it or they shall be under no obligation:

(i)      to make, and such person shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(ii)     to provide any additional information or to provide any such information on any subsequent occasion;

(iii)    to undertake any investigation; or

(iv)     to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

8.5    <u>Subrogation</u>.  With respect to the value of any payments or distributions in cash, property or other assets that any Junior Collateral Agent or any other Junior Claimholder pays over to the Senior Collateral Agents or the other Senior Claimholders under the terms of this Agreement, such Junior Collateral Agent or such other Junior Claimholder shall be subrogated to the rights of each Senior Collateral Agent and the other Senior Claimholders; <u>provided</u> that each Junior Collateral Agent, on behalf of itself and its Related Claimholders, hereby agrees that neither it nor its Related Claimholders shall assert or enforce any such rights of subrogation it may acquire with respect to its Liens on the Collateral in which a Junior Claimholder has a Junior Lien as a result of any payment hereunder until the Discharge of Senior Obligations has occurred.  Each Obligor acknowledges and agrees that the value of any payments or distributions in cash, property or other assets received by any Junior Collateral Agent or the other Junior Claimholders and paid over to the Senior Collateral Agents or the other Senior Claimholders pursuant to, and applied in accordance with, this Agreement, shall not relieve or reduce any of the Junior Obligations under the Junior Financing Documents.

8.6    <u>Application of Payments</u>.  All payments received by any Senior Collateral Agent or the other Senior Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the Senior Obligations as the Senior Claimholders, in their sole discretion, deem appropriate.  Each Junior Collateral Agent, on behalf of itself and its Related Claimholders, consents to any extension or postponement of the time of payment of the Senior Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the Senior Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

8.7    <u>SUBMISSION TO JURISDICTION; WAIVERS</u>.

**(a)      EACH PARTY HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) HEREBY**

IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS (AND THEIR) PROPERTY, TO THE EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK (OR ANY APPELLATE COURT THEREFROM) OVER ANY SUIT OR ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED EXCLUSIVELY IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENTS BY REGISTERED MAIL ADDRESSED TO SUCH PERSON SHALL BE EFFECTIVE SERVICE OF PROCESS AGAINST SUCH PERSON FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT. EACH OF THE PARTIES HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  EACH OF THE PARTIES HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)    TO THE EXTENT PERMITTED BY LAW, EACH PARTY HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL) DIRECTED TO IT AT ITS ADDRESS FOR NOTICES AS PROVIDED FOR IN SECTION 8.8.  EACH PARTY HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) HEREBY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER THAT SERVICE OF PROCESS WAS INVALID AND INEFFECTIVE.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(c)    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS), TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT (OR THEY) MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY ABL DOCUMENT OR TERM LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO

ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

        8.8     Notices. All notices to the ABL Claimholders and the Term Loan Claimholders permitted or required under this Agreement shall also be sent to the related ABL Collateral Agent and the related Term Loan Collateral Agent, respectively (and, for this purpose, (i) the ABL Credit Agreement Collateral Agent shall be deemed to be an agent for the ABL Secured Hedging Obligations and ABL Banking Services Obligations, (ii) the Directing First Lien Collateral Agent shall be deemed to be an agent for the First Lien Secured Hedging Obligations and the First Lien Banking Services Obligations, and (iii) the Directing Second Lien Collateral Agent shall be deemed to be an agent for the Second Lien Secured Hedging Obligations and the Second Lien Banking Services Obligations). Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served, sent by facsimile or sent by other electronic transmission or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile or other electronic transmission, or three (3) Business Days after depositing it in the United States mail with postage prepaid and properly addressed. For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

        8.9     Further Assurances. The ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, and each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, and each Obligor, agrees that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the ABL Credit Agreement Collateral Agent or the Directing Term Loan Collateral Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

        8.10    CHOICE OF LAW. THIS AGREEMENT, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT (WHETHER IN TORT, CONTRACT (AT LAW OR IN EQUITY) OR OTHERWISE), SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

        8.11    Binding on Successors and Assigns. This Agreement shall be binding upon the ABL Credit Agreement Collateral Agent, the ABL Claimholders, each First Lien Collateral Agent, the other First Lien Claimholders, each Second Lien Collateral Agent, the other Second Lien Claimholders and their respective successors and permitted assigns. If the ABL Credit Agreement Collateral Agent, any First Lien Collateral Agent or any Second Lien Collateral Agent resigns or is replaced pursuant to the ABL Documents, the First Lien Documents or the Second Lien Documents, as applicable, its successor shall be deemed to be a party to this Agreement and shall have all the rights of, and be subject to all the obligations of, this Agreement.

        8.12    Headings. Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

        8.13    Counterparts. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page

of this Agreement or any document or instrument delivered in connection herewith by facsimile or other electronic transmission (including ".pdf" or ".tiff" format) shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

8.14    Authorization; Binding Effect on Claimholders.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.  Each ABL Claimholder and each Term Loan Claimholder, by its acceptance of the benefits of the ABL Documents and Term Loan Documents, as the case may be, shall be deemed to have agreed to be bound by the agreements made herein, including the agreements made by any Collateral Agent on its behalf.

8.15    Exclusive Means of Exercising Rights under this Agreement.

(a)    The ABL Claimholders shall be deemed to have irrevocably appointed the ABL Credit Agreement Collateral Agent as their exclusive agent hereunder.  Consistent with such appointment, the ABL Claimholders further shall be deemed to have agreed that only the ABL Credit Agreement Collateral Agent (and not any individual claimholder or group of claimholders) as agent for the ABL Claimholders, or any of the ABL Credit Agreement Collateral Agent's agents, shall have the right on their behalf to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement); provided that (i) holders of the ABL Secured Hedging Obligations and the ABL Banking Services Obligations may exercise customary netting and set off rights under the ABL Hedge Agreements and ABL Banking Services Agreements to which they are, respectively, a party, (ii) cash collateral may be held pursuant to the terms of the ABL Documents (including any relating to ABL Hedge Agreements) and any such individual ABL Claimholder may act against such cash collateral in accordance with the terms of the relevant ABL Document or applicable law and (iii) the ABL Claimholders may exercise customary rights of setoff against depository or other accounts maintained with them in accordance with the terms of the relevant ABL Document or applicable law.  Specifically, but without limiting the generality of the foregoing, no ABL Claimholder or group of ABL Claimholders, other than the ABL Credit Agreement Collateral Agent (acting at the direction of, or pursuant to a grant of authority by, the Required ABL Claimholders), shall be entitled to take or file, and shall be precluded from taking or filing (whether in any Insolvency or Liquidation Proceeding or otherwise), any action, judicial or otherwise, to enforce any right or power or pursue any remedy under this Agreement (including any declaratory judgment or other action to interpret or otherwise enforce the provisions of this Agreement), except solely as provided in the proviso in the immediately preceding sentence.

(b)    The Term Loan Claimholders shall be deemed to have irrevocably appointed the Directing Term Loan Collateral Agent as their exclusive agent hereunder.  Consistent with such appointment, the Term Loan Claimholders further shall be deemed to have agreed that only the Directing Term Loan Collateral Agent (and not any individual claimholder or group of claimholders) as agent for the Term Loan Claimholders, or any of the Directing Term Loan Collateral Agent's agents, shall have the right on their behalf to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement); provided that, subject to the limitations, restrictions and other agreements set forth herein, (i) holders of First Lien Secured Hedging Obligations, First Lien Banking Services Obligations, the Second Lien Secured Hedging Obligations and the Second Lien Banking Services Obligations may exercise customary netting and set off rights under the First Lien Hedge Agreements, the First Lien Banking Services Agreements, the Second Lien Hedge Agreements and Second Lien Banking Services Agreements to which they are, respectively, a party, (ii) cash collateral may be held pursuant to the terms of the Term Loan Documents (including any relating to First Lien Hedge Agreements or Second Lien Hedge Agreements) and any such individual Term Loan Claimholder may act against such cash collateral

in accordance with the terms of the relevant Term Loan Document or applicable law and (iii) the Term Loan Claimholders may exercise customary rights of setoff against depository or other accounts maintained with them in accordance with the terms of the relevant Term Loan Document or applicable law. Specifically, but without limiting the generality of the foregoing, each Term Loan Claimholder or group of Term Loan Claimholders, other than the Directing Term Loan Collateral Agent (acting at the direction of, or pursuant to a grant of authority by, the Required Term Loan Claimholders), shall not be entitled to take or file, but instead shall be precluded from taking or filing (whether in any Insolvency or Liquidation Proceeding or otherwise), any action, judicial or otherwise, to enforce any right or power or pursue any remedy under this Agreement (including any declaratory judgment or other action to interpret or otherwise enforce the provisions of this Agreement), except solely as provided in the proviso in the immediately preceding sentence.

       8.16    No Third Party Beneficiaries; Provisions Solely to Define Relative Rights. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the ABL Claimholders and the Term Loan Claimholders. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the ABL Credit Agreement Collateral Agent and the other ABL Claimholders, on the one hand, and the Term Loan Collateral Agent and the other Term Loan Claimholders, on the other hand. None of the Obligors shall have any rights hereunder and no Obligor may rely on the terms hereof, other than any provision hereof expressly preserving any right of, or directly affecting, any Obligor under this Agreement, including the definition of "ABL DIP Cap Amount" and "Term Loan DIP Cap Amount", Sections 3.1 (as to the definition of "Standstill Period"), 4.1, 5.1, 5.2, 5.3, 5.4, 5.6, 5.8, 5.9, 5.10, 6.1, 6.2, 7.1, 8.1, 8.2, 8.3, 8.6, 8.7, 8.8, 8.9, 8.10, 8.11, 8.13, 8.14, 8.15, this Section 8.16, Sections 8.17, 8.18, and 8.21. Nothing in this Agreement is intended to or shall impair the obligations of the Obligors, which are absolute and unconditional, to pay the ABL Obligations and the Term Loan Obligations as and when the same shall become due and payable in accordance with their terms.

       8.17    No Indirect Actions. Unless otherwise expressly stated, if a party may not take an action under this Agreement, then it may not take that action indirectly, or support any other Person in taking that action directly or indirectly. "Taking an action indirectly" means taking an action that is not expressly prohibited for the party but is intended to have substantially the same effects as the prohibited action; provided that notwithstanding the foregoing, nothing in this Section 8.17 shall be deemed to limit the right of any party hereto to vote on any plan of reorganization, arrangement, compromise or liquidation or similar dispositive restructuring plan in any Insolvency or Liquidation Proceeding to the extent not inconsistent with the terms of this Agreement.

       8.18    Obligors; Additional Obligors. It is understood and agreed that Holdings, the Borrowers and each other Obligor on the date of this Agreement shall constitute the original Obligors party hereto. The original Obligors hereby covenant and agree to cause each subsidiary of Holdings which becomes a "Subsidiary Guarantor" as defined in the ABL Credit Agreement, the First Lien Credit Agreement or the Second Lien Credit Agreement (or any similar term in any other First Lien Financing Document or Second Lien Financing Document) after the date hereof to become a party hereto (as an Obligor) by duly executing and delivering a counterpart of the Intercreditor Joinder Agreement in the form of Exhibit A hereto to the ABL Credit Agreement Collateral Agent and the Directing Term Loan Collateral Agent in accordance with the relevant provisions of the relevant ABL Financing Documents and/or Term Loan Financing Documents, as applicable. The parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a "Subsidiary Guarantor" as defined in the ABL Credit Agreement, the First Lien Credit Agreement or the Second Lien Credit Agreement (or any similar term in any other ABL Financing Document or Term Loan Financing Document) at any time shall be subject to the provisions hereof as

-61-

fully as if same constituted an Obligor party hereto and had complied with the requirements of the immediately preceding sentence.

8.19    Right of Collateral Agent to Continue.  Any Person serving as a First Lien Collateral Agent shall be entitled to continue, including to continue to perform his, her or its rights, obligations and duties, as a First Lien Collateral Agent, notwithstanding whether any such Person has served or is serving as the ABL Credit Agreement Collateral Agent.  Without limiting the generality of the preceding sentence of this Section 8.19, any Person serving as a First Lien Collateral Agent shall be entitled to continue to so serve in such capacity (including to continue to perform any of such First Lien Collateral Agent's rights, obligations, and/or duties) even if any such Person has resigned as the ABL Credit Agreement Collateral Agent, but such resignation has not become effective for any reason, including because a successor Second Lien Collateral Agent has not been appointed or has accepted such appointment, without any liability to any of the Claimholders by virtue of any such resignation and any of the circumstances relating in any manner whatsoever to such resignation.

8.20    Claimholders.  Notwithstanding anything to the contrary in this Agreement, it is understood and agreed that this Agreement only applies to the  Claimholders in their capacities as holders of the  Obligations.  Without limiting the foregoing, this Agreement does not restrict or apply to the Claimholders in their capacities as holders of any Indebtedness or other obligations of the Obligors other than the  Obligations (or any Reorganization Securities issued as contemplated by Section 6.6), or in their capacities as holders of equity interests of the Obligors.

8.21    Additional Lien Obligations.  Subject to the terms and conditions of this Agreement and each Financing Document, the Obligors will be permitted from time to time to designate as an additional holder of First Lien Obligations and/or Second Lien Obligations hereunder each Person that is, or that becomes or is to become, the holder of any Additional Lien Obligations (or the Additional Liens Obligations Agent in respect of such Additional Liens Obligations).  Upon the issuance or incurrence of any such Additional Lien Obligations:

(a)    The Top Borrower shall deliver to each of the Collateral Agents a certificate of a Responsible Officer stating that the applicable Obligors intend to enter or have entered into an Additional Lien Obligations Agreement and certifying that the issuance or incurrence of such Additional Lien Obligations and the Liens securing such Additional Lien Obligations are permitted by the ABL Financing Documents, the First Lien Financing Documents, the Second Lien Financing Documents and each then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement.  Each of the Additional Lien Obligations Agents, the ABL Credit Agreement Collateral Agent, the First Lien Collateral Agents and the Second Lien Collateral Agents shall be entitled to rely conclusively on the determination of the Top Borrower that such issuance and/or incurrence is permitted under the ABL Financing Documents, the First Lien Financing Documents, the Second Lien Financing Documents and each then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement if such determination is set forth in such officer's certificate delivered to the ABL Credit Agreement Collateral Agent, the First Lien Collateral Agents and the Second Lien Collateral Agents; provided, however, that such determination will not affect whether or not the Obligors have complied with their undertakings in the ABL Financing Documents, the First Lien Financing Documents, the Second Lien Financing Documents or any then existing Additional First Lien Obligations Agreement or Additional Second Lien Obligation Agreement;

(b)    the Additional Liens Obligations Agent for such Additional Lien Obligations shall execute and deliver to the ABL Credit Agreement Collateral Agent, the First Lien Collateral Agent and the Second Lien Collateral Agent a Joinder Agreement in the form attached hereto as

-62-

Exhibit B acknowledging that such Additional Liens Obligations and the holders of such Additional Liens Obligations shall be bound by the terms hereof to the extent applicable to the Claimholders, and

    (c)    the ABL Credit Agreement Collateral Agent and each existing Term Loan Collateral Agent shall promptly enter into such documents and agreements (including amendments, restatements, amendments and restatements, supplements or other modifications to this Agreement) as the ABL Credit Agreement Collateral Agent or any existing Term Loan Collateral Agent (but no other ABL Claimholder or Term Loan Claimholder) or the Additional Lien Obligations Agent may reasonably request in order to provide to it the rights, remedies and powers and authorities contemplated hereby, in each case consistent in all respects with the terms of this Agreement; provided that, for the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, it is understood and agreed that any such amendment, restatement, amendment and restatement, supplement or other modification to this Agreement requested pursuant to this clause (c) may be entered into by the ABL Credit Agreement Collateral Agent and the existing Term Loan Collateral Agents without the consent of any other ABL Claimholder or Term Loan Claimholder to effect the provisions of this Section 8.21 and may contain additional intercreditor terms applicable solely to the holders of such Additional Lien Obligations *vis-à-vis* the holders of the relevant obligations hereunder or the holders of such Additional Lien Obligations *vis-à-vis* the ABL Credit Agreement Collateral Agent and the ABL Claimholders or the Directing Term Loan Collateral Agent and the Term Loan Claimholders, as applicable.

Notwithstanding the foregoing, nothing in this Agreement will be construed to allow any Obligor to incur additional Indebtedness unless otherwise permitted by the terms of each applicable ABL Financing Document, First Lien Financing Document, Second Lien Document and each then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement.

    8.22    <u>Additional Intercreditor Agreements</u>.  Subject to Section 8.1(b) of this Agreement, each party hereto agrees that the First Lien Claimholders (as among themselves) and the Second Lien Claimholders (as among themselves) may each enter into intercreditor agreements (or similar arrangements) with the applicable First Lien Collateral Agents or Second Lien Collateral Agents, as the case may be, governing the rights, benefits and privileges as among the First Lien Claimholders in respect of any or all of the First Lien Collateral, this Agreement and the First Lien Collateral Documents or as among the Second Lien Claimholders in respect of any or all of the Second Lien Collateral, this Agreement or the Second Lien Collateral Documents, as the case may be, including as to the application of proceeds of any Collateral, voting rights, control of any Collateral and waivers with respect to any Collateral, in each case so long as the terms thereof do not violate or conflict with the terms of this Agreement or the ABL Documents or the First Lien Documents or the Second Lien Documents, as applicable.  In any event, if a respective intercreditor agreement (or similar arrangement) exists, the provisions thereof shall not be (or be construed to be) an amendment, modification or other change to this Agreement or any ABL Document or any other First Lien Document or Second Lien Document, and the provisions of this Agreement and the ABL Documents, the other First Lien Documents and Second Lien Documents shall remain in full force and effect in accordance with the terms hereof and thereof (as such provisions may be amended, modified or otherwise supplemented from time to time in accordance with the terms thereof, including to give effect to any intercreditor agreement (or similar arrangement)).

**[Signature pages follow]**

-63-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**UBS AG, STAMFORD BRANCH**,
as ABL Credit Agreement Collateral Agent

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Address for Notices:
Attention:
Tel.:
Email:

**UBS AG, STAMFORD BRANCH**,
as First Lien Credit Agreement Collateral Agent

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Address for Notices:
Attention:
Tel.:
Email:

**GOLDMAN SACHS BANK USA,**
as Second Lien Credit Agreement Collateral Agent

By: _____
    Name:
    Title:


Address for Notices:
Attention:
Tel.:
Email:

[Signature Page to ABL Intercreditor Agreement]

Acknowledged and Agreed to by:

Holdings

DAWN INTERMEDIATE, INC.


By: _____
    Name:
    Title:


Borrowers

SERTA SIMMONS BEDDING, LLC


By: _____
    Name:
    Title:


NATIONAL BEDDING COMPANY L.L.C.


By: _____
    Name:
    Title:


SSB MANUFACTURING COMPANY


By: _____
    Name:
    Title:

[Signature Page to ABL Intercreditor Agreement]

Other Obligors

[_____]

By: _____
      Name:
      Title:


Address for Notices to Obligors:
Tel.:
Fax:
Attn:
Email:

EXHIBIT A

## FORM OF INTERCREDITOR JOINDER AGREEMENT

Reference is made to the ABL Intercreditor Agreement dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the **"Intercreditor Agreement"**), among UBS AG, STAMFORD BRANCH, in its capacity as ABL Credit Agreement Collateral Agent, UBS AG, STAMFORD BRANCH, in its capacity as the First Lien Credit Agreement Collateral Agent and GOLDMAN SACHS BANK USA, as the Second Lien Credit Agreement Collateral Agent (in each case, as defined therein), each other FIRST LIEN COLLATERAL AGENT that is from time to time party thereto and each other SECOND LIEN COLLATERAL AGENT that is from time to time party thereto and acknowledged and agreed to by DAWN INTERMEDIATE, INC., a Delaware corporation, SERTA SIMMONS BEDDING, LLC, a Delaware limited liability company, NATIONAL BEDDING COMPANY L.L.C., an Illinois limited liability company AND SSB MANUFACTURING COMPANY, a Delaware corporation and the other OBLIGORS (as defined therein) from time to time party thereto. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

This Intercreditor Joinder Agreement, dated as of [●] [●], 20[●] (this "**Joinder Agreement**"), is being delivered pursuant to requirements of the Intercreditor Agreement.

1.        Joinder.  The undersigned, [●], a [●], hereby agrees to become party to the Intercreditor Agreement as an Obligor thereunder for all purposes thereof on the terms set forth therein, and to be bound by the terms, conditions and provisions of the Intercreditor Agreement as fully as if the undersigned had executed and delivered the Intercreditor Agreement as of the date thereof.

2.        Agreements.  The undersigned Obligor hereby agrees, for the enforceable benefit of all existing and future ABL Claimholders, First Lien Claimholders and Second Lien Claimholders that the undersigned is bound by the terms, conditions and provisions of the Intercreditor Agreement to the extent set forth therein.

3.        Counterparts.  This Joinder Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and all of which, when taken together, shall constitute one contract.  Delivery of an executed signature page to this Joinder Agreement by facsimile transmission or other electronic transmission (including ".pdf", ".tiff" or similar format) shall be effective as delivery of a manually executed counterpart of this Joinder Agreement.

4.        Governing Law.  THIS JOINDER AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS JOINDER AGREEMENT, WHETHER IN TORT, CONTRACT (AT LAW OR IN EQUITY) OR OTHERWISE, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

6.        Miscellaneous.  The provisions of Section 8 of the Intercreditor Agreement shall apply with like effect to this Joinder Agreement.

**[Signature pages follow]**

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed by its authorized representative, and each Collateral Agent has caused the same to be accepted by its authorized representative, as of the date first written above.

**[NAME OF OBLIGOR]**,
as an Obligor

By: _____
     Name:
     Title:

**Acknowledged and Agreed to by:**

**UBS AG, STAMFORD BRANCH,**
as ABL Credit Agreement Collateral Agent

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**UBS AG, STAMFORD BRANCH,**
as First Lien Credit Agreement Collateral Agent,

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**GOLDMAN SACHS BANK USA,**
as Second Lien Credit Agreement Collateral Agent,

By: _____
     Name:
     Title:

**FORM OF INTERCREDITOR JOINDER AGREEMENT – ADDITIONAL INDEBTEDNESS**

Reference is made to the ABL Intercreditor Agreement dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the **"Intercreditor Agreement"**), among UBS AG, STAMFORD BRANCH, in its capacity as ABL Credit Agreement Collateral Agent, UBS AG, STAMFORD BRANCH, in its capacity as the First Lien Credit Agreement Collateral Agent and GOLDMAN SACHS BANK USA, as the Second Lien Credit Agreement Collateral Agent (in each case, as defined therein), each other FIRST LIEN COLLATERAL AGENT that is from time to time party thereto and each other SECOND LIEN COLLATERAL AGENT that is from time to time party thereto and acknowledged and agreed to by DAWN INTERMEDIATE, INC., a Delaware corporation, SERTA SIMMONS BEDDING, LLC, a Delaware limited liability company, NATIONAL BEDDING COMPANY L.L.C., an Illinois limited liability company AND SSB MANUFACTURING COMPANY, a Delaware corporation and the other OBLIGORS (as defined therein) from time to time party thereto.  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

This Intercreditor Joinder Agreement, dated as of [●] [●], 20[●] (this "**Joinder Agreement**"), is being delivered pursuant to requirements of the Intercreditor Agreement.

The undersigned Additional [First/Second] Lien Obligations Agent (the "**New Collateral Agent**") is executing this Joinder Agreement in accordance with the requirements of the Intercreditor Agreement.

1.      Joinder.  In accordance with Section 8.21 of the Intercreditor Agreement, the New Collateral Agent by its signature below becomes a [First/Second] Lien Collateral Agent, under, and it and the related [First/Second] Lien Claimholders represented by it hereby become subject to and bound by, the Intercreditor Agreement with the same force and effect as if the New Collateral Agent had originally been named therein as a [First/Second] Lien Collateral Agent, and the New Collateral Agent, on behalf of itself and each other [First/Second] Lien Claimholder represented by it, hereby agrees to all the terms and provisions of the Intercreditor Agreement. Each reference to a "Collateral Agent", "Term Loan Collateral Agent" or "[First/Second] Lien Collateral Agent" in the Intercreditor Agreement shall be deemed to include the New Collateral Agent and each reference to "[First/Second] Lien Claimholders" or "Term Loan Claimholders" shall include the [First/Second] Lien Claimholders represented by such New Collateral Agent. The Intercreditor Agreement is hereby incorporated herein by reference.

2.      Representations and Warranties.  The New Collateral Agent represents and warrants to the other Collateral Agents and Claimholders that (i) it has full power and authority to enter into this Joinder Agreement, in its capacity as [agent][trustee], (ii) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms and the terms of the Intercreditor Agreement and (iii) the [First/Second] Lien Obligations Agreements relating to such Additional [First/Second] Lien Obligations provide that, upon the New Collateral Agent's entry into this Agreement, the [First/Second] Lien Claimholders in respect of such Additional [First/Second] Lien Obligations will be subject to and bound by the provisions of the Intercreditor Agreement as [First/Second] Lien Claimholders.

3.      Counterparts.  This Joinder Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and all of which, when taken together, shall constitute one contract.  Delivery of an executed signature page to this Joinder Agreement by facsimile transmission or other electronic transmission (including ".pdf", ".tiff" or

similar format) shall be effective as delivery of a manually executed counterpart of this Joinder Agreement.

       4.     <u>Governing Law</u>.  THIS JOINDER AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS JOINDER AGREEMENT, WHETHER IN TORT, CONTRACT (AT LAW OR IN EQUITY) OR OTHERWISE, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

       6.     <u>Miscellaneous</u>.  The provisions of <u>Section 8</u> of the Intercreditor Agreement shall apply with like effect to this Joinder Agreement.

[Signature pages follow]

A-2

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed by its authorized representative, and each Collateral Agent has caused the same to be accepted by its authorized representative, as of the date first written above.

**[NAME OF NEW COLLATERAL AGENT]**,
as a [First/Second] Lien Collateral Agent

By: _____
   Name:
   Title:

   Address for notices:

   _____

   _____

   Attention of:_____

   Telecopy:_____

**Acknowledged by:**

**UBS AG, STAMFORD BRANCH,**
as ABL Credit Agreement Collateral Agent

By: _____
   Name:
   Title:

By: _____
   Name:
   Title:

**UBS AG, STAMFORD BRANCH,**
as First Lien Credit Agreement Collateral Agent,


By: _____
     Name:
     Title:


By: _____
     Name:
     Title:


**GOLDMAN SACHS BANK USA,**
as Second Lien Credit Agreement Collateral Agent,


By: _____
     Name:
     Title:

[FORM OF]
FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT

[See attached.]

FORM OF

FIRST LIEN INTERCREDITOR AGREEMENT

Among

DAWN INTERMEDIATE, INC.,
as Holdings,

SERTA SIMMONS BEDDING, LLC,
as the Top Borrower,

the other Grantors party hereto,

UBS AG, STAMFORD BRANCH,
as First Lien Credit Agreement Collateral Agent for the First Lien
Credit Agreement Secured Parties,

[      ]

as the Initial Additional First Lien Collateral Agent,

[      ]

as the Initial Additional Authorized Representative,

and

each additional Authorized Representative and additional Collateral Agent from time to time party hereto

dated as of [_____], 201_

FIRST LIEN INTERCREDITOR AGREEMENT, dated as of [____], 201__] (as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time, this "Agreement"), among Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), the other Grantors (as defined below) from time to time party hereto, UBS AG, STAMFORD BRANCH ("UBS"), as collateral agent for the First Lien Credit Agreement Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "First Lien Credit Agreement Collateral Agent"), [  ], as collateral agent for the Initial Additional First Lien Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "Initial Additional First Lien Collateral Agent"), [  ], as Authorized Representative for the Initial Additional First Lien Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "Initial Additional Authorized Representative") and each additional Authorized Representative and additional Collateral Agent from time to time party hereto for the other Additional First Lien Secured Parties of the Series (as each such term is defined below) with respect to which it is acting in such capacity.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the First Lien Credit Agreement Collateral Agent (for itself and on behalf of the First Lien Credit Agreement Secured Parties), the Initial Additional Authorized Representative (for itself and on behalf of the Initial Additional First Lien Secured Parties) and each additional Authorized Representative (for itself and on behalf of the Additional First Lien Secured Parties of the applicable Series) agree as follows:

ARTICLE I

Definitions

SECTION 1.01 Certain Defined Terms.  Capitalized terms used but not otherwise defined herein have the meanings set forth in the First Lien Credit Agreement (as defined below) or, if defined in the New York UCC, the meanings specified therein.  As used in this Agreement, the following terms have the meanings specified below:

"Additional First Lien Collateral Agent" means (a) in the case of the Initial Additional First Lien Obligations, the Initial Additional First Lien Collateral Agent and (b) in the case of any other Series of Additional First Lien Obligations that becomes subject to this Agreement after the date hereof, the Additional Senior Class Debt Collateral Agent for such Series named in the applicable Joinder Agreement.

"Additional First Lien Documents" means, with respect to the Initial Additional First Lien Obligations or any Series of Additional Senior Class Debt, the notes, indentures, credit agreements, collateral agreements, security documents, guarantees and other operative agreements evidencing or governing such Indebtedness and the Liens securing such Indebtedness, including the Initial Additional First Lien Documents and the Additional First Lien Security Documents and each other agreement entered into for the purpose of securing the Initial Additional First Lien Obligations or any Series of Additional Senior Class Debt; provided that, in each case, the Indebtedness thereunder (other than the Initial Additional First Lien Obligations) has been designated as Additional Senior Class Debt pursuant to Section 5.13 hereto.

"Additional First Lien Obligations" means collectively (1) the Initial Additional First Lien Obligations and (2) all amounts owing pursuant to the terms of any Series of Additional Senior Class Debt designated as Additional First Lien Obligations pursuant to Section 5.13 after the date hereof, including, without limitation, the obligation (including guarantee obligations) to pay principal, premium, interest, fees, expenses (including interest, fees and expenses that accrue after the commencement of a Bankruptcy Case, regardless of whether such interest, fees and expenses are an allowed claim under such Bankruptcy Case), letter of credit commissions, reimbursement obligations, charges, attorneys costs, indemnities, penalties, reimbursements, damages and other amounts payable by a Grantor under any Additional First Lien Document (including guarantees of the foregoing).

"Additional First Lien Secured Party" means the holders of any Additional First Lien Obligations and any Authorized Representative and Additional First Lien Collateral Agent with respect thereto and the beneficiaries of each indemnification obligation undertaken by each Borrower and the other Grantors under any related Additional First Lien Document, and shall include the Initial Additional First Lien Secured Parties and the Additional Senior Class Debt Parties.

"Additional First Lien Security Document" means any collateral agreement, security agreement or any other document now existing or entered into after the date hereof that creates or purports to create, Liens on any assets or properties of any Grantor to secure any of the Additional First Lien Obligations.

"Additional Senior Class Debt" has the meaning assigned to such term in Section 5.13.

"Additional Senior Class Debt Collateral Agent" has the meaning assigned to such term in Section 5.13.

"Additional Senior Class Debt Parties" has the meaning assigned to such term in Section 5.13.

"Additional Senior Class Debt Representative" has the meaning assigned to such term in Section 5.13.

"Agreement" has the meaning assigned to such term in the introductory paragraph of hereto.

"Applicable Authorized Representative" means, with respect to any Shared Collateral, (i) until the earlier of (x) the Discharge of First Lien Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the First Lien Credit Agreement Administrative Agent and (ii) from and after the earlier of (x) the Discharge of First Lien Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date, the Major Non-Controlling Authorized Representative.

"Authorized Representative" means, at any time, (i) in the case of any First Lien Credit Agreement Obligations or the First Lien Credit Agreement Secured Parties, the First Lien Credit Agreement Administrative Agent, (ii) in the case of the Initial Additional First Lien Obligations or the Initial Additional First Lien Secured Parties, the Initial Additional Authorized Representative, and (iii) in the case of any other Series of Additional First Lien Obligations or Additional First Lien Secured Parties that become subject to this Agreement after the date hereof, the Additional Senior Class Debt Representative for such Series named in the applicable Joinder Agreement.

"Bankruptcy Case" has the meaning assigned to such term in Section 2.05(b).

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Borrowers" means collectively, SSB, National Bedding and SSB Manufacturing.

"Closing Date" means November 8, 2016.

"Collateral" means all assets and properties subject to, or purported to be subject to, Liens created pursuant to any First Lien Security Document to secure one or more Series of First Lien Obligations.

"Collateral Agent" means (i) in the case of any First Lien Credit Agreement Obligations, the First Lien Credit Agreement Collateral Agent, (ii) in the case of the Initial Additional First Lien Obligations, the Initial Additional First Lien Collateral Agent and (iii) in the case of any other Series of Additional First Lien Obligations that become subject to this Agreement after the date hereof, the Additional Senior Class Debt Collateral Agent for such Series named in the applicable Joinder Agreement.

"Contingent First Lien Obligation" means, at any time, First Lien Obligations for taxes, costs, indemnifications, reimbursements, damages and other contingent liabilities (excluding (a) the principal of, and

interest and premium (if any) on, and fees and expenses relating to, any First Lien Obligation and (b) contingent reimbursement obligations in respect of amounts that may be drawn under outstanding letters of credit) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of First Lien Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"Controlling Collateral Agent" means, with respect to any Shared Collateral, (i) until the earlier of (x) the Discharge of First Lien Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date with respect to such Shared Collateral, the First Lien Credit Agreement Collateral Agent and (ii) from and after the earlier of (x) the Discharge of First Lien Credit Agreement Obligations and (y) the Non-Controlling Authorized Representative Enforcement Date with respect to such Shared Collateral, the Additional First Lien Collateral Agent for the Series of Additional First Lien Obligations represented by the Major Non-Controlling Authorized Representative.

"Controlling Secured Parties" means, with respect to any Shared Collateral, (i) at any time when the First Lien Credit Agreement Collateral Agent is the Controlling Collateral Agent with respect to such Shared Collateral, the First Lien Credit Agreement Secured Parties and (ii) at any other time, the Series of First Lien Secured Parties whose Authorized Representative is the Applicable Authorized Representative for such Shared Collateral.

"DIP Financing" has the meaning assigned to such term in Section 2.05(b).

"DIP Financing Liens" has the meaning assigned to such term in Section 2.05(b).

