# DEFENDANTS' EXHIBIT 331
## Part 2 of 3

## SCHEDULE 5.15

### POST-CLOSING OBLIGATIONS

1. Within 10 days of the Closing Date, the Top Borrower shall deliver ACORD certificates reasonably satisfactory to the Administrative Agent evidencing the insurance coverage required by Section 5.05 of this Agreement.

2. Within 10 days of the Closing Date, the Top Borrower shall deliver (subject to the Intercreditor Agreements) replacement membership certificates or a promissory note, as applicable, together with appropriate transfer powers executed in blank, in form and substance reasonably satisfactory to the Administrative Agent, for the following membership certificates and promissory note, as applicable:

Certificates

| Holder | Issuer | Description |
|--------|--------|-------------|
| Simmons Bedding Company | Dreamwell, Ltd. | Certificate No. 1; 100% interest |
| Simmons Bedding Company | The Simmons Manufacturing Co., LLC | Certificate No. 3; 100% interest |
| Simmons Bedding Company | Simmons Contract Sales, LLC | Certificate No. 3; 100% interest |
| Simmons Bedding Company | World of Sleep Outlets, LLC | Certificate No. 3; 100% interest |

Promissory Note:

| Holder | Issuer | Amount | Description |
|--------|--------|--------|-------------|
| Serta International Holdco. LLC | Star Bedding Products Company | C$18,129,814.04 | Promissory Note and corresponding Allonge and Memorandum of Agreement |

3. Within 45 days of the Closing Date, the Top Borrower shall deliver insurance endorsements reasonably satisfactory to the Administrative Agent in accordance with Section 5.05 of this Agreement.

4. Within 90 days of the Closing Date, the Top Borrower shall cause the applicable Loan Party to comply with the requirements set forth in clause (b) of the definition of "Collateral and Guarantee Requirement" with respect to the Material Real Estate Asset listed on Schedule 1.01(c) to this Agreement.

10

**SCHEDULE 6.01**

EXISTING INDEBTEDNESS

1. Indebtedness in respect of the Lease Agreement between the City of Shawnee and Simmons Company (predecessor-in-interest by assignment to The Simmons Manufacturing Co., LLC) relating to the Indenture of Trustee between City of Shawnee, Kansas and State Street Bank and Trust Company of Missouri, N.A., as Trustee, dated as of December 1, 1996, as amended, relating to $5,000,000 Private Activity Revenue Bonds, Series 1996 under which there is, as of the Closing Date, approximately $400,000 outstanding.

2. Indebtedness in respect of the Lease, dated as of August 24, 2011, by and between Healey Investments, L.P. and Simmons Bedding Company, as amended, under which there is, as of the Closing Date, approximately $3,412,530 outstanding.

3. Indebtedness in respect of the Lease dated as of February 24, 2015, by and between Park North 4, LLC and SSB Manufacturing Company, under which there is, as of the Closing Date, approximately $16,968,678 outstanding.

4. Indebtedness in respect of the Sublease dated as of August 28, 2014, by and between Turner Construction Company and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $470,200 outstanding.

5. Indebtedness in respect of the Lease dated as of June 29, 2016, by and between Presidio Technology Capital, LLC and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $3,698,183 outstanding.

6. Indebtedness in respect of the Lease dated as of October 3, 2016, by and between Presidio Technology Capital, LLC and Serta Simmons Bedding, LLC, under which there is, as of the Closing Date, approximately $4,365,738 outstanding.

7. Indebtedness in respect of the Lease dated as of November 20, 2015, by and between IAC Port 167 LLC and SSB Manufacturing Company, under which there is, as of the Closing Date, approximately $10,055,591 outstanding.

8. Indebtedness in respect of the Interest Rate Swap Transaction (Ref. No. ER3ND) dated December 13, 2013, by and between Morgan Stanley Capital Services, LLC and Serta Simmons Bedding, LLC under which there is, as of the Closing Date, an obligation of approximately $207,959.

9. Indebtedness in respect of the Interest Rate Swap Transaction (Ref. No. N1687484N) dated December 13, 2013, by and between Deutsche Bank AG New York and Serta Simmons Bedding, LLC under which there is, as of the Closing Date, an obligation of approximately $1,038,335.

10. Indebtedness in respect of the Interest Rate Swap Transaction (Ref. No. N1687485N) dated December 13, 2013, by and between Deutsche Bank AG New York and Serta Simmons Bedding, LLC under which there is, as of the Closing Date, an obligation of approximately $4,635,312.

11. Letter of Credit in the amount of $1,760,000 issued to New Jersey Department of Environmental Remediation for SSB Manufacturing Company to meet statutory requirements for funding of ongoing environmental remediation.

12. Indebtedness in connection with the Liens listed on <u>Schedule 6.02</u>.

WEIL:\95928017\2\74339.0038

## SCHEDULE 6.02

## EXISTING LIENS

1.  Liens in respect of the real property owned by Simmons Caribbean Bedding, Inc. and located at Las Cuevas Industrial Park, Trujillo Alto, Puerto Rico and arising in connection with the Deed of Mortgage, dated as of December 12, 1997, by and between Simmons Caribbean Bedding, Inc. and Banco Santander Puerto Rico.

2.  Liens in respect of the real property owned by SSH Bedding Canada Co. (successor in interest by amalgamation of Simmons Canada Inc.) and located at 3636 11A Street, Southeast, Calgary, Alberta and arising in connection with (i) the Memorandum of Agreement, dated as of December 10, 1965, between Simmons Canada Inc. (as successor-in-interest to Simmons Limited) and the City of Calgary, as amended, and (ii) the Transfer of Land Instrument, dated February 22, 1966, between Simmons Canada Inc. (as successor-in-interest to Simmons Limited) and the City of Calgary.

3.  Liens in respect of the real property owned by The Simmons Manufacturing Co., LLC, and located at 7910 Hedge Lane Terrace, Shawnee Mission, Kansas and arising in connection with the $5,000,000 Private Activity Revenue Bonds, Series 1996 (Simmons Company Project), of the City of Shawnee, Kansas and the documentation relating thereto.

4.  Liens in respect of the real property owned by The Simmons Manufacturing Co., LLC and located at 1809 Adel Street, Janesville, Wisconsin and arising in connection with the Industrial Development Revenue Bonds Series 1982 due October 15, 2017 and the documentation relating thereto.

5.  Liens in respect of the real property owned by The Simmons Manufacturing Co., LLC and located at 1925 Cleveland Street, Janesville, Wisconsin (i) arising in connection with the Warranty Deed from Frank W. Sass (d/b/a Sass Properties) to The Simmons Manufacturing Co., LLC, dated February 28, 2005 and (ii) disclosed under and/or subject to the title insurance policy issued by Chicago Title Insurance Company to The Simmons Manufacturing Co., LLC, dated effective as of February 28, 2005.

6.  Liens on funds on deposit in account number 2572006778 maintained at US Bank in an amount not to exceed $100,000 but only to the extent that funds on deposit in such account secure obligations arising under the Remediation Trust Agreement, dated as of September 29, 2003, by and between SSB Manufacturing Company (as successor to Simmons Bedding Company) and Wachovia Bank, N.A., as trustee.

7.  On October 28, 1998, UBS AG, Stamford Branch ("UBS") was granted a security interest against the "Greenwich" trademark (registration number 1988658), among others (the "98 UBS Lien"). The 98 UBS Lien was released with respect to trademark registrations (and the underlying indebtedness was repaid), but it is believed that the applicable release documentation neglected (in error) to include the aforementioned "Greenwich" mark.

8.  As recorded on April 15, 1996, Chemical Bank (now Chase Manhattan Bank) was granted a security interest in the "S Simmons (Stylized) and Design" trademark (registration number 2219191), among others (the "Chemical Bank Lien"). The security interest was released and terminated (and the underlying indebtedness was repaid), but the release recorded at 1820/0060 neglected (in error) to

include the aforementioned "S Simmons (Stylized) and Design" trademark (registration number 2219191).

9.  On March 22, 1996, Simmons Acquisition Corporation granted a security interest to Chemical Bank in the copyright registration titled "Dropping the ball" (registration number TX0004093428), among others (the "CB Lien"). Although, the CB Lien was released with respect to copyright registrations (and the underlying indebtedness was repaid), it is believed that (in error) no release documentation was executed regarding the aforementioned "Dropping the ball" copyright.

10. Liens consisting of cash collateral deposited in connection with (i) the Trust Agreement for Payment Agreement Obligations, effective as of January 8, 2010, among SSB Manufacturing Company (as successor to Simmons Bedding Company), as trustor, Wells Fargo Bank, N.A., as trustee, and National Union Fire Insurance Company of Pittsburgh, PA, on behalf of itself and its affiliates, as beneficiary, until the release thereof following the replacement thereof with a Letter of Credit issued under the Revolving Facility and (ii) the Trust Agreement for Payment Agreement Obligations, effective as of August 5, 2010, among National Bedding Company L.L.C., as trustor, Wells Fargo Bank, N.A., as trustee, and National Union Fire Insurance Company of Pittsburgh, PA, as beneficiary, as amended by Addendum #1 to Trust Agreement for Payment Agreement Obligations, effective as of August 5, 2010.

11. Liens in connection with the following filings:

WEIL:\95928017\2\74339.0038

| Jurisdiction | Debtor | Secured Party | Filing Info | Collateral |
|---|---|---|---|---|
| Illinois SOS | National Bedding Company L.L.C. | Northstar Recycling Company, Inc. | 016406449 7/1/2011 | Equipment |
| Illinois SOS | National Bedding Company L.L.C. | U.S. Bancorp Equipment Finance, Inc. | 016474258 7/27/2011 | Equipment |
| Illinois SOS | National Bedding Company L.L.C. | Wells Fargo Bank, N.A. | 017304860 5/22/2012 | Equipment |
| Illinois SOS | National Bedding Company, L.L.C. | IHFC Properties, LLC | 017369903 6/15/2012 | All installations, samples, goods, furniture, fixtures and other property placed by Debtor in showroom space #M530 including bays M532, M534 and M536, and in any wing of the International Home Furnishings Center, 210 East Commerce Street, High Point, NC under Lease Agreement dated May 30, 2012. |
| Illinois SOS | National Bedding Company L.L.C. | IHFC Properties, LLC | 19753549 10/27/2014 | All installations, samples, goods, merchandise, furniture, fixtures and other property located in Space No. M530, 210 E. Commerce Avenue, High Point, NC and in any part of the building located at 210 E. Commerce Avenue, High Point, NC |
| Illinois SOS | National Bedding Company L.L.C. | Wells Fargo Bank, N.A. | 20991011 12/31/2015 | Equipment |
| Illinois SOS | National Bedding Company, L.L.C. | IHFC Properties, LLC | 17639838 10/01/2012 | All installations, samples, goods furniture, fixtures and other property in showroom H1141, including bays under H1124 and H1137 under the Lease Agreement dated January 18, 2010, between Debtor and Secured Party. |

| Jurisdiction | Debtor | Secured Party | Filing Info | Collateral |
|---|---|---|---|---|
| Delaware SOS | North American Spring Enterprises Co., LLC[1] | Crown Credit Company | 2011 2166505 6/7/2011 | Equipment |
| Delaware SOS | Serta Simmons Bedding, LLC | Presidio Technology Capital, LLC | 2016 1311818 03/04/2016 | Equipment |
| Delaware SOS | Serta Simmons Bedding, LLC | Presidio Technology Capital, LLC | 2016 1311933 03/04/2016 | Equipment |
| Delaware SOS | Serta Simmons Bedding, LLC | Crown Equipment Corporation | 2016 5313711 08/31/2016 | Equipment |
| Delaware SOS | Simmons Bedding Company[2] | Meridian Leasing Corporation | 2011 4245166 11/3/2011 | Equipment |
| Delaware SOS | Simmons Bedding Company[3] | IHFC Properties, LLC | 2011 4714989 12/8/2011 | All installations, samples, goods, furniture, fixtures and other property placed by Debtor in showroom space #W746 including bays H742 and W745 and in any wing of the International Home Furnishings Center, 210 East Commerce Street, High Point, NC 27260 under Lease Agreement dated November 1, 2011. |
| Delaware SOS | Simmons Bedding Company[4] | Meridian Leasing Corporation | 2011 4843705 12/16/2011 | Equipment |

[1] National Bedding Company L.C.C. successor in interest to North American Spring Enterprises Co., LLC

[2] SSB Manufacturing Company as successor in interest to Simmons Bedding Company

[3] SSB Manufacturing Company as successor in interest to Simmons Bedding Company

[4] SSB Manufacturing Company as successor in interest to Simmons Bedding Company

WEIL:\99928017\2\74389.0038

| Jurisdiction | Debtor | Secured Party | Filing Info | Collateral |
|---|---|---|---|---|
| Delaware SOS | The Simmons Manufacturing Co., LLC | Crown Credit Company | 2010 0516215 2/17/2010 | Equipment |

## SCHEDULE 6.06

### EXISTING INVESTMENTS

1.   Investments in subsidiaries listed on Schedule 3.13 and existing on the Closing Date.

2.   Investments arising under the Promissory Note, dated as of August 31, 2005, made by SSH Bedding Canada Co. as successor by amalgamation to Star Bedding Products Company (as successor by merger to 3104394 Nova Scotia Company) in favor of Serta International Holdco, LLC (previously named AOT Bedding Holdings, LLC and, prior to assuming such name, AOT Bedding Holdings Corporation) under which there is, as of the Closing Date, approximately $13,537,532 outstanding (the "2005 SBPC Note").[5]

3.   Investments arising under the Promissory Note, dated as of June 11, 2007, made by SSH Bedding Canada Co. as successor by amalgamation to Star Bedding Products Company (as successor by merger to Serta Montreal, Inc.) in favor of National Bedding Company L.L.C., under which there is, as of the Closing Date, approximately $2,326,246 outstanding (the "2007 SBPC Note").[6]

---

[5] Promissory Note is actually denominated in Canadian dollars ($18,129,814) translated as of 10/29/2016.

[6] Promissory Note is actually denominated in Canadian dollars ($3,115,368) translated as of 10/29/2016.

**SCHEDULE 9.01**

<u>BORROWER'S WEBSITE FOR ELECTRONIC DELIVERY</u>

1.   www.intralinks.com/login/ Login then select: SSB Creditholders Info

[FORM OF]
AFFILIATED LENDER
ASSIGNMENT AND ASSUMPTION

This Affiliated Lender Assignment and Assumption (the "Affiliated Lender Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between **[Insert name of Assignor]** (the "Assignor") and **[Insert name of Affiliated Lender]** (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the First Lien Term Loan Agreement identified below (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "First Lien Term Loan Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex I attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Affiliated Lender Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the First Lien Term Loan Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Term Lender under the First Lien Term Loan Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable Requirements of Law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Term Lender) against any Person, whether known or unknown, arising under or in connection with the First Lien Term Loan Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). In the case where the Assigned Interest covers all of the Assignor's rights and obligations under the First Lien Term Loan Agreement, the Assignor shall cease to be a party thereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03 of the First Lien Term Loan Agreement with respect to facts and circumstances occurring on or prior to the Effective Date and subject to its obligations hereunder and under Section 9.13 of the First Lien Term Loan Agreement. Such sale and assignment is (i) subject to acceptance and recording thereof in the Register by the Administrative Agent pursuant to Section 9.05(b)(v) of the First Lien Term Loan Agreement, (ii) without recourse to the Assignor and (iii) except as expressly provided in this Affiliated Lender Assignment and Assumption, without representation or warranty by the Assignor.

1.      Assignor:  [●]

2.      Assignee:  [●] and is an Affiliated Lender **[that is a Non-Debt Fund Affiliate / Holdings, the Borrowers or a subsidiary thereof]**.

3.      Borrowers: Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing").

4.      Administrative Agent:  UBS AG, Stamford Branch, as administrative agent under the First Lien Term Loan Agreement.

5.      First Lien Term Loan Agreement:  That certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "First Lien Term Loan Agreement"), by and among, inter alios, SSB, National Bedding and SSB

Manufacturing, as borrowers, Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), the Lenders from time to time party thereto and UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders.

      6.      Assigned Interest:

| Aggregate Amount of Loans | Class of Loans Assigned | Amount of Loans Assigned[1] | Percentage Assigned of Loans under Relevant Class[2] | CUSIP Number |
|---|---|---|---|---|
| $ | | $ | % | |
| $ | | $ | % | |
| $ | | $ | % | |

      7.      THE PARTIES HERETO ACKNOWLEDGE THAT ANY ASSIGNMENT TO AN AFFILIATED LENDER WHICH RESULTS IN THE AGGREGATE PRINCIPAL AMOUNT OF TERM LOANS THEN HELD BY ALL AFFILIATED LENDERS EXCEEDING THE AFFILIATED LENDER CAP (AFTER GIVING EFFECT TO ANY SUBSTANTIALLY SIMULTANEOUS CANCELLATION OF TERM LOANS) SHALL BE NULL AND VOID WITH RESPECT TO THE AMOUNT IN EXCESS OF THE AFFILIATED LENDER CAP (SUBJECT TO SECTION 9.05(f)(ii) OF THE FIRST LIEN TERM LOAN AGREEMENT).

      Effective Date: [●] [●], 20[●] **[TO BE INSERTED BY THE ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR]**.

[Signature Page Follows]

---

[1]      Except in the case of any assignment to another Lender, any Affiliate of any Lender or any Approved Fund or any assignment of the entire remaining amount of the relevant assigning Lender's Loans or Commitments of any Class, not to be less than $1,000,000 unless the Top Borrower and the Administrative Agent otherwise consent.

[2]      Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

A-1-2

The terms set forth in this Affiliated Lender Assignment and Assumption are hereby agreed to:

**ASSIGNOR**

**[NAME OF ASSIGNOR]**

By: _____
    Name:
    Title:

**ASSIGNEE**

**[NAME OF ASSIGNEE]**

By: _____
    Name:
    Title:

**[Consented to:]**[3]


SERTA SIMMONS BEDDING, LLC,
    as the Top Borrower


By: _____
    Name:
    Title:

---

[3]    To be added only if the consent of the Top Borrower is required by <u>Section 9.05(b)(i)(A)</u> of the First Lien Term Loan Agreement.

WEIL:\95919473\9\74339.0038

STANDARD TERMS AND CONDITIONS FOR
AFFILIATED LENDER ASSIGNMENT AND ASSUMPTION

1.      ***Representations and Warranties***.

1.1     ***Assignor***.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) its Commitment in respect of Term Loans, and the outstanding balances of its Term Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth herein, and (iv) it has full power and authority, and has taken all action necessary, to execute and deliver this Affiliated Lender Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) makes no representation or warranty and assumes no responsibility with respect to (i) any statement, warranty or representation made in or in connection with the First Lien Term Loan Agreement, any other Loan Document or any other instrument or document furnished pursuant thereto (other than this Affiliated Lender Assignment and Assumption) or any collateral thereunder, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Top Borrower, any of its Restricted Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by Holdings, the Top Borrower, any of its Restricted Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.  The Assignor acknowledges and agrees that in connection with this Affiliated Lender Assignment and Assumption, (1) the applicable Affiliated Lender or its Affiliates may have, and later may come into possession of, material non-public information with respect to Holdings, the Top Borrower and/or any subsidiary thereof and/or their respective Securities "MNPI"), (2) the Assignor has independently, without reliance on the applicable Affiliated Lender, the Investors, Holdings, the Top Borrower, any of their respective subsidiaries, the Administrative Agent, the Arrangers or any of their respective Affiliates, made its own analysis and determination to participate in such assignment notwithstanding the Assignor's lack of knowledge of the MNPI, (3) none of the applicable Affiliated Lenders, the Investors, Holdings, the Top Borrower, any of their respective subsidiaries, the Administrative Agent, the Arrangers or any of their respective Affiliates shall have any liability to the Assignor, and the Assignor hereby waives and releases, to the extent permitted by applicable Requirements of Law, any claims it may have against the applicable Affiliated Lender, the Investors, Holdings, the Top Borrower, each of its respective subsidiaries, the Administrative Agent, the Arrangers and their respective Affiliates, under applicable Requirements of Law or otherwise, with respect to the nondisclosure of the MNPI and (4) the MNPI may not be available to the Administrative Agent, the Arrangers or the other Lenders.

1.2     ***Assignee***.  The Assignee (a) represents and warrants that (i) it is an Affiliated Lender and has full power and authority, and has taken all action necessary, to execute and deliver this Affiliated Lender Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the First Lien Term Loan Agreement, (ii) it satisfies the requirements, if any, specified in the First Lien Term Loan Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the First Lien Term Loan Agreement and the other Loan Documents as a Lender (including as an Affiliated Lender) thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender (including as an Affiliated Lender) thereunder, (iv) it has received a copy of the First Lien Term Loan Agreement and the Intercreditor Agreement, together with copies of the most recent financial statements referred to in Section 4.01(c) or delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Affiliated Lender Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent, the Assignor or any other Lender, (v) attached to the Affiliated Lender Assignment and Assumption is any documentation required to be delivered by it pursuant to Section 2.17 of the First Lien Term Loan Agreement, duly completed and executed by the Assignee, (vi) after giving effect to this Affiliated Lender Assignment and Assumption and subject to the provisions of Section 9.05(g)(ii), the aggregate principal amount of all Term Loans then held by

all Affiliated Lenders does not exceed the Affiliated Lender Cap (after giving effect to any substantially simultaneous cancellation thereof) and (vii) in the case of any assignment effected pursuant to a Dutch Auction and/or open market purchase conducted by Holdings, the Top Borrower or any of its Restricted Subsidiaries, (1) no Indebtedness incurred under the ABL Facility or any Additional Revolving Facility has been utilized to fund the purchase of the Assigned Interest, (2) no Default or Event of Default exists at the time of acceptance of bids for any Dutch Auction or the confirmation of any open market purchase and (3) the Term Loans in respect of such Assigned Interest shall, to the extent permitted by applicable Requirement of Law, be retired and cancelled immediately after the Effective Date; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it deems appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, (ii) it appoints and authorizes the Administrative Agent to take such action on its behalf and to exercise such powers and discretion under the First Lien Term Loan Agreement, the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto as are delegated to the Administrative Agent, by the terms thereof, together with such powers as are reasonably incidental thereto, and (iii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender  The Assignee agrees that, solely in its capacity as an Affiliated Lender, it will not be entitled to (a) attend (including by telephone) or participate in any meeting or discussions (or portion thereof) among the Administrative Agent or any Lender or among Lenders to which the Loan Parties or their representatives are not invited or (b) receive any information or material prepared by the Administrative Agent or any Lender or any communication by or among the Administrative Agent and one or more Lenders, except to the extent such information or material has been made available by the Administrative Agent or any Lender to any Loan Party or its representatives (and in any case, other than the right to receive notices of Borrowings, prepayments and other administrative notices in respect of its Term Loans required to be delivered to Lenders pursuant to <u>Article 2</u> of the First Lien Term Loan Agreement).

2.      ***Payments***.   From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (other than Assigned Interests assigned to Holdings, the Top Borrower or any of its Restricted Subsidiaries) (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued up to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.      ***General Provisions***.  This Affiliated Lender Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns.  This Affiliated Lender Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Affiliated Lender Assignment and Assumption by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Affiliated Lender Assignment and Assumption.  This Affiliated Lender Assignment and Assumption shall be construed in accordance with and governed by the laws of the State of New York.

EXHIBIT A-2

[FORM OF]
ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between **[Insert name of Assignor]** (the "<u>Assignor</u>") and **[Insert name of Assignee]** (the "<u>Assignee</u>").  Capitalized terms used but not defined herein shall have the meanings given to them in the First Lien Term Loan Agreement identified below (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>First Lien Term Loan Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in <u>Annex I</u> attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the First Lien Term Loan Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the First Lien Term Loan Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any letters of credit included in such facilities) and (ii) to the extent permitted to be assigned under applicable Requirements of Law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the First Lien Term Loan Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to <u>clause (i)</u> above (the rights and obligations sold and assigned pursuant to <u>clauses (i)</u> and <u>(ii)</u> above being referred to herein collectively as the "<u>Assigned Interest</u>").  In the case where the Assigned Interest covers all of the Assignor's rights and obligations under the First Lien Term Loan Agreement, the Assignor shall cease to be a party thereto but shall continue to be entitled to the benefits of <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u> and <u>9.03</u> of the First Lien Term Loan Agreement with respect to facts and circumstances occurring on or prior to the Effective Date and subject to its obligations hereunder and under <u>Section 9.13</u> of the First Lien Term Loan Agreement.  Such sale and assignment is (i) subject to acceptance and recording thereof in the Register by the Administrative Agent pursuant to <u>Section 9.05(b)(v)</u> of the First Lien Term Loan Agreement, (ii) without recourse to the Assignor and (iii) except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.     Assignor:          [●]

2.     Assignee:          [●]
       **[and is an Affiliate/Approved Fund of [identify Lender][4]]**

3.     Borrowers: Serta Simmons Bedding, LLC, a Delaware limited liability company ("<u>SSB</u>" or the "<u>Top Borrower</u>"), National Bedding Company L.L.C., an Illinois limited liability company ("<u>National Bedding</u>"), and SSB Manufacturing Company, a Delaware corporation ("<u>SSB Manufacturing</u>").

4.     Administrative Agent:  UBS AG, Stamford Branch, as administrative agent under the First Lien Term Loan Agreement

5.     First Lien Term Loan Agreement:  That certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the

---

[4]          Select as applicable.

"First Lien Term Loan Agreement"), by and among, *inter alios*, SSB, National Bedding and SSB Manufacturing, as borrowers, Dawn Intermediate, Inc., a Delaware corporation ("Holdings"), the Lenders from time to time party thereto and UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders.

6.      Assigned Interest:

| Aggregate Amount of Commitment/Loans | Class of Loans Assigned | Amount of Commitment/Loans Assigned[5] | Percentage Assigned of Commitment/Loans under Relevant Class[6] | CUSIP Number |
|---|---|---|---|---|
| $ | | $ | % | |
| $ | | $ | % | |
| $ | | $ | % | |

Effective Date:  [●] [●], 20[●] **[TO BE INSERTED BY THE ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR].**

7.      **THE PARTIES HERETO ACKNOWLEDGE THAT ANY ASSIGNMENT TO ANY DISQUALIFIED INSTITUTION WITHOUT OBTAINING THE REQUIRED CONSENT OF THE TOP BORROWER OR, TO THE EXTENT THE TOP BORROWER'S CONSENT IS REQUIRED UNDER SECTION 9.05 OF THE FIRST LIEN TERM LOAN AGREEMENT, TO ANY OTHER PERSON, SHALL BE NULL AND VOID, AND, IN THE EVENT OF ANY SUCH ASSIGNMENT (AND ANY ASSIGNMENT TO ANY AFFILIATE OF ANY DISQUALIFIED INSTITUTION (OTHER THAN A BONA FIDE DEBT FUND)), THE TOP BORROWER SHALL BE ENTITLED TO PURSUE THE REMEDIES DESCRIBED IN SECTION 9.05 OF THE FIRST LIEN TERM LOAN AGREEMENT.**

[Signature Page Follows]

---

[5]      Not to be less than $1,000,000 unless the Top Borrower and the Administrative Agent otherwise consent.

[6]      Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

**[NAME OF ASSIGNOR]**

By: _____

     Name:
     Title:

WEIL:\95919473\9\74339.0038

☐  **ASSIGNEE HAS EXAMINED THE LIST OF DISQUALIFIED INSTITUTIONS AND (I) REPRESENTS AND WARRANTS THAT (A) IT IS NOT IDENTIFIED ON SUCH LIST AND (B) IT IS NOT AN AFFILIATE OF ANY INSTITUTION IDENTIFIED ON SUCH LIST [(OTHER THAN, IN THE CASE OF THIS CLAUSE (B), A BONA FIDE DEBT FUND)][7] AND (II) ACKNOWLEDGES THAT ANY ASSIGNMENT MADE TO AN AFFILIATE OF A DISQUALIFIED INSTITUTION (OTHER THAN A BONA FIDE DEBT FUND) SHALL BE SUBJECT TO SECTION 9.05 OF THE FIRST LIEN TERM LOAN AGREEMENT.[8]**

**ASSIGNEE**

**[NAME OF ASSIGNEE]**

By: _____
Name:
Title:

Consented to and Accepted:

UBS AG, STAMFORD BRANCH
as Administrative Agent[9]

By: _____
Name:
Title:

By: _____
Name:
Title:

**Consented to:][10]**

SERTA SIMMONS BEDDING, LLC,
as the Top Borrower

By: _____
Name:
Title:

---

[7]    Insert bracketed language if Assignee is a Bona Fide Debt Fund.

[8]    To be completed by Assignee.

[9]    To be added only if the consent of the Administrative Agent is required.

[10]    To be added only if the consent of the Top Borrower is required by Section 9.05(b)(i)(A) of the First Lien Term Loan Agreement.

WEIL:\95919473\9\74339.0038

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.      *Representations and Warranties*.

1.1     *Assignor*.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) its Commitment, and the outstanding balances of its Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth herein and (iv) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) makes no representation or warranty and assumes no responsibility with respect to (i) any statement, warranty or representation made in or in connection with the First Lien Term Loan Agreement, any other Loan Document or any other instrument or document furnished pursuant thereto (other than this Assignment and Assumption) or any collateral thereunder, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Top Borrower, any of its Restricted Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by Holdings, the Top Borrower, any of its Restricted Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2     *Assignee*.  The Assignee (a) represents and warrants that (i) it is an Eligible Assignee and has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the First Lien Term Loan Agreement, (ii) it satisfies the requirements, if any, specified in the First Lien Term Loan Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the First Lien Term Loan Agreement and the other Loan Documents as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder and (iv) it has received a copy of the First Lien Term Loan Agreement and the Intercreditor Agreement, together with copies of the most recent financial statements referred to in Section 4.01(c) or the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, (v) it has examined the list of Disqualified Institutions and it is not (A) a Disqualified Institution or (B) an Affiliate of a Disqualified Institution [(other than, in the case of this Clause (B), a Bona Fide Debt Fund)] [11] and (vi) attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to Section 2.17 of the First Lien Term Loan Agreement, duly completed and executed by the Assignee and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it deems appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, (ii) it appoints and authorizes the Administrative Agent to take such action on its behalf and to exercise such powers and discretion under the First Lien Term Loan Agreement, the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto, and (iii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      *Payments*.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts)

---

[11]     Insert bracketed language if Assignee is a Bona Fide Debt Fund and not otherwise identified on the list of Disqualified Institutions.

to the Assignor for amounts which have accrued up to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.    ***General Provisions***.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and permitted assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be construed in accordance with and governed by the laws of the State of New York.

<u>EXHIBIT B</u>

[FORM OF]<br>BORROWING REQUEST

UBS AG, Stamford Branch
as Administrative Agent for the Lenders referred to below
Attention: Structured Finance Processing
600 Washington Blvd., 9th Floor
Stamford, Connecticut 06901
Facsimile:  (203) 719-3888
Telephone: (203) 719-4319
Email: Agency-UBSAmericas@ubs.com

[●] [●], 20[●]<sup>12</sup>

Ladies and Gentlemen:

Reference is hereby made to that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "<u>First Lien Term Loan Agreement</u>"), by and among, *inter alios*, Dawn Intermediate, Inc., a Delaware corporation ("<u>Dawn Intermediate</u>" or "<u>Holdings</u>"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("<u>SSB</u>" or the "<u>Top Borrower</u>"), National Bedding Company L.L.C., an Illinois limited liability company ("<u>National Bedding</u>"), and SSB Manufacturing Company, a Delaware corporation ("<u>SSB Manufacturing</u>"), as borrowers, the Lenders from time to time party thereto, UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders.  Terms defined in the First Lien Term Loan Agreement are used herein with the same meanings unless otherwise defined herein.

The undersigned hereby gives you notice pursuant to <u>Section 2.03 </u>of the First Lien Term Loan Agreement that it requests the Borrowings under the First Lien Term Loan Agreement to be made on [●] [●], 20[●], and in that connection sets forth below the terms on which the Borrowings are requested to be made:

(A)     Borrower [**Serta Simmons Bedding, LLC**] [**National Bedding Company L.L.C.**] [**SSB Manufacturing Company**]

(B)     Date of Borrowing (which shall be a Business Day)                    [●]

---

<sup>12</sup>     The Administrative Agent must be notified in the form of a written Borrowing Request, appropriately completed and signed by a Responsible Officer of the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) or by telephone (with such telephonic notification to be promptly confirmed in writing by a Borrowing Request, appropriately completed and signed by a Responsible Officer of the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower)), and must be received by the Administrative Agent (by hand delivery, fax or other electronic transmission (including ".pdf" or ".tif")) not later than (i) 1:00 p.m. three Business Days prior to the requested day of any Borrowing of LIBO Rate Loans (or one Business Day in the case of any Borrowing of LIBO Rate Loans to be made on the Closing Date) and (ii) 9:00 a.m. on the requested date of any Borrowing of ABR Loans (or, in each case, such later time as is acceptable to the Administrative Agent); provided, however, that if the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) wishes to request LIBO Rate Loans having an Interest Period of other than one, two, three or six months in duration as provided in the definition of "Interest Period," (A) the applicable notice from the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) must be received by the Administrative Agent not later than 1:00 p.m. four Business Days prior to the requested date of the relevant Borrowing (or such later time as is reasonably acceptable to the Administrative Agent), whereupon the Administrative Agent shall give prompt notice to the appropriate Lenders of such request and determine whether the requested Interest Period is available to them and (B) not later than 12:00 p.m. three Business Days before the requested date of the relevant Borrowing, the Administrative Agent shall notify the relevant Borrower (or the Top Borrower as agent for the relevant Borrower) whether or not the requested Interest Period is available to the appropriate Lenders.

B-1

(C)     Aggregate Amount of Borrowing[13]                                   $[●]

(D)     Type of Borrowing[14]                                    [●]

(E)     Class of Borrowing                                       [●]

(F)     Interest Period[15] (in the case                         [●]
        of a LIBO Rate Borrowing)

(G)     Amount, Account Number and Location

| Wire Transfer Instructions: | |
| --- | --- |
| Amount | $[●] |
| Bank: | [●] |
| ABA No.: | [●] |
| Account No.: | [●] |
| Account Name: | [●] |

[The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Borrowing at the time of and immediately after giving effect to the Borrowing, no Default or Event of Default exists.][16]

[Signature Page Follows]

---

[13]    Subject to Section 2.02(c) of First Lien Term Loan Agreement.

[14]    State whether a LIBO Rate Borrowing or ABR Borrowing. If no Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.

[15]    Must be a period contemplated by the definition of "Interest Period". If no Interest Period is specified, then the Interest Period shall be of one-month's duration.

[16]    Include bracketed language only for Borrowings under any Incremental Facility other than Incremental Term Loans made in connection with any Permitted Acquisition or other similar Investment permitted under the First Lien Term Loan Agreement to the extent agreed by the lenders providing such Incremental Term Loans.

B-2

**[SERTA SIMMONS BEDDING, LLC]**
**[NATIONAL BEDDING COMPANY L.L.C.]**
**[SSB MANUFACTURING COMPANY]**

By: _____
      Name:
      Title:

B-3

EXHIBIT C

[FORM OF]
FIRST LIEN TERM LOAN INTELLECTUAL PROPERTY SECURITY AGREEMENT

This FIRST LIEN TERM LOAN INTELLECTUAL PROPERTY SECURITY AGREEMENT is entered into as of [●] [●], 20[●], (this "Agreement"), by [●] ([**each, a**][**the**] "Grantor") in favor of UBS AG, Stamford Branch ("UBS"), as administrative agent and collateral agent for the Secured Parties (in such capacities, the "Administrative Agent").

Reference is made to that certain First Lien Pledge and Security Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"), among the Grantors party thereto and the Administrative Agent. The First Lien Lenders (as defined below) have extended credit to the Top Borrower (as defined in First Lien Term Loan Agreement (as defined below)) subject to the terms and conditions set forth in that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "First Lien Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, Inc., a Delaware corporation ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party thereto (the "First Lien Lenders"), UBS, in its capacities as administrative agent and collateral agent for the Lenders. Consistent with the requirements set forth in Sections 4.01 and 5.12 of the First Lien Term Loan Agreement and Section 4.03(c) of the Security Agreement, the parties hereto agree as follows:

SECTION 1. *Terms*. Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the Security Agreement (including any terms defined therein by reference).

SECTION 2. *Grant of Security Interest*. As security for the prompt and complete payment or performance, as the case may be, in full of the Secured Obligations, [**each**][**the**] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign, mortgage, transfer and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the ratable benefit of the Secured Parties, a continuing security interest in all of its right, title or interest in, to or under all of the following assets, whether now owned or at any time hereafter acquired by or arising in favor of [**such**][**the**] Grantor, and regardless of where located (collectively, the "IP Collateral"):

A. all Trademarks, including the Trademark registrations and pending applications for registration in the United States Patent and Trademark Office listed on Schedule I hereto;

B. all Patents, including the issued Patents and pending Patent applications in the United States Patent and Trademark Office listed on Schedule II hereto

C. all Copyrights, including the Copyright registrations and pending applications for registration in the United States Copyright Office listed on Schedule III; and

D. all Proceeds of the foregoing;

in each case to the extent the foregoing items constitute Collateral.

SECTION 3. *Security Agreement*. The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement. [**Each**][**The**] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the IP Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully

C-1

set forth herein.  In the event of any conflict between the terms of this Agreement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.  ***Governing Law***.  This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

SECTION 5.  ***Counterparts***.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or by email as a ".pdf" or ".tif" attachment or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

[Signature Pages Follow]

WEIL:\95919473\9\74339.0038

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

[●]

By: _____
      Name:     [●]
      Title:      [●]

C-3

## SCHEDULE I

TRADEMARK REGISTRATIONS

| REGISTERED OWNER | REGISTRATION NUMBER | TRADEMARK |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

TRADEMARK APPLICATIONS

| APPLICANT | SERIAL NUMBER | TRADEMARK |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Schedule I to Exhibit C

WEIL:\98404791\6\68084.0008

## SCHEDULE II

PATENTS

| REGISTERED OWNER | PATENT NUMBER | TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

PATENT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

## SCHEDULE III

COPYRIGHT REGISTRATIONS

| REGISTERED OWNER | REGISTRATION NUMBER | TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

COPYRIGHT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Schedule III to Exhibit C

**EXHIBIT A**

[FORM OF]
FIRST LIEN TERM LOAN INTELLECTUAL PROPERTY SECURITY AGREEMENT SUPPLEMENT

This FIRST LIEN TERM LOAN INTELLECTUAL PROPERTY SECURITY AGREEMENT SUPPLEMENT is entered into as of [●] [●], 20[●] (this "IP Security Agreement Supplement"), by [●] (["**each, a**"]["**the**"] "**Grantor**") in favor of UBS AG, Stamford Branch ("UBS"), as administrative agent and collateral agent for the Secured Parties (in such capacities, the "Administrative Agent").

Reference is made to that certain First Lien Pledge and Security Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"), among the Grantors party thereto and the Administrative Agent. The First Lien Lenders (as defined below) have extended credit to the Borrowers (as defined in First Lien Term Loan Agreement (as defined below)) subject to the terms and conditions set forth in that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "First Lien Term Loan Agreement"), by and among, *inter alios*, Dawn Intermediate, Inc., a Delaware corporation ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party thereto (the "First Lien Lenders") and UBS, in its capacities as administrative agent and collateral agent for the Lenders. Consistent with the requirements set forth in Sections 4.01 and 5.12 of the First Lien Term Loan Agreement, the [**Grantor**][**Grantors**] and the Administrative Agent have entered into that certain First Lien Term Loan Intellectual Property Security Agreement, dated as of [●] (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) [**which was recorded at the United States Patent and Trademark Office on [●] at Reel/Frame No. [●], and at the United States Copyright Office on [●] at Volume/Page No. [●]**][17]. Under the terms of the Security Agreement, the Grantor has granted to the Administrative Agent for the benefit of the Secured Parties a security interest in the Additional IP Collateral (as defined below) and have agreed, consistent with the requirements of Section 4.03(c) of the Security Agreement, to execute this IP Security Agreement Supplement. Now, therefore, the parties hereto agree as follows:

SECTION 1. **Terms**. Capitalized terms used in this IP Security Agreement Supplement and not otherwise defined herein have the meanings specified in the Security Agreement (including any terms defined therein by reference).

SECTION 2. ***Grant of Security Interest***. As security for the prompt and complete payment or performance, as the case may be, in full of the Secured Obligations, [**each**][**the**] Grantor, pursuant to the Security Agreement, did and hereby does pledge, collaterally assign, mortgage, transfer and grant to the Administrative Agent, its successors and permitted assigns, on behalf of and for the ratable benefit of the Secured Parties, a continuing security interest in all of its right, title or interest in, to or under all of the following assets, whether now owned or at any time hereafter acquired by or arising in favor of the [**such**][**the**] Grantor, and regardless of where located (collectively, the "Additional IP Collateral"):

    A. the Trademark registrations and pending applications for registration in the United States Patent and Trademark Office listed on Schedule I hereto;

    B. the issued Patents and pending Patent applications in the United States Patent and Trademark Office listed on Schedule II hereto

---

[17] Included bracketed information to the extent then available.

C.      the Copyright registrations and pending applications for registration in the United States Copyright Office listed on Schedule III; and

D.      all Proceeds of the foregoing;

in each case to the extent the foregoing items constitute Collateral.

SECTION 3.    *Security Agreement*.    The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement.  [**Each**][**The**] Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Additional IP Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.  In the event of any conflict between the terms of this IP Security Agreement Supplement and the Security Agreement, the terms of the Security Agreement shall govern.

SECTION 4.    *Governing Law*.    This IP Security Agreement Supplement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

SECTION 5.    *Counterparts*.    This IP Security Agreement Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this IP Security Agreement Supplement by facsimile or by email as a ".pdf" or ".tif" attachment or other electronic transmission shall be effective as delivery of a manually executed counterpart of this IP Security Agreement Supplement.

[Signature Pages Follow]

Exhibit A-2 to Exhibit C

IN WITNESS WHEREOF, the parties hereto have duly executed this IP Security Agreement Supplement as of the day and year first above written.

[●]

By: _____
      Name:    [●]
      Title:     [●]

## SCHEDULE I

TRADEMARK REGISTRATIONS

| REGISTERED OWNER | REGISTRATION NUMBER | TRADEMARK |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

TRADEMARK APPLICATIONS

| APPLICANT | SERIAL NUMBER | TRADEMARK |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**SCHEDULE II**

PATENTS

| REGISTERED OWNER | PATENT NUMBER | TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

PATENT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

WEIL:\98304617\99\43780.0030

EXHIBIT C

## SCHEDULE III

COPYRIGHT REGISTRATIONS

| REGISTERED OWNER | REGISTRATION NUMBER | TITLE |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

COPYRIGHT APPLICATIONS

| APPLICANT | APPLICATION NUMBER | TITLE |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

WEIL:\95049475\06\42390.0008

Case 23-90001 Document 2561-14 Filed in TXSB on 10/24/23 Page 40 of 182

<u>EXHIBIT D</u>

[FORM OF]
COMPLIANCE CERTIFICATE

[●] [●], 20[●]

To:    The Administrative Agent and each of the Lenders parties to the
First Lien Term Loan Agreement described below

This Compliance Certificate is furnished pursuant to <u>Section 5.01(c)</u> of that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified, the "<u>First Lien Term Loan Agreement</u>"), by and among, *inter alios*, Dawn Intermediate, Inc., a Delaware corporation ("<u>Dawn Intermediate</u>" or "<u>Holdings</u>"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("<u>SSB</u>" or the "<u>Top Borrower</u>"), National Bedding Company L.L.C., an Illinois limited liability company ("<u>National Bedding</u>"), and SSB Manufacturing Company, a Delaware corporation ("<u>SSB Manufacturing</u>"), as borrowers, the Lenders from time to time party thereto, UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent for the Lenders. Unless otherwise defined herein, capitalized terms used in this Compliance Certificate have the meanings ascribed thereto in the First Lien Term Loan Agreement.

THE UNDERSIGNED HEREBY CERTIFIES, AS A RESPONSIBLE OFFICER OF THE TOP BORROWER, IN SUCH CAPACITY AND NOT IN AN INDIVIDUAL CAPACITY, THAT:

1.    I am the duly elected [●] of the Top Borrower and a Responsible Officer of the Top Borrower;

2.    I have reviewed the terms of the First Lien Term Loan Agreement and I have made, or have caused to be made under my supervision, a review in reasonable detail of the transactions and conditions of the Top Borrower and its Restricted Subsidiaries, on a consolidated basis, during the **[Fiscal Quarter][Fiscal Year]** covered by the attached financial statements;

3.    Any pro forma "run rate" cost saving, operating expense reduction, operational improvement and/or synergy added back in calculating Consolidated Adjusted EBITDA in reliance on <u>clause (e)</u> of the definition of "Consolidated Adjusted EBITDA" during the Fiscal Quarter covered by the attached financial statements is, in my good faith determination, reasonably identifiable and factually supportable.

4.    **[The attached financial statements fairly present, in all material respects, in accordance with GAAP, the consolidated financial condition of the Top Borrower as at the dates indicated and its income and cash flows for the periods indicated, subject to the absence of footnotes and changes resulting from audit and normal year-end adjustments.]**[18]

5.    **[Except as described in the disclosure set forth below, the][The] examinations described in <u>paragraph 2</u> did not disclose, and I have no knowledge of the existence of any condition or event which constitutes a Default or Event of Default that exists as of the date of this Compliance Certificate [and the disclosure set forth below specifies, in reasonable detail, the nature of any such condition or event and any action taken or proposed to be taken with respect thereto.]**

---

[18]    Include to the extent the relevant Compliance Certificate is delivered in connection with unaudited quarterly financials.

D-1

6.      [Schedule 1 attached hereto sets forth reasonably detailed calculations of Excess Cash Flow for such Excess Cash Flow Period.][19]

7.      [Attached as Schedule 2 hereto is a summary of the pro forma adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries from the attached financial statements.][20]

8.      [Attached as Schedule 3 hereto is consolidating financial information summarizing in reasonable detail the information regarding the Parent Company to which the attached financial statements relate, on the one hand, and the information relating to the Top Borrower, on the other hand.][21]

9.      [Attached as Schedule 4 hereto is a list of the Unrestricted Subsidiaries of the Top Borrower as of the date hereof.][22] [There is no change in the list of Unrestricted Subsidiaries since the later of the Closing Date and the date of the last Compliance Certificate.]

[Signature Page Follows]

---

[19]    Only required to the extent the relevant Compliance Certificate is delivered in connection with audited annual financial statements (commencing with the Fiscal Year ending December 31, 2017).

[20]    Only required if a subsidiary of the Top Borrower is or has been designated as an Unrestricted Subsidiary at the time of delivery of the applicable Compliance Certificate.

[21]    Only required to the extent required by the last paragraph of Section 5.01 of the First Lien Term Loan Agreement.

[22]    Only required if a subsidiary has been designated as an Unrestricted Subsidiary since later of the delivery of the last Compliance Certificate and the Closing Date.

WEIL:\95919473\9\74339.0038

The foregoing certifications, together with the information set forth in the Schedules hereto and the financial statements delivered with this Compliance Certificate in support hereof, are made and delivered as of the date first written above. [23]

SERTA SIMMONS BEDDING, LLC

By: _____
      Name:
      Title:

---

[23]      Please note the deadlines for satisfaction of the following requirements correspond with the delivery of each Compliance Certificate (unless otherwise indicated):

1.      The delivery of documents and deliverables required under Section 4.02(a) of the Security Agreement relating to any (i) certificated Securities and/or (ii) Instruments having a face amount in excess of $10,000,000, in each case acquired during the Fiscal Quarter covered by the attached financial statements. **NOTE:** If any Loan Party acquires (i) certificated Securities and/or (ii) Instruments having a face amount in excess of $10,000,000 during the fourth Fiscal Quarter of any Fiscal Year, the documents and deliverables required under Section 4.02(a) of the Security Agreement must be delivered within 60 days after the end of such Fiscal Quarter (or in each case such longer period as the Administrative Agent may reasonably agree).

2.      The delivery of documents and deliverables required under Section 4.03(c) of the Security Agreement relating to any registration (or any application for registration of) any Patent, Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, filed or acquired during the Fiscal Quarter covered by the attached financial statements. **NOTE:** If any Loan Party acquires any registration (or files any application for registration) of any Patent, Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, during the fourth Fiscal Quarter of any Fiscal Year, the documents and deliverables required under Section 4.03(c) of the Security Agreement must be delivered within 60 days after the end of such Fiscal Quarter (or in each case such longer period as the Administrative Agent may reasonably agree).

3.      The delivery of the documents required under Section 4.04 of the Security Agreement relating to any Commercial Tort Claim with an individual value (as reasonably estimated by the Top Borrower) in excess of $10,000,000 acquired after the Closing Date. **NOTE:** If any Loan Party acquires any Commercial Tort Claim with an individual value (as reasonably estimated by the Top Borrower) in excess of $10,000,000 during the fourth Fiscal Quarter of any Fiscal Year, the documents and deliverables required under Section 4.04 of the Security Agreement must be delivered within 60 days after the end of such Fiscal Quarter (or in each case such longer period as the Administrative Agent may reasonably agree).

4.      The delivery of the documents required to be delivered under Section 5.12(a) of the First Lien Term Loan Agreement as a result of (i) the formation or acquisition after the Closing Date of any Restricted Subsidiary that is a Domestic Subsidiary (other than an Excluded Subsidiary), (ii) the designation of any Unrestricted Subsidiary as a Restricted Subsidiary (other than an Excluded Subsidiary), (iii) any Restricted Subsidiary that is a Domestic Subsidiary ceasing to be an Immaterial Subsidiary and/or (iv) any Restricted Subsidiary that was an Excluded Subsidiary ceasing to be an Excluded Subsidiary, in each case during the Fiscal Quarter covered by the attached financial statements. **NOTE**: upon the taking of any action or the occurrence of any event described in clauses (i) through (iv) during the fourth Fiscal Quarter of any Fiscal Year, the documents required to be delivered under Section 5.12(a) of the First Lien Term Loan Agreement must be delivered within 60 days after the end of such Fiscal Quarter (or in each case such longer period as the Administrative Agent may reasonably agree).

D-3

Calculation of Excess Cash Flow

Schedule 1 to Exhibit D

Summary of Pro Forma Adjustments for Unrestricted Subsidiaries

Schedule 2 to Exhibit D

Consolidating Financial Information

Unrestricted Subsidiaries

Schedule 4 to Exhibit D

[Reserved.]

[FORM OF]
INTERCOMPANY NOTE

[Date]

FOR VALUE RECEIVED, each of the undersigned, to the extent a borrower from time to time from any other entity listed on a signature page hereto (each, in such capacity, a "Payor"), hereby promises to pay on demand to such other entity listed below (each, in such capacity, a "Payee"), in lawful money of the United States of America, or in such other currency as agreed to by such Payor and such Payee, in immediately available funds, at such location as a Payee shall from time to time designate, the unpaid principal amount of all loans and advances constituting a loan made by such Payee to such Payor in reliance on clause (B) of the definition of "Investment" or indebtedness borrowed by such Payor from such Payee in reliance on clause (B) of the proviso to the definition of "Indebtedness". Each Payor promises also to pay interest, if any, on the unpaid principal amount of all such loans and advances in like money at said location from the date of such loans and advances until paid at such rate per annum as shall be agreed upon from time to time by such Payor and such Payee.

Reference is made to (i) that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "First Lien Term Loan Agreement"), by and among, inter alios, Dawn Intermediate, Inc., a Delaware corporation ("Dawn Intermediate" or "Holdings"), Serta Simmons Bedding, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing" and together with SSB and National Bedding, the "Borrowers"), the lenders from time to time party thereto (the "First Lien Term Loan Lenders"), UBS AG, Stamford Branch ("UBS"), in its capacities as administrative agent and collateral agent for the First Lien Term Loan Lenders (the "First Lien Agent"), and the First Lien Term Loan Lenders and other parties from time to time party thereto, (ii) that certain Second Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Second Lien Term Loan Agreement"), by and among, inter alios, Holdings, the Borrowers, the Lenders from time to time party thereto (the "Second Lien Term Loan Lenders"), Goldman Sachs Bank USA, in its capacities as administrative agent and collateral agent for the Second Lien Term Loan Lenders (the "Second Lien Agent") and (iii) that certain ABL Credit Agreement, dated as of November 8, 2016 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "ABL Credit Agreement" and, together with the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement, the "Credit Agreements"), by and among, inter alios, Holdings, the Borrowers, the Lenders from time to time party thereto (the "ABL Lenders"), UBS, in its capacities as administrative agent and collateral agent for the ABL Lenders (the "ABL Agent" and together with First Lien Agent and the Second Lien Agent, the "Agents")). Each Payee hereby acknowledges and agrees that the applicable Agent may exercise all rights provided in the Loan Documents, as applicable, with respect to this Note. Capitalized terms used in this Intercompany Note (this "Note") but not otherwise defined herein shall have the meanings given to them in the Credit Agreements, as applicable. This Note is the Intercompany Note referred to in Credit Agreements.

Notwithstanding anything to the contrary contained in this Note, each Payee understands and agrees that no Payor shall be required to make, and shall not make, any payment of principal, interest or other amounts on this Note to the extent that such payment is prohibited by, or would give rise to a default or an event of default under, the terms of any Senior Indebtedness (as defined below) (each a "Credit Agreement Default"). The failure to make such payment because such payment would result in any Credit Agreement Default shall not constitute a default hereunder.

Anything in this Note to the contrary notwithstanding, the Indebtedness evidenced by this Note owed by any Payor that is a Loan Party to any Payee that is not a Loan Party shall be subordinated and junior in right of payment, to the extent and in the manner hereinafter set forth, to all of the Secured

F-1

Obligations of such Payor; *provided* that each Payor may make payments to the applicable Payee so long as no Event of Default under and as defined in applicable Credit Agreement shall have occurred and be continuing (such Secured Obligations and, in each case, other indebtedness and obligations in connection with any renewal, refunding, restructuring or refinancing thereof, including interest, fees and expenses thereon accruing after the commencement of any proceedings referred to in clause (i) below, whether or not such interest, fees and expenses is an allowed claim in such proceeding, being hereinafter collectively referred to as "Senior Indebtedness"):

      (i)     In the event of any insolvency or bankruptcy proceedings, and any receivership, liquidation, reorganization or other similar proceedings in connection therewith, relative to any Payor that is a Loan Party (each such Payor, an "Affected Payor") or to its property, and in the event of any proceedings for voluntary liquidation, dissolution or other winding up of such Affected Payor (except as expressly permitted by the Loan Documents), whether or not involving insolvency or bankruptcy, if an Event of Default has occurred and is continuing (x) the holders of Senior Indebtedness shall be paid in full in cash in respect of all amounts constituting Senior Indebtedness (including, without limitation, post-petition interest at the rate provided in the documentation with respect to the Senior Indebtedness, whether or not such post-petition interest is an allowed claim against the debtor in any bankruptcy or similar proceeding) (other than (A) contingent indemnification obligations as to which no claim has been asserted and (B) Banking Services Obligations and Secured Hedging Obligations) and no Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit related thereto has been cash collateralized or back-stopped or otherwise in a manner reasonably satisfactory to the applicable Issuing Bank and the ABL Agent and in a face amount to be reasonably determined by the applicable Borrower and the applicable Issuing Bank (but not less than 100% of the Outstanding Amount of the applicable Letter of Credit), or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank and the ABL Agent) before any Payee that is not a Loan Party (each such Payee, an "Affected Payee") is entitled to receive (whether directly or indirectly), or make any demands for, any payment on account of this Note and (y) until the holders of Senior Indebtedness are paid in full in cash in respect of all amounts constituting Senior Indebtedness (including, without limitation, post-petition interest at the rate provided in the documentation with respect to the Senior Indebtedness, whether or not such post-petition interest is an allowed claim against the debtor in any bankruptcy or similar proceeding) (other than (A) contingent indemnification obligations as to which no claim has been asserted and (B) Banking Services Obligations and Secured Hedging Obligations) and no Letter of Credit shall remain outstanding (unless the Outstanding Amount of the Letter of Credit related thereto has been cash collateralized or back-stopped by a letter of credit or otherwise in a manner reasonably satisfactory to the applicable Issuing Bank and the ABL Agent and in a face amount to be reasonably determined by the applicable Borrower and the applicable Issuing Bank (but not less than 100% of the Outstanding Amount of the applicable Letter of Credit), or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank and the ABL Agent), any payment or distribution to which such Affected Payee would otherwise be entitled (other than equity or debt securities of such Affected Payor that are subordinated, to at least the same extent as this Note, to the payment of all Senior Indebtedness then outstanding (such securities being hereinafter referred to as "Restructured Securities")) shall be made to the holders of Senior Indebtedness;

      (ii)    (x) if any Event of Default under Sections 7.01(a), 7.01(f) or 7.01(g) of any Credit Agreement occurs and is continuing and (y) subject to the Intercreditor Agreements, either any Agent delivers notice to the Borrowers instructing that the applicable Agent is thereby exercising its rights pursuant to this clause (ii) (provided that no such notice shall be required to be given in the case of any Event of Default arising under Sections 7.01(f) or 7.01(g) of the Credit Agreements, as applicable), then, unless otherwise agreed in writing by the applicable Agent in its reasonable discretion, no payment or distribution of any kind or character shall be made by or on behalf of any Affected Payor or any other Person on its behalf, and no payment or distribution of any

kind or character shall be received by or on behalf of any Affected Payee or any other Person on its behalf, with respect to this Note until (x) the applicable Senior Indebtedness shall have been paid in full in cash (other than (A) contingent indemnification obligations as to which no claim has been asserted, (B) Banking Services Obligations and Secured Hedging Obligations and (C) the Outstanding Amount of any Letter of Credit that has been cash collateralized or back-stopped or otherwise in a manner reasonably satisfactory to the applicable Issuing Bank and the First Lien Agent and in a face amount to be reasonably determined by the relevant Borrowers and the applicable Issuing Bank (but not less than 100% of the Outstanding Amount of the applicable Letter of Credit), or such Letter of Credit has been deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank and the First Lien Agent) or (y) such Event of Default shall have been cured or waived;

(iii) if any payment or distribution of any character, whether in cash, securities or other property (other than Restructured Securities), in respect of this Note shall (despite these subordination provisions) be received by any Affected Payee in violation of the foregoing clause (i) or (ii), such payment or distribution shall be held in trust for the benefit of, and shall be paid over or delivered in accordance with the relevant Collateral Documents, the applicable Agent, on behalf of the applicable Secured Parties, subject to the terms of the Intercreditor Agreements; and

(iv) Each Affected Payee agrees to file all claims against each relevant Affected Payor in any bankruptcy or other proceeding in which the filing of claims is required by law in respect of any Senior Indebtedness and the Agents shall be entitled to all of such Affected Payee's rights thereunder. If for any reason an Affected Payee fails to file such claim at least ten (10) days prior to the last date on which such claim should be filed, such Affected Payee hereby irrevocably appoints each Agent as its true and lawful attorney-in-fact and each Agent is hereby authorized to act as attorney-in-fact in such Affected Payee's name to file such claim or, in such Agent's discretion, to assign such claim to and cause proof of claim to be filed in the name of such Agent or its nominee. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to the applicable Agent the full amount payable on the claim in the proceeding, and, to the full extent necessary for that purpose, each Affected Payee hereby assigns to each of the Agents all of such Affected Payee's rights to any payments or distributions to which such Affected Payee otherwise would be entitled. If the amount so paid is greater than such Affected Payor's liability hereunder, the Agents shall pay the excess amount to the party entitled thereto under the applicable Intercreditor Agreement and applicable law. In addition, upon the occurrence and during the continuance of an Event of Default, each Affected Payee hereby irrevocably appoints each Agent as its attorney-in-fact to exercise all of such Affected Payee's voting rights in connection with any bankruptcy proceeding or any plan for the reorganization of each relevant Affected Payor.

Except as otherwise set forth in clauses (i) and (ii) above, any Payor is permitted to pay, and any Payee is entitled to receive, any payment or prepayment of principal and interest on the Indebtedness evidenced by this Note.

To the fullest extent permitted by applicable Requirements of Law, no present or future holder of Senior Indebtedness shall at any time or in any way be prejudiced or impaired in its right to enforce the subordination of this Note by any act or failure to act on the part of any Affected Payor or Affected Payee or by any act or failure to act on the part of such holder or any trustee or agent for such holder, or by any noncompliance by the Payor with the terms and provisions of the Note, regardless or any knowledge thereof which any such holder may have or be otherwise charged with. Each Affected Payee and each Affected Payor hereby agrees that the subordination of this Note is for the benefit of each Agent and the other Secured Parties. Each Agent and the other Secured Parties are obligees under this Note to the same extent as if their names were written herein as such and each Agent (or other applicable Representative) may, on behalf of itself, and the applicable Secured Parties, proceed to enforce the subordination provisions herein, in each case, subject to the terms of the Intercreditor Agreements.

F-3

The holders of the Senior Indebtedness may, without in any way affecting the obligations of the holder of the Note with respect hereto, at any time or from time to time and in their absolute discretion, change the manner, place or terms of payment of, change or extend the time of payment of, or renew or alter, any Senior Indebtedness or amend, modify or supplement any agreement or instrument governing or evidencing such Senior Indebtedness or any other document referred to therein, or exercise or refrain from exercising any other of their rights under the Senior Indebtedness including, without limitation, the waiver of default thereunder and the release of any collateral securing such Senior Indebtedness, all without notice to or assent from any Payor or Payee.

Nothing contained in the subordination provisions set forth above is intended to or will impair, as between each Payor and each Payee, the obligations of such Payor, which are absolute and unconditional, to pay to such Payee the principal of and interest on this Note as and when due and payable in accordance with its terms, or is intended to or will affect the relative rights of such Payee and other creditors of such Payor other than the holders of Senior Indebtedness.

Each Payee is hereby authorized (but not required) to record all loans and advances made by it to any Payor (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting *prima facie* evidence of the accuracy of the information contained therein.  For the avoidance of doubt, this Note shall not in any way replace, or affect the principal amount of, any intercompany loan outstanding between any Payor and any Payee prior to the execution hereof, and to the extent permitted by applicable law, from and after the date hereof, each such intercompany loan shall be deemed to incorporate the terms set forth in this Note to the extent applicable and shall be deemed to be evidenced by this Note together with any documents and instruments executed prior to the date hereof in connection with such intercompany Indebtedness.

Each Payor hereby waives presentment, demand, protest or notice of any kind in connection with this Note.  Except to the extent of any taxes required by law to be withheld, all payments under this Note shall be made without offset, counterclaim or deduction of any kind.

This Note shall be binding upon each Payor and its successors and assigns, and the terms and provisions of this Note shall inure to the benefit of each Payee and their respective successors and assigns, including subsequent holders hereof.

If, at any time, all or part of any payment with respect to Senior Indebtedness theretofore made by the Payor or any other Person or entity is rescinded or must otherwise be returned by the holders of the Senior Indebtedness for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of the Payor or such other Person or entity), the subordination provisions set forth herein shall continue to be effective or be reinstated, as the case may be, all as though such payment had not been made.

If any Payee shall acquire by indemnification, subrogation or otherwise, any lien, estate, right or other interest in any of the assets or properties of any Payor, that lien, estate, right or other interest shall be subordinate in right of payment to the Senior Indebtedness and the lien of the Senior Indebtedness as provided herein, and each Payee hereby waives any and all rights it may acquire by subrogation or otherwise to any lien of the Senior Indebtedness or any portion thereof until such time as all Senior Indebtedness has been indefeasibly repaid in full in cash.

From time to time after the date hereof, additional Subsidiaries of the Top Borrower may become parties hereto (as Payor and/or Payee, as the case may be) by executing a counterpart signature page hereto, which shall be automatically incorporated into this Note (each additional Subsidiary, an "Additional Party").  Upon delivery of such counterpart signature page to the Payees, notice of which is hereby waived by the other Payors, each Additional Party shall be a Payor and/or a Payee, as the case may be, and shall be as

F-4

fully a party hereto as if such Additional Party were an original signatory hereof. Each Payor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Payor or Payee hereunder. This Note shall be fully effective as to any Payor or Payee that is or becomes a party hereto regardless of whether any other person becomes or fails to become or ceases to be a Payor or Payee hereunder.

Indebtedness governed by this Note shall be maintained in "registered form" within the meaning of Section 163(f) of the Internal Revenue Code of 1986, as amended. The Payor or its designee (which shall be the Applicable Administrative Agent) shall record the transfer of the right to payments of principal and interest on the Indebtedness governed by this Note to holders of the Senior Indebtedness in a register (the "Register"), and no such transfer shall be effective until entered in the Register.

Any Payor shall be automatically released from this Note in the event that such Payor ceases to be a Loan Party pursuant to Article 8 or Section 9.22 of the Credit Agreements. Any Payee shall be automatically released from this Note in the event that such Payee ceases to be a wholly-owned Restricted Subsidiary of the Top Borrower pursuant to a transaction permitted by the Credit Agreements.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

*[Signature Pages Follow]*

F-5

[●], as Payee[24]


By:_____
    Name:
    Title:


[●], as Payor[25]


By:_____
    Name:
    Title:

---

[24] To be executed by Restricted Subsidiaries that are not Loan Parties to the extent required in accordance with the provisions of the applicable Credit Agreement.

[25] To be executed by Loan Parties to the extent required in accordance with the provisions of the applicable Credit Agreement.

*Signature Page to Intercompany Note*

[FORM OF]
FORM OF ABL INTERCREDITOR AGREEMENT

[See attached.]

EXECUTION VERSION

ABL INTERCREDITOR AGREEMENT

dated as of November 8, 2016,

among

UBS AG, STAMFORD BRANCH,
as ABL Credit Agreement Collateral Agent;

UBS AG, STAMFORD BRANCH,
as First Lien Credit Agreement Collateral Agent;

GOLDMAN SACHS BANK USA
as Second Lien Credit Agreement Collateral Agent,

and

EACH OTHER COLLATERAL AGENT PARTY HERETO

and acknowledged and agreed to by

DAWN INTERMEDIATE, INC.,

as Holdings,

SERTA SIMMONS BEDDING, LLC

as Top Borrower,

THE OTHER BORROWERS PARTY HERETO,

and

EACH OF THE OTHER OBLIGORS PARTY HERETO,

## TABLE OF CONTENTS

Page

**SECTION 1.    DEFINITIONS** ........................................................................................ **3**

    1.1    Defined Terms ........................................................................................... 3
    1.2    Terms Generally ...................................................................................... 25
    1.3    DIP Cap Amounts .................................................................................... 26

**SECTION 2.    LIEN PRIORITIES** ............................................................................... **26**

    2.1    Relative Priorities ................................................................................... 26
    2.2    Prohibition on Contesting Liens .............................................................. 27
    2.3    No New Liens .......................................................................................... 28
    2.4    Similar Liens and Agreements ................................................................. 28
    2.5    Nature of Obligations .............................................................................. 28
    2.6    Certain Cash Collateral ........................................................................... 29
    2.7    [Reserved] ............................................................................................... 29
    2.8    Tracing of Proceeds ................................................................................. 29

**SECTION 3.    ENFORCEMENT** ................................................................................... **29**

    3.1    Exercise of Remedies .............................................................................. 29
    3.2    Actions Upon Breach; Specific Performance ........................................... 34

**SECTION 4.    PAYMENTS** ........................................................................................... **34**

    4.1    Application of Proceeds ........................................................................... 34
    4.2    Payments Over ........................................................................................ 34
    4.3    Mixed Collateral Proceeds ...................................................................... 35

**SECTION 5.    OTHER AGREEMENTS** ....................................................................... **36**

    5.1    Releases .................................................................................................. 36
    5.2    Insurance and Condemnation Awards ...................................................... 37
    5.3    Amendments to Financing Documents ..................................................... 38
    5.4    Confirmation of Subordination in Collateral Documents .......................... 39
    5.5    Gratuitous Bailee/Agent for Perfection ................................................... 40
    5.6    When Discharge of Senior Obligations Deemed to Not Have Occurred ...... 41
    5.7    [Reserved] ............................................................................................... 41
    5.8    Consent to License to Use Intellectual Property ...................................... 41
    5.9    Access to Information .............................................................................. 42
    5.10   Access to Property to Process and Sell Inventory .................................... 42
    5.11   Obligor Consent ...................................................................................... 44

**SECTION 6.    INSOLVENCY OR LIQUIDATION PROCEEDINGS** ........................... **44**

    6.1    Finance and Sale Issues ........................................................................... 44
    6.2    Relief from the Automatic Stay ............................................................... 46
    6.3    Adequate Protection ................................................................................ 47

-i-

**Page**

| | | |
|---|---|---|
| 6.4 | No Waiver | 49 |
| 6.5 | Reinstatement | 49 |
| 6.6 | Reorganization Securities | 49 |
| 6.7 | Post-Petition Interest | 49 |
| 6.8 | Waivers | 50 |
| 6.9 | Separate Grants of Security and Separate Classification | 50 |
| 6.10 | Effectiveness in Insolvency or Liquidation Proceedings | 51 |

**SECTION 7. RELIANCE; WAIVERS; ETC. ........ 51**

| | | |
|---|---|---|
| 7.1 | Reliance | 51 |
| 7.2 | No Warranties or Liability | 51 |
| 7.3 | No Waiver of Lien Priorities | 52 |
| 7.4 | Waiver of Liability | 53 |
| 7.5 | Obligations Unconditional | 54 |

**SECTION 8. MISCELLANEOUS ........ 55**

| | | |
|---|---|---|
| 8.1 | Conflicts | 55 |
| 8.2 | Effectiveness; Continuing Nature of this Agreement; Severability | 55 |
| 8.3 | Amendments; Waivers | 56 |
| 8.4 | Information Concerning Financial Condition of the Obligors and their Subsidiaries | 56 |
| 8.5 | Subrogation | 57 |
| 8.6 | Application of Payments | 57 |
| 8.7 | SUBMISSION TO JURISDICTION; WAIVERS | 57 |
| 8.8 | Notices | 59 |
| 8.9 | Further Assurances | 59 |
| 8.10 | CHOICE OF LAW | 59 |
| 8.11 | Binding on Successors and Assigns | 59 |
| 8.12 | Headings | 59 |
| 8.13 | Counterparts | 59 |
| 8.14 | Authorization; Binding Effect on Claimholders | 60 |
| 8.15 | [Reserved] ........ **Error! Bookmark not defined.** |
| 8.16 | No Third Party Beneficiaries; Provisions Solely to Define Relative Rights | 61 |
| 8.17 | No Indirect Actions | 61 |
| 8.18 | Obligors; Additional Obligors | 61 |
| 8.19 | Right of Collateral Agent to Continue | 62 |
| 8.20 | Claimholders | 62 |
| 8.21 | Additional Lien Obligations | 62 |
| 8.22 | Additional Intercreditor Agreements | 63 |

# ABL INTERCREDITOR AGREEMENT

This **ABL INTERCREDITOR AGREEMENT** (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, this "**Agreement**") is dated as of November 8, 2016, and entered into by and among UBS AG, STAMFORD BRANCH, in its capacity as collateral agent under the ABL Credit Agreement and the ABL Collateral Documents relating thereto (in each case as defined below) (in such capacity and together with its successors and assigns in such capacity, the "**ABL Credit Agreement Collateral Agent**"), UBS AG, STAMFORD BRANCH, in its capacity as collateral agent under the First Lien Credit Agreement and the First Lien Collateral Documents relating thereto (in each case, as defined below) (in such capacity and together with its successors and assigns in such capacity, the "**First Lien Credit Agreement Collateral Agent**"), GOLDMAN SACHS BANK USA in its capacity as collateral agent under the Second Lien Credit Agreement and the Second Lien Collateral Documents relating thereto (in each case, as defined below) (in such capacity and together with its successors and assigns in such capacity, the "**Second Lien Credit Agreement Collateral Agent**"), each other FIRST LIEN COLLATERAL AGENT that is from time to time party hereto and each other SECOND LIEN COLLATERAL AGENT that is from time to time party hereto and acknowledged and agreed to by DAWN INTERMEDIATE, INC., a Delaware corporation ("**Holdings**"), SERTA SIMMONS BEDDING, LLC, a Delaware limited liability company (the "**Top Borrower**"), NATIONAL BEDDING COMPANY L.L.C., an Illinois limited liability company ("**National Bedding**"), SSB MANUFACTURING COMPANY, a Delaware corporation ("**SSB Manufacturing**" and, together with the Top Borrower and National Bedding, the "**Borrowers**") and the other OBLIGORS (as defined below) from time to time party hereto.

## RECITALS

Holdings, the Borrowers, the financial institutions party thereto from time to time, UBS AG, Stamford Branch ("**UBS**"), as administrative agent (in such capacity and together with its successors and assigns in such capacity, the "**ABL Administrative Agent**"), the ABL Credit Agreement Collateral Agent, letter of credit issuer and swingline lender, have entered into that certain ABL Credit Agreement, dated as of November 8, 2016 (as amended, amended and restated, supplemented, modified or Refinanced from time to time, the "**ABL Credit Agreement**");

Holdings, Borrowers, the financial institutions party thereto from time to time, UBS, as administrative agent (in such capacity and together with its successors and assigns in such capacity, the "**First Lien Administrative Agent**") and the First Lien Credit Agreement Collateral Agent, have entered into that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, amended and restated, supplemented, modified or Refinanced from time to time, the "**First Lien Credit Agreement**");

Holdings, the Borrowers, the financial institutions party thereto from time to time, Goldman Sachs Bank USA ("**GS**"), as administrative agent (in such capacity, the "**Second Lien Administrative Agent**") and Second Lien Term Loan Agreement Collateral Agent, have entered into that certain Second Lien Term Loan Credit Agreement, dated as of November 8, 2016 (as amended, amended and restated, supplemented, modified or Refinanced from time to time, the "**Second Lien Credit Agreement**");

Pursuant to (i) the ABL Credit Agreement, (A) the Borrowers may incur loans and ABL Letters of Credit may be issued and (B) the relevant ABL Obligors have agreed to guarantee the ABL Obligations, (ii) the First Lien Credit Agreement, (A) the Borrowers will incur loans and (B) the relevant First Lien Obligors have agreed to guarantee the First Lien Obligations, and (iii) the Second Lien Credit

Agreement, (A) the Borrowers will incur loans and (B) the relevant Second Lien Obligors have agreed to guarantee the Second Lien Obligations;

The obligations of each ABL Obligor under (i) the ABL Financing Documents, (ii) any ABL Hedge Agreements and (iii) any ABL Banking Services Agreements will be secured on (x) a first priority basis by Liens on the ABL Priority Collateral of such ABL Obligor and (y) a third priority basis by Liens on the Term Loan Priority Collateral of such ABL Obligor, in each case pursuant to the terms of the ABL Collateral Documents;

The obligations of each First Lien Obligor under (i) the First Lien Financing Documents, (ii) any First Lien Hedge Agreements and (iii) any First Lien Banking Services Agreements will be secured on (x) a first priority basis by Liens on the Term Loan Priority Collateral of such First Lien Obligor and (y) a second priority basis by Liens on the ABL Priority Collateral of such First Lien Obligor, in each case pursuant to the terms of the First Lien Collateral Documents;

The obligations of each Second Lien Obligor under (i) the Second Lien Financing Documents, (ii) any Second Lien Hedge Agreements and (iii) any Second Lien Banking Services Agreements will be secured on (x) a second priority basis by Liens on the Term Loan Priority Collateral of such Second Lien Obligor and (y) a third priority basis by Liens on the ABL Priority Collateral of such Second Lien Obligor, in each case pursuant to the terms of the Second Lien Collateral Documents;

The ABL Credit Agreement, the First Lien Credit Agreement and the Second Lien Credit Agreement require, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral;

The Obligors may, from time to time, to the extent permitted by this Agreement, the ABL Financing Documents, the First Lien Financing Documents and the Second Lien Financing Documents, incur additional secured debt which the Obligors and the debtholders thereunder may elect, subject to the terms and conditions hereof, of the ABL Financing Documents, the First Lien Financing Documents and of the Second Lien Financing Documents, to be secured by the Collateral;

In order to induce the ABL Credit Agreement Collateral Agent and the other ABL Claimholders to consent to the Obligors incurring the First Lien Obligations and the Second Lien Obligations and to induce the ABL Claimholders to extend credit and other financial accommodations and lend monies to or for the benefit of the ABL Obligors, each First Lien Collateral Agent, each Second Lien Collateral Agent and each Additional Lien Obligations Agent, on behalf of itself and its respective Claimholders, and each First Lien Claimholder, each Second Lien Claimholder and each Additional Lien Obligations Claimholder, by its acceptance of the benefits of the First Lien Collateral Documents, the Second Lien Collateral Documents or the Additional Lien Obligations Agreements, as applicable, has agreed to the intercreditor and other provisions set forth in this Agreement;

In order to induce each First Lien Collateral Agent and the other First Lien Claimholders to consent to the Obligors incurring the ABL Obligations and the Second Lien Obligations and to induce the First Lien Claimholders to extend credit and other financial accommodations and lend monies to or for the benefit of the First Lien Obligors, the ABL Credit Agreement Collateral Agent, each Second Lien Collateral Agent and each Additional Lien Obligations Agent, on behalf of itself and its respective Claimholders, and each ABL Claimholder, each Second Lien Claimholder and each Additional Lien Obligations Claimholder, by its acceptance of the benefits of the ABL Collateral Documents, the Second Lien Collateral Documents or the Additional Lien Obligations Agreements, as applicable, has agreed to the intercreditor and other provisions set forth in this Agreement; and

-2-

In order to induce each Second Lien Collateral Agent and the other Second Lien Claimholders to consent to the Obligors incurring the ABL Obligations and the First Lien Obligations and to induce the Second Lien Claimholders to extend credit and other financial accommodations and lend monies to or for the benefit of the Second Lien Obligors, the ABL Credit Agreement Collateral Agent, each First Lien Collateral Agent and each Additional Lien Obligations Agent, on behalf of itself and its respective Claimholders and each ABL Claimholder, each First Lien Claimholder and each Additional Lien Obligations Claimholder, by its acceptance of the benefits of ABL Collateral Documents, the First Lien Collateral Documents or the Additional Lien Obligations Agreements, as applicable, has agreed to the intercreditor and other provisions set forth in this Agreement.

## AGREEMENT

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1.**    **Definitions**.

1.1    Defined Terms.  The following terms which are defined in the UCC are used herein as so defined:  Account, Chattel Paper, Deposit Account, Document, Equipment, Fixture, General Intangible, Good, Instrument (as defined in Article 9 thereof), Inventory, Investment Property, Letter-of-Credit Right, Money, Securities, Securities Account, Security Entitlement and Supporting Obligation.  As used in this Agreement, the following terms shall have the following meanings:

"**ABL Administrative Agent**" has the meaning set forth in the Recitals to this Agreement.

"**ABL Banking Services**" means any of the following services provided to any ABL Obligor or any of its "subsidiaries" as defined in the ABL Credit Agreement:  commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash management and deposit accounts.

"**ABL Banking Services Agreement**" means any documentation with an ABL Claimholder governing any ABL Banking Services Obligations.

"**ABL Banking Services Obligations**" means any and all obligations of any ABL Obligor or any of its "subsidiaries" as defined in the ABL Credit Agreement (or any similar term in any other ABL Document), whether absolute or contingent and however and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), in connection with ABL Banking Services, in each case, that constitute ABL Obligations; provided that in no event shall any obligations constitute ABL Banking Services Obligations to the extent such obligations constitute First Lien Banking Services Obligations or Second Lien Banking Services Obligations.

"**ABL Claimholders**" means, at any relevant time, the holders of ABL Obligations at that time, including the ABL Lenders, the ABL Administrative Agent, the ABL Credit Agreement Collateral Agent and the other agents under the ABL Credit Agreement.

-3-

"**ABL Collateral**" means (i) the "Collateral" (as defined in the ABL Credit Agreement) and (ii) any other assets and property of any Obligor, whether real, personal or mixed, with respect to which a Lien is granted or purported to be granted as security for any ABL Obligations or that is otherwise subject to a Lien securing any ABL Obligations.

"**ABL Collateral Documents**" means the "Collateral Documents" as defined in the ABL Credit Agreement and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing any ABL Obligations or under which rights or remedies with respect to such Liens are governed.

"**ABL Credit Agreement**" has the meaning set forth in the Recitals to this Agreement.

"**ABL Credit Agreement Collateral Agent**" has the meaning set forth in the Preamble to this Agreement.

"**ABL DIP Cap Amount**" means 115% of the sum of (a) the maximum principal amount of all Indebtedness consisting of ABL Obligations that are permitted to be incurred under the First Lien Credit Agreement as in effect on the date hereof and (b) any accrued and unpaid interest (including interest accruing at the default rate specified in the applicable ABL Financing Document and any Post-Petition Interest) and premiums (including tender premiums and prepayment premiums) payable on account of any ABL Obligations and any underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities paid or payable by any Obligor in connection with incurrence or issuance of any ABL Obligation or any Refinancing of any ABL Obligation in accordance with the terms of this Agreement.

"**ABL DIP Financing**" has the meaning set forth in Section 6.1(b).

"**ABL Documents**" means (i) the ABL Financing Documents, (ii) the ABL Hedge Agreements governing ABL Secured Hedging Obligations and (iii) the ABL Banking Services Agreements, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**ABL Financing Documents**" means the ABL Credit Agreement, the ABL Collateral Documents, the other "Loan Documents" as defined in the ABL Credit Agreement and each of the other agreements, documents and instruments providing for or evidencing any other ABL Obligation (other than any ABL Other Obligation), and any other document or instrument executed or delivered at any time in connection with any ABL Obligations (other than any ABL Other Obligations), including any intercreditor or joinder agreement among any ABL Claimholders, to the extent such are effective at the relevant time, as each may be Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**ABL Hedge Agreement**" means any agreement with respect to any Derivative Transaction between any ABL Obligor or any "subsidiary" as defined in the ABL Credit Agreement (or any similar term in any other ABL Document) and any ABL Claimholder.

"**ABL Hedging Obligations**" means, with respect to any ABL Obligor or any "subsidiary" as defined in the ABL Credit Agreement (or any similar term in any other ABL Document), the obligations of such Person under any ABL Hedge Agreement.

"**ABL Issuing Bank**" means each issuing bank in respect of an ABL Letter of Credit.

-4-

"**ABL Lenders**" means the "Lenders" (or any similar term) as defined in the ABL Credit Agreement and also shall include all ABL Issuing Banks.

"**ABL Letters of Credit**" means any letters of credit issued (or deemed issued) from time to time under any ABL Financing Document.

"**ABL Liens**" means the Liens on the Collateral in favor of the ABL Claimholders under ABL Collateral Documents.

"**ABL Obligations**" means all "Secured Obligations" (or any similar term) as defined in the ABL Credit Agreement and all "Secured Obligations" (or any similar term) in any other ABL Financing Document. To the extent any payment with respect to any ABL Obligation (whether by or on behalf of any ABL Obligor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Term Loan Claimholder, receiver or other Person, then the obligation or part thereof originally intended to be satisfied shall, for all purposes of this Agreement and the rights and obligations of the ABL Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred. In the event that any interest, fees, expenses or other amounts (including any interest accruing at the default rate or any Post-Petition Interest) to be paid by a ABL Obligor pursuant to the ABL Financing Documents, the ABL Hedge Agreements governing ABL Secured Hedging Obligations or the ABL Banking Services Agreements are disallowed by order of any court of competent jurisdiction, including by order of a court presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and other amounts (including default interest and Post-Petition Interest) shall, as between the Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "ABL Obligations."

"**ABL Obligors**" means, collectively, the "Loan Parties" (or any similar term) as defined in the ABL Credit Agreement and the "Loan Parties" (or any similar term) as defined in any other ABL Document.

"**ABL Other Obligations**" means the ABL Banking Services Obligations and the ABL Secured Hedging Obligations.

"**ABL Priority Collateral**" means all interests of each Obligor in the following Collateral, in each case whether now owned or existing or hereafter acquired or arising and wherever located, including (a) all rights of each Obligor to receive moneys due and to become due under or pursuant to the following, (b) all rights of each Obligor to receive return of any premiums for or Proceeds of any insurance, indemnity, warranty or guaranty with respect to the following or to receive condemnation Proceeds with respect to the following, (c) all claims of each Obligor for damages arising out of or for breach of or default under any of the following, and (d) all rights of each Obligor to terminate, amend, supplement, modify or waive performance under any of the following, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder:

(i)     all Accounts, but for purposes of this clause (i) excluding rights to payment for any property which specifically constitutes Term Loan Priority Collateral which has been or is to be sold, leased, licensed, assigned or otherwise disposed of; provided, however, that, for the avoidance of doubt, all rights to payment arising from any sale or lease of Inventory, Goods or merchandise (other than Fixtures or Equipment) or the provision of services shall constitute ABL Priority Collateral;

(ii)     all Chattel Paper;

      (iii)    all Deposit Accounts, Securities Accounts and all other demand, deposit, time, savings, cash management, passbook and similar accounts maintained with any bank or other financial institution and all cash, money, securities, Instruments and other investments deposited or required to be deposited in any of the foregoing (in each case, other than a Term Proceeds Account, all monies, securities, Instruments and other investments held in a Term Proceeds Account or credited to a Term Proceeds Account which constitute Term Loan Priority Collateral, all identifiable Proceeds of any Term Loan Priority Collateral and any accounts containing cash constituting Tax and Trust Funds);

      (iv)    all Inventory, including any Inventory incorporating any Intellectual Property, and all rights to receive payments, indebtedness and other obligations which arise as a result of the sale or lease of Inventory, Goods or merchandise (in each case other than Fixtures or Equipment) or provision of services, including the right to payment of interest or finance charges;

      (v)    all cash, Money and Cash Equivalents (other than (i) identifiable Proceeds of the Term Loan Priority Collateral, (ii) cash collateral subject to a Permitted Lien (other than the Lien in favor of any ABL Claimholder or Term Loan Claimholder) or (iii) identifiable Tax and Trust Funds);

      (vi)    [reserved];

      (vii)    to the extent evidencing or governing any of the items referred to in the preceding clauses (i) through (vi), all General Intangibles (excluding capital stock and any Intellectual Property to the extent such Intellectual Property is not attached to or necessary to sell any item of Inventory), letters of credit (whether or not the respective letter of credit is evidenced by a writing), Letter-of-Credit Rights, Instruments and Documents; provided that to the extent any of the foregoing also relates to Term Loan Priority Collateral, only that portion related to the items referred to in the preceding clauses (i) through (vi) as being included in the ABL Priority Collateral shall be included in the ABL Priority Collateral;

      (viii)    to the extent relating to any of the items referred to in the preceding clauses (i) through (vii), all insurance; provided that to the extent any of the foregoing also relates to Term Loan Priority Collateral only that portion related to the items referred to in the preceding clauses (i) through (vii) as being included in the ABL Priority Collateral shall be included in the ABL Priority Collateral;

      (ix)    to the extent relating to any of the items referred to in the preceding clauses (i) through (viii), all Supporting Obligations; provided that to the extent any of the foregoing also relates to Term Loan Priority Collateral only that portion related to the items referred to in the preceding clauses (i) through (viii) as being included in the ABL Priority Collateral shall be included in the ABL Priority Collateral;

      (x)    to the extent relating to any of the items referred to in the preceding clauses (i) through (ix), all Commercial Tort Claims; provided that to the extent any of the foregoing also relates to Term Loan Priority Collateral only that portion related to the items referred to in the preceding clauses (i) through (viii) as being included in the ABL Priority Collateral shall be included in the ABL Priority Collateral;

      (xi)    all books and records, including all books, databases, customer lists and records related thereto; and

(xii)    all cash Proceeds and, solely to the extent not constituting Term Loan Priority Collateral, non-cash Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (including all insurance proceeds) and all collateral security, guarantees and other collateral support given by any Person with respect to any of the foregoing.

"**ABL Secured Hedging Obligations**" means all ABL Hedging Obligations of the ABL Obligors, whether absolute, or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions or modifications thereof and substitutions therefor), in each case, that constitute ABL Obligations.

"**Additional First Lien Obligations**" means obligations with respect to Indebtedness of the Borrowers or any other Obligor (other than, for the avoidance of doubt, First Lien Credit Agreement Obligations) issued or guaranteed following the date of this Agreement and documented in an agreement other than any agreement governing any then existing First Lien Obligations; provided that (a) such Indebtedness is permitted by the terms of each of the ABL Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement and each then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement to be secured by Liens on the Collateral ranking *pari passu* with the Liens securing the First Lien Obligations, (b) the Obligors have granted or purport to have granted Liens on the Collateral to secure the obligations in respect of such Indebtedness on a *pari passu* basis with the other First Lien Obligations, (c) the applicable Additional First Lien Obligations Agent, for itself and on behalf of the holders of such Indebtedness and obligations in respect of such Indebtedness, has entered into a Joinder Agreement pursuant to Section 8.21(b) acknowledging that such Indebtedness, obligations and Liens shall be subject to, and such Additional First Lien Obligations Agent and such holders shall be bound by, and shall have the rights and obligations provided under, the terms of this Agreement applicable to the First Lien Collateral Agent and the other First Lien Claimholders, respectively and (d) an amendment to or other modification of this Agreement shall have been entered into pursuant to Section 8.3 to the extent contemplated and requested pursuant to Section 8.21(c).

"**Additional First Lien Obligations Agent**" means any Person appointed to act as trustee, agent or similar representative for the holders of Additional First Lien Obligations pursuant to any Additional First Lien Obligations Agreement (including, in the case of any bilateral arrangement, the actual holder of the relevant Additional First Lien Obligations unless such holder has otherwise appointed a trustee, agent or similar representative acting on its behalf) and has been designated as such in the applicable Joinder Agreement, and any successor thereto.

"**Additional First Lien Obligations Agreements**" means (i) the indenture, credit agreement, guarantee or other agreement evidencing or governing any Additional First Lien Obligations that are designated as Additional First Lien Obligations pursuant to Section 8.21 and (ii) any other "Loan Documents," or "Financing Documents" (or similar term as may be defined in the foregoing or referred to in the foregoing), in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Additional First Lien Obligations Claimholders**" means, at any relevant time, the lenders, creditors and secured parties under any Additional First Lien Obligations Agreements, any Additional First Lien Obligations Agent and the other agents under such Additional First Lien Obligations Agreements, in each case, in their capacities as such.

"**Additional Lien Obligations**" means, collectively, the Additional First Lien Obligations and the Additional Second Lien Obligations.

"**Additional Lien Obligations Agent**" means the Additional First Lien Obligations Agent and/or the Additional Second Lien Obligations Agent, as applicable.

"**Additional Lien Obligations Agreements**" means, collectively, the Additional First Lien Obligations Agreements and the Additional Second Lien Obligations Agreements.

"**Additional Lien Obligations Claimholders**" means, collectively, the Additional First Lien Obligations Claimholders and the Additional Second Lien Obligations Claimholders.

"**Additional Second Lien Obligations**" means obligations with respect to Indebtedness of the Borrowers or any other Obligor (other than, for the avoidance of doubt, Second Lien Credit Agreement Obligations) issued or guaranteed following the date of this Agreement and documented in an agreement other than any agreement governing any then existing Second Lien Obligations, provided that (a) such Indebtedness is permitted by the terms of each of the ABL Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement and any then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement to be secured by Liens on the Collateral ranking *pari passu* with the Liens securing the Second Lien Obligations, (b) the Obligors have granted or purport to have granted Liens on the Collateral to secure the obligations in respect of such Indebtedness on a *pari passu* basis with the other Second Lien Obligations, (c) the applicable Additional Second Lien Obligations Agent, for itself and on behalf of the holders of such Indebtedness and obligations in respect of such Indebtedness, has entered into a Joinder Agreement pursuant to Section 8.21(b) acknowledging that such Indebtedness, obligations and Liens shall be subject to, and such Additional Second Lien Obligations Agent and such holders shall be bound by, and shall have rights and obligations provided under, the terms of this Agreement applicable to the Second Lien Collateral Agent and the other Second Lien Claimholders, respectively and (d) an amendment to or other modification of this Agreement shall have been entered into pursuant to Section 8.3 to the extent contemplated and requested pursuant to Section 8.21(c).

"**Additional Second Lien Obligations Agent**" means any Person appointed to act as trustee, agent or similar representative for the holders of Additional Second Lien Obligations pursuant to any Additional Second Lien Obligations Agreement (including, in the case of any bilateral arrangement, the actual holder of the relevant Additional Second Lien Obligations unless such holder has otherwise appointed a trustee, agent or similar representative acting on its behalf) and has been designated as such in the applicable Joinder Agreement, and any successor thereto.

"**Additional Second Lien Obligations Agreements**" means (i) the indenture, credit agreement, guarantee or other agreement evidencing or governing any Additional Second Lien Obligations that are designated as Additional Second Lien Obligations pursuant to Section 8.21 and (ii) any other "Loan Documents" or "Financing Documents" (or similar term as may be defined in the foregoing or referred to in the foregoing), in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Additional Second Lien Obligations Claimholders**" means, at any relevant time, the lenders, creditors and secured parties under any Additional Second Lien Obligations Agreements, any Additional Second Lien Obligations Agent and the other agents under such Additional Second Lien Obligations Agreements, in each case, in their capacities as such.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with, that Person.

"**Agreement**" has the meaning set forth in the Preamble to this Agreement.

-8-

"**Banking Services**" means the ABL Banking Services, the First Lien Banking Services and the Second Lien Banking Services.

"**Banking Services Obligations**" means the ABL Banking Services Obligations, the First Lien Banking Services Obligations and the Second Lien Banking Services Obligations.

"**Bankruptcy Code**" means Title 11 of the United States Code (11. U.S.C. § 101 et seq.).

"**Borrowers**" has the meaning set forth in the Preamble to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or is required to be accounted for as a capital lease on the balance sheet of that Person.

"**Cash Collateral**" has the meaning set forth in Section 6.1(a).

"**Claimholders**" means each of the ABL Claimholders, the First Lien Claimholders and the Second Lien Claimholders.

"**Collateral**" means all of the assets and property of any Obligor, whether real, personal or mixed, that constitute or are required to constitute (including pursuant to this Agreement) both ABL Collateral and Term Loan Collateral, including any property subject to Liens granted pursuant to Section 6 to secure both ABL Obligations and Term Loan Obligations.

"**Collateral Agent**" means the ABL Credit Agreement Collateral Agent, any First Lien Collateral Agent and/or any Second Lien Collateral Agent, as applicable.

"**Collateral Documents**" means the ABL Collateral Documents and the Term Loan Collateral Documents.

"**Comparable Junior Collateral Document**" means, in relation to any Collateral subject to any Senior Lien created or purported to be created under any Senior Collateral Document, the Junior Collateral Document that creates or purports to create a Junior Lien on the same Collateral, granted by the same Obligor.

"**Contract Rights**" means all rights of any Obligor under each Contract, including (i) any and all rights to receive and demand payments under any or all Contracts, (ii) any and all rights to receive and compel performance under any or all Contracts and (iii) any and all other rights, interests and claims now existing or in the future arising in connection with any or all Contracts.

"**Contracts**" means all contracts between any Obligor and one or more additional parties (including any Hedge Agreements or contracts for Banking Services, licensing agreements and any partnership agreements, joint venture agreements and limited liability company agreements).

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Copyright**" means any and all copyrights throughout the world, including the following:  (a) all rights and interests in copyrights, works protectable by copyright whether published or unpublished, copyright registrations, copyright applications and other rights in works of authorship (including all copyrights embodied in software); (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including damages or payments for past or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing.

"**Debtor Relief Laws**" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or any state or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Derivative Transaction**" means (a) any interest-rate transaction, including any interest-rate swap, basis swap, forward rate agreement, interest rate option (including a cap, collar or floor), and any other instrument linked to interest rates that gives rise to similar credit risks (including when-issued securities and forward deposits accepted), (b) any exchange-rate transaction, including any cross-currency interest-rate swap, any forward foreign-exchange contract, any currency option, and any other instrument linked to exchange rates that gives rise to similar credit risks, (c) any equity derivative transaction, including any equity-linked swap, any equity-linked option, any forward equity-linked contract, and any other instrument linked to equities that gives rise to similar credit risk and (d) any commodity (including precious metal) derivative transaction, including any commodity-linked swap, any commodity-linked option, any forward commodity-linked contract, and any other instrument linked to commodities that gives rise to similar credit risks; <u>provided</u> that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees, members of management, managers or consultants of Holdings or its subsidiaries shall constitute a Derivative Transaction.

"**DIP Financing**" means an ABL DIP Financing or a Team Loan DIP Financing.

"**Directing First Lien Collateral Agent**" means, at any time of determination (a) if there is only one Series of First Lien Obligations with respect to which the Discharge of such First Lien Obligations has not occurred, the First Lien Collateral Agent for such Series and (b) if clause (a) does not apply, the First Lien Collateral Agent designated as the "Controlling Collateral Agent" (or any similar term) pursuant to the applicable intercreditor arrangements among the Series of First Lien Obligations at such time.  For purposes of this definition, no Discharge of any Series of First Lien Obligations shall be deemed to have occurred if the Borrowers or any other First Lien Obligor enters into any Refinancing of the First Lien Obligations of such Series with the proceeds of new First Lien Obligations.

"**Directing Junior Collateral Agent**" means (a) with respect to ABL Priority Collateral, the Directing Term Loan Collateral Agent and (b) with respect to the Term  Loan Priority Collateral, the ABL Credit Agreement Collateral Agent.

"**Directing Second Lien Collateral Agent**" means, at any time of determination (a) if there is only one Series of Second Lien Obligations with respect to which the Discharge of such Second Lien Obligations has not occurred, the Second Lien Collateral Agent for such Series and (b) if clause (a) does not apply, the Second Lien Collateral Agent designated as the "Controlling Collateral Agent" (or any similar term) pursuant to the applicable intercreditor arrangements among the Series of Second Lien Obligations at such time.  For purposes of this definition, no Discharge of any Series of Second Lien Obligations shall be deemed to have occurred if the Borrowers or any other Second Lien Obligor enters

-10-

into any Refinancing of the Second Lien Obligations of such Series with the proceeds of a new Second Lien Obligations.

"**Directing Senior Collateral Agent**" means (a) with respect to ABL Priority Collateral, the ABL Credit Agreement Collateral Agent and (b) with respect to the Term Loan Priority Collateral, the Directing Term Loan Collateral Agent.

"**Directing Term Loan Collateral Agent**" means (a) until the Discharge of First Lien Obligations, the Directing First Lien Collateral Agent and (b) thereafter, the Directing Second Lien Collateral Agent.

"**Discharge**" means, with respect to any Series, notwithstanding any discharge of such Series under any Debtor Relief Laws or in connection with any Insolvency or Liquidation Proceeding, except to the extent otherwise expressly provided in Section 5.6:

(a)     payment in full in cash of the principal of and interest (including Post-Petition Interest), and premium, if any, on all Indebtedness outstanding under the Financing Documents and constituting Obligations of such Series (other than any Other Obligations);

(b)     termination or expiration of all commitments, if any, to extend credit that would constitute Obligations of such Series;

(c)     termination or cash collateralization or backstopping (in an amount and manner reasonably satisfactory to the applicable issuing bank, but in no event greater than 105%) of the aggregate undrawn face amount of any letter of credit obligations constituting Obligations of such Series.

(d)     payment in full in cash of all other Obligations of such Series (or, in the case of any Other Obligations of such Series, the cash collateralization or backstopping of such Other Obligations on terms reasonably satisfactory to the applicable lender or counterparty, as applicable) that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (including Post-Petition Interest, but other than any indemnification or expense reimbursement obligations or any other obligations that by the terms of any Financing Document expressly survive termination of such Financing Document, in each case, for which no claim or demand for payment, whether oral or written, has been made at such time); and

(e)     adequate provision has been made for any contingent or unliquidated Obligations of such Series related to claims, causes of action or liabilities that have been asserted against the Claimholders of such Series for which indemnification is required under the Financing Documents of such Series.

provided that the Discharge of any Series of First Lien Obligations, Second Lien Obligations or ABL Obligations shall not be deemed to have occurred if such payments are made with the proceeds of (i) in the case of First Lien Obligations, other First Lien Obligations, (ii) in the case of Second Lien Obligations, other Second Lien Obligations or (iii) in the case of ABL Obligations, other ABL Obligations, in each case, that constitute an exchange or replacement for or a Refinancing of such Series of Obligations. Upon the satisfaction of the conditions set forth in clauses (a) through (e) with respect to the Obligations of any Series, the Collateral Agent of such Series agrees to promptly deliver to each other Collateral Agent written notice of the same.

"**Discharge of ABL Obligations**" means the Discharge of the ABL Credit Agreement Obligations.

"**Discharge of First Lien Obligations**" means the Discharge of the First Lien Credit Agreement Obligations and the Discharge of each Series of Additional First Lien Obligations.

"**Discharge of Second Lien Obligations**" means the Discharge of the Second Lien Credit Agreement Obligations and the Discharge of each Series of Additional Second Lien Obligations.

"**Discharge of Senior Obligations**" means (a) with respect to the ABL Priority Collateral, the Discharge of ABL Obligations and (b) with respect to the Term Loan Priority Collateral, the Discharge of Term Loan Obligations.

"**Discharge of Term Loan Obligations**" means, collectively, both the Discharge of First Lien Obligations and the Discharge of Second Lien Obligations.

"**Disposition**" has the meaning set forth in <u>Section 5.1(b)</u>.  "**Dispose**" has a meaning correlative thereto.

"**Domain Names**" means all Internet domain names and associated URL addresses in or to which any Obligor now or hereafter has any right, title or interest.

"**Enforcement Action**" means:

(a) any action to foreclose, execute, levy or collect on, take possession or control of (other than for purposes of perfection), sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise Dispose of (whether publicly or privately), any Collateral or otherwise exercise or enforce remedial rights with respect to any of the Collateral under the ABL Documents, the First Lien Documents or the Second Lien Documents (including by way of setoff, recoupment, notification of a public or private sale or other Disposition pursuant to the UCC or other applicable law, notification to account debtors, notification to depositary banks under deposit account control agreements, or exercise of rights under landlord consents, if applicable);

(b) any action to solicit bids from third Persons, or approve bid procedures for, any proposed Disposition of any of the Collateral or conduct any Disposition of any Collateral;

(c) any action to receive a transfer of any portion of the Collateral in satisfaction of Indebtedness or any other Obligation secured thereby;

(d) any action to otherwise enforce a security interest or exercise another right or remedy, as a secured creditor or otherwise, pertaining to any Collateral, whether at law, in equity or pursuant to the ABL Documents, the First Lien Documents or the Second Lien Documents (including the commencement of applicable legal proceedings or other actions with respect to any Collateral to facilitate the actions described in the preceding clauses, and exercising voting rights in respect of equity interests comprising any Collateral); or

(e) the Disposition of any Collateral by any Obligor after the occurrence and during the continuation of an "event of default" under the ABL Documents, the First Lien Documents or the Second Lien Documents with the consent of the ABL Credit Agreement Collateral Agent, the

-12-

First Lien Collateral Agents or the Second Lien Collateral Agents, as applicable (in any case, to the extent that such consent is required).

"**Financing Documents**" means the ABL Financing Documents, the First Lien Financing Documents and the Second Lien Financing Documents.

"**First Lien Administrative Agent**" has the meaning set forth in the Recitals to this Agreement.

"**First Lien Banking Services**" means any of the following services provided to any First Lien Obligor or any of its "subsidiaries" as defined in the First Lien Credit Agreement (or any similar term in any other First Lien Document): commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash management and deposit accounts.

"**First Lien Banking Services Agreement**" means any documentation with a First Lien Claimholder governing any First Lien Banking Services Obligations.

"**First Lien Banking Services Obligations**" means any and all obligations of any First Lien Obligor or any of its "subsidiaries" as defined in the First Lien Credit Agreement (or any similar term in any other First Lien Document), whether absolute or contingent and however and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), in connection with First Lien Banking Services, in each case, that constitute First Lien Obligations; provided that in no event shall any obligations constitute First Lien Banking Services Obligations to the extent such obligations constitute ABL Banking Services Obligations or Second Lien Banking Services Obligations.

"**First Lien Claimholders**" means, at any relevant time, the holders of First Lien Obligations at that time, including the First Lien Lenders, the First Lien Administrative Agent, the First Lien Collateral Agent, the other agents under the First Lien Credit Agreement and any Additional First Lien Obligations Claimholders.

"**First Lien Collateral**" means (i) the "Collateral" as defined in the First Lien Credit Agreement and (ii) any other assets and property of any Obligor, whether real, personal or mixed, with respect to which a Lien is granted or purported to be granted as security for any First Lien Obligations or that is otherwise subject to a Lien securing any First Lien Obligations.

"**First Lien Collateral Agent**" means the First Lien Credit Agreement Collateral Agent and any Additional First Lien Obligations Agent.

"**First Lien Collateral Documents**" means the "Collateral Documents" as defined in the First Lien Credit Agreement and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing any First Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**First Lien Credit Agreement**" has the meaning set forth in the Recitals to this Agreement.

-13-

"**First Lien Credit Agreement Collateral Agent**" has the meaning set forth in the Preamble to this Agreement.

"**First Lien Credit Agreement Obligations**" means all "Secured Obligations" (or any similar term) as defined in the First Lien Credit Agreement.

"**First Lien Documents**" means (i) the First Lien Financing Documents, (ii) the First Lien Hedge Agreements governing First Lien Secured Hedging Obligations and (iii) the First Lien Banking Services Agreements, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**First Lien Financing Documents**" means the First Lien Credit Agreement, the First Lien Collateral Documents, the other "Loan Documents" as defined in the First Lien Credit Agreement, any Additional First Lien Obligations Agreement and each of the other agreements, documents and instruments providing for or evidencing any other First Lien Obligation (other than any First Lien Other Obligation), and any other document or instrument executed or delivered at any time in connection with any First Lien Obligations (other than any First Lien Other Obligations), including any intercreditor or joinder agreement among any First Lien Claimholders (including, without limitation, the First Lien/Second Lien Intercreditor Agreement), to the extent such are effective at the relevant time, as each may be Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**First Lien Hedge Agreement**" means any agreement with respect to any Derivative Transaction between any First Lien Obligor or any "subsidiary" as defined in the First Lien Credit Agreement (or any similar term in any other First Lien Document) and any First Lien Claimholder.

"**First Lien Hedging Obligations**" means, with respect to any First Lien Obligor or any "subsidiary" as defined in the First Lien Credit Agreement (or any similar term in any other First Lien Document), the obligations of such Person under any First Lien Hedge Agreement.

"**First Lien Issuing Bank**" means each issuing bank in respect of a First Lien Letter of Credit.

"**First Lien Lenders**" means the "Lenders" (or any similar term) as defined in the First Lien Credit Agreement and the "Lenders" (or any similar term) as defined in any Additional First Lien Obligations Agreement and also shall include all First Lien Issuing Banks.

"**First Lien Letters of Credit**" means any letters of credit issued (or deemed issued) from time to time under any First Lien Financing Document.

"**First Lien Obligations**" means the First Lien Credit Agreement Obligations and all "Secured Obligations" (or any similar term) as defined in any other First Lien Financing Document. To the extent any payment with respect to any First Lien Obligation (whether by or on behalf of any First Lien Obligor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any ABL Claimholder, Second Lien Claimholder, receiver or other Person, then the obligation or part thereof originally intended to be satisfied shall, for all purposes of this Agreement and the rights and obligations of the First Lien Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred. In the event that any interest, fees, expenses or other amounts (including any interest accruing at the default rate or any Post-Petition Interest) to be paid by a First Lien Obligor pursuant to the First Lien Financing Documents, the First Lien Hedge Agreements governing First Lien

-14-

Secured Hedging Obligations or the First Lien Banking Services Agreements are disallowed by order of any court of competent jurisdiction, including by order of a court presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and other amounts (including default interest and Post-Petition Interest) shall, as between the Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "First Lien Obligations."

"**First Lien Obligors**" means, collectively, the "Loan Parties" (or any similar term) as defined in the First Lien Credit Agreement and the "Loan Parties" (or any similar term) as defined in any other First Lien Document.

"**First Lien Other Obligations**" means the First Lien Banking Services Obligations and the First Lien Secured Hedging Obligations.

"**First Lien/Second Lien Intercreditor Agreement**" means the First Lien/Second Lien Intercreditor Agreement dated as of the date hereof, among, *inter alios*, the First Lien Credit Agreement Collateral Agent, the Second Lien Credit Agreement Collateral Agent and the Obligors from time to time party thereto.

"**First Lien Secured Hedging Obligations**" means all First Lien Hedging Obligations of the First Lien Obligors, whether absolute, or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions or modifications thereof and substitutions therefor), in each case, that constitute First Lien Obligations.

"**GAAP**" means generally accepted accounting principles in the United States in effect and applicable to the accounting period in respect of which reference to GAAP is being made.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state or locality of the United States, the United States, or a foreign government.

"**GS**" has the meaning set forth in the Recitals to this Agreement.

"**Hedge Agreements**" means the ABL Hedge Agreements, the First Lien Hedge Agreements and the Second Lien Hedge Agreements.

"**Hedging Obligations**" means the ABL Hedging Obligations, the First Lien Hedging Obligations and the Second Lien Hedging Obligations.

"**Holdings**" has the meaning set forth in the Preamble to this Agreement.

"**Indebtedness**" means "Indebtedness" within the meaning of the ABL Credit Agreement, the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable. For the avoidance of doubt, "Indebtedness" shall not include Hedging Obligations or Banking Services Obligations.

"**Insolvency or Liquidation Proceeding**" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other Debtor Relief Laws with respect to any Obligor, (b) the appointment of or taking possession by a receiver, interim receiver, receiver and manager, (preliminary) insolvency receiver, liquidator, sequestrator, trustee or other custodian for all or a

-15-

substantial part of the property of any Obligor, (c) except as would not result in an "event of default" under any Financing Document, any liquidation, administration (or appointment of an administrator), dissolution, reorganization or winding up of any Obligor, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or (d) any general assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Obligor.

"**Intellectual Property**" means any and all Licenses, Patents, Copyrights, Trademarks and Trade Secrets constituting Collateral.

"**Joinder Agreement**" means a supplement to this Agreement in the form of (i) in the case of any joining additional Obligor, <u>Exhibit A</u> hereto and (ii) in the case of any joining Additional Lien Obligations Agent, <u>Exhibit B</u> hereto.

"**Junior ABL Agent**" has the meaning set forth in Section 8.3.

"**Junior ABL Obligations**" has the meaning set forth in Section 8.3.

"**Junior Claimholders**" means (a) with respect to the ABL Priority Collateral, the Term Loan Claimholders and (b) with respect to the Term Loan Priority Collateral, the ABL Claimholders.

"**Junior Collateral Agent**" means (a) with respect to the ABL Priority Collateral, the Term Loan Collateral Agents and (b) with respect to the Term Loan Priority Collateral, the ABL Credit Agreement Collateral Agent.

"**Junior Collateral Documents**" means (a) with respect to the ABL Priority Collateral, the Term Loan Collateral Documents and (b) with respect to the Term Loan Priority Collateral, the ABL Collateral Documents.

"**Junior Financing Documents**" means (a) with respect to the ABL Priority Collateral, the Term Loan Financing Documents and (b) with respect to the Term Loan Priority Collateral, the ABL Financing Documents.

"**Junior Liens**" means (a) with respect to the ABL Priority Collateral, the Term Loan Liens and (b) with respect to the Term Loan Priority Collateral, the ABL Liens.

"**Junior Obligations**" means (a) with respect to the ABL Priority Collateral, the Term Loan Obligations and (b) with respect to the Term Loan Priority Collateral, the ABL Obligations.

"**Licenses**" means, with respect to any Obligor, all of such Obligor's right, title, and interest in and to (a) any and all licensing agreements or similar arrangements, whether as licensor or licensee, in (1) Patents, (2) Copyrights, (3) Trademarks, (4) Trade Secrets, (5) Software or (6) Domain Names, (b) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future breaches thereof and (c) all rights to sue for past, present, and future breaches thereof.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case in the nature of security; <u>provided</u> that in no event shall an operating lease in and of itself be deemed a Lien.

-16-

"**Loan Guaranty**" has the meaning assigned to "Loan Guaranty" in the ABL Credit Agreement.

"**New Senior Agent**" has the meaning set forth in <u>Section 5.6</u>.

"**Obligations**" means the ABL Obligations, the First Lien Obligations and/or the Second Lien Obligations, as the context may require.

"**Obligors**" means each ABL Obligor, each First Lien Obligor and each Second Lien Obligor and each other Person that has executed and delivered, or may from time to time hereafter execute and deliver, an ABL Collateral Document, a First Lien Collateral Document or a Second Lien Collateral Document as a "grantor" or "pledgor" (or the equivalent thereof).

"**Other Obligations**" means any ABL Other Obligations, First Lien Other Obligations or Second Lien Other Obligations.

"**Patent**" means the following: (a) any and all patents and patent applications throughout the world; (b) all inventions described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions and continuations in part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including damages and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or any other entity.

"**Pledged Assets**" means all Pledged Stock, including all stock certificates, options or rights of any nature whatsoever in respect of the Pledged Stock that may be issued or granted to, or held by, any Obligor, all Instruments, Securities and other Investment Property owned by any Obligor, whether or not physically delivered to the applicable Collateral Agent pursuant to any of the Collateral Documents, whether now owned or hereafter acquired by such Obligor and any and all Proceeds thereof, but, in each case, excluding any items specifically excluded from the definition of Collateral.

"**Pledged Collateral**" has the meaning set forth in <u>Section 5.5(a)</u>.

"**Pledged Stock**" shall mean, with respect to any Obligor, the shares of capital stock required to be pledged by such Obligor pursuant to any of Collateral Documents.

"**Post-Petition Interest**" means interest (including interest accruing at the default rate specified in the applicable ABL Documents, the applicable First Lien Documents or the applicable Second Lien Documents, as the case may be), fees, expenses and other amounts that pursuant to the ABL Documents, the First Lien Documents or the Second Lien Documents, as the case may be, continue to accrue or become due after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other amounts are allowed or allowable, voided or subordinated under any Debtor Relief Law or other applicable law or in any such Insolvency or Liquidation Proceeding.

"**Proceeds**" shall have the meaning assigned in Article 9 of the UCC and, in any event, shall also include, but not be limited to, (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to any Collateral Agent or any Obligor from time to time with respect to any of the Collateral, (ii) any and all payments (in any form whatsoever) made or due and payable to any Obligor

-17-

from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any Person acting under color of governmental authority) and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"**Recovery**" has the meaning set forth in <u>Section 6.5</u>.

"**Refinance**" means, in respect of any Indebtedness and any agreement governing any such Indebtedness, to refinance, extend, increase, renew, defease, amend, restate, amend and restate, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for or refinancing of, such Indebtedness in whole or in part, including by adding or replacing lenders, creditors, agents, obligors and/or guarantors, and including, in each case, but not limited to, after the original instrument giving rise to such Indebtedness has been terminated. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Related Claimholders**" means (a) with respect to the ABL Credit Agreement Collateral Agent, the ABL Claimholders, (b) with respect to any First Lien Collateral Agent, its Related First Lien Claimholders or (c) with respect to any Second Lien Collateral Agent, its Related Second Lien Claimholders.

"**Related First Lien Claimholders**" means, with respect to any First Lien Collateral Agent, the First Lien Claimholders for which such First Lien Collateral Agent acts as the "collateral agent" (or other agent or similar representative) under the applicable First Lien Documents.

"**Related Second Lien Claimholders**" means, with respect to any Second Lien Collateral Agent, the Second Lien Claimholders for which such Second Lien Collateral Agent acts as the "collateral agent" (or other agent or similar representative) under the applicable Second Lien Documents.

"**Required ABL Claimholders**" means (a) at all times prior to the occurrence of the Discharge of ABL Obligations (other than the ABL Other Obligations), the ABL Claimholders holding more than 50% of the sum of (i) the aggregate outstanding principal amount of ABL Obligations (including participations in the face amount of the ABL Letters of Credit and any disbursements thereunder that have not been reimbursed, but excluding the ABL Other Obligations) plus (ii) the aggregate unfunded commitments to extend credit which, when funded, would constitute ABL Obligations (other than the ABL Other Obligations), and (b) at all times following the occurrence of the Discharge of ABL Obligations (other than the ABL Other Obligations), the ABL Claimholders holding more than 50% of the sum of (i) the then outstanding ABL Secured Hedging Obligations plus (ii) the then outstanding ABL Banking Services Obligations; provided that, in the case of both clauses (a) and (b) above, in the event there are separate intercreditor arrangements between the holders of the ABL Obligations (or their agents), the Required ABL Claimholders will mean the "Required ABL Claimholders" (or any similar term) or "Controlling Secured Parties" (or any similar term) as defined in the documentation providing such separate intercreditor arrangements.

"**Required First Lien Claimholders**" means (a) at all times prior to the occurrence of the Discharge of First Lien Obligations (other than the First Lien Other Obligations), the First Lien Claimholders holding more than 50% of the sum of (i) the aggregate outstanding principal amount of First Lien Obligations (including participations in the face amount of the First Lien Letters of Credit and any disbursements thereunder that have not been reimbursed, but excluding the First Lien Other Obligations) plus (ii) the aggregate unfunded commitments to extend credit which, when funded, would constitute First Lien Obligations (other than the First Lien Other Obligations); and (b) at all times following the occurrence of the Discharge of First Lien Obligations (other than the First Lien Other

-18-

Obligations), the First Lien Claimholders holding more than 50% of the sum of (i) the then outstanding First Lien Secured Hedging Obligations <u>plus</u> (ii) the then outstanding First Lien Banking Services Obligations; <u>provided</u> that, in the case of both clauses (a) and (b) above, in the event there are separate intercreditor arrangements among the holders of the First Lien Obligations (or their agents), the Required First Lien Claimholders will mean the "Required First Lien Claimholders" (or any similar term) or "Controlling Secured Parties" (or any similar term) as defined in the documentation providing such such separate intercreditor arrangements.

"**Required Second Lien Claimholders**" means (a) at all times prior to the occurrence of the Discharge of Second Lien Obligations (other than the Second Lien Other Obligations), the Second Lien Claimholders holding more than 50% of the sum of (i) the aggregate outstanding principal amount of Second Lien Obligations <u>plus</u> (ii) the aggregate unfunded commitments to extend credit which, when funded, would constitute Second Lien Obligations (other than the Second Lien Other Obligations), and (b) at all times following the occurrence of the Discharge of Second Lien Obligations (other than the Second Lien Other Obligations), the Second Lien Claimholders holding more than 50% of the sum of (i) the then outstanding Second Lien Secured Hedging Obligations <u>plus</u> (ii) the then outstanding Second Lien Banking Services Obligations; <u>provided</u> that, in the case of both clauses (a) and (b) above, in the event there are separate intercreditor arrangements between the holders of the Second Lien Obligations (or their agents), the Required Second Lien Claimholders will mean the "Required Second Lien Claimholders" (or any similar term) or "Controlling Secured Parties" (or any similar term) as defined in the documentation providing such separate intercreditor arrangements.

"**Required Term Loan Claimholders**" means (a) until the Discharge of First Lien Obligations, the Required First Lien Claimholders and (b) thereafter, the Required Second Lien Claimholders.

"**Responsible Officer**" of any Person means the chief executive officer, the president, the chief financial officer, the treasurer, any assistant treasurer, any executive vice president, any senior vice president, any vice president or the chief operating officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"**Second Lien Administrative Agent**" has the meaning set forth in the Recitals to this Agreement.

"**Second Lien Banking Services**" means any of the following services provided to any Second Lien Obligor or any of its "subsidiaries" as defined in the Second Lien Credit Agreement (or any similar term in any other Second Lien Financing Document) commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash management and deposit accounts.

"**Second Lien Banking Services Agreement**" means any documentation with a Second Lien Claimholder governing any Second Lien Banking Services Obligations.

"**Second Lien Banking Services Obligations**" means any and all obligations of the Second Lien Obligors, whether absolute or contingent and however and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), in connection with Second Lien Banking Services, in each case, that constitute Second Lien

-19-

Obligations; provided that in no event shall any obligations constitute Second Lien Banking Services Obligations to the extent such obligations constitute ABL Banking Services Obligations or First Lien Banking Services Obligations.

"**Second Lien Claimholders**" means, at any relevant time, the holders of Second Lien Obligations at that time, including the Second Lien Lenders, the Second Lien Administrative Agent, the Second Lien Collateral Agent, the other agents under the Second Lien Credit Agreement and any Additional Second Lien Obligations Claimholders.

"**Second Lien Collateral**" means (i) the "Collateral" as defined in the Second Lien Credit Agreement and (ii) any other assets and property of any Obligor, whether real, personal or mixed, with respect to which a Lien is granted or purported to be granted as security for any Second Lien Obligations or that is otherwise subject to a Lien securing any Second Lien Obligations.

"**Second Lien Collateral Agent**" means the Second Lien Credit Agreement Collateral Agent and any Additional Second Lien Obligations Agent.

"**Second Lien Collateral Documents**" means the "Collateral Documents" as defined in the Second Lien Credit Agreement and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing any Second Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**Second Lien Credit Agreement**" has the meaning set forth in the Recitals to this Agreement.

"**Second Lien Credit Agreement Collateral Agent**" has the meaning set forth in the Preamble to this Agreement.

"**Second Lien Credit Agreement Obligations**" means all "Secured Obligations" (or any similar term) as defined in the Second Lien Credit Agreement.

"**Second Lien Documents**" means (i) the Second Lien Financing Documents, (ii) the Second Lien Hedge Agreements governing Second Lien Secured Hedging Obligations and (iii) the Second Lien Banking Services Agreements, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Second Lien Financing Documents**" means the Second Lien Credit Agreement, the Second Lien Collateral Documents, the other "Loan Documents" as defined in the Second Lien Credit Agreement, any Additional Second Lien Obligations Agreement, and each of the other agreements, documents and instruments providing for or evidencing any other Second Lien Obligation (other than any Second Lien Other Obligation), and any other document or instrument executed or delivered at any time in connection with any Second Lien Obligations (other than any Second Lien Other Obligations), including any intercreditor or joinder agreement among any Second Lien Claimholders, to the extent such are effective at the relevant time, as each may be Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Second Lien Hedge Agreement**" means any agreement with respect to any Derivative Transaction between any Second Lien Obligor or any "subsidiary" as defined in the Second Lien Credit Agreement (or any similar term in any other Second Lien Document) and any Second Lien Claimholder.

-20-

"**Second Lien Hedging Obligations**" means, with respect to any Second Lien Obligor or any "Subsidiary" as defined in the Second Lien Credit Agreement (or any similar term in any other Second Lien Document), the obligations of such Person under any Second Lien Hedge Agreement.

"**Second Lien Lenders**" means the "Lenders" (or any similar term) under and as defined in the Second Lien Credit Agreement or any similar term in any Additional Second Lien Obligations Agreement.

"**Second Lien Obligations**" means the Second Lien Credit Agreement Obligations and all "Secured Obligations" (or any similar term) as defined in any other Second Lien Financing Document. To the extent any payment by a Second Lien Obligor with respect to any Second Lien Obligation (whether by or on behalf of any Second Lien Obligor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any ABL Claimholder, any receiver or other Person, then the obligation or part thereof originally intended to be satisfied shall, for all purposes of this Agreement and the rights and obligations of the Second Lien Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  In the event that any interest, fees, expenses or other amounts (including any interest accruing at the default rate or any Post-Petition Interest) to be paid pursuant to the Second Lien Financing Documents, the Second Lien Hedge Agreements governing Second Lien Secured Hedging Obligations or the Second Lien Banking Services Agreements are disallowed by order of any court of competent jurisdiction, including by order of a court presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and other amounts (including default interest and Post-Petition Interest) shall, as between the Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Second Lien Obligations."

"**Second Lien Obligors**" means, collectively, the "Loan Parties" (or any similar term) as defined in the Second Lien Credit Agreement and the "Loan Parties" (or any similar term) as defined in any other Second Lien Document.

"**Second Lien Other Obligations**" means the Second Lien Banking Services Obligations and the Second Lien Secured Hedging Obligations.

"**Second Lien Secured Hedging Obligations**" means all Second Lien Hedging Obligations of the Second Lien Obligors, whether absolute, or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions or modifications thereof and substitutions therefor), in each case, that constitute Second Lien Obligations.

"**Senior Claimholders**" means (a) with respect to the ABL Priority Collateral, the ABL Claimholders and (b) with respect to the Term Loan Priority Collateral, the Term Loan Claimholders.

"**Senior Collateral Agent**" means (a) with respect to the ABL Priority Collateral, the ABL Credit Agreement Collateral Agent and (b) with respect to the Term Loan Priority Collateral, the Term Loan Collateral Agents.

"**Senior Collateral Documents**" means (a) with respect to the ABL Priority Collateral, the ABL Collateral Documents and (b) with respect to the Term Loan Priority Collateral, the Term Loan Collateral Documents.

"**Senior Financing Documents**" means (a) with respect to the ABL Priority Collateral, the ABL Financing Documents and (b) with respect to the Term Loan Priority Collateral, the Term Loan Financing Documents.

US-DOCS\72672018.5

"**Senior Liens**" means (a) with respect to the ABL Priority Collateral, the ABL Liens and (b) with respect to the Term Loan Priority Collateral, the Term Loan Liens.

"**Senior Obligations**" means (a) with respect to the ABL Priority Collateral, the ABL Obligations and (b) with respect to the Term Loan Priority Collateral, the Term Loan Obligations.

"**Series**" means, with respect to any Obligations, all Obligations secured by the same Collateral Documents and represented by the same Collateral Agent acting in the same capacity.

"**Shared Collateral Documents**" means any Collateral Document that is each of an ABL Collateral Document, a First Lien Collateral Document and a Second Lien Collateral Document.

"**Standstill Period**" has the meaning set forth in Section 3.1(a)(1).

"**Software**" means computer programs, source code, object code and supporting documentation including "software" as such term is defined in Article 9 of the UCC, as well as computer programs that may be construed as included in the definition of Goods.

"**subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof; provided that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interests in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.  Unless otherwise specified, "subsidiary" shall mean any subsidiary of the Top Borrower.

"**Tax and Trust Funds**" means cash, cash equivalents or other assets that are comprised solely of (a) funds used for payroll and payroll taxes and other employee benefit payments to or for the benefit of any Obligor's employees, (b) taxes required to be collected, remitted or withheld (including federal and state withholding taxes (including the employer's share thereof)) and (c) any other funds which any Obligor holds in trust or as an escrow or fiduciary for the benefit of another Person which is not an Obligor in the ordinary course of business.

"**Term Cash Proceeds Notice**" shall mean a written notice delivered by the Directing Term Loan Collateral Agent to the ABL Credit Agreement Collateral Agent (a) stating that an "Event of Default" has occurred and is continuing under any Term Loan Document and specifying the relevant Event of Default and (b) identifying with reasonable detail any cash proceeds which may be deposited in any Deposit Account or Securities Account constituting Term Loan Priority Collateral.

"**Term Loan Claimholders**" means the First Lien Claimholders and the Second Lien Claimholders.

"**Term Loan Collateral**" means the First Lien Collateral and the Second Lien Collateral.

"**Term Loan Collateral Agent**" means the First Lien Collateral Agents and the Second Lien Collateral Agents.

"**Term Loan Collateral Documents**" means the First Lien Collateral Documents and the Second Lien Collateral Documents.

"**Term Loan DIP Financing**" has the meaning set forth in Section 6.01(a).

"**Term Loan DIP Cap Amount**" means 115% of the sum of (a) the sum of (w) $1,950,000,000, (x) the "Incremental Cap" (as defined in the First Lien Credit Agreement as of the date hereof) as of the applicable date of determination, (y) $450,000,000 and (z) the "Incremental Cap" (as defined in the Second Lien Credit Agreement as of the date hereof) and (b) any accrued and unpaid interest (including interest accruing at the default rate specified in the applicable Term Loan Financing Documents and any Post-Petition Interest) and premiums (including tender premiums and prepayment premiums) payable on account of any Term Loan Obligations and any underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities paid or payable by any Obligor in connection with incurrence or issuance of any Term Loan Obligation or any Refinancing of any Term Loan Obligation in accordance with the terms of this Agreement.

"**Term Loan Documents**" means the First Lien Documents and the Second Lien Documents.

"**Term Loan Financing Documents**" means the First Lien Financing Documents and Second Lien Financing Documents.

"**Term Loan Hedge Agreements**" means the First Lien Hedging Agreements and the Second Lien Hedging Agreements.

"**Term Loan Liens**" means the Liens on the Collateral in favor of the Term Loan Claimholders under Term Loan Collateral Documents.

"**Term Loan Obligations**" means the First Lien Obligations and the Second Lien Obligations.

"**Term Loan Other Obligations**" means First Lien Other Obligations and Second Lien Other Obligations.

"**Term Loan Priority Collateral**" shall mean all interests of each Obligor in the following Collateral, in each case whether now owned or existing or hereafter acquired or arising and wherever located, including (a) all rights of each Obligor to receive moneys due and to become due under or pursuant to the following, (b) all rights of each Obligor to receive return of any premiums for or Proceeds of any insurance, indemnity, warranty or guaranty with respect to the following or to receive condemnation Proceeds with respect to the following, (c) all claims of each Obligor for damages arising out of or for breach of or default under any of the following, and (d) all rights of each Obligor to terminate, amend, supplement, modify or waive performance under any of the following, to perform thereunder and to compel performance and otherwise exercise all remedies thereunder:

  (i)     all Term Proceeds Accounts, and all cash, money, securities, Instruments and other investments deposited therein or credited thereto;

  (ii)     all Equipment;

  (iii)     all Fixtures;

(iv)     all General Intangibles, including Contracts, together with all Contract Rights arising thereunder (in each case other than General Intangibles evidencing or governing ABL Priority Collateral);

(v)     all letters of credit (whether or not the respective letter of credit is evidenced by a writing), Letter-of-Credit Rights, Instruments and Documents (except, in each case, to the extent evidencing or governing or attached or related to (to the extent so attached or related) ABL Priority Collateral);

(vi)     all Intellectual Property (other than Intellectual Property contemplated by clauses (iv) and (vii) of the definition of ABL Priority Collateral);

(vii)     except to the extent constituting or relating to, ABL Priority Collateral, all Commercial Tort Claims;

(viii)     all Pledged Assets and other Investment Property (except Investment Property constituting ABL Priority Collateral pursuant to clause (iii) or (vii) of the definition thereof);

(ix)     all real property (including, if any, leasehold interests) on which the Obligors are required to provide a Lien to the Term Claimholders pursuant to any Term Loan Financing Document and any title insurance with respect to such real property (other than title insurance actually obtained by the ABL Credit Agreement Collateral Agent in respect of such real property) and the Proceeds thereof;

(x)     except to the extent constituting ABL Priority Collateral, all other personal property (whether tangible or intangible) of such Obligor;

(xi)     to the extent constituting or relating to, any of the items referred to in the preceding clauses (i) through (x), all insurance; provided that to the extent any of the foregoing also relates to ABL Priority Collateral only that portion related to the items referred to in the preceding clauses (i) through (x) as being included in the Term Loan Priority Collateral shall be included in the Term Loan Priority Collateral;

(xii)     to the extent relating to any of the items referred to in the preceding clauses (i) through (xi), all Supporting Obligations; provided that to the extent any of the foregoing also relates to ABL Priority Collateral only that portion related to the items referred to in the preceding clauses (i) through (xi) as being included in the Term Loan Priority Collateral shall be included in the Term Loan Priority Collateral;

(xiii)     all books and records, including all books, databases, customer lists and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing; provided that to the extent any of such material also relates to ABL Priority Collateral only that portion related to the items referred to in the preceding clauses (i) through (xii) as being included in the Term Loan Priority Collateral shall be included in the Term Loan Priority Collateral; and

(xiv)     all cash Proceeds and, solely to the extent not constituting ABL Priority Collateral, non-cash Proceeds, products, accessions to, substitutions or replacements for, rents and profits of or in respect of any of the foregoing and all collateral security, guarantees and other collateral support given by any Person with respect to any of the foregoing.

-24-

"**Term Proceeds Account**" means any Deposit Account holding solely the Proceeds of Term Loan Priority Collateral.

"**Top Borrower**" has the meaning set forth in the Preamble to this Agreement.

"**Trademark**" means any and all trademarks throughout the world, including the following: (a) all trademarks (including service marks), common law marks, trade names, trade dress, and logos, slogans and other indicia of origin under the Requirements of Law of any jurisdiction in the world, and the registrations and applications for registration thereof and the goodwill of the business symbolized by the foregoing; (b) all renewals of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including damages, claims, and payments for past and future infringements thereof; (d) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (e) all rights corresponding to any of the foregoing.

"**Trade Secrets**" means, with respect to any Obligor, all of such Obligor's right, title and interest in and to the following: (a) any and all confidential and proprietary information, including unpatented inventions, invention disclosures, engineering or other data, information, production procedures, know-how, financial data, customer lists, supplier lists, business and marketing plans, processes, schematics, algorithms, techniques, analyses, proposals, source code, data, databases and data collections; (b) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims and payments for past and future misappropriations or infringements thereof; (c) all rights to sue for past, present and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (d) all rights corresponding to any of the foregoing throughout the world

"**UBS**" has the meaning set forth in the Recitals to this Agreement.

"**UCC**" means the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

1.2    Terms Generally.  The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise:

(a)    any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time permitted to be Refinanced or replaced in accordance with the terms hereof, in each case to the extent so Refinanced or replaced;

(b)    any reference herein to any Person shall be construed to include such Person's permitted successors and assigns;

(c)    the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(d)    all references herein to Sections, clauses or paragraphs shall be construed to refer to Sections, clauses or paragraphs of this Agreement, unless otherwise specified;

-25-

(e)     any reference to any law or regulation shall (i) include all statutory and regulatory provisions consolidating, amending, replacing, interpreting or supplementing such law or regulation, and (ii) unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time; and

(f)     the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Notwithstanding anything to the contrary set forth in this Agreement, any reference herein to the ABL Financing Documents, the ABL Documents, the ABL Credit Agreement or any other ABL Document individually "as in effect on the date hereof," "as in effect on the date entered into" or words of similar meaning shall include a reference to any amendment or other modification of any such document that has been made in accordance with, or with respect to any matters that are not prohibited by, <u>Section 5.3(a)</u>; <u>provided</u> that any statement herein to the effect that a capitalized term shall have the meaning as defined in an ABL Document "as in effect on the date hereof," "as in effect on the date entered into" (or words of similar meaning) shall not include any changes to such term, if any, contained in any such amendment or modification.  Notwithstanding anything to the contrary set forth in this Agreement, any reference herein to the Term Loan Financing Documents, the Term Loan Documents or any of the Term Loan Credit Agreements or any other Term Loan Document individually "as in effect on the date hereof," "as in effect on the date entered into" or words of similar meaning shall include a reference to any amendment or other modification of any such document that has been made in accordance with, or with respect to any matters that are not prohibited by, <u>Section 5.3(a)</u>; <u>provided</u> that any statement herein to the effect that a capitalized term shall have the meaning as defined in a Term Loan Document "as in effect on the date hereof," "as in effect on the date entered into" (or words of similar meaning) shall not include any changes to such term, if any, contained in any such amendment or modification.

1.3     <u>DIP Cap Amounts</u>.  For avoidance of doubt, it is understood and agreed that any increase in the aggregate Indebtedness for borrowed money constituting principal outstanding under the ABL Documents and the Term Loan Documents (in each case, including in any Refinancing thereof) after the date of the original incurrence or issuance of such Indebtedness solely as a result of a fluctuation in the exchange rate of the currency in which such Indebtedness is denominated shall be ignored for purposes of determining compliance with the ABL DIP Cap Amount and the Term DIP Loan Cap Amount, and any such incremental Indebtedness attributable to any such currency fluctuation shall be deemed to be an Obligation or a Term Loan Obligation, as applicable, for all purposes hereof.

## SECTION 2.     <u>Lien Priorities</u>.

2.1     <u>Relative Priorities</u>.  Notwithstanding the date, time, method, manner or order of grant, attachment, recordation or perfection of any Liens on the Collateral securing the ABL Obligations or of any Liens on the Collateral securing the Term Loan Obligations, and notwithstanding any provision of the UCC or any other applicable law, or the ABL Documents or the Term Loan Documents, or any defect or deficiencies in, or failure to perfect or lapse in perfection of, or avoidance as a fraudulent conveyance or otherwise of, the Liens securing any of the Obligations or any other circumstance whatsoever, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Obligor, each Collateral Agent, on behalf of itself and its Related Claimholders, hereby agrees that:

(a)     any Lien on the ABL Priority Collateral securing any ABL Obligations now or hereafter held by or on behalf of the ABL Credit Agreement Collateral Agent, any other ABL Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute (including any judgment lien), operation of law, subrogation or otherwise,

-26-

shall be senior in all respects and prior to any Lien on the ABL Priority Collateral securing any of the Term Loan Obligations;

(b)        any Lien on the ABL Priority Collateral securing any Term Loan Obligations now or hereafter held by or on behalf of any Term Loan Collateral Agent, any other Term Loan Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute (including any judgment lien), operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the ABL Priority Collateral securing any of the ABL Obligations;

(c)        all Liens on the ABL Priority Collateral securing any ABL Obligations shall be and remain senior in all respects and prior to all Liens on the ABL Priority Collateral securing any Term Loan Obligations for all purposes, whether or not such Liens securing any ABL Obligations are subordinated to any Lien on the ABL Priority Collateral securing any other obligation of the Obligors or any other Person;

(d)        any Lien on the Term Loan Priority Collateral securing any Term Loan Obligations now or hereafter held by or on behalf of any Term Loan Collateral Agent, any other Term Loan Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute (including any judgment lien), operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Term Loan Priority Collateral securing any of the ABL Obligations;

(e)        any Lien on the Term Loan Priority Collateral securing any ABL Obligations now or hereafter held by or on behalf of the ABL Credit Agreement Collateral Agent, any other ABL Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute (including any judgment lien), operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Term Loan Priority Collateral securing any of the Term Loan Obligations; and

(f)        all Liens on the Term Loan Priority Collateral securing any Term Loan Obligations shall be and remain senior in all respects and prior to all Liens on the Term Loan Priority Collateral securing any ABL Obligations for all purposes, whether or not such Liens securing any Term Loan Obligations are subordinated to any Lien on the Term Loan Priority Collateral securing any other obligation of the Obligors or any other Person.

2.2        <u>Prohibition on Contesting Liens</u>.  The ABL Credit Agreement Collateral Agent, for itself and on behalf of its Related Claimholders, and each Term Loan Collateral Agent, for itself and on behalf of its Related Claimholders, agrees that it and its Related Claimholders will not (and each hereby waives any right to) directly or indirectly contest or challenge, or support any other Person in contesting or challenging, in any proceeding (including any Insolvency or Liquidation Proceeding), (i) the validity or enforceability of any ABL Document or any Term Loan Document, or any ABL Obligation or any Term Loan Obligation, (ii) the existence, validity, perfection, priority or enforceability of the Liens securing any ABL Obligations or any Term Loan Obligations or (iii) the relative rights and duties of the ABL Claimholders or the Term Loan Claimholders granted and/or established in this Agreement or any Collateral Document with respect to such Liens; <u>provided</u> that nothing in this Agreement shall be construed to prevent or impair the rights of any Senior Collateral Agent or any other Senior Claimholder to enforce this Agreement or to exercise any of its remedies or rights hereunder, including the provisions of this Agreement relating to the priority of the Liens on the Collateral in which a Senior Claimholder has a Senior Lien securing the Senior Obligations as provided in <u>Sections 2.1</u> and <u>3.1</u>.

2.3    <u>No New Liens</u>. Subject to Section 2.6 hereof, the parties hereto agree that, so long as neither the Discharge of ABL Obligations nor the Discharge of Term Loan Obligations has occurred, (a) none of the Obligors shall grant or permit any additional Liens on any asset or property of any Obligor to secure any ABL Obligation unless it has granted, or concurrently therewith grants, through documentation in form and substance satisfactory to the Directing Term Loan Collateral Agent, a Lien on such asset or property of such Obligor to secure the Term Loan Obligations; and (b) none of the Obligors shall grant or permit any additional Liens on any asset or property of any Obligor to secure any Term Loan Obligation unless it has granted, or concurrently therewith grants, through documentation in form and substance satisfactory to the ABL Credit Agreement Collateral Agent, a Lien on such asset or property of such Obligor to secure the ABL Obligations. Subject to <u>Section 2.6</u>, so long as neither the Discharge of ABL Obligations nor the Discharge of Term Loan Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the Obligors, the parties hereto agree that if any Claimholder shall acquire or hold any Lien on any assets of any Obligor securing any Obligation which assets are not also subject to the Lien of the other Claimholders under the other Collateral Documents, then, without limiting any other rights and remedies available to any Collateral Agent or the other Claimholders, the applicable Collateral Agent holding such Lien, on behalf of itself and its Related Claimholders, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens so granted shall be subject to <u>Section 4.2</u>.

2.4    <u>Similar Liens and Agreements</u>. In furtherance of <u>Sections 2.3</u> and <u>8.9</u>, the ABL Credit Agreement Collateral Agent, for itself and on behalf of its Related Claimholders, and each Term Loan Collateral Agent, for itself and on behalf of its Related Claimholders, agrees, subject to the other provisions of this Agreement:

   (a)    upon request by the ABL Credit Agreement Collateral Agent or the Directing Term Loan Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the ABL Collateral and the Term Loan Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the ABL Documents and the Term Loan Documents; and

   (b)    that the documents, agreements or instruments creating or evidencing the ABL Collateral and the Term Loan Collateral and guaranties for the ABL Obligations and the Term Loan Obligations, subject to <u>Section 5.3(c)</u>, shall be in all material respects the same forms of documents, agreements or instruments, other than with respect to the priority of the Liens thereunder, the identity of the secured parties that are parties thereto or secured thereby and other matters contemplated by this Agreement.

2.5    <u>Nature of Obligations</u>. The priorities of the Liens provided in Section 2.1 shall not be altered or otherwise affected by (a) any Refinancing of the Senior Obligations or the Junior Obligations or (b) any action or inaction which any of the Senior Claimholders or the Junior Claimholders may take or fail to take in respect of the Collateral. Each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, agrees and acknowledges that (i) a portion of the Senior Obligations may be revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, (ii) the terms of the Senior Documents and the Senior Obligations may be amended, supplemented or otherwise modified, and the Senior Obligations, or a portion thereof, may be Refinanced from time to time and (iii) the aggregate amount of the Senior Obligations may be increased, in each case, without notice to or consent by the Junior Collateral Agents or the Junior Claimholders and without affecting the provisions hereof, except as otherwise expressly set forth herein. As between the Borrowers and the other Obligors and the Junior Claimholders, the

-28-

foregoing provisions will not limit or otherwise affect the obligations of the Borrowers and the Obligors contained in any Junior Document with respect to the incurrence of additional Senior Obligations.

        2.6      <u>Certain Cash Collateral</u>. Notwithstanding anything in this Agreement or any other ABL Document or Term Loan Document to the contrary, collateral consisting of cash and cash equivalents pledged to secure (i) ABL Obligations under any ABL Financing Document consisting of reimbursement obligations in respect of ABL Letters of Credit issued thereunder, (ii) ABL Obligations in respect of ABL Hedge Agreements to the extent permitted by the ABL Documents and the Term Loan Documents, (iii) Term Loan Obligations under any Term Loan Financing Document consisting of reimbursement obligations in respect of letters of credit issued thereunder and (iv) Term Loan Obligations under Term Loan Hedge Agreements to the extent permitted by the ABL Documents and the Term Loan Documents, in each case shall be applied as specified in the relevant ABL Documents, the relevant Term Loan Document, the relevant ABL Hedge Agreement and/or the relevant Term Loan Hedge Agreement, as applicable, and will not constitute Collateral hereunder.

        2.7      <u>[Reserved]</u>.

        2.8      <u>Tracing of Proceeds</u>. The ABL Credit Agreement Collateral Agent, for itself and on behalf of the ABL Claimholders, and each Term Loan Collateral Agent for itself and on behalf of its Related Claimholders, agree that prior to an issuance of any notice of any Enforcement Action by such Collateral Agent or any of its Related Claimholders to each other Collateral Agent (unless a bankruptcy or insolvency "Event of Default" then exists under any Financing Document), any proceeds of Collateral, whether or not deposited in Deposit Accounts subject to control agreements, which are used by any Obligor to acquire other property which is Collateral shall not (solely as between the Collateral Agents and the Claimholders) be treated as Proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired. Notwithstanding anything to the contrary contained in this Agreement or any Term Loan Document, unless and until the earliest of (x) the Discharge of ABL Obligations, (y) the commencement of an Insolvency or Liquidation Proceeding with respect to any of the Obligors, or (z) a notice of an Enforcement Action is delivered by the Directing Term Loan Collateral Agent to the ABL Credit Agreement Collateral Agent, the ABL Credit Agreement Collateral Agent is hereby permitted to deem all collections and payments deposited in any Deposit Account or Securities Account (for the avoidance of doubt other than any Term Proceeds Account) to be Proceeds of ABL Priority Collateral and each Term Loan Collateral Agent, on behalf of itself and each other Term Loan Claimholder, consents to the application of such funds to the ABL Obligations, and no such funds credited to such account shall be subject to disgorgement or be deemed to be held in trust by the ABL Credit Agreement Collateral Agent for the benefit of any Term Loan Collateral Agent or any other Term Loan Claimholder; <u>provided</u> that with respect to any such funds that are identifiable proceeds of Term Loan Priority Collateral credited to any such account, with respect to which funds the ABL Credit Agreement Collateral Agent has received a Term Cash Proceeds Notice prior to the application of such funds by the ABL Credit Agreement Collateral Agent to the ABL Obligations, the ABL Credit Agreement Collateral Agent shall turn over any such misdirected proceeds of the Term Loan Priority Collateral to the Directing Term Loan Collateral Agent.

        **SECTION 3.**      **Enforcement**.

        3.1      <u>Exercise of Remedies</u>.

        (a)      Until the Discharge of Senior Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the Obligors, each of the Junior Collateral Agents, for itself and on behalf of its Related Claimholders, hereby agrees that it and its Related Claimholders:

(1)     will not exercise or seek to exercise any rights or remedies (including setoff) with respect to any Collateral in which a Junior Claimholder has a Junior Lien or institute or commence, or join with any Person in instituting or commencing, any other Enforcement Action or any other action or proceeding with respect to such rights or remedies (including any action of foreclosure, enforcement, collection or execution and any Insolvency or Liquidation Proceeding); provided that the Directing Junior Collateral Agent may (as between the Term Loan Collateral Agents, subject to the First Lien/Second Lien Intercreditor Agreement) commence an Enforcement Action or otherwise exercise any or all such rights or remedies after the passage of a period of at least 210 days since the Directing Senior Collateral Agent shall have received notice from the Directing Junior Collateral Agent with respect to the acceleration by the Junior Claimholders of any Series of the maturity of all then outstanding Junior Obligations of such Series (and requesting that Enforcement Action be taken with respect to the Collateral in which a Junior Claimholder has a Junior Lien) so long as the applicable "event of default" shall not have been cured or waived (or the applicable acceleration rescinded) (the "**Standstill Period**"); provided, further that notwithstanding anything herein to the contrary, in no event shall the Junior Collateral Agents or any other Junior Claimholders exercise any rights or remedies with respect to any Collateral in which a Junior Claimholder has a Junior Lien or institute or commence, or join with any Person in instituting or commencing, any other Enforcement Action with respect to any Collateral or any other action or proceeding with respect to such rights or remedies, if, notwithstanding the expiration of the Standstill Period, either (A) the Directing Senior Collateral Agent or any other Senior Claimholder shall have commenced and be diligently pursuing (or shall have sought or requested and be diligently pursuing relief from or modification of the automatic stay or any other stay in any Insolvency or Liquidation Proceeding to enable the commencement and the pursuit of) an Enforcement Action or other exercise of their rights or remedies in each case with respect to all or any material portion of the Collateral (with any determination of which such Collateral to proceed against, and in what order, to be made by the Directing Senior Collateral Agent or such Senior Claimholders in their reasonable judgment) or (B) any of the Obligors is then a debtor in any Insolvency or Liquidation Proceeding.

(2)     will not contest, protest or object to any Enforcement Action brought by any Senior Collateral Agent or any other Senior Claimholder or any other exercise by any Senior Collateral Agent or any other Senior Claimholder of any rights and remedies relating to the Collateral in which a Senior Claimholder has a Senior Lien under the Senior Documents or otherwise;

(3)     subject to their rights under clause (a)(1) above, will not object to the forbearance by any Senior Collateral Agent or the other Senior Claimholders from bringing or pursuing any Enforcement Action or any other exercise of any rights or remedies relating to any Collateral in which a Senior Claimholder has a Senior Lien, in each case so long as any proceeds received by the Senior Collateral Agents or other Senior Claimholders with respect to such Collateral in excess of those necessary to achieve a Discharge of Senior Obligations are distributed in accordance with Section 4.1; and

(4)     will not take or receive any Collateral in which a Senior Claimholder has a Senior Lien, or any proceeds of or payment with respect to any such Collateral, in connection with any Enforcement Action or any other exercise of any right or remedy with respect to any such Collateral or any Insolvency or Liquidation Proceeding in its capacity as a creditor or in connection with any insurance policy award or any award in a condemnation or similar proceeding (or deed in lieu of condemnation) with respect to any such Collateral, in each case unless and until the Discharge of Senior Obligations has occurred, except, (x) as between the First Lien Credit Agreement Collateral Agent and the Second Lien Credit Agreement Collateral Agent,

-30-

as expressly permitted by the First Lien/Second Lien Intercreditor Agreement and (y) in connection with any foreclosure expressly permitted by Section 3.1(a)(1) to the extent such Junior Collateral Agent and its Related Claimholders are permitted to retain the proceeds thereof in accordance with Section 4.1.

Without limiting the generality of the foregoing, until the Discharge of Senior Obligations has occurred, except as expressly provided in Sections 3.1(a)(1), 3.1(c) and 6.3(b), the sole right of each Junior Collateral Agent and the other Junior Claimholders with respect to any Collateral in which a Junior Claimholder has a Junior Lien (other than inspection, monitoring, reporting and similar rights provided for in the Junior Financing Documents) is to hold a Lien on such Collateral pursuant to the Junior Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of Senior Obligations has occurred.

For the avoidance of doubt, nothing contained in this Agreement shall prohibit (i) the exercise of rights by the ABL Credit Agreement Collateral Agent or the ABL Administrative Agent during a Cash Dominion Period (as defined in the ABL Credit Agreement), including the notification of depository institutions or any other person to deliver proceeds of ABL Priority Collateral to the ABL Credit Agreement Collateral Agent or the ABL Administrative Agent, (ii) the reduction of advance rates or sub-limits by the ABL Administrative Agent, (iii) the imposition of any Reserve (as defined in the ABL Credit Agreement) by the ABL Administrative Agent, (iv) the cessation of lending pursuant to, and in accordance with, the provisions of the ABL Documents or (v) the consent by the ABL Credit Agreement Collateral Agent to any disposition by any Grantor of any of the ABL Priority Collateral or the Directing Term Loan Collateral Agent to any disposition by any Grantor of any of the Term Loan Priority Collateral.

(b)     Until the Discharge of Senior Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Obligor, subject to Sections 3.1(a)(1), 3.1(c) and 6.3(b), the Senior Collateral Agents and the other Senior Claimholders shall have the exclusive right to commence and maintain an Enforcement Action or otherwise exercise any rights and remedies with respect to the Collateral in which a Senior Claimholder has a Senior Lien (including set-off, recoupment and the right to "credit bid" their debt, except that the Junior Collateral Agents shall have the "credit bid" rights set forth in Section 3.1(c)(6)), and make determinations regarding the release, Disposition, or restrictions with respect to such Collateral, in each case without any consultation with or the consent of any Junior Collateral Agent or any other Junior Claimholder; provided that any proceeds received by any Senior Collateral Agent on account of such Collateral in excess of those necessary to achieve a Discharge of Senior Obligations are distributed in accordance with Section 4.1.  In commencing or maintaining any Enforcement Action or otherwise exercising rights and remedies with respect to any Collateral in which a Senior Claimholder has a Senior Lien, the Senior Collateral Agents and the other Senior Claimholders may enforce the provisions of the Senior Documents and exercise rights and remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion in compliance with any applicable law and without consultation with any Junior Collateral Agent or any other Junior Claimholder and regardless of whether any such exercise is adverse to the interest of any Junior Claimholder.  Such exercise and enforcement shall include the rights of an agent appointed by the Senior Claimholders to sell or otherwise Dispose of Collateral in which a Senior Claimholder has a Senior Lien upon foreclosure, to incur expenses in connection with such sale or other Disposition, and to exercise all the rights and remedies of a secured creditor under the UCC or other applicable law and of a secured creditor under Debtor Relief Laws of any applicable jurisdiction.

US-DOCS\72672018.5

(c)        Notwithstanding the foregoing, each Junior Collateral Agent and any other Junior Claimholder may:

(1)        file a claim, proof of claim or statement of interest with respect to the Junior Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against any of the Obligors;

(2)        take any action in order to create, perfect, preserve or protect (but not enforce) its Lien on the Collateral in which a Junior Claimholder has a Junior Lien to the extent (A) not adverse to the priority status of the Liens on such Collateral securing the Senior Obligations, or the rights of any Senior Collateral Agent or the other Senior Claimholders to exercise rights and remedies in respect thereof, and (B) not otherwise inconsistent with the terms of this Agreement, including the automatic release of Liens provided in Section 5.1;

(3)        file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Junior Claimholders, including any claims or Liens secured by the Collateral in which a Junior Claimholder has a Junior Lien, if any, in each case to the extent not inconsistent with the terms of this Agreement;

(4)        vote on any plan of reorganization, arrangement, compromise or liquidation, file any proof of claim, make other filings and make any arguments and motions with respect to the Junior Obligations and the Collateral in which a Junior Claimholder has a Junior Lien that are, in each case, in accordance with the terms of this Agreement; provided that (A) no filing of any claim or vote, or pleading relating to such claim or vote, to accept or reject a disclosure statement, plan of reorganization, arrangement, compromise or liquidation, or any other document, agreement or proposal similar to the foregoing by any Junior Collateral Agent or any other Junior Claimholder in respect of such Collateral may be inconsistent with the terms of this Agreement and (B) neither any Junior Collateral Agent nor any other Junior Claimholder shall propose, vote to accept, or otherwise support a plan of reorganization that is inconsistent with the terms of this Agreement with respect to treatment of such Collateral;

(5)        exercise any of its rights or remedies with respect to the Collateral (after the termination of the Standstill Period to the extent permitted by Section 3.1(a)(1)); and

(6)        bid for or purchase any Collateral in which a Junior Claimholder has a Junior Lien at any public, private or judicial foreclosure upon such Collateral initiated by the Senior Collateral Agents or any other Senior Claimholder, or any sale of any such Collateral during an Insolvency or Liquidation Proceeding; provided that any such bid may not include a "credit bid" in respect of any Junior Obligations unless the cash proceeds of such bid are otherwise sufficient to cause the Discharge of Senior Obligations.

(d)        Subject to Sections 3.1(a)(1), 3.1(c) and 6.3(b) each Junior Collateral Agent, for itself and on behalf of its Related Claimholders:

(1)        agrees that it and its Related Claimholders will not take any action that would hinder, delay, limit or prohibit any exercise of rights or remedies under the Senior Documents or is otherwise prohibited hereunder with respect to any Collateral in which a Junior Claimholder has a Junior Lien, including any collection or Disposition of any such Collateral, whether by foreclosure or otherwise, or that would limit, invalidate, avoid or set aside any Lien securing any Senior Obligations or any Senior Collateral Document or subordinate the priority of the Senior

-32-

Obligations to the Junior Obligations with respect to such Collateral or grant the Liens on such Collateral securing the Junior Obligations equal ranking to the Liens securing the Senior Obligations;

(2)     hereby waives any and all rights it or its Related Claimholders may have as a junior Lien creditor or otherwise (whether arising under the UCC or under any other law) to object to the manner in which the Senior Collateral Agents or the other Senior Claimholders seek to enforce or collect the Senior Obligations or the Liens securing the Senior Obligations with respect to the Collateral in which a Junior Claimholder has a Junior Lien, regardless of whether any action or failure to act by or on behalf of any Senior Collateral Agent or any other Senior Claimholders is adverse to the interest of any Junior Claimholders with respect to such Collateral; and

(3)     hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Junior Collateral Documents or any other Junior Document shall be deemed to restrict in any way the rights and remedies of any Senior Collateral Agent or the other Senior Claimholders with respect to the Collateral in which a Junior Claimholder has a Junior Lien as set forth in this Agreement and the Senior Documents.

(e)     The Junior Collateral Agents and the other Junior Claimholders may exercise rights and remedies as unsecured creditors against the Obligors that have guaranteed or granted Liens to secure the Junior Obligations in accordance with the terms of the Junior Documents and applicable law (other than initiating or joining in an involuntary case or proceeding under any Debtor Relief Law with respect to any Obligor, prior to the termination of the Standstill Period; provided that (i) any such exercise shall not be inconsistent with the terms of this Agreement (including Sections 2.2 and 6) and (ii) in the event that any Junior Claimholder becomes a judgment Lien creditor in respect of any Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Junior Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the Senior Obligations) as the other Liens securing the Junior Obligations are subject to this Agreement. Nothing in this Agreement shall prohibit the receipt by any Junior Collateral Agent or Junior Claimholder of the required payments of principal, premium, interest, fees and other amounts due under the Junior Documents so long as such receipt is not the direct or indirect result of the exercise by a Junior Collateral Agent or other Junior Claimholder of rights or remedies as a secured creditor in respect of Collateral in which a Junior Claimholder has a Junior Lien.

3.2     Agreement among Term Loan Claimholders.  Each Term Loan Collateral Agent, on behalf of itself and its Related Term Loan Claimholders, solely as among themselves in such capacity and solely for their mutual benefit, hereby agrees that the Term Loan Collateral Agent designated as the Directing Term Loan Collateral Agent shall have the sole right and power, as among the Term Loan Collateral Agents and the other Term Loan Claimholders, to take and direct any right or remedy with respect to Term Loan Priority Collateral in accordance with the terms of this Agreement, the relevant Term Loan Collateral Documents and any other intercreditor agreement among the Directing Term Loan Collateral Agent and each other Term Loan Collateral Agent.  The Directing Term Loan Collateral Agent shall be entitled to the benefit of all the exculpatory, indemnity and reimbursement provisions set forth in any Term Loan Document for the benefit of any "collateral agent" (or any other agent or similar representative) with respect to any exercise by the Directing Term Loan Collateral Agent of any of the rights or remedies under this Agreement, including any such exercise of any right or remedy with respect to any Term Loan Priority Collateral, or any other action or inaction by it in its capacity as the Directing Term Loan Collateral Agent.

-33-

3.3     Actions Upon Breach; Specific Performance.  If any Junior Claimholder, in contravention of the terms of this Agreement, in any way takes, attempts to or threatens to take any action with respect to the Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement), or fails to take any action required by this Agreement, this Agreement shall create an irrebutable presumption and admission by such Junior Claimholder that relief against such Junior Claimholder by injunction, specific performance and/or other appropriate equitable relief is necessary to prevent irreparable harm to the Senior Claimholders, it being understood and agreed by each Junior Collateral Agent, on behalf of its Related Junior Claimholders, that (i) the Senior Claimholders' damages from actions of any Junior Claimholder may at that time be difficult to ascertain and may be irreparable and (ii) each Junior Claimholder waives any defense that the Obligors and/or the Senior Claimholders cannot demonstrate damage and/or be made whole by the awarding of damages. Each of the Senior Collateral Agents may demand specific performance of this Agreement. Each Junior Collateral Agent, on behalf of itself and its Related Junior Claimholders, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by any Senior Collateral Agent or any other Senior Claimholder.  No provision of this Agreement shall constitute or be deemed to constitute a waiver by any Senior Collateral Agent on behalf of itself and its Related Senior Claimholders of any right to seek damages from any Person in connection with any breach or alleged breach of this Agreement.

**SECTION 4.     Payments**.

4.1     Application of Proceeds.  So long as the Discharge of Senior Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Obligor, any Collateral in which a Senior Claimholder has a Senior Lien or any Proceeds (whether in cash or otherwise) thereof received in connection with any Enforcement Action or other exercise of rights or remedies by any Senior Collateral Agent or the other Senior Claimholders with respect to such Collateral (including any Disposition referred to in Section 5.1) or any Insolvency or Liquidation Proceeding, shall be applied by the Directing Senior Collateral Agent to the Senior Obligations in accordance with the terms of the Senior Documents, including any other intercreditor agreement among the Senior Collateral Agents.  Upon the Discharge of Senior Obligations, the Directing Senior Collateral Agent shall deliver to the Directing Junior Collateral Agent any remaining Collateral in which a Senior Claimholder has a Senior Lien and Proceeds thereof then held by it in the same form as received, with any necessary endorsements (such endorsements shall be without recourse and without representation or warranty) to the Directing Junior Collateral Agent, or as a court of competent jurisdiction may otherwise direct, to be applied by the Junior Collateral Agents to the Junior Obligations in accordance with the terms of the Junior Documents, including any intercreditor agreement among the Junior Collateral Agents.

4.2     Payments Over.

(a)     So long as the Discharge of Senior Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Obligor, any Collateral in which a Senior Claimholder has a Senior Lien or Proceeds thereof (including any assets or proceeds subject to Liens that have been avoided or otherwise invalidated (including as a result of failure to perfect or lack of perfection)), any assets or proceeds subject to Liens referred to in Section 2.3, any amounts referred to in the last sentence of Section 6.3(b) or any other distribution (whether or not expressly characterized as such) in respect of such Collateral (including in connection with any Disposition of any such Collateral) received by any Junior Collateral Agent or any other Junior Claimholders in connection with any Enforcement Action or any Insolvency or Liquidation Proceeding or other exercise of any right or remedy (including set-off or recoupment) relating to such Collateral in contravention of this Agreement or not in accordance with Section 4.1, or received by any Junior Collateral Agent or any other Junior

-34-

Claimholders in connection with any insurance policy claim or any condemnation award (or deed in lieu of condemnation) in respect of such Collateral, in each case, shall be held in trust and forthwith paid over to the Directing Senior Collateral Agent for the benefit of the Senior Claimholders in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.

(b)     Except as otherwise set forth in Section 6.3 (or with respect to any Reorganization Securities which shall be subject to Section 6.6 and not this Section 4.2), so long as the Discharge of Senior Obligations has not occurred, if in any Insolvency or Liquidation Proceeding any Junior Collateral Agent or any other Junior Claimholders shall receive any distribution of money or other property in respect of or on account of the Collateral in which a Junior Claimholder has a Junior Lien (including any assets or proceeds subject to Liens that have been avoided or otherwise invalidated or any amounts referred to in the last sentence of Section 6. 3(b)), such money, other property or amounts shall be held in trust and forthwith paid over to the Directing Senior Collateral Agent for the benefit of the Senior Claimholders in the same form as received, with any necessary endorsements. Any Lien on Collateral in which a Junior Claimholder has a Junior Lien received by any Junior Collateral Agent or any other Junior Claimholders in respect of any of the Junior Obligations in any Insolvency or Liquidation Proceeding shall be subject to the terms of this Agreement.

(c)     Until the Discharge of Senior Obligations occurs, each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, hereby irrevocably constitutes and appoints the Directing Senior Collateral Agent and any officer or agent of the Directing Senior Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Junior Collateral Agent or any such Junior Claimholder or in the Directing Senior Collateral Agent's own name, from time to time in the Directing Senior Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 4.2, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 4.2, including any endorsements or other instruments of transfer or release. This power is coupled with an interest and is irrevocable until the Discharge of Senior Obligations.

4.3     Mixed Collateral Proceeds.  Notwithstanding anything to the contrary contained above or in the definition of the ABL Priority Collateral or Term Loan Priority Collateral, in the event that Proceeds of Collateral are received from (or are otherwise attributable to the value of) a sale or other disposition of Collateral that involves a combination of ABL Priority Collateral and Term Loan Priority Collateral, the portion of such Proceeds that shall be allocated as Proceeds of ABL Priority Collateral for purposes of this Agreement shall be an amount equal to the net book value of such ABL Priority Collateral (except in the case of Accounts (as described in clause (i) of the definition of ABL Priority Collateral, and excluding any Accounts to the extent excluded pursuant to said clause (i)) which amount shall be equal to the face amount of such Accounts). In addition, notwithstanding anything to the contrary contained above or in the definition of the ABL Priority Collateral or Term Loan Priority Collateral, to the extent Proceeds of Collateral are Proceeds received from (or are otherwise attributable to the value of) the sale or disposition of all or substantially all of the capital stock of any of the Subsidiaries of Holdings which is an Obligor, or all or substantially all of the assets of any such Subsidiary, and in each case in connection with such sale the ABL Credit Agreement Collateral Agent releases its Liens on the ABL Priority Collateral of such Subsidiary, then such Proceeds shall constitute (1) first, in an amount equal to the face amount of the Accounts (as described in clause (i) of the definition of ABL Priority Collateral, and excluding any Accounts to the extent excluded pursuant to said clause (i)) and the net book value of the Inventory owned by such Subsidiary at the time of such sale, ABL Priority Collateral and (2) second, to the extent in excess of the amounts described in preceding clause (1), Term Loan Priority Collateral.

-35-

SECTION 5.     **Other Agreements**.

5.1     Releases.

(a)     In connection with any Enforcement Action by the Directing Senior Collateral Agent or any other exercise by the Directing Senior Collateral Agent of rights or remedies in respect of the Collateral in which a Senior Claimholder has a Senior Lien (including any Disposition of any of such Collateral by any Obligor, with the consent of the Directing Senior Collateral Agent, after the occurrence and during the continuance of an "event of default" under the Senior Documents), in each case, prior to the Discharge of Senior Obligations, the Directing Senior Collateral Agent is irrevocably authorized (at the cost of the Obligors in accordance with the terms of the applicable Senior Financing Document and without any consent, sanction, authority or further confirmation from the Directing Junior Collateral Agent, any other Junior Claimholder or any Obligor): (i) to release any of its Liens on any part of such Collateral or any other claim over such Collateral that is the subject of such Enforcement Action, in which case the Junior Liens or any other claim over the asset that is the subject of such Enforcement Action, if any, of any Junior Collateral Agent, for itself or for the benefit of the other Junior Claimholders, shall be automatically, unconditionally and simultaneously released to the same extent as the Liens or other claims of the Directing Senior Collateral Agent and each other Senior Collateral Agent are so released (and the Directing Senior Collateral Agent is irrevocably authorized to execute and deliver or enter into any release of such Liens or claims that may, in the discretion of the Directing Senior Collateral Agent, be considered necessary or reasonably desirable in connection with such releases); and (ii) if the Collateral that is the subject of such Enforcement Action consists of the equity interests of any Obligor, to release (x) such Obligor and any subsidiary of such Obligor from all or any part of its Senior Obligations, in which case such Obligor and any subsidiary of such Obligor shall be automatically, unconditionally and simultaneously released to the same extent from its Junior Obligations (it being understood that any Proceeds of such Enforcement Action with respect to such equity interests shall be dealt with in a manner consistent with Section 4.3), and (y) any Liens or other claims on any assets of such Obligor and any subsidiary of such Obligor, in which case the Junior Liens or other claims on such assets of each Junior Collateral Agent, for itself or for the benefit of its Related Claimholders, shall be automatically, unconditionally and simultaneously released to the same extent as such Senior Liens of the Directing Senior Collateral Agent and each other Senior Collateral Agent are so released (and the Directing Senior Collateral Agent is irrevocably authorized to execute and deliver or enter into any release of such Liens or claims that may, in the discretion of the Directing Senior Collateral Agent, be considered necessary or reasonably desirable in connection with such releases). Each Junior Collateral Agent, for itself or on behalf of its Related Claimholders, promptly shall execute and deliver to the Directing Senior Collateral Agent or such Obligor such termination statements, releases and other documents as the Directing Senior Collateral Agent or such Obligor may request to effectively confirm the foregoing releases upon delivery to the Junior Collateral Agents of copies of such termination statements, releases and other documents used to effect such releases with respect to the Collateral in which a Senior Claimholder has a Senior Lien securing the Senior Obligations from a Responsible Officer of the requesting party. In the case of any Disposition of any of the Collateral in which a Senior Claimholder has a Senior Lien that is subject to this Section 5.1(a) by the Directing Senior Collateral Agent or by any Obligor with the consent of the Directing Senior Collateral Agent (the party so Disposing of such Collateral being called the "**Disposing Party**"), the Disposing Party shall take reasonable care (as determined in the reasonable credit judgment of the Directing Senior Collateral Agent or the reasonable business judgment of such Obligor, as the case may be) to obtain a fair market price under the prevailing market conditions and with regard to all other relevant circumstances, including the distressed nature of such Disposition, and if the Disposing Party is an Obligor, to conduct such Disposition in a commercially reasonable manner (it being understood that in any case the Disposing Party shall have no obligation to postpone any such Disposition in order to achieve a higher price, and that any Disposition approved by any bankruptcy court in any Insolvency or Liquidation Proceeding shall be conclusively presumed to be made at a fair market price and to have been

-36-

conducted in a commercially reasonable manner). The proceeds of any such Disposition shall be applied in accordance with Section 4.1.

(b)    If in connection with any sale, lease, exchange, transfer or other disposition (collectively, a "**Disposition**") of any Collateral by any Obligor permitted under the terms of both the Senior Financing Documents and the Junior Financing Documents (other than in connection with an Enforcement Action or other exercise of any Collateral Agent's rights or remedies in respect of the Collateral, which shall be governed by Section 5.1(a) above), the Directing Senior Collateral Agent or any other Senior Collateral Agent, for itself or on behalf of any of the other Senior Claimholders, releases any of its Liens on any part of the Collateral in which a Senior Claimholder has a Senior Lien, or releases any Obligor from its obligations under its guaranty of the Senior Obligations, in each case other than in connection with, or following, the Discharge of Senior Obligations, then the Liens, if any, of each Junior Collateral Agent, for itself or for the benefit of its Related Claimholders, on such Collateral, and the obligations of such Obligor under its guaranty of the Junior Obligations, shall be automatically, unconditionally and simultaneously released; provided that such release by such Junior Collateral Agent, for itself or for the benefit of its Related Claimholders, shall not extend to or otherwise affect any of the rights of the Junior Claimholders to the proceeds from any such Disposition. Each Junior Collateral Agent, for itself or on behalf of its Related Claimholders, promptly shall execute and deliver to the Directing Senior Collateral Agent or such Obligor such termination statements, releases and other documents as the Directing Senior Collateral Agent or such Obligor may request to effectively confirm the foregoing releases upon delivery to the Junior Collateral Agents of copies of such termination statements, releases and other documents used to effect such release with respect to the Collateral in which a Senior Claimholder has a Senior Lien securing the Senior Obligations from a Responsible Officer of the Top Borrower or the Directing Senior Collateral Agent and an officer's certificate of a Responsible Officer of the requesting party stating that such disposition has been consummated in compliance with the terms of the Junior Financing Documents.

(c)    Until the Discharge of Senior Obligations occurs, each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, hereby irrevocably constitutes and appoints the Directing Senior Collateral Agent and any officer or agent of the Directing Senior Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Junior Collateral Agent or such Junior Claimholders or in the Directing Senior Collateral Agent's own name, from time to time in the Directing Senior Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release. This power is coupled with an interest and is irrevocable until the Discharge of Senior Obligations.

(d)    Until the Discharge of Senior Obligations occurs, to the extent that any Senior Collateral Agent or the other Senior Claimholders (i) have released any Lien on Collateral in which a Senior Claimholder has a Senior Lien or any Obligor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (ii) obtain any additional guarantees from any Obligor or any Domestic Subsidiary of Holdings, then each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, shall be granted an additional guaranty.

5.2    Insurance and Condemnation Awards. Until the Discharge of Senior Obligations has occurred, the Directing Senior Collateral Agent shall have the sole and exclusive right, subject to the rights of the Obligors under the Senior Financing Documents, to settle or adjust claims over any insurance policy covering the Collateral in which a Senior Claimholder has a Senior Lien in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting such Collateral. Until the Discharge of Senior Obligations has occurred,

US-DOCS\72672018.5

and subject to the rights of the Obligors under the Senior Financing Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) in respect of the Collateral in which a Senior Claimholder has a Senior Lien shall be paid to the Directing Senior Collateral Agent for the benefit of the Senior Claimholders pursuant to the terms of the Senior Documents, including any other intercreditor agreement among the Senior Collateral Agents (including, without limitation, for purposes of cash collateralization of commitments, Letters of Credit constituting Senior Obligations and obligations under Hedge Agreements governing any First Lien Secured Hedging Obligations constituting Senior Obligations) and thereafter, if the Discharge of Senior Obligations has occurred, and subject to the rights of the Obligors under the Junior Financing Documents, to the Directing Junior Collateral Agent for the benefit of the Junior Claimholders to the extent required under the Junior Collateral Documents, and thereafter, if the Discharge of the Junior Obligations has occurred, to the owner of the subject property, as directed by the Top Borrower or as a court of competent jurisdiction may otherwise direct. Until the Discharge of Senior Obligations has occurred, if any Junior Collateral Agent or any other Junior Claimholders shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in respect of Collateral in which a Senior Claimholder has a Senior Lien in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such proceeds over to the Directing Senior Collateral Agent in accordance with the terms of <u>Section 4.2</u>. To the extent that an insured loss covers or constitutes both ABL Priority Collateral and Term Loan Priority Collateral, then the ABL Credit Agreement Collateral Agent and the Directing Term Loan Collateral Agent will work jointly and in good faith to collect, adjust or settle (subject to the rights of the relevant Obligors under the ABL Documents and the Term Loan Financing Documents) under the relevant insurance policy, with the proceeds thereof being applied in accordance with the provisions of <u>Section 4.1</u> of this Agreement.

        5.3     <u>Amendments to Financing Documents</u>.

        (a)     Subject to, in the case of the Term Loan Documents, the First Lien/Second Lien Intercreditor Agreement and any other intercreditor agreement among the Term Loan Claimholders, Financing Documents may be amended, restated, amended and restated, supplemented or otherwise modified in accordance with their terms, and the Financing Documents and any Obligations thereunder may be Refinanced, in each case, without notice to, or the consent of any Collateral Agent or any other Claimholder, all without affecting the Lien subordination or other provisions of this Agreement; <u>provided</u> that the holders of such Refinancing debt bind themselves in a writing addressed to the Collateral Agents and the other Claimholders to the terms of this Agreement or another intercreditor agreement that is reasonably satisfactory to the Collateral Agents, and any such amendment, restatement, amendment and restatement, supplement, modification or Refinancing shall not, contravene the provisions of this Agreement or any other Financing Document.

        (b)     In the event that any Senior Collateral Agent enters into any amendment, restatement, amendment and restatement, supplement or other modification in respect of or replaces any of the Senior Collateral Documents for purposes of adding to, or deleting from, or waiving or consenting to any departures from any provisions of any Senior Collateral Document or changing in any manner the rights of the applicable Senior Collateral Agent, the Senior Claimholders, or any Obligor thereunder, in each case in respect of the Collateral in which a Senior Claimholder has a Senior Lien (including the release of any Liens on such Collateral securing the Senior Obligations), then such amendment, restatement, amendment and restatement, supplement or other modification in a manner that is applicable to all Senior Claimholders and all Senior Obligations shall apply automatically to any comparable provisions of each Comparable Junior Collateral Document without the consent of any Junior Collateral Agent, Junior Claimholder or any Obligor; <u>provided</u>, <u>however</u> that (1) such amendment, restatement, amendment and restatement, supplement or other modification does not (A) remove assets subject to any Liens on the Collateral securing any of the Junior Obligations or release any such Liens, except to the

extent such release is permitted or required by <u>Section 5.1</u> and provided there is a concurrent release of the corresponding Liens securing the Senior Obligations, (B) affect the rights or duties of any Junior Collateral Agent without its consent or (C) otherwise materially adversely affect the rights of the applicable Junior Claimholders or the interest of the applicable Junior Claimholders in such Collateral and not the Senior Collateral Agent or the Senior Claimholders that have a Senior Lien on the affected Collateral in a like manner, and (2) written notice of such amendment, restatement, amendment and restatement, supplement or other modification shall have been given to each Junior Collateral Agent within ten (10) Business Days of the effectiveness thereof (it being understood that the failure to deliver such notice shall not impair the effectiveness of any such amendment, restatement, amendment and restatement, supplement or other modification).

       5.4    <u>Confirmation of Subordination in Collateral Documents</u>.  (a) Each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, agrees that each Term Loan Collateral Document shall include the following language (or language to similar effect approved by the ABL Credit Agreement Collateral Agent):

    "Notwithstanding anything herein to the contrary, the lien and security interest granted to the Collateral Agent in the Collateral pursuant to this Agreement and the exercise of any right or remedy by the Collateral Agent hereunder are subject to the provisions of the ABL Intercreditor Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "ABL Intercreditor Agreement"), among UBS AG, Stamford Branch, as ABL Credit Agreement Collateral Agent, UBS AG, Stamford Branch, as First Lien Credit Agreement Collateral Agent and Goldman Sachs Bank USA, as Second Lien Credit Agreement Collateral Agent, and certain other Persons party or that may become party thereto from time to time and acknowledged and agreed to by Dawn Intermediate Inc., a Delaware corporation, Serta Simmons Bedding, LLC, a Delaware limited liability company, the other borrowers party thereto and the other obligors party thereto.  In the event of any conflict between the terms of the ABL Intercreditor Agreement and this Agreement, the terms of the ABL Intercreditor Agreement shall govern and control."

       (b)    The ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, agrees that each ABL Collateral Document shall include the following language (or language to similar effect approved by the Directing Term Loan Collateral Agent):

    "Notwithstanding anything herein to the contrary, the lien and security interest granted to the Collateral Agent in the Collateral  pursuant to this Agreement and the exercise of any right or remedy by the Collateral Agent hereunder are subject to the provisions of the ABL Intercreditor Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "ABL Intercreditor Agreement"), among UBS AG, Stamford Branch, as ABL Credit Agreement Credit Collateral Agent, UBS AG, Stamford Branch, as First Lien Credit Agreement Collateral Agent and Goldman Sachs Bank USA as Second Lien Credit Agreement Collateral Agent, and certain other Persons party or that may become party thereto from time to time and acknowledged and agreed to by Dawn Intermediate Inc., a Delaware corporation, Serta Simmons Bedding, LLC, a Delaware limited liability company, the other borrowers party thereto and the other obligors party thereto.  In the event of any conflict between the terms of the ABL Intercreditor Agreement and this Agreement, the terms of the ABL Intercreditor Agreement shall govern and control."

US-DOCS\72672018.5

5.5     Gratuitous Bailee/Agent for Perfection; Shared Collateral Documents.

(a)     Each Collateral Agent agrees to hold that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC or other applicable law (such Collateral being the "**Pledged Collateral**") as gratuitous bailee on behalf of and for the benefit of each other Collateral Agent (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the UCC) solely for the purpose of perfecting, or improving the priority of, the security interest granted under the Collateral Documents, subject to the terms and conditions of this Section 5.5; provided that, in the case of any such possession or control of Collateral by any Junior Collateral Agent, the foregoing shall not be deemed to be a waiver of any restriction set forth herein on such possession or control or of any breach by such Junior Collateral Agent of any terms of this Agreement in respect of such possession or control.

(b)     Until the Discharge of Senior Obligations has occurred, each Senior Collateral Agent shall be entitled to deal with the Pledged Collateral that constitutes Collateral in which it has a Senior Lien in accordance with the terms of the Senior Financing Documents as if the Liens of any Junior Collateral Agent under the Junior Collateral Documents did not exist.  The rights of each Junior Collateral Agent in Collateral in which it has a Junior Lien shall at all times be subject to the terms of this Agreement and to each Senior Collateral Agent's rights under the Senior Financing Documents.

(c)     No Collateral Agent shall have any obligation whatsoever to any Claimholder to ensure that the Pledged Collateral is genuine or owned by any of the Obligors or to preserve rights or benefits of any Person with respect thereto except as expressly set forth in this Section 5.5 or, in the case of any Junior Collateral Agent, the other provisions hereof (including the turnover provisions set forth in Section 4.2). The duties or responsibilities of each Collateral Agent under this Section 5.5 shall be limited solely to holding the Pledged Collateral as bailee in accordance with this Section 5.5 and, in the case of any Senior Collateral Agent, delivering the Pledged Collateral to the Directing Junior Collateral Agent upon a Discharge of Senior Obligations as provided in paragraph (e) below or, in the case of any Junior Collateral Agent, delivering the Pledged Collateral to the Directing Senior Collateral Agent in accordance with the provisions hereof (including the turnover provisions set forth in Section 4.2).

(d)     Each Collateral Agent, for itself and on behalf of its Related Claimholders, hereby waives and releases each other Collateral Agent and each other Claimholder from all claims and liabilities arising pursuant to any Collateral Agent's role under this Section 5.5 as gratuitous bailee and gratuitous agent with respect to the Pledged Collateral; provided that, in the case of any possession or control of any Pledged Collateral in which a Senior Claimholder has a Senior Lien by any Junior Collateral Agent, the foregoing shall not be deemed to be a waiver of any restriction set forth herein on such possession or control or of any breach by such Junior Collateral Agent of any terms of this Agreement in respect of such possession or control.  None of the Term Loan Collateral Agents or any other Term Loan Claimholders shall have by reason of the Term Loan Collateral Document, the ABL Collateral Documents, the Shared Collateral Documents, this Agreement or any other document, a fiduciary relationship in respect of the ABL Credit Agreement Collateral Agent or any other ABL Claimholder, and it is understood and agreed that the interests of the Term Loan Collateral Agents and the other Term Loan Claimholders, on the one hand, and the ABL Credit Agreement Collateral Agent and the other ABL Claimholders, on the other hand, may differ and that the Term Loan Collateral Agents and the other Term Loan Claimholders shall be fully entitled to act in their own interest without taking into account the interests of the ABL Credit Agreement Collateral Agent or the other ABL Claimholders. Neither the ABL Credit Agreement Collateral Agent nor any other ABL Claimholders shall have by reason of the ABL Collateral Documents, the Term Loan Collateral Documents, the Shared Collateral Documents, this Agreement or any other document, a fiduciary relationship in respect of any Term Loan

-40-

Collateral Agent or any other Term Loan Claimholder, and it is understood and agreed that the interests of the ABL Credit Agreement Collateral Agent and the other ABL Claimholders, on the one hand, and the Term Loan Collateral Agents and the other Term Loan Claimholders, on the other hand, may differ and that the ABL Credit Agreement Collateral Agent and the other ABL Claimholders shall be fully entitled to act in their own interest without taking into account the interests of the Term Loan Collateral Agents or the other Term Loan Claimholders.

(e)     Upon the Discharge of Senior Obligations, each Senior Collateral Agent shall deliver the remaining Pledged Collateral in its possession or control (if any) (or proceeds thereof) together with any necessary endorsements (such endorsement shall be without recourse and without any representation or warranty), <u>first</u>, to the Directing Junior Collateral Agent, to the extent the Discharge of Junior Obligations has not occurred and <u>second</u>, upon the Discharge of Junior Obligations, to the Obligors to the extent no Obligations remain outstanding (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral) or as a court of competent jurisdiction may otherwise direct. Following the Discharge of Senior Obligations, each Senior Collateral Agent further agrees to take, at the expense of the Obligors (which expense reimbursement shall be subject to the provisions of the applicable Senior Document), all other actions reasonably requested by the Directing Junior Collateral Agent in connection with the Directing Junior Collateral Agent obtaining a first-priority interest in the Pledged Collateral that is in such Senior Collateral Agent's possession or control.

5.6     <u>When Discharge of Obligations Deemed to Not Have Occurred</u>. If, substantially concurrently with or after the Discharge of the Obligations of any Series having occurred, any Borrower or any other Obligor enters into any Refinancing of any Financing Document evidencing a Obligation of such Series, which Refinancing is permitted hereby and by the terms of the other Financing Documents, then such Discharge shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any action taken as a result of the occurrence of such Discharge prior to the Refinancing of such Obligations), and the obligations under such Refinancing of such Financing Document shall automatically be treated as Obligations of the Refinanced Series for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the New Senior Agent shall be a Collateral Agent of such Refinanced Series (and, if applicable in accordance with the definition of such term, the Directing Senior Collateral Agent or Directing Junior Collateral Agent) for all purposes of this Agreement. Upon receipt of a notice from any Borrower or any other Obligor stating that a Borrower or such other Obligor has entered into a Refinancing of any Financing Document (which notice shall include the identity of the new senior collateral agent (such agent, the "**New Senior Agent**")), each Collateral Agent shall promptly (a) enter into such documents and agreements (including amendments or supplements to, or amendment and restatement of, this Agreement) as such Borrower, such other Obligor or the New Senior Agent shall reasonably request in order to provide to the New Senior Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement, and (b) in the case of each Junior Collateral Agent only, deliver to the New Senior Agent (if it is the Directing Senior Collateral Agent) any Pledged Collateral in which the New Senior Agent is to have a Senior Lien held by it together with any necessary endorsements (or otherwise allow the New Senior Agent to obtain control of such Pledged Collateral). The New Senior Agent shall agree in a writing addressed to the other Collateral Agents and the other Claimholder to be bound by the terms of this Agreement, for itself and on behalf of its Related Senior Claimholders.

5.7     <u>[Reserved]</u>.

5.8     <u>Consent to License to Use Intellectual Property</u>. Each Term Loan Collateral Agent, on behalf of its Respective Claimholders (a) consents (without any representation, warranty or obligation whatsoever) to the grant by any Obligor to the ABL Credit Agreement Collateral Agent of a

-41-

non-exclusive royalty-free license to use, subject to any limitations and restrictions in any relevant ABL Collateral Document, for a period not to exceed 180 days (commencing with the initiation of any enforcement of Liens by any of the Term Loan Collateral Agents (provided, in each case, that the ABL Credit Agreement Collateral Agent has received notice thereof) or the ABL Credit Agreement Collateral Agent) any Patent, Trademark or proprietary information of such Obligor that is subject to a Lien held by any Term Loan Collateral Agent (or any Patent, Trademark or proprietary information acquired by such purchaser, assignee or transferee from any Obligor, as the case may be) and (b) to the extent, if any, it has sufficient rights therein to do so, grants, in its capacity as a secured party (or as a purchaser, assignee or transferee, as the case may be), to the ABL Credit Agreement Collateral Agent a non-exclusive royalty-free license to use for a period not to exceed 180 days (commencing with (x) the initiation of any enforcement of Liens by any Collateral Agent or (y) the purchase, assignment or transfer, as the case may be (provided, in each case, that the ABL Credit Agreement Collateral Agent has received notice thereof)) any Patent, Trademark or proprietary information that is subject to a Lien held by any Term Loan Collateral Agent (or subject to such purchase, assignment or transfer, as the case may be), in each case in connection with the enforcement of any Lien held by the ABL Credit Agreement Collateral Agent upon any Inventory or other ABL Priority Collateral of any Obligor and to the extent the use of such Patent, Trademark or proprietary information is necessary or appropriate, in the good faith opinion of the ABL Credit Agreement Collateral Agent, to process, ship, produce, store, complete, supply, lease, sell or otherwise dispose of any such Inventory in any lawful manner. The 180 day license periods shall be tolled during the pendency of any Insolvency or Liquidation Proceeding of any Obligor pursuant to which the ABL Credit Agreement Collateral Agent is effectively stayed from enforcing its rights and remedies with respect to the ABL Priority Collateral.

5.9    Access to Information. If any Term Loan Collateral Agent takes actual possession of any documentation of an Obligor (whether such documentation is in the form of a writing or is stored in any data equipment or data record in the physical possession of any Term Loan Collateral Agent), then upon the reasonable request of the ABL Credit Agreement Collateral Agent and reasonable advance notice, the Term Loan Collateral Agents will permit the ABL Credit Agreement Collateral Agent or its representative to inspect and copy such documentation.

5.10    Access to Property to Process and Sell Inventory.   (a)  (i) If the ABL Credit Agreement Collateral Agent commences any action or proceeding with respect to any of its rights or remedies (including any action of foreclosure but excluding any exercise of rights solely in connection with the occurrence and continuation of a Cash Dominion Period, as such term is defined in the ABL Credit Agreement (as in effect on the date hereof)), enforcement, collection or execution with respect to the ABL Priority Collateral ("ABL Priority Collateral Enforcement Actions") or if any Term Loan Collateral Agent commences any action or proceeding with respect to any of its rights or remedies (including any action of foreclosure), enforcement, collection or execution with respect to the Term Loan Priority Collateral, and such Term Loan Collateral Agent (or a purchaser at a foreclosure sale conducted in foreclosure of any Liens of any Term Loan Collateral Agent) takes actual or constructive possession of Term Loan Priority Collateral of any Obligor ("Term Loan Priority Collateral Enforcement Actions"), then the applicable Term Loan Claimholders shall (subject to, in the case of any Term Loan Priority Collateral Enforcement Action, a prior written request by the ABL Credit Agreement Collateral Agent to the applicable Term Loan Collateral Agent (the "Term Loan Priority Collateral Enforcement Action Notice")) (x) cooperate with the ABL Credit Agreement Collateral Agent (and with its officers, employees, representatives and agents) in its efforts to conduct ABL Priority Collateral Enforcement Actions in the ABL Priority Collateral and to finish any work-in-process and process, ship, produce, store, complete, supply, lease, sell or otherwise handle, deal with, assemble or dispose of, in any lawful manner, the ABL Priority Collateral, (y) not hinder or restrict in any respect the ABL Credit Agreement Collateral Agent from conducting ABL Priority Collateral Enforcement Actions in the ABL Priority Collateral or from finishing any work-in-process or processing, shipping, producing, storing, completing,

-42-

supplying, leasing, selling or otherwise handling, dealing with, assembling or disposing of, in any lawful manner, the ABL Priority Collateral, and (z) permit the ABL Credit Agreement Collateral Agent, its employees, agents, advisers and representatives, at the cost and expense of the ABL Claimholders, to enter upon and use the Term Loan Priority Collateral (including equipment, processors, computers and other machinery related to the storage or processing of records, documents or files and intellectual property), for a period commencing on (I) the date of the initial ABL Priority Collateral Enforcement Action or the date of delivery of the Term Loan Priority Collateral Enforcement Action Notice, as the case may be, and (II) ending on the earlier of the date occurring 180 days thereafter and the date on which all ABL Priority Collateral (other than ABL Priority Collateral abandoned by the ABL Credit Agreement Collateral Agent in writing) has been removed from the Term Loan Priority Collateral (such period, the "ABL Priority Collateral Processing and Sale Period"), for purposes of:

(A)    assembling and storing the ABL Priority Collateral and completing the processing of and turning into finished goods any ABL Priority Collateral consisting of work-in-process;

(B)    selling any or all of the ABL Priority Collateral located in or on such Term Loan Priority Collateral, whether in bulk, in lots or to customers in the ordinary course of business or otherwise;

(C)    removing and transporting any or all of the ABL Priority Collateral located in or on such Term Loan Priority Collateral;

(D)    otherwise processing, shipping, producing, storing, completing, supplying, leasing, selling or otherwise handling, dealing with, assembling or disposing of, in any lawful manner, the ABL Priority Collateral; and/or

(E)    taking reasonable actions to protect, secure, and otherwise enforce the rights or remedies of the ABL Claimholders and/or the ABL Credit Agreement Collateral Agent (including with respect to any ABL Priority Collateral Enforcement Actions) in and to the ABL Priority Collateral;

provided, however, that nothing contained in this Agreement shall restrict the rights of any Term Loan Collateral Agent from selling, assigning or otherwise transferring any Term Loan Priority Collateral prior to the expiration of such ABL Priority Collateral Processing and Sale Period if the purchaser, assignee or transferee thereof agrees in writing (for the benefit of the ABL Credit Agreement Collateral Agent and the ABL Claimholders) to be bound by the provisions of this Section 5.10. If any stay or other order prohibiting the exercise of remedies with respect to the ABL Priority Collateral has been entered by a court of competent jurisdiction, such ABL Priority Collateral Processing and Sale Period shall be tolled during the pendency of any such stay or other order.

(ii)    During the period of actual occupation, use and/or control by the ABL Claimholders and/or the ABL Credit Agreement Collateral Agent (or their respective employees, agents, advisers and representatives) of any Term Loan Priority Collateral, the ABL Claimholders and the ABL Credit Agreement Collateral Agent shall be obligated to repair at their expense any physical damage to such Term Loan Priority Collateral resulting from such occupancy, use or control, and to leave such Term Loan Priority Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted. Notwithstanding the foregoing, in no event shall the ABL Claimholders or the ABL Credit Agreement Collateral Agent have any liability to the Term Loan Claimholders pursuant to this Section 5.10(a) as a result of any condition (including any environmental condition, claim or

-43-

liability) on or with respect to the Term Loan Priority Collateral existing prior to the date of the exercise by the ABL Claimholders of their rights under this Section 5.10(a) and the ABL Claimholders shall have no duty or liability to maintain the Term Loan Priority Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the ABL Claimholders, or for any diminution in the value of the Term Loan Priority Collateral that results from ordinary wear and tear resulting from the use of the Term Loan Priority Collateral by the ABL Claimholders in the manner and for the time periods specified under this Section 5.10(a).  Without limiting the rights granted in this Section 5.10(a), the ABL Claimholders shall cooperate with the Term Loan Claimholders in connection with any efforts made by the Term Loan Claimholders to sell the Term Loan Priority Collateral.

(b)     The ABL Claimholders shall (i) use the Term Loan Priority Collateral in accordance with applicable law; (ii) obtain insurance for damage to property and liability to persons, including property and liability insurance, substantially similar to the insurance maintained by the Obligors, naming each of the Term Loan Collateral Agents as mortgagee, loss payee and additional insured, at no cost to the Term Loan Claimholders, but only to the extent such insurance is not otherwise in effect; and (iii) indemnify the Term Loan Claimholders from any claim, loss, damage, cost or liability arising out of any claim asserted by any third party as a result of any acts or omissions by the ABL Credit Agreement Collateral Agent, or any of its agents or representatives, in connection with the exercise by the ABL Claimholders of their rights of access set forth in this Section 5.10.  In no event shall any ABL Claimholders have any liability to the Term Loan Claimholders pursuant to this Section 5.10(b) or otherwise as a result of any condition on or with respect to the Term Loan Priority Collateral existing prior to the date of the exercise by the ABL Claimholders of their access rights under this Section 5.10(b), and the ABL Claimholders shall have no duty or liability to maintain the Term Loan Priority Collateral in a condition or manner better than that in which it was maintained prior to the access and/or use thereof by the ABL Claimholders.

(c)     Each of the Term Loan Collateral Agents (x) shall, at the request of the ABL Credit Agreement Collateral Agent, provide reasonable cooperation to the ABL Credit Agreement Collateral Agent in connection with the manufacture, production, completion, handling, removal and sale of any ABL Priority Collateral by the ABL Credit Agreement Collateral Agent as provided above and (y) shall be entitled to receive, from the ABL Credit Agreement Collateral Agent, fair compensation and reimbursement for their reasonable costs and expenses incurred in connection with such cooperation, support and assistance to the ABL Credit Agreement Collateral Agent.  Each of the Term Loan Collateral Agents and/or any such purchaser (or its transferee or successor) shall not otherwise be required to manufacture, produce, complete, remove, insure, protect, store, safeguard, sell or deliver any Inventory subject to any Lien held by the ABL Credit Agreement Collateral Agent or to provide any support, assistance or cooperation to the ABL Credit Agreement Collateral Agent in respect thereof.

5.11     Obligor Consent.  Each Obligor consents to the performance by each of the Term Loan Collateral Agents of the obligations set forth in Sections 5.8, 5.9 and 5.10 and acknowledges and agrees that no Term Loan Claimholder shall ever be accountable or liable for any action taken or omitted by any ABL Claimholder or its or any of their officers, employees, agents successors or assigns in connection therewith or incidental thereto or in consequence thereof.

## SECTION 6.     Insolvency or Liquidation Proceedings.

6.1     Finance and Sale Issues.

(a)     Until the Discharge of Term Loan Obligations has occurred, if any Obligor shall be subject to any Insolvency or Liquidation Proceeding and the Directing Term Loan Collateral Agent

shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code or any similar Debtor Relief Law) constituting Term Loan Priority Collateral or to permit any Obligor to obtain financing, whether from the Term Loan Claimholders or any other Person, under Section 364 of the Bankruptcy Code or any similar Debtor Relief Law, that is (i) senior or pari passu with the Liens on the Term Loan Priority Collateral securing the Term Loan Obligations and (ii) junior to the Liens on the ABL Priority Collateral securing the ABL Obligations (each a "**Term Loan DIP Financing**"), then the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, agrees that it and its Related Claimholders will raise no objection to, or oppose or contest (or join with or support any third party opposing, objecting or contesting), such Cash Collateral use or Term Loan DIP Financing (including any proposed orders for such Cash Collateral use and/or Term Loan DIP Financing which are acceptable to the Directing Term Loan Collateral Agent) and it and its Related Claimholders will be deemed to have consented to such Cash Collateral use or Term Loan DIP Financing (including such proposed orders), and to the extent the Liens on the Term Loan Priority Collateral securing the Term Loan Obligations are subordinated to or pari passu with such Term Loan DIP Financing, the ABL Credit Agreement Collateral Agent will subordinate its Liens on the Term Loan Priority Collateral to the Liens securing such Term Loan DIP Financing (and all obligations relating thereto and any customary "carve-out" agreed to on behalf of the Term Loan Claimholders by the Directing Term Loan Collateral Agent) and to all adequate protection Liens granted to the Term Loan Claimholders on property of the type constituting Term Loan Priority Collateral on the same basis as the Liens securing the ABL Obligations are subordinated to the Liens on the Term Loan Priority Collateral securing the Term Loan Obligations under this Agreement and will not request adequate protection or any other relief in connection therewith (except as expressly agreed by the Directing Term Loan Collateral Agent or to the extent permitted by Section 6.3); provided that (i) the aggregate principal amount of Indebtedness for borrowed money under such Term Loan DIP Financing plus the aggregate outstanding principal amount of Indebtedness for borrowed money under the Term Loan Financing Documents (which, for the avoidance of doubt, excludes any Term Loan Other Obligations) plus the aggregate face amount of any First Lien Letters of Credit (except any portion thereof that is no longer available for drawing as a result of any disbursement thereunder that has been reimbursed) does not exceed the Term Loan DIP Cap Amount, (ii) the ABL Credit Agreement Collateral Agent and the other ABL Claimholders retain a Lien on the Collateral to secure the ABL Obligations, and, with respect to the ABL Priority Collateral only, with the same priority as existed prior to the commencement of the Insolvency or Liquidation Proceeding, (iii) the foregoing provisions of this Section 6.1(a) shall not prevent the ABL Credit Agreement Collateral Agent and the ABL Claimholders from objecting to any provision in any Term Loan DIP Financing relating to any provision or content of a plan of reorganization or liquidation that are inconsistent with this Agreement and (iv) the terms of such Term Loan DIP Financing or such use of Cash Collateral do not require any Obligor to seek any approval for any plan of reorganization or liquidation that is inconsistent with the terms of this Agreement.

(b)     Until the Discharge of ABL Obligations has occurred, if any Obligor shall be subject to any Insolvency or Liquidation Proceeding and the ABL Credit Agreement Collateral Agent shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code or any similar Debtor Relief Law) constituting ABL Priority Collateral or to permit any Obligor to obtain financing, whether from the ABL Claimholders or any other Person, under Section 364 of the Bankruptcy Code or any similar Debtor Relief Law, that is (i) senior or pari passu with the Liens on the ABL Priority Collateral securing the ABL Obligations and (ii) junior to the Liens on the Term Loan Priority Collateral securing the Term Loan Obligations (each a "**ABL DIP Financing**"), then each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, agrees that it and its Related Claimholders will raise no objection to, or oppose or contest (or join with or support any third party opposing, objecting or contesting), such Cash Collateral use or ABL DIP Financing (including any proposed orders for such Cash Collateral use and/or ABL DIP Financing which are acceptable to the ABL Credit Agreement Collateral Agent) and it and its Related Claimholders will be deemed to have consented

-45-

to such Cash Collateral use or ABL DIP Financing (including such proposed orders), and to the extent the Liens on the ABL Priority Collateral securing the ABL Obligations are subordinated to or *pari passu* with such ABL DIP Financing, each Term Loan Collateral Agent will subordinate its Liens on the ABL Priority Collateral to the Liens securing such ABL DIP Financing (and all obligations relating thereto and any customary "carve-out" agreed to on behalf of the ABL Claimholders by the ABL Credit Agreement Collateral Agent) and to all adequate protection Liens granted to the ABL Claimholders on property of the type constituting ABL Priority Collateral on the same basis as the Liens securing the Term Loan Obligations are subordinated to the Liens on the ABL Priority Collateral securing the ABL Obligations under this Agreement and will not request adequate protection or any other relief in connection therewith (except as expressly agreed by the ABL Credit Agreement Collateral Agent or to the extent permitted by Section 6.3); provided that (i) the aggregate principal amount of Indebtedness for borrowed money under such ABL DIP Financing plus the aggregate outstanding principal amount of Indebtedness for borrowed money under the ABL Financing Documents (which, for the avoidance of doubt, excludes any ABL Other Obligations) plus the aggregate face amount of any ABL Letters of Credit (except any portion thereof that is no longer available for drawing as a result of any disbursement thereunder that has been reimbursed) does not exceed the ABL DIP Cap Amount, (ii) each Term Loan Collateral Agent and the other Term Loan Claimholders retain a Lien on the Collateral to secure the Term Loan Obligations, and, with respect to the Term Loan Priority Collateral only, with the same priority as existed prior to the commencement of the Insolvency or Liquidation Proceeding, (iii) the foregoing provisions of this Section 6.1(b) shall not prevent the Term Loan Collateral Agents and the Term Loan Claimholders from objecting to any provision in any ABL DIP Financing relating to any provision or content of a plan of reorganization or liquidation that are inconsistent with this Agreement and (iv) the terms of such ABL DIP Financing or use of Cash Collateral do not require any Obligor to seek any approval for any plan of reorganization or liquidation that is inconsistent with the terms of this Agreement.

(c)     Each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, agrees that it and its Related Claimholders will not seek consultation rights in connection with, and will raise no objection or oppose or contest (or join with or support any third party objecting, opposing or contesting), a motion to sell, liquidate or otherwise Dispose of Collateral in which the Junior Claimholders have a Junior Lien under Section 363 of the Bankruptcy Code if the requisite Senior Claimholders have consented to such sale, liquidation or other Disposition; provided that (1) to the extent the net cash proceeds of such sale or other Disposition are used to pay the principal amount of Indebtedness for borrowed money constituting Senior Obligations, or to reimburse disbursements under, or cash collateralize the face amount of, the Letters of Credit constituting Senior Obligations, the Liens of the Junior Claimholders shall attach to any remaining proceeds and (2) such motion does not impair the rights of the Junior Claimholders under Section 363(k) of the Bankruptcy Code; and provided, further, however, that the Junior Claimholders may assert any objection with respect to any proposed orders to retain professionals or set bid or related procedures in connection with such sale, liquidation or Disposition that may be raised by an unsecured creditor of the Obligors.

6.2     Relief from the Automatic Stay.  Until the Discharge of Senior Obligations has occurred, each Junior Collateral Agent, on behalf of itself and its Related Claimholders agrees that none of them shall (a) seek (or support any other Person seeking) relief from or modification of the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of any of the Collateral in which a Junior Claimholder has a Junior Lien, in each case without the prior written consent of the Directing Senior Collateral Agent, or (b) oppose (or support any other Person in opposing) any request by any Senior Collateral Agent for relief from or modification of such stay.

-46-

6.3     Adequate Protection.

(a)     The ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, agrees that none of them shall contest (or support any other Person contesting):

(i)     any request by any Term Loan Collateral Agent or the other Term Loan Claimholders for adequate protection with respect to the Term Loan Priority Collateral under any Debtor Relief Law; or

(ii)     any objection by any Term Loan Collateral Agent or the other Term Loan Claimholders to any motion, relief, action or proceeding based on such Term Loan Collateral Agent or the other Term Loan Claimholders claiming a lack of adequate protection with respect to the Term Loan Priority Collateral.

(b)     Notwithstanding the foregoing provisions in Section 6.3(a), in any Insolvency or Liquidation Proceeding:

(i)     if the Term Loan Claimholders (or any subset thereof) are granted adequate protection with respect to the Term Loan Priority Collateral in the form of a Lien on additional or replacement collateral in connection with any use of Cash Collateral or DIP Financing, then the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, may seek or request adequate protection in the form of a Lien on such additional or replacement collateral, which Lien will be subordinated to the Liens securing the Term Loan Obligations and such use of Cash Collateral or DIP Financing (and all obligations relating thereto) on the same basis as the other Liens securing the ABL Obligations are so subordinated to the Liens on the Term Loan Priority Collateral securing the Term Loan Obligations under this Agreement; and

(ii)     the ABL Credit Agreement Collateral Agent and the other ABL Claimholders shall only be permitted to seek adequate protection with respect to their respective rights in the Term Loan Priority Collateral in any Insolvency or Liquidation Proceeding in the form of (A) additional collateral; provided that as adequate protection for the Term Loan Obligations, each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, is also granted a Lien on such additional collateral that is senior to any Lien granted to the ABL Credit Agreement Collateral Agent and the other ABL Claimholders; (B) replacement Liens on the Term Loan Priority Collateral; provided that as adequate protection for the Term Loan Obligations, each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, is also granted replacement Liens on the Term Loan Priority Collateral that are senior to any Lien granted to the ABL Credit Agreement Collateral Agent and the other ABL Claimholders; (C) an administrative expense claim in respect of the Term Loan Priority Collateral; provided that as adequate protection for the Term Loan Obligations, each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, is also granted an administrative expense claim that is senior and prior to the administrative expense claim of the ABL Credit Agreement Collateral Agent and the other ABL Claimholders; (D) cash payments made with Term Loan Priority Collateral with respect to current fees and expenses; provided that (1) as adequate protection for the Term Loan Obligations, each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, is also granted cash payments made with Term Loan Priority Collateral with respect to current fees and expenses and (2) each Term Loan Collateral Agent may object to the amounts of fees and expenses sought by the ABL Credit Agreement Collateral Agent and the other ABL Claimholders; and (E) cash payments made with Term Loan Priority Collateral with respect to interest on the ABL Obligations; provided that (1) as adequate protection for the Term Loan Obligations, each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, is

-47-

also granted cash payments made with Term Loan Priority Collateral with respect to interest on the Term Loan Obligation represented by it, and (2) such cash payments do not exceed an amount equal to the interest accruing on the principal amount of ABL Obligations outstanding on the date such relief is granted at the interest rate under the applicable ABL Documents and accruing from the date the ABL Credit Agreement Collateral Agent is granted such relief.

(c)     Each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, agrees that none of them shall contest (or support any other Person contesting):

(i)     any request by the ABL Credit Agreement Collateral Agent or the other ABL Claimholders for adequate protection with respect to the ABL Priority Collateral under any Debtor Relief Law; or

(ii)     any objection by the ABL Credit Agreement Collateral Agent or the other ABL Claimholders to any motion, relief, action or proceeding based on the ABL Credit Agreement Collateral Agent or the other ABL Claimholders claiming a lack of adequate protection with respect to the ABL Priority Collateral.

(d)     Notwithstanding the foregoing provisions in Section 6.3(c), in any Insolvency or Liquidation Proceeding:

(i)     if the ABL Claimholders (or any subset thereof) are granted adequate protection with respect to the ABL Priority Collateral in the form of a Lien on additional or replacement collateral in connection with any use of Cash Collateral or DIP Financing, then each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, may seek or request adequate protection in the form of a Lien on such additional or replacement collateral, which Lien will be subordinated to the Liens securing the ABL Obligations and such use of Cash Collateral or DIP Financing (and all obligations relating thereto) on the same basis as the other Liens securing the Term Loan Obligations are so subordinated to the Liens on the ABL Priority Collateral securing the ABL Obligations under this Agreement; and

(ii)     each Term Loan Collateral Agent and the other Term Loan Claimholders shall only be permitted to seek adequate protection with respect to their respective rights in the ABL Priority Collateral in any Insolvency or Liquidation Proceeding in the form of (A) additional collateral; provided that as adequate protection for the ABL Obligations, the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, is also granted a Lien on such additional collateral that is senior to any Lien granted to the Term Loan Collateral Agents and the other Term Loan Claimholders; (B) replacement Liens on the ABL Priority Collateral; provided that as adequate protection for the ABL Obligations, the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, is also granted replacement Liens on the ABL Priority Collateral that are senior to any Lien granted to the Term Loan Collateral Agents and the other Term Loan Claimholders; (C) an administrative expense claim in respect of the ABL Priority Collateral; provided that as adequate protection for the ABL Obligations, the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, is also granted an administrative expense claim that is senior and prior to the administrative expense claim of the Term Loan Collateral Agents and the other Term Loan Claimholders; (D) cash payments made with ABL Priority Collateral with respect to current fees and expenses; provided that (1) as adequate protection for the ABL Obligations, the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, is also granted cash payments made with ABL Priority Collateral with respect to current fees and expenses and (2) each ABL Collateral Agent may object to the amounts of fees and expenses sought by the Term

-48-

Loan Collateral Agents and the other Term Loan Claimholders; and (E) cash payments made with ABL Priority Collateral with respect to interest on the Term Loan Obligations; provided that (1) as adequate protection for the ABL Obligations, the ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, is also granted cash payments made with ABL Priority Collateral with respect to interest on the ABL Obligation represented by it, and (2) such cash payments do not exceed an amount equal to the interest accruing on the principal amount of Term Loan Obligations outstanding on the date such relief is granted at the interest rate under the applicable Term Loan Documents and accruing from the date the Term Loan Collateral Agents are granted such relief.

6.4     No Waiver.  Subject to Section 6.7(b), nothing contained herein shall prohibit or in any way limit any Senior Collateral Agent or any other Senior Claimholder from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by any Junior Collateral Agent or any other Junior Claimholders, including the seeking by any Junior Collateral Agent or any other Junior Claimholders of adequate protection or the asserting by any Junior Collateral Agent or any other Junior Claimholders of any of its rights and remedies under the Junior Financing Documents or otherwise, in each case in respect of such Junior Claimholder's Liens in respect of the Collateral in which a Junior Claimholder has a Junior Lien.  Without limiting the foregoing, notwithstanding anything herein to the contrary, the Senior Claimholders shall not be deemed to have consented to, and expressly retain their rights to object to, the grant of adequate protection in the form of cash payments to the Junior Claimholders made pursuant to Section 6.3(b) or (d), as applicable.

6.5     Reinstatement.  If any Senior Claimholder of any Series is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of any Obligor any amount paid in respect of its Senior Obligations (a "**Recovery**"), then such Senior Claimholder shall be entitled to a reinstatement of its Senior Obligations with respect to all such recovered amounts on the date of such Recovery, and from and after the date of such reinstatement the Discharge of such Series of Senior Obligations and the Discharge of such Series of Term Loan Obligations or the Discharge of ABL Obligations, as applicable, shall be deemed not to have occurred for all purposes hereunder.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.  Any amounts received by any Junior Collateral Agent or any other Junior Claimholder on account of the Junior Obligations after the termination of this Agreement shall, upon a reinstatement of this Agreement pursuant to this Section 6.5, be held in trust for and paid over to the Directing Senior Collateral Agent for the benefit of the Senior Claimholders, for application to the reinstated Senior Obligations.  This Section 6.5 shall survive termination of this Agreement.

6.6     Reorganization Securities.  If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization, arrangement, compromise or liquidation or similar dispositive restructuring plan, both on account of ABL Obligations and on account of Term Loan Obligations, then, to the extent the debt obligations distributed on account of the ABL Obligations and on account of the Term Loan Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

6.7     Post-Petition Interest.

(a)     Each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, agrees that neither it nor its Related Claimholders shall oppose or seek to challenge (or join with any other

-49-

Person opposing or challenging) any claim by any Senior Collateral Agent or any other Senior Claimholder for allowance in any Insolvency or Liquidation Proceeding of Senior Obligations consisting of Post-Petition Interest to the extent of the value of the Senior Claimholders' Lien on the Collateral in which a Senior Claimholder has a Senior Lien. Regardless of whether any such claim for Post-Petition Interest is allowed or allowable, and without limiting the generality of the other provisions of this Agreement, this Agreement expressly is intended to include, and does include the "rule of explicitness," and is intended to provide the Senior Claimholders with the right to receive payment of all Post-Petition Interest through distributions made pursuant to the provisions of this Agreement on account of the Collateral in which a Senior Claimholder has a Senior Lien even though such Post-Petition Interest may not be not allowed or allowable against the bankruptcy estate of any Borrower or any other Obligor under Section 502(b)(2) or Section 506(b) of the Bankruptcy Code or under any other provision of the Bankruptcy Code or any other Debtor Relief Law.

(b)    Subject to <u>Sections 6.3(b) and (d)</u>, none of any Senior Collateral Agent nor any of its Related Claimholders shall oppose or seek to challenge any claim by any Junior Collateral Agent or any other Junior Claimholder for allowance in any Insolvency or Liquidation Proceeding of Junior Obligations consisting of Post-Petition Interest to the extent of the value of the Lien of any Junior Collateral Agent, on behalf of the Junior Claimholders, on the Junior Claimholders Lien on the Collateral in which a Junior Claimholder has a Junior Lien (after taking into account the amount of the Senior Obligations).

6.8    <u>Waivers</u>.  (a) Each Junior Collateral Agent, for itself and on behalf of its Related Junior Claimholders, waives any claim it or its Related Claimholders may hereafter have against any Senior Claimholder arising out of (a) the election of any Senior Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code with respect to any Collateral in which a Senior Claimholder has a Senior Lien or (b) any cash collateral or financing arrangement, or any grant of a security interest in connection with the Collateral in which a Senior Claimholder has a Senior Lien, in any Insolvency or Liquidation Proceeding so long as such actions are not in express contravention of the terms of this Agreement.

(b)    Each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, agrees that it will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code or any similar provision of any other Debtor Relief Law senior to or on a parity with the Senior Liens on the Collateral in which a Senior Claimholder has a Senior Lien securing the Senior Obligations for costs or expenses of preserving or disposing of any such Collateral.

6.9    <u>Separate Grants of Security and Separate Classification</u>.  Each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, and each Senior Collateral Agent, for itself and on behalf of its Related Claimholders, acknowledges and agrees that:

(a)    the grants of Liens pursuant to the Senior Collateral Documents and the Junior Collateral Documents constitute, and, in the case of the Shared Collateral Documents, are intended to constitute, two separate and distinct grants of Liens; and

(b)    because of, among other things, their differing rights in the Collateral, the Junior Obligations are fundamentally different from the Senior Obligations and must, subject to applicable law, be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding.

To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the Senior Claimholders and the Junior Claimholders in respect of

-50-

any Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then each of the parties hereto hereby acknowledges and agrees that, subject to <u>Sections 2.1</u> and <u>4.1</u>, all distributions shall be made as if there were separate classes of senior and junior secured claims against the Obligors in respect of such Collateral with the effect being that, to the extent that the aggregate value of the Collateral in which a Senior Claimholder has a Senior Lien is sufficient (for this purpose ignoring all claims held by the Junior Claimholders), the Senior Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing (or that would be owing if there were such separate classes of senior and junior secured claims) in respect of Post-Petition Interest, including any additional interest payable pursuant to the Senior Documents arising from or related to a default, regardless of whether any such claim is allowed or allowable in any Insolvency or Liquidation Proceeding, before any distribution is made in respect of the claims held by the Junior Claimholders with respect to such Collateral, with each Junior Collateral Agent, for itself and on behalf of its Related Claimholders, hereby acknowledging and agreeing to turn over to the Directing Senior Collateral Agent, for itself and on behalf of the Senior Claimholders, such Collateral or proceeds of such Collateral or any other distribution (whether or not expressly characterized as such) in respect of such Collateral, otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Junior Claimholders.

    6.10 <u>Effectiveness in Insolvency or Liquidation Proceedings</u>.  The parties acknowledge that this Agreement is a "subordination agreement" under Section 510(a) of the Bankruptcy Code and under comparable provisions of any other applicable Debtor Relief Law, which will be effective before, during and after the commencement of any Insolvency or Liquidation Proceeding. All references in this Agreement to any Obligor will include such Person as a debtor-in-possession and any receiver or trustee for such Person in any Insolvency or Liquidation Proceeding.

    **SECTION 7.**  **Reliance; Waivers; Etc**.

    7.1 <u>Reliance</u>.  Other than any reliance on the terms of this Agreement, each ABL Collateral Agent, on behalf of itself and its Related Claimholders, acknowledges that it and its Related Claimholders have, independently and without reliance on any Term Loan Collateral Agent or any other Term Loan Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the ABL Documents (as applicable) and be bound by the terms of this Agreement, and they will continue to make their own credit decision in taking or not taking any action under the ABL Documents or this Agreement.  Each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, acknowledges that it and its Related Claimholders have, independently and without reliance on the ABL Credit Agreement Collateral Agent or any other ABL Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Term Loan Documents and be bound by the terms of this Agreement, and they will continue to make their own credit decision in taking or not taking any action under the Term Loan Documents or this Agreement.

    7.2 <u>No Warranties or Liability</u>.

    (a)  Each ABL Collateral Agent, on behalf of itself and its Related Claimholders, acknowledges and agrees that, except as set forth in <u>Section 8.14</u>, no Term Loan Collateral Agent or other Term Loan Claimholders have made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the Term Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The Term Loan Claimholders will be entitled to manage and supervise their respective extensions of

credit under the Term Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.

(b)        Each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, acknowledges and agrees that, except as set forth in <u>Section 8.14</u>, neither the ABL Credit Agreement Collateral Agent nor other ABL Claimholders have made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the ABL Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The ABL Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the ABL Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.

(c)        The Term Loan Collateral Agents and the other Term Loan Claimholders shall have no duty to the ABL Collateral Agents or any of the other ABL Claimholders, and the ABL Credit Agreement Collateral Agent and the other ABL Claimholders shall have no duty to the Term Loan Collateral Agents or any of the other Term Loan Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with any Obligor (including the ABL Financing Documents and the Term Loan Financing Documents, but in each case other than this Agreement), regardless of any knowledge thereof which they may have or be charged with.

7.3        <u>No Waiver of Lien Priorities</u>.

(a)        No right of the Senior Collateral Agents or any other Senior Claimholders, or any of them, to enforce any provision of this Agreement or of any Senior Document with respect to their Liens on the Collateral in which a Senior Claimholder has a Senior Lien shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Obligor or by any act or failure to act by any Senior Collateral Agent or any other Senior Claimholder, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the Senior Documents or any of the Junior Documents, regardless of any knowledge thereof which the Senior Collateral Agents or the other Senior Claimholders, or any of them, may have or be otherwise charged with.

(b)        Without in any way limiting the generality of the foregoing <u>paragraph (a)</u> (but subject to the rights of the Senior Obligors under the Senior Documents and subject to the provisions of <u>Section 5.3(a)</u>), the Senior Collateral Agents and the other Senior Claimholders, or any of them, may at any time and from time to time in accordance with the Senior Documents and/or applicable law, without the consent of, or notice to, any Junior Collateral Agent or any other Junior Claimholders, without incurring any liabilities to any Junior Collateral Agent or any other Junior Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of any Junior Collateral Agent or any other Junior Claimholders is affected, impaired or extinguished thereby) do any one or more of the following:

(1)        make loans and advances to any Obligor or issue, provide or obtain Letters of Credit for the account of any Obligor or otherwise extend credit to any Obligor, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing;

(2)        change the manner, place or terms of payment of, or change or extend the time of payment of, or amend, renew, exchange, increase or alter the terms of, any of the Senior Obligations or any Lien on any Collateral in which a Senior Claimholder has a Senior Lien or guaranty thereof or any liability of any Obligor, or any liability incurred directly or indirectly in

-52-

respect thereof (including any increase in or extension of the Senior Obligations, without any restriction as to the tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by any Senior Collateral Agent or any of the other Senior Claimholders, the Senior Obligations or any of the Senior Documents;

(3)     sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Collateral in which a Senior Claimholder has a Senior Lien or any liability of any Obligor to any Senior Collateral Agent or any other Senior Claimholders, or any liability incurred directly or indirectly in respect thereof;

(4)     settle or compromise any Senior Obligation or any other liability of any Obligor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the Senior Obligations) in any manner or order;

(5)     exercise or delay in or refrain from exercising any right or remedy against any Obligor or any security or any other Person or with respect to any security, elect any remedy and otherwise deal freely with any Obligor or any Collateral in which a Senior Claimholder has a Senior Lien and any security and any guarantor or any liability of any Obligor to the Senior Claimholders or any liability incurred directly or indirectly in respect thereof; and

(6)     release or discharge any Senior Obligation or any guaranty thereof or any agreement or obligation of any Obligor or any other Person or entity with respect thereto.

(c)     Until the Discharge of Senior Obligations, each Junior Collateral Agent, on behalf of itself and its Related Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral on which it has a Junior Lien or any other similar rights a junior secured creditor may have under applicable law.

7.4     Waiver of Liability.

(a)     Each Junior Collateral Agent, on behalf of itself and its Related Claimholders, agrees that the Senior Collateral Agents and the other Senior Claimholders shall have no liability to any Junior Collateral Agent or any other Junior Claimholders, and each Junior Collateral Agent, on behalf of itself and its Related Junior Claimholders, hereby waives any claim against any Senior Collateral Agent or any other Senior Claimholder, arising out of any and all actions which any Senior Collateral Agent or any other Senior Claimholders may take or permit or omit to take with respect to: (i) the Senior Documents (including, without limitation, any failure to perfect or obtain perfected security interests in the Collateral in which a Senior Claimholder has a Senior Lien), (ii) the collection of the Senior Obligations or (iii) the foreclosure upon, or sale, liquidation or other Disposition of, any Collateral in which a Senior Claimholder has a Senior Lien. Each Junior Collateral Agent, on behalf of itself and its Related Claimholders, also agrees that the Senior Collateral Agents and the other Senior Claimholders have no duty, express or implied, fiduciary or otherwise, to them in respect of the maintenance or preservation of the Collateral in which a Senior Claimholder has a Senior Lien, the Senior Obligations or otherwise. Neither the Senior Collateral Agents nor any other Senior Claimholder nor any of their respective directors, officers, employees or agents will be liable for failure to demand, collect or realize upon any of the Collateral in which a Senior Claimholder has a Senior Lien or for any delay in doing so, or will be under any obligation to sell or otherwise Dispose of any such Collateral upon the request of any

-53-

Obligor or upon the request of any Junior Collateral Agent, any other Junior Claimholder or any other Person or to take any other action whatsoever with regard to such Collateral or any part thereof. Without limiting the foregoing, each Junior Collateral Agent, on behalf of itself and its Related Claimholders, agrees that neither any Senior Collateral Agent nor any other Senior Claimholder (in directing its Senior Collateral Agent to take any action with respect to the Collateral in which a Senior Claimholder has a Senior Lien) shall have any duty or obligation to realize first upon any Collateral in which a Senior Claimholder has a Senior Lien or to sell or otherwise Dispose of all or any portion of such Collateral in any manner, including as a result of the application of the principles of marshaling or otherwise, that would maximize the return to any Senior Claimholders or any Junior Claimholders, notwithstanding that the order and timing of any such realization, sale or other Disposition may affect the amount of proceeds actually received by such Claimholders from such realization, sale or other Disposition.

(b)      With respect to its share of the ABL Obligations, UBS shall have and may exercise the same rights and powers hereunder as, and shall be subject to the same obligations and liabilities as and to the extent set forth herein for, any other ABL Claimholder, all as if UBS were not the ABL Credit Agreement Collateral Agent. With respect to its share of the First Lien Obligations, UBS shall have and may exercise the same rights and powers hereunder as, and shall be subject to the same obligations and liabilities as and to the extent set forth herein for, any other First Lien Claimholder, all as if UBS were not the First Lien Credit Agreement Collateral Agent. With respect to its share of the Second Lien Obligations, GS shall have and may exercise the same rights and powers hereunder as, and shall be subject to the same obligations and liabilities as and to the extent set forth herein for, any other Second Lien Claimholder, all as if GS were not the Second Lien Credit Agreement Collateral Agent. The term "Claimholders" or any similar term shall, unless the context clearly otherwise indicates, include UBS and GS, each in its individual capacity as a Claimholder. UBS, GS and their respective Affiliates may lend money to, and generally engage in any kind of business with, the Obligors or any of their Affiliates as if UBS were not acting as the ABL Credit Agreement Collateral Agent, UBS were not acting as the First Lien Credit Agreement Collateral Agent and GS were not acting as the Second Lien Credit Agreement Collateral Agent and without any duty to account therefor to any other Claimholder.

7.5      <u>Obligations Unconditional</u>. All rights, interests, agreements and obligations of the ABL Credit Agreement Collateral Agent and the other ABL Claimholders and the Term Loan Collateral Agents and the other Term Loan Claimholders, respectively, hereunder (including the Lien priorities established hereby) shall remain in full force and effect irrespective of:

(a)      any lack of validity or enforceability of any ABL Documents or any Term Loan Documents;

(b)      any change in the time, manner or place of payment of, or, subject to the limitations set forth in <u>Section 5.3</u>, in any other terms of, all or any of the ABL Obligations or Term Loan Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any ABL Document or any Term Loan Document;

(c)      any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the ABL Obligations or Term Loan Obligations or any guaranty thereof;

(d)      the commencement of any Insolvency or Liquidation Proceeding in respect of any Obligor; or

-54-

(e) any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Obligor in respect of the ABL Credit Agreement Collateral Agent, any other ABL Claimholder, the ABL Obligations, any Term Loan Collateral Agent, any other Term Loan Claimholder or the Term Loan Obligations in respect of this Agreement.

**SECTION 8.** **Miscellaneous**.

8.1 Conflicts.

(a) Subject to Section 8.1(b), in the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the ABL Documents or the Term Loan Documents, the provisions of this Agreement shall govern and control.

(b) The parties hereto acknowledge, authorize and consent to the entry by the Term Loan Collateral Agents into the First Lien/Second Lien Intercreditor Agreement and any other intercreditor agreement solely among the Term Loan Collateral Agents (or any subset of them). In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the First Lien/Second Lien Intercreditor Agreement or such other intercreditor agreement with respect to the rights and obligations of the Term Loan Collateral Agents and the other Term Loan Claimholders (or any subset of them) to each other in respect of the Term Loan Collateral, the provisions of the First Lien/Second Lien Intercreditor Agreement or such other intercreditor agreement shall control.

8.2 Effectiveness; Continuing Nature of this Agreement; Severability. This Agreement shall become effective when executed and delivered by the parties hereto. This is a continuing agreement of Lien subordination and each of the ABL Claimholders and the Term Loan Claimholders may continue, at any time and without notice to any Term Loan Collateral Agent or any other Term Loan Claimholder or any ABL Collateral Agent or any other ABL Claimholder, to extend credit and other financial accommodations and lend monies to or for the benefit of any Obligor constituting ABL Obligations and/or Term Loan Obligations in reliance hereon. Each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement. Each ABL Collateral Agent, on behalf of itself and its Related Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. All references to any Obligor shall include such Obligor as debtor and debtor-in-possession and any receiver, trustee or similar Person for any Obligor (as the case may be) in any Insolvency or Liquidation Proceeding. This Agreement shall terminate and be of no further force and effect:

(a) with respect to the ABL Credit Agreement Collateral Agent, the other ABL Claimholders and the ABL Obligations, upon the Discharge of ABL Obligations, subject to Section 5.6 and the rights of the ABL Claimholders under Section 6.5; and

(b) with respect to any Term Loan Collateral Agent, the other Term Loan Claimholders and the Term Loan Obligations of any Series, upon the Discharge of such Series of Term Loan Obligations.

Notwithstanding the foregoing, such termination shall not relieve any such party of its obligations incurred hereunder prior to the date of such termination.

-55-

8.3     Amendments; Waivers.  Neither this Agreement nor any provision hereof may be amended, modified or waived except pursuant to an agreement or agreements in writing entered into by the ABL Credit Agreement Collateral Agent and each Term Loan Collateral Agent then party hereto; provided that (a) the ABL Credit Agreement Collateral Agent and the Directing Term Loan Collateral Agent may, at the reasonable expense of the Obligors and without the written consent of any other ABL Claimholder, any other Term Loan Claimholder or any Obligor, agree to any amendment to or other modifications of this Agreement for the purpose of giving effect to Section 8.21 or any Refinancing of any ABL Obligations or Term Loan Obligations, (b) any Additional Lien Obligations Agent may become party hereto by execution and delivery of a Joinder Agreement in the form of Exhibit B hereto in accordance with the provisions of Section 8.21 and (c) additional Obligors may be added as parties hereto upon the execution and delivery of a counterpart of the Intercreditor Joinder Agreement in the form of Exhibit A hereto in accordance with the provisions of Section 8.18.  Each of the ABL Credit Agreement Collateral Agent and the Directing Term Loan Collateral Agent shall execute and deliver an amendment or other modification of this Agreement at the other's request to permit new creditors to become a party hereto as set forth in the proviso to the immediately preceding sentence.  Notwithstanding the provisions of any other ABL Document or Term Loan Document, the ABL Credit Agreement Collateral Agent and the Directing Term Loan Collateral Agent may, with the consent of the Top Borrower, make any amendments, restatements, amendment and restatements, supplements or other modifications to this Agreement to correct any ambiguity, defect or inconsistency contained herein without the consent of any other Person.  Each waiver of the terms of this Agreement, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties owed to such party in any other respect or at any other time.  Notwithstanding the foregoing, no Obligor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except (x) to the extent such Obligor's rights are directly and adversely affected by such amendment, modification or waiver, (y) to the extent reducing the rights or increasing the obligations of such Obligor or (z) any amendment, modification or waiver of the ABL DIP Cap Amount or the Term Loan DIP Cap Amount, if the effect of such amendment, modification or waiver is to reduce the amount thereof from the amount thereof in effect on the date hereof; provided, however, that the Top Borrower shall be given notice of any amendment, modification or waiver of this Agreement promptly after the effectiveness thereof (it being understood that the failure to deliver such notice to the Top Borrower shall in no way impact the effectiveness of any such amendment, modification or waiver).  To the extent permitted by the provisions of the ABL Financing Documents and the Term Loan Documents, the Borrowers may incur additional ABL Obligations under one or more debt facilities junior to the ABL Credit Agreement ("**Junior ABL Obligations**").  In connection with any such incurrence this Agreement shall be amended, at the Borrowers' expense (to the extent provided in the applicable Financing Documents), to join the agent or representative of such Junior ABL Obligations (a "**Junior ABL Agent**") as a party hereto on behalf of itself and the holders of such Junior ABL Obligations and to make other necessary amendments to this Agreement where customary and appropriate.  Such amendments shall provide that upon any such Junior ABL Agent becoming a party hereto, all obligations of such Series of Junior ABL Obligations shall be secured by a Lien on the Collateral in accordance with the terms hereof and the Junior ABL Agent and the holders of such Junior ABL Obligations shall be subject to the terms of this Agreement to the same extent vis-à-vis the Term Loan Claimholders and Term Loan Collateral Agents as the ABL Lenders and ABL Credit Agreement Collateral Agent are bound hereby.

8.4     Information Concerning Financial Condition of the Obligors and their Subsidiaries.  The ABL Credit Agreement Collateral Agent and the other ABL Claimholders, on the one hand, and the Term Loan Collateral Agents and the other Term Loan Claimholders, on the other hand, shall be responsible for keeping themselves informed of (a) the financial condition of the Obligors and their subsidiaries and all endorsers and/or guarantors of the ABL Obligations or the Term Loan Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the ABL Obligations

-56-

or the Term Loan Obligations.  The ABL Credit Agreement Collateral Agent, the Term Loan Collateral Agents, the ABL Claimholders and the Term Loan Claimholders shall have no duty to advise any other party of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the ABL Credit Agreement Collateral Agent, any Term Loan Collateral Agents, any ABL Claimholders or any Term Loan Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it or they shall be under no obligation:

       (i)      to make, and such person shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

       (ii)     to provide any additional information or to provide any such information on any subsequent occasion;

       (iii)    to undertake any investigation; or

       (iv)    to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

       8.5     <u>Subrogation</u>.  With respect to the value of any payments or distributions in cash, property or other assets that any Junior Collateral Agent or any other Junior Claimholder pays over to the Senior Collateral Agents or the other Senior Claimholders under the terms of this Agreement, such Junior Collateral Agent or such other Junior Claimholder shall be subrogated to the rights of each Senior Collateral Agent and the other Senior Claimholders; <u>provided</u> that each Junior Collateral Agent, on behalf of itself and its Related Claimholders, hereby agrees that neither it nor its Related Claimholders shall assert or enforce any such rights of subrogation it may acquire with respect to its Liens on the Collateral in which a Junior Claimholder has a Junior Lien as a result of any payment hereunder until the Discharge of Senior Obligations has occurred.  Each Obligor acknowledges and agrees that the value of any payments or distributions in cash, property or other assets received by any Junior Collateral Agent or the other Junior Claimholders and paid over to the Senior Collateral Agents or the other Senior Claimholders pursuant to, and applied in accordance with, this Agreement, shall not relieve or reduce any of the Junior Obligations under the Junior Documents.

       8.6     <u>Application of Payments</u>.  All payments received by any Senior Collateral Agent or the other Senior Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the Senior Obligations as the Senior Claimholders, in their sole discretion, deem appropriate.  Each Junior Collateral Agent, on behalf of itself and its Related Claimholders, consents to any extension or postponement of the time of payment of the Senior Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the Senior Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

       8.7     <u>SUBMISSION TO JURISDICTION; WAIVERS</u>.

       **(a)     EACH PARTY HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS (AND THEIR) PROPERTY, TO THE EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW**

-57-

YORK (OR ANY APPELLATE COURT THEREFROM) OVER ANY SUIT OR ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED EXCLUSIVELY IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENTS BY REGISTERED MAIL ADDRESSED TO SUCH PERSON SHALL BE EFFECTIVE SERVICE OF PROCESS AGAINST SUCH PERSON FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT. EACH OF THE PARTIES HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  EACH OF THE PARTIES HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)     TO THE EXTENT PERMITTED BY LAW, EACH PARTY HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL) DIRECTED TO IT AT ITS ADDRESS FOR NOTICES AS PROVIDED FOR IN SECTION 8.8.  EACH PARTY HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) HEREBY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER THAT SERVICE OF PROCESS WAS INVALID AND INEFFECTIVE.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(c)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS), TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT (OR THEY) MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY ABL DOCUMENT OR TERM LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT

-58-

**BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

8.8     Notices.  All notices to the ABL Claimholders and the Term Loan Claimholders permitted or required under this Agreement shall also be sent to the related ABL Collateral Agent and the related Term Loan Collateral Agent, respectively (and, for this purpose, (i) the ABL Credit Agreement Collateral Agent shall be deemed to be an agent for the ABL Secured Hedging Obligations and ABL Banking Services Obligations, (ii) the Directing First Lien Collateral Agent shall be deemed to be an agent for the First Lien Secured Hedging Obligations and the First Lien Banking Services Obligations, and (iii) the Directing Second Lien Collateral Agent shall be deemed to be an agent for the Second Lien Secured Hedging Obligations and the Second Lien Banking Services Obligations).  Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served, sent by facsimile or sent by other electronic transmission or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile or other electronic transmission, or three (3) Business Days after depositing it in the United States mail with postage prepaid and properly addressed.  For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

8.9     Further Assurances.  The ABL Credit Agreement Collateral Agent, on behalf of itself and its Related Claimholders, and each Term Loan Collateral Agent, on behalf of itself and its Related Claimholders, and each Obligor, agrees that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the ABL Credit Agreement Collateral Agent or the Directing Term Loan Collateral Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

8.10     CHOICE OF LAW.  THIS AGREEMENT, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT (WHETHER IN TORT, CONTRACT (AT LAW OR IN EQUITY) OR OTHERWISE), SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

8.11     Binding on Successors and Assigns.  This Agreement shall be binding upon the ABL Credit Agreement Collateral Agent, the ABL Claimholders, each First Lien Collateral Agent, the other First Lien Claimholders, each Second Lien Collateral Agent, the other Second Lien Claimholders and their respective successors and permitted assigns.  If the ABL Credit Agreement Collateral Agent, any First Lien Collateral Agent or any Second Lien Collateral Agent resigns or is replaced pursuant to the ABL Documents, the First Lien Documents or the Second Lien Documents, as applicable, its successor shall be deemed to be a party to this Agreement and shall have all the rights of, and be subject to all the obligations of, this Agreement.

8.12     Headings.  Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

8.13     Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by facsimile or other

electronic transmission (including ".pdf" or ".tiff" format) shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

8.14    Authorization; Binding Effect on Claimholders.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.  Each ABL Claimholder and each Term Loan Claimholder, by its acceptance of the benefits of the ABL Documents and Term Loan Documents, as the case may be, shall be deemed to have agreed to be bound by the agreements made herein, including the agreements made by any Collateral Agent on its behalf.

8.15    Exclusive Means of Exercising Rights under this Agreement.

(a)    The ABL Claimholders shall be deemed to have irrevocably appointed the ABL Credit Agreement Collateral Agent as their exclusive agent hereunder.  Consistent with such appointment, the ABL Claimholders further shall be deemed to have agreed that only the ABL Credit Agreement Collateral Agent (and not any individual claimholder or group of claimholders) as agent for the ABL Claimholders, or any of the ABL Credit Agreement Collateral Agent's agents, shall have the right on their behalf to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement); provided that (i) holders of the ABL Secured Hedging Obligations and the ABL Banking Services Obligations may exercise customary netting and set off rights under the ABL Hedge Agreements and ABL Banking Services Agreements to which they are, respectively, a party, (ii) cash collateral may be held pursuant to the terms of the ABL Documents (including any relating to ABL Hedge Agreements) and any such individual ABL Claimholder may act against such cash collateral in accordance with the terms of the relevant ABL Document or applicable law and (iii) the ABL Claimholders may exercise customary rights of setoff against depository or other accounts maintained with them in accordance with the terms of the relevant ABL Document or applicable law.  Specifically, but without limiting the generality of the foregoing, no ABL Claimholder or group of ABL Claimholders, other than the ABL Credit Agreement Collateral Agent (acting at the direction of, or pursuant to a grant of authority by, the Required ABL Claimholders), shall be entitled to take or file, and shall be precluded from taking or filing (whether in any Insolvency or Liquidation Proceeding or otherwise), any action, judicial or otherwise, to enforce any right or power or pursue any remedy under this Agreement (including any declaratory judgment or other action to interpret or otherwise enforce the provisions of this Agreement), except solely as provided in the proviso in the immediately preceding sentence.

(b)    The Term Loan Claimholders shall be deemed to have irrevocably appointed the Directing Term Loan Collateral Agent as their exclusive agent hereunder.  Consistent with such appointment, the Term Loan Claimholders further shall be deemed to have agreed that only the Directing Term Loan Collateral Agent (and not any individual claimholder or group of claimholders) as agent for the Term Loan Claimholders, or any of the Directing Term Loan Collateral Agent's agents, shall have the right on their behalf to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement); provided that, subject to the limitations, restrictions and other agreements set forth herein, (i) holders of First Lien Secured Hedging Obligations, First Lien Banking Services Obligations, the Second Lien Secured Hedging Obligations and the Second Lien Banking Services Obligations may exercise customary netting and set off rights under the First Lien Hedge Agreements, the First Lien Banking Services Agreements, the Second Lien Hedge Agreements and Second Lien Banking Services Agreements to which they are, respectively, a party, (ii) cash collateral may be held pursuant to the terms of the Term Loan Documents (including any relating to First Lien Hedge Agreements or Second Lien Hedge Agreements) and any such individual Term Loan Claimholder may act against such cash collateral in accordance with the terms of the relevant Term Loan Document or applicable law and (iii) the Term

-60-

Loan Claimholders may exercise customary rights of setoff against depository or other accounts maintained with them in accordance with the terms of the relevant Term Loan Document or applicable law. Specifically, but without limiting the generality of the foregoing, each Term Loan Claimholder or group of Term Loan Claimholders, other than the Directing Term Loan Collateral Agent (acting at the direction of, or pursuant to a grant of authority by, the Required Term Loan Claimholders), shall not be entitled to take or file, but instead shall be precluded from taking or filing (whether in any Insolvency or Liquidation Proceeding or otherwise), any action, judicial or otherwise, to enforce any right or power or pursue any remedy under this Agreement (including any declaratory judgment or other action to interpret or otherwise enforce the provisions of this Agreement), except solely as provided in the proviso in the immediately preceding sentence.

      8.16    No Third Party Beneficiaries; Provisions Solely to Define Relative Rights. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the ABL Claimholders and the Term Loan Claimholders. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the ABL Credit Agreement Collateral Agent and the other ABL Claimholders, on the one hand, and the Term Loan Collateral Agent and the other Term Loan Claimholders, on the other hand. None of the Obligors shall have any rights hereunder and no Obligor may rely on the terms hereof, other than any provision hereof expressly preserving any right of, or directly affecting, any Obligor under this Agreement, including the definition of "ABL DIP Cap Amount" and "Term Loan DIP Cap Amount", Sections 3.1 (as to the definition of "Standstill Period"), 4.1, 5.1, 5.2, 5.3, 5.4, 5.6, 5.8, 5.9, 5.10, 6.1, 6.2, 7.1, 8.1, 8.2, 8.3, 8.6, 8.7, 8.8, 8.9, 8.10, 8.11, 8.13, 8.14, 8.15, this Section 8.16, Sections 8.17, 8.18, and 8.21. Nothing in this Agreement is intended to or shall impair the obligations of the Obligors, which are absolute and unconditional, to pay the ABL Obligations and the Term Loan Obligations as and when the same shall become due and payable in accordance with their terms.

      8.17    No Indirect Actions. Unless otherwise expressly stated, if a party may not take an action under this Agreement, then it may not take that action indirectly, or support any other Person in taking that action directly or indirectly. "Taking an action indirectly" means taking an action that is not expressly prohibited for the party but is intended to have substantially the same effects as the prohibited action; provided that notwithstanding the foregoing, nothing in this Section 8.17 shall be deemed to limit the right of any party hereto to vote on any plan of reorganization, arrangement, compromise or liquidation or similar dispositive restructuring plan in any Insolvency or Liquidation Proceeding to the extent not inconsistent with the terms of this Agreement.

      8.18    Obligors; Additional Obligors. It is understood and agreed that Holdings, the Borrowers and each other Obligor on the date of this Agreement shall constitute the original Obligors party hereto. The original Obligors hereby covenant and agree to cause each subsidiary of Holdings which becomes a "Subsidiary Guarantor" as defined in the ABL Credit Agreement, the First Lien Credit Agreement or the Second Lien Credit Agreement (or any similar term in any other First Lien Financing Document or Second Lien Financing Document) after the date hereof to become a party hereto (as an Obligor) by duly executing and delivering a counterpart of the Intercreditor Joinder Agreement in the form of Exhibit A hereto to the ABL Credit Agreement Collateral Agent and the Directing Term Loan Collateral Agent in accordance with the relevant provisions of the relevant ABL Financing Documents and/or Term Loan Financing Documents, as applicable. The parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a "Subsidiary Guarantor" as defined in the ABL Credit Agreement, the First Lien Credit Agreement or the Second Lien Credit Agreement (or any similar term in any other ABL Financing Document or Term Loan Financing Document) at any time shall be subject to the provisions hereof as

-61-

fully as if same constituted an Obligor party hereto and had complied with the requirements of the immediately preceding sentence.

8.19    Right of Collateral Agent to Continue.  Any Person serving as a First Lien Collateral Agent shall be entitled to continue, including to continue to perform his, her or its rights, obligations and duties, as a First Lien Collateral Agent, notwithstanding whether any such Person has served or is serving as the ABL Credit Agreement Collateral Agent.  Without limiting the generality of the preceding sentence of this Section 8.19, any Person serving as a First Lien Collateral Agent shall be entitled to continue to so serve in such capacity (including to continue to perform any of such First Lien Collateral Agent's rights, obligations, and/or duties) even if any such Person has resigned as the ABL Credit Agreement Collateral Agent, but such resignation has not become effective for any reason, including because a successor Second Lien Collateral Agent has not been appointed or has accepted such appointment, without any liability to any of the Claimholders by virtue of any such resignation and any of the circumstances relating in any manner whatsoever to such resignation.

8.20    Claimholders.  Notwithstanding anything to the contrary in this Agreement, it is understood and agreed that this Agreement only applies to the  Claimholders in their capacities as holders of the  Obligations.  Without limiting the foregoing, this Agreement does not restrict or apply to the Claimholders in their capacities as holders of any Indebtedness or other obligations of the Obligors other than the  Obligations (or any Reorganization Securities issued as contemplated by Section 6.6), or in their capacities as holders of equity interests of the Obligors.

8.21    Additional Lien Obligations.  Subject to the terms and conditions of this Agreement and each Financing Document, the Obligors will be permitted from time to time to designate as an additional holder of First Lien Obligations and/or Second Lien Obligations hereunder each Person that is, or that becomes or is to become, the holder of any Additional Lien Obligations (or the Additional Liens Obligations Agent in respect of such Additional Liens Obligations).  Upon the issuance or incurrence of any such Additional Lien Obligations:

(a)    The Top Borrower shall deliver to each of the Collateral Agents a certificate of a Responsible Officer stating that the applicable Obligors intend to enter or have entered into an Additional Lien Obligations Agreement and certifying that the issuance or incurrence of such Additional Lien Obligations and the Liens securing such Additional Lien Obligations are permitted by the ABL Financing Documents, the First Lien Financing Documents, the Second Lien Financing Documents and each then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement.  Each of the Additional Lien Obligations Agents, the ABL Credit Agreement Collateral Agent, the First Lien Collateral Agents and the Second Lien Collateral Agents shall be entitled to rely conclusively on the determination of the Top Borrower that such issuance and/or incurrence is permitted under the ABL Financing Documents, the First Lien Financing Documents, the Second Lien Financing Documents and each then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement if such determination is set forth in such officer's certificate delivered to the ABL Credit Agreement Collateral Agent, the First Lien Collateral Agents and the Second Lien Collateral Agents; provided, however, that such determination will not affect whether or not the Obligors have complied with their undertakings in the ABL Financing Documents, the First Lien Financing Documents, the Second Lien Financing Documents or any then existing Additional First Lien Obligations Agreement or Additional Second Lien Obligation Agreement;

(b)    the Additional Liens Obligations Agent for such Additional Lien Obligations shall execute and deliver to the ABL Credit Agreement Collateral Agent, the First Lien Collateral Agent and the Second Lien Collateral Agent a Joinder Agreement in the form attached hereto as

-62-

Exhibit B acknowledging that such Additional Liens Obligations and the holders of such Additional Liens Obligations shall be bound by the terms hereof to the extent applicable to the Claimholders, and

(c)     the ABL Credit Agreement Collateral Agent and each existing Term Loan Collateral Agent shall promptly enter into such documents and agreements (including amendments, restatements, amendments and restatements, supplements or other modifications to this Agreement) as the ABL Credit Agreement Collateral Agent or any existing Term Loan Collateral Agent (but no other ABL Claimholder or Term Loan Claimholder) or the Additional Lien Obligations Agent may reasonably request in order to provide to it the rights, remedies and powers and authorities contemplated hereby, in each case consistent in all respects with the terms of this Agreement; provided that, for the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, it is understood and agreed that any such amendment, restatement, amendment and restatement, supplement or other modification to this Agreement requested pursuant to this clause (c) may be entered into by the ABL Credit Agreement Collateral Agent and the existing Term Loan Collateral Agents without the consent of any other ABL Claimholder or Term Loan Claimholder to effect the provisions of this Section 8.21 and may contain additional intercreditor terms applicable solely to the holders of such Additional Liens Obligations vis-à-vis the holders of the relevant obligations hereunder or the holders of such Additional Lien Obligations vis-à-vis the ABL Credit Agreement Collateral Agent and the ABL Claimholders or the Directing Term Loan Collateral Agent and the Term Loan Claimholders, as applicable.

Notwithstanding the foregoing, nothing in this Agreement will be construed to allow any Obligor to incur additional Indebtedness unless otherwise permitted by the terms of each applicable ABL Financing Document, First Lien Financing Document, Second Lien Document and each then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement.

8.22     Additional Intercreditor Agreements.  Subject to Section 8.1(b) of this Agreement, each party hereto agrees that the First Lien Claimholders (as among themselves) and the Second Lien Claimholders (as among themselves) may each enter into intercreditor agreements (or similar arrangements) with the applicable First Lien Collateral Agents or Second Lien Collateral Agents, as the case may be, governing the rights, benefits and privileges as among the First Lien Claimholders in respect of any or all of the First Lien Collateral, this Agreement and the First Lien Collateral Documents or as among the Second Lien Claimholders in respect of any or all of the Second Lien Collateral, this Agreement or the Second Lien Collateral Documents, as the case may be, including as to the application of proceeds of any Collateral, voting rights, control of any Collateral and waivers with respect to any Collateral, in each case so long as the terms thereof do not violate or conflict with the terms of this Agreement or the ABL Documents or the First Lien Documents or the Second Lien Documents, as applicable.  In any event, if a respective intercreditor agreement (or similar arrangement) exists, the provisions thereof shall not be (or be construed to be) an amendment, modification or other change to this Agreement or any ABL Document or any other First Lien Document or Second Lien Document, and the provisions of this Agreement and the ABL Documents, the other First Lien Documents and Second Lien Documents shall remain in full force and effect in accordance with the terms hereof and thereof (as such provisions may be amended, modified or otherwise supplemented from time to time in accordance with the terms thereof, including to give effect to any intercreditor agreement (or similar arrangement)).

**[Signature pages follow]**

-63-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**UBS AG, STAMFORD BRANCH**,
as ABL Credit Agreement Collateral Agent


By: _____
     Name:
     Title:


By: _____
     Name:
     Title:


Address for Notices:
Attention:
Tel.:
Email:




**UBS AG, STAMFORD BRANCH**,
as First Lien Credit Agreement Collateral Agent


By: _____
     Name:
     Title:


By: _____
     Name:
     Title:


Address for Notices:
Attention:
Tel.:
Email:

**GOLDMAN SACHS BANK USA,**
as Second Lien Credit Agreement Collateral Agent


By: _____
    Name:
    Title:


Address for Notices:
Attention:
Tel.:
Email:

Acknowledged and Agreed to by:

Holdings

DAWN INTERMEDIATE, INC.


By: _____
    Name:
    Title:


Borrowers

SERTA SIMMONS BEDDING, LLC


By: _____
    Name:
    Title:


NATIONAL BEDDING COMPANY L.L.C.


By: _____
    Name:
    Title:



SSB MANUFACTURING COMPANY


By: _____
    Name:
    Title:

Other Obligors

[_____]

By: _____
      Name:
      Title:

Address for Notices to Obligors:
Tel.:
Fax:
Attn:
Email:

[Signature Page to ABL Intercreditor Agreement]

EXHIBIT A

## FORM OF INTERCREDITOR JOINDER AGREEMENT

Reference is made to the ABL Intercreditor Agreement dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the **"Intercreditor Agreement"**), among UBS AG, STAMFORD BRANCH, in its capacity as ABL Credit Agreement Collateral Agent, UBS AG, STAMFORD BRANCH, in its capacity as the First Lien Credit Agreement Collateral Agent and GOLDMAN SACHS BANK USA, as the Second Lien Credit Agreement Collateral Agent (in each case, as defined therein), each other FIRST LIEN COLLATERAL AGENT that is from time to time party thereto and each other SECOND LIEN COLLATERAL AGENT that is from time to time party thereto and acknowledged and agreed to by DAWN INTERMEDIATE, INC., a Delaware corporation, SERTA SIMMONS BEDDING, LLC, a Delaware limited liability company, NATIONAL BEDDING COMPANY L.L.C., an Illinois limited liability company AND SSB MANUFACTURING COMPANY, a Delaware corporation and the other OBLIGORS (as defined therein) from time to time party thereto.  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

This Intercreditor Joinder Agreement, dated as of [●] [●], 20[●] (this "**Joinder Agreement**"), is being delivered pursuant to requirements of the Intercreditor Agreement.

1. <u>Joinder</u>.  The undersigned, [●], a [●], hereby agrees to become party to the Intercreditor Agreement as an Obligor thereunder for all purposes thereof on the terms set forth therein, and to be bound by the terms, conditions and provisions of the Intercreditor Agreement as fully as if the undersigned had executed and delivered the Intercreditor Agreement as of the date thereof.

2. <u>Agreements</u>.  The undersigned Obligor hereby agrees, for the enforceable benefit of all existing and future ABL Claimholders, First Lien Claimholders and Second Lien Claimholders that the undersigned is bound by the terms, conditions and provisions of the Intercreditor Agreement to the extent set forth therein.

3. <u>Counterparts</u>.  This Joinder Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and all of which, when taken together, shall constitute one contract.  Delivery of an executed signature page to this Joinder Agreement by facsimile transmission or other electronic transmission (including ".pdf", ".tiff" or similar format) shall be effective as delivery of a manually executed counterpart of this Joinder Agreement.

4. <u>Governing Law</u>.  THIS JOINDER AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS JOINDER AGREEMENT, WHETHER IN TORT, CONTRACT (AT LAW OR IN EQUITY) OR OTHERWISE, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

6. <u>Miscellaneous</u>.  The provisions of <u>Section 8</u> of the Intercreditor Agreement shall apply with like effect to this Joinder Agreement.

**[Signature pages follow]**

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed by its authorized representative, and each Collateral Agent has caused the same to be accepted by its authorized representative, as of the date first written above.

**[NAME OF OBLIGOR]**,
as an Obligor

By: _____
     Name:
     Title:

**Acknowledged and Agreed to by:**

**UBS AG, STAMFORD BRANCH,**
as ABL Credit Agreement Collateral Agent

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**UBS AG, STAMFORD BRANCH,**
as First Lien Credit Agreement Collateral Agent,

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**GOLDMAN SACHS BANK USA,**
as Second Lien Credit Agreement Collateral Agent,

By: _____
     Name:
     Title:

EXHIBIT B

**FORM OF INTERCREDITOR JOINDER AGREEMENT – ADDITIONAL INDEBTEDNESS**

Reference is made to the ABL Intercreditor Agreement dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the **"Intercreditor Agreement"**), among UBS AG, STAMFORD BRANCH, in its capacity as ABL Credit Agreement Collateral Agent, UBS AG, STAMFORD BRANCH, in its capacity as the First Lien Credit Agreement Collateral Agent and GOLDMAN SACHS BANK USA, as the Second Lien Credit Agreement Collateral Agent (in each case, as defined therein), each other FIRST LIEN COLLATERAL AGENT that is from time to time party thereto and each other SECOND LIEN COLLATERAL AGENT that is from time to time party thereto and acknowledged and agreed to by DAWN INTERMEDIATE, INC., a Delaware corporation, SERTA SIMMONS BEDDING, LLC, a Delaware limited liability company, NATIONAL BEDDING COMPANY L.L.C., an Illinois limited liability company AND SSB MANUFACTURING COMPANY, a Delaware corporation and the other OBLIGORS (as defined therein) from time to time party thereto.  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

This Intercreditor Joinder Agreement, dated as of [●] [●], 20[●] (this "**Joinder Agreement**"), is being delivered pursuant to requirements of the Intercreditor Agreement.

The undersigned Additional [First/Second] Lien Obligations Agent (the "**New Collateral Agent**") is executing this Joinder Agreement in accordance with the requirements of the Intercreditor Agreement.

1.      Joinder.  In accordance with Section 8.21 of the Intercreditor Agreement, the New Collateral Agent by its signature below becomes a [First/Second] Lien Collateral Agent, under, and it and the related [First/Second] Lien Claimholders represented by it hereby become subject to and bound by, the Intercreditor Agreement with the same force and effect as if the New Collateral Agent had originally been named therein as a [First/Second] Lien Collateral Agent, and the New Collateral Agent, on behalf of itself and each other [First/Second] Lien Claimholder represented by it, hereby agrees to all the terms and provisions of the Intercreditor Agreement. Each reference to a "Collateral Agent", "Term Loan Collateral Agent" or "[First/Second] Lien Collateral Agent" in the Intercreditor Agreement shall be deemed to include the New Collateral Agent and each reference to "[First/Second] Lien Claimholders" or "Term Loan Claimholders" shall include the [First/Second] Lien Claimholders represented by such New Collateral Agent. The Intercreditor Agreement is hereby incorporated herein by reference.

2.      Representations and Warranties.  The New Collateral Agent represents and warrants to the other Collateral Agents and Claimholders that (i) it has full power and authority to enter into this Joinder Agreement, in its capacity as [agent][trustee], (ii) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms and the terms of the Intercreditor Agreement and (iii) the [First/Second] Lien Obligations Agreements relating to such Additional [First/Second] Lien Obligations provide that, upon the New Collateral Agent's entry into this Agreement, the [First/Second] Lien Claimholders in respect of such Additional [First/Second] Lien Obligations will be subject to and bound by the provisions of the Intercreditor Agreement as [First/Second] Lien Claimholders.

3.      Counterparts.  This Joinder Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and all of which, when taken together, shall constitute one contract.  Delivery of an executed signature page to this Joinder Agreement by facsimile transmission or other electronic transmission (including ".pdf", ".tiff" or

A-1

similar format) shall be effective as delivery of a manually executed counterpart of this Joinder Agreement.

        4.     <u>Governing Law</u>.  THIS JOINDER AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS JOINDER AGREEMENT, WHETHER IN TORT, CONTRACT (AT LAW OR IN EQUITY) OR OTHERWISE, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

        6.     <u>Miscellaneous</u>.  The provisions of <u>Section 8</u> of the Intercreditor Agreement shall apply with like effect to this Joinder Agreement.

[Signature pages follow]

A-2

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed by its authorized representative, and each Collateral Agent has caused the same to be accepted by its authorized representative, as of the date first written above.

**[NAME OF NEW COLLATERAL AGENT]**,
as a [First/Second] Lien Collateral Agent

By: _____
     Name:
     Title:

Address for notices:

_____

_____

Attention of: _____

Telecopy: _____

**Acknowledged by:**

**UBS AG, STAMFORD BRANCH,**
as ABL Credit Agreement Collateral Agent

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

A-3

**UBS AG, STAMFORD BRANCH,**
as First Lien Credit Agreement Collateral Agent,

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**GOLDMAN SACHS BANK USA,**
as Second Lien Credit Agreement Collateral Agent,

By: _____
     Name:
     Title:

A-4

[FORM OF]
FORM OF FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT

[See attached.]

EXECUTION VERSION

FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT

dated as of November 8, 2016,

among

UBS AG, STAMFORD BRANCH,
as First Lien Credit Agreement Collateral Agent;

GOLDMAN SACHS BANK USA,
as Second Lien Credit Agreement Collateral Agent,

EACH OTHER FIRST LIEN COLLATERAL AGENT PARTY HERETO

and

EACH OTHER SECOND LIEN COLLATERAL AGENT PARTY HERETO

and acknowledged and agreed to by

DAWN INTERMEDIATE, INC.

as Holdings,

SERTA SIMMONS BEDDING, LLC

as the Top Borrower,

THE OTHER BORROWERS PARTY HERETO,

and

EACH OF THE OTHER OBLIGORS PARTY HERETO

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| **SECTION 1.** | **DEFINITIONS** .................................................................. | **2** |
| | 1.1 | Defined Terms .................................................................. | 2 |
| | 1.2 | Terms Generally .................................................................. | 16 |

| | | |
|---|---|---|
| **SECTION 2.** | **LIEN PRIORITIES** .................................................................. | **17** |
| | 2.1 | Relative Priorities .................................................................. | 17 |
| | 2.2 | Prohibition on Contesting Liens .................................................................. | 17 |
| | 2.3 | No New Liens .................................................................. | 18 |
| | 2.4 | Similar Liens and Agreements .................................................................. | 18 |
| | 2.5 | Nature of Obligations .................................................................. | 18 |
| | 2.6 | Certain Cash Collateral .................................................................. | 19 |

| | | |
|---|---|---|
| **SECTION 3.** | **ENFORCEMENT** .................................................................. | **19** |
| | 3.1 | Exercise of Remedies .................................................................. | 19 |
| | 3.2 | Actions Upon Breach; Specific Performance .................................................................. | 22 |

| | | |
|---|---|---|
| **SECTION 4.** | **PAYMENTS** .................................................................. | **23** |
| | 4.1 | Application of Proceeds .................................................................. | 23 |
| | 4.2 | Payments Over .................................................................. | 24 |

| | | |
|---|---|---|
| **SECTION 5.** | **OTHER AGREEMENTS** .................................................................. | **25** |
| | 5.1 | Releases .................................................................. | 25 |
| | 5.2 | Insurance and Condemnation Awards .................................................................. | 26 |
| | 5.3 | Amendments to First Lien Financing Documents and Second Lien Financing Documents .................................................................. | 27 |
| | 5.4 | Confirmation of Subordination in Second Lien Collateral Documents .................................................................. | 28 |
| | 5.5 | Gratuitous Bailee/Agent for Perfection .................................................................. | 29 |
| | 5.6 | When Discharge of First Lien Obligations Deemed to Not Have Occurred .................................................................. | 30 |
| | 5.7 | Purchase Right .................................................................. | 30 |

| | | |
|---|---|---|
| **SECTION 6.** | **INSOLVENCY OR LIQUIDATION PROCEEDINGS** .................................................................. | **32** |
| | 6.1 | Finance and Sale Issues .................................................................. | 32 |
| | 6.2 | Relief from the Automatic Stay .................................................................. | 33 |
| | 6.3 | Adequate Protection .................................................................. | 33 |
| | 6.4 | No Waiver .................................................................. | 35 |
| | 6.5 | Reinstatement .................................................................. | 35 |
| | 6.6 | Reorganization Securities .................................................................. | 35 |
| | 6.7 | Post-Petition Interest .................................................................. | 36 |
| | 6.8 | Waivers .................................................................. | 36 |
| | 6.9 | Separate Grants of Security and Separate Classification .................................................................. | 36 |
| | 6.10 | Effectiveness in Insolvency or Liquidation Proceedings .................................................................. | 37 |

|  |  | **Page** |
|---|---|---|
| **SECTION 7.** | **RELIANCE; WAIVERS; ETC.** | **37** |
| 7.1 | Reliance | 37 |
| 7.2 | No Warranties or Liability | 38 |
| 7.3 | No Waiver of Lien Priorities | 38 |
| 7.4 | Waiver of Liability | 39 |
| 7.5 | Obligations Unconditional | 40 |
| **SECTION 8.** | **MISCELLANEOUS** | **41** |
| 8.1 | Conflicts | 41 |
| 8.2 | Effectiveness; Continuing Nature of this Agreement; Severability | 41 |
| 8.3 | Amendments; Waivers | 42 |
| 8.4 | Information Concerning Financial Condition of the Obligors and their Subsidiaries | 42 |
| 8.5 | Subrogation | 43 |
| 8.6 | Application of Payments | 43 |
| 8.7 | SUBMISSION TO JURISDICTION; WAIVERS | 43 |
| 8.8 | Notices | 45 |
| 8.9 | Further Assurances | 45 |
| 8.10 | CHOICE OF LAW | 45 |
| 8.11 | Binding on Successors and Assigns | 45 |
| 8.12 | Headings | 45 |
| 8.13 | Counterparts | 45 |
| 8.14 | Authorization; Binding Effect on Claimholders | 45 |
| 8.15 | [Reserved] | **Error! Bookmark not defined.** |
| 8.16 | No Third Party Beneficiaries; Provisions Solely to Define Relative Rights | 47 |
| 8.17 | No Indirect Actions | 47 |
| 8.18 | Obligors; Additional Obligors | 47 |
| 8.19 | Right of First Lien Collateral Agent to Continue | 48 |
| 8.20 | Second Lien Claimholders | 48 |
| 8.21 | Additional Lien Obligations | 48 |
| 8.22 | Additional Intercreditor Agreements | 49 |

# FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT

This **FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT** (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, this "**Agreement**") is dated as of November 8, 2016, and entered into by and among UBS AG, STAMFORD BRANCH, in its capacity as collateral agent under the First Lien Credit Agreement and the First Lien Collateral Documents relating thereto (in each case, as defined below) (in such capacity and together with its successors and assigns in such capacity, the "**First Lien Credit Agreement Collateral Agent**"), GOLDMAN SACHS BANK USA, in its capacity as collateral agent under the Second Lien Credit Agreement and the Second Lien Collateral Documents relating thereto (in each case, as defined below) (in such capacity and together with its successors and assigns in such capacity, the "**Second Lien Credit Agreement Collateral Agent**"), each other FIRST LIEN COLLATERAL AGENT that is from time to time party hereto and each other SECOND LIEN COLLATERAL AGENT that is from time to time party hereto and acknowledged and agreed to by DAWN INTERMEDIATE, INC., a Delaware corporation ("**Holdings**"), SERTA SIMMONS BEDDING, LLC, a Delaware limited liability company (the "**Top Borrower**"), NATIONAL BEDDING COMPANY L.L.C., an Illinois limited liability company ("**National Bedding**"), SSB MANUFACTURING COMPANY, a Delaware corporation ("**SSB Manufacturing**" and, together with the Top Borrower and National Bedding, the "**Borrowers**") and the other OBLIGORS (as defined below) from time to time party hereto.

## RECITALS

Holdings, the Borrowers, the financial institutions party thereto from time to time, UBS AG, Stamford Branch ("**UBS**"), as administrative agent (in such capacity and together with its successors and assigns in such capacity, the "**First Lien Administrative Agent**") and the First Lien Credit Agreement Collateral Agent, have entered into that certain First Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, amended and restated, supplemented, modified or Refinanced from time to time, the "**First Lien Credit Agreement**");

Holdings, the Borrowers, the financial institutions party thereto from time to time, GOLDMAN SACHS BANK USA ("**GS**"), as administrative agent (in such capacity, the "**Second Lien Administrative Agent**") and Second Lien Credit Agreement Collateral Agent, have entered into that certain Second Lien Term Loan Agreement, dated as of November 8, 2016 (as amended, amended and restated, supplemented, modified or Refinanced from time to time, the "**Second Lien Credit Agreement**");

Pursuant to (i) the First Lien Credit Agreement, (A) the Borrowers will incur loans and (B) the relevant First Lien Obligors have agreed to guarantee the First Lien Obligations, and (ii) the Second Lien Credit Agreement, (A) the Borrowers will incur loans and (B) the relevant Second Lien Obligors have agreed to guarantee the Second Lien Obligations;

The obligations of each First Lien Obligor under (i) the First Lien Financing Documents, (ii) any First Lien Hedge Agreements and (iii) any First Lien Banking Services Agreements will be secured on a first priority basis by Liens on certain assets of each First Lien Obligor pursuant to the terms of the First Lien Collateral Documents;

The obligations of each Second Lien Obligor under (i) the Second Lien Financing Documents, (ii) any Second Lien Hedge Agreements and (iii) any Second Lien Banking Services Agreements will be secured on a second priority basis by Liens on certain assets of each Second Lien Obligor pursuant to the terms of the Second Lien Collateral Documents;

The First Lien Credit Agreement and the Second Lien Credit Agreement require, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral;

The Obligors may, from time to time, to the extent permitted by this Agreement, the First Lien Financing Documents and the Second Lien Financing Documents, incur additional secured debt which the Obligors and the debtholders thereunder may elect, subject to the terms and conditions hereof, of the First Lien Financing Documents and of the Second Lien Financing Documents, to be secured by the Collateral on a first priority basis or a second priority basis;

In order to induce each First Lien Collateral Agent and the other First Lien Claimholders to consent to the Obligors incurring the Second Lien Obligations and to induce the First Lien Claimholders to extend credit and other financial accommodations and lend monies to or for the benefit of the First Lien Obligors, each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, and each Second Lien Claimholder by its acceptance of the benefits of the Second Lien Collateral Documents, has agreed to the intercreditor and other provisions set forth in this Agreement; and

In order to induce each Second Lien Collateral Agent and the other Second Lien Claimholders to consent to the Obligors incurring the First Lien Obligations and to induce the Second Lien Claimholders to extend credit and other financial accommodations and lend monies to or for the benefit of the Second Lien Obligors, each First Lien Collateral Agent, on behalf of itself and its Related First Lien Claimholders, and each First Lien Claimholder by its acceptance of the benefits of the First Lien Collateral Documents, has agreed to the intercreditor and other provisions set forth in this Agreement.

## <u>AGREEMENT</u>

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1.** <u>Definitions</u>.

1.1    <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined herein have the meanings set forth in the First Lien Credit Agreement.  As used in this Agreement, the following terms shall have the following meanings:

"**Additional First Lien Obligations**" means obligations with respect to Indebtedness of the Borrowers or any other Obligor (other than, for the avoidance of doubt, First Lien Credit Agreement Obligations) issued or guaranteed following the date of this Agreement and documented in an agreement other than any agreement governing any then existing First Lien Obligations; <u>provided</u> that (a) such Indebtedness is permitted by the terms of each of the ABL Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement and each then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement to be secured by Liens on the Collateral ranking *pari passu* with the Liens securing the First Lien Obligations, (b) the Obligors have granted or purport to have granted Liens on the Collateral to secure the obligations in respect of such Indebtedness on a *pari passu* basis with the other First Lien Obligations, (c) the applicable Additional First Lien Obligations Agent, for itself and on behalf of the holders of such Indebtedness and obligations in respect of such Indebtedness, has entered into a Joinder Agreement pursuant to <u>Section 8.21(b)</u> acknowledging that such Indebtedness, obligations and Liens shall be subject to, and such Additional First Lien

-2-

Obligations Agent and such holders shall be bound by, and shall have the rights and obligations provided under, the terms of this Agreement applicable to the First Lien Collateral Agent and the other First Lien Claimholders, respectively and (d) an amendment to or other modification of this Agreement shall have been entered into pursuant to <u>Section 8.3</u> to the extent contemplated and requested pursuant to <u>Section 8.21(c)</u>.

"**Additional First Lien Obligations Agent**" means any Person appointed to act as trustee, agent or similar representative for the holders of Additional First Lien Obligations pursuant to any Additional First Lien Obligations Agreement (including, in the case of any bilateral arrangement, the actual holder of the relevant Additional First Lien Obligations unless such holder has otherwise appointed a trustee, agent or similar representative acting on its behalf) and has been designated as such in the applicable Joinder Agreement, and any successor thereto.

"**Additional First Lien Obligations Agreements**" means (i) the indenture, credit agreement, guarantee or other agreement evidencing or governing any Additional First Lien Obligations that are designated as Additional First Lien Obligations pursuant to <u>Section 8.21</u> and (ii) any other "Loan Documents," or "Financing Documents" (or similar term as may be defined in the foregoing or referred to in the foregoing), in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Additional First Lien Obligations Claimholders**" means, at any relevant time, the lenders, creditors and secured parties under any Additional First Lien Obligations Agreements, any Additional First Lien Obligations Agent and the other agents under such Additional First Lien Obligations Agreements, in each case, in their capacities as such.

"**Additional Lien Obligations**" means, collectively, the Additional First Lien Obligations and the Additional Second Lien Obligations.

"**Additional Lien Obligations Agent**" means the Additional First Lien Obligations Agent and/or the Additional Second Lien Obligations Agent, as applicable.

"**Additional Lien Obligations Agreements**" means, collectively, the Additional First Lien Obligations Agreements and the Additional Second Lien Obligations Agreements.

"**Additional Second Lien Obligations**" means obligations with respect to Indebtedness of the Borrowers or any other Obligor (other than, for the avoidance of doubt, Second Lien Credit Agreement Obligations) issued or guaranteed following the date of this Agreement and documented in an agreement other than any agreement governing any then existing Second Lien Obligations, <u>provided</u> that (a) such Indebtedness is permitted by the terms of each of the ABL Credit Agreement, First Lien Credit Agreement, the Second Lien Credit Agreement and any then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement to be secured by Liens on the Collateral ranking *pari passu* with the Liens securing the Second Lien Obligations, (b) the Obligors have granted or purport to have granted Liens on the Collateral to secure the obligations in respect of such Indebtedness on a *pari passu* basis with the other Second Lien Obligations, (c) the applicable Additional Second Lien Obligations Agent, for itself and on behalf of the holders of such Indebtedness and obligations in respect of such Indebtedness, has entered into a Joinder Agreement pursuant to <u>Section 8.21(b)</u> acknowledging that such Indebtedness, obligations and Liens shall be subject to, and such Additional Second Lien Obligations Agent and such holders shall be bound by, and shall have rights and obligations provided under, the terms of this Agreement applicable to the Second Lien Collateral Agent and the other Second Lien Claimholders, respectively and (d) an amendment to or other modification of this Agreement shall

-3-

have been entered into pursuant to Section 8.3 to the extent contemplated and requested pursuant to Section 8.21(c).

"**Additional Second Lien Obligations Agent**" means any Person appointed to act as trustee, agent or similar representative for the holders of Additional Second Lien Obligations pursuant to any Additional Second Lien Obligations Agreement (including, in the case of any bilateral arrangement, the actual holder of the relevant Additional Second Lien Obligations unless such holder has otherwise appointed a trustee, agent or similar representative acting on its behalf) and has been designated as such in the applicable Joinder Agreement, and any successor thereto.

"**Additional Second Lien Obligations Agreements**" means (i) the indenture, credit agreement, guarantee or other agreement evidencing or governing any Additional Second Lien Obligations that are designated as Additional Second Lien Obligations pursuant to Section 8.21 and (ii) any other "Loan Documents" or "Financing Documents" (or similar term as may be defined in the foregoing or referred to in the foregoing), in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Additional Second Lien Obligations Claimholders**" means, at any relevant time, the lenders, creditors and secured parties under any Additional Second Lien Obligations Agreements, any Additional Second Lien Obligations Agent and the other agents under such Additional Second Lien Obligations Agreements, in each case, in their capacities as such.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with, that Person.

"**Agreement**" has the meaning set forth in the Preamble to this Agreement.

"**Banking Services**" means the First Lien Banking Services and the Second Lien Banking Services.

"**Banking Services Obligations**" means the First Lien Banking Services Obligations and the Second Lien Banking Services Obligations.

"**Bankruptcy Code**" means Title 11 of the United States Code (11. U.S.C. § 101 et seq.).

"**Borrowers**" has the meaning set forth in the Preamble to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or is required to be accounted for as a capital lease on the balance sheet of that Person.

"**Cash Collateral**" has the meaning set forth in Section 6.1(a).

"**Claimholders**" means each of the First Lien Claimholders and the Second Lien Claimholders.

"**Collateral**" means all of the assets and property of any Obligor, whether real, personal or mixed, that constitute or are required to constitute (including pursuant to this Agreement) both First

-4-

Lien Collateral and Second Lien Collateral, including any property subject to Liens granted pursuant to Section 6 to secure both First Lien Obligations and Second Lien Obligations.

"**Collateral Agent**" means any First Lien Collateral Agent and/or any Second Lien Collateral Agent, as applicable.

"**Collateral Documents**" means the First Lien Collateral Documents and the Second Lien Collateral Documents.

"**Comparable Second Lien Collateral Document**" means, in relation to any Collateral subject to any Lien created or purported to be created under any First Lien Collateral Document, the Second Lien Collateral Document that creates or purports to create a Lien on the same Collateral, granted by the same Obligor.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Debtor Relief Laws**" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or any state or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Derivative Transaction**" means (a) any interest-rate transaction, including any interest-rate swap, basis swap, forward rate agreement, interest rate option (including a cap, collar or floor), and any other instrument linked to interest rates that gives rise to similar credit risks (including when-issued securities and forward deposits accepted), (b) any exchange-rate transaction, including any cross-currency interest-rate swap, any forward foreign-exchange contract, any currency option, and any other instrument linked to exchange rates that gives rise to similar credit risks, (c) any equity derivative transaction, including any equity-linked swap, any equity-linked option, any forward equity-linked contract, and any other instrument linked to equities that gives rise to similar credit risk and (d) any commodity (including precious metal) derivative transaction, including any commodity-linked swap, any commodity-linked option, any forward commodity-linked contract, and any other instrument linked to commodities that gives rise to similar credit risks; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees, members of management, managers or consultants of Holdings or its subsidiaries shall constitute a Derivative Transaction.

"**DIP Cap Amount**" means 115% of the sum of (a) the maximum principal amount of all Indebtedness constituting First Lien Obligations that are permitted to be incurred under the Second Lien Credit Agreement as in effect on the date hereof and (b) any accrued and unpaid interest (including interest accruing at the default rate specified in the applicable First Lien Financing Document and any Post-Petition Interest) and premiums (including tender premiums and prepayment premiums) payable on account of any First Lien Obligations and any underwriting discounts, fees, commissions and expenses (including original issue discount, upfront fees or initial yield payments), attorneys' fees, costs, expenses and indemnities paid or payable by any First Lien Obligor in connection with incurrence or issuance of any First Lien Obligation or any Refinancing of any First Lien Obligation in accordance with the terms of this Agreement.

"**DIP Financing**" has the meaning set forth in Section 6.1(a).

"**Directing First Lien Collateral Agent**" means, at any time of determination (a) if there is only one Series of First Lien Obligations with respect to which the Discharge of such First Lien Obligations has not occurred, the First Lien Collateral Agent for such Series and (b) if clause (a) does not apply, the First Lien Collateral Agent designated as the "Controlling Collateral Agent" (or any similar term) pursuant to the First Lien Intercreditor Agreement or other applicable intercreditor arrangements among the Series of First Lien Obligations at such time. For purposes of this definition, no Discharge of any Series of First Lien Obligations shall be deemed to have occurred if the Borrowers or any other First Lien Obligor enters into any Refinancing of the First Lien Obligations of such Series with the proceeds of new First Lien Obligations.

"**Directing Second Lien Collateral Agent**" means, at any time of determination (a) if there is only one Series of Second Lien Obligations with respect to which the Discharge of such Second Lien Obligations has not occurred, the Second Lien Collateral Agent for such Series and (b) if clause (a) does not apply, the Second Lien Collateral Agent designated as the "Controlling Collateral Agent" (or any similar term) pursuant to the applicable intercreditor arrangements among the Series of Second Lien Obligations at such time. For purposes of this definition, no Discharge of any Series of Second Lien Obligations shall be deemed to have occurred if the Borrowers or any other Second Lien Obligor enters into any Refinancing of the Second Lien Obligations of such Series with the proceeds of a new Second Lien Obligations.

"**Discharge**" means, with respect to any Series of First Lien Obligations or Second Lien Obligations, notwithstanding any discharge of such Series under any Debtor Relief Laws or in connection with any Insolvency or Liquidation Proceeding, except to the extent otherwise expressly provided in Section 5.6:

(a)     payment in full in cash of the principal of and interest (including Post-Petition Interest), and premium, if any, on all Indebtedness outstanding under the First Lien Documents or Second Lien Documents of such Series, as applicable, and constituting First Lien Obligations or Second Lien Obligations of such Series, as applicable (other than any First Lien Other Obligations or Second Lien Other Obligations);

(b)     termination or expiration of all commitments, if any, to extend credit that would constitute First Lien Obligations or Second Lien Obligations of such Series, as applicable;

(c)     termination or cash collateralization or backstopping (in an amount and manner reasonably satisfactory to the applicable issuing bank, but in no event greater than 105%) of the aggregate undrawn face amount of any letter of credit obligations constituting First Lien Obligations or Second Lien Obligations of such Series, as applicable.

(d)     payment in full in cash of all other First Lien Obligations or Second Lien Obligations of such Series, as applicable (or, in the case of any First Lien Other Obligations or Second Lien Other Obligations, the cash collateralization or backstopping of such First Lien Other Obligations or Second Lien Other Obligations on terms reasonably satisfactory to the applicable lender or counterparty, as applicable) that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (including Post-Petition Interest, but other than any indemnification or expense reimbursement obligations or any other obligations that by the terms of any First Lien Document or Second Lien Document of such Series, as applicable, expressly survive termination of such First Lien Document or Second Lien Document, in each case, for which no claim or demand for payment, whether oral or written, has been made at such time); and

-6-

(e)        adequate provision has been made for any contingent or unliquidated First Lien Obligations or Second Lien Obligations of such Series, as applicable, related to claims, causes of action or liabilities that have been asserted against the First Lien Claimholders or Second Lien Claimholders of such Series, as applicable, for which indemnification is required under the First Lien Documents or Second Lien Documents of such Series, as applicable;

provided that the Discharge of any Series of First Lien Obligations or Second Lien Obligations, as applicable, shall not be deemed to have occurred if such payments are made with the proceeds of (i) in the case of First Lien Obligations, other First Lien Obligations or (ii) in the case of Second Lien Obligations, other Second Lien Obligations, as applicable, that constitute an exchange or replacement for or a Refinancing of such Series of First Lien Obligations or Second Lien Obligations, as applicable. Upon the satisfaction of the conditions set forth in clauses (a) through (e) with respect to any Series, the Collateral Agent of such Series agrees to promptly deliver to each other Collateral Agent written notice of the same.

"**Discharge of First Lien Obligations**" means the Discharge of the First Lien Credit Agreement Obligations and the Discharge of each Series of Additional First Lien Obligations.

"**Discharge of Second Lien Obligations**" means the Discharge of the Second Lien Credit Agreement Obligations and the Discharge of each Series of Additional Second Lien Obligations.

"**Disposition**" has the meaning set forth in Section 5.1(b).  "**Dispose**" has a meaning correlative thereto.

"**Enforcement Action**" means:

(a)        any action to foreclose, execute, levy or collect on, take possession or control of (other than for purposes of perfection), sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise Dispose of (whether publicly or privately), any Collateral or otherwise exercise or enforce remedial rights with respect to any of the Collateral under the First Lien Documents or the Second Lien Documents (including by way of setoff, recoupment, notification of a public or private sale or other Disposition pursuant to the UCC or other applicable law, notification to account debtors, notification to depositary banks under deposit account control agreements, or exercise of rights under landlord consents, if applicable);

(b)        any action to solicit bids from third Persons, or approve bid procedures for, any proposed Disposition of any of the Collateral or conduct any Disposition of any Collateral;

(c)        any action to receive a transfer of any portion of the Collateral in satisfaction of Indebtedness or any other Obligation secured thereby;

(d)        any action to otherwise enforce a security interest or exercise another right or remedy, as a secured creditor or otherwise, pertaining to any Collateral, whether at law, in equity or pursuant to the First Lien Documents or the Second Lien Documents (including the commencement of applicable legal proceedings or other actions with respect to any Collateral to facilitate the actions described in the preceding clauses, and exercising voting rights in respect of equity interests comprising any Collateral); or

(e)        the Disposition of any Collateral by any Obligor after the occurrence and during the continuation of an "event of default" under the First Lien Documents or the Second Lien Documents with the consent of the First Lien Collateral Agents or the Second Lien Collateral Agents, as applicable (in either case, to the extent that such consent is required).

-7-

"**Escrow Account**" has the meaning set forth in Section 6.3(b)(ii).

"**First Lien Administrative Agent**" has the meaning set forth in the Recitals to this Agreement.

"**First Lien Banking Services**" means any of the following services provided to any First Lien Obligor or any of its "Subsidiaries" as defined in the First Lien Credit Agreement (or any similar term in any other First Lien Document):  commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash management and deposit accounts.

"**First Lien Banking Services Agreement**" means any documentation with a First Lien Claimholder governing any First Lien Banking Services Obligations.

"**First Lien Banking Services Obligations**" means any and all obligations of any First Lien Obligor or any of its "subsidiaries" as defined in the First Lien Credit Agreement (or any similar term in any other First Lien Document), whether absolute or contingent and however and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), in connection with First Lien Banking Services, in each case, that constitute First Lien Obligations.

"**First Lien Claimholders**" means, at any relevant time, the holders of First Lien Obligations at that time, including the First Lien Lenders, the First Lien Administrative Agent, the First Lien Collateral Agent, the other agents under the First Lien Credit Agreement and any Additional First Lien Obligations Claimholders.

"**First Lien Collateral**" means (i) the "Collateral" as defined in the First Lien Credit Agreement and (ii) any other assets and property of any Obligor, whether real, personal or mixed, with respect to which a Lien is granted or purported to be granted as security for any First Lien Obligations or that is otherwise subject to a Lien securing any First Lien Obligations.

"**First Lien Collateral Agent**" means the First Lien Credit Agreement Collateral Agent and any Additional First Lien Obligations Agent.

"**First Lien Collateral Documents**" means the "Collateral Documents" as defined in the First Lien Credit Agreement and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing any First Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**First Lien Credit Agreement**" has the meaning set forth in the Recitals to this Agreement.

"**First Lien Credit Agreement Collateral Agent**" has the meaning set forth in the Preamble to this Agreement.

"**First Lien Credit Agreement Obligations**" means all "Secured Obligations" (or any similar term) as defined in the First Lien Credit Agreement.

-8-

"**First Lien Documents**" means (i) the First Lien Financing Documents, (ii) the First Lien Hedge Agreements governing First Lien Secured Hedging Obligations and (iii) the First Lien Banking Services Agreements, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**First Lien Financing Documents**" means the First Lien Credit Agreement, the First Lien Collateral Documents, the other "Loan Documents" as defined in the First Lien Credit Agreement, any Additional First Lien Obligations Agreement and each of the other agreements, documents and instruments providing for or evidencing any other First Lien Obligation (other than any First Lien Other Obligation), and any other document or instrument executed or delivered at any time in connection with any First Lien Obligations (other than any First Lien Other Obligations), including any intercreditor or joinder agreement among any First Lien Claimholders (including, without limitation, the ABL Intercreditor Agreement), to the extent such are effective at the relevant time, as each may be Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**First Lien Hedge Agreement**" means any agreement with respect to any Derivative Transaction between any First Lien Obligor or any "subsidiary" as defined in the First Lien Credit Agreement (or any similar term in any other First Lien Document) and any First Lien Claimholder.

"**First Lien Hedging Obligations**" means, with respect to any First Lien Obligor or any "subsidiary" as defined in the First Lien Credit Agreement (or any similar term in any other First Lien Document), the obligations of such Person under any First Lien Hedge Agreement.

"**First Lien Incremental Facility**" means an "Incremental Facility" and any "Incremental Equivalent Debt" as defined in the First Lien Credit Agreement (or any similar terms in any other First Lien Financing Document).

"**First Lien Intercreditor Agreement**" has the meaning assigned to such term in the First Lien Credit Agreement.

"**First Lien Issuing Bank**" means each issuing bank in respect of a First Lien Letter of Credit.

"**First Lien Lenders**" means the "Lenders" (or any similar term) as defined in the First Lien Credit Agreement and the "Lenders" (or any similar term) as defined in any Additional First Lien Obligations Agreement and also shall include all First Lien Issuing Banks.

"**First Lien Letters of Credit**" means any letters of credit issued (or deemed issued) from time to time under any First Lien Financing Document.

"**First Lien Obligations**" means the First Lien Credit Agreement Obligations and all other "Secured Obligations" (or any similar term) as defined in any other First Lien Financing Document. To the extent any payment with respect to any First Lien Obligation (whether by or on behalf of any First Lien Obligor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any Second Lien Claimholder, receiver or other Person, then the obligation or part thereof originally intended to be satisfied shall, for all purposes of this Agreement and the rights and obligations of the First Lien Claimholders and the Second Lien Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred.  In the event that any interest, fees, expenses or other amounts (including any interest accruing at the default rate or any Post-Petition Interest) to be paid by a First Lien Obligor pursuant to the First Lien Financing Documents, the First Lien Hedge Agreements

-9-

governing First Lien Secured Hedging Obligations or the First Lien Banking Services Agreements are disallowed by order of any court of competent jurisdiction, including by order of a court presiding over an Insolvency or Liquidation Proceeding, such interest, fees, expenses and other amounts (including default interest and Post-Petition Interest) shall, as between the First Lien Claimholders and the Second Lien Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "First Lien Obligations."

"**First Lien Obligors**" means, collectively, the "Loan Parties" (or any similar term) as defined in the First Lien Credit Agreement and the "Loan Parties" (or any similar term) as defined in any other First Lien Document.

"**First Lien Other Obligations**" means the First Lien Banking Services Obligations and the First Lien Secured Hedging Obligations.

"**First Lien Replacement Revolving Facility**" means a "Replacement Revolving Facility" under and as defined in the First Lien Credit Agreement as in effect on the date hereof (or any similar term in any other First Lien Financing Document).

"**First Lien Replacement Term Loan**" means a "Replacement Term Loan" under and as defined in the First Lien Credit Agreement as in effect on the date hereof (or any similar term in any other First Lien Financing Document).

"**First Lien Secured Hedging Obligations**" means all First Lien Hedging Obligations of the First Lien Obligors, whether absolute, or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions or modifications thereof and substitutions therefor), in each case, that constitute First Lien Obligations.

"**GAAP**" means generally accepted accounting principles in the United States in effect and applicable to the accounting period in respect of which reference to GAAP is being made.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state or locality of the United States, the United States, or a foreign government.

"**GS**" has the meaning set forth in the Recitals to this Agreement.

"**Hedge Agreements**" means the First Lien Hedge Agreements and the Second Lien Hedge Agreements.

"**Hedging Obligations**" means the First Lien Hedging Obligations and the Second Lien Hedging Obligations.

"**Holdings**" has the meaning set forth in the Preamble to this Agreement.

"**Indebtedness**" means "Indebtedness" within the meaning of the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable.  For the avoidance of doubt, "Indebtedness" shall not include Hedging Obligations or Banking Services Obligations.

-10-

"**Insolvency or Liquidation Proceeding**" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other Debtor Relief Laws with respect to any Obligor, (b) the appointment of or taking possession by a receiver, interim receiver, receiver and manager, (preliminary) insolvency receiver, liquidator, sequestrator, trustee or other custodian for all or a substantial part of the property of any Obligor, (c) except as would not result in an "event of default" under the First Lien Credit Agreement or any Additional First Lien Obligations Agreement, any liquidation, administration (or appointment of an administrator), dissolution, reorganization or winding up of any Obligor, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or (d) any general assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Obligor.

"**Joinder Agreement**" means a supplement to this Agreement in the form of (i) in the case of any joining additional Obligor, Exhibit A hereto and (ii) in the case of any joining Additional Lien Obligations Agent, Exhibit B hereto.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case in the nature of security; provided that in no event shall an operating lease in and of itself be deemed a Lien.

"**New First Lien Agent**" has the meaning set forth in Section 5.6.

"**Obligors**" means each First Lien Obligor and each Second Lien Obligor and each other Person that has executed and delivered, or may from time to time hereafter execute and deliver, a First Lien Collateral Document or a Second Lien Collateral Document as a "grantor" or "pledgor" (or the equivalent thereof).

"**Other Obligations**" means the First Lien Other Obligations and the Second Lien Other Obligations.

"**Pay-Over Amount**" has the meaning set forth in Section 6.3(b)(ii).

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or any other entity.

"**Pledged Collateral**" has the meaning set forth in Section 5.5(a).

"**Post-Petition Interest**" means interest (including interest accruing at the default rate specified in the applicable First Lien Documents or the applicable Second Lien Documents, as the case may be), fees, expenses and other amounts that pursuant to the First Lien Documents or the Second Lien Documents, as the case may be, continue to accrue or become due after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other amounts are allowed or allowable, voided or subordinated under any Debtor Relief Law or other applicable law or in any such Insolvency or Liquidation Proceeding.

"**Purchase Price**" has the meaning set forth in Section 5.7(a).

"**Recovery**" has the meaning set forth in Section 6.5.

-11-

"**Refinance**" means, in respect of any Indebtedness and any agreement governing any such Indebtedness, to refinance, extend, increase, renew, defease, amend, restate, amend and restate, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for or refinancing of, such Indebtedness in whole or in part, including by adding or replacing lenders, creditors, agents, obligors and/or guarantors, and including, in each case, but not limited to, after the original instrument giving rise to such Indebtedness has been terminated. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Related Claimholders**" means, with respect to any Collateral Agent, its Related First Lien Claimholders or its Related Second Lien Claimholders, as applicable.

"**Related First Lien Claimholders**" means, with respect to any First Lien Collateral Agent, the First Lien Claimholders for which such First Lien Collateral Agent acts as the "collateral agent" (or other agent or similar representative) under the applicable First Lien Documents.

"**Related Second Lien Claimholders**" means, with respect to any Second Lien Collateral Agent, the Second Lien Claimholders for which such Second Lien Collateral Agent acts as the "collateral agent" (or other agent or similar representative) under the applicable Second Lien Documents.

"**Required First Lien Claimholders**" means (a) at all times prior to the occurrence of the Discharge of First Lien Obligations (other than the First Lien Other Obligations), the First Lien Claimholders holding more than 50% of the sum of (i) the aggregate outstanding principal amount of First Lien Obligations (including participations in the face amount of the First Lien Letters of Credit and any disbursements thereunder that have not been reimbursed, but excluding the First Lien Other Obligations) plus (ii) the aggregate unfunded commitments to extend credit which, when funded, would constitute First Lien Obligations (other than the First Lien Other Obligations), and (b) at all times following the occurrence of the Discharge of First Lien Obligations (other than the First Lien Other Obligations), the First Lien Claimholders holding more than 50% of the sum of (i) the then outstanding First Lien Secured Hedging Obligations plus (ii) the then outstanding First Lien Banking Services Obligations; provided that, in the case of both clauses (a) and (b) above, in the event there are separate intercreditor arrangements between the holders of the First Lien Obligations (or their agents), the Required First Lien Claimholders will mean the "Required First Lien Claimholders" (or any similar term) or "Controlling Secured Parties" (or any similar term) as defined in the documentation providing such separate intercreditor arrangements.

"**Required Second Lien Claimholders**" means (a) at all times prior to the occurrence of the Discharge of Second Lien Obligations (other than the Second Lien Other Obligations), the Second Lien Claimholders holding more than 50% of the sum of (i) the aggregate outstanding principal amount of Second Lien Obligations plus (ii) the aggregate unfunded commitments to extend credit which, when funded, would constitute Second Lien Obligations (other than the Second Lien Other Obligations), and (b) at all times following the occurrence of the Discharge of Second Lien Obligations (other than the Second Lien Other Obligations), the Second Lien Claimholders holding more than 50% of the sum of (i) the then outstanding Second Lien Secured Hedging Obligations plus (ii) the then outstanding Second Lien Banking Services Obligations; provided that, in the case of both clauses (a) and (b) above, in the event there are separate intercreditor arrangements between the holders of the Second Lien Obligations (or their agents), the Required Second Lien Claimholders will mean the "Required Second Lien Claimholders" (or any similar term) or "Controlling Secured Parties" (or any similar term) as defined in the documentation providing such separate intercreditor arrangements.

"**Responsible Officer**" of any Person means the chief executive officer, the president, the chief financial officer, the treasurer, any assistant treasurer, any executive vice president, any senior vice

-12-

president, any vice president or the chief operating officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"**Second Lien Adequate Protection Payments**" has the meaning set forth in <u>Section 6.3(b)(ii)</u>.

"**Second Lien Administrative Agent**" has the meaning set forth in the Recitals to this Agreement.

"**Second Lien Banking Services**" means any of the following services provided to any Second Lien Obligor or any of its "Subsidiaries" as defined in the Second Lien Credit Agreement (or any similar term in any other Second Lien Financing Document) commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with cash management and deposit accounts.

"**Second Lien Banking Services Agreement**" means any documentation with a Second Lien Claimholder governing any Second Lien Banking Services Obligations.

"**Second Lien Banking Services Obligations**" means any and all obligations of the Second Lien Obligors, whether absolute or contingent and however and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), in connection with Second Lien Banking Services, in each case, that constitute Second Lien Obligations; <u>provided</u> that in no event shall any obligations constitute Second Lien Banking Services Obligations to the extent such obligations constitute First Lien Banking Services Obligations.

"**Second Lien Claimholders**" means, at any relevant time, the holders of Second Lien Obligations at that time, including the Second Lien Lenders, the Second Lien Administrative Agent, the Second Lien Collateral Agent, the other agents under the Second Lien Credit Agreement and any Additional Second Lien Obligations Claimholders.

"**Second Lien Collateral**" means (i) the "Collateral" as defined in the Second Lien Credit Agreement and (ii) any other assets and property of any Obligor, whether real, personal or mixed, with respect to which a Lien is granted or purported to be granted as security for any Second Lien Obligations or that is otherwise subject to a Lien securing any Second Lien Obligations.

"**Second Lien Collateral Agent**" means the Second Lien Credit Agreement Collateral Agent and any Additional Second Lien Obligations Agent.

"**Second Lien Collateral Documents**" means the "Collateral Documents" as defined in the Second Lien Credit Agreement and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing any Second Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"**Second Lien Credit Agreement**" has the meaning set forth in the Recitals to this Agreement.

-13-

"**Second Lien Credit Agreement Collateral Agent**" has the meaning set forth in the Preamble to this Agreement.

"**Second Lien Credit Agreement Obligations**" means all "Secured Obligations" (or similar term) as defined in the Second Lien Credit Agreement.

"**Second Lien Documents**" means (i) the Second Lien Financing Documents, (ii) the Second Lien Hedge Agreements governing Second Lien Secured Hedging Obligations and (iii) the Second Lien Banking Services Agreements, in each case, as Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Second Lien Financing Documents**" means the Second Lien Credit Agreement, the Second Lien Collateral Documents, the other "Loan Documents" as defined in the Second Lien Credit Agreement, any Additional Second Lien Obligations Agreement, and each of the other agreements, documents and instruments providing for or evidencing any other Second Lien Obligation (other than any Second Lien Other Obligation), and any other document or instrument executed or delivered at any time in connection with any Second Lien Obligations (other than any Second Lien Other Obligations), including any intercreditor or joinder agreement among any Second Lien Claimholders, to the extent such are effective at the relevant time, as each may be Refinanced from time to time in accordance with the terms thereof and subject to the terms hereof.

"**Second Lien Hedge Agreement**" means any agreement with respect to any Derivative Transaction between any Second Lien Obligor or any "subsidiary" as defined in the Second Lien Credit Agreement (or any similar term in any other Second Lien Document) and any Second Lien Claimholder.

"**Second Lien Hedging Obligations**" means, with respect to any Second Lien Obligor or any "subsidiary" as defined in the Second Lien Credit Agreement (or any similar term in any other Second Lien Document), the obligations of such Person under any Second Lien Hedge Agreement.

"**Second Lien Incremental Facility**" means an "Incremental Facility" and any "Incremental Equivalent Debt" as defined in the Second Lien Credit Agreement or any similar terms in any other Second Lien Financing Document.

"**Second Lien Lenders**" means the "Lenders" (or any similar term) under and as defined in the Second Lien Credit Agreement and the "Lenders" (or any similar term) as defined in any Additional Second Lien Obligations Agreement and also shall include the issuing banks of any letters of credit issued (or deemed issued) under any Second Lien Financing Document.

"**Second Lien Obligations**" means the Second Lien Credit Agreement Obligations and all "Secured Obligations" (or any similar term) as defined in any other Second Lien Financing Document. To the extent any payment by a Second Lien Obligor with respect to any Second Lien Obligation (whether by or on behalf of any Second Lien Obligor, as proceeds of security, enforcement of any right of setoff or otherwise) is declared to be a fraudulent conveyance or a preference in any respect, set aside or required to be paid to a debtor in possession, any receiver or other Person, then the obligation or part thereof originally intended to be satisfied shall, for all purposes of this Agreement and the rights and obligations of the First Lien Claimholders and the Second Lien Claimholders, be deemed to be reinstated and outstanding as if such payment had not occurred. In the event that any interest, fees, expenses or other amounts (including any interest accruing at the default rate or any Post-Petition Interest) to be paid pursuant to the Second Lien Financing Documents, the Second Lien Hedge Agreements governing Second Lien Secured Hedging Obligations or the Second Lien Banking Services Agreements are disallowed by order of any court of competent jurisdiction, including by order of a court presiding over an

-14-

Insolvency or Liquidation Proceeding, such interest, fees, expenses and other amounts (including default interest and Post-Petition Interest) shall, as between the First Lien Claimholders and the Second Lien Claimholders, be deemed to continue to accrue and be added to the amount to be calculated as the "Second Lien Obligations."

"**Second Lien Obligors**" means, collectively, the "Loan Parties" (or any similar term) as defined in the Second Lien Credit Agreement and the "Loan Parties" (or any similar term) as defined in any other Second Lien Document.

"**Second Lien Other Obligations**" means the Second Lien Banking Services Obligations and the Second Lien Secured Hedging Obligations.

"**Second Lien Replacement Term Loan**" means a "Replacement Term Loan" as defined in the Second Lien Credit Agreement as in effect on the date hereof (or any similar term in any other Second Lien Financing Document).

"**Second Lien Secured Hedging Obligations**" means all Second Lien Hedging Obligations of the Second Lien Obligors, whether absolute, or contingent and howsoever and whenever created, arising, evidenced or acquired (including all renewals, extensions or modifications thereof and substitutions therefor), in each case, that constitute Second Lien Obligations; provided that in no event shall any obligations constitute Second Lien Secured Hedging Obligations to the extent such obligations constitute First Lien Secured Hedging Obligations.

"**Series**" means, with respect to First Lien Obligations or Second Lien Obligations, all First Lien Obligations or Second Lien Obligations secured by the same First Lien Collateral Documents or same Second Lien Collateral Documents, as the case may be, and represented by the same Collateral Agent acting in the same capacity.

"**Shared Collateral Documents**" means any Collateral Document that is both a First Lien Collateral Document and a Second Lien Collateral Document.

"**Short Fall**" has the meaning set forth in Section 6.3(b)(ii).

"**Standstill Period**" has the meaning set forth in Section 3.1(a)(1).

"**subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof; provided that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interests in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding. Unless otherwise specified, "subsidiary" shall mean any subsidiary of the Top Borrower.

"**Term Loan Priority Collateral**" has the meaning assigned to such term in that certain the ABL Intercreditor Agreement, dated as of the date hereof, among, inter alios, the UBS AG, Stamford Branch, as agent for the ABL Claimholders referred to therein, the First Lien Credit Agreement Collateral Agent, as agent for the First Lien Claimholders referred to therein, the Second Lien Credit Agreement

-15-

Collateral Agent, as agent for the Second Lien Claimholders referred to therein and the Loan Parties from time to time party thereto.

"**Trigger Event**" has the meaning set forth in <u>Section 5.7(a)</u>.

"**UBS**" has the meaning set forth in the Recitals to this Agreement.

"**UCC**" means the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

      1.2   <u>Terms Generally</u>.  The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise:

      (a)   any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time permitted to be Refinanced or replaced in accordance with the terms hereof, in each case to the extent so Refinanced or replaced;

      (b)   any reference herein to any Person shall be construed to include such Person's permitted successors and assigns;

      (c)   the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

      (d)   all references herein to Sections, clauses or paragraphs shall be construed to refer to Sections, clauses or paragraphs of this Agreement, unless otherwise specified;

      (e)   any reference to any law or regulation shall (i) include all statutory and regulatory provisions consolidating, amending, replacing, interpreting or supplementing such law or regulation, and (ii) unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time; and

      (f)   the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

      Notwithstanding anything to the contrary set forth in this Agreement, any reference herein to the First Lien Financing Documents, the First Lien Documents or any of the First Lien Credit Agreement or any other First Lien Document individually "as in effect on the date hereof," "as in effect on the date entered into" or words of similar meaning shall include a reference to any amendment or other modification of any such document that has been made in accordance with, or with respect to any matters that are not prohibited by, <u>Section 5.3(a)</u>; <u>provided</u> that any statement herein to the effect that a capitalized term shall have the meaning as defined in a First Lien Document "as in effect on the date hereof," "as in effect on the date entered into" (or words of similar meaning) shall not include any changes to such term, if any, contained in any such amendment or modification.  Notwithstanding anything to the contrary set forth in this Agreement, any reference herein to the Second Lien Documents or any of the Second Lien Financing Documents or the Second Lien Credit Agreement or any other

-16-

Second Lien Document individually "as in effect on the date hereof," "as in effect on the date entered into" or words of similar meaning shall include a reference to any amendment or other modification of any such document that has been made in accordance with, or with respect to any matters that are not prohibited by, Section 5.3(b); provided that any statement herein to the effect that a capitalized term shall have the meaning as defined in a Second Lien Document "as in effect on the date hereof," "as in effect on the date entered into" (or words of similar meaning) shall not include any changes to such term, if any, contained in any such amendment or modification.

       1.3.    Dip Cap Amount. For avoidance of doubt, it is understood and agreed that any increase in the aggregate Indebtedness for borrowed money constituting principal outstanding under the First Lien Credit Agreement and the other First Lien Documents (in each case, including in any Refinancing thereof) after the date of the original incurrence or issuance of such Indebtedness solely as a result of a fluctuation in the exchange rate of the currency in which such Indebtedness is denominated shall be ignored for purposes of determining compliance with the DIP Cap Amount, and any such incremental Indebtedness attributable to such currency fluctuation shall be deemed to be a First Lien Obligation for all purposes hereof.

## SECTION 2.    Lien Priorities.

       2.1    Relative Priorities. Notwithstanding the date, time, method, manner or order of grant, attachment, recordation or perfection of any Liens on the Collateral securing the Second Lien Obligations or of any Liens on the Collateral securing the First Lien Obligations, and notwithstanding any provision of the UCC or any other applicable law, or the Second Lien Documents or the First Lien Documents, or any defect or deficiencies in, or failure to perfect or lapse in perfection of, or avoidance as a fraudulent conveyance or otherwise of, the Liens securing the First Lien Obligations or any other circumstance whatsoever, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Obligor, each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, hereby agrees that:

       (a)    any Lien on the Collateral securing any First Lien Obligations now or hereafter held by or on behalf of any First Lien Collateral Agent, any other First Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute (including any judgment lien), operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any of the Second Lien Obligations;

       (b)    any Lien on the Collateral securing any Second Lien Obligations now or hereafter held by or on behalf of any Second Lien Collateral Agent, any other Second Lien Claimholders or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute (including any judgment lien), operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing any of the First Lien Obligations; and

       (c)    all Liens on the Collateral securing any First Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Second Lien Obligations for all purposes, whether or not such Liens securing any First Lien Obligations are subordinated to any Lien securing any other obligation of the Obligors or any other Person.Prohibition on Contesting Liens. Each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders, and each First Lien Collateral Agent, for itself and on behalf of its Related First Lien Claimholders, agrees that it and its Related Claimholders will not (and each hereby waives any right to) directly or indirectly contest or challenge, or support any other Person in contesting or challenging, in any proceeding (including any Insolvency or Liquidation Proceeding), (i) the

-17-

validity or enforceability of any First Lien Document or any Second Lien Document, or any First Lien Obligation or any Second Lien Obligation, (ii) the existence, validity, perfection, priority or enforceability of the Liens securing any First Lien Obligations or any Second Lien Obligations or (iii) the relative rights and duties of the First Lien Claimholders or the Second Lien Claimholders granted and/or established in this Agreement or any Collateral Document with respect to such Liens; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any First Lien Collateral Agent or any other First Lien Claimholder to enforce this Agreement or to exercise any of its remedies or rights hereunder, including the provisions of this Agreement relating to the priority of the Liens securing the First Lien Obligations as provided in Sections 2.1 and 3.1.

      2.3    No New Liens.  Subject to Section 2.6 hereof, the parties hereto agree that, so long as the Discharge of First Lien Obligations has not occurred, (a) none of the Obligors shall grant or permit any additional Liens on any asset or property of any Obligor to secure any Second Lien Obligation unless it has granted, or concurrently therewith grants, through documentation in form and substance satisfactory to the Directing First Lien Collateral Agent, a Lien on such asset or property of such Obligor to secure the First Lien Obligations; and (b) none of the Obligors shall grant or permit any additional Liens on any asset or property of any Obligor to secure any First Lien Obligation unless it has granted, or concurrently therewith grants, through documentation in form and substance satisfactory to the Directing Second Lien Collateral Agent, a Lien on such asset or property of such Obligor to secure the Second Lien Obligations.  So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the Obligors, the parties hereto agree that if any Second Lien Claimholder shall acquire or hold any Lien on any assets of any Obligor securing any Second Lien Obligation which assets are not also subject to the first priority Lien of the First Lien Claimholders under the First Lien Collateral Documents, then, without limiting any other rights and remedies available to any First Lien Collateral Agent or the other First Lien Claimholders, the applicable Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens so granted shall be subject to Section 4.2.

      2.4    Similar Liens and Agreements.  In furtherance of Sections 2.3 and 8.9, each First Lien Collateral Agent, for itself and on behalf of its Related First Lien Claimholders, and each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders, agrees, subject to the other provisions of this Agreement:

      (a)    upon request by the Directing First Lien Collateral Agent or the Directing Second Lien Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the First Lien Collateral and the Second Lien Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the First Lien Documents and the Second Lien Documents; and

      (b)    that the documents, agreements or instruments creating or evidencing the First Lien Collateral and the Second Lien Collateral and guaranties for the First Lien Obligations and the Second Lien Obligations, subject to Section 5.3(c), shall be in all material respects the same forms of documents, agreements or instruments, other than with respect to the "first priority" and the "second priority" nature of the Liens thereunder, the identity of the secured parties that are parties thereto or secured thereby and other matters contemplated by this Agreement.

      2.5    Nature of Obligations.  The priorities of the Liens provided in Section 2.1 shall not be altered or otherwise affected by (a) any Refinancing of the First Lien Obligations or the Second Lien Obligations or (b) any action or inaction which any of the First Lien Claimholders or the Second

Lien Claimholders may take or fail to take in respect of the Collateral. Each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders, agrees and acknowledges that (i) a portion of the First Lien Obligations may be revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, (ii) the terms of the First Lien Documents and the First Lien Obligations may be amended, supplemented or otherwise modified, and the First Lien Obligations, or a portion thereof, may be Refinanced from time to time and (iii) the aggregate amount of the First Lien Obligations may be increased, in each case, without notice to or consent by the Second Lien Collateral Agents or the Second Lien Claimholders and without affecting the provisions hereof, except as otherwise expressly set forth herein. As between the Borrowers and the other Obligors and the Second Lien Claimholders, the foregoing provisions will not limit or otherwise affect the obligations of the Borrowers and the Obligors contained in any Second Lien Document with respect to the incurrence of additional First Lien Obligations.

2.6     Certain Cash Collateral. Notwithstanding anything in this Agreement or any other First Lien Document or Second Lien Document to the contrary, collateral consisting of cash and cash equivalents pledged to secure (i) First Lien Obligations under any First Lien Financing Document consisting of reimbursement obligations in respect of First Lien Letters of Credit issued thereunder, (ii) First Lien Obligations under First Lien Hedge Agreements to the extent permitted by the First Lien Documents and the Second Lien Documents and/or (iii) Second Lien Obligations under Second Lien Hedge Agreements to the extent permitted by the First Lien Documents and the Second Lien Documents, shall be applied as specified in the relevant First Lien Financing Document, the relevant First Lien Hedge Agreement and/or the relevant Second Lien Hedge Agreement, as applicable, and will not constitute Collateral hereunder.

**SECTION 3.     Enforcement**.

3.1     Exercise of Remedies.

(a)     Until the Discharge of First Lien Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any of the Obligors, each of the Second Lien Collateral Agents, for itself and on behalf of its Related Second Lien Claimholders, hereby agrees that it and its Related Second Lien Claimholders:

(1)     will not exercise or seek to exercise any rights or remedies (including setoff) with respect to any Collateral or institute or commence, or join with any Person in instituting or commencing, any other Enforcement Action or any other action or proceeding with respect to such rights or remedies (including any action of foreclosure, enforcement, collection or execution and any Insolvency or Liquidation Proceeding); provided that the Directing Second Lien Collateral Agent may commence an Enforcement Action or otherwise exercise any or all such rights or remedies after the passage of a period of at least 180 days since the Directing First Lien Collateral Agent shall have received notice from the Directing Second Lien Collateral Agent with respect to the acceleration by the relevant Second Lien Claimholders of the maturity of all then outstanding Second Lien Obligations (and requesting that Enforcement Action be taken with respect to the Collateral) so long as the applicable "event of default" shall not have been cured or waived (or the applicable acceleration rescinded) (the "**Standstill Period**"); provided further that notwithstanding anything herein to the contrary, in no event shall the Second Lien Collateral Agents or any other Second Lien Claimholders exercise any rights or remedies with respect to any Collateral or institute or commence, or join with any Person in instituting or commencing, any other Enforcement Action or any other action or proceeding with respect to such rights or remedies, if, notwithstanding the expiration of the Standstill Period, either (A) the Directing First

-19-

Lien Collateral Agent or any other First Lien Claimholder shall have commenced and be diligently pursuing (or shall have sought or requested and be diligently pursuing relief from or modification of the automatic stay or any other stay in any Insolvency or Liquidation Proceeding to enable the commencement and the pursuit of) an Enforcement Action or other exercise of their rights or remedies in each case with respect to all or any material portion of the Collateral (with any determination of which Collateral to proceed against, and in what order, to be made by the Directing First Lien Collateral Agent or such First Lien Claimholders in their reasonable judgment) or (B) any of the Obligors is then a debtor in any Insolvency or Liquidation Proceeding;

(2)    will not contest, protest or object to any Enforcement Action brought by the Directing First Lien Collateral Agent or any other First Lien Claimholder or any other exercise by the Directing First Lien Collateral Agent or any other First Lien Claimholder of any rights and remedies relating to the Collateral under the First Lien Documents or otherwise;

(3)    subject to their rights under clause (a)(1) above, will not object to the forbearance by the Directing First Lien Collateral Agent or the other First Lien Claimholders from bringing or pursuing any Enforcement Action or any other exercise of any rights or remedies relating to the Collateral, in each case so long as any proceeds received by the Directing First Lien Collateral Agents or other First Lien Claimholders in excess of those necessary to achieve a Discharge of First Lien Obligations are distributed in accordance with Section 4.1; and

(4)    will not take or receive any Collateral, or any proceeds of or payment with respect to any Collateral, in connection with any Enforcement Action or any other exercise of any right or remedy with respect to any Collateral or any Insolvency or Liquidation Proceeding in its capacity as a creditor or in connection with any insurance policy award or any award in a condemnation or similar proceeding (or deed in lieu of condemnation) with respect to any Collateral, in each case unless and until the Discharge of First Lien Obligations has occurred, except in connection with any foreclosure expressly permitted by Section 3.1(a)(1) to the extent such Second Lien Collateral Agent and its Related Second Lien Claimholders are permitted to retain the proceeds thereof in accordance with Section 4.1.

Without limiting the generality of the foregoing, until the Discharge of First Lien Obligations has occurred, except as expressly provided in Sections 3.1(a)(1), 3.1(c) and 6.3(b), the sole right of each Second Lien Collateral Agent and the other Second Lien Claimholders with respect to the Collateral (other than inspection, monitoring, reporting and similar rights provided for in the Second Lien Financing Documents) is to hold a Lien on the Collateral pursuant to the Second Lien Collateral Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First Lien Obligations has occurred.

(b)    Until the Discharge of First Lien Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any First Lien Obligor, subject to Sections 3.1(a)(1), 3.1(c) and 6.3(b), the First Lien Collateral Agents and the other First Lien Claimholders shall have the exclusive right to commence and maintain an Enforcement Action or otherwise exercise any rights and remedies (including set-off, recoupment and the right to "credit bid" their debt, except that the Second Lien Collateral Agents shall have the "credit bid" rights set forth in Section 3.1(c)(6)), and make determinations regarding the release, Disposition, or restrictions with respect to the Collateral, in each case without any consultation with or the consent of any Second Lien Collateral Agent or any other Second Lien Claimholder; provided that any proceeds received by any First Lien Collateral Agent in excess of those necessary to achieve a Discharge of First Lien Obligations are distributed in accordance with Section 4.1.  In commencing or maintaining any Enforcement Action or

-20-

otherwise exercising rights and remedies with respect to the Collateral, the First Lien Collateral Agents and the other First Lien Claimholders may enforce the provisions of the First Lien Documents and exercise rights and remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion in compliance with any applicable law and without consultation with any Second Lien Collateral Agent or any other Second Lien Claimholder and regardless of whether any such exercise is adverse to the interest of any Second Lien Claimholder. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise Dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or other Disposition, and to exercise all the rights and remedies of a secured creditor under the UCC or other applicable law and of a secured creditor under Debtor Relief Laws of any applicable jurisdiction.

(c)     Notwithstanding the foregoing, each Second Lien Collateral Agent and any other Second Lien Claimholder may:

(1)     file a claim, proof of claim or statement of interest with respect to the Second Lien Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against any of the Second Lien Obligors;

(2)     take any action in order to create, perfect, preserve or protect (but not enforce) its Lien on the Collateral to the extent (A) not adverse to the priority status of the Liens on the Collateral securing the First Lien Obligations, or the rights of any First Lien Collateral Agent or the other First Lien Claimholders to exercise rights and remedies in respect thereof, and (B) not otherwise inconsistent with the terms of this Agreement, including the automatic release of Liens provided in Section 5.1;

(3)     file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Claimholders, including any claims or Liens secured by the Collateral, if any, in each case to the extent not inconsistent with the terms of this Agreement;

(4)     vote on any plan of reorganization, arrangement, compromise or liquidation, file any proof of claim, make other filings and make any arguments and motions with respect to the Second Lien Obligations and the Collateral that are, in each case, in accordance with the terms of this Agreement; provided that no filing of any claim or vote, or pleading relating to such claim or vote, to accept or reject a disclosure statement, plan of reorganization, arrangement, compromise or liquidation, or any other document, agreement or proposal similar to the foregoing by any Second Lien Collateral Agent or any other Second Lien Claimholder may be inconsistent with the terms of this Agreement;

(5)     exercise any of its rights or remedies with respect to the Collateral after the termination of the Standstill Period to the extent permitted by Section 3.1(a)(1); and

(6)     bid for or purchase any Collateral at any public, private or judicial foreclosure upon such Collateral initiated by the Directing First Lien Collateral Agent or any other First Lien Claimholder, or any sale of any Collateral during an Insolvency or Liquidation Proceeding; provided that such bid may not include a "credit bid" in respect of any Second Lien Obligations unless the cash proceeds of such bid are otherwise sufficient to cause the Discharge of First Lien Obligations.

(d)     Subject to Sections 3.1(a)(1), 3.1(c) and 6.3(b) each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders:

(1)     agrees that it and its Related Second Lien Claimholders will not take any action that would hinder, delay, limit or prohibit any exercise of rights or remedies under the First Lien Documents or is otherwise prohibited hereunder, including any collection or Disposition of any Collateral, whether by foreclosure or otherwise, or that would limit, invalidate, avoid or set aside any Lien securing any First Lien Obligations or any First Lien Collateral Document or subordinate the priority of the First Lien Obligations to the Second Lien Obligations or grant the Liens securing the Second Lien Obligations equal ranking to the Liens securing the First Lien Obligations;

(2)     hereby waives any and all rights it or its Related Second Lien Claimholders may have as a junior Lien creditor or otherwise (whether arising under the UCC or under any other law) to object to the manner in which the First Lien Collateral Agents or the other First Lien Claimholders seek to enforce or collect the First Lien Obligations or the Liens securing the First Lien Obligations, regardless of whether any action or failure to act by or on behalf of any First Lien Collateral Agent or any other First Lien Claimholders is adverse to the interest of any Second Lien Claimholders; and

(3)     hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second Lien Collateral Documents or any other Second Lien Document shall be deemed to restrict in any way the rights and remedies of any First Lien Collateral Agent or the other First Lien Claimholders with respect to the Collateral as set forth in this Agreement and the First Lien Documents.

(e)     The Second Lien Collateral Agents and the other Second Lien Claimholders may exercise rights and remedies as unsecured creditors against the Obligors that have guaranteed or granted Liens to secure the Second Lien Obligations in accordance with the terms of the Second Lien Documents and applicable law (other than initiating or joining in an involuntary case or proceeding under any Insolvency or Liquidation Proceeding with respect to any Obligor, prior to the termination of the Standstill Period); provided that (i) any such exercise shall not be inconsistent with the terms of this Agreement (including Sections 2.2 and 6) and (ii) in the event that any Second Lien Claimholder becomes a judgment Lien creditor in respect of any Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Second Lien Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First Lien Obligations) as the other Liens securing the Second Lien Obligations are subject to this Agreement. Nothing in this Agreement shall prohibit the receipt by any Second Lien Collateral Agent or Second Lien Claimholder of the required payments of principal, premium, interest, fees and other amounts due under the Second Lien Documents so long as such receipt is not the direct or indirect result of the exercise by a Second Lien Collateral Agent or other Second Lien Claimholder of rights or remedies as a secured creditor in respect of Collateral.

3.2     Actions Upon Breach; Specific Performance. If any Second Lien Claimholder, in contravention of the terms of this Agreement, in any way takes, attempts to or threatens to take any action with respect to the Collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement), or fails to take any action required by this Agreement, this Agreement shall create an irrebutable presumption and admission by such Second Lien Claimholder that relief against such Second Lien Claimholder by injunction, specific performance and/or other appropriate equitable relief is necessary to prevent irreparable harm to the First Lien Claimholders, it being understood and agreed by each Second Lien Collateral Agent, on behalf of its Related Second Lien Claimholders, that (i) the First

-22-

Lien Claimholders' damages from actions of any Second Lien Claimholder may at that time be difficult to ascertain and may be irreparable and (ii) each Second Lien Claimholder waives any defense that the Obligors and/or the First Lien Claimholders cannot demonstrate damage and/or be made whole by the awarding of damages. Each of the First Lien Collateral Agents may demand specific performance of this Agreement. Each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by any First Lien Collateral Agent or any other First Lien Claimholder. No provision of this Agreement shall constitute or be deemed to constitute a waiver by any First Lien Collateral Agent on behalf of itself and its Related First Lien Claimholders of any right to seek damages from any Person in connection with any breach or alleged breach of this Agreement.

    3.3 <u>Agreement among First Lien Claimholders; Agreement among Second Lien Claimholders</u>.

    (a) Subject to the First Lien Intercreditor Agreement or other applicable intercreditor arrangements among the Series of First Lien Obligations, each First Lien Collateral Agent, on behalf of itself and its Related First Lien Claimholders, solely as among themselves in such capacity and solely for their mutual benefit, hereby agrees that the First Lien Collateral Agent designated as the Directing First Lien Collateral Agent shall have the sole right and power, as among the First Lien Collateral Agents and the other First Lien Claimholders, to take and direct any right or remedy with respect to Collateral in accordance with the terms of this Agreement, the relevant First Lien Collateral Documents and any other intercreditor agreement among the Directing First Lien Collateral Agent and each other First Lien Collateral Agent. The Directing First Lien Collateral Agent shall be entitled to the benefit of all the exculpatory, indemnity and reimbursement provisions set forth in any First Lien Document for the benefit of any "collateral agent" (or any other agent or similar representative) with respect to any exercise by the Directing First Lien Collateral Agent of any of the rights or remedies under this Agreement, including any such exercise of any right or remedy with respect to any Collateral, or any other action or inaction by it in its capacity as the Directing First Lien Collateral Agent.

    (b) Subject to any applicable intercreditor arrangements among the Series of Second Lien Obligations, each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, solely as among themselves in such capacity and solely for their mutual benefit, hereby agrees that the Second Lien Collateral Agent designated as the Directing Second Lien Collateral Agent shall have the sole right and power, as among the Second Lien Collateral Agents and the other Second Lien Claimholders, to take and direct any right or remedy with respect to Collateral in accordance with the terms of this Agreement, the relevant Second Lien Collateral Documents and any other intercreditor agreement among the Directing Second Lien Collateral Agent and each other Second Lien Collateral Agent. The Directing Second Lien Collateral Agent shall be entitled to the benefit of all the exculpatory, indemnity and reimbursement provisions set forth in any Second Lien Document for the benefit of any "collateral agent" (or any other agent or similar representative) with respect to any exercise by the Directing Second Lien Collateral Agent of any of the rights or remedies under this Agreement, including any such exercise of any right or remedy with respect to any Collateral, or any other action or inaction by it in its capacity as the Directing Second Lien Collateral Agent.

    **SECTION 4.**  **Payments**.

    4.1 <u>Application of Proceeds</u>. Subject to the ABL Intercreditor Agreement, so long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Obligor, any Collateral or any proceeds (whether in cash or otherwise) thereof received in connection with any Enforcement Action or other exercise of rights

-23-

or remedies by any First Lien Collateral Agent or the other First Lien Claimholders (including any Disposition referred to in <u>Section 5.1</u>) or any Insolvency or Liquidation Proceeding, shall be applied by the Directing First Lien Collateral Agent to the First Lien Obligations in accordance with the terms of the First Lien Documents, including any First Lien Intercreditor Agreement and any other intercreditor agreement among the First Lien Collateral Agents. Upon the Discharge of First Lien Obligations, the Directing First Lien Collateral Agent shall deliver to the Directing Second Lien Collateral Agent any remaining Collateral and proceeds thereof then held by it in the same form as received, with any necessary endorsements (such endorsements shall be without recourse and without representation or warranty) to the Directing Second Lien Collateral Agent, or as a court of competent jurisdiction may otherwise direct, to be applied by the Directing Second Lien Collateral Agent to the Second Lien Obligations in accordance with the terms of the Second Lien Documents, including any other intercreditor agreement among the Second Lien Collateral Agents.

        4.2    <u>Payments Over</u>.

        (a)    So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Obligor, any Collateral or proceeds thereof (including any assets or proceeds subject to Liens that have been avoided or otherwise invalidated (including as a result of failure to perfect or lack of perfection)), any assets or proceeds subject to Liens referred to in <u>Section 2.3</u>, any amounts referred to in the last sentence of <u>Section 6.3(b)</u> or any other distribution (whether or not expressly characterized as such) in respect of the Collateral (including in connection with any Disposition of any Collateral) received by any Second Lien Collateral Agent or any other Second Lien Claimholders in connection with any Enforcement Action or any Insolvency or Liquidation Proceeding or other exercise of any right or remedy (including set-off or recoupment) relating to the Collateral in contravention of this Agreement or not in accordance with <u>Section 4.1</u>, or received by any Second Lien Collateral Agent or any other Second Lien Claimholders in connection with any insurance policy claim or any condemnation award (or deed in lieu of condemnation), in each case, shall be held in trust and forthwith paid over to the Directing First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.

        (b)    Except as otherwise set forth in <u>Section 6.3</u> (or with respect to any Reorganization Securities which shall be subject to <u>Section 6.6</u> and not this <u>Section 4.2</u>), so long as the Discharge of First Lien Obligations has not occurred, if in any Insolvency or Liquidation Proceeding any Second Lien Collateral Agent or any other Second Lien Claimholders shall receive any distribution of money or other property in respect of or on account of the Collateral (including any assets or proceeds subject to Liens that have been avoided or otherwise invalidated or any amounts referred to in the last sentence of <u>Section 6.3(b)</u>), such money, other property or amounts shall be held in trust and forthwith paid over to the Directing First Lien Collateral Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements. Any Lien received by any Second Lien Collateral Agent or any other Second Lien Claimholders in respect of any of the Second Lien Obligations in any Insolvency or Liquidation Proceeding shall be subject to the terms of this Agreement.

        (c)    Until the Discharge of First Lien Obligations occurs, each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders, hereby irrevocably constitutes and appoints the Directing First Lien Collateral Agent and any officer or agent of the Directing First Lien Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Second Lien Collateral Agent or any such Second Lien Claimholder or in the Directing First Lien Collateral Agent's own name, from time to time in the Directing First Lien Collateral Agent's discretion, for the purpose of carrying out the terms of this <u>Section 4.2</u>, to take any and all appropriate action and to execute any and all documents and instruments

-24-

which may be necessary to accomplish the purposes of this <u>Section 4.2</u>, including any endorsements or other instruments of transfer or release.  This power is coupled with an interest and is irrevocable until the Discharge of First Lien Obligations.

<strong>SECTION 5.</strong>     <strong><u>Other Agreements</u></strong>.

5.1     <u>Releases</u>.

(a)     In connection with any Enforcement Action by the Directing First Lien Collateral Agent or any other exercise by the Directing First Lien Collateral Agent of rights or remedies in respect of the Collateral (including any Disposition of any of the Collateral by any Obligor, with the consent of the Directing First Lien Collateral Agent, after the occurrence and during the continuance of an "event of default" under the First Lien Documents), in each case, prior to the Discharge of First Lien Obligations, the Directing First Lien Collateral Agent is irrevocably authorized (at the cost of the Obligors in accordance with the terms of the applicable First Lien Financing Document and without any consent, sanction, authority or further confirmation from the Directing Second Lien Collateral Agent, any other Second Lien Claimholder or any Obligor):  (i) to release any of its Liens on any part of the Collateral or any other claim over the asset that is the subject of such Enforcement Action, in which case the Liens or any other claim over the asset that is the subject of such Enforcement Action, if any, of any Second Lien Collateral Agent, for itself or for the benefit of the other Second Lien Claimholders, shall be automatically, unconditionally and simultaneously released to the same extent as the Liens or other claims of the Directing First Lien Collateral Agent and each other First Lien Collateral Agent are so released (and the Directing First Lien Collateral Agent is irrevocably authorized to execute and deliver or enter into any release of such Liens or claims that may, in the discretion of the Directing First Lien Collateral Agent, be considered necessary or reasonably desirable in connection with such releases); and (ii) if the asset that is the subject of such Enforcement Action consists of the equity interests of any Obligor, to release (x) such Obligor and any subsidiary of such Obligor from all or any part of its First Lien Obligations, in which case such Obligor and any subsidiary of such Obligor shall be automatically, unconditionally and simultaneously released to the same extent from its Second Lien Obligations, and (y) any Liens or other claims on any assets of such Obligor and any subsidiary of such Obligor, in which case the Liens or other claims on such assets of each Second Lien Collateral Agent, for itself or for the benefit of its Related Second Lien Claimholders, shall be automatically, unconditionally and simultaneously released to the same extent as such Liens of the Directing First Lien Collateral Agent and each other First Lien Collateral Agent are so released (and the Directing First Lien Collateral Agent is irrevocably authorized to execute and deliver or enter into any release of such Liens or claims that may, in the discretion of the Directing First Lien Collateral Agent, be considered necessary or reasonably desirable in connection with such releases).  Each Second Lien Collateral Agent, for itself or on behalf of its Related Second Lien Claimholders, promptly shall execute and deliver to the Directing First Lien Collateral Agent or such Obligor such termination statements, releases and other documents as the Directing First Lien Collateral Agent or such Obligor may request to effectively confirm the foregoing releases upon delivery to the Second Lien Collateral Agents of copies of such termination statements, releases and other documents used to effect such releases with respect to the Collateral securing the First Lien Obligations from a Responsible Officer of the requesting party.  In the case of any Disposition of any of the Collateral that is subject to this <u>Section 5.1(a)</u> by the Directing First Lien Collateral Agent or by any Obligor with the consent of the Directing First Lien Collateral Agent (the party so Disposing of such Collateral being called the "**Disposing Party**"), the Disposing Party shall take reasonable care (as determined in the reasonable credit judgment of the Directing First Lien Collateral Agent or the reasonable business judgment of such Obligor, as the case may be) to obtain a fair market price under the prevailing market conditions and with regard to all other relevant circumstances, including the distressed nature of such Disposition, and if the Disposing Party is an Obligor, to conduct such Disposition in a commercially reasonable manner (it being understood that in any case the Disposing Party shall have no

-25-

obligation to postpone any such Disposition in order to achieve a higher price, and that any Disposition approved by any bankruptcy court in any Insolvency or Liquidation Proceeding shall be conclusively presumed to be made at a fair market price and to have been conducted in a commercially reasonable manner). The proceeds of any such Disposition shall be applied in accordance with <u>Section 4.1</u>.

(b)     If in connection with any sale, lease, exchange, transfer or other disposition (collectively, a "**Disposition**") of any Collateral by any Obligor permitted under the terms of both the First Lien Financing Documents and the Second Lien Financing Documents (other than in connection with an Enforcement Action or other exercise of any First Lien Collateral Agent's rights or remedies in respect of the Collateral, which shall be governed by <u>Section 5.1(a)</u> above), the Directing First Lien Collateral Agent or any other First Lien Collateral Agent, for itself or on behalf of any of the other First Lien Claimholders, releases any of its Liens on any part of the Collateral, or releases any Obligor from its obligations under its guaranty of the First Lien Obligations, in each case other than in connection with, or following, the Discharge of First Lien Obligations, then the Liens, if any, of each Second Lien Collateral Agent, for itself or for the benefit of its Related Second Lien Claimholders, on such Collateral, and the obligations of such Obligor under its guaranty of the Second Lien Obligations, shall be automatically, unconditionally and simultaneously released; <u>provided</u> that such release by such Second Lien Collateral Agent, for itself or for the benefit of its Related Second Lien Claimholders, shall not extend to or otherwise affect any of the rights of the Second Lien Claimholders to the proceeds from any such Disposition. Each Second Lien Collateral Agent, for itself or on behalf of its Related Second Lien Claimholders, promptly shall execute and deliver to the Directing First Lien Collateral Agent or such Obligor such termination statements, releases and other documents as the Directing First Lien Collateral Agent or such Obligor may request to effectively confirm the foregoing releases upon delivery to the Second Lien Collateral Agents of copies of such termination statements, releases and other documents used to effect such release with respect to the Collateral securing the First Lien Obligations from a Responsible Officer of the Top Borrower or the Directing First Lien Collateral Agent and an officer's certificate of a Responsible Officer of the requesting party stating that such disposition has been consummated in compliance with the terms of the Second Lien Credit Agreement.

(c)     Until the Discharge of First Lien Obligations occurs, each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders, hereby irrevocably constitutes and appoints the Directing First Lien Collateral Agent and any officer or agent of the Directing First Lien Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Second Lien Collateral Agent or such Second Lien Claimholders or in the Directing First Lien Collateral Agent's own name, from time to time in the Directing First Lien Collateral Agent's discretion, for the purpose of carrying out the terms of this <u>Section 5.1</u>, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this <u>Section 5.1</u>, including any endorsements or other instruments of transfer or release. This power is coupled with an interest and is irrevocable until the Discharge of First Lien Obligations.

(d)     Until the Discharge of First Lien Obligations occurs, to the extent that any First Lien Collateral Agent or the other First Lien Claimholders (i) have released any Lien on Collateral or any Obligor from its obligation under its guaranty and any such Liens or guaranty are later reinstated or (ii) obtain any additional guarantees from any Obligor or any subsidiary of Holdings, then each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders, shall be granted an additional guaranty.

5.2     <u>Insurance and Condemnation Awards</u>. Until the Discharge of First Lien Obligations has occurred, the Directing First Lien Collateral Agent shall have the sole and exclusive right, subject to the rights of the First Lien Obligors under the First Lien Financing Documents, to settle or

-26-

adjust claims over any insurance policy covering the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral. Until the Discharge of First Lien Obligations has occurred, and subject to the rights of the First Lien Obligors under the First Lien Financing Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) in respect of the Collateral shall be paid to the Directing First Lien Collateral Agent for the benefit of the First Lien Claimholders pursuant to the terms of the First Lien Documents, including any First Lien Intercreditor Agreement and any other intercreditor agreement among the First Lien Collateral Agents (including, without limitation, for purposes of cash collateralization of commitments, First Lien Letters of Credit and obligations under First Lien Hedge Agreements governing any First Lien Secured Hedging Obligations) and thereafter, if the Discharge of First Lien Obligations has occurred, and subject to the rights of the Second Lien Obligors under the Second Lien Financing Documents, to the Directing Second Lien Collateral Agent for the benefit of the Second Lien Claimholders to the extent required under the Second Lien Collateral Documents, and thereafter, if the Discharge of the Second Lien Obligations has occurred, to the owner of the subject property, as directed by the Top Borrower or as a court of competent jurisdiction may otherwise direct. Until the Discharge of First Lien Obligations has occurred, if any Second Lien Collateral Agent or any other Second Lien Claimholders shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such proceeds over to the Directing First Lien Collateral Agent in accordance with the terms of <u>Section 4.2</u>.

   5.3  <u>Amendments to First Lien Financing Documents and Second Lien Financing Documents</u>.

    (a)  The First Lien Financing Documents may be amended, restated, amended and restated, supplemented or otherwise modified in accordance with their terms, and the First Lien Financing Documents and any First Lien Obligations thereunder may be Refinanced, in each case, without notice to, or the consent of any Second Lien Collateral Agent or any other Second Lien Claimholder, all without affecting the Lien subordination or other provisions of this Agreement; <u>provided</u> that the holders of such Refinancing debt execute a Joinder Agreement, and any such amendment, restatement, amendment and restatement, supplement, modification or Refinancing shall not, without the consent of the Directing Second Lien Collateral Agent, contravene the provisions of this Agreement; <u>provided</u> that, notwithstanding the provisions of this <u>Section 5.3(a)</u> and for the avoidance of doubt, the First Lien Financing Documents may be amended, restated, amended and restated, supplemented or otherwise modified and/or Refinanced from time to time in accordance with their terms in order to effect the making or provision of (x) any First Lien Incremental Facility, (y) any First Lien Replacement Term Loan or First Lien Replacement Revolving Facility or (z) any Extended Term Loans, Extended Revolving Loans or Extended Revolving Credit Commitment (each as defined in the First Lien Credit Agreement as in effect on the date hereof), in each case, as and to the extent provided in the First Lien Credit Agreement as in effect on the date hereof, without notice to, or the consent of, any Second Lien Collateral Agent or any other Second Lien Claimholder.

    (b)  The Second Lien Financing Documents may be amended, restated, amended and restated, supplemented or otherwise modified in accordance with their terms, and the Second Lien Financing Documents and any Second Lien Obligations thereunder may be Refinanced, in each case, without notice to, or the consent of any First Lien Collateral Agent or the other First Lien Claimholders (in each case, except to the extent such notice to or consent is otherwise expressly required under the First Lien Financing Documents), all without affecting the Lien subordination or other provisions of this Agreement; <u>provided</u> that the holders of such Refinancing debt bind themselves in a writing addressed to the First Lien Collateral Agents and the other First Lien Claimholders to the terms of this Agreement and prior to the Discharge of First Lien Obligations no such amendment, restatement, amendment and

restatement, supplement, modification or Refinancing shall, without the consent of the Directing First Lien Collateral Agent, contravene the provisions of this Agreement; provided that notwithstanding the provisions of this Section 5.3(b) and for the avoidance of doubt, the Second Lien Financing Documents may be amended, restated, amended and restated, supplemented or otherwise modified and/or Refinanced from time to time in accordance with their terms in order to effect the making or provision of (x) any Second Lien Incremental Facility, (y) any Second Lien Replacement Term Loan or (z) any Extended Term Loans (each as defined in the Second Lien Credit Agreement as in effect on the date hereof), in each case, as and to the extent provided in the Second Lien Credit Agreement, without notice to, or the consent of, any First Lien Collateral Agent or any other First Lien Claimholder.

(c)     In the event that any First Lien Collateral Agent enters into any amendment, restatement, amendment and restatement, supplement or other modification in respect of or replaces any of the First Lien Collateral Documents for purposes of adding to, or deleting from, or waiving or consenting to any departures from any provisions of any First Lien Collateral Document or changing in any manner the rights of the applicable First Lien Collateral Agent, the First Lien Claimholders, or any Obligor thereunder (including the release of any Liens on the Collateral securing the First Lien Obligations), then such amendment, restatement, amendment and restatement, supplement or other modification in a manner that is applicable to all First Lien Claimholders and all First Lien Obligations shall apply automatically to any comparable provisions of each Comparable Second Lien Collateral Document without the consent of any Second Lien Collateral Agent, Second Lien Claimholder or any Obligor; provided, however that (1) such amendment, restatement, amendment and restatement, supplement or other modification does not (A) remove assets subject to any Liens on the Collateral securing any of the Second Lien Obligations or release any such Liens, except to the extent such release is permitted or required by Section 5.1 and provided there is a concurrent release of the corresponding Liens securing the First Lien Obligations, (B) adversely affect the rights or duties of any Second Lien Collateral Agent without its consent or (C) otherwise materially adversely affect the rights of the applicable Second Lien Claimholders or the interest of the applicable Second Lien Claimholders in the Collateral and not the First Lien Collateral Agent or the First Lien Claimholders that have a Lien on the affected Collateral in a like manner, and (2) written notice of such amendment, restatement, amendment and restatement, supplement or other modification shall have been given to each Second Lien Collateral Agent within ten (10) Business Days of the effectiveness thereof (it being understood that the failure to deliver such notice shall not impair the effectiveness of any such amendment, restatement, amendment and restatement, supplement or other modification).

5.4     Confirmation of Subordination in Second Lien Collateral Documents.  Each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, agrees that each Second Lien Collateral Document shall include the following language (or language to similar effect approved by the Directing First Lien Collateral Agent):

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the Second Lien Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Second Lien Collateral Agent hereunder are subject to the provisions of the First Lien/Second Lien Intercreditor Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "First Lien/Second Lien Intercreditor Agreement"), among UBS AG, Stamford Branch, as First Lien Credit Agreement Collateral Agent and Goldman Sachs Bank USA, as Second Lien Credit Agreement Collateral Agent, and certain other Persons party or that may become party thereto from time to time, and acknowledged and agreed to by Dawn Intermediate, Inc., a Delaware corporation, Serta Simmons Bedding, LLC, a Delaware limited liability company, the other borrowers party thereto and the other obligors party thereto.  In the event of any conflict between the

-28-

terms of the First Lien/Second Lien Intercreditor Agreement and this Agreement, the terms of the First Lien/Second Lien Intercreditor Agreement shall govern and control."

     5.5    <u>Gratuitous Bailee/Agent for Perfection; Shared Collateral Documents</u>.

     (a)    Each Collateral Agent agrees to hold that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC or other applicable law (such Collateral being the "**Pledged Collateral**") as gratuitous bailee on behalf of and for the benefit of each other Collateral Agent (such bailment being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-313(c) of the UCC) solely for the purpose of perfecting, or improving the priority of, the security interest granted under the First Lien Collateral Documents and the Second Lien Collateral Documents, as applicable, subject to the terms and conditions of this <u>Section 5.5</u>; <u>provided</u> that, in the case of any such possession or control by any Second Lien Collateral Agent, the foregoing shall not be deemed to be a waiver of any restriction set forth herein on such possession or control or of any breach by such Second Lien Collateral Agent of any terms of this Agreement in respect of such possession or control.

     (b)    Until the Discharge of First Lien Obligations has occurred, each First Lien Collateral Agent shall be entitled to deal with the Pledged Collateral in accordance with the terms of the First Lien Financing Documents as if the Liens of any Second Lien Collateral Agent under the Second Lien Collateral Documents did not exist. The rights of each Second Lien Collateral Agent shall at all times be subject to the terms of this Agreement and to each First Lien Collateral Agent's rights under the First Lien Financing Documents.

     (c)    No Collateral Agent shall have any obligation whatsoever to any Claimholder to ensure that the Pledged Collateral is genuine or owned by any of the Obligors or to preserve rights or benefits of any Person with respect thereto except as expressly set forth in this <u>Section 5.5</u> or, in the case of any Second Lien Collateral Agent, the other provisions hereof (including the turnover provisions set forth in <u>Section 4.2</u>). The duties or responsibilities of each Collateral Agent under this <u>Section 5.5</u> shall be limited solely to holding the Pledged Collateral as bailee in accordance with this <u>Section 5.5</u> and, in the case of any First Lien Collateral Agent, delivering the Pledged Collateral to the Directing Second Lien Collateral Agent upon a Discharge of First Lien Obligations as provided in <u>paragraph (e)</u> below or, in the case of any Second Lien Collateral Agent, delivering the Pledged Collateral to the Directing First Lien Collateral Agent in accordance with the provisions hereof (including the turnover provisions set forth in <u>Section 4.2</u>).

     (d)    Each Collateral Agent, for itself and on behalf of its Related Claimholders, hereby waives and releases each other Collateral Agent and each other Claimholder from all claims and liabilities arising pursuant to any Collateral Agent's role under this <u>Section 5.5</u> as gratuitous bailee and gratuitous agent with respect to the Pledged Collateral; <u>provided</u> that, in the case of any possession or control of any Pledged Collateral by any Second Lien Collateral Agent, the foregoing shall not be deemed to be a waiver of any restriction set forth herein on such possession or control or of any breach by such Second Lien Collateral Agent of any terms of this Agreement in respect of such possession or control. None of the First Lien Collateral Agents or any other First Lien Claimholders shall have by reason of the First Lien Collateral Documents, the Second Lien Collateral Documents, the Shared Collateral Documents, this Agreement or any other document, a fiduciary relationship in respect of any Second Lien Collateral Agent or any other Second Lien Claimholder, and it is understood and agreed that the interests of the First Lien Collateral Agents and the other First Lien Claimholders, on the one hand, and the Second Lien Collateral Agents and the other Second Lien Claimholders, on the other hand, may differ and that the First Lien Collateral Agents and the other First Lien Claimholders shall be fully entitled to act in their

-29-

own interest without taking into account the interests of the Second Lien Collateral Agents or the other Second Lien Claimholders.

(e)    Upon the Discharge of First Lien Obligations, each First Lien Collateral Agent shall deliver the remaining Pledged Collateral in its possession or control (if any) (or proceeds thereof) together with any necessary endorsements (such endorsement shall be without recourse and without any representation or warranty), first, to the Directing Second Lien Collateral Agent, to the extent the Discharge of Second Lien Obligations has not occurred and second, upon the Discharge of Second Lien Obligations, to the Obligors to the extent no Obligations remain outstanding (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral) or as a court of competent jurisdiction may otherwise direct. Following the Discharge of First Lien Obligations, each First Lien Collateral Agent further agrees to take, at the expense of the Obligors (which expense reimbursement shall be subject to the provisions of the applicable First Lien Document), all other actions reasonably requested by the Directing Second Lien Collateral Agent in connection with the Directing Second Lien Collateral Agent obtaining a first-priority interest in the Pledged Collateral.

5.6    When Discharge of First Lien Obligations Deemed to Not Have Occurred. If, substantially concurrently with or after the Discharge of any Series of First Lien Obligations having occurred, the Borrowers or any other First Lien Obligor enters into any Refinancing of any First Lien Financing Document evidencing a First Lien Obligation of such Series, which Refinancing is permitted hereby and by the terms of the Second Lien Financing Documents, then the Discharge of such Series of First Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any action taken as a result of the occurrence of such Discharge of First Lien Obligations prior to the Refinancing of such First Lien Obligations), and the obligations under such Refinancing of such First Lien Financing Document shall automatically be treated as First Lien Obligations of the Refinanced Series for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, and the New First Lien Agent shall be a First Lien Collateral Agent of such Refinanced Series (and, if applicable in accordance with the definition of such term, the Directing First Lien Collateral Agent) for all purposes of this Agreement. Upon receipt of a notice from the Borrowers or any other First Lien Obligor stating that the Borrowers or such other First Lien Obligor has entered into a Refinancing of any First Lien Financing Document (which notice shall include the identity of the new first lien collateral agent (such agent, the "**New First Lien Agent**")), each Collateral Agent shall promptly (a) enter into such documents and agreements (including amendments or supplements to, or amendment and restatement of, this Agreement) as the Borrowers, such other First Lien Obligor or the New First Lien Agent shall reasonably request in order to provide to the New First Lien Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement, and (b) in the case of each Second Lien Collateral Agent only, deliver to the New First Lien Agent (if it is the Directing First Lien Collateral Agent) any Pledged Collateral held by it together with any necessary endorsements (or otherwise allow the New First Lien Agent to obtain control of such Pledged Collateral). The New First Lien Agent shall agree in a writing addressed to the other Collateral Agents and the other Claimholders to be bound by the terms of this Agreement, for itself and on behalf of its Related First Lien Claimholders.

5.7    Purchase Right.

(a)    Without prejudice to the enforcement of any of the First Lien Claimholder's rights or remedies under this Agreement, any other First Lien Financing Documents, at law or in equity or otherwise, each First Lien Collateral Agent, on behalf of its Related First Lien Claimholders, agrees that at any time following the earlier of (i) an acceleration of all the First Lien Obligations in accordance with the terms of the First Lien Financing Documents or (ii) the commencement of any Insolvency or Liquidation Proceeding with respect to any Obligor (the "**Trigger Event**"), the First Lien Claimholders

-30-

will, within 10 Business Days of the first Trigger Event (or such later day as may be agreed by the Directing Second Lien Collateral Agent), offer each Second Lien Claimholder the opportunity to purchase at par the entire aggregate outstanding amount of the First Lien Obligations (and to assume the entire amount of unfunded commitments under the First Lien Financing Documents), at the Purchase Price (together with the deposit of cash collateral as set forth below), without warranty or representation or recourse except as provided in Section 5.7(c), on a *pro rata* basis among the First Lien Claimholders. The "**Purchase Price**" will equal the sum of: (1) the principal amount of all loans, advances or similar extensions of credit included in the First Lien Obligations (including the unreimbursed amount of all issued letters of credit (including First Lien Letters of Credit), but excluding the undrawn amount of then outstanding letters of credit (including the undrawn amount of then outstanding First Lien Letters of Credit)), all accrued and unpaid interest (including Post-Petition Interest) thereon through the date of purchase and any prepayment penalties or premiums that would be applicable upon prepayment of the First Lien Obligations, (2) the net aggregate amount then owing to counterparties under First Lien Hedge Agreements governing the First Lien Secured Hedging Obligations and First Lien Banking Services Agreements, including, in the case of such First Lien Hedge Agreements, all amounts owing to the counterparties as a result of the termination (or early termination) thereof, and (3) all accrued and unpaid fees, expenses and other amounts owed to the First Lien Claimholders under the First Lien Documents on the date of purchase. The Purchase Price shall be accompanied by delivery to the Directing First Lien Collateral Agent of cash collateral in immediately available funds, to be deposited under the sole control of the Directing First Lien Collateral Agent, in such amount as the Directing First Lien Collateral Agent determines is reasonably necessary to secure the First Lien Claimholders in connection with any issued and outstanding First Lien Letters of Credit under the First Lien Financing Documents but in any event not to exceed 105% of the sum of (x) the aggregate undrawn amount of all such First Lien Letters of Credit outstanding pursuant to the First Lien Financing Documents and (y) the aggregate facing and similar fees which will accrue thereon through the stated maturity of the First Lien Letters of Credit (assuming no drawings thereon before stated maturity). It is understood and agreed that (i) at the time any facing or similar fees are owing to an issuer with respect to any First Lien Letter of Credit, the Directing First Lien Collateral Agent may apply amounts deposited with it as described above to pay same and (ii) upon any drawing under any First Lien Letter of Credit, the Directing First Lien Collateral Agent shall apply amounts deposited with it as described above to repay the respective unpaid drawing. After giving effect to any payment made as described above in this paragraph (a), those amounts (if any) then on deposit with the Directing First Lien Collateral Agent as cash collateral, described in this paragraph (a) which exceed 105% of the sum of the aggregate undrawn amount of all then outstanding First Lien Letters of Credit and the aggregate facing and similar fees (to the respective issuers) which will accrue thereon through the stated maturity of the then outstanding First Lien Letters of Credit (assuming no drawings thereon before stated maturity), shall be returned to the respective purchaser or purchasers, as their interests appear. Furthermore, at such time as all First Lien Letters of Credit have been cancelled, expired or been fully drawn, as the case may be, and after all applications described above have been made, any excess cash collateral then on deposit with the Directing First Lien Collateral Agent as described above in this paragraph (a) (and not previously applied or released as provided above) shall be returned to the respective purchaser or purchasers, as their interests appear.

(b) The Second Lien Claimholders shall irrevocably accept or reject such offer to purchase within thirty (30) days of the receipt thereof by the Directing Second Lien Collateral Agent and the parties shall endeavor to close promptly thereafter. The Second Lien Claimholders shall only be permitted to acquire the entire amount of the First Lien Obligations pursuant to this Section 5.7, and may not acquire less than all of such First Lien Obligations. If any Second Lien Claimholders timely accept such offer, it shall be exercised pursuant to documentation mutually acceptable to each of the First Lien Collateral Agents and the relevant Second Lien Collateral Agents. If the Second Lien Claimholders reject such offer (or do not so irrevocably accept such offer within the required timeframe), the First Lien Claimholders shall have no further obligations pursuant to this Section 5.7 and may take any further

actions in their sole discretion in accordance with the First Lien Documents and this Agreement. Each First Lien Claimholder will retain all rights to indemnification and expense reimbursement provided in the relevant First Lien Documents for all claims and other amounts relating to periods prior to the purchase of the First Lien Obligations pursuant to this Section 5.7. Upon the consummation of the purchase and sale of the First Lien Obligations, each First Lien Collateral Agent shall, at the request of the Directing Second Lien Collateral Agent, resign from its role in accordance with the applicable First Lien Document (and comply with any provisions contained therein with respect to successors to such role or the powers granted in connection with such role) and cooperate with an orderly transition of Liens in the Collateral.

(c)     The purchase and sale of the First Lien Obligations under this Section 5.7 will be without recourse and without representation or warranty of any kind by the First Lien Claimholders, except that the First Lien Claimholders shall severally and not jointly represent and warrant to the Second Lien Claimholders that on the date of the purchase, immediately before giving effect to such purchase:

(i)     the principal of and accrued and unpaid interest on the First Lien Obligations, and the fees, expenses and other amounts in respect thereof owed to the respective First Lien Claimholders, are as stated in any assignment agreement prepared in connection with the purchase and sale of the First Lien Obligations;

(ii)     each First Lien Claimholder owns the First Lien Obligations purported to be owned by it free and clear of any Liens; and

(iii)     that such First Lien Claimholder has the right to assign the First Lien Obligations being assigned by it and its assignment has been duly authorized and delivered.

## SECTION 6.     Insolvency or Liquidation Proceedings.

### 6.1     Finance and Sale Issues.

(a)     Until the Discharge of First Lien Obligations has occurred, if any Obligor shall be subject to any Insolvency or Liquidation Proceeding and the Directing First Lien Collateral Agent shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code or any similar Debtor Relief Law) on which the First Lien Collateral Agents or any other creditor has a Lien or to permit any Obligor to obtain financing, whether from the First Lien Claimholders or any other Person, under Section 364 of the Bankruptcy Code or any similar Debtor Relief Law ("**DIP Financing**"), then each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, agrees that it and its Related Second Lien Claimholders will raise no objection to, or oppose or contest (or join with or support any third party opposing, objecting or contesting), such Cash Collateral use or DIP Financing (including any proposed orders for such Cash Collateral use and/or DIP Financing which are acceptable to the Directing First Lien Collateral Agent) and it and its Related Second Lien Claimholders will be deemed to have consented to such Cash Collateral use or DIP Financing (including such proposed orders), and to the extent the Liens securing the First Lien Obligations are subordinated to or *pari passu* with such DIP Financing, each Second Lien Collateral Agent will subordinate its Liens in the Collateral to the Liens securing such DIP Financing (and all obligations relating thereto and any customary "carve-out" agreed to on behalf of the First Lien Claimholders by the Directing First Lien Collateral Agent) and to all adequate protection Liens granted to the First Lien Claimholders on the same basis as the Liens securing the Second Lien Obligations are subordinated to the Liens securing the First Lien Obligations under this Agreement and will not request adequate protection or any other relief in connection therewith (except as expressly agreed by the Directing First Lien Collateral Agent or to the extent permitted by Section 6.3); provided that (i) the aggregate principal

US-DOCS\72672063.7

amount of Indebtedness for borrowed money under any DIP Financing that is secured by a Lien on the Term Loan Priority Collateral on a pari passu or super priority basis to the Lien securing the First Lien Obligations plus the aggregate outstanding principal amount of Indebtedness for borrowed money under the First Lien Financing Documents (which, for the avoidance of doubt, excludes any First Lien Other Obligations) plus the aggregate face amount of any First Lien Letters of Credit (except any portion thereof that is no longer available for drawing as a result of any disbursement thereunder that has been reimbursed) does not exceed the DIP Cap Amount, and (ii) the Second Lien Collateral Agents and the Second Lien Secured Parties retain the right to object to any ancillary agreements or arrangements regarding the use of Cash Collateral or the DIP Financing that require a specific treatment of a claim in respect of the Second Lien Obligations for purposes of a plan of reorganization.

(b)        Each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders, agrees that it and its Related Second Lien Claimholders will not seek consultation rights in connection with, and will raise no objection or oppose or contest (or join with or support any third party objecting, opposing or contesting), a motion to sell, liquidate or otherwise Dispose of Collateral under Section 363 of the Bankruptcy Code if the requisite First Lien Claimholders have consented to such sale, liquidation or other Disposition; provided that (1) to the extent the net cash proceeds of such sale or other Disposition are used to pay the principal amount of Indebtedness for borrowed money constituting First Lien Obligations, or to reimburse disbursements under, or cash collateralize the face amount of, the First Lien Letters of Credit constituting First Lien Obligations, the Liens of the Second Lien Secured Parties shall attach to any remaining proceeds and (2) such motion does not impair the rights of the Second Lien Claimholders under Section 363(k) of the Bankruptcy Code; and provided, further, however, that the Second Lien Claimholders may assert any objection with respect to any proposed orders to retain professionals or set bid or related procedures in connection with such sale, liquidation or Disposition that may be raised by an unsecured creditor of the Obligors.

6.2        Relief from the Automatic Stay.  Until the Discharge of First Lien Obligations has occurred, each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders agrees that none of them shall (a) seek (or support any other Person seeking) relief from or modification of the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of any of the Collateral, in each case without the prior written consent of the Directing First Lien Collateral Agent, or (b) oppose (or support any other Person in opposing) any request by any First Lien Collateral Agent for relief from or modification of such stay.

6.3        Adequate Protection.

(a)        Each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, agrees that none of them shall contest (or support any other Person contesting):

(i)        any request by any First Lien Collateral Agent or the other First Lien Claimholders for adequate protection under any Debtor Relief Law; or

(ii)        any objection by any First Lien Collateral Agent or the other First Lien Claimholders to any motion, relief, action or proceeding based on such First Lien Collateral Agent or the other First Lien Claimholders claiming a lack of adequate protection with respect to the Collateral.

(b)        Notwithstanding the foregoing provisions in this Section 6.3, in any Insolvency or Liquidation Proceeding:

-33-

(i)    if the First Lien Claimholders (or any subset thereof) are granted adequate protection in the form of a Lien on additional or replacement collateral in connection with any use of Cash Collateral or DIP Financing, then each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, may seek or request adequate protection in the form of a Lien on such additional or replacement collateral, which Lien will be subordinated to the Liens securing the First Lien Obligations and such use of Cash Collateral or DIP Financing (and all obligations relating thereto) on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the Liens securing the First Lien Obligations under this Agreement; and

(ii)    the Second Lien Collateral Agents and the other Second Lien Claimholders shall only be permitted to seek adequate protection with respect to their respective rights in the Collateral in any Insolvency or Liquidation Proceeding in the form of (A) additional collateral; provided that as adequate protection for the First Lien Obligations, each First Lien Collateral Agent, on behalf of itself and its Related First Lien Claimholders, is also granted a Lien on such additional collateral that is senior to any Lien granted to the Second Lien Collateral Agents and the other Second Lien Claimholders; (B) replacement Liens on the Collateral; provided that as adequate protection for the First Lien Obligations, each First Lien Collateral Agent, on behalf of itself and its Related First Lien Claimholders, is also granted replacement Liens on the Collateral that are senior to any Lien granted to the Second Lien Collateral Agents and the other Second Lien Claimholders; (C) an administrative expense claim; provided that as adequate protection for the First Lien Obligations, each First Lien Collateral Agent, on behalf of itself and its Related First Lien Claimholders, is also granted an administrative expense claim that is senior and prior to the administrative expense claim of the Second Lien Collateral Agents and the other Second Lien Claimholders; and (D) cash payments with respect to current fees and expenses; provided that (1) as adequate protection for the First Lien Obligations, each First Lien Collateral Agent, on behalf of itself and its Related First Lien Claimholders, is also granted cash payments with respect to current fees and expenses and (2) each First Lien Collateral Agent may object to the amounts of fees and expenses sought by the Second Lien Collateral Agents and the other Second Lien Claimholders; and (E) cash payments with respect to interest on the Second Lien Obligations; provided that (1) as adequate protection for the First Lien Obligations, each First Lien Collateral Agent, on behalf of itself and its Related First Lien Claimholders, is also granted cash payments with respect to interest on the First Lien Obligation represented by it, (2) such cash payments do not exceed an amount equal to the interest accruing on the principal amount of Second Lien Obligations outstanding on the date such relief is granted at the interest rate under the applicable Second Lien Documents and accruing from the date the applicable Second Lien Collateral Agent is granted such relief and (3) such cash payments are held in the Escrow Account as described below.  If any Second Lien Claimholder is entitled by order of a court of competent jurisdiction to receive or receives adequate protection payments for post-petition interest in an Insolvency or Liquidation Proceeding ("**Second Lien Adequate Protection Payments**"), then all such payments shall be payable or transferred to, and held in, an escrow account (the "**Escrow Account**") pursuant to terms mutually satisfactory to the Directing First Lien Collateral Agent and the Directing Second Lien Collateral Agent, in each case until the effectiveness of the plan of reorganization for, or conclusion of, that Insolvency or Liquidation Proceeding. If the First Lien Claimholders do not receive payment in full in cash of all First Lien Obligations upon the effectiveness of the plan of reorganization for, or conclusion of, that Insolvency or Liquidation Proceeding, then an amount contained in the Escrow Account shall be paid over to the First Lien Claimholders (the "**Pay-Over Amount**") equal to the lesser of (x) the Second Lien Adequate Protection Payments received by the Second Lien Claimholders and (y) the amount of the short-fall (the "**Short Fall**") in payment in full in cash of the First Lien Obligations; provided that to the extent any portion of the Short Fall represents payments

-34-

received by the First Lien Secured Parties in the form of promissory notes, equity or other property equal in value to the cash paid in respect of the Pay-Over Amount, the First Lien Claimholders shall, upon receipt of the Pay-Over Amount, transfer those promissory notes, equity or other property, equal in value to the cash paid in respect of the Pay-Over Amount, to the applicable Second Lien Claimholders pro rata in exchange for the Pay-Over Amount. Upon the effectiveness of the plan of reorganization for, or conclusion of, that Insolvency or Liquidation Proceeding, any amounts remaining in the Escrow Account after application of amounts provided for above shall be paid to the Second Lien Claimholders as their interests may appear. It is understood and agreed that nothing in this Section 6.3(b) shall modify or otherwise affect the other agreements by or on behalf of the Second Lien Collateral Agents and the other Second Lien Claimholders set forth in this Agreement (including the agreements to raise no objection to, or oppose or contest, that are set forth in Section 6.1). To the extent the First Lien Collateral Agents are not granted such adequate protection in the applicable form, any amounts recovered by or distributed to any Second Lien Collateral Agent or any other Second Lien Claimholder pursuant to or as a result of any such additional collateral, any such replacement Lien, any such administrative expense claim or any such cash payment shall be subject to Section 4.2.

6.4    No Waiver.  Subject to Section 6.7(b), nothing contained herein shall prohibit or in any way limit any First Lien Collateral Agent or any other First Lien Claimholder from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by any Second Lien Collateral Agent or any other Second Lien Claimholders, including the seeking by any Second Lien Collateral Agent or any other Second Lien Claimholders of adequate protection or the asserting by any Second Lien Collateral Agent or any other Second Lien Claimholders of any of its rights and remedies under the Second Lien Financing Documents or otherwise.  Without limiting the foregoing, notwithstanding anything herein to the contrary, the First Lien Claimholders shall not be deemed to have consented to, and expressly retain their rights to object to, the grant of adequate protection in the form of cash payments to the Second Lien Claimholders made pursuant to Section 6.3(b).

6.5    Reinstatement.  If any First Lien Claimholder is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of any Obligor any amount paid in respect of First Lien Obligations (a "**Recovery**"), then such First Lien Claimholder shall be entitled to a reinstatement of its First Lien Obligations with respect to all such recovered amounts on the date of such Recovery, and from and after the date of such reinstatement the Discharge of First Lien Obligations shall be deemed not to have occurred for all purposes hereunder.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.  Any amounts received by any Second Lien Collateral Agent or any other Second Lien Claimholder on account of the Second Lien Obligations after the termination of this Agreement shall, upon a reinstatement of this Agreement pursuant to this Section 6.5, be held in trust for and paid over to the Directing First Lien Collateral Agent for the benefit of the First Lien Claimholders, for application to the reinstated First Lien Obligations in accordance with the First Lien Financing Documents and any First Lien Intercreditor Agreement, if then in effect.  This Section 6.5 shall survive termination of this Agreement.

6.6    Reorganization Securities.  If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization, arrangement, compromise or liquidation or similar dispositive restructuring plan, both on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt obligations distributed on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the

-35-

provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

       6.7    <u>Post-Petition Interest</u>.

       (a)    Each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders, agrees that neither it nor its Related Second Lien Claimholders shall oppose or seek to challenge (or join with any other Person opposing or challenging) any claim by any First Lien Collateral Agent or any other First Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of First Lien Obligations consisting of Post-Petition Interest.  Regardless of whether any such claim for Post-Petition Interest is allowed or allowable, and without limiting the generality of the other provisions of this Agreement, this Agreement expressly is intended to include, and does include the "rule of explicitness," and is intended to provide the First Lien Claimholders with the right to receive payment of all Post-Petition Interest through distributions made pursuant to the provisions of this Agreement even though such Post-Petition Interest may not be not allowed or allowable against the bankruptcy estate of the Borrowers or any other Obligor under Section 502(b)(2) or Section 506(b) of the Bankruptcy Code or under any other provision of the Bankruptcy Code or any other Debtor Relief Law.

       (b)    Subject to <u>Section 6.3(b)</u>, none of any First Lien Collateral Agent nor any of its Related First Lien Claimholders shall oppose or seek to challenge any claim by any Second Lien Collateral Agent or any other Second Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of Second Lien Obligations consisting of Post-Petition Interest to the extent of the value of the Lien of any Second Lien Collateral Agent, on behalf of the Second Lien Claimholders, on the Collateral (after taking into account the amount of the First Lien Obligations).

       6.8    <u>Waivers</u>.  (a) Each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders, waives any claim it or its Related Second Lien Claimholders may hereafter have against any First Lien Claimholder arising out of (a) the election of any First Lien Claimholder of the application of Section 1111(b)(2) of the Bankruptcy Code or (b) any cash collateral or financing arrangement, or any grant of a security interest in connection with the Collateral, in any Insolvency or Liquidation Proceeding so long as such actions are not in express contravention of the terms of this Agreement.

       (b)    Each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders, agrees that it will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code or any similar provision of any other Debtor Relief Law senior to or on a parity with the Liens securing the First Lien Obligations for costs or expenses of preserving or disposing of any Collateral.

       6.9    <u>Separate Grants of Security and Separate Classification</u>.  Each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders, and each First Lien Collateral Agent, for itself and on behalf of its Related First Lien Claimholders, acknowledges and agrees that:

       (a)    the grants of Liens pursuant to the First Lien Collateral Documents and the Second Lien Collateral Documents constitute, and, in the case of the Shared Collateral Documents, are intended to constitute, two separate and distinct grants of Liens; and

       (b)    because of, among other things, their differing rights in the Collateral, the Second Lien Obligations are fundamentally different from the First Lien Obligations and must, subject to

-36-

applicable law, be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding.

To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Lien Claimholders and the Second Lien Claimholders in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then each of the parties hereto hereby acknowledges and agrees that, subject to Sections 2.1 and 4.1, all distributions shall be made as if there were separate classes of senior and junior secured claims against the Obligors in respect of the Collateral with the effect being that, to the extent that the aggregate value of the Collateral is sufficient (for this purpose ignoring all claims held by the Second Lien Claimholders), the First Lien Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing (or that would be owing if there were such separate classes of senior and junior secured claims) in respect of Post-Petition Interest, including any additional interest payable pursuant to the First Lien Documents arising from or related to a default, regardless of whether any such claim is allowed or allowable in any Insolvency or Liquidation Proceeding, before any distribution is made in respect of the claims held by the Second Lien Claimholders with respect to the Collateral, with each Second Lien Collateral Agent, for itself and on behalf of its Related Second Lien Claimholders, hereby acknowledging and agreeing to turn over to the Directing First Lien Collateral Agent, for itself and on behalf of the First Lien Claimholders, Collateral or proceeds of Collateral or any other distribution (whether or not expressly characterized as such) in respect of the Collateral, otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Lien Claimholders.

6.10    Effectiveness in Insolvency or Liquidation Proceedings.  The parties acknowledge that this Agreement is a "subordination agreement" under Section 510(a) of the Bankruptcy Code and under comparable provisions of any other applicable Debtor Relief Law, which will be effective before, during and after the commencement of any Insolvency or Liquidation Proceeding. All references in this Agreement to any Obligor will include such Person as a debtor-in-possession and any receiver or trustee for such Person in any Insolvency or Liquidation Proceeding.

### SECTION 7.    Reliance; Waivers; Etc.

7.1    Reliance.  Other than any reliance on the terms of this Agreement, each First Lien Collateral Agent, on behalf of itself and its Related First Lien Claimholders, acknowledges that it and its Related First Lien Claimholders have, independently and without reliance on any Second Lien Collateral Agent or any other Second Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the First Lien Documents (as applicable) and be bound by the terms of this Agreement, and they will continue to make their own credit decision in taking or not taking any action under the First Lien Documents or this Agreement.  Each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, acknowledges that it and its Related Second Lien Claimholders have, independently and without reliance on any First Lien Collateral Agent or any other First Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Second Lien Documents and be bound by the terms of this Agreement, and they will continue to make their own credit decision in taking or not taking any action under the Second Lien Documents or this Agreement.

7.2     No Warranties or Liability.

(a)     Each First Lien Collateral Agent, on behalf of itself and its Related First Lien Claimholders, acknowledges and agrees that, except as set forth in Section 8.14, no Second Lien Collateral Agent or other Second Lien Claimholders have made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the Second Lien Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  The Second Lien Claimholders will be entitled to manage and supervise their respective extensions of credit under the Second Lien Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.

(b)     Each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, acknowledges and agrees that, except as set forth in Section 8.14, no First Lien Collateral Agent or other First Lien Claimholders have made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the First Lien Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  The First Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the First Lien Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate.

(c)     The Second Lien Collateral Agents and the other Second Lien Claimholders shall have no duty to the First Lien Collateral Agents or any of the other First Lien Claimholders, and the First Lien Collateral Agents and the other First Lien Claimholders shall have no duty to the Second Lien Collateral Agents or any of the other Second Lien Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with any Obligor (including the First Lien Financing Documents and the Second Lien Financing Documents, but in each case other than this Agreement), regardless of any knowledge thereof which they may have or be charged with.

7.3     No Waiver of Lien Priorities.

(a)     No right of the First Lien Collateral Agents or any other First Lien Claimholders, or any of them, to enforce any provision of this Agreement or of any First Lien Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Obligor or by any act or failure to act by any First Lien Collateral Agent or any other First Lien Claimholder, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First Lien Documents or any of the Second Lien Documents, regardless of any knowledge thereof which the First Lien Collateral Agents or the other First Lien Claimholders, or any of them, may have or be otherwise charged with.

(b)     Without in any way limiting the generality of the foregoing paragraph (a) (but subject to the rights of the First Lien Obligors under the First Lien Documents and subject to the provisions of Section 5.3(a)), the First Lien Collateral Agents and the other First Lien Claimholders, or any of them, may at any time and from time to time in accordance with the First Lien Documents and/or applicable law, without the consent of, or notice to, any Second Lien Collateral Agent or any other Second Lien Claimholders, without incurring any liabilities to any Second Lien Collateral Agent or any other Second Lien Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of any Second Lien Collateral Agent or any other Second Lien Claimholders is affected, impaired or extinguished thereby) do any one or more of the following:

-38-

(1)      make loans and advances to any Obligor or issue, provide or obtain First Lien Letters of Credit for the account of any Obligor or otherwise extend credit to any Obligor, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing;

(2)      change the manner, place or terms of payment of, or change or extend the time of payment of, or amend, renew, exchange, increase or alter the terms of, any of the First Lien Obligations or any Lien on any First Lien Collateral or guaranty thereof or any liability of any Obligor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the First Lien Obligations, without any restriction as to the tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by any First Lien Collateral Agent or any of the other First Lien Claimholders, the First Lien Obligations or any of the First Lien Documents;

(3)      sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the First Lien Collateral or any liability of any Obligor to any First Lien Collateral Agent or any other First Lien Claimholders, or any liability incurred directly or indirectly in respect thereof;

(4)      settle or compromise any First Lien Obligation or any other liability of any Obligor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the First Lien Obligations) in any manner or order;

(5)      exercise or delay in or refrain from exercising any right or remedy against any Obligor or any security or any other Person or with respect to any security, elect any remedy and otherwise deal freely with any Obligor or any First Lien Collateral and any security and any guarantor or any liability of any Obligor to the First Lien Claimholders or any liability incurred directly or indirectly in respect thereof; and

(6)      release or discharge any First Lien Obligation or any guaranty thereof or any agreement or obligation of any Obligor or any other Person or entity with respect thereto.

(c)      Until the Discharge of First Lien Obligations, each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

7.4      <u>Waiver of Liability</u>.

(a)      Each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, agrees that the First Lien Collateral Agents and the other First Lien Claimholders shall have no liability to any Second Lien Collateral Agent or any other Second Lien Claimholders, and each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, hereby waives any claim against any First Lien Collateral Agent or any other First Lien Claimholder, arising out of any and all actions which any First Lien Collateral Agent or any other First Lien Claimholders may take or permit or omit to take with respect to:  (i) the First Lien Documents (including, without limitation, any failure to perfect or obtain perfected security interests in the First Lien Collateral), (ii) the collection of the First Lien Obligations or (iii) the foreclosure upon, or sale, liquidation or other Disposition of, any

-39-

First Lien Collateral. Each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, also agrees that the First Lien Collateral Agents and the other First Lien Claimholders have no duty, express or implied, fiduciary or otherwise, to them in respect of the maintenance or preservation of the First Lien Collateral, the First Lien Obligations or otherwise. Neither the First Lien Collateral Agents nor any other First Lien Claimholder nor any of their respective directors, officers, employees or agents will be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so, or will be under any obligation to sell or otherwise Dispose of any Collateral upon the request of any Obligor or upon the request of any Second Lien Collateral Agent, any other Second Lien Claimholder or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. Without limiting the foregoing, each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, agrees that neither any First Lien Collateral Agent nor any other First Lien Claimholder (in directing the First Lien Collateral Agent to take any action with respect to the Collateral) shall have any duty or obligation to realize first upon any type of Collateral or to sell or otherwise Dispose of all or any portion of the Collateral in any manner, including as a result of the application of the principles of marshaling or otherwise, that would maximize the return to any First Lien Claimholders or any Second Lien Claimholders, notwithstanding that the order and timing of any such realization, sale or other Disposition may affect the amount of proceeds actually received by such Claimholders from such realization, sale or other Disposition.

(b)    With respect to its share of the First Lien Obligations, UBS shall have and may exercise the same rights and powers hereunder as, and shall be subject to the same obligations and liabilities as and to the extent set forth herein for, any other First Lien Claimholder, all as if UBS were not the First Lien Collateral Agent. With respect to its share of the Second Lien Obligations, GS shall have and may exercise the same rights and powers hereunder as, and shall be subject to the same obligations and liabilities as and to the extent set forth herein for, any other Second Lien Claimholder, all as if GS were not the Second Lien Credit Collateral Agent. The term "Claimholders" or any similar term shall, unless the context clearly otherwise indicates, include UBS and GS, each in its individual capacity as a Claimholder. UBS, GS and their respective Affiliates may lend money to, and generally engage in any kind of business with, the Obligors or any of their Affiliates as if UBS were not acting as the First Lien Collateral Agent and GS were not acting as the Second Lien Collateral Agent and without any duty to account therefor to any other Claimholder.

7.5    Obligations Unconditional. All rights, interests, agreements and obligations of the First Lien Collateral Agents and the other First Lien Claimholders and the Second Lien Collateral Agents and the other Second Lien Claimholders, respectively, hereunder (including the Lien priorities established hereby) shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any First Lien Documents or any Second Lien Documents;

(b)    any change in the time, manner or place of payment of, or, subject to the limitations set forth in Section 5.3, in any other terms of, all or any of the First Lien Obligations or Second Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First Lien Document or any Second Lien Document;

(c)    any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First Lien Obligations or Second Lien Obligations or any guaranty thereof;

-40-

(d)     the commencement of any Insolvency or Liquidation Proceeding in respect of any Obligor; or

(e)     any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Obligor in respect of any First Lien Collateral Agent, any other First Lien Claimholder, the First Lien Obligations, any Second Lien Collateral Agent, any other Second Lien Claimholder or the Second Lien Obligations in respect of this Agreement.

### SECTION 8.     **Miscellaneous**.

8.1     <u>Conflicts</u>.

(a)     In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the First Lien Documents or the Second Lien Documents, the provisions of this Agreement shall govern and control; <u>provided</u> that the foregoing shall not be construed to limit the relative rights and obligations as among the First Lien Claimholders or as among the Second Lien Claimholders; as among the First Lien Claimholders, such rights and obligations are governed by, and any provisions herein regarding them are therefore subject to, the provisions of any First Lien Intercreditor Agreement, and as among the Second Lien Claimholders, such rights and obligations are governed by, and any provisions herein regarding them are therefore subject to, the provisions of any intercreditor agreement governing the rights and obligations of Second Lien Claimholders solely amongst themselves.

(b)     The parties hereto acknowledge, authorize and consent to the entry by each First Lien Collateral Agent and each Second Lien Collateral Agent into the ABL Intercreditor Agreement.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the ABL Intercreditor Agreement with respect to the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) or otherwise with respect to the rights and obligations of the ABL Claimholders (as defined in the ABL Intercreditor Agreement) on the one hand and the Term Loan Claimholders (as defined in the ABL Intercreditor Agreement) on the other hand, the provisions of the ABL Intercreditor Agreement shall control.

8.2     <u>Effectiveness; Continuing Nature of this Agreement; Severability</u>.  This Agreement shall become effective when executed and delivered by the parties hereto.  This is a continuing agreement of Lien subordination and each of the First Lien Claimholders and the Second Lien Claimholders may continue, at any time and without notice to any Second Lien Collateral Agent or any other Second Lien Claimholder or any First Lien Collateral Agent or any other First Lien Claimholder, to extend credit and other financial accommodations and lend monies to or for the benefit of any Obligor constituting First Lien Obligations or Second Lien Obligations in reliance hereon.  Each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement. Each First Lien Collateral Agent, on behalf of itself and its Related First Lien Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to any Obligor shall include such Obligor as debtor and debtor-in-possession and any receiver, trustee or similar Person for any Obligor (as the case may be) in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect:

-41-

(a)     with respect to any First Lien Collateral Agent, the other First Lien Claimholders and the First Lien Obligations of any Series, upon the Discharge of such Series of First Lien Obligations, subject to <u>Section 5.6</u> and the rights of the First Lien Claimholders of such Series under <u>Section 6.5</u>; and

(b)     with respect to any Second Lien Collateral Agent, the other Second Lien Claimholders and the Second Lien Obligations of any Series, upon the Discharge of such Series of Second Lien Obligations.

Notwithstanding the foregoing, such termination shall not relieve any such party of its obligations incurred hereunder prior to the date of such termination.

8.3     <u>Amendments; Waivers</u>.  Neither this Agreement nor any provision hereof may be amended, modified or waived except pursuant to an agreement or agreements in writing entered into by each First Lien Collateral Agent and each Second Lien Collateral Agent then party hereto; <u>provided</u> that (a) the Directing First Lien Collateral Agent and the Directing Second Lien Collateral Agent may, at the reasonable expense of the Obligors and without the written consent of any other First Lien Claimholder, any other Second Lien Claimholder or any Obligor, agree to any amendment to or other modifications of this Agreement for the purpose of giving effect to <u>Section 8.21</u> or any Refinancing of any First Lien Obligations or Second Lien Obligations, (b) any Additional Lien Obligations Agent may become party hereto by execution and delivery of a Joinder Agreement in the form of <u>Exhibit B</u> hereto in accordance with the provisions of <u>Section 8.21</u> and (c) additional Obligors may be added as parties hereto upon the execution and delivery of a counterpart of the Intercreditor Joinder Agreement in the form of <u>Exhibit A</u> hereto in accordance with the provisions of <u>Section 8.18</u>.  Each of the Directing First Lien Collateral Agent and the Directing Second Lien Collateral Agent shall execute and deliver an amendment or other modification of this Agreement at the other's request to permit new creditors to become a party hereto as set forth in the proviso to the immediately preceding sentence.  Notwithstanding the provisions of any other First Lien Document or Second Lien Document, the Directing First Lien Collateral Agent and the Directing Second Lien Collateral Agent may, with the consent of the Top Borrower, make any amendments, restatements, amendment and restatements, supplements or other modifications to this Agreement to correct any ambiguity, defect or inconsistency contained herein without the consent of any other Person.  Each waiver of the terms of this Agreement, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties owed to such party in any other respect or at any other time.  Notwithstanding the foregoing, no Obligor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except (x) to the extent such Obligor's rights are directly and adversely affected by such amendment, modification or waiver, (y) to the extent applicable to such Obligor, with respect to any provisions identified in <u>Section 8.16</u> or (z) any amendment, modification or waiver of the DIP Cap Amount, if the effect of such amendment, modification or waiver is to reduce the amount thereof from the amount thereof in effect on the date hereof; <u>provided</u>, <u>however</u>, that the Top Borrower shall be given notice of any amendment, modification or waiver of this Agreement promptly after the effectiveness thereof (it being understood that the failure to deliver such notice to the Top Borrower shall in no way impact the effectiveness of any such amendment, modification or waiver).

8.4     <u>Information Concerning Financial Condition of the Obligors and their Subsidiaries</u>.  Each of the First Lien Collateral Agents and the other First Lien Claimholders, on the one hand, and the Second Lien Collateral Agents and the other Second Lien Claimholders, on the other hand, shall be responsible for keeping themselves informed of (a) the financial condition of the Obligors and their subsidiaries and all endorsers and/or guarantors of the First Lien Obligations or the Second Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the First Lien

-42-

Obligations or the Second Lien Obligations. The First Lien Collateral Agents and the other First Lien Claimholders shall have no duty to advise any Second Lien Collateral Agent or any other Second Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event any First Lien Collateral Agent or any of the other First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to any Second Lien Collateral Agent or any other Second Lien Claimholder, it or they shall be under no obligation:

(i)     to make, and such First Lien Collateral Agent and such First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided;

(ii)     to provide any additional information or to provide any such information on any subsequent occasion;

(iii)     to undertake any investigation; or

(iv)     to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

8.5     Subrogation. With respect to the value of any payments or distributions in cash, property or other assets that any Second Lien Collateral Agent or any other Second Lien Claimholder pays over to the Directing First Lien Collateral Agent or the other First Lien Claimholders under the terms of this Agreement, such Second Lien Collateral Agent or such other Second Lien Claimholder shall be subrogated to the rights of each First Lien Collateral Agent and the other First Lien Claimholders; provided that each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, hereby agrees that neither it nor its Related Second Lien Claimholders shall assert or enforce any such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of First Lien Obligations has occurred. Each Obligor acknowledges and agrees that the value of any payments or distributions in cash, property or other assets received by any Second Lien Collateral Agent or the other Second Lien Claimholders and paid over to the Directing First Lien Collateral Agent or the other First Lien Claimholders pursuant to, and applied in accordance with, this Agreement, shall not relieve or reduce any of the Second Lien Obligations under the Second Lien Documents.

8.6     Application of Payments. All payments received by any First Lien Collateral Agent or the other First Lien Claimholders may be applied, reversed and reapplied, in whole or in part, to such part of the First Lien Obligations as the First Lien Claimholders, in their sole discretion, deem appropriate. Each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, consents to any extension or postponement of the time of payment of the First Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the First Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

8.7     SUBMISSION TO JURISDICTION; WAIVERS.

(a)     EACH PARTY HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS (AND THEIR) PROPERTY, TO THE EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW

-43-

YORK (OR ANY APPELLATE COURT THEREFROM) OVER ANY SUIT OR ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED EXCLUSIVELY IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENTS BY REGISTERED MAIL ADDRESSED TO SUCH PERSON SHALL BE EFFECTIVE SERVICE OF PROCESS AGAINST SUCH PERSON FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT. EACH OF THE PARTIES HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH OF THE PARTIES HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)     TO THE EXTENT PERMITTED BY LAW, EACH PARTY HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL) DIRECTED TO IT AT ITS ADDRESS FOR NOTICES AS PROVIDED FOR IN SECTION 8.8. EACH PARTY HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) HEREBY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER THAT SERVICE OF PROCESS WAS INVALID AND INEFFECTIVE. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(c)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS), TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT (OR THEY) MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY FIRST LIEN DOCUMENT OR SECOND LIEN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO (IN THE CASE OF EACH COLLATERAL AGENT, FOR ITSELF AND ON BEHALF OF ITS RELATED CLAIMHOLDERS) (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT

-44-

**BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

8.8     Notices.  All notices to the First Lien Claimholders and the Second Lien Claimholders permitted or required under this Agreement shall also be sent to the related First Lien Collateral Agent and the related Second Lien Collateral Agent, respectively (and, for this purpose, the Directing First Lien Collateral Agent shall be deemed to be an agent for the First Lien Secured Hedging Obligations and the First Lien Banking Services Obligations, and the Directing Second Lien Collateral Agent shall be deemed to be an agent for the Second Lien Secured Hedging Obligations and the Second Lien Banking Services Obligations).  Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served, sent by facsimile or sent by other electronic transmission or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile or other electronic transmission, or three (3) Business Days after depositing it in the United States mail with postage prepaid and properly addressed.  For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

8.9     Further Assurances.  Each First Lien Collateral Agent, on behalf of itself and its Related First Lien Claimholders, and each Second Lien Collateral Agent, on behalf of itself and its Related Second Lien Claimholders, and each Obligor, agrees that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Directing First Lien Collateral Agent or the Directing Second Lien Collateral Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

8.10     CHOICE OF LAW.  THIS AGREEMENT, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT (WHETHER IN TORT, CONTRACT (AT LAW OR IN EQUITY) OR OTHERWISE), SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

8.11     Binding on Successors and Assigns.  This Agreement shall be binding upon each First Lien Collateral Agent, the other First Lien Claimholders, each Second Lien Collateral Agent, the other Second Lien Claimholders and their respective successors and permitted assigns.  If any First Lien Collateral Agent or any Second Lien Collateral Agent resigns or is replaced pursuant to the First Lien Documents or the Second Lien Documents, as applicable, its successor shall be deemed to be a party to this Agreement and shall have all the rights of, and be subject to all the obligations of, this Agreement.

8.12     Headings.  Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

8.13     Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by facsimile or other electronic transmission (including ".pdf" or ".tiff" format) shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

8.14     Authorization; Binding Effect on Claimholders.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto

that it is duly authorized to execute this Agreement. Each First Lien Claimholder and each Second Lien Claimholder, by its acceptance of the benefits of the First Lien Documents and Second Lien Documents, as the case may be, shall be deemed to have agreed to be bound by the agreements made herein, including the agreements made by any Collateral Agent on its behalf.

8.15    Exclusive Means of Exercising Rights under this Agreement.

(a)    The First Lien Claimholders shall be deemed to have irrevocably appointed the Directing First Lien Collateral Agent as their exclusive agent hereunder as and to the extent set forth in Section 3.2(a). Consistent with such appointment, the First Lien Claimholders further shall be deemed to have agreed that only the Directing First Lien Collateral Agent (and not any individual claimholder or group of claimholders) as agent for the First Lien Claimholders, or any of the Directing First Lien Collateral Agent's agents, shall have the right on their behalf to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement); provided that (i) holders of the First Lien Secured Hedging Obligations and the First Lien Banking Services Obligations may exercise customary netting and set off rights under the First Lien Hedge Agreements and First Lien Banking Services Agreements to which they are, respectively, a party, (ii) cash collateral may be held pursuant to the terms of the First Lien Documents (including any relating to First Lien Hedge Agreements) and any such individual First Lien Claimholder may act against such cash collateral in accordance with the terms of the relevant First Lien Document or applicable law and (iii) the First Lien Claimholders may exercise customary rights of setoff against depository or other accounts maintained with them in accordance with the terms of the relevant First Lien Document or applicable law. Specifically, but without limiting the generality of the foregoing, no First Lien Claimholder or group of First Lien Claimholders, other than the Directing First Lien Collateral Agent (acting at the direction of, or pursuant to a grant of authority by, the Required First Lien Claimholders), shall be entitled to take or file, and shall be precluded from taking or filing (whether in any Insolvency or Liquidation Proceeding or otherwise), any action, judicial or otherwise, to enforce any right or power or pursue any remedy under this Agreement (including any declaratory judgment or other action to interpret or otherwise enforce the provisions of this Agreement), except solely as provided in the immediately preceding sentence.

(b)    The Second Lien Claimholders shall be deemed to have irrevocably appointed the Directing Second Lien Collateral Agent as their exclusive agent hereunder as and to the extent set forth in Section 3.2(b) and to have authorized the Directing First Lien Collateral Agent to act as gratuitous agent for the Directing Second Lien Collateral Agent under any Shared Collateral Document in accordance with Section 5.5. Consistent with such appointment, the Second Lien Claimholders further shall be deemed to have agreed that only the Directing Second Lien Collateral Agent (and not any individual claimholder or group of claimholders) as agent for the Second Lien Claimholders, or any of the Directing Second Lien Collateral Agent's agents (including the Directing First Lien Collateral Agent acting as gratuitous agent for the Second Lien Collateral Agent under any Shared Collateral Document), shall have the right on their behalf to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement); provided that, subject to the limitations, restrictions and other agreements set forth herein, (i) holders of the Second Lien Secured Hedging Obligations and the Second Lien Banking Services Obligations may exercise customary netting and set off rights under the Second Lien Hedge Agreements and Second Lien Banking Services Agreements to which they are, respectively, a party, (ii) cash collateral may be held pursuant to the terms of the Second Lien Documents (including any relating to Second Lien Hedge Agreements) and any such individual Second Lien Claimholder may act against such cash collateral in accordance with the terms of the relevant Second Lien Document or applicable law and (iii) the Second Lien Claimholders may exercise customary rights of setoff against depository or other accounts maintained with them in accordance with the terms of the relevant Second Lien Document or

-46-

applicable law. Specifically, but without limiting the generality of the foregoing, each Second Lien Claimholder or group of Second Lien Claimholders, other than the Directing Second Lien Collateral Agent (acting at the direction of, or pursuant to a grant of authority by, the Required Second Lien Claimholders), shall not be entitled to take or file, but instead shall be precluded from taking or filing (whether in any Insolvency or Liquidation Proceeding or otherwise), any action, judicial or otherwise, to enforce any right or power or pursue any remedy under this Agreement (including any declaratory judgment or other action to interpret or otherwise enforce the provisions of this Agreement), except solely as provided in the proviso in the immediately preceding sentence.

        8.16    No Third Party Beneficiaries; Provisions Solely to Define Relative Rights. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the First Lien Claimholders and the Second Lien Claimholders. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Collateral Agent and the other First Lien Claimholders, on the one hand, and the Second Lien Collateral Agent and the other Second Lien Claimholders, on the other hand. None of the Obligors shall have any rights hereunder and no Obligor may rely on the terms hereof, other than any provision hereof expressly preserving any right of, or directly affecting, any Obligor under this Agreement, any First Lien Document or any Second Lien Document, including the definition of "DIP Cap Amount" and Sections 3.1 (as to the definition of "Standstill Period"), 4.1, 5.1, 5.2, 5.3, 5.4, 5.6, 5.7, 6.1, 6.2, 8.1, 7.1, 8.2, 8.3, 8.6, 8.7, 8.8, 8.9, 8.10, 8.11, 8.13, 8.14, 8.15, this Section 8.16, Sections 8.17, 8.18, and 8.21. Nothing in this Agreement is intended to or shall impair the obligations of the Obligors, which are absolute and unconditional, to pay the First Lien Obligations and the Second Lien Obligations as and when the same shall become due and payable in accordance with their terms.

        8.17    No Indirect Actions. Unless otherwise expressly stated, if a party may not take an action under this Agreement, then it may not take that action indirectly, or support any other Person in taking that action directly or indirectly. "Taking an action indirectly" means taking an action that is not expressly prohibited for the party but is intended to have substantially the same effects as the prohibited action; provided that notwithstanding the foregoing, nothing in this Section 8.17 shall be deemed to limit the right of any party hereto to vote on any plan of reorganization, arrangement, compromise or liquidation or similar dispositive restructuring plan in any Insolvency or Liquidation Proceeding to the extent not inconsistent with the terms of this Agreement.

        8.18    Obligors; Additional Obligors. It is understood and agreed that Holdings, the Borrowers and each other Obligor on the date of this Agreement shall constitute the original Obligors party hereto. The original Obligors hereby covenant and agree to cause each subsidiary of Holdings which becomes a "Subsidiary Guarantor" as defined in the First Lien Credit Agreement or the Second Lien Credit Agreement (or any similar term in any other First Lien Financing Document or Second Lien Financing Document) after the date hereof to become a party hereto (as an Obligor) by duly executing and delivering a counterpart of the Intercreditor Joinder Agreement in the form of Exhibit A hereto to the Directing First Lien Collateral Agent in accordance with the relevant provisions of the relevant First Lien Financing Documents and/or Second Lien Financing Documents, as applicable. The parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a "Subsidiary Guarantor" as defined in the First Lien Financing Document or Second Lien Financing Document) at any time shall be subject to the provisions hereof as fully as if same constituted an Obligor party hereto and had complied with the requirements of the immediately preceding sentence.

8.19 Right of First Lien Collateral Agent to Continue. Any Person serving as First Lien Collateral Agent shall be entitled to continue, including to continue to perform his, her or its rights, obligations and duties, as the First Lien Collateral Agent, notwithstanding whether any such Person has served or is serving as a Second Lien Collateral Agent. Without limiting the generality of the preceding sentence of this Section 8.19, any Person serving as a First Lien Collateral Agent shall be entitled to continue to so serve in such capacity (including to continue to perform any of such First Lien Collateral Agent's rights, obligations, and/or duties) even if any such Person has resigned as a Second Lien Collateral Agent, but such resignation has not become effective for any reason, including because a successor Second Lien Collateral Agent has not been appointed or has accepted such appointment, without any liability to any of the Second Lien Claimholders by virtue of any such resignation and any of the circumstances relating in any manner whatsoever to such resignation.

8.20 Second Lien Claimholders. Notwithstanding anything to the contrary in this Agreement, it is understood and agreed that this Agreement only applies to the Second Lien Claimholders in their capacities as holders of the Second Lien Obligations. Without limiting the foregoing, this Agreement does not restrict or apply to the Second Lien Claimholders in their capacities as holders of any Indebtedness or other obligations of the Obligors other than the Second Lien Obligations (or any Reorganization Securities issued as contemplated by Section 6.6), or in their capacities as holders of equity interests of the Obligors.

8.21 Additional Lien Obligations. Subject to the terms and conditions of this Agreement, each First Lien Financing Document and each Second Lien Financing Document, the Obligors will be permitted from time to time to designate as an additional holder of First Lien Obligations and/or Second Lien Obligations hereunder each Person that is, or that becomes or is to become, the holder of any Additional Lien Obligations (or the Additional Liens Obligations Agent in respect of such Additional Liens Obligations). Upon the issuance or incurrence of any such Additional Lien Obligations:

(a) The Top Borrower shall deliver to each of the First Lien Collateral Agents and the Second Lien Collateral Agents a certificate of a Responsible Officer stating that the applicable Obligors intend to enter or have entered into an Additional Lien Obligations Agreement and certifying that the issuance or incurrence of such Additional Lien Obligations and the Liens securing such Additional Lien Obligations are permitted by the First Lien Financing Documents, the Second Lien Financing Documents and each then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement. Each of the Additional Lien Obligations Agents, the First Lien Collateral Agents and the Second Lien Collateral Agents shall be entitled to rely conclusively on the determination of the Top Borrower that such issuance and/or incurrence is permitted under the First Lien Financing Documents, the Second Lien Financing Documents and each then existing Additional First Lien Obligations Agreement and Additional Second Lien Obligations Agreement if such determination is set forth in such officer's certificate delivered to the First Lien Collateral Agents and the Second Lien Collateral Agents; provided, however, that such determination will not affect whether or not the Obligors have complied with their undertakings in the First Lien Financing Documents, the Second Lien Financing Documents or any then existing Additional First Lien Obligations Agreement or Additional Second Lien Obligation Agreement;

(b) the Additional Liens Obligations Agent for such Additional Lien Obligations shall execute and deliver to the First Lien Collateral Agent and the Second Lien Collateral Agent a Joinder Agreement in the form attached hereto as Exhibit B acknowledging that such Additional Liens Obligations and the holders of such Additional Liens Obligations shall be bound by the terms hereof to the extent applicable to the First Lien Claimholders or the Second Lien Claimholders, as applicable, and

-48-