# DEFENDANTS' EXHIBIT 332
# Part 1 of 11

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SERTA SIMMONS BEDDING, LLC, | § | Case No. 23-90020 (DRJ) |
| *et al.*, | § | |
| | § | (Joint Administration Requested) |
| Debtors.[1] | § | |
| | § | |

## DECLARATION OF JOHN LINKER IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, John Linker, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct:

1. I am Chief Financial Officer of Serta Simmons Bedding, LLC ("**Serta Simmons Bedding**"). Serta Simmons Bedding, together with certain of its affiliates, including Dawn Intermediate, LLC ("**Dawn Intermediate**" and, collectively, the "**Company**" or the "**Debtors**") is one of the leading manufacturers and marketers of bedding products in North America, operating various bedding manufacturing facilities across the United States and Canada. I am knowledgeable about and familiar with the Company's business and financial affairs. I submit this declaration (this "**Declaration**") in support of the Debtors' voluntary petitions for relief and motions filed concurrently herewith (the "**First Day Motions**")[2]. I am authorized to submit this Declaration on behalf of the Debtors.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2662); Tuft & Needle, LLC (2158); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

[2] Capitalized terms used but not defined herein shall have the meaning given such terms in the Plan (as defined below).

Exhibit
LINKER 0003

2. Before joining Serta Simmons Bedding, I served as Executive Vice President and Chief Financial Officer of JELD-WEN Holding, Inc., a leading global manufacturer of windows and doors, from November 2018 through March 2022. Prior to that from 2012 to November 2018, I held other leadership roles at JELD-WEN Holdings, Inc. in investor relations, corporate development, and treasury. Prior to that, I held corporate development and finance leadership roles in the Aerospace Systems Division of United Technologies Corporation (and its predecessor, Goodrich Corporation), and earlier in my career, as an investment banker with Wells Fargo Securities and a consultant for Accenture. I have a Bachelor of Arts in Economics and Comparative Area Studies from Duke University, and a master's degree in business administration from Duke University's Fuqua School of Business.

3. Commencing on January 23, 2023 (the "**Petition Date**"), the Debtors filed in this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). I am knowledgeable about and familiar with the Company's business and financial affairs since joining the company in 2022 and my reasonable inquiry into periods prior to 2022. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Company's operations and financial condition, my own reasonable inquiry, and/or my discussions with the Company's other officers, directors, and restructuring advisors, including professionals at Weil, Gotshal & Manges LLP ("**Weil**"), Evercore Group L.L.C. ("**Evercore**"), and FTI Consulting, Inc. (together with Weil and Evercore, the "**Advisors**"). If called upon to testify, I would testify to the facts set forth in this Declaration.

2

4. This Declaration has been organized into four (4) sections. The **first** provides an overview of the Debtors and their chapter 11 cases, including the general framework for the Debtors' restructuring. The **second** describes the Company's business, its organizational and capital structure, its history and its current operations. The **third** describes the events leading to the filing of these chapter 11 cases and the Debtors' prepetition restructuring efforts. The **fourth** section summarizes the relief requested in, and the legal and factual bases supporting, the First Day Motions.

### I. Overview

5. As stated above, the Company is one of North America's leading manufacturers and marketers of bedding products. The Company and its predecessors have been developing innovative products and technologies to provide their customers a better night's sleep since 1876. Today, the Company manufactures and markets mattresses, foundations, and bedding-related products through four primary brands: Beautyrest®, Serta®, Simmons®, and Tuft & Needle®. The Company is headquartered in Doraville, Georgia.



The first Simmons manufacturing facility opened in 1870 in Kenosha, Wisconsin to produce cheese boxes before expanding operations to mattresses in 1876.



Workers in a Simmons factory produce mattresses utilizing Simmons' revolutionary Pocketed Coil® ca. 1925

3

6. Together with their non-debtor affiliates, the Debtors operate twenty-one (21) bedding manufacturing facilities across the United States and Canada, as shown in the map below:



The Debtors manufacture, sell and distribute their bedding products to individual consumers through a number of channels. The Debtors primarily sell their products in the United States through dealers which, in 2022, included approximately 2,200 authorized independent retailers, including one or more mattress specialty stores, as well as furniture stores, department stores, furniture rental stores, mass merchandisers, and juvenile specialty stores. The Debtors also sell their products (i) to hospitality customers, such as hotels, casinos and resort properties, through SSB Hospitality, LLC; (ii) to third party resellers, who purchase overstock and discontinued models through four (4) warehouses operated by World of Sleep Outlets, LLC; and (iii) directly to consumers through their e-commerce platforms and retail stores.

