DEFENDANTS' EXHIBIT 332
Part 2 of 11

majority stake in Serta Simmons Bedding to Advent International ("**Advent**"). In 2018, the Company acquired Tuft & Needle, Inc. ("**Tuft & Needle**"), a mattress-in-a-box manufacturer that now operates as a wholly-owned subsidiary of Serta Simmons Bedding. Today, Serta Simmons Bedding is a significant player in the North American bedding industry, with $2.4 billion in sales for the twelve (12) months ending June 2022, accounting for approximately 19% U.S. bedding share.



Serta Simmons Bedding's Houston manufacturing facility, opened in 2017.

### 4. COVID-19 Pandemic and the 2020 Transaction

23. In April 2020, the COVID-19 pandemic spread throughout the United States and its impact forced the Company to curtail its operations and its customers to quarantine. During this time, I understand that Serta Simmons Bedding solicited proposals from and entered into discussions with potential lenders, including certain of its existing lenders, to explore alternatives to raise liquidity and reduce its debt and interest expense. In the course of its review process, I understand that the Company, with the guidance of an independent finance committee comprised of newly-appointed independent managers at Dawn Intermediate, Joan Hilson and Harvey Tepner (the "**Finance Committee**"), analyzed multiple proposals and negotiated with numerous lender groups in search of a strategic partner.

24. On June 8, 2020, Serta Simmons Bedding announced it had entered into a transaction support agreement to recapitalize the Company. In connection with this transaction, (i) certain parties to the transaction support agreement, including certain of the Debtors' then-existing first lien and second lien lenders, made available to the borrowers a new "first lien first out" term loan in the aggregate principal amount of $200 million (the "**FLFO Term Loans**"), and (ii) second, certain of the Debtors' then-existing first lien and second lien lenders sold to Serta Simmons Bedding and the other borrowers approximately $1 billion of outstanding term loans under the Non-PTL Term Loan Facility and $300 million outstanding under the Debtors' second lien term loan facility[4] in exchange for "first lien second out" term loans under the PTL Credit Agreement (the "**FLSO Term Loans**", and together with the FLFO Term Loans, the "**PTL Facility**"). The issuance of the FLFO Term Loans and exchange of outstanding first lien and second lien term loans for FLSO Term Loans is referred to collectively herein as the "**2020 Transaction**." I understand that the 2020 Transaction resulted in a reduction in the Company's debt and interest expense.

5. Corporate Governance & Management

25. The Debtors are controlled by the board of managers of Dawn Intermediate, LLC (the "**Board**"). Each separate Debtor is either a member-managed limited liability company or a corporation. The current Board consists of nine (9) members, shown below alongside their respective affiliations:

| Name | Position |
| --- | --- |
| Jefferson Case | Director (Advent) |
| George David | Director (Advent) |
| Joan Hilson | Director (Independent) |
| Shelley Huff | Director & Chief Executive Officer, Serta Simmons Bedding |

---

[4] The second lien term loan facility has since been repaid in full.

13

| Name | Position |
|---|---|
| Glenn Murphy | Director (Advent) |
| David Porter | Chairman of the Board |
| Harvey Tepner | Director (Independent) |
| Brandi Thomas | Director (Independent) |
| Judith Toland | Director (Independent) |

26. The Finance Committee was appointed by the Board on March 11, 2020 by unanimous written consent to consider, evaluate, and recommend to the Board to pursue a restructuring transaction on behalf of the Company, including to oversee discussions with the Company's stakeholders and the implementation and execution of any transaction that has been approved by the Board. On June 3, 2020, the Board unanimously voted to delegate additional transaction authority to the Finance Committee with respect to a restructuring transaction process, including with respect to:

- Approval of any transaction, action or agreement or transaction in furtherance thereof on behalf of the Board;

- Discussions and negotiations with stakeholders of Dawn Intermediate and its subsidiaries in respect of a transaction;

- The implementation and execution of a transaction and all related documentation thereto, including with respect to the marketing of Dawn Intermediate's assets and any bids or proposals submitted in connection with the transaction;

- The analysis and, if applicable, resolution of claims or causes of action in favor of Dawn Intermediate in connection with a transaction;

- Authorize or instruct the Company's advisors to discuss and negotiate the terms of a transaction with potential counter-parties and Dawn Intermediate's stakeholders; and

- Such other actions as the Finance Committee considers necessary or desirable in order to carry out its mandate.

