DEFENDANTS' EXHIBIT 333
Part 3 of 27

alongside five (5) remaining minority licensees who collectively control the other approximately 18% of the outstanding common stock of Serta, Inc. (the "**Minority Licensees**"). Pursuant to Serta Inc.'s governing documents, NBC is entitled to elect four (4) of the seven (7) directors on Serta Inc.'s board, each with three (3) votes, and the Minority Licensees are entitled to elect the remaining three (3) directors, each with one (1) vote.

The parties' rights and obligations with respect to the license and marketing of the Serta, Inc. brand are governed by a series of agreements, including, among other agreements: (i) a *Standard License Agreement* entered into between Serta, Inc. and each of the licensees, respectively; (ii) the charter and bylaws of Serta, Inc.; (iii) that certain *Restructuring Agreement*, dated as of September 10, 2004, by and among NBC and the Minority Licensees, which sets forth the services to be provided by NBC on behalf of Serta, Inc. and the Minority Licensees; and (iii) those certain *2018 Amended and Restated Rules and Regulations*, dated as of December 29, 2018, which, among other things, govern the brand management standards to be maintained by NBC on behalf of the Minority Licensees.

In addition to its equity interests, among other things, each Minority Licensee has been granted a territory within the United States in which to manufacture Serta®-branded mattresses and foundations and pays certain fees for brand-management services provided by NBC, including manufacturing assistance, research and development, national advertising, and management of intellectual property. Fees payable on account of such services are generally structured as a percentage of the preceding year's sales. In addition, NBC has exclusive rights to (i) manufacture Serta® branded mattresses domestically within NBC's own area of primary responsibility; (ii) manage domestic national customer accounts (such as sales to retail stores with a national reach and hospitality customers, such as national hotel chains); and (iii) license the Serta® brand domestically to other companies who make bedding-related and textile products (including pillows, mattress toppers, pet products, and bathroom textiles, among others) as well as internationally, from which licensing agreements the Minority Licensees receive certain fees.

        3.        **Serta Simmons Bedding, LLC**

In 2010, NBC combined with Simmons to become the Company's main operating entity, SSB. In 2012, Ares and OTPP sold their majority stake in SSB to Advent. In 2018, the Company acquired Tuft & Needle, LLC, a mattress-in-a-box manufacturer that now operates as a wholly-owned subsidiary of SSB. Today, SSB is a significant player in the North American mattress industry, with $2.4 billion in sales for the twelve (12) months ending June 2022 and accounting for approximately 19% of U.S. bedding sales.

        4.        **COVID-19 Pandemic and the 2020 Transaction**

In April 2020, as the impact of the COVID-19 pandemic spread throughout the United States forcing businesses to halt operations and customers to quarantine, SSB solicited proposals from and entered into separate discussions with potential lenders, including the New Money Lenders (as defined herein), to explore alternatives for raising liquidity and reducing its debt and interest expense. The Company analyzed multiple proposals and negotiated with numerous lender groups before ultimately selecting, with the approval of the Finance Committee (as defined herein), the transaction discussed below.

On June 8, 2020, SSB announced it had entered into a transaction support agreement to recapitalize the Company. In connection with this transaction, (i) certain of the lenders from time to time party to the transaction support agreement, including certain of the Debtors' then-existing first-lien and second-lien lenders (the "**New Money Lenders**") made available to the borrowers a new "first lien first out" term loan in the aggregate principal amount of $200 million under the PTL Credit Agreement (the "**FLFO Term Loans**") and (ii) certain of the Debtors' then-existing first-lien and second-lien lenders (the "**Exchanging Existing Lenders**") sold to SSB and the other borrowers approximately $1 billion of outstanding term loans

