# DEFENDANTS' EXHIBIT 333
# Part 4 of 27

the demand headwinds, the industry faced significant inflation in raw material costs, supply chain disruptions, as well as the adverse market effects created by the COVID-19 pandemic. While the fundamentals of the Debtors' business remain strong, the Debtors are facing significant debt maturities in 2023. Accordingly, the Debtors filed these chapter 11 cases to implement a comprehensive financial restructuring that will result in a reduction of the Company's total debt of approximately $1.57 billion and allow it to continue operating as a going concern with a substantially healthier balance sheet.

### B. Finance Committee Appointed to Oversee Strategic Process

On March 11, 2020, the Board established the Finance Committee to (i) consider, evaluate, and recommend to the Board to pursue a restructuring transaction on behalf of the Company, and (ii) oversee discussions with the Company's stakeholders and the implementation and execution of any transaction that has been approved by the Board. On June 3, 2020, the Board delegated additional transaction authority to the Finance Committee with respect to a restructuring transaction process, including with respect to: (i) approval of any transaction, action or agreement or transaction in furtherance thereof on behalf of the Board; (ii) discussions and negotiations with stakeholders of Dawn Intermediate and its subsidiaries in respect of a transaction; (iii) implementation and execution of a transaction and all related documentation thereto, including with respect to the marketing of Dawn Intermediate's assets and any bids or proposals submitted in connection with the transaction; (iv) analysis and, if applicable, resolution of claims or causes of action in favor of Dawn Intermediate in connection with a transaction; (v) authorizing or instructing the Company's advisors to discuss and negotiate the terms of a transaction with potential counterparties and Dawn Intermediate's stakeholders; and (vi) such other actions as the Finance Committee considers necessary or desirable in order to carry out its mandate.

### C. 2020 Transaction

In April 2020, SSB solicited proposals from and entered into separate discussions with potential lenders, including the New Money Lenders, to explore alternatives for raising liquidity and reducing its debt and interest expense. The Company analyzed multiple proposals and negotiated with numerous lender groups before ultimately selecting, with the approval of the Finance Committee, the transaction discussed below. On June 8, 2020, SSB announced it had entered into the 2020 Transaction.

### D. Prepetition Strategic Efforts

Prior to filing these Chapter 11 Cases, the Company explored and evaluated potential strategic transactions, including potentially developing and implementing a comprehensive plan to restructure the Company's balance sheet, whether in-court or out-of-court, with the help of advisors Weil, Gotshal & Manges LLP ("**Weil**") as counsel, Evercore Group, L.L.C. ("**Evercore**"), as investment banker, and FTI Consulting, Inc. ("**FTI**"), as financial advisor (collectively, the "**Advisors**"). The Finance Committee did not retain additional financial advisors or additional legal counsel.

As a result of the challenges discussed above (among other factors), the Debtors determined they would not be able to generate sufficient earnings to service its debt and maintain operations without additional liquidity and/or reducing its debt burden. The Company and its Advisors began to evaluate balance sheet restructuring options.

#### 1. Refinancing Efforts

Prior to filing these Chapter 11 Cases, the Debtors attempted to address their capital structure and upcoming debt maturities without a comprehensive in-court restructuring. In April 2022, the Debtors, through their investment banker, Evercore, initiated outreach to approximately twenty (20) potential third-party

19

financing parties seeking a maturity extension transaction to refinance its existing capital structure. The Debtors did not receive any proposals through this competitive financing process. Accordingly, the Company shifted its focus to engagement with its current lenders regarding the terms of a comprehensive restructuring.

2. **Restructuring Negotiations**

In the months preceding the Chapter 11 Cases, the Company and its advisors engaged in extensive negotiations with members of an ad hoc group of PTL Lenders (the "**PTL Lender Group**") and its advisors regarding a go-forward business plan and restructuring transaction, which ultimately culminated in the execution of the Restructuring Support Agreement, pursuant to which the Debtors, Consenting Creditors and the Consenting Equity Holders (collectively, the "**Consenting Parties**") have agreed to support the Restructuring.

In September 2022, the Company and its Advisors began actively engaging in discussions and negotiations regarding restructuring alternatives with (i) the PTL Lender Group, which is represented by Gibson, Dunn & Crutcher LLP, as legal counsel, and Centerview Partners LLC, as investment banker (the "**PTL Advisors**"), (ii) an ad hoc group of Non-PTL Term Loan Lenders under the Non-PTL Term Loan Facility (the "**Non-PTL Term Loan Lender Group**") represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, as legal counsel, and PJT Partners, Inc., as investment banker (the "**Non-PTL Advisors**", and together with the PTL Advisors, the "**Lender Group Advisors**").

