DEFENDANTS' EXHIBIT 333
Part 5 of 27

The Bankruptcy Court entered, on a final basis, the relief requested in the Joint Administration Motion on January 24, 2023 (Docket No. 46), the Consolidated Creditor Matrix Motion on January 24, 2023 (Docket No. 89), the Scheduling Motion on February 8, 2023 (Docket No. 267) (the "**Scheduling Order**"), and the Ordinary Course Professionals Motion on February 26, 2023 (Docket No. 368). The Bankruptcy Court entered an order granting the relief requested in the Interim Compensation Motion on a final basis on March 6, 2023 (Docket No. 422).

### B. Retention of Chapter 11 Professionals

The Debtors have filed several applications to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include: (i) Evercore, as investment banker (Docket No. 250); (ii) FTI, as financial advisors (Docket No. 251); (iii) PricewaterhouseCoopers, LLP ("**PWC**"), as audit and tax services advisor (Docket No. 253); (iv) Epiq, as claims, noticing and solicitation agent (Docket No. 23); and (v) Weil, as legal counsel (Docket No. 249).

On January 24, 2023, Epiq was authorized to be retained by the Debtors as claims, noticing and solicitation agent (Docket No. 43).

### C. Official Committee of Unsecured Creditors

On February 9, 2023 the U.S. Trustee appointed an Official Committee of Unsecured Creditors (Docket No. 274) (the "**Committee**"). The Committee was reconstituted on February 14, 2023 (Docket No. 321). The Committee is represented by Kelley Drye & Warren LLP as proposed legal counsel and Force Ten Partners, LLC as proposed financial advisor.

### D. Confirmation Hearing

On February 8, 2023, the Bankruptcy Court entered the Scheduling Order, scheduling the hearing to consider confirmation of the Plan on May 8, 2023. On March 23, 2023, the Bankruptcy Court approved the adequacy of the Disclosure Statement and Solicitation, and granted other related relief (Docket No. 540) (the "**Disclosure Statement Approval Order**").

### E. Commencement of Adversary Proceedings

Concurrently with the commencement of these Chapter 11 Cases, the Debtors and certain PTL Lenders commenced an adversary proceeding (the "**2020 Transaction Adversary Proceeding**") with the aim of comprehensively resolving the claims against the Debtors and PTL Lenders arising from pending or future litigation related to the 2020 Transaction, including any claims alleged within the 2021 LCM Litigation and the 2022 Non-PTL Term Loan Lenders Litigation (Docket No. 30). The 2020 Transaction Adversary Proceeding seeks a declaratory judgment that the 2020 Transaction was valid under the terms of the Non-PTL Term Loan Agreement, that the 2020 Transaction was completed as an open market purchase, and that the 2020 Transaction did not violate the covenant of good faith and fair dealing. A ruling in the 2020 Transaction Adversary Proceeding should provide issue preclusion in the pending and any future litigation over the validity of the 2020 Transaction. On February 23, 2023, the Non-PTL Term Loan Lenders filed an answer and counterclaims, asserting claims against the Debtors and the PTL Lenders for breach of the Non-PTL Term Loan Agreement and breach of the covenant of good faith and fair dealing. (Docket No. 66 of Adv. Pro. No. 23-09001). Apollo also asserted a counterclaim against SSB, seeking a declaratory judgment that it has a valid assignment of the $192 million in face amount First Lien Term Loans that it has purchased. On February 24, 2023, the Debtors and certain PTL Lenders filed motions for summary judgment on their claims for declaratory judgment. (Docket Nos. 69 & 70 of Adv. Pro. No. 23-09001) The Non-PTL Term Loan Lenders and LCM responded to the motions for summary judgment on March 16,

26

2023, arguing that their consent was required under the Non-PTL Term Loan Agreement because the 2020 Transaction was not an open market purchase. In addition to opposing summary judgment, they asked the Bankruptcy Court to *sua sponte* enter summary judgment in their favor or, in the alternative, that summary judgment was inappropriate because additional discovery was necessary, particularly on the good faith and fair dealing claim. The Debtors' and certain PTL Lenders' replies are due on March 24, 2023. The Bankruptcy Court will hear oral argument on the summary judgment motions on March 28, 2023. Separately, on March 3, 2023, the parties to the 2020 Transaction Adversary Proceeding entered a stipulation with the Committee regarding the Committee's rights to participate in the 2020 Transaction Adversary Proceeding. (Docket No. 76 of Adv. Pro. No. 23-09001).

