DEFENDANTS' EXHIBIT 333
Part 7 of 27

8. **Ownership and Disposition of the New Term Loans**

In general, payments of stated interest on the New Term Loans should be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received, in accordance with the holder's regular method of tax accounting.

In addition, depending on the issue price, some or all New Term Loans may be treated as issued with OID. A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" (as defined above, *see* B.2 — "U.S. Holders of FLFO Claims") by more than a statutorily defined de minimis amount. The "stated redemption price at maturity" of each series of New Term Loans would include all principal and interest payable over the term of such New Term Loans, other than qualified stated interest (i.e., other than stated interest that is unconditionally payable at least annually at a constant rate in cash or property other than debt of the issuer). The stated interest payable on the New Term Loans should be considered qualified stated interest for this purpose.

A U.S. Holder will be required to include any OID in income for U.S. federal income tax purposes as it accrues, regardless of its regular method of accounting, in accordance with a constant-yield method, before the receipt of cash payments attributable to this income. Under this method, a U.S. Holder generally will be required to include in income increasingly greater amounts of OID in successive accrual periods.

Upon the sale or other taxable disposition of a New Term Loan, a U.S. Holder will recognize taxable gain or loss equal to the difference between the amount realized on the sale or other taxable disposition and its adjusted tax basis in the New Term Loan. A U.S. Holder's adjusted tax basis in a New Term Loan generally will equal its initial tax basis in the New Term Loan, increased by any OID previously included in income with respect to the New Term Loan and decreased by payments on the New Term Loan other than payments of qualified stated interest. For these purposes, the amount realized does not include any amount attributable to accrued interest, which will be taxable as interest if not previously included in income. Gain or loss recognized on the sale or other taxable disposition of a New Term Loan will generally be capital gain or loss and will be long-term capital gain or loss if, at the time of sale or other taxable disposition, the New Term Loan is treated as held for more than one (1) year.

Each holder of a New Term Loan is urged to consult its tax advisor regarding the application of the OID rules to the New Term Loans.

9. **Ownership and Disposition of the New Common Interests**

   (a) **Distributions**

Any distributions made on account of the New Common Interests will constitute a dividend for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Parent as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its New Common Interests (determined on a share-by-share basis). Any such distributions in excess of the U.S. Holder's basis in its New Common Interests (determined on a share-by-share basis) generally will be treated as capital gain from the sale or exchange thereof, as described below under "Sale, Exchange, Redemption, Repurchase or Other Taxable Disposition." Under current law, dividends received by non-corporate U.S. Holders on the New Common Interests may be subject to U.S. federal income tax at lower rates than other types of ordinary income if certain conditions, including holding period requirements, are met. Dividends received by corporate U.S. Holders on the New Common Interests may be eligible for a dividends received deduction (the benefits of

which may be mitigated by the extraordinary dividend rules). As further described in VIII.D.4 — "No Intention to Pay Dividends," the Reorganized Parent does not anticipate paying any dividends on the New Common Interests.

(b) **Sale, Exchange, Redemption, Repurchase or Other Taxable Disposition**

Subject to the discussion below, U.S. Holders generally will recognize capital gain or loss upon the sale, exchange, redemption, repurchase or other taxable disposition of New Common Interests in an amount equal to the difference, if any, between (i) the U.S. Holder's adjusted tax basis in New Common Interests disposed of and (ii) the sum of the cash and the fair market value of any other consideration received from such disposition. Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period for its New Common Interests disposed of is more than one year at that time. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

Any gain recognized by a U.S. Holder upon a disposition of New Common Interests (or any stock or property received for such New Common Interests in a later tax-free exchange) received in exchange for an FLSO Claim or Non-PTL Term Loan Claim will be treated as ordinary income for U.S. federal income tax purposes to the extent of any ordinary loss incurred upon exchange of its FLSO Claim or Non-PTL Term Loan Claim for New Common Interests or any ordinary bad debt deduction previously claimed as a result of the write-down of the FLSO Claim or Non-PTL Term Loan Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the FLSO Claim or Non-PTL Term Loan Claim. With respect to a cash-basis U.S. Holder, proper adjustment to the amount treated as ordinary income pursuant to the previous sentence shall be made for any amounts which would have been included in its gross income if such U.S. Holder's FLSO Claim or Non-PTL Term Loan Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

In addition, in the case of an exchange of any Allowed Non-PTL Term Loan Claims for New Common Interests that qualifies as a "recapitalization," any accrued market discount in respect of such Claims that is not included in income should carry over to such New Common Interests, such that any gain recognized by a U.S. Holder upon a subsequent disposition of such New Common Interests would be treated as ordinary income to the extent of any accrued market discount not previously included in income.

