DEFENDANTS' EXHIBIT 333
Part 11 of 27

holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out; and (m) any other Released Party, even if such Released Party purports to opt out of the releases set forth herein.

1.126 "**Reorganized Debtors**" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Parent.

1.127 "**Reorganized Parent**" means, from and after the Effective Date, the Entity or Entities serving as the parent or parents of the Reorganized Debtors, identified in and consistent with the Restructuring Transactions Exhibit and as reorganized pursuant to the Plan.

1.128 "**Requisite Consenting Creditors**" means, as of the date of determination, Consenting Creditors holding at least a majority in aggregate principal amount outstanding under the PTL Credit Agreement held by all of the Consenting Creditors.

1.129 "**Restructuring Fees and Expenses**" means (i) the Consenting Equity Holder Fees and Expenses; and (ii) all reasonable and documented fees, costs and expenses of each of the PTL Group Advisors and the PTL Agent, in each case, (i) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the Restructuring Support Agreement, this Plan, and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and, to the extent applicable, (ii)(A) consistent with any engagement letters or fee reimbursement letters entered into between the Company, on the one hand, and the applicable PTL Group Advisors, on the other hand (as supplemented and/or modified by this Agreement), or (B) as provided in the DIP Order and/or the Confirmation Order.

1.130 "**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of January 23, 2023, by and among the Debtors, the Consenting Creditors, and the Consenting Equity Holders, including any exhibits attached thereto (as may be amended, supplemented or modified from time to time in accordance with the terms thereof).

1.131 "**Restructuring Transactions**" means one or more transactions premised on a debt-for-equity exchange to occur on the Plan Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, in each case, subject to the applicable Consenting Creditor Consent Rights, including: (i) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree, including the documents comprising the Plan Supplement; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) such other transactions that are required to effectuate the Restructuring Transactions Exhibit in the most tax efficient manner for the Debtors and Reorganized Debtors, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (v) the execution, delivery, and filing, if applicable, of the Definitive Documents; (vi) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being

required under applicable law, regulation, order or rule; (vii) pursuing, litigating, adjudicating, diligently prosecuting, resolving, and taking all other necessary actions with respect to the Adversary Proceeding, the Apollo Action, and the LCM Action consistent with the Plan and this Agreement; and (viii) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

1.132 "*Restructuring Transactions Exhibit*" means a memorandum setting forth the transactions that are required to effectuate the Restructuring Transactions contemplated by the Plan and included in the Plan Supplement, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights, and solely with respect to the Redemption Transaction, acceptable to the Consenting Equity Holders.

1.133 "*Serta Simmons Bedding Equity Interests*" means any outstanding Interests in Serta Simmons Bedding that existed immediately prior to the Effective Date.

1.134 "*Schedule of Assumed Contracts*" means the schedule of executory contracts and unexpired leases to be assumed by the Debtors pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

1.135 "*Schedule of Rejected Contracts*" means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

1.136 "*Schedule of Retained Causes of Action*" means a schedule of Causes of Action to be retained by the Reorganized Debtors a set forth in the Plan Supplement, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

1.137 "*Schedules*" means any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy code.

1.138 "*Secured Claim*" means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code exceeds the value of the Claim, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. For the avoidance of doubt, the Non-PTL Claims are not Secured Claims.

1.139 "*Security*" means any Security, as such term is defined in section 101(49) of the Bankruptcy Code.

1.140 "*Solicitation Materials*" means materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement, the Disclosure Statement Approval Order, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan, consistent with the Restructuring Support Agreement and, in each case, subject to the Consenting Creditor Consent Rights.

1.141 "*Steelworkers Pension Trust*" means the pension trust, in which eligible employees in the Debtors' Monroe, Ohio, and Moreno Valley, California plants participate.

*1.142* "**Subsequent Condition**" shall have the meaning ascribed to such term in Section 9.2 of the Plan.

*1.143* "**Tax Code**" means the Internal Revenue Code of 1986, as amended from time to time.

*1.144* "**Teamsters National 401(k) Savings Plan**" means the savings plan in which eligible employees in Hawaii participate.

*1.145* "**Trading Order**" means the order entered by the Bankruptcy Court, related to, among other things, certain transfers and rights to purchase or sell Interests in the Debtors.

*1.146* "**U.S. Trustee**" means the United States Trustee for Region 7.

*1.147* "**Unimpaired**" means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

*1.148* "**Unsecured Claim**" means all Claims that are not a Secured Claim, Other Secured Claims, Priority Tax Claim, Priority Non-Tax Claim, Professional Fee Claim, DIP Claim, or an Administrative Expense Claim. For the avoidance of doubt, deficiency claims in respect of the FLSO Claims are not Unsecured Claims.

*1.149* "**Vendor Order**" means, as applicable, the *Final Order (I) Authorizing Debtors to Pay (A) Critical Vendor Claims, (B) Lien Claims, (C) 503(b)(9) Claims, and (D) Certain Royalties; and (II) Granting Related Relief* (Docket No. 369) or the *Interim Order (I) Authorizing Debtors to Pay (A) Critical Vendor Claims, (B) Lien Claims, (C) 503(b)(9) Claims, and (D) Certain Royalties; and (II) Granting Related Relief* (Docket No. 106).

*1.150* "**Voting Deadline**" means the date and time as may be set by the Bankruptcy Court pursuant to the Solicitation Materials.

