# DEFENDANTS' EXHIBIT 443

# Alerts & Publications

## Priming Transactions Update: Boardriders

10月 25, 2022

A new decision out of the New York state court has added to the recent trend of courts refusing to dismiss legal challenges to priming transactions.

Priming transactions are a means by which distressed borrowers take on contractual or structurally senior debt, which has the effect of "priming" the company's existing debt, in order to bring in additional liquidity and providing the breathing room to bring the business back on track. They are often done with the participation of some—but not all—holders of the company's existing debt in an amount sufficient to authorize any amendments to the existing credit documents necessary to permit the priming transaction. In these transactions, the participating holders usually provide the new senior money and, in some cases, exchange their existing debt for new senior debt.

Boardriders, Inc. engaged in such a transaction in 2021, and the non-participating holders of its existing debt, who were left subordinated to $476 million of new super-priority debt, sued to challenge the transaction in the New York state court. This a

Privacy - Terms

highlights some of the arguments the New York court found persuasive in allowing the non-participating lenders' suit to survive a motion to dismiss.

## Priming Recap

Our prior alerts contain a variety of examples of priming transactions, including direct priming transactions or drop-down, structurally senior financings (as detailed in our prior client alerts (COVID 19: Prime Time for Priming, Predatory Priming: How Can Investors Protect Their Priority?, Priming Transactions Update: Don't Sleep on Serta, and Priming Transactions Update: TPC Group Inc.).

Murray Energy Holdings ("Murray"), Serta Simmons Bedding, LLC ("Serta"), TriMark USA ("TriMark") and TPC Group, Inc. ("TPC") have all notably engaged in a similar up-tiering transaction as the one implemented by Boardriders. In this variety of priming transaction, the parties typically use a combination of existing debt and lien baskets and covenant exceptions, together with the right of majority lenders to amend certain covenants, to prime existing debt. TriMark and Boardriders took the additional step of concurrently removing many covenants, defaults, and other lender protections from the existing credit agreement.

In ensuing litigation, an argument often advanced by the non-participating lenders is that the priming transaction breached the terms of the existing credit agreement because the provisions that were amended to facilitate the transaction were among their "sacred rights"—provisions that could not be amended without the consent of every lender affected by the change. These sacred rights often include the pro rata sharing provisions of the credit agreement and the release of substantially all collateral. These lenders usually argue that, while these provisions may not have technically been amended, the up-tiering transaction had the effect of altering the pro rata sharing between participating and non-participating lenders or had the same effect as releasing all collateral given the new subordinate position in the capital structure.

The bankruptcy courts in which the Murray and TPC cases were pending largely sided with the majority lenders in these disputes. On the other hand, a group of minority lenders in Serta got past a motion to dismiss in New York federal court, where the matter is still pending, and the New York state court similarly ruled that the TriMark allegations could withstand a motion to dismiss, after which the parties settled.

The Boardriders transaction can now be tallied with Serta and TriMark.

## Boardriders

Boardriders designs and distributes branded apparel, footwear, accessories, and related products under six primary brands, including Quiksilver, Billabong, ROXY, DC Shoes, RVCA, and Element. In February 2016, Quiksilver emerged from bankruptcy and in April 2018, Quiksilver merged with Billabong to form Boardriders. In connection with its emergence from bankruptcy, the company borrowed $450 million in term loans under a syndicated senior-secured credit agreement.

The COVID-19 pandemic resulted in an approximately 40% year-over-year revenue decline in the second quarter of 2020. Together with merger integration expenses, among other things, Boardriders faced a significant near-term liquidity need. In August 2021, Boardriders engaged in an up-tiering transaction with the support of the holders of approximately $321 million of the existing term loans. The participating lenders provided $155 million of new-money commitments, which were given priority status over the existing term loans. At the same time, the participating lenders exchanged their $321 million of existing term loans for $321mm of new priority debt.

