# DEFENDANTS' EXHIBIT 444



# *Boardriders*: In Important Uptiering Case, Minority Lender Claims Survive Another Day

**Oct 24, 2022**

On October 17, 2022, a significant decision on liability management and uptiering transactions was issued in a decision and order (the "Opinion")[1] coming out of the *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, No. 655175/2020 (N.Y. Sup. Ct. filed Oct. 9, 2020) ("Boardriders") litigation. Pursuant to the Opinion the court (the "Court") ruled on the defendant's various motions to dismiss.

Commonly stylized as a "Serta" transaction (so called after its well-known iteration), uptiering transactions are a form of liability management[2] designed to grant payment and/or lien priority to certain lenders ahead of other lenders in an existing facility, and in exchange those participating lenders receive favorable treatment in terms of rates, priority, additional liens, favorable covenants, or other improvements in position. Given the contentious nature of such transactions, several recent court decisions have addressed challenges to uptiering; the Court's recent ruling in *Boardriders* provides further context for understanding the associated legal risks. Liability management transactions are both controversial and increasingly common but, when conducted within the bounds of the credit documents agreed to by sophisticated lenders, are potentially permitted transactions.

This client alert provides background on the *Boardriders* litigation and a brief summary of the holdings set forth in the Opinion, in particular with respect to the claims of (1) lack of standing, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) tortious interference with contract.

## BACKGROUND

In April 2018, Oaktree Capital ("Oaktree") completed a leveraged buyout of surf and streetwear company Billabong International Limited (the "Company"), financed with a $450 million syndicated credit facility (the "2018 Credit Agreement"). Fast-forward to the summer of 2020—when debt under the Original Credit Agreement was trading at approximately 50¢ on the dollar—a group of lenders affiliated with Oaktree (the "Oaktree Lenders") initiated targeted discussions with a "hand-selected" subset of existing lenders (together with the Oaktree Lenders, the "Participating Lenders") regarding a potential liquidity financing. Despite repeated attempts to access information regarding the Company's finances or engage

in discussions regarding liquidity options, the excluded lenders (collectively, the "Excluded Lenders") were unaware of these discussions until the Participating Lenders closed their proposed liquidity financing in August 2020.

The Participating Lenders collectively constituted "required lenders" under the Credit Agreement, thereby enabling such lenders to amend the 2018 Credit Agreement (the "Amendment") in any manner they agreed to with the Company so long as they did not amend or otherwise modify any of the expressly enumerated "sacred rights," which require the consent of all (or all affected) lenders. The Participating Lenders used that power (allegedly in violation of the 2018 Credit Agreement and in breach of the implied covenant of good faith and fair dealing, in the view of the Excluded Lenders) to amend the 2018 Credit Agreement to, among other things, permit the incurrence of a new, super priority debt tranche, remove various covenants inconsistent with the new debt incurrence, strip out various affirmative and negative covenants, and amend the "no-action" clause that sought to restrict the ability of the Excluded Lenders to challenge any aspect of the uptiering transactions germane to the litigation by requiring written consent of the administrative agent and posting of a bond.[3]

Shortly thereafter, the Company and the Participating Lenders entered into a new Super Priority Term Loan Credit Agreement ("Super Priority Credit Agreement"), which provided $411 million of new debt split among three tranches held by the Participating Lenders, each of which primed the existing (previously senior) loans, which, after giving effect to the Amendment and the transactions related thereto, were held exclusively by the Excluded Lenders. In connection with the Amendment and the Super Priority Credit Agreement, the Participating Lenders utilized the "open market" provisions under the 2018 Credit Agreement to exchange at par approximately $321 million of term loans under the 2018 Credit Agreement for an equal amount of new, super priority term loans under the Super Priority Credit Agreement. In addition to the $321 million of exchanged term loans, the Participating Lenders issued $110 million of new-money debt. The overall effect of these transactions was to prime approximately $119 million of loans owing to the Excluded Lenders with $421 million of term loans under the Super Priority Credit Agreement owing to the Participating Lenders, of which only approximately one-third was actual new money.

In October 2020, a group of the Excluded Lenders filed claims against various parties including the Company, the Oaktree Lenders, and the Participating Lenders, alleging that the uptiering transaction breached the provisions of the Credit Agreement and violated their so-called sacred rights by modifying the pro rata sharing provisions without the consent of all lenders and by amending the Credit Agreement without the consent of directly affected lenders. Importantly, the plaintiffs also alleged that the "secret" negotiations leading to the Amendment violated New York law's implied duty of good faith and fair dealing.

## HOLDINGS

Standing (No Action Clause)

The defendants' motion to dismiss argued that the Excluded Lenders lacked standing to challenge the transactions, pointing to the "no action" provision amended in the Original Credit Agreement by the Participating Lenders and the Company. Citing *Trimark*[4] as a precedent, the Court found that the

Excluded Lenders "sufficiently alleged that [the Original Credit Agreement] was amended in bad faith to prevent plaintiffs from suing to enforce their rights."[5] The amended "no action" provision included in the Participating Lenders' amendment was denied as a basis for a motion to dismiss.

