# DEFENDANTS' EXHIBIT 446

# Securitization as an Integral Part of a Corporate Capital Structure

Shearman & Sterling LLP



Bjorn Bjerke

## Introduction

Companies are increasingly incorporating securitizations and securitization-like financing arrangements as part of their capital structure. Utilizing these types of structured financing arrangements enables companies to diversify their lender base, increase their borrowing capacity, and even lower their financing costs. Securitization techniques may also be used to capture other benefits such as tailoring the financing to desired credit ratings, reducing lenders' regulatory capital charges or achieving particular treatments for tax or accounting purposes.

Asset-based lending complements cash-flow based lending by assigning a lending value to assets that in a cash-flow loan may not add much to a company's borrowing capacity. Cash-flow loans, even if secured, primarily look to a borrower's EBITDA and enterprise value. So long as the company retains sufficient enterprise value that the company is likely to restructure (and not liquidate) in case of any insolvency and cash-flow lenders retain their status as secured lenders in case of any restructuring or other insolvency proceedings, any additional collateral will likely be viewed as boot collateral: nice to have, but not necessary or necessarily particularly additive to the company's borrowing capacity. Secured cash-flow lenders also tend to focus on obtaining a security interest in core assets that are important to maintaining the enterprise value of the company. In contrast, asset-based lenders primarily look to the liquidation value of the financed assets and may therefore be able to obtain significant additional borrowing capacity from the very same assets that cash-flow lenders do not give much value or where the asset-based financing does not have any particular adverse impact on the company's EBITDA. Using an asset-based financing for such assets in combination with a cash-flow loan will naturally unlock value and increase borrowing capacity. This is particularly true where the asset-based financing is in the form of a securitization (or uses securitization techniques) to decouple the asset-based financing from the credit risk of the related operating company (at time referred to herein as the "securitization sponsor"). This decoupling is typically achieved by establishing a bankruptcy-remote special purpose entity (the "securitization SPE") that neither provides, nor relies on, credit support to or from the company or its non-SPE affiliates that acquire the relevant assets required to support the securitization debt in a true sale. For some assets, such as ordinary course trade receivables, the impact on the company's EBITDA is minimal, whether the company simply collects its trade receivables directly or receives payment in the form of a combination of cash proceeds and cash-flow on equity securities issued by a securitization SPE that has acquired the receivables and even secured cash-flow based loans to highly leveraged companies (i.e. "leveraged loans") typically contain an unlimited or near-unlimited basket for such receivables financings.

The relationship between asset-based lenders and cash-flow lenders is more complex where the underlying asset is of a type that is central to the company's enterprise value or where the securitized asset consists of less liquid operating assets where any full decoupling from the company requires time and additional credit enhancements to investors in the securitization debt. Securitization structures nevertheless may be able to unlock additional value, even for assets that a company is likely to view as important for its business and therefore likely to hang on to in a reorganization. It is, for example, possible to construct a securitization of assets for which the related cash-flows are in the form lease, rent, licensing fees or other payments from the related company and for which the securitization lenders have to be prepared for any third-party sale to take significant time and require a significant discount. However, cash-flow lenders typically include a number of covenants that are intended to protect them in case of securitizations or similar add-on financings of such assets. While it is usually possible to carefully structure a securitization of operating assets to comply with a typical high-yield or leveraged loan covenant package, such securitizations will have elements in common with some liability management transactions that are not always viewed favorably by cash-flow lenders. For example, there have been instances where lenders to distressed companies have objected to the use of "drop down" financings to move assets away from the cash-flow lenders. However, while drop-down liability management transactions have many aspects in common with a securitization, there are also important differences where a financing is structured outside such distressed scenario. This will be discussed in more detail below.

## Summary of Securitization Features and Character of the Receivables

### a. Securitizations – a summary of key features

Securitization, at its core, involves isolating the securitized asset from the originator and its affiliates and obtaining financing secured and serviced by such assets. Typically, such asset isolation will involve a "true sale" of such assets to a "bankruptcy remote" special purpose entity (i.e. the securitization SPE). True sale is a legal and accounting concept intended to capture a transfer that will be respected in a potential bankruptcy of the transferor, such that the transferred assets are no longer part of a transferor's property or bankruptcy estate. That analysis hinges on whether the attributes of the transaction have more in common with a sale than a secured loan. Not surprisingly, the more attributes the relevant transfer has in common with

a typical sale transaction, the more likely it is that a court will determine the transfer to be a true sale. Conversely, the more the transaction includes features that are more typical of a loan, the greater the likelihood that the transaction would be characterized as a transfer of collateral securing a loan. Some features, such as transferring the economic risks and rewards of ownership, are given greater weight than others in determining whether a purported sale will in fact be respected as such or instead be recharacterized as a loan.

