# DEFENDANTS' EXHIBIT 450

**RESTRUCTURING INTERVIEWS**

Home    Restructuring Guides

Restructuring Blog

Top 15 Restructuring Interview Questions

About    Contact Me



# Incora's Restructuring: An Unruly Uptier Transaction

Updated: December 11, 2022

There's no getting around the fact that a lot of the reading you'll have to do as an analyst or associate in restructuring is going to be dry, tedious, and (worst of all) repetitive. For example, you'll be looking through countless credit docs - rife with boiler-plate language and riddled with defined terms - while searching for whatever specific language you've been told to find which will be, at best, ever-so-slightly different than the same kind of specific language contained in a credit doc you were looking at the day before.

This shouldn't be any surprise: your job as an analyst or associate will be to read lots of things drawn up by bleary-eyed lawyers. And, while they may may have once had dreams of writing the next great American novel, they've long since resigned themselves to ensuring unrestricted subsidiaries are being appropriately defined.

But there does come a time in which these bleary-eyed lawyers get to let loose their pent-up angst, revive whatever literary abilities were laying dormant, and show off their potential as a polemicist – and, for this, we should all be thankful.

In the world of restructuring, where you'll most often see this is after a contentious restructuring transaction occurs. As those who felt they got a raw deal will then bring suit and their initial complaint will generally take the approach of feigning indignation and incredulity – gobsmacked by the level of injustice brought upon them, unsuspecting as they allegedly are, by the company or other creditors or both.

Anyway, let's quickly talk about Incora (a.k.a Wesco Aircraft Holdings, Inc.). It's one of the more interesting restructuring transactions of the year as it's a non-pro rata uptier similar in style to Serta (that I talked about at length in one of the guides in the members area).

However, there are a few twists with Incora relative to the non-pro rata uptiers of the past – not least being that it involves notes (not loans) which makes it a bit more straight-forward.

Fortunately, on Halloween of this year (spooky!) a suit was filed by the *non-participating noteholders* over the transaction and the bleary-eyed lawyers who wrote it pulled out all the stops: calling the restructuring a "Sham Transaction" involving "Phantom Notes" that was "violently detrimental" to the non-participating noteholders who were "ravaged" by the sponsor (Platinum) who had "lucrative (and sinister) aims". While I'm not a psychologist, there seems to have been a lot of non-restructuring-related angst being taken out while writing this complaint – so, I hope it proved cathartic!

## INCORA'S RESTRUCTURING TRANSACTION

As per usual, this is going to be a substantially longer post than I originally intended. So, feel free to click around the links below, or read it through from the beginning.

Background on Incora

The First Draft of Incora's Uptier Transaction

The Issue with the First Draft of Incora's Uptier Transaction

The Mechanics of Incora's Uptier Transaction

The Challenge to Incora's Uptier Transaction

## BACKGROUND ON INCORA

As I wrote a month ago, many of the more aggressive restructuring transactions we'll see out-of-court over the next year will likely be done by sponsor-backed companies, and Incora fits the bill: it was bought out by Platinum just prior to the onset of the pandemic with slightly over $2b of debt layered over an initial equity investment of only $266m.

The capital structure was pretty straight-forward: $650 in 2024 Senior Secured Notes, $900m in 2026 Senior Secured Notes, and $525m in 2027 Unsecured Notes. As you'd expect, with the Senior Secured Notes residing atop the capital structure, they had a first lien on substantially all the company's assets.

Since the company is predominantly in the aerospace and defense supply chain space, it was hit hard by the pandemic and, when combined with its heavy debt-load, began facing a liquidity crunch through the latter-half of 2021 and into 2022.

So, for the sponsor, Platinum, the question became two-fold: how do we get some liquidity injected into Incora to stave off having to file and how do we try to salvage some level of return here?

You may think those two questions are one and the same, since if the company were to file that would almost surely result in Platinum having no meaningful return, given that they're just the equity holder – but, as you'll see in a moment, there's a reason I'm separating these two.

