# DEFENDANTS' EXHIBIT 451

# The Loan Market Response to Dropdown and Uptier Transactions

## Vincent S.J. Buccola and Greg Nini[*]

June 2022

## Abstract

Hardball recapitalizations have emerged in recent years as an important feature in the landscape of corporate financial distress. Since 2016, borrowers have sought to incur super-senior debt, priming existing first-lien lenders, on the strength of aggressive though plausible interpretations of their loan contracts. The two principal transaction forms borrowers have used—the "dropdown" and the "uptier"—can cause significant losses to creditors, suggesting to some that borrower power has run amok and casting doubt on the loan market's capacity to generate efficient contracts. We weigh these possibilities by examining changes in loan contracts after salient dropdown and uptier transactions, J. Crew in 2016 and Serta Simmons in 2020.

Our primary result is a contrast. In the year following the Serta transaction, the frequency of loans that block uptiers increased from about 40% to about 75%, suggesting that syndicated loan contracts can adjust rapidly to curtail borrower flexibility if market participants perceive it to be value-destructive. Conversely, the frequency of loans that block dropdowns—and the magnitude of vulnerability in loans that do not—changed little in the years following J. Crew. The muted reaction to J. Crew suggests that the contractual flexibility underlying the dropdown transaction may be valuable on net, even if it can be used to prime first-lien debt. In a range of loans, the optimal contract may permit borrowers to subordinate lenders by one means but not the other.

[*] Vincent Buccola (buccola@wharton.upenn.edu) is Associate Professor of Legal Studies & Business Ethics at the Wharton School, University of Pennsylvania. Greg Nini (gpn26@drexel.edu) is Associate Professor of Finance at LeBow College of Business, Drexel University. For helpful comments we thank Yonathan Arbel, Ken Ayotte, Julian Bulaon, Emiliano Catan, Shahar Dilbary, Jared Ellias, Elisabeth de Fontenay, Brook Gotberg, Ed Morrison, Bob Rasmussen, Adriana Robertson, Roberta Romano, David Smith, Holger Spamann, Eric Talley, as well as participants in the Corporate Restructuring & Insolvency Seminar, the Corporate Law Academic Workshop Series, at the BYU Winter Deals Conference, and at a workshop at Alabama. We thank Jackson Maxwell for excellent research assistance.

# 1   Introduction

A proliferation of hardball recapitalization transactions in recent years has become a major theme in corporate reorganization (e.g. Ellias and Stark 2020; Mengden 2021; Dick 2021). Since 2016, more than a dozen distressed companies have claimed unilaterally, or with the support of a handpicked majority, a counter-intuitive right to issue new debt with priority over what had been understood to be first-lien loans (Buccola 2022). The borrowers undertaking these priming transactions have been able to access liquidity on favorable terms where Chapter 11 otherwise would have beckoned. Dismayed lenders have cried foul, however, asserting in and out of court that the tactics borrowers have resorted to violate the spirit, if not the letter, of their contracts. In this paper, we examine the extent to which the letter of loan contracts has changed to express that avowed spirit.

Two types of transaction have proved especially fit for priming: so-called "dropdowns" and "uptiers." In a dropdown, the borrower transfers collateral backing its existing loans to a subsidiary deemed by the credit agreement to be an "unrestricted subsidiary." The act of transferring the collateral causes the lenders' lien to be released. Because indebtedness and lien covenants do not apply to unrestricted subsidiaries, in effect the borrower is able to re-pledge the collateral to support new secured debt.[2] The subsidiary immediately leases back the collateral's use, so there is no effect on the borrower's operations. But the transaction subordinates the pre-existing secured lenders because they now stand in line behind the newly created debt. In an uptier transaction, the borrower persuades a majority of lenders to amend the loan contract to

---

[2] Liens on collateral are released when encumbered assets are validly transferred to non-guarantor restricted subsidiaries as well as unrestricted subsidiaries. For that reason, borrowers could, in principle, execute a dropdown without resort to an unrestricted subsidiary. That possibility is not typically feasible in distress situations, however, because restricted subsidiaries are subject to borrowers' indebtedness and lien covenants. In practice, borrowers' ability to designate unrestricted subsidiaries appears to be pivotal to the kinds of hardball transactions we are concerned with.

allow the issuance of new debt backed by a superior lien. The trick is in the mode of persuasion. Unlike a typical loan amendment, the borrower does not offer to compensate all consenting lenders on a pro rata basis. Instead, the borrower offers a bare majority of lenders the chance to sell their existing loan back to the borrower for a generous price if they consent to amend the existing loan to permit issuance of new super-priority debt (which the consenting lender may also fund). The borrower thus shares with the chosen majority part of the surplus is creates by subordinating the minority.

Priming transactions received critical attention almost as soon as it became clear that large, distressed firms could plausibly pursue them without overwhelming creditor support. Indignant lenders sued to enjoin the transactions in several instances. Finance specialists at the leading law firms quickly began to publish client memoranda warning of the transactions and sketching proposed "fixes" to standard loan terms that could block aggressive borrowers going forward. Informational intermediaries specializing in leveraged finance—such as Debtwire, Covenant Review, and Reorg—have produced a torrent of critical commentary.

Disinterested academic commentators likewise have expressed skepticism about the transactions (Ellias and Stark 2020; de Fontenay 2020a, 2020b, 2021; Mengden 2021; Ayotte and Scully 2021; Dick 2021). Most have assumed, as least implicitly, that the borrower flexibility needed to execute the transactions is substantively unreasonable whatever the literal terms of the relevant contracts might provide and have thus interpreted the wave of priming transactions as evidence of borrower power run amok.[3] These scholars have implicitly situated

---

[3] Agreement on this score is perhaps surprising. Judged a priori, the dropdown and uptier transactions have ambiguous significance for enterprise value and for the value of various investors' interests in the companies that undertake them. On one hand, the transactions allow borrowers to resolve debt overhang without resorting to the Chapter 11, where distressed companies unable to secure creditor consensus have traditionally looked for liquidity (Ayotte and Skeel 2013). Avoiding bankruptcy's cumbersome processes could conserve wealth. On the other hand,

the leveraged loan market in a broader literature about the failure of markets with sophisticated participants to create optimal terms (see Gulati and Scott 2013; Choi et al. 2017a, 2017b; Gulati and Kahan 2018; Clayton 2021).

This paper reports on changes to syndicated term loan contracts after the plausibility of dropdowns and uptiers became evident to market participants, in 2016 and 2020, respectively. We read the credit agreements underlying a large sample of leveraged loans to determine whether borrowers would be able to undertake a dropdown or uptier transaction. The resulting data allows us to document the extent to which contracts became more likely to "block" the transactions after they became widely salient.[4]

There are two principal reasons to care about the evolution of contracts following these transactions. First, understanding the state of play in the leveraged loan market is important in its own right. Borrowers' ability to issue priming debt has important implications for the way financial distress will be resolved in coming years. As an alternative to Chapter 11, the dropdown and uptier transactions allow a distressed company to access liquidity when debt overhang coupled with renegotiation frictions might otherwise preclude it. Yet the method by which a company accesses liquidity can have profound implications for enterprise value and for the way investors share that value. For example, equity investors are apt to prefer recapitalizing outside of bankruptcy, where the absolute priority rule and judicial oversight of extraordinary

---

an optimal contract might use debt overhang affirmatively to create a state-contingent toggle of control rights from borrower to lenders (or to a judge charged with taking creditor interests into account) (Buccola 2019). Whatever the efficiency properties of dropdowns and uptiers, however, the transactions, at least in their first iterations, seem to have come as a surprise to lenders, suggesting that the capacity to execute them may not have been anticipated when the loan was originated.

[4] For the dropdown, we peg the date at J. Crew's announcement of the transfer of its trademarks to an unrestricted subsidiary, which happened in December 2016. For the uptier, we peg the date at Serta Simmons' announcement, in June 2020. Each had precursors, however, and the conceptual possibility of the transactions must have occurred to market participants at varying times, so there is no unique date around which to build a perfect event study.

transactions tend to weaken the rights of junior creditors and shareholders (e.g. Buccola 2022; Casey 2011).

Second, changes in contract terms can teach us about the desirability of borrower flexibility that makes dropdowns and uptiers possible and about the leveraged loan market more generally. Optimal contract theory predicts that, absent bargaining impediments, loan agreements should constrain borrowers in a way that maximizes the parties' expected joint surplus. Given imperfect foresight—that is, parties' inability to foresee all prospective uses of borrower flexibility (see Ayotte and Scully 2021)—one arrives at a conditional prediction of change: if parties discover that a type of borrower flexibility commonly found in loan agreements is value-destructive, contracts will adjust to root out the source of flexibility. For example, if parties generally believe that a borrower's ability to prime lenders via a dropdown is value-destructive, net of anticipated value-*enhancing* dropdowns, then, the theory predicts, contracts agreed after the J. Crew transaction became known should foreclose the possibility. If such a change occurred, it would bolster critics' suspicion of the dropdown and suggest that the leveraged loan market is at least minimally capable of correcting terms that prove value-destructive. Conversely, it also follows that, if there is no such change, then either the market suffers from significant bargaining frictions *or* parties value the flexibility underlying the dropdown despite its capacity to prime existing lenders. Likewise for the uptier.

To study the evolution of contract terms, we read and code more than 600 syndicated term loan contracts for their susceptibility to a dropdown or uptier transaction. The loans were originated between January 2016 and September 2021—that is, from approximately one year before J. Crew announced the first phase of its dropdown to approximately fifteen months after

Serta Simmons announced its uptier. The sample is drawn from Thomson Reuters' Practical Law service and provides a representative sample of leveraged loans to publicly traded borrowers.[5]

We review the legal prerequisites of each of the transactions and develop a set of contract features that block them or mitigate their effects. For the dropdown transaction, the only fully preventative measure is to forswear unrestricted subsidiaries altogether, since the inapplicability of covenants and liens that apply to the borrower and its assets, respectively, define what it is for a subsidiary to be unrestricted. In our sample, roughly one-half of loans permit the borrower to create unrestricted subsidiaries. That fraction remained constant throughout the period we study. More modestly, however, credit agreements can limit the magnitude of a potential dropdown by restricting the amount or type of assets the borrower can move into unrestricted subsidiaries. We find no evidence that relevant investment baskets have shrunk over time, but we do find evidence that contracts entered since 2020 have become more likely to prohibit the dropping down of intellectual property (IP) assets specifically. We infer that creditors object not so much to dropdown transactions as such, but to the fragility of liens on an asset class that is notoriously difficult to value.

There are two generic ways a loan contract can block an uptier. It can prohibit the borrower or its affiliates from repurchasing loans on a discriminatory basis (that is, from favored creditors only) or it can require supermajority or unanimous consent for the borrower to subordinate the lien and payment priority of existing loans. Before the Serta transaction, roughly 40% of contracts blocked uptiers. Most did so by adhering to a pre-financial crisis norm that

---

[5] Since the credit agreements are sourced from SEC filings, the borrowers have publicly traded securities at some point near the origination of the loan. In our analysis, we merge the loans with accounting data, so the analysis sample includes firms that filed a 10-K or 10-Q within 180 days following the loan origination. Nevertheless, 20% of our sample borrowers are backed by a private equity sponsor.

prohibited non-pro-rata loan repurchases altogether. In the year after Serta, however, the frequency of uptier blockers rose sharply to about three-quarters of loans. Nearly all of the change was attributable to an increase in the frequency of contracts that made loan priority a "sacred right" requiring unanimous approval to change.

