# DEFENDANTS' EXHIBIT 452

King & Spalding

**HOW DID THEY DO IT?**

# J. Crew & The Original Trap Door

**King & Spalding Private Credit & Special Situations Investing**

# Situation Overview

In 2016, facing the impending maturity of over $540 million in unsecured PIK notes and an ailing retail market, J. Crew Group, Inc. (the "*Company*") needed to find a way to raise cash.

- If the PIK notes were to remain outstanding until maturity, the note balance would swell by $125 million due to PIK interest.

- The Company also faced potential "going concern" qualifications in 2018 if auditors determined that the Company could not satisfy the PIK note obligations at maturity.

- The Company needed to raise enough cash to cover the PIK notes, but had no new assets to pledge as collateral since substantially all existing assets were already pledged as collateral for over $1.5 billion dollars in term loans… until it found a way to (1) move the vast majority of its intellectual property outside the existing collateral structure, (2) use those assets to secure $300 million in new loans and (3) ultimately consummate a discounted PIK note exchange transaction.

*Locked into a term loan securing their most valuable collateral, how did the Company essentially move its entire business out from under secured lenders' noses?*

# Key Takeaways

The tactics employed by the Company to raise new debt with already encumbered assets raise a number of interesting points to consider, both when trying to tighten up credit document terms and when assessing options in structuring potential new secured debt investments. When reading the following slides, keep in mind the following. . .

- The Company capitalized on an investment basket, now known in the market as the "trap door," to maximize the size of its investment assets and set the stage for the exchange transactions with its PIK noteholders.

- This "trap door" was a two-step process that effectively created additional unrestricted subsidiary investment capacity using the proceeds of permitted investments in non-guarantor restricted subsidiaries.

- Expecting an adverse reaction from the term lenders, the Company filed a preemptive lawsuit against its term loan agent seeking declaratory judgment that its actions were permissible under the existing term loan agreement and applicable law. This tactic resulted in any dispute being litigated in the Company's preferred forum and brought interested parties into the open.

- The Company then launched a term loan amendment process and PIK notes exchange and, utilizing this "carrot and stick" approach (i.e., proactive litigation paired with an aggressive timeline), put pressure on existing lenders/noteholders to accept a deal.

# Initial IP Transfer and Related Litigation

In order to create currency to be used as consideration in a discounted debt exchange with the PIK noteholders, the Company invested over 70% of its domestic trademarks, valued at $250 million and part of the collateral package securing the Company's existing $1.5 billion term loan (the "*IP*"), into a newly formed unrestricted subsidiary via a two-step process.

- First, the Company used a $150 million basket permitting investments in non-guarantor restricted subsidiaries and a $100 million general investment basket to transfer the IP to a Cayman Islands restricted subsidiary ("*J. Crew Cayman*").
  - As a restricted subsidiary, J. Crew Cayman was subject to the terms of the credit facility, including the negative covenants. However, as a foreign subsidiary, it was not a guarantor of the existing debt.
  - Another investment basket allowed investments of *any* amount by a non-guarantor restricted subsidiary (e.g., J. Crew Cayman) into an unrestricted subsidiary if financed with the proceeds from other permitted investments.
  - **_This, along with the above $150 million investment basket, created a "trap door."_**

- Second, J. Crew Cayman was now free to transfer all the IP to an unrestricted subsidiary ("*Unrestricted J. Crew*").
  - Unrestricted J.Crew was not bound by the terms of the credit facility and was free to incur additional indebtedness secured by a lien on the IP.

- In response to rumors that the Company's term lenders intended to issue a notice of default alleging that the IP transfer was impermissible, J. Crew filed a lawsuit seeking declaratory judgment that the IP transfer was expressly permitted by the terms of the credit agreement and that no default or event of default had occurred.

# A Closer Look at the Trap Door…

What exactly were the permitted investment baskets that created the "trap door"?

1. **General Basket:** Allowing investments, including in unrestricted subsidiaries, that do not exceed (1) the greater of $100 million or 3.25% of total assets plus (2) the Available Amount.

2. **Intercompany Investments Basket:** Investments made by loan parties in non-loan party restricted subsidiaries are capped at (1) the greater of $150 million or 4% of total assets plus (2) the Available Amount.

3. **Non-Loan Party Investments Financed with the Proceeds of Certain Other Investments:** Allowing investments by non-loan party restricted subsidiaries funded with the proceeds of investments made in such non-loan parties under the intercompany investments basket.

