# DEFENDANTS' EXHIBIT 453

LOCKE LORD®
QUICK Study
Securitization and Debt Finance Practice

October 4, 2017



## J. Crew Group, Inc.: Use of Credit Facility Baskets Eviscerates Value of Term Loan Collateral

By: Christine Dreyer McCay, George Ticknor and Jonathan W. Young

On September 7, 2017, an ad hoc, minority group of J. Crew's senior term lenders (the "Dissenting Lenders") filed an amended complaint against J. Crew and its affiliates (collectively, "J. Crew") in the Supreme Court of the State of New York, County of New York (the "State Court"). The Dissenting Lenders complained that J. Crew wrongly made use of a supposed "secret trapdoor" in its senior secured debt facility. According to the amended complaint, J. Crew created a new group of unrestricted subsidiaries—entitled to hold assets free and clear of the liens and restrictions set forth in the senior credit facility. Relying upon the "Permitted Investment" and "Permitted Disposition" safe harbors contained in the term loan agreement, J. Crew transferred—to its newly created unrestricted subsidiaries—an undivided interest in the J. Crew brand and related IP rights. J. Crew then caused those subsidiaries to make an exchange offer to the holders of its PIK notes maturing in 2019—well before the 2021 maturity of the senior term loans. These PIK notes were unsecured obligations of the operating entity's holding company, and were therefore structurally subordinated to the secured term loan debt. In exchange for the surrender of the PIK notes, the PIK note holders would receive a strip of senior secured notes and equity provided by the unrestricted subsidiaries.[1]

When the dust cleared, the holders of the new PIK notes held claims against those unrestricted subsidiaries, secured by first priority liens on the J. Crew brand and IP assets comprising the core of J. Crew's enterprise value. These transactions eviscerated the value of the senior term lenders' collateral package. The *Wall Street Journal* reported that, following this restructuring, recoveries on the $1.57 billion term loan were expected to be 41 cents on the dollar.[2] J. Crew effectively succeeded in reallocating a substantial portion of the value of the senior collateral package to structurally subordinated PIK notes that were virtually out of the money in a liquidation scenario.

How could this happen? Senior credit facility provisions prevalent in the broadly syndicated market provide generous baskets for investments in unrestricted subsidiaries. These provisions permit such an investment to occur in exchange for an assumption of debt by the entity receiving the investment. Thus, the unrestricted subsidiaries "paid" for the transfer of the J. Crew brand by assuming the underlying obligation to the PIK note holders and, consistent with market precedent, treating that debt assumption as cash or cash equivalents for purposes of determining whether the transaction was permitted under the credit agreement.

The Dissenting Lenders have put up a spirited fight against these restructuring transactions. After J. Crew filed an initial action for declaratory relief (seeking confirmation that the restructuring transactions were permissible under the senior term loan agreements) the Dissenting Lenders sought to enjoin the restructuring. The State Court denied this motion for a preliminary injunction, given that a majority of the senior term lenders had voted to approve the restructuring and to ratify the prior actions taken by the

---

1  *See generally* Amended Complaint, *Eaton Vance Management et al. v. Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent et al.*, Index No. 654397/2017 (Sup. Ct. N.Y., September 7, 2017), at 2-39.
2  *See Wall Street Journal*, "Deal To Save J. Crew from Bankruptcy Angers High-Yield Debt Investors", September 21, 2017.

Securitization & Debt Finance Practice | LOCKE LORD QUICKStudy

October 4, 2017



Collateral Agent.[3] The State Court also concluded that the Dissenting Lenders had not shown a likelihood that they would ultimately succeed in their challenge to these transactions.

Following the denial of the preliminary injunction, J. Crew closed and implemented its restructuring transactions. The Dissenting Lenders have now filed their Amended Complaint, asserting that these transactions amounted to a breach of the senior term loan agreement, as well as a fraudulent transfer of key operating assets by J. Crew. The Dissenting Lenders argue that these transactions resulted in a transfer of substantially all of J. Crew's assets, for which consent of each Dissenting Lender was required. The Dissenting Lenders further contend that the restructuring transactions were not a legitimate permitted investment, and that the value of the IP assets transferred far exceeded the cap on the permitted investment basket. These arguments are factually intensive, and may take years to resolve. Given the closing of the restructuring transaction, the Dissenting Lenders have lost the benefit of their most valuable collateral, and have been left to assert unsecured litigation claims. From a secured lending perspective, the horse has left the barn, and is several miles down the road.

Senior secured lenders should view the J. Crew restructuring as a cautionary tale—especially where those lenders have provided credit to companies with valuable, specifically identifiable "core" assets critical to operating such as commercial brands, related intellectual property, real estate and specialized equipment ("Core Assets"). In order to protect themselves against their borrower "pulling a J. Crew,"[4] lenders may wish to include in their credit agreements express prohibitions against transferring substantial Core Assets without the consent of *each* affected lender (or at least a supermajority of lenders, e.g., 75%). Alternatively, lenders may consider subjecting Core Asset transfers to a robust valuation process—one designed to assure that the value of the assets transferred is truly within the permitted investment basket. Finally, lenders may wish to require that, when a permitted investment is funded through an assumption of liabilities, the assumed liabilities are owed by the borrower making the investment, and of equal or greater priority than the senior secured debt. Simply stated, if Core Assets are to be transferred to an unrestricted subsidiary, such transfer should not result in a reordering of the priority scheme embodied in the borrower's capital structure.

For more information on the matters discussed in this *Locke Lord QuickStudy*, please contact the authors.

**Christine Dreyer McCay** | 617-239-0536 | christine.mccay@lockelord.com
**George Ticknor** | 617-239-0357 | george.ticknor@lockelord.com
**Jonathan W. Young** | 617-239-0367 | jonathan.young@lockelord.com

---

3 The Dissenting Lenders contend, in their Amended Complaint, that a number of the PIK Note holders acquired claims in the senior term loan facility, and voted those claims in favor of the restructuring.  *See* Amended Complaint, 14, at 50.
4 "[T]he Company's *senior secured creditors*, whose loans were meticulously secured by liens on a comprehensive collateral package, are now left holding what looks like an empty sack. Formerly *unsecured* creditors of the Company have had their loans refinanced and are now holding debt secured by the Company's crown jewel asset—the J. Crew brand.  According to the press, this maneuver is called "pulling a J. Crew."" *See* Amended Complaint, 3, at 1 (internal citations omitted).



Practical Wisdom, Trusted Advice.

www.lockelord.com

Atlanta | Austin | Boston | Chicago | Cincinnati | Dallas | Hartford | Hong Kong | Houston | London | Los Angeles
Miami | Morristown | New Orleans | New York | Providence | San Francisco | Stamford | Washington DC | West Palm Beach

Locke Lord LLP disclaims all liability whatsoever in relation to any materials or information provided. This piece is provided solely for educational and informational purposes. It is not intended to constitute legal advice or to create an attorney-client relationship. If you wish to secure legal advice specific to your enterprise and circumstances in connection with any of the topics addressed, we encourage you to engage counsel of your choice. If you would like to be removed from our mailing list, please contact us at either unsubscribe@lockelord.com or Locke Lord LLP, 111 South Wacker Drive, Chicago, Illinois 60606, Attention: Marketing. If we are not so advised, you will continue to receive similar mailings.

Attorney Advertising © 2017 Locke Lord LLP