# DEFENDANTS' EXHIBIT 455

# Sponsor Control: A New Paradigm for Corporate Reorganization

*Vincent S.J. Buccola* [†]

Bankruptcy scholars have long organized their field around a stylized story—a paradigm—of lender control. When lenders extend credit, the story goes, they insist on the borrower agreeing to strict covenants and granting blanket liens on its assets; then, if the borrower later encounters financial distress, they use their bargained-for rights as prods to steer the company toward a resolution favorable to themselves whether or not value-maximizing to investors as a group. As fruitful as the lender control heuristic has been, however, it no longer corresponds to reality.

This article introduces a new interpretive paradigm that better accounts for a changed world. Today, more often than not, equity sponsors rather than senior lenders have practical control of the way distressed companies respond to their financial problems. Lenders no longer hold the big sticks they once wielded to establish precedence, and the people guiding the modal large, distressed business have powerful incentives to preserve the value of sponsor investments. The predictable effect of the new locus of control has been to stand familiar restructuring dynamics on their head. Indeed, a number of seemingly unconnected trends in reorganization practice may best be understood as resulting from sponsors' first-order incentives to postpone a reckoning that might crystallize losses. Identifying the dynamics of sponsor control as such thus promises to shed light on a variety of scholarly and policy debates around corporate reorganization.

90 U. Chi. L. Rev. __ (forthcoming 2023)

[†]   Associate Professor, The Wharton School of the University of Pennsylvania. For their helpful comments on previous drafts, I thank Ken Ayotte, Douglas Baird, Allison Buccola, Jared Ellias, Josh Feltman, Elisabeth de Fontenay, Sujeet Indap, Adam Levitin, Lynn LoPucki, Stephen Lubben, Samir Parikh, Sarah Paterson, Bob Rasmussen, Harrison Shure, Mike Simkovic, David Skeel, George Triantis, Kate Waldock, @HalCapLLC, and participants at workshops at USC and Wharton.

# Contents

Introduction ................................................................................................ 3

I.   The Manager and Lender Control Paradigms .......................................... 7

   A.   Manager Control .............................................................................. 8

   B.   Lender Control ............................................................................... 11

II.  (Financing) Causes of Sponsor Control .................................................. 17

   A.   Borrower-Friendly Loan Terms ..................................................... 18

      1.   Covenant Slack ............................................................................. 19

      2.   Lien Fragility ................................................................................ 21

   B.   Equity Sponsorship ........................................................................ 22

III. Sponsor Incentives ............................................................................... 26

   A.   Sponsor Incentives in a Vacuum .................................................... 26

   B.   Sponsor Incentives with Feedback ................................................. 29

      1.   Anticipated Effects on Sponsor Reputation ................................. 29

      2.   Coasean Bargaining ..................................................................... 31

IV.  (Reorganization) Consequences of Sponsor Control ............................ 33

   A.   Emphasis on Runway ..................................................................... 33

      1.   Hardball Priming Transactions .................................................... 33

      2.   Complex Capital Structures .......................................................... 37

      3.   Tardy Bankruptcy Filings ............................................................ 38

   B.   Sponsor Releases and "Contractual" Bankruptcy ........................... 41

Conclusion ................................................................................................. 45

Table 1 ...................................................................................................... 47

Table 2 ...................................................................................................... 49

## INTRODUCTION

By common account, two contrasting eras have defined large-scale corporate reorganization since the Bankruptcy Code was enacted, in 1978.[1] For much of the Code's first twenty years, incumbent managers dominated the process. They chose when to invoke Chapter 11 on a company's behalf. They were difficult to unseat once there and, with the help of indulgent bankruptcy judges, could cause proceedings to drag on for years.

Starting in the late-1990s, however, practice underwent a marked shift. The formal law of bankruptcy had not changed, but Chapter 11 cases were proceeding differently. Incumbent managers were being fired.[2] Debtors were relying on bankruptcy-specific loans to fund their time in Chapter 11 and could no longer linger indefinitely.[3] Cases were concluding more rapidly, often through a quick sale of the business as a going concern.[4]

To account for the new realities, leading commentators developed a stylized story, or paradigm, centered on lender control.[5] When advancing credit to a leveraged borrower, senior lenders had begun taking a "blanket" lien on the borrower's assets and insisting on tightly calibrated covenants designed to be breached at the first sign of trouble. These newly standard terms could be expected to give lenders clout if the borrower's financial condition were to deteriorate. Lenders would not have de jure power to manage the business, but the prospect of their exercise of remedies would hang like a sword over the borrower and induce management to resolve distress in ways favorable to the lenders. A new pattern in the financing of leveraged

---

[1]   Bankruptcy Reform Act of 1978, Pub. L. 95–598, 92 Stat. 2549 (Nov. 6, 1978).

[2]   Kenneth M. Ayotte & Edward R. Morrison, *Creditor Control and Conflict in Chapter 11*, 1 J. LEGAL ANALYSIS 511, 522–23 (2009).

[3]   David A. Skeel, Jr., *Creditors' Ball: The "New" New Corporate Governance in Chapter 11*, 152 U. PA. L. REV. 917, 923–26 (2003); Douglas G. Baird & Robert K. Rasmussen, *The End of Bankruptcy*, 55 STAN. L. REV. 751, 784–85 (2002).

[4]   *See* Skeel, *supra* note 3; Elizabeth Warren & Jay L. Westbrook, *Secured Party in Possession*, 22 AM. BANKR. INST. J. 12 (2003); Baird & Rasmussen, *The End of Bankruptcy*, *supra* note 3.

[5]   *See, e.g.*, Douglas G. Baird & Robert K. Rasmussen, *Private Debt and the Missing Lever of Corporate Governance*, 154 U. PA. L. REV. 1209 (2006); *see also infra* notes 39–66 and accompanying text.

but otherwise healthy businesses had thus given rise to a new power dynamic in distress.[6]

Changes in reorganization practice made sense under this lens. In general, a lender whose collateral might deteriorate wants its borrower to resolve distress quickly and in a manner that turns the lender's uncertain claim on the future into cash today.[7] For such a lender, the future is to be feared. If the borrower performs well, the lender has little to gain, because it can recover no more than the face amount of its loan. But if the borrower performs poorly, the lender has everything to lose, because there is no getting blood from a stone.[8] From this perspective, the emerging pattern of distress resolution—a series of waivers and loan amendments to remedy covenant breaches followed, if necessary, by a speedy bankruptcy directed toward either a sale of the business or a plan extinguishing the claims of junior investors—looked to be just about what lenders would choose if they had formal control rights.[9] The lender control paradigm thus joined theory with practice, and it has dominated scholarship and set the terms of policy debate ever since.

Over the last decade, however, reorganization practice has once again decoupled from the prevailing model. A move out of court, so to speak, has been the most striking change. Increasingly, distressed companies seek to raise new capital and restructure old debts without recourse to bankruptcy. Such recapitalization transactions are often directly contrary to the interests of senior lenders. The recent vogue for contentious "liability management" transactions that subordinate ostensibly first-lien loans would have been unimaginable fifteen years ago and is impossible to square with a regime of lender control.[10] Trends in Chapter 11 likewise signal a shift in the locus of power. For example, extensive use of multi-lateral, agenda-setting devices known

---

[6] *See* Skeel, *Creditors' Ball*, *supra* note 3; Warren & Westbrook, *supra* note 4; Baird & Rasmussen, *The End of Bankruptcy*, *supra* note 3.

[7] *See, e.g.*, Anthony J. Casey, *The Creditors' Bargain and Option-Preservation Priority in Chapter 11*, 78 U. CHI. L. REV. 759 (2011).

[8] *See, e.g.*, Zohar Goshen, Richard Squire & Felix Steffek, The Law of Corporate Debt: A Unifying Theory *4–6 (Nov. 24, 2021) (unpublished manuscript) (on file with author) (describing generic creditor-shareholder conflict).

[9] *See, e.g.*, Ayotte & Morrison, *supra* note 2, at 520–26; *see also* Casey, *supra* note 7, at 784–86 (describing how bankruptcy's absolute priority rule fosters resolutions of distress that truncate volatility).

[10] *See infra* note 132.

as restructuring support agreements, or RSAs, fits uncomfortably with the notion that lenders tacitly run the show.[11]

This article introduces a new organizing paradigm that better explains a broad range of cases. The central observation is that financial sponsors,[12] not lenders, now frequently shape the path by which financially troubled companies resolve distress. By developing an account of the new balance of power—its causes and consequences—the article helps to explain otherwise inexplicable and seemingly unconnected developments in reorganization practice.

The turn toward sponsor control, like the rise of lender control before it, has been a function primarily of developments in the way leveraged companies are ordinarily financed. One part of the story involves a widely remarked-upon loosening of loan terms.[13] Weaker covenant packages mean more financial and operating flexibility for distressed borrowers. Lenders simply no longer hold the big sticks they once used to establish precedence.[14]

The other part of the story has largely hidden in plain sight. The equity ownership of distressed businesses has transformed in the decades since scholars first called attention to lender control. The quintessential large-corporate debtor of the late-1990s and early-2000s was publicly traded. Its board was populated by independent directors who in distress sought continuity in the business they superintended and had little reason to hold out for shareholders' distinctive interests. Stringent loan contracts may have been the most remarkable feature of the lender control era, but lender power was always also predicated on the reluctance of the boards of distressed companies to play with fire. Such caution has become the exception rather than the rule. Now most large businesses encountering distress

---

[11]   *See infra* notes 151–160 and accompanying text. RSAs make little sense in a world of lender control, since the model assumes that lenders can deploy soft power in an ad hoc fashion.

[12]   A financial sponsor is an investor who applies a model of investment typically associated with private equity managers. According to one representative definition, a financial sponsor is an entity "whose principal business activity is acquiring, holding, and selling investments (including controlling interests) in otherwise unrelated companies that each are distinct legal entities with separate management, books and records and bank accounts, whose operations are not integrated with one another and whose financial condition and creditworthiness are independent of [one another]."

[13]   *See infra* notes 50–54 and accompanying text.

[14]   *See infra* notes 73–90 and accompanying text.

are controlled by a private equity fund.[15] The strategic decisionmakers are not staid part-timers whose fortunes were made and lie elsewhere. They are operators with powerful incentives to ensure that equity investors recover what they can.

At first approximation, the interests of an equity sponsor are a mirror image of those of senior lenders. To the shareholders of a distressed company, private equity fund or otherwise, a volatile future is not an enemy but a friend. Shareholders have little to lose if the company performs poorly (because of limited liability) and capture most of the upside if it performs well. They are for that reason keen—from a social perspective, *excessively* keen—to avoid realization events such as the absolute priority rule catalyzes. Sponsors have especially strong incentives in this regard. In addition to benefiting from the prospect of future dividends and stock-price appreciation, sponsors typically draw advisory fees from their portfolio companies. A realization event that wipes out equity interests will also turn off the fee spigot. Moreover, in the event of a bankruptcy, sponsors are uniquely likely to face litigation seeking to claw back dividends and other asset transfers, recover for breach of fiduciary duty, and the like.

Sponsors' prominence and effective power may thus help to explain important trends in reorganization. For example, it figures that the vogue for liability management emerged only when private equity had become a large share of the market and that sponsor-owned companies are responsible for almost every hardball priming transaction to date.[16] Such transactions "extend runway" for the distressed company but heighten litigation risk and reputational damage to the individuals behind them, a combination well matched to sponsor incentives. The same incentives can help to account for greater complexity in the capital structures of deeply distressed businesses and for what may for some companies be socially excessive delay in invoking Chapter 11.

Sponsor power may also reveal an unappreciated function of pre-bankruptcy agreements—restructuring support agreements and debtor-in-possession loan agreements—in sponsor-backed cases destined for Chapter 11. A common although controversial feature of the plans contemplated by RSAs in such cases is a broad release from

---

[15]   Mayra Rodriguez Valladares, *Over Half of Rated Company Defaulters Are Owned by Private Equity Firms*, FORBES.COM (July 16, 2020).

[16]   *See infra* notes 132–138 and accompanying text.

liability for prepetition conduct of the sponsor and its affiliates and representatives.[17] The principal objection to sponsor releases is economic: that they are granted on terms excessively favorable to the sponsors.[18] One way to understand a cheap release, however, is as an inducement for the sponsor to capitulate to bankruptcy resolution notwithstanding its first-order incentives—as, that is, consideration supporting a Coasean bargain between sponsor and consenting creditors. Viewed in that light, restrictive "milestone" provisions increasingly found in DIP loan agreements may appear as much to be a way for sponsors to secure the terms of the bargain as for senior lenders to exercise market power.

The article proceeds in four parts. Part 1 sketches the standard account of the history of reorganization under the Bankruptcy Code. Parts 2–4 comprise the article's central argument. Part 2 describes the changes in capital markets and financial contracting that have yielded a new balance of power. Part 3 sketches sponsor incentives when a portfolio company is in distress. And part 4 considers developments in reorganization practice consistent with and that may be attributable to sponsor control.

## I.   The Manager and Lender Control Paradigms

When the Bankruptcy Code was enacted, in 1978, it began a new era in the reorganization of large, distressed businesses.[19] The Code wrought major structural changes. It did away with what had been a privileged role for the Securities and Exchange Commission under Chapter X of the Bankruptcy Act.[20] It revamped the requirements for plan confirmation to reduce the prospect of minority holdout.[21] Perhaps most importantly, by allowing managers and their financial

---

[17]   *See infra* notes 158–159 and accompanying text.

[18]   There are legal objections as well to the release of non-debtors' claims. *See, e.g.*, Patterson v. Mahwah Bergen Retail Group, Inc., 636 B.R. 641 (Bankr. E.D. Va. 2022).

[19]   Bankruptcy Reform Act of 1978, Pub. L. 95–598, 92 Stat. 2549 (Nov. 6, 1978).

