# DEFENDANTS' EXHIBIT 457

**KING & SPALDING**



**HOW DID THEY DO IT?**

# NYDJ, or Can You Really Prime 47% of Lenders Without Their Consent?

**King & Spalding Private Credit & Special Situations Investing**

# Situation Overview

Facing a potential breach of its financial covenants, on May 25, 2017, Not Your Daughters Jeans ("NYDJ") entered into back-to-back amendments to its existing credit agreement with a group of lenders representing approximately 53% of the outstanding loans (the "Majority Lenders").

**THE AMENDMENTS**

- The first amendment:
  - Permitted NYDJ to borrow up to $20 million as incremental term loans.
  - Eliminated the financial covenants.
- The second amendment:
  - Altered the existing waterfall and pro rata sharing provisions in the credit agreement by elevating the payment priority of the new $20 million incremental facility along with existing term loans held by the Majority Lenders ahead of all remaining existing term loans (the "Minority Lenders").

**THE PROCESS**

- Minority Lenders were not offered the ability to participate in the new money financing, nor were they provided with notice of, or an opportunity to sign, the related amendments, which were simply posted as a *fait accompli*.

Did the documents really permit Majority Lenders to fund new money under an existing credit facility on a priming basis while effectively rolling up their existing loan exposure into a priming position as well, leaving non-participating lenders at the bottom of the waterfall?

# Key Takeaways

The NYDJ priming transaction raises a number of contractual and equitable considerations that borrowers and lenders must be aware of when entering into a credit facility, or seeking to inject additional liquidity as part of a rescue financing or other special situations investment.

- The NYDJ credit agreement contained fairly standard waterfall and pro rata sharing provisions – the revolving loans and term loans all shared equally on a pro rata basis. **But, importantly, these provisions were not included among the sacred rights that would require 100% or "all affected lenders" for any amendments**.

- As a result, by a slim majority vote, NYDJ obtained additional liquidity in the form of a new loan that purported to prime and effectively subordinate the loans held by 47% of its existing lenders and then argued that such actions were permissible under the loan documents. The minority lenders promptly sued and the case ultimately settled.

- Even if a party can argue that a transaction is technically permitted, a dissatisfied group of minority lenders may still challenge the transaction alleging breach of the implied covenant of good faith and fair dealing, which is implied in every contract. The financial condition of the borrower, whether participation was offered to all existing lenders, the level of participation from existing lenders, and availability of alternative transactions could all affect whether a NYDJ-style transaction withstands a legal challenge.

- For borrowers, the ability to incur priming debt or otherwise alter payment priorities can unlock value in a distressed scenario by providing security for a new capital infusion that would otherwise not be available on a pari passu or junior basis.

- Lenders need to carefully analyze the sacred rights contained in the credit agreement to assess the risks of future priming transactions, or whether additional protections may be necessary at the drafting stage. [Drafting Tips to Address Liability Management Transactions](#)

- Even with appropriate protections against a NYDJ-transaction, a distressed borrower may attempt to argue that other provisions in their loan documents (e.g., loan buyback provisions) purport to permit comparable priming transactions, as [the lenders tried to do in Serta](#).

- Furthermore, even if the waterfall and pro rata sharing provisions are included as sacred rights, it is still less common for sacred rights to include lien subordination, which means the majority lenders may try to achieve an effectively comparable transaction under a separate credit facility authorizing the priming of existing liens.

# NYDJ Payment Waterfall – Before and After

Through the amendments, $20MM in new loans came in at the top of the waterfall, existing loans of participating lenders received higher payment priority, and payment priority of non-participating minority lenders was effectively subordinated – ***all with a 53% lender vote***.

- Prior to the amendments, NYDJ's debt consisted primarily of a credit agreement with loans/commitments in an amount of approximately $156.5 million, representing (i) $12.5 million in outstanding principal of revolving loans and related commitments and (ii) $144 million in outstanding principal of term loans.
    - The revolving loans and term loans shared pro rata in all payments and recoveries.
- Following the amendments, the new capitalization structure of NYDJ and priority of payments under the credit agreement were structured as follows:
    - First, the $20 million incremental facility provided by the Majority Lenders.
    - Second, $12.5 million of revolving loans provided by the revolving lenders.
    - Third, $76.3 million of existing term loans held by the Majority Lenders.
    - Fourth, $67.7 million of existing term loans held by the Minority Lenders.

| BEFORE | | AFTER |
|---|---|---|
| $12.5 million revolver | $144 million term loans | $20 million incremental |
| | | $12.5 million revolver |
| | | $76.3 million Majority Lender term loans |
| | | $67.7 million Minority Lender term loans |

# Relevant Credit Agreement Provisions

NYDJ and the Majority Lenders argued that the "sacred rights" in the NYDJ credit agreement – i.e., those amendments that require heightened consent above the standard "Required Lenders" threshold (i.e., more than 50%) – allowed the priming transactions for two notable reasons:

- First, the sacred rights did not contain a general prohibition on modifying the payment waterfall. Instead, the sacred rights only protected the pro rata sharing among lenders of the same tranche.

- Second, the pro rata sharing sacred right was not an "all lender" or "all affected lender" vote as is more customary in syndicated credit documents.  Rather, pro rata sharing could be altered with the consent of the majority of the lenders in an affected class.  Prior to the amendments going effective, there were only two classes of lenders – a revolving class and a term loan class.

