# DEFENDANTS' EXHIBIT 458

# Bloomberg
## LAW

New York Law Journal, Open Market Purchases, Past and Future

**Printed By:**   LBROWN323 on Thu, 11 May 2023 22:28:52 -0400

## *Open Market Purchases, Past and Future*

*By Eric Wise*
*September 16, 2022*
*Appears in: New York Law Journal*

Recent developments in the credit markets and in restructuring practices have led to priming financings and non-ratable roll-ups of commercial credit agreement lenders into uptiered facilities in connection with out-of-court balance sheet restructurings. See Liability Management Transactions, Loan Syndications & Trading Association (Sept. 30, 2020). The origin of these provisions may help understand where the practice is and where it is headed.

Within living memory, credit markets were much different. Creditors extended credit either through commercial banks in the form of credit facilities, or through the high yield bond markets.

Commercial bank products typically included a rapidly amortizing term loan with a relatively short maturity (often as little as three years) and maintenance financial covenants. This kept a borrower on a short leash, either refinancing to access more credit or restructuring to address amortization burdens or breaches of maintenance financial covenants. Commercial bank products were usually held by a small number of banks and a significant portion of the debt was held by the arranger, aligning risk and underwriting.

High yield products had a longer maturity (often seven years), no amortization, and incurrence-based financial covenants which meant the issuer defaults would largely be limited to failure to pay interest. High yield bonds permitted the issuer to grow and incur debt, make investments or pay dividends so long as the issuer met certain financial ratios. High yield products were distributed broadly to many bond holders.

Over time, in parallel with the convergence of commercial banks and investment banks with the repeal in 1999 of the Glass-Steagall Act, the two markets, for bank loan credit and high yield bond credit, converged. There first emerged on the commercial bank loan side term loan B, which had longer maturities (typically five years) and limited amortization (typically 1% a year). This was followed by "covenant-lite" commercial bank loans which did not include maintenance financial covenants and included builder baskets and accordion and equivalent debt features (the ability to increase the size of the loan without a vote of the syndicate). Today, as much as 90% of the market is covenant-lite. See Abby Latour, Covenant-lite deals exceed 90% of leveraged loan issuance, setting new high, S&P Global (Oct. 8, 2021).

Many differences remained, including that, despite the convergence of the markets, commercial bank loans were not securities and not subject to the tender offer rules, while high yield bonds were securities and were subject to tender offer rules.



© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

// PAGE 1

Another key difference persisted: Commercial bank loans contained provisions which limited the ability of a lender to take any payment that was not paid pro rata to all other lenders. High yield bonds did not have this limitation. An issuer of bonds could repurchase those bonds from individual lenders, within the limits of the tender offer rules under the securities laws.

Under most credit facilities, if a lender received a payment on a basis that was not ratable under the credit facility, that lender was obliged to purchase from the other lenders a participation, for cash, in an amount equal to their pro rata share of the payment. This meant that a debt-for-debt exchange by a lender with the borrower or an affiliate of the borrower would trigger a cash payment to other lenders to effect pro rata sharing.

These pro rata sharing provisions were typically protected by the "sacred rights" provisions of the credit agreement which required the consent of each affected lender or all lenders to amend or modify the pro rata sharing provisions. Usually, this was done by prohibiting an amendment to the specific section containing the pro rata sharing, e.g., "the consent of each affected Lender shall be required to … amend Section 2.18."

This feature became strained in the run-up to the 2008 global liquidity triggered by the collapse of Lehman Brothers. High yield bonds were more flexible than bank credit for effecting an out-of-court balance sheet restructuring because it was possible to purchase the bonds, in either a tender offer or a private transaction on a non-ratable basis. High yield bonds were simply more amenable to out of court restructuring, because coercive exchanges, covenant stripping and uptiering clearly could be done.

