# DEFENDANTS' EXHIBIT 459

# KING & SPALDING



**HOW DID THEY DO IT?**

## Revlon's BrandCo Spin-Off, or *J. Crew* Revisited

**King & Spalding Private Credit & Special Situations Investing**

# Situation Overview

In July of 2017, the corporate family rating of Revlon (the "Company") was formally downgraded due to deteriorating financial performance and high leverage, while its debt was trading at distressed levels.

- At the time, the Company had various outstanding classes debt totaling approximately $3 billion, with the largest single tranche comprised of debt under the Company's existing $1.7 billion senior secured term loan credit agreement ("2016 Term Loan Agreement") which was provided in conjunction with the acquisition of Elizabeth Arden.

- Starting in 2018, the Company's controlling equity holder, MacAndrews and Forbes, hinted at undergoing one or more liability management transactions in an effort to fully finance and implement a turnaround plan.

- In 2019, the Company disclosed that it had transferred a significant amount of Intellectual Property ("IP"), comprising the American Crew brand, out of the reach of existing creditors to foreign Unrestricted Subsidiaries ("BrandCo"), entered into a Term Credit Agreement ("2019 Term Loan Agreement") for a $200 million term loan ("2019 Term Loans") secured by new first lien indebtedness senior to existing secured debt on the transferred assets, and pari passu on all other assets, and licensed back the transferred IP to the Company's operating business.

- Then, in 2020, the Company went a few steps further and transferred the vast majority of remaining IP collateralizing the 2016 Term Loan, including IP comprising the Elizabeth Arden brand, to BrandCo and used the transferred IP (together with the IP previously transferred in 2019) secure, on a first priority basis, a new term loan facility (the "2020 Term Loan Agreement") that, among other things, refinanced in full the 2019 Term Loans.

- The lenders under the 2016 Term Loan Agreement ("2016 Term Loan Lenders") have recently challenged the transfers relating to both the 2019 Term Loan Agreement and the 2020 Term Loan Agreement, and the overall enforceability of the 2020 Term Loan Agreement. Meanwhile, the 2016 Term Loan Lenders have since received payment in full on their loans, only to see the agent under the 2016 Term Loan Agreement to bring suit claiming the repayment was made in error.

How was Revlon able to move nearly all of its IP out of reach of existing lenders and enter into multiple  "J. Crew style" drop-down financing transactions using fairly standard credit agreement baskets?

# Key Takeaways

While the 2019 Term Loan Agreement has since been refinanced by the 2020 Term Loan Agreement, both transactions and the related transfer of IP assets raise a number of considerations when drafting credit agreements to prevent similar instances of collateral leakage.

- At the time each transaction was entered into, the Company's existing debt instruments contained negative convents concerning designation/activities of Unrestricted Subsidiaries, and limiting investment and pari passu debt capacity.

- Nevertheless, the Company was able to divert whole brands outside of the collateral pool for their existing secured lenders to obtain - not one, but two -  lifelines and extend runway amid serious financial distress.

  - The Company's existing debt instruments had significant amounts of investment capacity to move assets outside of the collateral pool, including provisions similar to those utilized in J. Crew, and did not require any formal valuation of assets for transfers to affiliates.

  - The 2016 Term Loan facility did not limit transfers of material IP assets, and contained the fairly common PetSmart loophole.

  - While incremental loans incurred under the 2016 Term Loan would be subject to a "same guarantor/same collateral" requirement; this limitation did not apply to incremental equivalent debt or pari passu debt incurred under the general basket.

- For sponsors, these provisions can prove essential to preserving maximum flexibility for liability management transactions down the line, and may free up attractive newly-unencumbered assets that can serve as collateral in new rescue financings or other special situations investments.

- Conversely, carefully restricting negative covenant flexibility can help existing lenders preserve collateral security and avoid potentially significant leakage of valuable assets.

# Creation of the Unrestricted Subsidiaries, Transfer of IP and Release of Existing Liens

The 2019 and 2020 Term Loan Agreements were each secured by a first lien on certain IP previously designated as collateral under the 2016 Term Loan Agreement.

