# DEFENDANTS' EXHIBIT 460



# Liability Management – Vaccine or Pandemic? Private Credit Restructuring Year in Review

January 17, 2023

5/11/23, 11:35 PM                                    Liability Management – Variant of Pandemic? Private Credit Restructuring Year-in-Review | Insights | Proskauer Rose LLP

Case 23-09001 - Document 257-73 - Filed in TXSB on 05/14/23 - Page 3 of 9

Once again, we reflect on the prior year for restructuring trends impacting private credit lenders. Last year it was all about "liability management"—the latest trend in which the limits of sponsor-favorable loan documents are being tested, in some cases past the breaking point.

It is not surprising that boundaries are being tested. We are, after all, in a volatile market with rising defaults. Proskauer's Private Credit Default Index shows that defaults rose from an anemic 1.12% in the 1Q22 to a still below normative rate of 2.06% for the 4Q22. Perhaps the low default rate reflects the resilience of middle market companies continuing to battle the pressure of the increasing cost of capital, lingering supply chain disruptions, rising labor costs, and general inflationary pressures. While the default rate remains relatively modest, we are seeing a general uptick in out-of-court restructuring activity.

So, what is driving these restructurings? One word: liquidity (or more precisely, lack of liquidity).

The macro-economic environment has radically shifted from an extended period of historically low interest rates and high growth to a period of rapidly rising interest rates and sustained inflation, coupled with the devastating war in Ukraine, supply chain uncertainty, volatile energy prices, and geopolitical risks. These factors are pressure testing the cash flows of middle market companies. Strict cost controls, hiring freezes, and even layoffs can only go so far. For some, these measures were insufficient to bridge their cash flow needs. Consequently, sponsors and lenders looked for ways to infuse liquidity into troubled situations to bridge through a turnaround plan, sometimes not knowing what the business would look like when they got to the other side.

Many of these liquidity transactions in the private credit market do not hit the media wire, no less the courtroom. However, this year we witnessed a number of investments, situations, or other matters that highlight the opportunities (or perils, depending upon which side of the equation one sits) that flexible documentation affords to sponsors, often hand-in-hand with lenders controlling "required lender" vote. Many of these situations involve interpretation of credit agreement provisions that are being tested in court cases that remain unresolved. Private credit lenders have seen enough that we are getting daily calls for our "red flag" review. Indeed, forewarned is forearmed.

As a result, our 2022 Year in Review is largely confined to liability management cases.

So let's jump right into it.

### The Priming Arena: Lender on Lender Violence Continues

*"The code is more what you'd call 'guidelines' than actual rules."*[1]

In 2022, a number of distressed borrowers induced existing lenders to provide new financing by creating new "super-priority" priming facilities. An additional feature in some (but not all) of the priming financings involved the exchange and roll-up of existing (select) lenders' debt into the new "super-priority" priming debt, a practice

known as "uptiering." In each case, the participating majority lenders agreed to amend the existing credit documents to permit the borrowers to issue the new-money "super-priority" debt and, in the uptiering transactions, promptly traded their existing debt for the super-priority debt. Minority lenders, who may not have been offered the opportunity to participate, were left in the lurch, with their existing debt now subordinated or junior to the new priming debt. Naturally, those transactions generated significant litigation, exemplified by *TPC Group, Boardriders*, and *Serta*.

**TPC Group: Challenge to Priming Transaction Dismissed**

TPC effectuated a priming transaction pursuant to which it obtained $200 million of new superpriority financing from a majority of its existing secured creditors. Minority lenders were not offered the opportunity to participate. The new facility was secured by liens that ranked senior to the liens securing the roughly $930 million of existing first lien debt. To implement the transaction, the company (i) amended the terms of the existing indenture to permit the issuance of new priming debt, and (ii) executed a new intercreditor agreement to afford the liens securing the new notes priority over the existing notes. The TPC transaction did not include an uptiering; none of the existing debt was rolled up into the priming tranche.

After TPC filed for chapter 11, certain minority holders of the existing notes sued to invalidate the priming transaction. The dispute centered on whether the original indenture required unanimous consent of all affected holders to subordinate the existing liens to the new priming facility, based on a sacred right providing that each affected lender must consent before there is any change to how collateral proceeds are distributed.

