# DEFENDANTS' EXHIBIT 461

5/12/23, 5:47 AM  Financial Restructuring & Reorganization Advisory: TriMark: Are Sacred Rights Still Sacrosanct? | News & Insights | Alston & Bird

Case 23-09001 Document 257-74 Filed in TXSB on 05/14/23 Page 2 of 12

Menu

Professionals
Services
Innovation
News & Insights
Our Firm
Offices
Careers

Advisories     September 10, 2021

# Financial Restructuring & Reorganization Advisory: *TriMark*: Are "Sacred Rights" Still Sacrosanct?

## Executive Summary

 9 MINUTE READ

A recent decision by the Supreme Court of New York suggests that current lender-on-lender violence through majority uptiering and covenant-stripping may not be without a remedy. Our Financial Restructuring & Reorganization Group explains how a group of leveraged buyout lenders sought to restructure debt to put themselves at the front of the line.

- A brief background on uptiering transactions and sacred rights

- "Subtle this was not" – the story of **TriMark** and its creditors

5/12/23, 5:47 AM  Financial Restructuring & Reorganization Advisory: TriMark Aie Sacred Rights Still Sacrosanct? | News & Insights | Alston & Bird

Case 23-09001 Document 257-74 Filed in TXSB on 05/14/23 Page 3 of 12

- Implications and takeaways – what can you do to protect yourself and your clients?

Sophisticated, multimillion-dollar credit facilities are often syndicated among a group of lenders to shield a single lender from absorbing all the credit risk. As part of this syndication, lenders generally agree to a credit agreement that theoretically protects their interests in an equitable manner in which decisions are governed by majority rule, except for a discrete, yet critical, list of "sacred rights" over which each lender (or each affected lender) maintains a veto right. Sacred rights typically include decisions to extend maturity, delay or reduce scheduled payments, reduce interest margins, change pro rata sharing/payments, increase lenders' commitments, release all or substantially all the collateral, and modify other similar fundamental aspects of the debt. Because of the combination of market-driven relaxation of terms in credit agreements over the last several years and opportunistic and creative borrowers and counsel seeking out-of-court restructuring options, exceptions, loopholes, and lack of careful drafting of sacred rights have been exploited to the detriment of minority lenders.

Indeed, in the last couple of years and with increasing regularity through the COVID-19 pandemic, courts have been called upon to determine the propriety of so-called "lender-on-lender violence," where lenders holding a majority of a borrower's syndicated debt engage in restructuring transactions or amendments that materially disadvantage other lenders in the syndicate by stripping covenants and uptiering their positions based on technical, and often unanticipated, maneuvering around the sacred rights provisions. Uptiering is the creation of one or more superpriority tranches of debt that are secured by liens with priority over the existing secured debt. Put simply, uptiering is just a priming transaction. The more aggressive form

of uptiering typically limits participation in the "new money" uptiering transaction to a subset of existing lenders to create a first-out tranche and then "rolls up" some or all of the existing debt into a second-out superpriority tranche, relegating the nonparticipating lenders' formerly first-priority debt into second- or third-priority junior or unsecured debt.

Before these cases—most notably, the *Serta Simmons*, *Boardriders*, and *TriMark* cases—it was often assumed (perhaps wrongly) that typical sacred rights provisions in credit agreements protected nonparticipating lenders from these transactions. But given the unprecedented market volatility stemming from the pandemic, a pioneering group of borrowers, sponsors, and over-exposed lenders formulated a way to engage in restructuring transactions that creatively structured around credit agreements' sacred rights provisions so that only majority—instead of unanimous—consent was required.

More specifically, these uptiering transactions typically follow a two-step process. First, the participating lenders use their majority status to amend the credit agreement so that it no longer prevents the borrower from issuing superpriority debt or subordinating the existing first and second liens to any forthcoming superpriority debt. Because the mechanics contained in these provisions are not facially considered sacred rights, the participating lenders are able to amend the original credit agreement without obtaining unanimous consent. Second, through a debt-for-debt exchange, the borrower acquires the tranches of the earlier syndicated loan held by the participating lenders through an "open-market purchase," which removes the participating lenders from the now-subordinated first- and second-lien facilities and places them in a new superpriority facility governed by a separate credit agreement.

