IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


| | | |
|---|---|---|
| IN RE: | § | CASE NO. 23-90020-11 |
| | § | JOINTLY ADMINISTERED |
| | § | HOUSTON, TEXAS |
| SERTA SIMMONS BEDDING, LLC, | § | MONDAY, |
| ET AL, | § | MAY 15, 2023 |
| DEBTORS. | § | 9:30 A.M. TO 12:24 P.M. |

************************************************************

| | | |
|---|---|---|
| SERTA SIMMONS BEDDING, LLC, | § | CASE NO. 23-9001-ADV |
| ET AL, | § | JOINTLY ADMINISTERED |
| | § | HOUSTON, TEXAS |
| VERSUS | § | MONDAY, |
| | § | MAY 15, 2023 |
| AG CENTRE STREET PARTNERSHIP, | § | |
| ET AL | § | 9:30 A.M. TO 12:24 P.M. |

### CONFIRMATION DAY ONE - MORNING SESSION (VIA ZOOM)

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:                              SEE NEXT PAGE


**(Recorded via CourtSpeak.  No log notes.)**




TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (VIA ZOOM):


FOR THE DEBTOR:                    WEIL GOTSHAL & MANGES, LLP
                                  Ray Schrock, Esq.
                                  David Lender, Esq.
                                  Alexander Welch, Esq.
                                  700 Louisiana, Ste. 1700
                                  Houston, TX  77002
                                  713-546-5000


FOR CITADEL:                      FAEGRE DRINKER BIDDLE & REATH
                                  James Millar, Esq.
                                  1177 Avenue of the Americas
                                  41st Floor
                                  New York, NY  10036
                                  212-248-3140


FOR PRIORITY LENDERS:             GIBSON DUNN & CRUTCHER, LLP
                                  Gregg J. Costa, Esq.
                                  Lee Wilson, Esq.
                                  811 Main Street
                                  Suite 3000
                                  Houston, TX  77002
                                  346-728-6649


FOR SERTA MINORITY LICENSEES:     FISHMAN JACKSON RONQUILLO, PLLC
                                  Mark Ralston, Esq.
                                  4835 LBJ Freeway
                                  Suite 475
                                  Dallas, TX  75244
                                  972-419-5544

FOR THE STATE OF CONNECTICUT
DEPARMENT OF ECONOMIC AND
COMMUNITY DEVELOPMENT:            MR. BOWMAN


FOR THE EXCLUDED LENDERS:         FRIEDMAN KAPLAN SEILER
                                  & ADELMAN, LLP
                                  Eric Seiler, Esq.
                                  7 Times Square
                                  New York, NY  10036-6516
                                  212-833-1103

<u>APPEARANCES (CONT'D) (VIA ZOOM)</u>:


FOR LCM LENDERS:                    HOLWELL SHUSTER & GOLDBERG, LLP
                                   Neil Liberman, Esq.
                                   425 Lexington Avenue
                                   New York, NY  10017
                                   646-837-5151


(Please also see Electronic Appearances.)

INDEX

OPENING STATEMENTS:
 By Mr. Lender                28
 By Mr. Costa                 42
 By Mr. Seiler                58
 By Mr. Lieberman             80
 By Mr. Millar                92


                                                   VOIR
WITNESSES:          Direct    Cross    Redirect    Recross    DIRE

 (None called in this morning segment.)


EXHIBITS:                      Marked    Offered    Admitted

 (Exhibits pre-admitted.)


                            ***

1          **HOUSTON, TEXAS; MONDAY, MAY 15, 2023; 9:30 A.M.**

2                THE COURT:  May 15, 2023, this is the docket for

3     Houston, Texas.

4                On the 9:30 docket this morning, we have joint

5     proceedings in the main bankruptcy case, Case Number 23-90020,

6     Serta Simmons Bedding, LLC, et al, as well as the adversary

7     proceeding, 23-9001.

8                Folks, don't forget to record your electronic

9     appearance today.

10               If, for some reason, you're appearing in one case,

11    but not the other, enter your appearance in the main case and

12    just note by your name if you only want your appearance

13    entered in, say, the adversary or just the main case.  We'll

14    pick that up and -- but we will record the notice of

15    appearance in the main bankruptcy proceeding.

16               First time that you do step up and speak, if you

17    would, please state your name and who you represent.  That

18    really does serve as a good point of reference for what we all

19    know will be a long transcript this week.

20          (Laughter)

21               THE COURT:  We are recording using CourtSpeak.  What

22    we'll do is we'll break up both the CourtSpeak, as well as the

23    transcript when we break for lunch, so that we can go ahead,

24    get that downloaded, so you'll see that trickling in, at least

25    the CourtSpeak in the afternoon.

1    The court reporting, all I can do is upload it, I

2    can't make anything happen beyond that.

3    For the folks who are in the courtroom, since we do

4    have approximately 100 people who are watching by video, when

5    you speak -- and I know it's going to be hard -- but if you

6    would, please come to the lectern to be heard.  That is the

7    only place where there is a camera, and I want you to both be

8    seen and be heard.

9    And with that, Mr. Schrock, good morning.

10    MR. SCHROCK:  Good morning, Your Honor.  Ray

11    Schrock, Weil, Gotshal & Manges, counsel for the Debtors.

12    THE COURT:  All right.  There were a number of

13    things filed this morning.  I was not able to match up all of

14    the objection withdrawals.  It seems to me they were -- at

15    least just looking at the titles, those were the easy ones --

16    MR. SCHROCK:  Yes.

17    THE COURT:  -- that we all knew you would fix.

18    Do you want to take just a couple of minutes and

19    sort of tell me where you think we stand going forward today?

20    MR. SCHROCK:  Sure, Your Honor.

21    And I did have a -- I have a quick deck to walk

22    through, and we had a --

23    THE COURT:  Okay.

24    MR. SCHROCK:  We have a slide, actually, that

25    outlines it.

1           THE COURT:  Okay.

2           MR. SCHROCK:  So I think we've got 11 formal

3    objections that have been filed to confirmation of the plan,

4    and there's 13 other parties that have filed limited

5    objections to confirmation, solely based on disputed cures.

6    We've been able to kick all the cure issues, per normal.

7           We have four of the plan objections and all the

8    informal comments that have been resolved consensually through

9    the addition of clarifying agreed-upon language in the

10   proposed confirmation order.

11          THE COURT:  Ah.

12          MR. SCHROCK:  So the remaining objections are the

13   non-PTL Lenders, which is Docket Number 824.  This is for

14   confirmation, as well as Docket Number 825, that's the LCM

15   joinder.

16          We have the Citadel objection at Docket Number 810;

17          The United States Trustee at Docket Number 820; and

18          Then we have a few litigation counterparties that

19   have filed objections:

20          Cameron Thierry at Docket Number 826;

21          The minority licensees at Docket Number 827;

22          And then Alan and Ruth Humphries at Docket No. 829.

23          And so that's everything.

24          But what I was proposing to do, Your Honor, is just

25   go through a few comments to open up, hand it over to

1      Mr. Lender, who's going to handle the majority of the legwork

2      on making the opening comments, and then turn it over to the

3      PTL Lenders to speak.

4                THE COURT:  No, absolutely, and thank you.

5                I saw the deck.  I didn't -- I was rushing to get it

6      printed, so I have a copy.  I have not seen it.  And I do see

7      that you have plan objection slide, so my apologies --

8                MR. SCHROCK:  Okay.

9                THE COURT:  -- for asking the question.

10               MR. SCHROCK:  No, no worries, Judge.

11               THE COURT:  Let me ask, just so that I know how to

12     switch back and forth:  Who is your control person for

13     publishing documents?

14         (Participants confer)

15               MR. SCHROCK:  Jorge is -- what is it?

16               MR. MARTORELL:  Martorell.

17               MR. SCHROCK:  Martorell.

18               THE COURT:  I'm sorry.  I just couldn't hear.

19               MR. MARTORELL:  It's Jorge and it's Martorell.  Do

20     you want me to spell that for you, Judge?

21               THE COURT:  No.  So, when you typed in your name --

22               MR. MARTORELL:  Uh-huh.

23               THE COURT:  How did you do that because I was

24     looking for the G, it's not there.

25               MR. MARTORELL:  Oh, I'm sorry.  It's Jorge.

1          THE COURT:  All right.  Oh, got it.  Okay.  There it

2     is.

3          (Court and court personnel confer)

4          THE COURT:  Ah, so you are simply -- I

5     misunderstood.  So you're going to do the publishing only in

6     the courtroom, not over GoToMeeting?

7          MR. MARTORELL:  It -- whatever the parties --

8     whatever my side wants.  I can do it only in the courtroom or

9     I can --

10         THE COURT:  I'm just asking because I have to hit a

11    different button.

12         MR. MARTORELL:  Right, I understand.  So --

13         THE COURT:  Okay.

14         MR. MARTORELL:  -- do straight up in the courtroom?

15         UNIDENTIFIED:  I think -- well, we're fine

16    displaying it everywhere, right?

17         MR. SCHROCK:  Yes.  And is the issue that he's not

18    logged in to GoToMeeting?  Is that --

19         THE COURT:  I did not --

20         MR. MARTORELL:  No, no, no.  I'm on.  It just

21    depends on how the Judge is going to project us, whether we're

22    going to do it outside of the courtroom, so everyone can see,

23    or just in the courtroom?

24         MR. SCHROCK:  No, we're going to do it for

25    everywhere.

1          MR. MARTORELL:  Okay.  GoToMeeting then it is.

2          THE COURT:  Okay.

3      (Pause in proceedings)

4          THE COURT:  And things are -- I'm having a hard

5  time, people are moving in and out.  Could you just raise your

6  hand, and I will --

7          MR. MARTORELL:  Sure.

8          THE COURT:  -- that will help me.

9          MR. MARTORELL:  Sure.  Can you see me?

10          THE COURT:  Yes.

11      (Court and court personnel confer)

12          THE COURT:  Let me ask you and this will be easier.

13  Can you -- oh, you don't have a camera.  I can try to do it

14  this way.

15          MR. MARTORELL:  I was on the screen.  I'm on the

16  third row to the bottom.

17          THE COURT:  Now I see you.  Thank you.  We will get

18  this.  Now I know.  All right.

19          MR. MARTORELL:  Okay.

20          THE COURT:  Mr. Schrock, my apologies.

21          MR. SCHROCK:  No, no worries.

22          MR. MARTORELL:  No worries.

23          THE COURT:  It's sad when I'm the tech guy.

24      (Laughter)

25          MR. MARTORELL:  We are sharing.

1          MR. SCHROCK:  Okay.  Perfect.  All right.  Let's --
2    do you want to go ahead and just put --
3          MR. MARTORELL:  (Indiscernible).
4          MR. SCHROCK:  Oh, okay.  So, if I do it --
5          MR. MARTORELL:  (Indiscernible) yeah, you can use
6    that.
7          MR. SCHROCK:  All right.  We got it.  Okay, Judge.
8    Here we go.
9          It looks like we're going to the mattresses on this
10   one.
11      (Laughter)
12          MR. SCHROCK:  In all seriousness, we're pleased to
13   be before the Court today to seek confirmation of the Debtors'
14   Plan of Reorganization.
15          There is also the declaratory judgment action,
16   which, as you well know, is inextricably intertwined with the
17   plan.
18          Debtors are standing at the precipice of
19   confirmation and emergence from Chapter 11.  This has been,
20   you know, the better part of a year putting this in the works.
21   And I'm going to address confirmation issues and what some of
22   the evidence will show, some of the trial scheduling.  David
23   Lender will follow.  So, really, I'm going to try and give
24   context, settlement with the Committee, overview of plan
25   voting, trial calendar, briefly on plan treatment, and then a

1    short discussion around the objections and kind of what the

2    evidence will show, we believe.

3         Your Honor, I'd be remiss if I didn't put everyone's

4    attention on the fact that, you know, despite all of the legal

5    arguments that are going to be made here, we have a company

6    that has more than 3,000 employees, that is fighting to

7    reorganize, it's fighting to survive.  It is very much, I

8    know, on Your Honor's mind.  It is very much on our --

9    everybody on the Debtors' team's mind, the board of directors,

10   the management team.

11        This is not a company that can afford to stay in

12   Chapter 11 and simply see what happens.  They're in an

13   extremely competitive industry.  They need to get back to the

14   business of doing what they do best.  And as everybody knows,

15   the landscape gets more competitive all the time.

16        This plan has the overwhelming support of the

17   Debtors' stakeholders and incorporates settlements with the

18   consenting creditors, the equity holders, as well as a global

19   settlement with the Creditors Committee.

20        The Creditors Committee global settlement represents

21   a compromise among the Debtors, the Creditors Committee, as

22   well as the RSA parties, the requisite consenting creditors.

23   It is a resolution of all disputes asserted by the Creditors

24   Committee.

25        They've negotiated for enhanced treatment for

general unsecured creditors under the plan; namely -- and this is what some of the changes were that were filed:

Class 6A now receives full payment the later of 60 days after the effective date or the date of execution of a trade agreement.

The 6B holders receive interest in a trust which will be funded by $5.75 million.  There's a creation of a trust.  The Creditors Committee and its members are included exculpated parties and release parties.

But very importantly, you know, this plan is really structured around what really needs to happen, which is a resolution of the litigation that has been an overhang to this company over the last three years, as well as a de-leveraging of the company's capital structure by over $1.6 billion.

So let's just take a quick look at the voting results, and this will be shown in the evidence.

The F-L-O -- FLFO claims are -- there's only one party that's objecting; 90 -- you know, almost 99 percent in number accepting.

The FLSO, also an accepting class, 98 percent in number accepting.

The non-PTL claims, not surprisingly, they voted to reject the plan, so we'll be dealing with them on cramdown.

Ongoing general unsecured claims that are getting paid, those that voted to accept, and then other general

1    unsecured claims that voted to reject.  So we will be dealing

2    with the cramdown standards on that particular class.

3            However, as we did note, the Unsecured Creditors

4    Committee has reached a compromise and, you know, is now

5    supporting the plan.

6            THE COURT:  Terrific.

7            MR. SCHROCK:  Let's talk a little bit about the

8    calendar, which could be aspirational.  We'll see how we can

9    go, but this is what we've agreed to.

10           And on the left, in the boxes, this is, you know,

11   what the evidence is that's going to be covered by that

12   witness during live testimony.  And then, on the right, there

13   is the -- what's going to be covered by Declaration.

14           So we were able to work with the objecting parties

15   and, where it didn't look like something was going to be a

16   contested issue, we are planning on -- we filed Declarations.

17   We're going to move to admit those probably, you know, at the

18   close of the Debtors' case because we just filed them and

19   we're giving them a couple of days to look at them.

20           But as you can see, on Monday, after opening

21   statements, the Debtors' investment banker Roopesh Shah, who

22   is in the courtroom with us today, will be testifying as to

23   the 2020 transaction.  Valuation and exit financing are going

24   to be handled by Declaration.

25           We also have Mr. Ken Prince from Advent.  He will be

1    discussing the DQ list issues of -- that have been the subject

2    of litigation.

3           On day two, we have continued witness testimony from

4    day one, to the extent necessary.  And I understand we're

5    moving forward in the afternoon.

6           Harvey Tepner, a member of our Finance Committee, is

7    going to hit governance, good faith, settlements, and

8    exculpations.  I expect, you know, he'll have a rather lengthy

9    direct and cross.

10          And then the PTL Lenders are putting on Mr. Karn

11   Chopra of Centerview and Andrew Sveen from Eaton Vance on the

12   2020 transaction.

13          Day three, we'll have Mr. Bartholin from UBS.  It

14   will be any other PTL Lender witnesses.  And then we have the

15   Debtors' CFO John Linker, who will be hitting good faith and

16   other 1129 requirements; Mr. Talarico, who will be hitting the

17   liquidation analysis by Declaration; and Ms. Young, who will

18   be handling the voting and tabulation.

19          To the extent we need more time, then we're going to

20   have day four on Thursday.  And from what I understand, I

21   think we have a full day on Thursday, and then Friday, if

22   needed.

23          We've currently got time scheduled with Your Honor

24   for May 25th for closing arguments, and we'll be working on

25   proposed Findings of Fact and Conclusions of Law in the

1    meantime.

