1                IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                        HOUSTON DIVISION

4   IN RE:                      §      CASE NO. 23-090020-11
                                §      JOINTLY ADMINISTERED
5   SERTA SIMMONS BEDDING, LLC, §      HOUSTON, TEXAS
    ET AL,                      §      MONDAY,
6                               §      MAY 15, 2023
            DEBTORS.            §      1:01 P.M. TO 6:00 P.M.
7   ***********************************************************
    SERTA SIMMONS BEDDING, LLC, §      CASE NO. 23-09001-ADV
8   ET AL                       §      JOINTLY ADMINISTERED
                                §      HOUSTON, TEXAS
9   VERSUS                      §      MONDAY,
                                §      MAY 15, 2023
10  AG CENTRE STREET PARTNERSHIP, §
    ET AL                       §      1:01 P.M. TO 6:00 P.M.

11

12      **CONFIRMATION DAY ONE -- AFTERNOON SESSION (VIA ZOOM)**

13            BEFORE THE HONORABLE DAVID R. JONES
                UNITED STATES BANKRUPTCY JUDGE

14

15      APPEARANCES:                    SEE NEXT PAGE

16      COURTROOM DEPUTY:               VRIANA PORTILLO

17

18              **(Recorded via CourtSpeak)**

19

20            TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22              Sugar Land, TX 77478
                  281-277-5325
23          www.judicialtranscribers.com

24

25      Proceedings recorded by electronic sound recording;
          transcript produced by transcription service.

```
 1                         APPEARANCES (VIA ZOOM):

 2   FOR THE DEBTOR:                WEIL GOTSHAL & MANGES, LLP
                                    Ray Schrock, Esq.
 3                                  David Lender, Esq.
                                    Alexander Welch, Esq.
 4                                  700 Louisiana, Ste. 1700
                                    Houston, TX  77002
 5                                  713-546-5000

 6   FOR CITADEL:                   FAEGRE DRINKER BIDDLE & REATH
                                    James Millar, Esq.
 7                                  1177 Avenue of the Americas
                                    41st Floor
 8                                  New York, NY  10036
                                    212-248-3140

 9

10   FOR PRIORITY LENDERS:          GIBSON DUNN & CRUTCHER, LLP
                                    Gregg J. Costa, Esq.
11                                  Lee Wilson, Esq.
                                    811 Main Street
12                                  Suite 3000
                                    Houston, TX  77002
13                                  346-728-6649

14

15   FOR SERTA MINORITY LICENSEES:  FISHMAN JACKSON RONQUILLO,
                                    PLLC
16                                  Mark Ralston, Esq.
                                    4835 LBJ Freeway
17                                  Suite 475
                                    Dallas, TX  75244
18                                  972-419-5544

19   FOR THE STATE OF CONNECTICUT
     DEPARTMENT OF ECONOMIC AND
20   COMMUNITY DEVELOPMENT:         MR. BOWMAN

21

22   FOR THE EXCLUDED LENDERS:      FRIEDMAN KAPLAN SEILER
                                    & ADELMAN, LLP
                                    Eric Seiler, Esq.
23                                  7 Times Square
                                    New York, NY  10036-6516
24                                  212-833-1103

25
```

1                    <u>APPEARANCES (CONT'D) (VIA ZOOM)</u>:

2

3    FOR LCM LENDERS:              HOLWELL SHUSTER &
                                  GOLDBERG, LLP
4                                 Neil Lieberman, Esq.
                                  425 Lexington Avenue
5                                 New York, NY  10017
                                  646-837-5151
6

7    FOR APOLLO:                  PAUL WEISS RIFKIND WHARTON
                                  & GARRISON, LLP
8                                 Andrew Ehrlich, Esq.
                                  1285 Avenue of the Americas
9                                 New York, NY  10019
                                  212-373-3000
10

11

12

13   (Please also see Electronic Appearances.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX

 2

 3   WITNESS:            Direct      Cross    Redirect    Recross

 4   ROOPESH SHAH
       By Mr. Lender     8            .        119          .
 5     By Mr. Seiler     .           65          .        127
       By Mr. Lieberman  .           98          .          .
 6     By Mr. Millar     .          100          .        123
       By the Court    114            .          .          .
 7
     KENNETH PRINCE
 8     By Mr. Lender   131            .        207          .
       By Mr. Seiler     .          153          .          .
 9     By the Court    201            .          .          .
       By Mr. Lieberman  .          202          .          .
10     By Mr. Millar     .          206          .        212

