IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


| | | |
|---|---|---|
| IN RE: | § | CASE NO. 23-90020-11 |
| | § | JOINTLY ADMINISTERED |
| | § | HOUSTON, TEXAS |
| SERTA SIMMONS BEDDING, LLC, | § | TUESDAY, |
| ET AL, | § | MAY 16, 2023 |
| DEBTORS. | § | 12:32 P.M. TO 4:51 P.M. |

*************************************************************

| | | |
|---|---|---|
| SERTA SIMMONS BEDDING, LLC, | § | CASE NO. 23-9001-ADV |
| ET AL, | § | JOINTLY ADMINISTERED |
| | § | HOUSTON, TEXAS |
| VERSUS | § | TUESDAY, |
| | § | MAY 16, 2023 |
| AG CENTRE STREET PARTNERSHIP, | § | |
| ET AL | § | 12:32 P.M. TO 4:51 P.M. |

### <u>CONFIRMATION DAY TWO - AFTERNOON SESSION (VIA ZOOM)</u>


BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:                          SEE NEXT PAGE


**(Recorded via CourtSpeak.  Witnesses could barely be heard.)**


<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (VIA ZOOM):


FOR THE DEBTOR:                      WEIL GOTSHAL & MANGES, LLP
                                     Ray Schrock, Esq.
                                     David Lender, Esq.
                                     Alexander Welch, Esq.
                                     Luna Barrington, Esq.
                                     700 Louisiana, Ste. 1700
                                     Houston, TX  77002
                                     713-546-5000


FOR CITADEL:                         FAEGRE DRINKER BIDDLE & REATH
                                     James Millar, Esq.
                                     1177 Avenue of the Americas
                                     41st Floor
                                     New York, NY  10036
                                     212-248-3140


FOR PRIORITY LENDERS:                GIBSON DUNN & CRUTCHER, LLP
                                     Gregg J. Costa, Esq.
                                     Lee Wilson, Esq.
                                     811 Main Street
                                     Suite 3000
                                     Houston, TX  77002
                                     346-728-6649


FOR SERTA MINORITY LICENSEES:        FISHMAN JACKSON RONQUILLO, PLLC
                                     Mark Ralston, Esq.
                                     4835 LBJ Freeway
                                     Suite 475
                                     Dallas, TX  75244
                                     972-419-5544

FOR THE STATE OF CONNECTICUT
DEPARTMENT OF ECONOMIC AND
COMMUNITY DEVELOPMENT:               MR. BOWMAN


FOR THE EXCLUDED LENDERS:            FRIEDMAN KAPLAN SEILER
                                     & ADELMAN, LLP
                                     Eric Seiler, Esq.
                                     7 Times Square
                                     New York, NY  10036-6516
                                     212-833-1103

<u>APPEARANCES (CONT'D) (VIA ZOOM)</u>:


FOR LCM LENDERS:                    HOLWELL SHUSTER & GOLDBERG, LLP
                                    Neil Lieberman, Esq.
                                    425 Lexington Avenue
                                    New York, NY  10017
                                    646-837-5151

FOR APOLLO:                         PAUL WEISS RIFKIND WHARTON
                                    & GARRISON, LLP
                                    Andrew Ehrlich, Esq.
                                    1285 Avenue of the Americas
                                    New York, NY  10019
                                    212-373-3000



(Please also see Electronic Appearances.)

4

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| HARVEY TEPNER | | | | |
| By Ms. Barrington | 9 | . | 139,141 | . |
| By Mr. Ehrlich | . | 63 | . | . |
| By Mr. Goldman | . | 114 | . | . |
| By Mr. Millar | . | 118 | . | 140 |
| KARN CHOPRA | | | | |
| By Mr. Wilson | 144 | . | . | . |

| EXHIBITS: | Received |
|---|---|
| No. 23, ECF 248-24 | 67 |
| No. 35, ECF 248-36 | 70 |
| No. 49, ECF 861-43 | 147 |
| No. 50, ECF 861-44 | 184 |
| No. 64, ECF 248-64 | 82 |
| No. 79, ECF 862-33 | 151 |
| No. 100, ECF 248-100 | 85 |
| No. 144, ECF 863-37 | 161 |
| No. 150, ECF 863-43 | 173 |
| No. 152, ECF 863-45 | 23 |
| No. 155, ECF 863-48 | 176 |
| No. 169, ECF 864-12 | 180 |
| No. 176, ECF 864-19 | 183 |
| No. 184, ECF 864-27 | 185 |
| No. 185, ECF 864-28 | 188 |
| No. 194, ECF 864-37 | 189 |
| No. 220, ECF 908-1 | 191 |
| No. 226, ECF 865-18 | 197 |
| No. 252, ECF 865-42 | 110 |
| No. 279, ECF 252-90-97 | 97 |
| No. 281, ECF 866-17 | 43 |
| No. 296, ECF 866-32 | 49 |
| No. 342, ECF 866-42 | 158 |
| No. 343, ECF 866-13 | 159 |

***

1          **HOUSTON, TEXAS; TUESDAY, MAY 16, 2023; 12:32 P.M.**

2          THE COURT:  This is -- today is May the 16th, 2023.

3    This is the Docket for Houston, Texas.

4          We have, today, the continued proceedings, the main

5    case, Case No. 23-90020, the jointly administered cases under

6    Serta Simmons Bedding, LLC, as well as the adversary, which is

7    23-9001.

8          As always, folks, please don't forget to record your

9    electronic appearance.  It's a quick trip to the website.  You

10   can do that at any time, but I do ask that you do it every

11   day.

12         The first time that you speak, if you would, please

13   state your name and who you represent.  That really does help

14   the court reporter, in the event that a transcript request is

15   made.

16         We are recording this afternoon using CourtSpeak,

17   and I -- we will continue to do that.  As always, we'll split

18   the proceedings.

19         And let me pause right there.  Are you getting the

20   kind of response that you need, in terms of transcript

21   requests, or do we not yet know?  We are.  Okay.  Good.  And

22   so, for what it's worth, I sent a screaming email, but I never

23   know if it works or not.

24         And I think, with that, folks on video, if you're

25   watching, I have activated the hand-raising feature.  I think

1    most parties are just simply observing.  But if you do need to

2    speak, if you'll hit five star for me, I will get you unmuted.

3              And as always, folks in the courtroom, so that folks

4    can both see you and hear you clearly, if you would come to

5    the lectern to speak.  All right?

6              Good afternoon.

7              MS. BARRINGTON:  Good afternoon, Your Honor.  Luna

8    Barrington on behalf of the Debtors.

9              Before we start today, I wanted to just tackle a

10   couple of ministerial things from the Record yesterday, just

11   in relation to exhibits.

12         (Begin referring to an unofficial transcript.)

13              Debtors' Exhibit 180 was not listed in the index,

14   but was admitted into evidence.  And Defendants' Exhibit 268

15   was mistakenly, I think, listed as Debtors' exhibit in the

16   index, as well as Defendants' Exhibit 232 and 237.  So I just

17   wanted to make sure that the Record was clear.

18         (End referring to an unofficial transcript.)

19              THE COURT:  So help me because I'm going to work off

20   my notes.

21              MS. BARRINGTON:  Sure.

22              THE COURT:  And so I assume you were reading off the

23   Docket Entry?

24              MS. BARRINGTON:  I'm reading off the -- not -- would

25   you like the ECF numbers, Your Honor?  Is that --

1        THE COURT:  No, no, no.  I'm sorry.  So were you

2    reading -- it's -- so I keep my own list.

3        MS. BARRINGTON:  Uh-huh.

4        THE COURT:  And I don't really pay attention to what

5    gets done in the Docket entry because my list is what I work

6    from.  And so are you telling me that the Docket entries are

7    wrong or this is --

8        MS. BARRINGTON:  This is from the transcript of the

9    proceeding.

10        THE COURT:  From the transcript.

11        MS. BARRINGTON:  Yes.

12        THE COURT:  All right.  So let's start over.

13        MS. BARRINGTON:  Sure.

14        THE COURT:  You can go slow.

15    (Begin referring to an unofficial transcript.)

16        MS. BARRINGTON:  Debtors' Exhibit 180 we believe was

17    admitted into evidence, but it wasn't listed in the index of

18    the transcript.

19        THE COURT:  So I agree with that.  It was --

20    Debtors' Exhibit 180, Docket Number 864-23, was both offered

21    and admitted, according to my notes.

22        MS. BARRINGTON:  Thank you, Your Honor.

23        Defendants' Exhibit 268 was admitted.  But in the

24    transcript, it's listed as Debtors' Exhibit 268.

25        THE COURT:  So I agree it's Defendants' Exhibit 268,

1       which is Docket Number 252-69, was both offered and admitted.

2                   MS. BARRINGTON:  Thank you, Your Honor.

3                   Defendants' Exhibits 232 and 237 are listed in the

4       transcript as Debtors' Exhibit Number, Defendant --

5                   THE COURT:  I agree.  Defendants' Exhibit 232, which

6       is 252-34, was both offered and admitted.

7                   And Defendants' Exhibit 237, which is Docket Number

8       252-39, was both offered and admitted.

9                   MS. BARRINGTON:  Thank you, Your Honor.

10                  THE COURT:  All right.  Thank you.

11                  MS. BARRINGTON:  And Your Honor, we just wanted to

12      let you know that we did file Debtors' Demonstrative Number 1

13      on the Docket last night, and that's at ECF 914.

14              (End referring to an unofficial transcript.)

15                  THE COURT:  Got it.  Thank you.

16                  Any chance -- I can print one out.  But any chance

17      you have an extra?

18                  MS. BARRINGTON:  I'm sure we can get you one, Your

19      Honor.

20                  THE COURT:  And I can print one out, not a big deal.

21                  All right.  Thank you.

22                  MS. BARRINGTON:  You're welcome.

23                  At this time, Your Honor, the Debtors would like to

24      call Mr. Harvey Tepner to the stand.

25                  THE COURT:  So, before we do this -- Mr. Tepner,

1     hold on just one second.

2               Any other issues that we need to talk about?  I just

3     didn't want to bypass anything.

4          (No verbal response)

5               THE COURT:  All right.  Terrific.

6               Mr. Tepner, come on up, please, sir.

7               Yes, Mr. Tepner, right up here.  Good afternoon.

8               MR. TEPNER:  Good afternoon, Your Honor.

9               THE COURT:  If you'd raise your right hand?

10          HARVEY TEPNER, WITNESS FOR THE DEBTORS, SWORN

11               THE COURT:  All right.  Thank you.

12               And can you get Mr. Tepner -- do you have a bottle

13     of water already?  Yes, you've got it.

14               All right.  Thank you.

15          (Participants confer)

16               THE COURT:  And are we -- just here?

17               UNIDENTIFIED:  Yep.

18               THE COURT:  Okay.  So that's off the table.

19          (Participants confer)

20               MS. BARRINGTON:  Your Honor, may I approach the

21     witness to give him a --

22               THE COURT:  Absolutely.

23               MS. BARRINGTON:  Thank you.

24                              DIRECT EXAMINATION

25     BY MS. BARRINGTON:

1  Q    Good afternoon, Mr. Tepner.  Would you please state your

2  name for the Record?

3  A    Harvey Tepner.

4  Q    And are you currently affiliated with the company?

5  A    Yes, I'm an Independent Director of Dawn Intermediate,

6  which is the wholly owned owner of Serta Simmons Bedding.

7  Q    And when did you become an Independent Manager of Dawn

8  Intermediate?

9  A    On March 2020.

10 Q    And do you currently hold any other positions outside of

11 the company?

12 A    Yes, I have several other directorships.

13 Q    So -- and what do you do in those roles?

14 A    I simply serve as an independent director, they are both

15 troubled and non-troubled companies, and help, the typical

16 role of the director of a company, sometimes with enhanced

17 duties because of going through a restructuring.

18 Q    Thank you.

19      And where did you work prior to these board positions?

20 A    I was a senior executive at WL Ross & Company for about

21 eight years.  And I started my career in New York at a -- as

22 an investment banker with Rothschild, then Dillon Reed, then

23 Lowe Partners Corporation and Compass Advisors before joining

24 WL Ross.

25 Q    Can you briefly describe your education background?

HARVEY TEPNER - DIRECT BY MS. BARRINGTON

11

1    A    Yes.  I have a Bachelor's in Economics from Carlton

2    University in Ottawa.  I have a Master -- and MBA from Cornell

3    University in Ithaca, New York.  I am a chartered accountant

4    now, with the designation chartered professional accountant,

5    from the CPA -- in Ontario, Institute of CPAs of Canada.

6    Q    How did you come to serve on the Board of Dawn

7    Intermediate?

8    A    In February 2020, I received a phone call from Ryan Dahl,

9    who was then a partner at Weil Gotshal, asking about my

10   availability and whether I'd be interested in serving on the

11   Board of Serta Simmons.

12   Q    Did you have any involvement with the company prior to

13   joining the Finance Committee?

14   A    None.

15   Q    Do you own any stock or other equity or debt in the

16   company?

17   A    None.

18   Q    Have you ever?

19   A    Not as -- no.

20   Q    And what was your understanding as to why Dawn was

21   establishing an Independent Finance Committee in March of

22   2020?

23   A    The company was looking at refinancing its debt when it

24   came due.  It was concerned about liquidity.  It was concerned

25   about its overall leverage.  And they wanted to have an

HARVEY TEPNER - DIRECT BY MS. BARRINGTON

1  independent group of directors to evaluate potential

2  alternatives that were not conflicted.

3  Q    And what was the purpose of the Finance Committee?

4  A    To try and create a liability management event and

5  improve liquidity for the company.

6  Q    Who else was on the Independent Finance Committee with

7  you?

8  A    Joan Hilson.

9  Q    And to the best of your knowledge, did Ms. Hilson have

10  any prior connection to the company?

11  A    None.

12  Q    To the best of your knowledge, did Ms. Hilson own any

13  stock or other equity or debt in the company?

14  A    None.

15  Q    And did the Finance Committee have advisors working at

16  their direction?

17  A    Yes, we did.

18  Q    And who were those advisors?

19  A    Counsel was Weil Gotshal and the investment banker and

20  financial advisor was Evercore.

21  Q    And --

22  A    And ultimately, FTI was hired, as well.

23  Q    And what was FTI's role?

24  A    FTI's role was to help with financial projections, cash

25  projections, cash management.

1    Q    And who had the authority to direct the actions of the

2    advisors?

3    A    The Finance Committee.

4    Q    Can you describe the company's financial condition when

5    you joined the board?

6    A    The company had approximately $1.9 billion of first term

7    debt, four hundred and -- or first lien debt, $420 million

8    approximately in second lien debt.  It had an ABL facility, we

9    think about $225 million.  And it had some capital leases,

10   about 75 to $80 million.

11   Q    Did the COVID-19 impact -- excuse me.

12        Did the COVID-19 pandemic have an impact on the company's

13   financial condition?

14   A    It had a very material impact.  In -- in the month of

15   March alone, the company lost $50 million in revenue that it

16   was projecting.  And as Feb -- as of February 28th, they had

17   no inkling that was going to happen.

18        They had -- it had an effect on its supply chain,

19   especially because some of the -- some of the supplies started

20   getting harder to receive.  It had an effect on its customers

21   because retail stores were shutting down, customers were

22   asking for extension in -- in payment terms.  Those were the

23   most immediate effects.

24        And it also had an effect on factories.  A number of the

25   factories had to shut down based upon court orders or people

1    getting sick and concern about the spread of COVID.

2    Q    Was it your understanding that the company was struggling

3    before COVID?

4    A    The company was concerned about its liability.  It had

5    had decreasing sales for a number of years.  It had

6    significant challenges in the marketing place and it -- and it

7    had liabilities coming due in a short -- a relatively short

8    period of time that it was worried about its ability to

9    manage.

10        In addition, its liquidity forecast for the Summer of

11   2020 shows that it could possibly run out of working capital

12   and cash.

13   Q    So what was your principal concern when you joined the

14   board of the Finance Committee, Mr. Tepner?

15   A    The principal concern was to try and find a solution to

16   solve, ultimately, for three things:

17        One was to get additional capital for the company.

18        The second was to see if there could be a plan where you

19   can get a debt reduction.

20        And the third was to try and take benefit of the discount

21   that the first -- the 1-Ls and the 2-Ls, the debt was trading

22   at, and capture some of that discount for the benefit of the

23   company.

24   Q    Thank you, Tepner.

25        I'd like to now direct you to Tab 1 of your binder, which

1    is Exhibit 51, ECF 861-45.

2           MS. BARRINGTON:  And Your Honor, I believe this

3    exhibit has been admitted into evidence already.

4           THE COURT:  Agreed.

5    BY MS. BARRINGTON:

6    Q    Mr. Tepner, are these the minutes of the Finance

7    Committee dated March 31, 2020?

8    A    Yes, they are.

9    Q    And did you attend this meeting?

10   A    Yes, I did.

11   Q    And if we can turn to page 4 of the exhibit.

12        And this is the deck that was attached to this -- these

13   minutes.

14   A    That is correct.

15   Q    And if we can turn to page 11 of the exhibit.

16        This is a slide titled "Summary of Recent Business

17   Developments."  And at the top it says:

18        "The company successfully tracked its budget in 2020

19   through the middle of March, until COVID-19-related business

20   disruptions began to materially impact revenues and cash

21   receipts over the last two weeks."

22        Was that your understanding at the time?

23   A    Yes, it was.

24   Q    And if you look at the first bullet and the first sub-

25   bullet, what was causing the company's liquidity crisis?

1    A     The macro environment generally.   There was industry

2    issues that was compounded dramatically -- well, not by March

3    -- March 11th, but it was going to become compounded

4    dramatically before the end of the month because of COVID.

5         There was more competition.   There was direct-to-consumer

6    competition, which is a relatively new category that Serta

7    Simmons was -- was adjusting for.

8         Customers -- customers were stretching their payment

9    terms even before COVID.   It was a -- it was a tough

10   environment.

11        And there was a looming -- looming debt maturity and

12   running out of liquidity, which is one of the issues that we

13   were facing.

14   Q     Was the company, at this time, forecasting a sale

15   shortfall of over $50 million in March?

16   A     At that point, yes.

17   Q     Now, if you look at the second bullet, it says here that:

18        "Local, state, or provincial mandated closures of

19   nonessential business have necessitated that the company

20   furlough its employees in 14 of 27 manufacturing facilities."

21        Did that have an impact on the company?

22   A     A major impact on the company.   Without the ability to

23   manufacture, you can't supply customers, you may not supply

24   them with the right type of mattresses that different type of

25   customers want.   And -- and it dramatically hurts cash flow

1    and everything else.

2    Q    And if you look at the third bullet right underneath

3    that, it says:

4         "Moreover, behavior among the company's largest customers

5    has changed materially, as customers have asked to stretch

6    terms on their accounts payable owed to SSB."

7         Did that also have an impact on SSB's liquidity?

8    A    An impact on liquidity, yes.

9    Q    And if we can look at the fifth and sixth square bullet.

10        It says here:

11        "The company has already requested 90-day term extensions

12   with its major suppliers to help mitigate the cash impact of

13   customer payment delays and declining sales."

14        Was that your understanding?

15   A    Yes, it -- yes, it was.

16   Q    And were there other efforts that the company was

17   engaging in to try to mitigate the cash impact from COVID-19?

18   A    The company, I believe, reduced some of its advertising

19   and marketing expenditures.

20        It reduced travel, which I guess was around the -- around

21   the country, everybody reduced travel.

22        It tried to work with some of its suppliers to get

23   extensions on its terms.  Some were more willing than others.

24        And it, of course, engaged Joan and I and ramped up the

25   -- the work of our advisors, we ramped up work with the

1    advisors to help find solutions to what was now much more

2    pressing towards the end of March than it was the beginning of

3    March.

4    Q    And given the company's liquidity position, did the

5    finance company want to get a transaction done as soon as

6    possible?

7    A    We wanted to get a transaction done as soon as possible

8    and definitely before July 2020.

9    Q    And was it your understanding that, as of July 2020, the

10   company could run out of cash?

11   A    It -- its working capital would have been very, very --

12   the projection was that its working capital would be very,

13   very skinny and stretched had we not been able to do anything.

14        And we, again, did not know -- no one, at that point,

15   knew what was going to happen, how dramatic the fallout from

16   COVID was going to be.

17   Q    Let's turn to page 19 of this exhibit.

18        And was the company considering other options at this

19   time to shore up the liquidity?

20   A    The com -- the page -- page 19 -- one, two, three, four,

21   five, six, seven -- eight type of potential roles to play.

22   But the company would consider anything that was feasible

23   could be enacted during a short period of time.  We were not

24   -- we had no religious view about one way or another.  It's

25   what would work, what would provide the company with enough

1    liquidity to put it on sustainable footing.

2    Q    How did the Independent Finance Committee ultimately

3    decide which sort of transaction to pursue?

4    A    We had a lot of initiatives that we looked at:

5        We looked at full takeout of our ABL loan;

6        A supplement to our ABL loan for -- which would give the

7    new invest -- the new financiers a second out on that.

8        We looked at creating a subsidiary and financing our --

9    using that subsidiary to get financing for our trademarks and

10   internet -- intellectual property.

11       We considered selling a stake in our Chinese joint

12   venture.

13       We looked at and actually we consummated a sale/leaseback

14   of some excess real estate in West Palm Beach.

15       (Electronic sound.)

16       THE WITNESS:  We had discussions as to whether an equity

17   -- as to whether an equity investment would be possible.

18       (Electronic sound.)

19       THE WITNESS:  I'm not sure if I'm causing the feedback

20   between the --

21           THE COURT:  No.  Your voice is soft, Mr. Tepner, so

22   I had raised the volume.  I -- that was -- I have now turned

23   it back down.  My apologies.

24           THE WITNESS:  No problem.

25           It's nice that somebody referred to my voice as

1    being soft.  That's kind of a first, Your Honor.

2         (Laughter)

3         THE WITNESS:  Anything that was practical, doable,

4    didn't cause -- you know, didn't have much friction between

5    idea and implementation would be considered.

6    BY MS. BARRINGTON:

7    Q    Did there come a time when the company and Finance

8    Committee decided to focus on an IPCO transction?

9    A    When -- there was -- the -- the advantage of an IPCO

10   transaction was that it was -- these were unencumbered assets

11   and did not have any other -- any liabilities or encumbrance

12   attached to it, and theoretically, it should be an easy-to-

13   finance matter.

14        So it was a good thing to go out and get -- use that as a

15   -- as a point to start discussions with both existing lenders

16   and new -- new potential investors.

17   Q    Was the company only interested in an IPCO transaction?

18   A    No.  The company would have considered anything or any

19   combination of things that would work and be -- be executable.

20   Q    Did the Finance Committee every place any restrictions on

21   the types of transactions that Evercore could consider?

22   A    No, no restrictions.

23   Q    And what was the company's strategy in terms of reaching

24   out to potential lenders?

25   A    Potential lenders were already investors in the company.

1    They knew the company.  They had concerns about the company.

2    They wanted to protect, obviously, their interests.  And it's

3    a very logical source for perhaps new financing or some form

4    of debt restructuring that could be -- that -- that could be

5    undertaken.

6    Q    Did there come a time when the company also reached out

7    to third-party lenders?

8    A    Yes.

9    Q    And did the Finance Committee place any restrictions on

10   who Evercore could reach out to?

11   A    No.

12   Q    Which specific lenders do you recall Evercore

13   specifically talking to about a potential transaction?

14   A    Amongst the incumbent lenders, Angelo Gordon, Barings,

15   what I would refer to as, ultimately, the "Gibson Dunn Group."

16   There were others along the way.

17        And among the -- among new parties, Blue Torch,

18   Charlesbank, Great American for a second lien, our ABL

19   financing, and then several others.

20   Q    Did all of these parties make proposals to the Finance

21   Committee?

22   A    No.

23   Q    But did the Independent Finance Committee evaluate all

24   the proposals that were made?

25   A    Yes.

1    Q    And what were the Finance Committee's objectives in

2    getting a deal done at this time?

3    A    We had three objectives:  Additional capital, debt

4    reduction, and debt discount capture.

5    Q    At a high level, Mr. Tepner, could you please describe

6    how the Independent Finance Committee would evaluate the

7    proposals that it received?

8    A    Well, typically -- typically, we would receive a deck,

9    usually the night before or the day before, which had the

10   latest discussions that our financial advisors had with

11   various parties.  They outlined them, what -- whoops -- they

12   outlined what they were.  And we would have a discussion on

13   the pluses and minuses at the next day, come to conclusions

14   and recommendations or more questions or -- or ideas for

15   counterproposals.

16   Q    How often did the Committee meet?

17   A    At least once a week, sometimes several times a week, and

18   I think there was once more than that.

19   Q    And who participated in these Independent Finance

20   Committee meetings?

21   A    Joan Hilson, my fellow independent manager, and I,

22   management -- the CEO, the CFO, the general counsel --

23   Evercore, Weil Gotshal, FTI, and sometimes Advent would sit

24   in, the principal equity holder.

25   Q    Let's discuss some of the different proposals that the

1    company received.

2        Do you recall approximately how many proposals the

3    Independent Finance Committee evaluated?

4    A    I believe we received at least eight written proposals.

5    Q    And ultimately, which proposals did the Finance Committee

6    believe were potentially the best deals for the company?

7    A    We came down to a proposal by -- sponsored by Angelo

8    Gordon and another one sponsored by what I call the "Gibson

9    Dunn Group."

10   Q    And I'd like to discuss the proposals that were rejected.

11   So if we can please turn to Tab 2, Exhibit 152, which is at

12   ECF 863-45.

13       Are these the meetings from the an Independent Finance

14   Committee meeting on May 26th, 2020?

15   A    Yes, they are.

16   Q    And did you attend this meeting, Mr. Tepner?

17   A    Yes, I did.

18       MS. BARRINGTON:  Your Honor, I'd like to move this

19   document into evidence, please.

20           THE COURT:  Any objection?

21           UNIDENTIFIED:  No, Your Honor.

22           THE COURT:  All right.  Thank you.  It's admitted.

23       (Exhibit 152, ECF 863-45,, received in evidence)

24   BY MS. BARRINGTON:

25   Q    If you could turn to page 4?

1          And was this the presentation that was presented to the

2     Finance Committee on this date?

3     A    Yes, it was.

4     Q    And if we can please turn to page 13 of the exhibit?

5          Can you explain what this is -- what is shown on this

6     slide?

7     A    Yes.  That was two term sheets, one provided by Fortress

8     and one provided TPG Sixth Street Partners, regarding a new

9     financing for the company.

10    Q    Let's start with Fortress.

11         Was Fortress an existing lender at this time?

12    A    I believe they were.

13    Q    For -- I'm sorry.  What was that?  I'm sorry.

14    A    I believe they were --

15    Q    Okay.

16    A    -- yes.

17    Q    What was the proposal from Fortress?

18    A    The proposal from Fortress was to put in $200 million of

19    -- of new term loan, and it would be backed by what we called

20    sort of the "IPCO transaction," which is the intellectual

21    property of the company, the trademarks of Simmons, Tuft &

22    Needle, license agreements, pledge of subsidiary stock of

23    Serta, and -- and some manufacturing facilities.

24    Q    Did the Finance Committee ultimately go with the proposal

25    from Fortress?

1    A    No, we did not.

2    Q    And why was that?

3    A    One of the reasons was it didn't have any debt reduction

4    components to it.  It had -- it was relatively expensive in

5    the time frame that it was provided.  And it didn't have any

6    certainty that it could -- it could be -- it would give the

7    company enough value for it.

8    Q    Now let's turn to the proposal from TPG Sixth Street

9    Partners.

10        To the best of your understanding, was TPG an existing

11   lender at this time?

12   A    Yes, they were.

13   Q    And what was the proposal from TPG Sixth Street Partner?

14   A    Buy $225 million of first lien term loan, same type of

15   IPCO type transaction, with the collateral being the Simmons

16   and Tuft & Needle intellectual property, license agreements,

17   pledges of IPCO stock, pledges of Serta -- Serta stock, and

18   you know -- and it was relatively -- you know, interest rates

19   of so on and so forth.

20        And it, too -- I'm trying to see -- just recall if it had

21   a -- had an exchange component to it.

