IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 23-90020-11 |
| | § | JOINTLY ADMINISTERED |
| | § | HOUSTON, TEXAS |
| SERTA SIMMONS BEDDING, LLC, | § | WEDNESDAY, |
| ET AL, | § | MAY 17, 2023 |
| DEBTORS. | § | 9:02 A.M. TO 12:00 P.M. |

****************************************************************

| | | |
|---|---|---|
| SERTA SIMMONS BEDDING, LLC, | § | CASE NO. 23-9001-ADV |
| ET AL, | § | JOINTLY ADMINISTERED |
| | § | HOUSTON, TEXAS |
| VERSUS | § | WEDNESDAY, |
| | § | MAY 17, 2023 |
| AG CENTRE STREET PARTNERSHIP, | § | |
| ET AL | § | 9:02 A.M. TO 12:00 P.M. |

**CONFIRMATION DAY THREE - MORNING SESSION (VIA ZOOM)**

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                         SEE NEXT PAGE

**(Recorded via CourtSpeak.  Witnesses could not be heard
clearly.)**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES (VIA ZOOM)</u>:


FOR THE DEBTOR:                    WEIL GOTSHAL & MANGES, LLP
                                   Ray Schrock, Esq.
                                   David Lender, Esq.
                                   Alexander Welch, Esq.
                                   700 Louisiana, Ste. 1700
                                   Houston, TX  77002
                                   713-546-5000


FOR CITADEL:                       FAEGRE DRINKER BIDDLE & REATH
                                   James Millar, Esq.
                                   1177 Avenue of the Americas
                                   41st Floor
                                   New York, NY  10036
                                   212-248-3140


FOR PRIORITY LENDERS:              GIBSON DUNN & CRUTCHER, LLP
                                   Gregg J. Costa, Esq.
                                   Lee Wilson, Esq.
                                   Amanda Aycock, Esq.
                                   Scott Greenberg, Esq.
                                   811 Main Street
                                   Suite 3000
                                   Houston, TX  77002
                                   346-728-6649


FOR SERTA MINORITY LICENSEES:      FISHMAN JACKSON RONQUILLO, PLLC
                                   Mark Ralston, Esq.
                                   4835 LBJ Freeway
                                   Suite 475
                                   Dallas, TX  75244
                                   972-419-5544

FOR THE STATE OF CONNECTICUT
DEPARTMENT OF ECONOMIC AND
COMMUNITY DEVELOPMENT:             MR. BOWMAN


FOR THE EXCLUDED LENDERS:          FRIEDMAN KAPLAN SEILER
                                   & ADELMAN, LLP
                                   Eric Seiler, Esq.
                                   7 Times Square
                                   New York, NY  10036-6516
                                   212-833-1103

<u>APPEARANCES (CONT'D) (VIA ZOOM)</u>:


FOR LCM LENDERS:                     HOLWELL SHUSTER & GOLDBERG, LLP
                                     Neil Lieberman, Esq.
                                     425 Lexington Avenue
                                     New York, NY  10017
                                     646-837-5151

FOR APOLLO:                          PAUL WEISS RIFKIND WHARTON
                                     & GARRISON, LLP
                                     Andrew Ehrlich, Esq.
                                     1285 Avenue of the Americas
                                     New York, NY  10019
                                     212-373-3000



(Please also see Electronic Appearances.)

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| KARN CHOPRA | | | | |
| By Mr. Wilson | . | . | 70 | . |
| By Mr. Seiler | . | 6 | . | 82 |
| By Mr. Lieberman | . | 56 | . | . |
| By Mr. Millar | . | 58 | . | . |
| | | | | |
| ANDREW SVEEN | | | | |
| By Ms. Aycock | 89 | . | . | . |

| EXHIBITS: | Received |
|---|---|
| No. 167, ECF 250-73 | 24 |
| No. 188, ECF 864-31 | 116 |

\*\*\*

1        **HOUSTON, TEXAS; WEDNESDAY, MAY 17, 2023; 9:02 A.M.**

2              THE COURT:  Today is May the 17th, 2023.  This is

3        the Docket for Houston, Texas.  We have continued proceedings

4        in the jointly administered cases under Case No. 23-90020,

5        Serta Simmons Bedding, LLC, as well as the associated

6        adversary proceeding, which is 23-9001.

7              As always, folks, please don't forget to record your

8        electronic appearance today.  That is the way we note the fact

9        that you were here.  That's a quick trip to the website, a

10       couple mouse clicks.  You can do that at any time prior to the

11       conclusion of the hearing this afternoon.

12             First time that you speak, if you would, please

13       state your name and who you represent.  That does greatly

14       assist the court reporter in the performance of his or her

15       duties.  We are recording using Courtspeak.  We're going to

16       continue the practice of splitting the audio when we take our

17       break.

18             And finally, I think I think we've got everything

19       else.  We don't currently have the camera at the lectern up.

20       That's due to the fact that Mr. Alonzo has forgotten his basic

21       computer skills, but I have no doubt that he will work those

22       out.

23             But for folks who are both listening online, as well

24       as watching the video, currently you only see the witness and

25       me.  That will be remedied momentarily, but we're going to go

1    ahead and start.  So I don't see the need to wait.

2              If you are online and you decide you need to speak,

3    I have activated the hand-raising feature.  So you need to hit

4    five star, otherwise you will not be able to be heard.

5              And with that, I will note that Mr. Chopra is back

6    on the stand.  We're ready to begin Cross, correct?

7              MR. SEILER:  Yes, Your Honor.

8              THE COURT:  All right, thank you.  Whenever you're

9    ready.

10             MR. SEILER:  Will I be able to bring exhibits up?

11             THE COURT:  I switched it.  You should have control.

12             MR. SEILER:  You'll be able to see them?  You will?

13             THE COURT:  Yes.

14             MR. SEILER:  Good morning, Your Honor.  Eric

15   Seiler.  I'm counsel for the excluded lenders or the non-

16   priority lenders depending on who's describing us.

17                        CROSS-EXAMINATION

18   BY MR. SEILER:

19   Q    Mr. Chopra, good to see you again.

20   A    Good morning.

21   Q    Good morning.

22        I take it you weren't watching any the testimony that

23   proceeded yours during this trial?  Either reading it or

24   watching it?  Correct?

25   A    Correct.

1    Q    And last night you didn't discuss the case with anyone?

2    A    I did not.

3    Q    Your testimony?

4    A    I did not, sorry.

5    Q    You're lucky.  I had to talk to a lot of people last

6    night.  You've been better than me.

7         I want to just go through a few things you talked about

8    and then I have some other questions as well.

9              MR. SEILER:  And I'm going to ask Emilio to call up

10   Debtor's 144, which was marked yesterday.

11        (Pause in the proceeding.)

12   BY MR. SEILER:

13   Q    And these were materials that you prepared, correct?

14   A    Correct.  These are materials that Centerview prepared.

15   Q    Every time we talk about Centerview it's fair to talk

16   about you as well, right?  You worked on everything that

17   Centerview did?

18   A    That's correct, yes.

19   Q    And you looked at -- yesterday we looked at page 14 of 25

20   of Debtor's 144 which is also, for the Record, in the, I think

21   in the main case 863-37.  It's been admitted.

22        And this was where you were modeling not only the

23   transaction that you were working on, but also your

24   expectations about a transaction that others could be working

25   on in competition; is that correct?

1    A    (No audible response.)

2              MR. SEILER:  Oh, yes, bring up page 14 of 25 of this

3    exhibit.  Can we do that?

4              MR. EMILIO:  Which page was that?

5              MR. SEILER:   Page 14 of 25.  There we go.

6    BY MR. SEILER:

7    Q    You talked about this yesterday, right?

8    A    I did.

9    Q    And you knew by -- this is May, you know that there were

10   other people talking to the company including a group that you

11   believed included Angelo Gordon, Apollo and Gamut, right?

12   A    Correct.

13   Q    But you surmised that they we be working on a dropdown

14   transaction?

15   A    Correct.

16   Q    And sometimes that's referred to as a J-Crew transaction,

17   same thing?

18   A    Correct.

19   Q    And you didn't know the terms they were proposing, but

20   you -- because you were familiar with those kinds of

21   transactions, you were modeling what you thought those terms

22   would be and then what the recovery range would be for your

23   clients if that happened.  And also what the discount capture

24   would be for the company with various assumptions, correct?

25   A    Correct.

1   Q    And that's what we see under Basket -- particularly I'm
2   looking at Basket 3b.
3   A    Correct.  It's under Column 3b.
4   Q    Under, sorry?
5   A    Column 3b.
6   Q    Column 3b, good point.  And so -- and that helped inform
7   your analysis of what was under Column 2b, which was not
8   something that had been proposed, but something you wanted
9   your clients to consider proposing?
10  A    Correct.
11  Q    And you used a 60 percent exchange rate in that example?
12  A    I did.
13  Q    And your clients ended up only having to do with
14  74 percent exchange rate in the transaction that ultimately
15  occurred?
16  A    Correct.
17  Q    But you were using this to convince your clients that if
18  they wanted to avoid a J-Crew transaction occurring, they were
19  going to have to -- not only give $200 million of new money,
20  superpriority priming basis, but also consider exchanging
21  their existing 1-L debt at 60 cents on the dollar face?
22  A    I wouldn't say I was trying to convince my clients.  I
23  think at this point in the conversation we were trying to have
24  a conversation with our client about what the potential
25  alternatives might be and what their potential proposal might

1    be to the company.  And so we were laying out what I think of

2    as the goal posts for that conversation.

3    Q    Sure, but -- because you believed that if the Angelo

4    Gordon group were to propose something along the lines of

5    what's in Column 3b and that created a model discount of 393

6    million.  If you wanted to have a discount that was

7    commensurate, you would need to have a exchange ratio around

8    60, not one that higher.

9         The higher the ratio, the lower discount captured,

10   correct?

11   A    I think that's too specific a point to make from this

12   page.  Yes, that is a factor, but I think you could also point

13   to the fact that under 3b, the recovery to our clients could

14   have been as well as 11 percent.

15        And so it wasn't simply saying that the only way to match

16   the 393, which again were assumptions.

17   Q    Right.

18   A    We didn't know.  We were trying to provide guideposts for

19   a conversation.  It wasn't just simply that in order to match

20   393, you had to give 60 percent of par.  That wasn't the way

21   the conversation went.

22        The way the conversation went was to walk through the

23   alternatives and to think about it from various different

24   lenses.  And to highlight to the client that in order for the

25   clients to avoid the damage that was caused in 3b, they would

1   need to consider 2b because 2a was not to the company on its

2   own.

3   Q    Let's just be clear.  The damage that would have been

4   caused by 3b -- because 3b was an assumed hypothetical?

5   A    It was a hypothetical, but with the understanding that

6   the company had told us they were engaged in a conversation a

7   long the lines of 3b.

8        Assumptions were not known or the actual terms were not

9   know.  But, it wasn't like this was a -- it was in IPCO.  It

10   was actually again discussed by the company with a third party

11   person.

12   Q    But you had to hypothesize what the exact terms would be

13   in order to calculate what the capture discount thing?

14   A    We had to make assumptions to be able to understand what

15   the potential discount might be.

16   Q    And when you did that, the example you chose to model for

17   your clients so that you could also calculate a discount

18   captured was 60 percent, not some other number.  Not 80, not

19   74.  You chose to illustrate one and it was 60; is that

20   correct?

21   A    In this presentation, yes, although we adjust that over

22   time.

23   Q    Yeah, but this is the presentation that was in the four

24   days before your first proposal?

25   A    Correct.  There was another presentation before the

KARN CHOPRA - CROSS BY MR. SEILER

1    proposal was made.

2    Q    Because your clients didn't like 60 percent.  They

3    thought it was too steep to propose, correct?

4    A    It was one of the terms that was adjusted, yes.

5    Q    Now let's just get some math out of the way because you

6    talked about this the other day, yesterday, and it confused

7    me.

8         The discount captured is a mathematical result of both

9    the percentage participation and the exchange ratio, right?

10   A    Correct, the price.

11   Q    And you -- we'll call that the price.  So the percentage

12   participation and the price.  And here -- so our Record is

13   clear, the percentage participation you were assuming was

14   50.1 percent and the price was 60 percent?

15   A    Correct.

16   Q    And you needed to be at least 50.1 percent because you

17   knew amendments were required and that was the minimum

18   required to do amendments?

19   A    For the amendment required to facilitate the $200 million

20   new money superpriority financing, correct.

21   Q    But there was no -- that wasn't the maximum allowable.

22   It could have been a higher percentage?

23   A    It could have, yes.

24   Q    And the higher percent -- the percentage, all else equal,

25   the more discount capture the company would receive?

1    A    Correct.  All of them together.

2    Q    And conversely, just multiplication, holding the

3    percentage of participation constant, the lower -- the lower

4    the number of the price, the more discount the company would

5    receive?

6    A    Correct.

7    Q    Because you testified yesterday that the company -- what

8    the company cared about was the discount received, right?

9    A    I testified that the company cared about discount

10   received, but they were -- I also testified that they were

11   trying to maximize the value of every dollar that was

12   exchanged.

13        And as a result, in the back and forth it was cleared up

14   that their primary focus was on price, not necessarily on

15   participation.

16   Q    But that's what surprises me mathematically because if

17   they could have tolerated a somewhat higher price with more

18   participation because they had gotten a bigger discount.  It's

19   just multiplication, right?

20   A    Correct, but they, too, were trying to find a solution

21   with a third party that needs to agree.  We're the third party

22   that needs to agree and as I testified, we were focused on

23   getting the -- the fact that in order to give the discount, we

24   needed to keep the participation level at a level that would

25   keep the (indiscernible) in a size that we felt comfortable.

1    Q    Right and that's because for you, while the company was

2    getting discount capture, what your clients would be getting

3    in this uptier transaction was they would be getting to jump

4    over the people who didn't participate and they would,

5    therefore, if it turned out in 2021 or '22 that the company

6    needed to be restructured or went into bankruptcy, it might

7    turn out very good to have jumped above the people who used to

8    be *pari passu*.

9        And your clients wanted to keep the group that jumped

10   above as small possible.  It had to be 50.1 and they didn't

11   want it to be any larger than 50.1 percent; isn't that true?

12   A    There's a lot they did there.  What I would say is that

13   our clients were -- it's not like we were getting something

14   and not giving something.  We were giving discount.  We were

15   conceding value.  We were not able to achieve that value in

16   the future.  You're not able to recoup that value.  It was a

17   crystallization of a loss on the par instrument.

18       In exchange for the crystallization of the loss, yes, we

19   wanted the new instrument that we were receiving to trade well

20   and/or recover well in a downside scenario.

21       But again, this is all with an eye toward avoiding the

22   harm that would have otherwise been caused at an alternative

23   group that you represent been able to consummate

24   (indiscernible).

25   Q    Look, I represent them now.  I didn't represent them

1    then.  And you didn't know what they were proposing then?  You

2    were hypothesizing what they could have been proposing then?

3    A    We were making assumptions, correct.

4    Q    And -- but I think you didn't really quite answer my

5    prior question.  My prior question was your clients wanted to

6    keep the group they were in as small as possible, 50.1 percent

7    or as close thereto as they could, because that maximized the

8    benefit they would have in an event where there was a

9    restructuring or a bankruptcy and they could jump over other

10   people who wouldn't do as well who they used to be *pari passu*

11   with?

12   A    I think there's a distinction there.  You keep saying the

13   group they were in, which implies that you're trying to keep

14   people away.  What you're trying to do is minimize the size of

15   the first lien second out instrument, which requires

16   definitionally that you keep the participation level at a

17   certain level.

18   Q    Right, because you don't -- because the more -- if

19   everybody was in it, no one would have jumped ahead of anyone?

20   A    If everyone was in it, no one would be willing to give

21   the company discounts.

22   Q    Maybe so.  But if everyone was in it, no one would have

23   jumped ahead of everyone, correct?

24   A    Correct.

25   Q    And if 60 percent were in it, that's less good for the

1    people who are in it than if it's 50.1?  And your clients

2    cared a lot about keeping it at 50.1 or as close as possible

3    thereto.

4        That was very important to your clients; isn't that fair?

5    A    At 60 percent there may not have been a deal and so it's

6    not easy to just say that 60 percent you may be worse off.

7    There may not have been a deal.

8        So I think ultimately it was two sophisticated parties

9    negotiating and we were trying to get to a resolution of

10   (indiscernible).

11   Q    But all I'm trying to get you -- I understand that you

12   want to keep saying that you needed to have a deal or there

13   wasn't a deal.  I get that.

14       But it's also true, isn't it, that your clients wanted

15   50.1 percent.  In fact, the company countered with 55 and you

16   said no, 50.1; isn't that true?

17   A    Correct.

18   Q    Now I'm confused a little bit about Barings.  So in the

19   very beginning, Barings was in your group.  If we look at

20   Debtor's Exhibit 49, which was also marked as 863-37 in the

21   main case.

22       And it was a working group list.  And on page 4 of 14,

23   one of the working groups is Barings.  Do you see that?

24   A    I do.

25   Q    And -- so this is back in -- on March 30th and the first

1    page is the email that you were sending.  So Barings was in

2    your group on March 30th?

3    A    Correct.

4    Q    But they weren't in your group on May 22nd the exhibit we

5    were just looking at?

6    A    Correct.

7    Q    In fact, they were talking to the company separately

8    about a dropdown transaction?

9    A    I don't know what Barings was talking to the company

10   about.

11   Q    How did they get out of your group?

12   A    That's Baring' decision if they do or do not want to be

13   part of our group.

14   Q    Did you learn -- when did they get out of your group?

15   A    I don't know exactly when they formally dropped.  But I

16   know that when we were getting our clients restricted or

17   excuse me, when we were getting restricted advisors on

18   May 10th, we sent the company a list of who we believe were in

19   our (indiscernible) and they alerted us that one of the people

20   on the list had separately executed an NDA.

