1                 IN THE UNITED STATES BANKRUPTCY COURT

2               FOR THE SOUTHERN DISTRICT OF TEXAS

3                         HOUSTON DIVISION

4    IN RE:                      §      CASE NO. 23-090020-11
                                 §      JOINTLY ADMINISTERED
5    SERTA SIMMONS BEDDING, LLC, §      HOUSTON, TEXAS
     ET AL,                      §      WEDNESDAY,
6                                §      MAY 17, 2023
             DEBTORS.            §      2:02 P.M. TO 5:52 P.M.
7    ************************************************************
     SERTA SIMMONS BEDDING, LLC, §      CASE NO. 23-09001-ADV
8    ET AL                       §      JOINTLY ADMINISTERED
                                 §      HOUSTON, TEXAS
9    VERSUS                      §      WEDNESDAY,
                                 §      MAY 17, 2023
10   AG CENTRE STREET PARTNERSHIP, §
     ET AL                       §      2:02 P.M. TO 5:52 P.M.

11

12      **CONFIRMATION DAY THREE -- AFTERNOON SESSION (VIA ZOOM)**

13               BEFORE THE HONORABLE DAVID R. JONES
                    UNITED STATES BANKRUPTCY JUDGE

14

15      APPEARANCES:              SEE NEXT PAGE

16      COURTROOM DEPUTY:         VRIANA PORTILLO

17

18                    **(Recorded via CourtSpeak)**

19

20               TRANSCRIPTION SERVICE BY:

21            JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                  935 Eldridge Road, #144
22                 Sugar Land, TX 77478
                      281-277-5325
23              www.judicialtranscribers.com

24

25      Proceedings recorded by electronic sound recording;
           transcript produced by transcription service.

1                      <u>APPEARANCES (VIA ZOOM)</u>:

2   FOR THE DEBTOR:            WEIL GOTSHAL & MANGES, LLP
                              Ray Schrock, Esq.
3                             David Lender, Esq.
                              Alexander Welch, Esq.
4                             Theodore Tsekerides, Esq.
                              700 Louisiana, Ste. 1700
5                             Houston, TX  77002
                              713-546-5000
6
    FOR CITADEL:              FAEGRE DRINKER BIDDLE & REATH
7                             James Millar, Esq.
                              1177 Avenue of the Americas
8                             41st Floor
                              New York, NY  10036
9                             212-248-3140

10  FOR PRIORITY LENDERS:     GIBSON DUNN & CRUTCHER, LLP
                              Gregg J. Costa, Esq.
11                            Lee Wilson, Esq.
                              Amanda Aycock, Esq.
12                            Allison Wallen, Esq.
                              Alexandra Perloff-Giles, Esq.
13                            811 Main Street
                              Suite 3000
14                            Houston, TX  77002
                              346-728-6649
15
    FOR SERTA MINORITY
16  LICENSEES:                FISHMAN JACKSON RONQUILLO,
                              PLLC
17                            Mark Ralston, Esq.
                              4835 LBJ Freeway
18                            Suite 475
                              Dallas, TX  75244
19                            972-419-5544

20
    FOR THE STATE OF CONNECTICUT
21  DEPARTMENT OF ECONOMIC AND
    COMMUNITY DEVELOPMENT:  MR. BOWMAN
22

23

24

25

```
1                    APPEARANCES (CONT'D) (VIA ZOOM):

2

3   FOR THE EXCLUDED
    LENDERS:                FRIEDMAN KAPLAN SEILER
4                           & ADELMAN, LLP
                            Eric Seiler, Esq.
5                           Anne Beaumont, Esq.
                            Blair Albom, Esq.
6                           7 Times Square
                            New York, NY  10036-6516
7                           212-833-1103

8

    FOR LCM LENDERS:        HOLWELL SHUSTER &
9                           GOLDBERG, LLP
                            Neil Lieberman, Esq.
10                          Brian Goldman, Esq.
                            425 Lexington Avenue
11                          New York, NY  10017
                            646-837-5151
12

13  FOR APOLLO:             PAUL WEISS RIFKIND WHARTON
                            & GARRISON, LLP
14                          Andrew Ehrlich, Esq.
                            Robert O'Loughlin, Esq.
15                          1285 Avenue of the Americas
                            New York, NY  10019
16                          212-373-3000

17

18

19

20  (Please also see Electronic Appearances.)

21

22

23

24

25
```

```
 1                              INDEX

 2   WITNESS:            Direct      Cross     Redirect    Recross

 3   ANDREW SVEEN
       By Ms. Aycock      .          .          .          .
 4     By Ms. Beaumont    .          9          .          .
       By Mr. Lieberman   .          18         .          .
 5     By Mr. Millar      .          23         .          .
     MICHAEL SEARLES
 6     By Mr. Wallen      29         .          68         .
       By Mr. O'Loughlin  .          49         .          .
 7     By Mr. Goldman     .          62         .          .
       By Mr. Millar      .          64         .          .
 8   DAVIS MEIERING
       By Mr. Nadler      72         .          .          .
 9     By Ms. Albom       .          83         .          .
       By Mr. Goldman     .          95         .          .
10     By Mr. Millar      .          97         .          .
     PHILIP YARROW
11     By Ms. Perloff-Giles
                          101         .          130        .
12     By Ms. Albom       .          122        .          .
       By Mr. Lieberman   .          129        .          .
13   JOHN LINKER
       By Mr. Tsekerides 134         .          .          .
14     By Mr. Seiler      .          142        .          .
       By Mr. Millar      .          147        .          .
15
     EXHIBITS:              Received
16   No. 95, ECF 862-39       108
     No. 104, ECF 889-1       37
17   No. 116, ECF 863-9       38
     No. 149, ECF 863-42      110
18   No. 175, ECF 250-82      87
     No. 195, ECF 864-38      140
19   No. 210, ECF 865-3       43
     No. 206, ECF 864-49      69
20   No. 218                  114
     No. 231, ECF 865-23      115
21   No. DX-255, ECF 252-56   91
     No. DX-473, ECF 264-3    124
22
     No. 779                  150
23   No. 881                  149
     No. 884                  134
24

25                              ***
```

1          __HOUSTON, TEXAS; WEDNESDAY, MAY 17, 2023; 2:02 P.M.__

2          THE COURT:  All right.  We are back on the Record

3    in the jointly administered cases under Case No. 23-90020,

4    as well as the Adversary.

5          Mr. Schrock, good to see you.  Hadn't seen you

6    since Day One.

7          MR. SCHROCK:  It's good to see you as well, Your

8    Honor.  Ray Schrock for the Record, Weil Gotshal & Manges,

9    counsel for the Debtors.

10         Your Honor, I told you I think at the conclusion

11   of Monday's hearing that we're going to try and work on a

12   resolution the disqualification count.

13         THE COURT:  Oh, yes.

14         MR. SCHROCK:  And I'm pleased to report that we

15   have reached a resolution subject to enter of a stipulation

16   and agreed order by this Court.  And I have a highly

17   negotiated statement, which I've been authorized to read to

18   the Court regarding that resolution.

19         THE COURT:  Okay.

20         MR. SCHROCK:  Although the Debtors and Apollo each

21   feel very strongly and in good faith about the

22   disqualification and validity respectively of Apollo's

23   claims, to save the time and cost and expense of the

24   parties, as well as the Court's time associated with this

25   matter, the parties reached a view that reaching a

1 commercial and consensual resolution of this dispute was in

2 both parties' best interests.

3       The Debtors and Apollo have agreed that 50 percent

4 of Apollo's approximately $181 million claim, as noted on

5 the 2019 statement filed with the Court, will be allowed to

6 clear and 50 percent will not be allowed to clear.

7       We finalized a stipulation and agreed order that,

8 as I mentioned, that's subject to the Court's approval,

9 would resolve the matter and we'll be filing it with the

10 Court this afternoon.

11       THE COURT:  All right.  So I just want to make

12 sure I understand, and I'm not in any way trying to change

13 the deal, I just want to understand the deal.

14       MR. SCHROCK:  Yes.

15       THE COURT:  So of the $181 million that were

16 purchased, half is going to be allowed to go through, the

17 other half is not?

18       MR. SCHROCK:  Correct.

19       THE COURT:  And then with respect to the DQ List

20 going forward?

21       MR. SCHROCK:  They're still on the DQ List.

22       THE COURT:  It's an agreement that they're on the

23 DQ List.

24       MR. SCHROCK:  Correct.

25       THE COURT:  And then the claim that's filed in the

1  Adversary is being withdrawn with prejudice?

2           MR. SCHROCK:  Yes, Your Honor.

3           THE COURT:  All right.  Can we get confirmation

4  that that is the deal?

5           Mr. Hermann?

6           MR. HERMANN:  Good afternoon, Your Honor.  For the

7  Record, Brian Hermann from Paul Weiss on behalf of Apollo.

8           That is correct.

9           THE COURT:  All right.  Thank you.

10          MR. HERMANN:  Thank you.

11          THE COURT:  When you all have gotten the document

12  signed off by everyone, just let Mr. Alonzo know and I'll

13  promptly turn that around.

14          And just for the Record, that relieves the

15  obligation of the gentleman whose name I have forgotten --

16          MR. SCHROCK:  Mr. Prince.

17          THE COURT:   -- to appear.

18          MR. SCHROCK: Okay.

19          THE COURT:  All right.

20          MR. SCHROCK:  Thanks, Your Honor.

21          THE COURT:  Thank you.

22          Maybe I should just send you back out with Mr.

23  Hermann and you guys can work on the rest of it.

24      (Laughter.)

25          MR. HERMANN:  Well, we may go to dinner, Your

1   Honor, tonight.

2          THE COURT:  Okay.

3          MR. HERMANN:  So you never know.

4          THE COURT:  Who's paying?  That will give me

5   something --

6      (Laughter)

7          MR. HERMANN:  We haven't worked that out yet.

8          THE COURT:  Okay.  Fair enough.  Small steps.

9          All right.  Thank you for the announcement.

10         All right.  And Mr. Sveen is ready?  Are we ready

11  for Cross?

12         Let me ask, are you going to need control?

13         MS. BEAUMONT:  Yes, for Mr. Carlock, yes.

14         THE COURT:  All right.

15         UNIDENTIFIED SPEAKER:  Want me to turn it on?

16         THE COURT:  That would be so much better.  Thank

17  you.  That's just so much easier.

18      (Pause in the proceedings.)

19         THE COURT:  All right.  You have control.  Thank

20  you.

21         MS. BEAUMONT:  Thank you, Judge.  I am Anne

22  Beaumont from Friedman Kaplan Seiler Adelman & Robbins for

23  the Excluded Lenders.

24                      CROSS-EXAMINATION

25  BY MS. BEAUMONT:

1  Q     Good afternoon, Mr. Sveen, nice to see you again.

2  A     Good afternoon.

3  Q     I believe we sent you a sealed envelope.  Did you

4  receive that?

5  A     Yes, I have it right here.

6  Q     Okay.  If you'd like to go ahead and open that up,

7  that'd be great.

8  A     (Opens envelope.)  All set.

9  Q     That's all -- that's great.  Thank you very much.  You

10  won't need that right away but in a moment I'll have you

11  turn to it.

12  A     Okay.  Thank you.

13  Q     All right.  So at some point in 2016 Eaton Vance bought

14  Serta's 1-L term loans as an allocation in the initial deal.

15  Right?

16  A     Yes.

17  Q     And Eaton Vance also bought and sold Serta's first lien

18  term loans in the secondary market.

19  A     Yes, that's correct.

20  Q     When Eaton Vance transacted in Serta's first lien term

21  loans in the secondary market they used standard LSTA

22  documentation for those trades.  Correct?

23  A     That's correct, yes.

24  Q     At the time the 2016 credit agreement was entered into,

25  you were not aware of any transaction that had previously

1  been done that included the components of what eventually

2  was the June 2020 Serta transaction.  Correct?

3  A    Using those exact components together in the mechanism

4  that was used, that's correct.

5  Q    Now I'd like to show you a document that is in your

6  binder and it was -- it's Defendant's Exhibit 167, it should

7  be the third tab in your binder.  It's ECF Number 250-73,

8  and that's already in evidence.

9            THE COURT:  Agreed.

10  BY MS. BEAUMONT:

11  Q    And if you'll turn to the third page of the exhibit,

12  this is a letter from Gibson Dunn to UBS from June 4, 2020.

13  Correct?

14  A    Yes.

15  Q    And Eaton Vance was aware that this letter was being

16  sent?

17  A    Yes, we were.

18  Q    The cover email that's on the prior page indicates that

19  the letter was sent at about 7:30 in the evening of June 4,

20  2020.  Correct?

21  A    Yes, it does.

22  Q    Please turn to, it's page 2 of the letter, it's page 4

23  of the exhibit.

24  A    Okay.  Thank you.

25  Q    And then in the third paragraph on that page, the

1  second sentence from the end, it states -- there's some

2  reference to some prohibited transactions that have been

3  called to the attention of UBS.

4      Do you see that?

5  A    In the face of such potential prohibited transactions,

6  yes.

7  Q    That's right.  And it says, "The secured lender group

8  is prepared to take the necessary steps to exercise its

9  rights to prevent such a transaction."

10      Do you see that?

11  A    Yes.

12  Q    Now that's a threat of litigation, isn't it?

13  A    I don't read it as such, no.

14  Q    No, but that letter was sent the day after you had

15  emailed, as we saw this morning, with Mr. Daniello

16  (phonetic) about having a good shot at avoiding litigation.

17  Correct?

18  A    I'm not sure if that's in the same context as this.

19  Q    Okay.

20  A    I'll have to look at that.

21  Q    Now please look at the -- let's see, the last paragraph

22  on the same page, page 2 of the letter.  The second sentence

23  reads, "With a highly levered capital structure, extensive

24  debt service obligations in the face of limited liquidity,

25  significant general cash burn, a stated need for new capital

1 and a severe decline in revenue with no clear foreseeable

2 recovery to normalized operations, we believe it is highly

3 likely that the company may very well already be insolvent."

4       Do you see that?

5 A    I do.

6 Q    And at the time this letter was sent Eaton Vance did

7 not believe that Serta was insolvent.  Correct?

8 A    I stated previously to you that I didn't believe the

9 company was insolvent.

10 Q    And you don't recall any discussion among the secured

11 lender group about Serta's insolvency.  Correct?

12 A    I wasn't in the day-to-day discussions with the other

13 lenders nor with counsel.  I was one step removed from those

14 discussions --

15 Q    But you were the --

16 A    -- which I'm fine on that.

17 Q    -- you were the 30(b)(6) designee for Eaton Vance when

18 I deposed you on May 5th.  Correct?

19 A    That's correct.

20 Q    And when I asked you, "At the time" -- on page 178 of

21 your deposition I asked you, "At the time the June 4th

22 letter was sent, Gibson Dunn was representing Eaton Vance in

23 some capacity.  Correct?"

24       And you answered, "Yes."

25       And then I asked, "And they were not authorized to make

 1  the statement that they made to the effect that" --

 2      And you answered, "They're making the statement on

 3  behalf of the group of the lenders and they had potentially

 4  done their own evaluations and I can't -- I just can't

 5  recall exactly any discussion around insolvency.  So I can't

 6  recall comment, I don't recall discussion around that."

 7      Is that correct?

 8  A    That is correct, that's special.

 9          MS. AYCOCK:  Objection, Your Honor, improper

10  impeachment.

11          THE COURT:  Yeah, I didn't quite understand that

12  either.

13          Help me understand what you are trying to impeach.

14          MS. BEAUMONT:  Well, Mr. Sveen is saying today

15  that he can't say anything about that and he was able to

16  talk about that at his deposition just --

17          THE COURT:  Actually, I mean what you read me

18  sounded pretty consistent.

19          MS. BEAUMONT:  I'll move on, Your Honor.

20          THE COURT:  Okay.

21  BY MS. BEAUMONT:

22  Q    And you don't recall Centerview doing an analysis of

23  Serta's solvency.  Correct?

24  A    That's correct, not to my knowledge.

25  Q    Now within -- sorry, the day after sending the letter

1   to UBS, the secured lender group did agree in principle on a

2   transaction with Serta.  Correct?

3   A    On June 5, yes, that's correct.

4   Q    That transaction was announced on June 8, 2020?

5   A    Yes, I believe the company made that announcement on

6   June 8, that's correct.

7   Q    And all of the members of the secured lender group

8   represented by Gibson Dunn participated in that transaction.

9   Correct?

10  A    I'm sorry, can you repeat the question?

11  Q    Sure.  All the members of the secured lender group

12  participated in the transaction announced on June 8, 2020.

13  A    All of the members?  Well, the members of the Ad Hoc

14  Committee participated in the transaction.  I'm sorry, you

15  mentioned all of -- all the lenders.

16  Q    Sorry, did all the members of the -- I'm using the

17  defined term, "Secured Lender Group," as it was used in the

18  letter to Gibson Dunn.  So that's, yes, that's the Ad Hoc

19  group that you referred to?

20  A    Okay.  Yes, for the -- yes, I understand.

21  Q    Let me ask the question again.

22  A    So let's see -- yeah.

23  Q    All the members of the Ad Hoc group, to use your

24  terminology, participated in the transaction that was

25  announced on June 8, 2020.  Correct?

1   A     That is my knowledge, yes.

2   Q     After the announcement various lenders that had not

3   previously been part of that group contacted Eaton Vance.

4   Correct?

5   A     That's true, yes.

6   Q     They asked to be allowed to participate in the

7   transaction?

8   A     Some asked us that, but we didn't have the authority to

9   grant that so we passed them to the borrower -- to Advent.

10  Q     The decision of who ultimately got to participate

11  beyond the original Ad Hoc Group that was up to Advent and

12  the company?

13  A     Yes, that's my understanding, it had responsibility for

14  that solely with Advent, the company.

15  Q     Okay.  Switching gears to a different topic, this

16  morning Ms. Aycock asked you some questions about the

17  indemnity in the 2020 credit agreement.

18        Do you remember that?

19  A     Yes.

20  Q     Now Eaton Vance was not involved in the negotiation of

21  the indemnity language in the 2020 credit agreement.

22  Correct?

23  A     Well, when you say Eaton Vance, our -- Gibson Dunn was

24  negotiating on our behalf, well, Eaton Vance.  No, they

25  would not have been directly negotiating the terms of that

1  indemnity agreement, no.

2  Q    And that indemnity was not something that Eaton Vance

3  had requested.  Correct?

4  A    We expected indemnity, well, we expected an appropriate

5  indemnity clause and we relied upon our counsel to ascertain

6  the needs of that indemnity clause and execute it.  And so

7  that's -- yeah.

8  Q    Now when you testified at your deposition as the

9  Rule 30(b)(6) designee for Eaton Vance, as part of your

10 preparation you spoke with Mr. Daniello.  Correct?

11 A    That's correct.

12 Q    And you spoke specifically with Mr. Daniello about this

13 indemnity?

14 A    We spoke about -- yes, indemnity, we did speak about it

15 on broad terms, yes.

16 Q    And Mr. Daniello did not know who -- that that had been

17 a negotiated point.  Correct?

18 A    He said it wasn't a hotly contested point, so, yes,

19 that point was negotiated.  He said that it was not a hotly

20 negotiated point, but rather the point was accepted by the

21 other side without objection, or at least the negotiation

22 got to a point where it was acceptable to our counsel and it

23 wasn't something that had to rise to something that needed

24 to be debated or discussed with us at any material length.

25 Q    Now I'm just going to show you --

1          MS. BEAUMONT:  Can you pull up Mr. Sveen's

2 deposition, page 202, please, S-V-E-E-N.

3          MR. CARLOCK:  What page?

4          MS. BEAUMONT:  202.

5 BY MS. BEAUMONT:

6 Q    And do you see that on the screen there, Mr. Sveen?

7 A    I do.

8 Q    Okay.  And starting at Line 12 I asked you, "And do you

9 have any understanding as to whether the indemnity described

10 in Section 903(b) of Exhibit 18, the 2020 agreement, would

11 require Serta to indemnify Eaton Vance for any damages

12 awarded it might have to pay in this case?"

13       And there was an objection and you answered, "I don't

14 know, I wasn't party to that negotiation of these

15 provisions."

16       And then I asked you, "Is there anybody at Eaton Vance

17 would know?"

18       And you responded, "In -- I did discuss with Patrick

19 Daniello who was -- would have been closest to the

20 discussion of indemnity provisions in some of the different

21 documents that we're reviewing today.  And the initial one,

22 his understanding is that indemnities weren't -- he was --

23 that the indemnities -- that it was not a -- something that

24 he was involved in discussing or debating or approving and

25 that they were rather standard indemnities as far as he

1  understood and that just that were in the provisions.  And

2  he didn't know that that was a negotiated point that brought

3  -- that was something that he was involved in."

4       And then I asked you, "That wasn't something that Eaton

5  Vance requested?"

6       And you said, "No."

7            Do you see that?

8            MS. AYCOCK:  Objection, calls for --

9            THE WITNESS:  I do.

10           THE COURT:  And to the extent that there was any

11 inconsistency, I'll let it stand.  But it says what it says.

12           MS. BEAUMONT:  Okay.  I have no further questions,

13 Judge.

14           THE COURT:  All right.  Thank you.

15                      CROSS-EXAMINATION

16 BY MR. LIEBERMAN:

17 Q    Good morning, Mr. Sveen.  How are you?  Actually,

18 good --

19 A    Good morning.

20 Q     -- afternoon.

21 A    Yeah.  Okay.

22 Q    It's morning somewhere.

23 A    Exactly.

24 Q    Are you familiar with LCM?

25 A    Yes, I am.

1   Q    They're an investment firm that invests in large

2   financings.  Right?

3   A    That's what I understand, yes.

4   Q    And you don't view LCM as a predatory lender.  Right?

5   A    No, I don't.

6   Q    Do you recall reaching out to LCM regarding joining the

7   exchange that was consummated in June 2020?

8   A    No.

9   Q    Do you recall reaching out to LCM regarding any

10  alternative structure?

11  A    No, I wouldn't have personally done that anyway, but I

12  don't believe my team did either.

13  Q    Are you aware of anyone in the Ad Hoc Group asking LCM

14  to participate in the transaction?

