IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

```
IN RE:                          § CASE NO. 23-90020-11
                                § JOINTLY ADMINISTERED
                                § HOUSTON, TEXAS
SERTA SIMMONS BEDDING, LLC,     § THURSDAY,
ET AL,                          § MAY 18, 2023
              DEBTORS.          § 9:00 A.M. TO 12:19 P.M.
****************************************************************
SERTA SIMMONS BEDDING, LLC,     § CASE NO. 23-9001-ADV
ET AL,                          § JOINTLY ADMINISTERED
                                § HOUSTON, TEXAS
VERSUS                          § THURSDAY,
                                § MAY 18, 2023
AG CENTRE STREET PARTNERSHIP,   §
ET AL                           § 9:00 A.M. TO 12:19 P.M.
```

**<u>CONFIRMATION DAY FOUR - MORNING SESSION (VIA ZOOM)</u>**

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                          SEE NEXT PAGE

**(Recorded via CourtSpeak.  Witnesses could barely be heard.)**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES (VIA ZOOM)</u>:


FOR THE DEBTOR:                        WEIL GOTSHAL & MANGES, LLP
                                       Ray Schrock, Esq.
                                       David Lender, Esq.
                                       Alexander Welch, Esq.
                                       Luna Barrington, Esq.
                                       700 Louisiana, Ste. 1700
                                       Houston, TX  77002
                                       713-546-5000


FOR CITADEL:                           FAEGRE DRINKER BIDDLE & REATH
                                       James Millar, Esq.
                                       1177 Avenue of the Americas
                                       41st Floor
                                       New York, NY  10036
                                       212-248-3140


FOR PRIORITY LENDERS:                  GIBSON DUNN & CRUTCHER, LLP
                                       Gregg J. Costa, Esq.
                                       Lee Wilson, Esq.
                                       811 Main Street
                                       Suite 3000
                                       Houston, TX  77002
                                       346-728-6649


FOR SERTA MINORITY LICENSEES:          FISHMAN JACKSON RONQUILLO, PLLC
                                       Mark Ralston, Esq.
                                       4835 LBJ Freeway
                                       Suite 475
                                       Dallas, TX  75244
                                       972-419-5544


FOR THE STATE OF CONNECTICUT
DEPARTMENT OF ECONOMIC AND
COMMUNITY DEVELOPMENT:                 MR. BOWMAN


FOR THE EXCLUDED LENDERS:              FRIEDMAN KAPLAN SEILER
                                       & ADELMAN, LLP
                                       Eric Seiler, Esq.
                                       7 Times Square
                                       New York, NY  10036-6516
                                       212-833-1103

<u>APPEARANCES (CONT'D) (VIA ZOOM)</u>:


FOR LCM LENDERS:                    HOLWELL SHUSTER & GOLDBERG, LLP
                                   Neil Lieberman, Esq.
                                   425 Lexington Avenue
                                   New York, NY  10017
                                   646-837-5151

FOR APOLLO:                        PAUL WEISS RIFKIND WHARTON
                                   & GARRISON, LLP
                                   Andrew Ehrlich, Esq.
                                   1285 Avenue of the Americas
                                   New York, NY  10019
                                   212-373-3000



(Please also see Electronic Appearances.)

4

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|----------|--------|-------|----------|---------|
| THEO KWON | | | | |
| By Mr. Ehrlich | 7 | . | 136 | . |
| By Mr. Lieberman | . | 48 | . | . |
| By Mr. Ruzinsky | . | 50 | . | . |

| EXHIBITS: | Received |
|-----------|----------|
| No. 6, ECF 853-5 | 82 |
| No. 15, ECF 861-9 | 12 |
| No. 43, ECF 861-37 | 59 |
| No. 48, ECF 861-42 | 65 |
| No. 65, ECF 862-9 | 79 |
| No. 82, ECF 248-82 | 32 |
| No. 212, ECF 865-5 | 127 |
| No. 261, ECF 889-2 | 108 |
| No. 266, ECF 866-3 | 132 |
| No. 303 | 35 |
| No. 361 | 118 |
| No. 365, ECF 254-66 | 23 |

\*\*\*

1        **HOUSTON, TEXAS; THURSDAY, MAY 18, 2023; 9:00 A.M.**

2               THE COURT:  Good morning, everyone.  This is Judge

3    Jones.  The time is 9:00 o'clock Central.  Today is May 18th,

4    2023.

5               This is the Docket for Houston, Texas.  On the

6    9:00 o'clock Docket, we have continued proceedings in the

7    jointly administered cases under Case No. 23-90020, Serta

8    Simmons Bedding LLC, as well as the adversary, 23-9001.

9               As always, please don't forget to record your

10   electronic appearance.  A quick trip to the website, a couple

11   of mouse clicks.  You can do that at any time prior to the

12   conclusion of today's hearing.

13              First time that you speak, if you would please state

14   your name and who you represent.  That will greatly assist the

15   court reporter do their very difficult job.

16              As always, we are recording these in Courtspeak.

17   We'll get the audio again we've been splitting up into two

18   pieces.  I hope some of you have taken advantage of that.  But

19   we'll continue that process.

20              And with respect to the folks who are observing

21   online, I have activated the hand-raising feature.  If for any

22   reason you need to speak, you need to hit five star on your

23   telephone. I'll see that.  I'll get you unmuted and then you

24   can be heard.

25              All right, I think that's everything.

1          MS. BARRINGTON:  Good morning, Your Honor.  Luna
2     Barrington for the Debtors.
3          Just a minor housekeeping matter before we begin,
4     Your Honor.  The Debtors would like to move into evidence the
5     30(b)(6) deposition transcripts of Defendants Angelo Gordon,
6     Gamut and North Star.
7          And we've got copies here for the court today.
8          THE COURT:  Thanks.  Are they marked as exhibits or
9     are we just agreeing to tender them as the testimony?
10          MR. EHRLICH:  We're happy to tender them or mark
11     them as the Court prefers.
12          THE COURT:  Yeah, just for purposes because the
13     Record is going to be slightly messy in all of this.
14          Why don't we actually mark them and if you have
15     somebody do that then just come back and tell me what the
16     numbers are.  Don't forget.  I'll make a note as well.
17          That way they're there and then I'll take them.
18     Obviously, I'm not going to read them until tomorrow or
19     Saturday anyway.
20          MS. BARRINGTON:  Sure, absolutely, Your Honor.
21          THE COURT:  All right.
22          MS. BARRINGTON:  Thank you.
23          THE COURT:  Mr. Ehrlich?
24          MR. EHRLICH:  Good morning, Your Honor.  For the
25     Record, Andrew Ehrlich from Paul Weiss on behalf of the Ad Hoc

1       Group of Excluded Lenders.

2               We would call as our first witness, Theo Kwon.

3               THE COURT:  All right, Mr. Kwon, if you'd please

4       come forward, sir?

5           (Pause in the proceeding.)

6               THE COURT:  Mr. Kwon, right up here, please, sir.

7           (Pause in the proceeding.)

8               THE COURT:  Good morning, before you sit down, if

9       you would raise your right hand, please, sir?

10          (Witness sworn.)

11              THE COURT:  Thank you, sir.

12              MR. EHRLICH:  Your Honor, may I approach?

13              THE COURT:  Absolutely.  Thank you.

14          (Pause in the proceeding.)

15              THE COURT:  And Mr. Ehrlich, are we just publishing

16      in the courtroom this morning?

17              MR. EHRLICH:  Refer to Mr. Carlock on that.

18              MR. CARLOT:  Yes.  Please, Your Honor.

19              THE COURT:  All right.  It should be ready to go.

20              MR. EHRLICH:  May I proceed, Your Honor?

21              THE COURT:  Please.

22                          DIRECT EXAMINATION

23      BY MR. EHRLICH:

24      Q    Good morning, Mr. Kwon.  Can you please introduce

25      yourself to the Court?

1    A    Yeah, good morning, Your Honor.  I am Theo Kwon.

2    Q    And Mr. Kwon, what do you do for a living?

3    A    I'm an investment professional at Apollo.

4    Q    And before entering the courtroom today, did you read or

5    listen to any of the proceedings at this trial and

6    confirmation hearing?

7    A    (No audible response.)

8    Q    And what's your position at Apollo?

9    A    I'm a partner at Apollo.

10    Q    And when did you join the firm?

11    A    I joined the firm in 2015.

12    Q    And when did you become a partner?

13    A    A partner in 2019.

14    Q    And what did you do before you joined Apollo?

15    A    I joined the private equity field for most of my career.

16    And prior to that, few years in investing.

17    Q    And do you hold any academic degrees?

18    A    I do.  I have a bachelor in science of economics from the

19    Warden School at the University of Pennsylvania.  And also

20    have master of business administration from the same school.

21    Q    Now can you describe for the Court, Mr. Kwon, just at a

22    high level, what it is that Apollo does?

23    A    Yeah Apollo is a global alternative asset manager.  What

24    does that mean?  We invest on behalf of our clients across the

25    risk spectrum from credit, yield, hybrid equity to equity.

1    And we manage close to $600 billion in assets.

2    Q    And are you in any particular group within Apollo?

3    A    I'm in a few groups, but mostly in the private equity

4    group.

5    Q    And as a partner who works with the private equity group,

6    what are you responsibilities?

7    A    My primary responsibilities are to source good attractive

8    risk return investment opportunities for investors.  To

9    underwrite them.

10    Q    Now has Apollo purchased Serta first lien loans,

11    Mr. Kwon?

12    A    Yes, we have.

13    Q    And when was the first time that Apollo purchased Serta

14    first lien loans?

15    A    My recollection, starting in 2016.

16    Q    And was that part of the initial syndication of the

17    credit agreement?

18    A    (No audible response.)

19    Q    And did Apollo purchase additional loans in 2017?

20    A    My understanding, yes.

21    Q    And how about 2018?

22    A    I believe so.

23    Q    And do you know when Apollo sold out of the loans that

24    were purchased in 2016, '17, and '18?

25    A    My understanding sometime in 2018.

1    Q    And did you have any personal involvement in those

2    purchases and sales in the 2016 to 2018 period?

3    A    I did not.

4    Q    Now, did there come a time that Apollo began to purchase

5    Serta first lien loans, again after it sold it's position in

6    2018?

7    A    Yes, we did.

8    Q    And do you remember roughly when those purchases began?

9    A    They began in March of 2020.

10   Q    And did you have personal involvement in those purchases?

11   A    I did.

12   Q    And, when did Apollo first start considering making the

13   purchases that ultimately occurred in March of 2020?

14   A    For the 2020 purchases, we started our work a few years

15   before.  I think starting late 2018, early 2019.

16   Q    And when you consider making investment of the kind you

17   ultimately made, do you have an underwriting process?

18   A    We do.  It's fairly extensive.

19   Q    Can you describe for the Court the process you undertook

20   before making the purchases in March 2020?

21   A    Yes.  Like I mentioned, it's a fairly rigorous

22   underwriting process throughout Apollo.  I think we take pride

23   in that for investors.

24        Typically for all investments, we will look at the

25   industries and target.  We will look at the company, the

THEO KWON - DIRECT BY MR. EHRLICH

1     business model, management team, competitive positioning,

2     long-term trend, short-term trends.

3          We like to take a 360 view of the company and the

4     industry.  In addition, if we're looking at credit

5     investments, we will diligence the credit agreements and

6     ancillary related agreements as well.

7     Q     And, Mr. Kwon, when you do all of that work, do you

8     typically memorialize it in a memo?

9     A     Yes.

10    Q     And did you do that in the case of Serta?

11    A     Yes, we did.

12          MR. EHRLICH:  And if I could ask Mr. Carlock, please

13    to bring up what's been marked at Debtor's Exhibit No. 15 in

14    the main case, bearing the ECF 861-9.

15    BY MR. EHRLICH:

16    Q     Mr. Kwon, it the first document behind Tab 1 in your

17    binder or you can look at it on the screen.

18          This is an email from someone named David Cheeon

19    (phonetic) to you, dated March 2nd, 2020.  Who is Mr. Cheeon?

20    A     Mr. Cheeon is a principal on my team.

21    Q     Okay and do you recognize this?

22    A     I do.

23          MR. EHRLICH:  Your Honor, I would move Debtor's 15

24    into evidence.

25          THE COURT:  Any objection?

1          MR. RUSINZYK:  No objection.

2          THE COURT:  It's admitted.

3       (Exhibit 15 received in evidence.)

4    BY MR. EHRLICH:

5    Q    Now, Mr. Kwon, if you turn to the next page of the

6    document, you'll se the first page of a memorandum to

7    interested parties from David Cheeon and Theo Kwon.

8          Can you explain to the Court what this memorandum is?

9    A    Yeah, so this is the investment memo summarizing our

10   diligence on Serta Simmons, the mattress industry and our

11   recommendation  to buy first lien term loans.  Looks like this

12   was issued in 2019 -- late 2019.

13   Q    And --

14   A    I have a practical question.  Is this mine?

15   Q    Yes, you can -- absolutely look at the hard copy there.

16   A    What exhibit is it?

17   Q    It's Tab 1.

18   A    Thank you.

19   Q    Were you involved in the preparation of this document?

20   A    Yes.

21   Q    Now, can you explain to the Court, at a very high-level,

22   what was Apollo's investment thesis around Serta Simmons in

23   November of 2019?

24   A    Yeah.  Like I mentioned, we spent over a year diligencing

25   the industry, the company.  Our -- if we take a step back, our

1    investment thesis was that we liked -- we thought the

2    long-term trend in the mattress industry were attractive.  You

3    had a stable industry with consolidated players.  Serta

4    Simmons, in particular, had up to that point, you know,

5    10 years running of number one market share.

6        We generally like large companies of scale.  We like

7    dominate players in the industry.  Specific with Serta

8    Simmons, you know, they also had strong customer recognition

9    with their brand in Serta, in Simmons, in Beauty Rest and the

10   recently acquired Tuft and Needle at that time.

11       That was the long-term opportunity.  The short-term

12   opportunity was the company had been going through a period of

13   disruption within their marketplace and within their

14   operations.

15       And the short-term opportunity we thought best realized

16   itself in the first lien debt that we recommended.

17   Q   So if I could direct your attention, please, Mr. Kwon, to

18   the paragraph at the bottom of this page that begins "For over

19   10 consecutive years."

20       And in the middle of that paragraph, it states, "As

21   presented throughout the memo, we have spent significant time

22   and effort diligencing these industry head winds and

23   production declines and do not believe these challenges impair

24   the franchise nature of Serta."

25       Can you explain how that relates to your investment

1    thesis, sir?

2    A    Yes, I mean that sums it up more eloquently than how I

3    described it.

4         Basically again, we felt very comfortable with the long-

5    term attractiveness of the industry and actually of the

6    company itself.

7         However, there were short-term issues that we need to

8    diligence.  After that diligence, which we summarized in this

9    memo, we felt comfortable that the long-term prospects for the

10   company were not impaired and that it was a good longstanding

11   company for that type.

12   Q    Now at this point in November of 2019, did Apollo buy

13   Serta debt?

14   A    In 2019, no.  We had recommended to buy it, but we did

15   not.

16   Q    And why didn't you?

17   A    It was approved by the investment committee.  Our target

18   price was, I believe according to the memo, 52.  The market

19   price just never got -- I'm sorry -- never got to that point.

20   So we never were able to buy.

21   Q    Now at this point in time when you're recommending the

22   purchase of Serta loans, did you believe that a restructuring

23   of Serta was necessarily going to occur?

24   A    We did.

25   Q    You did?

THEO KWON - DIRECT BY MR. EHRLICH

1    A     Yeah, that was basis.

2    Q     And if it had not occurred, would that be a negative for

3    Apollo?

4    A     Can you clarify?

5    Q     Yeah, what if a restructuring hadn't occurred?  How would

6    Apollo view that?

7    A     I'm assuming if you mean -- so our base case was that the

8    company, while strong in it's long-term prospects, had short-

9    term disruptions.  Mirror that with a capital structure where

10   they raised in 2016, they raised a significant amount of debt

11   to pay a dividend to the company and to the owners.

12         However, the profitability compared to 2016 versus when

13   we were underwriting the case, was significantly lower.

14   Meaning under our projection model the profitability of Serta

15   Simmons would never get to a -- would not likely get to a

16   point where it can be in a position to significantly refinance

17   the capital structure.

18         I.E., that's when the company expect would have to go

19   through restructuring.

20   Q     Now I'd like to turn to the final sentence of this

21   paragraph where it says, "By reflecting the industry pressures

22   into our underwriting, we believe a distress for control

23   investment into Serta's first lien term loan presents a

24   compelling opportunity to invest at the top of the capital

25   structure within an attractive risk return profile for a

1    franchise business we would want to own at the right price."

2    So a couple of questions for you about this, Mr. Kwon.

3    First, what do you mean in this memo by distress for control?

4    A    So this kind of goes back to the prior question.  Our

5    base case understanding, the most likely scenario was that

6    Serta Simmons, while again good from a long-term perspective,

7    would not to get to a point -- that it would be able to

8    refinance its capital structure.

9    And so it would have to restructure its debt through a

10   bankruptcy process.  And our view was that the first lien

11   loans would be basically the converted to equity at that point

12   in time.

13   Q    Now, how much Serta first lien loan did Apollo ultimately

14   acquire?

15   A    Ultimately?

16   Q    Yeah.

17   A    Around 190 million in par value.

18   Q    And do you know prior to the 2020 transaction, how large

19   the tranche was?

20   A    1.9 billion.

21   Q    So was Apollo ever attempting to acquire enough liens to

22   actually or loans, rather, to actually control the company?

23   A    No.  I mean, 1.9 is a big amount.  Especially -- well at

24   least at Apollo, we like to authorize certain amounts.  And as

25   we get to the market and buy more.  If we continue to like the

1    opportunity, we'll continue to scale.  But initial approval

2    was to buy a smaller amount and then reassess the situation

3    after that.

4    Q    Now, Mr. Kwon, do you -- when you do this type of

5    analysis, do you model downside scenarios?

6    A    We do, yes.

7    Q    And did you do that in the case of Serta?

8    A    Yes, we did.

9    Q    And did that include the company entering into a

10   potential liability management transactions?

11   A    Yes, it did.  That was included in both our base cases

12   and our company.

13   Q    Can you explain what it means that it was included in the

14   base case?

15   A    Yeah, I'm sorry.  At least at Apollo, when we underwrite

16   and evaluate investment, we model or project various

17   scenarios.  Typically they're broken down into three

18   scenarios.

19        If the based case, which is the most likely outcome from

20   our prospective and diligence that will occur, there's upside

21   case if things break the right way.  And you know, the company

22   is able to execute an opportunity that we know are available,

23   just, you know, that we don't conservatively incorporate into

24   our base case that's what's called an upside case.

25        And a down side case is the inverse of that.  It is

1    things break against the company and in a negative fashion.

2         Here we incorporated on top of just business operating

3    projection, we put this to the credit investment, additional

4    liability management action that the company could take

5    against the first lien lender.

6    Q    Okay and if I could direct your attention, Mr. Kwon, to

7    the page -- page 7 of the memo.  It's page 8 of 112 at the

8    bottom of the page.

9         And I'd like to address the paragraph at the bottom of

10   the page.  It says at the beginning of this paragraph that

11   Serta's credit documents from the 2016 recap are,

12   quote/unquote, "Sponsor friendly with sizable debt incurrence

13   and investment baskets.  As such, we've been very focused on

14   the ability of Serta to add additional senior secured debt

15   that neither layer or dilute the first lien term loan or

16   transfer value away from the credit group."

