1          IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                    HOUSTON DIVISION

4

IN RE:                          §      CASE NO. 23-90020-11
5                                 §      JOINTLY ADMINISTERED
SERTA SIMMONS BEDDING, LLC,      §      HOUSTON, TEXAS
6  ET AL,                         §      THURSDAY,
                                  §      MAY 18, 2023
7          DEBTORS.               §      12:35 P.M. TO 1:51 P.M.
***************************************************************
8  SERTA SIMMONS BEDDING, LLC,    §      CASE NO. 23-09001-ADV
   ET AL                          §      JOINTLY ADMINISTERED
9                                 §      HOUSTON, TEXAS
VERSUS                           §      THURSDAY,
10                                §      MAY 18, 2023
AG CENTRE STREET PARTNERSHIP,    §
11 ET AL                          §      12:35 P.M. TO 1:51 P.M.

12     **CONFIRMATION DAY FOUR -- AFTERNOON SESSION (VIA ZOOM)**

13            BEFORE THE HONORABLE DAVID R. JONES
                  UNITED STATES BANKRUPTCY JUDGE

14

15

        APPEARANCES:                    SEE NEXT PAGE
16
        COURTROOM DEPUTY:               VRIANA PORTILLO
17

18
                    **(Recorded via CourtSpeak)**
19

20              TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22               Sugar Land, TX 77478
                   281-277-5325
23            www.judicialtranscribers.com

24

        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.

```
 1                        APPEARANCES (VIA ZOOM):

 2
     FOR THE DEBTOR:                  WEIL GOTSHAL & MANGES, LLP
 3                                    Ray Schrock, Esq.
                                      David Lender, Esq.
 4                                    Alexander Welch, Esq.
                                      700 Louisiana, Ste. 1700
 5                                    Houston, TX  77002
                                      713-546-5000
 6

 7   FOR CITADEL:                     FAEGRE DRINKER BIDDLE & REATH
                                      James Millar, Esq.
 8                                    1177 Avenue of the Americas
                                      41st Floor
 9                                    New York, NY  10036
                                      212-248-3140
10

11   FOR PRIORITY LENDERS:           GIBSON DUNN & CRUTCHER, LLP
                                      Gregg J. Costa, Esq.
12                                    Lee Wilson, Esq.
                                      811 Main Street
13                                    Suite 3000
                                      Houston, TX  77002
14                                    346-728-6649

15
     FOR SERTA MINORITY LICENSEES:   FISHMAN JACKSON RONQUILLO,
16                                    PLLC
                                      Mark Ralston, Esq.
17                                    4835 LBJ Freeway
                                      Suite 475
18                                    Dallas, TX  75244
                                      972-419-5544
19
     FOR THE STATE OF CONNECTICUT
20   DEPARTMENT OF ECONOMIC AND
     COMMUNITY DEVELOPMENT:           MR. BOWMAN
21

22   FOR THE EXCLUDED LENDERS:       FRIEDMAN KAPLAN SEILER
                                      & ADELMAN, LLP
23                                    Eric Seiler, Esq.
                                      7 Times Square
24                                    New York, NY  10036-6516
                                      212-833-1103
25
```

1                    APPEARANCES (CONT'D) (VIA ZOOM):

2

3   FOR LCM LENDERS:              HOLWELL SHUSTER &
                                  GOLDBERG, LLP
4                                 Neil Lieberman, Esq.
                                  425 Lexington Avenue
5                                 New York, NY  10017
                                  646-837-5151
6

7   FOR APOLLO:                   PAUL WEISS RIFKIND WHARTON
                                  & GARRISON, LLP
8                                 Andrew Ehrlich, Esq.
                                  1285 Avenue of the Americas
9                                 New York, NY  10019
                                  212-373-3000
10

11

12

13   (Please also see Electronic Appearances.)

14

15

16

17

18

19

20

21

22

23

24

25

4

1                           INDEX

2

3    WITNESS:          Direct     Cross    Redirect    Recross

4    MICHAEL HANIGAN
      By Mr. Ehrlich     5          .          .           .
5     By Mr. Costa       .         27          .           .

6

7    EXHIBITS:                   Received

8    No. 34, ECF 861-28            15
     No. 174, ECF 864-17          23
9

10                             ***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1          **HOUSTON, TEXAS; THURSDAY, MAY 18, 2023; 12:35 P.M.**

2          THE COURT:  -- under Case No. 23-90020, Serta

3    Simmons Bedding, LLC, et al, as well as the associated

4    adversary proceeding.

5          Mr. Ehrlich, your final witness.

6          MR. EHRLICH:  Yes, Your Honor.  The Ad Hoc Group

7    of Excluded Lenders calls Michael Hanigan.

8          THE COURT:  All right.  Mr. Hanigan, if you'd

9    please come forward?

10         Good afternoon.  Come right on up here.  And if --

11   before you take your seat, if you'd raise your right hand,

12   please, sir.

13     MICHAEL HANIGAN, EXCLUDED LENDERS' WITNESS, SWORN

14         THE COURT:  Thank you, sir.

15         MR. EHRLICH:  May I approach, Your Honor?

16         THE COURT:  Certainly.  Thank you.

17       (Pause in the proceedings.)

18         MR. EHRLICH:  Okay.  You all set, Mr. Hanigan?

19         THE WITNESS:  I'm all set.

20         MR. EHRLICH:  Great.

21                    DIRECT EXAMINATION

22   BY MR. EHRLICH:

23   Q    Can you please introduce yourself to the Court?

24   A    I'm Michael Hanigan.

25   Q    And where are you from, Mr. Hanigan?

1 A    I actually grew up here.  I grew up in Northwest

2 Houston.  I went to school at the University of Texas at

3 Austin.

4 Q    And what's your degree in?

5 A    I have a bachelor in business administration with a

6 major in finance.

7 Q    And where did you go to work after you graduated from

8 UT?

9 A    After UT I worked at investment bank called Moelis and

10 Company in New York.

11 Q    And where'd you go from Moelis?

12 A    After Moelis I started at Gamut in January 2017.

13 Q    And you've been there continuously since?

14 A    Ever since.

15 Q    And what's your role at Gamut?

16 A    I'm a principal.

17 Q    And can you explain to the Court what it is that Gamut

18 does?

19 A    Sure.  So we are a New York-based private equity firm.

20 The core of what we do is a private equity firm, so we buy

21 and sell companies and manage those companies as --

22      (Electronic noise.)

23           THE COURT:  My fault.  I forgot to turn that back

24 down.

25           Let's see.  Your voice carries, so give me just a

1  second.

2            Shouldn't do that anymore, my apologies.

3            THE WITNESS:  Okay.

4            So, yeah, we are a New York-based private equity

5  firm at our core.  We make value-oriented investments.  But

6  we do a flexible mandate, which means we can make

7  investments across the capital structure.

8  BY MR. EHRLICH:

9  Q    And roughly what portion of Gamut's investments are

10 what we would think of as traditional private equity

11 investments?

12 A    The vast majority are traditional private equity-

13 controlled investments.

14 Q    And does Gamut also from time to time invest in debt

15 securities --

16 A    We do.

17 Q    -- or leverage loans?

18 A    Yeah.

19 Q    And as a principal, I should have asked you this,

20 Mr. Hanigan, what's your role?

21 A    So my role is broad, but it's really overseeing all

22 aspects of the investment execution and management, so

23 everything from the underwriting to the monitoring to the

24 continuing management of the investment.

25 Q    Now, with respect to Gamut's debt investments, do you

1 participate in those type of investments as well?

2 A    I do.

3 Q    And does Gamut have any particular investment

4 philosophy vis-à-vis buying leverage loans or debt?

5 A    Our investment philosophy is we first look for good

6 companies.  You know, we need to first make sure that

7 they're structurally sound companies that have long-term

8 value that's still intact.  So that's the first thing that

9 we look for.

10       A lot of times the companies that we are investing in

11 in the secondary credit markets are companies that are

12 undergoing some short-term issues and maybe have excess

13 leverage on their balance sheets.

14 Q    And were you personally involved in -- well, let me ask

15 you this:  Did Gamut acquire Serta first lien loans?

16 A    We did.

17 Q    And were you personally involved in those acquisitions?

18 A    Yes.

19 Q    And when did Gamut begin to purchase first lien loans?

20 A    December 2018.

21 Q    And why did Gamut begin to purchase Serta first lien

22 loans in late 2018?

23 A    So it kind of goes back to the fundamentals of what we

24 look for in a credit investment.  First, we look for a good

25 business.  You know, I think when we were looking at Serta,

1  we first saw that it was undergoing a lot of short-term

2  headwinds.  I think some of it was industry-driven by some

3  disruption in some of the new entrants to the space.  And

4  some of it was also mismanagement we identified.

5      But once we did our diligence, we determined that the

6  long-term value proposition of the company remained intact,

7  had very well-recognized brands.  It had the strong free

8  cash flow proposition.  And so that's what was important to

9  us to first identify.

10     Now, the opportunity to buy into the capital structure

11 was because the company itself had excess leverage on its

12 balance sheet which was the result of a 2016 dividend that

13 the sponsor took out.

14 Q   Now, as you're considering whether or not to buy Serta

15 first lien debt, did you have an underwriting process that

16 you used?

17 A   Yes.

18 Q   And what did that entail?  And just at a general level.

19 A   Sure.  So part of it was the business diligence aspect

20 and understanding the fundamentals of the business.

21     The other was understanding where our investment could

22 go.  You know, I think our first priority is understanding

23 what the returns would be if we got paid back our principal

24 at maturity.  You know, that has to make sense for us

25 because there's a very high likelihood that that could

1 | happen.  So that is one outcome we would be underwriting to.

