**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SERTA SIMMONS BEDDING, LLC, et al. | : | Case No. 23-90020 (DRJ) |
| | : | |
| | : | (Jointly Administered) |
| SERTA SIMMONS BEDDING, LLC, INVESCO | : | |
| SENIOR SECURED MANAGEMENT, INC., | : | Adversary Proc. No. 23-09001 (DRJ) |
| CREDIT SUISSE ASSET MANAGEMENT, LLC, | : | |
| and BARINGS LLC, | : | |
| | : | |
| *Plaintiffs and Counterclaim-Defendants,* | : | |
| | : | |
| - against – | : | |
| | : | |
| AG CENTRE STREET PARTNERSHIP L.P., AG | : | |
| CREDIT SOLUTIONS NON-ECI MASTER | : | |
| FUND, L.P., AG SF MASTER (L), L.P., AG | : | |
| SUPER FUND MASTER, L.P., SILVER OAK | : | |
| CAPITAL, L.L.C., ASCRIBE III | : | |
| INVESTMENTS, LLC, COLUMBIA CENT CLO | : | |
| 21 LIMITED, COLUMBIA CENT CLO 27 | : | |
| LIMITED, COLUMBIA FLOATING RATE | : | |
| INCOME FUND, A SERIES OF COLUMBIA | : | |
| FUNDS SERIES TRUST II, COLUMBIA | : | |
| STRATEGIC INCOME FUND, A SERIES OF | : | |
| COLUMBIA FUNDS SERIES TRUST I, | : | |
| CONTRARIAN CAPITAL FUND I, L.P., | : | |
| CONTRARIAN CENTRE STREET | : | |
| PARTNERSHIP, L.P., CONTRARIAN | : | |
| DISTRESSED DEBT FUND, L.P., GAMUT | : | |
| CAPITAL SSB, LLC, LCM XXII LTD., LCM | : | |
| XXIII LTD., LCM XXIV LTD., LCM XXV LTD., | : | |
| LCM 26 LTD., LCM 27 LTD., LCM 28 LTD., | : | |
| NORTH STAR DEBT HOLDINGS, L.P., | : | |
| SHACKLETON 2013- III CLO, LTD., | : | |
| SHACKLETON 2013-IV-R CLO, LTD., | : | |
| SHACKLETON 2014-V-R CLO, LTD., | : | |
| SHACKLETON 2015-VII-R CLO, LTD., | : | |
| SHACKLETON 2017-XI CLO, LTD., Z | : | |
| CAPITAL CREDIT PARTNERS CLO 2018-1 | : | |
| LTD., AND Z CAPITAL CREDIT PARTNERS | : | |
| CLO 2019-1 LTD., | : | |
| *Defendants and Counterclaim-Plaintiffs.* | : | |

i

## <u>LCM DEFENDANTS' POST-TRIAL BRIEF</u>[*]

HOLWELL SHUSTER & GOLDBERG
425 Lexington Ave., 14th Floor
New York, New York 10017
Tel: 646.837.5151

MCKOOL SMITH P.C.
600 Travis Street, Suite 7000
Houston, Texas 77002
Tel. 713.485.7300

*Counsel for the LCM Defendants*

---

[*] The LCM Defendants are LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd. and LCM 28 Ltd.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 2

    A.  Serta and the PTL Lenders Negotiate and Consummate the Exchange Transaction.... 2

    B.  The Mechanics of the Exchange Transaction ............................................................. 5

    C.  The Role of the LCM Defendants ............................................................................... 7

ARGUMENT ......................................................................................................................... 8

  I.  THE FACTS AT TRIAL ESTABLISHED A BREACH OF CONTRACT...................... 8

  II.  THE FACTS AT TRIAL ESTABLISHED A VIOLATION OF THE COVENANT OF
      GOOD FAITH AND FAIR DEALING.................................................................... 14

    A.  Plaintiffs Breached The Implied Covenant............................................................... 14

        1.  Getting Paid To Amend, And Amending, The Agreement On The Way Out...... 15

        2.  Stripping LCM's Priority Rights ......................................................................... 19

    B.  Plaintiffs' Defenses Fail Under The Law ................................................................. 21

        1.  Defining Market Expectations As Encompassing All "Position-Enhancing
            Transactions" Is Legally Erroneous................................................................... 21

        2.  An "Unclean Hands" Defense Is Unavailing...................................................... 24

  CONCLUSION................................................................................................................. 26

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                          **Page(s)**

*AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC,*
    185 N.Y.S.3d 73 (N.Y. App. Div. 1st Dep't 2023) .................................................... 20

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,*
    404 F.3d 566 (2d Cir. 2005) ........................................................................................ 24

*Anexia, Inc. v. Horizon Data Sols. Ctr., LLC,*
    2022 WL 1195436 (N.Y. Sup. Ct. (N.Y. Cnty.) Apr. 21, 2022) ................................. 16

*Atwater & Co. v. Panama R.R. Co.,*
    246 N.Y. 519 (1927) ...................................................................................................... 9

*Broad v. Rockwell Int'l Corp.,*
    642 F.2d 929 (5th Cir. 1981) ............................................................................. 9, 11, 12

*Carvel Corp. v. Baker,*
    79 F. Supp. 2d 53 (D. Conn. 1997) ............................................................................ 22

*Cohen v. Elephant Wireless, Inc.,*
    2004 WL 1872421 (S.D.N.Y. Aug. 19, 2004) ............................................................ 24

*Cole v. Macklowe,*
    99 A.D.3d 595 (N.Y. App. Div. 1st Dep't 2012) ....................................................... 12

*Compagnie Financiere de CIC v. Merrill Lynch, Pierce, Fenner & Smith Inc.,*
    232 F.3d 153 (2d Cir. 2000) .......................................................................................... 9

*Cordero v. Transamerica Annuity Serv. Corp.,*
    2023 WL 3061503 (N.Y. Apr. 25, 2023) .................................................................... 21

*Dalton v. Educ. Testing Serv.,*
    87 N.Y.2d 384 (1995) .................................................................................................. 14

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.,*
    680 F. Supp. 2d 625 (S.D.N.Y. 2010) ................................................................... 14, 22

*Fleischman v Furgueson,*
    223 N.Y. 235 (1918) .................................................................................................... 12

*Griggs v. Provident Consumer Disc. Co.,*
    459 U.S. 56 (1982) ....................................................................................................... 13

*ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*,
   2022 WL 10085886 (N.Y. Sup. Ct. (N.Y. Cnty.) Oct. 17, 2022) ........................................ 16

*In re Charter Commc'ns*,
   419 B.R. 221 (Bankr. S.D.N.Y. 2009) ................................................................. 12

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ................................................................. 22

*In re LightSquared Inc.*,
   511 B.R. 253 (Bankr. S.D.N.Y. 2014) ................................................... 14, 22, 23

*In re Murray Energy Holdings Co.*,
   616 B.R. 84 (Bankr. S.D. Ohio 2020) ................................................................. 11

