**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| SERTA SIMMONS BEDDING, LLC, et al., | Case No. 23-90020 (DRJ) |
| Debtors, | (Jointly Administered) |
| SERTA SIMMONS BEDDING, LLC, et al., | |
| Plaintiffs and Counterclaim Defendant, | Adv. Proc. No. 23-09001 (DRJ) |
| v. | |
| AG CENTRE STREET PARTNERSHIP L.P., et al., | |
| Defendants and Counterclaim Plaintiffs, | |
| v. | |
| AGF FLOATING RATE INCOME FUND, et al., | |
| Additional Counterclaim Defendants. | |

**EXCLUDED LENDERS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
7 Times Square
New York, NY 10036
(212) 833-1100

*Attorneys for the Excluded Lenders*

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, TX  77002
(713) 226-6000

*Attorneys for the Excluded Lenders with respect to Plaintiffs' Claims and Counterclaims Only*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..................................................................................... iii

TABLE OF ABBREVIATIONS AND DEFINED TERMS ........................................ V

PROPOSED FINDINGS OF FACT ......................................................................1

I.  THE EXCLUDED LENDERS HAD A PROTECTED, FUNDAMENTAL RIGHT
    TO *PRO RATA* TREATMENT UNDER THE 2016 CREDIT AGREEMENT ..................**1**

II.  PLAINTIFFS' NEGOTIATION OF THE UNLAWFUL EXCHANGE
     TRANSACTION ...........................................................................................3

     A.  Serta Solicited Proposals for Drop-Down Transactions .........................3

     B.  Serta Intended to Use the Drop-Down Proposals as
         Leverage for an Eventual Deal with the Favored Lenders .....................5

     C.  The Favored Lenders Required Participation to
         Be Limited to 50.1% of Outstanding First Lien Term Loans .................6

     D.  Advent Arbitrarily Selected First Lien Lenders to Reach
         the 50.1% Threshold and Fill Additional Basket Capacity.....................8

III.  THE AD HOC GROUP THREATENS UBS, THE ADMINISTRATIVE
      AGENT, TO THWART THE FIRST LIEN LENDER GROUP'S PROPOSAL...............10

IV.  THE UNLAWFUL EXCHANGE TRANSACTION........................................12

V.  THE FAVORED LENDERS DEMAND TO BE
    INDEMNIFIED FOR BAD FAITH AND MATERIAL BREACH..................................14

VI.  THE FIRST LIEN LENDER GROUP'S "COMPETING" PROPOSAL.........................17

VII.  THE UNLAWFUL EXCHANGE TRANSACTION
      WAS A FIRST-OF-ITS-KIND TRANSACTION ..............................................18

PROPOSED CONCLUSIONS OF LAW ..................................................................21

VIII.  PLAINTIFFS BREACHED THE IMPLIED COVENANT OF
       GOOD FAITH AND FAIR DEALING IN THE 2016 CREDIT AGREEMENT.............21

       A.  Plaintiffs Owed the Excluded Lenders a Duty of Good Faith and Fair Dealing ...21

       B.  The Implied Covenant Included a Promise Not to Deprive Defendants
           of Their Right to *Pro Rata* Treatment Under the 2016 Credit Agreement............22

i

C.      The Unlawful Exchange Transaction Destroyed
        the Excluded Lenders' Right to *Pro Rata* Treatment ...............................................24

D.      Plaintiffs Schemed to Deprive the Excluded
        Lenders of Their Rights to *Pro Rata* Treatment ....................................................25

E.      Additional Evidence of the Favored Lenders' Lack of Good Faith......................27

        1.      The Ad Hoc Group's June 4, 2020 Letter to UBS ....................................27

        2.      The Favored Lenders' Demand for Indemnification ................................27

        3.      Amendments to the 2016 Credit Agreement.............................................28

F.      Plaintiffs' Purported Justifications for the
        Unlawful Exchange Transaction are Not a Defense ............................................30

IX.     THE COURT SHOULD DENY PLAINTIFFS' DECLARATORY JUDGMENT
        CLAIM.......................................................................................................................31

X.      THE COURT SHOULD GRANT THE RELIEF SOUGHT BY THE EXCLUDED
        LENDERS...................................................................................................................31

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
  98 N.Y. 2d 144 (2002) ........................................................................................21

*Am. Tissue, Inc. v. Donaldson*,
  351 F. Supp. 2d 79 (S.D.N.Y. 2004).......................................................................28

*Carvel Corp. v. Baker*,
  79 F. Supp. 2d 53 (D. Conn. 1997).........................................................................31

*CBS Corp. v. Eaton Corp.*,
  2010 WL 1375169 (S.D.N.Y. Mar. 30, 2010) .........................................................28

*Cordero v. Transamerica Annuity Serv. Corp.*,
  No. 21, 2023 WL 3061503 (N.Y. Apr. 25, 2023)....................................................23

*Dalton v. Educ. Testing Serv.*,
  87 N.Y.2d 384 (1995) ...............................................................................22, 25

*Dreni v. PrinterOn Am. Corp.*,
  486 F. Supp. 3d 712 (S.D.N.Y. 2020)......................................................................26

*Ellison v. Island Def Jam Music Grp.*,
  79 A.D.3d 458 (N.Y. App. Div. (1st Dep't) 2010) ....................................................25

*Fleet Cap. Corp. v. Yamaha Motor Corp., U.S.A.*,
  2002 WL 31174470 (S.D.N.Y. Sept. 26, 2002)........................................................27

*Gray & Assocs., LLC v. Speltz & Weis LLC*,
  2009 WL 416138 (N.Y. Sup. Ct. (N.Y. Cnty.) 2009)................................................25

*Hadami, S.A. v. Xerox Corp.*,
  272 F. Supp. 3d 587 (S.D.N.Y. 2017)......................................................................22

*ICG Global Loan Fund I DAC v. Boardriders, Inc.*,
  2022 WL 10085886 (N.Y. Sup. Ct. Oct. 17, 2022) ..................................................29

*Kotite v. Shea*,
  274 A.D.2d 503 (N.Y. App. Div. (2d Dep't) 2000).................................................29

*LCM XII, Ltd. V. Serta Simmons Bedding, LLC*,
  2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ...........................................................29

iii

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018)......................................................................23

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
    716 F. Supp. 1504 (S.D.N.Y. 1989)......................................................................22

*P&G Auditors & Consultants, LLC v. Mega Int'l Com. Bank Co.*,
    2019 WL 4805862 (S.D.N.Y. Sept. 30, 2019)......................................................27

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,
    309 A.D.2d 288 (N.Y. App. Div. (1st Dep't) 2003).............................................25

*Topps Co. v. Cadbury Stani S.A.I.C.*,
    380 F. Supp. 2d 250 (S.D.N.Y. 2005)...................................................................30

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
    41 F.3d 1570 (2d Cir. 1994).............................................................................25, 27

**Other Authorities**

Federal Rule of Civil Procedure 52(a) .............................................................................1

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

| Abbreviation/Defined Term | Meaning |
| --- | --- |
| 2016 Credit Agreement | First Lien Term Loan Agreement dated as of November 8, 2016 |
| Ad Hoc Group | CSAM, Eaton Vance, Invesco, First Eagle, PGIM, MJX, BlackRock, Symphony |
| Advent | Advent International, Inc. |
| AM | Trial Transcript, Morning Session |
| Angelo Gordon | Angelo Gordon & Co., L.P. |
| Apollo | Apollo Global Management, Inc. |
| Barings | Barings LLC |
| Centerview | Centerview Partners, LLC |
| Chopra | Karn Chopra |
| Company | Serta Simmons Bedding, LLC |
| CSAM | Credit Suisse Asset Management, LLC |
| Eaton Vance | Eaton Vance Management |
| Ex. | Trial Exhibit |
| Excluded Lenders | AG Centre Street Partnership L.P., AG Credit Solutions Non-ECI Master Fund, L.P., AG Super Fund Master, L.P., AG SF Master (L), L.P., Silver Oak Capital, L.L.C., Ascribe III Investments, LLC, Columbia Cent CLO 21 Limited, Columbia Cent CLO 27 Limited, Columbia Floating Rate Fund, a series of Columbia Funds Series Trust II, Columbia Strategic Income Fund, a series of Columbia Funds Series Trust I, Contrarian Capital Fund I, L.P., Contrarian Distressed Debt Fund, L.P., Contrarian Centre Street Partnership, L.P., Gamut Capital SSB, LLC, North Star Debt Holdings, L.P., Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., Shackleton 2017-XI CLO, Ltd., Z Capital Credit Partners CLO 2018-1 Ltd., and Z Capital Credit Partners CLO 2019-1 Ltd. |
| Evercore | Evercore Group L.L.C. |
| Favored Lenders | Ad Hoc Group and Barings |
| First Lien Lenders | Lenders holding loans under the 2016 Credit Agreement |
| First Lien Lender Group | Angelo Gordon, Apollo, and Gamut |
| First Lien Term Loans | Loans issued under the 2016 Credit Agreement |
| Gamut | Gamut Capital Management, L.P. |
| Gibson Dunn | Gibson Dunn & Crutcher LLP |
| Hanigan | Michael Hanigan |
| Invesco | Invesco Senior Secured Management |
| Kwon | Theodore Kwon |
| Meiering | Davis Meiering |
| PM | Trial Transcript, Afternoon Session |
| Prince | Kenneth Prince |
| Searles | Michael Searles |

