**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| SERTA SIMMONS BEDDING, LLC, et al., | Case No. 23-90020 (DRJ) |
| Debtors, | (Jointly Administered) |
| SERTA SIMMONS BEDDING, LLC, et al., | |
| Plaintiffs and Counterclaim Defendant, | Adv. Proc. No. 23-09001 (DRJ) |
| v. | |
| AG CENTRE STREET PARTNERSHIP L.P., et al., | |
| Defendants and Counterclaim Plaintiffs, | |
| v. | |
| AGF FLOATING RATE INCOME FUND, et al., | |
| Additional Counterclaim Defendants. | |

## EXCLUDED LENDERS' POST-TRIAL MEMORANDUM OF LAW

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
7 Times Square
New York, NY 10036
(212) 833-1100

*Attorneys for the Excluded Lenders*

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, TX 77002
(713) 226-6000

*Attorneys for the Excluded Lenders with respect to Plaintiffs' Claims and Counterclaims Only*

3725592.1

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT ......................................................................................................................4

I.    Serta and the Favored Lenders Breached the Implied Covenant of Good Faith and
      Fair Dealing in the 2016 Credit Agreement ......................................................4

      A.    The Excluded Lenders Could Not Reasonably Have Foreseen the
            Unlawful Exchange Transaction ..............................................................4

      B.    The Excluded Lenders' Right to *Pro Rata* Treatment Is a Fundamental
            "Fruit" of the 2016 Credit Agreement ....................................................11

      C.    The Trial Evidence Shows that Plaintiffs Schemed to Deprive the
            Excluded Lenders of Their Fundamental Right to *Pro Rata* Treatment ...............14

            1.    The Favored Lenders Secretly Threatened UBS to Block the
                  Excluded Lenders' Proposal and Pave the Way for the Unlawful
                  Exchange Transaction ....................................................................14

            2.    The Favored Lenders Designed the Unlawful Exchange
                  Transaction to Maximize Its Harm to the Excluded Lenders ...................16

            3.    On Their Way Out, the Favored Lenders Enacted Dozens of
                  Oppressive Amendments to the 2016 Credit Agreement, Leaving
                  the Excluded Lenders Behind to Live with the Consequences of
                  Those Amendments ........................................................................19

            4.    The Favored Lenders' Self-Serving and Illegal Indemnity Is
                  Further Evidence of Their Misconduct ..............................................21

II.   The Excluded Lenders' Implied Covenant Claim is Not Duplicative of Their
      Contract Claim ..............................................................................................23

III.  THIS COURT SHOULD NOT REVISIT THE DEFINITION OF "OPEN
      MARKET PURCHASES" ..............................................................................27

      A.    The Excluded Lenders Were Not Given Notice That the Open Market
            Purchase Claim Would Be at Issue at the Trial ........................................30

      B.    The Court Lacks Jurisdiction to Supplement Its Prior Decision ......................31

CONCLUSION ..................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
98 N.Y.2d 144 (2002) ...........................................................................................11

*In re Acis Cap. Mgmt., L.P.*,
604 B.R. 484 (N.D. Tex. 2019).............................................................................32

*AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*,
2023 WL 2394680 (N.Y. App. Div. (1st Dep't) Mar. 7, 2023)...................... *passim*

*Attorney First, LLC v. Ascension Entertainment, Inc.*,
144 Fed. App'x 283 (4th Cir. 2005) .....................................................................31

*Austin v. Gould*,
137 A.D.3d 495 (1st Dep't 2016) ...........................................................................7

*Barbagallo v. Marcum LLP*,
2012 WL 1664238 (E.D.N.Y. May 11, 2012) ......................................................21

*CBS Corp. v. Eaton Corp.*,
2010 WL 1375169 (S.D.N.Y. Mar. 30, 2010*)* ....................................................21

*Chase Manhattan Bank v. Keystone Distribs., Inc.*,
873 F. Supp. 808 (S.D.N.Y. 1994) .......................................................................11

*Cordero v. Transamerica Annuity Serv. Corp.*,
2023 WL 3061503 (N.Y. Apr. 25, 2023)................................................................5

*D'Onofrio v. Vacation Publ'ns, Inc.*,
888 F.3d 197 (5th Cir. 2018) ...............................................................................30

*Dalton v. Educ. Testing Serv.*,
87 N.Y.2d 384 (1995) ..............................................................................4, 11, 12

*Dayton Indep. Sch. Dist. v. U.S. Min. Prod. Co.*,
906 F.2d 1059 (5th Cir. 1990) .............................................................................32

*E. Ramapo Cent. Sch. Dist. v. N.Y. Schs. Ins. Reciprocal*,
199 A.D.3d 881 (N.Y. App. Div. (2d Dep't) 2021)........................................11, 25

*Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*,
680 F. Supp. 2d 625 (S.D.N.Y. 2010), *aff'd*, 381 F. App'x 117 (2d Cir. 2010).....................12

*Farmhand, Inc. v. Anel Eng'g Indus.*,
693 F.2d 1140 (5th Cir. 1982) .............................................................................33

**Page(s)**

*In re Felt,*
    176 F.3d 478 (5th Cir. 1999) ........................................................................30

*Fleet Cap. Corp. v. Yamaha Motor Corp., U.S.A.,*
    2002 WL 31174470 (S.D.N.Y. Sept. 26, 2002).........................................14, 16

*Frye v. Anadarko Petroleum Corp.,*
    2018 WL 5921016 (S.D. Tex. Nov. 13, 2018) ..............................................33

*H&W Indus., Inc.* v. *Formosa Plastics Corp., USA,*
    860 F.2d 172 (5th Cir. 1988) ........................................................................30

*ICG Global Loan Fund 1 DAC v. Boardriders, Inc.,*
    2022 WL 10085886 (N.Y. Sup. Ct. (N.Y. Cnty.) Oct. 17, 2022) ................... *passim*

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC,*
    2009 WL 321222 (S.D.N.Y. Feb. 9, 2009)...................................................25

*Kotite v. Shea,*
    274 A.D.2d 503 (N.Y. App. Div. (2d Dep't) 2000)......................................20

*LCM XII Ltd. v. Serta Simmons Bedding, LLC,*
    2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ..............................13, 19, 27

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
    299 F. Supp. 3d 430 (S.D.N.Y. 2018)..........................................................12

*In re LightSquared Inc.,*
    511 B.R. 253 (Bankr. S.D.N.Y. 2014)..........................................................11

*Manshion Joho Ctr. Co., Ltd. v. Manshion Joho Ctr., Inc.,*
    24 A.D.3d 189 (N.Y. App. Div. (1st Dep't) 2005) .......................................7

*In re Matter of Stonecraft LLC,*
    260 Fed. App'x 656 (5th Cir. 2007) .............................................................28

*Mercury Partners LLC v. Pac. Med. Bldgs., L.P.,*
    2007 WL 2197830 (S.D.N.Y. July 31, 2007) ..............................................5

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.,*
    716 F. Supp. 1504 (S.D.N.Y. 1989)..............................................................12

*North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC,*
    2020 WL 3411267 (N.Y. Sup. Ct. (N.Y. Cnty.) June 19, 2020) ................10

*P&G Auditors & Consultants, LLC v. Mega Int'l Com. Bank Co.,*
    2019 WL 4805862 (S.D.N.Y. Sept. 30, 2019)........................................16, 24

*Powell v. United States,*
    849 F.2d 1576 (5th Cir. 1988) ......................................................................28

iii

**Page(s)**

*Providence Title Co.* v. *Truly Title, Inc.*,
    2021 WL 5003273 (E.D. Tex. Oct. 28, 2021) ......................................................32

*Pub. Serv. Mut. Ins. Co. v. Goldfarb*,
    53 N.Y.2d 392 (1981) ............................................................................................22

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,
    309 A.D.2d 288 (N.Y. App. Div. (1st Dep't) 2003)........................................18, 22

*In re Scopac*,
    624 F.3d 274 (5th Cir. 2010) .................................................................................32

*In re Serta Simmons Bedding, LLC*,
    No. 23-90012 (5th Cir. Apr. 26, 2023) ..................................................................31

*Sobel v. Major Energy Servs., LLC*,
    2020 WL 6561602 (S.D.N.Y. July 31, 2020) ........................................................24

*Standard Gen. L.P. v. Charney*,
    2017 WL 6498063 (Del. Ch. Dec. 19, 2017), *aff'd*, 195 A.3d 16 (Del. 2018) ........7

*In re Transtexas Gas Corp.*,
    303 F.3d 571 (5th Cir. 2002) .................................................................................32

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
    41 F.3d 1570 (2d Cir. 1994)...................................................................................16

*Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*,
    2021 WL 3668092 (S.D.N.Y. Aug. 17, 2021) .......................................................24

*TVT Recs. v. Island Def Jam Music Grp.*,
    244 F. Supp. 2d 263 (S.D.N.Y. 2003)......................................................................4

*United States* v. *Ruvalcava-Garza*,
    750 F. App'x 353 (5th Cir. 2018) ....................................................................33, 34

*United States* v. *Spencer*,
    513 F.3d 490 (5th Cir. 2008) .................................................................................33

*Vista Outdoor Inc. v. Reeves Fam. Tr.*,
    725 F. App'x ....................................................................................................10, 12

*Wireless Agents, LLC v. Sony Ericsson Mobile Comms. AB*,
    2006 WL 1189687 (N.D. Tex. May 3, 2006) ........................................................32

**Statutes and Other Authorities**

28 U.S.C. § 158(d)(2)(A)................................................................................................31

Fed. R. Bankr. 8002(b) ...................................................................................................33

iv

Defendants and counterclaim plaintiffs AG Centre Street Partnership L.P., AG Credit Solutions Non-ECI Master Fund, L.P., AG Super Fund Master, L.P., AG SF Master (L), L.P., Silver Oak Capital, L.L.C., Ascribe III Investments, LLC, Columbia Cent CLO 21 Limited, Columbia Cent CLO 27 Limited, Columbia Floating Rate Fund, a series of Columbia Funds Series Trust II, Columbia Strategic Income Fund, a series of Columbia Funds Series Trust I, Contrarian Capital Fund I, L.P., Contrarian Distressed Debt Fund, L.P., Contrarian Centre Street Partnership, L.P., Gamut Capital SSB, LLC, North Star Debt Holdings, L.P., Shackleton 2013-III CLO, Ltd., Shackleton 2013-IV-R CLO, Ltd., Shackleton 2014-V-R CLO, Ltd., Shackleton 2015-VII-R CLO, Ltd., Shackleton 2017-XI CLO, Ltd., Z Capital Credit Partners CLO 2018-1 Ltd., and Z Capital Credit Partners CLO 2019-1 Ltd. (collectively, the "Excluded Lenders") respectfully submit this post-trial memorandum of law in connection with the trial of this action which commenced on May 15, 2023 and concluded on May 18, 2023 (the "Adversary Proceeding Trial").

