IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SERTA SIMMONS BEDDING, LLC, *et al.*, | § | Case No. 23-90020 (DRJ) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |
| ---------------------------------------------------------- | § | |
| | § | |
| SERTA SIMMONS BEDDING, LLC, *et al.*, | § | Adversary Proc. No. 23-09001 (DRJ) |
| | § | |
| Plaintiffs and Counterclaim Defendant, | § | |
| v. | § | |
| | § | |
| AG CENTRE STREET PARTNERSHIP L.P., *et al.*, | § | |
| | § | |
| Defendants and Counterclaim Plaintiffs, | § | |
| v. | § | |
| | § | |
| AGF FLOATING RATE INCOME FUND, *et al.*, | § | |
| | § | |
| Third Party Defendants. | § | |
| ---------------------------------------------------------- | § | |

**DEBTORS' AND PLAINTIFFS' PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW FOR ADVERSARY
PROCEEDING NO. 23-09001 AND IN SUPPORT OF THE CONFIRMATION
OF THE DEBTORS' MODIFIED SECOND AMENDED JOINT CHAPTER 11
PLAN OF SERTA SIMMONS BEDDING, LLC AND ITS AFFILIATED DEBTORS**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

## TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT.................................................................................2

    I.      Market Players Knew that Credit Agreements in 2016 Were Loose and Borrower-Friendly..................................................................................2

    II.     Consistent with Market Understanding, The Term Loan Agreement Provided the Company With Flexibility......................................................4

    III.    The Company Needed To Take Action Because of Liquidity Problems Exacerbated by The COVID-19 Pandemic.............................................7

    IV.    The Company Created an Independent Finance Committee To Consider Options For Addressing its Liquidity Problems....................................9

    V.      The Company Engaged in A Good-Faith, Competitive Process To Consider Various Transactions That Could Right-Size The Company's Financial Condition................................................................................10

    VI.    The Ad Hoc Group of Non-PTL Lenders Proposed A Position Enhancing Transaction...........................................................................12

    VII.   After Originally Proposing A New Money Super-Priority Financing Available to All Lenders, the PTL Lender Group Defensively Pivoted To proposing A New Financing Paired With A Debt Repurchase Transaction.......................18

    VIII.  The Company Exercised Its Business Judgment In Determining That the Ad Hoc Group of PTL Lenders' Proposal Was the Best Option for the Company.............25

    IX.    The Company Invited Other Lenders Into The Transaction To Achieve Additional Discount...................................................................................31

    X.      The Non-PTL Lenders Attempt To Thwart The 2020 Transaction......................34

    XI.    The Company And The PTL Lenders Amend The Term Loan Agreement As Permitted By Its Terms........................................................................35

    XII.   The Market Recognized The Benefits Of The 2020 Transaction Before Downturns Led To The Company's Bankruptcy....................................................36

    XIII.  Indemnification—Standard in Credit Agreements—Was An Essential Component Of The 2020 Transaction Documents.....................................................38

    XIV.  Position Enhancing Transactions Like The 2020 Transaction Have Long Been Familiar To Sophisticated Market Participants—And Some Of The Defendants Themselves Have Engaged In Such Transactions...............................40

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
COMMON INTEREST

XV.    Defendants' Litigation Campaign Challenging The 2020 Transaction Is Long-
       running.......................................................................................................43

PROPOSED CONCLUSIONS OF LAW.....................................................................46

I.     Jurisdiction................................................................................................46

       A.    The Claims In This Adversary Proceeding Are Core................................47

       B.    The Bankruptcy Court Has Constitutional Authority to Enter Final
             Judgment on the Claims and Counterclaims...............................................51

       C.    Defendants' Challenge to Jurisdiction is Procedurally Improper.............53

II.    The 2020 Transaction Did Not Breach the Covenant Of Good Faith and Fair
       Dealing...................................................................................................56

       A.    New York Law Strictly Limits the Scope of Claims for Breach of the
             Implied Covenant of Good Faith and Fair Dealing..................................56

       B.    Defendants' Implied Covenant Claim Impermissibly Duplicates Their
             Breach of Contract Claim.............................................................62

       C.    The Term Loan Agreement Expressly Authorized the 2020 Transaction.62

       D.    These Sophisticated Defendants Could Not Reasonably Have Understood
             the Detailed Term Loan Agreement to Impliedly Prohibit the 2020
             Transaction................................................................................67

       E.    The Company and the PTL Lenders Had a "Legitimate Business Purpose"
             for the 2020 Transaction, Again Precluding Defendants' Implied Covenant
             Claims......................................................................................73

       F.    Defendants Cannot Show that the Company or the PTL Lenders Acted
             with Malevolence in Including the Indemnity...........................................83

       G.    LCM's "Amend to Exit" Arguments Fail for Multiple Reasons...............85

III.   This Court Of Equity May Consider Defendants' Unclean Hands And Find That It
       Bars Any Recovery By Angelo Gordon, Apollo, and Gamut Here Regardless....89

IV.    Counterclaim Plaintiffs Also Have Not Carried Their Burden With Respect To
       The Represented Third-Party Defendants.................................................90

CONCLUSION.....................................................................................................92

## TABLE OF AUTHORITIES

### Cases

*55 Eckford Realty LLC v. Indus. & Comm. Bank of China (USA) NA*,
   39 Misc.3d 1208(A) (N.Y. Sup. Ct. 2013) ........................................................74, 80

*Ability Ins. Co. v. ST Paper, LLC*,
   2022 WL 912927 (S.D.N.Y. Mar. 29, 2022) ...........................................................58

*Alpert v. 28 Williams St. Corp.*,
   63 N.Y.2d 557 (N.Y. 1984) ....................................................................................80

*Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*,
   70 A.D.3d 423 (N.Y. App. Div. 2010) ...................................................................60

*Apogee Handcraft, Inc. v. Verragio, Ltd.*,
   155 A.D.3d 494 (N.Y. App. Div. 2017) .................................................................59

*In re Bellingham Ins. Agency, Inc.*,
   702 F.3d 553 (9th Cir. 2012), *aff'd sub. nom. Exec. Benefits Ins. Agency v.*
   *Arkison*, 573 U.S. 25 (2014) ...................................................................................54

*In re Bernard L. Madoff Inv. Sec. LLC*,
   740 F.3d 81 (2d Cir. 2014).......................................................................................48

*In re Best Prods. Co.*,
   68 F.3d 26 (2d Cir. 1995) ........................................................................................47

*BH Sutton Mezz LLC v. Sutton 58 Assocs. LLC (In re BH Sutton Mezz LLC)*,
   2016 WL 8352445 (Bankr. S.D.N.Y. Dec. 1, 2016)...............................................67

*BNP Paribas v. Wayzata Opportunities Fund II, L.P.*,
   2009 WL 5061750 (S.D.N.Y. Dec. 23. 2009) ........................................................69

*Bonady Apartments Inc. v. Columbia Banking Fed. Sav. & Loan Ass'n*,
   119 Misc.2d 923 (N.Y. Sup. Ct. 1983) .............................................................58, 74

*Broad v. Rockwell Int'l Corp.*,
   642 F.2d 929 (5th Cir. 1981) .............................................................................64, 66

*Brown v. Deutsche Bank Nat'l Tr. Co.*,
   120 A.D.3d 440 (N.Y. App. Div. 2014) .................................................................68

*Carvel Corp. v. Baker*,
   79 F. Supp. 2d 53 (D. Conn. 1997).........................................................................83

*Cent. Va. Community Coll. v. Katz*,
    546 U.S. 356 (2006)................................................................52

*Chase Equip. Leasing Inc. v. Architectural Air, L.L.C.*,
    84 A.D.3d 439 (N.Y. App. Div. 2011) .............................................68

*Citibank, N.A. v. American Banana Co., Inc.*,
    50 A.D.3d 593 (N.Y. App. Div. 2008) .............................................89

*Citibank, N.A. v. United Subcontractors, Inc.*,
    581 F. Supp. 2d 640 (S.D.N.Y. 2008)............................................59

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*,
    70 N.Y.2d 382 (N.Y. 1987) ....................................................62

*Cordero v. Transamerica Annuity Serv. Corp.*,
    -- N.E.3d --, 2023 WL 3061503 (N.Y. Apr. 25, 2023)...................56, 57, 63, 75

*D&L Holdings v. Goldman Co.*,
    287 A.D.2d 65 (N.Y. App. Div. 2001) .........................................58, 63

*Dalton v. Educ. Testing Serv.*,
    87 N.Y.2d 384 (N.Y. 1995) ....................................................57

*In re Davis*,
    538 F. App'x 440 (5th Cir. 2013) ..............................................51

*Dowling v. Harvey*,
    2006 WL 8436123 (W.D. Tex. Mar. 30, 2006)...................................86, 87

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
    2017 WL 1355388 (E.D. Tex. Apr. 13, 2017).....................................48

*Fasolino Foods Co. v. Banca Nazionale del Lavaro*,
    961 F.2d 1052 (2d Cir. 1992)..............................................59, 75

*Federated Dep't Stores, Inc. v. Moitie*,
    452 U.S. 394 (1981)..........................................................86

*Fesseha v. TD Waterhouse Inv. Servs., Inc.*,
    305 A.D.2d 268 (N.Y. App. Div. 2003) .........................................68

*In re First River Energy, LLC*,
    2019 WL 1103294 (W.D. Tex. Mar. 7, 2019)...............................48, 58, 87

*Free v. Abbott Labs., Inc.*,
    164 F.3d 270 (5th Cir. 1999) .................................................54

*Gaia House Mezz LLC v. State Street Bank and Trust Co.*,
720 F.3d 84 (2d Cir. 2013) ......................................................................59, 74, 75

*Gallagher v. Lambert*,
143 A.D.2d 313 (N.Y. App. Div. 1988), *aff'd*, 74 N.Y.2d 562 (N.Y. 1989) ..........................59

*Gartner, Inc. v. HCC Speciality Underwriters, Inc.*,
2023 WL 1380290 (S.D.N.Y. Jan. 31, 2023) ..........................................................59

*In re Glob. Crossing Ltd.*,
295 B.R. 726 (Bankr. S.D.N.Y. 2003) ...................................................................78

*Good Hill Master Fund L.P. v. Deutsche Bank AG*,
146 A.D.3d 632 (N.Y. App. Div. 2017) .................................................................59

*Highland Crusader Offshore Partners LP v. LifeCare Holdings Inc.*,
377 F. App'x 422 (5th Cir. 2010) .......................................................................64

*Hildene Cap. Mgmt. LLC, v. Friedman*,
2012 WL 3542196 (S.D.N.Y. Aug. 15, 2012) ..........................................................70

*HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp. LLC*,
994 F. Supp. 2d 520 (S.D.N.Y. 2014) ...................................................................74

*Jeda Capital-56, LLC v. Village of Potsdam*,
198 A.D.3d 1211 (N.Y. App. Div. 2021) ...............................................................85

*JN Contemporary Art LLC v. Phillips Auctioneers LLC*,
507 F. Supp. 3d 490 (S.D.N.Y. 2020) ...................................................................58

*Kallman v. Krupnick*,
891 N.Y.S.2d 490 (N.Y. App. Div. 2009) ...............................................................89

*KeyBank N.A. v. Franklin Advisers, Inc.*,
616 B.R. 14 (Bankr. S.D.N.Y. 2020) .............................................................77, 78, 88

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
2021 WL 918705 (S.D.N.Y. Mar. 10, 2021) ...........................................................44

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
2022 U.S. Dist. LEXIS 57976 (S.D.N.Y. Mar. 29, 2022) ...........................................36

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ...........................................................44

*In re Lehman Bros. Holdings*,
541 B.R. 551 (S.D.N.Y. 2015) ..........................................................................71

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ...................................................................57

*In re Lopez*,
   2017 WL 3382099 (S.D. Tex. Mar. 20, 2017) .........................................................55

*Lykins v. IMPCO Tech., Inc.*,
   2018 WL 3231542 (S.D.N.Y. Mar. 6, 2018) .............................................58, 63, 79

*M/A-COM Sec. Corp. v. Galesi*,
   904 F.2d 134 (2d Cir. 1990) ....................................................................................59

*Med. Ctr. Pharmacy v. Holder*,
   634 F.3d 830 (5th Cir. 2011) ...................................................................................54

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
   571 U.S. 191 (2014) .................................................................................................57

*Metropolitan Life Insurance Company v. RJR Nabisco, Inc.*,
   716 F. Supp. 1504 (S.D.N.Y. 1989) ........................................................................70

*Mill Fin., LLC v. Gillet*,
   122 A.D.3d 98 (N.Y. App. Div. 2014) .............................................59, 60, 61, 62

*Murphy v. Am. Home Prod. Corp.*,
   58 N.Y.2d 293 (N.Y. 1983) ......................................................................................58

*In re Musicland Holding Corp.*,
   318 F. App'x ............................................................................................................65

*In re Musicland Holding Corp.*,
   386 B.R. ....................................................................................................65, 75, 83

*Najjar Grp., LLC v. W. 56th Hotel LLC*,
   850 Fed. App'x 69 (2d Cir. 2021) ..........................................................................73

*North Star Debt Holdings L.P. v. Serta Simmons Bedding LLC*,
   2020 WL3411267 (N.Y. Sup. Ct. June 19, 2020) ........................................ *passim*

*Paru v. Mut. of Am. Life Ins. Co.*,
   52 A.D.3d 346 (N.Y. App. Div. 2008) ....................................................................62

*In re Pioneer Carriers, LLC*,
   583 B.R. 891 (Bankr. S.D. Tex. 2018) ....................................................................52

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806 (1945) .................................................................................................89

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
    23 N.Y.3d 549 (N.Y. 2014) ........................................................................63

*In re Quality Properties, LLC*,
    2011 WL 6161010 (Bankr. N.D. Ala. Nov. 29, 2011) ............................52

*In re Renaissance Hosp. Grand Prairie Inc.*,
    713 F.3d 285 (5th Cir. 2013) ...............................................................51, 52

*In re Revlon, Inc.*,
    2023 WL 2229352 (Bankr. S.D.N.Y. Feb. 24, 2023) ........................48, 89

*Reyes v. Quality Logging, Inc.*,
    2017 WL 10646614 (S.D. Tex. Dec. 5, 2017) ........................................86

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,
    309 A.D.2d 288 (N.Y. App. Div. 2003) ..................................................77

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
    60 A.D.3d 61 (N.Y. App. Div. 2008), *aff'd*, 13 N.Y.3d 398 (N.Y. 2009)................................63

*In re Saenz*,
    2016 WL 9021733 (Bankr. S.D. Tex. Dec. 19, 2016), *aff'd sub nom. Saenz v.*
    *Gomez*, 899 F.3d 384 (5th Cir. 2018) .....................................................55

*Schweizer v. Sikorsky Aircraft Corp.*,
    634 F. App'x 827 (2d Cir. 2015) ............................................................59

*Sebastian Holdings, Inc. v. Deutsche Bank, AG.*,
    108 A.D.3d 433 (N.Y. App. Div. 2013) ..................................................60

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*,
    769 F.3d 807 (2d Cir. 2014)...................................................................59

*Singh v. City of New York*,
    --- N.E.3d ----, 2023 WL 3098734 (N.Y. Apr. 27, 2023) ..........................57, 63, 67

*In re Solutia, Inc.*,
    2007 WL 1302609 (Bankr. S.D.N.Y. May 1, 2007)...........................58, 63, 70

*In re Spillman Dev. Grp., Ltd.*,
    710 F.3d 299 (5th Cir. 2013) .................................................................53

*State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*,
    374 F.3d 158 (2d Cir. 2004).........................................................58, 74, 79, 80

*Stern v. Marshall*,
    564 U.S. 462 (2011)................................................................46, 51, 52, 54

*Team 125, Inc. v. U.S. Aviation Underwriters, Inc.*,
  2022 WL 329317 (S.D.N.Y. Feb. 2, 2022)............................................................67

*Topps Co. v. Cadbury Stani S.A.I.C.*,
  380 F. Supp. 2d 250 (S.D.N.Y. 2005)...............................................................82

*In re TPC Grp.*,
  2022 WL 2498751 (Bankr. D. Del July 6, 2022)............................................63, 73

*Vela v. City of Houston*,
  276 F.3d 659 (5th Cir. 2001) ...........................................................................54, 86

*In re Villarreal*,
  639 B.R. 427 (Bankr. S.D. Tex. 2022) ................................................................52

*Villegas v. Schmidt*,
  788 F.3d 156 (5th Cir. 2015) .............................................................................52

*Vista Outdoors Inc. v. Reeves Family Trust*,
  234 F. Supp. 3d 558 (S.D.N.Y. 2017)................................................................91

*VSP Labs, Inc. v. Hillair Capital Investments LP*,
  619 B.R. 883 (N.D. Tex. 2020)..........................................................................55

*Vt. Teddy Bear Co., Inc. v. 538 Madison Realty Co.*,
  1 N.Y.3d 470 (N.Y. 2004) .................................................................................57

*Wagner v. JP Morgan Chase Bank*,
  2011 WL 856262 (S.D.N.Y. Mar. 9, 2011) ..............................................58, 63, 73

*Wellness Int'l Network, Ltd. v. Sharif*,
  575 U.S. 665 (2015)..............................................................................53, 54, 56

*Wey v. NASDAQ, Inc.*,
  66 Misc.3d 1222(A), (N.Y. Sup. Ct.), *aff'd*, 188 A.D.3d 587 (N.Y. App. Div.
  2020) ...............................................................................................................70

*Wilder v. World of Boxing LLC*,
  310 F. Supp. 3d 426 (S.D.N.Y. 2018), *aff'd*, 777 F. App'x 531 (2d Cir. 2019)....................73

*Women's Interart Ctr., Inc. v. N.Y. City Econ. Dev. Corp.*,
  2014 WL 2126811 (N.Y. Sup. Ct. Apr. 28, 2014)................................................74

*Young v. United States*,
  535 U.S. 43 (2000)...........................................................................................89

## Statutes

11 U.S.C. § 1123 .............................................................................................47

11 U.S.C. § 1129..................................................................................................47

28 U.S.C. § 157(b)..............................................................45, 46, 47, 48, 50, 51, 52, 54

28 U.S.C. § 157(c)................................................................................................54

28 U.S.C. § 1334..................................................................................................45

28 U.S.C. § 1408..................................................................................................46

28 U.S.C. § 1409..................................................................................................46

1.      Pursuant to Federal Rule of Civil Procedure 52(a), Plaintiffs Serta Simmons Bedding, LLC (the "**Company**" or the "**Debtors**"),[1] along with Barings LLC ("**Barings**"), Boston Management and Research ("**Boston Management**"), Credit Suisse Asset Management LLC ("**Credit Suisse**"), Eaton Vance Management ("**Eaton Vance**"), and Invesco Senior Secured Management, Inc. ("**Invesco**") (together with Barings, Boston Management, Credit Suisse, and Eaton Vance, the "**PTL Lenders**" or "**Lender Plaintiffs**"), as well as the Represented Additional Counterclaim Defendants, (*see* ECF Nos. 217 & 220), respectfully submit these proposed findings of fact and conclusions of law concerning the bench trial that took place before this Court from May 15, 2023 through May 18, 2023.

2.      The adversary proceeding is core to the confirmation of the Company's *Second Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (the "**Plan**").  As set forth in the Debtors' Supplemental Memorandum of Law in Support of Confirmation of the Plan and Findings of Fact, Conclusions of Law, and Order Confirming the Plan, both filed contemporaneously herewith, expressly incorporated herein by reference, and attached as Exhibits A and B, favorable judgment for the Lender Plaintiffs and the Debtors is a condition precedent to Plan confirmation, and for good reason.  If Defendants are right, the Plan cannot be confirmed because they may need to be reclassified, potentially with holders of FLSO Claims.  Recognizing that the Plan simply would not make sense with that kind of fundamental uncertainty looming, the Debtors and Plan proponents negotiated the Plan over several months and were careful to make it a condition precedent that the "Bankruptcy Court shall have entered an order granting the relief sought by the Debtors in the Adversary Proceeding."  ECF No. 874 § 9.1(f).

---

[1] Capitalized terms not otherwise defined herein have the meaning given to them in the Term Loan Agreement or the Complaint filed in this adversary proceeding, *Serta Simmons Bedding, LLC v. AG Centre Street Partnership L.P.*, No. 23-9001 (Bankr. S.D. Tex. Jan. 24, 2023), ECF No. 1, or as the context otherwise requires.

The adversary proceeding and Plan confirmation thus fit together, hand in glove, as each is integral to the other.  The implied covenant claim is the last live issue arising out of the 2020 Transaction, and one of the only remaining impediments to Plan confirmation.  For the reasons explained below, the Court should enter judgment in favor of the Lender Plaintiffs and the Debtors on the implied covenant claim, enter judgment in favor of the Counterclaim-Defendants on all of the counterclaims, and enter an order confirming the Plan.

## PROPOSED FINDINGS OF FACT

### I.   MARKET PLAYERS KNEW THAT CREDIT AGREEMENTS IN 2016 WERE LOOSE AND BORROWER-FRIENDLY

3.     In the period following the 2008 financial crisis, there has been a "gradual process [of] issuers seeking looser documents," May 17 Tr. (AM) 96:21–22 (Sveen)—or what lenders may think of as "document erosion," May 17 Tr. (PM) 46: 24 (Searles).

4.     From the borrower's perspective, a looser credit agreement offers "quite a lot of flexibility."  May 17 Tr. (PM) 103:9–10 (Yarrow).  Borrowers and sponsors "have been very interested in having looser documents" to "expand the flexibility of the credit agreement" for "when they need it."  May 17 Tr. (AM) 96:23–97:2 (Sveen).

5.     From the lender's perspective, however, loose credit agreements create risks, for example, that a lender "could see collateral moved away" from the company or that a sponsor could "try[] to leak money" away from the company's capital structure.  May 17 Tr. (PM) 104:11–12 (Yarrow).  Lenders preferred "tighter document[s]" that "typically provide [lenders] with better protections."  May 17 Tr. (AM) 95:15–16 (Yarrow).

6.     As transactions became "over-subscribed" in the years following the 2008 financial crisis, borrowers were able to achieve "more and more flexible terms in their credit agreements," and loose credit agreements became more "prevalent."  May 17 Tr. (PM) 103:15–22 (Yarrow).

Borrowers and sponsors not only "favor[ed]" these looser documents; they were "willing to pay for" the flexibility.  May 17 Tr. (AM) 97:4–5 (Sveen).

7.      Lenders had little choice but to agree to such loose, borrower-friendly terms; if they didn't, they "would be doing virtually no deals," May 17 Tr. (PM) 104:22 (Yarrow), and their investors expected them to "put [cash] to work in the bank loan market," May 17 Tr. (PM) 104:18–19 (Yarrow).

8.      As a result, when the Company's First Lien Term Loan Agreement (the "Term Loan Agreement") was entered into in 2016, documents in the syndicated loan industry had "gotten generally looser," which had "been accepted by the marketplace."  May 17 Tr. (AM) 97:9–10 (Sveen).  Indeed, by 2016, "most of the credit agreements were, generally speaking, loose."  May 17 Tr. (PM) 104:19–20 (Yarrow).

9.      Any lender who was active in this market, would have included in its "ongoing and even initial credit review" process, May 17 Tr. (PM) 47:1–2 (Searles), this "understanding of the documents and the flexibility that the company had as a result" of loose documents, *id.* 47:9–10 (Searles).

10.      Within the market, there was "open knowledge that documents are looser."  May 17 Tr. (AM) 125:18-19 (Sveen).  Lenders who "willingly signed up for these [looser] documents" "shouldn't be surpris[ed]," May 17 Tr. (AM) 124:24–125:1 (Sveen), at borrowers trying to take advantage of that flexibility.  With more flexible documents comes a "broad understanding," May 17 Tr. (AM) 125:8 (Sveen), among market participants that they might not always predict "how those documents might be [applied] in the future for the benefit of the borrower,"  May 17 Tr. (AM) 125-20-21 (Sveen).

3

11.     The Term Loan Agreement was no exception.  It was "generally considered to be loose," May 17 Tr. (PM) 32:14–15 (Sveen), and "gave the company significant flexibility with respect to a liability management transaction."  May 17 Tr. (PM) 35:9–11 (Sveen).

12.     Defendants Apollo Global Management, Angelo Gordon, and Gamut Capital are among the most sophisticated financial institutions in the world. Collectively, they manage over $650 billion of assets.  *See* May 18 Tr. (AM) 8:24–9:1; 51:17–19 (Kwon) (Apollo "manage[s] close to $600 billion in assets); Debtors' Ex. 372 (ECF No. 941) at 19:18–21 (Gladstone) ("Angelo Gordon is a $55 billion asset manager."); Debtors' Ex. 373 (ECF No. 941-1) at 19:18–19 (Hanigan) (Gamut has "somewhere above $2 billion of assets under management."). Each have significant "experience" as "participant[s] in the syndicated markets."  May 18 Tr. (AM) 57:11–12 (Kwon); Debtors' Ex. 372 (ECF No. 941) at 20:23–21:15 (Gladstone).

13.     These Defendants, too, recognized that the Company's Term Loan Agreement was a "very loose" credit agreement and "weak," meaning it is "[c]ompany-friendly with respect to the ability to move assets and execute liability management transactions."  May 18 Tr. (AM) 57:2–4 (Kwon); Debtors' Ex. 8 (ECF No. 861-3) at 44–45 ("Exploit weak credit documents to propose a solution to the Company."); *see also* Debtors' Ex. 11 (ECF No. 861-5) at 44 ("Loose credit documents may present liability management solution anchored by IP / brand value").

## II.     CONSISTENT WITH MARKET UNDERSTANDING, THE TERM LOAN AGREEMENT PROVIDED  THE COMPANY WITH FLEXIBILITY

14.     Section 9.05(g) of the Term Loan Agreement governs the assignment of loans to "**Affiliated Lenders**," defined to include the "Top Borrower," *i.e.*, the Company.  *See* Debtors' Ex. 6 (ECF No. 853-6) § 1.01.  It provides, in relevant part:

> Notwithstanding anything to the contrary contained herein, any Lender may, at any time assign all or a portion of its rights and obligations under this Agreement in

respect of its Term Loans to any Affiliated Lender[2] on a ***non-pro rata basis*** (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases, each case with respect to clauses (A) and (B) without the consent of the [Agent.]

*Id.* § 9.05(g) (emphasis added).

15.     Section 9.05(g) expressly permits the Company to repurchase debt from its Lenders on a non-pro rata basis.  Section 2.18 of the Term Loan Agreement also makes clear that the pro rata sharing rights are "[s]ubject in all respects to the provisions of each applicable Intercreditor Agreement."  *Id.* § 2.18(b). Section 2.18 of the Term Loan Agreement further provides that:

If any Lender obtains payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of ***such Class*** . . . , then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans of other Lenders of ***such Class*** at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of ***such Class*** ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of ***such Class***; ***provided that . . . (ii) the provisions of this paragraph shall not apply to*** . . .  (B) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with Sections 2.22, 2.23, 9.02(c) and/or ***Section 9.05***.

*Id.* § 2.18(c) (emphasis added).

16.     Thus, while First Lien Term Loan holders (the "**First Lien Term Loan Lenders**") are generally entitled to payments on a pro rata basis pursuant to a waterfall, it only applies to payment in the same Class of debt, *see id.*; *see also id.* § 2.18(a), and there are exceptions where pro rata sharing is *not* required, including any assignment of a loan under Section 9.05(g).  *See id.* § 2.18(c); May 18 Tr. (AM) 83:8-13 (Kwon) (recognizing "there is an exception" to the prohibition

---

[2] "**Affiliated Lender**" means "any Non-Debt Fund Affiliate, Holdings, the Top Borrower and/or any subsidiary of the Top Borrower."  Debtors' Ex. 6 (ECF No. 853-6) § 1.01.  The Company is the Top Borrower.

on altering the pro rata sharing of payments among lenders in the same class); *id.* 81:21-24 (Kwon) (payments under Section 9.05 are an exception to the pro rata sharing requirements in Section 2.18(c)).

17.     Under the Term Loan Agreement, only the consent of a simple majority of the First Lien Term Loan Lenders is required to amend the Term Loan Agreement, unless the amendment involves so-called "sacred rights," which generally require the consent of all lenders.  Among other things, the "sacred rights" deal with the payment waterfall in the event of a default, which provides for proceeds of collateral to be shared "pro rata*"* and for any overpayment received by a lender to be paid to the other lenders ratably.  Debtors' Ex. 6 (ECF No. 853-6) § 2.18(b)-(c).  Section 9.02(b) provides, in relevant part:

> . . . . [N]either this Agreement nor any other Loan Document or any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by [the Company] and the Required Lenders . . . .

*Id.* § 9.02(b).

18.     "**Required Lenders**" are defined as "Lenders having Loans or unused Commitments representing more than 50% of the sum of the total Loans and such unused commitments at such time."  *See id.* § 1.01.

19.     Even for the handful of "sacred rights" however, there is an express carveout for open market purchases under 9.05(g):

> [T]he consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders) shall be required for any waiver, amendment or modification that:  . . . waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby (***except in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c) and/or 9.05(g)*** or as otherwise provided in this Section 9.02);

*Id.* § 9.02(b)(A)(6) (emphasis added); *see* May 18 Tr. 92:21-25 (Kwon) (Section 9.05(g), which "provides for . . . open market purchases," as "an exception" to Section 9.02(b)(A)(6)).  Defendants also understood Section 9.05(g)'s open market purchase provision to permit similar debt exchanges.  *See infra* ¶ 57; Debtors' Ex. 65 (ECF No. 862-9) at 6, 7.

20.     As this Court has held, it is "very clear" that the open market purchase component of the 2020 Transaction "fits within the definition of" and was "what's intended by a concept of an open market purchase" under Section 9.05(g).  Mar. 28, 2023 Hr'g Tr. at 134.

## III.     THE COMPANY NEEDED TO TAKE ACTION BECAUSE OF LIQUIDITY PROBLEMS EXACERBATED BY THE COVID-19 PANDEMIC

21.     Serta Simmons Bedding is one of the largest bedding manufacturer in North America.  *See* Debtors' Ex. 77 (ECF No. 862-21); *see also* May 18 Tr. (AM) 13:3–5 (Kwon) (stating that Serta Simmons Bedding held the number one market share in the mattress industry for ten years).  Along with its subsidiaries and affiliates, Serta Simmons Bedding is one of the leading manufacturers and distributors of mattresses in North America, and owns and manages some of the best-selling bedding brands in the mattress industry:     Serta®, Beautyrest®, Simmons®, and Tuft & Needle®.  *See* Debtors' Ex. 77 (ECF No. 862-21) at 10.  The Company distributes its brands through national, regional, and independent retail channels, as well as through direct-to-consumer channels.  *See id.*

22.     "Even before COVID," the Company faced a tough economic environment.  May 16 Tr. 16:9–10 (Tepner).  Its sales had been decreasing "for a number of years" caused in part by "direct to consumer competition."  May 16 Tr. 14: 2–9, 16:5–9 (Tepner). The Company was also "concerned about its liability" because "it had liabilities coming due in a . . . relatively short period of time that it was worried about its ability to manage."  May 16 Tr. 14: 2–9 (Tepner); *see also* Debtors' Ex. 51 (ECF No. 861-45) (Mar. 31, 2020 Finance Committee board minutes).

23.     At the time, the Company had approximately $1.9 billion of 1L debt, $420 million of 2L debt, $225 million from an ABL facility, and $80 million in capital leases. May 16 Tr. 13:6–10 (Tepner).

24.     Because of the economic uncertainties, the Company engaged the investment bank Evercore, Inc. ("**Evercore**") in mid to late 2019 "to evaluate both liquidity enhancement alternatives and liability management alternatives designed to capture, discount, or otherwise manage their liabilities."  May 15 Tr. (PM) 9:21–23 (Shah).

25.     With the onset of COVID-19, by March 2020, the Company was facing a liquidity crisis and needed an economic lifeline.  The COVID-19 pandemic obviously and indisputably had a "material impact" on the Company, resulting in "supply chain" issues, closures of retail stores, and mandated closures that halted the Company's "ability to manufacture" its products.  May 16 Tr. (PM) 13:4, 13:18, 13:21, 16:22–23 (Tepner).

26.     Indeed, in March 2020 alone, the Company "lost $50 million in revenue that it was projecting" in sales, and customers were extending their payment terms, both of which compounded the Company's liquidity crisis.  May 16 Tr. 13:14–16 (Tepner).  The Company projected that it was going to run out of liquidity as early as July 2020.  *See* Debtors' Ex. 51 (ECF No. 861-45) ("Current cash flow forecasts indicate the company may run out of liquidity as early as July, necessitating an evaluation of transaction alternatives to raise near-term liquidity."); May 16 Tr. 14:10–20 (Tepner) (testifying that the Company's "liquidity forecast for the summer of 2020 shows that it could possibly run out of working capital and cash."); May 15 Tr. (PM) 9:24–10:11 (Shah).

27.     In light of this liquidity crunch, the Company's "objective was to raise new liquidity in order to make sure that the company could survive, as well as potentially right[-]size the balance

sheet through achieving discount."  May 15 Tr. 132:2123–134:4 (Prince).

28.  Time was of the essence.  If the Company was unable to get a deal by June 2020, the Company "might have been forced to file for bankruptcy or, worse, liquidate."  May 16 Tr. 41:18–19 (Tepner); May 15 Tr. (PM) 10:12–14 (Shah).

## IV.   THE COMPANY CREATED AN INDEPENDENT FINANCE COMMITTEE TO CONSIDER OPTIONS FOR ADDRESSING ITS LIQUIDITY PROBLEMS

29.  As COVID-19 began to spread across the United States, the Company took the prudent step of establishing an "independent group of directors to evaluate potential alternatives" to aid the Company.  May 16 Tr. 11:23–12:2 (Tepner).

30.  Specifically, on March 11, 2020, the Company created an independent finance committee (the "Finance Committee") "to review the company's situation and review all alternatives and decide on a course of action to help alleviate the liquidity and leverage situation the company was facing."  May 15 Tr. (PM) 10:20–25 (Shah); *see also* Debtors' Ex. 16 (ECF No. 861-10); Debtors' Ex. 51 (ECF No. 861-45). The Finance Committee received additional authority in June 2020 to select and approve the final transaction.  *See* Debtors' Ex. 190 (ECF No. 864-33).

31.  The Company tasked the Finance Committee with trying to "find a solution to solve ultimately for three things."  May 16 Tr. 14:15–16 (Tepner).  First, to "get additional capital for the company."  May 16 Tr. 14:17–23 (Tepner).  Second, "to see if there could be a plan where [the Company could] get a debt reduction."  May 16 Tr. 14:18-19 (Tepner).  Third, to "take benefit of the discount that" the first lien term loan ("1L") and second lien term loan ("2L") debt "was trading to, and capture some of that discount for the benefit of the company."  May 16 Tr. 14:17–23 (Tepner); *see also* May 16 Tr. 22:3–4 (Tepner) ("We had three objectives:  additional capital, debt reduction and debt discount capture.").

32.     After its formation in March 2020, the Finance Committee considered every available option to the Company, including "modifications to the company's ABL potential, last-out tranches to the ABL," "vendor and working capital management," sale-leasebacks, "sales of [the Company's] interest in a China joint venture," as well as "potential dropdown situations and dropdown scenarios to raise liquidity."  May 15 Tr. 12:11–25 (Shah); *see also* Debtors' Ex. 5 (ECF No. 853-5).

33.     By early April 2020, the Finance Committee had decided to focus on an "IPCo" or "drop-down" intellectual property transaction, where the Company "would drop certain [intellectual property] assets of [the Company] into an unrestricted subsidiary and then secure financing against those assets."  May 15 Tr. (PM) 18:16–21 (Shah); *see also* Debtors' Ex. 62 (ECF No. 862-6).  The IPCo structure initially "was really the only structure" the Company contemplated because it was "the only transaction that seemed feasible."  May 15 Tr. (PM) 26:7–16 (Shah).

## V.     THE COMPANY ENGAGED IN A GOOD-FAITH, COMPETITIVE PROCESS TO CONSIDER VARIOUS TRANSACTIONS THAT COULD RIGHT-SIZE THE COMPANY'S FINANCIAL CONDITION

34.     The Company engaged with various parties to discuss a potential transaction.  The Company "ran a competitive process" whereby the Finance Committee "eventually chose a group that was the winners."  May 15 Tr. (PM) 132:21–133:4 (Shah); *see also* Debtors' Ex. 62 (ECF No. 862-6) at 1 ("expect a competitive process").  "The objective of the engagement process was to obtain multiple proposals for any transaction and enable a competitive process to obtain the best terms available for the company."  Debtors' Ex. 63 (ECF No. 862-7) (Apr. 10, 2020 Finance Committee minutes).

35.     Evercore first reached out to the market in April 2020.  Debtors' Ex. 63.  Evercore and the Company "came up with a list of potential third party as well as existing lenders and came

up with a robust list of parties to reach out to to pursue financing." May 15 Tr. 13:16–22 (Shah); *see also* Debtors' Ex. 62.

36.     The Company offered the counterparties non-disclosure agreements "to give them more fulsome information." May 15 Tr. (PM) 13:23–14:2 (Shah). This would also allow the Company "to maintain control over process so you don't have lenders colluding" and instead "keep people separate and run a competitive process." May 15 Tr. (PM) 14:5–10 (Shah). The Company could then "get multiple bids" and then "play terms off of each other to get the best terms for the company." May 15 Tr. (PM) 16:6-10 (Shah).

37.     Confidentiality during such negotiations is standard. *See* May 15 Tr. 16:11-18 (Shah) ("That's how we approach, you know, virtually every deal we do."); May 17 Tr. (PM) 113:23–114:3 (Yarrow); May 18 Tr. 111:3–6 (Kwon).

38.     Ultimately, the Company solicited proposals from thirteen then-current lenders and third parties. Debtors' Ex. 145 (ECF No. 863-38) at 7; *see also* May 15 Tr. (PM) 18:2–7 (Shah); Debtors' Ex. 62 (ECF No. 862-6). From that broad outreach, the Company "received at least eight written proposals." May 16 Tr. 23:4 (Tepner). The Company evaluated each and every proposal it received, including from the Ad Hoc Group of Non-PTL Lenders, the Gibson Dunn group, Barings, Oaktree, and Blue Torch, among others. All told, the Company was in discussions with lenders that represented "1.3 to 1.4 billion" of 1L debt, which was approximately "70 percent of the existing 1L debt at that time." May 15 Tr. (PM) 30:5–11 (Shah); *see also* Debtors' Ex. 145.

39.     While the Company initially solicited proposals for an IPCo transaction, the Company was not wed to the structure, as it was only "something that they were considering until a better alternative came about." May 15 Tr. (PM) 136:19–23 (Prince). Indeed, "the company

would consider anything that was feasible [and] could be enacted during the short period of time."
May 16 Tr. 18:18–19:1 (Tepner).

40.     As such, the Company put "no restrictions" on proposals and "would have considered anything or any combination of things that would work and be executable."  May 16 Tr. 20:18–19, 21:22 (Tepner).

41.     The Company was also aware that under an IPCo proposal, not all 1L debt would participate and that any 1L debt that did not participate "would lose their claim on those assets and presumably have less collateral backing their claim."  May 15 Tr. (PM) 26:21–25 (Shah).

## VI.    THE AD HOC GROUP OF NON-PTL LENDERS PROPOSED A POSITION ENHANCING TRANSACTION

42.     As early as mid-2019, Angelo Gordon understood that the Company was facing a precarious financial situation and liquidity crunch and sought to capitalize on it.  *See* Debtors' Ex. 372 (ECF No. 941) at 27:13–15 (Gladstone); Debtors' Ex. 373 (ECF No. 941-1) at 84:13–20 (Hanigan).

43.     Angelo Gordon first began purchasing the Company's First Lien Term Loans on May 15, 2019, Debtors' Ex. 304 (ECF No. 866-37) at 1, and continued to purchase 1L debt between May 2019 and March 2020 at distressed prices ranging from 72.5 down to 33 cents on the dollar, *see* Debtors' Ex. 312 (ECF No. 866-39).

44.     By January 2020, Angelo Gordon was crafting a drop down restructuring transaction involving the open market.  In an internal January 2020 presentation, Angelo Gordon noted it saw an "opportunity" to "[e]xploit weak credit documents to propose a solution to the Company," using a "[l]iability management [to] delever via debt exchanges."  Debtors' Ex. 8 (ECF No. 861-3), at 45.  It envisioned that the Company's equity interest in Serta Inc. and other valuable intellectual property assets would be stripped away as collateral from other 1L lenders and

12

transferred to a new unrestricted subsidiary for the exclusive benefit of Angelo Gordon and other participating lenders, in exchange for Angelo Gordon providing "new money to the Company which would be structurally senior to all other debt." Debtors' Ex. 8 (ECF No. 861-3) at 22, 23, 25.

45.     In March 2020, Angelo Gordon internally recommended "Buy[ing] SSB 1L at prices under 60 and 2L at prices under 35," noting that "[t]he SSB 1L and 2L debt have recently traded off to levels that we believe are fundamentally attractive – additionally, AG stands to benefit from potential LME transaction utilizing URS to exchange debt at a discount to par." Debtors' Ex. 11 (ECF No. 861-5) at 14. On March 4, 2020, before the Company ever solicited proposals for an IPCo transaction, Angelo Gordon sent a proposal to Ken Prince, a representative of the Company's sponsor, Advent, with terms substantially similar to the contemplated debt exchange Angelo Gordon had drawn up in January 2020. *See* Debtors' Ex. 29 (ECF No. 861-23); Debtors' Ex. 17 (ECF No. 861-11); May 15 Tr. 155:24–156:3 (Shah).

46.     In total, Angelo Gordon acquired 1L debt with a face value of $237 million, Debtors' Ex. 304 (ECF No. 866-37) at 2, at an estimated cost basis of approximately 58 cents on the dollar, Debtors' Ex. 163 (ECF No. 864-6) at -499.

47.     Angelo Gordon knew that if the Company filed for chapter 11, the 1L term loans it purchased would serve as "fulcrum security and put it in a position to own the Company"— something that Angelo Gordon would have "loved." *See* Debtors' Ex. 372 (ECF No. 941) at 49:7–13 (Gladstone); Debtors' Ex. 60 (ECF No. 862-4) at 3 ("Love to own the business if it files.").

48.     Meanwhile, Apollo and Gamut were also buying up the Company's debt at a considerable discount.

13

49.     Gamut, which first began to purchase the Company's debt in December 2018, *see* May 18 Tr. (PM) 8:19–20 (Hanigan), bought $40 million of debt in just two weeks in March 2020, *see* Debtors' Ex. 34 (ECF No. 861-28) at 1, and ultimately came to acquire debt with a face value of $163 million, Debtors' Ex. 305 (ECF No. 866-38) at 2, with an average cost basis of approximately 58 cents on the dollar, *see* Debtors' Ex. 67 (ECF No. 862-11) at 1.  *See generally* May 18 Tr. (PM) 13:12–17 (Hanigan) (Gamut purchased additional Company debt "throughout 2019 and into 2020").

50.     Apollo, which had participated in the original syndication in 2016 but had sold its position in the Company's debt "sometime in 2018," May 18 Tr. (AM) 9:25 (Kwon), determined that the Company's 1L debt presented a "distressed-for-control investment" opportunity that could put Apollo "at the top of the capital structure."  Debtors' Ex. 15 (ECF No. 861-9) at 2.  It began attempting to purchase the Company's 1L debt again in March of 2020.  May 18 Tr. (AM) 10:9 (Kwon); *see also* Debtors' Ex. 22 (ECF No. 861-16) at 1 (Apollo's "First purchase for Serta!" of $27 million of first-lien loans at a cost basis of 49.75 on March 12, 2020).  In internal emails from late March, Apollo explained that it "[w]ant[ed] to be driving the process given loose docs but be aggressive." Debtors' Ex. 43 (ECF No. 861-37) at 1.

51.     Apollo "extensively diligenced with Paul Weiss during the original distressed debt underwriting" whether a majority of the lenders could affect the waterfall arrangement, Ex. 261 (ECF No. 889-2) at 2; *see* May 18 Tr. (AM) 53:4–6 (Kwon) ("Apollo "did a lot of significant due diligence" "[b]efore purchasing the first lien debt that Apollo now owns").  By May 3, 2020, Apollo purported to own a face amount of $192 million of the Company's first-lien debt, at an average cost basis of 45 cents on the dollar. Debtors' Ex. 107 (ECF No. 863) at 4.

52.     By April 24, 2020, Apollo, Angelo Gordon, and Gamut (the "**Ad Hoc Group of Non-PTL Lenders**") had joined together and collectively held "$575MM, which represents 30.5% of the 1L TL," or just "$54MM short of a 1/3rd blocking position." Debtors' Ex. 94 (ECF No. 862-38) at 2–3.   While Apollo, Angelo Gordon and Gamut wanted to get to a 1/3 blocking position because they understood that it was a "material threshold in bankruptcy," they made a calculated decision to stop purchasing the Company's debt before they had acquired such a position and instead entered into non-disclosure agreements ("**NDAs**") with the Company to begin diligence. Debtors' Ex. 372 at 112:12–112:20; *see also* Debtors' Ex. 94 (ECF No. 862-38) (Apollo writing on April 29, 2020: "At this point I think the risk/reward makes sense to restrict").   Entering into an NDA to allow for substantive negotiations to commence and is "standard" in the industry. Debtors' Ex. 372 (ECF No. 941) at 138:20–139:8 (Gladstone).

53.     The IPCo transaction that the Ad Hoc Group of Non-PTL Lenders initially proposed to the Company had the same economic effect and many other same features as the "uptier" transaction that the Company and the PTL Lenders subsequently engaged in.  *See* May 17 Tr. (PM) 79:20–80:8 (Meiering).

| **Non-PTL IPCo Transaction** | **PTL Lender Uptier Transaction** |
|---|---|
| Position enhancing transaction | Position enhancing transaction |
| Does not include all lenders | Does not include all lenders |
| Private negotiations | Private negotiations |
| Exchanged existing debt at discount to par but above the debt's current trading price | Exchanged existing debt at discount to par but above the debt's current trading price |
| Use 9.05(g) open market purchase provision | Use 9.05(g) open market purchase provision |

54.     While both transactions sought to enhance the position of the participating lenders at the expense of the non-participating lenders, there was a difference.  An "IPCo has got elements

of an uptier transaction," May 16 Tr. 91:19–20 (Tepner), in that it effectively gives participating lenders "senior debt as to the nonparticipating lenders," May 18 Tr. (AM) 100:7–14 (Kwon), but through "a different type of structural discrimination" in which "one group of lenders [does] not have access to the other group of lenders' collateral." May 16 Tr. 91:19-23 (Tepner); *accord* May 18 (PM) Tr. 57:22–25 (Kwon) (stating that 1L lenders "lose priority" with respect to claims against transferred collateral).

55.     The Ad Hoc Group of Non-PTL Lenders' IPCO transaction also did not contemplate additional lenders joining its proposed transaction. It wanted "to be as small as possible in case it turned out that being senior was a valuable thing as the company moved forward."  May 15 Tr. (PM) 72:24–73:3 (Shah).  For that reason, it "did not include all of the 1L lenders," but only a "limited set."  May 18 Tr. (PM) 96:6–11 (Kwon); *see also* 96:9–11(Kwon) (stating that "both offers involved a limited set of lenders").

56.     Additionally, the Ad Hoc Group of Non-PTL Lenders' IPCo proposal involved private negotiations between the Company and the participating lenders, *see* May 18 Tr. (AM) 95:17–19 (Kwon); providing the Company with approximately $200mm of new money, *see id.* 96:12–13 (Kwon); exchanging 1L debt and 2L debt, *see id.* 96:14–16 (Kwon); and exchanging existing debt at negotiated rates below par to give the Company a discount while providing participating lenders a premium above the debts' current trading prices, *see id.* 96:17–19, 97:1–3 (Kwon).

57.     Finally, the Ad Hoc Group of Non-PTL Lenders's IPCo proposal included using Section 9.05(g) of the Term Loan Agreement to opportunistically repurchase debt on the open market.  *See* Debtors' Ex. 65 (ECF No. 862-9) at 6, 7 (referring to "cancel[ing] loans under § 9.05(g)" and noting that "[a]ll can be done on a private basis"); May 18 Tr. (AM) 81:3–6 (Kwon)

(conceding the Ad Hoc Group of Non-PTL Lenders' proposal "involved using 9.05(g) to purchase loans at a discount to par from the ad hoc group only"); May 18 Tr. (AM) 87:22–90:13 (Kwon) (agreeing that that the Ad Hoc Group of Non-PTL Lenders never "propose[d] any auction or Dutch auction" and that "if 9.05(g) was going to be used for any purpose and it was not going to involve a Dutch auction, it had to be used in connection with an open market purchase"); *see also* Debtors' Ex. 300 (ECF No. 858-49) at 9; Debtors' Ex. 301 (ECF No. 859) at 9; Debtors' Ex. 302 (ECF No. 859-1) at 9.

58.     The Company exchanged term sheets with the Ad Hoc Group of Non-PTL Lenders in early May 2020 on the IPCo transaction proposal.  Apollo felt that its initial offer was "too favorable" and that the Ad Hoc Group of Non-PTL lenders were "leaving money on the table," that the "new $ is too cheap" and that "[w]e don't need to give this discount."  Debtors' Ex. 66 (ECF No. 862-10) at 1.  Internally, Apollo also acknowledged that its proposal was "without much discount."  Debtors' Ex. 126 (ECF No. 863-19) at 2.  And during the back-and-forth negotiations, the Ad Hoc Group of Non-PTL Lenders indicated its desire to "control the box and any future exchanges" rather than allow the Company to engage in future debt repurchases.  *See* Debtors' Ex. 183 (ECF No. 864-26) at 1.

59.     After several rounds of negotiations with the Company, the final proposal from the Ad Hoc Group of Non-PTL Lenders would have provided $200 million in new money and exchanged $483 million of 1L debt at a 77.5% exchange rate and $41 million of 2L debt at a 30% exchange rate for $387 million in new structurally senior debt.  *See* Debtors' Ex. 303 (ECF No. 866-36) at 37; *see also* Debtors' Ex. 202 (ECF No. 864-45) at 9–10. This proposal would have increased the Company's overall debt by $38 million. *See* May 16 Tr. 36:15–18 (Tepner).

60.     Since the Company was originally interested in an IPCo transaction, the Ad Hoc Group of Non-PTL Lenders was initially viewed as the "best horse."  May 15 Tr. (PM) 21:17-22:2 (Shah); *see also* Debtors' Ex. 111 (ECF No. 863-4) at 1 ("We should focus on Angelo Gordon as they continue to be our best horse.").  In fact, the Ad Hoc Group of Non-PTL Lenders—including Angelo Gordon, which, again, had been formulating an IPCo before the Company began soliciting proposals—had a head start and was "furthest ahead and had the most developed proposals."  May 15 Tr. (PM) 21:17-22:2 (Shah).

## VII.   AFTER ORIGINALLY PROPOSING A NEW MONEY SUPER-PRIORITY FINANCING AVAILABLE TO ALL LENDERS, THE PTL LENDER GROUP DEFENSIVELY PIVOTED TO PROPOSING A NEW FINANCING PAIRED WITH A DEBT REPURCHASE TRANSACTION

61.     As the Ad Hoc Group of Non-PTL Lenders began negotiating with the Company, another group of lenders began to coalesce.  The PTL Lenders, consisting of Eaton Vance, Credit Suisse, Invesco, Barings, First Eagle, PGIM, MJX, BlackRock, and Symphony, engaged Gibson Dunn as legal advisor and Centerview as financial advisor to work on its behalf.  *See* May 16 Tr. 145:5–9 (Chopra); Debtors' Ex. 49 (ECF No. 861-43).

62.     The PTL Lenders initially wanted to work together with the other first-lien lenders because, had they done so, they "could have done a better deal" from the lenders' perspective. May 17 Tr. (AM) 111:14-21 (Sveen); *see also* May 17 Tr. (PM) 107:19–21 (Yarrow) ("I thought maybe it would just end up that we would sort of converge into one group.").

63.     On April 7, 2020, Gibson Dunn sent a letter on behalf of the PTL Lenders, noting their "keen desire" "to be a constructive and supportive partner to [the Company] and "to ensure that the Company [was] properly capitalized to weather" its financial troubles.  Debtors' Ex. 56 (ECF No. 862) at 4.  The Company did not respond to that letter, *see, e.g.*, May 17 Tr. (AM) 105:14–15 (Sveen), because there was a concern that certain lenders who had previously litigated

against similar IPCo transactions would try to disrupt the negotiations, *see* May 15 Tr. (PM) 19:19–20:2 (Shah).  But the PTL Lenders nevertheless learned that the Company was discussing potential transactions with other lenders even though it did not engage with them.  *See, e.g.*, May 17 Tr. (AM) 106:2–8 (Sveen); May 17 Tr. (PM) 109:3–5 (Yarrow).

64.     Gibson Dunn sent another letter on April 24, 2020, reiterating the PTL Lenders' desire to partner with the Company and its concern that other proposals might place needlessly "onerous terms" on the Company.  Debtors' Ex. 87 (ECF No. 862-31) at 3.  Gibson Dunn attached a draft term sheet for a priority term loan new money financing transaction, but with no exchange component or ability for the Company to capture discount and reduce debt.  *See id.*

65.     When the PTL Lenders "learned that the Company was also looking to delever," *id.* 156:23–157:2 (Chopra), that "other lenders were negotiating with the company" and offering "both new money and the opportunity to delever," and that "some sort of IPCo dropdown-type transaction" "was likely to be put on the table," *see id.* 150:4–10, 157:3–7 (Chopra); *see* May 17 Tr. (PM) 109:9–16, 109:24–110:2 (Yarrow), the PTL Lenders determined they needed to put "a competitive proposal on the table" because they "can ill afford to have that magnitude of assets – in particular the IP – dropped from our borrower." *Id.* at 111:12-15 (Yarrow).  Debtors' Ex. 149 (ECF No. 863-42).

66.     The PTL Lenders' advisors went under NDA on May 10, 2020, and "realized quite quickly [] there was a fair bit of activity," prompting those PTL Lenders to execute NDAs on "an expedited time frame."  May 16 Tr. 159:22, 160:2–4 (Chopra); *see* Debtors' Ex. 342 (ECF No. 866-42); Debtors' Ex. 343 (ECF No. 866-43).

67.     To push for the best deal, the Company was "continuing to prepare diligence materials" for the Centerview and Gibson Dunn group in parallel with "negotiating all of that"

going on with the Ad Hoc Group of Non-PTL Lenders.  May 15 Tr. (PM) 23:10–24:9 (Shah).  The goal with the PTL Lenders was to "parallel process their diligence" with a "view towards consummating the IPCo transaction."  May 15 Tr. (PM) 19:13–20:5 (Shah); *see also* Debtors' Ex. 62 (ECF No. 862-6).

68.     Although typically advisors "spend at least a few weeks, if not more, diligencing [a] company" to assess what a transaction might look like before clients sign their own NDAs, the PTL Lenders moved more quickly than usual because Centerview learned of the "dire" liquidity needs of the Company and the "competitive tension" brewing between the Company and many of its lenders.  May 16 Tr. 159:22–160:9 (Chopra).

69.     Within days of executing the NDAs, Centerview made a presentation to the PTL Lenders on or around May 22, 2020, detailing "what alternatives [Centerview] thought the company may be exploring with alternative lender groups and an alternative that [Centerview] wanted them to consider."  May 16 Tr. 161:22–162:1 (Chopra); Debtors' Ex. 144 (ECF No. 863-37).

70.     This presentation outlined two possible transactions that the PTL Lenders could propose. Option 2(a) was solely "a $200 million super priority new money financing," similar to the late April term sheet, while Option 2(b) paired the new money financing with "a debt repurchase of the first lien debt, 50.1 percent of the first lien debt at a price of 60 percent of par."  May 16 Tr. 164:17–23 (Chopra); *see* Debtors' Ex. 144 (ECF No. 863-37 at 14).

71.     To "help guide the conversation with the clients," Centerview also analyzed Options 3(a) and 3(b), hypothetical drop-down transactions that reflected "what [the PTL Lenders] assumed the alternative lender group and the Company were potentially considering," even though the PTL Lenders and their advisors had no "definitive guidance as to what the [C]ompany was

considering or what was being offered to them by the alternative lender group." May 16 Tr. 165:23–166:5, 10–16 (Chopra); *see* Debtors' Ex. 144 (ECF No. 863-37) at 14.  The possibility of a IPCo transaction with new money, a discount, and collateral components was a "curveball" for the PTL Lenders.  May 17 Tr. 107:12-13 (Sveen).

72.     Centerview's analysis revealed that "allowing the alternative lender group to consummate their transaction" had as a "downside scenario" of a small recovery for Centerview's clients—"as low as 11 to 13 percent."  May 16 Tr. 169:9–14 (Chopra).  Based on its analysis, Centerview advised its clients "that there is a fair bit of harm that could be caused to you by allowing the other group to do the [anticipated] transaction," but if the PTL Lenders "proposed and then ultimately [were] able to consummate a transaction along the lines of 2(b), the recovery range was much tighter and much higher."  May 16 Tr. 169:15–22 (Chopra).

73.     After that presentation, the PTL Lenders gave Centerview "a fair bit of feedback" on the proposed transaction described in 2(b), including that the indicative 60 percent discount capture for the 1L debt "was too low."  May 16 Tr. 171:25–172:2 (Chopra); Debtors' Ex. 150 (ECF No. 863-43).  The PTL Lenders were disappointed that they might need to forego a lot of principal in order to stay competitive given the proposal the Ad Hoc Group of Non-PTL Lenders had put on the table.  *See* May 17 Tr. (AM) 108:20–23 (Sveen).

74.     On May 26, 2020, the PTL Lenders sent a proposal to the Company, which included "a $200 million first lien/first out [facility], . . . which is for  new money.  And then a debt repurchase of the company's first lien and second lien loans using first lien/second out as currency."  May 16 Tr. 176:21–24 (Chopra); Debtors' Ex. 155 (ECF No. 863-48).  The PTL Lenders proposed that the debt repurchase "would be for 50.1 percent of the first lien loan at a

price of 80 percent of par and 25 percent of the second lien loans at a price of 42.5 percent of par." May 16 Tr. 176:25-177:2 (Chopra); Debtors' Ex. 155 (ECF No. 863-48).

75.    The PTL Lenders and their advisors understood that the "company was pushing hard for a discount." May 16 Tr. 177:13 (Chopra). For them to provide that discount, they wanted "the new instrument" and "the first lien/second out, to both trade well, but also recover well in the scenarios" that they had discussed with Centerview. May 16 Tr. 179:8–16 (Chopra). Those results required limiting "the size of the first and second out to a certain level." *Id* at 177:19-20 (Chopra)*.*

76.    Thus,  like the IPCo proposed transaction, "the only way to offer the [C]ompany the discount and really to thwart the alternative which was being pursued by other lenders at [the PTL Lenders'] expense was to limit the size of the First Lien Second Out and not have it" be a pro rata opportunity. May 16 Tr. 178:24–179:3 (Chopra).

77.    The PTL Lenders went through several rounds of arm's length negotiations with the Company in the hopes of offering a more favorable proposal to the Company than what they believed the competing group was offering with respect to the IPCo transaction. *See, e.g.*, Debtors' Ex. 169 (ECF No. 864-12); Debtors' Ex. 176 (ECF No. 864-19).

78.    "[T]he only way" to "convince the [C]ompany to take [the PTL Lenders'] new money and to buy themselves the incremental liquidity necessary, but importantly to not pursue a transaction with an alternative lender group that would have materially diluted the collateral package" and "materially influence[d] [the PTL Lenders'] recoveries in a downside scenario, . . . was to convince the company that [the PTL Lenders'] proposal was the right proposal for them to pursue." May 16 Tr. 182:21–183:3 (Chopra).

22

79.     That said, the PTL Lenders had "a fair bit of hesitancy . . . about providing discount." May 16 Tr. 186:25–187:1 (Chopra).  They would have stuck to offering only new money but for the proposed IPCo transaction.  *See* May 17 Tr. 873:10–13 (Yarrow).

80.     The PTL Lenders had primarily obtained the loans at par early after issuance.  *See* May 17 Tr. (AM) 95:12-13 (Sveen); *id.* (PM) 102:23 & (PM) 104:2–6 (Yarrow).  And the IPCo transaction presented some upside—"[i]f the [C]ompany had done well and was able to meet all its future obligations and recovered, then there was a possibility [for the PTL Lenders] to receive full principal at 100 cents on the dollar."  May 17 Tr. (AM) 110:20–23 (Sveen).  But the PTL Lenders' proposal was "essentially" a "permanent cap to our [] potential recovery" in which the PTL Lenders would be selling back to the Company below par debt that they had purchased at par.  *Id.* 111:3–4 (Sveen).

81.     They worried because they "were conceding value"—value which they "were not able to achieve . . . in the future."  May 17 Tr. (AM) 14:14–16 (Chopra).  As a result, the PTL Lenders asked Centerview around June 3, 2020 to "value the collateral, the IP that would be dropped down into the unrestricted subsidiary and then use that as a means to try and determine what [the remainder of the Company] would be worth."  May 16 Tr. (PM) 187:6–10 (Chopra).  That analysis would help inform what recovery the PTL Lenders could expect "in that circumstance."  *Id.* 187:9–10 (Chopra); Debtors' Ex. 184 (ECF No. 864-27).

82.     The PTL Lenders were only willing to concede that value to "avoid[] the harm that would have otherwise been caused had an alternative group . . . been able to consummate" an IPCo transaction.  May 17 Tr. (AM) 14:21–24 (Chopra).  That had disastrous potential because it would have "stripped away" "pretty much the entirety of the collateral" from the Company.  May 17 Tr. (PM) 114:23–115:1 (Yarrow); *see* Debtors' Ex. 218 (ECF No. 857-67).  At least one PTL Lender

forecasted that if the Company took the IPCo transaction, the PTL Lender could lose hundreds of millions of par value in the event of a default.  *See* May 17 Tr. (PM) 78:19–22 (Meiering).

83.     For that reason, the PTL Lenders knew they had to "put a transaction on the table" that was better for the Company because if they did not, "the [C]ompany was going to choose a dropdown transaction and [the PTL Lenders] would end up having a lot of [their] collateral, including the IP, stripped away."  May 17 Tr. (PM) 111:17–22 (Yarrow); *see also* Debtors' Ex. 149 (ECF No. 863-42). The IPCo proposal from the Ad Hoc Group of Non-PTL Lenders resulted in the PTL Lender Group "being backed into a corner a bit" to "come up with a more competitive alternative."  May 17 Tr. (AM) 117:3–5 (Sveen).

84.     And "the only reason" the PTL Lenders put a proposal on the table was as a defensive measure to "essentially stop [the Company] from doing the [Ad Hoc Group of Non-PTL Lenders'] transaction."  May 17 Tr. (PM) 115:9–11 (Yarrow); *see* Defendants' Ex. 218 (ECF No. 252-20) at 5.  The risk that collateral would depart the Company put the PTL Lenders "in the position of likely having to accept something lower than [they] otherwise would."  Debtors' Ex. 149 (ECF No. 863-42) at 1.

85.     The PTL Lenders thus made a "trade-off," accepting that their proposed transaction would come with a recovery "floor," May 17 Tr. (AM) 117:17–19 (Sveen), even though the "permanent" discount to their upside was "tough . . . to swallow," *id.*  117:6-7; *see also* Debtors' Ex. 188 (ECF No. 864-1) at 1 ("I think its [sic] tough to drop below a 25% haircut on the 1st.").  The PTL Lenders knew they were "taking a very large discount on [their] loan[s]," but were "forced" to do so to stop the IPCo transaction.  May 17 Tr. (PM) 120:18–23 (Yarrow).  Some of the PTL Lenders were "disappointed" to forego that debt, but felt that they had "made the best of a bad situation."  May 17 Tr. 126:20–23 (Sveen).

86.     On June 8, 2020, the PTL Lenders agreed to the Company's repurchase price proposals of 74% for the 1L loans, and 39% for the 2L loans. May 16 Tr. (PM) 189:21–24 (Chopra); Debtors' Ex. 220 (ECF No. 908-1).  At that price, the PTL Lenders "were starting to reach the[ir] limit" and, assuming all else equal, "would have preferred what they expected the alternative transaction was to offering further discount."  May 16 Tr. (PM) 190:6–14 (Chopra).

87.     When Centerview finally saw the terms of the competing group's proposal on June 8, 2020, it "learned that what had been proposed by the Gamut, Angelo [Gordon], Apollo group was actually far more damaging to the collateral package" than the PTL Lenders "had anticipated," including that "there was movement of more IP."  May 16 Tr. (PM) 194:11–20 (Chopra).

## VIII.   THE COMPANY EXERCISED ITS BUSINESS JUDGMENT IN DETERMINING THAT THE PTL LENDERS' PROPOSAL WAS THE BEST OPTION

88.     The Company extensively analyzed each of the proposals it received as part of its solicitation process. Debtors' Ex. 220 (ECF No. 908-1).  The Company received proposals from existing lenders including Barings, Oaktree, the Ad Hoc Group of Non-PTL Lenders, and the PTL Lenders.  *Id*.  The Company also received proposals from third-parties, including Fortress, Blue Torch, and Charlesbank.

89.     The Finance Committee rejected the proposals from the third-parties.  Blue Torch offered only $75 million, which would not have been enough to solve the Company's liquidity needs.  *See* May 16 Tr. (PM) 27:7–15 (Tepner).  And the Charlesbank proposal only "provided $160 million of term loan," and had "no debt recapture, discount capture at all in their proposal."  May 16 Tr. (PM) 28:17–20.  Fortress, for its part, would not have reduced the Company's debt and it was not clear it would provide enough value.  May 16 Tr. (PM) 24:24–25:7 (Tepner).

90.     The proposals from most of the Company's existing other lenders suffered from other infirmities. The Barings proposal had "roughly the same structure and same contemplated

steps" as Angelo Gordon's, but there were different economics.  May 15 Tr. (PM) 28:18–22

(Shah).  "The proposal had a hundred and twenty-five to two hundred [million in new money], and

the company was looking for $200 million, so it was not sufficient in terms of amount."  May 15

Tr. (PM) 31:12–14 (Tepner).Similarly, Oaktree's proposal to uptier $60 million of 1L debt at par,

with an additional $200 million in new money where Oaktree was only willing to provide $100

million, "was not complete enough to help the company."  May 16 Tr. (PM) 27:20–28:1222

(Tepner); *see also* Debtors' Ex. 152 (ECF No. 863-45).

91.    In the end, "the most viable proposals were the Angelo Gordon group proposal and

the proposal that eventually emerged out of the Gibson Dunn Group.  May 15 Tr. (PM) 30:15–20

(Shah); *see also* Debtors' Ex. 202 (ECF No. 864-45) at 6 ("Over the last week the company and

advisors have: Engaged in prolonged term sheet negotiations with PJT/PW group; Centerview /

Gibson Dunn group; Barings.").  Both of them were Position Enhancing Transactions that would

include $200 million in new money financing paired with participating first and 2L lenders

obtaining senior debt as consideration for the purchase of their existing loans at a discount.

92.    The Ad Hoc Group of Non-PTL Lenders' proposal "had two parts."  May 15 Tr.

(PM) 25:8–18 (Shah).  First, it would "drop assets into a non-guarantor subsidiary and raise some

new money," then it would do a debt exchange with that subsidiary.  May 15 Tr. (PM) 25:19–22

(Shah); *see also* Debtors' Ex. 145 (ECF No. 863-38) (May 22, 2020 Finance Committee board

minutes).  The collateral would have been "certain IP; namely, the Simmons and Tuft & Needle

IP" and "an as—yet--undetermined percentage of the company's equity ownership in Serta, Inc.,

the prime asset of which was the Serta trademark, and some third-party licensing revenue and some

real estate."  May 15 Tr. (PM) 27:20–28:2 (Shah).

93.     There would be $285 million of "new first lien term loan at that subsidiary, which would have been 200 million of new money, plus 100 million would have been offered in exchange for existing debt of the Angelo Gordon Group."  May 15 Tr. (PM) 27:13–19. At this time the exchange "was going to be a $435 million new term loan offered wholly for an exchange for the Angelo Group holdings in" the Company, with $493 million of existing 1L debt exchanged at 85% and $41 million of existing 2L debt exchanged at 40%. May 15 Tr. (PM) 28:8–12 (Shah); Debtors' Ex. 145 (ECF No. 863-38) at 11.

94.     The Company and Evercore ultimately did not consider the Ad Hoc Group of Non-PTL Lenders' offer a "fully-baked proposal."  May 15 Tr. (PM) 40:4–11 (Shah).  There were "five or six[] critical open points," but even if the Company could bridge the gap on those open points, it was still "not superior to what Gibson Dunn was offering."  May 15 Tr. (PM) 40:4–11 (Shah); *see also* Debtors' Ex. 224 (ECF No. 865-16) (explaining the issues with the Ad Hoc Group of Non PTL-Lenders' proposal).  Among other issues, the unrestricted subsidiary would be "bankruptcy remote," which meant that "in the event of any future bankruptcy . . . the unrestricted subsidiary holding the IP of [the Company] would not be subject to those same bankruptcy proceedings." May 15 Tr. (PM) 41:8–17 (Shah). This would have been a "significant negative" for the Company "in the event of any future restructuring," May 15 Tr. (PM) 174:3–10 (Shah), because the assets would not be available to pay the Company's debts.

95.     There was also a concern about "security leakage" because the Ad Hoc Group of Non-PTL Lenders' proposal, which included two separate steps, would have "put more assets at the non-guarantor, which would have over-collateralized the non-guarantor," while "under-collateralizing another box"—the unrestricted subsidiary.  May 15 Tr. (PM) 42:5–21 (Shah).

96.     Under this proposal, "the only place [the Company] could have done a step-two transaction and bring lenders in after the fact would have been at the unrestricted subsidiary, but it would have had fewer assets, and therefore, less step-two transactions."  May 15 Tr. (PM) 42:5–21 (Shah).

97.     Another concern with the Ad Hoc Group of Non-PTL Lenders' proposal was whether "the debt reduction [would] be large enough to help the company achieve its three objectives."  May 16 Tr. 33:4–11 (Tepner).  Indeed, the "amount of new debt being sought for liquidity outweighed the discount capture" the Ad Hoc Group of Non-PTL Lenders was offering.  May 15 Tr. (PM) 49:16–20 (Shah).  In other words, the Ad Hoc Group of Non-PTL Lenders' proposal would not have reduced the company's overall debt, May 15 Tr. (PM) 49:16–20 (Shah), and the Company wanted "more discount capture" than the Ad Hoc Group of Non-PTL Lenders' proposal offered.  *See* May 15 Tr. (PM) 41:24–42:4 (Shah).

98.     Additionally, the Ad Hoc Group of Non-PTL Lenders' proposal also gave them, instead of the Company, "the right to buy debt in the market" so that participating lenders could then "put it to the company at a fixed price" and capture greater returns.  May 15 Tr. (PM) 43:2–7 (Shah).  The Ad Hoc Group of Non-PTL Lenders also "wanted stricter limitations around [the Company's] ability to sell assets and use those proceeds to pay non-participants."  May 15 Tr. (PM) 43:8–14 (Shah).

99.     The PTL Lenders offered materially better terms.  The PTL Lenders "proposed $200 million new funds to come into the company and an exchange of . . . $698.5 million of first lien term loan and $41.3 million of second lien term loan," as well as new collateral that "was ranked equally amongst the PTL and the first lien lenders [and t]he second lien [lenders' would] have their second lien rights to it."  May 16 Tr. 34:13–35:20 (Tepner).

100.    The PTL Lenders further improved their offer over "multiple rounds of negotiation around the exchange ratio being more favorable to the company [and] around overall call protections, ability to do a step-two transaction with pari-passu or junior debt capacity among other" things.  May 15 Tr. (PM) 37:14–18 (Shah).  The improved exchange ratio meant that the PTL Lenders would be "exchanging their debt at a lower price or a higher discount and the company [would] benefit[] from that discount capture as dollar-for-dollar deleveraging."  May 15 Tr. (PM) 37:22–24 (Shah); *see also* Debtors' Ex. 208 (ECF No. 865-1).  The PTL Lenders' deal also "provide[d] more flexibility to make restricted debt payments; *i.e.*, repay parties who were not in the transaction." May 15 Tr. (PM) 45:2–4 (Shah).

101.    The PTL Lenders' proposal also improved through negotiations over time in other ways.  Initially, they "wanted to restrict the rate or the yield at which we could exchange non-participants into other debt and they wanted to cap the rate we could offer them."  May 15 Tr. (PM) 45:15–17 (Shah).  But the Company "pushed back on that to have more flexibility to cut deals with non-participants and they ultimately did give [the Company] that."  May 15 Tr. (PM) 45:18–20 (Shah).  Additionally, the PTL Lenders ultimately agreed to provide 100 percent credit for any paydown on the exchange, rather than two-thirds credit, which was their initial offer. Debtors' Ex. 208 (ECF No. 865-1); *see also* May 15 Tr. (PM) 46:12–23 (Shah).

102.    In the end, the PTL Lenders' "proposal was the best in terms of providing the amount of new liquidity the company needed," "greater discount capture," and "less interest expense in total."  May 15 Tr. (PM) 48:10–13 (Shah).  It also had "good step-two capacity" and, crucially, "the participation and support of a larger number of lenders."  May 15 Tr. (PM) 46:12–23 (Shah); *see also* Debtors' Ex. 202 (ECF No. 864-45) at 1 ("Gibson Dunn group represented the best financing and exchange transaction opportunity among the proposals reviewed.").

29

103.    Although the PTL Lenders "provided for the same amount of new money" as compared to the Ad Hoc Group of Non-PTL Lenders, they represented "a bigger group," allowing the Company to "captur[e] materially more discount at 310 million." May 15 Tr. (PM) 50:2–14 (Shah). This meant that "the debt in total [for the Company] came down on a net basis by 185 million and interest only went up by 22 million, which was more favorable than" the Ad Hoc Group of Non-PTL Lenders' proposal. May 15 Tr. (PM) 50:14–16 (Shah). In other words, they "would not have achieved the same level of discount" and "would have had more limitations on long-term operating flexibility" under the Ad Hoc Group of Non-PTL Lenders' proposal. May 15 Tr. (PM) 138:12–14 (Prince).

104.    The differences between the proposals on a point-by-point basis are even starker. Indeed, the PTL Lenders' proposal "had more favorable terms on virtually every term that was important to the company." May 15 Tr. (PM) 50:24–25 (Shah). Whereas the Ad Hoc Group of Non-PTL Lenders' proposal would have *increased* the Company's debt by $38 million, the PTL Lenders' proposal reduced debt by $185 million. May 16 Tr. 36:13–18 (Tepner). Interest payments under the Ad Hoc Group of Non-PTL Lenders' proposal increased by $37 million, while the PTL Lenders' proposal only increased interest payments by $22 million. May 16 Tr. 36:19–24 (Tepner). In addition to the amount of discount capture, the proposal also provided for a lower overall interest rate. May 16 Tr. 37:16–19 (Tepner). This meant that "the basic interest burden, the weighted-average cost of debt was lower under the Gibson Dunn proposal than under the Angelo Gordon proposal." May 16 Tr. 37:16–19 (Tepner). And the PTL Lenders' discount capture was $470 million to the Ad Hoc Group of Non-PTL Lenders' $283 million. May 16 Tr. (PM) 37:1–5 (Tepner); *see* Debtors' Ex. 202 (ECF No. 864-45). This significantly higher discount capture was a key factor for the Company. May 16 Tr. 37:13–15 (Tepner) ("[T]he punch line, of

course, was the dramatically different amount of discount capture that was very important to the company to help them delever its balance sheet.").

105.    Ultimately, the Finance Committee had the final say on which transaction was approved.  May 15 Tr. (PM) 133:3–4 (Prince).  For the reasons explained above, the Finance Committee chose the PTL Lenders' proposal because they thought it "was the best proposal for the company."  May 16 Tr. 38:6–9 (Tepner).

## IX.    THE COMPANY INVITED OTHER LENDERS INTO THE TRANSACTION TO ACHIEVE ADDITIONAL DISCOUNT

106.    After the 2020 Transaction was announced, Mr. Shah and Mr. Prince informed Angelo Gordon and "open[ed] the door to potentially seeing if we could negotiate the deal to include" Angelo Gordon, but they "said they weren't interested" and "declined the invitation to potentially participate."  May 15 Tr. (PM) 52:12–17 (Shah).

107.    To reach the 50.1% necessary to effectuate the 2020 Transaction, the Company included Barings, Oaktree, and Sixth Street in the deal.  Debtors' Ex. 249 (ECF No. 865-40) at 7. Each of these companies had made IPCo proposals to the Company.  Debtors' Ex. 152 (ECF No. 863-45) at 9, 13–16; May 16 Tr. 31:6–17 (Tepner); May 16 Tr. 27:16–28:14 (Tepner); May 16 Tr. 25:8–26:14 (Tepner).  Barings, which was the "largest combined lender" of both 1L and 2L loans, held "hundreds of millions of dollars" in debt, or "more than 10 percent."  May 16 Tr. 31:2–5 (Tepner);  May 15 Tr. (PM) 193:24 (Prince); May 15 Tr. (PM) 76:16–21 (Shah).

108.    As part of the Ad Hoc Group of PTL Lenders' deal, $949 million of 1L debt and $231 million of 2L debt was already signed onto the deal, which represented over 50 percent of both tranches.  May 15 Tr. (PM) 58:10—13 (Shah).  Then, holders of approximately $218 million of 1L and $105 million of 2L debt attempted to get into the basket.  May 15 Tr. (PM) 58:1—3 (Shah); *see also* Debtors' Ex. 249 (ECF No. 865-40).

109.    The Company selected additional lenders to be allowed into the basket based on "various criteria in terms of cross holdings, the amount of discount capture they could offer . . ., the size and their ability to fit in the basket, their potential future lending relationship with the company and made kind of the hard decisions to filter through all the inbounds and figure out who best to take."  May 15 Tr. (PM) 56:12–17 (Shah).  The Company and its advisors also considered "[l]ending relationships," meaning "people who were viewed as potential future supportive lenders in the company."  May 15 Tr. (PM) 56:19–21 (Shah); *see also* May 15 Tr. (PM) 139:22–140:3 (Prince).  But ultimately "economics were the most important factor."  May 15  Tr. (PM) 140:2–3 (Prince).  The parties let in represented approximately an additional "30 million" of the Company's debt.  May 15 Tr. (PM) 56:22–57:1 (Shah); May 15  Tr. (PM) 139:13–15 (Prince).

110.    Ultimately, the Finance Committee approved an additional five lenders to participate in the transaction: (i) Monarch, (ii) Arrowmark, (iii) Marble Point, (iv) Marathon, and (v) Venor.  None of these additional lenders had any role in negotiating the terms of the 2020 Transaction.

111.    Monarch had been "fairly aggressive in the way they bought into the debt and the way they treated" the Company.  May 15 Tr. (PM) 141:17–20 (Prince).  As such, the Company originally did not want Monarch in the deal.  May 15 Tr. (PM) 141:21–142:8 (Prince); *see also* Debtors' Ex. 180 (ECF No. 864-23).  But "the size of their second lien holding specifically" "made them a very economic trade inside the confines of [the Company's] baskets."  May 15 Tr. PM 142:11–15 (Prince).  They were let in because they held "entirely second liens" so the Company was "getting the greatest discount capture on their holdings."  May 15 Tr. 58:20-22 (Shah).

112.    Arrowmark held a "mix of 1L and 2L" debt.  May 15 Tr. (PM) 58:23–59:2 (Shah). They were "let in" because "they were interest neutral" and provided "also [a] future lending

relationship." May 15 Tr. (PM) 58:23–59:2 (Shah). Marble Point held a "mix of 1L and 2L" debt, which gave an addition $11 million in discount capture, and their participation would largely not impact any interest for the Company. May 15 Tr. (PM) 59:3–59:8 (Shah); *see* Debtors' Ex. 249 (ECF No. 865-40). Marathon was let in because they were a "small, but very sophisticated" lender whose participation utilized only approximately $4 million in exchange capacity. Debtors' Ex. 249 (ECF No. 865-40); May 15 Tr. (PM) 59:9–59:13 (Shah). Venor was let in because "[t]hey were all second lien and small, so they offered the greatest discount capture," as well as roughly $400K of interest savings. May 15 Tr. (PM) 59:14–17 (Shah); *see also* Debtors' Ex. 249 (ECF No. 865-40).

113.   LCM never reached out to Evercore, the Company, or the PTL Lenders to discuss participation in the deal. May 15 Tr. PM 59:21–23 (Shah).

## X.   THE NON-PTL LENDERS ATTEMPT TO THWART THE 2020 TRANSACTION

114.   After learning that the Company had selected the PTL Lenders' proposal on June 5, 2020, the Ad Hoc Group of Non-PTL Lenders first tried to convince one or more of the PTL Lenders to break their agreement with the Company by offering them $30 million dollars to not go through with the deal. May 18 Tr. (AM) 128:15–129:2, 131:14–15 (Kwon); Debtors' Ex. 212 (ECF No. 865-5), at -184 (listing "$30 million fee paid directly to ad hoc group members" as an "[o]ption"). The Company would not have received any portion of the $30 million and would have been left without the additional liquidity it needed to stave off bankruptcy. May 18 Tr. (AM) 129:3–4 (Kwon).

115.   Angelo Gordon also contacted other lenders to try to prevent them from joining the Centerview group. Debtors' Ex. 372 (ECF No. 941) at 176:21–177:3 (Gladstone).

116.   Soon after, the Ad Hoc Group of Non-PTL Lenders and LCM filed suit in New York state court, unsuccessfully seeking to enjoin the transaction. *See North Star Debt Holdings*

*L.P. v. Serta Simmons Bedding LLC*, 2020 WL3411267, at *1 (N.Y. Sup. Ct. June 19, 2020); *LCM Asset Mgmt. LLC v. Serta Simmons Bedding, LLC*, No. 652555/2020 (N.Y. Sup. Ct. 2020).  After they lost their bid for a preliminary injunction and that court ruled they could not "establish likelihood of success" on their claims, the Transaction closed on June 22, 2020.  *North Star*, 2020 WL 3411267, at *5.

117.    In September 2020, the Ad Hoc Group of Non-PTL Lenders entered into a cooperation agreement with a larger group of lenders whereby each agreed they would not consent to any reorganization plan unless all members of their group agreed.  May 18 Tr. (AM) 133:21–135:15 (Kwon); *see also* Debtors' Ex. 266 (ECF No. 866-3).  This agreement prohibited the signatories, including the Ad Hoc Group of Non-PTL Lenders, from selling the Company's debt even when it traded at almost 80 cents on the dollar, well above what they had paid for it.  May 18 Tr. (PM) 42:9–21 (Hanigan).

## XI.    THE COMPANY AND THE PTL LENDERS AMEND THE TERM LOAN AGREEMENT AS PERMITTED BY ITS TERMS

118.    To effectuate the Transaction, the Company and the PTL Lenders, who held more than 50% of the Company's outstanding loans, entered into certain permitted amendments to the Term Loan Agreement to allow the Company's newly issued loans ("**PTL Loans**") to have senior payment priority.[3]  *See* Debtors' Ex. 250 (ECF No. 857-99).  Specifically, the Term Loan Agreement was amended to allow the Company to incur incremental equivalent debt—as permitted under Section 6.01(z)—that is senior in right of payment to the First Lien Term Loans.

---

[3] The Company also entered into a separate Super-Priority Term Loan Agreement, dated June 22, 2020 (the "**PTL Credit Agreement**"), *see* Debtors' Ex. 252 (ECF No. 865-42) an Open Market Purchase and Cashless Exchange Agreement, dated June 22, 2020 (the "**Exchange Agreement**"), *see* Debtors' Ex. 251 (ECF No. 865-41), and a First Lien Intercreditor Agreement, dated June 22, 2020, *see* Debtors' Ex. 254 (ECF No. 865-44), pursuant to which the PTL Loans rank senior in right of payment, but *pari passu* with respect to security, to the First Lien Term Loans under the Term Loan Agreement.  *See North Star*, 2020 WL 3411267, at *2, *4.  The Company and the PTL Lenders made certain other amendments to the Term Loan Agreement, none of which are relevant to this dispute.

The definition of Incremental Equivalent Debt, as amended, is:

> Indebtedness issued, incurred or implemented in lieu of loans under an Incremental Facility in the form of notes or loans and/or commitments in respect of the foregoing (***including Indebtedness issued under the PTL Credit Agreement*** (including the Priority New Money Term Loans and the Priority Exchange Term Loans)) in each case, ***which may be senior***, *pari passu* or junior ***in right of payment*** and/or with respect to security with the Obligations hereunder . . . .

*See id.* § 1.01 (emphasis added).

119.    Section 8.08 of the Term Loan Agreement was also amended to authorize the Agent to enter into a separate intercreditor agreement to establish senior payment priority for the new loans.  Section 8.08, as amended, provides:

> Each Secured Party irrevocably authorizes and instructs the Agent to, and the Agent shall: . . . (d) enter into subordination, intercreditor, collateral trust and/or similar agreements with respect to Indebtedness (including the Initial Intercreditor Agreement, the PTL First Lien Intercreditor Agreement and any other Acceptable Intercreditor Agreement . . . that is (i) required or permitted to be senior, *pari passu* or subordinated hereunder . . . .

*See id.* § 8.08.

120.    The amendments made as part of the Transaction were permitted by consent of the "Required Lenders," *i.e.*, a majority of the Company's lenders, which the PTL Lenders provided. No changes were made to the waterfall provision (which already had an express carveout for "open market purchases" under Section 9.05(g)) or any other "sacred right" in the Term Loan Agreement, and no liens were stripped away from other First Lien Term Loan Lenders.  *See* Debtors' Ex. 252 (ECF No. 865-42) § 2.18; *supra* Section II.B.  Importantly, the Term Loan Agreement does not include an "anti-subordination" provision as a sacred right, which would have required all affected lenders to agree to any amendment that subordinates the loans governed by the underlying Term Loan Agreement to other new or existing loans.  *See* Debtors' Ex. 6 (ECF No. 853-6); May 18 Tr. (AM) 93:1-5 (Kwon).  And Defendants have affirmatively conceded that "the new money aspect

of the [2020] Transaction was permitted," (ECF No. 148 ¶ 269), which was implemented through these same amendments to the Term Loan Agreement.  May 17 Tr. (AM) 12:16–20 (Chopra).

## XII.   THE MARKET RECOGNIZED THE BENEFITS OF THE 2020 TRANSACTION BEFORE DOWNTURNS LED TO THE COMPANY'S BANKRUPTCY

121.    In the first quarter of 2020, the price of the Company's 1L debt on the secondary market came "down from the mid to high 60s down to 40ish."  May 15 Tr. (PM) 60:15-21 (Shah).  This decline was caused "in large part to COVID and all the same pressures that were causing the company's liquidity to deteriorate and business prospects to suffer."  May 15 (PM) Tr. 60:15-21 (Shah).  Right before the Transaction, the 1L debt was trading "[r]ight around 43 cents on the dollar."  May 15 Tr. (PM) 60:22-25 (Shah).

122.    After the Transaction closed, "the debt price had fallen to somewhere in the 20s to low 30s."  May 15 Tr. (PM) 61:1-4 (Shah).  It began trading up just "two months later," however, and went on to trade at "about 80" through 2021.  May 15 Tr. (PM) 61:5-13 (Shah).  This showed that the "transaction worked.  The company got liquidity and breathing room, it captured discount and therefore, reduced its leverage."  May 15 Tr. (PM) 61:14-20 (Shah).  Even Angelo Gordon recognized that the 2020 Transaction provided "immediate benefits" to the Company.  Debtors' Ex. 266 (ECF No. 866-3).

123.    While 2021 was a strong year for the Company, continuing macro-economic headwinds (including rising inflation, supply chain disruptions, and a downturn in the mattress industry overall) led the Company to miss its financial projections in 2022.  *See* May 16 Tr. (PM) 41:20–43:5 (Tepner); *see also* Debtors' Ex. 249 (ECF No. 865-40).  The Company initially planned for a higher earnings before interest, taxes, depreciation, and amortization ("**EBIDTA**") in 2022, but subsequently "projections were that EBITDA would not come close to the business

plan," which "made it very difficult to try and refinance based on poor performance."  May 16 Tr. (PM) 42:21–43:5 (Tepner); *see also* Debtors' Ex. 249 (ECF No. 865-40).

124.    The Company's debt began to trade down due to "competitive pressure, margin pressure, and raw material pressures," eventually reaching its pre- 2020 Transaction prices again on "May 10, 2022."  May 15 Tr. (PM) 61:21–62:8 (Shah).

125.    After the Company was unable to refinance its debt in early 2022 due to poor EBITDA performance, the Company began to prepare for Chapter 11.  In conjunction with filing for bankruptcy, the Debtors were able to negotiate a settlement with a majority of its lenders, culminating in the restructuring support agreement ("**RSA**") and the Plan.  *See* Debtors' Ex. 296 (ECF No. 866-32); May 16 Tr. (PM) 49:12-20 (Tepner).  The RSA "was the best deal for the company" and provides for $200 million of cash, as well as approximately $747 million of debt reduction. May 16 Tr. (PM) 65:2–9 (Tepner); *see* Debtors' Ex. 296 (ECF No. 866-32).  A new $300 million term loan would be effectuated by First Lien First Out creditors receiving $196 million of claims, and "$104 million distributed pro rata amongst the group" of First Lien Second Out creditors.  May 16 Tr. (PM) 49:25–50:7 (Tepner).  Any non-PTL Lenders will receive 1 percent of the reorganized equity of the debtor if they support the Plan.  ECF No. 977 § 4.5.  In exchange for a significant equitization of the First Lien First Out and First Lien Second Out debt, the Company agreed to provide an indemnity to those creditors as part of the RSA and the Plan. *See* May 17 Tr. (PM) 117:20–118:6 (Yarrow) ("[A]s part of the RSA we were equitizing a substantial amount of our debt . . . . And I don't think we would have agreed to do that if we hadn't some downside protection from the indemnity.").  Under the Plan, equity holders receive $1.5 million in cash, as well as $200,000 for fees and expenses, in order to capture significant tax benefits.  May 16 Tr. 431:3–5 (Tepner).

126.   This RSA—to comprehensively restructure their balance sheet, resulting in an approximately $1.6 billion deleveraging—was the best deal for the Company.  *See* May 16 Tr. 47:14–20 (Tepner) ("One, we had a decent sized cash balance at the time, which aided in our ability to try and effectuate a transaction and preserve liquidity while we were going through it. But we were looking to substantially deleverage the company to a sustainable debt level -- debt level, which was estimated to be three hundred or $400 million, and of course, create runway, so the company would have long-term viability.").  The Company subsequently settled similar claims with the Creditor's Committee.

## XIII. INDEMNIFICATION—STANDARD IN CREDIT AGREEMENTS—WAS AN ESSENTIAL COMPONENT OF THE 2020 TRANSACTION DOCUMENTS AND THE RSA

127.   Lenders and financial advisers in the industry understand indemnity provisions to be "pretty standard practice in any transaction."  May 17 Tr. (PM) 45:2–3 (Searles); *see also* May 17 Tr. (PM) 117:5 (Yarrow).   Indemnities in a credit agreement are "commonplace" and "important," May 16 Tr. 192: 5-6 (Chopra), "traditional," May 17 Tr. (AM) 33:17-18 (Chopra), and "routine[]," May 17 Tr. (PM) 61:3–6 (Searles).  As such, players in this space expect indemnity provisions and generally place significant value on them.

128.   Lenders rely on their counsel "to ensure that [any indemnity provision] is drafted and documented in accordance with market."  May 17 Tr. (PM) 61:5–6 (Searles); *see id.* (AM) 119:21–23 (Sveen) (outside counsel relied upon to "identify" the need for an indemnity provision "and negotiate that"); *id.* (PM) 118:20–22 (Yarrow) (confirming he reached out to counsel "just to make sure that. . . my understanding was correct of the indemnity").

129.   It was "highly important," May 17 Tr. (PM) 81:21 (Meiering), to the PTL Lenders that an indemnity provision be included in the PTL Credit Agreement in 2020, particularly given the backdrop of litigation.  By the time the PTL Credit Agreement was signed, a number of the

PTL Lenders and the Company were already defendants in "active litigation" commenced by the Ad Hoc Group of Non-PTL Lenders.  May 16 Tr. 192:15 (Chopra); May 17 Tr. (PM) 45:11–15 (Searles).  As Phil Yarrow of Invesco noted, "we were already being sued, and so we wanted to have some protection. . . . around that."  May 17 Tr. (PM) 116:25–117:2 (Yarrow).  Today, "almost three years into litigation over the 2020 transaction," the indemnification obligation is "even more important" to the PTL Lenders.  May 17 Tr. (AM) 120: 4–11 (Sveen).  As a result, the go-forward indemnity obligation set forth in the Plan is just as important to the PTL Lenders, and was the result of hard fought, arm's-length negotiations culminating in the settlement embodied in the Plan and the New Term Loan Credit Facility Agreement.  *See* May 17 Tr. 117:20–118:6 (Yarrow).

130.    Defendants have argued that the scope of the indemnity in the PTL Credit Agreement is unusually broad insofar as it covers claims related to the 2020 Transaction arising from bad faith, gross negligence, willful misconduct and breach of contract by the PTL Lenders. Defendants have presented no evidence to support their assertions concerning "standard" indemnity provisions, however, nor have they accounted for the rare situation where they had already sued the PTL Lenders for their participation in the 2020 Transaction at the time of the PTL Credit Agreement.  *North Star*, No. 652243/2020, NYSCEF 1 (N.Y. Sup. Ct. June 18, 2020); *LCM Asset Mgmt.*, No. 652555/2020, NYSCEF 1 (N.Y. Sup. Ct. June 18, 2020).  Moreover, Angelo Gordon negotiated a similar indemnification provision for itself in its Envision-AmSurg IPCo transaction.  *See* Debtors' Ex. 359 (ECF No. 889-5) § 13.5(a).  Angelo Gordon's own behavior is consistent with a finding that the indemnification in the PTL Credit Agreement is standard

XIV. **POSITION ENHANCING TRANSACTIONS LIKE THE 2020 TRANSACTION HAVE LONG BEEN FAMILIAR TO SOPHISTICATED MARKET PARTICIPANTS—AND SOME OF THE DEFENDANTS THEMSELVES HAVE ENGAGED IN SUCH TRANSACTIONS**

131.     The 2020 Transaction was "similar in certain aspects" to other transactions that had preceded it, meaning that by the time the 2020 Transaction took place, sophisticated lenders "[had] seen a transaction structure like [it] before."  May 17 Tr. (PM) 47:13–17 (Searles).  The 2020 Transaction structure should not have come as a surprise since it "was [not] inconsistent" with what market participants had "seen prior and what [they] might expect."  May 17 Tr. (PM) 81:8– 11 (Meiering).   There may have been "nuances to this" particular transaction, but similar transactions with "similar economic features ha[d] certainly occurred." May 17 Tr. (PM) 80:3–7 (Meiering).  Transactions with some such "similar components" include Trident, J. Crew, and PetSmart, May 17 Tr. (PM) 120:16–121:3 (Yarrow), and priming facilities combined with a discounted debt exchange such as the Murray Energy transaction were "pretty common in the high yield bond world," even if the "exact facts and circumstances" necessarily vary from deal to deal. May 17 Tr. (PM) 63:16–21, 64:11–15 (Searles).  It was thus not a "surprising event that these three components were used together in this transaction," and it "shouldn't be surprising to the marketplace" that such a transaction could occur given that the Company's lenders "willingly signed up for these documents" and know that there are looser documents elsewhere in the marketplace.  May 17 Tr. (AM) 124:21–125:2 (Sveen).

132.     Angelo Gordon and Apollo have each participated in multiple transactions substantially similar to the 2020 Transaction, including transactions in which certain lenders received benefits "not offered to all lenders" in the same class.  Debtors' Ex. 316 (ECF No. 859- 14) at 7; Debtors' Ex. 320 (ECF No. 859-18) at 6–7.

133.    In May 2020, for example—prior to the 2020 Transaction—Angelo Gordon participated in a transaction in which Revlon transferred its intellectual property to newly formed subsidiaries and removed the liens on those assets from a 2016 term loan.  Debtors' Ex. 316 (ECF No. 859-14) at 9.  In the Revlon transaction, Angelo Gordon and other lenders agreed to fund approximately $1 billion in new money in exchange for being permitted to exchange their 2016 term loans for new loans with liens on the new subsidiary, effectively jumping ahead of the minority lenders.  *Id*.

134.    Angelo Gordon also participated in an IPCo transaction involving Envision Healthcare.  Debtors' Ex. 316 (ECF No. 859-14) at 7–8; Debtors' Ex. 372 (ECF No. 941) at 210:2–9 (Gladstone).  In its Envision transaction, the first step involved Angelo Gordon and others "loan[ing] approximately $1.1 billion to AmSurg, LLC," a newly created unrestricted subsidiary of Envision.  Debtors' Ex. 316 (ECF No. 859-14) at 2; *see* Debtors' Ex. 372 (ECF No. 941) at 211:20–212:11 (Gladstone).   AmSurg then used that new Angelo Gordon-provided debt to repurchase certain existing loans held by participating Envision lenders at a discount, which was not available to other Envision lenders.  Debtors' Ex. 316 (ECF No. 859-14) at 3.  This transaction was nearly identical to the IPCo structure proposed by the Ad Hoc Group of Non-PTL Lenders, and AmSurg's April 29, 2022 credit agreement governing those new loans contains an indemnification provision covering Angelo Gordon (and others) from any claims related to the AmSurg IPCo transaction, including those arising from their bad faith, willful misconduct and gross negligence.  Debtors' Ex. 359 (ECF No. 889-5) at § 13.5(a).  Then, in "the second half of 2022," Angelo Gordon also "funded incremental loans to AmSurg LLC, the proceeds of which were distributed to Envision and used to acquire the Envision loans from Angelo Gordon." Debtors' Ex. 316 (ECF No. 859-14) at 3.

135.    In addition, Apollo participated in two uptier transactions not available to all lenders: Mitel Network and the above mentioned Envision transaction.  *See* May 18 Tr. (AM) 43:16–17 (Kwon).  In the Mitel restructuring, lenders including Apollo "uptiered their existing debt holdings" into senior debt "through an exchange." May 18 Tr. (AM) 123:15–20 (Kwon); *see also* Debtors' Ex. 320 (ECF No. 859-18) at 3 ("The participating lenders provided $156 million of new money in a 'first out' position and exchanged their existing first and second lien loans for super-senior 'second out' and 'third out' term loans, respectively.").  "Apollo participated in [that] debt exchange transaction with Mitel and got benefits that were not open to all of the lenders in that group." May 18 Tr. (AM) 116:23–117:1 (Kwon); *see id*. at 123:21–24 ("Apollo received financial benefits in the Mitel transaction it participated in that excluded lenders did not receive."). The first lien credit agreement in Mitel was amended to permit the uptier transaction after having been originally entered into on November 30, 2018, two years before the 2020 Transaction. *See* Debtors' Ex. 361 (ECF No. 933) at § 9.05(b).

136.    And in Apollo's Envision transaction, "a majority of [Envision's] creditors amended the parties' existing agreements to permit the issuance of new senior priming debt," with the amendment "negotiated with holders of a majority of Envision's first lien term loan facility." May 18 Tr. (AM) 115:17–23 (Kwon); *see* Debtors' Ex. 320 (ECF No. 859-18) at 2–3 ("[T]he borrower transacted with a majority of its creditors and amended the parties' existing agreements to permit the issuance of new senior priming debt."). Apollo participated in that Envision "uptier debt exchange transaction."  May 18 Tr. (AM) 115:13–16 (Kwon).

137.    Apollo contends it acted ethically and in good faith with respect to the transactions in which it participated.  *See* May 18 Tr. (AM) 125:5–8 (Kwon); Debtors' Ex. 374 (ECF No. 941-2) at 268:17–20 (Kwon).  Apollo also claimed that the IPCo transaction was proposed in good

faith.  May 18 Tr. (AM) 52:25–53:3 (Kwon). Angelo Gordon likewise contends that it "always operate[s] at the highest ethical standards," Debtors' Ex. 372 (ECF No. 941) at 23:21–24:3 (Gladstone), and the IPCo transaction was made in good faith.  Debtors' Ex. 301 (ECF No. 859) at 11.  Those assertions cannot be squared with their allegations concerning the substantively similar 2020 Transaction at issue here.

## XV.   DEFENDANTS' LITIGATION CAMPAIGN CHALLENGING THE 2020 TRANSACTION IS LONG-RUNNING

138.    As noted, on June 11, 2020, the Ad Hoc Group of Non-PTL Lenders filed a complaint in New York state court, seeking a temporary restraining order and preliminary injunction to stop the 2020 Transaction. *North Star*, No. 652243/2020, NYSCEF 1 (N.Y. Sup. Ct. June 11, 2020).  On June 18, 2020, LCM sought to intervene in the *North Star* action and separately filed its own complaint.  *See North Star*, No. 652243/2020, NYSCEF 57-61 (N.Y. Sup. Ct. June 18, 2020); *LCM Asset Mgmt.*, No. 652555/2020, NYSCEF 1 (N.Y. Sup. Ct. June 18, 2020).  On June 20, 2020, the New York state court denied their request for a preliminary injunction, allowing the 2020 Transaction to close.  *North Star*, 2020 WL 3411267, at *6.

139.    On July 2, 2020, LCM withdrew its request to intervene and voluntarily discontinued its separate action.  *North Star*, No. 652243/2020, NYSCEF 124 (July 2, 2020); *LCM Asset Mgmt.*, No. 652555/2020, NYSCEF 14 (July 2, 2020).  The Ad Hoc Group of Non-PTL Lenders would also later voluntarily dismiss its action over the Company's and the PTL Lenders' objections.  *North Star*, No. 652243/2020, NYSCEF 212 (Dec. 1, 2020).

140.    On the same day it discontinued its state court action, LCM filed a new case in the Southern District of New York.  *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2021 WL 918705, at *2 (S.D.N.Y. Mar. 10, 2021).  On March 10, 2021, that court dismissed LCM's first federal case for lack of subject matter jurisdiction.  *LCM*, 2021 WL 918705, at *6.

141.    On May 4, 2021, LCM re-filed its action in the Southern District of New York by dropping the PTL Lenders to manufacture diversity jurisdiction. *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *5 (S.D.N.Y. Mar. 29, 2022).  That court rejected LCM's core argument that the 2020 Transaction improperly subordinated LCM's loans because there were no sacred rights in the Term Loan Agreement protecting against subordination.  *LCM*, 2022 WL 953109, at *10.

142.    On November 16, 2022, in the midst of negotiations with the Company and the PTL Lenders, the Ad Hoc Group of Non-PTL Lenders re-filed their action in New York state court two years after they originally discontinued their claims.  *AG Centre Street Partnership L.P. v. Serta Simmons Bedding,* LLC, No. 654181/2022, NYSCEF 11 (N.Y. Sup. Ct. Nov. 16, 2022).

143.    On January 23, 2023, the Company filed for Chapter 11 protection in this Court. *In re Serta Simmons Bedding, LLC*, No. 23-90020 (Bankr. S.D. Tex. Jan. 23, 2023).  The Company also initiated adversary proceedings (1) for a declaratory judgment that the 2020 Transaction did not breach the Term Loan Agreement or the implied covenant of good faith and fair dealing, *Serta Simmons Bedding, LLC v. AG Centre Street Partnership L.P.*, No. 23-9001 (Bankr. S.D. Tex. Jan. 24, 2023); and (2) to stay the New York litigation against the PTL Lenders, *Serta Simmons Bedding, LLC v. AG Centre Street Partnership L.P.*, No. 23-3007 (Bankr. S.D. Tex. Jan. 24, 2023). The Company did so, in part, because resolution of the litigation concerning the 2020 Transaction is a condition precedent to confirmation of the Plan.

144.    On March 20, 2023, this Court entered an order staying the New York litigation against the PTL Lenders, finding, among other things, that the matter was a core proceeding pursuant to 28 U.S.C. § 157(b).  *Serta Simmons Bedding, LLC v. AG Centre Street Partnership*

*L.P.*, No. 23-3007, ECF No. 124 (Bankr. S.D. Tex. Mar. 20, 2023).  Defendants did not appeal that order.

145.    On February 24, 2023, the Company and PTL Lenders moved for summary judgment.  On March 28, 2023, the Court held a hearing at which time it ruled from the bench, holding that it is "very clear" that the debt buyback process the Lender Plaintiffs and the Debtors engaged in was "what's intended by a concept of an open market purchase" and "what was intended by the agreements." Mar. 28, 2023 Hr'g Tr. at 134.

146.    On April 6, 2023, the Court entered a written order granting in part the motion for summary judgment.  ECF No. 142.  As relevant here, the Court found that this is a core proceeding under 28 U.S.C. § 157(b) and that it "should enter partial final judgment in Plaintiffs' favor on Plaintiffs' claim that the Transaction was permitted under the Non-PTL Term Loan Agreement." ECF No. 141 ¶¶ 1, 4.  Defendants appealed only that part of the order granting partial summary judgment, but not that part of the order establishing this Court's jurisdiction over this core proceeding.  That appeal is currently pending before the United States Court of Appeals for the Fifth Circuit.

## PROPOSED CONCLUSIONS OF LAW

### I.    JURISDICTION

147.    This Court is empowered to fully and finally adjudicate the claims and the Plan that were tried before it.  It has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

148.    The Ad Hoc Group of Non-PTL Lenders challenges this Court's jurisdiction to decide its counterclaims against the PTL Lenders and the Company, arguing that they are neither core proceedings under 28 U.S.C. § 157(b)(2), nor matters on which this Court can permissibly

enter final judgment under *Stern v. Marshall*, 564 U.S. 462 (2011). *See* ECF No. 241 at 31–33. LCM limits its argument to the Court's constitutional authority under *Stern*, but applies that argument to both "[t]he declaratory-judgment claims and related counterclaims." (ECF No. 245 ¶ 28). Neither argument is availing.

149.    The dispute between the parties, whether as set forth in the declaratory judgment claims brought by the Debtors' or in the mirror image counterclaims, is fundamentally about the priority of the claims and who is first in line to recover now that the Company has commenced these Chapter 11 proceedings. Thus, both the declaratory judgment claims and the counterclaims inherently involve a "determination[] of the validity, extent, or priority of liens." 28 U.S.C. § 157(b)(2)(K). Indeed, one counterclaim seeks a declaration that the 2020 Transaction was void and that the Defendants "retain the absolute and relative rights they had prior to the transaction." *See* ECF No. 148 at 125.

150.    The Debtors' proposed Plan depends upon the validity of the 2020 Transaction, particularly regarding the priority, classification, and treatment of classes 3, 4, and 5. For this reason, the Plan makes a declaratory judgment from this Court finding that the 2020 Transaction was valid an express condition precedent to the Plan going into effect. *See* ECF No. 875 at 60 (Modified First Amended Joint Chapter 11 Plan § 9.1(f)). If the 2020 Transaction were to be declared unlawful, such a ruling would reset the priority positions of all creditors and preclude confirmation of the Plan as written.

151.    It would also render the Plan unconfirmable because the requirement under Section 1129(a)(1) that the Plan "compl[y] with all the applicable provisions" of the Bankruptcy Code could not be satisfied since the current classification and treatment scheme would constitute unfair discrimination in violation of Section 1129(b)(1) and violate the bedrock principle of equal

treatment codified in Section 1123(a)(4).  By contrast, if the Debtors and the PTL Lenders prevail on their declaratory judgment claims and counterclaims, the classification and priority scheme reflected in the Plan and shaped by the outcome of this adversary proceeding validating the 2020 Transaction would be consistent with the Bankruptcy Code.

A.     The Claims at Issue in the Adversary Proceeding are Core

152.     A dispute that impacts the order of priority is as core as core proceedings get.  *See* 28 U.S.C. § 157(b)(2)(K).  "Fixing the order of priority of creditor claims against a debtor is an integral and historic bankruptcy function, and without this power the bankruptcy court would be rendered powerless to rehabilitate a debtor."  *In re Best Prods. Co.*, 68 F.3d 26, 31 (2d Cir. 1995).

153.     This Court already found that the claims here are core when it stayed the  New York litigation that the Ad Hoc Group of Non-PTL Lenders were pursuing against the PTL Lenders. *See* Mar. 13, 2023 Hr'g Tr. at 60-61 ("[I]t runs directly to core function of the claims adjudication process over which there are very few exceptions.  It also really does affect the plan process and the findings that I'm required to make under [11 U.S.C. §§] 1129(a) and 1123.").  In doing so, the Court expressly held that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  *Serta Simmons Bedding, LLC v. AG Centre Street Partnership L.P.*, No. 23-3007, ECF No. 124 (Bankr. S.D. Tex. Mar. 20, 2023).  Defendants did not appeal that decision, which is now law of the case. *See Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 2017 WL 1355388, at *4 (E.D. Tex. Apr. 13, 2017).

154.     While Defendants attempt to draw a distinction between their claims against the Debtors and non-Debtor parties, that is a distinction without a difference. The counterclaims against the non-Debtor parties amount to a collateral attack on the Debtors' current capital structure, with Defendants seeking the same economic result, *i.e.*, unwinding of the 2020 Transaction and/or resetting the priority of the liens prior to the 2020 Transaction.  *See* ECF No.

148 ¶ 304 (seeking declaration that 2020 Transaction and "the agreements purporting to implement it" are "invalid and *void ab initio*").

155.    Defendants cannot seek relief against non-Debtors that is "substantively identical" to that which they otherwise seek against the Debtors and avoid a finding that their claims are core. *See In re Revlon, Inc.*, 2023 WL 2229352, at *15 (Bankr. S.D.N.Y. Feb. 24, 2023).

156.    Further, Defendants cannot "disguise[]" core claims involving lien priority by pretending they are ordinary common law claims independent of the bankruptcy. *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 94 (2d Cir. 2014) (bankruptcy court has constitutional authority to enjoin state law tort actions); *see also In re First River Energy, LLC*, 2019 WL 1103294, at *1, *4–5 (W.D. Tex. Mar. 7, 2019) (declaratory-judgment proceeding involving state-law counterclaims is core under, *inter alia*, Section 157(b)(2)(K)).

157.    In addition to its effect on the priority of liens, the dispute over the validity of the 2020 Transaction is also core because it directly implicates "the administration of the [Debtors'] estate." 28 U.S.C. § 157(b)(2)(A). As the Debtors have previously explained, the resolution of these claims is "fundamental to the company's reorganization [and] governance." Jan. 24, 2023 Motions Hr'g Tr. at 31–32. The Debtors and PTL Lenders made this a condition precedent to the Plan becoming effective, requiring that "the Bankruptcy Court shall have entered an order granting the relief sought by the Debtors in the Adversary Proceeding," before the Plan may go into effect. *See* Case No. 23-90020, ECF No. 875 at 60 (Modified First Amended Joint Chapter 11 Plan § 9.1(f)). The Debtors' proposed Plan cannot be confirmed and will not become effective absent a decision in the Lender Plaintiffs' and the Debtors' favor in this adversary proceeding.

158.    Further, the PTL Credit Agreement includes an indemnification obligation running from the Company to the PTL Lenders. The PTL Lenders bargained for this obligation in June

2020 because Defendants had already commenced litigation against the Company and the PTL Lenders before the 2020 Transaction even closed. Indeed, the PTL Lenders would not have entered the 2020 Transaction without such an indemnity. *See* May 17 Tr. (AM) 33:14– 18(Chopra); May 17 Tr. (AM) 122:13–16 (Sveen); May 17 Tr. (PM) 45:20–23 (Searles); May 17 Tr. (PM) 118:15–17 (Yarrow).

159. The Plan also contains an indemnification obligation that would apply if the PTL Lenders were subject to post-confirmation litigation arising out of the 2020 Transaction. And the PTL Lenders testified that the indemnity was also a "critical component" of the Plan, on which their approval of the Plan depends, precisely because Defendants' litigation campaign against the Company and the PTL Lenders continues to this day. May 17 Tr. (AM) 120:22–121:4 (Sveen); *see* May 17 Tr. (AM) 122:13–16 (Sveen); May 17 Tr. (AM) 123:23–124:3 (Sveen); May 17 Tr. (PM) 45:20–23 (Searles); May 17 Tr. (PM) 82:15–17 (Meiering); May 17 Tr. (PM) 119:1–3 (Yarrow). Indeed, the PTL Lenders would not equitize their debt without an indemnity. *See* May 17 Tr. (PM) 117:20–118:6 (Yarrow) ("[A]s part of the RSA we were equitizing a substantial amount of our debt . . . . And I don't think we would have agreed to do that if we hadn't some downside protection from the indemnity.").

160. Under both the PTL Credit Agreement and the Plan, the Debtors' estates and the reorganized debtors are on the hook for any judgment entered against the PTL Lenders, underscoring the core nature of these claims.

161. The validity of the PTL Credit Agreement and underlying indemnity is further supported by the Court's order approving the Debtors' postpetition financing and consensual use of cash collateral to fund the Chapter 11 cases. *See* Case No. 23-900020, ECF No. 406 (the "DIP

Order").[4]   The DIP Order contained, among other relief, certain stipulations regarding the validity

of claims and prepetition agreements, including the PTL Credit Agreement.  *See* DIP Order, ¶ F.

Such stipulations were critical to the Debtors' ability to enter into the post-petition financing and

obtain consensual use of cash collateral.  The stipulations are binding on all parties that received

notice of the DIP Order and did not follow the proscribed process to challenge the stipulations by

the deadline set forth in the DIP Order.  As the Debtors have previously explained, no party validly

challenged the stipulations or sought standing to challenge the stipulations prior to the expiration

of the challenge deadline.[5]

162.    For all of these reasons, all of the claims arising out of the validity of the 2020

Transaction implicate both lien priority under Section 157(b)(2)(K) and the administration of the

Debtors' estates under Section 157(b)(2)(A), and are therefore "core" proceedings that this Court

has an obligation to decide.

**B.      The Bankruptcy Court Has Constitutional Authority to Enter Final Judgment
          on the Claims and Counterclaims**

163.    *Stern v. Marshall* does not impact this Court's jurisdiction to decide all of the claims

at issue in both the declaratory judgment action and the counterclaims.  564 U.S. 462 (2011).

164.    *Stern* merely held that the bankruptcy court "lacked the constitutional authority to

enter a final judgment on a state law counterclaim" for tortious interference—an ordinary common

law claim "that simply attempt[ed] to augment the bankruptcy estate"—brought against a person

filing a claim against the estate.  *Stern*, 564 U.S. at 495, 497, 503.  In doing so, *Stern* cabined the

authority of the bankruptcy courts only "in one isolated respect" by invalidating 28 U.S.C. §

---

[4] *See Amended Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying Automatic Stay, and (IV) Granting Related Relief*, dated March 3, 2023.
[5] *Debtors' Response to (1) the Ad Hoc Group of First Lien Lenders' (I) Statement and Reservation of Rights with Respect to the Challenge Deadline and (II) Objection to the Favored Lenders' Indemnity Claims and (2) Joinders Thereto*, filed on April 28, 2023.  *See* Case No. 23-90020, ECF No. 725.

157(b)(2)(C), which permitted bankruptcy courts to hear state law "counterclaims by the estate against persons filing claims against the estate," at least when such claims stand entirely "independent of the federal bankruptcy law" and are "not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 475, 487, 503.[6]

165.    *Stern* did not hold that bankruptcy courts lack constitutional authority to enter final judgment on all statutorily core matters.  And the Fifth Circuit has refused to extend *Stern* to other core proceedings, holding that bankruptcy courts may constitutionally enter final judgment determining "the priority of liens" under 28 U.S.C. § 157(b)(2)(K) without "encroach[ing]" on Article III courts.  *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 n.12 (5th Cir. 2013); *see also In re Davis*, 538 F. App'x 440, 443 (5th Cir. 2013) ("declin[ing] to extend *Stern*'s limited holding" in determining that the bankruptcy court had jurisdiction over a counterclaim against the bankruptcy estate).  Bankruptcy courts in this district have likewise declined to extend *Stern* to other types of core proceedings beyond 28 U.S.C. § 157(b)(2)(C).  *See, e.g.*, *In re Villarreal*, 639 B.R. 427, 432–33 (Bankr. S.D. Tex. 2022); *In re Pioneer Carriers, LLC*, 583 B.R. 891, 897-98 (Bankr. S.D. Tex. 2018).

166.    Such distinctions make sense because, even with respect to core proceedings, some are more core than others.  A "[c]ritical feature[] of every bankruptcy proceeding" is the "equitable distribution" of a debtor's property to creditors.  *Cent. Va. Community Coll. v. Katz*, 546 U.S. 356, 363-64 (2006), which turns on the priority of liens among creditors.  *See In re Quality Properties, LLC*, 2011 WL 6161010, at *6 (Bankr. N.D. Ala. Nov. 29, 2011), *cited by In re Renaissance Hosp.*, 713 F.3d at 294 n.12.  As the Supreme Court noted in *Stern*, "resolution" by a specialized

---

[6] Of course, *Stern* does not ever prevent a court from issuing a decision; it simply speaks to narrow circumstances in which the bankruptcy court may only issue a report and recommendation, rather than entering a final, binding judgment.

bankruptcy court of a tortious interference counterclaim brought by the estate to augment the value

of the estate is not inherently "essential to [the] limited regulatory objective within the [bankruptcy

courts'] authority." *Stern*, 564 U.S. at 490.  Such counterclaims, while technically core, do not

implicate or affect lien priority.  By contrast, causes of action "that more nearly resemble . . .

creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res" are "integrally

related" to the expertise of the bankruptcy courts.  *Id.* at 490, 492.  Defendants attempt to disguise

their counterclaims as merely independent common law claims, but these are core claims involving

lien priority that directly implicate the administration of the Debtors' estates.

167.     Even if *Stern* did apply to all statutorily core matters (which, to be clear, it does

not), it still would not preclude jurisdiction here because the claims in this action would necessarily

be "resolved in the process of ruling on a creditor's proof of claim."  *Stern*, 564 U.S. at 503; *see

also Villegas v. Schmidt*, 788 F.3d 156, 158 (5th Cir. 2015) (acknowledging this exception to

*Stern*'s holding).

168.     Through UBS in its role as the the Non-PTL Administrative Agent, Defendants

filed a proof of claim that "arises out of and is based on" the Term Loan Agreement.  *See*

Addendum to Proof of Claim filed by UBS AG, Stamford Branch, in its Capacity as Prepetition

Term Loan (NPTL) Agent (the "NPTL Proof of Claim") ¶ 4.  Likewise, through Wilmington

Savings Fund Society as the PTL Administrative Agent, the PTL Lenders filed a proof of claim to

certain obligations due "under the Prepetition PTL Agreement," i.e., the PTL Credit Agreement.

Addendum to Proof of Claim of Wilmington Savings Fund Society, FSB, as Administrative Agent

under the Super-Priority Term Loan Agreement (the "PTL Proof of Claim") ¶ 3.

169.     These proofs of claim are "inextricably intertwined with the interpretation" of the

Term Loan Agreement, *In re Spillman Dev. Grp., Ltd.*, 710 F.3d 299, 306 (5th Cir. 2013) and the

validity of the 2020 Transaction—the central issues in this adversary proceeding.   The Court

cannot resolve the proofs of claim without rendering judgment on whether the 2016 Term Loan

Agreement or the 2020 PTL Credit Agreement governs the rights and priorities of the parties.

Accordingly, this core matter, at minimum, falls within *Stern*'s exception for state-law claims that

will be resolved during a ruling on a creditor's proof of claim.

### C.      Defendants' Challenge to Jurisdiction is Procedurally Improper

170.     What is more, Defendants have already waived their right to challenge this Court's

jurisdiction. Defendants did not raise any jurisdictional arguments in their summary judgment

briefing before the Court, despite the fact that the Lender Plaintiffs and the Debtors sought

summary judgment on both the breach of contract and covenant of good faith and fair dealing

claims.[7] "Having lost" then, they cannot now "assert a right [they] never thought to pursue when

[they] still believed [they] might win." *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 570 (9th

Cir. 2012), *aff'd sub. nom. Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014); *cf. Vela v.

City of Houston*, 276 F.3d 659, 678–79 (5th Cir. 2001) (argument not raised in opposition to

summary judgment denied as forfeited).

171.     At the summary judgment hearing, the Court determined that it has "jurisdiction"

and "constitutional authority" to enter a final order resolving the Lender Plaintiffs' and the

Debtors' declaratory judgment claims, of which Defendants' counterclaims are mirror images.

Mar. 28, 2023 Hrg. Tr. at 133:14–19.   "[W]hen a court decides upon a rule of law, that decision

should continue to govern the same issue in subsequent stages of the same case."   *Med. Ctr.*

---

[7] Defendants' actions make clear that this consent was "knowing and voluntary."   *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 685 (2015).   The Defendants had objected to the Court's final-judgment jurisdiction in their original answer, *see* ECF No. 68 ¶ 235, and their amended answers post-summary judgment, *see* ECF No. 146 ¶ 108; ECF No. 148 ¶ 235.   That they failed to make the same objection at summary judgment means that they *chose* not to or, at a minimum, can be held to the consequences of not doing so.

*Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) (internal quotations omitted); *see also Free v. Abbott Labs., Inc.*, 164 F.3d 270, 273 (5th Cir. 1999) (jurisdictional findings qualify as the law of the case).

172.    In addition, Defendants consented through their actions to this Court's jurisdiction. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 686 (2015).

173.    When all parties consent, the Court may enter a final judgment on even non-core proceedings as well as core proceedings that would otherwise be constitutionally barred as set forth in *Stern*. *See id.*; 28 U.S.C. § 157(c)(2).

174.    After the Court issued its summary judgment ruling from the bench, it directed the parties to agree to and submit a proposed order enshrining the Court's holding. *See* Mar. 28, 2023 Hrg. Tr. at 138. The parties submitted such an order, "the form of which [was] agreed to by the parties and reflect[ed]" the Court's summary judgment ruling. ECF No. 138 at 2.

175.    That proposed order provided that the Lender Plaintiffs' and the Debtors' declaratory judgment claim was "a core proceeding pursuant to 28 U.S.C. § 157(b)" and that the Court has "Constitutional authority to issue a final order." *See* ECF No. 138-1 at 2. The Court's order reflects the same language and Defendants agreed to such language to facilitate their goal of appealing directly to the Fifth Circuit. *See* ECF No. 142 ¶ 2.[8]

176.    Defendants nevertheless appealed only the Court's summary judgment ruling regarding the interpretation of the phrase "open market purchase" to the Fifth Circuit. *See* Petition

---

[8] While the Court did not decide the covenant of good faith and fair dealing claim on summary judgment, consent to a final order cannot be given for one claim and not for another related claim. *Cf. In re Lopez*, 2017 WL 3382099, at *4 (S.D. Tex. Mar. 20, 2017) (factors such as "economy," "convenience," and "fairness" weighed in favor of "jurisdiction over related claims").

for Permission to Appeal at 12, *Excluded Lenders v. Serta Simmons*, No. 23-90012 (5th Cir. Apr. 23, 2023), Dkt. No. 2.  They did not similarly appeal this Court's jurisdictional finding.

177.    Throughout the proceedings in this Court, Defendants have been "represented by experienced and sophisticated bankruptcy counsel" who "negotiated and jointly proposed" the language of this Court's summary judgment order and "requested the [ ] Court to include such language." *VSP Labs, Inc. v. Hillair Capital Investments LP*, 619 B.R. 883, 900 (N.D. Tex. 2020).  Given Defendants' and their counsel's active participation and express agreement, the Defendants consented to the Court's entry of a final judgment.  *See id.*; *In re Saenz*, 2016 WL 9021733, at *6 (Bankr. S.D. Tex. Dec. 19, 2016), *aff'd sub nom. Saenz v. Gomez*, 899 F.3d 384, 390-91 (5th Cir. 2018) ("Because [Defendants] were represented by experienced bankruptcy counsel, they should have been aware of the right and the need to refuse consent to a final judgment before trial.").

178.    Defendants cannot now withdraw their consent to this Court's jurisdiction now that they are seeing the frailties of their position on the merits post-expedited discovery and trial.

179.    Finally, Defendants have only formally raised this jurisdictional objection only *after* the Court entered final judgment against them on the "open market purchase" breach of contract issue.  That cuts directly against the consent rule articulated in *Wellness*, which exists to "check[] gamesmanship" by a party.  *Wellness Int'l*, 575 U.S. at 685.

180.    Therefore, even if the Court somehow otherwise lacked authority to issue a final judgment (which it does not), Defendants' consent to the Court's statutory and constitutional authority permit entry of such judgment on the good faith and fair dealing declaratory judgment claim and related counterclaims.

## II.     THE 2020 TRANSACTION DID NOT BREACH THE COVENANT OF GOOD FAITH AND FAIR DEALING IMPLIED IN THE TERM LOAN AGREEMENT

### A.     New York Law Strictly Limits the Scope of Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing

181.     New York law, which governs the parties' dispute, *see* Debtors' Ex. 6 (ECF No. 853-6) § 9.10(a), implies a covenant of good faith and fair dealing in the performance of every contract. *See Cordero v. Transamerica Annuity Serv. Corp.*, -- N.E.3d --, 2023 WL 3061503, at *3 (N.Y. Apr. 25, 2023).  But, as New York's highest court recently reaffirmed, a party cannot "invoke the implied covenant by simply alleging that a defendant's conduct 'drastically undermined a fundamental objective of the parties' contract.'" *Id.* (citation omitted). "Rather, the implied duty must arise from the contract and the promisee's reasonable expectations," at the time of the transaction.  *Id.*

182.     Courts enforce only those promises that "a reasonable person in the position of the promisee would be justified in understanding were included in a contract at the time the contract was made." *Id.* at *5 (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (N.Y. 1978)). "[T]o plead a valid cause of action for breach of the covenant of good faith, a plaintiff must allege facts sufficient to demonstrate that the plaintiff reasonably understood the contract or contractual provision at issue to state a duty to take or refrain from taking a particular action." *Id.* (internal quotation omitted).  However, "[it] does not stand for a general proposition that a plaintiff can invoke the implied covenant by simply alleging that a defendant's conduct 'drastically undermined a fundamental objective of the parties' contract… Rather, the implied duty must arise from the contract and the promisee's reasonable expectations." *Id.*

183.     The inquiry is thus an objective one, *see In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 605 (S.D.N.Y. 2018), focused on the promisee's (*i.e.*, Defendants') reasonable expectations at the "time the contract was made," *Cordero*, 2023 WL

3061503, at *3.  Even so, those expectations are constrained by the "other terms of the agreement." *Singh v. City of New York*, --- N.E.3d ----, 2023 WL 3098734, at *2 (N.Y. Apr. 27, 2023).  The test should take into account that the promisees here were sophisticated players in the syndicated loan market, *see supra* ¶ 12, given that New York courts look at "a reasonable person *in the position of the promissee*."  *Singh*, 2023 WL 3098734, at *5 (emphasis added).

184.    Because the implied covenant of good faith and fair dealing should not be a vehicle for rewriting the words the parties agreed to, a party asserting such a claim bears a "heavy burden" to prove that the "particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole." *Cordero*, 2023 WL 3061503, at *3 (*quoting Rowe*, 46 N.Y.2d at 69); *see also Vt. Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (N.Y. 2004) (courts are "extremely reluctant" to imply contract terms that the parties did not "specifically include").  *Cf. Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 198–201 (2014) (procedural framework of declaratory judgment action does not shift burden of proof).

185.    New York law expressly "limits" application of the implied covenant doctrine in several respects. *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (N.Y. 1995). Four of these limitations independently defeat an implied covenant claim in this case.

186.    *First*, courts may not imply an obligation that "would be inconsistent with" other contract terms. *Murphy v. Am. Home Prod. Corp.*, 58 N.Y.2d 293, 304 (N.Y. 1983). Any conduct "contemplated and expressly permitted" by a contract does not violate the implied covenant of good faith and fair dealing. *Ability Ins. Co. v. ST Paper, LLC*, 2022 WL 912927, at *6 (S.D.N.Y. Mar. 29, 2022); *see also JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 507 F. Supp. 3d 490, 505 (S.D.N.Y. 2020) (not bad faith or unfair dealing "to do what a contract explicitly authorizes a party to do").

187.     *Second*, New York courts are especially reticent to find an implied covenant has been breached when a contract concerns a commercial matter negotiated at arm's length by "sophisticated, counseled business entities." *ELBT Realty, LLC v. Mineola Garden City Co.*, Ltd., 144 A.D.3d 1083, 1084 (N.Y. App. Div. 2016). "It is not the place of the Court to imply . . . a provision after the fact when sophisticated, counseled businesspeople did not explicitly include it." *Wagner v. JP Morgan Chase Bank*, 2011 WL 856262, at *5 (S.D.N.Y. Mar. 9, 2011); *see also Lykins v. IMPCO Tech., Inc.*, 2018 WL 3231542, at *9 (S.D.N.Y. Mar. 6, 2018) (same); *D&L Holdings v. Goldman Co.*, 287 A.D.2d 65, 73 (N.Y. App. Div. 2001) ("The covenant of good faith and fair dealing cannot be used to add a new term to a contract, especially to a commercial contract between two sophisticated commercial parties represented by counsel."); *In re Solutia, Inc.*, 2007 WL 1302609, at *10 (Bankr. S.D.N.Y. May 1, 2007) ("[N]othing in the doctrine of good faith and fair dealing allows a court to create contract terms that the parties have not negotiated for.").

188.     *Third*, a decision "made for a legitimate business purpose" does not violate the covenant of good faith and fair dealing. *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004); *see Lykins*, 2018 WL 3231542, at *11; *Bonady Apartments Inc. v. Columbia Banking Fed. Sav. & Loan Ass'n*, 119 Misc.2d 923, 928 (N.Y. Sup. Ct. 1983).  It is "well established" that commercial decisions in a party's self-interest are made for a legitimate business purpose and do not support a claim for breach of the implied covenant—even where such acts "may incidentally lessen the other party's expected benefit," *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014) (*quoting Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 34 (N.Y. 1972)), or "anticipated profits," *Gaia House Mezz*

*LLC v. State Street Bank and Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013).[9]  Put simply, "[e]ven after you have signed a contract, you are not obliged to become an altruist towards the other party." *Fasolino Foods Co. v. Banca Nazionale del Lavaro*, 961 F.2d 1052, 1057 (2d Cir. 1992) (internal quotations and citations omitted).

189.    *Fourth*, an implied covenant claim does not lie when it duplicates a party's breach of contract claim. To be duplicative, an implied covenant claim need not be based on identical allegations but must only either arise from the same operative facts or seek the same damages. *See Mill Fin., LLC v. Gillet*, 122 A.D.3d 98, 104–05 (N.Y. App. Div. 2014). Further, an implied covenant claim may be duplicative even when the plaintiff "only pleaded [certain] factual allegations in connection with its implied covenant claim, and not its breach of contract claims." *Gartner, Inc. v. HCC Speciality Underwriters, Inc.*, 2023 WL 1380290, at *5 (S.D.N.Y. Jan. 31, 2023). New York courts routinely dismiss implied covenant claims when duplicative of a breach of contract claim that is also dismissed. *See, e.g.*, *Apogee Handcraft, Inc. v. Verragio, Ltd.*, 155 A.D.3d 494, 495–96 (N.Y. App. Div. 2017); *Sebastian Holdings, Inc. v. Deutsche Bank, AG.*, 108 A.D.3d 433, 434 (N.Y. App. Div. 2013); *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70 A.D.3d 423, 426 (N.Y. App. Div. 2010).

190.    Applying these legal principles, trial has conclusively demonstrated that Defendants cannot establish any claim for breach of the implied covenant of good faith and fair

---

[9] *See also M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) ("implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract" (internal quotations and citation omitted)); *Schweizer v. Sikorsky Aircraft Corp.*, 634 F. App'x 827, 830 (2d Cir. 2015) (same); *Citibank, N.A. v. United Subcontractors, Inc.*, 581 F. Supp. 2d 640, 646 (S.D.N.Y. 2008) ("A party to a contract is allowed to act in its own self-interest consistent with its rights under the contract."); *Good Hill Master Fund L.P. v. Deutsche Bank AG*, 146 A.D.3d 632, 636 (N.Y. App. Div. 2017) (negotiations "at arm's length" "in a commercially reasonable manner," "however aggressive[]," belied allegation of bad faith); *Gallagher v. Lambert*, 143 A.D.2d 313, 315 (N.Y. App. Div. 1988) (no breach of implied covenant claim where "plaintiff had no guarantee, contractual or otherwise, that defendants would not act in their own self-interest"), *aff'd*, 74 N.Y.2d 562 (N.Y. 1989).

dealing here for multiple reasons.  Therefore, judgment must be granted to the Lender Plaintiffs and the Debtors and the Additional Counterclaim Defendants on both the Lender Plaintiffs' and the Debtors' remaining declaratory judgment and Defendants' counterclaims.

191.    First, Defendants' implied covenant claims impermissibly duplicate their failed breach of contract claims.  *See Mill Fin.*, 122 A.D.3d at 104–05.

192.    Second, Defendants' arguments fail on the merits because the implied covenant they seek to read in contradicts the express terms of the Term Loan Agreement.  They claim that the 2020 Transaction breached the implied covenant because it deprived them of a "fundamental right to pro rata treatment" and was "unprecedented" and contrary to the expectations of the market."  ECF No. 241 at 11–15; see also ECF No. 245 at 24–26.  But any reading of the relevant provisions of the contract shows that there are numerous express exceptions to pro rata treatment, including "open market purchases" that the Court has previously held covered the 2020 Transaction.  *See infra* section II.C.

193.    Third, these sophisticated parties could not reasonably have understood the 2020 Transaction to be prohibited.  The 2020 Transaction was a Position Enhancing Transaction, which was far from unprecedented in the industry.  Defendants' own conduct both with respect to the Company and in other deals shows that they understood Position Enhancing Transactions to be consistent with the parties' understanding of what was permitted under borrower-friendly agreements like the Term Loan Agreement.  *See infra* section II.D.  The PTL Lenders' testimony, which is the only evidence in the record about what the parties to the contract intended at the time it was made, similarly supports the conclusion that the 2020 Transaction and other Position Enhancing Transactions were reasonably contemplated by the parties and not understood to be

prohibited by the Term Loan Agreement.  May 17 Tr. (AM) 126:1–12 (Sveen); May 17 Tr. (PM) 46:21–47:10 (Searles); May 17 Tr. (PM) 80:5–8 (Meiering); May 17 Tr. (PM) 119:4–13 (Yarrow).

194.   Fourth, Defendants allege the Company and the PTL Lenders had "improper motive[s]," ECF No. 241 at 15–19, and hand-selected additional lenders to participate in the 2020 Transaction. But the Lender Plaintiffs and the Debtors had valid business justifications for entering into the 2020 Transaction and, in the Company's case, for including certain lenders, *see infra* section II.E.

195.   Fifth, Defendants also argue without any evidentiary support that the indemnity provision negotiated in the PTL Credit Agreement and carried forward in the RSA somehow indicates wrongful conduct, ECF No. 241 at 20–21.  Yet these provisions are standard in the industry and match what certain of Defendants themselves have negotiated, *see infra* section II.F.

196.   Finally, LCM's amend to exit argument, which impermissibly seeks to relitigate the breach of contract claim on which they already agreed to a partial final judgment, lacks merit because there is no support for it anywhere in the relevant agreements.  ECF No. 245 at 13–18; *see also infra* section II.G.

### B.   Defendants' Implied Covenant Claim Impermissibly Duplicates Their Breach of Contract Claim

197.   Defendants' implied covenant claims are based on the same facts and seek the same remedy as their breach of contract claims and must therefore be rejected.  *See Mill Fin.,* 122 A.D.3d at 104.  *See* ECF No. 244 at ¶¶ 74–88.

198.   At the hearing on Summary Judgment, the Non-PTL Lenders said they "actually have specific facts that [they said] relate to good faith and fair dealing that are separate from just the 9.05(g) wasn't satisfied."  Mar. 28, 2023 Hr'g Tr. 120:12-17.  Those facts did not materialize at trial.  No evidence presented at trial took the good faith and fair dealing claim outside the scope

of the allegations overlapping entirely with the breach of contract claim.  *See* ECF No. 244 at ¶ 77 (chart comparing Ad Hoc Group of Non-PTL Lenders' implied covenant and breach of contract allegations); *id.* at ¶ 83 (chart comparing LCM's implied covenant and breach of contract allegations).  Instead, the Defendants characterized their alleged harm from the 2020 Transaction as "reeningeer[ing] the waterfall" so that their 1L loans were "now near the bottom of the capital structure," May 18 Tr. (AM) 44:25-45:4 (Kwon), and getting "moved to last in line," May 18 Tr. 13:4-8 (Hanigan).  As the Court noted following trial presentations, ultimately Defendants chose to relitigate their breach of contract claim at trial.  *See* May 17 Tr. (PM) 158:20–22 ("[A]ll [Defendants] have done thus far is . . . retried the issue."); *see also* ECF No. 224 at 2 (excluding Sarah Ward's testimony as effectively "an inappropriate motion to reconsider").  Because their implied covenant claim, as presented, was entirely duplicative of their already resolved contract claim, it cannot stand.  *See Mill Fin.*, 122 A.D.3d at 104–05.

### C.     The Term Loan Agreement Expressly Authorized the 2020 Transaction

199.     Defendants' implied covenant claims also fail for the simple reason that the Term Loan Agreement authorized the 2020 Transaction.  "It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (N.Y. 1987); *see also, e.g.*, *Paru v. Mut. of Am. Life Ins. Co.*, 52 A.D.3d 346, 347 (N.Y. App. Div. 2008) (no breach of the implied covenant when the contract "expressly permits the actions being challenged). Put another way, "it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists." *Cordero*, 2023 WL 3061503, at *5. Thus, where there is inconsistency between the express terms of the contract and the alleged implied promise,

a party "cannot justifiably have expected that [the counterparties] were contractually committing themselves" to the purported implied promise. *Singh*, 2023 WL 3098734, at \*2.

i. <strong>The Term Loan Agreement Permitted Subordination</strong>

200.    The Term Loan Agreement left the door open to the creation of super-priority debt because it does not contain an anti-subordination provision among the sacred rights. Had the parties intended to prohibit subordination, they could have done so by inserting a short clause into Section 9.02(b) of the Agreement to that effect.  *See* Debtors' Ex. 372 (ECF No. 941) at 204:12–18.  They did not, *see* May 18 Tr. (AM) 93:1–5 (Kwon)—even though "the inclusion of express anti-subordination clauses [is] sufficiently commonplace" and "standard," *In re TPC Grp.*, 2022 WL 2498751, at \*11 (Bankr. D. Del July 6, 2022).

201.    When "parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560 (N.Y. 2014); *see also Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 66 (N.Y. App. Div. 2008) ("A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties."), *aff'd*, 13 N.Y.3d 398 (N.Y. 2009). It is emphatically "not the place of the Court to imply" the existence of contract provisions or limitations "after the fact when sophisticated, counseled businesspeople did not explicitly include" them.  *Wagner*, 2011 WL 856262, at \*5; *accord Lykins*, 2018 WL 3231542, at \*9; *D&L Holdings*, 287 A.D.2d at 73; *see also In re Solutia*, 2007 WL 1302609, at \*10 ("[N]othing in the doctrine of good faith and fair dealing allows a court to create contract terms that the parties have not negotiated for.").  The decision by the sophisticated parties to the Term Loan Agreement not to include anti-subordination as a sacred right must therefore be given significance and deference.

202.     Consistent with this conclusion, the Non-PTL Lenders has in fact admitted in its counterclaims that "the new money aspect of the Unlawful Exchange Transaction was permitted, since new money loans could be given priority without unanimous vote."  ECF No. 148 ¶ 269.

### ii.     The Term Loan Agreement Authorized Amendments Without Unanimous Lender Approval

203.     The limited scope of the implied covenant enforces the primacy of the parties' written agreement. Section 9.02(b) generally authorized amendments to the Term Loan Agreement by a majority vote (except for sacred rights provisions), expressly placing lenders at risk of being outvoted by majority lenders in ways damaging to their commercial interests. *Id.* § 9.02(b).  When "risk" is "inherent" in a deal, the law requires the parties to bear the consequences of that risk. *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 957 (5th Cir. 1981) (applying New York law). For that reason, the Fifth Circuit has rejected a claim that amendments to a credit agreement violated the implied covenant of good faith and fair dealing under New York law because the credit agreement "expressly allow[ed] amendments such as th[e] one" at issue there "to be made without all parties consenting." *Highland Crusader Offshore Partners LP v. LifeCare Holdings Inc.*, 377 F. App'x 422, 427 (5th Cir. 2010). The court explained that accepting the argument that amendments permitted under the contract could still breach the implied covenant "would result not in a 'fair play' standard being applied but rather a wholesale rewriting of the contract to grant [the plaintiff] a benefit for which it did not bargain." *Id.* That is indistinguishable from Defendants' argument here that a majority of lenders somehow breached the implied covenant by exercising their contractual right to amend the Term Loan Agreement's non-sacred rights provisions.  *See* May 16 Tr. 528:18–529:2 (Tepner).

204.     *In re Musicland Holding Corp.* is also instructive. In that case, junior creditors brought suit against the agent for the senior creditors, alleging, inter alia, that the agent breached

64

the implied covenant by amending an intercreditor agreement to bring in an additional term lender. 374 B.R. 113, 121 (Bankr. S.D.N.Y. 2007), *aff'd* 386 B.R. 428, 439 (S.D.N.Y. 2008), *aff'd*, 318 F. App'x 36, 37 (2d Cir. 2009). The bankruptcy court rejected that argument because the intercreditor agreement gave the agent "a broad right" to act as it did. *Id.* The district court agreed, explaining that it "cannot employ the covenant of good faith and fair dealing to impose on the parties obligations that are inconsistent with the express terms of the Intercreditor Agreement," which "allowed [the agent] to amend . . . to include a term loan." *In re Musicland Holding Corp.*, 386 B.R. at 439. And the Second Circuit affirmed "[f]or substantially the reasons set forth" by the courts below. *In re Musicland Holding Corp.*, 318 F. App'x at 37.

205.    As in *Musicland*, if the Defendants here "harbored . . . an expectation" "that they 'bargained for'" a Term Loan Agreement that could not be amended to create super-priority debt without the approval of all lenders, that expectation "remained a secret one, contradicted by the language they agreed to in their contract." 374 B.R. at 121.

### iii.    The Term Loan Agreement Authorized Non-Pro Rata Debt Repurchases

206.    Section 9.05(g) of the Agreement expressly authorized the Company to repurchase outstanding debt on a non-pro rata basis via "open market purchases." Debtors' Ex. 6 (ECF No. 853-6) § 9.05(g). As this Court recently held, it is "very clear" that the debt buyback process the Lender Plaintiffs and the Debtors' engaged in was "what's intended by a concept of an open market purchase"—"what was intended by the agreements." Mar. 28, 2023 Hr'g Tr. at 134; *see also* ECF No. 142 ¶ 3. In short, the Term Loan Agreement expressly allowed all aspects of the 2020 Transaction, and the Lender Plaintiffs' and the Debtors' "mere exercise of [their] contractual rights, without more, cannot constitute . . . a breach" of the implied covenant, *Broad*, 642 F.2d at 957.

207.    The Court's holding on summary judgment that the Transaction constituted an open-market purchase under section 9.05(g) of the Term Loan Agreement and was expressly permitted by the terms of the Term Loan Agreement has only been confirmed on the fuller trial record.  As was clear to all parties well before the 2020 Transaction was ever on the table, the Term Loan Agreement gave the Company considerable flexibility. Angelo Gordon and Apollo, for example, recognized that the Company's "loose" credit documents lacked certain "standard 1L protections," would permit "a liability management solution," and offered opportunities for them to be aggressive. Debtors' Ex. 8 (ECF No. 861-3) at 44, 46; Debtors' Ex. 42 (ECF No. 861-36) at 1; *see also* Debtors' Ex. 374 (ECF No. 941-2) at 62:4–5 (Kwon)  ("The credit agreement is very loose."); May 18 Tr. (AM) 56:23-25, 57:1-4 (Kwon).  The PTL Lenders' testimony was consistent with Apollo's and Angelo Gordon's views.  May 17 Tr. (AM) 96:18-97:2 (Sveen); May 17 Tr. (PM) 103:8-13 (Yarrow).  This flexibility brought with it risks to the lenders that were clear on the face of the Term Loan Agreement. As Apollo has admitted, "[t]hese are very sponsor-friendly, company-friendly documents that allow for potential liability management transactions" and "actions that could be taken against" any given lender; "[o]ne hundred percent [Apollo] recognized" "that there could be value taken away from the . . . first lien debt."  Debtors' Ex. 374 (ECF No. 941-2) at 68:17–24, 74:1–12 (Kwon). LCM offered no evidence to the contrary.

### D.    These Sophisticated Defendants Could Not Reasonably Have Understood the Detailed Term Loan Agreement to Impliedly Prohibit the 2020 Transaction

208.    Even setting aside the express terms authorizing the 2020 Transaction, the implied covenant must stay within a contract's four corners, as it only "encompasses promises which a reasonable person in the position of the promisee would be justified in understanding were included" in a contract, *Cordero*, 2923 WL 3061503, at *5, and "applies only where an implied promise is so interwoven into the contract 'as to be necessary for effectuation of the purposes of

the contract,'" *Team 125, Inc. v. U.S. Aviation Underwriters, Inc.*, 2022 WL 329317, at *3 (S.D.N.Y. Feb. 2, 2022) (*quoting Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006)).

209.    The implied covenant does not "create independent contractual rights," and it prohibits "attempt[s] to make an 'end-run' around clear prohibitions in a contract." *In re BH Sutton Mezz LLC*, 2016 WL 8352445, at *29–30 (Bankr. S.D.N.Y. Dec. 1, 2016) (internal quotations omitted).

210.    No "reasonable person" in Defendants' shoes would have understood the Term Loan Agreement to be impliedly promising not to do the very thing that the contract's plain terms permitted. *Singh*, 2023 WL 3098734, at *2.   As the New York Court of Appeals recently recognized, industry practices of which the sophisticated parties would reasonably "have been aware" inform the assessment of whether an "alleged promise was . . . reasonably inferable under the circumstances."  *Singh*, 2023 WL 3098734, at *2.   Here, industry custom and practice—including as reflected by the Ad Hoc Group of Non-PTL Lenders' actions in their own negotiations with the Company—confirm that potential Position Enhancing Transactions like the 2020 Transaction were contemplated by the parties to the Term Loan Agreement not only at origination but also when Defendants acquired their loans at significant discounts and were purportedly assigned their interests in the 1L and 2L term loans in late 2019 and 2020.  Accordingly, the 2020 Transaction cannot give rise to a claim for breach of the implied covenant.

211.    The essence of any credit agreement is the lending of money to a borrower with the borrower's promise to repay the loan with interest.  The 2020 Transaction allowed the Company to continue making interest payments for an additional two-and-a-half years longer than the Company would have been able to, had it run out of cash in summer 2020, and for a time it resulted

in the near doubling of the 1L Debt's pre-2020 Transaction trading price on the secondary market. May 15 Tr. 195:22–196:17 (Shah).

212.    Although the Defendants tried to establish that the Term Loan Agreement impliedly prevented them from being subordinated, that is simply not so.  As discussed *supra*, the Term Loan Agreement expressly allowed the Company to repurchase debt on a non pro-rata basis from its existing lenders, and further allowed the Company to amend the Term Loan Agreement to incur super-priority debt with majority consent (which the PTL Lenders provided). Although parties are free to negotiate for pro rata protections with no carve-outs, or for anti-subordination sacred rights provisions, they must secure those rights at the bargaining table.  They are not free-floating protections that exist outside the four corners of the credit agreement.  To hold otherwise would contradict well-established New York law that prohibits the implied covenant from being "construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Fesseha v. TD Waterhouse Inv. Servs., Inc.*, 305 A.D.2d 268, 268 (N.Y. App. Div. 2003); *see also Brown v. Deutsche Bank Nat'l Tr. Co.*, 120 A.D.3d 440, 441 (N.Y. App. Div. 2014); *Chase Equip. Leasing Inc. v. Architectural Air, L.L.C.*, 84 A.D.3d 439, 439 (N.Y. App. Div. 2011). Here, Defendants got what they bargained for.  They cannot expand the protections provided to lenders in the Term Loan Agreement because they are frustrated with their inability to identify any contractual provisions that have been breached.

213.    The implied covenant also does not require a company to treat all lenders equally, in every conceivable way, where an express requirement to do so is not included in the terms of a credit agreement.  *See BNP Paribas v. Wayzata Opportunities Fund II, L.P.*, 2009 WL 5061750, at *5 (S.D.N.Y. Dec. 23. 2009).  Unless it is provided for in the contract, the implied covenant will not be used to construe a credit agreement "to permit only those amendments that 'advance the

interest of either all or a majority of the Lenders.'" *Id.* (quoting party's argument). Rather, even where one lender is benefitted to another lender's disadvantage, the implied covenant "does not add to the contract a substantive provision not included by the parties." *Id.* (internal quotations omitted). In short, there is no implied promise in all credit agreements that all lenders be treated equally; that is a specific benefit that parties must bargain for. *See id.*

214.    Here, the open market purchase provision in Section 9.05(g) expressly permitted the Company to repurchase debt on a "non pro-rata basis," which necessarily allowed the Company to treat first-lien lenders differently. Any lender reviewing the contract would have seen Section 9.05(g), and seen it referenced in both the pro rata sharing provisions and the sacred rights amendment provisions. *See* May 18 Tr. (AM) 82:22–87:15 (Kwon). In particular, the waterfall provision in Section 2.18 that Defendants rely on applies only to a single class of debt, again making clear that different classes of debt could be treated differently, and has a clear carve-out for payments under Section 9.05. Because there is no explicit language in the Term Loan Agreement requiring that all lenders be treated equally, the Court should not imply a term that the Ad Hoc Group of Non-PTL Lenders did not bargain for.

215.    The same result here should be consistent with *Waxman v. Cliffs Natural Resources*, which rejected an implied covenant claim challenging the non-pro rata treatment of bondholders. 222 F. Supp. 3d 288 (S.D.N.Y. 2016). As *Waxman* explained, "the Indentures here could have included a provision barring differential treatment of bondholders in exchange offers, but it did not. The [] Indentures 'could easily have been drafted to incorporate expressly the terms the Plaintiffs now urge this court to imply.' They were not; that is the end of the claim." *Id.* at 295–96 (internal citation omitted); *see also Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, 2012 WL 3542196, at *7 (S.D.N.Y. Aug. 15, 2012); *In re Solutia, Inc.*, 2007

WL 1302609, at *13 (Bankr. S.D.N.Y. May 1, 2007); *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1521–22 (S.D.N.Y. 1989).  That same reasoning applies with equal force here, and is similarly dispositive of Defendants' claims.

216.    Although courts should never imply obligations inconsistent with the contractual relationship, vigilance against doing so is especially warranted when the parties to a contract are "sophisticated, counseled business entities." *ELBT Realty*, 144 A.D.3d at 1084.

217.    It is difficult to imagine more sophisticated entities than these Defendants when it comes to syndicated loans. Apollo Global Management Inc. manages $500 billion in assets, invests tens of billions in credit markets, and has been expressly recognized by courts as among "the largest and most powerful and sophisticated institutional investors" in the world. *Wey v. NASDAQ, Inc.*, 66 Misc.3d 1222(A), at *1 (N.Y. Sup. Ct.), *aff'd*, 188 A.D.3d 587 (N.Y. App. Div. 2020). Angelo Gordon manages approximately $5 billion in assets and emphasizes credit investing.  *See* Debtors' Ex. 372 (ECF No. 941) at 19:18–21 (Gladstone). Gamut and LCM Asset Management also oversee billions of dollars in investments and routinely engage in complex financial transactions, including in the leveraged loan market.  Debtors' Ex. 373 (ECF No. 941-1) at 19:18–19 (Hanigan) (Gamut manages "above $2 billion of assets"); ECF No. 83 ¶ 1 ("LCM presently manages approximately $12.3 billion in assets).

218.    Defendants may not use the implied covenant merely because they are "now dissatisfied with the bargain they struck."  *In re Lehman Bros. Holdings Inc.*, 541 B.R. 551, 570 (S.D.N.Y. 2015).  In *Lehman Brothers*, "[t]he parties were sophisticated players, represented by counsel, and practiced in executing and administering contracts" of the type at issue such that the Court should "not now rewrite the parties' contractual text—with express or implied terms—to provide [the plaintiff] with language more beneficial than what it negotiated."  *Id.*  So too here.

Defendants here are sophisticated parties represented by experienced counsel who bargained only for certain specific contractual provisions regarding equal treatment, which had express carveouts and amendment provisions that allowed for further changes.  They should have anticipated a Position Enhancing Transaction—indeed, the Ad Hoc Group of Non-PTL Lenders not only anticipated that result but hoped to execute its own.

219.    There are different species of Position Enhancing Transactions that reasonable parties in this industry would expect.  Although the details and specifics may vary, at their core these Position Enhancing Transactions share a fundamental objective: to structure deals, within the strictures of the governing agreements, so that the participating lenders have their position enhanced relative to the non-participating lenders.  Whether it is moving collateral for the benefit of the participating lenders or accomplishing the same goal through amending the agreement to create a super-priority class of debt used to repurchase the debt of the participating lenders, the only limits are set by the terms of the applicable contract.

220.    Sophisticated lenders regularly take advantage of flexible credit-agreement provisions to execute refinancing transactions on favorable terms themselves.  Take the example of Envision Healthcare.  There, Angelo Gordon first provided financing in connection with a restructuring transaction that facilitated certain lenders leap-frogging other creditors in the same class in the payment waterfall. *See* Debtors' Ex. 316 (ECF No. 859-14) at 8.  Apollo then subsequently participated in an exchange of its existing 1L Envision loans for super-priority Envision loans, in a transaction not available to all lenders.  *See* Debtors' Ex. 320 (ECF No. 859-18) at 3.  Similarly, during the restructuring of Mitel Network, a group of lenders including Apollo exchanged hundreds of millions of dollars of existing 1L and 2L debt for super-priority loans, pushing non-participating lenders' loans down in the company's capital structure.  *See id.* at 3.

And in connection with Revlon, a lender group including Angelo Gordon engineered an IPCo transaction that allowed lenders in the majority group to claim certain Revlon intellectual property as collateral for new-money financing, jumping ahead of the minority lenders whose loans were no longer secured by that same intellectual property. *See generally* Debtors' Ex. 316 (ECF No. 859-14) at 9.

221.    Most telling, however, is the IPCo transaction that the Ad Hoc Group of Non-PTL Lenders proposed to the Company itself.  The IPCo transaction they proposed was entirely consistent with these other restructuring maneuvers, underscoring its belief that this type of Position Enhancing Transaction was in good faith and understood by the parties not to be barred by the implied covenant of good faith and fair dealing. The Ad Hoc Group of Non-PTL Lenders' proposal would have removed hundreds of millions of dollars in collateral from the non-participating 1L debt holders, *see* May 15 Tr. (PM) 159:4–12 (Shah), and then used Section 9.05(g) of the Term Loan Agreement to exchange the Ad Hoc Group of Non-PTL Lenders' own 1L loans for new senior debt. *See* Debtors' Ex. 65 (ECF No. 862-9) at 3; *see also* Debtors' Ex. 300 (ECF No. 858-49) at 9; Debtors' Ex. 301 (ECF No. 859) at 9; Debtors' Ex. 302 (ECF No. 859-1) at 9. That, in turn, would have allowed the Ad Hoc Group of Non-PTL Lenders to profit immediately from their below par investments, while reducing the value of the loans held by all non-participating lenders. Even so, the Ad Hoc Group of Non-PTL Lenders admit that its proposal— differential treatment and all—was made "in good faith," *see, e.g.*, Debtors' Ex. 301 (ECF No. 859) at 11; May 18 Tr. 52:25–53:2 (Kwon), presumably because it was permitted by the terms of the Term Loan Agreement.

222.    Sophisticated lenders understand the risks they assume and are free to contract around them. "To the extent [creditors] want to be protected against self-interested actions by

borrowers and other holders, they must include such protections in the terms of their agreements." *In re TPC Grp., Inc.*, 2022 WL 2498751, at \*12. Defendants—who are entirely familiar with (and in at least some instances practitioners of) the "self-interested," even aggressive actions common in their industry—are not entitled to protections that appear nowhere in the detailed Term Loan Agreement.

223.    These sophisticated Defendants must be held to the express terms of the Term Loan Agreement they acceded to and the risks they thereby assumed. That was the bargain they made. No reasonable party entering into the Term Loan Agreement would have understood the agreement to impliedly bar the 2020 Transaction.

**E.    The Company and the PTL Lenders Had a "Legitimate Business Purpose" for the 2020 Transaction, Again Precluding Defendants' Implied Covenant Claims**

224.    Where the actions are not prohibited by the terms of a contract, under New York law, to establish a breach of the implied covenant of good faith and fair dealing, the moving party must show the company acted "malevolently for its own gain as part of a purposeful scheme designed to deprive [the other party] of the benefits of the joint venture." *Najjar Grp., LLC v. W. 56th Hotel LLC*, 850 Fed. App'x 69, 72 (2d Cir. 2021) (internal quotation omitted); *see also Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 451 (S.D.N.Y. 2018), *aff'd*, 777 F. App'x 531 (2d Cir. 2019).  The implied covenant does not apply where a party is acting in its own self-interest in ways that are not in contravention of the contract terms. *Wagner*, 2011 WL 856262, at \*4 (finding there was "no credible evidence" that "Defendant sabotaged its own investment" where there was an "alignment of interests" between the parties).  A party does not act in bad faith if it has valid business reasons "on the merits" for its actions.  *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp. LLC*, 994 F. Supp. 2d 520, 538 (S.D.N.Y. 2014).

225.     One of the key "'limits' on the duty of good faith and fair dealing" under New York law is that an entity does not "violate[] the implied covenant of good faith and fair dealing by acting in its own self- interest consistent with its rights under a contract." *Women's Interart Ctr., Inc. v. N.Y. City Econ. Dev. Corp.*, 2014 WL 2126811, at *35 (N.Y. Sup. Ct. Apr. 28, 2014) (*citing Suthers v Amgen Inc.*, 441 F. Supp. 2d 478, 485 (S.D.N.Y. 2006)). As Apollo itself put it succinctly, "[t]he intent to protect your interests is always good faith." Debtors' Ex. 374 (ECF No. 941-2) at 200:17–18 (Kwon). A decision "made for a legitimate business purpose," cannot support a claim for breach of the implied covenant. *Inversiones Errazuriz Limitada*, 374 F.3d at 170; *accord Bonady Apartments*, 119 Misc.2d at 928. If the law were otherwise, fear of implied covenant liability would deter the profit-maximizing behavior that commercial law encourages and our capitalist economy depends on. New York courts have thus analogized the good faith and fair dealing analysis to another doctrine of commercial law that recognizes the legitimacy of profit-seeking behavior—the business judgment rule. When a commercial entity acts to promote its own "legitimate interests," courts "should defer to good faith decisions made in business settings*." 55 Eckford Realty LLC v. Indus. & Comm. Bank of China (USA) NA*, 39 Misc.3d 1208(A), at *12 (N.Y. Sup. Ct. 2013) (*citing 40 W. 67th St. v. Pullman*, 100 N.Y.2d 147, 153 (N.Y. 2003)).

226.     A commercial entity is of course free to act in its "own self-interest," so long as its actions are not inconsistent with the written terms of a contract. *Gaia House*, 720 F.3d at 93. This remains true even if the party's actions will lessen "anticipated profits" or compound "difficult economic conditions" for a counter-party. *Id.*; *see also Fasolino Foods*, 961 F.2d at 1057. Individual creditors are not "obligated" to act "for the[] benefit" or in the best interest of other creditors. *Mashreqbank psc v. Heller Fin., Inc.*, 2001 WL 11065, at *4 (S.D.N.Y. Jan. 4, 2001); *see also Musicland*, 374 B.R. at 121. "To hold otherwise would create an implied fiduciary duty,"

which "would be contrary to [New York courts'] hesitation to transport contracting parties to the higher realm of a fiduciary relationship . . . when they have not created their own relationship of higher trust in the contract's express terms." *Cordero*, 2023 WL 3061503, at *6 (citation omitted).

227.     All parties to the 2020 Transaction had legitimate business justifications for their actions.  Accordingly, a claim for breach of the implied covenant cannot lie here.

### i.     The Company Had A Legitimate Business Justification to Enter into the 2020 Transaction and the RSA

228.     From the Company's perspective, it was already operating in the red when the COVID-19 pandemic hit.  *See* Debtors' Ex. 23 (ECF No. 861-17) at 2.  Many of the mattress stores that carried the Company's products shut their doors.  *See* Debtors' Ex. 152 (ECF No. 863-45) at 25. And when state and local governments closed nonessential businesses, the Company's sales plummeted further still.  *See id.* at 37.  The Company's parent company established an independent Finance Committee to explore potential refinancing transactions to stave off insolvency and steady its financial footing.  *See* Debtors' Ex. 16 (ECF No. 861-10) at 2.  Through its financial advisor, Evercore, the Company solicited proposals from various lenders and undertook extensive negotiations with certain lenders whose proposals came closest to meeting the Company's needs. The Company understood that, for basic economic reasons, it was in the strongest position to find a restructuring solution if it engaged with a number of lenders and incentivized them to deliver the best terms by running a competitive process.  *See* May 15 Tr. (PM) 146:15–23 (Shah); Debtors' Ex. 63 (ECF No. 862-7) at 1.

229.     The Non-PTL Lenders claim that the Company used the Ad Hoc Group of Non-PTL Lenders "as a stalking horse" and "never had any intention of allowing a transaction" with them. ECF No. 241, at 8. But there is no support for that conspiratorial theory in the record. Rather, the evidence indisputably shows that the Company initially viewed the proposal from the

Ad Hoc Group of Non-PTL Lenders as the "best horse" on which it focused its attention. May 15

Tr. (PM) 152:17-25 (Shah); Debtors' Ex. 11 (ECF No. 861-5).

230.    Indeed, the Company did not even contact the PTL Lenders before they sent an

unsolicited letter on April 7, 2020, to which the Company did not reply, and the Lender Plaintiffs

and the Debtors had no negotiations at all for several weeks after the PTL Lenders sent a draft term

sheet on April 24, 2020 proposing a super-priority financing available to all first-lien lenders.

Debtors' Ex. 56 (ECF No. 862); Debtors' Ex. 87 (ECF No. 862-31).  By the time the Company

and the PTL Lenders engaged with one another, the Ad Hoc Group of Non-PTL Lenders had more

than a month's head start after initially proposing their IPCo transaction in early March.  Debtors'

Ex. 17 (ECF No. 889); May 15 Tr. (PM) 155:24-156:3 (Shah).  In total, the Company negotiated

with lenders holding over 70% of the Company's existing debt.

231.    It was only after several rounds of arm's length negotiations, *e.g.*, Debtors' Ex. 169

(ECF No. 864-17); Debtors' Ex. 176 (ECF No. 864-19), and the PTL Lenders making a major

concession in "taking a very large discount on [their] loan[s]," May 17 Tr. (PM) 120:18-23

(Yarrow), that the Company chose their proposal over the one put forward by the Ad Hoc Group

of Non-PTL Lenders.

232.    The Company's Finance Committee determined that the PTL Lenders' proposed

transaction, which reduced the Company's total debt by approxiamtely $185 million, resulted in

lower interest payments, and provided $200 million in new money, was the Company's best

financing solution.  Debtors' Ex. 202 (ECF No. 864-45) at 1.  Among other advantages, it

"maximiz[ed] near-term and future discount capture, enhance[d] liquidity, and minimize[d] other

legal and financial risks."  *Id.* at 6.

233.     In assessing which additional lenders to let into the 2020 Transaction thereafter, the Company looked to "various criteria," including "cross holdings, the amount of discount capture they could offer us, the size and their ability to fit in the basket, [and] their potential future lending relationship with the company." May 15 Tr. (PM) 190:23-191:4 (Shah). "[E]conomics were the most important factor." May 15 Tr. (PM) 280:2-3 (Prince). Thus, for example, Arrowmark, which "had a mix of 1L and 2L" and was "interest neutral" was let in, May 15 Tr. 190:12-16 (Shah), as was Venor Capital Management, which was "all second lien and small, so [it] offered the greatest discount capture," May 15 Tr. (PM) 191:5-8 (Shah). There was nothing "malevolent[]," *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302 (N.Y. App. Div. 2003), or "arbitrary," ECF No. 241 at 25 (citing *Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 731 (S.D.N.Y. 2020)), about the Company's competitive process or its decision regarding which lenders to invite to participate in the 2020 Transaction.

234.     As a result, this case is a far cry from the transaction at issue in *KeyBank National Ass'n v. Franklin Advisers, Inc.*, 616 B.R. 14, 40 (Bankr. S.D.N.Y. 2020), on which LCM relies. *See* ECF No. 245 ¶ 58. There, the plaintiff alleged that "the purported $100 million loan was just a ruse" and did not actually correspond to the amount of new financing. *KeyBank*, 616 B.R. at 41. The court agreed, holding that "[t]ransactions that lack economic substance" are "prime examples of matters that may constitute breaches of the implied covenant of good faith and fair dealing." *Id.* at 40. But the 2020 Transaction provided indisputable economic benefits to the Company, enabling it to stay afloat—and to continue paying all lenders interest—for over two years. For a struggling business, a more legitimate business purpose is difficult to conceive. Likewise, the RSA and the Plan indisputably provide the Company with enormous economic benefit. The RSA and the Plan allow the Company to comprehensively restructure its balance sheet, resulting in an

approximately $1.6 billion deleveraging, *see* May 16 Tr. 47:14–20 (Tepner), and they permit the company to emerge expeditiously from bankruptcy, rather than having to wait for a final, non-appealable judgment in the litigation, *see* May 17 Tr. (PM) 117:24–118:6 (Yarrow).  As a result, there can be no doubt that the Company had a legitimate business purpose in entering into the RSA and the settlements contemplated therein.

235.    The Ad Hoc Group of Non-PTL Lenders also argues that the Company's business justification was not legitimate because its "purported commercial goals of raising cash and de-levering its balance sheet" could have been achieved in a different way.  ECF No. 241 at 24.

236.    But, as a matter of law, the possibility of a hypothetical alternative does nothing to undermine the parties' valid business justifications for entering the 2020 Transaction. *Cf. In re Glob. Crossing Ltd.*, 295 B.R. 726, 746 (Bankr. S.D.N.Y. 2003) (acts are "well within the bounds of reasonable business judgment" even when there are "alternatives").

237.    And, as a matter of fact, the PTL Lenders' proposal was superior to any other proposal on the table.  *See generally* Debtors' Ex. 202 (ECF No. 864-45) at 12.  "It provided for greater discount capture," May 15 Tr. (PM) 181:24-182:4 (Shah): $470 million to the Ad Hoc Group of Non-PTL Lenders' $283 million, May 16 Tr. 37:1-5 (Tepner).  "It provided for less interest expense in total," May 15 Tr. 181:24-182:4 (Shah): $22 million to the Ad Hoc Group of Non-PTL Lenders' $37 million, May 16 Tr. 36:21-24 (Tepner).  It provided for $185 million in debt reduction, as compared to a debt *increase* of $38 million under the Ad Hoc Group of Non-PTL Lenders' proposal.  *See* May 16 Tr. 36:13-18 (Tepner).  Finally, "[i]t provided for good step-two capacity, and it had the participation and support of a larger number of lenders."  May 15 Tr. (PM) 48:13-15 (Shah).  The Ad Hoc Group of Non-PTL Lenders' proposal "would not have achieved the same level of discount and it would have had more limitations on long-term operating

flexibility." May 15 Tr. (PM) 138:8-14 (Prince). The Company thus had valid reasons for choosing the PTL Lenders' Position Enhancing Transaction over any other proposal on the table, including the Non-PTL Lenders' alternative Position Enhancing Transaction. Such business-driven decisions do not run afoul of the implied covenant. *See Inversiones Errazuriz Limitada*, 374 F.3d at 170 (a decision "made for a legitimate business purpose" is "neither unreasonable nor arbitrary" and does not violate the covenant of good faith and fair dealing).

### ii.    The PTL Lenders' Likewise Had a Legitimate Business Justification to Enter into the 2020 Transaction

238.    As an initial matter, all parties' interests were "aligned" with the Company's, given that all lenders "would have benefitted from" the Company's improved financial condition and continued ability to pay back its loans with interest. *Lykins*, 2018 WL 3231542, at *10 (quoting *Wagner*, 2011 WL 856262, at *4); *see* Debtors' Ex. 191 (ECF No. 864-34) (email from Karn Chopra to Gibson Dunn and Centerview stating that "we are in many ways aligned" on long-term deleveraging objectives).

239.    Nevertheless, the PTL Lenders also each had a legitimate business interest in protecting their downside if the 2020 Transaction was ultimately unsuccessful in keeping the Company out of bankruptcy. The PTL Lenders had originally put forward a new money super-priority financing open to all lenders on April 24, 2020. *See* Debtors' Ex. 87 (ECF No. 862-31) at 3. But thereafter they learned that the Ad Hoc Group of Non-PTL Lenders and others had proposed IPCo transactions that would have stripped the Company of its most valuable collateral—including key intellectual property—and placed that collateral in a non-guarantor entity. May 16 Tr. (PM) 150:6–10 (Chopra). That possibility posed an economic threat to the PTL Lenders, as well as to all other non-participating lenders. If their hundreds of millions of dollars in first- and second-tier

loans were no longer backed by the Company's full collateral, then their recoveries in a downside scenario would decline precipitously.

240.   Faced with this risk, and recognizing the Company's interest in discount capture, the PTL Lenders were wholly "justified in seeking to protect [themselves]." *Inversiones Errazuriz Limitada*, 374 F.3d at 170.  Indeed, lenders have fiduciary obligations to try to protect their investors' assets.  *See* May 18 Tr. (AM) 77:4-6 (Kwon); May 18 Tr. (AM) 115:4-8 (Kwon); May 18 Tr. (PM) 41:19-21 (Hanigan); *see generally Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 569 (N.Y. 1984).  The PTL Lenders' May 26, 2020 proposal, which included new money plus a debt-for-debt repurchase at a discount component, was therefore an appropriate defensive measure proposed in response to the threat of losing valuable collateral, "justified under the circumstances" and "honestly made in order to promote [their] legitimate interests." *55 Eckford Realty*, 39 Misc.3d 1208(A), at *12.

241.   It also bears emphasis that the PTL Lenders made significant sacrifices as part of this revised deal structure.  By agreeing to take a haircut to par on their existing loans as part of a debt repurchase, the PTL Lenders were permanently foregoing their upside on those loans and would never be able to recover 100% of par even if the Company right-sized its business and flourished going forward.  The Company pushed the PTL Lenders hard during negotiations, until the PTL Lenders ultimately put its best and final offer on the table and was not willing to go lower. This was not a bonanza deal for the PTL Lenders; rather, it was a somewhat reluctant decision to permanently give up any prospect of a full recovery on their loans to defend against the significant downside risk inherent in the Company going with the Ad Hoc Group of Non-PTL Lenders' proposal. *See* May 16 Tr. 186:24–187:1 (Chopra); May 17 Tr. (AM) 109:16–110:15 (Sveen); May 17 Tr. (AM) 117:8–19 (Sveen); May 17 Tr. (PM) 120:14–121:2  (Yarrow).

242.    Barings likewise operated with legitimate business justifications throughout the process. In March of 2020, Barings had conversations with CSAM, Eaton Vance, and Invesco about engaging with the Company, but, as Barings came to understand "the company was actively exploring alternative transactions in the context of a liability management transaction," it stepped away from that group and opted instead for "direct outreach to the company." May 17Tr. (PM) 33:14–21, 35:7–8, 36:12–21 (Searles). Barings entered into an NDA with the Company on May 1, 2020, *see* Debtors' Ex. 104 (ECF No. 889-1), and made its first proposal on May 8, 2020, *see* Debtors' Ex. 116 (ECF No. 863-9). Its initial proposal involved "a new money component consisting of somewhere between 150 and $200 million new money to be used for liquidity for the business, with a subsequent tranche of debts that would be used for the purposes of effectuating a repurchase of our first and second lien debt." May 17Tr. (PM) 39:3–11 (Searles). Ultimately, Barings learned that the Company was not going to move forward with its proposal, but was invited to be part of the transaction proposed by the PTL Lenders.  May 17 Tr. (PM) 40:20–25 (Searles). Barings concluded that the PTL Lenders' proposal was a "cleaner, more efficient transaction" than Barings' proposed IPCo transaction and "required [Barings] to advance substantially less new money," May 17 Tr. (PM) 42:4–18 (Searles), and accordingly signed on, preferring to participate in the 2020 Transaction rather than to have a transaction done around them.

243.    So, too, with the other PTL Lenders.  Monarch, Marble Point, Marathon, ArrowMark, and Venor, all were accepted into the deal by the Company, but had no role in negotiating the 2020 Transaction.  Each made a calculated business decision that the protection against downside risk was worth giving the Company the agreed-upon discount by exchanging the loans they held for less than their face value.  Notably, no evidence was put on at trial to even

attempt to establish that these PTL Lenders acted in bad faith or breached the implied covenant of good faith and fair dealing.

244.    In the face of such clear business rationales, the Ad Hoc Group of Non-PTL Lenders, citing case law discussing "efficient breach" in the breach of contract context, argues that economic justifications "do[] not constitute a defense to a contract claim."  ECF No. 241 at 16–17, 28 (citing *Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 262 n.12 (S.D.N.Y. 2005); *159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 369 (2019) (Wilson, J., dissenting)). Perhaps so, but business justification *does* constitute a defense to claims for breach of the implied covenant of good faith and fair dealing, which is the only counterclaim remaining here.

245.    The Court has already held that there was no breach of contract, as the debt repurchase component of the 2020 Transaction was an open market purchase within the meaning of the Term Loan Agreement.  *See* Mar. 28, 2023 Hr'g Tr. at 134. In light of that decision, the parties agreed to entry of partial final judgment that the Transaction complied with the terms of the Term Loan Agreement.  ECF No. 142 at ¶ 4.

246.    If anything, Defendants' "efficient breach" cases merely prove the *Lender Plaintiffs' and the Debtors'* argument.  In a capitalist system, there is nothing "blameworthy," *Topps*, 380 F. Supp. 2d at 262 n.12, about economic actors maximizing profits.  Indeed, their doing so may be "socially beneficial."  ECF No. 241 at 17 (citing *159 MP Corp.*, 33 N.Y.3d at 369).

247.    The Ad Hoc Group of Non-PTL Lenders also relies heavily on *Carvel Corp. v. Baker*, 79 F. Supp. 2d 53, 65–66 (D. Conn. 1997), a decision denying summary judgment on Carvel's request for a declaratory judgment that its supermarket distribution program did not violate its Type A franchise agreement or the covenant of good faith and fair dealing implied therein. But as the Southern District of New York explained in *Musicland*, a case on all fours with

this one, the "contract[] at issue" in *Carvel* did not "permit the conduct allegedly breaching the implied covenant of good faith and fair dealing." *In re Musicland Holding Corp.*, 386 B.R. at 439. When the contract expressly permits amendments (and open market purchases for that matter), like both the Term Loan Agreement at issue here and the intercreditor agreement at issue in *Musicland*, the implied covenant cannot be used "to impose on the parties obligations that are inconsistent" with the relevant contract. *Id.*

248.     Because the Lender Plaintiffs and the Debtors had legitimate business reasons for agreeing to and entering into the 2020 Transaction and the subsequent RSA, their actions did not violate the implied covenant.

**F.     Defendants Cannot Show that the Company or the PTL Lenders Acted with Malevolence in Including the Indemnity**

249.     Defendants also argue that the indemnity provision in the PTL Credit Agreement somehow establishes bad faith. ECF No. 241, at 27. The inclusion of the indemnification provision does not show bad faith; it shows fair dealing.  As part of the original Term Loan Agreement, the Company agreed to indemnify all lenders against any losses, claims, or liabilities "arising out of, in connection with, or as a result of" their performance of their obligations under the 2016 Term Loan Agreement. *See* Debtors' Ex. 6 (ECF No. 853-6) § 9.03(b). That indemnification then carried over to the PTL Credit Agreement. *See* Debtors' Ex. 252 (ECF No. 865-42) § 9.03(b).

250.     Indemnifications like those the Company provided to the PTL Lenders are included in credit agreements as a "general rule."  Debtors' Ex. 309 (ECF No. 859-8) § 10.2; *see also* Debtors' Ex. 374 (ECF No. 941-2) at 25:10–11 & 119:9–13 (Kwon) (indemnification provisions for the benefit of lenders are "standard in the industry").   They are an "important component of all credit agreements." May 16 Tr. 191:25–192:11 (Chopra).  Indeed, such indemnities are "pretty standard practice in any transaction," May 17 Tr. (PM) 44:21–45:3 (Searles), and considered

"commonplace," May 16 Tr. 191:25–192:11 (Chopra), "traditional," May 17 Tr. (AM) 33:1–18

(Chopra), and "routine[]," May 17 Tr. (PM) 60:22–61:8 (Searles).

251.    Although the PTL Credit Agreement included all claims arising out of the 2020

Transaction within its indemnity, that provision was more than warranted given that the Ad Hoc

Group of Non-PTL Lenders had already run to court to try to enjoin the 2020 Transaction before

it closed, and, along with LCM, sued the Company and a number of the PTL Lenders for damages

for both breach of contract and breach of the implied covenant of good faith and fair dealing. *North

Star*, No. 652243/2020, NYSCEF 1 (N.Y. Sup. Ct. June 18, 2020); *LCM Asset Mgmt.*, No.

652555/2020, NYSCEF 1 (N.Y. Sup. Ct. June 18, 2020).  Since the PTL Lenders "were already

being sued, [they] wanted to have some protection. . . . around that May 17 Tr. (PM) 116:21–117:3

(Yarrow).  Given the backdrop of litigation, it is understandable that the indemnity was "highly

important," to the PTL Lenders. May 17 Tr. (PM) 81:17-22 (Meiering).  And since litigation is

ongoing, the go-forward indemnity obligation under the RSA and Plan is equally as important to

the PTL Lenders.  May 16 Tr. (PM) 192:21–193:8 (Chopra); May 17 Tr. (AM) 119:24–121:7,

122:13–124:3 (Sveen); May 17 Tr. (PM) 45:4–46:15 (Searles), 81:23–82:17 (Meiering), 117:14–

119:3 (Yarrow).

252.    Nor is this provision unusual.  For example, Angelo Gordon included a very similar

indemnification provision in a new credit agreement created to facilitate its Envision/AmSurg

transaction. The indemnification provision in the Envision/AmSurg transaction expressly covered

"any and all losses, claims, damages, liabilities, obligations, demands, actions (including in

connection with any bankruptcy case), judgments, suits, costs, expenses, disbursements or

penalties of any kind or nature whatsoever" with no exceptions for bad faith, willful misconduct

or gross negligence for claims "arising from an Indemnified Person's participation in the

Transactions."  Debtors' Ex. 359 (ECF No. 889-5) § 13.5(a)(iii) at pp. 187–88.  This is just like the indemnification provision in the PTL Credit Agreement, which carves out "gross negligence, bad faith or willful misconduct," but carves conduct related to participating in the 2020 Transaction back into the indemnity.  Debtors' Ex. 252 (ECF No. 865-42) § 9.03(b) at 130.

G.    **LCM's "Amend to Exit" Arguments Fail for Multiple Reasons**

253.    LCM—in a bid to relitigate its breach of contract claim in this trial--argued that Plaintiffs breached the Credit Agreement and its implied covenant because the Required Lenders entered into a new credit agreement shortly after amending the old Term Loan Agreement. *See* ECF No. 245 ¶¶ 33–45, 57–58.

254.    As an initial matter, principles of waiver and res judicata preclude the Court's consideration of LCM's breach of contract argument.  In its opposition to summary judgment, LCM made multiple arguments as to why the 2020 Transaction breached the Term Loan Agreement.  *See* ECF No. 79.  It did not argue, as it does now, that the Company lacked the Required Lenders to amend the Term Loan Agreement because of the timing of such amendments. Those arguments are therefore forfeited.  *See Vela*, 276 F.3d at 678–79 (deeming forfeited an argument not raised in opposition to summary judgment); *Reyes v. Quality Logging, Inc.*, 2017 WL 10646614, at *3, n.4 (S.D. Tex. Dec. 5, 2017) (same); *Dowling v. Harvey*, 2006 WL 8436123, at *2 (W.D. Tex. Mar. 30, 2006) (same).

255.    The Court subsequently issued a written order following its summary judgment ruling, the language of which was agreed upon in advance by the parties, stating that "the parties to this adversary proceeding agree that . . .  the Court should enter partial final judgment in Plaintiffs' favor on Plaintiffs' claim that the Transaction was permitted under the Non-PTL Term Loan Agreement" and accordingly "enter[ing] partial final judgment in Plaintiffs' favor on that claim under Federal Rule of Civil Procedure 54(b)."  ECF No. 142 ¶ 4.  Defendants, including

LCM, agreed to final judgment on any contract claims precisely so that this Court's judgment could be appealed immediately to the Fifth Circuit.  *See id.*

256.    "A final judgment on the merits of [a claim] precludes the parties or their privies from relitigating issues that were or could have been raised" in the adjudication of that claim. *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).  LCM cannot relitigate a breach of contract claim that has already been fully disposed of by this Court.

257.    In any event, on the merits of both the breach of contract and breach of the implied covenant claims, LCM fares no better.  LCM cites just one case in connection with its argument that Required Lenders, who are otherwise indisputably free to amend the non-sacred rights terms of a credit agreement with the consent of the Borrower, may not do so when they will subsequently enter into a new credit agreement.  But that one case supports the *Lender Plaintiffs' and the Debtors'* position.

258.    In *In re Murray Energy Holdings Co.*, the plaintiff, Black Diamond, argued, as LCM does here, that the consent of the superpriority lenders "should not be counted toward the majority needed to amend the Credit Agreement because they had already committed to sell their loans back . . . at the time they executed" the amendment.  616 B.R. 84, 97 (Bankr. S.D. Ohio 2020).    The bankruptcy court "rejected" that "Zombified Votes" argument "as fiction and sophistry," looking to the recitals in the relevant agreements to conclude that the amendment "was entered into" before the loans were sold—even though both events occurred on the "same day." *Id.* at 98.  *Murray Energy* thus makes clear that there was nothing untoward about the contractually permissible amendment process that took place here.

259.    As LCM is forced to concede, "the amendments came into effect . . . before the exchange."  ECF No. 245 ¶ 58.  That is evidenced in at least three different respects in the relevant 2020 Transaction documents.

260.    *First*, the PTL Credit Agreement has, as a condition precedent, that the amendments to the First Lien Term Loan Agreement and Second Lien Term Loan Agreement must both have been "duly executed" "prior to the making" of the new loans under the PTL Credit Agreement. Debtors' Ex. 252 (No. 865-42) at 85.  "The obligations of each Lender to make Loans . . . shall not become effective until" that condition precedent "is satisfied."  *Id.* at 84.

261.    *Second*, the first two "whereas" recitals of the Open Market Purchase and Cashless Exchange Agreement, which effectuated the purchase, state that the parties to that agreement are already party to the previous first-lien and second-lien term loan agreements "*as amended by* that certain Amendment No. 1 to the Term Loan Agreement, dated as of June 22, 2020," which amended the Term Loan Agreement to allow for super-priority debt.  Debtors' Ex. 251 (ECF No. 865-41) at 3 (emphasis added).  In other words, the Term Loan Agreement was already amended by Required Lenders before any debt exchange or repurchase occurred.

262.    *Third*, Section 6 of Amendment No. 1 to the Term Loan Agreement—the "Conditions Subsequent" section—provides that the new PTL Credit Agreement "shall become effective" "[i]mmediately *following*" the amendments, at which time the open market purchase "shall be consummated," again emphasizing that the amendments were first in time.  Debtors' Ex. 250 (ECF No. 857-99) at 4 (emphasis added).

263.    These documents establish that Required Lenders holding more than "50% of the sum of the total Loans . . . *at such time*" as Amendment No. 1 was executed voted to amend the

Case 23-09001   Document 302   Filed in TXSB on 05/23/23   Page 98 of 206

Term Loan Agreement. *See* Debtors' Ex. 6 (ECF No. 853-6) at 54. *Murray Energy* is thus on all fours and forecloses LCM's arguments.

264.    Moreover, LCM presented no evidence at trial in support of its argument concerning the timing and sequencing of the Lender Plaintiffs' and the Debtors' actions. LCM cannot therefore argue that the clear terms of the various agreements that implemented the June 2020 Transaction do not mean exactly what they say. *Murray Energy*, 616 B.R. at 97. Nor did LCM prevent any evidence at trial that the parties to the Term Loan Agreement somehow understood that they were not permitted to exercise their express rights under the Term Loan Agreement if they intended to subsequently sell their debt, despite no provision in the Term Loan Agreement providing for any such restriction. To the contrary, as discussed above in Section I, the PTL Lenders unanimously testified that they understood that the 2020 Transaction was permitted by the Term Loan Agreement and were comfortable with the structure of the 2020 Transaction.

## III.    THIS COURT OF EQUITY MAY CONSIDER DEFENDANTS' UNCLEAN HANDS AND FIND THAT IT BARS ANY RECOVERY BY ANGELO GORDON, APOLLO, AND GAMUT HERE REGARDLESS

265.    Bankruptcy courts are "courts of equity," *Young v. United States*, 535 U.S. 43, 50 (2000), that require parties to "have acted fairly . . . as to the controversy at issue," *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945). Moreover, to the extent Defendants still seek to unwind the 2020 Transaction, in the unlikely event that Defendants prevail, the Court may still consider the Lender Plaintiffs' and the Debtors' equitable defenses and reject that remedy as inequitable. *See* ECF No. 148 at 124–25 (requesting the Court find the 2020 Transaction "invalid and void ab initio," such that the parties "retain the absolute and relative rights they had prior to the transaction."); *see also AIMCO CLO 10 Ltd. v. Revlon, Inc*. (*In Re Revlon Inc*.), 2023 WL 2229352, at *17 (Bank. S.D.N.Y. Feb. 24, 2023) ("undoing" a transaction is an

equitable remedy); *Kallman v. Krupnick*, 67 A.D.3d 1093, 1094 (N.Y. App. Div. 2009) (plaintiff could not seek rescission of contract where his own actions "constituted unclean hands barring [such] equitable relief").

266.    The doctrine of unclean hands prevents recovery where a defendant was "guilty of immoral or unconscionable conduct directly related to the subject matter." *Citibank, N.A. v. American Banana Co., Inc.*, 50 A.D.3d 593, 594 (N.Y. App. Div. 2008) (internal quotation omitted).  Accordingly, Apollo's, Angelo Gordon's and Gamut's conduct should bar their recovery on any implied covenant of good faith and fair dealing claim here.

267.    While an implied covenant claim employs an objective standard, the actions of the Ad Hoc Group of Non-PTL Lenders here—as well as in other transactions—show that a reasonable person in the position of the promisee would have understood that Position Enhancing Transactions were permissible under the Term Loan Agreement.  The Ad Hoc Group of Non-PTL Lenders proposed a similar Position Enhancing Transaction to the Company and have entered into similar agreements in other transactions.  *See supra* section IX.  Therefore, litigating this claim for approximately three years even after the Company filed for bankruptcy is just one way the Ad Hoc Group of Non-PTL Lenders has unclean hands.  Indeed, if this Court had found that the 2020 Transaction breached the implied covenant of good faith and dealing, then the Court would have also necessarily found that Apollo, Angelo Gordon and Gamut's proposal likewise breached the implied covenant of good faith and fair dealing.

268.    Further, the Ad Hoc Group of Non-PTL Lenders attempted to sabotage the deal once they realized that they had been "outmaneuvered."  *See* Debtors Ex. 212 (ECF No. 865-5). They first worked to undermine the Company and the 2020 Transaction by attempting to poach the support of other lenders and then attempted to buy off certain of the PTL Lenders with $30

million to forego entering into the Transaction, at the expense of the Company's business.  *See supra* section V.E.

269.    Lastly, Defendants entered into a cooperation agreement that prevents them from selling any of the Company's debt and pursuant to which they agreed not to vote for any plan unless they all agreed.  *See supra* section V.E.  As a result, they have not been able to mitigate any purported damages, including by selling their loans when those loans were trading at elevated prices following the 2020 Transaction.  And notably, the cooperation agreement has further prevented them from voting in favor of the Plan, which is yet another way they have put the Company's vitality at risk.  *See also supra* section V.E.

270.    Thus, even if the Ad Hoc Group of Non-PTL Lenders had made out a case for a breach of the implied covenant, which they have not, these particular lenders may not recover.

## IV.    COUNTERCLAIM PLAINTIFFS ALSO HAVE NOT CARRIED THEIR BURDEN WITH RESPECT TO THE REPRESENTED THIRD-PARTY DEFENDANTS

271.    Defendants have failed to carry their burden with respect to all of the participating lenders.  But they have not even attempted to do so with respect to the scores of Counterclaim Defendants they named that played no role in planning, negotiating, or structuring the 2020 Transaction.  This includes all entities affiliated with Monarch, Marble Point, Marathon, ArrowMark, and Venor.  *See generally* ECF No. 217 (answering for the Represented Third-Party Defendants).

272.    The law requires any party asserting a counterclaim to carry its burden on that claim as though it were the plaintiff.  *See* 57 Francis C. Amendola, et al., N.Y. Jurisprudence, Evidence and Witnesses § 165 (2d ed. May 2023) ("If the defendant serves a counterclaim, the defendant is in the position of a plaintiff alleging a cause of action and must bear the burden of proof

accordingly.")  Thus, the Counterclaim Plaintiffs were obliged to show that each Counterclaim Defendant violated New York's implied duty of good faith and fair dealing.

273.    It is not enough to claim that the transaction was improper on the whole.  Instead, potential liability attaches to individual entities.  *See Vista Outdoors Inc. v. Reeves Family Trust*, 234 F. Supp. 3d 558, 567–68 (S.D.N.Y. 2017) (holding that an individual violated the implied covenant for his role in a transaction, but that a trust did not violate the implied covenant for its role in the same transaction).

274.    Here, the Counterclaim Plaintiffs did not present any evidence that many of the individual third-party Counterclaim Defendants were involved in planning, negotiating, or structuring the 2020 Transaction, or that they otherwise acted in bad faith.  In fact, the evidence presented at trial showed that the many of the Counterclaim Defendants played no material role in negotiating or formulating the disputed transaction, and that there was nothing "inappropriate about additional lenders reaching out, seeking to get added to the deal."  May 16 Tr. 589:24–590:2 (Chopra).  Accordingly, there is no evidence to support any claims against those entities.

## CONCLUSION

275.    For the foregoing reasons, the Court finds for the Lender Plaintiffs and the Debtors and the Represented Additional Counterclaim Defendants and enters these findings of fact and conclusions of law (1) declaring that the Lender Plaintiffs and the Debtors did not violate the implied covenant of good faith and fair dealing by entering into the 2020 Transaction; and (2) dismissing Defendants' counterclaims against the Lender Plaintiffs, the Debtors, and Represented Additional Counterclaim Defendants.

Dated: May 23, 2023

/s/ David J. Lender
_____

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 1700
Houston, TX 77002
Tel:  (713) 546-5040
Fax: (713) 224-9511
Email:  Gabriel.Morgan@weil.com
         Stephanie.Morrison@weil.com

WEIL, GOTSHAL & MANGES LLP
David J. Lender (admitted *pro hac vice*)
Ray C. Schrock (admitted *pro hac vice*)
Luna Barrington (admitted *pro hac vice*)
Alexander W. Welch (admitted *pro hac vice*)
Richard Gage (admitted *pro hac vice*)
Taylor B. Dougherty (admitted *pro hac vice*)
Joseph R. Rausch (admitted *pro hac vice*)
Elaina K. Aquila (admitted *pro hac vice*)
Michael P. Goodyear (admitted *pro hac vice*)
Nicholas J. Reade (admitted *pro hac vice*)
767 Fifth Avenue
New York, NY 10153
Tel:    (212) 310-8000
Fax:    (212) 310-8007
Email: david.lender@weil.com
       ray.schrock@weil.com
       luna.barrington@weil.com
       alexander.welch@weil.com
       richard.gage@weil.com
       taylor.dougherty@weil.com
       joseph.rausch@weil.com
       elaina.aquila@weil.com
       michael.goodyear@weil.com
       nick.reade@weil.com

*Counsel for Plaintiff Serta Simmons Bedding, LLC*

/s/ Gregg Costa
_____

GIBSON, DUNN & CRUTCHER LLP
Gregg Costa (24028160)
Samuel D. Adkisson (24131212)

811 Main Street, Suite 3000
Houston, TX 77002
Telephone: (346) 718-6600
Fax: (346) 718-6620
gcosta@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
Scott Greenberg (admitted *pro hac vice*)
C. Lee Wilson (admitted *pro hac vice*)
Jason Goldstein (admitted *pro hac vice*)
Amanda M. Aycock (admitted *pro hac vice*)
Akiva Shapiro (admitted *pro hac vice*)
Alison L. Wollin (admitted *pro hac vice*)
Michael L. Nadler (admitted *pro hac vice*)
Alexandra Perloff-Giles (admitted *pro hac vice*)
Telephone: (212) 351-4000
Fax: (212) 351-4035
sgreenberg@gibsondunn.com
clwilson@gibsondunn.com
jgoldstein@gibsondunn.com
aaycock@gibsondunn.com
ashapiro@gibsondunn.com
awollin@gibsondunn.com
mnadler@gibsondunn.com
aperloff-giles@gibsondunn.com

*Counsel for Invesco Senior Secured Management,
Inc., Credit Suisse Asset Management, LLC, Eaton
Vance Management, Boston Research and
Management, Barings LLC, and the Represented
Counterclaim Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 23, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' claims, noticing, and solicitation agent.

_/s/ Gabriel A. Morgan_
Gabriel A. Morgan

**EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  | § |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| SERTA SIMMONS BEDDING, LLC, | § | Case No. 23-90020 (DRJ) |
| *et al.*, | § |  |
|  | § | Jointly Administered |
| Debtors.[1] | § |  |

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
CONFIRMING SECOND AMENDED JOINT CHAPTER 11 PLAN
OF SERTA SIMMONS BEDDING, LLC AND ITS AFFILIATED DEBTORS[2]

Serta Simmons Bedding, LLC ("**Serta Simmons Bedding**"), and its debtor affiliates in the

above-captioned chapter 11 cases, as debtors and debtors in possession (collectively,

the "**Debtors**") having:

a. commenced, on January 23, 2023 (the "**Petition Date**"), these chapter 11 cases by
   filing voluntary petitions in the United States Bankruptcy Court for the Southern
   District of Texas (the "**Court**") for relief under chapter 11 of title 11 of the United
   States Code (the "**Bankruptcy Code**");

b. obtained, on January 24, 2023, entry of the *Order Directing Joint Administration of
   Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule
   1015-1* (Docket No. 46);

c. proposed and filed the *Second Amended Joint Chapter 11 Plan of Serta Simmons
   Bedding, LLC and Its Affiliated Debtors*, dated May 23, 2023 (Docket No. 977)
   (including any exhibits and schedules thereto and as may be modified, amended, or

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta
International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company
(5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016);
SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow
Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957).  The Debtors' corporate
headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

[2]  The proposed findings of fact and conclusions of law set forth herein are intended to be in addition to, and not
in lieu of, proposed findings of fact and conclusions of law to be submitted by the Debtors at the conclusion of
any final proceedings related to the Plan.

supplemented from time to time, the "**Plan**")[3] and filed the *Disclosure Statement for Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors*, dated March 23, 2023 (Docket No. 545) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented from time to time, the "**Disclosure Statement**");

d.  obtained, on February 8, 2023, after notice and hearing, entry of the *Order (I) Scheduling Certain Hearing Dates and Deadlines, (II) Establishing Certain Protocols in Connection with Such Hearings, and (III) Granting Related Relief* (Docket No. 267), which, among other things, set the deadline for filing objections to confirmation of the Plan and scheduled a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**");

e.  obtained, on March 23, 2023, after notice and hearing, entry of the *Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (IV) Approving Notice Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* (Docket No. 540) (the "**Disclosure Statement Order**"), which, among other things, (i) approved the Disclosure Statement and (ii) approved solicitation procedures related to the Disclosure Statement;

f.  served, through their claims, noticing, and solicitation agent, Epiq Corporate Restructuring, LLC ("**Epiq**"), the Disclosure Statement, the Plan, and related solicitation materials, including the ballots (the "**Ballots**"), notice of non-voting status, and notice of the Confirmation Hearing (collectively, the "**Solicitation Materials**") to holders of Claims and Interests in accordance with the Disclosure Statement Order, as described in the *Certificate of Service of Solicitation Materials* (Docket No. 758) filed on May 2, 2023 (the "**Solicitation Affidavit**") and the *Declaration of Emily Young of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and its Affiliated Debtors* (Docket No. 779), filed on May 4, 2023 (the "**Solicitation Declaration**");

g.  caused to be published in USA Today, on April 3, 2023, notice of the Confirmation Hearing as set forth in the *Verification of Publication*, filed by Epiq on April 3, 2023 (Docket No. 603) (the "**Certificate of Publication**");

h.  served, through Epiq, the *Notice of Adjournment of Hearing on Debtors' Request for Confirmation of Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 703), that provides notice of (i) the reset of the deadline for filing objections to confirmation of the Plan to May 11, 2023 at 12:00 p.m. (Central Time) and (ii) the adjournment of the commencement of the Confirmation Hearing to

---

3   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.  The rules of interpretation set forth in <u>Article I</u> of the Plan and the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Confirmation Order.

May 15, 2023 at 9:30 a.m. (Central Time), as set forth in the *Certificate of Service*, filed on May 1, 2023 (Docket No. 738);

i.   caused, through Epiq, (i) the *Notice of (I) Assumption of Executory Contracts and Unexpired Leases, and (II) Cure Claims Related Thereto In Connection with Confirmation of Plan* (Docket No. 668) on April 14, 2023, (ii) the *Amended Notice of (I) Assumption of Executory Contracts and Unexpired Leases, and (II) Cure Claims Related Thereto In Connection with Confirmation of Plan* (Docket No. 720) on April 27, 2023, (iii) the *Second Amended Notice of (I) Assumption of Executory Contracts and Unexpired Leases, and (II) Cure Claims Related Thereto In Connection with Confirmation of Plan* (Docket No. 788) on May 5, 2023, (iv) the *Third Amended Notice of (I) Assumption of Executory Contracts and Unexpired Leases, and (II) Cure Claims Related Thereto In Connection with Confirmation of Plan* (Docket No. 871) on May 13, 2023, and (v) the *Fourth Amended Notice of (I) Assumption of Executory Contracts and Unexpired Leases, and (II) Cure Claims Related Thereto In Connection with Confirmation of Plan* (Docket No. [●]) on May [24], 2023 (collectively, and as may be further amended or supplemented from time to time, the "**Cure Notice**") to be served on the counterparties to such executory contracts and unexpired leases as set forth in (i) the *Certificate of Service*, filed April 26, 2023 (Docket No. 707), (ii) the *Certificate of Service*, filed April 26, 2023 (Docket No. 714), (iii) the *Certificate of Service*, filed May 1, 2023 (Docket No. 731), (iv) the *Certificate of Service*, filed May 2, 2023 (Docket No. 762), (v) the *Certificate of Service*, filed May 8, 2023 (Docket No. 793), and (vi) the *Certificate of Service*, filed May 18, 2023 (Docket No. 942);

j.   filed, (i) on March 29, 2023, the *Notice of Filing of Plan Supplement in Connection with Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 588), (ii) on April 21, 2023, the *Notice of Filing of Second Amended Plan Supplement in Connection with Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 692), (iii) on May 13, 2023, the *Notice of Filing of Third Amended Plan Supplement in Connection with Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 869), (iv) on May 14, 2023, the *Notice of Filing of Fourth Amended Plan Supplement in Connection with Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 873), and (v) on May [24], 2023, the *Notice of Filing of Fifth Amended Plan Supplement in Connection with Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. [●]) (collectively, and as may be further amended or supplemented from time to time, the "**Plan Supplement**");

k.   filed, on May 14, 2023, the (i) *Debtors' Memorandum of Law in Support of Confirmation of Modified First Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 879), (ii) *Declaration of Michael J. Talarico in Support of Confirmation of Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 881) (the "**Talarico Declaration**"), (iii) *Declaration of Roopesh Shah in Support of Confirmation of Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 882) (the "**Shah Declaration**"), and (iv) *Declaration of John Linker in Support of Confirmation of Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its*

*Affiliated Debtors* (Docket No. 884) (the "**Linker Declaration**" and, together with the Solicitation Declaration, the Talarico Declaration, and the Shah Declaration, the "**Supporting Declarations**");

l.  filed, on May 23, 2023, the *Debtors' Supplemental Memorandum of Law in Support of Confirmation of Second Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 979); and

m.  filed, in the Adversary Proceeding, (i) on May 14, 2023, the *Serta Simmons Bedding, LLC's Pre-Trial Memorandum of Law* (Adv. Proc. No. 23-09001, Docket No. 242) and (ii) on May [23], 2023, the *Plaintiffs' Findings of Fact and Conclusions of Law* (Adv. Proc. No. 23-09001, Docket No. [●]) (as amended, modified, and entered, the "**Adversary Findings of Fact and Conclusions of Law**").

This Court having:

a.  held the Confirmation Hearing on May 15, 2023 through May 18, 2023 and on May 25, 2023;

b.  heard the arguments and considered the evidence presented, proffered, and adduced at the Confirmation Hearing;

c.  considered the entire record of the Confirmation Hearing and the Adversary Proceeding;

d.  taken judicial notice of the entire record of these chapter 11 cases;

e.  entered, in the Adversary Proceeding, (i) the *Order on Summary Judgment* on April 6, 2023 (Adv. Proc. No. 23-09001, Docket No. 142) and (ii) the [●] on May [●], 2023 (Adv. Proc. No. 23-09001, Docket No. [●]), including incorporating the Adversary Findings of Fact and Conclusions of Law; and

f.  overruled all objections to the Plan and Confirmation and all statements and reservations of rights not consensually resolved or withdrawn, except as expressly provided herein.

NOW, THEREFORE, after due deliberation and sufficient cause appearing therefor, this Court hereby FINDS, DETERMINES, and CONCLUDES as follows:

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

a.  <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth (i) herein, (ii) in the Adversary Findings of Fact and Conclusions of Law, and (iii) in the record of the Confirmation Hearing constitute this Court's findings of fact and conclusions of law pursuant

to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). All findings of fact and conclusions of law announced by this Court at the Confirmation Hearing in relation to confirmation of the Plan and the Adversary Proceeding are hereby incorporated into this Confirmation Order and are essential, inextricable, and nonseverable components and terms of this Confirmation Order and the treatment and distributions provided under the Plan. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

b.     Jurisdiction, Venue, Core Proceeding. This Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. § 1334. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to enter a final order with respect thereto. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors are eligible debtors under section 109 of the Bankruptcy Code and are proper plan proponents under section 1121(a) of the Bankruptcy Code.

c.     Chapter 11 Petitions. On the Petition Date, the Debtors commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code. On January 24, 2023, this Court entered an order authorizing the joint administration of the Debtors' chapter 11 cases in accordance with Bankruptcy Rule 1015(b). *See* Docket No. 46.

d.     Since the Petition Date, the Debtors have operated their business and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On February 9, 2023, the U.S. Trustee appointed an official committee of unsecured creditors (the "**Creditors' Committee**") in these chapter 11 cases pursuant to section 1102 of the

Bankruptcy Code (Docket No. 274).  No trustee or examiner has been appointed in these chapter 11 cases.

e.       <u>Judicial Notice</u>.  This Court takes judicial notice of the docket of these chapter 11 cases maintained by the Clerk of this Court, including all pleadings and other documents filed and all orders entered in the main case and any related adversary proceeding, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before this Court during the pendency of these chapter 11 cases.  Any resolution of objections to confirmation of the Plan explained on the record at the Confirmation Hearing is hereby incorporated by reference. Except to the extent set forth herein, all unresolved objections, statements, informal objections, and reservations of rights, if any, related to the Plan or confirmation of the Plan are overruled on the merits and denied in their entirety.

f.       <u>Burden of Proof</u>.  Based on the record of these chapter 11 cases, each of the Debtors has met the burden of proving by a preponderance of the evidence each applicable element of sections 1129(a) and (b) of the Bankruptcy Code, including all other sections of the Bankruptcy Code referenced therein or implicated thereby.

g.       <u>Principal Purpose</u>.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

h.       <u>Solicitation</u>.  As described in and evidenced by the Solicitation Affidavit and the Solicitation Declaration, transmittal and service of the Solicitation Materials (collectively, the "**Solicitation**") were timely, adequate, appropriate, and sufficient under the circumstances. The Solicitation (i) was conducted in good faith, (ii) complied with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Disclosure Statement Order, and

all other applicable non-bankruptcy rules, laws, and regulations applicable to the Solicitation, and (iii) was appropriate and satisfactory based upon the circumstances of these chapter 11 cases.  The Released Parties, the Exculpated Parties, and the Global Settlement Parties (as defined below) acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including with respect to (1) the solicitation of acceptance or rejection of the Plan and (2) the participation in the offer, issuance, sale, or purchase of a security offered or sold under the Plan, and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan and this Confirmation Order.

      i.    <u>Notice</u>.  As evidenced by the Solicitation Affidavit, the Certificate of Publication, and the Solicitation Declaration, all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to confirmation of the Plan) have been given due, proper, adequate, timely, and sufficient notice of the Confirmation Hearing in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all other applicable non-bankruptcy rules, laws, and regulations and such parties had an opportunity to appear and be heard with respect thereto.  No other or further notice is required with respect thereto.

      j.    <u>Voting Record Date</u>.  The Solicitation Materials and the Plan were distributed to holders in the Voting Classes that held a Claim or Interest as of March 20, 2023 (the "**Voting Record Date**").  The establishment and notice of the Voting Record Date were reasonable and sufficient.

      k.    <u>Tabulation</u>.  As described in the Solicitation Declaration, the holders of Claims in Class 3 (FLFO Claims), Class 4 (FLSO Claims), and Class 6A (Ongoing General Unsecured Claims) are Impaired under the Plan and have voted to accept the Plan in the numbers and amounts

required by section 1126 of the Bankruptcy Code.  All procedures used to tabulate the Ballots were fair, reasonable, and conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (effective as of January 1, 2023), the Disclosure Statement Order, and all other applicable non-bankruptcy rules, laws, and regulations.  Pursuant to the Disclosure Statement Order, the other Classes of Claims against and Interests in the Debtors are either deemed to reject or presumed to accept the Plan.

l. <u>Bankruptcy Rule 3016</u>.  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as proponents of the Plan.  The Debtors appropriately filed the Disclosure Statement and the Plan with this Court, thereby satisfying Bankruptcy Rule 3016(b). The discharge, release, injunction, and exculpation provisions of the Plan are set forth in bold and with specific and conspicuous language, thereby complying with Bankruptcy Rule 3016(c).

m. <u>Cram Down Requirements</u>.  With respect to those classes that rejected or are deemed to reject the Plan, the requirements of section 1129(b) of the Bankruptcy Code have been satisfied and the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code. The Plan does not unfairly discriminate between similarly situated Classes of Claims or Interests that rejected or are deemed to reject the Plan.  Furthermore, the Plan is fair and equitable with respect to the Classes of Claims or Interests that rejected or are deemed to reject the Plan, as the Plan provides that no holder of any Claim or Interest that is junior to the Claims or Interests of such Classes will receive or retain any property under the Plan on account of such junior Claim or Interests.

n. <u>Prepetition ABL Obligations</u>.  Dawn Intermediate, Serta Simmons Bedding, certain of the other Debtors (collectively, with the guarantors of the Prepetition ABL Facility,

the "**Prepetition ABL Obligors**"), and the Prepetition ABL Agent, and the Prepetition ABL
Lenders are party to the Prepetition ABL Agreement (collectively, with the Loan Documents (as
defined in therein) and the Prepetition ABL Payoff Letter (as defined in the DIP Order),
the "**Prepetition ABL Documents**" and the revolving facility thereunder, the "**Prepetition ABL
Facility**").  Pursuant to the Prepetition ABL Documents, the Prepetition ABL Lenders provided
revolving credit, certain banking products and other financial accommodations to, and issued
letters of credit for the account of, the Prepetition ABL Obligors.  Under the Prepetition ABL
Agreement, the Prepetition ABL Lenders provided the Prepetition ABL Obligors with, among
other things, up to $200,000,000 in Revolving Commitments (as defined in the Prepetition ABL
Agreement), including a $40,000,000 Letter of Credit Sublimit (as defined in the Prepetition ABL
Agreement).  As of the Petition Date, there were (i) no outstanding revolving loans, (ii) $28 million
in existing letters of credit, and (iii) other outstanding obligations under the Prepetition ABL
Documents, including, without limitation, reimbursement obligations (contingent or otherwise) in
respect of letters of credit, any fees, expenses and disbursements (including, without limitation,
attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and
related expenses and disbursements), treasury, cash management, bank product and derivative
obligations, indemnification obligations, guarantee obligations, and other charges, amounts and
costs of whatever nature owing, whether or not contingent, whenever arising, accrued, due, owing
or chargeable in respect of any of the Prepetition ABL Obligors' obligations pursuant to, or secured
by, the Prepetition ABL Documents, in each case payable pursuant to the terms and conditions of
the Prepetition ABL Agreement (collectively,  the "**Prepetition ABL Obligations**").   The
Prepetition ABL Obligations are secured by (a) first priority security interests in and liens on the
ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) and (b) second priority

security interests in and liens on the Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement) (the ABL Priority Collateral and the Term Loan Priority Collateral together, the "**Prepetition Collateral**" and the liens and security interests in clauses (a) and (b), the "**Prepetition ABL Liens**").

        o.    <u>PTL Obligations</u>.  Dawn Intermediate, Serta Simmons Bedding, and certain of the other Debtors as borrowers (together with the guarantors of the PTL Facility, collectively, the "**PTL Obligors**"), the PTL Agent, and the PTL Lenders are party to the PTL Credit Agreement (collectively, with the Loan Documents (as defined therein) the "**PTL Documents**" and the term loan facility thereunder, the "**PTL Facility**").  As of the Petition Date, the PTL Obligors were obligated under the PTL Documents to the PTL Lenders in the aggregate outstanding principal amount of not less than $1.027 billion, on account of Term Loans (as defined in the PTL Credit Agreement) plus all accrued, accruing, and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, due, owing or chargeable in respect of any of the PTL Obligors' obligations pursuant to, or secured by, the PTL Documents, in each case constituting "Obligations" (as defined in the PTL Credit Agreement) and due and payable pursuant to the terms and conditions of the PTL Credit Agreement (the "**PTL Obligations**").  The PTL Obligations are secured by (a) first priority security interests in and liens on the Term Loan Priority Collateral, and (b) second priority security interests in and liens on the ABL Priority Collateral (the liens and security interest in clauses (a) and (b), the "**PTL Liens**").

p.   <u>Non-PTL Obligations</u>.  Dawn Intermediate, Serta Simmons Bedding, and certain of the other Debtors as borrowers (together with the guarantors, collectively, the "**Non-PTL Obligors**"), the Non-PTL Agent (together with the PTL Agent, the "**Prepetition Term Loan Agents**" and, together with the Prepetition ABL Agent, collectively, the "**Prepetition Agents**"), and the Non-PTL Lenders (together with the PTL Lenders, the "**Prepetition Term Loan Lenders**" and, together with the Prepetition ABL Lenders, collectively, the "**Prepetition Secured Creditors**") are party to the Non-PTL Term Loan Agreement (collectively with the Loan Documents (as defined therein), the "**Non-PTL Documents**" and the term loan facility thereunder, the "**Non-PTL Facility**" and together with the Prepetition ABL Facility and the PTL Facility, the "**Prepetition Loan Facilities**" and, the obligations under the Non-PTL Documents, the "**Non-PTL Obligations**" and, together with the PTL Obligations, collectively, the "**Prepetition Term Loan Obligations**" and, together with the Prepetition ABL Obligations, collectively, the "**Prepetition Secured Obligations**").  The Non-PTL Obligations are secured by (a) first priority security interests in and liens on the Term Loan Priority Collateral, and (b) second priority security interests in and liens on the ABL Priority Collateral (the liens and security interest in clauses (a) and (b), the "**Non-PTL Liens**" and, together with the PTL Liens, the "**Prepetition Term Loan Liens**" and, together with the Prepetition ABL Liens, collectively, the "**Prepetition Liens**"), subject in all respects to the Intercreditor Agreements.

q.   <u>Intercreditor Agreements</u>.  Pursuant to the ABL Intercreditor Agreement, the Prepetition Agents have agreed, among other things and as more specifically set forth therein, on the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Creditors with respect to the Prepetition Collateral.

r.      Pursuant to the First Lien Intercreditor Agreement, the Prepetition Term Loan Agents have agreed, among other things and as more specifically set forth therein, on the respective rights, interests, obligations, priority and positions of the Prepetition Term Loan Creditors with respect to the Prepetition Collateral.   The Intercreditor Agreements are "subordination agreements" within the meaning of section 510(a) of the Bankruptcy Code.   The DIP Credit Agreement constitutes a "Refinancing" (as such term is defined in the applicable Intercreditor Agreement).   As a result thereof, the DIP Lenders' interests in the Prepetition Collateral and DIP Collateral (as defined in the DIP Order) shall be the same as the Prepetition ABL Agent's prior to such Refinancing and shall be governed by the Intercreditor Agreements unless otherwise expressly provided by the DIP Order.   The Intercreditor Agreements are, in each case, binding and enforceable against the Prepetition Secured Creditors in accordance with their terms.

s.      <u>Prepetition Secured Obligations</u>.   The Prepetition ABL Obligations and the PTL Obligations owing to the Prepetition ABL Lenders and the PTL Lenders, respectively, constitute legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition ABL Obligations and the PTL Obligations owing to the Prepetition ABL Lenders and the PTL Lenders, respectively, is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

t.      <u>Prepetition Liens</u>.   The Prepetition Liens granted to the Prepetition Secured Creditors constitute legal, valid, binding, enforceable (other than in respect of the stay of

enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests in and liens on the Prepetition Collateral, were granted to, or for the benefit of, the applicable Prepetition Secured Creditors for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

u.      <u>2020 Transaction</u>.  The 2020 Transaction was negotiated in good faith and at arm's length by and among the Debtors and the PTL Lenders and was fair, equitable, and reasonable. The obligations arising pursuant to the 2020 Transaction, including obligations under the PTL Credit Agreement, each of the Loan Documents (as defined in the PTL Credit Agreement), and First Lien Intercreditor Agreement, constitute legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective terms.

v.      <u>Challenge Deadline</u>.  The Challenge Deadline (as defined in the DIP Order) has expired and all findings of fact and stipulations under the DIP Order are binding and effective on all third parties.

w.      <u>Executory Contracts and Unexpired Leases</u>.  The Debtors have exercised reasonable business judgment in determining whether to assume or reject executory contracts and unexpired leases pursuant to <u>Article VIII</u> of the Plan.  Each assumption of an executory contract or unexpired lease pursuant to <u>Article VIII</u> of the Plan shall be legal, valid, and binding upon the Debtors or Reorganized Debtors and their successors and assigns and all non-Debtor parties and their successors and assigns to such executory contract or unexpired lease.  Moreover, the Debtors have cured, or provided adequate assurance that the Debtors or Reorganized Debtors or their successors and assigns, as applicable, will cure, defaults (if any) under or relating to each of the

executory contracts and unexpired leases that are being assumed by the Debtors pursuant to the Plan.

x.      Plan Supplement.  The documents contained in the Plan Supplement comply and are consistent with the Bankruptcy Code and the terms of the Plan, and the filing and notice of such documents were good and proper and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Disclosure Statement Order, and the facts and circumstances of these chapter 11 cases.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan and the Restructuring Support Agreement, the Debtors, with the consent of the Requisite Consenting Creditors, reserve the right to alter, amend, update, or modify the Plan Supplement at any time before the Effective Date.

y.      Best Interest of Creditors.  The liquidation analysis provided in the Disclosure Statement as Exhibit E, and the other evidence presented, proffered, or adduced at the Confirmation Hearing, including the Talarico Declaration, (i) are persuasive and credible, (ii) have not been controverted by any evidence, and (iii) establish that each holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

z.      Value.  Based on valuation analysis set forth in Exhibit F to the Disclosure Statement, and the testimony presented, proffered, or adduced at the Confirmation Hearing, including the Shah Declaration, which this Court has determined to be credible, persuasive, and based on appropriate assumptions and valid analysis and methodology, this Court finds that the

14

valuation implied by the Restructuring, a range for which is set forth in the Disclosure Statement, is a reasonable and appropriate measure of the Reorganized Debtors' enterprise value given the facts and circumstances of these chapter 11 cases.

aa.    <u>Feasibility</u>.   The financial projections provided in the Disclosure Statement as <u>Exhibit H</u>, and the other evidence presented, proffered, or adduced at the Confirmation Hearing, including the Linker Declaration, (i) are persuasive and credible, (ii) have not been controverted by any evidence, and (iii) establish that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization.

bb.    <u>Directors, Officers, and Insiders</u>.   The officers, directors, and managers of the Debtors shall be relieved of any and all duties with respect to the Debtors as of the Effective Date of the Plan.  The identities and affiliations of the persons proposed to serve as the initial managers and officers of the Reorganized Debtors after the Effective Date have been fully disclosed to the extent such information is available, and the appointment to, or continuance in, such offices of such persons is consistent with the interests of holders of Claims against and Interests in the Debtors and with public policy.

cc.    <u>Release, Exculpation, and Injunction Provisions</u>.   The injunction, release, and exculpation provisions contained in the Plan for the benefit of the Released Parties and Exculpated Parties, as applicable, are essential components of the Plan.  The releases of non-Debtors contained in the Plan are consensual in that all Releasing Parties were given due and adequate notice thereof and sufficient opportunity and instruction to elect to opt out of such releases.  Good and valid justifications have been demonstrated in support of the releases granted by the Debtors and their Estates and the Reorganized Debtors (the "**Debtor Releases**"), and the Debtors have satisfied the business judgment standard with respect to the Debtor Releases.  The Debtor Releases represent a

15

valid exercise of the Debtors' business judgment.  Accordingly, as has been established based upon the record in these chapter 11 cases, the Supporting Declarations, and the evidence presented in connection with the Confirmation Hearing, the release provisions contained in Article X of the Plan (i) were an integral part of the Requisite Consenting Creditors' agreement to support the Plan and their entry into the Restructuring Support Agreement, as reflected in the Restructuring Support Agreement, and are essential to the formulation and implementation of the Plan, as required by section 1123 of the Bankruptcy Code, (ii) are consistent with and permissible under applicable law, (iii) were given in exchange for good and valuable consideration provided by the Released Parties, (iv) are in the best interests of the Debtors, their Estates, holders of Claims and Interests, and all other parties in interest, (v) were negotiated in good faith and at arm's length, (vi) confer substantial benefits on the Debtors' estate and their creditors, and (vii) are fair, equitable, and reasonable, and failure to implement the Debtor Releases, injunctions and exculpation provisions set forth in the Plan and approved in this Confirmation Order would seriously impair and jeopardize the Debtors' ability to confirm and implement the Plan, and the compromises and settlements provided therein.

dd.     The process described in the Solicitation Declaration and the Solicitation Affidavit that the Debtors and Epiq followed to identify the relevant parties on which to serve the applicable Ballot or notice containing an opportunity to opt out of the releases (each, a "**Release Opt-Out Form**") and to distribute the Release Opt-Out Forms (i) is consistent with the industry standard, and (ii) was reasonably calculated to ensure that each holder of Claims or Interests in each Class was informed of its ability to opt out of the releases and the consequences for failing to timely do so.  For the avoidance of doubt, any party that validly elected in the Release Opt-Out Form or in the Ballot to opt out of the releases prior to any deadline to submit a Ballot, whether under any

original or extended deadline, shall be neither a Released Party nor a Releasing Party under the Plan.

ee.    The exculpation provisions contained in the Plan are appropriately tailored to the circumstances of these chapter 11 cases and are appropriate under applicable law, including *In re Highland Capital Mgmt., L.P.*, 48 F. 4th 419 (5th Cir. 2022), because they are supported by proper evidence, proposed in good faith, formulated following extensive good faith, arm's-length negotiations with key constituents, and appropriately limited in scope.  The Exculpated Parties reasonably relied upon the exculpation provisions as a material inducement to engage in postpetition negotiations with the Debtors and other key stakeholders that culminated in the Plan, the Creditors' Committee Global Settlement, and all other settlements and compromises therein that maximize value for the Debtors' Estates.  The record in these chapter 11 cases supports the exculpation provisions are appropriately tailored to protect the Exculpated Parties from unnecessary litigation, and contain appropriate carve outs for actions determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.  The record in these chapter 11 cases further supports the inclusion of the Debtors' independent managers (Harvey Tepner and Joan Hilson) as Exculpated Parties because such parties were integral to the restructuring, owed fiduciary duties to the Debtors and the Debtors' Estates, and fulfilled their fiduciary duties at all times throughout these chapter 11 cases.

ff.    The injunction provisions contained in the Plan are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the discharge, release, and exculpation provisions of the Plan.  The injunction provisions are appropriately tailored to achieve those purposes.  Subject in all respects to <u>Article XI</u> of the Plan, no entity or person may commence or pursue a Claim or Cause of Action of any kind against any Released Party or Exculpated Party

that arose or arises from, in whole or in part, a Claim or Cause of Action subject to <u>Section 7.3</u>, <u>Section 7.4</u>, or <u>Section 7.5</u> of the Plan, without this Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim for actual fraud, gross negligence, or willful misconduct against such Released Party or Exculpated Party and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against such Released Party or Exculpated Party.

gg.     The Indemnification Obligations contained in the Plan and the New Term Loan Credit Facility Agreement are essential to the Plan and are necessary to implement the Plan.  The Indemnification Obligations represent a valid exercise of the Debtors' business judgment. Accordingly, as has been established based upon the record in these chapter 11 cases, the Supporting Declarations, and the evidence presented in connection with the Confirmation Hearing, the indemnification provisions contained in <u>Section 8.5</u> of the Plan (i) were an integral part of the Requisite Consenting Creditors' agreement to support the Plan and their entry into the Restructuring Support Agreement, as reflected in the Restructuring Support Agreement, and are essential to the formulation and implementation of the Plan, (ii) are consistent with and permissible under applicable law, (iii) were given in exchange for good and valuable consideration provided by the PTL Lenders, (iv) are in the best interests of the Debtors, their Estates, holders of Claims and Interests, and all other parties in interest, (v) were negotiated in good faith and at arm's length, (vi) confer substantial benefits on the Debtors' estate and their creditors, (vii) are fair, equitable, and reasonable, and (viii) pursuant to the Restructuring Support Agreement and the Creditors' Committee Global Settlement, are part of an integrated and global good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual and legal rights of the PTL Lenders.

hh.     <u>Modifications to Plan</u>.  Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan made after solicitation of the Plan or in this Confirmation Order (including those modifications announced on the record of the Confirmation Hearing) constitute technical or clarifying changes, changes with respect to particular Claims by agreement with holders of such Claims, or such modifications do not materially and adversely affect or change the treatment of any other Claim under the Plan.  Notice of these modifications was adequate and appropriate under the facts and circumstances of these chapter 11 cases.  In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that holders of Claims or Interests be afforded any further opportunity to change previously cast acceptances or rejections of the Plan.  Accordingly, the Plan is properly before this Court, and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

ii.     <u>Compromises and Settlements</u>.  The Plan is deemed to constitute a motion under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 with respect to all settlements provided for therein, including those set forth in <u>Section 5.1(a)</u> and <u>(b)</u>, (collectively, the "**Plan Settlements**").  Entry of this Confirmation Order constitutes this Court's approval of the terms of the Plan Settlements provided for under the Plan.  In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases, and other benefits provided under the Plan and with the support of the various creditors, stakeholders, and other parties in interest, including the Consenting Parties and the Global Settlement Parties, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Causes of Action, disputes, and controversies released, settled,

compromised, or otherwise resolved pursuant to the Plan.  In addition, the compromises and Plan Settlements embodied in the Plan are integral to the Plan and preserve value by enabling the Debtors to avoid extended, value-eroding litigation that could delay the Debtors' emergence from chapter 11.  Entry of this Confirmation Order constitutes this Court's approval of the Plan Settlements and compromises, including the releases in connection with the Plan Settlements, and a finding by this Court that the Plan Settlements are fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and holders of Claims and Interests because, among other things: (a) each of the Plan Settlements reflects a reasonable balance between the possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes and allowing the Debtors to expeditiously exit chapter 11, on the other hand; (b) absent each of the Plan Settlements, there is a likelihood of complex and protracted litigation with the attendant expense, inconvenience, delay and uncertainty that has a possibility to derail the Debtors' reorganization efforts and would jeopardize the Debtors' ability to confirm and implement the Plan, and the compromises and settlements provided therein; (c) each of the parties supporting each of the Plan Settlements, including the Debtors, the Requisite Consenting Creditors, the Consenting Equity Holders, and the Global Settlement Parties, are represented by counsel that is recognized as being knowledgeable, competent, and experienced; (d) each of the Plan Settlements is the product of arm's-length bargaining and good faith negotiations between sophisticated parties; and (e) each of the Plan Settlements will maximize the value of the Debtors' Estates by preserving and protecting the ability of the Reorganized Debtors to continue operating outside of bankruptcy protection and in the ordinary course of business, and is essential to the successful implementation of the Plan.  Based on the foregoing, the Plan Settlements satisfy the requirements of applicable Fifth Circuit law for

approval of settlements and compromises pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, and the Plan Settlements are hereby approved.

jj.     The Creditors' Committee Global Settlement is the product of good faith arm's-length negotiations between the Debtors, the Requisite Consenting Creditors, and the Creditors' Committee.  The Creditors' Committee Global Settlement, as incorporated into the Plan, resolves any and all claims and causes of action raised by the Creditors' Committee including all disputes raised or asserted by the Creditors' Committee in its letter dated April 4, 2023.  The Creditors' Committee supports the Plan and Plan Settlements in accordance with the terms of the Creditors' Committee Global Settlement.

kk.     <u>Exit Capital Structure, Exit Facilities, and New Debt</u>.  The evidentiary record demonstrates that the exit capital structure contemplated by the Plan, Plan Supplement, and the RSA is reasonable and appropriate and sufficient to fully perform all of the Debtors' obligations under the Plan, as well as all obligations of the Reorganized Debtors under all assumed agreements. The terms and structure of the New Term Loan and the Exit ABL Facility (together, the "**Exit Facilities**"), as currently contemplated by the Plan (and any commitments, engagements, or similar arrangements with respect to the provisions, arrangement or structuring thereof), are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are supported by reasonably equivalent value and fair consideration, and are in the best interests of the Debtors' Estates and their creditors.

ll.     <u>Good Faith</u>.  The Debtors have proposed the Plan (and all documents necessary to effectuate the Plan, including the Plan Supplement) in good faith and not by any means forbidden by applicable law.  The Debtors' good faith is evident from the facts and record of these chapter 11 cases, the Solicitation Materials, the Supporting Declarations, the record of the Confirmation

Hearing, and other proceedings held before this Court in these chapter 11 cases. The Plan (including all documents necessary to effectuate the Plan, including the Plan Supplement) was negotiated at arm's length among the Consenting Parties, the Global Settlement Parties, the Released Parties, the Exculpated Parties and their respective advisors, each as applicable. The Debtors, the Consenting Parties, the Global Settlement Parties, the Released Parties, and the Exculpated Parties have been and will be acting in good faith if they proceed to: (i) consummate the Plan and the agreements, settlements, transactions, distributions, and other transfers contemplated therein and in this Confirmation Order, including the funding or deemed funding (in each case, to the extent applicable) of (a) the New Term Loan pursuant to the terms and conditions of the New Term Loan Credit Facility Agreement and any other documentation with respect thereto (the "**New Term Loan Documents**") and (b) the Exit ABL Facility pursuant to the terms and conditions of the Exit ABL Facility Credit Agreement and any other documentation with respect thereto (the "**Exit ABL Facility Documents**" and, together with the New Term Loan Documents, the "**Exit Facilities Documents**"); and (ii) take any actions authorized by the Plan and this Confirmation Order.

mm.     <u>Satisfaction of Confirmation Requirements</u>. The Plan satisfies the requirements for confirmation by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation, as set forth in section 1129 of the Bankruptcy Code.

nn.     <u>Likelihood of Satisfaction of Conditions Precedent to Effective Date</u>. Each of the conditions precedent to the Effective Date, as set forth in <u>Article IX</u> of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with the Plan.

**ORDER**

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

**A.     Confirmation of Plan**

1.     The Plan and each of its provisions is confirmed pursuant to section 1129 of the Bankruptcy Code.  The documents contained in or contemplated by the Plan, including the Plan Supplement (collectively, the "**Plan Documents**"), are hereby authorized and approved.  The terms of the Plan and the Plan Documents are incorporated herein by reference and are an integral part of this Confirmation Order.  The terms of the Plan, the Plan Documents, all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date.  Subject to the terms of the Plan and the DIP Documents, the Debtors reserve the right to alter, amend, update, or modify the Plan Documents prior to the Effective Date, consistent with the Restructuring Support Agreement.  The failure to specifically include or refer to any particular article, section, or provision of the Plan or the Plan Documents in this Confirmation Order shall not diminish or impair the effectiveness or enforceability of such article, section, or provision nor constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its entirety and incorporated herein by this reference.

**B.     Objections**

2.     Except as set forth herein, any objections (including any reservations of rights contained therein) to confirmation of the Plan or other responses or reservations of rights with respect thereto that have not been withdrawn or resolved prior to entry of this Confirmation Order shall be, and hereby are, overruled on the merits and denied.

C.    **No Action**

3.    Pursuant to the appropriate provisions of any applicable State's general corporation or limited liability company laws, other applicable non-bankruptcy law, and section 1142(b) of the Bankruptcy Code, (i) no action of the respective directors, managers, members, stockholders, or other equity holders of the Debtors, as applicable, shall be required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including any Plan Document, and (ii) to the extent the Debtors determine any Person or Entity is a necessary party to execute and deliver or join in the execution or delivery of any instrument required to effect a transfer of property dealt with by the Plan, or perform any other act in furtherance of the transactions contemplated by the Plan and this Confirmation Order, and in furtherance of consummation of the Plan, and such Person or Entity is so informed by the Debtors, then such Person or Entity is directed to take such steps as necessary to comply with the foregoing and section 1142(b) of the Bankruptcy Code.

D.    **Governmental Approvals Not Required**

4.    Except as otherwise set forth herein, this Confirmation Order constitutes all approvals and consents required, if any, by the laws, rules, or regulations of any State or any other governmental authority with respect to the implementation and consummation of the Plan and the Plan Documents and any other acts that may be necessary or appropriate for the implementation or consummation of the Plan or the Plan Documents to the fullest extent permitted by law and nothing herein to the contrary shall diminish the authority of section 1142 of the Bankruptcy Code.

E.      **Implementation and Effectiveness of Plan**

5.      On or before the Effective Date, the Debtors and the Reorganized Debtors, as applicable, and the appropriate officers, representatives, and members of the boards of managers or boards of directors thereof, as applicable, shall be authorized to and may issue, execute, deliver, file, or record such documents, securities, contracts, instruments, releases, and other agreements, including the Plan Documents, and take any other actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, including the Restructuring Transactions and all other actions delineated in <u>Article V</u> of the Plan or otherwise contemplated by the Plan, including the conversion, merger, or dissolution of any Debtor, without the need for any further approvals (including, without limitation, by any stockholder, member, board of directors, or board of managers), authorization, or consents, except for those expressly required pursuant to the Plan.  All actions contemplated by the Plan, including all actions in connection with any Plan Document, are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, without further application to, or order of this Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors or Reorganized Debtors.

F.      **Restructuring Transactions**

6.      On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with this Confirmation Order and the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions and the issuance of the New Common Interests under and in connection with the Plan and the Plan Documents.

7.      This Confirmation Order shall, and shall be deemed to, pursuant to sections 363, 1123, 1142, 1145, and 1146 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions, and, to the extent such actions were taken before the Confirmation Date, such actions are ratified in all respects, and, in each case, no further approvals, authorization, or consents, except those expressly required pursuant to the Plan or this Confirmation Order, or, to the extent applicable, the DIP Documents, shall be required.  All Consenting Parties, all Global Settlement Parties, and any other parties necessary to effectuate, to the full extent permitted under section 1142 of the Bankruptcy Code, any transactions approved by, contemplated by, or necessary to effectuate the Plan, shall be deemed to consent to any such transactions, subject to the terms of the RSA.

**G.      Class 6B Trust**

8.      The Class 6B Trust Agreement, substantially in the form filed in the Plan Supplement, is hereby approved in all respects.  The Class 6B Trust shall be established and funded pursuant to, and in accordance with, the terms of the Plan and the Class 6B Trust Agreement.  The Debtors, the Reorganized Debtors, and any of their Affiliates (or anyone acting on their behalf) shall not be responsible for any Class 6B Trust Expenses and shall incur no liability in connection with the Class 6B Trust (subject to any obligations of the Debtors or Reorganized Debtors, as applicable, pursuant to the Plan or Class 6B Trust Agreement).  The appointment of UMB Bank, N.A. as Class 6B Trustee pursuant to the terms of the Class 6B Trust Agreement is hereby approved.

**H.      Authorization and Issuance of Plan Securities**

9.      The Reorganized Debtors are authorized to issue all Plan-related securities, including the New Common Interests, in accordance with the terms of the Plan; provided that

nothing herein shall deem anything that is not a security to be a security; <u>provided</u> <u>further</u> that nothing herein or in the Plan Documents shall deem the Class 6B Trust Interests to be securities. All New Common Interests shall be, upon issuance, duly authorized, validly issued, fully paid and non-assessable.

## I.    Securities Registration Exemption

10.    The offer, issuance and distribution under the Plan of the New Common Interests to holders of FLSO Claims and Non-PTL Claims will, in each case, be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

11.    The New Common Interests may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, subject to: (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; and (iii) applicable regulatory approval.

12.    The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

## J.    Authorization and Entry into Exit Facilities

13.    The Reorganized Debtors are authorized to enter into, execute, and deliver the Exit Facilities Documents on the terms consistent with the Plan (including the consent rights thereunder).

14.    On and after the Effective Date, the Exit Facilities Documents shall constitute legal, valid, and binding obligations of the applicable Reorganized Debtors and be enforceable in

accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or this Confirmation Order, and the Reorganized Debtors, as applicable, shall be authorized to incur the obligations under the Exit Facilities and use the proceeds of such debt, in each case, in accordance with the terms of the Plan and the Exit Facilities Documents without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person or Entity.  The terms and conditions of the Exit Facilities Documents shall bind the Reorganized Debtors and each other Entity that enters into the Exit Facilities Documents.

15.     This Confirmation Order approves the Exit Facilities Documents (including the transactions and related agreements contemplated thereby, all actions to be taken, undertakings to be made, and obligations to be incurred, and fees, expenses, indemnities and other amounts paid and/or obligated to be paid by the Debtors or Reorganized Debtors, as applicable, in connection therewith), any commitment letters, engagement letters, fee letters, or similar arrangements in connection with the structuring, arranging, negotiation, or implementation of the Exit Facilities (including the transactions contemplated thereby, all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred, and fees, expenses, indemnities, and other amounts paid and/or obligated to be paid in connection therewith (including any payments under any such commitment letter, engagement letter, fee letter or similar agreement)), and, to the extent not approved by this Court previously, each Reorganized Debtor is authorized to, without further notice to this Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, including the Exit Facilities Documents, and incur and pay any fees, expenses, indemnities, and other amounts paid and/or obligated to be paid in connection therewith, and (ii) in

connection with the Exit Facilities, make any act or take any action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person or Entity, subject to such modifications as the applicable Reorganized Debtor may deem to be necessary to enter into the Exit Facilities Documents.

16.      On the Effective Date, all of the claims, liens, and security interests to be granted in accordance with the terms of the Exit Facilities Documents, as applicable (i) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder, in accordance with the terms of the Exit Facilities Documents, (ii) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facilities Documents with the priorities established in respect thereof under applicable non-bankruptcy law and any intercreditor agreement entered into in connection with the Exit Facilities Documents, and (iii) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or applicable non-bankruptcy law.  To the extent provided in the Exit Facilities Documents, the New Term Loan Agent, the Exit ABL Agent, or any agent, trustee, or other representative of the relevant debtholders acting in a similar capacity, as applicable, under the Exit Facilities Documents, as applicable, are authorized, but not required, to file with the appropriate authorities mortgages, financing statements, and other documents and to take any other action in order to evidence, validate, and perfect such liens or security interests.

17.      Following the Effective Date, the PTL Lenders shall be indemnified by the Reorganized Debtors with respect to all present and future actions, suits, and proceedings against the PTL Lenders or their respective Related Parties in connection with or related to the Adversary

Proceeding, the Prepetition Adversary Actions, and/or any other claims, proceedings, actions, or causes of action in connection with or related to the PTL Credit Agreement, the Exchange Agreement, the Intercreditor Agreements, and/or the 2020 Transaction on the same terms and limitations as afforded under the PTL Credit Agreement and New Term Loan Credit Facility Agreement.

**K.    Distributions**

18.    The Debtors, the Reorganized Debtors, the Class 6B Trust, and the Disbursing Agents, as applicable, are authorized and directed to make all distributions under the Plan pursuant to the terms of the Plan and the Class 6B Trust Agreement and to pay, as applicable, any fees and expenses approved by this Confirmation Order, including by incorporation and adoption of the Adversary Findings of Fact and Conclusions of Law, or any other order of this Court.

19.    Any presentment or surrender of a security or the performance of any other act as a condition to participation in distribution under the Plan from the Debtors or Reorganized Debtors shall be taken not later than one year after the date of the entry of this Confirmation Order.  Any entity that has not within such time presented or surrendered such entity's security or taken any such other action that the Plan requires may not participate in distribution under the Plan.

**L.    Executory Contracts and Unexpired Leases**

20.    Pursuant to Section 8.1 of the Plan, as of and subject to the occurrence of the Effective Date (except as otherwise provided herein or in the Plan) and the payment of any applicable claim for Cure, all executory contracts and unexpired leases to which any of the Debtors are parties, and which have not expired by their own terms on or prior to the Confirmation Date shall be deemed assumed by the applicable Reorganized Debtor(s) except for any executory contract or unexpired lease that: (a) with the reasonable consent of the Requisite Consenting Creditors, previously has been assumed, assumed or assigned, or rejected pursuant to a Final Order

of this Court; (b) with the reasonable consent of the Requisite Consenting Creditors, is the subject of a separate (i) assumption motion filed by the Debtors or (ii) rejection motion filed by the Debtors under section 365 of the Bankruptcy Code before the Confirmation Date; (c) with the reasonable consent of the Requisite Consenting Creditors, is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts; or (d) is the subject of a pending Cure Dispute.

21.     Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor or assignee in accordance with its terms, except as modified by the provisions of the Plan, any order of this Court authorizing and providing for its assumption or assumption and assignment, or applicable law.

22.     To the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed to be modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

23.     If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable, intend to assume or assume and assign is not listed on a Cure Notice, the proposed Cure amount for such executory contract or unexpired lease is deemed to be zero dollars ($0).

24.     If there is a Cure Dispute pertaining to assumption or assumption and assignment of an executory contract or unexpired lease, such dispute shall be heard by this Court prior to such assumption or assumption and assignment, as applicable, being effective; provided that, on the Effective Date or as soon as reasonable practicable thereafter, or on such other terms as the parties to such executory contract or unexpired lease may otherwise agree, the Debtors or the Reorganized Debtors, as applicable (with the reasonable consent of the Requisite Consenting Creditors), may settle any dispute regarding the Cure amount or the nature thereof without any further notice to any party, other than the Class 6B Trust, or any action, order, or approval of this Court.

25.     Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption or assumption and assignment, as applicable, of such executory contract or unexpired lease or the relevant Cure amount within fifteen (15) days of the service of the applicable Cure Notice, (i) shall be deemed to have assented to (A) such Cure amount and the nature thereof, (B) assumption or assumption and assignment, as applicable, of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (1) prohibit, restrict, or condition the transfer or assignment of such contract or lease, or (2) terminate or permit the termination of a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan, and (ii) shall be forever barred, estopped, and enjoined from challenging the validity of such assumption or assumption and assignment, as applicable, or the Allowed amount of such Cure amount thereafter.

26.     Upon an agreement between the Debtors and the counterparty to the relevant executory contract or unexpired lease, any Cure Dispute or any other unresolved objection regarding the assumption of such executory contract or unexpired lease may be adjourned to a hearing after the Confirmation Hearing.

27.     If there is a Cure Dispute or a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under the Plan, the Debtors or Reorganized Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such Cure Dispute to alter their treatment of such contract or lease by filing a notice indicating such altered treatment.

**M.     6A Trade Agreements**

28.     Except as otherwise provided in the Plan, to receive treatment and a distribution under Class 6A, each holder of an Ongoing General Unsecured Claim (Class 6A) must execute a 6A Trade Agreement, except as expressly provided below, and deliver a copy of the fully executed 6A Trade Agreement to Epiq Corporate Restructuring, LLC by e-mail at SertaSimmons6ATA@epiqglobal.com by no later than the Effective Date (or such later date as agreed to by the Debtors).  If a holder of an Ongoing General Unsecured Claim (Class 6A) fails to execute and deliver a 6A Trade Agreement in accordance with the foregoing sentence, unless otherwise expressly agreed in writing by the Debtors or the Reorganized Debtors in their sole discretion, such holder will receive the treatment provided to such claims under Class 6B.

29.     Notwithstanding anything to the contrary in this Confirmation Order or the Plan, any counterparty to (i) an executory contract or unexpired lease assumed pursuant to Article VIII of the Plan or (ii) an existing CV Trade Agreement (provided that such CV Trade Agreement is in effect as of the Effective Date) shall not be required to execute a 6A Trade Agreement in order to receive treatment under Class 6A.

N.     **Compromises and Settlements**

30.     The Plan is a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual and legal rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.

31.     The entry of this Confirmation Order constitutes this Court's approval of the compromise or settlement of all such Claims, Interests, and controversies referenced in paragraph 30 above, as well as a finding by this Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.  The compromises, settlements, and releases described herein and in the Plan are nonseverable from each other and from all other terms of the Plan.  In accordance with and subject to the provisions of the Plan (including the consent rights thereunder), pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of this Court, after the Confirmation Date, (i) the Reorganized Debtors or the Class 6B Trust, as applicable and subject to the Class 6B Trust Agreement, may compromise and settle any Claims against, and Interests in, the Debtors and their Estates, and (ii) the Reorganized Debtors or the Class 6B Trust, as applicable and subject to the Class 6B Trust Agreement, may compromise and settle Causes of Action against other Persons or Entities.

32.     Certain Claims and Causes of Action may exist between one or more of the Debtors and one or more of their Affiliates, which Claims and Causes of Action have been settled, and such settlement is reflected in the treatment of the Intercompany Claims and the Claims against and Interests in each Debtor entity.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of such Claims and Causes of Action pursuant to Bankruptcy Rule 9019.

33.     The provisions of the Plan Settlements constitute a good faith compromise and settlement among the Debtors and the Consenting Parties of all Claims, Causes of Action, Interests, and controversies among such parties, including all potential Claims, Causes of Action, Interests, and controversies between the Debtors and the Consenting Parties, and are in consideration of the value provided to the Estates by the Consenting Parties pursuant to the Plan Settlements.  The Plan shall be deemed a motion to approve the Plan Settlements as a good faith compromise and settlement of all of the Claims, Interests, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.  Entry of this Confirmation Order constitutes this Court's approval of the Plan Settlements, as well as a finding by this Court that the Plan Settlements are in the best interests of the Debtors, their Estates, and holders of Claims and Interests and are fair, equitable, and reasonable.

34.     Creditors' Committee Global Settlement.   The provisions of the Creditors' Committee Global Settlement constitute a good faith compromise and settlement among the Debtors, the Consenting Parties, and the Creditors' Committee (collectively, the "**Global Settlement Parties**") of all Claims, Causes of Action, Interests, and controversies among such parties, including all potential Claims, Causes of Action, Interests, and controversies between the Global Settlement Parties, and are in consideration of the value provided to the Estates by the Global Settlement Parties pursuant to the Creditors' Committee Global Settlement.  The Plan shall be deemed to be a motion to approve the Creditors' Committee Global Settlement as a good faith compromise and settlement of all of the Claims, Interests, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. Entry of this Confirmation Order constitutes this Court's

35

approval of the Creditors' Committee Global Settlement in all respects, as well as a finding by this Court that the Creditors' Committee Global Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.

35.     Solely with respect to the exculpation provisions in the Plan, notwithstanding anything to the contrary in the Plan or Plan Supplement, the Debtors, the Global Settlement Parties, and the Consenting Parties shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (1) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, or (2) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the Plan.  No entity or person may commence or pursue a Claim or Cause of Action of any kind against any Debtor, Global Settlement Party, or Consenting Party that arose or arises from, in whole or in part, a Claim or Cause of Action subject to this paragraph 35 of this Confirmation Order, without this Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim that is not otherwise inconsistent with the terms and provisions of the Plan and this Confirmation Order or the Restructuring Transactions implemented by the Plan for actual fraud, gross negligence, or willful misconduct against any such Debtor, Global Settlement Party, or Consenting Party and such party is not exculpated pursuant to this provision; and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against such Debtor, Global Settlement Party, or Consenting Party.

**O.     Conditions Precedent to Effective Date**

36.     The Plan shall not become effective unless and until all conditions set forth in Section 9.1 of the Plan have been satisfied or waived pursuant to Section 9.3 of the Plan.

36

P.      **Release, Exculpation, and Injunction Provisions**

37.      As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan or any Plan Document, all injunction, release, discharge, and exculpation provisions embodied in the Plan, including those contained in Article X, are hereby approved and shall be effective and binding on all Persons and Entities, to the extent provided in the Plan, without further order or action by this Court.  For the avoidance of doubt, any holder of a Claim that abstained from voting to accept or reject the Plan but timely opted out of the releases set forth in the Plan shall not be a "Releasing Party" under the Plan. Notwithstanding the language of the following specified provisions of the Plan, nothing in Section 10.6(a) (Releases by Debtors), Section 10.6(b) (Releases by Holders of Claims and Interests), or Section 10.7 (Exculpation) shall be construed to release any Person from willful misconduct, intentional fraud, or gross negligence as determined by a Final Order.

Q.      **Dissolution of Official Committees**

38.      On the Effective Date, any official committees appointed in these chapter 11 cases, including the Creditors' Committee, shall dissolve; provided that, following the Effective Date, any such committees, including the Creditors' Committee, shall continue in existence solely for the purposes of (i) filing and prosecuting applications for allowance of Professional Fee Claims, (ii) seeking removal of the committee as a party in interest in any proceeding on appeal, and (iii) any appeals of this Confirmation Order.  Upon the dissolution of any official committees appointed in these chapter 11 cases, including the Creditors' Committee, such committee members and their respective Professionals shall cease to have any duty, obligation, or role arising from or related to these chapter 11 cases and shall be released and discharged from all rights and duties from or related to these chapter 11 cases; provided that, for the avoidance of doubt, any Claims or Causes of Action asserted by the Creditors' Committee, whether direct or derivative (including

any Claims seeking declaratory judgments) shall be withdrawn with prejudice and/or vest in the Debtors' Estates, to be immediately fully and indefensibly released in accordance with <u>Section 10.6</u> of the Plan.

**R.     Retention of Jurisdiction**

39.     Subject to <u>Article XI</u> of the Plan, pursuant to sections 105(a) and 1142 of the Bankruptcy Code, this Court shall retain exclusive jurisdiction with respect to all matters arising from or related to these chapter 11 cases, the Plan, the Adversary Proceeding, and the implementation of this Confirmation Order, including those matters set forth in <u>Article XI</u> of the Plan.

**S.     Statutory Fees**

40.     All fees due and payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  The Debtors shall file all monthly operating reports through the Effective Date.  On and after the Effective Date, the Reorganized Debtors or any Disbursing Agent shall pay any and all such fees in full in Cash when due and payable, and shall file with this Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of quarterly fees.

**T.     Documents, Mortgages, and Instruments**

41.     Each federal, State, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the transactions, including the Restructuring

Transactions, contemplated by the Plan and this Confirmation Order and directed pursuant to section 1142 of the Bankruptcy Code to take such steps with respect to the foregoing to implement the transactions necessary to consummate the Plan.

**U.    Exemption from Certain Transfer Taxes**

42.    Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security interest, (c) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, assignment or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan and Restructuring Transactions Exhibit (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the New Term Loan Credit Facility Agreement, (e) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, this Confirmation Order, and (f) the transfer of Class 6B Trust Assets to the Class 6B Trust, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded

shall, pursuant to this Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

**V.      Reversal/Stay/Modification/Vacatur of Order**

43.      Except as otherwise provided in this Confirmation Order, if any or all of the provisions of this Confirmation Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or Lien incurred or undertaken by the Debtors, the Reorganized Debtors, the Creditors' Committee, the Class 6B Trust, or any other Person or Entity authorized or required to take action to implement the Plan, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur.  Notwithstanding any such reversal, stay, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order, the Plan, the Plan Documents, or any amendments or modifications to the foregoing.

**W.      Provisions of Plan and Confirmation Order Nonseverable and Mutually Dependent**

44.      The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

**X.      Headings**

45.      Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

**Y.      Governing Law**

46.      Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise with respect to such document, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).  The rights, duties, and obligations arising under the Plan Documents shall be governed by the applicable law set forth therein.

**Z.      Applicable Non-Bankruptcy Law**

47.      Pursuant to sections 1123(a) and 1142 of the Bankruptcy Code, the provisions of this Confirmation Order, the Plan, the Plan Documents, and any other related documents or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

**AA.    Professional Fee Claims**

48.      Subject to <u>Section 2.2</u> of the Plan, all Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims may file, on or before the date that is forty-five (45) days after the Effective Date (unless extended by the Reorganized Debtors), their respective applications for combined interim and final allowances of compensation for services rendered and reimbursement of expenses incurred.

**BB.    Notice of Entry of Confirmation Order and Effective Date**

49.      In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Confirmation Date, the Debtors shall serve notice of the entry of this Confirmation Order, substantially in the form attached as **<u>Exhibit B</u>** hereto (the "**Confirmation Notice**"), on all parties who hold a Claim or Interest in these cases, the U.S. Trustee, and any other

parties in interest. Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of entry of this Confirmation Order.

50.     As soon as reasonably practicable after the Effective Date, the Reorganized Debtors shall serve notice of the occurrence of the Effective Date, substantially in the form attached as **Exhibit C** hereto (the "**Consummation Notice**"), on all parties who hold a Claim or Interest in these cases, the U.S. Trustee, and any other parties in interest. Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of occurrence of the Effective Date.

**CC.     Final Order**

51.     This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

**DD.     Waiver of Stay**

52.     The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of 14 days after entry of the order are hereby waived. This Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

**EE.     Inconsistency**

53.     The provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each, however, if there is determined to be any inconsistency between any provision of the Plan and any provision of this Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of this Confirmation Order shall govern, and any such provisions of this Confirmation Order shall be deemed a modification of the Plan.

**FF.    Valid and Binding**

54.     All documents necessary to implement the Plan and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements.

**GG.    Term of Injunctions or Stays**

55.     Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays arising under or entered during these chapter 11 cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**HH.    Substantial Consummation**

56.     On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

**II.    Closure of these Chapter 11 Cases**

57.     The Reorganized Debtors shall, in consultation with the Class 6B Trust, after the full administration of these chapter 11 cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of this Court to close these chapter 11 cases.  As of the Effective Date, the Reorganized Debtors, in consultation with the Class 6B Trust, may submit separate orders to this Court under certification of counsel closing certain individual chapter 11 cases and changing the caption of these chapter 11 cases accordingly.  Matters concerning Claims may be heard and adjudicated in a Debtor's chapter 11 case that remains open regardless of whether the applicable Claim is against a Debtor in a chapter 11 case that is closed.

**JJ.     Miscellaneous Provisions.**

58.     *Epiq Services*.  The Debtors are hereby authorized to employ Epiq to implement the Restructuring, including as a distribution and paying agent.

59.     *Texas Comptroller*.  Nothing provided in the Plan or this Confirmation Order shall impair any valid statutory or common law setoff rights of the Texas Comptroller of Public Accounts (the "**Texas Comptroller**"), in accordance with section 553 of the Bankruptcy Code. Further, nothing provided in the Plan or this Confirmation Order shall preclude the payment of interest at the statutory rate on the Texas Comptroller's Priority Tax Claim(s) or Administrative Expense Claim(s) after the later of the due date of the liabilities or the Effective Date in accordance with the Bankruptcy Code.  In connection with the foregoing, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under applicable law in favor of the Debtors, Reorganized Debtors, or the Texas Comptroller, as applicable, are preserved.

60.     The following paragraphs 61 through 64 of this Confirmation Order will govern the treatment of the Texas Comptroller concerning the duties and responsibilities of the Debtors and the Reorganized Debtors relating to all unclaimed property presumed abandoned (the "**Texas Unclaimed Property**") under Texas Property Code, Title 6, Chapters 72-76 and other applicable Texas laws (the "**Texas Unclaimed Property Laws**").

61.     Notwithstanding section 362 of the Bankruptcy Code and/or any injunction contained in Section 10.5 of the Plan, after the Effective Date, the Texas Comptroller and its agents may commence an audit of the Debtors in accordance with the Texas Unclaimed Property Laws (the "**Texas Unclaimed Property Audit**").  Upon completion of the Texas Unclaimed Property Audit, the Texas Comptroller will promptly inform the Debtors or the Reorganized Debtors, as applicable, that such audit is complete and the results.  The Debtors, the Reorganized Debtors, and the Texas Comptroller shall retain and reserve, and nothing in the Plan or this Confirmation Order

shall prejudice such party's right to argue, all rights, defenses, claims, counterclaims, and affirmative defenses that exist under applicable law arising from or relating to Texas Unclaimed Property, the Texas Unclaimed Property Audit, and/or any action to recover Texas Unclaimed Property, including but not limited to arguments that Texas Unclaimed Property is or is not property of the Debtors' Estates that vests in the Reorganized Debtors' Estates, that alleged Texas Unclaimed Property is held in trust for the State of Texas, and that claims asserted against the Debtors or the Reorganized Debtors are or are not unsecured claims subject to discharge in these chapter 11 cases.

62.    Upon agreement between the Debtors or the Reorganized Debtors and the Texas Comptroller or a final nonappealable determination by a court or other tribunal with jurisdiction as to the amount of unremitted Texas Unclaimed Property, if any, that is due in connection with the Texas Unclaimed Property Audit, the Debtors or the Reorganized Debtors shall turn over such unremitted Texas Unclaimed Property and all known information about absent owners of the Texas Unclaimed Property to the Texas Comptroller.

63.    The Texas Comptroller may amend any timely filed Proofs of Claim in these chapter 11 cases following the Effective Date (i) to reflect a pending audit or the results of an audit that may be performed with respect to alleged Texas Unclaimed Property, (ii) following the filing of any property reports by the Debtors or Reorganized Debtors in connection with Texas Unclaimed Property, or (iii) to liquidate an unliquidated claim in connection with Texas Unclaimed Property; provided that the foregoing does not prejudice the Debtors' or Reorganized Debtors' rights to object to such Proofs of Claim in accordance with the Bankruptcy Code.

64.    Nothing herein or in the Plan exempts the Debtors from compliance from and after the Effective Date with obligations pursuant to the Texas Unclaimed Property Laws. The Texas

Comptroller of Public Accounts reserves all rights relating to any unclaimed property presumed abandoned by the Reorganized Debtors from and after the Effective Date pursuant to the Texas Unclaimed Property Laws and any defenses, claims, counterclaims, and affirmative defenses that exist under applicable law in favor of the Debtors, to contest any action of the Texas Comptroller to recover Texas Unclaimed Property are preserved.

65.     *Maricopa County*.  Notwithstanding anything to the contrary contained in the Plan or Disclosure Statement, any taxes due by any of the Debtors to the Maricopa County Treasurer in the State of Arizona ("**MCT**") for the 2023 tax year shall be paid in the ordinary course.  Any secured claims of MCT shall be entitled to interest to the extent provided under sections 506(b), 1129 and/or 511 of the Bankruptcy Code.  Any valid and perfected liens securing MCT's claims shall retain the same force and effect and priority pursuant to state law until such claims are satisfied in full.  In connection with the foregoing, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under applicable law in favor of the Debtors, Reorganized Debtors, or MCT, as applicable, are preserved.

66.     *Texas Taxing Authorities*.  Notwithstanding anything to the contrary contained in the Plan or Disclosure Statement, any secured ad valorem taxes due by any of the Debtors to Cypress-Fairbanks Independent School District, Dallas County and Harris County (each, a "**Texas Taxing Authority**") for tax years 2022 and prior shall be paid on or before the Effective Date, or when such claim is Allowed, subject to the applicable time limitations, if any, under the Bankruptcy Code.  Any 2023 ad valorem taxes due by any of the Debtors to any Texas Taxing Authority shall be paid in the ordinary course.  Any secured claims of each Texas Taxing Authority shall be entitled to interest to the extent provided under sections 506(b), 1129 and/or 511 of the Bankruptcy Code.  Any valid and perfected liens securing each Texas Taxing Authority's claims

shall retain the same force and effect and priority pursuant to state law until such claims are satisfied in full.  In connection with the foregoing, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under applicable law in favor of the Debtors, Reorganized Debtors, or each Texas Taxing Authority, as applicable, are preserved.  Each Texas Taxing Authority may amend any timely filed Proof of Claim to liquidate an unliquidated claim; provided that the foregoing does not prejudice the Debtors' or Reorganized Debtors' rights to object to such Proofs of Claim in accordance with the Bankruptcy Code.

67.     *Mississippi Department of Revenue*.   Nothing provided in the Plan or this Confirmation Order shall impair any valid statutory or common law setoff rights of the Mississippi Department of Revenue (the "**MDOR**"), in accordance with section 553 of the Bankruptcy Code. Nothing provided in the Plan or Confirmation Order shall be construed to preclude the payment of any administrative expense tax claims held by the MDOR.  The MDOR may amend any timely filed Proof of Claim (a) to reflect a pending audit or an audit that may be performed with respect to any pre- or post-petition tax return, (b) following the filing of a tax return, or (c) to liquidate an unliquidated claim.  Nothing in the Plan or this Confirmation Order shall preclude the payment of interest on any valid Claim of MDOR in accordance with the Bankruptcy Code.   In connection with the foregoing, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under applicable law in favor of the Debtors, Reorganized Debtors, or the MDOR, as applicable, are preserved.

68.     *Louisiana Department of Revenue*.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order: (i) the Louisiana Department of Revenue ("**LDR**") shall not be deemed a Releasing Party under the terms of the Plan irrespective of the withdrawal of LDR's objection to the Plan; (ii) LDR shall not be required to file any request for any payment of

Administrative Expense Claims for such expenses to be Allowed expenses and paid in the ordinary course of business; (iii) any postpetition tax returns and taxes due to LDR by the Debtors or the Debtors' Estate shall be filed and paid in the ordinary course of business when due pursuant to Louisiana law, and all delinquent prepetition returns shall be filed and paid as soon as practicable before any order on a motion for final decree is entered by this Court; (iv) any administrative tax expenses due to LDR shall be paid with interest and penalties to the extent provided for in sections 503(b)(1)(B) and (C) and 1129(a)(9)(A) of the Bankruptcy Code at the rate required by section 511 of the Bankruptcy Code; (v) any Allowed Priority Tax Claims of LDR shall be paid with interest to the extent provided for in section 1129(a)(9)(C) at the rate required by section 511 of the Bankruptcy Code not later than the time required by section 1129(a)(9)(C) of the Bankruptcy Code; (vi) payments received by LDR shall not be deemed paid on any date other than the date of receipt by LDR and such payments are not a settlement or compromise pursuant to Bankruptcy Rule 9019; (vii) no payment distribution due to LDR by the Debtors or the Debtors' Estates shall be deemed unclaimed property of the Estates and all distributions due to LDR shall remain due until received by LDR; (viii) the valid statutory or common law setoff rights and recoupment rights of the LDR are fully preserved; and (ix) LDR may amend any timely filed Proof of Claim (a) to reflect a pending audit or an audit that may be performed with respect to any pre- or post-petition tax return, (b) following the filing of a tax return, or (c) to liquidate an unliquidated claim.

69.     *AIG.*   All insurance policies that have been issued (or provided coverage) by National Union Fire Insurance Company of Pittsburgh, Pa. and/or each of the affiliates and successors (collectively, "**AIG**") to which any Debtor is a party as of the Effective Date and any agreements, endorsements, addenda, schedules, documents or instruments relating thereto (the "**AIG Insurance Contracts**") shall be assumed in their entirety under the Plan and nothing

herein shall alter, modify, waive or otherwise amend the terms and conditions of (or the coverage provided by) the AIG Insurance Contracts or the Debtors' obligations thereunder, regardless of when they arise.  In lieu of Cure, all obligations due and unpaid under such agreements accruing prior to the Effective Date shall be unimpaired and reinstated; <u>provided</u> that, in connection with each assumption and the related obligations (if any), any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under such agreement and applicable law in favor of the Debtors, Reorganized Debtors, or AIG, as applicable, are preserved.  For the avoidance of doubt, all parties' rights are reserved regarding the enforceability of the arbitration provisions under the AIG Insurance Contracts.

70.    *Life Insurance Company of North America*.   Notwithstanding anything to the contrary in this Confirmation Order, the Plan, or any notice related thereto, the Employee Benefits Agreements (as defined in the *Objection of Life Insurance Company of North America to Disclosure Statement for Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 489)) shall be assumed under the Plan and, in lieu of Cure, all obligations due and unpaid under such agreements accruing prior to the Effective Date shall be unimpaired and reinstated; <u>provided</u> that, in connection with each assumption and the related obligations (if any), any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under such agreement and applicable law in favor of the Debtors, Reorganized Debtors, or the Life Insurance Company of North America, as applicable, are preserved.

71.    *SIR Policy Claims*.   For the avoidance of doubt, nothing in the Plan or this Confirmation Order, including <u>Section 5.1(b)(iv)</u> and <u>Section 8.7(d)</u> of the Plan, shall (i) require any payment on account of an SIR for an Insured Litigation Claim before such holder of an Insured Litigation Claim can pursue recovery in excess of an applicable SIR from any applicable insurance

policy; and (ii) limit the amount a holder of an Insured Litigation Claim can pursue against any applicable insurance policy above any applicable SIR; <u>provided</u> that any recovery on account of the Insured Litigation Claim in excess of an applicable SIR shall be recoverable solely from the Debtors' or Reorganized Debtors' (as applicable) insurance coverage, if any, and only to the extent of available insurance coverage and any proceeds thereof.

72.     *McCormick Carve-Out.*  With regard to the plaintiffs, their successors and assigns, (collectively, the "**McCormick Claimants**") in the products liability personal injury suit styled *Lashan McCormick et al. v. Serta Simmons Holding, LLC a/k/a Serta Simmons Bedding, LLC, et al.*, Case No. CC21CV968 (the "**McCormick Action**"), pending in the Circuit Court of Montgomery County, Tennessee, for the Nineteenth Judicial District at Clarksville (the "**TN State Court**"), against certain Debtors, as described in the McCormick Claimants' timely filed proofs of claim (claim numbers: 20165, 20167, 20168, 20169, 20170, 20171, and 20175), as such proofs of claim may be revised or amended from time to time (the "**McCormick POCs**"):

      a.  For a period of 75 days following the Effective Date, the McCormick Action will remain subject to the injunction provisions of the Plan, during which time, the McCormick Claimants, the Reorganized Debtors and the Class 6B Trust shall confer in good faith regarding the consensual reconciliation of the McCormick Action and, to the extent such reconciliation cannot be accomplished, an appropriate mechanism for the reconciliation of the McCormick POCs.

      b.  Upon the expiration of such 75-day period, the McCormick Claimants, shall, by stipulation amongst the McCormick Claimants, the Reorganized Debtors and the Class 6B Trust in form reasonably satisfactory to the parties, be granted limited relief from the injunction provisions of the Plan that: (i) allows the McCormick Claimants to pursue the McCormick Action in TN State Court nominally against the Debtors solely to recover from proceeds of the Debtors' or Reorganized Debtors' (as applicable) applicable insurance policies (ii) waives any right of recovery against the Debtors and their estates, the Reorganized Debtors, or the Class 6B Trust other than on account of any applicable SIR; (iii) provides that the McCormick Claimants assume all risks with respect to coverage under any applicable insurance policies to the extent coverage is not confirmed by an applicable insurance provider during the 75-day period; and (iv) provides that neither the Reorganized Debtors nor the Class

6B Trustee shall have any obligation to participate or otherwise expend any resources, financially or otherwise, in connection with the McCormick Action. The Reorganized Debtors and the Class 6B Trust, as applicable, shall provide the McCormick Claimants reasonable access to such information as is reasonably appropriate to identify the extent of coverage available under any applicable insurance policy.

c.  To the extent the parties are unable to agree to the stipulation set forth in (b) above, the McCormick Parties shall have the right to seek relief from the injunction provisions of the Plan with all rights of the Reorganized Debtors and the Class 6B Trust reserved.

73.     Nothing in this Confirmation Order or the Plan, including Section 7.3 of the Plan, shall, with respect to a party to the McCormick Action, increase or diminish any rights of any party with regard to any request to estimate the McCormick POCs under section 502(c) of the Bankruptcy Code including, without limitation, the McCormick Claimant's right to challenge the jurisdiction or constitutional authority of a court to estimate the McCormick POCs and the McCormick Claimant's rights to seek reconsideration of any estimation of the McCormick POCs under section 502(j) of the Bankruptcy Code.

74.     *Continuum*.  Notwithstanding anything to the contrary in this Confirmation Order or the Cure Notice subject to and upon the assumption of the CMS Agreements (as defined below), the Debtors shall, in accordance with Article VIII of the Plan and section 365 of the Bankruptcy Code, pay any undisputed outstanding, past-due invoices (both pre- and postpetition), provided that, to the extent a disputed invoice contains amounts that are not in dispute, Debtors shall pay all such undisputed amounts, pursuant to the following agreements: (i) that certain *Master Services Agreement*, dated as of December 17, 2021, by and between Continuum Marketing Services LLC ("**CMS**") and Serta Simmons Bedding and (ii) that certain *SOW Pop & Marketing Print Managed Services Agreement*, dated as of December 17, 2021, by and between CMS and Serta Simmons Bedding (collectively, the "**CMS Agreements**"); provided that nothing herein shall effect CMS's

right to assert an administrative claim for unpaid, post-petition services provided by CMS to the Debtors.

75.     *Ratzon Realty*.  Nothing in this Confirmation Order shall be construed to release, waive, or enjoin any Claims that Ratzon Realty (Interstate Park Logistics Center Florida) Limited Partnership ("**Ratzon Realty**") may assert against the Debtors' applicable insurance providers with respect to third-party claims related to the Debtors' use and occupancy of the applicable premises prior to the Effective Date, as long as such pursuit does not result in any liability to the Debtors or their estates, provided, however, for the avoidance of doubt, nothing herein (a) creates a direct right of action if one does not otherwise exist under applicable law, and (b) shall be deemed to modify, amend, waive, or otherwise prejudice any of the insurance providers' rights or defenses under or with respect to the insurance policies.  All rights of Ratzon Realty to payment of attorney's fees under its unexpired lease are reserved and any dispute regarding such fees will be adjourned to a date to be agreed between the Debtors and Ratzon Realty.

76.     *Unexpired Leases of Ratzon Realty and WPG*.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, with respect to any unexpired leases of non-residential real property of Ratzon Realty or WPG Legacy, LLC ("**WPG**") assumed under the Plan, the Debtors or Reorganized Debtors, as applicable, shall be obligated to pay any undisputed accrued but unbilled amounts under such assumed unexpired lease as any such amounts become due in accordance with the terms of the applicable unexpired lease.  Nothing in the Plan or this Confirmation Order shall modify the respective rights, if any, of Ratzon Realty and WPG, each as a counterparty to an assumed unexpired lease, to assert any right of indemnification, setoff, subrogation or recoupment that such counterparty may have under applicable law except to the extent modified by the Plan (including the injunction set forth in Section 10.5 of the Plan) or under

such party's unexpired lease.   In connection with the foregoing, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under applicable law in favor of the Debtors, Reorganized Debtors, Ratzon Realty, or WPG, as applicable, are preserved.

77.   *Humphries Carve-Out.*  With regard to the plaintiffs, their successors and assigns, (collectively, the "**Humphries Claimants**") in the automobile collision related personal injury suit styled *Ruth Ann Humphries and Alan Humphries v Reginald Jervon Pauley and SSB Logistics, LLC*, Cause No. 2023-CP-46-01106, (the "**Humphries Action**"), pending in the in the Court of Common Pleas, County of York, South Carolina (the "**SC State Court**"), against SSB Logistics, LLC and Reginald Jervon Pauley, as described in the Humphries Claimants' proofs of claim, which are deemed timely (claim numbers 20408, 20409, 20410 and 20411) (collectively, the "**Humphries POCs**"):

   a.   For a period of 75 days following the Effective Date, the Humphries Action will remain subject to the Plan Injunction, during which time, the Humphries Claimants, the Reorganized Debtors and the Class 6B Trust shall confer in good faith regarding the consensual reconciliation of the Humphries Action and, to the extent such reconciliation cannot be accomplished, an appropriate mechanism for the reconciliation of the Humphries POCs.

   b.   Upon the expiration of such 75-day period, the Humphries Claimants, shall, by stipulation amongst the Humphries Claimants, the Reorganized Debtors and the Class 6B Trust in form reasonably satisfactory to the parties, be granted limited relief from the Plan Injunction that: (i) allows the Humphries Claimants to pursue the Humphries Action in SC State Court nominally against the Debtors solely to recover from proceeds of the Debtors' or Reorganized Debtors' (as applicable) applicable insurance policies; (ii) waives any right of recovery against the Debtors and their estates, the Reorganized Debtors, or the Class 6B Trust other than on account of any applicable SIR; (iii) provides that the Humphries Claimants assume all risks with respect to coverage under any applicable insurance policies to the extent coverage is not confirmed by an applicable insurance provider during the 75-day period; and (iv) provides that neither the Reorganized Debtors nor the Class 6B Trustee shall have any obligation to participate or otherwise expend any resources, financially or otherwise, in connection with the Humphries Action.  The Reorganized Debtors and the Class 6B Trust, as applicable, shall provide the Humphries Claimants

reasonable access to such information as is reasonably appropriate to identify the extent of coverage available under any applicable insurance policy.

c.   To the extent the parties are unable to agree to the stipulation set forth in (b) above, the Humphries Claimants shall have the right to seek relief from the injunction provisions of the Plan with all rights of the Reorganized Debtors and the Class 6B Trust reserved.

78.   The Humphries Claimants are deemed to have opted out of the third party releases contained in Section 10.6 of the Plan.

79.   Nothing in this Confirmation Order or the Plan, including Section 7.3 of the Plan, shall, with respect to a party to the Humphries Action, increase or diminish any rights of any party with regard to any request to estimate the claims asserted in the Humphries POCs under section 502(c) of the Bankruptcy Code including, without limitation, the Humphries Claimant's right to challenge the jurisdiction or constitutional authority of a court to estimate the Humphries POCs and the Humphries Claimant's rights to seek reconsideration of any estimation of the Humphries POCs under section 502(j) of the Bankruptcy Code.  The Humphries Claimants acknowledge and agree that any such request to estimate or reconsider the related rights and defenses shall be brought in and decided by this Court.

80.   *Minority Licensees*.  Nothing provided in the Plan or this Confirmation Order shall impair beyond the scope of the Bankruptcy Code any and all defenses or counterclaims of the Minority Licensees with respect to claims that may be asserted by any of the Reorganized Debtors, including any statutory or common law rights of setoff and recoupment preserved in accordance with section 553 of the Bankruptcy Code.

81.   *State of Connecticut*.  In accordance with the Plan, following the Effective Date, the initial Class 6B Cash Contribution Allocation may be reallocated in accordance with the Plan by the Class 6B Trust, acting by and through the Class 6B Trustee, with the consent of the

Reorganized Debtors, in their reasonable business judgment to recalibrate for, among other things, (i) the amount of the Allowed Other General Unsecured Claims against each Debtor as determined in accordance with the reconciliation and objection process provided for in the Plan, (ii) the amount and purpose of Class 6B Trust Expenses, and (iii) any recoveries by the Class 6B Trust on account of Class 6B Causes of Action; provided that such reallocation will be effective upon 10 days' notice of the reallocation being filed with this Court.

Dated: _____, 2023
        Houston, Texas

_____
THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

**Plan**

**[Exhibit Omitted]**

**Exhibit B**

**Confirmation Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** | § | Case No. 23-90020 (DRJ) |
| *et al.,* | § | |
| | § | **Jointly Administered** |
| Debtors.[1] | § | |

**NOTICE OF ENTRY OF ORDER CONFIRMING
SECOND AMENDED JOINT CHAPTER 11 PLAN OF
SERTA SIMMONS BEDDING, LLC AND ITS AFFILIATED DEBTORS**

      **PLEASE TAKE NOTICE** that on May [●], 2023, the Honorable David R. Jones, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), entered the *Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. [●]) (the "**Confirmation Order**") confirming the *Second Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors*, dated May 23, 2023 (Docket No. 977) (as supplemented, the "**Plan**").[2]

      **PLEASE TAKE FURTHER NOTICE** that copies of the Confirmation Order, Plan, and Disclosure Statement may be obtained free of charge by visiting the website maintained by Epiq Corporate Restructuring, LLC ("**Epiq**") at https://dm.epiq11.com/sertasimmons.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at https://www.pacer.gov/.  Please note that a PACER password and login are required to access documents via PACER.

      **PLEASE TAKE FURTHER NOTICE** that the Plan and the provisions thereof are binding on the Debtors, the Reorganized Debtors, any holder of a Claim against, or Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder voted to accept the Plan.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957).  The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Dated:  May [●], 2023
      Houston, Texas

                          */s/ Draft*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan
Stephanie N. Morrison
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

– and –

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Alexander W. Welch (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

**Exhibit C**

**Consummation Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  | § |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| SERTA SIMMONS BEDDING, LLC, | § | Case No. 23-90020 (DRJ) |
| *et al.,* | § |  |
|  | § | Jointly Administered |
| Debtors.[1] | § |  |

NOTICE OF EFFECTIVE DATE OF MODIFIED
FIRST AMENDED JOINT CHAPTER 11 PLAN OF
SERTA SIMMONS BEDDING, LLC AND ITS AFFILIATED DEBTORS

PLEASE TAKE NOTICE that on May [●], 2023, the Honorable David R. Jones, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), entered the *Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. [●]) (the "**Confirmation Order**") confirming the *Second Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors*, dated May 23, 2023 (Docket No. 977) (as supplemented, the "**Plan**").[2]

PLEASE TAKE FURTHER NOTICE that on [●], 2023 all conditions precedent to consummation of the Plan were satisfied or waived in accordance with Article IX of the Plan. Further, no stay of the Confirmation Order is in effect.  Accordingly, [●], 2023 is the Effective Date of the Plan.  As of the Effective Date, the injunction set forth in Section 10.5 of the Plan is now in place.

PLEASE TAKE FURTHER NOTICE that in accordance with Section 8.1 of the Plan, on the Effective Date, except as otherwise provided in the Plan, and subject to the payment of any applicable Cure amount, subject to Section 8.6 of the Plan governing Employee Arrangements, and subject to the Consenting Creditor Consent Rights and any other applicable consent rights set forth in the Restructuring Support Agreement, all executory contracts and unexpired leases to which any of the Debtors are parties, and which have not expired by their own terms on or prior to the Confirmation Date shall be deemed to be assumed except for any executory contract or unexpired lease that (a) with the reasonable consent of the Requisite Consenting Creditors,

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957).  The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

previously has been assumed, assumed or assigned, or rejected pursuant to a Final Order of the Bankruptcy Court, (b) with the reasonable consent of the Requisite Consenting Creditors, is the subject of a separate (i) assumption motion filed by the Debtors, or (ii) rejection motion filed by the Debtors under section 365 of the Bankruptcy Code before the Confirmation Date, (c) with the reasonable consent of the Requisite Consenting Creditors, is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, or (d) is the subject of a pending Cure Dispute.  As of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that copies of the Confirmation Order, Plan and Disclosure Statement may be obtained free of charge by visiting the website maintained by Epiq Corporate Restructuring, LLC ("**Epiq**") at https://dm.epiq11.com/sertasimmons.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at https://www.pacer.gov/.  Please note that a PACER password and login are required to access documents via PACER.

**PLEASE TAKE FURTHER NOTICE** that the Plan and the provisions thereof (including the exhibits and schedules thereto and all documents and agreements executed pursuant thereto or in connection therewith), the Plan Supplement, and the Confirmation Order are effective and enforceable and shall bind the Reorganized Debtors, the Released Parties, the Exculpated Parties, all holders of Claims and Interests (irrespective of whether such Claims or Interests are impaired under the Plan or whether the holders of such Claims or Interests accepted or are deemed to have accepted the Plan), any other person giving, acquiring, or receiving property under the Plan, any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, any other party in interest in the Chapter 11 Cases, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing.  All settlements, compromises, releases (including, without limitation, the releases set forth in Section 10.6 of the Plan), waivers, discharges, exculpations, and injunctions set forth in the Plan are effective and binding on any Person or entity that may have had standing to assert any settled, compromised, released, waived, discharged, exculpated, or enjoined Causes of Action.

[*Remainder of Page Left Blank Intentionally*]

Dated:  [●], 2023
      Houston, Texas

                                     */s/ Draft*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan
Stephanie N. Morrison
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

– and –

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Alexander W. Welch (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

3

**EXHIBIT B**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SERTA SIMMONS BEDDING, LLC, | § | Case No. 23-90020 (DRJ) |
| *et al.,* | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | Re: Docket Nos. 874, 879, 977 |
| | § | |

**DEBTORS' SUPPLEMENTAL**
**MEMORANDUM OF LAW IN SUPPORT OF**
**CONFIRMATION OF SECOND AMENDED JOINT CHAPTER 11**
**PLAN OF SERTA SIMMONS BEDDING, LLC AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock (admitted *pro hac vice*)
Alexander Welch (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Counsel for the Debtors*
*and Debtors in Possession*

Dated: May 23, 2023
            Houston, Texas

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

## TABLE OF CONTENTS

Page

SUPPLEMENTAL RESPONSE ................................................................................................. 1

I.      Plan Satisfies Requirements for Confirmation Under Section 1129, Including with Respect to Go-Forward Indemnity, Redemption Transaction, and Class 5 Treatment ..................................................................... 2

      A.  Go-Forward Indemnity Is Integral to Plan Settlements and Entry into Indemnity Is Proper Exercise of Business Judgment ....................................... 2

      B.  Plan Does Not Violate Absolute Priority Rule ............................................... 10

      C.  Debtors Modified Plan to Eliminate Death Trap .......................................... 12

II.     Bankruptcy Court Should Overrule Unresolved Objections ................................. 13

CONCLUSION ...................................................................................................................... 14

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ........................................................................12

*In re Bigler LP*,
    442 B.R. 537 (Bankr. S.D. Tex. 2010) .........................................................................5

*In re Carlson Travel, Inc.*,
    No. 21-90017 (MI) (Bankr. S.D. Tex. Nov. 12, 2021) ...............................................12

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*,
    68 F.3d 914 (5th Cir. 1995) ..........................................................................................5

*In re Denbury Resources Inc.*,
    No. 20-33801 (DRJ) (Bankr. S.D. Tex. Sep. 2, 2020) ..............................................12

*In re Drexel Burnham Lambert Group, Inc.*,
    138 B.R. 714 (Bankr. S.D.N.Y. 1992) ........................................................................12

*In re Fencepost Prods., Inc.*,
    629 B.R. 289 (Bankr. D. Kan. 2021) ..........................................................................11

*In re G-I Holdings Inc.*,
    420 B.R. 216 (D.N.J. 2009) ........................................................................................11

*In re Idearc Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009), *subsequently aff'd,* 662 F.3d 315 (5th
    Cir. 2011) ......................................................................................................................6

*JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re
    Charter Commc'ns, Inc.)*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ..........................................................................9

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988) .......................................................................................11

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
    2022 WL 953109 (S.D.N.Y. Mar. 29, 2022) ................................................................4

*In re Mallinckrodt PLC*,
    639 B.R. 837 (Bankr. D. Del. 2022) ...........................................................................11

*In re MPM Silicones, LLC*,
    2014 WL 4637175 (S.D.N.Y. Sept. 17, 2014) ............................................................12

*In re Neiman Marcus Group LTD LLC*,
    No. 20-32519 (DRJ) (Bankr. S.D. Tex. Jan. 4, 2020) (Docket No. 1795) ...............12

*North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*,
    2020 WL 3411267 (N.Y. Sup. Ct. June 19, 2020) .......................................................3

*In re OCA, Inc.*,
    357 B.R. 72 (Bankr. E.D. La. 2006) .......................................................................9

*Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*,
    801 F.3d 530 (5th Cir. 2015) ................................................................................5

*Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349 (5th Cir. 1997) ................................5

*In re Pioneer Energy Services Corp.*,
    No. 20-31425 (DRJ) (Bankr. S.D. Tex. May 11, 2020) .......................................12

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
    624 F.2d 599 (5th Cir. 1980) ................................................................................5

*In re Rosehill Resources, Inc.*,
    No. 20-33695 (DRJ) (Bankr. S.D. Tex. Aug. 28, 2020)........................................12

**Statutes**

11 U.S.C. § 1123(b)(3)(A) .............................................................................................5

11 U.S.C. § 1129 ........................................................................................................2, 13

Bankruptcy Code, Chapter 11 ................................................................................ *passim*

**Other Authorities**

Fed. R. Bankr. P. 3019 ..................................................................................................13

Fed. R. Bankr. P. 9019 ................................................................................................5, 9

The Debtors submit this supplement (the "**Supplement**") to the *Debtors'*
*Memorandum of Law in Support of Confirmation of Modified First Amended Joint Chapter 11*
*Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors*, filed on May 14, 2023 (Docket
No. 879) (the "**Confirmation Brief**") in support of the *Second Amended Joint Chapter 11 Plan of*
*Serta Simmons Bedding, LLC and Its Affiliated Debtors*, filed on May 23, 2023 (Docket No. 977)
(including any exhibits and schedules thereto and as may be modified, amended, or supplemented
from time to time in accordance with the terms thereof, the "**Plan**")[2] and in response to certain
comments by the Bankruptcy Court at the combined hearing to consider confirmation of the Plan
and the Adversary Proceeding (Adv. Proc. No. 23-09001), held from May 15–18, 2023
(the "**Combined Hearing**"), with respect to (A) the go-forward indemnification of the PTL
Lenders pursuant to a settlement, (B) the Plan's compliance with the absolute priority rule, and
(C) the "death trap" with respect to Class 5 (Non-PTL Claims) recoveries, and respectfully
represent as follows:

## SUPPLEMENTAL RESPONSE

1.       The Debtors are seeking confirmation of the Plan, which enjoys
overwhelming support from its key constituencies, including 99.9% of the aggregate amount of
FLFO Claims, 95.63% of the aggregate amount of FLSO Claims, the Creditors' Committee which
is a party to a global settlement, and the Consenting Equity Holders which are parties to a global
settlement with the Debtors and are parties to the Restructuring Support Agreement.  For the
reasons set out in further detail in the Confirmation Brief, which is incorporated herein by

---

[2]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan, the *Disclosure*
*Statement for Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors*, filed on
March 23, 2023 (Docket No. 545) (the "**Disclosure Statement**"), or the Confirmation Brief, as applicable.

reference, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

2.      An updated summary of the objections the Debtors received relating to (i) the confirmation of the Plan (the "**Confirmation Objections**"), and (ii) the assumption of executory contracts and unexpired leases (the "**Cure Objections**" and, together with the Confirmation Objections, the "**Objections**"), resolutions reached as of the filing of this Supplement, and the Debtors' responses to the Objections is included in the chart annexed hereto as **Exhibit A** (the "**Response Chart**").

I.      **Plan Satisfies Requirements for Confirmation Under Section 1129, Including with Respect to Go-Forward Indemnity, Redemption Transaction, and Class 5 Treatment**

A.      *Go-Forward Indemnity Is Integral to Plan Settlements and Entry into Indemnity Is Proper Exercise of Business Judgment*

(i)      **Entry into Indemnity Is Proper Exercise of Business Judgment**

3.      The go-forward indemnity obligation is the result of hard-fought, arm's-length negotiations culminating in the settlement with the PTL Lenders that is embodied in the Plan. The Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code with approximately $160 million of liquidity on their balance sheet. *See* Disclosure Statement § III.E.3.b. The liquidity available before filing gave the Debtors a relative advantage during negotiations because it provided them significant runway to negotiate the best deal available under the circumstances. Indeed, the Debtors reached this outcome—an agreement to comprehensively restructure their balance sheet, resulting in an approximately $1.6 billion deleveraging, and to resolve the litigation in connection with the 2020 Transaction—not through economic coercion, but as part of a negotiated deal that they determined was in the best interests of the Debtors and their estates. *See* May 16 Trial Tr. 47:14–20 (Tepner) ("One, we had a decent

sized cash balance at the time, which aided in our ability to try and effectuate a transaction and preserve liquidity while we were going through it.  But we were looking to substantially deleverage the company to a sustainable debt level -- debt level, which was estimated to be three hundred or $400 million, and of course, create runway, so the company would have long-term viability.").

4.      As part of the settlement, the Debtors determined to prosecute the 2020 Transaction and agreed to indemnify the PTL Lenders on a go-forward basis.  Notably, the Debtors included conditions precedent in the Plan that allowed the Debtors to mitigate any potential downside of the indemnity by conditioning emergence from these Chapter 11 Cases on a favorable outcome in the Adversary Proceeding.  *See* Plan §§ 9.1(f), (i).  In the event the Debtors received an unfavorable ruling, the Plan—as constituted—would not go effective and, therefore, the go-forward indemnity would not go into effect, mooting the issue.  *See* Plan § 9.1(i).  Thus, the conditions precedent provide the Debtors with a safety valve, effectively limiting the Debtors' potential exposure under the indemnity to appellate risk.

5.      The agreement to indemnify the PTL Lenders must be considered within its proper context.  The PTL Lenders' insistence on getting the indemnity and the Debtors' decision to give the indemnity are reasonable given the parties' expectation that, as has become apparent through the Combined Hearing, the Non-PTL Lenders and LCM Lenders were likely to continue to press their claims in the Adversary Proceeding (and beyond) relentlessly.  *See generally Debtors' and Plaintiffs' Proposed Findings of Fact and Conclusions of Law for Adversary Proceeding No. 23-09001 and in Support of the Debtors' Second Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (the "**Findings and Conclusions**"), filed contemporaneously herewith and incorporated by reference herein.  Indeed, the Debtors' decision followed a long history of litigation.   Even before the 2020 Transaction was

3

consummated, the Debtors received a favorable ruling on the validity of the transaction in New York State court. *See North Star Debt Holdings, L.P. v. Serta Simmons Bedding, LLC*, 2020 WL 3411267, at *5 (N.Y. Sup. Ct. June 19, 2020) (denying the Non-PTL Lenders' motion for a preliminary injunction of the 2020 Transaction because claims were "unlikely to survive a motion to dismiss"). Likewise, in 2020, Judge Failla for the United States District Court for the Southern District of New York denied Serta Simmons Bedding's motion to dismiss in part, but rejected the LCM Lenders' core argument that the 2020 Transaction improperly subordinated the LCM Lenders because there were no sacred rights in the Non-PTL Term Loan Agreement protecting against subordination. *See LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, 2022 WL 953109, at *9–11 (S.D.N.Y. Mar. 29, 2022) (rejecting the core of the LCM Lenders' claims and finding that the subordination of the LCM Lenders' liens was permissible). Most recently, the Debtors' position was affirmed by this Bankruptcy Court's finding on summary judgment that "the term 'open market purchase' in Section 9.05(g) of the Non-PTL Term Loan Agreement is clear and unambiguous, and . . . that the transaction entered into by Plaintiffs and certain other lenders in June 2020 . . . constituted an 'open market purchase' under Section 9.05(g) of the Non-PTL Term Loan Agreement." *See Order On Summary Judgment* (Adv. Proc. No. 23-09001, Docket No. 142).

6.     As the evidence has shown, the Debtors took into consideration both the benefits of a restructuring, including deleveraging, and the risks of the attendant litigation when granting the indemnity and they determined, in a valid exercise of their business judgment, to enter into the settlement with the PTL Lenders that included the indemnity.[3] *See* May 16 Trial Tr. 51:8–

---

[3]     The Debtors' chief financial officer separately testified that the Debtors did not typically include large, contingent assets and liabilities in the Financial Projections where there was uncertainty around the amount and timing of an

52:10, 131:24–132:11 (Tepner).  Without the indemnity, there would be no deleveraging, there would be no restructuring, and the Debtors' businesses would face a highly leveraged capital structure coupled with the litigation.  *Id*. at 51:8–52:7 ("[The indemnity was included in the RSA because:] that was -- that was the deal to get -- to get the transaction done. Second, it was a continuation of an indemnity that was offered to and granted to the PTL [L]enders in the June 2020 transaction. And third, there was a lot of litigation overhang, which still continues to this day. And it was an inducement, and an important economic inducement, for [the PTL Lenders] to participate and support the restructuring.").

> **(ii)** **Restructuring Support Agreement Is Fair and Equitable Under Section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019**

7.      Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  In evaluating settlements under section 1123(b)(3)(A), courts apply "the [same] standards used to evaluate compromises under [Bankruptcy] Rule 9019."  *In re Bigler LP*, 442 B.R. 537, 543 n.6 (Bankr. S.D. Tex. 2010) (citing *In re MCorp Fin., Inc.*, 160 B.R. 941, 951 (S.D. Tex. 1993)).  A court may approve a settlement that is "fair and equitable and in the best interest of the estate."  *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995).

8.      To determine whether a settlement is fair and equitable, courts "apply [a] three-part test . . . with a focus on comparing 'the terms of the compromise with the likely rewards of litigation.'"  *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*, 801 F.3d

---

event.  Consistent with this practice, the Debtors did not include any potential cash payments in connection with the indemnification obligation or any potential tax refund in connection with the restructuring in the Financial Projections.  *See* May 17 (P.M.) Trial Tr. 139:2–140:14 (Linker).

5

530, 540 (5th Cir. 2015) (quoting *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980)).  Specifically, courts in this circuit evaluate what is "fair and equitable" using the following factors: (i) "the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law," (ii) "the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay," and (iii) "all other factors bearing on the wisdom of the compromise," including (a) "the best interests of the creditors, with proper deference to their reasonable views," and (b) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion."  *Age Refin.*, 801 F.3d at 540 (first citing *Jackson Brewing*, 624 F.2d at 602; then quoting *Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997); and then quoting *Foster Mortg.*, 68 F.3d at 917–18) (internal quotation marks omitted).  A court need only determine that the settlement does not "fall beneath the lowest point in the range of reasonableness."  *See In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), *subsequently aff'd,* 662 F.3d 315 (5th Cir. 2011) (internal quotations and citation omitted).

9.      The Plan embodies various settlements and compromises, including the settlements with the PTL Lenders and Consenting Equity Holders, as reflected in the Restructuring Support Agreement, and the settlement resolving all disputes raised or asserted by the Creditors' Committee.  The settlement with the PTL Lenders, as memorialized in the Restructuring Support Agreement and Plan, meets the controlling standard for settlements under the Bankruptcy Code, is in the best interest of the estates, and should be approved for the following reasons.  *First*, the Debtors were unlikely to successfully reorganize without the Restructuring Support Agreement and also believed they had a high probability of success on the merits in the litigation on the 2020 Transaction.  *See* May 16 Trial Tr. 131:24–132:11 (Tepner) ("And based upon the review of

what was happening, the advice of counsel, [the Debtors] believe that the indemnity is proper, that the litigation -- the successful litigation, as I understand it, succeeding under the indemnity under a lack of indemnity against the [PTL Lenders] is small because the transaction was permitted."). Entry into the Restructuring Support Agreement provided for a comprehensive restructuring and a clear path to the Debtors' exit from chapter 11 with a significantly deleveraged balance sheet.  In connection with the Restructuring Support Agreement, the Consenting Creditors have supported the Plan, have agreed to compromise or waive their own rights or claims, and, in the case of holders of (i) FLFO Claims, agreed to forgo cash repayment in exchange for take back debt, and (ii) FLSO Claims, have agreed to equitize their claims and carve out value from their collateral to provide a recovery to the unsecured creditors and the holders of Non-PTL Claims.  *See* Plan § 5.1; Disclosure Statement, Ex. B.

10.     As multiple parties testified during the Combined Hearing, the go-forward indemnity claim was a critical component of the 9019 settlement reached with the PTL Lenders. *See* May 16 Trial Tr. 139:22–23 (Tepner) ("Indemnity was a condition of the deal."); *see also id*. at 192:16–193:8 (Chopra) (testifying that the continuing indemnity was important to the PTL Lenders "in conjunction with their willingness to provide a significant equalization of their debt and to allow the company to emerge on an expeditious basis that the indemnity continue thereafter.").  There would be no restructuring without the agreement to indemnify the PTL Lenders on a go-forward basis in connection with the 2020 Transaction.   The evidence demonstrates that the PTL Lenders would not have agreed to support the Plan or to equitize their claims absent indemnification, especially given the litigation that was ongoing as to the validity of the 2020 Transaction as of the Petition Date.  *See* May 17 (A.M.) Trial Tr. 119:24–121:5 (Sveen) (testifying that Eaton Vance would not have voted to accept the Plan without the go-forward

indemnity, which was "a critical term that's included.  All the -- all the terms are negotiated.  And -- and clearly that is a critical component of the overall plan."); *see also* May 17 (P.M.) Trial Tr. 45:4–46:14 (Searles) (testifying that Barings' support of the Plan is dependent on the on-going indemnity because "[t]here's been ongoing litigation in this company for three years since the transaction has been done . . . there has been litigation even prior to the transaction closing, and there's every reason to believe, or to be sure that there's going to be litigation following this company emerging from bankruptcy."); *Id*. at 82:1–17 (Meiering) (testifying that Credit Suisse Asset Management would not support the Plan without the go-forward indemnity); *Id*. at 117:4–119:3 (testifying that Invesco would not have signed the Restructuring Support Agreement without the go-forward indemnity because they "were equitizing a substantial amount of [their] debt and agreeing to, you know, allow the company to move through bankruptcy as quickly as possible, which I think was in the interest of the company.  And I don't think [Invesco] would have agreed to do that if we hadn't some downside protection from the indemnity.").  Indeed, under the present circumstances, an indemnity is a rational demand in response to the material equitization of debt while parties threaten continued litigation.

11.     *Second*, the settlement with the PTL Lenders facilitated a confirmable plan of reorganization and provided for a chapter 11 process that allows the Debtor to exit bankruptcy, avoiding value destruction associated with an extended bankruptcy process.  *See* May 16 Trial Tr. 122:8–123:10 (Tepner) ("[I]f we did not do the indemnity today, I don't think we would have a confirmable plan. . . . [the downside of which is] the delay in exiting Chapter 11, the effect on the business, the effect on your customers, the suppliers, employee morale. I think it's a very negative effect.").  Absent the Restructuring Support Agreement, the Debtors might have found themselves in chapter 11 with insufficient support by their creditors and no comparable option for emergence,

resulting in attendant expense, inconvenience, and delay to the detriment of the Debtors and their estates.  Accordingly, the factor of "complexity and likely duration of litigation and any attendant expense, inconvenience, and delay" weights in favor of the settlement.

12.     *Third*, all other factors bearing on the wisdom of the compromise weigh in favor of the settlement.  Beginning in early 2022, the Debtors engaged in an extensive process to preserve the company's businesses in light of near-term challenges faced.  Initially, the Debtors' advisors contacted twenty parties to gauge interest in a $1.6 billion capital raise.  Subsequently, in the summer of 2022, the Debtors began discussions with a variety of parties, including existing lenders regarding the terms of a potential restructuring that would provide for long-term viability. *See* May 16 Trial Tr. 43:20–46:18 (Tepner).  The Debtors ultimately reached the settlement with the PTL Lenders.  The Debtors' independent director testified that the settlement with the PTL Lenders resulted in a viable Plan that facilitated a deleveraging of the Debtors' balance sheet and enabled the Debtors to preserve jobs and to preserve the economic enterprise.  *Id*. at 52:1–3 (Tepner).  He further testified that (i) the indemnity was necessary to get the transaction done and was "an important economic inducement, for [the PTL Lenders] to participate [in] and support the restructuring," (ii) he believed the indemnity was "fair and equitable to the other lenders," and (iii) he exercised business judgment in approving the Restructuring Support Agreement.  *Id*. at 51:8–52:10 (Tepner).  Further, the Creditors' Committee affirmed the settlement with the PTL Lenders, including the indemnity, in their own settlement, which is also embodied in the Plan and provides further evidence of the reasonableness and fairness of the compromise and the wishes of the creditors.  *See* Plan § 5.1(b); Confirmation Brief ¶ 191.

13.     Accordingly, there is ample evidence that the grant of the go-forward indemnity in connection with the settlement with the PTL Lenders was a reasonable exercise of

sound business judgment in light of the circumstances the Debtors faced, and was fair, equitable, and otherwise consistent with the standards under Bankruptcy Rule 9019.

### B.   *Plan Does Not Violate Absolute Priority Rule*

14.    As discussed at length in the Confirmation Brief, the $1.5 million payment to the Consenting Equity Holders under the Plan pursuant to the Consenting Equity Holders' Settlement does not violate the absolute priority rule because it is made pursuant to a settlement and not "on account of" any equity interest held by Class 10 (Intermediate Equity Interests).  *See* Confirmation Brief ¶¶ 178, 210–17.  Distributions to equity holders do not violate the absolute priority rule if the distributions are presented through the "plan of reorganization . . . and the parties [make] . . . a showing that the settlement is in the best interests of the estate" and the requirements for approval of a settlement are satisfied.  *In re OCA, Inc*., 357 B.R. 72, 88 (Bankr. E.D. La. 2006); *see also JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.)*, 419 B.R. 221, 269 (Bankr. S.D.N.Y. 2009) (overruling absolute priority objections and holding that the debtors' existing controlling shareholder was not receiving recovery "on account of" his equity interest, but that the recovery was granted on account of his agreement to maintain requisite voting power to avoid a change of control, preserve valuable tax attributes, transfer valuable interests in a solvent debtor, and compromise certain contract claims).

15.    Here, as part of the Consenting Equity Holder's Settlement, the Consenting Equity Holders are (i) facilitating and cooperating in connection with the implementation of the Plan, inclusive of the Restructuring Transactions, through their role as an equity holder and as a party with certain contractual rights vis-à-vis other equity holders (*e.g.*, drag rights), and (ii) through the merger of Dawn Holdings, transferring certain miscellaneous assets to Dawn Intermediate, all of which unquestionably provide value to the Debtors and their estates.  *See* Confirmation Brief ¶¶ 25–26.  Additionally, as a consequence of such settlement, the Debtors

preserve the ability to recognize a significant tax benefit, which is part of the value proposition from the Debtors' perspective.

16.    The uncontroverted evidence shows that the Consenting Equity Holders agreed to, among other things, facilitate the implementation of the Plan and "enact a series of measures that would allow the reorganized company access to up to $54 million of potential tax benefits, including tax refunds." *See* May 16 Trial Tr. 51:2–7 (Tepner).  Pursuant to the settlement, the Debtors agreed to pay the Consenting Equity Holders $1.5 million in cash and up to $200,000 for attorneys' fees and expenses in exchange for their support of the Plan and other benefits provided.  *Id*. at 50:21–51:7.  The record is bereft of any evidence that contradicts the Debtors' evidence with respect to the absolute priority rule arguments.

17.    In any event, neither the Non-PTL Lenders nor the LCM Lenders situated in Class 5 (Non-PTL Claims) has standing to raise the absolute priority rule objections included in the objections filed at Docket Nos. 824 and 825.  As a threshold matter, "creditors have standing only to challenge those parts of a reorganization plan that affect their direct interests."  *In re G-I Holdings Inc.*, 420 B.R. 216, 255 (D.N.J. 2009); *In re Mallinckrodt PLC*, 639 B.R. 837, 878 (Bankr. D. Del. 2022); *see also In re Fencepost Prods., Inc.*, 629 B.R. 289, 299 (Bankr. D. Kan. 2021) (finding that creditor did not have standing to object on absolute priority grounds because such creditor "would not benefit from enforcement of the requirements that the Debtors' plan . . . satisfy the absolute priority rule" under any conceivable scenario).  This is particularly applicable where "one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan."  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 644 (2d Cir. 1988).

18.     Here, Class 5 (Non-PTL Claims) and the classes junior to it in priority are not entitled to any distribution on account of their claims, nor are they receiving any such distribution under the Plan. *See Declaration of Roopesh Shah in Support of Confirmation of Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 882) (the "**Shah Declaration**"), ¶ 10.   Rather, the recoveries for Class 5, Class 6A and Class 6B are provided as part of a voluntary carve out from the collateral (or the value of such collateral) securing the FLSO Claims in Class 4, and not on account of any value that holders of claims in Class 5 would otherwise be entitled to recover. *See Declaration of John Linker in Support of Confirmation of Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 884), ¶ 34.   Valuation evidence to this effect was entered through the Shah Declaration at Debtors' Exhibit No. 356 and was uncontested by the objecting parties.   Any amounts received by classes junior to Class 5 pursuant to the settlements embodied in the Plan would not otherwise be for the benefit of holders of Class 5 claims and therefore do not affect such holders' direct interests.

19.     Accordingly, holders of claims in Class 5 (Non-PTL Claims) do not have standing to raise an objection on absolute priority rule grounds.   For this reason and the reasons set forth above and in the Confirmation Brief, the absolute priority rule objections should be overruled.

### C.     *Debtors Modified Plan to Eliminate Death Trap*

20.     The Plan previously provided for an improved recovery of 4% of the New Common Interests—as compared to 1%—to holders in Class 5 (Non-PTL Claims) if the Class voted to accept the Plan. *See Modified First Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 874), § 4.5.   Such improved treatment for voting in favor of a plan—sometimes referred to as a "death trap"—is consistent with the

12

provisions of the Bankruptcy Code and has been approved by courts in this and other circuits.[4]

However, heeding the Bankruptcy Court's warning to not allow the death trap to be a distraction,

the Debtors have amended the Plan to remove the death trap mechanism and to instead provide a

flat recovery of 1% of the New Common Interests to holders of allowed claims in Class 5 (Non-

PTL Claims).  *See* Plan § 4.5; *see also* May 18 (P.M.) Trial Tr. 49:9–22.  This modification to the

Plan does not require re-solicitation under Bankruptcy Rule 3019 because it does not adversely

change the treatment of Class 5, which voted to reject the Plan and would have received the same

treatment of 1% under the death trap included in the version of the Plan that was solicited.[5]

21.     Accordingly, the treatment of Class 5 (Non-PTL Claims) under the Plan is

appropriate, consistent with precedent in this circuit, and not prohibited by the Bankruptcy Code.

## II.     Bankruptcy Court Should Overrule Unresolved Objections

22.     As set forth in the Confirmation Brief and the Response Chart, the Debtors

received twelve (12) Confirmation Objections, including the objection filed by the State of

---

[4]  *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 717 (Bankr. S.D.N.Y. 1992) (overruling 1129(b)(1) objection to plan with death trap providing no recovery to rejecting class because where "the only class that is affected by its negative vote is the class itself and not any junior classes . . . . we have no conceptual problem with senior interests offering to junior interests an inducement to consent to the Plan"); *In re MPM Silicones, LLC*, 2014 WL 4637175, at *3 (S.D.N.Y. Sept. 17, 2014) ("Such fish-or-cut-bait, death-trap, or toggle provisions have long been customary in Chapter 11 plans"); *In re Adelphia Commc'nsCorp.*, 368 B.R. 140, 275 (Bankr. S.D.N.Y. 2007) ("I see no valid Absolute Priority Rule objection to the so called 'deathtrap provision,' requiring equity holders to vote in favor of the Plan or forfeit their distributions under it . . . ."); *see also In re Carlson Travel, Inc.*, No. 21-90017 (MI) (Bankr. S.D. Tex. Nov. 12, 2021) (Docket No. 106) (confirming chapter 11 plan providing improved treatment to class of claims if such class voted to accept); *In re Denbury Resources Inc.*, No. 20-33801 (DRJ) (Bankr. S.D. Tex. Sep. 2, 2020) (Docket No. 273) (same); *In re Rosehill Resources, Inc.*, No. 20-33695 (DRJ) (Bankr. S.D. Tex. Aug. 28, 2020) (Docket No. 186) (same); *In re Pioneer Energy Services Corp.*, No. 20-31425 (DRJ) (Bankr. S.D. Tex. May 11, 2020) (Docket No. 331) (same); *In re Neiman Marcus Group LTD LLC*, No. 20-32519 (DRJ) (Bankr. S.D. Tex. Jan. 4, 2020) (Docket No. 1795) (same).

[5]  Bankruptcy Rule 3019 provides that a plan that is modified after it has been accepted "shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan" to the extent the "the proposed modification does not adversely change the treatment . . . ."  Fed. R. Bankr. P. 3019(a).

Connecticut, Department of Economic and Community Development ("**DECD**") on May 16, 2023 (Docket No. 917) (the "**DECD Objection**"), and thirteen (13) Cure Objections.[6]

23.     Since filing the Confirmation Brief, the Debtors have continued to work constructively with parties that filed Confirmation Objections with a view towards reaching consensual resolutions, including through the addition of language in the proposed order confirming the Plan, filed contemporaneously herewith (the "**Proposed Confirmation Order**"). To that end, the Debtors have resolved three additional objections since the filing of the Confirmation Brief: the Humphries Objection, the Minority Licensees Objection (each as defined in the Confirmation Brief), and the DECD Objection, through the inclusion of additional language in the Proposed Confirmation Order.  At the time of filing of this Supplement, the only remaining outstanding Confirmation Objections are: (i) the Citadel Objection; (ii) the Non-PTL Objection; (iii) the LCM Joinder; (iv) the U.S. Trustee Objection; and (v) the Thierry Objection.  The Debtors respectfully request that the Bankruptcy Court overrule each such unresolved Confirmation Objection for the reasons set forth herein, in the Confirmation Brief, as reflected in the Response Chart, and in the Findings and Conclusions.

## CONCLUSION

24.     The Plan satisfies all of the applicable requirements of section 1129 of the Bankruptcy Code and should be confirmed.  For the reasons set forth herein, in the Confirmation Brief, in the Findings and Conclusions, and based on the evidence put forth at the Combined

---

[6]     All of the Cure Objections have either been resolved or consensually adjourned until after the Confirmation Hearing.

Hearing, the Debtors respectfully request that the Bankruptcy Court confirm the Plan, overrule any objections, and grant such other and further relief as is just and appropriate.

Dated: May 23, 2023
       Houston, Texas

                                        Respectfully submitted,

                                         /s/ *Gabriel A. Morgan*
                                        _____

                                        WEIL, GOTSHAL & MANGES LLP
                                        Gabriel A. Morgan (24125891)
                                        Stephanie N. Morrison (24126930)
                                        700 Louisiana Street, Suite 1700
                                        Houston, Texas 77002
                                        Telephone: (713) 546-5000
                                        Facsimile:  (713) 224-9511
                                        Email: Gabriel.Morgan@weil.com
                                                Stephanie.Morrison@weil.com

                                        – and –

                                        WEIL, GOTSHAL & MANGES LLP
                                        Ray C. Schrock (admitted *pro hac vice*)
                                        Alexander Welch (admitted *pro hac vice*)
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone:  (212) 310-8000
                                        Facsimile:  (212) 310-8007
                                        Email: Ray.Schrock@weil.com
                                                Alexander.Welch@weil.com

                                        *Attorneys for Debtors*
                                        *and Debtors in Possession*

15

## **Certificate of Service**

I hereby certify that on May 23, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' claims, noticing, and solicitation agent.

_/s/ Gabriel A. Morgan_
Gabriel A. Morgan

**<u>Exhibit A</u>**

**Response Chart**

**IN RE SERTA SIMMONS BEDDING, LLC**
**CH. 11 CASE NO. 23-90020 (DRJ)**

**SUMMARY CHART OF CONFIRMATION OBJECTIONS[1]**

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|---|---|---|---|---|
| **Unresolved Objections to Confirmation of the Plan** | | | | |
| 1. | 810 | Citadel Equity Fund Ltd. ("**Citadel**")* | Citadel asserts that: | **Unresolved.** The Debtors agreed to provide an indemnity in the New Term Loan pursuant to a settlement agreement that is fair and equitable under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. *See* Supplemental Brief ¶¶ 7–13. Further, as the evidence has shown, the Debtors took into consideration both the benefits of a restructuring, including deleveraging, and the risks of the attendant litigation when granting the indemnity and they determined, in a valid exercise of their business judgment, to enter into the settlement with the PTL Lenders that included the indemnity. *See* Supplemental Brief ¶¶ 3–6. |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the *Debtors' Memorandum of Law in Support of Confirmation of Modified First Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (the "**Confirmation Brief**"), the *Debtors' Supplemental Memorandum of Law in Support of Confirmation of Second Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (the "**Supplemental Brief**") to which this summary chart (the "**Response Chart**") is appended, the revised proposed confirmation order filed concurrently herewith (the "**Proposed Confirmation Order**"), the relevant Objections, the Plan, or the Disclosure Statement, as applicable.  This Response Chart summarizes certain key issues raised in the Objections.  This Response Chart is provided for summary purposes only and qualified in entirety by reference to the full text of the Objection or Confirmation Brief, as applicable.  To the extent that an Objection or a specific point raised in an Objection is not addressed herein, the Confirmation Brief, or the Supplemental Brief, the Debtors reserve the right to respond to such Objection up to and at the Confirmation Hearing.

[2]   Objections marked with an asterisk indicate that the objection does not comply with the procedural filing requirements, including as a result of (i) failure to file a certificate in accordance with Local Bankruptcy Rule 9013-1(g) that, either (a) a conference was held and that the parties were unable to resolve the matter; or (b) the specific dates that the respondent attempted to contact the movant, and the reason why no conference was held; (ii) failure to include a proposed order in accordance with Local Bankruptcy Rule 9013-1(h); and/or (iii) failure to provide a proposed modification to the Plan that would resolve such objection in accordance with the *Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (IV) Approving Notice Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* (Docket No. 540).

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|-----|-----------|-----------------|----------------------|-------------------------------|
| | | | a) The PTL Lender Group's indemnity claim under the PTL Credit Agreement should be disallowed under section 502(e)(1)(B) of the Bankruptcy Code. | a) The section 502(e)(1)(B) standard is conjunctive and requires that three factors be satisfied for disallowance. Here, the element of co-liability is not met—at least not with respect to each and every cause of action allegedly held by the Non-PTL Lenders against the PTL Lenders—and therefore disallowance is not applicable. *See* Confirmation Brief ¶ 198. |
| | | | b) The Plan is not feasible given the potential impact of the Indemnity Claim if the PTL Lenders are found to have liability in connection with the 2020 Transaction. | b) The Citadel Objection ignores the reasonable probability that the Debtors and PTL Lenders prevail in connection with any appeal of the 2020 Transaction, in which case the Indemnity Claim would have no impact on the Plan's feasibility. Even if the PTL Lenders lose, there is no agreed or certain amount of damages, if any, that would be payable; and if payable, what may be subject to offset through counterclaims. Nor is there any evidence of damages offered by Citadel. Accordingly, all discussion of feasibility based on the PTL Indemnity is speculative and remote. *See* Confirmation Brief ¶¶ 205–09. |
| | | | c) Section 509(c) of the Bankruptcy Code compels subordination of any allowed Indemnity Claim. | c) Section 509(c) of the Bankruptcy Code provides that a co-debtor's allowed claim for reimbursement or contribution will be subordinated to the claim of a creditor only to the extent that such creditor's claim is not paid in full. Even assuming that the Debtors and the PTL Lenders are found to be jointly liable to the Non-PTL Lenders in connection with the 2020 Transaction, any Indemnity Claim of the PTL Lenders against the Debtors are subordinated only to those Class 5 (Non-PTL Claims) pertaining to the 2020 Transaction, and only if the PTL Lenders do not pay the Non-PTL Lenders in full. *See* Confirmation Brief ¶ 204. |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|-----|-----------|-----------------|----------------------|-------------------------------|
| | | | d) Allowance of the Indemnity Claim results in differential treatment of the current FLSO Claims. | d) The treatment under the Plan is afforded equally to holders in Class 4 (FLSO Claims), which will receive a portion of the New Term Loans as part of their recovery under the Plan. *See* Plan § 4.4. Under the New Term Loan, the PTL Indemnity will be provided to all holders. All holders in Class 4 are being treated the same under the Plan. *See* Confirmation Brief ¶ 202. |
| 2. | 820 | Office of the United States Trustee for Region 7 (the "**U.S. Trustee**") | The U.S. Trustee asserts that the Plan's definition of "Exculpated Parties," which includes independent directors of the Debtors, violates applicable Fifth Circuit Law. | **Unresolved.** The Debtors' Exculpation Provision is consistent with Fifth Circuit precedent, including *Highland Capital* and the terms of chapter 11 plans subsequently approved in this district. Independent directors can act as fiduciaries for a debtor-in-possession within the scope of duties under section 1107 and are therefore entitled to qualified immunity. Additionally, even if the Bankruptcy Court were inclined to sustain the U.S. Trustee Objection, denial of confirmation of the Plan on these grounds is unnecessarily drastic remedy. *See* Confirmation Brief ¶¶ 184–85. |
| 3. | 824 | Ad Hoc Group of First Lien (1L) Lenders (the "**Non-PTL Lender Group**")* | The Non-PTL Lender Group asserts that the Plan:<br><br>a) Provides for an Indemnity Claim that is assumed as if part of an executory contract—the PTL Credit Agreement—when in reality they are unclassified, contingent liabilities barred by § 502(e)(1)(B) and § 509(c).<br><br>b) Does not comply with the absolute priority rule due to a distribution to Intermediate Equity Interests and payment to $200,000 for fees and expenses on behalf of Advent and Dawn Holdings. | **Unresolved.**<br><br>a) *See* Debtors' response to the Citadel Objection at 1(a) above.<br><br>b) Intermediate Equity Interests are receiving value under the Plan in exchange for the consideration they provided to the Debtors pursuant to the Consenting Equity Holders' Settlement (as subsequently settled again pursuant to the Creditors' Committee Global Settlement). A distribution to equity holders under a plan may be paid, even when creditors are not paid in full, if such payment is made incident to a settlement in *furtherance* of a reorganization of the debtors. In |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|-----|-----------|-----------------|----------------------|--------------------------------|
| | | | | the alternative, even if the Court were to determine that the Restructuring Transactions provided for a distribution on account of the Intermediate Equity Interests, the "new value exception" would apply. *See* Confirmation Brief ¶¶ 211–17; *see also* Supplemental Brief ¶¶ 14–16. Moreover, neither the Non-PTL Lenders nor the LCM Lenders have standing to raise an absolute priority rule objection because the amounts received by junior classes do not affect their direct interests. *See* Supplemental Brief ¶¶ 17–19. |
| 4. | 825 | LCM Lenders[3]* | The LCM Lenders join, incorporate by reference, and adopt as their own, the arguments of the Non-PTL Lender Group. | **Unresolved.** The LCM's Lenders' joinder should be dismissed for all of the reasons set out in the Confirmation Brief and Supplemental Brief. *See* Confirmation Brief ¶¶ 211–17; *see also* Supplemental Brief ¶¶ 3–19. |
| 5. | 826, 891 | Cameron Thierry ("**Mr. Thierry**")* | Mr. Thierry asserts that the Plan bars him from proceeding in his prepetition employment discrimination complaint for damages. | **Unresolved.** The Objection, and *Cameron M. Thierry's Brief in Support of His Objection to First Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC, and Its Affiliated Debtors [DKT. Nos. 796 & 874]* reiterates issues already pending before the Bankruptcy Court in unrelated Motions brought by Mr. Thierry. Mr. Thierry's claim will ultimately be liquidated and reduced to an Allowed Amount, if any, in accordance with the procedures set out in the Plan. *See* Confirmation Brief ¶ 220.<br><br>The Debtors have proposed language to Mr. Thierry for inclusion in the Proposed Confirmation Order that mirrors the settlement terms reached with other Class 6B litigation counterparties as reflected at paragraphs 72–73 and 77 and 79 of the Proposed Confirmation Order. As of the time of filing this Response Chart, Mr. Thierry does not agree to the inclusion of the proposed language to resolve his pending objection. |

---

[3]   The LCM Lenders are: LCM XIII Limited Partnership, LCM XIV Limited Partnership, LCM XV Limited Partnership, LCM XVI Limited Partnership, LCM XVII Limited Partnership, LCM XVIII Limited Partnership, LCM XIX Limited Partnership, LCM XX Limited Partnership, LCM XXI Limited Partnership, LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd. and LCM 28 Ltd (the "**LCM Lenders**").

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|---|---|---|---|---|
| **Resolved Objections to Confirmation of the Plan** | | | | |
| 6. | 617 | Maricopa County Treasurer ("**MCT**") | MCT asserts that the Plan appears to treat secured tax claims in the same manner as priority tax claims and fails to provide for the accrual of statutory interest on these secured liens. | **Resolved**.  MCT withdrew its Objection at Docket No. 817. The Debtors have resolved this Objection with the following language included in paragraph 65 of the Proposed Confirmation Order:<br><br>Notwithstanding anything to the contrary contained in the Plan or Disclosure Statement, any taxes due by any of the Debtors to the Maricopa County Treasurer in the State of Arizona ("**MCT**") for the 2023 tax year shall be paid in the ordinary course. Any secured claims of MCT shall be entitled to interest to the extent provided under sections 506(b), 1129 and/or 511 of the Bankruptcy Code. Any valid and perfected liens securing MCT's claims shall retain the same force and effect and priority pursuant to state law until such claims are satisfied in full.  In connection with the foregoing, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under applicable law in favor of the Debtors, Reorganized Debtors, or MCT, as applicable, are preserved. |
| 7. | 821 | Texas Comptroller of Public Accounts (the "**Texas Comptroller**") | The Texas Comptroller objects to the Plan to the extent that it restricts their rights to enforce state law in connection with property that is presumed to be abandoned under the Texas Property Code. | **Resolved.**  The Debtors have resolved this Objection with the following language included in paragraphs 60–64 of the Proposed Confirmation Order:<br><br>The following paragraphs 60 through 64 of this Confirmation Order will govern the treatment of the Texas Comptroller concerning the duties and responsibilities of the Debtors and the Reorganized Debtors relating to all unclaimed property presumed abandoned (the "**Texas Unclaimed Property**") under Texas Property Code, Title 6, Chapters 72-76 and other applicable Texas laws (the "**Texas Unclaimed Property Laws**"). |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|-----|-----------|-----------------|---------------------|-------------------------------|
|     |           |                 |                     | Notwithstanding section 362 of the Bankruptcy Code and/or any injunction contained in Section 10.5 of the Plan, after the Effective Date, the Texas Comptroller and its agents may commence an audit of the Debtors in accordance with the Texas Unclaimed Property Laws (the "**Texas Unclaimed Property Audit**").  Upon completion of the Texas Unclaimed Property Audit, the Texas Comptroller will promptly inform the Debtors or the Reorganized Debtors, as applicable, that such audit is complete and the results.  The Debtors, the Reorganized Debtors, and the Texas Comptroller shall retain and reserve, and nothing in the Plan or this Confirmation Order shall prejudice such party's right to argue, all rights, defenses, claims, counterclaims, and affirmative defenses that exist under applicable law arising from or relating to Texas Unclaimed Property, the Texas Unclaimed Property Audit, and/or any action to recover Texas Unclaimed Property, including but not limited to arguments that Texas Unclaimed Property is or is not property of the Debtors' Estates that vests in the Reorganized Debtors' Estates, that alleged Texas Unclaimed Property is held in trust for the State of Texas, and that claims asserted against the Debtors or the Reorganized Debtors are or are not unsecured claims subject to discharge in the Chapter 11 Cases.<br><br>Upon agreement between the Debtors or the Reorganized Debtors and the Texas Comptroller or a final nonappealable determination by a court or other tribunal with jurisdiction as to the amount of unremitted Texas Unclaimed Property, if any, that is due in connection with the Texas Unclaimed Property Audit, the Debtors or the Reorganized Debtors shall turn over such unremitted Texas Unclaimed Property and all known information about absent owners of the |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|---|---|---|---|---|
| | | | | Texas Unclaimed Property to the Texas Comptroller. |
| | | | | The Texas Comptroller may amend any timely filed Proofs of Claim in these Chapter 11 Cases following the Effective Date (i) to reflect a pending audit or the results of an audit that may be performed with respect to alleged Texas Unclaimed Property, (ii) following the filing of any property reports by the Debtors or Reorganized Debtors in connection with Texas Unclaimed Property, or (iii) to liquidate an unliquidated claim in connection with Texas Unclaimed Property; provided that the foregoing does not prejudice the Debtors' or Reorganized Debtors' rights to object to such Proofs of Claim in accordance with the Bankruptcy Code. |
| | | | | Nothing herein or in the Plan exempts the Debtors from compliance from and after the Effective Date with obligations pursuant to the Texas Unclaimed Property Laws.  The Texas Comptroller of Public Accounts reserves all rights relating to any unclaimed property presumed abandoned by the Reorganized Debtors from and after the Effective Date pursuant to the Texas Unclaimed Property Laws and any defenses, claims, counterclaims, and affirmative defenses that exist under applicable law in favor of the Debtors, to contest any action of the Texas Comptroller to recover Texas Unclaimed Property are preserved. |
| 8. | 827 | Dormae Products, Inc., Serta Restokraft Mattress Company Inc., Palu Bedding Co., Inc., Salt Lake Mattress & Mfg. Co., and AW Industries, Inc. | The Minority Licensees assert that the Plan may extinguish:<br><br>a) the Minority Licensees' rights of setoff and recoupment contrary to the Bankruptcy Code; and | **Resolved.**  The Debtors have resolved this Objection with the following language included in paragraph 80 of the Proposed Confirmation Order:<br><br>*Minority Licensees*. Nothing provided in the Plan or this Confirmation Order shall impair beyond the scope of the Bankruptcy Code any and all |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|---|---|---|---|---|
| | | (the "**Minority Licensees**") | b)  the Minority Licensees of their arbitration rights under the 2004 Restructuring Agreement. | defenses or counterclaims of the Minority Licensees with respect to claims that may be asserted by any of the Reorganized Debtors, including any statutory or common law rights of setoff and recoupment preserved in accordance with section 553 of the Bankruptcy Code. |
| 9. | 829 | Alan and Ruth Humphries (the "**Humphries**") | The Humphries assert that:<br><br>a)  SSB Logistics, LLC ("**SSB Logistics**") is self-insured and failed to make proper disclosures of such self-insurance in the Schedules and Disclosure Statement.<br><br>b)  The Plan is not proposed in good faith because SSB does not qualify as self-insured under applicable state law.<br><br>c)  The Humphries' unsecured prepetition claim should not be classified together with the Other General Unsecured Claims because the Humphries allege that their claim is covered by insurance.<br><br>They would receive more in a chapter 7 liquidation than under the Plan. | **Resolved.**  The Humphries withdrew their Objection at Docket No. 896. The Debtors have resolved this Objection with the following language included in paragraphs 77–79 of the Proposed Confirmation Order:<br><br>*Humphries Carve-Out*.  With regard to the plaintiffs, their successors and assigns, (collectively, the "**Humphries Claimants**") in the automobile collision related personal injury suit styled *Ruth Ann Humphries and Alan Humphries v Reginald Jervon Pauley and SSB Logistics, LLC*, Cause No. 2023-CP-46-01106, (the "**Humphries Action**"), pending in the in the Court of Common Pleas, County of York, South Carolina (the "**SC State Court**"), against SSB Logistics, LLC and Reginald Jervon Pauley, as described in the Humphries Claimants' proofs of claim, which are deemed timely (claim numbers 20408, 20409, 20410 and 20411) (collectively, the "**Humphries POCs**"):<br><br>(a) For a period of 75 days following the Effective Date, the Humphries Action will remain subject to the Plan Injunction, during which time, the Humphries Claimants, the Reorganized Debtors and the Class 6B Trust shall confer in good faith regarding the consensual reconciliation of the Humphries Action and, to the extent such reconciliation cannot be accomplished, an appropriate |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|-----|-----------|-----------------|----------------------|--------------------------------|
|     |           |                 |                      | mechanism for the reconciliation of the Humphries POCs.<br><br>(b) Upon the expiration of such 75-day period, the Humphries Claimants, shall, by stipulation amongst the Humphries Claimants, the Reorganized Debtors and the Class 6B Trust in form reasonably satisfactory to the parties, be granted limited relief from the Plan Injunction that: (i) allows the Humphries Claimants to pursue the Humphries Action in SC State Court nominally against the Debtors solely to recover from proceeds of the Debtors' or Reorganized Debtors' (as applicable) applicable insurance policies; (ii) waives any right of recovery against the Debtors and their estates, the Reorganized Debtors, or the Class 6B Trust other than on account of any applicable SIR; (iii) provides that the Humphries Claimants assume all risks with respect to coverage under any applicable insurance policies to the extent coverage is not confirmed by an applicable insurance provider during the 75-day period; and (iv) provides that neither the Reorganized Debtors nor the Class 6B Trustee shall have any obligation to participate or otherwise expend any resources, financially or otherwise, in connection with the Humphries Action. The Reorganized Debtors and the Class 6B Trust, as applicable, shall provide the Humphries Claimants reasonable access to such information as is reasonably appropriate to identify the extent of coverage |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|---|---|---|---|---|
| | | | | available under any applicable insurance policy.<br><br>(c) To the extent the parties are unable to agree to the stipulation set forth in (b) above, the Humphries Claimants shall have the right to seek relief from the injunction provisions of the Plan with all rights of the Reorganized Debtors and the Class 6B Trust reserved.<br><br>The Humphries Claimants are deemed to have opted out of the third party releases contained in Section 10.6 of the Plan.  Nothing in this Confirmation Order or the Plan, including Section 7.3 of the Plan, shall, with respect to a party to the Humphries Action, increase or diminish any rights of any party with regard to any request to estimate the claims asserted in the Humphries POCs under section 502(c) of the Bankruptcy Code including, without limitation, the Humphries Claimant's right to challenge the jurisdiction or constitutional authority of a court to estimate the Humphries POCs and the Humphries Claimant's rights to seek reconsideration of any estimation of the Humphries POCs under section 502(j) of the Bankruptcy Code.  The Humphries Claimants acknowledge and agree that any such request to estimate or reconsider the related rights and defenses shall be brought in and decided by this Court. |
| 10. | 823 | Cypress-Fairbanks Independent School District, Dallas County, and Harris County *et al.* (collectively, | The Texas Taxing Authorities assert that:<br><br>a)  The Plan lacks specificity with respect to the timing of payments. | **Resolved.**    Texas Taxing Authorities withdrew its Objection at Docket No. 895.  The Debtors have resolved this Objection with the following language included in paragraph 66 of the Proposed Confirmation Order:<br><br>Notwithstanding anything to the contrary contained in the Plan or Disclosure Statement, any |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|-----|-----------|-----------------|----------------------|-------------------------------|
| | | the "**Texas Taxing Authorities**") | b) The Plan does not properly provide for interest payments on Texas Taxing Authorities' claims.<br><br>c) The Plan fails to provide for the retention of the Texas Taxing Authorities' liens on the collateral.<br><br>d) The Texas Taxing Authorities should be able to amend their 2023 tax claim.<br><br>e) The Plan provides for an Exit Financing Facility that may prime or subordinate their senior secured tax liens. | secured ad valorem taxes due by any of the Debtors to Cypress-Fairbanks Independent School District, Dallas County and Harris County (each, a "**Texas Taxing Authority**") for tax years 2022 and prior shall be paid on or before the Effective Date, or when such claim is Allowed, subject to the applicable time limitations, if any, under the Bankruptcy Code.   Any 2023 ad valorem taxes due by any of the Debtors to any Texas Taxing Authority shall be paid in the ordinary course.   Any secured claims of each Texas Taxing Authority shall be entitled to interest to the extent provided under sections 506(b), 1129 and/or 511 of the Bankruptcy Code. Any valid and perfected liens securing each Texas Taxing Authority's claims shall retain the same force and effect and priority pursuant to state law until such claims are satisfied in full.   In connection with the foregoing, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under applicable law in favor of the Debtors, Reorganized Debtors, or each Texas Taxing Authority, as applicable, are preserved.   Each Texas Taxing Authority may amend any timely filed Proof of Claim to liquidate an unliquidated claim; <u>provided</u> that the foregoing does not prejudice the Debtors' or Reorganized Debtors' rights to object to such Proofs of Claim in accordance with the Bankruptcy Code. |
| 11. | 830 | Louisiana Department of Revenue ("**LDR**") | LDR asserts that:<br><br>a) The Plan should provide for proposed treatment of Administrative Claims under 1129(a)(9)(A), not 1129(a)(9).<br><br>b) The Plan does not provide for LDR's interest and penalties allowable under 503(b)(1)(B)does not except governmental | **Resolved.**  The LDR withdrew its Objection at Docket No. 894.  The Debtors have resolved this Objection with the following language included in paragraph 68 of the Proposed Confirmation Order:<br><br>Notwithstanding anything to the contrary in the Plan or this Confirmation Order: (i) the Louisiana Department of Revenue ("**LDR**") shall not be deemed a Releasing Party under the terms of the Plan  irrespective of the withdrawal of LDR's |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|---|---|---|---|---|
| | | | units for filing payment requests of administrative expenses.<br><br>c)  The Plan may prejudice Priority Tax Claims in a manner inconsistent with the Bankruptcy Code.<br><br>d)  The Plan provides for estimation of a greater proportion of claims than contemplated under section 502 of the Bankruptcy Code. | objection to the Plan; (ii) LDR shall not be required to file any request for any payment of Administrative Expense Claims for such expenses to be Allowed expenses and paid in the ordinary course of business; (iii) any postpetition tax returns and taxes due to LDR by the Debtors or the Debtors' Estate shall be filed and paid in the ordinary course of business when due pursuant to Louisiana law, and all delinquent prepetition returns shall be filed and paid as soon as practicable before any order on a motion for final decree is entered by this Court; (iv) any administrative tax expenses due to LDR shall be paid with interest and penalties to the extent provided for in sections 503(b)(1)(B) and (C) and 1129(a)(9)(A) of the Bankruptcy Code at the rate required by section 511 of the Bankruptcy Code; (v) any Allowed Priority Tax Claims of LDR shall be paid with interest to the extent provided for in section 1129(a)(9)(C) at the rate required by section 511 of the Bankruptcy Code not later than the time required by section 1129(a)(9)(C) of the Bankruptcy Code; (vi) payments received by LDR shall not be deemed paid on any date other than the date of receipt by LDR and such payments are not a settlement or compromise pursuant to Bankruptcy Rule 9019; (vii) no payment distribution due to LDR by the Debtors or the Debtors' Estates shall be deemed unclaimed property of the Estates and all distributions due to LDR shall remain due until received by LDR; (viii) the valid statutory or common law setoff rights and recoupment rights of the LDR are fully preserved; and (ix) LDR may amend any timely filed Proof of Claim (a) to reflect a pending audit or an audit that may be performed with respect to any pre- or post-petition tax return, (b) following the filing of a tax return, or (c) to liquidate an unliquidated claim. |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|-----|-----------|-----------------|----------------------|-------------------------------|
| 12. | 917 | State of Connecticut, Department of Economic and Community Development ("**DECD**") | DECD asserts that:<br><br>a) The Class 6B Cash Contribution should be allocated differently—*i.e.*, bearing some relation to asset values at the Debtors.<br><br>b) The Plan violates § 1123(a)(3) of the Bankruptcy Code because it does not clearly specify the treatment.<br><br>c) DECD's due process rights have been violated for lack of notice of the Plan or Disclosure Statement. | **Resolved.** The Debtors have resolved Objection with the following language included in paragraph 81 of the Proposed Confirmation Order:<br><br>In accordance with the Plan, following the Effective Date, the initial Class 6B Cash Contribution Allocation may be reallocated in accordance with the Plan by the Class 6B Trust, acting by and through the Class 6B Trustee, with the consent of the Reorganized Debtors, in their reasonable business judgment to recalibrate for, among other things, (i) the Amount of the Allowed Other General Unsecured Claims against each Debtor as determined in accordance with the reconciliation and objection process provided for in the Plan, (ii) the amount and purpose of Class 6B Trust Expenses, and (iii) any recoveries by the Class 6B Trust on account of Class 6B Causes of Action; provided that, such reallocation will be effective upon 10 days' notice of the reallocation being filed with the Bankruptcy Court. |
| **Cure Objections (Regarding Cure and Assumption Only)** | | | | |
| 1. | 726 | Safety National Casualty Corporation ("**Safety National**") | Safety National asserts Cure costs relating to four (4) insurance policies with the Debtors, totaling $421,534.75. | **Adjourned.** The Debtors and Safety National are working to resolve this matter. The parties agreed to adjourn any Cure dispute until after the Confirmation Hearing. |
| 2. | 739<br><br>740 (Supp. Decl.) | Salesforce, Inc. ("**Salesforce**") | Salesforce asserts total Cure costs of $1,162,791.56 as of April 28, 2023 and asserts that its contracts constitute an integrated executory contract that should be assumed in its entirety. If these contracts are assumed in connection with the Plan, then Salesforce asserts that $4,418,491.43 is owed. | **Adjourned**. The Debtors and Salesforce are working to resolve this matter. The parties agreed to adjourn any Cure dispute until after the Confirmation Hearing. |
| 3. | 746 | XTRA Lease LLC ("**XTRA**") | XTRA requests certain clarifications regarding its contracts on the Cure Notice. | **Adjourned.** The Debtors and XTRA are working to resolve this matter. The parties agreed to adjourn any Cure dispute until after the Confirmation Hearing. |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|---|---|---|---|---|
| 4. | 742<br><br>744 (Supp. Decl.) | Cisco Systems Capital Corporation ("**Cisco Capital**") | Cisco Capital asserts a Cure amount of $55,052.37 for an IT Agreement and a Capital Lease and asserts that its contracts constitute an integrated executory contract that should be assumed in its entirety. If these contracts are assumed in connection with the Plan, then Cisco Capital asserts that $165,854.08 is owed. | **Resolved**. Cisco Capital withdrew its Objection at Docket No. 956. |
| 5. | 676 | Microsoft Corporation ("**Microsoft**") | Microsoft asserts that the total Cure amount required to be paid upon assumption is $154,909.12. | **Resolved**. Microsoft withdrew its Objection at Docket No. 719. |
| 6. | 701 | RLIF Riviera Beach SPE, LLC ("**Riviera Beach**") | Riviera Beach asserts the cost to cure is $78,282.24 in aggregate Cure amounts for rent, charges, expenses, and taxes under a lease. | **Resolved**. Riviera Beach withdrew its Objection at Docket No. 757. |
| 7. | 718 | LIT Gateway Portfolio, LLC ("**LIT**") | LIT asserts Cure costs of $149,740.00 in aggregate amounts for "additional operating and other expense recoveries" relating to two leases. | **Resolved**. LIT withdrew its Objection at Docket No. 815. |
| 8. | 721 | WPG Legacy, LLC ("**WPG**") | WPG asserts Cure costs of $7,926.32 in aggregate amounts for unpaid rent, including attorneys' fees, and requests that the Debtors reaffirm any obligations they may have to indemnify WPG as stipulated under the lease. | **Resolved.** WPG withdrew its Objection at Docket No. 897. The Debtors have resolved this Objection with the following language included in paragraph 76 of the Proposed Confirmation Order:<br><br>Notwithstanding anything to the contrary in the Plan or this Confirmation Order, with respect to any unexpired leases of non-residential real property of Ratzon Realty or WPG Legacy, LLC ("**WPG**") assumed under the Plan, the Debtors or Reorganized Debtors, as applicable, shall be obligated to pay any undisputed accrued but unbilled amounts under such assumed unexpired lease as any such amounts become due in accordance with the terms of the applicable unexpired lease. Nothing in the Plan or this Confirmation Order shall modify the respective rights, if any, of Ratzon Realty and WPG, each as a counterparty to an assumed unexpired lease, to assert any right of indemnification, setoff, |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|---|---|---|---|---|
| | | | | subrogation or recoupment that such counterparty may have under applicable law except to the extent modified by the Plan (including the injunction set forth in <u>Section 10.5</u> of the Plan) or under such party's unexpired lease.  In connection with the foregoing, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under applicable law in favor of the Debtors, Reorganized Debtors, Ratzon Realty, or WPG, as applicable, are preserved. |
| 9. | 743 | Six Continents Hotels, Inc. ("**IHG**") | IHG asserts a Cure amount of $49,486.54 as a cost recovery fee. | **Resolved**.  IHG withdrew its objection at Docket No. 814. |
| 10. | 751 | Mattress Firm, Inc. ("**Mattress Firm**") | Mattress Firm filed a limited objection reserving rights with respect to certain settlement discussions regarding certain assumed agreements. | **Resolved**.  Mattress Firm withdrew its Objection at Docket No. 872. |
| 11. | 752 | Ratzon Realty (Interstate Park Logistics Center Florida) Limited Partnership ("**Ratzon Realty**") | Ratzon Realty asserts Cure costs of $27,312.03 for December rent and 2022 taxes plus an unliquidated amount for attorney's fees and costs and requests language in the Confirmation Order preserving its right to assert claims against the Debtors' applicable insurance providers relating to the Debtors' use and occupancy (provided such pursuit does not result in any liability to the Debtors or their estates). | **Resolved.**  The Debtors have resolved this Objection with the following language included in paragraph 75 of the Proposed Confirmation Order:<br><br>Nothing in this Confirmation Order shall be construed to release, waive, or enjoin any Claims that Ratzon Realty (Interstate Park Logistics Center Florida) Limited Partnership ("**Ratzon Realty**") may assert against the Debtors' applicable insurance providers with respect to third-party claims related to the Debtors' use and occupancy of the applicable premises prior to the Effective Date, as long as such pursuit does not result in any liability to the Debtors or their estates, provided, however, for the avoidance of doubt, nothing herein (a) creates a direct right of action if one does not otherwise exist under applicable law, and (b) shall be deemed to modify, amend, waive, or otherwise prejudice any of the insurance providers' rights or defenses under or with respect to the insurance policies.  All rights of Ratzon Realty to payment of attorney's fees |

| No. | Docket No. | Objecting Party | Summary of Objection | Status and Debtors Response[2] |
|---|---|---|---|---|
| | | | | under its unexpired lease are reserved and any dispute regarding such fees will be adjourned to a date to be agreed between the Debtors and Ratzon Realty. |
| 12. | 753 | HP Assembly I, LLC (“**HP Assembly**”) | HP Assembly asserts Cure costs of $161,921.00, comprised of two payments owed and invoiced as of December 2022. | **Resolved.** HP Assembly withdrew its Objection at Docket No. 794. |
| 13. | 754 | Continuum Marketing Services LLC (“**CMS**”) | CMS asserts Cure costs of $2,245,418.47, including certain postpetition Cure costs and requests that any order confirming the Plan include language reserving its rights and providing for payment of all past-due amounts under the applicable agreements. | **Resolved.**  The Debtors have resolved this Objection with the following language included in paragraph 74 of the Proposed Confirmation Order:<br><br>Notwithstanding anything to the contrary in this Confirmation Order or the Cure Notice subject to and upon the assumption of the CMS Agreements (as defined below), the Debtors shall, in accordance with <u>Article VIII</u> of the Plan and section 365 of the Bankruptcy Code, pay any undisputed outstanding, past-due invoices (both pre- and postpetition), <u>provided</u> that, to the extent a disputed invoice contains amounts that are not in dispute, Debtors shall pay all such undisputed amounts, pursuant to the following agreements: (i) that certain *Master Services Agreement*, dated as of December 17, 2021, by and between Continuum Marketing Services LLC (“**CMS**”) and Serta Simmons Bedding and (ii) that certain *SOW Pop & Marketing Print Managed Services Agreement*, dated as of December 17, 2021, by and between CMS and Serta Simmons Bedding (collectively, the “**CMS Agreements**”); <u>provided</u> that nothing herein shall effect CMS's right to assert an administrative claim for unpaid, post-petition services provided by CMS to the Debtors. |