"DIP Lenders" has the meaning assigned to such term in Section 2.05(b).

"Discharge" means, with respect to any Shared Collateral and any Series of First Lien Obligations, the date on which (i) such Series of First Lien Obligations have been paid in full in cash (other than any Contingent First Lien Obligations) and are no longer secured and no longer required to be secured by such Shared Collateral pursuant to the terms of the documentation governing such Series of First Lien Obligations or, with respect to any obligations and liabilities under Secured Hedge Agreements or Treasury Services Agreements secured by the Collateral Documents for such Series of First Lien Obligations, any of (x) such obligations and liabilities under Secured Hedge Agreements and Treasury Services Agreements have been paid in full in cash (other than obligations and liabilities under Treasury Services Agreements and Secured Hedge Agreements not due and payable), (y) such obligations and liabilities under Secured Hedge Agreements and Treasury Services Agreements shall have been cash collateralized on terms satisfactory to each applicable counterparty (or other arrangements satisfactory to the applicable counterparty shall have been made) (other than obligations and liabilities under Treasury Services Agreements and Secured Hedge Agreements not due and payable) or (z) such obligations and liabilities under Secured Hedge Agreements and Treasury Services Agreements are no longer secured and no longer required to be secured by such Shared Collateral pursuant to the terms of the documentation governing such Series of First Lien Obligations (other than obligations and liabilities under Treasury Services Agreements and Secured Hedge Agreements not due and payable), (ii) any letters of credit issued pursuant to documentation governing such Series of First Lien Obligations shall either have expired or have been terminated (other than letters of credit that are cash collateralized or back-stopped or deemed reissued under another facility, in each case, in the amount and form required under the applicable Series of First Lien Obligations) and (iii) all commitments under such Series of First Lien Obligations have terminated. The term "Discharged" shall have a corresponding meaning.

"Discharge of First Lien Credit Agreement Obligations" means, with respect to any Shared Collateral, the Discharge of the First Lien Credit Agreement Obligations with respect to such Shared Collateral; provided that the Discharge of First Lien Credit Agreement Obligations shall not be deemed to have occurred in connection with a Refinancing of such First Lien Credit Agreement Obligations with Additional First Lien Obligations secured by such Shared Collateral under an Additional First Lien Document which has been designated in writing by the First Lien Credit Agreement Administrative Agent (under the First Lien Credit

Agreement so Refinanced) to the Additional First Lien Collateral Agents and each other Authorized Representative as the "First Lien Credit Agreement" for purposes of this Agreement.

"Event of Default" means an "Event of Default" (or similarly defined term) as defined in any Secured Credit Document.

"First Lien Credit Agreement Administrative Agent" means the "Administrative Agent" as defined in the First Lien Credit Agreement and shall include any successor administrative agent (including as a result of any Refinancing or other modification of the First Lien Credit Agreement permitted by Section 2.15 thereof).

"First Lien Credit Agreement Collateral Agent" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"First Lien Credit Agreement" means the First Lien Term Loan Agreement, dated as of the Closing Date, among, *inter alios*, Holdings, the Borrowers, UBS, as First Lien Credit Agreement Administrative Agent and each lender from time to time party thereto, as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"First Lien Credit Agreement Collateral Documents" means the First Lien Security Agreement, the other "Collateral Documents" (or similarly defined term) as defined in the First Lien Credit Agreement and each other agreement entered into in favor of the First Lien Credit Agreement Collateral Agent for the purpose of securing and/or perfecting any First Lien Credit Agreement Obligations.

"First Lien Credit Agreement Obligations" means all "Secured Obligations" (or similarly defined term) as defined in the First Lien Credit Agreement.

"First Lien Credit Agreement Secured Parties" means the "Secured Parties" (or similarly defined term) as defined in the First Lien Credit Agreement.

"First Lien Obligations" means, collectively, (i) the First Lien Credit Agreement Obligations and (ii) each Series of Additional First Lien Obligations.

"First Lien Secured Parties" means (i) the First Lien Credit Agreement Secured Parties and (ii) the Additional First Lien Secured Parties with respect to each Series of Additional First Lien Obligations.

"First Lien Security Agreement" means the "Security Agreement" (or similarly defined term) as defined in the First Lien Credit Agreement.

"First Lien Security Documents" means, collectively, (i) the First Lien Credit Agreement Collateral Documents and (ii) the Additional First Lien Security Documents.

"Grantors" means Holdings, the Borrowers and each of the Subsidiary Guarantors (as defined in the First Lien Credit Agreement) and each other parent entity or subsidiary of the Top Borrower which has granted a security interest pursuant to any First Lien Security Document to secure any Series of First Lien Obligations (including any such Person which becomes a party to this Agreement as contemplated by Section 5.16). The Grantors existing on the date hereof are set forth in Annex I hereto.

"Holdings" has the meaning assigned to such term in the introductory paragraph hereto.

"Impairment" has the meaning assigned to such term in Section 1.03.

"Initial Additional Authorized Representative" has the meaning assigned to such term in the introductory paragraph hereto.

"Initial Additional First Lien Agreement" mean that certain [Indenture] [Other Agreement], dated as of [_____], among the relevant Borrower, [the Subsidiary Guarantors identified therein,] and [   ], as [trustee], as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"Initial Additional First Lien Collateral Agent" has the meaning assigned to such term in the introductory paragraph hereto.

"Initial Additional First Lien Documents" means the Initial Additional First Lien Agreement, the [debt securities issued] [loans made] thereunder, the Initial Additional First Lien Security Agreement and any collateral agreements, security documents, guarantees and other operative agreements evidencing or governing the Indebtedness thereunder, and the Liens securing or purporting to secure, such Indebtedness.

"Initial Additional First Lien Obligations" means the [Obligations] as such term is defined in the Initial Additional First Lien [Agreement] [Security Agreement].

"Initial Additional First Lien Secured Parties" means the Initial Additional First Lien Collateral Agent, the Initial Additional Authorized Representative and the holders of the Initial Additional First Lien Obligations issued pursuant to the Initial Additional First Lien Agreement.

"Initial Additional First Lien Security Agreement" means the security agreement, dated as of the date hereof, among the relevant Borrowers, the Initial Additional First Lien Collateral Agent and the other parties thereto, as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"Insolvency or Liquidation Proceeding" means:

(1)    any case commenced by or against any Borrower or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of any Borrower or any other Grantor, any receivership or assignment for the benefit of creditors relating to any Borrower or any other Grantor or any similar case or proceeding (including any such proceeding under applicable corporate law) relative to any Borrower or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(2)    any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to any Borrower or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)    any other proceeding of any type or nature in which substantially all claims of creditors of any Borrower or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"Intervening Creditor" has the meaning assigned to such term in Section 2.01(a).

"Joinder Agreement" means a joinder to this Agreement substantially in the form of Annex II hereto or such other form as shall be approved by the Controlling Collateral Agent.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); provided that in no event shall an operating lease in and of itself be deemed to be a Lien.

"Major Non-Controlling Authorized Representative" means, with respect to any Shared Collateral, the Authorized Representative of the Series of Additional First Lien Obligations that constitutes the largest outstanding principal amount of any then outstanding Series of Additional First Lien Obligations with respect to such Shared Collateral; provided, however, that if there are two outstanding Series of Additional First Lien Obligations which have an equal outstanding principal amount, the Series of Additional First Lien Obligations with the earlier maturity date shall be considered to have the larger outstanding principal amount for purposes of this definition.

"National Bedding" has the meaning assigned to such term in the introductory paragraph hereto.

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Non-Controlling Authorized Representative" means, at any time with respect to any Shared Collateral, any Authorized Representative that is not the Applicable Authorized Representative at such time with respect to such Shared Collateral.

"Non-Controlling Authorized Representative Enforcement Date" means, with respect to any Non-Controlling Authorized Representative, the date which is 180 days (throughout which 180 day period such Non-Controlling Authorized Representative was the Major Non-Controlling Authorized Representative) after the occurrence of both (i) an Event of Default (under and as defined in the Additional First Lien Document under which such Non-Controlling Authorized Representative is the Authorized Representative) and (ii) each Collateral Agent's and each other Authorized Representative's receipt of written notice from such Non-Controlling Authorized Representative certifying that (x) such Non-Controlling Authorized Representative is the Major Non-Controlling Authorized Representative and that an Event of Default (under and as defined in the Additional First Lien Document under which such Non-Controlling Authorized Representative is the Authorized Representative) has occurred and is continuing and (y) the Additional First Lien Obligations of the Series with respect to which such Non-Controlling Authorized Representative is the Authorized Representative are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Additional First Lien Document; provided that the Non-Controlling Authorized Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to the Shared Collateral (1) at any time the First Lien Credit Agreement Collateral Agent, the Applicable Authorized Representative or the Controlling Collateral Agent has commenced and is diligently pursuing any enforcement action with respect to the Shared Collateral or a material portion thereof or (2) at any time any Grantor which has granted a security interest in any Shared Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"Non-Controlling Secured Parties" means, with respect to any Shared Collateral, the First Lien Secured Parties which are not Controlling Secured Parties with respect to such Shared Collateral.

"Possessory Collateral" means any Shared Collateral in the possession and/or control of any Collateral Agent (or its agents or bailees), to the extent that possession and/or control thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction. Possessory Collateral includes, without limitation, any Certificated Securities, Promissory Notes, Instruments, and Chattel Paper, in each case, delivered to or in the possession of and/or under the control of any Collateral Agent under the terms of the First Lien Security Documents.

"Proceeds" has the meaning assigned to such term in Section 2.01(a).

"Refinance" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay such indebtedness, or to issue other indebtedness or enter into alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "Refinanced" and "Refinancing" have correlative meanings.

"Secured Credit Document" means (i) the First Lien Credit Agreement and each Loan Document (or similarly defined term) (as defined in the First Lien Credit Agreement), (ii) each Initial Additional First Lien Document, and (iii) each Additional First Lien Document for Additional First Lien Obligations incurred after the date hereof.

WEIL:\95919475\5\74339.0038

"Secured Hedge Agreement" means any Hedge Agreement evidencing Secured Hedging Obligations (or equivalent term under any Additional First Lien Document).

"Series" means (a) with respect to the First Lien Secured Parties, each of (i) the First Lien Credit Agreement Secured Parties (in their capacities as such), (ii) the Initial Additional First Lien Secured Parties (in their capacities as such), and (iii) the Additional First Lien Secured Parties (in their capacities as such) that become subject to this Agreement after the date hereof that are represented by a common Authorized Representative (in its capacity as such for such Additional First Lien Secured Parties) and (b) with respect to any First Lien Obligations, each of (i) the First Lien Credit Agreement Obligations, (ii) the Initial Additional First Lien Obligations, and (iii) the Additional First Lien Obligations incurred after the date hereof pursuant to any Additional First Lien Document, the holders of which, pursuant to any Joinder Agreement, are to be represented hereunder by a common Authorized Representative (in its capacity as such for such Additional First Lien Obligations).

"Shared Collateral" means, at any time, Collateral in which the holders of two or more Series of First Lien Obligations (or their respective Authorized Representatives or Collateral Agents on behalf of such holders) hold or purport to hold a valid security interest at such time. If more than two Series of First Lien Obligations are outstanding at any time and the holders of less than all Series of First Lien Obligations hold or purport to hold a valid security interest in any Collateral at such time, then such Collateral shall constitute Shared Collateral for those Series of First Lien Obligations that hold or purport to hold a valid security interest in such Collateral at such time and shall not constitute Shared Collateral for any Series which does not have or purport to have a valid security interest in such Collateral at such time.

"SSB" has the meaning assigned to such term in the introductory paragraph hereto.

"SSB Manufacturing" has the meaning assigned to such term in the introductory paragraph hereto.

"Top Borrower" has the meaning assigned to such term in the introductory paragraph hereto.

"Treasury Services Agreement" means any agreement that evidences Banking Services Obligations (or equivalent term under any Additional First Lien Document).

"UBS" has the meaning assigned to such term in the introductory paragraph hereto.

SECTION 1.02 Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "hereto", "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

SECTION 1.03 Impairments. It is the intention of the First Lien Secured Parties of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Secured Parties of any other Series) bear the risk of (i) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations

(other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have a valid and perfected security interest in any of the Collateral securing any other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations) on a basis ranking prior to the security interest of such Series of First Lien Obligations but junior to the security interest of any other Series of First Lien Obligations or (ii) the existence of any Collateral for any other Series of First Lien Obligations that is not Shared Collateral for such Series (any such condition referred to in the foregoing clauses (i) or (ii) with respect to any Series of First Lien Obligations, an "Impairment" of such Series); provided that the existence of a maximum claim with respect to any Material Real Estate Asset (as defined in the First Lien Credit Agreement) subject to a mortgage that applies to all First Lien Obligations shall not be deemed to be an Impairment of any Series of First Lien Obligations. In the event of any Impairment with respect to any Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including, without limitation, the right to receive distributions in respect of such Series of First Lien Obligations pursuant to Section 2.01) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment. Additionally, in the event the First Lien Obligations of any Series are modified pursuant to applicable law (including, without limitation, pursuant to Section 1129 of the Bankruptcy Code or any other provision of any Bankruptcy Law), any reference to such First Lien Obligations or the First Lien Security Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

ARTICLE II

Priorities and Agreements with Respect to Shared Collateral

SECTION 2.01 Priority of Claims.

(a) Anything contained herein or in any of the Secured Credit Documents to the contrary notwithstanding (but subject to Section 1.03), if an Event of Default has occurred and is continuing, and the Controlling Collateral Agent or any First Lien Secured Party is taking action to enforce rights in respect of any Shared Collateral, or any distribution is made in respect of any Shared Collateral in any Bankruptcy Case of any Borrower or any other Grantor or any First Lien Secured Party receives any payment pursuant to any intercreditor agreement (other than this Agreement) with respect to any Shared Collateral, the proceeds of any sale, collection or other liquidation of any such Shared Collateral by the Controlling Collateral Agent or any other First Lien Secured Party on account of such enforcement of rights or remedies or distribution in respect thereof in any Bankruptcy Case or any payment received by the Controlling Collateral Agent or any other First Lien Secured Party pursuant to any such intercreditor agreement (other than this Agreement) with respect to such Shared Collateral (subject, in the case of any such payment or distribution, to the sentence immediately following) (all proceeds of any sale, collection or other liquidation of any Collateral and all proceeds of any such payment or distribution being collectively referred to as "Proceeds"), shall be applied (i) FIRST, to the payment in full in cash of all amounts owing to each Collateral Agent (in its capacity as such and, in the case of the First Lien Credit Agreement Collateral Agent, in its capacity as First Lien Credit Agreement Administrative Agent) pursuant to the terms of any Secured Credit Document, (ii) SECOND, subject to Section 1.03, to the payment in full in cash of the First Lien Obligations of each Series on a ratable basis, with such Proceeds to be applied to the First Lien Obligations of a given Series in accordance with the terms of the applicable Secured Credit Documents and (iii) THIRD after Discharge of all First Lien Obligations, to the Borrowers and the other Grantors or their successors or assigns, as their interests may appear, or to whomsoever may be lawfully entitled to receive the same, or as a court of competent jurisdiction may direct. If, despite the provisions of this Section 2.01(a), any First Lien Secured Party shall receive any payment or other recovery in excess of its portion of payments on account of the First Lien Obligations to which it is then entitled in accordance with this Section 2.01(a), such First Lien Secured Party shall hold such payment or recovery in trust for the benefit of all First Lien Secured Parties in accordance with Section 2.03(b) for distribution in accordance with this Section 2.01(a). Notwithstanding the foregoing, with respect to any Shared Collateral for which a third party (other than a First Lien Secured Party) has a lien or security interest

that is junior in priority to the security interest of any Series of First Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of any other Series of First Lien Obligations (such third party, an "Intervening Creditor"), the value of any Shared Collateral or Proceeds allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Shared Collateral or Proceeds to be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.

(b)     Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing any Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Secured Credit Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of any Series or any other circumstance whatsoever (but, in each case, subject to Section 1.03), each First Lien Secured Party hereby agrees that the Liens securing each Series of First Lien Obligations on any Shared Collateral shall be of equal priority.

SECTION 2.02  Actions with Respect to Shared Collateral; Prohibition on Contesting Liens.

(a)     Only the Controlling Collateral Agent shall act or refrain from acting with respect to any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral). At any time when the First Lien Credit Agreement Collateral Agent is the Controlling Collateral Agent, no Additional First Lien Secured Party shall or shall instruct any Collateral Agent to, and no Collateral Agent that is not the Controlling Collateral Agent shall, commence any judicial or non-judicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any Additional First Lien Security Document, applicable law or otherwise, it being agreed that only the First Lien Credit Agreement Collateral Agent, acting in accordance with the First Lien Credit Agreement Collateral Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral at such time.

(b)     With respect to any Shared Collateral at any time when the First Lien Credit Agreement Collateral Agent is not the Controlling Collateral Agent, (i) the Controlling Collateral Agent shall act only on the instructions of the Applicable Authorized Representative, (ii) the Controlling Collateral Agent shall not follow any instructions with respect to such Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral) from any Non-Controlling Authorized Representative (or any other First Lien Secured Party other than the Applicable Authorized Representative) and (iii) no Non-Controlling Authorized Representative or other First Lien Secured Party (other than the Applicable Authorized Representative) shall or shall instruct the Controlling Collateral Agent to, commence any judicial or non-judicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any First Lien Security Document, applicable law or otherwise, it being agreed that only the Controlling Collateral Agent, acting on the instructions of the Applicable Authorized Representative and in accordance with the applicable Additional First Lien Security Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral.

(c)     Notwithstanding the equal priority of the Liens securing each Series of First Lien Obligations with respect to any Shared Collateral, the Controlling Collateral Agent may deal with the Shared Collateral as if such Controlling Collateral Agent had a senior and exclusive Lien on such Shared Collateral.  No Non-Controlling Authorized Representative or Non-Controlling Secured Party will contest, protest or object (or support any other Person in contesting, protesting or objecting) to any foreclosure proceeding or action brought

by the Controlling Collateral Agent, the Applicable Authorized Representative or any Controlling Secured Party or any other exercise by the Controlling Collateral Agent, the Applicable Authorized Representative or any Controlling Secured Party of any rights and remedies relating to the Shared Collateral, or to cause the Controlling Collateral Agent to do so. The foregoing shall not be construed to limit the rights and priorities of any First Lien Secured Party, the Controlling Collateral Agent or any Authorized Representative with respect to any Collateral not constituting Shared Collateral.

(d) Each of the First Lien Secured Parties agrees that it will not (and hereby waives any right to) question or contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity, attachment or enforceability of a Lien held by or on behalf of any of the First Lien Secured Parties in all or any part of the Collateral, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Collateral Agent or any Authorized Representative to enforce this Agreement.

SECTION 2.03 No Interference; Payment Over.

(a) Each First Lien Secured Party agrees that (i) it will not challenge or question in any proceeding the validity or enforceability of any First Lien Obligations of any Series or any First Lien Security Document or the validity, attachment, perfection or priority of any Lien under any First Lien Security Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Shared Collateral by the Controlling Collateral Agent, (iii) except as provided in Section 2.02, it shall have no right to (A) direct the Controlling Collateral Agent or any other First Lien Secured Party to exercise, and shall not exercise, any right, remedy or power with respect to any Shared Collateral (including pursuant to any intercreditor agreement) or (B) consent to the exercise by the Controlling Collateral Agent or any other First Lien Secured Party of any right, remedy or power with respect to any Shared Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Controlling Collateral Agent or any other First Lien Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Shared Collateral, and none of the Controlling Collateral Agent, any Applicable Authorized Representative or any other First Lien Secured Party shall be liable for any action taken or omitted to be taken by the Controlling Collateral Agent, such Applicable Authorized Representative or other First Lien Secured Party with respect to any Shared Collateral in accordance with the provisions of this Agreement, (v) if not the Controlling Collateral Agent, it will not seek, and hereby waives any right, to have any Shared Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Controlling Collateral Agent or any other First Lien Secured Party to enforce this Agreement.

(b) Each First Lien Secured Party hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any such Shared Collateral, pursuant to any First Lien Security Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Secured Parties and promptly transfer such Shared Collateral, proceeds or payment, as the case may be, to the Controlling Collateral Agent, to be distributed in accordance with the provisions of Section 2.01 hereof.

SECTION 2.04 Release of Liens; Power of Attorney.

(a) If, at any time the Controlling Collateral Agent forecloses upon or otherwise exercises remedies against any Shared Collateral resulting in a sale or disposition thereof, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of each other Collateral Agent

for the benefit of each Series of First Lien Secured Parties upon such Shared Collateral will automatically be released and discharged as and when, but only to the extent, such Liens of the Controlling Collateral Agent on such Shared Collateral are released and discharged; provided that (i) the Liens in favor of each Collateral Agent for the benefit of each related Series of First Lien Secured Parties secured by such Shared Collateral attach to any such Proceeds of such sale or disposition with the same priority vis-à-vis all the other First Lien Secured Parties as existed prior to the commencement of such sale or other disposition, and any such Liens shall remain subject to the terms of this Agreement until application thereof pursuant to Section 2.01 and (ii) any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.01.

(b)     Each Collateral Agent and Authorized Representative agrees to execute and deliver (at the sole costs and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Controlling Collateral Agent to evidence and confirm any release of Shared Collateral provided for in this Section.

(c)     Each Non-Controlling Authorized Representative and Collateral Agent that is not the Controlling Collateral Agent, for itself and on behalf of the First Lien Secured Parties of the Series for whom it is acting, hereby irrevocably appoints the Controlling Collateral Agent and any officer or agent of the Controlling Collateral Agent, which appointment is coupled with an interest with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Non-Controlling Authorized Representative, Collateral Agent or First Lien Secured Party, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Agreement, including the exercise of any and all remedies under each First Lien Security Document with respect to Shared Collateral and to evidence and confirm any release of Shared Collateral provided for in this Section 2.04.

SECTION 2.05 Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)     This Agreement shall continue in full force and effect notwithstanding the commencement of any Insolvency or Liquidation Proceeding.  The parties hereto acknowledge that the provisions of this Agreement are intended to be enforceable as contemplated by Section 510(a) of the Bankruptcy Code.  All references herein to any Grantor shall include such Grantor as a debtor-in-possession and any receiver or trustee for such Grantor.

(b)     If any Borrower and/or any other Grantor shall become subject to a case or proceeding (a "Bankruptcy Case") under the Bankruptcy Code or any other Bankruptcy Law and shall, as debtor(s)-in-possession, move for approval of financing ("DIP Financing") to be provided by one or more lenders (the "DIP Lenders") to such Borrower or such Grantor under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law or the use of cash collateral under Section 363 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, each First Lien Secured Party (other than any Controlling Secured Party or the Authorized Representative of any Controlling Secured Party) agrees that it will not raise, join or support any objection to any such financing or to the Liens on the Shared Collateral securing the same ("DIP Financing Liens") or to any use of cash collateral that constitutes Shared Collateral, unless the Controlling Collateral Agent (acting on the instructions of the Applicable Authorized Representative) shall then oppose or object (or join in or support any objection) to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Shared Collateral as set forth herein), in each case so long as (A) the First Lien Secured Parties of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-à-vis all the

other First Lien Secured Parties (other than any Liens of the First Lien Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Secured Parties of each Series are granted Liens on any additional collateral pledged to any First Lien Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-à-vis the First Lien Secured Parties (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens) as set forth in this Agreement, (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.01, and (D) if any First Lien Secured Parties are granted adequate protection, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.01; provided that this Agreement shall not limit the right of the First Lien Secured Parties of each Series to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Secured Parties of such Series or its Authorized Representative that shall not constitute Shared Collateral; and provided, further, that the First Lien Secured Parties receiving adequate protection shall not object to any other First Lien Secured Party receiving adequate protection comparable to any adequate protection granted to such First Lien Secured Parties in connection with a DIP Financing or use of cash collateral.

SECTION 2.06 Reinstatement.  In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference or other avoidance action under the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash.

SECTION 2.07 Insurance.  As between the First Lien Secured Parties, the Controlling Collateral Agent (acting at the direction of the Applicable Authorized Representative) shall have the right to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation, expropriation or similar proceeding affecting the Shared Collateral.

SECTION 2.08 Refinancings, etc.  The First Lien Obligations of any Series may, subject to the limitations set forth in the then extant Secured Credit Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced (in whole or in part) or otherwise amended or modified from time to time, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the Refinancing transaction under any Secured Credit Document) of any First Lien Secured Party of any other Series, all without affecting the priorities provided for in Section 2.01(a) or the other provisions hereof; provided that the Authorized Representative and Collateral Agent of the holders of any such Refinancing indebtedness shall have executed a Joinder Agreement on behalf of the holders of such Refinancing indebtedness.

SECTION 2.09 Possessory Collateral Agent as Gratuitous Bailee and Agent for Perfection.

(a)  The Possessory Collateral shall be delivered to the Controlling Collateral Agent and the Controlling Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee and non-fiduciary agent for the benefit of each other First Lien Secured Party for which such Possessory Collateral is Shared Collateral and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09; provided that at any time the existing Controlling Collateral Agent ceases to be the Controlling Collateral Agent hereunder, the outgoing Controlling Collateral Agent shall (at the sole cost and expense of the Grantors), at the request of the Additional First Lien Collateral Agent that is the new Controlling Collateral Agent, promptly deliver all Possessory Collateral to such Additional First Lien Collateral Agent together with any necessary endorsements (or otherwise allow such Additional First Lien Collateral Agent to obtain control of such Possessory Collateral).   Each Borrower and the other Grantors shall

take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify each Collateral Agent for loss or damage suffered by such Collateral Agent as a result of such transfer except for loss or damage suffered by such Collateral Agent as a result of its own willful misconduct, gross negligence or bad faith (as determined by a court of competent jurisdiction in a final, non-appealable judgment).

(b)     The Controlling Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral, from time to time in its possession, as gratuitous bailee and non-fiduciary agent for the benefit of each other First Lien Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09.

(c)     The duties or responsibilities of the Controlling Collateral Agent and each other Collateral Agent under this Section 2.09 shall be limited solely to holding any Shared Collateral constituting Possessory Collateral as gratuitous bailee and non-fiduciary agent for the benefit of each other First Lien Secured Party for purposes of perfecting the Lien held by such First Lien Secured Parties thereon.

SECTION 2.10 Amendments to Security Documents.

(a)     Without the prior written consent of the First Lien Credit Agreement Collateral Agent, each Additional First Lien Secured Party agrees that no Additional First Lien Security Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Additional First Lien Security Document would be prohibited by any of the terms of this Agreement.

(b)     Without the prior written consent of the Additional First Lien Collateral Agents, the First Lien Credit Agreement Collateral Agent agrees that no First Lien Credit Agreement Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new First Lien Credit Agreement Collateral Document would be prohibited by any of the terms of this Agreement.

(c)     In making determinations required by this Section 2.10, each Collateral Agent may conclusively rely on a certificate of a Responsible Officer of the Top Borrower stating that such amendment is permitted by Sections 2.10(a) or (b) as the case may be.

ARTICLE III

Existence and Amounts of Liens and Obligations

SECTION 3.01 Determinations with Respect to Amounts of Liens and Obligations.  Whenever a Collateral Agent or any Authorized Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of any Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of any Series, it may request that such information be furnished to it in writing by each other Authorized Representative or Collateral Agent and shall be entitled to make such determination or not make any determination on the basis of the information so furnished; provided, however, that if an Authorized Representative or a Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Collateral Agent or Authorized Representative shall be entitled to make any such determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Top Borrower.  Each Collateral Agent and each Authorized Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Secured Party or any other person as a result of such determination.

ARTICLE IV

The Controlling Collateral Agent

SECTION 4.01 Authority.

(a)     Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on any Controlling Collateral Agent to any Non-Controlling Secured Party or any other Person, regardless of whether an Event of Default has occurred or is continuing, or give any Non-Controlling Secured Party the right to direct any Controlling Collateral Agent, except that each Controlling Collateral Agent shall be obligated to distribute proceeds of any Shared Collateral in accordance with Section 2.01 hereof.

(b)     In furtherance of the foregoing, each Non-Controlling Secured Party acknowledges and agrees that the Controlling Collateral Agent shall be entitled, for the benefit of the First Lien Secured Parties, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Security Documents, as applicable, pursuant to which the Controlling Collateral Agent is the collateral agent and/or administrative agent for such Shared Collateral, without regard to any rights to which the Non-Controlling Secured Parties would otherwise be entitled as a result of the First Lien Obligations held by such Non-Controlling Secured Parties.  Without limiting the foregoing, each Non-Controlling Secured Party agrees that none of the Controlling Collateral Agent, the Applicable Authorized Representative or any other First Lien Secured Party shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Non-Controlling Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured Parties from such realization, sale, disposition or liquidation. Except with respect to any actions expressly prohibited or required to be taken by this Agreement, each of the First Lien Secured Parties waives any claim it may now or hereafter have against any Collateral Agent or the Authorized Representative of any other Series of First Lien Obligations or any other First Lien Secured Party of any other Series arising out of (i) any actions which any Collateral Agent, Authorized Representative or the First Lien Secured Parties take or omit to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Security Documents or any other agreement related thereto or to the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations, (ii) any election by any Applicable Authorized Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.05, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, by the Loan Parties or any of their subsidiaries, as debtor-in-possession. Notwithstanding any other provision of this Agreement, the Controlling Collateral Agent shall not accept any Shared Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the Uniform Commercial Code of any jurisdiction, without the consent of each Authorized Representative representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral.

SECTION 4.02 Rights as a First Lien Secured Party.  The Person serving as the Controlling Collateral Agent hereunder shall have the same rights and powers in its capacity as a First Lien Secured Party under any Series of First Lien Obligations that it holds as any other First Lien Secured Party of such Series and may exercise the same as though it were not the Controlling Collateral Agent and the term "First Lien Secured Party" or "First Lien Secured Parties" or (as applicable) "First Lien Credit Agreement Secured Party", "First Lien Credit Agreement Secured Parties", "Additional First Lien Secured Party", "Additional First Lien Secured Parties", "Initial Additional First Lien Secured Party" or "Initial Additional First Lien Secured

-14-

Parties" shall, if applicable and unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Controlling Collateral Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Borrower or any subsidiary or other Affiliate thereof as if such Person were not the Controlling Collateral Agent hereunder and without any duty to account therefor to any other First Lien Secured Party.

SECTION 4.03 Exculpatory Provisions.

(a)     The Controlling Collateral Agent shall not have any duties or obligations except those expressly set forth herein and in the other First Lien Security Documents to which it is a party. Without limiting the generality of the foregoing, the Controlling Collateral Agent:

(i)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other First Lien Security Documents that the Controlling Collateral Agent is required to exercise as directed in writing by the Applicable Authorized Representative; provided that the Controlling Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Controlling Collateral Agent to liability or that is contrary to any First Lien Security Document or applicable law;

(ii)     shall not, except as expressly set forth herein and in the other First Lien Security Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Controlling Collateral Agent or any of its Affiliates in any capacity;

(iii)     shall not be liable for any action taken or not taken by it (A) with the consent or at the request of the Applicable Authorized Representative or (B) in the absence of the willful misconduct, gross negligence, bad faith or material breach of this Agreement by the Controlling Collateral Agent or any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of the Controlling Collateral Agent (in each case, as determined by a court of competent jurisdiction in a final, non-appealable judgment) or (C) in reliance on a certificate of a Responsible Officer of the Top Borrower stating that such action is permitted by the terms of this Agreement (it being understood and agreed that the Controlling Collateral Agent shall be deemed not to have knowledge of any Event of Default under any Series of First Lien Obligations unless and until notice describing such Event of Default is given to the Controlling Collateral Agent by the Authorized Representative of such First Lien Obligations or the Top Borrower); shall not be responsible for or have any duty to ascertain or inquire into (A) any statement, warranty or representation made in or in connection with this Agreement or any other First Lien Security Document, (B) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any default, (D) the validity, enforceability, effectiveness or genuineness of this Agreement, any other First Lien Security Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the First Lien Security Documents, (E) the existence, value or the sufficiency of any Collateral for any Series of First Lien Obligations, or (F) the satisfaction of any condition set forth in any Secured Credit Document, other than to confirm receipt of items expressly required to be delivered to the Controlling Collateral Agent; and

(iv)     with respect to the First Lien Credit Agreement or any Additional First Lien Document, may conclusively assume that the Grantors have complied with all of their obligations thereunder unless advised in writing by the Authorized Representative thereunder to the contrary specifically setting forth the alleged violation.

(b)     Each First Lien Secured Party acknowledges that, in addition to acting as the initial Controlling Collateral Agent, UBS also serves as Administrative Agent (under, and as defined in, the First Lien Credit Agreement), and each First Lien Secured Party hereby waives any right to make any objection or claim against UBS (or any successor Controlling Collateral Agent or any of their respective counsel) based on

any alleged conflict of interest or breach of duties arising from the Controlling Collateral Agent also serving as the First Lien Credit Agreement Collateral Agent.

SECTION 4.04 <u>Reliance by Controlling Collateral Agent</u>.  The Controlling Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Controlling Collateral Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  The Controlling Collateral Agent may consult with legal counsel (who may include, but shall not be limited to, counsel for any Grantor or counsel for the Applicable Authorized Representative), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 4.05 <u>Delegation of Duties</u>.  The Controlling Collateral Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other First Lien Security Document by or through any one or more sub-agents appointed by the Controlling Collateral Agent.  The Controlling Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Affiliates of the Controlling Collateral Agent and any such sub-agent.

SECTION 4.06 <u>Non Reliance on Controlling Collateral Agent and Other First Lien Secured Parties</u>.  Each First Lien Secured Party acknowledges that it has, independently and without reliance upon the Controlling Collateral Agent, any Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the other Secured Credit Documents.  Each First Lien Secured Party also acknowledges that it will, independently and without reliance upon the Controlling Collateral Agent, any Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Secured Credit Document or any related agreement or any document furnished hereunder or thereunder.

ARTICLE V

Miscellaneous

SECTION 5.01 <u>Notices</u>.  All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)  if to the First Lien Credit Agreement Collateral Agent or to the Authorized Representative for the First Lien Credit Agreement Secured Parties, to it at UBS AG, Stamford Branch, Attention: Structured Finance Processing, 600 Washington Blvd., 9th Floor, Stamford, Connecticut 06901 (Fax No. (203) 719-3888; E-mail: Agency-UBSAmericas@ubs.com);

(b)  if to the Initial Additional First Lien Collateral Agent or the Initial Additional Authorized Representative, to it at [_____], Attention of [        ] (Fax No. [   ]);

(c)  if to any other additional Authorized Representative, to it at the address set forth in the applicable Joinder Agreement.

Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and, may be personally served, telecopied, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or upon receipt via U.S. mail (registered or

-16-

certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth above or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties party hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by telecopy or on the date three Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 5.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 5.01. To the extent agreed to in writing among each Collateral Agent and each Authorized Representative from time to time and upon notification to the Top Borrower, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

SECTION 5.02 Waivers; Amendment; Joinder Agreements.

(a)     No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by Section 5.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)     Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified (other than pursuant to any Joinder Agreement or any Supplement contemplated by Section 5.16) except pursuant to an agreement or agreements in writing entered into by each Authorized Representative and each Collateral Agent (and with respect to any such termination, waiver, amendment or modification which by the terms of this Agreement requires any Borrower's consent or which increases the obligations or reduces the rights of or otherwise materially adversely affects any Borrower or any other Grantor, with the consent of the Top Borrower).

(c)     Notwithstanding the foregoing, without the consent of any First Lien Secured Party, any Authorized Representative may become a party hereto by execution and delivery of a Joinder Agreement in accordance with Section 5.13 and upon such execution and delivery, such Authorized Representative and the Additional First Lien Secured Parties and Additional First Lien Obligations of the Series for which such Authorized Representative is acting hereunder agree to be bound by, and shall be subject to, the terms hereof.

(d)     Notwithstanding the foregoing, in connection with any Refinancing of First Lien Obligations of any Series, or the incurrence of Additional First Lien Obligations of any Series, the Collateral Agents and the Authorized Representatives then party hereto shall enter (and are hereby authorized to enter without the consent of any other First Lien Secured Party or any Loan Party), at the request of any Collateral Agent, any Authorized Representative or the Top Borrower, into such amendments or modifications of this Agreement as are reasonably necessary to reflect such Refinancing or such incurrence in compliance with the Secured Credit Documents and are reasonably satisfactory to each such Collateral Agent and each such Authorized Representative, provided that any Collateral Agent or Authorized Representative may condition its execution and delivery of any such amendment or modification on a receipt of a certificate from a Responsible Officer of the Top Borrower to the effect that such Refinancing or incurrence is permitted by the then existing Secured Credit Documents.

-17-

SECTION 5.03 <u>Parties in Interest</u>.   This Agreement shall be binding upon and inure to the benefit of the First Lien Secured Parties hereto and their respective successors and permitted assigns, as well as the other First Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement. Except as specifically set forth in <u>Section 5.02(b)</u> and <u>Section 5.12</u>, no other person, including the Borrowers, Grantors or any other creditors thereof shall have or be entitled to assert rights or benefits hereunder.

SECTION 5.04 <u>Survival of Agreement</u>.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 5.05 <u>Counterparts</u>.   This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile, pdf. or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

SECTION 5.06 <u>Severability</u>.  Any provision of this Agreement that is held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality or enforceability of the remaining provisions hereof, and the invalidity in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.   The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.07 <u>GOVERNING LAW</u>.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 5.08 <u>Submission to Jurisdiction Waivers; Consent to Service of Process</u>.  Each party hereto (and in the case of Collateral Agent and each Authorized Representative, on behalf of itself and the First Lien Secured Parties of the Series for whom it is acting) irrevocably and unconditionally:

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement and the First Lien Security Documents, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York in the City of New York, Borough of Manhattan, the courts of the United States for the Southern District of New York, and, in each case, appellate courts from any thereof;

(b)      consents and agrees that any such action or proceeding shall be brought in such courts and irrevocably waives (to the extent permitted by applicable law) any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Authorized Representative) at the address set forth in <u>Section 5.01</u>;

(d)      agrees that nothing herein shall affect the right of any other party hereto (or any First Lien Secured Party) to effect service of process in any other manner permitted by law; and

-18-

(e)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Section 5.08</u> any special, exemplary, punitive or consequential damages.

SECTION 5.09  <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 5.09 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

SECTION 5.10  <u>Headings</u>.  Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 5.11  <u>Conflicts</u>.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any of the First Lien Security Documents or any of the other Secured Credit Documents, the provisions of this Agreement shall control to the extent of the conflict or inconsistency.

SECTION 5.12  <u>Provisions Solely to Define Relative Rights</u>.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Secured Parties in relation to one another.  None of the Borrowers, any other Grantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement (provided that nothing in this Agreement (other than <u>Section 2.04</u>, <u>2.05</u>, <u>2.08</u>, <u>2.09</u> or <u>Article V</u>) is intended to or will amend, waive or otherwise modify the provisions of the First Lien Credit Agreement or any Additional First Lien Documents), and none of the Borrowers or any other Grantor may rely on the terms hereof (other than <u>Sections 2.04</u>, <u>2.05</u>, <u>2.08</u>, <u>2.09</u> and <u>Article V</u>).  Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.

SECTION 5.13  <u>Additional Senior Debt</u>.  To the extent, but only to the extent permitted by the provisions of each of the then-extant Secured Credit Documents, any Borrower may incur additional indebtedness after the date hereof that is secured on an equal and ratable basis by the Liens securing the First Lien Obligations on a first lien basis (such indebtedness referred to as "<u>Additional Senior Class Debt</u>").  Any such Additional Senior Class Debt may be secured by a Lien and may be Guaranteed by the Grantors on a senior basis (which Lien shall rank on a *pari passu* basis with the Liens on the Shared Collateral securing all other First Lien Obligations that are secured on a first lien basis), in each case under and pursuant to the Additional First Lien Documents, if and subject to the condition that the Authorized Representative of any such Additional Senior Class Debt (each, an "<u>Additional Senior Class Debt Representative</u>"), acting on behalf of the holders of such Additional Senior Class Debt and the collateral agent for the holders of such Additional Senior Class Debt (each, an "<u>Additional Senior Class Debt Collateral Agent</u>") (such Additional Senior Class Debt Representative, Additional Senior Class Debt Collateral Agent and holders in respect of any Additional Senior Class Debt being referred to as the "<u>Additional Senior Class Debt Parties</u>"), becomes a party to this Agreement as an Authorized Representative and Collateral Agent, as applicable, by satisfying the conditions set forth in clauses (i) through (iv) of the immediately succeeding paragraph.

-19-

In order for an Additional Senior Class Debt Representative and Additional Senior Class Debt Collateral Agent to become a party to this Agreement as an Authorized Representative and Collateral Agent, as applicable,

(i)       such Additional Senior Class Debt Representative, such Additional Senior Class Debt Collateral Agent, each Collateral Agent, each Authorized Representative and each Grantor shall have executed and delivered a Joinder Agreement (with such changes as may be reasonably approved by the Controlling Collateral Agent and Additional Senior Class Debt Representative) pursuant to which such Additional Senior Class Debt Representative becomes an Authorized Representative hereunder, such Additional Senior Class Debt Collateral Agent becomes a Collateral Agent hereunder and the Additional Senior Class Debt in respect of which such Additional Senior Class Debt Representative is the Authorized Representative constitutes Additional First Lien Obligations and the related Additional Senior Class Debt Parties become subject hereto and bound hereby as Additional First Lien Secured Parties;

(ii)      the Borrowers shall have (x) delivered to each Authorized Representative and each Collateral Agent true and complete copies of each of the Additional First Lien Documents relating to such Additional Senior Class Debt, certified as being true and correct by a Responsible Officer of the Top Borrower and (y) identified in a certificate of a Responsible Officer the obligations to be designated as Additional First Lien Obligations and the initial aggregate principal amount or face amount thereof and certified that such obligations are permitted to be incurred and secured on a *pari passu* basis with the then-extant First Lien Obligations and by the terms of the then extant Secured Credit Documents;

(iii)     all filings, recordations and/or amendments or supplements to the First Lien Security Documents necessary or desirable in the reasonable judgment of such Additional Senior Class Debt Collateral Agent to confirm and perfect the Liens securing the relevant obligations relating to such Additional Senior Class Debt shall have been made, executed and/or delivered (or, with respect to any such filings or recordations, acceptable provisions to perform such filings or recordations shall have been taken in the reasonable judgment of such Additional Senior Class Debt Collateral Agent), and all fees and taxes in connection therewith shall have been paid (or acceptable provisions to make such payments have been taken in the reasonable judgment of such Additional Senior Class Debt Collateral Agent); and

(iv)      the Additional First Lien Documents, as applicable, relating to such Additional Senior Class Debt shall provide, in a manner reasonably satisfactory to each Collateral Agent, that each Additional Senior Class Debt Party with respect to such Additional Senior Class Debt will be subject to and bound by the provisions of this Agreement in its capacity as a holder of such Additional Senior Class Debt.

SECTION 5.14 <u>Agent Capacities</u>.  Except as expressly provided herein or in the First Lien Credit Agreement Collateral Documents, UBS is acting in the capacities of First Lien Credit Agreement Administrative Agent and First Lien Credit Agreement Collateral Agent solely for the First Lien Credit Agreement Secured Parties.  Except as expressly provided herein or in the Initial Additional First Lien Security Documents, [  ] is acting in the capacity of Initial Additional First Lien Collateral Agent solely for the Initial Additional First Lien Secured Parties.  Except as expressly set forth herein, none of the First Lien Credit Agreement Administrative Agent, the First Lien Credit Agreement Collateral Agent or any Additional First Lien Collateral Agent shall have any duties or obligations in respect of any of the Collateral, all of such duties and obligations, if any, being subject to and governed by the applicable Secured Credit Documents.

SECTION 5.15 <u>Integration</u>.   This Agreement together with the other Secured Credit Documents and the First Lien Security Documents represents the agreement of each of the Grantors and the First Lien Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by any Grantor, the First Lien Credit Agreement Collateral Agent, or any other First Lien Secured

Party relative to the subject matter hereof not expressly set forth or referred to herein or in the other Secured Credit Documents.

SECTION 5.16 <u>Additional Grantors</u>.  The Top Borrower agrees that, if any subsidiary shall become a Grantor after the date hereof, they will promptly cause such subsidiary to become party hereto by executing and delivering an instrument in the form of Annex III.  Upon such execution and delivery, such subsidiary will become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein.  The parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a Grantor at any time (and any security granted by any such Person) shall be subject to the provisions hereof as fully as if same constituted a Grantor party hereto and had complied with the requirements of the immediately preceding sentence.  The execution and delivery of such instrument shall not require the consent of any other party hereunder, and will be acknowledged by the First Lien Credit Agreement Collateral Agent, the Initial Additional Authorized Representative and each additional Authorized Representative.  The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

UBS AG, STAMFORD BRANCH,
as First Lien Credit Agreement Collateral Agent


By: _____
    Name:
    Title:


[    ],
as Initial Additional First Lien Collateral Agent and as Initial Additional Authorized Representative
By: _____
    Name:
    Title:

DAWN INTERMEDIATE, INC.

By: _____
    Name:
    Title:

SERTA SIMMONS BEDDING, LLC

By: _____
    Name:
    Title:

NATIONAL BEDDING COMPANY L.L.C.

By: _____
    Name:
    Title:

SSB MANUFACTURING COMPANY

By: _____
    Name:
    Title:

Grantors

[●]

[FORM OF] JOINDER NO. [  ] dated as of [ _], 201_ to the FIRST LIEN INTERCREDITOR AGREEMENT dated as of [  ], 20[ ] (the "First Lien Intercreditor Agreement"), among Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), and certain subsidiaries and affiliates of the Top Borrower (each, a "Grantor"), UBS AG, STAMFORD BRANCH, as First Lien Credit Agreement Collateral Agent for the First Lien Credit Agreement Secured Parties under the First Lien Security Documents (in such capacity, the "First Lien Credit Agreement Collateral Agent"), [  ] as Authorized Representative, and the additional Authorized Representatives and Collateral Agents from time to time a party thereto.[1]

A.     Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Intercreditor Agreement.

B.     As a condition to the ability of the Borrowers to incur Additional First Lien Obligations and to secure such Additional Senior Class Debt with the liens and security interests created by the Additional First Lien Security Documents relating thereto, the Additional Senior Class Debt Representative in respect of such Additional Senior Class Debt is required to become an Authorized Representative, the Additional Senior Class Debt Collateral Agent is respect of such Additional Senior Class Debt is required to become a Collateral Agent, and such Additional Senior Class Debt and the Additional Senior Class Debt Parties in respect thereof are required to become subject to and bound by, the First Lien Intercreditor Agreement. Section 5.13 of the First Lien Intercreditor Agreement provides that such Additional Senior Class Debt Representative may become an Authorized Representative, such Additional Senior Class Debt Collateral Agent may become a Collateral Agent and such Additional Senior Class Debt and such Additional Senior Class Debt Parties may become subject to and bound by the First Lien Intercreditor Agreement as Additional First Lien Obligations and Additional First Lien Secured Parties, respectively, upon the execution and delivery by the Additional Senior Class Debt Representative and the Additional Senior Class Debt Collateral Agent of an instrument in the form of this Joinder Agreement and the satisfaction of the other conditions set forth in Section 5.13 of the First Lien Intercreditor Agreement.  The undersigned Additional Senior Class Debt Representative (the "New Representative") and Additional Senior Class Debt Collateral Agent (the "New Collateral Agent") is executing this Joinder Agreement in accordance with the requirements of the First Lien Intercreditor Agreement and the First Lien Security Documents.

Accordingly, each Collateral Agent, each Authorized Representative and the New Representative and the New Collateral Agent agree as follows:

SECTION 1.     In accordance with Section 5.13 of the First Lien Intercreditor Agreement, the New Representative by its signature below becomes an Authorized Representative under, the New Collateral Agent by its signature below becomes a Collateral Agent under, and the related Additional Senior Class Debt and Additional Senior Class Debt Parties become subject to and bound by, the First Lien Intercreditor Agreement as Additional First Lien Obligations and Additional First Lien Secured Parties, with the same force and effect as if the New Representative had originally been named therein as an Authorized Representative and the New Collateral Agent had originally been named therein as Collateral Agent, and each of the New Representative and the New Collateral Agent, on its behalf and on behalf of such Additional Senior Class Debt Parties, hereby agrees to all the terms and provisions of the First Lien Intercreditor Agreement applicable to it as Authorized Representative or Collateral Agent, as applicable and to the Additional Senior Class Debt Parties that it represents as Additional First Lien Secured Parties.  Each reference to an "Authorized Representative" in the First Lien Intercreditor Agreement shall be deemed to include the New Representative.  Each reference to a

---

[1]     In the event of the Refinancing of the First Lien Credit Agreement Obligations, revise to reflect joinder by a new First Lien Credit Agreement Collateral Agent

"Collateral Agent" in the First Lien Intercreditor Agreement shall be deemed to include the New Collateral Agent. The First Lien Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.    Each of the New Representative and the New Collateral Agent represents and warrants to each Collateral Agent, each Authorized Representative and the other First Lien Secured Parties, individually, that (i) it has full power and authority to enter into this Joinder, in its capacity as [trustee/administrative agent and collateral agent] under [describe new facility], (ii) this Joinder has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability and (iii) the Additional First Lien Documents relating to such Additional Senior Class Debt provide that, upon the New Representative's entry into this Agreement, the Additional Senior Class Debt Parties in respect of such Additional Senior Class Debt will be subject to and bound by the provisions of the First Lien Intercreditor Agreement as Additional First Lien Secured Parties.

SECTION 3.    This Joinder may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.   This Joinder shall become effective when each Collateral Agent shall have received a counterpart of this Joinder that bears the signatures of the New Representative and the New Collateral Agent.   Delivery of an executed signature page to this Joinder by telecopy, .pdf or other electronic imaging means shall be effective as delivery of a manually signed counterpart of this Joinder.

SECTION 4.    Except as expressly supplemented hereby, the First Lien Intercreditor Agreement shall remain in full force and effect.

SECTION 5.    THIS JOINDER AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 6.    In case any one or more of the provisions contained in this Joinder should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the First Lien Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the First Lien Intercreditor Agreement.  All communications and notices hereunder to the New Representative or the New Collateral Agent shall be given to it at its address set forth below its signature hereto.

SECTION 8.    Each Borrower agrees to reimburse each Collateral Agent and each Authorized Representative for its reasonable out-of-pocket expenses in connection with this Joinder, including the reasonable fees, other charges and disbursements of counsel, in each case as required by the applicable Secured Credit Documents.

ANNEX II-2

IN WITNESS WHEREOF, the New Representative has duly executed this Joinder to the First Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE], as
[    ] for the holders of
[    ],

By: _____
     Name:
     Title:


Address for notices:


_____
_____
attention of: _____
Telecopy: _____


[NAME OF NEW COLLATERAL AGENT], as
collateral agent for the holders of
[    ],

By: _____
     Name:
     Title:


Address for notices:


_____
_____
attention of: _____
Telecopy: _____

Acknowledged by:

UBS AG, STAMFORD BRANCH,
as the First Lien Credit Agreement Collateral Agent,

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:


[    ],
as Authorized Representative,


By: _____
     Name:
     Title:


[OTHER AUTHORIZED REPRESENTATIVES]

DAWN INTERMEDIATE, INC., as Holdings

By: _____
     Name:
     Title:

SERTA SIMMONS BEDDING, LLC, as the Top Borrower

By: _____
     Name:
     Title:

NATIONAL BEDDING COMPANY L.L.C., as a Borrower

By: _____
     Name:
     Title:

SSB MANUFACTURING COMPANY, as a Borrower

By: _____
     Name:
     Title:

THE OTHER GRANTORS

[●]

By: _____
     Name:
     Title:

SUPPLEMENT NO. [ ] dated as of [   ], 20[ ], to the FIRST LIEN INTERCREDITOR AGREEMENT dated as of [  ], (the "First Lien Intercreditor Agreement"), among Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), and certain subsidiaries and affiliates of the Top Borrower (each, a "Grantor"), UBS AG, STAMFORD BRANCH, as collateral agent under the First Lien Credit Agreement, [   ], as Authorized Representative, and the additional Authorized Representatives and Collateral Agents from time to time party thereto.

A.      Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Intercreditor Agreement.

B.      The Grantors have entered into the First Lien Intercreditor Agreement.  Pursuant to the First Lien Credit Agreement and certain Additional First Lien Documents, certain newly acquired or organized subsidiaries of the Top Borrower are required to enter into the First Lien Intercreditor Agreement.  Section 5.16 of the First Lien Intercreditor Agreement provides that such subsidiaries may become party to the First Lien Intercreditor Agreement by execution and delivery of an instrument in the form of this Supplement.   The undersigned subsidiary (the "New Grantor") is executing this Supplement in accordance with the requirements of the First Lien Credit Agreement and the Additional First Lien Documents.

Accordingly, each Authorized Representative and the New Subsidiary Grantor agree as follows:

SECTION 1.      In accordance with Section 5.16 of the First Lien Intercreditor Agreement, the New Grantor by its signature below becomes a Grantor under the First Lien Intercreditor Agreement with the same force and effect as if originally named therein as a Grantor, and the New Grantor hereby agrees to all the terms and provisions of the First Lien Intercreditor Agreement applicable to it as a Grantor thereunder.   Each reference to a "Grantor" in the First Lien Intercreditor Agreement shall be deemed to include the New Grantor.  The First Lien Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.      The New Grantor represents and warrants to each Authorized Representative and the other First Lien Secured Parties that (i) it has the full power and authority to enter into this Supplement and (ii) this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by Bankruptcy Law and by general principles of equity.

SECTION 3.      This Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.   This Supplement shall become effective when each Authorized Representative shall have received a counterpart of this Supplement that bears the signature of the New Grantor.  Delivery of an executed signature page to this Supplement by facsimile transmission or other electronic method shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4.      Except as expressly supplemented hereby, the First Lien Intercreditor Agreement shall remain in full force and effect.

SECTION 5.      THIS SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 6.      In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the First Lien Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to

replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.   All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the First Lien Intercreditor Agreement.  All communications and notices hereunder to the New Grantor shall be given to it in care of the Top Borrower as specified in the First Lien Intercreditor Agreement.

SECTION 8.   The Top Borrower agrees to reimburse each Authorized Representative for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable fees, other charges and disbursements of counsel for each Authorized Representative as required by the applicable Secured Credit Documents.

IN WITNESS WHEREOF, the New Grantor, and each Authorized Representative have duly executed this Supplement to the First Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW SUBSIDIARY GRANTOR]

By: _____
    Name:
    Title:

Acknowledged by:

UBS AG, STAMFORD BRANCH,
as the First Lien Credit Agreement Collateral Agent and Authorized Representative,

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[          ],
as the Initial Additional Authorized Representative [and the Initial Additional First Lien Collateral Agent and],

By: _____
    Name:
    Title:

[OTHER AUTHORIZED REPRESENTATIVES]

[FORM OF]
FIRST LIEN INTERCREDITOR AGREEMENT

[See attached.]

FIRST LIEN INTERCREDITOR AGREEMENT

among

DAWN INTERMEDIATE, LLC,
as Holdings,

SERTA SIMMONS BEDDING, LLC,
as the Top Borrower,

the other Grantors party hereto,

UBS AG, STAMFORD BRANCH,

as Priority First Lien Credit Agreement Collateral Agent for the Priority First Lien
Credit Agreement Secured Parties and as the Priority First Lien Credit Agreement Administrative Agent,

UBS AG, STAMFORD BRANCH

as the Existing First Lien Collateral Agent for the Existing First Lien
Secured Parties,
and as the Existing Authorized Representative,

and

each additional Authorized Representative and additional Collateral Agent from time to time party hereto

dated as of June 22, 2020

FIRST LIEN INTERCREDITOR AGREEMENT, dated as of June 22, 2020 (as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time, this "Agreement"), among Dawn Intermediate, LLC, a Delaware limited liability company ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing" ), the other Grantors (as defined below) from time to time party hereto, UBS AG, Stamford Branch ("UBS"), as Authorized Representative for the Priority First Lien Credit Agreement Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "Priority First Lien Credit Agreement Administrative Agent"), UBS, as collateral agent for the Priority First Lien Credit Agreement Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "Priority First Lien Credit Agreement Collateral Agent"), UBS, as collateral agent for the Existing First Lien Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "Existing First Lien Collateral Agent"), UBS, as Authorized Representative for the Existing First Lien Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "Existing Authorized Representative") and each additional Authorized Representative and additional Collateral Agent from time to time party hereto for the other Additional First Lien Secured Parties of the Series (as each such term is defined below) with respect to which it is acting in such capacity.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Priority First Lien Credit Agreement Collateral Agent (for itself and on behalf of the Priority First Lien Credit Agreement Secured Parties), the Existing Authorized Representative (for itself and on behalf of the Existing First Lien Secured Parties) and each additional Authorized Representative (for itself and on behalf of the Additional First Lien Secured Parties of the applicable Series) agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01 Certain Defined Terms.  Capitalized terms used but not otherwise defined herein have the meanings set forth in the Priority First Lien Credit Agreement (as defined below) or, if defined in the New York UCC, the meanings specified therein.  As used in this Agreement, the following terms have the meanings specified below:

"ABL Intercreditor Agreement" means the "ABL Intercreditor Agreement" (or similarly defined term) as defined in the Priority First Lien Credit Agreement

"Additional First Lien Collateral Agent" means (a) in the case of the Existing First Lien Obligations, the Existing First Lien Collateral Agent and (b) in the case of any other Series of Additional First Lien Obligations that becomes subject to this Agreement after the date hereof, the Additional Senior Class Debt Collateral Agent for such Series named in the applicable Joinder Agreement.

"Additional First Lien Documents" means, with respect to the Existing First Lien Obligations or any Series of Additional Senior Class Debt, the notes, indentures, credit agreements, collateral agreements, security documents, guarantees and other operative agreements evidencing or governing such Indebtedness and the Liens securing such Indebtedness, including the Existing First Lien Documents and the Additional First Lien Security Documents and each other agreement entered into for the purpose of securing the Existing First Lien Obligations or any Series of Additional Senior Class Debt; provided that, in each case, the Indebtedness thereunder (other than the Existing First Lien Obligations) has been designated as Additional Senior Class Debt pursuant to Section 5.13 hereto.

"Additional First Lien Obligations" means collectively (1) the Existing First Lien Obligations and (2) all amounts owing pursuant to the terms of any Series of Additional Senior Class Debt designated as Additional First Lien Obligations pursuant to Section 5.13 after the date hereof, including, without limitation, the obligation (including guarantee obligations) to pay principal, premium, interest, fees, expenses (including

interest, fees and expenses that accrue after the commencement of a Bankruptcy Case, regardless of whether such interest, fees and expenses are an allowed claim under such Bankruptcy Case), letter of credit commissions, reimbursement obligations, charges, attorneys costs, indemnities, penalties, reimbursements, damages and other amounts payable by a Grantor under any Additional First Lien Document (including guarantees of the foregoing).

"<u>Additional First Lien Secured Party</u>" means the holders of any Additional First Lien Obligations and any Authorized Representative and Additional First Lien Collateral Agent with respect thereto and the beneficiaries of each indemnification obligation undertaken by each Borrower and the other Grantors under any related Additional First Lien Document, and shall include the Existing First Lien Secured Parties and the Additional Senior Class Debt Parties.

"<u>Additional First Lien Security Document</u>" means any collateral agreement, security agreement or any other document now existing or entered into after the date hereof that creates or purports to create, Liens on any assets or properties of any Grantor to secure any of the Additional First Lien Obligations.

"<u>Additional Senior Class Debt</u>" has the meaning assigned to such term in <u>Section 5.13</u>.

"<u>Additional Senior Class Debt Collateral Agent</u>" has the meaning assigned to such term in <u>Section 5.13</u>.

"<u>Additional Senior Class Debt Parties</u>" has the meaning assigned to such term in <u>Section 5.13</u>.

"<u>Additional Senior Class Debt Representative</u>" has the meaning assigned to such term in <u>Section 5.13</u>.

"<u>Agreement</u>" has the meaning assigned to such term in the introductory paragraph of hereto.

"<u>Applicable Authorized Representative</u>" means, with respect to any Shared Collateral, (i) until the Discharge of Priority First Lien Credit Agreement Obligations, the Priority First Lien Credit Agreement Administrative Agent, (ii) from and after the Discharge of Priority First Lien Credit Agreement Obligations until a Discharge of Existing First Lien Credit Agreement Obligations has occurred, the Existing Authorized Representative and (iii) from and after the Discharge of Existing First Lien Credit Agreement Obligations, the Major Non-Controlling Authorized Representative.

"<u>Authorized Representative</u>" means, at any time, (i) in the case of any Priority First Lien Credit Agreement Obligations or the Priority First Lien Credit Agreement Secured Parties, the Priority First Lien Credit Agreement Administrative Agent, (ii) in the case of the Existing First Lien Obligations or the Existing First Lien Secured Parties, the Existing Authorized Representative, and (iii) in the case of any other Series of Additional First Lien Obligations or Additional First Lien Secured Parties that become subject to this Agreement after the date hereof, the Additional Senior Class Debt Representative for such Series named in the applicable Joinder Agreement.

"<u>Bankruptcy Case</u>" has the meaning assigned to such term in <u>Section 2.05(b)</u>.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, as amended.

"<u>Bankruptcy Law</u>" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"<u>Borrowers</u>" means collectively, SSB, National Bedding and SSB Manufacturing.

"<u>Closing Date</u>" means November 8, 2016.

"<u>Collateral</u>" means all assets and properties subject to, or purported to be subject to, Liens created pursuant to any First Lien Security Document to secure one or more Series of First Lien Obligations.

"<u>Collateral Agent</u>" means (i) in the case of any Priority First Lien Credit Agreement Obligations, the Priority First Lien Credit Agreement Collateral Agent, (ii) in the case of the Existing First Lien Obligations, the Existing First Lien Collateral Agent and (iii) in the case of any other Series of Additional First Lien Obligations that become subject to this Agreement after the date hereof, the Additional Senior Class Debt Collateral Agent for such Series named in the applicable Joinder Agreement.

"<u>Contingent First Lien Obligation</u>" means, at any time, First Lien Obligations for taxes, costs, indemnifications, reimbursements, damages and other contingent liabilities (excluding (a) the principal of, and interest and premium (if any) on, and fees and expenses relating to, any First Lien Obligation and (b) contingent reimbursement obligations in respect of amounts that may be drawn under outstanding letters of credit) in respect of which no assertion of liability (whether oral or written) and no claim or demand for payment (whether oral or written) has been made (and, in the case of First Lien Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"<u>Controlling Collateral Agent</u>" means, with respect to any Shared Collateral, (i) until the Discharge of Priority First Lien Credit Agreement Obligations, the Priority First Lien Credit Agreement Collateral Agent, (ii) from and after the Discharge of Priority First Lien Credit Agreement Obligations, until a Discharge of Existing First Lien Credit Agreement Obligations has occurred, the Existing First Lien Collateral Agent and (iii) from and after the Discharge of Existing First Lien Credit Agreement Obligations, the Additional First Lien Collateral Agent for the Series of Additional First Lien Obligations represented by the Major Non-Controlling Authorized Representative.

"<u>Controlling Secured Parties</u>" means, with respect to any Shared Collateral, (i) at any time when the Priority First Lien Credit Agreement Collateral Agent is the Controlling Collateral Agent with respect to such Shared Collateral, the Priority First Lien Credit Agreement Secured Parties and (ii) at any time when the Existing First Lien Collateral Agent is the Controlling Collateral Agent with respect to such Shared Collateral, the Existing First Lien Secured Parties and (iii) at any other time, the other Additional First Lien Secured Parties that are represented by the then applicable Major Non-Controlling Representative.

"<u>DIP Financing</u>" has the meaning assigned to such term in <u>Section 2.05(b)</u>.

"<u>DIP Financing Liens</u>" has the meaning assigned to such term in <u>Section 2.05(b)</u>.

"<u>DIP Lenders</u>" has the meaning assigned to such term in <u>Section 2.05(b)</u>.

"<u>Direction of the Priority First Lien Credit Agreement Required Lenders</u>" means a written direction or instruction from Priority First Lien Credit Agreement Lenders constituting the Priority First Lien Credit Agreement Required Lenders which may be in the form of an email or other form of written communication and which may come from any Specified Lender Advisor. Any such email or other communication from a Specified Lender Advisor shall be conclusively presumed to have been authorized by a written direction or instruction from the Priority First Lien Credit Agreement Required Lenders and such Specified Lender Advisor shall be conclusively presumed to have acted on behalf of and at the written direction or instruction from the Priority First Lien Credit Agreement Required Lenders. For the avoidance of doubt, with respect to each reference herein to (i) documents, agreements or other matters being "satisfactory," "acceptable," "reasonably satisfactory" or "reasonably acceptable" (or any expression of similar import) to the Required Lenders, such determination may be communicated by a Direction of the Priority First Lien Credit Agreement Required Lenders as contemplated above and/or (ii) any matter requiring the consent or approval of, or a determination by, the Priority First Lien Credit Agreement Required Lenders, such consent, approval or determination may be communicated by a Direction of the Priority First Lien Credit Agreement Required Lenders as contemplated above.

"<u>Discharge</u>" means, with respect to any Shared Collateral and any Series of First Lien Obligations, the date on which (i) such Series of First Lien Obligations have been paid in full in cash (other than any Contingent First Lien Obligations) and are no longer secured and no longer required to be secured by such Shared Collateral pursuant to the terms of the documentation governing such Series of First Lien Obligations

or, with respect to any obligations and liabilities under Secured Hedge Agreements or Treasury Services Agreements secured by the Collateral Documents for such Series of First Lien Obligations, any of (x) such obligations and liabilities under Secured Hedge Agreements and Treasury Services Agreements have been paid in full in cash (other than obligations and liabilities under Treasury Services Agreements and Secured Hedge Agreements not due and payable), (y) such obligations and liabilities under Secured Hedge Agreements and Treasury Services Agreements shall have been cash collateralized on terms satisfactory to each applicable counterparty (or other arrangements satisfactory to the applicable counterparty shall have been made) (other than obligations and liabilities under Treasury Services Agreements and Secured Hedge Agreements not due and payable) or (z) such obligations and liabilities under Secured Hedge Agreements and Treasury Services Agreements are no longer secured and no longer required to be secured by such Shared Collateral pursuant to the terms of the documentation governing such Series of First Lien Obligations (other than obligations and liabilities under Treasury Services Agreements and Secured Hedge Agreements not due and payable), (ii) any letters of credit issued pursuant to documentation governing such Series of First Lien Obligations shall either have expired or have been terminated (other than letters of credit that are cash collateralized or back-stopped or deemed reissued under another facility, in each case, in the amount and form required under the applicable Series of First Lien Obligations) and (iii) all commitments under such Series of First Lien Obligations have terminated.  The term "Discharged" shall have a corresponding meaning.

"Discharge of Existing First Lien Credit Agreement Obligations" means, with respect to any Shared Collateral, the Discharge of the Existing First Lien Obligations with respect to such Shared Collateral; provided that the Discharge of First Lien Credit Agreement Obligations shall not be deemed to have occurred in connection with a Refinancing of such Existing First Lien Obligations with Additional First Lien Obligations secured by such Shared Collateral under an Additional First Lien Document which has been designated in writing by the Existing First Lien Credit Agreement Administrative Agent (under the Existing First Lien Credit Agreement so Refinanced) to the Additional First Lien Collateral Agents and each other Authorized Representative as the "Existing First Lien Credit Agreement" for purposes of this Agreement.

"Discharge of Priority First Lien Credit Agreement Obligations" means, with respect to any Shared Collateral, the Discharge of the Priority First Lien Credit Agreement Obligations with respect to such Shared Collateral; provided that the Discharge of Priority First Lien Credit Agreement Obligations shall not be deemed to have occurred in connection with a Refinancing of such Priority First Lien Credit Agreement Obligations with Additional First Lien Obligations secured by such Shared Collateral under an Additional First Lien Document which has been designated in writing by the Priority First Lien Credit Agreement Administrative Agent (under the Priority First Lien Credit Agreement so Refinanced) to the Additional First Lien Collateral Agents and each other Authorized Representative as the "Priority First Lien Credit Agreement" for purposes of this Agreement.

"Event of Default" means an "Event of Default" (or similarly defined term) as defined in any Secured Credit Document.