7. The Debtors also license their intellectual property for use by third party manufacturers of bedding products. The Debtors' key trademarks are as follows:

2



Debtor Dreamwell, Ltd. licenses the Beautyrest® and Simmons® trademarks for the manufacture of mattresses and foundations both within the United States for use on Beautyrest® and Simmons® branded bedding-related products and home textiles and outside of the United States to licensees who manufacture Beautyrest® and Simmons® branded mattress and bedding-related products. Serta, Inc. ("**Serta**"), a non-Debtor entity, licenses the Company's Serta® trademarks for the manufacture of mattresses and foundations in the United States to the Minority Licensees (as defined herein), who also hold minority equity stakes in Serta, as well as to licensees who manufacture bedding-related products and home textiles in the United States and to licensees outside of the United States who manufacture Serta® branded mattress and bedding-related products.

8.  The Debtors have commenced these chapter 11 cases to implement a prearranged restructuring (the "**Restructuring**"), supported by (a) holders representing approximately (i) 81% of the aggregate outstanding principal amount of Class 3 (FLFO Claims) under its prepetition PTL Facility, and (ii) 77% of the aggregate outstanding principal amount of Class 4 (FLSO Claims) under its prepetition PTL Facility (collectively, the "**Consenting Creditors**"), and (b) Dawn Holdings, Inc., as the sole member, and holder of interests in, Dawn Intermediate, and funds managed by Advent International Corporation, as holder of interests in Dawn Holdings, Inc. (collectively, the "**Consenting Equity Holders**" and, together with the Consenting Creditors, the "**Consenting Parties**"), in each case, that are party to that certain *Restructuring Support Agreement* dated as of January 23, 2023, annexed hereto as **Exhibit A** (as

3

amended from time to time and including all exhibits thereto, the "**Restructuring Support Agreement**"). Subject to the terms and conditions of the Restructuring Support Agreement, the Restructuring will be implemented pursuant to the *Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and its Affiliated Debtors* (the "**Plan**") filed contemporaneously herewith. Upon its implementation, the Plan will substantially delever the Company by reducing its balance sheet liabilities from approximately $1.9 billion in total debt to approximately $300 million (plus original issue discount) in total debt upon emergence and result in the resolution of certain pending claims against the Debtors brought by certain of its Non-PTL Lenders (defined below).

9. As set forth in greater detail in the Plan, the Restructuring provides that:

    (a) each holder of an Allowed FLFO Claim (as defined in the Plan) under the PTL Facility has agreed to exchange its claims for its *pro rata* share of $195,000,000 in aggregate principal amount of New Term Loans;

    (b) each holder of an Allowed FLSO Claim (as defined in the Plan) under the PTL Facility has agreed to exchange its claims for its *pro rata* share of (x) one hundred percent (100%) of the equity in the Reorganized Debtors (less any such equity distributed to holders of Class 5 Non-PTL Claims (defined below) and subject to dilution by equity distributed pursuant to the Management Incentive Plan), and (ii) $105,000,000 in aggregate principal amount of takeback debt in the form of the New Term Loans;

    (c) each holder of an Allowed Non-PTL Term Loan Claim will receive:

        (i). If Class 5 votes to accept the Plan: Its Pro Rata Share of 4% of New Common Interests issued on the Effective Date, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan;

        (ii). If Class 5 votes to reject the Plan: Its Pro Rata Share of 1% of New Common Interests issued on the Plan Effective Date, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan;

    (d) each holder of an Allowed Ongoing General Unsecured Claim shall receive, in exchange for executing a trade agreement providing for the continuation of goods or services on the same or better terms as existed prior to the Petition Date, no more than four (4) Cash installments, which payments

4

shall result in full payment in the Allowed amount of such Ongoing General Unsecured Claim on no better terms than payment in the ordinary course of business;

(e) each holder of an Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata Share of the Other General Unsecured Claims Recovery Pool as set forth in the GUC Recovery Allocation Table; and

(f) a settlement shall be approved among the Debtors, the Consenting Creditors, and the Consenting Equity Holders resulting in the contribution of non-Debtor entity Dawn Holdings, Inc. into the restructuring.

10. Under the Plan, the Debtors will also enter into (a) a new term loan credit facility in the aggregate principal amount of $300,000,000.00 (plus original issue discount), and (b) a first lien asset-backed revolving credit facility, which, as of the Effective Date, will roll up or replace the DIP Facility, to provide the Company with working capital to fund its business post-emergence.