27. The Debtors' current senior management team consists of the following individuals:

14

| Name | Position |
|---|---|
| Shelley Huff | Chief Executive Officer |
| John Linker | Chief Financial Officer |
| Kristen McGuffey | Chief Legal Officer and Secretary |
| Esther Ni | Chief Human Resources Officer |

The Company has recently bolstered its management team through recent senior additions, including Shelley Huff, who joined the Company in 2020 and was ultimately appointed to her current role as Chief Executive Officer in December 2021. Shelley came to Serta Simmons Bedding after spending more than 15 years in the retail industry, most recently serving as President and CEO of Hayneedle.com, a Walmart-owned online home furnishings destination. Prior to that, Shelley held a variety of leadership roles within Walmart's U.S. division and at Walmart eCommerce, including serving as the Vice President of Operations at Walmart eCommerce, General Manager of Home and Apparel at Walmart.com and Vice President of Housewares at Walmart U.S.

**B.      Capital Structure**

28.     The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements. The following

15

table provides a summary of the approximate outstanding principal amounts of the Debtors' funded debt obligations, as described in more detail below.[5]

| | |
|---|---:|
| $200mm ABL | $ - |
| FLFO Tranche | 195 |
| FLSO Tranche | 832 |
| **ABL + PTL Facility** | **$1,027** |
| Non-PTL Term Loan | $862 |
| **Total Debt** | **$1,889** |

1. **ABL Facility**

29. The Debtors are party to that certain *ABL Credit Agreement*, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Prepetition ABL Agreement**"), by and among Dawn Intermediate, as holdings; Serta Simmons Bedding, SSB Manufacturing Company ("**SSB Manufacturing**"), and NBC, as borrowers; the lenders from time to time party thereto (the "**ABL Lenders**"); and UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacity, the "**ABL Agent**"). Pursuant to the Prepetition ABL Agreement, the ABL Lenders made available to the borrowers revolving credit loans, subject to borrowing base availability, in an aggregate principal amount up to $200 million with a $40 million letter of credit sublimit. The Prepetition ABL Facility is secured, subject to certain exceptions and permitted liens, by (i) a first-priority security interest in the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as defined below)) of each of the Debtors, which includes, among other things, cash, deposit accounts, accounts receivable, and inventory, and (ii) a second-priority security interest in the Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement) of each of the

---

[5]  Excludes capital lease obligations.

16

Debtors junior to the PTL Facility and the Non-PTL Facility, which includes all material assets of the Debtors other than the ABL Priority Collateral, including all real estate, equipment, intellectual property, and equity interests in their direct subsidiaries.

30. As of the Petition Date, there were approximately $28 million in issued and outstanding letters of credit under the Prepetition ABL Facility, plus any applicable interest, fees, and other amounts outstanding under the ABL Credit Agreement.

### 2. Super-Priority Term Loans

31. Each of the Debtors is an obligor under the PTL Facility pursuant to that certain *Super-Priority Term Loan Agreement*, dated as of June 22, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**PTL Credit Agreement**"), by and among Dawn Intermediate, as holdings; Serta Simmons Bedding, SSB Manufacturing, and NBC, as borrowers; the lenders from time to time party thereto (the "**PTL Lenders**"); and UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacity and including any successors thereto, the "**PTL Agent**"). The PTL Facility is guaranteed by each of the other Debtors that is not a borrower thereunder, including Dawn Intermediate (the "**Guarantors**"), and the obligations thereunder are secured, subject to certain exceptions and permitted liens, by (i) a first-priority lien on the Term Loan Priority Collateral of each of the Debtors, and (ii) a second-priority lien on the ABL Priority Collateral. As of the Petition Date, (i) the aggregate principal amount of FLFO Term Loans outstanding under the PTL Credit Agreement is approximately $195,000,000 million and (ii) the aggregate principal amount of FLSO Term Loans outstanding under the PTL Credit Agreement is approximately $832,012,999 million.