11

under the Non-PTL Term Loan Facility and $315 million (including original issue discount, if any) of outstanding term loans under the Debtors' second lien term loan facility (which has since been paid off in full) (such outstanding term loans, the "**Relevant Existing Term Loans**") to the relevant borrowers in exchange for "first lien second out" term loans under the PTL Credit Agreement (the "**Initial FLSO Term Loans**" and, together with any subsequently exchanged loans, the "**FLSO Term Loans**"). The issuance of the FLFO Term Loans and the sale of the Relevant Existing Term Loans to the relevant borrowers in exchange for the FLSO Term Loans is referred to collectively as the "**2020 Transaction**." The PTL Facility is guaranteed by each of the guarantors party thereto, and is secured, subject to certain exceptions and permitted liens, on a *pari passu* basis with the Non-PTL Term Loan Facility (and together with the PTL Facility, the "**Term Facilities**") by (i) a first-priority lien on the Term Loan Priority Collateral of each of the Debtors, and (ii) a second-priority lien on the ABL Priority Collateral of each of the Debtors that is junior to the liens securing the Prepetition ABL Facility.

### 5. AI Dream Joint Venture

In 2021, Serta, Inc. sold its minority interest in AI Dream 1 (Cayman) Limited ("**AI Dream**"), the exclusive licensee of the Serta® brand in Greater China. Serta, Inc. initially entered the Chinese market in 1998, when it began to license the Serta® brand to a number of licensees for the manufacture and marketing of mattresses, foundations, and other bedding related products in China. In 2009, Serta, Inc. granted an exclusive license to Airland Group in China, and by 2018, Airland Group was a leader in the Chinese mattress market with more than 1,400 retail outlets in over 400 cities. In 2018, Advent formed AI Dream with King Koil Shanghai Sleep System Co., Ltd., an entity which was majority owned by Advent, and the Serta®-branded business in Greater China that was acquired from Airland Holding Company Ltd. As part of that transaction, Serta, Inc. entered into an exclusive license with AI Dream in return for a minority stake in AI Dream. By 2021, AI Dream had grown to one of the largest mattress manufacturers in the greater Chinese market, with multi-branded outlets in more than six hundred (600) cities in China and Hong Kong. In 2021, Serta, Inc. sold its minority interest in AI Dream as part of a larger transaction in which Advent sold its majority interest to Hillhouse Investment Management and AI Dream remains the exclusive licensee of the Serta® brand in China under the new majority owner. Prior to the sale of AI Dream, the interests in the shares entitled to receive the proceeds in AI Dream were owned exclusively by NBC. Accordingly, upon the sale of AI Dream, the proceeds of the sale were provided to NBC in the form of a dividend in 2021.

### C. Recent Operational Initiatives

The Company has undertaken certain strategic initiatives to profitably grow the Company's sales as well as improve its cost structure, including:

#### 1. Grow with Omni Retailers and Regional & Independents Channel and Drive Premium Assortment

With the aim of growing its sales, the Company has made strategic investments in innovation, sales force coverage and training, increased brand awareness through strategic investments in media, advertising, and branding, and new premium product offerings while maintaining superior customer service and experience.

#### 2. Accelerate Direct to Consumer Sales

In addition to the acquisition of Tuft & Needle, LLC in 2018, the Company has improved its position with direct-to-consumer offerings by deploying a refreshed e-commerce platform, with additional e-commerce platforms forthcoming for the Beautyrest® and Serta® brands.

3. **Value Engineering and Product Simplification**

The Company has delivered margin improvement by containing costs and executing a value engineering approach to optimize material content, resulting in enhanced unit economics and cost competitiveness, while maintaining the features, comfort, and quality of the product.

4. **Quality Improvement**

A reduction in the total cost of quality has occurred through a disciplined approach to product quality, improving the standard work instructions for mattress assembly, enhancing quality assurance training to ensure quality design for manufacturability, developing effective supplier partners to reduce material waste, and eliminating excess customer accommodations and returns.

5. **Facility Network Optimization**

The Company has taken steps to permanently reduce fixed cost structure while optimizing customer delivery performance by rationalizing and upgrading its manufacturing facility network. The Company continues to look for opportunities to rationalize its manufacturing footprint to deliver best-in-class service and increased flexibility for demand changes while reducing operational overhead.