In October 2022, the Lender Group Advisors executed non-disclosure agreements and received access to a virtual data room maintained by the Company containing over 19,000 pages for the purpose of assessing a potential restructuring transaction.

On November 1, 2022, certain members of the PTL Lender Group executed non-disclosure agreements (the "**PTL Holder NDAs**") with the Debtors. On November 2, 2022, the Debtors held in-person meetings in New York attended by certain members of the PTL Lender Group and the PTL Advisors for the purpose of, among other things, meeting with the Debtors' management team and discussing the Debtors' recent and projected financial performance.

On November 3, 2022, the Non-PTL Term Loan Lender Group filed a complaint commencing the 2022 Non-PTL Term Loan Lenders Litigation against SSB and the PTL Lender Group. On the same day that this litigation was commenced, the Non-PTL Term Loan Lender Group sent a restructuring proposal to the PTL Lender Group. This restructuring proposal was not deemed actionable by the PTL Lender Group. In light of the 2022 Non-PTL Term Loan Lenders Litigation, the Company revoked the data room access of the Non-PTL Advisors.

Upon the commencement of the 2022 Non-PTL Term Loan Lenders Litigation, the Debtors focused their restructuring efforts with the PTL Lender Group.

Following the November 2, 2022, meeting with the PTL Lender Group, the Debtors and their Advisors continued working with the PTL Lender Group and the PTL Advisors to respond to information and diligence requests regarding the Debtors and their business plan, so as to inform the framework for a potential restructuring. The Company received and exchanged several term sheets with the PTL Lender Group regarding the Company's potential restructuring and plans regarding upcoming maturities. During this time, the Debtors and PTL Lender Group engaged in ongoing negotiations and discussions regarding the terms of a potential settlement with the Non-PTL Term Loan Lenders. To that end, in December 2022, the PTL Lender Group delivered a settlement counterproposal to the Non-PTL Term Loan Lender Group,

following which four (4) of the Non-PTL Term Loan Lender Group holders signed non-disclosure agreements with the Company to receive diligence in connection with such proposal.

The Company's business-plan diligence with the PTL Advisors and PTL Lender Group continued for nearly five (5) months, from September 2022 through January 2023. The Debtor held several diligence sessions with the PTL Lender Group and PTL Advisors to elaborate on, among other topics: (i) expected views of the bedding market in 2023 to 2024, (ii) the Company's 2023 budget and long-range business plan, (iii) pricing, product mix, and channel engagement strategies, (iv) ongoing and planned cost-saving actions, and (v) value-accretive capital expenditure projects. The Company and its Advisors also comprehensively addressed over one hundred (100) diligence questions by the PTL Lender Group and PTL Advisors in an effort to instruct them on various aspects of the Debtor's go-forward business plan.

On January 17, 2023, an approximate $11.9 million interest payment became due under the PTL Credit Agreement. The Company elected not to pay such interest and instead utilized the five (5) day grace period under the PTL Credit Agreement in order to preserve liquidity and continue negotiations with stakeholders.

### 3. Debtor-in-Possession Financing Negotiations

In parallel with the restructuring transaction negotiations, and as further detailed in the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Claims with Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (Docket No. 11) (the "**DIP Motion**"), in November 2022 the Debtors launched a solicitation process to obtain debtor-in-possession financing and the consensual use of cash collateral to fund these Chapter 11 Cases.

Over the course of the solicitation process, the Debtors and its Advisors contacted existing lenders, traditional lenders, and alternative lenders. In the outreach, twenty-two (22) parties were contacted, of which eleven (11) parties executed non-disclosure agreements.

The Debtors were able to secure postpetition financing (the "**DIP Financing**") in the form of a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of $125 million (the "**DIP Facility**"), to be led by Eclipse Business Capital LLC ("**Eclipse**"). On the Effective Date, claims under the DIP Facility will be converted on a dollar-for-dollar basis into obligations under or refinanced by the Exit ABL Facility, to be used by the reorganized Company to fund its working capital needs.