In addition to the 2020 Transaction Adversary Proceeding and concurrently with the commencement of these Chapter 11 Cases, the Debtors filed (i) an adversary complaint against the plaintiffs in the 2022 Non-PTL Term Loan Lenders Litigation (Docket No. 113), and (ii) an emergency motion for an order declaring that the automatic stay applies, or in the alternative, should be extended to certain non-Debtor parties, including the PTL Lenders, in the 2022 Non-PTL Term Loan Lenders Litigation and to enjoin the litigation (Docket No. 3 of Adv. Pro. No. 23-03007) (collectively, the "**Automatic Stay Extension Adversary Proceeding**"). On February 1, 2023, the Bankruptcy Court granted LCM's unopposed motion to intervene. (Docket No. 53 of Adv. Pro. No. 23-03007). An order temporarily staying certain prepetition actions, including the 2022 Non-PTL Term Loan Lenders Litigation, was granted by the Bankruptcy Court on February 2, 2023, (Docket No. 66 of Adv. Pro. No. 23-03007). On February 24, 2023, Non-PTL Term Loan Lenders and LCM filed their Objections to the Debtors' stay motion. (Docket Nos. 97 & 98 of Adv. Pro. No. 23-03007). On February 27, 2023, the Bankruptcy Court granted the PTL Lenders' unopposed motion to intervene. (Docket No. 100 of Adv. Pro. No. 23-03007). On March 6, 2023, the Debtors and PTL Lenders filed their replies to the stay motions. (Docket Nos. 104 and 105 of Adv. Pro. No. 23-03007). The Bankruptcy Court heard oral argument on the stay motion on March 13, 2023, and ruled that the automatic stay was to be extended to the non-Debtor co-defendants in the 2020 Non-PTL Term Loan Lenders Litigation and that the litigation be enjoined. On March 21, 2023, the Bankruptcy Court entered an order extending the automatic stay to SSB's co-defendants in the 2022 Non-PTL Term Loan Lenders Litigation, including the PTL Lenders (Docket No. 124 of Adv. Pro. No. 23-03007).

Separately, on March 3, 2023, the parties to the Automatic Stay Extension Adversary Proceeding entered a stipulation with the Committee regarding the Committee's rights to participate in the Automatic Stay Extension Adversary Proceeding. (Docket No. 103 of Adv. Pro. No. 23-03007).

F.     **Timetable for the Chapter 11 Cases**

In accordance with the Restructuring Support Agreement and DIP Facility, the Debtors have agreed to proceed with the implementation of the Plan through the Chapter 11 Cases. Among the Milestones contained in the Restructuring Support Agreement and DIP Facility is the requirement that the Bankruptcy Court enter the order confirming the Plan no later than June 5, 2023. The Restructuring Support Agreement and DIP Facility also requires that the Effective Date occur no later than June 6, 2023. Although the Debtors will request that the Bankruptcy Court approve a timetable consistent with the Restructuring Support Agreement and DIP Facility, there can be no assurance that the Effective Date will occur on such timetable. In accordance with these documents, on the Petition Date the Debtors filed a motion seeking establish a schedule of key dates and hearings in these chapter 11 cases (Docket No. 24, 137) (the "**Scheduling Motion**"). The relief requested in the Scheduling Motion was granted by the Bankruptcy Court on February 8, 2023 (Docket No. 267).

27

G. **Motions to Lift Stay**

On March 3, 2023, the Minority Licensees filed a motion for relief from the automatic stay to allow the arbitration to proceed (Docket No. 405) (the "**Minority Licensee Stay Motion**"). On March 6, 2023, Cameron M. Thierry filed a motion for relief from the automatic stay to allow Mr Thierry to proceed with an employment discrimination complaint for damages (Docket No. 420) (the "**Theirry Stay Motion**"). Both the Minority Licensee Stay Motion and the Thierry Stay Motion are scheduled to be heard by the Bankruptcy Court on March 29, 2023.

## VI.
## TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAW

The issuance of, and distribution under, the Plan of New Common Interests will be issued without registration under the Securities Act or any similar federal, state, or local law. The issuance, and distribution of the New Common Interests to holders of FLFO Claims, FLSO Claims, and Non-PTL Term Loan Claims, as applicable, under Article IV of the Plan shall be exempt, without further act or actions by any legal entity, from registration under the Securities Act and all rules and regulations promulgated thereunder to the fullest extent permitted by section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale pursuant to a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the New Common Interests will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to the New Common Interests such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Resales of New Common Interests by holders deemed to be "underwriters" (which includes controlling persons of the issuer) are not exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law, even though such securities are not "restricted" securities. Notwithstanding the foregoing, under certain circumstances, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act which permits the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Whether any particular person would be deemed to be an "underwriter" (including whether the person is a control person of the issuer) with respect to the New Common Interests would depend upon various facts and circumstances applicable to that person. Parties who believe they may be statutory underwriters as

defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

To the extent certificated, certificates evidencing the New Common Interests held by holders of 10% or more of the outstanding New Common Interests, or who are otherwise underwriters as defined in Section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

**THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE FEDERAL AND STATE SECURITIES LAWS.**

Recipients of New Common Interests issued under the Plan are advised to consult with their own legal advisors as to the availability of any such an exemption from registration requirements under state law in any given instance and as to any applicable requirements or conditions to such availability.