**10. Tax Treatment of the Disputed Claims Reserve**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

Accordingly, the Disputed Claims Reserve will be subject to tax annually on a separate entity basis. All distributions from such assets (which distributions will be net of the expenses, including taxes, of the Disputed Claims Reserve) will be treated as received by holders in respect of their Allowed Other General Unsecured Claims as if distributed directly by the Debtors.

All parties (including, without limitation, the Debtors and the holders of Other General Unsecured Claims) will be required to report for tax purposes consistently with the foregoing.

11. **Information Reporting and Backup Withholding**

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement, or other disposition of the New Term Loans and New Common Interests, may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information, and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information also may be required to be provided to the IRS concerning payments, unless an exemption applies. U.S. Holders are urged to consult their own tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

**The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of an FLFO Claim, FLSO Claim, Non-PTL Term Loan Claim, or Other General Unsecured Claim. All holders of such Claims are urged to consult their own tax advisors concerning the U.S. federal, state, local, and other tax consequences applicable under the Plan.**

## VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Debtors' business, the Plan, or its implementation.

A. **Certain Bankruptcy Law Considerations**

1. **General**

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers, vendors, suppliers, and employees. The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

2. **Risk of Material Adverse Effect on Operations**

The commencement of these Chapter 11 Cases could adversely affect the relationship between the Debtors and their customers, employees, vendors, lenders, partners and others. There is a risk, due to uncertainty about the Company's future, that: (i) customers could seek alternative providers; (ii) customers' confidence in the Debtors' ability to provide products could erode and, as a result, there could be a significant and

precipitous decline in revenues, profitability, and cash flow; (iii) it may be more difficult to attract or replace employees; (iv) employees could be distracted from performance of their duties or more easily attracted to other career opportunities; (v) suppliers, vendors, and service providers could terminate their relationship with the Debtors or require financial assurances or enhanced performance; and (vi) additional involvement by regulatory, taxing, and other authorities may increase the administrative burden on the Debtors and their operations. These factors could adversely affect the Debtors' ability to obtain confirmation of the Plan.

### 3. Risk Related to Obtaining First Day Relief

The Debtors have tried to address potential concerns of key customers, vendors, employees, and other key parties in interest that might arise through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate court orders to ensure a seamless transition between the Debtors' prepetition and postpetition business operations. However, there can be no guaranty that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such relief, and as a result, the Debtors' business might suffer.

### 4. Ongoing Litigation and Other Contingencies Could Affect the Outcome of the Chapter 11 Cases

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. For example, the Debtors cannot predict with certainty the outcome or effect of the resolution of claims arising from pending litigation, including with respect to the 2021 LCM Litigation, the 2022 Non-PTL Term Loan Lenders Litigation and the 2020 Transaction Adversary Proceeding, and an adverse outcome against the Debtors with respect to such litigation (including the invalidation of the 2020 Transaction) could materially affect the ability for the Debtors to consummate the Plan and would result in protracted Chapter 11 Cases. Further, in such an event, the Consenting Parties may terminate the Restructuring Support Agreement. The occurrence of such contingencies could affect distributions to holders of Claims and Interests under the Plan, resulting in protracted Chapter 11 Cases, and could significantly and detrimentally impact the Debtors' relationships with, among others, vendors, suppliers, employees, and major customers.

### 5. Severability of the Plan

The Debtors cannot guarantee that the Bankruptcy Court will approve every provision of the Plan, and certain provisions may be modified or removed, while the rest of the Plan will be confirmed.

### 6. Non-Consensual Confirmation

In the event that an impaired class of claims does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one (1) impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements; however, there can be no assurances that the Bankruptcy Court will reach the same conclusion.