*1.151* "**Western Conference of Teamsters Pension Trust**" means the pension trust in which eligible employees in the Debtors' Moreno Valley, California truck drivers participate.

B. **Interpretation; Application of Definitions and Rules of Construction**.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.  **Computation of Time**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.  **Reference to Monetary Figures**.

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

E.  **Controlling Document**.

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document). In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control. The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, that*, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan.

F.  **Consultation, Information, Notice, and Consent Rights**.

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (without enhancement or expansion thereof), including any Consenting Creditor Consent Rights, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, the Disclosure Statement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein. In case of a conflict between the consent rights of the Consenting Creditors or other applicable parties that are set forth in the Restructuring Support Agreement with those parties' consent rights that are set forth in the Plan or the Plan Supplement, unless otherwise set forth in this Plan, the consent rights in the Restructuring Support Agreement shall control. Any and all consent rights of the Requisite Consenting Creditors referenced in the Plan or the Restructuring Support Agreement, to the extent given, not given, or otherwise withheld, may be communicated by email transmission by counsel.

**ARTICLE II.   ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.**

2.1.  *Administrative Expense Claims*.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to different treatment, each holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided*,

*however*, Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders, course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

2.2. *Professional Fee Claims*.

(a) All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall (i) file, on or before the date that is forty-five (45) days after the Effective Date (unless extended by the Reorganized Debtors), their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claims.

(b) The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

2.3. *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtor or the Reorganized Debtors, as applicable, in consultation with the Requisite Consenting Creditors, Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course; *provided that*, the Debtors and the Reorganized Debtors, as applicable, reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium.

2.4. *DIP Claims*.

Subject to the DIP Order, on the Effective Date, each DIP Claim will be indefeasibly paid in full in Cash upon the Effective Date, and all letters of credit issued under the DIP Credit Agreement shall be cash collateralized in accordance with the terms of the DIP Credit Agreement, unless otherwise agreed to by the Debtors, DIP Agent, and DIP Lenders, subject in all respects to the terms of the Commitment Letter.

2.5. *Restructuring Fees and Expenses*.

The Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date activities, after the Effective Date, including, without limitation, in connection with or related to the Adversary Proceeding, the Apollo Proceeding, the LCM Proceeding, and/or any other claims, proceedings, actions, or causes of action in connection with or related to the PTL Credit Agreement, the Exchange Agreement, the Intercreditor Agreements, and/or the 2020 Transaction), shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid or satisfied during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement,

without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval. All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided, however,* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Fees and Expenses. On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Fees and Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

2.6. *Professional Fee Escrow*.

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Claims, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the New Reorganized Debt, or otherwise). The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (ii) shall be held in trust for the Professionals; *provided that* funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors. Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; *provided that* the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow from the Debtors' Estates without any further action or order of the Bankruptcy Court.

**ARTICLE III.   CLASSIFICATION OF CLAIMS AND INTERESTS.**

3.1. *Classification in General*.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided,* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2. *Formation of Debtor Groups for Convenience Only*.

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

3.3.  *Summary of Classification*.

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified. The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Priority Non-Tax Claims | Unimpaired | No (Presumed to Accept) |
| 3 | FLFO Claims | Impaired | Yes |
| 4 | FLSO Claims | Impaired | Yes |
| 5 | Non-PTL Claims | Impaired | Yes |
| 6A | Ongoing General Unsecured Claims | Impaired | Yes |
| 6B | Other General Unsecured Claims | Impaired | Yes |
| 7 | Intercompany Claims | Unimpaired/Impaired | No (Presumed to Accept/Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired/Impaired | No (Presumed to Accept/Deemed to Reject) |
| 9 | Other Intercompany Interests | Impaired | No (Deemed to Reject) |
| 10 | Intermediate Equity Interests | Impaired | No (Deemed to Reject) |

3.4.  *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.5.  *Elimination of Vacant Classes*.

Any Class of Claims against or Interests in a Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject such Debtor's Plan, and disregarded for purposes of determining whether such Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.6.  *No Waiver*.

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

**ARTICLE IV.**       **TREATMENT OF CLAIMS AND INTERESTS.**

    4.1.     ***Other Secured Claims (Class 1)***.

        (a)     *Classification*: Class 1 consists of the Other Secured Claims. To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 1 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

        (b)     *Treatment*: The legal, equitable, and contractual rights of the holders of Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, in consultation with the Requisite Consenting Creditors, (i) each such holder shall receive payment in Cash in an *amount* equal to such Claim, (ii) such holder's Allowed Other Secured Claim shall be Reinstated, or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

        (c)     *Impairment and Voting*: Class 1 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

    4.2.     ***Priority Non-Tax Claims (Class 2)***.

        (a)     *Classification*: Class 2 consists of Priority Non-Tax Claims.

        (b)     *Treatment*: The legal, equitable, and contractual rights of the holders of Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the option of the Debtors or the Reorganized Debtors, in consultation with the Requisite Consenting Creditors, (i) each such holder shall receive payment in Cash in an amount equal to such Claim, (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated, or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

        (c)     *Impairment and Voting*: Class 2 is Unimpaired, and the holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-*Tax* Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

    4.3.     FLFO Claim*s (Class 3)*.

        (a)     *Classification*: Class 3 consists of FLFO Claims.

        (b)     *Allowance*: The FLFO Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code in the aggregate amount of no less than $197,658,283.32. Holders of FLFO Claims and the PTL Agent shall not be required to file proofs of Claim on account of their FLFO Claims.