To facilitate the transaction, participating lenders consented to amendments to the 2018 term loan agreement that increased the company's priority debt and lien capacity and eliminated substantially all affirmative and negative covenants in the 2018 credit agreement. The amendments also authorized the administrative agent to enter into a new intercreditor agreement governing the relative rights between the existing term loan and the new priority debt and amended the "no-action clause" of the agreement. Finally, to effectuate the par exchange of existing term loans for new priority term loans, the company entered into "Open Market Purchase Agreements" with the participating lenders in reliance upon an exception to the pro rata sharing provisions of the loan agreement that permitted acquisition of the debt on a non-pro rata basis pursuant to open market purchases.

As a result of these transactions, the non-participating lenders were left with approximately $85 million under a subordinate credit facility behind up to $476 million of super-priority debt. These lenders brought suit against Boardriders and the participating lenders in New York state court challenging the up-tiering transaction, asserting causes

of action for breach of contract, breach of the implied duty of good faith and fair dealing, and declaratory judgment that the no-action provisions of the credit agreement were unenforceable. The plaintiff also asserted a claim of tortious interference against one of the participating lenders who was also the majority equity holder of the company.

In ruling on the defendant participating lenders' motion to dismiss, the court allowed the claims for breach of contract, breach of the implied duty of good faith and fair dealing, and declaratory judgment to proceed, dismissing only the tortious interference claim against the participating lenders.

As an initial matter, similar to the courts in TriMark and TPC, the court rejected the participating lenders' arguments that the plaintiffs had no standing to bring these claims based on the no-action clause of the credit agreement. The no-action clause at issue here permitted lenders to take action to enforce their rights only if they constituted "Required Lenders" and directed the administrative agent to take such action on their behalf. The court observed that the no-action clause was one of the provisions amended as part of the up-tiering transaction and, prior to the amendment, it did not bar lenders from bringing these sorts of claims; because the enforceability of the amendment itself was being challenged, the amended no-action clause could not be the basis to deny standing, and the plaintiffs had sufficiently alleged that that the provision was amended in bad faith.

The breach-of-contract claim came down to whether the sacred rights provisions of the existing credit agreement were violated. Specifically, the plaintiffs asserted that the debt exchange and the imposition of a new intercreditor subordinating the existing debt to the new debt impermissibly violated the pro rata sharing provisions of the credit agreement. While the credit agreement contained an exception to the pro rata sharing provision for "open market provisions," the plaintiffs argued that the exchange was clearly not consistent with a plain-meaning interpretation of open market because it wasn't offered to all lenders for market value (which, at the time, was significantly under the par purchase price at which the participating lenders' debt was exchanged) and must result in a retirement of the debt and not an exchange.

In response, the company argued that none of the pro rata sharing provision was expressly altered as part of the transaction nor were they violated—no distributions were made in respect of the term loans under the existing credit agreement on a non-pro rata basis other than in reliance upon the express open- market exception.

The court acknowledged that nothing in the sacred rights provision of the credit agreement expressly prohibited the subordination that was effectuated by the up-tiering transaction, but the court had an "obligation to consider the context of the entire contract and not in isolation of particular words—or in this case, the absence of particular words." Because accepting the company's position "would essentially vitiate" the ratable sharing provisions, the court concluded that the plaintiffs had adequately alleged a breach of contract.

In evaluating the contrasting positions regarding the open market exception, the court observed that the open market exception in the documents lacked elaboration and did not expressly contain any of the requirements advanced by the plaintiffs. This was in contrast to another section of the document pertaining to Dutch auction purchase offers that expressly required, among other things, that the offer be open to all lenders on a pro rata basis. The fact that the open market exception on which the up-tiering transaction relied did not contain any such requirement supported Boardriders' approach. On the other hand, the court found, the plaintiffs' plain-meaning argument was reasonable, leaving the contract susceptible to multiple interpretations, which was sufficient to survive a motion to dismiss. This outcome is consistent with the outcome in Serta where, even though the open market exchange there followed a competitive offer process, the court couldn't conclude based on the contract whether or not an open market exchange had to be opened up to all existing lenders.