Breach of Contract

*"Open Market" Provisions*

A key contention made by the Excluded Lenders is that the "open market" transactions were anything but, arguing that the sale of debt in this case did not meet the plain meaning of the term "open market," given that the transaction was not "available to all buyers and sellers in the marketplace, … was made [only] available to select first-lien lenders; free competition did not determine the market price, no third-party advisor or broker was hired to canvass the market for first lien debt to purchase at a discount, and, the Company did not purchase the loans at market value but rather it exchanged the Participating Lenders and Oaktree Lenders' loans at par value despite the trading value at 40-50% discount to par."[6] The Court, finding the term "open market" to be ambiguous, declined to rely on the inclusion of the term in the Agreement as a basis to dismiss claims related to sale.

*Sacred Rights*

The Court similarly held that the claims that the defendants had breached the plaintiffs' sacred rights could move forward. Citing existing New York precedent that all the agreements executed by the defendants on August 31, 2020 (i.e. the closing date), be treated as "one instrument,"[7] the Court noted the cumulative effect thereof was to violate the pro rata sharing provision in that "[w]hile there is nothing in the sacred rights provision that expressly prohibits the subordination of any lenders' liens … [a]ccepting the Company's argument would essentially vitiate the equal repayment provisions."[8]

Breach of the Implied Duty of Good Faith and Fair Dealing

The Court also held that the "backroom" and furtive nature of the negotiations and transactions provided a sufficient factual basis for claims of bad faith to proceed. Under New York law, claims of bad faith that are duplicative of separate contractual claims arising from the same facts will be dismissed.[9] Here, because the defendants carried out the negotiations in secret (and allegedly ignored requests from the Excluded Lenders for information or any ability to meaningfully participate), the Court found a basis for a separate claim exists.

Tortious Interference (against the Sponsor)

In a limited victory for the defendants, the Court dismissed a claim of tortious interference against Oaktree. The Court held that Oaktree had an independent economic interest of carrying out these transactions and therefore—absent any additional showing of malice, fraud, or illegality—concluded that the "economic interest" defense was sufficient to dismiss a tortious interference claim against the shareholders.

# KEY TAKEAWAYS

Liability management transactions are based on the specific facts and circumstances, including the terms of the relevant debt documents, unique to that situation, and any judicial opinion must be read in that light. It is important to note that the Opinion simply issued holdings with respect to motions to dismiss, not final judgments on the Excluded Lenders' claims.

That being said, the Opinion in *Boardriders*—as *Trimark* did before it—provides a modicum of hope to lenders excluded from a liability management financing and garners new support for claims that these transactions may violate a lender's sacred rights and/or the duty of good faith and fair dealing inherent in credit agreements. Specifically,

- in analyzing whether a lender's "sacred rights" have been breached for purposes of a motion to dismiss, the Court showed a willingness to reject narrow, technical readings of the relevant provisions and instead opted to "consider the context of the entire contract and not in isolation of particular words."[10]

- with respect to violations of the duty of good faith and fair dealing, the Court focused on the fact that the Company ignored the Excluded Lenders' requests for information regarding liquidity as well as to offer the Excluded Lenders the opportunity to participate in the new financing transaction, in addition to the fact that the Amendment removed all the covenants and modified the "no action" clause in a manner to block the Excluded Lenders from challenging the transaction.

- the Court appeared to have little patience for the amendments of the "no action" clause attempting to limit the ability of nonparticipating lenders to take action in connection with uptiering transactions.[11]

- whether the privately negotiated exchanges utilized in many uptiering transactions constitute "open market" purchases remains unsettled at this juncture. Whether these provisions are ultimately found to have plain and ordinary meaning or permit privately negotiated exchanges will be a critical determination for uptiering transactions going forward.

---

[1] *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, No. 655175/2020 (N.Y. Sup. Ct. Oct. 17, 2022).

[2] In addition to uptiering, another well-known liability management iteration is "J.Crew" which utilized a so-called "drop down" transaction. A drop down transaction occurs when a loan party forms an "unrestricted subsidiary" (not subject to the covenants of the loan documents) and transfers material assets to this new subsidiary, thereby reducing the secured collateral under the loan documents. In the case of "J.Crew," the unrestricted subsidiary received material IP.

[3] The existing agent under the Original Credit Agreement resigned rather than be party to the relevant amendments; a new agent selected by the Participating Lenders was installed at the same time the amendments were made and Super Priority Credit Agreement entered into.

[4] *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, No. 565123/2020 (JMC), 150 N.Y.S.3d 894 (N.Y. Sup. Ct. 2021).

[5] *See* Opinion at 17.

[6] *See id.* at 21–22.

[7] *See BWA Corp. v Alltrans Express U.S.A., Inc.*, 112 A.D.2d 850, 852 (1st Dept 1985).

[8] *See* Opinion at 19.

[9] *See id.* at 23.

[10] *See id.* at 19.

[11] *See Audax Credit Opportunities Offshore Ltd.*, 150 N.Y.S.3d 894; *North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*, No. 652243/2020 (N.Y. Sup. Ct. June 19, 2020); *LCM XXII LTD. v. Serta Simmons Bedding, LLC*, No. 20-cv-5090 (S.D.N.Y. July 2, 2020).

## RELATED PROFESSIONALS



**Gregory Gartland** Partner
New York +1 212-294-2693



**April Doxey** Of Counsel
Chicago +1 312-558-8105



**Samuel Levinson**
Associate New York
+1 212-294-9185