Effectuating a true sale to a securitization SPE that is affiliated with the transferor would not be of much use in effectuating isolation of the assets, if the SPE itself would be combined with its affiliates' bankruptcy estates, whether as a result of the SPE becoming subject to a bankruptcy filing or as a result of the SPE being substantively consolidated with a bankrupt affiliate. It is therefore typical to include various features in the SPE's charter and the relevant transactions documents to limit the likelihood of such events.

The risk of the SPE becoming subject to an involuntary bankruptcy is reduced by limiting the SPE's activities to the securitization transaction and requiring transaction parties to waive or limit their right to bring a bankruptcy proceeding against the SPE. Contractual provisions that prevent the SPE from voluntarily filing for bankruptcy protection are not enforceable on public policy grounds. Therefore, the risk of a voluntary filing by the SPE is addressed more indirectly: in part, by limiting the activities of the SPE; in part, requiring the SPE's contract counterparties to agree that their claims against the SPE will be limited to its assets; and in part, by requiring that any bankruptcy filing and certain other material actions require the affirmative vote of an independent manager whose fiduciary duty runs to the SPE itself and not its shareholders. Finally, to protect against a bankruptcy court applying the equitable "substantive consolidation" doctrine, the charter and transaction documents typically include a number of separateness covenants that are required to be observed at all times.

The "decoupling" of the securitization SPE from its affiliates, together with credit enhancements such as overcollateralization, collateral pool diversification, liquidity reserves and cash trap or amortization triggers, typically enables the securitization SPE to issue debt with a significantly better credit rating than the cashflow loans of the SPE's affiliates. This can be very attractive to companies with a low investment grade or sub-investment grade rating. Even where the collateral is limited to a single asset for which the cash-flow to the securitization SPE comes from the affiliated borrower group and its restricted subsidiaries, it is possible to achieve a credit rating above that of the relevant payment obligors if the securitized asset is sufficiently important to the continued business of the payment obligors such that they are likely to continue to make lease, license or other relevant payments relating to such asset, even if they become subject to Chapter 11 bankruptcy.

Given the collateral isolation and the non-recourse nature of securitization debt, there is typically a lot of flexibility around where in the corporate organization structure the securitization SPE can be located. The securitization issuer can be a subsidiary of the borrower group or it can be a sister company that sits outside the borrower group. The SPE can be wholly-owned or owned only in part by the borrower group or its affiliates and it can be structured as an unaffiliated entity altogether.

| b. | Receivables arising under non-executory contracts |

As noted above, there is a broad variety of cash-flows that can be securitized. Loans, leases and payment obligations for goods and services that have been delivered such that the only remaining obligation is the payment, are particularly well suited for securitizations. Such contracts are not executory, and therefore cannot be rejected in case of a bankruptcy affecting either party to the transaction giving rise to such receivable. Receivables arising from a company's ongoing business activities with its customers may also be securitized but will be subject to some increased risks of delay or failure to pay if the originating company fails to perform any future obligations to the customer. Such failures could result in the customer (i.e. "account debtor") using such future breach as a counterclaim to reduce its payment obligations with respect to the assigned receivables.

Generally, the uniform commercial code distinguishes between set-off rights stemming from different contracts, and set-off rights arising under the same contract (also referred to as recoupment). An assignee, including a securitization vehicle, can generally prevent set-off from unrelated claims simply by giving the obligor notice of the assignment, but will generally not be able to prevent recoupment under the same contract absent express waiver from the payment obligor. In order to protect the SPE against such defenses to payments or the costs of disputes around whether the customer in fact is obligated to pay the relevant receivable, it is typical to include recourse for such losses and costs to the company that sold such receivable to the SPE. However, to maintain the true sale of the receivables to the SPE, it is important to appropriately limit such recourse and there should not be recourse to the company for the account debtor's financial inability to pay. The recourse provided for set-off and recoupment claims, as well as for any indemnity or repurchase obligations relating to any breach of representations, warranties or covenants of any seller of assets to a securitization SPE or of any service provider to the SPE, are often referred to as "typical securitization undertakings" (or words of similar import in leveraged loan facilities) and are generally permitted in conjunction with any permitted securitization transactions.