In the end, it was thought that Incora probably needed around $200m of fresh capital to give it the breathing space needed to (hopefully!) effectuate a turnaround. Needless to say, this could have come through the sponsor injecting more money itself. But doubling down on an investment that's already at (effectively) zero after two years isn't the modus operandi for most sponsors. Especially when creditors are lining up to give the company fresh capital if the company is willing to get a little creative and endure a little litigation…

## THE FIRST DRAFT OF INCORA'S UPTIER TRANSACTION

What I'm going to do here is try my best to run through the restructuring transaction incrementally to hopefully make it more digestible for those less familiar with restructuring. But, if you're interested, you should read the actual complaint filed by (most) of the non-participating creditors involved here – all joking about lawyerly-angst aside, it's a very readable account of what happened that shouldn't take more than a few hours to read.

Anyway, the best way to think about this transaction is that, in the run up to Incora's restructuring, there were (roughly) four groups of importance…

First, you had the company itself, advised by PJT, who had two primary objectives: get existing creditors to lend it more money since they (obviously) didn't have the ability to tap the traditional primary market, and keep cash interest expenses down as much as possible.

Second, you had a group holding the bare majority – but not a two-thirds super-majority – of the Senior Secured Notes. This group, comprised primarily of Silverpoint and Pimco,

were advised by Evercore (who was also debtor-side on Serta and who is almost invariably involved in these more creative restructuring transactions).

Third, you had Carlyle that held the majority of the Unsecured Notes and Platinum (the sponsor) that had bought up a non-trivial number of Unsecured Notes leading up to the transaction.

Fourth, you had a long list of smaller creditors (e.g., various funds tied to Blackrock, JPM, GS, etc.) who owned smaller bits of the 2024 Senior Secured Notes, 2026 Senior Secured Notes, and/or 2027 Unsecured Notes (e.g., taken together, these smaller creditors didn't comprise a majority of holders in any of the Notes).

In January of 2022, the state of play was basically this: you had a company (Incora) that needed to do something (raise around $200m of fresh cash, the more the better!) and a few very large players, holding a simple majority of the Senior Secured Notes, who are always looking to get their hands dirty in interesting special situations (e.g., Pimco has a staring role in this case and was also involved in the even more creative and contentious restructuring of Envision Healthcare this year as well). On top of this you also had a few very large players, holding a super-majority of the Unsecured Notes, that happened to now include the sponsor itself.

Given this, it's not a surprise that initial conversations took place between Incora (a.k.a Wesco) and the majority holders of the Senior Secured Notes regarding what a potential restructuring transaction could look like that would include a substantial new money investment. Both were eager to come to the bargaining table.

And, in the end, it seemed there was an obvious solution: do some kind of exchange whereby the majority holders of the Senior Secured Notes exchange into new (higher priority) notes while also lending the company new money (within this new, higher priority tranche). Thereby leaving those Senior Secured Notes who didn't participate – or, more aptly put in this case, weren't given the option to participate – behind them in the capital structure.

**Note:** Just to be clear, since the Senior Secured Notes (pre-transaction) had a lien on substantially all the company's assets, to effectuate this transaction that lien needed to be stripped so that it could be given to the new notes that participating Senior Secured Notes were exchanging into (thereby rendering the non-participating Senior Secured Notes effectively unsecured, as we'll get into much more below).

For the participating Senior Secured creditors, this is an ideal solution as it keeps them in the highest position within the capital structure, ensures there's less debt pari to them, and since the exchange was done at par that's just an added benefit. Sure, you're putting

more money in. But if there's going to be some kind of out-of-court deal done, it's better for you to be steering it and to be in a relatively better position (from a priority perspective) than other creditors you were previously pari with (as opposed to the opposite).

The question then became what to do with the Unsecured Notes, which were majority held by Carlyle but with the sponsor also holding a non-trivial chunk. In the end, it was decided that certain holders would be given the opportunity to just roll-up their holdings into newly created notes that would be behind what the participating Senior Secured Notes exchanged into, but in front of the pre-existing Senior Secured Notes who weren't given the opportunity to participate in the exchange.

So, to recap this first draft of the restructuring transaction, the majority holders of the Senior Secured Notes would exchange into new notes, while simultaneously also lending new money to the company, while the majority of the Unsecured Notes would exchange into new notes sitting above the non-exchanging Senior Secured Notes (e.g., jumping in front of them). Those in the minority of the pre-existing Senior Secured Notes and Unsecured Notes would then be bumped back in the capital structure (into, effectively, third and fourth position) behind all of this newly created debt.