We draw two principal conclusions. First, we reject the hypothesis that syndicated loan contracts are slow to adjust when the anticipated burden of a value-destructive term falls on creditors. After Serta Simmons announced its plan to use common loan provisions to split its first-lien lenders and subordinate a large minority of them, new loans rapidly adopted terms to prevent borrowers doing likewise in the future. It follows that persistent terms should enjoy a presumption that they are, if not value-enhancing, at least not materially value-destructive. Second, we conclude that contractual features permitting the borrower flexibility to access liquidity, including by subordinating first-lien lenders, are part of the optimal loan contract for some borrowers. Despite the high salience of dropdown transactions, contracts are just as likely now as before J. Crew to allow borrowers to create (and transfer assets free and clear of liens to) unrestricted subsidiaries. This fact, when viewed in light of the way contracts adjusted after the Serta transaction, suggests that for some kinds of borrowers the utility of the unrestricted subsidiary outweighs the costs to lenders of potential subordination.

## 2   Institutional Setting

Managers of financially distressed companies often would like to issue debt that has priority over existing claims. Distressed businesses have capital needs like all businesses—to pay operating expenses, invest in capital, retire maturing debts, and so on—but, by definition, distressed businesses are unlikely to be able to finance their needs with operating cash flows. They therefore frequently must seek external capital, and distressed companies face a distinctive

market constraint. Debt overhang can rule out the sale of junior debt or equity (Myers 1977). Issuing first-priority claims may be the only way to access capital. Benmelech, Kumar, and Rajan (2022) find, perhaps for that reason, that distressed firms are more likely than investment-grade firms to issue secured debt.

Traditionally, companies with a secured loan in place had to get lender approval to issue priming debt. Two features of standard loan contracts make the need for consent explicit. First, debt-incurrence and lien covenants provide that neither borrowers nor their subsidiaries can take on new debt or permit the creation of new liens other than pre-specified types and amounts. If a borrower sought to issue new debt in defiance of the covenants, the lenders would be entitled to penalty interest rates and could even call the existing loan and begin enforcement proceedings. Second, in connection with a loan, borrowers and their subsidiaries typically granted liens on substantially all of their assets. Potential subsequent lenders would therefore know that it would rank behind the bank in a liquidation or bankruptcy scenario, irrespective of whatever the borrower might promise (Adler & Kahan 2013; Picker 1992).

A broader pattern of lender control has long reinforced borrowers' contractual obligation to seek approval of new senior financing (see Baird and Rasmussen 2006). Quite apart from establishing liens and restrictions on the incurrence of new debt, traditional loan contracts imposed financial maintenance covenants that borrowers were likely to breach at the onset of financial distress. These covenants in effect cast lenders' shadows over everything a distressed borrower might do (e.g. Nini, Smith & Sufi 2009, 2012; Roberts & Sufi 2009). In such an environment, a distressed borrower would not dare try to subordinate its bank lenders even if it discovered language in its loan contract that arguably allowed it to do so. Nor would potential capital providers be likely to lend into such a transaction. Lenders had too many ways to make

life difficult. If a borrower wanted to issue priming debt, the only options were either to get bank consent or try its luck in Chapter 11.[6]

After the 2008 financial crisis, however, the foundations of lender control began to give way. Term loans, traditionally held by the banks that provided a borrower's revolving credit, were increasingly sold to non-bank institutions—CLOs, loan mutual funds, private credit funds, and the like. As lenders became more diffuse and renegotiation therefore became more costly, restrictions on borrower activity loosened (Griffin et al. 2020; Ivashina and Vallée 2020). The virtual disappearance of financial maintenance covenants from term loan contracts was the most striking development (see e.g. Becker and Ivashina 2016; for a qualification, see Berlin et al. 2020). But borrowers have gained flexibility in a variety of less obvious ways, as well, for example through more expansive definitions of terms used in financial covenants (see e.g. Badawi et al. 2021, p. 37).

Covenants restricting lien creation and debt issuance remain staples of every leveraged loan, but subtle contractual changes have turned the constraints, in some instances, into a kind of Maginot Line. Two transaction types have proved especially effective for borrowers looking to sidestep the old barriers: the "dropdown" and the "uptier." They have much in common. Both are very much products of the new environment. Neither transaction would have been possible, let alone advisable, under the loan terms that typically prevailed before the financial crisis. Both are at least arguably permitted by terms commonly found in post-crisis loans. But although the transactions share an historical origin and allow borrowers to achieve similar ends, they work by

---

[6] Even in Chapter 11, it is often difficult to subordinate incumbent lenders without broad consent. In principle, the Bankruptcy Code permits debtors to issue priming debt while in bankruptcy, 11 U.S.C. § 364(d), or under the terms of a plan of reorganization. But bankruptcy judges apply stringent standards when determining whether to approve super-priority debtor-in-possession financing or to "cram up" a plan on non-consenting lenders.

9

very different legal logics. The elements of a loan contract that permit borrowers to execute one are conceptually as well as practically independent of the elements that permit the other; so, too, therefore, are the contractual terms lenders can deploy to thwart the transactions.

## 2.1    The Dropdown

### 2.1.1    Structure and Logic

In a dropdown, the borrower moves valuable assets out of its lenders' collateral package to a so-called "unrestricted subsidiary," which re-encumbers the assets to support its own newly issued, priming debt.[7] From 30,000 feet, the transaction is straightforward. Assets are transferred downstream and out from underneath existing liens; the downstream entity borrows against the assets and uses the proceeds to relieve an upstream entity's capital needs; upstream creditors are subordinated in the process. But the transaction's mechanics are subtle. In particular, a borrower's ability to do a dropdown is predicated on two features common to, but by no means universal in, post-crisis syndicated loan contracts: the power to designate subsidiaries as "unrestricted" and the capacity to transfer valuable assets to those subsidiaries.

We illustrate a generic dropdown transaction in Figure 1. In the example, the borrower has two subsidiaries—"Sub A" and "Sub B." Sub A is a restricted subsidiary and subject to all terms of the loan agreement. The so-called "restricted group" is illustrated by the dotted box containing the borrower and Sub A. Sub B is an unrestricted subsidiary. Its existence creates two opportunities that are central to the dropdown. First, the valid transfer of an asset from the

---

[7] The unrestricted subsidiary is a construct of credit documents rather than a generic legal concept. It is a subsidiary in the ordinary sense—the borrower controls it and holds its equity (directly or indirectly)—but lenders agree to treat it for most purposes as if it were an arm's-length entity. The construct has been a staple of high-yield bonds for some time, but it came to the syndicated loan market after the 2008 financial crisis (Bellucci and McCluskey 2017). Loan agreements that contemplate unrestricted subsidiaries typically allow the borrower to designate subsidiaries as it sees fit, subject to modest conditions.

borrower to it causes any lien on the asset to be released. Collateral moved to an unrestricted subsidiary ceases to be collateral for the original loan. Second, because unrestricted subsidiaries are not bound by the covenants of the original loan, they can issue an unlimited amount of debt backed with liens on their assets.[8] Together these features make the dropdown a formal possibility—collateral that validly passes from a borrower to an unrestricted subsidiary can be re-pledged to support debt issued by the subsidiary. In Figure 1, the new lenders to Sub B are granted a first-priority lien on the collateral transferred from Sub A to Sub B.

For the dropdown to matter as more than a formal possibility, however, a borrower must be able to transfer a substantial amount of collateral to its unrestricted subsidiaries. The power to do so is a function of what are known in the trade as the borrower's "investment baskets." In modern syndicated loan contracts, it is standard for borrowers to covenant that they will not make "investments," defined to include capital contributions to subsidiaries, unless an enumerated exception, or basket, permits it. Many common baskets can be aggregated to generate substantial capacity to transfer assets to unrestricted subsidiaries. Some loans include a basket specifically for investments in unrestricted subsidiaries. Virtually all loans include one or more general investment baskets, which give the borrower permission to invest a limited amount in whatever it wants. Investment baskets do not typically specify the kinds of assets borrowers can transfer. If a borrower wishes to invest something other than cash or a cash-equivalent, it must simply make a good-faith estimate of the value to be transferred. The significance of a

---

[8] A third implication bears importantly on the designation of unrestricted subsidiaries but is not fundamental to the dropdown transaction. An unrestricted subsidiary's balance sheet is not consolidated with the borrower's for purposes of covenant tests. This is a double-edged sword. The borrower cannot use the subsidiary's assets or earnings to reduce its reported leverage, but, on the other hand, nor must it count the subsidiary's debts or losses against its leverage.

potential dropdown transaction therefore varies with the size of a borrower's investment baskets and its ability or willingness to understate the value of assets it might transfer.

The upshot of a dropdown transaction is the ability to issue new debt with structural and lien priority over pre-existing debt. New lenders provide financing to Sub B and have a priority claim on the collateral that was transferred from Sub A. If the transferred assets are required for the operations of the borrower, Sub B can license their use to Sub A so the borrower can continue operating as usual. The pre-existing lenders, however, are left with a subordinated claim on the collateral.

### 2.1.2   Salience — The J. Crew Transaction

The dropdown came to widespread attention in a transaction executed by J. Crew in two stages beginning December 2016. The J. Crew transaction is so (in)famous, in fact, that in leveraged finance circles the company's name has become a synonym for the dropdown and, more broadly, for aggressive out-of-court recapitalizations. It is not unusual to hear of lenders being "J. Crewed."[9]

This is not to say that the transaction emerged from nowhere. The roots of the dropdown trace to the subordination of corporate bonds. Because unrestricted subsidiaries are not subject to a standard bond indenture's negative pledge or debt covenant, they can create secured debt with priority over the parent's bonds. In fact, just a year prior to the J. Crew transaction, iHeart Media sparked litigation on the matter by transferring shares in subsidiary Clear Channel to an unrestricted subsidiary. At the time, iHeart made its intentions clear, describing the purpose of

---

[9] *See, e.g.*, Peter Coy, *In Finance, 'J. Crew' is a Verb. It Means to Stick It to a Lender*, Bloomberg Businessweek (June 17, 2019), https://www.bloomberg.com/news/articles/2019-06-17/in-finance-j-crew-is-a-verb-it-means-to-stick-it-to-a-lender.

the transaction as "to provide greater flexibility in support of future financing transactions, share dispositions and other similar transactions."[10] Holders of notes subordinated by the transaction challenged its legality on the theory that a transfer of assets to an unrestricted subsidiary *for the purpose of effecting a financing* should not be understood as an "investment." The matter was resolved in iHeart's favor.[11]

A dropdown was first used to subordinate a secured loan in 2016, when Claire's Stores moved assets into an unrestricted subsidiary and issued debt secured by the transferred assets. Claire's Stores offered the new debt in exchange for existing second-lien and unsecured debt, effectively priming the first-lien debt holders. Interestingly, the Claire's transaction did not spur much rancor at the time, let alone litigation, perhaps because the lenders thought the economic value of their positions was being preserved.

J. Crew brought the dropdown to center stage. The operating company's assets were encumbered in support of approximately $1.5 billion of term loans. Upstream from the operating company, a holding company through which J. Crew's private equity sponsors owned the company had approximately $500 million of unsecured PIK notes outstanding. The notes were set to mature before the term loan. Given the operating company's performance, and concomitant restrictions on dividends to the holding company, the PIK notes would be difficult to repay. The noteholders thus had no direct claim against the operating company but could wipe out the sponsors' equity interests. A dropdown promised to resolve the sponsors' problem, as newly issued, priming debt could be exchanged for the notes.

---

[10] See Clear Channel Outdoor Holdings' 13-D filing from December 10, 2015; available at https://www.sec.gov/Archives/edgar/data/1334978/000119312515399227/d63687dsc13da.htm.