- The last basket, in combination with the first two baskets, creates the "trap door", i.e. the ability to move assets of any type (not just a new business venture or to support the existing business) into an unrestricted subsidiary.

- Furthermore, because these baskets did not restrict which assets could be used for investments (e.g. cash vs. intellectual property vs. other collateral) or the party in which the investment could be made (e.g. joint venture or third party vs. an unrestricted subsidiary), the Company was able to transfer its most valuable assets to unrestricted subsidiaries.

# Exchange Transactions & Resolution of Litigation

In June 2017, the Company began a series of negotiations with certain holders of its unsecured PIK notes to structure a series of interrelated exchange transactions.

- First, Unrestricted J. Crew commenced a private offer to exchange the Company's unsecured PIK notes for (x) new, senior secured notes issued by Unrestricted J. Crew (secured by the newly transferred IP) and (y) preferred and common equity.
    - 99.9% of PIK notes participated in this exchange
- Second, in exchange for dismissing the litigation with the term loan lenders over the permissibility of the IP transfer, the Company made a $150 million par paydown on its existing term loans (funded, in part, by the new $300 million term loan and the new notes issued by Unrestricted J. Crew), increased the applicable interest rate and amortization, and tightened certain restrictive covenants in the existing term loan facility.
    - 88% of term loans participated in this exchange
- As a result of these exchanges, the Company de-levered its balance sheet by approximately $340 million, captured $130 million of trading discount, and was ultimately able to extend its runway, at least for a few years… before ultimately filing for Ch. 11 in 2020.

# Considerations for Lenders

Lenders should be wary of the pitfalls surrounding permitted investments in unrestricted subsidiaries and creative utilization of investment baskets in general. Mitigating this "trap door" in risk in loan documentation can take many forms, including…

- EBITDA or Consolidated Total Assets tests for designation/creation of unrestricted subsidiaries

    - *EBITDA Example:* "(x) the EBITDA of such Unrestricted Subsidiary and its Subsidiaries as of [*date*] do not exceed an amount equal to [___]% of the Consolidated EBITDA of the Borrower and its Subsidiaries as of such date and (y) the EBITDA of such Unrestricted Subsidiary and its Subsidiaries and all other Unrestricted Subsidiaries and their respective Subsidiaries as of [*date*] do not exceed an amount equal to [___]% of the Consolidated EBITDA of the Borrower and its Subsidiaries as of such date"

    - Consolidated Total Assets Example: "(x) the consolidated total assets of such Unrestricted Subsidiary and its Subsidiaries as of [*date*] do not exceed an amount equal to [___]% of the consolidated total assets of the Borrower and its Subsidiaries as of such date and (y) the consolidated total assets of such Unrestricted Subsidiary and its Subsidiaries and all other Unrestricted Subsidiaries and their respective Subsidiaries as of the last day of the most recently ended Fiscal Quarter do not exceed an amount equal to 5.0% of the consolidated total assets of the Borrower and its Subsidiaries as of such date"

- Restrictions on transfer of IP (or other "crown jewel" assets) to unrestricted subsidiaries

    - Example: "no Unrestricted Subsidiary shall own any Capital Stock or Indebtedness of, or owns or holds any Lien on, any property of, Holdings or any Subsidiary of Holdings (other than any Subsidiary of the Subsidiary to be so designated or an Unrestricted Subsidiary), or own any material Intellectual Property"

# Considerations for Lenders (cont.)

**OTHER LEAKAGE PROTECTION MECHANISMS**

- Lenders can also:
  - Impose caps on the borrower's ability to invest in non-loan parties. *Note that unlimited investment capacity among Restricted Subsidiaries creates the same leakage risk as it allows unlimited investments in Foreign Subsidiaries outside the credit box.*
  - Remove automatic lien release mechanisms in cases where collateral has been transferred to affiliates How Did They Do It? PetSmart & The Phantom Guarantee.
  - Specify that general baskets may not be used to incur debt that is secured by collateral held by an unrestricted subsidiary.

**J. CREW REDUX**

- Protecting against unrestricted subsidiary leakage risk is especially important as other borrowers have shown their willingness to utilize similar "trap door" provisions in the current environment:
  - Revlon used similar provisions to take advantage of their debt instruments' significant investment capacity to move assets outside of the collateral pool.
  - Though Neiman Marcus exploited different provisions under their financing documents, the move to strip valuable IP from the collateral pool is analogous to J. Crew.
  - More recently, Travelport also utilized the unrestricted subsidiary provisions in their credit agreement to transfer IP assets valued at $1.15 billion to unrestricted subsidiaries.