[20]   *See generally* Michael E. Hooton, *The Role of the Securities and Exchange Commission Under Chapter X, Chapter XI and Proposed Amendments to the Bankruptcy Act*, 18 B.C. Indus. & Comm. L. Rev. 427 (1977) (comparing the SEC's role under the Bankruptcy Act and the then-pending Code legislation).

[21]   *See* 11 U.S.C. § 1129(a)(8), (b) (providing that a class's acceptance of a plan waives individual investors' objections grounded in absolute priority).

advisors to remain in position during the case—indeed to set its agenda—the new law transformed bankruptcy from a site of capitulation into a viable forum for reorganizing.[22]

According to conventional wisdom, two very different periods of reorganization have marked the interval since the Code's enactment.[23] The first period was dominated by corporate managers. Availing themselves of the new tools Chapter 11 provided, managers were able to hold creditors at bay and oversee extended negotiations of which they themselves were often prime beneficiaries. Starting in the late 1990s, however, something changed. The second period was defined by a regime in which senior secured lenders were frequently able to dictate the mode and timing of a reorganization and to secure their own recoveries at the expense of junior investors.

## A. Manager Control

In the early years of the Bankruptcy Code, large-scale corporate reorganization was defined by a pattern of manager control.[24] Chapter 11 offered incumbents a harbor in which they could operate a business free from worry about the exercise of creditor remedies. They could thus use Chapter 11 to prolong tenure and gamble on a turnaround, to the detriment of lenders, bondholders, and even shareholders.[25]

---

[22]  *See* 11 U.S.C. §§ 1107(a) (allowing debtor-in-possession to exercise most of the powers of a trustee), 1121(b) (giving debtor-in-possession the exclusive right for 120 days to propose a plan of reorganization).

[23]  For accounts defining eras of restructuring along a much longer time horizon, see Mark J. Roe, *Three Ages of Bankruptcy*, 7 HARV. BUS. L. REV. 187 (2017); Stephen J. Lubben, *Fairness and Flexibility: Understanding Bankruptcy's Arc*, 23 U. PA. J. BUS. L. 132 (2020).

[24]  The literature often calls this paradigm "debtor control" or "debtor in control." *See, e.g.*, David A. Skeel, Jr., *Competing Narratives in Corporate Bankruptcy: Debtor in Control vs. No Time to Spare*, 2009 MICH. ST. L. REV. 1187, 1189 ("Debtor in control was the standard resolution narrative for large-scale corporate bankruptcies for the first decade after the enactment of the current bankruptcy laws in 1978."). I use the term "manager control" because it more specifically indicates the constituency thought to determine and benefit from the mode in which debtors resolve distress.

[25]  Critics charged that managers were using influence over process to advance their own substantive interests at the expense of the investors whom bankruptcy was supposed to protect. *See, e.g.*, Lynn M. LoPucki, *The Trouble with Chapter 11*, 1993 WIS. L. REV. 729; Michael Bradley and Michael Rosenzweig, *The Untenable Case for Chapter 11*, 101 YALE L.J. 1043 (1992). Defenders of the status quo saw

They could also *threaten* to invoke bankruptcy and so drive the terms of a consensual reorganization.

The new law was part of the story. Under Chapter X of the Bankruptcy Act, the commencement of a case had ousted the debtor's incumbent managers. A judicially appointed trustee was handed the reins in their place.[26] As a consequence, managers of distressed companies had faced powerful incentives to avoid bankruptcy. Their jobs had depended on persuading creditors to accept a compromise without judicial process.[27] Chapter 11 changed all that. It broke radically from the New Dealers' preoccupation with independent expertise. Chapter 11 began instead with a presumption that incumbents would remain in power. It gave them license to run the company on a day-to-day basis.[28] It gave them agenda control with respect to extraordinary transactions (for which judicial blessing would be required).[29] And for the first 120 days of a case it gave them the exclusive right to propose a plan of reorganization.[30]

The bankruptcy judges charged with administering Chapter 11 doubled down on the statute's presumption. They deferred to managers on the decision to operate in bankruptcy, even when immediate solvency was not in doubt.[31] They granted managers serial extensions of the exclusivity period, even though Congress had suggested four months as an appropriate interval.[32] They resisted efforts to unseat managers for whom delay seemed a positive good,

---

advantages to managerial power. *See, e.g.*, Elizabeth Warren, *The Untenable Case for Repeal of Chapter 11*, 102 YALE L.J. 437 (1992).

[26] Chandler Act of 1938, §§ 156, 158.

[27] An alternative was to try to shoehorn one's case into Chapter XI, the part of the Bankruptcy Act designed for smaller, private businesses. *See* Eugene V. Rostow & Lloyd N. Cutler, *Competing Systems of Corporate Reorganization: Chapters X and XI of the Bankruptcy Act*, 48 YALE L.J. 1334, 1337 (1939) (noting that the "tremendous advantages of procedure and of result to corporate management" offered by Chapter XI would "seem specially tempting when contrasted with the closely supervised reorganization system provided by Chapter X").

[28] 11 U.S.C. § 1107 (granting debtors in possession most of the rights and powers and saddling them with most of the functions and duties of a trustee).

[29] 11 U.S.C. §§ 363–65.

[30] 11 U.S.C. § 1121.

[31] *See, e.g.*, *In re* Johns-Manville Corp., 36 B.R. 727 (Bankr. S.D.N.Y. 1984).

[32] *Id*. Chapter initially 11 allowed the bankruptcy judge to extend the exclusivity period indefinitely. In 2005, Congress capped exclusivity at 18 months. Pub. L. 109–8, 119 Stat. 106, 113, codified at 11 U.S.C. § 1121(d)(2) (Apr, 20, 2005).

even though the statute preserved the possibility of a trustee's appointment for cause or for the benefit of creditors.[33] Together the statute and its judicial application made bankruptcy a decidedly more attractive environment for managers than it had been under the Act.

As important as the new apparatus of Chapter 11 was, manager control was equally a function of the prepetition capital structures that prevailed during the Code's early years. With the wrong financial contracts in place, managers would have lacked access to the liquidity on which their prerogatives always inevitably depend, whatever the law might say. In particular, if liens had been more extensive, secured creditors' right to "adequate protection" of their interests in collateral could have hamstrung managers.[34] Debtors in possession have a general right to use encumbered property in the ordinary course of business,[35] but that right does not extend to cash. Cash collateral they can use only with the secured lenders' consent or on a finding that the lenders' interests are adequately protected.[36] When liens blanket a company's assets, all of the cash generated during bankruptcy is collateral, and lenders can second-guess its use.[37]

During the Code's early years, however, large corporate debtors typically entered Chapter 11 with substantial unencumbered assets. That meant cash produced by operations was typically not collateral.[38] Free of the ordinary obligation to service debt, many companies could fund operations indefinitely in Chapter 11 using operating revenues alone. That access to liquidity was crucial to managers' ability to persist in bankruptcy without creditor buy-in (and, therefore, to achieve substantively favorable restructurings).

---

[33]   11 U.S.C. § 1104(a).

[34]   *See, e.g.*, 11 U.S.C. § 362(d)(1) (providing that the automatic stay of foreclosure proceedings be lifted if creditor's interest in collateral not adequately protected).

[35]   11 U.S.C. § 363(c)(1).

[36]   11 U.S.C. § 363(c)(2).

[37]   11 U.S.C. §§ 363(a), 552 (providing that property acquired during the pendency of a Chapter 11 case is not subject to a floating lien unless it is "proceeds, products, offspring, or profits" of prepetition collateral). For discussion of the implications of tracing requirement, see generally Melissa B. Jacoby & Edward J. Janger, *Tracing Equity: Realizing and Allocating Value in Chapter 11*, 96. TEX. L. REV. 673 (2018).

[38]   Skeel, *Creditors' Ball*, *supra* note 3, at 918.

*B.  Lender Control*

By the early 2000s, however, leading commentators noticed that something had changed. Cases were resolving more quickly.[39] What had taken years now could be finished in months, often with new executives at the helm who lacked allegiance to the incumbents.[40] Chapter 11 no longer acted as a stand-still against the background of which investors could begin to negotiate in earnest. Increasingly it was instead being used simply as a means to effectuate a sale of the debtor's business, repay senior lenders, and distribute any remaining proceeds down the priority ladder.[41] In 2002, Douglas Baird and Bob Rasmussen declared that the era of corporate reorganizations had "come to an end."[42] The claim, if hyperbolic, highlighted a remarkable shift in reorganization practice.[43] Large Chapter 11's no longer seemed to vindicate the interests of incumbent managers. Lenders had taken control.[44]

Observers attributed the revolution in large part to a new pattern of debt financing. The Bankruptcy Code had changed little in the twenty years since it was enacted.[45] What had changed were the

---

[39]   Skeel, *Creditors' Ball*, *supra* note 3, at 918.

[40]   Ayotte & Morrison, *supra* note 2, at 522 (finding, in a study of large Chapter 11's filed in 2001, that 70% of companies had replaced their CEO within the two years preceding bankruptcy).

[41]   *See* Baird & Rasmussen, *The End of Bankruptcy*, *supra* note 3, at 786–88; Warren & Westbrook, *supra* note 6, at 12; Skeel, *Creditors' Ball*, *supra* note 3, at 918; George W. Kuney, *Let's Make It Official: Adding an Explicit Preplan Sale Process as an Alternative Exit from Bankruptcy*, 40 HOUS. L. REV. 1265, 1267–68 (2004).

[42]   Baird & Rasmussen, *The End of Bankruptcy*, *supra* note 3, at 753.

[43]   Subsequent writers disputed in particular the degree to which Chapter 11 had become *just* a glorified auction block. *See, e.g.*, Lynn LoPucki, *The Nature of the Bankrupt Firm: A Reply to Baird and Rasmussen's* End of Bankruptcy, 56 STAN. L. REV. 645 (2003); Barry E. Adler, *Bankruptcy Primitives*, 12 AM. BANKR. INST. L. REV. 219 (2004); Jay Lawrence Westbrook, *Bankruptcy Control of the Recovery Process*, 12 AM. BANKR. INST. L. REV. 245 (2004). But no one doubted that an important change had taken place.

[44]   Following Baird and Rasmussen, commentators sometimes use the generic term "creditor control" to refer specifically to the influence of a senior secured lender or small syndicate of lenders. Baird & Rasmussen, *End of Bankruptcy*, *supra* note 3, at 785; *Chapter 11 at Twilight*, *supra* note 43, at 675, 684, 698.

[45]   The most notable amendments to the Code, in 1984, principally addressed constitutional doubts raised in *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), about the jurisdiction of non-Article III courts. Bankruptcy

capital structures of the large businesses that encountered distress. It had become common for leveraged companies to rely on bank loans and revolving credit facilities backed by security interests in substantially all of the borrower's assets.[46] Two mutually reinforcing features of these deals—tight covenants and blanket liens—gave lenders a pronounced influence over the way a borrower's prospective distress would be resolved.[47]

*Tight covenants.* Covenants in the new loan agreements were written to give lenders negotiating leverage early in a borrower's descent into distress. Maintenance covenants, which oblige a borrower to maintain minimum leverage ratios and other markers of financial health, were central to the logic of the new loans. They were typically written so that even modest deterioration in the borrower's financial position could cause an event of default.[48] That would give lenders the option to shut off access to the borrower's lines of credit

---

Amendments and Federal Judgeship Act of 1984, Pub. L. 98–353, 98 Stat. 333 (July 10, 1984).

[46]   *See, e.g.,* Baird & Rasmussen, *End of Bankruptcy, supra* note 3, at 784–85 ("[R]evolving credit facilities and the practical control they give lenders over a firm are some of the most striking changes in Chapter 11 practice over the last twenty years."). Empirical research suggests that companies rely increasingly on secured debt as their leverage, and thus the risk of a default, increases. *See* Efraim Benmelech, Nitish Kumar & Raghuram Rajan, The Decline of Secured Debt *34 (April 2021) (unpublished manuscript) (on file with author) (finding that security increases "as firms' credit risk rises"); Kenneth Ayotte & Edward R. Morrison, *Creditor Conflict and Control in Chapter 11,* 1 J. Legal Analysis 511, 518 (2009) (observing "an eleven-fold increase in secured debt . . . during the one to two years preceding the bankruptcy filing"); Joshua D. Rauh & Amir Sufi, *Capital Structure and Debt Structure,* 23 REV. FIN. STUD. 4242, 4243–4244 (2010) (finding that, as credit quality deteriorates, firms increasingly finance operations with secured bank debt rather than arm's-length unsecured debt); *see also* Ronald J. Mann, *Explaining the Pattern of Secured Credit,* 110 HARV. L. REV. 625, 629 n.15 (1997) (noting the near-total absence of secured credit "from the balance sheets of the most creditworthy companies").

[47]   *See* Baird & Rasmussen, *Private Debt and the Missing Lever, supra* note 5, at 1226–36 (describing each mechanism and their interaction).

[48]   *See* Sudheer Chava & Michael R. Roberts, *How Does Financing Impact Investment? The Role of Debt Covenants,* 63 J. FIN. 2085 (2008); Ilia D. Dichev & Douglas J. Skinner, *Large-Sample Evidence on the Debt Covenant Hypothesis,* 40 J. ACCOUNTING RESEARCH 1091 (2002).

and, if need be, to accelerate the obligation to repay principal and to foreclose on collateral, effectively forcing a bankruptcy filing.[49]

*Blanket liens*. The new loans frequently were supported by security interests in substantially all of a borrower's productive assets.[50] A so-called blanket lien would allow lenders to block a distressed borrower's access to liquidity from two otherwise available sources. First, it prevented the borrower from raising cash by selling assets or offering them as security for a new loan. Outside bankruptcy, the first-in-time-first-in-right rule of lien priority implied that providers of new capital would rank behind existing lenders even if the borrower were willing to violate its covenants; debt overhang would have rendered junior financing impossibly expensive in most cases and a positive boon to existing lenders anyway.[51] In principle, bankruptcy allows borrowers to incur priming liens.[52] But in practice, the standard for subordinating secured claims over the claimholders' objection is too forbidding to be of much use.[53] Second, a blanket lien would cut off the borrower's ability to finance an extended bankruptcy with cashflow from operations. When a lien encumbers all of a company's assets, revenues are at least presumptively proceeds of collateral as to

---

[49]   David A. Skeel, Jr., *The Past, Present and Future of Debtor-in-Possession Financing*, 25 CARDOZO L. REV. 1905 (2004); Baird & Rasmussen, *Private Debt and the Missing Lever*, *supra* note 5.