    - Specifically, Section 9.02(b) provides that in addition to Required Lender consent, no amendment shall "change Section 2.18(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of the Lenders holding a Majority in Interest of the outstanding Loans and unused Commitments of each adversely affected Class."

# The Litigation

A group of Minority Lenders filed a complaint in the Supreme Court for the State of New York challenging the validity of the amendments.

| The Minority Lenders argued, among other things: | The Majority Lenders responded to these claims by arguing, among other things: |
|---|---|
| • altering the waterfall to place their term loans in the last-out position effectively resulted in a reduction in the principal amount of their term loans;<br><br>• incurring the liens securing the priming incremental facility effectively acted as a release of such liens securing the term loan obligations;<br><br>• altering the waterfall changed the pro rata sharing of payments among the lenders, which required the consent of the new class of Minority Lenders to effectuate; and<br><br>• the amendments violated the implied covenant of good faith and fair dealings by excluding the Minority Lenders from the process and capturing economic value only for the participating Majority Lenders. | • amending the waterfall was not a sacred right and could be done through Required Lender consent;<br><br>• there is no sacred right requiring additional consents to subordinate the liens securing the existing term loan obligations, and incurring debt on a priming basis is not a "release" of any existing liens as such existing liens remain in place; and<br><br>• amending the pro rata sharing provision was not an all lender sacred right; rather the pro rata sharing provisions could be amended with the consent of the majority of any affected class, which was obtained (i.e., the revolving lenders consented and the existing term loans consented via the Majority Lenders);<br><br>• the is no violation of the implied covenant of good faith and fair dealings as the Majority Lenders operated in accordance with the terms of the credit agreement, which the Minority Lenders agreed to lend under and therefore understood the risks associated thereunder. |

## The Litigation (continued)

### The Parties Settled, but the Judge Expressed Skepticism With the Transaction…

- The Majority Lenders and Minority Lenders ultimately settled the dispute without a court ruling on the merits.

- However, during a hearing on a motion to dismiss the complaint, Judge Charles E. Ramos made several statements that lenders should be aware of in the event that they seek to undertake or challenge future similar transactions.

    - Judge Ramos stated in certain circumstances a priming transaction like the NYDJ transaction could pass muster. Specifically, Judge Ramos believed a transaction that rewarded consenting lenders by providing better terms than non-consenting lenders would not violate the implied covenant of good faith and fair dealings.

    - However, Judge Ramos viewed the exclusion of the Minority Lenders from the process as possible evidence of bad faith. As Judge Ramos explained:

        > "And I'm really disturbed at what the Plaintiffs are alleging happened … what they're alleging is that a group of lenders, without notifying another group of lenders, on their own said look, we can do something for ourselves at the expense of our co-lenders…
        >
        > This sounds like a conspiracy.  I know that's not a separate tort, but it offends me."

    

    - Despite Judge Ramos's critical language, Judge Ramos did recognize that through discovery facts could demonstrate the actions of the Majority Lenders were commercially reasonable under the specific situation. But since he was adjudicating a motion to dismiss, all he had before him to base his opinions on are the allegations in the complaint.

# Considerations for Lenders

Without a ruling on the merits, borrowers and lenders are left to seek guidance from Judge Ramos's non-binding commentary, which implies that even if a transaction is arguably permitted under a given set of credit documents, the transaction may still be subject to challenge on other grounds, e.g., as violative of the implied covenant of good faith and fair dealing that applies to all commercial transactions.

**SCENARIOS WHERE A NYDJ PRIMING TRANSACTION COULD OCCUR**

| SCENARIO 1 | A credit agreement's sacred rights do not contain waterfall or pro rata sharing protections. In this scenario, altering payment priorities is permitted by majority vote. |
|---|---|
| **SCENARIO 2** | A credit agreement's sacred rights contain waterfall and pro rata sharing protections, but do not contain a protection against subordinating the obligations and liens securing the lenders' loans to third party debt/liens. In this scenario, a group of majority lenders could lend new money under a separate credit facility and vote to subordinate the obligations and liens under the existing credit agreement to the new money facility. |

In either scenario, a group of majority lenders would need to consider, among other things, the risks of violating the implied covenant of good faith and fair dealings.  Factors that can impact this analysis include:

- Is participation in the new money priming facility being offered to all lenders?  Offering the opportunity to participate to all lenders and ultimately allowing those parties to make their own decision can mitigate potential equitable concerns.

- How dire is a company's liquidity need?  A company facing an imminent liquidity crunch could justify limiting participation in a new money priming facility if there is concern the process would delay funding and jeopardize the company's ability to manage its liquidity.

- Are there other proposals for a liquidity infusion?  Judge Ramos indicated the lack of other viable options for a borrower could provide lenders greater leeway in structuring a priming transaction.

Minority lenders would want to focus on the same factors in challenging a transaction.  Further, if a group of minority lenders are aware of a pending NYDJ priming transaction, proactively approaching the company with an alternative transaction may prove to be a valuable fact should litigation ultimately ensue, demonstrating that alternative financing on non-priming terms was available.

*The provisions used by NYDJ continue to be found in loan documents today and can present a double-edged sword for market participants. Smaller lenders should fully appreciate their voting rights and obtain a clear understanding of priming risk, which can significantly reduce the strength of a minority's negotiating position vis-à-vis others in the capital structure. Conversely, these provisions, depending on the circumstances, can provide borrowers and larger lenders with flexibility to engage in new capital injections or other special situations investments on meaningfully more attractive terms.*