In the wave of bankruptcies that followed the collapse of Lehman in 2008, the non-ratable provisions of credit became problematic, as some institutions simply did not have the liquidity to shoulder post-petition financings. In cases like LyondellBasell, at $8 billion in 2009 the largest debtor-in-possession facility then to date, "rolled-up" only prepetition lenders who provided post-petition financing into the priming debtor in possession facility, arguably in derogation of the pro rata sharing provisions of the credit agreements. See Christie Smythe, LyondellBasell's US Units Seek $8B In DIP Financing, Law360 (Jan. 7, 2009).

As the liquidity crisis receded, and the debt markets reopened, new facilities increasingly had exceptions to pro rata sharing provisions. Some, like the J. Crew and Not Your Daughter's Jeans credit facilities in 2017 did not include "sacred rights" protection for pro rata sharing and permitted these to be modified by a simple majority. Others contained exceptions for "Dutch auction" which typically required borrowers to offer to repurchase the debt to all lenders, but to only purchase a specified amount of debt, non-ratably, at the most favorable pricing.

In addition, some credit agreements now provide for exception to pro rata sharing for "open market" transactions. In 2020 two transactions, one by Serta Simmons Bedding and one by Boardriders, exploited open market transaction or purchase exceptions to pro rata sharing provisions and were challenged in court on the basis, inter alia, that such purchases were negotiated in private transactions, i.e., were not offered to all lenders, and not priced at market value. These challenges require construction, or interpretation of the meaning of, "open market exchange" or "open market purchase."



In *LCM XXII Ltd. v. Serta Simmons Bedding*, U.S. District Judge Katherine Failla of the Southern District of New York denied defendant Serta Simmons motion to dismiss Lender challenges of its non-ratable uptier exchange transaction relying on the "open market" language.

Similarly, in *ICG Global Loan Fund v. Boardriders*, the plaintiff contended that the debt-for-debt exchanges did not constitute "open market" purchases, but instead were voluntary prepayments subject to the requirement that they be made on a pro rata basis to all lenders. Following argument, New York Supreme Court Justice Andrea Masley took under advisement the motions to dismiss of the defendant and noted that "this decision is going to take some time."

Construing the meaning of the language "open market," an undefined term, will not be a simple feat for either court. A standard rule of construction is that words are to be understood in their ordinary, everyday meanings unless the context indicates they bear a technical sense. Unfortunately, "open market" provides few clues.

In order to understand the meaning of the term, perhaps the courts will find it helpful to consider the origin of these exceptions in the convergence of the bank and bond markets for credit, as well as their continued divergence, in which the former is not a security and the regulation of which is almost entirely by contract, and the latter is a security and is the subject of the protections of securities laws such as the Trust Indenture act and the Securities Exchange Act of 1934.

On the one hand, tender offer rules require that public offers be made to all security holders on equal terms, but permit discrimination against non-tendering holders of debt (i.e., exiting bondholders may consent to covenant stripping of the non-tendering debt). The tender offer rules also do not bar private transactions not constituting a tender offer. The securities laws do not precisely define what is a tender offer.

On the other hand, if the parties to a credit document had intended to incorporate rules like tender offer rules in their credit documents, they could have bargained for that expressly. Those agreements that require "Dutch auction" mechanics to make a solicitation for the repurchase of debt that will be outside of the terms of the pro rata sharing protections do in fact do that.

Another consideration is the purpose of creating exceptions to pro rata sharing such as "open market" transaction and "Dutch auction" provisions has been, the history suggests, to allow commercial bank loan credit documents to perform in restructuring more like bonds. And, as noted above, bonds do not preclude an issuer from negotiating a private deal with select bondholders. At the end of the day, defining "open market" where there is no clear meaning to the phrase—and inserting the court as a de facto regulator of the fairness of contracts made between sophisticated party may harm New York's usual posture of encouraging market stability by strictly construing contracts without favor to either party.

It's difficult to say precisely what is the right answer. It's easy to agree with Justice Masley that it is going to



take some time.

**Eric Wise** *is a partner in the financial restructuring and reorganization practice at Alston & Bird.*

Copyright ALM Properties, Inc. All rights reserved.