Under the 2016 Term Loan Agreement, subject to investment capacity, there are *no limitations* on the types of assets that can be invested, similar to J. Crew.

Furthermore, each of the Company's existing classes of debt provided for fairly generous investment capacity:

| | |
|---|---|
| **LOAN AGREEMENTS** | • **Basket for Investments in Unrestricted Subsidiaries**: greater of $100 mm and 3% of total assets.<br><br>• **Basket for General Investments**: greater of $300 mm and 9% of total assets.<br><br>• **Shared Basket**: $75 mm shared between investments RPs and junior debt prepayments and (ii) shared annual basket equal to the greater of $40 mm and 1.2% of total assets basket, with unused amounts allowed to be carried forward to subsequent years, up to the greater of $120 mm and 3.6% of total assets in the aggregate.<br><br>• **Available Amount Basket**: the 2016 Term Loan Agreement also allows investments with the Available Amount which builds from a $200 mm starter amount.<br><br>• **Payment Conditions Basket**: the existing 2016 ABL Credit Agreement also allows unlimited investments subject to satisfaction of the Payment Conditions.<br><br>At least $715 mm of capacity for Investment in non-Guarantors |
| **EXISTING NOTES** | • **2021 Notes:** General and other Baskets allow for at least $384.3 mm.<br><br>• **2024 Notes:** General and other Baskets allow for at least $550 mm. |

# Creation of the Unrestricted Subsidiaries, Transfer of IP and Release of Existing Liens (cont'd)

**THE J. CREW "TRAP-DOOR"**

Additionally, the 2016 Term Loan Agreement contained a J. Crew-style "trap-door" which would allow virtually all such investment capacity to go to Unrestricted Subsidiaries through a two-step process:

| STEP 1 Investment in a Non-Guarantor Subsidiary | STEP 2 Investment in an Unrestricted Subsidiary |
|---|---|
| The intercompany investments carve out under Section 7.7(z)(ii) permits the Borrower or any Subsidiary Guarantor to make an uncapped amount of investments in any Non-Guarantor Subsidiary that is a Restricted Subsidiary.<br><br>Only Investments that are in cash are capped while all other Investments are uncapped. | Section 7.7(j) permits Non-Guarantor Subsidiaries to make uncapped investments in other Non-Guarantor Subsidiaries.<br><br>"Non-Guarantor Subsidiaries" is defined to include any subsidiary that is not a guarantor including Unrestricted Subsidiaries. |



- Once the IP was transferred into Unrestricted Subsidiaries (here, the BrandCo entities), existing liens were released and the Company was able to use the IP as collateral for the new 2019 Term Loan.  The same mechanism was used to transfer the additional IP that ultimately secured the 2020 Term Loan.

- Following each IP transfer, the IP was then licensed back to the operating business.

- There were no disclosures as to how the transfer occurred and the value of the IP, which inserts a degree of opacity in any effort to analyze appropriate use of available investment capacity.

# The 2019 Term Loan Facility

## A closer look at the 2019 Term Loans…

- The Company entered into the 2019 Term Loan Agreement for a $200 million senior secured term loan facility with affiliates of Ares Management (the "2019 Term Loans") which generally shared the same guarantors and collateral pool with the existing 2016 Term Loans, but was also secured by a first-priority lien on the American Crew IP.

  - The American Crew IP no longer serves as collateral for the 2016 Term Loans due to the fact the IP was transferred to a foreign subsidiary incorporated in the Cayman Islands and, accordingly, an Excluded Subsidiary under the 2016 Term Loan Agreement.

  - Further, applicable covenants permitting incremental equivalent debt and other pari passu debt under the 2016 Term Loan Agreement did not require the same guarantors and collateral.

- The Lenders under the 2019 Term Loan Agreement also benefitted from a tighter covenant package, including among other things, a senior debt maintenance covenant (Maximum 5x Net Secured Leverage Ratio and Structurally Senior Leverage Ratio), an absolute cap on such debt ($2.5 billion) and a minimum EBITDA covenant ($250 mm beginning March 2021).

- The 2019 Term Loan Agreement also generally prohibited the BrandCo entities from operating businesses other than ownership of the IP and some ancillary actions.