Judge Goldblatt of the Delaware Bankruptcy Court held that lien subordination was not expressly identified as a sacred right and therefore the new priming notes ranked senior to the existing notes. He rejected the argument that lien subordination was tantamount to amending collateral waterfall provisions. The court, focusing on the express provisions of the indenture, narrowly interpreted the indenture and emphasized the absence of anti-subordination provisions in the sacred rights. The minority holders thereafter sought a stay of the decision pending appeal, but District Judge Andrews denied the stay, agreeing with the lower court's findings.

**Boardriders and Serta: Uptier Suits Survive Motions to Dismiss**

The NYS court in *Boardriders* and *Serta* took a markedly different approach to issues which involved matters of contract interpretation: whether anti-subordination intent can be read into a credit agreement.

**Boardriders**

In *Boardriders*, the company effectuated an uptier exchange that resulted in $110 million of new super-priority secured loans and the roll-up of certain existing loans held by lenders participating in the new money transaction (including the sponsor) at par, despite the loan trading at a substantial discount (50–60% of par

5/11/23, 11:35 PM
Case 23-09001 Document 257-73 Filed in TXSB on 05/14/23 Page 5 of 9
Liability Management Mid-a Pandemic? Private Credit Restructuring Year in Review | Insights | Proskauer Rose LLP

value). All of the new money loans and rolled-up loans primed the loans held by minority lenders not offered the opportunity to participate.

Like many credit agreements, the Boardriders' documentation generally prohibited non-pro rata repayments of loans and required the consent of lenders adversely affected to amend that requirement. However, the documentation also included a common exception that permitted non-pro rata repayments through the use of (undefined) "open market purchases." The company used the "open market purchase" exception to accomplish its uptier exchange. The non-participating lenders sued.

Unlike in *TPC Group*, Justice Masley of the New York Supreme Court determined that despite the absence of an express "no subordination" sacred right, such a right could be *implicit* in the pro rata sharing and related provisions of the credit agreement. Further, a narrow reading of the sacred rights to require express anti-subordination language would "essentially vitiate the equal repayment provisions" and cut against the court's obligation to consider the context of the entire contract and not isolate particular words (or in this case, "the absence of particular words"). As a result, the court viewed the uptier transaction, in the context of the entirety of the credit agreement, as potentially violating the *intent* of the parties.

The court also refused to accept the borrower's characterization of the transaction as an "open market purchase." The court considered allegations such as the debt was exchanged (as opposed to retired), the purchases were not at market value, not all lenders were offered an opportunity to bid, and the exchange was done as part of various related transactions, if ultimately proven, as bearing on whether the transaction qualified as an "open market purchase." Consequently, the court denied motions to dismiss the majority, and strongest, of the plaintiffs' claims. The company and certain other defendants have appealed the decision. Visit our prior Boardriders Alert for more detail.



You may also like

Boardriders: Minority Lenders Win Round One

**Serta**

5/11/23, 11:35 PM    Liability Management Mid-Pandemic? Private Credit Restructuring Year in Review | Insights | Proskauer Rose LLP

Case 23-09001 Document 257-73 Filed in TXSB on 05/14/23 Page 6 of 9

By now a household name for private credit lenders, the *Serta* saga rages on. Similar to *Boardriders*, the dispute in *Serta* revolves around a non-pro rata uptier exchange. Like *Boardriders*, Serta relied on the undefined "open market" provisions of the credit agreement to accomplish an uptiering on a non-pro rata basis. Before the Southern District of New York, Serta maintained that "open market" can only mean an arm's length exchange for fair market value. Recently, Judge Failla denied Serta's motion to dismiss the action, rejecting Serta's argument. Like the court in *Boardriders*, Judge Failla could not find that the transaction, as alleged, definitely took place in what is conventionally understood as an "open market" (*i.e.*, open to all lenders in a class at a fair market price). The court also allowed claims for breach of the implied duty of good faith and fair dealing to survive.