### The *TriMark* Transaction

5/12/23, 5:47 AM    Financial Restructuring & Reorganization Advisory: TriMark: Are Sacred Rights Still Sacrosanct? | News & Insights | Alston & Bird

Case 23-09001   Document 257-74   Filed in TXSB on 05/14/23   Page 5 of 12

The core facts of *TriMark*, *Audax Credit Opportunities Offshore Ltd., et al. v. TMK Hawk Parent Corp., et al.*, No. 565123/2020 (N.Y. Sup. Ct. Aug. 16, 2021), reflect these dynamics. In August 2017, two private equity firms acquired a majority stake in TriMark, a Massachusetts distributor of food service equipment, through a leveraged buyout (LBO). Roughly two-thirds of the purchase price was financed through an $820 million syndicated loan. Due to the COVID-19 pandemic and its effect on indoor restaurant dining, TriMark began to experience significant financial headwinds in the first half of 2020.

During the spring and summer of 2020, a group of the LBO lenders holding a majority of the debt collaborated with TriMark and its equity sponsors to engage in a restructuring transaction that, according to the court, had three main components. First, TriMark entered into a "Super Senior Credit Agreement" where the company issued new "First-Out Super Senior Debt" to the participating lenders. TriMark did not offer to issue this new debt to the remaining LBO loan lenders. Second, TriMark issued new "Second-Out Super Senior Debt" to the participating lenders in a dollar-for-dollar exchange for the debt they originally held in the LBO loan. Finally, the participating lenders stripped covenants from the original credit agreement that: (1) allowed TriMark to incur new debt senior in priority to the LBO loan; (2) subordinated the LBO loan's collateral position to the Super Senior debt; and (3) installed new obstacles designed to impede the remaining LBO loan lenders from successfully filing suit against the borrower and the participating lenders (i.e., they broadened the scope of the "no-action clause").[1]

The plaintiffs—the remaining LBO loan lenders—filed suit in New York against TriMark, its equity sponsors, and the participating lenders, setting forth multiple claims: (1) a declaratory judgment that the original credit agreement as amended by the participating lenders is void and unenforceable; (2) that TriMark and the participating lenders breached the

5/12/23, 5:47 AM Financial Restructuring & Reorganization Advisory: TriMark: Are Sacred Rights Still Sacrosanct? | News & Insights | Alston & Bird

Case 23-09001 Document 257-74 Filed in TXSB on 05/14/23 Page 6 of 12

original credit agreement; (3) that the defendants' actions breached the implied covenant of good faith and fair dealing; (4) that the transaction constituted a fraudulent transfer; and (5) that TriMark's equity sponsors tortiously interfered with the original credit agreement by helping to engineer the underlying restructuring transaction. The defendants filed a motion to dismiss all counts.

**The Motion to Dismiss Ruling—"Subtle this was not."**

In its ruling, the court partially granted the defendants' motion to dismiss. At the outset, the court rejected the defendants' argument that the amended no-action provision mandated dismissal of the plaintiffs' claims. After examining the typical context in which no-action provisions are enforced, the court distinguished the situation in *TriMark*, stating that there, the amended no-action provision was, "according to Plaintiffs, purpose-built to prevent *these Plaintiffs* from suing *these Defendants* in connection with *this transaction*—a preemptive self-pardon of sorts. Subtle this was not." Accordingly, the court held that the amended no-action provision was unenforceable and inapplicable to the plaintiffs' claims.