2           On the right, we have what we're going to try and

3    handle by Declaration.  Now, to the extent that parties have

4    cross and things come up as we move forward, we'll just have

5    to adjust and, you know, there could be a need for redirect.

6           THE COURT:  Okay.

7           MR. SCHROCK:  Just briefly on the plan treatment,

8    just to keep this all in mind, the FLSO claims are getting

9    100 percent of the new common interest on the effective date,

10   less any common interest to Class 5 and sort of dilution,

11   pursuant to the management incentive plan.  They're also going

12   to get aggregate term loans, less amounts distributed on

13   account of Class 3.

14          Because Class 5 voted to reject the plan, they're

15   getting one percent of the new common interest issued on the

16   effective date, subject to any dilution by new common

17   interested distributed pursuant to MIP.

18          Ongoing general unsecured claims we already talked

19   about.

20          Other general unsecured claims, we already spoke

21   about.

22          The rest of these are not really contested issues,

23   but there's an absolute priority objection that I'll hit, you

24   know, at the conclusion of my remarks.

25          THE COURT:  Okay.

1          MR. SCHROCK:  On the plan objection front -- and we

2     already previewed this -- these were the objecting parties.

3     These are, you know, what we're going to be dealing with.  But

4     I would be remiss, you know, if we didn't focus on a couple of

5     these on the next slide.

6          The -- there's a -- the non-PTL Lenders object to

7     the plan on the grounds that the PTL credit agreement should

8     be classified as a -- an un -- a con -- an unclassified,

9     contingent reimbursement or contribution claim regarding the

10    indemnity.  That's what they're focused on is the indemnity

11    portion of that claim.

12         And Your Honor, I really think that, you know, as we

13    move through this litigation and when we go through the

14    evidence, you know, it's pretty clear, at least to us, what

15    the real game plan is here.  The game plan is:  Do everything

16    possible to try and sever the issues associated with the

17    adversary and the plan, so that on appeal, if there's a lucky,

18    you know, strike and they hit something, that we're not back

19    in front of this Court.  That's the game, that's the strategy.

20         I think that the indemnity claim, there's no doubt

21    that weaving it into a comprehensive settlement, part of that

22    settlement no one would agree to equitize their claims without

23    an indemnity.

24         THE COURT:  Right.  So I assume that this is simply

25    going to be part of the presentation and I'm going to see --

1              MR. SCHROCK:  Yes.

2              THE COURT:  -- evidence regarding the Debtors'

3     business judgment as to why it decided to go down this path,

4     right?

5              MR. SCHROCK:  Absolutely, Your Honor.  That's what

6     we're going to show.

7              THE COURT:  All right.

8              MR. SCHROCK:  The absolute priority rule was

9     regarding the Debtors' equity sponsor.  That, of course, not

10    surprisingly, we take great issue with that.  There's

11    substantial new value that's being provided by the equity

12    sponsor, including support throughout the RSA.  And the

13    Debtors' ability to realize significant tax attributes, absent

14    their cooperation, would not even be available, so we'll put

15    testimony on to deal with that.

16             We did get an objection from Citadel and a lot of

17    last minute, I would say, activity from them.  They lobbed in

18    an objection and then they put in a proposal for a new term

19    loan over the weekend.

20             If you saw on the prior voting slide, they are the

21    one lender that objected in the F-L-S-O -- F-O class.  Their

22    objection is primarily the indemnity should not be part of a

23    go-forward term loan.  So they asked the Debtor to ditch the

24    RSA, go with their no -- new term loan, and that somehow we

25    could still -- we could sever the indemnity, still keep the

1    RSA parties bound by the RSA, not re-solicit, move forward,

2    and then I guess somehow negotiate for the revised capital

3    structure documents still with the PTL Lenders and move

4    forward.

5              The Finance Committee met last night.  They

6    respectfully declined to breach the RSA and move forward with

7    that.  The -- you know, the analysis on that is pretty

8    straightforward:

9              One, we don't think the indemnity claim is severable

10   as part of an overall settlement.

11             Two, we think that, if we did walk away from the

12   RSA, we would still have to deal -- get a deal with the PTL

13   Lenders.  We don't have a way out of bankruptcy, we would be

14   stuck in bankruptcy.  We would have to formulate a new plan

15   and we would be stuck in Chapter 11.  It just didn't seem like

16   a wise maneuver.  There are other sort of reasons that we'll

17   hit during the evidence.

18             But they also take issue that the plan is not

19   feasible, given the potential impact of the indemnity claim.

20   We disagree.  We don't think there will be any evidence to

21   that effect.

22             They said that the indemnity claim should be

23   subordinated.  We don't think that that's correct as a matter

24   of law.

25             And that allowance of the indemnity claim revoke --

1    results in differential treatment.  That is also incorrect.

2    The indemnity is available to all of the lenders.  And I

3    believe, even in, you know, the recent case that was filed

4    with a similar structure envisioned has an indemnity, as the

5    evidence will show.

6         The U.S. Trustee also lobbed in an objection on the

7    exculpations.  I don't think that's going to be the subject of

8    musk evidence -- much evidence, but we will be dealing with

9    that during closing arguments.

10        THE COURT:  All right.  But it seems to me, on that

11   one, is you can perhaps tweak your evidence, make some

12   additional findings, and it will solve Mr. Duran's policy

13   problem and also get you what you need.

14        MR. SCHROCK:  And Your Honor, yes, I didn't want to

15   indicate that we're not dealing -- Mr. Tepner is going to be

16   putting in some evidence --

17        THE COURT:  Right.

18        MR. SCHROCK:  -- that we hope will solve that

19   objection.

20        THE COURT:  I got it.

21        MR. SCHROCK:  Okay.  So, Your Honor, that's it, in

22   terms of my comments.  I'm happy to answer any questions that

23   you might have.  And otherwise, I can turn it over to

24   Mr. Lender.

25        THE COURT:  Sure.  Spend just a moment on the

1    remaining litigation claim objections, if you would, because

2    I'm not sure I really understood them.

3            MR. SCHROCK:  Sure, Your Honor.  And actually, I'm

4    going to turn that over to Mr. Welch for just a moment --

5            THE COURT:  Of course.

6            MR. SCHROCK:  -- just to give you --

7            THE COURT:  Of course.

8            MR. SCHROCK:  -- just to give you a line on that.

9            THE COURT:  Certainly.  Thank you.

10       (Participants confer)

11           THE COURT:  And folks in the back, I'm trying to

12   find some more chairs.  As -- if they start bringing them in,

13   just grab one even if it's down one side of the aisle or

14   across the back.  But we're looking for some additional

15   chairs.  I don't want you folks to have to stand.

16           Mr. Welch, my apologies.

17           MR. WELCH:  For the Record, Alexander Welch, Weil

18   Gotshal, for the Debtors.

19           Your Honor, just with respect to the litigation

20   claims, we're in continued discussions with their counsel.

21           THE COURT:  Okay.  So do they have bankruptcy

22   counsel or litigation counsel?

23           MR. WELCH:  They have -- minority licensees on the

24   list have both.

25           THE COURT:  Right.  That one I understand.

1           MR. WELCH:  Yeah.  The Humphries have both.

2           THE COURT:  Okay.

3           MR. WELCH:  And Mr. Thierry, who I know you're

4    familiar with, is going it alone.

5           THE COURT:  Okay.  All right.

6           MR. WELCH:  But we'll continue to talk to them over

7    the course of the week and see if we can get things resolved

8    before we come on -- come before you on confirmation issues on

9    Friday.

10          THE COURT:  Surely, thank you.  It just seems to me

11   that, if everybody is looking at the Code in a very

12   straightforward way, that one is just easy to fix.

13          MR. WELCH:  We agree with Your Honor.  And we've

14   also been working with the Creditors Committee counsel to help

15   on that, as well.

16          THE COURT:  Certainly.  Certainly.  Thank you.

17          MR. WELCH:  Thank you, Your Honor.

18          THE COURT:  All right.  Let me -- I'm sorry.  Go

19   ahead.

20          MR. SCHROCK:  Oh --

21          THE COURT:  Go ahead.  Yes, sir.

22          MR. SCHROCK:  Yes, Your Honor.

23          THE COURT:  So let me just -- so is that sort of the

24   -- that's sort of here's where we are?

25          MR. SCHROCK:  That's where we are, Your Honor.

1          THE COURT:  All right.  Let me do this.  Again, not

2     opening statements.  But anyone else just have an announcement

3     they needed to make, so that they could then go on about the

4     rest of their day, or are there any other comments and not

5     opening statements?  You'll get your opportunity.  Just things

6     that I need to hear before we get started.

7          (No verbal response)

8          THE COURT:  Then opening statements it is.  Ah, wait

9     a minute.

10          So, folks -- and I'm sorry.  There were a number of

11     people that raised their hand on GoToMeeting.  If you want to

12     be heard and you're on the video, if you would give me a five

13     star on your telephone and I'll get you unmuted.

14          All right.  We have someone from Dallas, area code

15     214.

16          (No verbal response)

17          THE COURT:  All right.  We have someone -- I think

18     203 is Connecticut.  Is that right?

19          UNIDENTIFIED:  That's right.

20          THE COURT:  All right.

21          MR. BOWMAN:  I'm sorry, Your Honor.

22          THE COURT:  Yes, sir.  Mr. Bowman?  I'm sorry.  Is

23     that you?

24          MR. BOWMAN:  Yes, it is, Your Honor.

25          THE COURT:  Good morning.

1           MR. BOWMAN:  Can you hear me?

2           THE COURT:  And loud and clear.  Thank you, sir.

3           MR. BOWMAN:  Yes.  Yes, good morning, Your Honor.

4     I just wanted -- I just wanted to make sure that I

5     didn't fall under the radar.  I represent the State of

6     Connecticut Department of Economic and Community Development.

7           Your Honor may have seen we filed a motion for an

8     extension of time to file a confirmation objection.  I just

9     wanted to make clear that we were not listed as a creditor in

10    Debtors' Schedules, and the State -- the Department of

11    Economic and Community Development learned of this bankruptcy

12    quite by happenstance.

13          THE COURT:  Okay.

14          MR. BOWMAN:  It came about when the Department of

15    Labor in Connecticut received a notice in April again, tight

16    notice, that Serta or SSBM manufacturing was closing its plan

17    in Windsor Locks, Connecticut.  And later in April, it came to

18    the attention of the Department of Economic and Community

19    Development, which provided an assistance loan to SSB

20    Manufacturing in the amount of $5 million.  And that required

21    them to maintain a certain level of employment in the State in

22    a certain period of time, which was not fulfilled.

23          And so for that reason, we expect to file a Proof of

24    Claim in the amount of at least $5 million in the SSB

25    Manufacturing case.  And Serta Bedding was also a guarantor,

1      so we would have a claim against Serta Bedding, as well.

2              We certainly did not receive the notice required by

3      the Bankruptcy Rule 25 notice of a confirmation hearing and

4      the objection deadline.  I, myself, just got involved in the

5      case.  I think the date of the -- I filed my *pro hac* motion,

6      which Your Honor was kind enough to grant this morning.

7              So I think we're being generous in asking until the

8      end of the day tomorrow to file objections.  I am still trying

9      to get up to speed on the case, which is quite involved, as I

10     learned in the (indiscernible) from the presentation that Your

11     Honor just heard.

12             Just an issue I'm having that I think the arbitrary

13     nature of the recovery table, it seems to have shortchanged

14     the SSB Manufacturing estate.  I'm not sure -- I haven't seen

15     any criteria by which those numbers were arrived at, and I

16     just note that as an initial concern.

17             And so I -- with that, I would just appreciate Your

18     Honor acting on that extension motion and giving us the --

19     obviously, you know (indiscernible) how you want to proceed,

20     but that's what I have to say on that, Your Honor.

21             THE COURT:  Understood.  Mr. Bowman, when do you

22     think, realistically, you're going to be able to file your

23     objection?  If we said by noon tomorrow, is that going to be

24     enough time?

25             MR. BOWMAN:  I would actually ask for the end of the

1    day tomorrow --

2            THE COURT:  I know, but --

3            MR. BOWMAN:  -- if Your Honor would --

4            THE COURT:  So here's what I was trying to do.  And

5    I -- where are you, just geographically?

6            MR. BOWMAN:  I'm -- right now, I'm in Bridgeport,

7    Connecticut, Your Honor.

8            THE COURT:  All right.  What I would ask that you do

9    is you get that objection on file by tomorrow at 4:00.

10           MR. BOWMAN:  Okay.  4:00 Central Time?

11           THE COURT:  4:00 Central Time, yes, sir.  Thank you

12   for the clarification.

13           What I -- and what I'd like to be able to do is we

14   have that, I didn't get a chance to see what it is.  And then

15   perhaps tomorrow, toward the end of the day, we can have a

16   conversation about how we want to deal with it, whether or not

17   you intend to seek to introduce any evidence, whether it's

18   argument, and also to give the Debtors' team an opportunity to

19   sit and talk to you about whatever issues that are set forth

20   in the objection.

21           Does that make sense?

22           MR. BOWMAN:  It does, Your Honor, and I appreciate

23   the accommodation.

24           THE COURT:  Certainly.

25           So, if I could ask you -- and I know you have other

1    things to do.  You may decide you're going to listen to all of

2    this.  But I would ask that you be on the video, sort of, you

3    know, say, from -- I don't know -- mid-afternoon, at least

4    have it on in your office, sort of mid-afternoon forward

5    tomorrow.

6              MR. BOWMAN:  Oh, absolutely, Your Honor.

7              THE COURT:  Okay.

8              MR. BOWMAN:  Not a problem.

9              THE COURT:  All right.  Thank you.

10             Mr. Bowman, anything else --

11             MR. BOWMAN:  Okay.

12             THE COURT:  -- today?

13             MR. BOWMAN:  No.  No, Your Honor.  Thank you.

14             THE COURT:  All right.  Thank you.

15             Mr. Ralston, then were you the -- were you the 214

16   number?

17             MR. RALSTON:  I was, Your Honor.  Sorry, I was on

18   mute when I was trying to speak with you.  Yes.  And Your

19   Honor, I represent certain minority licensees, their

20   confirmation objection.

21             I think I understood Mr. Welch to say that the Court

22   would -- if we don't resolve this matter in the course of the

23   week, that the Court would be taking up the objection -- which

24   I believe is just legal argument.  I don't believe the thing

25   -- we put together some exhibits.  I don't think that they're

1    -- you know, most of which are Proofs of Claim that are of

2    record and other exhibit being the Restructuring Agreement

3    between certain of the Debtors and my clients.  So I -- so, if

4    we don't resolve things, if I understand Mr. Welch, we will be

5    taking that up on Friday.

6         And I only say that, Your Honor, because this is a

7    lengthy proceeding and I don't know if my client is going to

8    pay my way through sitting in for the entirety of this week.

9         (Laughter)

10        THE COURT:  And I'm sure it's a -- I'm sure it's

11   actually beneath your market worth.

12        (Laughter)

13        MR. RALSTON:  It's a very reasonable rate,

14   nonetheless, Your Honor.  I am very sensitive to my fees.

15        THE COURT:  Okay.  Mr. Welch.

16        MR. WELCH:  Thank you, Your Honor.  Alexander Welch,

17   Weil Gotshal, for the Debtors.

18        So the schedule, we're a little bit at the mercy of

19   the progress of this week.  Based on how it looks today, it

20   did look like we would be able to get to confirmation

21   objection argument for Friday.  I would hate to think that, if

22   peace broke out today or tomorrow, however unlikely that may

23   be, or maybe it is, that we would then all have to put pencils

24   down until Friday to have those arguments.