11   EXHIBITS:                     Received

12   Exhibit 4, ECF 248-4           155
     Exhibit 5, ECF 853-5           148
13   Exhibit 29, ECF 861-23          38
     Exhibit 35, ECF 877            103
14   Exhibit 51, ECF 861-45          11
     Exhibit 59, ECF 265-21          32
15   Exhibit 62, ECF 862-6           15
     Exhibit 63, ECF 862-7           17
16   Exhibit 67, ECF 248-67         174
     Exhibit 87, ECF 862-31          23
17   Exhibit 91, ECF 862-35         149
     Exhibit 93, ECF 248-93         164
18   Exhibit 96, ECF 248-96         168
     Exhibit 111, ECF 863-4          21
19   Exhibit 120, ECF 250-20          .
     Exhibit 145, ECF 863-38         22
20   Exhibit 150, ECF 250-52        178
     Exhibit 154, ECF 863-47        144
21   Exhibit 177, ECF 250-84        186
     Exhibit 180, ECF 864-23        140
22   Exhibit 189, ECF 250-96          .
     Exhibit 190, ECF 250-97          .
23   Exhibit 202, ECF 864-45         47
     Exhibit 208, ECF 865-1          44
24   Exhibit 214, ECF 865-7         135
     Exhibit 224, ECF 865-16         41
25   Exhibit 229, ECF 865-21         32
```

1                    INDEX (CONT'D):

2

3    EXHIBITS:                    Received

4    Exhibit 232, ECF 252-45      193
     Exhibit 237, ECF 252-39      199
5    Exhibit 249, ECF 865-4        57
     Exhibit 252                  204
6    Exhibit 265, ECF 252-66      194
     Exhibit 268, ECF 252-69      196
7    Exhibit 356, ECF 887-3        64

8

     Demonstrative 1, pages 28 and 29,
9    ECF 877 marked page 108

10                          ***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **HOUSTON, TEXAS; MONDAY, MAY 15, 2023; 1:01 P.M.**

2          THE COURT:  All right.  We are back on the

3     Record.  The time is 1:01 Central.  Today is May the 15th,

4     2023.  Joint proceedings in the main bankruptcy case, Case

5     Number 23-90020, the jointly administered cases under Serta

6     Simmons Bedding, LLC, as well as the Adversary 23-9001.

7          All right.  Are we ready to get started with our

8     first witness?

9          MR. LENDER:  Yes, Your Honor.

10         THE COURT:  All right.  So these two folks are my

11    summer interns.  I have told them how much I respect all of

12    you and how you're the best in the country.  So, if you let

13    me down, there will be consequences.

14         (Laughter)

15         MR. LENDER:  Your Honor, just one preliminary

16    thing.  Just, given the issues we were having with doing it

17    through WiFi --

18         THE COURT:  Sure.

19         MR. LENDER:  -- what I was hoping we could do for

20    the direct is put the exhibits out, keep it local.  But I'll

21    -- now it's, with each exhibit, docket number and the

22    exhibit number, so people can find it playing at home.

23         THE COURT:  Certainly fine by me.

24         MR. LENDER:  Thank you.

25         THE COURT:  So let's do this and let's see if

1  this works.

2         (Participants confer)

3              THE COURT:  That should be the left table.

4         (Participants confer)

5              THE COURT:  All right.  So you're up and live.

6              MR. LENDER:  The only question, Your Honor, is I

7  have a binder of exhibits that I was going to hand to the

8  witness.  I have a copy for you, if you want one.

9              THE COURT:  So I typically function better by

10 simply if you just give me the number, I will pull it up.

11             MR. LENDER:  Okay.  All right.  Your Honor, the

12 debtors call as their first witness Mr. Roopesh Shah.

13             THE COURT:  All right.  Mr. Shah, if you'd please

14 come forward, sir.  Right up here.  And if -- Mr. Shah --

15 I'm sorry.

16        (Participants confer)

17             THE COURT:  Go ahead, you were answering a

18 question.

19        (Participants confer)

20             THE COURT:  All right.  If you'd raise your right

21 hand.

22          ROOPESH SHAH, WITNESS FOR THE DEBTORS, SWORN

23             THE COURT:  All right.  Thank you, sir.

24                       DIRECT EXAMINATION

25 BY MR. LENDER:

1  Q    Mister -- can you please state your full name for the

2  Record?

3  A    Roopesh Shah.

4  Q    After you were asked to leave during the openings, did

5  you review any -- did you watch any of the openings on Zoom

6  or through a computer?

7  A    I did not.

8  Q    Mr. Shah, who do you work for?

9  A    Evercore.

10 Q    And what is "Evercore"?

11 A    Evercore is an investment bank and financial advisory

12 firm.

13 Q    What is your current title at Evercore?

14 A    Senior Managing Director.

15 Q    And when did you join Evercore?

16 A    In 2017.

17 Q    What are your general responsibilities as a Senior

18 Manager/Director at Evercore?

19 A    I work on and oversee a team focused on corporate

20 restructurings, corporate financings, and liability

21 management transactions.

22 Q    And where did you work before you joined Evercore?

23 A    I was at Goldman Sachs for approximately 11 years.

24 Q    And where were you -- and where were you before that?

25 A    Miller Buckfire.

1  Q     Before that?

2  A     Now you're testing my memory.  Wasserstein Perella.

3  Q     And what is your educational background?

4  A     I received a Bachelor of Science in Economics from the

5  Wharton School of the University of Pennsylvania in 1997.

6  Q     For how many years have you been working as an

7  investment banker?

8  A     Twenty-six years.

9  Q     Does Evercore have experience working on corporate

10 restructurings?

11 A     It does.

12 Q     And what about yourself?  Can you briefly describe your

13 restructuring experience?

14 A     Sure.  For 23 of those 26 years, I focused on

15 restructurings in otherwise stressed is distressed

16 situations.

17 Q     And now when were you first retained in connection with

18 Serta Simmons Bedding, SSB, the company?

19 A     We started working with Serta in mid-to-late 2019.

20 Q     And what were you hired to do back at that time?

21 A     We were hired to evaluate both liquidity enhancement

22 alternatives and liability management alternatives designed

23 to capture discount or otherwise manage their liabilities.

24 Q     And can you describe what happened to the company's

25 financial condition starting in the second quarter of

1  roughly 2022 -- 2020?

2  A    Well, it really started in the first quarter of 2020,

3  when COVID started.  What started as a liability management

4  exercise designed to capture, discount, and right-size

5  leverage, while that was still an objective, liquidity was

6  suffering as a result of COVID, with stores closing,

7  factories shutting, and so liquidity became front and

8  center.

9       And at the time we came on and made that a focus in

10 March, there was a liquidity runway that was expiring

11 potentially as soon as June or July of that year.

12 Q    And what would have happened if SSB wasn't able to

13 restructure its debt or get additional liquidity?

14 A    It would have had to file for bankruptcy.

15 Q    Are you familiar with the Independent Finance Committee

16 of SSB?

17 A    I am.

18 Q    And what was -- or what is the "Independent Finance

19 Committee of SSB"?

20 A    The Finance Committee were comprised of two independent

21 board members who were brought on in roughly March of 2020

22 to review the company's situation and review all

23 alternatives and -- and decide on a course of action to help

24 alleviate the liquidity and leverage situation the company

25 was facing.

1  Q    And did you discuss the company's financial condition

2  with the Finance Committee?

3  A    Repeatedly.

4  Q    I'd like to ask you if you can look at the first

5  document in your binder.  This is Document 861-45, Debtors'

6  Exhibit Number 51.

7       Mr. Shah, are these the minutes of the Independent

8  Finance Committee dated March 31, 2020?

9  A    Yes, they are.

10  Q    And did you attend this meeting?

11  A    I did.

12          MR. LENDER:  Your Honor, I would ask to move

13  Debtors' Exhibit Number 51 into evidence.

14          THE COURT:  Any objection?

15      (No verbal response)

16          THE COURT:  It's admitted.

17      (Exhibit 51, ECF 861-45, received in evidence)

18  BY MR. LENDER:

19  Q    Let's turn, if we could, to page 4 of the exhibit,

20  which is the first page of a presentation.

21  Was this presentation provide to the Independent Finance

22  Committee in or around March 31, 2020?

23  A    It was.

24  Q    And if we could turn to page 3 of the deck, which is

25  page 8 of the exhibit, can you describe what is being

1  discussed here in the situation overview?

2  A    Of course.  The headline to the page really is, you

3  know, despite the company having a strong start of the year,

4  the onset of COVID had a sudden and material impact on SSB's

5  performance, particularly as it related to customers'

6  performance and their orders.  And so the focus had shifted,

7  as I had mentioned before, from a liability management

8  transaction, which could have reduced leverage, to really

9  focusing on -- on very near-term liquidity enhancement and

10 liquidity management alternatives.

11 Q    And what were some of the potential transactions the

12 company and you were looking at to get additional liquidity

13 into the company?

14 A    We were looking, at the time, on modifications to the

15 company's ABL, potential last-out tranches to the ABL.

16 There was vendor and working capital management.

17      We also began discussing potential drop-down

18 situations and drop-down scenarios to raise liquidity.

19 Q    Did the company also look at potential sale lease-

20 backs?

21 A    Yes, actively.

22 Q    How about sales of Serta's interest in a China joint

23 venture?

24 A    It was the -- it was the subject of discussion at the

25 time, yes.

1  Q    Okay.  If we look further down in the slide, do you see

2  where it says:

3       "Current cash flow forecasts indicate the company may

4  run out of liquidity as soon as early July, necessitating an

5  evaluation of transaction alternatives to raise near-term

6  liquidity."

7       Was this consistent with your recollection as to the

8  status of the company's cash flow at this point in time?

9  A    Yes, it was.

10 Q    All right.  Let's now change subjects and talk a little

11 bit about the process that led to the 2020 transaction

12 that's at issue in this case.

13      When did Evercore first reach out to the market to

14 discuss a possible transaction involving SSB?

15 A    I recall it was sometime in late March.

16 Q    And how did you go about reaching out to various

17 potential participants for the transaction?

18 A    There had been certain parties who had in-bounded to

19 SSB.  And Evercore, together with the company, came up with

20 a list of potential third-party, as well as existing

21 lenders, and came up with a robust list of parties to reach

22 out to, to pursue financing.

23 Q    And after you identified potential existing lenders and

24 third-party lenders, did you have them sign NDAs?

25 A    We did.  We contacted parties, we had a teaser of

1  information.  And to the extent folks were willing to, we

2  then had NDAs to give them more fulsome information.

3  Q    And was there a no-talk included in the NDAs?

4  A    There was.

5  Q    And why are no-talks included in NDAs?

6  A    No-talks allow the company to maintain control over a

7  process, so you don't have lenders colluding, parties

8  getting together and coming up with a deal and presenting it

9  to the company as a fait accompli.  It lets us keep people

10  separate and run a competitive process.

11  Q    Okay.  Thank you.

12       Let's now turn to the second document in your binder.

13  A    Mr. Lender, before you go on, is it possible to get a

14  bottle of water just up here?

15  Q    Definitely.

16           MR. LENDER:  Your Honor, may I approach?

17           THE COURT:  Please.  Thank you.

18       (Participants confer)

19           MR. LENDER:  Just a request, if you can try to

20  talk into the microphone, that would be great.  Thank you.

21           UNIDENTIFIED:  Thank you.

22           THE COURT:  I can probably up the volume a little

23  bit.  Just try that.

24  BY MR. LENDER:

25  Q    Okay.  The second exhibit I wanted to ask you, Tab 2,

 1  it's -- for the Record, it's Document 862-6, also Debtors'

 2  Exhibit Number 62.

 3       Is Debtors' Exhibit 62 an internal email chain within

 4  Evercore involving you, dated April 9th, 2020?

 5  A   It is.

 6            MR. LENDER:  Your Honor, I'd ask that Debtors'

 7  Exhibit Number 62 be admitted into evidence.

 8            THE COURT:  Any objection?

 9       (No verbal response)

10            THE COURT:  It's admitted.

11       (Exhibit 62, ECF 862-6, received in evidence)

12  BY MR. LENDER:

13  Q   I'd like to focus on the email from Brent Banks to you,

14  dated April 9th, 2020.

15       First of all, can you just identify for the Court who

16  Mr. Banks is?

17  A   Mr. Banks is a member of my team, he's currently a

18  Senior Managing Director at Evercore; at this time, he was a

19  Managing Director.

20  Q   Okay.  In the first two sentences of the email, Mr.

21  Banks writes:

22       "I just spoke, hung up with TSSP.  They asked if we

23  are reaching out to anyone else.  Told them, look, expect a

24  competitive process."

25       In your view, was it always contemplated that the

1  restructuring process would be a competitive process?

2  A    Yes, been -- that's the reason we went out to a number

3  of parties, you know, a dozen or more parties, and had the

4  no-talk provision, was to run a specifically competitive

5  process.

6  Q    And how would a competitive process help get the best

7  deal for the company?

8  A    It allows us to get multiple bids and keep horses

9  separate, if you will, so we can play terms off of each

10 other to get the best terms for the company.

11 Q    Do you recall having discussions with the independent

12 board committee about enabling a competitive process?

13 A    I do.  It was almost a predicate to the entire deal.

14 That's how we approach, you know, virtually every deal we

15 do.  And from the beginning, it was set up to be a

16 competitive process, where we told the Finance Committee the

17 number of parties and, in an interactive way, the parties we

18 would go to by definition to create that competition.

19 Q    All right.  Let me just ask you briefly to turn to the

20 next exhibit.  We're going to return to the email in a

21 minute.

22         MR. LENDER:  And this, for the Record, is

23 Document 862-7, Debtors' Exhibit Number 63.

24 BY MR. LENDER:

25 Q    Is Debtors' Exhibit 63 a copy of the April 10, 2020

 1  board meeting minutes of the Independent Finance Committee?

 2  A    Yes.

 3  Q    And did you attend that meeting?

 4  A    I did.

 5          MR. LENDER:  Your Honor, I'd ask that Debtors'

 6  Exhibit Number 63 be admitted into evidence.

 7          THE COURT:  Any objection?

 8      (No verbal response)

 9          THE COURT:  It's admitted.

10      (Exhibit 63, ECF 862-7 received in evidence.)

11  BY MR. LENDER:

12  Q    Okay.  Let's look under "Lender Engagement."  Do you

13  see where it says that:

14      "In response to a question from Mr. Tepner regarding

15  the outreach strategy, Mr. Shah noted the object of the

16  engagement process was to obtain multiple proposals for any

17  transaction and enable a competitive process to obtain the

18  best terms available for the company."

19      Is that consistent with what you told the independent

20  committee?

21  A    Yes --

22  Q    And is --

23  A    -- it is.

24  Q    And is that what you did?

25  A    That is what we did.

1

2  Q    All right.  Let's just briefly go back to the prior

3  exhibit, again, 862-6, Debtors' Exhibit Number 62.

4       How many different lenders or third parties did the

5  company reach out to?

6  A    I don't remember the exact number.  It was in excess of

7  a dozen.

8  Q    And does exhibit -- does Debtors' Exhibit Number 62

9  identify some of those existing lenders and third-party

10 investors that Evercore reached out to?

11 A    It does.

12 Q    And did all of these lenders and potential lenders

13 identified on Debtors' Exhibit Number 62 make an offer?

14 A    I don't recall if every one of them made an offer, but

15 a number of these did.

16 Q    And what was the structure of the transaction that was

17 contemplated at this time, early April 2020?

18 A    At that time, the structure that we were contemplating

19 was an IPCO structure, where we would drop certain assets of

20 SSB into an unrestricted subsidiary and then secure

21 financing against those assets.

22 Q    And what happens if there's a default?

23 A    If there's a default at which entity?

24 Q    If there's a default at the NewCo entity that's created

25 with the collateral that's put into that NewCo?

1

2   A    The lenders would have recourse to the collateral that

3   was placed into that entity.

4   Q    And would the collateral that's moved into the IPCO

5   entity be available to the first lien lenders who were not

6   asked to participate in funding that new entity?

7   A    Not directly, no.  They may -- there may be an equity

8   pledge of the residual of those assets, but they would not

9   have a claim at those assets.

10  Q    Okay.  I want to ask you:  At the bottom of Debtors'

11  Exhibit Number 62, it says "Week of 4/13 and 4/20."  And if

12  you turn to the second page, Jorge put it all into one slide

13  here.  It says:

14       "If reach" -- "if receive outreach from Gibson Dunn or

15  they get wind of financing process, do not engage or engage

16  in diligence with advisors while financing process is

17  ongoing."

18       Can you explain what this is about?

19  A    Sure.  I -- I didn't write it.  But you know, the --

20  the recollection at the time, the IPCO transactions were

21  ones that traditional institutional lenders, such as CLOs,

22  who were main parties in the Gibson Dunn Group, and had

23  litigated against, they tend to not like those types of

24  transactions.  And so the worry was, if that group got wind

25  of the fact that we were contemplating a drop-down or an

1   IPCO transaction, that they would -- they could litigate

2   against it or try to disrupt it in some way.

3        So the goal was to either not engage with them in any

4   way or parallel process their diligence, but again, all with

5   the view towards consummating the IPCO transaction.

6   Q    I want to just briefly talk about the different parties

7   that are involved in this case and who they're representing.

8        Who is PJT?

9   A    PJT is a financial advisor to the non-PTL lenders.

10  Q    And the non-PTL lenders are what we sometimes refer to

11  as the "Angelo Gordon Group" or things like that?

12  A    Correct.

13  Q    And who did Paul Weiss represent?

14  A    Paul Weiss was counsel to those lenders, same lenders.

15  Q    All right.  For purposes of my questioning today, I'm

16  going to try to refer to that group as either the "PJT

17  group" or the "Angelo Gordon Group," just so we can have as

18  clean a Record as possible.  Would that be okay?

19  A    Okay.

20  Q    And can you tell us who Centerview is?

21  A    Centerview is financial advisor to the PTL group.

22  Q    Okay.  And who did Gibson Dunn represent?

23  A    They were counsel -- counsel to that same group.

24  Q    And again, just to have a clean Record, I will do my

25  best to refer to that group as the "PTL lenders" or the

1  "Centerview group."  Is that okay?

2  A    Okay.

3  Q    Great.

4        Let's take a look at our next exhibit, which is, for

5  the Record, Document 863-4, Debtors' Exhibit Number 111.

6        Is the top email in the chain an email that you wrote

7  and sent to Mr. Banks, copying others at Evercore, dated

8  May 5th, 2020?

9  A    It is.

10             MR. LENDER:  I'd like to move Debtors' Exhibit

11  Number 111 into evidence.

12             THE COURT:  Any objection?

13        (No verbal response)

14             THE COURT:  It's admitted.

15        (Exhibit 111, ECF 863-4 received in evidence)

16  BY MR. LENDER:

17  Q    In the third paragraph, you wrote:

18        "We should focus on Angelo Gordon, as they continue to

19  be our best horse."

20        What did you mean by that?

21  A    Well, at the time, just that.  The Angelo Gordon Group

22  was our best horse.  They had sent a proposal into the

23  company, we were negotiating that proposal.  They were

24  furthest ahead and had the most developed proposal.  So,

25  based on the competitive process to that date, while we had

1   a lot of other parties participating, the view at the time

2   was the Angelo Gordon Group was the best horse.

3   Q    Okay.  Let me ask you to turn to the next exhibit in

4   your binder.

5          MR. LENDER:  And for the Record, it's Document

6   863-38, Debtors' Exhibit Number 145.

7   BY MR. LENDER:

8   Q    Mr. Roopesh, is Debtors' Exhibit Number 145 a copy of

9   the board minutes from the Independent Finance Committee for

10  SSB, dated May 22, 2020?

11  A    Yes.

12  Q    And did you attend this meeting?

13  A    I did.

14         MR. LENDER:  Your Honor, I'd ask that Debtors'

15  Exhibit Number 145 be admitted into evidence.

16         THE COURT:  Any objection?

17     (No verbal response)

18         THE COURT:  It's admitted.

19     (Exhibit 145, ECF 863-38 received in evidence)

20  BY MR. LENDER:

21  Q    Now, if we can look down at the lender engagement,

22  which is the bottom of page 1.

23     Can you just describe at a high level what was being

24  discussed at this meeting?

25  A    At that time, we were discussing the various term

1  sheets that we -- "we," the company -- had received,

2  including to Angelo Gordon, Barings, and other lenders.  But

3  we -- at -- in this case, we had presented a term sheet back

4  to them, in terms of a counter.

5  Q    Okay.  Great.

6       Let's turn to page 4 of the exhibit.

7       And is it -- was this presentation provided to the

8  Independent Finance Committee?

9  A    Yes.

10 Q    And I'm going to walk -- I want to walk through some of

11 the different things that were discussed in this

12 presentation.

13      Let's turn to page 2 of the deck, which is page 6 of

14 the exhibit.

15      Under -- and under "Executive Summary," it talks about

16 the status of various revised terms that were being

17 discussed.  But can you just describe briefly what the --

18 what this executive summary is intending to say?

19 A    It's -- it's really giving the status of the

20 competitive process.

21      So the first bullet talks about how, in the last week,

22 the company has reverted with term sheet responses to the

23 PJT group, to Barings, and to other providers who were in

24 the process:  Oaktree, TSSP, Fortress, Charles Bank, and

25 Blue Torch.

1        We were continuing to prepare diligence materials for

2    the Centerview and Gibson Dunn Group in parallel with all of

3    that, even though we hadn't had a proposal or had them under

4    NDA group, and that we were also continuing to look at other

5    transactions.  Some of them are marked privileged, but you

6    can see one there, a parallel process with the company and

7    Advent regarding a more holistic recapitalization.

8        So we were -- we were looking at all options and

9    providing a status update on each of them.

10   Q    Thank you.

11       Let's turn to the next slide, which is page 7 of the

12   exhibit, entitled "IPCO Financing Lender Outreach Summary."

13       Can you describe to the -- for the Court what this

14   slide shows?

15   A    This was a running list we kept and would present to

16   the Finance Committee, showing the status of each party that

17   we were speaking to.  And you can see there's the Angelo

18   Gordon Group, there's the Gibson Dunn Group.

19   And then the third-party lenders, we would track when we

20   contacted them, whether they were under NDA, whether they

21   had access to a data room, whether they had sent us a

22   proposal, et cetera.

23   Q    And how many parties did the company reach out to

24   concerning a potential transaction as of the date of this

25   document?

1  A      Thirteen.  Even if you count groups as one party,

2  thirteen groups of parties.

3  Q      And how many of those parties entered NDAs with the

4  company?

5  A      Eleven.

6  Q      And how many term sheets did the company receive?

7  A      Seven.

8  Q      Let's now turn to page 9 of the document, the page that

9  says "IPCO Financing Term Sheet Summaries."

10       And if you could just flip through the next couple of

11  pages and just let us know, sort of at a high level, what

12  appears behind this slide in the deck.

13  A      Well, the first two pages -- two pages are a status

14  update on the Angelo Gordon proposal.  The left column is

15  what they were proposing; the right column is what the

16  company was proposing to counter.

17       The reason it's on two pages is their proposal had two

18  parts, there were actually going to be two drop-downs:

19  The first page, which is marked page 11, is where they were

20  going to drop -- we were going to drop assets into a non-

21  guarantor subsidiary and raise some new money, as well as do

22  an exchange there.

23       The second page is where assets were going to be put

24  into an unrestricted subsidiary and an exchange would be

25  done there.

1        And so, again, the left side is what was being

2    proposed by them; the right side was, at that moment, what

3    we'd be countering with.

4    Q    And are the pages that follow different bids and asks

5    from other lenders and potential lenders?

6    A    They are.

7    Q    Were all the proposals that the company received as of

8    May 22, 2020, the date of this document, IPCO transactions?

9    A    Yes, they were.

10   Q    And why was that?

11   A    That was really the only structure we had been

12   contemplating.  We had ruled out certain other structures,

13   such as a FILO under the ABL, due to size and feasibility.

14   And at the time, the only transaction that seemed feasible

15   was the IPCO transaction, so that was really the only basis

16   on which we were -- we were talking to the market.

17   Q    And did all the transactions propose moving assets into

18   a new company for the benefit of the participating lenders,

19   as you described earlier?

20   A    Yes, they did.

21   Q    And if the company had proceeded with one of the IPCO

22   transactions, what would have happened to the remainder of

23   the 1-L debt that was not asked to participate?

24   A    They would lose their claim on those assets and

25   presumably have less collateral backing their claim.

1  Q    I want to walk through some of the different proposals.

2  And let's start with the Angelo Gordon Group's proposal, and

3  let's start at the first page of that, which is page 4 of

4  this -- of the deck, page 10 of the exhibit.

5       And just is -- this is -- is this the latest version

6  of the Angelo Gordon Group's IPCO financing term sheet

7  that's discussed in this document?

8  A    At that time, yes.

9  Q    And on -- under the proposal, who was going to be the

10 borrower for the new money financing?

11 A    It was going to be a newly formed, non-guarantor,

12 restricted subsidiary of the company.

13 Q    And if we go to the row that says "Amount," what does

14 this show?

15 A    Under their proposal, there was going to be a 285 new

16 first lien term loan at that subsidiary, which would have

17 been 200 million of new money, plus 100 million would have

18 been offered in exchange for existing debt of the Angelo

19 Gordon Group.

20 Q    And if we go down to the collateral, what was the

21 collateral that the Angelo Gordon Group was proposing for

22 this deal?

23 A    It was going to be certain IP; namely, the Simmons and

24 Tuft & Needle IP, an as-yet-undetermined percentage of the

25 company's equity ownership in Serta, Inc., the prime asset

1  of which was the Serta trademark, and some third-party

2  licensing revenue and some real estate.

3  Q    Okay.  If we go to the next slide at page 11 of the

4  exhibit, can you describe what this slide shows as page 2?

5  A    This is, in essence, the second piece of the

6  transaction, which is a transfer of assets to an

7  unrestricted subsidiary, against which we could raise debt.

8  Q    And if we look at "Amount," what was the exchange that

9  the Angelo Gordon Group was proposing at this time?

10 A    It was going to be a $435 million new term loan offered

11 wholly for an exchange of the Angelo Group holdings in

12 Serta.

13 Q    Let's now turn to the next slide, which is page 12 of

14 the exhibit, entitled "Barings IPCO Financing Term Sheet."

15 What is this slide showing?

16 A    This shows where we were at that point with Barings on

17 a competing IPCO financing.

18 Q    And generally, how does the Barings' term sheet compare

19 with the Angelo Gordon term sheet that we just looked at?

20 A    It's roughly the same structure and same contemplated

21 steps.  There was -- my guess is there were different

22 economics between them, but it was an identical structure.

23 Q    Let's turn to the next page, page 13 of the slide -- of

24 the exhibit.

25        What does this slide show?

ROOPESH SHAH - DIRECT BY MR. LENDER                    29

1    A     This shows two other proposals that we were evaluating

2    at the time, one from Fortress and one from TPG Sixth

3    Street.

4    Q     And how did these -- I'm sorry.  How do these proposals

5    compare to the Angelo Gordon proposal?

6    A     Again, similar in structure.  And when I say "similar

7    in structure," in some ways, they were actually simpler.  I

8    don't believe that -- that they were going to have the two-

9    box structure of the non-loan party and the unrestricted

10   subsidiary.  They were simpler, in that they were all going

11   to be an unrestricted subsidiary.  But other than that, by

12   and large, similar structure, similar concepts.

13   Q     And let's turn to page 15 of the exhibit, the one that

14   says:

15         "Other IPCO Financing Term Sheet Summaries, Blue Torch

16   Capital, Oaktree, Charles Bank."

17         Can you describe what this shows?

18   A     Similar, all three different versions of IPCO

19   financings on the same structure or similar structure to the

20   Angelo Gordon proposal.

21   Q     Let me ask you now to turn to page 11 of the slide

22   deck, which is page 18 of the exhibit.

23         And what is this slide showing?

24   A     page 11 shows the holders that we were talking to at

25   the time.  And again, the point of slide is not just to

1  focus on the holdings, but we were trying at the time to

2  estimate holders' cost bases as a form for negotiation.

3        But -- but the left column shows the amount of

4  outstanding debt that those parties held.

5  Q    And how much total 1-L debt is represented by the

6  various holders you were in discussions with?

7  A    It adds up to around 1.3 to 1.4 billion.

8  Q    And how does that compare to the total amount of 1-L

9  debt the company had at this point in time?

10  A    That's approximately 70 percent of the existing 1-L

11  debt at that time.

12  Q    And do be clear, did the company also talk to and

13  solicit proposals from non-lenders, third parties?

14  A    Yes.

15  Q    Now, of all the various proposals that we just went

16  through, what proposals were ultimately considered by the

17  Independent Finance Committee?

18  A    As we went on, the two -- the most viable proposals

19  were the Angelo Gordon Group proposal and the proposal that

20  eventually emerged out of the Gibson Dunn Group.

21  Q    And why did it come down to those two proposals?

22  A    Both would have accomplished the main goals of

23  providing liquidity, as well as capturing some discount in

24  the debt, albeit they were under different structures,

25  different complexities.  But at the root, they provided what

1  the company needed, in terms of both holistic-ness of new

2  money, as well as capturing the discount of the debt.

3  Q    All right.  Let's turn to our next exhibit.

4         MR. LENDER:  And for the Record, it's Document

5  865-21, Debtors' Exhibit Number 29 -- Debtors' Exhibit

6  Number 229, entitled "Financing Transaction Timeline."

7  BY MR. LENDER:

8  Q    Can you explain what this document is?

9  A    This document is a timeline that Evercore prepared,

10  really documenting at a very granular level the interactions

11  between Evercore and the company and the Gibson Dunn Group

12  and the PJT group over the course of several weeks of

13  negotiation.

14  Q    And why did you create this timeline?

15  A    This was created because, after we told the PJT group

16  that we were going with the Gibson Dunn Group proposal, they

17  raised, you know, some concerns within Evercore about the

18  decisions that were reached and the process that was run.

19  And so this was put together really just to review the

20  process and make sure, from a best practices standpoint, you

21  know, that we -- that everything was run in a proper way.

22         MR. LENDER:  Your Honor, I'd ask to move Debtor's

23  Exhibit No. 229 into evidence.

24         THE COURT:  Any objection?

25      (No audible response.)

1          THE COURT:  It's admitted.

2      (Exhibit 229, ECF 265-21, received in evidence.)

3  BY MR. LENDER:

4  Q    All right, I want to walk through some of the items

5  that you set forth in their timeline, and I'm going to go

6  through it -- let's start with the Centerview Gibson Dunn

7  Group and then we'll do the PJT Angelo Gordon Group second.

8      So, starting with -- let's turn, if we could, to the

9  timeline.  It's page 2 of the timeline, page 4 of the

10  exhibit, and first question is:  When did the Centerview

11  Gibson Dunn Group first formally reach out to management?

12  A    I believe on April 7 Gibson Dunn sent the letter on

13  behalf of the group to the company.

14  Q    And if you could just look at the next exhibit in your

15  binder, Document 862-3, Debtor's Exhibit No. 59, is Debtor's

16  Exhibit 59 a copy of Gibson Dunn's April 7th, 2020 letter

17  that you just mentioned?

18  A    Yes.

19          MR. LENDER:  Your Honor, I'd offer Debtor's

20  Exhibit No. 59 into evidence.

21          THE COURT:  Any objection?

22      (No audible response.)

23          THE COURT:  It's admitted.

24      (Exhibit 59, ECF 265-21, received in evidence.)

25  BY MR. LENDER:

1  Q    If we can turn to the second page of Gibson Dunn's

2  letter, do you see in the second paragraph where Gibson Dunn

3  wrote:

4      "The secured lender group believes that the company

5  should work with the secured lender group to explore ways in

6  which it can assist the company in dealing with its

7  deteriorating liquidity position and unsustainable capital

8  structure in a way that maximizes the value of the company's

9  assets as a whole?"

10     And then if we go to the next paragraph, they wrote:

11     "The secured lender group, given its senior position in

12 the company's capital structure and its exclusive power to

13 amend or provides consents as part of the credit agreements,

14 is well positioned to augment the company's liquidity in the

15 most cost and time efficient matter."

16     To your knowledge, is this the first time that Gibson

17 Dunn had formally reached out to the company?

18 A    Yes, I believe so.

19 Q    Did Gibson Dunn propose terms for any transaction in

20 this letter?

21 A    No.

22 Q    Going back to the timeline, Debtor's Exhibit No. 229,

23 Document 865-21, when did the company -- excuse me -- when

24 did the Centerview Group first make a proposal to the

25 company?

1  A    On April 24, they sent in their first proposal.

2  Q    Let's take a look at that, the next exhibit in your

3  binder, Document 862-31, Debtor's Exhibit No. 87.

4       Is Debtor's Exhibit 87 a copy of Gibson Dunn's letter

5  dated April 24, 2020 that you just referenced?

6  A    Yes.

7            MR. LENDER:  Your Honor, I'd ask that Debtor's

8  Exhibit No. 87 be moved into evidence.

9            THE COURT:  Any objection?

10      (No audible response.)

11           THE COURT:  It's admitted.