22   Q    Yeah.  If we can turn to page 14 of the exhibit.

23        If you look under "other," first bullet, it says:

24        "Use of proceeds to include 42.5 million uptier of TSSP

25   2-L TL into IPCO 1-L TL at 50."

1      What was your understanding of that proposal?

2   A    That would -- that would be a great proposal for -- for

3   Sixth Street Group because it would take 50 -- it would

4   receive $50 million of new principal amount of term loan in

5   exchange for $42 million of principal amount of second lien

6   loan, which was trading at -- at a dramatic discount at the

7   time.  So that would give them a nice immediate boost up in

8   terms of their collateral position and a gain on it.

9   Q    But was that better for the company?

10  A    No, not -- if that was the only proposal that was

11  available, maybe it's something we would have considered

12  further, but no, not at the time.

13  Q    And did you reject this proposal from TPG Sixth Street

14  Partners?

15  A    We did reject the proposal.

16  Q    Now let's turn to page 15 of the exhibit.

17       And Mr. Tepner, does this slide summarize the proposals

18  of IPCO financing term sheet summaries from Blue Torch

19  Capital, Oaktree, and Charlesbank?

20  A    Yes, it does.

21  Q    And was you understanding whether or not Blue Torch was

22  an existing lender at this time?

23  A    Blue Torch was not an existing lender.

24  Q    And what was the proposal from Blue Torch?

25  A    A willingness to provide $75 million of capital in a

1    minority position, which they, too, wanted to have, you know,

2    the same asset pledges and then all of the other bells and

3    whistles that go with the -- with the financing.

4        They did not have anything about a debt restructuring or

5    debt recapture, and it was insufficient in terms of dollar

6    amount, amongst other things.

7    Q    Was $75 million enough to solve the company's liquidity

8    needs at this time?

9    A    No.

10   Q    And how much money was needed to solve the company's

11   liquidity needs?

12   A    The sections were -- were seeking $200 million.

13   Q    And is that part of the reason why you rejected this

14   proposal?

15   A    (No verbal response)

16   Q    Let's turn to Oaktree.

17       Was Oaktree an existing lender at this time?

18   A    Yes, Oaktree was an existing lender.

19   Q    And can you describe what the proposal was from Oaktree?

20   A    Their proposal was to provide $260 million of first lien

21   term loan based upon the same IPCO type structure, 60 million

22   of -- they were willing to participate in up to 100 million,

23   so there was a huge deficiency of what -- what was in that

24   proposal.

25   Q    And was that why you rejected the Oaktree proposal?

1    A     Part -- that was part of it.

2          They also wanted to get $60 million of -- of IPCO term

3    loan date in exchange for the sixty-million-dollar holding

4    that Oaktree again, which, again, would give them a nice

5    little bump in value based upon the trading price of the 1-L

6    debt at the time.

7    Q     But was that helpful for the company?

8    A     It -- you know, it -- if -- if it had $260 million of new

9    cash, it probably would have been much more compelling, that

10   was fully underwritten, it might have been a much more

11   compelling proposal.  It was not complete enough to help the

12   company.

13   Q     And is that why you rejected the proposal?

14   A     That's why we rejected the proposal.

15   Q     And if you can tell the Court, please, what was the

16   proposal from Charlesbank?

17   A     Charlesbank provided $160 million of term loan.  They had

18   a very healthy proposed pricing and interest rate and -- and a

19   discount on the original amount.  And I believe they had no

20   debt recapture, discount capture at all in their proposal.

21   They, too, were not a lender to the company or an investor in

22   the company at the time.

23   Q     And is that why you rejected the proposal from

24   Charlesbank?

25   A     Well, yes.  Uh-huh.

1    Q    So, in addition to these five deals, did you evaluate

2    proposals from the Gibson Group -- excuse me -- the Gibson

3    Group, the Angelo Gordon Group, and Barings?

4    A    Yes, we did.

5    Q    And was Barings one of the final proposals the company

6    was considering?

7    A    Barings was one of the proposals that it was considering.

8    Q    If we can please turn to Exhibit 202, which should be

9    Tab 3 in your binder, Mr. Tepner.  And that's at ECF 864-45.

10        MS. BARRINGTON:  Your Honor, I believe this exhibit

11   has been admitted into evidence already.

12        THE COURT:  I agree.

13   BY MS. BARRINGTON:

14   Q    Mr. Tepner, is Exhibit 202 the meeting minutes from an

15   Independent Finance Committee meeting on June 5th, 2020?

16   A    Yes.

17   Q    And did you attend this meeting?

18   A    I did.

19   Q    At this meeting, did the company's advisors recommend

20   that the company accept the Gibson Dunn Group proposal?

21   A    The company did, the Committee did.  Yes.

22   Q    If you can look at the front page of the minutes under

23   "lender engagement," it says here:

24        "Mr. Banks informed the Committee of the advisors' view

25   that the offer of the Gibson Dunn Group represented the best

HARVEY TEPNER - DIRECT BY MS. BARRINGTON

30

1     financing and exchange transaction opportunity among the

2     proposals reviewed."

3          Did you agree with your advisors' recommendation?

4     A    Yes, I -- yes, I did.

5     Q    And let's turn to page 4.

6          This -- was this the deck that was presented to the

7     Finance Committee?

8     A    Yes, it was.

9     Q    If we can please turn to page 6, under the executive

10    summary.

11         Under the first section, it says here:

12         "Over the last week, the company and its advisors had

13    engaged in prolonged term sheet negotiations with PJT/PW

14    Group, Centerview/Gibson Dunn Group, and Barings."

15         Is that your understanding?

16    A    Yes.

17    Q    And if you can please turn to page 11 of the exhibit?

18    And I'll refer you the column on the right-hand side, which

19    shows the proposal from Barings as of June 4th, 2020.

20         Do you see that?

21    A    Yes, I do.

22    Q    And at this time, was Barings an existing lender to the

23    company?

24    A    Barings was an existing lender to the company.

25    Q    And do you recall approximately how much debt Barings

HARVEY TEPNER - DIRECT BY MS. BARRINGTON

1    held?

2    A    I believe they were the largest combined lender.  And I

3    don't exactly recall the number, but they have numbers up here

4    that are probably indicative of their position of $190 million

5    1-L and $82 million at 2-L.

6    Q    And can you please describe what Barings was proposing?

7    A    They were proposing a 125 to $200 million.  They were

8    proposing the exchange their -- or 190 and $82 million of 1-L

9    and 2-L debt at 65 cents on the dollar and 45 cents on the

10   dollar, respectively.

11   Q    Do you recall why you rejected the proposal from Barings?

12   A    The proposal had a hundred and twenty-five to two

13   hundred, and the company was looking for $200 million, so it

14   was not sufficient in terms of amount.  And as I recall, there

15   was -- there was no concern that we would have enough debt

16   discount capture by their proposal, compared to what else was

17   on the table.

18   Q    Please turn to page 9 of the exhibit.  And this is the

19   Angelo Gordon financing term sheet summary.

20        Is this the new money financing proposal that Angelo

21   Gordon made to the company as of May 30, 2020?

22   A    Yes, it is.

23   Q    And at this point in time, how many rounds of

24   negotiations had the company gone through with Angelo Gordon?

25   A    Multiple.

1    Q    And how about with the Gibson Dunn Group?

2    A    Multiple.

3    Q    Did you view this as a competitive process?

4    A    I most certainly viewed it as a competitive process.

5    Q    And as of May 30, 2020, what was the Angelo Group

6    proposing?

7    A    They were proposing basically almost an IPCO-type

8    transaction again.  They were going to provide $200 million of

9    new money, plus $110 million existing 1-L, exchanged at a

10   ratio of 77.5 percent.  The collateral was -- is listed below,

11   the Simmons and Tuft & Needle trademarks, the patents,

12   et cetera, a pledge of the stock of Serta, and so on and so

13   forth.

14   Q    And did you understand that the collateral that they were

15   proposing here would be collateral that would transferred away

16   from existing first lien and second lien lenders?

17   A    There was new collateral to be added that wasn't part of

18   the existing 1-L lenders.  And it was going to provide for --

19   they had some collateral would be transferred away, yes.

20   Q    Thank you.

21        And we can turn to the -- page 10, please.

22        And Mr. Tepner, is this the exchange piece of the

23   proposal that Angelo Gordon was proposing on May 30th, 2020?

24   A    Yes.  Yes.

25   Q    And can you describe what this exchange piece was?

1    A    To exchange $483 million of exiting first lien term loan

2    at a ratio of 77.5 percent and $41 million of second lien term

3    loan at a ratio of 30 cents on the dollar.

4    Q    Did you have any concerns with the Angelo Gordon

5    proposal, as proposed on May 30th, 2020?

6    A    Well, one of the broadest concerns was potential of

7    mixing of collateral packages between existing term loan

8    lenders and the new proposed term loan structure and whether

9    or not the discount would be large enough to help the company,

10   and the debt reduction be large enough to help the company

11   achieve its three objectives.

12   Q    And if you look under the first row where it says

13   "borrower," it says:

14        "Newly formed bankruptcy remote unrestricted subsidiary."

15        Did that cause concern for you, as well?

16   A    Yes, it did.

17   Q    And why was that?

18   A    Because they were going to take the intellectual property

19   of the company and put it into a new restrict -- unrestricted

20   subsidiary.  It -- and presumably, there was going to be

21   license fees and things like that, that would flow to that to

22   help -- help pay down -- help pay down their obligations.

23        The concern would be, one, that additional burden; and

24   two, that you have competing interests over assets that

25   ideally should belong in one structure, which is the company's

1    operations and its trade names and its intellectual property

2    ideally should be in the same pool or collateral pool, so that

3    the company can control all of its assets and not try and set

4    up an effective royalty stream subsidiary and an operating

5    stream subsidiary.  It made a very -- it could make a very

6    burdensome case if the company had to undergo further

7    refinancings or a future restructuring.

8    Q    Now let's turn and talk about the Gibson Dunn proposal.

9         Can we turn to page 8 of the exhibit?

10        And Mr. Tepner, is this the Gibson Dunn indicative term

11   sheet dated June 5th, 2020?

12   A    Yes, it is.

13   Q    And can you, if you look at the top two rows, summarize

14   what the Gibson Dunn Group was proposing at this time?

15   A    Sure.  They proposed $200 million new funds to come into

16   the company and an exchange of 699 -- $698.5 million of first

17   lien term loan and $41.3 million of second lien term loan.

18   Q    Now if we can look at the row titled, "Collateral."  It

19   says:

20        "Secured by:

21        "(1) *Pari passu* lien on existing term loan priority

22   collateral;

23        "(2) Second priority lien on ABL priority collateral;"

24   and,

25        "(3) First priority lien on unencumbered property" --

1  defined term -- "'new collateral,' including 100 percent

2  pledge of any first-tier foreign subs and pledge of Serta,

3  Inc., excluding A-I-R Dream.  Real estate also excluded from

4  collateral."

5  What was your understanding of this collateral package?

6  A    That it was just going to be additional -- existing

7  collateral that was there in the first -- the prior term loan

8  and the new collateral that people talk about putting into the

9  IPCO type transaction to be part of this collateral pool.  So

10  all the collateral would be over the operating assets or some

11  of their -- or stock of the subsidiaries, as well as the

12  intellectual property.

13  Q    And what did you understand "*pari passu*" to mean?

14  A    A ranking equal.

15  Q    And do you know if the new collateral was also ranked

16  equally amongst the PTL lenders and the first and second lien

17  lenders?

18  A    It was ranked equally amongst the PTL and the first lien

19  lenders.  The second lien have their second lien rights to it,

20  yes.

21  Q    Thank you.

22  And what was your view of the Gibson proposal?

23  A    That it was structurally easier.  It provided the same

24  amount of new money, roughly.  And it had a much higher degree

25  of debt discount and debt reduction.

HARVEY TEPNER - DIRECT BY MS. BARRINGTON

36

1    Q    And if we can please turn to page 12 of the exhibit?

2         Mr. Tepner, can you describe what this slide shows?

3    A    This was the -- this was a comparison of the two

4    proposals that we had on the Angelo Gordon Group and the

5    Gibson Dunn Group, and comparing all the economics of it --

6    Q    And the Gibson --

7    A    -- per our -- our advisors.

8    Q    Thank you.

9         And the Gibson Dunn Group looks like it's dated June 4,

10   2020.  Is that your understanding?  This was before --

11   A    That's correct.

12   Q    Thank you.

13        And under the Angelo Gordon Group proposal, what would

14   have been the total change in debt?

15   A    The total change in debt would have been an increase of

16   $38 million.

17   Q    And how about under the Gibson Dunn proposal?

18   A    A total reduction in debt of $185 million.

19   Q    Under the Angelo Gordon proposal, what would have been to

20   the interest rate, in terms of total change?

21   A    The total change in -- change in total interest would --

22   would increase by $37 million.

23   Q    And what about the Gibson Dunn proposal?

24   A    $22 million.

25   Q    And if you look at the bottom of the page, Mr. Tepner,

1    what would have been the discount capture under the Angelo

2    Gordon proposal?

3    A    Total discount capture would have been 283 million.

4    Q    And what about under the Gibson Dunn proposal?

5    A    470 million.

6    Q    Which proposal did the Finance Committee ultimately

7    select?

8    A    The Finance Committee selected a modified Gibson Dunn

9    proposal, which provided for $200 million of new -- new money.

10   Q    And why did the Independent Finance Committee choose to

11   accept this proposal, instead of the Angelo Gordon Group's

12   proposal?

13   A    The -- the punch line, of course, was the dramatically

14   different amount of discount capture that was very important

15   to the company to help them delever its balance sheet.

16        The total interest rate, the cash amount versus the PIK

17   amount.  But the total interest rate was less, although, you

18   know, it's not -- not on one twenty-five, it's on two hundred,

19   which is not on this page here.

20        And it gave the company better -- better economics.  It's

21   -- there was -- there was the basic interest burden, the

22   weighted average cost of debt was lower under the Gibson Dunn

23   proposal than under the Angelo Gordon proposal.

24        And the -- and the discount rate was obviously, you know,

25   much more beneficial to the company.

1    Q    Who on the Independent Finance Committee voted for the

2    Gibson Dunn proposal?

3    A    Joan Hilson and I voted for the proposal.

4    Q    And at that time, did you believe that this was the best

5    deal for the company?

6    A    Given the pressing COVID situation, the need for

7    liquidity in -- in July, and the amount discount capture

8    amongst it and lower -- lower overall interest rate, we

9    thought this was the best proposal for the company.

10   Q    Did the Independent Finance Committee have the final

11   approval authority --

12   A    Yes, we --

13   Q    -- to --

14   A    Yes, we did.

15   Q    In deciding to go with this proposal, was the Independent

16   Finance Committee intending to harm specific lenders that

17   weren't participating?

18   A    No, not at all.

19   Q    And what was your intent?

20   A    Our intent was to give the company viability for moving

21   forward to face the issues of cash and to face the headwinds

22   of COVID, to face the headwinds in the marketplace and to be

23   able to put it back -- put itself back on a secured footing

24   once COVID had ended, so that you could operate normally,

25   refinance your debt going forward, and so on.

HARVEY TEPNER - DIRECT BY MS. BARRINGTON

39

1   Q    After the transaction was announced to the public, did

2   the company allow certain other lenders to participate?

3   A    Yes, they did.

4   Q    And who made the decision to allow them to participate?

5   A    The ultimate decision was made by the Finance Committee.

6   Q    And if we could turn to Tab 4 of your binder.  This is

7   Exhibit 249, ECF 865-40.

8        MS. BARRINGTON:  And Your Honor, I believe this

9   exhibit has been admitted into evidence already.

10       THE COURT:  I agree.

11       MS. BARRINGTON:  Thank you.

12  BY MS. BARRINGTON:

13  Q    And Mr. Tepner, are these the minutes from an Independent

14  Finance Committee meeting on June 20, 2020?

15  A    Yes, they are.

16  Q    And did you attend this meeting?

17  A    Yes, I did.

18  Q    If we can go to page 2, please.

19       And here it says:

20       "Mr. Shah then explained the rationale behind the

21  selection of certain additional holders of the company's

22  indebtedness to participate in the exchanges contemplated by

23  the transaction."

24       Is that your recollection of this meeting?

25  A    Yes.

1      Q    And if we can please turn to page 4.

2           Was this the deck that was presented to the Independent

3      Finance Committee?

4      A    Yes, it was.

5      Q    If we can please turn to page 7, which is a slide titled:

6           "Transaction Participants and Proposed Additional

7      Participants."

8           Do you see that?

9      A    Yes, I do.

10     Q    And if you look at this chart, under "additional and

11     proposed participants," who are those lenders that Mr. Shah

12     was proposing be included in the transaction?

13     A    Monarch, ArrowMark, Marble Point, Marathon, and Venor --

14     or Venor.

15     Q    And was there an economic basis for the Finance Committee

16     to include each of these lenders into the transaction?

17     A    Yes, there was.

18     Q    And did the Finance Committee approve these lenders

19     entering into the transaction?

20     A    Yes, we did.

21     Q    Are you aware that the transaction was announced to the

22     public on or about June 8th, 2020?

23     A    Yes, I am.

24     Q    And do you know if the company was sued shortly after the

25     transaction was announced?

1   A    Yeah, the company was sued almost immediately after.

2   Q    And in connection with documenting the transaction, did

3   the company provide an indemnity to the PTL lenders in

4   connection with the transaction?

5   A    Yes, we did.

6   Q    And why did the company provide an indemnity to the PTL

7   lenders as part of that transaction?

8   A    One of -- one of the reasons was that it was fraught with

9   litigation risk and we needed a proper economic inducement for

10  the PTL lenders to participate and go through with providing

11  new money and providing the discount that the company needed.

12  Q    Mr. Tepner, what would have happened to the company if

13  they were not able to get to a deal in March -- or June of

14  2020?

15  A    There was -- we would have had severe liquidity

16  constraints.  We probably would have had continued pressure

17  from our suppliers and our customers.  It might have run out

18  of cash.  It might have been forced to file for bankruptcy or,

19  worse, liquidate.

20  Q    Now let's talk about the Restructuring Support Agreement.

21  How did the company's financial position change after the 2020

22  transaction closed?

23  A    Well, the company's financial position changed throughout

24  for the better because it had a large discount -- a large debt

25  reduction.  It had $200 million of additional liquidity.

1     There started to be some hope that COVID would end in the year

2     that followed 2020, and that -- some level of normalcy.

3          But the market had changed.  There was factors of supply

4     chain restrictions.  There was factors of inflation.  There --

5     we couldn't get certain products to help build our mattresses.

6     There were still competitive pressures.  Our ability to visit

7     stores and so on and so forth was restricted because of COVID.

8     So it was -- it was still a lot headwinds the company was

9     facing.

10    Q    Did there come a time when the company was evaluating a

11    refinancing of its debt in early '22?

12    A    2022, the outlook was brightening and we thought that we

13    might be able to refinance the debt that we had on our balance

14    sheet.

15    Q    And who oversaw that process?

16    A    The Finance Committee oversaw that process.

17    Q    And was the company ultimately able to refinance in 2022?

18    A    The company engaged Evercore to seek potential investors

19    or re-financiers, and it was not able to obtain new

20    investment.

21    Q    And can you explain why?

22    A    Despite the fact that 2021 was a better performance year

23    than 2020, 2022, which had a very decent financial projection,

24    didn't -- that didn't materialize.  The company had severe

25    headwinds in all aspects of its business, including overall

1    market deterioration that affected all mattress producers.

2         And what we thought would be a higher EBITDA number, the

3    projections were that EBITDA would not come close to the

4    business plan.  And it made it very difficult to try and

5    refinance based upon poor performance.

6    Q    All right.  I'd like to now ask that you turn to Tab 5,

7    which is Exhibit 281, ECF 866-17.

8         And Tepner, is this a deck from a company board meeting

9    on December 15, 2022?

10   A    Yes, it is.

11   Q    And did you attend this meeting?

12   A    Yes, I did.

13        MS. BARRINGTON:  Your Honor, I'd like to move

14   Exhibit 281 into evidence, please.

15             THE COURT:  Any objection?

16             MR. LENDER:  No, Your Honor.

17             THE COURT:  All right.  It's admitted.

18        (Exhibit 281, ECF 866-17, received in evidence.)

19   BY MS. BARRINGTON:

20   Q    And if you could please turn to page 7 of the exhibit?

21        And if you look under "operational considerations," the

22   first bullet, it says:

23        "Despite strong market share and long-term performance

24   recovery, the company has faced several near-term challenges."

25        And if you'd look at the third sub-bullet.

1    A    Yep.

2    Q    Were sales dropping at this time?

3    A    Sales were very soft and were dropping and volumes were

4    substantially lower than the prior -- prior period.

5    Q    And if you look at the fourth sub-bullet, it says:

6    "The company's competitors and deals also" -- "and

7    dealers also view Q2-Q4 2022 as one of the most difficult

8    periods in the mattress industry, with TPX disclosing its

9    expectations for a full year 2022 market volume to be down

10   approximately 25 percent."

11   Was that your understanding of how the mattress industry

12   was doing at this time?

13   A    That was my understand and -- and the reality.

14   Q    And looking at the second square bullet up top, what was

15   the company's capital structure at this time?

16   A    The company had a million -- a billion, 30 million of PTL

17   debt.  It had $865 million of first lien debt.  It had 75 to

18   $80 million in capital leases.  And it had an undrawn ABL of

19   200 million, a $200 million facility.

20   Q    Now let's please turn to page 8 of the exhibit.

21   And if we can look at the first bullet, this describes

22   the company's efforts to refinance the capital structure in

23   2022.  Do you see that?

24   A    Yes, I do.

25   Q    And can you describe the company's efforts to re-fi in

1    2022?

2    A    Evercore contacted 20 parties to see their interest in a

3    1.6-billion-dollar capital raise.  Based -- as it says there,

4    marked -- marketed off of pro forma 2020 EBITDA.  And -- and

5    they talked to several relationship funds, they talks to -- to

6    a variety -- a variety of participants, including existing

7    lenders.

8    Q    Thank you.

9         And it says here:

10        "Lenders struggled with pro forma EBITDA adjustments and

11   had reservations about the company's ability to outpace

12   inflation and grow share."

13        Was that under -- your understanding as to why the

14   company was not able to refinance in 2022?

15   A    Underperforming EBITDA was one of the critical reasons.

16        With the market -- you know, I think the company, as I

17   recall, did pretty well, on its market share and even had some

18   growth in some areas.  But it was a diminishing market.

19   Q    When did the company start considering a Chapter 11

20   restructuring?

21   A    During the Summer of 2022.

22   Q    And were you still on the board and the Independent

23   Finance Committee at this time?

24   A    Yes, I was.

25   Q    And what was the role of the Independent Finance

1    Committee during these restructuring negotiations?

2    A    Well, the role was to review all financial matters

3    relating to the balance sheet of the company, to explore

4    alternatives, you know, including the March '22 outreach to

5    try and do refinancing, and here, to try and engage in

6    restructuring transactions to delever the balance sheet and

7    provide for its long-term survivability and viability.

8    Q    Did the board delegate authority to the Finance Committee

9    to consider, evaluate, and approve a restructuring

10   transaction?

11   A    (No verbal response).

12   Q    And why did the board do that?

13   A    Because the independent board member -- the independent

14   board members and the members of the Finance Committee, Joan

15   and I, were not conflicted.  We weren't equity holders, we

16   weren't there for any prior transactions, other than the 2020

17   deleveraging transaction.  And I think we were, you know,

18   independent minded.

19   Q    How often did the Finance Committee meet to discuss the

20   potential restructuring transactions?

21   A    Usually every week.

22   Q    And who attended those meetings?

23   A    It was Joan and I, senior management -- CEO, CFO, general

24   counsel -- Weil Gotshal, Evercore, FTI.

25   Q    And if we can please turn to page 9 of your exhibit.  And

HARVEY TEPNER - DIRECT BY MS. BARRINGTON

1    this is a slide titled:

2         "Potential Transactions Executive Summary.

3         "The company, Evercore, Weil, and FTI teams were pleased

4    to provide the board with an update on the events leading up

5    to the ongoing restructuring negotiations with the company's

6    existing lenders."

7         Was it your understanding that the company was trying to

8    negotiate a restructuring with its existing lenders?

9    A    Yes.

10   Q    And can you describe the outreach that was made to these

11   existing lenders?

12   A    Sure.  It reached out to its existing lenders for a

13   restructuring transaction concerning the somewhat key factors:

14        One, we had a decent sized cash balance at the time,

15   which aided in our ability to try and effectuate a transaction

16   and preserve liquidity while we were going through it.  But we

17   were looking to substantially deleverage the company to a

18   sustainable debt level -- debt level, which was estimated to

19   be three hundred or $400 million, and of course, create

20   runway, so the company would have long-term viability.

21   Q    Did the company also negotiate potential restructuring

22   transactions with the Angelo Gordon Group at this time?

23   A    Yes, they did.

24   Q    And why did the company engage with the Angelo Gordon

25   Group after the fallout from the 2020 transaction?

1    A    They were substantial lenders to the company.  They would

2    be a participant in some future transaction, one way or

3    another.  It could be constructive to talk to lenders who have

4    pockets, people refinancing or -- or backstopping a

5    restructuring.  And they were an important constituent.

6    Q    Can you describe how those negotiations ultimately ended?

7    A    I think they ended poorly.

8    Q    And why was that?

9    A    I think there was -- on deleveraging the company and who

10   would get what equity splits, there was a complete separation

11   of view between the 1-L lenders, which Angelo Gordon was

12   sitting in, and the PTL lenders, of how the equity should be

13   split after the new capital debt amount was established.

14   Q    And during these negotiations, did there come a time when

15   the Angelo Gordon Group re-filed their litigation against the

16   company in 2022?

17   A    Yes.

18   Q    Was the company trying to reach a consensual resolution

19   with the Angelo Gordon Group all the way through pretty much

20   the filing of these Chapter 11 proceedings?

21   A    Yes.

22   Q    Now I'd like to show you Exhibit 296, which is Tab 6 in

23   your binder.  This is ECF 866-32.

24        And Mr. Tepner, is this the presentation from a board

25   meeting on January 23rd, 2023?

1    A    Yes.

2    Q    And did you attend this meeting?

3    A    I did.

4         MS. BARRINGTON:  Your Honor, I'd like to move

5    Exhibit 296 into evidence, please.

6         THE COURT:  Any objection?

7         (No verbal response)

8         THE COURT:  It's admitted.

9         (Exhibit 296, ECF 866-32 received in evidence.)

10        MS. BARRINGTON:  Thank you.

11   BY MS. BARRINGTON:

12   Q    What was the purpose of this meeting?

13   A    The purpose of the meeting was to finalize the structure

14   of a final Chapter 11 Plan, approve the Restructuring Support

15   Agreement, and commence -- and authorize the company to

16   commence a Chapter 11 filing.

17   Q    And if we can please turn to page 10 of the exhibit?

18        What does this slide show?

19   A    This shows the terms of the proposed Plan of

20   Reorganization and restructuring.

21   Q    Let's talk about the proposed transaction.

22        Looking at the second bullet, what would the new term

23   loan credit facility be?

24   A    The new term loan would be $300 million.

25   Q    And how about if you look at the third bullet?

1      How would that be effectuated?  Under the first sub-

2      bullet, what would the holder of an allowed FLFO claim

3      receive?

4      A      The -- the first lien, first out creditors would receive

5      $196 million of claim.

6             The -- the first lien, second out would receive

7      $104 million distributed pro rata amongst the group.

8      Q      And what would the allowed non-PTL term loan claimants

9      receive under the third sub-bullet?

10     A      The non-PTL term loan lenders would receive up to

11     4 percent of reorganized equity of the Debtor -- of the equity

12     of the Reorganized Debtor, depending upon if they supported

13     the plan or did not support the plan.

14     Q      And under the fourth sub-bullet, what was the proposal's

15     effect on trade agreements and services?

16     A      Well, there was a -- there was ongoing -- trade creditors

17     were important to the company, and they would essentially get

18     a hundred cents and be paid post-petition --

19     post-reorganization.  And then there would be a basket for all

20     the other unsecured creditors.