21   Q    So you learned it from the company that Barings had left

22   your group on or about May 10th?

23   A    Correct.

24   Q    And so you knew on May 10th you didn't have 50.1 percent

25   of the 1-L lenders in your group?

1    A    Correct.

2    Q    But you were -- and even through and including June 4th

3    and 5th, Barings hadn't come back to your group?

4    A    Correct.

5    Q    And so when you made your proposal on June 4th that had

6    74 percent price on it, you didn't have 50.1 percent in your

7    group?

8    A    No, but we always felt comfortable as to the company that

9    we would be able to achieve 50.1 percent if the agreement had

10   been reached.

11   Q    I know you said that yesterday and I'm going to ask you

12   about that in a second.  But let's just answer my narrow

13   question.  You didn't have 50.1 percent when you made your

14   June 4th proposal.

15        You needed other people in order for your proposal to

16   actually be effected -- to be effectuatable, if that's a word?

17   A    Correct.

18   Q    And you were confident because you thought Barings would

19   come back?

20   A    Incorrect.

21   Q    You were comfortable because you thought someone would

22   join you?

23   A    Correct.

24   Q    No view about who?

25   A    Correct.

1    Q    But you were highly confident and so was the company?

2    A    Correct.

3    Q    Did you talk about who might come and join you with the

4    company?

5    A    At what point in time are you asking?

6    Q    June 4th, June 5th.

7    A    I don't recall directly, but it would seem logical that

8    we would be having that conversation at that point in time in

9    the time period.

10   Q    Seeming logical.  A lot of things seem logical.  I could

11   testify about what seems logical.  But I'm asking you if you

12   can testify about actually whether you talked to the company

13   or not about who could join the group when you made the

14   proposal on June 4th or June 5th?

15   A    I don't recall.

16   Q    Could Angelo Gordon have joined your group on June 4th or

17   June 5th?

18   A    I don't know.

19   Q    To join your group and help you get over 50.1 percent,

20   you'd need to be a holder of 1-L debt?

21   A    Correct.

22   Q    So -- and you knew who other holders of 1-L debt were?

23   A    I believe so.

24   Q    You knew Angelo Gordon was one?

25   A    I actually don't know if I knew Angelo held 1-L debt or

1    2-L debt.

2    Q    Okay, you knew that Apollo was one?

3    A    I think -- same answer.

4    Q    And did you know if Gamut held 1-L or 2-L debt?

5    A    I don't recall.

6    Q    So you knew there were -- did you think the company was

7    working with other people on the dropdown transaction to only

8    hold 2-L debt?

9    A    No.

10   Q    How about Oak Tree?  Did you know if they held 1-L debt?

11   A    Yes, I believe I did know that they held 1-L debt.

12   Q    Did you know how much they held?

13   A    I don't recall.

14   Q    And you don't remember anything -- so you didn't how much

15   anybody else had, but you were highly confident you could get

16   enough people to join your group and you believed the company

17   was highly confident as well.

18        Why do you believe the company was highly confident that

19   you could get enough people to join your group on June 4th or

20   June 5th?

21   A    Because they were negotiating a deal with us that

22   required 50.1 percent.  If they didn't believe that we were

23   going to be able to get the 50.1, then presumably they

24   wouldn't have continued in negotiations.

25   Q    And you don't have any recollection of them telling you

1    we know we can deliver people to your group?

2    A    I don't recall.

3    Q    I'm confused about something else, which is you said that

4    the deal was entered on June 8th and that's when the

5    information was blown up and you got to see the proposal that

6    the company was actually working on with Angelo Gordon.

7         Do you remember that testimony?

8    A    I do.

9    Q    Did you -- was -- did you learn on June 5th that the

10   company had decided to go with you and to finalize the deal

11   with you?  That was a Friday.

12   A    I believe on June 4th through CBD (indiscernible) we had

13   a deal on principal subject to a couple of open points that we

14   were negotiating.  I don't recall exactly when I knew we had a

15   deal.

16        I think it was around June 6th.

17   Q    You think you got an email on June 4th that said you had

18   a deal on principal?

19   A    I do.

20   Q    Do you remember what time of day?  Morning, the

21   afternoon, evening?

22   A    I don't recall.

23   Q    After you made your proposal at 74 percent?

24   A    Correct.

25   Q    I mean you were showing these dropdown J-Crew type

1      proposals as the 3b alternative to people in your group, did

2      you ever explore with them whether they would be interested in

3      participating in a dropdown proposal?

4      A    I don't recall if we discussed that directly.

5      Q    There was nothing that would make it impossible for them

6      to want to participate in the dropdown proposal, was there?

7      A    I don't believe so.

8      Q    On direct you talked about this being an auction.

9           Do you remember saying that?

10     A    I do.

11     Q    So when I think of an auction, you bring people together

12     in either a room or now it's online.  And they all bid on the

13     same thing at the same time.

14          Is that generally what an auction is?

15     A    No.

16     Q    Okay, that's one kind of an auction?

17     A    That's one kind of an auction, yes.

18     Q    And here, we didn't have that kind of auction.  That is,

19     different discussions were going on with different groups at

20     the same time over different proposals?

21     A    Correct.

22     Q    And sometimes in an auction, the auctioneer just stands

23     there and lets people yell out their prices and the highest

24     price wins.  And the auctioneer isn't negotiating.

25          Here, if you view the company as the auctioneer, they

1    were actually negotiating at each of those private

2    conversations, correct?  They were making counters.

3    A    Correct.

4    Q    So this is more like a group of parallel negotiated sales

5    going on separately than an auction where everybody is bidding

6    on the same thing?

7    A    I don't agree with that characterization.

8    Q    Well it wasn't an auction where everybody was bidding on

9    the same thing at the same time?

10   A    It doesn't matter if we were if we were bidding on the

11   same --

12   Q    Just answer my question.  Were they bidding on the same

13   thing at the same time?

14   A    At the same time, yes.  Not on the same thing.

15   Q    But you don't know the timing of the communications

16   between the company and the Angelo Gordon group?

17   A    I don't know specifically, no.

18   Q    You don't know if they talked to them on June 3rd or

19   June 4th or June 5th about increasing their bid or not?

20   A    That's right.

21        (Pause in the proceeding.)

22        MR. SEILER:  Let me ask Emilio to bring up a

23   document you didn't look at yesterday, which is Defendant's

24   Exhibit 167, which is also in the adversary 250-73.

25        Did I get that right?

1              And you see it's an email exchange with an email --
2      transmittal email is the first page.  That's what he's showing
3      you.  But then let's go to the next page and you'll see it's a
4      letter from Gibson Dunn, which is four pages long.
5              And if you could go to the last page just to start
6      with, the letter, you'll see that you were cc'd on the letter.
7      BY MR. SEILER:
8      Q    Do you see that?
9      A    I do.
10     Q    And then go back to the first page.  It's a June 4th
11     letter sent by Gibson Dunn to UBS, the Stanford branch.  And
12     so let me -- to you believe that you received a copy of this
13     letter at or about June 4th, 2020 as a cc?
14     A    I do.
15             MR. SEILER:   I offer it.
16             THE COURT:  Any objection?
17             MR. WILSON:  No objection, Your Honor.
18             THE COURT:  It's admitted.
19         (Exhibit 167 received in evidence.)
20     BY MR. SEILER:
21     Q    So do you remember getting this letter at the time it was
22     sent?
23     A    I don't.
24     Q    Do you want to just take a minute and read it to yourself
25     without -- to see if it refreshes your recollection of

1    whether --

2    A    I have reviewed it subsequent to -- I think the question

3    was do I remember reading at the exact time.  I have read it

4    subsequent.

5    Q    And your review of it subsequent to didn't refresh your

6    recollection as if you -- as to whether or not you saw it on

7    June 4th?

8    A    It did not.

9    Q    But typically in your normal practice if Gibson Dunn

10   copied you on a letter in connection with this transaction,

11   would you have reviewed it?

12   A    Yes.

13   Q    And you see, if you go to the second page now, we'll go

14   down to that last paragraph and maybe you could start

15   highlighting it for me.  It says:

16        "In addition a transfer of collateral to an unrestricted

17   subsidiary for no discernable consideration in return, as may

18   be contemplated in connection with the dropdown transaction

19   may constitute an actual or constructive fraudulent transfer

20   and violation of applicable law."

21        Do you see that?

22   A    I do.

23   Q    And I take it at the time, Gibson Dunn sent this letter,

24   they didn't know more about the terms of the other groups'

25   discussions than you did, as far as you know?

1    A    Correct.

2    Q    And did you -- had you concluded that the dropdown

3    transaction that you modeled in Column 3b was a fraudulent

4    transfer or a constructive fraudulent transfer?

5    A    I think there's a "may" in the sentence and no, we hadn't

6    done work on that at the time.

7    Q    One way or the other?

8    A    Correct.

9    Q    And then the next sentence says:

10        "With a high capital structure extensive debt service

11   obligations in the face of limited liquidity, significant

12   general cash burn, as stated a need for new capital and a

13   severe decline in revenue with no clear foreseeable recovery

14   to normalized operations, we believe it is highly likely that

15   the company may very already be insolvent."

16        Do you see that?

17   A    I do.

18   Q    Is that something that Centerview believed?

19   A    This letter wasn't drafted by Centerview.

20   Q    I know.  I understand that.  I'm asking did Centerview

21   share that belief that's articulated by Gibson Dunn on

22   June 4th?

23   A    Give me a second.

24   Q    Sure.

25        (Pause in the proceedings.)

1    A    Again, there's a "may" in there, "may very well be

2    insolvent."  I don't know what we believed at the time.

3    Q    You hadn't done an insolvency analysis?

4    A    Correct.

5    Q    You did a very careful modeling.  At our deposition, I

6    asked for it, you sent me those Excel spreadsheets that stand

7    behind all those analyses you did for your clients.

8        And I looked at them all.  There's no page where there's

9    an insolvency analysis, is there?

10    A    Correct.

11    Q    And so the sentence"

12        "We believe it is highly likely that the company may very

13    well already be insolvent" that doesn't really say anything

14    about insolvency because it has the word "may" before very

15    well already.

16        That's your reading of the sentence?

17    A    Correct.

18    Q    But you wouldn't have written that sentence because you

19    have no idea if it was very likely, already insolvent or not

20    because you didn't do an insolvency analysis?

21    A    I don't know how to answer your question. It's a

22    hypothetical.

23    Q    You weren't asked to review this letter before it was

24    sent?

25    A    I don't recall if I was asked to review the letter before

1   it was sent.

2   Q    Do you think that Gibson Dunn did an insolvency analysis?

3   A    No, I do not.

4   Q    And then at the end of the letter, we go back to the last

5   page, they wrote:

6        "This letter constitutes a confidential lender to agent

7   communication and should not be provided or disclosed to or

8   otherwise shared with the company or any of the other loan

9   parties."

10       Do you see that?

11  A    I do.

12  Q    Did you have any understanding of why Gibson Dunn didn't

13  want the company to know it was writing to the company's agent

14  about the fact that it may very well already be insolvent?

15  A    So at the time, I think you said it actually earlier in

16  your questions, we weren't necessarily sure if we were going

17  to be selected counterpart regardless of what the company

18  communicated.  As you mentioned or as I mentioned, we were in

19  an auction and the other party could have decided that they

20  wanted to drop their discount by 50 percent and agree to a

21  deal.

22       And so we were communicating to the agents -- the agents

23  are representatives of the lenders -- this is a lender to

24  agent communication.  I think it's perfectly reasonable for

25  the lenders not the agent, to keep that communication between

1    themselves.

2    Q    Well what was the point of -- why do you think the letter

3    was trying to get the agent to do?

4    A    It was not asking the agent to do anything.  It was

5    alerting the agent to the fact that there was an alternative

6    transaction that we thought was damaging to the collateral

7    value of the lenders.

8         And it was asking really the agent to just take a breath

9    when they got asked -- if they got asked to facilitate the

10   transaction to indeed with us who represented the material

11   portion of the term loan and to, you know, evaluate it within

12   the context of everything else that was going on.

13           MR. SEILER:  Could you go back to the first page

14   where the email, the actual email is from Mr. Jason Zachary

15   Goldstein to UBS?

16         (Pause in the proceeding.)

17   BY MR. SEILER:

18   Q    And you were copied on the email, too.  That was at

19   7:31 p.m. on the 4th, right?

20   A    I see that.

21   Q    And the 4th was the day you had already been told that

22   they had chosen you and you were going to work and finalize

23   things.  You didn't remember what time, but on the very same

24   day you learned that you had won, subject to final

25   documentation, this letter gets sent to UBS?

KARN CHOPRA - CROSS BY MR. SEILER

1    A    Correct.  But as I said we were in an auction.

2    Q    But you had just been told you won the auction.

3    A    Subject to and the documentation had been finalized and

4    there were terms that were still open.  And the other

5    counterpart could have put up a better proposal.

6         This was not about a best and final where you know with

7    actual clarity that you're the chosen party.  We were told

8    that we were subject to and we were still doing everything in

9    our power to avoid the alternative transaction.

10   Q    Including telling the agent not to go ahead with the

11   alternative transaction because you didn't want the auction to

12   continue, to use your term, to my term the parallel

13   negotiations to continue.

14        You wanted to stop it where it was.  Stop the counting,

15   stop the bidding because you're the winner.

16   A    No, I wouldn't characterize it that way.

17   Q    Now, I'm going to shift a little bit to another topic

18   that you brought up at the end of your direct.

19        (Pause in the proceeding.)

20   Q    Let me ask you this to get into it.  The Gibson Dunn

21   Group changed over time, right?  Your client group has changed

22   over time?

23   A    Has changed over time?

24   Q    Has changed over time.  And we've talked already about

25   Barings was in it and then they were out.  Barings ends back

1    in the group, right?

2    A    No.

3    Q    They end up in the deal, but not in the group?

4    A    Correct.

5    Q    Are they in the group that Gibson Dunn is representing in

6    connection with this bankruptcy?

7    A    They are.

8    Q    Okay, so they're back in the -- I'm not going back -- the

9    Gibson Dunn Group starts out as the group that is trying to do

10   a deal, ends up as the group chosen to do a deal, and now is

11   the group that's supporting the deal in the bankruptcy?

12   A    Yes, sir.

13   Q    And they're still all your clients?

14   A    We've had two engagements letters that our clients have

15   shifted over time.  But yes, correct.

16   Q    You still have an active client engagement with the

17   Gibson Dunn Group today?

18   A    Correct.

19   Q    So that's my point.  The group has changed over time.

20   A    Correct.

21   Q    And you talked about the importance of the indemnity to

22   the group and you did it in a general way.  But I'm going to

23   ask you about it at different points in time.  Okay?

24   A    Okay.

25   Q    Because if they're the indemnity that existed in June of

1   2020.  There's an indemnity that's contained in the RSA?

2   A    Sure.

3   Q    There's an indemnity that carries forward into the plan

4   that was filed for bankruptcy?

5   A    Yes.

6   Q    And now there's an indemnity that's carried forward in

7   the exit term loan financial facility?

8   A    Yes.

9   Q    And did you review that indemnifying the Gibson Dunn

10  Group of clients, that each of those indemnities is essential

11  to the deal?

12  A    I don't think that the indemnity is just limited to the

13  Gibson Dunn Group.

14  Q    It would apply to anyone who worked on the June 2020

15  transaction, Gibson Dunn Group and others who participated in

16  the transaction?

17  A    It would apply to anybody who I believe participated in

18  the first lien second out instrument.  And I believe it would

19  apply to anyone who owned the first lien second out

20  instrument.  And it would apply to any body who owned the take

21  back debt in the future.

22  Q    And you're view is that the inclusion of that -- I think

23  you used the term continuing indemnity -- is essential to the

24  participation of the indemnitees?

25  A    I'm sorry, I don't understand that question.

1   Q    All right, I'll take it -- work at it a different way.

2        I think you said a proposal that had the effect of

3   removing the continuing indemnity for the priority lender

4   group for claims related to the June 20 transaction would be

5   adverse to the interest of that group.

6        Do you agree with that?

7   A    Correct.

8   Q    And that was true in June of 2020?

9   A    Correct.

10  Q    And that was true with the RSA?

11  A    All right, Mr. Seiler, can you tell me who we're talking

12  about that you're saying is important to in this question?

13  Q    The people who are in the Priority Lender Group.

14  A    You're making a -- you're grouping everybody together.  I

15  think there may be some distinction there, but correct, the

16  Priority Lender Group back in 2020 all would have required the

17  indemnity, which is just traditional in a credit agreement, to

18  consummate the 2020 transaction.

19  Q    We're going to talk about what was traditional and what's

20  not in a minute.  But I want to stick with the groups for now.

21       But even today, with the exit financing, is it your view

22  that it's critical to all the members of the Priority Lender

23  Group -- all the Gibson Dunn Group today to have this

24  indemnity?

25  A    I think the importance of the indemnity differs by

1    lender.

2    Q   Right, because some of the lenders were holders of the

3    2016 debt.  And some have bought the debt subsequently had

4    nothing to do with the 2020 transaction, correct?

5    A   I think they're both influenced by the indemnity just to

6    varying degrees.  If you are a participant in the 2020

7    transaction, then specifically a participation that been

8    litigated against, then there's obviously an important

9    indemnity.

10    However, if you were not a participant of the 2020

11    transaction, you own FLSO debt, what your clients are

12    attempting to do is unwind the transaction which would

13    influence the equity splits that potentially that are being

14    achieved in the Chapter 11 case.

15    I think those parties who were not participant in the

16    2020 transaction still value the indemnity.