15  A    I'm not aware of that, no.

16  Q    You're aware that the parties amended the 2016 credit

17  agreement as part of the June 2020 transaction.  Right?

18  A    Yeah.

19  Q    And you're also aware that the superpriority lenders

20  entered into a new credit agreement.  Right?

21  A    That's correct.

22  Q    As well as a new inter-creditor agreement?

23  A    Yes, that's my understanding.

24  Q    And the open market purchase and exchange agreement?

25  A    I'm sorry, you're speaking about new credit agreements

1   and then you mentioned --

2   Q    The inter-creditor --

3   A    -- the provision, the open market provision.

4   Q    Yes.  No, no, sorry, what I was trying to get at, there

5   was a number of agreements that were signed at once to

6   effectuate the June 2020 transaction.  One of those

7   including the, I think it's called the open market exchange

8   and open market purchase agreement, something like that.

9   A    I haven't read that document or -- I know it was an

10  open market purchase consummated, but I'm not familiar with

11  the specific document you're referring to.

12  Q    Okay.  But you agree that there were a number of

13  documents and the amendment, including the amendment to the

14  June -- the 2016 credit agreement that were signed during

15  the --

16  A    Yes.

17  Q    -- transaction?  Now from your point of view --

18  A    For 2020, yes.

19  Q    -- yeah, and from your -- what's that?

20         FEMALE SPEAKER:  (Indiscernible).

21  BY MR. LIEBERMAN:

22  Q    Sorry, go ahead, repeat your answer.

23  A    You're referring to the 2020 transaction, that there

24  were a number of documents signed, and that's true.

25  Q    And from your point of view the amendment to the 2016

1  term loan agreement and the entry into the other transaction

2  documents happened together.  Right?

3  A    Well, yeah, once again --

4           MS. AYCOCK:  Objection, Your Honor --

5           THE WITNESS:  -- yes, but referring to other

6  documents, I'm not --

7           THE COURT:  So, Mr. Sveen, hold on --

8           THE WITNESS:   -- it's not a lot of specificity.

9           THE COURT:  Mr. Sveen, hold on just one second,

10  there's been an objection raised.

11           Yes, ma'am?

12           MS. AYCOCK:  Calls for a legal conclusion.

13           THE COURT:  So, Mr. Lieberman, I had difficulty

14  with the question the way -- in the way that you asked it.

15  I'm not sure I understand that it calls for a legal

16  conclusion.  But if you want to help me understand the

17  point, maybe it would be better if you tried to ask that

18  again.

19  BY MR. LIEBERMAN:

20  Q    Did Eaton Vance ever consider approving the amendments

21  to the 2016 credit agreement without participating in the

22  debt repurchase?

23  A    Well, there was only one transaction presented and it

24  was all -- it was one transaction together, so that was the

25  transaction to consider and that's the one that we signed

1  and agreed to.

2  Q    It was all one transaction.

3  A    The repurchase at a discount event through the market

4  purchase provision and superpriority debt, yes.  And the

5  consideration coming from the second superpriority debt,

6  that all those components worked together with the new

7  money, yes.  All of those work together along with other

8  items that were negotiated in that document and that there

9  was a number of other items that were also agreed to in

10 order for that -- you know, every component was important

11 for us to agree to it.

12 Q    And you would not have done one without the other, or

13 one part of them without the other.  Right?

14 A    Well, it's just speculation now and I'm not sure which

15 part we're referring to.  So really at that time we decided

16 all those different components together and we negotiated

17 the documents with -- or I believe we negotiated all sorts

18 of specific terms.  And all those things together

19 consummated and we signed on that.

20      So everything was heavily negotiated, all those

21 different components coming together for that deal to be

22 signed.  So we would have -- so if one component was

23 missing, of course it's just speculation whether that would

24 have been sufficient for us to continue.  But it wasn't, so,

25 we put all those components together and that's what we

1   signed off on.

2           MR. LIEBERMAN:  Okay.  Thank you very much,

3   Mr. Sveen.

4           THE COURT:  All right.

5           THE WITNESS:  All right.  Thank you.

6           MR. MILLAR:  Good afternoon, Your Honor.  James

7   Millar of Faegre Drinker.

8                       CROSS-EXAMINATION

9   BY MR. MILLAR:

10  Q    Good afternoon, Mr. Sveen.  I'm James Millar, I

11  represent Citadel.  Nice to meet you, at least virtually.

12  A    Good afternoon.

13  Q    Just a couple of questions.

14  A    Good afternoon.

15  Q    I believe you said that the indemnity for the 2020

16  transaction was important.  Was that right?

17  A    Well, I think -- I'm not sure in what context, but,

18  yeah, it is important.

19  Q    Okay.

20  A    I would agree with that statement.

21  Q    Sure.  And that indemnity runs in favor of those that

22  participated in the 2020 transaction.  Correct?

23           MS. AYCOCK:  Objection, calls for a legal

24  conclusion.

25           THE COURT:  Overruled.

1          THE WITNESS:  I'm not --

2          THE COURT:  Mr. Sveen, if you can answer it,

3   answer it.  Don't guess, just if you can answer, answer,

4   otherwise say you don't know.  Don't guess.

5          THE WITNESS:  Yeah, I'm sorry, yeah, I'd have to

6   re-read it and probably consult with counsel.  I'm not

7   100 percent sure.

8   BY MR. MILLAR:

9   Q    Okay.  But it runs in favor of Eaton Vance as a

10  participant in the 2020 transaction.  Correct?

11  A    Well, indemnity clauses can go both ways in favor of

12  both, you know, both the lenders and the borrower.  I think

13  indemnity clauses are generally -- in credit agreements are

14  really to protect both sides.  So I'd have to look once

15  again at the specific portion of the provision you're

16  speaking to, as opposed to just generally.

17  Q    I'm sorry, Mr. Sveen, I don't mean for this to be a

18  difficult question.  Eaton Vance has an indemnity against

19  the company for the 2020 transaction.  Correct?

20  A    Yes.

21  Q    And so do the other participants in the 2020

22  transaction.  Correct?

23  A    I believe so.

24  Q    And that indemnity continues in the proposed Chapter 11

25  Plan.  Correct?

1  A    Yes, I believe it does, but I have not been close to

2  the discussions of the most recent plan.

3  Q    And it --

4  A    So I don't know the particulars of that.

5  Q    Okay.  And the indemnity exists in the proposed exit

6  financing.  Correct?

7  A    I know there's an indemnity, I don't know all the

8  details of it.

9  Q    There is an indemnity in the exit financing for those

10 that participated it the 2020 transaction.  Correct?

11              THE COURT:  So, Mr. Sveen --

12              THE WITNESS:  I --

13              THE COURT:  Well, hold on just one second.  As I

14 understand it --

15              THE WITNESS:  Yeah.

16              THE COURT:   -- you now work for a different

17 company.  Correct?

18              THE WITNESS:  I work for Morgan Stanley, yes.

19              THE COURT:  Right.  So --

20              THE WITNESS:  Morgan Stanley purchased Eaton

21 Vance.

22              THE COURT:  No, I know that.  But I assume that

23 you have different duties these days.

24              Have you been involved in that negotiation and

25 reviewing that credit agreement?

1          THE WITNESS:  The most recent one, the -- no, I

2  have not been.  I have not been involved in the most recent

3  negotiations, I've just been kept aware of it by my team

4  members and we've had counsel on the ground working on these

5  specific clauses.

6          THE COURT:  All right.  Thought I was going to

7  help, apparently I wasn't.  My apologies.

8  BY MR. MILLAR:

9  Q    Mr. Sveen, you understand that debt under credit

10  agreements trades in the market.  Correct?

11  A    In the market meaning?  Can you just clarify what you

12  mean by the market?

13  A    I mean debt under credit agreements, such as the FLSO

14  debt and the FLFO debt, is available to be purchased in the

15  market.  Is that right?

16  A    There's a secondary, an active secondary trading market

17  for the buying and selling of this particular transaction

18  and other large syndicated loans, yes.

19  Q    So the FLSO debt can trade in the market, yes?

20  A    Yes.

21  Q    And the --

22  A    Trade in the syndicated market.

23  Q    And the FLFO debt could trade in the secondary market,

24  yes?

25  A    I'm sorry the FL -- the second one, or the FL --

1  Q    FLFO, first lien first out debt.

2  A    Yes, unless there's restrictions in the credit

3  agreement that limit the trading activity of that and it

4  should be able to trade in secondary, yes, and --

5  Q    So a party could sell their FLFO and FLSO debt, yes?

6  A    Once again, unless there's restrictions in the credit

7  agreement that limit the trading activity of that particular

8  tranche or limits the -- who you're selling it to.

9  Q    And a party that sells the FLFO and FLSO would still

10 get an indemnity from the Reorganized Debtors.  Is that

11 correct?

12 A    I don't know, I think we lost -- that's not my -- I

13 don't have -- I would have to consult counsel and understand

14 the situation better to be able to respond to that.

15 Q    Okay.  Thank you.

16 A    Thank you.

17         THE COURT:  All right.  Thank you.

18         Is there any Recross -- or any Redirect?

19         MS. AYCOCK:  Nothing further, Your Honor.

20         THE COURT:  All right.  Any reason Mr. Sveen

21 cannot be excused?

22     (No audible response.)

23         THE COURT:  All right.  Mr. Sveen, I very much

24 appreciate your participation this afternoon.  You are free

25 to go.  To the extent that you would have any interest, and

1   I can't imagine you would, you are released from the Rule

2   and you are free to view the proceedings if you so with.

3           THE WITNESS:  I think I'll check out, but thank

4   you, Your Honor, appreciate it.

5       (Laughter.)

6           THE COURT:  Okay.  Thank you, sir.

7           THE WITNESS:  All right.  Bye now.

8           THE COURT:  Bye.

9       (Witness excused.)

10          MR. SCHROCK:  We've got to make this more exciting

11  again, Your Honor.

12          Could we take another just short break just so we

13  can get out next witness on?  It's going to be Michael

14  Searles of Barings.

15          THE COURT:  Michael Searles.

16          MR. SCHROCK:  And he is going to be testifying

17  remotely as well, and he's obviously not watching what's

18  going on.

19          THE COURT:  Ah, so you need -- sure.

20          MR. SCHROCK:  We just need to get him on and --

21          THE COURT:  So maybe 2:40?

22          MR. SCHROCK:  That would work fine.

23          THE COURT:  All right.  Thank you.

24          We'll be adjourned until 2:40.

25          THE CLERK:  All rise.

1           (Recess taken from 2:33 p.m. to 2:44 p.m.)

2                          AFTER RECESS

3                THE COURT:  Thank you.

4                Mr. Searles, good afternoon.  Could you just

5    confirm for me that you can hear me?

6                MR. SEARLES:  Yes, Your Honor.

7                THE COURT:  All right.  Thank you.

8                And we are back on the Record in Case

9    No. 23-90020.  We ready to start with Mr. Searles?

10               MS. WALLEN:  Yes.  Good afternoon, Your Honor.

11               THE COURT:  Good afternoon.

12               MS. WALLEN:  Allison Wallen from Gibson Dunn on

13   behalf of the PTL Lenders and the additional counterclaim

14   Defendants.

15               THE COURT:  All right.  Thank you.

16               Mr. Searles, if you'd please raise your right

17   hand, please, sir?

18          (Witness sworn.)

19               THE COURT:  All right.  Thank you.

20               Counsel, whenever you're ready.

21                       DIRECT EXAMINATION

22   BY MS. WALLEN:

23   Q    Good afternoon, Mr. Searles.

24               THE COURT:  Before I do this, let me get you all

25   situated.

1

2              MS. WALLEN:  Thank you, Your Honor.

3              THE COURT:  All right.  Give Mr. Herndon just a

4   moment to get everything up and running.

5        (Pause in the proceedings.)

6              THE COURT:  All right.  He's good.  Sorry about

7   that.  Whenever you're ready.

8              MS. WALLEN:  Thank you, Your Honor.

9   BY MS. WALLEN:

10  Q    Good afternoon, Mr. Searles.

11  A    Good afternoon.

12  Q    Have you watched or listened to any other witness's

13  testimony in this hearing?

14  A    No.

15  Q    Where are you currently employed?

16  A    Barings, LLC.

17  Q    What is Barings?

18  A    Barings is a $350 billion global asset manager.

19  Q    How long have you worked at Barings?

20  A    Approximately five years.

21  Q    So since 2018?

22  A    Yes.

23  Q    What is your position at Barings today?

24  A    I'm a managing director in the capital solutions

25  business and head of investments for North American capital

 1  solutions.

 2  Q    What are your responsibilities in that position?

 3  A    I oversee all investments originated or managed out of

 4  the capital solutions business within the firm, which is a

 5  $5 billion portfolio of assets.  And I also oversee all

 6  situations with respect to cross-platform investments or

 7  investments made across the firm that come into or require

 8  my group's level of expertise or capability.

 9  Q    Where did you work before Barings?

10  A    Octagon Credit Investors.

11  Q    Did you work anywhere before Octagon?

12  A    I started my career at Credit Suisse.

13  Q    Approximately how long have you been in this industry?

14  A    Approximately 15 years.

15  Q    After you joined Barings in 2018 did you come to learn

16  that Barings held Serta debt that was issued pursuant to a

17  2016 credit agreement?

18  A    Yes.

19  Q    When did you learn that?

20  A    It would have been shortly after I started at Barings,

21  so some time in late 2018, early 2019.

22  Q    What was Barings' involvement with Serta at that time?

23  A    Funds that we manage had sizable positions in both the

24  first and second lien loans with Serta.

25  Q    What were your responsibilities regarding Serta?

1

2  A    I was involved in analyzing the company working with

3  analysts who had been following the company for some period

4  of time prior to that in evaluating the situation, the

5  business, current trading levels, and making recommendation,

6  or assisting recommendations throughout the firm with

7  respect to the firm's position in those loans.

8  Q    Did you at some point review the 2016 credit agreement?

9  A    From a businessperson's perspective, yes.

10 Q    Generally how would you characterize the 2016 credit

11 agreement?

12 A    In my view, again, from a businessperson's perspective,

13 it was similar to credit agreements originated in the

14 general duration of this, which would be generally

15 considered to be loose.

16 Q    Was there something in particular that prompted you to

17 review the 2016 credit agreement?

18 A    No.

19 Q    Was that part of your regular practice?

20 A    Yes.

21 Q    When did you do this review of the Serta 2016 credit

22 agreement?

23 A    Yes, as I stated, it would be part of our regular

24 practice, so any time I would be involved in a name or my

25 team would be involved in a situation, it would be standard

1    ordinary course to do an ongoing document reviews.  It would

2    consist of an initial document review, leveraging all of our

3    internal and external resources, as well as the ongoing

4    reviews in the context of whatever situation is unfolding at

5    the time.

6    Q    What were your responsibilities with respect to

7    Barings' investment in Serta debt in early 2020?

8    A    We were -- continued to be a very large holder in both

9    first and second lien debt, my involvement would have been

10   the same as it had been leading up to 2020, which is

11   actively monitoring the company, evaluating trading levels,

12   evaluating in terms of strategic position with respect to

13   buying or selling those loans.

14   Q    I'd like to fast forward to March of 2020.  Did you

15   have communications with other holders of Serta debt in

16   March of 2020?

17   Q    Yes.

18   Q    Who did you speak to?

19   A    I would have spoken to certainly the largest holders,

20   which would have included CSAM, Invesco, Eaton Vance, to

21   name a few.  We would have also -- this would be a pretty

22   consistent trend with respect to companies in this position,

23   certainly during COVID.  We would have gotten outreach from

24   a number of smaller holders or holders throughout the

25   capital structure.  I can't -- couldn't tell you exactly who

1  that was, but that would have been pretty consistent and

2  would have occurred in this manner.

3  Q    Was there anything in particular that prompted these

4  conversations?

5  A    No, as I said, this would have been fairly standard

6  operating procedure for a company with loans trading at a

7  discount.  Obviously at this time COVID was a pretty topical

8  situation, certainly within the -- with this company, and

9  therefore those conversations would have been geared around

10 the company's position with respect to COVID and how they

11 were going to manage through that.

12 Q    After these initial conversations, did you engage

13 conversations did you engage with a group of lenders

14 including CSAM, Eaton Vance and Invesco that were advised by

15 Gibson Dunn?

16 A    Yes.

17 Q    What was the goal of the Gibson Dunn advised group of

18 lenders during the time in which Barings was participating

19 in discussions with them?

20 A    While we were involved in discussions with that group

21 they were focused on hiring a financial advisor and really

22 focused on just formation up until the time when the main

23 focus was really putting up -- drafting a letter to send to

24 the company.

25 Q    Did Barings eventually step away from the group of

1  holders advised by Gibson Dunn?

2  A    Yes.

3  Q    Why did Barings decide to step away from the Gibson

4  Dunn advised group?

5  A    In our view the Gibson Dunn advised group at the time

6  didn't really have a direction or a purpose.  We knew that

7  the company was actively exploring alternative transactions

8  in the context of the liability management transaction.  We

9  understood the document was fairly loose and gave the

10 company significant flexibility with respect to a liability

11 management transaction.

12       Our view in -- overall in every situation, especially

13 in this one, was a direct outreach to the company to

14 indicate a willingness to participate in those transactions,

15 to be a partner with providing liquidity, and being a

16 constructive solution versus kind of engaging in a letter

17 writing campaign was the more constructive way to, well,

18 approach.

19 Q    At the time Barings decided to pursue its own

20 transaction with the company, were you aware of any other

21 lender group seeking to make a proposal to the company?

22 A    We were generally aware that there were other groups

23 out there, we were aware that this was going to be and was a

24 competitive process.  We -- I can't say that we were

25 definitively aware of who those groups were and what their

1   motivations were.

2   Q    Did you know what kind of proposal the other groups

3   were going to be making to the company?

4   A    No.

5   Q    Based on your assessment of the 2016 credit agreement

6   did you have an understanding of what the other groups might

7   have been proposing?

8   A    Yeah, I think we would have assumed that the

9   transaction would have been similar, the transaction that

10  that they were proposing would have been similar to what we

11  were proposing.

12  Q    And we'll get to that in a few minutes.  After Barings

13  decided to step away from the group of holders advised by

14  Gibson Dunn, did you engage in discussions with Serta?

15  A    Yeah.

16  Q    What were those conversations?

17  A    As I stated earlier, the goal was to make direct

18  outreach to the company or their advisors to indicate that

19  we wanted to be a solution provider.  In this situation,

20  we're interested in advancing new money to the company and

21  wanted to engage in direct dialogue with them.

22  Q    Did Barings eventually sign an NDA with Serta?

23  A    Yes.

24  Q    I'd like to show you what has been filed at Docket

25  Number 889-1, which is Debtor's Exhibit 104.

1          MS. WALLEN:  If we could bring that up,

2    Mr. Herndon?

3    BY MS. WALLEN:

4    Q    Mr. Searles, is this a May 1, 2020 email from Weil to

5    Barings' in-house counsel?

6    A    Yes.

7          MS. WALLEN:  And, Mr. Herndon, if we can go

8    forward to page 9, to see the attachment?

9    BY MS. WALLEN:

10   Q    Mr. Searles, is this the confidentiality agreement

11   between Barings and the company?

12   A    Yes.

13   Q    And the NDA is dated May 1, 2020?

14   A    Yes.

15          MS. WALLEN:  Your Honor, I'd like to move to admit

16   Debtor's Exhibit 104 filed at Docket Number 889-1.

17          THE COURT:  Any objection?

18          MR. SCHROCK:  No objection, Your Honor.

19          THE COURT:  Thank you.  It's admitted.

20          MS. WALLEN:  Thank you, Your Honor.

21      (Exhibit 104, ECF 889-1, received in evidence.)

22   BY MS. WALLEN:

23   Q    What happened next after Barings entered into this NDA

24   with Serta?

25   A    We quickly continued to have discussions with the

1  company, this time on a more granular level.  We would have

2  sent over a diligence list, and for standard ordinary course

3  of business diligence that we would conduct with any new

4  money transaction, and we got to work with internal and

5  external counsel on formulating a proposal to be shared with

6  the company.

7  Q    Do you recall approximately when Barings made its first

8  proposal to Serta?

9  A    It would have been around early May.

10 Q    I'd like to show you what has been filed at Docket

11 Number 863-9, which is Debtor's Exhibit 116.

12          MS. WALLEN:  If we can bring that up?  Thank you.

13 BY MS. WALLEN:

14 Q    Is this an email from you to Evercore on May 8, 2020

15 with an attached summary term sheet?

16 A    Yes.

17          MS. WALLEN:  I'd like to move to admit Debtor's

18 Exhibit 116 filed at Docket Number 863-9.

19          THE COURT:  Thank you.

20          Any objection?

21          MR. SCHROCK:  No objection.

22          THE COURT:  Thank you.  It's admitted.

23          MS. WALLEN:  Thank you.

24     (Exhibit 116, ECF 863-9, received in evidence.)

25 BY MS. WALLEN:

1   Q    At a high level, Mr. Searles, can you tell what Barings

2   was proposing to Serta?

3   A    We were proposing a transaction whereby the company

4   would designate certain intellectual property assets to an

5   unrestricted subsidiary.  That unrestricted subsidiary would

6   be financing two components, the first being a new money

7   component consisting of somewhere between 150- and $200

8   million new money to be used for liquidity for the business,

9   with a subsequent tranche of debt that would be used for the

10  purposes of effectuating a repurchase of our first and

11  second lien debt.

12  Q    After this initial proposal were there negotiations

13  back and forth between Barings and Serta?

14  A    Yes.

15  Q    Do you recall how many rounds of negotiations there

16  were?

17  A    It would have been at least three.

18  Q    How would you characterize the negotiations between

19  Barings and Serta?

20  A    I would characterize them as being fairly typical for

21  any competitive process, auction or competitive financing

22  that I've been a part of in my career.

23  Q    I'm not going to take the time to go through all of the

24  term sheets that were exchanged back and forth, but I would

25  like to show you what has been filed at Docket No. 864-38,

1  which is Debtor's Exhibit 195.

2      Is this a June 4, 2020 email from Freshfields to Weil

3  and Evercore with an updated draft of the term sheet in

4  response to Serta's last comments?