17        Can you explain the analysis that you were doing there?

18   A    Yeah, it's a good question.  So like I mentioned we pride

19   ourselves on diligent underwriting.

20        This is getting to the second part of that where we were

21   underwriting our views on the credit agreement.  And as we're

22   going through the credit agreement, there are specific

23   provisions that us and other debt investors will focus on.

24        They are debt incurrence baskets, investment baskets,

25   payment baskets.  Just the ability --

1          FEMALE SPEAKER:  What was the last --

2     BY MR. EHRLICH:

3     Q    If you could just speak a little bit more slowly for the

4     court reporter, Mr. Kwon?  Thank you.

5     A    I think the last one was restricted payment baskets.

6     That is the ability for the company to take dividends away

7     from the credit group to the company itself.

8          So we will scrutinize those provisions very closely.

9     Those are usually highly negotiated during the issuance and

10    creation of the credit agreement.  And with these specific

11    provisions they're quantified.

12         So the amount of value you can take away to a different

13    entity outside the credit group or dividend up to the

14    ownership group or incur above you is usually quantified and

15    so we did a very thorough underwriting of that.

16         And in our assessment was that it was a very sponsor

17    friendly credit document, that's why we described it as such.

18    Q    And when you say sponsor friendly, what do you mean?

19    A    Business friendly, company friendly.

20    Q    Now if we look at the last sentence of this paragraph,

21    you say, "We believe incorporating these aggressive capital

22    structure moves the transfer value and bolster liquidity at

23    the expense of the first lien position, reflect an appropriate

24    amount of conservatism in the base case given the flexible

25    debt documentation."

1         Do you see that?

2    A    Yes.

3    Q    So what does it mean that this was incorporated into your

4    base case?

5    A    Yeah, I think this refers to how we kind of created our

6    most likely scenario.  This -- our underwriting mirrored our

7    perspective on the credit agreement.  And so, because there

8    was pretty sizable baskets, as I talked about, those

9    provisions it was prudent to incorporate various liability

10   management transactions.  Because we felt as though the

11   company was heading to restructuring.  That the company would

12   pull on various levers to give them more time or evaluate the

13   credit agreement.

14   Q    And if I could ask you, please, to turn to the next page,

15   it's page 9 of 112.  There is a box at the top of the page

16   with what looks like a flow chart.

17        Can you explain to the Court what is represented here?

18   A    Yes.  So this is the summary of what we are discussing.

19   This incorporates various liability management transactions

20   that we had seen in the market occur very frequently.

21        And so with our market experience, mirrored again with

22   the underwriting of the credit agreement, we quantified and

23   incorporated various scenarios here into our underwriting.

24        So the very top is basically status quo.  If we buy the

25   first lien term loan and everything breaks our way, nothing

1        from a liability management perspective happens, then we would

2        have a very strong return for our investors.

3            We didn't think that was reasonable and prudent to

4        incorporate into our projections just given the state of the

5        company and given, again, the large provisions in the credit

6        agreement that we just discussed.

7            So we -- in -- for the sake of the discussion with our

8        credit committee -- sorry, investment committee, we layered in

9        various scenarios sequentially to show people that we have

10       been thoughtful about our underwriting and how we have

11       incorporated various what we thought was the most likely

12       avenue for liability management into our investment of the

13       first lien.

14           So, again this is kind of a spectrum of what can happen

15       here.  And then the second to last row is basically our base

16       case which incorporated sale lease back which incorporated a

17       dividend of the entire business, which was incorporated in

18       exchange of second lien loans.

19           So summing that all up.  How does that translate to our

20       returns and this is what you are seeing on the right-hand side

21       of the page.

22       Q    And Mr. Kwon, when you were doing this analysis in the

23       fall of 2019, did you account for in potential liability

24       management transactions, a transaction of a kind that was done

25       ultimately in June of 2020?

1    A    We did not.

2    Q    Now, I'd like to --

3         MR. EHRLICH:  You can take this down Mr. Carlock,

4    thank you.

5    BY MR. EHRLICH:

6    Q    I'd like to move ahead to March of 2020.  What was your

7    understanding of Serta's financial condition in March of 2020?

8    A    It was difficult like a lot of business during that time

9    due to COVID pandemic.

10   Q    And did you go back to the investment committee to seek

11   authority to once again purchase Serta loans?

12   A    Yes.  During this time, we refreshed a lot of our work on

13   a lot of different industries and companies at that point in

14   time.  The purpose was to incorporate the latest pandemic and

15   our views of the pandemic against the original underwriting.

16        For Serta Simmons, we did that and our view was that the

17   long-term value and a franchise nature of the company was

18   intact.  However, they were going through another short-term

19   disruption.  This one played out in terms of the COVID

20   pandemic.

21        How did that impact the company?  This company

22   manufactures mattress and they sell mattresses predominantly

23   in North America through brick and mortar retail channels.

24   Those retain channels were literally shut when the COVID

25   pandemic started.

1     So we incorporated various assumptions on how the

2  pandemic would play out.  And according to the assumptions, we

3  thought that the first lien term loans given that they were at

4  the top of the capital structure, would have been an

5  attractive investment albeit at a different price.

6  Q   Mr. Kwon, I'd like you please to turn to Tab 3 in your

7  binder.

8          MR. EHRLICH:  And Mr. Carlock, if you could bring up

9  Document 254-66, Defendant's 365?

10         (Pause in the proceeding.)

11  BY MR. EHRLICH:

12  Q   And Mr. Kwon, this is an email from someone named Gray

13  Son (phonetic), excuse me, to a large number of people to

14  including yourself subject, executive committee approval form

15  Serta term loan.

16         Do you recognize this?

17  A   Yes.

18         MR. EHRLICH:  Your Honor, I would move this document

19  in evidence, 365 Defendants.

20         THE COURT:  Thank you.

21         Any objection?

22         MR. RUSINZYK:  No, Your Honor.

23         THE COURT:  Thank you, it's admitted.

24      (Exhibit 365, ECF 254-66 received in evidence.)

25  BY MR. EHRLICH:

1    Q   Now, Mr. Kwon, if you could turn to the attachment to

2    this email to the very first page.  Can you explain to the

3    Court what this is?

4    A   Yes, so this is the official approval form.  After you

5    receive approval from the investment committee, this is the

6    document that -- documents, I'm sorry.  And this one was

7    official authority for us to buy $150 million of par first

8    lien term -- sorry -- par value first lien term loans in Serta

9    Simmons at a price (indiscernible).

10   Q   And did that price target decline because due to the

11   pandemic?

12   A   Yes, it did.

13   Q   And if we go to the middle of the second paragraph, it

14   says, "The investment team has conducted diligence on these

15   industry head winds and production declines and do not believe

16   these challenges impair the franchise nature of Serta."

17       So had your investment thesis fundamentally change

18   between November and March?

19   A   Not a long-term thesis, but again the short-term impact

20   of COVID needed to be incorporated.

21   Q   And was this approval granted?

22   A   It was.

23   Q   And did Apollo then, in fact, then go out into the market

24   and buy 150 million in term loans?

25   A   Yes, yes, we did.

THEO KWON - DIRECT BY MR. EHRLICH

1    Q    And it says here below the description, "Counterparty

2    open market transaction."  What did you understand that to

3    mean?

4    A    That the avenue of which we were going to buy term loans

5    was going to be not the company, but in the old market,

6    through brokers in our (indiscernible).

7    Q    Now by the end of March, had you successfully acquired

8    this amount of term loan?

9    A    I'm sorry, what was the tender?

10   Q    End of March?

11   A    I can't remember how much we purchased.  We did start

12   purchasing.

13   Q    If I could ask you to turn to Tab 7 in your binder,

14   Mr. Kwon?

15        MR. EHRLICH:  And Mr. Carlock, if I could ask you to

16   please Debtor's Exhibit 43.  It's ECF 861-37 in the main case.

17        Mr. Kwon, this is an email from a gentleman named David

18   Sambur to yourself dated March 27, 2020.  Who is Mr. Sambur?

19   A    Mr. Sambur is the co-head of the private equity group at

20   Apollo.

21   Q    And you write to him on March 27, "We picked up 9 million

22   base today.  We're at 140 million total.  Can represent close

23   to 150 million on the call."

24        So do you believe by the end of March you had acquired

25   close to 150 million in term loan?

1    A    Yes, as of March 27th, yes.

2    Q    Now around the time that Apollo started acquiring Serta

3    term loan in March 2020, did Apollo try to engage with the

4    company at all?

5    A    What's the time period?

6    Q    In March of 2020?

7    A    I believe so.

8    Q    And is there -- we refer to Mr. Cheong (phonetic) on your

9    team earlier.  Did Mr. Cheong try to reach out to the company?

10   A    Yes.

11        MR. EHRLICH:  And if I could ask you, Mr. Carlock,

12   to bring up Debtor's Exhibit 358, document 254-59 in the

13   adversary?

14   BY MR. EHRLICH:

15   Q    This is an email --

16   A    Which tab?

17   Q    Excuse me, I'm sorry about that, Mr. Kwon.  It's Tab 5.

18        This is an email chain that is between two individuals at

19   Serta Simmons.  But if you turn to the last page, you will see

20   an email from Mr. Cheong to Ms. McGuffy.  Do you see that?

21   A    Yes.

22   Q    First of all, do you recognize this email?

23   A    I do.

24        MR. EHRLICH:  We would move exhibit -- Defendant's

25   358 into evidence.

1          THE COURT:  Any objection?

2       (Pause in the proceeding.)

3          MR. RUSINZYK:  I'll object to hearsay reasons.

4          FEMALE SPEAKER:  I'm sorry?

5          THE COURT:  Any response?

6          MR. EHRLICH:  I really want to show the fact that it

7    was sent, not for the truth of the email.

8          THE COURT:  The objection is sustained.

9    BY MR. EHRLICH:

10   Q    Okay, well let me ask you this, Mr. Kwon:  Do you recall

11   instructing Mr. Cheong to reach out to the company?

12   A    Yes.

13   Q    And do you know why Mr. Cheong was reaching out to the

14   company?  For what reason?

15   A    Yeah, so we had done a lot of work on the company and

16   industry, but we had never been able to engage with the

17   company.  And we were buying their loans and we wanted to

18   reach out to let them know that we were you know, a creditor

19   with them.

20        We wanted to be supportive.  This was a tough time that

21   they were going through.  And if we could share -- if there

22   was anything that we could to help in terms of sharing what

23   we're seeing in other customer businesses, a company that we

24   owned or if there's just anything that we could do to support

25   them, that's why we reached out.

1    Q    And did the company respond to that outreach?

2    A    Not really.

3    Q    Well did they just not respond or did they tell you

4    something?

5    A    They responded, but they not want to engage.

6    Q    Now after Apollo began purchasing first lien Serta debt

7    again in March of 2020, did there come a time that Apollo

8    started talking to other holders of first lien Serta first

9    lien loans?

10   A    Yes.

11   Q    About your holdings in Serta term loans?

12   A    Yes.  Yes, and also just kind of sharing our perspective

13   on the industry, COVID, the economy, Serta Simmons the

14   company, yeah.

15   Q    And who did you begin speaking with about our holdings in

16   Serta term loan?

17   A    The firms were Angelo Gordon and Gamut.

18   Q    And how did it come to be that that dialogue got started?

19   A    As I recall they were inbounds into Apollo.  They had

20   heard that we were purchasing term loans in the market and

21   wanted to reach out to just establish a --

22   Q    And what was the purpose of coming together, at least in

23   the first instance?

24   A    In the very initial instance was, again, we had done a

25   lot of work on the sector, you know, Gamut and Angelo do

1   similar rigorous underwriting.  So, it was to kind of just

2   share perspectives on the industry, the company, state of --

3   state of the world essentially.

4        And then after that it involved into, well, we're lenders

5   of the company, they were as well.  And then just sharing

6   thoughts on that.

7   Q    Now, at some point did this group engage advisors in

8   connection with its holdings of Serta Simmons?

9   A    We did.

10  Q    Who did you engage?

11  A    We engaged PJT and Hoyt.

12  Q    And what was the purpose of engaging advisors?

13  A     I think at that point in time, again the company was

14  going through a significant period of destruction.  And they

15  were in the liquidity crunch, you know, again given their

16  revenues were impacted because their outlets were shut.

17       So they were facing a liquidity short fall and they were

18  reaching out to potential groups to get a solution for the

19  liquidity.  Also at the same time, I believe at that point

20  they were looking to potentially capture discount in the

21  market just given where the term loans were trading.

22  Q    And did Apollo continue to buy term loan in April of

23  2020?

24  A    Yes.

25  Q    And why did you do that?

1    A    We had the authority to continue buying.  Our investment

2    thesis still remained intact.  So we continued to buy because

3    we thought the opportunity was the right risk just for return

4    for investment.

5    Q    And did there come a time, Mr. Kwon, that Apollo entered

6    into an NDA with Serta Simmons?

7    A    Yes, our group did.

8    Q    And that included Apollo?

9    A    Yes.

10   Q    And did there come a time that the company solicited

11   proposals for restructuring from your group?

12   A    Yes.

13   Q    And do you recall generally the nature -- well, let me

14   ask you this:  Did the company propose an illustrative

15   transaction structure?

16   A    Yeah, to my recollection, they provided a structure that

17   they were looking to accomplish.  So they provided the initial

18   structure.

19   Q    And what were the broad contours of the structure that

20   they provided?

21   A    It was to move collateral through the provisions that we

22   discussed.  Through investment baskets into various new

23   entities that we created and to raise debt at those new

24   entities and also exchange loans into those entities --

25   recapture discount.

1    Q    And did your group, in response to that request for

2    proposal, in fact make a proposal to Serta?

3    A    We did.  We responded to their initial request.

4    Q    And if I could ask you, Mr. Kwon, please, turn to Tab 12

5    of the -- of your binder.

6    A    Yeah.

7    Q    And do you see here an email from a gentlemen at PJT.

8         MR. EHRLICH:  This is for the Record, Defendant's

9    82; it's document 248-82.

10   BY MR. EHRLICH:

11   Q    Do you see an email from someone at PJT.  That was your

12   advisor?

13   A    Yes, that's correct.

14   Q    To someone at Evercore, Mr. Shah.  Do you see that?

15   A    Yes.

16   Q    And who is Mr. Shah?

17   A    He was the advisor for the company.

18   Q    And did your group direct Mr. Cajigas (phonetic) to send

19   this email?

20   A    Correct.

21   Q    And if you turn to the next page, do you see a financing

22   proposal?

23   A    We do, yes.

24   Q    And do you recognize this document?

25   A    Yes.

1          MR. EHRLICH:  And I would move Defendant's 82 into

2    evidence.

3          THE COURT:  Any objection?

4          MR. RUZINSKY:  No, Your Honor.

5          THE COURT:  It's admitted.

6    (Exhibit 82, ECF 248-82, received in evidence.)

7    BY MR. EHRLICH:

8    Q    Now is this the proposal your group authorized to be sent

9    to the company on or about May 4th of 2020?

10   A    To my recollection, yes.

11   Q    And if we turn to the next page, which is 4 of 18 on the

12   ECF, page 2 of the slide deck, can you describe for the Court

13   at a high level the indicative financing proposal that your

14   group offered to the company?

15   A    Sure.  You have to excuse me.  It was some time ago.  It

16   was -- it was the creation of two entities.  One is a

17   non-guarantor subsidiary.  The other is an unrestricted

18   subsidiary.

19          The creation of those two entities and the framework was

20   to transfer collateral using the provisions in the credit

21   agreement specifically the missing baskets, to transfer

22   collateral into those entities and then to raise debt at those

23   various entities, 200 million of which was to provide the

24   company what we call new money, so fresh capital, to help them

25   with the liquidity crisis.

1          And the remaining was to exchange our loans at a discount

2     to help the company capture discount and delever the company

3     and exchange those loans into those non-guarantor and new

4     un-restricted subsidiaries.

5     Q    Now, Mr. Kwon, did the company accept this proposal?

6     A    No, they did not.

7     Q    And did a negotiation and exchange of term sheets ensue?

8     A    Yes.

9     Q    And roughly speaking, how many term sheets were exchanged

10    back and forth between the company on the one hand and your

11    group in the other?

12    A    Roughly?

13    Q    Roughly.

14    A    A few.

15    Q    And how long did that exchange -- the process the

16    exchange of term sheets continue?

17    A    When was this, May?  I think we're maybe two weeks, maybe

18    three weeks.  But a short period of time.

19    Q    Now if I could direct you -- your attention to Tab 16 in

20    your binder, which is marked as Debtor's Exhibit 303.  Did you

21    submit a Declaration earlier I the early stage of this case?

22    A    I'm sorry, I missed the tab.

23    Q    It's Tab 16.  Did you submit a Declaration early in this

24    case?

25    A    I did.

1     Q    And did you attach to that Declaration a series of term

2     sheets that were exchanged between your group on the one hand

3     and the company on the other?

4     A    That's correct.

5     Q    Okay.  And if we turn, for instances, to page 10 of 52.

6     A    (Indiscernible).

7     Q    Yep, do you recognize this?

8     A    Yes.

9     Q    And what is it?

10    A    This is a term sheet proposal for -- it's one of the term

11    sheet proposals offered by the company and on it looks like

12    May 19th.

13         MR. EHRLICH:  And Your Honor, I would offer

14    Debtor's 303.

15         THE COURT:  Any objection?

16         MR. RUSINZKY:  Your Honor, I have no objection to

17    the term sheets that are attached.  I do have an objection to

18    the declaration.

19         MR. EHRLICH:  And that's fine.  We happy to

20    reformulate the exhibit as simply the term sheets.

21         THE COURT:  If you'll just give me -- if you guys

22    can agree on the page numbers I'll just partially rip the

23    exhibit.

24         MR. EHRLICH:  We're going to have, Your Honor, at

25    the conclusion of the case, a series of stipulated exhibits.

1    And what we'll do is we will include the relevant pages in

2    that stipulation, if that's okay with Your Honor.

3              THE COURT:  Certainly.  Then I'll admit that portion

4    of 303, that reflect or that contain the series of term

5    sheets.

6         (Exhibit 303, term sheets only, received in evidence.)

7              MR. EHRLICH:  Thank you, Your Honor.

8              THE WITNESS:  And this is for the non-guarantor, if

9    necessary.

10             MR. EHRLICH:  Thank you.

11   BY MR. EHRLICH:

12   Q    Now if we turn ahead, Mr. Kwon, to page 30 of 52, do you

13   recognize this document?

14   A    Yes, I do.

15             MR. EHRLICH:  And if we look at the top of the page,

16   Mr. Carlock?

17   BY MR. EHRLICH:

18   Q    Do you see the date on that document, Mr. Kwon?

19   A    Can you say that one more time?

20   Q    Yeah, do you see the date on that document?

21   A    Yes, it looks like it's May 30th.

22   Q    And do you know if that's the last term sheet that your

23   group sent to the company over this negotiation that began a

24   few weeks earlier?

25   A    I can't recall.  I have to kind of flip to the series of

1    the term sheets, but around end of May was when our last term

2    sheet was signed.

3    Q    And if you go a few pages beyond that to page 48 of 52,

4    Mr. Kwon.  Do you recognize this document?

5    A    I'm sorry, Mr. Ehrlich, what page?

6    Q    48 of 52.

7    A    Yes, I do.

8    Q    And when is this document dated?

9    A    Looks like June 3rd, 2020.

10   Q    And do you know if there were any further term sheets

11   exchanged after this date?

12   A    I don't believe so.

13   Q    What happened in the negotiation after you received this

14   term sheet?