2 |     The other outcome is the scenario, especial because

3 | we're a passive debt holder, we don't know where the company

4 | is going to go, there's a scenario where the company can't

5 | pay back its obligations.  So, you know, for us it was

6 | important to be a first lien lender because if the company

7 | couldn't pay back its obligations, we wanted to ensure that

8 | we would be first in line.

9 | Q    Now, do you model when you do your underwriting any

10 | kind of various scenarios for outcomes?

11 | A    We do.

12 | Q    And when you acquired Serta debt did you model

13 | different potential scenarios of outcomes?

14 | A    Sure.  We would have looked at getting paid back our

15 | principal at maturity.  We would have looked at us owning

16 | the business through a restructuring where the company

17 | couldn't pay us back.  You know, I think that's one of the

18 | outcomes.  We would have been happy with all outcomes.

19 |     For us, the reason we're comfortable with the scenario

20 | where the company can't pay back what's owed is because,

21 | like I said, we are a private equity firm.  A lot of what we

22 | do is we own businesses.

23 |     A lot of the businesses that we buy into need to be

24 | turned around.  So we have the operational expertise to turn

25 | businesses around to reduce leverage from its balance sheet.

1  So it's an outcome that we were comfortable with.

2  Q    And when you were doing your diligence and underwriting

3  on Serta, did you manage -- did you model potential

4  liability management transactions?

5  A    Yes.  One of the things that we would always do, and we

6  did in this case, is we would review the credit agreement

7  alongside external counsel and review it holistically.

8       But I think one of the things that would be important

9  for us to understand is the sizes of the baskets that are

10 allowed, the investment basket capacities, and the

11 indemnities basket capacities in particular.  Those are

12 things that, you know, we're aware of because we participate

13 in the credit markets, not just on buying debt or lending to

14 companies.

15      But also we're a frequent borrower when we own these

16 businesses.  So one of the things we looked at was

17 quantifying the basket capacities to understand the risk

18 that the company could pursue a liability management

19 transaction where assets moved and debt was raised.

20 Q    Let me just unpack something that you just said there,

21 Mr. Hanigan.  You said that Gamut is a frequent borrower.

22 Is that because -- does Gamut own companies that enter into

23 leverage loan agreements?

24 A    Yes.

25 Q    And do you and your colleagues at Gamut participate in

1  the negotiation of those agreements with prospective

2  lenders?

3  A    Yes.

4  Q    Now, did you in connection with Serta in particular

5  model any particular types of liability management

6  transactions or think about the possibility those might

7  happen?

8  A    Yeah.  The main liability management exercise we

9  modeled to understand what the impact would be to our

10 investment would be the movement of assets and the raising

11 of debt as allowed under the baskets that were written in

12 the credit agreement.

13 Q    Now, you're aware that in June of 2020 the company

14 entered into what I'll call a priming uptier transaction,

15 right?

16 A    Yes.

17 Q    And was that something that you modeled as you were

18 doing your diligence in the fall of 2018?

19 A    No.

20 Q    Why not?

21 Q    You know, I think we went into this, like I said,

22 thinking about different outcomes.  One is getting paid

23 back, one is owning the business because they can't pay us

24 back.

25      What was critical to us was being a first lien lender.

1    We weren't buying into the second lien term loan because it

2    was important for us to be first in line with the rest of

3    our class to own the business if we couldn't get paid back.

4        What we didn't model out or ever expect was that within

5    our class, there would be certain lenders who were chosen to

6    get paid before us because fundamentally important to us was

7    being first in line.  So, you know, when we got moved to

8    last in line, it was unexpected.  We had never heard of a

9    transaction that happened like that.  And it was fundamental

10   -- against the fundamentals of our investment pieces.

11   Q    Now, Gamut purchased additional Serta Simmons debt

12   after -- excuse me.  Did Gamut purchase additional Serta

13   Simmons debt after late 2018?

14   A    Yes.

15   Q    And did it did -- did it do so into 2020?

16   A    Yeah, throughout 2019 and into 2020.

17   Q    So let's jump ahead to 2020.  After the onset of the

18   COVID-19 pandemic in March of 2020, how, if at all, did your

19   view of Serta Simmons change?

20   A    The near term dynamics were obviously much different.

21   There was a ton of uncertainty in Serta Simmons and, you

22   know, every other business.  And I think the medium term

23   outlook was also uncertain.  The company continued to

24   struggle.

25       For us, though, we continued to believe in the

1  long-term value proposition of the business.  So we were

2  still comfortable that that was still there and it was still

3  a good investment for us to make.

4  Q    If I could -- I put a small binder in front of you,

5  Mr. Hanigan.  If I could ask you to look at Tab 4 there?

6          MR. EHRLICH:  Mr. Carlock, it's Debtor's

7  Exhibit 34, ECF 861-28 on the main Docket.

8  BY MR. EHRLICH:

9  Q    Do you recognize this email, Mr. Hanigan?

10 A    Yes.

11 Q    And it was from you to an individual named Jordan Zaken

12 (phonetic) and an individual named Michael Krieger

13 (phonetic); you see that.

14 A    Yeah.

15 Q    And who is Mr. Zaken?

16 A    He's a cofounder of Gamut.

17 Q    And who is Mr. Krieger?

18 A    He's a partner at Gamut.

19 Q    And was this the core deal team for the Serta Simmons

20 investment at Gamut?

21 A    Yes, at this time.

22         MR. EHRLICH:  Your Honor, I would offer

23 Debtor's 34.

24         THE COURT:  Any objection?

25         MR. RUZINSKY:  No objection.

1          THE COURT:  All right.  Thank you.

2          It's admitted.

3     (Exhibit 34, ECF 861-28 received in evidence.)

4  BY MR. EHRLICH:

5  Q    Now, Mr. Krieger [sic], if I could direct your

6  attention to the full paragraph in the middle of the page,

7  it states, "The existing sponsors re-levered the business in

8  2016 to pay a distribution, saddling the business with an

9  unsustainable capital structure in the face of an ever

10 competitive retail environment.  For Gamut, this is a

11 classic DFC opportunity:  good company, bad balance sheet."

12      Do you see that?

13 A    Yep.

14 Q    How does that relate to the investment pieces that you

15 shared with us earlier?

16 A    So this is really summarizing in a few words what I

17 went into more detail.  Good company, we liked the brands,

18 we thought that over the long term the company could

19 continue to succeed.  But the balance sheet was an issue.

20 They had way too much debt.  I think it actually impacted

21 the way they were operating the business.  And so those were

22 the two dynamics that we looked for more broadly in our DFC

23 strategy and what we saw here.

24 Q    And can you explain to the Court what is meant by DFC?

25 A    Sure.  So DFC, it stands for "Distressed For Control."

1   It's a bit of a misnomer.  It really just is an acronym for

2   how we approach the debt markets.  It's not that we'll

3   always get control of a business.  Actually, oftentimes we

4   get paid back our principal.  But it is a possibility that

5   we could end up as a controlling stakeholder of the

6   business.

7   Q    Now, with respect to Serta Simmons, what was at the end

8   of the day the maximum investment that Gamut made in the

9   first lien?

10  A    We ultimately held $161 million of face value of debt.

11  Q    And do you know the size of the first lien tranche

12  prior to the June, 2020 transaction?

13  A    About 1.9 billion.

14  Q    So was Gamut seeking to acquire a controlling position

15  in the -- even if there was an equitization of the 1-L?

16  A    No.  We never would have been able to.

17  Q    Now, at this point in time, though, was a restructuring

18  in your view likely?

19  A    At this time it was certainly more likely than

20  pre-COVID.

21  Q    Let me direct your attention to, I guess, the third

22  from the -- or fourth from the bottom line.  It states, "The

23  likelihood of a near term restructuring, which is a

24  meaningful positive to our investment these -- I think it

25  probably means thesis -- has increased dramatically to also

1   a certainty.  The current creation value for the business is

2   an exceptional discount to historical transaction levels and

3   public comparables."

4        Can you explain to the Court what's intended here?

5   A    Sure.  So where the two outcomes are, you can get paid

6   back at maturity or you can get control of a business when

7   they can't pay you back at maturity.

8        One of the risks that we had grappled with for a while

9   was the maturity here wasn't until 2023, and we were talking

10  about this in 2020.  And the company continued to struggle.

11  You know, I think part of the issue was the company had too

12  much debt and it was doing unnatural things to manage that

13  debt load.

14       And we were concerned that over the next few years,

15  before it reached a maturity, there may be things that the

16  company may do, like fire employees, close facilities,

17  impact product quality, that could actually deteriorate the

18  long-term value of the business that was important to us.

19  So if there was a near term restructuring, we could kind of

20  take control of the destiny of the business.

21  Q    Now, at some point in early 2020, did you learn that

22  Serta was soliciting proposals to help it with its liquidity

23  problems and its balance sheet?

24  A    Yes.

25  Q    And was Gamut part of a group that made a proposal to

1  the company?

2  A    Yes.

3  Q    And who did you work with?

4  A    As part of our group was Angelo Gordon and Apollo.  And

5  then our advisors were PJT and Paul Weiss.

6  Q    And how did it come to be that you worked with Angelo

7  Gordon and Apollo?

8  A    Angelo Gordon originally reached out to us informally,

9  both as first lien debt holders.  And then Apollo ultimately

10  also entered into our informal group as another holder.

11  Q    And did the informal group at some point become a

12  formal group?

13  A    Yes.

14  Q    And did your group, in fact, make a proposal to Serta

15  Simmons?

16  A    Yes.

17  Q    And do you recall at a high level what the components

18  of that were?

19  A    Sure.  So there were a few parts of it.  One was

20  providing the company more liquidity, which was something

21  that I understood was important to the company.  So we were

22  providing a new money investment.

23      We were also moving assets as allowed under the credit

24  agreement based on the investment capacity, moving assets

25  into a non-loan party and unrestricted subsidiary, and

1  exchanging our debt into debt that would be against the

2  assets that we would move.