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
   386 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................................ 24

*Kass v. Eastern Air Lines, Inc.*,
   1986 WL 13008 (Del. Ch. Nov. 14, 1986) ......................................................... 17

*Katz v. Oak Indus. Inc.*,
   508 A.2d 873 (Del. Ch. 1986) ..................................................................... 15, 17

*Kirk La Shelle Co. v. Armstrong Co.*,
   263 N.Y. 79 (1933) ........................................................................................ 14

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
   2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ...................................................... 18

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
   842 F. Supp. 2d 682 (S.D.N.Y. 2012) ............................................................... 24

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
   716 F. Supp. 1504 (S.D.N.Y. 1989) .................................................................. 22

*North Star Debt Holdings, L.P., et al. v. Serta Simmons Bedding, LLC, et al.*,
   Index No. 652243/2020 (N.Y. Sup. Ct. 2020) ..................................................... 5

*Nuance Commc'ns, Inc. v. Int'l Bus. Machines Corp.*,
   544 F. Supp. 3d 353 (S.D.N.Y. 2021) ............................................................... 18

*Octagon Credit Investors, LLC v. NYDJ Apparel, LLC*,
   Index No. 656677/2017 (N.Y. Sup. (N.Y Cty.)) ................................................. 17

*Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*,
   2013 WL 4409434 (E.D.N.Y. Aug. 2, 2013) ................................................... 24

*Richbell Info. Servs. v. Jupiter Partners*,
   309 A.D.2d 288 (N.Y. App. Div. 1st Dep't 2003) .................................... 15

*Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*,
   13 N.Y.3d 398 (2009) ........................................................................................ 9

*Rowe v. Great Atl. & Pac. Tea Co.*,
   46 N.Y.2d 62 (1978) ........................................................................ 14, 21, 24

*Shatz v. Chertok*,
   180 A.D.3d 609 (N.Y. App. Div. 1st Dep't 2020) .................................... 15

*Starr Indem. & Liab. Co. v. Water Quality Ins. Syndicate*,
   320 F. Supp. 3d 549 (S.D.N.Y. 2018) ................................................ 8, 9

*Stern v. Marshall*,
   564 U.S. 462 (2011) ........................................................................................ 8

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
   41 F.3d 1570 (2d Cir. 1994) ........................................................................ 18

*Vista Outdoor Inc. v. Reeves Fam. Tr.*,
   234 F. Supp. 3d 558 (S.D.N.Y. 2017) ...................................................... 22

*390 W. End Assoc. v Baron*,
   274 A.D.2d 330 (N.Y. App. Div. 1st Dep't 2000) ............................ 24, 25

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
   98 N.Y.2d 144 (2002) ........................................................................ 21

## Other Authorities

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .... 12

Richard A. Lord, *Williston on Contracts* (4th ed.) .................................... 24

## INTRODUCTION

1.      The week-long trial permits only one set of results: the PTL Lenders and Serta violated New York's implied covenant of good faith and fair dealing, and breached the 2016 Term Loan Agreement, in consummating the June 2020 restructuring transaction at issue in this case.

2.      This conclusion is compelled by effectively undisputed evidence. There are the transaction documents themselves, which establish beyond doubt (reinforced by the PTL Lenders' witness testimony) that the amendments to the 2016 Agreement and the debt exchange happened all at once, as part of a single transaction; that each was contingent on the other; that none of the non-participating lenders approved the amendments; that the participating lenders approved the amendments solely because those would permit the restructuring and never detrimentally apply to them; and that they received consideration that the non-participating lenders did not. There is testimony from Messrs. Shah and Sveen that the amendments were necessary to create the priming tranche, and that there would have been no amendment without the corresponding (and simultaneous) exchange. And there is testimony from Mr. Tepner that priority of payment is fundamental to credit agreements such as the 2016 Agreement, as well as testimony from Mr. Chopra that the transaction effectuated here—extension of a priming facility combined with a debt-exchange—had never been done before. These basic facts establish the breaches asserted by the LCM Defendants.

3.      The Plaintiffs' defenses should be rejected. There is no defense of unclean hands to a legal claim for damages—and breach of the implied covenant (as well as breach of contract) is a legal claim. Nor is there any merit to the assertion that the Court should find there is no breach here simply because so-called "position-enhancing" transactions generally were expected in the marketplace. The LCM Defendants do not advance a claim of breach based on the theory that

1

position-enhancing transactions are proscribed by the implied covenant. Rather, the LCM Defendants claim that *this* transaction was proscribed. The Court must undertake the reasonable-person analysis to evaluate this transaction and the conduct of these plaintiffs.

4.     Finally, although not relevant to the claims at issue, there was evidence about the LCM Defendants' economic motivations at trial. The LCM Defendants are frequent transactors in the leveraged loan market. They have an economic interest in ensuring that credit agreements are not read to permit bad-faith transactions such as the one that took place. And to the extent the Court considers the actions of the parties in assessing the merits of the claims asserted here, as was made clear at trial, the LCM Defendants are not being funded by any of the Apollo Group; are not in any lock-up agreement with them; were never invited to participate in any transaction—dropdown, debt-exchange, priming facility, etc.—in the lead-up to the June 8, 2020 restructuring; never reached out to the PTL Lenders after the transaction was announced to try and get cut in on the deal; and are not considered predatory lenders. Indeed, outside of the context of a court-administered restructuring proceeding, the LCM Defendants have never participated in a transaction that resulted in them receiving differential treatment, consideration, benefits or terms than other lenders in the same class of debt that was not offered to all such lenders on a *pro rata* basis.

## STATEMENT OF FACTS[1]

### A.     Serta and the PTL Lenders Negotiate and Consummate the Exchange Transaction

5.     On November 8, 2016, Serta Simmons Bedding, LLC ("**Serta**") raised capital by entering into a First Lien Term Loan Agreement (the "**Credit Agreement**" or "**Agreement**") with

---

[1] The LCM Defendants are simultaneously filing Proposed Findings of Fact and Conclusions of Law.

a number of lenders (the "**First Lien Lenders**"). *See* Debtors' Ex. 6, ECF No. 853-6.[2] That Agreement specifies in Section 2.18 that any payment by Serta on account of the loans would be made *pro rata* to all First Lien Lenders based on the face amount of ownership—meaning no First Lien Lender would receive better treatment (the "**First Lien Loans**"). *See id*. at 81-82.

6.      By March 2020, in the face of liquidity concerns occasioned by a weakening financial performance and the substantial impact of the COVID-19 pandemic, Serta began to search for refinancing alternatives that would infuse new money into the company and prevent it from defaulting on the Agreement. *See* Trial Transcript ("Tr.) at 140:4:17, 141:2-7.