| Abbreviation/Defined Term | Meaning |
|---|---|
| Serta | Serta Simmons Bedding, LLC |
| Shah | Roopesh Shah |
| Super-Priority Term Loan Agreement | Super-Priority Term Loan Agreement dated as of June 22, 2020 |
| Sveen | Andrew Sveen |
| Symphony | Symphony Asset Management |
| Tepner | Harvey Tepner |
| Unlawful Exchange Transaction | Transaction consummated between Serta and the Favored Lenders pursuant to the Super-Priority Term Loan Agreement, Open Market Purchase and Cashless Exchange Agreement, Priority Intercreditor Agreement, and Amendment No. 1 to First Term Loan Agreement, all dated as of June 22, 2020 |
| Yarrow | Phillip Yarrow |

After trial in this matter on (i) Plaintiffs' claim for a declaratory judgment that they did not violate the implied covenant of good faith and fair dealing in entering into the Unlawful Exchange Transaction[1] and (ii) the Excluded Lenders' counterclaim against Plaintiffs and Counterclaim Defendants for breach of the implied covenant based on the Unlawful Exchange Transaction, and pursuant to Federal Rule of Civil Procedure 52(a), the Excluded Lenders respectfully submit the following proposed findings of fact and conclusions of law.[2]

## PROPOSED FINDINGS OF FACT

### I.
### THE EXCLUDED LENDERS HAD A PROTECTED, FUNDAMENTAL RIGHT TO *PRO RATA* TREATMENT UNDER THE 2016 CREDIT AGREEMENT

1.  Serta entered into the 2016 Credit Agreement dated as of November 8, 2016, which was executed by Serta and various affiliates and counterparties.  The 2016 Credit Agreement provided for a face amount of $1.95 billion in First Lien Term Loans.  (Debtors' Ex. 5, ECF No. 853-5.)

2.  The Excluded Lenders are holders of First Lien Term Loans governed by the 2016 Credit Agreement.  (Day Four – AM 9:10-22 (Kwon); Day Four – PM 8:14-20 (Hanigan); Defs.' Ex. 260, ECF No. 252-61; Debtors' Ex. 202, ECF No. 864-45, at 30); Debtors' Ex. 63, ECF No. 862-7).)

---

[1] Unless otherwise noted, capitalized terms have the meanings indicated in the Table of Abbreviations.

[2] As agreed at the May 10 status conference, the Excluded Lenders hereby submit Proposed Findings of Fact and Conclusions of Law limited to issues being litigated in this Adversary Proceeding, with the understanding that any issues of law and fact related to the Excluded Lenders' objections to confirmation of the Debtors' proposed chapter 11 plan are to be addressed through oral argument before this Court, scheduled to commence on May 25, 2023 at 2:00 p.m. (prevailing Central Time).  *See* May 10, 2023 Status Conference Tr. at 10:1-5 ("MR. WELCH:  . . . amongst the parties, there is a desire, we'd like to put on, on the adversary specifically, findings of fact and conclusions of law, if Your Honor is amenable to it, discuss delivering notes to Your Honor by the 23rd, which is the following Tuesday.").

3.     Section 2.18(a) of the 2016 Credit Agreement mandates that each payment of principal or interest in respect of the loans of a given class "shall be allocated pro rata among the Lenders" in accordance with their respective percentage ownership of loans in that class. (Debtors' Ex. 5, ECF No. 853-5, § 2.18(a).)

4.     Section 2.18(b) contains a waterfall providing for the allocation of collateral proceeds upon an event of default, which includes a bankruptcy.  Pursuant to Section 2.18(b), the proceeds of any collateral, after payment of certain expenses, shall be divided among the First Lien Lenders on a *pro rata* basis.  (Debtors' Ex. 5, ECF No. 853-5, § 2.18(b).)

5.     Section 2.18(c) provides that if any First Lien Lender receives any payment "in respect of any principal of or interest" in excess of its proportional share, it must pay that excess ratably to all other First Lien Lenders by purchasing (for cash at face value) participation in the First Lien Lenders' outstanding loans.  (Debtors' Ex. 5, ECF No. 853-5, § 2.18(c).)

6.     Most provisions in the 2016 Credit Agreement may be amended by "Required Lenders," defined as lenders representing more than 50% of the outstanding face amount of the loans – that is, a majority of the First Lien Lenders.  (Debtors' Ex. 5, ECF No. 853-5, § 1.01.)

7.     However, certain provisions in the 2016 Credit Agreement may be amended only with "the consent of each Lender directly and adversely affected thereby," that is, by unanimous consent of all First Lien Lenders.  (Debtors' Ex. 5, ECF No. 853-5, § 9.02(b)(A).) Rights that can be amended only with the unanimous consent of all lenders are known as "sacred rights."  (Day Four – AM 83:4-7 (Kwon); Debtors' Ex. 373, ECF No. 941-1 at 50:20-24.)

8.     The collateral proceeds waterfall and *pro rata* sharing requirement set forth in Sections 2.18(b) and (c), respectively, are protected "sacred rights" that may be amended only

2

with the unanimous consent of all First Lien Lenders.  (Debtors' Ex. 5, ECF No. 853-5, § 9.02(b)(A).)

9.    As reflected by the unanimity requirement, the collateral proceeds waterfall and *pro rata* sharing requirement in Section 2.18 are fundamental to the 2016 Credit Agreement. A lender's priority of payment with respect to the collateral securing its loan is fundamental to a lender's decision to extend credit to a company.  (Day Two – PM 117:11-17 (Tepner).)

10.   The Excluded Lenders' first-lien priority right under the proceeds waterfall to the collateral securing the First Lien Term Loans was "fundamental" to their decision to purchase loans under the 2016 Credit Agreement.  (Day Four – AM 45:16-22 (Kwon), Day Four – PM 12:25-13:10 (Hanigan).)

## II.
## PLAINTIFFS' NEGOTIATION OF THE UNLAWFUL EXCHANGE TRANSACTION

### A.    Serta Solicited Proposals for Drop-Down Transactions

11.    In April 2020, Serta was facing a near-term liquidity crunch, and gaining access to liquidity was the company's primary objective**.**  (Day One – PM 10:2-14 (Shah).)

12.    On April 7, 2020, Serta, through its Finance Committee, directed Evercore to solicit proposals for a "drop-down" transaction structure, which would have involved a new loan to an unrestricted subsidiary of Serta secured by certain of Serta's intellectual property, as well as a debt exchange.  (Day Two – PM 71:12-18 (Tepner); Day One – PM 18:16-21 (Shah); Day One – PM 173:4-7 (Prince).)

13.    Drop-down transactions had been done before and were well known in the leveraged loan market.  (Day Two – PM 74:10-12 (Tepner); Day Four – AM 44:11-13 (Kwon); Day One – PM 78:14-18 (Shah).)  This type of transaction structure was commonly referred to as

3

an "IPCo" or "J. Crew" transaction.  (Day Three – AM 8:16-18 (Chopra); Day One – PM 18:16-21 (Shah).)

14.     Serta solicited and received proposals for this type of transaction from, among others, the First Lien Lender Group and Barings, which was ultimately invited to participate in the Unlawful Exchange Transaction.  (Day Four – AM 30:13-31:2 (Kwon); Day Four – PM 22:6-9 (Hanigan); Defs.' Ex. 82, ECF No. 248-82; Debtors' Ex. 116, ECF No. 863-9; Debtors' Ex. 125, ECF No. 863-18 at 12-15; Debtors' Ex. 77, ECF No. 862-21; Defs.' Ex. 93, ECF No. 348-93.)

15.     The First Lien Lender Group's drop-down proposal would have used existing "basket" capacity under the 2016 Credit Agreement and would not have required any amendments to that agreement.  (Day One – PM 182:1-4 (Prince); Day Four – AM 32:11-33:4 (Kwon); Day Two – PM 151:14-152:3 (Chopra).)