## INTRODUCTION[1]

At the Adversary Proceeding Trial, the Court heard evidence on the Excluded Lenders' counterclaim against Serta and the Favored Lenders for breach of the implied covenant of good faith and fair dealing in the 2016 Credit Agreement, and the claim of Serta and the Favored Lenders for a declaratory judgment that they did not breach the implied covenant.[2]  The evidence is clear the Excluded Lenders relied on the "sacred rights" protections of the 2016 Credit Agreement in purchasing their loans.  In 2016 and even 2020, they could not have reasonably anticipated what transpired – an unprecedented debt-for-debt priming transaction that

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Excluded Lenders' Amended Answer to the Amended Adversary Complaint, Counterclaims, and Third-Party Claims ("Counterclaims").  (ECF No. 148.)

[2] (*See* ECF No. 148, Counterclaims; ECF No. 38, Amended Adversary Complaint.)

allowed one class of First Lien Lenders (and even some Second Lien Lenders) to leapfrog over others.

The Favored Lenders argue that the 2016 Credit Agreement was "flexible" enough to permit the Unlawful Exchange Transaction, and the Excluded Lenders should have "reasonably inferr[ed]" that the Transaction would occur based on both their proposed alternative transaction and on later unrelated transactions involving unrelated credit agreements.  (ECF No. 244, Lenders Br. ¶¶ 100-06.)  But even if New York recognized this "unclean hands" defense to an implied covenant claim (it does not), those other transactions were either inchoate, distinct in form, or executed well after the Unlawful Exchange Transaction, which redefined market expectations.

Take the Excluded Lenders' proposed transaction.  While both that transaction and the Unlawful Exchange Transaction were at a high level "position enhancing," there are fundamental differences between the two.  The Excluded Lenders' proposal, which was never enacted, would have utilized express baskets within the 2016 Credit Agreement.  Any lender reading the 2016 Credit Agreement could have easily determined the amount of assets that could be subject to a drop-down.  Unlike the Unlawful Exchange Transaction, no amendments to the 2016 Credit Agreement would have been required.  By contrast, the Unlawful Exchange Transaction transformed the 2016 Credit Agreement in a way neither the Excluded Lenders nor the leveraged loan market could have contemplated.

Unsurprisingly, the trial evidence, much of it uncontradicted, establishes how Plaintiffs' misconduct violated the Excluded Lenders' reasonable expectations under the 2016 Credit Agreement.  Well-settled New York law, which governs the agreement, provides that the implied covenant is breached when a contracting party deprives another contracting party of the

"fruits" of the parties' contractual bargain.  Even if (giving effect to the Court's summary judgment ruling) there was no technical breach of the 2016 Credit Agreement under the "open market purchase" provision, Serta and the Favored Lenders undeniably have deprived the Excluded Lenders of the fruits of their bargain in multiple ways.

To name a few, in June 2020, the Favored Lenders covertly threatened UBS, Serta's Administrative Agent under the 2016 Credit Agreement, pressuring it to obstruct the Excluded Lenders' proposed transaction.  The Favored Lenders structured their own transaction to maximize their gains at the expense of the Excluded Lenders, demanding that Serta surgically limit participation to 50.1% of First Lien Lenders even though broader participation would have been in Serta's interest.  This structure left the Excluded Lenders with no recovery in the likely event of Serta's default, which is exactly what transpired.  Worse still, Plaintiffs enacted at least two dozen amendments to the 2016 Credit Agreement to elevate the Favored Lenders to super-priority status while leaving the Excluded Lenders – who were formerly *pari passu* or even senior to the Favored Lenders – to live with oppressive terms they neither bargained for nor could have anticipated.  Moreover, the Favored Lenders achieved their priority position through a new intercreditor agreement that they forced on the Excluded Lenders because the 2016 Credit Agreement expressly prohibited any change in the waterfall priority.  Through all this, the Favored Lenders sought to ensure they would never face financial exposure for their actions: They required Serta to include a non-standard indemnity that violates New York public policy and made it a condition for voting for the company's Chapter 11 plan of reorganization.

Notably, even before trial began, the Favored Lenders had assumed that in light of this Court's summary judgment decision, dismissal of the good faith and fair dealing claim was a *fait accompli*.  In their pre-trial brief, the Favored Lenders cherry-picked phrases from the

3725592.1

Excluded Lenders' pleading to argue that the claim is "duplicative of their failed breach of contract claim" and should be dismissed.  (ECF No. 244, Lenders Br. ¶¶ 9, 74-88.)  This oversimplifies and mischaracterizes the Excluded Lenders' allegations of Plaintiffs' misconduct, which have been proven at trial.  (*See infra* at 14-16.)

## ARGUMENT

### I.
### SERTA AND THE FAVORED LENDERS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN THE 2016 CREDIT AGREEMENT

New York law is clear that a party to a contract breaches the implied covenant of good faith and fair dealing where it acts in a manner that destroys the other party's right to receive the expected benefit of its contractual bargain.  The trial evidence makes clear that unlike a drop-down transaction, which was common in the market at the time, the Unlawful Exchange Transaction was unexpected under the 2016 Credit Agreement because it eviscerated the Excluded Lenders' sacred rights to *pro rata* payments, proceeds of collateral, and sharing.  As Plaintiffs' witnesses admit, these rights are fundamental to the parties' contractual bargain.

**A.    The Excluded Lenders Could Not Reasonably Have Foreseen the Unlawful Exchange Transaction**

The implied covenant of good faith and fair dealing encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the relevant contract.  *See Dalton*, 87 N.Y.2d at 389.  New York law is clear that the parties' contractual language informs those expectations.  *TVT Recs. v. Island Def Jam Music Grp.*, 244 F. Supp. 2d 263, 278 (S.D.N.Y. 2003) ("The covenant protects a promisee not against a breach of the express terms of a contract but of the reasonable expectations and inferences otherwise derived from the agreement.") (emphasis added).  "In discerning what is 'reasonable,' the Court looks to what the parties would have expected under the contract: the

4

Court will infer that contracts 'include any promises which a reasonable person in the position of the promisee would be justified in understanding were included' <u>at the time the contract was made</u>.'" *Cordero v. Transamerica Annuity Serv. Corp.*, 2023 WL 3061503, at *5 (N.Y. Apr. 25, 2023) (citations omitted and emphasis added); *cf. Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*, 2007 WL 2197830, at *14 (S.D.N.Y. July 31, 2007) ("It is the parties' intention as it existed at the time the contract was executed which must control rather than any subsequent intention tailored to complement an individual's posture once an agreement has gone sour." (internal punctuation omitted)).

The Favored Lenders argue that even if the implied covenant claim can stand alone, (i) the parties to the 2016 Credit Agreement understood it to be "flexible" enough to allow the Unlawful Exchange Transaction, and (ii) the Excluded Lenders should have "reasonably inferr[ed]" it would occur based on their proposed transaction with Serta and other later unrelated transactions executed under unrelated credit agreements.  (ECF No. 244, Lenders Br. ¶¶ 100-105.)

First, with respect to the contract terms, whether the witnesses considered the 2016 Credit Agreement "flexible" or "loose" is beside the point.  The Excluded Lenders in 2020 – let alone 2016 – could not have reasonably expected that a group of first lien lenders would exploit the term "open market purchase" to execute a priming transaction with a debt repurchase at a discount.  The testimony from every lender witness as well as Serta's and the Favored Lenders' advisors confirms that such a transaction had never been done before.  (*See* Day One Afternoon Session, Tr. 84:11-22 (Shah) (describing the Unlawful Exchange Transaction as either "the first or among the first of its kind, given its size"); Day One Afternoon Session, Tr. 181:15-25 (Prince) (admitting that Advent had never "done a transaction like the Serta transaction");

Day Three Morning Session, Tr. 81:7-17 (Chopra) (admitting that prior to the Serta transaction neither he nor Centerview had never "done or advised on a priming facility with a debt repurchase at a discount"); Day Two Afternoon Session, Tr. 90:1-11 (Tepner); Day Three Afternoon Session, Tr. 9:24-10:4 (Sveen); Day Three Afternoon Session, Tr. 58:17-22 (Searles); Day Three Afternoon Session, Tr. 128:6-20 (Yarrow)).  As Mr. Hanigan, principal at Excluded Lender Gamut, testified:

> What was critical to us was being a first lien lender.  We weren't buying into the second lien term loan because it was important for us to be first in line with the rest of our class to own the business if we couldn't get paid back.  What we didn't model out or ever expect was that within our class, there would be certain lenders who were chosen to get paid before us, because fundamentally important to us was being first in line.  So, you know, <u>when we got moved to last in line, it was unexpected.</u> <u>We had never heard of a transaction that happened like that and it was … against the fundamentals of our investment thesis</u>.