"Existing Authorized Representative" has the meaning assigned to such term in the introductory paragraph hereto.

"Existing First Lien Agreement Administrative Agent" means the "Administrative Agent" as defined in the Existing First Lien Credit Agreement and shall include any successor administrative agent (including as a result of any Refinancing).

"Existing First Lien Credit Agreement" means the First Lien Term Loan Agreement, dated as of the Closing Date, among, inter alios, Holdings, the Borrowers, UBS, as First Lien Credit Agreement Administrative Agent and each lender from time to time party thereto, as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"Existing First Lien Collateral Agent" has the meaning assigned to such term in the introductory paragraph hereto.

"Existing First Lien Agreement Collateral Documents" means the Existing First Lien Security Agreement, the other "Collateral Documents" as defined in the First Lien Agreement and each other agreement entered into in favor of the Existing First Lien Collateral Agent for the purpose of securing and/or perfecting any Existing First Lien Obligations.

"Existing First Lien Documents" means the Existing First Lien Credit Agreement, the loans made thereunder, the Existing First Lien Security Agreement and any collateral agreements, security documents, guarantees and other operative agreements evidencing or governing the Indebtedness thereunder, and the Liens securing or purporting to secure, such Indebtedness.

"Existing First Lien Obligations" means all Secured Obligations as such term is defined in the Existing First Lien Credit Agreement.

"Existing First Lien Secured Parties" means the "Secured Parties" as defined in the Existing First Lien Credit Agreement.

"Existing First Lien Security Agreement" means the "Security Agreement" (or similarly defined term) as defined in the Existing First Lien Credit Agreement

"First Lien Obligations" means, collectively, (i) the Priority First Lien Credit Agreement Obligations, (ii) the Existing First Lien Obligations and (iii) each other Series of Additional First Lien Obligations.

"First Lien/Second Lien Intercreditor Agreement" means the "First Lien/Second Lien Intercreditor Agreement" (or similarly defined term) as defined in the Priority First Lien Credit Agreement

"First Lien Secured Parties" means (i) the Priority First Lien Credit Agreement Secured Parties, (ii) the Existing First Lien Secured Parties and (iii) the Additional First Lien Secured Parties with respect to each other Series of Additional First Lien Obligations.

"First Lien Security Documents" means, collectively, (i) the Priority First Lien Credit Agreement Collateral Documents, (ii) the Existing First Lien First Lien Credit Agreement Collateral Documents and (ii) the Additional First Lien Security Documents.

"Grantors" means Holdings, the Borrowers and each of the Subsidiary Guarantors (as defined in the Priority First Lien Credit Agreement) and each other parent entity or subsidiary of the Top Borrower which has granted a security interest pursuant to any First Lien Security Document to secure any Series of First Lien Obligations (including any such Person which becomes a party to this Agreement as contemplated by Section 5.16). The Grantors existing on the date hereof are set forth in Annex I hereto.

"Holdings" has the meaning assigned to such term in the introductory paragraph hereto.

"Insolvency or Liquidation Proceeding" means:

(1) any case commenced by or against any Borrower or any other Grantor under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of any Borrower or any other Grantor, any receivership or assignment for the benefit of creditors relating to any Borrower or any other Grantor or any similar case or proceeding (including any such proceeding under applicable corporate law) relative to any Borrower or any other Grantor or its creditors, as such, in each case whether or not voluntary;

(2) any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to any Borrower or any other Grantor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3) any other proceeding of any type or nature in which substantially all claims of creditors of any Borrower or any other Grantor are determined and any payment or distribution is or may be made on account of such claims.

"<u>Joinder Agreement</u>" means a joinder to this Agreement substantially in the form of Annex II hereto or such other form as shall be approved by the Controlling Collateral Agent.

"<u>Lien</u>" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); <u>provided</u> that in no event shall an operating lease in and of itself be deemed to be a Lien.

"<u>Major Non-Controlling Authorized Representative</u>" means, with respect to any Shared Collateral, for so long as the Discharge of Existing First Lien Credit Agreement Obligations has not occurred, the Existing Authorized Representative and, from and after the Discharge of Existing First Lien Credit Agreement Obligations, the Authorized Representative of the Series of Additional First Lien Obligations that constitutes the largest outstanding principal amount of any then outstanding Series of Additional First Lien Obligations with respect to such Shared Collateral; provided, however, that if there are two outstanding Series of Additional First Lien Obligations which have an equal outstanding principal amount, the Series of Additional First Lien Obligations with the earlier maturity date shall be considered to have the larger outstanding principal amount for purposes of this definition.

"<u>National Bedding</u>" has the meaning assigned to such term in the introductory paragraph hereto.

"<u>New York UCC</u>" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"<u>Non-Controlling Authorized Representative</u>" means, at any time with respect to any Shared Collateral, any Authorized Representative that is not the Applicable Authorized Representative at such time with respect to such Shared Collateral.

"<u>Non-Controlling Secured Parties</u>" means, with respect to any Shared Collateral, the First Lien Secured Parties which are not Controlling Secured Parties with respect to such Shared Collateral.

"<u>Possessory Collateral</u>" means any Shared Collateral in the possession and/or control of any Collateral Agent (or its agents or bailees), to the extent that possession and/or control thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction. Possessory Collateral includes, without limitation, any Certificated Securities, Promissory Notes, Instruments, and Chattel Paper, in each case, delivered to or in the possession of and/or under the control of any Collateral Agent under the terms of the First Lien Security Documents.

"<u>Priority First Lien Credit Agreement</u>" means the Super-Priority Term Loan Agreement, dated as of June 22, 2020, among, *inter alios*, Holdings, the Borrowers and UBS, as administrative agent and collateral agent, as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

"<u>Priority First Lien Credit Agreement Administrative Agent</u>" means the "Administrative Agent" as defined in the Priority First Lien Credit Agreement and shall include any successor administrative agent, including as a result of any Refinancing.

"<u>Priority First Lien Credit Agreement Collateral Agent</u>" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Priority First Lien Credit Agreement Collateral Documents</u>" means the Priority First Lien Security Agreement, the other "Collateral Documents" (or similarly defined term) as defined in the Priority First Lien Credit Agreement and each other agreement entered into in favor of the Priority First Lien Credit Agreement Collateral Agent for the purpose of securing and/or perfecting any Priority First Lien Credit Agreement Obligations.

"Priority First Lien Credit Agreement Lenders" means all "Lenders" as defined in the Priority First Lien Credit Agreement.

"Priority First Lien Credit Agreement Obligations" means all "Secured Obligations" (or similarly defined term) as defined in the Priority First Lien Credit Agreement.

"Priority First Lien Credit Agreement Required Lenders" means "Required Lenders" as defined in the Priority First Lien Credit Agreement.

"Priority First Lien Credit Agreement Secured Parties" means the "Secured Parties" (or similarly defined term) as defined in the Priority First Lien Credit Agreement.

"Priority First Lien Security Agreement" means the "Security Agreement" (or similarly defined term) as defined in the Priority First Lien Credit Agreement.

"Proceeds" has the meaning assigned to such term in Section 2.01(a).

"Refinance" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay such indebtedness, or to issue other indebtedness or enter into alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "Refinanced" and "Refinancing" have correlative meanings.

"Secured Credit Document" means (i) the Priority First Lien Credit Agreement and each Loan Document (or similarly defined term) (as defined in the Priority First Lien Credit Agreement), (ii) each Existing First Lien Document, and (iii) each Additional First Lien Document for Additional First Lien Obligations incurred after the date hereof.

"Secured Hedge Agreement" means any Hedge Agreement evidencing Secured Hedging Obligations (or equivalent term under any Additional First Lien Document).

"Series" means (a) with respect to the First Lien Secured Parties, each of (i) the Priority First Lien Credit Agreement Secured Parties (in their capacities as such), (ii) the Existing First Lien Secured Parties (in their capacities as such), and (iii) the Additional First Lien Secured Parties (in their capacities as such) that become subject to this Agreement after the date hereof that are represented by a common Authorized Representative (in its capacity as such for such Additional First Lien Secured Parties) and (b) with respect to any First Lien Obligations, each of (i) the Priority First Lien Credit Agreement Obligations, (ii) the Existing First Lien Obligations, and (iii) the Additional First Lien Obligations incurred after the date hereof pursuant to any Additional First Lien Document, the holders of which, pursuant to any Joinder Agreement, are to be represented hereunder by a common Authorized Representative (in its capacity as such for such Additional First Lien Obligations).

"Shared Collateral" means, at any time, "Collateral" (as defined in the Priority First Lien Security Agreement) or any other Shared Collateral Documents or any other assets and properties subject to Liens created pursuant to any First Lien Security Document to secure one or more Series of First Lien Obligations.

"Shared Collateral Documents" means the Collateral Documents (as defined in the Priority First Lien Credit Agreement or any similar term in any Refinancing thereof), and each other agreement entered into in favor of any Collateral Agent for the purpose of securing any Priority First Lien Credit Agreement Obligations, any Existing First Lien Obligations or any other Additional First Lien Obligations.

"Specified Lender Advisors" means all "Specified Lender Advisors" (or similarly defined term) as defined in the Priority First Lien Credit Agreement.

"SSB" has the meaning assigned to such term in the introductory paragraph hereto.

"SSB Manufacturing" has the meaning assigned to such term in the introductory paragraph hereto.

"Subsequent Exchange Term Loans" means any "Subsequent Exchange Term Loans" as defined in the Priority First Lien Credit Agreement.

"Top Borrower" has the meaning assigned to such term in the introductory paragraph hereto.

"Treasury Services Agreement" means any agreement that evidences Banking Services Obligations (or equivalent term under any Additional First Lien Document).

"UBS" has the meaning assigned to such term in the introductory paragraph hereto.

SECTION 1.02 Terms Generally.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".    The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "hereto", "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

## ARTICLE II

### Priorities and Agreements with Respect to Shared Collateral

SECTION 2.01 Priority of Claims and Priority of Liens.

(a)        Anything contained herein or in any of the Secured Credit Documents to the contrary notwithstanding, in the event that the Collateral Agent or any First Lien Secured Party receives any payment or distribution to be applied to the First Lien Obligations (other than (i) so long as no Event of Default then exists, payments at the maturity date thereof as in effect on the date of this agreement (or in the case of Additional First Lien Obligations entered into after the date hereof, the date of the applicable Joinder Agreement), (ii) regularly scheduled payments of interest and amortization payments pursuant to the Existing First Lien Credit Agreement or other Additional First Lien Document and/or (iii) any payments or distributions made to any Existing First Lien Secured Party to facilitate or effectuate Subsequent Exchange Term Loans as and to the extent permitted pursuant to Section 2.22 of the Priority First Lien Credit Agreement) from the Grantors or arising from the Shared Collateral, whether arising from payments by the Grantors, realization on Shared Collateral, setoff, or otherwise (including any payment pursuant to any intercreditor agreement (other than this Agreement, but including the First Lien/Second Lien Intercreditor Agreement)), and whether or not an Event of Default shall have occurred and be continuing, and including any such proceeds received as a result of any payment or distribution made by a Grantor in an Insolvency or Liquidation Proceeding (collectively, all such proceeds of Shared Collateral (including such proceeds received in an Insolvency or Liquidation Proceeding) being collectively referred to as "Proceeds"), shall be applied (i) FIRST, to payment of that portion of the

Priority First Lien Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest) payable to the Priority First Lien Collateral Agent in its capacity as Collateral Agent hereunder and under the Priority First Lien Security Agreement, until paid in full, (ii) SECOND, to payment of Priority First Lien Credit Agreement Obligations owing to the Priority First Lien Credit Agreement Secured Parties and, if applicable, the Specified Lender Advisors (as defined in the Priority First Lien Credit Agreement) in accordance with the terms of the Priority First Lien Credit Agreement, until paid in full, (iii) THIRD, ratably to payment of Existing First Lien Obligations owing to the Existing First Lien Secured Parties in accordance with the terms of the Existing First Lien Documents and Additional First Lien Obligations (other than the Existing First Lien Obligations) owing to the Additional First Lien Secured Parties (other than the Existing First Lien Secured Parties) on a ratable basis, with such Proceeds to be applied to such Additional First Lien Obligations (other than the Existing First Lien Obligations) of a given Series in accordance with the terms of the applicable Secured Credit Documents, until paid in full, and (v) FOURTH, after payment of all First Lien Obligations, to the Borrowers and the other Grantors or their successors or assigns, as their interests may appear, or to whomsoever may be lawfully entitled to receive the same, or as a court of competent jurisdiction may direct. If, despite the provisions of this Section 2.01(a), any First Lien Secured Party shall receive any payment or other recovery in excess of its portion of payments on account of the First Lien Obligations to which it is then entitled in accordance with this Section 2.01(a), such First Lien Secured Party shall hold such payment or recovery in trust for the benefit of all First Lien Secured Parties for distribution in accordance with this Section 2.01(a).

(b)     It is acknowledged that the First Lien Obligations of any Series may, subject to the limitations set forth in the then extant Secured Credit Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended or modified from time to time, all without affecting the payment priorities set forth in Section 2.01(a) or the provisions of this Agreement defining the relative rights of the First Lien Secured Parties of any Series.

(c)     Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing any Series of First Lien Obligations granted on the Shared Collateral and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Secured Credit Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of any Series or any other circumstance whatsoever, each First Lien Secured Party hereby agrees that the Liens securing each Series of First Lien Obligations on any Shared Collateral shall be of equal priority.

SECTION 2.02 <u>Actions with Respect to Shared Collateral; Prohibition on Contesting Liens</u>.

(a)     Only the Controlling Collateral Agent shall act or refrain from acting with respect to any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral). At any time when the Priority First Lien Credit Agreement Collateral Agent is the Controlling Collateral Agent, no Additional First Lien Secured Party shall or shall instruct any Collateral Agent to, and no Collateral Agent that is not the Controlling Collateral Agent shall, commence any judicial or non-judicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any Additional First Lien Security Document, applicable law or otherwise, it being agreed that only the Priority First Lien Credit Agreement Collateral Agent, acting in accordance with the Priority First Lien Credit Agreement Collateral Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral at such time.

(b)     With respect to any Shared Collateral at any time when the Priority First Lien Credit Agreement Collateral Agent is not the Controlling Collateral Agent, (i) the Controlling Collateral Agent shall act only on the instructions of the Applicable Authorized Representative, (ii) the Controlling Collateral Agent

shall not follow any instructions with respect to such Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral) from any Non-Controlling Authorized Representative (or any other First Lien Secured Party other than the Applicable Authorized Representative) and (iii) no Non-Controlling Authorized Representative or other First Lien Secured Party (other than the Applicable Authorized Representative) shall or shall instruct the Controlling Collateral Agent to, commence any judicial or non-judicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any First Lien Security Document, applicable law or otherwise, it being agreed that only the Controlling Collateral Agent, acting on the instructions of the Applicable Authorized Representative and in accordance with the applicable Additional First Lien Security Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral.

(c)      Notwithstanding the equal priority of the Liens securing each Series of First Lien Obligations with respect to any Shared Collateral, the Controlling Collateral Agent may deal with the Shared Collateral as if such Controlling Collateral Agent had a senior and exclusive Lien on such Shared Collateral.  No Non-Controlling Authorized Representative or Non-Controlling Secured Party will contest, protest or object (or support any other Person in contesting, protesting or objecting) to any foreclosure proceeding or action brought by the Controlling Collateral Agent, the Applicable Authorized Representative or any Controlling Secured Party or any other exercise by the Controlling Collateral Agent, the Applicable Authorized Representative or any Controlling Secured Party of any rights and remedies relating to the Shared Collateral, or to cause the Controlling Collateral Agent to do so.   The foregoing shall not be construed to limit the rights and priorities of any First Lien Secured Party, the Controlling Collateral Agent or any Authorized Representative with respect to any Collateral not constituting Shared Collateral.

(d)      Each of the First Lien Secured Parties agrees that it will not (and hereby waives any right to) question or contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity, attachment or enforceability of a Lien held by or on behalf of any of the First Lien Secured Parties in all or any part of the Shared Collateral, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Collateral Agent or any Authorized Representative to enforce this Agreement.

SECTION 2.03  No Interference; Payment Over.

(a)      Each First Lien Secured Party agrees that (i) it will not challenge or question in any proceeding the validity or enforceability of any First Lien Obligations of any Series or any First Lien Security Document or the validity, attachment, perfection or priority of any Lien under any First Lien Security Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Shared Collateral by the Controlling Collateral Agent, (iii) except as provided in Section 2.02, it shall have no right to (A) direct the Controlling Collateral Agent or any other First Lien Secured Party to exercise, and shall not exercise, any right, remedy or power with respect to any Shared Collateral (including pursuant to any intercreditor agreement) or (B) consent to the exercise by the Controlling Collateral Agent or any other First Lien Secured Party of any right, remedy or power with respect to any Shared Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Controlling Collateral Agent or any other First Lien Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Shared Collateral, and none of the Controlling Collateral Agent, any Applicable Authorized Representative or any other First Lien Secured Party shall be liable for any action taken or omitted to be taken by the Controlling Collateral Agent, such Applicable Authorized Representative or other First Lien Secured Party with respect to any Shared Collateral in accordance with the provisions of this Agreement, (v) if not the Controlling Collateral Agent, it

will not seek, and hereby waives any right, to have any Shared Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Shared Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Controlling Collateral Agent or any other First Lien Secured Party to enforce this Agreement.

(b)     Each First Lien Secured Party hereby agrees that if it shall obtain possession of any Shared Collateral or shall realize any proceeds or payment in respect of any such Shared Collateral, pursuant to any First Lien Security Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the First Lien Obligations, then it shall hold such Shared Collateral, proceeds or payment in trust for the other First Lien Secured Parties and promptly transfer such Shared Collateral, proceeds or payment, as the case may be, to the Controlling Collateral Agent, to be distributed in accordance with the provisions of Section 2.01 hereof.

SECTION 2.04  Release of Liens; Power of Attorney.

(a)     If, at any time the Controlling Collateral Agent forecloses upon or otherwise exercises remedies against any Shared Collateral resulting in a sale or disposition thereof, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of each other Collateral Agent for the benefit of each Series of First Lien Secured Parties upon such Shared Collateral will automatically be released and discharged as and when, but only to the extent, such Liens of the Controlling Collateral Agent on such Shared Collateral are released and discharged; provided that (i) the Liens in favor of each Collateral Agent for the benefit of each related Series of First Lien Secured Parties secured by such Shared Collateral attach to any such Proceeds of such sale or disposition with the same priority vis-à-vis all the other First Lien Secured Parties as existed prior to the commencement of such sale or other disposition, and any such Liens shall remain subject to the terms of this Agreement until application thereof pursuant to Section 2.01 and (ii) any proceeds of any Shared Collateral realized therefrom shall be applied pursuant to Section 2.01.

(b)     Each Collateral Agent and Authorized Representative agrees to execute and deliver (at the sole costs and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Controlling Collateral Agent to evidence and confirm any release of Shared Collateral provided for in this Section.

(c)     Each Non-Controlling Authorized Representative and Collateral Agent that is not the Controlling Collateral Agent, for itself and on behalf of the First Lien Secured Parties of the Series for whom it is acting, hereby irrevocably appoints the Controlling Collateral Agent and any officer or agent of the Controlling Collateral Agent, which appointment is coupled with an interest with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Non-Controlling Authorized Representative, Collateral Agent or First Lien Secured Party, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Agreement, including the exercise of any and all remedies under each First Lien Security Document with respect to Shared Collateral and to evidence and confirm any release of Shared Collateral provided for in this Section 2.04.

SECTION 2.05  Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)     This Agreement shall continue in full force and effect notwithstanding the commencement of any Insolvency or Liquidation Proceeding.  The parties hereto acknowledge that the provisions of this Agreement are intended to be enforceable as contemplated by Section 510(a) of the Bankruptcy Code.  All references herein to any Grantor shall include such Grantor as a debtor-in-possession and any receiver or trustee for such Grantor.

(b)     If any Borrower and/or any other Grantor shall become subject to a case or proceeding (a "Bankruptcy Case") under the Bankruptcy Code or any other Bankruptcy Law and shall, as debtor(s)-in-

possession, move for approval of financing ("DIP Financing") to be provided by one or more lenders (the "DIP Lenders") to such Borrower or such Grantor under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law or the use of cash collateral under Section 363 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, each First Lien Secured Party (other than any Controlling Secured Party or Authorized Representative of any Controlling Secured Party)agrees that it will not raise, join or support any objection to or in any manner oppose, and that it consents to and shall at all times consent to, any DIP Financing and to the Liens on the Shared Collateral securing the same ("DIP Financing Liens") and to any use of cash collateral that constitutes Shared Collateral that is provided, proposed or approved by the Controlling Secured Parties (including, in the case of the Priority First Lien Credit Agreement Secured Parties, the Priority First Lien Credit Agreement Required Lenders in their capacities as such or the Controlling Collateral Agent (acting at the direction of the Controlling Secured Parties (including, in the case of the Priority First Lien Credit Agreement Secured Parties, at the Direction of the Priority First Lien Credit Agreement Required Lenders). With respect to any DIP Financing, DIP Financing Liens and any use of cash collateral that constitutes Shared Collateral that is not provided, proposed or approved by the Controlling Secured Parties (including, in the case of the Priority First Lien Credit Agreement Secured Parties, Priority First Lien Credit Agreement Required Lenders in their capacities as such or the Controlling Collateral Agent (acting at the direction of the Controlling Secured Parties (including, in the case of the Priority First Lien Credit Agreement Secured Parties, at the Direction of the Priority First Lien Credit Agreement Required Lenders), each of the other First Lien Secured Parties agrees that it will raise no objection to, or in any manner oppose, any such DIP Financing, any such DIP Financing Liens and any such use of cash collateral that constitutes Shared Collateral unless the Controlling Collateral Agent (acting at the direction of the Controlling Secured Parties (including, in the case of the Priority First Lien Credit Agreement Secured Parties, at the Direction of the Priority First Lien Credit Agreement Required Lenders) shall then oppose or object to such DIP Financing, such DIP Financing Liens or such use of cash collateral. Additionally, each Authorized Representative that is not the Applicable Authorized Representative and each First Lien Secured Party that is not a Controlling Secured Party agrees that none of them shall in such capacities provide or propose any DIP Financing (for the avoidance of doubt, other than with respect to any First Lien Secured Parties that are also Controlling Secured Parties, in each case, acting in their capacity as Controlling Secured Parties). To the extent (I) that any such DIP Financing Liens are senior to the Liens on any such Shared Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Shared Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (II) such DIP Financing Liens rank *pari passu* with the Liens on any such Shared Collateral granted to secure the First Lien Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Shared Collateral as set forth herein, in each case so long as (A) the First Lien Secured Parties of each Series retain the benefit of their Liens on all such Shared Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-à-vis all the other First Lien Secured Parties (other than any Liens of the First Lien Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Secured Parties of each Series are granted Liens on any additional collateral pledged to any First Lien Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral with the same priority vis-à-vis the First Lien Secured Parties (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens) as set forth in this Agreement, (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.01, and (D) if any First Lien Secured Parties are granted adequate protection, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection are applied pursuant to Section 2.01; provided that the First Lien Secured Parties receiving adequate protection shall not object to any other First Lien Secured Party receiving adequate protection comparable to any adequate protection granted to such First Lien Secured Parties in connection with a DIP Financing or use of cash collateral.

SECTION 2.06 Reinstatement. In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment

for disgorgement of a preference or other avoidance action under the Bankruptcy Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash.

SECTION 2.07 Insurance. As between the First Lien Secured Parties, the Controlling Collateral Agent (acting at the direction of the Applicable Authorized Representative) shall have the right to adjust or settle any insurance policy or claim covering or constituting Shared Collateral in the event of any loss thereunder and to approve any award granted in any condemnation, expropriation or similar proceeding affecting the Shared Collateral.

SECTION 2.08 Refinancings, etc. The First Lien Obligations of any Series may, subject to the limitations set forth in the then extant Secured Credit Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced (in whole or in part) or otherwise amended or modified from time to time, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the Refinancing transaction under any Secured Credit Document) of any First Lien Secured Party of any other Series, all without affecting the priorities provided for in Section 2.01(a) or the other provisions hereof; provided that the Authorized Representative and Collateral Agent of the holders of any such Refinancing indebtedness shall have executed a Joinder Agreement on behalf of the holders of such Refinancing indebtedness.

SECTION 2.09 Possessory Collateral Agent as Gratuitous Bailee and Agent for Perfection.

(a)       The Possessory Collateral shall be delivered to the Controlling Collateral Agent and the Controlling Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee and non-fiduciary agent for the benefit of each other First Lien Secured Party for which such Possessory Collateral is Shared Collateral and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09; provided that at any time the existing Controlling Collateral Agent ceases to be the Controlling Collateral Agent hereunder, the outgoing Controlling Collateral Agent shall (at the sole cost and expense of the Grantors), at the request of the Additional First Lien Collateral Agent that is the new Controlling Collateral Agent, promptly deliver all Possessory Collateral to such Additional First Lien Collateral Agent together with any necessary endorsements (or otherwise allow such Additional First Lien Collateral Agent to obtain control of such Possessory Collateral). Each Borrower and the other Grantors shall take such further action as is required to effectuate the transfer contemplated hereby and shall indemnify each Collateral Agent for loss or damage suffered by such Collateral Agent as a result of such transfer except for loss or damage suffered by such Collateral Agent as a result of its own willful misconduct, gross negligence or bad faith (as determined by a court of competent jurisdiction in a final, non-appealable judgment).

(b)       The Controlling Collateral Agent agrees to hold any Shared Collateral constituting Possessory Collateral, from time to time in its possession, as gratuitous bailee and non-fiduciary agent for the benefit of each other First Lien Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09.

(c)       The duties or responsibilities of the Controlling Collateral Agent and each other Collateral Agent under this Section 2.09 shall be limited solely to holding any Shared Collateral constituting Possessory Collateral as gratuitous bailee and non-fiduciary agent for the benefit of each other First Lien Secured Party for purposes of perfecting the Lien held by such First Lien Secured Parties thereon.

SECTION 2.10 Amendments to Security Documents.

(a)       Without the prior written consent of the Priority First Lien Credit Agreement Collateral Agent, each Additional First Lien Secured Party agrees that no Additional First Lien Security Document may

-13-

be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Additional First Lien Security Document would be prohibited by any of the terms of this Agreement.

(b)     Without the prior written consent of the Additional First Lien Collateral Agents, the Priority First Lien Credit Agreement Collateral Agent agrees that no Priority First Lien Credit Agreement Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Priority First Lien Credit Agreement Collateral Document would be prohibited by any of the terms of this Agreement.

(c)     In making determinations required by this Section 2.10, each Collateral Agent may conclusively rely on a certificate of a Responsible Officer of the Top Borrower stating that such amendment is permitted by Sections 2.10(a) or (b) as the case may be.

ARTICLE III

Existence and Amounts of Liens and Obligations

SECTION 3.01 Determinations with Respect to Amounts of Liens and Obligations.  Whenever a Collateral Agent or any Authorized Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of any Series, or the Shared Collateral subject to any Lien securing the First Lien Obligations of any Series, it may request that such information be furnished to it in writing by each other Authorized Representative or Collateral Agent and shall be entitled to make such determination or not make any determination on the basis of the information so furnished; provided, however, that if an Authorized Representative or a Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the requesting Collateral Agent or requesting Authorized Representative shall be entitled to make any such determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Top Borrower.  Each Collateral Agent and each Authorized Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Secured Party or any other person as a result of such determination.

ARTICLE IV

The Controlling Collateral Agent

SECTION 4.01 Authority.

(a)     Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on any Controlling Collateral Agent to any Non-Controlling Secured Party or any other Person, regardless of whether an Event of Default has occurred or is continuing, or give any Non-Controlling Secured Party the right to direct any Controlling Collateral Agent, except that each Controlling Collateral Agent shall be obligated to distribute proceeds of any Shared Collateral in accordance with Section 2.01 hereof.

(b)     In furtherance of the foregoing, each Non-Controlling Secured Party acknowledges and agrees that the Controlling Collateral Agent shall be entitled, for the benefit of the First Lien Secured Parties, to sell, transfer or otherwise dispose of or deal with any Shared Collateral as provided herein and in the First Lien Security Documents, as applicable, pursuant to which the Controlling Collateral Agent is the collateral agent and/or administrative agent for such Shared Collateral, without regard to any rights to which the Non-Controlling Secured Parties would otherwise be entitled as a result of the First Lien Obligations held by such

-14-

Non-Controlling Secured Parties. Without limiting the foregoing, each Non-Controlling Secured Party agrees that none of the Controlling Collateral Agent, the Applicable Authorized Representative or any other First Lien Secured Party shall have any duty or obligation first to marshal or realize upon any type of Shared Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Shared Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Non-Controlling Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured Parties from such realization, sale, disposition or liquidation. Except with respect to any actions expressly prohibited or required to be taken by this Agreement, each of the First Lien Secured Parties waives any claim it may now or hereafter have against any Collateral Agent or the Authorized Representative of any other Series of First Lien Obligations or any other First Lien Secured Party of any other Series arising out of (i) any actions which any Collateral Agent, Authorized Representative or the First Lien Secured Parties take or omit to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Security Documents or any other agreement related thereto or to the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations, (ii) any election by any Applicable Authorized Representative or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to <u>Section 2.05</u>, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code or any equivalent provision of any other Bankruptcy Law, by the Loan Parties or any of their subsidiaries, as debtor-in-possession. Notwithstanding any other provision of this Agreement, the Controlling Collateral Agent shall not accept any Shared Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the Uniform Commercial Code of any jurisdiction, without the consent of each Authorized Representative representing holders of First Lien Obligations for whom such Collateral constitutes Shared Collateral. Notwithstanding the foregoing, any Existing Authorized Representative shall at times comply with, and be subject to, the instruction of the Controlling Collateral Agent in such Existing Authorized Representative's capacity under the ABL Intercreditor Agreement and the First Lien/Second Lien Intercreditor Agreement.

SECTION 4.02 <u>Rights as a First Lien Secured Party</u>. The Person serving as the Controlling Collateral Agent hereunder shall have the same rights and powers in its capacity as a First Lien Secured Party under any Series of First Lien Obligations that it holds as any other First Lien Secured Party of such Series and may exercise the same as though it were not the Controlling Collateral Agent and the term "First Lien Secured Party" or "First Lien Secured Parties" or (as applicable) "Priority First Lien Credit Agreement Secured Party", "Priority First Lien Credit Agreement Secured Parties", "Additional First Lien Secured Party", "Additional First Lien Secured Parties", "Existing First Lien Secured Party" or "Existing First Lien Secured Parties" shall, if applicable and unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Controlling Collateral Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Borrower or any subsidiary or other Affiliate thereof as if such Person were not the Controlling Collateral Agent hereunder and without any duty to account therefor to any other First Lien Secured Party.

SECTION 4.03 <u>Exculpatory Provisions</u>.

(a)     The Controlling Collateral Agent shall not have any duties or obligations except those expressly set forth herein and in the other First Lien Security Documents to which it is a party. Without limiting the generality of the foregoing, the Controlling Collateral Agent:

(i)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other First Lien Security Documents that the Controlling Collateral Agent is required to exercise as directed in writing by the

Applicable Authorized Representative; <u>provided</u> that the Controlling Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Controlling Collateral Agent to liability or that is contrary to any First Lien Security Document or applicable law;

(ii)    shall not, except as expressly set forth herein and in the other First Lien Security Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Controlling Collateral Agent or any of its Affiliates in any capacity;

(iii)    shall not be liable for any action taken or not taken by it (A) with the consent or at the request of the Applicable Authorized Representative or (B) in the absence of the willful misconduct, gross negligence, bad faith or material breach of this Agreement by the Controlling Collateral Agent or any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of the Controlling Collateral Agent (in each case, as determined by a court of competent jurisdiction in a final, non-appealable judgment) or (C) in reliance on a certificate of a Responsible Officer of the Top Borrower stating that such action is permitted by the terms of this Agreement (it being understood and agreed that the Controlling Collateral Agent shall be deemed not to have knowledge of any Event of Default under any Series of First Lien Obligations unless and until notice describing such Event of Default is given to the Controlling Collateral Agent by the Authorized Representative of such First Lien Obligations or the Top Borrower); shall not be responsible for or have any duty to ascertain or inquire into (A) any statement, warranty or representation made in or in connection with this Agreement or any other First Lien Security Document, (B) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any default, (D) the validity, enforceability, effectiveness or genuineness of this Agreement, any other First Lien Security Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the First Lien Security Documents, (E) the existence, value or the sufficiency of any Collateral for any Series of First Lien Obligations, or (F) the satisfaction of any condition set forth in any Secured Credit Document, other than to confirm receipt of items expressly required to be delivered to the Controlling Collateral Agent; and

(iv)    with respect to the Priority First Lien Credit Agreement, Existing First Lien Credit Agreement or any Additional First Lien Document, may conclusively assume that the Grantors have complied with all of their obligations thereunder unless advised in writing by the Authorized Representative thereunder to the contrary specifically setting forth the alleged violation.

(b)    Each First Lien Secured Party acknowledges that, in addition to acting as the initial Controlling Collateral Agent, UBS also serves as Administrative Agent (under, and as defined in, the Priority First Lien Credit Agreement), and each First Lien Secured Party hereby waives any right to make any objection or claim against UBS (or any successor Controlling Collateral Agent or any of their respective counsel) based on any alleged conflict of interest or breach of duties arising from the Controlling Collateral Agent also serving as the Priority First Lien Credit Agreement Collateral Agent.

SECTION 4.04 <u>Reliance by Controlling Collateral Agent</u>.  The Controlling Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Controlling Collateral Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  The Controlling Collateral Agent may consult with legal counsel (who may include, but shall not be limited to, counsel for any Grantor or counsel for the Applicable Authorized Representative), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 4.05 <u>Delegation of Duties</u>.  The Controlling Collateral Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other First Lien Security Document by or through any one or more sub-agents appointed by the Controlling Collateral Agent.  The Controlling Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Affiliates of the Controlling Collateral Agent and any such sub-agent.

SECTION 4.06 <u>Non Reliance on Controlling Collateral Agent and Other First Lien Secured Parties</u>.  Each First Lien Secured Party acknowledges that it has, independently and without reliance upon the Controlling Collateral Agent, any Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the other Secured Credit Documents.  Each First Lien Secured Party also acknowledges that it will, independently and without reliance upon the Controlling Collateral Agent, any Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Secured Credit Document or any related agreement or any document furnished hereunder or thereunder.