11. The effects of the Restructuring can be summarized as follows[3]:

| Status Quo | | Pro Forma | |
|---|---|---|---|
| $200mm ABL | $ - | $125mm ABL | $ - |
| FLFO Tranche | 195 | New Term Loan | 300 |
| FLSO Tranche | 832 | | |
| **ABL + PTL Facility** | **$1,027** | **ABL + New Term Loan** | **$300** |
| Non-PTL Term Loan | $862 | | |
| **Total Debt** | **$1,889** | **Total Debt** | **$300** |

12. As described more fully below, the Restructuring is the culmination of a years-long effort on the part of the Debtors to right-size their balance sheet. Since 2019, in conjunction with operational initiatives designed to grow its sales, the Company has been seeking a transaction that would reduce its debt and provide the working capital necessary to carry out its

---

[3] New Term Loan amount shown excludes original issue discount. Exit ABL Facility will be subject to a minimum draw to be determined. Excludes capital lease obligations.

5

long term plans. As for many companies, the onset of the COVID-19 pandemic put significant pressure on this process and the Company's business at large, threatening to derail its efforts. In response to these challenges, in June 2020, the Company closed a recapitalization transaction with certain of its existing secured lenders. Referred to herein as the "**2020 Transaction**," upon closing, the Company received an infusion of $200 million in new money through a new, super-priority PTL Facility, which allowed the Company to weather the economic downturn.

13. However, I understand that the various macroeconomic and operational headwinds the Debtors continued to face, along with the Debtors' leverage profile, remained a hindrance to long term healthy growth. In addition, certain of the Company's existing lenders that were not party to the 2020 Transaction have sued the Company and certain of the PTL Lenders (referred to collectively herein as the "**2020 Transaction Litigation**"), two of which are currently pending. In one action, pending in the United States District Court for the Southern District of New York, plaintiffs seek damages for alleged breaches of the Non-PTL Term Loan Agreement and the implied covenant of good faith and fair dealing, among other causes of action. In the second, pending in New York State Supreme Court, plaintiffs likewise seek damages for alleged breach of the Non-PTL Term Loan Agreement and the implied covenant of good faith and fair dealing, and additionally seeks to unwind the 2020 Transaction entirely. Under threat from the 2020 Transaction Litigation, and with significant maturities looming in 2023, the Company redoubled its efforts to find a strategic partner, including engagement with plaintiffs in the state court action to attempt to negotiate the terms of a settlement. While settlement discussions were ultimately unsuccessful, in January 2023, the Company and the PTL Lenders reached agreement with respect to the terms of a recapitalization transaction, culminating in the Restructuring Support Agreement and the Plan.

14. The Company's ability to restructure its balance sheet and emerge from chapter 11 is inextricably tied to the resolution of the disputes raised in the 2020 Transaction Litigation. Accordingly, contemporaneously with the filing of the petitions, the Debtors are initiating an adversary proceeding (the "**Adversary Proceeding**") to comprehensively resolve the claims against the Debtors—and by extension, the PTL Lenders—arising from the 2020 Transaction Litigation and any future litigation related to the 2020 Transaction. The Adversary Proceeding seeks a declaratory judgment that the 2020 Transaction was valid under the terms of the Non-PTL Term Loan Agreement (as defined below). In conjunction with the Adversary Proceeding, the Debtors have filed the *Debtors' Motion for Entry of Order (I) Scheduling Certain Hearing Dates and Deadlines, (II) Establishing Certain Protocols in Connection with the Confirmation of the Debtors' Plan of Reorganization, and (III) Granting Related Relief* (the "**Scheduling Motion**"). The Scheduling Motion requests a timetable for the Adversary Proceeding to ensure that it is resolved on the same timetable as confirmation of the Debtors' chapter 11 plan of reorganization. I understand that the Debtors believe, upon discussion with their advisors, that this relief will ensure that the Debtors' reorganization can proceed and be resolved in one consolidated proceeding before the Bankruptcy Court.

## II. Background

### A. History, Corporate Structure, and Management

15. The Company's main operating entity, Serta Simmons Bedding, was formed in 2010 following the combination of two highly recognizable brands in bedding: Serta® and Simmons®. Today, Serta Simmons Bedding employs over 3,600 employees and accounts for approximately 19% of the annual bedding sales in the United States through a diverse portfolio of

7

brands, including the premium Simmons® Beautyrest® line, Serta®, the value-oriented Simmons®, and most recently mattress-in-a-box brand Tuft & Needle®, acquired in 2018.



The Company's Tuft & Needle brand first began marketing its signature mattress-in-a-box in 2012, among the first of its kind.