17

### 3. Non-PTL Term Loan

32. Each of the Debtors is an obligor under that certain *First Lien Term Loan Agreement*, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Non-PTL Credit Agreement**", and the credit facility issued thereunder, the "**Non-PTL Facility**"), by and among Dawn Intermediate, as holdings; Serta Simmons Bedding, SSB Manufacturing, and NBC, as borrowers; the lenders from time to time party thereto (the "**Non-PTL Lenders**", and together with the PTL Lenders, the "**Term Loan Lenders**"); and UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacity and including any successors thereto, the "**Non-PTL Agent**"). The Non-PTL Facility is guaranteed by each of the Guarantors, and the obligations thereunder are secured by the same collateral as, and on a *pari passu* basis with, the obligations under the PTL Facility. As of the Petition Date, the Debtors had outstanding indebtedness of approximately $862 million under the Non-PTL Facility.

### 4. Intercreditor Agreements

33. The relative rights and priorities of the PTL Lenders and the Non-PTL Lenders in the collateral securing the obligations under the PTL Facility and Non-PTL Facility are governed by that certain First Lien Intercreditor Agreement, dated as of June 22, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Intercreditor Agreement**"), by and among each of the Debtors, the PTL Agent, the Non-PTL Agent, and each other person party thereto from time to time.

34. The relative priorities and rights in the collateral of the PTL Lenders and the Non-PTL Lenders, on the one hand, and the ABL Lenders, on the other, are governed by that certain ABL Intercreditor Agreement, dated as of November 8, 2016 (as amended, restated,

amended and restated, supplemented or otherwise modified from time to time, the "**ABL Intercreditor Agreement**" and, together with the First Lien Intercreditor Agreement, the "**Intercreditor Agreements**"), by and among each of the Debtors, UBS AG, Stamford Branch, as the ABL Agent, the PTL Agent, and the Non-PTL Agent, and each other person party thereto from time to time.

35. The Intercreditor Agreements control the lenders' rights and obligations with respect to, among other things, priority of interests in collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection. The ABL Intercreditor Agreement provides, among other things, that subject to certain requirements, no PTL Lender or Non-PTL Lender may object to debtor in possession financing secured by, or the use of cash collateral constituting, ABL Priority Collateral (as defined in the ABL Intercreditor Agreement). *See* ABL Intercreditor Agreement, § 6.1.

5. **Other Debtor Obligations**

    i. **Surety Bonds**

36. Surety bonds provide financial performance assurance to third parties on behalf of certain subsidiaries for obligations including, but not limited to, the U.S. Customs and Border Protection Agency ("**CBPA**") to secure the Debtors' payment or performance of obligations in connection with its customs bonds (i.e., contracts between the Debtors (as importer), a surety, and the CBPA (the "**Surety Bond Program**"). Customs bonds govern importer compliance with CBPA regulations, guarantees that the CBPA receives payment of any potential duties, taxes and fees that may accrue, and allows the CBPA to clear a shipment without having to wait for additional payments. The Debtors have two continuous customs bonds with the CBPA.

37. The Company's liability with respect to any surety bond is released once the obligations secured by the surety bond are performed. Surety bond providers generally have the right to request additional collateral or request that such bonds be replaced by alternate surety providers, in each case upon the occurrence of certain events. As of the Petition Date, the Debtors have $1.5 million in outstanding surety bonds, which obligations are partially collateralized by (i) letters of credit in the approximate amount of $250,000 issued for the benefit of Avalon Risk Management Insurance Agency; and (ii) a letter of credit in the approximate amount of $500,000 issued for the benefit of Avalon Risk Management Insurance Agency.