6. **Enhanced Management**

The Company has bolstered its management team through key senior additions, including a new Chief Executive Officer in December 2021, and a new Chief Financial Officer in April 2022.

D. **Board of Managers and Officers**

The Company is indirectly controlled by the board of managers of Dawn Intermediate (the "**Board**"). Each Debtor (other than Dawn Intermediate) is either a member-managed limited liability company or a corporation with its own board of directors. The current Board consists of nine (9) members:

| Name | Position |
|---|---|
| Jefferson Case | Director |
| George David | Director |
| Joan Hilson | Director |
| Shelley Huff | Director & Chief Executive Officer |
| Glenn Murphy | Director |
| David Porter | Chairman of the Board |
| Harvey Tepner | Director |
| Brandi Thomas | Director |
| Judith Toland | Director |

As discussed more fully below, on March 11, 2020, the Board established an independent finance committee of newly appointed independent managers of Dawn Intermediate (the "**Finance Committee**"). Members of the Finance Committee include managers Joan Hilson and Harvey Tepner. Additional information regarding circumstances for establishing the Finance Committee and delegation of authority is discussed more fully in Section IV, below.

The composition of the Board of the Reorganized Parent (the "**New Board**") will be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code. The initial New Board will be comprised of (i) the current chief executive officer of SSB, and (ii) additional members the number and identity of whom will be selected by the Requisite Consenting Creditors in consultation with the Company.

The Company's current senior management team consists of the following individuals:

| Name | Position |
|---|---|
| Shelley Huff | Chief Executive Officer |
| John Linker | Chief Financial Officer |
| Kristen McGuffey | Chief Legal Officer and Secretary |
| Esther Ni | Chief Human Resources Officer |

E. **Capital Structure**

1. **Prepetition Indebtedness**

The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements. The following table provides a summary of the Debtors' total debt, as described in more detail below.

| Facility | Maturity | Principal |
|---|---|---|
| Prepetition ABL Facility | Aug. 2023 | $0[10] |
| PTL Facility | Aug. 2023 | $1,027,012,999 |
| Non-PTL Term Loan Facility | Nov. 2023 | $862,297,855 |
| **Total Funded Debt:** | | **$1,889,310,854[11]** |

*Prepetition ABL Agreement*

Certain of the Debtors are party to the Prepetition ABL Agreement, pursuant to which the lenders from time to time party thereto (the "**ABL Lenders**") made available to the borrowers revolving credit loans, subject to a borrowing base availability, in an aggregate principal amount up to $200 million with a $40 million letter of credit sublimit. The Prepetition ABL Facility is guaranteed by each of the guarantors party thereto and is secured, subject to certain exceptions and permitted liens, by (i) a first-priority security interest in the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as defined below)) of each of the Debtors, which includes, among other things, cash, deposit accounts, accounts receivable, and inventory, and (ii) a second-priority security interest in the Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement) of each of the Debtors that is junior to the liens securing the Term Facilities (as defined below), which includes all material assets of the Debtors other than the ABL Priority Collateral, including all material real estate, equipment, intellectual property, and equity interests in their direct subsidiaries.

---

[10] Calculation does not include the approximately $28,014,282 of issued but undrawn letters of credit.

[11] Calculation excludes capital lease obligations in the approximate amount of $77,945,909.

14

As of the Petition Date, under the ABL Credit Agreement, there are approximately $28,014,282 of issued but undrawn letters of credit, plus any applicable interest, fees, and other amounts outstanding, and no outstanding revolving credit loans.