### 4. Prepetition Compensation Program

Upon the recommendation of the Finance Committee and the compensation committee of Dawn Holdings (the "**Compensation Committee**"), the Board approved the implementation of a Key Employee Retention Program (the "**KERP**") on July 18, 2022, for two hundred and ten (210) employees of SSB, with a capped discretionary pool for any other employees whose roles were significantly expanded as a result of any potential restructuring of SSB. The KERP was designed to retain key employees of SSB in their current roles over the near term while providing them with financial stability. Pursuant to the KERP, these key employees must continue their employment with SSB for approximately twelve (12) months after executing an agreement under the KERP (the "**Retention Date**") or they will forfeit the full amount of the retention payment. If, before the Retention Date, a KERP participant is terminated for cause or voluntarily terminates their employment with SSB without good reason (other than as a result of death or disability), such participant must repay their KERP payment in full.

E. **Restructuring Support Agreement and Plan**

As noted above, following months of extensive, arms' length negotiations, the Debtors reached an agreement with the Consenting Parties and memorialized their support for the Restructuring in the Restructuring Support Agreement.[12] The terms of the Restructuring are reflected in the Plan. Upon its full implementation, the Plan will effect a significant deleveraging of the Debtors' capital structure by reducing the Company's total debt by approximately $1.57 billion. The reduced debt burden and exit financing anticipated under the Plan will provide the Debtors with sufficient liquidity, not only to continue funding their operations, but to make the necessary capital expenditures and investments to ensure that the Company will remain an industry leader in mattresses, as well as resolve pending disputes and ongoing litigation with certain of its significant creditors.

Upon the Effective Date, the provisions of the Plan, including the settlement of all Claims, Interests, and controversies among the Debtors and the Consenting Parties given in consideration of the value provided to the Estates by the Consenting Parties (the terms of which are set out in the Restructuring Support Agreement and incorporated by reference in the Plan), shall constitute an integrated and global good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest, including pursuant to the transactions set forth in the Restructurings Transactions Exhibit. Specifically, in relation to matters relating to the Consenting Equity Holders, the Restructuring Support Agreement provides for certain treatment and consideration in exchange for their support for the Restructuring, as part of a global settlement and waiver of their claims or interests, and if the Restructuring Transactions Exhibit includes the Redemption (as defined herein), agreement that the Debtors will pay the Consenting Equity Holders Cash in the amount of $1.7 million, including the Consenting Equity Holder Fees and Expenses, subject to the terms of the Restructuring Support Agreement; *provided*, that if the Debtors do not pursue the Redemption (as defined herein), the Debtors will still pay the Consenting Equity Holder Fees and Expenses also subject to the terms of the Restructuring Support Agreement.

F. **Implementation and Potential Transaction Structures**

Subject to the outcome of negotiations with certain parties in interest, including the Consenting Creditors and holders of Intermediate Equity Interests, the Plan will be implemented in the most favorable transaction structure as set forth in the Restructuring Transactions Exhibit. Such potential structures may include:

- Redemption or distribution on equity: a cash distribution by SSB in complete redemption of its existing equity held by Dawn Intermediate (with Dawn Intermediate in turn distributing the proceeds to its existing equity holder, Dawn Holdings) concurrently with SSB issuing the New Common Interests.

- Asset sale transaction: an actual or deemed sale of the assets of SSB and its subsidiaries to an unrelated corporation (to be indirectly owned by certain holders of Claims).

V.
**EVENTS
DURING THE CHAPTER 11 CASES**

The Debtors are operating their businesses in the ordinary course during the pendency of the Chapter 11 Cases, which are being jointly administered for procedural purposes only pursuant to section 1015(b) of the

---

[12] The Restructuring Support Agreement is attached hereto as **Exhibit B**.

22

Bankruptcy Code. As described more fully below, on the Petition Date, the Debtors filed various motions seeking important and urgent relief from the Bankruptcy Court.

A. **Commencement of the Chapter 11 Cases and First Day Motions**

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course. Such relief is designed to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations. The following is a brief overview of the substantive relief the Debtors sought on the Petition Date to maintain their operations in the ordinary course.