Upon the Effective Date of the Plan, the New Common Interests will not be publicly traded or listed on any national securities exchange. Accordingly, no assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Interests through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Interests under applicable securities laws.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Interests is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. The Confirmation Order shall provide that DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Interests is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

## VII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. This summary does not address the U.S. federal income tax consequences to holders of Claims whose Claims are entitled to payment in full in Cash, or holders of Claims who are deemed to have accepted or rejected the Plan.

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "**Tax Code**"), existing and proposed U.S. Treasury Regulations thereunder (the "**Treasury Regulations**"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "**IRS**") all as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested a ruling from the IRS with respect to any of the tax aspects of the Plan. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any position discussed herein.

This summary does not address foreign, state, local, gift or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Claims in light of their individual circumstances or to a holder that may be subject to special tax rules (such as any person who is not a U.S. Holder (as defined below), as well as broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, retirement plans, individual retirement, and other tax-deferred accounts, S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes, persons holding securities as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of accounting for their security holding, dealers in securities or foreign currencies, U.S. Holders whose functional currency is not the U.S. dollar, and persons who use the accrual method of accounting and report income on an "applicable financial statement"). Additionally, this discussion does not address the Foreign Account Tax Compliance Act, U.S. federal taxes other than income taxes, the alternative minimum tax, or the "Medicare" tax on net investment income, nor does it apply to any person that acquires the New Common Interests or the New Term Loans in the secondary market or otherwise not pursuant to the Plan.

The discussion assumes that all FLFO Claims, FLSO Claims, Non-PTL Term Loan Claims, and Other General Unsecured Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated), and that such Claims will be respected as debt for U.S. federal income tax purposes in accordance with their form.

The Debtors currently contemplate, and the following discussion assumes, that (i) Reorganized Parent will be the existing SSB limited liability company entity (and not a reincorporated entity or a new entity) and will be the common parent of the post-emergence consolidated tax group, and (ii) each of the Reorganized Debtors that are currently treated as entities disregarded as separate from SSB for U.S. federal income tax purposes will continue to be disregarded as separate from SSB following the Effective Date (the "**Current Structure**"). However, under the Plan, the definition of "Reorganized Parent" allows for alternative structures, including the possibility that Reorganized Parent could be a different entity that acquires the assets or equity of the existing SSB. Any deviations from the Current Structure could materially change the U.S. federal income tax consequences of the Plan to the Debtors and holders of Claims described herein.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon a holder's individual circumstances. Holders of Claims are urged to consult their own tax advisor with respect to the U.S. federal, state, local, and other tax consequences applicable under the Plan.*

### A. Consequences to the Debtors

Each of the Debtors is either a member of an affiliated group of corporations that files consolidated U.S. federal income tax returns with Dawn Holdings as the common parent (such group, the "**Dawn Group**") or an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Dawn Group. The Debtors estimate that, as of January 1, 2023, the Dawn Group has consolidated U.S. federal

NOL carryforwards of approximately $75.0 million, among other tax attributes (including tax basis in assets), and disallowed business interest expense carryovers under Section 163(j) of the Tax Code ("**Section 163(j) Carryforwards**") of approximately $290.0 million. However, the amount of any NOL carryforwards, Section 163(j) Carryforwards and other U.S. federal tax attributes, as well as the application of any limitations on the use thereof, remain subject to review and adjustment by the IRS. Further, as discussed below, in connection with and as a result of the implementation of the Plan, it is anticipated that the Debtors' remaining NOLs and certain other tax attributes (other than Section 163(j) Carryforwards) will be significantly reduced or eliminated.