7. **Risk Related to Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

The Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

8. **Risks Related to Possible Objections to the Plan**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

9. **Releases, Injunctions, and Exculpation Provisions May Not Be Approved**

Article X of the Plan provides for certain releases, injunctions, and exculpations, for claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

10. **Risk of Non-Confirmation of the Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if the voting class votes in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization. Furthermore, if the Plan is not confirmed, the Restructuring Support Agreement could be terminated, and if the Restructuring Support Agreement were to be terminated, the Debtors' efforts to reorganize would be delayed and possibly jeopardized. Additionally, should the Plan fail to be approved, confirmed, or consummated, non-debtor parties-in-interest may file alternative plans of reorganization pursuant to section 1121 of the Bankruptcy Code.

11. **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the

Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 12. Risk of Termination of the Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the Consenting Parties the ability to terminate the Restructuring Support Agreement if various conditions are satisfied. Termination of the Restructuring Support Agreement would result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with, among others, vendors, suppliers, employees, and major customers.

### 13. Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Section X.C hereof, as well as the Liquidation Analysis attached hereto as **Exhibit E**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

## B. Additional Factors Affecting the Value of the Reorganized Debtors

### 1. Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the Financial Projections attached hereto as **Exhibit H** and feasibility analysis herein, and the variation may be material.

### 2. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### 3. Debtors' Business and Industry

The risks associated with the Debtors' businesses and industry include, but are not limited to, the following:

In deteriorating economic conditions including an economic recession or other adverse economic conditions, as well as prolonged market volatility, customers and vendors may be more likely to fail to meet contractual terms or their payment obligations;

The ongoing impact of the COVID-19 pandemic, or a similar pandemic, or even a perceived threat of such an outbreak, could cause significant disruptions to the Reorganized Debtors' supply chain, manufacturing capability, corporate support infrastructure, or distribution system that could adversely impact the ability to produce and deliver products, as well as negatively impact consumer confidence and consumer demand generally;

Some of the Reorganized Debtors' principal competitors may be less highly-leveraged, have greater access to financial or other resources, have lower cost operations, and/or be better able to withstand changing market conditions;

The Company's products are and will continue to be subject to regulation in the United States and Canada by various federal, state, provincial, and local regulatory authority, and other governments and agencies in other jurisdictions regulate the sale and distribution of such products, which may negatively impact the Reorganized Debtors' businesses;

The Reorganized Debtors' marketing and advertising practices could become the subject of proceedings before regulatory authorities or the subject of claims by other parties which could require the Company to alter or end such practices or adopt new practices that are not as effective or are more expensive;

Operations are subject to federal, state, provincial, and local laws and regulations relating to pollution, environmental protection, occupational health and safety and labor and employee relations, and the Reorganized Debtors may be held liable for the costs of ensuring compliance and/or remediation efforts;

The Debtors' businesses are subject to a number of risks inherent in new product introductions, including development delays, failure of new products to achieve anticipated levels of market acceptance, and costs associated with failed product introductions, and any failure of new product introductions may reduce the Reorganized Debtors' ability to sell their products at appropriate price levels;

The Debtors have historically experienced and expect to continue to experience seasonal and quarterly fluctuations in net sales and operating income, and therefore a sequential quarter to quarter comparison may not be a good indication of how the Reorganized Debtors' businesses will perform in the future;

The Debtors have relied on a small number of suppliers for a large percentage of their raw materials, and any disruptions in their relations with their suppliers could negatively impact the manufacturing process of the Reorganized Debtors' businesses;

The Debtors depend on relatively few large retailers for a significant proportion of their sales, and any disruptions in their relations with these retailers could negatively impact the marketing, sales, competitive viability, cost structure, financial condition, and other aspects of the Reorganized Debtors' businesses;

The price and availability of the raw materials used in the Debtors' products, as well as the cost of fuel to transport the products to market, are subject to market conditions affecting supply and demand, and such fluctuation may impair the financial condition of the Reorganized Debtors' business to the extent that they are unable to pass those higher costs on to their customers; and

To compete effectively with other companies, the Reorganized Debtors must maintain the proprietary nature of the Debtors' owned and licensed intellectual property, which may be subject to the following risks: (i) it may be possible for others to circumvent their trademarks, service marks, patents and other rights; (ii) their products and promotional materials, including trademarks, service marks, may now or in the future violate the proprietary rights of others; (iii) the Reorganized Debtors may be prevented from using their own trademarks, service marks, product designs, or manufacturing technology, if challenged;