The plaintiffs raised the further novel argument that the transactions violated the sacred right against reducing the principal amount of any term loan without the consent of each lender affected thereby. In the most straightforward application, that sacred right would prohibit a borrower from reducing the amount it owes a particular lender without that particular lender's consent. But in this case, the plaintiffs argued that it was the reduction of the participating lenders' existing term loans (which occurred when the existing term loans were exchanged into new senior term loans, thereby reducing the existing term loans to $0) that had an effect on the non-participating lenders—that effect being the

subordination resulting from the exchange. The court accepted the plaintiffs' arguments, pointing out that the sacred right doesn't say whose term loans may not be reduced or forgiven or whether that needs to be the same party as the affected lender, and, therefore, two reasonable interpretations of the agreement existed, creating a sufficient basis for the claims to proceed.

On the good faith and fair dealing claim, the court spotlighted the fact that the negotiations between Boardriders and the participating lenders were "carried out in secret" with the non-participating lenders receiving notice only after-the-fact. In contrast, the court credited the non-participating lenders' assertions that the company and the participating lenders rebuffed their multiple attempts to negotiate a consensual transaction. The plaintiffs also argued that the majority lenders abused their authority to effectuate the up-tiering and went so far as to hinder the plaintiffs' ability to bring suit. The court concluded that these allegations were sufficient to show that the "defendants worked in concert and in secret to deprive plaintiffs of their bargain, i.e., pro rata distribution of loan repayments in bad faith."

Lastly, the court dismissed the tortious interference claim brought against one of the participating lenders who also happened to be the majority shareholder of Boardriders. The court concluded that, as a matter of law, this lender was entitled to the benefit of the "economic interest defense." This defense bars a tortious interference claim where the alleged tortfeasor was acting to protect its own legal or financial stake, because it defeats an allegation that the tortfeasor acted with malice, fraud or illegality, a required element of a tortious interference claim under New York law.

## Takeaways

In contrast to the recent result in the TPC case, where the dismissal of claims appeared to turn on the express language of the credit agreement at issue, the Boardriders court appears to have placed emphasis on overall "context" or spirit of the deal, if you will. Because the outcome of this motion to dismiss is not a final resolution of the claims (and TriMark and others before this one have tended to result in settlement rather than a final testing of the allegations), it is yet to be seen whether the spirit of a credit agreement will prevail over the words of the document. If so, parties to credit agreements may need to revisit the efforts needed in the language of the document to reach a different outcome—assuming, of course, that is the parties' business intent.

*This memorandum is a summary for general information and discussion only and may be considered an advertisement for certain purposes. It is not a full analysis of the matters presented, may not be relied upon as legal advice, and does not purport to represent the views of our clients or the Firm. Daniel S. Shamah, an O'Melveny partner licensed to practice law in New York and Jennifer Taylor, an O'Melveny partner licensed to practice law in California, contributed to the content of this newsletter. The views expressed in this newsletter are the views of the authors except as otherwise noted.*

*© 2022 O'Melveny & Myers LLP. All Rights Reserved. Portions of this communication may contain attorney advertising. Prior results do not guarantee a similar outcome. Please direct all inquiries regarding New York's Rules of Professional Conduct to O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY, 10036, T: +1 212 326 2000.*

## Key Contacts



**Daniel S. Shamah**

New York

D: +1-212-326-2138



# Jennifer Taylor

San Francisco

D: +1-415-984-8922

---

## Related Practices

Bankruptcy & Restructuring

Corporate & Transactional

Bank Finance

---

  

**Quick links +**

**Subscribe**

Disclaimer                    Privacy Policy                    Contact Us                    Employee Portal

Attorney Advertising © 2023 O'Melveny & Myers LLP. All Rights Reserved.