| c. | Receivables arising under executory contracts |

Any contract where both parties have performance obligations remaining at the time that one party becomes subject to bankruptcy proceedings are likely to be an "executory contract" that can be rejected in bankruptcy; see, Bankruptcy Code Section 365 (providing that subject to court approval and certain limitations, a debtor in bankruptcy can assume or reject any executory contract or unexpired lease), and, e.g. *Matter of C & S Grain Co.*, 47 F.3d 233, 237 (7th Cir. 1995). (For the purposes of the Bankruptcy Code, an executory contract is one in which the obligations of each party remain substantially unperformed.); and In *re Spectrum Information Technologies, Inc.*, 190 B.R. 741, 747 (Bankr. E.D.N.Y. 1996) ("contracts where one party has completed performance are excluded from the ambit of section 365"). Examples of executory contracts include intellectual property licenses and ongoing service contracts. Any risk that a bankruptcy by the company could result in a material reduction in the payment obligations under the receivables sold by the company is, naturally, inconsistent with the securitization principle of decoupling the SPE's credit from the company's credit.

If a securitization includes receivables under executory contracts, the question then becomes how best to insulate the SPE from the Company's rejection risk. As noted above, one way to address the issue would be to have the account debtor agreeing to waive its right to assert any counterclaims or right to set-off and recoupment for the assigned receivables. Such waiver could either be entered into directly with the SPE, for example at the time of assignment or any invoicing by the SPE. Such agreement could also be entered into between the

company and the customer, for the benefit of any assignee of the payment rights, including the securitization SPE. The uniform commercial code expressly provides that such waiver of rights under commercial contracts are enforceable so long as the assignee took assignment for value, in good faith and without knowledge of any existing counterclaims. See UCC 9-403 (b). The only exceptions to enforcing such waiver are defenses based on: (i) infancy of the obligor to the extent that it is a defense to a simple contract; (ii) duress, lack of legal capacity or illegality of the transaction under other law; (iii) fraud in the inducement; or (iv) discharge of the obligor in insolvency proceedings. Notably, rejection by the account creditor or account debtor of a contract in bankruptcy does not amount to discharge of such contract nor does any breach by the account creditor constitute one of the remaining defenses that can be asserted after assignment.

One might ask why an account debtor would be willing to waive such recoupment rights against an assignee of the payment claim. However, the customer will typically continue to be able to make a claim against the provider of goods and services, even if it waives its right to dispute any payment obligations. In that respect, the waiver puts the assignee of the receivable in the same position as if the assignee had made a loan directly to the account debtor for the purpose of the account debtor to pay for the goods and services at the time of the contract. The account debtor would in either case be expected to repay its loan regardless of whether the account debtor was satisfied with the goods delivered or services rendered.

In many circumstances, it will not be practicable, however, to obtain a waiver of recoupment rights from the customer. Under those circumstances, it may be necessary to ensure that additional assets or rights have been transferred to the securitization SPE in order to give the SPE the ability to continue to perform under the executory contract if the company fails to do so.

### d.   Transfer of assets beyond receivables and related contracts

Some executory contracts provide counterparties with additional protections against a rejection in bankruptcy, in particular intellectual property licenses and real-property leases. Section 365(n) of the bankruptcy code provides the licensee with a right to either elect to treat such contract as terminated (to the extent the licensee otherwise had a contractual right to do so) or to retain its rights under its license of such intellectual property, as such rights existed immediately before the commencement of the bankruptcy case. Leases of real property where the debtor is the lessor also are afforded similar bankruptcy protection where the bankrupt entity is the lessor, allowing the lessee to retain its rights under the lease for the remainder of the lease term pursuant to Section 365(h), even if the lessor rejects such lease in bankruptcy.

It is therefore possible to protect any related license or lease payment streams by ensuring that the securitization SPE becomes the lessee *vis-à-vis* the company that owns such property, with rights to sub-lease or sub-license such real or intellectual property, as applicable, to the relevant third-party obligors. Should the licensor or lessor file for bankruptcy, the SPE will, naturally, elect to continue such lease and license transactions.