If you've read through the guides, this looks like a pretty classic out-of-court restructuring dynamic. But what makes it unique is the non-pro rata nature of it. Meaning, only the pre-ordained majority holders of these tranches had the opportunity to participate in the exchange. For the minority holders, even though they almost surely would have participated if given the opportunity, they were simply left out in the cold – and, in this example, behind over a billion dollars of newly created debt.

## THE ISSUE WITH THE FIRST DRAFT OF INCORA'S UPTIER TRANSACTION

When discussing Serta's non-pro rata uptier, I spent a significant amount of time discussing specific verbiage within the docs around open-market purchasing language and all that fun stuff because, in that case, we were dealing with term loans.

What makes the case of Incora (Wesco) unique among the smattering of non-pro rata uptier situations we've seen over the past few years is that we're dealing with bonds with their much more straight-forward governing docs (indentures).

As the complaint lays out, you have three basic kinds of consent thresholds with notes: those requiring a bare majority of 50%+1, those requiring a super-majority of 66.67%,

and those requiring unanimity (e.g., for anything involving changes to the "sacred rights" of the notes).

In order to effectuate the non-pro rata uptier Pimco, Silverpoint, et al. needed to have enough of the Senior Secured Notes to release the liens the Notes held on collateral (since the Notes were secured by substantially all of the company's assets) which required having a super-majority.

But, on February 7 of 2022, a Debtwire article was released describing the early discussions that had been taking place between the majority of the Senior Secured Notes and the company (e.g., describing the plans, as outlined in the prior section, for some kind of non-pro rata uptier, even though the exact details weren't hammered out yet).

This set the minority holders of the Senior Secured Notes into a frenzy. They knew what was coming: if they weren't given the opportunity to participate, they would go from having a first-priority position to holding Notes that were entirely unsecured (not to mention behind potentially in excess of a billion dollars of new debt!).

So, this rag-tag group of minority holders coordinated themselves with a singular goal in mind: to create a blocking position that would ensure that this kind of uptier couldn't take place without this minority group's consent. It was quickly realized that it was possible to potentially create a blocking position within the 2026 Senior Secured Notes, so a bidding war quickly ensued between the two sides (e.g., the majority creditors and this rag-tag group of minority creditors).

As the complaint illustrates, this created bizarre price action after the Debtwire article was released whereby the 2026 Senior Secured Notes went from trading around 85 to well over par. Further, since only a blocking position could be created in the 2026 notes, a large spread opened up between the trading levels of the 2024 Notes and the 2026 Notes (despite, obviously, the 2024 Notes having the same claim on the company while also maturing two years earlier!).



In the end, by late February of 2022, this rag-tag group had firmly established a blocking position, and a collective sigh of relief was no-doubt released. However, that's when the real creativity of this transaction began.

## THE MECHANICS OF INCORA'S UPTIER TRANSACTION

After having established a blocking position, this group of minority lenders began (trying) to engage with the company on a few different solutions in early March of 2022. The contemplated transactions were more classic out-of-court stuff: providing new cash while also converting the existing Senior Secured Notes into PIK Notes – all of which, needless to say, would have been open to everyone to participate in (e.g., not be something that only an exclusive group of creditors could participate in, as the non-pro rata uptier per se was).

But the proposed transaction wasn't quite as appealing to the company from a new-money perspective and it's not entirely clear how seriously the company even took the offers placed on the table by this rag-tag group of minority creditors.

So, in the end, just a few weeks later and without warning to minority creditors on March 28 the non-pro rata uptier took place and the company announced it had completed its restructuring on March 29.

Here's how the restructuring transaction worked, and how the blocking position that was so hard-won was casually side-stepped along the way…

As previously discussed, the binding constraint on doing the non-pro rata uptier was the blocking position that had been developed by this group of minority creditors in the 2026 Senior Secured Notes.

While the non-pro rata group (e.g., Pimco, Silverpoint, et al.) held a majority of the 2026 Notes, they didn't have the supermajority necessary to strip the Notes of their liens. But, obviously, they wanted to exchange their existing holdings into newer, higher priority debt that would have liens on substantially all the company's assets, so it was strictly necessary to strip the liens from the Senior Secured Notes.

While this put them in a bit of a quagmire, they dreamt up a solution: if you can't get a supermajority by (allegedly) hoovering up all the 2026 Notes you can get your hands on in the open market, maybe you can just manufacture a supermajority of your own.