[11] Franklin Adivsers, Inc. v. iHeart Communications Inc., No. 04–16–00532–CV, 2017 WL 4518297 (Tex. App. Oct. 11, 2017); see also iHeart Communications, Inc. v. Benefit Street Partners LLC, 2017 WL 1032510, at *3–5 (W.D. Tex. Mar. 16, 2017).

J. Crew announced the transfer of its trademarks to an unrestricted subsidiary in December 2016. It had $250 million of capacity to invest in unrestricted subsidiaries and had received an opinion valuing its intellectual property at $347 million. J. Crew thus transferred downstream what it called 72% of an undivided interest in the IP; 72% of $347 million is just under $250 million.[12] The new owner of J. Crew's trademarks then offered an exclusive license of its rights back to an affiliate of the old owner for a $59 million annual payment.

Although the writing was on the wall as of December 2016, J. Crew did not have its unrestricted subsidiary incur new debt until June 2017. Wanting to be able to issue new debt cloud-free, J. Crew first sought a declaratory judgment vindicating its transfer of the IP.[13] The lenders counterclaimed, arguing that the loan agreement forbade the transfers and that they amounted to a fraudulent conveyance in any case.[14] Ultimately, J. Crew persuaded a supermajority of the lenders to settle: for their explicit ratification of the transaction, the consenting lenders would be allowed to sell $150 million of their loans, which were trading at around 70 cents on the dollar, at par. The settlement allowed J. Crew to borrow without a cloud on the IP.[15]

---

[12] The J. Crew transaction was structured in a manner slightly more complicated than what we have described. In particular, J. Crew arranged a series of transfers that moved IP from a loan party, through a non-guarantor restricted subsidiary, to the unrestricted subsidiary that would eventually issue new debt. The transaction was so arranged to take advantage of what is sometimes called a "proceeds" basket. The proceeds basket in effect allowed J. Crew to transfer more to its unrestricted subsidiary via an indirect method than it could have transferred directly ($250 million instead of $100 million). This two-step procedure is also sometimes described as J. Crew's "trap door."

[13] Complaint for Declaratory Judgment, J. Crew Group, Inc., et al. v. Wilmington Savings Fund Society, FSB, No. 650574/2017 (N.Y. Sup. Ct. Feb. 1, 2017).

[14] Answer with Counter-Claims, J. Crew Group, Inc. v. Wilmington Savings Fund Society, FSB, No. 650574/2017 (N.Y. Sup. Ct. June 22, 2017).

[15] A rump of non-consenting lenders continued to press claims against J. Crew. Amended Complaint, Eaton Vance Mgmt. v. Wilmington Savings Fund Society, FSB, No. 654397/2017 (N.Y. Supreme Court Sept. 7, 2017). The loan agreement's amendment had mooted the lenders' strongest arguments, however. Consequently, although the New York courts dismissed most of the remaining claims, Eaton Vance Mgmt. v. Wilmington Savings Fund Society, 2018 WL 1947405 (N.Y. Sup. Ct., Apr. 25, 2018) (dismissing all claims except one turning on notion that IP was "substantially all" of the lenders' collateral); Eaton Vance Mgmt. v. Wilmington Savings Fund Society, 171

Importantly, arguments against the transaction's legality focused on facts peculiar to J. Crew. The lenders contended, for example, that J. Crew's total leverage ratio was too high for the company to designate unrestricted subsidiaries; that the company's valuation of its trademarks was specious; that, because J. Crew was insolvent, the transfer of an undivided interest in those marks was a fraudulent conveyance. Had a majority of the lenders not ultimately consented to the deal, the courts would have had to confront difficult questions.[16] But there likely would not have been questions about the formal validity of dropdown transactions generally.

### 2.1.3   *Subsequent Dropdowns and Litigation*

Lenders' views since late 2016 about the importance of blocking dropdowns should depend not only on their knowledge and assessment of the merits of the J. Crew transaction, but also on their sense of the likelihood of subsequent dropdowns and of judicial attitudes toward the transaction.

In the immediate aftermath of J. Crew, two companies, Neiman Marcus and PetSmart, used similar tactics to strip collateral from existing loans. Then there was a pause. But in 2020, as the fallout from Covid uncertainty and lockdowns threatened many businesses, four big-name distressed companies—Revlon, Travelport, Cirque du Soleil, and Party City—executed dropdowns and others are rumored to have threatened to do the same. Most recently, Envision Healthcare executed another dropdown in 2022. IP has proven to be the preferred asset to move

---

A.D.3d 626 (N.Y. Sup. Ct. App. Div. 2019) (affirming with costs), and the minority lenders ultimately dropped their case, one should be careful not to read the decisions to say anything about the transaction's fundamental legality under the terms of the initial agreement.

[16] Whether J. Crew estimated the value of the assets it transferred in good faith seems an especially hard question. Among other things, it makes little sense to assume that 72% of an undivided interest in property would be worth 72% of the property's value—nor, indeed, that such a fractional interest is even legally recognizable.

into the unrestricted subsidiary. In the first four of the deals, IP comprised nearly all of the collateral backing the new priming debt.

Litigation has been spare. Aggrieved lenders challenged the PetSmart and Neiman Marcus transactions. As in J. Crew, however, the borrowers were able in each case to settle with and procure amendments ratifying the deal. No judicial decision has addressed the transaction's essential permissibility.

### 2.1.4   Contractual Blockers

The structure and history of the dropdown suggest three ways loan agreements could limit the impact of or prevent a J. Crew-type dropdown if market participants wished to do so: (1) limit the kinds of assets borrowers can invest into unrestricted subsidiaries, (2) reduce the amount they can invest, or (3) do away with unrestricted subsidiaries altogether. We refer to these contractual provisions as "blockers."

The last mechanism—getting rid of unrestricted subsidiaries—is the most effective though also the bluntest. There can be no dropdown if all of a borrower's significant subsidiaries are subject to debt and lien covenants. Until recently, that was the rule in virtually every leveraged loan, and our data show that it is still true of about one-half of credit agreements today.

Eschewing unrestricted subsidiaries altogether presumably entails costs, however, at least for some borrowers, since unrestricted subsidiaries can provide valuable flexibility. Because their balance sheets are not consolidated with the borrower's, unrestricted subsidiaries are useful for housing high-growth add-on business lines.[17] Leland (2007) shows theoretically the

---

[17] Inherent uncertainty at the time of a loan as to whether the borrower will have reason to make use of an unrestricted subsidiary might help to explain why loan contracts began to contemplate the construct only since the financial crisis. Bond indentures, which are famously difficult to amend, have long allowed borrowers to designate and invest into unrestricted subsidiaries. As the number of lenders in a typical leveraged loan syndicate has grown—

advantages of allowing a firm to design stand-alone financing arrangements for business lines with disparate risk, size, and other features that bear on optimal capital structure. In practice, firms often use unrestricted subsidiaries to finance faster growing segments of their business. For example, Scientific Games designated its social gaming subsidiaries as unrestricted in 2016. According to the press release accompanying the event, the move was made "with the goal of maximizing growth for the company … including potential new joint ventures, acquisitions, IPO, and other growth options."[18] Indeed, Scientific Games completed an IPO of a minority stake in SciPlay Corporation in 2019.

Perhaps recognizing the utility of the unrestricted subsidiary, leading law firms developed a response to J. Crew that did not depend on scotching the construct altogether.[19] The standard advice involves prohibiting unrestricted subsidiaries from owning intangible assets, especially intellectual property material to the borrower's business. The logic of what we call the "IP blocker" is twofold. First, IP is prone to abuse. As an asset class, it is notoriously difficult to value accurately. A borrower, by strategically underestimating the value of its IP, might move $500 million of value out of the lenders' collateral pool under investment baskets that on their face allow only, say, $100 million. Second, the most contentious dropdowns, including J. Crew, have in fact been premised on a transfer of IP. The "IP blocker" thus does not prevent a dropdown but rather reduces the potential for what lenders might see as abusive transactions.

---

and the hazard of securing ex post permissions with it—it follows that the value to borrowers of establishing ex ante a right later to carve out part of the lenders' collateral would have grown, too.

[18] The press release is available at https://www.prnewswire.com/news-releases/scientific-games-positions-itself-to-accelerate-growth-in-its-interactive-business-300323611.html.

[19] Jonathan Schwarzberg, "Investors tighten loan documents with J Crew blocker," Reuters (May 3, 2018), https://www.reuters.com/article/jcrew-blocker/investors-tighten-loan-documents-with-j-crew-blocker-idUSL1N1SA1W8.

Finally, loan agreements could dampen the significance of potential dropdowns by reducing the size of baskets borrowers can use to transfer assets to unrestricted subsidiaries. As an economic matter, it is not borrowers' ability to drop down assets *in general* that matters to lenders; it is their ability to drop down assets *valuable in relation to the business's economics*. Loans vary substantially in the kinds of investment baskets they make available to borrowers. It is very common, however, to provide a basket specifically for investments in unrestricted subsidiaries and *general* investment baskets for use as the borrower sees fit: a static, dollar-denominated basket, a "builder" basket that scales with retained earnings, and a contingent basket permitting unlimited investments if the borrower's leverage is below a stated ceiling. The tighter these baskets are, the smaller is the amount by which a dropdown can subordinate lenders.

## 2.2    The Uptier

### 2.2.1    Structure and Logic

Like the dropdown, the uptier allows a borrower to issue priming debt. In an uptier, however, no assets change hands, no liens are released, and subsidiaries are irrelevant. The transaction works via contractual amendment. The borrower persuades a bare majority of lenders, by granting them favorable treatment, to amend the governing loan contract in a manner that explicitly permits the borrower to create priming debt.

There are two parts to the uptier, which we illustrate with a contrived example in Figure 2. One is the operative part, which is the amendment itself. Standard loan contracts prevent the incurrence of priming debt in the ordinary course. A debt covenant limits the amount of debt borrowers can incur and requires that any new debt be, among other things, junior in repayment priority. Moreover, liens on the enterprise's productive assets are governed by a rule of first-in-

time-first-in-right, so borrowers cannot create priming debt even if they are willing to violate covenants (Adler and Kahan 2013). In combination, these features mean that a borrower can create priming debt only if it can secure a valid amendment relaxing the debt covenant and altering the repayment waterfall or authorizing subordination of the existing lien. It has long been standard for loan contracts to condition the outright *release* of liens on the unanimous consent of lenders. But a bare majority of lenders have been allowed merely to *subordinate* the loan and relax its debt covenant. In Figure 2, Lender B, which funds 60% of the existing loan, can agree to amend the credit agreement to permit a new lien that is senior (labeled "super-priority" in Figure B) to the existing first lien.

The other part of an uptier is securing majority consent. Traditional loan contracts make it difficult for borrowers to funnel value to favored lenders. A borrower cannot, for example, simply offer to pay some lenders, but not others, for their consent. Loan contracts direct the borrower to channel all payments through the administrative agent, and so-called pro rata sharing provisions—which usually can be amended only with unanimous lender consent—require any lender who nonetheless recovers directly from the borrower to share the value it recovers ratably with fellow lenders (Bellucci and McCluskey 2017, p. 637). In our example in Figure 2, the borrower must find a tactic to compensate Lender B for agreeing to the amendment.