[50]   The reasons for this change are not self-evident. Some speculate that changes to Article 9 of the Uniform Commercial Code that made it easier for lenders to take a security interest in substantially all assets were at least an enabling part of the story. *See, e.g.*, William W. Bratton & Adam J. Levitin, *The New Bond Workouts*, 166 U. PA. L. REV. 1597, 1642 nn.193–94 (2018); Baird & Rasmussen, *Private Debt and the Missing Lever*, *supra* note 5 154 U. PA. L. REV. 1209, 1228 (2006). For critical discussion of the amendments, see generally G. Ray Warner, *The Anti-Bankruptcy Act: Revised Article 9 and Bankruptcy*, 9 AM. BANKR. INST. L. REV. 3 (2001). For discussion of amendments allowing lenders more easily to take a security interest in bank accounts, see generally Bruce A. Markell, *From Property to Contract and Back: An Examination of Deposit Accounts and Revised Article 9*, 74 CHI.-KENT L. REV. 963 (1999).

[51]   *See* Stewart C. Myers, *Determinants of Corporate Borrowing*, 5 J. FIN. ECON. 147 (1977) (providing canonical explanation of how the existence of senior debt can prevent the financing of even concededly positive-value investments).

[52]   11 U.S.C. § 364(d).

[53]   *Id.*

which lenders can demand adequate protection.[54] In effect, a blanket lien meant that new money would have to come from, or with the consent of, existing lenders.

In combination, tight covenants and blanket liens encouraged distressed borrowers to look after lender interests. Bank power was usually tacit.[55] For example, although covenant breaches became commonplace, lenders only rarely called their loans. In most instances, they waived breach and modified their agreements to accommodate borrower circumstances.[56] But lenders got something for their forbearance. Research focusing on periods between the late-1990s and the great financial crisis shows that defaulting borrowers

---

[54]   *See, e.g.,* Jay Lawrence Westbrook, *The Control of Wealth in Bankruptcy*, 82 Tex. L. Rev. 795, 810–813 (2004) (calling attention to the distinctive power of what he called a "dominant" secured lender, namely a lender with a blanket lien on an business's assets). There is academic controversy about whether this is the right way to think about proceeds. *See, e.g.,* Am. Bankr. Inst. Comm'n to Study the Reform of Chapter 11, 2012–2014, Final Report & Recommendations 233–34 (2014). Melissa Jacoby and Ted Janger have been the most prominent critics of the common wisdom about the significance—even the logical possibility—of a blanket lien. *See* Edward J. Janger, *The Logic and Limits of Liens*, 2015 U. Ill. L. Rev.  589; Jacoby & Janger, *Tracing Equity, supra* note 38; *see also* Michelle M. Harner, *The Value of Soft Variables in Corporate Reorganizations*, 2015 U. Ill. L. Rev. 509, 511–13 (arguing that "soft variables" on which liens cannot be asserted are part of going-concern value). But they acknowledge that their view has not been reflected in practice. *See id.*; *see also* Douglas G. Baird, *The Rights of Secured Creditors After* Rescap, 2015 U. Ill. L. Rev. 849; Barry E. Adler, *Priority in Going-Concern Surplus*, 2015 U. Ill. L. Rev. 811.

[55]   Baird & Rasmussen, *Private Debt and the Missing Lever, supra* note 5, at 1212 ("When a business enters financial distress, the major decisions—whether the CEO should go, whether the business should search for a suitor, whether the corporation should file for Chapter 11—require the blessing of the banks."); *see also* Frederick Tung, *Leverage in the Board Room: The Unsung Influence of Private Lenders in Corporate Governance*, 57 UCLA L. Rev. 115 (2009).

[56]   *See* Michael R. Roberts & Amir Sufi, *Renegotiation of Financial Contracts: Evidence from Private Credit Agreements*, 93 J. Fin. Econ. 159, 160 (2009) (reporting that over ninety percent of public companies' credit agreements with stated maturities of a year or longer were renegotiated before maturity); David J. Denis & Jing Wang, *Debt Covenant Renegotiations and Creditor Control Rights*, 113 J. Fin. Econ. 348, 349 (2014) (finding that restrictive or financial covenants are modified in fifty-three percent of debt contracts); Michael R. Roberts, *The Role of Dynamic Renegotiation and Asymmetric Information in Financial Contracting*, 116 J. Fin. Econ. 61, 62 (2015) (finding that over seventy-five percent of covenant breaches are followed by renegotiation).

often began immediately taking steps to protect lender interests even when bankruptcy was only a distant concern.[57]

When necessary, lenders could also apply pressure in Chapter 11 proceedings.[58] The power managers had enjoyed in bankruptcy during the era of manager control stemmed from their ability to bide an extended process with internal financing. The new loans cut off that ability, making existing lenders the only realistic source of bankruptcy financing in many cases.[59] Lenders frequently formalized and even extended their influence in bankruptcy with a debtor-in-possession loan agreement.[60] But the writing usually was already on the wall.[61]

Loan terms were not the whole story, however. A submissive attitude among the directors of distressed companies was essential to the form of lender control that prevailed.[62] Banks only rarely sought to exercise their state-law remedies. Foreclosure of liens would have been a massively destructive and costly exercise. They instead relied on debtors conceding to threats that liquidity would be shut off.

At first glance, it might seem obvious that directors would throw in the towel. Capitulation typically would have been the surest way

---

[57]   Chava & Roberts, *supra* note 48 (finding diminished capital investment); Greg Nini, David C. Smith & Amir Sufi, *Creditor Control Rights and Firm Investment Policy*, 92 J. FIN. ECON. 400 (2009) (finding diminished investment); Roberts & Sufi, *supra* note 56 (2009) (finding decline in debt issuance); Greg Nini, David C. Smith & Amir Sufi, *Creditor Control Rights, Corporate Governance, and Firm Value*, 25 REV. FIN. STUD. 1713 (2012) (finding decline in distributions to shareholders).

[58]   *See, e.g.*, Skeel, *The Past, Present and Future*, *supra* note 49.

[59]   *See, e.g.*, Ayotte & Morrison, *supra* note 2, at 525 (finding that the vast majority of priming liens "involve[d] the DIP lender priming itself").

[60]   *See, e.g.*, Harvey R. Miller, *Chapter 11 in Transition—From Boom to Bust and into the Future*, 81 AM. BANKR. L.J. 375, 390 (2007) ("By controlling terms of the DIP agreement, creditors substitute the judgment and decision-making of the debtor-in-possession, who is supposed to serve as an independent fiduciary, with that of a self-interested creditor who uses the process to protect its interests.").

[61]   *See* Stephen J. Lubben, *The Board's Duty to Keep Its Options Open*, 2015 ILL. L. REV. 817, 821 (noting concern about lender control authorized by DIP financing agreements, but concluding that no feasible alternative is usually realistic by the time a case is filed, because "the lender has a virtual stranglehold on the debtor's operations coming into bankruptcy by virtue of a lien on all of the debtor's assets and possession of all of the debtor's cash").

[62]   The role of boards of directors is often ignored in accounts of lender control. For an important exception, see Baird & Rasmussen, *Chapter 11 at Twilight*, *supra* note 43 at 693–99.

to maximize enterprise value and preserve the livelihoods of as many employees and contractual partners as possible. On examination, though, it is not at all obvious that directors would adopt a supine posture. The board of a hopelessly insolvent debtor playing hardball with lenders to secure value for shareholders is a story as old as corporate reorganization.[63]

By the turn of the new millennium, however, most boards had no reason to hold out for shareholders. The Delaware Court of Chancery had recently outlined a new vision of fiduciary obligation.[64] Directors of companies "in the vicinity of insolvency" were advised that they could face personal liability for failing to honor creditor interests sufficiently.[65] Even if the prospect of having to pay damages was remote, there was nothing in it for the directors of large, distressed businesses to court risk. These businesses were for the most part publicly traded. Their boards were populated by independent directors with reputations to protect and no particular allegiance to the various mutual funds and others who happened to hold shares at a given time.[66] The median director had every reason to cooperate with the banks who seemed to hold all the cards anyway.

*     *     *

---

[63] *See, e.g.*, Railroad v. Howard, 74 U.S. (7 Wall.) 392 (1869) (describing how a debtor's board conditioned its willingness to authorize a value-maximizing asset sale on a distribution to shareholders).

[64] *See* Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp., 1991 WL 277613 at *34, Civ. A. No. 12150 (Del Ch. 1991) (announcing that the fiduciary duties of such directors no longer run primarily to shareholders).

[65] Chancellor Allen offered his dictum on shifting duties in the context of a judgment exonerating directors from a shareholder challenge. *See id*. The duty to creditors was meant to be a shield, not necessarily a sword. But commentators recognized immediately that the decision's logic would open directors to liability in creditor suits. At least a dozen articles on the matter appeared in just the first year after the decision was announced. *See* C. Robert Morris, *Directors' Duties in Nearly Insolvent Corporations: A Comment on* Credit Lyonnais, 19 J. Corp. L. 61, 61 n.2 (1993) (collecting scholarship). In any case, the decision appears to have affected board decisionmaking. *See* Bo Becker & Per Strömberg, *Fiduciary Duties and Equity-Debtholder Conflicts*, 25 REV. FIN. STUD. 1931 (2012).

[66] The trend toward independent boards pre-dated Sarbanes-Oxley. By 2000, more than 80 percent of public-company boards were majority-composed of independent directors. *See* Vidhi Chhaochharia & Yaniv Grinstein, *The Changing Structure of US Corporate Boards: 1997–2003*, 15 CORP. GOVERNANCE 1215 (2007). For story of "rise" of independent director, see Yaron Nili, *The Fallacy of Director Independence*, 2020 WIS. L. REV. 491, 495–502.

What began as an explanatory account of changing bankruptcy practices in the early 2000s has structured serious thinking about corporate reorganization ever since. Lender control is the interpretive paradigm through which scholars and elite practitioners still for the most part organize their concrete observations of the field. For a generation, it has set the agenda of empirical scholarship and grounded far-ranging normative debate. Much impressive work has sought to clarify and measure the significance of the various channels through which lenders are supposed to exercise their power.[67] And the premises of lender control underlie almost every important reform-oriented debate of the last fifteen years. Arguments about the terms of debtor-in-possession financing, about the rules around section 363 going-concern sales, about forum shopping, about the absolute priority rule—all can be understood as proxy arguments about the desirability of lender control and the legal system's capacity to address its shortcomings.

## II. (FINANCING) CAUSES OF SPONSOR CONTROL

Two developments in the financing of large, leveraged businesses have shifted the balance of power in many distress situations. The first is a trend toward more borrower-friendly loan terms. As has been widely observed, leveraged borrowers today are bound by weaker covenants and offer more porous collateral packages than in the 1990s

---

[67] *See, e.g.*, Sandeep Dahiya, Kose John, Manju Puri & Grabriel Ramirez, *Debtor-in-Possession Financing and Bankruptcy Resolution: Empirical Evidence*, 69 J. FIN. ECON. 259 (2003); Upinder S. Dhillon, Thomas Noe & Gabriel G. Ramirez, *Debtor-in-Possession Financing and the Resolution of Uncertainty in Chapter 11 Reorganizations*, 3 J. FIN. STABILITY 238 (2007); Greg McGlaun, Lender Control in Chapter 11: Empirical Evidence (Feb. 15, 2007) (unpublished manuscript); Lynn M. LoPucki & Joseph Doherty, *Bankruptcy Fire Sales*, 106 MICH. L. REV. 1 (2007); Ayotte & Morrison, *supra* note 2; Nini, Smith & Sufi, *Firm Investment Policy*, *supra* note 57; Roberts & Sufi, *supra* note 56; Becker & Strömberg, *supra* note 65; Nini, Smith & Sufi, *Corporate Governance, and Firm Value*, *supra* note 57; Barry E. Adler, Vedran Capkun & Lawrence A. Weiss, *Value Destruction in the New Era of Chapter 11*, 29 J. LAW, ECON. & ORG. 461 (2013); B. Espen Eckbo, Karin S. Thorburn & Wei Wang, *How Costly Is Corporate Bankruptcy for the CEO?*, 121 J. FIN. ECON. 210 (2016); Denis & Wang, *supra* note 56; Frederick Tung, *Financing Failure: Bankruptcy Lending, Credit Market Conditions, and the Financial Crisis*, 37 YALE J. ON REGUL. 651 (2020); Kenneth Ayotte & Jared A. Ellias, *Bankruptcy Process for Sale*, 39 YALE J. ON REGUL. 1 (2022); B. Espen Eckbo, Kai Li & Wei Wang, Loans to Chapter 11 Firms: Contract Design and Pricing (April 2022) (unpublished manuscript).

and 2000s. The sources of soft power instrumental to the lender control framework have thus deteriorated. The second development is a transformation in the equity ownership of distressed companies. Now, unlike twenty years ago, most large leveraged businesses are controlled by a financial sponsor. The directors and senior executives of sponsor-backed firms are responsive to shareholder interests— which often conflict with lenders' interests—in a way that the managers of public companies are not.  Together these changes mean that the modal large, distressed company has more flexibility and is more apt to use it for the benefit of its shareholders.