- Additionally, there was an overarching prohibition on liens incurred over the BrandCo held IP limiting the security support such collateral provides to the 2019 Term Loans and ordinary course items.

- Following the closing of the 2019 Term Loan Agreement, the new subsidiary leased back the right to use the American Crew IP to the Company (the "Sale-Leaseback").

# The 2019 Sale and Leaseback

## A closer look at Sale and Leaseback post-2019 Term Loan Agreement...

- The 2016 Credit Agreement restricts sale-leasebacks unless property involved in the transaction has a FMV no greater than $100 million or 3% of the total assets.

- In April of this year, the Company held a lender presentation where in 2019 alone it was estimated that the American Crew brand was worth $300 million. Further, in providing the 2019 Term Loans, Ares Management had valued the American Crew IP at more than $200 million in materials relayed to market participants based on information obtained from the Company.

- However, at the time of the sale-leaseback, the Company's CFO certified that the American Crew IP was worth no more than $100 million without any formal valuation of the assets by the Company or a third party.

- Shortly thereafter, the Company took another position and instead of noting the value of the American Crew IP, they stated that the Sale and Leaseback restriction under the 2016 Term Loan Agreement was not applicable to the IP and only applicable to real property. However, the 2016 Term Lenders have disagreed given that the section applies to "real or personal *Property*" and "Property" is defined as any interest in or "to property or assets of any kind whatsoever … whether *tangible or intangible*"

- In the same month, the 2016 Term Lenders issued a Notice of Event of Default under the 2016 Term Loan Agreement to Citibank, the administrative agent, stating that the Sale-Leaseback was done without their consent and prohibited by the 2016 Term Loan Agreement amounting to a theft of the lender's security interest. Further, the 2016 Term Lenders noted that the Sale-Leaseback was in violation of the good faith and fair dealing inherent in the 2016 Term Loan Agreement under NY law because it was done to purposely strip the 2016 Term Lenders of its collateral and protection of the first priority liens they had bargained for.

# The 2020 Term Loan Facility

A similar playbook was used to effect the 2020 Term Loans, but on a much greater scale:

- In May of this year, the Company utilized many of these same mechanisms to take things a step further by exploiting the 2016 Term Loan Agreement's "trap-door" yet again and entering into new 2020 Term Loan Agreement (which refinanced the 2019 Term Loans in full).

- The Company entered into the 2020 Term Loan Agreement comprised of a $815 million Initial B-1 Term Loan, a $65 million Additional B-1 term Loan, up to $950 million Initial B-2 Term Loan and a $3 million Initial Term B-3 Loan (collectively, the "2020 Term Loans"). The Company used the 2020 Term Loans to, among other things, completely refinance the 2019 Term Loan Agreement and repay the Company's senior unsecured notes due in 2021.

- The 2020 Term Loans were again collateralized on a first priority basis by newly transferred IP assets (plus the American Crew IP that had originally secured the 2019 Term Loans). As in 2019, the transferred IP was then licensed back to the Company for use in ongoing business operations.

- The collateral package securing the 2020 Term Loans is substantially larger than that securing the 2019 Term Loans in that it benefits from a first lien on ***substantially all of the Company's IP assets***, and a pari passu lien on all other assets currently collateralizing the 2016 Term Loans.

- While the 2020 Term Loan Agreement was negotiated by the Company, certain 2016 Term Loan Lenders were preparing to put an end to any further pillaging of their collateral.

# The 2020 Term Loan Facility (cont'd)

## The 2016 Term Loan Lenders resist...

- In order for the Company to enter into the 2020 Term Loan Agreement, the Company would need to enter into an amendment of the 2016 Term Loan Agreement ("Amendment") which required the consent of Required Lenders defined as the holders of more than 50% of the unpaid principal amount of the Term Loans outstanding and the Revolving Commitments then in effect.

- At the time of the Amendment there were no Revolving Commitments and therefore the Company required 50% of the existing 2016 Term Loan Lenders.