### Diebold Nixdorf, Incora and Revlon: The Next Frontier

*"Deserves got nothing to do with it."*[2]

Undoubtedly, Clint Eastwood was not imagining himself in the world of high yield debt when he uttered his famous line. But, we will take some artistic license for the sake of the next slate of transactions, which occupy their own wild west of sorts.

### Diebold Nixdorf

Diebold Nixdorf is another illustration of creative structuring in a syndicated credit facility. In late 2022, Diebold Nixdorf found itself needing to plug a $213 million liquidity hole, eliminate certain restrictive financial covenants, and extend impending debt maturities. To that end, Diebold entered into a transaction support agreement ("TSA") with the vast majority of the creditors holding term loans and secured and unsecured notes. The TSA embodied a comprehensive restructuring, which included a new $400 million super-senior term loan facility, a $250 million replacement revolver, and various maturity extensions.

To reach consensus, the company agreed to pay fees and provide additional collateral for the benefit of participating lenders. The participating senior noteholders agreed to amend the applicable indenture to authorize the transaction, remove substantially *all* negative covenants and mandatory prepayments, and extend the grace period (*i.e.*, the period of time during which a borrower can cure a default before it becomes an event of default permitting noteholders to accelerate the notes) with respect to payment of interest defaults *until the maturity date* of the senior notes. In other words, regardless of the company failing to pay interest, noteholders would ostensibly be rendered powerless to enforce remedies until the scheduled maturity date, effectively stripping their right to interest in the interim.

There is a technical distinction between when interest is due in the first instance and when an event of default materializes, but when you cross that line is not always so clear. Although the dust is still settling on the Diebold transaction, the cost of litigation alone may ward off challenges.

### Incora

In March 2022, Incora tapped incremental debt capacity under an existing secured indenture, after which certain holders comprised the super-majority (*i.e.*, 66.67%) required to take certain actions. Those holders simultaneously amended the controlling debt documentation to allow the company to issue $250 million of new super-priority notes, incur new junior secured debt, and strip the liens of the minority (non-participating) holders. The participating holders then exchanged their existing notes for new (i) super-priority notes and (ii) first lien notes with a longer maturity. In addition, select holders of the company's unsecured notes (including the sponsor) rolled those notes into new "1.25" lien notes, effectively transforming their (previously) unsecured debt into a secured credit. The minority non-participating holders were either left with their unsecured debt or were now relegated to unsecured status by virtue of the exiting majority stripping their liens. The transaction hinged on the "favored" lenders constituting a super-majority.

Months later, certain holders of the legacy secured (now unsecured) notes filed suit, claiming that the transaction was invalid because, contrary to the company's position, their (greater than one-third) blocking position precluded the amendments necessary to effectuate the transaction. According to plaintiffs, the issuance of "phantom" notes to give favored lenders super-majority status was engineered to improperly circumvent their blocking position and their "sacred rights." Because the "phantom" notes were issued in a single, integrated transaction for no other purpose than to gerrymander a vote—indeed, they were exchanged and cancelled on the same day they were issued—the phantom notes should be excluded from any calculation of a super-majority and the court should deem the entire transaction null and void. The case remains pending.

**Revlon**

In August 2019, Revlon engaged in a liability management transaction to obtain $200 million to address liquidity needs and in connection with that transaction transferred certain valuable intellectual property that supported obligations under its existing 2016 term facility.  In 2020, when facing the prospect of insolvency and in further need of liquidity, Revlon reached into its liability management grab bag a second time and entered into an agreement with a subset of lenders under the 2016 credit agreement to incur new first lien debt and roll up a portion of the debt under the 2016 facility into two new roll-up facilities. The new-money facility was used in part to repay the $200 million term loan and was secured on a first lien basis by the intellectual property transferred away from the 2016 credit agreement loan parties and into a new subsidiary.

While apparently open to all lenders, the transaction depended on Revlon securing majority lender consent under the 2016 facility. In what the non-participating lenders later described as a "sham" to "manipulate lender voting," Revlon tapped $65 million in incremental revolver capacity under the 2016 credit agreement to provide the participating lenders with the "exact amount of commitments necessary to purportedly inch over a 50.0% consent threshold." The condition was changed to an actual drawdown (vs. mere commitments) following aired grievances, but the revolver was nevertheless intended to be replaced with part of the new debt just 10-15 business days later.