The court then held that the plaintiffs' fraudulent transfer, tortious interference, and good-faith and fair-dealing claims each failed as a matter of law. On the fraudulent transfer count, the court held that New York's fraudulent transfer statute did not apply since all parties agreed that the restructuring transaction took place in Massachusetts, not New York. According to the court, the plaintiffs would need to look to Massachusetts' fraudulent transfer statute to plead this claim. Next, the court dismissed the plaintiffs' tortious interference claim against TriMark's equity sponsors because the plaintiffs failed "to show that the Equity Sponsors acted without economic justification in procuring a breach of the Original Agreement." The court also dismissed the plaintiffs' claim for breach of the covenant of good faith and fair dealing because, in the court's analysis, the

5/12/23, 5:47 AM  Financial Restructuring & Reorganization Advisory: TriMark: Are Sacred Rights Still Sacrosanct? | News & Insights | Alston & Bird

Case 23-09001 Document 257-74 Filed in TXSB on 05/14/23 Page 7 of 12

plaintiffs had failed to show how this claim was distinguishable from the plaintiffs' breach of contract claims. Finally, the court found that one of the grounds for seeking declaratory relief failed as a matter of law. The plaintiffs argued that when the participating lenders sought to amend the original credit agreement, they did not constitute "required lenders" as defined in the agreement because the participating lenders had, according to the plaintiffs, already assigned their interests in the loan. Focusing on the chronology of events, however, the court held that no debt had actually changed hands before the amendments, and therefore the participating lenders constituted the required lenders.

On the other hand, the court denied the defendants' motion to dismiss the plaintiffs' other declaratory judgment and breach of contract claims. The court was convinced that the plaintiffs' other theory for declaratory relief overcame the motion to dismiss hurdle. It found that the plaintiffs had advanced a plausible interpretation of the credit agreement that the participating lenders had indirectly implicated the nonparticipating lenders' sacred rights. Under the plaintiffs' theory, the restructuring transaction indirectly implicated the plaintiffs' sacred rights insofar as the creation of the Super Senior debt "would by its terms alter the order of application of proceeds" by subordinating the plaintiffs' priority interest in the collateral. The court also found that this issue—that is, whether the amendments to the credit agreement affected the nonparticipating lenders' sacred rights without unanimous consent—also went to the heart of the plaintiffs' breach of contract claims and therefore allowed them to proceed as well.

## Implications & Takeaways

While the market has been adapting to the recent surge in uptiering transactions by adding protective provisions to credit agreements to more clearly prohibit or at least define the parameters of such transactions, *TriMark* leaves the courthouse doors open for the legacy transactions that

do not contain these drafting fixes. For instance, the court's refusal to enforce the amended no-action provision—which was specifically designed to add administrative hurdles and increase upfront capital required to litigate—and its willingness to entertain the plaintiffs' argument that the restructuring transaction indirectly implicated the lenders' sacred rights both indicate that there may be a limit on creative amendments made by majority lenders to prime nonparticipating lenders in the syndicate.

Still, the *TriMark* case should provide finance lawyers and lenders increased incentive to ensure that credit agreements fully contemplate the range of scenarios in which lenders in a syndicate can try to take advantage of one another. One avenue is to include in credit agreement amendment provisions language requiring that each lender consent to any modification that would subordinate the payment priority of the credit agreement obligations or the liens on the collateral securing those obligations, in each case to any other debt, unless such lender is given a bona fide opportunity to participate in such debt transaction (including with similar compensatory economics).

Finally, while litigators may feel duty bound to include a claim for the breach of good faith and fair dealing, *TriMark* instructs that such claims must be independent of a breach of contract claim (i.e., "cannot be used to impose obligations or restrictions going beyond what is set forth in the contract") and must not seek the exact same damages. From a drafting perspective, it may be easy to assume that certain actions not specifically identified in the credit agreement, if undertaken, would amount to a breach of the covenant of good faith and fair dealing. The *TriMark* opinion suggests drafters should reconsider that assumption. Similarly, tortious interference of contract does not appear to be a viable path to bringing the borrower's equity sponsors into the litigation because courts will be inclined to examine early on whether such sponsors possessed any economic justification for their

5/12/23, 5:47 AM  Financial Restructuring & Reorganization Advisory: TriMark: Are Sacred Rights Still Sacrosanct? | News & Insights | Alston & Bird

Case 23-09001   Document 257-74   Filed in TXSB on 05/14/23   Page 9 of 12

actions—and will be quick to dismiss if those justifications are even remotely credible.