25        THE COURT:  Perfect sense.  We'll all stay flexible.

1          Mr. Ralston, what I would -- are you going to -- are
2     you going to come in and out of these proceedings.  Is that
3     the goal?
4          MR. RALSTON:  I think that there may be me and some
5     other attorneys representing my clients may be popping in and
6     out.  If Mr. Welch would just give us advance notice or me
7     more advance notice, we can be -- I can be -- I'm fairly
8     available this week.  And if there's an issue, it should be
9     very specific as to a time block, so I think I can make myself
10     available at a reasonable -- during the week, if peace does
11     break out between the -- and I'll say major litigants in this
12     matter.
13          THE COURT:  Makes perfect sense to me.  It was
14     exactly what I was going to ask.  Mr. Welch is nodding in the
15     affirmative.  He'll just keep you updated with email, text,
16     however it is you all are communicating.  Okay?
17          MR. WELCH:  Will do.  Thank you, Your Honor.
18          THE COURT:  All right.  Thank you.
19          MR. RALSTON:  That's great, Your Honor.  Thank you
20     so much.
21          THE COURT:  All right.  Thank you, Mr. Ralston.
22          Anyone else before we get to opening statements?
23        (No verbal response)
24          THE COURT:  All right.  Opening statements it is.
25          MR. WELCH:  Okay.  Thanks, Your Honor.

1          THE COURT:  Good morning.

2          MR. LENDER:  David Lender for the Debtors, from Weil

3     Gotshal.

4              OPENING STATEMENTS ON BEHALF OF THE DEBTORS

5          BY MR. LENDER:  In late 2018, one of SSB's largest

6     retail customers, Mattress Firm, filed for bankruptcy.  The

7     company's sales and profits had decreased over the previous

8     year and it was significantly over-leveraged.

9          In mid-2019, the company hired Evercore to assist

10    them in finding ways to reduce their debt and interest

11    expense, so as to position the company for a better future.

12         The company also took several -- undertook several

13    key initiatives to try to improve its business, including

14    hiring new key executives, launching new direct-to-consumer

15    websites, and launching new product lines.

16         Unfortunately for the company, the COVID pandemic

17    hit the United States in March 2020, significantly impacting

18    its business.  Hotels and retail stores were shut down and the

19    company had to close a number of its manufacturing plants.

20    SSB's sales plummeted and the company forecast significant

21    sales drops throughout the rest of 2020.  As a result, the

22    company had to shift its near-term focus to exploring various

23    alternatives to raise liquidity, in addition to reducing its

24    debt burden.

25         You will hear, when Evercore's Senior

Manager/Director Roopesh Shah testifies that the company -- of the company did not obtain additional liquidity and restructure its debt, it likely would have been forced into bankruptcy back in 2020.

Defendants claim the 2020 transaction was not permitted under the credit agreements and sought to block that transaction back in 2020, but failed.  They have revived their argument here, which the Court rejected in part, holding that the transaction constituted an open market purchase and granting summary judgment to the company on that issue.  What remains is Defendants' claim that the transaction violated the implied covenant of good faith and fair dealing.

Defendants argue that the company and the PTL Lenders executed the 2020 transaction in secret and in bad faith to harm the nonparticipating lenders and deprive them of the fruits of the contract.  The evidence will show that nothing could be further from the truth.  SSB did the transaction, not to harm any lenders, but because it was facing an existential threat and was trying to save the company.

Defendants are sophisticated lenders.  They bought into SSB's debt knowing it was subject to the credit agreements, which did not include anti-subordination as a sacred right and allowed a majority of lenders to amend its terms.

1    As you can see from this chart included in a June

2    2020 presentation to the Independent Finance Committee, Angelo

3    Gordon and Gamut, who is part of the Angelo Gordon group,

4    started purchasing SSB debt in 2019 at a discount, and

5    continued to acquire larger positions as the company's debt

6    traded down due to its financial troubles.  Apollo also

7    attempted to purchase SSB debt in March of 2020, again, at a

8    significant discount, which it was not permitted to do.  This

9    is the subject of our disqualification claim that Advent's Ken

10    Prince will talk about when he testifies.

11    Angelo Gordon's internal documents revealed one of

12    the reasons why it was purchasing a large position in SSB as

13    its debt traded down because, as Angelo Gordon's Ryan Moffett

14    (phonetic) revealed in an internal document dated in April of

15    2020, they would love to own the business if it files, given

16    its value.

17    The LCM Defendants argue we should have done the

18    transaction a different way or offered the transaction to all

19    lenders, but they ignore that the credit agreement explicitly

20    stated that we didn't have to offer the deal to all lenders

21    since open market purchases can be done on a non prorata

22    basis.  As Your Honor knows, the implied covenant cannot be

23    used to rewrite the parties' agreement.  And by having

24    different groups of lenders compete against each other, the

25    company got the best deal available.  The fact that LCM would

1   have preferred we did the transaction a different way does not

2   mean we violated the implied covenant.

3          Defendants also complain that the company played

4   favorites and only allowed certain lenders to participate in

5   the additional available basket capacity remaining after the

6   transaction was announced.  The company used around

7   $28 million of that capacity to purchase additional debt at a

8   discount.  This newly minted argument, not raised in prior

9   litigations, shows how far Defendants will go to try to get

10  some claim to stick.

11         You will recall during the summary judgment argument

12  that Defendants argued that open market purchases are one-off

13  transactions.  That's exactly what the company did here in

14  deciding which additional lenders to allow to participate in

15  their remaining capacity.  Yet, now Defendants argue that

16  doing precisely what they claim we could do violates the

17  implied covenant.  The implied covenant is not some

18  freestanding catchall claim that covers anything in business

19  you don't agree with.

20         During this trial, we believe the evidence will show

21  three things which prove that the company and the PTL Lenders

22  acted in good faith and did not breach the implied covenant:

23         First, SSB entered into the 2020 transaction because

24  it was in financial trouble and was trying to stave off

25  bankruptcy, not to harm the Defendants.

1          Second, Defendant engaged in a good faith
2     competitive process to find the best deal it could.
3          And third, SSB's Independent Finance Committee
4     evaluated the various proposals and selected the best deal the
5     company could get.  And the market responded favorably as
6     shown by the price of SSB's 1-L debt, which increased well
7     above the pre-2020 transaction price.  Engaging the market to
8     get the best deal you can is the epitome of acting in good
9     faith.
10          Unfortunately for the company, its looming debt
11     maturities and the downturn of the mattress industry generally
12     made its capital structure unsustainable, forcing the company
13     to file for bankruptcy in January of 2023.  But the evidence
14     will show that the 2020 transaction actually worked and
15     benefitted the company and the Defendants for some time.
16          Let me now walk through the three points in more
17     detail and preview some of the evidence you will see during
18     this case, which shows that SSB did not breach the implied
19     covenant:
20          First, SSB entered into the 2020 transaction because
21     it was in financial trouble and was trying to stave off
22     bankruptcy, not to harm the Defendants.  Evercore's Roopesh
23     Shah will be our first witness and will testify and explain
24     the serious risks facing the company after the COVID pandemic
25     hit the United States, all but shutting down its business.

1          As you can see from this -- I'm just trying to get

2     the next slide.  Lost it.  Some technical difficulties.

3          (Participants confer)

4          MR. LENDER:  Oh, great.

5          (Participants confer)

6          MR. LENDER:  Sorry.  One second.

7          THE COURT:  No, of course.

8          (Participants confer)

9          MR. LENDER:  Great.  Whoops.

10         (Participants confer)

11         MR. LENDER:  Okay.  Great.

12         As you can see from this company board document, in

13    March 2020, SSB's board of managers established an Independent

14    Finance Committee and appointed two independent managers to

15    the board, Joan Hilson and Harvey Tepner.  Mr. Tepner will

16    testify in this case.

17         The board ultimately designated full decision-making

18    authority to the Independent Committee concerning the

19    approval, negotiation, and implementation of a transaction to

20    structure -- to restructure SSB's debt or incur new financing.

21         Here are the minutes of the Independent Finance

22    Committee dated March 31, 2020, and here is the situation

23    overview that the board and its advisors discussed at the

24    meeting:

25         "Following a strong start to the year, COVID-19 has

1    had a material impact on SSB's and its customers' performance.

2    Current cash flow forecasts indicate the company may run out

3    of liquidity as soon as early July, necessitating an

4    evaluation of transaction alternatives to raise near-term

5    liquidity."

6          Looking to save the company and avoid bankruptcy was

7    the company's motivation, not to harm certain lenders.

8          This leads us to our second point, which is that SSB

9    engaged in a good faith competitive process to find the best

10   deal it could.

11         Starting in April 2020, the company was looking at

12   several alternatives to find near-term liquidity, given its

13   concerns that it could run out of money.

14         As you can see from the slide deck presented to the

15   Finance Committee, the company looked at all kinds of options,

16   including sale lease-backs, selling its interest in its

17   China JV, and raising financing from third-party lenders.  It

18   also believed that existing lenders could be the most likely

19   source of liquidity for a comprehensive transaction.

20         As a result, you will hear that, throughout April

21   and May 2020, Evercore, on behalf of the company, solicited

22   proposals from existing holders of SSB's debt and potential

23   third-party lenders and negotiated with those parties, trying

24   to get the best deal it could for the company.  This was all

25   done in good faith and in the open.  It was not being done to

1    harm one group of lenders or to favor one group over another.

2    Evercore's Roopesh Shah explained this to the

3    Independent Finance Committee at its meeting of April 10,

4    2020.  As you can see, Mr. Shah noted the object to the

5    engagement process was to obtain multiple proposals for any

6    transaction and enable a competitive process to obtain the

7    best terms available to the company.

8    Here is an internal Evercore email identifying some

9    of the parties Evercore reached out to concerning a potential

10   transaction.  This included several of SSB's existing lenders,

11   including Oaktree, Gamut, TSSP, and Angelo Gordon, and it also

12   included several third parties, including HPS, Fortress,

13   Centerbridge, Blue Torch, Pinko (phonetic), and Silver Point.

14   Now, at the time, Evercore was discussing an IP

15   co-financing transaction with these potential lenders.  As

16   Mr. Shah will explain when he testifies how an IP

17   co-transaction works is that you form a new company, move

18   certain of the company's assets, including its valuable IP,

19   into that new company and then you use those assets as the

20   collateral for the debt held in the new company by the

21   participating lenders for their sole benefit.

22   And then if there's a default, the participating

23   lenders alone are able to foreclose on that collateral that

24   supported the loans and get repaid.

25   Now at this point in time, in early April 2020, the

1    lenders represented by Centerview and Gibson Dunn, who

2    ultimately consummated the 2020 transaction with Serta, had

3    not even made a proposal.

4           However, you will hear that when these lenders got

5    wind of the IP code transaction that the company was

6    discussing with potential lenders, they got involved and made

7    a counterproposal that they believe would be better for the

8    company and not based on what it's lawyer's refer to in an

9    April 24th 2020 letter to Mr. Schrock as a predatory pricing

10   structure and on onerous terms.

11          Moving forward in time, here are the minutes of a

12   May 22, 2020 meeting of he Independent Finance Committee that

13   you will see during this trial.  Slide three from the board

14   deck summarizes the different outreach done by Evercore and

15   the pages that follow summarize the different terms Evercore

16   was negotiating with various lenders.

17          As you can see among others, Evercore was

18   negotiating with Angelo Gordon Group, Barrens, Fortress and

19   TPG, and Blue Torch Capital Oaktree and Charles Bank.

20          This slide how much of the 1-L lenders Evercore was

21   negotiating with.  As you can see, those lenders held nearly

22   1.4 billion of the first lien debt, representing more than

23   70 percent of the debt.  So the idea that this was somehow

24   being done by the company in secret is ludicrous.  The company

25   literally approached 70 percent of the existing market to try

1    to cut the best deal that it could.

2         Looking at the Angelo Gordon proposal, you can see

3    how similar it is to the 2020 transaction that they're now

4    challenging.  It had both a $200 million new money component

5    and an exchange component whereby $100 million of existing

6    debt would be exchanged at an exchange rate of 85 percent.

7         They also proposed exchanging an additional $493

8    million of existing 1-L debt at 85 percent and $42 million of

9    existing 2-L debt at 40 percent.  The structure was different

10   than the 2020 transaction in that the Angelo Gordon Group

11   proposal involved the IP Code transaction that I mentioned a

12   moment ago.  You can see that they proposed forming a new

13   entity and then certain valuable assets of SSB would be

14   transferred into that new company to serve as collateral for

15   the new loan.

16        But to be clear, the Angelo Gordon Group's proposal

17   had the exact same practical effect as the 2020 transaction

18   they are now challenging.  In both proposals, the parties were

19   providing $200 million in new money and exchanging their

20   existing debt for new debt at a discount.

21        In both cases, if there was a default certain

22   lenders would be favored over other lenders.  In the case of

23   the Angelo Gordon Group proposal, in the event of default they

24   would be able to foreclose on collateral that was made only

25   available to them so they would have payment priority over the

1        other non-participating lenders in terms of that collateral.

2              In the case of the 2020 transaction, a new -- the

3        new debt had superpriority status, but no collateral was

4        stripped away.  In fact, additional collateral was added for

5        the benefit of all lenders.

6              Angelo Gordon also knows that its claim that the

7        company somehow breached the implied covenant in a manner by

8        which it used $28 million of additional debt capacity to

9        acquire 1-L and 2-L debt at a discount after the transaction

10       was announced, has no merit.

11             Here's a debt presented by Angelo Gordon to the

12       company back in March of 2020 when they first disclosed the

13       details of their proposed IP code transaction.

14             You can see that it involves a new money piece and a

15       debt-for-debt exchange piece.  Just like the 2020 transaction.

16       And look at what they propose in the last bullet.  "Company

17       uses excess debt proceeds to opportunistic purchase 1-L and

18       2-L term loans in the open market for subsequent

19       transactions."

20             So Angelo Gordon was proposing that after SSB did

21       the debt-for-debt exchange with them, the company could go

22       into the open market and opportunistically purchase additional

23       debt.

24             This is exactly what the company did after it

25       announced the transaction, which Defendants now claim somehow

1          also violated the implied covenant of good faith and fair

2          dealing.

3                    And in fact, Your Honor, the evidence will show that

4          the company didn't just randomly decide who could participate

5          and who could not.  After announcing the 2020 transaction,

6          several lenders reached out to try to get in on the deal.

7                    As shown in this slide presented to the Finance

8          Committee at the June 20, 2020 meeting, $218 million of 1-L

9          debt and $105 million of 2-L debt reached out to try to get on

10         the deal.  Notably, LCM never reached out.  They just went

11         straight to litigation.

12                   The company only limited remaining capacity.  So it

13         couldn't let everyone in to the deal that asked.  But as you

14         can see from the slide, they were clear business rationales

15         for every single lender the company added, which was all

16         approved by the Independent Finance Committee.

17                   It's also interesting to see why Angelo Gordon

18         thought they could do an IP code transaction, which would have

19         benefited a select group of lenders, including them over

20         others, undermining the very equal treatment they claim is

21         paramount.

22                   Here is an internal Angelo Gordon debt concerning

23         their March 2020 proposal.  And look what they said.  It's

24         because Angelo Gordon believed they could exploit weak credit

25         documents to propose a solution to the company that favored a

1    certain set of lenders over others.

2            Let me now just turn briefly to the third point,

3    which is that the Independent Finance Committee evaluated the

4    various proposals and selected the best deal the company could

5    get.

6            You'll hear that as the negotiations proceeded, it

7    eventually came down to the PJT Angelo Gordon Group and the

8    Centerview Group.  Harvey Tepner, a member of the Independent

9    Finance Committee, will explain when he testifies that after

10   reviewing both proposals, the Committee decided to go with the

11   Centerview proposal because it was a better deal for the

12   company.

13           This slide summarizes some of those benefits,

14   including that the Centerview proposal resulted in less debt

15   and interest expense for the company.  And did not strip away

16   any collateral.

17           The evidence will also show that the 2020

18   transaction worked and the market responded favorably.  Here

19   is a demonstrative tracking the price of SSB 1-L debt.

20           After initially dropping in price, SSB's debt

21   rebounded and exceeded the pre-transaction price.  In fact,

22   the 1-L debt traded as high as 79, nearly doubled the

23   pre-transaction price before it began to fall more than a year

24   later due to the negative market trends and because Defendants

25   could not refinance their debt -- and because the company

1    could not refinance their debt.

2           Defendant's bought into the debt knowing full well

3    its terms and anti-subordination was not a sacred right and

4    amendments were allowed on majority consent of the lenders.

5           The 2020 transaction clearly benefited the company.

6    Without it, the company likely would have been fored to file

7    for bankruptcy back in 2020.  And the market responded

8    favorably.