12      (Exhibit 87, ECF 862-31, received in evidence.)

13 BY MR. LENDER:

14 Q    Did Gibson Dunn make a financing proposal for the

15 company's review and consideration?

16 A    They did.

17 Q    And had the company negotiated with the Centerview

18 Group in those two weeks since they first reached out on

19 April 7th?

20 A    No.

21 Q    Had the company executed an NDA with the Centerview

22 Group during that period of time?

23 A    I don't believe so.

24 Q    Is April 24, 2020 the first time the company received

25 any financial proposal from the Centerview Group?

1  A    Yes.

2  Q    Had the company solicited any financial terms from the

3  Centerview Group before this?

4  A    No.

5  Q    Let's take a look at the attached proposal, which is at

6  page 7 of the exhibit, and can you summarize what the

7  Centerview Group proposed at this time?

8  A    It was solely a new financing, a superpriority new

9  financing in an amount TBD because they hadn't done

10 diligence to know how much we need but they're proposing to

11 open up a super senior or priority tranche to provide for a

12 new liquidity for the company.

13 Q    Just briefly, looking back at Gibson Dunn's, the

14 substance of the letter, do you see in the third paragraph

15 where they wrote:

16      "Based on the current state of the capital markets and

17 the company's specific capital structure, we expect any

18 third-party financing to be based on a predatory pricing

19 structure and require onerous terms?"

20      What did you understand they were referring to here?

21 A    I think specifically, a dropdown or an IPCO

22 transaction, among others, a worry that any third party not

23 in the structure would want, and a predatory price on an

24 exorbitant return, and in a structure that could be harmful

25 to those lenders that Gibson Dunn represented.

1  Q    Okay, thank you.

2       Let's return back to the timeline, Document 865-21,

3  Debtor's Exhibit No. 229, and page 6.

4       Do you see under the week of May 25th, it states:

5       "GDC/CV, Gibson Dunn/Centerview, sent revised financing

6  terms to WGMEVR, Evercore, first term sheet with new money

7  plus exchange?"

8  A    Yes.

9  Q    Is this the first time that the Gibson Dunn Centerview

10 Group had proposed a deal involving both new money and an

11 exchange?

12 A    Yes, it was.

13 Q    Now, in the timeline, you wrote, "had serious flaws."

14 What were those flaws?

15 A    I think they were proposing, at the time, an exchange

16 rate that we viewed as too high, in other words, not enough

17 discount capture.  They also were not giving us enough

18 capacity to do what we were going to call a second step

19 transaction, which was to include other lenders who didn't

20 participate in the first step an ability to join and get

21 refinanced.

22 Q    Now, did you continue to negotiate with the Centerview

23 Group?

24 A    Yes.

25 Q    And did you also continue to talk to and negotiate with

1    the PJT Group?

2    A    Yes.

3    Q    Were you also negotiating with other potential lenders

4    at this point in time?

5    A    I believe we may have been negotiating with Barings.  I

6    think some of the other transactions were falling away due

7    to size or other feasibility.  At a minimum, the two you

8    mentioned and possibly Barings, and Oaktree was in the mix

9    somewhere.  So, yes, others.

10   Q    Did Centerview ultimately improve their financial

11   offer?

12   A    They did.

13   Q    And how did they improve their offer?

14   A    Over multiple rounds of negotiations around the

15   exchange ratio being more favorable to the company around

16   overall call protection, ability to do a step two

17   transaction with *pari passu* or junior debt capacity, among

18   others.

19   Q    And how does improving the exchange ratio, how is that

20   better for the company?

21   A    What an improved exchange ratio means that the Gibson

22   Dunn Group is exchanging their debt at a lower price or a

23   higher discount and the company benefits from that discount

24   capture as dollar-for-dollar deleveraging.

25   Q    Okay, let's go back to the timeline, and now I want to

1  talk just briefly about the PJT Angelo Gordon Group.

2        And if you look at page 2 of the timeline, page 4 of

3  the exhibit, when did the company first receive a proposal

4  from the Angelo Gordon Group?

5  A    I believe Advent had received it the week of March 9.

6  We received it March 18.

7  Q    Let me ask you to look at the next exhibit in your

8  binder.

9             MR. LENDER:  This is, for the Record, Document

10 861-23, Debtor's Exhibit No. 29.

11 BY MR. LENDER:

12 Q    Is Debtor's Exhibit 29 a copy of the proposal that

13 Angelo Gordon made in March 2020?

14 A    Yes.

15            BY MR. LENDER:  Your Honor, I'd ask that Debtor's

16 Exhibit No. 29 be admitted.

17            THE COURT:  Any objection?

18       (No audible response.)

19            THE COURT:  It's admitted.

20       (Exhibit 29, ECF 861-23, received in evidence.)

21 BY MR. LENDER:

22 Q    Let's turn to page 4 of the exhibit, which is entitled

23 SSB Proposed Transaction; does this slide summarize the

24 proposal made by the Angelo Gordon Group?

25 A    It does.

1  Q    And can you briefly describe the proposal that they

2  made?

3  A    Their proposal was to set up an unrestricted subsidiary

4  and transfer assets, including IP and equity of Serta, and

5  at that subsidiary, Angelo Gordon would lend $200 million

6  for new money and they would exchange their debt into that

7  subsidiary at the same time.

8  Q    Now, let's look at the last bullet under transaction

9  steps; do you see where it says:

10      "Company uses excess debt proceeds to opportunistically

11 purchase 1-L/2-L term loans in the open market or subsequent

12 transactions?"

13      What did you understand that step of their proposal was

14 about?

15 A    It was to use either the cash that they had put in or

16 further exchange capacity to go out and repurchase other

17 nonparticipants, participants away from Angelo Gordon at

18 that time.

19 Q    And is this any different than what Serta did after the

20 transaction was announced?

21 A    I think it's the same thing.

22 Q    During your negotiations with the PJT Angelo Gordon

23 Group, did they ever propose any structure other than an

24 IPCO structure?

25 A    Not that I'm aware of.

ROOPESH SHAH - DIRECT BY MR. LENDER                    40

1  Q     Did they improve any of the terms during the

2  negotiations?

3  A     They did.

4  Q     What were your views of the Angelo Gordon Group's

5  proposal?

6  A     Ultimately by the end, we didn't have a fully baked

7  proposal.  There were a handful, five or six, critical open

8  points, but at the end of it, based on what was on the

9  table, putting aside whether we could actually get it to

10  completion given those open points, it still was not

11  superior to what Gibson Dunn was offering.

12  Q     Let me ask you if we could turn to the next exhibit in

13  your binder.

14          MR. LENDER:  This is, for the Record, Document

15  865-16, Debtor's Exhibit No. 224.

16  BY MR. LENDER:

17  Q     Is Debtor's Exhibit 224 and email exchange involving

18  you dated in or around June 4 or June 8th, 2020 relating to

19  the PJT Angelo Gordon Group proposal?

20  A     Yes.

21          MR. LENDER:  Your Honor, I'd ask that Defendant's

22  No. 224 be admitted into evidence.

23          THE COURT:  Any objection?

24      (No audible response.)

25          THE COURT:  It's admitted.

1        (Exhibit 224, ECF 865-16, received in evidence.)

2   BY MR. LENDER:

3   Q    I want to focus on the June 4th email if we could.

4   Mr. Shah, does the June 4th email included on page 1 of

5   Debtor's Exhibit 224 summarize some of the issues Evercore

6   had with the PJT Angelo Gordon proposal?

7   A    Yes, it does.

8   Q    And I'd like to walk through them if we could, and

9   let's just tick through them.

10       The first one identified says bankruptcy remote

11  designation; can you explain what that one's about?

12  A    Yes.  Somewhere in the course of the negotiations, the

13  Angelo Group wanted the unrestricted subsidiary to be

14  bankruptcy remote, in other words, not be ring fenced away

15  from SSB, and in the event of any future bankruptcy of SSB,

16  the unrestricted subsidiary holding the IP of SSB would not

17  be subject to those same bankruptcy proceedings.

18  Q    And what's the concern about that?

19  A    It keeps the IP, the main asset, and the unrestricted

20  subsidiary from being dragged into an SSB bankruptcy and

21  being compromised.  I understand why they would want it as

22  lenders, but it's significant negative for SSB in the event

23  of any future restructuring.

24  Q    Next one down, number two says exchange ratio; what was

25  the issue with the exchange ratio?

ROOPESH SHAH - DIRECT BY MR. LENDER                    42

1  A    We wanted a lower ratio, in other words, more discount

2  capture, and that time, we were comparing to neck and neck

3  the negotiations we were having with the Gibson Dunn Group

4  around the same term.

5  Q    The next one down says security leakage; what's that

6  one about?

7  A    So, by virtue of their two box structure where certain

8  assets were going to be put into a non-guarantor and other

9  assets would be put into an unrestricted subsidiary, we

10 were, in essence, dividing the transaction among two boxes

11 and they wanted to put more assets at the non-guarantor,

12 which would have over-collateralized the non-guarantor and

13 put comparably fewer assets at the unrestricted subsidiary.

14 And therefore, the only place we could have done a step two

15 transaction and bring lenders in after the fact would have

16 been at the unrestricted subsidiary, but it would have had

17 fewer assets and therefore less step two transactions.

18      And so, when we say leakage, we were

19 over-collateralizing one box for their benefit, under

20 collateralizing another box which would have been to the

21 detriment of a step two.

22 Q    Next one down says call protection; what was that one

23 about?

24 A    I believe it was call protection on if we repaid the

25 debt at the non-loan party or at the unrestricted

1   subsidiary, they wanted a significant make whole.

2   Q    Next one is exchange rate; what was that about?

3   A    They were looking for the right to, after the deal

4   closed, to go into the -- as opposed to having the company

5   go into the market and exchange more debt, they wanted to

6   have the right to buy debt in the market and put it into the

7   company at a fixed price thereby earning that spread.

8   Q    And finally, negative covenant, what was the issue

9   with the negative covenant?

10  A    They wanted stricter limitations around our ability to

11  sell assets and use those proceeds to pay nonparticipants.

12  Generally, it was around what we call RDP, Restricted Debt

13  Payments, which was our ability post-to-closing to satisfy

14  or repay the nonparticipants.

15  Q    Okay, let's now turn and just talk about the Centerview

16  proposal; were there issues that you identified with the

17  Centerview proposal that you also were trying to negotiate?

18  A    Yes.

19           MR. LENDER:  Let me ask if we can now look at, for

20  the Record, Document 865-1, Debtor's Exhibit 208.

21  BY MR. LENDER:

22  Q    Is Debtor's Exhibit No. 208 an email chain involving

23  you dated in or around June 5th, 2020 relating to the Gibson

24  Dunn Centerview Group proposal?

25  A    Yes.

1          MR. LENDER:  Your Honor, I'd ask that Debtor's

2    Exhibit No. 208 be admitted into evidence.

3          THE COURT:  Any objection?

4       (No audible response.)

5          THE COURT:  It's admitted.

6       (Exhibit 208, ECF 865-1, received in evidence.)

7    BY MR. LENDER:

8    Q    All right, you know how these email chains, they work

9    like reverse order?  So, let's move -- where I want to start

10   is the email at the bottom of page 6 of the document, and

11   it's an email from Brent Banks to you dated June 6th -- I'm

12   sorry -- dated June 4th, 2020.

13       Does this identify some of the issues, the open issues

14   with the Centerview proposal from Evercore's perspective?

15   A    It does.

16   Q    Now, one of the issues identified, it says, "Allowed

17   RDP."  Do you see that?

18   A    Yes.

19   Q    And I want to move up to an email that you wrote and

20   ask you about that.

21          If we move up to page 3 of the exhibit, there's an

22   email from you dated June 4th, 2020 at 8:30 p.m.  Do you see

23   that on the screen?

24   A    Yes.

25   Q    And you wrote, "Okay on our RDP concept."  What was the

1  RDP concept?

2  A    It was generally to provide more flexibility to make

3  restricted debt payments, i.e., repay parties who were not

4  in the transaction.  And I recall we were negotiating a

5  basket to use asset sale proceeds to make such payments.  I

6  think if we repaid some of the exchange debt, we could also

7  free up a basket.  So, it was basically flexibility to

8  create basket capacity to then repay nonparticipants.

9  Q    And did the Centerview Group ultimately accept the

10  company's RDP concept?

11  A    They did.

12  Q    The next bullet says -- in your email, you wrote, "They

13  will drop the yield limitation entirely."

14      What was that about?

15  A    At the time, they wanted to restrict the rate or the

16  yield at which we could exchange nonparticipants into other

17  debt and they wanted to cap the rate we could offer them,

18  and we pushed back on that to have more flexibility to cut

19  deals with nonparticipants.  So, they ultimately did give

20  that.

21  Q    Okay, thank you.

22      And then, the third and final bullet says, "We take all

23  $200 million of new money now and we have up to 12 months to

24  repay up to $75 million of the second priority debt at the

25  MW amount and we get 2/3 credit for any paydown, i.e.,

1  75 million paydown yields 50 million of exchange credit, you

2  see that?

3  A    I do.

4  Q    And what was your reaction to this?

5  A    So, this was again trying to create more capacity, more

6  basket capacity to bring in non-participants into the deal,

7  and we negotiated to potentially repay 75 million of this

8  tranche, and they were only willing to give us 2/3 credit or

9  open up a 50 million basket.  As you can see, that was the

10 one I told them I thought was insulting, but that's where

11 they were at the time.

12 Q    All right, let's move up the email chain if we could to

13 the bottom of page 2.  This is your email of June 4th, 2020,

14 at 9:40 p.m., and do you see you wrote, "We have gone back

15 and said okay on all, but on number 3, before we reject the

16 concept of 2/3 credit, instead should get 100 percent

17 credit?"

18 A    Yes.

19 Q    So, did you push back on this point?

20 A    We did.

21 Q    And if we go up one more email, did Centerview

22 ultimately agree and concede on this point?

23 A    Yes.

24 Q    Now, did you ultimately present the Angelo Gordon

25 Group's proposal and the Centerview Group's proposal to the

1  Independent Finance Committee for consideration?

2  A    We did.   The Angelo Gordon proposal was not finalized.

3  We had those open points, and we did not get a response on

4  those points in totality, but we did present it as we

5  understood it to be at the time relative to the Gibson Dunn

6  proposal.

7  Q    Thank you.

8       And let's now turn to our next exhibit in your binder.

9           MR. LENDER:  For the Record, this is Document

10 864-45, Debtor's Exhibit No. 202.

11 BY MR. LENDER:

12 Q    Is Debtor's Exhibit 202 a copy of the minutes of the

13 Independent Finance Committee dated June 5th, 2020?

14 A    They are.

15 Q    And did you attend this meeting?

16 A    I did.

17          MR. LENDER:  Your Honor, I'd ask that Debtor's

18 Exhibit No. 202 be admitted into evidence.

19          THE COURT:  Any objection?

20     (No audible response.)

21          THE COURT:  They're admitted.

22     (Exhibit 202, ECF 864-45, received in evidence.)

23 BY MR. LENDER:

24 Q    Mr. Shah, is the June 5th, 2020 meeting the meeting

25 where the Independent Finance Committee approved moving

ROOPESH SHAH - DIRECT BY MR. LENDER                        48

1  forward with the Centerview Group proposal?

2  A    Yes.

3  Q    If we look under lender engagement, it says that

4  Mr. Banks informed the Committee of the advisor's view that

5  the offer of the Gibson Dunn Group represented the best

6  financing and exchange transaction opportunity among the

7  proposals reviewed; did you agree with that?

8  A    Yes.

9  Q    And why did you agree with that?

10  A    The Gibson Dunn proposal was the best in terms of

11  providing the amount of new liquidity the company needed.

12  It provided for greater discount capture.  It provided for

13  less interest expense in total.  It provided a good step two

14  capacity, and it had the participation and support of a

15  larger number of lenders.

16  Q    Let's turn to page 12 of the exhibit entitled,

17  "Financial term sheet proposal caparison."  What does this

18  slide show?

19  A    It's a comparison of the latest Angelo Gordon details

20  relative to where we had reached with the Gibson Dunn Group.

21  Q    And now can you summarize what the Angelo Group

22  proposal was at least as of the date of its latest proposal?

23  A    It was for 200 million of new money.  The rate would

24  have been LIBOR plus 550 in cash plus another 4.5 percent in

25  PIK, 3 percent in fees, which, when you run that all through

1  the math, you get to the WACD, is Weighted Average Cost of

2  Debt -- it's a way to blend everything into a single number

3  -- and you see that the Angelo new debt was 11.7 percent.

4  And then, if you go further down, in exchange, they were

5  proposing certain exchange ratio, 77.5 percent on the 1-L,

6  30 on the 2-L which yielded 162 million of discount capture.

7  And if you go further down, you can see the change in total

8  interest and everything else, all the facets of the Angelo

9  bid.

10 Q    And what would have been the overall effect of the

11 proposal in terms of the collateral?

12 A    All the collateral that we'd discussed would have been

13 shifted away from the restricted group and away from

14 non-participating lenders into either an unrestricted

15 subsidiary or a non-guarantor.

16 Q    Now at the end of the day, would the Angelo Gordon

17 proposal have helped to reduce the company's debt?

18 A    On a net basis, no.  The amount of new debt being

19 sought for liquidity outweighed the discount capture they

20 were offering.

21 Q    And what would have been the change in the interest

22 payments?

23 A    Inclusive of the PIK amount, 37 million.

24 Q    Okay, let's briefly just look at the Gibson Dunn, the

25 Centerview proposal, and can you just briefly summarize that

1  proposal for us?

2  A    Sure.  It provided for the same amount of new money.

3  The reason this says 125 is in order to make this apples-to-

4  apples, we assumed, as I've talked about before, we

5  negotiated a $75 million repayment.  This is pro forma for

6  that repayment because that goes to step two, but it shows a

7  lower all-in rate at L plus 750 and no PIK, similar fees

8  getting to a lower weighted average cost of debt.  It had

9  better call protection being no call one as opposed to no

10  call life, which is a pretty significant term.

11       Their ratio of discount was better on the first lien at

12  74, a little bit worse on the second lien at 39, but because

13  they were a bigger group, we were capturing materially more

14  discount at 310 million in so that the debt in total came

15  down on a net basis by 185 million and interest only went up

16  by 22 million, which was more favorable than where we were

17  with the Angelo Gordon Group.

18  Q    And did both groups insist on a priority position?

19  A    They did.

20  Q    And is that unusual in your experience?

21  A    No.

22  Q    What was your view of the Centerview proposal?

23  A    The Centerview proposal at the time was more advanced

24  and had more favorable terms on virtually every term that

25  was important to the company.

1  Q    Let's turn, if we could, to page 12 of the deck, which

2  is page 18 of the exhibit; does this slide set forth some of

3  the advantages and considerations of the Gibson Dunn

4  proposal?

5  A    It does.

6  Q    We've actually covered most of these points.  I just

7  wanted to ask you about two in particular under

8  consideration.  It's the last two bullets.  One of the

9  considerations, the second to last bullet, says, "Harms

10 relationship with those that do not participate."  What did

11 you mean by that?

12 A    Well, by definition, in these groups where one group is

13 seeking priority over another, those who don't participate

14 are often upset and could affect long-term lending

15 relationships and their appetite to support the company

16 going forward.  The same would have been true under the

17 Angelo Gordon proposal.

18 Q    Are relationships important in the leverage loan

19 business?

20 A    They are.

21 Q    Now, another consideration -- it's the last bullet --

22 says, "Proposal requires 50.1 percent of 1-L term loan

23 participation which Gibson Dunn Group has yet to secure."

24 Did they ultimately get to the 50.1 percent?

25 A    Yes, shortly thereafter.

1  Q    Did you have any concerns about their ability to get to

2  the 50.1 percent?

3  A    No.

4  Q    Now, after the Independent Finance Committee met on

5  June 5th, 2020, did you inform Angelo Gordon that their

6  group was not selected?

7  A    Yes.

8  Q    And how did they react?

9  A    Very negatively.

10  Q    Now, after you told the Angelo Gordon Group that you

11  were not going to take the deal, what did they do?

12  A    We did offer on that call, open the door to potentially

13  seeing if we could negotiate the deal to include them, but

14  they said they weren't interested in that with them alone.

15  They were acting as a group and given the transaction

16  couldn't hold them as a group, they declined the invitation

17  to potentially participate.

18       And then over the next 24 to 48 hours, our

19  understanding based on calls we got from other lenders was

20  that they were calling around to lenders to solicit support

21  away from the majority group and into their proposal.

22            MALE SPEAKER:  Your Honor, objection

23  (indiscernible).

24            THE COURT:  Any response?

25            MR. LENDER:  This is just his present sense of

1  what's going on.  I'm actually going to show an exhibit

2  where he actually puts this in writing as something that was

3  happening.

4            THE COURT:  As phrased, I'll sustain the

5  objection.

6            MR. LENDER:  Thank you.

7            Your Honor, let me -- let's look to the next

8  exhibit in your binder, 865-6, Debtor's Exhibit No. 213.

9  BY MR. LENDER:

10 Q    Is Debtor's Exhibit No. 213 an email that you wrote on

11 or about June 6th, 2020?

12 A    Yes.

13           MR. LENDER:  I'd ask that Debtor's Exhibit No. 213

14 be admitted into evidence.

15           THE COURT:  Any objection?

16           MR. SEILER:  No objection to the exhibit except

17 for portions that he's offering the truth of the portions

18 that are hearsay about what other people said.

19           THE COURT:  So, he's offering it for all purposes.

20 So --

21           MR. SEILER:  Then I object to it, Your Honor.

22           THE COURT:  All right.

23           MR. LENDER:  I'm not offering it for the truth of

24 the matter asserted, but I am offering to the point that --

25 for somebody who's raising good faith/bad faith, this is

1   potentially circumstantial evidence of bad faith on their

2   part.

3           MR. SEILER:  Your Honor, the fact that the issue

4   in the case is good faith or bad faith doesn't change the

5   rules of evidence to the hearsay rule.  So, if they want to

6   bring in what other people were doing, they can.  If he

7   wants to offer it not for the purpose of the truth, but the

8   fact that he wrote the email, I don't object to that but --

9           MR. LENDER:  Your Honor, we've put the email into

10  evidence.  We could ask the Apollo witnesses when they

11  arrive as to what they were doing.

12          THE COURT:  And I think that there are ways that

13  you can use it with this witness, but as you've chosen to

14  proceed, I think the objection's appropriate.

15          So, I will, at this point, sustain the objection

16          MR. LENDER:  Your Honor, it sounds like there was

17  no objection coming in, but I won't ask specific questions

18  about the --

19          THE COURT:  I think he changed his mind.

20          MR. LENDER:  Oh, he did?

21          MR. SEILER:  When the Court asked me if I objected

22  to it because you were offering it for all purposes, I said

23  I did.

24          MR. LENDER:  Okay, we can move past that.

25          Thank you.

1            THE COURT:  And while I have you at a breaking

2   point --

3            MR. LENDER:  Yes.

4            THE COURT:  Did you offer 864-45?  It's 202.  You

5   talked about it but I didn't mark that you had actually

6   offered it.

7            MR. LENDER:  You know, I meant to if I didn't, but

8   I'll move it in now just to make sure.

9            Your Honor, I'd like to move in Document 864-45,

10  Debtor's Exhibit No. 202.  That's the June 5th, 2020 meeting

11  minutes of the Independent Finance Committee.

12           THE COURT:  All right, thank you.

13           Any objections?

14       (No audible response.)

15           THE COURT:  They're admitted.

16       (Exhibit 202, ECF 864-45, received in evidence.)

17  BY MR. LENDER:

18  Q    Now, Mr. Shah, once the company announced that it was

19  entering into the deal with the Centerview Group, did other

20  lenders reach out to try to get in on the deal?

21  A    They did.

22  Q    Were all of those lenders let into the deal?

23  A    No.

24  Q    And why weren't all lenders allowed to participate?

25  A    We didn't have capacity to take everybody who wanted to

1  be let in.

2  Q    Why is that?

3  A    Because the Gibson Dunn Group and their proposal had a

4  cap on the amount of allowable participation.

5  Q    Under your understanding of the PJT Angelo Gordon

6  Group, was every lender going to be allowed to participate

7  in their proposal?

8  A    No.

9  Q    How was it determined which additional lenders to let

10 into the transaction?

11 A    We fielded a number of inbounds and then applied

12 various criteria in terms of cross-holding, the amount of

13 discount capture they could offer us, the size and their

14 ability to fit in the basket, their potential future lending

15 relationship with the company, and made kind of the hard

16 decisions to filter through all the inbounds to figure out

17 who best to take.

18 Q    Was it also based on lending dynamics?

19 A    Yes, or lending relationships with people who were

20 viewed as potential future supportive lenders of the

21 company.

22 Q    Do you recall approximately how much additional 1-L

23 debt was allowed to participate after the transaction was

24 announced?

25 A    I believe it was an order of magnitude 30 million, but

1    I don't recall exactly.

2    Q    Let me ask you to take a look at the next exhibit in

3    your binder.

4              MR. LENDER:  For the Record, it's Document 865-40.

5    Debtor's Exhibit 249.

6    BY MR. LENDER:

7    Q    Is Debtor's Exhibit No. 249 the minutes of a June 20th,

8    2020 meeting of the Independent Finance Committee?

9    A    Yes.

10   Q    And did you attend this meeting?

11   A    I did.

12             MR. LENDER:  Your Honor, I'd offer Debtor's

13   Exhibit 249 into evidence.

14             THE COURT:  Any objection?

15       (No audible response.)

16             THE COURT:  It's admitted.

17       (Exhibit 249, ECF 865-40, received in evidence.)

18   BY MR. LENDER:

19   Q    I want to ask you to look at the presentation that's

20   included in these meeting minutes, and particularly, let's

21   turn and start at page 8 of the exhibit.

22       And what does this slide show?

23   A    It shows all the parties who inbounded into the company

24   looking to participate, and then at the top are the folks

25   who we ultimately let in.

ROOPESH SHAH - DIRECT BY MR. LENDER                    58

1  Q    And how many inbounds did the company receive?

2  A    Approximately 218 million of first lien and 105 million

3  of second lien.

4  Q    All right.  If we go back one slide in the deck, this

5  is page 7 of the exhibit, Slide 2 of the deck; what does

6  this slide show?

7  A    This shows the potential participants, both in the

8  Gibson Dunn Group and then additional participants using the

9  capacity that we had.

10  Q    Now, how many 1-L lenders were already signed up under

11  the transaction support agreement?

12  A    949 million of first lien and 231 million of second

13  lien.  So, in excess of 50 percent of both tranches.

14  Q    And how was it decided who would be allowed added to

15  the deal, the one through five listed below under additional

16  participants?

17  A    Based on those criteria mentioned below: size, nature

18  of holdings, lending relationship.

19  Q    Let's briefly walk through them.  The first one is

20  Monarch; why was Monarch allowed into the deal?

21  A    Monarch had almost entirely second liens.  We were

22  getting the greatest discount capture on their holdings.

23  Q    The next one, number two, is Arrow Mark; why were they

24  allowed into the deal?

25  A    They had a mix of 1-L and 2-L.  They were also a future

1  lending relationship, and given they were interest neutral,

2  they were let in.

3  Q    Next one down is Marble Point; why were they allowed

4  into the deal?

5  A    Similar, a mix of 1-L and 2-L.  They were also in the

6  Gibson Dunn Group, but there was some confusion.  I think

7  they were in, but there was some clerical issue that they

8  weren't technically in.  So, on that basis, we let them in.

9  Q    Next one down is Marathon.

10 A    Small -- Marathon's obviously a sophisticated lender, a

11 recurring lender to the company.  So, just given the small

12 size but the view they could be a recurring lender and also

13 sophisticated and could raise objections, they were let in.

14 Q    And the last one is Vennor (phonetic); why were they

15 let in?

16 A    They were all second lien and small.  So, they offered

17 the greatest discount capture.

18 Q    And who ultimately approved these five additional

19 participants joining the transaction?

20 A    The Finance Committee.

21 Q    Did anyone from LCM ever reach out to you to

22 participate in the deal after it was announced?

23 A    Not to my knowledge.

24 Q    Let me change topics.  Is there a way to track the

25 price of SSB debt over time?

1   A    There is.

2   Q    I'd like to ask you to take a look at a demonstrative

3   exhibit; and can you identify this document for the Court?

4   A    It's the price of Serta debt.

5   Q    And where did the data come from that is tracked on

6   this demonstrative?

7   A    Evercore has data sources that provide for debt

8   pricing.

9   Q    And did you also look at data that was produced by SNP

10  in this case?

11  A    Yes.

12  Q    And how did the data compare, the SNP data, to the data

13  that you reviewed?

14  A    They were very similar.

15  Q    Can you generally describe the trading levels of the

16  first lien debt in the first quarter of 2020?

17  A    In the first quarter of 2020, the debt price had come

18  down owing in large part to COVID and all the same pressures

19  that were causing the company's liquidity to deteriorate and

20  business prospects to suffer.  They came down from the mid

21  to high 60s down to 40-ish.

22  Q    And what was the first lien debt trading at on

23  June 5th, 2020 immediately before the announcement of the

24  transaction?

25  A    Right around 43 cents on the dollar.

1 Q     And what was the first lien debt trading at immediately

2 after the close of the transaction on June 23rd, 2020?

3 A     Immediately after the close of the transaction, the

4 debt price had fallen to somewhere in the 20s to low 30s.

5 Q     Now, at what point in time did the first lien debt

6 start trading up?

7 A     About two months later.

8 Q     And did the first lien debt consistently trade above

9 43 cents after October 29, 2020?

10 A     It did.

11 Q     And to your understanding, what was the highest it

12 traded at?

13 A     Just about 80.

14 Q     And do you have a view as to why SSB's debt traded up?

15 A     Well, at the time, there was a view that, to some

16 extent, the transaction worked.  The company got liquidity

17 and breathing room, it captured discount and therefore,

18 reduced its leverage.  The world was coming out of COVID.

19 There was an expectation of a rebound, the company was doing

20 better, you know, as you head through the middle of '21.

21 Q     And when did the first lien debt start to trade down

22 below 43 cents on the dollar, the pre-transaction price?

23 A     May 10, 2022.

24 Q     So, just so we're clear, from October 2020 until May of

25 2022, your understanding is that the first lien debt was

1   trading above pre-transaction levels?

2   A    Correct.

3   Q    And then, what happened in May of 2022?

4   A    The company's prospects, again, were diminished.  There

5   were competitive pressures, margin pressures, raw material

6   pressures.  And given all of that, the company, you know,

7   sustaining the losses on its top line and its profitability,

8   which then impacted debt prices.

9   Q    All right, I want to move to one more topic with you.

10       In connection with confirmation of the Debtor's plan,

11  are you offering any opinions in this Chapter 11 proceeding?

12  A    I am.

13  Q    And how many opinions are you offering?

14  A    Three.

15  Q    Okay, what is the subject matter of the first opinion?

16  A    The valuation of the Reorganized Debtors.

17  Q    And what about the second one?

18  A    The reasonableness of the ABL financing.

19  Q    And what about the last one?

20  A    The reasonableness of the term loan, the exit term

21  loan.

22  Q    Are your opinions reflected in a document that's been

23  filed with the Court?

24  A    Yes.

25  Q    Let me ask you to look at the last document in your

1  binder.

2          MR. LENDER:  And for the Record, it's Document

3  887-3, Debtor's Exhibit No. 356.

4  BY MR. LENDER:

5  Q    Is Defendant's Exhibit 356 the Declaration that you

6  prepared that was submitted to the Court on May 14th, '23?

7  That's document 887-3?

8  A    Yes, it is.

9  Q    And does this Declaration set forth the opinions that

10 you have regarding the three issues we just identified?

11 A    Yes.

12         MR. LENDER:  Your Honor, we'd ask that Mr. Shah's

13 Declaration be admitted into evidence, Debtor's Exhibit

14 No. 356, in lieu of his direct testimony on these topics.

15         THE COURT:  Any objection?

16     (No audible response.)

17         THE COURT:  All right.  Then without objection,

18 I'll admit it.

19     (Exhibit 356, ECF 887-3, received in evidence.)

20         MR. LENDER:  Your Honor, at this point, I pass the

21 witness.

22         Thank you.

23         THE COURT:  All right, thank you.

24         Mr. Costa or?

25         MR. COSTA:  Nothing with this witness, Your Honor.

ROOPESH SHAH - DIRECT BY MR. LENDER                    64

1          THE COURT:  All right, thank you.

2          Anyone else in support of confirmation?

3      (No audible response.)

4          THE COURT:  All right, Mr. Seiler?

5          MR. SEILER:  Your Honor, a technical question; do

6   you have the ability to view his exhibits?

7      (Multiple people speaking in the background.)

8          THE COURT:  You're hooked up at the right table?

9          MR. SEILER:  So, I'm going to start with that very

10  last exhibit.  This would be a good time to see if we could

11  call it up.

12     (Multiple people speaking in the background.)

13         MR. SEILER:  It came up -- it has two numbers on

14  it.  It has --