21     Q      And did the -- under the fifth sub-bullet, was -- what

22     was provided to the consenting equity holders?

23     A      The consenting equity holders received $1.5 million in

24     cash and $200,000 for their attorneys' fees and expenses.

25     Q      And was the consenting equity holder Advent at this time?

1   A    Yes.

2   Q    And why did the company agree to give the consenting

3   equity holders --

4   A    So that Advent would enact a series of measures that

5   would allow the reorganized company access to up to

6   $54 million of potential tax benefits, including tax refunds.

7   And it was seen as a pretty good trade.

8   Q    And did this Restructuring Support Agreement include an

9   indemnity provision?

10  A    It did.

11  Q    And why was an indemnity provision included in the RSA?

12  A    One, that was -- that was the deal to get -- to get the

13  transaction done.

14        Second, it was a continuation of an indemnity that was

15  offered to and granted to the PTL lenders in the June 2020

16  transaction.

17        And third, there was a lot of litigation overhang, which

18  still continues to this day.

19        And it was an inducement, and an important economic

20  inducement, for them to participate and support the

21  restructuring.

22  Q    So was the indemnity an important component of the RSA?

23  A    Yes, it was.

24  Q    And what did the company get in exchange for this

25  indemnity?

1    A    It got a plan of -- it got a Plan of Reorganization.  It

2    got -- it got viability.  It got the ability to delever and

3    continue on, preserve jobs, preserve the economic enterprise.

4    Q    And Mr. Tepner, was this RSA agreement, in your judgment,

5    including the indemnity provision, fair and equitable to the

6    other lenders?

7    A    All things considered, yes.

8    Q    And did you exercise your business judgment in approving

9    this RSA?

10   A    Yes, we did.

11   Q    If you can please turn to page 11 of the exhibit?

12        This slide shows a summary of the material terms of the

13   RSA, and I'd just like to walk through them with you.

14        What was the company's commitment under the RSA?

15   A    Just give me a second to reread it, if you don't mind.

16   Q    Sure.

17   A    The company's commitment was:

18        To support and take all steps necessary to consummate the

19   proposed restructuring;

20        Use commercially reasonable efforts to obtain

21   confirmation of the plan as soon as practical following the

22   petition date;

23        Complete -- you know, do the -- negotiate the

24   documentation in good faith;

25        And not propose, solicit, file, support, seek, or pursue

1    an alternative restructuring proposal.

2    Q    And what were the consenting creditors' commitments under

3    the RSA?

4    A    It was a mirror -- a mirror of that:

5         Vote in favor of the plan;

6         Take reasonable efforts to support all actions necessary

7    to get the plan, you know, filed;

8         And vote -- vote for the plan;

9         Not object or take any action to obscure solicitation;

10        And agree to provide and not opt out of various releases

11   of the plan;

12        And to assume employment agreements with management.

13   Q    And what about the consenting equity holder commitments;

14   what were they obligated to do?

15   A    It was similar:

16        Use reasonable efforts to support the plan;

17        Not object to the plan;

18        And not propose or seek an alternative plan.

19   Q    And if we can please turn to page 14 of this exhibit?

20        Mr. Tepner, can you describe what is on this slide?

21   A    This is a valuation summary of the company under various

22   methods, showing what the range of the implied total

23   enterprise value was.

24   Q    And did the Finance Committee approve the RSA and

25   commence these Chapter 11 proceedings?

1    A    The Finance Committee did.

2    Q    And in your opinion, was the RSA the best deal for the

3    company at this time?

4    A    It was the best deal for the company at the time.  It

5    allowed us to consummate the trans -- the transaction

6    contemplated by the RSA to get $200 million of cash, 400-plus

7    million dollars of debt reduction, have liquidity in the

8    company, and avoid the -- the pitfall of running out of cash

9    and working capital in the Summer of 2020.

10   Q    And what about with respect to the RSA, did you believe

11   that the RSA was in the best interest of the company?

12   A    I did.

13   Q    And why was that?

14   A    Same -- for the same reasons I just answered a minute

15   ago.

16   Q    Are you aware that Citadel made a proposal the company?

17   A    Sorry.  One more time, please?

18   Q    Are you aware that Citadel has made a proposal to the

19   company?

20   A    Yes, I am.

21   Q    And did the Finance Committee consider that proposal?

22   A    Yes, we did.

23   Q    And what did the Finance Committee conclude?

24   A    We concluded that the proposal was not in the best

25   interest of the company.

1    Q    And why was that?

2    A    One, we weren't sure that it was viable, the ability to

3    deliver the votes and get the company out of Chapter 11 on a

4    more timely basis.  There was a question as to whether or not

5    there would be a requirement to re-solicit the votes, which

6    would be a further delay.

7         There was a payment of some amount in the tens of

8    millions of dollars for the company to drop the indemnity

9    provision given to the PTL lenders and to reject its own

10   Restructuring Support Agreement and without any assurance that

11   you have viability on the other side or even any view as to

12   what the indemnity value is worth.

13   Q    Now just turning to another topic.

14        Are you familiar with the Unsecured Creditors Committee's

15   global settlement in this case?

16   A    Yes, I am.

17   Q    Did the Creditors Committee make certain claims against

18   the Debtor, including claims related to the 2020 transaction,

19   claims related to the Key Employee Retention Plan, claims

20   related to the unperfected liens and fraudulent transfer

21   claims?

22   A    Yes, they did.

23   Q    And how did the Finance Committee respond to those

24   claims?

25   A    We didn't believe there was merit to those claims.  We

1  thought a lot of it was unnecessary noise in the system.  But

2  the Creditors Committee has the right to review and

3  investigate more and continue pursuing avenues.  We thought it

4  would be a large use of company time, a large consumption of

5  capital to pay for the professional fees in pursuit of that

6  and that they would find that there were no colorable claims;

7  that we, as the Finance Committee thought it was best to try

8  and settle with them.

9  Q    Okay.  And do you recall, did the Finance Committee

10  approve that settlement?

11  A    Yes, we did.

12  Q    And what was that settlement?

13  A    The settlement was a cash payment of the $5.75 million

14  into the Creditor Committee's instrument pro rata.

15  Q    And did the Finance Committee believe that this was the

16  best option for the company and the estate under the

17  circumstances?

18  A    It was one that was actionable to allow us to get to

19  confirmation and try to get out of Chapter 11 in a more speedy

20  manner, yes.

21  Q    Now let's briefly talk about the Plan of Reorganization.

22  As a member of the company's Board and Independent Finance

23  Committee, are you familiar with the Debtors' plan?

24  A    Yes, I am.

25  Q    And did the Debtors' directors, managers and officers

HARVEY TEPNER - DIRECT BY MS. BARRINGTON

57

1    oversee the solicitation of the plan?

2    A    They did.

3    Q    Was the Plan of Reorganization the culmination of

4    extensive negotiations between the Debtors, PTL lenders, the

5    consenting equity holders and the Creditors Committee?

6    A    Yes, it was.

7    Q    Do you believe that the comprehensive settlements that

8    are set forth in the RSA -- excuse me, in the plan is in the

9    best interest of the Debtors, their estate and their

10   stakeholders?

11   A    No.

12   Q    And do you believe that the Plan of Reorganization will

13   help the Debtors' long-term financial viability?

14   A    Yes, I definitely do.

15   Q    Do you as -- did you as a member of the Finance Committee

16   approve the Plan of Reorganization?

17   A    Yes, I did.

18   Q    Now let's turn to the exculpation provisions in the plan.

19   Are you familiar with those provisions?

20   A    I believe I am.

21   Q    And could you briefly explain your understanding of these

22   provisions?

23   A    These provisions release I guess basically actors related

24   to the Chapter 11 restructuring from all claims and actions

25   against them in connection with their duties to get the

1    company through and out of Chapter 11.

2    Q    And do you recall or know who those exculpated parties

3    are?

4    A    It would be members of the Creditors Committee, some

5    restructuring professionals, and Joy Hillson (phonetic) and

6    myself.

7    Q    And do you continue to serve in the role of an

8    independent director after the Debtors filed their petitions

9    for bankruptcy?

10   A    I did.

11   Q    And my next few questions are going to be about this

12   post-petition period during the time that these bankruptcy

13   cases have been pending.

14        When you acted as an independent director did you believe

15   you owed certain duties to the Debtors and their estates?

16   A    Yes, I did.

17   Q    And what was the nature of those duties that you owed to

18   the Debtors and their estates?

19   A    Paid attention to the most important one, to try and help

20   the company fashion a Plan of Reorganization or

21   recapitalization that would put it on a solid financial

22   footing, improve its prospects for the future, maintain its

23   long-term viability, ideally continue to support the

24   employment and the business efforts of the company and its

25   employees, and to provide a new capital structure that would

1    allow it to not have to be reorganized in the future.

2    Q    Did you act as a fiduciary for the Debtors and its

3    estates during this time, and did you seek to exercise those

4    fiduciary duties in connection with all of you activities in

5    your role as an independent director of the Debtors?

6    A    Yes, I did.

7    Q    And can you provide some examples of how you carried out

8    your fiduciary duties?

9    A    One, reviewed the Plan of Reorganization and had

10   discussions with the company's professionals, and sometimes

11   the management, about the type of Plan of Reorganization that

12   would work, the debt structure, the allocation of the value of

13   the company, review of the business plan, review of financial

14   projections, be as fully engaged as a director could be,

15   sometimes plus provide guidance as to what they should be

16   looking at, question assumptions, question proposals, make

17   sure I was comfortable and understood them all.

18   Q    Were you in any way acting in furtherance of your own

19   personal interests?

20   A    No.

21   Q    And Mrs. Hillson also served as an independent director

22   during this same period.  Is that correct?

23   A    That's correct.

24   Q    And in your observations from working with Ms. Hillson in

25   her capacity as an independent director, how would you

1    describe her conduct?

2    A    Similar to mine.

3    Q    And did you exercise your business judgment, Mr. Tepner,

4    in improving the Plan of Reorganization?

5    A    Yes, I did.

6    Q    Now, Mr. Tepner, are you familiar with the various

7    release provisions that are contained in the plan?

8    A    Yes, I am.

9    Q    And can you describe for us what those releases are?

10   A    They're releases to the Debtors, the Debtors' advisors,

11   the PTL lenders and their agents and other parties for all

12   prior pre-petition acts.

13   Q    And did you come to determine that those pre-petition

14   claims and causes of action should be released?

15   A    Yes.

16   Q    And why was that?

17   A    During my slightly more than three years with the company

18   and seeing all the actions that were undertaken, I thought

19   everybody was working for the best interests of the company in

20   good faith, putting in strong efforts to try and, you know,

21   initially just do the June 2020 transaction, hopefully that

22   was enough to give it longer term viability.  But then when

23   that didn't work because of all the stuff about the head winds

24   and COVID, everything else like that, to come up with a

25   more -- a larger more comprehensive plan to reorganize the

1   company in Chapter 11, get it out as quickly and expeditiously

2   as possible.

3   Q    And did you as a member of the Finance Committee approve

4   the Debtor releases?

5   A    Yes, I did.

6   Q    Now let's turn to the third-party releases.  Is it your

7   understanding that the Debtors executed certain third-party

8   releases?

9   A    Would you please repeat that?

10  Q    Yeah.  Is it your understanding that the Debtor -- or

11  you, as a member of the Finance Committee, approved certain

12  releases related to third parties?

13  A    Yes.

14  Q    And can you tell us about those third-party releases?

15  A    Well, they were releases to the PTL lenders, you know,

16  for one, and to the company's advisors.

17  Q    And was their releases granted to the consenting equity

18  holders and the Creditors Committee, among others?

19  A    Yes.  Thank you very much.  Yes, they were.

20  Q    And were these third-party releases given with

21  consideration in return?

22  A    Yes, they were, they were -- you know, there was new

23  money, new value, dramatic reduction in debt, there was -- for

24  the consenting equity holders there was substantial potential

25  for tax benefits and supporting the Plan of Reorganization,

HARVEY TEPNER - DIRECT BY MS. BARRINGTON

1    they were all important to confirmation of the plan.

2    Q    And were these releases an integral part of the Plan of

3    Reorganization?

4    A    Yes, they are.

5    Q    Thank you, Mr. Tepner.

6              MS. BARRINGTON:  Your Honor, I pass the witness.

7              THE COURT:  All right.  Thank you.

8              PTL lenders have any questions, Mr. Costa?

9              MR. COSTA:  No, Your Honor.

10             THE COURT:  All right.  Thank you.

11             All right.  Are you taking -- are you taking first

12   shot?

13             MR. EHRLICH:  Yes, Your Honor.

14             THE COURT:  All right.  Fair enough.

15             And are we --

16             MR. EHRLICH:  Yes.

17             THE COURT:   -- just inside.  Okay.

18             MR. EHRLICH:  Yes.

19             THE COURT:  Terrific.

20             MR. EHRLICH:  Thank you.

21             THE COURT:  Thank you.  The right table should

22   have -- you should be up.

23             MR. EHRLICH:  Yes.

24             THE COURT:  Okay.  Good.

25        (Pause in the proceedings.)

1           MR. EHRLICH:  One second, Your Honor, just while

2      we --

3           THE COURT:  Of course.

4           MR. EHRLICH:  -- the binders for the witness and

5      Ms. Barrington, please.

6          (Pause in the proceedings.)

7           MR. EHRLICH:  May I approach, Your Honor?

8           THE COURT:  Of course.  Thank you.

9           THE WITNESS:  Thank you.

10          (Pause in the proceedings.)

11                          CROSS-EXAMINATION

12     BY MR. EHRLICH:

13     Q    Good afternoon, Mr. Tepner, how are you?

14     A    I'm fine.  Thank you.

15     Q    Now, Mr. Tepner, you joined the Finance Committee in

16     March of 2020.  Right?

17     A    That's correct.

18     Q    And I think you testified on direct examination that

19     Job 1 was to address liquidity for the company.  Right?

20     A    Correct.

21     Q    And as part of your duties on the Finance Committee you

22     began working with the company's advisors to evaluate

23     potential structures.  Correct?

24     A    Correct.

25     Q    And those were to be cleared, those were the company's

1    advisors, not the Committee's advisors.  Right?

2    A    They were serving the company, they were acting at our

3    direction.

4    Q    Right.  But the Committee had the authority to engage

5    independent advisors, but it didn't do so.  Right?

6    A    Correct.

7    Q    And that's because you thought the advisors were capable.

8    Right?

9    A    Well, when we first met with Weil Gotshal and we first

10   met with Evercore, I believe I asked them about their

11   independence --

12   Q    Uh-huh.

13   A     -- how they were engaged, what they were going to do,

14   et cetera.

15   Q    And you thought they were capable.

16   A    Well, I know they were capable, but that was one issue.

17   The question was were they independent, and would they serve

18   the needs of the company most of all.

19   Q    Understood.  And now you didn't personally negotiate the

20   transaction.  Right?

21   A    I did not personally engage in negotiations of the

22   transactions, correct.

23   Q    You never spoke with Gibson Dunn?

24   A    Not that I recall.

25   Q    And you never spoke with Centerview.  Right?

HARVEY TEPNER - CROSS BY MR. EHRLICH

65

1    A    Not that I recall.

2    Q    The advisors did that.  Right?

3    A    Correct.

4    Q    Now, Mr. Tepner, the Finance Committee kept minutes of

5    its meetings.  Correct?

6    A    Correct.

7    Q    And I think you testified on direct that prior to the

8    meetings you would get lengthy decks from the advisors.

9    Correct?

10   A    We would get a deck prior to the meeting, yes.

11   Q    And you would review those in the meetings.  Right?

12   A    Yes.

13   Q    And they were in most cases quite lengthy and detailed,

14   you'd agree?

15   A    They had the information I thought we needed, yes.

16   Q    And you would agree with me, sir, that if the Committee

17   gave material attention to a particular transaction structure,

18   it would have been reflected in those materials.  Right?

19   A    I'm not sure I understand the question.

20   Q    Yeah, if the Committee gave material attention during its

21   evaluation of different transaction structures in the spring

22   of 2020 it would have been reflected in those Committee

23   materials.  Right?

24   A    Probably, yeah.

25   Q    Now in the spring of 2020 the Committee had two basic

1      work streams, one focused on near-term liquidity, and one on a

2      comprehensive liquidity management -- liability management

3      transaction.  Is that right?

4      A    Right.

5      Q    And so on direct examination you mentioned a bunch of

6      initiatives, I believe a sale lease back, a potential sale of

7      a JV, FLFO financing and so forth.  Those were all near-term

8      initiatives.  Right?

9      A    Those were all initiatives that we -- everything was to

10     be in near term initially.  We were looking at July 2020 so

11     everything was near term that way.

12     Q    Right, but those were not comprehensive liability

13     management transactions.

14     A    Not necessarily, no, correct.

15     Q    Right.  If we could look at, please, Tab 1 in the binder

16     I handed you, which is Defendant's Exhibit 23, that's ECF in

17     the Adversary 248-24.

18     Q    That is the -- those are the minutes of the March 25,

19     2020 Finance Committee.  Do you see that, sir?

20     A    I do.

21     Q    And you attended that meeting.  Right?

22     A    I did.

23     Q    And do you recognize these meeting -- these minutes?

24     A    I believe I do, yes.

25                MR. EHRLICH:  Your Honor, I move Defendant's 23 into

1    evidence.

2              THE COURT:  Any objection?

3              MS. BARRINGTON:  None, Your Honor.

4              THE COURT:  They're admitted.  Thank you.

5         (Exhibit 23, ECF 248-24 received in evidence.)

6    BY MR. EHRLICH:

7    Q    Now there is a PowerPoint attached to the minutes.  Do

8    you see that?

9    A    Yes, I do.

10   Q    And if I could ask you to go now to page -- it's page 14

11   of the deck, it's 22 of 91 on the ECF.  I think I got that

12   wrong.  It's page 14 of the deck.

13        And this slide is select transaction considerations for

14   liability management.  Right?

15   A    Correct.

16   Q    And it lists a number of the various transaction types

17   that you testified about earlier that the company was

18   considering.  Right?

19   A    Correct.

20   Q    And none of these resemble the transaction that was

21   entered into in June of 2020.  Is that fair?

22   A    I'm just giving them a quick review.  (Perusing

23   documents.)  That's probably directionally correct.

24   Q    The 2020 transaction involved *pari passu* 1-L lenders

25   being primed with a new priority loan.  Right?

HARVEY TEPNER - CROSS BY MR. EHRLICH

1     A    There was a new priority loan, there was debt reduction,

2     and there was discount capture.

3     Q    Yes, but my question, Mr. Tepner, is simply that

4     transaction involved *pari* lenders being primed with a new

5     priority loan.  Correct?

6     A    Not to be difficult, but I don't -- a prime -- I don't

7     think it was prime, but I could see how it could be

8     characterized that way.  So for the sake of simplicity I'll

9     say sure.

10    Q    Right.  And we're subordinated.  Right?

11    A    We're subordinated.

12    Q    And 1-L lenders who were *pari* with them exchanged into

13    new senior loans.  Right?

14    A    They were subordinated in terms of not -- of payments

15    under the collateralM but, yes --

16    Q    Right.  Right.

17    A     -- they did.

18    Q    And so formerly *pari* lenders exchanged into senior loans

19    secured by the same collateral pool.  Correct?

20    A    Not completely correct.  There was additional collateral

21    added to that pool.

22    Q    Right.  But it was those previously *pari* lenders became

23    senior with respect to the same pool.  Right?

24    A    Senior as to priority of payment, yes.

25    Q    Yes.  And that transaction structure, that 2020

1   transaction structure was not being discussed on May 25th of

2   2020.  Correct?

3   Q    It wasn't -- it wasn't in the deck.  I don't recall that

4   we discussed it, but it wasn't in the deck.

5   A    Well, in fact, Mr. Tepner, your advisors never proposed

6   that transaction structured.  Isn't that right?

7   A    We had a lot of discussions about types of transaction

8   structures.  I don't recall if they proposed it or we acted

9   too on.  We may have discussed could we do some other

10  transaction structure that provided for, you know, liquidity,

11  debt reduction, discount capture.

12  Q    Okay.  But the transaction structure that we described

13  was not discussed in the May -- in the March 25th minutes.

14  Right?

15  A    That's correct.

16  Q    Okay.  Let's move forward a couple of weeks.  Let's go,

17  if we could, to Tab 4 in the binder, that is Defendant's 35,

18  Mr. Tepner.

19  Q    And these are the minutes of the Finance Committee of

20  April 7, 2020.  Is that right?

21  A    That is correct.

22  Q    And you attended this meeting?

23  A    I did.

24  Q    You recognize these minutes?

25  A    I do.

1          MR. EHRLICH:  Your Honor, I'd move Defendant's 35

2    into evidence.

3               THE COURT:  Any objection?

4               MS. BARRINGTON:  None, Your Honor.

5               THE COURT:  It's admitted.  Thank you.

6          (Exhibit 35 received into evidence.)

7    BY MR. EHRLICH:

8    Q    And if I could direct your attention, sir, please to

9    page 2 of the PowerPoint, which is page 7 of 30 on the ECF.

10              MR. EHRLICH:  And for the Record, I should have

11   stated that it's 248-36 in the Adversary.

12              THE COURT:  Thank you.

13   BY MR. EHRLICH:

14   Q    Now this is an executive summary and there are two

15   sections to the page.  The first half there are liquidity

16   alternatives, sale lease back, JV sale, Serta financing, ABL.

17   You see that?

18   A    Yes, I do.

19   Q    And those are not the comprehensive transactions.  Right?

20   Those are just liquidity related transactions.  That's the top

21   half of the page.  Right?

22   A    Those, right.

23   Q    And then the bottom half of the page talks about -- it

24   says that the first square bullet, "The existing lenders can

25   be the most likely source of liquidity or a comprehensive

1    transaction sequencing an engagement is critical to achieve

2    the optimal outcome for the company in the following potential

3    transactions."  Right?

4    A    Correct.

5    Q    And the only transactions listed here are either an

6    IPCOde transaction or first out financing.  Right?

7    A    Correct.

8    Q    Okay.  So again, no mention of a priming uptier

9    transaction here either.  Right?

10   A    No mention of the transaction that was consummated in

11   June 2022.

12   Q    Right.  But there was -- and what you did actually on

13   this day, right, is you directed the advisors to go out and

14   pursue a process with respect to an AB -- with an IPCO

15   financing.  Right?

16   A    Amongst -- I think the answer to that is I believe, yes,

17   but there may have been other things that were directive as

18   well.

19   Q    Okay.  Let's go back, if we may, to the first page of the

20   minutes, and if we could -- page 2 of 30 on the ECF, and if we

21   could go the bottom of the page.  Mr. Tepner, it states, "The

22   Finance Committee determined the company's advisors should

23   engage with the first lien lender group, execute a

24   confidentiality agreement so diligence could commence, and

25   consider or make proposals to or from that group with a focus

1    on exploring an IPCO transaction."  Right?

2    A    Yep.

3    Q    And the first lien lender group you understood to be the

4    Angelo Gordon Group.  Right?

5    A    Well, there was -- Angelo Gordon was a member of the

6    first lien lenders, so was Barings or other lenders.

7    Q    Okay.  But that was the only 1-L lender group that

8    existed at the time.  Correct?

9    A    Not to be cute about it, but you're describing groups,

10   there are 30 names or so in the 1-Ls of which five or six

11   really counted the most.  Angelo Gordon was one, Barings was

12   there, there were others.

13   Q    Okay.  Well, let me see if I can -- I didn't mean to

14   interrupt.

15   A    Well, what is --

16   Q    Finish your answer.

17   A     -- what is the group is --

18   Q    Okay.  Well, let's answer that question.  Let's go to

19   page 3, page 8 of 30 of the document.

20   A    Uh-huh.

21          MR. EHRLICH:  And this is -- it's Slide 3, I'm

22   sorry, Emilo.  It's page 8 of 30 of the ECF.

23   BY MR. EHRLICH:

24   Q    And this is a slide entitled, "Lender Engagement

25   Considerations for Potential Transactions."  Right?

1     A     Right.

2     Q     And the only 1-L focus group identified at this point in

3     time by Evercore is the Angelo Gordon, Gamet and Apollo Group.

4     Right?

5     A     Please repeat the question, the second part of it.

6     Q     Yeah, the only 1-L group identified at this point that it

7     had formed was Angelo Gordon, Gamet and Apollo.  Right?

8     A     For this chart, sure.

9     Q     Yes.  On the date that you authorized the advisors to

10    engage with the first lien lender group.  Right?

11    A     Correct.

12    Q     And, in fact, the Finance Committee authorized the

13    advisors to disseminate an illustrative transaction, or an

14    IPCO transaction.

15    A     Correct.

16    Q     Right?

17    A     Correct.

18    Q     And that transaction structure was not disseminated to

19    what ultimately became the Gibson Dunn Group.  Right?

20    A     I believe that's correct.

21    Q     And that's because, as it indicates on this page, they

22    were an unlikely counterparty for an IPCO transaction due to

23    size of group, type of lender CLOs.  Right?

24    A     That's what it says, yes.

25    Q     And the company and its advisors spent quite a bit of

HARVEY TEPNER - CROSS BY MR. EHRLICH

74

1    time and effort negotiating a potential IPCO transaction.

2    Right?

3    A    There was a lot and effort on that, yes.

4    Q    And it was first authorized on this date.  Right?

5    A    Yeah, I thought the minutes would be what the minutes

6    are, but I believe that's correct, yes.

7    Q    Well, you certainly authorized it on this date according

8    to the minutes.  Right?

9    A    Right.

10   Q    And it was a type of transaction that had been done

11   before in other liability management circumstances.  Right?

12   A    There were transactions that we'd heard of, yes.

13   Q    Right.  In fact, it even had a name, it was the Jay Crew

14   (phonetic) transaction.  Right?

15   A    (No audible response.)

16   Q    And you wouldn't have authorized the advisors to go out

17   and solicit these proposals if you thought it was an

18   illegitimate transaction.  Right?

19   A    Correct.

20   Q    In fact, you thought it was in the best interest of the

21   company at this point in time for the advisors to go out and

22   solicit exactly this.  Right?

23   A    What my view point versus a specific date, we generally

24   wanted to find something that would be helpful to the company

25   to solve three objectives.

1    Q    Well, and if you thought there was a better option at
2    this point in time, you would have said to the advisors, Go do
3    that.  Right?
4    A    It's more complicated.  Three objectives:  Additional
5    capital, debt reduction, discount capture.  We were -- we
6    would have considered any proposal that could be done to be
7    something that we should be talking about.  By trying to do an
8    IPCO type transaction, which is what the initial negotiations
9    and discussions were we went out with, was something that we
10   didn't have to get releases for collateral, we didn't have
11   to -- we didn't -- we had unencumbered collateral that could
12   be financed with a relatively high valuation.
13        So the thought was that might be the easiest way to
14   pursue a transaction without having to compromise or otherwise
15   change the collateral of other lenders to the company.
16             And two, it would be a terrible situation if the
17   company went out and said, "We need to restructure but we
18   haven't got a clue how to do it."  We had very capable legal
19   and financial advisors and the discussions centered on -- this
20   is something that we know we could get done if the value -- if
21   the money works.  So that was the reason for the focus.
22   Whether it was April 7, April 6, the discussion thereafter,
23   but that was the reason for the focus.
24   Q    But that was the path you chose as the best path at the
25   time.  Right?

1   A    As one that we thought we could execute on and get done

2   within a short period of time with assets that we could

3   encumber and could raise capital on.

4   Q    Because time was of the essence.  Right?

5   A    Time was very much at the forefront of --

6   Q    And you spent six weeks soliciting proposals only related

7   to this type of transaction structure.  Right, Mr. Tepner?

8   A    I just don't recall for the six weeks, but we did --

9   we -- our outward discussions were on that scenario.

10  Q    Right.  And we saw on direct examination that the Debtors

11  got term sheets from seven or eight different parties for

12  different iterations of IPCO transactions.  Right?

13  A    Correct.

14  Q    And for a comprehensive liability management transaction,

15  other than the Gibson Dunn Group proposal, you didn't get

16  transaction term sheets for any other type of structure.

17  Right?

18  A    I believe that's correct.  Well, there was a general

19  financing structure and FLFO thing, but, yes, generally for

20  something that's more comprehensive, that's correct.