17    Q   Right.  Have you talked to any of them about that?

18    A   No.

19    Q   Have you talked to any -- well let's go back to 2020.

20    When you testified about what you thought the lenders wanted,

21    did you talk to any of them then about the indemnity?

22    A   I don't believe I testified to what the lenders want.

23    Q   All right, thank you.

24    (Pause in the proceeding.)

25    Q   Just give me a minute.

1        (Pause in the proceeding.)

2    Q    And so yesterday at page 584 of the transcript, you were

3    asked, was it important to the Priority Lender Group that

4    there would be an indemnity provision in that priority term

5    loan agreement?

6        Answer, it was.

7        Question, why?

8        Answer, as I understand it indemnity is a commonplace in

9    credit agreement so I think it is an important component of

10   all credit agreements, but in particular in this situation, we

11   announced the transaction on June 8th.  If I remember

12   correctly the company and a certain subset of the lenders were

13   then litigated against at that point.  Even prior to closing

14   the transaction in later June.

15       Question, so by the time the June 22nd Priority Term Loan

16   Agreement was signed up, a number of the lenders, as well as

17   the company were already subject to litigation?

18       Answer, correct, active litigation.

19       Question, and are you aware that the Chapter 11 Plan

20   proposed in this case includes an continuing indemnity for the

21   Priority Lender Group for losses, damages or claims including

22   in connection with the 2020 transaction?

23       Answer, I am.

24       Was it important to the Priority Lender Group that a

25   continuing indemnity group be provided for in the plan?

1        Answer, it was.

2        And why was that?

3        Answer, again, we're in active litigation as we sit here

4    today and I think the lenders felt like it was important for

5    their -- to you know, in conjunction with their willingness to

6    provide a significant equilization of their debt and to allow

7    the company to emerge on an expeditious basis that the

8    indemnity continue thereafter.

9        (READING FROM AN UNOFFICIAL TRANSCRIPT.)

10   BY MR. SEILER:

11   Q    So my question is, you testified I think the lenders

12   felt.  Did you talk to any of the lenders to learn what they

13   felt?

14   A    To not really confuse these question you posed before,

15   you just read by testimony with 2020.  Now you've move forward

16   to 2023.

17   Q    Well, I couldn't tell from your answer when you thought

18   the lenders felt.  So let's do it each time.

19        Did you think the lenders felt the indemnity was

20   important in 2020?

21   A    I believe the indemnity was part of a broader transaction

22   and it was part of the transaction.

23   Q    I know that.  But did you think the lenders felt it was

24   important -- an important part of the transaction in 2020?

25   A    Yes.

KARN CHOPRA - CROSS BY MR. SEILER

1    Q    And did you know that because you talked to them and
2    learned it from them?
3    A    No.
4    Q    Okay.  In 2023, which I think this paragraph certainly
5    refers to because it's with the plan.  Did you think the
6    lenders felt it was important for them to have a continuing
7    indemnity?
8    A    Yes.
9    Q    And did you learn that from any of the lenders?
10   A    Yes.
11   Q    Who did you talk to in 2023?
12   A    We've had this conversation with Eaton Vance, CeSam, and
13   others.  And they believe the indemnity is important to the
14   plan.
15   Q    Who at Eaton Vance did you talk to?
16   A    Pat Daniel.
17   Q    When?
18   A    We discussed it after the -- sorry, the Citadel proposal
19   came in.
20   Q    Anyone else at Eaton Vance?
21   A    No, I don't believe so.
22   Q    Okay, how about CeSam?
23   A    Michael Jason Walker.
24   Q    And what did he -- let's got back to Mr. Daniel
25   (phonetic).  What did he tell you about the importance of the

1    indemnity to him?

2    A    That the indemnity was part of the agreement to support

3    the (indiscernible).

4    Q    We know that. It's in the agreement.  What -- did he tell

5    you why it was important?

6    A    (No audible response).

7    Q    Okay.  How about at CeSam?

8    A    Dan Esser.

9    Q    Okay, who else did you talk to?  I've forgotten.  I went

10   to get my pen, besides CeSam and Eaton Vance.

11   A    I don't recall if Barings (indiscernible) or others.

12   Q    So this is a call that they're on together?

13   A    Correct, it's a group call.

14   Q    You don't remember who's on the call?

15   A    No, I'm sorry.  I don't recall Barings and

16   (indiscernible) but I do recall Sedus (phonetic) and

17   (indiscernible).

18   Q    Sedus.  Now Sedus didn't own any of the 2016 deck,

19   correct?

20   A    I don't recall.

21   Q    Okay.  But they were in your client group in 2020 were

22   they?

23   A    Correct.

24        (Pause in the proceeding.)

25   Q    So they weren't a priority term loan lender in 2020,

1    correct?

2    A    I don't know when they bought the debt.

3    Q    Well the record will show what it shows.  For someone who

4    was not in the 2020 transaction and was not a 1-L or 2-L

5    lender under the 2016 loan agreement, if my clients are to

6    prevail that the lender group that consummated the 2020

7    agreement wins damages from other people for doing the

8    transaction, someone who didn't participate in the transaction

9    isn't going to be paying any damages, correct?

10   A    Correct.

11   Q    And the indemnity is from the company, right?

12   A    Correct.

13   Q    Post-bankruptcy?

14   A    Which indemnity are we talking about?

15   Q    The one that's in the exit term loan facility now?

16   A    Correct.

17   Q    And if the indemnity is called upon and the company has

18   to pay, then that's not great for the equity holders of the

19   company at that time?

20   A    Correct.

21   Q    Of which Sedus would be one under the plan?

22   A    Correct.

23   Q    And that would be true for anyone else that's similarly

24   situated, the answers you gave for Sedus would be the same?

25   A    Correct.

1           (Pause in the proceeding.)

2      Q    Do you know a fund called Poseidon or part of KPS?

3      A    I did, yes, I'm aware, but not Poseidon.

4      Q    Okay KPS -- I was looking at your 2019 filing for the

5      Gibson Dunn Group in March of this year in connection with

6      this bankruptcy.  And it lists -- I think it calls them

7      Poseidon, but I think they're part of KPS.

8           Do you know whether or not they're in the Gibson Dunn

9      group now?

10     A    They're not.

11     Q    But were they on June 24th, 2023 and then still on March

12     of -- we'll do it one at a time.  I'm looking at the Rule 2019

13     filing on June 24th, 2023 and the bankruptcy was filed

14     January 24th, 2023.  And it lists Poseidon V, Roman V, LP.

15          THE COURT:  Mr. Seiler, if I can interrupt.  Since

16     we started off with June 23rd of 2023.

17          MR. SEILER:  Yeah, I should start that question over

18     Your Honor.  I think --

19          THE COURT:  Thank you.

20          MR. SEILER:  You and the witness are correct.

21          THE COURT:  Do you want the overhead?

22          MR. SEILER:  Sure.

23          THE COURT:  Just asking because you were standing in

24     front of it.

25          MR. SEILER:  Yeah, no I think it would help me.  If

1    we get things right.

2    BY MR. SEILER:

3    Q    So I'm looking at a document filed in the bankruptcy case

4    23-90020 on January 24th, 2023, the verified statement of the

5    Ad Hoc Priority Lender Group pursuant to Bankruptcy Rule 2019.

6         Do you see that?

7    A    I do.

8    Q    You're familiar with those kinds of statements that get

9    filed, correct?

10   A    I am.

11   Q    Probably more than I am.  And then at the back there's

12   the list of the people who are in the group.  And I'm going to

13   try and show that.

14        (Pause in the proceeding.)

15   Q    And you see that there's -- if I do this right.  Barings,

16   they're -- you know we talked about them.  They came back in

17   -- they didn't come back into the Gibson Dunn client group,

18   but they came back into the deal in 2020.

19   A    Correct.

20   Q    And BNP and if we're looking particularly at the FLSO

21   Column, BNP -- was BNP in the deal in 2020?

22   A    I don't recall.

23   Q    Okay.  Sedus, 34 million of FLSO.  Were they in the deal

24   in 2020?

25   A    As I mentioned earlier, I don't recall.

1    Q    Okay.  CeSam, you know they were in the deal, right?

2    A    Right.

3    Q    Eaton Vance, you know they were in the deal?

4    A    Right.

5    Q    Farelon (phonetic) Capital.  Do you know if they were in

6    the deal?

7    A    They were not.

8    Q    They were not.  And they have 106 million of FLSO debt as

9    of the filing of the bankruptcy.  And they also held some

10   non-PTL term loans.  See that?

11   A    Right.

12   Q    Okay.  But they're in the Gibson Dunn group filing the

13   bankruptcy?

14   A    Correct.

15   Q    Okay.  Then go to the back, which is where I tried to

16   start, you see Poseidon -- I figured out in the list you see

17   Invest Co and two small ones and then Poseidon V LP in care of

18   Walkers Corporate Limited Camon.

19        Do you see that, 98 million?

20   A    Right.

21   Q    Is that the KPS holder?

22   A    I believe so.

23   Q    Okay.  And they were in the group in January.  And then I

24   have the same document from March that is a successor document

25   from March, which I'll show you.

1         (Pause in the proceeding.)

2    Q    This is March 1st, the subsequent 2019 filing.  You see

3    they're still there?

4    A    Correct.

5    Q    Are they still in the group today?

6    A    They are not.

7    Q    Why not?  What happened to them?

8    A    So KPS reached out -- I don't recall exactly when --

9    obviously after that last 2019 statement.  They are more well

10   known as a private equity firm.  They were originally

11   investment, I think, with an eye towards growing that

12   investment and potentially growing an equity seed in the

13   business over time.

14        They had done a fair bit of diligence, frankly even more

15   so than others in the lender group, trying to assess if they

16   wanted to increase the size of their investment for reasons

17   that I think you have to ask them.

18        They ultimately decided that they did not want to

19   increase their stake and as a result, they ultimately decided

20   that instead of being a minority shareholder, they would

21   prefer to sell their paper.

22   Q    And you learned that all from them?

23   A    I learned that all from them.

24   Q    Who?

25   A    Mark and I -- Mark, his last name is slipping my mind.

1      I'm so sorry.

2      Q     When?

3      A     As I mentioned, I don't know exactly when.

4      Q     Before this trial started?

5      A     Yes.

6      Q     And who did they sell their paper to?

7      A     I believe it was Valpos (phonetic), although I don't know

8      if the trade closed.

9      Q     Valpos join your group?

10     A     They did not.

11     Q     Okay.  But so now Poseidon or KPS, they're no longer in

12     your group because they've sold their paper, right?

13     A     I guess normally I would say they signed the RSA.  They

14     may not be technically in the group, but they are, say, a

15     counterparty.

16     Q     Do you know whether a subsequent 2019 schedule was filed

17     after March 1st that took them out of your group?

18     A     I don't know.

19     Q     You testified when you were talking about the importance

20     of keeping the indemnity, about the blocking position that

21     some members of the group would have against the plan going

22     forward that changed the indemnity or eliminated it.

23           Do you remember that testimony?

24     A     I do.

25     Q     And how did you determine that the amount they owned

1    would represent a blocking position under such circumstances?

2    A   Gibson and our team spoke about what we understood the

3    holding to be of those four at this point in time.

4    Q   Do you have --

5    A   Based on the latest -- sorry to interrupt -- based on the

6    latest information we have (indiscernible).

7    Q   Do you have an understanding of the percentage that

8    constitutes a blocking position?

9    A   I do.

10    Q   Which is?

11    A   32.3 percent of aggregate holdings of party voting in the

12    (indiscernible).

13    Q   And so the voting already took place, but you were

14    worrying about a circumstance where the plan would change in

15    some way, perhaps by changing or stripping out the indemnity

16    and that the Court would conclude that there needed to be new

17    voting and then if a group of 33 percent or more was against

18    the plan, the plan wouldn't get confirmed?

19    A   Correct.

20    Q   And if we had a group of 33 percent or more who loved the

21    plan, but hated the indemnity because they weren't getting

22    indemnified because they weren't involved in 2020, and they

23    would be against the indemnity, they would have a blocking

24    position, too?

25    A   Correct.

1    Q    More than one group could have a blocking position?

2    A    Correct.

3    Q    And then you said that -- well, I'm not really sure.  Let

4    me ask you.  Today we have the plan and it has the indemnity

5    and we're going to talk about the terms of it in a second.

6         And if for some reason the Court would say, well, that

7    indemnity doesn't work, there's a number of possible outcomes.

8    One is the changed indemnity where people still support the

9    plan.  Correct?

10   A    Mr. Seiler, I just want to revert back to your prior

11   question.  I just want to highlight that --

12   Q    I shouldn't let you do that, but I will.  Go ahead.

13   A    -- but that people have signed the RSA and so --

14   Q    Oh, thank you.  I was supposed to ask about that, but go

15   ahead.

16   A    -- signed the REA to support the plan.

17   Q    Right, and they're muzzled against criticizing the plan

18   unless the RSA is terminated?  Muzzle is a technical legal

19   term.

20   A    (indiscernible) muzzle.

21   Q    They're not allowed to speak up against the plan.

22   They've contractually committed to support the plan and not

23   oppose it while the RSA is still in effect?

24   A    Correct.

25   Q    But if the plan, I believe, if the plan were changed and

KARN CHOPRA - CROSS BY MR. SEILER

1    the indemnity were set aside and now it was time to ask again
2    and they were free to act, some people -- they could say I'd
3    rather have this plan before without an indemnity.  That would
4    be one possibility?
5    A    In the scenario where the RSA was terminated, then yes,
6    you're correct.
7    Q    And another possibility is the plan would fail and there
8    wouldn't be a confirmable plan?
9    A    Again, if the RSA was terminated.
10   Q    But wouldn't your clients prefer to have a confirmable
11   plan even without the indemnity than having it all fall apart?
12   Wouldn't they still vote to support the plan without the
13   indemnity?
14   A    You're using my clients generally.
15   Q    Cesam, Barings, Eaton Vance, Invest Co.
16   A    I don't believe so.
17   Q    Well because they faced -- the risk they face from this
18   litigation we've brought is that the decision -- the well
19   reason decision of this Court gets reversed or the Court
20   grants our position on good faith and fair dealing and that
21   gets affirmed or they deny it and it gets reversed.
22        And so then the members of that group who were involved
23   in 2020 who we say materially breached the 2016 contract, they
24   lose and they have to pay damages.  And they don't have the
25   company to help bail them out.

1          That's the risk they're worried about if there's no

2     indemnity?

3     A    I think everyone is -- was involved in that case is not

4     just the claims against the lenders, but also the claims

5     against the company.

6     Q    Well, but maybe.  But maybe my clients only win against

7     the lenders.  Maybe we decide to only go against the lenders.

8     So let's imagine that.

9          We're only going against the lenders.  We win against the

10    lenders and there's no indemnity against those lenders who

11    were involved back in 2020 who had obligations under the 2016

12    loan agreements.  If they lose, they have to pay damages and

13    they'd rather have an indemnity.

14         But wouldn't they rather confirm the plan because they

15    face that risk anyway.  If there was a breach in 2020, there

16    was.  If we win damages because of what it did to our stock,

17    our loan values then, it does whether there's a plan or not a

18    plan.  2020 is gone.

19              MR. WILSON:  Your Honor, objection, calls for

20    speculation.

21              THE COURT:  It's -- I'm not even sure that there was

22    a question.  So let's try to start over.

23         (Laughter.)

24              MR. SEILER:  Okay.  That was a fair comment.

25              THE COURT:  But it was a great closing argument.  I

1    got it.

2         (Laughter.)

3         MR. SEILER:  I was getting to -- well, there's an

4    audience I figured, why not.

5         THE COURT:  I --

6    BY MR. SEILER:

7    Q   Isn't it true that the company -- strike that.

8         Isn't it true that if the lenders in your group face a

9    damage risk whether or not the plan is confirmed, they might

10   well still prefer to have the plan confirmed?

11        MR. WILSON:  Objection, Your Honor.  Calls for

12   speculation.

13        THE COURT:  Yeah, if you know?

14        THE WITNESS:  I don't believe so, but I believe

15   they're going to be testifying, too. I'm sure you'll be asking

16   that.

17   BY MR. SEILER:

18   Q   Well, but I started off -- the only reason I've gone down

19   this whole line of testimony is because you testified about

20   what you thought what the lenders thought based on the

21   conversations you had with a couple of them.

22        So I was following up on your thinking and how it was

23   informed.

24        So let me just now go back.  I promised you I'd talk

25   about the terms of the indemnity.  I remember you were not

1     involved in negotiating the terms of the indemnity at all,

2     correct?

3     A     Correct.

4     Q     And when I asked you about it at your deposition, you

5     were generally familiar with that transactions like this have

6     indemnity, correct?  Remember that?

7     A     That I was familiar with the credit agreement coming --

8     Q     Credit.  And typically they're carve outs from those

9     indemnities for gross negligence, willfulness, bad faith,

10    material breach, correct?

11    A     I don't know.

12    Q     You don't know one way or the other?

13    A     I guess not.

14    Q     So when you're testifying that an indemnity is important,

15    do you have any understanding of whether that depends in any

16    way on the terms of the indemnity?

17    A     I don't know.

18    Q     Because you would agree that not all indemnities are

19    necessarily the same?

20    A     I would.

21    Q     Have you come to learn in this case that there's a

22    dispute about changes that were made to the indemnity after

23    the deal was agreed and announced on June 8th and the day

24    after June 20th, but before June 22nd?

25    A     No.

1    Q    So you have nothing to say about the actual form of the

2    indemnity that's at issue?

3    A    No.

4    Q    And same thing's true for the actual form of the

5    indemnity and the RSA?

6    A    Correct.

7    Q    And the same thing's true for the actual form of the

8    indemnity and the exit finance facility?

9    A    Correct.

10        (Pause in the proceeding.)

11   Q    Because I think I might have just many one more topic to

12   ask you about, but let me make sure.