5  A    Yes.

6  Q    Was Freshfields representing Barings at this time in

7  connection with a potential transaction with Serta?

8  A    Yes.

9          MS. WALLEN:  I'd like to move to admit Debtor's

10 Exhibit 195 filed at Docket Number 864-38.

11          THE COURT:  Thank you.  Any objection?

12          MR. SCHROCK:  No objection.

13          THE COURT:  Thank you.  It's admitted.

14          MS. WALLEN:  Thank you, Your Honor.

15     (Exhibit 195, ECF 864-38, received in evidence.)

16 BY MS. WALLEN:

17 Q    Did Barings get a response from Serta from its June 4

18 counterproposal?

19 A    Yes.

20 Q    What was Serta's response?

21 A    I got a call the next day from the company's financial

22 advisor indicating that they were not going to move forward

23 with our proposal, they were going to move forward with an

24 alternative proposal, and they had asked us to evaluate that

25 and determine whether we'd like to be part of it.

1   Q    The phone call that you received from the company's

2   financial advisor, who in particular was that from?

3   A    Roopesh Shah.

4   Q    Did Mr. Shah tell you which proposal the company had

5   decided to move forward with?

6   A    I believe so, yeah.

7   Q    Which group?

8   A    It would have been a group that would consist of a

9   majority of holders in the first lien and second lien loans

10  of Serta.

11  Q    Was it the Gibson Dunn advised group that you had

12  initially been in discussions with?

13  A    Yeah.

14  Q    If I call them the "PTL Lenders," does that work for

15  you?

16  A    Yeah.

17  Q    Did Mr. Shah or Evercore provide you with any

18  information about the PTL Lenders' proposal?

19  A    In a brief conversation on the day after this last term

20  sheet was provided from us, I believe he walked us through

21  at a very high level the summary terms and structure of the

22  transaction, but indicated that we would get a more

23  substantive term sheet later in the day.

24  Q    What was your reaction to learning that Serta had

25  decided to go with the PTL Lenders' proposal?

1 A    We indicated we would evaluate the transaction and come

2 back to the company shortly thereafter once we had all of

3 the information available to make a determination.

4 Q    What did you conclude from you evaluation of the PTL

5 Lenders' proposal?

6 A    Well, we concluded broadly that the economic treatment

7 for us was broadly similar to that in which were proposing

8 as a stand-alone plan.  There were certain attributes or

9 benefits to pursuing this transaction, the one we ultimately

10 pursued.  We believe that the transaction we were

11 contemplating, given that it was a designation of certain

12 intellectual property, would have involved evaluation of

13 that intellectual property and would bring potential

14 litigation or judgment risk into the transaction.

15      This was, from our perspective, a cleaner more

16 efficient transaction that didn't have those same risks.  It

17 also required us to advance substantially less new money

18 than we would have in a sole Barings-led transaction.

19 Q    I'd like to show you what has been filed at Docket

20 Number 865-3, which is Debtor's Exhibit 210.

21      Is this an email from Bryan High (phonetic) to you and

22 several others at Barings dated June 5, 2020?

23 A    Yes.

24           MS. WALLEN:  I'd like to move to admit Debtor's

25 Exhibit 210 filed at Docket Number 865-3.

1              THE COURT:  Any objection?

2              MR. SCHROCK:  No objection.

3              THE COURT:  It's admitted.

4         (Exhibit 210, ECF 865-3 received in evidence.)

5    BY MS. WALLEN:

6    Q    Mr. Searles, what's being discussed in this email?

7    A    This looks like emails from two individuals at Barings

8    to two different investment committees at Barings who would

9    have had positions in the name, outlining the terms of the

10   transaction and indicating very high level views.

11             MS. WALLEN:  And if we scroll down a little bit

12   further, Mr. Herndon, so we can see the rest of the bottom

13   email?

14             THE COURT:  Sorry, I blew it up so I could read

15   it.

16             MS. WALLEN:  Oh.  Is there a particular portion

17   Your Honor would like to see?

18             THE COURT:  No, it's just I changed the screen.

19             MS. WALLEN:  Oh, okay.

20             THE COURT:  I put it back to where it was.

21             MS. WALLEN:  We can blow it up again.

22             THE COURT:  I'm fine.  Thank you.

23             MS. WALLEN:  And if we zoom in on the bottom,

24   towards the bottom of the page, Mr. Herndon, where it stars

25   with, "We believe?"

1    BY MS. WALLEN:

2    Q    And Mr. Stewart wrote, "We believe this new transaction

3    is attractive as the economics work out to similar levels

4    for Barings, but significantly de-risks the investment

5    Barings could have done on its own.  The group that formed

6    and represented less than 50 percent of 1-L holdings has

7    also agreed to this transaction, and though Barings was not

8    part of the group, we are receiving the same opportunity and

9    terms as the group."

10         Do you see that, Mr. Searles?

11   A    Yes.

12   Q    Okay.  Switching topics slightly --

13         MS. WALLEN:  You can take that down, Mr. Herndon.

14   BY MS. WALLEN:

15   Q    -- Mr. Searles, are you aware that there is an

16   indemnity provision in the priority term loan agreement

17   whereby the borrower indemnifies the lender for losses,

18   damages or claims including in connection with the

19   transaction?

20   A    Yes.

21   Q    Did Barings want an indemnity provision in the priority

22   term loan agreement?

23   A    Yes.

24   Q    Why?

25   A    As far as I'm aware -- and this would be better suited

1  to be answered by counsel, internal or external, but from my

2  perspective indemnities are pretty standard practice in any

3  transaction we're involved in.

4  Q    Do you understand that this will be a go-forward

5  indemnification obligation?

6  A    Yes.

7  Q    Is that important to Barings, that the indemnity go

8  forward?

9  A    Yes.

10  Q    Why?

11  A    There's been active ongoing litigation in this company

12  for three years since the transaction has been done.  It was

13  -- there has been litigation even prior to the transaction

14  closing, and there's every reason to believe, or to be sure

15  that there's going to be litigation following this company

16  emerging from bankruptcy.

17  Q    Did Barings vote in favor of the Plan of

18  Reorganization?

19  A    Yes.

20  Q    If the plan and the take-back debt did not provide for

21  a go-forward indemnity following plan effectiveness, would

22  Barings have voted in favor of the plan?

23  A    No.

24  Q    Are you aware that Citadel has made a proposal to

25  provide exit financing for the Reorganized Debtor and

1  replace the take-back paper?

2  A    Yes.

3  Q    If that proposal had the effect of removing Serta's go-

4  forward indemnity for the priority lender group for claims

5  related to the June 2020 transaction, would you view that as

6  adverse to Barings?

7  A    Yes.

8  Q    Was Barings' support of the plan dependent on Barings

9  receiving an on-going indemnity?

10 A    Yes.

11 Q    Why?

12 A    As I said earlier, there's been ongoing litigation on

13 this company and this transaction for three years, and it --

14 we have every reason to expect it's going to continue

15 following emergence.

16 Q    Defendants have argued in this case that at the time of

17 the 2016 credit agreement, and even as late as 2020, the

18 credit industry did not expect that a transaction like the

19 2020 transaction could occur.

20      What's your reaction to that?

21 A    Based on my experience in the market, in 2016 any

22 institution that was involved in making loans or purchasing

23 loans would have had a process in place and would have very

24 well understood the document erosion with an ongoing theme

25 in the industry, and would have -- that would have been a

1  topical point for any ongoing, even an initial credit

2  review.  Certainly thereafter transactions which highlighted

3  the flexibility that companies have with respect to these

4  documents, those processes and procedures to do ongoing

5  reviews of documents would have strengthened and would have

6  become more formalized such that at any point from the time

7  that the loan was issued until the transaction any lender

8  who has acted in this market would have had a process and

9  would have had an understanding of the documents and the

10  flexibility that the company had as a result of that.

11  Q    Mr. Searles, had you seen a transaction structure like

12  this before?

13  A    Yeah, I've seen transaction structure like this before.

14  Every transaction is unique and so I've never seen a

15  transaction that's identical to another one in my career,

16  but there have been transactions that have been similar in

17  certain aspects to this one.

18  Q    Were you ultimately comfortable with this transaction

19  structure?

20  A    Yes.

21  Q    Why?

22  A    First and foremost, the company was asking for and

23  needed new money, there was a competitive process and many

24  institutions as I understand it that were willing to provide

25  that new money, there's a competitive assessment with

1  respect to what the company can do and pursue in the context

2  of liability management.  We felt very comfortable with

3  respect to what the document said and allowed for, and this

4  provided the company with everything it needed to continue

5  to go forward.

6  Q    Would Barings have participated in the 2020 transaction

7  if it did not believe doing so was in good faith?

8  A    No.

9  Q    If Serta had decided to go with the proposal submitted

10  by Apollo, Angelo Gordon and Gamut instead, and Barings was

11  invited to participate in that deal, would you have done so?

12  A    We would have had to evaluate that transaction to

13  determine if it was something that we deemed to be suitable

14  for us, but assuming it was, yeah.

15          MS. WALLEN:  Thank you, Mr. Searles.  I have no

16  further questions.

17          THE COURT:  All right.  Thank you.

18          Does anyone else have questions in support of

19  confirmation?  Just checking.

20      (No audible response.)

21          THE COURT:  All right.  Thank you.

22          Can you flip your camera on for me?

23          MR. CARLOCK:  Yes.

24          THE COURT:  Thank you.

25          Mr. Carlock has control, you should be ready.

1          MR. O'LOUGHLIN:  Thank you, Your Honor.  Just give

2     me a moment to organize my notes here.

3          THE COURT:  Take all the time you need.

4        (Pause in the proceedings.)

5                    CROSS-EXAMINATION

6     BY MR. O'LOUGHLIN:

7     Q    Good afternoon, Mr. Searles.  Robert O'Loughlin from

8     Paul Weiss on behalf of the Excluded Lenders.

9        I just want to go over a few points of your testimony

10    to get some clarification here.  I believe you said that

11    Barings stepped away from the Gibson Dunn Group some time

12    before May 2020.  Is that right?

13    A    Yes.

14    Q    And then for a period of time Barings was negotiating

15    its own financing transaction with Serta.  Correct?

16    A    Yes.

17    Q    And your counsel showed you what I believe was Debtor's

18    Exhibit No. 1 -- I'm sorry, which one was it, Debtor's

19    Exhibit No. 116 which was filed in the main bankruptcy

20    proceeding at Docket 863-9.

21          MR. O'LOUGHLIN:  Could we put that up on the

22    screen?

23    BY MR. O'LOUGHLIN:

24    Q    And if you flip ahead to the term sheet that's attached

25    to this document, this is the initial term sheet that

1    Barings proposed to Serta on May 8, 2020.  Is that correct?

2    A    Yes.

3    Q    Okay.  Now I believe you testified that under this

4    proposal, Barings would have funded a new term loan

5    facility.  Is that correct?

6    A    Yes.

7    Q    And this proposal also would have included a debt

8    exchange where affiliated funds of Barings would have

9    exchanged all of their first and second lien terms loans at

10   a discount.  Is that correct?

11   A    Yes, I mentioned that it would have effectuated a

12   re-purchase, there would have been a second tranche that

13   would have effectuated a re-purchase of our first and second

14   lien loans.

15   Q    Understood.  Thanks for that clarification.

16        And in consideration for this exchange in the new money

17   facility, Barings would have received new senior secured

18   loans with first priority liens against the equity interest

19   in assets of newly created IPCO.  Is that correct?

20   A    Yes.

21   Q    Okay.  And the lenders who would have participated in

22   that transaction would have been limited to the affiliated

23   funds of Barings.  Is that correct?

24   A    Yes.

25   Q    And in this term sheet there's nowhere mention here of

1  any amendment to the credit agreement that would have been

2  needed to effectuate this.  Is that correct?

3  A    Not that I can recall.

4  Q    Looking at the term -- feel free to look at the term

5  sheet.

6       Do you see anywhere in there that there would be an

7  amendment to the credit agreement?

8  A    No, not that I can see.

9  Q    Now you're aware that the Angelo Gordon Group proposed

10 a deal with the same structure and it differed only on the

11 economics.  Is that correct?

12 A    I became aware of it, I think, when materials were

13 blown out consequent to the transaction.

14 Q    And you may have said this before, and if not, forgive

15 me.  I think you testified that you believed this

16 transaction structure that was proposed by Barings was

17 permissible under the existing credit agreement and --

18 within the four corners of the credit agreement.  Is that

19 correct?

20 A    Yes.

21 Q    Okay.  Did you believe that if Serta had accepted this

22 offer, that it would have constituted an actual or

23 constructive fraudulent transfer in violation of applicable

24 law?

25 A    I'm not equipped to make that determination, that would

1   be -- we would -- I would rely on internal and external

2   counsel to advise me.

3   Q    Would it surprise you if Gibson Dunn had sent a letter

4   to UBS, the administrative agent for the Serta term loans,

5   and argued that a transaction structure like this would

6   potentially be an actual or constructive fraudulent

7   transfer?

8   A    I've been doing this for a long time, nothing like that

9   would surprise me, but --

10        (Laughter.)

11            THE WITNESS:   -- I don't feel I have a

12   perspective on that.

13            MR. O'LOUGHLIN:  I'm not sure what that says about

14   the legal profession, but thank you for that.

15   BY MR. O'LOUGHLIN:

16   Q    Now, Mr. Searles, I believe you -- well, let me back

17   up.

18        I take it be that you would not agree with the Gibson

19   Dunn position on that?

20   A    If we would have agreed with it, I wouldn't have had

21   permission to send a term sheet.

22   Q    Thank you.

23        Now, Mr. Searles, I believe you testified that after

24   you sent this term sheet you engaged in some continued

25   rounds of negotiation -- or, sorry, Barings engaged in

1  continued rounds of negotiation with Serta.  Is that

2  correct?

3  A    Yes.

4  Q    And in these negotiations, Barings never proposed an

5  uptier style transaction of the type that was actually

6  consummated in June of 2020.  Is that correct?

7  A    No.

8  Q    Your negotiations with Serta focused on this dropdown

9  IPCO style of transaction.  Correct?

10  A    Yes.

11  Q    Now I'd like to turn back to another exhibit that your

12  counsel showed.  Let me get it in front of me.

13      I believe this was Debtor's Exhibit 210, which would

14  have been, pardon me, filed on the main bankruptcy docket at

15  ECF Number 865-3.

16      Do you recall looking at those documents?

17  A    Yeah.

18  Q    And this is the email following Barings' receipt of

19  news from Serta that it was going with the Gibson Dunn

20  Group's uptier proposal.  Is that correct?

21  A    Yes.

22  Q    And your counsel walked through some of the language in

23  this docket, but I just want to make sure we've covered some

24  of this.

25      In the first email in this chain, which is at the

 1  bottom of the first page, it's from Mr. Jeffrey Stewart at

 2  Barings.  Do you see that?

 3  A    Yeah.

 4  Q    And who is Mr. Stewart?

 5  A    He's a former employee of Barings.

 6  Q    What was his position at this time?

 7  A    He was a research analyst.

 8  Q    Okay.  And he says that first, "We were informed this

 9  afternoon that Serta Simmons has decided to pursue a

10  different structure than the one we internally had

11  proposed."

12       Do you understand Mr. Stewart there to be referring to

13  the difference between the uptier transaction that was now

14  on the table versus the dropdown transaction you had been

15  negotiating?

16  A    Yeah, said differently, the transaction, I believe

17  there's a term sheet that's attached to this email, the

18  transaction that's in the term sheet attached to this email.

19  Q    Fair enough.  And the new proposal that the company was

20  now offering had a different structure than the one you had

21  been negotiating with them over the past month.  Is that

22  correct?

23  A    Yes.

24  Q    Okay.  Mr. Stewart goes on to say, "And we love carving

25  out assets into an unrestricted subsidiary.  The new

1  structure will amend the pro rata provision at OPCO to

2  create a priority tranche that sits above the current first

3  and second lien notes."

4       Do you see that?

5  A    Yes.

6  Q    And just to reiterate, the proposal that you had been

7  negotiating over the past month, did not include any

8  amendments to the credit agreement.  Correct?

9  A    Correct.

10 Q    Including any amendments to the pro rata provision?

11 A    Correct.

12 Q    Mr. Stewart further writes, this is in the -- if you

13 look at the bullet points, the third -- the top level black

14 bullet point down, he writes, "The new money is offered on a

15 pro rata basis for 1-L holdings to approximately 50 percent

16 of lenders, which mean Barings will have 20 percent of the

17 new money exposure of $40 million."  Do you see that?

18 A    Yes.

19 Q    Now if my math is right, I think that works out that

20 Barings had about 10 percent of Serta's 1-L holdings.  Is

21 that correct?

22 A    That would be the proper math equation, yes.

23 Q    I'm glad my arithmetic still works.  Below that, now at

24 the bottom, Mr. Stewart summarizes -- this is in the

25 paragraph at the bottom of this page and continuing on to

1  the top of the next one -- We believe this new transaction

2  is attractive as the economics work out to similar levels

3  for Barings, but significantly de-risks the investment

4  Barings could have done on its own.

5      I believe you testified earlier that this de-risking

6  referred to Barings advancing less capital.  Is that

7  correct?

8  A    Advancing less capital and also inviting less

9  litigation.  Right.

10 Q    I guess that was a dream at the time.  A group that

11 formed and represented less than 50 percent of the 1-L

12 holdings has also agreed to this transaction, and though

13 Barings was not part of that group we are receiving the same

14 opportunity/terms as the group that negotiated the above

15 terms.  Do you see that?

16 A    Yeah.

17 Q    Okay.  And I believe you said earlier that this

18 proposed -- you viewed this proposed structure from Serta as

19 broadly similar -- sorry, strike that.

20      You said earlier that you viewed this proposal from

21 Serta to be broadly similar to the transaction that you had

22 proposed.  Is that correct?

23 A    In terms of the economic treatment to work on, yes.

24 Q    Okay.  So now going up to the next email above this

25 from Mr. Martin Horn -- or, I'm sorry, from Mr. Bryan High

1  to Martin Horn.  Do you see that?

2  A    Yes.

3  Q    And who is Bryan High?

4  A    He's the head of capital solutions.

5  Q    Mr. High writes, and this is at the bottom of this

6  email, the second paragraph up, second sentence, "Fantastic

7  landing point from my perspective to the extent we push it

8  over the finish line in documentation."

9       Do you see that?

10 A    Yes.

11 Q    Do you know what Barings did to get this fantastic

12 offer from Serta that was not offered to the Angelo Gordon

13 Group?

14 A    I can only presume that he was referring to making a

15 good faith effort to negotiate with the company and putting

16 our best foot forward in the process such that they viewed

17 us as an attractive partner.

18 Q    Now this proposal that you received from Serta does not

19 contemplate offering at the new money provision on a pro

20 rata basis to all the existing 1-L lenders.  Is that

21 correct?

22 A    Correct.

23 Q    And indeed it's correct that this fantastic transaction

24 for Barings would not have occurred if 100 percent of the

25 lenders would have participated.  Correct?

1

2    A    This transaction would not have occurred if 100 percent

3    of the lenders would have participated.

4    Q    Mr. Searles, you don't know what criteria may have been

5    used to select -- what criteria Serta may have used to

6    select Barings to participate in this transaction.  Correct?

7    A    I do not, no.

8    Q    You don't know whether all existing Serta lenders

9    received the same opportunity as Barings?

10   A    I do not know.  I have a sense that that's not the case

11   based on all of the subsequent litigation, but I don't know

12   that for sure.

13   Q    Okay.  In fact, you don't even know who it was who made

14   the decision to ask Barings to participate in the

15   transaction.  Correct?

16   A    I do not, no.

17   Q    Mr. Searles, I believe you said earlier that you are

18   not aware of a transaction prior to Serta that had the

19   particular characteristics of this Serta transaction.  Is

20   that correct?

21   A    Yes, I think I said that I'm now aware of any

22   transaction that was exactly the same as this.

23   Q    Right.  And that's because different credit agreements

24   have different terms and they are informed by those very

25   specific documents.  Is that correct?

1  A    It's far more complex than that.  Different credit

2  agreements have different terms, different companies that

3  face a different situation, have different goals, different

4  capital stacks exist throughout, different companies that --

5  like I said, I've never been a part of any transaction that

6  has been identical to another one.

7  Q    Mr. Searles, last line of questioning here for you, I

8  believe you testified earlier that Barings wanted an

9  indemnity here.  Is that correct?  As part of the 2020

10  transaction?

11  A    Yes.

12  Q    Did you say yes?

13  A    Yes.

14  Q    Thank you, sir.

15      There's a lag on your video feed and audio feed, so we

16  were talking over each other.

17         Mr. Searles, do you remember giving a deposition

18  in this case approximately two weeks ago?

19  A    Yes.

20  Q    Okay.  And you were asked -- this is on page 212 of

21  your deposition transcript starting at Line 1, "As the

22  corporate representative for Barings on Topic Number 12, do

23  you have any understanding of the indemnification

24  obligations that Serta owes Barings?

25      "Answer, I have an understanding that one exists, I

1  don't have any other detailed understanding beyond that.

2  That would be something that I would rely on my attorneys to

3  inform me about."

4      Do you see that testimony, sir?

5  A    Yes.

6  Q    That was your answer two weeks ago?

7  A    Yes.

8  Q    Mr. Searles, my question to you is what --

9          MS. WALLEN:  Your Honor?

10         MR. O'LOUGHLIN:  Do you have an objection?

11         MS. WALLEN:  Your Honor, improper impeachment.

12         THE COURT:  What statement was it that you were

13 using that to impeach?

14         MR. O'LOUGHLIN:  So Mr. Searles has testified

15 today that Barings affirmatively wanted an indemnification,

16 two weeks ago he said that he did not have any understanding

17 of what the indemnification was.

18         But I can move on, Your Honor, maybe I can ask a

19 question that gets us past this.

20         THE COURT:  All right.  Thank you.

21 BY MR. O'LOUGHLIN:

22 Q    Mr. Searles, my question to you is:  What did you do is

23 what did you do in the last two weeks to educate yourself

24 about the indemnification obligation?

25 A    Maybe I don't understand what's going on here, but the

1   line of questioning relative to the deposition doesn't make

2   a whole lot of sense.