15   A    To my recollection, we had a call with the company, their

16   sponsor and advisor.  Basically all hands call and tried to

17   get to an agreement on the broader terms -- not the finer

18   terms, but the broader issues that were still outstanding.

19        That's what happened.

20   Q    And was there any further negotiation after that call?

21   A    No, not after the call.

22   Q    What happened next?

23   A    After the call the other side went dark.  And a few hours

24   thereafter, we had heard that they were executing a deal with

25   another proposal -- specifically the other person lenders.

1    Q    Now at this point in time, Mr. Kwon, do you have any

2    certainty as to what the final agreement between -- if your

3    group and Serta had reached one, what it would have looked

4    like?

5    A    I'm sorry can you repeat it?

6    Q    At this point in time, June 3rd, June 4th of 2020, do you

7    have any certainty as to -- if you had reached an agreement

8    with Serta what it would have looked like?

9    A    No.

10    Q    Why not?

11    A    I would characterize this still at being at the

12    preliminary stages.  These proposals were non-binding, subject

13    to a significant amount of diligence -- both business

14    diligence, people diligence.  So, these were close to

15    executing them.

16    Q    One element of the proposal that was included was

17    identifying collateral that might be loaned against, right,

18    Mr. Kwon?

19    A    Yes.

20    Q    And had that collateral been finalized?

21    A    No.

22    Q    Had it been valued?

23    A    Not to my recollection.

24    Q    Another element of the potential transaction was an

25    exchange of loans.  Had the company and your group agreed on

1   exchange rate?

2   A    To my recollection, no.

3   Q    And this proposal would have had an element of new debt,

4   correct?

5   A    Correct.

6   Q    And had there been any agreement about the pricing of

7   that debt?

8   A    To my recollection, no.

9   Q    Had you begun any legal documentation of this proposal?

10  A    No.

11  Q    Now while you were in negotiating with Serta in May of

12  2020, did Serta ever ask your group to include any other

13  lenders?

14  A    Not to my recollection.

15  Q    And did you reach out to any other lenders to seek to

16  include them in your group as you were negotiating in May of

17  2020?

18  A    No.

19  Q    Why not?

20  A    This is during May?

21  Q    Yes.

22  A    So in May we were bound to the NDA, confidentiality

23  agreement that we had to place.  And I believe that restricted

24  our ability to talk to other lenders.

25  Q    Now you did have a conversation in May, Mr. Kwon, -- did

1    you have a conversation in May, I should say, with Eaton

2    Vance?

3    A    I did, yes.

4    Q    And if I could ask you to turn to Tab 13 in your binder.

5    And that's Defendants Exhibit 146.  It's Document 250-48 in

6    the adversary.

7         And this is an email between someone named Patrick

8    Daniello and you, dated May 28th, 2020.  Do you see that?

9    A    I do, yes.

10   Q    And it says, "Theo, sorry for the delay" -- first of all,

11   do you know if Eaton Vance had reached out to Apollo or Apollo

12   had reached out to Eaton Vance?

13   A    No, this was an in bound.  So they reached out to a

14   partner of mine.

15   Q    Okay.  And it says here, "Happy to chat today.  I know we

16   were both under NDA and know we want to respect that, but I

17   think we can at least introduce ourselves and chat very high

18   level."

19        Do you see that?

20   A    Yes.

21   Q    And did you, in fact, speak to Mr. Daniello on or about

22   this date?

23   A    On or about, yes.

24   Q    And do you recall that conversation?

25   A    I do.

1    Q    And what was the sum and substance of the conversation?

2    A    I would say actually that this email sums it up pretty

3    well.  It was a very short conversation.  We were very

4    respectful of the NDA that we had in place.

5         And like I said, it was very short.  He wanted to

6    introduce himself to me and likewise to him and we just said

7    let's keep an open dialogue on going.

8         There really wasn't much of substance.

9    Q    Now you said earlier, Mr. Kwon, that you learned that

10   Serta had elected to pursue a transaction with a different

11   group of lenders, right?

12   A    Yes.

13   Q    And was Apollo ever invited to participate in that

14   transaction in any way?

15   A    Not to my understanding.

16   Q    And what did you learn about the proposal -- well, first

17   of all how did you learn about the fact that the company had

18   made that decision to go a different direction?

19   A    Yeah, as I recall happened that after the negotiations

20   stopped abruptly.  I believe our group -- not us, but our

21   group had found out that they were doing a transaction with

22   another company.  So we had learned out about it from others.

23   Q    And did you ultimately learn the terms of the transaction

24   that was done?

25   A    You mean at that point in time?

1    Q    Well first immediately.

2    A    Immediately, no.  Ultimately, yes, just because.

3    Q    And what was your reaction when you learned the terms of

4    the transaction?

5    A    Very surprised, very shocked.

6    Q    Why were you surprised and why were you shocked?

7    A    A deal like this, to my knowledge, had not been done.

8    This was a very novel, new deal.  Pretty ground breaking, and

9    you know the general markets felt that way.

10        This was one where the waterfall was re-engineered.

11   Collateral was moved, but the waterfall was re-engineered so

12   that our first lien claims were not first lien any more.

13   Q    And was this type of transaction the type of transaction

14   that you diligence when you were doing your work in 2019

15   reflected in Exhibit 15?

16   A    It was not reflected.

17   Q    And why wasn't it reflected?

18   A    Because we had not seen a transaction like that before.

19   Not where the waterfall was protected.  And -- but, however,

20   moving collateral, creating unsubs, and non-guarantor subs and

21   doing dropdown transaction.

22        Like I said, that was pretty familiar in the market at

23   the point in time.  So we took, like I said, our market

24   experience and incorporated what we had seen to be, you know,

25   pretty frequent in liability management transaction like that.

THEO KWON - DIRECT BY MR. EHRLICH

1          We had not seen a transaction like this.  This was, like

2     I said, very novel, very different.

3     Q    Now Apollo is a private equity sponsor, right, Mr. Kwon?

4     A    Yes.

5     Q    And so it is the primary owner of portfolio companies; is

6     that correct?

7     A    Correct.

8     Q    Do those portfolio companies borrow through loan

9     agreements in the market?

10    A    Yes, they do.

11    Q    And in your experience, has any of those companies needed

12    to do a restructuring transaction?

13    A    Yes.

14    Q    And have you had personal involvement in any such

15    transaction?

16    A    I did, yes.

17    Q    Which one?

18    A    Claire Stores.

19    Q    And what was the nature of the transaction there?

20    A    As I recall it was a dropdown transaction where we

21    created various new subsidiaries and we raised debt and

22    exchanged debt through those series.  Debt transaction when we

23    did it, was open to all members.

24    Q    Now, your -- the transaction that you had been

25    negotiating with Serta, at the time was just on the behalf of

THEO KWON - DIRECT BY MR. EHRLICH

43

1    your group, correct?

2    A    That's correct.

3    Q    Was there anything that prevented it from potentially

4    being open to others?

5    A    Not --

6    Q    In the transaction structure?

7    A    Not that I'm aware of.  Nothing to prevent it.

8    Q    Now are you aware that the Plaintiffs in this case have

9    asserted that certain transactions Apollo has participated in

10   are similar to the June 2020 transaction?

11   A    I'm aware.

12   Q    And do you recall being asked at your deposition about a

13   couple of those?

14   A    Yes.

15   Q    And do you recall what they are?

16   A    They were two specifically, Mytel and Envision

17   (phonetic).

18   Q    And when in time did those transactions occur in relation

19   to when the Serta transaction occurred?

20   A    You can keep me honest, but the Serta transaction

21   occurred call it late June 2020.  And Mytel and Envision, to

22   my understanding occurred in 2022.  So call it roughly two

23   years after the Serta.

24   Q    And did you have any personal involvement in those

25   transactions with respect to Apollo?

THEO KWON - DIRECT BY MR. EHRLICH

1    A    No, I did not.

2    Q    Based on your knowledge, did Apollo play a roll in

3    structuring or leading those transactions?

4    A    No.  To my understanding we were merely a participant.

5    Q    Now the Plaintiffs in this case say, in essence, the

6    transaction that we were negotiating that ultimately was not

7    finalized was in substance the same thing they were doing.

8    That we were basically doing the same thing.

9         What's your reaction to that statement?

10   A    I don't agree with that.  How you execute it matters.

11   That the transaction that we were looking at, like I

12   mentioned, was a transaction that the market had generally

13   seen and had grown accustomed to.

14        They were utilizing highly negotiated provisions and

15   credit agreement that quantified how much collateral that a

16   company can move from one entity to another.

17        And corporations, whether distressed or in good standing

18   or stressed have used those provisions to do just that, move

19   collateral.  And so our transaction was based off of, you

20   know, similar thing.

21        This transaction was significantly different. Like I

22   mentioned, one, we had not seen it in the market.  And then

23   two, this transaction did not move any collateral.  The

24   collateral stayed in place.  Fundamentally stayed in place.

25        This transaction, though, did re-engineered the waterfall

1     where our first lien loans, which as we mentioned in our memo,

2     top of the capital structure which is how us and our investors

3     got comfortable with the risk was now near the bottom of the

4     capital structure.

5         We were first lien loans when we bought them in March to

6     May 2020.  After this transaction, we were -- what's the

7     right -- there was first lien first out.  First lien second

8     out.  There was a first lien third out tranche that was

9     created.  And then we were first lien fourth out.

10        So even though we were first lien in name, we were fourth

11    out in substance in technical.

12    Q    And were those tranches superior to you claiming on the

13    same collateral?

14    A    Same collateral, yes.  Through the waterfall, we are

15    literally, you know, one of the last in line.

16    Q    And when you were underwriting the deal, how important

17    was your first claim on the collateral to Apollo as it was

18    making its investment decision?

19    A    Fundamental.  Fundamental.  That's how we price our risk.

20    That's how we price the target prices for the loans we want to

21    buy.  All of our returns, all of our projections were based

22    off an understanding that we were first in debt.

23    Q    Now did there come a time after the June 2020 transaction

24    was announced that any rating agencies took action on the

25    Serta first lien loans that you held?

1    A    My understanding, yes.

2    Q    And what rating action do you recall?

3    A    I remember pretty immediately thereafter there was a

4    Moody's report that came out and downgraded the company.

5           MR. EHRLICH:  If I can ask you, Mr. Carlock, to

6    bring up Debtor's Exhibit 239?

7           THE WITNESS:  Where's that?

8    BY MR. EHRLICH:

9    Q    It's the final tab in your binder, 17.

10         (Pause in the proceeding.)

11   Q    And if we go to page 2 of 10.  Do you recognize this

12   document, Mr. Kwon?

13   A    Yes, I do.

14   Q    And was this something you read at the time?

15   A    Yes.

16   Q    And I'd like to direct your attention to the next page of

17   the document where it says, "Additionally Moody's believes the

18   term loan lenders who do not consent to the contractual

19   potentially be left with little or no remaining collateral

20   coverage in Serta Simmons, as well as in a position that is

21   supported -- subordinated to new higher priority debt."

22        And Mr. Kwon, that statement about being "left with

23   little or not collateral coverage" was that significant to you

24   as you thought about this transaction?

25   A    Absolutely.  Yes.

THEO KWON - DIRECT BY MR. EHRLICH

1    Q    Why?

2    A    Because that's not what we expected.  We expected first

3    lien on the collateral piece.

4    Q    And why was the absence of collateral important,

5    Mr. Kwon?

6    A    Sorry, the absence?

7    Q    Yeah, the fact that there'd be little or no remaining

8    collateral for your loans.  Why did that matter?

9    A    I mean, that's fundamental to any loan, the underlying

10   value of collateral.

11   Q    And what is the effect of collateral if you end up in a

12   courtroom like this one day?

13   A    I think you're seeing it play out.  I believe under the

14   restructuring plan, our class as it stand right now, if we

15   voted in favor of the plan, would receive 4 percent of the

16   equity.  And the other class, the favorite lenders, are

17   receiving close to 70 percent of equity.

18        So there's a vast fundamental difference of recovering

19   value between their class and ours.

20   Q    Is so that even though your loans are secured by the same

21   collateral?

22   A    Same collateral.  We are fundamental different in the

23   waterfall.

24   Q    And is that what you thought you were getting when you

25   bought these loans in March of 2020?

1    A    Absolutely not.

2    Q    Thank you, Mr. Kwon.  I have nothing further.

3              THE COURT:  All right thank you.

4              Anyone else, excuse me, that opposes confirmation

5    and questions for Mr. Kwon?

6              Mr. Liberman.

7         (Pause in the proceeding.)

8              MR. LIEBERMAN:  Neil Lieberman, Schuster and

9    Goldberg on behalf of LCM.

10                        CROSS-EXAMINATION

11   BY MR. LIEBERMAN:

12   Q    Good morning, Mr. Kwon.

13   A    Good morning.

14   Q    Have you and I ever spoken before this?

15   A    Never.

16   Q    Has Apollo ever discussed LCM's litigations against the

17   Plaintiff's with anyone at LCM?

18   A    Never -- not to my understanding.

19   Q    Great, thank you.

20        Is Apollo contributing directly or indirectly to any of

21   the funding of LCM's litigation against any of the Plaintiffs?

22   A    Not to my understanding.

23   Q    Does Apollo know who, if anyone, is funding LCM's

24   litigation?

25   A    Not to my understanding.

THEO KWON - CROSS BY MR. LIEBERMAN

1  Q    Does Apollo have any knowledge regarding the funding of

2  LCM's litigation against any of the Plaintiffs?

3  A    I'm sorry, can you repeat the question?

4  Q    Sorry.  Does Apollo have any knowledge regarding the

5  funding of LCM's litigation against any of the Plaintiffs?

6  A    Not to my understanding.

7  Q    Does Apollo have any reason to believe that LCM is not

8  funding its own litigation?

9  A    Not to my understanding.

10 Q    Thank you very much.

11            THE COURT:  All right, anyone else?

12            Mr. Millar?

13            MR. MILLAR:  Oh, no.  Thank you, Your Honor.

14            THE COURT:  Mr. Rusinzky, any Cross?

15            MR. RUSINZKY:  Yes, Your Honor.

16            THE COURT:  All right, please let me switch over.

17            THE WITNESS:  Judge, can I just stand up and stretch

18 my legs?

19            THE COURT:  Absolutely.

20        (Pause in the proceedings.)

21            THE WITNESS:  Thank you.

22            THE COURT:  Can we get Mr. Kwon a fresh bottle of

23 water?

24            Let me ask you, Mr. Kwon, do you need five minutes

25 just to walk about the floor would that help you?

1          THE WITNESS:  Yeah, if you don't mind.

2          THE COURT:  I don't mind at all.  Why don't we do

3      this, can we come back at 10:00 o'clock?

4          (No audible response.)

5          THE COURT:  All right we'll be adjourned until

6      10:00 o'clock.

7          THE CLERK:  All rise.

8          (Recess taken from 9:55 a.m. to 10:01 a.m.)

9                          AFTER RECESS

10         (Witness resumes stand)

11         THE COURT:  All right.  We are back on the Record in

12     the jointly administered cases under 23-90020, Serta Simmons

13     Bedding, LLC.

14         Mr. Ruzinsky, I've transferred control to your IT

15     person.  I think we're ready to go.

16         MR. RUZINSKY:  Thank you, Your Honor.

17         May I approach the witness just with some binders?

18         THE COURT:  Absolutely.  Thank you.

19         (Participants confer)

20                      CROSS-EXAMINATION

21     BY MR. RUZINSKY:

22     Q    Mr. Kwon, good morning.

23     A    Good morning.

24     Q    You would agree with me, would you not, that Apollo has

25     extensive experience in the syndicated credit market?

THEO KWON - CROSS BY MR. RUZINSKY

1     A     Yes.

2     Q     And Apollo has been a party to many syndicated credit

3     agreements, correct?

4     A     Correct.

5     Q     So many that you couldn't quantify that for us here

6     today, right?

7     A     (No audible response).

8     Q     I'm going to have to ask you to speak up a little louder,

9     right into --

10    A     No.

11    Q     -- the mic.

12    A     No.

13    Q     Thank you.  Okay.

14          And Apollo funds have upwards of $100 billion or more

15    invested in credit instruments alone.  Isn't that correct?

16    A     Upwards of 100 billion, yes.

17    Q     Plus hundreds of billions of dollars in additional assets

18    under management, right?

19    A     Close to 600.

20    Q     Apollo employs hundreds of investment professionals,

21    correct?

22    A     (No audible response).

23    Q     And is it fair to say that Apollo is a sophisticated and

24    repeat player in the credit markets?

25    A     (No audible response).

1    Q    And you would agree with me, would you not, that Apollo

2    competes with a lot of the Plaintiffs in this case?

3    A    Correct.

4    Q    And you would absolutely agree with me that Apollo works

5    every day to be a fair, ethical, and responsible partner,

6    correct?

7    A    Absolutely.

8         THE COURT:  Mr. Kwon, can I ask you just to get --

9    sit a little closer to the microphone?

10         THE WITNESS:  Yes.

11         THE COURT:  Thank you.  That will help everybody.

12         THE WITNESS:  How is this?

13         THE COURT:  That's perfect --

14         MR. RUZINSKY:  Yes.

15         THE COURT:  -- if you can --

16         THE WITNESS:  Okay.

17         THE COURT:  -- maintain that.

18    BY MR. RUZINSKY:

19    Q    Mr. Kwon, you would also agree with me, would you not,

20    that Apollo always acts with integrity and sound ethics --

21    excuse me -- has always acted with integrity and sound ethics

22    in participating in the Ad Hoc Group proposal, that alternate

23    2020 transaction?

24    A    Yes.

25    Q    And in negotiating that Ad Hoc Group proposal transaction

THEO KWON - CROSS BY MR. RUZINSKY

1    that never got consummated, you would also agree with me that

2    Apollo, at all times, acted in good faith.

3    A    Yes.

4    Q    Before purchasing the first lien debt that Apollo now

5    owns, it did a lot of significant due diligence, right?

6    A    Correct, yes.

7    Q    And that took place for several years before the 2020

8    purchases, correct?

9    A    Correct.

10   Q    You researched Serta Simmons, right?

11   A    Correct.

12   Q    You researched the industry.

13   A    Correct.

14   Q    You did a really deep underwrite, correct?

15   A    Correct.

16   Q    And Apollo takes pride in its diligence, right?

17   A    Correct.

18   Q    And as part of your deep underwrite, you carefully

19   reviewed the credit agreement, right?

20   A    That's correct.

21   Q    So, on January 1st, 2020, Apollo owned no Serta Simmons

22   debt.  Is that correct?

23   A    Can you repeat the date, please?

24   Q    Date January 1, 2020.

25   A    Yeah.  We did not own any debt.

THEO KWON - CROSS BY MR. RUZINSKY

1   Q    Okay.  And the 2020 purchases of Serta 1-L debt began in

2   March of 2020, correct?

3   A    (No audible response).

4   Q    You knew there was a risk at the time of those purchases

5   that the debt might not be repaid in full, correct?

6   A    Correct.

7   Q    In fact, you thought it was more likely than not that

8   Serta Simmons would have to go through a bankruptcy

9   restructuring process, correct?

10  A    Right.

11  Q    And that was the base case you were talking about

12  earlier, correct?

13  A    Correct.

14  Q    So, even though you thought a bankruptcy restructuring

15  process was the likely result, Apollo kept purchasing Serta

16  debt in the Spring of 2020, correct?

17  A    Correct.

18  Q    And by March 2 -- March 27, 2020, Apollo owned $140

19  million face amount of Serta Simmons debt, correct?