3  Q    And what would the impact from your perspective of that

4  proposal have been on other creditors, other 1-L lenders,

5  had it been actually consummated?

6  A    Sure.  So there would be a few things.  One was, of

7  course, the company would have increased liquidity, so it

8  would avoid the liquidity shortfall that we understood was

9  imminent.

10     It would also be a deleveraging transaction on a net

11 debt basis.

12     But then third was we would be moving our debt and

13 lending against the assets that we moved, and we would be

14 structurally senior to the other lenders.

15 Q    Now, Mr. Hanigan, do you frequently participate in

16 restructuring transactions at Gamut?

17 A    No.

18 Q    Have you participated in any?

19 A    Gamut has only been part of one restructuring, which

20 was a consensual out-of-court restructuring.

21 Q    And when was Gamut founded, to your knowledge?

22 A    2015.

23 Q    Fair to say you're not a frequent player in

24 restructuring -- the restructuring space.

25 A    Gamut as a whole, correct.

1  Q    Now, was your initial proposal accepted by the company?

2  A    No.

3  Q    And after did the company counter?

4  A    Yes.

5  Q    And was there an exchange of further term sheets?

6  A    Yeah.  There were many exchanges of term sheets.  The

7  terms moved around quite a bit from term sheet to term

8  sheet.

9  Q    And over time did -- how would you characterize the

10 nature of the terms in your Ad Hoc Group's term sheets,

11 vis-à-vis the company?

12 A    I'm sorry, can you repeat?

13 Q    Sure.  Did the terms of your term sheet become more or

14 less company-favorable over time?

15 A    More favorable to the company over time.  The discount,

16 something in particular, is something that widened for the

17 company over time.

18 Q    Now, did there come a time that negotiations between

19 your Ad Hoc Group and the company stopped?

20 A    Yes.

21 Q    And do you recall generally when that was?

22 A    Early June.

23 Q    And how did you learn that?

24 A    The company stopped communicating with us, and then we

25 ultimately learned through informal channels that the

1  company was going to enter into a transaction with a

2  different group.

3  Q    And at the time that you completed or when the

4  negotiations ceased, I should say, had you done legal due

5  diligence on the transaction?

6  A    No.  We went through our steps.  You know, I think

7  where we started was a term sheet, we were very careful to

8  mark it with "Draft, this is for communication purposes

9  only, this is a nonbinding proposal."

10      We wanted to figure out terms that could work on a

11  principal basis.  And that's typically how the process goes.

12      The next step would be have the lawyers actually figure

13  out the mechanics and go through the documentation to see if

14  it can work.  You know, we obviously had no reason to think

15  our deal couldn't work or we wouldn't have been proposing

16  it.  But we didn't get to the step where we even did the

17  work to ultimately decide one way or the other.

18  Q    Were there important terms that in your view were still

19  left open?

20  A    Almost every term continued to change as we traded term

21  sheets back and forth.  I would say the collateral pool in

22  particular is something that there was still quite a bit of

23  diligence that would have been left to do to figure out what

24  was moving, what the assets were, if they could move, what

25  the value would be.  So that was one of many things that

1  were moving around.

2  Q    So far as you're aware, Mr. Hanigan, while your Ad Hoc

3  Group was negotiating with Serta, did Serta ever steer any

4  other lenders to you and suggest they join your group?

5  A    No.

6  Q    So far as you're aware, did Serta ever suggest to your

7  group that you propose a transaction structure other than an

8  IPCO structure?

9  A    No.

10 Q    So far as you're aware while you were negotiating with

11 Serta did the -- did any other lender approach your group

12 and ask to join?

13 A    After we went under NDA with the company, no.

14      (Pause in the proceedings.)

15 Q    Mr. Hanigan, if I could ask you to turn, please, to

16 Tab 3 in your binder.

17      MR. EHRLICH:  And this is Debtor's 174, ECF 864-17

18 on the main Docket.

19 BY MR. EHRLICH:

20 Q    Mr. Hanigan, this is an email from someone named Ryan

21 Brady to a number of people within Gamut; do you recognize

22 this?

23 A    Yep.

24 Q    And if you turn to the next page, you'll see it's a

25 presentation entitled "Serta Simmons Transaction Update May

1   2020."

2        Do you see that?

3   A    Yes.

4   Q    Were you a part of the preparation of this document?

5   A    Yep.

6             MR. EHRLICH:  Your Honor, I would move Defendant

7   -- excuse me, Debtor's 174 into evidence.

8             THE COURT:  Any objection?

9             MR. SPEAKER:  No.

10            THE COURT:  It's admitted.

11       (Exhibit 174, ECF 864-17, received in evidence.)

12  BY MR. EHRLICH:

13  Q    Now, Mr. Hanigan, could I ask you please to turn to

14  page 7 of the document?  Then we go to the one, two, three,

15  four, fifth bullet, says, "While the asset's in structure."

16       It says, "While the asset is in structure of the

17  collateral package."

18       Does this reflect the current state of the negotiations

19  as of the date of this document in terms of what collateral

20  might be included in a transaction?

21  A    Yeah.  At the time, this would have been the thought of

22  what could be included.

23  Q    And had there been evaluation done of these various

24  types of collateral at this point in time?

25  A    Not to completion.

1   Q    And would you have had to do that in order to negotiate

2   definitive documents?

3   A    Yes.

4   Q    Now turning to the bottom bullet, it says, "The terms

5   as described are based on the AHG's latest counterproposal

6   sent to the company on May 29th.  While the data spread

7   between our counterproposal and the company's position has

8   narrowed, there may be further revisions to economics

9   presented as we further negotiate."

10       Do you see that?

11  A    Yep.

12  Q    And did you expect at this point in time to have

13  further negotiations with the company?

14  A    Yeah.  I mean, I think there's two parts of it.  One is

15  there would be further negotiations and things could change

16  in the economic tier.

17       We also didn't comment at all here on the mechanics and

18  legally how it would get done because we hadn't really even

19  started there.

20  Q    So sitting here today, do you know if you had been able

21  to reach a deal with the company what it would have looked

22  like?

23  A    It's impossible to tell because of when conversations

24  ended.

25  Q    Now going back to when you learned of the proposal the

1  company went with, what was your understanding of that

2  transaction?

3  A    Sure.  So we learned the details slowly.  We didn't get

4  access to the amended credit agreement or the inter-creditor

5  credit agreement, or the new credit agreement until after

6  the deal had actually happened.  But once we started

7  learning the general structure of the deal, you know, we

8  were surprised by what the deal construct was.

9      It ultimately involved a new money investment, but also

10  included a number of amendments throughout the document and

11  a new inter-creditor agreement which effectively allowed the

12  other group, which is now called the favored lender group,

13  to leapfrog everyone else.

14      And for our group, we went from first in line as first

15  lien credit holders to effectively last in line.

16  Q    Now, just so it's clear, was Gamut ever invited to your

17  knowledge to participate in that transaction?

18  A    No.

19  Q    And when you went into buying Serta first lien loans,

20  Mr. Hanigan, in the -- starting in the fall of 2018 through

21  March of 2020, was it your expectation that the type of

22  transaction that was undertaken was possible?

23  A    No.

24  Q    Why not?

25  A    Like I said, something fundamental to us was being

1  first in line, so getting paid off with all the other first

2  lien lenders.  If we couldn't get paid back our principal,

3  we would own the business.  I think to us, part of our

4  understanding comes from being a borrower.

5       So we never enter into a credit agreement with lenders

6  and then think, well, if things don't go well we can pay

7  off, you know, maybe half of the group before we pay off the

8  other half of the group because, you know, we do more

9  business with this half.  It's just not something that has

10  ever been done before so we wouldn't have expected it,

11  something we never thought to do as a borrower or a lender.

12      You know, if we did think that that was a risk that we

13  wouldn't actually be a first lien lender, we probably never

14  would have bought into the credit here.  But it's nothing

15  that we would have or could have expected.

16          MR. EHRLICH:  Thank you, Mr. Hanigan.  I have

17  nothing further.  I'll pass the witness.

18          THE COURT:  All right, thank you.

19          Anyone else that opposes confirmation have

20  questions?

21      (No audible response.)

22          THE COURT:  All right.  Thank you, gentlemen.

23          All right.  Mr. Costa.

24          MR. COSTA:  Thank you.

25          Good afternoon, Mr. Hanigan.

1          THE WITNESS:  Good afternoon.

2          MR. COSTA:  Good to see you again.  We met in New

3    York last week, correct?

4          THE WITNESS:  Yeah.  Nice to see you.

5          MR. COSTA:  All right.  I think we're going to get

6    you a binder here.

7          MR. SPEAKER:  May I approach the witness?

8          THE COURT:  Of course, thank you.

9                         CROSS-EXAMINATION

10   BY MR. COSTA:

11   Q    You said a few times in your testimony that you thought

12   Gamut would be first in line under the credit agreement,

13   correct?

14   A    Yeah.

15   Q    Is it fair to say your main complaint is that after the

16   2020 transaction happened, Gamut's no longer first in line?

17   A    That after the 2020 transaction that there's other

18   first lien lenders that get paid off before us, yes.

19   Q    Right.  Gamut bought all of its Serta debt on the

20   secondary market, correct?

21   A    Correct.

22   Q    Gamut was not a party to the original 2016 credit

23   agreement, right?

24   A    We were not involved in the original negotiation.  We

25   got assigned to it.

1  Q    Right.  But Gamut wasn't there at the negotiating table

2  in 2016, right?

3  A    Correct.

4  Q    And you don't have any personal knowledge about the

5  negotiations in 2016, right?

6  A    No.

7  Q    And would you also agree you have no personal knowledge

8  about the intent of the people who negotiated the agreement

9  in 2016?