7.      Serta, acting with and through its advisors at Evercore Group LLC and Weil Gotshal & Manges LLP, and largely directed by its private-equity sponsor, Advent International ("**Advent**"), engaged in negotiations with a substantial number of financial institutions—including Oaktree, Barings, Sixth Street, Fortress, Blue Torch Capital, Charlesbank, and an ad hoc group of lenders (hereafter, the "**Apollo Group**") affiliated with Apollo Global Management, Angelo Gordon, and Gamut Capital. *Id*. at 144:1-14; 154:12-25. These firms proposed to infuse new money into the business through what is colloquially known as a "drop-down" transaction, whereby an infusion of new capital would be collateralized by the transfer of assets into a so-called unrestricted subsidiary that issues new debt. *Id*. at 988:10-17, 1001:18-24. In such a transaction, there is no subordination (rather, there is a change to the pool of collateral securing the first lien loans), and the first-lien loans remain first-lien. *Id.* at 973:15–975:13.

8.      In parallel, Serta and its advisors explored a different kind of transaction with an ad hoc group of existing first- and second-lien lenders represented by Gibson Dunn & Crutcher LLP

---

[2] References to "ECF No." with respect to Debtors' Exhibits refer to the docket entry in the main proceeding (No. 23-90020); references to "ECF No." with respect to Defendants' Exhibits refer to the docket entry in the adversary proceeding (No. 23-90001).

and Centerview Partners LLC (hereafter, the "**PTL Lenders**"). ████████████████

████████████████████████████████████████████

████████████████████████████████████. As the

lead from Centerview (Mr. Chopra) explained, the PTL Lenders' first term sheet contemplated

that this new money financing would be backstopped by the ad hoc group but that it would be

"available to all first lien lenders." Tr. at 468:17-20 (discussing Defs. Ex. 64, ECF No. 248-64);

721:12-17.

9.      At some later point, however, the PTL Lenders and Serta began to discuss not only

providing Serta with liquidity through a new-money tranche, but also engaging in an "exchange"

by which certain of Serta's first-lien and second-lien lenders would exchange their existing debt

at a discount to par in return for a priming position that would sit below the new money tranche

but above Serta's then-existing first- and second-lien debt. *Id.* at 207:10-13, 555:3-24. Unlike the

"drop-down" proposals Serta was entertaining, this deal encompassing both the new money and

exchange tranches (hereafter, the "**Exchange Transaction**") required amendments to the

Agreement. *See* Debtors' Ex. 250, ECF No. 857-99.

10.      Because of the need to amend the Agreement, the PTL Lenders and Serta decided

to invite other lenders to participate in their deal so as to get the participation rate to be as close to

50.1% as possible, and to seek the consent of the participating lenders—and only the participating

lenders—to amend the Agreement on their way out. *Id.*; *see also* Tr. at 568:3–569:1. They

incentivized participating lenders to amend the agreement by offering them consideration not

offered to the non-participating lenders—*i.e.*, new loans senior to those held by the non-

participating lenders.  Tr. at 554:14-23. And they refused to seek the approval of all lenders or

otherwise to offer the deal to all lenders. *Id.* at 503:25–504:4.

11.     On Monday, June 8, 2020, Serta publicly announced the Exchange Transaction. Tr. at 583:3-4.

12.     On Thursday, June 11, 2020, the Apollo Group initiated a lawsuit to restrain Serta and the PTL Lenders from consummating the Exchange Transaction. *North Star Debt Holdings, L.P., et al. v. Serta Simmons Bedding, LLC, et al.*, Index No. 652243/2020 (N.Y. Sup. Ct. 2020). On Friday, June 12, Justice Andrea Masley of New York State Supreme Court entered a temporary restraining order enjoining consummation of the transaction, *see id.* Dkt. 48, but on the next Friday, June 19, Justice Masley dissolved the TRO and denied the Apollo Group's request for a preliminary injunction, *see id.* Dkt. 88.[3] Serta and the PTL Lenders closed the deal first thing in the morning on Monday, June 22. Tr. at 590:14-15. Following that closing, there were now four classes of Serta debt: the new money (or "FLFO") tranche; the exchange (or "FLSO") tranche; the legacy first-lien debt, which now ranked *third* in priority; and the legacy second-lien debt, which now ranked fourth.

### B.     The Mechanics of the Exchange Transaction

13.     As a baseline, and subject to certain exceptions, the Agreement stated in Section 9.02(b) that it could be amended with the approval of the "Required Lenders," and the Agreement in Section 1.01 defined the term "Required Lenders" to mean "Lenders having Loans . . . representing more than 50% of the sum of the total Loans." Debtors' Ex. 6, ECF No. 853-6 at 54. The PTL Lenders who negotiated the deal with Serta prior to June 8 did not comprise 50% of lenders. Tr. at 213:4-9.

---

[3] The LCM Defendants' Collateral Manager, LCM Asset Management LLC, sought to intervene in that case, but, after the transaction closed and Serta objected to the Collateral Manager's intervention, the Collateral Manager withdrew its motion, and a new action was filed in the SDNY.

14.     Among other things, the PTL Lenders and Serta amended Section 1.01 of the Agreement to change the definition of "Incremental Equivalent Debt" to include new money priority term loans that could be senior in right of payment (to account for the new money tranche); and they excised Section 7.01(*l*) from the Agreement, which had previously defined any subordination of the first lien loans as an event of default (to prevent the issuance of the new loans from creating an event of default that would have accelerated repayment). *See* Debtors' Ex. 250, ECF No. 857-99 at 158, 258.

15.     The PTL Lenders executed these amendments on the condition that they would no longer be parties to the Agreement, and they contemporaneously exchanged their existing debt for new, super-priority debt. Thus, the "Open Market Purchase and Cashless Exchange Agreement" (*see* Debtors' Ex. 251, ECF No. 865-41), by which the PTL Lenders exchanged their existing loans for super-priority debt, and the Amendment (*see* Debtors' Ex. 250, ECF No. No. 857-99), by which the PTL Lenders ratified Serta's incurrence of super-priority debt, were executed by the PTL Lenders at precisely the same time, and became effective contemporaneously.

16.     The Super-Priority Term Loan Agreement (the "**PTL Agreement**") makes clear that "each Exchanging Lender (x) sold, in an open market purchase and sale transaction, its Relevant Existing Loans to [Serta] in exchange for consideration consisting of a new Class of term loans . . . as further described in the Open Market Purchase and Cashless Exchange Agreement . . . [and] (y) provided their consent to . . . Amendment No. 1 to First Lien Term Loan Agreement." Defs. Ex. 304, ECF No. 256-4 at Recitals B. The Open Market Purchase and Cashless Exchange Agreement, in turn, recites that ███████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

Debtors' Ex. 251 at 4, ECF No. 865-41. Section 6 of the First Amendment then states that "[i]mmediately following" the execution of the amendment "the PTL Credit Agreement shall become effective and . . . the PTL New Money Term Loans shall be funded and the Initial PTL Exchange Transactions shall be consummated." Debtors' Ex. 250 at 4, ECF No. 857-99. These agreements were executed by exactly the same parties at exactly the same time—the morning of June 22, 2020—and all were effective that day.