16.     Similarly, Barings' drop-down proposal also relied on existing provisions of the 2016 Credit Agreement and would not have required any amendments to it.  (Debtors' Ex. 116, ECF No. 863-9; Day Three – PM 51:6-8 (Searles).)

17.     The First Lien Lender Group's drop-down proposal would have accomplished Serta's main goals of providing liquidity and capturing discount.  (Day One – PM 30:21-31:2 (Shah).)

18.     Serta never solicited or attempted to engage the Favored Lenders in negotiating a competing drop-down proposal.  (Day One – PM 76:3-4 (Shah); Day Two – PM 73:12-20 (Tepner); Defs.' Ex. 35, ECF No. 248-36 at 8.)

**B.      Serta Intended to Use the Drop-Down Proposals as
         <u>Leverage for an Eventual Deal with the Favored Lenders</u>**

19.      On April 7, 2020 – the same day that it authorized Evercore to engage in discussions with the First Lien Lender Group about a drop-down transaction – Serta received a letter from Gibson Dunn on behalf of the Ad Hoc Group, which represented that the Ad Hoc Group comprised a majority of First Lien Lenders and was interested in providing liquidity financing to Serta.  (Debtors' Ex. 56, ECF No. 862.)  Serta did not respond to this letter.  (Day Three – AM 101:24-102:14 (Sveen); Day Two – PM 77:12-14 (Tepner); Defs.' Ex. 64, ECF No. 248-64.)

20.      When Serta's Finance Committee authorized Evercore to engage with the First Lien Lender Group on a drop-down transaction, it intentionally sequenced that discussion to precede any discussions with the Ad Hoc Group.  (Defs.' Ex. 35, ECF No. 248-36; Day Two – PM 79:13-17 (Tepner).)  The Finance Committee acknowledged that the Ad Hoc Group would be "████████████████████████," and that, "█████████████████ ███████████████████████████████████████████████ ████████████████████████ (Defs.' Ex. 35, ECF No. 248-36; Day Two – PM 79:18-80:3 (Tepner).)

21.      According to Prince, "████████████████████]," and Evercore "████████████████████████████████ ████████████████████████." (Debtors' Ex. 214, ECF No. 865-7.)  The group that Serta "wanted to do a deal with all along" was the Ad Hoc Group.  (Day One – PM 183:4-15 (Prince).)

22.      On April 24, 2020, the Ad Hoc Group's counsel wrote a letter to Serta's Counsel, complaining about Serta's failure to respond to the April 7 letter to the company.

5

(Debtors' Ex. 87, ECF No. 862-31.)  Together with the letter, the Ad Hoc Group submitted an unsolicited proposal for a priming facility of $200 million in new money that would be made available to all First Lien Lenders on a *pro rata* basis.  (Debtors' Ex. 87, ECF No. 862-31; Day Two – PM 154:18-22 (Chopra).)  Under this proposal, the Ad Hoc Group was offering to provide Serta with new money without exchanging or selling any First-Lien Loans at a discount, based on the understanding that Serta's primary, immediate focus was obtaining liquidity.  (Day Two – PM 155:2-9 (Chopra).)

23.     Serta never responded to the Ad Hoc Group's April 24 proposal.  (Day Three – AM 101:24-102:14 (Sveen).)  Serta did not engage with the Ad Hoc Group until May 10, when Serta and the advisors of the Ad Hoc Group entered into nondisclosure agreements.  (Day Two – PM 86:3-8 (Tepner); Defs.' Ex. 100, ECF No. 248-100 at 8.)

24.     At or around this time, Serta communicated to the Ad Hoc Group's advisors that the company was interested not only in liquidity but also in discount capture and leverage reduction, and that it had been negotiating with other First Lien Lenders to achieve those objectives.  (Day Two – PM 156:7-17 (Chopra).)

**C.    The Favored Lenders Required Participation to
         Be Limited to 50.1% of Outstanding First Lien Term Loans**

25.     On May 26, 2020, the Ad Hoc Group submitted a new proposal to Serta, which proposed a priming facility of $200 million in "first-out" debt, coupled with a "second-out" debt repurchase at a discount, capped at 50.1% of the outstanding face amount of the First Lien Term Loans. (Debtors' Ex. 155, ECF No. 863-48.)

26.     The Unlawful Exchange Transaction could not be completed without the participation of First Lien Lenders holding at least 50.1% of the outstanding face amount of the First Lien Loans, because that was the minimum needed to vote through the purported

amendments to the 2016 Credit Agreement that the deal required.  (Day One – PM 72:13-16 (Shah); Day Three – AM 12:16-20 (Chopra).)

27.     The Unlawful Exchange Transaction was not open to all First Lien Lenders that wanted to participate because the Ad Hoc Group capped participation at or around 50.1% of the outstanding face amount of First Lien Term Loans.  (Day One – PM 55:18-56:4 (Shah); Day One – PM 186:21-187:10 (Prince).)

28.     There was no reason, however, that the transaction could not be made available to more First Lien Lenders, or to a higher percentage of First Lien Lenders.  (Day Three – AM 12:21-23 (Chopra).)  Yet the Ad Hoc Group insisted that participation be kept at or around the minimum of 50.1% because, all things equal, the lower the amount of First Lien Term Loans exchanged, the better their chances of a recovery superior to other First Lien Lenders in the event of a Serta bankruptcy.  (Day One – PM 72:17-73:3 (Shah); Day Three – AM 14:1-20, 58:1-6 (Chopra).)

29.     The Ad Hoc Group modeled the Unlawful Exchange Transaction using an assumption that Serta would file for bankruptcy within 18 months, as early as the end of 2021. (Debtors' Ex. 144, ECF No. 863-37.)

30.     From Serta's perspective, allowing more First Lien Lenders into the deal was not only possible but also preferable, because Serta would have reduced its leverage by a greater amount if a larger percentage of First Lien Term Loans were exchanged.  (Day One – PM 198:4-19 (Prince); Day Three – AM 12:24-13:1 (Chopra).)

31.     During negotiations, Serta pushed to increase the participation level to 55% to enable the company to capture more discount, but the Ad Hoc Group insisted on limiting participation to 50.1%, which Serta accepted.  (Debtors' Ex. 169, ECF No. 864-12 at 3; Debtors'

Ex. 176, ECF No. 86-23; Debtors' Ex. 184, ECF No. 864-27; Day Two – PM 185:15-186:14

(Chopra); Day Three – AM 16:11-17 (Chopra); Defs'. Ex. 238, ECF No. 252-39.)

      32.   Serta and the Favored Lenders knew that the First-Lien Loans of the lenders

that were excluded from the deal would be subordinated to the Favored Lenders' new super-

priority debt.  (Day Two – PM (Tepner) 68:3-17; Day Three – AM 15:4-24 (Chopra).)

**D.**    **Advent Arbitrarily Selected First Lien Lenders to Reach
the 50.1% Threshold and Fill Additional Basket Capacity**

      33.   The Unlawful Exchange Transaction could have been completed with any

combination of First Lien Lenders that comprised 50.1% of the outstanding face amount of First

Lien Term Loans.  (Day One – PM 77:22-25 (Shah).)

      34.   For example, Serta could have transacted the deal with the First Lien

Lender Group, Barings, Oaktree, and other lenders whose holdings together totaled 50.1% of the

outstanding face amount of the First Lien Term Loans.  (Day One – PM 77:13-25 (Shah).)

      35.   At the time Serta accepted the Ad Hoc Group's proposal, the Ad Hoc

Group comprised only 39% of the 50.1% participation level that Serta and the Ad Hoc Group

had agreed upon.  (Day One – PM 77:2-8 (Shah); Day One – PM 185:5-11 (Prince); Day Two –

PM 77:8-11 (Tepner); Debtors' Ex. 202, ECF No. 864-45 at 18.)

      36.   To bridge the gap, Advent recruited Barings, Oaktree, and TPG to join the

deal.  (Defs.' Ex. 175, ECF No. 250-82; Day Three – PM 89:1-14 (Meiering).)

      37.   These lenders were selected because the size of their holdings would allow

the Favored Lenders to reach the 50.1% threshold with the fewest additional participants.  (Defs.'

Ex. 177, ECF No. 250-84.)  Barings was selected for the additional reason that the relationship

was important to Advent.  (Defs.' Ex. 232, ECF No. 252-34; Day One – PM 193: 9-12 (Prince);

Defs.' Ex. 190, ECF No. 250-97.)