(Day Four Afternoon Session, Tr. 12:17-13:10 (Hanigan) (emphasis added).)  Mr. Hanigan further testified that the Unlawful Exchange Transaction deprived Gamut and the other Excluded Lenders of their "sacred right" to "*pro rata* treatment."  (Day Four Afternoon Session, Tr. 33:9-20 (Hanigan); *see also AEA Middle Mkt. Debt Funding LLC*, 2023 WL 2394680, at *12 (majority lenders may violate implied covenant by "defeat[ing] minority lenders' contractual expectations of *pro rata* treatment").)

The market's immediate reaction to the Unlawful Exchange Transaction confirms that the Unauthorized Exchange Transaction turned industry expectations on their head.  The market price of the First Lien Term Loans, which had been trading at about 43 cents, plunged to 31 cents as soon as the deal was announced.  (ECF No. 866-40, Debtors Ex. 323.)  Within days of the announcement, Moody's Investors Service downgraded its rating of the First Lien Term

6

Loans from Caa3 to Ca, reflecting its belief that "term loan lenders who do not consent to the transaction will potentially be left with little or no remaining collateral coverage in Serta Simmons, as well as in a position that is subordinated to new, higher priority debt."  (Day Four Morning Session, Tr. 46:16-47:3 (Kwon).)

Second, with respect to the Excluded Lenders' other transactions and proposed transactions, the Favored Lenders insist that the Excluded Lenders proposed a drop-down transaction to Serta in the spring of 2020 that was "entirely consistent with … other aggressive" tactics employed by the Favored Lenders.  (ECF No. 244, Lenders Br. ¶ 108.)  But an "unclean hands" defense such as this is unavailable here because the Excluded Lenders' implied covenant claim is a contract claim for which they are exclusively seeking damages.  *Austin v. Gould*, 137 A.D.3d 495, 496 (1st Dep't 2016) ("[A] claim for breach of the implied covenant of good faith is essentially a contract claim."); *Manshion Joho Ctr. Co., Ltd. v. Manshion Joho Ctr., Inc.*, 24 A.D.3d 189, 190 (N.Y. App. Div. (1st Dep't) 2005) ("The doctrine of unclean hands is an equitable defense that is unavailable in an action exclusively for damages."); *Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at *25 (Del. Ch. Dec. 19, 2017) ("Under both New York and Delaware law, "the unclean hands doctrine bars equitable, but not legal, relief.  Because [the breach of contract claim] seeks money damages—a quintessentially legal form of relief— [defendant]'s unclean hands defense fails a matter of law," *aff'd*, 195 A.3d 16 (Del. 2018) (internal punctuations omitted).)

And even if unclean hands were a proper defense to an implied covenant claim (it is not), the Favored Lenders are relying on a false equivalency.  While it may be true at a high level of abstraction that both drop-downs and uptiers like the Unlawful Exchange Transaction are "position enhancing," they are fundamentally different.  Under the Excluded Lenders'

3725592.1

transaction, the company would have "moved collateral" into an unrestricted subsidiary and raised new money "only tied to the collateral that was moved."  (Day Four Morning Session, Tr. 99:16-100:6 (Kwon).)  The Excluded Lenders would have taken a "senior" position only with respect to the moved collateral.  (Day Four Morning Session, Tr. 69:19-70:2 (Kwon).)  In particular, the 2016 Credit Agreement included express provisions that the Borrower could create "Unrestricted Subsidiaries",[3]  and subject to a cap, "invest" assets into an unrestricted subsidiary.[4]  The 2016 Credit Agreement, thus, did not permit all assets to be moved.

Such drop-downs were commonplace in the leveraged loan market because non-participating lenders could maintain a first lien on a significant portion of a borrower's assets. (Day Four Morning Session Tr. 69:16-70:2 (Kwon).)  In entering credit agreements, lenders frequently underwrote that risk.  (Day Four Morning Session, Tr. 41:17-25 (Kwon).)  And drop-down transactions were a preferred form of liability management for borrower – in the spring of 2020, Serta informed interested First Lien Lenders that a drop-down was the type of transaction it was hoping to accomplish.  (*Id.* at 30:10-25 (Kwon).)  And so, that is the transaction the Excluded Lenders proposed.  (*Id.* at 31:1-3 (Kwon).)

---

[3] (ECF No. 853-5, Debtors Ex. 5 § 5.10) ("The Top Borrower may at any time after the Closing Date designate (or redesignate) any subsidiary as an Unrestricted Subsidiary ….").

[4] Section 6.06 of the 2016 Credit Agreement limits the amount of investments the Borrower or Restricted Subsidiaries can make while the loans are outstanding, but includes exceptions listed in paragraphs (a)-(ee), which include, among other things, an express exception to make investments in unrestricted subsidiaries and move assets, including  "(d) Investments in any Unrestricted Subsidiary and/or any Similar Business (including any joint venture) in an aggregate outstanding amount not to exceed the greater of $100,000,000 and 2.5% of Consolidated Total Assets as of the last day of the most recently ended Test Period", "(q) Investments made after the Closing Date by the Top Borrower and/or any of its Restricted Subsidiaries in an aggregate amount at any time outstanding not to exceed: (i) (A) the greater of $150,000,000 and 3.75% of Consolidated Total Assets as of the last day of the most recently ended Test Period." (ECF No. 853-5, Debtors Ex. 5 § 6.06.)

The Unlawful Exchange Transaction, by contrast, was a type of deal foreign to the leveraged loan market at the time.  (Day Four Morning Session, Tr. 41:3-42:2 (Kwon).)  It "re-engineered" the waterfall, subverting the Excluded Lenders' *pro rata* rights to payment on all collateral under the 2016 Credit Agreement.  (Day Four Morning Session, Tr. 41:6-12 (Kwon).)  And the Favored Lenders did so not by utilizing express baskets within the 2016 Credit Agreement, but rather by executing two dozen amendments and going outside the 2016 Credit Agreement to impose a new intercreditor agreement on the Excluded Lenders.  *See infra* at 20.  This is not just a difference in degree: one transaction was contemplated by the 2016 Credit Agreement, and the other "re-engineered" the 2016 Credit Agreement's fundamental right to *pro rata* treatment for all First Lien Lenders.  As is key to the implied covenant claim, in 2016, the parties reasonably could have anticipated the Excluded Lenders' proposed transaction but not the Unlawful Exchange Transaction, given that:

- The 2016 Credit Agreement provided for basket capacity that allowed assets to be moved.  (Day Four Morning Session, Tr. 32:8-25 (Kwon); Day Four Afternoon Session, Tr. 35:7-18 (Hanigan).)  While the Unlawful Exchange Transaction required a series of bespoke and unforeseeable amendments to the 2016 Credit Agreement, the Excluded Lenders' transaction could be executed based on terms of the existing agreement. (Day Four Morning Session, Tr. 32:8-25 (Kwon); Day Four Afternoon Session, Tr. 24:25-25:13 (Hanigan).)

- To execute these amendments while subordinating as much non-participating first lien debt as possible, the Favored Lenders limited participation in the Unlawful Exchange Transaction to 50.1% (Day One Afternoon Session, Tr. 55:18-56:4 (Shah); Day One Afternoon Session, Tr. 72:9-73:3 (Shah); Day 2 Afternoon Session, Tr. 185:15-186:14 (Chopra); Day Three Morning Session, Tr. 12:16-20 (Chopra); Day Three Morning Session, Tr. 14:1-20 (Chopra)), whereas participation in the Excluded Lenders' transaction had no inherent minimum or cap.  ((Day Four Morning Session, Tr. 43:307 (Kwon).)

- A priming transaction like the Unlawful Exchange Transaction was the first of its kind (*see supra* at 5-6), whereas by 2020, drop-down transactions like the Excluded Lenders' proposal were "familiar in the

market." (Day Four Morning Session, Tr. 41:13-23 (Kwon)).  It is because drop-downs were a known commodity that Serta and its advisors initially solicited proposals for such transactions.  (Day Two Afternoon Session, Tr. 74:10-25 (Tepner).)

In short, the Excluded Lenders could not reasonably have expected in 2016 (or even 2020) that the 2016 Credit Agreement would permit an unprecedented priming transaction that allowed one class of First Lien Lenders to leapfrog others in derogation of their *pro rata* rights.  *See Vista Outdoor Inc. v. Reeves Fam. Tr.*, 725 F. App'x at 17, 21-22) (2ⁿᵈ Cir. 2018) (holding that defendants breached the implied covenant by engineering an unexpected "self-dealing" transaction that violated the purpose of the purchase agreement's earn-out provision as understood by the parties "at the time" of the agreement).