ARTICLE V

Miscellaneous

SECTION 5.01 <u>Notices</u>.  All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)    if to the Priority First Lien Credit Agreement Collateral Agent or to the Priority First Lien Credit Agreement Administrative Agent, to it at UBS AG, Stamford Branch, Attention: Structured Finance Processing, 600 Washington Blvd., 9th Floor, Stamford, Connecticut 06901 (Fax No. (203) 719-3888; E-mail: Agency-UBSAmericas@ubs.com);

(b)    if to the Existing First Lien Collateral Agent or the Existing Authorized Representative, to it at: UBS AG, Stamford Branch, Attention: Structured Finance Processing, 600 Washington Blvd., 9th Floor, Stamford, Connecticut 06901 (Fax No. (203) 719-3888; E-mail: Agency-UBSAmericas@ubs.com);

(c)    if to any other additional Authorized Representative, to it at the address set forth in the applicable Joinder Agreement.

Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and, may be personally served, telecopied, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or upon receipt via U.S. mail (registered or certified, with postage prepaid and properly addressed).  For the purposes hereof, the addresses of the parties hereto shall be as set forth above or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties party hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by telecopy or on the date three Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this <u>Section 5.01</u> or in accordance with the latest unrevoked direction from such party given in accordance with this <u>Section 5.01</u>.  To the extent agreed to in writing among each Collateral Agent and each Authorized

Representative from time to time and upon notification to the Top Borrower, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

SECTION 5.02 Waivers; Amendment; Joinder Agreements.

(a)    No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.    The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have.    No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by Section 5.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.    No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified (other than pursuant to any Joinder Agreement or any Supplement contemplated by Section 5.16) except pursuant to an agreement or agreements in writing entered into by each Authorized Representative and each Collateral Agent (and with respect to any such termination, waiver, amendment or modification which by the terms of this Agreement requires any Borrower's consent or which increases the obligations or reduces the rights of or otherwise materially adversely affects any Borrower or any other Grantor, with the consent of the Top Borrower).

(c)    Notwithstanding the foregoing, without the consent of any First Lien Secured Party, any Authorized Representative may become a party hereto by execution and delivery of a Joinder Agreement in accordance with Section 5.13 and upon such execution and delivery, such Authorized Representative and the Additional First Lien Secured Parties and Additional First Lien Obligations of the Series for which such Authorized Representative is acting hereunder agree to be bound by, and shall be subject to, the terms hereof.

(d)    Notwithstanding the foregoing, in connection with any Refinancing of First Lien Obligations of any Series, or the incurrence of Additional First Lien Obligations of any Series, the Collateral Agents and the Authorized Representatives then party hereto shall enter (and are hereby authorized to enter without the consent of any other First Lien Secured Party or any Loan Party), at the request of any Collateral Agent, any Authorized Representative or the Top Borrower, into such amendments or modifications of this Agreement as are reasonably necessary to reflect such Refinancing or such incurrence in compliance with the Secured Credit Documents and are reasonably satisfactory to each such Collateral Agent and each such Authorized Representative, provided that any Collateral Agent or Authorized Representative may condition its execution and delivery of any such amendment or modification on a receipt of a certificate from a Responsible Officer of the Top Borrower to the effect that such Refinancing or incurrence is permitted by the then existing Secured Credit Documents.

SECTION 5.03 Parties in Interest.    This Agreement shall be binding upon and inure to the benefit of the First Lien Secured Parties hereto and their respective successors and permitted assigns, as well as the other First Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.    Except as specifically set forth in Section 5.02(b) and Section 5.12, no other person, including the Borrowers, Grantors or any other creditors thereof shall have or be entitled to assert rights or benefits hereunder.

SECTION 5.04 Survival of Agreement.    All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 5.05 Counterparts.    This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be

deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile, pdf. or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

SECTION 5.06 <u>Severability</u>.  Any provision of this Agreement that is held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality or enforceability of the remaining provisions hereof, and the invalidity in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.07 <u>GOVERNING LAW</u>.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 5.08 <u>Submission to Jurisdiction Waivers; Consent to Service of Process</u>.  Each party hereto (and in the case of each Collateral Agent and each Authorized Representative, on behalf of itself and the First Lien Secured Parties of the Series for whom it is acting) irrevocably and unconditionally:

(a)       submits for itself and its property in any legal action or proceeding relating to this Agreement and the First Lien Security Documents, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York in the City of New York, Borough of Manhattan, the courts of the United States for the Southern District of New York, and, in each case, appellate courts from any thereof;

(b)       consents and agrees that any such action or proceeding shall be brought in such courts and irrevocably waives (to the extent permitted by applicable law) any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)       agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Authorized Representative) at the address set forth in <u>Section 5.01</u>;

(d)       agrees that nothing herein shall affect the right of any other party hereto (or any First Lien Secured Party) to effect service of process in any other manner permitted by law; and

(e)       waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Section 5.08</u> any special, exemplary, punitive or consequential damages.

SECTION 5.09 <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 5.09 WITH ANY COURT AS WRITTEN

EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

SECTION 5.10 <u>Headings</u>.  Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 5.11 <u>Conflicts</u>.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any of the First Lien Security Documents or any of the other Secured Credit Documents, the provisions of this Agreement shall control to the extent of the conflict or inconsistency.

SECTION 5.12 <u>Provisions Solely to Define Relative Rights</u>.   The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Secured Parties in relation to one another.  None of the Borrowers, any other Grantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement (provided that nothing in this Agreement (other than <u>Section 2.04</u>, <u>2.05</u>, <u>2.08</u>, <u>2.09</u> or <u>Article V</u>) is intended to or will amend, waive or otherwise modify the provisions of the Priority First Lien Credit Agreement, the Existing First Lien Agreement or any other Additional First Lien Documents), and none of the Borrowers or any other Grantor may rely on the terms hereof (other than <u>Sections 2.04</u>, <u>2.05</u>, <u>2.08</u>, <u>2.09</u> and <u>Article V</u>).  Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.

SECTION 5.13 <u>Additional Senior Debt</u>.   To the extent, but only to the extent permitted by the provisions of each of the then-extant Secured Credit Documents, any Borrower may incur additional indebtedness after the date hereof that is secured on an equal and ratable basis by the Liens securing the First Lien Obligations on a first lien basis (such indebtedness referred to as "<u>Additional Senior Class Debt</u>").  Any such Additional Senior Class Debt may be secured by a Lien and may be Guaranteed by the Grantors on a senior basis (which Lien shall rank on a *pari passu* basis with the Liens on the Shared Collateral securing all other First Lien Obligations that are secured on a first lien basis), in each case under and pursuant to the Additional First Lien Documents, if and subject to the condition that the Authorized Representative of any such Additional Senior Class Debt (each, an "<u>Additional Senior Class Debt Representative</u>"), acting on behalf of the holders of such Additional Senior Class Debt and the collateral agent for the holders of such Additional Senior Class Debt (each, an "<u>Additional Senior Class Debt Collateral Agent</u>") (such Additional Senior Class Debt Representative, Additional Senior Class Debt Collateral Agent and holders in respect of any Additional Senior Class Debt being referred to as the "<u>Additional Senior Class Debt Parties</u>"), becomes a party to this Agreement as an Authorized Representative and Collateral Agent, as applicable, by satisfying the conditions set forth in clauses (i) through (iv) of the immediately succeeding paragraph.

In order for an Additional Senior Class Debt Representative and Additional Senior Class Debt Collateral Agent to become a party to this Agreement as an Authorized Representative and Collateral Agent, as applicable,

(i)     such Additional Senior Class Debt Representative, such Additional Senior Class Debt Collateral Agent, each Collateral Agent, each Authorized Representative and each Grantor shall have executed and delivered a Joinder Agreement (with such changes as may be reasonably approved by the Controlling Collateral Agent and Additional Senior Class Debt Representative) pursuant to which such Additional Senior Class Debt Representative becomes an Authorized Representative hereunder, such Additional Senior Class Debt Collateral Agent becomes a Collateral Agent hereunder and the Additional Senior Class Debt in respect of which such Additional Senior Class Debt Representative is the Authorized Representative constitutes Additional First Lien Obligations and the related Additional Senior Class Debt Parties become subject hereto and bound hereby as Additional First Lien Secured Parties;

(ii)     the Borrowers shall have (x) delivered to each Authorized Representative and each Collateral Agent true and complete copies of each of the Additional First Lien Documents relating to

-20-

such Additional Senior Class Debt, certified as being true and correct by a Responsible Officer of the Top Borrower and (y) identified in a certificate of a Responsible Officer the obligations to be designated as Additional First Lien Obligations and the initial aggregate principal amount or face amount thereof and certified that such obligations are permitted to be incurred and secured on a *pari passu* basis with the then-extant First Lien Obligations and by the terms of the then extant Secured Credit Documents;

(iii)    all filings, recordations and/or amendments or supplements to the First Lien Security Documents necessary or desirable in the reasonable judgment of such Additional Senior Class Debt Collateral Agent to confirm and perfect the Liens securing the relevant obligations relating to such Additional Senior Class Debt shall have been made, executed and/or delivered (or, with respect to any such filings or recordations, acceptable provisions to perform such filings or recordations shall have been taken in the reasonable judgment of such Additional Senior Class Debt Collateral Agent), and all fees and taxes in connection therewith shall have been paid (or acceptable provisions to make such payments have been taken in the reasonable judgment of such Additional Senior Class Debt Collateral Agent); and

(iv)    the Additional First Lien Documents, as applicable, relating to such Additional Senior Class Debt shall provide, in a manner reasonably satisfactory to each Collateral Agent, that each Additional Senior Class Debt Party with respect to such Additional Senior Class Debt will be subject to and bound by the provisions of this Agreement in its capacity as a holder of such Additional Senior Class Debt.

SECTION 5.14 <u>Agent Capacities</u>.  Except as expressly provided herein or in the Priority First Lien Credit Agreement Collateral Documents, UBS is acting in the capacities of Priority First Lien Credit Agreement Administrative Agent and Priority First Lien Credit Agreement Collateral Agent solely for the Priority First Lien Credit Agreement Secured Parties.  Except as expressly provided herein or in the Existing First Lien Agreement Collateral Documents, UBS is acting in the capacity of Existing First Lien Credit Agreement Administrative Agent and Existing First Lien Collateral Agent solely for the Existing First Lien Secured Parties.  Except as expressly set forth herein, none of the Priority First Lien Credit Agreement Administrative Agent, the Priority First Lien Credit Agreement Collateral Agent, the Existing First Lien Credit Agreement Administrative Agent, the Existing First Lien Collateral Agent or any Additional First Lien Collateral Agent shall have any duties or obligations in respect of any of the Collateral, all of such duties and obligations, if any, being subject to and governed by the applicable Secured Credit Documents.

SECTION 5.15 <u>Integration</u>.   This Agreement together with the other Secured Credit Documents and the First Lien Security Documents represents the agreement of each of the Grantors and the First Lien Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by any Grantor, the Priority First Lien Credit Agreement Collateral Agent, or any other First Lien Secured Party relative to the subject matter hereof not expressly set forth or referred to herein or in the other Secured Credit Documents.

SECTION 5.16 <u>Additional Grantors</u>.  The Top Borrower agrees that, if any subsidiary shall become a Grantor after the date hereof, they will promptly cause such subsidiary to become party hereto by executing and delivering an instrument in the form of Annex III.  Upon such execution and delivery, such subsidiary will become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein.  The parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a Grantor at any time (and any security granted by any such Person) shall be subject to the provisions hereof as fully as if same constituted a Grantor party hereto and had complied with the requirements of the immediately preceding sentence.  The execution and delivery of such instrument shall not require the consent of any other party hereunder, and will be acknowledged by the First Lien Credit Agreement Collateral Agent, the Existing Authorized Representative and each additional Authorized Representative.  The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

UBS AG, STAMFORD BRANCH,
as Priority First Lien Credit Agreement Collateral Agent
and Priority First Lien Credit Agreement Administrative
Agent


By: _____
    Name:
    Title:


UBS AG, STAMFORD BRANCH,
as Existing First Lien Collateral Agent and as Existing
Authorized Representative


By: _____
    Name:
    Title:

DAWN INTERMEDIATE, INC.

By: _____
    Name:  Kristen McGuffey
    Title:   Executive Vice President, General Counsel
            and Secretary


SERTA SIMMONS BEDDING, LLC

By: _____
    Name:  Kristen McGuffey
    Title:   Executive Vice President, General Counsel
            and Secretary


NATIONAL BEDDING COMPANY L.L.C.

By: _____
    Name:  Kristen McGuffey
    Title:   Executive Vice President, General Counsel
            and Secretary


SSB MANUFACTURING COMPANY

By: _____
    Name:  Kristen McGuffey
    Title:   Executive Vice President, General Counsel
            and Secretary


*Signature Page to Super-Priority First Lien Intercreditor Agreement*

Grantors

DAWN INTERMEDIATE, LLC
DREAMWELL, LTD.
NATIONAL BEDDING COMPANY L.L.C.
SERTA SIMMONS BEDDING, LLC
SIMMONS BEDDING COMPANY, LLC
SSB HOSPITALITY, LLC
SSB LOGISTICS, LLC
SSB MANUFACTURING COMPANY
SSB RETAIL, LLC
THE SIMMONS MANUFACTURING CO., LLC
TOMORROW SLEEP LLC
TUFT & NEEDLE, LLC
WORLD OF SLEEP OUTLETS, LLC
SERTA INTERNATIONAL HOLDCO, LLC

[FORM OF] JOINDER NO. [ ] dated as of [ _], 20[__] to the FIRST LIEN INTERCREDITOR AGREEMENT dated as of June 22, 2020 (the "First Lien Intercreditor Agreement"), among Dawn Intermediate, LLC, a Delaware limited liability company ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), and certain subsidiaries and affiliates of the Top Borrower (each, a "Grantor"), UBS AG, Stamford Branch ("UBS"), as Priority First Lien Credit Agreement Collateral Agent for the Priority First Lien Credit Agreement Secured Parties under the Priority First Lien Security Documents (in such capacity, the "Priority First Lien Credit Agreement Collateral Agent") and as First Lien Credit Agreement Administrative Agent, UBS, as Existing First Lien Collateral Agent and as Authorized Representative for the Existing First Lien Secured Parties, and the additional Authorized Representatives and Collateral Agents from time to time a party thereto.[1]

A.      Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Intercreditor Agreement.

B.      As a condition to the ability of the Borrowers to incur Additional First Lien Obligations and to secure such Additional Senior Class Debt with the liens and security interests created by the Additional First Lien Security Documents relating thereto, the Additional Senior Class Debt Representative in respect of such Additional Senior Class Debt is required to become an Authorized Representative, the Additional Senior Class Debt Collateral Agent is respect of such Additional Senior Class Debt is required to become a Collateral Agent, and such Additional Senior Class Debt and the Additional Senior Class Debt Parties in respect thereof are required to become subject to and bound by, the First Lien Intercreditor Agreement. Section 5.13 of the First Lien Intercreditor Agreement provides that such Additional Senior Class Debt Representative may become an Authorized Representative, such Additional Senior Class Debt Collateral Agent may become a Collateral Agent and such Additional Senior Class Debt and such Additional Senior Class Debt Parties may become subject to and bound by the First Lien Intercreditor Agreement as Additional First Lien Obligations and Additional First Lien Secured Parties, respectively, upon the execution and delivery by the Additional Senior Class Debt Representative and the Additional Senior Class Debt Collateral Agent of an instrument in the form of this Joinder Agreement and the satisfaction of the other conditions set forth in Section 5.13 of the First Lien Intercreditor Agreement. The undersigned Additional Senior Class Debt Representative (the "New Representative") and Additional Senior Class Debt Collateral Agent (the "New Collateral Agent") is executing this Joinder Agreement in accordance with the requirements of the First Lien Intercreditor Agreement and the First Lien Security Documents.

Accordingly, each Collateral Agent, each Authorized Representative and the New Representative and the New Collateral Agent agree as follows:

SECTION 1.      In accordance with Section 5.13 of the First Lien Intercreditor Agreement, the New Representative by its signature below becomes an Authorized Representative under, the New Collateral Agent by its signature below becomes a Collateral Agent under, and the related Additional Senior Class Debt and Additional Senior Class Debt Parties become subject to and bound by, the First Lien Intercreditor Agreement as Additional First Lien Obligations and Additional First Lien Secured Parties, with the same force and effect as if the New Representative had originally been named therein as an Authorized Representative and the New Collateral Agent had originally been named therein as Collateral Agent, and each of the New Representative and the New Collateral Agent, on its behalf and on behalf of such Additional Senior Class Debt Parties, hereby agrees to all the terms and provisions of the First Lien Intercreditor Agreement applicable to it as Authorized Representative or Collateral Agent, as applicable and to the Additional Senior Class Debt Parties that it represents as Additional First Lien Secured Parties. Each reference to an "Authorized Representative" in the

---

[1]      In the event of the Refinancing of the Priority First Lien Credit Agreement Obligations, revise to reflect joinder by a new First Lien Credit Agreement Collateral Agent

First Lien Intercreditor Agreement shall be deemed to include the New Representative. Each reference to a "Collateral Agent" in the First Lien Intercreditor Agreement shall be deemed to include the New Collateral Agent. The First Lien Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.     Each of the New Representative and the New Collateral Agent represents and warrants to each Collateral Agent, each Authorized Representative and the other First Lien Secured Parties, individually, that (i) it has full power and authority to enter into this Joinder, in its capacity as [trustee/administrative agent and collateral agent] under [describe new facility], (ii) this Joinder has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability and (iii) the Additional First Lien Documents relating to such Additional Senior Class Debt provide that, upon the New Representative's entry into this Agreement, the Additional Senior Class Debt Parties in respect of such Additional Senior Class Debt will be subject to and bound by the provisions of the First Lien Intercreditor Agreement as Additional First Lien Secured Parties.

SECTION 3.     This Joinder may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Joinder shall become effective when each Collateral Agent shall have received a counterpart of this Joinder that bears the signatures of the New Representative and the New Collateral Agent. Delivery of an executed signature page to this Joinder by telecopy, .pdf or other electronic imaging means shall be effective as delivery of a manually signed counterpart of this Joinder.

SECTION 4.     Except as expressly supplemented hereby, the First Lien Intercreditor Agreement shall remain in full force and effect.

SECTION 5.     THIS JOINDER AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 6.     In case any one or more of the provisions contained in this Joinder should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the First Lien Intercreditor Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.     All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the First Lien Intercreditor Agreement. All communications and notices hereunder to the New Representative or the New Collateral Agent shall be given to it at its address set forth below its signature hereto.

SECTION 8.     Each Borrower agrees to reimburse each Collateral Agent and each Authorized Representative for its reasonable out-of-pocket expenses in connection with this Joinder, including the reasonable fees, other charges and disbursements of counsel, in each case as required by the applicable Secured Credit Documents.

IN WITNESS WHEREOF, the New Representative has duly executed this Joinder to the First Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE], as
[     ] for the holders of
[     ],

By:    _____
        Name:
        Title:


Address for notices:


_____
_____
attention of:   _____
Telecopy:   _____


[NAME OF NEW COLLATERAL AGENT], as
collateral agent for the holders of
[     ],

By:    _____
        Name:
        Title:


Address for notices:


_____
_____
attention of:   _____
Telecopy:   _____

Acknowledged by:

UBS AG, STAMFORD BRANCH,
as the Priority First Lien Credit Agreement Collateral Agent and Priority First Lien Credit Agreement
Administrative Agent,

By:   _____
        Name:
        Title:

By:   _____
        Name:
        Title:


UBS AG, STAMFORD BRANCH,
as Existing First Lien Collateral Agent and Authorized Representative for the Existing First Lien Secured
Parties,


By:   _____
        Name:
        Title:


[OTHER AUTHORIZED REPRESENTATIVES]

DAWN INTERMEDIATE, INC., as Holdings

By: _____
      Name:
      Title:

SERTA SIMMONS BEDDING, LLC, as the Top Borrower

By: _____
      Name:
      Title:

NATIONAL BEDDING COMPANY L.L.C., as a Borrower

By: _____
      Name:
      Title:

SSB MANUFACTURING COMPANY, as a Borrower

By: _____
      Name:
      Title:

THE OTHER GRANTORS

[●]

By: _____
      Name:
      Title:

SUPPLEMENT NO. [ ] dated as of [ ], 20[ ], to the FIRST LIEN INTERCREDITOR AGREEMENT dated as of June 22, 2020, (the "First Lien Intercreditor Agreement"), among Dawn Intermediate, LLC, a Delaware limited liability company ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), and certain subsidiaries and affiliates of the Top Borrower (each, a "Grantor"), UBS AG, Stamford Branch ("UBS"), as administrative agent and collateral agent under the First Lien Credit Agreement, as Existing First Lien Collateral Agent and Authorized Representative for the Existing First Lien Secured Parties, and the additional Authorized Representatives and Collateral Agents from time to time party thereto.

A.    Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Intercreditor Agreement.

B.    The Grantors have entered into the First Lien Intercreditor Agreement. Pursuant to the Priority First Lien Credit Agreement and certain Additional First Lien Documents, certain newly acquired or organized subsidiaries of the Top Borrower are required to enter into the First Lien Intercreditor Agreement. Section 5.16 of the First Lien Intercreditor Agreement provides that such subsidiaries may become party to the First Lien Intercreditor Agreement by execution and delivery of an instrument in the form of this Supplement. The undersigned subsidiary (the "New Grantor") is executing this Supplement in accordance with the requirements of the Priority First Lien Credit Agreement and the Additional First Lien Documents.

Accordingly, each Authorized Representative and the New Subsidiary Grantor agree as follows:

SECTION 1.    In accordance with Section 5.16 of the First Lien Intercreditor Agreement, the New Grantor by its signature below becomes a Grantor under the First Lien Intercreditor Agreement with the same force and effect as if originally named therein as a Grantor, and the New Grantor hereby agrees to all the terms and provisions of the First Lien Intercreditor Agreement applicable to it as a Grantor thereunder. Each reference to a "Grantor" in the First Lien Intercreditor Agreement shall be deemed to include the New Grantor. The First Lien Intercreditor Agreement is hereby incorporated herein by reference.

SECTION 2.    The New Grantor represents and warrants to each Authorized Representative and the other First Lien Secured Parties that (i) it has the full power and authority to enter into this Supplement and (ii) this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by Bankruptcy Law and by general principles of equity.

SECTION 3.    This Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Supplement shall become effective when each Authorized Representative shall have received a counterpart of this Supplement that bears the signature of the New Grantor. Delivery of an executed signature page to this Supplement by facsimile transmission or other electronic method shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4.    Except as expressly supplemented hereby, the First Lien Intercreditor Agreement shall remain in full force and effect.

SECTION 5.    THIS SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 6.    In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality

and enforceability of the remaining provisions contained herein and in the First Lien Intercreditor Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the First Lien Intercreditor Agreement. All communications and notices hereunder to the New Grantor shall be given to it in care of the Top Borrower as specified in the First Lien Intercreditor Agreement.

SECTION 8.    The Top Borrower agrees to reimburse each Authorized Representative for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable fees, other charges and disbursements of counsel for each Authorized Representative as required by the applicable Secured Credit Documents.

IN WITNESS WHEREOF, the New Grantor, and each Authorized Representative have duly executed this Supplement to the First Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF NEW SUBSIDIARY GRANTOR]

By: _____

Name:
Title:

Acknowledged by:

UBS AG, STAMFORD BRANCH,
as the Priority First Lien Credit Agreement Collateral Agent and Priority First Lien Credit Agreement Administrative Agent,

By: _____

Name:
Title:

By: _____

Name:
Title:

UBS AG, STAMFORD BRANCH,
as the Existing Authorized Representative and the Existing First Lien Collateral Agent and,

By: _____

Name:
Title:

[OTHER AUTHORIZED REPRESENTATIVES]

[FORM OF]
INTEREST ELECTION REQUEST

UBS AG, Stamford Branch
as Administrative Agent for the Lenders referred to below
Attention: Structured Finance Processing
600 Washington Blvd., 9th Floor
Stamford, Connecticut 06901
Facsimile:  (203) 719-3888
Telephone: (203) 719-4319
Email: Agency-UBSAmericas@ubs.com

[●] [●], 20[●][22]

Ladies and Gentlemen:

Reference is hereby made to that certain Super-Priority Term Loan Agreement, dated as of June [__], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified, the "Super-Priority Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, LLC, a Delaware limited liability company ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party thereto, UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders.  Terms defined in the Super-Priority Term Loan Agreement are used herein with the same meanings unless otherwise defined herein.

The undersigned hereby gives you notice pursuant to Section 2.08 of the Super-Priority Term Loan Agreement of an interest rate election, and in that connection sets forth below the terms thereof:

(A)      [on **[insert applicable date]** (which is a Business Day), the undersigned will convert $[●][23] of the aggregate outstanding principal amount of the Term Loans, bearing interest at the **[ABR][LIBO]** Rate, into a **[LIBO Rate][ABR]** Loan **[and, in the case of a LIBO Rate Loan, having an Interest Period of** [●] **month(s)]**[24]**[; and][.]]**

(B)      [on **[insert applicable date]** (which is a Business Day), the undersigned will continue $[●] of the aggregate outstanding principal amount of the Term Loans bearing interest at the LIBO Rate, as LIBO Rate Loans having an Interest Period of [●] month(s)[25].]

---

[22]      The Administrative Agent must be notified of the applicable election in writing in the form of an Interest Election Request, appropriately completed and signed by a Responsible Officer of the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) to the Administrative Agent or by telephone (with such telephonic notification to be promptly confirmed in writing by an Interest Election Request), which must be received by the Administrative Agent (by hand delivery, fax or other electronic transmission (including ".pdf" or ".tif")) not later than (i) 1:00 p.m. three Business Days prior to the requested day of any conversion or continuation of LIBO Rate Loans (or one Business Day in the case of any conversion or continuation of LIBO Rate Loans on the Closing Date) and (ii) 9:00 a.m. on the requested date of any conversion of any Borrowing to ABR Loans (or, in each case, such later time as is reasonably acceptable to the Administrative Agent.

[23]      Subject to Section 2.02(c) of the Super-Priority Term Loan Agreement.

[24]      Must be a period contemplated by the definition of "Interest Period."

[25]      Must be a period contemplated by the definition of "Interest Period."

H-1

[Signature Page Follows]

H-2

**[SERTA SIMMONS BEDDING, LLC]**
**[NATIONAL BEDDING COMPANY L.L.C.]**
**[SSB MANUFACTURING COMPANY]**

By: _____

     Name:

     Title:

H-3

EXHIBIT I

[FORM OF]
SUPER-PRIORITY TERM LOAN GUARANTY AGREEMENT


[See attached.]

SUPER-PRIORITY TERM LOAN GUARANTY AGREEMENT

THIS SUPERPRIORITY TERM LOAN GUARANTY AGREEMENT (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Loan Guaranty") is entered into as of June 22, 2020, by and among Dawn Intermediate, LLC, a Delaware limited liability company ("Holdings"), the Borrowers referred to below and the Subsidiary Guarantors (as defined in the Credit Agreement) from time to time party hereto (Holdings, the Borrowers and the Subsidiary Guarantors, collectively, the "Loan Guarantors") and UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent for the lenders party to the Credit Agreement referred to below (in such capacities, the "Administrative Agent").

PRELIMINARY STATEMENT

Reference is hereby made to that certain Super-Priority Term Loan Agreement, dated as of June 22, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among, *inter alios*, Holdings, Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing" and, together with SSB and National Bedding, the "Borrowers"), the Lenders from time to time party thereto and the Administrative Agent.

The Loan Guarantors are entering into this Loan Guaranty in order to induce the Lenders to enter into and extend credit to the Borrowers under the Credit Agreement and to guarantee the Secured Obligations.

Each Loan Guarantor will obtain benefits from the incurrence of Loans by the Borrowers for the accounts of the Borrowers and their respective subsidiaries and the incurrence by the Loan Parties of Secured Hedging Obligations and Banking Services Obligations.

ACCORDINGLY, the parties hereto agree as follows:

ARTICLE 1
Definitions

SECTION 1.01     Definitions of Certain Terms Used Herein.  As used in this Loan Guaranty, in addition to the terms defined in the preamble and Preliminary Statement above, the following terms shall have the following meanings:

"Accommodation Payments" has the meaning assigned to such term in Section 2.09.

"Administrative Agent" has the meaning assigned to such term in the preamble.

"Article" means a numbered article of this Loan Guaranty, unless another document is specifically referenced.

"Borrower Primary Obligations" means the Obligations of each Borrower under the Credit Agreement.

"Borrowers" has the meaning assigned to such term in the preliminary statement.

"Credit Agreement" has the meaning assigned to such term in the preliminary statement.

"Exhibit" refers to a specific exhibit to this Loan Guaranty, unless another document is specifically referenced.

"Guaranteed Obligations" means (a) with respect to any Borrower, the Other Guaranteed Obligations of each Borrower other than such Borrower and (b) with respect to any Loan Guarantor other than any Borrower, the Borrower Primary Obligations and the Other Guaranteed Obligations of each other Loan Guarantor, including in the case of both (a) and (b) amounts that would become due but for the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a) (excluding, for the avoidance of doubt, any Excluded Swap Obligation) together with any expenses which may be incurred by the Administrative Agent in collecting any of the Guaranteed Obligations that are reimbursable in accordance with Section 9.03 of the Credit Agreement and excluding, in any event, any Excluded Swap Obligation.

"Guarantor Percentage" has the meaning assigned to such term in Section 2.01.

"Holdings" has the meaning assigned to such term in the preamble.

"Loan Guarantors" has the meaning assigned to such term in the preamble.

"Loan Guaranty" has the meaning assigned to such term in the preamble.

"Maximum Liability" has the meaning assigned to such term in Section 2.09.

"National Bedding" has the meaning assigned to such term in the preliminary statement.

"Non-ECP Guarantor" means each Loan Guarantor other than a Qualified ECP Guarantor.

"Non-Paying Guarantor" has the meaning assigned to such term in Section 2.09.

"Obligated Party" has the meaning assigned to such term in Section 2.02.

"Other Guaranteed Obligations" means, with respect to the Loan Guaranty provided by any Loan Party, any Banking Services Obligations and/or any Secured Hedging Obligation of any other Loan Party.

"Paying Guarantor" has the meaning assigned to such term in Section 2.09.

"Qualified ECP Guarantor" means in respect of any Swap Obligation, each Loan Party that, at the time the relevant guarantee (or grant of the relevant security interest, as applicable) becomes or would become effective with respect to such Swap Obligation, has total assets exceeding $10,000,000 or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and which may cause another person to qualify as an "eligible contract participant" with respect to such Swap Obligation at such time by entering into a keepwell pursuant to section 1a(18)(A)(v)(II) of the Commodity Exchange Act (or any successor provision thereto).

"Section" means a numbered section of this Loan Guaranty, unless another document is specifically referenced.

"SSB" has the meaning assigned to such term in the preliminary statement.

"SSB Manufacturing" has the meaning assigned to such term in the preliminary statement.

2

"<u>Top Borrower</u>" has the meaning assigned to such term in the preliminary statement.

"<u>UFCA</u>" has the meaning assigned to such term in <u>Section 2.09(a)</u>.

"<u>UFTA</u>" has the meaning assigned to such term in <u>Section 2.09(a)</u>.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms. Capitalized terms used in this Loan Guaranty and not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

ARTICLE 2
LOAN GUARANTY

SECTION 2.01    <u>Guaranty</u>.    Except as otherwise provided for herein (including under Section 3.15), each Loan Guarantor hereby agrees that it is jointly and severally liable for, and, as primary obligor and not merely as surety, and absolutely and unconditionally and irrevocably guarantees to the Administrative Agent (acting as agent for the Secured Parties, pursuant to Article 8 of the Credit Agreement) for the ratable benefit of the Secured Parties, the full and prompt payment, when and as the same become due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Guaranteed Obligations. Each Loan Guarantor further agrees that the Guaranteed Obligations may be increased, extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. In addition, if any or all of the Guaranteed Obligations become due and payable hereunder, each Loan Guarantor, unconditionally and irrevocably, promises to pay such Guaranteed Obligations to the Administrative Agent for the benefit of the Secured Parties, on demand. Each Loan Guarantor unconditionally and irrevocably guarantees the payment of any and all of the Guaranteed Obligations whether or not due or payable by the Borrowers upon the occurrence of any of the Events of Default specified in <u>Sections 7.01(f)</u> or <u>7.01(g)</u> of the Credit Agreement and thereafter irrevocably and unconditionally promises to pay such Guaranteed Obligations to the Administrative Agent for the benefit of the Secured Parties. This Loan Guaranty is a continuing one and shall remain in full force and effect until the Termination Date, and all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon.

SECTION 2.02    <u>Guaranty of Payment</u>.    This Loan Guaranty is a guaranty of payment and not of collection. Each Loan Guarantor waives any right to require the Administrative Agent or any Lender to sue the Borrowers, any Loan Guarantor, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (the Borrowers, each Loan Guarantor, each other guarantor or such other Person, an "<u>Obligated Party</u>"), or otherwise to enforce its rights in respect of any Collateral securing all or any part of the Guaranteed Obligations. The Administrative Agent may enforce this Loan Guaranty at any time when an Event of Default has occurred and is continuing.

SECTION 2.03    <u>No Discharge or Diminishment of Loan Guaranty</u>.

(a)    Except as otherwise provided for herein (including under <u>Section 3.15</u>), the obligations of each Loan Guarantor hereunder are unconditional, irrevocable and absolute and not subject to any reduction, limitation, impairment or termination for any reason, including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Obligated Party; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any other Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; (iv) the

3

existence of any claim, setoff or other right which any Loan Guarantor may have at any time against any Obligated Party, the Administrative Agent, any Lender or any other Person, whether in connection herewith or in any unrelated transaction; (v) any direction as to application of payments by the Borrowers or by any other party; (vi) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Guaranteed Obligations; (vii) any payment on or in reduction of any such other guaranty or undertaking; (viii) any dissolution, termination or increase, decrease or change in personnel by the Borrowers or (ix) any payment made to any Secured Party on the Guaranteed Obligations which any such Secured Party repays to the Borrowers pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and each Loan Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding.