1. **Simmons**

16. The Company that would become Simmons Bedding (together with its affiliates, "**Simmons**") was founded in 1870 when Zalmon G. Simmons began manufacturing wooden cheese boxes and telegraph insulators in a factory on the shores of Lake Michigan in Kenosha, Wisconsin. In 1876, Zalmon G. Simmons developed an automated process for the manufacture of coil spring mattresses that were both more comfortable and less expensive to purchase. Over the ensuing century, Simmons pioneered a number of innovations in bedding, including an individually-wrapped coil spring unit, called the Pocketed Coil® spring, that would lead to the development of the iconic Beautyrest mattress in the 1920s.


In 1995, Simmons' iconic "The Bowling Ball Mattress" ad debuted, demonstrating the power of the Pocketed Coil® to resist motion transfer.

17. In the ensuing years, Simmons had expanded its operations worldwide and domestically to new businesses such as hospital beds and furniture. By the 1990s, it disposed of most of its foreign and non-bedding domestic operations. In connection with such sales, Simmons entered into licensing arrangements with third parties who now produce and distribute Simmons-branded products within certain designated territories internationally. Simmons also entered into licensing arrangements domestically, pursuant to which third parties manufacture and distribute juvenile furniture, crib mattresses, sheets, pillows, and other bedding-related products and home textiles under the Simmons brand. In 2010, in connection with its chapter 11 cases, Simmons was acquired by Ares Capital Management, LLC ("**Ares**") and the Ontario Teacher's Pension Plan ("**OTPP**").

2. **Serta**

18. Serta was formed in 1931 by a group of independent mattress manufacturers that wanted to sell throughout the United States under the Serta® brand, each of which became a licensee and stockholder of Serta. Over the course of nearly a century since its founding, Serta

9

has gained recognition both for the quality and comfort of its mattresses, foundations, and other bedding-related products and its prominence in the consumer imagination, in part owing to the antics of its iconic mascot, the Counting Sheep:



Serta's "Counting Sheep" have been delighting audiences since their debut in Serta television spots in the year 2000.

19. In 2003, one Serta licensee, Debtor NBC, acquired a majority of the outstanding common stock of Serta through a series of acquisitions of other Serta licensees and stockholders. In 2005, NBC was acquired by Ares and OTPP, and NBC was combined with Simmons in 2010 under ultimate parent Serta Simmons Bedding. Today, NBC owns approximately 82% of the outstanding common stock of Serta, alongside five (5) remaining minority licensees who collectively control the other approximately 18% of the outstanding common stock of Serta (the "**Minority Licensees**"). Pursuant to Serta's governing documents, NBC is entitled to elect four (4) of the seven (7) directors on Serta's board, each with three (3) votes, and the Minority Licensees are entitled to elect the remaining three (3) directors, each with one (1) vote.

20. The rights and obligations of NBC and the Minority Licensees with respect to the license and marketing of the Serta® brand are governed by a series of agreements, including,

among others: (i) a separate *Standard License Agreement* entered into between Serta and each of the Minority Licensees; (ii) the charter and bylaws of Serta; (iii) that certain *Restructuring Agreement*, dated as of September 10, 2004, by and among NBC and the Minority Licensees, which sets forth the services to be provided by NBC on behalf of Serta and the Minority Licensees; and (iv) those certain *2018 Amended and Restated Rules and Regulations*, dated as of December 29, 2018, which, among other things, govern the brand management standards to be maintained by NBC on behalf of the Minority Licensees.

21. In addition to its equity interests, among other things, each Minority Licensee has been granted a territory within the United States in which to manufacture Serta®-branded mattresses and foundations and each Minority Licensee pays certain fees for brand-management and other shared services provided by NBC, including manufacturing assistance, research and development, national advertising, and management of intellectual property. Fees payable on account of such services are generally structured as a percentage of the preceding year's sales. In addition, NBC has exclusive rights to (i) manufacture Serta® branded mattresses domestically within NBC's own area of primary responsibility; (ii) manage domestic national customer accounts (such as sales to retail stores with a national reach and hospitality customers like hotel chains); and (iii) license the Serta® brand to other companies that make bedding-related and textile products (including pillows, mattress toppers, pet products, and bathroom textiles, among others) both domestically and internationally, with a portion of the profits from such licensing agreements owed to the Minority Licensees.

3. **Serta Simmons Bedding**

22. As mentioned above, in 2010, NBC combined with Simmons to become the Company's main operating entity, Serta Simmons Bedding. In 2012, Ares and OTPP sold their

11