### ii. Ongoing General Unsecured Claims

38. In the ordinary course of business, the Debtors utilize certain vendors and service providers who supply essential raw materials used in manufacturing their bedding products, and services used in selling and distributing their bedding products, including raw materials, shipping services, and IT services (the "**Ongoing General Unsecured Creditors**"). The Ongoing General Unsecured Creditors are a vital part of the Debtors' ongoing business, and an interruption in the flow of goods and services from such creditors would have an immediate impact on the Debtors' ability to continue operating. As of the Petition Date, the Debtors owe approximately $150 million in respect of trade debt and other potential liabilities.

### iii. Other General Unsecured Claims

39. As of the Petition Date, the Debtors also owe approximately $30 million in respect of general unsecured claims and other potential liabilities not owed to creditors vital to the operation of the Debtors' business, including certain rejection damages claims.

        iv. **Equity**

40. As discussed above, Advent owns approximately 60% of the equity interests in Dawn Holdings, Inc., the Debtors' ultimate parent. The remaining equity is owned by, among other holders, Ares, OTPP, certain current and former employees and directors of the Company, and the founders and other prior owners of Tuft & Needle.

**C.    Ongoing Litigation**

41. The Debtors are subject to a number of prepetition lawsuits, including among others:

42. <u>2021 Non-PTL Federal Court Litigation</u>. In July 2020, I understand that Non-PTL Lenders LCM XXII LTD and certain related funds advised by LCM Asset Management LLC (the "**LCM Plaintiffs**") sued Serta Simmons Bedding, among others, in the United States District Court for the Southern District of New York, asserting that the 2020 Transaction constituted a breach of contract and a breach of the implied covenant of good faith and fair dealing. In March 2021, the court dismissed the plaintiffs' suit for lack of subject matter jurisdiction.

43. In May 2021, I understand that the plaintiffs refiled their suit in the United States District Court for the Southern District of New York, naming Serta Simmons Bedding as the sole defendant to resolve the prior jurisdictional issue (the "**Non-PTL Federal Court Litigation**"). In the re-filed lawsuit, the plaintiffs alleged, among other things, that entry into the 2020 Transaction violated the terms of the Non-PTL Term Loan Agreement and the implied covenant of good faith and fair dealing. In March 2022, the motion to dismiss was granted in part and denied in part. The Non-PTL Federal Court Litigation is currently pending in the United States District Court for the Southern District of New York but is stayed as a result of the automatic stay.

21

44. <u>Non-PTL State Court Litigation</u>. In June 2020, I understand that certain of the Company's Non-PTL Lenders, including funds managed by Angelo, Gordon Management LLC, and Gamut Capital Management LP, sued Serta Simmons Bedding and certain of the PTL Lenders in the Supreme Court of the State of New York, seeking to enjoin Serta Simmons Bedding from completing the 2020 Transaction. I also understand that North Star Debt Holdings, L.P., an affiliate of funds managed by Apollo Global Management, Inc. ("**Apollo**") was also a party to the lawsuit, despite a dispute as to whether Apollo is a "disqualified institution" under the Non-PTL Term Loan Agreement and whether it holds any loans under the Non-PTL Term Loan Agreement and is therefore disallowed from holding loans issued under the Non-PTL Term Loan Facility. The court denied the injunction, allowing the closing and consummation of the 2020 Transaction. I understand that the plaintiffs were subsequently permitted to discontinue their lawsuit in state court without prejudice.