*PTL Credit Agreement*

Certain of the Debtors are party to the PTL Credit Agreement, pursuant to which (i) the New Money Lenders made available to the borrowers the FLFO Term Loans, and (ii) the Exchanging Existing Lenders sold the Relevant Existing Term Loans to the relevant borrowers in exchange for the Initial FLSO Term Loans. The PTL Facility is guaranteed by each of the guarantors party thereto, and is secured, subject to certain exceptions and permitted liens, on a *pari passu* basis with the Non-PTL Term Loan Facility by (i) a first-priority lien on the Term Loan Priority Collateral of each of the Debtors, and (ii) a second-priority lien on the ABL Priority Collateral of each of the Debtors that is junior to the liens securing the Prepetition ABL Facility. As of the Petition Date, (i) the aggregate principal amount of FLFO Term Loans outstanding under the PTL Credit Agreement is approximately $195 million and (ii) the aggregate principal amount of FLSO Term Loans outstanding under the PTL Credit Agreement is approximately $832 million.

*Non-PTL Term Loan Agreement*

Certain of the Debtors are party to the Non-PTL Term Loan Agreement, pursuant to which the lenders from time to time party thereto made available to the borrowers term loans in an aggregate principal amount of $1.95 million. The Non-PTL Term Loan Facility is guaranteed by each of the guarantors party thereto, and is secured, subject to certain exceptions and permitted liens, on a *pari passu* basis with the PTL Facility by (i) a first-priority lien on the Term Loan Priority Collateral of each of the Debtors, and (ii) a second-priority lien on the ABL Priority Collateral of each of the Debtors that is junior to the liens securing the Prepetition ABL Facility. As of the Petition Date, the aggregate principal amount outstanding under the Non-PTL Term Loan Agreement was approximately $862.3 million.

*Intercreditor Agreements*

The relative rights and priorities of the PTL Lenders and the Non-PTL Term Loan Lenders in the collateral securing the obligations under the PTL Facility and the Non-PTL Term Loan Facility are governed by (i) that certain First Lien Intercreditor Agreement, dated as of June 22, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Intercreditor Agreement**"), by and among each of the Debtors, the PTL Agent, the Non-PTL Term Loan Agent, and each other person party thereto from time to time, and (ii) the relative priorities and rights in the collateral of the PTL Lenders, the Non-PTL Term Loan Lenders, and the ABL Lenders are governed by that certain ABL Intercreditor Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**ABL Intercreditor Agreement**" and, collectively with the First Lien Intercreditor Agreement, the "**Intercreditor Agreements**").

The Intercreditor Agreements control the rights and obligations of the aforementioned holders with respect to, among other things, priority of interests in collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection. The ABL Intercreditor Agreement provides, among other things, that subject to certain requirements, no PTL Lender or Non-PTL Term Loan Lender may object to debtor-in-possession financing secured by, or the use of cash collateral constituting, ABL Priority Collateral (as defined in the ABL Intercreditor Agreement). *See* ABL Intercreditor Agreement, § 6.1.

15

*Capital Lease Obligations*

Certain of the Debtors are parties to certain capital leases. The majority of such capital leases relate to real estate leases for the Company's headquarters and manufacturing plants, with the remaining capital leases relating to the Company's information technology business needs. As of the Petition Date, the aggregate amount of obligations related to capital leases was approximately $77,945,909.

*Surety Bonds*

Surety bonds provide financial performance assurance to third parties on behalf of certain subsidiaries for obligations including, but not limited to, continuous customs bonds with the U.S. Customs and Border Protection Agency. In the event of nonperformance by the applicable subsidiary, the beneficiary would make a claim to the surety, and the Company would be required to reimburse any payment by the surety. The Company's liability with respect to any surety bond is released once the obligations secured by the surety bond are performed. Surety bond providers generally have the right to request additional collateral or request that such bonds be replaced by alternate surety providers, in each case upon the occurrence of certain events. As of the Petition Date, the aggregate amount of surety bonds outstanding was approximately $1.5 million, which obligations are partially collateralized by letters of credit in the approximate amount of $750,000.