1. **Cash Management System**

The Debtors maintain a centralized cash management system designed to receive, monitor, aggregate, and distribute cash among the various Debtors (and non-Debtors). On the Petition Date, the Debtors filed a motion (Docket No. 12) seeking authority to continue the use of their existing cash management system, bank accounts, and related business forms, as well as to continue their intercompany arrangements to avoid disruption in the Debtors' operations and facilitate the efficient administration of the Chapter 11 Cases (the "**Cash Management Motion**"). Among other things, the Cash Management Motion sought to continue the Debtors' credit card and P-Card programs which, on average, the Debtors expect to incur approximately $1.4 million per month. The Cash Management Motion also sought authority to continue cash management arrangements among the Minority Licensees and NBC, which manages invoicing and cash collections from sales of Serta® branded product to national account customers, including sales of mattresses that are made by the Minority Licensees for distribution to locations in their respective territories. The Bankruptcy Court granted the relief requested in the Cash Management Motion on an interim basis on January 24, 2023 (Docket No. 84).

2. **Debtor-in-Possession Financing**

To address their working capital needs and fund their reorganization efforts, on the Petition Date, the Debtors sought approval of an agreement with Eclipse, as administrative agent (in such capacity, the "**DIP Agent**"), to provide a postpetition superpriority senior secured asset-based revolving loan facility (the "**DIP Facility**") in an aggregate principal amount of up to $125 million. On the Petition Date, the Debtors filed a motion (Docket No. 11) seeking approval of the DIP Facility (the "**DIP Motion**"). The final order attached to the DIP Motion reflects an agreement between and among the Debtors and the Prepetition Secured Creditors regarding the use of Cash Collateral (as defined in section 363(a) of the Bankruptcy Code), and the terms of adequate protection to be provided to certain parties. The Bankruptcy Court entered a final order approving the DIP Facility on March 1, 2023 (Docket No. 394). The Bankruptcy Court entered a revised final order approving the DIP Facility on March 3, 2023 (Docket No. 406).

3. **Vendors**

In the ordinary course of business, the Debtors rely upon a variety of vendors and service providers and intend to continue to pay such vendors and service providers for goods or services provided to the Debtors after the Petition Date in the ordinary course of business. To avoid the detrimental effects of potential actions taken by the Debtors' vendors and service providers, and to minimize any disruption to the Debtors' operations, on the Petition Date the Debtors filed a motion (Docket No. 14) (the "**Vendor Motion**") seeking authority to pay the prepetition amounts owed to certain vendors and service providers who execute a CV Trade Agreement. Additionally, the Vendor Motion sought authority to pay in the ordinary course certain domestic and international royalties payable to Minority Licensees on account of each of their respective

portions of the royalties in accordance with the relevant governing documents. The Bankruptcy Court entered an interim order granting the relief requested in the Vendor Motion on January 24, 2023 (Docket No. 106) and entered a final order granting the relief requested in the Vendor Motion on February 26, 2023 (Docket No. 369) (collectively, the "**Vendor Order**").

4. **Taxes**

Pursuant to the Plan, the Debtors intend to pay all taxes and fees in full to various taxing and regulatory authorities. To minimize any disruption to the Debtors' operations and ensure the efficient administration of the Chapter 11 Cases, on the Petition Date, the Debtors filed a motion (Docket No. 17) seeking authority to pay all taxes, fees, and similar charges and assessments, whether arising pre- or postpetition, to the appropriate taxing authorities in the ordinary course of the Debtors' businesses (the "**Tax Motion**"). The Bankruptcy Court entered an order granting the relief requested in the Tax Motion on a final basis on January 24, 2023 (Docket No. 86).

5. **Utilities**

In the ordinary course of business, the Debtors incur certain expenses related to the essential utility services, such as electricity, telecommunications, natural gas, water, waste disposal, and other similar services. On the Petition Date, the Debtors filed a motion (Docket No. 18) seeking authority to provide such utility providers with adequate assurance in the amount of approximately $491,000 to be held in a segregated account and approval of procedures for resolving objections relating to the adequacy of the proposed adequate assurance (the "**Utilities Motion**"). The Bankruptcy Court entered an order granting the relief requested in the Utilities Motion on January 24, 2023 (Docket No. 107).