1. **The Restructuring Transactions**

Pursuant to the Plan, the Debtors will engage in certain restructuring transactions set forth in the Restructuring Transactions Exhibit. As a result of such transactions, which are expected to include (and herein assumed to include, unless otherwise indicated) (1) the issuance of New Common Interests and (2) a distribution of cash and/or other property by SSB in complete redemption of its equity interests held by Dawn Intermediate (the "**Redemption**"), SSB and the members of the Dawn Group owned directly or indirectly by SSB will cease to be members of the Dawn Group (and the taxable years of such entities will end) effective at the end of the day on the Effective Date, and will become members of a new SSB consolidated tax group.

As a result of the Redemption, Dawn Holdings is expected to recognize taxable loss equal to the difference between the amount of consideration received in the Redemption and Dawn Holdings' adjusted basis in the equity interests of SSB. Such loss is expected to be a capital loss that, to the extent not used in the current taxable year, is generally eligible to be carried back to the three taxable years of the Dawn Group preceding the taxable year in which the loss is recognized and carried forward to each of the five taxable years of the Dawn Group succeeding the taxable year in which the loss is recognized. The amount of such capital loss will first be carried to the earliest of the taxable years to which it may be carried, and any remaining portion will be carried successively to subsequent taxable years to which such loss may be carried. It is expected that the Dawn Group will carry back such capital loss to offset capital gain that the Dawn Group recognized in its 2021 taxable year, which is expected to result in a substantial refund of U.S. federal income tax previously paid with respect to such gain.

It is possible that the Restructuring Transactions Exhibit will not include the Redemption, and instead may contemplate alternative restructuring transactions. For example, the Restructuring Transactions Exhibit may include an actual or deemed sale of the assets of SSB and its subsidiaries to an unrelated corporation (to be indirectly owned by certain holders of Claims). If the Restructuring Transaction Exhibit includes such an actual or deemed asset sale or one or another alternative transactions, the U.S. federal income tax consequences to the Debtors and holders of Claims would be materially different from those discussed herein.

2. **Cancellation of Debt Income**

In general, absent an applicable exception, a taxpayer will realize and recognize any cancellation of debt ("**COD**") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD income is generally the excess of (a) the "adjusted issue price" (within the meaning of the Treasury Regulations) of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness issued by the taxpayer, and (iii) the fair market value of any other non-cash consideration (including, for this purpose, New Common Interests), in each case, given in satisfaction of such indebtedness at the time of the exchange. Unless an exception or exclusion applies, COD income constitutes taxable income like any other item of taxable income.

31

Under section 108 of the Tax Code, however, a taxpayer is not required to include any amount of COD income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets (but, in the case of tax basis in assets, not below the amount of liabilities to which the taxpayer remains subject immediately after the discharge)—by the amount of any COD income incurred pursuant to a confirmed chapter 11 plan. If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOLs or other tax attributes. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group must also be reduced. Any reduction in tax attributes in respect of COD income does not occur until after the determination of the Debtors' income or loss for the taxable year in which the COD income is incurred. The taxable year of the Debtors is expected to end on the Effective Date. In the absence of contrary guidance, it appears that Section 163(j) Carryforwards are not subject to reduction under these rules. Any excess COD income over the amount of available tax attributes described above will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

As a result of the implementation of the Plan as provided in the Restructuring Transactions Exhibit, the Debtors expect to incur a substantial amount of COD income for U.S. federal income tax purposes, with an attendant reduction in tax attributes (but, in the case of tax basis, only to the extent such tax basis exceeds the amount of the respective Debtor's liabilities, as determined for these purposes, immediately after the Effective Date). The ultimate amount of COD income and resulting attribute reduction is primarily dependent on the fair market value of the New Common Interests and the issue price of the New Term Loans; it is currently expected that attribute reduction will completely eliminate the Debtors' NOL carryforwards, and will reduce but not eliminate the tax basis in the Debtors' assets.

### 3. Limitation on Use of Tax Attributes

Following the Effective Date, any NOL carryforwards and certain other tax attributes (including any Section 163(j) Carryforwards) allocable to periods on or prior to the Effective Date ("**Pre-Change Losses**") may be subject to certain limitations. Any such limitations apply in addition to, and not in lieu of, the reduction of tax attributes that results from COD income arising in connection with the Plan. As described above, although it is expected that attribute reduction will completely eliminate Debtors' NOL carryforwards, the Section 163(j) Carryforwards are not anticipated to be subject to attribute reduction and (in addition to any other Pre-Change Losses that attribute reduction does not eliminate) are expected to be subject to limitation under section 382 of the Tax Code as further described below.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors anticipate that the Redemption and the issuance of the New Common Interests pursuant to the Plan will result in an ownership change of SSB and its subsidiaries.

The amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is generally equal to the product of (A) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (B) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (2.92% for ownership changes occurring in March 2023). For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined

32