For other assets that do not have such express bankruptcy protections available, it may be necessary for the securitization sponsor to transfer actual ownership of the relevant assets required to service the financed cash-flows to the SPE upfront. The more revenue-generating assets and related rights are transferred to the SPE, the greater the SPE's ability to generate revenue and service its debt, effectively operating as a separate business line, even if the transferor becomes subject to bankruptcy proceedings.

In some cases, such as whole business securitization, the principal revenue-generating assets of the business will reside in the securitization structure, thereby making it difficult for the non-SPE portion of the corporation to obtain financing outside the securitization. Nevertheless, a company may decide that securitizations would still be preferable compared to other corporate financing alternatives. Whole business securitizations of a business line, where significant operating assets reside in the SPE, can theoretically be readily decoupled from the current operating company by providing for arm's-length servicing of the SPE in a manner that allows a replacement servicer to step in and operate the business or that allows for such business to be transferred to a third-party operator. The more readily a third party could step in and take over the servicing of the assets (or otherwise be incentivized to pay down the financing at the SPE level in order to take out the assets), the greater the extent to which the credit of the SPE can be decoupled from the credit of the parent company. However, even where the decoupling is constrained, a whole business securitization structure will often permit a sub investment grade corporate group to achieve a ratings step-up to a low investment grade rating, which significantly increases the investor base. As such, whole business securitization is used in a significant number of restaurant franchises such as Sonic, Domino's, Wendy's and Taco Bell, as well as fitness clubs such as Planet Fitness and automotive services such as Driven Brands, all with a rating typically in the BBB (sf) range.

It is worth noting some of the criticism levied against corporate securitizations by some rating agencies, which primarily centers around overstating the benefits of some highly leveraged corporate securitizations. For example, Fitch Ratings commentary published in December 2019 titled "U.S. Whole Business Securitization Benefits Overstated" criticized some whole business securitizations that had achieved an investment grade rating (in the "BBB" range) despite leverage multiples of 7x to 8x of EBITDA (which otherwise would qualify for a rating significantly below investment grade). Fitch Ratings noted several factors that raised its concerns; the first being whether the securitization related to "the vast majority of [the sponsors'] assets and liabilities" in contrast to "traditional securitizations that are designed to isolate only a part of the assets from the fortunes of the company itself", and others being industry considerations that were not of a type that could be mitigated by use of a special purpose entity, triggers or covenants alone, such as low barriers to entry, exposure to technological advances and changes and consumer preferences and lastly what Fitch viewed as an overstatement of the difference between the control lenders had over replacing management over the securitized operating assets compared to the influence lenders and shareholders had in a more traditional financing structure.

While there may be debate around the amount of credit enhancements that a securitization structure of all of a Company's assets should be able to achieve as compared to a traditional cash-flow based financing, there seems to be far less controversy and much greater acceptance of the credit enhancement that a securitization can achieve where only a portion of the company's assets are separated out in a securitization structure. Of course, the credit rating of the SPE itself depends on typical credit factors such as overall leverage, liquidation value of the assets, value of the assets when operated by the SPE, ability for an alternative operator to step in and operate the SPE without a material adverse impact on the cash-flows or value of the assets, barriers to entry, etc. In SPEs where the brand name and intangible rights tied to a particular operator are crucial to the SPE's value, especially when operating in a business with low barriers to entry, the ability to decouple the SPE's credit from the operator's credit may be limited. Conversely, a whole business SPE structure in which valuable real assets are transferred

to the SPE and where such assets are of a type and in a line of business where a multitude of different operators could step in and provide the required servicing of the assets to ensure that the cash-flow to the SPE continues, then there is a greater ability to decouple the credit of the SPE from the credit of the sponsor-company. Examples of the latter include oil and gas royalty securitizations from proved developed and producing oil and gas reserves, and securitization of telecommunication tower lease payments.