On March 28 the company executed the "Third Supplemental Indenture" that allowed the company to issue $250m of additional 2026 Senior Secured Notes. However, these Notes weren't offered to all existing holders on a pro-rata basis (e.g., all existing 2026 Noteholders couldn't just buy their pro-rata share), nor were they made available to purchase on the open market.

Instead, they were issued to a select group of existing noteholders: namely, those that wanted to do the non-pro rata option. With this non-pro rata group now holding $250m more of the 2026 Notes, they now had a supermajority position (as, obviously, the blocking position that had been carefully built up by minority creditors was diluted by this new issuance).

The complaint called these Phantom Notes, which is a reasonably accurate description because on the same day, March 28, this newly created supermajority consented to the "Fourth Supplemental Indenture" which released all the liens the 2024 and 2026 Senior Secured Notes had on their collateral.

With the liens now released, the company could pursue the non-pro rata exchange. So, the non-pro rata group – which included holders of the so-called Phantom Notes – exchanged their Notes for $1.27b of newly issued 1L Notes that, obviously, ranked senior to the now-unsecured 2024 and 2026 Senior Secured Notes.

To add insult to injury the 2024 and 2026 Senior Secured Notes – who could do nothing but watch as this all unfolded – the Unsecured Notes were exchanged for $473m of

newly issued 1.25L Notes that, obviously, also ranked senior to the now-unsecured 2024 and 2026 Senior Secured Notes.

Here's a great illustration from the complaint that outlines the transaction. As you can see, the Phantom Notes and the non-pro rata group's Senior Secured Note holdings were exchanged into roughly $1.27b of new 1L Notes that reside atop the capital structure.

Then Carlyle and Platinum exchanged their Unsecured Notes into new 1.25L Notes, jumping ahead of the remaining Senior Secured Notes ($539m) and the remaining Unsecured Notes ($104m).

So, effectively, the old 2024 and 2026 Senior Secured Notes are now third in priority in the capital structure (they used to be first and have a first lien on all the company's assets!) and the poor Unsecured Notes are now fourth in priority (and, obviously, also have no lien on any of the company's assets).



As you can imagine, the announcement of the transaction – even though it was quite well forecast for those in the know beforehand – caused a sharp drop in the trading prices of the Senior Secured Notes...



## THE CHALLENGE TO INCORA'S UPTIER TRANSACTION

If I get time over the coming months, my plan is to create a little guide in the members area to walk through a few of the more creative transactions we've seen this year in a bit more detail – including, importantly, how these kinds of transactions are being challenged in court.

Because many new to the world of restructuring look at these kinds of transactions and think to themselves, "Regardless of what the docs *technically* permit to be done, this just *seems* fundamentally unfair!" And this kind of appeal to common sense – as opposed to relying exclusively on a strict textualist reading of the docs – is something that has gained some initial traction in certain courts (although not everywhere!).

To this end, there is an implied covenant of good faith and fair dealing that could be applicable with these kinds of transactions – although its implied nature, obviously, means what is and is not done in good faith, or what is or is not fair, is hotly debated. But, for many, a few large creditors who happen to hold a supermajority stripping all liens from a given tranche of debt and then exchanging their holdings into new debt (at a higher priority and with new liens replicating those just stripped), all without allowing any minority holders to participate, does seem to be something that surely must fall somehow under this covenant (although I don't really fall into this camp, but that's partly for self-serving reasons!).

Regardless, as we've discussed above, the case of Incora goes a step further than "conventional" non-pro rata uptiers in two major ways. First, by using the Phantom Notes to manufacture the supermajority needed in the 2026 Senior Secured Notes to effectuate the transaction. Second, by allowing the Unsecured Notes to also uptier the original Senior Secured Notes – and to do so when a large holder of the Unsecured Notes is Platinum itself (thus manufacturing a significant economic gain for the sponsor).



If you read the actual complaint, you'll quickly see that plaintiffs – who represent 75% of the left behind 2026 Senior Secured Notes and over 30% of the left behind 2024 Senior

Secured Notes – are taking the approach of throwing out as many arguments against the transaction as they can think of in the hope that one or two stick. So, given how long this post already is, I'll save a more detailed discussion of the arguments being made for the new guide whenever I'm able to put it together.