The approach that uptiering borrowers have settled on is to *buy*, at an attractive price, the favored lenders' loans using (some of) the newly created super-priority debt as consideration. Even this move is not legally straightforward, however. Until recently, most loan contracts prohibited lenders from assigning their loans to the borrower or its affiliates. To the extent a lender did so anyway—or tried to—most pro rata sharing provisions would expressly require the assigning lender to share proceeds pro rata (unlike in the case of assignments other than to the

borrower or its affiliates). Although a bare majority of lenders could have amended the contract to allow assignments to the borrower, pro rata sharing provisions usually could not be so easily amended. It was thus just not possible for borrowers to offer to repurchase from select lenders on preferential terms.

In recent years, however, some loan contracts began to establish exceptions to the general rule prohibiting assignments to the borrower (Bellucci and McCluskey 2017, pp. 640–643). These exceptions sought to replicate bond issuers' longstanding ability to repurchase debt trading below par. Two common exceptions declare that, notwithstanding a general prohibition on borrower repurchases, the borrower or its affiliates can buy loans through (1) an auction procedure open to all lenders on a pro rata basis (typically run by the administrative agent) or (2) on a non-pro rata basis in what are called "open market" repurchases. Crucially, the contracts that allow repurchase through auction or open market transactions also carve out from the general pro rata sharing rule the proceeds of such exceptional repurchases. In Figure 2, Lender B provides $40M of new money in exchange for a new super-priority loan with a face value of $70M. The borrower repurchases B's $30M share of the original loan, leaving Lender A's original $20M loan contractually subordinated to the new newly created debt. For the uptier to work, the loan swap must qualify as an "open market" transaction even though the terms surrounding the trade are highly negotiated.

### 2.2.2   Salience — The Serta Simmons Transaction

Serta Simmons executed an uptier in June 2020. In the run-up to the transaction, Serta had first- and second-lien term loans outstanding. In March, with the prices of both loans trading at distressed levels, the company sought lender proposals for restructuring the balance sheet. After reportedly receiving proposals from multiple lender groups, Serta announced on June 8 that

it had entered a transaction support agreement with a bare majority of first-and second-lien lenders.

Under the terms of the transaction, Serta would create $1.075 billion of new, super-priority debt and would have a right to issue more later. Of that amount, $200 million would represent new money for the business. The remaining $875 million would be used, in effect, as currency with which to repurchase consenting lenders' loans. At the agreed-upon exchange ratios, the roll-up would reduce Serta's net debt by approximately $400 million. First-lien lenders not invited to participate would thus find themselves subordinated to more than a billion dollars of incremental debt despite Serta's assets increasing by only $200 million.

The transaction did not close without a hitch. Minority lenders sued in New York state court to enjoin the deal, contending that the transaction violated the pro rata sharing and collateral release rules, each of which require unanimous consent to amend. The trial court denied the injunction, however, and the transaction closed on June 22.[20]

The Serta uptier had little precedent. Very generally, distressed companies have long sought creditors' permission to borrow on a priming basis while in a sense threatening non-participating creditors with subordination. The tradition is especially long in the bond-exchange context, where issuers commonly offer new, priming debt to holders who agree to have their bonds subordinated (e.g. Bratton and Levitin 2018, p. 1639; Donaldson et al. 2021). An analogous tactic is not foreign to the loan market, but traditionally—in both the bond and loan

---

[20] North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC, 2020 WL 3411267, No. 652243/2020 (N.Y. Sup. Ct. June 19, 2020).

context—inducements have been offered to creditors on a pro rata basis.[21] The unique feature of the transactions in 2020 is the discriminatory nature of the offer.

The closest precursor to the summer of 2020 was a discriminatory uptier that specialty clothier NYDJ contemplated, but never executed, in 2017. In form, the transaction NYDJ proposed would have been quite similar to the 2020 transactions. But when the company announced its plan, minority lenders complained in court that they were being excluded unfairly.[22] After the judge expressed displeasure with what he viewed as an inappropriate process,[23] the parties resolved their differences, and the company invited all lenders to participate in funding a new facility on a pro rata basis.[24] Thus NYDJ in a sense could have revealed a latent weakness in some credit documents, and to some finance lawyers it certainly did; but perhaps because it was a relatively small company and the transaction did not close, the affair did not capture public attention in the way the Serta Simmons and follow-on transactions did.

### 2.2.3   Subsequent Uptiers and Litigation

Two uptiers followed quickly on the heels of the Serta transaction. Boardriders announced an uptier on August 31, 2020. TriMark did the same two weeks later.

Litigation could plausibly put an end to uptiers, because the permissibility of the uptier under even the most permissive contracts is doubtful in a way that the permissibility of a generic

---

[21] A caveat is that exchange offers are typically not extended to bondholders whose receipt of the replacement security being offered would prohibit the issuer's use of the SEC's Rule 144A registration exemption.

[22] Complaint, Octagon Credit Investors LLC v. NYDJ Apparel, LLC, No. 656677/2017 (N.Y. Sup. Ct. Nov. 1, 2017).

[23] Transcript of Proceedings, Octagon Credit Investors LLC v. NYDJ Apparel, LLC, No. 656677/2017 (N.Y. Sup. Ct. Feb. 6, 2018).

[24] Affirmation, Exh. B, Octagon Credit Investors LLC v. NYDJ Apparel, LLC, No. 656677/2017 (N.Y. Sup. Ct. Mar. 13, 2018).

dropdown is not. Most obviously, the highly negotiated terms of the loan repurchases through which the uptier is effected do not look like "open market" repurchases. To date, however, courts have given mixed signals about their willingness to condemn uptiers.

Each of the three uptiers executed in 2020 gave rise to lawsuits by minority lenders challenging the transactions' legality. As we have said, the judge asked to enjoin the Serta transaction declined to do so. In her order denying the requested injunction, she was clear that she thought the plaintiffs unlikely to succeed on the merits of their claims.[25] A different group of Serta lenders found a more receptive audience on a damages action in federal court. Denying Serta's motion to dismiss, the district judge held that the lenders had stated a viable case because, among other things, Serta's agreement to repurchase the majority lenders' loans "did not take place in what is conventionally understood as an 'open market.'"[26] The borrowers that have executed uptiers to date all have relied on an "open market" exception to the general rule prohibiting borrowers and their affiliates from repurchasing loans. On the district court's view, the uptier would seem to be illegal under the terms of almost all leveraged loan agreements.

Lenders subordinated in the TriMark uptier likewise prevailed on a motion to dismiss their damages case.[27] The trial justice in their case held that the initial contract could plausibly be read to block amendment of a term that was necessary to effect the subordination without unanimous lender consent. The applicability of the justice's rationale to a broader set of potential uptiers is unclear, but the decision can be interpreted to reflect a baseline level of skepticism about the *class* of transaction. The case subsequently settled.

---

[25] Id.

[26] LCM XXII LTD. v. Serta Simmons Bedding, LLC, 2022 WL 953109, *8, No. 21 Civ. 3987 (KPF) (S.D.N.Y. Mar. 29, 2022).

[27] Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp., 150 N.Y.S.3d 894 (Sup. Ct. 2021).

With the court in the Boardriders litigation yet to opine,[28] the judicial picture is murky. An educated observer of the state of play any time between late 2020 and today could reasonably predict that, even absent changes to prevailing contract terms, the courts would settle on a rule making uptiers impossible. That equilibrium has never been, and is not now, obvious, however.

### 2.2.4   Contractual Blockers

An uptier can be blocked by preventing either of the transaction's two parts—an amendment that allows loans to be subordinated or the discriminatory inducement (i.e., the non-pro rata loan repurchase). The simplest approach is to declare that liens can be subordinated only with unanimous or supermajority lender consent. Requiring unanimous consent could, of course, create challenges in the cases when it is in the lenders' collective interest to allow a priming loan, but raising the threshold for consent to issue priming debt will prohibit unwanted uptier transactions.[29]

The other way to block an uptier is to prohibit or otherwise limit a borrower's ability to repurchase debt on a non-pro rata basis. The traditional terms of syndicated loan contracts frequently accomplish this incidentally, by forbidding assignments to the borrower or requiring that the proceeds of any such assignment be shared pro rata. Loans that prevent amendment of those assignment rules absent unanimous or supermajority consent effectively block an uptier. In theory a contract could also limit the percentage of outstanding loans a borrower can repurchase—the borrower needs to be able to repurchase 51%—or could define the open market

---

[28] ICG Global Fund 1 DAC v. Boardriders, Inc., No. 655175/2020 (N.Y. Sup. Ct.).
[29] For greater detail on flavors of possible uptier blockers observed in the market, see Julian Bulaon, Covenant Trends: Expanded Sacred Rights Provisions in Recent Credit Agreements Provide Varying, Sometimes Circumventable Protections Against Lien Subordination Amendments, *Reorg* (Feb. 25, 2022).

exception to clarify that it entails paying market price, perhaps in cash, for a loan sourced through a dealer. We do not observe these forms of a blocker in our sample.

## 3    Hypotheses and Research Design

We try to answer whether and how loan contracts changed after it became evident that borrowers subordinating lenders via dropdowns and uptiers was a serious risk. We use the salience of the J. Crew and Serta Simmons transactions as events that alerted market participants to weaknesses in existing contract language and to the possibility that borrowers would use that language to issue priming debt.

We posit that contracting parties will write terms that they anticipate will maximize the joint surplus of their agreement net of contracting costs. Contracts are incomplete because it is impossible, or prohibitively costly, to anticipate every contingency and negotiate the proper outcomes in advance. Because parties may fail to anticipate remote contingencies (Ayotte and Scully 2021), it should not be surprising to find that contracts change after the occurrence of a value-destructive event the latent possibility of which was a function of earlier terms. When an economically significant contingency becomes salient, parties ought to reassess contractual language to assign rights more efficiently. Although priming transactions have undoubtedly always been a risk for lenders, the public response to the J. Crew and Serta Simmons transactions suggests that the risk of these specific types of subordination became much more prominent in late-2016 and mid-2020, respectively. We test the null hypothesis of no change in contracts against the alternative that contracts updated to prevent these transactions.

### 3.1 The Null Hypothesis

There are two reasons why loan contracts might not have changed. First, the contractual features that permit a dropdown or uptier may provide benefits sufficient to make them sensible components of some credit agreements despite the prospect of borrower opportunism they entail. As we have suggested, unrestricted subsidiaries may provide certain borrowers with valuable flexibility to develop, account for, and finance separately new high-growth lines of business. Eliminating the construct altogether might be too costly. More generally, it may be efficient to have a non-bankruptcy mechanism for subordinating loans, particularly in an era when syndicated loans are held by many dispersed investors (Bord and Santos 2012).

The second reason why loan contracts may not change, at least in the short-run, is that commercial contracts can be sticky. Legal scholars have noted several examples of debt contracts not updating despite a salient event that one might think would have spurred a change in the optimal contract (e.g. Gulati and Scott 2013; Choi et al. 2017a, 2017b; Gulati and Kahan 2018). This research suggests that frictions in the negotiation or drafting process can, in some contexts, prevent contracts from updating to reflect parties' assessments of the costs and benefits of salient terms (see also Clayton 2022).

### 3.2 The Alternative Hypothesis

The alternative hypothesis is that loan contracts updated to prevent dropdowns and uptiers, which  one should expect if blocking the priming transactions is a preferred contract feature *and* syndicated loan contracts adjust. It is a joint hypothesis since both legs must be true for us to observe a change in contract language. Stated differently, failing to reject the null hypothesis does not let us distinguish between whether allowing the priming transactions is

perceived to be efficient or whether loan contracts simply have not adjusted to the new information.