## A.  *Borrower-Friendly Loan Terms*

Loans are as important to the financing of leveraged companies as they were twenty years ago.[68] Indeed, the funded debt of many leveraged companies consists of nothing else.[69] But with respect to governance, loans are not what they once were. Rapid growth in demand for corporate loans from non-bank financial institutions, especially collateralized loan obligations (CLOs), drove important changes in standard terms.[70] Before the "originate-to-distribute" model was perfected, a small group of banks would provide loan capital and monitor borrower performance. Now, by contrast, 200 or more institutions, including CLOs, loan mutual funds, private credit funds, and hedge funds, may each hold a piece of a given loan.[71] In this environment, where monitoring is apt to be illusory, the theoretical justifications for tight loan agreements are lacking. At the same time, the costs of inflexibility are greater because the difficulty of renegotiation is magnified. The development of an institutional

---

[68]  Benmelech, Kumar & Rajan, *supra* note 46, at *10, 52.

[69]  *Cf.* Jonathan Hemingway, US Leveraged Loan 2022 Outlook: After Record Year, a Tough Act to Follow, S&P Global: Market Intelligence (Dec. 20, 2021), https://perma.cc/3X2F-SZ6S (detailing growth of leveraged loans relative to the U.S. economy).

[70]  Jeremy McClane, *Reconsidering Creditor Governance in a Time of Financial Alchemy*, 2020 COLUM. BUS. L. REV. 192, 221–24; Sarah Paterson, *The Rise of Covenant-Lite Lending and Implications for the UK's Corporate Insolvency Toolbox*, 39 OXFORD J. LEGAL STUD. 654, 662–64 (2019); Elisabeth de Fontenay, *Do the Securities Laws Matter? The Rise of the Leveraged Loan Market*, 39 J. CORP. L. 725, 738–41 (2014).

[71]  *See, e.g.*, McClane, *supra* note 70, at 212–16.

investor base thus heralded more borrower-friendly loan terms.[72] Indeed, it is only a slight exaggeration to say that today's syndicated loans resemble traditional bond indentures as much as they do the restrictive loans of the 1990s or 2000s.[73] Two dimensions of change are important to understand for present purposes: looser covenants and more fragile liens.

### 1. *Covenant Slack.*

Much has been made of the relatively weak covenants found in today's syndicated loans.[74] The retreat of financial maintenance covenants has been the starkest change.[75] At the height of the lender control era, financial covenants were ubiquitous and tightly set.[76] These amounted to a freestanding option for lenders to call the loan.[77] As recently as 2011, more than 80 percent of newly originated leveraged term loans had at least one financial covenant.[78] Now, though, some 90 percent are "cov-lite."[79] Maintenance covenants are

---

[72] *Id.* For discussion of alternative explanations, see *id*. at 659–62; Sarah Paterson, Covenant Loose Loans and Interacting Agency Problems *7-8 (May 27, 2022) (unpublished manuscript).

[73] *See, e.g.*, de Fontenay, *supra* note 70, at 738–57.

[74] For a useful overview, see Jeremy McClane, *Reconsidering Creditor Governance in a Time of Financial Alchemy*, 2020 COLUM. BUS. L. REV. 192, 221–24

[75] *See, e.g.*, de Fontenay, *supra* note 73; *see also* Paterson, *The Rise of Covenant-Lite Lending*, *supra* note 70 (exploring the significance for reorganization of an analogous trend in UK loans).

[76] *See* Roberts & Sufi, *supra* note 56 (finding that 95 percent of loan agreements contain at least one financial covenant); Chava & Roberts, *supra* note 48, at 2094–95 (finding, in sample of loans originated between 1994–2005, that current ratio and net worth thresholds were set on average just 1.1 and 0.7 standard deviations above the respective values at the start of the loan).

[77] Thomas P. Griffin, Greg Nini & David C. Smith, Losing Control? The 20-Year Decline in Loan Covenant Violations *37 (December 2021) (unpublished manuscript) (on file with author) (showing that, among SEC-reporting companies, the frequency of breach of a maintenance covenant dropped from nearly 20 percent, in 2001, to less than 6 percent after the financial crisis).

[78] See Abby Latour, Covenant-Lite Deals Exceed 90% of Leveraged Loan Issuance, Setting New High, S& P Global: Market Intelligence (Oct. 8, 2021), https://perma.cc/4XLY-QDZY.

[79] *Id.*; *see also* Bo Becker & Victoria Ivashina, Covenant-Light Contracts and Creditor Coordination (Mar. 2016) (unpublished manuscript) (on file with author).

still common in revolving loan facilities,[80] but they are frequently designed to "spring" into effect only when a substantial part of the revolver is drawn, and there is little reason to think they do much to protect institutional term lenders.[81] In most cases, therefore, a borrower's poor financial performance no longer allows lenders to convene negotiations from a position of strength.

Lender power to block specific transactions that might weaken the credit has also atrophied. Explicit carveouts from standard incurrence covenants—known as "baskets"—give borrowers more freedom than in the past to incur incremental *pari passu* debt, diluting lender claims, and to make distributions to junior creditors and shareholders, shrinking the asset base from which lenders can expect to recover.[82] Some such baskets are available for the borrower's use as long as it is not in default.[83] With no (or only loosely written) maintenance covenants to satisfy, that condition can be achievable even when the borrower is facing serious financial problems. Other baskets, which typically allow the borrower to incur unlimited debt or distribute unlimited value, are available only if after giving pro forma effect to a proposed transaction the borrower would achieve specified financial ratios.[84] But those thresholds often permit substantial leverage.

To compound matters, the restrictions that covenants seem on their face to announce have become easier for borrowers to finesse. The most common metrics on which covenant thresholds are set— leverage ratios and interest coverage ratios—use EBITDA in the denominator. But loan contracts now frequently define EBITDA to allow the borrower to adjust earnings on the basis of speculative

---

[80]   Mitchell Berlin, Greg Nini & Edison G. Yu, *Concentration of Control Rights in Leveraged Loan Syndicates*, 137 J. FIN. ECON. 249 (2020). Revolving lenders can therefore decline to fund undrawn commitments, or even enforce remedies, if a borrower cannot satisfy them. Frederick Tung, *Do Lenders Still Monitor? Leveraged Lending and the Search for Covenants*, 47 J. CORP. L. 153 (2022).

[81]   *See* Paterson, *The Rise of Covenant-lite Lending*, *supra* note 70, at 661–62.

[82]   The change is hard to quantify, because there is no standard metric for comparing incurrence covenant slack across loans. *Cf.* Victoria Ivashina & Boris Vallée, Complexity in Loan Contracts (May 6, 2022) (unpublished manuscript) (inferring loosening of covenants from increasing numbers of baskets).

[83]   These are sometimes called "freebie baskets." *See* Xtract Research, Cov 101: Glossary of Commonly Used Terms in US Loans 5 (July 14, 2021).

[84]   These are sometimes called "ratio baskets." *See, e.g., id.* at 6 (defining "Incremental Leverage Ratio Basket").

projections and subjective characterizations of one-time costs.[85] A borrower's power to adjust and announce so-called add-backs to earnings, although finite, gives borrowers additional flexibility on the margin. If leverage and interest coverage ratios were ever hard measures, they no longer are.

### 2. *Lien Fragility.*

In recent years, syndicated loans are also less likely to put in place a robust blanket lien on the borrower's assets. Recall that the blanket lien was an important part of the lender control paradigm—not perhaps in the foreground as much as tight covenants, but crucial to preventing borrowers from circumventing covenants or using a bankruptcy filing to sunder floating security interests.[86]

The point of the general rule that liens follow property out of the debtor's hands is to discourage transfers likely to diminish the value of secured creditors' collateral.[87] But syndicated loans now give borrowers a number of ways to transfer assets free and clear of liens. Many asset-sale covenants allow liens to be destroyed merely on the condition that a sale fetches fair value, even if the sale is to an affiliate of the borrower.[88] Liens often can be destroyed to enable what is effectively incremental borrowing through a sale-and-leaseback transaction.[89] And liens are released when a borrower transfers assets to a non-guarantor subsidiary.[90] Unrestricted subsidiaries, which are not bound by the borrower's covenants, were unknown in the

---

[85]  *See, e.g.,* Adam B. Badawi, Scott D. Dyreng, Elisabeth de Fontenay & Robert W. Hills, Contractual Complexity in Debt Agreements: The Case of EBITDA (May 7, 2021) (unpublished manuscript) (on file with author).

[86]  *See supra* notes 50–54 and accompanying text.

[87]  *See, e.g.,* Unif. Comm. Code § 9–315(a)(1) (codifying the general rule for security interests in personal property).

[88]  Many loan agreements condition the sale of especially valuable assets on the borrower receiving a minimum percentage of the proceeds, often 75 percent, in cash. Cash sweeps—requirements that a borrower use some of the excess cash it receives to repay principal—put a limit on a borrower's ability to raise new money with an asset sale.

[89]  Bellucci & McCluskey, *supra* note 91, at 381.

[90]  Bellucci & McCluskey, *supra* note 91, at 301–03.

syndicated loan market in 2000.[91] Now most loans allow borrowers to create and transact through unrestricted subsidiaries.[92] Borrowers thus can destroy liens if and to the extent they can locate basket capacity to transfer assets to an unrestricted subsidiary. Outside bankruptcy, such flexibility can allow borrowers to access liquidity (by, in effect, re-pledging collateral) without negotiating with lenders; inside bankruptcy, it threatens to undermine lenders' distinctive rights with respect to the debtor's cash.

## B. *Equity Sponsorship*

As much attention as commentators have paid to changing loan terms, a parallel development no less important to the reorganization calculus has largely escaped notice. Private equity sponsors now predominate as the owners of large, distressed businesses.

The growth of private equity's role in distress over the last two decades is hard to overstate. In the years just since the global financial crisis, the share of companies on Moody's "B3 Negative and Lower List" owned by a private equity sponsor has increased by twenty-five percentage points. As of 2017, approximately 70 percent of such companies were sponsor-owned.[93] The change in ownership of distressed businesses may reflect a more general trend in the American (and indeed global) economy.[94] Between 2000 and 2017, the number of companies controlled by a private equity sponsor increased fivefold, while the number of listed public companies dropped by a third.[95] In any case, the bottom line is that private equity ownership of distressed assets has gone from the exception to the rule.

Equity sponsorship is important because it shapes the priorities of those who exercise immediate control of distressed businesses. The

---

[91]  *See* MICHAEL BELLUCCI & JEROME MCCLUSKEY, THE LSTA'S COMPLETE CREDIT AGREEMENT GUIDE (2d ed.) 301–03 (2017) (explaining the migration of the unrestricted subsidiary construct from bond indentures to loan agreements).

[92]  *See* Vincent S.J. Buccola & Greg Nini, The Loan Market Response to Dropdown and Uptier Transactions *33–34 (June 2022) (unpublished manuscript) (finding that approximately half of leveraged loans to SEC-filing borrowers contemplate unrestricted subsidiaries and noting that loans to private borrowers are more likely to entertain the construct).

[93]  Valladares, *supra* note 15.

[94]  *See* George S. Georgiev, *The Breakdown of the Public-Private Divide in Securities Law: Causes, Consequences, and Reforms*, 18 N.Y.U. J. L. & BUS. 221, 275–77 (2021).

[95]  *Id.* at 313.

boards of sponsored companies are totally different in character from those of comparable, widely held public firms. Public-company boards are populated overwhelmingly with directors whose economic stakes in the businesses they govern are minimal and who, therefore, are supposed to be free from the CEO's influence.[96] Public company directors also tend to be at the tail end of distinguished careers. They tend for that reason to be risk averse. For them, as Gilson and Gordon put it, "the downside of reputational embarrassment … generally exceeds the potential financial gains."[97] When it comes to resolving distress, most public company directors thus have only very weak financial incentives to adopt the kind of aggressive, risky postures that shareholders might prefer and much stronger personal reasons to steer a safer course that ensures continuity of enterprise.

The boards of private equity-owned companies are constituted on a different logic. Portfolio company boards are relatively small.[98] The directors, as a group, are deeply knowledgeable about the business and committed to shareholder interests.[99] The CEO typically has a seat alongside two or more representatives of the sponsor—often employees with differential expertise in the financial and operational aspects of the business—and perhaps an outside advisor with experience in the relevant industry. Gilson and Gordon summarize a common structure:

> One board member will be, in effect, the lead director, who will drive the PE firm's engagement with the portco. This person will have substantial personal financial gain/loss on the line, not only from portco-specific payoffs in an IPO or private exit but also in terms of his/her career within the PE firm. This "empowered lead director" can marshal the full analytic capacity of the PE firm to assess the strategic and operational questions facing the portco. Analysts from the PE firm will be able to access portco-specific information in their work. The annual time commitment that the PE senior staff and

---

[96]   *E.g.*, Jill E. Fisch, *Taking Boards Seriously*, 19 CARDOZO L. REV. 265 (1997).

[97]   Ronald J. Gilson & Jeffrey N. Gordon, *Board 3.0: An Introduction*, 74 BUS. LAW. 349, 357 (2019).

[98]   *Id.* at 359; Elizabeth Pollman, *Team Production Theory and Private Company Boards*, 38 SEATTLE U. L. REV. 619, 635 (2015).

[99]   Gilson & Gordon, *supra* note 97, at 359.

analysts will devote to monitoring the portco's performance is in the thousands of hours.[100]

Not even the most ardent proponent of shareholder primacy could imagine public company directors so singularly motivated.[101] Nor is distress likely to change portfolio company directors' orientation. The private board is a far cry from a "mediating hierarch."[102] It is structured to see that the sponsor takes as much as possible from any reorganization.