- In the months leading up to the closing of the 2020 Term Loan Agreement, the Company entered into a commitment letter with Jefferies Finance LLC and an ad hoc group of 2016 Term Lenders who would serve as anchor lenders ("AHG Lenders") under the new facility in an attempt to secure the required consent of the majority 2016 Term Lenders. However, the AHG Lenders held less than half of the outstanding 2016 Term Loans.

- When the transaction was disclosed in the 8-K of the Company, a majority group of 2016 Term Loan Lenders (the "Co-op Lenders") agreed under a cooperation agreement to not consent to the further stripping away of collateral from the 2016 Term Loan facility and the prospective new facility. Shortly thereafter, the Co-op Lenders informed Company of their intention to vote against the transaction.

- In an effort to get around this new road block, the Company put into motion its plan to dilute the voting rights of the existing 2016 Term Loan Lenders.

# The 2020 Term Loan Facility (cont'd)

## Turning out the Vote…

- Under the 2016 Term Loan Agreement, the Borrower may elect to request the establishment of Revolving Commitments as long as no "Event of Default shall exist *on [the] Increased Amount Date immediately after giving effect* to such New Loan Commitments"

-  In an effort to circumvent the voting authority of the Co-op Lenders, the Company prepared a $100 million revolving loan commitment under the 2016 Credit Agreement ("Special Revolving Loan"). The Company had no intent to draw on these commitments and the Amendment would actually eliminate the Special Revolving Loan facility entirely.

- The Co-op Lenders sent notice to the Company noting that the new revolving commitments were to manipulate the vote on the Amendment and that it was clear that the Company had no intention to use the Special Revolving Loan facility,

- The Company responded to the Required Lenders by modifying the Amendment so that instead of eliminating the Special Revolving Loan, it would include it going forward and providing for a draw of $65 million.

- However, the new 2020 Term Loan Agreement also specifically provided for a $65 million draw for the exclusive purpose of repaying the outstanding Special Revolving Loan. This new design of the transaction suggested that the purpose of Special Revolving Loan was to affect the voting rights of the Required Lenders.

- With the new revolving loans, the Co-op Lenders' estimated majority of 51.5% was turned into an estimated 49.9% minority and the Amendment and the new 2020 Term Loan facility were approved.

Note, the 2016 Term Loan Agreement did not have the language we normally prefer to see: "no Event of Default shall exist prior to or immediately after giving effect"

# The 2016 Term Loan Lenders Fight Back

The 2016 Term Loan Lenders have commenced litigation in connection with the Company's and Citibank's breach of the 2016 Term Loan Agreement.

- As part of the 2020 Term Loan Agreement, the 2019 Term Loans were refinanced and retired at closing. In order to induce certain 2016 Term Loan Lenders to participate in the 2020 Term Loan Agreement, the Company purported to "roll-up" approximately $953 million of the 2016 Term Loans into new tranches of debt secured by second and third liens on the transferred IP, leaving the remaining 2016 Term Loan Lenders without any lien or security interest on arguably the most important asset of the business – it's brands.

- Prior to the Special Revolving Loan, certain 2016 Term Lenders issued a Notice of Event of Default to Citibank, the administrative agent, under the 2016 Term Loan Agreement.

- The remaining 2016 Term Loan Lenders have now filed a suit against the Company, Citibank (agent under the 2016 Term Loan Agreement), and Jefferies Finance LLC (Agent under the 2020 Term Loan Agreement) alleging that:

    - the Company has materially breached the 2016 Term Loan Agreement, challenging the transfers of IP that took place in connection with both the 2019 Term Loans and the 2020 Term Loans, and seeking rescission of the 2020 Term Loan Agreement; and

    - Citibank breached its duties under the 2016 Term Loan Agreement to act in the 2016 Term Loan Lenders' best interest.

- At the same time, the 2016 Term Lenders have since received full repayment on their claims through what Citibank has described as a clerical error (and Citibank has initiated a series of lawsuits seeking return of such funds).

# The challenges to the "Trap Door" and 2020 Term Loans

## The challenges against the Company…

- UMB Bank ("UMB"), a 2016 Term Loan Lender (and successor administrative agent for the 2016 Term Loan Lenders following Citibank's resignation), claims that Company breached the 2016 Term Loan Agreement on multiple grounds:

  - Breach of Contract:

    - The 2019 and 2020 Sale-Leasebacks of the IP violated the prohibition against such transactions in the 2016 Term Loan Agreement because the value was above the $100,000,000 permitted under the agreement's restrictions on sale-leasebacks to third parties.