5/11/23, 11:35 PM                    Liability Management – Vaccine or Pandemic? Private Credit Restructuring Year in Review | Insights | Proskauer Rose LLP

Case 23-09001 Document 257-73 Filed in TXSB on 05/14/23 Page 8 of 9

More than two years later, following Revlon's descent into bankruptcy, non-participating lenders initiated an adversary proceeding, asserting myriad claims that distill to an attempt to unwind the 2020 transaction under the court's equitable powers and restore what the plaintiffs call their "rightful first-lien priority position" on the intellectual property. Alternatively, they seek the economic equivalent of invaliding the transaction, whether through damages or equitable subordination.

In response, Revlon and the BrandCo lenders moved to dismiss the suit, arguing that the claims are time barred under the DIP order or the lenders otherwise lack standing. Also, they assert that the transactions did not violate the terms of the applicable credit agreements and, in any event, it is impossible to unscramble the egg more than two years after effectuating the transactions. The plaintiffs recently filed a reply to the motion to dismiss. Citing the *Boardriders* and *Serta* decisions denying similar motions to dismiss, the plaintiffs argue that "[i]n other recent vote rigging and related cases, courts have recognized that 'an explicitly discretionary contract right cannot be exercised in such bad faith as to deprive the other party of the benefit of the bargain." The case bears watching.

---

You may also like

Special Alert: Fifth Circuit Rules That Make Whole Claims Are Unenforceable In Bankruptcy

---

### *Ultra Petroleum & Hertz*: The Latest from the Make-Whole Frontlines

"*There's no crying in baseball!*"[3]

The enforceability of make-whole premiums slid back into the headlines this year. In its latest installment, the Fifth Circuit held that an unsecured claim for a make-whole premium tied to future interest payments is the functional equivalent of unmatured interest and therefore not recoverable under Section 502(b)(2) of the Bankruptcy Code. The Fifth Circuit made clear that payment of an otherwise valid premium is nevertheless required when the debtor is solvent. *See* our Special Alert for additional discussion.

Following the Fifth Circuit's lead, in *Hertz* Judge Walrath of the Delaware Bankruptcy Court disallowed a $223 million unsecured make-whole claim because, as a factual matter, it was the economic equivalent of unmatured interest. Like in *Ultra Petroleum*, the make-whole was calculated using the present value of

5/11/23, 11:35 PM	Liability Management：Vaccine or Pandemic? Private Credit Restructuring Year-in-Review | Insights | Proskauer Rose LLP

Case 23-09001 Document 257-73 Filed in TXSB on 05/14/23 Page 9 of 9

remaining interest payments. Judge Walrath agreed with the Fifth Circuit that the economic reality of the transaction is outcome determinative. Judge Walrath rejected the argument that the make-whole represented liquidated damages for reinvestment costs incurred by the early repayment—rather than consideration for the use or forbearance of money—because the underlying formula was "tied entirely" to unpaid interest and did not account for costs associated with marketing or finding a replacement borrower. However, in direct contrast to *Ultra Petroleum*, the make-whole was not resurrected by virtue of the solvent-debtor exception. According to Judge Walrath, the common law exception did not survive the Bankruptcy Code's adoption, unless specifically codified therein.

## Conclusion and a Look Forward

Last year certainly saw action between and among lender groups. This litigation was, for the most part, largely confined to lenders in the broadly syndicated market. We predict 2023 will be the same. Clubs of private credit lenders are less likely to engage in such behavior because of the relationships among private credit lenders and sponsors. If it does occur in private credit club deals, we expect that it will only be after significant efforts to negotiate a solution have been exhausted and offers to participate have been declined. *Nonetheless, the overarching takeaway is that the need to address exigent liquidity issues can sometimes develop suddenly so our view is that it makes sense for private credit lenders to proactively review their documents and have a solid "red flag liability management" document review on hand*. We stand ready to assist you.

[1]  Geoffrey Rush, *Pirates of the Caribbean: The Curse of the Black Pearl.*

[2]  Clint Eastwood, *Unforgiven*.

[3]  Tom Hanks, *A League of Their Own.*