---

**[1]** No-action clauses are common in financing transactions. These clauses limit the right of individual lenders to bring an action in certain circumstances. No-action clauses prevent individual lenders from bringing claims for unjustified reasons, causing expense to the borrower and diminishing its assets, and ensure that remedies pursued under the loan will benefit all its holders.

---

### Gerard S. Catalanello
Partner

Phone: +1 212 210 9509
Email: gerard.catalanello@alston.com

### Dennis J. Connolly
Partner

Phone: +1 404 881 7269
Other Phone: +1 212 905 9154
Email: dennis.connolly@alston.com

# Related News & Insights

Press Release       November 19, 2020

## Alston & Bird Continues London Growth with Arrival of Corporate Partners Phillip Taylor and Saloni Joshi

Alston & Bird continues to grow its London presence with the addition of partners Phillip Taylor and Saloni Joshi as the firm further

strengthens its transatlantic offering for both contentious and noncontentious finance and corporate matters.

Financial Services & Products Advisory        August 10, 2020

## *Financial Services & Products Advisory*: It's Not Over Yet: FFIEC Issues Guidance for Additional Loan Accommodations

As the coronavirus (COVID-19) pandemic continues, loan accommodation periods first instituted under the CARES Act in the spring are beginning to expire. Our Financial Services & Products Group analyzes the latest guidance from federal banking regulators to aid financial institutions that seek to continue to accommodate borrowers still reeling from the pandemic.

Financial Restructuring & Reorganization Advisory        April 9, 2020

## *Financial Restructuring & Reorganization Advisory*: Protecting Recoveries in a Pandemic: What Creditors Can Do Right Now

Use this time to prepare. Our Financial Restructuring & Reorganization Group provides proactive steps creditors can take now to prepare for whatever comes after the coronavirus pandemic subsides.

Advisories        March 25, 2020

## *Antitrust / Mergers & Acquisitions Advisory*: COVID-19 Affects European Merger Control Reviews and Court Procedures: New

Procedures and Delays

Our European Antitrust and Mergers & Acquisitions Groups examine changes in the way European competition authorities will review merger transactions during the coronavirus pandemic, as well as changes to English and European court procedures.

---

Advisories     November 15, 2022

*Financial Restructuring & Reorganization Advisory*: *Sequana*: UK Supreme Court Provides Useful Guidance for Directors of Financially Distressed Companies on the Existence of Creditor Duty and When It Arises

When a company is facing the prospect of insolvency, even far in the future, do the directors protect the investors or the creditors first? Our Financial Restructuring & Reorganization Group considers a UK Supreme Court case that could provide a tipping point for when insolvency is imminent.

# Media Contact

### Alex Wolfe
Communications Director

Phone: +1 212.210.9442
Email: alex.wolfe@alston.com

Professionals
Services
Innovation
News & Insights
Our Firm

5/12/23, 5:47 AM                   Financial Restructuring & Reorganization Advisory: TriMark: Are "Sacred Rights" Still Sacrosanct? | News & Insights | Alston & Bird

Case 23-09001 Document 257-74 Filed in TXSB on 05/14/23 Page 12 of 13

Offices
Careers
Alumni
Disclaimer
Disclosures
Privacy
Contact Us
Secure Login
Professionals
Services
Innovation
News & Insights
Offices
Careers

# Join Our Team

Careers

# Receive Our Updates

Subscribe
Alumni
Disclaimer
Disclosures
Privacy
Contact Us
Secure Login

©2023 ALSTON & BIRD LLP

English

# Connect