9           Defendants received the fruits of the bargain,

10   significant interest payments for several years.  Defendants

11   could have sold their position as the debt price soared, but

12   they chose not to.  That was their decision, not ours.

13          Ultimately now, due to the market, the company

14   cannot refinance its debt and was forced to file for

15   bankruptcy.  But this doesn't render the 2020 transaction to

16   be one taken in bad faith.

17          And so we believe the evidence will show that

18   Defendant's claims has no merit and that the company and the

19   PTL Lenders acted in good faith.

20          At the conclusion of the hearing, we're going to ask

21   that you enter judgment in favor of the company and the PTL

22   Lenders holding that the 2020 transaction did not breach the

23   implied covenant of good faith and fair dealing.  And we're

24   also going to ask that you hold that Apollo was a disqualified

25   entity and not permitted to trade in SSB's debt.

1           Thank you, Your Honor.  With that, I both turn it
2     over to my colleague, Mr. Costna (phonetic).
3           THE COURT:  All right.  Thank you.
4        (Pause in the proceedings.)
5           MR. COSTNA:  Good morning, Your Honor.
6           THE COURT:  Good morning, Mr. Costa.
7           MR. COSTNA:  I think we might need to switch to the
8     center.  It's Mr. Herndon, Tim Herndon.
9        (Pause in the proceedings.)
10          THE COURT:  He'd be on as SH?
11          MR. HERNDON:  I'm sorry.
12          THE COURT:  How did you log on?
13          MR. HERNDON:  Tim Herndon.
14          THE COURT:  Oh, Tim Herdon, my apologies.
15       (Pause in the proceedings.)
16          THE COURT:  People list here.  All right,
17    Mr. Herndon, you should have control.
18          OPENING STATEMENT ON BEHALFOF THE PRIORITY LENDERS
19          BY MR. COSTA:  Gregg Costa, Your Honor, from Gibson
20    Dunn on behalf of the Priority Lenders.
21          Two pillars of our commercial law will decide this
22    trial.  The first is that businesses can rely on the words of
23    the contracts that they sign.
24          The second is that businesses have a duty to their
25    investors to pursue profit and protect against loss.

1          Both of these principals aren't just pillars of our
2     commercial law, they're pillars of our entire economic system.
3     And the evidence you're going to see and hear over the next
4     week will show that the Priority Lenders' conduct was
5     consistent with both of these bedrock principals.
6          They executed a transaction in 2020 that you've
7     already held was allowed under the plain words of the credit
8     agreement.  And the reason they entered into that transaction
9     was to defend against the serious downside risk posed to their
10    investors by a drop down proposal that would have wiped away
11    the critical collateral backing up loans.
12         For both of those reasons, the implied covenant
13    claim will fail after you've heard the testimony this week.
14         I'll start with what the evidence is going to show
15    on the first controlling principal.  That businesses can rely
16    on the words of the contracts that they sign.
17         The implied covenant doctrine doesn't override what
18    the parties agree to in the words of a contract.  Just last
19    month, the New York Court of Appeals recognized that the
20    implied covenant is a limited doctrine.  It doesn't allow a
21    part to come in and insert new terms that they wish they had
22    negotiated when they entered into the contract.
23         As the New York Court said last month, "The implied
24    covenant must arise from the contract itself."  But what
25    you're going to hear from the Defense is an attempt to

1    re-write the contract and to undo this Court's ruling that the
2    credit agreement allowed this transaction.
3          The Defendants are going to present testimony that
4    they -- it upset their expectations.  They couldn't imagine
5    something happening like the 2020 transaction.
6          But the expectations the parties should have under a
7    credit agreement should be based on what those sophisticated
8    parties wrote into the contract.
9          That's why borrowers, sponsors and lenders pay the
10   best lawyers money can buy to draft, negotiate and review
11   147-page credit agreements.
12         And here's the other thing about this testimony
13   about what a shock it was when the 2020 transaction happened.
14   You're going to see that that's not what they were saying in
15   the real world, back in 2020 when these events were unfolding.
16         Let's take a look at what some of the Defendants
17   were saying in early 2020 before they were in the litigation
18   posture.  We'll start with Apollo.
19         March of 2020, Apollo described the credit documents
20   as loose and recognized they allowed for an aggressive
21   restructuring.  Angelo Gordon was saying pretty much the same
22   thing.  That the credit documents were weak, could be
23   exploited.  And that there was a liability management
24   possibility to delever via debt exchanges, which is exactly
25   what ended up happening.

1            Angelo Gordon also -- can we have the slide to go --

2      recognized that the credit agreements stripped standard first

3      lien protections.  And they recognized the possibility of a

4      liability management solution.

5            In fact, they were proposing their own.  And

6      specifically they recognized the exact mechanism that the 2020

7      transaction would end up using.  Section 9.05(g) of the credit

8      agreement.

9            Company uses a portion of debt proceeds to purchase

10     loans at a discount to par and then cancel the loans under

11     9.05(g).  So you'll see that the Defendant's own words show

12     that the emergence of liability management solutions in 2020

13     didn't upset contractual expectations, it was the contractual

14     expectations.

15           So this evidence is going to show that the implied

16     covenant claim fails because the words the parties agreed to

17     allow the 2020 transaction and set the parties' expectations

18     for what might be possible.  But if that doesn't defeat the

19     claim on its own, any doubt will be removed by the second

20     principal I started with.

21           Businesses have a duty to protect their investors

22     from losses.  Now New York law incorporates that principal

23     into the law of good faith and fair dealing by recognizing

24     that a party acts in good faith when it has a valid business

25     justification.

1          And here, both the company and the Priority Lenders

2     didn't just have valid business justifications, they had

3     business imperatives entering into the 2020 transaction.

4          For the company, as you just heard Mr. Lender say,

5     it was a matter of self-preservation.  In the depths of the

6     COVID pandemic, the deal infused new cash and allowed the

7     company to delever its balance sheet to the tune of hundreds

8     of millions of dollars.

9          And for our clients, the Priority Lenders, it was a

10     matter of self defense.  The deal was a defensive maneuver

11     that prevented other lenders, including a number of the

12     Defendants, from executing a drop down transaction with a very

13     serious down side risk for their investors.

14          The law doesn't require lenders to just sit back and

15     twiddle their thumbs when facing such a serious threat.  To

16     the contrary, lenders have a fiduciary duty to act and protect

17     their investors.

18          Now the Priority Lenders would have acted in good

19     faith even if they had unilaterally proposed the uptier

20     transaction.  Last time I checked, businesses were entitled to

21     pursue their self interest.

22          And the law recognizes that by saying that good

23     faith exists any time a company acts in pursuit of its self

24     interest.  There actually has to be malice that motivates the

25     business decision instead of self interest.

1          But this is going to be an even easier case, Your

2     Honor, because our clients didn't move first.  A group lead by

3     Angelo Gordon did.  And in fact, our clients weren't excited

4     about the prospect of selling their loans at a steep discount.

5          But they decided they had to do it to fend off the

6     drop down transaction that was going to strip away this

7     valuable collateral.  Just like people, businesses act in good

8     faith when motivated by self defense.

9          So I'm going to go through the timeline of events.

10     And this chronology will show that our decision to enter into

11     the 2020 transaction was a defensive maneuver to fend off the

12     risk posed by the Angelo Gordon Group's drop down proposal.

13          From our clients' perspective, the story begins in

14     the final quarter of 2019.  Serta is facing economic

15     difficulties.  Mattress Firm has been in bankruptcy.  Stores

16     selling Serta mattresses have closed and revenue is down

17     10 percent over the prior year.

18          Angelo Gordon picked up on this and by early 2020 --

19     January of 2020, Angelo Gordon is already putting together a

20     drop down proposal, the IP code transaction that Mr. Lender

21     discussed.

22          Fast forward a couple of months to March of 2020.

23     the pandemic hits the United States, stores are closed, the

24     company as to furlough workers and it appoints a Finance

25     Committee to begin looking at potential refinancings.

1          Now also in this time, early to mid-March when the

2     market is down, both Gamut and Apollo are buying up Serta debt

3     at very low prices.  It's not until the end of March that a

4     group of Priority Lenders starts to come together to coalesce

5     into a group that our firm will represent and that wants to do

6     something to help support the company during this time.

7          But by the end of March, right after the Finance

8     Committee is put together, Angelo Gordon emails its proposal

9     because it had already been in the works for a couple of

10    months.

11         Now we go into April of 2023, the Priority Lenders

12    continue to consider a proposal, but at this time our clients

13    thought the company just wanted new money financing.  So in

14    late April, we submitted a proposal that would have injected

15    new money into the company.

16         It was a new money superpriority financing, back

17    stopped by the Priority Lenders in exchange for a back stop

18    fee, but otherwise available to all first lien lenders.

19    Nothing controversial about that proposal.

20         Meanwhile, Angelo Gordon, Apollo and Gamut are

21    continuing to push forward with their drop down proposal.

22    There's other proposals at this time.  Berrings (phonetic)

23    decides as a large lender that it's going to put together it's

24    own drop down proposal to maximize it's upside.

25         And by late April rumors or circulating in the

1      industry about an aggressive drop down proposal.

2              Now at some point -- excuse me -- some point in May,

3      the Priority Lender groups learns that in addition to a new

4      money financing, the company is also interested in delevering

5      its balance sheet and that the drop down proposal was going to

6      be paired with a debt-for-debt exchange that would allow for

7      that deleveraging.

8              So, rather than sit idly by while other lenders try

9      to strip away this critical collateral, the Priority Lender

10     group moved forward with a proposal that would be more

11     favorable to the company than the drop down proposal.

12             So in May our clients and their advisors enter into

13     NDAs with the lenders.  Now our clients decided to include the

14     debt exchange reluctantly.  They had bought company debt at

15     par.  So selling in the 70s, which is the price people were

16     walking about, was going to lock in losses, something our

17     clients didn't want to do.

18             Now on the other hand, the Angelo Gordon proposal

19     was a win-win for its side.  It was going to give them

20     structural priority on the new debt and because they had

21     bought Serta debt at such a discount on the secondary market,

22     they were going to achieve gains on the sale.

23             So why were the Priority Lenders willing to take a

24     haircut on the 1-L debt and sell at a significant?  Well, even

25     though they were'nt excited about it, the fear of the drop

1    down transaction loomed large.

2          And you're going to see as we get into the nitty

3    gritty of the negotiations into late May -- see if you can

4    pull that up.

5          By late May and early June both groups are trading

6    back and forth proposals with the company.  And by June 4th,

7    you're going to see that the company comes back with a

8    counterproposal asking to buy back the debt at 74 cents.

9          And a lot of the lenders group thought that --

10   preferred lenders thought that was already too low.  But

11   you'll see emails, you'll hear testimony that they were

12   willing to go to 74 cents ultimately because the alternative

13   was just too dire for their clients and the investors.

14         That the fear of a drop down motivated the Priority

15   Lenders to agree the low buy back price of 74 cents.

16         And by early June, the company's Finance Committee,

17   vets the proposals and determines that the Priority Lenders

18   proposal was the best on virtually every metric that mattered.

19         So on June 4th, that's when the final negotiations

20   took place.  The next day the company selects the Priority

21   Lenders' proposal as the deal and in the following days the

22   term sheets are signed.

23         So this timeline will show you, Your Honor, why the

24   2020 transaction was a matter of self defense for the Priority

25   Lenders.  If they hadn't pursued it, the drop down transaction

1    likely would have prevailed risking a severe downside for our

2    clients with disastrous consequences in the event of a

3    default.

4          And one more thing about the unsuccessful drop down

5    transaction that the Angelo Gordon group put together,

6    everything they complain about and cite is bad faith in our

7    transaction, existed for their proposal.

8          So for example, they criticize our proposal for

9    relying on the open market purchase provision, but the same

10    was true of their proposal.

11          They challenge our transaction because it was

12    privately negotiated.  But so was theirs.

13          They complained because our deal required a new

14    credit agreement.  But so did theirs.

15          They challenged ours for limiting participation, but

16    there's limited participation to an even greater degree.

17    Their deal only allowed a minority of lenders to participate.

18          They argue our deal is done in bad faith because

19    only the preferred lenders were able to gain priority status.

20    But, of course, the same was true of their deal.  That's why

21    they did it.

22          And finally, Your Honor, they argue that the debt

23    was repurchased -- the fact that the debt was repurchased at a

24    prices above the secondary market trading price means ours was

25    done in bad faith.  But of course, as you can guess by now,

1        the same was true for their deal.

2                Now speaking of the goose and gander rule, you'll

3        also hear evidence that Angelo Gordon and Apollo have engaged

4        in transactions with other companies in which they benefitted,

5        but other lenders did not have a chance to participate.  The

6        way thing they are complaining about here.

7                Angelo Gordon helped finance a restructuring for

8        Envision Healthcare in which existing lenders stepped ahead of

9        other lenders of the same class in the payment waterfall.

10               And in Mitel (phonetic), Apollo exchanged certain

11       first and second lien debt for new debt with structural

12       priority in an uptier transaction not open to all existing

13       first and second lien debt holders.

14               So the evidence is going to show that the

15       understanding these Defendants expressed in the board room of

16       what credit agreements allow, is different than what they

17       argue in the courtroom.

18               To sum up, Your Honor, your ruling that the credit

19       agreement allowed this transaction alone is enough to defeat

20       the implied covenant claim because businesses are allowed to

21       rely on the words of a contract.

22               But if there's any doubt about that, the evidence

23       you see this week will show that the Priority Lenders acted in

24       good faith.

25               In fact, their conduct in entering into the 2020

1          transaction was motivated by the most fundamental business

2          justification of all.  The need to protect investors and

3          enforce -- and follow through on that fiduciary duty.

4                      We look forward to presenting the evidence that will

5          show that there was no bad faith here just good business

6          judgment.

7                      And Your Honor, that wraps it up on the adversary.

8          But there are a couple points on the confirmation I wanted to

9          discuss and Mr. Greenberg will discuss them in more details at

10         closing.  And we responded to these confirmation objections

11         yesterday in our filing at Document 886.

12                     But just briefly to address the indemnity challenge

13         that the Defendants in Citadel are bringing.  There's a number

14         of responses we have, but the one I want to point to today is

15         that their mistakenly characterizing that going forward

16         indemnity is a continuation of the pre-petition indemnity

17         obligation.

18                     And in fact, these are new bargained for indemnity

19         obligations that our clients and the Debtors bargained for as

20         part of a package that would allow the company to move

21         expeditiously through bankruptcy, to not wait for appellate

22         process to play out and as part of that the PTL Lenders agree

23         to equitize the significant amount of their debt.

24                     So the Debtors' agreement to these new

25         indemnification obligation is a valid exercise of their

1   business judgment and not to mention is entirely standard in

2   bankruptcies, especially those involving take back debt.

3          The second point on confirmation Citadel objects

4   that the plan is in feasible given the ongoing litigation and

5   the risk that the lenders may make a claim under the

6   go-forward indemnity obligations.

7          But that argument relies on their entirely

8   speculation -- entirely speculative calculation of damages,

9   which are significantly overstated and of the potential

10  adverse result on appeal.

11         So those speculative future impacts do not alter the

12  fact that this Reorganized Debtor will be on sound financial

13  footing leaving them well positioned to deal with future

14  financial success.

15         There's been no finding of liability against our

16  clients or the Debtors by any court whether here or by the

17  State Court in New York or by the Federal Court in New York.

18  So the concept that a potential future judgment with damages

19  no one has ever even attempted to calculate, the idea that

20  that prevents confirmation from a feasibility standpoint just

21  doesn't hold up.

22         But again, we'll deal with that more thoroughly at

23  the closing arguments next week.

24         Thank you, Your Honor.

25         THE COURT:  All right.  Thank you.

1          All right, anyone else that supports confirmation

2    wish to make an opening statement?

3          (No audible response.)

4          THE COURT:  All right, those parties opposing

5    confirmation?

6          Good morning.

7          MR. SEILER:  Good morning, Your Honor.  Eric Seiler

8    for the Excluded Lenders or the non-Priority Lenders,

9    depending on which side is describing us.

10         And there are others who are here aligned with my

11   interest who are going to make a brief opening as well.

12         THE COURT:  Absolutely.  Absolutely.

13         MR. SEILER:  So, they have their own interest, but

14   are opposing something.