15     (Multiple people speaking in the background.)

16         THE COURT:  What is it that you need, Mr. Seiler?

17         MR. SEILER:  The Debtor's Exhibit 356, the

18  affirmation that they just did.

19         THE COURT:  887-3.

20         MR. SEILER:  887-3.

21     (Indiscernible).

22         MR. SEILER:  Maybe I could ask your people to put

23  it back up.  That would be great.

24         Eric Seiler again for the Excluded Lenders, Your

25  Honor.

1              Can I proceed?

2              THE COURT:  Let's get it back up on the screen

3    just so that -- that's what you wanted?

4              MR. SEILER:  I do, and I'd like you to turn to

5    page 13 of 17.

6              Okay.  There we go.

7                         CROSS-EXAMINATION

8    BY MR. SEILER:

9    Q    Do you see that, Mr. Shah?

10   A    I do.

11   Q    So, Paragraph 31, you talk about the new term loan

12   credit facility agreement and you state that it reflects

13   terms that are generally consistent with market terms for

14   loans of similar size and tenor; do you see that?

15   A    I do.

16   Q    And then right below that, you say:

17        "I understand that the new term loan credit facility

18   agreement provides that the Debtors will indemnify holders

19   of the FLFO claims and FLSO claims in connection with the

20   2020 transaction.  I understand the indemnification

21   provision was a central component and condition to the PTL

22   lenders' support for the plan and overall settlement."

23        Do you see that?

24   A    I do.

25   Q    So, you're not offering any opinion on whether the

1  terms of the indemnity were generally consistent with market

2  terms for new term loan credit facility?  You have no

3  opinion on that one way or the other, correct?

4  A    I wasn't involved in the negotiation of the indemnity

5  provisions.

6  Q    That was going to be my next question, but stick with

7  my question.  You have no opinion to offer about whether the

8  terms of the indemnity are consistent with market terms or

9  not?

10 A    I understand that indemnities generally exist in credit

11 agreements.

12 Q    But I'm talking about the specific terms of this

13 indemnity; you're not offering an opinion on whether the

14 specific terms of this indemnity are market or not, correct?

15 A    I believe that's correct.

16 Q    Okay, and you did not participate in the negotiation of

17 the indemnity at all?

18 A    Other than understanding that it was a critical

19 component of the deal, no.

20 Q    So, but you didn't talk to anybody on the other side

21 about the indemnity, right?

22 A    I did not.

23 Q    So, your source of information about how critical it

24 was is from people on your side, if anyone?

25 A    No, it's from reviewing a series of markups and

1  documents, and understanding the status of those

2  negotiations.

3  Q    At the time?

4  A    At the time.

5           THE COURT:  So, now I'm confused, Mr. Shah, and

6  don't hurt your credibility.

7           Who told you that it was critical?  Did someone

8  tell you?

9           THE WITNESS:  It was included in term sheets and

10  proposals.  It's not a position that I focused on.  I didn't

11  negotiate it.

12           THE COURT:  So, there are a lot of terms that

13  would have started from Draft 1 to Draft 15; what made this

14  critical in your mind?

15           THE WITNESS:  That they never backed down on it,

16  that it was in every draft that I saw.

17           THE COURT:  And so, you saw drafts that were

18  deleted, and then you would see counter-drafts that would

19  stick it back in.

20           THE WITNESS:  Your Honor, I don't recall the

21  sequencing of the drafts.

22           THE COURT:  Okay, my apologies for interrupting.

23           MR. SEILER:  No, no problem, Your Honor.

24  BY MR. SEILER:

25  Q    Maybe we can look at the exhibit that has the great,

1  big document in it, which was --

2           BY THE COURT:  So, now, are we going back to your

3  person?

4           MR. SEILER:  I hope so.

5           THE COURT:  Okay.

6           MR. SEILER:  We'll see if he has it.

7           Can you pull up 865-40?

8           MR. SEILER:  What's the number?

9           MR. SEILER:  865-40

10          FEMALE SPEAKER:  In which case?

11          THE COURT:  It's 249 if it helps.

12          MR. SEILER:  In which every one he used on his

13  case.

14          MALE SPEAKER:  249?

15          MR. SEILER:  Yes, yes.

16 BY MR. SEILER:

17 Q   And so, that's the minutes of the board meeting that

18 you testified about just a few minutes ago; do you remember

19 that, Mr. Shah?

20 A   Yes.

21 Q   And attached to it is the then -- it's a great, big

22 document -- but it's the then working draft of this new

23 superpriority term loan agreement as of that date.  It's the

24 Weil Gotshal draft of 6/17/20.

25          MR. SEILER:  And if you could pull up page 20 of

1  401, he'll see the cover page.

2  BY MR. SEILER:

3  Q    Do you see that?

4  A    I do.

5  Q    So, then if we go and look at page 147 of 401, you'll

6  see the indemnity section that existed on that date,

7  June 17th, 2020, and you'll see it starts on 146 and then

8  goes to 147.  It's Section 903(a), but the one we care about

9  is 903(b).  So, let's go to the next page.

10      And you don't remember looking at the agreement on that

11  date, right?

12  A    I don't remember looking at the agreement on that date.

13  Q    But that date, just so we're clear, that's after the

14  board has approved going with the Centerview deal, it's

15  after you've told Angelo Gordon, their group, that they're

16  not chosen, but it's before the final definitive documents

17  have been agreed to, correct?

18  A    I believe that'd be the case.

19  Q    And it's after the litigation that was designed to stop

20  the case had been filed -- I'm sorry.  It was after the

21  litigation that was seeking a TRO against the transaction

22  had been filed in New York?

23  A    I don't have that date offhand, but I can take your

24  word for it.

25  Q    Okay, and I just call your attention to the B section

1   where this indemnity -- it has a big indemnity, and then it

2   had a provision section, if you go up a little further, that

3   has a carve-out for gross negligence, bad faith, and willful

4   misconduct, or arising out of any material breach of the

5   loan documents.  Do you see that?

6   A    I do.

7   Q    But there's no exception after those two terms saying

8   that this transaction isn't subject to the carve-out.

9   That's not in this document, right?

10  A    I did not negotiate this provision.

11  Q    I understand that but you don't see any words with an

12  exception that follows that provided that, do you?

13  A    It's a big paragraph here.  It's tough for me to

14  interpret everything on the fly.

15  Q    Fair enough, it's in evidence.  So, you don't -- if

16  such terms were added in after this draft, you had nothing

17  to do with that, why they were there at all, correct?

18  A    Correct.

19  Q    But by this time, the deal was done, that is the

20  economic terms were all agreed to?

21  A    Correct.

22  Q    Nothing changed after June 20th in terms of economic

23  terms?

24  A    Not that I can recall.

25            MR. SEILER:  We can take that down.

1  BY MR. SEILER:

2  Q    Let me just see if we can agree on some things without

3  having to look at a lot of documents to do it.

4       The deal that was ultimately agreed to had $200 million

5  of new money?

6  A    Correct.

7  Q    And that was superpriority debt, top of the capital

8  structure?

9  A    Correct.

10 Q    And that was the money that the company needed for its

11 liquidity going forward?

12 A    Correct.

13 Q    And that money was also available from other

14 participants who were not chosen?

15 A    That quantum of capital was available, yes.

16 Q    And that's the quantum of capital that the company

17 wanted?

18 A    Correct.

19 Q    And the deal that was done, the existing, the old 1-L,

20 the 1-L holders who participated and exchanged their debt

21 for new prior lien debt?

22 A    Yes.

23 Q    And the company signed off on those who were ultimately

24 included?

25 A    Correct.

1  Q    And similarly, it didn't let in the people who

2  ultimately sought to be let in, but were excluded?

3  A    Well, that wasn't an entirely company decision.  It had

4  only so much capacity to do that.

5  Q    Well, because the capacity was dictated by the lenders

6  who said, "We only want there to be 50.1 percent?"

7  A    It was ultimately more than 50.1 percent, but a certain

8  amount was allowed.

9  Q    It was more because they allowed a basket on top of

10 50.1 percent?

11 A    Well, when we closed on it, it was more than 50.1, and

12 then there was a 50 basket on top of that as well.

13 Q    And the reason that the lenders wanted 50.1 percent was

14 that that was the minimum required to amend the agreement in

15 everyone's view?

16 A    Correct.

17 Q    But keeping the participation as low as possible gave

18 the biggest advantage to the participating lenders in the

19 event that the company went into bankruptcy subsequently?

20 A    I would say that.  I can't talk about what would have

21 happened in the bankruptcy, but by definition, it's a

22 credit-enhancing transaction for those who are moving

23 further up in priority over others.

24 Q    The lenders wanted to be the group that moved up in

25 priority to as small as possible in case it turned out that

1  being senior was a valuable thing as the company moved

2  forward; is that a fair way --

3  A    That is a typical position.

4  Q    Okay, and prior to the transaction, the debt was

5  trading in the 40s, the 1-L debt.

6  A    Immediately prior to the transaction, correct.

7  Q    And by the way, that chart we looked at, that's not

8  like a stock market service where you're seeing every trade

9  that occurs.  That's services that SNP has or your firm has

10 where they're showing indicative prices that are available

11 at moments in time?

12 A    I don't know where their source is.  It should reflect

13 trades as well as bids.  It should reflect the market, but I

14 don't know.  I know what my data source is.  I don't know

15 where they then get their data.

16 Q    Well, let's stick with your --

17        THE COURT:  Mr. Seiler, if I could, if I could

18 interrupt you for a second?  Let's mark the demonstrative as

19 Debtor Demonstrative No. 1.  Give your side, give everybody

20 who wants one a copy, and then let's get in on the docket

21 just so that it's part of the Record, as opposed to not

22 having a number.

23        Can we do that?

24        MR. LENDER:  Your Honor, we'll take care of that

25 after court today.

1       THE COURT:  Absolutely.  Thank you.

2       MR. LENDER:  Thank you.

3       THE COURT:  And Mr. Seiler, do you need a copy of

4  it or --

5       MR. SEILER:  I have it right here.  He gave me all

6  the exhibits.  I'm --

7  BY MR. SEILER:

8  Q    So, let me just take this -- so on Debtor

9  Demonstrative 1, is that the Centerview data or the SNP

10 data, or some combination of both if you know?

11 A    This demonstrative is data that Evercore procured.

12 Q    I'm sorry.  I said Centerview.  I meant to say

13 Evercore.  I apologize.

14 A    Through its data services, we did also compare it with

15 the SNP data, and it generally matched.  I just understood

16 that we couldn't use the SNP data due to some

17 confidentiality, but the data sets generally matched.

18 Q    So, this is Evercore -- from Evercore's data reservoir

19 for this debt.  Do know if it's actual trades or indicative

20 prices, or both, you, personally?

21 A    I don't personally know.

22 Q    And do you -- and there's nothing about this that tells

23 anyone how much you could buy or sell at a particular price?

24 A    There's nothing on this demonstrative that says that.

25 Q    And you would agree with me that sometimes when you try

ROOPESH SHAH - CROSS BY MR. SEILER                    75

1  to buy or sell a big block of debt, that affects the price

2  you could trade?

3  A    That can sometimes happen.

4  Q    So, the debt was trading in the 40s.  In your exchange,

5  holders of 1-L debt got 74 cents of the new priority debt?

6  A    Correct.

7  Q    And in fact, right afterward, that didn't trade at par

8  but it traded in the 80s or 90s, right?

9  A    I don't recall exactly.

10  Q    It didn't trade back at 43, did it, the new priority

11  debt?

12  A    Which tranche of the new priority debt?

13  Q    Not the 200 million but the tranche that the 1-L

14  holders were trading up into.

15  A    I recall that it traded below par for a period of time.

16  I don't recall the exact level.

17  Q    But not down in the 40s, right?

18  A    I don't believe so.

19  Q    And participation in the deal that was done was not

20  open to anyone who wanted to be involved, correct?

21  A    Correct.

22  Q    And in fact, you really had two processes going on side

23  by side.  You had the IPCO process that all the other

24  lenders other than the Centerview Group were working on,

25  some got further than others, and then once they shifted in

1  May to what I'll call the "uptier transaction," they were

2  the only ones working on that; is that fair?

3  A    There can really only be one group working on it

4  because it requires a majority.

5  Q    Well, you say that, but they didn't have a majority

6  until after you agreed to do the deal with them, right?

7  A    (No audible response.)

8  Q    Just answer yes or no.  They didn't have a majority.

9  On June 5th, the Gibson Dunn Centerview Group did not have a

10 majority.

11 A    But we knew the lenders that could comprise that

12 majority, but correct, they did not.  That group, in and of

13 itself, did not have a majority.

14 Q    They had a potential for a majority if other people

15 would join them?

16 A    I think it's a little more complicated than that.

17 There was a party who held more than 10 percent who was,

18 from what we understand, was in the group, which would have

19 given them majority, and then we, the company, pulled them

20 out of that group in order to negotiate the IPCO.  That was

21 Barings.

22      And so, they were sort of one foot in, one foot out.

23 So, we had visibility, very close visibility to that

24 majority.  So, they weren't just a random third party.  They

25 were a party that I think had been in that group, and then

1  we pulled them out in order to run a parallel process.

2  Q    And that's very helpful, but I was just asking the math

3  question.  They were around 39 percent in their group.  They

4  needed to get over 50, and it sounds like you were

5  optimistic that Barings would join them.

6  A    Correct.

7  Q    And in fact, Barings and Oaktree joined them?

8  A    Correct.

9  Q    Did you need Oaktree to get over 50 percent also, or

10 were they just extra?

11 A    I don't recall the exact movements, but I believe we

12 needed Oaktree in addition to Barings.

13 Q    So, if the Angelo Gordon, Gambit, Apollo Group had

14 gotten Oaktree and Barings, and maybe a couple of the other

15 lenders who were in the Centerview Group, they could have

16 gotten over 50.1 percent also, right?  They just needed to

17 get there.

18 A    Well, believe me, they wouldn't have gotten there with

19 Barings and Oaktree, and then they still would have needed a

20 number of other lenders to come on board.  So, the path to

21 the 50.1 were not equal between the two of them.

22 Q    Fine, but I'm just asking the mathematical question.

23 The mathematical question is a group that could get to

24 50.1 percent could do an uptier transaction?

25 A    That's correct.

1  Q    And you never tried to get anyone in the Centerview

2  Group to work on the IPCO transactions with the Angelo

3  Gordon Group?

4  A    They were two competing horses.  We were keeping

5  separate.

6  Q    Yeah, and similar, you never tried, except at the very

7  end when you offered to talk to Angelo Gordon after the deal

8  was announced, exclusive of the other members of their

9  group, you never opened the opportunity for anyone in the

10 Angelo Gordon Group to try and get into the Centerview

11 Group, correct?

12 A    Doing so would have undermined both of the horses.  So,

13 no, we did not do that.

14 Q    I appreciate that you're adding your reasoning.  I'm

15 just trying to find out what you did and didn't do, but I'm

16 -- and I take it everyone knew you could do a dropdown

17 transaction because they'd happened before, right?

18 A    They had happened before, yes.

19 Q    And the company was asking for them.  So, everybody

20 knew you were asking for dropdown transactions, including

21 the Centerview Group?

22 A    I don't know if the Centerview Group knew that.  We

23 never approached them on a dropdown transaction.

24 Q    When you went out to all the holders, did you

25 specifically exclude the Centerview Group from the dropdown

1  transaction possibility?

2  A    We didn't speak to them as a group.  We talked to

3  individual lenders who were existing lenders.

4  Q    In their group?  Eaton Vance, CSAM?

5  A    We did not talk to Eaton Vance or CSAM about a dropdown

6  transaction, no.

7  Q    Why not?

8  A    There was a general view that those types of lenders

9  had in the past resisted and fought against dropdown

10 transactions, and would therefore not want to do those.

11 Q    So, when you learned on April 7th that some of them had

12 formed into a group with Gibson Dunn, did you ask anyone at

13 Gibson Dunn or Centerview whether they were interested in

14 working on a dropdown transaction?

15 A    Well, their letter suggested that they had a majority

16 and could therefore do other things.  So, we didn't talk to

17 them about a dropdown transaction.  We talked to them about

18 the things that they were proposing in their letter.

19 Q    I'm talking April 7th.  Even by April 24th, they

20 proposed a transaction that wasn't an uptier transaction.

21 It was open, ending and all, right?  So, in the month of

22 April, did you ever talk to them about what kind of

23 transaction they could do once they formed as a group?

24 A    In April, we talked to them about doing a superpriority

25 transaction when they said that they had a majority or had

1  the exclusive power to amend the document.

2  Q    I should have been more clear.  Between April 7th and

3  April 24th, did you talk to them about that?

4  A    We did not talk to them about a dropdown transaction.

5  Q    And on April 24th, they made a proposal for giving you

6  new money, and making it open to any and all lenders, right?

7  That was the term sheet of April 24th?

8  A    I'd have to go look at the term sheet --

9  Q    Well, you can.  I think was, in your documents --

10         MR. SEILER:  Your guy's got me confused with the

11  order of documents.  Let's see if I can find it for you.  Of

12  course, if the hundreds of people here could help me find

13  which exhibit it is, I'll take that graciously.

14         THE COURT:  Yeah, the room got empty, didn't it?

15     (Laughter)

16         MR. SEILER:  Well, I have it in my outline.  So,

17  I'll find it later.

18  BY MR. SEILER:

19  Q    You remember getting the first term sheet you got from

20  them?  Wasn't it true that the first term sheet you got from

21  the Centerview Group had the idea -- it didn't have the

22  prices and it didn't have the amount, but it had the idea of

23  being open to any and all 1-L lenders?  Is that correct?  Do

24  you remember that?

25  A    That's right.

1   Q     Okay, there.  Didn't need the document.

2        But when you got that proposal, the company also wanted

3   to capture some discount, right?  In addition to getting

4   liquidity, it wanted to capture discount?

5   A     Correct.

6   Q     And you testified a couple of times that the Angelo

7   Gordon Group proposal allowed you to capture discount,

8   correct?

9   A     Correct.

10  Q     And it contemplated that you could use the proceeds to

11  purchase at a discount debt, and you said that it could have

12  been with new exchange debt not just with cash.  Why did you

13  say that?

14  A     (No audible response.)

15  Q     From other people, not from the people in the group,

16  but the idea that you would be able to buy up other debt at

17  a discount.  It was in the proposal, but it talked about

18  purchase.  Why did you think you could purchase it with

19  additional debt as opposed to with excess proceeds of cash

20  from the new money?

21  A     Can you point me to the language?

22  Q     Well, I'm just talking your testimony.  I'm asking you

23  -- well, just take your testimony.  Did you think that the

24  Angelo Gordon proposal was suggesting that you issue new

25  debt to other people who weren't in their group so you could

1  retire more of their debt at a discount?

2  A    Well, I think it was vague because it talked about them

3  approaching the market and doing -- it said repurchases or

4  subsequent transactions.  So, I think it was open as to what

5  form it would take.

6  Q    But did it suggest repurchases or subsequent

7  transactions with debt, as opposed to with cash?

8  A    That's why I'm happy to look at the words.  You're

9  asking me to recall the testimony.  I'm happy to interpret

10  the term sheet, but I have to look at the term sheet.

11  Q    Well, I'm just asking what you remember.

12  A    Again, you're asking me to interpret what's on the term

13  sheet.  That's what I -- I'm happy to refer to the term

14  sheet if you can point me to it.  I just have to look

15  through the exhibit.

16  Q    We'll do that in a second.

17       Had you ever worked on an uptier transaction before the

18  Serta transaction?

19  A    Up-tier is a broad umbrella of transactions.  Can you

20  define for me when you say --

21  Q    So, I'll be very specific.  In the context of a credit

22  that had a waterfall with existing debt where the holders of

23  the 1-L debt were *pari passu* to each other, where unanimity

24  was required to change that, where new money was coming in

25  to prime that level because for liquidity, and where the

1  company would be repurchasing debt at a discount, had you

2  ever worked on a transaction that had those elements prior

3  to Serta?

4  A    Personally, not with every one of those elements.

5  Q    That's what I'm asking.  My question is all of those

6  together.

7  A    I had not.

8  Q    And no one at Evercore had either, to your knowledge,

9  correct?

10  A    That I don't know.

11  Q    And you're not aware of any such transaction that

12  anyone in the market had worked on with all of those

13  elements together?

14  A    I'm not sure if that's the case.  I thought there has

15  been some precedent transactions where those elements were

16  present.

17  Q    So, I'm going to ask you to affirmatively tell me that

18  you're testifying to this Court that affirmatively you could

19  testify that there were such transactions that had all of

20  those elements in them?

21  A    I could tell you that I believe I've read cases that

22  would have had them, but I'm not an expert and didn't work

23  on those.  So, I can't affirmatively say that they had all

24  of those things.  I know in the back of my mind I've read

25  about a couple of cases that would have had those, but

1  again, I didn't work on them and --

2  Q    Which ones are in the back of your mind that you can't

3  testify to but are informing your answer?

4  A    There was one for a company called NYDJ.  There might

5  have been one for a company called Trident Health, but I'm

6  not purporting to be an expert on those, but I --

7  Q    And you're not purporting to tell the Court that all of

8  those elements were in them because you don't know from your

9  personal knowledge one way or the other?

10  A    That's correct.

11  Q    Would you describe this as a first-of-its-kind

12  transaction in the leverage loan market?

13  A    It was the first or among the first, given its size.

14  Q    What do you mean by first of its kind?

15  A    Like I said, I vaguely recall that concepts of this had

16  been done.  So, I think that's a subjective

17  characterization.  Taking all of these together, I wouldn't

18  say it was a routine transaction.

19  Q    Well, there's a difference between being routine and

20  first of its kind.  Would you call it a first-of-its-kind

21  transaction in the leverage loan market?

22  A    It may have been.

23  Q    Do you know if anyone else working on it called it that

24  on your team?

25  A    I don't know.

1  Q    Or counsel?

2  A    I don't know.

3         MR. SEILER:  Your Honor, I don't know how to do

4  this, but I wanted to put something up and show it to the

5  witness on the -- I see it here, but I don't know how to

6  make it be so you can see it and he can see it.

7         THE COURT:  I do.

8         MR. SEILER:  And it not be upside down.  I'm going

9  to fix that.

10         THE COURT:  Oh, we were half there.

11  BY MR. SEILER:

12  Q    I just found this on the website over the weekend from

13  Weil Gotshal, Ms. Barrington who's counsel here, and she

14  writes, and it was there yesterday at least, her recent work

15  has included "defending Serta Simmons Bedding in multiple

16  lawsuits challenging a first-of-its-kind transaction in the

17  leverage loan market."

18       Would you agree with that description of the

19  transaction?

20  A    As I said, I thought there were folks who had done

21  something like this before.  So, I don't know that I would

22  use that description.

23  Q    And if Mr. Chopra testified from Centerview that he'd

24  never worked on anything like this kind of uptier

25  transaction before, would you have any basis to disagree

1    with that?

2              MR. LENDER:  Your Honor, objection; hearsay,

3    inappropriate question.

4              THE COURT:  Your response?

5              MR. SEILER:  It's Cross.  I'm not offering it for

6    the truth.  I'm asking it if -- he said he would disagree

7    with that.

8              THE COURT:  I think he's testing his credibility.

9    He's not asking for the substance of it.  He's just said if

10   he said it -- so, I'll overrule the objection.

11             THE WITNESS:  Do you mind repeating the question?

12   BY MR. SEILER:

13   Q    If Mr. Chopra would say that he'd never been aware of a

14   transaction that had those elements -- I'll repeat them --

15   that there was a waterfall where people were *pari passu*,

16   where unanimous consent was required to change it, where

17   there was a prime main financing that would bring in super

18   debt, and there was an exchange by the company at a

19   discount, those elements together, if he'd said he had no

20   familiarity with any transaction like that prior to Serta,

21   would you have a basis to disagree with him?

22   A    I have no reason to disagree with Mr. Chopra.

23   Q    Let me talk to you a bit about Apollo.  I saw on some

24   of the documents Apollo was listed as part of the Angelo

25   Gordon Group.  Did you understand that Apollo held Serta

1  debt in April and May of 2020?

2          THE COURT:  And Mr. Seiler, if -- and again, I

3  used to walk as well, but for the folks who are listening --

4          MR. SEILER:  Oh, you're so right, Your Honor.  I

5          THE COURT:  -- you need to stay in front of the

6  microphone.

7          Thank you.

8          MR. SEILER:  Your Honor, I was doing so good

9  because usually, I'd be over there and over there

10  (indicating).

11          THE COURT:  I used to do the same thing.  I got

12  it.

13          MR. SEILER:  But it was before there were

14  microphones and video.

15          THE COURT:  I could come up with some leg irons if

16  it would help.

17      (Laughter)

18          MR. SEILER:  Mr. Higgins warned me that that was a

19  risk.  So, I said well -- anyway, I'm going to stay right

20  here so everyone can hear me, and not walk.

21  BY MR. SEILER:

22  Q    You knew -- what was your understanding of the holdings

23  of Apollo in April and May of 2020?

24  A    So, I understood that Apollo, within the Angelo Gordon

25  Group, represented by PJT and Paul Weiss, that they had

1  purported to own debt.  They didn't show up on a lender

2  register, which is where we looked to see who held debt.  I

3  understood that they were a potentially disqualified lender.

4  So, there was an open question as to what they held or

5  through what, but that they were part of the group.

6  Q    Was one of the reasons that you chose not to go with

7  the Angelo Gordon Group was that you couldn't count on

8  Apollo being able to deliver their debt into the deal?

9  A    I don't think that was a factor.

10 Q    And when you were thinking about the group, you assumed

11 that Apollo was participating with Angelo Gordon in some

12 fashion?

13 A    We understood Apollo and Angelo Gordon were acting

14 together.

15 Q    And in fact, you knew or you believed that Angelo

16 Gordon and Apollo has acquired their debt in the secondary

17 market and had a lower basis in it than many of the lenders

18 who were in the Centerview Group, correct?

19 A    That's correct.

20 Q    And you thought that might make them more willing to

21 make a deal that was in the company's interest?

22 A    Correct.

23 Q    Now so, as I understand the timeline, and I might try

24 to put that back up, but what I see is that the decision to

25 go with the Centerview Group was made sometime on June 5th?

1  A    Correct.

2  Q    And that's when the advisors recommended it to the

3  Finance Committee?

4  A    I believe that's true.

5  Q    So, had you reached the conclusion sometime before

6  June 5th, or you just woke up that morning and said, "Let's

7  go with the Centerview Group?"

8  A    Based on the proposals we had as of the morning of

9  June 5th, which was the deadline we'd given folks to come

10 back with their proposals, just that recommendation was made

11 on June 5th.

12 Q    Okay, but had you reached the conclusion on June 4th,

13 let's say?

14 A    I have to look back at the exact timing of the emails.

15 I think we still had open issues under both proposals for at

16 least some part of June 4th.

17 Q    Okay.  So, your best recollection is the decision to

18 advise the Financial Committee of Serta was made either on

19 the 5th or very shortly before; is that fair?

20 A    Correct.

21 Q    And at that time, did you believe that Serta was

22 insolvent?

23 A    I don't know.

24 Q    Had you conducted any analysis at Evercore to determine

25 whether or not Serta was insolvent?

1  A    We did not.

2  Q    Had you told any of the members of any of the groups

3  that you thought Serta was insolvent?

4  A    I don't believe we discussed solvency with any of the

5  groups.

6  Q    Did any of the groups tell you that they thought Serta

7  was insolvent?

8  A    I don't recall.

9  Q    Okay, did you think that the dropdown transaction was a

10  fraudulent conveyance as of June 4th or June 5th?

11  A    I don't recall any analysis around that.

12  Q    Did anyone of any of the groups tell you that a

13  dropdown transaction was a fraudulent conveyance?

14  A    I don't recall.

15          MR. SEILER:  So, now we're going to try to mark

16  Adversary Proceeding ECF No. 250-73, which is also

17  Defendant's Exhibit 167, perfect.  So, I'm marking a cover

18  email; do you --

19          MALE SPEAKER:  Do you have copies of the exhibits?

20          MR. SEILER:  I do not have copies of this exhibit.

21          Would you like to look at mine?

22          MALE SPEAKER:  No, I gave you a binder.

23          MR. SEILER:  I know.

24          MALE SPEAKER:  Usually, I give copies in real-time

25  but I'll try to look at it online, I guess.

1          MR. SEILER:  Okay, but I'm happy to wait a minute

2   for your side to pull it up.  It's a letter that the --

3   maybe the Gibson Dunn lawyers can give it to you because

4   it's a letter they wrote on June 4th.

5   BY MR. SEILER:

6   Q    But the cover email is a communication from Gibson Dunn

7   to UBS.  Do you see that, Mr. Shah?

8   A    Yes.

9   Q    And it was sent at 7:30 in the evening in some time

10  zone on June 4th?

11  A    I see that.

12  Q    And if you look what it's attaching, it's a letter that

13  Gibson Dunn wrote on June 4th to UBS; see that?

14  A    I do.

15  Q    So, this is the evening right before you decided to

16  recommend the Gibson Dunn led Centerview deal to the board,

17  the Finance Committee of the board, correct?

18  A    Correct.

19  Q    And we'll start at the end of the letter which is on

20  page 4.  It says:

21       "This letter constitutes a confidential lender-to-agent

22  communication and should not be provided or disclosed to or

23  otherwise shared with the company or any of the other loan

24  parties."

25          Do you see that?

1          THE COURT:  So, are we going to offer this?

2          MR. SEILER:  Oh, Your Honor, I apologize.

3          THE COURT:  Because we haven't yet, he hasn't yet

4    said that he's ever seen it before.

5          MR. SEILER:  Your Honor, I don't know that he has.

6    That was my next question.  This is a letter I wanted to --

7          THE COURT:  So, normally, before we get to the

8    substance of a letter, we generally deal with authenticity

9    first, at least that's the way I was trained.

10          MR. SEILER:  And you were trained properly.  I

11   think that's right.

12   BY MR. SEILER:

13   Q    I can't -- let me ask you have you ever seen this

14   letter before?

15   A    I'd have to see the whole letter to --

16   Q    You have it.  So, let's take them one page at a time,

17   and tell them when you're ready to go past the next page.

18          (Witness reading.)

19          THE WITNESS:  Next page, please.

20          (Witness reading.)

21          THE WITNESS:  Next page.

22          (Witness reading.)

23          THE WITNESS:  Okay.  Next page.

24          (Witness reading.)

25          THE WITNESS:  Okay.

1  BY MR. SEILER:

2  Q    Have you ever seen Exhibit 167?  167, previously?

3  A    Not that I'm aware of.

4  Q    Then I won't offer it.

5       Did you ever come to learn from anyone at Centerview

6  that either Gibson Dunn or Centerview had sent the letter to

7  UBS on or about June 4th or June 5th?

8  A    Not that I'm aware of.

9  Q    Did you ever come to learn that anyone at Gibson Dunn

10 had suggested to UBS that it was highly likely the company

11 may very well be insolvent?

12 A    Not that I'm aware of.

13 Q    Did you ever come to learn from anyone at Centerview or

14 Gibson Dunn that the dropdown transaction might be a

15 fraudulent conveyance?

16 A    Not that I'm aware of.

17 Q    Did you have a view at the time as to whether or not

18 the different groups should be communicating confidentially

19 to UBS, the agent of Serta, without telling Serta that they

20 were communicating with them?

21 A    I didn't have a view on that.

22         MR. SEILER:  We can put that aside.  That's not

23 offered.  I'll offer it through someone else later on.

24 BY MR. SEILER:

25 Q    I was looking at the documents where you were showing

ROOPESH SHAH - CROSS BY MR. SEILER                    94

1  the negotiations you were having with both sides and then

2  when you were discussing them, and some of them were

3  internal discussions at Centerview and others were

4  discussions with Ken Prince; is that consistent with your

5  recollection that you were keeping Mr. Prince informed of

6  the evolution of the negotiations?

7  A    Among other people, yes.

8  Q    Okay.  Well, just stick with why were you keeping

9  Mr. Prince informed?

10 A    Mr. Prince worked at Advent, the majority shareholder

11 of the company.  He was also in charge of their capital

12 markets activities and lending relationships.  So, he was

13 our main counterparty at Advent to talk about those things.

14 Q    And who was your main party at Serta other than

15 Mr. Prince and his role as shareholder of Serta?

16 A    At Serta, we would speak with the CEO and the CFO, and

17 general counsel, and primarily, the Independent Finance

18 Committee.

19 Q    And it was the Independent Finance Committee you

20 addressed on June 5th with your recommendation?