21  Q    Now the company got a letter from the Gibson Dunn Group

22  on April 7 of 2020.  Right?

23  A    Correct.

24  Q    And the letter stated that Gibson Dunn represented a

25  majority of the first lien loans.  Right?

1    A    Correct.

2    Q    And when you actually did the transaction in June they

3    represented 39 percent of the loans.  Right?

4    A    The transaction date we had more than 50 percent

5    subscribed to the transaction, so whether Gibson Dunn

6    represented them, I can't answer that question with

7    specificity, but we had enough to get 50 percent plus one.

8    Q    Well, you knew that the people you had a handshake deal

9    with on June 5 only had 39 percent of the loans and you needed

10   to get to 50.1.  Right?

11   A    We knew we had to increase the group participating, yes.

12   Q    Right.  Now the company didn't respond to the Gibson Dunn

13   letter of April 7.  Right?

14   A    I believe that's correct.

15   Q    And that was part of a deliberate strategy.  Correct?

16   A    I don't recall one way or the other if it was deliberate,

17   but it was obvious -- we obviously discussed the letter, I

18   don't recall the nature of every discussion about whether we

19   respond to them now or not or whatever.

20   Q    Okay.  But on April 7 you're facing a liquidity runway

21   potentially July.  Right?

22   A    Yes.

23   Q    You get a letter that purports to be on behalf of half of

24   your lenders.  Right?

25   A    Yes.

1    Q    And you did nothing for two weeks.  Right?

2    A    I just can't tell you everything that happened in that

3    period.

4    Q    So you don't recall whether there was a deliberate

5    strategy to hold off the Gibson Dunn lenders while you

6    negotiated the IPCO transaction?

7    A    I just don't -- I just don't recall.  I'm sure we didn't

8    do -- I have double negatives -- I'm sure we didn't ignore it

9    willy-nilly.

10   Q    Right.  You thought about it and you said, "Let's keep

11   these people at bay while we get a better deal over here."

12   Right?

13   A    Well, we had no deal with anybody, but I don't recall

14   that discussion one way or the other.

15   Q    Okay.  But if you did get acceptable terms with the

16   Angelo Gordon Group, then you could use that as leverage with

17   the Gibson Dunn Group.  Right?

18   A    We were looking for proposals to help the company, we are

19   not monolithic for what we would consider, so I made a

20   counter-proposal to our IPCO approach.  We had these other

21   things which would help liquidity which we've already covered

22   in some of your questions.  So there was nothing specifically

23   designed to be exclusionary of any new ideas or

24   considerations.

25   Q    Can we go back, please, Mr. Tepner, to Tab 4 in your

1     binder, which is Defendant's 35.

2     A     Sure.

3     Q     And if we -- go to Tab -- page 4, it's ECF 9 of 30.  And

4     do you see the slide called "Illustrative Engagement

5     Strategy"?

6     A     Yes.

7     Q     And it says here, "Sequencing discussions among various

8     constituents will be critical to driving the optimal outcome."

9     Right?

10    A     I recall that line, which -- remind me where it is.

11    Q     The very bold -- second bold line at the top of the page.

12    A     Oh, yes, right at the top.  Thank you.

13    Q     Because that's what the company was doing.  Right?  You

14    were sequencing the discussions, first with the IPCO folks and

15    then you were going to deal with Gibson Dunn.

16    A     I think that's what it says, that's probably correct,

17    but --

18    Q     Okay.  And, in fact, if we go down to the last square

19    bullet on the page, it says here, "To the extent the company

20    determines that an IPCO transaction is most attractive, it

21    could use the transaction as negotiating leverage with the

22    cross-lenders'/cross-holders' group to determine if a superior

23    transaction exists.  Right?

24    A     Yes.

25    Q     Okay.  And the cross-holders' group, right, is the Gibson

HARVEY TEPNER - CROSS BY MR. EHRLICH

80

1    Dunn Group.  Correct?

2    A    That's primarily the cross-holder group that we

3    identified, yes.

4    Q    Right.  There's no doubt in your mind that's who that

5    refers to.  Right?

6    A    My recollection from three years ago is not as great

7    as --

8    Q    Okay.

9    A     -- the statements are here, so some of it's a

10   little (indiscernible)/

11   Q    So let's turn back a page.  I want to make sure the

12   Record's clear.  Let's turn back to page 3 of the document,

13   sir, and there's a heading, it says, "Cross-holders Group."

14   Right?  See all the holders, sir?

15   A    I'm not aware now and probably not that many other cross-

16   holder groups.

17   Q    Okay.  So you hold the Gibson Dunn Group at bay for two

18   weeks and they write to you again on April 24.  Right?

19   A    Yes.

20   Q    And they complain that you haven't been talking to them.

21   Right?

22   A    Yes.

23   Q    And they say, "You've got a deal with us."  Right?

24   A    I believe that's correct.  I'd have to read the letter

25   just to refresh my recollection, but, yes.

1    Q    Okay.  But the company continued to slow-walk it with the

2    Gibson Dunn Group even after that.  Isn't that right, sir?

3    A    I'd have -- apologies, long time ago.  I know we had

4    engagements with a variety of people for a variety of things

5    so I can't recall specifically, and I don't know that we

6    specifically wanted to slow walk --

7    Q    Okay.

8    A     -- any group that had a proposal for us.

9    Q    Well, let's go to Tab 6 in your binder, please, which is

10   Defendant's 64, it's ECF 248-64 in the Adversary.

11   A    Yes.

12   Q    And this is an email from Ms. McGuffy to a number of

13   people including you.  You see that?

14   A    Just one second.  Is this Tab --

15   Q    It's Tab 6 in your binder.  Dated Friday, April 24.

16   A    What page number?

17   Q    Well, it's the very first page, it's ECF page 2 of 9, by

18   its dependence -- I'll get there.

19        (Pause in the proceedings.)

20   BY MR. EHRLICH:

21   Q    Oh, I apologize, Mr. -- I realize I have mis-spoken, it's

22   Tab 5 in your binder.  That's probably why you're having

23   confusion.

24        It's also on the screen if that's easier.

25   A    I got it.  Thank you.

1     Q    Okay.  And do you recognize this email from ms. McGuffy

2     to you and others dated April 24?

3     A    I do.

4     Q    Any doubt that you received it?

5     A    No.

6          MR. EHRLICH:  I move Defendant's 65 into evidence,

7     please, Your Honor.

8          THE COURT:  Any objection?

9          MS. BARRINGTON:  No, Your Honor.

10          THE COURT:  All right.  It's admitted.

11     (Exhibit 65 received in evidence.)

12     BY MR. EHRLICH:

13     Q    And if you turn to the attachment, Mr. Tepner, it's a

14     letter from Gibson Dunn.  Correct?

15     A    Correct.

16     Q    And in the first paragraph, and it's to Mr. Schrock, and

17     it says, "We write to follow up on the letter we delivered to

18     Mr. Barry," I'm going to mangle the pronunciation, "Kaneep

19     [phonetic 2:03:31] and others."

20          And it then goes on to say in the second sentence, "While

21     the secured lender group understands and appreciates the

22     company's likely dedicating extensive resources addressing

23     numerous operational challenges resulting from the COVID-19

24     pandemic, we have yet to receive a response to the April 7

25     letter."  Right?

1    A    Yes.

2    Q    And they then in this document attach a proposed

3    transaction.  Right?  Of indicative terms for a transaction.

4    A    Yes, there's a deck, yes.

5    Q    Right.  And if we go to page 2 of that deck --

6              THE COURT:  Could I interrupt you for just one

7    second --

8              MR. EHRLICH:  Of course.

9              THE COURT:  -- because I'm checking as we go.  You

10   offered Exhibit 65 as 248-64.  I think you meant 64, as

11   248-64.

12             MR. EHRLICH:  248-64.  You're absolutely right, Your

13   Honor.

14             THE COURT:  I want the Record to be clear, and I'm

15   sorry for interrupting --

16             MR. EHRLICH:  It's not -- not at all.

17             THE COURT:  -- it takes me a minute to --

18             MR. EHRLICH:  Apologize --

19             THE COURT:  -- follow up.

20             MR. EHRLICH:  -- for me mis-speaking.

21             THE COURT:  All right.

22   BY MR. EHRLICH:

23   Q    So you recall receiving this deck.  Right, Mr. Tepner?

24   A    Yes, I do.

25   Q    And this was the first time anybody had proposed a

1    superpriority financing for Serta.  Right?

2    A    I think that is correct.

3    Q    Well, can you identify here today anyone proposing this

4    transaction structure either on the company side or outside of

5    the company before Exhibit 65 here?

6    A    Not that I recall.

7    Q    64.

8    A    Not that I recall.

9    Q    Now if we look at page -- and you're aware, sir, right,

10   that this superpriority financing was, if we look at page 2 of

11   the deck in the middle of the page, one more page forward,

12   sorry, there's a line that says, "Lenders," and it says,

13   "Backstop by certain members of the Ad Hoc Group each on a

14   pro rata basis, but available to all existing first term --

15   lien term lenders pro rata, collectively 'priority term

16   lenders.'"  Right?

17   A    Yes.

18   Q    So this proposal was available -- would have been

19   enacted, available to all first lien lenders.  Right?

20   A    That's what it says.

21   Q    Okay.  Now notwithstanding the fact that time was of the

22   essence, it took a couple of more weeks for the company to

23   engage with Gibson Dunn.  Right?

24   A    Yeah, I just would have to just check the minutes just to

25   refresh my recollection.

1    Q    Okay.  Well, let's go to Tab 7 -- oh, let's go to Tab 6

2    in your binder, Mr. Tepner, which is Document 248-100 in the

3    Adversary, and Defendant's 100.

4    Q    And these are minutes from the Finance Committee dated

5    May 12, 2020.  Right?

6    A    That's correct.

7    Q    And you attended this meetings?

8    A    I did.

9    Q    You recognize the minutes?

10   A    I do.

11          MR. EHRLICH:  Your Honor, I'd offer Defendant's 100

12   into evidence.

13          THE COURT:  Any objection?

14          MS. BARRINGTON:  None, Your Honor.

15          THE COURT:  It's admitted

16       (Exhibit 100 received in evidence.)

17   BY MR. EHRLICH:

18   Q    And if I could direct your attention, sir, to the very

19   first page of the substantive deck, it's page 8 of 69 on the

20   ECF.  It says here in the middle of the page, "Initiated

21   discussion with and opened data room for Centerview, Gibson

22   Dunn, who are representing a group of existing 1-L and 2-L

23   cross-lenders."  Do you see that?

24   A    Yes, I do.

25   Q    And it states that there was an advisor group call on

1    Sunday, May 10.

2    A    Yes.

3    Q    So notwithstanding the fact that we saw in the prior

4    exhibit the company got a letter complaining of lack of

5    engagement from Gibson Dunn on April 24, it wasn't, in fact,

6    until Sunday, May 10, that there was even an initial advisor

7    call.  Is that right?

8    A    That's what it says.

9    Q    Okay.  And that was part of the strategy.  Right, sir?

10   A    Generally it was a strategy to be talking to whoever

11   talked to us, I'll take it that we didn't speak to Gibson Dunn

12   in response to their first letter, but I believe as part of

13   trying to find alternatives there may have been discussion

14   with other people who were also in 1-L or 2-L groups, which is

15   why I don't think we completely ignored their existence, we

16   haven't ignored Gibson Dunn.  But --

17   Q    Right.

18   A     -- which was a fluid period of time and multiple

19   discussions.

20   Q    You were busily negotiating, as we see here on this page,

21   with TPG, Fortress, Barings, Charles Bank and Angelo Gordon at

22   a minimum.  Right?

23   A    Correct.

24   Q    Okay.  And you're not aware of the Finance Committee, or

25   the company I should say, and its advisors negotiating any

1   other comprehensive restructuring transaction structure other

2   than the IPCO transaction and the Gibson Dunn transaction.

3   Right?

4   A    We were looking at, as you well, know, other types of

5   sources of financing including the AB, you know, ABL loans,

6   you know, FLFO, sale of assets and all this other stuff.  So a

7   comprehensive --

8   Q    Comprehensive, sir.

9   A    -- as you define it, no, I don't think so.

10  Q    Now the company ultimately got a term sheet, a

11  preliminary term sheet from the Gibson Dunn Group on May 26.

12  Right?

13  A    I think that's correct.

14  Q    Well, let me -- let's not -- let's not have ambiguity in

15  the Record.  Let's go to Tab 7 in your binder -- no, to Tab 9

16  in your binder, Defendant's 134, it bears the document number

17  250-35 in the Adversary.

18  A    And with apologies, I want to be sure before I say yes to

19  a specific date and specific event, which is why I have

20  answered that way.

21  Q    That's totally fine.  We want a clear Record.

22  A    Okay.  I'm there.

23  Q    And you see this preliminary financing term sheet.

24  Right?  May 26?

25  A    Yes.

1    Q    And this is a preliminary term sheet for a superpriority

2    financing transaction.  Right?

3    A    That's what it says, yes.

4    Q    And this is the first time that anyone had proposed a

5    priming transaction that was not open to all first lien

6    lenders pro rata.  Correct?

7    A    Do you mind if I take a minute and just read through it,

8    please?

9    Q    Sure.

10   A    (Perusing document.)  Can you please repeat the question?

11   Q    Yes.  This is the first time in your work on the Finance

12   Committee for Serta Simmons Bedding that anyone proposed a

13   transaction structure that was a priority priming loan that

14   was not open to all lenders pro rata.  Correct?

15   A    As I sit here today I don't recall another one, there may

16   have been discussions about another one so I can't give you an

17   ambiguous yes or no to that.

18   Q    But you can't identify one.

19   A    I can't identify it as I sit here today.

20   Q    Right.  And you had not spent material time within the

21   Finance Committee analyzing this type of proposal prior to

22   receiving it.  Right?

23   A    Material is an ambiguous term.  Could you repeat the

24   question again, please?

25   Q    Yeah, you hadn't spent material time within the Finance

1    Committee evaluating, discussing this type of transaction

2    structure before getting this inbound from Gibson Dunn.

3    Right?

4    A    We had a whole series of discussions about transaction

5    proposals.  I don't -- as I sit here today I don't recall if

6    we did or did not.  We may have, we may not have maybe

7    discussed an outline of something like this.  I don't recall.

8    Q    Well, Mr. Tepner, you testified earlier that if you spent

9    material time analyzing the transaction, it likely would have

10   been in the Evercore materials.  Right?

11   A    Right.

12   Q    And you can't identify, can you, sir, any discussion in

13   the Evercore materials of this type of transaction type prior

14   to receiving it on May 26.  Right?

15   A    But that doesn't exclude the fact we had wide-ranging

16   conversations about alternatives in a fair number of our

17   Finance Committee meetings.

18   Q    And you testified earlier, sir, and that was truthful,

19   that if you spent material time working on something, it would

20   have been reflected in the materials.  Right?

21   A    I generally think that's true, but --

22   Q    Right.

23   A     -- I can't say it's absolutely true.

24   Q    But that's what you said earlier.  Right?

25   A    Right.

1    Q    Now, Mr. Tepner, you yourself did not have any

2    experience, you'd never been involved in a transaction with

3    the structural features found in Exhibit 134.  Right,

4    Mr. Tepner?  That had a priming loan, exchange of *pari* loans

5    into senior loans where the waterfall was protected?  You were

6    never involved in a transaction like that.  Right?

7    A    I can't recall being involved in a transaction like that.

8    Q    Nor can you identify one that happened prior to Serta

9    Simmons that had those features.  Right?

10   A    I can't think as I sit here today that I had one like

11   that, yes.

12   Q    Now after receiving this illustrative transaction

13   proposal on May 26, by June 5 the Finance Committee had

14   authorized the company's advisors to move forward with the

15   Gibson Dunn Group.  Right?

16   A    Correct.

17   Q    And at no point in that roughly 10-day period did the

18   company go back to the Angelo Gordon Group and say, "Hey, here

19   are indicative terms for a uptier transaction, would you be

20   interested in proposing one?"  Right?

21   A    I do know that the company's advisors engaged in

22   discussions with Angelo Gordon about trying to improve the

23   quality of bids, which they did several times.

24   Q    The IPCO structure.

25   A    IPCO structure.

HARVEY TEPNER - CROSS BY MR. EHRLICH

1    Q    The company's advisors never went to Angelo Gordon and

2    its other group members and advisors and said, "Here are" --

3    as they did in April with illustrative transaction terms and

4    said, "Hey, here is an illustrative transaction, would you be

5    interested in doing something like this?"  Right?

6    A    I don't recall -- I don't recall that they did that

7    specifically or hinted at it or said, "Would you consider it,"

8    I just don't --

9    Q    You're not aware of it.

10   A    I'm not aware of the full range of conversations that --

11   Q    Right.

12   A     -- our advisors had with Angelo Gordon about

13   alternative --

14   Q    But you can't remember telling them to do that either,

15   can you?

16   A    No, I don't think I told them to do that.

17   Q    And there was not competition among the lender groups

18   over the terms of an uptier transaction.  Right?

19   A    Well, you could argue that the IPCO's got elements of an

20   uptier transaction becuase of the splitting of collateral into

21   different pools and one group of lenders would not have access

22   to the other group of lenders' collateral.  So in one sense

23   there's a different type of structural discrimination.

24   Q    But the company never went back to the Angelo Gordon

25   Group and tried to foster competition under the structure

HARVEY TEPNER - CROSS BY MR. EHRLICH

1    found in Exhibit 134.  Right, sir?

2    A    Specifically that?  Not that I can recall.

3    Q    Okay.

4    A    But we did have a competitive process.

5    Q    Right.  Now I think we established earlier that when you

6    reached that handshake deal on June 5, the Gibson Dunn Group

7    had roughly 39 percent of the loans.  Right?

8    A    It had a number, well, below 50.1 percent, yes.

9    Q    Right.  And were you aware that the Angelo Gordon Group

10   had approximately 30 percent of the loans?

11   A    I believe so, yes.

12   Q    And did the company suggest to them that they consider

13   anchoring a transaction of the kind that the Gibson Dunn Group

14   was proposing?

15   A    I believe the company went to Angelo Gordon Group and

16   asked them if they wanted to participate in this type of

17   transaction.

18   Q    Who did they speak with?

19   A    It was reported by our advisors that it's either Evercore

20   or Weil Gotshal.

21   Q    Did the company ever propose to the Gibson Dunn Group

22   that the exchange be open to all first lien lenders?

23   A    I remember discussing that in the Finance Committee about

24   having it be more open and whether that was practical to the

25   time constraints and whether we'd still have the anchor

1    investors in it.

2    Q    And the answer is "no."  Right, Mr. Tepner?

3    A    The answer to?

4    Q    To whether the company ever suggested that the

5    transaction that was done be open to all lenders, is the

6    answer is "no," it did not suggest that.

7    A    Well, I know we discussed it in the Finance Committee --

8    Q    Okay.  But you never suggested it, sir.

9    A    I don't recall if we asked our advisors to go back to the

10   Gibson Dunn Group and open it up and whether that was part of

11   the negotiations with them.

12   Q    And part of the reason that the company didn't open the

13   uptier transaction to competition is because Advent didn't

14   want the deal to go to the Angelo Gordon Group.  Isn't that

15   right?

16   A    I don't think I had any knowledge of that fact.

17   Q    Okay.  Well, let's look, if we can, at Defendant's 176.

18            MR. EHRLICH:  And this is, for the Record, ECF

19   250-83.

20   BY MR. EHRLICH:

21   Q    And you can look at it as much as you like, I'd like to

22   direct your attention to the bottom of page 3 of 14 of this

23   exhibit, which is an email exchange between Mr. Shaw and

24   Mr. Prince on June 4, 2020.

25            Now this is the day before the Finance Committee voted to

1    move forward with the Gibson Dunn Group.  Right?

2    A    That's June 4.

3    Q    And the Finance Committee has not yet given direction to

4    the advisors to approve the Gibson Dunn transaction.  Right?

5    A    No, we had not.

6    Q    And Mr. Prince says to Mr. Shaw here, "We should start

7    socializing with Barings, make sure they don't get looped into

8    AG," et cetera.  That's the total killer move if they get

9    taken away from us.  Right?

10            MS. BARRINGTON:  Objection, Your Honor, I think that

11    counsel must lay foundation, the witness is not on this email

12    chain.

13            MR. EHRLICH:  I'm not seeking to admit it. I'm

14    seeking to get his reaction to it.

15            THE COURT:  Then I misunderstood the question.  Can

16    I ask you do it again, please?

17            MR. EHRLICH:  Sure.

18    BY MR. EHRLICH:

19    Q    Well, first do you see the email from Mr. Prince

20    displayed on the screen?

21    A    I see that, yes.

22    Q    And did anyone ever tell you that Mr. Prince was trying

23    to keep Barings from teaming up with the Angelo Gordon Group

24    even before the Finance Committee had approved the Gibson Dunn

25    deal?

1    A    Not that I recall, about having any direction about that

2    at all.

3    Q    Now I'd like to shift gears, Mr. Tepner.  You testified

4    on direct examination that the Finance Committee approved the

5    June 2020 transaction.  Right?

6    A    Yes.

7    Q    And you as a member of that Committee and a fiduciary of

8    the company.  Right?

9    A    Yes.

10   Q    And as part of that transaction Serta re-purchased first

11   lien loans of the participating lenders.  Right?

12   A    Yes.

13   Q    And now we all know, sir, right, that the Court has held

14   that that exchange was permitted under the open market

15   purchase exception.  Right?

16   A    Yes.

17   Q    But there were components of the transaction other than

18   just the exchange of loans.  Right?  Many of them.

19   A    I'm going to let you offer them up, please.

20   Q    Okay.  Well, there was a new inter-creditor agreement,

21   right, inter-creditor agreement.

22   A    Yes.

23   Q    And there was a new priority term loan agreement, and as

24   part of the June 2020 transaction the first lien term loan

25   agreement was amended in a number of ways by a majority of the

1    lenders.  Right?

2    A    Yes.

3    Q    And that majority was the group that was participating in

4    the transaction.  Right?

5    A    Yes.

6    Q    So they were exchanging out of the loan as they were

7    amending the terms for the people who would be left there.

8    Right?

9    A    Yes.

10   Q    And the people who'd be left there who were not

11   participating were going to be governed by those changes.

12   Right?

13   A    Yes.

14   Q    Now if I could ask you to take a look at Exhibit 279.  I

15   believe that is in the -- one of those two separate binders

16   that I handed to you earlier, Mr. Tepner.

17        Oh, I am again wrong about that.  Ms. Prosco (phonetic)

18   reminds me it's actually Tab 15 in the binder before you.  I

19   apologize, Mr. Tepner.

20        MR. EHRLICH:  And this is Defendant's 279, it's

21   252-90 in the Adversary.

22   BY MR. EHRLICH:

23   Q    And if we go to the second page, page 2 -- oh, we have we

24   up.  This is entitled,"Amendment Number 1 to the First Lien

25   Term Loan Agreement."  You with me?

1    A    Yes.

2    Q    And that is a document that you approved as a member of

3    the Committee.  Right?

4    A    I believe I did, yes.

5    Q    And you recognize this as such?

6    A    I just don't have specific recall now on this document.

7    I know we approved the transaction, I know the transaction had

8    a pile of documents attached to it.  I believe I received

9    those documents.

10   Q    And one of those is an amendment to the first lien term

11   loan agreement.  Right?

12   A    Yes.

13   Q    And your recognize this is Amendment Number 1 to first

14   lien term loan agreement?

15   A    I recognize it says what it says.

16   Q    And an executed version.

17          MR. EHRLICH:  I would offer Defendant's 279, Your

18   Honor.

19          THE COURT:  Any objection?

20          MS. BARRINGTON:  None, Your Honor.

21          THE COURT:  Then without objection it's admitted.

22       (Exhibit 279 received in evidence.)

23   BY MR. EHRLICH:

24   Q    Now if we go to the bottom of this page where it says,

25   "Section 1," you see that this document states that "The

1      existing term loan agreement effective as of and subject to

2      the occurrence of the first amendment effective date as

3      amended," and it states that the stricken text is deleted and

4      the double underlined text was added.  Do you see that, sir?

5      A    I do.

6      Q    Okay.  Now let's, if we can, turn to page 105 of the

7      amended agreement which follows the covering amendment, it's

8      page -- it's ECF 252-97, page -- actually we're going to start

9      at page 3 of 42.  Page 101 at the bottom.

10          Are you with me, Mr. Tepner?

11     A    Not yet.

12     Q    Okay.  Take your time.

13          (Pause in the proceedings.)

14              THE WITNESS:  It's actually a little easier for me

15     if you use the page numbers in the bottom right.

16     BY MR. EHRLICH:

17     Q    1095, that type of number?

18     A    Yeah, that -- yes, sir.

19          (Pause in the proceedings.)

20              THE WITNESS:  I'm sorry.  Got it.

21     BY MR. EHRLICH:

22     Q    Okay.  And this section is entitled, "Article 5,

23     Affirmative Covenants."  Right?

24     A    That's what it says, yes.

25     Q    And you're generally aware based on your experience what

HARVEY TEPNER - CROSS BY MR. EHRLICH

99

1    an affirmative covenant is.  Right?  On a lender -- a borrower

2    rather?

3    A    I think so, yes.

4    Q    Yeah, it's things that they have to do --

5    A    Yes.

6    Q    -- under the agreement.  And if we look at Section --

7    the very first one, Financial Statements and Other Reports,

8    little (b) says, Annual Financial Statements.  Right?  You see

9    me?

10   A    Correct.

11   Q    And that's pretty typical, right, that a borrower has to

12   deliver financial statements to its lenders?

13   A    It's pretty typical, yes.

14   Q    Yeah, and if you turn the page, Mr. Tepner, on little

15   (b), you will see that it's -- there's language that is

16   stricken.

17        And on the carryover it states that "The borrower is

18   required to deliver with respect to such consolidated

19   financial statements a report thereon of an independent

20   certified public accountant of recognize national standing,"

21   and then there's some language struck.  Right?

22   A    Yes.

23   Q    And it used to say that the report would not be subject

24   to a going concern opinion.  Right?

25   A    Yes.

HARVEY TEPNER - CROSS BY MR. EHRLICH

1    Q    And now that language is stricken in the -- by the

2    lenders on the way out the door.  Right?

3    A    Yes.

4    Q    And a going concern opinion is not a good thing.  Right?

5    You have an accounting background.

6    A    A going concern does emphasize that there's a going

7    concern.

8    Q    Right.  And would it surprise you to learn that there's

9    no -- that the priority term loan agreement that the

10   exchanging lenders entered into does not have this language

11   stricken, that it remains there?

12   A    I'm sorry, could you repeat the question?

13   Q    Yeah, would it surprise you to learn that this language

14   was retained in the priority term loan agreement, but stricken

15   in this?

16   A    I just --

17   Q    You don't know.

18   A     -- I just don't know.

19   Q    Okay.

20   A    I just don't know.

21   Q    Let's turn ahead to ECF, it's 252-97, 12 of 42,

22   Mr. Tepner, it's 1104 at the bottom.

23   A    Right.

24   Q    And this section is entitled, "Negative Covenants."

25   Right?

HARVEY TEPNER - CROSS BY MR. EHRLICH

1    A    Yes, it is.

2    Q    And you understand what negative covenants are generally.

3    Right?

4    A    Generally I believe I do.

5    Q    It's stuff the borrower can't do.  Right?

6    A    Right.

7    Q    And if you turn ahead -- well, if we start actually first

8    on this page, the very first one, 601, is indebtedness.

9    Right?

10   A    Yes.

11   Q    And that's among the most important of the covenants.

12   Right?

13   A    I'm not going to -- I can't say yes or no to that, but I

14   hear what you're saying.

15   Q    How much debt a company can take on when you're a lender

16   is really important to you, no?

17   A    Yes.

18   Q    And it says, "Indebtedness, top borrower shall not nor

19   shall permit any of its restricted subsidiaries to directly or

20   indirectly create, incur, assume," da da, da da, da da,

21   "except."  Right?

22   A    Yep.

23   Q    And then let's go to page 17 of 42.  It's 1109 for you,

24   Mr. Tepner, at the bottom.

25   A    Thank you.

1    Q    And it used to say in little sub (z) here, "Incremental

2    equivalent debt."  Right?