13        (Pause in the proceeding.)

14   Q    At the very end of your testimony yesterday, you were

15   talking about the 2020 transaction and its component pieces

16   that everyone was familiar with, when you testified I had

17   worked on a number of superpriority financings in other

18   instances so it was pretty commonplace in the marketplace and

19   there had been a number of distressed repurchased

20   transactions.

21        (READING FROM AN UNOFFICIAL TRANSCRIPT.))

22   BY MR. SEILER:

23   Q    But, I'd like to ask you to think about the components

24   altogether.  So what I'll list for you are you have a

25   transaction with 1-L debt and a waterfall that has pro rata

1    rights where the -- if anyone wants to give up those rights

2    that requires unanimity where the proposed transaction primes

3    that in a financing and there is a repurchase with either cash

4    or with -- repurchase has an exchange at a discount -- all

5    those components together.

6         And isn't it true that you never worked on a transaction

7    with all those components together?

8    A    I don't believe our deal had those (indiscernible).

9    Q    Well, answer my question.  You never worked on a

10   transaction with those components together?

11   A    Did the pro rata rates have carve outs?

12   Q    I guess.  Did you work on -- did you ever work on a deal

13   whether that has carve outs or not?

14   A    No.

15   Q    No, you never worked on a transaction?

16   A    No, I never worked on a transaction with those

17   parameters.

18   Q    Because this was a first of its kind transaction,

19   correct?

20   A    Correct.

21   Q    And then you said -- and this actually surprised me --

22   strike that.  It doesn't matter if it surprised me.

23        You said were you -- Question, were you ultimately

24   comfortable with the structure of the June 2020 transaction?

25        Answer, I was.

1          And why was that, you were asked?

2          Because it was allowed for under the documentation.

3          (READING FROM AN UNOFFICIAL TRANSCRIPT.)

4     BY MR. SEILER:

5     Q    But you're not giving a legal opinion?

6     A    Correct.

7     Q    In 2020, you hadn't had the benefit of Justice Masely's

8     denial of the motion for a preliminary injunction in June 8th?

9     A    No.

10    Q    And you certainly hadn't had the benefit of this Court's

11    grant of summary judgment?

12    A    Correct.

13    Q    And you couldn't predict the result of this hearing?

14    A    Correct.

15    Q    And you didn't really carefully review because I asked

16    you this, the terms of the 1-L debt to see what was allowed

17    and what wasn't?

18    A    Correct.

19    Q    You're not here offering any legal opinion on what's

20    allowed, correct?

21    A    Yes.

22    Q    And then you said -- well, you were asked, if Centerview

23    did not believe that the transaction was negotiated and

24    consumated in good faith, you would have reviewed the Priority

25    Lender Group that they should pursue it.

1          (READING FROM AN UNOFFICIAL TRANSCRIPT.)

2     BY MR. SEILER:

3     Q    You wouldn't have done that, right?

4          Answer, no, we would have not -- we wouldn't have not,

5     that's your answer, correct?

6     A    (No audible response.)

7     Q    But when you gave that answer, were you thinking about

8     the letter that the Gibson Dunn firm sent to UBS on June 4th

9     to stop the negotiation -- stop UBS from acting on the other

10    side's position if they were to prevail?  Did you -- were you

11    thinking about that as part of your decision as to whether the

12    transaction was processed in good faith or not?

13    A    I don't really understand the question.

14    Q    Were you thinking about that letter when you gave the

15    answer about good faith?

16    A    I was thinking about the advice that we were giving on

17    the totality of the transaction.

18    Q    Centerview was giving?

19    A    Can you repeat that back, the question that I was asked

20    specifically?

21    Q    Sure.  Were you thinking about the letter that Gibson

22    Dunn sent when you gave the answer that Centerview wouldn't

23    have worked on something if they thought it wasn't in good

24    faith?

25    A    I'm asking you to ask the direct question I was asked on

1    direct.  I didn't say (indiscernible).

2    Q    No, I'm asking you a different question.  It's cross.

3    I'm just asking you a question straight up.

4    A    Okay.

5    Q    Centerview believes that this transaction was done in

6    good faith, correct?

7    A    (No audible response.)

8    Q    And as part of that, are you considering whether or not

9    the letter from Gibson Dunn on June 4th was consistent with

10   acting in good faith?

11   A    Am I considering it now you're asking me?

12   Q    Then, yeah.

13   A    In 2020?

14   Q    At the time of the transaction.

15   A    Again, I was thinking about the transaction in total.

16             MR. SEILER:  Can I have a minute, Your Honor?

17             THE COURT:  Of course.

18        (Pause in the proceedings.)

19             MR. SEILER:  I got nothing more, Your Honor.

20             THE COURT:  Interesting.  All right.

21             MR. SEILER:  I'm getting out of the way.

22             THE COURT:  All right.  Mr. Lieberman?

23             MR. LIEBERMAN:  Neil Lieberman, Holwell, Shuster &

24   Goldberg on behalf of the LCM, I guess, Defendants.

25                      CROSS-EXAMINATION

1    BY MR. LIEBERMAN:

2    Q    Good morning, Mr. Chopra.

3    A    Good morning.

4    Q    Good to see you again.

5    A    Good to see you.

6    Q    Mr. Chopra, did you ever contact LCM to join the Gibson

7    Dunn Group?

8    A    I did not.

9    Q    Did you ever contact LCM to participate in the

10   transaction that was consummated in June 2020?

11   A    I did not.

12   Q    Did you ever discuss with anyone having LCB join the

13   transaction in June of 2020?

14   A    I did not.

15   Q    And did you ever come to learn that LCM was involved in

16   any competing proposal during that time frame?

17   A    I did not.

18   Q    Because they weren't, right?

19   A    I don't believe so.

20   Q    Thank you.

21        You've worked with LCM on other transactions, right?

22   A    I believe they have been part of the group, yes.

23   Q    Because they have other holdings and leveraged loans,

24   right?

25   A    Right.

1    Q    And you just testified that the Serta transaction was the

2    first of its kind transaction, right?

3    A    I testified that the component pieces have been done

4    before, but altogether I had not worked on it.

5    Q    Well, I think -- have there been transactions subsequent

6    to Serta where all the component pieces have been done

7    together?

8    A    It's a (indiscernible) million-dollar market.  I don't

9    know the answer to that.

10   Q    Have you worked on any?

11   A    I have not.

12   Q    Thank you.

13        Do you know of any?

14   A    With the exact parameters that Mr. Seiler identified?

15   Q    Yeah.

16   A    I don't believe so.

17   Q    You don't, so there have never -- there haven't been any

18   subsequent?

19   A    No, I did not say there haven't been.  I said I don't

20   know of any, although I guess -- I think there might have some

21   similarities, but I don't know specifically.

22   Q    You testified that the size of the priority term loan had

23   to be capped to make the economics of the transaction work,

24   right?

25   A    The first lien second out (indiscernible).

1    Q    Which meant that some first lien lenders would be left

2    behind by design, right?

3    A    By necessity.

4    Q    By necessity, and the more left behind, the better for

5    your clients, right?

6    A    All else equal, yes.

7              MR. LIEBERMAN:  Thank you very much.

8              MR. MILLAR:  Good morning, Your Honor.

9              THE COURT:  Good morning.

10             MR. MILLAR:  For the Record, it's morning.

11             THE COURT:  Got it.  Still without a friend?

12             MR. MILLAR:  Oh, by the way, Peter Zuckerman, I'd

13   like to introduce to the Court from Citadel is here with his

14   bag of money.

15             MR. ZUCKERMAN:  I'm looking for a friend.

16             THE COURT:  Yeah, got it.

17             MR. ZUCKERMAN:  Yeah, he's got some friends.

18             THE COURT:  I have no friends.

19             MR. MILLAR:  Oh, a couple of things.

20                       CROSS-EXAMINATION

21   BY MR. MILLAR:

22   Q    Good morning.  How are you?

23   A    Good morning.

24   Q    With regard to the Chapter 11 Plan, the FLSO get two

25   things under the plan, new debt and new equity, correct?

1    A    Correct.

2    Q    And the new equity, you would agree with me, would be the

3    same value or higher if the reorganized company was not

4    subject to the indemnity, correct?

5    A    At least the same value.

6    Q    And the new debt would be likewise, the same value or

7    higher if the company was not subject to the indemnity?

8    A    That definition doesn't have the same outside options of

9    equity, but yes, they are.

10    Q    Okay.  So if this exact plan were put in place without

11    the indemnity, the treatment of the FLSO would be the same or

12    better?

13    A    Not to every recipient of that FLSO debt.

14    Q    Because some of those recipients benefit from an

15    indemnity that is in a different part of the plan, correct?

16            MR. WILSON:  Objection, calls for legal conclusion,

17    lack of foundation.

18            THE COURT:  Well, he can say I don't know and then

19    there's a follow-up, so let's see what he knows.

20            MR. WILSON:  Okay.  I apologize.

21    BY MR. MILLAR:

22    Q    Let me try it this way:  Under the plan that was sent out

23    to the folks to be included, the indemnity is under

24    Section 8.5(b), correct?

25    A    I'm sorry, sir.  I don't know.

1    Q   All right.  But you agree that the treatment of the FLSO

2    is debt and equity?

3    A   Those are the two instruments that they receive from

4    (indiscernible), yes.

5    Q   And there are members of your group -- and I'll give you

6    a few examples, Bowpost (phonetic), Sedus, Feralon (phonetic),

7    they weren't involved in the 2020 transaction, correct?

8    A   Bowpost is not part of our group, you're correct

9    (indiscernible).

10    Q   All right.  So they have no need for any indemnity under

11    the Plan with respect to the 2020 transaction because they

12    were involved in it?

13            MR. WILSON:  Objection, calls for legal conclusion.

14            THE COURT:  It was the second part of your statement

15    that was made in the affirmative that caused me heartburn, so

16    why don't we try again?

17    BY MR. MILLAR:

18    Q   Bowpost, Sedus, Feralon, they were not involved in the

19    2020 transaction, correct?

20    A   I testified I didn't know about Sedus, but I agree about

21    Feralon and Bowpost.

22    Q   Those entities are not being sued by the Paul Weiss

23    group, correct?

24    A   Correct.

25    Q   They have no need for the indemnity under the plan?

1    A    They have a need for a confirmable plan.  It would be

2    helpful to their company, so it's hard to say did they have a

3    need under the plan.  The plan is supported by the creditors

4    to be able to allow those companies to emerge.

5    Q    They're locked up, right, under an RSA?

6    A    They have signed an RSA to support (indiscernible).

7    Q    And not take any action -- what's the right word?  -- in

8    detriment to the plan?

9    A    I'm sorry.  I don't know what the (indiscernible).

10   Q    Shall we go through it?  I guess we can do that.

11   A    If you'd like to.

12   Q    Thank you.

13        Give me one second.

14        (Pause in the proceedings.)

15             MR. MILLAR:  Your Honor, can you bear with me just

16   one sec?

17             THE COURT:  Of course.

18        (Pause in the proceedings.)

19             MR. MILLAR:  These things are never as easy to find

20   as they should be.

21             THE COURT:  If it helps you, I've read the RSA.

22             MR. MILLAR:  Could you --

23             THE COURT:  I got it.

24             MR. MILLAR:  Oh, I know, I know it.

25             Your Honor, could you testify as to the terms of the

KARN CHOPRA - CROSS BY MR. MILLAR

1    RSA loan while I'm looking for it?

2         (Laughter.)

3              THE COURT:  The last thing you want to do is put me

4    on the stand.

5         (Laughter.)

6              MR. MILLAR:  I think I found it.  And now I need

7    this little light to go on.

8              THE COURT:  It's already there.

9              MR. MILLAR:  Oh.  Wait a second.

10        (Pause in the proceedings.)

11             MR. MILLAR:  That's not it.  You know, I'm not going

12   to -- well, let me see.  Let me just try once more to see if I

13   can find it.

14        (Pause in the proceedings.)

15             MR. MILLAR:  It seems to be escaping me.

16             Wait, I think I got it.  I got it, okay.

17   BY MR. MILLAR:

18   Q    So okay.  Do you see that there?

19   A    Are you directing me to Section D?

20   Q    Section D, yeah, and I'll represent to you that this

21   comes from the RSA, which is filed in Case No. 23-90020,

22   Document 26-1, page 10 of 68.

23        Do you see that?

24   A    I do.

25   Q    And this is the agreement of the consenting creditors in

1   four, do you see that?

2   A    I do.

3   Q    And it says -- this is what they shall not do:  "Not

4   directly or indirectly object to, delay, impede or take any

5   other action to interfere with the Chapter 11 cases, DIP

6   financing or acceptance, confirmation, implementation of the

7   Plan, or the restructuring transactions, propose, support,

8   vote for, encourage, seek, solicit, pursue, initiate, assist,

9   join in, participate in the formulation of or enter into any

10  negotiations or discussions with any entity regarding any

11  alternative restructuring, including for the avoidance of

12  doubt, making or supporting any filings with the Bankruptcy

13  Court or any regulatory agency, or making or supporting any

14  press release, press reporter, comparable public statement, or

15  filing with respect to any alternative restructuring."

16      Or romanette iii, "Otherwise take any action that would

17  interfere with, delay or postpone the consumation of the

18  restructuring."

19      Do you see that?

20  A    I do.

21  Q    So they're locked up?

22  A    No.  Let me read the rest of Section D first.

23  Q    Oh, I'll read it with me.

24  A    No, you don't need to.  I just need to do this.

25          THE COURT:  It is a lot more interesting when you

1    read it versus when they read it.

2         (Laughter.)

3              MR. MILLAR:  I know.  I may have missed my calling.

4    I could --

5              THE COURT:  May have.

6              MR. MILLAR:  -- you know?  I'll be here all week.

7    Try the veal.

8    BY MR. MILLAR:

9    Q    I'll read it:  "Provided that the consenting creditors

10   shall not be required to give any notice, order, instruction

11   or direction to any administrative agent or collateral agent,

12   as applicable, or other such agent, or" --

13             THE COURT:  There we go.

14   BY MR. MILLAR:

15   Q    Yeah, "trustee, if the consenting creditors are required

16   to incur any out-of-pocket costs or provide any indemnity in

17   connection therewith."

18        I'm candidly exhausted after reading that, but they're

19   locked up, right?

20   A    They're -- correct.

21   Q    They can't come into court and say anything, can they?

22   A    That would be -- I don't know what that distinction would

23   be --

24   Q    Okay.

25   A    -- support or not.

KARN CHOPRA - CROSS BY MR. MILLAR

1    Q    By the way, that's true of the equity, as well?

2    A    I'm sorry.  I don't understand the question.

3    Q    The equity is similarly locked up under the RSA?

4    A    Who -- what equity are you talking about?

5    Q    The equity of the company that is also a party to the

6    RSA?

7    A    You mean the sponsor, Advent?

8    Q    Yes, I'm sorry.  Thank you.

9    A    I didn't know if you were talking about post-petition

10   equity.

11   Q    No, no, pre-petition, Advent, yes.  Uh-huh.

12   A    I believe Advent did sign the RSA (indiscernible) I

13   believe (indiscernible).

14   Q    All right.  I'm not going to read that provision again.

15   I'm going to take that answer.

16        And I think you testified that you never explained the

17   value of the indemnity to those in your group that did not

18   participate in the 2020 transaction?

19   A    I don't believe I testified to that.

20   Q    Oh, I may have misheard you.

21        Did you ever explain the value of the indemnity to the

22   non-participants?

23   A    I don't really understand what "explain the value of the

24   indemnity."

25   Q    Did you ever up a value on the indemnity that the company

1    post-reorg might face?  That's a terrible question.

2         Post-reorg --

3         MR. MILLAR:  Thank you for nodding, Judge Jones, on

4    my terrible question.

5    BY MR. MILLAR:

6    Q    Post-org, the company is -- would be subject to the

7    indemnity under this plan, yes?

8    A    Yes.

9    Q    And that indemnity is a liability of the company?

10   A    It's a contingent liability.

11   Q    And did you ever tell the members of your group, those

12   that did not participate in the 2020 transaction, what the

13   value of that contingent liability is?

14        MR. WILSON:  Your Honor, I'd object to the extent

15   it's calling for privilege advice that was given by Gibson

16   Dunn.

17        THE COURT:  I agree.  The question was asked is a

18   yes/no question and I think that he can answer that without

19   invading any privilege.

20        THE WITNESS:  No.

21        MR. MILLAR:  Your Honor, thank you for indulging me.

22   I have -- I'd like to make the first of its kind in my career,

23   an oral motion under Rule 2019.

24        THE COURT:  All right.

25        MR. MILLAR:  Under Rule 2019(d), supplemental

1     statements.

2          For the Record, 2019(d):  "If any fact disclosed in

3     its most recent filed statement has changed materially, an

4     entity, group or Committee" -- and I'm making reference to the

5     Gibson Dunn Group -- "shall file a verified supplemental

6     statement whenever it takes a position before the Court or

7     solicits votes on the confirmation of a plan."

8          Gibson Dunn is here taking a position before the

9     Court and I ask that they either affirm that the 2019 on file

10    is correct.  If it's not correct, then I drop to letter (e),

11    "determination of failure to comply, sanctions."

12         "A motion of any party-in-interest" -- and this is

13    my motion on behalf of Citadel -- "or on Your Honor's own

14    motion, the Court may determine whether there has been a

15    failure to comply with any provision of this rule.

16         "If the Court finds such a failure to comply, it

17    may, (a) refuse to permit the entity, group or Committee to be

18    heard or to intervene in the case; (b) hold invalid any

19    authority, acceptance, rejection, or objection, given,

20    procured or received by the entity, group, or committee; or

21    (c) grant other appropriate relief."