3        I'm aware that an indemnification exists, I'm aware

4   that I routinely ask for one and ensure that, you know,

5   we're getting one.  I rely on our lawyers to ensure that it

6   is drafted and documented in accordance with the market.  I

7   think that's totally consistent with my deposition testimony

8   and the testimony I've given today.

9   Q    That's fair, Mr. Searles, but my question was, and

10  maybe I'll ask it a different way, did you do anything in

11  the last two weeks to educate yourself on the particular

12  indemnification obligations that exist under the -- that

13  exist under the 2020 agreement?

14  A    No, it would be totally out of my league to do anything

15  to educate myself on something that I would rely on counsel

16  for.

17  Q    Okay.  Did you do anything to educate yourself about

18  what Barings would have wanted in 2020?

19  A    Well, other than what I knew then which was we would

20  get an indemnity and we would expect one pursuant to any

21  other transactions they do, but nothing else.

22  Q    Okay.  And this is a yes/no question, did you speak

23  with counsel about this indemnification obligation in the

24  past two weeks?  And again, I'm not asking --

25  A    No.

1  Q      -- for the contents, just yes/no.  No?

2  A     No.

3          MR. O'LOUGHLIN:  Okay.  Thank you, Mr. Searles.  I

4  have no more questions for you.

5          THE COURT:  All right.  Thank you, sir.

6          Did we lose -- ah, okay.  Got it.

7          Good afternoon.

8          MR. GOLDMAN:  Brian Goldman of Holwell Shuster &

9  Goldberg for the LCM parties.

10                         CROSS-EXAMINATION

11 BY MR. GOLDMAN:

12 Q   Good afternoon, Mr. Searles.  Good to see you again.  I

13 represent the --

14 A    Good afternoon.

15 Q     -- LCM lenders in this case and I just have a few

16 questions for you.

17      Do you have any recollection of the LCM entities being

18 invited to participate in the June 2020 transaction?

19 A    No.

20 Q    Do you recall ever reaching out to LCM regarding

21 possibly participating in the Barings proposed IPCO

22 transaction?

23 A    No.

24 Q    And you're aware that the 2016 first lien credit

25 agreement was amended in order to effectuate generally

1  speaking the June 2020 transaction?

2  A    I'm sorry, can you repeat that?

3  Q    Generally speaking you're aware that the 2016 1-L

4  credit agreement was amended in order to effectuate the

5  June 2020 transaction?

6  A    I'd have to refresh myself on if there were amendments

7  because frankly I actually don't know or recall if there

8  were.

9  Q    You don't recall whether or not the 2016 1-L credit

10 agreement was amended in order to permit the June 2020

11 transaction?

12 A    No.

13 Q    Pre-Serta did you ever -- did you ever participate in a

14 priming facility combined with a debt exchange at a

15 discount?

16 A    I would say, yes, that's pretty common in the high

17 yield bond world and we would have been involved in some of

18 that.

19 Q    And what the --

20 A    And again, exact -- any exact direct correlation in

21 terms of the exact fact and circumstances, I don't know, but

22 directionally this type of transaction we looked on in high

23 yield bonds.

24 Q    So just I'm clear on the answer --

25 A    Yeah.

1   Q     -- to the question, pre-Serta, specifically with these

2   components, did you ever participate in a priming facility

3   that was also combined with a debt exchange at a discount?

4   A     I do believe so, yes, but when you say I think the

5   opening was something around specifically more specific to

6   it, an exact transaction like this, though.

7   Q     All right.

8   A     Again, I'll say generally speaking, yes.

9   Q     You have no more specifics to offer on the deals you

10  have in mind?

11  A     I don't believe you asked me specifically about deals,

12  but I'm happy to give you a sense of some that we have done.

13  Murray Energy we were involved with, Cineworld to a certain

14  extent was somewhat similar in a number of different

15  instances that was [indiscernible 3:31:36] world.  In a high

16  yield world I think we've done a couple of -- Apollo had one

17  that was a 1-1/8 lien I believe at one point.  Now again,

18  different transactions, different circumstances, but there

19  were serial exchanges, some involved new money, some didn't.

20  Q     Okay.  Thank you.

21          MR. GOLDMAN:  No further questions.

22          THE COURT:  All right.  Thank you.

23          Mr. Millar?

24                          CROSS-EXAMINATION

25  BY MR. MILLAR:

1  Q     Good afternoon, Mr. Searles.  I'm Jim Millar from

2  Faegre Drinker on behalf of Citadel.

3         How are you?  Can you hear me okay?

4  A     Doing well, thank you.

5  Q     Thank you.

6         Mr. Searles, I believe you testified on direct that if

7  the plan did not include the indemnity for the 2020

8  transaction, you would vote no.  Is that right?

9  A     Yes.

10  Q     So if it was the exact same plan without the indemnity,

11  you're going to vote no.

12  A     Yes.

13  Q     So what you're telling the Court is you will prevent

14  the restructuring of Serta on terms you otherwise find

15  acceptable unless you get the indemnity.  Is that right?

16  A     I wish we were that powerful, I don't think we have the

17  power to prevent the restructuring of Serta.

18  Q     You will vote no --

19  A     That would be nice.

20         (Laughter.)

21  BY MR. MILLAR:

22  Q     Right.  But you understand that you could be part of a

23  blocking position.  Is that correct?

24  A     I understand what -- if we voted no, what that means

25  for -- in terms of our voting percentage.

1  Q    And that there could be a blocking position.  Correct?

2  A    I can only speak for Barings.

3  Q    And Barings will vote no on the restructuring of Serta

4  on terms that you otherwise find acceptable unless you get

5  your indemnity.  Is that right?

6  A    I'm not so sure on terms we otherwise find acceptable.

7  There's a holistic package that we voted in favor of.  If

8  that holistic package excludes the indemnity, we would vote

9  no.

10 Q    So if it was the exact same plan without the indemnity,

11 you're voting no?

12 A    Yes.

13 Q    So the indemnity must be really, really important to

14 Barings.  Correct?

15 A    If you change any single element of a transaction, then

16 different circumstances and calculations are taken into

17 effect.

18 Q    Is the indemnity really important to Barings?

19 A    That's no different than you telling me -- that's no

20 different than you telling me that if you change or haircut

21 the equity percentage we're going to get without any context

22 to it, that it's a minor change or something that shouldn't

23 alter our vote.

24 Q    Is the indemnity really important to Barings?

25 A    Yes.

1  Q    You understand that the FLSO and FLFO debt trades in

2  the market.  Yes?

3  A    Yes.

4  Q    And you understand that a 2020 participant in the

5  transaction can therefore trade out of the FLSO and FLFO

6  debt.  Correct?

7  A    Yes.

8  Q    And if they trade out, they would still get an

9  indemnity from the Reorganized Debtors.  Correct?

10 A    Again, the specifics of that indemnity and exactly how

11 that works through, that would make sense to me, yes, but

12 I'm not qualified to go into the specifics of how that

13 indemnity works.

14         MR. MILLAR:  Thank you very much, Mr. Searles.

15         THE COURT:  All right.  Thank you.

16         Anyone else?

17    (No audible response.)

18         THE COURT:  All right.  Any Redirect?

19         MS. WALLEN:  Just a few questions, Your Honor.

20         THE COURT:  Certainly.

21         MS. WALLEN:  Could we give the control back to

22 Mr. Herndon?  I see you're --

23         THE COURT:  One step --

24         MS. WALLEN:   -- one step ahead of me.

25         THE COURT:   -- ahead of you.

 1           MS. WALLEN:  Excellent.  Thank you, Your Honor.

 2           THE COURT:  For once today.

 3                         REDIRECT EXAMINATION

 4   BY MS. WALLEN:

 5   Q   Mr. Searles, Mr. O'Loughlin asked you about

 6   Exhibit 210, which it at Docket Number 865-3.

 7           MS. WALLEN:  If we could bring that up, please,

 8   Mr. Herndon?

 9   BY MS. WALLEN:

10   Q   And he asked you about a number of statements, but the

11   one I'd like to go back to is in Mr. Stewart's email where

12   he says, The new structure will amend the pro rata provision

13   at OPCO.  If we could focus on that, please?  In the second

14   paragraph there.

15       Okay.  Mr. Searles, on June 5 when Mr. Stewart wrote

16   this had Barings seen the documents that were ultimately

17   entered into to effectuate the transaction?

18   A   No.

19   Q   Had Barings seen anything more than the 1-page term

20   sheet that you said Evercore sent to you?

21   A   No.

22   Q   Let's take a look at that term sheet.

23           MS. WALLEN:  Could we bring up Docket No. 864-49,

24   which is Debtor's Exhibit 206?

25   BY MS. WALLEN:

1  Q    Mr. Searles, is this a June 5, 2020 email from Ankit

2  Dalal at Evercore to you and others at Evercore?

3  A    Yes.

4  Q    And does this email attach the 1-page term sheet that

5  you received from Evercore on June 5?

6  A    Yes.

7  Q    Can you look at that term sheet and tell me, does it

8  say anything about an amendment to the pro rata provision?

9  A    It does not.

10  Q    Do you know what Mr. Stewart was talking about there?

11  A    No.

12          MS. WALLEN:  I'd like to move Docket No. 864-49,

13  Debtor's Exhibit 206, into evidence.

14          THE COURT:  Any objection?

15          MR. SCHROCK:  No objection.

16          THE COURT:  It's admitted.

17      (Exhibit 206, ECF 864-49, received in evidence.)

18          MS. WALLEN:  Thank you, Mr. Searles.  I have no

19  further questions.

20          THE COURT:  All right.  Thank you.

21          And any limited Recross?

22          MR. O'LOUGHLIN:  No, Your Honor.

23          THE COURT:  All right.  Thank you.

24          Mr. Herndon, or, I'm sorry, Mr. Millar.

25          MR. MILLAR:  No, thank you, Your Honor.

```
 1            THE COURT:  All right.  Thank you.

 2            Any reason that Mr. Searles cannot be excused?

 3       (No audible response.)

 4            THE COURT:  All right.  Mr. Searles, thank you for

 5  your time this afternoon.  You've been very helpful.  You

 6  are excused from the Rule which means you're free to watch

 7  if you wish, you are also free to get back to what I'm sure

 8  is an otherwise interesting day.

 9            THE WITNESS:  Thank you, Your Honor.

10            THE COURT:  Thank you, sir.

11       (Witness excused.)

12            MS. WALLEN:  Your Honor, if we could have another

13  short recess?   Our next witness is also testifying

14  remotely.

15            THE COURT:  All right.

16            MS. WALLEN:  So just to --

17            THE COURT:  Who's the --

18            MS. WALLEN:  -- allow him to connect.

19            Davis Meiering from Credit Suisse Asset

20  Management.

21            THE COURT:  So that's -- all right.  Do you want

22  to just take until 3:50?  Does that work?

23            MS. WALLEN:  Sure.  Thank you --

24            THE COURT:  All right.

25            MS. WALLEN:  -- Your Honor.
```

 1              THE COURT:  All right.  Thank you.  We'll be

 2   adjourned until 3:50.

 3              THE CLERK:  All rise.

 4         (Recess taken from 3:39 p.m. to 3:53 p.m.)

 5                         AFTER RECESS

 6              THE COURT:  We are back on the Record in Case

 7   No. 23-90020, Simmons Serta's Bedding (sic), LLC, et al.

 8              All right.  And we have our next witness?

 9              MR. NADLER:  Yes, Your Honor.  Michael Nadler from

10   Gibson Dunn on behalf of the PTL Lenders and the additional

11   counterclaim Defendants.

12              Our next witness is Mr. Davis Meiering.

13              THE COURT:  All right.  Thank you, sir.

14              Good afternoon.  Could you just confirm for me

15   that you can hear me?

16              MR. MEIERING:  Yes, I can.

17              THE COURT:  All right, thank you.  If you would,

18   please, sir, if you'd raise your right hand?

19          DAVIS MEIERING, PTL LENDERS' WITNESS, SWORN

20              THE COURT:  All right, thank you, sir.

21              Let me make sure I got your tech all right.  So

22   he's exactly where he should be, all right?  You're ready.

23              MR. NADLER:  All right.  Mr. Meiering, before we

24   begin, is there anyone else in the room with you at this

25   time?

1           THE WITNESS:  Yes, Jennifer Huffman, Credit

2   Suisse's internal litigation counsel.

3           MR. NADLER:  All right.  And, Mr. Meiering, I

4   would just ask if you could not communicate with Ms. Huffman

5   about the substance of your testimony while you're on the

6   stand.

7                       DIRECT EXAMINATION

8   BY MR. NADLER:

9   Q    Mr. Meiering, have you observed any of the trial prior

10  to testifying today?

11  A    No.

12  Q    And where are you employed, sir?

13  A    Credit Suisse Asset Management.

14  Q    Is that sometimes referred to as "CSAM"?

15  A    Yes.

16  Q    And how long have you worked at CSAM?

17  A    I started fulltime in February 2016, and I did an

18  internship from October 2014 to December 2015, so just over

19  eight years.

20  Q    What is your title there?

21  A    My corporate title is vice president.  And within my

22  group, my functional title is credit and special situations

23  analyst.

24  Q    And in 2020 what were your job responsibilities at

25  CSAM?

1   A    I covered part of the technology sector in the credit

2   industry.  And then I also did special situations and

3   restructuring, so anything from distressed secondary

4   investing to, you know, bankruptcy and workout activities.

5   Q    And how many loan transactions or investments would you

6   say you've worked on in your career?

7   A    I mean, I don't really keep count.  But if we're

8   including, you know, new issue, restructurings, everything,

9   it's got to be well north of a hundred.

10  Q    Okay.  Mr. Meiering, are you familiar with Serta

11  Simmons Bedding?

12  A    I am.

13  Q    And did there come a time in your career at CSAM when

14  you began covering Serta?

15  A    I've picked up formal coverage in 2019 when the former

16  senior analyst left this firm.  But I also had a brief

17  period of time in 2016 when that same analyst was on leave

18  and I covered it temporarily.

19  Q    And are you aware of how long CSAM has invested in debt

20  issued by Serta?

21  A    The current structure, you know the loan issued in

22  2016, I believe are involving dates all the way back to the

23  original issue.  I think we were also involved in

24  predecessor entities, but I don't know how much further it

25  goes back than that.

1  Q    And in 2016 are you aware of how much of Serta's debt

2  CSAM purchased at that time?

3  A    I don't have the exact number off the top of my head,

4  but it's significant.  I think likely north of a hundred

5  million.

6  Q    And did CSAM continue to hold onto some amount of those

7  loans through 2020?

8  A    Yes.

9  Q    And did there come a time when you began to coordinate

10  in some way with other of Serta's term loan holders?

11  A    Yes.  It was kind of around early 2020.

12  Q    And why did you do that?

13  A    Well, I mean, the business performance had been, you

14  know, difficult for some time.  And the loans traded at

15  discounts, I think.  And then COVID started to happen and we

16  had some concerns about, you know, the industry and the

17  business.  And so, you know, we just wanted to be ready and

18  organized if the company needed something and we'd have an

19  organized group to respond.

20  Q    And at that point did you have any particular

21  transaction or proposal in mind to offer Serta?

22  A    No.  I mean, at that point we didn't even know what

23  they would need, so nothing in particular.

24  Q    And did there come a time when CSAM did approach Serta

25  with an idea?

1   A     Yes.  As part of the lender group in April of 2020, we

2   sent a kind of high-level strawman term sheet for liquidity

3   financing of the company.

4   Q     Why did CSAM do that?

5   A     Well, I mean, like I mentioned earlier, we suspected

6   that the industry would be difficult with COVID going on.

7   And if the company ran into a liquidity need, we wanted them

8   to know that we were, you know, potentially willing

9   providers.

10  Q     At that time did you have any understanding as to

11  whether Serta was having discussions with other term loan

12  lenders or other sources of possible liquidity?

13  A     At that time we didn't know for sure.  I mean, we

14  hadn't seen -- I don't think we'd seen a term sheet or

15  anything like that.  But we had been hearing rumors in the

16  marketplace that there were, you know, other groups or other

17  lenders sending proposals to the company.  We heard rumors.

18  Q     And do you recall if those rumors suggested anything

19  about what other proposals might be on the table for Serta?

20  A     I mean, look, high-level most of the rumors suggested

21  at the very least aggressive.  I think, you know, we came to

22  understand that it might be a dropdown IPCO-type transaction

23  over time.

24  Q     And you mentioned making a new money proposal to Serta

25  in April 2020.  Did that get any traction with the company?

1  A     Not really.

2  Q     And did there come a time when Serta did eventually

3  engage with CSAM?

4  A     Yeah.  We entered into NDA in May of 2020 and they

5  shared, you know, quite a bit of, you know, diligent

6  financial performance information and began negotiating with

7  us.  You know, we went through a lengthy negotiation and

8  ultimately arrived at the transaction that we're in now.

9  Q     And when CSAM entered into an NDA and began those

10 negotiations, at that time did you have a sense of -- or do

11 you have any understanding of whether Serta was having --

12 was engaged in negotiations with other lenders, as well?

13 A     I mean, again, I don't think we know for sure.  But,

14 you know, the more rumors we hear, the more certain we start

15 to feel.  And we were pretty confident that there was

16 something going on at that time.

17 Q     And what happened after CSAM signed an NDA with Serta?

18 A     Well, after we signed an NDA, we received information,

19 you know, Centerview reviewed the business plan, you know,

20 normal kind of restructuring negotiation, although we traded

21 a few term sheets, I don't remember exactly how many, and

22 then ultimately arrived at this deal.

23 Q     And what do you recall about the group's negotiations

24 with Serta?  How would you describe the tenor of those

25 discussions?

1  A     They were pretty typical in my mind as far as

2  restructuring negotiations go.  I don't remember how many

3  rounds, like I said, but, you know, we did several rounds.

4  And so both sides were pretty firm in their positioning.

5  You know, didn't seem terribly unusual.

6  Q     And during the course of those negotiations, did you

7  ever attempt to quantify the possible impact on CSAM if

8  Serta went with what you referred to earlier as a dropdown

9  transaction with some other group of lenders?

10  A     Yeah, we did.

11  Q     And what do you recall about that analysis?

12  A     It was at, you know, relatively high level, but

13  basically sensitized a range of potential enterprise value

14  that the company might end up at and analyzed, you know,

15  what kind of recovery a lender who's left out of an IPCO

16  dropdown transaction would have, you know, assuming a

17  certain amount of value is moved out of your collateral, and

18  when you recover, you know, based upon that enterprise

19  value.

20  Q     And based on your analysis, what was your view as to

21  what the worst case for CSAM might be if Serta entered into

22  a dropdown transaction with some other group of lenders?

23  A     I mean, realistically we considered our worse case

24  potentially to be a zero recovery.  I think the like the

25  case of the analysis probably set out like a few cents,

1  single digit percentage recovery, but a very bad one.

2  Q    And at that point do you recall roughly the size of

3  CSAM's investment in Serta term loans?

4  A    I don't remember exactly, but it was north of

5  200 million, maybe even close to 300 par value.

6  Q    And did there come a time when you learned the details

7  of any alternative proposals that Serta had been

8  considering?

9  A    Yes, at least one.  The Apollo, Angelo, Gamut proposal

10 was posted to, I think it was the lender's site, so we saw

11 it eventually in the end.

12 Q    And how -- once you saw the details of that proposal,

13 how close to the mark was your analysis?

14 A    I mean, look, it wasn't perfect, but it was pretty

15 close.

16 Q    And so how bad would it have been for CSAM if Serta had

17 engaged in the transaction it was negotiating with the

18 Apollo, Angelo Gordon, Gamut Group?

19 A    I mean, at the very least it would have very, very

20 significantly elevated the amount of risk we were exposed to

21 and potentially could have lost, you know, over $200 million

22 of par value.

23 Q    What was your reaction upon learning that Serta had

24 accepted the proposal put on the table by the group CSAM was

25 a part of?

1  A     Sorry, could you repeat that question?

2  Q     Sure.  What was your reaction when you learned that

3  Serta had accepted the proposal that CSAM and others were

4  offering?

5  A     I mean, I don't really remember exactly how I reacted,

6  but I imagine we would have been relieved that we weren't,

7  you know, being exposed to the kind of risk that would have,

8  you know, accompanied their proposal.

9          MR. NADLER:  The court reporter asked if you could

10  please repeat that?

11          THE WITNESS:  Sure.

12  BY MR. NADLER:

13  Q     The court reporter asked if you could please repeat

14  that.  We didn't quite get it in the courtroom.

15  A     Oh, apologies.  I think I said something along the

16  lines of I don't remember exactly how I reacted at that

17  moment, but I imagine I would have been, you know, relieved

18  that we weren't, you know, left in the Apollo, Angelo

19  proposal exposed to the kind of risk that was mentioned.

20  Q     Now, the Defendants in this case have argued that the

21  2020 transaction that Serta did engage in was, quote,

22  "Unprecedented and contrary to the expectations of the

23  markets and the parties."

24      What's your reaction to that?

25  A     I mean, I find that a bit surprising and contrary to

1  the expectation of the parties because from an economic

2  perspective, their proposal had a lot of similarities.

3       You know, from the market broadly, look, I mean, you

4  don't see these types of transactions every day.  And, you

5  know, maybe there are some nuances to this one.  But similar

6  types of, you know, transactions that have similar economic

7  features have certainly occurred.  So I don't think it

8  should have been unexpected.

9  Q   You said that you viewed their proposal and your

10 proposal as similar in some ways.  What do you mean by that?

11 What were the similarities in your view?

12 A   I mean, at a high level, you're providing new

13 liquidities financing in a priority position.  You're moving

14 existing claims into a new priority position at a discount.

15 And the company is, you know, getting some level of par

16 value reduction on their debt.

17 Q   Mr. Meiering, when you were involved in negotiations

18 for this transaction, did you believe yourself to be

19 negotiating in good faith?

20 A   Yes.

21 Q   In your view were those negotiations undertaken at

22 arm's-length?

23 A   Yes.

24 Q   Did you ever have a view or did you ever believe that

25 the transaction was somehow -- that your proposed

1  transaction at that time was somehow inappropriate?

2  A    No.

3  Q    Or that it was somehow impermissible?

4  A    No.

5  Q    Did you ever have a view or a belief that the

6  transaction you were proposing was somehow inconsistent with

7  industry norms or expectations?