20  A    That's correct.

21  Q    And by May of 2020, Apollo owned $192 million of Serta

22  first lien debt, correct?

23  A    Sorry.  What was the date again?

24  Q    May of 2020.

25  A    That sounds about right, yes.

1    Q    And 192 million face amount was 10 percent of the 1-L

2    debt.  Is that correct?

3    A    Yes.

4    Q    And that was purchased at an average cost of about

5    45 percent to the face of the debt, correct?

6    A    That sounds about right.

7    Q    By late March 2020, Apollo had entered into ongoing

8    discussions with two other companies, Gamut and Angelo Gordon,

9    correct?

10   A    (No audible response).

11   Q    And the plan was to work together and engage advisors in

12   connection with Serta Simmons, right?

13   A    I'm sorry.  Can you repeat the question?

14   Q    Sure.  The plan was to work together and engage advisors

15   in connection with Serta Simmons, right?

16   A    Can you clarify what you mean by the "the plan"?

17   Q    Your intent at that time was to work together and engage

18   advisors, Apollo, Angelo Gordon, and Gamut.

19   A    Not initially.  Like I said, you know, initially, we were

20   just, you know, sharing notes and perspectives.  That did

21   evolve that way, just given the circumstances of the company.

22   Q    And when do you believe that commenced?

23   A    It moved pretty fast, but it was, call it "late March."

24   Q    All right.  And Apollo began splitting purchases of Serta

25   1-L debt with Gamut, correct?

1    A    Yes.

2    Q    And the split was 70 to Apollo, 30 for Gamut?

3    A    To my recollection, yes, for certain purchases.

4    Q    And by the end of March 2020, you began exploring

5    potential transaction structures in connection with Serta

6    Simmons, correct?

7    A    I'm sorry.  Can you repeat the date again?

8    Q    The end of March 2020.

9    A    I believe so.

10   Q    You would agree with me that, at all times, the group

11   that Apollo was a party to -- that three-party group, the Ad

12   Hoc Group, Apollo, Gamut, and Angelo Gordon -- it only

13   consisted of those parties and there was none others.  Is that

14   correct?

15   A    That's correct.

16   Q    The credit agreement, the 2016 credit agreement for Serta

17   Simmons, was rigorously scrutinized by Apollo, correct?

18   A    Correct.

19   Q    And you especially scrutinized Serta Simmons' ability to

20   layer or move assets or reduce the value of loans that you

21   would be buying, correct?

22   A    Correct.

23   Q    And you concluded that the credit agreement, the 2016

24   credit agreement, was very loose, right?

25   A    Correct.

THEO KWON - CROSS BY MR. RUZINSKY

1    Q    And by "loose," you mean company friendly, right?

2    A    Company friendly with the respect to the ability to move

3    assets and execute liability management transactions that we

4    had seen in the market, yes.

5    Q    So is that the only way it was company friendly?

6    A    That -- when we describe it was "sponsor friendly,"

7    "loose," that is in specific reference to those provisions

8    that I mentioned before:  Ability to move assets, ability to

9    execute dividends, ability to incur senior debt, those

10   specific provisions because those are based off of, again, our

11   -- our historical experience, as you mentioned, being a

12   prevalent participant in the syndicated markets.

13        (Pause in the proceedings.)

14   Q    And at the time that Apollo bought Serta 1-L debt in

15   2020, Apollo understood that a dropdown transaction was

16   possible, correct?

17   A    Yes.

18   Q    And the dropdown transaction involved setting up a new

19   entity, transferring collateral, and lending against that

20   collateral, correct?

21   A    Correct.

22   Q    The existing first lien holders in a dropdown transaction

23   would lose priority with respect to claims against any

24   transferred collateral, correct?

25   A    That's correct.

1    Q    So, as Apollo began making its purchases in 2020, it

2    recognized that transactions might occur where it would lose

3    priority over certain Serta Simmons assets, correct?

4    A    (No audible response).

5    Q    Now, because the credit agreement was loose, Apollo

6    wanted to drive the process and be aggressive, right?

7    A    Can you restate that question?

8    Q    Sure.

9        Because the credit agreement was loose, Apollo wanted to

10   drive the process and be aggressive, correct?

11   A    I'm sorry.  What's that referring to?

12   Q    I'm referring to Apollo's approach with respect to Serta,

13   with a loose credit agreement.

14   A    Not -- not necessarily.

15       I'm sorry.  Can you repeat that question again?

16   Q    Sure.

17           MR. RUZINSKY:  Let me go ahead and ask Tim if you

18   can please pull up Exhibit 43, Debtors' Exhibit 43.  It is

19   ECF 861-37.

20           THE WITNESS:  I'm sorry.  And --

21   BY MR. RUZINSKY:

22   Q    And Mr. Kwon, it will be Tab 2 in the smaller of the two

23   binders that I gave you.

24   A    Thank you.

25   Q    You're welcome.

1          (Pause in the proceedings.)

2     Q    Now this is a couple of emails between you and David

3     Sambur in late March of 2020, correct?

4     A    Yes.

5     Q    And David Sambur is your colleague at Apollo, right?

6     A    Yes.

7     Q    And about midway through the first page of this exhibit,

8     Debtors' Exhibit 43, there's an email from you to David

9     Sambur, March 27, 2020, 9:39 a.m.  And you sent that email to

10    David Sambur then, right?

11    A    Yes, that's right.

12    Q    All right.  And you received the email that he sent back

13    on March 27th, correct?

14    A    Yes.

15          MR. RUZINSKY:  Okay.  To the extent this is not

16    already admitted, I would offer it for admission.

17          THE COURT:  It was talked about, but it was not

18    offered or admitted.  So you're moving to introduce the

19    exhibit?

20          MR. RUZINSKY:  Yes, I am, Your Honor.

21          MR. EHRLICH:  No objection.

22          THE COURT:  Any objection?  I'm sorry.

23          MR. EHRLICH:  No objection, Your Honor.

24          THE COURT:  Thank you.  Then it's admitted.

25          (Exhibit 43, ECF 861-37, received in evidence)

1          MR. RUZINSKY:  Thank you, Judge.

2     BY MR. RUZINSKY:

3     Q    Mr. Kwon, if you would please look to about two-thirds of

4     the way down.

5          MR. RUZINSKY:  And Tim, if you could please

6     highlight the second bullet point there.  There we go.

7     BY MR. RUZINSKY:

8     Q    Mr. Kwon, it says -- and this is you emailing David

9     Sambur.  It says:

10         "Josh at PJT, they're going to send ideas they had on

11    Serta, but they're thinking about it just like we were, want

12    to be driving the process given loose docs, but be

13    aggressive."

14         Do you see that?

15    A    Yes.

16    Q    Okay.  And this was you describing your -- part of your

17    conversation with Josh at PJT.  Is that correct?

18    A    That's correct.

19    Q    And PJT was the advisor -- one of the advisors for the Ad

20    Hoc Group that Apollo was a part of, right?

21    A    That's correct.

22    Q    And so you also say here:

23         "Thinking about it just like we were."

24         Right?

25    A    Yes.

THEO KWON - CROSS BY MR. RUZINSKY

1    Q    Okay.  So what Josh at PJT was suggesting was just the

2    way you were thinking about it, right?

3    A    Yes.  I don't recall what I was thinking about at that

4    time, three years ago, but yes, that's what I stated.

5    Q    Well, wouldn't it be what you thought was important

6    enough to write in this email, which is wanting to drive the

7    process, given loose docs, and be aggressive?

8    A    I -- I think that the last word is important,

9    "aggressive."  I can't recall the specific context -- sorry,

10   the specific context.  This could be in relation to --

11   remember, the company had reached out and had specific terms

12   that they were looking for, new money and also capturing

13   discount.

14        This could, on one hand, be taken as we want to be

15   aggressive to hit what the company wants and be constructive

16   to them.  It -- that could be how I was messaging this.

17        I don't recall the specifics of this one bullet point in

18   an email three -- three years ago.

19   Q    And it could also be just as likely that you wanted to be

20   aggressive in forcing the company to a place where Apollo

21   wanted to be, but the company didn't necessarily want to be,

22   right?

23   A    What does that mean?

24        MR. RUZINSKY:  Would you please read back the

25   question?

1          STENOGRAPHER:  Sure.

2          "And it could also be just as likely that you wanted

3     to be aggressive in forcing the company to a place where

4     Apollo wanted to be, but the company didn't necessarily want

5     to be, right?"

6          (Readback from Stenographer.)

7          THE WITNESS:  The reason I'm -- I'm -- I'm

8     questioning that is:  Remember, we, at that point in time, had

9     $150 million in loans, we had less than 10 percent of the

10    loans.  I don't understand how we could force the company to

11    be in a place they didn't want to be.

12          This was in reaction to a proposal that they were

13    looking for, the company.  There were terms they were looking

14    for, dollar amounts they were looking for to help fund their

15    liquidity.  We had no leverage here, so I don't understand how

16    we could be forcing the company to a position that they don't

17    want to be in.

18    BY MR. RUZINSKY:

19    Q    So you wanted terms that were favorable to Apollo and the

20    other members of the Apollo Group, right?

21    A    That -- that could be one meaning of "aggressive."

22          The other meaning could be we want to be aggressive to

23    make sure we get the company what they want, so they transact

24    with us.

25    Q    And sitting here today, you can't tell us which one it

1   is, right?

2   A     Yeah.  I mean, it could go both ways.

3            THE COURT:  So, Mr. Kwon, I'm having a hard time

4   reconciling that.  If you could just help me.

5            How is it that you used the term "aggressive," in

6   terms of "give the company what they want"?  I mean, if you

7   give the company what they want, how is that being aggressive?

8   You're just giving them what they want.

9            THE WITNESS:  "Aggressive" in the context of a

10  competitive bid.

11           THE COURT:  Ah --

12           THE WITNESS:  So --

13           THE COURT:  -- so you didn't want -- you didn't want

14  someone to put something better on the table, that's what you

15  meant by "aggressive," let's go ahead and give them what they

16  want sooner, rather than later, so that nobody else is a

17  player?

18           THE WITNESS:  Yeah.  I think, for example, you know,

19  they were looking for terms on -- on new money, they were

20  looking for 200 million.  You know, cash, at that point in

21  time, was very, very valuable.

22           THE COURT:  Got it.

23           THE WITNESS:  "Aggressive" could mean hit -- hit the

24  bid on the -- the quantum, 200 million, give them what they

25  want, let's not nickel-and-dime and say we were going to give

1        them 150 --

2                    THE COURT:  Okay.

3                    THE WITNESS:  -- or 170 --

4                    THE COURT:  That's very helpful.  Thank you.

5                    THE WITNESS:  No problem, Judge.

6                    MR. RUZINSKY:  Thank you, Judge.

7                    THE COURT:  Sorry for the interruption.

8                    MR. RUZINSKY:  No problem at all, Judge.

9        BY MR. RUZINSKY:

10       Q    Mr. Kwon, by the end of March 2020, Apollo began working

11       with its advisors on proposals that it could offer to Serta

12       Simmons, whereby it would take Apollo's paper, the 1-L debt

13       that Apollo owned, and it would be put in a more senior

14       position, correct?

15       A    I'm sorry.  I missed the date.

16       Q    Late -- the end of March 2020.

17       A    Yeah, that's about right.

18            This was, again in reaction to the proposal from the

19       company.

20                    MR. RUZINSKY:  Tim, would you please pull up

21       Exhibit 48, Debtors' Exhibit 48.  It's ECF 861-42.

22       BY MR. RUZINSKY:

23       Q    And Mr. Kwon, it's Tab 5 in your binder there.

24       A    Thank you.

25       Q    You're welcome.

1          (Pause in the proceedings.)

2     Q    And Mr. Kwon, this is an email from you to Andrew Jhawar

3     at Apollo, correct?

4     A    Correct.

5     Q    He's your colleague there?

6     A    He is.

7     Q    And you sent this email on March 30, 2020, to Andrew

8     Jhawar, correct?

9     A    That's correct.

10          MR. RUZINSKY:  Your Honor, if this is not already

11     admitted, I would ask that it be admitted.

12          MR. EHRLICH:  No objection.

13          THE COURT:  Thank you.  Let me just check my list.

14          (Pause in the proceedings.)

15          THE COURT:  I don't show it as being admitted, so

16     we'll admit 48.

17          (Exhibit 48, ECF 861-42, received in evidence)

18          MR. RUZINSKY:  Thank you, Your Honor.

19     BY MR. RUZINSKY:

20     Q    And Mr. Kwon, in the first email at the top there, in the

21     second paragraph, you say -- you start by saying:

22          "We updated our Serta models to account for earlier

23     restructuring scenarios."

24          And that was true, right?

25     A    Yes.

1    Q    All right.  And then a couple of lines down --

2            MR. RUZINSKY:  Tim, would you highlight that,

3    please?  That -- the sentence start -- yeah, that's it.

4    BY MR. RUZINSKY:

5    Q    And then you say, Mr. Kwon:

6        "We're starting to work with PJT and PW to think through

7    cap structure, liquidity solutions we can offer Serta that

8    puts our paper in a more senior position."

9        Correct?

10   A    Correct.

11   Q    And "our paper" was the 1-L debt that Apollo held, right?

12   A    Yes, plus the new money, as well.  That's -- you know,

13   that's included there, as well.

14   Q    Okay.  Okay.  But you wanted to be senior to other

15   lenders, right?  That was important to Apollo.

16   A    The new money was definitely important.  Putting in new

17   capital at this point in time to be senior was important to

18   use.

19        And then the -- the "our paper," current position, we

20   were looking at options, one of which included being more in

21   the senior position, again.

22   Q    And by this time, you understood that, you know, a Serta

23   -- the odds of a Serta Simmons bankruptcy was somewhat

24   greater.

25   A    Yes.  This is in the middle of the pandemic.  As we will

1    recall --

2    Q    Uh-huh.

3    A    -- that was a very fluid time.

4    Q    So you were open to a restructuring transaction with

5    Serta that created structurally senior debt, right?

6    A    I'm sorry.  Can you repeat the question?

7    Q    So you were open to a restructuring transaction with the

8    Debtor, Serta Simmons, that created structurally senior debt.

9    A    Yes.

10            MR. RUZINSKY:  Tim, would you please pull up

11   Exhibit 53?  It's ECF 861-47.  That's Debtors' Exhibit 53.

12   BY MR. RUZINSKY:

13   Q    And Mr. Kwon, it's Tab 8 in your binder there.

14   A    Thank you, again.

15   Q    You're welcome.

16            (Pause in the proceedings.)

17   Q    And before we get to this exhibit, where we just talked

18   about exchanging structurally senior -- or creating

19   structurally senior debt, that also included exchanging

20   existing debt for structurally senior debt, didn't it?

21            THE COURT:  So we lost the exhibit.

22            MR. RUZINSKY:  Ah --

23            THE COURT:  There we go.

24            MR. RUZINSKY:  Thank you.

25            THE WITNESS:  Can you repeat the question?

1            MR. RUZINSKY:  Sure.

2      BY MR. RUZINSKY:

3      Q    Mr. Kwon, when you -- actually, let me get the reading

4      back.

5            MR. RUZINSKY:  Thank you.

6            STENOGRAPHER:  Let me get it.

7            MR. RUZINSKY:  Good.

8            STENOGRAPHER:  "Before we get to this exhibit, where

9      we just talked about exchanging structurally senior" -- excuse

10     me -- "or creating structurally senior debt, that also

11     included exchanging existing debt for structurally senior

12     debt, didn't it?"

13           THE WITNESS:  Yes, that's correct.

14           MR. RUZINSKY:  Okay.  So we're on 48 now, Debtors'

15     Exhibit 48.  So we're going to flip to that one, or flip back

16     to it.

17     BY MR. RUZINSKY:

18     Q    So, Mr. Kwon, Exhibit 48, Tab 5.  We're back here.

19           (Pause in the proceedings.)

20     Q    Now I'm sorry.  I'm back on 53.  My mistake.

21           (Pause in the proceedings.)

22     Q    Mr. Kwon, Debtors' Exhibit 53 is -- it starts at the top,

23     an email from David Sambur to you and to David Cheong,

24     April 1st, 2020.  And below that are emails between you and

25     David Cheong.  Is that correct?

1    A    Correct.

2    Q    So the first sentence of your 7:30 a.m., April 1st, 2020

3    email reads as follows:

4        "An un-sub transaction should help tighten up this

5    leakage to the junior creditors, but the real value in PJT's

6    proposal, which Advent won't go for, is you would jump the

7    other 1-Ls by taking a haircut to face on our paper."

8        Do you see that?

9    A    Yes.

10   Q    Okay.  So, by this time, you had seen a proposal from

11   PJT, correct?

12   A    Correct.

13   Q    And it involved an un-sub or a dropdown transaction,

14   correct?

15   A    Yes.

16   Q    And you saw real value in taking a position that's senior

17   to the other 1-Ls, right?

18   A    Correct.

19   Q    All right.  And that's what you -- that's what "jumping"

20   the other 1-Ls is, right?  Taking a position senior to the

21   other 1-Ls.

22   A    On -- on the collateral that's moved into the

23   unrestricted subsidiary.

24   Q    Uh-huh.  So you wanted to make sure that you were senior

25   with respect to all that collateral that got moved to the

1    subsidiary, right?

2    A    On that collateral, yes.

3    Q    Okay.  And that was pretty valuable collateral that you

4    wanted moved into that subsidiary, right?

5    A    The -- the actual specifics of the collateral was never

6    finalized, but it would have been collateral valuable, yes.

7    Q    Right.

8         And what you envisioned was collateral that would be

9    worth multiples of the amount of your new debt that would

10   secure it, right?

11   A    What -- what do you mean by "multiples"?

12   Q    Two times, three times.

13   A    I don't recall the coverage, but I don't think it was

14   multiples.

15   Q    You --

16   A    It was coverage, but not -- not two times, three times.

17   Q    It's -- so it was more than 100 percent.  You'd want --

18   you'd want an equity cushion there, --

19   A    Yes.

20   Q    -- right?

21   A    Yes, that's right.

22   Q    Okay.  And you would do this by taking a haircut to face

23   on Apollo's paper, right?

24   A    That's the discount I mentioned that the company was

25   looking for, yes.

THEO KWON - CROSS BY MR. RUZINSKY

1   Q    In other words, you would exchange your debt at prices

2   below par in exchange for a more senior position or jumping

3   the other 1-Ls, right?

4   A    On the collateral that was moved.  I think that part is

5   right.  Not on the current collateral.

6   Q    And you would do this by taking a haircut to face on the

7   paper.

8   A    That's what we were analyzing and assessing.

9   Q    So I -- did I understand your testimony on Direct that it

10  was Serta Simmons' request for a dropdown with a debt-for-debt

11  exchange, that wasn't your group's -- your group didn't come

12  up with that, that was Serta's request.  Is that right?

13  A    To my understanding, that was Serta's request, yes.

14  Q    Okay.

15  A    Is that volume better, by the way?

16  Q    Yes, it is.  Thank you.

17  A    All right.

18        THE COURT:  Certainly.  Thank you.

19  BY MR. RUZINSKY:

20  Q    But wasn't it, in fact, your group's idea and one that

21  you didn't think that Advent would go for?

22  A    Sorry.  The -- to my understanding, the company had laid

23  out the framework for a dropdown transaction.

24  Q    Well, here you are in this April 1st email, you've got

25  discussion about an un-sub transaction.  This is what Apollo

1    wanted.  And it characterizes this as "PJT's proposal," which

2    Advent won't go for.

3         And Advent is Serta's sponsor, right?

4    A    Well, can I go back?  You mentioned "Apollo wanted."

5    Q    This -- no, let me -- I'll let you go there.

6         But first, Advent was and is Serta's sponsor, their main

7    equity holder, right?