10 A    Not the specific people but the market more generally.

11 Q    The market more generally -- okay.  Well, in 2016 you

12 were an investment banking analysts one year out of the

13 University of Texas, correct?

14 A    Yeah.

15 Q    And I'll stipulate that's a great education, but would

16 you agree with me that you weren't following the credit

17 markets in 2016?

18 A    I had an internship at Apollo, internship in investment

19 banking, worked at investment banking.  And then after that

20 in private equity you don't just focus on the current

21 market.  You also focus on past market environments to

22 understand what's possible.

23          MR. COSTA:  Object as nonresponsive, Your Honor.

24          THE COURT:  Sustained.

25 BY MR. COSTA:

1  Q     In 2016 were you following the credit markets when you

2  were in that junior level investment banking analyst

3  position?

4  A     I worked across M&A in restructuring.  So I fully admit

5  I was fresh out of college, but I was following the credit

6  markets.

7  Q     You'd never been involved in negotiating a credit

8  agreement in 2016, correct?

9  A     In 2016, no.

10  Q     Right.  Now, at Gamut -- you moved to Gamut, and you

11  said in late 2018 Gamut first bought Serta debt, correct?

12  A     Yep.

13  Q     And you were part of the team at Gamut that monitored

14  that investment, right?

15  A     Yep.

16  Q     I think you said Mike Krieger, who is a partner, was

17  involved in that team, right?

18  A     Yes.

19  Q     And Jordan Zaken, who was a founding partner, was also

20  on that team, right?

21  A     Yeah.

22  Q     But Mr. Krieger's not testifying today, right?

23  A     Correct.

24  Q     Mr. Zaken's not testifying today, right?

25  A     Correct.

1  Q    Okay.  You're the lucky one that was sent to testify in

2  court.

3  A    Well, yeah, I mean, I think I went through my

4  responsibilities as a principal before, which is overseeing

5  all aspects of the investment.  So that's really why I was

6  chosen to come here.

7  Q    Let's talk generally about Gamut.  You said there was a

8  normal, the usual diligence process Gamut conducted when

9  buying debt; do you recall that testimony?

10 A    Yeah.

11 Q    But the fact is Serta's the biggest debt holding

12 Gamut's ever had, correct?

13 A    Correct.

14 Q    And Gamut's only had one other major debt holding,

15 correct?

16 A    Correct.

17 Q    So would you agree Gamut's not a frequently player in

18 the syndicated debt market on the lender's side at least?

19 A    On the lender's side we have not successfully purchased

20 a lot of debt.  I would say for everything that we actually

21 do purchase there is tens of things that we attempt to

22 purchase and do our diligence on.  And we also are a

23 frequent borrower.

24 Q    You've never been involved in a liability management

25 transaction that was consummated, correct?

 1  A    We have not.

 2  Q    All right.  And, in fact, before 2020 you didn't really

 3  know anything about liability management transactions,

 4  correct?

 5  A    I didn't know how they worked.  But I also knew that

 6  basket capacities are important to understand the

 7  flexibility available to the borrower.

 8  Q    You hadn't ever examined a credit agreement prior to

 9  buying Serta debt in which a liability management

10  transaction had occurred, correct?

11  A    We never participated in any liability management --

12  Q    Right.

13  A    -- transaction so that's right.

14  Q    Right.  So you didn't look at credit agreements to see

15  what provisions had allowed liability management

16  transactions, right?

17  A    We never looked at any credit agreements after a

18  liability management transaction was done.  But we did

19  assess the basket capacities.

20  Q    Let's talk about this credit agreement.  One of the

21  terms that's been discussed quite a bit this week is the

22  indemnification provision.  You don't even have an

23  understanding of what indemnification means, correct?

24  A    I think I testified I work with counsel, and

25  indemnification is something that's more in their scope so

1   they would focus on.  It's important to us.  But I'm not a

2   lawyer so I don't have a deep knowledge of it.

3   Q    Deep knowledge.  But you don't really have even a

4   general understanding of indemnification, right?

5   A    In the secondary credit markets I would have had

6   counsel look at it.  And I don't have a -- even a basic

7   knowledge to really speak to it in this court.

8   Q    Okay.  So a long answer, but you agree it sounds like

9   that you don't have a basic understanding of how indemnity

10  works.

11  A    In the secondary credit markets.

12  Q    Right.

13          THE COURT:  Do you have an understanding of it in

14  any other market?

15          THE WITNESS:  I understand very broadly it's about

16  who is exposed to liability, and that's mostly it.

17          THE COURT:  So your definition of an indemnity is

18  who's exposed to liability.

19          THE WITNESS:  Who is going to bear a liability

20  that could present itself?

21          THE COURT:  That's your definition of an

22  indemnity?

23          THE WITNESS:  Yes.

24          THE COURT:  Okay.

25  BY MR. COSTA:

1  Q    All right.  Let's talk about something else in this

2  credit agreement that's been a focus, Section 9.05(g) of the

3  credit agreement.  Now, today are you familiar with that

4  provision?

5  A    Yes.

6  Q    And what does it do?

7  A    It broadly outlines exceptions to a sacred right, one

8  of which is an open market purchase.

9  Q    Right.  And just to be -- the sacred right is the

10  sacred right to pro rata treatment, right?

11  A    Yes.

12  Q    And 9.05(g) is an exception to that sacred right,

13  correct?

14  A    Yeah.

15  Q    And pro rata treatment is really what you're saying you

16  were deprived of here, correct?

17  A    Correct.

18  Q    You thought you were going to be first in line.  Now

19  you're not first in line, right?

20  A    Yeah.

21  Q    Okay.  But back before you bought the Serta debt did

22  you ever review Section 9.05(g)?

23  A    Our lawyers and -- reviewed the entire credit

24  agreement.

25          MR. COSTA:  Object as nonresponsive.

1              THE COURT:  Sustained.

2    BY MR. COSTA:

3    Q    Did you, yourself, Mr. Hanigan, ever review 9.05(g)

4    before buying Serta debt in late 2019?

5    A    I would have reviewed the entire credit agreement.

6    It's hard to recall five years ago.  But I would have

7    reviewed the whole thing.

8    Q    But you have no recollection of actually paying any

9    particular attention to 9.05(g), right?

10   A    I can't remember one way or the other.

11   Q    And did you have any general understanding of what an

12   open market purchase is back in 2019?

13   A    Sure.  The -- an undefined open market purchase, I

14   would have had my view of what that is.

15   Q    But in credit agreements you had no experience with the

16   term "open market purchase," correct?

17   A    Correct.

18   Q    And you didn't know whether they were common or

19   uncommon in credit agreements, correct?

20   A    Correct.

21   Q    And during this diligence process that you said was so

22   thorough, you never focused on the open market purchase

23   provision, correct?

24   A    I don't recall.  It's something counsel would have

25   looked at.  But I don't recall if we focused on it or not.

1  Q    So sitting here today you can't remember ever focusing

2  on 9.05(g) before buying the debt.

3  A    Correct.  I don't remember one way or the other.

4  Q    So you said that your beef is not being first in line

5  anymore, correct?

6  A    Yeah.

7  Q    But you understand the deal you were proposing was

8  going to give you structural priority over the other first

9  lien lenders who didn't participate, right?

10 A    Uh-huh.

11 Q    So effectively they would have had the same -- they

12 would have been in the same situation, correct?

13 A    No.  We would have only been first in line against the

14 assets that we would have moved.  And we would have moved

15 those assets based on the basket capacities outlined in the

16 credit agreement, which is something that we and I think

17 most people in the credit markets expect is, you know,

18 something that's available to the company.

19 Q    Well you said people expect that that could happen on

20 the credit market, right; is that your testimony?

21 A    Yes.

22 Q    And I think you believe your proposal was made in good

23 faith, right?

24 A    Yeah.

25 Q    And that's because, one, you think it was allowed under

1   the credit agreement, right?

2   A    Yeah.

3   Q    And, two, because you thought people would have

4   expected a transaction like that, right?

5   A    Yeah.

6   Q    Okay.  And what transaction was precedent for the type

7   of transaction you were proposing?

8   A    I mean, there were precedent transactions, a number of

9   them.  I wouldn't be able to name all of them or even know

10  the details of them.  I think we spoke about in my

11  deposition J. Crew is one that was newsworthy about moving

12  IP and lending against it.

13  Q    Right.  In fact, I think your testimony was J. Crew was

14  the only dropdown transaction that you could cite as a

15  precedent for your proposal, correct?

16  A    Correct.  I couldn't cite a bunch of precedent cases.

17  I just knew conceptually what happened and how it could

18  happen.

19          MR. COSTA:  Object to the rest of his answer after

20  "yes" as nonresponsive.

21          THE COURT:  Sustained.

22  BY MR. COSTA:

23  Q    When did J. Crew occur?  When did that transaction take

24  place?

25  A    I don't recall.

1    Q    You're not aware it took place in 2017.

2    A    I didn't know the year, no.

3    Q    But would you agree with me that under your view of the

4    world where people have to have seen a prior transaction,

5    what would matter is whether a transaction had happened

6    before this agreement was signed in 2016, right?

7    A    From my view of the world I think that expectations

8    certainly are enhanced when something has happened.  I think

9    there is also an expectation that there's fundamental things

10   you're buying into.  So, you know, I won't go into what our

11   fundamental view was, but obviously being first in line was

12   important.

13             MR. COSTA:  Strike as nonresponsive, Your Honor.

14             THE COURT:  Sustained.

15   BY MR. COSTA:

16   Q    I guess my question's a pretty basic one.  If J. Crew

17   happened in 2017, it's obvious that couldn't have been on

18   the minds of people who negotiated this credit agreement in

19   2016, right?