17.     As the PTL Lenders conceded—and as economic realities dictate—they would never have executed the amendments if they were not simultaneously exchanging their newly minted third- or fourth-lien paper for what would now become the new, real first- and second-lien Serta debt. Tr. at 882:3-5. As Mr. Yarrow, a representative from one of the exchanging lenders, agreed, it was all "one transaction." *Id*. at 882:6-8.

### C.     The Role of the LCM Defendants

18.     The LCM Defendants are CLOs that invest in "large financings." They are not considered to be predatory lenders. Tr. at 764:22–765:4; *see also id*. at 669:19-24 (LCM Defendants have "other holdings and leverage loans").

19.     It is uncontested that outside court-administered restructurings, the LCM Defendants have never participated in a transaction that resulted in them receiving differential treatment, consideration, benefits, or terms than other lenders in its same class of debt that was not offered to all such lenders on a pro rata basis. *See* Debtors' Ex. 321, ECF No. 859-19 at 2.

20.     It is also undisputed that the LCM Defendants did not participate in any discussions with Serta, the Apollo Group or the PTL Lenders before June 8 regarding a potential restructuring of the Company's debt (and thereafter the LCM Defendants were not invited to participate in the transaction). Tr. at 237:7-19, 346-347, 501-503, 669:3-17, 765:5-14, 811-812, 846-847.

## ARGUMENT

21.     For the reasons explained in the LCM Defendants' pre-trial brief (ECF No. 245 at pp. 10-13), pursuant to *Stern v. Marshall*, 564 U.S. 462 (2011), the Court should enter a report and recommendation on the contract and implied-covenant claims. To avoid burdening the Court with additional paper, and because there were no factual issues raised at trial relevant to the constitutional authority of this Court, those arguments are incorporated by reference here.

22.     In this section, the LCM Defendants discuss the legal and factual points bearing on the disposition of the breach of contract and implied covenant claims before the Court. For the avoidance of doubt, the LCM Defendants incorporate all legal arguments and undisputed factual points raised in their pre-trial brief if not otherwise mentioned herein.

## I.      THE FACTS AT TRIAL ESTABLISHED A BREACH OF CONTRACT

23.     The undisputed facts adduced at trial established that Plaintiffs breached the Agreement by effectuating the Transaction, in particular, by failing to abide by Section 9.02(b)'s requirement that the Agreement could be amended only by "Required Lenders," which the Agreement defines as lenders that, "at such time" of the amendment, "represent[] more than 50% of the sum of the total" loans outstanding.[4] Having agreed to exchange their first lien loans, the PTL Lenders were not first lien lenders at the time of the amendment, and thus were not "Required Lenders."

---

[4] The Court held at summary judgment that Plaintiffs complied with Section 9.05(g) of the Agreement, and, although the LCM Defendants are appealing that determination and reserve all their rights in that respect, the LCM Defendants argued at trial that Plaintiffs breached the Agreement regardless of the determination of that question on appeal.  In that regard, the LCM Defendants note that the Court expressly left open whether Plaintiffs otherwise complied with the Agreement in all respects—which is the declaration they seek by way of this Adversary Proceeding. *See* MSJ Tr. at 135:4-9 ("What I'm not prepared to find that in all aspects that the Credit Agreement was complied with, I don't have that evidence before me. What I was asked to determine – at least the way that I read it – was whether or not that the commercial transaction that was engaged in fit within 9.05(g) and I find that it does.").

24.     Under New York law, "as a matter of contract interpretation . . . the Court begins with the plain text of the term at issue." *Starr Indem. & Liab. Co. v. Water Quality Ins. Syndicate*, 320 F. Supp. 3d 549, 569 (S.D.N.Y. 2018). Courts "must give the words and phrases employed in the contract their plain meaning." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 948 (5th Cir. 1981) (en banc) (applying New York law). Importantly, "particular words [in a contract] should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) (quoting *Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524 (1927)). Whether a provision is unambiguous is a question of law for the Court. *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir. 2000).

25.     Section 9 of the Agreement sets forth the requirements for amending it. As a general rule, and subject to certain exceptions not alleged to be present here, any amendment required the consent of the "Required Lenders" under Section 9.02(b): "neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified, except . . . pursuant to an agreement or agreements in writing entered into by the Top Borrower and the Required Lenders[.]" Debtors' Ex. 6 at 142, ECF No. 853-6. In turn, the Agreement defined the term "Required Lenders" in Section 1.01 to mean "at any time, Lenders having Loans or unused Commitments representing more than 50% of the sum of the total Loans and such unused commitments at such time." *Id*. at 54.

26.     The Amendment itself recognizes that Section 9.02(b) must be complied with and purported to adhere to its requirements; thus, it states in the recitals that "in accordance with Section 9.02(b) of the Existing Term Loan Agreement, the Top Borrower has requested that the

Lenders (as defined in the Existing Term Loan Agreement) party hereto (which collectively constitute the Required Lenders under and as defined in the Existing Term Loan Agreement) . . . agree to make certain amendments to the Existing Term Loan Agreement as set forth herein." Debtors' Ex. 250, ECF No. 857-99 at 2.

27.     But, in fact, the Amendment did not comply with Section 9.02(b)'s requirement that lenders holding more than "50% of the sum of the total Loans . . . *at such time*" approve any amendment. In fact, at the time of the Amendment, the voting lenders—*i.e.*, the PTL Lenders— were *exiting* the Agreement and had agreed to amend it only because it would apply to the first-lien lenders that were remaining behind, and never to them. Indeed, the Amendment was made effective simultaneous with the consummation of the exchange—meaning there was no moment in time that both (i) the PTL Lenders held loans under the original Agreement and (ii) were subject to the Agreement as amended while still holding such debt. Moreover, the amendment and exit were each contingent on the other, and the PTL Lenders agreed to amend the Agreement only because the amendments would redound to their benefit while disadvantaging those left behind.

28.     The PTL Lenders admitted as much in their testimony. As Mr. Sveen explained:

[T]here was only one transaction presented and it was all—it was one transaction together. So that was the transaction to consider and that's the one that we signed and agreed to . . . . [E]verything was heavily negotiated, and all of those different components had come together for that deal to be signed.

29.     Tr. at 768:1-769:2. He also explained that he did not believe that the amendments would have been approved without the debt repurchase. *Id*. at 769:3-7.

30.     Mr. Yarrow testified to the same understanding, explaining that he "[n]ever consider[ed] voting for the amendments without participating in the exchange." Tr. at 882:3-5. He also agreed that the pieces of the deal formed "one transaction." *Id*. at 882:6-8.