8

38.     Advent also had primary responsibility for determining which First and Second Lien Lenders would fill a basket of additional exchange capacity in the "second out" super-priority tranche that Serta negotiated with the Favored Lenders.  (Defs.' Ex. 255, ECF No. 252-56; Day One – PM 196:15-197:14 (Prince); Debtors' Ex. 248, ECF No. 865-39; Defs.' Ex. 239, ECF No. 252-41; Defs.' Ex. 261, ECF No. 252-62.)

39.     Although the Finance Committee had ultimate authority as to which lenders would be permitted to participate, the Company did not get involved in deciding which lenders would be included or excluded. (Day One – PM 196:15-197:1 (Prince).)

40.     Prince communicated directly with potential participants without including Serta on those communications because he owned the relationships.  (Defs.' Ex. 265, ECF No. 252-66; Day One – PM 197:9-12 (Prince).)  Prince told certain lenders that they would be included in the basket without obtaining approval from Serta, because he felt confident that if Advent recommended their inclusion, Serta would agree.  (Defs.' Ex. 265, ECF No. 252-66.) Prince recommended for inclusion those lenders with which Advent had a preexisting relationship.  (Defs.' Ex. 265, ECF No. 252-66; Defs.' Ex. 232, ECF No. 252-34; Day One – PM 193:3-18 (Prince); Day One – PM 195:3-10 (Prince); Day One – PM 53:22-23 (Shah); Defs.' Ex. 268, ECF No. 252-69.

41.     The First Lien Lender Group was never advised of or given the opportunity to participate in the Unlawful Exchange Transaction prior to public announcement of the deal.  (Day One – PM 72:24-73:3 (Shah); Day Two – PM 182:2-4 (Chopra).)

42.     After the deal was announced, Evercore called Angelo Gordon to discuss a potential offer to participate in the subsequent exchange capacity, which Angelo Gordon declined because the offer expressly excluded Apollo and Gamut, the other two members of the First Lien

9

Lender Group.  (Day One – PM 52:10-17 (Shah).)  Apollo and Gamut were never invited to

participate in the Unlawful Exchange Transaction.  (Day Four – AM 40:13-41:5 (Kwon); Day

Four – PM 25:16-18 (Hanigan).)

### III.
### THE AD HOC GROUP THREATENS UBS, THE ADMINISTRATIVE
### AGENT, TO THWART THE FIRST LIEN LENDER GROUP'S PROPOSAL

43.     On June 4, 2020, the Ad Hoc Group received an email from Serta stating

that Serta and the Ad Hoc Group had reached a deal in principle.  (Day Three – AM 21:12-19

(Chopra).)

44.     Despite knowing their proposal had been selected, the Ad Hoc Group was

"still doing everything in our power to avoid the alternative transaction" proposed by the First

Lien Lender Group.  (Day Three – AM 30:2-9 (Chopra).)

45.     To preclude competition, the Ad Hoc Group sent a letter to UBS, the

Administrative Agent under the 2016 Credit Agreement, concerning the drop-down transaction

that the Ad Hoc Group understood Serta to be negotiating with other First Lien Lenders.  (Defs.'

Ex. 167, ECF No. 250-73; Day Three – AM 29:4-7 (Chopra).)

46.     The letter represented that ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████."  (Defs.' Ex. 167, ECF No. 250-73.)

47.     There is no basis in the record to support an assertion that a dropdown

transaction would have constituted an actual or constructive fraudulent transfer.  The Ad Hoc

Group's financial adviser, Centerview, had not concluded that a dropdown transaction would

constitute a fraudulent transfer, (Day Three – AM 26:2-8 (Chopra)), and to the contrary, believed

that the First Lien Lender Group's proposal relied on "basket availability in the existing first lien credit agreement." (Day Two – PM 151:14-152:3 (Chopra).) Serta's financial adviser, Evercore, also had not concluded that a dropdown transaction would constitute a fraudulent transfer, (Day One – PM 90:9-11 (Shah)), and Serta's Finance Committee would not have authorized Evercore to solicit proposals for a dropdown transaction if it believed that such a transaction structure would be illegitimate. (Day Two – AM 74:16-19 (Tepner).)

48.     The letter further represented that "██████████████████████████ ████████████████████████." (Defs.' Ex. 167, ECF No. 250-73.) There was no basis to support an assertion that Serta was insolvent as of June 4, 2020, or even to indicate that any of the Ad Hoc Group members believed that to be the case. Evercore had not conducted an insolvency analysis or discussed solvency with any of the First Lien Lenders with which it was negotiating, (Day One – PM 89:24-90:5 (Shah)), and Centerview had not done an insolvency analysis or concluded that Serta was insolvent as of that date. (Day Three – AM 27:3-4 (Chopra).) Nor had any of the Ad Hoc Group members reached the conclusion that Serta was insolvent as of June 4, (Day Three – PM 95:7-11 (Meiering)), and Eaton Vance, one of the Ad Hoc Group Members, affirmatively believed that Serta was *not* insolvent. (Day Three – PM 12:6-9 (Sveen).)

49.     In the letter, the Ad Hoc Group told UBS that, "if ████████████████  ████████████████████████████████████████████ ████████████████████████████████████ " it should "████████████████████████████████ ██████ " the Ad Hoc Group. The Ad Hoc Group warned UBS that it was "████████████████

██████████████████████████████████████████," and further directed UBS not to disclose the letter to Serta or any other First Lien Lender.  (Defs.' Ex. 167, ECF No. 250-73.)

## IV.
## THE UNLAWFUL EXCHANGE TRANSACTION

50.     The Unlawful Exchange Transaction was consummated on June 22, 2020, pursuant to several agreements executed simultaneously between Serta and the Favored Lenders, including the Super-Priority Term Loan Agreement, Open Market Purchase and Cashless Exchange Agreement, Priority Intercreditor Agreement, and Amendment No. 1 to First Term Loan Agreement.  (Debtors' Ex. 252, ECF No. 865-42; Debtors' Ex. 251, ECF No. 865-41; Debtors' Ex. 254, ECF No. 865-44; Debtors' Ex. 250, ECF No. 857-99.)

51.     The Unlawful Exchange Transaction provided for a new super-priority term loan facility with three tranches: (i) $200 million of new money super-priority "first out" debt; (ii) up to $875 million of super-priority "second out" debt issued in exchange for First Lien Term Loans and Second Lien Term Loans held by the Favored Lenders; and (iii) an unspecified amount of capacity to incur still more super-priority "third-out" debt.  (Debtors' Ex. 252, ECF No. 865-42.)

52.     All three tranches are secured by the same collateral as the First Lien Term Loans, and rank senior in priority with respect to right to payment from proceeds of the collateral.  (Day Two – PM 68:12-24 (Tepner); Day Four – AM 47:11-23 (Kwon).)

53.     Prior to the Unlawful Exchange Transaction, both the Excluded Lenders and the Favored Lenders held First Lien Term Loans that were *pari passu* with respect to the right to payment, secured by a single pool of collateral.  As a result of the Unlawful Exchange Transaction, the Favored Lenders exchanged into loans, secured by the same collateral, that were

12

senior in right to payment vis-à-vis the Excluded Lenders, whose loans became subordinated to those of the Favored Lenders. (Day Two – PM 68:12-24 (Tepner).)

54.     The Unlawful Exchange Transaction thus "reengineered the waterfall." (Day Four – AM 44:25-45:15 (Kwon); Day One – PM (Prince) 205:14-24.)  Although the First Lien Lenders remained "first-lien" in name, they were "fourth-out in substance."  (Day Four – AM 45:10-11 (Kwon).)

55.     To effectuate the Unlawful Exchange Transaction, the Favored Lenders also approved various amendments to the 2016 Credit Agreement.  Among other things, the amendments approved by the Favored Lenders modified the 2016 Credit Agreement effectively to allow the incurrence of unlimited additional debt senior to the First Lien Term Loans. Specifically, the amendments modified the definition of "Incremental Equivalent Debt" permissible under the Agreement to include "███████████████████████ ████████████████████████████████████████████████████ ████████████████████████  (Defs.' Ex. 279, ECF No. 252-90-99, §§ 1.01, 6.01(z).)

56.     Prior to this amendment, the 2016 Credit Agreement had permitted the incurrence of additional indebtedness only if it was junior or *pari passu* to the First Lien Loans in right of payment.  (Debtors' Ex. 5, ECF No. 853-5, § 6.01; Day Two – PM 104:13-18 (Tepner).)

57.     The amendments also altered Section 8.08 of the 2016 Credit Agreement to authorize the Administrative Agent to enter into a separate intercreditor agreement establishing senior payment priority for the PTL Loans.  (Defs.' Ex. 279, ECF No. 252-90-99, § 8.08(d).)