Finally, the Favored Lenders argue that the Excluded Lenders should have "contemplated" the Unlawful Exchange Transaction based on their participation in post-Serta uptier transactions such as Mitel and Envision.  (ECF No. 244, Lender Br. ¶¶ 106-107.)  Yet, each of these transactions is materially different from the Unlawful Exchange Transaction, and more importantly, both occurred in 2022 – two years after the Unlawful Exchange Transaction. (Day Four Morning Session, Tr. 43:8-23 (Kwon).)  Indeed, by the time the Envision and Mitel transactions were executed in 2022, litigation over the Unlawful Exchange Transaction had commenced, one New York court had issued a ruling allowing the transaction to proceed,[5] and market expectations regarding the possibility and permissibility of uptier transactions had shifted.  (ECF No. 866-40, Debtors' Ex. 323; Day Four Morning Session, Tr. 43:12-23 (Kwon).) Neither of these transactions (and no other transaction that post-dates the Unlawful Exchange

---

[5] *See North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*, 2020 WL 3411267, at *1 (N.Y. Sup. Ct. (N.Y. Cnty.) June 19, 2020)

Transaction) logically can show what the parties' expectations were in 2016, when the 2016 Credit Agreement was executed.

**B.     The Excluded Lenders' Right to *Pro Rata* Treatment
        Is a Fundamental "Fruit" of the 2016 Credit Agreement**

Under New York law, "all contracts imply a covenant of good faith and fair dealing in the course of performance," *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002), which constitutes "a pledge that neither party to the contract shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract, <u>even if the terms of the contract do not explicitly prohibit such conduct</u>." *E. Ramapo Cent. Sch. Dist. v. N.Y. Schs. Ins. Reciprocal*, 199 A.D.3d 881, 884 (N.Y. App. Div. (2d Dep't) 2021) (emphasis added); *Chase Manhattan Bank v. Keystone Distribs., Inc.*, 873 F. Supp. 808, 815 (S.D.N.Y. 1994) ("A party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations.").[6]

The implied covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the relevant contract. *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (citation and quotation marks omitted) (affirming finding after non-jury trial that testing service breached covenant of good faith and fair dealing). "The relevant inquiry called for by the implied covenant is

---

[6] The Court made clear that the parties could not relitigate the Court's summary judgment decision, which determined that the Unlawful Exchange Transaction was not a breach of the 2016 Credit Agreement because it constituted an "open market purchase" within the meaning of § 9.05(g). The Excluded Lenders do not seek to do so. As the foregoing case law makes clear, however, a party may be in breach of the implied covenant even if it is not in technical breach of its contractual obligation, where, as here, the implied covenant claim is based on separate conduct. Were it otherwise, as long as a "Credit Agreement does not explicitly prohibit a particular transfer by its express terms, any contrivance or subterfuge to avoid running afoul of those express terms is a-ok." *In re LightSquared Inc.*, 511 B.R. 253, 338 (Bankr. S.D.N.Y. 2014). That cannot be the law. *Id.*

11

objective, not subjective[.]"  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 605 (S.D.N.Y. 2018).

To determine whether the implied covenant of good faith and fair dealing has been breached, "[t]he appropriate analysis … is first to examine the [relevant contract] to determine the fruits of the agreement between the parties, and then to decide whether those fruits have been spoiled."  *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1518 (S.D.N.Y. 1989) (implied covenant applies "where, while the express terms may not have been technically breached, one party has nonetheless effectively deprived the other of those express, explicitly bargained-for benefits").

A contract's "fruits" depend on its language and purpose.  *See Vista Outdoor Inc.*, 725 F. App'x at 21-22 (finding breach of the implied covenant where defendants had colluded to trigger an earnout payment in a purchase agreement because "[t]he goal of the earn-out was to reflect the full value of [the business] at the time of acquisition and to compensate the Sellers if the business was more valuable than it was anticipated to be at the time of acquisition"); *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631-32 (S.D.N.Y. 2010) (where loan agreement gave debtor right to veto assignments of loan, lender's agreement granting 90% participation in loan "purposely undercut what … the assignment veto was designed to prevent," thus depriving debtor of "fruits" of the contract), *aff'd*, 381 F. App'x 117 (2d Cir. 2010).  In the context of a credit agreement, lenders' right to "pro rata treatment" is considered a "fruit" of the bargain.  *See AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*, 2023 WL  2394680, at *11-12 (N.Y. App. Div. (1st Dep't) Mar. 7, 2023) (declining to dismiss implied covenant claim where plaintiffs alleged that "contractual expectations of *pro rata* treatment" were a "benefit of the bargain").  Judge Failla in

*LCM XII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022),

analyzing the same 2016 Credit Agreement at issue here, found plausible the plaintiff CLOs'

allegations that their "first-lien, priority, *pro rata* rights" under the agreement were the

"benefit[s] of their bargain." *Id.* at *16.

       Serta argues that the Excluded Lenders' only conceivable "fruit" under the 2016

Credit Agreement is repayment of "the[ir] loan[s] with interest."  (ECF No. 242, Serta Br. ¶ 36.)

Not so.  While this might be true if the 2016 Credit Agreement were a simple promissory note,

the agreement is in fact a lengthy, 150-plus page document detailing numerous rights and

obligations, including the First Lien Lenders' rights to *pro rata* distribution of payments and

collateral proceeds as well as *pro rata* sharing of payments among those lenders.  (ECF No. 853-

5, Debtors Ex. 5 § 2.18(b) & (c).)  Section 2.18(a) of the 2016 Credit Agreement mandates that

each payment of principal or interest in respect of the loans of a given class "shall be allocated

*pro rata* among the Lenders" in accordance with their respective percentage ownership of loans

in that class.  (*Id.* § 2.18(a).)  Section 2.18(b) provides that, upon an event of default (including

bankruptcy and acceleration of the loans), the proceeds of any collateral, after payment of certain

expenses, must be divided among the First Lien Lenders on a *pro rata* basis.  (*Id.* § 2.18(b).)

Section 2.18(c) provides that if any First Lien Lender somehow receives any payment "in respect

of any principal or interest" in excess of its proportional share, it must pay that excess ratably to

all other First Lien Lenders.  (*Id.* § 2.18(c).)  Because these provisions were essential elements of

the parties' bargain, they may be amended only with "the consent of each Lender directly and

adversely affected thereby."  (*Id.* § 9.02(b)(A).)  By contrast, most other provisions of the 2016

Credit Agreement may be amended merely by a vote of the "Required Lenders," that is, lenders

representing a majority of the face value of the loans.

Trial testimony from both Plaintiffs and the Excluded Lenders confirms that *pro rata* treatment for all First Lien Lenders was a "fundamental" benefit of their bargain under the 2016 Credit Agreement.  (*See* Day Two Afternoon Session, Tr. 117:11-17 (Tepner); Day Four Morning Session, Tr. 45:16-22 (Kwon); Day Four Afternoon Session, Tr. 12:13-13:10 (Hanigan).)  As Mr. Kwon explained, Apollo "pric[ed] [its] risk" as a first lien lender with *pro rata* protections.  (Day Four Morning Session, Tr. 45:16-22 (Kwon) ("All of our returns, all of our projections were based off an understanding that we were first in debt."))

**C.    The Trial Evidence Shows that Plaintiffs
         Schemed to Deprive the Excluded Lenders
         of Their Fundamental Right to *Pro Rata* Treatment**

The Excluded Lenders have proven by a preponderance of the evidence that Plaintiffs breached the implied covenant of good faith and fair dealing in the 2016 Credit Agreement.

**1.    The Favored Lenders Secretly Threatened UBS to Block the Excluded
          Lenders' Proposal and Pave the Way for the Unlawful Exchange Transaction**

Under New York law, bad faith conduct includes "abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."  *Bank of China*, 937 F.2d at 789 (quoting Restatement (Second) of Contracts, § 205 cmt. d); *see, e.g., Fleet Cap. Corp. v. Yamaha Motor Corp., U.S.A.*, 2002 WL 31174470, at *27 (S.D.N.Y. Sept. 26, 2002) (pressuring company to "agree" to take an action that effectively overrides another lender's priority under an intercreditor agreement is a violation of the implied covenant).  One of the most obvious examples of the Favored Lenders' misconduct is the letter they sent to UBS on June 4, 2020 in an effort to obstruct the Excluded Lenders' proposed transaction by threatening litigation and lobbing false claims about Serta's insolvency.  As Mr. Karn Chopra testified on behalf of Centerview (the Favored Lenders' advisor), even after Serta selected the Favored

Lenders' proposal, the Favored Lenders felt they had to "do[] everything in [their] power to avoid the [Excluded Lenders'] alternative transaction."  (Day Three Morning Session, Tr. 30:2-9 (Chopra).)  As Mr. Chopra explained, the Favored Lenders feared that even at that time, the Excluded Lenders could "put up a better proposal."  (*Id.* at 30:2-9.)

In their letter, the Favored Lenders warned UBS that it acted under the direction of the First Lien Lenders, as holders of a significant portion of the First Lien Loans, and cautioned UBS that a "███████████" in connection with the Excluded Lenders' proposed transaction would be "██████████ because Serta "█████████████████," and thus, the proposed transaction "████████████████████████."  (ECF No. 250-73, Def. Ex. 167 at 3.)  The Favored Lenders then threatened to "████████ ████████████████████████████" (*Id.* at 2.)