(b)     Except for termination of a Loan Guarantor's obligations hereunder or as expressly permitted by <u>Section 3.15</u>, the obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any Requirements of Law purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)     Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Administrative Agent to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrowers for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other Person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Administrative Agent with respect to any Collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity, in each case other than as set forth in <u>Section 3.15</u>.

SECTION 2.04     <u>Defenses Waived</u>.  To the fullest extent permitted by applicable Requirements of Law, and except for termination of a Loan Guarantor's obligations hereunder or as otherwise provided for herein (including under <u>Section 3.15</u>), each Loan Guarantor hereby waives any defense based on or arising out of any defense of the Borrowers or any other Loan Guarantor or arising out of the disability of the Borrowers or any other Loan Guarantor or any other party or the unenforceability of all or any part of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrowers or any other Loan Guarantor. Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by applicable Requirements of Law, any notice not provided for herein or in any other Loan Document, including any notice of nonperformance, notice of protest, notice of dishonor, notice of acceptance of this Loan Guaranty, and any notice of the existence, creation or incurring of new or additional Guaranteed Obligations, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person, including any right (except as may be required by applicable Requirements of Law and to the extent the relevant requirement cannot be waived) to require the Administrative Agent to (i) proceed against the Borrowers, any other guarantor or any other party, (ii) proceed against or exhaust any security held from the Borrowers, any other Loan Guarantor or

4

any other party or (iii) pursue any other remedy in the Administrative Agent's power whatsoever. The Administrative Agent may, at its election and in accordance with the terms of the applicable Loan Documents, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent permitted by applicable Requirements of Law), accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any Collateral securing all or a part of the Guaranteed Obligations, and the Administrative Agent may, at its election, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, or any security, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guaranty, except as otherwise provided in Section 3.15. To the fullest extent permitted by applicable Requirements of Law, each Loan Guarantor waives any defense arising out of any such election even though such election may operate, pursuant to applicable Requirements of Law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

SECTION 2.05     Authorization.  Each Loan Guarantor authorizes the Administrative Agent without notice or demand (except as may be required by applicable Requirements of Law and to the extent the relevant requirement cannot be waived), and without affecting or impairing its liability hereunder (except as set forth in Section 3.15), from time to time, subject to each applicable Intercreditor Agreement and the terms of the referenced Loan Documents, to:

(a)     change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Loan Guaranty shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

(b)     take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(c)     exercise or refrain from exercising any rights against the Borrowers, any other Loan Party or others or otherwise act or refrain from acting;

(d)     release or substitute any endorser, any guarantor, the Borrowers, any other Loan Party and/or any other obligor;

(e)     settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrowers to its creditors other than the Secured Parties;

(f)     apply any sum by whomsoever paid or howsoever realized to any liability or liabilities of the Borrowers to the Secured Parties regardless of what liability or liabilities of the Borrowers remain unpaid;

(g)     consent to or waive any breach of, or any act, omission or default under, this Loan Guaranty, the Credit Agreement, any other Loan Document, any agreement relating to

5

Banking Services Obligations, any Hedge Agreement with respect to any Secured Hedging Obligation or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Loan Guaranty, the Credit Agreement, any other Loan Document, any agreement relating to Banking Services Obligations, any Hedge Agreement with respect to any Secured Hedging Obligation or any of such other instruments or agreements; and/or

(h)     take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of the Loan Guarantors from their respective liabilities under this Loan Guaranty.

SECTION 2.06     Rights of Subrogation.  No Loan Guarantor will assert any right, claim or cause of action, including any claim of subrogation, contribution or indemnification that it has against any Loan Party in respect of this Loan Guaranty until the occurrence of the Termination Date; provided that if any amount is paid to such Loan Guarantor on account of such subrogation rights at any time prior to the Termination Date, then unless such Loan Guarantor has already discharged its liabilities under this Loan Guaranty in an amount equal to such Loan Guarantor's Maximum Liability as of such date, such amount shall be held by the recipient Loan Guarantor in trust for the benefit of the Secured Parties and shall forthwith be paid by the recipient Loan Guarantor to the Administrative Agent (for the benefit of the Secured Parties) to be credited and applied to the Guaranteed Obligations, whether matured or unmatured, in accordance with Section 2.18(b) of the Credit Agreement.

SECTION 2.07     Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of a Borrower or otherwise, each Loan Guarantor's obligations under this Loan Guaranty with respect to such payment shall be reinstated at such time as though the payment had not been made.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of a Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the other Loan Guarantors forthwith on demand by the Administrative Agent.

SECTION 2.08     Information.  Each Loan Guarantor assumes all responsibility for being and keeping itself informed of each Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that none of the Administrative Agent, any Lender or any other Secured Party shall have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

SECTION 2.09     Contribution; Subordination; Maximum Liability.

(a)     In the event that any Loan Guarantor (a "Paying Guarantor") makes any payment or payments under this Loan Guaranty or suffers any loss as a result of any realization upon any Collateral granted by it to secure its obligations under this Loan Guaranty (each such payment or loss, an "Accommodation Payment"), each other Loan Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Guarantor Percentage" of such Accommodation Payment by such Paying Guarantor.  For purposes of this Article 2, each Non-Paying Guarantor's "Guarantor Percentage" with respect to any Accommodation Payment by a Paying Guarantor shall be determined as of the date on which such Accommodation Payment was made by reference to the ratio of (a) such Non-Paying Guarantor's Maximum Liability (as defined below) as of such date to (b) the aggregate Maximum Liability of all Loan Guarantors hereunder (including such Paying Guarantor) as of such date.  As of any date of determination, the "Maximum Liability" of each

6

Loan Guarantor shall be equal to the maximum amount of liability which could be asserted against such Loan Guarantor hereunder and under the Credit Agreement without (i) rendering such Loan Guarantor "insolvent" within the meaning of Section 101(32) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraud Conveyance Act ("UFCA"), (ii) leaving such Loan Guarantor with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA or Section 5 of the UFCA, or (iii) leaving such Loan Guarantor unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA or Section 5 of the UFCA. Nothing in this provision shall affect any Loan Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Loan Guarantor's Maximum Liability). Each of the Loan Guarantors covenants and agrees that its right to receive any contribution under this Loan Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the Secured Obligations until the Termination Date. If, prior to the Termination Date, any such contribution payment is received by a Paying Guarantor at any time when an Event of Default has occurred and is continuing, such contribution payment shall be collected, enforced and received by such Loan Guarantor as trustee for the Secured Parties and be paid over to the Administrative Agent on account of the Secured Obligations, but without affecting or impairing in any manner the liability of such Loan Guarantor under the other provisions of this Loan Guaranty. This provision is for the benefit of the Administrative Agent, the Lenders and the other Secured Parties.

(b) It is the desire and intent of the Loan Guarantors and the Secured Parties that this Loan Guaranty shall be enforced against the Loan Guarantors to the fullest extent permissible under the Requirements of Law and public policies applied in each jurisdiction in which enforcement is sought. The provisions of this Loan Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, Federal or foreign bankruptcy, insolvency, reorganization or other Requirements of Law affecting the rights of creditors generally, if the obligations of any Loan Guarantor under this Loan Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Loan Guarantor's liability under this Loan Guaranty, then, notwithstanding any other provision of this Loan Guaranty to the contrary, the amount of such liability shall, without any further action by the Loan Guarantors or the Secured Parties, be automatically limited and reduced to such Loan Guarantor's Maximum Liability. Each Loan Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of such Loan Guarantor without impairing this Loan Guaranty or affecting the rights and remedies of the Administrative Agent hereunder; provided that nothing in this sentence shall be construed to increase any Loan Guarantor's obligations hereunder beyond its Maximum Liability.

SECTION 2.10    Representations and Warranties. As, when (including on the date hereof) and to the extent required in accordance with the terms of the Credit Agreement, each Loan Guarantor hereby makes each applicable representation and warranty made in the Loan Documents by the Top Borrower with respect to such Loan Guarantor and each Loan Guarantor hereby further acknowledges and agrees that such Loan Guarantor has, independently and without reliance upon any Secured Party and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Loan Guaranty and each other Loan Document to which it is or is to be a party, and such Loan Guarantor has established adequate means of obtaining from each other Loan Guarantor on a continuing basis information pertaining to the business, condition (financial or otherwise), operations, performance, properties and prospects of each other Loan Guarantor.

SECTION 2.11    Covenants. Each Loan Guarantor covenants and agrees that, until the Termination Date, such Loan Guarantor will perform and observe, and cause each of its subsidiaries that constitutes a Restricted Subsidiary to perform and observe, all of the terms, covenants and agreements set

7

forth in the Loan Documents that the Top Borrower has agreed to cause such Loan Guarantor or such subsidiary to perform or observe. Until the Termination Date, no Guarantor shall, without the prior written consent of the Administrative Agent, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding against a Borrower or any Guarantor (it being understood and agreed, for the avoidance of doubt, that nothing in this Section 2.11 shall prohibit any Guarantor from commencing or joining with the Borrowers or Guarantor as a co-debtor in any bankruptcy, reorganization or insolvency case or proceeding).

ARTICLE 3
GENERAL PROVISIONS

SECTION 3.01     Liability Cumulative. The liability of each Loan Guarantor under this Loan Guaranty is in addition to and shall be cumulative with all liabilities of such Loan Guarantor to the Administrative Agent and the Lenders under the Credit Agreement and the other Loan Documents to which such Loan Guarantor is a party or in respect of any obligations or liabilities of the other Loan Guarantors, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

SECTION 3.02     No Waiver; Amendments. No delay or omission of the Administrative Agent in exercising any right or remedy granted under this Loan Guaranty shall impair such right or remedy or be construed to be a waiver of any Default or Event of Default or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Loan Guaranty whatsoever shall be valid unless in writing signed by the Loan Guarantors and the Administrative Agent in accordance with Section 9.02 of the Credit Agreement and then only to the extent specifically set forth in such writing.

SECTION 3.03     Severability of Provisions. To the extent permitted by applicable Requirements of Law, any provision of this Loan Guaranty that is held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions of this Loan Guaranty; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 3.04     Additional Subsidiaries. Restricted Subsidiaries of the Top Borrower may be required to enter into this Loan Guaranty as Subsidiary Guarantors pursuant to and in accordance with Section 5.12 of the Credit Agreement. Upon execution and delivery by any such Restricted Subsidiary of a Joinder Agreement, such Restricted Subsidiary shall become a Subsidiary Guarantor hereunder with the same force and effect as if originally named as a Subsidiary Guarantor herein. The execution and delivery of any such instrument shall not require the consent of any other Loan Guarantor hereunder or any other Person. The rights and obligations of each Loan Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any new Loan Guarantor as a party to this Loan Guaranty.

SECTION 3.05     Headings. The titles of and section headings in this Loan Guaranty are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Loan Guaranty.

SECTION 3.06     Entire Agreement. This Loan Guaranty and the other Loan Documents constitute the entire agreement among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

8

SECTION 3.07    CHOICE OF LAW.    THIS LOAN GUARANTY AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS LOAN GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 3.08    CONSENT TO JURISDICTION; CONSENT TO SERVICE OF PROCESS.

(a)    EACH    PARTY    HERETO    HEREBY    IRREVOCABLY    AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK (OR ANY APPELLATE COURT THEREFROM) OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN GUARANTY AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL (EXCEPT AS PERMITTED BELOW) BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, FEDERAL COURT.    EACH PARTY HERETO AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY REGISTERED MAIL ADDRESSED TO SUCH PERSON SHALL BE EFFECTIVE SERVICE OF PROCESS AGAINST SUCH PERSON FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT. EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON SUCH JUDGMENT   OR   IN   ANY   OTHER   MANNER   PROVIDED   BY   APPLICABLE REQUIREMENTS OF LAW.

(b)    EACH    PARTY    HERETO    HEREBY    IRREVOCABLY    AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LOAN GUARANTY AND BROUGHT IN ANY COURT REFERRED TO IN PARAGRAPH (a) OF THIS SECTION.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY CLAIM OR DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION, SUIT OR PROCEEDING IN ANY SUCH COURT.

(c)    TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL) DIRECTED TO IT AT ITS ADDRESS FOR NOTICES PROVIDED IN SECTION 9.01 OF THE CREDIT AGREEMENT. EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER THAT SERVICE OF PROCESS WAS INVALID AND INEFFECTIVE. NOTHING IN THIS LOAN GUARANTY WILL AFFECT THE RIGHT OF ANY PARTY TO THIS LOAN GUARANTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

9

SECTION 3.09    WAIVER OF JURY TRIAL.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS LOAN GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS LOAN GUARANTY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 3.10    Indemnity.    Each Loan Guarantor hereby agrees to indemnify the Administrative Agent and the other Indemnitees, as set forth in Section 9.03 of the Credit Agreement.

SECTION 3.11    Counterparts.    This Loan Guaranty may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Loan Guaranty by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Loan Guaranty. The words "execution," "signed," "signature," and words of like import in this letter shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 3.12    INTERCREDITOR AGREEMENTS GOVERN.    NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE GUARANTEE OF THE GUARANTEED OBLIGATIONS GRANTED TO THE ADMINISTRATIVE AGENT, FOR THE BENEFIT OF THE SECURED PARTIES, PURSUANT TO THIS LOAN GUARANTY AND THE EXERCISE OF ANY RIGHT OR REMEDY BY THE ADMINISTRATIVE AGENT ARE SUBJECT TO THE PROVISIONS OF EACH APPLICABLE INTERCREDITOR AGREEMENT. IN THE EVENT OF ANY CONFLICT BETWEEN THE PROVISIONS OF THE RELEVANT INTERCREDITOR AGREEMENT AND THIS LOAN GUARANTY, THE PROVISIONS OF THE RELEVANT INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL.

SECTION 3.13    Successors and Assigns.    Whenever in this Loan Guaranty any party hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party; and all covenants, promises and agreements by or on behalf of any Loan Guarantor or the Administrative Agent that are contained in this Loan Guaranty shall bind and inure to the benefit of their respective successors and permitted assigns. Except in a transaction permitted (or not restricted) under the Credit Agreement, no Loan Guarantor may assign any of its rights or obligations hereunder without the written consent of the Administrative Agent.

SECTION 3.14    Survival of Agreement.    Without limitation of any provision of the Credit Agreement or Section 3.10 hereof, all covenants, agreements, indemnities, representations and warranties made by the Loan Guarantors in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Loan Guaranty or any other Loan Document shall be

10

considered to have been relied upon by the Lenders and shall survive the execution and delivery of the Loan Documents and the making of any Loan, regardless of any investigation made by any such Lender or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect until the Termination Date, or with respect to any individual Loan Guarantor until such Loan Guarantor is otherwise released from its obligations under this Loan Guaranty in accordance with Section 3.15.

SECTION 3.15     Release of Loan Guarantors.  A Subsidiary Guarantor shall automatically be released from its obligations hereunder and its Loan Guaranty shall be automatically released in the circumstances described in Article 8 and Section 9.22 of the Credit Agreement.  In connection with any such release, the Administrative Agent shall promptly execute and deliver to any Loan Guarantor, at such Loan Guarantor's expense, all documents that such Loan Guarantor shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to the preceding sentence of this Section 3.15 shall be without recourse to or warranty by the Administrative Agent (other than as to the Administrative Agent's authority to execute and deliver such documents).

SECTION 3.16     Payments.  All payments made by any Loan Guarantor hereunder will be made without setoff, counterclaim or other defense and on the same basis as payments are made by the Borrowers under Sections 2.18 and 2.19 of the Credit Agreement.

SECTION 3.17     Notice, etc.  All notices and other communications provided for hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email, as follows:

(a)     if to any Loan Guarantor, addressed to it in care of the Top Borrower at its address specified in Section 9.01 of the Credit Agreement;

(b)     if to the Administrative Agent or any Lender, at its address specified in Section 9.01 of the Credit Agreement;

(c)     if to any Secured Party in respect of any Secured Hedging Obligations, at its address specified in the Hedge Agreement to which it is a party; or

(d)     if to any Secured Party in respect of any Banking Services Obligations, at its address specified in the relevant documentation to which it is a party.

SECTION 3.18     Set Off.  In addition to any right now or hereafter granted under applicable Requirements of Law and not by way of limitation of any such right, while an Event of Default has occurred and is continuing, the Administrative Agent, each Lender, each Issuing Bank and each of their respective Affiliates shall be entitled to rights of setoff to the extent provided in Section 9.09 of the Credit Agreement.

SECTION 3.19     Waiver of Consequential Damages, Etc.  To the extent permitted by applicable Requirements of Law, none of the Loan Guarantors nor the Secured Parties shall assert, and each hereby waives, any claim against each other or any Related Party thereof, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Loan Guaranty or any agreement or instrument contemplated hereby, except, in the case of any claim by any Indemnitee against any of the Loan Guarantors, to the extent such damages would otherwise be subject to indemnification pursuant to the terms of Section 3.10.

11

SECTION 3.20    Keepwell.    Each Qualified ECP Guarantor hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each Non-ECP Guarantor to honor all of its obligations under this Loan Guaranty in respect of Swap Obligations that would otherwise be Excluded Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 3.20 for the maximum amount of such liability that can be hereby incurred, and otherwise subject to the limitations on the obligations of Loan Guarantors contained in this Loan Guaranty, without rendering its obligations under this Section 3.20, or otherwise under this Loan Guaranty, voidable under applicable Requirements of Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  This Section 3.20 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each Non-ECP Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

[SIGNATURE PAGE FOLLOWS]

12

IN WITNESS WHEREOF, each Loan Guarantor and the Administrative Agent have executed this Loan Guaranty as of the date first above written.

Holdings:

DAWN INTERMEDIATE, LLC


By: _____
         Name:    Kristen McGuffey
         Title:     Executive Vice President, General
                   Counsel and Secretary

Borrowers:

SERTA SIMMONS BEDDING, LLC
SSB MANUFACTURING COMPANY


By: _____
         Name:    Kristen McGuffey
         Title:     Executive Vice President, General
                   Counsel and Secretary


NATIONAL BEDDING COMPANY L.L.C.


By: _____
         Name:    Kristen McGuffey
         Title:     General Counsel and Secretary

Subsidiary Guarantors:

DREAMWELL, LTD.
SIMMONS BEDDING COMPANY, LLC
SSB HOSPITALITY, LLC
SSB LOGISTICS, LLC
SSB RETAIL, LLC
THE SIMMONS MANUFACTURING CO., LLC
TOMORROW SLEEP LLC
TUFT & NEEDLE, LLC
WORLD OF SLEEP OUTLETS, LLC


By:   _____
Name:   Kristen McGuffey
Title:   Executive Vice President, General Counsel
        and Secretary


SERTA INTERNATIONAL HOLDCO, LLC


By:   _____
Name:   Kristen McGuffey
Title:   Authorized Person

UBS AG, STAMFORD BRANCH,
as Administrative Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

## EXHIBIT A
## SUBSIDIARY GUARANTORS

1. DAWN INTERMEDIATE, LLC
2. DREAMWELL, LTD.
3. NATIONAL BEDDING COMPANY L.L.C.
4. SERTA SIMMONS BEDDING, LLC
5. SIMMONS BEDDING COMPANY, LLC
6. SSB HOSPITALITY, LLC
7. SSB LOGISTICS, LLC
8. SSB MANUFACTURING COMPANY
9. SSB RETAIL, LLC
10. THE SIMMONS MANUFACTURING CO., LLC
11. TOMORROW SLEEP LLC
12. TUFT & NEEDLE, LLC
13. WORLD OF SLEEP OUTLETS, LLC
14. SERTA INTERNATIONAL HOLDCO, LLC

A-1

[FORM OF]
PERFECTION CERTIFICATE

[●] [●], 20[●]

Reference is hereby made to (i) that certain Super-Priority Term Loan Agreement, dated as of June [__], 2020 (as it may be amended, restated, amended and restated, supplemented or otherwise modified and in effect as of the date hereof, the "Super-Priority Term Loan Agreement"), by and among, *inter alios,* Dawn Intermediate, LLC, a Delaware limited liability company ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company (the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding") and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing", together with National Bedding and Top Borrower, the "Borrowers"), the lenders from time to time party thereto (the "Lenders") and UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders party thereto (the "Administrative Agent") and (ii) that certain Super-Priority Pledge and Security Agreement, dated as of June [__], 2020  (as it may be amended, restated, amended and restated, supplemented or otherwise modified and in effect as of the date hereof, the "Security Agreement"), by and among the Loan Parties from time to time party thereto and the Administrative Agent. Capitalized terms used but not otherwise defined herein have the meanings assigned to such terms in the Super-Priority Term Loan Agreement.

As used herein, the term "Company" means [each][the] signatory hereto.

As of the date hereof, the undersigned hereby represents and warrants to each Administrative Agent as follows:

1. Names.  (a) The exact legal name of [each][the] Company, as such name appears in its [respective] Organizational Documents filed with the Secretary of State or other relevant authority of [such][the] Company's jurisdiction of organization is set forth in Schedule 1(a).  [Each][The] Company is the type of entity disclosed next to its name in Schedule 1(a).  Also set forth in Schedule 1(a) is the organizational identification number, if any, of [each][the] Company, the Federal Taxpayer Identification Number of [each][the] Company that is a Loan Party and the jurisdiction of organization of [each][the] Company.

(b) Except as otherwise disclosed in Schedule 1(c) or Schedule 1(d), set forth in Schedule 1(b) hereto is  any other legal name that [any][the] Company has had, together with the date of the relevant change in the past five years.

(c) Set forth in Schedule 1(c) is a list of the information required by Section 1(a) of this certificate for any other Person (i) to which [any][the] Company became the successor by amalgamation, merger, consolidation or acquisition or (ii) that has been liquidated into, or transferred all or substantially all of its assets to, [any][the] Company, at any time within the past five years.

(d) Except as set forth in Schedule 1(d), or as otherwise disclosed in Schedule 1(c), [no Company has][the Company has not] changed its jurisdiction of organization or form of entity at any time during the past four months.

2. Locations.  (a) The chief executive office of [each][the] Company that is a Loan Party is currently located at the address set forth in Schedule 2(a) hereto.

(b) Except as otherwise disclosed in Schedule 2(a), all other locations where any Company currently maintains any Collateral consisting of Inventory (including property in possession of a third party (e.g., a warehouseman or other bailee or on consignment)), other than (i) any such Inventory that is in transit or out for repair in the ordinary course of business, (ii) such locations that

J-1

are owned by any Loan Party and (iii) such locations at which a Company maintains Collateral consisting of Inventory with an aggregate fair market value below $50,000.00 are set forth in Schedule 2(b) hereto.

3. <u>Stock Ownership and Other Equity Interests</u>. Attached hereto as <u>Schedule 3</u> is a true and correct list of all of the issued and outstanding stock, partnership interests, limited liability company membership interests or other equity interests owned by [**any**][**the**] Company other than Excluded Assets, the beneficial owners of such stock, partnership interests, membership interests or other equity interests and the percentage of the total issued and outstanding stock, partnership interests, membership interests or other equity interests of the relevant issuer represented thereby.

4. <u>Instruments and Tangible Chattel Paper</u>. Attached hereto as <u>Schedule 4</u> is a true and correct list of all Instruments (other than checks to be deposited in the ordinary course of business) and Tangible Chattel Paper, in each case, having a face amount exceeding $2,000,000, held by [**any**][**the**] Company as of the date hereof, including the names of the obligors, the amounts owing and the due dates.

5. <u>Intellectual Property</u>. (a) Attached hereto as <u>Schedule 5(a)</u> is a schedule setting forth all of [**each**][**the**] Company's United States Patents and United States Trademarks registered with and published by (or applied for in) the United States Patent and Trademark Office (excluding, for the avoidance of doubt, any United States Patent or United States Trademark that has expired or been abandoned, but including United States Trademarks that would constitute Collateral upon the filing of a "Statement of Use" or an "Amendment to Allege Use" with respect thereto), including the name of the registered owner and the registration or publication number (or, if applicable, the applicant and the application number) of each such United States Patent and United States Trademark.

(b) Attached hereto as <u>Schedule 5(b)</u> is a schedule setting forth all of [**each**][**the**] Company's Copyrights registered with (or applied for in) the United States Copyright Office (excluding, for the avoidance of doubt, any Copyright that has expired or been abandoned), including the name of the registered owner and the registration number (or, if applicable, the applicant and the application number) of each such Copyright.

6. <u>Commercial Tort Claims</u>. Attached hereto as <u>Schedule 6</u> is a true and correct list of all Commercial Tort Claims with an individual value of at least $1,000,000 (as reasonably determined by the Top Borrower), held by [**any**][**the**] Company, including a brief description thereof.

7. <u>Deposit Accounts, Securities Accounts and Commodities Accounts</u>. Attached hereto as <u>Schedule 7</u> is a true and complete list of all Deposit Accounts, Securities Accounts and Commodities Accounts maintained by [**each**][**the**] Company, including the name of the institution where each such account is held, the name of each such account and the name of [**each**][**the**] Company that holds each such account.

[Signature Page Follows]

WEIL:\97509555\6\40416.0003

IN WITNESS WHEREOF, the undersigned has hereunto signed this Perfection Certificate as of the date first written of above.

[●]

By: _____
     Name:    [●]
     Title:     [●]

J-3

## SCHEDULE 1(A)

LEGAL NAMES

| Legal Name | Jurisdiction | Type | Organizational Number | Federal Taxpayer Identification Number |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Schedule 1(A) to Exhibit J

## SCHEDULE 1(B)

PRIOR ORGANIZATIONAL NAMES

| Company | Prior Legal Name | Date of Change |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

## SCHEDULE 1(C)

PREDECESSOR ENTITIES

| Company | Action | Legal Name of Predecessor Entity | Jurisdiction of Organization of Predecessor Entity | Date |
|---------|--------|----------------------------------|----------------------------------------------------|------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

WEIL:\97509555\6\40416.0003

## SCHEDULE 1(D)

### CHANGES IN JURISDICTION OR FORM

| Company | Current Jurisdiction of Organization/Form | Prior Jurisdiction of Organization/Form | Date of Change |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

WEIL:\97509555\6\40416.0003

## SCHEDULE 2(a)

CHIEF EXECUTIVE OFFICE ADDRESSES/REGISTERED OFFICE ADDRESS

| Company | Address |
|---------|---------|
|         |         |
|         |         |
|         |         |
|         |         |
|         |         |



Schedule 3 to Exhibit J

**SCHEDULE 2(b)**

LOCATIONS OF INVENTORY

## SCHEDULE 3

EQUITY INTERESTS

| Issuer | Holder | Certificate No. | No. Shares/Interest | % of Issued and Outstanding Shares |
|--------|--------|-----------------|---------------------|-----------------------------------|
|        |        |                 |                     |                                   |
|        |        |                 |                     |                                   |
|        |        |                 |                     |                                   |
|        |        |                 |                     |                                   |

## SCHEDULE 4

INSTRUMENTS

1.      Promissory Notes/Instruments:

| Obligee | Obligor | Principal Amount | Maturity |
|---------|---------|------------------|----------|
|         |         |                  |          |
|         |         |                  |          |
|         |         |                  |          |
|         |         |                  |          |

2.      Tangible Chattel Paper:

Schedule 4 to Exhibit J

## SCHEDULE 5(A)

### PATENTS AND TRADEMARKS

**PATENTS**

| REGISTERED OWNER | SERIAL NUMBER | DESCRIPTION |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**PATENT APPLICATIONS**

| APPLICANT | APPLICATION NO. | DESCRIPTION |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**TRADEMARKS**

| REGISTERED OWNER | REGISTRATION NUMBER | TRADEMARK |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**TRADEMARK APPLICATIONS**

| APPLICANT | APPLICATION NO. | TRADEMARK |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

WEIL:97508555\94\41160003

## SCHEDULE 5(B)

### COPYRIGHTS

COPYRIGHTS

| REGISTERED OWNER | REGISTRATION NUMBER | TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

COPYRIGHT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

WEIL:\97609555\4\04040000 1 1

**<u>SCHEDULE 6</u>**

COMMERCIAL TORT CLAIMS

**SCHEDULE 7**

DEPOSIT ACCOUNTS

[FORM OF] JOINDER AGREEMENT

A.        SUPPLEMENT NO. [●] dated as of [●] (this "Supplement"), to (a) the Super-Priority Term Loan Pledge and Security Agreement dated as of June [●], 2020 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"), by and among Dawn Intermediate, LLC, a Delaware limited liability company ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company (the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding") and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing", together with National Bedding and Top Borrower, the "Borrowers"), the Subsidiary Guarantors (as defined in the Super-Priority Term Loan Agreement referenced below) from time to time party thereto (the foregoing, collectively, the "Grantors") and UBS AG, Stamford Branch, in its capacity as administrative agent and collateral agent for the Secured Parties (in such capacities, the "Administrative Agent") and (b) the Super-Priority Term Loan Guaranty Agreement dated as of dated as of June [●], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Loan Guaranty"), by and among Holdings, the Borrowers, the Subsidiary Guarantors from time to time party thereto and the Administrative Agent.

B.        Reference is made to the Super-Priority Term Loan Agreement dated as of dated as of June [●], 2020, (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Super-Priority Term Loan Agreement"), by and among, inter alios, Holdings, the Borrowers, the lenders from time to time party thereto and the Administrative Agent.

C.        Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Super-Priority Term Loan Agreement, the Security Agreement or the Loan Guaranty, as applicable.

D.        The Loan Parties have entered into the Security Agreement and the Loan Guaranty in order to induce the Lenders to make Loans.  Section 7.10 of the Security Agreement, Section 3.04 of the Loan Guaranty and Section 5.12 of the Super-Priority Term Loan Agreement provide that additional subsidiaries of the Top Borrower may become Subsidiary Guarantors under the Security Agreement and the Loan Guaranty by executing and delivering an instrument in the form of this Supplement.  [The] [Each] undersigned Restricted Subsidiary (the "New Subsidiary") is executing this Supplement in accordance with the requirements of the Super-Priority Term Loan Agreement to become a Grantor under the Security Agreement and a Subsidiary Guarantor under the Loan Guaranty in order to induce the Lenders to make additional Loans and as consideration for Loans previously made and to Guaranty and secure the Secured Obligations, including [its] [their] obligations under the Loan Guaranty.

Accordingly, [the] [each] New Subsidiary agrees as follows:

SECTION 1.        In accordance with Section 7.10 of the Security Agreement, [the] [each] New Subsidiary by its signature below becomes a Subsidiary Guarantor and a Grantor under the Security Agreement with the same force and effect as if originally named therein as a Grantor, and [the] [each] New Subsidiary hereby (a) agrees to all the terms and provisions of the Security Agreement applicable to it as a Grantor thereunder and (b) makes the representations and warranties applicable to it as a Grantor under the Security Agreement[, subject to Schedule A hereto,] on and as of the date hereof; it being understood and agreed that any representation or warranty that expressly relates to an earlier date shall be deemed to refer to the date hereof. In furtherance of the foregoing, [the] [each] New Subsidiary, as security for the payment and performance in full of the Secured Obligations, does hereby create and grant to the Administrative Agent, its successors and permitted assigns, for the benefit of the Secured Parties, their successors and permitted assigns, a security interest in and Lien on all of [the] [each] New Subsidiary's right, title and interest in and to the Collateral of [the] [each] New Subsidiary.  Upon the effectiveness of this Supplement, each reference to a "Grantor" and "Subsidiary Guarantor" in the Security Agreement shall be deemed to include [the] [each] New Subsidiary.  The Security Agreement is hereby incorporated herein by reference.

SECTION 2.    [**Each**] [**The**] New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, [**each**] [**the**] New Subsidiary will be deemed to be a Loan Guarantor under the Loan Guaranty and a Loan Guarantor for all purposes of the Credit Agreement and shall have all of the rights, benefits, duties and obligations of a Loan Guarantor thereunder as if it had executed the Loan Guaranty. [**Each**] [**The**] New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Loan Guaranty.  Without limiting the generality of the foregoing terms of this <u>paragraph 1</u>, [**each**] [**the**] New Subsidiary hereby absolutely and unconditionally guarantees, jointly and severally with the other Loan Guarantors, to the Administrative Agent and the Secured Parties, the prompt payment of the Guaranteed Obligations in full when due (whether at stated maturity, upon acceleration or otherwise) to the extent of and in accordance with the Loan Guaranty. [**Each**] [**The**] New Subsidiary hereby waives acceptance by the Administrative Agent and the Secured Parties of the guaranty by the New Subsidiary upon the execution of this Agreement by [**each**] [**the**] New Subsidiary. [**Each**] [**The**] New Subsidiary hereby (x) makes, as of the date hereof, the representation and warranty set forth in Section 2.10 of the Loan Guaranty[**, except as set forth on <u>Schedule A</u> hereto,**][26] and (y) agrees to perform and observe, and to cause each of its Restricted Subsidiaries to perform and observe, the covenant set forth in <u>Section 2.11</u> of the Loan Guaranty.

SECTION 3.    [**The**] [**Each**] New Subsidiary represents and warrants to the Administrative Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to the Legal Reservations.

SECTION 4.    This Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Supplement shall become effective when the Administrative Agent shall have received a counterpart of this Supplement that bears the signature of [**the**] [**each**] New Subsidiary and the Administrative Agent has executed a counterpart hereof.  Delivery of an executed signature page to this Supplement by facsimile transmission or by email as a ".pdf" or ".tif" attachment shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 5.    Attached hereto is a duly prepared, completed and executed Perfection Certificate, which includes information with respect to [**the**] [**each**] New Subsidiary, and [**the**] [**each**] New Subsidiary hereby represents and warrants that the information set forth therein with respect to itself is correct and complete in all material respects as of the date hereof.

SECTION 6.    Except as expressly supplemented hereby, the Loan Guaranty and the Security Agreement shall remain in full force and effect.

SECTION 7.    THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 8.    In case any one or more of the provisions contained in this Supplement is invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and in the Security Agreement shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  Each Borrower and the Administrative Agent shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

---

[26] Subject to <u>Section 5.12(c)(x)</u> of the Credit Agreement.

SECTION 9.     All communications and notices hereunder shall be in writing and given as provided in <u>Section 9.01</u> of the Super-Priority Term Loan Agreement.