45. In November 2022, certain of the Company's Non-PTL Lenders, including funds managed by Angelo, Gordon Management LLC, Apollo Management Holdings, L.P., Gamut Capital Management LP, Contrarian Capital Management, L.L.C., Alcentra NY LLC, and Z Capital Group L.L.C., refiled their lawsuit against Serta Simmons Bedding and certain of the PTL Lenders, alleging, among other things, that Serta Simmons Bedding and certain such PTL Lenders breached the terms of the Non-PTL Credit Agreement and the implied covenant of good faith and fair dealing when they entered into the 2020 Transaction (the "**Non-PTL State Court Litigation**", and together with the Non-PTL Federal Court Litigation, the "**2020 Transaction Litigation**"). Entities affiliated with Apollo are also a party to the litigation against the Debtors, joining in all claims and also seeking a declaratory judgment to resolve the dispute over its status as a "disqualified institution" and require Serta Simmons Bedding to execute assignments of loans

under the Non-PTL Term Loan Agreement The Non-PTL State Court Litigation is currently pending in New York state court but is stayed as to Serta Simmons Bedding as a result of the automatic stay. Serta Simmons Bedding has moved in the Bankruptcy Court to extend the automatic stay to its co-defendants, the PTL Lenders.

46. <u>Minority Licensee Arbitration</u>. As explained above, Serta Simmons Bedding and NBC own approximately 82% of Serta. The remaining approximately 18% is owned by the Minority Licensees. Several disputes have arisen between the parties in recent years, driven by claims that Serta Simmons Bedding's and NBC's management of the Serta® brand has allegedly favored Serta Simmons Bedding's other mattress brands over the Serta® brand. Serta Simmons Bedding and NBC deny those allegations.

47. In December 2020, I understand that the Minority Licensees named Serta Simmons Bedding and NBC as respondents in an arbitration alleging, among other things, breach of fiduciary duty, antitrust violations, breach of contract, and tortious interference with contracts and prospective business relationships. The Minority Licensees seek monetary relief in an amount to be determined and certain non-monetary forms of relief. The arbitration, styled *AW Industries, Inc. et al. v. Serta Simmons Bedding LLC, et al.* Case No. 01200093145, is before the American Arbitration Association. To be clear, Serta Simmons Bedding and NBC deny each of the allegations made by the Minority Licensees in full.

48. In January 2021, the parties agreed to stay the arbitration to attempt to resolve their disputes through mediation; however, these negotiations ultimately proved unsuccessful, and a definitive agreement was never reached. On September 8, 2022, the Minority Licensees notified the American Arbitration Association that they intended to recommence the arbitration. On November 14, 2022, the Minority Licensees filed an amended arbitration demand

asserting most of the same claims (excluding the antitrust and tortious interference claims), which are disputed by the Company.

49. The arbitration is currently pending, and if the arbitration proceeds, Serta Simmons Bedding and NBC expect to file an answering statement to the Minority Licensees' amended demand as well as counterclaims against the Minority Licensees. I understand that the arbitration with the Minority Licensees is stayed during the pendency of these Chapter 11 Cases.

### III. Key Events Leading to Chapter 11

#### A. Challenges Facing Debtors' Business

50. In addition to its looming maturities and unsustainable capital structure, the Debtors face financial challenges as a result of the downturn of the mattress industry generally. The U.S. bedding industry has been subject to significant disruptions recently, including a decline in industry demand beginning in 2022 as a result of slower economic growth caused by recent geopolitical and macroeconomic uncertainty, as well as reduced consumer spending as a result of higher interest rates. Prior to the demand headwinds, the industry faced significant inflation in raw materials costs, supply chain disruptions, and the adverse market effects created by the COVID-19 pandemic. While the fundamentals of the Debtors' business remain strong, the Debtors are facing significant debt maturities in 2023. Accordingly, the Debtors have filed these chapter 11 cases to implement a comprehensive financial restructuring that will result in a reduction of the Company's funded debt by approximately $1.59 billion and allow it to continue operating as a going concern with a substantially healthier balance sheet.

#### B. Prepetition Strategic Efforts

51. Prior to filing these chapter 11 cases, I understand that the Debtors attempted to address their capital structure and liquidity needs without the need for an in-court restructuring. At the outset of its strategic review process, in 2019, the Company found itself over-