*Ongoing General Unsecured Claims*

As of the Petition Date, the Debtors owe approximately $150 million in respect of trade debt and other potential liabilities. As noted above, except to the extent that a holder of an Allowed Ongoing General Unsecured Claim agrees to less favorable treatment, if a holder of an Allowed Ongoing General Unsecured Claim executes a 6A Trade Agreement, on and after the Effective Date, or as soon as reasonably practical thereafter, such holder of an Allowed Ongoing General Unsecured Claim shall receive no more than four (4) Cash installments over a period of no more than 365 days from the Effective Date, which payments shall result in full payment in the Allowed amount of such Ongoing General Unsecured Claim on no better terms than payment in the ordinary course of business. For the avoidance of doubt, a holder of Ongoing General Unsecured Claims that is a counterparty to (i) an executory contract or unexpired lease assumed pursuant to Article VIII of the Plan or (ii) an existing CV Trade Agreement (provided that such CV Trade Agreement is in effect as of the Effective Date) shall not be required to execute a 6A Trade Agreement to receive a distribution under Class 6A under the Plan.

*Other General Unsecured Claims*

As of the Petition Date, the Debtors owe approximately $30 million in respect of general unsecured claims and other potential liabilities, exclusive of Ongoing General Unsecured Claims. As noted above, except to the extent that a holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata Share of the Other General Unsecured Claims Recovery Pool as set forth in the GUC Recovery Allocation Table.

The GUC Recovery Allocation Table allocates the amounts available for distribution in the Other General Unsecured Claims Recovery Pool to the various Debtor entities based on the anticipated Claims to be asserted against the respective Debtors. All recoveries on account of an Ongoing General Unsecured Claim or Other General Unsecured Claim are the result of a carve out of the FLSO Term Loans' collateral. The Debtors reserve the right to modify these amounts on notice to parties in interest in consultation with the Committee.

2. **Equity Ownership**

The Debtors' direct or indirect parent is Dawn Holdings. Advent owns approximately 60% of the equity in Dawn Holdings. The remaining equity is owned by, among other holders, Ares, OTPP, certain current and former employees and directors of the Company, and the founders and other prior owners of Tuft & Needle, LLC. As of the Petition Date, Dawn Holdings has 334,939 issued and outstanding shares of common stock.

A chart illustrating the Debtors' organizational structure is attached to this Disclosure Statement as **Exhibit D**.

3. **Cash and Cash Equivalents**

As of the Petition Date, the Debtors hold approximately $159.6 million in cash in their bank accounts, and substantially all of the Debtors' cash is secured by a first priority lien in favor of ABL Lenders.

F. **Litigation**

1. **Arbitration with Minority Licensees**

As discussed above, SSB and NBC own approximately 82% of non-Debtor affiliate Serta, Inc. The remaining approximately 18% is owned by the Minority Licensees. Several disputes have arisen between the parties in recent years, driven by claims that SSB and NBC's management of the Serta, Inc. brand has allegedly favored SSB's Simmons' other mattress brands over the Serta® brands. SSB and NBC deny those allegations.

In December 2020, SSB and NBC were named as respondents in an arbitration by the Minority Licensees, alleging, among other things, breach of fiduciary duty, antitrust violations, breach of contract, tortious interference with contracts and prospective business relationships, and certain violations of the Sherman Antitrust Act. The Minority Licensees seek monetary relief in an amount to be determined and certain non-monetary forms of relief. The case styled *AW Industries, Inc. et al. v. Serta Simmons Bedding LLC, et al.* Case No. 01200093145 is currently before the American Arbitration Association. As noted, SSB and NBC deny the allegations made.

In January 2021, the parties agreed to stay the arbitration to attempt to resolve their claims through mediation; however, these negotiations ultimately proved unsuccessful, and a definitive agreement was never reached. On September 8, 2022, the Minority Licensees notified the American Arbitration Association that they intended to recommence the arbitration. On November 14, 2022, the Minority Licensees filed an amended arbitration demand asserting most of the same claims (excluding the antitrust and tortious interference claims), which are disputed by the Company.