6. **Insurance**

In connection with the operation of the Debtors' businesses, the Debtors maintain various insurance policies designed to protect their property, assets, key personnel, and business operations. The types of insurance policies maintained by the Debtors include general liability, excess liability, directors' and officers' liability, fiduciary liability, workers' compensation, property, and crime. The Debtors are also obligated to provide certain surety bonds to the U.S. Customs and Border Patrol Agency. The maintenance of certain insurance coverage and provision of surety bonds is essential to the Debtors' operations and is required by laws, various regulations, financing agreements, and contracts. The Debtors believe that the satisfaction of their insurance and surety obligations, whether arising pre- or postpetition, is necessary to maintain the Debtors' relationships with their insurance providers and ensure the continued availability and commercially-reasonable pricing of such insurance coverage and surety bonds. Accordingly, on the Petition Date, the Debtors filed a motion (Docket No. 16) seeking authority to continue to honor their insurance obligations in the ordinary course (the "**Insurance Motion**"). The Bankruptcy Court entered an order granting the relief requested in the Insurance Motion on a final basis on January 24, 2023 (Docket No. 93).

7. **Employee Wages and Benefits**

The Debtors' businesses rely upon approximately 3,600 employees throughout the United States. Generally, members of the Debtors' workforce rely upon their compensation to meet their daily living expenses and various healthcare and other benefits to access ordinary and critical healthcare needs. Additionally, the Debtors engage with various third-parties to administer the payment of wages and payroll taxes, and the maintenance of employee benefits. To minimize the uncertainty and potential distractions associated with their Chapter 11 Cases and the potential disruption of the Debtors' operations resulting therefrom, on the Petition Date, the Debtors filed a motion (Docket No. 13) seeking authority to continue

to honor their obligations to their workforce in the ordinary course of business, including (i) the payment of pre- and postpetition wages, salaries, and reimbursable employee expenses, (ii) the payment of pre- and postpetition wages of independent contractors and their supplemental workforce, (iii) the payment of pre- and postpetition accrued and unpaid employee benefits, and (iv) the continuation of certain of the Debtors' benefit and incentive programs and policies (the "**Employee Wages and Benefits Motion**"). The Debtors did not seek authority to pay or honor any prepetition obligations on account of any severance payments or any severance payments to insiders. The Bankruptcy Court entered an order granting the relief requested in the Employee Wages and Benefits Motion on a final basis on January 24, 2023 (Docket No. 85).

8. **Customer Programs**

In connection with the operation of the Debtors' businesses, the Debtors engage in certain customary activities to develop and sustain positive relationships with their customers. The Debtors have implemented various customer-related programs designed to ensure their satisfaction and loyalty, increase sales, respond to competitive pressures, improve profitability, and generate goodwill for the Debtors and their products. The customer programs are integral to the Debtors' efforts to stabilize their businesses, promote the continuity and continued vitality of the Debtors' businesses, and ultimately deliver the most value to all stakeholders in the Chapter 11 Cases. Accordingly, on the Petition Date, the Debtors filed a motion (Docket No. 15) seeking authority to continue the customer programs in the ordinary course of business and to perform and honor their prepetition obligations thereunder (the "**Customer Programs Motion**"). The Bankruptcy Court entered an order granting the relief requested in the Customer Programs Motion on a final basis on January 24, 2023 (Docket No. 105).

9. **Carryforwards of Net Operating Losses**

On the Petition Date, the Debtors filed a motion (Docket No. 21) seeking approval of procedures to protect the potential value of the Debtors' carryforwards of net operating losses ("**NOLs**"), disallowed and deferred business interest expense, and certain other tax benefits (including certain state tax attributes) (collectively, the "**Tax Attributes**") for use during the Chapter 11 Cases and in connection with the reorganization of the Debtors (the "**NOL Motion**"). An order approving the NOL Motion on a final basis was entered by the Bankruptcy Court on February 26, 2023 (Docket No. 391).

10. **Other Procedural Motions and Retention of Professionals**

The Debtors filed various motions regarding procedural matters that are common to chapter 11 cases of similar size and complexity as these Chapter 11 Cases, seeking authority to, among other things:

- Jointly administer the Debtors' estates (Docket No. 2) (the "**Joint Administration Motion**");

- File a consolidated creditor matrix and list of thirty (30) largest unsecured creditors (Docket No. 20) (the "**Consolidated Creditor Matrix Motion**");

- Establish a schedule of key dates and hearings in these chapter 11 cases (Docket No. 24) (the "**Scheduling Motion**");

- Establish procedures to employ ordinary course professionals and for reimbursement of expenses of chapter 11 professionals (Docket No. 196) (the "**Ordinary Course Professionals Motion**"); and

- Establish procedures for interim compensation and reimbursement of expenses of chapter 11 professionals (Docket No. 252) (the "**Interim Compensation Motion**").