It is also possible to construct solid securitization structures where the primary source of income to the securitization entity consists of lease or royalty payments from the sponsor company (or its affiliates). Where the lease to the relevant asset can be readily transferred to another user, it is relatively straightforward to structure the securitization such that it will have liquidity lines or debt reserves necessary to enable it to service its debt and other obligations during the time it would take to enter into a replacement lien or effectuate an orderly liquidation sale. For example, in aircraft securitizations using enhanced equipment trust certificates, the lenders benefit from liquidity facilities that can be drawn when the lessee files for bankruptcy and rejects the lease. As noted above, where the relevant asset is important to the current user, the risk of rejection of any lease or license by such user may be low, even if the lessee or licensee files for bankruptcy protection, which further enhances the securitization credit. The importance of these factors is illustrated in the securitization of spectrum by Sprint Communications, Inc., where Moody's awarded the notes a Baa2 (sf) rating at a time when the Sprint corporate family rating was B2. As part of its ratings rationale, Moody's noted the significant franchise value of Sprint, its substantial customer base and its nationwide network structure as important contributing factors, and that in case of an insolvency, Sprint would be more likely to realize more value as a going concern and therefore to file under Chapter 11 rather than Chapter 7. Because the securitized spectrum portfolio was important to Sprint's business operations, Sprint would be strongly incentivized to assume the lease to avoid any disruptions in its operations resulting from any Chapter 11 filing. In turn, this would avoid disruption in the payments on the securitized notes. The securitized notes also benefited from a liquidity reserve and significant excess value of the collateral, but because of the illiquid nature of the spectrum and the low number of comparable spectrum license sales and the value of the spectrum, Moody's assigned secondary value to this credit enhancement in the spectrum notes.

## Lender Concerns and Debt Covenants

> **a. Typical cash-flow debt covenants impacting securitization financings.**

A cash-flow loan covenant package will generally focus on ensuring that a sufficient portion of the earnings generated by the borrower group and its restricted subsidiaries will be available to service the lenders under the cash-flow facility and other permitted senior or *pari passu* debt.

For an investment grade company, the covenant package is typically relatively light, but it will still usually include one or more restrictions that may impact securitizations. For example, the covenants may include a negative pledge that restricts the company from granting liens on more than a permitted portion of the consolidated group's assets before all the investment grade debt must be secured *pari passu* by the relevant assets. There would also typically be a covenant limiting the overall debt that may be incurred by the consolidated corporate group. These types of covenants will, absent a specific carve-out, generally apply to the company and its subsidiaries, including securitization SPEs, unless such securitization SPEs are structured to not fall within the definition of "subsidiaries" to which such covenants apply.

If the borrower group is below investment grade, there will typically be additional covenants that come into play. Leveraged loan facilities generally require that all existing and future subsidiaries, other than "unrestricted subsidiaries" and "excluded subsidiaries" become part of the borrower group as guarantors and grantors of a security interest in their assets. In addition, leveraged loans contain a multitude of negative covenants that may restrict the activities of, and the borrower group and its restricted subsidiaries' dealings with, the Securitization SPE.

While such structured receivable transactions may be attractive to the company and the structured facility lenders, it is also important to assess how such transactions would be viewed by lenders under the corporate debt documents. As noted above, it is fairly common for leveraged loan facilities to permit securitizations of customer receivables. It is also fairly typical to give a broad ability to securitize loans and leases made by a borrower group, either as part of lender financing or because the relevant borrower group is otherwise in the business of making such loans and leases. However, securitization of other assets may require navigating the general covenant restrictions of the cash-flow facility without a specific exemption. The covenants are often sufficiently flexible to allow for such other forms of securitization financings. However, there are numerous examples of lenders that are unpleasantly surprised when borrowers find some less obvious ways to transfer significant assets to unrestricted subsidiaries and then use such assets to support additional borrowing.

For example, as part of the restructuring of Claire's Stores, Inc. in 2016, Claire's engaged in a set of transactions that involved the transfer of its intellectual property from a restricted subsidiary to a newly formed unrestricted subsidiary. Claire's then entered into a debt exchange whereby new notes were issued by the newly formed unrestricted subsidiary and, as part of the restructuring, Claire's agreed to pay annual licensing fees for the intellectual property previously owned by it. No litigation arose out of this transaction at the time, but following Claire's subsequent bankruptcy in 2018, a second-lien lender protested this overall arrangement on a variety of grounds, including that it amounted to transfer of core intellectual property rights to a restricted subsidiary and away from the corporate borrower group without the transferor receiving reasonably equivalent value for such assets. The second lien lenders ultimately settled their claims with Claire's prior to confirmation of Claire's Chapter 11 restructuring plan.