However, the main argument made by the plaintiffs is that the "two-step" process utilized by the company to effectuate the transaction (e.g., executing the Third Supplemental Indenture to create the Phantom Notes, and then executing the Fourth Supplemental Indenture to release the liens and allow the transaction to proceed) should be viewed as one integrated or singular transaction.

In other words, even though it was technically possible, from a textualist perspective, for the company to create the $250m in additional 2026 Senior Secured Notes with a simple majority, not a supermajority, the rationale behind creating these $250m in new Notes was purely to manufacture the supermajority needed to strip the liens held by the Senior Secured Notes.

The proof of this, to their mind, is that both transactions occurred on the same day; the Phantom Notes were not made available pro-rata, but were rather made available to those in the non-pro rata group; and the Phantom Notes consented to, and participated in, the exchange into the new 1L Notes (therefore, they only existed for less than a day!).

Nobody disputes that the 66.67% consent threshold to release liens needs to based on the amount of Senior Secured Notes "then outstanding" (e.g., outstanding prior to the period before the transaction occurs). The arguments of the company – along with the non-pro rata group – is that this period is between when the Third Supplemental Indenture was executed and the Fourth Supplemental Indenture was executed (e.g., after the Phantom Notes have been added, thus creating the supermajority which allowed for the liens to be stripped on the Senior Secured Notes).

But plaintiffs are arguing this was all one integrated transaction, so the period that should be looked at is prior to when the Third Supplemental Indenture was executed (e.g., before the creation of the Phantom Notes and when the blocking position was still intact). Therefore, the transaction should be voided as there wasn't actually a sufficient level of consent to strip the liens.

Here's the best summation of this line of argument...

> 117. The phrase in section 9.02, "66⅔% in aggregate principal ... *then* outstanding," which is a prerequisite to the exercise of any valid consent right, can refer only to 2026 Senior Secured Notes outstanding immediately *before* consent is given. The Phantom Notes were not then-outstanding 2026 Senior Secured Notes when Defendants effected the Sham Transaction, which was executed via multiple documents, but a single integrated agreement. Therefore, those votes are a nullity under the Governing Indenture.
>
> 118. Indeed, it defies any plausible reading of the Governing Indenture that a simple majority of holders could, in an instant, dilute Plaintiffs' consent rights via the Phantom Notes, vote as a feigned supermajority, exchange their Phantom Notes for new senior secured notes, strip Plaintiffs' security interests in the Collateral, and give those interests to themselves.

And…

> Indenture Trustee, and a simple majority of holders could collude to grant those holders a gerrymandered supermajority, *just to subvert* a supermajority consent threshold. Indeed, such a reading would allow issuers and 50.1% majority noteholders market-wide to disregard any supermajority consent threshold simply by amending the amount of additional notes that can be issued, issuing such notes in an amount necessary to exceed the required supermajority level, and effectuating the desired transaction over the objections of minority holders. This would eviscerate supermajority consent rights.

## CONCLUSION

Well, there you have it. Incora was one of the more interesting cases of the past year and will be heavily litigated moving forward. This latter point won't come as a surprise to either Incora or PJT. They specifically included a 1.25L settlement basket to try to get those minority holders "left behind" to exchange their existing notes into the new 1.25L Notes to settle any litigation (this may still end up happening!).

Anyway, hopefully I've done a reasonably good job breaking things down in a relatively approachable way. Just keep in mind, if you're gearing up for restructuring interviews, that no one is proactively going to be asking you about non-pro rata uptiers! For

Case 23-09001   Document 257-63   Filed in TXSB on 05/14/23   Page 15 of 16

interview purposes, make sure you have a sound understanding of what restructuring investment banking is all about and go through all the restructuring interview questions I've put together.

And, as always, if you end up getting an offer anywhere because of the blog and the guides, be sure to let me know. It always absolutely makes my day to get those e-mails, so I really appreciate when people take the time to send them.

SHARE     TWEET     PIN IT

---

## Leave a comment

**Name**

**Email**

**Message**

*Please note, comments must be approved before they are published*

POST COMMENT

← BACK TO RESTRUCTURING

## Quick links

Restructuring GuidesRestructuring BlogTop 15 Restructuring Interview Questions

Contact MeAboutRefund PolicyTerms of ServicePrivacy Policy

## Newsletter

| Email address | SUBSCRIBE |



© 2023, Restructuring Interviews Powered by Shopify