There are reasons to believe that syndicated loan contracts can update quite quickly in response to a salient event. Borrowers and lenders are sophisticated parties, and there is a lot of money at stake. Talley (2021) studies the effect of a judicial decision that assigned to administrative agents the risk of accidental disbursement of funds, after Citibank, the administrative agent on a loan to Revlon, mistakenly wired the full principal amount of the loan to lenders who were in a dispute with the borrower. Bucking market convention, some lenders refused to return the funds, and a judge held that they were justified in holding onto the erroneously wired funds. Talley (2021) documents that loan contracts were quickly amended to clarify that mistaken disbursements must be returned to the administrative agent. Of course, the situation explored by Talley (2021) may be unique since administrative agents are active participants in drafting loan contracts and have incentive to protect their own interests. It remains an open question whether (and how quickly) the loan market updates in response to practices that implicate the broader set of lenders.

It is also reasonable to suspect that the contract provisions that permit borrowers to prime lenders are not features of the optimal contract—that, instead, dropdowns and uptiers represent opportunistic borrower behavior lenders had not foreseen. For the uptier, in particular, the non-pro rata mechanism results in intra-facility conflicts that syndicated loan contracts generally try to minimize. Such conflict could seemingly be avoided while preserving the ability of a borrower with broad-based lender support to access priming debt outside Chapter 11. For example, a straightforward alternative would allow a borrower to issue priming debt with simple majority

support from lenders but require that every lender be allowed to participate pro rata in the new priming loan.[30]

Putting these ideas together we get the following syllogism. If after 2016 (2020), syndicated term loans change to block dropdowns (uptiers), then the flexibility to do a dropdown (uptier) is not perceived to be part of an efficient contract *and* the loan market adjusts in response to lender interests. Conversely, if contract terms do not change, then *either* the relevant type of borrower flexibility can be part of an efficient contract *or* non-price loan terms are insensitive to lender interests.

### 3.3   Empirical Design

Our empirical analysis is a form of an event study. Using data on the contractual provisions that block the priming transactions, we ask how the frequency of dropdown and uptier blockers changed following announcement of the J. Crew and Serta Simmons transactions. We define the event dates as the end of 2016 (12/31/2016) and the middle of 2020 (6/30/2020). This is not to suggest that the end of 2016 and middle of 2020 were uniquely informative moments. Transactions take time to execute and involve multiple parties. At least some market participants must have contemplated the possibility of dropdowns and uptiers before J. Crew and Serta announced their respective deals. Likewise, subsequent events—later transactions and litigation outcomes—may have helped market participants to calibrate their views about future subordination transactions and, therefore, about the utility of blocking them.[31] J. Crew and Serta

---

[30] So-call "amend and extend" provisions work this way. Since 2008, many syndicated loan contracts allow borrowers to extend the maturity of a loan with the consent of only lenders willing to provide the extension, often in exchange for a higher interest rate. However, the amendment requires that all lenders be given the opportunity to participate in the extension. See Bellucci and McCluskey (2017, p. 64).

[31] Ivahina and Vallée (2020) show that the secondary market price of J. Crew's existing term loan fell sharply beginning on June 12th, 2017.

did, however, alert a broad segment of market participants—lawyers as well as investors—to the logic of dropdown and uptier recapitalizations and to the fact that well-advised borrowers might try to execute them. We thus use December 2016 and June 2020 to partition our sample into three broad periods: (1) a baseline period with contracts originated before the priming transactions became salient, (2) a period following the J. Crew transaction when salience of the dropdown increased, and (3) a period following the Serta Simmons transaction when the salience of the uptier increased. Our null hypothesis is that the frequency of blockers remained constant across the periods, and we test this hypothesis against the alternatives that the frequency of dropdown blockers increased in period 2 and that the frequency of uptier blockers increased in period 3.

## 4   Data

### 4.1   The Practical Law Sample

We draw a sample of loan contracts from Thomson Reuters' Practical Law (PL) service. PL provides access to roughly 700 corporate credit agreements per year through their Comprehensive Deal Database, which compiles agreements taken from SEC filings. We begin with 4,182 contracts from January 1, 2016, through September 30, 2021, that have non-missing data on the amount of the loan. Using data provided by PL, we exclude 649 contracts that are marked as amendments to original agreements, leaving us with a sample of 3,533 loan contracts.

The PL sample appears comprehensive and representative of the full set of leveraged loans made to SEC-reporting borrowers over this period. To assess the representativeness of the PL contracts, we compare the sample with a sample of loans taken from Dealscan, which is a database of loans used by Thomson Reuters to generate league tables and other summaries of the loan market. Figure A1 in the Appendix plots the aggregate amount of loans covered in each of

the samples. The figure shows that the PL sample includes roughly $500 billion of loans per year, which varies between 40 percent and 60 percent of the Dealscan sample. We believe the difference in sample sizes reflects the fact that Dealscan covers a larger set of financing events. As discussed in Roberts (2014), observations in Dealscan correspond to loan originations, amended and restated contracts, and loan amendments.[32] Although PL includes amended and restated agreements, we exclude all amendments.

Table 1 provides some summary statistics on the borrowers and loans covered by PL and Dealscan. Panel A shows that the distributions of loan size, spread, and maturity are quite similar across the two groups. On average, loan spreads are slightly smaller in the PL sample, but the difference is driven by the tails of the distribution; the median loan spread is identical across the groups. Panel B compares the distribution of borrowers across industries based on the Fama and French (1997) classification of SIC codes. The distributions are nearly identical, suggesting that the samples are taken from the same underlying set of borrowers.

The advantage of the PL data is that we have easy access to the underlying credit agreements, since PL provides the URL of the underlying SEC filing in EDGAR. We use this link to extract the contract so that we can read and code contract provisions that are not available in existing datasets such as Dealscan. To focus on loans most susceptible to a dropdown or uptier, we make several restrictions to the PL sample, which are summarized in Table 2. Although the restrictions substantially reduce the sample, there are two useful benefits. First, the restrictions produce a more homogenous sample of loans that expose lenders to the highest risk

---

[32] There is, unfortunately, no easy way to distinguish among the types of contracts.

of an aggressive recapitalization. Second, the restrictions can all be implemented using data from PL, which reduces the amount of reading required.

We remove loans that PL labels as unsecured, since priming of first-lien loans is an essential ingredient in the transactions we study. We also drop the few secured loans granted to investment-grade borrowers to create a more homogeneous sample of loans. As shown in the last two columns of the table, the removed loans very rarely include the terms "unrestricted subsidiary" or "open market," which we determine based on an automated search of the full sample of contracts. Since the ability to create an unrestricted subsidiary is necessary for a firm to complete a dropdown transaction, this term is necessary for a loan to permit a dropdown. Similarly, since the right to repurchase loans through an open market purchase suggests that lenders have contemplated the possibility of non-pro rata assignment to the borrower, this term again creates the possibility that a loan could permit an uptier. In our final sample that we analyze, the frequencies of these terms are 47% and 37%, confirming that the excluded loans are indeed quite different.

We next exclude debtor-in-possession loans (DIPs), second-lien loans, and asset-based loans based on the logic that these loans have unique collateral packages. We follow typical convention to drop loans to firms in financial services since many of these firms will be regulated and have unique capital structures. Finally, we drop a small number of loans with a maturity less than one year or granted in a currency other than U.S. dollars. Lenders with a short maturity are unlikely to face much risk of being primed, and the currency restriction helps create a more homogeneous sample.

For each of the remaining 1,221 contracts, we read the contract to make two further restrictions. First, we exclude loans that include only a line of credit. Second, we exclude any

31

loan that we determine was not broadly syndicated, since single-lender and club loans provide no opportunity for priming within the lending group. These last two restrictions further reduce the sample to 611 contracts, which we refer to as our analysis sample.

### 4.2   Contract Data

For each contract in the analysis sample, we code a set of provisions necessary to determine if the contract blocks the dropdown and uptier transactions. For dropdowns, any contract that allows the creation or existence of an unrestricted subsidiary will permit the borrower to conduct a dropdown transaction, since every such contract in our sample provides at least some basket exception to the negative investment covenant. We code any contract that does not permit an unrestricted subsidiary as fully prohibiting a dropdown. However, among loans that allow unrestricted subsidiaries, there are two contract provisions that limit the magnitude of any potential dropdown. First, the contract can prevent IP from being invested into an unrestricted subsidiary, which we term an "IP blocker."[33] Second, we code the size of the general investment and unrestricted subsidiary baskets. Since basket capacity is cumulative, we add them together and standardize by the size of the loan. Smaller baskets restrict the amount of assets that can be moved away from existing lenders.

For uptiers, we code the two approaches to blocking the transaction. For each contract, we determine whether the contract requires unanimous or supermajority consent to subordinate existing loans. If so, the contract blocks an uptier by preventing the subordination step of the transaction. We also determine if the contract prohibits the lender from repurchasing debt on a non-pro rata basis, which can be accomplished in two ways. First, the contract can prohibit

---

[33] We include in this category the two sample contracts that limit investments into unrestricted subsidiaries to cash and cash-equivalents.

lenders from assigning any loan to the borrower or its affiliates and preclude amendment of the anti-assignment rule without consent of a super-majority of lenders. Second, the contract can require that the proceeds of any assignment to the borrower or its affiliates be shared among lenders pro rata and preclude amendment of the sharing rule without consent of a super-majority of lenders. We also code whether the contract explicitly permits the borrower to repurchase the loan on a non-pro rata basis, either through an open market purchase or a Dutch auction.

Table 3 summarizes the results of this exercise for the full analysis sample of contracts. Across the years 2016-2021, 53% of contracts prohibit a dropdown transaction. The unrestricted subsidiary construct is present in less than half of leveraged loan contracts, so the majority of loan contracts do not allow the borrower to conduct a J. Crew-type transaction. Only 15% of contracts that permit unrestricted subsidiaries block the transfer of IP, but as we will show below, these blockers have become much more common by 2021. Slightly less than half (45%) of loan contracts block an uptier exchange, with the majority of the uptier blockers operating via prevention of discriminatory assignment. Among loans that contemplate non-pro rata repurchases by the borrower, which includes 40% of the sample, the frequency of uptier blockers is only 29%. However, as we show below, these blockers have become more common since the Serta Simmons transaction.

## 5    Testing the Hypothesis

### 5.1    The Time Series of Blockers in Leveraged Loans

We begin by exploring the time series of the unconditional frequency that contracts block dropdowns and uptiers. Panel A in Figure 2 plots the half-year frequency of contracts that lack

an unrestricted subsidiary construct.[34] In our sample, the use of unrestricted subsidiaries did not decrease after the J. Crew transaction was announced. The frequency of contracts contemplating unrestricted subsidiaries remained roughly constant, at about one-half, throughout the six-year sample period. Similarly, panel B shows no discernable trend in the average cumulative size of the baskets that borrowers can use to make investments into unrestricted subsidiaries. Panel C does, however, show a slow but steady increase over time in the frequency of contracts that contain an IP blocker. IP blockers were non-existent before the J. Crew transaction. In the most recent periods, a majority of contracts that allow the borrower to invest in unrestricted subsidiaries prohibit the investment of material IP. The combined evidence suggests that granting borrowers the ability to make investments in unrestricted subsidiaries remains a sensible component of credit agreements but allowing the transfer of IP assets provides too much borrower discretion that is subject to abuse. The evidence also shows a slow evolution of contract terms that accelerated following the Serta transaction.