One might expect corporate fiduciary principles to check directors' sponsor-oriented proclivities. Corporate directors owe obligations of good faith and loyal service.[103] In conditions of financial health, the law arguably instructs them to look after shareholders' interests. When a company becomes financially distressed, however, preferring shareholder interests at the expense of the company's enterprise value won't do.[104] The Delaware courts have made clear that creditors can, on a derivative basis, sue directors for disloyalty

---

[100] *Id.* (synthesizing academic literature and results of interviews with leading private equity firms).

[101] This was Michael Jensen's rationale for thinking the public company would be superseded, as to some extent it seems to have been. *See* Michael Jensen, *Eclipse of the Public Corporation*, 67 Harv. Bus. Rev. 61 (1989).

[102] *Cf.* Margaret M. Blair & Lynn A. Stout, *A Team Production Theory of Corporate Law*, 85 Va. L. Rev. 247 (1999). Indeed, precisely because of the effective shareholder power in private companies, Blair and Stout explicitly limited their account of the board as mediating hierarch to the context of public companies. *See id.* at 281. Though this doesn't mean private boards can't solve *some* analogous team production issues. *See* Elizabeth Pollman, *Team Production Theory and Private Company Boards*, 38 Seattle U. L. Rev. 619, 635–46 (2015).

[103] Holger Spamann, Scott Hirst & Gabriel Rauterberg, Corporations in 100 Pages 35–36 (2d ed. 2021).

[104] In *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, No. 12150, 1991 WL 277613 (Del. Ch. Dec. 30, 1991), Chancellor Allen famously opined that directors' fiduciary duties embrace creditor interests when a company is in "the vicinity of insolvency." *Id.* at *34 n.55. Although many commentators have taken issue with language suggesting a *shifting* obligation, the Chancellor's opinion is best understood to mean only that the identity of the primary economic beneficiaries of sound stewardship change with the degree of the company's solvency. So understood, *Credit Lyonnais* is consistent with subsequent cases to which it is sometimes contrasted, such as *North American Catholic Education Programming Fund v. Gheewalla*, 930 A.2d 92 (Del. 2007) (denying the existence of a fiduciary duty to creditors *qua* creditors), and *Quadrant Structure Products Co. v. Vertin*, 102 A.3d 155 (Del. Ch. 2014) (conditioning creditors' standing to assert fiduciary violations on the company's insolvency).

calculated to benefit shareholders at the company's expense.[105] The prospect of having to pay damages, if nothing else, might focus a board's attention. To neutralize the threat of judicial second-guessing, moreover, portfolio companies deep in distress sometimes appoint new directors, with weaker ties to the sponsor, and retain bankers and lawyers to support them.[106] At least in principle, independent directors could address concerns about a portfolio company board's willingness to sacrifice expected enterprise value for a sponsor's benefit.

In practice, however, neither the threat of litigation nor the interposition of (nominally) independent directors has much bite. By design, judicial enforcement of directors' fiduciary duties aims to target only the most egregious decisions.[107] Delaware's courts, at least, have made clear that their review is to be no more searching while a corporation is insolvent than while it is solvent.[108] In both conditions, the business judgment rule insulates the vast majority of decisions for which directors can articulate a plausible rationale.[109] Independent directors often seem to be appointed only when a bankruptcy, with its concomitant scrutiny of conflicted transactions, is inevitable. Their prosecution of claims against former directors and controlling sponsors in that forum does not always appear to be as vigorous as it could be.[110] Indeed, the appearance of a number of "bankruptcy directors" hired repeatedly by sponsored companies has led some to question whether the real function of independence isn't precisely to enforce fiduciary law's laxity.[111] The essential weakness of fiduciary law thus has ensured that sponsor-backed distressed businesses today

---

[105] Quadrant Structured Prod. Co. v. Vertin, 102 A.3d 155 (Del. Ch. 2014); N. Am. Catholic Educ. Programming Fund v. Gheewalla, 930 A.2d 92 (Del. 2007).

[106] *See generally* Jared A. Ellias, Ehud Kamar & Kobi Kastiel, *The Rise of Bankruptcy Directors*, 95 S. CAL. L. REV. __ (forthcoming 2022).

[107] *E.g.*, E. Norman Veasey, *New Insights into Judicial Deference to Directors' Business Decisions: Should We Trust the Courts?*, 39 BUS. LAW. 1461, 1464 (1984).

[108] Quadrant Structured Prod. Co. v. Vertin, 102 A.3d 155, 192 (Del. Ch. 2014) (emphasizing that risk profile of a board's strategic choice is not a ground for challenge absent self-dealing or other conflict).

[109] *Id.* For a sustained argument that the fiduciary duty regime protects creditors only on the margin, see Jared A. Ellias & Robert J. Stark, *Bankruptcy Hardball*, 108 CAL. L. REV. 745, 759–62 (2020).

[110] *See, e.g.*, Ellias, Kamar & Kastiel, *supra* note 106, at __ [*2] (describing role of independent directors in Nine West bankruptcy).

[111] *See, e.g.*, *id.*

use the flexibility they now have under their loan contracts to the advantage of their private equity owners.

### III. SPONSOR INCENTIVES

If the shifting locus of power in many distressed firms has changed restructuring dynamics, it must be because equity sponsors have different incentives than senior lenders. What exactly do sponsors want? This part addresses that question in two steps. First, it develops an account of how sponsors are apt to think about distress in a vacuum, so to speak, where other parties' interests are not brought to bear. It then considers how reputational concerns and Coasean bargaining might moderate or qualify the first approximation. The punch line is that, in general, sponsors are biased against resolving distress in Chapter 11—they want portfolio companies to use and extend "runway" even when a bankruptcy resolution is socially optimal—but that this generic disposition can be overcome if creditors who would benefit from bankruptcy are able credibly to promise a sponsor value for relenting.

#### A. Sponsor Incentives in a Vacuum

Financial distress is a crisis of liquidity. A distressed business is one that risks failing to meet its economic potential because it lacks sufficient cash. The dramatic threat is a premature collapse of the business following a creditor run.[112] The prosaic if perhaps more important threat is a slow decline owing to underinvestment.[113] If a company is short on cash, it has to prioritize current expenses over capital investments calculated to pay off in the long run. Over time, failure to make cost-justified investments is a recipe for value destruction.

Bankruptcy offers a cure for illiquidity. Indeed, the influential "creditors' bargain" literature justifies bankruptcy law precisely

---

[112] *See, e.g.*, Thomas H. Jackson, *Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain*, 91 YALE L.J. 857, 864–65 (1982). If a company cannot pay its debts as they mature, disappointed creditors may foreclose or otherwise levy on assets essential to the business. Moreover, the mere possibility that they might do so can cause a business to unravel, as investors without fixed claims (or with claims not soon maturing) seek to exit while they can.

[113] *See* Kenneth Ayotte & David A. Skeel, Jr., *Bankruptcy Law as a Liquidity Provider*, 80 U. CHI. L. REV. 1557 (2013).

because, but only to the extent that, it allows investors to overcome rigidities that might prevent a distressed company from gaining access to an appropriate amount of liquidity.[114]

Not every company facing a liquidity constraint should opt for Chapter 11, however. The bankruptcy process is expensive in indirect as well as out-of-pocket terms.[115] A voluntary transaction may be able to accomplish everything a bankruptcy could at a fraction of the price.[116] Moreover, some loss attributable to illiquidity must be accepted. Since even the most efficient restructuring process is costly, the optimal real costs of financial distress are strictly positive. In principle, a company's managers should reorganize in Chapter 11 when doing so can be expected to save more by relieving the real costs of distress than the process itself imposes—no sooner and no later.

At first approximation, however, equity sponsors will tend to do best if their portfolio companies avoid bankruptcy even when resolution of distress in Chapter 11 is cost-justified. There are three main considerations.

First, bankruptcy law is at odds with the interest sponsors, like all equity investors, have in preserving the option-value of equity. When a company is insolvent, the equity is "out of the money." This means that if the business were to be sold, or if creditors' claims to asset value

---

[114] *See, e.g.*, Vincent S.J. Buccola, *Bankruptcy's Cathedral: Property Rules, Liability Rules, and Distress*, 114 Nw. U. L. Rev. 705, 722–27 (2019).

[115] Indirect costs are difficult to quantify but may be quite big. *See, e.g.*, Samuel Antill & Megan Hunter, Consumer Choice and Corporate Bankruptcy (July 3, 2021) (unpublished manuscript) (on file with author) (estimating impact of diminished consumer appetite for Hertz rental cars due to the company's Chapter 11 case). Presumably costs are much less in prepackaged bankruptcies. For an argument that at least some bankruptcy cases might not be much costlier than analogous out-of-court transactions, see Stephen J. Lubben, Protecting Ma and Pa: Bond Workouts and the Trust Indenture Act in the 21st Century *13, 47–64 (Aug. 31, 2021) (unpublished manuscript) (on file with author).

[116] For example, creditors' voluntary forbearance or acceptance of an extended maturity schedule are as effective at preventing a run as are the automatic stay and the rules of plan confirmation. And creditors' willingness to swap their claims for equity or to allow new, priming debt is as effective at overcoming debt overhang as is any coercive intervention bankruptcy might offer. *See, e.g.*, Press Release, Diamond Sports Group Enters into Agreement with Creditors on Liquidity Enhancing Transaction (Jan. 13, 2022), https://sbgi.net/pr-news/diamond-sports-group-enters-into-agreement-with-creditors-on-liquidity-enhancing-transaction/ (summarizing transaction in which lenders agree to be subordinated by newly created debt so that borrower can raise $600 million of new money).

were otherwise crystallized, the equity would be wiped out. Chapter 11 is designed to crystallize claims in just this way.[117] The absolute priority rule, arguably the single most important notion in corporate bankruptcy,[118] provides that a plan of reorganization may not return anything to equity unless every impaired class of creditor consents.[119] Such unanimity is hard to achieve, and consequently distributions to equity are rare. If a distressed company can avoid a crystallization event, however, there is no immediate significance to equity's being out of the money. Fortunes could improve. If they do, junior investors are the primary beneficiaries. Thus equity is worth something as long as the company can persist as a going concern.

Second, bankruptcy cuts off management fees. It is a common practice for sponsors to contract with their portfolio companies to offer advisory services for a fee. The amounts at stake can be large. In Toys "R" Us, for example, creditors have alleged that over twelve years the company's sponsors received some $250 million in advisory fees not tied to any particular services.[120] There is nothing inherently improper with such arrangements. But it is a flow of cash payment that a Chapter 11 filing is almost certain to end.

Finally, bankruptcy produces litigation risk for sponsors and their representatives. At the outset of a Chapter 11 case, the United States trustee is tasked with establishing a creditors' committee to protect the interests of the general body of unsecured creditors. A principal committee function is to look for ways to recover value for the estate.[121] That often entails counsel for the committee (or for a successor trust) asserting claims for breach of fiduciary duties, receipt of fraudulent transfers, and otherwise.[122] Sponsors have proved to be

---

[117]   *See, e.g.*, Casey, *supra* note 7, at 784–89.

[118]   *See, e.g.*, Douglas G. Baird, *Priority Matters: Absolute Priority, Relative Priority, and the Costs of Bankruptcy*, 165 U. PA. L. REV. 785, 786 (2017) (describing the rule as "the organizing principle of the modern law of corporate reorganizations").

[119]   11 U.S.C. § 1129(b).

[120]   Second Amended Complaint, TRU Creditor Litig. Tr. v. Brandon (*In re* Toys "R" Us U.S., Inc.), No. 17–34665–KLP Adv. Pro. 20–03038–KLP (Bankr. E.D. Va. Sept. 3, 2021).

[121]   11 U.S.C. §§ 1102–03. Section 1103 specifically charges committees with, among other things, "investigat[ing] the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business." *Id.*

[122]   This can also be done after bankruptcy by a trustee who succeeds to the committee's rights under the terms of a plan of reorganization

attractive targets. They have deep pockets and, as often as not, years of extensive and inherently conflicted financial dealings with portfolio companies that wind up in Chapter 11. In principle, creditors could bring analogous claims outside bankruptcy. In practice, though, a variety of obstacles to instituting and funding challenges make Chapter 11 a hotbed for creditor litigation. Recently some sponsors have tried to blunt committees' practical power by having independent directors appointed to portfolio companies' boards in anticipation of bankruptcy.[123] But, from a sponsor's perspective, the threat of litigation remains an important downside of entering Chapter 11.

### B.   Sponsor Incentives with Feedback

Sponsors do not exist in a vacuum, of course. Their preferences are shaped in part by others' reactions (or anticipated reactions) to portfolio company conduct. Two feedback channels are especially prominent: sponsor reputation and Coasean bargaining. In theory, either channel could unwind completely the first-order incentives described above. Realistically, they are likely to moderate or qualify sponsor incentives, but not to undo or reverse their direction.

#### 1.   Anticipated Effects on Sponsor Reputation

A private equity sponsor evaluating how it wants its portfolio companies to deal with financial distress is not facing a one-shot game. Sponsors are repeat players. They control multiple companies and hope to buy and control more in the future. And those companies will need credit. Concern for the terms on which their portfolio companies will be able to borrow should discipline a sponsor's willingness to burn creditors today.