    - The Special Revolving Loan was issued after an Event of Default notice was provided to the Agent and the Amendment and 2020 Term Loan Agreement were approved as a result without the adequate consent of the 2016 Term Loan Lenders

    - The Co-op Lenders sent Citibank, administrative agent under the 2016 Term Loan Agreement, notice of the Company's breach of the 2016 Term Loan Agreement by the Sale-Leaseback prior to when the Special Revolving Loan and the 2020 Term Loan Agreement were approved.

  - Breach of the Implied Covenant of Good Faith and Fair Dealing

    - The IP Sale-Leaseback transaction was done purposely to deprive the 2016 Term Loan Lenders of their collateral.

    - The Special Revolving Loan was purely for the purpose of diluting the votes of the Required Lenders under the 2016 Term Loan Agreement.

# The challenges to the "Trap Door" and 2020 Term Loans (cont'd)

## The challenges against Citibank...

- UMB claims that Citibank breached its requirement to act in the best interest of the Lenders or at best committed gross negligence:

    - Before the effective date of the Sham Revolving Loan, the Co-op Lenders provided Citibank with notice of the Sale-Leaseback Event of Default under the 2016 Loan Agreement and followed up with repeated notices. However, Citibank refused to act and did not provide the notice to the other 2016 Term Loan Lenders.

    - The Co-op Lenders directed Citibank to resign as Agent, which Citibank agreed and later reneged.

    - Citibank's execution of the docs, the facilitation of the vote manipulation, including the Special Revolving lenders in the vote and the ratification of the amendment, which proposed to waive all existing Event of Default, caused the breach.

- UMB further claims that Citibank had a signification conflict of interest which is the likely reason for its actions:

    - In 2018, Revlon amended its 2016 ABL Facility to add $41.5 million in senior secured Tranche B Revolving Commitments and Citibank was one of the Tranche B Lenders. The Tranche B Revolving Loans matured before Tranche A.

    - Contemporaneously with the 2016 Amendment,  the Tranche B Maturity date was extended by a month in exchange for an increased interest rate. Citibank also agreed to act as a Replacement Lender for a Non-Extending Lender under the 2016 ABL Facility. Citibank had, thus, effectively increased its risk and added an extra month to that risk. As an ABL lender, they were second to any claims on Revlon's IP by the 2016 Term Lenders. Therefore, Citibank had a stake at the success of the Amendment and a reason to deny the right to call a default because Citibank could lose the amounts it had provided under the ABL facility. Citibank arguably betrayed its duty to the 2016 Term Lenders by refusing to acknowledge defaults under the 2016 Term Loan Agreement and putting its interest as a Tranche B ABL Lender ahead of them.

# From Bad to Worse – Citibank's $900 Million Operational Mistake

Citibank has commenced litigation in connection with a $900 million payment it claims was mistakenly transferred to the 2016 Term Loan Lenders

- Between August 17, 2020, Citibank filed a complaint against a 2016 Term Loan Lender demanding the return of $175 million which Citibank claims it had mistakenly wired to one of the Co-op Lenders, and who now is refusing to return the funds.

- Citibank claims the payment was intended to be an interest payment from the Company under the 2016 Term Loan Agreement and instead Citibank overpaid by more than 100x with its own money.

- The 2016 Term Loan Lender has retained the payment on the understanding that the overpayment was actually intended to pay off the Company's entire principal under the 2016 Term Loan.

- Citibank has followed up their suit against the 2016 Term Loan Lender with other complaints against other 2016 Term Loan Lenders demanding return of the $900 million.

- All the 2016 Term Loan Lenders involved have made similar claims to the funds.

- As of August 24, 2020, all of the suits have been consolidated and the court has granted a freeze on the funds until the litigation has been resolved.

# Citibank's Compliant - What Happened

A closer look at the Citibank litigation ...