15         Before I start, I didn't want to interrupt the other

16   side, just to note.  There are a couple of things in the

17   schedule that Mr. Schrock proposed that are actually different

18   from the schedule we worked out.  I'm sure we'll work it all

19   out.  But that's not for now.

20         But the other thing that we did agree that the

21   witnesses would be sequestered.  And in my opening --

22         THE COURT:  So the parties agreed to invoke the

23   rule?

24         MR. SEILER:  We did.  The rule, I learned that when

25   I was young.  The rule.

1          I said what's the rule and they said you don't have

2     to be a lawyer.  Anyway, we did and so I know that they said

3     that Mr. Shaw is here from the opening.

4          There's some things I would talk to you about that I

5     wouldn't want him to hear.

6          THE COURT:  But he's an expert, right?

7          MR. SEILER:  No, no.  He's a fact witness.

8          THE COURT:  He's a fact witness.

9          MR. SEILER:  He might have expertise, but he's a

10     fact witness about the events that occurred.

11          THE COURT:  Mr. Welch, or whose taking the lead on

12     that?

13          MR. LENDER:  So he's -- Your Honor, David Lender for

14     the Debtor.  So he is both a fact witness and an expert.  He's

15     an expert on evaluation issues and I don't know whether

16     that's --

17          THE COURT:  So, let's me just do it the simple way.

18     Was an expert report provided?

19          MR. LENDER:  We submitted the Declaration for him

20     last night.  That's what we were going to move into evidence

21     for his direct testimony on the expert issues.  But

22     Mr. Seiler, the scope of what Mr. Seiler is going to get into

23     is probably not those expert issues.

24          MR. SEILER:  What I'm going to talk about is nothing

25     to do with evaluation or the details of the exit financing

1     economics.  It's entirely to do with his involvement in the

2     timeline that you just saw.  And there's some things that I

3     think he has admitted that I don't want him to hear in my

4     opening.

5              THE COURT:  What I would ask that we do -- and

6     Mr. Shaw, where are you?  Ah.  So Mr. Shaw, I'm going to ask

7     and do we have a member of the Weil team find a place for

8     Mr. Shaw where he's out of ear shot?

9              And then please, when we get to the point where we

10    have gotten past those issues, just deep breath tell me.  So

11    that to the extent that's -- there are expert issues that are

12    going to be made and the commentary he's entitled to obviously

13    hear those, although I still didn't get good answer to did you

14    get an expert report?  That's how I measure whether or not

15    you're serving as an expert.

16             MR. SEILER:  So just to be clear, the things that

17    I'm going to talk about are -- I'm not going to talk in my

18    opening the valuation at all.

19             THE COURT:  all.  Okay, so then --

20             MR. SEILER:  And so, he doesn't need to.  And we

21    received a I would call a Declaration that had the valuation

22    report yesterday.  And I don't think we're challenging the

23    valuation information is my thought.

24             MR. GIBSON:  Hi, Your Honor, Lee Wilson of Gibson

25    Dunn on behalf of the Priority Lenders.  I'm pretty sure that

1    our witnesses were all told not to Zoom in, but to avoid any

2    issue given that the rule has been invoked, to the extent that

3    any of the testifying PTL Lenders or Mr. Chopra are on the

4    video, please drop now.

5              THE COURT:  So let me ask if you are -- let me do it

6    this way.  If you've been told that you are going to be a fact

7    witness and you are on line, I need for you to disconnect now.

8    And I will expect the lawyers to ask that as the first

9    question when they are sworn and take the stand, whether in

10   person or virtually.

11             All right.  And Mr. Seiler, did you have a tech

12   person?

13             MR. SEILER:  I do, Emilio.

14             THE COURT:  And how are you logged on, sir?

15             MR. EMILIO:  Emido.

16             THE COURT:  That makes it easy.  All right, you

17   should have control.

18             OPENING STATEMENTS FOR THE EXCLUDED LENDERS

19             BY MR. SEILER:  Good morning again, Your Honor, Eric

20   Seiler for the Excluded Lenders.

21             And what I argued on the sumary judgment motion, the

22   Debtor and the Priority Lenders didn't have a slide deck and I

23   did.  And I lost.

24             And so today I thought since they have slide decks,

25   I would just talk to you for awhile about what I think we're

going to show in the case.  Maybe that will reverse my luck.

So, -- and I think in listening to the openings there's a lot that we don't disagree about here.  For example, we don't disagree that Serta was challenged and it was more challenged during COVID.

And that it needed new money.  And I think we saw that everybody who was talking to them, understood that and offered new money.  In fact they ended up offering the money that Serta said they wanted, around $200 million.

And we also know that the transaction that was entered into, the uptier transaction, I think was the first of its kind.  I'm going to talk about that more in a second. But the company was seeking new money and was exploring with everybody else drop down transactions.

Indeed, they would have been happy to explore it with the Priority Lender group except that -- and I think you heard the economics -- they thought they were less inclined to want to do it because most of them has bought their debt at par.  Whereas, other people had bought their debt in the market.  But that doesn't make the clients who bought it in the market bad.

Indeed, you're going to see in some of the documents, you'll see in the case that Evercore understood that that made them more open to doing something that was helpful and they wanted to take advantage of that in the

1    negotiations.

2         And I'm not complaining -- we're not complaining

3    that they couldn't talk to multiple people.  But we ought to

4    look at what the evidence will ultimately show, which is who

5    talked to who about what and when?

6         And that's the part of the timeline that's going to

7    be important.  And in the beginning -- I mean, and it's true

8    Angelo Gordon was thinking about participating in a drop down

9    transaction even before the company reached out to them and

10   Bearings and other people and Oak Tree with the same idea.

11        Why was that?  Because people had done drop down

12   transactions.  And they hadn't done the uptier transactions.

13   And so they talk about the claims that are now still in the

14   case.

15        And I want to be really clear.  I'm not here to

16   reargue your decision on open market purchase.  That's the

17   decision in this case.  Some judgments were granted.  The

18   fifth circuit will hear it some day, but that's not for us.

19             THE COURT:  Okay.

20             MR. SEILER:  I am here to say that what was left in

21   the case, good faith and fair dealing, and also the

22   disqualification issues of Apollo that should have -- need to

23   be resolved.  That's why we're here.

24        There are times when some of the facts for good

25   faith and fair dealings sound like facts that might or might

1     not have been relevant on the open market purchase question.

2     I can't help that.

3           But we're not trying to argue the other and we're

4     going to -- and as an example -- and this is some place we

5     also seem to agree.  We started to use the language the fruits

6     of the contracts and if you read their briefs that came last

7     night, they talk about the fruits of the contracts.

8           It's interesting because the company says well the

9     fruits are getting their interest paid for the next two years.

10    And certainly that was a fruit of the contract is to get

11    interest and hopefully principal pay.

12          But another fruit of the contract is what happens if

13    the company gets into trouble and needs to restructure and go

14    into bankruptcy.  What happens then?  And the contract had

15    provisions that said what happens then.  It said that the 1-L

16    holders should be treated prorata, *pari passau*, and it said if

17    one of the lenders get some money or some consideration that

18    the others don't get, they have to redistribute it.  That's

19    218(c).

20          Now, Your Honor's ruled that the open market

21    purchase exception allows non-prorata treatment.  But if the

22    fruit of the contract is getting prorata treatment, and if

23    together the company and the lenders change a bunch of other

24    things to defeat a reasonable objective exception of getting

25    that fruit, that's a good faith and fair dealing claim.

1        And what I hope to do in the opening is show you the

2   kinds of evidence you're going to get to hear.  And then after

3   the trial is over in the Findings and Conclusions and I think

4   a post-trial brief, we will address the very detailed brief

5   that Gibson Dunn put in, which is basically saying again, "We

6   can't bring this claim because it's preclude by your contract

7   position."

8        I thought that was wrong before on Summary Judgment.

9   I still think it's wrong.  I think there's room for a good

10  faith and fair dealing.  But I recognize we have to convince

11  you whatever the evidence shows that we've fallen into that --

12  they did a bunch of things.

13       Some of them we think were done with some finality

14  and I'm going to point those out of the next few days.  But

15  that those things make you decide even though the contractual

16  language on its face isn't the breach, they still imply the

17  covenant of good faith and fair dealing.

18       And to be clear, obviously we've appealed the other

19  decision and if that changes, that changes.  But for this case

20  that's the law and we understand that.

21       And so -- and I should also say we agreed to

22  bifurcate damages.  And so I saw the chart that showed that,

23  well, the prices went down after the deal was announced, but

24  then there was later time that the prices went up.

25       I actually think that's a chart of indicative

1   prices.  I don't know what evidence they're going to use to

2   put that in.  There's not going to be, I don't think, any

3   proof that the volume of debt that our clients held could have

4   been sold at those prices subsequently.  I think that's

5   relevant to damages.

6          I think damages are measured at the time of the

7   breach, not later. But that's all for naught for this case.

8   And I would point out, one one of the things they did to our

9   clients was they put them all on the DQ list in June of 2020.

10  So we have clients that couldn't buy more debt to take

11  advantage of the movement of price.

12          And with Apollo they had a cloud over their holdings

13  because they said they are DQ'd before hand.  So they maybe

14  only had participation rights.  So if they were going to be in

15  a position to take advantage of some subsequent sale, they had

16  a cloud that they shouldn't have had.

17          I say, well, I don't think that's really part of the

18  case, but Mr. Lender showed -- I'm sorry, Mr. Costa showed

19  that chart and I don't -- and I think it's going to be hard to

20  prove that that chart was really available, but I just wanted

21  to remind the Court that damages are bifurcated.

22          And so now what I would like to talk about is, well,

23  what is it that -- no I think I've talked about that.  I want

24  to talk about what is it that we had and I guess I just

25  emphasize this.  The -- whatever the rights are, we had to

1    prorata treatment and to avoid what they did, they were all

2    agreed to be sacred rights.

3         So most contracts are implied covenant -- breach of

4    covenant good faith and fair dealing, it's just a contractual

5    right.  Here to right that requires unanimity to be overcome

6    and everyone in the industry refers to it as a sacred right.

7         So it would seem to me that if you would do

8    something that could be a breach of the implied covenant

9    against a normal contractual right, it's even more pronounced

10   when it has to do with what's agreed to be a sacred right.

11        And that's what we say happened in the transaction

12   and we went through a whole transaction before.  I know the

13   Court is familiar with it.  But one thing that hasn't been

14   mentioned today is it had this extra little wrinkle to it,

15   which was that so you have new money -- and that's the

16   superpriority -- you have the exchange, which now becomes the

17   priority loans ahead of us.

18        But they all agreed on another provision, which was

19   if the company needed more money, it would come in below them

20   and above us.  So there could be second liens, third liens,

21   fourth lien, fifth lien.  If the company hadn't gone into

22   bankruptcy in 2023, we could have been further and further and

23   further down the curve.

24        And their deal gave that right to the company.  It

25   didn't hurt them, but it undermined yet another expectation of

1    ours that we would be treated a certain way.  And even the

2    deal they let the 2-Ls jump over us.

3          So it wasn't only that they undermined the prorata

4    treatment we were entitled to, but they let the 2-L's jump

5    over us.  And I think -- so the question is, well, you should

6    have expected that.  That's their argument because you had

7    loose documents.  Loose documents that allowed an IP code

8    transaction in which the company was asking for.

9          But let's be clear, no one had ever done a priming

10   facility with a debt repurchase at a discount in a contract

11   that had a waterfall with a prorata requirement that requires

12   unanimity.  You're not going to hear anyone tell you that that

13   had ever happened before.

14           Mr. Chopra's deposition said he'd never heard of

15   it.  I don't think Mr. Shaw will say it ever happened before

16   either.  I think the parties didn't expect that that could

17   happen.  I think it will be viewed as a first of its kind

18   transaction in the leverage loan market.

19          Now it might be that that doesn't matter.  And Your

20   Honor might decide well, but these other things were sort of

21   like it.  So, this is just something that's different.  But

22   we -- something that is one of the -- that already existed.

23          And we're not trying to argue at the end of the case

24   that the differences do matter.  But the fact shouldn't

25   confuse us.

1          Nobody had ever done this before.  Now, since people

2     have done it.  There are differences there, too.  And now

3     we're going to, I guess, talk about Envision, which apparently

4     was filed and is across the hall from you, I'm told.  So you

5     won't have to wrestle with two of them, and Mitel.

6          And I predicted in the summary judgment there are

7     going to be more them.  Because we didn't get an injunction in

8     2020.  And so people said, ah, and now you've ruled on open

9     market purchase, which is important in the literature and is

10    going on.

11         So I think whatever happens in the future doesn't

12    tell you what the expectations were in 2020.  And indeed, I

13    think it's the expectations in 2016 that matter when the loan

14    agreements that we're talking about being violated were made,

15    but it certainly 2020.

16         And so anything that happened afterward doesn't

17    count and I don't think there's any suggestion it happened

18    earlier.

19         So let me talk for a minute about the drop down that

20    we were exploring because there are some differences.  First,

21    the company requested the proposals even though Angelo Gordon

22    was thinking about it before that.  Drop downs had been done

23    in other transactions.  Amendments to the loan documents were

24    not needed in the same way.  Yes, there was a new credit

25    agreement, but the kinds of amendments that you're going to

hear they put in here weren't required.  There's I don't think
any evidence that we saw at the special indemnity, and I'm
going to talk a fair amount in a few minutes about the
indemnity.

And the Gibson Dunn group could have proposed a drop
down transaction, too, they could have proposed to be included
in ours.  Yes, the modeling showed it not being taken by
everyone, and they might not wanted to have been in it because
they didn't want to trade debt at a discount because they'd
bought their debt at par.  But we don't know because the
final -- the evidence is going to show that the final terms of
the Angelo Gordon drop down proposal was never reached because
the company chose to go in a different direction.

And it never -- and do we had two parallel
negotiations going on.  One with our group and others like us
and one with their group and Bering's allowed to jump between
the two groups at the end.  Because why?  Because to do their
deal you needed 50.1 percent approval to get the amendments.
They didn't have 50.1 percent in their group.  They had 39 at
the end, and they needed more.

And so the company chose to let Bering's, who had
started in their group talk to us in the middle, made its own
proposal, left and joined them along with Oak Tree to get over
the top.  It doesn't make that opportunity available to our
group.  They could have said to our group, "Well, you have

30 percent or so" is what we had, that's too much because we don't want to be way over 50.1.  But they could have said, "Well, we'll let you in halfway."

There were other things they could have done to try and make this available to everyone.  And I'm going to ask Mr. Shaw and Mr. Chopra about those decisions at the end and why they didn't actually have competition over the thing they ended up doing.  Who was willing to give the biggest discount contingent on putting new money into the company at the level that's required and maybe even rewarding the priority group lenders who had led the way giving them some kind of premium for having stood there, of if they're the backstop, because that's what happens in other deals, paying them for being the backstop, but making it open to everyone, which is what they had proposed in the beginning.  And that's the problem, that they didn't do any of that, and I think those are the differences.

So I think you're also going to see evidence that some of the motives and tactics implied both by the company and by the lender group are evidence of bad faith, or at least the absence of good faith and fair dealing.  You'll see some evidence that some of them at least saw our group as a stalking horse and they really hoped to use us to leverage against their group.  You'll see that in some of the decks that we're going to show you.

1          And you're going to hear evidence that Advent, which

2     owned Serta, was the controlling shareholder and Mr. Prince,

3     they didn't really want to do a deal that involved Apollo

4     because they were competitors and they didn't want to have a

5     credit where Apollo had an interest.  So and that of course is

6     part of the story behind the DQ.  Apollo is viewed as someone

7     you could negotiate with, but we don't really want them at

8     all.

9          So you're going to see evidence that talks about the

10    role of Apollo, and I think what you'll conclude is,

11    respectfully, that we were only an option if the other option

12    fell apart.  So we were the stalking horse to get the other

13    option more motivated, but we were only an other option if the

14    option fell apart.  And there's going to be a lot of evidence

15    about who got to be in and who got to be out of it.  I'm not

16    talking about subsequent purchases, those are fine.  I'm

17    talking about who got included in the transaction that they

18    needed to get the 50.1 percent.