21 A    That was one meeting, correct.

22 Q    Had you made a recommendation to them before that

23 meeting --

24 A    We made recommendations as to -- sorry.

25 Q    -- as to who to choose?

1  A    As to who to choose, no.

2  Q    Had you discussed your thinking about the

3  recommendation let's say between -- strike that.

4       The Centerview proposal emerged at the very end of May,

5  right?  May 26th, 27th, somewhere in there?

6  A    Correct.

7  Q    That was your timeline, and by June 5th, they had won.

8  So, I want you to focus on that timeframe between May 26th

9  and June 5th.

10      Did you discuss the Centerview proposal with Ken Prince

11 during that time?

12 A    Yes.

13 Q    Other than at Finance Committee meetings that we have

14 minutes of, did you discuss it with any of the members of

15 the Serta Finance Committee who had delegated authority in

16 that time frame prior to June 5th?

17 A    We were having frequent update calls.  So, it is very

18 possible we spoke in we call them ad hoc or update calls as

19 opposed to formal meetings.

20 Q    So, I want to leave out very possible.  Do you

21 affirmatively remember discussing the Centerview proposal

22 between May 26th and June 5th with members of the Finance

23 Committee, as opposed to with Mr. Prince?

24 A    Is your question away from formal meetings?

25 Q    Correct.

1  A    I don't recall.  I don't have a specific recollection.

2  Q    And how about the CEO of Serta?  Same question.

3  A    I believe we did -- I don't remember the CEO.  I do

4  know with the CFO we would have had those conversations.

5  Q    During that period of time, May 26th to June 4th?

6  A    I believe so, but again, I can't recall a specific, but

7  I do recall generally having conversations with management

8  around the implications of those proposals.

9  Q    Did Mr. Prince concur with your decision to recommend

10 the Centerview proposal before you made the recommendation

11 to the Finance Committee?

12 A    I believe he did.

13 Q    Did Mr. Prince ever express a view to you about whether

14 or not he was willing to do a transaction with the group

15 that included Apollo?

16 A    Could you just repeat the question?

17         MR. SEILER:  Could you read it back, please?

18         COURT REPORTER:  Sure.

19    (The following reading is not from an official

20 transcript.)

21         FEMALE SPEAKER:  "Did Mr. Prince ever express a

22 view to you about whether or not he was willing to do a

23 transaction with the group that included Apollo?"

24         THE WITNESS:  I believe he was supportive of doing

25 a transaction with Apollo while we were negotiating it.

1  Certainly, by June 4th or 5th, his recommendation or his

2  viewpoint had changed.

3  BY MR. SEILER:

4  Q    So, even though they were on the DQ List, he was

5  supportive of doing a transaction with a group that included

6  Apollo?

7  A    Yes.

8  Q    And he told you that?

9  A    That's why were negotiating with his knowledge and

10 understanding, and there was no other alternative until the

11 very wee last few days.  So, yes.

12 Q    But wasn't it -- no, strike that.

13         MR. SEILER:  Can I have just a minute, Your Honor?

14         THE COURT:  Of course.

15     (Pause in proceedings.)

16         MR. SEILER:  I have no further questions, Your

17 Honor.

18         THE COURT:  All right, thank you.

19         Mr. Lieberman?

20         MR. LIEBERMAN:  Good afternoon, Mr. Shah.

21         THE WITNESS:  Good afternoon.

22         MR. LIEBERMAN:  I'm Neil Lieberman.  I represent

23 the LCM lenders.

24         Are you seeing this?

25         THE COURT:  No, what would you like for me to do?

1           MR. LIEBERMAN:  I need to figure out how to turn

2   on the ELMO.

3           THE COURT:  I just total control up here.

4           MR. LIEBERMAN:  Oh, okay.

5                        CROSS-EXAMINATION

6   BY MR. LIEBERMAN:

7   Q    Okay, this is the -- you'll see this is the April 24th

8   letter.  It was Debtor's Exhibit 87.  It's in your folder,

9   and -- so, you were asked on your Direct about the sentence

10  that I've highlighted below.  The following sentence states

11  that "The secured lender group enjoys longstanding

12  familiarity with the company, maintains the largest and

13  senior-most position in the company's capital structure, and

14  has the exclusive power to amend the first lien credit

15  agreement, which means it is in unique position to quickly

16  and seamlessly unlock financing solutions for the company

17  such as a priming credit facility."

18       Do you see that?

19  A    I do.

20  Q    What is your understanding of a priming credit

21  facility?

22  A    A tranche of debt that ranks senior or otherwise primes

23  other lenders in a capital structure.

24  Q    And that means that tranche would have priority in

25  repayment rights under certain circumstances, correct?

1  A    Correct.

2  Q    And the importance of having exclusive power to amend

3  the first lien credit agreement is that it was necessary to

4  amend the credit agreement to create the priming tranche,

5  correct?

6  A    Correct.

7  Q    Mr. Shah, you testified on your direct that LCM never

8  contacted you between the announcement of the transaction

9  and when it closed, correct?

10 A    Correct.

11 Q    And you never contacted LCM during any of the

12 negotiations prior to the announcement, correct?

13 A    Correct.

14 Q    And you never contacted them after the announcement of

15 the transaction, correct?

16 A    Correct.

17 Q    According to you, you don't believe you had any contact

18 in or outbound with LCM, correct?

19 A    Correct.

20         BY MR. LIEBERMAN:  Thank you very much.

21         THE COURT:  Is that all?

22         MR. LIEBERMAN:  Thank you, Your Honor.

23         THE COURT:  Thank you, Mr. Lieberman.

24         Anyone else?

25         MR. MILLAR:  Good morning, Your Honor.

1          James Millar of Faegre Drinker on behalf of

2   Citadel, and I have a binder for the witness, but we are

3   also, I understand, able to put them on the screen.

4          THE COURT:  True.

5          MR. MILLAR:  May I give the binder to the witness?

6          THE COURT:  Absolutely.

7      (Pause in the proceedings.)

8          MR. MILLAR:  I apologize, Mr. Shah, that that

9   binder is so big, but we're only going to focus on a couple

10  exhibits.

11                     CROSS-EXAMINATION

12  BY MR. MILLAR:

13  Q    Let's turn to Citadel Exhibit No. 35 filed at Docket

14  877, page 9.  And the first page that you should be looking

15  at, Mr. Shah, is a cover letter from me at my firm, Faegre

16  Drinker.  Do you see that?

17  A    I do.

18  Q    Okay.  So, let's just orientate ourselves around what

19  this is.  The first 1, 2, 3, 4 pages are the cover letter,

20  and then we get to page 5 and it says, "Exhibit 1 Commitment

21  Letter."  Do you see that?

22  A    I do.

23  Q    And then, we have page, let's see, 1, 2, 3, 4, 5 --

24          THE COURT:  Mr. Millar, I do apologize.

25          Were you going to have someone put that up or do

1    you need me to put it up?

2              MR. MILLAR:  Oh, Ms. Perry is here, and I forgot

3    about that.  I'm sort of not that well-versed in these kinds

4    of things.

5              THE COURT:  And are we plugging directly in, or

6    what are we doing?  Are you on GoToMeeting?

7              MS. PERRY:  I've got it up on my screen.

8              FEMALE SPEAKER:  She's in GoToMeeting.

9              THE COURT:  Okay, got it.

10             FEMALE SPEAKER:  Under her name.

11             MR. MILLAR:  It's under Kristen Perry.  I

12   apologize for that.

13             THE COURT:  No, no, no.  I just got to get back --

14   I don't see the name; was it Perry perhaps?

15             MS. PERRY:  I put it under Kristen Perry.

16             THE COURT:  So, can you turn your camera on?

17   That'll be the easiest way.

18        (Ms. Perry complies.)

19             THE COURT:  And you are the presenter.  You can

20   turn your camera off if you wish.

21             Thank you.

22        (Multiple people speaking in the background.)

23             THE COURT:  All right.  Mr. Millar, she should

24   have control.

25             MR. MILLAR:  Awesome.

1   BY MR. MILLAR:

2   Q     Mr. Shah, so, let's just orientate ourselves on this

3   document.   The next pages 1, 2, 3, 4, 5, 6, 7, signature

4   page is 8.

5         Do you understand that's a commitment letter?

6   A     Yes.

7   Q     Signed by Christopher Ramsay at Citadel?

8   A     Yes.

9   Q     And the Annex A to that commitment letter is a term

10  sheet?

11  A     Yes.

12  Q     And did you receive this document?

13  A     I did.

14  Q     Did you receive it from Peter Zuckerman at Citadel?

15  A     I either received it from Peter or from Weil Gotshal.

16  I don't remember which.

17  Q     Okay, and you understand that it's a signed commitment

18  letter?

19  A     Yes.

20  Q     And I might call it an offer from Citadel for exit

21  financing; does that sound right?

22  A     Yes.

23  Q     And you've seen it before today?

24  A     I have.

25  Q     And it's a true and correct copy of what you received?

1  A     I have no way to know that.

2          THE COURT:  Let's try it the easy way because I

3  want to read it.

4          Any objection to the admission of what's filed at

5  877 in the pages -- it's a little unique in how this was

6  done.  It will be pages -- what's marked as Exhibit 35, it's

7  page -- of 877.  It's page 9 --

8          MR. LENDER:  Your Honor, we have no objection to

9  the commitment letter coming in, the actual commitment, no

10 objection to that.

11         THE COURT:  All right, thank you.

12         So, it's 9 through page -- well, it keeps going.

13 Hold on, I will get there.  So, through page 27.

14         MR. MILLAR:  And for the avoidance of doubt, that

15 includes the term sheet.

16         THE COURT:  I'm admitting page 9 through 27

17 because, again, I want to read it.

18     (Exhibit 35, ECF 877, pages 9 through 27 received in

19 evidence.)

20 BY MR. MILLAR:

21 Q    Okay.  Mr. Shah, let's turn to the term sheet, and do

22 you see page 1, it says, "Alternative Term Loan Term Sheet"?

23 A    I do.

24 Q    Okay, we'll come back to the structure, but let's flip

25 over to page 2 and just go through a few of these terms.

1      Do you see the first block?  Principle amount, do you

2  see that?

3  A    I do.

4  Q    I'm going to say it's 315 million plus some minor

5  adjustments for things like PIK fees; you see that?

6  A    I do.

7  Q    That is approximately the same as the -- I'm going to

8  call it the RSA term loan?

9  A    I believe that's right.

10 Q    And then, let's flip to the next page.  We have some

11 more conditions.  Maturity date, five years after the

12 effective date of the plan, you see that?

13 A    Yes.

14 Q    That's the same as the RSA term loan, yes?

15 A    I believe that's true.

16 Q    Next one, security, same as the RSA term loan, correct?

17 A    Correct.

18 Q    Next one, interest rate, SOFR plus 7.5 percent, same as

19 the term loan, correct?

20 A    Correct.

21 Q    And you don't disagree that the use of the same as the

22 term loan?

23 A    I don't.  I don't have that in front of me, but I

24 believe that to be the case.

25 Q    Okay.  Amortization, this is no amortization in '23,

1  '24, or '25 and 1 percent per annum beginning in 2026.  Do

2  you see that in the term sheet?

3  A    I do.

4  Q    And you agree that it's an improvement from the RSA

5  term loan?

6  A    I do.

7  Q    Call protection, do you agree it's the same as the RSA

8  term loan?

9  A    I believe so.

10  Q    And financial covenants, none.  Do you see that?

11  A    I do.

12  Q    And that's better than the RSA term loan, yes?

13  A    It is.

14  Q    And let's flip over to the next page, the bottom block

15  that is labeled "Other favorable improvements to RSA Credit

16  Agreement."  Do you see that?

17  A    I do.

18  Q    And in the lead-in, it says the backstop party --

19  that's Citadel -- "shall work in good faith with the Debtors

20  to identify ways in which the RSA Credit Agreement can be

21  improved so as to enhance the flexibility of and reduce the

22  operational burdens for the Reorganized Debtors."

23       Do you see that?

24  A    I do.

25  Q    Do you have any reason to doubt that Citadel wouldn't

1  live up to that term?

2  A    I'd have no reason to doubt that.

3  Q    Okay.  And the terms that are below that, I won't go

4  through each and every one, but it looks like there is five

5  or six baskets.  Do you see those baskets?

6  A    I do.

7  Q    and they're all increased, compared to the RSA term

8  loan, yes?

9  A    Correct.

10 Q    And so that's an improvement to the RSA term loan?

11 A    It's an improvement from the company's perspective,

12 yes.

13 Q    Absolutely, thank you.  This is all from the company's

14 perspective.  That's certainly what my client cares about.

15     Let's go up on that page to "Indemnity.  There shall be

16 no indemnity to any party in respect of the adversary

17 proceeding, the pre-petition adversary actions and/or any

18 other claims, proceedings, actions, or causes of action in

19 connection with or related to the PTL Credit Agreement, the

20 Exchange Agreement, the Inter Creditor Agreement, and/or the

21 2020 transaction."

22     Do you see that?

23 A    I do.

24 Q    That's better for the company; is that right?

25 A    Correct.

1  Q    What day did you receive this, if you remember,

2  Mr. Shah?

3  A    It would have been -- it was over the weekend.

4  Q    Did you have any conversations with anybody at Citadel

5  about this term sheet?

6  A    I understand that counsel had picked up this

7  conversation.  I did not have a conversation with anyone at

8  Citadel.

9  Q    You're the investment banker for the company, right?

10 A    I am.

11        MR. MILLAR:  If we may, can we look at the next

12 exhibit, Citadel Exhibit 36, Docket 877, page 28.  This is,

13 Your Honor, the chart that I looked at -- we looked at on

14 opening.  I'd like to use this as a demonstrative.

15        THE COURT:  All right.  So that's page 28 and 29

16 of Exhibit 877?

17        MR. MILLAR:  That's correct.

18        THE COURT:  All right.  For future reference, the

19 procedures actually provide that you do these as separate

20 attachments, which really makes it easier for me to help

21 you.  Okay today, just if you have any more?

22        MR. MILLAR:  I will try to do better.  I

23 apologize.

24        THE COURT:  No, no, no.  Don't apologize.  I've

25 not done it before.  I just -- it makes it easier for me to

1  help you.

2          All right.  So let's mark Citadel's Exhibit No. --

3  what's marked as Citadel Exhibit 36.  Let's call it "Citadel

4  Demonstrative 1," and it is pages 28 and 29 of Docket 877.

5      (Citadel Demonstrative 1 marked for identification.)

6  BY MR. MILLAR:

7  Q    And Mr. Shah, in -- on page -- the first page of this

8  exhibit, we see what purports to be a comparison chart on

9  the treatment of the various classes.  This is -- the first

10 page has the FLFO claims.

11         Do you see that?

12 A    I do.

13 Q    And you understand that under Citadel's proposal, the

14 FLFO get a choice.  They can either have cash in the amount

15 of everything they're owed, or they can participate in the

16 exit facility.

17         Do you understand that's Citadel's proposal?

18 A    I do.

19 Q    And in either case, under our proposal or the RSA, it's

20 100 percent, right?  They recover 100 percent?

21 A    Correct.

22 Q    But we actually give them a cash-out option, which

23 makes them unimpaired.  Do you agree with that?

24 A    Yes.

25 Q    Let's go to the second page of the chart.

1      And Class 4, which is the FLSO claims, do you see that?

2 A    I do.

3 Q    And the FLSO, likewise, get either a cash-out option or

4 they can participate in the new term loan.  Do you

5 understand that's Citadel's offer?

6 A    I just want to be clear.  When you say "cash-out,"

7 obviously not for their entire claim?

8 Q    No, for their entire claim.

9 A    (No audible response.)

10 Q   So Citadel's offer is they have an election -- oh, I'm

11 sorry, I'm sorry.  You're talking about the equity piece.

12 A   I'm talking about their entire claim.  You said "cash-

13 out," I think of cash-out as cash-out.

14 Q   All right.  All right.  We were talking past each

15 other.  Okay.  Or I was talking and not comprehending what

16 you were saying.

17      So let's -- yeah, let's go through it a little more

18 carefully.  This is dent paragraph, but if we can go down to

19 romanette 1, so they get common stock.  You see that, so

20 that's essentially the same as the existing plan; is that

21 right?

22 A   Correct.

23 Q   And then for romanette 2, they have a choice.  They can

24 be cashed out or they can take their proportionate share of

25 the FLSO term loan.  Do you --

1   A     Yes.

2   Q     Do you understand that, as well?  Okay.

3         And that cash-out is actually at 102.

4   A     I see that.

5   Q     Do you see that?  Yes.

6         And if we look over on the right-hand side of the

7   chart, under the RSA, the amount that comes to the FLSO

8   claims is between 33.6 and 69.3 percent and that comes from

9   the Disclosure Statement, right?

10  A     Okay.

11            THE COURT:  So just for purposes of clarity in

12  explaining this document, I don't think it's a cash-out at

13  102 percent.  I don't think that's what that says.  But I

14  would like -- I mean, maybe it is and maybe I need to learn.

15            But you asked the question.  It's not what the

16  document said, but he answered in the affirmative.  So I

17  really would like to understand what it means, just looking

18  at the words.

19            And I blew them up for you on the screen, if

20  that's helpful.

21            MR. MILLAR:  Yeah, because I can't --

22            THE COURT:  And I can make it even bigger.

23            MR. MILLAR:  Okay.  All right.  So let's go

24  through that, Your Honor, with the help of Mr. Shah.

25            So we're looking at romanette 2.

1            THE COURT:  Right.

2            MR. MILLAR:  So at the holder's election, we have

3   an election here.

4   BY MR. MILLAR:

5   Q    Yes, Mr. Shah?

6   A    Correct.

7   Q    They can receive either cash equal to the product of

8   102 and an amount of the alternative term loans equal to the

9   initial principle amount less the amount of allowed FLFO

10  claims.

11           THE COURT:  So product means we multiply, right?

12           MR. MILLAR:  We multiply those.

13           THE COURT:  All right.

14  BY MR. MILLAR:

15  Q    And what's that --

16           MR. MILLAR:  And Your Honor, this is -- I'm trying

17  to phrase this in a question for Mr. Shah.

18           THE COURT:  Okay.  Let me ask you this:  Mr. Shah,

19  do you --

20           MR. MILLAR:  Please.

21           THE COURT:  -- do you understand what that means?

22           MR. MILLAR:  That's why I asked in the initial

23  question.  I believe, parsing every single definition, I

24  believe it is the FLSO claims are getting a mix of what

25  would have been take-back paper of approximately

ROOPESH SHAH - CROSS BY MR. MILLAR                    112

1  $100 million and equity.  They're not touching the equity

2  piece of it, but in lieu of the 100-or-so-million-dollars of

3  take-back, they can get 102 percent of that in cash.  I

4  believe that's what it says without having parsed through

5  every definition.

6            MR. MILLAR:  Thank you, Mr. Shah.  That is spot

7  on.

8            THE COURT:  Okay.

9  BY MR. MILLAR:

10 Q    Okay.  And over here in the recovery amount, you see a

11 recovery there, a percentage, 71.2 percent?

12 A    I do.

13 Q    Sitting here today, are you able to say whether or not

14 that is accurate?

15 A    The 71.2 percent?

16 Q    Yes.

17 A    For the alternative, which is the Citadel proposal?

18 Q    Yes.

19 A    I'm not.

20 Q    You have no reason to think it's not accurate?  You

21 just don't know?

22 A    I think it's a function of a very hypothetical

23 calculation.

24 Q    Mr. Shah, are you prepared to visit further with

25 Citadel regarding this offer?

1   A    We're always prepared to talk to anybody who has better

2   offers for the company.

3   Q    But since you've got this offer, you never actually

4   responded to Citadel, did you?

5   A    I was given ongoing litigation.  I was told counsel was

6   corresponding directly with Citadel representatives on this

7   matter.

8   Q    Do you understand that Mr. Zuckman (phonetic) from

9   Citadel is being deposed tomorrow?

10  A    I understood that was a request.

11  Q    But the investment banker for the company never reached

12  out to him; is that right?

13  A    As I said, we were advised by counsel that it was

14  neither actionable in its current form, nor given litigation

15  via the lawyers we've talking about.

16  Q    So your -- the question -- so the company's problem is

17  that this is not actionable; is that right?

18  A    In its current form, that would be, yes.

19  Q    You're prepared to have discussions and making it

20  actionable, yes?

21  A    Of course.

22  Q    Do you understand that Citadel has extended this offer

23  -- is extending the expiration of this offer through Friday

24  of this week?

25  A    I'll take your word on it.

ROOPESH SHAH - CROSS BY MR. MILLAR                    114

1          MR. MILLAR:  Your Honor, I'd like to represent to
2    the Court that Citadel is extending their offer through
3    Friday of this week.
4          THE COURT:  All right.  Thank you.  Duly noted.
5    BY MR. MILLAR:
6    Q    Mr. Shah, you now understand that Citadel -- I'm
7    kidding.
8        (Laughter)
9          MR. MILLAR:  That's all for me, thank you, Your
10   Honor.
11         THE COURT:  All right.  Thank you.
12         Anyone else?
13       (No audible response.)
14         THE COURT:  All right.  Mr. Shaw, I've got just a
15   couple of questions for you.
16         THE WITNESS:  Yes, sir.
17                      EXAMINATION
18         BY THE COURT:  So when -- I just want to do a
19   little clean up.  When you got this proposal, when you got
20   the Citadel proposal, is it effectively you were just told
21   to stand down and you follow instructions from your client;
22   is that where we are?
23         THE WITNESS:  No.  With respect to the
24   communication of it.  I understood Weil is speaking to
25   Citadel's counsel.  We did evaluate it.  We did present it

1    to the Finance Committee and we did look at the pros and

2    cons of it and had that discussion with the financing.

3          So we didn't ignore it, but in terms of moving

4    further on it, I understand that it had some critical flaws

5    that counsel would have had to work out in order to get them

6    to negotiate all the business points of it.

7          THE COURT:  I got it.  I don't want to know what

8    was discussed.  I just want to know that you've been the

9    investment banker.

10         I want to go back to your Declaration, which was

11   at 877.  I can put it up, if you need to, but I don't think

12   I will, but if you want to see it, let me know and I'll put

13   it back up on the screen.

14         When you calculated your enterprise value -- and I

15   understand how TUD is calculated -- but I'm curious as to

16   what you did with the indemnity issue?  I mean -- and let me

17   start with just a couple of questions.

18         Have you read the new form of indemnity?

19         THE WITNESS:  I have reviewed it.  I will not tell

20   you that I've read every word of it, but I'm aware of it.

21         THE COURT:  Don't -- and I know you're not a

22   lawyer and I'm not trying to trap you.  I'm looking at this

23   from an economic perspective.

24         Have you been able to -- obviously the low is

25   there is no indemnity claim, so that the low is zero.

1          Have you been able to figure out what maximum

2   exposure is?

3          THE WITNESS:  We did not undertake a -- if you

4   will, evaluation of the indemnity.  That would have then

5   affected the enterprise valuation.  That was not included.

6          THE COURT:  No, I totally got it.  What you've got

7   -- and this is my question for you:  You've got a unique

8   event that sitting out there, unlike most things that you

9   see.  And I'm trying to figure out how you accounted for

10  such a huge -- such a huge number and it can never be in

11  between, right?  It's either going to be zero or a big

12  number that you haven't calculated.

13         And I'm curious as to what you did with that and

14  how it affects your view of the world?

15         THE WITNESS:  So you're right.  It's a highly

16  unknown, given its contingent unliquidated.  Our approach in

17  valuation is to not value it.  Often companies have a

18  plethora of litigation and contingent claims.

19         Given the nature of this claim, we didn't seek to

20  value it as, quote, "a liability."  That's to be conducted

21  from the enterprise value.  But no, sometimes things like

22  pension, you may, but for this -- the nature of this claim,

23  we did not value it or MPV it in in any way or risk assess

24  it in order to make it a factor in the enterprise value.

25         THE COURT:  No, I got it.  I mean, you didn't do a

1  negative BCF or anything like that, correct?

2          THE WITNESS:  Correct.

3          THE COURT:  Okay.  And I assume -- and I never

4  like to assume anything, do you believe that the reorganized

5  company without the new form of indemnity is better off than

6  the new company without the indemnity, all other things

7  being equal?

8          That didn't make sense.  Let me start over.

9          Assume all other things equal, company better off

10 with or without the indemnity?

11         THE WITNESS:  I would say the company is better

12 off without indemnity and contingent claims, if it could do

13 that.

14         THE COURT:  Got it.  But you haven't tried to

15 figure out -- you haven't run any sort of sensitivity

16 analysis or anything what that does to feasibility or the

17 balance sheet?  If it turns out that I was wrong and

18 Mr. Seiler was right, then it's a big number?

19         THE WITNESS:  We did not.

20         THE COURT:  Okay.  And if you were to do that,

21 what would you do?

22         THE WITNESS:  If I knew the answer to that, I

23 probably would have done it by now.  We would have to -- we

24 have two big unknowns.  We have a percentage likelihood of

25 losing in litigation, as well as what the damages are.  And

1  I suppose we'd have to brainstorm together with counsel,

2  both the A times B, the percentage of, you know, litigation

3  risk and the damages, how one would calculate that or

4  unscramble an egg.  So I don't sit here today saying I know

5  exactly how I would do it, but we have to have that

6  conversation.

7         THE COURT:  Totally understood, and I appreciate

8  the candor.  Are you able to say that if it turns out that

9  it goes against the company, that that could have a material

10  effect on the company's ability to go forward as a

11  reorganized entity?

12         THE WITNESS:  It's possible, without knowing the

13  magnitude of what we're talking about.  But obviously the

14  company is getting exit financing today with that indemnity

15  claim, but I guess in a world where that's crystalized and

16  it all goes against the company, there is certainly a

17  quantum of claim that the could affect the company's

18  liability in that scenario.

19         THE COURT:  No, I got it.  And I'm not suggesting

20  you should have done anything different.  I'm just trying to

21  understand all of the "what ifs" down the decision tree.

22         All right.  I appreciate your candor.

23         Let me ask:  Does anyone have any follow-up

24  questions based solely on the questions that I asked?

25         Actually you get an opportunity for Redirect.  I'm

1  sorry.

2           I didn't mean you to take that away from you.

3           MR. LENDER:  That's okay.  Why don't I see if

4  anybody has any -- if it's okay with you, I can see if

5  anyone has any follow-ups on your questions?

6           THE COURT:  So you have no questions based on my

7  follow-up?

8           MR. LENDER:  No, I have some Redirect based on --

9           THE COURT:  Understood and my apologies.

10           MR. SEILER:  I have no questions based on your

11  follow-up.

12           THE COURT:  All right.  Thank you.

13           Anyone else?

14       (No audible response.)

15           THE COURT:  All right.  Then your Redirect.

16           MR. LENDER:  Thank you so much.  Just briefly.

17                        REDIRECT EXAMINATION

18  BY MR. LENDER:

19  Q    You were -- Mr. Shah, you were asked some questions

20  about whether this alternative proposal from Citadel would

21  be better for the company.  Do you remember those questions?

22  A    I do.

23  Q    If things are -- if it's better for the company, is it

24  therefore worse for the FLSO lenders who have already voted

25  to accept the plan?

1  A    In terms of those terms, more flexibility for the

2  company is typically worse for the lenders under that

3  facility.

4  Q    And if it's worse for the lenders, do you understand

5  that you would therefore need to go out and re-solicit?

6  A    I do understand that -- I do understand that.

7  Q    Are you aware of any support for this proposal from the

8  PTL lenders, including the holders of the FLSO claims?

9  A    I'm not.

10  Q    What were some of the issues that you saw, based on

11  your review of this Citadel term sheet?

12  A    I think the two major issues, one was economic.  It

13  does propose a rather significant backstop fee for providing

14  the facility where we have no backstop fee under the

15  existing deal.  Perhaps more going to the overall

16  feasibility of it, I understand that the crux of it is to

17  remove the indemnity from the plan and from the credit

18  documents, which I understand was a term that's being

19  required by the PTL lenders and many of the folks who voted

20  for the plan.

21       And so to the extent that causes -- that need to

22  terminate an RSA and resolicit a plan, I don't know who our

23  -- I don't know who would vote for that.

24  Q    You were asked a couple of questions about indemnities

25  and you may remember counsel showed you a term sheet.  Do

1   you remember that?

2   A    I do.

3   Q    I just -- can you -- I don't have the ability to put it

4   up, but I think we can take a look at it.

5        Do you have Citadel Exhibit No. 35 in front of you?

6   It's the document I showed you.

7   A    I'll get it.

8            THE COURT:  Would you like for me to put it up?

9            MR. LENDER:  Yeah, that would be great, if you can

10  -- oh, I can use the ELMO.  I forgot I can do that.

11  BY MR. LENDER:

12  Q    And what I want to ask you about is the commitment

13  letter and what I put up -- if we can get this on the ELMO,

14  I have to find out how to do that.

15       Whoops.  What I put up on the screen, which is page 8

16  of the commitment letter, do you see that the Citadel

17  commitment letter actually includes an indemnity.  Do you

18  see that?

19  A    I do.

20  Q    And you may remember, like Mr. Seiler started his exam

21  and was asking you questions about what he called the carve

22  out from the carve out.  Do you remember that?

23  A    I do.

24  Q    If we go down in the Citadel proposal, you'll see

25  you've got that same provided that he was talking about?

1   "Providing that the final indemnity shall not apply to

2   losses for gross negligence, bad faith and willful

3   misconduct.  Do you see that?

4   A    I do.

5   Q    And then there's the carve out from the carve out:

6        "Other than any claims against the commitment party or

7   the administrative agent acting in its capacity or

8   fulfilling its role as an agent, or any similar role in

9   respect of the alternative term loan facility."

10       Do you see that?

11  A    I do.

12  Q    And the alternative term loan facility, that's the

13  facility that Citadel was proposing, right?

14  A    Correct.

15  Q    Just a couple more questions.

16       How much debt does Citadel currently own?

17  A    I remember something in the order of magnitude around

18  60 million, I believe.

19  Q    And can Citadel carry the vote with $60 million of

20  debt?

21  A    No.

22           MR. LENDER:  Your Honor, I have no further

23  questions.  Thank you.

24           THE COURT:  All right.  Thank you.

25           MR. MILLAR:  Your Honor, Recross?

1          THE COURT:  Let me go in order, absolutely.

2          Mr. Seiler?

3          MR. SEILER:  (No audible response.)

4          THE COURT:  Oh, I'm sorry, did we have anybody

5  from the PTL?  You didn't participate the first time, so no

6  questions.

7          MALE SPEAKER:  I think it's logically -- I'd be

8  surprised if I have questions like Mr. Millar's.

9          THE COURT:  All fine by me.  I just didn't want

10 you to be upset.

11         MALE SPEAKER:  Thank you.

12         MR. MILLAR:  Hello again, Mr. Shah.  James

13 Millar, Faegre Drinker on behalf of Citadel.

14                    RECROSS-EXAMINATION

15 BY MR. MILLAR:

16 Q    I want to talk to you about the recoveries by the FLSO

17 group under Citadel's proposal.

18      You understand that they get equity and new debt,

19 correct?

20 A    Correct.

21 Q    And the equity is going to be worth more if there's no

22 indemnity, correct?

23 A    Are you holding everything else equal, including fees?

24 Q    Yes.

25 A    Assuming the indemnity is valued at something more than

ROOPESH SHAH - REDIRECT BY MR. LENDER                    124

1  zero, I don't know that to be the case.

2  Q    But let's assume it's valued at something more than

3  zero.  Then as you testified on -- when I was speaking with

4  you a moment ago, it's better for the company with no

5  indemnity and that would logically mean equity value is

6  higher, yes?

7  A    As I said, I didn't -- we didn't deduct in terms of our

8  plan equity value anything related to the indemnity, so

9  philosophically a company that doesn't have an indemnity is

10 better than a company that does.

11      It wouldn't have changed the stipulated plan equity

12 value.

13 Q    Okay.  And then the debt piece, there's a cash-out

14 offer in the Citadel provision, right?  You testified to

15 that, 102, yes?

16 A    Correct.

17 Q    And that's the call price immediately after the RSA

18 exit facility would close, right?

19 A    Correct.

20 Q    So if the FLSO group is getting something that's as

21 good as, or perhaps better by way of equity, and if they're

22 getting a cash-out feature on the debt, that overall package

23 has to be as good as, or better than what is offered under

24 the RSA, right?

25 A    No, I don't think that's the case.

1  Q    So if the equity is as good as or better and the debt

2  is cashed out at whole value, you don't think that's as good

3  as or better than what they're offered?

4  A    There's other components of values, so no, I think

5  there's other components of values you haven't addressed.

6  Q    They're getting equity and debt.  They're not getting

7  anything else, are they?

8  A    They're getting a release under the plan.

9  Q    No, not --

10 A    I'm sorry, indemnity of the plan.

11 Q    Well, let's focus on it.  Thank you for raising that.

12       That's not a distribution to the FLSO group, is it?

13 A    I don't believe so.

14 Q    And it's not a distribution to the FLFO group, is it?

15 A    I'm not a lawyer, but I don't think so.

16 Q    And so if we're talking about those classes as defined

17 under the plan that the Debtor, your client, submitted, they

18 don't need to be resolicited, do they?

19 A    I'm not a lawyer, so I can't remember that, but also,

20 you forgot about the fee.  There's a large gee that -- so

21 that goes to equity value, as well.

22 Q    Let's look at that backstop fee.

23       MR. LENDER:  If we may go the term sheets?  Under

24 backstop fee, on page 2 of the term sheet.

25       Are we able to put that up on the screen?