3    A    Well, it still says incremental equivalent --

4    Q    Right.  But you say only incremental equivalent debt.

5    Right?

6    A    The double underline seems to be an addition.

7    Q    Right.  And in addition now there's, for the avoidance of

8    doubt, any PTL facility and any PTL incremental debt.  So the

9    lenders on the way out the door amend this agreement to allow

10   the creation of the PTL facility and PTL incremental debt.

11   Right?

12   A    Are you asking are the PTL lenders going out the door?

13   Q    The 1-L lenders exchanging out of this agreement

14   undertook this amendment.  Right?

15   A    Yes, I think that's correct.

16   Q    And let's go back, if we could, to -- for you,

17   Mr. Tepner, it's 1032, on the Docket it's 252-95, page 19.

18   A    It's 1092 you said?

19   Q    1032.

20   A    1032.  Thank you.

21   Q    And on the Docket 252-95, in the adversary 19 of 40.

22   A    Okay.

23   Q    And this is the definition of incremental equivalent

24   debt.  Right?

25   A    It's the definition of incremental equivalent debt, it

1     appears, yes.

2     Q    And before the lenders, exchanging lenders amended it it

3     was indebtedness in the form of *pari passu* senior secured or

4     unsecured notes or junior secured or unsecured notes or loans.

5     Right?

6     A    That was going to be struck language, yes.

7     Q    And now if you read the full paragraph and the final

8     clause, it allows senior, *pari* or junior in right of payment

9     with respect to the 1-L lenders who were left under this

10    agreement.  Right?

11    A    All right.  One more time, please?

12    Q    Yes.  As amended by the exchanging lenders at the time

13    that they left this agreement, the agreement was changed to

14    allow the incurrence of not just *pari* or junior debt, but also

15    senior debt.  Right?

16    A    I'm not trying to be difficult, I would like to give it a

17    very careful read before I gave you a yes or no.

18    Q    Absolutely.

19    A    And I want -- so -- (Perusing document.)

20         THE COURT:  While he's doing that, you offered 279

21    as 252-90, but then you referenced other parts.  I think what

22    you meant to do was offer 279 in its entirety which is 252-90

23    through 252-99.  I just want to make sure I understood that.

24         MR. EHRLICH:  That's correct, Your Honor.  Thank you

25    for the clarification.  It was for reasons that aren't totally

1     clear to me had to be filed in 10 parts.

2               THE COURT:  My guess is there was a size

3     limitation --

4               MR. EHRLICH:  Yeah.

5               THE COURT:  -- and you just broke it up.  No big

6     deal.  I just -- I just wanted to make sure it was all

7     included.

8               MR. EHRLICH:  Thank you.

9               THE COURT:  Uh-huh.

10              THE WITNESS:  All right.  Could you repeat your

11    question?

12    BY MR. EHRLICH:

13    Q    Yes.  The question is and you know, sir, from approving

14    the transaction that the first lien credit agreement which

15    previously only permitted *pari* and junior additional

16    indebtedness was amended to allow senior debt to be incurred,

17    senior to this first lien creditor agreement, right?

18    A    Senior in terms of payment, yes.

19    Q    Yes.  Now, Mr. Tepner, the Committee approved this

20    transaction on June 20, correct?

21    A    That's correct, yes.

22              MR. EHRLICH:  And we looked on your direct

23    examination at DX-49.  I think we have it in our binder as

24    well, just to kill the maximum number of trees.

25              If I could ask you bring it up?  And DX-249.  It's

1    actually I think might be in one of those separate binders I

2    have.

3                Are you with me, Mr. Tepner?

4                THE WITNESS:  Not yet.  You're going to hopefully

5    guide me there.

6                MR. EHRLICH:  Oh, okay.  But do you have DX-249 in

7    front of you?

8                THE WITNESS:  Which book am I looking in?  The

9    smaller of the --

10               MR. EHRLICH:   It's -- may I approach, Your Honor?

11               THE COURT:  Of course.

12               MR. EHRLICH:  Here, one --

13               THE WITNESS:  Oh, I see, thank you.

14               MR. EHRLICH:  Of course.

15               THE WITNESS:  Okay.

16               MR. EHRLICH:   Okay.

17   BY MR. EHRLICH:

18   Q    So now this -- we looked at this -- you looked at this

19   exhibit rather on direct examination.  This is the minutes of

20   the June 20 Committee meeting, --

21   A    Yes.

22   Q    -- right?  And this is the meeting -- this is the big

23   meeting where you approved the final documents, right?

24   A    This is the meeting where we approved the transaction.

25   Q    Right.  And it closed two days later, correct?

HARVEY TEPNER - CROSS BY MR. EHRLICH

1    A    Believe that's correct, yes.

2    Q    Okay.  And if we go to page 10 of 41, there were

3    resolutions that were approved, right?

4    A    That's correct.

5    Q    And on page 11 we see that the PTL agreement was

6    approved, right?  That's the new priority term loan agreement.

7    A    Hang on a second, please.

8    Q    Sure.

9    A    Sorry.  What page are you referencing?

10   Q    I'm on page 11 of 401.

11   A    Yes, okay.

12   Q    And then on the next page, or actually two pages ahead,

13   13 of 401, we see you approve the first lien amendment, right?

14   A    Yes.

15   Q    And were these the final documents or was management

16   empowered to make whatever additional changes were necessary

17   to close the transaction?

18   A    We approved the transaction.  I believe the documents

19   were provided to us.  There was an explanation by counsel what

20   was in the documents.  I don't know if there were amendments

21   thereafter, but if there were, I'm sure they weren't material.

22   But I just don't know, just don't recall, sorry.  I knew then

23   but I just don't recall now.

24        I felt uncomfortable with the review that we got from

25   counsel at the time and the advice of counsel of what was in

1    it.  And that's that.

2    Q    Okay.  If I could direct your attention, Mr. Tepner, to

3    -- well, you see on page 19 of 401 there's a header that says

4    draft transaction documents, right?

5    A    Where are we now?

6    Q    Page 19 of 401.

7    A    Hang on a second.

8    Q    Sure.

9    A    Okay.

10   Q    And then they follow if you turn the page to 20, you see

11   the superpriority term loan agreement follows?

12   A    I do.

13   Q    Okay.  And I'd like to look, if we could, at page 122.

14   Excuse me, 147.  I apologize.

15       And you testified on direct examination that there is an

16   indemnity in this transaction, right?

17   A    Correct.

18   Q    And the indemnity was important because by June 20th, the

19   certain parties had filed the litigation, right?

20   A    Correct.

21   Q    And in fact that litigation I'll represent to you was

22   filed on June 11th.

23   A    Okay.

24   Q    So it was ongoing at the time -- or it had already been

25   filed, I should say, by the time this transaction document was

1    approved.

2    A    Correct.

3    Q    And if we look at "B" here on page 147, you can read as

4    much of it as you like, but I -- what I'd like to do is direct

5    your attention to the clause in the middle of the paragraph

6    that begins with the underlined word "provided."  And it says:

7         "Provided that such indemnity shall not as to any

8    indemnitee be available to the extent that any loss, claim,

9    damage or liability is determined by a final and non-

10   appealable judgment of a court of competent jurisdiction or

11   document in any settlement agreement referred to below to have

12   resulted from the gross negligence, bad faith, or willful

13   misconduct of such indemnitee or, to the extent such judgment

14   finds or any settlement agreement acknowledges any such loss,

15   claim, damage, or liability resulted from such person's

16   material breach of the loan document."

17        Do you see that?

18   A    I do.

19   Q    And in your experience, sir, that's pretty typical.  You

20   don't indemnify for fraud and you don't indemnify for material

21   breach, right?

22   A    I believe that's correct, yes.

23   Q    Okay.  And in the document you approved on June 20th,

24   that's the indemnity that appears, correct?

25   A    Yes.

1    Q    Okay.  Now I would like to look if I could at ECF 865-42.

2    I will get you the reference.  Mr. Tepner, it's in a separate

3    binder for you again.

4         And this is Debtors' Exhibit 252.

5    A    Okay.

6         (Pause)

7    Q    Are you with me, Debtors' 252?  The -- it's superpriority

8    term loan agreement.

9    A    Yeah, I'm with you.

10        MR. EHRLICH:  Okay.  Terrific.  And for the record,

11   this is in the main case 865-42, Debtors' 252.

12   BY MR. EHRLICH:

13   Q    And, Mr. Tepner, you recognize this, excuse me, as the

14   superpriority term loan agreement.

15   A    Yes.

16   Q    And if you turn -- and it's marked at the top execution

17   version, right?

18   A    Yes.

19   Q    And if you were to turn say to page 145 of 558, which is

20   2168 at the bottom, you will see that it's executed, right?

21   A    One second, please.

22   Q    Sure.

23   A    Yes.

24        MR. EHRLICH:  Okay.  And, Your Honor, I'd move, to

25   the extent it's not in evidence, Defendant's 252.

1          THE COURT:  I don't show that it is.  Any objection?

2          MS. BARRINGTON:  None, Your Honor.

3          THE COURT:  All right.  Then it's admitted.

4      (Exhibit 252 received in evidence.)

5  BY MR. EHRLICH:

6  Q    Now I'd like to direct your attention, Mr. Tepner, to

7  page 123 of the document.  It's the ECF page 129.  And the

8  Bates page I guess is 2152, if that's easier for you.

9  A    Thank you.

10          MR. CARLOCK:  123.

11      (Pause in the proceedings.)

12          THE WITNESS:  Okay.

13  BY MR. EHRLICH:

14  Q    Okay.  Are you with me?  You see it's the same indemnity

15  section, Section 9.03?

16  A    I do.

17  Q    Okay.  Now let's look at Section B again.  And if you

18  turn to the next page, it's section -- paragraph "B" carries

19  over.  And that same proviso is there.

20      Do you see that?

21  A    Hang on a sec.

22  Q    Sure.

23  A    All right.

24  Q    Sort of about, I want to say roughly, ten lines down.

25  It's also on the screen if that's easier.

1    A    Am I allowed to mark this just for --

2    Q    Sure.

3    A    Just to keep my eyes focused.  Okay.  Go ahead.

4    Q    Absolutely.  And so it's the same carveout for gross

5    negligence, bad faith, or willful misconduct and material

6    breach of the agreement.  But now you will see there is a new

7    parenthetical here starting with "excluding."  And it says:

8         "Excluding in each case for the avoidance of doubt any

9    indemnitee's participation in the exchange transactions and

10   the transactions."

11        Do you see that?

12   A    I do.

13   Q    So, in fact, what the final document does, which the

14   document you approved on June 20th does not, is indemnify the

15   participating lenders for fraud, bad faith, and gross

16   negligence, right, in connection with the transaction?

17   A    Can you please repeat the second part --

18   Q    Yes.

19   A    -- of your question?

20   Q    This document, unlike the version you approved two days

21   earlier, indemnifies the participating lenders for fraud, bad

22   faith, or willful misconduct in connection with the

23   transaction, right?

24   A    I think you're asking me to come to a legal conclusion.

25   And I'm not sure I understand how it does that.

HARVEY TEPNER - CROSS BY MR. EHRLICH

1    Q    Okay.  But you would agree with me, sir, that there is

2    now an exclusion here that says excluding in each case for the

3    avoidance of doubt participation -- the indemnity's

4    participation in the exchange transaction, right?

5    A    I see that, yes.

6    Q    And you don't know who negotiated this, do you?

7    A    Well, obviously one of the parties that was --

8    Q    Right.

9    A    -- a party to it was our counsel and our advisors.

10   Q    Right.  But you didn't participate in the negotiations,

11   right?

12   A    I did not participate in that negotiation, no.

13   Q    And this was after you approved the document, right?

14   A    Probably, yes.

15   Q    And you don't know why it was added, do you?

16   A    Well, I think I could guess why it's added.

17   Q    Okay, but you don't know.  I don't want you to guess.

18   A    You know, I may have known at the time.  We may have been

19   advised at the time.  I have a pretty good basis to answer the

20   question, but I'll leave it at that.

21   Q    Okay.  And the economic terms by June 20th when you

22   approved the agreement had been agreed, right?

23   A    Yes.

24   Q    And the 50.1 percent had been achieved, right?

25   A    Yes.

1    Q   And the deal was effectively done because they brought it

2    to the Committee for approval, right?

3    A   Yes.

4    (Pause)

5    Q   And you're aware, Mr. Tepner, that in connection with

6    leverage loan agreements of the kind at issue here, borrowers

7    maintain disqualified institution lists, right?

8    A   I'm aware of that.

9    Q   And that's a list of institutions not permitted to hold

10    the loans in question, right?

11    FEMALE SPEAKER:  Slow down.  That what?

12    BY MR. EHRLICH:

13    Q   That's a list of institutions not permitted to hold the

14    loans, right?

15    A   Yes.

16    Q   And when this transaction was entered into in June of

17    2020, each of the members of the Angelo Gordon Group was added

18    to the Disqualified Institutions List for the new priority

19    loans, right?

20    A   I just don't recall that.

21    Q   You have no reason to doubt that.

22    A   I'll take at your face.

23    MR. EHRLICH:  Okay.  Thank you, Mr. Tepner.  I have

24    nothing further.

25    Ms. Prosco once again corrects me that I had said

1     Defendant's 252 earlier which is, you know, an occupational

2     hazard from someone who's not always in Bankruptcy Court.  It

3     was Debtors'.

4                    THE COURT:  No, I got it.  I made a specific note.

5     Thank you.

6                    MR. EHRLICH:  Had no doubt.

7                    THE COURT:  Thank you.

8                    All right, who's next?

9                    Afternoon.

10                    MR. GOLDMAN:  Hi, Your Honor.  Brian Goldman of

11    Holwell, Shuster, and Goldberg for the LCM parties.

12                    Good afternoon, Mr. Tepner.  I represent the LCM

13    lenders in this case and have just a few questions for you.

14                    THE WITNESS:  Sure.

15                                    CROSS-EXAMINATION

16    BY MR. GOLDMAN:

17    Q    To your knowledge, as a member of the Finance Committee,

18    was LCM Asset Management or any of the funds its manages ever

19    invited to participate in the June 2020 transaction before it

20    was announced?

21    A    I don't recall if they were or not.

22    Q    And to your knowledge was LCM ever invited to participate

23    in any alternative transaction proposed prior to the June 2020

24    transaction?

25    A    I just don't recall one way or another today.  May have

1    known then, but I just don't recall today.

2    Q    Okay.  Thank you.

3         Did the Finance Committee consider whether LCM would be

4    able to offer a competitive bid to participate in the June

5    2020 transaction?

6    A    Not that I know of.

7    Q    And did the Finance Committee consider whether LCM --

8    A    Could you repeat the question for the prior question?

9    Q    Sure.  The question was:  Did the Finance Committee

10   consider whether LCM would be able to offer a competitive bid

11   to participate in the June 2020 transaction?

12   A    I recall we discussed LCM.  We may have discussed that.

13   I just don't recall.

14   Q    Okay.  Did the Finance Committee consider whether LCM

15   would be able to offer any solution to the restructuring

16   problems faced by the company in the March to June 2020 time

17   period?

18   A    Same answer as the prior question.  I recall discussing

19   LCM.  I just don't remember full context of the discussion.

20   Q    Do you recall the specifics of any solution that LCM may

21   have offered to the company's restructuring strategy in that

22   time period?

23   A    I don't recall, given that solution.

24   Q    And you don't recall the --

25        (Automated announcement.)

HARVEY TEPNER - CROSS BY MR. GOLDMAN

1          THE COURT:  My apologies for that.

2          MR. GOLDMAN:  Thank you.

3          THE COURT:  It's we didn't cut it off at lunchtime

4    so it's going to do that again, so.

5          MR. GOLDMAN:  Okay.  Fair enough.

6          THE COURT:  But my apologies.

7    BY MR. GOLDMAN:

8    Q    And, Mr. Tepner, you don't recall the consent of

9    nonparticipating lenders being sought to amend the loan

10   documents, do you?

11   A    Could you repeat that, please?

12   Q    You don't recall the consent of nonparticipating lenders

13   being sought to amend the loan documents that as you walked

14   through with Mr. Ehrlich ended up being amended.

15   A    Recall that.

16   Q    And, Mr. Tepner, you agreed generally in the April 2020

17   time period in evaluating its options that Serta should be

18   talking to its constituent lenders about how to find

19   additional liquidity, right?

20   A    Yes.

21   Q    But Serta in fact did not solicit the entire lender

22   group; is that right?

23   A    That is correct.

24   Q    And the Finance Committee also never counter-proposed a

25   version of the uptier exchange that had participation rights

1     for all first lien lenders on a pro rata basis, right?

2     A    Could you please repeat the question?

3     Q    Of course.

4     A    I think there's a few questions in there so --

5     Q    Well, it's intended -- I'll try to make sure it's just

6     one question, okay?

7          The Finance Committee never counter-proposed a version of

8     the uptier exchange that had participation rights for all

9     first lien lenders pro rata.

10    A    Not that I know of.

11    Q    Okay.  And, Mr. Tepner, you agree that priority of

12    payment is a very important feature to anybody who signs up to

13    lend money to a company, right?

14    A    Generally, yes.

15    Q    In fact, priority of payment is fundamental to such a

16    deal, right?

17    A    Generally, yes.

18              MR. GOLDMAN:  No further questions.

19              THE COURT:  All right, thank you.

20         (Pause in the proceedings.)

21              MR. MILLAR:  Good morning, Your Honor.  For the

22    Record, James Millar on behalf of Citadel.

23              Morning, Mr. Tepner.  How are you?

24              THE WITNESS:  Morning, Mr. Millar.  How are you?

25              THE COURT:  I just wonder what time --

1           THE WITNESS:  Good afternoon, sorry.

2           THE COURT:  -- zone you're -- yeah.  I'm just

3    wondering what time zone you're in.

4           MR. MILLAR:  Me?

5           THE COURT:  Yes.

6           MR. MILLAR:  Why?

7           THE COURT:  You said good morning to both of us.

8           MR. MILLAR:  Oh, that's a good question, right?  I

9    mean, that's actually not a good question to start my cross

10   with.  I thought it was morning.  Maybe it's not.

11          THE COURT:  It is somewhere, right?

12          MR. MILLAR:  It is somewhere, yeah.

13      (Laughter.)

14                         CROSS-EXAMINATION

15   BY MR. MILLAR

16   Q    Mr. Tepner, you understand that the company's plan

17   includes a post-reorganization indemnity with respect to the

18   2020 transaction.  And do you know the range of the company's

19   potential liability on that indemnity post-reorganization?

20   A    The range?  I don't -- sure I understand the question.

21   Q    So, well, what's the value of the indemnity?  Like how

22   much -- what's the value of the liability on the indemnity?

23   A    We nor our advisors, to the best of my knowledge, have

24   ever valued that.  I think it's a very hard thing to value.

25   Q    Okay.  But you agreed to it in the settlement with the

1    Gibson Group.

2    A    Yes, we did.

3    Q    And it could be a pretty big number, right?

4    A    This is a theoretical discussion.

5    Q    Well, there is a risk, is there not, that if that

6    indemnity were ever called, it would put the company back in

7    Chapter 22, right?

8    A    Theoretical discussion, if there's an indemnity and it's

9    called because there's claims against the indemnitees, if I

10   said that right, people are going to argue the number could be

11   very, very large, and they'd come back to the company for

12   payment under that.

13         MR. MILLAR:  Your Honor, may I put something on this

14   little screen here?

15         THE COURT:  Of course.

16         MR. MILLAR:  Okay.  I'm sorry, first, for the

17   Record, this is Docket 104 in Case 23-03007 entitled "Debtors'

18   Omnibus Reply to Objections to Debtors' Emergency Motion For

19   an Order Declaring That the Automatic Stay Applies to Certain

20   Non-Debtor Parties or, Alternatively, Extending the Automatic

21   Stay to Certain Non-Debtor Parties and Preliminarily Enjoining

22   the Prepetition Action."

23   BY MR. MILLAR:

24   Q    And, Mr. Tepner, I'd like to point you to -- well, wait a

25   minute.  That's the wrong page, sorry.

HARVEY TEPNER - CROSS BY MR. MILLAR

1       I'd like you to point -- you see this little sentence

2   here?  This is in the Debtors' paper; you understand that.

3   A    Yes.

4   Q    And --

5   A    Can you show me the first page of that paper?

6   Q    Oh, sure.

7   A    The cover page.

8   Q    There we go.

9   A    And the date, can you slide the slide down a little bit?

10  Q    It's -- I can't figure it out.  There it is.  March 6,

11  2023.

12  A    Thank you.

13  Q    Okay.  And so you understand that the Debtor said to this

14  Court the following two sentences.  The first is, "Moreover

15  the Reorganized Debtors will indemnify the non-Debtor parties

16  for any claims that arise from litigation of the 2020

17  transaction," correct?

18  A    Yes.

19  Q    And the second is, "Thus, the Debtors face the risk of

20  landing back in bankruptcy in the event of an adverse

21  decision," correct?

22  A    Yes.

23  Q    And you agree with that, correct?

24  A    On the face of it, it's a very broad statement, but, yes.

25  Q    Well, hang on.  I don't want to belabor it.  But you're

1    the one that directs the advisors, right?

2    A    Yes.

3    Q    And they filed this paper in this court, right?

4    A    Yes.

5    Q    And you filed this paper in support of a motion that was

6    granted by this Court, correct?

7    A    Yes.

8    Q    So you're not disavowing that statement, are you?

9    A    No.

10   Q    Would it be better for the company to get exactly the

11   same deal that is proposed under this plan but to discharge

12   the indemnity in bankruptcy?

13   A    That's a theoretical question.

14   Q    Theoretical or not, would it be better to get exactly the

15   same deal --

16   A    It --

17   Q    -- proposed in the plan --

18   A    Always better if you can get "X" for something less than

19   "X" if you offer less consideration.

20   Q    Okay.  So would it be better to get exactly the same deal

21   that is proposed under this plan, except the company is not

22   subject to the indemnity?

23   A    Theoretically it would be better if we could have a plan

24   reorganization come out of bankruptcy, and have a viable,

25   confirmable plan that allows -- puts the company on real

HARVEY TEPNER - CROSS BY MR. MILLAR

1   footing, sure.

2   Q    Okay.  So you're saying "yes" to my question?

3   A    It's a theoretical question so I'm giving you a

4   theoretical yes.

5   Q    Did you ever draw a line in the sand with the negotiating

6   parties and say, "I'm not going to agree to the indemnity"?

7   A    Finance Committee never said that.

8   Q    Okay.  What do you think would happen if you proposed the

9   exact same plan, but without the indemnity?

10  A    I'm not -- again, it's a theoretical question.  We'd have

11  to have a confirmable plan.  Company has an interest in having

12  confirmable plan that would take us through a Chapter 11

13  without delay, without disruption for our customer

14  relationships, our supply relationships, our employee morale,

15  et cetera, et cetera.  I can talk about that as much as you

16  would like.  But I'm not sure I can answer it with any real

17  facts other -- you know, factual basis other than a

18  theoretical basis.

19  Q    Okay.  What's the downside that you worry about, if you

20  were to draw that line in the sand?

21  A    That if we didn't have the indemnity and we could get

22  everything else done as the plan is constituted --

23       THE COURT:  No, that wasn't his question.  His

24  question was that if you said we're not doing the indemnity,

25  what do you think would happen?  That was his question.

1           THE WITNESS:  Well, I think if we did not do the

2      indemnity today, I don't think we would have a confirmable

3      plan.

4      BY

5      Q    And what's the downside to that?

6      A    Not having a confirmable plan, the delay in exiting

7      Chapter 11, the effect on the business, the effect on your

8      customers, the suppliers, employee morale.  I think it's a

9      very negative effect.  Whether or not we can get some

10     alternative plan in place.

11     Q    Or maybe even liquidation, right?

12     A    Or maybe even liquidation.

13     Q    All right.  So on the one hand, the choice is plan with

14     everything but taking out the indemnity.  And on the other

15     hand, it's all these bad things, company stays in bankruptcy,

16     maybe liquidates, employees are upset, business goes in the

17     tank.

18          What do you think the counterparty -- what do you think

19     the Gibson Group would do?

20     A    I think the indemnity is part of the deal and it's

21     important to them so I can only speculate that they would

22     withdraw the support for the plan.

23     Q    Okay.  What do you think they would do if they were given

24     those two choices?

25     A    I can't speak for them.  I'm not them.

1   Q    Okay.  But would you agree that the choice where the plan

2   stays exactly how it is but without the indemnity is better

3   than the choice where all these bad things that you testified

4   to might happen?

5   A    Choice for the Gibson Group, the choice for the company,

6   the choice for who?  I'm not sure I understand the question.

7   Q    Okay.  You don't think that -- well, let me try the

8   question once more.

9        Choice plan just as written but no indemnity or all the

10  bad things that lead to a deterioration in value for all the

11  stakeholders, all the bad things that you just testified to.

12              MS. BARRINGTON:  Your Honor, --

13  BY MR. MILLAR:

14  Q    You're negotiating with them.  What do you think they're

15  going to do?

16              MS. BARRINGTON:  -- objection, speculation.

17              THE COURT:  Sustained.

18              MS. BARRINGTON:  Thank you.

19              THE COURT:  I've been waiting.

20  BY MR. MILLAR:

21  Q    Mr. Tepner, are you -- if there was a Bankruptcy Code

22  section that disallows the indemnity, would you want the

23  Debtor to avail itself of that?

24  A    Can you please repeat the question?

25  Q    If there was a Bankruptcy Code section that disallowed

1    the indemnity, would you want the Debtor to avail itself of

2    that?

3                MS. BARRINGTON:  Objection, Your Honor, speculation.

4                THE COURT:  So I'm going to raise my own objection.

5    Lay the foundation if you're going to do this.  I don't know

6    what --

7                MR. MILLAR:  Let me --

8                THE COURT:  -- effect it's going to have, but go

9    ahead.

10               MR. MILLAR:  Let me just try one other question,

11   Your Honor.

12   BY MR. MILLAR:

13   Q    Do you understand there is a dispute presently before the

14   Court about whether the prepetition indemnity is disallowable

15   under Section 502(e)(1)(B)?

16   A    I don't know what Section 502(e)(1)(B) is specifically,

17   so I'm not sure I can answer the question.

18   Q    Okay.  But you're in charge of directing your advisors,

19   right?

20   A    Yes.  Finance Committee is in charge of directing the

21   advisors.

22   Q    Okay.  I just want to show you one other document.  This

23   is Document 879 in the main case, case 23-90020, page 112,

24   page 145.  This is the Debtors' confirmation brief.

25               Let's see here.  This is not intuitive to me.

1          THE COURT:  It's hard to read when you're moving it

2     around like that.

3          MR. MILLAR:  Well, it's hard for me to move it

4     around.  Okay.

5     BY MR. MILLAR:

6     Q    You understand this is the Debtors' confirmation brief.

7     A    I'll take it from your --

8     Q    Okay.  I'll represent to you that this is the Debtors'

9     confirmation brief.

10         Okay.  Paragraph 198, let's just go through it quickly.

11    "Finally, the Citadel objection argues that the indemnity

12    claim filed by the PTL lender group should be disallowed under

13    Section 502(e)(1)(B) of the Bankruptcy Code because it is

14    contingent, a claim for reimbursement, and the claimant is

15    co-liable with respect to the claim."

16         Do you see that?

17    A    I do.

18    Q    Next paragraph.  "The Debtors acknowledge that the

19    prepetition indemnity claim is both contingent and a claim for

20    reimbursement or contribution."

21         Do you see that?

22    A    I do.

23    Q    "However, the Section 502(e)(1)(B) standard is

24    conjunctive and requires that all three factors be satisfied

25    for disallowance."

1          Do you see that?

2     A    I do.

3     Q    All right.  Now let's go to the next -- all right --

4     sentence.

5          "Putting aside that the go-forward indemnity is part of a

6     settlement and is not assumed, in any event the element of co-

7     liability is not met, at least not with respect to each and

8     every cause of action allegedly held by the non-PTL lenders

9     against the PTL lenders and, therefore, disallowance is not

10    applicable."