22         Your Honor, if they're before the Court making

23    arguments and their verified statement is not correct, that's

24    a problem, and his testimony, I grant it, he's only one

25    witness, but it strikes me that there's enough here for Your

1    Honor to inquire.  And I ask that you do.

2              THE COURT:  So one, there are very few instances

3    where I actually take oral motions because you have

4    implications of due process.  If you believe -- and you're

5    willing to put your name on a pleading, pursuant to 9011, and

6    you're willing to make those allegations, I will take it up on

7    an emergency basis, but I think due process demands that

8    whoever it is that you're going to seek relief against is

9    entitled to have notice of what's coming.

10             And I got it, you know, it's a great sound byte for

11   whoever of the press is listening online, but not appropriate

12   in terms of just trying to sandbag somebody at a confirmation

13   hearing.

14             But I'm also telling you, I look past that.  I take

15   the process very seriously.  I will go to great lengths to

16   ensure that the process is transparent -- and as I'm sure you

17   have read, I can be incredibly harsh.  And I do it when I

18   think the process demands it.

19             If you think that you have something, again, put

20   your name on a pleading and I will make the time.  I'll take

21   it up and if there is a problem, I will react to that problem

22   swiftly, harshly, and whatver that causes the proceedings to

23   diverge to, it happens.

24             Fair enough?

25             MR. MILLAR:  Taking that totally onboard and

1     candidly, Your Honor, I am going from what I heard today.

2     Walking in here at 9:00 a.m., that wasn't a thought in my

3     mind.

4               THE COURT:  Okay.

5               MR. MILLAR:  So that's where it comes from.

6               THE COURT:  No, I'm not bothered by it.  Again, I

7     just -- but I just think due process requires that, again, you

8     put it in writing, you put your name on it, that way, quite

9     honestly, I then have both of you and I'll sort it out.

10              MR. MILLAR:  All right.  Thank you so much.

11              THE COURT:  Yes, sir.  Thank you.

12              I guess before we go back to Redirect, anyone else

13    have questions?

14         (No audible response.)

15              THE COURT:  All right.  Any Redirect?

16              MR. WILSON:  Yes, Your Honor, may I just have one

17    minute -- one moment?

18              THE COURT:  Let me ask:  I mean, do you want --

19              MR. WILSON:  I don't need a recess, I just want to

20    get (indiscernible).

21              THE COURT:  Of course.

22         (Pause in the proceedings.)

23              MR. WILSON:  Thank you for your patience, Your

24    Honor.

25              THE COURT:  Of course.

1          MR. WILSON:  Tim, do you have control again?

2          MALE SPEAKER:  I do.

3          MR. WILSON:  Okay.  Can we go back to Debtors'

4     Exhibit 144, please?  And can we go to page 14, please?

5                      REDIRECT EXAMINATION

6     BY MR. WILSON:

7     Q    You were asked a few questions about this exhibit on

8     Cross, Mr. Chopra.

9          Do you remember?

10    A    I do.

11    Q    And you were asked about the terms of the proposal in 2b

12    and what it implied for the discount.

13         Do you remember that?

14    A    I do.

15    Q    This proposal in 2b only contemplates a 1-L exchange,

16    correct?

17    A    Correct.

18    Q    Ultimately did that change between now and the proposal

19    you made to the company?

20    A    Yes.  We not only changed the terms of 1-L exchange, but

21    we also added 2-L purchasing to the (indiscernible).

22    Q    And did that have an impact on the discount captured?

23    A    It did.  It increased the discount captured.

24    Q    And was 3b in this proposal that you were comparing 2b

25    to, was 3b a proposal that you thought the other side might be

KARN CHOPRA - REDIRECT BY MR. WILSON

1    making that involved both the 1-L and a 2-L repurchase

2    component?

3    A    Yes, it did.

4    Q    You were asked a number of questions about Defendant's

5    Exhibit 167, a UBS letter dated June 4th, 2022?

6         Do you remember that?

7         Sorry, dated June 4th, 2020.

8    A    I do.

9    Q    I'm not going to put it back up.

10        At the time that letter was sent on June 4th, did

11   Centerview and the Gibson Dunn teams know the details of

12   whatever proposals the Apollo, Angelo Gordon, and Gamut group

13   were making to the company?

14   A    I didn't know the (indiscernible).

15   Q    And at that time, had the priority term lender groups

16   signed up a deal with the company?

17   A    We had not.

18   Q    Was it possible that whatever proposal the Angelo Gordon

19   and Apollo, Gamut group was making, might have violated the

20   terms of the credit agreement?

21   A    It is.

22   Q    But you didn't know, because you didn't know the terms,

23   correct?

24   A    Correct.

25   Q    And it's possible that that proposal might have, for

1    example, moved too much collateral out of the, you know,

2    existing company in violation of the term loan agreement,

3    correct?

4              MALE SPEAKER:  Objection, leading.

5              MR. WILSON:  Your Honor, I'm just responding to the

6    Cross questions.

7              THE COURT:  The issue was, it's a leading question.

8    He's your witness.

9              MR. WILSON:  I'm happy to rephrase it, Your Honor.

10             THE COURT:  All right.  I'll sustain the objection.

11   BY MR. WILSON:

12   Q    Is one of the ways that the proposal could have violated

13   the credit agreement that it involved the movement of too much

14   collateral out of the (indiscernible)?

15             MALE SPEAKER:  Same objection.

16             THE COURT:  Sustained.

17   BY MR. WILSON:

18   Q    Can you give me an example of a way that the Apollo,

19   Angelo Gordon and Gamut proposal might have violated the terms

20   of the credit agreement?

21   A    Yeah, it could have either moved more collateral than the

22   baskets would otherwise have allowed for.  It could have had

23   moved almost potentially all the value that would have

24   otherwise (indiscernible).

25   Q    In your view, is there anything inappropriate about

1    sending a letter to make sure that the agent for the lenders

2    focuses on whether a particular transaction is compliant with

3    the terms of the credit agreement?

4    A    No.

5    Q    Did UBS ever respond or engage with the Gibson Dunn Group

6    after that letter was sent?

7    A    I don't recall that.

8    Q    You were asked a number of questions about the indemnity

9    in the plan.

10        Do you remember?

11   A    I do.

12   Q    Are you a lawyer?

13   A    I am not.

14   Q    However, you advised the Priority Lender Group with

15   Gibson Dunn, correct?

16   A    I do.

17   Q    So without disclosing any privilege, did you discuss the

18   indemnity in the plan as recently as yesterday with members of

19   the group?

20   A    We did.

21   Q    And did that discussion include Eaton Vance?

22   A    It did.

23   Q    Did it include Barings?

24   A    It did -- I'm sorry, I don't recall Barings.

25   Q    Did it include Feralon?

KARN CHOPRA - REDIRECT BY MR. WILSON

1    A    Yes.

2    Q    Did it include Credit Suisse?

3    A    Yes.

4    Q    Did it include InvestCo?

5    A    I don't recall.

6    Q    Did it include Sedus?

7    A    Yes.

8    Q    Is it your understanding sitting here today that it's

9    critical to the group that the indemnity remain in the plan?

10   A    Yes.

11   Q    You were asked a number of questions about the indemnity

12   and the take-back paper.

13        Do you remember that?

14   A    I do.

15   Q    And you testified that the take-back paper is part of the

16   Priority Lender Group's recovery here, correct?

17   A    Correct.

18   Q    And it's your understanding that an ongoing indemnity is

19   embedded in the take-back paper, correct?

20   A    Correct.

21   Q    And the take-back paper is a large portion of the first

22   lien first out and first lien second out recovery under the

23   plan, correct.

24   A    Correct.

25   Q    You were asked a number of questions about KPS's

1    ownership and its trades.  Do you know whether KPS's trades

2    have closed?

3    A    I do not.

4    Q    Do you know whether KPS voted in favor of the plan?

5    A    I do not.

6    Q    You were asked if the Apollo, Angelo Gordon, and Gamut

7    group would have had a blocking position back in 2020,

8    correct?

9    A    I don't believe so, Mr. Wilson.  I just thought that the

10    question was if there would be a (indiscernible).

11    Q    Got it.

12    Is it your understanding that 99 percent to 98 percent of

13    the first lien, first out, and first lien, second out debt

14    owed in favor of the plan?

15    A    Yes.

16    Q    And that's for the plan that includes the indemnity?

17    A    Yes.

18    Q    You were asked about the terms of the indemnity in the

19    2020 PTL credit agreement.

20    Do you remember that?

21    A    I do.

22    Q    And again, you're not a lawyer?

23    A    Right.

24    Q    Would it be your typical practice to rely on counsel to

25    handle the proper scope of the indemnity in any agreement?

1    A    Yes.

2    Q    And here, at the time that the PTL credit agreement was

3    being entered into, was the transaction already being

4    litigated?

5    A    Yes.

6    Q    And the PTL Lenders, including Eaton Vance, CeSam,

7    InvestCo, they had already been named as Defendants in the

8    Complaint, correct?

9    A    Yes.

10   Q    And they had been accused of breach of contract and

11   breach of the implied covenant of good faith and fair dealing

12   at that time, correct?

13   A    Correct.

14        MR. WILSON:  I have no further questions, Your

15   Honor.

16        THE COURT:  All right.

17        I'm sorry, Mr. Greenberg.  I just couldn't hear you.

18        MR. GREENBERG:  Your Honor, Scott Greenberg, Gibson

19   Dunn & Crutcher for the Record.

20        Whenever Mr. Chopra is done with his testimony, I

21   just wanted to deal with the 2019 issue, just to clarify some

22   facts for the Court, if it's helpful.  It may be avoid --

23        THE COURT:  I don't have anything before me, so I'm

24   not worried, until -- again, I said this before.  Until

25   someone puts their name on a pleading and lives with the

1    consequences of that, again, I'll take it up and if there is a

2    problem, there's a problem.

3              There's an ongoing duty to supplement.

4              MR. GREENBERG:  Sure.

5              THE COURT:  And so if there's -- if that duty has

6    been triggered, I assume I'll see a supplement.  If that duty

7    hadn't been triggered, then until somebody puts their name on

8    a pleading, not worried about, not going to get distracted.

9              MR. GREENBERG:  Okay.  Your Honor, I was going to

10   perhaps save Mr. Millar a little bit of time, but just so --

11             THE COURT:  My guess is, that's a thing better left

12   for out in the hall than before me, so fair enough.

13             MR. GREENBERG:  Okay.  Thank you, Your Honor.

14             THE COURT:  No, thank you, Mr. Greenberg.

15             MR. SEILER:  Good afternoon, ready for some recross?

16             THE COURT:  Absolutely.  Let me do one thing because

17   it may change the question that you answer and maybe we can

18   save some time.

19             So Mr. Chopra, let me ask you, Mr. Seiler gave you a

20   list of items and he said have you ever seen a transaction

21   that had A, B, C, and D.

22             Do you remember that?

23             THE WITNESS:  I do.

24             THE COURT:  And you disagreed with him that this

25   transaction didn't have A, B, C, and D.

1          Do you remember that?

2          THE WITNESS:  I do.

3          THE COURT:  No one ever asked you what the

4    difference was, so I'm going to ask you.  If you could explain

5    your answer why you believed that Mr. Seiler's

6    characterization of the transaction wasn't accurate, I would

7    really like to hear that.

8          MR. WILSON:  Happy to, Your Honor.

9          So Your Honor, Mr. Seiler's questions started with

10   the concept that there was a pro rata treatment of the secured

11   credit agreement (indiscernible).  There is a pro rata

12   provision in the credit agreement that Mr. Seiler actually

13   showed me during my deposition that has exclusive carve outs

14   that I responded to at that time.

15         THE COURT:  Okay.  So that's what you were focused

16   on?

17         THE WITNESS:  Yes.

18         THE COURT:  All right.  So let me ask you this:  You

19   have seen the Citadel proposal, correct?

20         THE WITNESS:  I have.

21         THE COURT:  And now that I've seen it, the

22   statements about being a true patriot ring a bit hollow.  I

23   understand perfectly.  I said before I understand -- I

24   understand greed and I understand opportunity and I know how

25   to deal with it.

1          That all being said, is there -- you're here.

2     You're going to have soem spare time.  Is there anything that

3     could change -- and I don't want specifics, just a yes or no,

4     is there anything that could change about the Citadel proposal

5     that you would find interesting in terms of making the plan

6     better for the company?

7          THE WITNESS:  Just to be fair, Your Honor, are you

8     saying is there anything that Citadel could change to meet

9     their proposal?

10         THE COURT:  Yes, yes, that you would say, hum, well,

11    we could integrate -- we could integrate parts A, B, and E

12    into what we have and it results in a better outcome for the

13    contituents, for the Debtor?  I'm just trying to get your view

14    of the world.

15         THE WITNESS:  I think -- I don't want to give you a

16    blanket no, because I think (indiscernible) specific negative

17    covenants to say that negative covenant (indiscernible) that

18    $5 million dollars, would it be better and the answer would be

19    "yes" in that circumstance.

20         So I think the answer as a result is yes, but it's

21    -- I think there is (indiscernible) and not necessarily for

22    the whole thing.

23         THE COURT:  And so you're saying -- and I'm not

24    trying to put words in your mouth, I'm genuinely trying to

25    understand.  You're telling me that if you got -- if you could

1    make all the changes to the proposal that you wanted, it would

2    only get incrementally better and it's not worth the time.

3            Is that what you're telling me?

4            And again, I don't mean anything by it.  I'm just

5    trying to get to the crux.

6            THE WITNESS:  You know, Your Honor, it's I guess it

7    depends on who would it be better for?  It would be -- if you

8    say it's better for the company, it might not be what would

9    then allow the lenders feel comfortable, right?

10           And so I guess, yes, you could take provisions from

11   the Citadel term sheet and say that would be better for the

12   company, but I'm not sure that's better for the lenders group

13   who have voted to support the plan, which is why I'm not

14   trying to hedge.

15           It's just a difficult question to answer.

16           THE COURT:  No, I intended for it to be.

17           And I'm just trying to -- I'm just trying to

18   understand where you currently sit.  It helps me understand

19   the rest of your testimony.

20           But I understand the answer, and thank you for

21   indulging me.

22           With that, Mr. Seiler, I don't know if that

23   influences your Cross or not, but you certainly have another

24   opportunity.

25           MR. SEILER:  It does, in part, Your Honor.

KARN CHOPRA - RECROSS BY MR. SEILER

1                           RECROSS-EXAMINATION

2      BY MR. SEILER:

3      Q    So two areas, Mr. Chopra.  First, following up on Your

4      Honor's correcting my failure to tie down your question about

5      the -- what you'd worked on before, let me just ask it in the

6      simplest terms.

7           Prior to this transaction, had you ever done or advised

8      on a priming facility with a debt repurchase at a discount?

9      And to your knowledge, as senior person at Centerview, when

10     indeed you were the Centerview 30(b)(6) witness in this case,

11     to Centerview's knowledge had Centerview worked on a priming

12     facility with a debt repurchase at a discount?

13     A    No.

14     Q    And was -- as a representative of Centerview, was

15     Centerview aware of anyone else having done a priming facility

16     with a debt repurchase at a discount prior to June of 2020?

17     A    No.

18     Q    So when I was asking you about the attitude of certain of

19     your clients about the indemnity and you talked about CeSam

20     and others, I didn't learn until Redirect that that was a

21     conversation that took place yesterday.

22          Is that the same thing that you told me?  It was all

23     yesterday?

24     A    Yes.

25     Q    When yesterday?

1    A    Yesterday early morning.

2    Q    Before you testified?

3    A    Correct.

4    Q    Because before that, you didn't know what any of your

5    clients thought about the importance of continuing the

6    indemnity from direct conversation with them?

7    A    Yes.

8    Q    But during this case, you had that conversation?

9    A    Before my testimony yesterday.

10   Q    And who was on the call besides you?  How many other

11   people are on the call, to the best of your knowledge?

12   A    It was Gibson Dunn, so just Goldstein, Scott Greenberg

13   and then the client that I mentioned, I remember being on the

14   call, Caroline Sedus from CeSam and Eaton Vance.  I know that

15   InvestCo and Barings were invited, I just don't recall their

16   being on.

17   Q    Did anyone of the clients tell you why continuing the

18   indemnity was important to them in that call?

19        MALE SPEAKER:  Objection, Your Honor, to the extent

20   it calls for privileged communications from counsel.

21        THE COURT:  So I got it.  May be the next question,

22   but I appreciate you being careful.  I think is just a yes/no,

23   so I think that he can answer without invading the privilege.

24        THE WITNESS:  No.

25        MR. SEILER:  Could you read back (indiscernible).

1          (Laughter.)

2                    MR. SEILER:  Your Honor, I'm getting old.  It's been

3     a long day.

4                    FEMALE SPEAKER:  "Did anyone of the clients tell you

5     why continuing the indemnity was important to them in the

6     call?"

7          (READING FROM THE STENOGRAPHER'S NOTES.)

8     BY MR. SEILER:

9     Q    Without telling me the content of what any of the lawyers

10    said, just yes or no, was there a discussion about reasons why

11    it would be important to continue the indemnity?

12    A    No.

13                   MR. WILSON:  Nothing further.

14                   THE COURT:  Okay.  Thank you.

15                   Anything else?

16                   Mr. Lieberman?

17                   MR. LIEBERMAN:  Nothing else.

18                   THE COURT:  All right.  Mr. Millar?

19                   MR. MILLAR:  No.  Thank you.

20                   THE COURT:  All right.  Thank you.

21                   I asked some questions after you did your Redirect,

22    you're certainly entitled to go into those areas.

23                   MR. WILSON:  You did an effective job, Your Honor.

24    I have nothing else.

25                   THE COURT:  All right.  Mr. Chopra, I know that this

1   has been difficult, not what you like doing for a living, but

2   I very much appreciate the candor of your testimony.

3            Thank you, sir.  You can step down.

4            THE WITNESS:  Thank you, Your Honor.

5       (Witness steps down.)