8  A    I mean, kind of like I alluded to a moment ago, this

9  doesn't happen every day.  But I don't think it was

10  inconsistent with what we've seen prior and what you might

11  expect.

12  Q    And as part of the 2020 transaction, did you think that

13  it was important that as part of the new -- as part of the

14  priority term loan agreement in 2020 that there was an

15  indemnity provision?

16  A    Yes, it's important.

17  Q    Why is that?

18  A    You know, my understanding of the indemnity provision,

19  a lot of it hinges on discussions with a lawyer that works

20  within CSAM and with Gibson Dunn.  So I'm aware that it's

21  important and highly important to us.  But the specifics of

22  why, I mean, I'm not as aware of.

23  Q    Are you aware that the reorganization plan provides for

24  an indemnity for CSAM going forward if the Plan of

25  Reorganization is confirmed?

1  A    I'm aware that there's a go-forward indemnity.  I'm not

2  privy to how it's being implemented.

3  Q    Do you understand that that go-forward indemnity to

4  also be important to CSAM?

5  A    Yes, it is.

6  Q    Are you aware that Citadel has made a proposal to

7  provide exit financing to the Reorganized Debtor, a

8  competing proposal?

9  A    I'm aware.

10  Q    And if that proposal had the effect of removing the

11  go-forward indemnity for CSAM and the other priority term

12  lenders following confirmation of the plan, would you view

13  that as adverse to CSAM's interests?

14  A    Yes, we would.

15  Q    And would CSAM support a Plan of Reorganization if it

16  did not indemnify CSAM on a going forward basis?

17  A    We would not.

18        MR. NADLER:  Thank you.  I have nothing further at

19  this time.

20        THE COURT:  All right.  Thank you.

21        Anyone else that supports confirmation have

22  questions?

23     (No audible response.)

24        THE COURT:  All right, who's taking the lead with

25  the other group?

1          Ah, all right.  Could I get you to flip on your

2    screen again?

3          MR. SPEAKER:  Yes.

4          THE COURT:  Thank you.

5          I got you, thank you.  Oops, I did not get you, my

6    apologies.

7          MS. ALBOM:  Good afternoon, Mr. Meiering.  My name

8    is Blair Albom and I'm here representing the Defendants and

9    Counterclaim Plaintiffs.

10                         CROSS-EXAMINATION

11   BY MS. ALBOM:

12   Q    You testified on Direct that you had heard rumors that

13   some other group or groups of lenders were proposing a

14   potential dropdown transaction, correct?

15   A    That's right.

16   Q    And you didn't know the identity of those other lenders

17   at the time you heard those rumors, correct?

18   A    I don't think we knew the identity and specifics for a

19   fact, but we -- you know, we had over time, you know, come

20   to know who it might be, had a, you know, assumption.

21   Q    But at the time that -- well, but my -- you didn't know

22   who the identity of those other lenders were at the time you

23   heard those rumors, correct?

24   A    That's right.

25   Q    And in fact, you didn't learn their identities until

1 their proposal became -- well, eventually you came to learn

2 that one of those lender groups included Angelo Gordon,

3 Gamut, and Apollo, correct?

4 A    Yeah, eventually we came to learn that.

5 Q    Okay.  And you didn't learn their identities until

6 their proposal became publicly available, correct?

7 A    I don't remember exactly when we learned their

8 identities.  That might have been when we knew it for fact.

9 But before then we had a sense that it was them.

10 Q    Well let me -- do you recall giving a deposition in

11 this case, Mr. Meiering?

12 A    I do.

13 Q    Okay.  And do you have a copy of your deposition

14 transcript in front of you?

15 A    I think it might be in one of these binders here.

16 Q    Okay.

17 A    Yes, I do.

18 Q    We're also going to put it on the screen as well.

19 A    Okay.

20 Q    And let me direct your attention to page 110, line 19.

21 And you were asked the following questions and gave the

22 following answers:

23      "QUESTION:  Were there any other lenders that you knew

24 to be negotiating alternative proposals with the company,

25 other than Apollo?

1       "ANSWER:  I think that the rumors that we heard from

2  about these proposals were limited to one group.  If we

3  learned of more later, it would have come from counsel.

4       "QUESTION:  And when you say limited to one group, you

5  mean the Apollo group?

6       "ANSWER:  Like I said earlier, at the time I didn't

7  know who was in it.  We learned of the other side's proposal

8  when it was cleansed on the lender's side."  Site, excuse

9  me.

10       Did I read that correctly?

11            MR. NADLER:  Objection, improper impeachment.

12            THE COURT:  Any response?

13            MS. ALBOM:  Well, he said that he thought that

14  they -- that maybe they knew who -- which of the lenders

15  were within that group.  And he had testified at his

16  deposition that they didn't know who was in it at the time

17  that they heard the rumors.

18            THE COURT:  He didn't know specifically.  Yeah, I

19  agree.  I don't think that that is an appropriate use of a

20  depo for impeachment.  I'll sustain the objection.

21            MS. ALBOM:  I'll move on.

22  BY MS. ALBOM:

23  Q    Moving to another topic, Mr. Meiering, CSAM was part of

24  the Ad Hoc Group represented by Gibson Dunn in the 2020

25  transaction, correct?

1   A    Yes.

2   Q    And in addition to the Ad Hoc Group, certain other of

3   Serta's first and second lien lenders participated in the

4   2020 transaction, correct?

5   A    Yes.

6   Q    CSAM was not involved in deciding which of Serta's

7   lenders outside the Ad Hoc Group participated in the 2020

8   transaction, correct?

9   A    That's correct.

10  Q    And CSAM didn't advocate for certain lenders to be

11  included in the 2020 transaction, right?

12  A    Not that I know of.

13  Q    And CSAM didn't advocate for certain lenders to be

14  excluded from the 2020 transaction, right?

15  A    Not that I know of.

16  Q    I want to show you what's been filed as Defendants'

17  Exhibit 175, which was filed at adversary proceeding ECF

18  No. 250-82.

19       Do you have that in front of you?

20  A    Yeah, one moment.

21       (Pause in the proceedings.)

22  A    You know, I can see it on the screen.

23  Q    Okay.

24  A    We'll go from there.

25  Q    Okay.  Is this a Bloomberg instant message conversation

1  that you participated in on June 5th, 2020?

2  A    That's right.

3         MS. ALBOM:  Okay.  Your Honor, I'd like to move

4  this exhibit into evidence.

5         THE COURT:  Any objection?

6         MR. NADLER:  No objection, Your Honor.

7         THE COURT:  All right, it's admitted.

8      (Exhibit 175, ECF 250-82, received in evidence.)

9  BY MS. ALBOM:

10 Q    Go with me, if you will, to the second page of this

11 document, which is the Bates stamp ending 458607 on the

12 bottom.

13     Go with me to the -- I guess it's the third line from

14 the bottom.  "D. Meiering," that's you, right?

15 A    That's right.

16 Q    And D. Mechlin is David Mechlin, a portfolio manager at

17 CSAM.

18 A    That's right.

19 Q    You write, "Advent earmarked Barings, Oaktree, and TPG

20 to fill the gap."

21     And Mr. Mechlin replies, "The last ten percent?"

22     And then going on to the next page, you reply, "Yeah."

23     And then 11 lines down from that you say, "And Angelo,

24 Apollo, Gamut are being left out."

25         Do you see that?

DAVIS MEIERING - CROSS BY MS. ALBOM                    88

1   A    Yeah, I see that.

2   Q    When you wrote "Advent earmarked Barings, Oaktree, and

3   TPG to fill the gap," by "fill the gap," you meant reach the

4   participation threshold in the term sheet, correct?

5   A    I don't really remember sending this message.

6   Q    Do you recall that I asked you about this message in

7   your -- at your deposition?

8   A    (No audible response.)

9   Q    Let's just go to page 208, line 24.

10       And let me just ask you to be clear, putting aside that

11  you don't recall writing this message, when you wrote,

12  "Advent earmarked Barings, Oaktree, and TPG to fill the

13  gap," by "fill the gap," you meant CSAM -- you meant reach

14  the participation threshold in the term sheet, correct?

15  A    I mean, I just don't really remember sending the

16  message.  It's been a long time.

17  Q    Okay.  But that's not what I asked you.  I'm asking you

18  when you wrote, "Advent earmarked Barings, Oaktree, and TPG

19  to fill the gap" by "fill the gap" you meant reach the

20  participation threshold in the term sheet, correct?

21  A    I mean, that might have been what I meant.  But I don't

22  remember sending the message, so it's tough to confirm that

23  now.

24  Q    Well, do you remember that I -- let's go to page 208

25  and line 24 of your deposition.  And at that time when I

1   asked you, "Question, what did you mean that Advent

2   earmarked Barings, Oaktree, TPG to fill the gap?"

3       You answered, "By earmarked, I mean tentatively

4   selected.  And to fill the gap was to reach the

5   participation threshold in the term sheet."

6       Did I read that correctly?

7   A    Yes.

8           THE COURT:  And does that refresh your memory as

9   to why you said that?

10  BY MS. ALBOM:

11  Q    And does that refresh your memory as to why you said

12  that?

13  A    Earmarked makes sense.  Fill the gap, you know, I guess

14  it kind of makes sense, too.  So, yeah, I suppose.

15  Q    I want to show you Defendants' Exhibit 255, which was

16  filed at adversary proceeding ECF Number 252-56.

17      And let -- before we actually do that, let me just ask

18  you something.  We were just talking a minute ago about

19  reaching the participation threshold.  That threshold was

20  50.1 percent, correct?

21  A    I believe that was the number that we ultimately landed

22  on, --

23  Q    Okay.

24  A    -- yes.

25  Q    All right.  Now I would like to show you Defendants'

1  Exhibit DX-255, which was filed at adversary proceeding ECF

2  No. 252-56.

3       Do you have that in front of you?

4  A    I'm searching for it, but I can also see it on the

5  screen.

6  Q    Okay.  Is this a Bloomberg instant message conversation

7  that you participated in on June 11, 2020?

8  A    Yes.

9  Q    Go with me to the first page of this document where the

10 conversation begins, and you write, "Two things on Serta" --

11 this is sort of three-quarters of the way down the page.

12      "Two things on Serta.  Advent already used or earmarked

13 all of the exchange capacity except 10 million.  And do you

14 guys want to extend a helping hand to those smaller managers

15 by giving 10 million more room?"

16      Now go with me to the fourth page of this document,

17 towards the top.  And you write, "I'm personally

18 uncomfortable with the concept of picking and choosing.

19 Advisors have a list of like five institutions that have

20 reached out, guys like New York Life, Marathon, SVP, and

21 El Sentra (phonetic).  We can't include everyone.  That's

22 not the deal.  Advent is deciding."

23          Do you see that?  Did I read that correctly?

24 A    I see.

25 Q    Okay.  And by "Advent is deciding," you meant Advent is

1 deciding which lenders were able to participate in the deal,

2 correct?

3 A     Look, I mean, I don't really remember sending that

4 message.  I may have thought that had been the case at the

5 time.  But I don't know how I could have possibly known

6 that.

7       (Pause)

8            MS. ALBOM:  I'd like to admit this document into

9 evidence.

10            THE COURT:  Any objection?

11            MR. NADLER:  No objection, Your Honor.

12            THE COURT:  All right, it's admitted.

13       (Exhibit DX-255, ECF 252-56, received in evidence.)

14            MS. ALBOM:  I also asked you about this document

15 at your deposition.  If you go to page 222, line six.

16            THE COURT:  So let me ask a question.

17            Mr. Meiering, you don't dispute that these are

18 your messages, do you?

19            THE WITNESS:  No.  Those are my messages.

20            THE COURT:  All right.  So you said what you said.

21            MS. ALBOM:  Okay.  I'll move on.

22            THE COURT:  You don't have to move on.  But

23 sometimes I'm not very smart so a lot -- most of the time I

24 take the easy way out.  You know, if he didn't -- if he

25 can't run from them, then they're his statements.

1  BY MS. ALBOM:

2  Q    Well, you acknowledged at your deposition that that is

3  what you meant; is that right, Mr. Meiering?

4  A    Could you -- just to clarify refer to where that is in

5  the transcript?

6  Q    Yeah.  At page 222, line six, I had asked you:

7       "QUESTION:  You said Advent is deciding.  Did you mean

8  Advent is deciding which lenders were able to participate in

9  the deal?

10       "ANSWER:  So where is this?

11       "QUESTION:  This is the Bates ending 659 towards the

12  top.

13       "ANSWER:  I don't remember writing this specific

14  message, but it does seem that that's what I meant."

15       Do you recall telling me that at your -- answering that

16  question at your deposition?

17  A    I recall answering that, yes.  But I also recall

18  towards the end of the deposition I was asked whether or not

19  I could have known.  And I don't -- I think I answered

20  something --

21  Q    Wait, --

22  A    -- along the lines of I don't know how I --

23  Q    -- Mr. Meiering, --

24  A    -- could have known.

25  Q    Mr. Meiering, I --

1  A     Those are my words.

2  Q     Mr. Meiering, I just asked you a simple question, which

3  is whether that was the answer that you gave at your

4  deposition, and it's a yes or a no.  And I believe you

5  answered --

6  A     That is the answer, yeah.

7  Q     -- the question "yes."

8        Okay.  You can put that aside.  You're aware that as

9  part of the 2020 transaction Serta indemnified the lenders

10 who participated in the 2020 transaction, correct?

11 A     Yes.

12 Q     And that indemnity was contained in a provision in one

13 of the agreements memorializing the 2020 transaction,

14 correct?

15 A     Yes.

16 Q     And you don't believe that CSAM negotiated that

17 provision directly with Serta, right?

18 A     I don't remember how exactly it was negotiated.  I

19 imagine it would have been through Gibson Dunn and highly

20 advised by them.

21 Q     At the time that that provision was being negotiated,

22 you didn't know what terms were being negotiated, correct?

23       (Pause in the proceedings.)

24 A     I'm a bit confused by the question.  The time the

25 indemnity was being negotiated, we knew some of the terms of

1  the deal, --

2  Q    Well, I'm asking --

3  A    -- are you referring to the specific terms within the

4  indemnity?

5  Q    Yes, that's correct.

6  A    Well, for this type of provision we heavily rely on the

7  advice of counsel.  So, you know, I can't remember if we

8  were aware of specific terms but it would have all been in

9  discussion with them.  It would have been -- that type of

10 understanding would have been privileged I think.

11 Q    Okay.  So anything you know about the negotiation of

12 the indemnity provision you know through conversations with

13 counsel, correct?

14 A    That's right.

15 Q    But you don't know, in fact, whether this provision was

16 the subject of negotiations between your counsel and Serta's

17 counsel, correct?

18 A    I mean, I know it was negotiated, that's for sure; just

19 the details I don't have handy.

20 Q    Were you personally involved in those negotiations?

21 A    I don't remember.

22 Q    And your understanding of the indemnity provision is

23 based solely on the advice of counsel; is that right?

24 A    That's right.

25 Q    In 2020 you maintained a financial model that analyzed,

1  among other things, Serta's ability to service its debt

2  obligations; is that right?

3  A    Yeah, that's right.

4  Q    You updated that model quarterly and perhaps even more

5  often, correct?

6  A    Correct.

7  Q    As of June 4, 2020 CSAM had not reached a conclusion

8  that Serta would be unable to meet its obligations to its

9  first lien loan holders under the 2016 credit agreement,

10  correct?

11  A    I wouldn't say that we reached a conclusion.

12         MS. ALBOM:  Okay.  Thank you.

13         I have no further questions.

14         THE COURT:  All right.  Thank you.

15     (Pause in the proceedings.)

16         MR. GOLDMAN:  Brian Goldman of Holwell, Shuster,

17  and Goldberg for the LCM parties.

18         Good afternoon, Mr. Meiering.  I represent the LCM

19  lenders in this case and have just a few short questions for

20  you.

21                    CROSS-EXAMINATION

22  BY MR. GOLDMAN:

23  Q    Do you have any recollection of whether the LCM lenders

24  were invited to participate in the June 2020 transaction?

25  A    I don't know if they were or not.

DAVIS MEIERING - CROSS BY MR. GOLDMAN                    96

1  Q     Sorry.  So you don't know whether you have a

2  recollection?

3  A     I don't know if they were invited or not.

4  Q     You don't recall them ever being invited to

5  participate; is that accurate?

6  A     I wouldn't phrase it that way.

7  Q     How would you phrase it?

8  A     I don't know whether or not they were invited to

9  participate.

10          THE COURT:  So ask him the question that he has

11  personal knowledge of.

12          MR. GOLDMAN:  Do you have -- thank you.

13  BY MR. GOLDMAN:

14  Q     Do you have personal knowledge of whether the LCM

15  entities were ever invited to participate in the June 2020

16  transaction?

17  A     No.

18  Q     Okay, thank you.

19          Do you have any personal knowledge of whether the LCM

20  entities were ever invited to participate in any alternative

21  transaction that Serta proposed?

22  A     No.

23  Q     Okay.  And are you aware that the first lien creditor

24  agreement was amended in order to effectuate the June 2020

25  transaction?

1  A    I'm aware.

2  Q    And do you have personal knowledge of ever considering

3  voting for those amendments without participating in the

4  debt exchange?

5       (Pause in the proceedings.)

6  A    We evaluate on a fund-by-fund basis whether or not we

7  vote for an amendment.  So, I mean, we considered it.  I'm

8  not sure if we considered that in that exact way, but again.

9            MR. GOLDMAN:  Okay.  No further questions.

10            THE COURT:  All right, thank you.

11            Mr. Millar.

12            MR. MILLAR:  Good afternoon.  I'm James Millar,

13  Faegre Drinker, on behalf of Citadel.  Just a couple

14  questions.

15                     CROSS-EXAMINATION

16  BY MR. MILLAR:

17  Q    By way of recap from your direct testimony, I believe

18  you testified that the indemnity in the PTL agreement is

19  important; is that right?

20  A    That's right.

21  Q    And you testified the indemnity in the exit financing

22  is important, yes?

23  A    I'm not sure how the ongoing indemnity is being

24  implemented, but the indemnity is important.

25  Q    Okay.  But you testified that you don't know why.

1           MR. NADLER:  Objection, that mischaracterizes his

2   testimony, Your Honor.

3           MR. MILLAR:  It's what he said, Your --

4           THE COURT:  It's the --

5           MR. MILLAR:  -- Honor, candidly.

6           THE COURT:  -- substance of it.  It's not exactly

7   what it says.  It's the collusion -- it's the conclusion you

8   come to when you listen to his answer.

9           MR. NADLER:  Your Honor, I --

10          THE COURT:  So why don't you just re-ask him the

11  question?  Because the answer that he gave was very

12  unsatisfactory, but no one pressed him.  But, I mean, if you

13  want to make that assumption, go ahead.  But why don't you

14  just ask him?

15          MR. MILLAR:  I'm not sure I'm following you, Your

16  Honor.  Ask him.

17          THE COURT:  No, then I'll be quiet.  I --

18          MR. MILLAR:  No, I --

19          THE COURT:  -- so want to get up and cross-examine

20  and I'm just not allowed to do that anymore, so.

21          MR. MILLAR:  Oh, no, you can.  I cede the podium.

22          Well, I'm going to ask the question again.

23  BY MR. MILLAR:

24  Q    Do you know why the indemnity -- well let me -- strike

25  that.

1          Do you know what's in the indemnity?

2    A    I -- look, I'm not involved in the day-to-day on the

3    bankruptcy case now, but my colleague is.  And so my

4    understanding of this is really based on a discussion I had

5    with him at Gibson Dunn yesterday.  I mean, I know it's

6    important to us, but I don't -- I've never even looked at

7    the wording of this indemnity.

8    Q    So your testimony that the indemnity is important is

9    based on a discussion with Gibson Dunn.

10   A    No.  We -- well, Gibson Dunn wasn't involved in the

11   discussion.  We looped in Michael (indiscernible), who's

12   CSAM's credit investments group's head of restructuring, and

13   he confirmed that it is important to us, very important to

14   us.

15            MR. MILLAR:  Okay.  Thank you.

16            THE COURT:  Thank you.

17            Anyone else?

18         (No audible response.)

19            All right, any Redirect?

20            MR. NADLER:  No, Your Honor.  And our next witness

21   is here in person.  I believe he's in the hallway.  I can go

22   grab him.  It's Phil Yarrow of Invesco.

23            THE COURT:  All right.  First, Mr. Meiering, thank

24   you for your time this afternoon.  You are excused from the

25   rule.  You're welcome to watch if you wish.  You're also

1  free to get about your day.  But I appreciate you taking

2  time out.  All right?

3          THE WITNESS:  Thank you.

4          THE COURT:  Thank you, sir, you're excused.

5      (Witness excused.)

6          THE COURT:  All right.  You want to grab next

7  witness?

8          MR. NADLER:  Yes, Your Honor.

9          THE COURT:  All right, thank you.

10      (Pause in the proceedings.)

11          MR. NADLER:  And, Your Honor, this will be our

12  last witness for the day.

13          THE COURT:  Oh, okay.

14          MALE SPEAKER:  That's not true.

15          MR. NADLER:  Sorry, Weil may have others.  The

16  Debtors may have others.  This will be the last of the

17  lender witnesses.

18          THE COURT:  All fine.  I was having a tough time

19  believing that anyway.  It's okay.  All right.

20          Are you the gentleman, are you the witness?

21  Please come on up.

22          MALE SPEAKER:  Our last witness, I should have

23  been clearer.

24          THE COURT:  Good afternoon.  Before you sit down,

25  if you could raise your right hand?

1          PHILIP YARROW, LENDER'S WITNESS, SWORN

2          THE COURT:  All right, thank you.

3          Good afternoon.

4          MS. PERLOFF-GILES:  Good afternoon.  Alexandra

5   Perloff-Giles from Gibson Dunn & Crutcher on behalf of

6   the --

7          THE COURT:  All right, sir, --

8          MS. PERLOFF-GILES:  Sorry.

9          THE COURT:  -- you can sit down.

10          FEMALE SPEAKER:  What's your name?

11          MS. PERLOFF-GILES:  Alexandra Perloff-Giles from

12   Gibson Dunn & Crutcher on behalf of the Ad Hoc Group of PTL

13   Lenders.

14          Your Honor, may I approach?

15          THE COURT:  Of course.  Thank you.

16          And are we doing this one just within the

17   courtroom?