8    A    Correct.

9    Q    Okay.  All right.  And PJT had a proposal by this time,

10   right?

11   A    Proposal here might have been just ideas that we were

12   evaluating on our side.

13   Q    This --

14   A    Now --

15   Q    But they didn't say -- I mean, you're not saying PJT has

16   some ideas.  You're saying "PJT's proposal."  Those are your

17   words, right?

18   A    I absolutely said "proposal."

19   Q    Well, you know the difference between a "proposal" and an

20   "idea," don't you?

21   A    Well, this could have been PJT's proposal inbound into

22   us, not a proposal to the company yet.  This was -- in

23   April 1, this was still in ideation phase.

24   Q    Okay.  Are you sure there was no PJT proposal to Serta at

25   this time?

1    A    I'm not sure.

2    Q    Okay.  But you are sure that there was at least a PJT

3    proposal to your group this time.

4    A    Correct.

5    Q    Okay.  And this was -- and I -- and this was a proposal,

6    whether it was straight to Serta or whether it was to your

7    company, that would have a dropdown transaction with a debt-

8    for-debt exchange, right?

9    A    Correct.

10   Q    And that you knew or believed that Advent wouldn't go for

11   it, right?

12   A    I can't recall why I put that in the parenthetical there.

13   I'm sure there were nuances in this idea that PJT had sent

14   over, that, you know, they -- they would not want to go for.

15   I don't know why -- what that was based off of.

16   Q    Well, let's take a look at the words that you used here

17   back in April of 2020.  You know, the second part of this

18   sentence, you say:

19       "But the real value in PJT's proposal, which Advent won't

20   go for, is you would jump the other 1-Ls by taking a haircut

21   to face on our paper."

22       Did I read that right?

23   A    You did.

24   Q    And so doesn't that inform us, doesn't that tell us that

25   what Advent -- what you believe Advent wouldn't go for was

1    jumping the other 1-Ls, "taking a haircut to face on our

2    paper"?

3    A    That -- that was my assumption on April 1, at that time.

4    We had not talked to Advent, again, we had not even talked to

5    the company.  So this was me responding with my perspectives,

6    it looks like an idea that PJT had sent over to us --

7    Q    Well --

8    A    -- so giving my assessment of the situation.

9    Q    Whether that was just an idea or whether that was an

10   actual PJT proposal to Serta Simmons, you don't know, right?

11   A    So this is April 1.  I am fairly certain we did not send

12   proposals on or near April 1 to the company.  So I believe

13   this is when PJT was sending ideas to us on potential

14   transactions.  We had no insight into the state of mind of

15   Advent or the company.  Again, this is my assessment, outside

16   in.  That's purely it.

17   Q    Mr. Kwon, you would agree with me that a -- the Ad Hoc

18   Group that Apollo was a part of eventually exchanged term

19   sheets with Serta Simmons, correct?

20   A    (No audible response).

21   Q    And in those termsheets, Apollo, as part of the Ad Hoc

22   Group, offered to enter into a dropdown transaction, right?

23   A    Correct.

24   Q    And that transaction would have given Apollo seniority

25   over non-participating lenders with respect to the transferred

1    collateral.

2    A    Not just Apollo.  We were part of a group.  But yes, on

3    the transferred -- potentially transferred collateral, yes.

4    Q    Okay.  So, in other words, Apollo and the other members

5    of that group, by doing that, would have jumped the other

6    1-Ls, right?

7    A    On the collateral that was potentially transferred, that

8    could have been transferred, yes.

9    Q    Well, on the collateral that was transferred, right?

10   That would be transferred.  When it's transferred, if this

11   transaction structure was done, this Ad Hoc Group proposal, it

12   would result in jumping the other 1-Ls, which means the 1-Ls

13   not part of this group, right?

14   A    Correct.  So on the -- on the transferred assets, yes.

15   Q    And you would agree with me that, when Apollo was

16   negotiating for that more senior position to jump the other

17   1-Ls, that it was acting in good faith, --

18   A    Yes.

19   Q    -- right?

20   A    In reaction to the company's request, yes.

21   Q    And you would agree with me that Apollo was acting

22   ethically when, as part of the Ad Hoc Group, it -- that was a

23   part of, it jumped the other 1-Ls.

24   A    Well, we never executed on anything.  We -- we were

25   acting ethically in responding to the company with proposals

1      -- to their proposals with, you know, what we thought were

2      proposals that could be -- that could be beneficial for the

3      company.

4      Q    And you felt like that proposal that was entirely ethical

5      that you were making to the company, those proposals, right?

6      A    Yes.

7      Q    There came a time, Mr. Kwon, when the company pushed back

8      on some of the Ad Hoc Group proposals, right?

9      A    Yes.  Well, sorry.  What do you mean by "pushed back"?

10     Q    Well, didn't accept them and --

11     A    Yep.

12     Q    -- countered, --

13     A    Yeah.

14     Q    -- right?

15          And there also came a time when the Ad Hoc Group,

16     including Apollo, learned that there was competition out there

17     for a transaction with Serta, right?

18     A    I believe so, yeah.

19     Q    As Apollo saw things, there was a *de facto* gun to its

20     head because, if there wasn't a deal made with Serta by the Ad

21     Hoc Group, then Apollo's position and Apollo's investors'

22     investments would be very negatively impacted, right?

23     A    I believe so.  The way that the company and advisors had

24     set this up, it was -- yes.  If you were -- yes, that's

25     correct.

1    Q    Right.

2         And that's the *de facto* gun to the head, right?

3    A    Correct.

4    Q    You recognized that you had a fiduciary duty to protect

5    your investors' position, right?

6    A    Yes.

7    Q    So you and the Ad Hoc Group made the proposal that

8    included a dropdown transaction, giving Apollo, Angelo Gordon,

9    and Gamut seniority over nonparticipating lenders with respect

10   to the transferred collateral, right?

11   A    Correct.

12   Q    And you had testified earlier that, by this time,

13   dropdown transactions were common or familiar in the market,

14   right?

15   A    Familiar in the market, yes.

16   Q    And when did that start; when did dropdown transactions

17   start coming to the market?

18   A    That's a good question.  I couldn't give you a specific

19   date.

20   Q    What's the first one that you know of?

21   A    Claire Stores because I worked on it.  That was 2018, I

22   believe.

23   Q    How about J. Crew?

24   A    I don't know the exact timing of J. Crew.

25   Q    But you would agree with me that --

1     A     Pre-COVID.

2     Q     You would agree with me that J. Crew was a dropdown

3     transaction?

4     A     Correct.

5     Q     All right.  And so you don't recall that J. Crew was

6     2017?

7     A     '17, that's correct.  So I guess Claire was before that.

8     Q     You had mentioned earlier that Claire was 2018.

9     A     Yeah.  I misremember years.  Everything is -- that --

10    there's a lot of blur before COVID.  But yes, to my

11    recollection, Claire was before J. Crew.

12    Q     Okay.  Let's go to Debtors' Exhibit 65, which is ECF

13    862.9.  And Mr. Kwon, it's Tab 6 in your binder.

14    A     Thank you again.

15    Q     You're welcome.

16          So, Mr. Kwon, this is an email from David Sambur to you,

17    and then there is an email below it that you received from a

18    Daniel -- and I'm going to mispronounce this and my apologies

19    -- Cajigas -- C-A-J-I-G-A-S -- from April 11.  So your email

20    was April 12; his was April 11.

21          Do you remember receiving -- or actually, you received

22    this email from David Sambur on April 12th, didn't you?

23    A     Correct.

24          MR. RUZINSKY:  Your Honor, if this is not in

25    evidence already, I would move to introduce it.

1           THE COURT:  Any objection?

2           MR. EHRLICH:  No objection, Your Honor.

3           THE COURT:  All right.  Thank you.

4           It's admitted.

5       (Exhibit 65, ECF 862-9, received in evidence)

6   BY MR. RUZINSKY:

7   Q    Mr. Kwon, I want to focus your attention on the slide

8   deck.  So, on the third page of Exhibit 65, there is a slide

9   deck from PJT Partners dated March 31, 2020.

10          Do you see that?

11  A    Yes.  Which page, though?

12  Q    That's the third page.

13  A    5 of 15?

14  Q    Which is 3 of 15.

15  A    3, yes.

16  Q    So we've got the March 31, 2020 date of the slide deck.

17  And it shows a proposed transaction structure from PJT.  Is

18  that correct?

19  A    Correct.

20  Q    And if we go to page 4 of 15, under "executive summary,"

21  it says:

22      "The company has two primary structures to raise

23  structurally senior debt."

24      Is that right?

25  A    Yes.

1    Q    Let's go to page 4 of the slide deck, which is page 6

2    of 15.

3         (Pause in the proceedings.)

4    Q    And would you agree with me that the basic subject

5    concerns, ways to raise structurally senior debt?

6    A    Yes.

7    Q    All right.  On the left-hand side of the page, there is a

8    column entitled "Transaction Steps."

9         Do you see that?

10   A    Yes, I do.

11   Q    And those steps showed a proposed -- or show a proposed

12   dropdown transaction, as well as a proposed infusion of new

13   money by the Ad Hoc Group lending against the dropdown assets,

14   correct?

15   A    It does.

16   Q    Let's look at step four.  It says:

17        "Company uses a portion of debt proceeds to purchase AHG

18   loans at a discount to par and then cancels loans under

19   Section 9.05(g)."

20        Do you see that?

21   A    I do.

22   Q    And "AHG" refers to the Ad Hoc Group of Apollo, Gamut,

23   and Angelo Gordon.  Is that correct?

24   A    Correct.

25   Q    And the reference to "9.05(g)" is to the 2016 loan

1    agreement, correct?

2    A    That's correct.

3    Q    And so this proposal involved using 9.05(g) to purchase

4    loans at a discount to par from the Ad Hoc Group only.  Is

5    that correct?

6    A    That's correct.

7    Q    And if we go to the next page of Exhibit 65, on the

8    left-hand side, under "Transaction Steps," we look at step

9    number three.  It, again, mentions using Section 9.05(g) of

10   the 2016 credit agreement in the same way, correct?

11   A    Yes, it looks like it.

12   Q    Mr. Kwon, at this time, I'd like you to -- oh, let me

13   back up here.

14            MR. RUZINSKY:  Your Honor, is Debtors' Exhibit 65

15   admitted?

16            THE COURT:  You just offered it and it was admitted.

17            MR. RUZINSKY:  And it is admitted.  Yes, thank you.

18            THE COURT:  We got that one.

19            MR. RUZINSKY:  I will move on.

20   BY MR. RUZINSKY:

21   Q    Mr. Kwon, Debtors' Exhibit 6, which is ECF 853-5, it's

22   also Tab 17.  So this is going to be in the second notebook,

23   Mr. Kwon, the big one that only has two documents in it.

24        (Pause in the proceedings.)

25   A    Yes.

1     Q    All right.

2          (Pause in the proceedings.)

3     Q    And you would agree with me, would you not, that this

4     Exhibit 17 -- I'm sorry -- Exhibit 6, which is Tab 17 in your

5     notebook there, is the 2016 credit agreement for Serta

6     Simmons, --

7     A    Yes.

8     Q    -- correct?

9     A    That's correct.

10         MR. RUZINSKY:  Okay.  Your Honor, if this is not

11    already admitted, then I would move to admit it.

12         THE COURT:  Mr. Ehrlich?

13         MR. EHRLICH:  No objection, Your Honor.

14         THE COURT:  All right.  Thank you.

15         Let me just check.

16     (Participants confer)

17         THE COURT:  It's admitted.

18         MR. RUZINSKY:  Thank you, Judge.

19         THE COURT:  Thank you, Mr. Ruzinsky.

20         (Exhibit 6, ECF 853-5, received in evidence.)

21    BY MR. RUZINSKY:

22    Q    And Mr. Kwon, you know that this agreement applied to the

23    Serta Simmons 1-L debt and the entities that purchased that

24    debt, right?

25    A    Yes, I do.

1    Q    And you understand that this credit agreement, this 2016

2    credit agreement, protects certain sacred rights?

3    A    Correct.

4    Q    And sacred rights are rights within an agreement that

5    can't be changed without a hundred percent vote to change it,

6    right?

7    A    Right.

8    Q    Now one of the sacred rights in the 2016 credit agreement

9    prohibits altering the pro rata sharing of payments among

10   lenders in the same class, correct?

11   A    Correct.

12   Q    But there's an exception to that prohibition, correct?

13   A    Yes.

14   Q    And it's -- let's take a look.

15        (Pause in the proceedings.)

16   Q    I'd like you to turn to, in Exhibit 6, it is Document

17   page 76.  The ECF footers at the top say "page 81 of 475."

18   A    I see it.

19   Q    All right.  And down at the -- this -- on this page, it

20   starts Section 2.18.  Do you see it?

21   A    I'm sorry.  2.1-what?

22   Q    2.18.

23   A    18, yes.

24   Q    Okay.  And at the very bottom of that page is subsection

25   (c).  Do you see that?

THEO KWON - CROSS BY MR. RUZINSKY

1    A    Yes, I do.

2    Q    And even before we start talking about subsection (c),

3    the title of subsection 2.1 -- of Section 2.18 reads:

4         "Payments Generally, Allocation of Proceeds, Sharing of

5    Payments."

6         Do you see that?

7    A    I do.

8    Q    Okay.  So let's go down to subsection (c) as in Charlie,

9    and it starts off by saying "if any lender obtains payment,"

10   right?

11   A    Yes.

12   Q    "-- whether voluntary or involuntary, through the

13   exercise of a right of setoff or otherwise, in respect of any

14   principal of or interest on any of the loans of any class held

15   by it, resulting in such lender receiving payment of a greater

16   proportion of the aggregate amount of its loans of such class

17   and accrued interest therein than the proportion received by

18   any other lender with loans of such class, then the lender

19   receiving such greater proportion shall purchase" --

20        And then it has more after that.  Do you see that?

21   A    I do.

22   Q    All right.  And so this is covering pro rata treatment of

23   lenders under this agreement, correct?

24   A    Yes.

25   Q    All right.  And if you'll turn the page, please, the very

1    first line of the next page -- page 77 is a document number

2    and page 82 of 475 on the ECF numbering -- in the top line

3    there is a "provided that."  And then there is a -- you know,

4    a good part of a paragraph after that.

5         Do you see it?

6    A    Yes.

7    Q    Okay.  So "provided that."

8         And then go to Subsection (ii).  It says "the provisions

9    of this paragraph," which we've now talked about the pro rata

10   sharing, "shall not apply to" -- and then there's an (a) and a

11   (b).  Do you see that?

12   A    I do.

13   Q    And under (b), it says:

14        "Any payment obtained by any lender as consideration for

15   the assignment of or sale of a participation in any of its

16   loans to any permitted assignee or participant, including any

17   payment made or deemed made in connection with Sections 2.22,

18   2.23, 9.02(c), and/or Section 9.05."

19        Do you see that?

20   A    Correct.

21   Q    So, in this Section 2.18(c), the pro rata requirements

22   contain multiple exceptions, one of which is as provided in

23   Section 9.05.  Do you see that?

24   A    Yes.

25             MR. EHRLICH:  Your Honor, objection, to the extent

1    that the witness is being asked to give a legal conclusion.

2    He is a -- he is a lay witness.  I'm not -- I don't think

3    that's -- this is an appropriate question.

4            THE COURT:  No.  He is a sophisticated party that

5    deals with these agreements all the time.  I feel very

6    confident, given what I've heard thus far, that, if he doesn't

7    know, he will say he doesn't know.

8            MR. EHRLICH:  Thank you, Your Honor.

9            THE COURT:  All right.  Thank you.

10           MR. RUZINSKY:  Thank you, Judge.

11   BY MR. RUZINSKY:

12   Q    Now let's go to Section 9.05.  9.05 is --

13        (Pause in the proceedings.)

14        (Participants confer)

15   BY MR. RUZINSKY:

16   Q    Okay.  9.05, and I want to take us to (g).

17        (Pause in the proceedings.)

18   Q    And so, Mr. Kwon, 9.05(g) says:

19        "Notwithstanding anything to the contrary contained

20   herein, any lender may, at any time, assign all or a portion

21   of its rights and obligations under this agreement in respect

22   of its term loans to any affiliated lender on a non pro rata

23   basis:

24        "(a) Through Dutch auctions open to all lenders holding

25   the relevant term loans on a pro rata basis; or,

1          "(b) Through open-market purchases in each case with

2     respect to Clauses (a) and (b), without the consent of the

3     administrative agent."

4          And then there are some "provided that" sections that are

5     afterwards.  Do you see that?

6     A    Yes, I do.

7     Q    This subsection allows for a lender to assign their

8     rights and obligations on a non pro rata basis in two

9     circumstances, right?

10    A    Yes, it does.

11    Q    One, through the Dutch auction open to all lenders

12    holding the relevant term loans on a pro rata basis; and then,

13    second, through an open market -- in open-market purchases,

14    right?

15    A    Yes.

16    Q    Now PJT's proposal was that Serta uses proceeds from a

17    transaction to purchase the Ad Hoc Group's debt at a discount

18    and then cancels the loans under Section 9.05(g), correct?

19    A    This is the prior?

20    Q    Yeah, yeah.

21    A    It looks that way, yes.

22    Q    Okay.  Now that wasn't going to be a Dutch auction open

23    to all, that PJT proposal, was it?

24    A    I don't recall.

25    Q    Well, let's go back and take a look.

1       And even before we do that, do you have any recollection

2   of any proposal that was from PJT Partners or communicated

3   through PJT Partners that in -- to Serta Simmons that involved

4   a Dutch auction?

5   A    I don't recall.

6   Q    Okay.  So let's go back to --

7        (Pause in the proceedings.)

8        (Participants confer)

9   BY MR. RUZINSKY:

10  Q    Let's go back to Exhibit 65, Debtors' Exhibit 65, sir.

11  A    Which tab?

12  Q    It is Tab 6.

13  A    Thank you.

14  Q    You're welcome.

15       And pages 6 and 7 of 15.  On page 6 of 15, it is Step 4

16  under "Transaction Steps," and on page 7 of 15, it is Step 3.

17       Do you see that?

18  A    Yes.

19  Q    Okay.  And so do you see where the PJT proposal

20  transaction step involves using 9.05(g) this way?

21  A    I do.

22       (Pause in the proceedings.)

23  Q    And nowhere in here is there any mention of any Dutch

24  auction, right?

25  A    No, not that I can see.

1          I also don't see a mention of -- of market purchase,

2     either.

3     Q    Now you had -- we have admitted the term sheets that got

4     exchanged between the parties, right?

5     A    Correct.

6     Q    And do you recall anything in any of those term sheets

7     about a Dutch auction?

8     A    No.

9          I also don't recall any --

10    Q    That's my only question.  Do you --

11    A    No.

12    Q    -- recall about a Dutch --

13    A    No.

14    Q    -- auction?

15         And do you recall anything in any of those proposals from

16    the Ad Hoc Group or back from Serta that involve any type of

17    auction?

18    A    Not that I can -- not that I can recall.

19    Q    In fact, at no point did the Ad Hoc Group propose any

20    auction or Dutch auction to Serta Simmons, correct?

21    A    Not that I can recall.

22    Q    So the only other way, under 9.05(g), to -- or the only

23    way to accomplish the goal of 9.05(g), other than a Dutch

24    auction as described in that provision, was the open-market

25    purchase, correct?