20   A    Sure.

21   Q    Okay.  And speaking about priority, part of your

22   proposal was a $200 million new cash loan, correct?

23   A    Yeah.

24   Q    And that would have had priority, correct?

25   A    Yeah.

1   Q    So the first lien lenders under the original credit

2   agreement would no longer be first in line because that 200

3   million would come first, right?

4   A    By using the indemnities baskets allowed.

5   Q    Oh, you say -- you're saying, but the answer is yes,

6   they wouldn't have been first in line anymore, correct?

7   A    Correct.  There are certain baskets that allow for new

8   money to come in and be senior to the first lien.

9   Q    Right.  And that's because the credit agreement

10  provides for that, right?

11  A    And companies often times tap the credit markets and do

12  exercises similar to that, yes.

13  Q    Okay.  So there was no absolute right to be first in

14  line, you'll agree with that.

15  A    There is exceptions to the absolute right.

16  Q    Right.  You were just really complaining about the

17  mechanics of how you came to be -- lose your priority

18  status, correct?

19  A    And where I ultimately ended up where other first lien

20  lenders now get paid first and my recovery is basically

21  zero.

22  Q    Right.  But someone else could have done a drop --

23  Apollo and Angelo Gordon could have done a dropdown

24  transaction without you, right?

25  A    Yeah.

1  Q    And then you would have been facing the -- those

2  similar consequences, correct?

3  A    I would say it's a totally different deal but --

4  Q    As to the IP collateral, you wouldn't have been first

5  in line, correct?

6  A    Yes.

7  Q    All right.  You weren't happy you said when the -- when

8  Serta accepted our client's proposal, correct?

9  A    Correct.

10  Q    But it wasn't clear then if it was going to be a good

11  or bad thing for you, right?

12  A    It was pretty clear that we went from being a first

13  lien lender to being behind a billion dollars of debt so --

14  Q    Right.

15  A    -- it was not good.

16  Q    And that matters if the company can't pay, correct?

17  A    Correct.

18  Q    But it also meant you weren't going to have to give a

19  discount on your -- the debt you held, correct?

20  A    Correct.

21  Q    So if the company flourished, you would have been

22  better off not doing the deal, correct?

23  A    I think there's another scenario where the company

24  didn't do the deal and then was restructured.  So that's

25  something we would have also been comfortable with.  So

1  there's multiple outcomes.

2  Q    But my question is, if the company was on -- stayed on

3  firm financial footing, was paying back its interest, you

4  would have been better off not selling your debt at a

5  discount, correct?

6  A    Correct.

7  Q    Okay.  And, in fact, for a while Serta debt was trading

8  well above where you had bought it at, but after the 2020

9  transaction?

10  A    Not immediately.  It ultimately ended up trading up.

11  Q    Right.  So let's look at Debtor's Demonstrative No. 1,

12  which has already been admitted.  And your cost basis at

13  Gamut was in the 50s, right?

14  A    Yeah.

15  Q    And if we look starting around March, 2021, it's in the

16  high fifties.  And then for basically over a year it's

17  trading above your cost basis, correct?

18  A    Yeah.

19  Q    In fact, in May, June it's almost trading at 80,

20  correct?

21  A    Yeah.

22  Q    So you could have made quick math about 30 percent; is

23  that right?  Just ballpark, if you were able to see it in

24  the high 70s.

25  A    If we could have sold into any liquid market.

1  Q    Right.  But you didn't even think about selling it in

2  2021 when it was selling at almost 80 cents on the dollar,

3  correct?

4  A    The down markets are a liquid.  So for us, with a

5  position of size, we wouldn't have been able to sell out of

6  it anyway.  So we didn't even try.

7  Q    Okay.  So you finally got to the answer at the end.

8  You didn't even think try, though.

9  A    Correct.

10 Q    Even though you have a fiduciary duty to your investors

11 to make them money and protect against loss, correct?

12 A    Correct, because we physically wouldn't be able to see

13 160 million dollars of debt into a liquid market.

14 Q    But you said you didn't even look into it, into selling

15 some of it, right?

16 A    But we also understand the volume that --

17 Q    Did you or did you not look into selling any of it?

18 A    We did not try to sell any of it.

19 Q    Even though you acknowledge you have a fiduciary duty

20 to your investors to make them money and prevent loss.

21 A    Correct.

22 Q    Now, in 2021, when the prices were trading close to 80,

23 you were subject to a cooperation agreement with Angelo

24 Gordon and with Apollo concerning the Serta debt, correct?

25 A    Correct.

1          MR. COSTA:  All right.  If we can -- it was

2    already admitted.  It was admitted with the last witness,

3    Debtor's 266.  And turn to page 28.  If we can blow up that

4    page?

5    BY MR. COSTA:

6    Q    Under that cooperation agreement there were limits on

7    your attempts to sell any Serta debt, correct?

8    A    Yes.

9    Q    Okay.  If you actually look at the third bullet under

10   the first bullet.  "During the cooperation period, each

11   holder agrees it will not support, pursue, or enter into any

12   agreement with respect to any exchange offer, tender offer,

13   sale purchase, or repurchase of 1-L or 2-L debt."

14       So this cooperation agreement didn't allow you to sell

15   the debt in 2021 when it was trading at almost 80 cents on

16   the dollar, correct?

17   A    Correct.  We are comfortable with it because we

18   wouldn't have been able to sell anyways was our view.

19   Q    But that was -- the agreement prevented you from doing

20   so, correct?

21   A    Correct.

22   Q    You also testified that did you say you weren't sure

23   your proposal was lawful?

24   A    No.  I believe I went through the steps where I said we

25   didn't get to the point to determine one way or the other.

1   But we certainly didn't think that it was unlawful or we

2   wouldn't have proposed it was what I testified.

3   Q    Well you were exchanging all these terms with the

4   company, correct?

5   A    Yeah.

6   Q    You had Paul Weiss as legal counsel, right?

7   A    Yeah.

8   Q    One of the best restructuring practices in the country,

9   correct?

10  A    Yeah.

11  Q    You're paying them a lot of money, right?

12  A    Yeah.

13  Q    And you -- today, you're not sure if the proposal you

14  made was lawful.

15  A    Well we never got into the mechanics of actual

16  definitive documentation to determine one way or the other.

17  We were an interim step, which I think is why the term sheet

18  says this is for discussion purposes, this isn't a legally

19  binding document, because we never got there.  We were in a

20  middle stage.

21  Q    So it's a long way of saying, no, you weren't sure it

22  was legal.

23  A    We had no reason to think it was illegal.  But we

24  didn't make a final determination.

25  Q    And your suggestion is that maybe, you know, your

1  proposal wouldn't have been accepted or wouldn't have been

2  the actual deal that Serta entered into; is that right?

3  A     Yeah.

4  Q     But you made a term sheet offer, correct?

5  A     Correct.

6  Q     And Serta could have accepted, correct?

7  A     No.  It actually says you can't accept anything on

8  here.  It's nonbinding, so there's nothing they could have

9  accepted.  We could have continued the negotiation.

10 Q     So you didn't even have a proposal for Serta that they

11 could have accepted and an alternative to the one they did

12 accept.

13 A     If they continued to advance the negotiations we would

14 have ultimately gotten to something.  But there were a lot

15 of steps that were left to do, and we didn't get the full

16 engagement to get there.

17          MR. COSTA:  All right.  Nothing further, Your

18 Honor.

19          THE COURT:  All right, thank you.

20          Anyone else that supports confirmation have

21 questions?

22      (No audible response.)

23          THE COURT:  All right.  Any Redirect, Mr. Ehrlich?

24          MR. EHRLICH:  No, Your Honor.

25          THE COURT:  All right.  Mr. Hanigan, thank you for

1    your testimony this afternoon.  You are free to go.

2              THE WITNESS:  Thank you.

3         (Witness excused.)

4              THE COURT:  Thank you.

5              All right.  Mr. Ehrlich.

6              MR. EHRLICH:  So, Your Honor, at this point we do

7    not have any further witness testimony.

8              THE COURT:  All right.

9              MR. EHRLICH:  We do -- we are working I think

10   cooperatively with the Debtors and the PTL lenders on

11   stipulated exhibits.

12             THE COURT:  Okay.

13             MR. EHRLICH:  What we would ask is that we be

14   permitted to rest, and I guess this goes for our

15   counterparties as well, with the exception of being able to

16   submit proposed stipulated exhibits to you.  And I think we

17   should be able to do that very likely if not later today,

18   tomorrow.

19             THE COURT:  Got it.  Let me do this first.  I

20   assume there's no rebuttal?

21        (No audible response.)

22             THE COURT:  All right, so no rebuttal.  So subject

23   to the submission of stipulated exhibits, as well as these

24   three transcripts, or have they already been provided?  You

25   have them in that book.

1           MS. BARRINGTON:  Yes.  I mean, we have filed them.

2           THE COURT:  I was really hoping it'd be a smaller

3   notebook.

4           MS. BARRINGTON:  Unfortunately not, Your Honor.

5           THE COURT:  Just tell me the type is big.  I mean,

6   give me something.

7           MS. BARRINGTON:  That's why it's so large, the

8   type is big, Your Honor.

9           THE COURT:  Fair enough.

10          MS. BARRINGTON:  Your Honor, we did file these and

11  mark them as exhibits.

12          THE COURT:  Terrific.  So they're already on the

13  Docket.

14          MS. BARRINGTON:  That's correct.  And I can

15  provide those ECF numbers and the exhibit numbers on the

16  Record if you'd like.

17          THE COURT:  That's -- no.  If they're on the

18  Docket, that's terrific.  So I've got three transcripts.

19  You're going to give me a list of stipulated exhibits.  And

20  with that, that will close the evidence?