31.     In other words, the PTL Lenders did not meet the basic definition of "Required Lenders." This is apparent from the face of the documents alone, and this conclusion is bolstered by the testimony of the lenders. *See, e.g.*, Debtors' Ex. 250, ECF No. 857-99, Recitals Section C ("On the First Amendment Effective Date [*i.e.*, June 22, 2020—the date of the Amendment], the Borrowers will enter into the PTL Credit Agreement and in connection therewith, the Borrowers will consummate the Initial PTL Exchange Transactions."); *id.* Section 6 ("Immediately following the transactions contemplated under this First Amendment the Initial PTL Exchange Transactions shall be consummated."); *see also* Defs. Ex. 304 at 7, ECF No. 256-4, Recitals Section C ("each Exchanging Lender (x) sold, in an open market purchase and sale transaction, its Relevant Existing Loans to [Serta] in exchange for consideration consisting of a new Class of term loans . . . as further described in the Open Market Purchase and Cashless Exchange Agreement . . . [and] (y) provided their consent to . . . Amendment No. 1 to First Lien Term Loan Agreement.").

32.     *In re Murray Energy Holdings Co.*, 616 B.R. 84 (Bankr. S.D. Ohio 2020) is instructive. There, lenders who had been left behind by new "super-priority lenders" argued that the debtor failed to achieve the required threshold of lenders for amendment to a credit agreement because the super-priority lenders "had already committed to sell their loans back" to the debtor at the time they agreed to amend the credit agreement. *Id*. at 97–98. The court rejected this argument, stating that it could not be that a "commitment to sell notes . . . itself effectuated a sale of the notes." *Id*. at 98. But the facts of this case lead to just the opposite conclusion: here, the PTL Lenders had not just "committed" to exchange their notes, they in fact exchanged their notes at the same time they purported to amend the Agreement, and each was contingent on the other. *Compare id*. ("Committing to do something is not, of course, the same thing as doing it."); *see also id*. ("[T]he Third Amendment was entered into before the Specified Auction was conducted.").

33.     Considering the Agreement's broader context further supports the conclusion that there was a breach of contract. Under New York law, "the entire contract must be considered," and "that interpretation is favored which will make every part of the contract effective." *Broad*, 642 F.2d at 947; Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("Context is the primary determinant of meaning. A legal instrument typically contains many interrelated parts [and] [t]he entirety of the document thus provides the context for each of its parts."). Moreover, courts in New York reject contractual readings that "produce an absurd result, [or] one that is commercially unreasonable." *See Cole v. Macklowe*, 99 A.D.3d 595, 596 (N.Y. App. Div. 1st Dep't 2012); *Fleischman v Furgueson*, 223 N.Y. 235, 241 (1918) ("It is a well-established canon of interpretation that in seeking for the intent of the parties the fact that a construction contended for would make the contract unreasonable may be properly taken into consideration.").

34.     Interpreting Section 9.02(b) and the definition of "Required Lenders" to allow for lenders to amend the agreement on their way out and contingent on their exit—in such a fashion that the amendments will never apply to them but will actively injure the interests of the remaining parties to the Agreement—leads to a commercially unsustainable interpretation. Majority-amendment requirements are designed to protect lenders *who are in the contract*; the point is to ensure that a change affecting the lenders is approved by a majority of them. *Cf. In re Charter Commc'ns*, 419 B.R. 221, 238 (Bankr. S.D.N.Y. 2009) ("[O]rdinary voting power . . . is exercised by means of shareholder votes for directors who in turn govern the management of CCI and its subsidiaries[.]"). Reading the Agreement to permit lenders to amend—and, at the same time and

12

contingent on the amendment, exit the deal—undermines that context.[5] Indeed, the starkest example of this is in the Amendment's striking of the going-concern requirement—a requirement that appears in the PTL Agreement. *See* Tr. 485:5–486:13.

35.     The Court should also consider the exceptions set forth in the Agreement for amending it, as these also make clear that the Required Lenders must actually be affected by an amendment in order to be permitted contractually to make it. Thus, the Agreement states that, to amend certain of the provisions in the Agreement, including the *pro rata* sharing provision, then Serta would need to obtain the consent not just of 50.1% of the lenders, but instead the approval of *everyone* who is "directly and adversely affected" by the amendment. Debtors' Ex. 6, ECF No. 853-6 at 142. In the event a lender is stripped of a right to receive *pro rata* payment, then that lender must agree.

36.     In that context, it makes no sense to conclude—as the Court must conclude to give Plaintiffs a clean bill of health—that, for the amendments requiring approval by the Required Lenders, *not a single lender* who is in fact directly and adversely affected by an amendment must approve. The Required Lenders must actually be Serta lenders at the time of the amendment, and must actually be affected by it. That ensures approval by a majority of lenders actually representing

---

[5] There is further contextual support for an interpretation of "Required Lenders" that excludes the PTL Lenders. Section 9.05(g)(vi)(A) instructs that if an "Affiliated Lender" acquires loans in the open market but is not automatically required to retire and cancel those loans pursuant to Section 9.05(g)(i), "the Term Loans held by such Affiliated Lender shall be disregarded in both the numerator and denominator in the calculation of any Required Lender or other Lender vote[.]"  Debtors' Ex. 6, ECF No. 853-6 at 155.  This clause further reflects the contracting parties' intent to prevent voting by lenders whose interests are aligned with the borrower rather than their co-lenders—just as the PTL Lenders' interests were aligned with those of Serta vis-à-vis the excluded lenders in the Exchange Transaction.

those affected by the amendment. In this case, the amendments were not approved by a single one

of the lenders actually adversely affected by them. Tr. at 504:1-4, 880:25–881:3.[6]

## II.    THE FACTS AT TRIAL ESTABLISHED A VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

37.    Even if the Court finds, as a legal matter, that the amendment process followed by

Plaintiffs as described *supra* in Part I technically complied with the contract, the evidence at trial

demonstrated that the conduct breached the covenant of good faith and fair dealing. The LCM

Defendants first address how the evidence and testimony compel a finding that the Plaintiffs

breached the implied covenant (*infra*, Section A), before addressing the Court's questions raised

at the conclusion of the trial (*infra*, Section B).

### A.    Plaintiffs Breached The Implied Covenant

38.    Under New York law, every contract contains an implied covenant of good faith

and fair dealing, according to which "'neither party shall do anything which will have the effect

of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton*

*v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (quoting *Kirk La Shelle Co. v. Armstrong Co.*,

263 N.Y. 79, 87 (1933)). Put otherwise, "the undertaking of each promisor in a contract must

include any promises which a reasonable person in the position of the promisee would be justified

in understanding were included." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978);

*see also Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d

---

[6] The LCM Defendants note that the Court suggested it would provide a definition of "open market purchase." *See* Tr. at 912:23-913:10. That definition is not relevant to their breach of contract or implied-covenant claims, and the LCM Defendants further believe that, in light of the pending appeal, the Court lacks jurisdiction to provide a new definition of the previously disputed contractual term. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) ("A federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously. Thus, the filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.").

625, 632 (S.D.N.Y. 2010) ("[A]n end-run [around contractual terms], if not a downright sham, is not permissible if, as here, it does away with the 'fruits' of the contract."); *In re LightSquared Inc.*, 511 B.R. 253, 333 (Bankr. S.D.N.Y. 2014) (noting that *Empresas* "found that conduct technically permissible under a credit agreement may nevertheless give rise to a breach of the implied covenant of good faith and fair dealing if it is intended to achieve a result that is prohibited").