58.     The amendments also added a new subpart to Section 2.11(b), which outlines the circumstances triggering mandatory prepayment of the First Lien Term Loans, and which affirmed that the PTL Loans had rights of payment senior to that of the First Lien Lenders. (Defs.' Ex. 279, ECF No. 252-90-99, § 2.11(b)(vii).)

59.     The amendments further excised Section 7.01(l), which designates any subordination of the First Lien Term Loans as an event of default.  (Defs.' Ex. 279, ECF No. 252-90-99, § 7.01(l).)

60.     After the Unlawful Exchange Transaction was announced, the market price of the First Lien Term Loans, which had been about 43 cents, plunged to 31 cents. (Debtors' Ex. 323, ECF No. 866-40.)  Within days of the announcement, Moody's Investors Service downgraded its rating of the First Lien Term Loans from Caa3 to Ca, reflecting its belief that "term loan lenders who do not consent to the transaction will potentially be left with little or no remaining collateral coverage in Serta Simmons, as well as in a position that is subordinated to new, higher priority debt."  (Day Four – AM 46:16-47:3 (Kwon).)

## V.
## THE FAVORED LENDERS DEMAND TO BE
## INDEMNIFIED FOR BAD FAITH AND MATERIAL BREACH

61.     The 2016 Credit Agreement contained an indemnity provision that indemnified the First Lien Lenders for claims regarding the 2016 Credit Agreement.  (Debtors' Ex. 5, ECF No. 853-5, § 9.03(b).)   Section 9.03(b) contained a carve-out from this indemnity for liability arising from gross negligence, bad faith, or willful misconduct of, or material breaches by, the First Lien Lenders. (Debtors' Ex. 5, ECF No. 853-5, § 9.03(b)).  This carve-out was consistent with market standards for indemnity provisions in credit agreements.  (Day Two – PM 108:19-22 (Tepner).)

14

62.     As of June 20, 2020, the economic terms of the Unlawful Exchange Transaction had been agreed upon, and the deal was "effectively done."  (Day Two – PM 112:21-113:3 (Tepner).)

63.     On June 20, 2022, Serta's Finance Committee approved the Super-Priority Term Loan Agreement, which, in the form as it was approved by the Finance Committee, contained the same indemnity provision as in the 2016 Credit Agreement.  (Debtors' Ex. 249, ECF No. 865-40, § 9.03(b); Day Two – PM 108:3-18 (Tepner).)

64.     However, the indemnity provision as it appeared in the Super-Priority Term Loan Agreement as executed on June 22, 2020, was different:  it eliminated the standard carve-out from liability for gross negligence, bad faith, willful misconduct, or material breach. The indemnity provision in the executed version thus purports to indemnify the Favored Lenders from liability for gross negligence, bad faith, willful misconduct, or material breach of the 2016 Credit Agreement in connection with the Unlawful Exchange Transaction.  (Debtors' Ex. 252, ECF No. 865-42, § 9.03(b); Day Two – PM 111:20-112:5 (Tepner).)

65.     No proof was offered at trial concerning why the provision was changed in the interim between Serta's approval of the Super-Priority Term Loan Agreement on June 20, 2020 and its execution on June 22, 2020, including who changed it or who requested that it be changed.  (Day Two – PM 112:6-12 (Tepner); Day Three – PM 15:20-18:9 (Sveen).)  Similarly, no proof was offered concerning whether any consideration was paid in exchange for eliminating the carve-out for bad faith and material breach.

66.     Witnesses from Serta and the Favored Lenders testified that the Favored Lenders considered the indemnity provision in the Super-Priority Term Loan Agreement to be important, (Day Two – PM 107:18-20 (Tepner); 191:25-192:3 (Chopra); Day Three – AM

15

119:16-23 (Sveen); Day Three – AM 44:21-23 (Searles); 81:12-16 (Meiering): 116:21-23 (Yarrow)), but none had any personal knowledge of the negotiation of the provision, what terms were negotiated, or the importance of eliminating the carve-out for bad faith and material breach. (Day Two – PM 112:6-12 (Tepner); Day Three – AM 37:1-3 (Chopra); Day Three – PM 16:2-7, 17:8-18:6 (Sveen); 59:20-60:20 (Searles); 81:12-22, 94:15-24, 98:24-99:14 (Meiering); 126:25-127:6 (Yarrow).)

67.     Indeed, Davis Meiering, CSAM's corporate representative, testified that his understanding of the indemnity provision "is really based on conversation I had with [CSAM's in-house counsel] at Gibson Dunn yesterday.  I mean, I know it's important to us, but I don't – I've never even looked at the wording of this indemnity."  (Day Three – PM 99:1-7 (Meiering).)

68.     As part of Serta's Chapter 11 Plan, Serta and the Favored Lenders purported to agree that the indemnity provision is carried forward to survive the company's emergence from bankruptcy.  The indemnity provision is incorporated into the exit term loan facility.  (*In re Serta Simmons* Bedding LLC, et al., Notice of Filing First Amendment to Restructuring Support Agreement and Amended Takeback Debt Terms, ECF No. 622.)

69.     Serta and the Favored Lenders testified that carrying forward the indemnity was important to the Favored Lenders and that they would not have agreed to confirmation of the Plan without it (Day Three – AM 37:5-10 (Chopra); Day Three – AM 121:8-10 (Sveen); Day Three – PM 81:23-82:2, 97:21-24 (Meiering); Day Two – PM 51:11-52:3, 138:7-15 (Tepner); Day Three – PM 145:21-146:3 (Linker); Day Three – PM 116:16-119:3 (Yarrow)), but none had any personal knowledge of the negotiation of the carry-forward, what terms were negotiated, or why it was necessary to have the carve-out for bad faith and material

breach.  (Day Three – AM 37:24-38:6 (Chopra); Day Three – PM 24:24-25:8 (Sveen); Day Three – PM 83:23-82:2 (Meiering); Day Two – PM 51:11-21 (Tepner); Day Three – PM 145:21-146:3 (Linker); Day Three – PM 116:16-119:3 (Yarrow).)

70.     Nor was any evidence offered at trial concerning the value of the indemnity.  Indeed, Serta did not value the indemnity at all in its projections for plan feasibility.  (Day Two – PM 118:16-24 (Tepner); Day Three – PM 146:4-12 (Linker).)

## VI.
## THE FIRST LIEN LENDER GROUP'S "COMPETING" PROPOSAL

71.     The drop-down transaction proposed by the First Lien Lender Group was never consummated, nor did it even reach a stage of finality where the terms had been fully negotiated.  (Day Four – AM 37:6-38:10 (Kwon); Day Four – PM 21:3-22:1 (Hanigan); Day One – PM 40:6-8 (Shah) ("Ultimately, by the end, we didn't have a fully-baked proposal.  There were a handful, five or six critical open points."); Day One – PM 47:2 (Shah) ("The Angelo Gordon proposal was not finalized.").)

72.     The First Lien Lender Group's proposal was nonbinding, in its preliminary stages, and still subject to a significant amount of business and legal diligence.  None of the critical terms had been finalized, including what collateral would be transferred and how it would be valued, or at what price debt would be exchanged.  (Day Four – AM 37:6-38:10 (Kwon); Day Four – PM 21:3-22:1 (Hanigan).)

73.     Even in its preliminary stages, some features of the First Lien Lender Group's proposal were known.  A drop-down transaction would not have disturbed the rights of existing First Lien Lenders to *pro rata* distribution of payments or remaining collateral securing the First Lien Term Loans.  (Day Four – AM 71:1-5 (Kwon).)   Nor would it have required any amendments to the 2016 Credit Agreement; rather, it utilized existing basket capacity under the

17

2016 Credit Agreement to establish certain subsidiaries, against which Serta could borrow money.  (Day One – PM 182:1-4 (Prince); Day Four – AM 32:11-33:4 (Kwon); Day Two – PM 151:14-152:3 (Chopra).)  Furthermore, nothing about the transaction structure prevented it from being open to other First Lien Lenders. (Day Four – AM 43:3-7 (Kwon).)

74.     The First Lien Lender Group's proposal was for "a transaction that the markets had generally seen and grown accustomed to."  (Day Four – AM 44:11-13 (Kwon).) The transaction structure was "familiar" to Centerview, which modeled it extensively when developing the proposal that would eventually become the Unlawful Exchange Transaction. (Debtors' Ex. 185, ECF No. 864-28; Day Two – PM 165:21-166:5, 174:1-14, 187:2-13 (Chopra); Day Three – AM 8:19-25 (Chopra).)