This was undeniably false.  There was no basis as of June 4, 2020 to support an assertion that Serta was insolvent, or even to indicate that any of the Favored Lenders believed that Serta was insolvent as of that date.  Serta's advisor, Evercore, had not conducted an insolvency analysis or discussed solvency with any of the First Lien Lenders with which it was negotiating, (Day One Afternoon Session, Tr. 89:24-90:5 (Shah)), and Centerview had not conducted an insolvency analysis or otherwise concluded that Serta was insolvent as of that date. (Day Three Morning Session, Tr. 27:3-4 (Chopra).)  Nor had any of the Favored Lenders reached the conclusion that Serta was insolvent as of June 4, 2020 (Day Three  Afternoon Session, Tr. 95:7-11 (Meiering)), and Eaton Vance (one of the Favored Lenders), affirmatively believed that Serta was *not* insolvent.  (Day Three Afternoon Session, Tr. 12:6-9 (Sveen).)[7]  Given this blatant

---

[7] Mr. Michael Searles of Barings, which at the time was not part of the Favored Lenders' group and had proposed its own competing structure similar to that of the Excluded Lenders, testified that he did not agree with the Favored Lenders' letter to UBS, because he "wouldn't have had

misrepresentation about Serta's financial condition, it is not surprising that the Favored Lenders

forbade UBS from disclosing the letter to Serta or "any other Loan Part[y]."  (ECF No. 250-73,

Def. Ex. 167 at 4.)  The Favored Lenders were "doing everything in [their] power" – including

abusing their position as significant holders of First Lien Term Loans – to defeat their rivals'

proposal.  (Day Three Morning Session, Tr. 30:2-9 (Chopra).).

> **2.**     **The Favored Lenders Designed the Unlawful Exchange**
> **Transaction to Maximize Its Harm to the Excluded Lenders**

Conduct designed to deprive another contractual party of the benefit of its bargain

violates the implied covenant of good faith and fair dealing.  *See Travellers Int'l*, 41 F.3d at 1577

("[Defendant] was trying to maximize its profits by eliminating [plaintiff] as the middleman.").

The evidence at trial demonstrates that the Favored Lenders sought intentionally to subvert the

2016 Credit Agreement's *pro rata* sharing provisions by limiting the percentage of First Lien

Lenders that could participate.  Their hope was to improve the Favored Lenders' recovery in the

event of Serta's likely bankruptcy.  As Mr. Chopra explained, the Unlawful Exchange

Transaction could not be completed without the participation of at least 50.1% of all First Lien

Lenders, because that was the minimum needed to make the purported amendments to the 2016

Credit Agreement that the deal required.  (Day Two Afternoon Session, Tr. 177:3-10 (Chopra),

Day Three Morning Session, Tr. 12:16-20 (Chopra).).  Although participation by a greater

percentage of First Lien Lenders was possible, the Favored Lenders insisted that Serta

"minimize" participation because, as Mr. Chopra admitted, all else equal, the smaller the "first

---

permission to send a term sheet" to Serta if it the allegations were true.  (Day One Afternoon
Session 52:18-21 (Searles).)

lien second out instrument," the better the chances of the Favored Lenders' recovery "in a

downside scenario."  (Day Three Morning Session, Tr. 14:1-20 (Chopra).)

       Allowing more of the First Lien Lenders to participate would have been not only

possible but also advantageous to Serta because it would have allowed Serta to "capture [a]

bigger discount."  (Day Three Morning Session, Tr. 13:7-25 (Chopra).)  Indeed, Serta pushed to

increase the participation level to 55% of First Lien Lenders (*see* Day Three Morning Session,

Tr. 16:11-17 (Chopra); ECF No. 864-12, Debtors Ex. 169), but the Favored Lenders refused.

(Day Three Morning Session, Tr. 16:11-17 (Chopra).)  Because the transaction was predicated

on limiting participation in the deal for the benefit of the Favored Lenders (*id*. at 15:4-24; Day

One Afternoon Session, Tr. 72:24-3 (Shah); Day Two Afternoon Session, Tr. 182:2-4 (Chopra)),

Serta did not solicit the Excluded Lenders to participate, or even disclose that it was negotiating

with the Favored Lenders.  (Day Four Morning Session, Tr. 40:13-41:5 (Kwon); Day Four

Afternoon Session, Tr. 25:19-26:16 (Hanigan).)

       Serta and the Favored Lenders argue their conduct is justified, because they claim

they had "valid business reasons" for agreeing to the Unlawful Exchange Transaction.  (ECF No.

242, Serta Br. ¶ 41; ECF No. 244, Lenders Br. ¶ 115.)  The Favored Lenders argue they were

entitled to negotiate for the best terms possible in their "own self-interest" even if it

disadvantaged their "counter-party."  (ECF No. 244, Lenders Br. ¶ 114.)  Because they exercised

"business judgment," Plaintiffs claim, they cannot have violated the implied covenant of good

faith and fair dealing.  (*Id.* ¶ 125.)  But Plaintiffs conflate their ability to exercise discretion

under the 2016 Credit Agreement with a license to act wrongfully.  Even an "explicitly

discretionary contract right cannot be exercised in such bad faith as to deprive the other party of

the benefit of the bargain."  *ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, 2022 WL

10085886, at *9 (N.Y. Sup. Ct. (N.Y. Cnty.) Oct. 17, 2022) ("Boardriders").  And New York law

does not allow a party to exercise its discretion "malevolen[tly]" by hiding behind the "guise of

business dealings."  *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302-03

(N.Y. App. Div. (1st Dep't) 2003).[8]

        The evidence is clear that Plaintiffs intentionally chose a transaction that would

harm the non-participating lenders even though Serta could have satisfied its stated liquidity and

debt-reduction needs through a deal offered to all First Lien Lenders.  Plaintiffs knew that the

First Lien Term Loans of the lenders that were excluded from the deal would be subordinated to

the Favored Lenders' new super-priority debt (*see* Day Two Afternoon Session, Tr. 68:3-24

(Tepner); Day Three Morning Session, Tr. 15:4-24 (Chopra)), rendering those loans worthless in

the event of a default.  Serta's purported commercial goals of raising cash and de-levering did

not have to be achieved in a manner that destroyed the Excluded Lenders' fruits of the bargain.

(Day One Afternoon Session, Tr. 30:21-31:2 (Shah); Day Three Afternoon Session, Tr. 105:19-

106:5 (Yarrow); Day Three Morning Session, Tr. 13:16-25 (Chopra).)  For example, Serta could

have set its desired participation limit of 55% for a debt exchange and allowed all the First Lien

Lenders to bid for the discount level at which they would participate.  The company could have

then chosen the participating lenders based on who would take the most discount, with such

lenders contributing their *pro rata* share of the $200 million in new money the company was

seeking.  The best way to achieve the company's stated goals – of raising new money, capturing

---

[8] To the extent Plaintiffs admit they violated the implied covenant but should be excused because
they did so in their economic interest, they still owe the Excluded Lenders damages under the
theory of efficient breach.  *See Topps*, 380 F. Supp. 2d at 262 n.12 ("[T]he law presumes that
parties to contracts are rational: they chose to breach contracts because it is more efficient to
breach and pay compensatory damages than to perform. If so, efficiency is promoted by allowing
parties to break their promise, provided that they compensate the non-breaching party for actual
losses.").

18

discount and reducing debt – would have been to open the deal to all First Lien Lenders and let them bid on the exchange price, allowing into the deal the lenders who offered the greatest discount.

> 3.     **On Their Way Out, the Favored Lenders Enacted Dozens of Oppressive Amendments to the 2016 Credit Agreement Leaving the Excluded Lenders Behind to Live with the Consequences of Those Amendments**

In *LCM*, the district court found plausible the plaintiffs' allegations that their first-lien rights under the 2016 Credit Agreement "were subverted by [Serta's] creation of a new tranche of debt with priority rights senior to those held by [p]laintiffs." *LCM*, 2022 WL 953109, at *15. The court further held that even if the "letter of the Agreement permitted" certain actions, those actions could have breached the implied covenant where Serta "colluded with a bare majority of lenders to abuse its power to amend the Agreement to create a new class of debt," and "systematically combed through the Agreement tweaking every provision that seemingly prevented it from issuing a senior tranche of debt, thereby transforming a previously impermissible transaction into a permissible one." *Id.* at *15-16. Thus, even if a party has a right to amend an agreement, doing so in a way that deprives another party of the benefit of its bargain can violate the implied covenant. *Boardriders*, 2022 WL 10085886, at *9 (majority lenders that "amend[ed] the [credit agreement's] no-action provisions to hinder [minority lenders'] ability to sue and eliminat[ed] every affirmative and negative covenant" may have acted in bad faith); *Kotite v. Shea*, 274 A.D.2d 503, 503-04 (N.Y. App. Div. (2d Dep't) 2000) (denying summary judgment on implied covenant claim where an otherwise permissible amendment to a club's bylaws was considered "void" because it was adopted in bad faith).

Indeed, Serta and the Favored Lenders amended more than two dozen provisions of the 2016 Credit Agreement to: (i) authorize the Super-Priority Term Loan Agreement, (ii)

19

ratify the Unlawful Exchange Transaction, and (iii) instruct the Administrative Agent to enter into the new intercreditor agreement providing for payment subordination of the First Lien Term Loans to the new Priority Term Loans.  (*See* ECF No. 252-90-99, Def. Ex. 279; ECF No. 252-117, Def. Ex. 297; ECF No. 865-42, Debtors Ex. 252; ECF No. 865-41, Debtors Ex. 251.) Through Amendment No. 1, the Favored Lenders declared that "borrowing and/or incurrence of the Priority Term Loans under the PTL Credit Agreement and the other transactions … shall be and are permitted under the provisions of the Amended Term Loan Agreement and each other Loan Document."  (ECF No. 252-90-99, Def. Ex. 279 § 4.)  The Favored Lenders further "instruct[ed] the Administrative Agent to … take … any and all actions … necessary, advisable or desirable in carrying out, effectuating or otherwise in furtherance of the transactions related to or in connection with" Amendment No. 1.  (*Id.* § 14(a).)

Notably, the amendments allowed Serta to incur an <u>unlimited</u> amount of incremental equivalent debt that is senior (rather than junior or *pari passu*) in right of payment to the First Lien Loans.  (*Id.* §§ 1.01, 6.01(z).)  Adding insult to injury, Plaintiffs deleted Section 7.01(l), which designates "subordination" of the First Lien Term Loans as an "event of default." (*See id.* § 7.01(l).)