SECTION 10.     [**The**] [**Each**] New Subsidiary agrees to reimburse the Administrative Agent for its expenses in connection with this Supplement, including the fees, other charges and disbursements of counsel in accordance with <u>Section 9.03(a)</u> of the Credit Agreement.

SECTION 11.     This Supplement shall constitute a Loan Document, under and as defined in, the Super-Priority Term Loan Agreement.

[Signature pages follow]

WEIL:\97509555\6\40416.0003

IN WITNESS WHEREOF, [**each**] [**the**] New Subsidiary has duly executed this Joinder Agreement as of the day and year first above written.

[NAME OF NEW SUBSIDIARY]


By: _____
     Name:
     Title:

WEIL:\97509555\6\40416.0003

[SCHEDULE A
CERTAIN EXCEPTIONS]

Schedule A to Exhibit K

EXHIBIT L

[FORM OF]
PROMISSORY NOTE

$[●]

New York, New York
[●] [●], 20[●]

     FOR VALUE RECEIVED, the undersigned Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing" and, together with SSB and National Bedding, the "Borrowers"), hereby jointly and severally promise to pay on demand to [●] (the "Lender") or its registered permitted assign, at the office of UBS AG, Stamford Branch ("UBS") at [●], Term Loans in the principal amount of $[●] or such lesser amount as is outstanding from time to time, on the dates and in the amounts set forth in the Super-Priority Term Loan Agreement, dated as of June [__], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified, the "Super-Priority Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, LLC, a Delaware limited liability company ("Dawn Intermediate" or "Holdings"), the Borrowers, the Lenders from time to time party thereto, UBS, in its capacities as administrative agent and collateral agent for the Lenders. Each Borrower also promises to pay interest from the date of such Term Loans on the principal amount thereof from time to time outstanding, in like Dollars, at such office, in each case, in the manner and at the rate or rates per annum and payable on the dates provided in the Super-Priority Term Loan Agreement. Terms used but not defined herein shall have the meanings assigned to such terms in the Super-Priority Term Loan Agreement.

     Each Borrower promises to pay interest on any overdue principal and, to the extent permitted by applicable Requirements of Law, overdue interest from the relevant due dates, in each case, in the manner, at the rate or rates and under the circumstances provided in the Super-Priority Term Loan Agreement.

     Each Borrower hereby waives diligence, presentment, demand, protest and notice of any kind to the extent possible under any applicable Requirements of Law. The non-exercise by the holder hereof of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

     All Borrowings evidenced by this promissory note and all payments and prepayments of the principal hereof and interest hereon and the respective dates thereof shall be endorsed by the holder hereof on the schedules attached hereto and made a part hereof or on a continuation thereof which shall be attached hereto and made a part hereof, or otherwise recorded by such holder in its internal records; provided, however, that the failure of the holder hereof to make such a notation or any error in such notation shall not affect the obligations of each Borrower under this Note.

     This promissory note is one of the promissory notes referred to in the Super-Priority Term Loan Agreement that, among other things, contains provisions for the acceleration of the maturity hereof upon the happening of certain events, for optional and mandatory prepayment of the principal hereof prior to the maturity hereof and for the amendment or waiver of certain provisions of the Super-Priority Term Loan Agreement, all upon the terms and conditions therein specified. This promissory note is entitled to the benefit of the Super-Priority Term Loan Agreement, and the obligations hereunder are guaranteed and secured as provided therein and in the other Loan Documents referred to in the Super-Priority Term Loan Agreement.

     If any assignment by the Lender holding this promissory note occurs after the date of the issuance hereof, the Lender agrees that it shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender this promissory note to the Administrative Agent for cancellation.

     THE ASSIGNMENT OF THIS PROMISSORY NOTE AND ANY RIGHTS WITH RESPECT THERETO ARE SUBJECT TO THE PROVISIONS OF THE SUPER-PRIORITY TERM LOAN

WEIL:\97509555\6\40416.0003

AGREEMENT, INCLUDING THE PROVISIONS GOVERNING THE REGISTER AND THE PARTICIPANT REGISTER.

THIS PROMISSORY NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

THE FOLLOWING INFORMATION IS SUPPLIED SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES. THIS NOTE WAS ISSUED WITH "ORIGINAL ISSUE DISCOUNT" ("OID") WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), AND THIS LEGEND IS REQUIRED BY SECTION 1275(c) OF THE CODE. EACH HOLDER MAY OBTAIN INFORMAITON REGARDING THE AMOUNT OF ANY OID, THE ISSUE PRICE, THE ISSUE DATE, AND THE YIELD TO MATURITY RELATING TO THIS NOTE BY SUBMITTING A REQUEST FOR SUCH INFORMATION TO THE TOP BORROWER AT THE FOLLOWING ADDRESS: SERTA SIMMONS BEDDING, LLC, 2451 INDUSTRY AVENUE, DORAVILLE, GA 30360, ATTENTION: SALLY A. ERICKSON.

[Remainder of Page Intentionally Left Blank]

L-2

SERTA SIMMONS BEDDING, LLC


By: _____
   Name:
   Title:

NATIONAL BEDDING COMPANY L.L.C.


By: _____
   Name:
   Title:

SSB MANUFACTURING COMPANY


By: _____
   Name:
   Title:

WEIL:\97509555\6\40416.0003

## LOANS, CONVERSIONS AND REPAYMENTS OF ABR LOANS

| Date | Amount of ABR Loans | Amount Converted to ABR Loans | Amount of Principal of ABR Loans Repaid | Amount of ABR Loans Converted to LIBO Rate Loans | Unpaid Principal Balance of ABR Loans | Notation Made By |
|------|------|------|------|------|------|------|
|      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |
|      |      |      |      |      |      |      |

Schedule A to Exhibit I

LOANS, CONTINUATIONS, CONVERSIONS AND REPAYMENTS OF LIBO RATE LOANS

| Date | Amount of LIBO Rate Loans | Amount Converted to LIBO Rate Loans | Interest Period and LIBO Rate with Respect Thereto | Amount of Principal of LIBO Rate Loans Repaid | Amount of LIBO Rate Loans Converted to ABR Loans | Unpaid Principal Balance of LIBO Rate Loans | Notation Made By |
|------|------|------|------|------|------|------|------|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

Schedule B to Exhibit L

[FORM OF]
SUPER-PRIORITY TERM LOAN PLEDGE AND SECURITY AGREEMENT

[See attached.]

## SUPER-PRIORITY PLEDGE AND SECURITY AGREEMENT

THIS SUPER-PRIORITY PLEDGE AND SECURITY AGREEMENT (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Security Agreement") is entered into as of June 22, 2020, by and among Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing" and, together with SSB and National Bedding, the "Borrowers"), Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), the Subsidiary Guarantors (as defined in the Credit Agreement) from time to time party hereto (the foregoing, collectively, the "Grantors") and UBS AG, Stamford Branch ("UBS"), in its capacity as administrative agent and collateral agent for the Secured Parties (as defined below) (in such capacities, the "Administrative Agent").

## PRELIMINARY STATEMENT

Holdings, the Borrowers, the Lenders party thereto, the Administrative Agent and others are entering into that certain Super-Priority Term Loan Agreement, dated as of June 22, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). The Grantors are entering into this Security Agreement in order to induce the Lenders to enter into and extend credit to the Borrowers under the Credit Agreement and to secure the Secured Obligations, including their obligations under the Loan Guaranty.

ACCORDINGLY, the parties hereto agree as follows:

## ARTICLE 1
### DEFINITIONS

Section 1.01.  *Terms Defined in Credit Agreement*.  All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

Section 1.02.  *Terms Defined in UCC*.  Terms defined in the UCC that are not otherwise defined in this Security Agreement or the Credit Agreement are used herein as defined in Articles 8 or 9 of the UCC, as the context may require (including without limitation, as if such terms were capitalized in Article 8 or 9 of the UCC, as the context may require, the following terms: "Account," "Commodities Account,", "Deposit Account," "Chattel Paper," "Commercial Tort Claim," "Document," "Electronic Chattel Paper," "Equipment," "Fixture," "General Intangible," "Goods," "Instruments," "Inventory," "Investment Property," "Letter-of-Credit Right," "Securities Account," "Securities Entitlement," "Supporting Obligation" and "Tangible Chattel Paper").

Section 1.03.  *Definitions of Certain Terms Used Herein*.  As used in this Security Agreement, in addition to the terms defined in the preamble and Preliminary Statement above, the following terms shall have the following meanings:

"Administrative Agent" has the meaning set forth in the preamble.

"Article" means a numbered article of this Security Agreement, unless another document is specifically referenced.

"Borrowers" has the meaning specified in the preamble.

"Collateral" has the meaning set forth in Article 2.

"Contract Rights" means all rights of any Grantor under any Contract, including, without limitation, (i) any and all rights to receive and demand payments under such Contract, (ii) any and all rights to receive and compel performance under such Contract and (iii) any and all other rights, interests and claims now existing or in the future arising in connection with such Contract.

"Contracts" means all contracts between any Grantor and one or more additional parties (including, without limitation, any Hedge Agreement, licensing agreement and any partnership agreement, joint venture agreement and/or limited liability company agreement).

"Control" has the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"Credit Agreement" has the meaning set forth in the Preliminary Statement.

"Cumulative Perfection Certificate" means the Perfection Certificate delivered pursuant to Section 4.01(i) of the Credit Agreement and any Perfection Certificate delivered pursuant to Section 5.12(a) of the Credit Agreement.

"Domain Names" means all Internet domain names and associated URL addresses in or to which any Grantor now or hereafter has any right, title or interest.

"Exhibit" refers to a specific exhibit to this Security Agreement, unless another document is specifically referenced.

"Grantors" has the meaning set forth in the preamble.

"Holdings" has the meaning set forth in the preamble.

"Intellectual Property Collateral" means, collectively, all Copyrights, Patents, Trademarks, Trade Secrets, Domain Names, Licenses and Software.

"Intellectual Property Security Agreement Supplement" means an Intellectual Property Security Agreement Supplement substantially in the form of Exhibit A to the Intellectual Property Security Agreement.

"Licenses" means, with respect to any Grantor, all of such Grantor's right, title, and interest in and to (a) any and all licensing agreements or similar arrangements, whether as licensor or licensee, in (1) Patents, (2) Copyrights, (3) Trademarks, (4) Trade Secrets or (5) Software, (b) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future breaches thereof, and (c) all rights to sue for past, present, and future breaches thereof.

"Money" has the meaning set forth in Article 1 of the UCC.

"National Bedding" has the meaning set forth in the preamble.

"Permits" shall mean, all licenses, permits, rights, orders, variances, franchises or authorizations of or from any Governmental Authority or agency.

-2-

"<u>Pledged Collateral</u>" means all Pledged Stock, including all stock certificates, options or rights of any nature whatsoever in respect of the Pledged Stock that may be issued or granted to, or held by, any Grantor, all Instruments owned by any Grantor, whether or not physically delivered to the Administrative Agent pursuant to this Security Agreement, whether now owned or hereafter acquired by such Grantor and any and all Proceeds thereof.

"<u>Pledged Stock</u>" means, with respect to any Grantor, the shares of Capital Stock held by such Grantor, including Capital Stock described in <u>Schedule 3</u> to the Cumulative Perfection Certificate as held by such Grantor, together with any other shares of Capital Stock as are hereafter acquired by such Grantor.

"<u>Proceeds</u>" has the meaning assigned in Article 9 of the UCC and, in any event, shall also include but not be limited to (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Administrative Agent or any Grantor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to any Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any Governmental Authority, (iii) any and all Stock Rights and (iv) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"<u>Receivables</u>" means any Account, Chattel Paper, Document, Instrument and/or any General Intangible, in each case, that is a right or claim to receive money (whether or not earned by performance).

"<u>Section</u>" means a numbered section of this Security Agreement, unless another document is specifically referenced.

"<u>Security Agreement</u>" has the meaning set forth in the preamble.

"<u>Software</u>" means computer programs, source code, object code and supporting documentation including "software" as such term is defined in Article 9 of the UCC, as well as computer programs that may be construed as included in the definition of Goods.

"<u>SSB</u>" has the meaning set forth in the preamble.

"<u>SSB Manufacturing</u>" has the meaning set forth in the preamble.

"<u>Stock Rights</u>" means all dividends, options, warrants, instruments or other distributions and any other right or property which any Grantor shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any Capital Stock constituting Collateral, any right to receive any Capital Stock constituting Collateral and any right to receive earnings, in which such Grantor now has or hereafter acquires any right, issued by an issuer of such Capital Stock.

"<u>Top Borrower</u>" has the meaning set forth in the preamble.

"<u>Trade Secrets</u>" means, with respect to any Grantor, all of such Grantor's right, title and interest in and to the following: (a) confidential and proprietary information, including unpatented inventions, invention disclosures, engineering or other data, information, production procedures, know-how, financial data, customer lists, supplier lists, business and marketing plans, processes, schematics, algorithms, techniques, analyses, proposals, source code, data, databases and data collections; (b) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims and payments for past and future misappropriations or infringements thereof; (c) all rights to sue for past, present and future infringements of the foregoing, including the right to settle

suits involving claims and demands for royalties owing; and (d) all rights corresponding to any of the foregoing.

"UBS" has the meaning set forth in the preamble.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

ARTICLE 2
GRANT OF SECURITY INTEREST

Section 2.01.    *Grant of Security Interest.*

(a)    As security for the prompt and complete payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby pledges, collaterally assigns, mortgages, transfers and grants to the Administrative Agent, its successors and permitted assigns, on behalf of and for the ratable benefit of the Secured Parties, a continuing security interest in all of its right, title and interest in, to all of the following personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Grantor, and regardless of where located (all of which are collectively referred to as the "Collateral"):

(i)    all Accounts;

(ii)    all Chattel Paper (including, without limitation, all Tangible Chattel Paper and all Electronic Chattel Paper);

(iii)    all Intellectual Property Collateral;

(iv)    all Documents;

(v)    all Equipment;

(vi)    all Fixtures;

(vii)    all General Intangibles;

(viii)    all Goods;

(ix)    all Instruments;

(x)    all Inventory;

(xi)    all Investment Property, Pledged Stock and other Pledged Collateral;

(xii)    all letters of credit and Letter-of-Credit Rights;

(xiii)    all Commercial Tort Claims described on Schedule 6 to the Cumulative Perfection Certificate (including any supplements to such Schedule 6 delivered pursuant to Section 4.04);

(xiv)    all Permits;

-4-

(xv)     all Software and all recorded data of any kind or nature, regardless of the medium of recording;

(xvi)     all Contracts, together with all Contract Rights arising thereunder;

(xvii)     all Money, Cash and Cash Equivalents;

(xviii)     all Deposit Accounts, Securities Accounts, Commodities Accounts and all other demand, deposit, time, savings, cash management, passbook and similar accounts maintained by such Grantor with any bank or other financial institution and all monies, securities, Instruments deposited or required to be deposited in any of the foregoing;

(xix)     all Securities Entitlements in any or all of the foregoing;

(xx)     all other personal property not otherwise described in clauses (i) through (xix) above;

(xxi)     all Supporting Obligations; and

(xxii)     all accessions to, substitutions and replacements for and Proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

(b)     Notwithstanding the foregoing, the term "Collateral" (and any component definition thereof) shall not include any Excluded Asset.  Notwithstanding anything to the contrary contained herein, immediately upon the ineffectiveness, lapse or termination of any restriction or condition set forth in the definition of "Excluded Assets" in the Credit Agreement that prevented the grant of a security interest in any right, interest or other asset that would have, but for such restriction or condition, constituted Collateral, the Collateral shall include, and the relevant Grantor shall be deemed to have automatically granted a security interest in, such previously restricted or conditioned right, interest or other asset, as the case may be, as if such restriction or condition had never been in effect.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

The Grantors, jointly and severally, represent and warrant to the Administrative Agent as and when required under the Credit Agreement, for the benefit of the Secured Parties, that:

Section 3.01.     *Title, Perfection and Priority; Filing Collateral*.     Subject to the Legal Reservations, this Security Agreement is effective to create a legal, valid and enforceable Lien on and security interest in the Collateral in favor of the Administrative Agent for the benefit of the Secured Parties and, subject to the satisfaction of the Perfection Requirements, the Administrative Agent will have a fully perfected Lien (with the priority set forth in the Intercreditor Agreements and subject to Permitted Liens) on such Collateral securing the Secured Obligations to the extent perfection can be achieved by the Perfection Requirements.

Section 3.02.     *Intellectual Property*.     As of the date hereof, no Grantor has actual knowledge of (i) any third-party claim (A) that any of its owned Patent, Trademark or Copyright registrations or applications is invalid or unenforceable, or (B) challenging such Grantor's rights to such registrations and

applications or (ii) any basis for such claims, other than, in each case, to the extent any such third-party claim would not reasonably be expected to have a Material Adverse Effect.

Section 3.03.    *Pledged Collateral*.  (i) All Pledged Stock has been duly authorized and validly issued (to the extent such concepts are relevant with respect to such Pledged Stock) by the issuer thereof and is fully paid and non-assessable, (ii) each Grantor is the direct owner, beneficially and of record, of the Pledged Stock described in <u>Schedule 3</u> to the Cumulative Perfection Certificate as held by such Grantor and (iii) each Grantor holds the Pledged Stock described in <u>Schedule 3</u> to the Cumulative Perfection Certificate as held by such Grantor free and clear of all Liens (other than Permitted Liens).

ARTICLE 4
COVENANTS

From the date hereof, and thereafter until the Termination Date:

Section 4.01.    *General*.

(a)    *Authorization to File Financing Statements; Ratification*.  Each Grantor hereby (i) authorizes the Administrative Agent to file (A) all financing statements (including fixture filings) and amendments thereto with respect to the Collateral naming such Grantor as debtor and the Administrative Agent as secured party, in form appropriate for filing under the UCC of the relevant jurisdiction and (B) filings with the United States Patent and Trademark Office and the United States Copyright Office (including any Intellectual Property Security Agreement) for the purpose of perfecting, enforcing, maintaining or protecting the Lien of the Administrative Agent in United States issued, registered and applied for Patents, Trademarks and Copyrights (in each case, to the extent constituting Collateral) and naming such Grantor as debtor and the Administrative Agent as secured party and, (ii) subject to the terms of the Loan Documents agrees to take such other actions, in each case as may from time to time be necessary and reasonably requested by the Administrative Agent (and authorizes the Administrative Agent to take any such other actions, which it has no obligation to take) in order to establish and maintain a valid, enforceable (subject to the Legal Reservations) and perfected security interest with the priority set forth in the Intercreditor Agreements (subject to Permitted Liens) in and subject, in the case of Pledged Collateral, to <u>Section 4.02</u> hereof, Control of, the Collateral.  Each Grantor shall pay any applicable filing fees, recordation fees and related expenses relating to its Collateral in accordance with <u>Section 9.03(a)</u> of the Credit Agreement.  Any financing statement filed by the Administrative Agent may (i) indicate the Collateral (A) as "all assets" of the applicable Grantor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such jurisdiction, or (B) by any other description which reasonably approximates the description contained in this Security Agreement and (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (A) in each case to the extent applicable, whether the Grantor is an organization, the type of organization and any organization identification number issued to the Grantor and (B) in the case of a financing statement filed as a fixture filing, a sufficient description of the relevant real property to which the Collateral relates. Each Grantor agrees to furnish any such information to the Administrative Agent promptly upon request.

(b)    *Further Assurances*.  Each Grantor agrees, at its own expense, to take any and all actions reasonably necessary to defend title to the Collateral against all Persons (other than Persons holding Permitted Liens on such Collateral that have priority over the Administrative Agent's Lien) and to defend the security interest of the Administrative Agent in the Collateral and the priority thereof against any Lien that is not a Permitted Lien.

-6-

(c)     *Limitations on Actions*.  Notwithstanding anything to the contrary in this Security Agreement, no Grantor shall be required to take any action in connection with Collateral pledged hereunder (and no security interest in such Collateral shall be required to be perfected) except to the extent consistent with Sections 5.12(c) and 5.14 of the Credit Agreement and the Perfection Requirements or expressly required hereunder and except in accordance with Requirements of Law.

Section 4.02.     *Pledged Collateral*.

(a)     *Delivery of Certificated Securities, Tangible Chattel Paper, Instruments and Documents*. Each Grantor will, after the Closing Date, hold in trust for the Administrative Agent upon receipt and, (x) if the event giving rise to the obligation under this Section 4.02(a) occurs during the first three Fiscal Quarters of any Fiscal Year, on or before the date on which financial statements are required to be delivered pursuant to Section 5.01(a) of the Credit Agreement for the Fiscal Quarter in which the relevant event occurred or (y) if the event giving rise to the obligation under this Section 4.02(a) occurs during the fourth Fiscal Quarter of any Fiscal Year, on or before the date that is 60 days after the end of such Fiscal Quarter (or, in each of the cases of clauses (x) and (y), such longer period as the Required Lenders may agree in their sole discretion, with such agreement to be evidenced by a Direction of the Required Lenders), deliver to the Administrative Agent for the benefit of the Secured Parties any (1) certificated Security representing or evidencing Pledged Collateral and (2) Instrument (A) in each case under this clause (2), having an outstanding balance in excess of $2,000,000 and (B) in each case under clauses (1) and (2), constituting Collateral received after the date hereof, accompanied by undated instruments of transfer or assignment duly executed in blank.  Notwithstanding anything to the contrary in this Security Agreement or any other Loan Document, the Grantors are not required to deliver any Tangible Chattel Paper or Document to the Administrative Agent or for the benefit of any Secured Party.

(b)     *Uncertificated Securities and Pledged Collateral*.  With respect to any partnership interest or limited liability company interest owned by any Grantor which is required to be pledged to the Administrative Agent pursuant to the terms hereof (other than a partnership interest or limited liability company interest held by a Clearing Corporation, Securities Intermediary or other financial intermediary of any kind) which is not represented by a certificate and which is not a Security for purposes of the UCC, such Grantor shall not permit any issuer of such partnership interest or limited liability company interest to allow such partnership interest or limited liability company interest (as applicable) to become a Security unless such Grantor causes such interest to be represented by a certificate and complies with the procedures set forth in Section 4.02(a) within the time period prescribed therein.  Each Grantor which is an issuer of any uncertificated Pledged Collateral described in this Section 4.02(b) hereby agrees to comply with all instructions from the Administrative Agent without such Grantor's further consent, in each case subject to the notice requirements set forth in Section 5.01(a)(iv) hereof.

(c)     *Registration in Nominee Name; Denominations*.  The Administrative Agent, on behalf of the Secured Parties, shall hold certificated Pledged Collateral required to be delivered to the Administrative Agent under clause (a) above in the name of the applicable Grantor, endorsed or assigned in blank or in favor of the Administrative Agent, but at any time when an Event of Default has occurred and is continuing, and upon at least one Business Day's notice to the Top Borrower, the Administrative Agent shall have the right (in its sole and absolute discretion, but subject to the penultimate paragraph of Section 7.01 of the Credit Agreement) to hold the Pledged Collateral in its own name as pledgee, or in the name of its nominee (as pledgee or as sub-agent).  At any time when an Event of Default has occurred and is continuing, but subject to the penultimate paragraph of Section 7.01 of the Credit Agreement, the Administrative Agent shall have the right to exchange the certificates representing Pledged Collateral for certificates of smaller or larger denominations for any purpose consistent with this Security Agreement.

(d)     *Exercise of Rights in Pledged Collateral.*  It is agreed that:

(i)     without in any way limiting the foregoing and subject to <u>clause (ii)</u> below, each Grantor shall have the right to exercise all voting rights or other rights relating to the Pledged Collateral for any purpose that does not violate this Security Agreement, the Credit Agreement or any other Loan Document;

(ii)     each Grantor will permit the Administrative Agent or its nominee at any time when an Event of Default has occurred and is continuing to exercise the rights and remedies provided under <u>Section 5.01(a)(iv)</u> (subject to the notice requirements and proviso set forth therein); and

(iii)     subject to <u>Section 5.01(a)(iv)</u>, each Grantor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Collateral; <u>provided</u> that any non-cash dividend or other distribution that would constitute Pledged Collateral, whether resulting from a subdivision, combination or reclassification of the outstanding Capital Stock of the issuer of any Pledged Collateral or received in exchange for Pledged Collateral or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall, to the extent constituting Collateral, be and become part of the Pledged Collateral, and, if received by any Grantor, shall be delivered to the Administrative Agent as and to the extent required by <u>clause (a)</u> above.

(e)     *Return of Pledged Collateral.*  The Administrative Agent shall promptly deliver to the applicable Grantor (without recourse and without any representation or warranty) any Pledged Collateral in its possession if requested to be delivered to the issuer or holder thereof in connection with any action or transaction that is permitted or not restricted by the Credit Agreement in accordance with <u>Article 8</u> of the Credit Agreement.

Section 4.03.     *Intellectual Property.*

(a)     At any time when an Event of Default has occurred and is continuing, and upon the written request of the Administrative Agent, each Grantor will (i) use its commercially reasonable efforts to obtain all consents and approvals necessary for the assignment to or for the benefit of the Administrative Agent of any License held by such Grantor in the U.S. to enable the Administrative Agent to enforce the security interests granted hereunder and (ii) to the extent required pursuant to any material License in the U.S. under which such Grantor is the licensee, deliver to the licensor thereunder any notice of the grant of security interest hereunder or such other notices required to be delivered thereunder in order to permit the security interest created or permitted to be created hereunder pursuant to the terms of such License.

(b)     Each Grantor shall notify the Administrative Agent promptly if it knows that any application for or registration of any Patent, Trademark, Domain Name, or Copyright (now or hereafter existing) has been abandoned or dedicated to the public, or of any determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court) abandoning such Grantor's ownership of any such Patent, Trademark or Copyright, its right to register the same, or to keep and maintain the same, except, in each case, to the extent the same is permitted or not restricted by the Credit Agreement or where the same, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

-8-

(c)      In the event that any Grantor files an application for the registration of any Patent, Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright Office, or acquires any such application or registration by purchase or assignment, in each case, after the Closing Date and to the extent the same constitutes Collateral (and other than as a result of an application that is then subject to an Intellectual Property Security Agreement or Intellectual Property Security Agreement Supplement becoming registered), it shall, (i) if the event giving rise to the obligation under this Section 4.03(c) occurs during the first three Fiscal Quarters of any Fiscal Year, on or before the date on which financial statements are required to be delivered pursuant to Section 5.01(a) of the Credit Agreement for the Fiscal Quarter in which the relevant event occurred or (ii) if the event giving rise to the obligation under this Section 4.03(c) occurs during the fourth Fiscal Quarter of any Fiscal Year, on or before the date that is 60 days after the end of such Fiscal Quarter (or, in the case of each of clauses (i) and (ii), such longer period as the Required Lenders may agree in their sole discretion, with such agreement to be evidenced by a Direction of the Required Lenders), notify the Administrative Agent and, promptly upon the Administrative Agent's request (acting at the Direction of the Required Lenders), execute and deliver to the Administrative Agent, at such Grantor's sole cost and expense, any Intellectual Property Security Agreement or Intellectual Property Security Agreement Supplement, as applicable, or other instrument as the Administrative Agent may reasonably request and require to evidence the Administrative Agent's security interest in such registered Patent, Trademark or Copyright (or application therefor), and the General Intangibles of such Grantor relating thereto or represented thereby.

(d)      Each Grantor shall take all actions reasonably necessary to (i) maintain and pursue each application and to obtain and maintain the registration of each Patent, Trademark, Domain Name and, to the extent consistent with past practices, Copyright included in the Collateral (now or hereafter existing), including by filing applications for renewal, affidavits of use, affidavits of noncontestability and, if reasonably necessary (taking into account the projected cost of such proceedings versus the expected benefit thereof), by initiating opposition and interference and cancellation proceedings against third parties, (ii) maintain and protect the secrecy or confidentiality of its Trade Secrets and (iii) otherwise protect and preserve such Grantor's rights in, and the validity or enforceability of, its Intellectual Property Collateral, in each case except where failure to do so (A) could not reasonably be expected to result in a Material Adverse Effect, or (B) is otherwise permitted under the Credit Agreement.

(e)      Each Grantor shall promptly notify the Agent of any material infringement or misappropriation of such Grantor's Patents, Trademarks, Copyrights or Trade Secrets of which it becomes aware and shall take such actions that, in the Grantors' commercially reasonable business judgment, are reasonable and appropriate under the circumstances to protect such Patent, Trademark, Copyright or Trade Secret, except where such infringement, misappropriation or dilution could not reasonably be expected to cause a Material Adverse Effect.

Section 4.04.      *Commercial Tort Claims*.  After the Closing Date, (i) if the event giving rise to the obligation under this Section 4.04 occurs during the first three Fiscal Quarters of any Fiscal Year, on or before the date on which financial statements are required to be delivered pursuant to Section 5.01(a) of the Credit Agreement for the Fiscal Quarter in which the relevant event occurred or (ii) if the event giving rise to the obligation under this Section 4.04 occurs during the fourth Fiscal Quarter of any Fiscal Year, on or before the date that is 60 days after the end of such Fiscal Quarter (or, in each of the cases of clauses (i) and (ii), such longer period as the Required Lenders may agree in their sole discretion, with such agreement to be evidenced by a Direction of the Required Lenders), each relevant Grantor shall notify the Administrative Agent of any Commercial Tort Claim with an individual value (as reasonably estimated by the Top Borrower) in excess of $1,000,000 acquired by it, together with an update to Schedule 6 to the Cumulative Perfection Certificate containing a summary description thereof, and such Commercial Tort Claim (and the Proceeds thereof) shall automatically constitute Collateral, all upon the terms of this Security Agreement.

Section 4.05.     [*Reserved*].

Section 4.06.     *Grantors Remain Liable.*

(a)     Each Grantor (rather than the Administrative Agent or any Secured Party) shall remain liable (as between itself and any relevant counterparty) to observe and perform all the conditions and obligations to be observed and performed by it under any Contract relating to the Collateral, all in accordance with the terms and conditions thereof.  Neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any Contract by reason of or arising out of this Security Agreement or the receipt by the Administrative Agent or any other Secured Party of any payment relating to such Contract pursuant hereto, nor shall the Administrative Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Contract, to make any payment, to make any inquiry as to the nature or sufficiency of any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

(b)     Each Grantor assumes all liability and responsibility in connection with the Collateral acquired by it, and the liability of such Grantor to pay the Secured Obligations shall in no way be affected or diminished by reason of the fact that such Collateral may be lost, destroyed, stolen, damaged or for any reason whatsoever unavailable to such Grantor.

(c)     Notwithstanding anything herein to the contrary, each Grantor (rather than the Administrative Agent or any Secured Party) shall remain liable under each of the Accounts to observe and perform all of the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to such Accounts.  Neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Security Agreement or the receipt by the Administrative Agent or any other Secured Party of any payment relating to such Account pursuant hereto, nor shall the Administrative Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by them or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to them or to which they may be entitled at any time or times.

ARTICLE 5
REMEDIES

Section 5.01.     *Remedies.*

(a)     Each Grantor agrees that, at any time when an Event of Default has occurred and is continuing, the Administrative Agent may (and acting at the Direction of the Required Lenders, shall) exercise any or all of the following rights and remedies (in addition to the rights and remedies existing under applicable Requirements of Law):

(i)     the rights and remedies provided in this Security Agreement, the Credit Agreement, or any other Loan Document; provided that this Section 5.01(a) shall not limit any rights available to the Administrative Agent prior to the occurrence of an Event of Default;

(ii)    the rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable Requirements of Law (including, without limitation, any law governing the exercise of a bank's right of setoff or bankers' Lien) when a debtor is in default under a security agreement;

(iii)    without notice (except as specifically provided in <u>Section 7.01</u> or elsewhere herein), demand or advertisement of any kind to any Grantor or any other Person, but subject to the terms of any applicable lease agreement, personally, or by agents or attorneys, enter the premises of any Grantor where any Collateral is located (through self-help and without judicial process) to collect, receive, assemble, process, appropriate, sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon, the Collateral or any part thereof in one or more parcels at one or more public or private sales (which sales may be adjourned or continued from time to time with or without notice and may take place at such Grantor's premises or elsewhere), for cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as the Administrative Agent may deem commercially reasonable;

(iv)    upon at least one Business Day's written notice to the Top Borrower, (A) transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, and (B) exercise the voting and all other rights as a holder with respect thereto (whereupon the voting and other rights of such Grantor described in <u>Section 4.02(d)(i)</u> above shall immediately cease such that the Administrative Agent shall have the sole right to exercise such voting and other rights while the relevant Event of Default is continuing), to collect and receive all cash dividends, interest, principal and other distributions made thereon (it being understood that all Stock Rights received by any Grantor while the relevant Event of Default is continuing shall be received in trust for the benefit of the Administrative Agent and forthwith paid over to the Administrative Agent in the same form as so received (with any necessary endorsements)) and to otherwise act with respect to the Pledged Collateral as though the Administrative Agent was the outright owner thereof; <u>provided</u>, that prior to any transfer of the Capital Stock of Serta Inc. and/or exercise of voting and other rights as a holder of the Capital Stock of Serta Inc., Serta Inc.'s interest in AI Dream shall be transferred to a subsidiary of Dawn Holdings, Inc. that is not a Grantor hereunder; and

(v)    to take possession of the Collateral or any part thereof, by directing such Grantor in writing to deliver the same to the Administrative Agent at any reasonable place or places designated by the Administrative Agent, in which event such Grantor shall at its own expense forthwith cause the same to be moved to the place or places so designated by the Administrative Agent and there delivered to the Administrative Agent;

(b)    Each Grantor acknowledges and agrees that compliance by the Administrative Agent, on behalf of the Secured Parties, with any applicable state or federal Requirements of Law in connection with a disposition of the Collateral will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(c)    Any Secured Party shall have the right in any public sale and, to the extent permitted by applicable Requirements of Law, in any private sale, to purchase all or any part of the Collateral so sold, free of any right of equity redemption that Grantor is permitted to release and waive pursuant to applicable Requirements of Law, and each Grantor hereby expressly releases such right to equity redemption to the extent permitted by applicable Requirements of Law.

(d)      Until the Administrative Agent is able to effect a sale, lease, transfer or other disposition of any particular Collateral under this Section 5.01, the Administrative Agent shall have the right to hold or use such Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving such Collateral or the value of such Collateral or for any other purpose deemed reasonably appropriate by the Administrative Agent.  At any time when an Event of Default has occurred and is continuing, the Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Administrative Agent and Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment.