The arbitration is currently pending, and if the arbitration proceeds, SSB and NBC expect to file an answering statement to the Minority Licensees' amended demand as well as counterclaims against the Minority Licensees. The arbitration with the Minority Licensees is stayed during the pendency of these Chapter 11 Cases.

2. **2021 LCM Litigation**

In July 2020, SSB and certain of the PTL Lenders were sued by Non-PTL Term Loan Lenders LCM XXII LTD and certain related funds advised by LCM Asset Management LLC in the United States District Court for the Southern District of New York, asserting that the 2020 Transaction constituted a breach of contract

and a breach of the implied covenant of good faith and fair dealing. In March 2021, the United States District Court for the Southern District of New York dismissed the plaintiffs' suit on lack of subject matter jurisdiction.

In May 2021, the LCM plaintiffs refiled their claims in federal court, naming SSB as the sole defendant to resolve the jurisdictional issue. In the re-filed lawsuit, the plaintiffs alleged, among other things, that entry into the 2020 Transaction violated the terms of the Non-PTL Term Loan Agreement and the implied covenant of good faith and fair dealing (the "**2021 LCM Litigation**"). In March 2022, the defendants' motion to dismiss was denied. The lawsuit is currently pending in the United States District Court for the Southern District of New York but is stayed as a result of the automatic stay.

### 3. 2022 Non-PTL Term Loan Lenders Litigation

In June 2020, SSB and certain of the PTL Lenders were sued by certain of the Company's Non-PTL Term Loan Lenders, including funds managed by Angelo, Gordon Management LLC, and Gamut Capital Management LP in the Supreme Court of the State of New York, seeking an injunction to prohibit SSB from completing the 2020 Transaction. Apollo Management Holdings, L.P. ("**Apollo**") was also a party to the litigation against the Debtors, despite there being a dispute as to whether Apollo is considered a disqualified institution and therefore disallowed to hold a loan under the Non-PTL Term Loan Agreement. The Supreme Court of the State of New York denied this request and the 2020 Transaction was effectuated. The plaintiffs were subsequently allowed to dismiss their lawsuit in state court without prejudice.

In November 2022, SSB and certain of the PTL Lenders were again sued by certain of the Company's Non-PTL Term Loan Lenders, including funds managed by Angelo, Gordon Management LLC, Gamut Capital Management LP, Contrarian Capital Management, L.L.C., Alcentra NY LLC, and Z Capital Group L.L.C., alleging, among other things, that entry into the 2020 Transaction violated the terms of the Non-PTL Credit Agreement and the implied covenant of good faith and fair dealing (the "**2022 Non-PTL Term Loan Lenders Litigation**"). Apollo was also a party to the litigation against the Debtors, joining in all claims and also seeking a declaratory judgment requiring SSB to execute assignments of loans under the Non-PTL Term Loan Agreement. The lawsuit is currently pending in New York state court but is stayed as to SSB as a result of the automatic stay. On March 21, 2023, the Bankruptcy Court entered an order extending the automatic stay to SSB's co-defendants in the 2022 Non-PTL Term Loan Lenders Litigation, including the PTL Lenders.

### 4. Other Litigation

Certain Debtors are named as defendants from time to time in other routine litigation proceedings. The Debtors, however, cannot predict with certainty the outcome or effect of the resolution of claims arising from pending or threatened litigation or legal proceedings, and the eventual outcome could materially differ from their current estimates.

## IV.
## KEY EVENTS LEADING TO
## THE COMMENCEMENT OF CHAPTER 11 CASES

### A. Challenges Facing Debtors' Business

Many of the Debtors' financial challenges mirror those in the downturn of the mattress industry generally. The U.S. bedding industry has been subject to significant disruptions recently, including a decline in industry demand beginning in 2022 as a result of slower economic growth caused by recent geopolitical and macroeconomic uncertainty as well as reduced consumer spending from higher interest rates. Prior to

18