J.Crew similarly transferred a significant portion of its trademarks to a newly formed unrestricted subsidiary by using a combination of investment baskets and asset-disposition to effectuate a debt swap whereby unsecured company debt was exchanged for new structurally senior debt backed by the intellectual property rights. This time, some lenders challenged the transaction, arguing that the transfer violated the credit agreement. Because a majority of lenders subsequently consented to the transaction, and because the credit agreement, with some exceptions, could be amended with majority lender consent, the real question became whether the transfer of the intellectual property rights constituted transfer of "all or substantially all" of the collateral, which would only be permitted with unanimous lender consent. See Decision & Order, *Eaton Vance Management v. Wilmington Savings Fund Society*, No. 654397/2017 (N.Y. Sup. April 25, 2018). During 2020, a number of other companies engaged in J.Crew-type transactions, including Travelport, Cirque de Soleil and Revlon.

The Loan Syndication and Trading Association ("LSTA") recently published a market advisory, "Liability Management Transaction: Drafting Fixes" (March 29, 2021) discussing, amongst others, "drop-down financings" of the type used in J.Crew. The LSTA advisory noted that "[i]n the recent past,

lenders have been caught unaware by certain liability management transactions ("LMTs") that have taken place an been permitted under credit agreements.  In a drop-down financing, a borrower identifies assets that may be readily separated from the rest of the business (such as a separate business line or discrete intellectual property) and transfers these assets to either an unrestricted subsidiary or a non-guarantor (excluded) restricted subsidiary ("NewCo").  Upon such transfer the lien on these assets securing the borrower's obligations to existing creditors is automatically released and such (newly) unencumbered assets are available to secure newly incurred indebtedness of NewCo provided by new creditors."

Drop-down financings have long been a feature in connection with high-yield bonds and as leveraged loans and high-yield bonds converge, it is not surprising that these types of transactions also start to affect leveraged loans.  The covenants that are typically implicated in these transactions are: (i) covenants that enable designation or formation of subsidiaries that are not subject to the collateral and guarantee requirements (typically the definition of "unrestricted subsidiary" and provisions relating to excluded subsidiaries and designation of unrestricted subsidiaries); (ii) covenants restricting transfer of assets to NewCo (typically investments covenants, asset sale covenants, collateral release provisions, in particular limitations on sale of "all or substantially all" of the collateral and "J.Crew blocker" provisions, and sale-leaseback covenants); (iii) debt covenants (which would not apply to NewCo if it is not a restricted subsidiary, but could apply to lease payment obligations of the borrower group and its restricted subsidiaries to NewCo); and (iv) *pro rata* sharing provisions and limitations on debt prepayments or repurchases, if the transaction also involves a "roll-up" of existing debt.

From a borrower group's perspective, it is of course important to maintain flexibility over its operations, business and capital structure, particularly as it is generally impractical to obtain consent from each lender in a broadly syndicated debt facility.  From a lender's perspective, the principal concern with liability management transactions typically centers on transactions that result in priming of collateral positions or repayments or refinancing opportunities that are not shared *pro rata*.  Sales of operating assets at an arm's-length price with at least 75% of the consideration consisting of cash (which is typically the requirement of the general permitted asset disposition exception) and where the cash proceeds are either reinvested or used to repay lenders are far less concerning.  Much has been written about J.Crew-type transactions and these transactions have given rise to a covenant "fix" in the form of a "J.Crew blocker provision" that prohibits (i) transfers of material intellectual property to unrestricted subsidiaries, and (ii) designating as "unrestricted" any subsidiaries that hold material intellectual property.  The LSTA's market advisory includes a version of the J.Crew blocker provision as it relates to disposition of "material assets" to unrestricted subsidiaries, but notes that the scope of material assets is often limited to material intellectual property.

However, outside the context of distressed liability management, in transactions that do not involve some of the more aggressive forms of debt priming and roll-up tactics, it stands to reason that a corporate group will be able to rebalance its capital structure between cash-flow loans to the borrower group and its restricted subsidiaries, and asset-backed securitizations entered into by securitization SPEs, without too many objections from existing cash-flow lenders, particularly because typical securitization transactions will fit better within the existing exceptions or baskets under the restrictive covenants compared to some of the more aggressive moves that were used in the liability management transactions to accommodate for the debt exchange.  Securitization transactions typically require sale of the underlying SPE in a "true sale", and for many securitized assets this means that the transfer to the SPE would readily satisfy the "arm's-length" transaction requirement for "affiliate transactions", as well as the general asset disposition exception that allows for dispositions at fair value with at least 75% of the consideration paid in cash.  The investment covenant also typically includes an allowance for the non-cash position received in connection with such permitted asset disposition, although sometimes it may be necessary to structure the securitization SPE's size and location to accommodate applicable investment restrictions.