Panel A in Figure 3 reports the time series of uptier blockers and shows that prohibitions on uptier exchanges increased sharply following Serta Simmons. In years prior to Serta, roughly 40% of contracts would block an uptier exchange. This frequency increased to about 75% by the middle of 2021, just one year after the Serta transaction was announced. The increase is due to a sharp rise in the frequency of contracts that make lien priority a sacred right. Figure A2 shows that, before Serta, the vast majority of contracts that blocked uptiers did so because they prohibited non-pro rata loan repurchases altogether. Among loans originated after Serta, roughly 90% of contracts that block an uptier condition loan subordination on the unanimous consent of lenders, or at least the consent of every lender affected by the amendment. That rate is about

---

[34] The second half of 2021 includes only the third quarter.

three times the rate prior to 2020. The sharp change suggests a concerted effort to prevent the uptier exchange. Panel B in figure 3 shows that the frequency of contracts permitting the borrower to repurchase loans on a non-pro rata basis did not decrease following the Serta transaction. Instead, contracts continue sometimes to permit borrowers to repurchase outstanding loans but now typically restrict borrowers' ability to compensate selling lenders with new super-senior debt.

### 5.2   The Time Series of Blockers Among Susceptible Loans

A striking takeaway of Figures 2 and 3 is that many contracts originated early in the sample, even prior to the J. Crew transaction, effectively blocked both dropdown and uptier transactions. We suspect many of these blockers were inadvertent, in the sense that no one specifically intended to prevent the subject transactions. Instead, the contract simply had no reason to permit an unrestricted subsidiary (and so blocked the dropdown) or enforced a strong pro-rata norm (and so blocked the uptier). The existence of such a large baseline fraction of loans blocking the transactions may mask larger underlying changes in the subset of loans most susceptible to the liability management transactions. In this subsection, we explore whether changes in the propensity to block dropdowns and uptiers was more pronounced in the kinds of contracts under which lenders would have been most vulnerable to subordination.

We begin by offering some evidence on how the frequency of blockers varies with characteristics of the borrower and loan, which helps identify the most susceptible deals. Table 4 reports the frequency of blockers for several subsamples of contracts, which we construct using data provided by PL, Compustat, and the loan agreements. PL provides data on the size of the loan and whether the borrower is backed by a private equity sponsor. We collect accounting data from Compustat for the borrower's total liabilities, book value of assets, and earnings before

interest, taxes, depreciation, and amortization (EBITDA), and we construct a measure of the firm's intangible assets as the book value of total assets less the book value of property, plant, and equipment (PPE), inventory, receivables, and cash.[35] Finally, we extract the name of the administrative agent for the loan from the credit agreements. We use this data to construct several variables that could affect the likelihood that a loan contains a blocker.

The top portion of Table 4 splits the sample according to the size of the loan, with buckets corresponding to the smallest quarter, middle 50%, and largest quarter of loans. We conjecture that larger loans are less likely to contain blockers due to higher renegotiation costs associated with larger lending syndicates and more complex firm operations and capital structures. Indeed, the data reveal a clear pattern: relative to small loans, large loans are much less likely to block either a dropdown or an uptier. Across the full sample period, less than one-third of the largest loans prohibit a dropdown, likely because the flexibility provided by unrestricted subsidiaries is particularly valuable for large firms. Similarly, the largest loans are less likely include an uptier blocker. Small loans are much less likely to permit borrower repurchases, so many small loans incidentally blocked uptiers prior to Serta Simmons.

The second panel in Table 4 splits the sample by borrower leverage, measured as the ratio of the borrower's total liabilities to the book value of the borrower's assets. Since we are examining a sample of leveraged loans, all borrowers have fairly high leverage. Nevertheless, the evidence suggests that the most leveraged firms are slightly less likely to face both types of blockers. The next panel in Table 4 splits the sample by borrower profitability, measured as the ratio of the borrower's EBITDA to assets. There is no evidence that blockers vary with the

---

[35] We merge the Compustat data to PL using the borrower's CIK number and use Compustat data as of the quarter-end immediately following the loan origination date. We can match 580 of the loans to Compustat and have data on the borrower's EBITDA for 565 of 580 of those loans.

borrower's profitability. The fourth panel splits the borrowers into groups by nature of operations. We measure the intangibility of the borrower's assets as 1 minus the ratio of tangible assets to total assets, where tangible assets are the sum of PPE, inventory, receivables, and cash. In the sample, the ratio varies between 1% and 97%, has a standard deviation of 27%, and is much larger for technology firms. Firms with more intangible assets are more likely to be able to designate unrestricted subsidiaries, but also more likely to face an IP blocker. The next panel splits the sample based on whether the borrower is backed by a private equity sponsor. Roughly 20% of the firms in our sample have a private equity sponsor. Sponsored firms are much more likely to be able to designate unrestricted subsidiaries and slightly less likely to face an uptier blocker; they are, however, more likely to face an IP blocker. The bottom panel in Table 4 splits the loans based on the type of lender that serves as administrative agent on the loan. We classify each agent as a large bank (which includes Bank of America, J.P. Morgan, Citigroup, and Wells Fargo), some other bank, or a nonbank. The bottom panel suggests that loans with nonbank agents are less likely to include uptier and dropdown blockers.

Because size and ownership type are strongly correlated with loan permissiveness, we examine the evolution of blockers among small and large loans and among sponsored and non-sponsored borrowers. Figure 4 shows the evolution of dropdown blockers among the smallest and largest loans in Panel A and among sponsored and non-sponsored borrowers in Panel B. Panel A confirms that, compared with large loans, small loans are significantly more likely to contain a dropdown blocker, but neither set of loans shows any trend over time. Panel B shows that sponsored borrowers are less likely to face a dropdown blocker, but again there is no discernable difference in the trend within either group. Figure 4 provides some comfort that the lack of trend in Panel A of Figure 2 does not mask offsetting trends in any subgroups.

Figure 5 explores the evolution of uptier blockers among small and large loans (Panel A) and among sponsored and non-sponsored borrowers (Panel B). Panel A shows that, prior to the Serta transaction, large loans, which are much more likely to permit discriminatory repurchases, were less likely to face an uptier blocker. Following the Serta transaction, however, the gap between large and small loans disappears, as loans that permit discriminatory repurchases start to make priority a sacred right. Figure 5 makes clear that the increase in uptier blockers documented in Figure 3 reflects a steep change among large loans that were most susceptible to the transaction and a more modest change among smaller loans that were likely to block the transaction anyway. Panel B shows that the sponsored status of the borrower has little relationship to the evolution of uptier blockers. By the end of the sample, uptier blockers are more common for non-sponsored borrowers, but the relatively small sample of sponsored borrowers prevents us from drawing conclusive inferences.

*5.3    Multivariate Analysis of Blockers in Leveraged Loans*

Figures 4 and 5 suggest that the trends documented in Figures 2 and 3 are not attributable to changes in the composition of loans or borrowers. Indeed, for uptier transactions, the aggregate trend understates the degree of adjustment in contracts because a substantial fraction already prohibited uptiers. In this section, we confirm this conclusion by examining the time series of blockers using regressions of the following form:

$$y_{it} = \alpha + \beta_1 \mathbf{I}(\,1/1/2017 \, < t < 6/30/2020\,) + \beta_2 \mathbf{I}(\,6/30/2021 \, \le t\,) + \beta_3 X_{it} + \varepsilon_{it} \qquad (1)$$

where $y_{it}$ is a feature of the contract to firm $i$ initiated at date $t$ and $X_{it}$ is a set of characteristics related to the loan and borrower. The important variables are the two indicator variables—

$\mathbf{I}(\,1/1/2017 < t < 6/30/2020)$ and $\mathbf{I}(\,6/30/2021 \leq t)$—which denote that the loan was

originated between the J. Crew and Serta transactions or after the Serta transaction, respectively.

The excluded group consists of loans originated before the J. Crew transaction, so the

coefficients $\beta_1$ and $\beta_2$ provide an estimate of how the contract feature changes during these

periods relative to the period prior to J. Crew. The regressions also allow us to formally test the

null hypothesis that the propensity of contracts to block dropdowns and uptiers has remained

constant over time.

Table 5 presents estimates of the parameters in equation (1) for an indicator that the

contract eschews unrestricted subsidiaries altogether, permits unrestricted subsidiaries but has an

IP blocker, and has as uptier blocker. For each outcome, we estimate a specification with no

control variables and a specification including controls for the variables in Table 4: the size of

the loan (the natural log of the amount of the loan), the borrower's leverage, the percentage of

the borrower's assets that are intangible, an indicator that the borrower has a private equity

sponsor, indicators that the lenders' agent is a small bank or a nonbank, and a set of industry

fixed effects based on the Fama and French (1997) classification of the borrower's SIC code, as

in panel B of Table 1. The control variables help rule out the possibility that the trend is caused

by change in the composition of the sample over time.[36]

The first two columns of Table 5 confirm that there is no evidence that leveraged loan

contracts are any more likely to prohibit a dropdown than they were before J. Crew. If anything,

incorporating control variables shifts the point estimates in column (2) more negative than

column (1), but we have no reason to reject the null hypothesis that the frequency of dropdown

---

[36] We do not include the borrower's profitability in the regression since there is no evident relationship in
Table 4 and data on EBITDA is missing for some of the sample. None of the results change if we include
profitability and estimate the regressions on the smaller sample.

blockers has remained constant across our sample. Similarly, including control variables has no impact on the inferences we draw regarding the evolution of IP blockers. Based on the estimates in columns (3) and (4), the frequency of IP blockers increased by about 6 percentage points during the post-J. Crew period and by about 45 percentage points following the Serta transaction. Columns (5) and (6) confirm that the trend documented in Figure 3 is not attributable to changes in loan composition. The propensity of otherwise similar contracts to block uptiers increased sharply after the Serta transaction. Compared to prior periods, the estimate in column (6) shows that contracts are about 35 percentage points more likely to block an uptier transaction during the year following the Serta transaction.[37]

Including control variables related to characteristics of the loan and borrower has very little impact on the estimated trend in any of the blockers. However, there does appear to be a strong relationship between the presence of a dropdown blocker and the size of the loan, the presence of a private-equity sponsor, and the type of entity serving as administrative agent. Given that about one-half of loans block a dropdown transaction, the estimated coefficients in column (2) on size, sponsorship, and agent type are quite large. A one standard deviation increase in the loan amount is associated with a 16.8 percentage point reduction in the likelihood of a dropdown blocker. Conditional on the loan permitting an unrestricted subsidiary, a one standard deviation increase in the loan amount is associated with an 8.0 percentage point reduction in the likelihood of am IP blocker. Compared with non-sponsored loans, sponsored loans are 24.3 percentage points less likely to block dropdowns. Loans with a nonbank agent are 14.7 percentage points less likely to do so.

---

[37] In the Appendix, Figure A3 displays estimates of half-year indicator variables used in place of the broad period indicator variable in equation (1). The point estimates show a sharp increase following the Serta transaction rather than a slowly increasing trend.

## 6   Discussion

Our empirical analysis is a formal test of the null hypothesis that the frequency of provisions bearing on borrowers' ability to execute dropdowns and uptiers has remained constant over time. That hypothesis rested on at least one of two premises being correct. Either the contractual provisions that permit dropdowns and uptiers are valuable components of some syndicated loan contracts, in the sense that the benefits to borrowers of unrestricted subsidiary capacity exceed the costs to lenders of potential subordination, or else they are not but non-price terms fail to adjust quickly to reflect lender interests.

Our findings allow us to reject the null hypothesis with respect to uptiers. Terms adjusted rapidly after the Serta transaction was announced. Within a year, the frequency of contracts that block uptiers had nearly doubled. We conclude that market participants often, at least, view the threat of an uptier as value-destructive and that contract terms in the leveraged loan market can adjust rapidly to lender sentiment. Of course, the frequency of uptier blockers did not immediately increase to 100 percent. One can infer either that flexibility to do an uptier is a valuable component of some contracts or, as we suspect, that the mechanisms by which terms change are imperfect. If our supposition is correct, uptier blockers, accomplished by making lien subordination a sacred right, should eventually become the norm for nearly all leveraged loan contracts.