Indeed, in a world of informationally efficient markets, a profit-maximizing sponsor with an infinite time horizon would never sacrifice a portfolio company's enterprise value to increase the value of its own investment in the company. If credit markets incorporate all relevant information, a sponsor would expect future lenders to take account of its proclivity to deal evenhandedly with creditors. Such lenders presumably would demand a higher coupon or tighter non-

---

[123]   *See* Ellias, Kamar & Kastiel, *supra* note 110.

price terms from the portfolio companies of sponsors known to steer the companies they control away from value-maximizing realization events such as bankruptcy. The incremental cost of debt capital would translate to weaker earnings at the portfolio company level or force the poor-reputation sponsor to use less leverage. Either way, the sponsor's returns would predictably suffer.[124]

There is empirical support for the idea that sponsor reputations matter at least to some extent. For example, sponsored firms are widely believed to borrow on more flexible terms than otherwise similar non-sponsored firms. Sponsor reputation is one explanation that has been proffered.[125] At least during the period before the financial crisis, companies owned by high-reputation sponsors seem to have borrowed at narrower spreads and to have been permitted more leverage.[126] Likewise, during the same period, the holders of defaulted bonds issued by sponsored companies seem to have fared no worse than holders of defaulted bonds issued by non-sponsored but otherwise similar companies.[127]

For several reasons, though, reputation effects are unlikely to do more than moderate or dampen the sponsor incentives described above. First, it is not clear whether (or to what degree) primary loan markets in fact reflect information about sponsor reputation. If sponsors do not believe that lenders distinguish between loans on that basis, then the whole mechanism falls apart. It is hard to believe that lenders don't "punish" aggressive sponsors at all. But some market participants express a view that institutional lenders such as CLOs do not. In any case, it is as yet an open empirical question to what degree the portfolio companies of sponsors who have behaved especially aggressively relative to their creditors have in fact been punished.

---

[124] For elaboration of this basic logic, see Elisabeth de Fontenay, *Private Equity Firms as Gatekeepers*, 33 REV. BANKING & FIN. L. 115, 148–60 (2013); Andrey Malenko & Nadya Malenko, *A Theory of LBO Activity Based on Repeated Debt-Equity Conflicts*, 117 J. FIN. ECON. 607 (2015).

[125] *See*; *see also* Victoria Ivashina & Anna Kovner, *The Private Equity Advantage: Leveraged Buyout Firms and Relationship Banking*, 24 REV. FIN. STUD. 2462 (2011) (concluding that sponsor relationships with banks lead to more flexible and cheaper loans).

[126] Cem Demiroglu & Christopher M. James, *The Role of Private Equity Group Reputation in LBO Financing*, 96 J. FIN. ECON. 306 (2010).

[127] Edith S. Hotchkiss, David C. Smith & Per Strömberg, *Private Equity and the Resolution of Financial Distress*, 10 REV. CORP. FIN. STUD. 694, 727–28 (2021).

Second, sponsors do not act as though they have an infinite time horizon. The principals of the management companies at the center of sponsor complexes may wish to maximize long-term value, but that is only the start of the matter. As in any organization, agency costs imply that the interests of day-to-day decisionmakers will influence sponsor behavior. The interests of those who act on a sponsor's behalf are only imperfectly aligned with principals' presumptive desire to maximize the sponsor's brand value. Sponsor employees may often do best in terms of salary, bonus, and prestige by maximizing short-run returns on the companies to which they are personally assigned.

Third, as Sarah Paterson has suggested, sponsors may be able to raise more new capital, or raise capital on more attractive terms, by trading off reputation with lenders for short-run returns.[128] Sponsor principals do not only or even primarily seek to maximize long-run returns on the capital they manage; they also seek to manage a lot of capital. One might even say that for most sponsors the former goal is instrumental to the latter. Retaining and indeed growing assets under management entails a perpetual marketing process aimed at pensions, endowments, and other institutions. The returns a sponsor has realized on its past and current funds is an important part of the pitch. Realization events that force it to mark down a troubled investment may thus carry a marketing cost far in excess of the associated economics loss. If potential investors knew that some of a fund's returns were attributable to sponsor initiatives with negative expected value—and if they believed that that such behavior would increase future interest costs of the sponsor's portfolio companies—in theory, they would discount past performance accordingly. But that level of transparency is unrealistic.[129] Consequently, sponsors focused on their own bottom line may not fully internalize the reputational consequences of sharp practice.

### 2. *Coasean Bargaining*

The possibility of cutting a deal with negatively affected creditors might lead sponsors to internalize the social costs of their aversion to loss crystallization even if anxiety about reputation does so only

---

[128]   Paterson, *The Rise of Covenant-lite Lending*, *supra* note 70, at 660–61.

[129]   Even well informed LPs may have heterogeneous views about the desirability of sponsor aggressiveness in defending its investments.

weakly. Creditors bear the burden in the first instance of a company's reluctance to enter bankruptcy. Where the anticipated benefits of Chapter 11 exceed anticipated costs, there is, by tautology, a surplus to be had if the affected creditors can credibly offer to share the net value of a Chapter 11 resolution with the controlling sponsor. The Coasean insight is that sponsors should *want* a reckoning for a distressed portfolio company when a reckoning would maximize its enterprise value, provided only that transaction costs are small.[130]

The trouble is that transaction costs are often not small. Two related sources of friction can prevent a mutually advantageous deal from emerging. One is a standard holdout problem. A schematic way to effect a deal would involve the creditors "taxing" themselves an appropriate sum and then handing over the proceeds to the sponsor. But large companies have many different kinds of debts and many different creditors holding them. There is no mechanism by which each creditor can be forced to contribute new money in proportion to the marginal benefits it is likely to realize from a bankruptcy. Indeed, there is no mechanism to compel contributions of new money at all. Raising a fund is not realistic in most instances.

A more plausible way for creditors to offer value to a sponsor is through the bankruptcy process itself. Most obviously, creditors could promise to gift the sponsor part of the proceeds of a going-concern sale (if there is to be a sale) or securities of the reorganized company (if there is to be a reorganization). Such a deal would not involve the institutional complications that go with trying to raise new money. But bargaining frictions do not disappear just because a deal invokes Chapter 11. Heterogeneity of creditor interests and generic holdout incentives persist. The absolute priority rule gives each creditor class a veto power with respect to any plan under which a sponsor receives value for its equity.[131] And the prospect of a veto means that creditor promises about what a sponsor will be allowed in bankruptcy are potentially illusory unless every class's support is lined up in advance of a filing. But prepackaged plans are realistic only in a subset of cases.

This is not to say that creative deals can't be struck. In some instances, as we shall see, willing creditors may be able credibly to

---

[130]   R.H. Coase, *The Problem of Social Cost*, 3 J. L. & ECON. 1 (1960).

[131]   11 U.S.C. § 1129(a)(8), (b).

promise a sponsor value that law does not treat as a distribution subject to the absolute priority rule. In such cases, the opportunity to deal qualifies the first-order incentives described above.

## IV. (REORGANIZATION) CONSEQUENCES OF SPONSOR CONTROL

Sponsor prominence in so many instances of corporate financial distress can help to explain otherwise puzzling, practical changes in distress resolution. Consistent with the discussion of incentives above, one should expect sponsor control to contribute to two important and widely observed trends: first, more lavish efforts by reorganizers to "extend the runway"—that is, to increase the time a cash-strapped company has to operate before illiquidity forces a bankruptcy reckoning; and second, weightier reliance on multilateral agreements negotiated outside bankruptcy to direct the course of proceedings in Chapter 11.

### A.  Emphasis on Runway

Private equity sponsors have always had reason to prefer that their portfolio companies avoid bankruptcy, all else equal. But in recent years, as sponsors have occupied a more pronounced role in the distressed environment, and as loan contracts have given borrowers more flexibility, the desire to find liquidity outside Chapter 11 has been brought to bear on an expanded opportunity set. The fruits of this impulse may be discerned in a variety of artifacts of reorganization practice that might appear unconnected: in the wave of contentious, out-of-court recapitalization transactions; in the complexity of the capital structures common to many highly distressed companies; and perhaps, although proof is harder to discern, in the relatively beleaguered condition of some companies that eventually end up in bankruptcy.

#### 1.  Hardball Priming Transactions.

Among the most striking developments in reorganization during the last decade has been a proliferation of hardball priming

transactions.[132] These are out-of-court deals in which a distressed company creates new senior secured debt that subordinates (previously) first-lien obligations, with minimal support from the affected creditors. The company can use the newly created, super-senior debt capacity to raise new money for its operating needs or as fodder to swap for other, maturing debts the company would struggle to refinance. Either way the aim is to secure liquidity for the company without having to resort to Chapter 11, where subordinating and restructuring existing debts is quotidian business but where equity interests usually go to heaven.

Two transactional forms have proved especially fit for purpose: the dropdown and the non-pro rata uptier. In a dropdown, the distressed company transfers collateral to a subsidiary outside the credit group and, in effect, *re-uses* the collateral to support new debt. The crux of the transaction is the company's right, under its credit documents, to invest assets into subsidiaries it designates as "unrestricted."[133] Covenants restricting a company's right to create new debt do not bind its unrestricted subsidiaries, and liens are automatically released from assets validly transferred to them.[134] Thus, to the extent a company has the will and the capacity under its credit documents to invest collateral into an unrestricted subsidiary, it can have the subsidiary create new debt with structural and lien priority over what it had previously dubbed first-lien debt.

---

[132] The trend has been widely discussed in practitioner circles, *see, e.g.*, LOAN SYNDICATION AND TRADING ASSOC., LIABILITY MANAGEMENT TRANSACTIONS (Sept. 30, 2020), https://www.lsta.org/news-resources/liability-management-transactions/ (summarizing webinar on the subject), as well as in the academic literature, *see* Buccola & Nini, *supra* note 92; Stephen J. Lubben, *Holdout Panic*, 96 AM. BANKR. L.J. 1 (2022); Diane Lourdes Dick, *Hostile Restructurings*, 96 WASH. L. REV. 1333 (2021); Kenneth Ayotte & Christina Scully, *J. Crew, Nine West, and the Complexities of Financial Distress*, 131 YALE L.J. FORUM 363 (2021); Mitchell Mengden, *The Development of Collateral Stripping by Distressed Borrowers*, 16 CAPITAL MARKETS L.J. 56 (2021); Robert K. Rasmussen & Michael Simkovic, *Bounties for Errors: Market Testing Contracts*, 10 HARV. BUS. L. REV. 117, 141–48 (2020); Ellias & Stark, *supra* note 109.

[133] In principle, a distressed company could alternatively execute a dropdown by transferring value into a non-guarantor "restricted" subsidiary. The transfer of collateral to any non-guarantor causes liens to be released. But restricted subsidiaries are not practical tools in most circumstances, because they are subject to lien and indebtedness covenants and thus will not usually be able to incur new debt without causing the borrower to default.

[134] BELLUCCI & MCCLUSKEY, *supra* note 91, at 301–03.

In a non-pro rata uptier, the distressed company procures an amendment to its credit documents that allow it to incur new debt backed by new, super-senior liens. An uptier involves no shuffling of assets around the debtor's corporate group. It works by creditor consent. But the consent is of a special kind. Until the last few years, standard practice for a company seeking relief from creditors— compelled by market norms if (arguably) not law—was to offer an inducement to creditors within an affected facility on a pro rata basis. If a creditor did not consent to giving relief, it might find itself in an inferior position; but it was given a chance to participate. In a non-pro rata uptier, by contrast, the distressed company offers inducement only to a favored subset of affected creditors. It might offer to roll up the favored creditors' claims into a new, super-prior facility or else might simply allow the favored creditors to fund new-money debt contemplated by the transaction on above-market terms. In so dividing the affected creditors, the company reduces the price of obtaining permission to create priming debt and increases the chance that it will be able to obtain permission at all.

Before the financial crisis, neither type of priming transaction was a plausible tactic for dealing with illiquidity. For one thing, neither would have been compatible with the black-letter terms that then prevailed in syndicated loan contracts. Pre-crisis loans did not contemplate unrestricted subsidiaries and prohibited borrower repurchases. Tight financial covenants also meant that any technical permissions a distressed borrower might find in its loan contracts were always implicitly subject to lender veto. Quite apart from contractual limitations, dropdowns and especially non-pro rata uptiers would have been unthinkable under pre-crisis commercial norms. Lending syndicates of the 1990s and 2000s tended to present as united groups, at least within a tranche. Lenders were fewer in number and mostly banks, repeat players in an industry in which relationships are everything.[135] Deference to the "lead bank" that had arranged a loan and put together the syndicate was the norm.[136] Liquidity strategies that depend on splitting a syndicate could not succeed until, at a minimum, syndicates grew in number and

---

[135]  Elisabeth de Fontenay, *The $900 Million Mistake*, 16 CAPITAL MARKETS L.J. 307 (2021).

[136]  *See, e.g.*, Amir Sufi, *Information Asymmetry and Financing Arrangements: Evidence from Syndicated Loans*, 62 J. FIN. 629, 629–30 (2007).

heterogeneity, as they did in the 2010s. Even with respect to bonds, the terms of which were never so tight and the holders of which never so tethered to an equality norm, the kinds of priming transactions that have become commonplace would have been hard to contemplate.

The conspicuous variable in almost all every hardball priming transaction to date is a private equity sponsor. Table 1 is a list of dropdowns executed since 2015. It shows that twelve of thirteen such transactions have been executed by sponsor-backed companies. The lone exception is Party City. Notably, Party City's transaction is one of six dropdowns the legality of which creditors declined to challenge in litigation. Table 2 is a list of non-pro rata uptiers executed since 2015. It shows that all six have been executed by sponsor-backed companies. Taken together, then, sponsor-controlled companies are responsible for eighteen of the nineteen hardball priming transactions executed as of June 2022.[137]

The fact that sponsor influence has been closely associated with the execution of dropdowns and uptiers makes sense. Priming transactions allow distressed companies to access liquidity that might otherwise be available only in and through bankruptcy. But they also often hinge on dubious claims of legal right and almost always flout well-established norms. They therefore invite costly litigation that may bear negatively on a distressed company's expected enterprise value, and they pose reputational risk for the managers and directors who acquiesce in them. Prudent business leaders with relatively low-

---

[137]   Drawing a line between "hardball" and other liquidity-preserving transactions is, at the limit, unavoidably arbitrary. Owing to its contentious aftermath, one might wish to label as hardball an uptier transaction pursued by the family owned (but non-sponsored) Murray Energy, in 2018. Murray offered all lenders a pro rata opportunity to participate in a proposed super-senior facility. *See* Black Diamond Commercial Fin., L.L.C. v. Murray Energy Corp. (*In re* Murray Energy Holdings Co.), 616 B.R. 84 (Bankr. S.D. Ohio 2020). Hence the deal does not qualify by the standards I have employed. But Murray did rely on a very aggressive reading of its contractual rights, so reasonable minds could differ on how best to characterize the deal. Other instances in which a distressed company has persuaded first-lien creditors to allow a super-senior facility— Cineworld, Bioscrip, McDermott, and CPI Card Group—were pro rata deals and insufficiently controversial to generate litigation.

powered incentives to avoid Chapter 11 may understandably wish to curtail these risks.[138]

### 2. *Complex Capital Structures.*

Emphasis on extending runway can help to explain the complex capital structures some deeply distressed companies now have. More or less hierarchical capital structures used to be the norm. A large company entering bankruptcy would have multiple classes of financial debt, but creditors of each class typically had a claim on the enterprise as a whole.[139] The sources of potential conflict with respect to a reorganization were thus limited. Senior creditors might argue for a low enterprise valuation, so that their claims would be entitled to a relatively larger percentage of the reorganized business. Junior creditors might do the opposite. But the number of creditor groups that might conflict were few and negotiations correspondingly straightforward. How the waterfall broke was in doubt, but there was a waterfall.