- Citibank is the administrative agent for a $1.8 billion loan to Revlon.

- On August 11, 2020, Revlon made a required interest payment of <u>$1.5 million</u> to Citibank.

- Citibank then, on the same day, wired <u>$900 million</u> to Revlon's lenders.

  - Citibank says it was a mistake—that it intended to transfer Revlon's interest payment to the lenders but, due to a "human error" and "issues with [its] loan-processing system," sent $900 million of its own funds instead.

  - Credit Agreement required 3 days' notice to pre-pay principal and the Company did not indicate publicly (or otherwise) that it was pre-paying loan.

  - Citibank sent notices to the lenders the next day (and again the following day) stating the transfers were in error and seeking return of the money.

  - Some lenders returned the funds they received, while others did not (or returned only a portion)—keeping at least $527 million of the transferred funds.

# The Litigation

Between August 17 and 20, Citibank filed lawsuits against 12 lenders (or lenders' advisors), seeking the return of the transferred funds (minus the amounts interest payment not in dispute).

- Cases consolidated in S.D.N.Y.

- Citibank successfully sought TROs freezing the disputed funds.

  - Order prohibits fund recipients from "removing, withdrawing, transferring, assigning, or otherwise disposing" of the funds.

- On highly accelerated case schedule, with trial set for November 9, 2020.

- On August 27, 2020, Citibank voluntarily dismissed its claims against Highland Capital (recipient of $244,000, the smallest of the transferred amounts)—suggesting that Citibank and Highland reached a settlement.

  - Highland Capital is in bankruptcy, which may have played a role.

# The Parties' Competing Claims

Citibank asserts four legal claims against each lender: (i) unjust enrichment, (ii) conversion, (iii) money had and received, and (iv) payment by mistake.

- The lenders assert the "discharge for value" defense:

> [A] creditor of another . . . who has received from a third person any benefit in discharge of the debt . . . , is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake.

*Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 192 (N.Y. 1991) (quoting Restatement of Restitution § 14[1]).

- In this case, the "discharge for value" defense appears to turn on whether the lender-recipients had "notice" of Citibank's mistake.

  - The recipient lenders contend that "notice" must be *actual*, pre-transfer notice.

  - Citibank contends that constructive notice is sufficient.

The parties also point to different facts to support their views on whether the transfers were mistaken or whether the lenders' knew or should have known of the mistake.

| CITIBANK'S ARGUMENT | LENDER'S ARGUMENT |
|---|---|
| • Only interest payments were due; principal was not due for 3 years.<br>• The transfers were accompanied by statements calculating the amount of the interest payment due.<br>• The payments were not credited in the official Register, maintained by Citibank (not the individual lenders).<br>• The lenders filed lawsuits, alleging default under the Credit Agreement, *after* their receipt of the transfers—showing that the lenders did not believe the balances were paid.<br>• Early payment of principal requires 3 days' notice under the Credit Agreement.<br>• "Many" lenders returned the funds. | • Transfer amounts were exactly for outstanding principal and interest, to the penny.<br>• Notices of an alleged mistake were not sent until the next day.<br>  The statements showed the interest calculations, not payment amounts.<br>• Revlon knew that the lenders were appointing a successor agent and on the verge of accelerating the loan.<br>• The suit was filed the day after the transfers; the complaint had long been in draft.<br>• The Credit Agreement's setoff provision allows the lenders to retain funds up the amount due under the loan—and all was due under the acceleration.<br>• "Most all" of the lenders did not return the funds. |

# Other Litigation

- As previously noted, on August 12, 2020—the day after the mistaken transfers—UMB, alleging itself to have been appointed by a majority of the 2016 Term Loan Lenders to successor administrative agent on the loan—filed an action on behalf of the lenders against the Company (and its affiliates), Citibank, and others.

  - UMB alleges that the Company, with Citibank's and others' assistance, transferred collateral securing the loan (i.e., IP rights pertaining to certain brands) to affiliates—in violation of the Credit Agreement and related contracts.

  - Against Citibank, UMB asserts claims for (i) breach of implied covenant of good faith and fair dealing, (ii) breaches of contracts, (iii) aiding and abetting conversion, (iv) gross negligence and willful misconduct, (v) unjust enrichment, (vi) tortious interference with contract, and (vii) actual and constructive fraudulent transfer.