19         And so we're going to point to that as an improper

20    process, not the beginning, not through the April, the end of

21    April, but in May, the very end of May and the fist of June,

22    and then we're going to show which provisions they tweaked to

23    make sure they got what they got, and there's some evidence --

24    we're going to show you improper communications with third

25    parties that I'll wait till we show them to talk about their

1    significance.

2         And, but the one thing I do want to talk about now

3    is the indemnity because it relates both to the confirmation

4    issue and to the good faith and fair dealing.  And we should

5    at least agree on what it is, and I think with the help of

6    Emilio, I will be able to do that with exhibits that will come

7    in.  I'm hoping, because I've been schooled by Porter Hedges

8    people about how to refer to exhibits for the case, so I'm

9    going to try my best to get it right.

10        THE COURT:  I makes the Record work better.

11        MR. SEILER:  Well, I know that.  So I'm going to

12   want to have to bring up Adversary Proceeding ECF 248-7, which

13   is also Defendant's Exhibit 7, and let's see if -- so this is

14   the old loan agreement and if we can look at -- no, we got to

15   go to the prior page.  Let's just make sure we're on the

16   right -- you can see the beginning and down at the bottom we

17   can see 903(b), so let's scroll down.  There we go, and let's

18   bring it up so we can see it.

19        So in each of these -- so this is the old loan

20   agreement, and it has an indemnification for all kinds of

21   losses, claims, damages and liabilities including fees.  So

22   let's go to the second page now, which is the intro.

23        Now, and there's a long discussion, anything to do

24   basically with the entry and execution, delivery or operations

25   under the loan documents, but then there's a provided.  And

1    the provided's about 10 lines down now, it's in the middle of

2    your screen.  "Provided that such indemnity" -- you went too

3    far, come back just a little, there we go -- yeah, "is not

4    resulting from the gross negligence, bad faith or willful

5    misconduct of any such indemnity, or to the extent such

6    judgment finds any such loss, claim, damage or liability has

7    resulted from such person's material breach of the loan

8    agreements."

9         So you have a carve out from a broad indemnity for

10   the usual things, gross negligence, willfulness, bad faith, or

11   a material breach of the loan documents.  And if that were the

12   indemnity that we had here, I think Citadel still objects to

13   there being any indemnity and I'm not trying to interfere with

14   that, but at least that's an indemnity that would allow my --

15   if I win my claim against the lenders, either because they

16   made a material breach if we win on appeal in the 5th Circuit

17   and it went on remand, or we win on bad faith, if bad faith --

18   bad faith, I should be honest with this, bad faith is not

19   necessarily the same as absence of good faith and fair

20   dealing, but if we win absence of good faith and fair dealing

21   enough that we've shown bad faith, then this indemnity

22   wouldn't apply.

23        And that's why the lenders care about it.  And I was

24   surprised, before I show you the next one, to read in the

25   Gibson Dunn brief filed yesterday noon on page -- the last

1    page, 56, I don't think it has an ECF number that I can point

2    to.  I'll just read what they say.  They say this is

3    Paragraphs 127 and 128 of their brief, they say, "The plan

4    merely continues pre-existing and long-standing

5    indemnification protections.  Serta agreed to indemnity all

6    lenders against any losses, claims or liabilities arising out

7    of, in connection with, or as a result of their performance

8    obligations under the 2016 contract."

9         That indemnification carried over to the PTL loan

10   agreement and proved warranted because they were sued and then

11   they say, "Indemnification like the one Serta provided to the

12   PTL Lenders are included in credit agreements as a general

13   rule.  This plan carried -- thus carries over the same

14   indemnification protections that are common practice in the

15   industry."

16        If that's all they'd done, that would all be true.

17   But that's not what they'd done, and that's why when Mr. Shaw

18   puts in his confirmation order to the Court, he talks about

19   the new credit facility being on market terms, but then he

20   says, "I understand the indemnification provision was a

21   central component and condition to the PTL Lenders' support

22   for the plan and the overall settlement, which is what you

23   heard in the opening.

24        So now let's look at the difference, and it's 19

25   words.  If we can now bring up -- where did I lose the --

1     well, you know what it is, I'm going to say it for the Record

2     though.  ECF 254-16 -- oh, here it is -- in the adversary

3     proceeding.  And it looks -- we need to get to the right page,

4     which is, I think it's B, come down to that, so B starts at

5     the end, go down to the bottom a little more so the Court can

6     see it.  It's the same beginning of the indemnity, the same

7     scope, and then we turn to the next page, and let's blow it up

8     a little bit, we'll find the same proviso with the same carve

9     out, other than such as loss or claim resulting from a

10    material breach, but then after the word loan documents we add

11    19 words, "Excluding in each case for the avoidance of doubt

12    any indemnity's participation in the exchange transactions and

13    the transactions.  Exchange transactions are the 220 deal --

14    2020 deal.

15            So we have a carve out and then we carve out from

16    the carve out, or accept from the carve out this deal, so

17    there's no longer a carve out.  So if we win and this is the

18    indemnity, which is now the indemnity in the exit financing

19    because they're not trying to run it through the plan, I

20    think, they've changed their tactic on it.

21            Then the company had to pay them.  So if we win that

22    they acted in bad faith, or we win that they committed the

23    material breach of the loan documents in 2016 by doing this

24    deal in 2020, then they're going to come to the company post-

25    bankruptcy and say, "You owe us $200 million or $300 million

1    or $12," whatever it turns out that we win.

2          THE COURT:  Right.  And help me -- if you've been

3    paid, which is the only thing that would trigger the

4    indemnity, why do you care?

5          MR. SEILER:  So I -- well, I care -- well, because

6    I'm not in the company, that's a fair point.  I guess I care

7    because they're insistence on having this in the plan so for

8    me this --

9          THE COURT:  I'm not criticizing, I'm just trying to

10   understanding economically because the way I read that is that

11   it never gets triggered until -- I think I heard you at one

12   prior hearing say, "We'll take $600 million," it may have been

13   Mr. Herman, I don't remember which --

14         MR. SEILER:  He always wants more money.

15         THE COURT:  Yeah, he always wants more money.

16      (Laughter.)

17         THE COURT:  But if it was once you've been paid

18   your, let's call it $600 million, then why do you care?  So

19   Mr. Herman just told you what the answer is.

20      (Laughter.)

21         MR. SEILER:  Well, okay, we get 1 percent of the

22   company in the plan so we care a little, that's one answer.

23         THE COURT:  Okay.  But I mean --

24         MR. SEILER:  Even if by voting no, we still get

25   1 percent, so if the company has to pay in the future, that

1     hurts us.  I think people like Citadel care more because they

2     weren't the old --

3             THE COURT:  I have a different question for them.

4     I'm just trying to understand why you care.

5             MR. SEILER:  Well, we -- I think we care for that

6     reason, and but we also care because of the insistence on this

7     provision, it was an extra provision that forced everyone to

8     do this deal this way.  I mean, what the --

9             THE COURT:  All right.  So let's take a step back,

10    because -- I mean, and I saw the difference and, you know, I

11    made the comment earlier, I think it was to Mr. Shrock about

12    I'm going to see testimony about business judgment and why it

13    was done the way it was done.  That's why I made that comment.

14            And so I'm just -- and because of the change there's

15    going to have to be -- there's going to have to be some fairly

16    persuasive testimony on that issue or there was a give and a

17    take and here's what we got and this is why we gave that up,

18    whatever it turns out.  I don't -- I haven't the foggiest

19    notion what it's going to be.

20            But I'm still trying to understand economically, and

21    because you're not in this for 1 percent of the company if you

22    get a $600 million judgment and they have to pay.  I'm just

23    trying to understand economically why you're -- why you care

24    about this.  I mean, if you just tell me because it's a

25    technical confirmation objection, I got that, and I always

1     appreciate honesty.  If there's something else, I'm genuinely

2     trying to understand.

3          MR. SEILER:  Well, it shows that they knew that

4     there was a problem.

5          THE COURT:  So let's --

6          MR. SEILER:  That's one thing.

7          THE COURT:   -- it shows -- who's they?

8          MR. SEILER:  The lenders.  It shows that the

9     Priority Lenders appreciated that notwithstanding how things

10    have turned out since Your Honor ruled against us in open

11    market purchase, and they blew against us on good faith and

12    fair dealing.  They cared so much that they wouldn't do the

13    plan unless they got this protection, so that tells us/*sta

14    something about that they knew maybe they were doing something

15    wrong, and that's why we cite the *Martha Stewart* case in our

16    brief.

17         THE COURT:  All right.

18         MR. SEILER:  So there --

19         THE COURT:  So can I stop you there?

20         MR. SEILER:  Certainly.

21         THE COURT:  Because I genuinely want to understand

22    this point.  I mean, they're going to get up and say, "Look,

23    if we're going to give up the leverages that we had as a

24    lender in order to take equity, we wanted this protection."

25    And this is just -- this is just good lawyering and it's just

1    good business.  I understand why they care.  I want to

2    understand why you care.

3            MR. SEILER:  Okay.  But, so I care because their

4    caring shows that they thought they were doing something that

5    was questionable.  That's the point I was just trying to make.

6    And I also think this all goes a little bit to the whole

7    question of equitable mootness because I don't -- if the

8    reason I don't care is --

9            THE COURT:  I'll circuit for that.

10           MR. SEILER:  I'm saying I don't ever want to hear

11   them say, "Well, it's too late now because this so bad for the

12   company."  So if they're never going to say that, I care a

13   little bit less because I want -- so whether or not -- because

14   I don't want them to say, "Well, the company can't afford to

15   lose on our indemnity, so and therefore you can't pursue your

16   appeal.  We want -- we came here -- it was Mr. Herman that did

17   the talking, we said, "Send us to New York."  But we said,

18   "Even if it's here, this doesn't need to get decided as

19   against the lenders for the plan to be confirmed."  And you

20   said, Your Honor, "Well, but it does because I have to know

21   that the transaction works over the market purchase," but on

22   the good faith and fair dealing the things that the lenders

23   did, this -- if -- it's only this indemnity that makes this an

24   issue for the company at all.

25           THE COURT:  So what you're telling me is that

1      Mr. Shrock was right, or whoever it was that stood up and said

2      it,  "This is just litigation strategy, there's not an

3      economic reason" --

4                  MR. SEILER:  Well --

5                  THE COURT:  -- that's the one plan.

6                  MR. SEILER:  -- that's the one.  I don't want to

7      give up on the 1 percent, but it's only 1 percent.

8                  THE COURT:  I got it, no --

9                  MR. SEILER:  I can't -- but, you know, people fight

10     about -- we're fighting about the million and a half hours

11     that the equity shouldn't get because it violates the absolute

12     priority rule, too.  That's a confirmation issue.

13                 THE COURT:  We'll get there.

14                 MR. SEILER:  Okay.  Well, I'm going to -- with that

15     I'm going to let Mr. Herman convince of you of that --

16                 THE COURT:  Okay.

17                 MR. SEILER:  -- at the end of the case.

18             So I -- look, I think it's -- it matters what the --

19     I mean, I'm looking forward to -- I'll be honest with you, I'm

20     looking forward to hear how they agreed to it, too.  We asked

21     Mr. Shaw, he didn't know he didn't do the negotiation.  I

22     don't know who did it.  You know, we had the discovery we had,

23     we had this tight time frame, we did the best we could.  But

24     I'm looking forward to hearing why this indemnity got changed.

25                 And then I also think there's an issue because the

1      way they were first going to do it was having the provision in

2      the new loan agreements slide through.  And I think we pointed

3      out, well, you can't just pick a paragraph out of an entire

4      agreement and have that slide through.  So they said, "Well,

5      we're going to put it in the new exit financing agreement."

6      And then I asked, "Well, why does it go there, why are the

7      people indemnifying people who aren't even party to that

8      agreement?"

9             You have some people who were both in 2020 and are

10     still there, but you have people who for part of this

11     transaction in 2020 who were protecting themselves from their

12     holdings in 2016, they're long gone, and they're getting the

13     same benefit.  And I think that's what Citadel's going to

14     complain about because they're actually come forward not just

15     to complain, but to say they've got money.

16            So but I guess I'll stop talking about that because

17     I don't want to step on their toes, but I think it's an

18     example of, among other changes they made that made this deal

19     work in a way that took away our fruits, which it wouldn't

20     have done, and I think they've admitted that, they wouldn't

21     have done it unless they got the indemnity therewith because

22     they still won't do it even after Your Honor's ruling on open

23     market purchase.

24            So I think I will -- unless you have some more

25     questions for me, I apologize if I went longer than --

1          THE COURT:  No, no, no.

2          MR. SEILER:  -- I promised, but that's --

3          THE COURT:  I appreciate the engagement.

4          MR. SEILER:  -- that's what I have to say.

5   Hopefully the evidence will show what I've said, and at the

6   closing I'll -- because otherwise you'll point that out to me

7   I fear, so anyway.  Thank you very much.

8          THE COURT:  Thank you.

9          All right.  Who's next?  And are you using

10  Mr. Carlock (phonetic), too, or --

11         MR. LIEBERMAN:  I'm not using the deck.  We're all

12  good.

13         THE COURT:  Ah, okay.  Got it.  Thank you.

14      OPENING STATEMENTS ON BEHALF OF THE LCM DEFENDANTS

15         MR. LIEBERMAN:  Good morning, Your Honor.  Neil

16  Lieberman from HSG on behalf of the LCM Defendants.

17         I'm not going to rehash the topics that have been

18  discussed by my colleague, Mr. Seiler.  I'm going to

19  concentrate on the theories LCM is pursuing that were not just

20  addressed, although we agree with the theories they're

21  pursuing on the good faith and fair dealing.

22         But before we get to the substance I think it's

23  important to focus on LCM's role because this morning you've

24  heard counsel for Serta tout their restructuring process,

25  about how Serta negotiated transaction alternatives with

1    70 percent of their lender base and your heard Mr. Costa say

2    that the reason the PTL Lenders abandoned the pro bono terms

3    of their initial offer was a defensive measure, self-defense

4    to fend off a deal with predatory lenders that would destroy

5    their investment value.

6         But none of this applies to LCM.  It is uncontested

7    that LCM was not asked to participate to the 2020 transaction

8    negotiations, neither the company nor the PTL Lenders asked

9    them to participate, and you'll hear representatives from the

10   company, the PTL Lenders and advisors testify to that fact.

11   And it is uncontested that LCM wasn't involved in a so-called

12   predatory bid that the PTL Lenders felt constrained to defend

13   against.  LCM was not a part of the Apollo transaction, and on

14   a more basic level Mr. Sim from Eaton Mense (phonetic) will

15   testify that the LCM CLOs are not considered predatory

16   lenders.

17        And LCM isn't alone.  They are aligned with a class

18   of long-term Citadel lender that reasonably expected to be

19   treated prorata with their fellow lenders, that were no threat

20   to their fellow lenders, that were given no opportunity to

21   participate in this restructuring, and were as badly damaged

22   by the PTL Lender's conduct, if not more so, than they would

23   have been under any other alternative transaction.

24        Each of the parties negotiated -- to the

25   negotiations, the company, the PTL Lenders, and Advent fully

1    understood that they were leaving like LCM behind.  Indeed,

2    the value of this transaction to the PTL Lenders depended upon

3    leaving behind as many of their fellow lenders as possible.

4    So when the PTL Lenders fall back on arguments about whether

5    they had to defeat a value destroying transaction by predatory

6    lenders, to lenders like LCM, it was the PTL Lenders that

7    caused disastrous consequences, and purposely so.

8           Now moving on to the claims that we're pursuing:  In

9    these proceedings we're focused on a breach of the credit

10    agreement and the implied covenant to that agreement that

11    arise out of the amendment process.  And as you've instructed,

12    we've steered clear of the open market term and issues related

13    to it per Your Honor's order.  And while the testimony at

14    trial will corroborate our theories, they stand on their own

15    based on the undisputed facts of the case.

16           Turning to the breach of contract:  The PTL Lenders

17    purported to amend the credit agreement with 50.1 percent of

18    the lenders, the so-called required lenders requirement.  That

19    figure comes from Section 9.2(b) of the agreement which

20    requires that, quote/unquote, "require lenders constitute more

21    than 50 percent of the sum total of loans outstanding at the

22    time."