```
 1              FEMALE SPEAKER:  I'll (indiscernible).

 2              THE COURT:  What is it that she wanted?

 3              MR. LENDER:  Yeah, can I do this?  Can I put it

 4   here?

 5              THE COURT:  If you want it, sure.

 6              MR. LENDER:  Give it a go.  Whoops.

 7   BY MR. LENDER:

 8   Q    Okay.  Backstop fee.  Do you see that, Mr. Shah?

 9   A    I do.

10   Q    And "The backstop fee shall be based on the base amount

11   equal to the lesser of romanette 1 and romanette 2."

12        Do you see that?

13   A    I do.

14   Q    Romanette 1 is a 10 percent backstop fee, but we're

15   going to do the lesser, right?

16   A    Okay.

17   Q    Romanette 2, 75 percent of the deemed net present value

18   as calculated in good faith by the Debtors with the

19   consultation of the backstop parties of the indemnification

20   obligations originally contemplated to be preserved under

21   Section 8.5(b) of the plan.

22        So the backstop fee -- don't worry, we're going to get

23   to the end -- the backstop fee under this formulation is

24   actually only 75 percent of the value -- whatever that value

25   might be, the expected value of the indemnification
```

1  obligation.

2        Do you see that?  Do you understand that?

3  A    I do.

4  Q    And then there is a minimum backstop fee of 20 million.

5  Do you see that?

6  A    I do.

7  Q    And you understand Citadel is here in town, ready to

8  negotiate, yes?

9  A    You made that clear.

10        MR. LENDER:  Thank you.

11        THE COURT:  All right.  Mr. Seiler?

12        MR. SEILER:  I have one more.

13        THE COURT:  Do you have one more?

14        MR. SEILER:  Just one more.

15        THE COURT:  It was a great exit.  I mean, you just

16  turned around and left the room.

17     (Laughter)

18        THE COURT:  I was looking for the mic on the

19  floor.

20        MR. SEILER:  Yeah, I know.  I just -- you're

21  supposed to walk away and then just go, just go one more.

22        THE COURT:  Fair enough.

23                         RECROSS-EXAMINATION

24  BY MR. SEILER:

25  Q    Have you ever reached out to any of the members of the

ROOPESH SHAH - RECROSS BY MR. SEILER

128

1  Ad Hoc Group about whether they like this proposal?

2  A    Which group are you referring to?

3  Q    I'm sorry, we're referring to the Gibson Dunn Group.

4  A    I did not personally.  I was advised that, again, that

5  conversation occurred between counsel.  What the outcome of

6  that discussion was, I do not.

7  Q    Do you think you should reach out to the principles of

8  that group?

9  A    Those principles are advised by advisors who are

10  up-to-speed on the issues in the group.  I generally speak

11  to the advisors, as opposed to the principles, when they're

12  already properly advised.

13  Q    So the answer is no?  You don't think you should reach

14  out to the principles?

15  A    I would typically start with the advisors and then

16  decide whether or not an approach to principles makes sense.

17  Q    Do you understand that some of those in that group are

18  in the same position of Citadel in the sense that we did not

19  participate at all in the 2020 transaction?

20  A    I understand some people in that group have that

21  position.

22  Q    And it would follow then, that some of those people

23  shouldn't care about the indemnity, should they?

24  A    I don't know that to be the case.

25  Q    Do you want to ask them?

ROOPESH SHAH - RECROSS BY MR. SEILER                    129

1  A    I would start with advisors and if we determine that

2  there's an opening, I would certainly go to principles.

3  Q    When are we going to make that determination?

4            THE COURT:  So we're hitting scope.

5            MR. SEILER:  I'm sorry?

6            THE COURT:  We're hitting scope.

7            MR. SEILER:  Okay.  I'm sorry.

8            Thank you, Your Honor.

9            THE COURT:  Thank you.

10           All right.

11           MALE SPEAKER:  I have nothing, Your Honor.

12           THE COURT:  All right.  Any reason that Mr. Shah

13 cannot be excused?

14       (No audible response.)

15           THE COURT:  All right.  Mr. Shah, I know you have

16 many other activities on your calendar.

17           I would like to ask:  Are you able to be available

18 throughout the week if you can't be here?

19           THE WITNESS:  Yes, Your Honor.

20           THE COURT:  All right.  Thank you, sir.

21       (Witness steps down.)

22           THE COURT:  All right.  Mr. Lender?

23           MR. LENDER:  Your Honor, if it would be okay to

24 take a short break so we can transition to our next witness,

25 which will be Ken Prince?

1          THE COURT:  Absolutely.  I should have said this

2    earlier.  When folks need a break, you need to tell me

3    'cause I won't take one unless you ask, and it doesn't

4    bother me at all.

5          You want to say 3:45?

6          MR. LENDER:  That would be perfect.

7          THE COURT:  All right.  Thank you.

8          We'll be adjourned until 3:45.

9          COURT SECURITY OFFICER:  All rise.

10      (Recess taken from 3:30 p.m. to 3:47 p.m.)

11                         AFTER RECESS

12          THE COURT:  We are back on the Record.  The time

13    is 3:47 Central.  Today is May the 15th, 2023.

14          And are we ready to proceed with Mr. Prince?

15          MR. LENDER:  Yes, Your Honor.  For our next

16    witness we call Ken Prince.

17          THE COURT:  All right, thank you.

18          Mr. Prince, if you'd come forward, please, sir.

19    Mr. Prince, right up here.  I turned the electricity off so

20    you don't have to worry.  Just joking.

21          Before you sit down, if you'd raise your right

22    hand please, sir.

23       KENNETH S. PRINCE, DEBTOR'S WITNESS, SWORN

24          THE COURT:  All right, thank you, sir.  Just get

25    comfortable.  And try to make sure you've got the microphone

1  right in front of you.  It'll make things go a lot easier.

2  All right.

3          FEMALE SPEAKER:  Can you (indiscernible).  Thank

4  you.

5          THE COURT:  Whenever you're ready.

6          MR. LENDER:  Thank you.

7                    DIRECT EXAMINATION

8  BY MR. LENDER:

9  Q    Please state your full name for the Record.

10 A    Kenneth S. Prince.

11 Q    And where are you currently employed?

12 A    Advent International.

13 Q    What is your role at Advent International?

14 A    I'm a partner, managing director, and head of capital

15 markets North America.

16 Q    And can you just describe some of your job

17 responsibilities as head of capital markets?

18 A    I help coordinate all the firm's interactions with Wall

19 Street, including the lender community.

20 Q    Does Advent International have an ownership

21 relationship with regard to Serta Simmons Bedding?

22 A    We do.

23 Q    And what is that relationship?

24 A    We were the majority owner.

25 Q    What role did you play with regard to SSB?

1    A    I helped advise the team and the board of the company

2    on their financing transactions.

3    Q    Now, are you familiar with the transaction that the

4    company entered into with certain of its lenders in 2020?

5    A    I am.

6    Q    And are you familiar with the negotiations surrounding

7    the 2020 transaction?

8    A    I am.

9    Q    What was Advent's role in those negotiations?

10   A    Advent was working with the Independent Finance

11   Committee as they were examining different transactions that

12   they could take on.  And we were helping to advise them,

13   along with their advisors in Evercore and Weil.

14   Q    Was Advent the main party negotiating the deal?

15   A    No.

16   Q    Who was?

17   A    The Independent Finance Committee.

18   Q    And do you generally have an understanding as to how

19   the negotiation process worked?

20   A    I do.

21   Q    And can you just briefly explain how your understanding

22   of that worked?

23   A    Through the company's advisors in Evercore and Weil.

24   Specifically they solicited a number of inbounds to help

25   raise new money financing, as well as potentially achieve

1  debt discount.  They ran a competitive process and then

2  eventually chose a group that was the winners.

3  Q    And who chose the group that was the winners?

4  A    The Finance Committee.

5  Q    And what is the Finance Committee?

6  A    It's a subcommittee developed by the board to examine

7  transactions like this.

8  Q    And did any member of Advent sit on the Independent

9  Finance Committee?

10 A    We did not.

11 Q    Did admit -- Advent have the final say on what

12 transaction to approve?

13 A    We did not.

14 Q    Who did?

15 A    The Finance Committee members.

16 Q    And what is your understanding as to how the Finance

17 Committee received the authority to make the decision as to

18 who to approve with regard to the 2020 transaction?

19 A    They were authorized by the board.

20 Q    When the company first entered into negotiations with

21 lenders and various third-party lenders, what was your

22 understanding as to what they were trying to achieve?

23 A    When the company started those discussions, it was just

24 before and just at the time when the COVID pandemic was

25 starting to hit the company.  The company was looking at

1   potentially running out of cash within a few months.  And so

2   the objective was to raise new liquidity in order to make

3   sure that the company could survive, as well as potentially

4   right-size the balance sheet through achieving discount.

5   Q    Now, how were those goals of the negotiations achieved,

6   to your understanding?

7   A    They -- the advisors and the Finance Committee reached

8   out to a number of third parties.  They gave them a feel for

9   what sort of transactions and what sizing financing need was

10  -- would be acceptable for the company.  And they solicited

11  feedback off of those.

12       That ran the course of a number of months, including

13  signing of non-disclosure agreements with number of lenders,

14  providing them with information so that they could assess

15  the financial health of the company, and understand those

16  financing needs and the necessity of that.

17       And then as that progressed, different lender groups

18  came up with different strategies and structures that were

19  -- had different reasons for there being of what they wanted

20  to transact.  And then eventually the company chose a group

21  that they could transact with.

22  Q    Great, thank you.

23       Let's turn to the first exhibit in your binder.

24            MR. LENDER:  For the Record, that's Document

25  865-7, Debtor's Exhibit Number 214.

1  BY MR. LENDER:

2  Q    Is Debtor's Exhibit 214 an internal email within Advent

3  that you sent to Dave McKenna at Advent on June 6, 2020?

4  A    It is.

5        MR. LENDER:  Your Honor, I'd ask that Debtor's

6  Exhibit Number 214 be admitted into evidence.

7             THE COURT:  Any objection?

8             MALE SPEAKER:  No objection.

9             THE COURT:  It's admitted.

10       (Exhibit 214, ECF 865-7, received in evidence.)

11            THE COURT:  I'm sorry?

12            MALE SPEAKER:  We won't be able to share.

13            MALE SPEAKER:  We're going to go on GoToMeeting.

14            THE COURT:  Oh.

15            MR. LENDER:  Oh, yeah, sorry.  Thank you.

16            MALE SPEAKER:  On the Jorge Martorell (phonetic)

17  and I turn my camera on.

18            THE COURT:  That would be great.  Thank you.

19       (Pause in the proceeding)

20            MR. LENDER:  Great.

21  BY MR. LENDER:

22  Q    Now, who was Dave McKenna to whom you sent your June 6,

23  2020 email in Debtor's Exhibit Number 214?

24  A    Dave McKenna was a managing partner at Advent.

25  Q    And why did you send this email to Mr. McKenna?

1  A    I was sending the email to Mr. McKenna following the

2  execution of the transaction because he was connecting with

3  Ralph Schlosstein (phonetic), who was the president of

4  Evercore.  And I wanted to give him background on exactly

5  what the transaction execution was like and how supportive

6  Evercore had been to the company.

7  Q    Now, in the first bullet, you wrote, "Avoiding the IPCO

8  was important to SSB.  Roop and Brent understood that and

9  crafted a process to get us to a position to have a

10 negotiating lever with the group we wanted to do a deal with

11 all along."

12      Do you see that?

13 A    I do.

14 Q    What are you referring to here when you talk about

15 crafting a process to get us to a position to have a

16 negotiating lever?

17 A    The process by which they were able to negotiate and

18 compare different alternatives for the company.

19 Q    And did the company always want to avoid an IPCO

20 transaction?

21 A    The company didn't always want to avoid an IPCO

22 transaction.  It was something that they were considering

23 until a better alternative came about.

24 Q    And do you recall when the better proposal came about?

25 A    Late May 2020.

137

1  Q    Now, the group you referred to in your June 6, 2020

2  email that you wanted to do a deal with all along, who was

3  that group?

4  A    It was a group of CLO investors, collateralized loan

5  obligation investors, which are regular-way market

6  participants in the leverage finance market and long-term

7  supports of the company.

8  Q    And did you know you wanted to do a deal with the

9  Gibson Group in March of 2020 or April of 2020, or even

10 early May of 2020?

11 A    No.  They hadn't -- we hadn't seen anything from them

12 that would imply that there was a deal to be done.

13 Q    And what did you mean when you wrote the group we

14 wanted to do a deal with all along?

15 A    I think this is the group that if they had had a

16 similar transaction, it would have been a group that would

17 have had ancillary benefits for the company.  But until they

18 came in late May, there wasn't a deal to be done with them.

19 Q    Now, in the second bullet you wrote, "We're capturing

20 $400 million of discount and raising $200 million in new

21 financing, all in the face of COVID and original liquidity

22 protections.  We would run out of money in July, so the

23 timing was beyond crucial and they are hitting that."

24         THE COURT:  So projections, not protections.

25         MR. LENDER:  Oh, I'm sorry, let me do it again for

1   the Record.  Thank you.

2   BY MR. LENDER:

3   Q    In the second bullet you wrote, "We're capturing $400

4   million of discount, plus raising $200 million of new

5   financing, all in the face of COVID and original liquidity

6   projections where we would run out of money in July.  So the

7   timing was beyond crucial and they are hitting that."

8        Did the Gibson Dunn Group's proposal provide these

9   benefits to the company?

10  A    It did.

11  Q    How about the Angelo Gordon Group?

12  A    The Angelo Gordon Group would not have achieved the

13  same level of discount, and it would have had more

14  limitations on long-term operating flexibility.

15  Q    Now, after the Independent Finance Committee decided to

16  go with the Gibson Dunn Group, did you inform Angelo Gordon?

17  A    We did.

18  Q    And who did you reach out to?

19  A    Ryan Mollett.

20  Q    And how did he respond?

21  A    He was quite upset with our decision to go with a

22  different group.

23  Q    And during that call did you discuss with Angelo Gordon

24  the possibility of participating in the transaction in some

25  way?

1    A    We did offer Ryan the opportunity to consider

2    participating.

3    Q    And how did he respond?

4    A    Declined.

5    Q    Now, did other lenders participate in the deal post-

6    announcement?

7    A    We did have a small group of other lenders that

8    participated.

9    Q    And why was that?

10   A    We had negotiated very hard to have a basket available

11   to us that would allow us to achieve additional discount to

12   help right-size the company's balance sheet.

13   Q    And how much additional basket capacity did the company

14   use to purchase additional debt after the transaction was

15   announced?

16   A    Around $30 million.

17   Q    And how was it decided on which lenders to allow into

18   the transaction?

19   A    It was primarily based on the economics of those

20   lenders and what they could offer the company in terms of

21   discounts from their existing holdings.

22   Q    Did lenders' reputations or the type of lender play any

23   role in determining whether they would be invited into the

24   deal?

25   A    I think the company and the Finance Committee certainly

1   took into account whether lenders could be supportive of the

2   company going forward.  Those are important factors.  But

3   economics were the most important factor.

4          MR. LENDER:  Let me ask if we can look at the next

5   exhibit in your binder, for the Record Document 864-23,

6   Debtor's Exhibit Number 180.

7   BY MR. LENDER:

8   Q    Is Debtor's Exhibit 180 an email chain between yourself

9   and Roopesh Shah dated June 2nd, 2020?

10  A    It is.

11         MR. LENDER:  Your Honor, I'd ask that Debtor's

12  Exhibit Number 180 be admitted into evidence.

13         THE COURT:  Any objection?

14         MALE SPEAKER:  No.

15         THE COURT:  It's admitted.  Thank you.

16      (Exhibit 180, ECF 864-23, received in evidence.)

17         MR. LENDER:  Okay.

18  BY MR. LENDER:

19  Q    I want to start -- these email chains go in reverse

20  order so let's start in the back.  And if you go to the

21  third page of the exhibit, do you see that the email chain

22  starts with an email from Patrick Fallon at Monarch asking

23  Mr. Shah if he's free to catch up on Serta today on this.

24      Do you see that?

25  A    I do.

1  Q     And then I want to go to the second page of the email,

2  the next one up where Mr. Shah writes to you, "Going to have

3  to figure out what to do about Monarch.  They have been

4  fairly consistent in calling and wanting to be part of

5  something."

6        Do you see that?

7  A    I do.

8  Q    Was Monarch one of the existing lenders that was trying

9  to get into the 2020 transaction as part of the additional

10 basket capacity?

11 A    That's correct.

12           MR. LENDER:  All right.  Let's go up the email

13 chain.

14 BY MR. LENDER:

15 Q    You responded to Mr. Shah's email and you stated, "I

16 have zero desire to do anything with them."

17      Why didn't you want to let Monarch into the deal?

18 A    Our previous experiences with them had been that they

19 were fairly aggressive in the way that they bought into the

20 debt and the way that they treated us and management.

21 Q    All right.  Let's move up to the first page of the

22 document.  And there's an email from you on June 2nd, 2020

23 at 8:58 a.m.

24      Do you see that?

25 A    I do.

1  Q     And you wrote, "Monarch has zero relationship value for

2  us.  They were bullies on the way in, they are litigious by

3  nature, and they kept going after management for time when

4  we told them to stop.  Feels like we can do as well with

5  some others."

6       Were these some of the reasons why you did not want

7  Monarch included in the deal?

8  A     They are.

9  Q     Did Monarch ultimately participate in the transaction?

10  A     They did.

11  Q     Why was Monarch ultimately allowed to participate in

12  the deal, if they had zero relationship value for you?

13  A     Because of the size of their second lien holding

14  specifically that made them a very economic trade inside the

15  confines of our baskets.

16  Q     And how was that beneficial for the company?

17  A     It reduced outstanding debt and cash interest expense.

18  Q     Okay.  I want to switch topics now and talk about the

19  DQ issue.

20       Are you familiar with an entity called North Star Debt

21  Holdings LP?

22  A     I've become familiar with them through this

23  transaction.

24  Q     And what is your understanding of what North Star is?

25  A     It's a shell company created by Apollo Global

1  Management, I think is the formal name, to buy debt in

2  Serta.

3  Q    And what is Apollo?

4  A    Apollo is a private equity and asset manager.

5  Q    Are you familiar with the concept of a disqualified

6  institution or DQ List?

7  A    I am.

8  Q    And what is your understanding of a DQ List?

9  A    A DQ List is a list of lenders that are not allowed to

10  own or participate in the debt of a company.

11  Q    Are you familiar with the DQ List for SSB's first lien

12  debt?

13  A    I am.

14  Q    Is Apollo on the SSB DQ List?

15  A    Apollo dominates the SSB DQ List.

16  Q    Were they on the SSB DQ List in March of 2020?

17  A    They were.

18  Q    Has Apollo always been on the SSB DQ List?

19  A    They have been.

20  Q    Did you at some point agree to allow certain funds of

21  Apollo to trade in Serta's debt?

22  A    We allowed Apollo to be part of the initial allocation

23  of the Serta debt in 2016, which is the debt that eventually

24  became part of the 2020 transaction.  Should just clarify

25  that because there was debt prior to that.

1       And so as part of that allocation we allowed Apollo to

2   be part of that allocation, even they were on the DQ List.

3   Q    And what does that mean in terms of the DQ List going

4   forward with regard to Apollo?

5   A    It means inside the document there's language where if

6   they -- if Apollo had sold out of the debt entirely, then

7   they would not be able to repurchase into the debt without

8   getting the company's consent.

9   Q    And who determines who is or isn't on the DQ List?

10  A    The company.

11  Q    Can Advent take someone off the SSB DQ List?

12  A    It cannot under the credit agreement.

13            MR. LENDER:  Let me ask you to look at the next

14  exhibit in your binder, which is Document 863-47, Debtor's

15  Exhibit Number 154.

16  BY MR. LENDER:

17  Q    Is Debtor's Exhibit 154 an email chain between yourself

18  and Brendan Dillon at UBS attaching a document entitled

19  "Advent Disqualified Institutions List," and another email

20  sent by you dated May 26, 2020?

21  A    It is.

22            MR. LENDER:  Your Honor, I'd ask that Debtor's

23  Exhibit Number 154 be admitted into evidence.

24            THE COURT:  Any objection?

25            MALE SPEAKER:  None, Your Honor.

1          THE COURT:  It's admitted.

2       (Exhibit 154, ECF 863-47, received in evidence.)

3          MR. LENDER:  All right.

4  BY MR. LENDER:

5  Q    I want to first start with the email that appears on

6  page ten of Debtor's Exhibit 154.  Is this an email that you

7  wrote to Brendan Dillon at UBS on or about October 18th,

8  2016 with the subject line "Apollo"?

9  A    It is.

10 Q    And who is Mr. Dillon?

11 A    Brendan Dillon was the head of leverage finance at UBS

12 at the time.

13 Q    Now, you wrote "Off DQ List for SSB."

14      Why did you write that?

15 A    Because we were confirming that we were okay with them

16 receiving an allocation in the original syndication of the

17 debt.

18 Q    Okay.  Let's now look at your May 26, 2020 email in the

19 middle of the first page to Brendan Dillon and Simon

20 Canning.

21      Actually, I didn't ask you, but who is Mr. Canning?

22 A    Simon is our coverage officer at UBS, manages the

23 relationship.

24 Q    Okay.  In your May 26, 2020 email to Brendan Dillon at

25 UBS, you wrote, "This email was with respect to their liquid

1  funds which were participating in the transaction, not their

2  loan to own private equity funds which have bought the loan

3  now."

4      By "this email," are you referring to your 2016 email

5  that we just looked at?

6  A    That's correct.

7  Q    And what distinction were you making here?

8  A    That the original allocation was to a part of Apollo

9  that is similar to the lenders that we're talking about

10  earlier, their CLO group, and that we were allowing them to

11  move into the transaction to be a part of the allocation,

12  but that we were keeping Apollo as a general statement on

13  the DQ List.

14      And in the transactions that we were subsequently

15  discussing as to whether they were or were not allowed on

16  part of the DQ List, we were clarifying that the arm that

17  has been set up that bought this debt through North Star

18  Holdings was through their private equity funds, which is a

19  totally different buyer universe.

20  Q    You then write, the question is where's the actual DQ

21  List that you're referring to in your commentary that they

22  aren't on the DQ List.

23      Do you see that?

24  A    I do.

25  Q    Then if we go to the email above yours, Mr. Dillon from

1  UBS responds, "The DQ List is the one your counsel at Weil

2  sent us on October 4, 2016, attached, as modified by your

3  email telling us that Apollo was no longer on the list."

4        Do you see that?

5  A    I do.

6  Q    And did you remove Apollo from the DQ List?

7  A    I don't have the right to.

8  Q    Now, if you turn to the next page of the exhibit, is

9  this the SSB DQ List referenced in Mr. Dillon's email?

10 A    It is.

11 Q    And for how many pages does it go on with lists of

12 Apollo entities that are on the Disqualified Institutions

13 List?

14 A    They appear to be on five pages.

15 Q    Have you ever seen a SSB DQ List that does not include

16 Apollo?

17 A    I have not.

18 Q    To your knowledge was Apollo ever taken off the DQ

19 List?

20 A    No.

21 Q    Now, Mr. Prince, are affiliates of companies on the DQ

22 List also on the DQ List?

23 A    They are.

24 Q    I want to ask you to briefly look at our next exhibit.

25        MR. LENDER:  For the Record it's 853-5,

1  Defendant's Exhibit Number 5.

2  BY MR. LENDER:

3  Q    And is this a copy of the original 1-L credited --

4  credit agreement?

5  A    It is from 2016.

6           MR. LENDER:  Your Honor, I'd ask to move in

7  Debtor's Exhibit Number 5.

8           THE COURT:  Any objection?

9           MALE SPEAKER:  None.

10           THE COURT:  It's admitted.  Thank you.

11       (Exhibit 5, ECF 853-5, received in evidence.)

12           MR. LENDER:  All right.

13  BY MR. LENDER:

14  Q    I want to ask if you can turn to page -- it's 148 of

15  the agreement, but page 154 of the document.

16           MR. LENDER:  And the section for the Record, I

17  think it's 9.05(f) little two.

18  BY MR. LENDER:

19  Q    Let me know when you're there.  It's the bottom of page

20  148, --

21  A    I've got it.

22  Q    -- 154.  You see where it says, "If an assignment or

23  participation under this Section 9.05 is made to any

24  disqualified institution and/or any affiliate of any

25  disqualified institution, other than any bona fide debt

1  fund, without the top borrower's prior written consent, any

2  such person a disqualified person, then the top borrower may

3  at its sole expense and effort, upon notice to the

4  applicable disqualified person and the administrative

5  agent," and then it has three different options that are

6  available.  Do you see that?

7  A    I do.

8  Q    Does this confirm that the DQ List includes affiliates

9  of disqualified institutions?

10 A    It does.

11 Q    Mr. Prince, let me ask you to look at the last exhibit

12 in your binder.

13         MR. LENDER:  And for the Record, it's Document

14 862-35, Debtor's Exhibit Number 91.

15 BY MR. LENDER:

16 Q    Is Debtor's Exhibit 91 an email chain between yourself

17 and folks at Serta dated around April 27th and 28th of 2020?

18 A    It is.

19         MR. LENDER:  Your Honor, I'd ask that Debtor's

20 Exhibit Number 91 be admitted into evidence.

21         THE COURT:  Any objection?

22         MALE SPEAKER:  No.

23         THE COURT:  Thank you.  It's admitted.

24     (Exhibit 91, ECF 862-35, received in evidence.)

25         MR. LENDER:  Okay.

1  BY MR. LENDER:

2  Q    I want to start with the email on the bottom of the

3  first page.  That's the email from Sally Erickson to you

4  dated April 27th, 2020 at 7:09 p.m.

5       Do you see that?

6  A    I do.

7  Q    And who was Sally Erickson, the author of this email?

8  A    She was the treasurer and controller of SSB.

9  Q    In the email, she writes to you saying, "Attached is an

10  assignment for your review and approval."  And a few lines

11  down in the email, she also says, "Can you advise if we

12  should accept or reject this assignment request?"

13       Do you see that?

14  A    I do.

15  Q    What do you understand she's asking you to review and

16  approve the assignment?

17  A    So she notes that the person who signed it was directly

18  associated with Apollo and therefore is basically calling

19  out that they are an affiliate of Apollo.  And she's saying

20  whether or not we should accept this, which would be for all

21  intents and purposes the company allowing them to circumvent

22  the DQ List and not making that applicable or reject it

23  because they're an affiliate and therefore a disqualified

24  lender.

25  Q    Okay, thank you.

1        And if we move up to your response dated April 28th,

2    2020 at 12:28 p.m., you say, "We've discussed and would

3    recommend we reject the assignment."

4        Do you see that?

5    A    I do.

6    Q    And why was that your recommendation?

7    A    Because Apollo was on the Disqualified Institution List

8    and we had feelings about their intentions.

9    Q    And do you know if Ms. Erickson rejected the

10   assignment?

11   A    I believe she did.  Her email above that says that she

12   will reject, and my understanding is she did.

13   Q    Now, did you have any conversations with Apollo about

14   the original allocation in 2016 that you discussed?

15   A    We did.  I had conversations with Jim Zelter (phonetic)

16   and Jim Vanek (phonetic) at the time discussing exactly what

17   their intentions were and why we might allocate them some of

18   the debt in 2016.

19   Q    And did you have any other conversations with Apollo in

20   2020 about the DQ List?

21   A    I did.  Matt Manin and David Sandberg from the private

22   equity side of Apollo called me, pushing that they should be

23   allowed and claiming that they were not on the DQ List.

24   When I reiterated that they were, they asked for the credit

25   agreement because they hadn't actually reviewed it at that

1  point in time.  They then had Jim Vanek reach out to me

2  because he manages their CLOs, who noted that he found that

3  the whole conversation was quite ironic given where they

4  were in this.

5  Q    And then did you have any further conversations with

6  Apollo about this issue?

7  A    We had conversations with them over time.  And then

8  they reached out over the last week.

9           MR. LENDER:  Thank you.

10          No further questions at this time.  Appreciate it.

11          THE COURT:  All right.  Thank you.

12          Let me just ask, Mr. Costa, any questions?

13          MR. COSTA:  No, Your Honor.

14          THE COURT:  All right.  Thank you.  All right.

15          MALE SPEAKER:  Give me just a minute, Your Honor.

16          THE COURT:  You're ready to go, all right,

17  terrific.  Do you need control?

18          MALE SPEAKER:  No.  Mr. Carlock (phonetic) will --

19          THE COURT:  Oh, Mr. Carlock, okay.

20          MALE SPEAKER:  -- I guess handle that for me,

21  thanks.

22          THE COURT:  Got it.

23          MALE SPEAKER:  If you don't mind, could we do it

24  by CM because the -- sorry, the --

25          THE COURT:  Oh, you just want to do it in the

 1  courtroom, okay.  He's got the video.

 2       (Pause)

 3            MR. SEILER:  Mr. Prince, how are you?

 4            THE WITNESS:  Good.  How are you?

 5            MR. SEILER:  Good.  Been a couple weeks since we

 6  last saw you at your deposition.

 7                      CROSS-EXAMINATION

 8  BY MR. SEILER:

 9  Q    The DQ List that you just reviewed with counsel, do you

10  know how that got to UBS?

11  A    How the DQ List got to UBS?

12  Q    Right.  How did the Serta DQ List --

13  A    Yeah.

14  Q    -- you just reviewed with counsel get to UBS?

15  A    Sure.  The Disqualified Institution List is attached to

16  the credit agreement as an appendix.  UBS is the

17  administrative agent for the loan and so they have access to

18  the credit agreement.

19  Q    Let me pull up what we're going to mark what is DX-4.

20  It's ECF 248-4.  And this email begins on October 4, 2016.

21  This is prior to the 2016 credit agreement, right?

22  A    Correct.

23  Q    Yeah.  And you have an email to Lewis Benton copying

24  Michael Lawton.  Do you see that?

25  A    Yeah.

1  Q    And you're familiar with this email exchange?

2  A    I see that I'm on it so I'll say that I am familiar

3  with it.  I don't think I've seen it in seven years.

4  Q    Do you recall reviewing this at your deposition with

5  me?

6  A    Actually I do not.

7            MR. SEILER:  Your Honor, I offer the admission of

8  DX-4.

9            THE COURT:  Well let's see if there's an

10 objection.

11           MR. LENDER:  No objection.

12           THE COURT:  All right.  Then it's admitted.

13      (Exhibit DX-4, ECF 248-4, received in evidence.)

14           MR. SEILER:  All right.

15 BY MR. SEILER:

16 Q    Let's look at the beginning email from you on

17 October 4, 2016 at 9:14 p.m.  Do you see that?

18 A    Yeah.

19 Q    You instruct Mr. Benton to send Michael our standard DQ

20 List.  Do you see that?

21 A    I do.

22 Q    And who is Mr. Benton?

23 A    It's Mr. Lewis, but Benton Lewis is a lawyer at Weil

24 who we use.

25 Q    And Weil was representing Serta, correct?

1   A    Weil was Serta's lawyer, that's correct.

2   Q    Thank you.

3        And so you instructed him to send the standard DQ List.

4        MR. SEILER:  And let's scroll up, Mr. Carlock.

5   BY MR. SEILER:

6   Q    And Michael says, "Please see attached," right?

7   A    Yeah.

8        MR. SEILER:  Let's go up to the very top.

9   BY MR. SEILER:

10  Q    And Michael Lawton now has the DQ List, right?

11  A    Okay.

12  Q    And let's look attached.  And this is DQ List that we

13  just looked at with your counsel, right?

14  A    I'm assuming that this is the same list that is finally

15  attached to the formal credit agreement.  If that's the

16  case, then that's correct.

17  Q    And there's no one copied on this email who works for

18  Serta, right?

19  A    If you flip back to the email?

20  Q    Sure.

21  A    That's correct.

22  Q    So did you have authority on behalf of Serta to send

23  the DQ List or have it -- instruct someone to send it to UBS

24  on October 4, 2016?

25  A    We can send a DQ List to a number of people.  That

1   doesn't make it the formal document that governs the trades.

2   Q    Did you have authority on behalf of Serta to direct

3   Weil Gotshal to send the DQ List to UBS on October 4, 2016?

4   A    I don't think that I ever asked for formal authority

5   from them to send it, but I think that it would be implied

6   from our work with Serta that we could ask Weil to send that

7   to their admin agent, yes.

8   Q    So you had some agency authority for Serta to do this,

9   right?

10  A    We have authority to help them execute on the

11  transaction that they're working on, yes.

12  Q    And part of that would be sending a DQ List to UBS,

13  right?

14  A    Part of it could be help facilitating communication

15  between the parties that need to communicate, yes.

16  Q    Part of it be to send the DQ List to UBS, right?

17  A    Sure.

18  Q    Okay.  Does your email clarify that this is a limited

19  -- or, excuse me.

20          MR. SEILER:  Let's go to the next email.  Let me

21  look at Prince or DX-132.  It's ECF 250-33.

22  BY MR. SEILER:

23  Q    Actually, you just looked at this with your counsel or,

24  excuse me, Mr. Lender.  He's not your counsel.

25          All right.  You looked at this just a minute ago.  It's

1  admitted as Debtor's Exhibit 154.  Do you remember this

2  email?

3  A    I do.

4  Q    All right.  And you asked Mr. Brendan Dillon and you're

5  asking Simon Canning -- and Simon Canning's at UBS I think

6  you said.

7  A    Correct.

8  Q    Yeah.  You have a question about where's the actual DQ

9  List, right?

10  A    Yeah.  I'm asking him where the list that's attached to

11  the credit agreement as a legal document is.

12  Q    Do you see anywhere in your email that you've asked

13  where the document is that's attached to the credit

14  agreement?

15  A    I didn't use those words, but I'm not sure why I would

16  ask for anything that's not applicable.

17  Q    So if you look at the top email from Mr. Dillon back to

18  you, he says, the DQ List -- and now we're in May of 2020,

19  right?

20  A    (No audible response.)

21  Q    In May of 2020 UBS writes back that the DQ List is the

22  one your counsel at Weil sent to us on October 4, 2016,

23  attached, right?

24  A    That is what Brendan Dillon says.

25  Q    And the list that was sent on October 4, 2016 is the

1  one that you instructed Weil to send, right?

2  A    Again, I mean, I don't have the emails in front of me

3  because you don't have physical copies.  But if you're

4  telling me that the email that we just reviewed was the

5  October 4th, 2016, then that would make sense.

6  Q    All right.  And he writes, "Further, as modified by

7  your email telling us Apollo is no longer on the list."

8       Do you see that.

9  A    I see that Brendan says this.  But the fact of the

10  matter is that whatever he's saying about what --