11         Do you see that?

12    A    I do.

13    Q    Does that seem strange to you?

14              MS. BARRINGTON:  Objection, Your Honor.

15              THE COURT:  So let me ask you.  Given that a deal

16    has been negotiated with the Committee that's got a cap, why

17    does the Debtor care whether it's disallowed or allowed?  If

18    it's a general unsecured claim, it's a general unsecured

19    claim.

20              MR. MILLAR:  Sorry.  The -- it's got a deal with the

21    Debtor for a cap.  I'm sorry, with the Committee for a cap.

22              THE COURT:  Yeah.  They funded a -- they agreed to

23    fund a cap, did they not, as part of the settlement?

24              MR. MILLAR:  Sure, yeah.  But my point here is

25    simply, Your Honor, is that there -- this indemnity has an

1    infirmity under Section 502(e)(1)(B).

2              THE COURT:  My point is why do they care?  Why does

3    the Debtor care?

4              MR. MILLAR:  Because they can challenge it and that

5    gives them leverage.  But what they've done --

6              THE COURT:  Why would they care?  Because if it is a

7    prepetition claim, they've already capped their liability with

8    the deal they made with the UCC.

9              MR. MILLAR:  This is a prepetition senior secured

10   claim.

11             THE COURT:  A prepetition senior secured claim.

12   What's it secured by?

13             MR. MILLAR:  It's in the PTL agreement.

14             THE COURT:  That doesn't make it secured.

15             MR. MILLAR:  Oh, but if you work your way through

16   the agreement, it's a secured obligation.  And it's actually

17   towards the very top of the waterfall.  It's ahead of the new

18   money, it's ahead of the FLFO.

19             THE COURT:  Okay.  So you're saying that it's not a

20   general unsecured claim, it's --

21             MR. MILLAR:  It's not --

22             THE COURT:  -- actually a secured claim secured by

23   all the assets of the Debtor?

24             MR. MILLAR:  Yeah.  Comes only behind the agent's

25   fees.

1              THE COURT:  Okay.  I still don't understand the

2      purpose of your question, but go ahead.

3              MR. MILLAR:  Yeah.  I mean, look, we believe there

4      is a challenge to this indemnity.

5              THE COURT:  Okay.

6              MR. MILLAR:  And they've chosen to take the opposite

7      view from that.

8              THE COURT:  Right.

9              MR. MILLAR:  And that is very unusual for a Debtor

10     to say we're going to support a claim against us that is so

11     big, it could cause us to go into Chapter 22.

12             THE COURT:  Well, so isn't the argument that they've

13     made -- not this witness.  But isn't the argument that they've

14     made is that what we got in exchange for agreeing to carry

15     this forward, we think is a net plus?  That's the argument I

16     heard.

17             MR. MILLAR:  That's the argument.  I mean, they

18     can't value it, so I think I've made my point.

19             THE COURT:  I got it.  So --

20             MR. MILLAR:  Yeah.

21             THE COURT:  -- why not focus --

22             MR. MILLAR:  Move on.

23             THE COURT:  Well, no.  Why not focus on the other

24     side of that question?  And if he's really the decision maker

25     -- I said from the moment we started this hearing, --

1          MR. MILLAR:  Yeah.

2          THE COURT:  -- and the question I asked was, am I

3     going to hear exercise of business judgment with respect to

4     this resolution?  And if he doesn't know how much it's worth

5     -- if he's the decision maker, I don't know.  But if he's --

6     if he doesn't have any idea of what the potential downside of

7     the indemnity is, and haven't heard anybody ask how did you

8     value what you got, then that goes a long way to suggesting

9     that there couldn't possibly have been the exercise of

10    business judgment if you don't understand the trade.

11    BY MR. MILLAR:

12    Q    Mr. Tepner, how'd you value what you got?

13         THE COURT:  How about laying the foundation and see

14    if he knows what he got?

15    BY MR. MILLAR:

16    Q    Mr. Tepner, tell us about the deal whereupon you gave the

17    indemnity in exchange for the provisions under the plan.

18    Let's go through some of those provisions under the plan,

19    shall we?

20    A    Sure.

21    Q    You agreed to take back paper 315 million.

22    A    Correct.

23    Q    You gave up 100 percent of the -- well, 99 percent of the

24    company to the FLSO; is that right?

25    A    Possibly, yes.  But 95, depends on how the vote goes.

HARVEY TEPNER - CROSS BY MR. MILLAR

131

1    Q    Right.  Sitting here today it's 99.

2    A    Okay.

3    Q    And one percent went to the non-PTL.

4    A    Correct.

5    Q    And you get -- you agreed that there would be a post-

6    petition indemnity.

7    A    Correct.

8    Q    And you don't have a valuation for that.

9    A    I don't have a numerical valuation of any specificity.

10   Q    And what do you feel you got in this deal in exchange for

11   the indemnity?

12   A    I feel we got a viable Plan of Reorganization that allows

13   the company to emerge and to be profitable and to support its

14   residual equity holders and debt holders or post-

15   reorganization equity holders and debt holders.

16   Q    And if the indemnity is called, it could go into

17   Chapter 22; is that right?

18   A    If the indemnity -- if there is a prosecution under an

19   indemnity that's still out -- you know, if there's a

20   prosecution and the company has to indemnify the indemnitees,

21   then it could be a very large number, it could be a smaller

22   number.  It would clearly -- it could clearly imperil the

23   company.

24        But the actual number is unknown because there's an issue

25   of whether the litigation -- there was no indemnity, whether

HARVEY TEPNER - CROSS BY MR. MILLAR

1   the litigation would succeed, whether the strength of the

2   litigation had -- could result in damages of a material

3   amount, and there's a series of probabilities.  Could the

4   litigation succeed?  What would the damages be?  And that

5   would form what the potential value is.

6        And based upon the review of what was happening, the

7   advice of counsel, they believe that the indemnity is proper,

8   that the litigation -- the successful litigation, as I

9   understand it, succeeding under the indemnity under a lack of

10  indemnity against the PTLs is small because the transaction

11  was permitted.

12  Q    How small?

13            THE COURT:  Now, --

14  A    I --

15            MR. MILLAR:  All right.  Your Honor, I think I'm

16  finished.

17            THE COURT:  Just hold on.  You've raised some

18  interesting issues.

19            So, Mr. Tepner, --

20            THE WITNESS:  Sir.

21            THE COURT:  -- the indemnity -- do you agree that

22  the indemnity only creates a liability if I was wrong in the

23  decision that I made on summary judgment?  Is that your

24  understanding, or is it something more than that?

25            THE WITNESS:  I -- from my non-legal perspective,

1    Your Honor, I think that's correct.

2             THE COURT:  Okay.  And then obviously there's the

3    claim that I didn't rule on, which was the breach of the

4    implied duty of good faith and fair dealing, correct?

5             THE WITNESS:  Correct.

6             THE COURT:  Okay.  So if I was wrong or I decide

7    that in fact there was a breach, do you have any idea what the

8    company's looking at in terms of that indemnity?  Do you know

9    -- and I'm not asking you to the penny, but is it 50 million,

10   hundred million, 400 million, 600 million?

11            I know that you said your advisors didn't value it.

12   But you had to have some idea because I looked you up.  You're

13   an extremely smart person.  You know -- you've been in this

14   for a long time.  You had to have some idea of what your

15   downside was.  We're all Plan B people.

16            THE WITNESS:  So if you didn't rule the way you did,

17   Your Honor, which is a fundamental ruling in this case, --

18            THE COURT:  Right.

19            THE WITNESS:  -- it would clearly increase the

20   likelihood that the indemnity might be have to be -- the

21   indemnification have to be triggered and there'd be claims

22   against the company.

23            THE COURT:  Okay.

24            THE WITNESS:  But as I understand it from my non-

25   legal perspective -- I didn't go to law school -- is that we

1  -- they would need a successful appeal on your ruling --

2          THE COURT:  Right.

3          THE WITNESS:  -- which is probability issue one,

4  and --

5          THE COURT:  But you gave the indemnity before I ever

6  ruled so you couldn't possibly have been assessing appellate

7  risk.

8          THE WITNESS:  No.  But we -- you know, there was a

9  view of what's the process by which an indemnity could

10  actually get triggered.

11          THE COURT:  Okay.

12          THE WITNESS:  And so it goes through a series of

13  probabilities of future litigation, could that litigation

14  succeed, would it be appealed, would that appeal succeed?  And

15  then if there's a damage, and say the damage was for the

16  entire dollar amount of the residual 1-L loans and second --

17  and 2-L loans, right, let's say that's the highest and plus

18  interest and penalties, --

19          THE COURT:  Right.

20          THE WITNESS:  -- it would be a notable number

21  possibly approaching a billion dollars.

22          When you assume the probability, even do 50, 50 that

23  it succeeds, it starts to be smaller and smaller and smaller.

24          THE COURT:  I got it.  And --

25          THE WITNESS:  And that --

1          THE COURT:  -- you said a million.  You meant a
2     billion, right?
3          THE WITNESS:  A billion, right.
4          THE COURT:  Yeah.
5          THE WITNESS:  I'm very --
6          THE COURT:  No, no, it's okay.
7          THE WITNESS:  Yes, a billion dollars.  So you start
8     to do some simple probability analysis, it sort of gives the
9     idea of range of settlement.  And just sort of ballparking 50
10    percent times 50 percent times a billion, you're talking about
11    well, below $200 million, which could be a big number but
12    might be solvable.  That's speculation.  I'd have to actually
13    try and work through it with the advice of counsel the --
14          THE COURT:  No, that --
15          THE WITNESS:  -- success of that.
16          THE COURT:  That's why we're having the
17    conversation.  And, you know, unless I confirm the plan,
18    there's really no loss, is there?
19          THE WITNESS:  (No audible response.)
20          THE COURT:  Or do you disagree with that?
21          THE WITNESS:  One more time, sir.
22          THE COURT:  If -- there's no loss until I actually
23    confirm the plan, right?
24          THE WITNESS:  Correct.
25          THE COURT:  Or do you disagree with that?

1          THE WITNESS:  I mean, there's obviously people

2     traded out of their positions there'd be a loss.  But there's

3     no, you know, the one -- the existing 1-Ls would still exist,

4     the existing 2-Ls would still exist until a plan is confirmed.

5          THE COURT:  Okay.  So somewhere that liability is

6     somewhere between zero and a number that very difficult to

7     determine; that fair assessment of where that is.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Okay.  So what did you get for that?

10         THE WITNESS:  I think we got --

11         THE COURT:  And I don't want to hear I got a

12    confirmable plan.  I -- that's a lawyer answer, and you

13    already told me you're not a lawyer.

14         I want a businessman's answer.

15         THE WITNESS:  I apologize, sir.  I hang around a lot

16    with too many lawyers.

17         THE COURT:  I know.  I do the same.

18        (Laughter.)

19         THE WITNESS:  I think, one, we got the initial

20    transaction done back in 2020, which really allowed for

21    potentially long-term viability and more cash in the system --

22         THE COURT:  So is it your belief that you're bound

23    to do this post -- I'm going to call it a post-bankruptcy

24    indemnification based upon the initial 2020 transaction?

25         THE WITNESS:  No.  It's --

1           THE COURT:  Okay.

2           THE WITNESS:  -- my belief that we probably wouldn't

3      have had the deal that we had without that --

4           THE COURT:  Okay.

5           THE WITNESS:  -- in there today.

6           THE COURT:  And do you agree with counsel's

7      statement that the indemnity obligation is secured by all of

8      the assets of the company?

9           THE WITNESS:  I don't have a view on that.

10          THE COURT:  Okay.  And can you -- I want to come

11     back to what you got.  So you saved the company by entering

12     into the transaction in the first place.

13          THE WITNESS:  Yes, sir.

14          THE COURT:  And nobody's really shown me that you

15     weren't right in that regard.  So what did you get in terms of

16     agreeing to put the indemnity in the plan to carry forward;

17     what did you get?

18          Your lawyer gave an answer when he gave his opening.

19     I'm just trying to see if you're listening or if you agreed.

20          THE WITNESS:  I wasn't here when my lawyer --

21          THE COURT:  Okay.

22          THE WITNESS:  I was asked not to show up in court

23     before today, sir.

24          THE COURT:  No, you don't have to be in the

25     courtroom to listen.  That's why I have all of this expensive

1      equipment.

2                   THE WITNESS:  I'm sorry, sir, could you please

3      repeat the question so --

4                   THE COURT:  Certainly.

5                   THE WITNESS:  -- I make sure I get it right, I

6      understand?

7                   THE COURT:  I just want to know what you think you

8      got in exchange for the indemnity.  Because your lawyer told

9      me what you got, but I wanted to hear it from somebody that

10     actually made the decision, not the lawyer.

11                  THE WITNESS:  I think we got a viable plan of -- or

12     viable, confirmable Plan of Reorganization and the

13     survivability and hopefully future prosperity of the company.

14                  THE COURT:  Okay.  Anything else?

15                  MR. MILLAR:  No.

16                  THE COURT:  And I apologize for interrupting you.  I

17     just --

18                  MR. MILLAR:  No, you did --

19                  THE COURT:  You raised some interesting issues.

20                  MR. MILLAR:  -- much better than I was doing.  Thank

21     you.

22                  THE COURT:  Not at all.  All right.  Any -- I'm --

23     let me -- anyone else have questions before we go back to

24     Redirect?

25                  (No audible response.)

1      All right.  Yes, ma'am.

2      MS. BARRINGTON:  Just very briefly, Your Honor.

3                   REDIRECT EXAMINATION

4   BY MS. BARRINGTON:

5   Q    Mr. Tepner, do you know how much the PTL lenders owned in

6   first lien first out debt and first lien second out debt

7   before the restructuring; would it be approximately over a

8   billion dollars?

9   A    A billion 30 million as I recall.

10  Q    Okay.  Thank you.

11      And under the RSA, did the PTL lenders agree to reduce

12  that debt down to $300 million?

13  A    Yes, they did.

14  Q    So did that result in a net reduction of our -- of the

15  company's debt by approximately $727 million?

16  A    It did.

17  Q    And do you believe that the potential claim that's at

18  issue here that with respect to the indemnity, do you believe

19  that that's worth over $727 million?

20  A    With my crude math that I was doing, I'd be very

21  surprised if it was that high.

22  Q    And was the indemnity a condition of the deal?

23  A    Indemnity was a condition of the deal.

24  Q    And just to be clear, Mr. Tepner, did you get at least

25  approximately a billion dollars of equitization as a result of

1       the RSA in this plan?

2       A       Yes, we did.

3       Q       Thank you.

4               And one final question, Mr. Tepner.  Unrelated to the

5       indemnity, was the company permitted to amend the transaction

6       -- you recall Mr. Ehrlich walked through a few amendments with

7       you earlier today, right?

8       A       Yes.

9       Q       And was -- do you know whether or not the company was

10      permitted to amend the transaction with majority consent?

11      A       The 2020 transaction?

12      Q       That's correct.

13      A       Yes, it was.

14              MS. BARRINGTON:  Thank you.

15              Nothing further, Your Honor.

16              THE COURT:  All right, thank you.

17              MR. MILLAR:  One quick question.

18              THE COURT:  Well, so let's keep our same order if we

19      could.

20              MR. MILLAR:  I didn't see Mr. Ehrlich --

21              MR. EHRLICH:  Nothing for me, Your Honor.

22              THE COURT:  All right.  Thank you.  All right.  I --

23      you should -- you already knew that, I suppose.

24                              RECROSS-EXAMINATION

25      BY MR. MILLAR:

1    Q    You just compared the number 727 to the value of the

2    indemnity just now, yes?

3    A    It was -- yes, I guess that's right.

4    Q    But that 727, that was prepetition debt, right?

5    A    (No audible response.)

6    Q    And the indemnity that we're concerned with is post-

7    petition.

8    A    I'm -- okay.

9              MR. MILLAR:  Thank you.

10             THE COURT:  All right.

11             Anything else?

12             MS. BARRINGTON:  One second, Your Honor.

13             THE COURT:  Sure.

14         (Pause in the proceedings.)

15                   FURTHER REDIRECT EXAMINATION

16   BY MS. BARRINGTON:

17   Q    Mr. Tepner, would the PTL lenders have equitized their

18   claims without the indemnity?

19             MR. MILLAR:  Your Honor, I object, that's

20   speculation.

21             THE COURT:  Well, it's also beyond the scope.

22   That's a much better question or objection.

23             All right.  I'll sustain my own objection.

24         (Laughter.)

25             MS. BARRINGTON:  Thank you, Your Honor.

1           THE COURT:  All right.  Any reason that Mr. Tepner

2      cannot be excused?

3           (No audible response.)

4           THE COURT:  All right, Mr. Tepner, I know that the

5      afternoon has not been fun.  I very much appreciate the candid

6      nature of your testimony.  You've been very helpful to me.

7           Thank you, sir.

8           THE WITNESS:  Thank you, Your Honor.

9           (Witness steps down.)

10          THE COURT:  Yes.  All right.  Who's next,

11     Ms. Barrington or -- I'm sorry.  I always get it wrong.

12          MR. LENDER:  Your Honor, I was hoping we might be

13     able to take a short break as we transition to our next

14     witness?

15          THE COURT:  Okay.  3:30 give you enough time?

16          MR. LENDER:  That would be great, thank you.

17          THE COURT:  All right, thank you.  We'll be

18     adjourned until 3:30.

19          THE CLERK:  All rise.

20          (Recess taken from 3:18 p.m. to 3:33 p.m.)

21                         AFTER RECESS

22          THE COURT:  And we are back on the Record in the

23     jointly administered cases under Case No. 23-90020, as well as

24     the adversary.

25          Who is our next witness?

1           MR. WILSON:  Lee Wilson of Gibson Dunn on behalf of

2    the PTL Lenders and the additional counter claimed defendants.

3    And we're going to call Mr. Karn Chopra of Centerview Partners

4    to the stand.

5           THE COURT:  All right, thank you.  Can you please

6    come forward?

7           (Pause in the proceeding.)

8           THE COURT:  Good afternoon.

9           MR. CHOPRA:  Good afternoon.

10           THE COURT:  If you'd raise your right hand, please?

11           (Witness sworn.)

12           THE COURT:  Thank you sir.  And let's see I've got

13    that over there.

14           MR. WILSON:  And so I believe we will be presenting

15    a few exhibits, Your Honor.  And it would be Tim Hernden

16    (phonetic) who would need presenting authority if he doesn't

17    have it already.

18           THE COURT:  So right now I have you hooked up just

19    directly.

20           MR. WILSON:  That's perfect.  No, that's great.

21    That's all we need.

22           THE COURT:  Okay.  Do you want to just give me a

23    cursor flash or something so I know -- okay, got it.

24           You got it all worked out.

25           Thank you.

KARN CHOPRA - DIRECT BY MR. WILSON

1           DIRECT EXAMINATION

2      BY MR. WILSON:

3      Q    And with those preliminaries out of the way, Mr. Chopra

4      have you watched or heard any of the prior testimony in the

5      preceding prior to now?

6      A    I have not.

7      Q    Where are you employed?

8      A    Centerview Partners.

9      Q    And what is Centerview Partners?

10     A    Centerview Partners is an independent investment bank.

11     Q    All right, what sort of work does Centerview Partners do?

12     A    Strategic advisory assignments in mergers and

13     acquisitions and in debt advisory restructuring.

14     Q    And what is your current position at Centerview?

15     A    I'm a partner in the debt advisory and restructuring

16     practice.

17     Q    How long have you been in that role?

18     A    Five years.

19     Q    And what are your responsibilities in your current role?

20     A    To execute assignments that the firm or myself bring in

21     and to also try and generate new opportunities.

22     Q    And how long have you been in the restructuring industry,

23     generally?

24     A    A little bit over 20 years.

25     Q    And in your career, have you regularly advised companies

KARN CHOPRA - DIRECT BY MR. WILSON

1    on restructuring and financing transactions?

2    A    I have.

3    Q    Are you familiar with Serta Simmons Bedding?

4    A    I am.

5    Q    Did there come a time in 2020 when Centerview began

6    working on an engagement related to Serta?

7    A    There was.

8    Q    And roughly when was that?

9    A    Late March, 2020.

10   Q    And what was that engagement?

11   A    We were -- we received an inbound from one of the lenders

12   in the Survey Capital structure asking us to assist in the

13   evaluation of potential liquidity solutions for the company.

14   Q    How did Centerview come to be hired to advise -- did

15   Centerview at some point come to be hired to advise a group of

16   lenders?

17   A    We were.

18   Q    What group of lenders was that?

19   A    That was an Ad Hoc Group of first and second lien

20   lenders.

21   Q    And how did Centerview come to be hired?

22   A    We were asked to submit credentials.  We submitted

23   credentials, as well as a fee proposal.  And then we were,

24   alerted to the fact that we were selected to be the advisory

25   group.

1    Q    Do you recall when you were selected by the group to be

2    the financial advisor?

3    A    I do.

4    Q    And when was that?

5    A    March of -- late March 2020.

6    Q    And if I call them the Priority Lender Group today,

7    you'll know who I mean?

8    A    I do.  I will.

9    Q    What did the Priority Lender Group hire Centerview to do?

10   A    In the first instance, I think we were really brought in

11   to help the lenders, excuse me, evaluate the health of the

12   company and the liquidity needs of the company and then to

13   potentially negotiate for a liquidity solution to the company.

14        The expectation at the time was given the health of the

15   business before COVID and then exasperated by COVID that there

16   was going to be a fair bit of stress on the business and

17   liquidity needs for the business.

18        MR. WILSON:  I'd like to pull up Debtors'

19   Exhibit 49, which is Docket No. 861-43.

20        (Pause in the proceeding.)

21   BY MR. WILSON:

22   Q    And this is -- this is an email chain between you and

23   others at Centerview from March 30th, 2020, correct?

24   A    Correct.

25   Q    Can we scroll down to page 3?

1        (Pause in the proceeding.)

2    Q    What is this document?

3    A    This is a working group list that was prepared by the

4    Centerview team.

5             MR. WILSON:  I'd like to move to admit Docket

6    861-43, Debtors' Exhibit No. 49 into evidence.

7             THE COURT:  Thank you.

8             Any objection?

9        (No audible response.)

10            THE COURT:  It's admitted.

11       (Exhibit 49 received in evidence.)

12   BY MR. WILSON:

13   Q    So if you can just scroll through the pages of this

14   document quickly?

15   A    I have.

16   Q    Mr. Chopra, are these the names of the parties and the

17   advisors to the Priority Lender Group at this time?

18   A    They are.

19   Q    At a high level, what were you initial discussions with

20   the Priority Lender Group about -- what were they about at the

21   time that Centerview was retrained?

22   A    At the outset, it was primarily because there wasn't any

23   information provided to us at that time by the company.  It

24   was primarily about the perspective health of the company, as

25   well as potential rebound in the business based on prior

1    recessions.

2         The mattress industry has been through a number of

3    recessionary time period.  And it's historically rebounded

4    quite well and quite quickly relative to the broader

5    marketplace.  So then we were spending time looking at the

6    public comps trying to better understand what the rebound

7    would look like, what the financial health of the industry was

8    and then what the liquidity needs for the business maybe from

9    the outside looking in.

10   Q    Did there come a time when the Priority Lender Group

11   reached out to Serta for the first time?

12   A    There was.

13        MR. WILSON:  Can we pull up Docket 862-2, Debtors'

14   Exhibit 59.

15        (Pause in the proceeding.)

16   BY MR. WILSON:

17   Q    And this has already been admitted into evidence, but I'd

18   like to direct your attention to the attachment on page 3.

19   This is a letter sent by the Gibson Dunn Group, the Priority

20   Lender Group to the company on April 7th, correct?

21   A    It is.

22   Q    If we scroll down to page 5.  You were copied on this

23   letter, correct, Mr. Chopra?

24   A    I was.

25   Q    Why did the Priority Lenders send this letter to the

1    company?

2    A    The lenders -- well, the Ad Hoc Group of lenders at the

3    time wanted the company to know that they were obviously quite

4    sizeable in the capitol structure, that they were aware of the

5    challenges the company was facing, and that they were willing

6    to be a partner to the company in addressing the liquidity

7    challenges the company was facing.

8    Q    I believe you addressed this to a degree, but did you

9    know what the company was looking for at the time the group

10   sent this letter?

11   A    We didn't know with specificity what the company was

12   looking for at that point.

13   Q    Did you receive a response to this letter?

14   A    I don't believe so.

15   Q    Did there come a time when you learned that the company

16   was negotiating with other parties about a potential

17   transaction?

18   A    There was.

19   Q    And about when was that?

20   A    Mid to late April 2020.

21   Q    Did you know or suspect the identities of any of the

22   other parties involved in those negotiations?

23   A    I did.

24   Q    And what were your suspicions?

25   A    Our suspicions were that there were other third parties

1    that may not have had debt in the structure, but that were

2    interested in the company, as well as other lenders.

3    Primarily Gamut, Apollo and Angelo.

4    Q    Did you know any specifics about what they were proposing

5    to the company?

6    A    We learned later in the process that they were

7    contemplating a dropdown transaction where IP would be

8    transferred from the borrower down to an un-restricted

9    subsidiary.  But we didn't know much beyond that general

10   construct -- concept.

11   Q    Okay.

12          MR. WILSON:  I'd like to pull up Docket 862-23,

13   Debtors' Exhibit 79.

14   BY MR. WILSON:

15   Q    And this is an email chain between you and Mr. Greenberg

16   from Gibson Dunn on April 20th, 2020, correct?

17   A    Correct.

18   Q    And who is Mr. Greenberg?

19   A    Mr. Greenberg is a partner in Gibson Dunn.

20   Q    And was Gibson Dunn retained as counsel to the Priority

21   Lender Group on this transaction?

22   A    They were.

23          MR. WILSON:  I'd move to admit Docket 862-23,

24   Debtors' Exhibit 79 into evidence.

25          THE COURT:  Thank you.

KARN CHOPRA - DIRECT BY MR. WILSON

1          Any objection?

2          (No audible response.)

3              THE COURT:  It's admitted.

4          (Exhibit 79 received in evidence.)

5     BY MR. WILSON:

6     Q    Can we go to page 4 of this PDF?  And I want to direct

7     your attention to the bottom-most email, which is on page 4.

8     And you write, "Went back and forth with Roopesh this a.m. and

9     while he won't say either way, my sense is that the is talking

10    the Gamut Group, perhaps about liability management

11    transactions that might be available."

12         Do you see that?

13    A    I do.

14    Q    What did you mean by the Gamut Group there?

15    A    A group led by Gamut.  I don't know for sure if I knew

16    that Apollo and Angelo were working with them.  But obviously

17    we learned that later in the process.

18    Q    And what did you think they were talking to the company

19    about as of this April 20th email?

20    A    As of this email, I think we only suspected they were

21    talking about new money.  I did use the phrase "liability

22    management," but given that our group owned close to or if not

23    than 50.1 percent of the first lien, we didn't believe that

24    another group could provide a superpriority financing.

25         And so the only other way that we thought would be

1    logical for another group of lenders to provide capital would

2    be through some sort of basket availability in the existing

3    first lien credit agreement.

4    Q    At this time, did Mr. Shaw, who was at Evercore, the

5    Debtors' financial advisor, correct?

6    A    Correct.

7    Q    Did Mr. Shaw give you any details about any competing

8    transactions in your call with him on April 20th, to the best

9    of your recollection?

10   A    I don't believe so.  Sorry to interrupt.

11        MR. WILSON:  All right, can we pull up Docket

12   862-31, Debtors' Exhibit 87?

13   By MR. WILSON:

14   Q    And this document has already been admitted into evidence

15   as well.  If we can scroll down to the attachment?

16        This is the April 24th, 2020 from Gibson Dunn to the

17   company, correct?

18   A    It is.

19   Q    And if we can go to the bottom of page 4.  You were

20   copied on this letter, too; correct, Mr. Chopra?

21   A    I was.

22   Q    And can we go to page 5?  Did Centerview review and help

23   prepare the proposed term sheet that was attached to this

24   letter?

25   A    We did.

KARN CHOPRA - DIRECT BY MR. WILSON

1    Q    And what was the purpose of this letter and the attached

2    term sheet?