6            THE COURT:  Okay.  Who's next?

7            MR. WILSON:  Our next witness will be Andrew Sveen

8   of Eaton Vance.

9            Is it possible to take a five-minute break because

10   he's going to be testifying by video?  And we need to make

11   sure that he connects because he's not -- he wasn't watching.

12            THE COURT:  Why don't we do this?  I am sure that

13   there's some folks who probably would like to step down the

14   hall for a drink of water or otherwise.  Why don't we do this?

15   Why don't we -- do you want to just take until 10:55 to make

16   sure that you have a chance to walk around and we have the

17   video up and it's working?

18            So what we'll do, because normally we mute the phone

19   lines when I step off, we'll leave the phone lines on so that

20   you can actually get on and hear him and then obviously, the

21   video, you'll see.  It'll be -- I'll put it back up -- I'll

22   put back on the screens.

23            So when he pops on his camera, he'll be up on the

24   screen and you'll see him.

25            Will that work for everybody?

1          MR. WILSON:  That works well, Your Honor, and is it

2     possible to give control?

3          Tim, are you good?

4          MR. HERNDON:  I am on it.

5          MR. WILSON:  Then we're good.  I just wanted to make

6     sure you're a presenter 'cause it's going to be remote now.

7          THE COURT:  Yeah, what he's going to need is he's

8     going to need to be on GoToMeeting and then I give him control

9     from GoToMeeting.

10          MR. HERNDON:  I raise my hand, Your Honor.

11          THE COURT:  Ah, okay.  Let me do that before -- and

12     folks, please go ahead and go.  I will step down in just a

13     moment.  But feel free to go.

14          Let me just get Mr. Herndon where he needs to be.

15          (Pause in the proceedings.)

16          THE COURT:  All right.  So Mr. Herndon, you should

17     have control.

18          MR. HERNDON:  I see the share button is on, Your

19     Honor.

20          THE COURT:  All right.  Thank you.

21          Do you want to put something up just to make sure

22     it's working before I step down?

23          MR. WILSON:  Well, it looks like Mr. Sveen jumped on

24     very quickly.

25          THE COURT:  And --

1          MR. WILSON:  We will test it with him during the

2     recess, Your Honor.

3          THE COURT:  -- Mr. Sveen, just to -- so that you can

4     be heard here in the courtroom, if you would go ahead and give

5     me a five star on your telephone, so I can get you unmuted?

6          (Pause in the proceedings.)

7          MR. WILSON:  We still can't hear you, Andrew.  You

8     have to press five star.

9          THE COURT:  So hold on.  Let me catch up.

10         (Pause in the proceedings.)

11         THE COURT:  The security will come in and out is

12     burdensome.

13         All right.  Mr. Sveen, can you hear us?

14         MR. SVEEN:  I can hear you.  Can you hear me?

15         THE COURT:  Loud and clear, perfectly.  Thank you

16     for using a set of earphones.

17         MR. SVEEN:  Oh, good.

18         THE COURT:  All right, terrific.

19         MR. SVEEN:  Good.  Thank you.

20         THE COURT:  So I'm going to step down.  The lawyers,

21     as you can see, are in the courtroom and we'll get restarted

22     again at 10:55.

23         MR. WILSON:  Thank you, Your Honor.

24         MR. SVEEN:  Great.

25         THE CLERK:  All rise.

1           (Recess taken from 10:42 a.m. to 10:57 a.m.)

2                            AFTER RECESS

3           THE COURT:  We are back on the Record.

4           Are we ready to proceed with Mr. Sveen?

5           MS. AYCOCK:  Yes, Your Honor.

6           THE COURT:  All right.  Thank you.

7           MS. AYCOCK:  Amanda Aycock on behalf of the PTL

8    Lenders and additional counterclaim Defendants.

9           THE COURT:  All right.  Thank you.

10          MS. AYCOCK:  Good morning, Mr. Sveen.

11          THE COURT:  So what didn't we do?

12          MS. AYCOCK:  Oh, call Mr. Sveen to the stand.

13          THE COURT:  Plus we need to what?  You always --

14          MS. AYCOCK:  Swear him in.

15          THE COURT:  Exactly right.  Because sometimes I'm

16   old and I forget.  But it matters to you a lot that he gets

17   sworn in.  All right?

18       (Laughter)

19          THE COURT:  Mr. Sveen, good morning.  If you'd raise

20   your right hand, sir?

21          MR. SVEEN:  Good morning.

22          THE COURT:  Good morning.

23       ANDREW SVEEN, WITNESS FOR THE PTL LENDERS AND CERTAIN

24                      COUNTERCLAIM DEFENDANTS

25          THE COURT:  All right.  Thank you.

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1          Now let's see the A game.

2               DIRECT EXAMINATION

3   BY MS. AYCOCK:

4   Q   Good morning, Mr. Sveen.

5   A   Good morning.

6   Q   Now you're our first witness in this hearing testifying

7   remotely.  Where are you joining us from today?

8   A   I'm in Boston, Massachusetts, in my office in Boston.

9   Q   And no one is in the room there with you, are they?

10   A   No, nobody is in the room.

11   Q   And you don't have any notes in front of you, other than

12   the binders of exhibits that the parties have provided you.

13   Is that right?

14   A   That's correct.

15   Q   And can you please confirm for the Court that you have

16   not been watching or listening to the proceedings today?

17   A   I have not been watching or listening to the proceedings.

18   Q   Great.  Thank you, Mr. Sveen.

19       First, I want to talk a little bit about your background,

20   employment, and educational history.

21       Who is your current employer?

22   A   I work for Morgan Stanley.

23   Q   And were you previously at Eaton Vance?

24   A   Yes.  I was at Eaton Vance for many years.  Morgan

25   Stanley acquired Eaton Vance in February of 2021.

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    Q    And when did you start at Eaton Vance?

2    A    I started at Eaton Vance in January 1999.

3    Q    What's your current title?

4    A    My current title is head of the floating rate -- floating

5    rate team.

6    Q    Was it a similar role when you were at Eaton Vance?

7    A    Yes.  At -- at Eaton Vance, I was co-director.  It was a

8    slightly different title, but it was effectively the same

9    role, director versus head.

10   Q    And was that your title at the time of the 2020

11   transaction?

12   A    That's correct.

13   Q    And what about your role or title in 2016?

14   A    In 2016, that was previous to my directorship of the

15   group.  I was the head of trading and head of capital markets,

16   and I was also a portfolio manager on a number of the funds in

17   the floating rate loan team.

18   Q    And can you please describe your current role?

19   A    Sure.  My current role is to oversee the floating rate

20   team.  There's approximately 40 individuals.  Those are

21   investment professionals that are analysts, also traders,

22   operations professionals to help close trades and do

23   operations for our funds, and other professionals that work

24   within the team.  So I oversee all of those folks.

25        I'm also very active in the credit approval process and

1   portfolio management for all the funds we manage, along with a

2   number of other portfolio managers on my team.

3   Q    What did you do before you were at Eaton Vance?

4   A    Before I was at Eaton Vance, I worked at State Street

5   Bank here in Boston, that's as a loan officer.  I was at State

6   Street Bank for about four or five years.

7   Q    And before that?

8   A    Before that, I had a -- I was attaining an MBA at the

9   University of Rochester Simon School of Business.

10  Q    So how long would you say that you've been working in the

11  syndicated loan industry?

12  A    Really since I arrived at State Street Bank, so since

13  1995, which is 28 years.

14  Q    Do you have any professional designations?

15  A    I do.  In addition to the MBA I referred to, I have a CFA

16  designation.  That's a Chartered Financial Analyst

17  designation.

18  Q    And do you have or have you had any board memberships?

19  A    Yeah, not currently.  But I've recently just, I wouldn't

20  say "retire," but left the board of the LSTA, that's the Loan

21  Syndication Trade organization.  I had been on that board for

22  eight years.

23  Q    And can you explain a little bit what the "LSTA" is?

24  A    Sure.  As I mentioned, it's the Loan Syndication Trade

25  organization.  It's the -- the primary trade organization for

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    the syndicated loan market, the 1.4-trillion-dollar syndicated

2    loan market that was creating loans on behalf of borrowers and

3    then syndicating them to institutional investors, such as

4    themselves.  It's made of large, sale-side money center banks,

5    such as JPMorgan, Bank of America, Goldman, and many others.

6    So they are working with the borrowers in creating those loans

7    and underwriting them.

8         And then it's also the buy side.  So hundreds of

9    borrowers -- investors, such as ourselves, that are purchasing

10   these loans in the syndication process.

11        There's also a number of law firms that are involved in

12   the LSTA and actively involved.

13        There's associate members.

14        And those members work together towards driving

15   efficiencies and standards in the -- in the -- in the

16   syndicated loan market, and also marketing of the loan market.

17   Q    Now, in a minute I want to talk a little bit about the

18   2016 Serta credit facility, but before I do that, I'd like to

19   talk through Eaton Vance's approach to credit agreements more

20   generally.

21        You mentioned that you have oversight over -- or you had

22   oversight over Eaton Vance's investment process.  Can you tell

23   the Judge a little bit about how the process of negotiating

24   and purchasing into a syndicated loan facility played out in

25   your experience at Eaton Vance?

1    A     Sure.  So the syndicated loan opportunities are initiated

2    by, as I mentioned, sell-side banks, the large banks that --

3    that I referred to before.  They work with a certain issuer or

4    borrower to find financing needs they might have or an

5    acquisition, dividend, or whatever other need they might have.

6         They will structure that deal and underwrite that deal,

7    based on what they expect will help -- will clear the market.

8    And then they'll package that deal and deliver the information

9    to prospective clients and prospective buyers, such as, at

10   that time Eaton Vance, and now Morgan Stanley.

11        We'll receive that information typically on a data site,

12   and that information will include what's called a "CIM," a

13   Credit Information Memorandum, which outlines the prospects of

14   the company, the underlying company itself, the industry, and

15   a number of other items, such as a term sheet.

16        And then we'll also have a presentation, typically, from

17   management.  There will be a presentation, a written

18   presentation typically, a verbal discussion with management

19   that the investors can ask questions.

20        And then there will be other -- any third-party

21   information that might be pertinent or help investors make

22   that decision will also be included on that data site.

23        And then, also, critically and important is the credit

24   agreement.  So that will also be presented along with the term

25   sheet where the investors will initially focus on -- initially

ANDREW SVEEN - DIRECT BY MS. AYCOCK

93

1    focus on the term sheet to get the general understanding of --

2    of the provisions of the credit agreement.

3    Q    And once Eaton Vance receives these materials -- the

4    credit agreement, the term sheet, and the other materials you

5    mentioned -- how does Eaton Vance assess these opportunities?

6    What does it look at?

7    A    Well, in terms of looking at the prospects of the

8    company, that's our -- our analyst is doing that work and

9    considering the -- the opportunity.  To the extent that we're

10   available on that, of course, we'll also consider the term

11   sheet, the underlying terms, and so, on the very basic terms,

12   just the size of the term loan, the coupon, the collateral.

13       And then there's a number of other terms, as well, which

14   would be generally categorized as affirmative and negative

15   covenants or maintenance covenants.  So we'll definitely

16   consider all of those, as well, and that will govern what the

17   company can and can't do, while the -- within the provisions

18   of the document, and also what it can and can't do just in its

19   behavior, in general, to stay in compliance.

20       And we'll -- we'll outsource the review of that document

21   to third parties, attorneys, and we'll have attorneys evaluate

22   the credit document itself and -- and evaluate how it

23   correlates with the term sheet that we've been presented and

24   also make any other comments on the -- on the document itself

25   and the terms of it and the provisions within the document.

1    Q    And what -- those covenants that you mentioned, what

2    determines how those are set?

3    A    Definitely a negotiation.  It's -- it's really market

4    determined.  But certainly the banks -- the underwriting bank

5    will be working with the -- the borrower, trying to determine

6    what -- and informing them what would likely clear the market.

7    And then that borrower might be looking for certain types of

8    provisions that might be unique to their transaction and that

9    they might require or request.  And so that's part of a

10   negotiation.  And then that will be brought to market with an

11   expectation where it might clear.

12        And then there will be a fine-tuning of those covenants

13   in the syndication process, to the extent, you know, one party

14   has more leverage to negotiate whether the document should be

15   tighter or looser.  And that really will be driven by the --

16   by market demand (indiscernible) and the interest in the loan.

17   Q    And what do you mean by a "tighter" or "looser" document?

18   A    Sure.  A tighter document would have -- that would be

19   more lender friendly, and a looser document would be more

20   borrower friendly.  So, by a tighter document, for example,

21   loan provisions that we would consider and be interested and

22   how much additional debt a company could take on, either on a

23   *pari passu* basis with the term loan that was being syndicated

24   or on a priority basis or any other buckets of debt.

25        And if the debt was -- if it was tighter, then we would

1    want to, you know, constrict the ability for the company to

2    have additional debt on the company.  So, when we have more

3    debt on a company, it would be a negative towards lenders.

4         And then a looser document would have much broader

5    provisions, for example, on -- on the ability to add

6    additional debt.  And -- and that would be something that the

7    company would typically be interested in and favorable -- it

8    would be favorable towards the company or the issuer.

9    Q    So, as a lender, Eaton Vance would prefer a tighter

10   document?

11   A    Yes.  Generally speaking, we would seek a tighter

12   document.  We're always interested in protecting downside.

13   We're buying loans at par, and are trying to protect our

14   interest and, of course, always interested in the downside.

15   So a tighter document will typically -- a tighter document

16   will potentially typically provide us with better protections.

17   Q    Now let's talk about the 2016 Serta credit agreement.

18        Did Eaton Vance draft the 2016 credit agreement?

19   A    No, we didn't.  It was typical practice in the syndicated

20   loan market it would be drafted by a combination of the

21   company's counsel, in cooperation with the underwriting bank.

22   And that would be drafted by -- by counsel from -- yeah, from

23   the borrower.

24   Q    The analysis we discussed a moment ago, was this kind of

25   analysis undertaken before Eaton Vance entered into the 2016

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    credit agreement?

2    A    Yes.  Every deal we look at, we -- we outsource the

3    evaluation of the credit agreement to a third party,

4    attorneys.  We're also looking at the term sheet ourselves, of

5    course.  And then, to the extent that it's necessary, our --

6    or we have questions, then the analysts may also look at

7    aspects of the credit agreement.  But we do rely pretty

8    heavily on our -- our third-party attorneys to evaluate and --

9    and highlight the -- the issues within the credit agreement.

10   Q    And how would you have characterized the Serta credit

11   agreement on a loose or tight scale that you mentioned?

12   A    The -- the Serta credit agreement in 2016 was loose, and

13   the -- the -- you know, that wasn't unusual for that time

14   frame.  And you know, it was -- but that was a loose document,

15   yes.

16   Q    You said it "wasn't unusual for that time frame."  Can

17   you say a little bit more about that?

18   A    Sure.  There -- you know, leading up to that time frame,

19   and really since then, as well, there's been a movement

20   towards looser credit agreements, especially post the

21   financial crisis.  We've seen that, you know, be a gradual

22   process, issuers seeking looser documents.  Borrowers, and to

23   the extent there's a sponsor involved, sponsors have been very

24   interested in having looser documents, as well, to really

25   expand the flexibility of the credit agreement and -- and,

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    frankly, also improve their optionality, to give them more

2    flexibility when they need it.

3        And in my discussions with sponsors and -- and borrowers,

4    as well, over the years is that, in general, they favor that,

5    they're willing to pay for it.  So that's been a trend that's

6    been going on.  And the market has pushed back on some of the

7    trends and the looseness of documents.

8        But generally, we've been moving in that direction and

9    documents have gotten generally looser and it's been accepted

10   by the marketplace.

11   Q    I'd like to turn now to the time period leading up to the

12   2020 transaction.

13       How was Serta doing in early 2020?

14   A    So Serta, in early 2020, was challenged.  The -- the

15   company had not met its expectations of cost saves that it was

16   looking to, generally.  Leverage was high, higher -- much

17   higher than anticipated in previous years or that certainly

18   what the company -- company was expecting to do.  So we were

19   in somewhat of a -- the company was somewhat strained

20   financially.

21       You know, the company was still a very large, successful

22   company in the -- in the mattress industry, had a great market

23   share.  But they really weren't performing on a profitability

24   standpoint, so there was increasing concern about the

25   company's financial condition.

ANDREW SVEEN - DIRECT BY MS. AYCOCK

98

1    Q    How did Eaton Vance to be involved in the Ad Hoc Group

2    that would eventually undertake the transaction that is the

3    subject of this lawsuit?

4    A    Sure.  So, if we scroll back to 2020, then as March came

5    upon 2020, then we entered the period of COVID.  And so, you

6    know, there was a heightened concern on what might happen to

7    issuers that we were lending to, and we were really

8    undertaking a look at all of our companies and really

9    considering the liquidity needs of potential companies.  And

10   loans that we focused on (indiscernible) were companies that

11   were already in -- in financial strain.

12        So Serta was definitely in that category.  And it was

13   with speaking with the financial advisor community and

14   attorneys, Gibson was active in really working as a point

15   person to -- to -- where a number of large lenders in the

16   Serta deal coalesced and created an Ad Hoc Committee.  It's a

17   pretty typical process with joint interests, if they coalesce

18   with somebody, and then start to -- start to think about

19   options in the company.

20   Q    And when that group coalesced, did you or did the group

21   have a specific transaction structure in mind?

22   A    No.  I think, at this time, it was -- it wasn't a very

23   specific transaction, but rather, it was a concern for the

24   company knowing that it was coming in with a strained

25   financial position already.  We were especially concerned

1    about liquidity for both Serta and some other companies in our

2    portfolio.