18          MS. PERLOFF-GILES:  Yes, just within the

19   courtroom.

20          THE COURT:  Okay.  Hold on, let me get that.

21          All right.  You should be in good shape.

22          MS. PERLOFF-GILES:  Good afternoon, Mr. Yarrow.

23          THE WITNESS:  Good afternoon.

24                    DIRECT EXAMINATION

25   BY MS. PERLOFF-GILES:

1  Q    Before we begin, can you please confirm for the Court

2  that you did not listen to the other side's opening

3  presentations or any of the testimony of the other witnesses

4  in this case?

5  A    I did not.

6  Q    Thank you.

7       Where do you work?

8  A    I work at Invesco.

9  Q    And where did you work before that?

10 A    Before that I worked at Van Kampen.  And then before

11 that I worked in the banking industry at First Chicago Bank

12 One JPMorgan Chase.

13 Q    And when did you start working at Invesco?

14 A    I started in 2010.

15 Q    And what's your current role at Invesco?

16 A    So it's a split role between portfolio management and

17 on the credit side.  On the credit side I'm a team leader

18 and then I also cover certain names as an analyst, as well.

19 Q    And how long have you had that role at Invesco?

20 A    Since 2010.

21 Q    When did Invesco become party to the 2016 credit

22 agreement?

23 A    We came party to it in 2016 at origination.

24 Q    And who at Invesco made the recommendation to

25 participate in the 2016 transaction?

1   A      I did.

2   Q      And to your knowledge who drafted the 2016 credit

3   agreement?

4   A      It would have been drafted between the agent, UBS, and

5   the company and the sponsor.

6   Q      How would you characterize the 2016 credit agreement?

7   A      I would characterize it as a loose agreement.

8   Q      And what's a "loose" agreement?

9   A      One that gives the company and the sponsor quite a lot

10  of flexibility as far as its terms are concerned, and in

11  particular there's quite large baskets for making

12  investments or making restricted payments or adding

13  additional debt.

14  Q      Were loose credit agreements unusual in 2016?

15  A      Not really.  They were becoming more and more

16  prevalent.  After the great financial crisis, the market

17  started to pick up.  And a lot of the deals we were looking

18  at were well over-subscribed.  And when you typically have

19  an over-subscribed deal, the power in the negotiation of a

20  credit agreement switches more towards the borrower.  And so

21  they were able to get more and more flexible terms in their

22  credit agreements.

23  Q      Does Invesco prefer to enter into tight or loose credit

24  agreements?

25  A      We would definitely prefer tighter agreements.

1  Q     And why is that?

2  A     I mean, we come in to these transactions -- virtually

3  all the deals we do, we come in to them at origination, at

4  par.  These are performing companies.  And, you know, our

5  expectation is, is that they're going to continue to perform

6  and pay us back our loan with interest.  So, you know, we

7  are very concerned about, you know, downside risk.

8        And when you have looser credit agreements, it's a lot

9  harder to, you know, you're taking a lot more risk that if

10 the company doesn't perform as you expect, then there's a

11 lot more chance that you could see collateral moved away

12 from you or the sponsor trying to leak money away from you.

13 So it can really hurt your recovery in a downside scenario,

14 and we're really focused on that.

15 Q    So why did Invesco agree to a loose credit agreement if

16 it prefers tighter credit agreements?

17 A     Well, I mean, we have funds that have cash to put to

18 work and our investors expect us to put it to work in the

19 bank loan market.  And at that time most of the credit

20 agreements were generally speaking loose.

21       So if we decided not to do a deal just because of a

22 loose credit agreement, we would be doing virtually no deals

23 at that time.  So, you know, we have to sort of pick and

24 choose.

25 Q     So I'd like to turn now to the period leading up to the

1  2020 transaction.  What was your understanding of Serta's

2  financial condition at that time?

3  A    It was definitely very weak.  In 2018, their major

4  customer filed for bankruptcy.  And really from that time on

5  the company had been struggling from a performance

6  standpoint.

7  Q    How did Invesco come to be part of the Ad Hoc Group

8  that ultimately undertook the transaction?

9  A    We got invited into the Ad Hoc Group.  I actually

10 forget whether it was one of the other larger lenders

11 invited us or whether they'd already talked to Gibson Dunn

12 or whether Gibson Dunn approached us.

13     But typically in these scenarios it's one of the other

14 lenders or counsel that will reach out to us and ask if we

15 want to join the group.

16 Q    And when was that?

17 A    It was in March of 2020.

18 Q    What was the purpose of forming this Ad Hoc Group?

19 A    Well, we started to get wind that the company had a

20 liquidity need.  And so in those situations it's very

21 typical that the larger lenders will get together as a group

22 and hire counsel so that they can approach the company more

23 with what's one voice.

24 Q    Did you have a specific transaction structure already

25 in mind at this point in time?

1  A    Not initially.  But we fairly quickly sort of came

2  around to the idea that the right approach, the cleanest

3  approach, would be to offer them a new money superpriority

4  facility that would be open to all lenders to fulfill their

5  liquidity need.

6  Q    What other lenders did you speak to in this March time

7  period?

8  A    I spoke to Credit Suisse, Eaton Vance, Barings.  And I

9  did also speak to Gamut.

10 Q    How did you come to speak to Gamut?

11 A    They reached out to me and asked if, you know, if we

12 could have a call about it.

13 Q    Who at Gamut did you speak to?

14 A    Michael Krieger.

15 Q    And before you spoke to Mr. Krieger, what did you think

16 his reason was for wanting to speak to you?

17 A    I didn't really know that much about Gamut at the time

18 and I just assumed that they wanted to potentially join our

19 group.

20 Q    Would Invesco have had any objection to Gamut joining

21 its Ad Hoc Group?

22 A    No, not at all.

23 Q    What did Mr. Krieger say to you when you did, in fact,

24 speak to him?

25 A    He told me actually that they were forming their own

PHILIP YARROW - DIRECT BY MS. PERLOFF-GILES           107

1  group and had hired counsel and asked if we were interested

2  in joining their group.

3  Q    What was your reaction to learning that there was

4  another group forming?

5  A    I was pretty surprised because it -- especially at that

6  time, in my experience it is -- it was pretty rare to have

7  two first lien lender groups.

8  Q    Why didn't you join the Gamut group?

9  A    Within our group we had a lot of like-minded lenders to

10 ourselves.  And we'd worked a lot with Gibson Dunn in the

11 past, so we felt very comfortable in that group and really

12 saw no reason to change.

13 Q    What do you mean by like-minded lenders?

14 A    Other lenders that are typically going to come into the

15 loan at origination, as opposed to lenders that are going to

16 be more focused just on buying loans in this stressed or

17 distressed situations.

18 Q    Were you concerned about there being another 1-L group?

19 A    Initially I was just sort of surprised, and I thought

20 maybe it would just end up that we would sort of converge

21 into one group.  But I think it -- after discussions with

22 some of the other Ad Hoc Group members it became kind of

23 clear that they were going to be putting some sort of

24 competing transaction in front of the company.  And I think

25 that was definitely concerning.

1  Q    I'd like to show you Debtor's Exhibit 95.  That's ECF

2  No. 862-39 in the main case.  It should be tab number one in

3  your binder.

4      Do you recognize this as an April 29th, 2020 email

5  between you and James Irvin?

6  A    Yes, I do.

7          MS. PERLOFF-GILES:  I'd like to move to admit

8  Debtor's Exhibit 95.

9          THE COURT:  Any objection?

10          FEMALE SPEAKER:  None, Your Honor.

11          THE COURT:  Thank you.

12          It's admitted.

13      (Exhibit 95, ECF 862-39 received in evidence.)

14          MS. PERLOFF-GILES:  Thank you.

15  BY MS. PERLOFF-GILES:

16  Q    You can take a minute to read through the document if

17  you like, Mr. Yarrow.  I'd like to ask you about the first

18  sentence of your email.  You write, "Adding in the PMs

19  because this is a bit disturbing to me."  What was

20  disturbing to you?

21  A    Well, Jim Irvin, who's one of our traders, was

22  basically pointing out that there was a buyer of the debt

23  that day, but they were going to become restricted

24  immediately after that.

25      And so that was really what was disturbing because at

1  that point in time, we weren't really even close to coming

2  restricted.  Our advisors weren't restricted.  We were still

3  really trying to, you know, get on the company's radar.  So

4  this sort of clearly sort of indicated that certain lenders

5  were a lot further along with discussions with the company.

6  Q    Did you have any sense of what kind of transaction this

7  other group might be proposing?

8  A    I mean, we -- I think we started to hear that, you

9  know, the likelihood was it was going to be some sort of

10 IPCO or dropdown-type transaction.

11 Q    And why did you think that?

12 A    I think it was really just because of we started to --

13 our advisors had started to talk to the Serta advisors and I

14 think that was what was being heard through the grapevine

15 was that was the deal that was likely to be put on the

16 table.

17 Q    What kind of transaction, if any, was Invesco

18 envisioning in this April time period?

19 A    We were still envisioning, you know, a new money

20 superpriority facility that would -- all lenders would be

21 able to participate in.

22 Q    So why didn't Invesco ultimately propose a different

23 kind of transaction to Serta?

24 A    Well, once we started to have discussions with the

25 company and the company's advisors, it became pretty clear

1  that in addition to their goal of raising liquidity, they

2  also saw this as an opportunity to reduce their debt.  And

3  so it was clear that they were not going to entertain our

4  proposal.  So if we didn't offer something else, they were

5  clearly going to go down the route of one of these dropdown-

6  type transactions.

7  Q    I'd like to show you a document that has been marked as

8  Debtor's Exhibit 149, filed at ECF 863-42, which should be

9  tab number two in your binder.

10 A    Yeah.

11 Q    And do you recognize this as an email thread that

12 you're on from late May, 2020?

13 A    I do.

14       MS. PERLOFF-GILES:  I'd like to move to admit

15 Debtor's Exhibit 149.

16       FEMALE SPEAKER:  No --

17       THE COURT:  Any objection?

18       FEMALE SPEAKER:  No objection, Your Honor.

19       THE COURT:  Thank you.  It's admitted.

20     (Exhibit 149, ECF 869-42, received in evidence.)

21       MS. PERLOFF-GILES:  Thank you.

22 BY MS. PERLOFF-GILES:

23 Q    Directing your attention to page 3 of the document, you

24 write, "Evercore is going to work on a strawman proposal."

25       Was Evercore the financial advisor to your Ad Hoc

1  Group?

2  A    No.  It was Centerview.  I made a mistake when I was

3  drafting this memo.

4  Q    What is a strawman proposal?

5  A    It's basically just a proposal that sort of acts as a

6  starting point for the group to discuss.

7  Q    And if we could turn now to the bottom of page two, so

8  one page back, an email from Kevin Egan.  And who is

9  Mr. Egan?

10  A    He's a portfolio manager and a member of the investment

11  committee at Invesco.

12  Q    He writes, "Phil, I agree we -- that we have to put a

13  competitive proposal on the table.  We can ill afford to

14  have that magnitude of assets, in particular the IP, dropped

15  from our borrower."

16      What did you understand Mr. Egan to mean by that?

17  A    Well, he was concerned, as was I, that, you know, that

18  if we did not put a transaction on the table that would be

19  better for the company, then the company was going to choose

20  a dropdown transaction and we'd end up having a lot of our

21  collateral, including the IP, stripped away from our

22  borrower.

23  Q    Why would that have been a problem from Invesco's point

24  of view?

25  A    Well, I mean, clearly the collateral supporting a loan

1   is extremely important.  So to have that moved away would

2   have been pretty devastating for the value of our loan.

3   Q    Mr. Egan goes on to ask, "Do we know the composition of

4   that group?"

5        Did it matter to Invesco which particular lenders were

6   actually behind the competing transaction?

7   A    I mean, it didn't really because as, you know, whoever

8   did the transaction, it was still going to have the same

9   impact on us.

10       But knowing that, you know, it was three hedge funds

11  that we knew were pretty aggressive obviously made us pretty

12  concerned about the type of transaction that they were

13  likely to be proposing.

14  Q    And going up the chain now to page one of this

15  document, in the middle there's an email from David Lucas at

16  12:32 p.m.  Who is Mr. Lucas?

17  A    He's another portfolio manager and another member of

18  the investment committee at Invesco.

19  Q    And he writes there at the end of the first paragraph

20  at "L" plus 550, "600 we need to be protected as that rate

21  isn't overwhelmingly attractive."

22       What did you understand him to mean by that?

23  A    So I think he's talking about the new money that we

24  were putting up and the fact that we view LIBOR plus 550 to

25  600 to be below market for that type of money.  So it just

1  was really important that that money was in a protected

2  position.

3  Q    And he then writes, "Pricing, I agree it seems low, but

4  the risk of getting our collateral taken away puts us in the

5  position of likely having to accept something lower than we

6  otherwise would."

7       Did you think the pricing was low?

8  A    I did.  I think that in this type of situation, for a

9  company that was in, you know, this much financial stress

10 putting out new money, I think a market price would have

11 been higher than that.

12          MS. PERLOFF-GILES:  We can take that down, thank

13 you.

14 BY MS. PERLOFF-GILES:

15 Q    During the time the Ad Hoc Group of PTL Lenders was

16 negotiating with Serta did you ever see a term sheet for any

17 other proposal?

18 A    I did not.

19 Q    Did you know the details of the Angela Gordon, Apollo,

20 Gamut group proposal?

21 A    No.  We just knew sort of very high level what type of

22 transaction they were thinking about.

23 Q    Would you have expected to know the details of other

24 competing proposals?

25 A    No, not really.  I think it would have been in the

1  company's interest to have given us, you know, the details

2  of that transaction so that we knew what the competitive

3  proposal was.

4  Q    I'd like to show you a document that's been marked as

5  Defendants' Exhibit 218, please; should be the next tab.

6  And what is this document?

7  A    This is a summary that I put together of the different

8  transactions shortly after we'd agreed to the transaction

9  with the company.

10          MS. PERLOFF-GILES:  And I'd like to move to admit

11  Defendants' Exhibit 218.

12          THE COURT:  Any objection?

13          FEMALE SPEAKER:  No objection, Your Honor.

14          THE COURT:  Thank you.  It's admitted.

15      (Exhibit 218 received in evidence.)

16  BY MS. PERLOFF-GILES:

17  Q    If we could turn to the summary document itself, to the

18  final page.  You write, "If we had allowed the Gamut group

19  to complete their deal, it would have been a complete

20  disaster for us as we would have had virtually all the major

21  assets of the company stripped away from our borrower."

22      Why would that deal have been a complete disaster?

23  A    Because we would have had the collateral, pretty much

24  the entirety of the collateral stripped away from our

25  borrower, as well as the fact that our borrower would have

1  had to have guaranteed that -- the debt, the unrestricted

2  subsidiary, and would have had to have made royalty payments

3  to use the IP.  So the combination of these things would

4  have been very bad for the value of our term loan.

5  Q    And you then write, "Our deal, which we really pursued

6  as a defensive measure to stop the Gamut deal from going

7  through, did offer Advent a lot," and continues.

8      Why did you view this as a defensive measure?

9  A    Because the only reason why we put that deal in front

10 of the company was to essentially stop them from doing the

11 Gamut transaction.

12 Q    I'd like to show you a document that's been marked as

13 Debtor's Exhibit 231, filed at ECF No. 865-23.

14     Do you have that?  Do you recognize this document as an

15 email exchange between you and Matthew Brooks?

16 A    I do.

17          MS. PERLOFF-GILES:  I'd like to move to admit

18 Debtor's Exhibit 231.

19          THE COURT:  Any objection?

20          FEMALE SPEAKER:  No objection, Your Honor.

21          THE COURT:  Thank you.  It's admitted.

22      (Exhibit 231 received in evidence.)

23          MS. PERLOFF-GILES:  Thank you.

24 BY MS. PERLOFF-GILES:

25 Q    Who is Mr. Brooks?

1  A    He's a colleague of mine in the -- in Invesco private

2  credit group.

3  Q    Mr. Brooks writes, wow, would love to ask you some

4  questions about this when you have time over the next few

5  days.  What did you understand him to mean by wow?

6  A    I think he was expressing surprise at the outcome.  You

7  know, I think, you know, in a competitive situation with

8  three hedge funds that don't typically lose in these

9  scenarios, I think there was a lot of surprise that our

10  proposal was the one that was picked.

11          MS. PERLOFF-GILES:  We can take that down, thank

12  you.

13  BY MS. PERLOFF-GILES:

14  Q    I'd like to switch gears and talk about the indemnity

15  now.

16      Are you aware that there's an indemnity provision in

17  the priority term loan agreement whereby the borrower

18  indemnifies the lender for losses, damages, or claims,

19  including in connection with the transaction?

20  A    I am, yes.

21  Q    Did Invesco want an indemnity provision in the priority

22  term loan agreement?

23  A    Yes.

24  Q    And why is that?

25  A    Because there was already -- we were already being sued

1  and so we wanted to have some protection about this around

2  that.  You know, we're obviously very much concerned about

3  our downside so we wanted to be protected.

4  Q    Are indemnity provisions standard in your experience?

5  A    Yes, they are.

6  Q    Invesco was part of the priority lender group at the

7  time the RSA was being negotiated in this case; is that

8  right?

9  A    That's right.

10 Q    Was Invesco focused on whether a post-effectiveness

11 indemnity would be included in the plan while the RSA was

12 being negotiated?

13 A    Yeah, yes, we were.

14 Q    When Invesco signed onto the RSA was it aware that a

15 post-effectiveness indemnity was included in the plan?

16 A    Yes.

17 Q    And was that an important component of the plan from

18 Invesco's perspective?

19 A    Yes, it was.

20 Q    Would Invesco have signed the RSA if the post-

21 effectiveness indemnity was not included in the plan?

22 A    No, we wouldn't.

23 Q    Why not?

24 A    Again, I mean, we were very concerned about our

25 downside and we were -- as part of the RSA we were

1  equitizing a substantial amount of our debt and agreeing to,

2  you know, allow the company to move through bankruptcy as

3  quickly as possible, which I think was in the interest of

4  the company.  And I don't think we would have agreed to do

5  that if we hadn't some downside protection from the

6  indemnity.

7  Q    Are you aware that Citadel has made a proposal to

8  provide exit financing to the Reorganized Debtor and replace

9  the takeback paper?

10 A    I am.

11 Q    If that proposal had the effect of removing Serta's

12 indemnity for the PTL Lender group for claims related to the

13 2020 transaction, would you view that as adverse to Invesco?

14 A    I would, yes.

15 Q    Was Invesco's support of the plan dependent on Invesco

16 receiving that indemnity included in the plan?

17 A    Yes, it was.

18 Q    Did you do anything to confirm the indemnification was

19 in the plan?

20 A    I did reach out to Scott Greenberg from Gibson Dunn,

21 our counsel, just to make sure that I understood -- my

22 understanding was correct of the indemnity.

23 Q    And what was that understanding that you wanted to

24 confirm?

25 A    That we had an indemnity that would continue.

1  Q     And if that indemnity were removed from the plan would

2  Invesco vote for it?

3  A     No.

4  Q     Now I'd like to take a step back.  Defendants have

5  argued in this case that the transaction was contrary to the

6  expectations of the market and the parties; do you agree

7  with that?

8  A     No, I don't.  I mean, there was, you know, as we

9  discussed, a lot of loose credit agreements and a lot of

10  aggressive deals getting done.  And, you know, so I think we

11  felt that this was within the realms of the credit

12  agreement.  And obviously we rely a lot on our outside

13  counsel's view as well on the permissibility of it.

14  Q     Had you seen transactions like the one you ultimately

15  entered into with Serta before?

16  A     Certainly ones with the similar components.  We were in

17  a transaction called Trident just a couple of years before

18  that where a similar debt repurchase was done.

19        And, you know, we were starting to see more and more

20  aggressive deal so, you know, there was a J. Crew

21  transaction where collateral was moved to an unrestricted

22  subsidiary and bondholders were able to exchange their debt

23  into that unrestricted subsidiary and essentially sort of

24  leapfrog over the secured creditors in that situation.

25        And there was a Pet Smart transaction where the sponsor

1   made an investment of a very small amount of a subsidiary,

2   Chewy, and then tried to say it wasn't a now wholly-owned

3   subsidiary and take away the collateral.  So we were seeing

4   more and more examples of pretty aggressive deals being

5   done.

6   Q    Did you believe the 2020 transaction complied with the

7   credit agreement?

8   A    Yes, I did.

9   Q    Why is that?

10  A    Again, we knew the credit agreement was very loose and

11  allowed a lot of flexibility.  And, again, also relying on

12  our outside counsel's view of the transaction and its

13  permissibility.

14  Q    You testified earlier that Invesco prefers tight credit

15  agreements.  Looking back, didn't you benefit from the loose

16  credit agreement here?

17  A    Well, I mean, I think looking at it now we certainly

18  did benefit.  But at the time it was really hard to say.  We

19  were taking a very large discount on our loan, and we were

20  kind of forced to do that because we needed to do that as a

21  defensive measure to stop the alternative transaction

22  occurring, which would have, in our opinion, have been, you

23  know, very bad for us.

24       So it wasn't clear, though, when we entered into that

25  transaction and took that discount how exactly that would

 1  play out, but -- so, yes, it's benefitted us now.  But it

 2  wasn't clear at the time that it definitely would.

 3  Q    Did you have any reason to think that Defendants had a

 4  different understanding of what the credit agreement

 5  permitted?

 6  A    No.  I mean, they're sophisticated investors.  I think

 7  they understood the looseness of credit agreements.  And, I

 8  mean, their transaction had a lot of the same components as

 9  our transaction did.

10  Q    Would you have proposed the 2020 transaction that you

11  did along with the other members of the Ad Hoc Group if the

12  Defendants had not made their proposal?

13  A    No.  I think we would have stuck to just continuing to

14  offer the new money superpriority facility.  It's a much

15  cleaner and easier way of doing it from our standpoint.