1    A    Wait.  I'm sorry.  Is the question this -- the proposal

2    that PJT has sent on March 31, how that ties to the ultimate

3    termsheets that were sent to the company?

4    Q    No, I'm just taking you back to the parts of the credit

5    agreement that we went through that showed ways of

6    implementing Section 9.05(g) in two ways, two ways:  One

7    through the Dutch auction, one through open-market purchase,

8    right?

9    A    Correct.

10   Q    So if 9.05(g) was going to be used for any purpose, and

11   it was not going to involve the Dutch auction, it had to be

12   used in connection with an Open Market Purchase, correct?

13   A    Correct.

14   Q    Let's also go in Exhibit 6 to Section 9.02(b)(A)(6).

15   A    This is the credit agreement?

16   Q    Yes, it is the credit agreement.  And it should be

17   Exhibit -- page 143 of 475.

18        Actually, we're going to start on the page before that,

19   so it's page 142 of 475.

20   A    Okay.

21   Q    And so this is Section 9.02 entitled, "Waivers and

22   Amendments."

23        Do you see that?

24   A    Okay.  Which -- 9.02, yeah.

25   Q    Okay.  And when we flip the page to page 142 of 475,

1    subsection (b), small b then capital A, (A) starts, "The

2    consent of each lender directly and adversely affected

3    thereby, but not the consent of the required lenders, shall be

4    required for any waiver, amendment or modification that," and

5    then are 6 things listed under that.

6         Do you see that?

7    A    I do.

8    Q    Okay.  So this is saying that, this beginning part is

9    that 100 percent lenders shall be required for certain things.

10   Right?

11   A    Okay.  Which specific section are you referring?

12   Q    I'm on subsection capital (A).

13   A    Yeah.

14   Q    All right.  We haven't gotten to the numbers yet.  See

15   that?

16   A    Yes.

17   Q    Okay.  And then if we go to Number 6, "Waives, amends or

18   modifies the provisions of Sections 2.18(b) or (c) of this

19   agreement in a manner that would by its terms alter the pro

20   rata sharing of payments required thereby."

21        And then it says, "Except in connection with any

22   transaction permitted under Sections 2.22, 2.23, 9.02(c)

23   and/or 9.05(g), or as otherwise provided in this Section 9.02.

24        Do you see that?

25   A    I do.

THEO KWON - CROSS BY MR. RUZINSKY

1    Q    So, and you understand the reference there to 9.05(g) to

2    being an exception from the general provision in capital (A)

3    there of requiring 100 percent of the lenders.  Right?

4    A    Can you give me a moment because you're --

5    Q    Sure.  Please.

6    A     -- going through a lot of detail here.

7    Q    I want you to look at 9.02 small (b) capital (A) and then

8    I want you to look at subsection 6.

9    A    I got it.  I just need time to read the words.  (Perusing

10   document.)

11        Okay.

12   Q    Okay.  And 9.02(b)(A) is the sacred rights that you were

13   referring to earlier.  Correct?

14   A    Yes.

15   Q    And Sacred Right Number 6 requires 100 percent lender

16   consent for a waiver, amendment or modification of the

17   provisions of 2.1 (a), (b) or (c) of the agreement in a manner

18   that would, by its terms, alter the pro rata sharing of

19   payments required with exceptions to that.  Right?

20   A    As I can see it, yes.

21   Q    And one those exceptions is 9.05(g).  Correct?

22   A    Yes, it is.

23   Q    And 9.05(g) is the section that provides for auctions and

24   Open Market Purchases.  Right?

25   A    Yes.

1    Q    Now, Mr. Kwon, you would agree with me that the sacred

2    rights provision in this Section 9.02(b)(A) contains no anti-

3    subordination clause.  Right?

4    A    I'm not a legal expert, but I don't see one as I see it

5    right now.

6    Q    And there's no sacred rights provision here that bars

7    indemnification of lenders who engage in open market exchanges

8    with the company.  Right?

9    A    Could you repeat that?

10   Q    Sure.  There's nothing in these sacred rights in this

11   2016 creditor agreement that prevents indemnification of

12   lenders who engage in open market exchanges with the company,

13   Serta Simmons.

14   A    I haven't read, or re-read this with that specific

15   question in mind, and again, I'm not a legal expert, but I

16   don't see it in this section, 9.02(b)(A).

17   Q    Which is the sacred rights section.  Right?

18   A    (No audible response.)

19   Q    And there's no sacred rights provision barring

20   confidential negotiations between lenders and the company.

21   Right?

22   A    Not that I can see.

23   Q    And there's nothing stating that majority of lenders must

24   be allowed to participate in open market exchange

25   transactions, is there?

1    A    Could you repeat the --

2    Q    Sure.  There's nothing in the sacred rights or otherwise

3    that says that a majority of lenders must be allowed to

4    participate in open market exchange transactions.

5    A    I don't see that.

6    Q    And you understand that Open Market Purchase provisions

7    are common in credit agreements.  Right?

8    A    I don't know.

9        (Pause in the proceedings.)

10    BY MR. RUZINSKY:

11    Q    Have you ever testified differently, sir?

12    A    That Open Market Purchase exceptions are common in the

13    market?

14    Q    Uh-huh.

15    A    I don't recall.

16    Q    Let's go to your deposition testimony.

17        MR. RUZINSKY:  And if you could please pull page 93.

18    And this will be lines 6 through 13.

19    BY MR. RUZINSKY:

20    Q    Mr. Kwon, it's on the screen there.  I ask you a question

21    at line 6, page 93 of your deposition, "Open market purchase

22    provisions are common in credit agreements, aren't they?"

23        And then after Mr. Ehrlich objected to form and said you

24    could answer your response was, "To my understanding, yes."

25        And that was your testimony at your deposition.  Correct?

1    A    That's correct.

2    Q    You would agree with me that this particular credit

3    agreement, the 2016 credit agreement does not define the term

4    Open Market Purchase.  Right?

5    A    That's correct.

6    Q    And you'd also agree with me that the parties to this

7    credit agreement could have provided for a definition of Open

8    Market Purchase.  Right?

9    A    Of course.

10   Q    Especially if they wanted to deviate from the terms'

11   ordinary or unambiguous meaning.  Right?

12   A    Yes.

13   Q    So at this time, Mr. Kwon, I want to take a look and do a

14   little comparison of some of the -- actually the final

15   proposal from the Ad Hoc Group to the offer that Serta Simmons

16   accepted from the PTL Lenders.

17         Would you agree with me that both involved private and

18   not public negotiations?

19   A    Correct.

20   Q    And that both involved a limited set of lenders?

21   A    Could I put away the --

22   Q    Yes, you can.

23   A    Sorry, can you repeat the question?

24   Q    Sure.  And that both of those offers, the last offer from

25   the Ad Hoc Group and the offer that Serta Simmons accepted

1      from the PTL Lenders, both of those involved a limited set of

2      lenders.  Right?

3      A    What's your definition of limited?

4      Q    Not open to all.  So the Ad Hoc Group was just three

5      lenders.  Right?  Apollo, Gamut, and Angelo Gordon.  Right?

6      And the PTL Lender Group did not include all of the 1-L

7      lenders.  Right?

8      A    Right.

9      Q    So you would agree with me that both offers involved a

10     limited set of lenders.  Right?

11     A    Right.

12     Q    Both involved about $200 million in new money.  Right?

13     A    Eventually, yes.

14     Q    And both involved exchanging 1-L and 2-L debt for new

15     debt.  Right?

16     A    Yes.

17     Q    Both involved exchanging that existing debt below par to

18     give the company a discount.  Right?

19     A    Right.

20     Q    Both exchanges proposed -- were proposed at rates above

21     the secondary trading prices.  Right?

22     A    Correct, as I recall.

23     Q    Both involved discount rates that were negotiated rather

24     than paid to the secondary trading prices.  Right?

25     A    Can you repeat that one?

THEO KWON - CROSS BY MR. RUZINSKY

1    Q    Both involved discount rates that were negotiated rather
2    than paid to the secondary trading prices.
3    A    Correct.
4    Q    Both involved the issuance of new structurally senior
5    debt.  Right?
6    A    What do you mean by "structurally senior"?
7    Q    Had a senior right to the collateral or anything else.
8    A    But the term structurally, that's an important point,
9    what do you mean by structurally?
10   Q    What does that mean to you?
11   A    So structurally senior in my experience means when you
12   are senior, but parts of different collateral.  When you are
13   just talking about 1 pool of collateral, the word structurally
14   senior is irrelevant because it's one pool of collateral.  If
15   you're talking about structurally senior, there's collateral
16   in different aspects.  So again, unrestricted subsidiaries,
17   foreign JVs, collateral could be in different places.
18        When we mention structurally senior and the market
19   does, it means that the debt across the spectrum of a company,
20   when you pool that all together for these other entities, that
21   debt is structurally senior to the other collateral.
22        Here if we're talking about one pool of collateral, then
23   it's just senior or junior, that's it.
24   Q    So just looking at the last Ad Hoc Group proposal and the
25   PTL proposal that was accepted by Serta Simmons, and those are

1    compared, are you telling me that they both did not involve

2    the issuance of new structurally senior debt?

3    A    If you use the common market term of structurally senior,

4    our proposal would have been structurally -- that the debt at

5    the new entities created with new collateral would have been

6    structurally senior to the remaining debt and remaining

7    collateral.  The favored lender's structure did not move any

8    collateral, so it's just senior and junior.  There is no --

9    the term structurally senior is irrelevant.

10   Q    So your answer to my question would be no then.  Right?

11   A    You want to repeat the question?

12   A    Yeah, did both proposals involve the issuance of new

13   structurally senior debt?

14   A    No.

15   Q    Do both of the transactions, or both of the proposals

16   envision priming senior debt?

17   A    Envision priming -- on what collateral group?

18   Q    On any collateral.

19   A    On the new collateral?

20   Q    On any collateral.

21   A    I'll explain if you don't mind.  On new collateral

22   there's nothing primed because it's collateral that's

23   transferred so the debt raises new debt so --

24   Q    My question to you though, sir, is -- and I'm going to

25   hold that question for just a moment.

1          (Pause in the proceedings.)

2     BY MR. RUZINSKY:

3     Q    So is it your testimony that the last Ad Hoc Group

4     proposal did not involve structurally senior debt?

5     A    No, our -- the Ad Hoc Group's last preliminary proposal

6     did include structurally senior debt.  The other proposal that

7     was taken did not include structurally senior debt, it was

8     just senior debt.

9          THE COURT:  So, Mr. Kwon, just to try to keep this

10    from extending on forever, at the end -- assuming that both

11    transactions had occurred, in each the participating lenders

12    ended up with debt that was senior to the non-participating

13    lenders.  Is that a fair statement?

14         THE WITNESS:  That's not quite accurate, Judge.

15         THE COURT:  Okay.  Then please explain.

16         THE WITNESS:  In our proposal -- so status quo,

17    status quo is you have a 1st lien, 2nd lien at the company

18    with liens on most of the debt.  Our proposal, which again was

19    million mark, it moved collateral to new entities that were

20    created.  And the debt would have been raised on those new

21    entities only tied to that collateral that was moved.  Only

22    tied to the collateral.  So --

23         THE COURT:  I understand that.  And so you're

24    actually telling me that by moving the collateral to the new

25    entity, the non-participating lenders would have lost any

1    claim to that collateral.  Is that correct?

2              THE WITNESS:  Yes, they would have been a junior,

3    not lost all of it but they would have been a junior.

4              THE COURT:  So they would have had a subordinated

5    lien position.

6              THE WITNESS:  On the moved collateral, correct.

7              THE COURT:  Right.  So the participating lenders

8    would have had senior debt as to the non-participating

9    lenders.  Correct?

10             THE WITNESS:  On just the moved collateral.

11             THE COURT:  I get that you want to -- I get that you

12   want to limit it, I don't have to suffer that like

13   Mr. Ruzinsky does.  Just answer the question.

14             THE WITNESS:  Yeah.

15             THE COURT:  Okay.  Go ahead.

16             MR. RUZINSKY:  Thank you, Judge.

17   BY MR. RUZINSKY:

18   Q    Mr. Kwon, both proposals relied upon Section 9.05(g).  Is

19   that correct?

20   A    I'm not sure.  Our proposal as you showed, the March 31

21   idea from PJT, I'm not sure if that translated -- that exactly

22   kind of translated into the proposal that we offered

23   (indiscernible).

24   Q    You just don't know.

25   A    No.

THEO KWON - CROSS BY MR. RUZINSKY

1    Q    Let's go to Exhibit 202, it is ECF 864-45.

2    A    Which tab?

3

4    Q    This is Tab 10.

5    A    Thank you.

6    Q    You're welcome.

7         I'd like to focus on the slide deck and I want to go to

8    Slide 7.

9         (Pause in the proceedings.)

10   BY MR. RUZINSKY:

11   Q    Mr. Kwon, have you seen this before?

12   A    Yes, the first time was during my deposition.

13   Q    And we spent some time at your deposition going through

14   the chart on this particular page.  Right?  Page 12 of 34?

15   A    Correct.

16   Q    Okay.  And so I want to talk a little bit in terms of

17   comparison here.  First, the line for amount under new money

18   has got AG bid and AG is Angelo Gordon.  Right?

19   A    I would presume so, yes.

20   Q    Okay.  And that would -- and you would recognize this bid

21   from May 30, wouldn't you?

22   A    Yeah, it's -- yes.

23   Q    Okay.  So this is really the Ad Hoc Group proposal.

24   Right?

25   A    Yes.

THEO KWON - CROSS BY MR. RUZINSKY

1    Q    All right.  And then the 2nd -- or actually I think it's

2    the next column to the right is the GD bid and that would be

3    the Gibson Dunn Group, the PTL Lender Group.  Right?

4    A    Yes.

5    Q    Okay.  Now under amount it's got 200 million for the

6    Ad Hoc Group and it's got 125 million for the PTL Group.  But

7    there's also a footnote down at the bottom you'll see that it

8    says, "Assumes the company only borrows 125 million of new

9    money and expands subsequent exchange capacity by 75 million."

10        Do you see that?

11   A    I don't see the footnote, where is it?

12   Q    So if you go -- go down to the notes section, it is

13   right -- it's the 2nd line of the note section.

14   A    As a simplifying assumptions illustratively assumes

15   company only borrows that.  Is that the one?

16   Q    Yeah, that's it.  You see that?

17   A    Okay.  Yes.

18   Q    Okay.  And I think you had testified earlier that you

19   understand that the final deal with the PTL Lenders involved

20   $200 million --

21   A    Yes.

22   Q    -- of new money.  Right?  Okay.  So the new money terms

23   were the same, $200 million each.  Let's look at the cost of

24   capital as a comparison.

25        Would you agree with me that the accepted proposal, the

THEO KWON - CROSS BY MR. RUZINSKY

1    PTL Lenders' proposal, had a lower cost of capital than the

2    proposal submitted by the Ad Hoc Group?

3    A    Wait, so I'm sorry, so this bid -- because this is new --

4    this bid on June 4 I'm not -- does this reflect the final

5    terms?  You asked me to assess the final terms versus our last

6    proposal.

7    Q    Yeah, well, let's -- I believe so except for the 200

8    million, but let's do the comparison here, the comparison of

9    the Gibson Dunn bid on that column and we're comparing what's

10   on this page, cost of capital, and would you agree with me

11   that the accepted proposal had a lower cost of capital than

12   the proposal submitted by the Ad Hoc Group?

13   A    I'm sorry, before that, though, can we go back to the 125

14   you mentioned, because you jumped and said the final deal had

15   200 million of new money.  I don't understand this footnote,

16   so I don't understand the proposal that was offered.  The 125

17   new money from Gibson Dunn and expands subsequent exchange

18   capacity by 75.  I'm not sure that it equates to $200 million

19   of new money.

20   Q    Okay.  Well, let's set that aside for the moment.  You've

21   already testified that you understand the final deal was $200

22   million.

23   A    Correct.

24   Q    You knew because you had done the comparison and gotten

25   all riled up about the fact that the company took a -- you

1    know, accepted a different proposal.  You know the terms of

2    the accepted proposal.  Right?

3    A    Yes.  What do you mean -- when did I get riled up?

4        (Laughter.)

5    BY MR. RUZINSKY:

6    Q    You filed a lawsuit.  Right?

7    A    I did not file any lawsuit, our group did.

8        (Laughter.)

9            THE COURT:  Mr. Ehrlich?

10           MR. EHRLICH:  Yeah, I just would note my objection

11   that there's no foundation for this witness with this

12   document.  He didn't prepare it, he's not on it and it -- you

13   know, he's being asked to interpret words on a page.

14           THE COURT:  Mr. Ruzinsky?

15           MR. RUZINSKY:  I accept that and I'm not going to

16   ask him to interpret the words that he said he didn't

17   understand.

18           THE COURT:  All right.  Then sustained.

19   BY MR. RUZINSKY:

20   Q    The final deal, the final deal proposal --

21   A    Yes.

22   Q    -- okay, who had a lower cost of capital?

23   A    I don't recall, I'd have to do a comparison.  I don't

24   recall.  And we also have to bifurcate between cash, cost of

25   debt versus overall cost.

1   Q    Well, let's go to your proposal, the Ad Hoc Group's

2   proposal, it was LIBOR plus 550.  Right?

3   A    Yes.

4   Q    Okay.  And you also had a PIK rate of 4.5 percent.

5   Right?

6   A    Correct, non-cash.

7   Q    All right.  And you had -- so you put that together and

8   you've got LIBOR plus how much?

9   A    You're asking me to add it up?

10  Q    Okay.

11  A    Yeah, well, LIBOR plus 1,000.

12  Q    Plus 10 percent.

13  A    5 percent.

14  Q    Okay.  All right.  The deal that the company accepted was

15  how much?

16  A    LIBOR 750.

17  Q    Okay.  And so just focusing on that term, the lower

18  interest rate is better for Serta, higher interest rate was

19  worse for Serta.  Right?

20  A    Not necessarily.  Cash is very important, especially

21  during this period where the company is having liquidity

22  shortfall.  So cash interest is I would say if not equally

23  probably more important.

24  Q    So you think -- you think a combined -- your testimony is

25  a combined interest rate of cash and PIK interest that is

1    higher is beneficial, is more beneficial to the borrower than

2    a lower interest rate that ha no PIK interest component?

3    A    For a company that is in distress facing a short-term

4    liquidity -- well, a liquidity crisis, cash interest is --

5    probably should be more important than overall interest.

6    Q    But the lower cost of capital is the combined lower

7    interest rate.  Correct?

8    A    The total cost of capital?

9    Q    Uh-huh.

10   A    Yes, cost of capital includes both cash and PIK, but in

11   reality cash is what's being paid.

12   Q    Which proposal offered greater debt relief?

13   A    The other proposal.

14   Q    And for a company that was in trouble, debt relief was

15   pretty important to it.  Right?

16   A    (No audible response.)

17   Q    Isn't that your understanding?  Didn't you know from the

18   negotiations that debt relief was very -- a very significant

19   consideration for Serta?

20   A    It was important becuase the company wanted to be

21   opportunistic and extract the discount scene in the market at

22   the time.

23   Q    And that was important to Serta.  Right?

24   A    Yes.

25   Q    And the amount, the difference in the amount of the debt

THEO KWON - CROSS BY MR. RUZINSKY

1   relief was over $100 million.  Right?

2   A    I believe so.

3   Q    So under the last proposal from the Ad Hoc Group Serta

4   Simmons would have been left with more debt than it started

5   with.  Right?