21          MS. BARRINGTON:  That's right, Your Honor.

22          THE COURT:  All right.

23          MR. EHRLICH:  I think we agree.

24          THE COURT:  All right, thank you.

25          What else do we need to talk about today,

1  Mr. Schrock?  Thank you.

2          MR. SCHROCK:  Good afternoon, Your Honor, Ray

3  Schrock of Weil, Gotshal, and Manges, counsel for the

4  Debtors.  There's -- I think we're all done for today, --

5          THE COURT:  Okay.

6          MR. SCHROCK:  -- subject to anything the Court

7  would like to cover.

8          THE COURT:  So let me -- in terms of thinking

9  through -- and, first of all, with respect to closing and

10 your briefing, I want you to do whatever it is you think is

11 in the best interest of your client.

12         MR. SCHROCK:  Sure.

13         THE COURT:  To the extent that you're open to

14 making sure that you include certain things, --

15         MR. SCHROCK:  Yes.

16         THE COURT:  -- so let me for just a second.

17 Sorry.  One day I'll get rid of this.

18         There's been an awful lot of testimony with

19 certain assumptions about, you know, about dropdowns,

20 uptiers.  I mean, we all -- they're just words, right?  And

21 we all like to use them because they make us seem really

22 smart, and the general public says, you know, they must be

23 smarter than us.  But they're just words.

24         And so I'm going to give you a different word,

25 because I like acronyms.  I've looked at all of this as a

1   position enhancing transaction.  So my acronym is a PET.

2   And it doesn't really matter whether you have a cat or a

3   dog, the result's the same.  That's how I'm looking at this.

4          And so to the extent that you want to argue in one

5   direction or another or that I'm looking at this wrong, I

6   certainly want to hear that if there's some authority out

7   there that says, no, there's a fundamental difference.  But

8   I just don't -- I don't see it, as I look at this.

9          I'm not saying that anything is right or I'm not

10  saying anything is wrong.  I'm just telling you how I'm

11  looking at it.  I mean, the fact that people want to ascribe

12  titles to a particular transaction, I mean, you can go so

13  far down in the weeds, you can make everything different.

14  And I look at it sort of just cause and effect because

15  that's just -- that's how my brain works.

16         And but looking at it again as a pet, you know, if

17  you and I are lenders and my position is improved as to you,

18  by definition that means your position as to me is --

19         MR. SCHROCK:  Diminished.

20         THE COURT:  -- diminished.  I mean, that's exactly

21  right.

22         And so that's -- as you work through your closing,

23  as you work through your briefing, you know, might be

24  helpful to sort of tell me where I'm wrong in approaching it

25  like that because I've just never bought off on the fact

1   that, you know, 20-year-olds can get in a room late at night

2   and say, we're going to call it this, and now all of a

3   sudden that means something out in the market.  I just

4   fundamentally don't believe that.

5            And that's not a criticism of 20-year-olds.  They

6   are -- it is those young brains that make things work.  I'm

7   not being critical.  It's just I don't think they determine

8   what cause and effect is.

9            I do have a suggestion for the Debtors, as well as

10  the -- those folks who support the plan.  This is

11  complicated.  And I would ask that you consider getting rid

12  of the death trap --

13           MR. SCHROCK:  Okay.

14           THE COURT:  -- because I don't know that you want

15  that to be a distraction.  But, again, that's not a

16  requirement.  It doesn't mean that I'm going to do any

17  particular thing whether you do or not do it.  I'm just

18  saying, you know, just think through it.  And you know how

19  the Eighth Circuit has always talked about asking for too

20  much.

21           MR. SCHROCK:  Yeah.  We will, Your Honor.  We'll

22  talk it over.

23           THE COURT:  Got it.  I -- and I now understand --

24  I didn't understand why LCM was taking the position that it

25  was taking, but I now understand perfectly why they are

1  where they are.

2         I do -- I would like you, everybody, to focus on

3  this reasonable or the expectation of a reasonable person or

4  the reasonable expectations, however you want to phrase

5  that.

6         And I have been doing my own research.  But to the

7  extent that you have additional research that talks about,

8  you know, as I look at this, do I get to -- you know, do I

9  get to consider the actions of the parties involved, is that

10  definition -- or is that instructive as to what the actual

11  expectations of the parties were?

12         And, I mean, you've heard today you have really

13  different levels of experience.  I mean, it sounds great

14  until you start putting them next to one another and then --

15         MR. SCHROCK:  Right.

16         THE COURT:  -- you see there's a huge issue out

17  there.

18         But to the extent that, you know, as we look at

19  this, to continue my animal analogy, is that am I picking as

20  I -- am I picking sort of this, yeah, this dog out there

21  that has no experience in anything or am I looking at, you

22  know, the vultures that are sitting over the dying carcass

23  and, based upon their past experience and what they're after

24  and what they're trying to do, is that the world in which I

25  live?

1          And so to the extent that there can be additional

2    argument, briefing with respect to that issue, that would be

3    really helpful.  I have --

4          MR. SCHROCK:  Understood.

5          THE COURT:  I have some views about that.

6          With respect to the indemnity, I've heard a lot

7    and I've heard about how it's carried forward.  And I

8    understand the amendments that got made.  And I understand

9    why you made the amendments.  It was to address some of

10   those arguments.

11         You know, I started my whole analysis with looking

12   at it in the context of 1123(b)(2) and what you're entitled

13   to include under a plan and what you're not.

14         I understand -- you know, I understand that

15   sometimes you make the best business decision you can based

16   upon the circumstances that you face.  I mean, I think

17   that's exactly what the circuit talks about in some of those

18   decisions, such as *Jackson Brewing*, *Foster Mortgage*, and so

19   on.  I mean, you -- it's the process you go through and the

20   decisions that you make.

21         And so, you know, to the extent that you want to

22   focus the argument, the briefing on, you know, on that issue

23   and whether or not -- I mean, I've never heard this before,

24   but I'm not suggesting that there's not an economic coercion

25   issue out there.  I just don't know.  Never looked at it

1  from that perspective.  But I'm just trying to give

2  everybody insight as to how I look at this.

3          The arguments that got made about, well, if you

4  could just do the plan without this one feature, I mean,

5  while it was incredibly entertaining, it was also -- I mean,

6  it was just fanciful.  The plan that got proposed couldn't

7  have been proposed without consent.  And if you didn't have

8  that, you didn't have consent.  I got that; don't need to

9  address that.

10          But I didn't want anyone to think just because I

11  had fun poking at it that that was something that I was

12  really focused on.  It's not.  I fully understand that

13  issue.

14          With respect to the claim on the breach of the

15  implied duty of good faith and fair dealing, nobody's really

16  made the argument.  I don't even know if it's applicable.

17  But I'm curious, you know, it's -- that in large part is an

18  equitable remedy.

19          And I am very curious if there is any New York law

20  out there about, you know, the old concept about in order to

21  get equity, one must do equity.  And I would be very curious

22  to see what the state of the world is about that.

23          I didn't hear a lot of evidence, I can't think of

24  any, I mean, maybe there was some and I just missed it.  But

25  to the extent that the issue about the violation of the

1 absolute priority rule is still out there, I would like to

2 have a better understanding of what evidence supports that

3 and what arguments -- you know, maybe it'd just be, well,

4 all you have to do is look at these two provisions of the

5 plan, let me make the argument, cite the Fifth Circuit case,

6 and that's my argument.  I got all of that.  I just didn't

7 hear anything.

8          And obviously, you know, absolute priority rule

9 can only be bought -- can only be brought by certain

10 creditors.  You can't be at the top of the stack and say,

11 well, that violates the absolute priority rule.

12          So I'd be curious to hear arguments about whether

13 or not that is still an argument that I need to address.

14          I have signed the order with respect to the North

15 Star issue.  I don't think it's been docketed yet, but I did

16 sign it this morning.

17          MR. SCHROCK:  Thank you, Your Honor.

18          THE COURT:  Of course.

19          With that, I don't think -- I have all sorts of

20 questions, but I'm going to wait and see what people do with

21 closing argument as well as the briefing.

22          You know, please come prepared to engage because,

23 again, I mean, I -- this is important.  There are a lot of

24 people that are watching it.  It's, you know, I -- not in --

25 you know, not in the least the employees who want to make

1    sure that they're going to have a paycheck tomorrow.

2              And so I -- you know, I'm going to come prepared

3    to test what I believe.  I'm going to come prepared to test

4    what everybody believes in hopes that at the end of the day

5    I get it right.  And if I don't, someone will tell me.

6              What else do we need to talk about?  We've got a

7    date for closing.  Any other issues that we need to talk

8    about?

9              MR. SCHROCK:  Nothing from the Debtor's

10   perspective.

11             THE COURT:  All right.  Mr. Hermann or -- I know

12   you were listening or you were getting in -- you were

13   getting comments.

14             MR. HERMANN:  Thank you, Your Honor.

15             For the Record, Brian Hermann from Paul Weiss on

16   behalf of the non-favored lenders.

17             I would only make a practical observation, --

18             THE COURT:  Sure.

19             MR. HERMANN:  -- which is in my experience, when

20   there's a big gap between the closing of a trial and the

21   closing argument, people should use that time to maybe talk.

22   My friend Mr. Schrock over here and I will have no problem

23   doing that if there's something to talk about.

24             But I do think -- and I reflected on Mr. Millar's

25   comment yesterday about mediation and your response, which

1    I've heard many times that you're not going to order people

2    to mediate if there's -- if they're not willing.  And I

3    generally agree with that.

4              Here, I think the limitation on peoples' ability

5    to talk is really interfering with what I think, you know,

6    could possibly be a fruitful discussion or, you know, at

7    least a discussion.  And so I would --

8              THE COURT:  Is that because of contractual issues?

9              MR. HERMANN:  Yes.

10             THE COURT:  So I've been thinking about that.  And

11   when I was walking my dog this morning as I was thinking

12   about all of you, which is something I've got to get past.