39.     Thus, "the appropriate legal test is not difficult to deduce. It is this: is it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter. If the answer to this question is yes, then, . . . a court is justified in concluding that such act constitutes a breach of the implied covenant of good faith." *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (applying New York law). As shown, there are two separate and independent reasons to conclude here that Plaintiffs violated the implied covenant.

### 1.     Getting Paid To Amend, And Amending, The Agreement On The Way Out

40.     As explained above and as the deal documents show, while the PTL Lenders "consented" to change the Agreement to allow the issuance of super-priority loans and to make other amendments permitting the Transaction to proceed, they did so only on the condition that the changes would *not* apply to them, and only upon receiving consideration not offered to the non-participating lenders (*i.e.*, priming liens). The changes became effective only at the exact moment they entered into the "Open Market Purchase and Cashless Exchange Agreement" (Debtors' Ex. 251, ECF No. 865-41) and thereby stopped being first-lien lenders, consummating the Exchange Transaction.

41.     New York precedents demonstrate that Plaintiffs' manipulation of the amendment process violated the implied covenant of good faith and fair dealing. *First*, "explicit[] . . . right[s] cannot be exercised in bad faith so as to deprive the other party of the benefit of the bargain." *Shatz v. Chertok*, 180 A.D.3d 609, 610 (N.Y. App. Div. 1st Dep't 2020). That principle is well illustrated in *Richbell Info. Servs. v. Jupiter Partners*, 309 A.D.2d 288 (N.Y. App. Div. 1st Dep't 2003), in which the Appellate Division held that, notwithstanding the "apparently unfettered" contractual right of the majority partners in a joint venture to veto a particular transaction, "even where one has an apparently unlimited right under the contract, that right may not be exercised *solely for personal gain* in such a way as to deprive the party of the fruits of the contract." *Id.* at 302 (emphasis added); *Anexia, Inc. v. Horizon Data Sols. Ctr., LLC*, 2022 WL 1195436, at *3 (N.Y. Sup. Ct. (N.Y. Cnty.) Apr. 21, 2022) ("[A] party may be in breach of an implied duty of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruit of its bargain."); *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, 2022 WL 10085886, at *9 (N.Y. Sup. Ct. (N.Y. Cnty.) Oct. 17, 2022) (finding allegations that "defendants, who constitute 'majority lenders' under the Credit Agreement, abused their ability to amend the Credit Agreement to effectuate the Transaction" stated a claim for breach of the implied covenant).

42.     Here, there was undoubtedly a personal gain offered to the PTL Lenders—and only to them—and they approved the amendments needed to effectuate the deal *because* they were receiving this personal gain.  That special treatment was not offered to the non-participating lenders, who were deprived of the fruit of their contract, and indeed the Exchange Transaction was effective only because the non-participating lenders were being left behind and not allowed to

share equally in the benefits that the PTL Lenders would obtain as part of the Transaction. *See* Defs. Ex. 252, ECF No. 252-54 █████████████████████████████████████ ████████████████████████; Tr. at 671:9-11 (Chopra) ("And the more left behind, the better for your clients. Right? A. All else equal, yes.").

43.     *Second,* New York law makes clear that, under the implied covenant, all lenders had to be presented with the opportunity to join in the Transaction, such that a party could make an informed choice as to whether it wished to be bound by the new, amended Agreement, or instead preferred (as the PTL Lenders did) to join a new, super-priority agreement.

44.     That is the teaching of *Kass v. Eastern Air Lines, Inc.*, 1986 WL 13008 (Del. Ch. Nov. 14, 1986) (applying New York law), in which then-Chancellor Allen held that the implied covenant was not violated where a supermajority amended an indenture, but critically—and absent here—"[e]ach holder [wa]s offered the opportunity to accept or reject the consideration offered" meaning that "each has an economic incentive . . . to evaluate the question whether any threat to the value of his or her bonds posed by the amendment is more or less valuable than the consideration offered for his or her consent." *Id.* at *5; *see also Katz*, 508 A.2d at 881 (no violation where "the incentive to consent [wa]s equally available to all members of each class of bondholders").

45.     And indeed, the failure to provide an *opportunity* for all affected lenders to participate in a transaction requiring amendment to the deal documents (true here, *see* Tr. 504:1-4, 880:25–881:3) was precisely why New York's commercial court denied the motion to dismiss a claim for breach of the implied covenant in *Octagon Credit Investors, LLC v. NYDJ Apparel, LLC,* Index No. 656677/2017 (N.Y. Sup. (N.Y Cty.)). As Justice Ramos held, "it looks like the reasonable commercial expectations of the lenders participating in the agreement is being

17

undermined by some of the lenders getting together and saying look, if we don't tell the other guys what we're doing, we can cut them out of the picture. It doesn't seem very fair. . . . I'm offended by the idea that you can obtain consent, the required consent, by only notifying some of the lenders." Dkt. 81-2 (Transcript of Hearing on Jan. 9, 2018) at 21:11–17, 24:25–25:3. Here, it is undisputed that non-participating lenders, including the LCM Defendants, were never presented the opportunity to join the Transaction. *See supra* ¶ 7.

46.     By amending the Agreement only on the condition that it would *not* apply to them, and in exchange for consideration not offered to the other non-participating lenders, the Debtors and PTL Lenders robbed the LCM Defendants of the benefit of their bargain, in breach of the implied covenant of good faith and fair dealing. To put it bluntly, the PTL Lenders effectively sold their consent, and in exchange for their approval of an amendment that would never apply to them but would subordinate the lenders who remained behind, they obtained a benefit that was not shared equally by all first-lien lenders (namely, they became super-priority lenders).

47.     It does not matter whether the PTL Lenders and Serta claim to have had what they call a "business justification" for amending the Agreement in this fashion. *See* Tr. at 62:25; ECF No. 244 at 48 (PTL Lenders' Pre-Trial Brief). That argument misreads the law. It is not a defense to breach of contract (whether the breach is premised on an implied or express term) that a party had a "business justification" for violating the contract. *See Nuance Commc'ns, Inc. v. Int'l Bus. Machines Corp.*, 544 F. Supp. 3d 353, 372 (S.D.N.Y. 2021), *aff'd*, 2022 WL 17747782 (2d Cir. Dec. 19, 2022) ("While the implied covenant does not prevent a party from acting in its own interest, it prevents a party from breaking an implied promise that 'is so interwoven' with an express promise in the contract that the conduct destroys the ability of the nonbreaching party to receive the benefit of the express promise."); *see Travellers Int'l, A.G. v. Trans World Airlines*,

*Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994) (affirming finding of breach of the implied covenant, and rejecting contention that there could be no breach because the complained-of action was "consistent with reasonable business principles").