75.     CSAM, too, was able to model the proposal based on known features of drop-down transactions.  (Day Three – PM 77:6-19 (Meiering).)  Indeed, the transaction structure was so predictable that when the First Lien Lender Group's proposal ultimately was made publicly available, Favored Lender CSAM concluded that its model "wasn't perfect, but it was pretty close."  (Day Three – PM 78:6-15 (Meiering).)

## VII.
## THE UNLAWFUL EXCHANGE TRANSACTION
## WAS A FIRST-OF-ITS-KIND TRANSACTION

76.     The Unlawful Exchange Transaction was a first-of-its kind transaction; the evidence is undisputed that it had no precedent in the leveraged-loan market.  Prior to the Unlawful Exchange Transaction, there had never been a transaction involving a priming facility with a debt repurchase at a discount in a credit agreement that contained a payment waterfall with a *pro rata* requirement needing unanimous consent to be changed.

77.     Prior to the Unlawful Exchange Transaction, neither Evercore nor Centerview (financial advisors to Serta and the Favored Lenders, respectively) had worked on a transaction that involved a priming facility with a debt repurchase at a discount, nor are they aware of such a transaction having been done prior to the Unlawful Exchange Transaction.  (Day One – PM 83:17-84:10 (Shah); Day Three – AM 81:7-17 (Chopra).)

78.     Advent, Serta's private equity sponsor, also had not worked on such a transaction prior to the Unlawful Exchange Transaction.  Day I – PM 181:15-25 (Prince).)

79.     No other witness was able to identify any transaction prior to the Unlawful Exchange Transaction that had all the same components.  (Day Two – PM 90:8-11 (Tepner); Day Three – AM 124:14-15 (Sveen), Day Three – PM 10:3-4 (Sveen); Day Three – PM 58:17-22 (Searles); Day Three – PM 128:6-16 (Yarrow).)

80.     The Excluded Lenders never expected that the *pro rata* sharing rights in the 2016 Credit Agreement could be destroyed by a transaction like the Unlawful Exchange Transaction.  (Day Four – AM 41:3-42:2 (Kwon); Day Four – PM 13:4-10, 25:19-23 (Hanigan).)

81.     When the Unlawful Exchange Transaction was announced, Apollo was "shocked" by its terms, because it was a "novel," "groundbreaking" deal without precedent in the market.  (Day Four – AM 41:3-8 (Kwon).)  In projecting and modeling various liability management transactions that Serta might pursue, neither Apollo nor Gamut modeled a transaction like the Unlawful Exchange Transaction, because they did not think that such a transaction was even possible.  (Day Four – AM 41:13-25 (Kwon), Day Four – PM 13:4-7 (Hanigan).)

82.     The Excluded Lenders' purchase of First Lien Term Loans was premised on their belief, which was based on extensive due diligence and analysis of the 2016 Credit

19

Agreement, that they would have a first-lien priority right to the collateral securing the First Lien Term Loans.  (Day Four – AM 45:16-22 (Kwon); Day Four – PM 25:19-26:15 (Hanigan).)

83.     Indeed, had Gamut thought there was a risk that it would not have a first-lien priority right to the collateral securing the First Lien Term Loans, it likely would not have purchased loans under the 2016 Credit Agreement. (Day Four – PM 26:12-15 (Hanigan).) Gamut did not purchase second-lien term loans under the Second Lien Term Loan Agreement because "what was critical to us was being a first lien lender."  (Day Four – PM 12:25-13:3 (Hanigan).)

84.     The proposals initially offered by the Favored Lenders did not reflect any understanding that the 2016 Credit Agreement contemplated a priming financing with a debt repurchase at a discount.  On April 24, 2020, the Ad Hoc Group submitted an initial proposal that offered $200 million in new-money financing that would be backstopped by the members of the Ad Hoc Group and be open to all existing First Lien Lenders on a *pro rata* basis.  (Debtors' Ex. 87, ECF No. 862-31; Day Two – PM 154:18-22 (Chopra).)

85.     Likewise, on May 8, 2020, Barings (which was later selected by Advent to re-join the Favored Lenders) submitted a proposal for a "drop-down" transaction that involved a new loan to an unrestricted subsidiary of Serta secured by certain of Serta's intellectual property, as well as a debt exchange.  (Debtors' Ex. 116, ECF No. 863-9.)  Based on its assessment of the 2016 Credit Agreement, Barings assumed that other lender groups were proposing a similar transaction.  (Day Three – PM 36:5-11 (Searles).)

**PROPOSED CONCLUSIONS OF LAW**

**VIII.**
**PLAINTIFFS BREACHED THE IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING IN THE 2016 CREDIT AGREEMENT**

86.      The claims remaining to be adjudicated in this action are: (1) Plaintiffs'

claim for a declaratory judgment that they did not violate the implied covenant of good faith and

fair dealing, and (2) Defendants' mirror-image claim that Plaintiffs and Counterclaim Defendants

violated the covenant of good faith and fair dealing.  (Adversary Complaint, ECF No. 1, ¶¶ 75-

80; Amended Answering Defendants' Answer to the Amended Adversary Complaint,

Counterclaims and Third-Party Claims, ECF No. 148, ¶¶ 310-341, 363-392.)  As detailed below,

Defendants have proved their claims against Plaintiffs and Counterclaim Defendants, and

Plaintiffs have not proved their claims against Defendants.

**A.**      **Plaintiffs Owed the Excluded Lenders a Duty of Good Faith and Fair Dealing**

87.      Plaintiffs admit that the Excluded Lenders and the Favored Lenders are or

were parties to the 2016 Credit Agreement, which constitutes a valid and enforceable contract.

(Serta Simmons Bedding, LLC's Response to Answering Defendants' Amended Counterclaims,

ECF No. 180, ¶ 311; Represented Third-Party Defendants' Answer to the Third-Party Plaintiffs'

Claims, ECF No. 217, ¶ 353.)

88.      Under New York law, "all contracts imply a covenant of good faith and

fair dealing in the course of performance."  *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,

98 N.Y. 2d 144, 153 (2002).  The implied covenant "includes promises that a 'reasonable person

in the position of the promisee would be justified in understanding were included' in the contract,

that 'neither party shall do anything which will have the effect of destroying or injuring the right

of the other party to receive the fruits of the contract,' and, when the contract involves the

21

exercise of discretion, that the party promises 'not to act arbitrarily or irrationally in exercising

that discretion.'" *Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 598 (S.D.N.Y. 2017)

(quoting *Dalton v. Educ. Testing Serv*., 87 N.Y.2d 384, 389 (1995)).

**B.     The Implied Covenant Included a Promise Not to Deprive Defendants
of Their Right to *Pro Rata* Treatment Under the 2016 Credit Agreement**

89.     To determine what the "fruits" of the 2016 Credit Agreement are, the

Court examines the words of the contract.  *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F.

Supp. 1504, 1518 (S.D.N.Y. 1989) ("The appropriate analysis . . . is first to examine the [relevant

contract] to determine the fruits of the agreement between the parties, and then to decide whether

those fruits have been spoiled[.]").

90.     Even a cursory examination of the 2016 Credit Agreement makes clear

that a "fruit" of the contract owing to the First Lien Lenders is their right to *pro rata* treatment,

including the right to share ratably in payments of principal or interest on the First Lien Term

Loans, and the right to share ratably in the proceeds of the collateral securing the First Lien Term

Loans in the event of a default.  (Debtors' Ex. 5, ECF No. 853-5, § 2.18(a)-(c).)

91.     Reflecting the centrality of these provisions to the parties' bargain, the

proceeds waterfall and *pro rata* sharing requirement set forth in Sections 2.18(b) and (c),

respectively, are "sacred rights" which may be amended only with the unanimous consent of all

the First Lien Lenders.  (Debtors' Ex. 5, ECF No. 853-5, § 9.02(b)(A).)

92.     Given the protections afforded to these rights under the 2016 Credit

Agreement, the Excluded Lenders reasonably expected that they would not be violated, and

certainly not by a transaction like the Unlawful Exchange Transaction, which, on the undisputed

evidence, was a first-of-its kind transaction without precedent in the leveraged-loan market.  *See*

¶¶ 76-81, *supra*.

93.     As of 2016, when the 2016 Credit Agreement was executed – and even as of 2020 – a priming financing with a debt repurchase at a discount was uncontemplated in the credit markets.  *See Cordero v. Transamerica Annuity Serv. Corp.*, No. 21, 2023 WL 3061503, at *5 (N.Y. Apr. 25, 2023) ("In discerning what is 'reasonable,' the Court looks to what the parties would have expected under the contract: the Court will infer that contracts include any promises which a reasonable person in the position of the promisee would be justified in understanding were included *at the time the contract was made*.") (internal quotation marks omitted) (emphasis added).