These amendments subverted key terms of the 2016 Credit Agreement.  (Day Four Afternoon Session, Tr. 24:14-25:15 (Hanigan).)  Worse still, the oppressive new terms applied only to those lenders that retained first lien status <u>after</u> the Unlawful Exchange Transaction – *i.e.*, those First Lien Lenders who did not participate in or vote for the transaction. (Day Two Afternoon Session, Tr. 102:7-15 (Tepner).)  By "abus[ing] their ability to amend the [2016] Credit Agreement to effectuate the [Unlawful Exchange] Transaction," Plaintiffs

breached the implied covenant.  *See ICG Global Loan Fund 1 DAC v. Boardriders, Inc.*, 2022

WL 10085886, at *9 (N.Y. Sup. Ct. (N.Y. Cnty.) Oct. 17, 2022).

> **4.    The Favored Lenders' Self-Serving and Illegal**
> **Indemnity Is Further Evidence of Their Misconduct**

There is no doubt that indemnities are customary in general.  A typical indemnity,

like that in the 2016 Credit Agreement, includes carveouts for "gross negligence, bad faith, []

willful misconduct" or "material breach" of the loan documents.  (ECF No. 853-5, Debtors Ex. 5

§ 9.03(b).)  Such carveouts are standard because, under New York law, "contracts that would

indemnify a party for intentional or fraudulent conduct are void as against public policy."  *CBS*

*Corp. v. Eaton Corp.*, 2010 WL 1375169, at *2 (S.D.N.Y. Mar. 30, 2010*)*; *Barbagallo v.*

*Marcum LLP*, 2012 WL 1664238, at *4 (E.D.N.Y. May 11, 2012) (holding that a contract that

requires indemnification for intentional torts "no matter how explicit, cannot change the public

policy of this State").  As the New York Court of Appeals has explained:

> One who intentionally injures another may not be indemnified for any
> civil liability thus incurred … This is so because to allow such
> indemnity would be to violate the "fundamental principle that no one
> shall be permitted to take advantage of his own wrong."

*Pub. Serv. Mut. Ins. Co. v. Goldfarb*, 53 N.Y.2d 392, 399 (1981) (internal punctuation omitted).

Here, in perhaps their most insidious act, the Favored Lenders negotiated a self-

serving, non-standard and likely unlawful indemnity provision in the Super-Priority Term Loan

Agreement to "take advantage" of their wrongdoing.  *Id.*  Under the agreement, Serta purports to

indemnify the Favored Lenders from liability for "gross negligence, bad faith, [] willful

misconduct" or "material breach" of the 2016 Credit Agreement in connection with the Unlawful

Exchange Transaction.  (ECF No. 254-14-26, Defs.' Ex. 305 § 9.03(b).)  This indemnity is

continuing, carrying though to the Restructuring Support Agreement ("RSA"), the Plan, and the

exit term loan financial facility.  (Day Three Morning Session, Tr.  31:21-32:8 (Chopra); Day Two Afternoon Session, Tr. 118:25-119:2 (Tepner); ECF No. 874, Am. Chapt. 11 Plan.)  The parties agreed that the indemnity may not be discharged or impaired, is given priority above the waterfall, and survives the company's emergence from bankruptcy.  (ECF No. 874, Am. Chapt. 11 Plan.)

          Again, Plaintiffs cannot hide behind the supposed exercise of their "business judgment."  *See Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 293 (N.Y. App. Div. (1st Dep't) 2003) (upholding implied covenant claim where defendant "in the guise of business dealings" exercised its contractual veto power to deprive plaintiffs of the benefits of their joint venture).  Witnesses from both Serta and the Favored Lenders testified that they considered the improper indemnity "important."  (Day Two Afternoon Session, Tr. 51:11-23 (Tepner); Day Two Afternoon Session, Tr. 107:18-23 (Tepner); Day Two Afternoon Session, Tr. 191:25-192:8 (Chopra); Day Three Morning Session, Tr. 36:19-25 (Chopra); Day Three Morning Session, Tr. 119:24-120:18 (Sveen); Day Three Afternoon Session, Tr. 45:7-9 (Searles); Day Three Afternoon Session, Tr. 81:12-22 (Meiering).).  But not a single witness could explain why the indemnity was important, let alone what it said, who proposed it, when it was proposed, or how much it was worth.  (*See, e.g.*, Day Three Afternoon Session, Tr. 81:12-22 (Meiering); Day Three Afternoon Session, Tr. 98:24-99:14 (Meiering); Day Three Afternoon Session, Tr. 145:2-146:15 (Linker) (testifying that in the RSA, Serta projected the value of the indemnity as "zero"); Day Three Afternoon Session, Tr. 16:8-18:9 (Sveen); Day Three Afternoon Session, Tr. 59:20-60:20 (Searles); Day Three Afternoon Session, Tr. 94:20-24 (Meiering); Day Three Afternoon Session, Tr. 126:25-128:1 (Yarrow).)

Worse yet, there is no evidence Serta's board even approved the indemnity. Serta's Finance Committee met on June 20, 2020 to approve the Super-Priority Term Loan Agreement.  The draft that the committee reviewed contained a standard indemnity with a carveout for "gross negligence, bad faith, and willful misconduct," with no exception for any acts taken in connection with the Unlawful Exchange Transaction.  (Day One Afternoon Session, Tr. 68:17-70:6 (Shah); Debtors Ex. 249 (ECF No. 865-40); *see also* Day Three Morning Session, Tr.  50:21-51:9 (Chopra); Day Two Afternoon Session, Tr. 108:3-25 (Tepner); Day Two Afternoon Session, Tr. 110:14-113:3 (Tepner).)  The exception was inexplicably added two days later, and there is no evidence showing who requested it or why, much less that the Finance Committee knew about or approved it.  (Day Two Afternoon Session, Tr. 108:3-25 (Tepner); Day Two Afternoon Session, Tr. 110:14-113:3 (Tepner).)  The effect, of course, was to shield the Favored Lenders from exposure and force the Excluded Lenders, who had commenced litigation, to seek their recovery not from the Favored Lenders but from a company with severe liquidity problems who could not pay.

## II.
## THE EXCLUDED LENDERS' IMPLIED COVENANT CLAIM IS NOT DUPLICATIVE OF THEIR CONTRACT CLAIM

Despite abundant evidence of their lack of good faith (*see supra* at 14-23), the Favored Lenders recycle their unsuccessful argument from summary judgment that the Excluded Lenders' implied covenant claim should be dismissed as "duplicative" of their contract claim because both "relate to the same 2020 Transaction."  (ECF No. 244, Lender Br. ¶¶ 75-88 & n.6.) However, a good faith and fair dealing claim will be dismissed as duplicative of a breach of contract claim only where "both claims arise from the same facts <u>and</u> seek the identical damages for each alleged breach."  *Boardriders, Inc.*, 2022 WL 10085886, at *9 (emphasis added); *see*

*also AEA Middle Mkt.*, 2023 WL 2394680, at *11 ("A good faith claim, however, is not duplicative of a breach of contract claim where the complaint alleges conduct that is separate from the conduct constituting the alleged breach of contract and such conduct deprived the other party of the benefit of its bargain").

Even if there is some overlap between the facts underlying the two claims, a court should not dismiss an implied covenant claim unless it is "wholly duplicative" of the contract claim.  *See AEA Middle Mkt.*, 2023 WL 2394680, at *11; *P&G Auditors*, 2019 WL 4805862, at *6 (S.D.N.Y. Sept. 30, 2019) (declining to dismiss implied covenant claim based at least "in part" on "allegations different than those underlying the accompanying breach of contract claim").  Indeed, a court will allow an implied covenant claim to proceed even when the alleged damages are "intrinsically tied" to the same damages alleged in the contract claim, as long as the facts underlying the two claims "are not actually identical."  *Sobel v. Major Energy Servs., LLC*, 2020 WL 6561602, at *10 (S.D.N.Y. July 31, 2020), *report and recommendation adopted,* 2020 WL 5362357 (S.D.N.Y. Sept. 8, 2020); *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, 2021 WL 3668092, at *5 (S.D.N.Y. Aug. 17, 2021) ("[B]ecause different factual allegations underpin each of Plaintiffs' claims, the overlap in damages sought does not render Plaintiffs' claims duplicative.").  Likewise, where an implied covenant claim and a breach of contract claim "seek different categories and/or types of damages," the implied covenant claim should not be dismissed as duplicative.  *See E. Ramapo Cent. Sch. Dist.*, 199 A.D.3d 881 at 885.  Here, the two claims rely on distinct facts and, as will be shown at the damages phase, distinct damages.

With respect to the facts, the Favored Lenders pluck isolated phrases from the Excluded Lenders' pleading to argue that "discovery has now made undeniably clear that

Defendants' implied covenant claim is fundamentally premised on the same facts as their rejected claim that the 2020 Transaction breached the waterfall and *pro rata* treatment provisions of the [2016] Credit Agreement."  (ECF No. 244, Lenders Br. ¶¶ 75, 77-78.)  First, the Favored Lenders improperly treat dismissal of the implied covenant claim as an inevitability after the Court's dismissal of the contract claim.  This misapprehends the essence of the implied covenant, which allows a party to recover where there is no breach of the contract "in a technical sense" but "one party's conduct … nonetheless deprived the other party of the benefit of its bargain." *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, 2009 WL 321222, at *4 (S.D.N.Y. Feb. 9, 2009).