(e)      Notwithstanding the foregoing, the Administrative Agent shall not be required to (i) make any demand upon, or pursue or exhaust any of their rights or remedies against, the Grantors, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Secured Obligations or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof, (ii) marshal the Collateral or any guarantee of the Secured Obligations or to resort to the Collateral or any such guarantee in any particular order, or (iii) effect a public sale of any Collateral.

(f)      Each Grantor recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof.  Each Grantor also acknowledges that any private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that no such private sale shall be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private.  The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit any Grantor or the issuer of any Pledged Collateral to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities Requirements of Law, even if any Grantor and the issuer would agree to do so.

(g)      Each of the Administrative Agent and each Secured Party (by its acceptance of the benefits of this Security Agreement) acknowledges and agrees that notwithstanding any other provisions in this Security Agreement or any other Loan Document, the exercise of rights or remedies with respect to certain Collateral and the enforcement of any security interests therein may be limited or restricted by, or require any consent, authorization, approval or license under, any Requirements of Law.

(h)      Notwithstanding the foregoing, any rights and remedies provided in this Section 5.01 shall be subject to each applicable Intercreditor Agreement.

Section 5.02.      *Grantors' Obligations Upon Default*.  Upon the request of the Administrative Agent (acting at the Direction of the Required Lenders) at any time when an Event of Default has occurred and is continuing, each Grantor will:

(a)      at its own cost and expense (i) assemble and make available to the Administrative Agent, the Collateral and all books and records relating thereto at any place or places reasonably specified by the Administrative Agent, whether at such Grantor's premises or elsewhere, (ii) deliver all tangible evidence of its Accounts and Contract Rights (including, without limitation, all documents evidencing the Accounts and all Contracts) and such books and records to the Administrative Agent or to its representatives (copies of which evidence and books and records may be retained by such Grantor) and (iii) if the Administrative Agent so directs and in a form and in a manner reasonably satisfactory to the Administrative Agent, add a legend to the Accounts and the Contracts, as well as books, records and documents (if any) of such Grantor

evidencing or pertaining to such Accounts and Contracts, which legend shall include an appropriate reference to the fact that such Accounts and Contracts have been assigned to the Administrative Agent and that the Administrative Agent has a security interest therein; and

(b)    subject to the terms of any applicable lease agreement, permit the Administrative Agent and/or its representatives and/or agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral or the books and records relating thereto, or both, to remove all or any part of the Collateral or the books and records relating thereto, or both, and to conduct sales of the Collateral, without any obligation to pay any Grantor for such use and occupancy.

Section 5.03.    *Intellectual Property Remedies*.

(a)    For the purpose of enabling the Administrative Agent to exercise the rights and remedies under this Article 5 at any time when an Event of Default has occurred and is continuing, and at such time as the Administrative Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Administrative Agent a power of attorney to sign any document which may be required by the United States Patent and Trademark Office, the United States Copyright Office, domain name registrar or similar registrar in order to effect an absolute assignment of all right, title and interest in each registered Patent, Trademark, Domain Name and Copyright and each application for any such registration, and record the same.  At any time when an Event of Default has occurred and is continuing, the Administrative Agent may (and, acting at the Direction of the Required Lenders, shall) (i) declare the entire right, title and interest of such Grantor in and to each item of Intellectual Property Collateral to be vested in the Administrative Agent for the benefit of the Secured Parties, in which event such right, title and interest shall immediately vest in the Administrative Agent for the benefit of the Secured Parties, and the Administrative Agent shall be entitled to exercise the power of attorney referred to in this Section 5.03 to execute, cause to be acknowledged and notarized and record such absolute assignment with the applicable agency or registrar; (ii) sell any Grantor's Inventory directly to any Person, including without limitation Persons who have previously purchased any Grantor's Inventory from such Grantor and in connection with any such sale or other enforcement of the Administrative Agent's rights under this Security Agreement and subject to any restrictions contained in applicable third party licenses entered into by such Grantor, sell Inventory which bears any Trademark owned by or licensed to any Grantor and any Inventory that is covered by any Intellectual Property Collateral owned by or licensed to any Grantor, and the Administrative Agent may finish any work in process and affix any relevant Trademark Collateral owned by or licensed to such Grantor, and sell such Inventory as provided herein; (iii) direct such Grantor to refrain, in which event such Grantor shall refrain, from using any Intellectual Property Collateral in any manner whatsoever, directly or indirectly; and (iv) assign or sell any Patent, Trademark, Copyright, Domain Name, and/or Trade Secret, in each case to the extent constituting Collateral, as well as the goodwill of such Grantor's business symbolized by any such Trademark and the right to carry on the business and use the assets of such Grantor in connection with which any such Trademark or Domain Name has been used.

(b)    Each Grantor hereby grants to the Administrative Agent an irrevocable (until the Termination Date), nonexclusive, royalty-free, worldwide license to its right to use, license or sublicense any Intellectual Property Collateral now owned or hereafter acquired by such Grantor, wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and (to the extent not prohibited by any applicable license) to all computer software and programs used for compilation or printout thereof.  The use of the license granted to the Administrative Agent pursuant to the preceding sentence may be exercised, at the option of the Administrative Agent, only when an Event of Default has occurred and is continuing; provided, however,

-13-

that such licenses to be granted hereunder with respect to Trademarks shall be subject to, with respect to the goods and/or services on which such Trademarks are used, the maintenance of quality standards that are sufficient to preserve the validity of such Trademarks and are consistent with past practices.

Section 5.04.    *Application of Proceeds.*

(a)    Subject to each applicable Intercreditor Agreement, the Administrative Agent shall apply the proceeds of any collection, sale, foreclosure or other realization of any Collateral as set forth in Section 2.18(b) of the Credit Agreement.

(b)    Except as otherwise provided herein or in any other Loan Document, the Administrative Agent shall have absolute discretion as to the time of application of any such proceeds, money or balance in accordance with this Security Agreement.  Upon any sale of Collateral by the Administrative Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), a receipt by the Administrative Agent or of the officer making the sale of such proceeds, moneys or balances shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Administrative Agent or such officer or be answerable in any way for the misapplication thereof.  It is understood that the Grantors shall remain jointly and severally liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Secured Obligations.

## ARTICLE 6
### ACCOUNT VERIFICATION; ATTORNEY IN FACT; PROXY

Section 6.01.    *Account Verification*.    The Administrative Agent may (and acting at the Direction of the Required Lenders, shall) at any time and from time to time when an Event of Default has occurred and is continuing and upon one Business Day's notice to the relevant Grantor, in the Administrative Agent's own name, in the name of a nominee of the Administrative Agent, or in the name of any Grantor, communicate (by mail, telephone, facsimile or otherwise) with the Account Debtors of such Grantor, parties to Contracts with such Grantor and obligors in respect of Instruments of such Grantor to verify with such Persons, to the Administrative Agent's reasonable satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts, Contracts, Instruments, Chattel Paper, payment intangibles and/or other Receivables that constitute Collateral.

Section 6.02.    *Authorization for the Administrative Agent to Take Certain Action*.

(a)    Each Grantor hereby irrevocably authorizes the Administrative Agent and appoints the Administrative Agent (and all officers, employees or agents designated by the Administrative Agent) as its true and lawful attorney in fact (i) at any time that an Event of Default has occurred and is continuing, in the sole discretion of the Administrative Agent (in the name of such Grantor or otherwise), (A) to contact and enter into one or more agreements with the issuers of uncertificated securities that constitute Pledged Collateral or with securities intermediaries holding Pledged Collateral as may be necessary or advisable to give the Administrative Agent Control over such Pledged Collateral in accordance with the terms hereof, (B) to endorse and collect any cash proceeds of the Collateral and to apply the proceeds of any Collateral received by the Administrative Agent to the Secured Obligations as provided herein or in the Credit Agreement or any other Loan Document, but in any event subject to the terms of any applicable Intercreditor Agreement, (C) to demand payment or enforce payment of any Receivable in the name of the Administrative Agent or such Grantor and to endorse any check, draft and/or any other instrument for the payment of money relating to any such Receivable, (D) to sign such Grantor's name on any invoice or bill of lading relating to any Receivable, any draft against any Account Debtor of such

Grantor, and/or any assignment and/or verification of any Receivable, (E) to exercise all of any Grantor's rights and remedies with respect to the collection of any Receivable and any other Collateral, (F) to settle, adjust, compromise, extend or renew any Receivable, (G) to settle, adjust or compromise any legal proceeding brought to collect any Receivable, (H) to prepare, file and sign such Grantor's name on a proof of claim in bankruptcy or similar document against any Account Debtor of such Grantor, (I) to prepare, file and sign such Grantor's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with any Receivable, (J) to change the address for delivery of mail addressed to such Grantor to such address as the Administrative Agent may designate and to receive, open and dispose of all mail addressed to such Grantor (provided copies of such mail are provided to such Grantor), (K) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for Permitted Liens), (L) to make, settle and adjust claims in respect of Collateral under policies of insurance and endorse the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance, (M) to obtain or maintain the policies of insurance of the types referred to in Section 5.05 of the Credit Agreement or to pay any premium in whole or in part relating thereto and (N) to do all other acts and things or institute any proceeding which the Administrative Agent may reasonably deem to be necessary (pursuant to this Security Agreement and the other Loan Documents and in accordance with applicable Requirements of Law) to carry out the terms of this Security Agreement and to protect the interests of the Secured Parties; and, when and to the extent required pursuant to Section 9.03(a) of the Credit Agreement, such Grantor agrees to reimburse the Administrative Agent for any payment made in connection with this paragraph or any expense (including reasonable and documented attorneys' fees, court costs and out-of-pocket expenses) and other changes related thereto incurred by the Administrative Agent in connection with any of the foregoing (it being understood that any such sums shall constitute additional Secured Obligations); provided that, this authorization shall not relieve such Grantor of any of its obligations under this Security Agreement or under the Credit Agreement.

(b)     All prior acts of the Administrative Agent (or its attorneys or designees) are hereby ratified and approved by each Grantor. The powers conferred on the Administrative Agent, for the benefit of the Administrative Agent and Secured Parties, under this Section 6.02 are solely to protect the Administrative Agent's interests in the Collateral and shall not impose any duty upon the Administrative Agent or any Secured Party to exercise any such powers.

Section 6.03.    *PROXY*.  EACH GRANTOR HEREBY IRREVOCABLY (UNTIL THE TERMINATION DATE) CONSTITUTES AND APPOINTS THE ADMINISTRATIVE AGENT AS ITS PROXY AND ATTORNEY-IN-FACT (AS SET FORTH IN SECTION 6.02 ABOVE) WITH RESPECT TO THE PLEDGED COLLATERAL, INCLUDING, DURING THE CONTINUATION OF AN EVENT OF DEFAULT AND SUBJECT TO ANY NOTICE REQUIREMENT AS SET FORTH HEREIN, THE RIGHT TO VOTE SUCH PLEDGED COLLATERAL, WITH FULL POWER OF SUBSTITUTION TO DO SO.  IN ADDITION TO THE RIGHT TO VOTE ANY SUCH PLEDGED COLLATERAL, THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT SHALL INCLUDE THE RIGHT, UPON THE OCCURRENCE AND CONTINUATION OF AN EVENT OF DEFAULT AND SUBJECT TO ANY NOTICE REQUIREMENT AS SET FORTH HEREIN, TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF SUCH PLEDGED COLLATERAL WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF SHAREHOLDERS, CALLING SPECIAL MEETINGS OF SHAREHOLDERS AND VOTING AT SUCH MEETINGS).  SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY SUCH PLEDGED COLLATERAL ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF SUCH PLEDGED COLLATERAL OR ANY OFFICER OR AGENT THEREOF), IN EACH CASE ONLY

WHEN AN EVENT OF DEFAULT HAS OCCURRED AND IS CONTINUING AND UPON ONE BUSINESS DAY'S PRIOR WRITTEN NOTICE TO THE TOP BORROWER.

Section 6.04.    *NATURE OF APPOINTMENT; LIMITATION OF DUTY*.    THE APPOINTMENT OF THE ADMINISTRATIVE AGENT AS PROXY AND ATTORNEY-IN-FACT IN THIS <u>ARTICLE 6</u> IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE TERMINATION DATE.    NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NEITHER THE ADMINISTRATIVE AGENT, NOR ANY SECURED PARTY, NOR ANY OF THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT TO THE EXTENT SUCH DAMAGES ARE ATTRIBUTABLE TO BAD FAITH, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF SUCH PERSON AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE DECISION SUBJECT TO <u>SECTION 7.20</u> HEREOF; <u>PROVIDED</u>, THAT THE FOREGOING EXCEPTION SHALL NOT BE CONSTRUED TO OBLIGATE THE ADMINISTRATIVE AGENT TO TAKE OR REFRAIN FROM TAKING ANY ACTION WITH RESPECT TO THE COLLATERAL.

ARTICLE 7
GENERAL PROVISIONS

Section 7.01.    *Waivers*.    To the maximum extent permitted by applicable Requirements of Law, each Grantor hereby waives notice of the time and place of any judicial hearing in connection with the Administrative Agent's taking possession of the Collateral or of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made, including without limitation, any and all prior notice and hearing for any prejudgment remedy or remedies.  To the extent such notice may not be waived under applicable Requirements of Law, any notice made shall be deemed reasonable if sent to any Grantor, addressed as set forth in <u>Article 8</u>, at least 10 days prior to (a) the date of any such public sale or (b) the time after which any such private disposition may be made. To the maximum extent permitted by applicable Requirements of Law, each Grantor waives all claims, damages, and demands against the Administrative Agent arising out of the repossession, retention or sale of the Collateral, except those arising out of bad faith, gross negligence or willful misconduct on the part of the Administrative Agent as determined by a court of competent jurisdiction in a final and non-appealable judgment.  To the extent it may lawfully do so, each Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent, any valuation, stay (other than an automatic stay under any applicable Debtor Relief Law), appraisal, extension, moratorium, redemption or similar law and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Security Agreement, or otherwise.  Except as otherwise specifically provided herein, each Grantor hereby waives presentment, demand, protest, any notice (to the maximum extent permitted by applicable Requirements of Law) of any kind or all other requirements as to the time, place and terms of sale in connection with this Security Agreement or any Collateral.

Section 7.02.    *Limitation on Administrative Agent's Duty with Respect to the Collateral*.    The Administrative Agent shall not have any obligation to clean or otherwise prepare the Collateral for sale. The Administrative Agent shall use reasonable care with respect to the Collateral in its possession; <u>provided</u> that the Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially

equal to which it accords its own property. The Administrative Agent shall not have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Administrative Agent, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto. To the extent that applicable Requirements of Law impose duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it would be commercially reasonable for the Administrative Agent, subject to Section 7.06, (a) to elect not to incur expenses to prepare Collateral for disposition or otherwise to transform raw material or work in process into finished goods or other finished products for disposition, (b) to elect not to obtain third party consents for access to Collateral to be disposed of (unless expressly required under any applicable lease agreement), or to obtain or, if not otherwise required by any Requirements of Law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to elect not to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (d) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as any Grantor, for expressions of interest in acquiring all or any portion of such Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (k) to purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss in connection with any collection or disposition of Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of Collateral or (l) to the extent deemed appropriate by the Administrative Agent (acting at the Direction of the Required Lenders) to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any of the Collateral. Each Grantor acknowledges that the purpose of this Section 7.02 is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent would be commercially reasonable in the Administrative Agent's exercise of remedies with respect to the Collateral and that other actions or omissions by the Administrative Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 7.02. Without limitation upon the foregoing, nothing contained in this Section 7.02 shall be construed to grant any rights to any Grantor or to impose any duties on the Administrative Agent that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this Section 7.02.

Section 7.03. *Compromises and Collection of Collateral*. Each Grantor and the Administrative Agent recognize that setoffs, counterclaims, defenses and other claims may be asserted by obligors with respect to certain of the Receivables, that certain of the Receivables may be or become uncollectible in whole or in part and that the expense and probability of success in litigating a disputed Receivable may exceed the amount that reasonably may be expected to be recovered with respect to any Receivable. In view of the foregoing, each Grantor agrees that the Administrative Agent (acting at the Direction of the Required Lenders) may at any time and from time to time, if an Event of Default has occurred and is continuing and upon one Business Day's notice to the relevant Grantor, compromise with the obligor on any Receivable, accept in full payment of any Receivable such amount as the Administrative Agent (acting at the Direction of the Required Lenders as the Required Lenders shall determine in their sole discretion) or abandon any Receivable, and any such action by the Administrative Agent shall be commercially reasonable so long as the Required Lenders act reasonably in good faith based on information known to such Required Lenders at the time it takes any such action.

Section 7.04. *Administrative Agent Performance of Debtor Obligations*. Without having any obligation to do so, the Administrative Agent may, at any time when an Event of Default has occurred and is continuing and upon prior written notice to the Top Borrower, perform or pay any obligation which any Grantor has agreed to perform or pay under this Security Agreement and which obligation is due and unpaid and not being contested by such Grantor in good faith, and such Grantor shall reimburse the Administrative Agent for any amounts paid by the Administrative Agent pursuant to this Section 7.04 as a Secured Obligation payable in accordance with Section 9.03(a) of the Credit Agreement.

Section 7.05. *No Waiver; Amendments; Cumulative Remedies*. No delay or omission of the Administrative Agent (subject to the provisions of Article 8 of the Credit Agreement) to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any Default or an acquiescence therein, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by the Grantors and the Administrative Agent with the concurrence or at the direction of the Lenders to the extent required under Section 9.02 of the Credit Agreement and then only to the extent in such writing specifically set forth. All rights and remedies contained in this Security Agreement or afforded by law shall be cumulative and all shall be available to the Administrative Agent until the Termination Date.

Section 7.06. *Limitation by Law; Severability of Provisions*. All rights, remedies and powers provided in this Security Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable Requirements of Law, and all of the provisions of this Security Agreement are intended to be subject to all applicable Requirements of Law that may be controlling and to be limited to the extent necessary so that such provisions do not render this Security Agreement invalid, unenforceable or not entitled to be recorded or registered, in whole or in part. To the extent permitted by applicable Requirements of Law, any provision of this Security Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions of this Security Agreement; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. If the exercise of rights or remedies with respect to certain Collateral and the enforcement of any security interest therein require any consent, authorization, approval or license under any Requirements of Law, no such action shall be taken unless and until all requisite consents, authorizations approvals or licenses have been obtained.

Section 7.07. *Security Interest Absolute*. All rights of the Administrative Agent hereunder, the security interests granted hereunder and all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Loan Document, any agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument relating to the foregoing, (c) any exchange, release or non-perfection of any Lien on any Collateral, or any release or amendment or waiver of or consent under or departure from any guaranty, securing or guaranteeing all or any of the Secured Obligations, (d) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Grantor, (e) any exercise or non-exercise, or any waiver of, any right, remedy, power or privilege under or in respect of this Security Agreement or any other Loan Document or (f) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor in respect of the Secured Obligations or this Security Agreement (other than a termination of any Lien contemplated by Section 7.12 or the occurrence of the Termination Date).

Section 7.08. *Benefit of Security Agreement*. The terms and provisions of this Security Agreement shall be binding upon and inure to the benefit of each Grantor, the Administrative Agent and the Secured Parties and their respective successors and permitted assigns (including all Persons who become bound as a debtor to this Security Agreement). No sale of participations, assignments, transfers, or other dispositions of any agreement governing the Secured Obligations or any portion thereof or interest therein shall in any manner impair the Lien granted to the Administrative Agent hereunder for the benefit of the Administrative Agent and the Secured Parties.

Section 7.09. *Survival of Representations*. All representations and warranties of each Grantor contained in this Security Agreement shall survive the execution and delivery of this Security Agreement until the Termination Date.

Section 7.10. *Additional Subsidiaries*. Upon the execution and delivery by any Restricted Subsidiary of a Joinder Agreement, such Restricted Subsidiary shall become a Grantor hereunder with the same force and effect as if such Restricted Subsidiary was originally named as a Grantor herein. The execution and delivery of any such instrument shall not require the consent of any other Grantor or any other Person. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Security Agreement.

Section 7.11. *Headings*. The titles of and section headings in this Security Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Security Agreement.

Section 7.12. *Termination or Release*.

(a) This Security Agreement shall continue in effect until the Termination Date, and the Liens granted hereunder shall automatically be released in the circumstances described in Article 8 of the Credit Agreement.

(b) In connection with any termination or release pursuant to paragraph (a) above, the Administrative Agent (acting at the Direction of the Required Lenders) shall promptly execute (if applicable) and deliver to any Grantor, at such Grantor's expense, all UCC termination statements and similar documents that such Grantor shall reasonably request to evidence and/or effectuate such termination or release and all Pledged Collateral. Any execution and delivery of documents pursuant to this Section 7.12 shall be without recourse to or representation or warranty by the Administrative Agent or any Secured Party. The Borrowers shall reimburse the Administrative Agent for all reasonable and documented costs and out-of-pocket expenses, including the fees and expenses of one outside counsel (and, if necessary, of one local counsel in any relevant jurisdiction), incurred by it in connection with any action contemplated by this Section 7.12 pursuant to and to the extent required by Section 9.03(a) of the Credit Agreement.

(c) The Administrative Agent shall have no liability whatsoever to any other Secured Party as the result of any release of Collateral by it in accordance with (or which the Administrative Agent in good faith believes to be in accordance with) the terms of this Section 7.12.

Section 7.13. *Entire Agreement*. This Security Agreement, together with the other Loan Documents and each Intercreditor Agreement, embodies the entire agreement and understanding between each Grantor and the Administrative Agent relating to the Collateral and supersedes all prior agreements and understandings between any Grantor and the Administrative Agent relating to the Collateral.

Section 7.14.     *CHOICE OF LAW*.  **THIS SECURITY AGREEMENT, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS SECURITY AGREEMENT, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

Section 7.15.     *CONSENT TO JURISDICTION; CONSENT TO SERVICE OF PROCESS*.

(a)     EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK (OR ANY APPELLATE COURT THEREFROM) OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL (EXCEPT AS PERMITTED BELOW) BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, FEDERAL COURT.  EACH PARTY HERETO AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY REGISTERED MAIL ADDRESSED TO SUCH PERSON SHALL BE EFFECTIVE SERVICE OF PROCESS AGAINST SUCH PERSON FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT. EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE REQUIREMENTS OF LAW.  EACH PARTY HERETO AGREES THAT THE ADMINISTRATIVE AGENT RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION SOLELY IN CONNECTION WITH THE EXERCISE OF ITS RIGHTS IN RESPECT OF THE COLLATERAL UNDER THIS SECURITY AGREEMENT.

(b)     TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL) DIRECTED TO IT AT ITS ADDRESS FOR NOTICES AS PROVIDED FOR IN <u>SECTION 9.01</u> OF THE CREDIT AGREEMENT.  EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY LOAN DOCUMENT THAT SERVICE OF PROCESS WAS INVALID AND INEFFECTIVE.  NOTHING IN THIS SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS SECURITY AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE REQUIREMENTS OF LAW.

Section 7.16.     *WAIVER OF JURY TRIAL*.     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SECURITY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS SECURITY

-20-

AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 7.17.    *Indemnity*.  Each Grantor hereby agrees to indemnify the Indemnitees, as, and to the extent, set forth in <u>Section 9.03</u> of the Credit Agreement.

Section 7.18.    *Counterparts*.  This Security Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Security Agreement by facsimile or by email as a ".pdf" or ".tif" attachment or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Security Agreement.  The words "execution," "signed," "signature," and words of like import in this Security Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 7.19.    *INTERCREDITOR AGREEMENT GOVERNS*.

Section 7.20.    NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE LIENS AND SECURITY INTERESTS GRANTED TO THE ADMINISTRATIVE AGENT FOR THE BENEFIT OF THE SECURED PARTIES PURSUANT TO THIS SECURITY AGREEMENT AND THE EXERCISE OF ANY RIGHT OR REMEDY BY THE ADMINISTRATIVE AGENT WITH RESPECT TO ANY COLLATERAL HEREUNDER ARE SUBJECT TO THE PROVISIONS OF EACH INTERCREDITOR AGREEMENT.  IN THE EVENT OF ANY CONFLICT BETWEEN THE PROVISIONS OF ANY INTERCREDITOR AGREEMENT AND THIS SECURITY AGREEMENT, THE PROVISIONS OF SUCH INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL.  THE REQUIREMENTS OF THIS SECURITY AGREEMENT TO DELIVER PLEDGED COLLATERAL AND ANY CERTIFICATES, INSTRUMENTS OR DOCUMENTS IN RELATION THERETO TO THE AGENT OR ANY OBLIGATION WITH RESPECT TO THE DELIVERY, TRANSFER, CONTROL, NOTATION OR PROVISION OF VOTING RIGHTS WITH RESPECT TO ANY COLLATERAL SHALL BE DEEMED SATISFIED BY THE DELIVERY, TRANSFER, CONTROL, NOTATION OR PROVISION IN FAVOR OF THE PARTY SPECIFIED IN THE APPLICABLE INTERCREDITOR AGREEMENT.

Section 7.21.    *Waiver of Consequential Damages, Etc*.  To the extent permitted by applicable law, none of the Grantors or Secured Parties shall assert, and each hereby waives, any claim against each other or any Related Party thereof, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Security Agreement or any agreement or instrument contemplated hereby, except, in the case of any claim by any Indemnitee against any of the Grantors, to the extent such damages would otherwise be subject to indemnification pursuant to the terms of <u>Section 7.17</u>.

Section 7.22.    *Successors and Assigns*.  Whenever in this Security Agreement any party hereto is referred to, such reference shall be deemed to include the successors and permitted assigns of such party; and all covenants, promises and agreements by or on behalf of any Grantor or the Administrative Agent in this Security Agreement shall bind and inure to the benefit of their respective successors and permitted assigns.  Except in a transaction expressly permitted under the Credit Agreement, no Grantor

may assign any of its rights or obligations hereunder without the written consent of the Administrative Agent.

        Section 7.23.    *Survival of Agreement.*  Without limiting any provision of the Credit Agreement or <u>Section 7.17</u> hereof, all covenants, agreements, indemnities, representations and warranties made by the Grantors in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Security Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such Lender or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect until the Termination Date, or with respect to any individual Grantor until such Grantor is otherwise released from its obligations under this Security Agreement in accordance with the terms hereof.

## ARTICLE 8
### NOTICES

        Section 8.01.    *Sending Notices.*  Any notice required or permitted to be given under this Security Agreement shall be delivered in accordance with <u>Section 9.01</u> of the Credit Agreement (it being understood and agreed that references in such Section to "herein," "hereunder" and other similar terms shall be deemed to be references to this Security Agreement).

## ARTICLE 9
### THE ADMINISTRATIVE AGENT

        UBS has been appointed Administrative Agent for the Lenders hereunder pursuant to <u>Article 8</u> of the Credit Agreement.  It is expressly understood and agreed by the parties to this Security Agreement that any authority conferred upon the Administrative Agent hereunder is subject to the terms of the delegation of authority made by the Lenders to the Administrative Agent pursuant to the Credit Agreement, and that the Administrative Agent has agreed to act (and any successor Administrative Agent shall act) as such hereunder only on the express conditions contained in such <u>Article 8</u> of the Credit Agreement.  Any successor Administrative Agent appointed pursuant to <u>Article 8</u> of the Credit Agreement shall be entitled to all the rights, interests and benefits of the Administrative Agent hereunder.

        By accepting the benefits of this Security Agreement and any other Loan Document, each Secured Party expressly acknowledges and agrees that this Security Agreement and each other Loan Document may be enforced only by the action of the Administrative Agent, and that such Secured Party shall not have any right individually to seek to enforce or to enforce this Security Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Administrative Agent for the benefit of the Secured Parties upon the terms of this Security Agreement and the other Loan Documents.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each Grantor and the Administrative Agent have executed this Security Agreement as of the date first above written.

DAWN INTERMEDIATE, LLC
DREAMWELL, LTD.
NATIONAL BEDDING COMPANY L.L.C.
SERTA SIMMONS BEDDING, LLC
SIMMONS BEDDING COMPANY, LLC
SSB HOSPITALITY, LLC
SSB LOGISTICS, LLC
SSB MANUFACTURING COMPANY
SSB RETAIL, LLC
THE SIMMONS MANUFACTURING CO., LLC
TOMORROW SLEEP LLC
TUFT & NEEDLE, LLC
WORLD OF SLEEP OUTLETS, LLC

By: _____
Name:   Kristen McGuffey
Title:   Executive Vice President, General Counsel
          and Secretary

SERTA INTERNATIONAL HOLDCO, LLC

By: _____
Name:   Kristen McGuffey
Title:   Authorized Person

UBS AG, STAMFORD BRANCH
as the Administrative Agent

By: _____
      Name:
      Title:

Case 23-90007 Document 2628 Filed in TXSB on 05/14/23 Page 547 of 582

<u>EXHIBIT N</u>

[Reserved.]

WEIL:\97509555\6\40416.0003

[FORM OF]
U.S. TAX COMPLIANCE CERTIFICATE[27]

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Super-Priority Term Loan Agreement, dated as of June [●], 2020 (as amended, restated, amended and restated, supplemented or otherwise modified, the "PTL Agreement"), by and among Dawn Intermediate, LLC, a Delaware limited liability company ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company (the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing", together with the Top Borrower and National Bedding, collectively, the "Borrowers"), the other Loan Parties party thereto, the Lenders and UBS AG, Stamford Branch, as administrative agent and collateral agent for the Lenders (in such capacities, the "PTL Agent"). Terms defined in the PTL Agreement are used herein with the same meanings unless otherwise defined herein.

Pursuant to the provisions of Section 2.17(f) of the PTL Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Promissory Notes evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Top Borrower with a duly executed certificate of its non-U.S. person status on IRS Form W-8BEN or W-8BEN-E (as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstances renders the information on this certificate obsolete, expired or inaccurate in any respect, the undersigned shall promptly so inform each of the Top Borrower and the Administrative Agent in writing and deliver promptly to the Top Borrower and the Administrative Agent an updated certificate or other appropriate documentation (including any new documentation reasonably requested by the Top Borrower or the Administrative Agent) or promptly notify the Top Borrower and the Administrative Agent in writing of its legal ineligibility to do so, and (2) the undersigned shall have at all times furnished each of the Top Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF LENDER]**

By: _____
Name:
Title:

Date: [●] [●], 20[●]

---

[27] **NTD:** Forms of U.S. Tax Compliance Certificates subject to Latham Tax review.

[FORM OF]
## U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Super-Priority Term Loan Agreement, dated as of June [●], 2020 (the "PTL Agreement"), by and among Dawn Intermediate, LLC, a Delaware limited liability company ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company (the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing", together with the Top Borrower and National Bedding, collectively, the "Borrowers"), the other Loan Parties party thereto, the Lenders and UBS AG, Stamford Branch, as administrative agent and collateral agent for the Lenders (in such capacities, the "PTL Agent"). Terms defined in the PTL Agreement are used herein with the same meanings unless otherwise defined herein.

Pursuant to the provisions of Section 2.17(f) of the PTL Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a duly executed certificate of its non-U.S. person status on IRS Form W-8BEN or W-8BEN-E (as applicable). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstances renders the information on this certificate obsolete, expired or inaccurate in any respect, the undersigned shall promptly so inform such Lender in writing and deliver promptly to such Lender an updated certificate or other appropriate documentation (including any new documentation reasonably requested by such Lender) or promptly notify such Lender in writing of its legal ineligibility to do so, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF PARTICIPANT]**

By: _____
Name:
Title:

Date: [●] [●], 20[●]

O-2-1

[FORM OF]
U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Super-Priority Term Loan Agreement, dated as of June [●], 2020 (the "PTL Agreement"), by and among Dawn Intermediate, LLC, a Delaware limited liability company ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company (the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing", together with the Top Borrower and National Bedding, collectively, the "Borrowers"), the other Loan Parties party thereto, the Lenders and UBS AG, Stamford Branch, as administrative agent and collateral agent for the Lenders (in such capacities, the "PTL Agent"). Terms defined in the PTL Agreement are used herein with the same meanings unless otherwise defined herein..

Pursuant to the provisions of Section 2.17(f) of the PTL Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Promissory Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Promissory Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to the PTL Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members claiming the portfolio interest exemption is a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (v) none of its direct or indirect partners/members claiming the portfolio interest exemption is a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Top Borrower with a duly executed IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E (as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstances renders the information on this certificate obsolete, expired or inaccurate in any respect, the undersigned shall promptly so inform the Top Borrower and the Administrative Agent in writing and deliver promptly to the Top Borrower and the Administrative Agent an updated certificate or other appropriate documentation (including any new documentation reasonably requested by the Top Borrower or the Administrative Agent) or promptly notify the Top Borrower and the Administrative Agent in writing of its legal ineligibility to do so, and (2) the undersigned shall have at all times furnished the Top Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[Signature Page Follows]

[NAME OF LENDER]

By: _____
      Name:
      Title:

Date: [●] [●], 20[●]

WEIL:\97509555\6\40416.0003

[FORM OF]
U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Super-Priority Term Loan Agreement, dated as of June [●], 2020 (the "PTL Agreement"), by and among Dawn Intermediate, LLC, a Delaware limited liability company ("Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company (the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing", together with the Top Borrower and National Bedding, collectively, the "Borrowers"), the other Loan Parties party thereto, the Lenders and UBS AG, Stamford Branch, as administrative agent and collateral agent for the Lenders (in such capacities, the "PTL Agent"). Terms defined in the PTL Agreement are used herein with the same meanings unless otherwise defined herein.

Pursuant to the provisions of Section 2.17(f) of the PTL Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members claiming the portfolio interest exemption is a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (v) none of its direct or indirect partners/members claiming the portfolio interest exemption is a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a duly executed IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (as applicable) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E (as applicable) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstances renders the information on this certificate obsolete, expired or inaccurate in any respect, the undersigned shall promptly so inform such Lender in writing and deliver promptly to such Lender an updated certificate or other appropriate documentation (including any new documentation reasonably requested by such Lender) or promptly notify such Lender in writing of its legal ineligibility to do so, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

**[NAME OF PARTICIPANT]**

By: _____
       Name:
       Title:

Date: [●] [●], 20[●]

WEIL:\97509555\6\40416.0003