By separating out the securitized assets into an unrestricted subsidiary or other entity outside the borrower group, it is likely that any earnings of the SPE would not count directly as EBITDA of the borrower group and its subsidiaries.  However, distributions made from the SPE to the borrower group or its restricted subsidiaries would typically count as income when made, and any hit to EBITDA would therefore typically be limited to interest payments prior to triggering any amortization or cash trap provisions.

Where the transaction involves ongoing payment obligations to the SPE from the company, it will also be necessary to ensure that such payments are permitted, which may require careful review of the indebtedness definition and debt restrictions and also require examination of whether the arrangement constitutes a prohibited sale-leaseback transaction.  See, e.g. *U.S. Bank N.A. v. Windstream Services, LLC*, No. 17-cv-7857 (S.D.N.Y. 2017) (finding that although structured as a sale by one entity and a leaseback by a second entity that would fall outside the strict read of the sale and leaseback definition, the transaction was nevertheless in substance a prohibited sale leaseback).  However, if the company has capacity to incur additional lease obligations (as a combination of a permitted lien and debt or as a combination of a permitted asset sale and debt), it is also fairly typical for lenders to give the borrower such flexibility in conjunction with a sale-leaseback arrangement.

## Conclusion

Securitization techniques are powerful in their ability to isolate assets that are given only limited lending value in a typical cash-flow based debt facility and allow such assets to be used to issue higher rated debt, access additional debt or create financing structures that achieve certain tax and accounting goals.  The greater and more diversified the asset pool, the easier it may be to unlock such benefits.  However, even securitizations of operating assets with a single payment obligor under a related contract may achieve such goals, even where the payment obligor is the sponsor of such securitization.  While litigation around liability management transactions may give the impression of an uneasy relationship between secured lenders in a leveraged loan structure and secured lenders to an unrestricted subsidiary, the relationship is likely to be much more harmonious where securitization transactions are established outside a distressed scenario and a company that optimizes its capital structure and diversifies its lender pool is likely to enhance its enterprise value, which benefits all lenders to the relevant corporate group.



**Bjorn Bjerke** is a partner in the Finance practice and resident in the New York office.  He focuses his practice on representing lenders, borrowers, managers and investors in a broad range of complex financing arrangements across a wide spectrum of asset classes including securitizations and other structured financings, various shared collateral and second lien structures, repo facilities, commodity, equity, credit and fund-linked derivatives, subscription lines and a variety of funding arrangements tailored to existing purchase commitments such as energy management agreements and airline frequent flyer miles programs.  In addition, he has extensive experience representing investors, creditors and managers in complex restructurings, work-outs and acquisitions of distressed and non-performing assets.  He is involved in all aspects of deal structuring, negotiation and documentation.

| | |
|---|---|
| **Shearman & Sterling LLP** | Tel:     +1 212 848 4607 |
| 599 Lexington Avenue | Email:   bjorn.bjerke@shearman.com |
| New York | URL:    www.shearman.com |
| New York 10022–6069 | |
| USA | |

With lawyers in New York, London, Washington, D.C. and Frankfurt, Shearman & Sterling's Structured Finance & Securitization Group assists clients in developing, structuring and executing a broad range of financings including securitizations, structured products, asset-based lending, tailored leasing and royalty arrangements and other sophisticated financing techniques.  We have in-depth experience in all aspects of the public and private offering and distribution of structured finance securities.  Highly regarded by major corporations and financial institutions, we take a creative approach when handling different types of asset classes and transaction structures.  Utilizing both our legal experience and sophisticated business perspective, we work closely with clients to develop novel structured finance products that lower financing costs and achieve the specific legal, tax, corporate and financial objectives of all transaction parties.  We are adept at executing transactions in multiple jurisdictions in the U.S., Europe, Asia and Latin America, and have securitization experience in all relevant disciplines, including capital markets, banking, investment companies, tax, corporate, bankruptcy, investment advisors acts, ERISA, bank regulatory, securities regulation and secured financing.

**www.shearman.com**