The *way* contracts changed in response to uptiers allows us also to conclude that market participants perceive borrowers' ability to repurchase loans at least sometimes to be a valuable feature of leveraged loan deals. Contracts could have adjusted to the uptier by returning to the pre-financial crisis rule that made non-pro rata repurchases impossible. That is not what happened, however. Contracts are just as likely after as before Serta to permit borrowers and

41

their affiliates to repurchase loans. Instead, borrowers have given up what was once a ubiquitous power to subordinate liens with the consent of a bare majority of lenders.

Our conclusions with respect to the uptier shape our interpretation of the evidence on dropdown blockers. With respect to dropdowns, our findings do not allow us to reject the null hypothesis. The propensity of contracts to eschew unrestricted subsidiaries did not change after J. Crew. Nor did the magnitude of borrower capacity to invest in them. Because contract terms adjusted rapidly in response to the uptier, we are reluctant to attribute the persistence of unrestricted subsidiaries and associated basket capacity to a putatively non-responsive loan market (premise 2 above). Contracts could adjust to prevent dropdowns but did not. We thus interpret the evidence to suggest that, in some contexts, the unrestricted subsidiary—and therefore a borrower's ability to subordinate lenders—is a feature of the optimal loan contract (premise 1 above).

The pattern of change in the use of IP blockers is more mysterious. Although an IP blocker is less restrictive than elimination of unrestricted subsidiaries or reduction in basket capacity, it nevertheless limits borrowers' ability to conduct a dropdown. But the timing of the change is puzzling. For a while following the J. Crew transaction, the use of IP blockers barely budged. We only observe a large increase starting in the second half of 2020. Why did contracts not change quickly after J. Crew, but only later?

We propose that a flurry of dropdown transactions executed between April and July 2020 caused lenders to update their views on the likelihood that future borrowers would take advantage of contractual flexibility specifically by carving out of the collateral pool a type of asset the value of which is easy to understate. As stated previously, four distressed companies— Revlon, Travelport, Cirque du Soleil, and Party City—announced dropdowns as the initial

revenue shocks from Covid fallout hit corporate treasuries. They all used IP to effect the dropdown. Other companies are rumored to have threatened to do likewise. We cannot rule out the possibility that it took three years for the loan market to respond to the J. Crew transaction. But such a lag would be in tension with the market's responsiveness to the uptier. A better explanation is that the events of 2020 revealed new information to lenders about expected costs of borrower flexibility to drop down IP specifically.

Going forward we expect more priming transactions, as borrowers use unrestricted subsidiary capacity to finance new debt. Lenders seem content to allow borrowers the flexibility needed to do so even if it may decrease loans' expected recoveries in some cases. Splitting lender classes via uptier transactions will be very uncommon, however, as the vast majority of new contracts will prohibit borrowers from subordinating existing loans without unanimous or affected-lender consent. More broadly, our evidence suggests that the loan market can update quickly when borrowers exploit contract terms in ways that lenders did not foresee. Conversely, when one observes the persistence of provisions that seemingly allow borrowers to undermine lender expectations, one should therefore look to the countervailing benefits of borrower flexibility rather than market failure or borrower "power."

## References

Adler, Barry E. & Marcel Kahan. 2013. The Technology of Creditor Protection. *University of Pennsylvania Law Review* 161:1773–1814.

Ayotte, Kenneth & Christina Scully. 2021. J. Crew, Nine West, and the Complexities of Financial Distress. *Yale Law Journal Forum* 131:363–387.

Ayotte, Kenneth & David A. Skeel, Jr. 2013. Bankruptcy Law as a Liquidity Provider. *University of Chicago Law Review* 80:1557–1624.

Badawi, Adam B., Scott D. Dyreng, Elisabeth de Fontenay & Robert W. Hills. 2021. Contractual Complexity in Debt Agreements: The Case of EBITDA. Working Paper.

Baird, Douglas G. & Robert K. Rasmussen. 2006. Private Debt and the Missing Lever of Corporate Governance. *University of Pennsylvania Law Review* 154:1209–1251.

Becker, Bo & Victoria Ivashina. 2017. Covenant-Light Contracts and Creditor Coordination. Working Paper.

Bellucci, Michael & Jerome McCluskey. 2017. *The LSTA's Complete Credit Agreement Guide* (2d ed.). New York: McGraw-Hill.

Benmelech, Efraim, Nitish Kumar, & Raghuram Rajan. 2022. The Secured Credit Premium and the Issuance of Secured Debt. Working Paper.

Berlin, Mitchell, Greg Nini & Edison G. Yu. 2020. Concentration of control rights in leveraged loan syndicates. *Journal of Financial Economics* 137:249–271.

Bord, Vitaly M. Joan A.C. Santos. 2012. The Rise of the Originate-to-Distribute Model and the Role of Banks in Financial Intermediation *Economic Policy Review* 18:21–34.

Borowicz, M. Konrad. 2021. The Mechanisms of Loan Market Efficiency. *Review of Banking and Financial Law* 41:195–253.

Bratton, William W. & Adam. J. Levitin. 2018. The New Bond Workouts. *University of Pennsylvania Law Review* 166:1597–1674.

Buccola, Vincent S.J. 2019. Bankruptcy's Cathedral: Property Rules, Liability Rules, and Distress. *Northwestern University Law Review* 114:705–750.

_____. 2022. Sponsor Control: A New Paradigm for Corporate Reorganization. *University of Chicago Law Review* 90 (forthcoming).

Casey, Anthony J. 2011. The Creditors' Bargain and Option-Preservation Priority in Chapter 11. *University of Chicago Law Review* 78:759–807.

Chava, Sudheer, & Michael Roberts. 2011. How does Financing Impact Investment? The Role of Debt Covenants. *Journal of Finance* 63:2085–2121.

Cheek, Brad. 2019. Tearin' Up iHeart: The Recent Trend with Troubled Companies and the Unrestricted Subsidiary Transfer Tactic. *North Carolina Banking Institute* 23:271–293

Choi, Stephen J., Mitu Gulati & Robert E. Scott. 2017a. Variation in Boilerplate: Rational Design or Random Mutation? *American Law & Economics Review* 20:1–45.

_____. 2017b. The Black Hole Problem in Commercial Boilerplate. *Duke Law Journal* 67:1–77.

Clayton, William W. 2022. High-End Bargaining Problems. *Vanderbilt Law Review* 75:703–768.

Dick, Diane Lourdes. 2021. Hostile Restructurings. *Washington Law Review* 96:1333–1388.

Donaldson, Jason Roderick, Edward R. Morrison, Giorgia Piacentino & Xiaobo Yu. 2020. Restructuring vs. Bankruptcy. Working Paper.

Ellias, Jared A. & Robert J. Stark. 2020. Bankruptcy Hardball. *California Law Review* 108:745–787.

Fama, Eugene F. & Kenneth R. French. 1997. Industry Costs of Equity. *Journal of Financial Economics*. 43:153–193.

de Fontenay, Elisabeth. 2014. Do the Securities Laws Matter? The Rise of the Leveraged Loan Market. *Journal of Corporation Law* 39:725–768.

_____. 2020a. Windstream and Contract Opportunism. *Capital Markets Law Journal* 15:443–452.

_____. 2020b. Complete Contracts in Finance. *Wisconsin Law Review* 2020:533–551.

_____. 2021. The $900 Million Mistake: *In re Citibank August 11, 2020 Wire Transfers SDNY 16 February 2021)*. *Capital Markets Law Journal* 16:307–313.

Griffin, Thomas P., Greg Nini & David C. Smith. 2021. Losing Control? The 20-Year Decline in Loan Covenant Violations. Working Paper.

Gulati, Mitu & Marcel Kahan. 2018. *Cash America* and the Structure of Bondholder Remedies. *Capital Markets Law Journal* 13:570–586.

Gulati, Mitu & Robert E. Scott. 2013. *The Three and a Half Minute Transaction: Boilerplate and the Limits of Contract Design*. Chicago: University of Chicago Press.

Ivashina, Victoria. 2009. Asymmetric information effects on loan spreads. *Journal of Financial Economics* 92:300–319.

Ivashina, Victoria & Boris Vallée. 2020. Weak Credit Covenants. Working Paper.

Jennejohn, Matthew, Julian Nyarko & Eric Talley. 2022. Contractual Evolution. *University of Chicago Law Review* 89 (forthcoming).

Kahan, Marcel & Michael Klausner. 1997. Standardization and Innovation in Corporate Contracts. *Virginia Law Review* 83:713–770.

Leland, Hayne E. 2007. "Financial synergies and the optimal scope of the firm: Implications for mergers, spinoffs, and structured finance." *The Journal of Finance* 62: 765-807.

Mengden, Mitchell. 2021. The Development of Collateral Stripping by Distressed Borrowers. *Capital Markets Law Journal* 16:56–71.

Myers, Stewart C. 1977. Determinants of Corporate Borrowing. *Journal of Financial Economics* 5:147–175.

Nini, Greg, David C. Smith & Amir Sufi. 2009. Creditor Control Rights and Firm Investment Policy. *Journal of Financial Economics* 92:400–420.

_____. 2012. Creditor Control Rights, Corporate Governance, and Firm Value. *Review of Financial Studies* 25:1713–1761.

Picker, Randal C. 1992. Security Interests, Misbehavior, and Common Pools. *University of Chicago Law Review* 59:645–680.

Rasmussen, Robert K. & Michael Simkovic. 2020. Bounties for Errors: Market Testing Contracts. *Harvard Business Law Journal* 10:117–156.

Roberts, Michael R. & Amir Sufi. 2009. Renegotiation of Financial Contracts: Evidence from Private Credit Agreements. *Journal of Financial Economics* 93:159–184.

Roberts, Michael. 2014. The role of Dynamic Renegotiation and Asymmetric Information in Financial Contracting. *Journal of Financial Economics* 116:61–81.

Talley, Eric. 2021. Discharging the Discharge for Value Defense. *NYU Journal of Law & Business* 18:147–220.

Tung, Frederick. 2021. Do Lenders Still Monitor? Leveraged Lending and the Search for Covenants. *Journal of Corporation Law* 47:143–197.

**Figure 1. The Dropdown**



**Figure 2. The Uptier**



**Figure 2. The Evolution of Dropdown Blockers**

Panel A plots the half-year frequency of contracts that prevent a dropdown transaction. Among contracts that permit a dropdown, panel B plots the average sum of the general investment basket and the unrestricted subsidiary basket (if any) scaled by the size of the loan, and panel C plots the frequency of an IP blocker. The gray shaded regions are 95% confidence intervals, and the vertical lines are placed between the 2016h2 and 2017h1 and between 2020h1 and 2020h2.







**Figure 3. The Evolution of Uptier Blockers**

Panel A plots the half-year frequency of contracts that block an uptier transaction. Panel B plots the frequency of contracts that expressly permit the borrower to repurchase loans on a non-pro rata basis. The gray shaded regions are 95% confidence intervals, and the vertical lines are placed between the 2016h2 and 2017h1 and between 2020h1 and 2020h2.





**Figure 4. Dropdown Blockers among Susceptible Loans**

Panel A plots the half-year frequency at which contracts in the largest and smallest quartiles of the distribution (by loan amount) prevent a dropdown. Panel B plots the frequency at which contracts block a dropdown for sponsored and non-sponsored borrowers, respectively. The gray shaded regions are 95% confidence intervals, and the vertical lines are placed between the 2016h2 and 2017h1 and between 2020h1 and 2020h2.