In recent years, however, horizontally fragmented capital structures have marked many large Chapter 11 cases. One creditor group might have a claim on intellectual property only; another group might have a residual claim on IP but a first lien on certain hard assets; another might have a first claim on the profits of certain physical locations; and so on.

Ken Ayotte has shown that excessive fragmentation can result from differences of opinion among investors.[140] Suppose a company's productive process depends on two assets, X and Y. If investors disagree about the relative contribution of X and Y to the business, then, even if they agree on total enterprise value and agree that the assets are worth more together than apart, the company might be able

---

[138] This is not to say that dropdowns and uptiers will always predict sponsorship. If priming transactions come to be seen as legally permissible, ordinary-course responses to illiquidity, even relatively staid public-company boards will presumably consider them. The observation here is about the willingness of private equity sponsors to accept legal risk and pioneer norm change.

[139] Asset-based loans are an exception. ABLs use only select assets as collateral. But, because ABLs tend to be overcollateralized and use assets with low specificity to the debtor's business—especially inventory and accounts receivable—they are rarely implicated in bankruptcy disputes.

[140] Kenneth Ayotte, *Disagreement and Capital Structure Complexity*, 49 J. LEGAL STUD. 1, 4–5 (2020).

to minimize its cost of capital by selling claims against X and Y severally. The upshot is that CFOs may rationally wish to sell investors fragmented claims against the company in ways that will predictably create conflict in the event of distress.[141]

But what accounts for change in capital structure complexity if investors disagree about the world no more today than in the past? Sponsor control offers one explanation. Complexity is a frequent byproduct of sequential efforts to create liquidity. An important strategy for creating liquidity involves carving select assets out of an integrated business and selling financial claims against them while retaining their productive use. The dropdown is one example of this strategy at work: the company seeking liquidity transfers legal title to some of its productive assets to a newly created subsidiary—and uses the subsidiary to create claims with priority to those specific assets— without changing the operating footprint of the business. Less esoteric transaction forms have a similar logic. Sale-leasebacks and related-party asset sales, for example, are well-understood transactions that companies can use to raise cash, contracts permitting, but that are useful because, and only to the extent that, they produce horizontally fragmented claims.

The Caesars case offers an especially vivid illustration of the way a patchwork capital structure can emerge from staged liquidity-preserving transactions designed to protect sponsors' investments. The machinations of Apollo and TPG in Caesars are too numerous and complicated to document adequately here. Happily, the better part of an excellent book by Max Frumes and Sujeet Indap is devoted to the cause.[142] The punch line is that jury-rigged responses to impending illiquidity crises created a capital structure rife with conflicts by the time of Caesars' eventual bankruptcy.[143]

### 3.  *Tardy Bankruptcy Filings.*

Two recent, high-profile bankruptcies have spawned litigation alleging that the debtors' boards delayed commencement of Chapter 11 proceedings to benefit sponsors to whom they were in thrall. In one case, stemming from the Toys "R" Us bankruptcy, a trust representing

---

[141]  *Id.*

[142]  *See* MAX FRUMES & SUJEET INDAP, THE CAESARS PALACE COUP 47–145 (2021).

[143]  *Id.* at 149–219.

unsecured creditors argues that the company's directors breached their fiduciary duties by paying Bain and KKR almost $20 million in advisory fees over several years after they should have put the company in Chapter 11.[144] Six of the eight directors were appointed by the company's sponsors (Bain, KKR, and Vornado), and the CEO, Dave Brandon, was on his second gig as chief executive of a Bain-owned company (Domino's Pizza being the first).[145] In a motion for summary judgment, the directors argued, among other things, that Toys was solvent during the relevant period and that directors of solvent companies "can take actions that benefit the owners to the detriment of the company."[146] The bankruptcy judge denied summary judgment,[147] and, at the time of writing, the case is headed for a jury trial. Creditors in the Sears bankruptcy pursued a similar claim, arguing that the company's board allowed its equity sponsor, ESL, to syphon value from the company for years rather than resolve distress as it should have in bankruptcy.[148] That claim resulted in a global settlement in which ESL and Sears' insurers agreed to pay almost $170 million to resolve claims about mismanagement in the years before the company's Chapter 11 case.[149]

It is hard to know what, if anything, to make of these (historically anomalous) cases. Two cases hardly make a trend, and the plaintiffs' claims might not even be valid. Showing that loyal directors would have filed a company for bankruptcy at a particular moment is no simple task. It entails proving not only a counterfactual world likely

---

[144] Second Amended Complaint, TRU Creditor Litig. Tr. v. Brandon (*In re* Toys "R" Us U.S., Inc.), No. 17–34665–KLP Adv. Pro. 20–03038–KLP (Bankr. E.D. Va. Sept. 3, 2021).

[145] 189, TRU Creditor Litig. Tr. v. Brandon (*In re* Toys "R" Us U.S., Inc.), No. 17–34665–KLP Adv. Pro. 20–03038–KLP (Bankr. E.D. Va. Jan. 18, 2022).

[146] Defendants' Motion and Memorandum of Law for Summary Judgment 27–30, TRU Creditor Litig. Tr. v. Brandon (*In re* Toys "R" Us U.S., Inc.), No. 17–34665–KLP Adv. Pro. 20–03038–KLP (Bankr. E.D. Va. Dec. 13, 2021) (citing Quadrant Structured Prods. v. Vertin, 102 A.3d 155 (Del. Ch. 2014)).

[147] Memorandum Opinion 23–25, TRU Creditor Litig. Tr. v. Brandon (*In re* Toys "R" Us, Inc.), No. 17–34665–KLP Adv. Pro. 20–03038–KLP (Bankr. E.D. Va. June 27, 2022).

[148] Complaint, Sears Holding Corp. v. Lampert (*In re* Sears Holding Corp.), *1–10, 106–07 No. 19–08250 (Bankr. S.D.N.Y. Apr. 17, 2019).

[149] Alex Wolf, *Sears' $175 Million Bankruptcy Deal with Ex-CEO Lampert Approved*, BLOOMBERG LAW (Aug. 31, 2022), https://news.bloomberglaw.com/bankruptcy-law/sears-175-million-bankruptcy-deal-with-ex-ceo-lampert-approved.

subject to considerable doubt, but also that the directors understood the probabilistic decision matric in which they found themselves and consciously disregarded the value-maximizing route. On the other hand, difficulty of proof may suggest the existence of other cases with broadly consistent fact patterns that will never be observed because the cost of litigating exceeds expected recovery.

In any case, to the extent that the cases signal a change in practice, the dynamics of sponsor control can make sense of it. In general, there are two ways for a company to create liquidity. One is to raise new money. Doing so in distress is a challenge, however: debt overhang can make new equity investment uneconomical, and a combination of liens and contractual restrictions can make new debt investment impossible. The priming transactions described above are a way around the challenge. The other way to create liquidity is to reduce cash burn. A dropdown or uptier can help on this score, too, if the company can roll maturing debts into newly created, super-senior debt. But another and relatively straightforward way to conserve cash is to reduce capital investment. Investment requires cash today and returns cash only later.

A corollary of the idea that sponsor-owned companies put a premium on runway is that they tend to underinvest—to turn down positive-expected-value opportunities—when the liquidity profile of investment threatens to force a realization event such as bankruptcy. Indeed, the crux of one of the more plausible criticisms of the private equity industry is that sponsors' tendency to underinvest has an extractive character vis-à-vis employees and non-adjusting, typically junior creditors.[150] It follows that sponsor control should produce cases in which directors could maximize enterprise value by using Chapter 11 to address liquidity needs but choose not to. How pronounced such an effect is likely to be, and whether Toys "R" Us or Sears are examples, are for now matters of conjecture.

---

[150]  *See, e.g.*, Edward J. Janger, *Private Equity & Industries in Transition: Debt, Discharge & Sam Gerdano*, 71 SYRACUSE L. REV. 521 (2021) (defending Senator Warren's proposed anti-private equity legislation, the Stop Wall Street Looting Act, on this ground).

B.  *Sponsor Releases and "Contractual" Bankruptcy*

One of the most notable trends in Chapter 11 practice over the last decade has been toward a process defined by pre-bankruptcy contracting.[151] Agreements reached between a distressed company and select investors in anticipation of a filing now frequently set the agenda for, and to a substantial degree limit the practical possibilities of, Chapter 11 proceedings. Two kinds of agreements are at the center of the trend. A restructuring support agreement is a contract between a company and any number of its investors, usually from multiple classes, by which the parties commit to backing a specified approach to resolving distress (often via bankruptcy).[152] A debtor-in-possession loan agreement is a contract by which lenders, usually drawn from a company's existing first-lien creditors,[153] agree to provide cash to fund the business during a bankruptcy. Although RSAs and DIP loan agreements serve different functions, they often work hand-in-hand. An RSA will contemplate a particular mode of financing for the bankruptcy case, and milestones and covenants in a DIP loan agreement will reflect or indeed further the aims of an RSA.[154]

---

[151]  *See, e.g.*, David A. Skeel, Jr. & George Triantis, *Bankruptcy's Uneasy Shift to a Contract Paradigm*, 166 U. PA. L. REV. 1777 (2018).

[152]  For documentation of increasing use, see Anthony J. Casey, Frederick Tung & Katherine Waldock, Restructuring Support Agreements: An Empirical Analysis (Jan. 2022) (unpublished manuscript) (on file with author).

[153]  For a variety of reasons, there has traditionally been little competition among potential lenders to fund DIP loans. *See, e.g.*, Ayotte & Skeel., *supra* note 113, at 1579–84 (explaining adverse selection issue); Kenneth Ayotte, Anthony J. Casey & David A. Skeel, Jr., *Bankruptcy on the Side*, 112 NW. U. L. REV. 255 (2017) (explaining contractual prohibition of junior-lender competition).

[154]  In an instructive recent article, Ken Ayotte and Jared Ellias document changes over three decades in the influence DIP loan agreements exercise on bankruptcy process. Ayotte & Ellias, *supra* note 67. They report a trend that can be described as a tale of two periods. In the early period, DIP loans frequently set a drop-dead date for the debtor getting out of bankruptcy but did not seek to dictate much about what the process would entail. *Id.* at 14–15; *see also* Eckbo, Li & Wang, *supra* note 67, at 36 (documenting supra-competitive interest rates as well as frequent use of milestones, etc., and documenting a modest *increase* in DIP loan interest-rate spreads over past twenty years). In recent years that changed. Now DIP loans are more likely to condition credit on the debtor's progress toward a *particular* reorganization transaction. Ayotte & Ellias, *supra* note 67, at 14–15.

The causes and normative significance of the trend are a matter of substantial debate.[155] Critics focus on the capacity of pre-bankruptcy agreements to undermine statutory elements of bankruptcy designed to protect minority creditor classes and other outsiders. On the other hand, pre-bankruptcy agreements have obvious advantages. Chapter 11 is expensive in implicit and out-of-pocket terms. Deference to pre-bankruptcy agreements can shorten a case's duration substantially. It can also simplify dealmaking in a world of robust secondary-market trading of debt instruments.

The dynamics of sponsor control suggest another, heretofore unappreciated function of RSAs in sponsor-backed cases. Precisely because and insofar an RSA can practically influence the substantive terms of a bankruptcy resolution, it can support a credible promise of value to a sponsor value in exchange for capitulation to the interests of creditor signatories. In other words, it is a vehicle for concluding Coasean bargains.

If the RSA is a good vehicle for conveying value, a broad liability release is ideal cargo. In many instances, it would be practically impossible for signatory creditors to promise a sponsor a distribution under a plan. The absolute priority rule lets any dissenting class of creditor veto a plan that would offer value to equity without paying the objecting creditors in full.[156] Unless sufficient support from every creditor class can be lined up before a filing, therefore, any pre-bankruptcy deal to compensate a sponsor directly entails risk of upset. But a decree releasing the sponsor from liability for money fraudulently transferred from the debtor or for conduct in relation to the debtor's management is not a distribution subject to the absolute priority rule.[157]

RSAs in sponsor-backed cases in fact often contemplate broad releases. The term sheet attached to the RSA in the recently filed TPC

---

[155] For critical evaluation, see Edward J. Janger & Adam J. Levitin, *The Proceduralist Inversion—A Response to Skeel*, 130 YALE L.J. FORUM 335 (2020); David A. Skeel, Jr., *Distorted Choice in Corporate Bankruptcy*, 130 YALE L.J. 366 (2020); Edward J. Janger & Adam J. Levitin, *Badges of Opportunism: Principles for Policing Restructuring Support Agreements*, 13 BROOK. J. CORP., FIN. & COMM. L. 169 (2018); Skeel & Triantis, *supra* note 151; Douglas G. Baird, *Bankruptcy's Quiet Revolution*, 91 AM. BANKR. L.J. 593 (2017).