- No defendant in the UMB action has yet to appear or otherwise assert any defenses.

- The parties in the clawback litigation dispute whether the filing of this action evidences the lenders' knowledge that the mistaken transfers were, in fact, mistaken.

# The Lenders' Setoff Defense

- In the clawback litigation, the lenders alternatively assert the right to set off the transferred funds.

  - The lenders claim that the events of default alleged in the UMB litigation give rise to Revlon's immediate liability.

  - They assert the right to retain the transferred funds for that liability.

- The Credit Agreement's setoff provision provides:

  - *In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, . . . upon any amount becoming due and payable by the Borrower hereunder . . . to set off and appropriate and apply against such amount any and all deposits . . . , in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any Affiliate, branch or agency thereof to or for the credit or the account of the Borrower.*

- On its face, the setoff provision applies to funds "for the credit or the account of the Borrower."  The applicability of the setoff provision thus should turn on the merits of the underlying clawback dispute: whether the transfers were, in fact, "for the credit or account" of Revlon.

- The setoff provision also applies only to "any amount becoming due and payable."  The applicability of the provision thus also turns on the merits of the underlying UMB litigation.

# Analysis and How to Avoid Similar Problems in the Future

**EVALUATION OF CITIBANK'S CLAWBACK CLAIMS**

- By granting the TRO freezing the transferred funds, the court necessarily determined that Citibank is "likely to succeed on the merits" of its clawback claims.

- Nevertheless, the lenders' "discharge for value" defense is colorable and appears supported by a line of binding authority.

- The ultimate resolution likely will turn on the court's evaluation of the factual circumstances surrounding the transfers.

**COULD THIS HAVE BEEN AVOIDED?**

- If truly a "human error," additional, tighter controls on payments could have been implemented by the administrative agent.

- Going forward, administrative agents likely should consider including express clawback provisions in their agreements with lenders to allow for the recovery of mistaken transfers.

**OTHER IMPLICATIONS**

- Indemnification and exculpation may kick in for administrative agent absent a finding of gross negligence, bad faith or willful misconduct.

- Dollar amounts of alleged "mistake" does not *per se* affect whether actions constitiute gross negligence

# Considerations for Lenders

**ACCORDION DEBT AND REDUCING LAYERING RISK**

- Fully appreciate aggregate pari passu debt capacity (not just incremental or equivalent debt baskets).

- Consider seeking a right of first offer with respect to incremental or equivalent debt and any other debt permitted to be incurred on a pari passu basis.

- Unless any and all pari passu debt is required to have largely the same terms as existing first lien debt (e.g. same guarantors, collateral package and maturity date), such debt may obtain credit enhancements that result in such debt being more accurately viewed as "pari _plus_".

- Any new intercreditor agreements should be in form and substance acceptable to required lenders.

**J. CREW REVISITED**

- The Company was able to implement multiple J. Crew type drop-down transactions here through the large investment capacity, toothless/non-existing limitations on affiliate transfers, an investment "trap door", and the PetSmart lien release loophole.

- _**The provisions used here remain fairly common in the market and can provide both a source of concern to existing lenders, as well as opportunities for new sources of debt capital to pair with sponsors to provide additional liquidity in liability management transactions.**_

**AGENTS AND CLAWBACK PROVISIONS**

- As an administrative agent, consider including:

  - Express clawback provisions in loan agreements to allow recovery and

  - Tighter internal controls and oversight on outgoing payments.

_**Revlon**_ **Reminds Us of the Potential Value of Certain Protections Against Leakage, including:**

- Limiting transfer of "crown jewel" assets to non-loan party subsidiaries.

- Imposing caps on ability to invest in non-loan parties.

- Requiring leverage tests for designation/creation of unrestricted subsidiaries.

- Removing automatic lien release mechanism in cases where collateral has been transferred to affiliates.

- Tightening sale leaseback provisions to prohibit affiliate transactions and ensure any proceeds of such transactions are captured as part of a cash sweep mechanism.