23           But at the time the PTL Lenders amended the

24    agreement by purporting to constitute required lenders, they

25    were no longer holders of the first lien loans because at the

1   very moment they became PTL Lenders in exchange for their

2   first lien holdings pursuant to the open market purchase

3   agreement and the PTL credit agreement which were all executed

4   and came into effect simultaneously.

5   And as you'll hear from the PTL Lender witnesses,

6   none considered agreeing to the amendment without the ironclad

7   promise that they would be immediately extricated from the

8   loans.  They never intended to be subject to their amendments.

9   And so in this instance the *Murray Energy* case is

10   instructive.  In that case there was a commitment to exchange

11   loans and then an amendment signed that was challenged on the

12   same basis.  And the court rejected it saying, "No, a

13   commitment is an exchange."  Here we have the exchange

14   occurring simultaneously.

15   The PTL Lenders will argue that the amendments, as a

16   technical matter occurred just prior to the exchanges because

17   that's the way they wrote one of the agreements, but it is

18   commercially unsustainable and unreasonable to interpret a

19   contract in a fashion that allows a majority of contract

20   participants to vote to amend the contract so that the

21   amendments never apply to them.  Indeed, the purpose of a

22   majority vote requirement in these documents is to be

23   protective of the lenders.

24   And I point Your Honor to the treatment of certain

25   affiliated lenders when they repurchase are allowed to

1    continue to hold loans.  But under 9.05(g)(6)(A) of the credit

2    agreement, if they vote those loans, that doesn't count to the

3    numerator or the denominator of the required lender.  And that

4    just evinces of (a) an intent of the parties that when you're

5    in line with the lender -- when you're in line with the

6    borrower that you shouldn't be able to meet the required

7    lender threshold, and that's what happened here.

8         And similarly the exceptions to the contract for

9    amendments that require all adversely affected lenders to

10   vote -- provide additional support.  It just makes no sense to

11   have a situation where there's a bunch of provisions that

12   require adversely affected lenders to vote for them and

13   then -- but if you don't fall within that and you just fall

14   within the required lender bucket, that required lenders don't

15   have to have any interest whatsoever in ongoing interest in

16   those loans.

17        In terms of moving on to good faith and fair

18   dealing, even if the Court holds the amendment process was

19   technically permissible under the credit agreement, the

20   uncontested facts of the amendment support a claim for breach

21   of the implied covenant.  And Mr. Costa in particular said the

22   implied covenant must come from the words of the contract.  I

23   mean, that basically reads out to duty.  And the duty exists

24   in New York, it's more than just words of the contract, and it

25   basically says that neither party will do anything that has

1    the effect of destroying or injuring the right of the party to

2    receive the fruits of the contract based on a reasonable

3    belief of what -- that was justified to be understood in the

4    contract.

5             And so -- and that's an objective test.  Here, the

6    applied covenant claim is clear, the PTL Lenders were paid for

7    their consent to amend the agreement on their way out, and

8    they reaped a personal benefit and destroyed other lenders'

9    first lien priority rights.  The testimony will bear out that

10   first lien priority status was a fundamental aspect of the

11   2016 credit agreement, and that the amendments deprived LCM of

12   that element.

13            It was done in a manner to deprive the non-

14   participating lenders, they were not even aware of the deal

15   until it was fully baked, they didn't get the opportunity to

16   vote on it.  The deal was precisely 50.1 percent, and even

17   though Serta was willing to open the exchange to a larger

18   number of lenders, and the parties negotiated all manner of

19   other terms, the PTL Lenders never budged off of that number.

20   That is solely because they were out to maximize a return.

21            The PTL Lenders would never agree to amend the

22   agreement unless they received priming liens, and the

23   manipulations of rights like this for personal gain that

24   deprive other parties of the benefit of the bargain is a

25   violation of implied covenant under New York law.  We cite

1    cases in our brief to support that.  *Richvale* is one,

2    *Boardriders* that was recently decided is another.

3              New York law also allows for consent of non-

4    participants to cleanse implied duty.  That wasn't done here.

5    Cases that are instructive there are *Cass*, 986 WL 13008 from

6    Delaware Chancery Court, and the *Optigon v NYDJ*, which is

7    Index Number 656677-2017 which is a New York Supreme Court

8    case.

9              The PTL Lenders will no doubt argue that because

10   everything was executed simultaneously, the amendments came

11   into effect a millisecond before the exchange.  This is a

12   meaningless distinction in a good faith setting.  It elevates

13   form over substance because the consent and the exit were

14   contingent on one another and were all agreed to as part of

15   one bargain.  The *Key Bank v Franklin Advisors* case from the

16   Southern District Bankruptcy Court has held that transactions

17   that lack economic substance or that elevate form over

18   substance are violations of the good faith and fair dealing

19   duty.  And violate -- well, I'm going to stop there and leave

20   it at that.

21             THE COURT:  So just listening to what you said, is

22   it your belief that as I listen to the evidence regarding the

23   implied duty of good faith and fair dealing that I could reach

24   different conclusions as to particular Defendants?

25             And I want to be very clear, I heard you starting to

1      separate yourself from Mr. Seiler's clients, and I am curious

2      is -- do you believe that that's possible?

3            MR. LIEBERMAN:  I actually don't believe it's

4      necessary.  I think the whole -- do I think --

5            THE COURT:  That wasn't the question.

6            MR. LIEBERMAN:  Do I believe it's possible to

7      separate us?

8            THE COURT:  Uh-huh.

9            MR. LIEBERMAN:  I don't think -- I think we -- every

10     reasonable belief, reasonable and justifiable belief is an

11     objective standard.  So --

12           THE COURT:  Yes, I mean, if it's -- everybody talks

13     about that but let's -- and this by no means pertains to

14     anybody.

15           Let's assume that you have one party who's actively

16     engaged in the exact same conduct and one who isn't.  It is an

17     objective test, but it's based upon reasonable expectations

18     under the circumstances faced, right?  I don't ignore reality

19     when I start to look at that.

20           MR. LIEBERMAN:  No, but I think the circumstances,

21     as Mr. Seiler said, were that this was a transaction that no

22     one had ever --

23           THE COURT:  Okay.  I want to you to ignore

24     Mr. Seiler for a second, and I want you just to talk to me.

25     You started off the first part of your argument by saying,

1     "We're different."  And I'm trying to understand why -- I

2     assume that every time you step up to the lectern you mean

3     something by the words you choose.  I'm trying to make sure I

4     understand the import of what you were telling me.

5           MR. LIEBERMAN:  To me, the import is we're

6     different, we're different as there's a whole class of lenders

7     that are differently situated.

8           THE COURT:  All right.

9           MR. LIEBERMAN:  The thrust of the arguments you

10    heard this morning were painted as a broad brush.  And --

11          THE COURT:  All right.  And you think --

12          MR. LIEBERMAN:   -- so I'm distinguishing between --

13    yeah, what I'm saying, I think those arguments fail in their

14    entirety --

15          THE COURT:  Well, let's --

16          MR. LIEBERMAN:  -- once you recognize that there's a

17    class of lenders --

18          THE COURT:  -- assume they don't, let's assume they

19    don't, could I reach one conclusion as to Mr. Seiler's clients

20    and an entirely different conclusion as to your clients?

21    That's what I'm trying to understand.

22          MR. LIEBERMAN:  I suppose there's a certain set of

23    circumstances where you could do that.

24          THE COURT:  But you don't believe they're applicable

25    here?

1        MR. LIEBERMAN:  I don't believe it's -- I wouldn't

2   -- I don't think it's necessary to reach that conclusion here.

3        THE COURT:  Didn't say necessary, possible.

4        MR. LIEBERMAN:  It's -- I suppose it's possible,

5   Your Honor.

6        THE COURT:  But you don't think the facts would

7   support reaching different answers, is that --

8        MR. LIEBERMAN:  I think the facts support reaching

9   the answer we're advocating across the board.

10        THE COURT:  Okay.

11        MR. LIEBERMAN:  I mean, I don't think that it's

12   necessary to -- I wouldn't distinguish as I think we're

13   talking about their conduct, vis-à-vis lenders that are

14   excluded from --

15        THE COURT:  Okay.

16        MR. LIEBERMAN:  -- the transaction.

17        THE COURT:  All right.  So I get Mr. Seiler's

18   motivations.  I got him in the box I want him in, I understand

19   him perfectly.

20      (Laughter.)

21        THE COURT:  What is it that you're hoping to get out

22   of this?

23        MR. LIEBERMAN:  Our client has been interested since

24   2020 in having its position vindicated.

25        THE COURT:  What does that --

1          MR. LIEBERMAN:  As --

2          THE COURT:  -- you want me to tell you that you're

3     right?  The folks you represent don't care about that, they

4     care about money.

5          MR. LIEBERMAN:  Well, those are two elements.  One,

6     I would caution that my client cares very much that they may

7     be right.

8          THE COURT:  It wasn't a criticism.

9          MR. LIEBERMAN:  Well, no, I'm just saying they do

10    care very much if they've been right.  They spent quite a bit

11    of money and effort litigating this issue for three years and

12    you know what the size of their claim is relative to what's

13    going on here.

14          THE COURT:  Right.  So --

15          MR. LIEBERMAN:  So part of the motivation is that --

16          THE COURT:  -- so I'm going to come back to where I

17    started, and I really want a genuine answer to this.

18          What is it that your folks want?  Do you want to

19    talk to them and come back and answer that for me, or do you

20    know?

21          MR. LIEBERMAN:  It's both, they would like to be

22    vindicated in their view that this transaction was outside of

23    market.

24          THE COURT:  Okay.  So you --

25          MR. LIEBERMAN:   It was destructive to the market.

1      They would like to --

2                  THE COURT:   -- so you would have a hard time

3      convincing me that that's why you're here.  So what's Step 2?

4                  MR. LIEBERMAN:  Step 2 is obviously a financial

5      reward related to that.

6                  THE COURT:  So it is a financial reward in terms of

7      you want the right to participate, is it you want someone to

8      write you a check, is it -- I'm trying to figure out -- I'm

9      trying to figure out exactly what role you're playing.

10                 Again, I'm not being critical, I'm genuinely trying

11     to understand it.

12                 MR. LIEBERMAN:  As between those options, I'd have

13     to go back and ask, Your Honor.  I mean, I think that

14     there's -- in recent times there's not been any discussion in

15     the context of --

16                 THE COURT:  And I'm not suggesting that there should

17     be.  What I'm trying to figure out is that there is -- there

18     are a set of circumstances that could occur where you could

19     actually prevail and do worse.  Have you thought about that?

20     I can see that scenario.  Have you -- that's why I'm genuinely

21     trying to engage, trying to understand what your strategy map

22     is because it's different than Mr. Seiler's -- it should be

23     different than Mr. Seiler's, and I'm just trying to

24     understand.

25                 Because you could push this so hard, turn out to be

1    right, and the outcome is actually worse than if you'd done

2    nothing.  And I'm just trying to understand.  I haven't

3    figured you out yet.

4          MR. LIEBERMAN:  I don't -- well, I don't think my

5    client believes that, I don't think we do, but let's --

6          THE COURT:  Sometimes it takes reality to help

7    educate folks.  I got that.  Okay.  I appreciate your engaging

8    with me.

9          MR. LIEBERMAN:  You got it.

10         THE COURT:  Thank you.

11         MR. LIEBERMAN:  Thank you, Your Honor.

12         THE COURT:  All right.  Who's next?  Come on up.

13         Good morning.

14         MR. MILLAR:  Good morning, Your Honor.  James Millar

15   of Faegre Drinker Biddle & Reath, this is my colleague,

16   Ms. Kristin Perry, on behalf of Citadel.  You've heard our

17   names once or twice.

18         THE COURT:  Absolutely.

19         MR. MILLAR:  And now we get the chance to talk.

20   Delighted to be here.  Thank you.

21              OPENING STATEMENTS ON BEHALF OF CITADEL

22         BY MR. MILLAR:  So, Your Honor, Citadel is a holder

23   of both the FLSO claims and the non-PTL claims.  At bottom

24   Citadel is a big supporter of the company.  We believe in the

25   company, we are aligned with the company in wanting to see it

1    succeed after Chapter 11, and we would invest in helping.  And

2    we have indeed put our money where our mouth is.  We have

3    proposed a fully committed $315 million alternative exit

4    financing facility and we believe this is a better deal for

5    the company -- better for the company, better for the

6    stakeholders, better for the creditors and the equity holders.

7          And, Your Honor, we think that the company should

8    execute on this and that they can execute on this because it

9    actually provides better treatment for the voting classes.

10   And that's really important.  And I heard some commentary from

11   Mr. Shrock about the difficulties in effectuating this.  I

12   don't think it's that difficult.  I think the Debtor does,

13   Number 1, exercise their fiduciary duty out, everyone knows

14   they have it.

15          THE COURT:  Absolutely.

16          MR. MILLAR:  Number 2, take the existing plan,

17   delete the indemnity and say, "Here's our amended plan."

18   Maybe have to clean up a little bit of the condition for

19   precedent, and then come to you and say, "Okay, these classes

20   are actually being treated better, you don't need to re-

21   solicit them.  You have the votes, let's confirm the plan.  We

22   could do it this week."

23          That's better for the company, and we think they

24   should go down that road.  So I'm going to be here all week --

25          THE COURT:  Sure.

1          MR. MILLAR:  -- and I'm going to be saying that, we

2     think they should go down that road.  That's what we're trying

3     to get them to do.  And we don't think -- just one other point

4     on that, we don't think it's just in their business judgment,

5     Your Honor, these are things happening before you.  You have

6     some judgment here, you know.

7          THE COURT:  So let's be clear, my judgment is simply

8     whether or not the Debtors have acted in a range.  It is never

9     a substitution of what I might have done for what they've

10    decided to do.

11         MR. MILLAR:  Of course.  But I think you could push

12    them on that.  I think you can say to them, "Look, this looks

13    like a good deal."

14         THE COURT:  I can push everybody on a lot of things.

15         MR. MILLAR:  Yeah.

16         THE COURT:  So if I could, let me -- if I could poke

17    and prod just a little bit --

18         MR. MILLAR:  Yeah, absolutely.

19         THE COURT:  -- to understand what you've done.  So

20    you made a proposal --

21         MR. MILLAR:  Uh-huh.

22         THE COURT:  -- and the first time I found out about

23    it was yesterday.  Had you talked to the Committee before you

24    did that or since you've done that?

25         MR. MILLAR:  We've not talked to the Committee --

1          THE COURT:  Because why not?  Because you know how

2     this goes, I mean, you've been doing this a long time.  You've

3     got to have a friend.  Right?  You always need a friend.

4          MR. MILLAR:  Yeah, you know, look, I'm happy to talk

5     to the Committee.  If they -- I shouldn't say we didn't talk

6     to the Committee --

7          THE COURT:  All right.

8          MR. MILLAR:   -- we didn't talk to them about the

9     exit financing.  We did -- Mr. Wilson is here somewhere -- I

10    did speak with Mr. Wilson a few times about the things that we

11    were concerned about in the plan.

12         THE COURT:  Right.

13         MR. MILLAR:  But at the end of the day, you know,

14    what -- we really want to do the talking and our talking

15    really goes towards the Debtor, is the new money.  I'm happy

16    if the Committee wants to have that discussion.  They -- I

17    don't mean -- I mean, they have their own interests, and I

18    felt my best counterparty was the Debtor.

19         THE COURT:  I got it.  So you didn't -- hadn't yet

20    gotten a lot of traction with the Debtor.

21         Did you talk to Mr. Lieberman?

22         MR. MILLAR:  Mr. -- you'd have to remind me of

23    the --

24         THE COURT:  The gentleman I was just picking on.

25         MR. MILLAR:  Oh.

1         (Laughter.)

2              MR. MILLAR:  I spoke with the Paul Weiss group, I --

3    we did speak with Mr. Lieberman, again, previously in the

4    case.  Look --

5              THE COURT:  So you can't beat the giant, you've got

6    the isolate the giant.  I mean, this is just basic stuff.  So

7    you didn't talk to Mr. Lieberman.

8              MR. MILLAR:  I did not speak to Mr. Lieberman about

9    the exit financing.