11            MR. SEILER:  Objection, nonresponsive.

12            THE COURT:  Sustained.

13  BY MR. SEILER:

14  Q    Do you see what he's wrote?

15  A    Repeat your question.

16  Q    You see that he wrote, "Further, as modified by your

17  email telling us that Apollo was no longer on the list."

18  A    I see that an individual named Brendan Dillon wrote

19  that "As modified by your email telling us that Apollo is no

20  longer on the list."

21  Q    So in May of 2020, UBS is pulling its records to

22  respond to your email of May 26, 2020, they produced the DQ

23  List you instructed sent on October 4, and they pull up your

24  email from October 18, 2016 and attach it, right?

25  A    Okay.

1  Q    And look at the last page of this exhibit.  This is

2  your email.  And you're sending it to Mr. Dillon and

3  Mr. Lawton, and they were two of the recipients -- or two of

4  the people on the email from October 4, 2016, right?

5  A    Okay.

6  Q    And you just say, "Subject, Apollo off DQ List," right?

7  A    Yeah.

8  Q    You don't make any qualification about Apollo's --

9  Apollo on that DQ List, do you?

10 A    But then we have a DQ List that's attached to the

11 credit agreement as the final list further on.

12         MR. SEILER:  Objection, nonresponsive.

13         THE COURT:  Mr. Prince, let me ask.  You've gone

14 to great lengths to say that you didn't have the authority

15 to take someone -- to put someone on the list or to take

16 them off.  What authority did you have to send this email?

17         THE WITNESS:  The -- but at the same time what I

18 would say is the role that I have explained is that I'm

19 helping the company as their advisor in terms of executing

20 on transactions.

21         THE COURT:  Okay.  Then let me ask a different

22 question.

23         THE WITNESS:  Okay.

24         THE COURT:  Where did you get the authority to

25 send this very specific instruction to UBS?

1          THE WITNESS:  Quite frankly, I may not have been

2    authorized to send this.

3          THE COURT:  Okay.  That's a fair answer.

4          All right.  With that, if you would re-ask your

5    question?  Because I just wanted to understand how we got

6    here.  So --

7          MR. SEILER:  You want me to --

8          THE COURT:  You had asked a question that you had

9    objected to and, quite frankly, I've now forgotten it.

10         MR. SEILER:  Okay.

11   BY MR. SEILER:

12   Q    Mr. Prince, you did not qualify in any way how Apollo

13   was off the DQ List in your email, correct?

14   A    In this email I did not qualify.

15   Q    In fact, you do not have any email correspondence with

16   UBS about the DQ List until March of 2020, correct?

17   A    If you're saying that I didn't, then that's probably

18   correct.

19   Q    And you never withdrew this email from October 18,

20   2016, did you?

21   A    Nor did we amend the Disqualified Institution List that

22   was attached to the credit agreement.

23         MR. SEILER:  Objection, nonresponsive.

24         THE COURT:  No, it is responsive.  But it begs the

25   question.  If you didn't do that then what's the effect of

1   this email, Mr. Prince?

2          THE WITNESS:  Well, again, I realize there's

3   context to everything.  So the effect of this email was to

4   provide an allocation to Apollo at that point in time.

5          THE COURT:  And is there anything that is dated at

6   or around October the 18th of 2016 to support that

7   conclusion with respect to conversations with Mr. Dillon,

8   Mr. Lawton, Mr. Frank, Mr. Boland?  All of whom I don't

9   know, but --

10          THE WITNESS:  Yeah.

11          THE COURT:  -- I'm just repeating names.

12          THE WITNESS:  I don't know whether there's written

13   communication we could get the allocation list where Apollo

14   received an allocation.

15          THE WITNESS:  And what would that prove, other

16   than that they were no longer on the DQ List?

17          THE WITNESS:  It would show that they understood

18   that my intention was to provide them an allocation, but

19   that we entered into a credit agreement where they were

20   still on the Disqualified Institutions List.

21          THE COURT:  I see, okay.  I got the theory.

22          All right.  Sorry, go ahead, please.  I'm sorry

23   for interrupting.

24   BY MR. SEILER:

25   Q    Just to be clear, you never clarified for UBS a limited

KENNETH PRINCE - CROSS BY MR. SEILER                    162

1  disqualification of Apollo on the list, correct?

2  A    Other than the fact that the final Disqualified

3  Institution List doesn't comport with an email that you're

4  saying changes that list.

5  Q    You never clarified for UBS any qualification about

6  Apollo being on the DQ List, right?

7  A    Why would I do that?  The credit agreement stands on

8  its own.

9  Q    Did you ever have a conversation with anyone at UBS to

10 clarify Apollo's presence or lack of presence on the DQ

11 List, or limited using on the DQ List?

12 A    I'm sorry, I don't recall the conversations that I had

13 seven years ago, so I'm not sure.

14        THE COURT:  Can we go back to the first part of

15 the email?  So you get this email in May.  And I assume that

16 you are not happy with that email; is that a fair statement?

17        THE WITNESS:  I think that it created some concern

18 about exactly what list did or didn't properly exist, right?

19 And so it led to us exploring that.

20        But the email itself doesn't bother me.  And I

21 think the fact that UBS's eventual internal conclusion was

22 that Apollo was on the DQ List was consistent --

23        THE COURT:  So --

24        THE WITNESS:  -- with our conclusion.

25        THE COURT:  -- maybe we'll hear from UBS, maybe

1   not.  What I'm interested in, is what you did when you got

2   this email.

3            THE WITNESS:  We reviewed the credit -- the DQ

4   List associated with the credit agreement --

5            THE COURT:  So who's we?  I don't like indefinite

6   pronouns.

7            THE WITNESS:  Apologies.  Serta Simmons, --

8            THE COURT:  Okay.

9            THE WITNESS:  -- Weil, and then with Advent and

10  Evercore working with them.

11           THE COURT:  Right.  And did you send any further

12  correspondence or did you turn it over to the lawyers?

13           THE WITNESS:  There was the email chain that we

14  showed when David Lender was up where we talked with Sally,

15  who was the treasurer.  Sally sent in the rejection of the

16  trade.

17           THE COURT:  Okay.  Got it.  Thank you.

18  BY MR. SEILER:

19  Q    Did you ever forward your email of October 18, 2016 to

20  anyone at Serta?

21  A    I doubt that I forwarded that email chain to someone at

22  Serta.

23  Q    Okay.  Apollo purchased Serta debt after October 18,

24  2016, correct?

25  A    They -- you mean the North Star Holdings trade or

1   Apollo the CLO?

2   A     Apollo the CLO.

3   A     I don't know whether they acquired more debt after

4   their original allocation or not.  Before the North Star

5   Holdings trade, Apollo hold -- held none of the debt.

6   Q     Excuse me, what was the last part of your answer?

7   A     Prior to the trade that North Star Holdings did in

8   2020, Apollo was not a lender under the credit agreement.

9   Q     All right.  Let's look at DX-93, which is ECF 248-93.

10  This is a May 10, 2020 email between Jeff Chase at Advent

11  and David Mussafer (phonetic) at Advent; you see that.

12  A     I do.

13  Q     And I believe you're copied on the email at the bottom

14  of the page, you see your name in the CC list?

15  A     Yeah.

16  Q     Do you recall this email?

17  A     Yeah.  We discussed this at my deposition.

18          MR. SEILER:  Move for the admission of DX-93.

19          THE COURT:  Any objection?

20          MR. LENDER:  No, Your Honor.

21          THE COURT:  It's admitted.

22       (Exhibit DX-93, ECF 248-93, received in evidence.)

23          MR. SEILER:  All right.

24  BY MR. SEILER:

25  Q     Mr. Prince, the subject of this email is AIC, which is

1  Advent, right, EVR, Evercore, recap discussion; you see

2  that?

3  A    I do.

4  Q    All right.  And attached to this email is a

5  presentation.  And let me look up the presentation.  There

6  is a potential question and answer section on page five; do

7  you see that?

8  A    If somebody can --

9         MR. SEILER:  Can you go to page five of the

10 presentation, please, Mr. Carlock?

11 BY MR. SEILER:

12 Q    There you go; do you see that?

13 A    I do.

14 Q    All right.  So this is in May of 2020.  You're in the

15 midst of assessing financial options with the company at

16 this point in time, right?

17 A    Correct.

18 Q    You look at potential question/answer number three.

19 "Who are the current lenders and the debt and what do you

20 expect them to do?"  And the draft answer says, "However, as

21 you can imagine, with the debt trading where it is, groups

22 such as Apollo and Oaktree are in the mix."

23      Do you see that.

24 A    I do.

25 Q    And that's because they were in the mix because they

1  were current lenders to Serta, right?

2  A    No, it was they were in the mix because they were

3  exploring potential financing and buying debt of Serta.

4  Q    So you're saying that by "in the mix," what are you

5  saying -- what does in the mix mean to you?

6  A    Means that there are groups that could be around the

7  capital structure.  I think we could replace those two

8  names, right, there are two specific names, but I think you

9  could replace them with a whole host of distressed and

10 opportunistic investors that didn't hold positions in the

11 company.

12 Q    Do you recall me asking at your deposition what in the

13 mix means?

14 A    I don't recall the specific question, but --

15 Q    You recall giving me -- well, you probably don't recall

16 your answer, do you?

17 A    (No audible response.)

18         MR. SEILER:  Can we pull up the deposition of

19 Mr. Prince?  Let's go to page 79.

20 BY MR. SEILER:

21 Q    And, Mr. Prince, I'm going to direct you to line 14.

22 And 14 is down in question three, and you'll see on the

23 exhibit that we're looking at, that's the question, "Who are

24 the current lenders and the debt and what do you expect them

25 to do?"

1   A      Yeah.

2   Q      And who are the current lenders and the debt and what

3   they expect to do.  And I ask you at the bottom, "What is

4   meant by in the mix?"  Actually I asked you, "In part of the

5   proposed answer or potential answers, however, as you can

6   imagine, with the debt trading where it is, groups such as

7   Apollo and Oaktree are in the mix."  And I asked you, "What

8   is meant by in the mix?"

9          And your answer is, "They are current lenders," right?

10  A      Yeah, I do see that.

11  Q      Okay.  So they were current lenders as of May 2020.

12  A      Apollo didn't have an assignment in the debt.

13  Q      Well, when you answered the question that they are

14  current lenders, was it your view that they were current

15  lenders as of May 2020?

16  A      That was my interpretation of what I meant by in the

17  mix.  But I could tell you that they were not lenders by

18  assignment in the debt.

19          MR. SEILER:  Look at Exhibit 8.  All right.  Let's

20  see more evidence that they're lenders.  Look at -- let's

21  look at DX-96, which is ECF 248-96.

22          Let me know when you're with me.

23  BY MR. SEILER:

24  Q      All right.  This is an email between Mr. Banks at

25  Evercore and yourself.  And Mr. Shah is also on here and

1   some others; do you see that?

2   A    I do.

3   Q    All right.  Do you recall this email exchange?

4   A    I do.

5            MR. SEILER:  I move to admit DX-96.

6            THE COURT:  Any objection.

7            MR. LENDER:  No objection.

8            THE COURT:  It's admitted.

9        (Exhibit DX-96, ECF 248-96, received in evidence.)

10           MR. SEILER:  All right.

11  BY MR. SEILER:

12  Q    This is from May 11, 2020.  And the -- at 8:20 a.m.

13  you're asking your colleagues --

14           MR. SEILER:  And it's on the second page at the

15  bottom.  Right, and let's get the rest, Mr. Carlock, if you

16  can.

17  BY MR. SEILER:

18  Q    You're asking your colleagues to -- "Can you also send

19  around holder's info, latest aggregate list, estimate of

20  basis, quick summary of the groups?"

21       Do you see that?

22  A    Can we scroll so that I can see that?

23           MR. SEILER:  Oh, yeah, sorry, you're not with me.

24           Go to the bottom of the second page of the

25  exhibit, Mr. Carlock.  Go to the bottom next page.  All

1  right.

2  BY MR. SEILER:

3  Q    See, at the bottom of this page there's an email from

4  you at 8:20 a.m.

5  A    Uh-huh.

6  Q    All right.  Let's go to the next page.

7       And this is the actual email.  Thanks, going through

8  this now, helpful.  And you also send around holder's info,

9  latest aggregate list, plus estimate of basis.

10      Do you see that.

11 A    Uh-huh.

12 Q    All right.  And Mr. Banks responds back to you at

13 8:35 a.m., one lender we do not have a ton of insight into

14 is Apollo; do you see that?

15 A    I do.

16 Q    All right.  And you write back at 8:51 a.m., "My

17 understanding is that all of Apollo's holdings have been

18 acquired in the last six weeks.  I believe they will have a

19 very low basis, probably the lowest of anyone."

20      Do you see that?

21 A    I see that.

22 Q    You don't make any mention that Apollo's on a DQ List

23 and shouldn't hold Serta debt, do you?

24 A    There's no reason for me to there.  The way that loans

25 trade and the way that the -- this settlement would work is

1  that Apollo would go to execute on the trade.  And there

2  were emails that we talked about in my deposition that get

3  to exactly this point around the timing differential.  So

4  Apollo would have gone to execute on the trade and then the

5  trade would have cleared up to 30 to 60 days later.

6      So the Apollo holdings doesn't necessarily mean that

7  they are or aren't on the DQ List.  It's a reference to what

8  they think that they've acquired and what they think that

9  they can control.

10 Q    If they're on the DQ List should they have been allowed

11 to acquire debt at all?

12 A    They shouldn't have been.  But this is the email

13 exchange that we talked about in my deposition where they

14 are making claim that they should have been cleared and they

15 haven't been cleared.  So the way --

16 Q    And --

17 A    -- that this -- the way that it works in practicality

18 is that a disqualified lender may actually execute a trade

19 that eventually does not get cleared.

20 Q    You don't make any inquiry in your email about how

21 Apollo acquired the debt referenced in this email, do you?

22 A    I don't.

23 Q    You know -- you make no mention of a DQ List or that

24 they are improper holders of Serta debt in this email, do

25 you?

1  A    I may have my timing slightly off.  I don't remember

2  when Mother's Day was that year, but that was the day that

3  Jim Vanek from Apollo called me.  So that was the day that

4  we discussed whether they held and so --

5          MR. SEILER:  Objection, nonresponsive.  I'm asking

6  about this email.

7          THE COURT:  Overruled.  Go ahead.

8          THE WITNESS:  So the -- we understood that they

9  had outstanding trades that had not been cleared.

10         And so I go back to this point about holdings does

11 not mean that they are or not on the DQ List.  It doesn't

12 mean that their trade has been cleared.  It can be what they

13 potentially could control if they were cleared to clear

14 those trades.

15 BY MR. SEILER:

16 Q    Other than Brendan Dillon at UBS, you don't recall

17 discussing the Serta DQ List with anyone else at UBS, right?

18 A    Are we talking '16 or '20?

19 Q    Either one.

20 A    I don't recall from '16.  In 2020 there were a number

21 of broad discussions.  I don't remember who else he may have

22 had on the phone with him.

23 Q    And you never informed UBS that you were not authorized

24 to remove Apollo from the DQ List, did you?

25 A    I doubt that I would have said that.

1        (Pause in the proceedings.)

2   Q    And you're not aware of any correspondence from Serta

3   to UBS to clarify Apollo's status on the UB (sic) list -- on

4   the DQ List subsequent to your email of October 16, until we

5   see correspondence from Serta on May 19, 2020, right?

6   A    Other than the credit agreement that Serta signed.

7   Q    No, I'm talking about correspondence between Serta and

8   UBS.

9   A    I'm saying that Serta Simmons signs the credit

10  agreement with UBS as the agent that has the DQ List as an

11  appendix.  So I think that's correspondence.

12            MR. SEILER:  Let's switch gears a little bit.

13  BY MR. SEILER:

14  Q    You mentioned earlier that the Finance Committee, the

15  Serta Finance Committee was the main party negotiating the

16  credit facility; is that right?

17  A    The 2020 credit facility.

18  Q    Right.

19  A    Correct.

20  Q    And I don't think you mentioned who is on that Finance

21  Committee.  Who was on the Finance Committee?

22  A    I remember Harvey Tepner.  I don't remember all the

23  members.

24  Q    Serta initially sought to satisfy liquidity needs with

25  the dropdown transaction that included certain intellectual

1  property as collateral, right?

2  A    That was a structure that we contemplated, yes.

3       (Pause in the proceedings.)

4  Q    And Serta sought bids on an IPCO transaction, correct?

5  A    Yeah.  The presentation that you and I looked at in the

6  deposition, the company reached out to a number of lenders

7  to solicit potential IPCO structures.

8  Q    And the IPCO structure, don't want to belabor the

9  documents, but it was to drop down some IP into a sub for

10 purposes of improving the capital of the company, right?

11 A    Yeah.  It was to drop that IP into an entity that could

12 be used as collateral to raise new money financing for

13 liquidity.

14       MR. SEILER:  And in that -- let's look at the

15 request.  Let's look at Exhibit DX-67, Defense 67, which is

16 ECF 248-67.

17 BY MR. SEILER:

18 Q    And this is an email exchange from April 18, 2020

19 between Omar Nazzal (phonetic) and yourself; do you see

20 that?

21 A    Yeah.

22       MR. SEILER:  I would like to move for the

23 admission of DX-67.

24       MR. LENDER:  No objection, Your Honor.

25       THE COURT:  It's admitted.

1        (Exhibit DX-67, ECF 248-67, received in evidence.)

2            MR. SEILER:  Thank you.

3   BY MR. SEILER:

4   Q    And in this email you're asking exactly what was

5   delivered to the lenders who were looking at the IPCO.

6   A    Correct.

7   Q    Okay.  And specifically around structure and assets

8   being used value.  All right.  And Advent helped prepare the

9   presentation that's attached, did it not?

10  A    Yeah.  We helped the company prepare these things,

11  that's right.

12  Q    All right.  And this presentation was sent to lenders.

13  You signed a nondisclosure agreement; is that right?

14  A    That's correct.

15  Q    All right.  And Serta sought bids on an IPCO

16  transaction.  Let's look at page 22 of the presentation and

17  the --

18            MR. SEILER:  You can get there, Mr. Carlock.

19            MR. CARLOCK:  Twenty-two?

20            MR. SEILER:  Twenty-two of the presentation, yeah.

21  Okay.

22  BY MR. SEILER:

23  Q    And it's making a request under request proposal,

24  "Please provide financing proposals no later than Friday,

25  April 24."

1   A     Okay.

2   Q     Was there anything significant about requesting

3   proposals by Friday, April 24?

4   A     Not that I recall.  It's just to keep moving the

5   process along.

6   Q     All right.  And we also see that this request for

7   proposal includes an Indicative Financing Term Sheet.

8   That's the next page.  You helped prepare this, too.

9   A     We helped the company think about what could be in

10  there, yeah.

11  Q     Okay.  How did the IPCO transaction proposed here

12  address Serta's liquidity needs?

13  A     It was looking to raise 150 to $200 million of fresh

14  capital that would be available to the company.  And then as

15  you see in the, quote/unquote, "rate" row, it's looking for

16  both the ability to pay interest in cash and PIK, which is

17  Paid in Kind, so it would reduce interest expense.

18  Q     And the company received responses to this proposal,

19  did it not?

20  A     I believe it did.

21  Q     All right.  And you received one -- or the company

22  received from Angelo Gordon.

23  A     Believe so.

24  Q     And Barings.

25  A     Believe so.

1  Q    And others.  All right.  When did the concept of an

2  uptier transaction enter into the discussion?

3  A    The company first got a proposal from the group that

4  was able to execute the uptier late May.

5  Q    And as part of Advent's evaluation of options for the

6  Serta Finance Committee, it prepared analysis of the

7  transactions, did it not?

8  A    I think you -- the -- as part of the company's

9  evaluation of the financing transactions, Advent and the

10 company's advisors probably helped it contemplate what the

11 implications were of the various financing alternatives.

12 Q    I think you were behalf of Advent were working with the

13 Finance Committee to look at those options, right?

14        FEMALE SPEAKER:  I'm sorry, could you repeat that?

15 BY MR. SEILER:

16 Q    You on behalf of Advent were advising the Finance

17 Committee; is that right?

18 A    I was part of the group that was examining these

19 proposals and talking to the Finance Committee.

20        MR. SEILER:  All right.  Let's look at DX-150.

21 DX-150 is ECF 250-52.  And this was Prince 13 in your

22 deposition.

23 BY MR. SEILER:

24 Q    You see in the lower right it has the Advent

25 International Global Private Equity Seal?

1  A     I do.

2  Q     And this is a presentation that Advent prepared,

3  correct?

4  A     I don't know.  I see our logo on it, but --

5  Q     You put the logo on it because this is something you

6  worked -- your company worked on, right?

7  A     Our company probably worked on this, yes.

8           MR. SEILER:  All right.  Move for the admission of

9  DX-150.

10          MR. LENDER:  Your Honor, I think you need to lay a

11  foundation as to whether Mr. Prince saw it or was involved

12  in it.  I just don't know.

13          THE COURT:  Right.

14  BY MR. SEILER:

15  Q     Would it help you to look at a couple pages to see if

16  you're familiar with it?

17  A     Right.

18          MR. SEILER:  Okay.  Mr. Carlock, can you flip

19  through the executive summary?

20  BY MR. SEILER:

21  Q     Let me know if this executive summary is familiar to

22  you.

23      (Pause in the proceedings.)

24  A     Can you go to another page just so I --

25  Q     Sure.

1    A    -- can see it?

2    Q    In fact, let me --

3    A    Keep going.  Okay.  All right, I'm good.

4         Yeah, we helped prepare this.

5              MR. SEILER:  Okay.

6              THE COURT:  The exhibit, Mr. Lender, is being

7    reoffered; any objection?

8              MR. LENDER:  No objection, Your Honor, thank you.

9              THE COURT:  All right, thank you.  It's been

10   admitted.

11        (Exhibit DX-150, ECF 250-52, received in evidence.)

12             MR. SEILER:  All right.  Mr. Prince, let's go to

13   page 12.  And I'm going to direct Mr. Carlock.  I think the

14   Bates on there is 93813.

15   BY MR. SEILER:

16   Q    And this is a bid ask summary that was included in the

17   presentation, right?

18   A    Okay.

19   Q    And does this outline transactions under consideration

20   at the time?

21   A    Looks like it, yes.

22   Q    All right.  And it summarized the proposals from the

23   three groups.  You have the Angelo Gordon, Gamut, Apollo

24   group, Barings, and then Credit Suisse, Eaton Vance, THL,

25   and Vesco (phonetic); is that right?

1   A    Yeah.

2   Q    Credit Suisse, Eaton Vance, THL, and Vesco, these are

3   the parties that later formed the Gibson Dunn Lender Group,

4   right?

5   A    That's correct.

6   Q    Okay.  Had you received a proposal from -- is this the

7   proposal from the Gibson Dunn Lender Group that's summarized

8   here?

9   A    I believe that's correct.  And I think you had this

10  dated June 2020, correct?

11  Q    Front cover says June 2020.  I believe the metadata is

12  May 28th.

13  A    Okay.  Makes sense.

14  Q    The last section in here -- excuse me.

15       Were you in touch with individuals inside the Gibson

16  Dunn Group as of May 29, 2020 about their proposal?

17  A    Yes.

18  Q    And what were you discussing with them at the time?

19  A    Similar to the conversations with Angelo Gordon, we

20  were talking about the pros and cons of what they were

21  putting in front of the company.

22            MR. SEILER:  All right.  And let's look at the

23  last section of this presentation is called "Precedent

24  Transactions."  And it begins at Bates 93834.

25            MALE SPEAKER:  There's a page number at the top.

1          MR. SEILER:  Oh, here we go.  Go to 37 of 39.

2   That ought to get us there.

3          MALE SPEAKER:  The Bates number again.

4          MR. SEILER:  The Bates is 93834.  But if you go to

5   page 37 of 39 in the ECF document, that's probably going to

6   get the same place.

7          Thirty-seven.  Go back one more.  Go to 36.

8   Thirty-five.  There we go.  All right.

9   BY MR. SEILER:

10  Q    You see here on page 35 of 39 a list of precedent

11  transactions; you see that.

12  A    I do.

13  Q    And this is a summary of transaction that I take it

14  Advent has evaluated as part of its work for the Serta

15  transaction, right?

16  A    These are a number of transactions that have

17  similarities to what we were contemplating for -- with

18  Serta.

19  Q    And these transactions are precedent in that they model

20  different liability management transactions that resulted

21  from some combination of new liquidity and/or discount

22  captured through a restructuring of the existing balance

23  sheet, right?

24  A    Agreed.

25  Q    What's that?

1    A      Agreed.

2    Q      Agreed.  And is it true that none of these precedential

3    transactions on this page are the same uptier transaction

4    that was eventually used in the 2020 credit agreement,

5    correct?

6    A    I don't have enough familiarity with all of them, but I

7    believe that's correct.

8    Q    Is it true, Mr. Prince, that Advent had never utilized

9    an open market provision such as in the first lien term loan

10   agreement, the 2016 agreement, and any other transactions

11   until the 2020 transaction?

12   A    Sorry.  Your question is whether or not Advent has

13   executed an open market transaction with a first lien term

14   loan?

15   Q    Not whether Advent executed, but Advent has not been

16   part of a transaction utilizing an open market provision

17   such as in the first lien term loan agreement, the 2016

18   agreement, and any other transaction until we see it used in

19   the 2020 transaction, right?

20   A    I don't know that that's accurate.  I think your

21   question during the deposition was whether we had done a

22   transaction like the Serta transaction.  So if that's what

23   we're trying to get at, I can answer that for you.

24   Q    What's your answer?

25   A    Okay.  That is correct.

1  Q    Okay.  And is it true that none of the proposals from

2  Apollo or Gamut or Angelo Gordon required an amendment of

3  the 2016 credit agreement accomplishment?

4  A    I believe that's correct.

5  Q    All right.  And we've seen that on June 5, 2020, the

6  Finance Committee approved moving forward with the Gibson

7  Dunn lenders; you're familiar they did that in a meeting on

8  June 5, right?

9  A    Yes.

10 Q    All right.  And I don't believe you attended that

11 meeting, did you?

12 A    (No audible response.)

13      FEMALE SPEAKER:  I'm sorry, what was your answer?

14      THE WITNESS:  Did not.

15      MR. SEILER:  All right.  Let's look at

16 Exhibit 189, Defense 189.  It's ECF 250-96.

17 BY MR. SEILER:

18 Q    And I believe you looked at this with your counsel --

19 or, excuse me, Mr. Lender, not your counsel, Debtor's

20 counsel, just a minute ago.

21 A    Yeah.

22 Q    All right.  This is an email dated June 6, 2020.  So

23 this is the day after the Finance Committee elects to move

24 forward with the Gibson Dunn transaction, right?

25 A    Yeah.

1  Q    All right.  And you're preparing bullet points for a

2  script, right?

3  A    I am.

4  Q    And you wrote in your first bullet, "Avoiding the IPCO

5  was important to SSB.  Roop and Brent understood that and

6  crafted a process to get us to a position to have a

7  negotiating lever with the group we wanted to do a deal with

8  all along."

9       Do you see that?

10 A    Yeah.

11 Q    And the group referenced in your bullet is the Gibson

12 Dunn Group, right?

13 A    As I described to Mr. Lender, I think the group

14 eventually became the Gibson Dunn Group, that's correct.  It

15 was a group of CLO lenders.

16 Q    And -- but as used here, you want to do -- the group

17 you want to do a deal with all along was the Gibson Dunn

18 Group, right?

19 A    Sure.

20 Q    All right.  And you write further that it was crafted

21 -- that Brent understood that and crafted a process to get

22 us to a position to have negotiating -- a negotiating lever

23 with the group.

24      So was the IPCO transaction merely a tool crafted to

25 generate an offer such as that from the Gibson Dunn Group?

1  A    No.  If you look at the next bullet, right, we

2  explicitly say in the second line of the following bullet,

3  "We would run out of money in July so the timing was beyond

4  crucial, and they are hitting that."

5      So everything that we did leading up to the transaction

6  that the Committee eventually approved on June 5th was in

7  order to make sure that we had an opportunity to raise new

8  financing and save the company by the time that it ran out

9  of capital in July.

10 Q    But you used the proposals from lenders, such as Angelo

11 Gordon, who create the leverage, right?

12 A    Every competing opposal (sic) -- proposal creates lever

13 against another, yes.

14 Q    Was Angelo Gordon ever given word that Serta wanted to

15 consider the type of transaction, other than the IPCO?

16 A    I don't know.

17 Q    Are you aware of Serta ever soliciting proposals for a

18 transaction, other than the request for proposals in the

19 IPCO transaction that we looked at earlier?

20 A    Sorry.  Am I familiar with Serta soliciting proposals

21 for transactions other than --

22 Q    Are you aware of Serta soliciting proposals for

23 transactions other than the solicitation for an IPCO-style

24 transaction that we looked at earlier in the document?

25 A    I don't know whether the company explicitly solicited

1    that.  But clearly the Gibson Dunn Group came up with it.

2    Q    But you're not aware of a solicitation.

3    A    I don't know.  I'm not sure whether I'm aware of a

4    solicitation.  I don't recall one.

5    Q    So after the Finance Committee approves moving forward

6    with the Gibson Dunn Group, they did not have 50.1 percent

7    of lender participation as of that date, right?

8    A    Correct.

9    Q    And you went to work to help gather 50.1 percent of the

10   lender participation, correct?

11   A    Evercore did, yes.

12   Q    But you -- did you assist in that effort?

13   A    Sure, yes.

14        (Pause in the proceedings.)

15        MR. SEILER:  And I think you might have looked at

16   this earlier.  I'm going to show you what we're going to

17   mark as Exhibit 177.  This is ECF 250-84.

18   BY MR. SEILER:

19   Q    This is an email exchange amongst your colleagues and

20   you at Advent International; do you see that?

21   A    I do.

22        MR. SEILER:  Move for the admission of DX-177.

23        MR. LENDER:  No objection, Your Honor.

24        THE COURT:  Thank you.  It's admitted.

25        (Exhibit DX-177, ECF 250-84, received in evidence.)

1          MR. SEILER:  All right.

2   BY MR. SEILER:

3   Q    Mr. Prince, so this is later in the day after the

4   Finance Committee had made its decision.

5   A    Okay.

6   Q    That your recollection.

7   A    That seems right.  I mean, it's close to -- just to be

8   clear, that's a East Coast timestamp, 5:41.  My colleague

9   Giles is in London so I just want to make sure that I have

10  the time right.

11  Q    Right.

12  A    Okay.

13  Q    But you're writing it at --

14  A    Yeah, that's from me at 5:41 p.m. Eastern time.

15  Q    Okay.

16  A    Okay.

17  Q    Very good.  All right.  You write in this, could you

18  have included all the other lenders in the exchange proposed

19  by the Gibson Dunn Group?

20  A    I'm sorry, you're saying I write that?

21  Q    No.  I'm asking you could you have included them?

22  A    Could we have included all of the other --

23  Q    First --

24  A    -- all of the lenders that were not part of the Gibson

25  Dunn Group, the first lien lenders?

1   Q    Right.

2   A    Could we have included them?  The term -- I want to

3   make sure I'm answering your question, so please direct me

4   if I'm not.

5        The terms of the Gibson Dunn Group's agreement limited

6   the amount of capital that could participate.  So the answer

7   to that would be no.

8   Q    And that was a term that the Gibson Dunn Group

9   required, right?

10  A    That's correct.

11  Q    In here you write at 1820 that the group we have a

12  handshake with is 39.3 percent.  Is that roughly the

13  percentage of the first term lenders that they had in the

14  group at the time?

15  A    That's correct.

16  Q    And you're -- right, Barings is 10.6, Oaktree's another

17  3.1, so we're greater than 50 percent with those.

18       Did you consider any other lenders other than Barings

19  and Oaktree to reach the 50.1 percent threshold?

20  A    We did, including the fact that we offered Angelo

21  Gordon the opportunity to participate.

22  Q    And Angelo, Apollo Group is represented here as being a

23  little less than 30 percent, right?

24  A    Correct.

25  Q    Did you ever consider recommending to see if Angelo

KENNETH PRINCE - CROSS BY MR. SEILER                    188

1  Gordon, Apollo, Gamut Group would be interested in doing the

2  transaction?

3  A    We offered to Angelo Gordon to participate.

4  Q    Did you offer it to all three of them?

5  A    Not sure that we were explicit whether it was one or

6  three, but we would have preferred just Angelo.  They had

7  the largest second lien holdings to first lien holdings.

8  They were the most economic animal for us.

9  Q    At the beginning of this email you write that the non

10 -- at the very end, that "Once the non-CLO group hear we're

11 going this way, they will go ballistic."

12     Why did you anticipate that they would go ballistic?

13 A    Because they wanted to do the trade with us.

14 Q    And you didn't do anything to avoid them going

15 ballistic, did you?

16 A    Can you give me examples of what I would have done?

17 Q    Would you -- do you recall doing anything to avoid them

18 having an adverse reaction?

19 A    We made a proactive call to them before they saw a

20 release.

21     (Pause in the proceedings.)

22 BY MR. SEILER:

23 Q    Did you believe it was important to treat them fairly

24 in whatever deal the company moved forward with?

25 A    I think this is a long game.  We like to treat

1  everybody fairly.

2          MR. SEILER:  All right.  Let's look at Exhibit

3  190, ECF 250-97.

4  BY MR. SEILER:

5  Q    This is from June 6, 2020 email between yourself and

6  Mr. Shah.  Do you see that?

7  A    I do.

8  Q    This is the day after the Finance Committee approved

9  the deal, right?

10 A    Yes.

11 Q    And you write to Mr. Shah at 2:14 p.m., "Correct, so

12 using some of this to lock up more winnow and then attacking

13 2-L to jump ahead of AG makes sense to me."

14          Do you see that?

15 A    Can you scroll down so I can see the prior emails?

16 Q    This is how it was produced to us.  There is no prior

17 email.  It's one page.  This is the one page.

18 A    Okay.  The 2:01 email from the press is not --

19 Q    It was not produced.

20 A    Okay.  So I see the email that's in front of me.

21 Q    Okay.  So you were proposing to have second lien

22 lenders jump ahead of Angelo Gordon --

23 A    I'm sorry.  Can you scroll back out?  Because the email

24 that it's referring to is --

25 Q    I'm sorry, I need to -- there we go.

1       So you were proposing to have second lien lenders jump

2  ahead of Angelo Gordon, correct?

3  A    We were proposing -- then attaching -- that's right.

4  We were proposing to approach the most economic

5  (indiscernible) in the 2-L.

6  Q    Right.  But you're not just trying to approach the most

7  economic 2-Ls, you're actually targeting Angelo Gordon to

8  get leapfrogged by who you let in the deal, right?

9  A    Well, Angelo Gordon had told us in no uncertain words

10  that they did not plan on participating.  So we now knew

11  what their position was and we could approach 2-L lenders in

12  order to capture discount by having a participating

13  (indiscernible).

14  Q    But you're targeting AG in this email, right?

15  A    I'm using AG as an example of a lender who's left