3    A    This letter was to, really, in furtherance of the

4    April 7th letter to alert the company to our continued desire

5    to a partner to the company.  And to take it one step further,

6    to include very high level terms on a superpriority --

7         (Automated announcement.)

8              THE COURT:  Sorry about that.

9              THE WITNESS:  No problem.  Should I go ahead,

10   Mr. Wilson?

11   BY MR. WILSON:

12   Q    You can go ahead.

13   A    Okay, thank you.  So this was, again, in furtherance of

14   the April 7th letter to be continued partners to the company

15   and to take it a step further, which is to include a high

16   level superpriority financing term sheet.

17   Q    And that's the term sheet that starts on page 5 here?

18   A    That is correct.

19   Q    Can we go to page 7?  And I want to direct your attention

20   to facility size.

21        Do you see where it says, "TBD?"

22   A    I do.

23   Q    Why was the facility size left as TBD in this term sheet?

24   A    At this point, neither Gibson nor Centerview nor our

25   lenders was under NDA with the company.  We were not receiving

1    any non-public information.

2        And so while we expected the company had a liquidity

3    need, we were not aware of the size of that need.

4    Q    All right, and then can I direct your attention to the

5    row called "Lenders" on this page?  It's about five down.

6        It says, "Backstopped by certain members of the Ad Hoc

7    Group.  Each on a pro-rata basis.  The backstop group, but

8    available to all first lien term lenders pro-rata.

9    Collectively the 'Priority Term Lenders.'"

10       Do you see that?

11   A    I do.

12   Q    What does that mean?

13   A    The group of Ad Hoc Group members was willing to take

14   risk off the table as it relates to certainty of funds.  So

15   they were willing to backstop the financing.  But ultimately

16   were comfortable opening that financing up to all first lien

17   lenders on a pro-rata basis.

18   Q    So as of the time of this April 24th letter and the

19   Priority Lender Group was making a proposal for a new money

20   financing to the company -- apart from the backstop fee --

21   would be open to all first lien lenders?

22   A    That's correct.

23   Q    At this point, when you sent this letter, did the

24   Priority Lender Group know that the company was also looking

25   to deleverage the balance sheet?

KARN CHOPRA - DIRECT BY MR. WILSON

1    A    I don't believe so.  We wouldn't have sent the letter for

2    purely a new money financing if we knew with certainty that

3    the company was looking for anything beyond or more than just

4    liquidity.

5         And so at this point, I think our sense was that

6    liquidity was the primary focus and a priority term loan,

7    which, again, we had a unique ability to provide, would be the

8    most cost effective form of capital to the company.  So we

9    were focused on that in the first instance.

10   Q    At the time you sent this letter, did the Priority Lender

11   Group know whether other lenders had made proposals to the

12   company to provide both new money financing and delever the

13   company?

14   A    I don't believe so.

15   Q    Did Centerview and Gibson Dunn eventually enter into

16   Non-Disclosure Agreements with the company?

17   A    We did.

18   Q    Approximately when?

19   A    On May 10th.

20   Q    After you were under NDA, did Serta give you access to

21   more detailed financial information?

22   A    They did.  They gave us a presentation, which included

23   high level financial projections.

24   Q    And what did you do generally once the NDA was signed up

25   on or about May 10th?

A     I believe that Gibson and Centerview were afforded an
opportunity to speak with management.  We spent time on the
phone with them.  Tried to spend more time understanding the
macro/micro factors impacting the business.  And really dig in
a little bit more on the liquidity forecast and try to better
understand the liquidity of the business.

Q     After entering into the NDA, did you learn more about
what the company was looking for in terms of a potential
transaction?

A     I don't recall exactly when we learned that the tone
shifted from pure liquidity to liquidity plus discount.  I
believe it was some time between obviously the superpriority
financing term sheet and then later May when we provided the
proposal with the debt discount included.

      But it probably would have been around this time when the
NDAs were signed that we were learning a little bit more about
what the company's intentions were.

Q     Was this generally a busy time period for you,
Mr. Chopra?

A     Yeah, I think most restructuring practitioners at this
point just given where we were in economic cycle and the
impact of COVID were quite busy at this point in time.

Q     So sitting here today, you don't remember exactly when
you learned that the company was also looking to delever, but
you believe it was after April 24th when you sent the new

KARN CHOPRA - DIRECT BY MR. WILSON

1     money proposal, correct?

2     A    Absolutely at that time.

3     Q    At any point after you entered into the NDA, did you

4     learn whether other lenders were negotiating with the company

5     and were offering to provide the company both new money and

6     the opportunity to delever?

7     A    We did.

8     Q    And when did you learn that?

9     A    Again, I don't know the exact date, but I believe it

10    would have been in that mid-May time frame.

11    Q    At some point, did your clients, the Priority Lender

12    Group members, sign NDAs as well?

13    A    They did.

14    Q    And when was that?

15    A    I think it was between May 14th and May 18th.  I think

16    certain holders signed early and certain holders signed a

17    little bit later.

18         MR. WILSON:  Can we pull up Docket No. 866-42, which

19    is Debtors' Exhibit 342.

20    BY MR. WILSON:

21    Q    Mr. Chopra, feel free to take a little time to look at

22    the document, but are these the executed NDAs for -- well, let

23    me just ask.  Is this an email between Weil and a variety of

24    people at Gibson Dunn and Centerview, including you?

25    A    It is.

1    Q    And it's dated May 18th, 2020?

2    A    It is.

3    Q    Does this email attach the fully executed NDAs for the

4    members of the Priority Lender Group listed on the attachment

5    line here?

6    A    Yes, it is.

7              MR. WILSON:  I'd like to move to admit Docket

8    866-42, Debtors' Exhibit 342.

9              THE COURT:  Any objection?

10             MR. EHRLICH:  No objection.

11             THE COURT:  It's admitted.

12         (Exhibit 342 received in evidence.)

13   BY MR. WILSON:

14   Q    I just have one other quick question on this.  Can we go

15   to page 39?

16         Is this the signature line for Black Rock, one of the

17   members of the Priority Lender Group to an NDA?

18   A    It is.

19   Q    And what does it show underneath the signature line?

20   A    It shows Black Rock's holdings as of May 14th in the

21   credit agreement and the second lien credit agreement.

22   Q    So as of the date that the company entered into the NDAs

23   with the members of the Priority Lender Group, they knew what

24   the members of the Priority Lender Group held in terms of the

25   first lien and second lien loans?

1    A    They did.

2              MR. WILSON:  We can take that down.

3              Can we pull up Docket No. 866-43, which is Debtors'

4    Exhibit 343?

5    BY MR. WILSON:

6    Q    If you can look at this quickly.  Is this the NDA with a

7    company signed by the member of the Priority Lender Group

8    Pegum (phonetic)?

9    A    It is.

10             MR. WILSON:  I'd like to move to admit Docket

11   866-43, Debtors' Exhibit 343 into evidence.

12             THE COURT:  Any objection?

13             MR. LIEBERMAN:  No objection.

14             THE COURT:  Thank you.

15             It's admitted.

16        (Exhibit 343 received in evidence.)

17   BY MR. WILSON:

18   Q    So you entered into your advisor NDAs on May 10th and

19   then the clients and the Priority Lender Group entered into

20   NDAs on May 18th.  Was that a typical turnaround time between

21   advisor NDA and client NDAs, in your experience?

22   A    That's an expedited time frame.  Usually one of the

23   advisors get under NDA they spend at least a few weeks, if not

24   more, diligently the company.  Perhaps in some instances,

25   going back and forth with the company advisors on the outlines

1    of what a transaction may look like.

2         In this instance, the -- I think what Gibson Dunn and

3    Centerview realized quite quickly was there was a fair bit of

4    activity.  It sounded like a liquidity need for the business

5    or more time lead than we anticipated, or excuse me, or more

6    dire than we had anticipated.

7         And we also were -- understood there was a competitive

8    tension.  So we asked the lenders to get under NDA relatively

9    quickly.

10        MR. WILSON:  Can we pull up Docket 863-37, that is

11   Exhibit 144?

12        (Pause in the proceeding.)

13   BY MR. WILSON:

14   Q    This is a May 22nd, 2020 presentation prepared by

15   Centerview, correct?

16   A    It is.

17   Q    And can you flip to the second page?  At a high level,

18   what does this presentation cover?

19   A    There are three primary sections in the deck.  The first

20   is to do superior bench marking.  And as I mentioned earlier,

21   some recovery analysis to better understand how the peers had

22   recovered coming out of prior recessions.

23        The second is to go through illustrative transaction

24   analyses that -- for the lenders to consider.  And the last is

25   debt financing comps to help price the super senior financing.

KARN CHOPRA - DIRECT BY MR. WILSON

1    Q    And did you present this to the Priority Lender Group at

2    about this time?

3    A    We did.

4         MR. WILSON:  I'd like to move to admit Docket No.

5    863-37, Debtors' Exhibit 144 into evidence.

6         THE COURT:  Any objection?

7         MR. LIEBERMAN:  No objection.

8         THE COURT:  All right.  Thank you.

9         He's getting higher and higher in response.

10        (Debtors' Exhibit 144 received in evidence.)

11        (Laughter.)

12   BY MR. WILSON:

13   Q    So, Mr. Chopra, why did you put this presentation

14   together?

15   A    So there were a number of reasons for the presentation.

16   I think in the first instance, as I had said, based on public

17   information, we wanted to try and give the clients some

18   perspectives.  Not necessarily just the company's

19   perspectives, but Centerview's perspectives, on how the

20   company may rebound coming out of COVID to the extent that the

21   economy generally rebounded as well.

22        Probably more importantly was we wanted to start talking

23   to the clients about what alternatives we thought the company

24   maybe exploring with alternative lender groups.

25        And an alternative that we wanted them to consider which

1    ultimately ended up being the transaction the company

2    considered being a superpriority financing with a debt

3    repurchase transaction.

4         And then the lastly, we wanted to cover the debt

5    financing comps that we could help price the initial proposal

6    for the company.

7    Q    Thank you.

8         Could we go to page 13 of this PDF?  This is titled

9    "Illustrative Transaction Analysis."

10        And can we go to the next page?

11        At a high level, high level, can you describe what is the

12   illustrative transaction analysis?

13   A    Yeah, it's a comparison of alternatives that either we

14   thought the company was considering or we'd like the company

15   to consider.  And it also compared those alternatives, not

16   qualitatively, but quantitatively from the perspective of the

17   company, as well as from the perspective of our clients, the

18   Priority Lender Group.

19             THE COURT:  I hate to interrupt, I need to step down

20   for about five minutes.  I've got an emergency I need to just

21   answer a question.

22             So I really hate to do it from -- you're free to

23   step down, but please don't go anywhere.  I'll be right back.

24   Hopefully in less than five minutes.  All right?

25             MR. WILSON:  No problem.  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          THE CLERK:  All rise.

3      (Recess taken from 3:54 p.m. to 4:04 p.m.)

4                    AFTER RECESS

5          THE COURT:  Realization to learn at some point

6   you've become the old guy with experience.  That's just --

7   it's troubling to me.

8          MR. WILSON:  Well, now I know that if I have an

9   emergency, it's totally fine if I have to step out, right?

10         THE COURT:  Absolutely.  Absolutely.  Go ahead, my

11  apologizes again.

12         MR. WILSON:  Are we ready to go back on the Record?

13         THE COURT:  Vriana, are we back up?

14         THE CLERK:  Yes, Your Honor.

15         THE COURT:  She's ready.  Thank you.

16              DIRECT EXAMINATION (CONT'D)

17  BY MR. WILSON:

18  Q   All right, I think we had Docket No. 863-37, Debtors'

19  Exhibit 144 up and we were on page 13.

20      So if we can pull that back up, please.

21      (Pause in the proceeding.)

22         THE COURT:  Oh, he's not there.  Take a deep breath.

23  He had an emergency.

24         MR. WILSON:  We're all being understanding right

25  now.  So thank you, Your Honor.

KARN CHOPRA - DIRECT BY MR. WILSON

1       (Pause in the proceeding.)

2              THE COURT:  There we go.

3              MR. WILSON:  Wonderful.

4   BY MR. WILSON:

5   Q    So, just to reset I'm going to ask you again.  At a high

6   level what was -- what were you showing on this page of this

7   presentation, Mr. Chopra?

8   A    We were comparing alternatives for our clients to

9   evaluate both quantitatively and qualitatively from a

10  quantitative perspective through evaluating the alternate from

11  the company's perspective as well as from our client's

12  perspective.

13  Q    And this presentation was from May 22nd, correct?

14  A    Correct.

15  Q    Can you describe at a high level what the potential

16  transaction structures in 2a and 2b are?

17  A    Yes, in 2a the transaction structure was similar to the

18  late April term sheet.  It was just a $200 million

19  superpriority new money financing.

20       In 2b, we were paring that $200 million superpriority

21  financing in the form of a first out priming facility with a

22  debt repurchase of the first lien debt -- 50.1 percent of the

23  first lien debt at a price of 60 percent of par.

24  Q    So 2a was the transaction structure you had already

25  proposed to the company in your April 24th letter, correct?

1    A    Correct.

2    Q    You had it in a specific dollar number now, correct?

3    A    Correct.

4    Q    Where did that dollar number come from, the 200 million?

5    A    That came from the company.

6    Q    And then 2b is a new option that also added the debt

7    exchange repurchase component, correct?

8    A    Correct.

9    Q    Were the terms in 2b, the 50.1 percent of existing 1-L

10   term loans and the 60 percent of par discount, were those your

11   client's suggestions?

12   A    I don't believe so.  I think in this situation, it's

13   highly likely that Centerview would have made preliminary

14   estimates to help guide the conversation.  And then use the

15   conversation to help inform the ultimate proposal to be made

16   to the company.

17   Q    But 2a and 2b are transactions that you were -- that you

18   were discussing with the Priority Term Lender Group that they

19   might do with the company, correct?

20   A    That's correct.

21   Q    All right, what are the transactions listed as 3a and 3b,

22   in this document?

23   A    3a and 3b are what we assumed the alternative lender

24   group was potentially considering alongside the company,

25   whereby the company would be utilizing $600 million

1    unrestricted subsidiary adopted and $150 million non-loan

2    party basket to move IP into those baskets, allow for the

3    company to then raised that new money and then consummate an

4    exchange of first lien for first lien and second lien debt

5    into that unrestricted subsidiary.

6    Q    And now under 3a and 3b, you have a number of specific

7    terms.  For example, under 3a exchange, 542 million in 1-L

8    term loan at 60 percent of par.

9         Where did those terms come from?

10   A    Those were estimates.  We didn't have definitive guidance

11   as to what the company was considering or what was being

12   offered to them by the alternative lender group.  We were

13   simply trying to lay out what we thought was -- what might be

14   possible.

15        So it was again, to help guide the conversation with the

16   clients.

17   Q    Why did you view it as important to lay out for your

18   clients what might be possible, what the other groups might be

19   doing?

20   A    We were competing with that other group.  That group was

21   offering the company two things.  One was new money and the

22   second was discount.  And we knew at this point in time, given

23   the presentation given, we were preparing or we had prepared

24   that the company was clearly focused on discount factor.

25        And so in order to help the client assess what they may

KARN CHOPRA - DIRECT BY MR. WILSON

1    want to offer to the company, we wanted to lay out to them

2    what the alternative the company was considering would be.

3    Q    And if you look down the page a little bit, you see a box

4    that says, "Assumes a Chapter 11 filing at the end of Q4

5    2021."

6         Was the Priority Lender Group intending or anticipating a

7    Chapter 11 filing at the end of the fourth quarter of 2021?

8    A    We were not.  So if you were to compare these

9    alternatives and you thought that the new money would allow

10   for the company to continue as a going concern and ultimately

11   refinance all of it's debts maturities, then frankly you'd be

12   happy to have somebody else to provide the new money and

13   provide the company discount.  You wouldn't feel the need to

14   compete on that basis.

15        So if in the upside case, the company was going to be

16   quite successful and be able to avoid Chapter 11, then this

17   comparison is probably not necessary because you'd be happy to

18   have the other lender group consummate their transaction that

19   they had been contemplating.

20        On the opposite end of the spectrum if you thought that

21   this was just a bridge to a filing, which we absolutely did

22   not believe at the time, then you frankly would have gone even

23   more to avoid what the alternative lender group was otherwise

24   suggesting because you would have done everything in your

25   power to move up in the capital structure through the

1        transaction that had been contemplated.

2            Where we really were was kind of in the middle ground.

3        We were hopeful that the company would be successful.  We

4        wanted the company to be successful.  But we were being asked

5        to provide discount.

6            And so what we were trying to assess was in the

7        unfortunate circumstance where the company was unable to

8        continue as a going concern, which we estimated at Q4 '21,

9        which I'm sure was based on a liquidity extrapolation that

10        Centerview prepared for our clients, we were trying to

11        determine in that circumstance would it be better served doing

12        a transaction where you offered a discount or would you do

13        better served allowing the alternative lender group to provide

14        discount and harm your collateral package.

15            That's what we were trying to accomplish in this now.

16            MR. WILSON:  We can zoom out on this page a little

17        bit?

18        BY MR. WILSON:

19        Q    If you look further down the page, what did your

20        illustrative transaction analysis show in that regard?

21        A    Well, take it from two different lenses that the green

22        row is discount captured.  That's really the lens we thought

23        the company would be evaluating the focal from.

24            Obviously that's not the only factor that they were

25        considering, but it was a very important factor.  And so we

1    were trying to demonstrate was that the alternative lender

2    group could be offering the company anywhere between 200 and

3    $400 million of discount based on the assumption that we

4    utilized on this page.

5         And that if we, as a lender group, proposed the super

6    senior financing with 1-L debt repurchase or exchange, we

7    could match, you know, in general terms the same debt

8    discount.

9         The other item then is the yellow row.  That yellow row

10   really is from the perspective of our clients.  And so from

11   our client's perspective, what you can see is that the down

12   side scenario of allowing the alternative lender group to

13   consummate their transaction is that our client's recovery

14   could be as low as 11 to 13 percent.

15        And so, what we were showing to our clients was that

16   there's a fair bit of harm that could be caused to you by

17   allowing the other group to do the transaction that we were

18   anticipating or assuming.

19        Whereas if the lender group that we were advising

20   proposed and then was ultimately able to consummate a

21   transaction along the lines of 2b, the recovery range was much

22   tighter and much higher.

23   Q    And in the event that the alternative scenario that you

24   understood was out of the company would be successful, if it

25   got new money, it would do well, would the recovery ranges on

1  this chart apply?

2  A     In this scenario where the company was successful and no

3  Chapter 11 was ultimately required, in columns 3a and 3b, our

4  clients would have received 100 percent to par.  Because they

5  wouldn't have offered the company discount.  And they would

6  have remained in their existing position and they would have

7  ultimately been repaid upon maturity.

8       In 2b, the recovery would have been capped by whatever

9  discount you offered the company, which is preciously why you

10 didn't need to analyze a scenario where a company was

11 successful.  Because in that scenario you wouldn't propose a

12 discount.  You would have let somebody else propose the

13 discount.

14      We were trying to show the scenario where the discount

15 wouldn't be applicable.  And that was the scenario where there

16 was unfortunately a need for Chapter 11 in the future.

17 Q     You testified that the terms that you used for 2b here,

18 the assumptions, were just illustrative.  What was the

19 Priority Lender Group's reaction to the illustrative terms

20 that you put in 2b?

21 A     They felt that the discount that was being offered was

22 significantly too high or set in the inverse the price at

23 which the transaction would need to occur, would be about

24 60 percent.

25 Q     Even looking at the potential downsides of 3a and 3b,

1    they thought that the 60 percent of par discount was too high?

2    A    Correct.

3          MR. WILSON:  All right, can we go to page 20?

4    BY MR. WILSON:

5    Q    This is titled, "Precedent Financing Comps."  Can you

6    explain what this page shows?

7    A    Yeah, these were comparable financing transactions that

8    we have identified where the company was being offered super

9    senior capital, but not with an eye toward in your term

10   filing.  More with an eye toward giving the company the

11   opportunity to be successful.

12         And what we were trying to highlight for our clients is

13   the interest rate that was being proposed on the -- or excuse

14   me -- that was ultimately included in those financing.

15   Q    Do you recall what the ultimate risk rate that was used

16   for the new money component of the 2020 transaction was?

17   A    I do recall.  It was LIBOR plus 750 basis point which is

18   on the lower end of this comparable company is at or

19   comparable financing.

20   Q    So after --

21         MR. WILSON:  You can take this down.

22   By MR. WILSON:

23   Q    After you made this May 2020 presentation -- May 22nd

24   presentation to the Priority Lender Group, what happened next?

25   A    I believe we got a fair bit of feedback on that phone

1    call from our clients that would have informed how we were

2    considering making a proposal for the company.  We followed up

3    with a follow-up presentation that we just went through and

4    then ultimately made -- the company made that.

5              MR. WILSON:  Can we pull up Docket 863 -- hold on

6    one second.  I believe I moved that Debtors' Exhibit 144 into

7    evidence, but I just wanted to confirm.

8              THE COURT:  You did.

9              MR. WILSON:  Thank you, Your Honor.

10             Okay, can we pull up Docket 863-43, Debtors'

11   Exhibit 150?

12             FEMALE SPEAKER:  Can you say it again, a little

13   slower?

14             MR. WILSON:  Of course.  I had told you I wasn't

15   going to speak as fast as Mr. Lender and here I go.

16             Docket 863-43, Debtors' Exhibit 150.

17   BY MR. WILSON:

18   Q    And Mr. Chopra did Centerview prepare this analysis?

19   A    We did.

20   Q    Is this the follow-up analysis you were referencing where

21   you took your group's input and refined your analysis as to

22   the proposal the group should make?

23   A    It is.

24             MR. WILSON:  I'd like to move to admit Docket

25   863-43, Debtors' Exhibit 150 into evidence.

1        THE COURT:  Any objection?

2        MALE SPEAKER:  No objection.

3        THE COURT:  Good to see you today.

4        It's admitted.

5        (Exhibit 150 received in evidence.)

6    BY MR. WILSON:

7    Q    All right, can we scroll to page 3, please?

8        So can you describe the analysis on this page of the

9    May 26th presentation at a high level?

10   A    Yeah, it's a very similar analysis albeit, the

11   assumptions have been changed.  As you can see, we've now down

12   selected to just 2b and 3b for comparative purposes.

13       The other major adjustment is that we have sensitized the

14   discount captured in the middle row based on participation

15   level of 2-L -- or excuse me, based on price of the

16   transaction on the 1-L and 2-L.

17   Q    How did the economic assumptions in 2b change from the

18   May 22nd presentation?

19   A    There were two major changes.  The first is that you'll

20   see the price at which the 1-L would be repurchased has gone

21   from 60 percent to 77.5 percent, which would corroborates the

22   point that I made earlier that the clients felt that 60 was

23   too low.

24       And we've also now included the second lien, 25 percent

25   of the second lien, at a price of 42.5 percent.

KARN CHOPRA - DIRECT BY MR. WILSON

Q    And for 3b, I'm not going to ask you how the terms
changed, but at this point did you have more information on
the terms of the proposals that other lenders were offering to
the company?

A    I don't recall if we learned anything new.  I do recall
that during this phase, we were constantly kind of challenging
ourselves as to what the alternative group could be trying to
do and who could they co-op to support them.

Because we didn't know how much debt they held, but we
knew, you know, we could use the register to try and figure
out what perhaps, you know, they might hold; who might be
working with them; who might not be.

So then we were constantly, you know, working through
different assumptions on what 3b could entailed.

Q    To the best of your knowledge at this time, you still
didn't know from the company what other lenders had actually
put on the table?

A    We absolutely did not know what the other lenders put on
the table.  We did not know that until the cleansing materials
were made public.

Q    What was the feedback you received from the Priority
Lender Group on this -- on the proposal in 2b here?

A    If I remember correctly, Mr. Wilson, we ended up making
an even greater or making a minor adjustment and increasing
the price at which the 1-L would be repurchased to 80 percent

KARN CHOPRA - DIRECT BY MR. WILSON

1    of the original holder.

2        But ultimately, maybe at a higher level, the feedback we

3    received was we were now authorized to go forward and make a

4    proposal to the company along the lines of 2b with that minor

5    modification.

6    Q    Okay.

7        MR. WILSON:  Can we pull up Docket 863-43, Debtors'

8    Exhibit 155.  And can we go to page 2 of this?

9        FEMALE SPEAKER:  Excuse me.  Let me make an

10   announcement.  On this real time, if you could just hit the

11   word connect off line and then hit the internet connection and

12   then okay.  Yeah, it just went up to the cloud and it just

13   didn't come back on.  Do you see that?  Is it back on now?

14       THE CLERK:  No.

15       FEMALE SPEAKER:  Do you see where it says internet

16   at the top left?

17       THE CLERK:  Yeah, it's not working now.

18   BY MR. WILSON:

19   Q    I'll proceed.  Is this the first proposal that the

20   Priority Term Lender Group made to the company that had

21   both -- let's go to the next page, page 3 -- that had a new

22   money component combined with the debt repurchase component?

23   A    It is.

24   Q    Did some of you assist in preparing this term sheet?

25   A    We did.

1          MR. WILSON:  I'd like to move to admit Docket No.

2     863-42, Debtors' Exhibit 155 into evidence.

3          THE COURT:  So I think it's 863-48, Exhibit 155, but

4     if that's the offer, then I think you're in good shape.

5          MR. WILSON:  You are entirely correct.  Docket

6     863-48, Exhibit -- whichever you just said to be safe.

7          THE COURT:  155.

8          MR. WILSON:  155

9          MR. SEILER:  No objection.  I'll say the same thing.

10          THE COURT:  All right, thank you.

11          MR. WILSON:  I was trying to get one by Mr. Seiler

12     over there.  But, no.

13          THE COURT:  He doesn't miss much.

14          MR. WILSON:  He does not.

15          (Exhibit 155 received in evidence.)

16     BY MR. WILSON:

17     Q    If you look at the summary of terms page of this

18     document -- and specifically the structure section here -- can

19     you describe at a high level the structure of the first

20     proposal that the Priority Lender Group made to the company?

21     A    Yes, it was a $200 million first lien, first out utility

22     which is for new money.  And then a debt repurchase of the

23     company's first lien and second lien while using first lien

24     second out as currency.

25          That repurchase would be for 50.1 percent of the first

1    lien loan at the price of 80 percent of par.  And 25 percent

2    of the second lien loan at the price of 42.5 percent of par.

3    Q    I know there are a lot of pieces involved in this

4    transaction.  I'm just going to focus on a few of them today.

5         Why did the first proposal that you made contemplate

6    including only 50.1 percent of the first lien debt?

7    A    In order to provide the company super senior financing,

8    it was my understanding that abandonment would be required of

9    the first lien term loan, which would require 50.1 percent of

10   the term and lender sheet.

11   Q    And why was it set at 50.1 percent, as opposed to a

12   higher number of participating lenders?

13   A    The company was pushing hard for discount.  They wanted

14   to capture as much discount as possible.  And in order for the

15   clients to provide the discount the company was seeking, it

16   was looking for the new instrument, the first lien second out,

17   to both trade well, but also recover well, in the scenarios

18   that we've been discussing.

19        And so in order to do that, you needed to keep the size

20   of the first and second out to a certain level.  And a way to

21   do that would be through both factors, both price, as well as

22   participation level.

23   Q    And I think that largely answered the question.  But just

24   to be sure, your April 24th proposal to the company, the new

25   money priority financing, was opened to all lenders to

1    participate in.  This one was not.

2         Why was this proposed transaction not made open to all

3    lenders pro rata as compared to the earlier April 24th

4    proposal?

5    A    Because the April 24th proposal was simply a new money

6    financing.  And I think in that circumstance our client group

7    was comfortable with anybody and everybody in the first lien

8    group in participating.

9         The material difference is that this proposal and where

10   this company's desirable as with the capture discount.  The

11   other major difference was that the company had an alternative

12   that they were telling us was available to them to capture

13   that discount.

14        So we felt the need to offer the discount.  The only way

15   that you would be comfortable as a lender in conceding

16   discount and crystalizing that discount and not having the

17   ability to earn it back over time is if you were getting a

18   quid pro quo.