3        But in this case, specifically on Serta, knowing they

4    were already financial constrained.  Economic activity was

5    driving -- coming to a halt.  Was the company going to have

6    sufficient liquidity?  Which is really, first and foremost,

7    the thing that was -- was most damaging to the company, if

8    they run out of liquidity.

9        So we wanted to read your -- wanted to get together as a

10   -- as a group representing the first lien lenders and find

11   other participants that had the same interests and try to

12   initiate conversations with the company.  That was the goal.

13   Q    And as you mentioned a moment ago, Gibson Dunn

14   represented this Ad Hoc Group.  Is that right?

15   A    That's right.  Gibson Dunn was the -- the point

16   representing this group.

17   Q    Now I'd like to show you what has been previously

18   introduced into evidence and filed at Docket 862-3.  That's

19   Debtors' Exhibit 59.

20        MS. AYCOCK:  And I'll just give Tim a moment to pull

21   that up on the screen.

22   BY MS. AYCOCK:

23   Q    Do you see that, Mr. Sveen?

24   A    I do.  Yes, it's the April --

25        THE COURT:  Can we blow that up?

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1      THE WITNESS:  And I'm squinting a little bit because

2  it's --

3      THE COURT:  Can we --

4      THE WITNESS:  -- it's a little smaller.

5      THE COURT:  -- blow that up?

6      THE WITNESS:  This is the April 7 --

7      THE COURT:  Mr. Sveen, hold on just one second.

8  We'll get it -- we'll get it blown up a little bit for you.

9      THE WITNESS:  Okay.  Good.

10      THE COURT:  There we go.  Thank you.

11      THE WITNESS:  Yeah, I see the header here and I'm

12  familiar with this letter, yes, with the other portions that

13  aren't blown up right here, right now.  This is the April 7th

14  letter that was sent from Gibson on behalf of the Ad Hoc

15  Lender Group.  And it involved first lien lenders and some

16  crossover lenders that held second lien, as well.

17      This was our -- we had been working together and

18  decided to reach out to the company and provide them with a,

19  you know, more formal outreach, reaching out to the company

20  and suggesting that we were here and we had a vested interest

21  in working with them on various -- obviously, a vested

22  stakeholders, and was there anything they needed.  What was

23  their current financial condition, were they in need of

24  liquidity, and could we open a transparent and open discussion

25  with them?

1          And that -- this was the first attempt at making

2     that connection.

3     BY MS. AYCOCK:

4     Q    And at the time that you sent this letter, did you have

5     any sense of what the assistance the group was offering might

6     be?

7     A    Well, as I mentioned earlier, we -- first and foremost,

8     we were concerned about liquidity.  And I think we were

9     representing to the company that we were interested in trying

10    to help in any way we could.  Liquidity was certainly on our

11    mind, and I think that's referred to in this -- this letter,

12    as well.

13         But really, we just wanted to get the dialogue going and

14    understand more about the potential needs of the company

15    because we were still in the dark, as -- as we were on a lot

16    of our investments at that moment when COVID first set on us.

17    Q    And do you recall whether Serta responded to this letter?

18    A    To my knowledge, Serta did not respond to this letter.

19    Q    Now I'd like to show you what has been previously

20    admitted into evidence and filed at Docket 862-31.

21         MS. AYCOCK:  And Tim, if you can go to page 3 of

22    that exhibit, please, and zoom in.  Great.

23    BY MS. AYCOCK:

24    Q    Do you recognize this document, Mr. Sveen?

25    A    Yes.  This was a followup.  So now this is April 24th, a

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    couple of weeks later.  This is another letter that was sent

2    to, in this case, the -- this is -- this is to Weil Gotshal,

3    counsel to the company, reaching out to the company.  And this

4    was from Gibson, and this was listed on behalf of the same --

5    the same Ad Hoc Group.

6         At this point, we were -- we hadn't heard from the

7    company and we were increasingly concerned.  We imagined that

8    they were probably in the midst of it, as many companies were

9    in COVID, and trying to manage their cash.  At the same time,

10   we were anxious to open the dialogue and make sure that they

11   weren't going to be surprised or we weren't going to be

12   surprised at some quick development.

13        We were really anxious to get in front of them and

14   ascertain especially if they needed any liquidity.

15   Q    And to get in front of them, you attached a strawman

16   proposal or the group attached a strawman proposal to this

17   letter.  Isn't that right?

18   A    That's correct.

19   Q    Let's --

20   A    (Indiscernible) sorry.

21   Q    No, no, no.  You're fine.

22        MS. AYCOCK:  On Page 5, Tim is there now.

23   BY MS. AYCOCK:

24   Q    Have you seen this proposal before?

25   A    I have, yes.  The illustrative superpriority financing

1    terms, again, highlighted here on April 24th.  This was

2    attached to that letter.

3    Q    And can you please explain for the Court what the goals

4    of this proposal were?

5    A    Sure.  If you could just scroll down on the term sheet?

6          So the goal here was -- first, you see -- I must

7    highlight immediately that it's illustrative and it was --

8    there's a number of gaps in this term sheet, it's a very short

9    term sheet.

10         But by putting together a term sheet, we were really

11   trying to insist that the company understood that we were very

12   serious and that we didn't know exactly what their needs might

13   be or if they even had needs, if they, you know, maybe were

14   doing better than we anticipated.

15         But to the extent that they had needs, we wanted to be in

16   front of them, we wanted to be there to discuss with them what

17   those needs were.  And so that was the point of putting this

18   in front of them and -- and showing that we were ready to

19   negotiate these points, besides -- and we did outline some of

20   the basic ideas, such as the idea that it would be a

21   superpriority term loan that we would -- be best.

22   Q    Now, if you could direct your attention to the fifth row

23   down, it says "Lenders," and it says:

24         "Backstopped by certain members of the Ad Hoc Group, each

25   on a pro rata basis, but available to all existing first lien

1   lenders pro rata."

2        Can you please explain for the Court what that means?

3   A    Sure.  So we were part of a -- the Ad Hoc Group, and the

4   Ad Hoc Group is a subset, a meaningful subset, that was

5   working on behalf of -- at this time, it was working on behalf

6   of all lenders.  That was the goal, but that, for efficiency's

7   sake, we were working as a subgroup of larger lenders.  And

8   that group is -- is noted here as the "backstop group."

9        So the idea here is that the company could negotiate with

10  this subset group, come to a deal.  It would be, obviously, a

11  lot easier and more efficient to do that with a subgroup, and

12  that we would backstop the full commitment under the terms

13  that we negotiated.  So that would be easier and quicker for

14  the company to execute and -- and add a lot more certainty.

15       We also highlighted here that -- importantly, that --

16  that the idea here was that we were representing all first

17  lien lenders, and that we would have been offering this

18  superpriority term loan to all lenders on a pro rata basis

19  subsequent to cutting a deal.  That was the -- the idea behind

20  that.

21  Q    And you mentioned the idea was for the company to

22  negotiate with a subset group.  Is that a typical situation

23  for the industry?

24  A    Yes, it's very typical.  It's -- it's much more efficient

25  -- Ad Hoc Groups form in most stressed -- stressed situations,

ANDREW SVEEN - DIRECT BY MS. AYCOCK

105

1    when a company is under stress in the leveraged loan market.

2    It's very typical that the largest lenders will then come

3    together.  The idea of having the largest lenders come

4    together, obviously, they can provide a substantial number and

5    -- and dollar amount of the term loan and represent something

6    that could get done with the whole lender group, presumably.

7         And -- and it's also a smaller number would -- a smaller

8    number of lenders to have to get all on the same page.  So

9    it's much more efficient and cleaner for the company and their

10   advisors to work with a smaller Ad Hoc Group, and it's

11   extremely common when companies are actually distressed.

12   Q    And did the group receive a response to this strawman

13   proposal?

14   A    To my knowledge, we did not receive a response to this

15   proposal or just to the letter.

16   Q    And this proposal, was that what was ultimately

17   consummated with the company?

18   A    No.  And -- and no, this is a highly illustrative term

19   sheet, just really to get the attention of the company and let

20   them know we were serious.  The ultimately deal that was

21   consummated is significantly different than this.

22   Q    And why is that?  What changed after this proposal was

23   submitted?

24   A    Well, we didn't -- we didn't receive a direct response on

25   our letter or on -- on this particular term sheet.  But in --

ANDREW SVEEN - DIRECT BY MS. AYCOCK

106

1      in the beginning of May, we did hear from the company's

2      advisors, who spoke to our company -- our -- our advisors that

3      there was a -- there was another term sheet and there was

4      another proposal that was being submitted on behalf of a

5      subgroup of lenders that was not part of the Ad Hoc Group and

6      -- and that we were informed of that and informed of some of

7      the basic terms of that and told that that was something the

8      company was considering.

9      Q    And you said that you were informed of the basic terms of

10     that.  What was your knowledge of what the -- the deal might

11     entail at that time, in -- in or around May?

12     A    Sure.  We -- so we were presented that and it was a --

13     what we would deem to be a pretty aggressive proposal, and it

14     was -- was not favorable to the first lien lenders that --

15     that were not party to it.

16          It involved what's called a "dropdown," and which, at a

17     very high level, is -- is the -- at least in this case, it was

18     suggested it was material, not of the collateral, but would be

19     dropped down from the existing borrowing group into an

20     unrestricted sub, subsidiary, and that this minority group of

21     lenders would then advance new funds against that, provide new

22     liquidity to the company, and that they would also -- their

23     existing debt would -- would also be moved and -- and -- and

24     supported by that -- that collateral that had been removed.

25     The majority of the good collateral in the company was -- was

1    to be moved into the subsidiary and support that and that the

2    results were significant discounts being taken by those

3    participants on that debt.  So a discount component, the

4    removal of the collateral, and the new money component.

5    Q    What was your reaction when you heard about this other

6    dropdown transaction that another group might be pursuing?

7    A    So, at that time, I was definitely disappointed.  We were

8    trying to work openly and transparently with the company and

9    they hadn't responded.  But we were also, importantly, trying

10    to work on behalf of both the first and the second lien

11    lenders.  We were trying to work on behalf of the whole -- the

12    whole class of lenders.  And -- and so this was a real curve

13    ball.

14         And we were being asked by the company, essentially, to

15    -- if you want -- you know, we saw your -- we saw your other

16    stuff, we didn't respond, if you want to be involved, you need

17    to come up with something that's competitive with what we're

18    seeing from the third party.  And we were given the broad

19    outline, but really not the exact terms.  So we were being put

20    in competition and given marching orders that, if you wanted

21    to play, you needed to show debt reduction and -- and new

22    liquidity, and those are some of the primary objectives of the

23    company.

24    Q    And in order to negotiate with the company, the Ad Hoc

25    Group and Eaton Vance had to go under NDAs.  Is that right?

ANDREW SVEEN - DIRECT BY MS. AYCOCK

108

1    A    That's correct.  First, our professionals were under an

2    NDA, which was in early May, around -- I think it was May

3    10th.  And then, subsequently, Eaton Vance went under NDA

4    around -- on or around May 18th.

5    Q    And I'd like to talk about the Ad Hoc Group's first

6    formal proposal to the company after it went under NDA.  I'd

7    like to show you what's already been entered into evidence and

8    filed at Docket 863-43.  That's Debtors' Exhibit 150.

9         Have you seen this presentation before, Mr. Sveen?

10   A    I have, yes.

11   Q    And what is it?

12   A    So these were noted as discussion materials and these

13   were -- this was a combination of the efforts of Centerview,

14   our financial advisors, and Gibson.  And they were helping

15   elaborate and -- and show us proposals that -- that we could

16   potentially go back to the company with.  And this was a

17   summary of some of those transactions.

18   Q    And when you reviewed this proposal, what was your

19   reaction?

20   A    My first reaction was I was disappointed, and primarily

21   in the fact that we were going to have to forego so much

22   principal in other to counter the other transaction to be

23   somewhat competitive with our offering to the company.

24        You know, we were very concerned about the alternative

25   proposal because of the amount of collateral that was being

1    stripped from the borrower group would have been extremely

2    detrimental to the left-behind lenders in a downside scenario,

3    so we knew we had to be thoughtful, as thoughtful as we could

4    and be as competitive as we could in the offer we came up

5    with.

6         What I hadn't -- I don't think I had initially expected

7    the -- the amount of discount that we were going to have to

8    offer, so I was a little bit disappointed almost, or stunned

9    when we had started seeing the size of the discount that we

10   were potentially proposing.

11   Q    You mentioned that the competing proposal would be

12   detrimental on the down side.  Can you talk a little bit more

13   about the competing considerations in evaluating, you know, on

14   the one hand, the Ad Hoc Group proposal and what the

15   alternative might be, the dropdown proposal?

16   A    Yes.  This was a -- you know, it was a tough decision

17   with a lot of variables.  We were also competing against a

18   deal -- we didn't know the best facts of what the other deal

19   was; we knew the broader terms.  And we had to -- our

20   professionals, I should say, really had to evaluate the scope

21   of what it could be, the amount of collateral that could be

22   moved, and -- and the amount of discount that was being

23   offered.  We had to really look at the -- the scenario and

24   assume the most and then try to create a counterproposal

25   towards -- against that, that was favorable.

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1      And when we were evaluating those two different options,

2   whether we should proceed or not and to what degree, we had to

3   look at the downside and the upside of the two different

4   proposals.  And the downside of the alternative proposal we

5   thought was very poor.  If the company didn't do well in the

6   future, if all the collateral -- all the valuable IP

7   collateral was stripped from the term loan, that those that

8   weren't participating in that transaction would be left behind

9   in a very -- the chance for recovery would be very, very poor.

10   And given at the time we were -- of course, with COVID, there

11   was a lot of uncertainty.  We were very wary of downsides.

12      And then -- and then we did the same type of evaluation

13   on our proposal, our competing proposal, considering the

14   downside.  We were very interested in limiting our downside.

15   But there was a significant tradeoff for that.

16   Q    And was there any upside associated with the competing

17   dropdown proposal?

18   A    Certainly.  If the company had done extremely well and

19   recovered from COVID -- which, at that time, there was a

20   possibility, it was just a lot of uncertainty.  If the company

21   had done well and was able to meet of all of its future

22   obligations and recovered, then there was a possibility to

23   receive full principal at a hundred cents on the dollar.

24   Q    And how did that compare to the upside of the Ad Hoc

25   Group proposal?

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    A    Yes.  So that's -- and that was the -- the hard part

2    about accepting this.  We had that possibility in the ad hoc

3    proposal, so we were essentially realizing a permanent cap to

4    our potential recovery.  And we looked at a number of

5    different proposals, depending on how deep we would go with

6    the offer of debt reduction, which was really demanded by the

7    company as part of our -- if we wanted to be competitive.  So

8    we looked at those different proposals, and then we were going

9    to be capped on our recovery at something meaningfully less

10   than par.  So that was a -- that was a difficult tradeoff.

11   Q    And you've mentioned a few times that you were

12   disappointed, in part, because the 1-L lenders weren't all

13   working together.

14        Did Eaton Vance ever reach out to Apollo or others in the

15   competing group to work together?

16   A    Yes.  Throughout this process, I was -- I was, once

17   again, disappointed that we were competing against one other.

18   And to the extent that we had been working together, then we

19   probably could have -- as a -- as a -- as a class, we could

20   have negotiated a better deal relative to the borrower and the

21   issuer.

22        The issuer was really pitting us against one another with

23   -- with uncertainty of exactly what the other one was doing

24   and -- and leading to this outcome that was -- they had a

25   right to do and they were proceedings with their -- what they

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    deemed to be their best interests.  But nonetheless, it was

2    pitting the two of us against each other.

3        If we had been working together, I think we could have

4    gotten a better -- we certainly wouldn't have necessarily

5    taken a hit on the principal at that point in the -- in the --

6    at that point.  So I think we could have done a better deal.

7        So I was suggesting that to the other parties, and I know

8    there reach out to -- to the other side to try to bridge the

9    gap and say, hey, can't we -- can't we work together, wouldn't

10   we do -- all do better if we were on the same -- you know,

11   paddling in the same direction?

12   Q    And when was that outreach?

13   A    I know there was written outreach in -- in the middle of

14   May, and then there was calls made later in May, as well, at

15   least to my knowledge of -- there was calls made later, as

16   well.

17   Q    And did the two group of -- groups of lenders end up

18   working together?

19   A    No.  The offer was made and justification for working

20   together was made.  It was offered and -- and we were -- my

21   understanding is we were listened to, but that, ultimately,

22   there was no response -- either a response and there was no

23   real cooperation.

24           THE COURT:  Yes, ma'am.

25           FEMALE SPEAKER:  Objection.  The last part of the

Case 23-09001   Document 282   Filed in TXSB on 05/20/23   Page 113 of 128

ANDREW SVEEN - DIRECT BY MS. AYCOCK

113

1    answer is hearsay.  I don't believe there's a foundation that
2    Mr. Sveen participated in those conversations.
3              THE COURT:  Any response?
4              MS. AYCOCK:  My question was did the two groups of
5    lenders end up working together, so I was asking for
6    factual --
7              THE COURT:  So it was a yes-or-no question, right?
8              MS. AYCOCK:  That's right.
9              THE COURT:  Okay.  And so she didn't object to that
10   part of the answer.  What she objected to was the explanation
11   of what occurred.  The hearsay objection was raised, that was
12   the only objection that was raised.
13             How do you respond to that?
14             MS. AYCOCK:  He -- Mr. Sveen didn't testify as to
15   what anyone said, he just was testifying as to what -- you
16   know, the -- whether there was any subsequent action of them
17   working together or any response.
18             THE COURT:  All right.  Based on that response, the
19   objection is sustained.
20   BY MS. AYCOCK:
21   Q    So Eaton Vance continued to work with the members of the
22   Ad Hoc Group that would work with it, correct?
23   A    That's correct.
24   Q    When did the Ad Hoc Group first formally propose its
25   transaction to the company?