16          MS. PERLOFF-GILES:  I have no further questions at

17  this time.

18          THE COURT:  All right, thank you.

19          Anyone else in support of confirmation have

20  questions?

21      (No audible response.)

22          THE COURT:  All right.  Opposition, who's taking

23  the lead?

24      (Pause in the proceedings.)

25          MS. ALBOM:  Could we take just a five-minute

1  break, Your Honor?

2          THE COURT:  Of course.  Do you literally just need

3  five minutes?

4      (No audible response.)

5          THE COURT:  All right.  So back at 5:05.

6          All right, thank you.  Let's be adjourned.

7          THE CLERK:  All rise.

8      (Recess taken from 4:59 p.m. to 5:07 p.m.)

9                       AFTER RECESS

10         THE COURT:  We are back on the Record in jointly

11 administered cases under Case No. 23-90020 and the

12 associated adversary, and we are ready to begin cross-

13 examination of Mr. Yarrow.

14         Counsel, whenever you're ready.

15          MS. ALBOM:  Good afternoon, Mr. Yarrow.

16         My name is Blair Albom, and I represent the

17 Defendants and Counterclaim Plaintiffs in this litigation.

18         THE WITNESS:  Afternoon.

19                    CROSS-EXAMINATION

20 BY MS. ALBOM:

21 Q    On Direct, you testified that you had a conversation

22 with Gamut in March of 2020 where Gamut asked you to join

23 their lender group; do you recall that?

24 A    I do.

25 Q    And Gamut reached out to Invesco again on or about

1   May 26th, correct?

2   A      Yes, that's correct.

3   Q      I'd like to show you DX-473, which is also ECF No.

4   264-3 --

5              THE COURT:  It will show up on your screen,

6   Mr. Yarrow --

7              THE WITNESS:  Okay.

8              THE COURT:  -- as soon as they put it up for us.

9              THE WITNESS:  Okay.

10             MS. ALBOM:  And --

11             THE COURT:  So I assume that you were doing this

12  just in the courtroom, not for GoToMeeting.  I can do it

13  either way.

14             MALE SPEAKER:  I'm fine.

15             THE COURT:  Okay.

16             MS. ALBOM:  Your Honor, may I approach the

17  witness?

18             THE COURT:  Sure, and he'll get it in just a

19  minute.  It's totally up to you, however you'd like to do

20  it.

21        (Counsel discusses waiting for the exhibit to

22  display.)

23             THE COURT:  Remember, when you're at the lectern,

24  you control the courtroom.  Don't let the courtroom control

25  you.

1           MS. ALBOM:  Thank you, Your Honor.

2           THE COURT:  There we go.

3           MS. ALBOM:  Okay.

4    BY MS. ALBOM:

5    Q    Mr. Yarrow, is this an email between you and Paul

6    Tribiani (phonetic), who's also of Invesco?

7    A    Yes, it is.

8           MS. ALBOM:  I'd like to admit this into evidence,

9    Your Honor.

10          THE COURT:  Any objection?

11          MS. PERLOFF-GILES:  No objection, Your Honor.

12          THE COURT:  It's admitted.

13       (Exhibit DX-473, ECF 264-3, received in evidence.)

14   BY MS. ALBOM:

15   Q    Mr. Yarrow, if you'll go with me to the bottom email,

16   Mr. Tribiani emails you, and he says, "I got an urgent call

17   from Gamut just now. They are concerned the company has

18   effectively restricted two separate groups of 1-Ls with the

19   end goal of launching a J. Crew type financing around one of

20   the groups."

21       And then, above that, you respond, "Paul, I'm not

22   surprised they are calling you now. I think we need to keep

23   Gamut at arm's-length right now."

24       Do you see that?

25   A    I do.

PHILIP YARROW - CROSS BY MS. ALBOM                    125

1  Q     You wanted to keep Gamut at arm's-length because they

2  were the competition, correct?

3  A     Yeah, I mean, we were working with an Ad Hoc Group,

4  and typically, we wouldn't have one-off conversations with

5  other lenders outside of the Ad Hoc Group.

6  Q     And so, to your knowledge, no one from Invesco

7  responded to Gamut, correct?

8  A     That's correct.

9  Q     Okay.  Invesco was part of the Ad Hoc Group

10 represented by Gibson Dunn in the 2020 transaction, correct?

11 A     That's correct.

12 Q     And in addition to the Ad Hoc Group, certain other of

13 Serta's first and second lien lenders participated in the

14 2020 transaction, correct?

15 A     Yes.

16 Q     Invesco was not involved in deciding which of Serta's

17 lenders outside the Ad Hoc Group participated in the 2020

18 transaction, correct?

19 A     Yes, that's correct.

20 Q     And Invesco was not involved in the decision to admit

21 Barings into the deal, correct?

22 A     Yes, that's correct.

23 Q     And Invesco wasn't involved in the decision to admit

24 any other lender into the deal, correct?

25 A     That's correct.

PHILIP YARROW - CROSS BY MS. ALBOM                    126

1  Q    And Invesco was not asked for its input about which

2  lenders to include in the 2020 transaction, right?

3  A    Right.

4  Q    And Invesco didn't have any influence over which

5  lenders would be included in the 2020 transaction, right?

6  A    That's right.

7  Q    And Invesco didn't advocate for certain lenders to be

8  excluded from the 2020 transaction, correct?

9  A    That's correct.

10 Q    And as far as you're aware, none of the other Ad Hoc

11 Group members advocated for certain members to be included

12 or excluded from the 2020 transaction, correct?

13 A    As far as I'm aware, although I can't really speak for

14 all of them.

15 Q    And in fact, prior to closing, Invesco didn't even

16 know who else was going to be in the deal, other than the

17 members of your Ad Hoc Group, correct?

18 A    That's correct.

19 Q    You're aware that as part of the 2020 transaction,

20 Serta indemnified the lenders who participated in the 2020

21 transaction, correct?

22 A    Yes.

23 Q    Okay, and that included Invesco, right?

24 A    Yes.

25 Q    Invesco wasn't directly involved in the negotiation of

1  that indemnity, correct?

2  A      That's correct.

3  Q      And that the time that the provision was being

4  negotiated, you didn't know what terms were being

5  negotiated, correct?

6  A      Maybe not the exact terms, no.

7  Q      And Invesco was not involved in any discussions

8  concerning the survival of those indemnification obligations

9  as part of Serta's Chapter 11 Plan, correct?

10 A      Well, we were part of the Ad Hoc Group in discussing

11 the RSA.

12 Q      You mean, you discussed that with the Ad Hoc Group?

13 A      We discussed the terms of the RSA for sure.  Yes,

14 absolutely.

15 Q      Will you go with me to page 212, Line 15 of your

16 deposition?  You recall giving a deposition in this case,

17 correct?

18         (No audible response.)

19 BY MS. ALBOM:

20 Q      And you were asked during your deposition:

21         "Q   Did Invesco have any discussions as part of the

22 Ad Hoc Group concerning the survival of Serta's

23 indemnification obligations with respect to the PTL Lenders?

24         "A   No."

25         Did I read that correctly?

1   A     Yes.

2   Q     On Direct, you mentioned being involved in a

3   transaction called Trident.  That transaction was fully

4   consensual, right?

5   A     I mean, it ended up being fully consensual.

6   Q     And to your knowledge, prior to the Serta transaction,

7   had there ever been a transaction involving a credit

8   agreement that had a waterfall with existing debt where the

9   holders of the 1-L debt were *pari passu* to each other, and

10  unanimity was required to change that, and new money was

11  priming the 1-L level, and the company would be purchasing

12  debt at a discount?

13  A     Well, I think the Trident deal was similar to that,

14  and I mean, there were other transactions in the market that

15  we were not involved with that did involve similar type,

16  similar components to that.

17  Q     The transaction at issue in this case, the Serta

18  transaction was not on consent on all existing first lien

19  lenders, was it?

20  A     It was not.

21          MS. ALBOM:  No further questions, Your Honor.

22          THE COURT:  All right, thank you.

23          MR. LIEBERMAN:  Good afternoon, Mr. Yarrow.

24          THE WITNESS:  Good afternoon.

25          MR. LIEBERMAN:  I'm Neil Lieberman from Holwell

1  Shuster & Goldberg.  I represent LCM.

2                        CROSS-EXAMINATION

3  BY MR. LIEBERMAN:

4  Q     You don't have any recollection of LCM being invited

5  to participate in the June 2020 transaction, right?

6  A     That's right.

7  Q     And you don't have any recollection of LCM

8  participating in any alternative proposal to the June 2020

9  transaction, right?

10  A     That's right.

11  Q     You're aware that the first lien credit agreement had

12  to be amended to permit the transaction, right?

13  A     That's right.

14  Q     And you voted for the amendments, right?

15  A     Yes.

16  Q     Did you ever consider voting for the amendments

17  without participating in the exchange?

18  A     No.

19  Q     And that's because it was all one transaction, right?

20  A     That's right.

21          MR. LIEBERMAN:  Thank you very much.

22          THE COURT:  Thank you, Mr. Lieberman.

23          MR. GOLDMAN:  Nothing from me, Your Honor.

24          Thank you.

25          THE COURT:  Come on.  You've got to have

1  something.

2       (Laughter)

3            THE COURT:  Okay, all right.

4            Any Redirect?

5            MS. PERLOFF-GILES:  Just briefly, Your Honor.

6            THE COURT:  Okay.

7                       REDIRECT EXAMINATION

8  BY MS. PERLOFF-GILES:

9  Q    You were just asked a question about the consent

10  requirements for the credit agreement?

11  A     Yeah.

12  Q    Is it your understanding that the consent of all

13  lenders was required to issue the priming debt?

14  A     No.

15            MS. PERLOFF-GILES:  No further questions.

16            THE COURT:  All right, any Recross on that one

17  question?

18            MS. ALBOM:  No, Your Honor.

19            THE COURT:  All right, thank you.

20            Any reason that Mr. Yarrow cannot be excused?

21       (No audible response.)

22            THE COURT:  Mr. Yarrow, first of all, I want to

23  thank you for your time.  Your testimony's been very

24  helpful.  I know you are a busy man.  I appreciate you

25  taking the time out of your schedule.

1                  You are relieved from the rule.  That means you

2    can stay in the courtroom and observe if you wish.  You are

3    also free to go.

4                  THE WITNESS:  Thank you very much.

5                  THE COURT:  Thank you, sir.

6           (Witness steps down.)

7                  THE COURT:  Wondered when I was going to see you.

8                  MR. WELCH:  The yeomen are working, Your Honor.

9                  For the Record, Alexander Welch, Weil Gotshal &

10   Manges, for the Debtors.

11                 THE COURT:  Yes, sir.

12                 MR. WELCH:  If we could impose upon your

13   generosity a little bit longer --

14                 THE COURT:  Sure.

15                 MR. WELCH:  Thank you, Your Honor.

16                 We have three witnesses.  Two will just be by

17   Declaration.  I understand that there will not cross on

18   those, but they're available for Cross.

19                 We'd like to move Mr. Linker in, who we'll be

20   moving a Declaration, but with some supplemental Direct as

21   well.

22                 THE COURT:  All right.  So, you want to do the

23   two easy ones first?

24                 MR. WELCH:  I think I'd rather do the two easy

25   ones after.

1          THE COURT:  Oh, okay.  Fair enough.

2          MR. WELCH:  Mr. Tsekerides, he'll be doing

3  Direct.

4          THE COURT:  All right.

5          Mr. Tsekerides, good afternoon.

6          MR. TSEKERIDES:  I was going to flip it. but

7  we'll go that way.  It's fine.

8          THE COURT:  All right.

9          MR. TSEKERIDES:  Good afternoon, Your Honor.

10         I know it's been a long day.  I appreciate the

11 indulgence.

12         THE COURT:  No, it's all -- I mean, I look so

13 forward to Citadel coming up with some interesting questions

14 I'm still trying to figure out.  I didn't get on that round.

15         MR. TSEKERIDES:  I'm new to the game.  So, we'll

16 see.

17         THE COURT:  I'm disappointed.

18         All right.

19         MR. TSEKERIDES:  So, we'll start with Mr. Linker.

20 He's the Chief Financial and Operations Officer for the

21 Debtors.

22         THE COURT:  All right.

23         MR. TSEKERIDES:  His Declaration is at

24 Document 884, and we're going to ask to move that in with

25 the exhibit that's attached, and then we're going to present

1  some supplement Direct.

2          THE COURT:  All right, hold on just one second.

3          MR. TSEKERIDES:  I'm sorry, Theodore Tsekerides

4  from Weil, the Debtors.

5          THE COURT:  All right.  So, I don't ever read

6  these until they've been admitted.  And so, I'm looking at

7  this for the first time.  And so, I want to make sure the

8  exhibit that you're talking about is just the consolidated

9  P&L that's attached at the end, that's two pages, or is it

10  something more?

11          MR. TSEKERIDES:  No, that's correct.  Well, it's

12  the financial projections that appear at Appendix A -- so,

13  19 of 24 on that document --

14          THE COURT:  Right.

15          MR. TSEKERIDES:  -- which are the same as

16  Exhibit H to the Disclosure Statement.

17          THE COURT:  All right, fair enough.  So, let me

18  do it this way -- and I want to make sure that everyone

19  understands.  I don't admit Declarations if there is any

20  objection at all.  So, this only gets done by a consensus.

21          So, I want to make sure are there any objections

22  to the admission of Mr. Linker's Declaration found at Docket

23  No. 884, including what's marked as Appendix A titled

24  "Financial Projections"?

25          MR. SEILER:  No objection, as tempting as it is

1   to object, but no, we don't have an objection.

2           THE COURT:  Yeah, then it would get to be fun,

3   and we would see where this goes.

4           With that, I will admit the Declaration of

5   Mr. Linker at 884.

6       (Exhibit 884 received in evidence.)

7           THE COURT:  And then you're going to call

8   Mr. Linker and supplement it?

9           MR. TSEKERIDES:  Correct.

10          THE COURT:  All right, thank you.

11          MR. SEILER:  So, I'd like to do that right now.

12          THE COURT:  Of course.

13          Mr. Linker, if you'd please come forward?

14          I know that you were looking forward to like a

15   six-hour Cross.

16          If you would, please, raise your right hand.

17      (Witness sworn.)

18          THE COURT:  All right.  Thank you, sir.

19          MR. TSEKERIDES:  May I inquire, Your Honor?

20          THE COURT:  Of course.

21                    DIRECT EXAMINATION

22   BY MR. TSEKERIDES:

23   Q    Can you please say your name for the Record, sir?

24   A    John Linker.

25   Q    Mr. Linker, are you currently employed?

1    A     I am.

2    Q     And by who?

3    A     Serta Simmons Bedding.

4    Q     And what position do you hold at Serta?

5    A     I'm Chief Financial and Operations Officer.

6    Q     When did you become the Chief Financial and Operations

7    Officer?

8    A     I joined the company as CFO in April of 2022 and added

9    the operations responsibilities earlier this year.

10   Q     Where did you work before Serta?

11   A     Sheldon Holding.

12   Q     What kind of company is that?

13   A     Manufacturer of doors and windows.

14   Q     And what position did you have there?

15   A     I was CFO from 2018 to 2022, and prior to that, held

16   leadership positions from 2012 to '18.

17   Q     Just very briefly, what's your educational background?

18   A     I have an undergraduate degree and an MBA from Duke.

19   Q     What are your duties and responsibilities as the Chief

20   Financial and Operations Officer of Serta?

21   A     I've got responsibility for financial reporting,

22   accounting, treasury, cash management, financial planning

23   and analysis, as well as responsibility for our

24   manufacturing operations and outsourcing activities.

25   Q     In that role, are you knowledgeable and familiar with

1   the Debtor's business and financial affairs?

2   A      I am.

3   Q      Are you generally familiar with the terms and

4   provisions of the Plan of Reorganization in this case?

5   A      I am.

6   Q      Are you aware of the feasibility requirement in order

7   for a plan to be confirmed?

8   A      I am.

9   Q      What's your general, non-lawyer understanding of that?

10  A      I understand that the company needs to be able to make

11  all of the payments required under the plan post-emergence

12  and that it would need to be unlikely that the reorganized

13  company would be facing another restructuring event.

14  Q      Have the Debtors prepared any analysis to determine

15  whether the proposed plan, in this case, is feasible?

16  A      We have.

17  Q      What analysis is that?

18  A      That was the financial projections that we included

19  with the Disclosure Statement.

20  Q      And were you personally involved in preparing those

21  financial projections?

22  A      I was.

23  Q      Who at Serta is ultimately responsible for those

24  projections?

25  A      That's my responsibility.

1   Q      Can you describe for the Court how the Debtors went

2   about preparing the financial projections?

3   A      Yes.  So, myself and the management team took upon an

4   exercise to build on a new business plan to turn around the

5   financial performance of the company.  So, it was a set of

6   strategic initiatives that would grow our sales, grow our

7   market share, improve our cost structure, improve our

8   profitability.  We worked on that for a couple of months and

9   pressure tested those assumptions, and then ultimately,

10  those initiatives and that business plan is what formed the

11  inputs for the financial projections.

12  Q      Do you believe the business plan is achievable and

13  realistic based on the information known to you today?

14  A      I do.

15  Q      Do you believe the financial projections are

16  achievable and realistic based on the information known to

17  you today?

18  A      I do.

19  Q      Why do you believe that?

20  A      Well, the plan, the business plan and financial

21  projections are based off of a detailed set of assumptions

22  that were done at a sort of bottoms-up basis, and I

23  evaluated those assumptions in two ways.

24        First of all, just from my professional experience, I

25  evaluated the assumptions relative to the company's

1  capabilities and the company's cost structure.  And then

2  secondly, I benchmarked those assumptions and those metrics

3  against the company's historical financial performance.

4       In both cases, I concluded that the projections were

5  reasonable.

6  Q    Are you aware of a settlement between the Debtors and

7  the Creditors Committee?

8  A    I am.

9  Q    Did that settlement exist at the time you prepared the

10 financial projections?

11 A    It did not.

12 Q    Do you believe that the financial projections need to

13 be modified or altered in any as a result of that

14 settlement?

15 A    I don't.

16 Q    Why not?

17 A    The cash payment tied to the settlement with the UCC,

18 I believe it's immaterial relative to the overall actual

19 projections in the aggregate from 2023 to 2027.  And I also

20 believe that some of our assumptions or cash flow-related

21 items in the projections have enough room to absorb that

22 level of payment.

23 Q    Has anything else changed since the projections were

24 developed that would cause you to modify or alter your

25 financial projections?

1  A      No.

2  Q      Are you aware of the Debtor's indemnification

3  obligation to the PTL Lenders proposed under the plan?

4  A      I am.

5  Q      Do the financial projections include any cash payments

6  in connection with that indemnification obligation?

7  A      No, they don't.

8  Q      Why not?

9  A      Well, first of all, I'm not aware that the indemnified

10 parties have suffered a loss or that they actually owe any

11 damages that are quantified or quantifiable.  So, on that

12 basis, I don't have any information to estimate a cash

13 payment to put in the projection, and also, the timing of

14 any such payment is uncertain, so -- or even whether it

15 would occur within the projection period and through 2027.

16 So, on that basis, without knowing the amount and the

17 timing, it's not possible for me to include that in the

18 financial projection.

19 Q      Does the plan contemplate a redemption transaction

20 that would potentially result in the Reorganized Debtors

21 obtaining a tax refund?

22 A      It does.

23 Q      How much is that potential tax refund?

24 A      I understand it to be approximately $50 million.

25 Q      Is that potential tax refund in the financial

1    projections?

2    A      No, it's not.

3    Q      Why not?

4    A      Well, I'd say similar to the indemnity, there's some

5    uncertainty around the amount we're going to have to work

6    through with the IRS around finalizing the amount, and

7    presumably, there'd be some sort of audit process around a

8    refund of that size, and also, the timing is very uncertain.

9    So, without knowing the amount or the timing of the payment,

10   or the cash inflow, in that case, we did not include it in

11   the projections.

12   Q      Do the Debtors still stand behind the financial

13   projections?

14   A      We do.

15   Q      Based on the financial projections, will the

16   Reorganized Debtors have sufficient resources to service

17   their debts and make all known payments that are called for

18   under the plan?

19   A      Yes.

20   Q      Based on those same projections, is the Debtor's

21   reorganization likely to be followed by a liquidation or

22   another reorganization?

23   A      No.

24   Q      Why not?

25   A      The cash flow projections of the financial projections

1  show that we're cash flow positive for the period of 2023 to

2  2027 in aggregate.

3       So, on that basis, I conclude that the company is able

4  to make all the payments required under the plan.  I also

5  conclude that that would mean the company's liquidity

6  position and capital structure would be healthy and not

7  require another restructuring.

8  Q    Would there be any impacts on the Debtors if there's

9  any significant delay in confirming the plan?

10 A    I believe there would.

11 Q    And what would the impact be?

12 A    I think there's a couple of aspects.  We've set

13 expectations with customers, suppliers, employees that we're

14 going to complete this restructuring consistent with the

15 original timetable, which had confirmation this week and

16 emergence later in May, or at the latest, June 6th, I think,

17 is the outside date in the RSA.  And so, if that were to get

18 significantly extended, I do believe that would create doubt

19 in the marketplace on our viability as an industry player.

20      Also, this is a very expensive process and we're

21 burning a lot of cash on a weekly basis on professional fees

22 tied to this process.  So, an extension would hurt our

23 liquidity position because presumably, that would mean more

24 professional fees.

25      And then finally, that has a knock-on effect to our

1    exit credit facility.  There is a minimum cash requirement

2    and a minimum liquidity or availability requirement at our

3    exit ABL facility, and we're burning cash for an extended

4    period of time with a delay, that could risk our ability to

5    close the facility.

6          So, I think all of those factors could have an impact

7    on our ability to achieve the financial projections.

8          MR. TSEKERIDES:  Thank you.

9          I have no further questions, Your Honor.

10         THE COURT:  Okay, thank you.

11         Anyone else in support of confirmation have

12   questions?

13      (No audible response.)

14         THE COURT:  All right, thank you.

15         Mr. Seiler?

16         MR. SEILER:  Thank you, Your Honor.

17         Good afternoon.  My name's Eric Seiler.  I

18   represent the lenders who are not in the PTL group.