6   A    Are you taking into account the new money that was

7   invested.

8   Q    Taking into account everything.  There was new money,

9   there was some debt relief, and it was -- at the end of the

10  day Serta Simmons had more debt than it started with.  Right?

11  A    It looks like a touch more, 30 million more, if this is

12  an accurate representation of our deal and the other deal.

13  Q    So I'm just asking you about the PTL Lender Group offer,

14  the last offer at the time.  So --

15  A    PTL or non-PTL?

16  Q    I'm sorry, the Ad Hoc Group, the Ad Hoc Group non-PTL,

17  said it was $38 million more debt at the end of the day when

18  you factor in new money and debt relief.  Right?

19  A    Correct, $30 million -- $38 million more in debt.

20  Q    Right.  And then if you look at the last -- if you took

21  the accepted proposal, the accepted proposal gave well over

22  $100 million of total debt relief to Serta Simmons as one of

23  the consequences of accepting that transaction.  Correct?

24  A    Correct.

25  Q    Let's go to Exhibit, Debtor's Exhibit 261, it's ECF

1    889-2, and it's Tab 11 in your notebook, sir.

2    A    Thank you.

3    Q    All right.  This is an Apollo document entitled, "Serta

4    Simmons Update July 2020."  Is that right?

5    A    Yes, it looks like it was a draft.

6    Q    Okay.  And then I want to take you to the second page of

7    that slide deck which is page 2 of 47.

8         And, Mr. Kwon, this document was prepared by Apollo.

9    Right?  It says it's an Apollo document.  Right?

10   A    Yes.

11   Q    And you participated in -- did you participate in any of

12   the preparation of this document?

13   A    Yes.

14   Q    And do you remember any aspect of this document?

15   A    There were a lot of documents at the time, but, yes, some

16   of this is familiar.

17   Q    Okay.

18        MR. RUZINSKY:  Your Honor, I'm going to move to

19   admit Exhibit 261, Debtor's Exhibit 261.

20        MR. EHRLICH:  No objection.

21        THE COURT:  Thank you, sir.

22        It's admitted.

23        MR. RUZINSKY:  Thank you, Judge.

24        (Exhibit 261, ECF 889-2, received in evidence.)

25   BY MR. RUZINSKY:

THEO KWON - CROSS BY MR. RUZINSKY

1    Q    Mr. Kwon, let's got to the second page.  And it's

2    entitled, "Serta Simmons Update."

3         Do you see that?

4    A    I do.

5    Q    And there is a, you know, there's a blacked out or marked

6    out part in the middle, a big square there that says, TBU.

7         Do you see that?

8    A    Yes.

9    Q    And does that mean "to be updated"?

10   A    Correct.

11   Q    All right.  Now this line talks about the PTL Lenders'

12   proposal.  Right?

13   A    It looks like it, reading through that big TBU block, yes.

14   Q    Uh-huh.  And it also mentions -- right below the big TBU

15   block there it says, "Fund IX's position would be subordinated

16   by the new $1,075 million super senior debt."

17        Do you see that?

18   A    Yes.

19   Q    And Fund IX was an Apollo fund.  Right?

20   A    Correct.

21   Q    All right.  And it appears to mention -- you can see 875,

22   would that be $875 million exchange?

23   A    Most likely but, yeah, you've got to read through the big

24   to be updated block.

25   Q    Okay.  And it says, "Transaction support agreement is in

THEO KWON - CROSS BY MR. RUZINSKY

1  place with 51 percent of creditors, but definitive documents

2  have not yet been finalized."

3      Do you see that?

4  A   I see it.

5  Q   And that's -- you know that the PTL Lender Group had

6  51 percent of the 1-L tranche participation for that.  Right?

7  A   That was our understanding, yes.

8  Q   So this was made some time after Apollo had learned of the

9  accepted PTL proposal, but before it had closed.  Right?

10 A   Correct.

11 Q   Now there's been some suggestion that the PTL transaction

12 at issue, that has been referred to sometimes as an uptiering

13 transaction, was unforeseeable.

14     Do you recall that testimony?

15 A   Yes.

16 Q   And would you agree with me that this document says, in

17 the last bullet point above the blackout at the bottom it says,

18 "This specific risk of amending the waterfall with a majority

19 was extensively diligenced with Paul Weiss during the original

20 distressed debt underwriting and during this current

21 transaction process."

22     Do you see that?

23 A   Yes.

24 Q   And that's referencing the PTL Lender transaction.  Right?

25 A   Sure.

THEO KWON - CROSS BY MR. RUZINSKY

1      (Pause in the proceedings.)

2    BY MR. RUZINSKY:

3    Q    Mr. Kwon, would you agree with me that confidentiality

4    agreements are standard in the industry for these type of

5    transactions?

6    A    Yes.

7    Q    And when Apollo was negotiating the Ad Hoc Group proposed

8    transaction, it did not inform other lenders outside that

9    Ad Hoc Group of the proposal.  Right?

10   A    Correct.

11   Q    And you'd also agree with me that indemnification

12   provisions for the benefit of lenders in credit agreements are

13   standard in the industry.  Right?

14   A    It's my understanding, yes.

15   Q    Can you give us one example where Apollo bought debt under

16   a credit agreement that did not contain an indemnity provision?

17   Excuse me?

18   A    I just was drinking water.

19   Q    Okay.  And so the answer to the question is?

20   A    Can you repeat the question?

21   Q    The question is:  Can you give us one example where Apollo

22   bought debt under a credit agreement that did not contain an

23   indemnity provision for the benefit of the lender?

24   A    I cannot, but I'm not the best source of, you know, all

25   the indemnity provisions that Apollo has taken on though

1       confidentiality agreements.

2                   MR. RUZINSKY:  Your Honor, I'm going to object and

3       move to strike after --

4                   THE COURT:  Granted.

5                   MR. RUZINSKY:   -- the words, "I cannot."

6       BY MR. RUZINSKY:

7       Q    Mr. Kwon --

8                   FEMALE SPEAKER:  I'm sorry, I didn't catch the

9       judgment.

10                  THE COURT:  I can't hear her.

11                  MR. RUZINSKY:  Excuse me?

12                  THE COURT:  I can't hear her.

13                  FEMALE SPEAKER:  What did he say (indiscernible)?

14                  FEMALE SPEAKER:  Granted.

15                  MR. RUZINSKY:  Yeah, I thought you granted the

16      objection.

17                  THE COURT:  I granted the request to strike.

18                  MR. RUZINSKY:  Yeah.

19                  THE COURT:  It wasn't an objection.

20                  MR. RUZINSKY:  Yeah.  Thank you, Judge.

21      BY MR. RUZINSKY:

22      Q    Mr. Kwon, would you agree that it is common for lenders

23      making changes by majority vote in a credit agreement that a

24      borrower has already signed?  That amendments to credit

25      agreements that a borrower has already signed, that's common.

THEO KWON - CROSS BY MR. RUZINSKY

1      Right?

2      A    Sir, can you repeat it one more time?

3      Q    Sure.  Would you agree with me that it's common for

4      lenders to make changes by majority vote in a credit agreement

5      that a borrower has already signed.

6      A    Yes, it's common.

7      Q    And Apollo has participated in restructuring transactions

8      that involve amended credit agreements.  Right?

9      A    I believe so.

10     Q    And when Apollo signs credit agreements that permit

11     amendment by majority vote, Apollo understands the agreement is

12     subject to amendment or change.  Right?

13     A    I believe so.

14     Q    And you understand that the 2016 credit agreement in this

15     case also permits amendment by majority vote.  Right?

16     A    Yes, I believe so.

17     Q    And Apollo does not dispute that the amendments made to

18     this credit agreement received majority support.  Right?

19     A    That's correct.

20     Q    You would agree with me that Apollo has used its

21     relationships, prior dealings or potential for future deals

22     with other lenders or borrowers to participate in transactions

23     involving corporate debt or syndicated loans.

24     A    You're going to have to repeat that, please.

25     Q    Sure.  Would you agree with me that Apollo has used its

THEO KWON - CROSS BY MR. RUZINSKY

1    relationships, prior dealings or potential for future deals

2    with other lenders or borrowers to participate in transactions

3    involving corporate debt or syndicated loans?

4    A    I believe so.

5    Q    And you would agree with me that Apollo acted in good

6    faith when it did so.

7    A    I believe so.

8    Q    And that's also consistent with industry norms and ethics.

9    Right?

10   A    I believe so.

11   Q    Would you agree with me that Apollo has received benefits

12   in a debt exchange or re-purchase transaction that were not

13   given to Excluded Lenders?

14   A    Can you repeat the question, please?

15   Q    Would you agree with me that Apollo has received benefits

16   in a debt exchange or re-purchase transaction that were not

17   given to Excluded Lenders?

18   A    I believe so.

19   Q    And when Apollo did so it acted in good faith and

20   ethically.  Right?

21   A    I believe so.

22   Q    And doing so would be consistent with business norms.

23   Right?

24   A    I'm sorry what is the doing so?

25   Q    And doing so would be receiving benefits in a debt

THEO KWON - CROSS BY MR. RUZINSKY

1   exchange or re-purchase transaction that was not given to

2   Excluded Lenders.

3   A    It depends on the situation, but I believe so.

4   Q    You would also agree with me, would you not, that your

5   fiduciary duty is to your investors and if you're not

6   protecting your position, you're not going to like that.

7   Right?

8   A    Yes.

9   Q    You mentioned two transactions earlier in your Direct

10  testimony.  One was called Envision and one was called Mytell

11  (phonetic).  Do you remember that?

12  A    (No audible response.)

13  Q    With respect to Envision Apollo participated in an uptier

14  debt exchange transaction involving Envision Healthcare.

15  Correct?

16  A    Correct.

17  Q    And a majority of the creditors amended the parties'

18  existing agreements to permit the issuance of new senior

19  priming debt in that case.  Right?

20  A    As I understand, yes.

21  Q    That amendment had been negotiated with holders of a

22  majority of Envison's first lien term loan facility.  Right?

23  A    As I -- I believe so.

24  Q    And the participating lenders in that instance, including

25  Apollo, put in new money.  Right?

THEO KWON - CROSS BY MR. RUZINSKY

1    A    Yes.

2    Q    About $300 million.  Right?

3    A    Yes, but our portion of that was much smaller.

4    Q    Now Apollo did not invite or insist on inviting all first

5    lien lenders to participate in that transaction, did they?

6    A    I do not know.

7    Q    So you have no knowledge that anyone from Apollo invited

8    or insisted on inviting any other lenders to participate.  Is

9    that your testimony?

10   A    My testimony is I -- we were merely a participant.

11   Q    I understand you were a participant, but you could have

12   gone to any of the other lenders in that group and said, "I

13   want all the other lenders to be allowed the same opportunity."

14   You could have done that.  Right?

15   A    I'm not sure

16   Q    You're not sure?

17   A    I'm not sure.

18   Q    Were you involved in the Envision transaction?

19   A    I was not.

20   Q    But you have a general knowledge of the terms of that

21   transaction.  Right?

22   A    General knowledge, yes.

23   Q    Moving to Mytell, Apollo participated in a debt exchange

24   transaction with Mytell and got benefits that were not open to

25   all of the lenders in that group.  Right?

THEO KWON - CROSS BY MR. RUZINSKY

1   A    My understanding, yes.

2   Q    I'd like you to go to the big binder of the two that I had

3   given you, sir, and --

4           MR. RUZINSKY:  Which exhibit is the credit agreement?

5           UNIDENTIFIED SPEAKER:  361.

6           UNIDENTIFIED SPEAKER:  361.

7           MR. RUZINSKY:  Okay.  361.  Exhibit 361, sir, and it

8   would be in one of those two tabs.

9           THE WITNESS:  Which tab?

10          MR. RUZINSKY:  It would be --

11          THE WITNESS:  Yeah, 2, Mytell.

12          MR. RUZINSKY:  Of -- yes, Mytell.

13  BY MR. RUZINSKY:

14  Q    So the very first page of Exhibit 361 says, "First lien

15  credit agreement dated as of November 30, 2018."  Correct?

16  A    Yes.

17  Q    And you understand this to be the first lien credit

18  agreement in the Mytell transaction.  Right?

19  A    I do not.  I don't know.  I don't recognize MLN TopCo, MLN

20  UK HoldCo.  I'm not familiar with this document.

21  Q    Well, it was produced by your counsel.

22       (Pause in the proceedings.)

23  BY MR. RUZINSKY:

24  Q    If it was produced by your counsel as the Mytell

25  pre-existing credit agreement, do you have any information that

1   would dispute that?

2   A   No.  I'm just stating I don't recognize this document at

3   all.

4   Q   Okay.

5         MR. RUZINSKY:  All right.  I'm going to move to admit

6   the document.

7         THE COURT:  Any objection?

8         MR. EHRLICH:  Well, I don't think it's appropriate

9   through this witness, but, in fact, the parties had stipulated

10   to it this morning, that it's in evidence, so.

11         THE COURT:  Oh, is this -- is the one of the

12   stipulated documents that I haven't --

13         MR. EHRLICH:  I believe between --

14         THE COURT:  -- it's on the list --

15         MR. EHRLICH:  -- an exchange between my colleague,

16   Mr. O'Loughlin and Mr. Wilson, we had agreed.

17         UNIDENTIFIED SPEAKER:  I don't think it's been

18   formally in to the Record yet.

19         MR. EHRLICH:  What's that?

20         UNIDENTIFIED SPEAKER:  It's not formally --

21         MR. EHRLICH:  Okay.

22         UNIDENTIFIED SPEAKER:  -- in the Record yet.

23         MR. EHRLICH:  Then given that we've stated that we

24   would stipulate, I'm not going to object.

25         THE COURT:  All right.  Then it's admitted.

1          (Exhibit No. 361 received in evidence.)

2          MR. EHRLICH:  Which it reserves any objection to its

3     use with witness --

4          THE COURT:  Absolutely.

5          MR. EHRLICH:   -- depending on how it --

6          THE COURT:  If he asks him what something means --

7          MR. EHRLICH:   -- is used.

8          THE COURT:   -- and he can certainly have him read

9     sentences if that's what he wants to do, but I agree until he

10    lays a foundation that he has knowledge he can't ask him any

11    substantive questions.

12         MR. EHRLICH:  Thank you, Your Honor.

13         MR. RUZINSKY:  We're going to move off this exhibit

14    at the moment, Judge, and we're going to move to Exhibit --

15    it's Tab 14, Exhibit 362.

16         THE WITNESS:  Which tab again?

17         MR. RUZINSKY:  14.

18         (Pause in the proceedings.)

19    BY MR. RUZINSKY:

20    Q    Are you there, sir?

21    A    I am.

22    Q    Now you understand that Apollo's been sued for its role in

23    the Mytell transaction, don't you?

24    A    Us and other lenders, that's what I understand.

25    Q    Yes.  And if you look at this Exhibit 362, on the third

1   page you can see about halfway down the caption, you can see

2   Apollo Global Management Limited, John Doe Funds issued,

3   sponsored or managed by Apollo Global Management Limited.

4        Do you see that?

5   A    Yes, I do.

6   Q    As Defendants.  Do you see that?

7   A    Yes, I do.

8            MR. RUZINSKY:  Your Honor, I'm going to move for the

9   admission of this document, and I'm not asking that it be

10  admitted for the truth of the matters asserted in it.

11           THE COURT:  What purpose are you offering it?

12           MR. RUZINSKY:  The purpose of the offer is for when

13  it was filed, who it was filed against, and some of the

14  allegations that are contained in there that are just

15  allegations.  The cause -- there are two causes of action here

16  that I want to establish.  The claim has been made.

17           THE COURT:  Okay.

18           MR. EHRLICH:  Well, Your Honor, is this a document

19  that was filed on the Docket of the New York Supreme Court.  I

20  think it's appropriate for the Court to take judicial notice of

21  it if the Court thinks that relevant.  I don't think it should

22  be an exhibit in the Record of this proceeding.

23           MR. RUZINSKY:  The reason why I would like -- if I

24  may respond, Your Honor?

25           THE COURT:  Certainly.

1          MR. RUZINSKY:  The reason why I would like to admit

2     this is that I think the Court will see that the type of claims

3     that are being asserted against our clients have been asserted

4     against them in connection with a transaction that we

5     contend --

6          THE COURT:  All right.  So why don't we do it this

7     way, because the way you're going about it causes me all kinds

8     of heartburn from my years of having evidence fights.

9          MR. RUZINSKY:  Okay.

10          THE COURT:  So why don't you ask him if Apollo's been

11     sued on a particular claim when he says, "I can't remember,"

12     then you can use the document to refresh his recollection.

13     Because he's already said Apollo got sued.

14          THE WITNESS:  Yes.

15          THE COURT:  Why don't we do it that way?

16          MR. RUZINSKY:  I will do it that way, Judge.

17          THE COURT:  All right.

18          MR. RUZINSKY:  Thank you.

19     BY MR. RUZINSKY:

20     Q    Mr. Kwon, as part of that lawsuit that Apollo and others

21     have been sued on in connection with the Mytell transaction,

22     isn't it true that among the claims asserted against Apollo and

23     the other Defendants is that they breached the loan agreement?

24     A    I'm not sure.

25     Q    Okay.  Would you please turn in Exhibit 362 to page 52,

1    counting pages at the bottom.

2    A    Okay.

3    Q    All right.  And do you see there it says, "The fourth

4    cause of action, breach of contract, all Plaintiffs against all

5    Defendant lenders."

6         Do you see that?

7    A    Yes.

8    Q    And you know from the caption on page 3 that Apollo is

9    listed as one of the Defendant lenders.  Right?

10   A    Yes.

11   Q    And in numbered paragraph 161 there's a reference to the

12   original agreements.  Do you see that?

13   A    161?

14   Q    Numbered paragraph 161.

15   A    Yes.

16   Q    Also in numbered Paragraph 159, it talks about the

17   original agreements.

18            THE COURT:  Mr. Kwon, in looking at this page does

19   this refresh your memory that your company, Apollo, was sued

20   for breach of contact in that lawsuit?

21            THE WITNESS:  It does.

22            THE COURT:  All right.

23            MR. RUZINSKY:  Thank you, Judge.

24   BY MR. RUZINSKY:

25   Q    Turn, please, to page 56, Mr. Kwon.

1        THE COURT:  You've got to ask him the question first.

2   BY MR. RUZINSKY:

3   Q    Mr. Kwon, the seventh cause of action that's listed -- or

4   do you recall that in the Mytell lawsuit that Apollo and other

5   lenders were sued for breach of an implied covenant of good

6   faith and fair dealing?

7   A    I do not recall.

8   Q    Okay.  Please look at page 56.

9   A    I see it.

10  Q    Under seventh cause of action, you've seen that now, does

11  that refresh your recollection that, in fact, Apollo and the

12  other lender Defendants in this case were sued for breach of an

13  implied covenant of good faith and fair dealing?

14  A    Yes.

15  Q    And in Mytell the lenders there uptiered their existing

16  debt holdings into debt that was structurally senior through an

17  exchange.  Right?

18  A    That's my understanding except for the term structurally

19  senior, just senior.  I don't believe collateral is moved in

20  this.

21  Q    You would agree with me that Apollo received financial

22  benefits in the Mytell transaction and participated in that

23  Excluded Lenders did not receive.

24  A    My understanding, yes.

25  Q    And Apollo kept its negotiations in the Mytell transaction

1   from some of the non-participating lenders.  Right?

2   A    I do not recall, I do not know.

3   Q    Have you ever testified differently, sir?

4   A    I don't recall.

5   Q    Let's go to your deposition and see.  You want to go to

6   page 273 of your deposition, lines 6 through 9.