13        (Laughter)

14             THE COURT:  I have -- I toyed with the idea of --

15   and I don't want to cause heartburn for anybody.  But what I

16   toyed with was a vehicle by which I could say, you know, to

17   the extent, you know, I am ordering everybody to discuss

18   alternatives.

19             What I didn't want to do was to cause somebody an

20   immense amount of heartburn.  But I am perfectly happy to

21   enter that order.  And, again, once my view of that, so the

22   world hears it, if I enter that order, you are cloaked in my

23   immunity and have no liability under any contractual

24   arrangement that might exist.

25             This is about the Debtor.  And if there are

1  agreements out there that cause this Debtor harm because

2  people have said, don't talk -- because I knew LCM is in

3  that position.  And, again, because I never understood what

4  they were doing when I made the comments that I made on day

5  one.  I now understand perfectly where they are.  Maybe I

6  should have brought this up earlier because they've really

7  hurt themselves by just given where they are.

8          I am happy to enter that order if, you know, if

9  people think that would be helpful because I would think

10 with the skill and the talent that's in this room, and

11 understanding what I think you all are trying to do, and

12 that is to take something that someone worked really hard to

13 put together, i.e., the company in the first place, and

14 given its position in the market and the market that it

15 serves, that we would all find a way to, you know, perhaps

16 to, you know, give a little to try and make sure that this

17 doesn't die, you know, while waiting on a circuit decision

18 or a Supreme Court decision and that sort of thing.

19         And I'm not -- that's not a bad -- that's not a

20 comment on the court system.  It's just a comment that

21 sometimes you can die waiting to get the answer.

22         And I encourage that to happen.  But I -- if one

23 person stands up and says, no, that really causes me

24 heartburn, you know, then I won't do it.  But thank you for

25 reminding me about that.  I'm happy to hear comments about

1  that.

2            MR. SPEAKER:  I can --

3            MR. HERMANN:  I will give you the podium in a

4  second.

5            My response to that is we would welcome that

6  because I can't promise that ultimately we'll show up next

7  week and say that peace has broken out.  But we will

8  certainly try.

9            THE COURT:  Sure.

10            MR. HERMANN:  And right now I think we're impeded

11  from even trying.

12            THE COURT:  Then I -- you know, fair enough.  I am

13  perfectly happy -- Mr. --

14            MR. SCHROCK:  I have something to --

15            THE COURT:  -- Schrock, sure, please.

16            MR. SCHROCK:  Your Honor, I mean, as the -- as a

17  lawyer representing the one party that's fiduciary for all

18  stakeholders here, we -- you know, listen.  We do have

19  restructuring support agreements with people.  We have taken

20  votes.  We have a plan that's up for confirmation.

21            And with all due respect to my good friend

22  Mr. Hermann and Mr. Millar, they have one goal, which is to

23  blow up our plan, okay.  And I understand that there may be

24  attendant good reasons for what they good faith believe that

25  should happen.

1          But what I don't want to have happen is people get

2     ordered to a mediation because they have their own motives

3     for trying to make money and, you know, our plan gets put in

4     jeopardy.

5          If they have something to say, we will talk to

6     them.  We've said, listen, we are here, we will talk to

7     them.  We don't need a mediator at this moment --

8          THE COURT:  So, one, I was --

9          MR. SCHROCK:  -- to do that.

10          THE COURT:  -- never going to mediate.  The order

11     was going -- the order, if I enter it -- and I said if one

12     person said no, I wasn't going to do it -- that order would

13     just say the parties are free to discuss plan alternatives

14     without liability, period.  That's all I was going to say.

15          If that is not -- again, not trying to create a

16     problem --

17          MR. SCHROCK:  Yeah, I know, I just --

18          THE COURT:  -- for everyone --

19          MR. SCHROCK:  -- am thinking through, you know,

20     the implications --

21          THE COURT:  No, the fact that you're --

22          MR. SCHROCK:  -- for that for --

23          THE COURT:  -- worried about it says I shouldn't.

24     I came --

25          MR. SCHROCK:  Right.

1          THE COURT:  I was worried about it as well.  And I

2  came to --

3          MR. SCHROCK:  Yeah.

4          THE COURT:  -- the conclusion that I -- you know,

5  it would be an unusual order.

6          MR. SCHROCK:  I know.  I mean, I'll be honest with

7  Your Honor, I -- of course I defer to the Court on many

8  things.  This is one that I would say I don't love it --

9          THE COURT:  Sure.

10          MR. SCHROCK:  -- just because we're --

11          THE COURT:  Then I won't do it.

12          MR. SCHROCK:  -- in the middle of a confirmation

13  trial, and if there's something that's going to happen with

14  regard to this company, we want it to go through us.  We

15  really do.  And I don't want people going around us trying

16  to bring together some kind of --

17          THE COURT:  So --

18          MR. SCHROCK:  -- coalition of the willing to

19  change votes.

20          THE COURT:  -- let me ask this.

21          MR. SCHROCK:  And that's what'll happen.

22          THE COURT:  So fair enough.  Let me ask you this.

23  What if I order you and Mr. Hermann to have a settlement

24  conference?

25          MR. SCHROCK:  That's fine.

1         THE COURT:  Mr. Hermann, I know that doesn't get

2    you a hundred percent of where you are, but it does give you

3    some protection to at least have conversations.

4         MR. HERMANN:  Yeah.  I would say a couple of

5    things.  One is we're not here to blow up the Debtor's plan.

6    We actually want the company to reorganize.  We think there

7    is a better way to do this.

8         And we actually don't think an overhang of

9    litigation, whether it's here or the Fifth Circuit, back to

10   here or back to New York, wherever it is, is in the best

11   interest of the company.

12        I think I take Mr. Schrock's point.  We're not

13   looking to go around the Debtor.  If the Debtor wants to be

14   part of every conversation, I have no problem with that.

15        MR. SCHROCK:  That's code, Brian.

16        MR. HERMANN:  No, it's not.

17        MR. SCHROCK:  With all due respect.

18        MR. HERMANN:  No, it's not.

19        MR. SCHROCK:  Yes, I've been doing --

20        MR. HERMANN:  And --

21        MR. SCHROCK:  -- this a long time.

22        THE COURT:  In all fairness, I would have taken it

23   that way, as code.

24        MR. HERMANN:  Oh, no, it's definitely --

25        MR. SCHROCK:  I want you to be on the phone while

1  I talk to your creditors.

2          MR. HERMANN:  No, no, no, no.  I -- we have no

3  issue with the Debtor being involved in everything.  We're

4  not looking to go around the Debtor.

5          But I do think it's important to include

6  principals from Mr. Greenberg's group, not just the Eaton

7  Vances and Siestas (phonetic) of the world, but other people

8  in the group who frankly may have a different view about

9  some of the issues that are here; because I think frankly

10  without people in his group, my good friend over here is

11  going to be limited in what he can do.

12          THE COURT:  Mr. Greenberg.

13          MR. GREENBERG:  Afternoon, Your Honor.  Scott

14  Greenberg, Gibson Dunn & Crutcher for the Record.

15          And I was -- I know Mr. Hermann well and respect

16  him quite a bit.  But I was a little bit confused by the

17  commentary about people not being able to talk because that

18  sounds more like a co-op, which doesn't exist.

19          We do have an RSA, as Mr. Schrock said.

20          THE COURT:  Right.

21          MR. GREENBERG:  And we stand before you after a

22  week of evidence as we push towards confirmation.  I would

23  say as we always do in all of these deals, we're always

24  happy -- and I think in the first instance through the

25  advisors -- to hear from Mr. Hermann and his clients on that

1  side of the table if there's some kind of settlement

2  proposal that obviates the need for next week.

3          But I do think in the first instance there is an

4  RSA, votes are in.  There's overwhelming support for the

5  plan.

6          I share many of Mr. Schrock's concerns just in

7  practice --

8          THE COURT:  Right.

9          MR. GREENBERG:  -- about how these things happen

10  behind the scenes.  So I think the three of us candidly as

11  professionals that work together all the time, and others

12  that want to join us, not a formal mediation, should sit

13  down and use the week to progress conversations.

14          But I -- if what we're asking is to effectively

15  terminate an RSA as we're -- that does not work for us.

16          THE COURT:  No, I totally got that.  So let me

17  just -- let me poke at this a little bit --

18          MR. GREENBERG:  Sure.

19          THE COURT:  -- more because I'm trying to find out

20  where your line is.  If I ordered counsel and a client rep,

21  a non-lawyer, to meet, is that something that you think is

22  within your safe zone?

23          MR. GREENBERG:  Sure, I have no issue with that,

24  Your Honor.

25          MR. SCHROCK:  I think that's a good idea.

1          THE COURT:  Mr. Hermann.

2          MR. HERMANN:  I have no issue with that.  But I do

3  think that there are people within the Gibson Dunn Group

4  that we would like to talk to in the Debtor's presence, no

5  problem, that I don't think that is a monolithic group, and

6  I don't want to just talk to one person in that group who

7  may think one way, which is the way we've heard, because I

8  don't think that's going to be particularly productive.

9          THE COURT:  So who is that you're focused on?

10  It's a public forum.

11          MR. HERMANN:  I'm focused on Faralon, Sedus

12  (phonetic), and Baupost (phonetic).

13          THE COURT:  All right.  And are those -- have

14  those -- I mean, those folks have counsel, do they have --

15          MR. GREENBERG:  Scott Greenberg again for the

16  Record, Your Honor.

17          They are part of the group so we are their

18  counsel.  They're represented within our group.