### 2. Stripping LCM's Priority Rights

48.     Plaintiffs' conduct also violated the implied covenant for the second and independent reason that, as Judge Failla explained, the LCM Defendants "expressly bargained for 'first-lien, priority, *pro rata* rights' which rights were subverted by [Serta's] creation of a new tranche of debt with priority rights senior to those held by" the LCM Defendants. *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *15 (S.D.N.Y. Mar. 29, 2022). As Judge Failla explained, it is entirely reasonable to "ascribe bad faith to the manner in which [Serta and the PTL Lenders] exercised [their] contractual power to amend the Agreement and engage in debt exchanges because the economic reality of the Transaction suggests an intent to harm a subset of first-lien lenders by subordinating their debt"; Plaintiffs here "systematically combed through the Agreement tweaking every provision that seemingly prevented [them] from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one." *Id*.

49.     The undisputed evidence showcases this "transform[ation]" that Judge Failla described. *See, e.g.*, Debtors' Ex. 250, ECF No. 857-99, § 1.01 (altering, *inter alia*, the definitions of Acceptable Intercreditor Agreement and Incremental Equivalent Debt); *id*., § 7.01(l) (removing subordination as an event of default); *id*., § 8.08 (authorizing the Administrative Agent to enter the PTL Intercreditor Agreement)).

50.     The testimony at trial further bore this out. As Mr. Tepner admitted, the first-priority status of the First Lien Lenders was a "fundamental" aspect of the deal they struck in 2016. Tr. 505:5-7. He also admitted that priority of payment is a "very important feature" for one who

extends credit to a company. *Id.* at 505:1-4 ("Q. Okay. And, Mr. Tepner, you agree that priority of payment is a very important feature to anybody who signs up to lend money to a company. Right? A. Generally, yes."). Indeed, this is indisputable from the face of the Agreement, which provided, *e.g.*, that subordination was an event of default. *See* Debtors' Ex. 6, ECF No. 853-6 at § 7.01(*l*).

51.     The amendments permitting the creation of senior liens deprived the LCM Defendants of this "fundamental" aspect of the deal—*i.e.*, the fruits of the Agreement. In a deliberate scheme to deprive the non-participating first-lien lenders of the fruits of the contract (*i.e.*, their priority status), Serta and the PTL Lenders ensured that *only* the PTL Lenders voted on the amendments in a bare majority, and that no non-participating lenders were even aware that the 2016 contract was being amended (let alone given a chance to vote on the amendments). *See* Debtors' Ex. 250, ECF No. 857-99; *see also* Tr. 504:1-4, 880:25–881:3. The deliberate orchestration of this scheme is apparent in the fact that the participation rate of the PTL lenders was pegged at 50.1%—just enough to amend the agreement, and no more, so that the value of their new debt could be maximized (to the corresponding detriment of the non-participating first-lien lenders). Mr. Chopra openly acknowledged this at trial:

> Q. And why was it set at 50.1 percent as opposed to a higher number of participating lenders?
>
> A. So the company was pushing hard for discount. They wanted to capture as much discount as possible. And in order for the clients to provide the discount that the company was seeking, it was looking for the new instrument, the first lien/second out, to both trade well, but also recover well in the scenarios that we've been discussing. ***And so in order to do that, you needed to keep the size of the first lien/second out to a certain level***[.]

Tr. at 568:14-25; *see also id.* at 624:16-20 ("[Q.] But it's also true, isn't it, that your clients wanted 50.1 percent? In fact, the company countered with 55 and you said, no, 50.1. A. Correct."). Further, Mr. Shah admitted that "it was necessary to amend the credit agreement to create the priming tranche." Tr. at 237:2-6; *see also* Debtors' Ex. 87, ECF No. 862-31. Thus, there could be no

priming without amending the Agreement, and nobody—including the PTL Lenders themselves—would have ever agreed to amend the Agreement unless they received priming liens. *Supra* ¶¶ 28-30.

52.     A recent decision from the First Department—the intermediate appellate court that oversees (among others) Manhattan's commercial trial courts—illustrates how these activities violate the covenant. In *AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*, 185 N.Y.S.3d 73 (N.Y. App. Div. 1st Dep't 2023), the defendants (like plaintiffs here) argued that the implied-covenant claims on a credit agreement were "nothing more than a claim that defendants failed to share collateral ratably." *Id*. at 90. The court rejected this argument. It upheld a claim for breach of the implied covenant under New York law, where there was "bad faith conduct in conspiring to manufacture a restructuring process that deprived [some lenders] of the benefit of their bargain under the terms of the Credit Agreement," and the favored creditors in that case had "secretly designed [a] Restructuring Transaction so as to defeat [non-participating lenders] contractual expectations of *pro rata* treatment" and "concealed the transaction from [them] until it could be revealed as a *fait accompli*[.]" *Id*.  All of that is true here.

**B.     Plaintiffs' Defenses Fail Under The Law**

**1.     Defining Market Expectations As Encompassing All "Position-Enhancing Transactions" Is Legally Erroneous**

53.     As noted, under New York law, "the undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978). As to this standard, the Court raised the possibility that "position-enhancing transactions" might be commercially encompassed by the Agreement, and thus that any such position-enhancing

transaction would not violate the implied covenant. Tr. at 1125:4–1126:19. This conclusion would be erroneous for the following reasons.

54.     *First*, whether a transaction is position enhancing (or can be characterized as such) does nothing to change the fact that the PTL Lenders violated the implied obligation not to amend the contract in such a way that it would only apply to others and that it would be contingent on their exiting the contract.  ***That*** is a violation of the implied covenant, and it does not matter that there may be other transactions that could be described as position enhancing (such as up-tiering transactions) that might be obtainable without such a violation.

55.     *Second,* as the Court rightly observed (Tr. at 1127:12-21), the reasonable person standard in the implied-covenant context looks to the "reasonable person in the position of such a plaintiff." *Cordero v. Transamerica Annuity Serv. Corp.*, 2023 WL 3061503, at *5 (N.Y. Apr. 25, 2023); *see 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144 (2002) ("[P]laintiffs pleaded that they reasonably understood the offering plan to state a duty, at the very least, to sell a sufficient number of shares in a timely manner so as to create a viable cooperative."). And "[t]he relevant inquiry called for by the implied covenant is objective, not subjective." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 605 (S.D.N.Y. 2018).