94.     The market's immediate reaction to the Unlawful Exchange Transaction further confirms that the Transaction subverted reasonable expectations.  Shortly after the deal was announced, the market price of the First Lien Term Loans, which had been trading at about 43 cents, plunged by nearly 30% to 31 cents, and Moody's downgraded its rating of the First Lien Term Loans from Caa3 to Ca, reflecting its belief that "term loan lenders who do not consent to the transaction will potentially be left with little or no remaining collateral coverage in Serta Simmons, as well as in a position that is subordinated to new, higher priority debt."  *See* ¶ 60, *supra*.

95.     Although "the relevant inquiry called for by the implied covenant is objective, not subjective," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 605 (S.D.N.Y. 2018), evidence of the parties' subjective expectations concerning the 2016 Credit Agreement reflects that their views mirrored those of the credit market at-large.

96.     The Excluded Lenders' first-lien priority right under the proceeds waterfall was "fundamental" to their decision to purchase loans under the 2016 Credit Agreement.  *See* ¶ 10, *supra*.  Serta, too, recognized that a lender's priority of payment with respect to the

collateral securing its loan is "fundamental" to a lender's decision to extend credit to a company. *See* ¶ 9, *supra*. And, prior to embarking on their scheme to defeat at all costs the First Lien Lender Group's drop-down transaction, the Favored Lenders submitted proposals that would keep intact the First Lien Lenders' *pro rata* rights, indicating their understanding that these rights were expected fruits of the contract. *See* ¶¶ 84-85, *supra*.

**C.    The Unlawful Exchange Transaction Destroyed**
**the Excluded Lenders' Right to *Pro Rata* Treatment**

97.    There is no serious dispute that the Unlawful Exchange Transaction destroyed the Excluded Lenders' rights to *pro rata* treatment under the 2016 Credit Agreement. As a result of the Unlawful Exchange Transaction, the Excluded Lenders are now deeply subordinated creditors, standing in line behind roughly $1 billion in debt owned by the Favored Lenders, holding First Lien Term Loans that have no significant value. *See* ¶¶ 51-53, *supra*.

98.    The Unlawful Exchange Transaction completely reengineered the payment waterfall in the 2016 Credit Agreement. It is undisputed that prior to the Transaction, both the Excluded Lenders and the Favored Lenders held First Lien Term Loans that were *pari passu* with respect to the right to payment, secured by a single pool of collateral. But by virtue of their participation in the Transaction, the Favored Lenders exchanged into loans, secured by the same collateral, that were senior in right to payment vis-à-vis the Excluded Lenders, whose loans became subordinated to three tranches of super-priority loans owned by the Favored Lenders. Thus, while the First Lien Lenders remained "first-lien" in name, they were "fourth-out" in substance. *See* ¶¶ 52-54, *supra*.

99.    It is further undisputed that the Favored Lenders did not share ratably with the Excluded Lenders the benefits they received through the Unlawful Exchange Transaction.

24

**D.    Plaintiffs Schemed to Deprive the Excluded
        Lenders of Their Rights to *Pro Rata* Treatment**

100.    Under New York law, the implied covenant is breached when one party's conduct deprives the other party of the benefit of its bargain; the breaching party need not have destroyed the other party's fruits of the contract intentionally.  *See, e.g.*, *Dalton*, 87 N.Y.2d at 389 ("[The implied covenant] embraces a pledge that neither party shall do anything *which will have the effect* of destroying or injuring the right of the other party to receive the fruits of the contract.") (emphasis added).

101.    Here, however, there is ample evidence that Plaintiffs intentionally acted to deprive the Excluded Lenders of their rights under the 2016 Credit Agreement to further their own financial position and realize improper gains while purporting to act pursuant to contractual rights.  *See, e.g.*, *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570 (2d Cir. 1994); *Ellison v. Island Def Jam Music Grp.*, 79 A.D.3d 458, 458-59 (N.Y. App. Div. (1st Dep't) 2010); *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 293 (N.Y. App. Div. (1st Dep't) 2003); *Gray & Assocs., LLC v. Speltz & Weis LLC*, 2009 WL 416138, at *10 (N.Y. Sup. Ct. (N.Y. Cnty.) 2009).

102.    Serta could have arranged for liquidity financing, discount capture and and reduction in debt consistent with the parties' reasonable expectations concerning the *pro rata* sharing provisions of the 2016 Credit Agreement, but instead the Company and Advent manipulated the process to invite a transaction that destroyed those expectations entirely.  *See* ¶¶ 19-24, *supra*.

103.    Serta solicited proposals for a "drop-down" transaction – a structure that was well-known in the marketplace and that could have provided the Company with the liquidity and deleveraging it desired – with the intent of using those proposals as negotiating leverage for

25

an eventual deal with the Favored Lenders, with whom they wanted to transact "all along," without the Excluded Lenders.  *See* ¶¶ 12-21, *supra*.

104.   The Favored Lenders, for their part, seized the opportunity to transact with Serta on terms that intentionally subverted the 2016 Credit Agreement's *pro rata* sharing provisions.  The Favored Lenders sought to cap participation at 50.1% of the outstanding face amount of First Lien Term Loans – the bare minimum needed to amend the 2016 Credit Agreement to permit the Unlawful Exchange Transaction – and no more, so that they could maximize their recovery in the likely event of a Serta bankruptcy, to the detriment of the Excluded Lenders.  *See* ¶¶ 25-32, *supra*.

105.   After unsuccessfully negotiating to raise the participation level above 50.1%, which would have inured to the Company's benefit by increasing the amount of discount captured in the "second out" debt exchange tranche, Serta, through its private equity sponsor Advent, arbitrarily and unreasonably selected which First Lien Lenders could participate to reach the 50.1% threshold.  Advent's decisions were guided by two improper goals: (1) reaching the threshold with the fewest number of lenders, and (2) rewarding those lenders with whom it had a preexisting relationship.  *See* ¶¶ 33-34, 37, *supra*.  Advent similarly filled the additional basket capacity Serta negotiated as part of the "second out" tranche based on its relationships with certain lenders.  *See* ¶¶ 38-40, *supra*.  This is further evidence of Serta's breach of the implied covenant.  *See Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 731 (S.D.N.Y. 2020) (a breach of the implied covenant "can be inferred from evidence that the defendant's conduct was arbitrary or contrary to reasonable expectations").

26

**E.**     **Additional Evidence of the Favored Lenders' Lack of Good Faith**

      **1.**     **The Ad Hoc Group's June 4, 2020 Letter to UBS**

106.     In its June 4, 2020 letter to UBS, the Administrative Agent under the 2016 Credit Agreement, the Ad Hoc Group made unfounded misrepresentations regarding the legality of a drop-down transaction and Serta's solvency, with the improper motive of precluding competition by pressuring UBS to reject any deal between Serta and the First Lien Lender Group. Wielding the threat of litigation and implying that it constituted a majority of existing First Lien Lenders, the Ad Hoc Group warned UBS not to approve a drop-down transaction. It further cautioned UBS not to disclose the Ad Hoc Group's communication to the Company. *See* ¶¶ 43-49, *supra*. The letter bears all the hallmarks of bad faith and constitutes additional evidence of the Favored Lenders' violation of the implied covenant. *See, e.g., Fleet Cap. Corp. v. Yamaha Motor Corp., U.S.A.*, 2002 WL 31174470, at *27 (S.D.N.Y. Sept. 26, 2002) (pressuring a non-party to "agree" to take an action that effectively overrides a lender's priority under an intercreditor agreement is a violation of the implied covenant); *Travellers*, 41 F.3d at 1577 (a party that threatens another to enter into a transaction with an "improper motive" acts in bad faith); *P&G Auditors & Consultants, LLC v. Mega Int'l Com. Bank Co.*, 2019 WL 4805862, at *6 (S.D.N.Y. Sept. 30, 2019) (implied covenant claim supported by allegation of actions taken under "false pretenses").

      **2.**     **The Favored Lenders' Demand for Indemnification**

107.     The record as developed at trial is disturbingly thin on details concerning the negotiation of the indemnity provision contained in the Super-Priority Term Loan Agreement as executed on June 22, 2020. *See* ¶¶ 61-70, *supra*.