The Favored Lenders also mischaracterize the Excluded Lenders' allegations, all of which have been proven at trial.  In their implied covenant claim, the Excluded Lenders alleged that "[t]he Unlawful Exchange Transaction was designed and implemented in bad faith to deprive the Excluded Lenders of the expected fruits of the [2016] Credit Agreement."  (ECF No. 148, Counterclaim ¶ 318.)  They allege, for example, that (a) Plaintiffs "amended the Credit Agreement … to permit the Favored Lenders to conduct future exchanges of their First Lien and Second Lien Loans in exchange for super-priority debt ahead of the Excluded Lenders" (*id.* ¶ 325); (b) Serta "indemnif[ied] the Favored Lenders from claims regarding the Unlawful Exchange Transaction" (*id.* ¶ 330); and (c) the Favored Lenders "insisted upon the deep subordination of the Excluded Lenders' First Lien Loans as a non-negotiable condition of the Unlawful Exchange Transaction to increase the benefits of the deal to themselves."  (*Id.* ¶ 335)  As discussed, each of these allegations of misconduct, and others, has been proven at trial.  *See supra* at 14-23.

The recent decision of the New York intermediate appellate court in Manhattan, *AEA Middle Market,* is instructive.  185 N.Y.S.3d 73 (N.Y. App. Div. (1st Dep't) 2023).  There, the plaintiffs – a group of first lien lenders under a credit agreement – alleged that a group of favored lenders had "secretly designed the Restructuring Transaction so as to defeat Plaintiffs' contractual expectations of pro rata treatment, concealed the transaction from Plaintiffs until it could be revealed as a *fait accompli*, [and] withheld information from Plaintiffs necessary for them to effectively participate in the restructuring process."  *Id*. at *12.  The court rejected defendants' argument that the implied covenant claim was "wholly duplicative" of the contract claim, reasoning as follows:

> Defendants oversimplify the allegations in the complaint when they argue that plaintiffs' good faith and fair dealing claims are nothing more than a claim that defendants failed to share collateral ratably. Plaintiffs allege more than this. In essence, plaintiffs' good faith and fair dealing claims concern defendants' alleged bad faith conduct in conspiring to manufacture a restructuring process that deprived plaintiffs of the benefit of their bargain under the terms of the Credit Agreement.

*Id.*

Here, too, the Excluded Lenders "allege more" than that the Unlawful Exchange Transaction "breached the waterfall and *pro rata* treatment provisions of the [2016] Credit Amendment."  (ECF No. 244, Lenders Br. ¶ 75)[9]  As proven at trial, the Favored Lenders acted wrongfully by, for example, secretly threatening UBS to do their bidding, amending the 2016

---

[9] Contrary to the Favored Lenders' assertion (ECF No. 244, Lenders Br. ¶ 84), the Court's decision to exclude the expert testimony of the Excluded Lenders' industry expert, Sarah Ward, has no bearing on whether the allegations, let alone the <u>trial evidence</u>, support an independent claim for breach of the covenant of good faith and fair dealing.

Credit Agreement to harm the Excluded Lenders left behind, and negotiating a non-standard (and likely void) indemnity that Serta has failed to explain and cannot afford.  *See supra* at 14-23.

        With respect to damages, the Favored Lenders' argument regarding duplication is both misleading and premature.  As an initial matter, the parties agreed to bifurcate trial on damages from trial on liability (*see* ECF No. 207), so the parties have not yet presented evidence on the measure or quantum of the Excluded Lenders' damages.  Furthermore, the Favored Lenders ignore that the Excluded Lenders have advanced a theory of damages based on "the lost market value of their First Lien Term Loans caused by the Unlawful Exchange Transaction." (ECF No. 148, Counterclaims ¶ 339.)  This measure of damages differs from the damages sought on the breach of contract claim, which seeks to enforce the contractual remedy that requires the Favored Lenders "to purchase (for cash at face value) participations in the First Lien Term Loans held by the Excluded Lenders … so that the benefit[s] of the Unlawful Exchange Transaction are shared by the lenders ratably[.]"  (ECF No. 148, Counterclaims ¶¶ 362).)  To the extent the Excluded Lenders plead a "disgorgement" or "rescission" theory of damages in connection with their implied covenant claim, they do so in the alternative.  (*Id.* ¶¶ 390-91).  There is thus "no risk of redundant recoveries."  *See LCM*, 2022 WL 953109, at *15.

### III.
### THIS COURT SHOULD NOT REVISIT THE
### DEFINITION OF "OPEN MARKET PURCHASES"

        On March 28, 2022, the Court granted summary judgment in favor of Serta and the Favored Lenders on the issue of whether the 2020 Transaction was an "open market purchase," and subsequently issued a partial final judgment on that claim under Federal Rule of Civil Procedure 54(b).  (Mar. 28, 2023 Tr. 133:23-134:25; ECF No. 141 (Order on Summary Judgment).)  It is well-established that an order granting summary judgment is a "final

adjudication on the merits" and "forecloses any future litigation of a case*." Powell v. United States*, 849 F.2d 1576, 1579 (5th Cir. 1988); *see also In re Matter of Stonecraft LLC*, 260 Fed. App'x 656, 657 (5th Cir. 2007) (describing summary judgment as a "final adjudication").

During the Adversary Proceeding Trial, the Court indicated that it may nevertheless address the definition of an "open market purchase" within the meaning of the 2016 Credit Agreement because the parties had "retried the issue" and the Court believed it would "likely see [the issue] again in the terms of a request for additional Findings of Fact and Conclusions of Law." (Day Three Afternoon Session, Tr. 158:13-19.) The Excluded Lenders respectfully disagree with the Court's suggestion that the Excluded Lenders may have put this issue back on the table.

Cognizant of the Court's position that the open market purchase issue was settled after its summary judgment decision, the Excluded Lenders took steps to avoid relitigating the open market purchase claim, because the issue had already been decided. The Excluded Lenders did not seek discovery on the open market purchase claim after the Court's summary judgment decision, issuing requests for production[10] interrogatories,[11] and Rule 30(b)(6) deposition notices[12] that did not mention the open market purchase issue. The Excluded Lenders also did

---

[10] (*See* Ex. 1, April 10, 2023 Second Set of Requests for Production to Serta; *see* Ex. 2, April 10, 2023 Second Set of Requests for Production to Favored Lenders, April 19, 2023 First Set of Requests to Third-Party Defendants.)

[11] (*See* Ex. 3, April 9, 2023 Interrogatories to Third-Party Defendants.)

[12] Indeed, to the extent the Rule 30(b)(6) deposition topics could be read to implicitly request information about the open market purchase provision, the recipients of the notices objected to providing such testimony. (*See* Ex. 4, April 27, 2023 Serta Responses & Objections to 30(b)(6) Topics, Response to Topic No. 6 ("The Company further objects to this Topic to the extent it seeks to revisit the Judge Jones' ruling concerning the meaning of the term "open market purchase" in this Action. *See* ECF 142 at 3"); Ex. 5, May 1, 2023 Evercore Responses & Objections to 30(b)(6) Topics ("Evercore objects to the Topics to the extent they seek to revisit

28

not present any argument or elicit testimony during the Adversary Proceeding Trial that would be inconsistent with the Court's prior ruling.  (*See* Day One Morning Session, Tr. 62:15-17 ("And I want to be really clear.  I'm not here to reargue your decision on open market purchase. That's the decision in this case." (Opening Statement)); Day Two Afternoon Session, Tr. 95:13-16 ("[T]he Court has held that that exchange was permitted under the open market purchase exception.  Right? Yes." (Tepner)).)  Moreover, the Excluded Lenders were precluded at trial from offering the testimony of their expert, Sarah Ward, which addressed the reasonable expectations of market participants, because the Court excluded her opinions as "an attack on the Court's prior summary judgment ruling and amounts to little more than an inappropriate motion to reconsider."  (ECF No. 239.)  From the Excluded Lenders' perspective, the open market purchase issue was completely closed until the Court suggested otherwise on the afternoon of the third day of this four-day trial.

The Excluded Lenders respectfully submit that making additional Findings and Fact and Conclusions of Law regarding the open market purchase claim now, at the close of trial, would be inappropriate for two independent reasons:  First, because the Court ruled conclusively on the open market purchase issue in resolving plaintiffs' summary judgment motion, the Excluded Lenders did not present evidence on that issue at trial, and were not afforded the necessary notice and opportunity to litigate the issue at trial; the Court accordingly should not consider any evidence presented at trial on this issue.  Second, the Court lacks jurisdiction to consider the open market purchase issue at this point because final judgment has been entered on the Court's summary judgment ruling and an appeal is pending in the Fifth Circuit.

---

the Bankruptcy Court's ruling concerning the meaning of the term "open market purchase" in the Adversary Action. *See* ECF 142 at 3.").)