**Figure 5. Uptier Blockers among Susceptible Loans**

Panel A plots the half-year frequency at which contracts in the largest and smallest quartiles of the distribution (by loan amount) prevent an uptier. Panel B plots the frequency at which contracts block an uptier for sponsored and non-sponsored borrowers, respectively. The gray shaded regions are 95% confidence intervals, and the vertical lines are placed between the 2016h2 and 2017h1 and between 2020h1 and 2020h2.





**Table 1. Understanding the Practical Law Sample**

The table reports summary statistics for a sample of loans from Dealscan and the sample of contracts in Practical Law. The Dealscan sample includes loans to U.S. borrowers that can be matched to financial statement data in Compustat within 180 days of the origination date of the loan. Data on loan size is from Dealscan for the Dealscan sample and from Practical Law for the Practical Law Sample. Data on loan spread and loan maturity are from Dealscan and reported for the sample of Practical Law deals that can be merged to Dealscan. Panel B reports the distribution of firms by industry, based on the Fama-French classification of SIC code.

A. Borrower and Loan Characteristics

| | Mean | 25th Percentile | 50th Percentile | 75th Percentile | N |
|---|---|---|---|---|---|
| Loan size ($ millions) | | | | | |
| Dealscan | 945 | 196 | 450 | 1,000 | 8,116 |
| Practical Law | 930 | 150 | 450 | 1,000 | 3,533 |
| Loan spread (bps) | | | | | |
| Dealscan | 203 | 125 | 150 | 225 | 7,287 |
| Practical Law | 187 | 113 | 150 | 200 | 1,726 |
| Loan maturity (years) | | | | | |
| Dealscan | 4.2 | 3.0 | 5.0 | 5.0 | 8,051 |
| Practical Law | 4.1 | 3.0 | 5.0 | 5.0 | 1,853 |

B. Borrower Industry

| Industry | Dealscan | Practical Law |
|---|---|---|
| Consumer NonDurables | 5% | 6% |
| Consumer Durables | 3% | 3% |
| Manufacturing | 11% | 11% |
| Oil, Gas, and Coal | 5% | 7% |
| Chemicals and Allied Products | 3% | 3% |
| Business Equipment | 14% | 14% |
| Telephone and Television Transmission | 4% | 3% |
| Utilities | 7% | 7% |
| Wholesale, Retail, and Some Services | 11% | 11% |
| Healthcare, Medical Equipment, and Drugs | 6% | 9% |
| Finance | 17% | 15% |
| Other | 13% | 12% |

**Table 2. Understanding the Analysis Sample**

The table summarizes the process for generating the contracts that comprise the analysis sample. The sample begins with the unique credit agreements originated between January 1, 2016, and September 30, 2021, taken from Practical Law. We initially exclude the following loans, as determined by Practical Law: unsecured loans, debtor-in-possession (DIP) loans, second-lien loans, asset-based loans (ABL), borrowers from any financial services industry, loans with maturity less than one year, and loans not denominated in U.S. dollars. Of the remaining contracts, we exclude the following based on our reading of the agreements: deals without a term loan and loans not broadly syndicated. The columns "Search of excluded group" report the frequency that an automated search program finds the phrases "Unrestricted Subsidiary" and "Open Market" in the contracts of the excluded group. Among the contracts in the analysis sample, the frequencies of the phrases "Unrestricted Subsidiary" and "Open Market" are 47% and 37%, respectively.

|  | | Search of excluded group | |
|  | Remaining Contracts | "Unrestricted Subsidiary" | "Open Market" |
| --- | --- | --- | --- |
| Contracts that are not amendments | 3,533 | | |
| Removing unsecured and investment-grade | 1,970 | 7% | 3% |
| Removing DIPs, second-liens, and ABLs | 1,420 | 33% | 7% |
| Removing financial services | 1,307 | 14% | 8% |
| Removing maturity < 1 yr, non-U.S. dollar | 1,221 | 35% | 22% |
|  | | | |
| Contracts that we read | 1,221 | | |
| Removing loans without a term loan | 776 | 27% | 8% |
| Removing non-broadly syndicated loans | 611 | 18% | 6% |

**Table 3. Understanding Dropdown and Uptier Blockers**

The table summarizes the provisions in credit agreements that block dropdown and uptier transactions. The analysis sample is described in Table 2.

|  | Mean | 25th Percentile | 75th Percentile | N |
|---|---|---|---|---|
| *Dropdown Related Provisions* |  |  |  |  |
| Blocks a dropdown transaction | 53% |  |  | 611 |
| IP blocker | 15% |  |  | 285 |
| Investment basket / loan amount | 19% | 7% | 24% | 285 |
| *Uptier Related Provisions* |  |  |  |  |
| Blocks an uptier transaction | 45% |  |  | 611 |
| Via subordination blocker | 22% |  |  | 611 |
| Via assignment blocker | 33% |  |  | 611 |
| Permits discriminatory repurchases | 40% |  |  | 611 |
| Permits repurchase, prohibits uptier | 29% |  |  | 242 |

**Table 4. Dropdown and Uptier Provisions and Loan/Borrower Characteristics**

The table reports the frequency of credit agreements that block a dropdown transaction or an uptier transaction, split by characteristics of the loan or borrower.

| | N | Dropdown Blockers | | Uptier Blocker |
| | | Dropdown Blocker | IP Blocker | |
|---|---|---|---|---|
| *Overall* | 611 | 53% | 15% | 45% |
| *Loan size* | | | | |
|     Bottom 25% | 154 | 81% | 27% | 54% |
|     Middle 50% | 305 | 52% | 19% | 48% |
|     Top 25% | 152 | 28% | 6% | 30% |
| *Borrower debt / assets* | | | | |
|     Bottom 25% | 290 | 59% | 18% | 59% |
|     Middle 50% | 145 | 53% | 15% | 41% |
|     Top 25% | 580 | 49% | 14% | 39% |
| *Borrower ROA* | | | | |
|     Bottom 25% | 142 | 53% | 22% | 42% |
|     Middle 50% | 145 | 51% | 12% | 45% |
|     Top 25% | 290 | 53% | 15% | 47% |
| *Intangible assets %* | | | | |
|     Bottom 25% | 145 | 62% | 9% | 43% |
|     Middle 50% | 290 | 55% | 18% | 48% |
|     Top 25% | 145 | 41% | 14% | 40% |
| *Borrower sponsored* | | | | |
|     No | 485 | 59% | 12% | 46% |
|     Yes | 126 | 33% | 24% | 40% |
| *Admin agent* | | | | |
|     Large bank | 305 | 53% | 14% | 48% |
|     Other bank | 140 | 64% | 12% | 50% |
|     Nonbank | 160 | 44% | 19% | 35% |

**Table 5. Blockers across Periods**

The table reports coefficient estimates from OLS regressions of contract provisions on indicators that the loan was originated during the period 1/1/2017-6/30/2020 ("Post J. Crew, Pre Serta") and during the period 7/1/2020-9/30/2021 ("Post Serta"); the excluded category is loans originated between 1/1/2016 and 12/31/2016 ("Pre J. Crew"). In columns (1) and (2), the dependent variable is an indicator that the contract fully blocks a dropdown transaction; in columns (3) and (4), the dependent variable is an indicator that the contract prevents the borrower from investing intellectual property (IP) in the unrestricted subsidiary, and the sample is restricted to loans that permit a dropdown transaction; in columns (5) and (6), the dependent variable is an indicator that the contract blocks an uptier transaction. The regressions in columns (2), (4), and (6) include additional control variables, which are standardized, and a set of industry fixed effects based on the Fama and French (1997) classification of the borrower's SIC code. Robust standard errors are reported in parentheses. ** and * denote statistical significance at the 1% or 5% level, respectively.

| | Blocks a dropdown transaction | | IP Blocker | | Blocks an uptier transaction | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| **Post J. Crew, Pre Serta** | **-0.001** | **-0.015** | **0.060\*\*** | **0.062\*** | **0.065** | **0.040** |
| | **(0.054)** | **(0.052)** | **(0.019)** | **(0.029)** | **(0.051)** | **(0.053)** |
| **Post Serta** | **-0.008** | **-0.042** | **0.493\*\*** | **0.447\*\*** | **0.376\*\*** | **0.348\*\*** |
| | **(0.063)** | **(0.060)** | **(0.061)** | **(0.068)** | **(0.059)** | **(0.062)** |
| Ln(loan amount) | | -0.168\*\* | | -0.080\* | | -0.057 |
| | | (0.051) | | (0.031) | | (0.043) |
| Borrower debt / assets | | -0.015 | | 0.029 | | -0.054\* |
| | | (0.022) | | (0.024) | | (0.025) |
| Intangible assets % | | -0.037 | | 0.008 | | -0.019 |
| | | (0.024) | | (0.021) | | (0.025) |
| Borrower sponsored | | -0.243\*\* | | -0.006 | | -0.043 |
| | | (0.049) | | (0.050) | | (0.055) |
| Agent: small bank | | 0.082 | | 0.001 | | 0.028 |
| | | (0.052) | | (0.053) | | (0.053) |
| Agent: nonbank | | -0.147\*\* | | 0.014 | | -0.137\*\* |
| | | (0.049) | | (0.045) | | (0.050) |
| Industry fixed effects | No | Yes | No | Yes | No | Yes |
| R-squared | 0.000 | 0.216 | 0.284 | 0.298 | 0.079 | 0.140 |
| N | 611 | 580 | 285 | 262 | 611 | 580 |

**Appendix for**

"The Loan Market Response to Dropdown and Uptier Transactions"

Vincent S.J. Buccola and Greg Nini

**Figure A1. Coverage in Practical Law**

The figure plots the annual amount of loans issued in a sample of loans from Dealscan and in the sample of contracts in Practical Law. The Dealscan sample includes loans to U.S. borrowers that we can match to financial statement data in Compustat, using the linking file provided and updated by Chava and Roberts (2008), within 180 days of the origination date of the loan. The 2021 amount includes data through 9/30/2021 for Practical Law and through 6/30/2021 for Dealscan, and each amount is annualized.



## Figure A2. The Evolution of Uptier Blockers

The figure plots the half-year frequency of contracts that prohibit an uptier via subordination blocker (Panel A) and prohibit an uptier via assignment blocker (Panel B). The sample is limited to contracts that block an uptier transaction in some way. The gray shaded regions are 95% confidence intervals, and the vertical lines are placed between the 2016h2 and 2017h1 and between 2020h1 and 2020h2.





**Figure A3. Period-by-Period Evolution of Blockers**

The graphs plot the estimated coefficients and confidence intervals for the half-year indicator variables from an expanded version of regression (1) in the main text. The omitted period is the first half of 2016, so the estimated coefficients represent the change in the frequency of the blocker during the half-year relative to the first half of 2016, conditional on the characteristics of the borrower and loan. Each regression includes the additional control variables from Table 5: the natural log of the amount of the loan, the borrower's debt divided by assets, the borrower's EBITDA divided by assets, an indicator that the borrower has a private equity sponsor, and a set of industry fixed effects based on the Fama and French (1997) classification of the borrower's SIC code. In Panel A, the dependent variable is an indicator that the loan has an IP dropdown blocker, and in Panel B, the dependent variable is an indicator that the loan has any uptier blocker. The vertical lines are placed between the 2016h2 and 2017h1 and between 2020h1 and 2020h2.