[156] 11 U.S.C. § 1129(a)(8), (b).

[157] For discussion of the rule's limited doctrinal reach, see Stephen J. Lubben, *The Overstated Absolute Priority Rule*, 21 FORDHAM J. CORP. & FIN. L. 581, 584-85 (2017).

Group case is typical.[158] It does not propose to have the sponsors contribute anything of value to the bankruptcy estate, yet it would release them and their representatives from all claims the debtors *or the debtors' creditors* might have in relation to prepetition conduct.[159]

A broad release in an RSA is by no means a foolproof device. The deal binds only signatories. Nothing stops non-party creditors from objecting to a proposed plan, whether or not the terms are consistent with an RSA, or from seeking the court's leave to pursue a sponsor in litigation. But an agreement among a substantial number of important constituents creates momentum that may be difficult for a bankruptcy judge to resist.[160]

In loose terms, one can think of the RSA—whether it promises value to a sponsor through a release or otherwise—as a means for resuscitating the "relative priority" regime that once held sway in corporate reorganizations. In the railroad receiverships of the late-nineteenth and early-twentieth centuries, shareholders typically received equity in the reorganized business even though creditors were not paid in full. The shareholders had too much going for them to be left out. They might have had tacit knowledge about how to run the railroad. Often they had procedural rights which, if exercised, could prevent a value-maximizing disposition of the business.[161] Relative priority, whatever its flaws—and they are real[162]—could induce cooperation calculated to make all investors better off. One lesson of the discussion above is that, in many respects, financial sponsors today are situated similarly to nineteenth-century railroad

---

[158]  Decl. of Robert A. Del Genio in Support of Debtors' Chapter 11 Petitions and First Day Motions, Ex. A, 67–102, *In re* TPC Group Inc., No. 22-10493-CTG (Bankr. D. Del. June 1, 2022).

[159]  *Id.* at 83–86.

[160]  *See* Vincent S.J. Buccola, *Unwritten Law and the Odd Ones Out*, 131 Yale L.J. 1559 (2022).

[161]  *See, e.g.*, Railroad v. Howard, 74 U.S. (7 Wall.) 392 (1869) (discussing transaction in which shareholders received approximately ten percent of the sale price of a railroad despite mortgage bondholders recovering just over 60 percent of what was due them, because shareholders could have interposed defenses to foreclosure that would have blocked the deal).

[162]  Justice Douglas invented the absolute priority rule precisely because he perceived relative priority to be susceptible to insider abuse.

shareholders. It follows that the lure of relative priority would reemerge, as well perhaps as its dangers.[163]

   This way of looking at things should cause one to rethink the significance of process-oriented DIP loan agreements as well as RSAs. Bankruptcy scholars have long thought of the DIP loan as a tool with which a debtor's senior lenders can exercise control.[164] On the conventional view, therefore, the increasingly tight control DIP loan agreements seem to exercise over bankruptcy process is taken as evidence of a consolidation of lender power.[165] At least in sponsor-backed cases, however, a different interpretation might be warranted. If an RSA is the site of a Coasean bargain between a company's equity sponsor and a subset of its creditors (including those who seek to provide the DIP financing), then the sponsor as well as the proposed DIP lenders have an interest in a quick resolution tracking agreed-upon terms. Indeed, a sponsor might benefit from aggressive milestones more than the DIP lenders do, since the last thing a sponsor wants is a deliberate process with drawn-out investigations of prepetition conduct. In that sense, process-oriented DIP loan agreements might in some cases amount less to a sale of flexibility by the debtor and more to a collusive arrangement between lenders and sponsor.[166]

*     *     *

   My aim in this part has been to connect financial sponsors' generic interest in delaying realization events—and the conflict that interest is apt to create with creditors—to a handful of widely observed but otherwise apparently unrelated developments in reorganization practice. How far to attribute a causal effect of sponsorship is in each instance an open question. In that sense, the analysis is offered as a

---

[163] For critical discussion of absolute and relative priority, see Douglas G. Baird, *Priority Matters: Absolute Priority, Relative Priority, and the Costs of Bankruptcy*, 165 U. PA. L. REV. 785, 786 (2017); Barry E. Adler & George Triantis, *Debtor Priority and Options in Bankruptcy: A Policy Intervention*, 91 AM. BANKR. L.J. 563 (2017); AM. BANKR. INST. COMM'N, *supra* note 54, at 207–23; Casey, *supra* note 7; Douglas G. Baird & Donald S. Bernstein, *Absolute Priority, Valuation Uncertainty, and the Reorganization Bargain*, 115 YALE L.J. 1930 (2006).

[164] *See, e.g.*, Skeel, *Creditors' Ball, supra* note 3, at 923–26; Baird & Rasmussen, *The End of Bankruptcy, supra* note 3, at 784–85.

[165] Ayotte & Ellias, *supra* note 67. Their view is consistent with common wisdom. *See, e.g.*, Skeel, *The Past, Present and Future of Debtor-in-Possession Financing, supra* note 49.

[166] *Cf.* Buccola, *Unwritten Law, supra* note 160, at 1573–79.

provocation to empiricists. At the same time, the developments discussed in this part are offered merely as illustrations of the wide-ranging concrete effects that a shift toward sponsor power may be having on the resolution of financial distress.

## CONCLUSION

A theme of corporate reorganization over the last forty years is the contrast between the law's formal stability and its functional fluidity. The Bankruptcy Code persists unaltered, but its uses and therefore its economic significance shift with trends in the capital markets.

The transition from an era of manager control to one of lender dominance is a generally acknowledged illustration of this process of change. The pace of Chapter 11 accelerated and going-concern sales proliferated not because Congress so decreed, but because new loan terms produced an equilibrium in which the interests of incumbent managers no longer mattered as much. Because that equilibrium defined corporate reorganization for the better part of two decades, a corresponding heuristic—the lender control paradigm—has proved a durable guide for understanding practice.

Now the norms of leveraged finance have turned again. With looser loans and a more prominent role for financial sponsors have come a new characteristic power dynamic and, therefore, a new set of practices when large firms encounter distress. The lawyers and financiers who inhabit the world of distress have adjusted. The conceptual apparatus with which scholars make sense of the field should adjust, too.

A paradigm oriented around sponsor control can harmonize otherwise discordant trends on Wall Street and in the bankruptcy courts. More specifically, like the lender control paradigm did in the early-2000s, it can explain new patterns of reorganization as a function of the prevailing capital structures of leveraged businesses. The trend toward out-of-court liquidity transactions in particular makes perfect sense in light of the interaction between more flexible loan contracts and sponsors' incentives to avoid bankruptcy.

Insofar as the sponsor control paradigm can help to order thinking about modern practice, it also poses new questions. These include a variety of empirical questions about the new dynamics' significance—about the effects on investors' *ex post* recoveries, on the terms of their

*ex ante* contracts, and on the efficiency of the new dynamics relative to alternatives. They include questions about the future. If sponsorship reliably predicts an aggressive use of borrower discretion under its contracts, and if market participants perceive that tendency to be wealth destroying, then one might expect contracts to change—to tighten for sponsored borrowers. And they include policy questions about how, if at all, the legal system should adjust in response. In that sense, the contribution of sponsor control, like any new paradigm, may be to highlight what is interesting but unknown as much as it is to explain otherwise inexplicable facts.

T<small>ABLE</small> 1

This table lists dropdown transactions executed between 2015 and the end of Q2 2022.

| Year | Debtor | Sponsored? | Sponsor(s) | Litigation? |
|------|--------|------------|------------|-------------|
| 2015 | iHeart[167] | Y | Bain / T.H. Lee | Y |
| 2016 | Claire's Stores[168] | Y | Apollo | N |
| 2017 | J. Crew[169] | Y | TPG / L. Green | Y |
| 2017 | Neiman Marcus[170] | Y | Ares | Y |
| 2018 | PetSmart[171] | Y | BC | Y |
| 2019 | Revlon[172] | Y | M&F | Y |
| 2020 | Golden Nugget[173] | Y | Landry's | N |

---

[167] *See* Franklin Advisors, Inc. v. iHeart Communications Inc., No. 04–16–00532–CV, 2017 WL 4518297 (Tex. App. Oct. 11, 2017).

[168] *See* Emma Orr, *Retail Creditors Left Grasping As Brands Are Put Out of Reach*, C<small>HI.</small> T<small>RIB.</small> (Feb. 23, 2017), https://www.chicagotribune.com/business/ct-retail-creditors-owners-20170223-story.html.

[169] *See* Kenneth Ayotte & Christina Scully, *J. Cre, Nine West, and the Complexities of Financial Distress*, 131 Y<small>ALE</small> L.J. F<small>ORUM</small> 363 (2021); *see also* Eaton Vance Mgmt. v. Wilmington Savings Fund Society, FSSB, No. 654397/2017, 2018 WL 1947405 (N.Y. Sup. Ct. Apr. 25, 2018).

[170] *See* Complaint, UMB Bank, N.A. v. Neiman Marcus Group, Inc., Doc. 1, ¶¶ 56–75, No. 654509/2019 (N.Y. Sup. Ct. Aug. 8, 2019).

[171] *See* Complaint, Argos Holdings Inc. v. Wilmington Trust, N.A., Doc. 1, ¶¶ 17–32, No. 18–cv–05773 (DLC) (S.D.N.Y. June 26, 2018).

[172] *See* Complaint, UMB Bank, N.A. v. Revlon, Inc., Doc. 1, No. 20–cv–06532 (S.D.N.Y. Aug. 12, 2020).

[173] *See* King & Spalding, What Is It? Frequently Discussed Liability Management Transactions *13.

| 2020 | Cirque du Soleil[174] | Y | TPG | N |
|---|---|---|---|---|
| 2020 | Travelport[175] | Y | Elliott / Siris | N |
| 2020 | Revlon[176] | Y | M&F | Y |
| 2020 | Party City[177] | N | | N |
| 2020 | Hornblower[178] | Y | Crestview | N |
| 2022 | Envision Healthcare[179] | Y | KKR | tbd |

[174] *See* Andrew Willis, *Cirque du Soleil Asset Transfer Angers Creditors*, THE GLOBE & MAIL (May 15, 2020), https://www.theglobeandmail.com/business/article-cirque-du-soleil-asset-transfer-angers-creditors/.

[175] *See* Sean O'Neill, *Travelport Strikes Deal with Creditors That for Now Could Save It from Bankruptcy*, SKIFT (July 22, 2020), https://skift.com/2020/07/22/travelport-strikes-deal-with-creditors-that-for-now-could-save-it-from-bankruptcy/.

[176] *See See* Complaint, UMB Bank, N.A. v. Revlon, Inc., Doc. 1, No. 20–cv–06532 (S.D.N.Y. Aug. 12, 2020).

[177] *See* Reorg, Party City Holdco Inc. (May 29, 2020), https://reorg.com/party-city-seeks-to-exchange-unsecured-notes-for-1l-notes-at-existing-issuer-2l-notes-at-new-unsub-and-equity-intends-to-raise-100m-of-1l-notes-at-new-unsub/; https://www.sec.gov/Archives/edgar/data/1592058/000119312520207189/d43127d8k.htm (July 30, 2020).

[178] *See* Claire Boston & Katherine Doherty, *NYC Ferry's Hornblower Taps Niagara falls Assets for Cash*, BLOOMBERG (Oct. 7, 2020), https://www.bloomberg.com/news/articles/2020-10-07/nyc-ferry-operator-gets-rescue-financing-from-niagara-transfer#xj4y7vzkg.

[179] *See* Alexander Saeedy & Jodi Xu Klein, *KKR's Envision Sparks Lender Dispute with Centerbridge, Angelo Gordon Deal*, WALL ST. J. (May 2, 2022), https://www.wsj.com/articles/kkrs-envision-sparks-lender-dispute-with-centerbridge-angelo-deal-11651524188.

T A B L E  2

This table lists non-pro rata uptier transactions executed between 2015 and the end of Q2 2022.

| Year | Debtor | Sponsored? | Sponsor(s) | Litigation? |
|---|---|---|---|---|
| 2017 | NYDJ[180] | Y | Crestview / Maybrook | Y |
| 2020 | Serta Simmons[181] | Y | Advent | Y |
| 2020 | Boardriders[182] | Y | Oaktree | Y |
| 2020 | TriMark[183] | Y | Centerbridge | Y |
| 2021 | TPC Group[184] | Y | First Reserve / SK / Sawgrass | Y |
| 2022 | Incora[185] | Y | Platinum | tbd |

---

[180] After preliminary hearings in litigation concerning the transaction's legality, the company changed course and invited the creditors it sought to subordinate to participate on a pro rata basis. Dick, *supra* note 132, at 1359–62 (discussing transaction).

[181] *See* LCM XXII Ltd. v. Serta Simmons Bedding *3–4, LLC, No. 21 Civ. 3987 (KPF), 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022).

[182] *See* ICG Global Fund 1 DAC v. Boardriders, Inc., No. 655175/2020 (N.Y. Sup. Ct.).

[183] *See* Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp., 150 N.Y.S.3d 894 (Sup. Ct. Aug. 16, 2021).

[184] *See* Memorandum Opinion, Bayside Capital Inc. v. TPC Group Inc. (*In re* TPC Group Inc), No. 22–10493 (CTG) Adv. Proc. No. 22–50372 (CTG) (Bankr. D. Del. July 6, 2022).

[185] *See* Rachel Butt, Eliza Ronalds-Hannon & Sridhar Natarajan, *Silver Points, Pimco Cook Up a Distressed Debt Deal That Has Rival Creditors Fuming*, BLOOMBERG (Apr. 5, 2022), https://www.bloomberg.com/news/articles/2022-04-05/silver-point-pimco-cook-up-credit-trade-that-has-rivals-fuming#xj4y7vzkg.