10             THE COURT:  Talk to -- you wouldn't talk to

11   Mr. Costa because he's the litigator, but did you talk to the

12   business people for his clients?

13             MR. MILLAR:  And I don't mean to be dense here,

14   you're going to have to tell me who Mr. Costa represents.

15             THE COURT:  Mr. Costa, well, he's PTL.

16             MR. MILLAR:  PTL.  So, look, we spoke with the

17   Debtor and their professionals --

18             THE COURT:  Okay.

19             MR. MILLAR:  -- and that we had to start there.

20             THE COURT:  Okay.

21             MR. MILLAR:  That's where we feel we have to start.

22   And indeed they're the ones who are going to come up here and

23   say that --

24             THE COURT:  Right.  But let's be practical for just

25   a second.  You know, you do this at the last minute, which,

1    you know, I mean, I'm not going to tell you that I've never

2    done that.  But you do it at the last minute.  Yes, you've got

3    to start with the Debtor, but the Debtors are somewhat -- I

4    mean, they've got pressure at them from all sides, they're

5    trying to run a balance and it's hard for them to step out of

6    a course of action once they're committed unless all of those

7    folks who are pushing them forward start to see your view of

8    life and if it really is a better deal and if there are better

9    options and, you know, whatever your proposal was, you know,

10   what can they, you know, what can they extract in addition to

11   that?

12           I mean, you know how this process works.  So I got

13   it that you had to start with the Debtor, but it just seems to

14   me that you started with the Debtor and then you stopped.

15           MR. MILLAR:  Actually, no, I mean, if I may?

16           THE COURT:  Please.

17           MR. MILLAR:  Let's rewind the clock a little bit,

18   and this is not in our papers, but back in February we tried

19   to broker a deal.  My client actually --

20           THE COURT:  I don't want to talk about February.

21   Here we are in May.

22           MR. MILLAR:  Right.  But then because what we're

23   trying to do, Your Honor, is get to a place where this company

24   can exit bankruptcy in the best shape possible.  We tried to

25   broker a deal on the litigation, we sent a term sheet to both

1      sides.

2                    THE COURT:  Right.

3                    MR. MILLAR:  Then we raised the infirmity about the

4      indemnity in the plan.  In response to that they said, "Well,

5      there's nothing we can do about the exits in the exit

6      financing" -- somewhere around late April.

7                    THE COURT:  Right.

8                    MR. MILLAR:  And we said, "Well, we can fix that

9      problem, too."  We were trying to fix every problem that we

10     could see.

11                   THE COURT:  I got it.  And I want to try to help you

12     put your best foot forward --

13                   MR. MILLAR:  Okay.

14                   THE COURT:   -- because what I want is I want the

15     best capitalized company with the greatest chance of success.

16     If it's going to come out, I want it to come out with -- to be

17     as good as it can possibly be.  And if you can help that, I'm

18     trying to nudge you in terms of what your next steps are.

19                   You know, you're not going to care about a lot of

20     the evidence we're going to hear, which means you have a

21     captive audience in terms of starting to work.  Everybody's

22     got multiple lawyers here, everybody's got folks that can take

23     advantage of conference rooms and out-in-the hall discussions

24     and that sort of thing.

25                   And if -- and I'm not suggesting that they're not,

1     but if your folks have really brought money to the table and

2     they're committed, time to start -- time to start trying to

3     find a friend.  And I say it lightly, but I mean it.  It's

4     the --

5               MR. MILLAR:  I hear you.

6               THE COURT:  -- only way you get those things done.

7     I've been in this courtroom for 20-plus years standing where

8     you're standing.  I know how many things I got down out in the

9     hall, all because I found a friend.

10              MR. MILLAR:  I hear you.  I hear you.  Look, I mean,

11    let me be clear with you.  We haven't given up --

12              THE COURT:  Okay.

13              MR. MILLAR:  -- we're going to take that advice to

14    heart.  We're going to work the phones, we're going to talk to

15    lawyers, we're going to try and find people who are interested

16    in our exit financing, because our exit financing is a better

17    deal.  And, Your Honor --

18              THE COURT:  And are you going to put somebody up to

19    walk through me, do a comparison or --

20              MR. MILLAR:  I'm glad you mentioned that.  We, well,

21    I don't have -- I haven't put a witness on the Witness List.

22              THE COURT:  You can do it through Mr. Shaw, can't

23    you?

24              MR. MILLAR:  That's exactly where I was going to go.

25    I have a term sheet and that term sheet lays out all the

1   material terms and it says, "Equal or is better."  And we can

2   go through that very quickly, I don't think he will disagree.

3   No one on their side has said that our exit financing isn't

4   better.  What they say is, "Well, we can't do it."  I think

5   they can actually.  I think they can.

6            THE COURT:  Yeah.  I mean, that's part of -- that's

7   part of your job.  But, you know --

8            MR. MILLAR:  Yeah.

9            THE COURT:  -- it gets a whole easier if you'll

10  find a friend.

11           MR. MILLAR:  Yeah.  So, Your Honor, by the way I

12  do -- I would be remiss if I did not mention that we did put

13  in a demonstrative and I will ask Mr. Shaw about this, but for

14  the Record it is Citadel Exit -- I'm sorry, Citadel

15  Exhibit 36, Document 877 -- Docket 877, Page 28, it's a 2-page

16  demonstrative, and it just shows how the plan is better.

17           Why is it better?  A couple of quick reasons:  One

18  is that without the indemnity obligation, the equity is worth

19  more.  We can debate how much more, but it's worth more.  And

20  the second is that under our plan, creditors get a choice,

21  they can take the equity if they want it, or they can cash

22  out.  And for the FLSO they can cash out at 102.  That's

23  their -- that's the call priced post-effective date.  We're

24  willing to pay 102.

25           THE COURT:  So help me -- so 877 is a single

1  document that is an Exhibit List, I mean, you did the

2  catch-alls, but it's effectively 1 through 36?

3          MR. MILLAR:  Yeah, it's the last exhibit and it's --

4  I'm told it's on Page 28.

5          THE COURT:  Ah, okay, because it started with

6  Exhibit 35, I was confused.

7          MR. MILLAR:  Yeah.

8          THE COURT:  Okay.

9          MR. MILLAR:  Exhibit 35, we'll come to that with

10  Mr. Shaw.

11          THE COURT:  Okay.  So it's --

12          MR. MILLAR:  That's our exit financing.

13          THE COURT:  And so it says -- it's entitled,

14  "Supplement to Citadel's Alternative Exit Financing Offer."

15          Is that what you wanted me to look at?

16          MR. MILLAR:  Yeah, please.  Yes.  And it's pretty

17  straightforward, Your Honor.  It has the three classes,

18  Class 3 FLFO, Class 4 FLSO, and the non-PTLs.  And if it --

19          THE COURT:  Okay.  So you did -- you picked the

20  parties that -- I now understand.  I thought it was a complete

21  plan comparison.

22          MR. MILLAR:  Well --

23          THE COURT:  I misunderstood.

24          MR. MILLAR:   -- look, I mean, noting else changes.

25  Right?  And that's part of the point.  Nothing else --

1          THE COURT:  I didn't notice, so I was asking.

2          MR. MILLAR:  Yeah.

3          THE COURT:  Okay.

4          MR. MILLAR:  Yeah.  So we have -- we think that

5     alternative works.  And again, I'm not here to blow up any

6     plan, I'm here to see a plan succeed.

7          THE COURT:  Look, it doesn't matter to me why you're

8     here.

9          MR. MILLAR:  Yes.

10         THE COURT:  If you have something that's better

11    than -- for the Debtors, then I've got -- again, my view is I

12    have the best people in the world in the courtroom and if they

13    can't figure out what's better, then if there's a problem,

14    then that's where I come in.

15         MR. MILLAR:  Yeah, and --

16         THE COURT:  If you've been as open as you say you

17    have been, then, you know, you need to go talk to people.

18         MR. MILLAR:  Yeah, and look, I know I don't want to

19    belabor this point, but we do think that the Debtors need to

20    engage with us.  I mean, I can talk with the Committee, I can

21    talk with the non-PTLs, and I'm sort of wondering if that --

22    you know, it's helpful to me at the end of the day, given

23    the -- what I see as adversity between these parties.

24         THE COURT:  You don't know --

25         MR. MILLAR:  You don't know.

1          THE COURT:   -- till you figure it out.

2          MR. MILLAR:  But the Debtors -- the Debtors are the

3     ones that above all want this company to come out with the

4     best capital structure.  You and they and we, frankly.

5          THE COURT:  I got it.  And I can't imagine that the

6     Debtors wouldn't engage with you especially since I've sat

7     here now and talked to you for 10 minutes.  They're all smart,

8     they'll read the room, because they don't want me to ask the

9     next set of questions to their representative, so they'll

10    absolutely engage.  But you understand the concept of that.

11         MR. MILLAR:  Sure.  Absolutely.

12         THE COURT:  Okay.

13         MR. MILLAR:  You know, and my client is ready to

14    engage.  I mean, I'm the lawyer, but I have people at Citadel

15    standing by.

16         THE COURT:  Okay.  So you have somebody not here,

17    but you have somebody available by --

18         MR. MILLAR:  Oh, yeah.

19         THE COURT:   -- telephone or video?

20         MR. MILLAR:  Yeah.  Absolutely.  And if you want him

21    here, Your Honor, we'll bring him here.

22         THE COURT:  I've reserved the right to supplement

23    that answer over the course of the week.  But I just don't

24    know.

25         MR. MILLAR:  Yeah.

1          THE COURT:  I'm trying to understand, I mean, I --

2     you know, I'm, you know, doing what I do on a Sunday evening

3     when I've 3,000 pages to read --

4          (Laughter.)

5          THE COURT:  -- and I came across that, and I was

6     just -- I'm trying to learn about it, and I'm trying to

7     learn --

8          MR. MILLAR:  Yeah.

9          THE COURT:   -- that, you know, is it real, is it

10    not real, is it problematic, are there things that can be

11    tweaked about it?  I'm just -- I'm trying to learn.

12         MR. MILLAR:  Yeah.  And like I said, I'll be here

13    all week.

14         THE COURT:  Okay.

15         MR. MILLAR:  We'll work on that.  We're excited

16    about it, right, because we think we can do it, we're -- you

17    know, it's not often frankly when somebody shows up and says

18    -- I mean, this isn't like a term -- this is a commitment

19    letter, this is like sign up, 350 million.

20         THE COURT:  I know how to get people obligated.

21         MR. MILLAR:  Yeah.  So, Your Honor, you may be

22    asking the question -- well, you asked the question of other

23    parties and maybe it's obvious with me standing here, why do

24    we care about the indemnity so much?  And I'll tell you why we

25    care, because if they, the company, ever has to pay out on

1    that indemnity, as they have said, and as we believe, that's

2    going to be a Chapter 22.

3               THE COURT:  At best.

4               MR. MILLAR:  At best.

5               THE COURT:  Yeah.

6               MR. MILLAR:  And that means all the equity that

7    we're getting goes to zero.  And that's a bad result, and we

8    want to have it dealt with here and now to the extent

9    possible.  And the other things is, you know, I've heard a

10   little bit of commentary this morning about how in this

11   bankruptcy we're dealing with litigation.  And we are, right,

12   I mean, they are, I'm not, in front of you, but Your Honor

13   knows that the 5th Circuit took that appeal.  They accepted

14   that appeal and those are three appellate judges, I don't know

15   what they're going to do.

16              THE COURT:  Especially since I didn't give them a

17   definition.

18              MR. MILLAR:  Well, and since we're just talking

19   here, you know, if you would have given them a definition,

20   they would have probably found a way to say they had their

21   own.  Right?  But, and, you know, 5th Circuit appellate

22   justices I don't -- or judges, I don't mean to -- I'm not

23   disparaging them, but they don't sit in these courtrooms and

24   read financial documents all day.

25              THE COURT:  But they're all way smarter than me.  I

1      need --

2              MR. MILLAR:  Well --

3              THE COURT:   -- to put that on the Record.

4          (Laughter.)

5              MR. MILLAR:  Yeah, I'm going to join you in knowing

6      that they're smarter than me, as well, Your Honor.

7              So, look, I don't know what's going to happen there,

8      and I care about that, my client cares about that, because

9      let's say they show up and they say, "You know what?  This

10     side wins."  They could do that.  What if they certify that

11     question to the New York Board of Appeals, who has a whole

12     different set of issues concerning New York law.

13             THE COURT:  Right.

14             MR. MILLAR:  So, look, all I know is I care about

15     the risk.  And the one thing that I know is that if this plan

16     is confirmed like this, then the Debtors bear that risk, and

17     they don't need to.  There has to be an alternative.  So I'm

18     here, and I know I show up on the objector side of the docket,

19     but I'm here with a message, and I think I've conveyed it,

20     that we're here looking for an alternative solution so that

21     when this company emerges, it is not bound by this indemnity,

22     it is free of that and it can go and actually do things like

23     sell mattresses and be a profitable company, which we think is

24     where it's going to end up.

25             So thank you, Your Honor.  I think I've covered

1    everything I wanted.

2            THE COURT:  So before you go --

3            MR. MILLAR:  Yes.

4            THE COURT:   -- number one, I appreciate the

5    engagement and I appreciate the way that you've stuck yourself

6    out there if you will.  And I'm asking you -- I got it that

7    you said, "Well, we're here, we're ready to listen," I'm

8    asking you to go be the initiator.

9            MR. MILLAR:  Absolutely.  And I'll tell you my

10   client has been reaching out to all kinds of people, so much

11   so that -- well, I won't go there.  He's been reaching out, he

12   will continue to reach out, we will reach out to everybody in

13   this courtroom that wants -- that will return our call.

14           Happy to do it.

15           THE COURT:  All right.

16           MR. MILLAR:  If anybody has a view as to how this

17   exit financing could be better, send it over, we're ready to

18   talk.

19           THE COURT:  All right.  Thank you.

20           MR. MILLAR:  Thank you.

21           THE COURT:  All right.  Anyone else?

22        (No audible response.)

23           THE COURT:  All right.  So it's 11:55, who should I

24   be talking to on the Debtor's side?

25           Mr. Lender, is that you?

1      MR. LENDER:  Yes.

2      THE COURT:  All right.  It is 11:56.  As I'm sure

3   you've looked at the calendar, you know I have a relatively

4   quick, hopefully quick *Party City* hearing at noon, so my

5   thought is is that we adjourn now and then you tell me when

6   you would like to start with your first witness.

7      And I mean, that whether it be 1:00 or 1:30 or 2:00,

8   I want -- I don't know if there are things you need to prep

9   for, things you need to change.  Yeah, I will be done by 1:00,

10  so just -- but if you need extra time, take extra time.

11     MR. LENDER:  So it's 12:00, I think we can break, if

12  it's okay with Your Honor, till 1:00 and we can do our lunch

13  break between 12:00 and 1:00.

14     THE COURT:  Does that -- anyone --

15     MR. LEONARD:  If that works.

16     THE COURT:   -- anyone have an issue with resuming

17  at 1:00 o'clock Central?

18     UNIDENTIFIED SPEAKER:  That'd be perfect, Your

19  Honor.

20     THE COURT:  All right.  Terrific.  Then thank you.

21  And will someone please tell Mr. Shaw that he's -- that he's

22  allowed to come back in the courtroom.

23     MR. LENDER:  We'll take him to lunch.

24     (Laughter.)

25     THE COURT:  All right.  Then frankly, you can leave

1    everything right where it is unless you just feel compelled

2    to -- I don't think anybody is going to attend.  If I'm wrong,

3    I'm wrong, I'll make sure they don't move your stuff.  But I

4    think everybody is just going to be on video.  All right.

5              MR. LENDER:  Thank you.

6              THE COURT:  Thank you.  We'll be adjourned.

7         (Proceedings concluded at 12:24 p.m.)

8                         *  *  *  *  *

9         *I certify that the foregoing is a correct transcript*

10   *to the best of my ability due to the condition of the*

11   *electronic sound recording of the ZOOM/video/telephonic*

12   *proceedings in the above-entitled matter.*

13     */S./   MARY D. HENRY*

14   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

15   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

16   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

17   *JTT TRANSCRIPT #67218*

18   *DATE FILED:  MAY 15, 2023*

19

20

21

22

23

24

25