16  behind in the sub-1-L because they're the one lender that we

17  knew for certain had told us that they did not plan on

18  participating.

19  Q    But so you used the Angelo Gordon proposal for IPCO to

20  help gain leverage that eventually led to the Gibson Dunn

21  transaction, right?

22  A    We used the Angelo Gordon Group to examine

23  opportunities to raise capital that eventually led to a

24  competing offer from the Gibson Dunn Group that we

25  eventually transacted on because it provided us with more

1  efficient capital and more debt discount than what Angelo

2  Gordon Group was providing.

3  Q    And if you're targeting 2-L lenders to jump ahead of

4  AG, that's going to impair their position in the waterfall

5  by having second lien lenders exchange their paper for

6  superpriority loans, right?

7  A    Or could have led to them getting repaid at par if the

8  company had done a refinancing, rather than taking a

9  discount of 26 to 61 cents on the dollar.

10 Q    After the deal was made public, other lenders reached

11 out to a participator, right?

12 A    That's correct.

13 Q    And I think you've covered with Mr. Lender that certain

14 economic factors weighed into who got to participate in the

15 subsequent round; is that right?

16 A    Uh-huh.

17 Q    Did any aspect of that decision -- or you made

18 recommendations to the Finance Committee on who to include,

19 correct?

20 A    We helped the Finance Committee to consider

21 (indiscernible).

22 Q    You did that with a recommendation, right?

23 A    We certainly helped think about who we're dealing with?

24 Q    And how did you help them think about who it would be?

25 A    By looking at the size of the holdings and by giving

1  them thoughts as to how these people act in the past and

2  likely.

3  Q    And to what extent did your personal experience with

4  potential participants shape your recommendations to the

5  Finance Committee?

6  A    It does.  I do this day in and day out.  So we have a

7  feel for how lenders act and whether they're going to be

8  supportive of the company going forward.

9         MR. SEILER:  Let's look at some of these.  I want

10  to show you Defense Exhibit 232, which is ECF 252-34.

11  BY MR. SEILER:

12  Q    And this is a June 9, 2020 email between Mr. Shah,

13  Michael Searls (phonetic) at Barings, and yourself.  Do you

14  see that?

15  A    Sorry, can you scroll back up because right now I just

16  see the one between the (indiscernible).

17  Q    Yeah.

18  A    Yeah, okay.  So Michael emails Roopesh, Roopesh

19  forwards it to me.  Yep, got it.

20         MR. SEILER:  I'd like to admit Defense 232.

21         MR. LENDER:  No objection, Your Honor.

22         THE COURT:  All right.  232 is admitted.

23      (Exhibit 232, ECF 252-34, received in evidence.)

24  BY MR. SEILER:

25  Q    In this email, Barings inquires about adding an LP to

1  the transaction.  Do you see that?

2  A    I do.

3  Q    And they don't identify the LP, do they?

4  A    They don't.

5  Q    And you ultimately respond, "Tell him for the

6  relationship" -- and I take it you're telling him for the

7  relationship, you'll recommend they be included, right?

8  A    Correct.

9  Q    So without knowing who the LP was, you're willing to

10 make the recommendation just upon the relationship you had

11 with Barings, right?

12 A    Correct.

13 Q    No consideration of the economic factors that this LP

14 might have brought or not brought to the deal, correct?

15 A    They're part of the 1-L exchange, so we know the ratio

16 that they're exchanging at, how much discount, how much

17 basket is being utilized and that it's a relationship from

18 Barings.  All of those are correct.

19 Q    But no other specifics of who this unknown LP is?

20 A    That's correct.  It was a $3.2 million position in a

21 $2 billion deal, so I don't think that it really affects

22 whether they are going to be the one that's going to be

23 supportive per se for the company going forward; whereas,

24 Barings who had hundreds of millions of dollars, could have

25 been after that.

1          MR. SEILER:  All right.  Let me show you what

2   we're going to mark as "Exhibit 265."  It's ECF 252-66.

3        (Counsel confer.)

4          MR. SEILER:  It's DX-265, ECF 252-66.  Is that it?

5          Yes.

6   BY MR. SEILER:

7   Q    All right.  This is an email between you and Mr. Rasmon

8   at Marathon Fund.  Do you see that?

9   A    Yeah.

10  Q    Do you recall this exchange about them participating in

11  the deal?

12  A    I do.

13         MR. SEILER:  I'd like to admit Exhibit 265.

14         THE COURT:  Any objection?

15         MR. LENDER:  No objection.

16         THE COURT:  Thank you.  It's admitted.

17       (Exhibit 265, ECF 262-66, received in evidence.)

18  BY MR. SEILER:

19  Q    So Marathon sought to participate in the subsequent

20  rounds of transactions, right?

21  A    Correct.

22  Q    And you write in here that "The economics were not

23  favorable to let Marathon in," right?

24  A    (No audible response.)

25  Q    That "The 1-L economics are not actually attractive for

1   us."

2   A    Okay.

3   Q    So you're doing it purely on a relationship, right?

4   A    Uh-huh.

5   Q    Not on what the economics are for the deal, right?

6   A    Well, I think that there's an element of position in

7   here.  I mean, that the exchange ratio was 74 cents on the

8   dollar, so you're definition only capturing material

9   discount, but we're telling him that we're doing it purely

10  for relationship (indiscernible).

11           MR. SEILER:  All right.  Let's go to Exhibit 268.

12  268 is ECF 252-69.

13  BY MR. SEILER:

14  Q    And this is an exchange from June 18, 2020 that you had

15  with Cory Gice (phonetic) at Marble Point Credit.  Do you

16  see that?

17  A    Yep.

18  Q    Do you recall this exchange?

19  A    Yes.

20           MR. SEILER:  Move for the admission of 268.

21           THE COURT:  Any objection?

22           MR. LENDER:  No, Your Honor.

23           THE COURT:  It's admitted.

24      (Exhibit 268, ECF 252-69, received in evidence.)

25  BY MR. SEILER:

1  Q    Marble Point was a lender, correct?

2  A    Marble Point was a lender under the first lien credit.

3  Q    And it was seeking to participate in a subsequent round

4  up?

5  A    It was seeking to be included in the transaction;

6  that's right.

7  Q    And you ultimately tell Marble Point, "In the spirit of

8  partnership, we're including you guys in the trade."

9       Do you see that?

10 A    I do.

11 Q    Just in the last three emails we're talking to

12 prospective participants about doing the deal.  None of

13 those emails have anyone from Serta copied on it, do they?

14 A    It doesn't look like it.

15 Q    Is there a reason why Serta wasn't copied on your

16 negotiations of who was going to participate in the

17 transaction after the deal was announced?

18 A    These are -- a lot of these are relationships because I

19 operate in this market day in and day out.

20 Q    So Serta didn't have a role interfacing with the

21 parties that got in in the subsequent transactions?

22 A    Serta had a role of deciding whether or not they would

23 actually be included.

24 Q    Based upon your recommendations and those of its other

25 advisors?

1  A     Correct.

2  Q     But no role in actually discussing details with the

3  prospective participants, right?

4  A     They all participated on exactly the same terms as the

5  Gibson Dunn Group.

6  Q     But C has no role in communicating with the terms,

7  right?

8  A     They accepted the trades.

9  Q     Right, but they were on emails, that's my point.

10 A     They weren't on these emails that you're putting in

11 front of me that are between me and the lenders, that's

12 correct.

13     I don't think that that's definitive as to what their

14 role is.

15         MR. SEILER:  Let's look at -- let's look at

16 DX-237, ECF 252-39.

17 BY MR. SEILER:

18 Q     This is an email from June 10, 2020 between yourself

19 and Mr. Shah.  Do you see that?

20 A     I do.

21 Q     Do you recall the email exchange with Mr. Shah?

22 A     I do.

23         MR. SEILER:  Move for the admission of DX-237.

24         THE COURT:  Any objection?

25         MR. LENDER:  No, Your Honor.

 1              THE COURT:  It's admitted.

 2          (Exhibit DX-237, ECF 252-39, received in evidence.)

 3  BY MR. SEILER:

 4  Q     Did you ever push for an increase in the cap so that

 5  you could have more participation?

 6  A     I would definitely.

 7  Q     Why did you do that?

 8  A     Because capturing discount and the economics

 9  (indiscernible) were attractive.

10  Q     And that would have been better for Serta, right?

11  A     Correct.

12  Q     And you didn't do that because the Gibson Dunn Group

13  wouldn't allow it, right?

14  A     I'm sorry?

15  Q     Is the reason the cap wasn't increased is because the

16  Gibson Dunn Group wouldn't allow it?

17  A     That's correct.

18  Q     Even though it would have been better for Serta?

19  A     That's correct.

20          Doing so would have impacted the economics that they

21  had already negotiated separately.

22              MR. SEILER:  All right.  And let me show you what

23  we're going to mark as "Exhibit 137."  Exhibit 137 is also

24  ECF 250-39.

25  BY MR. SEILER:

1  Q    This is a May 27, 2020 email between yourself, Roopesh

2  and others.  Do you see that?

3  A    Yep.

4  Q    And this is before the transaction was approved, but

5  after you had learned about the Gibson Dunn transaction?

6  A    Correct.

7           MR. SEILER:  I move for the admission of DX-137.

8           THE COURT:  Any objection?

9           MR. LENDER:  No, Your Honor.

10          THE COURT:  It's admitted.

11     (Exhibit DX-137, ECF 250-39, received in evidence.)

12  BY MR. SEILER:

13  Q    All right.  In this email, you're having an exchange

14  you're having with Mr. Shah and others, you write at

15  6:51 p.m., "If we can discuss on call," but Mr. Shah writes,

16  "One other tweak the team is making is for our counter to GD

17  to assume we get to 51 percent."

18  A    Sorry, can you show that email?

19  Q    Sure.  It's the email between Shah and you at 2:50.

20     Do you see that?

21  A    (No audible response.)

22  Q    All right.  Do you recall that with Mr. Shah?

23  A    Yes.

24  Q    All right.  Let's get up to your response.  You write,

25  "Yep, can discuss on call, but agree with that shift and

1  also think we should push them to allow more 1-L into the

2  deal, arguing to them that it's the right thing to do."

3       And you wanted to increase the number of 1-L lenders in

4  the deal because it was the right thing to do, right?

5  A   We wanted to increase the amount of 1-L that could get

6  into the deal because the economics were markedly

7  attractive.  The argument that we were using to them, that

8  is the comment of, quote/unquote, "is the right thing to

9  do."

10 Q   And you needed an increase in the amount of discount

11 capture and deleveraging was the right thing for the

12 company, right?

13 A   It was an attractive option for the company.

14 Q   And you questioned and said it was the right thing to

15 do, but you never got to do it, did you, because the Gibson

16 Dunn Group wouldn't allow it, right?

17 A   I think we're conflating 2-L concerns.  What we asked

18 for was to increase the amount of 1-L debt that we could get

19 the size of those baskets, the amount of capture that we

20 could create was going to be most beneficial to the True

21 North in this transaction was raising to $6 million of

22 liquidity, that was the thing that we had to do in order to

23 make sure that we staved off an immediate liquidity of them

24 for the company.

25       Any argument that we were using to Gibson Dunn in order

1    to try to convince them that they, too, wanted to facilitate

2    this larger 1-L basket, was a moral argument, of course.

3         That's what's being said here as, quote/unquote, "the

4    right thing to do."  It's the argument that's being used.

5              MR. SEILER:  May I have a moment, Your Honor?

6              THE COURT:  Certainly.

7         (Pause in the proceedings.)

8              MR. SEILER:  Pass the witness, Your Honor.

9              THE COURT:  Before you do that, I've been trying

10   to, Mr. Prince, work my way through what you've told me and

11   I think I have it, but I just want to run this through with

12   you one more time.

13                           EXAMINATION

14             BY THE COURT:  So you send the email on October

15   the 18th, 2016 that says, "Apollo is off the DQ List."  You

16   don't know if you have authority, but it was certainly

17   recognized because Apollo received an allocation, correct?

18             THE WITNESS:  Correct.

19             THE COURT:  There was then a credit agreement that

20   was executed November the 8th, 2016, which has Apollo on the

21   DQ List and it's your position that UBS should have read

22   that?  Everyone should have read that because that's the

23   statement that was binding as of November the 8th, 2016.

24             Did I get that right?

25             THE WITNESS:  I agree with that.

1              THE COURT:  Okay.  I just wanted to make sure I

2    got it.

3              If you want to follow that up, I just want to give

4    you an opportunity.

5              MR. SEILER:  No, Your Honor.

6              THE COURT:  All right.  Thank you.

7              All right.  Anyone else?  Ah.

8              MR. LIEBERMAN:  Hi, Mr. Prince.  I'm Neil

9    Lieberman.  I represent the LCM Lenders.  Good afternoon.

10             THE WITNESS:  Great.  Thank you.

11                       CROSS-EXAMINATION

12   BY MR. LIEBERMAN:

13   Q    Did you ever recommend that LCM be included in the

14   transaction prior to closing?

15   A    Prior to closing the 2020 transaction?  No.

16   Q    Did you ever reach out to LCM prior to the closing?

17   A    Prior to the closing of the -- so I just want to be

18   clear.  (Both speaking at the same time.)

19   Q    Sorry.  Prior to the closing of the 2020 transaction,

20   yeah.

21             FEMALE SPEAKER:  Whoa, whoa, whoa.  One at a time.

22   I didn't get to do one of those.

23             MR. LIEBERMAN:  Let me start again.

24   BY MR. LIEBERMAN:

25   Q    Did you ever reach out to LCM prior to the closing of

1   the 2020 transaction?

2   A    No.

3   Q    Did you have any discussions at all with LCM prior to

4   the 2020 transaction?

5   A    I had never heard of LCM prior to the 2020 transaction.

6   Q    You were aware that the 2020 transaction was going to

7   upset the 1-L lenders who were left out, correct?

8   A    We explored that email where I said that the non-CLO

9   lenders would, quote/unquote, "Go ballistic."  So.

10  Q    And that was because the exchange tranche created a new

11  -- or the exchange transaction created a new tranche of

12  debt?

13  A    Well, for the lenders that I was referring to in that

14  email is because we had been negotiated with them and they

15  weren't the winners.

16  Q    What about the non-participant 1-L lenders?

17  A    I mean, we were created $200 million of liquidity to

18  facilitate the company to continue to exist.  Sounds pretty

19  good.

20  Q    So you did not believe that the 1-L lenders who were

21  left out were going to be upset by the deal?

22  A    I think everybody has a different view on that.

23  Q    Did you --

24          MR. LIEBERMAN:  Judge, could I use the ELMO,

25  please?

1          THE COURT: Of course.

2      (Pause in the proceedings.)

3          MR. LIEBERMAN:  Okay.  This is Defendant's Exhibit

4  252.  This is the top email here.

5  BY MR. LIEBERMAN:

6  Q    Do you see that this is from Ken Prince, you, to David

7  Roberts?

8  A    Yep.

9  Q    Do you recognize this email?

10  A    I do.

11          MR. LIEBERMAN:  I'd like to offer Defendant's

12  Exhibit 252 into evidence.

13          THE COURT:  Any objection?

14          MR. LENDER:  No, Your Honor.

15          THE COURT:  All right.  Thank you.  It's admitted.

16      (Exhibit 252 received in evidence.)

17  BY MR. LIEBERMAN:

18  Q    Okay.  And so last sentence of the email from you to

19  Roberts is, "Hate to say it, but we're just going to have to

20  live with 1-L guys not in the Ad Hoc Group, not liking us as

21  much.

22  A    Yeah.  This email is dated June 11th, so that is

23  subsequent to the execution of the transaction, when you

24  were actually able to observe the trading price of the debt

25  in the Debt Trade Agreement.

KENNETH PRINCE - CROSS BY MR. LIEBERMAN                205

1  Q    So you understood that the transaction upset the 1-L

2  lenders?

3  A    I understand that in a capitalist society, people don't

4  like losing money and that they're debt traded down.  So if

5  they weren't a part of it, they were harmed.

6  Q    And do you understand that's because the transaction

7  subordinated them?

8  A    I understand that the debt traded down at the same time

9  as our transaction.  I think that it's appropriate to

10 surmise that it was because of the transaction.

11 Q    Because the transaction subordinated them?

12 A    That the transaction was deemed to have hurt their

13 recovery.

14 Q    How did the transaction -- why was the transaction

15 deemed to have hurt their recovery?

16 A    Because of the structure of the waterfall.

17 Q    And what was the structure of the waterfall?  How did

18 that change?  It was because they were subordinated, right?

19 A    The term "subordination" is the wrong term, that's why

20 I'm not answering it.  So it's the structure of the

21 waterfall recovery.

22 Q    Okay.  And so what happened to the structure of the

23 waterfall recovery as a result of the transaction?

24 A    The lenders that participated got a prioritization.

25           MR. LIEBERMAN:  Thank you very much.

1          THE COURT:  All right.  Thank you.

2          You're still within arms' distance, if you want to

3   come back.

4          MR. MILLAR:  I have one question that you might --

5   if you don't let me ask it, I might ask them to ask.

6          THE COURT:  Somewhat irregular, but go ahead.  If

7   it's one question, ask the question.

8                        CROSS-EXAMINATION

9   BY MR. MILLAR:

10  Q    Mr. Prince, I believe you said that the DQ List was

11  attached to the 2016 credit agreement; is that right?

12  A    I believe it is.

13  Q    Look in your binder that Mr. Lender gave you, that's

14  exhibit -- look at Exhibit 4.

15       And this is the credit agreement, right?

16  A    Sorry, do you have a page number?  It might just be

17  easier to get that.

18  Q    I asked you if you recognize the document as the credit

19  agreement from 2016.

20  A    This is the credit agreement.  Can you point me to the

21  page number that's you're referencing as Exhibit No. 4?

22  Q    I'm sorry.  It's Tab 4.  It's actually --

23  A    I understood, yes.  That's correct.

24  Q    It's Debtor's Exhibit 5.

25  A    I understood, sorry.  Got it, yes.

1  Q    Where is the DQ List attached to this agreement?

2       (Pause in the proceedings.)

3  A    Ah, I don't see it attached.  I would have to work

4  through the document as to exactly where it is.

5  Q    You spent time flipping through the 476 pages, and you

6  didn't see it, right?

7  A    I didn't, but I didn't review the language, just to how

8  it's incorporated or where it's at.

9  Q    You're now saying it's incorporated, or that it's

10 attached?

11 A    I don't know.  I mean, if you'd like to give me a

12 digital copy, I could work through the legal elements of

13 exactly how it's allocated.

14 Q    Okay.  I just wanted to know.  You said it was attached

15 and if it's not attached, it's not attached.

16            MR. MILLAR:  I have no further questions.

17            THE COURT:  All right.  Any Redirect?

18            MR. LENDER:  Very, very short, Your Honor.  Thank

19 you.

20            THE COURT:  Terrific.

21                      REDIRECT EXAMINATION

22 BY MR. LENDER:

23 Q    Okay.  Mr. Prince, you have the credit agreement in

24 front of you, which for the Record is Defendant's Exhibit

25 No. 5, 853-5?  The document you just looked through?

1  A     Correct.

2  Q     Can you turn to page 27 of the document, which is

3  page 21 of the agreement?

4  A     Yep.

5          MR. LENDER:  And can we pull that up, George?  And

6  what I'd like to pull up is the definition of "Disqualified

7  Institution."

8          THE WITNESS:  Yep.

9          MR. LENDER:  Let's just pull it up, if you'd give

10 me one second?

11     (Pause in the proceedings.)

12         MR. LENDER:  Page 27, George?

13     (Pause in the proceedings.)

14         MR. LENDER:  The definition of Disqualified

15 Institution, please, the first paragraph.  Blow it up?

16     (Pause in the proceedings.)

17         MR. LENDER:  I can use the ELMO, if it's easier?

18 Let's get the ELMO.  I can't, I wrote all over it.

19     (Counsel confer.)

20         MR. LENDER:  Ah, beautiful.

21 BY MR. LENDER:

22 Q     Do you see there's the definition of "Disqualified

23 Institution" in the credit agreement?

24 A     I do.

25 Q     And let's just walk through this briefly:  "(a)(1) Any

1  person identified in writing to the left lead arranger on or

2  prior to October 6, 2016."

3       Do you see that?

4  A    Yep.

5  Q    And you'll recall that I think my counsel over there

6  marked the disqualification list that was provided to UBS.

7  Do you remember that?

8  A    (No audible response.)

9  Q    And let's look through the rest of this.

10      "Any affiliate of any person described in Clause 1 or 2

11  above that is reasonably identifiable as an affiliate of

12  such person on the basis of such affiliate's name and any

13  other affiliate of any person described in Clauses 1, 2,

14  or 3 above that is identified in a written notice to the

15  left lead arranger, if prior to the closing date or the

16  initiation of (indiscernible)."

17      Do you see that?

18  A    I do.

19  Q    After you learned that North Star was trying to

20  purchase SSB debt and was affiliated with Apollo, did you

21  tell UBS that they were on the Disqualification List?

22  A    Sally Erickson from the company did.

23  Q    Thank you.

24      Did Apollo ever admit to you in 2020 that they knew

25  they were on the Disqualification List?

1  A    Jim Vanek did.

2  Q    And who is Mr. Vanek?

3  A    He's one of the partners in their CLO Group.

4  Q    And is he in the same group within Apollo who attempted

5  to buy SSB debt back in March of 2020?

6  A    He's not.

7  Q    And can you tell us about the substance of those

8  conversations you had with Mr. Vanek?

9  A    Yes, so Jim --

10         MALE SPEAKER:  Objection; hearsay, Your Honor.

11         THE COURT:  It's all right.  He's requested to

12  appear.  I've now got a situation where I've either got

13  perjury or a problem.  He'll appear.

14         MR. LENDER:  Thank you.

15         THE WITNESS:  Jim was -- so Jim is a partner in

16  the CLO group at Apollo.  Jim was part of the conversations

17  in 2016 when we facilitated Apollo getting an allocation in

18  the original transaction.

19         And so when -- and then Jim and I had a

20  relationship from subsequent transactions that we worked on.

21  In 2020 when this situation became apparent to him, Jim

22  reached out to have a conversation and noted that it was

23  ironic that we were talking about this in the confines of

24  Serta Simmons and that he was aware that they were on the DQ

25  List and if it had come through him, which Apollo has

1    subsequently changed their policies for how their private

2    equity arm buys debt, that he would not have encouraged them

3    to do this.

4              MR. LENDER:  Thank you, Mr. Prince.

5              THE COURT:  All right.

6              MR. MILLAR:  I need to clarify a few things, Your

7    Honor.

8              THE COURT:  I think you probably need to.  I want

9    everyone to understand.  This has moved to a whole new area.

10   And I told you that this was out there.

11             If this witness is being truthful, I don't

12   understand how the lawyers could advance the claim.  If he's

13   lying, he needs to get a lawyer.  I have wasted a lot of

14   people's time and a lot of estate money based upon a claim

15   that's been advanced, and I got it.  I'm not happy with this

16   witness and the way that he's testified, but now put to

17   task, he's now said there was a definitive discussion.

18             The opinions can't stand together, which means

19   that to the extent that both people testify, there's

20   potentially a referral for one of them.  And I want

21   everybody to understand that.  I want to make sure it's

22   worth it.

23             Go ahead.

24                    RECROSS-EXAMINATION

25   BY MR. MILLAR:

1  Q    Mr. Prince, you mentioned that Sally Erickson had

2  informed UBS that Apollo or North Star was on the DQ List,

3  right?

4  A    That's my understanding based on the emails where we

5  instructed Sally to do that and UBS's subsequent actions.

6  Q    And I want to turn with you --

7          MR. MILLAR:  We might just have to show this on

8  the ELMO, Your Honor.  Well, --

9      (Speakers off mic)

10         MR. MILLAR:  One moment, Your Honor.

11         THE COURT:  Of course, what do you need?  I can

12 put things up as well.

13         MR. MILLAR:  I've got to get the ECF reference.

14         THE COURT:  Oh, okay.

15     (Pause in the proceedings.)

16         MR. MILLAR:  Let me see if I have it.

17         Oh, I have it.  It's DX-120, ECF 250-20.

18         THE COURT:  I can put it up.  Do you have it?

19         MR. MILLAR:  Yes.

20         THE COURT:  Okay.  Then let me give you red table.

21 BY MR. MILLAR:

22 Q    Mr. Prince, you mentioned that Ms. Erickson had

23 informed UBS that Apollo or North Star was on the DQ List,

24 right?

25 A    That was my understanding.

1  Q    I don't believe you included a date in your testimony;

2  is that accurate when she did that?

3  A    No.  I have no idea.

4  Q    Let's look at the second page of Exhibit 120.  This is

5  an email from Ms. Erickson dated May 19, 2020 to the

6  Agency-UBSAmericas@UBS.com copying someone at Serta Simmons,

7  and copying Alisha Skinner (phonetic) in daily or daly@ubs.

8  Do you see that?

9  A    I do.

10  Q    And in this email, she says at the top bar, "Notify

11  administrative agent that it does not consent to the

12  rejected transaction."  And it says in the middle here where

13  North Star is a disqualified institution.

14      Is this the email you were referring to?

15  A    This is an email from Sally to UBS about exactly this

16  point.

17  Q    Is this email that you recall where Ms. Erickson warned

18  UBS that --

19  A    I think what I said was that we referenced an email and

20  I want to be very careful with my words at this point,

21  right?  That I said that there was an email exchange where

22  we instructed Sally to do that, that I knew that there was

23  subsequent conversations with UBS.

24      This is an email that you showed me during my

25  deposition that shows Sally saying exactly what was in it.

1  Q    Question then, the instructions that you're aware of

2  from Ms. Erickson to UBS occurred in May of 2020, right?

3  A    The instructions about the trade with North Star

4  Holdings occurred in May of 2020 with these trades having

5  occurred at some point in the previous weeks, so yes, there

6  would be no reason for her to have sent this email prior to

7  that.

8  Q    Let me be more clear.  The email correspondence that

9  you're aware of between Ms. Erickson and UBS warning UBS

10 that Apollo and its affiliates are on the DQ List from May

11 of 2020, right?

12 A    Email that I'm aware of that you have in front of you

13 with Sally Erickson informing them that the trade is

14 rejected because Apollo is on the DQ List is from May of

15 2020.

16 Q    And you're not aware of any earlier email from

17 Ms. Erickson informing UBS that Apollo is on the DQ List,

18 correct?

19 A    I am not.

20        MR. MILLAR:  Nothing further, Your Honor.

21        THE COURT:  All right.  Does -- Mr. Prince, what's

22 the gentleman's name again that you had the conversation

23 with?

24        THE WITNESS:  There are three people at Apollo.

25 There's David Sambur, S-A-M-B-U-R.

1           THE COURT:  But you identified one person.

2           THE WITNESS:  Yes.  Jim Vanek is the partner in

3  their CLO Group.

4           THE COURT:  Can you spell Vanek for me, please?

5           THE WITNESS:  I believe it's V-A-N-E-K.

6           THE COURT:  All right.  Do we have a lawyer here

7  for Apollo?

8           MR. EHRLICH:  Yes, Your Honor.

9           THE COURT:  Do you want to reach out to Mr. Vanek

10 and tell him that if Apollo wishes to proceed with this

11 claim, he will be here in person.

12          MR. EHRLICH:  For the Record, Andrew Ehrlich from

13 Paul Weiss.

14          Yes, Your Honor, we will certainly do that.

15          THE COURT:  Right.  And when do you think that you

16 will be able to get him here?

17          MR. EHRLICH:  Given that I have no idea where in

18 the world he is at this moment, because it hadn't occurred

19 to us that he would be a witness, I honestly don't know, but

20 we will act with dispatch.

21          THE COURT:  Sure.

22     (Counsel confer.)

23          THE COURT:  I just didn't hear.

24          MR. EHRLICH:  Mr. Seiler said he believes he's

25 based on London now.

1          THE COURT:  Got it.  Then it's going to be a long

2    evening between now and Friday, traveling back, but if --

3    Apollo can make the decision that with the benefit of

4    hindsight it can withdraw the claim and at that point, it's

5    largely a no harm/no foul for me since it's all in the

6    public record now.

7          But I can't let this go.  This is -- this is the

8    integrity of the entire process at play now and I got -- I

9    understand greed.  I deal with greed every single day.  I

10   understand how to motivate greed.  I understand how to read

11   through greed.

12          But this is on a different level at this point

13   because I'm being asked to make decisions based upon

14   testimony and conversations.  That's a fraud on the Court

15   issue.

16          You can't with the specificity that was given in

17   that conversation, there can't be a mistake as to what

18   occurred.

19          So I want you to convey to Mr. Vanek -- and I also

20   want to tell you, I perfectly understand there are two sides

21   to every story.  And again, you know, I was very careful in

22   how this got brought up and I'm waiting.  I spent a lot of

23   time reading through these documents and I'm not done

24   waiting.

25          So please talk to Mr. Vanek.  Please let him know

1    the peril in which he finds himself at this point, but if he

2    believes that Mr. Prince is outright lying to me, I am

3    perfectly happy to hear his sworn testimony in person this

4    week.  Okay?

5              MR. EHRLICH:  Understood, Your Honor.

6              THE COURT:  Thank you very much.

7              All right.  Mr. Lender, I can't see you, so I

8    never know if you're actually still there.

9              MR. LENDER:  No, these seats are so low, it's

10   impossible.

11             THE COURT:  I know, I got second-rate chairs.

12   Can't -- I'm an Article One.

13             MR. LENDER:  So Your Honor, it's 5:45, so we have

14   our next witness available.  I think, should we --

15             THE COURT:  I'll let you make that call, but --

16             MR. LENDER:  Can you give us -- can we take a

17   five-minute break?

18             THE COURT:  Absolutely.  I'm not going to step

19   down, but if people need to run down the hall or people just

20   want to have a conversation, perfectly fine.

21             Why don't we say 5:55?

22             MR. LENDER:  That'll be perfect.  Just give us a

23   few minutes to talk.

24             THE COURT:  MS. TOMASCO:

25             MR. LENDER:  Is Mr. Prince excused for now?

1            THE COURT:  Is there any reason Mr. Prince cannot

2   be released?

3        (No audible response.)

4            THE COURT:  All right.  Mr. Prince, subject to my

5   ability to re-call you based upon what Mr. Vanek testifies

6   to, you are free to step down.  To the extent Mr. Prince and

7   I don't know who's telling the truth, but I know that if I

8   were in your position, I'd want somebody representing my

9   interest, not the interest of the company or someone else.

10           So to the extent that you need -- that you feel

11  like you need to get counsel, I think that would be a great

12  idea.  The recording of today's hearing will be up on the

13  Docket.  You can just download it on your phone to the

14  extent that you want to have somebody listen to it and give

15  you advice, okay?

16           THE WITNESS:  Understood.  Thank you.

17           THE COURT:  Thank you, sir.

18        (Witness steps down.)

19           THE COURT:  All right.  Folks, I'm going to stay

20  right here, but take your five minutes and I'll see you

21  back.

22        (Recess taken from 5:48 p.m. to 5:56 p.m.)

23                        AFTER RECESS

24           THE COURT:  All right.  We are back on the Record.

25  I am in both the main case, as well as the adversary.

1          As I understand it, Mr. Schrock, the decision has

2   been made that we'll just start fresh tomorrow.

3          MR. SCHROCK:  That's right, Your Honor.  We don't

4   think we can get through Direct and Cross for the next

5   witness, so it doesn't make sense to get started.

6          THE COURT:  No explanation needed.  All just fine.

7          Let me give you an update in terms of time

8   tomorrow.

9          MR. SCHROCK:  Sure.

10          THE COURT:  So the Panel turned out to be

11   relatively light, so we could probably start by 12:30, if

12   you wanted to.

13          I had anticipated going late tomorrow, but there

14   was a flurry of activity over the weekend, and I drew two of

15   them, and so I've got First Days at 5:00 and 6:30 tomorrow,

16   so we'll stop at 5:00, but 12:30 to 5:00 won't be the

17   longest day, but ought to be a substantive day.

18          Does that make sense?

19          MR. SCHROCK:  Yeah, that makes sense, Your Honor.

20   And I think we'll talk to -- we're going to get together

21   among the parties and see if we can find a way just to, you

22   know, take one of these issues off the table and see if we

23   can move forward.

24          THE COURT:  I just call balls and strikes.  You do

25   what you do.

1           MR. SCHROCK:  I understand, Your Honor.  I wanted

2    to let you know we're working on it.

3           THE COURT:  No, I know that you are.

4           And for parties that want to leave your stuff in

5    the courtroom, perfectly fine if it sits exactly right where

6    it is.  A Panel is all virtual, so there won't be anybody on

7    the courtroom other than me and Ms. Portillo.

8           And you know, we won't -- we'll lock the door

9    after everybody clears out.  So again, if you want to leave

10   things right where they are, all fine.  If you want to take

11   it with you, you're obviously welcome to do that, as well.

12          MR. SCHROCK:  Very good.  And Your Honor, could we

13   just get some visibility into Wednesday while I have you

14   here for a little while?

15          THE COURT:  Absolutely.

16          MR. SCHROCK:  I think we're in the morning, but I

17   understand you may have had some hearings move and know

18   you're fluid.

19          THE COURT:  We were -- sure, we were trying.

20       (Pause in the proceedings.)

21       (Court confers with staff.)

22          THE COURT:  There you go.  Well, thank your

23   colleagues on this side of the room for clearing out the

24   day.

25          FEMALE SPEAKER:  Good job.

1          THE COURT:  All right.  So you have the whole day

2   and if parties will talk, if you-all are up for a long day,

3   it's fine by me.  I'll leave that to you-all.

4          And I also -- and I mean this sincerely, I know

5   how hard it is to to sit and stand out there, and so don't

6   do it just for the sake of doing it.  If you feel like at

7   5:00 o'clock of 6:00 o'clock, you're just done for the day

8   and need to regroup, it's just fine with me.

9          If you're a night owl and you want to go till

10  8:00 o'clock, then you know, okay with me, too.

11         I'll leave that to you guys.

12         MR. SCHROCK:  Fair enough, Your Honor.  Listen our

13  goal is to get -- you know, get it finished this week, so I

14  think as long as we can do that, you know, we're in good

15  shape.

16         THE COURT:  No, I got it.

17         All right.  Anything else we need to talk about?

18     (No audible response.)

19         THE COURT:  All right.  Thank you, everyone.

20  We'll be adjourned.

21         MR. SCHROCK:  Thank you, Your Honor.

22         COURT SECURITY OFFICER:  All rise.

23     (Hearing adjourned 6:00 p.m.)

24

25                         *  *  *  *  *

1          *I certify that the foregoing is a correct*

2   *transcript to the best of my ability due to the condition of*

3   *the electronic sound recording of the ZOOM/video/telephonic*

4   *proceedings in the above-entitled matter.*

5   */S/ MARY D. HENRY*

6   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9   *JTT TRANSCRIPT #67219*

10  *DATE FILED:  MAY 18, 2023*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25