19        The quid pro quo was to be moved into an instrument that,

20   as I said, we would trade better or hopefully recover better

21   in a down side scenario. So in order to do that, you needed to

22   limit the size of the instrument you were exchanging it to.

23        And by definition, the way to limit the size of that

24   instrument was to limit the participation level.  So,

25   unfortunately, the only way to offer the company the discount

1     and really to work the alternative would be to convert, which

2     was being pursued by other lenders at your expense was to

3     limit the size of the FSLO and not have it (indiscernible).

4     Q    So in your view would this proposal have worked

5     economically from the Priority Lender Group's perspective if

6     it had been opened to all lenders?

7     A    No, it would not.

8     Q    Did you have -- to the extent you remember, Mr. Chopra --

9     did you have 50.1 percent of the existing first lien lenders

10    in your group at the time of this proposal?

11    A    I don't believe we did.  But I also know that neither we

12    nor the company was concerned that we would not be able to

13    achieve 50.1 percent if we were to proceed with the proposal.

14    Q    Would the company have known that you didn't have

15    50.1 percent of the first lien lenders in your group at the

16    time you made this proposal?

17    A    They would have based on the NDAs that had been signed

18    and the information provided by each of the holders to the

19    company at that point.

20         MR. WILSON:  I'd like to pull Docket No. 864-12,

21    Debtors' Exhibit 169.

22         And I'm going to look at the screen to make sure

23    that that's actually correct.  There we go.

24         Can we scroll to page 2 here?

25    BY MR. WILSON:

KARN CHOPRA - DIRECT BY MR. WILSON

1   Q    Is this the company's counterproposal to the Priority

2   Term Lender Group dated May 29th, 2020?

3   A    It is.

4   Q    And did you review this at the time that the Priority

5   Lender Group received it from Serta?

6   A    I did.

7        MR. WILSON:  I'd like to move to admit Docket No.

8   864-12, Debtors' Exhibit 169 into evidence.

9        THE COURT:  Any objection?

10       MALE SPEAKER:  No objection.

11       THE COURT:  Thank you.  It's admitted.

12       (Exhibit 169 received in evidence.)

13       MR. WILSON:  All right, can we go to page 10,

14   please?

15   BY MR. WILSON:

16   Q    So what does this page of the company's response show,

17   Mr. Chopra?

18   A    This is the black line of the company's response against

19   the Priority Term Lender Group's original proposal on the

20   26th.

21   Q    So it was showing what they changed from the original

22   proposal on May 26th?

23   A    Correct.

24       MR. WILSON:  Can we go to page 11?

25   BY MR. WILSON:

KARN CHOPRA - DIRECT BY MR. WILSON

1   Q    If you look at this section called "Structure."  And I

2   think it goes over to the next page, but can you explain what

3   Serta's counterproposal was on the structure of this

4   transaction?

5   A    Yeah, the structure of the transaction they were looking

6   to increase the participation of the first lien loan to

7   55 percent and decrease the price at which the transaction

8   would occur from 80 to 60.

9        And then on the second lien loan, they were looking at

10   increasing participation from 25 percent to 55 percent of the

11   loan and again, decrease the price at which the transaction

12   would occur from 2-1/2 percent to par to 32-1/2 percent to

13   par.

14   Q    Now I know there are a lot of other terms being

15   negotiated.  But just focusing on these, what was the Priority

16   Lender Group's reaction to these particular changes to the

17   proposed structure for the transaction?

18   A    As I mentioned, in order to give the company the discount

19   that it was seeking, we -- it was required to limit the size

20   of the participation and ultimately the size of the first lien

21   second out instrument.

22        And so the reaction from the lender group was that while

23   we had expected a negotiation on price, frankly, we expected

24   the company would be very focused on price because they were

25   really trying to maximize the benefit of every dollar of

KARN CHOPRA - DIRECT BY MR. WILSON

1    exchange loan.

2        We were desirous of keeping the participation levels as

3    close to our original proposal as possible.  And then we

4    ultimately engaged on a discussion round price.

5    Q    Do you believe that the discount levels being offered to

6    the company were more important to them than the level of

7    participation?

8    A    Those are linked concepts, but yes.  We thought that the

9    company really was focused on maximizing the benefit of every

10   dollar of exchanged debt.

11       And so while in an ideal world they'd get both, I think

12   when we were giving advice to our client, our expectation is

13   that they would be more focused on price than participation.

14   Q    And why was it important to the Priority Lender Group at

15   the time to focus on a transaction structure that was

16   attractive to the company?

17   A    As I mentioned earlier, Mr. Wilson, I'll use a phrase

18   that we're familiar with, we were effectively in an auction

19   and the auction was who was giving the company the greatest

20   discount.

21       So in order to convince the company to take our new money

22   to buy themselves incremental liquidity necessary, but

23   importantly to not pursue a transaction with an alternative

24   lender group that would have materially diluted the collateral

25   package and based on our analysis materially influenced their

1    recoveries in a downside scenario the only way to do so was to

2    convince the company that our proposal was the right proposal

3    for them to pursue.

4        We knew the company was focused on discount and we needed

5    to give them that discount.  We were just now trying to

6    negotiate their right solution for both parties.

7            MR. WILSON:  Can we pull up Docket 864-19, Debtors'

8    Exhibit 176?

9            (Pause in the proceeding.)

10           MR. WILSON:  And if we can scroll down to page 3?

11   BY MR. WILSON:

12   Q    Mr. Chopra was this the next term sheet that the Priority

13   Lender Group sent back to the company?

14   A    Yes, it was.

15   Q    And did Centerview help prepare this term sheet?

16   A    We did.

17           MR. WILSON:  I'd  like to move to admit Docket

18   864-19; Debtors' Exhibit No. 176 into evidence?

19           THE COURT:  Any objection?

20           MALE SPEAKER:  No, Your Honor.

21           THE COURT:  All right, thank you, it's admitted.

22       (Exhibit 176 received in evidence.)

23           MR. WILSON:  Then if we could just put this down.

24   I'd like to pull up Docket No. 861-44, Debtors' Exhibit 50.

25       (Pause in the proceeding.)

KARN CHOPRA - DIRECT BY MR. WILSON

1          MR. WILSON:  Can you scroll down to the term sheet?

2      (Pause in the proceeding.)

3  BY MR. WILSON:

4  Q    Mr. Chopra, was this the company's next response to the

5  term lenders' May 30th proposal?

6  A    It was.

7  Q    Is it a term sheet dated June 2nd, 2020?

8  A    Correct.

9  Q    Did you review this term sheet around the time it was

10 sent to you?

11 A    I did.

12         MR. WILSON:  I'd like to move to admit Docket

13 861-44, Debtors' Exhibit No. 50 into evidence.

14         THE COURT:  Any objection?

15         MALE SPEAKER:  No, Your Honor.

16         THE COURT:  Thank you, it's admitted.

17     (Exhibit 50 received in evidence.)

18         MR. WILSON:  And then can we pull up Docket 864-27,

19 Debtors' Exhibit 184?

20 BY MR. WILSON:

21 Q    Do you recognize this exhibit, Mr. Chopra?

22 A    I do.

23 Q    And this is a June 3rd, 2020 presentation prepared by

24 Centerview, correct?

25 A    Correct.

KARN CHOPRA - DIRECT BY MR. WILSON

1    Q    Can we go to page 2?

2         At a high level, can you explain what this presentation

3    shows?

4    A    Yeah, it shows the Ad Hoc Group's proposal on 6/1, the

5    company's response on 6/2, and then a proposed counter on 6/3

6    to help guide a conversation with our client.

7              MR. WILSON:  I'd like to move to admit Docket no.

8    865-27, Debtors' Exhibit 184 into evidence.

9              THE COURT:  Any objection to the admission of

10   864-27, Exhibit 184?

11             MALE SPEAKER:  As corrected, no, Your Honor.

12             THE COURT: All right, thank you.  It's admitted.

13        (Exhibit 184 received in evidence.)

14   BY MR. WILSON:

15   Q    So if you look at the top line on the 1-L participation

16   level, initially back on May 26th, the Priority Lender Group

17   had proposed 50.1 percent participation of the 1-L deck,

18   correct?

19   A    That's correct.

20   Q    And then you remember the company countered on 5/29

21   proposing 55 percent, correct?

22   A    Correct.

23   Q    So in the Priority Lender Group's June 1st

24   counterproposal, what participation level did they suggest?

25   A    50.1.

KARN CHOPRA - DIRECT BY MR. WILSON

1    Q    And then with regard to price, you had originally

2    proposed 80 percent on May 26th.  On June 1st, what did the

3    term lender group propose on price?

4    A    75 percent.

5    Q    Then moving on to the company's counterproposal on

6    June 2nd, did the accept the term lender's position as far as

7    the participation level?

8    A    They did.

9    Q    Did they continue to negotiate on price?

10   A    They did.

11   Q    So is this consistent with your view earlier that what

12   mattered more to the company was maximizing the total amount

13   of discount?

14   A    It does.

15        MR. WILSON:  All right, can we pull up Docket No.

16   864-28; Debtors' Exhibit 185?

17        And this is a June 3rd, 2020 presentation.

18        Can we go to the second page?

19   BY MR. WILSON:

20   Q    This was prepared by Centerview, Mr. Chopra?

21   A    It was.

22   Q    And at a high level, why did you put this presentation

23   together?

24   A    At the time, despite the fact that we were making

25   progress in the negotiation, there was still a fair bit of

1       hesitancy on our client's part about providing discount.

2           And so, we had continued to refine our analysis on what

3       we had referred to earlier as 3b, the dropdown transaction

4       lead by the alternative lender group.

5           After the client had asked us to do some more work on not

6       just the general concept of the dropdown, but actually trying

7       to value the collateral, the IP that would be dropped down

8       into the unrestricted subsidiary.  And then use that as a mean

9       to try and determine what remains co would be worth, which

10      would then help inform recovery levels for our clients.

11          So this presentation is effectively more nuance detailed

12      presentation of 3b that we were asked by our client to prepare

13      to help them guide the final aspects of their negotiations.

14      Q    So was it -- would you describe it as an aggressive

15      negotiation between the Priority Lender Group and the company

16      at this point?

17      A    Yes, it was a hard-fought negotiation at that point in

18      time.  And it still hadn't culminated, but we were in the

19      midst of negotiation and as you could tell by this

20      presentation, our clients weren't sure exactly how much more

21      discount to offer.  That was a very key focus for them, as

22      well as some other terms that were still in flex.

23      Q    So at this point, your clients were close to reaching the

24      limit as far as discount that they would offer and the asked

25      for this additional analysis to inform that decision?

KARN CHOPRA - DIRECT BY MR. WILSON                    188

1      A    That's correct.

2                  MR. WILSON:  I'd like to move to admit Docket

3      864-27, Debtors' Exhibit 185 into evidence.

4                  THE COURT:  Any objection?

5                  MALE SPEAKER:  No, Your Honor.

6                  THE COURT:  All right, I'll admit 864-28, marked as

7      Exhibit 185.

8                  (Exhibit 185 received in evidence.)

9                  MR. WILSON:  I appreciate your help again, Your

10     Honor.  Can we go to Docket 864-37, Debtors' Exhibit 194?

11                 And actually I'm going to -- there we go.  Just

12     verifying it all this time.

13     BY MR. WILSON:

14     Q    So this is an email from Gibson Dunn to Weil, as well as

15     Centerview from June 4th, 2020, correct?

16     A    Correct.

17     Q    Can I direct your attention to page 5?  What is this

18     document, Mr. Chopra?

19     A    This is the Priority Term Lender Group's counterproposal

20     on June 4th.  This is a clean copy of that term sheet.

21     Q    Did you review this document when you received it from

22     the company?

23     A    Mr. Wilson, I think this was a version we were sent to

24     the company.  But yes, I did review it before it was sent to

25     the company.

KARN CHOPRA - DIRECT BY MR. WILSON

1    Q    Thank you.

2         Did you assist in preparing this term sheet?

3    A    I did.

4         MR. WILSON:  I'd like to move to admit Docket

5    864-37, Debtors' Exhibit 194 into evidence.

6         THE COURT:  Any objection?

7         MALE SPEAKER:  No, Your Honor.

8         THE COURT:  It's admitted.

9         (Exhibit 194 is received in evidence.)

10   BY MR. WILSON:

11   Q    I'd like to direct your attention to page 14 of this PDF.

12        (Pause in the proceeding.)

13   Q    Is this, again, show a redline between the Priority

14   Lender Group's June 4th proposal and the last proposal that

15   you received from the company on June 2nd?

16   A    It does.

17   Q    And if you focus on this, the section entitled

18   "Structure" again, what changes did the Priority Lender Group

19   make to the structure of the transaction in the June 4th

20   proposal?

21   A    At this point, the only change in this section was to

22   increase the price at which the first lien term loan would

23   participate in the debt repurchase to 74 percent and the price

24   for the second lien to put.

25   Q    And why did your group propose those changes?

KARN CHOPRA - DIRECT BY MR. WILSON

1    A    I think at that point, we -- I think the bid ask was

2    narrowing what we still felt like the discount that was being

3    asked for by the company was too severe and too significant.

4    And as a result, we were seeking to reduce the level of

5    discount that was being offered.

6    Q    Did you have any understanding of whether the Priority

7    Lender's were willing to continue to negotiate to negotiate on

8    price after this proposal?

9    A    At this point, I think that we were starting to reach the

10   limit of the Priority Term Lenders were willing to consider.

11   Q    And at that point, they would have preferred what they

12   expected the alternative transaction was to offering further

13   discount?

14   A    All (indiscernible), yes.

15   Q    Did the Priority Lender's ultimately reach a deal with

16   the company?

17   A    They did.

18   Q    Do you remember when?

19   A    June 8th.  It was when it was announced.

20        MR. WILSON:  Can we pull up Docket No. 908-1?  It

21   should be Debtors' Exhibit 220.

22        And if you scroll down?

23   BY MR. WILSON:

24   Q    Is this the June 8th, 2020 term sheet that Weil sent to

25   the Priority Lender Group?

1    A    It is.

2    Q    Did you review this when the Priority Lender Group

3    received it?

4    A    I did.

5         MR. WILSON:  I'd like to move to admit Docket

6    865-12, Debtors' Exhibit -- sorry.  I'd like to move to admit

7    Docket 908-1, Debtors' Exhibit 220 into evidence.

8         (Automated annoucement.)

9         THE COURT:  Any objection?

10        MALE SPEAKER:  None, Your Honor.

11        THE COURT:  Thank you.

12        And just for clarity sake, 908-1, marked as Exhibit

13   220 is admitted.

14        (Exhibit 220 received in evidence.)

15   BY MR. WILSON:

16   Q    Was this the final term sheet?

17   A    It was.

18        MR. WILSON:  We can take this down.

19   BY MR. WILSON:

20   Q    Mr. Chopra, are you aware that there's an indemnity

21   provision in the Priority Term Lender Group Agreement where

22   the borrower indemnifies the lenders for losses, damages or

23   claims including in connection with the 2020 transaction?

24   A    I am.

25   Q    Was it important to the Priority Lender Group that there

KARN CHOPRA - DIRECT BY MR. WILSON

1    would be an indemnity provision in that Priority Term Loan

2    agreement?

3    A    It was.

4    Q    Why?

5    A    As I understand it, indemnities are commonplace in credit

6    agreements.  So I think it's an important component of all

7    credit agreements.  But in particular, in this situation, we

8    announced the transaction on June 8th.

9         If I remember correctly the company and certain subset of

10   lenders were then litigated against at that point, even prior

11   to closing the transaction in later June.

12   Q    Some by the time the June 22nd Priority Term Loan

13   Agreement was signed up, a number of the lenders, as well as

14   the company were already subject to litigation?

15   A    Correct, active litigation.

16   Q    And are you aware that the Chapter 11 Plan proposed in

17   this case includes an continuing indemnity for the Priority

18   Lender Group for losses, damages or claims including in

19   connection with the 2020 transaction?

20   A    I am.

21   Q    Was it important to the Priority Lender Group that a

22   continuing indemnity group be provided for in the Plan?

23   A    It was.

24   Q    And why was that?

25   A    Again, we're in active litigation and as we sit here

1    today and I think the lenders felt like it was important for

2    their -- well, to you know, in conjunction with their

3    willingness to provide a significant equalization of their

4    debt and to allow the company to emerge on an expeditious

5    basis that the indemnity continue thereafter.

6    Q    If the indemnity were stripped out of the Plan in some

7    fashion, would that be adverse to the Priority Lender Group?

8    A    It would.

9         MR. WILSON:  Can we pull up Docket No. 865-14,

10   Debtors' Exhibit 222?

11        (Pause in the proceeding.)

12   BY MR. WILSON:

13   Q    Sir, I believe you just testified that the deal was

14   publically announced on June 8th, 2020.

15        What is this document, Mr. Chopra?

16   A    This is an email exchange between myself and it looks

17   like Gibson Dunn, which is forwarding an email from East Vance

18   (phonetic).  The appendix or what was attached to the email, I

19   think, more importantly is the cleansing materials provided to

20   the marketplace by the company.

21        MR. WILSON:  And if we just scroll to page 3?

22   BY MR. WILSON:

23   Q    These are the start of the cleansing materials you were

24   referring to?

25   A    These are.

1    Q    Did you review the cleansing materials to get an

2    understanding of what deal the Angelo Gordon Group had been

3    offering to the company?

4    A    I did.

5    Q    Was that the first time when they saw these cleansing

6    materials that you became aware of the actual terms of what

7    any other lender group had been offering to the company?

8    A    It was.

9    Q    At a high level, what did you learn after reviewing the

10   materials?

11   A    I learned that what had been proposed by the Gamut,

12   Angelo, Apollo Group was actually far more damaging to the

13   collateral package that our lenders benefitted from than I had

14   anticipated.

15        In particular, there was movement of more IP than I had

16   anticipated.  There was a guarantee being provided by Serta

17   down to the IPCO entity, as well as there was not going to be

18   the extinguishment of the debt that had been transferred to

19   IPCO, thus requiring the borrower that our loan would have

20   been left at to pay interest to IPCO on a go-forward basis.

21        So holistically, my impression was that it was a very

22   good decision by our clients to participate in the transaction

23   they did and that the harm that would have been caused to them

24   by the alternative transaction would have been more severe

25   than I had anticipated.

1        MR. WILSON:  We can take this down.

2    BY MR. WILSON:

3    Q    Were the lender participants in the June 2020 transaction

4    set in stone at the time the transaction was announced on

5    June 8th of 2020?

6    A    Not all of them.

7    Q    How as it determined which additional lenders would

8    participate after June 8th, 2020?

9    A    The company would leverage some level of basket

10   availability in the first lien second out after accounting for

11   our clients and other lenders that they had identified to

12   include.

13       But, the direct answer to your question is, it was the

14   company that was making the determination as to who would

15   otherwise participate outside of our lender group.

16   Q    Did lenders reach out to you to see if they could

17   participate in the transaction?

18   A    They did.

19   Q    And what did you respond when they did so?

20   A    More often than not, I directed them either to Evercore

21   or the company to engage.

22        MR. WILSON:  Can we pull up Docket 865-18; Debtors'

23   Exhibit 226?

24   BY MR. WILSON:

25   Q    Mr. Chopra, are these emails between you and individuals

1       from MetLife on June 9th, 2020?

2       A     They are.

3       Q     And what is MetLife?

4       A     MetLife is an insurance company, but in this case

5       obviously a lender of Serta.

6       Q     I'd like to direct your attention to --

7                   MR. WILSON:  Can we go to page 2 -- to the

8       bottom-most email on page 2.

9                   What was -- it's the only email on page 2.  I'll

10      direct you to that one.

11      BY MR. WILSON:

12      Q     What was Mr. Driscoll asking you?

13      A     He was asking for more information on the transaction

14      support agreement and the transaction at large.  And was

15      asking for the opportunity to participate in the transaction.

16                  MR. WILSON:  Let me scroll back up to page 1.

17      BY MR. WILSON:

18      Q     On page 1, you respond, "Please note that participation

19      is in the hands of the company at this time."

20            What did you mean by that?

21      A     That ultimately the ability to participate was a decision

22      the company would make, not the lender group.

23                  MR. WILSON:  Your Honor, I'd move to admit Docket

24      No. 865-18, Debtors' Exhibit 226 into evidence.

25                  THE COURT:  Any objection?

1          MR. LIEBERMAN:  No objection.

2          THE COURT:  It's admitted.

3          (Exhibit 226 received into evidence.)

4     BY MR. WILSON:

5     Q    Did you see anything inappropriate about additional

6     lenders reaching out seeking to get added to the deal?

7     A    Not at all.

8     Q    Does Centerview have any authority over which additional

9     lenders were able to participate?

10    A    We did not.

11    Q    Did the Priority Lender Group have any authority over

12    which additional lenders were able to participate?

13    A    They did not.

14    Q    And ultimately the transaction closed after a New York

15    Court denied some of the Defendants here a preliminary

16    injunction, correct?

17    A    That's correct.

18    Q    And that was on or about June 22nd, 2020?

19    A    Correct.

20    Q    Turn to a slightly different topic.

21          Mr. Chopra, are you aware that Citadel has made a

22    proposal to provide exit financing to the Reorganized Debtors

23    and replace the take back paper that's contemplated by the

24    plan?

25    A    I am.

1    Q    If that proposal have the effect of removing the

2    continuing indemnity for the Priority Lender Group for claims

3    related to the June 2020 transaction, would that be adverse to

4    them?

5    A    It would.

6    Q    Would your group support of the Plan dependent on an

7    including an ongoing indemnity?

8    A    Yes, it was.

9    Q    And why was that?

10   A    Again, there's ongoing litigation the group -- which

11   includes members who participate in the 2020 transaction who

12   are actually named plaintiffs in that litigation or allowing

13   or agreeing to facilitate a significant equalization of the

14   company's balance sheet to allow for the company to emerge on

15   an expeditious basis.

16         And in exchange for doing so, they were seeking for the

17   continuation of the indemnity.

18              THE COURT:  And just so we're clear.  I assume they

19   were named as Defendants, not Plaintiffs?

20   BY MR. WILSON:

21   Q    They are Plaintiffs in this case.  They were named as

22   Defendants in litigation filed against them, correct?

23   A     That's correct.  Sorry, I meant to say in the other

24   cases, not this case.  I apologize.

25              THE COURT:  Understood.  All good.

199 of 204

KARN CHOPRA - DIRECT BY MR. WILSON

1    BY MR. WILSON:

2    Q    Among the members of the Priority Lender Group that had

3    been named as Defendants in ongoing litigation, are CeSam

4    (phonetic), Enton Vance (phonetic), Barings and Investco,

5    correct?

6    A    Correct.

7    Q    And they remain part of the Priority Lender Group today?

8    A    Correct.

9    Q    Do you know how much of the first lien, second out debt

10   of the company they currently hold?

11   A    Over 45 percent.

12   Q    Do you understand that to be a blocking position within

13   that class of debt?

14   A    I do.

15   Q    Without their support, could the company confirm a plan?

16   A    I don't believe so.

17   Q    One last topic:  Defendants here have argued that at the

18   time of the 2016 credit agreement and even as late as 2020,

19   the credit industry did not expect that a transaction like the

20   unlawful exchange transaction -- their words obviously --

21   could occur?  What's your reaction to that?

22   A    I don't think that that's an accurate depiction.  In

23   2016, we were actually just coming out of a relatively

24   aggressive period of liability management transactions from

25   the waive of distress in oil and gas companies.

KARN CHOPRA - DIRECT BY MR. WILSON

1        I think there was sophisticated parties who were

2   negotiating the 2016 term loan.  The 2016 term loan had

3   numerous borrower friendly terms that were consistent with

4   terms being negotiated in leveraged loan market at the time.

5        And generally speaking, the transaction that we

6   consummated had component pieces that everyone was very

7   familiar with.  I had worked on a number of superpriority

8   financings in other instances.  So it was pretty commonplace

9   in the marketplace.  And there had been a number of distressed

10  repurchased transactions.

11  Q    Were you ultimately comfortable with the structure of the

12  June 2020 transaction?

13  A    I was.

14  Q    And why was that?

15  A    Because it was allowed for under the documentation.  What

16  wasn't allowed for, we amended, which is the allowance for the

17  super senior financing.

18       And it was heavily negotiated between the company and the

19  lenders with the threat of an alternative group who was

20  proposing something that frankly would have been incredibly

21  damaging to our clients.

22  Q    If Centerview did not believe that the 2020 transaction

23  had been negotiated and consummated in good faith, would

24  Centerview have advised the Priority Lender Group that they

25  should pursue it?

1      A    No, we would have not.  No, we would not have.

2              MR. WILSON:  I have no further questions at this

3      time, Your Honor.

4              THE COURT:  All right, thank you.

5              Folks, as you know it's 4:49.  I do have First Days

6      both at 5:00 and 6:30 so I assume you don't want to wait to

7      continue.

8              We do have all day tomorrow.  So is this a

9      convenient breaking spot for everyone?

10             MALE SPEAKER:  Your Honor, I could start and spend

11     the 11 minutes and wouldn't finish.  Or I can come back

12     tomorrow.

13             THE COURT:  So I need a couple minutes to set up,

14     so.

15             MALE SPEAKER:  I didn't mean to --

16             THE COURT:  Yeah, theoretically I've go to be, you

17     know, I've got to totally switch brains and be prepared for

18     something else.

19             But you do have all day tomorrow as I understand the

20     calendar has been cleared.

21             MR. WILSON:  So I really appreciate Mr. Saunder's

22     willingness.  I think one of the challenges is that there's a

23     particular witness that they want to call from UBS that has to

24     go at 9:30 tomorrow.

25             THE COURT:  If you told me that, I totally forgot

KARN CHOPRA - DIRECT BY MR. WILSON

1    about that.

2         MR. WILSON:  I was just wondering if we could start

3    even earlier tomorrow with the goal of getting Mr. Chopra done

4    before the UBS witness?

5         MALE SPEAKER:  If I could suggest that you let the

6    parties work out the scheduling and start at whatever time

7    Your Honor wants, we'll work it out.

8         So if we have to interrupt Mr. Chopra, I don't think

9    we will, but there's some discussions going on.

10        THE COURT:  I'm perfectly happy for everyone to

11   talk.  I am happy to start earlier.  I'm happy to go late.

12   What I would ask, if you want to start -- let me do it this

13   way.

14        We're going to start at 9:00 unless you-all go out

15   in the hall in the next 15 minutes decide you want to start

16   earlier.  And then we have to figure out how to let everybody

17   know.

18        MALE SPEAKER:  An excellent idea, Your Honor.

19        MALE SPEAKER:  Sounds good, Your Honor.

20        MALE SPEAKER:  Switch here thinking to your other

21   cases.  We'll work it out.

22        THE COURT:  So fair enough.  But if I -- those folks

23   who are watching, if you would just hang around for another

24   10 minutes or so and I'll just re-confirm right before I call

25   the 5:00 o'clock case, the start time for tomorrow morning.

KARN CHOPRA - DIRECT BY MR. WILSON

1           So, if you decide on a at a different time,

2   please -- actually would somebody come back and tell me that

3   we are starting at 9:00 or we're starting at sometime

4   different?

5           MR. WILSON:  Will do, Your Honor.  Can Mr. Chopra

6   step down for now?

7           THE COURT:  Absolutely.  Mr. Chopra, thank you sir

8   and I'll see you back in the morning.

9           THE WITNESS:  Thank you, Judge.

10       (Witness steps down.)

11          THE COURT:  Thank you.

12          And folks, same as yesterday, everybody is going to

13  be on video.  You can leave everything exactly right where it

14  is and we'll lock the doors just as soon as we leave today.

15          All right, thank you, everybody.

16       (Proceedings concluded at 4:51 p.m.)

17

18

19

20

21

22

23

24

25                              * * * * *

1           I certify that the foregoing is a correct transcript

2       to the best of my ability due to the condition of the

3       electronic sound recording of the ZOOM/video/telephonic

4       proceedings in the above-entitled matter.

5        /S/   MARY D. HENRY

6       CERTIFIED BY THE AMERICAN ASSOCIATION OF

7       ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8       JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9       JTT TRANSCRIPT #67226

10       DATE FILED:  MAY 16, 2023

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25