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    A    I believe that was on May -- May 26th.

2    Q    And just to clarify your answer, Mr. Sveen, from a few

3    moments ago and just a yes-or-no on this one.  Did the two

4    groups of lenders ever end up working together after that

5    outreach you mentioned?

6    A    No, they did not.

7    Q    And going back to the first proposal to the company.

8         What were the main points of negotiation with the company

9    in your recollection?

10   A    Well, there were a number of components to the

11   transaction.  But the most pertinent one that there was the

12   most negotiation was the amount of discount that the PTL

13   lenders would offer the company, the amount of discount on the

14   principal.

15        FEMALE SPEAKER:  The amount of discount on what?

16   BY MS. AYCOCK:

17   Q    Mr. Sveen, can you just repeat your response?

18        FEMALE SPEAKER:  Just the last word.

19   BY MS. AYCOCK:

20   Q    Or the last word for the court reporter.

21   A    The amount of --

22   Q    She just didn't catch it.

23   A    Yeah, I'm sorry.  The amount of discount -- discount on

24   the principal, the amount of discount on the principal.  That

25   was the primary -- the most negotiated point, to my knowledge.

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    Q    Mr. Sveen, I would like to show you what has been filed

2    at Docket 864-31, which is Debtors' Exhibit 188.

3              MS. AYCOCK:  Can you zoom in please, Mr. Herndon?

4    BY MS. AYCOCK:

5    Q    This is an email exchange between you and Patrick

6    Daniello on June 3rd, 2020.  Is that right?

7    A    It is.

8         Can I just ask them to scroll down a little bit?  Right,

9    highlight that point?

10   Q    Can you see that, Mr. Sveen?

11   A    I can.  I see the whole thing now.  Thank you, yeah.

12   Q    And who is Mr. Daniello?

13   A    Mr. Daniello is a -- is a consultant that works a lot

14   with our team and he works on our behalf in -- usually in

15   workouts or in stress situations.  And this is, I guess, an

16   email to Patrick from me on June 3rd.

17             MS. AYCOCK:  And move to enter Debtors' Exhibit 188

18   into evidence.

19             THE COURT:  Any objection?

20        (No verbal response)

21             THE COURT:  It's admitted.

22        (Exhibit 188, ECF 864-31, received in evidence)

23   BY MS. AYCOCK:

24   Q    And what are you and Mr. Daniello discussing in this

25   email?

1    A    This was a discussion with our -- our professionals on --

2    that had listened in to a call.  So, at this point, there was

3    a -- some open dialogue with the company -- or with the issuer

4    or -- or the representatives about -- about whether we could

5    consummate the deal.  And so there was negotiation on terms

6    that was taking place and I was commenting on that.

7    Q    And do you recall what you meant by "It's tough to drop

8    below 25 percent haircut on the first"?

9    A    Yes.  That's -- this is me referring to the reduction in

10    principal that we would have to realize, the PTL lenders, that

11    was a key point for the company.  And I was hitting what I

12    thought to be a -- what I thought would be our limit as to how

13    low we could go.  It was already a very significant discount.

14    Q    And what was "tough" about that?

15    A    Well, once again, we didn't know the ultimate outcome of

16    this -- of Serta.  Serta certainly had entered this period

17    with high leverage, but it was still a very large, well known

18    company with -- with great market share, and yet, was not

19    generating enough cash flow.  And there was certainly the

20    possibility that it could rebound, both from those troubles

21    and also with the better -- if it was better run.

22         And it could also recover from COVID.  We didn't know

23    exactly where we were going yet, if we had -- we were able to

24    bridge the need for the company with some liquidity, it could

25    recover, in which case we could get a hundred cents on the

ANDREW SVEEN - DIRECT BY MS. AYCOCK

117

1    dollar, where the -- which is what we would normally

2    anticipate.

3         But here, because we were being backed into the corner a

4    bit and having to come up with a more -- a competitive

5    alternative, we were being forced to realize a 25-cent hit up

6    front on our principal, and that's the part that was tough for

7    me to swallow.

8    Q    And what convinced you to swallow it or sign off on it?

9    A    Ultimately, we considered the -- you know, we're lenders,

10   we care a lot about downside.  We really like to limit the

11   range of outcomes to get more certainty.  That's the way that

12   we operate or to work.

13        We don't like big writeoffs.  So, ultimately, given a

14   chance in a downside scenario, like a much bigger writeoff in

15   the alternative structure -- so we were willing to forego that

16   25 cents in order to secure a better potential outcome, to the

17   extent we were not in a -- in a distressed scenario.  We

18   wanted some kind of floor to our recovery.  And so that was

19   the tradeoff that we had to make when offering this up.

20   Q    And did the company ultimately accept the Ad Hoc Group or

21   the PTL Group's proposal?

22   A    They did.  I think the -- the ultimate number was a

23   discount -- they did accept our proposal and the discount was

24   26 cents.

25   Q    And when --

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    A    (Indiscernible).

2    Q    I'm sorry, Mr. Sveen.

3         When was that?

4    A    That was on June 6th, I think is the right date.  I'm

5    sorry.  June -- it might have been June 5th.

6    Q    Do you --

7    A    I'm sorry if I'm getting the dates off by one.

8    Q    That's all right.

9         Do you remember what happened in the days that followed

10   the company's acceptance of the proposal on June 5th?

11   A    Yes.  The company accepted our proposal and then they

12   made a public announcement that they had accepted our proposal

13   in -- in the couple of days that followed.

14   Q    And after that public announcement of the transaction,

15   what happened after that?

16   A    Well, then they -- a couple of days later, the opposing

17   group issued -- tried to litigate against the -- the

18   transaction and tried to stop the transaction.  I believe that

19   was on the 11th.

20   Q    And what was going as that litigation was filed?  What

21   was going on, on your side with the lenders, in terms of the

22   transaction?

23   A    Well, at that time, we were -- well, it -- our

24   representatives, our attorneys, were working actively with the

25   borrowers' attorneys and financial advisors to try to

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    consummate the transaction that had been agreed to.  So then

2    we were moving from term sheet to credit agreement and

3    fine-tuning all the -- all the -- and negotiating all the --

4    the credit agreements.  That was taking place at that time.

5    Q    And so it was while you were negotiating the credit

6    agreement and all that paperwork that the -- the other side

7    filed a lawsuit.  Is that right?

8    A    That's -- yes, that's correct.  That's when all the final

9    thing was still -- it was during that time frame that the --

10   that the lawsuit was filed, yes.

11   Q    And are you aware that there's an indemnity provision in

12   the priority term loan agreement whereby the borrower

13   indemnifies the lender for losses, damages, or claims,

14   including in connection with the transaction?

15   A    Yes, I'm aware of that.  Yes.

16   Q    And did Eaton Vance want an indemnity provision in the

17   priority term loan agreement?

18   A    Yeah, they were to have indemnity provisions.  And the

19   nature of those indemnity provisions will depend on -- on the

20   circumstances.  And clearly, in this circumstance, it was

21   important to have an indemnity provision.  And we were relying

22   heavily on our outside counsel to -- to identify that and --

23   and negotiate that.

24   Q    And do you understand that this indemnification

25   obligation is proposed to continue with the reorganized

ANDREW SVEEN - DIRECT BY MS. AYCOCK

120

1      company?

2      A    Yes, I understand there are still indemnities.  Yes.

3      Q    Is that important to Eaton Vance that it continue?

4      A    Yes, I think it's critical.  It's become even more

5      important, given that we -- we're almost three years into

6      litigation over the 2020 transaction and that -- that

7      continues unabated.  So, yes, we're very interested in

8      indemnity and -- and the appropriate amount of indemnity

9      negotiated in the --

10     Q    And did --

11     A    -- in the RSA and -- and the (indiscernible).

12          FEMALE SPEAKER:  What was the last part?  He just --

13     negotiate for the RSA and something.

14     BY MS. AYCOCK:

15     Q    Mr. Sveen, can you please just repeat the last part of

16     your answer?

17     A    I said the RSA and the credit agreement and -- and

18     whatever other documents are -- are required to have that.

19     Q    Did Eaton Vance vote in favor of the Plan of

20     Reorganization?

21     A    Yes.

22     Q    If the plan and the take-back debt did not provide for

23     continuing indemnity providing -- following plan

24     effectiveness, would Eaton Vance have voted in favor of the

25     plan?

1    A    No.  I think that's a -- that's a critical term that's

2    included.  All the -- all the terms are negotiated.  And --

3    and clearly that is a critical component of the overall plan.

4    And the answer is no.

5    Q    And so the ongoing indemnity was important to Eaton Vance

6    in deciding whether to approve the plan.  Is that right?

7    A    Yes, I think it's a very important consideration.

8    Q    Now are you involved in the day-to-day related to the

9    reorganization plan and the indemnity?

10   A    No.

11   Q    Who is involved with that?

12   A    Patrick Daniello, in terms of representing Eaton Vance,

13   continues to be active.  Cathy McDermott is also likely

14   active, although I haven't spoken to them about in the last --

15   in the most recent time frame.  They both should be acting on

16   it.  And then, of course, very importantly, they are our

17   counsel.

18   Q    But you're aligned institutionally with Mr. Daniello and

19   Ms. McDermott that the indemnity is important for Eaton Vance,

20   right?

21   A    Yes, it's critical and -- but you know, we -- we do rely

22   heavily on our -- our counsel to identify and to negotiate

23   that, the terms to which are -- we had agreed to.  To the

24   extent that it wasn't clear, that's something they would bring

25   to our attention and -- and we would have those discussions at

ANDREW SVEEN - DIRECT BY MS. AYCOCK

122

1    -- at any point.  And we do rely heavily on our counsel.  But

2    I'm confident that that's being addressed through -- through

3    my representatives and also through counsel.

4    Q    Are you aware that Citadel has made a proposal to provide

5    exit financing to the Reorganized Debtor and replace the take-

6    back paper?

7    A    I was made aware of that yesterday.

8    Q    If that proposal had the effect of removing Serta's

9    continuing indemnity for the priority lender group for claims

10   related to the June 2020 transaction, would you view that as

11   adverse to Eaton Vance?

12   A    Yes.

13   Q    Was Eaton Vance's support of the plan dependent on Eaton

14   Vance receiving an ongoing indemnity?

15   A    Certainly, that was part of the bargain we struck.  And

16   -- and the answer -- the quick answer is yes.

17   Q    And why was that -- why is that?

18   A    Like I answered before, indemnity is -- is being -- an

19   increasing concern, as we are almost three years into lawsuits

20   and litigation and continued efforts by -- by another party to

21   -- to challenge that transaction, and so it's -- it's of

22   concern to us until that issue is -- is nullified or

23   concluded.

24        And in this case, especially in this case, where we're --

25   you know, we're taking our whole debt claim -- or the vast

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    majority of our debt claim and converting it to equity, that's

2    a -- that's a huge move to take away that debt claim and --

3    and try to -- to not -- to not have that -- the -- all the

4    lawsuits concluded at this time and still move forward.  It's

5    critical that we have proper indemnities in place.

6         And certainly, I rely on our counsel to assist in that

7    and provide advice on that and make sure it's done properly.

8    I would definitely require greater indemnity now than -- in

9    this case, given the situation.

10   Q   All else being equal, would Eaton Vance have supported

11   the plan without that ongoing indemnity?  Excuse me.

12   A   No, that's -- that was part of the deal and that was part

13   of the deal that we struck.  And so that was part of the

14   bargain, and it's an important part of the bargain that was

15   struck with the company.

16             FEMALE SPEAKER:  I'm sorry.  Repeat the last

17   sentence.  I didn't hear.  It's important for --

18             MS. AYCOCK:  It's an important part --

19   BY MS. AYCOCK:

20   Q   Mr. Sveen, can you just repeat the last part of your

21   answer, please?

22   A   Of the agreement we struck with the company.

23   Q   And just to be clear, if the continuing indemnity were

24   removed from the current plan, would Eaton Vance vote for it?

25   A   I think that would be a materially adverse change and

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    we'd have to reevaluate.  So the short answer is no because

2    that was part of -- that was a critical part of the plan that

3    we negotiated.

4    Q    The Defendants in this case have argued, at the time of

5    the 2016 credit agreement, the credit industry did not expect

6    that a transaction like the "unlawful exchange transaction,"

7    as they call it -- the 2020 transaction -- could occur.

8         What is your reaction to that?

9    A    Well, first, it wasn't an unlawful exchange transaction,

10   as has already been established.  But we -- you know, the --

11   the terms are in the credit agreement, black and white.  Those

12   different provisions were certainly permitted.  And I think

13   that's been adjudicated.

14        And while we never actually engaged in a transaction that

15   had all the exact components, the different components apart

16   have certainly been utilized up through transactions approved

17   by 51 percent, change in priority and some priority liens on

18   this debt.

19        Open market purchases, very commonplace in transactions

20   and in credit agreements and have been for many years.

21        And these different components all existed.  And yeah,

22   documents are looser.  And if not, I don't think this is a

23   surprising event that these three components were used

24   together in this transaction.  It shouldn't be surprising to

25   the marketplace that -- and participants that are -- that

ANDREW SVEEN - DIRECT BY MS. AYCOCK

125

1    willingly signed up for these documents and know that these

2    are the documents that they're signing up for.

3    Q    Defendants have also argued that, even as late as 2020,

4    the credit industry did not expect that a transaction like the

5    2020 transaction could occur.

6         What's your reaction to that?

7    A    Well, once again, I think -- you know, I think there's

8    been a broad understanding within the market, as we've seen,

9    with documentation, that there's not always a full

10   understanding of how those documents might be used in the

11   future.  And I think that that's a broadly held view by

12   participants in the industry.

13        Nonetheless, issuers have continued to bargain for and

14   receive looser documentation in general, not all cases.  And

15   certainly, there's push-back on lots of different transactions

16   and specific changes are made to credit agreements before they

17   clear.

18        But there's a -- you know, that's open knowledge that the

19   documents are looser and it's not always clear exactly how

20   those documents might be advised in the future for the benefit

21   of the borrower.  And the borrower in this case was pursuing

22   their own best interests and they used provisions that were

23   permitted in the documents.

24        And so I don't think there's a -- there should be a

25   difference between (indiscernible) '16 or 2020.

ANDREW SVEEN - DIRECT BY MS. AYCOCK

1    Q    And were you ultimately comfortable with the 2020

2    transaction structure?

3    A    Yes, we were.  We rely on our counsel to evaluate the

4    credit agreement and look for alternatives.  We -- you know,

5    we were really forced into a corner to come up with something

6    that was going to be attractive for the company.  We looked at

7    the provisions in the credit agreement.  We found a

8    permittable way to offer a more attractive option for the

9    company and we reviewed those terms ourselves and as it was

10   explained to us by our attorneys and we agreed with it and

11   proceeded.  And I think, you know, once again, it's been

12   adjudicated that it was permitted by the documents.

13   Q    Would Eaton Vance have participated in the 2020

14   transaction if it did not believe that doing so was in good

15   faith?

16   A    No, I would never permit that.

17   Q    What was your reaction to the final terms of the 2020

18   transaction; were you happy about the way it turned out?

19   A    No.  I think, when it all concluded, I mean, yes, there

20   was a sense of we prevailed and made the best of a bad

21   situation, I want to say that.  That we had to forego that

22   debt was frustrating to me; and, yet, I think we did the best

23   we could with the challenge that was presented to us.

24        But certainly, I was disappointed.  I was disappointed

25   that we had -- you know, that we had to make that concession.

1    But on the flip side, I was -- I was pleased that we had,

2    you know, limited the range of outcomes that we might have,

3    especially on -- specifically on the down side.

4    Q    Were you concerned at any time after the execution of the

5    2020 transaction that you had made the wrong decision about

6    the discounted debt repurchase?

7    A    Yes.  I think there was plenty of time to reflect and

8    second guess, and that was especially true in the fall, as we

9    entered the fall and things started opening more.  COVID

10   seemed to be waning a bit and maybe this was moving over, the

11   company was going to get -- maybe, like a lot of

12   (indiscernible), we didn't realize anywhere near the expected

13   defaults that we thought originally we might realize in our

14   overall portfolio and it was true across the board.

15      A lot of our borrowers were doing much better than --

16   than anticipated.  And that was -- as we watched the market.

17   Prices were improving and optimism was -- was coming back to

18   the market, certainly felt the same for Serta.  Like, boy, did

19   I pull the trigger on a -- on the loss of 26 cents on the

20   dollar, and we're going to -- and we could have got 100, we

21   could have got our full principal back.  So, at that time,

22   there was some second-guessing.

23      MS. AYCOCK:  Thank you.  I have no further questions

24   for you at this time, Mr. Sveen.

25      THE COURT:  All right.

ANDREW SVEEN - DIRECT BY MS. AYCOCK

128

1          THE WITNESS:  Okay.

2          THE COURT:  Excuse me.

3          THE WITNESS:  Thank you.

4          THE COURT:  Thank you.

5          Mr. Sveen, don't go anywhere just yet.  The fun part

6    is about to start.

7          THE WITNESS:  Okay.

8          THE COURT:  All right.

9          THE WITNESS:  Okay.

10         (Proceedings concluded at 12:00 p.m.)

11                              * * * * *

12         *I certify that the foregoing is a correct transcript*

13    *to the best of my ability due to the condition of the*

14    *electronic sound recording of the ZOOM/video/telephonic*

15    *proceedings in the above-entitled matter.*

16    *  /S/   MARY D. HENRY*

17    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

18    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

19    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

20    *JTT TRANSCRIPT #67230*

21    *DATE FILED:  MAY 20, 2023*

22

23

24

25