19         THE WITNESS:  Good afternoon.

20                     CROSS-EXAMINATION

21   BY MR. SEILER:

22   Q    When did you do the financial projections that you

23   talked about just now?

24   A    The process started in summer of 2022, and the

25   projections, the operating projections were finalized in

1   December.  And then, we updated after the RSA was signed for

2   capital structure-related items during the spring, and they

3   were finalized with the March 2023 Disclosure Statement.

4   Q     The end was March of '23?

5   A     Correct.

6   Q     And do you have 884 that was offered for you in front

7   of you or not?

8   A     I don't have any exhibits in front of me.

9              MR. SEILER:  Is there any way we could give him

10  the --

11             THE COURT:  What is it that you --

12             MR. SEILER:  His Declaration.

13             THE COURT:  I can handle that one.

14             MR. SEILER:  Well, I hate to make you do it, Your

15  Honor.

16             THE COURT:  That's okay.  My goal in life is to

17  be your IT person.

18        (Laughter)

19             THE COURT:  What would you like?

20             MR. SEILER:  You could be so sure that that's not

21  your goal in life because my IT person will be sad as well.

22             If you go to page 5 of 24, that's the only page

23  I'm going to ask him about.

24             THE COURT:  Okay.

25             MR. SEILER:  Okay, that's -- the big bullet in

1  the middle, I think he can see it.  There you go.  "If the

2  holder."

3  BY MR. SEILER:

4  Q     You see the bullet that describes the treatment of the

5  6A trade?

6  A     I do.

7  Q     And are you familiar with that treatment?

8  A     I am.

9  Q     And you see how that's something that was negotiated

10 between the company and the Unsecured Creditors Committee,

11 that treatment that's in the plan?

12 A     I believe the 6B was the negotiation, but yes, I

13 mean, --

14 Q     So, you see how they're getting paid within 60 days of

15 the effective date, the bottom of the section?

16 A     Yes.

17 Q     Wasn't it an earlier version of this they were going

18 to get paid within a year?

19 A     I believe the previous language said up to a year.

20 Q     And now, it's only 60 days; do you know why the

21 representatives of the trade creditors wanted it to be so

22 much shorter?

23 A     I'd have to ask them.

24 Q     Was it because they were concerned about the company

25 assuming the obligation under the indemnity?

JOHN LINKER - CROSS BY MR. SEILER                145

1  A      I don't know.

2  Q      So, let's talk about the indemnity for a second.  I

3  heard you say you don't know when it might be called on and

4  you don't know how big it would be.  And so, you valued it

5  at zero in your projections?

6  A      I didn't say that.

7  Q      You didn't add it to your projections and count it?

8  A      I did not include an estimate for the indemnity in the

9  projections.

10 Q      Which, functionally, that means you counted it at

11 zero.  Other liabilities that you could measure, you

12 included the amount for those liabilities.

13 A      To the extent that a liability was estimable, it would

14 be on our balance sheet; and therefore, we would have a need

15 to reserve for that and pay it in the future.  Those types

16 of liabilities are included in the projections.

17 Q      And this liability on the indemnity is excluded,

18 there's no allowance for it?

19 A      The projections do not include an estimate for any

20 indemnity cash payments.

21 Q      But you do know that the lenders have all said -- you

22 weren't here back in 2020, but they've said now, in

23 connection with the RSA and the plan and the exit financing,

24 that getting that indemnity is very important to them and

25 they wouldn't have supported the plan if they didn't get the

1  indemnity; do you know that?

2  A    I understand they required it as a provision in the

3  RSA.  So, I understand that to be important to them.

4  Q    So, people don't typically require things that have no

5  value, right?

6  A    I don't know what you mean by that.

7  Q    Well, if something didn't matter, you wouldn't insist

8  upon it, would you?  Let me ask it this way:  Does it

9  trouble you that all the lenders who voted for the plan are

10  making their support contingent on getting an indemnity that

11  you have valued at zero in your projections for feasibility?

12  A    I'm not troubled by that.

13  Q    And you haven't changed your thinking about the

14  indemnity at all since this case started in March of 2023?

15  A    I haven't changed my thinking about the indemnity, no.

16             MR. SEILER:  That's all I have, Your Honor.

17             THE COURT:  All right, thank you.

18             Anyone else?

19        (No audible response.)

20             THE COURT:  Mr. Millar, come on up.

21             This is the witness you've been waiting for.

22             MR. MILLAR:  Mr. Seiler sort of stole my thunder.

23             THE COURT:  No, he didn't.  I promise you he

24  didn't.

25             MR. MILLAR:  Good afternoon, Mr. Linker.

1          How are you?

2          THE WITNESS:  Good afternoon.

3                CROSS-EXAMINATION OF JOHN LINKER

4    BY MR. MILLAR:

5    Q    So, you testified that the indemnity is a contingent

6    obligation; is that right?

7    A    I don't know if I would use the word contingent, but

8    the indemnified parties would have to suffer a loss in order

9    for us to fulfill our portion of the indemnity.

10   Q    But let's call that the contingency, okay?  And if

11   they do suffer the loss, the Debtors might have to pay out a

12   really big number, right?

13   A    I don't know what the number would be.

14   Q    Could it be a billion dollars?

15   A    I don't know.

16   Q    You have no idea how much that number could be?

17   A    I don't know how big the indemnity payment might be.

18   Q    And you don't know the likelihood that the company

19   might have to pay out, do you?

20   A    I don't.

21   Q    And it's just simply not included in your projections,

22   correct?

23   A    That's correct.

24   Q    Would you agree that the number was big enough where

25   you may have -- the company may have to file bankruptcy

1  again, or do you not know?

2  A      I don't know how big the number is.

3           MR. MILLAR:  That's all I have, Your Honor.

4           THE COURT:  All right, thank you.

5           Anyone else?

6       (No audible response.)

7           THE COURT:  Any Redirect?

8           MR. TSEKERIDES:  No, Your Honor.

9           THE COURT:  All right, thank you.

10           Mr. Linker, I very much appreciate your

11  testimony.  I assume that you will hang around in the

12  courtroom in case I need to talk to you.

13           THE WITNESS:  Okay, thank you.

14           THE COURT:  All right.  Thank you, sir.

15       (Witness steps down.)

16           THE COURT:  Okay, sir.

17           MR. TSEKERIDES:  Next up, we have the Declaration

18  of Michael Talerico.  He's the Managing Director at FTI

19  Consulting.  That is at Document 881, and there's an

20  attachment to that document which was also Exhibit E to the

21  Disclosure Statement.  So, we ask that be moved into

22  evidence.

23           THE COURT:  All right, thank you.

24           Give me just a moment.

25           MR. TSEKERIDES:  Sure.

1          (Pause in the proceedings.)

2               THE COURT:  So, there are actually two

3  attachments, it's his résumé, as well as the liquidation

4  analysis, correct?

5               MR. TSEKERIDES:  That's correct.  It's pages 1

6  through 49.

7               THE COURT:  I scanned through it.  I just want to

8  make sure --

9               MR. TSEKERIDES:  Yup.

10              THE COURT:  -- that's what we were talking about.

11              MR. TSEKERIDES:  Yup.

12              THE COURT:  All right, any objection to the

13  admission of the Declaration of Mr. Talerico found at -- and

14  the two attachments to that Declaration -- found at Docket

15  No. 881?

16              MR. SEILER:  No objection.

17              THE COURT:  All right, thank you.

18              It's admitted.

19          (Exhibit 881 received in evidence.)

20              THE COURT:  Anyone wish to Cross-examine

21  Mr. Talerico?

22          (No audible response.)

23              THE COURT:  Mr. Talerico here?

24              MR. TSEKERIDES:  He is.

25              THE COURT:  You can sprint for the door.  Thank

1    you, sir.

2             MR. TSEKERIDES:  And the last one, we have Emily

3    Young, a Senior Consultant at Epiq.  She is, I believe,

4    somewhere on the screen, although I don't know that we have

5    that.

6             THE COURT:  There's no challenge to the ballot

7    summary, is there?  I hadn't seen one.

8          (No audible response.)

9             MR. TSEKERIDES:  Let me go through the process,

10   then.

11            THE COURT:  Of course.

12            MR. TSEKERIDES:  So, that is at Document 779.

13   There's a Declaration and a couple of exhibits with the

14   tallies.  And she's a Senior Consultant at Epiq.

15            And we ask that that be moved into evidence.

16            THE COURT:  All right, thank you.

17            Anyone object to the admission of the Declaration

18   of Ms. Young found at Docket No. 779, including the

19   attachments?

20            MR. SEILER:  No objection.

21            THE COURT:  All right, thank you.

22            It's admitted.

23          (Exhibit 779 received in evidence.)

24            THE COURT:  Anyone wish to cross-examine

25   Ms. Young?

1          MR. SEILER:  No.

2          THE COURT:  All right, thank you.

3          Then Ms. Young -- is she in the courtroom?

4          MR. TSEKERIDES:  No, she was going to be on --

5          THE COURT:  She was going to be on -- Ms. Young,

6   if you are on the phone line, you are free to go.

7          Thank you for your hard work.

8          MR. TSEKERIDES:  That concludes my portion of the

9   events.

10          THE COURT:  Okay, that's --

11          MR. TSEKERIDES:  Thank you.

12          THE COURT:  Yes, sir.

13          MR. MILLAR:  Okay.  Your Honor, good evening.

14          Just a couple of housekeeping issues.  So, the

15   Debtors have some 30(b)(6) corporate deposition testimony

16   that they would like to submit as part of the Record.  We

17   are working with the other side to see if there are any

18   objections or cross-designations.

19          I guess, the question for Your Honor is we're

20   hoping to get it done by tomorrow, but if not, would it be

21   okay if we submitted it before the end of the week?

22          THE COURT:  Certainly.  Let me -- can we talk

23   about these things because if you're going to make me read

24   things, I really don't like getting a depo that is marked,

25   you know, pink, green, and yellow.

1          And number one, it's really hard because -- I

2    don't follow directions very well.  So, it's hard to expect

3    me to stay within the colors.  If you've got -- I don't want

4    to say this.  If the depositions are reasonable in length,

5    unless there's something objectionable, why don't you just

6    give them to me and let me read them?

7          MR. MILLAR:  That would be fine, Your Honor

8          THE COURT:  And it'll save you the time of

9    fighting about Line 12 and Line 15.  Just give them to me.

10          MR. MILLAR:  Okay, that'll be fine.  We can do

11   that, Your Honor.  We'll submit those.  We could just submit

12   them formally tomorrow if that's okay.

13          THE COURT:  That's perfect.

14          MR. MILLAR:  And then, we're also working on

15   trying to resolve some stipulated exhibits, and we're hoping

16   to get that done relatively soon as well.

17          THE COURT:  Okay.

18          MR. MILLAR:  Other than that, I think we are done

19   with our side.  My understanding is that tomorrow they'll be

20   calling a witness from Apollo and a witness from Gamut, and

21   then I think we'll be done with the live testimony tomorrow.

22          THE COURT:  All right.

23          Mr. Seiler, is that going to fit within your

24   schedule?

25          MR. SEILER:  That's all true.  That's all true,

1  Your Honor, and I think what it means for certainty for the

2  Court's point of view is there won't need to be Friday.

3           THE COURT:  Okay.  So, I can go ahead and use the

4  time, I can go ahead and give the Friday away?  I've got a

5  number of requests, and if you know you're not going to need

6  it, then I'm going to give it away.

7           MR. SEILER:  I look back at the rest of the room

8  to see if I can speak for anyone.

9           THE COURT:  Okay, no.  And so, just because I

10 want to make sure because I don't anyone to get cut short.

11          So, your two witnesses, Apollo and Gamut, I mean,

12 if you had to guess -- are you doing the direct, or is some

13 of your colleagues doing it?

14          MR. SEILER:  This young man here is --

15          THE COURT:  Okay, Mr. Ehrlich?

16          MR. EHRLICH: Young, that's great.  Young.

17          I do not anticipate a Direct in excess of an hour

18 on either of them.

19          THE COURT:  So, we ought to get one done in the

20 morning and one done in the afternoon?

21          MR. EHRLICH:  At the latest.

22          THE COURT:  At the latest, okay.  All works for

23 me.

24          And we still think that the schedule in terms of

25 having some time to prep for closing, that sort of thing --

1          MR. SEILER:  I believe, Your Honor, you scheduled

2    the closing for a week from Thursday.

3          THE COURT:  No, yeah.  I just want to make sure

4    that still worked.

5          MR. SEILER:  That would be perfect for us.

6          THE COURT:  Okay.

7          MR. SEILER:  And each side has proposed Findings

8    of Fact and Conclusions of Law, and briefing before that so

9    you have an advance.

10          THE COURT:  Okay, that sounds terrific.

11          MR. SEILER:  And we'll see you after tomorrow, a

12    week later.

13          THE COURT:  Okay, and that's all fine.

14          MR. SEILER:  That's correct?  Do I have it right?

15          MR. EHRLICH:  I'm sorry, I didn't quite hear.

16          MR. SEILER:  The closing's a week later, and the

17    briefing in between, and the proposed findings -- I didn't

18    want to speak for the Debtor.

19          MR. EHRLICH:  Yeah, that sounds right to us,

20    Judge, given we finished a day early unless you had any

21    other time.

22          THE COURT:  So, I mean this as a genuine

23    question.  Some of you know me, some of you don't.  I have

24    this tendency to start talking and I certainly, if there are

25    -- I know that things happen outside the door because I

1  lived for a long time outside the door.

2          If there are things being discussed, I don't want

3  to put my finger on the scale, and I'll just be quiet and

4  I'll wait until closing if I have something to say.  I'm

5  also -- I mean, if you get me going, you know, it's the

6  Energizer Bunny.  You wind me up, you can't turn me off.

7  And so, I just want to make sure that's -- I'm looking for

8  some guidance.

9          MR. EHRLICH:  I think, at this point, Your Honor,

10  I think we're prepared to go to closing.

11          THE COURT:  So, the question is -- see,

12  Mr. Hermann's going to come up here because he's seen me do

13  this before.

14      (Laughter)

15          MR. SEILER:  I only seen it from the back.  So,

16  I'm going to --

17          THE COURT:  No, no, no.  Mr. Hermann -- again,

18  and I mean, this as a genuine question.  I'm not suggesting

19  -- you know I don't believe that parties should settle

20  everything.  I'm here to resolve disputes, but I also know

21  that people listen very closely to what I say.  Sometimes I

22  get it right, sometimes I don't.

23          This is a complicated matter, and I have a lot of

24  views as I sit here right now about certain things.  I am

25  perfectly happy to keep all of them to myself and wait until

1  closing if there's a reason to do that.  If there's not, you

2  know, I may start asking questions about potentially things

3  that I want briefed, things that I don't want briefed.

4            MR. HERMANN:  Sure.

5            THE COURT:  And again, I'm genuinely looking for

6  guidance because again, I think you, and I said this before,

7  and I mean, I think you all are just simply the best there

8  are and I don't want to get in the way of really great

9  people doing really great things.

10            MR. HERMANN:  Can I go?

11            MR. EHRLICH:  Yeah.

12            MR. HERMANN:  Your Honor, for the Record, Brian

13  Hermann from Paul Weiss.

14            You asked a very simple question.  I'm prepared

15  to give you a very simple answer.

16            THE COURT:  Okay.

17            MR. HERMANN:  There are no discussions.

18            THE COURT:  Okay.

19            MR. HERMANN:  There should be discussion in my

20  opinion.  I listened to when you told Mr. Millar to go find

21  a friend.

22            THE COURT:  Uh-huh.

23            MR. HERMANN:  He can speak for himself, but I

24  think he's still in search of a friend, and that's where it

25  stands.

1                THE COURT:  Fair enough, okay.

2                MR. HERMANN:  I actually think it would be

3    helpful, Your Honor, to get some guidance, but it's

4    completely up to Your Honor.

5                Thank you.

6                THE COURT:  Okay, fair enough.

7                MR. MILLAR:  May I speak for myself?

8                THE COURT:  Of course, you can.

9          (Laughter)

10               MR. MILLAR:  So, Your Honor, look, I have an

11   idea, and maybe no one likes it, but one of the things that

12   we have faced in this case, and that I know you're aware of,

13   is that all of these different parties are locked up.  And

14   so, here's my idea.

15               What if between now and closing you put us in a

16   mediation where we could have discussions, perhaps in front

17   of Judge Isgur or someone else, where people didn't have to

18   worry about doing something other than trying to solve the

19   problem for the Debtor?

20               THE COURT:  So, a couple of reactions to that.

21   Number one, I don't want to say never, but I don't think

22   I've ever ordered anybody to mediation that didn't want to

23   go because that just doesn't seem appropriate to me, and

24   I've never conditioned anything on going to mediation first.

25               That all being said, Isgur owes me so much.  I

1  actually think --

2         (Laughter)

3            THE COURT:  I actually think I can stop his

4  calendar and get him to be available if the parties wanted

5  to go have a settlement conference with Judge Isgur.  It is

6  certainly not required.  It doesn't matter to me one way or

7  the other if you go or not.  I am genuinely indifferent.

8            I find this problem interesting.  And you know,

9  my view is I'm going to try to do the right thing.  And I

10 already know that everybody knows how to appeal me if they

11 don't think I got it right.  And I want to be very open

12 about this.

13           You know, I hinted at this earlier in the trial

14 when I specifically told you, and I hope everybody was

15 listening, that I didn't give a definition of an open-market

16 purchase, and I didn't do that on purpose knowing that I'll

17 likely see that again in the terms of a request for

18 additional Findings of Fact and Conclusions of Law or the

19 Circuit will just impart their own definition.

20           I did that out of respect for you all so that it

21 gave you wiggle room.  What you all have done thus far is

22 you've retried the issue.  So, I'm going to address it.  So,

23 that's coming.  You may like it, you may not like it.  You

24 know that I'm a commercial lawyer, and I've lived down in

25 street fights for 30 years.  I didn't have the benefit of

1    sitting up with clients that had billions of dollars that

2    could just say yes and no.  Everything my folks ever got is

3    because I ran over somebody.

4              That means what it means.  So, again, everybody's

5    -- I'm just trying to be completely transparent in what I

6    was trying to do.

7              So, if you decide that you want to go visit with

8    Judge Isgur -- he's in Corpus today -- I will catch him on

9    his way back from Corpus if it's helpful, but if you don't

10   want to go visit with Judge Isgur, then by all means, please

11   don't waste his time.  He will absolutely do what I ask him

12   to do, but I'm not going to ask him unless you all tell me

13   that you think it might be beneficial.

14             MR. SCHROCK:  Your Honor, you know, as a lawyer

15   that's been living with this dispute for the last three

16   years --

17             THE COURT:  Sure.

18             MR. SCHROCK:  -- I can say, I think, at this

19   moment, I would say I don't think that would be helpful.

20             THE COURT:  Okay.

21             MR. SCHROCK:  What I do think is always helpful,

22   Your Honor, is that when we finish up the evidence tomorrow,

23   getting your thoughts and perspectives as we move to

24   closing, I think that's always going to be helpful for the

25   parties, and frankly, it could help people think about what

1   things to focus on, you know, heading into closing, for one,

2   and you know, any other thoughts that you may have are

3   always welcome, but from the Debtor's perspective I think

4   that, I would hope, from everybody's perspective, we'd like

5   to get that.

6           THE COURT:  So, I'll certainly think about that

7   although -- I mean, just trying to be completely transparent

8   -- I mean, you and Mr. Hermann are two of simply the best

9   I've ever seen.  I mean, there are times in my career I

10  wanted to be like both of you because I saw what you did.  I

11  mean, I can't imagine that between the two of you haven't

12  thought through the things -- now, I may look at them

13  different, but I can't imagine that you haven't thought

14  through all of these things.

15          But I'll give it some thought and if, you know, I

16  may, you know, I may talk about specific questions I would

17  like answered in briefing, you know, that sort of thing.  I

18  may think about this and say I want argument and then

19  briefing.  I mean, I know we've talked about that --

20          MR. SCHROCK:  Sure.

21          THE COURT:  -- but I may change my mind about

22  that.  But I'll give it some thought.  Again, I am perfectly

23  comfortable in just taking this all the way to the very end.

24  My reason for raising this was I simply didn't want to

25  disturb anything that might be going on out in the hall, and

1    you know, since Mr. Hermann told me you were buying dinner

2    tonight -- you were out of the room when he said that -- no,

3    I'm just joking.

4              You know, if things change -- you know, you can

5    come in tomorrow and tell me something different.  I'm going

6    to take your comments at face value.  I'm going to think

7    about it.  And you know, again, you know, you know I'm not a

8    baby splitter.  I just simply don't believe in it.

9              MR. SCHROCK:  I know, Your Honor.

10             THE COURT:  I'm going to rule one way or the

11   other, and then if people are unhappy, then that's what, you

12   know, that's what the appellate process is for, okay?

13             MR. SCHROCK:  You got it, Your Honor.

14             THE COURT:  Okay, 9:00 o'clock tomorrow for

15   everybody?

16        (No audible response.)

17             THE COURT:  All right.  As always, you can leave

18   all your things in there.  Although I would ask -- the water

19   bottles are starting to multiply.

20        (Laughter)

21             THE COURT:  I mean, again, they'll come in and

22   empty the trash cans.

23             MR. SCHROCK:  We'll clean up, we'll clean up.

24             THE COURT:  Well, you don't have to clean up.

25   They just won't take things off the table because I've told

1    them, "Don't touch the lawyers' stuff," and evidently, that

2    includes ownership of water bottles.  So, if you could just

3    throw them in a garbage can, that'd be great.

4             With that, everybody, have a good evening.

5             We'll be adjourned.

6             THE CLERK:  All rise.

7        (Proceedings adjourned at 5:52 p.m.)

8                      *  *  *  *  *

9        *I certify that the foregoing is a correct*

10   *transcript to the best of my ability due to the condition of*

11   *the electronic sound recording of the ZOOM/video/telephonic*

12   *proceedings in the above-entitled matter.*

13   */S/ MARY D. HENRY*

14   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

15   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

16   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

17   *JTT TRANSCRIPT #67231*

18   *DATE FILED:  MAY 21, 2023*

19

20

21

22

23

24

25