7        "Question:  Did Apollo receive any financial benefits that

8   the Excluded Lenders did not receive?"

9        "Answer:  To my knowledge, yes."

10       Do you see that?

11  A    Yeah, I apologize, I thought I answered (indiscernible).

12            THE COURT:  I think you --

13            MR. RUZINSKY:  Oh, I'm sorry.  Got the wrong ones.

14  We're going 14 through 17.

15  BY MR. RUZINSKY:

16  Q    "Did Apollo keep its negotiations confidential from some

17  of the non-participating lenders" was the question, answer, "To

18  my knowledge, yes."

19       Do you see that?

20  A    I do.

21  Q    Okay.  And then let's go back to page 272 and line 4,

22  you'll see that the reference there is we're talking about the

23  Mytell transaction.

24       So that was your testimony at your deposition on that

25  question in connection with the Mytell transaction.  Correct?

THEO KWON - CROSS BY MR. RUZINSKY

1    A    Correct.

2    Q    And you don't recall Apollo ever trying to invite the

3    Excluded Lenders in Mytell into that transaction, do you?

4    A    I do not, no.

5    Q    In the Mytell transaction you believe that Apollo acted in

6    good faith and ethically with respect to all aspects of that

7    transaction.  Right?

8    A    Right.

9    Q    Now it was June 5, 2020 when Apollo learned that its

10   proposal was not being accepted.  Right?

11   A    That seems about right.

12   Q    And the Ad Hoc Group then began exploring ways to block

13   the PTL Lenders' deal.  Right?

14   A    On June 5, is that the question?

15   Q    That they began, you know, they began thereabouts.  Right?

16   A    Thereabouts, I don't know the specific date, but

17   thereabouts.

18   Q    And ultimately there was a lawsuit filed.  Right?

19   A    Right.

20   Q    But before that lawsuit was filed the Ad Hoc Group tried

21   other ways to stop the PTL Lender transaction.  Right?

22   A    I believe so.

23   Q    All right.  Let's go to Exhibit 212, ECF 865-5, it's

24   Tab 15 in your notebook, sir.

25   A    Thank you.

THEO KWON - CROSS BY MR. RUZINSKY

1   Q    Now this is an email from David Sambur to a William Everts

2   (phonetic) and you are cc'd on this email from Saturday,

3   June 6, 2020.  Correct?

4   A    Correct.

5   Q    And it also, you know, contains -- it contains a string of

6   email and you were either a direct recipient or cc'd on those

7   emails.  Correct?

8   A    Yeah, it looks like mostly cc'd.

9   Q    Well, let's go, so let's go to page 2 of 6 in Exhibit 212.

10  You're one of the -- you're one of the parties that was -- or

11  one of the people it was sent to directly.  You're not in the

12  cc list there, are you?

13  A    I'm on the email, yes.  I'm included in the email, CCR2.

14  Q    Okay.  And the same thing in the -- on page 3, it's to you

15  and others, you're not in the cc group there are you?

16  A    Again, throughout this email chain I affirmatively confirm

17  that I am on the email chain, whether it's on the "To" line or

18  the "CC" line.

19  Q    Okay.  And you received these emails.  Right?

20  A    Correct.

21  Q    Okay.

22          MR. RUZINSKY:  Your Honor, I'd like to introduce, if

23  it is not already in evidence, Debtor's Exhibit 212.

24          MR. EHRLICH:  No objections.

25          THE COURT:  Any objection?

1          MR. EHRLICH:  No objection.

2          THE COURT:  Thank you.  It's admitted.

3      (Exhibit No. 212 received in evidence.)

4   BY MR. RUZINSKY?

5   Q    And, Mr. Kwon, this email string shows that very shortly

6   after the PTL Lenders' transaction was announced as being

7   accepted by Serta Simmons, the Ad Hoc Group discussed ways --

8   you know, discussed reaching out to the PTL Lenders.  Right?

9   A    It looks like that way, yes.

10  Q    Okay.  And Angelo -- I'm sorry, not Angelo Gordon, but the

11  Ad Hoc Group put together certain talking points in

12  anticipation of one or more calls with the PTL Lenders.  Right?

13  A    Yes.

14  Q    All right.  And let's take a look at some of those.

15      One of those talking points is Advent, that's Serta's

16  sponsor, played our two groups off each other and continues to

17  do so.

18      Do you see that?

19  A    Where is that?

20  Q    That is --

21  A    Yes, I see it.

22  Q     -- page 1.

23  A    Yep.

24  Q    It also says in the next line, "We can see the Gibson and

25  Centerview Group has outmaneuvered our group."

THEO KWON - CROSS BY MR. RUZINSKY

1      Do you see that?

2    A    I do.

3    Q    And it also expresses concern about a race to the bottom

4    and litigation risk.  Right?

5    A    Correct.

6    Q    And it also proposed, on page 2, a lock up of the two

7    sides together.  Is that right?

8    A    It looks that way, yes.

9    Q    So this is the Ad Hoc Group saying, "We'll sign a lock up

10   that ties us all together that Gibson can draft," and then it

11   says, "The group will only pursue transactions that treat all

12   parties the same and are supported by the group."

13       Do you see that?

14   A    Correct.

15   Q    And then you've got a feature here where you say, "Payment

16   to Gibson/Centerview Group option."

17       Do you see that?

18   A    Yeah, I didn't say it, but, yes, it's drafted there.

19   Q    And it has two alternatives there.  It says, Ad Hoc Group

20   purchase of $200 million of face value at 65 cents, or

21   $30 million fee paid directly to Ad Hoc Group members.  Right?

22   A    Yes.

23   Q    So one of the things being considered was paying

24   $30 million to the PTL Lender Group to not do their

25   transaction.  Is that right?

THEO KWON - CROSS BY MR. RUZINSKY

1    A    Well, it looks like under this talking point, set of

2    talking points it was, yes, a fee to pay them to work together.

3    Q    Was Serta Simmons going to get any part of that money?

4    A    In this talking -- set of talking points?  No.

5    Q    And when you saw this, did you immediately reach out to

6    the folks who were on this email and say, "Stop, don't do

7    that"?

8    A    I did not.

9    Q    Do you know of anybody else in the PTL Lender Group -- I'm

10   sorry, in the Ad Hoc Group who expressed concern about a

11   $30 million payment to the other group whose deal had just been

12   announced as being accepted?

13   A    Well, sorry, this is June 6?

14   Q    Uh-huh.

15   A    I don't think the transaction was officially announced yet

16   Q    You don't think the transaction had been announced on

17   June 6?

18   A    Again, I'd have to recall the exact timing, but I don't

19   think it was announced.

20   Q    When was the first time you were told of the PTL Lender

21   transaction?

22   A    I think the day right before this, on Friday, June 5.

23   Q    Okay.  And so Friday, June 5 was when you learned of the

24   terms of the transaction that Serta Simmons was going with as

25   opposed to the Ad Hoc Group transaction.  Right?

THEO KWON - CROSS BY MR. RUZINSKY

1    A    At that point in time I don't think we knew about the

2    terms, all we knew that -- was that they were doing a

3    transaction with the Gibson Dunn Group.

4    Q    Okay.  So not knowing -- you're telling us not knowing the

5    terms of this transaction, you know, your Ad Hoc Group was

6    discussing making a $30 million payment to the competition,

7    whose deal had just gotten accepted by Serta, to not do that

8    deal.

9    A    That's how extreme the situation was that the company had

10   pit against us.

11   Q    And you thought doing something extreme in response to

12   that was proper?

13   A    What is -- what do you mean by extreme in our response?

14   Q    Paying $30 million to the competition to not do their

15   deal.

16   A    These are pretty standard in the industry.

17   Q    So you felt like it was good faith, it was fair and it was

18   ethical for there to be, from the Ad Hoc Group who had just

19   learned that their deal was not accepted, to make a $30 million

20   payment to the group whose deal was being accepted to not do

21   that deal.

22   A    I think, again, what these talking points drafted on

23   Saturday, June 6, they were offering the Gibson Dunn Group a

24   set of options, a set of alternatives.

25         MR. RUZINSKY:  Move to strike as non-responsive.

1          THE COURT:  Sustained.  If you'd re-ask the question.

2          MR. RUZINSKY:  Thank you, Judge.

3     BY MR. RUZINSKY?

4     Q    Mr. Kwon, my question is that you believe it was good

5     faith, fair and ethical for the Ad Hoc Group, right after they

6     learned of the Serta Simmons acceptance of the PTL Lender

7     transaction, for the Ad Hoc Group to offer $30 million to the

8     PTL Lender Group not to do the transaction with Serta Simmons?

9     A    (No audible response.)

10    Q    Are you telling this Court that was good faith, that was

11    fair, and that was ethical?

12    A    It was, yes.

13         THE COURT:  And perhaps I didn't hear him.

14         Mr. Kwon, was this offer actually made?

15         THE WITNESS:  I believe it was communicated.

16         THE COURT:  Okay.  I just didn't hear that, my

17    apologies.

18    BY MR. RUZINSKY:

19    Q    Mr. Kwon, after the 2020 transaction was consummated,

20    Apollo entered into a binding cooperation agreement with the

21    Angelo Gordon, Gamut, and other defendants in this case such as

22    Z Capital and Ascribe (phonetic).  Is that correct?

23    A    Correct.

24         MR. RUZINSKY:  And would you please pull up

25    Exhibit 266?

1          And just becuase I don't want to forget anything,

2     Judge, did I move to admit 212?

3               THE COURT:  You did.

4               MR. RUZINSKY:  Thank you.

5               THE COURT:  More importantly, did I admit it.

6               MR. RUZINSKY:  Yes, that is more important.

7               THE COURT:  I'm sorry.

8          (Laughter.)

9               THE COURT:  I'm just giving you a hard time.

10    BY MR. RUZINSKY:

11    Q    So we have 266, which is Tab 16, sir, in your binder.

12    A    Thank you.

13         (Pause in the proceedings.)

14    BY MR. RUZINSKY:

15    Q    Mr. Kwon, have you seen this before?

16    A    No.

17         (Pause in the proceedings.)

18              MR. RUZINSKY:  Your Honor, I'm going to move for the

19    admission of this document.  My understanding is it's been

20    stipulated to be admitted.

21              THE COURT:  Okay.  Mr. Ehrlich, do you need to verify

22    that?

23              MR. EHRLICH:  I will accept Counsel at his word, but

24    I'll reserve my rights as to this document, it's an Angelo

25    Gordon internal document.  But the witness has already

1      testified --

2              THE COURT:  Of course he said he'd never seen it

3      before.

4              MR. EHRLICH:   -- he never saw.  But no objection to

5      it being in the evidentiary record.

6              THE COURT:  Then I'll admit, pursuant to the

7      agreement of the parties, 266 found at 866-3.

8          (Exhibit 266, ECF 866-3, received in evidence.)

9              MR. RUZINSKY:  Thank you, Judge, and thank you,

10     Counsel.

11     BY MR. RUZINSKY:

12     Q    Mr. Kwon, would you turn, please, to -- it's Slide 26,

13     it's page 28 of 110.

14     A    Yes.

15     Q    And do you see there in the first bullet point, "On

16     September 28, 2020 the Ad Hoc Group, the Serta lenders which

17     includes AG, Apollo and Gamut, executed the co-op agreement

18     forming the co-op group."

19         Do you see that?

20     A    I do.

21     Q    And do you see in the last bullet point under Co-op Key

22     Provisions, it says, "Since the -- AHG executed the co-op

23     agreement, other non-exchanged 1-L TL holders joined, including

24     Ascribe Capital, Alcentra, LMR, and Z Capital."

25         Do you see that?

1    A     (No audible response.)

2    Q     Okay.  And is that consistent with your understanding?

3    A     Correct.

4    Q     All right.  And also consistent with your understanding

5    that the co-op agreement was entered into in September of 2020.

6    A     Yes.

7    Q     And under the co-op key provisions I want to focus your

8    attention on the 3rd and 4th bullet points there.  Do you

9    understand from this co-op agreement that the members of this

10   agreement were agreeing in September of 2020 that unless they

11   all agreed, that they wouldn't agree to certain things, one of

12   which was the vote to accept the Plan of Reorganization that

13   has not been consented to by everybody in their group.

14   A     Well, consented to by the requisite holders.

15   Q     And what did you understand the requisite holders to be?

16   A     The Ad Hoc Group members who were in Apollo and Gamut.

17   Q     Okay.

18          THE COURT:  Mr. Kwon, could you just look at that

19   again, make sure that that's your testimony.

20          THE WITNESS:  Can you repeat the question, please?

21          THE COURT:  Sure.  The question was, who were the

22   requisite holders, and you said -- what I heard you say was

23   Apollo -- or AG, Apollo and Gamut, which are identified as the

24   initial holders.  And then it says, "And further identified as

25   requisite directing holders," defined term requisite holders,

THEO KWON - CROSS BY MR. RUZINSKY

1    and then it's got an amendment to it.  And I'm just -- I just

2    want to make sure that you're going -- you're either going by

3    memory or reading the document, I just want to make sure I

4    understand what you're telling me.

5         THE WITNESS:  Sure.  Can you give me a second

6    because --

7         THE COURT:  Of course.

8         THE WITNESS:   -- there's a lot of definitions here.

9    (Perusing document.)

10        So I guess to answer, without the actual agreement I

11   can't tell you specifically who the requisite holders are, but

12   to your question about this third bullet point, that the group

13   cannot move forward unless it is consented by the requisite

14   holders.  I just don't know who fits in that definition right

15   now.

16        MR. RUZINSKY:  Your Honor, I'm going to pass the

17   witness.

18        THE COURT:  All right.  Is there anyone else that

19   supports confirmation that has questions?

20        Mr. Winger?

21        MR. WINGER:  Your Honor, if it would be okay, may I

22   be excused, my oldest daughter is graduating college tomorrow

23   and I've got to get her on a plane.

24        THE COURT:  That is a wonderful event in your life.

25   Congratulations.  Where is she graduating from?

THEO KWON - CROSS BY MR. RUZINSKY

1          MR. WINGER:  Fox University.

2          THE COURT:  Very, very cool.  That's -- you should be

3    very proud.

4          MR. WINGER:  I am.  I am.

5          THE COURT:  Is she going to follow in your footsteps?

6          MR. WINGER:  No chance.  She's a --

7          THE COURT:  No chance.

8      (Laughter.)

9          MR. WINGER:  -- she's a stand-up comic, so it's a

10   little bit different.  Maybe similar, but a little bit

11   different.

12          UNIDENTIFIED SPEAKER:  Oh, yeah.

13      (Laughter.)

14          THE COURT:  That just opens the door, I mean --

15          MR. WINGER:  We can have a sidebar on that later,

16   have a sidebar later.

17          THE COURT:  Congratulations.  Absolutely.

18          MR. WINGER:  Thank you.  Thank you.  We'll see you

19   next week.  Thank you so much.

20          THE COURT:  All right.  Any Redirect?

21          MR. EHRLICH:  Very briefly, Your Honor.

22          THE COURT:  Certainly.  Let me get you back --

23                  REDIRECT EXAMINATION

24   BY MR. EHRLICH:

25   Q    Mr. Kwon, I'd like to direct your attention back to

THEO KWON - REDIRECT BY MR. EHRLICH

1   Debtor's 212, which is Tab 15 in your binder, in the binder

2   that the Debtors had given you.

3   A    Where --

4   Q    Or the lenders I should say.  The one with all the tabs.

5   A    The smaller binder or the gigantic binder?

6   Q    And not the gigantic one.  The one with all the tabs.

7   A    Sorry, I --

8   Q    And it's Tab 15, Debtor's Exhibit 212.

9   A    Yes.

10   Q    And these are the talking points that were prepared over

11   the weekend of June 6 and 7.

12   A    Yes.

13   Q    Now, Mr. Kwon, let me ask you a question.  With respect to

14   the lenders that were in the PTL Group, do you have an

15   understanding of their cost basis in the Serta loans that they

16   owned?

17   A    My understanding was that it was high.

18   Q    Were any of them essentially par buyers in the

19   syndication?

20   A    Most likely, yes.

21   Q    And with respect to the lenders in your group, Gamut,

22   Angelo Gordon and Apollo, do you have an understanding of their

23   cost basis?

24   A    Yes, it was significantly lower.

25   Q    And do you understand that if you worked together in a

1  group that, as it says in this document, treats all parties the

2  same, the parties were they're proceeding from different cost

3  bases?

4  A    Sorry, can you repeat that?

5  Q    Were they proceeding from different cost bases if you

6  worked together --

7  A    Yes.

8  Q     -- the two groups?  And so how does a fee or a purchase

9  at 65 cents of either a transaction fee or a purchase at

10  65 cents make sense in the context of the different cost bases

11  of the two groups of lenders?

12  A    It's -- you could view it as compensating them for the

13  high cost basis that they have.

14  Q    So that was -- so in other words, if you were to pit --

15  well, step back.

16      If you were to do that deal together that treated all

17  parties the same that's outlined here, would that have a

18  disproportionate negative effect on the PTL Lenders given their

19  cost basis?

20  A    Right.

21  Q    And was this an attempt to compensate them for that?

22  A    I believe so.

23  Q    Thank you.  Nothing further.

24          THE COURT:  All right.  Thank you.

25          Anyone else?

1          (No audible response.)

2                THE COURT:  Any Recross on that one issue?

3                MR. RUZINSKY:  No, Your Honor.

4                THE COURT:  All right.  Any reason that Mr. Kwon

5      cannot be excuse?

6                MR. RUZINSKY:  No, sir.

7                THE COURT:  Mr. Kwon, number one, I am envious of

8      your educational background.  I always love when I get to go up

9      to Wharton and teach from time-to-time.  I can't imagine that

10     experience.  It's a fabulous institution.  So you should be

11     proud of that.

12               I very much appreciate your time this afternoon.  You

13     are excused from the Rule, you are free to go.  You are also

14     free to stay in the courtroom if you wish.

15               THE WITNESS:  Thank you, Judge.

16               THE COURT:  Thank you.

17          (Witness steps down.)

18               THE COURT:  Mr. Ehrlich, would you -- how would --

19     and I'm totally open, would you like to take a lunch break,

20     would you like to go ahead with your last witness, what would

21     you like to do?

22               MR. EHRLICH:  Can I confer briefly with Mr. Wilson?

23               THE COURT:  Absolutely.

24          (Pause in the proceedings.)

25               MR. EHRLICH:  Having conferred we would like to just

1     get it done.

2          (Laughter.)

3                THE COURT:  Fair enough.

4                UNIDENTIFIED SPEAKER:  There is that.

5                MR. EHRLICH:  Okay.  Can we take maybe a 15-minute

6     break?

7                THE COURT:  Absolutely.  So we'll adjourn until --

8     can we just say 12:30 just so I can keep it on an even number?

9                MR. EHRLICH:  Perfect.

10               THE COURT:  All right.  Thank you.

11               MR. EHRLICH:  Thank you, Your Honor.

12               THE COURT:  Adjourned until 12:30.

13               THE CLERK:  All rise.

14          (Proceedings adjourned at 12:35 p.m.)

15                              *  *  *  *  *

16          *I certify that the foregoing is a correct transcript*

17     *to the best of my ability due to the condition of the*

18     *electronic sound recording of the ZOOM/video/telephonic*

19     *proceedings in the above-entitled matter.*

20     *   /S/   MARY D. HENRY*
       _____

21     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

22     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

23     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

24     *JTT TRANSCRIPT #67232*

25     *DATE FILED:  MAY 21, 2023*