19          THE COURT:  So would you have an objection to the

20  extent they want to come --

21          MR. GREENBERG:  I'm happy to have a conversation

22  with them and --

23          THE COURT:  Okay.

24          MR. GREENBERG:  -- get their feedback and see how

25  they want to proceed.  I assume we're talking about people

1  that were involved in the original transaction versus not

2  involved in it.  So I understand where Mr. Hermann's going

3  with the selection.  So that's a conversation I need to have

4  with my clients.

5          MR. SCHROCK:  And I would just ask, Your Honor,

6  whatever we do, of course, I don't think there's any

7  objection to this, I'll call it 408 plus.  You know,

8  whatever we talk about in that context in the settlement

9  discussions, you know, doesn't -- you know, is not

10  admissible and/or is not otherwise --

11          THE COURT:  I won't ever --

12          MR. SCHROCK:  -- public.

13          THE COURT:  I won't ever hear it.

14          MR. SCHROCK:  Okay.

15          THE COURT:  I mean, under any circumstances,

16  except in a murder trial.  And I don't have that authority

17  so it won't be me.

18      (Laughter)

19          MR. SCHROCK:  Fair enough, Your Honor, thank you.

20          THE COURT:  All right.  Mr. Millar.

21          MR. MILLAR:  I feel sort of left out here.  I

22  guess I was -- Your Honor, I would say my client wants to be

23  part of that discussion, and I think you know why.  And that

24  is because we have money to put to work in this company.  We

25  want to see a solution.  We think we can solve peoples'

1  problems.

2          THE COURT:  Right.

3          MR. MILLAR:  And --

4          THE COURT:  So let me give you a reaction --

5          MR. MILLAR:  Yeah.

6          THE COURT:  -- before you go any further.  I

7  listened to you when you first step up.  You made certain

8  representations to me regarding what your client was really

9  trying to do.  And then I saw the proposal.

10          I've been around a long time.  And your statements

11  to me -- and I'm just giving you my perception.  I'm not

12  angry about it.  I'm just not going to do anything.  I'm

13  just giving you my perceptions.

14          Your statements to me and the proposal I saw were

15  not consistent.  And so my view of it is, you know, if you

16  can -- as I told you before, if you can independently go get

17  a friend, you go do whatever it is that you believe keeps

18  you within the rules, the Code, the law, all fine.  But I'm

19  not helping you, not given the way you stepped up and said,

20  here's what we're trying to do, and then I saw the proposal.

21          You know, you -- and, again, I'm not being

22  critical.  You tried to play a game with me.  And

23  unfortunately for you I've been around this a long time and

24  I've played about every game there is to play.  So I'm not

25  helping you.

1          MR. MILLAR:  Well, let me just say I apologize if --

2          THE COURT:  You don't --

3          MR. MILLAR:  -- I didn't --

4          THE COURT:  No, no, no, you don't need to

5    apologize.  I'm just giving you an honest reaction.

6          MR. MILLAR:  I truly thought I was making the

7    right representation --

8          THE COURT:  I don't --

9          MR. MILLAR:  -- in the term sheet.

10         THE COURT:  It doesn't in any way affect your

11   integrity, your capability.  I think you're a great lawyer,

12   I genuinely do.  It's just, you know, your client stuck you

13   in a bad position.  And, again, I'm not trying to help you.

14         MR. MILLAR:  Okay.  Thank you, Your Honor.

15         THE COURT:  Yes, sir.

16         Mr. Lieberman.

17         MR. LIEBERMAN:  Yes, Your Honor.  We feel a little

18   bit left out.

19         THE COURT:  You spent the entire trial trying to

20   be left out.

21      (Laughter)

22         MR. LIEBERMAN:  Awesome, true.  I appreciate your

23   comment and take it that you now understand the position --

24         THE COURT:  I do.

25         MR. LIEBERMAN:  -- we're in.

1          THE COURT:  I do.

2          MR. LIEBERMAN:  I think going forward, to the

3  extent that, you know, we should be talking to people, and

4  that's some of what you're talking about, --

5          THE COURT:  Do --

6          MR. LIEBERMAN:  -- we'd like to be included in --

7          THE COURT:  Do you have to talk to them through

8  Mr. Hermann?

9          MR. LIEBERMAN:  No.  We're not -- we don't have --

10  we tried to establish there's a -- you know, we have similar

11  positions, we're in the same class of creditor, but we're --

12          THE COURT:  So let me tell you this.  And, again,

13  I want to be helpful, but I'm not going to be meddlesome, if

14  that -- if -- hopefully you understand the distinction.

15          I am perfectly happy -- under the cloak of the

16  authority that I have and the protections that I have, I am

17  perfectly happy to order a settlement conference and say the

18  following people shall attend, you know, Weil with a client

19  rep, and Mr. Greenberg with representatives of "A," "B," and

20  "C," and Mr. Hermann with representatives of "A," "B," and

21  "C."  And if it needs to be Mr. Hermann and Mr. Lieberman, I

22  am perfectly happy to do that.

23          But it's going to be very, very specific.  There

24  are going to be no add-ons.  And there's not going to be,

25  well, we can agree that this person can come.  That order is

1   going to be strictly construed.

2           But, again, if people think it will help --

3   because at the end of the day, I don't want anyone to ever

4   forget.  I got it that there's litigation out there.  But I

5   care about the Debtors that I have in front of me.  I care

6   about their business.  I care about their employees.  I care

7   about the space they occupy in commercial America.  That's

8   what I care about.  If I can help bridge the two, I'm more

9   than happy to do it.

10          But I want a very specific order that says -- you

11  know, what I'd like it to say, we're going to meet in

12  New York at the offices of, you know, wherever on this date,

13  and the following people will be present.  And I'm happy if

14  you want to put in it that it's conducted pursuant to 408

15  plus, as Mr. Schrock suggested.  All for that.  But it's

16  going to be short and simple.

17          If that's helpful, great.  If it's not helpful,

18  then I got it.

19          MR. SCHROCK:  Your Honor, we're happy to put a

20  draft together and, you know, work with the -- with

21  Mr. Hermann and Mr. Greenberg and --

22          THE COURT:  Let me ask you this.  I mean, you

23  thought you were going to be here all day.  I got a spare

24  conference room.

25          MR. SPEAKER:  We don't have clients.

1          THE COURT:  I'm sorry?

2          MR. SCHROCK:  We don't have clients.

3          MR. SPEAKER:  They have clients -- no clients.

4          THE COURT:  Oh, you don't have clients.

5          MR. SCHROCK:  Yeah.

6          THE COURT:  Fair enough.  No, --

7          MR. SCHROCK:  We --

8          THE COURT:  I --

9          MR. SCHROCK:  The Debtors do, but --

10          THE COURT:  No, no, no, I got it, they got to have

11   that conversation.

12          MR. SCHROCK:  We -- yeah, we were thinking Monday,

13   you know, likely would be the day that we would set it up.

14          THE COURT:  All fine by me.

15          Mr. Hermann.

16          MR. HERMANN:  That is fine by me, Your Honor.

17          THE COURT:  And can you figure out again --

18   because -- and I'm not trying to get into internal politics.

19   Do you feel comfortable that you can come up with a, you

20   know, the following two or three lawyers and the following

21   three or four business people will attend?

22          MR. HERMANN:  Yes, for sure.

23          THE COURT:  Okay.

24          MR. HERMANN:  Thank you.

25          THE COURT:  Oh, I forgot about the Committee.  You

1  got your deal.  Why do you -- do you care about this?

2      (Laughter)

3          MR. WILSON:  Good afternoon, Your Honor.  Eric

4  Wilson of Kelley Drye for the Creditors Committee.

5          We got our deal.  We've kind of been a fly on the

6  wall.  But not knowing where these discussions are headed,

7  it feels like we should have a seat at that table.

8          THE COURT:  If you want to go, I mean, to that

9  meeting, I think that the Committee is certainly welcome to

10  go.

11          I would ask that from the Committee's perspective

12  that it be counsel only.  And if you need -- you know, if

13  you need to go link up and have a video call with your

14  Committee members, I've been I think in all of your

15  respective offices.  I know that you -- I know that they all

16  have great video capability, and I'm sure they would give

17  you some privacy and a link to let you do that.

18          But I'd ask that it be just counsel only because

19  you're really listening and making sure that the dynamics of

20  the deal you cut don't change.  Is that unfair?

21          MR. WILSON:  That's completely fair.  I appreciate

22  that.  Thank you.

23          THE COURT:  Yes, sir.  All right.  So with that,

24  anything else we need to talk about?

25          MR. SCHROCK:  I think that'll do it, Your Honor.

1          THE COURT:  All right.  I compliment everybody on

2    the trial.  So much fun to have everybody back in the

3    courtroom.  It's been so long.

4          I also want to say I very much appreciate your

5    giving the younger lawyers an opportunity to examine

6    witnesses.  The witnesses were all substantive.  And I say

7    this for everybody because I stood there actually in this

8    courtroom for a long time right there, I know how hard the

9    skillset is to acquire.  And the only way you get it is by

10   actually doing it.

11         And, you know, you see, you know, the world moves

12   at a much higher rate of speed when you're standing there

13   than before you come in the door.  So I appreciate you

14   giving the youngsters, all of you, the opportunity to work

15   on their respective skillsets.

16         With that, safe travels home.  And I'll see you

17   next week or whenever that is.

18         We'll be adjourned.

19         THE CLERK:  All rise.

20     (Hearing concluded 1:51 p.m.)

21

22

23

24

25                    *  *  *  *  *

1          I certify that the foregoing is a correct

2    transcript to the best of my ability due to the condition of

3    the electronic sound recording of the ZOOM/video/telephonic

4    proceedings in the above-entitled matter.

5    /S/ MARY D. HENRY

6    CERTIFIED BY THE AMERICAN ASSOCIATION OF

7    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9    JTT TRANSCRIPT #67233

10   DATE FILED:  MAY 18, 2023

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25