56.     As a result, courts consider the language and purpose of a contract to assess what the parties reasonably expected. *See, e.g.*, *Vista Outdoor Inc. v. Reeves Fam. Tr.*, 234 F. Supp. 3d 558, 565 (S.D.N.Y. 2017) (considering "terms of the Purchase Agreement" and "purpose of the earnout" in finding breach of the implied covenant). In other words, in response to the Court's question regarding whether it could consider "the actions of the parties involved" (Tr. at 1127:19-20), the answer is that the inquiry should focus on the language and purpose of the contract. *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1518 (S.D.N.Y. 1989) ("The appropriate

analysis … is first to examine the [relevant contract] to determine the fruits of the agreement between the parties[.]"); *see In re LightSquared Inc.*, 511 B.R. 253, 336 (Bankr. S.D.N.Y. 2014) ("This intent was readily apparent from the face of the Credit Agreement and is overtly evidenced by (i) the language utilized in the definitions of Eligible Assignee and of 'Disqualified Company' . . . and (ii) LightSquared's May 9 and May 12, 2012 amendments to the Credit Agreement[.]"). To the extent historical practice is relevant, it is only to further elucidate the purpose of the agreement. *See, e.g.*, *Carvel Corp. v. Baker*, 79 F. Supp. 2d 53, 62 (D. Conn. 1997).

57.     *Third*, in applying this objective standard, courts define the "fruits" of the contract by reference to the party's specific <u>claims</u>—and not at a broader level of generality (such as "position-enhancing transactions"). Consider in this regard *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631-32 (S.D.N.Y. 2010), *aff'd*, 381 F. App'x 117 (2d Cir. 2010). There, the loan agreement gave the plaintiff the right to veto certain loan assignments; the claim was that a lender-to-lender participation agreement undercut that veto right, because the participation agreement "so subvert[ed] the purposes underlying Cablevisión's right to veto assignments." *Id*. at 632. Accordingly, the implied-covenant inquiry focused on whether a reasonable person would understand the veto-right to be a "fruit" of the deal. The *LightSquared* case undertook a similar analysis. *See In re LightSquared Inc.*, 511 B.R. at 336 ("These purchases violate the spirit of the Credit Agreement, as the harm that LightSquared sought to avoid—a competitor entering its capital structure and acting against its interests—has now come to pass. Mr. Ergen's use of SPSO to evade the terms of the Credit Agreement that prevented him and DISH from buying the LP Debt thus deprived LightSquared of the fruits of the Credit Agreement's restrictions.").

58.     Of course, the specific theory of breach of the implied covenant advanced by the LCM Defendants is that the breach occurred by virtue of the PTL Lenders amending the Agreement on the way out, in ways that would not apply to them, in order to subordinate defendants' first-lien debt. It is no answer to say that the PTL Lenders' actions were permissible because it effectuated a "position-enhancing" deal, and that the PTL Lenders could have advantaged themselves through a different, drop-down transaction that did not require any amendment. The LCM Defendants' theory of breach is not that the fruits of the contract proscribed all position-enhancing transactions.

### 2.     An "Unclean Hands" Defense Is Unavailing

59.     The Court also inquired at the close of trial whether equitable defenses would be available to Plaintiffs, and Plaintiffs themselves appeared to press a defense sounding in unclean hands. *See* Tr. 68:22-25 ("[Mr. Costa:] And one more thing about the unsuccessful dropdown transaction that the Angelo Gordon group put together, everything they complain about and cite as bad faith in our transaction existed for their proposal."); *id*. at 1130:10 ("[The Court:] in order to get equity, one must do equity."). This equitable defense cannot lie for two reasons.

60.     *First*, it fails under blackletter law.  The implied covenant of good faith and fair dealing is a legal claim sounding in contract; it is not an equitable claim, and so the premise that the defendants seek to "get equity" doesn't track. *Rowe*, 46 N.Y.2d at 68; 23 *Williston on Contracts* § 63:22 (4th ed.) ("Violation of the duty of good faith and fair dealing constitutes a breach of contract."). As is settled, there is no defense of unclean hands to an action at law seeking damages. *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,* 404 F.3d 566, 607 (2d Cir. 2005) ("Because the SCA seeks damages in an action at law, Aetna cannot avail itself of unclean hands as a defense."); *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F. Supp. 2d 461, 477 (S.D.N.Y. 2005) ("Reich and Jossem cannot avail themselves of the defense of unclean

24

hands because unclean hands is an equitable defense that does not apply to actions at law that seek money damages.");

61.     Thus, it is commonplace for courts to reject an unclean-hands defense in cases asserting breach of contract, including where the contract breach concerns an implied term. *See, e.g.*, *Cohen v. Elephant Wireless, Inc.*, 2004 WL 1872421, at *3 (S.D.N.Y. Aug. 19, 2004) ("Here, plaintiffs seek money damages for defendant's alleged breach. As such, the court strikes defendant's unclean hands defense as clearly insufficient as a matter of law."); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 713 (S.D.N.Y. 2012); *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, 2013 WL 4409434, at *28 (E.D.N.Y. Aug. 2, 2013), *report and recommendation adopted as modified*, 2013 WL 5502852 (E.D.N.Y. Oct. 1, 2013).

62.     *Second*, the defense would not absolve the Plaintiffs of their liability as to the LCM Defendants anyway. Under New York law, in order to invoke the doctrine of unclean hands, the defendant bears the burden of showing that the plaintiff undertook "immoral or unconscionable conduct when the agreement was made, *and* that defendant was injured" by that conduct. *390 W. End Assoc. v Baron*, 274 A.D.2d 330, 332 (N.Y. App. Div. 1st Dep't 2000) (emphasis in original). But there has been no claim, let alone any factual showing, that the LCM Defendants committed any such misconduct; indeed, Plaintiffs did not attempt to make any such showing, and the testimony offered at trial made clear that the LCM Defendants had no involvement in either the PTL Lenders' proposal or the Apollo Group's drop-down transaction, and never reached out to either the debtor or the PTL Lenders to be cut in on the Exchange Transaction after it was announced in June 2020.  *See supra* ¶¶ 18-20.

## <u>CONCLUSION</u>

63.     The Court should issue a report recommending that the District Court find that the

Exchange Agreement violated the Agreement and New York's implied covenant.

Dated: May 23, 2023
       Houston, Texas

McKool Smith, PC

*/s/ John J. Sparacino*

John J. Sparacino (SBN 18873700)
S. Margie Venus (SBN 20545900)
Regan S. Jones (SBN 24110060)
600 Travis Street, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile (713) 485-7344
jsparacino@mckoolsmith.com
mvenus@mckoolsmith.com
rjones@mckoolsmith.com

-and-

Michael Shuster (admitted *pro hac vice*)
Vincent Levy (admitted *pro hac vice*)
Neil R. Lieberman (admitted *pro hac vice*)
Priyanka Timblo (admitted *pro hac vice*)
Brian T. Goldman (admitted *pro hac vice*)
Patrick J. Woods (admitted *pro hac vice*)
Holwell Shuster & Goldberg LLP
425 Lexington Avenue
New York, New York 10017
mshuster@hsgllp.com
vlevy@hsgllp.com
nlieberman@hsgllp.com
amiller@hsgllp.com
bgoldman@hsgllp.com
pwoods@hsgllp.com

*Counsel for the LCM Defendants*

27

## **CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing Post-Trial Brief was served by electronic delivery on all persons and entities receiving ECF notice in this adversary proceeding on May 23, 2023.

*/s/ John J. Sparacino*
John J. Sparacino