108.     The indemnity purports to insulate the Favored Lenders from liability for gross negligence, bad faith, willful misconduct, or material breaches of the 2016 Credit Agreement, which not only is highly irregular, but also likely unenforceable under New York law.  *See CBS Corp. v. Eaton Corp.*, 2010 WL 1375169, at *2 (S.D.N.Y. Mar. 30, 2010) ("[C]ontracts that would indemnify a party for intentional or fraudulent conduct are void as against public policy."); *accord Am. Tissue, Inc. v. Donaldson*, 351 F. Supp. 2d 79, 99 (S.D.N.Y. 2004) (same).

109.     Of particular concern is the fact that the "bad faith" carve-out was not contained in the Super-Priority Term Loan Agreement as approved by Serta's Finance Committee on June 20, 2022.  The record contains no evidence that Serta and its Finance Committee used any business judgment in assessing or agreeing to the indemnity, or that the Company received any consideration for taking on such a potentially enormous liability in the face of active litigation.

110.     Furthermore, the indemnity – and the Favored Lenders' insistence that it be carried forward through the Plan – strongly indicates that the Favored Lenders knew the Unlawful Exchange Transaction was improper and is further evidence to support a finding of breach of the implied covenant.

**3.      Amendments to the 2016 Credit Agreement**

111.     There is significant evidence that the Favored Lenders abused the 2016 Credit Agreement's voting rights provisions by making amendments intended to gain financial benefits on non-market terms and deprive the Excluded Lenders of critical, bargained-for rights and protections.  Even an "explicitly discretionary contract right cannot be exercised in such bad

28

faith as to deprive the other party of the benefit of the bargain." *ICG Global Loan Fund I DAC v. Boardriders, Inc.*, 2022 WL 10085886, at *9 (N.Y. Sup. Ct. Oct. 17, 2022).

112.    Knowing the payment waterfall provided by Section 2.18(b) of the Credit Agreement was a "sacred right" which could not be amended without the unanimous consent of all First Lien Lenders, Serta and the Favored Lenders entered into a new intercreditor agreement that altered the payment priority structure without amending the waterfall provision.  This new intercreditor agreement, which was designed and intended to defeat the unanimity requirement, is further evidence of the Favored Lenders' lack of good faith.  *See LCM XII, Ltd. V. Serta Simmons Bedding, LLC*, 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) (finding plausible plaintiffs' allegations that Serta breached implied covenant where it "colluded with a bare majority of lenders to abuse its power to amend the Ageement to create a new class of debt" and "systematically combed through the Agreement tweaking every provision that seemingly prevented it from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one"); *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, 2022 WL 10085886, at *9 (N.Y. Sup. Ct. (N.Y. Cnty.) Oct. 17, 2022) (majority lenders' amendment of no-action provisions to hinder minority lenders' ability to sue and eliminated affirmative and negative covenants may have acted in bad faith); *Kotite v. Shea*, 274 A.D.2d 503, 503-04 (N.Y. App. Div. (2d Dep't) 2000) (otherwise permissible amendment to club's bylaws held "void" because it was "in derogation of the Club's purpose . . . to operate for the benefit of all its members including the plaintiff" and otherwise "offensive" to "principles of fundamental justice").

113.    Of the more than two dozen provisions that Serta and the Favored Lenders amended as part of the Unlawful Exchange Transaction, one notably pernicious amendment

allowed Serta to incur an unlimited amount of incremental equivalent debt that is senior (rather than junior or *pari passu*) in right of payment to the First Lien Loans.  *See* ¶¶ 55-56, *supra.*

**F.     Plaintiffs' Purported Justifications for the**
**Unlawful Exchange Transaction are Not a Defense**

114.    At trial, Plaintiffs contended that they had valid business justifications for entering into the Unlawful Exchange Transaction.  Serta posited that the Transaction was necessary to obtain a cash infusion and to de-lever the Company.  (Day One – PM 34:20-22, 43:5-8 (Opening Statement).)  The Favored Lenders argued that the Transaction was necessary to defeat the First Lien Lender Group's alternative proposal, which they contend would have damaged the value of their First Lien Term Loans by removing certain collateral.  (Day One – PM 45:6-11 (Opening Statement).)

115.    However, economic justification for a breach does not constitute a defense to a claim for breach of the implied covenant.  To the extent this Court determines that Plaintiffs had valid economic reasons to conduct the Unlawful Exchange Transaction, the law obligates that they pay money damages to Defendants under the doctrine of "efficient breach."  *See Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 262 n.12 (S.D.N.Y. 2005) ("[T]he law presumes that parties to contracts are rational: they choose to breach contracts because it is more efficient to breach and pay compensatory damages than to perform.  If so, efficiency is promoted by allowing parties to break their promise, provided that they compensate the non-breaching party for actual losses."); *see also* 3 E. Farnsworth, Contracts § 12.8, at 194-195 (2d ed. 1990) ("Most courts have not infringed on the freedom to keep or break a contract traditionally afforded a party by the common law and endorsed by the notion of efficient breach.")

116.    Indeed, even the defense that a course of action "is totally necessary if [an implied covenant defendant] is to survive . . .,' is not conclusive of a finding of good faith."

*Carvel Corp. v. Baker*, 79 F. Supp. 2d 53, 63 (D. Conn. 1997) (applying New York law and denying summary judgment on implied covenant claim).

## IX.
## THE COURT SHOULD DENY PLAINTIFFS' DECLARATORY JUDGMENT CLAIM

117.    Plaintiffs seek a declaratory judgment that they did not violate the covenant of good faith and fair dealing by entering into the Unlawful Exchange Transaction. (Adversary Complaint ¶¶ 75-80, ECF No. 1.)

118.    Plaintiffs' claim for a declaratory judgment is the mirror image of Defendants' claim against Plaintiffs for breach of the implied covenant of good faith and fair dealing.  (Serta Simmons Beddings, LLC's Motion for Summary Judgment, ECF No. 69, at 36 (referring to Defendants' counterclaims as "mirror image" claims to Plaintiffs' declaratory judgment claims); Lender Plaintiffs' Motion for Summary Judgment, ECF No. 73, at 35 (same).)

119.    For the same reasons that Defendants' claim should be granted, Plaintiffs' claim should be denied in its entirety.

## X. THE COURT SHOULD GRANT THE RELIEF SOUGHT BY THE EXCLUDED LENDERS

120.    The Court should grant the following relief sought by the Excluded Lenders:

(a)    Award damages to the Excluded Lenders in an amount to be proven at trial[3] for all economic, monetary, actual, consequential, and compensatory damages that the Excluded Lenders suffered as a result of Serta's breach of the implied covenant of good faith and fair dealing, together with pre- and post-judgment interest at the maximum rate allowable by law;

---

[3] The parties to this Adversary Proceeding stipulated to bifurcate the issue of damages from that of liability in the trial held on May 15-18, 2023, such that the trial addressed the issue of liability only.  *See* ECF No. 207.

(b)    Award damages to the Excluded Lenders in an amount to be proven at trial for all economic, monetary, actual, consequential, and compensatory damages that the Excluded Lenders suffered as a result of the Favored Lenders' breach of the implied covenant of good faith and fair dealing, together with pre- and post-judgment interest at the maximum rate allowable by law;

(c)    Award the Excluded Lenders the costs of their suit, including reasonable attorneys' fees and expenses; and

(d)    Award such other and further relief as the Court may deem just and proper.

Dated:    New York, New York
          May 23, 2023

Respectfully submitted,

FRIEDMAN KAPLAN SEILER
   ADELMAN & ROBBINS LLP

_s/ Eric Seiler_
Lawrence S. Robbins*
Eric Seiler*
Anne E. Beaumont*
Jamuna D. Kelley*
Elizabeth Bierut*
Blair R. Albom*
7 Times Square
New York, NY  10036
(212) 833-1100
lrobbins@fklaw.com
eseiler@fklaw.com
abeaumont@fklaw.com
jkelley@fklaw.com
ebierut@fklaw.com
balbom@fklaw.com

_Attorneys for the Excluded Lenders_

**PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP**
Kenneth S. Ziman*
Brian S. Hermann*
Lewis R. Clayton*
Andrew J. Ehrlich*

32

Michael J. Colarossi*
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000
kziman@paulweiss.com
bhermann@paulweiss.com
lclayton@paulweiss.com
aehrlich@paulweiss.com
mcolarossi@paulweiss.com

*Attorneys for the Excluded Lenders with respect to Plaintiffs' Claims and Counterclaims Only*

**PORTER HEDGES LLP**
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan N. Young-John (TX 24088700)
1000 Main Street, 36th Floor
Houston, TX  77002
(713) 226-6000
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com

*admitted pro hac vice

*Attorneys for the Excluded Lenders with respect to Plaintiffs' Claims and Counterclaims Only*