29

Case 23-09001   Document 299   Filed in TXSB on 05/23/23   Page 35 of 41

**A.      The Excluded Lenders Were Not Given Notice That the**
**Open Market Purchase Claim Would Be at Issue at the Trial**

It would be patently unfair to now issue an opinion relying on evidence and arguments made during trial when the Excluded Lenders proceeded on the understanding that the open market purchase claim had already been finally adjudicated.  In sum, if the Court were to define "open market purchase" based on evidence introduced at trial, beyond the record that was before the Court at summary judgment, the Court would be doing so having effectively prevented the Excluded Lenders from pursuing discovery or presenting evidence on the issue.  In analogous situations, the Fifth Circuit has reversed lower courts that have issued merits decisions without proper notice as to the nature of the proceeding or the issues to be decided.  *See, e.g.*, *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 211 (5th Cir. 2018) (the court's decision to grant summary judgment *sua sponte* was error because "the lack of notice deprived the non-moving party of the opportunity to collect and submit" evidence, including depositions and written discovery); *H&W Indus., Inc.* v. *Formosa Plastics Corp., USA*, 860 F.2d 172, 178 (5th Cir. 1988) (explaining the prejudice from converting a preliminary injunction to a decision on the merits when the parties "conducted discovery for only six weeks" and "focus[ed] on the factors relevant to the preliminary injunction determination."); *In re Felt*, 176 F.3d 478 (5th Cir. 1999) (holding that when insufficient notice was provided before the court decided summary judgment *sua sponte* the error was not harmless when there was "additional evidence" not in the record); *see also Attorney First, LLC v. Ascension Entertainment, Inc.*, 144 Fed. App'x 283, 291 (4th Cir. 2005) (reversing the district court's decision after combining a preliminary injunction hearing with a trial on the merits, because "[t]he plaintiff having never been given notice that the trial was to be on the merits of its claims, was not required to, and did not, present fulsome evidence on the merits").

30

3725592.1

The same principles apply here.  The Excluded Lenders did not have notice that the "open market purchase" claim was being decided at trial given the prior summary judgment ruling.  Simply put, if the Excluded Lenders were given notice that the definition of open market purchase was at issue, both the information gathered during discovery and the presentation of evidence at trial would have been different.

## B.  The Court Lacks Jurisdiction to Supplement Its Prior Decision

Following the Court's summary judgment decision, the Court agreed to sign a proposed order to "sever" the breach-of-contract issue for interlocutory review, noting that if the parties wanted to "get something on file on an emergency basis," the Court would "act on it very promptly."  (Mar. 28, 2023, Tr. 136:20–137:23.)  Accordingly, the April 6, 2023 Order on Summary Judgment certified the open market purchase claim for direct appeal to the Fifth Circuit under 28 U.S.C. § 158(d)(2)(A).  (ECF No. 141.)  The Fifth Circuit subsequently granted the Excluded Lenders' petition for leave to appeal.  *See* Unpublished Order, *In re Serta Simmons Bedding, LLC*, No. 23-90012 (5th Cir. Apr. 26, 2023).

As the open market purchase claim is now on appeal, this Court is without jurisdiction to revisit it.  "'It is a fundamental tenet of federal civil procedure that—subject to certain, defined exceptions—the filing of a notice of appeal from the final judgment of a trial court divests the trial court of jurisdiction and confers jurisdiction upon the appellate court.'"  *In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 521 (N.D. Tex. 2019), *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021) (quoting *In re Transtexas Gas Corp.*, 303 F.3d 571, 578-79 (5th Cir. 2002)).  This "applies with equal force to bankruptcy cases" (*id.* at

31

521 (internal quotations omitted)),[13] and this Court lacks jurisdiction over "those aspects of the case involved in the appeal." *In re Scopac*, 624 F.3d 274, 280 (5th Cir. 2010).  Here, this would include any specific definition of "open market purchase," a term the Court was "careful" not to define when granting summary judgment.  (Mar. 28, 2023 Tr. 37:23–38:3.)

The Fifth Circuit has held that divestment of jurisdiction precludes bankruptcy courts from entering post-appeal orders that modify or are inconsistent with orders on appeal. For example, in *In re Transtexas*, the bankruptcy court had no jurisdiction even on the appellants' emergency motion to enter a post-appeal "supplemental order" reiterating the applicable interest rate under the confirmation plan because "pragmatic concerns cannot 'outweigh' a jurisdictional defect," and no exceptions applied.  303 F.3d at 579-80.  *See also In re Acis*, 604 B.R. at 521-22 (collecting cases); *Wireless Agents, LLC v. Sony Ericsson Mobile Comms. AB*, 2006 WL 1189687, at *3 (N.D. Tex. May 3, 2006) ("Because Wireless has appealed the court's denial of a preliminary injunction, the Federal Circuit has exclusive jurisdiction over the preliminary injunction motion, and this court cannot modify its preliminary findings of fact and conclusions of law during the pendency of the appeal.")

There are limited exceptions to this rule, but none applies here:  "(1) to amend or make additional findings of fact under Rule 7052, whether or not granting the motion would alter the judgment; (2) to alter or amend the judgment under Rule 9023; (3) for a new trial under Rule 9023; or (4) for relief under Rule 9024 if the motion is filed no later than 10 days after the entry of judgment."  *In re Transtexas*, 303 F.3d at 579 (citing Fed. R. Bankr. 8002(b)).  In particular, no party moved for further factual findings within 14 days of the Court's judgment as required

---

[13] This principle likewise applies to an interlocutory appeal.  *See, e.g.*, *Providence Title Co.* v. *Truly Title, Inc.*, 2021 WL 5003273, at *4 (E.D. Tex. Oct. 28, 2021) (citing *Dayton Indep. Sch. Dist.* v. *U.S. Min. Prod. Co.*, 906 F.2d 1059, 1064 (5th Cir. 1990))).

by Rule 7052, and no party has moved to amend or sought relief from the Court's partial final judgment in any way.

A further limited exception – which also does not apply here – allows courts to publish opinions on post-appeal issues that "aid in the appeal." *Frye v. Anadarko Petroleum Corp.*, 2018 WL 5921016, at *2 (S.D. Tex. Nov. 13, 2018) (citing *Farmhand, Inc. v. Anel Eng'g Indus.*, 693 F.2d 1140, 1145 (5th Cir. 1982)). This is typically restricted to "making clerical corrections in previous orders" and would certainly not include any decision that substantively expounds on an issue for which the Court has ceded jurisdiction. *See Frye*, 2018 WL 5921016, at *2;[14] *see also United States* v. *Ruvalcava-Garza*, 750 F. App'x 353, 356 (5th Cir. 2018) (citing *United States* v. *Spencer*, 513 F.3d 490, 491-92 (5th Cir. 2008)) ("[A]n amended judgment nearly two months after … timely notice of appeal" is clear error, as courts may correct clerical mistakes at any time but may not "alter the substance of" oral rulings). In certain limited circumstances, the Fifth Circuit may allow for a post-judgment opinion where the trial court possesses unique insight into an issue now out of its jurisdiction on appeal. In the readily distinguishable case of *In re Hermesmeyer*, for example, the district court entered a written order the same day it sanctioned Hermesmeyer and then three weeks later issued a supplemental order that included "'[d]escriptions of inappropriate conduct of Hermesmeyer in the handling of other cases before [this case that would] help explain the court's decision to impose discipline for his … conduct.'" 688 F. App'x 300, 304 (5th Cir. 2017) (alterations omitted). The Fifth Circuit approved of the second order, as it "did not assert alternate grounds for imposing the $500 fine

---

[14] Further limited exceptions exist but do not apply here. *See Frye*, 2018 WL 25921016 at *2 (discussing "the merits of a case when the appeal concerns a preliminary injunction," "entertain[ing] a motion to stay the judgment or order being appealed," and "modify[ing] or enforce[ing] preliminary injunctions").

3725592.1

… Rather, the supplemental order reiterated that the sanction was imposed pursuant to the Local Rule and provided context for the district court's discipline of Hermesmeyer." *Id.* By contrast, no further findings from this Court are necessary to assist the Fifth Circuit in determining whether the term "open market purchase" is ambiguous and, if not, whether the Unlawful Exchange Transaction qualifies as an open market purchase.

## **CONCLUSION**

For the foregoing reasons, the Excluded Lenders respectfully request that the Court (a) enter judgment in their favor on liability[15] on the Excluded Lenders' counterclaim for breach of the covenant of good faith and fair dealing, (b) issue proposed findings of fact and conclusions of law in their favor on liability on the implied covenant claim against Plaintiffs in this Action, and (c) grant such other and further relief as the Court deems just and proper.

---

[15] The parties to this Adversary Proceeding have stipulated to bifurcate the issue of damages from that of liability in the Adversary Proceeding Trial, such that the Adversary Proceeding Trial addressed only the issue of liability. (*See* ECF No. 207.)

34

3725592.1

Dated:  New York, New York
        May 23, 2023

Respectfully submitted,

FRIEDMAN KAPLAN SEILER
  ADELMAN & ROBBINS LLP

*s/ Eric Seiler*
Lawrence S. Robbins*
Eric Seiler*
Anne E. Beaumont*
Jamuna D. Kelley*
Elizabeth Bierut*
Blair R. Albom*
7 Times Square
New York, NY  10036
(212) 833-1100
lrobbins@fklaw.com
eseiler@fklaw.com
abeaumont@fklaw.com
jkelley@fklaw.com
ebierut@fklaw.com
balbom@fklaw.com

*Attorneys for the Excluded Lenders*

35

3725592.1

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Kenneth S. Ziman*
Brian S. Hermann*
Lewis R. Clayton*
Andrew J. Ehrlich*
Michael J. Colarossi*
Robert J. O'Loughlin*
Sarah J. Prostko*
Jackson Yates*
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000
kziman@paulweiss.com
bhermann@paulweiss.com
lclayton@paulweiss.com
aehrlich@paulweiss.com
mcolarossi@paulweiss.com
roloughlin@paulweiss.com
sprostko@paulweiss.com
jyates@paulweiss.com

*Attorneys for the Excluded Lenders with respect to Plaintiffs' Claims and Counterclaims Only*

**PORTER HEDGES LLP**
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan N. Young-John (TX 24088700)
1000 Main Street, 36th Floor
Houston, TX 77002
(713) 226-6000
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com

*admitted pro hac vice*

*Attorneys for the Excluded Lenders with respect to Plaintiffs' Claims and Counterclaims Only*

3725592.1