## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** | § | **Case No. 23-90020** |
| *et al.,* | § | |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |
| -------------------------------------------------------- | § | |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** | § | **Adversary Proc. No. 23-09001 (DRJ)** |
| *et al.,* | § | |
| | § | |
| Plaintiffs and Counterclaim Defendant, | § | |
| v. | § | |
| | § | |
| **AG CENTRE STREET PARTNERSHIP** | § | |
| **L.P.,** *et al.,* | § | |
| | § | |
| Defendants and Counterclaim Plaintiffs, | § | |
| v. | § | |
| | § | |
| **AGF FLOATING RATE INCOME FUND,** | § | |
| *et al.,* | § | |
| | § | |
| Third Party Defendants. | § | |
| -------------------------------------------------------- | § | |

## NOTICE OF FILING
## CONFIRMATION HEARING CLOSING DEMONSTRATIVE

    **PLEASE TAKE NOTICE** that, on May 23, 2023, Serta Simmons Bedding, LLC

and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in

---

[1]   The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

possession (collectively, the "**Debtors**"), filed the *Second Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 977) (as may be amended, modified, or supplemented in accordance with the terms thereof, the "**Plan**").[2]

PLEASE TAKE FURTHER NOTICE that, during the combined hearing to consider confirmation of the Plan and the relief sought in the adversary proceeding captioned *Serta Simmons Bedding, LLC, et al. v. AG Centre Street Partnership, L.P., et al.,* Case No. 23-09001 (Bankr. S.D. Tex.) (DRJ) held on **May 25, 2023 at 2:00 p.m. (Central Time)**, counsel for the Debtors presented to the Court a demonstrative in connection with closing arguments, a copy of which is attached hereto as **<u>Exhibit A</u>**.

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Dated:  May 25, 2023
      Houston, Texas

Respectfully submitted,

*/s/ Gabriel A. Morgan*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
           Stephanie.Morrison@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
David J. Lender (admitted *pro hac vice*)
Alexander W. Welch (admitted *pro hac vice*)
Luna Barrington (admitted *pro hac vice*)
Richard D. Gage (admitted *pro hac vice*)
Taylor B. Dougherty (admitted *pro hac vice*)
Joseph R. Rausch (admitted *pro hac vice*)
Michael P. Goodyear (admitted *pro hac vice*)
Nicholas J. Reade  (admitted *pro hac vice*)
767 Fifth Avenue
New York, NY 10153
Tel:  (212) 310-8000
Fax:  (212) 310-8007
Email: Ray.Schrock@weil.com
        David.Lender@weil.com
        Alexander.Welch@weil.com
        Luna.Barrington@weil.com
        Richard.Gage@weil.com
        Taylor.Dougherty@weil.com
        Joseph.Rausch@weil.com
        Michael.Goodyear@weil.com
        Nick.Reade@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

### Certificate of Service

I hereby certify that on May 25, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' claims, noticing, and solicitation agent.

_/s/ Gabriel A. Morgan_
Gabriel A. Morgan

## Exhibit A

**Closing Demonstrative**

# Confirmation Hearing Closing

## May 25, 2023

*In re Serta Simmons Bedding, LLC*
*Case No.* 23-90020 (DRJ)

# Status Update & Roadmap

- **Settlement Conference**
  - Consistent with the Court's *Order Setting Settlement Conference*, Weil hosted a settlement conference on Monday, May 22, 2023, at their offices among the Debtors' management team, the PTL Lenders and their advisors, the Non-PTL Lenders and their advisors, the LCM Lenders and their advisors, and counsel to the Creditors' Committee
  - Unfortunately, the parties were unable to reach a settlement

- **Roadmap**
  - As the Court is aware, the issues related to the Adversary Proceeding are inextricably intertwined with Confirmation of the Plan
  - David Lender will begin by addressing arguments specific to the Adversary Proceeding, including the claim of breach of the implied covenant of good faith and fair dealing
  - I will next address Confirmation-related topics, including objections raised regarding the indemnity, the Absolute Priority Rule (including the Redemption payment), and the exculpation provisions in the Plan
  - Alex Welch will address the remaining Confirmation topics by providing an overview of the other Plan objections (and resolutions, where applicable), the proposed Confirmation Order, and Plan modifications, including removal of the Death Trap



# 2020 Transaction Saved the Company



**Harvey Tepner**





```
10          THE COURT:  Okay.  And can you -- I want to come
11    back to what you got.  So you saved the company by entering
12    into the transaction in the first place.
13          THE WITNESS:  Yes, sir.
14          THE COURT:  And nobody's really shown me that you
15    weren't right in that regard.  So what did you get in terms of
```

Trial Transcript 5/16/23 PM Pg. 137:10-15

# 2020 Transaction Avoided Bankruptcy



**Roopesh Shah**





12  Q    And what would have happened if SSB wasn't able to

13  restructure its debt or get additional liquidity?

14  A    It would have had to file for bankruptcy.

Trial Transcript 5/15/23 PM Pg. 10:12-14

4

# Laugh Factory, Inc. v. Basciano,
# 608 F. Supp. 2d 549, 557 (S.D.N.Y. 2009)

As for the former trademark-related allegations, neither the SOA nor the IAR so much as mentions the rights to the Laugh Factory name and logo. There is nothing in either document to suggest that plaintiffs were bound to allow Basciano to continue to use them for the two-year "consulting period" or any other length of time. Defendants argue that the SOA is merely a summary of terms, not a fully integrated agreement, and that it is implicit in the agreement that the parties contemplated that Basciano would continue to run the Laugh Factory under its original name. They point to references to "the club" and the "World Famous Laugh Factory" as well as the fact that the terms are favorable to Masada. But to the extent that the SOA is not an integrated agreement and that, therefore, the Court may consider parol evidence to modify, explain or supplement it, *see Gualandi v. Adams,* 385 F.3d 236, 241 (2d Cir.2004), defendants point to no testimony or other evidence indicating that Masada promised defendants the use of the Laugh Factory name. While a court may read an implied covenant into a contract where it is necessary to effectuate the purposes of the contract, *DBT GmbH v. J.L. Min. Co.,* 544 F.Supp.2d 364, 384 (S.D.N.Y.2008), "a party who asserts the existence of an implied-in-fact covenant bears a heavy burden ... [and] must prove not merely that it would have been more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole," *id.* (quoting *Rowe v. Great Atl. & Pac. Tea Co., Inc.,* 46 N.Y.S.2d 62, 69, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978)). Here, even though, as subsequent events demonstrated, Basciano would have been wise to obtain rights to the Laugh Factory name and logo, defendants have not shown that such a promise is necessarily implied in the agreement by which he bought out his business partner. Accordingly, plaintiffs' motion for summary judgment dismissing Count Two of defendants' counterclaims is granted.



5

# *In re Solutia, Inc.*,
## 2007 WL 1302609, at *10 (Bankr. S.D.N.Y. May 1, 2007)

Nothing in the doctrine of good faith and fair dealing allows a court to create contract terms that the parties have not negotiated for. The implied covenant will only aid and further the explicit terms of the agreement and will never impose an obligation "which would be inconsistent with other terms of the contractual relationship." *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 335, 514 N.Y.S.2d 209, 212, 506 N.E.2d 919, 922 (1987); *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 246 F.Supp.2d 231, 256 (S.D.N.Y.2002), *cert. denied*, 543 U.S. 1177, 125 S.Ct. 1309, 161 L.Ed.2d 161 (2005) ("[t]he implied covenant cannot prevent a party from exercising a right that it has specifically been accorded pursuant to the contract"); *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 679 (S.D.N.Y.1991) ( "[t]he parties' contractual rights and liabilities may not be varied, not their terms eviscerated, by a claim that one party has exercised a contractual right but has failed to do so in good faith"); *In re Downtown Athletic Club of New York City, Inc.*, 1998 WL 898226 at *11 (Bankr.S.D.N.Y.1998) ("[a] party can exercise its rights under a contract for any reason it finds satisfactory and such act will not constitute a breach of the implied covenant of good faith and fair dealing"). Under New York law, a party does not violate the implied covenant "by acting in its own self interest consistent with its rights under a contract * * * even when such conduct is allegedly unreasonable." *See Suthers v. Amgen, Inc.*, 441 F.Supp.2d 478, 485 (S.D.N.Y. Apr. 19, 2006) (emphasis added); *M/A–Com Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990) ("the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract").



6

# HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC, 994 F. Supp. 2d 520, 538 (S.D.N.Y. 2014)



To be sure, WHG can point to a number of emails indicating that Hilton managers wished for "the QA [Quality Assurance] process to terminate the hotel." Barone Decl. Ex. A at 9, 12, 13. But, despite the opportunity to take full document and deposition discovery, WFG has not identified any evidence that this hope on the part of Hilton's managers was communicated to, let alone affected, the inspectors who actually conducted the evaluations. Further, the emails on which WHG relies reveal that the Hilton managers' hope that the Hotel would be terminated was itself a product of the Hotel's track record of failure, as overwhelmingly chronicled in years of negative evaluations. *See id.* at 9 ("always suffered from product issues"); *id.* at 10 ("five consecutive unacceptable evaluations mainly due to poor SALT scores and brand standards violations"); *id.* at 14 ("never represented the brand well"); *id.* at 21 ("underwhelming asset"), *id.* at 24 ("plagued by so-so management ... nightmarish Q/A track record"), *id.* at 27 ("always been plagued by product problems"). This is not evidence of bad faith: It is evidence that Hilton's managers, on the merits, had concluded that the Hotel was a bad asset and hoped that the Quality Assurance process would validate that, thereby contractually allowing Hilton to terminate the Hotel. WHG's contrary allegation of bad faith is wholly conclusory, reliant on mere "speculation or conjecture as to the true nature" of Hilton's inspectors motives in conducting the evaluations. *Hicks*, 593 F.3d at 166.

# *In re Solutia, Inc.,*
# 2007 WL 1302609, at *10-11 (Bankr. S.D.N.Y. May 1, 2007)

**The Implied Covenant of Good Faith and Fair Dealing**

The Indenture Trustee urges that the Debtor exploited the barren language of the Indenture and seeks to bridge any gap in the terms of the Indenture by invoking the doctrine of good faith and fair dealing. There is no question that the covenant of good faith and fair dealing is a fundamental part of New York contract law. This covenant, implied in all contracts, "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Leberman v. John Blair & Co.,* 880 F.2d 1555, 1560 (2d Cir.1989); *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933).

Nothing in the doctrine of good faith and fair dealing allows a court to create contract terms that the parties have not negotiated for. The implied covenant will only aid and further the explicit terms of the agreement and will never impose an obligation "which would be inconsistent with other terms of the contractual relationship." *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329,

**\*11** While the Court is not unsympathetic to the Noteholders' arguments, the Court must look to the actual terms of the contractual arrangement between the parties and not equity to determine this matter. None of the testimony or factual findings this Court has made warrant looking beyond the Indenture itself to determine its proper interpretation. Other courts that have been confronted with similar types of claims from bondholders who have lost the value of their bonds, most notably in the leveraged buy-out context, have likewise relied on the actual language of the controlling indenture. Those courts have explored the absence of protective provisions in the indentures and have declined to read into indentures provisions and protections that are not there. *See Metropolitan Life Insurance Company v. RJR Nabisco, Inc.,* 716 F.Supp. 1504 (S.D.N.Y.1989); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,* 723 F.Supp. 976, 991 (S.D.N.Y.1989) . [16]



8

# Loose Credit Agreement



**Opportunity:**
- Exploit weak credit documents to propose a solution to the Company, potentially via the 2L by attaching to IP that can be moved

**Brief Thesis**
- While struggling from various industry wide factors especially mattress-in-a-box ("MiB"), the Serta and Simmons brands carry high brand awareness
- Loose credit documents may present a liability management solution anchored by IP / brand value

Debtors Exhibit 11 at 1, 45, 47 (ECF 861-5)

9

# Angelo Gordon & Gamut
## Purchased SSB Debt at a Discount



Change in Top 25 First Lien Term Loan Lenders Over Time ($ in millions)

Change in First Lien Term Loan Holdings

| Lender | 3/31/18 – 6/30/18 | 6/30/18 – 9/30/18 | 9/30/18 – 12/31/18 | 12/31/18 – 3/31/19 | 3/31/19 – 9/30/19 | 9/30/19 – 12/17/19 | 12/17/19 – 2/7/20 | 2/7/20 – 3/2/20 | 3/2/20 – 3/24/20 | 3/24/20 – 4/15/20 | 4/15/20 – 6/11/20 | 3/31/18 – 5/11/20 | Holdings as of 5/11/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| * Angelo Gordon | | | | | $39 | $52 | $55 | (1) | (1) | $51 | $34 | $230 | $230 |
| Gamut | | | | | 1 | 73 | 7 | (0) | | 3 | 33 | 39 | 156 | 156 |

First Lien Term Loan Trading Price

EVERCORE    Weil

24

Confidential
Confidential

SSB_LCM_00088453
SSB_ADVERSARY00088453

Debtors' Exhibit No. 202
Page 34 of 34





(g)    Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Term Loans on a pro rata basis or (B) through open market purchases, in each case with respect to clauses (A) and (B), without the consent of the Administrative Agent; provided that:

# Section 2.18(c)

(c)      If any Lender obtains payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with Loans of such Class, then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans of other Lenders of such Class at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such Class ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not apply to (A) any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with Sections 2.22, 2.23, 9.02(c) and/or Section 9.05.  Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise rights of set-off and counterclaim against such Borrower with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.18(c) and will, in each case, notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this Section 2.18(c) shall, from and after the date of such purchase, have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.  For purposes of subclause (c) of the definition of "Excluded Taxes", any Lender that acquires a participation pursuant to this Section 2.18(c) shall be treated as having acquired such participation on the earlier date(s) on which such Lender acquired the applicable interest(s) in the Commitment(s) and/or Loan(s) to which such participation relates.

# Where Was LCM?





13

# Angelo Gordon Would Love to Own the Business





| From: | Ryan Mollett <rmollett@angelogordon.com> |
| --- | --- |
| Sent: | Wed, 8 Apr 2020 18:10:48 -0400 (EDT) |
| To: | Ryan Mollett <rmollett@angelogordon.com> |
| Subject: | Fw: CSF Notes |
| Attachments: | AG CSF Annex Dislocation Fund (ADF) vfinal.pdf |

**Serta:**
Iconic mattress brand - Serta/Simmons ~30% mkt share of entire Mattress market.  Does $2.5bn in revenues
LTM EBITDA of $200mm.  $2bn 1st line trading at 50 - Creating biz for less than $1bn  $400mm 2nd lien trades at 25c
Tempur has 25% mkt share and has a $6bn TEV (down with stock move) - and traded at 10x prior to the down trade
Has $300mm of liquidity and is FCF positive above $200mm EBITDA ($130mm Interest, $50 capex).  Does not have
liquidity or maturity issues.
Many CSF trades here - Serta brand not part of the collateral group (not a guarantor on the loans) and have almost
$600mm in baskets to move assets into unsubs (permitted investments, general debt basket, unrestricted subsidiary
capacity, restricted non-loan party...use the Jcrew loophole)
Love to own the business if if files - think it worth at least $1.5bn on our SOTP analysis (Serta, Simmons, Tuft and Needle)
Paid interest payment last week.  Centerview/Gibson Dunn organizing a 1st lien group.  AG/APO/Gamut - close to 1/3 of
positions

Debtors Exhibit 60 at 1,3 (ECF 862-4)



14

# So Would Apollo



### Next Steps and Recommendation

In summary, we believe a potential distressed-for-control investment into Serta's $1.9 billion 1st Lien Term Loan presents a compelling opportunity to invest at the top of the capital structure at an attractive value for a franchise asset that we would want the Apollo funds to own. We recommend and are seeking approval for Fund IX to start accumulating Serta's 1st Lien Term Loan at a target price of 52 or lower.

# Attempts to Block the 2020 Transaction



**Jacob Gladstone**





```
21      Q.      Was Angelo Gordon contacting
22  these other lenders to try to prevent them
23  from joining the Centerview group?
24          MR. O'LOUGHLIN:   Objection.
25      A.      I don't know the specific
2   conversations that took place, all I know
3   is that they took place.
```

# Agreement Not To Vote For Plan



**Jacob Gladstone**





> 21      Q.      And so just so we're clear, on
> 22  September 28th, 2020, AG, Apollo and Gamut
> 23  entered into a cooperation agreement and
> 24  **agreed not to vote to accept any plan of**
> 25  **reorganization** that has not been agreed to
>
> 2   or consented to by the requisite holders,
> 3   correct?
> 4       A.      Correct.

Deposition Tr. 5/8/23 Pg. 191:21-192:4 (ECF 941)

# Agreement Not To Vote For Plan



**Jacob Gladstone**





9      Q.     So whether or not the plan of

10  reorganization was better for the company

11  or its stakeholders, Angelo Gordon, Apollo

12  and Gamut were not going to vote in favor

13  of it, correct?

14        MR. O'LOUGHLIN:  Objection.

15      A.     Correct.

Deposition Tr. 5/8/23 Pg. 192:9-15 (ECF 941)

18

# SSB Did Not Breach the Implied Covenant

- **SSB entered into the 2020 Transaction because it was in financial trouble.**

- **SSB engaged in a good faith competitive process.**

- **SSB's independent finance committee evaluated the various proposals and selected the best deal.**



19

# SSB Did Not Breach the Implied Covenant

- **SSB entered into the 2020 Transaction because it was in financial trouble.**

- SSB engaged in a good faith competitive process.

- SSB's independent finance committee evaluated the various proposals and selected the best deal.



20

# March 31, 2020 Finance Committee Meeting



# COVID Adversely Impacted SSB's Business





DocuSign Envelope ID: 3E2CC1B9-9424-4F99-B16E-98559C0F9FA8

Prepared at Request of Counsel
Attorney Work Product
Privileged & Confidential

## Situation Overview

Following a **strong start** to the year, COVID-19 has had a material impact on SSB's and its customers' performance. The near-term focus of the Company has shifted from executing a liability management transaction to focusing on near-term liquidity management

▸ ...eaking with the Finance Committee on March 25, certain customers of SSB have sought to take actions adverse to ...retail locations have shut down. Rapid changes to customers' working capital management and deterioration of ...ability to the Company's near-term liquidity forecasting

▸ ...pects a sales shortfall to budget of over $50mm in March amid ongoing macroeconomic ...tion due to the spread of COVID-19. The Company expects the impact to Q2 2020 to be

▸ The Company has also hired FTI to provide additional forecasting and cash management support throughout this volatile period

▸ Simultaneously, the Company's advisors have begun contingency planning in the event near-term capital will be unavailable to bridge any forecasted liquidity shortfalls

EVERCORE   Weil                           3

Confidential
Confidential

SSB_LCM_00089020
SSB_ADVERSARY00089020

**Debtors' Exhibit No. 51**
**Page 8 of 44**

## Situation Overview

**Following a strong start to the year, COVID-19 has had a material impact on SSB's and its customers' performance.** The near-term focus of the Company has shifted from executing a liability management transaction to focusing on near-term liquidity management

# COVID Adversely Impacted SSB's Business





DocuSign Envelope ID: 3E2CC1B9-9424-4F99-B16E-98559C0F9FA8

Prepared at Request of Counsel
Attorney Work Product
Privileged & Confidential

## Situation Overview

Following a strong start to the year, COVID-19 has had a material impact on SSB's and its customers' performance. The near-term focus of the Company has shifted from executing a liability management transaction to focusing on near-term liquidity management

- Since last speaking with the Finance Committee on March 25, certain customers of SSB have sought to take actions adverse to the Company as retail locations have shut down. Rapid changes to customers' working capital management and deterioration of

**Current cash flow forecasts indicate the Company may run out of liquidity as soon as early July, necessitating an evaluation of transaction alternatives to raise near-term liquidity**

have been successful at pushing back on customer requests, there will
payables terms

- Current cash flow forecasts indicate the Company may run out of liquidity as soon as early July, necessitating an evaluation of transaction alternatives to raise near-term liquidity

  ▶ To that end, Evercore has reached out to 11 potential "First Lien, Last Out" ABL ("FLLO ABL") lenders, and is seeking preliminary proposals for incremental liquidity from certain parties by the end of this week

  ▶ The Company has also hired FTI to provide additional forecasting and cash management support throughout this volatile period

  ▶ Simultaneously, the Company's advisors have begun contingency planning in the event near-term capital will be unavailable to bridge any forecasted liquidity shortfalls

EVERCORE    Weil    3

Confidential

SSB_LCM_00089020
SSB_ADVERSARY00089020

Debtors' Exhibit No. 51
Page 8 of 44

# 2020 Transaction Intended to Provide Viability



**Harvey Tepner**



15    Q    In deciding to go with this proposal, was the Independent

16    Finance Committee intending to harm specific lenders that

17    weren't participating?

18    A    No, not at all.

19    Q    And what was your intent?

20    A    Our intent was to give the company viability for moving

21    forward to face the issues of cash and to face the headwinds

22    of COVID, to face the headwinds in the marketplace and to be

23    able to put it back -- put itself back on a secured footing

24    once COVID had ended, so that you could operate normally,

25    refinance your debt going forward, and so on.

Trial Transcript 5/16/23 PM Pg. 38:15-25

24

# SSB Did Not Breach the Implied Covenant

- SSB entered into the 2020 Transaction because it was in financial trouble.

- **SSB engaged in a good faith competitive process.**

- SSB's independent finance committee evaluated the various proposals and selected the best deal.



# April 7, 2020 Finance Committee Meeting



Case 23-90020   Document 862-2 *SEALED*   Filed in TXSB on 05/12/23   Page 6 of 29

DocuSign Envelope ID: 3E2CC1B9-9424-4F99-B16E-98569C0F9FA8

Prepared at Request of Counsel
Attorney Work Product
Privileged & Confidential

### Executive Summary

As the Company pursues near-term liquidity alternatives, it should also work in parallel to engage existing

■ The Company continues to pursue the following liquidity alternatives:

► **Sale Leaseback**: Could yield $30mm of liquidity

► **Sale of SSB's Interest in China JV**: Being explored through an advisor-run sale process

► **Serta Financing**: Raise up to $160mm of financing secured by a pledge of the stock of NBC's ownership interest in Serta, Inc. (dependent on views of Loan-to-Value)

► **FLLO ABL**: Appears less and less likely that the transaction will result in significant liquidity (Pathlight and Great American continue to do work on an FLLO ABL while TSSP is considering alternative structures; all other lenders have fallen away)

■ The existing lenders could be the most likely source of liquidity or a comprehensive transaction. Sequencing and engagement is critical to achieve the optimal outcome for the Company in the following potential transactions:

EVERCORE   Weil                                2

Confidential                                   SSB_LCM_00088964
Confidential                                   SSB_ADVERSARY00088964

Debtors' Exhibit No. 58
Page 6 of 29



26

# April 10, 2020 Finance Committee Meeting

**FINAL**
**MINUTES OF THE**
**FINANCE COMMITTEE**
**OF THE**
**BOARD OF MANAGERS**
**OF**
**DAWN INTERMEDIATE, LLC**

April 10, 2020

## 1. Lender Engagement

As the first order of business, Mr. Banks, with reference to a presentation which appears as Exhibit A (the "Presentation"), gave an update on engagement with the various lender groups who are potential participants in liquidity or broader liability management transaction. A discussion ensued and questions were asked and answered. In response to a question from Mr. Tepner regarding the outreach strategy, Mr. Shah noted the object of the engagement process was to obtain multiple proposals for any transaction and enable a competitive process to obtain the best terms available for the Company.

Debtors' Exhibit No. 63
Page 1 of 13

Debtors Exhibit 63 at 1 (ECF 862-7)



27

# Best Deal for the Company



**Roopesh Shah**





6  Q    And how would a competitive process help get the best

7  deal for the company?

8  A    It allows us to get multiple bids and keep horses

9  separate, if you will, so we can play terms off of each

10  other to get the best terms for the company.

28

# Reached Out to Numerous Parties

Case 23-90020   Document 862-6 *SEALED*   Filed in TXSB on 05/12/23   Page 1 of 3

**Message**

**From:** Shah, Roopesh [Roopesh.Shah@Evercore.com]
**Sent:** 4/9/2020 4:31:04 PM
**To:** Banks, Brent [Brent.Banks@Evercore.com]; Dalal, Ankit [Ankit.Dalal@evercore.com]; Augusiak, Adam [Adam.Augusiak@evercore.com]; Li, Alex [Alex.Li@Evercore.com]
**Subject:** RE: SSB Deliverables

I think should pair them up with Monarch. Would not pair them up with Angelo. Are they OK with that?

Roopesh Shah
Senior Managing Director
EVERCORE
55 East 52nd Street
New York, NY 10055
Office: 212-336-6631 | Cell: 917-747-4649
Email: roopesh.shah@evercore.com

**From:** Banks, Brent
**Sent:** Thursday, April 09, 2020 12:28 PM
**To:** Shah, Roopesh; Dalal, Ankit; Augusiak, Adam; Li, Alex
**Subject:** RE: SSB Deliverables

Do you think PIMCO would do this?

I just spoke hung up with TSSP. They asked if we are reaching out to anyone else, told them... look... expect a competitive process. They said, If Monarch and Angelo are going to be included... its going to be very awkward for them to be looking at this separately. Their first preference is for them not to be included and they would prefer to just do it alone. If we are telling them they are going to be part of the process, they would just want to be paired up early on.... And would expect we would go out to other 3rd parties to run a competitive process ...

They also suggested just offering up a pledge of Serta Inc (as part of IPCo) and dropping in the real estate assets. Told them we would consider it

4/9
- Discuss structure with TSSP (already under NDA, 2L)
- Finalize NDA; what did we want to do with no talk (to those outside the group)?
- Reach out to existing lenders individually and negotiate NDA with an eye towards finalizing Sunday-Tuesday
  - Oaktree (1L)
  - [Gamut] (1L)
  - TSSP (2L) (already under NDA)
  - Angelo (2L)
  - Monarch (2L)
  - ~~Blackstone/GSO is a cross holder~~
  - ~~Apollo (DQ)~~
- Reach out to third party investors
  - HPS
  - Fortress
  - Centerbridge
  - Blue Torch
  - PIMCO
  - Silver Point
Week of 4/13 or 4/20

Confidential

**Debtors' Exhibit No. 62**
**Page 1 of 3**

EVERCORE-SSB00008281
SSB_ADVERSARY00129649

---

**From:** Banks, Brent
**Sent:** Thursday, April 09, 2020 12:28 PM
**To:** Shah, Roopesh; Dalal, Ankit; Augusiak, Adam; Li, Alex
**Subject:** RE: SSB Deliverables

Do you think PIMCO would do this?

I just spoke hung up with TSSP. They asked if we are reaching out to anyone else, told them... look... expect a competitive process. They said, If Monarch and Angelo are going to be included... Its going to be very awkward for them to be looking at this separately. Their first preference is for them not to be included and they would prefer to just do it alone. If we are telling them they are going to be part of the process, they would just want to be paired up early on.... And would expect we would go out to other 3rd parties to run a competitive process ...

They also suggested just offering up a pledge of Serta Inc (as part of IPCo) and dropping in the real estate assets. Told them we would consider it

4/9
- Discuss structure with TSSP (already under NDA, 2L)
- Finalize NDA; what did we want to do with no talk (to those outside the group)?
- Reach out to existing lenders individually and negotiate NDA with an eye towards finalizing Sunday-Tuesday
  - Oaktree (1L)
  - [Gamut] (1L)
  - TSSP (2L) (already under NDA)
  - Angelo (2L)
  - Monarch (2L)
  - ~~Blackstone/GSO is a cross holder~~
  - ~~Apollo (DQ)~~
- Reach out to third party investors
  - HPS
  - Fortress
  - Centerbridge
  - Blue Torch
  - PIMCO
  - Silver Point
Week of 4/13 or 4/20

Debtors Exhibit 62 at 1 (ECF 862-6)

29



# Angelo Gordon March 2020 Proposal



## Key Assumptions

- New money: $200M
- AHG 1L TL Amount: $300M
- 1L Exchange price: 80 (~15 point premium to current market)
- AHG 2L TL Amount: $200M
- 2L Exchange price: 50 (~20 point premium to current market)

## Transaction Steps

- Set up new URS and transfer assets including the equity of Serta Inc. and up to $575M of other to be determined assets
  - Assets can include but are not limited to IP, an entire segment (Tuft & Needle) and real estate
- AHG funds debt into the URS in an amount equal to the exchange ratio for AHG 1L / 2L TL's[1]
- AHG backstops $200M of new money to URS for loans senior to URS debt issued in exchange
  - The Company can seek to raise funds in the market instead of borrowing from AHG
- URS distributes debt proceeds to the restricted group
- The Company uses debt proceeds to purchase AHG loans
- Company uses excess debt proceeds to opportunistically purchase 1L / 2L TL's in the open market or subsequent transactions



30

# Solicitation Began in April 2020



Debtors Exhibit 63 at 1, 7 (ECF 862-7)

31

# Company Was Not Engaging with Gibson Dunn Group



**From:** Banks, Brent
**Sent:** Thursday, April 09, 2020 12:28 PM
**To:** Shah, Roopesh; Dalal, Ankit; Augusiak, Adam; Li, Alex
**Subject:** RE: SSB Deliverables

Week of 4/13 or 4/20

- If receive outreach from Gibson Dunn or they get wind of financing process:
  o Do not engage, or
  o Engage in diligence with advisors while financing process is ongoing

# Company Was Not Engaging With Gibson Dunn Group



**Roopesh Shah**



10  Q    Okay.  I want to ask you:  At the bottom of Debtors'
11  Exhibit Number 62, it says "Week of 4/13 and 4/20."  And if
12  you turn to the second page, Jorge put it all into one slide
13  here.  It says:
14      "If reach" -- "if receive outreach from Gibson Dunn or
15  they get wind of financing process, do not engage or engage
16  in diligence with advisors while financing process is
17  ongoing."
18      Can you explain what this is about?
19  A    Sure.  I -- I didn't write it.  But you know, the --
20  the recollection at the time, the IPCO transactions were
21  ones that traditional institutional lenders, such as CLOs,
22  who were main parties in the Gibson Dunn Group, and had
23  litigated against, they tend to not like those types of
24  transactions.  And so the worry was, if that group got wind
25  of the fact that we were contemplating a drop-down or an
1   IPCO transaction, that they would -- they could litigate
2   against it or try to disrupt it in some way.
3      So the goal was to either not engage with them in any
4   way or parallel process their diligence, but again, all with
5   the view towards consummating the IPCO transaction.

Trial Transcript 5/15/23 PM Pg. 19:10-20:5

33

# April 24, 2020 Gibson Dunn Letter

**GIBSON DUNN**

April 24, 2020

**VIA ELECTRONIC MAIL**

Ray C. Schrock, Esq
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Re:   Serta Simmons Bedding, LLC _ Secured Lender Group

Dear Ray

> As you no doubt are aware, given the inherent uncertainty of the current situation and the continued closures across the retail channel, it is critical that the Company maintain adequate liquidity. We have heard, but not confirmed, that third parties have expressed interest in providing debt capital to the Company to shore up its liquidity resources. **Based on the current state of the capital markets and the Company's specific capital structure, we would expect any third-party financing to be based on a predatory pricing structure and require onerous terms.** As we indicated in the April 7th Letter, the Secured Lender Group enjoys a longstanding familiarity with the Company, maintains the largest and senior-most position in the Company's capital structure, and has the exclusive power to amend the First Lien Credit Agreement, which means it is in the unique position to quickly and seamlessly unlock financing solutions for the Company such as a priming credit facility, which would likely be based on less expensive pricing than any third-party financing available to the Company.

Confidential
Confidential

SSB_LCM_00042795
SSB_ADVERSARY00042795

**Debtors' Exhibit No. 87**
Page 3 of 8



# April 24, 2020 Gibson Dunn Letter

*Highly Preliminary Draft / Subject to Material Revision / FRE 408 / Prepared at the Direction of Counsel*

## Illustrative Super Priority Financing Terms

| | Illustrative Terms |
|---|---|
| Facility Size | • [TBD] – subject to satisfactory legal and business diligence review, including, without limitation, with respect to sizing of the facility and the verified cash flow needs of business |
| Structure | • Super Priority Delayed Draw Term Loan ("Priority Term Facility", and the loans thereunder, "Priority Term Loans"); draws subject to satisfaction of conditions precedent acceptable to the Ad Hoc Group |
| Borrower/Guarantors | • Same as under First Lien Term Loan Credit Agreement |
| Administrative Agent | • Same as under First Lien Term Loan Credit Agreement |
| Lenders | • Backstopped by certain members of the Ad Hoc Group, each on a pro rata basis (the "Backstop Group"), but available to all existing First Lien Term Lenders pro rata (collectively, the "Priority Term Lenders") |
| Premium Payments | • Backstop Payment: [TBD]% of principal amount, payable in cash at closing – only provided to Backstop Group<br>• Upfront Payment: [TBD]% of principal amount, payable in cash at closing – provided to all Priority Term Lenders |
| Interest | • L + [___] per annum (subject to 1.0% LIBOR floor); payable monthly |
| Amortization | • [TBD] |
| Call Protection | • [TBD] months:  Non-callable (i.e., make-whole for the first [TBD] months) |
| Maturity | • Earlier of (i) [August 10, 2023 (90 days inside maturity of First Lien Term Loan)] and (ii) acceleration |
| Priority/Collateral | • Senior in priority to the First Lien Term Loans on the Term Loan Priority Collateral and the ABL Priority Collateral<br>• First-priority lien on all currently encumbered collateral, subject only to the ABL Lenders' interest in ABL Priority Collateral<br>• Other collateral enhancements TBD |

CENTERVIEW PARTNERS
GIBSON DUNN

Confidential
Confidential

SSB_LCM_00042799
SSB_ADVERSARY00042799

**Debtors' Exhibit No. 87**
**Page 7 of 8**

35

# Needed a Competitive Proposal



Case 23-90020   Document 863-42 *SEALED*   Filed in TXSB on 05/12/23   Page 2 of 6

**Redacted – Privileged**

**Redacted – Privileged**

**Redacted – Privileged**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Highly Confidential

LCMvSorta_Invesco_0001594

SSB_ADVERSARY00153829

**Debtors' Exhibit No. 149**
Page 2 of 6

**From:** Egan, Kevin T <Kevin.Egan@invesco.com >
**Sent:** Saturday, May 23, 2020 1:20 PM
**To:** Yarrow, Philip <Philip.Yarrow@invesco.com >; *NY- HYL PMS <*NY-HYLPMS@invesco.com>
**Subject:** Re: Serta Simmons Bedding, LLC - Need any IC Feedback on Potentially Putting Together a New Money/Discounted 1L Exchange into Priming Facility Proposal

Phil:

I agree that we have to put a competitive proposal on the table. We can Ill afford to have that magnitude of assets - in particular the IP- dropped from our borrower. I was not clear from your note whether the competitive offer was coming from another Group of existing lenders- and if so - do we know the composition of that group- or if These were new money lenders. It doesn't change our need to provide a counterproposal- I was just interested in what other parties see value here.

Thanks,
Kevin

Debtors Exhibit 149 at 2 (ECF 863-42)

36

# Focused on AG Group Proposal

**Message**

**From:** Shah, Roopesh [Roopesh.Shah@Evercore.com]
**Sent:** 5/5/2020 11:31:27 AM
**To:** Banks, Brent [Brent.Banks@evercore.com]
**CC:** Augusiak, Adam [Adam.Augusiak@evercore.com]; Dalal, Ankit [Ankit.Dalal@evercore.com]; Li, Alex [Alex.Li@evercore.com]
**Subject:** Re: [EXTERNAL] Serta

We need to see where Fortress is.

Would pair BT up with Fortress if F needs a partner, else pair them with Oaktree and possibly Silverpoint to round it out. Yes there will be lowest common denominator risk but maybe you can use the tighter terms (BT) to push the more expensive guys (Oaktree) somewhere better. Ultimately this is about getting to the required quantum - I bet terms will be similar amongst everyone at the end of the day.

We should focus on AG as they continue to be our best horse. And maybe Oaktree can eventually pair with them.

We need DP to move more quickly. Can we push them to be done by early next week?

Will DP get to a liquidation appraisal that works for BT?

Roopesh Shah
Senior Managing Director
EVERCORE
55 East 52nd Street
New York, NY 10055
Office: 212-336-6631 | Cell: 917-747-6649
Email: roopesh.shah@evercore.com

On May 5, 2020, at 5:58 AM, Banks, Brent <Brent.Banks@evercore.com> wrote:

Oaktree is only willing to do $100mm... they requested to partner with AG
Ken has always been of the mind that a number of these guys get brought together at the very end

If you pair BT up with an Oaktree, dont you suffer from a lowest common denominator issue? E.g. they move to Oaktrees terms
Would seem more natural to partner BT with Fortress... but haven't heard Fortress say they need more money

We also don't know where Barings / Centerbridge come out on this.

To me seems like we are supposed to get feedback from everyone from this round... and then make the decision to pair people up. We haven't set a deadline for feedback, D&P maybe comes back mid next week... when do we want to push people towards?

**From:** Shah, Roopesh
**Sent:** Monday, May 4, 2020 9:57 PM
**To:** Augusiak, Adam

Confidential
Confidential

EVERCORE-SSB00012250
SSB_ADVERSARY20132616

**Debtors' Exhibit No. 111**
**Page 1 of 12**

---

## Message

| | |
|---|---|
| **From:** | Shah, Roopesh [Roopesh.Shah@Evercore.com] |
| **Sent:** | 5/5/2020 11:31:27 AM |
| **To:** | Banks, Brent [Brent.Banks@Evercore.com] |
| **CC:** | Augusiak, Adam [Adam.Augusiak@evercore.com]; Dalal, Ankit [Ankit.Dalal@evercore.com]; Li, Alex [Alex.Li@Evercore.com] |
| **Subject:** | Re: [EXTERNAL] Serta |

We need to see where Fortress is.

Would pair BT up with Fortress if F needs a partner, else pair them with Oaktree and possibly Silverpoint to round it out. Yes there will be lowest common denominator risk but maybe you can use the tighter terms (BT) to push the more expensive guys (Oaktree) somewhere better. Ultimately this is about getting to the required quantum - I bet terms will be similar amongst everyone at the end of the day.

We should focus on AG as they continue to be our best horse. And maybe Oaktree can eventually pair with them.

We need DP to move more quickly. Can we push them to be done by early next week?

Will DP get to a liquidation appraisal that works for BT?



# Focused on AG Group Proposal



**Roopesh Shah**



17  Q     In the third paragraph, you wrote:

18       "We should focus on Angelo Gordon, as they continue to

19  be our best horse."

20       What did you mean by that?

21  A     Well, at the time, just that.  The Angelo Gordon Group

22  was our best horse.  They had sent a proposal into the

23  company, we were negotiating that proposal.  They were

24  furthest ahead and had the most developed proposal.  So,

25  based on the competitive process to that date, while we had

1  a lot of other parties participating, the view at the time

2  was the Angelo Gordon Group was the best horse.

# May 22, 2020 Finance Committee Meeting

DocuSign Envelope ID: 3E2CC1B9-8424-4F96-B1BE-9B59FC0F9FAB

**FINAL
MINUTES OF THE
FINANCE COMMITTEE
OF THE
BOARD OF MANAGERS
OF
DAWN INTERMEDIATE, LLC**

**May 22, 2020**

A meeting of the Finance Committee of the Board of Managers (the "Committee") of Dawn Intermediate, LLC (the "Company") was held telephonically on Friday, May 22, 2020.

The following Committee members were present for all or a portion of the meeting:

Jean Hilson
Harvey Tepner

Chief Executive Officer David Swift was also present for the meeting. Also present by invitation for all or portions of the meeting were the following:

Barry Canipe – Executive Vice President, Chief Financial Officer, Treasurer and Assistant Secretary, the Company;
Kristen McGuffey – Executive Vice President, General Counsel and Secretary, the Company;

Ray Schrock – Partner, Weil, Gotshal & Manges LLP ("Weil");
Alex Welch – Associate, Weil;

Roopesh Shah – Senior Managing Director, Evercore Inc. ("Evercore");
Brent Banks – Managing Director, Evercore; and

Armen Emrikian – Senior Managing Director, FTI Consulting, Inc. ("FTI").

The meeting was called to order. All Committee members identified as well as the guests above were present at the beginning of the meeting.

1. **Lender Engagement**

As the first order of business, Mr. Banks, with reference to a presentation which appears as Exhibit A (the "Presentation"), updated the Committee on revised term sheets which had been provided to the Angelo Gordon, Barings and other potential lender groups, and the ongoing diligence process with these groups. A discussion ensued and questions were asked and answered.

Next, Mr. Banks updated the Committee on the status of the diligence process with the Gibson Dunn lender group. A discussion ensued and questions were asked and answered.

1

Confidential
Confidential

SSB_LCM_00088578
SSB_ADVERSARY00088578

**Debtors' Exhibit No. 145
Page 1 of 30**

Debtors Exhibit 145 at 1 (ECF 863-38)



39

# Lender Outreach

DocuSign Envelope ID: 3E2CC1B9-9424-4F99-B16E-96559C0F6FA6

Prepared at Request of Counsel
Attorney Work Product
Privileged & Confidential

## IPCo Financing Lender Outreach Summary

| # | Lender Name | Contacted? | NDA Sent? | NDA Executed? | Lender Pres Sent? | VDR Access? | Current Blowout? | Sent Term Sheet? | Recent Lender Correspondence |
|---|---|---|---|---|---|---|---|---|---|
| | **1L Focused Group:** | | | | | | | | |
| 1. | Angelo Gordon / Apollo / Gamut | ✓ | ✓ | ✓ | ✓ | ✓ | 5/29/2020 | | 5/20: EVR/WGM sent term sheet counter proposal<br>5/21-5/22: EVR/WGM calls with PJT/Paul Weiss to discuss counter |
| 2. | Oaktree | ✓ | ✓ | ✓ | ✓ | ✓ | 5/29/2020 | | 5/20: EVR/WGM sent term sheet counter proposal<br>5/21: EVR call with Oaktree to discuss counter |
| | **2L Focused Group:** | | | | | | | | |
| 1. | TSSP | ✓ | ✓ | ✓ | ✓ | ✓ | 5/29/2020 | | 5/20: EVR/WGM sent term sheet counter proposal<br>5/22: EVR call with TSSP to discuss counter |
| 2. | Monarch | | | | | | | | EVR to vet holdings vs. participations; waiting on further discussions with TSSP on partnering |
| | **Cross-holder Group:** | | | | | | | | |
| 1. | CSAM | ✓ | | | | | | | |
| 2. | Barings | ✓ | ✓ | ✓ | ✓ | ✓ | 5/29/2020 | | 5/20: EVR/WGM sent term sheet counter proposal<br>5/20: EVR call with Barings to discuss counter<br>5/21: EVR call with Centerview to encourage financing proposal as soon as possible |
| 3. | GDC / Centerview X-Holder Group | ✓ | | | | | | | |
| | **Third Party Lenders:** | | | | | | | | |
| 1. | Fortress | ✓ | ✓ | ✓ | ✓ | ✓ | N/A | ✓ | 5/20: EVR/WGM sent term sheet counter proposal<br>5/21: EVR call with Fortress to discuss counter |
| 2. | Blue Torch | ✓ | ✓ | ✓ | ✓ | ✓ | N/A | ✓ | 5/20: EVR/WGM sent term sheet counter proposal<br>5/21: EVR call with Blue Torch to discuss counter |
| 3. | Charlesbank | ✓ | ✓ | ✓ | ✓ | ✓ | N/A | ✓ | 5/20: EVR/WGM sent term sheet counter proposal<br>5/21: EVR call with Charlesbank to discuss counter |
| 4. | Centerbridge | ✓ | ✓ | ✓ | ✓ | ✓ | N/A | | 5/8: Call with EVR to discuss transaction and ask for TS; no further follow up from Centerbridge |
| 5. | Silver Point | ✓ | ✓ | ✓ | ✓ | ✓ | N/A | | 4/24: Less enthusiastic about the opportunity; cannot lead, but may do ~$40mm w/o Serta and ~$50-80mm with Serta, in conjunction with someone else |
| | **Passed on Opportunity:** | | | | | | | | |
| 1. | HPS | ✓ | ✓ | ✓ | ✓ | ✓ | N/A | | 4/24: Decided to pass on the opportunity |
| 2. | PIMCO | ✓ | ✓ | ✓ | ✓ | ✓ | N/A | | 4/30: Proposal never submitted as of last call with EVR |
| | Total | 13 | 12 | 11 | 11 | 11 | N/A | 7 | |

**REDACTED – PRIVILEGED**

EVERCORE   Wall                                              3

Confidential
Confidential

SSB_LCM_00088584
SSB_ADVERSARY00088584

**Debtors' Exhibit No. 145**
**Page 7 of 30**



# Lender Outreach

DocuSign Envelope ID: 3E2CC1B9-9424-4F99-B16E-96559C0F9FA8

Prepared at Request of Counsel
Attorney Work Product
Privileged & Confidential

## Angelo Gordon Group's IPCo Financing Term Sheet (Bid / Ask)

| | New Money Financing | New Money Financing Proposed Counter |
|---|---|---|
| Latest TS Date | 5/4/2020 | 5/12/2020 |
| Borrower | Newly-formed non-guarantor restricted subsidiary | Same |
| Guarantor | Immediate parent of Borrower, also a newly-formed non-guarantor restricted subsidiary | None |
| Amount | $285mm new 1L TL — $200mm new money plus $100mm of existing 1L TL exchanged at an exchange ratio of 85% | $285mm new 1L TL — $200mm new money plus $148mm of existing 1L TL exchanged at an exchange ratio of 57.5% |
| Collateral | 1L on Borrower equity and all assets, including: (i) Simmons and Tuft & Needle ("T&N") IP, (ii) [TBD%] of outstanding equity in Serta, Inc., (iii) Simmons' 3rd party licensing revenue, and (iv) real estate, facilities and equipment<br>■ Maximum loan-to-value [TBD%] | 1L on Borrower equity and assets, including (i) certain Simmons / T&N trademarks, including associated goodwill, patents and domain names related to the manufacture, marketing and sale of Simmons, Beautyrest and Tuft & Needle products, including royalty streams associated with certain third-party licenses, (ii) intercompany license between Borrower and SSB, (iii) pledge of 82% of Serta, Inc. equity (excl. AI Dream), and (iv) pledge of the equity of the guarantor under the Unrestricted Subsidiary facility<br>■ Same |
| Pricing | L + 700 cash pay plus 700 PIK<br>1.00% LIBOR floor | L + 700 cash pay; 300 PIK on new money portion of new 1L TL<br>L + 400 cash pay; 400 PIK on exchange debt portion of new 1L TL<br>Same |
| OID / Fees | Upfront Fee: 4% on new money proceeds ($8mm) | Upfront Fee: 2% on new money proceeds ($4mm) |
| Tenor | May 8th, 2024 | November 8th, 2024 |
| Amortization | None | None |
| Mandatory Prepayments | 100% of proceeds from (i) debt issuances after closing, (ii) asset sale proceeds, (iii) casualty and condemnation proceeds (iv) tax refunds, and (v) other extraordinary receipts | 100% of proceeds from debt issuances after closing |
| Prepayment Penalty | T+50bps make-whole premium prior to maturity | NC-1 / 104 / 102 on new money portion of new 1L TL<br>No prepayment penalty on exchange debt portion of new 1L TL |
| Financial Covenants | None | Same |
| Other | Borrower shall pay all advisor fees and expenses | Same |

EVERCORE   Wall
Source: Investor Term Sheets

4

Confidential
Confidential

SSB_LCM_00088587
SSB_ADVERSARY00088587

Debtors' Exhibit No. 145
Page 10 of 30

Debtors Exhibit 145 at 10 (ECF 863-38)



41

# Lender Outreach

DocuSign Envelope ID: 3E2CC1B9-9424-4F90-816E-96559C0F6FA8

Prepared at Request of Counsel
Attorney Work Product
Privileged & Confidential

## Barings IPCo Financing Term Sheet (Bid / Ask)

|  | IPCo Financing Proposal | IPCo Financing Proposed Counter |
|---|---|---|
| Latest TS Date | 5/6/2020 | 5/12/2020 |
| Borrower | Newly-formed unrestricted subsidiary ("IPCo") | Same |
| New Money Amount | New money $[150-200]mm Term B-1 Loans ("Term B-1 Loans") | New money $[200]mm Term B-1 Loans ("Term B-1 Loans") |
| Exchange Amount | $[240-250]mm term B-2 Loans ("Term B-2 Loans") comprised of existing $[190]mm 1L and $[92]mm 2L TL held by Barings exchanged at [TBD] <br> ▸ Implies a blended exchange ratio of ~90 assuming $245mm Term B-2 Loans based on Baring's existing 1L and 2L holdings | $[130]mm term B-2 Loans ("Term B-2 Loans") comprised of existing $[190]mm 1L TL and $[82]mm 2L held by Barings exchanged at 57.5 and 35, respectively |
| Collateral | 1L on all equity interests in and assets of IPCo, including the IP assets, the license agreement between IPCo and SSB, any third party licensing agreements, bank accounts and any 1L and 2L Exchanged Loans held by the IPCo | 1L on all equity interests in and assets of IPCo, including (i) certain Simmons / T&N trademarks, including associated goodwill, patents and domain names related to the manufacture, marketing and sale of Simmons, Beautyrest and Tuft & Needle products, including royalty streams associated with certain third-party licenses, (ii) license agreement between IPCo and SSB, (iii) third party licensing agreements, (iv) interco notes created from Term B-1 Loans proceeds, and (v) pledge of 82% interest in Serta, Inc. (or transfer of such share ownership) |
| Pricing | L + [500 – 700] cash | L + [600] cash / [200] PIK on Term B-1 Loans <br> L + [400] cash / [300] PIK on Term B-2 Loans |
| OID / Fees | None | Same |
| Tenor | November 6th, 2023 | November 6th, 2024 |
| Amortization | 1.0% per annum | 1.0% per annum only on the Term B-1 Loans |
| Prepayments | Optional prepayments and mandatory prepayments, including 100% of excess cash flow | Optional prepayments and mandatory prepayments |
| Prepayment Penalty | Make-whole prepayment premium payable upon acceleration | NC1 / 104 / 102 on Term B-1 Loans; also payable on acceleration <br> No prepayment penalty on Term B-2 Loans |
| Contingent Value Right | Terms TBD | Same |
| Financial Covenants | Minimum interest coverage ratio and debt to total asset ratio | Minimum interest coverage ratio |
| Negative Covenants | Customary for such facilities, including no restricted payments, no investments, no dispositions and no indebtedness or liens other than subordinated debt up to [a max debt / total asset ratio TBD][an amount not to exceed, together with the IP Term Loan Facility, $[700-750]mm] | Up to $[TBD]mm of pari passu indebtedness, subject to lender consent, and no $[TBD]mm of permitted junior lien indebtedness <br> Permitted sale / disposition of SSB's stake in the China JV |

EVERCORE   Weil
Source: Investor Term Sheets

6

Confidential
Confidential

SSB_LCM_00088589
SSB_ADVERSARY00088569

**Debtors' Exhibit No. 145**
**Page 12 of 30**

# Lender Outreach



DocuSign Envelope ID: 3E2CC1B0-9424-4F86-816E-90650C0F9FA6

Prepared at Request of Counsel
Attorney Work Product
Privileged & Confidential

## Other IPCo Financing Term Sheet Summaries

| | | **Fortress** | **TPG Sixth Street Partners** |
|---|---|---|---|
| | Latest TS Date | ▪ 5/11/2020 (revised to contemplate enhanced collateral package) | ▪ 5/8/2020 (revised to contemplate enhanced collateral package) |
| **New Money** | Amount | ▪ $200mm 1L TL | ▪ $225mm 1L TL |
| | Collateral | ▪ 1L on all assets of IPCo, incl. Simmons and T&N IP and internal / external licensing agreements; pledge of IPCo stock, and guarantee from new Serta HoldCo secured by pledge of 82% of Serta, Inc. stock and manufacturing facilities<br>▸ Portion of IPCo 1L TL will finance interco note between IPCo and SSB, which will be pledged to provide additional credit support at IPCo<br>▸ Interco note to be pari passu with existing 1L TL | ▪ 1L on all assets of IPCo, incl. Simmons and T&N IP and internal / external licensing agreements; pledge of IPCo stock, mortgages on manufacturing facilities, and guarantee from new Serta HoldCo and NBC, or pledge of 82% of Serta, Inc. stock<br>▸ Portion of IPCo 1L TL proceeds will finance interco note between IPCo and SSB, which will be pledged to provide additional credit support at IPCo<br>▸ Interco note to be pari passu with existing 1L TL |
| | Pricing | ▪ L + 750 cash, + 250 PIK<br>▪ 1.00% LIBOR floor<br>▪ Default rate: 4.0% | ▪ LIBOR + 800 cash, + 300 PIK<br>▪ 2% LIBOR floor |
| | OID / Fees | ▪ 96 OID | ▪ Closing Fee: 3%<br>▪ Admin Fee: $100K per annum<br>▪ Expense Deposit: $200K |
| | Tenor | ▪ November 8, 2024 (coterminous with existing 2L TL) | ▪ November 8, 2024 (coterminous with existing 2L TL)<br>▪ Springing maturity to existing 1L TL maturity |
| | Amortization | ▪ None | ▪ 0% / 5% / 7.5% per annum, payable quarterly |
| | Prepayment Penalty | ▪ Non-Call 2 / 103 / 101 / Par | ▪ Non-Call Life |

Source: Investor Term Sheets

EVERCORE  Weil

7

Confidential
Confidential

SSB_LCM_00088590
SSB_ADVERSARY00088590

**Debtors' Exhibit No. 145**
**Page 13 of 30**



43

# Lender Outreach





# Company Negotiated with More Than 70%

DocuSign Envelope ID: 3C3CC1B9-9434-4F90-B16E-66658C0F9FA8

Prepared at Request of Counsel
Attorney Work Product
Privileged & Confidential

## Estimated Cost Basis of Key Existing 1L and 2L Lenders

($ in millions)

| Lender | Amount Outstanding - 5/11 | | NDA | | Cost Basis Estimate | |
|---|---|---|---|---|---|---|
| | 1L | 2L | 1L | 2L | 1L | 2L |
| Angelo | $230 | $40 | | | 58 | 28 |
| Gamut | 158 [1] | - | | | 52 | - |
| Apollo | TBD [2] | - | | | Assumed low | - |
| **PJT / Paul Weiss** | **$386** | $40 | $593 | $41 | 56 | 28 |
| **Barings** | **$190** | $81 | $200 | $90 | 97 | 87 |
| Credit Suisse | $227 | $63 | | | 95 | 65 |
| Eaton Vance | 218 | - | | | 96 | - |
| THL / First Eagle | 77 | - | | | 90 | - |
| Invesco | 71 | 24 | | | 86 | 42 |
| PGIM | 53 | - | | | 95 | - |
| MJX | 47 | - | | | 97 | - |
| Marble Point | 27 | 7 | | | 95 | 78 [3] |
| Blackrock | 23 | 7 | | | 98 | 86 |
| Symphony | 12 | 13 | | | 97 | 74 |
| **Gibson Dunn / Centerview** | **$766** | $114 | $741 | $113 | 94 | 63 |
| **Oaktree** | **$59** | $1 | NA | NA | 88 | 78 [3] |
| TPG | - | 43 | NA | NA | - | 43 |

Source: Adhock, 800, UBS and Markit
1. Holdings are an assignment
2. Paul Weiss is confirming holdings
3. Estimate based on average trading price between initial allocation and first available lender list as of 10/11/2019

EVERCORE  [illegible]

11

Confidential
Confidential

SSB_LCM_00088595
SSB_ADVERSARY00088595

Debtors' Exhibit No. 145
Page 18 of 30



45

# AG Group Proposal



46

# AG Group Proposal



DocuSign Envelope ID: 3E2CC1B9-9424-4F99-B16E-98559C0F9FA5

Prepared at Request of Counsel
Attorney Work Product
Privileged & Confidential

## Angelo Gordon Group's IPCo Financing Term Sheet (Bid / Ask)

| | | Exchange Debt at UnSub | Exchange Debt at UnSub Proposed Counter |
|---|---|---|---|
| **Latest TS Date** | ■ | 5/4/2020 | 5/12/2020 |
| **Borrower** | ■ | Newly-formed unrestricted subsidiary | Same |
| **Guarantor** | ■ | Immediate parent of Borrower, also a newly-formed unrestricted subsidiary | Same |
| **Amount** | ■ | $435mm new 1L TL ▸ $493mm existing 1L TL exchanged at ratio of 85% and $41mm existing 2L TL exchanged at ratio of 40% | $270mm new 1L TL ▸ $445mm existing 1L TL exchanged at ratio of 57.5% and $41mm existing 2L TL exchanged at ratio of 35% |
| **Collat...** | ■ | ...n Borrower equity and all assets, including (i) acquired loans ...SB, (ii) T&N business, (iii) [TBD%] of outstanding equity in ..., and (iv) Simmons 3rd party licensing revenue | 1L on all Borrower equity and assets, including (i) certain Simmons / T&N trademarks, including associated goodwill, patents and domain names related to the manufacture, marketing and sale of Simmons, Beautyrest and Tuft & Needle products, including royalty streams associated with certain third-party licenses, and (ii) intercompany license between Borrower and SSB |
| | ■ | ...value [TBD%] | Same |
| **...rtization** | ■ | None | Same |
| **Mandatory Prepayments** | ■ | 100% of proceeds from (i) debt issuances after closing, (ii) asset sale proceeds, (iii) casualty and condemnation proceeds (iv) tax refunds, and (v) other extraordinary receipts | 100% of proceeds from (i) debt issuances after closing, (ii) asset sale proceeds, and (iii) casualty and condemnation proceeds |
| **Prepayment Penalty** | ■ | T+50bps make-whole premium prior to maturity | None |
| **Financial Covenants** | ■ | None | Same |
| **Other** | ■ | Borrower shall pay all advisor fees and expenses ■ AG, Apollo and Gamut to receive pro rata rights to exchange existing 2L TL after closing at an exchange ratio of 40% for additional loans ■ Exchanged existing 1L / 2L loans to remain outstanding at Borrower | Borrower shall pay all advisor fees and expenses ■ Up to $[TBD]mm of pari passu indebtedness, subject to lender consent, and up to $[TBD]mm of permitted junior lien indebtedness |

**Amount**
- $435mm new 1L TL
  - ▸ $493mm existing 1L TL exchanged at ratio of 85% and $41mm existing 2L TL exchanged at ratio of 40%

EVERCORE   Weil
Source: Investor Term Sheets

5

Confidential
Confidential

SSB_LCM_00088588
SSB_ADVERSARY00088588

**Debtors' Exhibit No. 145**
**Page 11 of 30**

47

# AG Group Proposal



DocuSign Envelope ID: 3E2CC1B9-9424-4F99-816E-98559C0F9FA8

Prepared at Request of Counsel
Attorney Work Product
Privileged & Confidential

## Angelo Gordon Group's IPCo Financing Term Sheet (Bid / Ask)

| | New Money Financing | New Money Financing Proposed Counter |
|---|---|---|
| Latest TS Date | 5/4/2020 | 5/12/2020 |
| Borrower | Newly-formed non-guarantor restricted subsidiary | Same |
| Guarantor | Immediate parent of Borrower, also a newly-formed non-guarantor restricted subsidiary | None |
| Amount | $285mm new 1L TL • $200mm new money plus $100mm of existing 1L TL exchanged at an exchange ratio of 85% | $285mm new 1L TL • $200mm new money plus $148mm of existing 1L TL exchanged at an exchange ratio of 57.5% |
| Collateral | 1L on Borrower equity and all assets, including: (i) Simmons and Tuft & Needle ("T&N") IP; (ii) [TBD%] of outstanding equity in Serta, Inc., (iii) Simmons' 3rd party licensing revenue, and (iv) real estate, facilities and equipment | 1L on Borrower equity and all assets, including: (i) certain Simmons / T&N trademarks, including associated goodwill, patents and domain names related to the manufacture, marketing and sale of Simmons, Beautyrest and Tuft & Needle products, including royalty streams associated with certain third-party licenses, (ii) intercompany license between Borrower and SSB, (iii) pledge of 62% of Serta, Inc. equity (excl. AI Dream), and (iv) pledge of the equity of the guarantor under the Unrestricted Subsidiary facility |
| | Maximum loan-to-value [TBD%] | Same |

**1L on Borrower equity and all assets, including: (i) Simmons and Tuft & Needle ("T&N") IP, (ii) [TBD%] of outstanding equity in Serta, Inc., (iii) Simmons' 3rd party licensing revenue, and (iv) real estate, facilities and equipment**

**Collateral**

**Maximum loan-to-value [TBD%]**

EVERCORE   Weil
Source: Investor Term Sheets

4

Confidential
Confidential

SSB_LCM_00088587
SSB_ADVERSARY00088587

**Debtors' Exhibit No. 145**
**Page 10 of 30**



# AG Group Proposal Would Have Subordinated Lenders



**Theodore Kwon**





| | |
|---|---|
| 7 | THE COURT:  Right.  So the participating lenders |
| 8 | would have had senior debt as to the non-participating |
| 9 | lenders.  Correct? |
| 10 | THE WITNESS:  On just the moved collateral. |
| 11 | THE COURT:  I get that you want to -- I get that you |
| 12 | want to limit it, I don't have to suffer that like |
| 13 | Mr. Ruzinsky does.  Just answer the question. |
| 14 | THE WITNESS:  Yeah. |

Trial Transcript 5/18/23 AM Pg. 100:7-14

49

# AG Group Proposal Would Have Subordinated Lenders



**Theodore Kwon**





22  Q    The existing first lien holders in a dropdown transaction

23  would lose priority with respect to claims against any

24  transferred collateral, correct?

25  A    That's correct.

Trial Transcript 5/18/23 AM Pg. 57:22-25

# Would Have Involved Limited Set of Lenders



**Theodore Kwon**





```
 9      Q    So you would agree with me that both offers involved a

10      limited set of lenders.  Right?

11      A    Right.
```

Trial Transcript 5/18/23 AM Pg. 96:9-11

# AG Group Proposal Would Have Utilized Section 9.05(g)





**Transaction Steps**

4. Company uses a portion of debt proceeds to purchase AHG loans at a discount to par and then cancel loans under §9.05(g)

Debtors' Exhibit No. 65
Page 6 of 15

Debtors Exhibit 65 at 3, 6 (ECF 862-9)



52

# Apollo Believed Its Proposal Was In Good Faith



**Theodore Kwon**





| 15 | Q | And you would agree with me that, when Apollo was |
|---|---|---|
| 16 | | negotiating for that more senior position to jump the other |
| 17 | | 1-Ls, that it was acting in good faith, -- |
| 18 | A | Yes. |
| 19 | Q | -- right? |
| 20 | A | In reaction to the company's request, yes. |

Trial Transcript 5/18/23 AM Pg. 75:15-20

# Angelo Gordon Believed Its Proposal Was In Good Faith



**Request No. 6:**  Admit that You believed you acted in good faith in proposing the Alternative Transaction.

**Response to Request No. 6:**

Angelo Gordon incorporates the foregoing General Objections as if fully set forth herein.  Angelo Gordon objects to this Request on the grounds that it is neither relevant to the claims or defenses of any party nor proportional to the needs of the case, particularly to the extent that it seeks information about debt transactions other than the Transaction.  Angelo Gordon further objects to this Request to the extent it seeks an admission as to a legal matter, as opposed to the truth of a matter relating to facts, the application of law to fact, or opinions about either, and thus exceeds the scope of Rule 36(a)(1) of the Federal Rules of Civil Procedure.

Subject to and without waiving the foregoing General and Specific Objections, Angelo Gordon admits that at all times it acted in good faith when negotiating the unconsummated Alternative Transaction with Angelo Gordon, Gamut, and Serta Simmons Bedding.

# Angelo Gordon Proposal





Debtors Exhibit 29 at 2, 4 (ECF 861-23)

55

# Additional Basket Capacity





# Angelo Gordon Proposal



**Roopesh Shah**



8    Q     Now, let's look at the last bullet under transaction

9    steps; do you see where it says:

10        "Company uses excess debt proceeds to opportunistically

11   purchase 1-L/2-L term loans in the open market or subsequent

12   transactions?"

13        What did you understand that step of their proposal was

14   about?

15   A     It was to use either the cash that they had put in or

16   further exchange capacity to go out and repurchase other

17   nonparticipants, participants away from Angelo Gordon at

18   that time.

19   Q     And is this any different than what Serta did after the

20   transaction was announced?

21   A     I think it's the same thing.

# June 20, 2020 Finance Committee Meeting





## Summary of Total Inbounds Received

($ in millions)

| Lender | Latest Stated Holdings 1L TL | Latest Stated Holdings 2L TL | Exchange Debt | Discount Capture | Change in Int. Expense |
|---|---|---|---|---|---|
| **Inbounds Received:** | | | | | |
| Monarch | $ – | $44 | $17 | $27 | ($3) |
| Parkwood (Barings LP) | 3 | – | 2 | 1 | 0 |
| Arrowmark | 11 | 10 | 12 | 9 | (0) |
| Marble Point | 27 | 7 | 22 | 11 | 0 |
| Marathon | 6 | – | 4 | 2 | 0 |
| Venor (Non-SMA Holdings) | – | 7 | 3 | 4 | (0) |
| Alcentra | 28 | – | 21 | 7 | 1 |
| New York Life | 22 | – | 16 | 6 | 0 |
| Venor (SMA Holdings) | – | 21 | – | – | – |
| PIMCO | 17 | – | 12 | 4 | 0 |
| Loomis Sayles | 15 | 2 | 12 | 5 | 0 |
| Columbia Management | 14 | 2 | 11 | 5 | 0 |
| Trimaran | 12 | – | 9 | 3 | 0 |
| Z Capital Credit | 12 | – | 9 | 3 | 0 |
| Palmer Square | 11 | – | 8 | 3 | 0 |
| Victory Capital | 11 | – | 8 | 3 | 0 |
| Metlife | 2 | 7 | 4 | 5 | (0) |
| HSBC | 4 | 5 | 5 | 4 | (0) |
| Tall Tree | 9 | – | 6 | 2 | 0 |
| Chicago Fundamental | 7 | – | 5 | 2 | 0 |
| Napier Park | 5 | – | 4 | 1 | 0 |
| Pacific Coast Bankers' Bank | 1 | – | 1 | 0 | 0 |
| **Total Inbounds Received** | **$218** | **$105** | **$194** | **$108** | **($1)** |
| *% of Tranche Outstanding* | *11.5%* | *24.6%* | | | |

1. Not looking to participate at this time

EVERCORE   Weil

3



58

# June 20, 2020 Finance Committee Meeting



**Transaction Participants and Proposed Additional Participants** *($ in millions)*

### Summary of Current and Proposed Transaction Participants

| Lender | Latest Stated Holdings 1L TL | Latest Stated Holdings 2L TL | Exchange Debt | Discount Capture | Change in Int. Expense |
|---|---|---|---|---|---|
| **TSA Participants:** | | | | | |
| Eaton Vance | $219 | $ - | $162 | $57 | $4 |
| CSAM | 206 | 63 | 177 | 92 | 0 |
| First Eagle | 72 | - | 53 | 19 | 1 |
| Invesco | 67 | 24 | 59 | 32 | (0) |
| PGIM | 53 | - | 39 | 14 | 1 |
| MJX | 47 | - | 35 | 12 | 1 |
| BlackRock | 23 | 7 | 20 | 10 | 0 |
| Symphony | 12 | 13 | 14 | 11 | (0) |
| Barings | 190 | 82 | 173 | 100 | (1) |
| Oaktree | 59 | - | 44 | 15 | 1 |
| TPG | 1 | 43 | 17 | 26 | (2) |
| **Total Through TSA Part.** | **$949** | **$231** | **$792** | **$387** | **$4** |
| % of Tranche Outstanding | 50.3% | 54.0% | | | |
| | | | | | |
| **Additional Participants:** | | | | | |
| ① Monarch | $ - | $44 | $17 | $27 | ($3) |
| Parkwood (Barings LP) | 3 | - | 2 | 1 | 0 |
| ② Arrowmark | 11 | 15 | 17 | 3 | (0) |
| **Total Through Additional Part.** | | | | | $1 |
| % of Tranche Outstanding | | | | | |
| | | | | | |
| **Proposed Participants:** | | | | | |
| ③ Marble Point | | | | | $0 |
| ④ Marathon | | | | | 0 |
| ⑤ Venor (Non-SMA Holdings) | | | | | (0) |
| **Total Through Proposed Part.** | | | | | $1 |
| % of Tranche Outstanding | | | | | |
| | | | | | |
| Total Exchange Capacity | | | | | |
| (-) Exchanged Debt Through Propose | | | | | |
| **Total Remaining Exchange Capac** | | | | | |

Source: TSA and NDA

EVERCORE | Weil

**Additional Participants:**
① Monarch
Parkwood (Barings LP)
② Arrowmark
**Total Through Additional Part.**
*% of Tranche Outstanding*

**Proposed Participants:**
③ Marble Point
④ Marathon
⑤ Venor (Non-SMA Holdings)

### Rationale for Proposed Participants

① Largest 2L only TL holder (excluding TSA participants). Offers ~$27mm of discount capture and ~$3mm of interest savings

② Large 1L and 2L TL crossholder; provides $9mm of discount capture and is roughly interest breakeven

③ Large 1L and 2L TL crossholder; Provides $11mm of discount capture and is roughly interest breakeven

④ Small but very sophisticated and vocal lender; utilizes only ~$4mm of exchange capacity

⑤ 2L only lender; provides ~$4mm incremental discount capture and ~$400K of interest savings

# Defendants Abandon Subsequent Purchases Theory



| 14 | option fell apart.  And there's going to be a lot of evidence |
| 15 | about who got to be in and who got to be out of it.  **I'm not** |
| 16 | **talking about subsequent purchases,** those are fine.  I'm |
| 17 | talking about who got included in the transaction that they |
| 18 | needed to get the 50.1 percent. |

Trial Transcript 5/15/23 AM Pg. 71:14-18

60

# SSB Did Not Breach the Implied Covenant

- SSB entered into the 2020 Transaction because it was in financial trouble.

- SSB engaged in a good faith competitive process.

- **SSB's independent finance committee evaluated the various proposals and selected the best deal.**



61

# Benefits of the 2020 Transaction

- **$200M in new money**

- **Debt discount capture of ~$400M**

- **Decreased total debt by ~$200M**

- **Lower interest payments than alternative**

- **Did NOT require transfer of IP and/or royalty streams as collateral to PTL loans**

- **Did NOT strip any existing 1L Lenders of collateral**

- **Had support of more lenders**

- **Provided flexibility for future transactions**



62

# Angelo Gordon Admits Benefits of 2020 Transaction





Debtors Exhibit 266 at 2, 24 (ECF 866-3)

63

# Serta First Lien Debt Price





# Defendants' Theory #1 - Company Solicited IPCo



# Defendants' Theory #1 - Company Solicited IPCo



# Defendants' Theory #2 - Never Contemplated Subordination

**Defendants' Theories**

**The Evidence**

Company Solicited IPCo

**Angelo Gordon Group Proposed IPCo First**

**Credit Agreement Never Contemplated Subordination**



67

# Defendants' Theory #2 - Never Contemplated Subordination

| Defendants' Theories | The Evidence |
|---|---|
| Company Solicited IPCo | Angelo Gordon Group Proposed IPCo First |
| Credit Agreement Never Contemplated Subordination | Angelo Gordon Group Proposed Subordination Through IPCo |



68

# Defendants' Theory # 3 – Novel Transaction

**Defendants' Theories**

**The Evidence**

Company Solicited IPCo

Angelo Gordon
Group Proposed IPCo First

Credit Agreement Never
Contemplated Subordination

Angelo Gordon Group Proposed
Subordination Through IPCo

No Deal Like the 2020 Transaction
Had Ever Been Done Before



69

# Defendants' Theory # 3 – Novel Transaction



**Roopesh Shah**





11  Q    And you're not aware of any such transaction that

12  anyone in the market had worked on with all of those

13  elements together?

14  A    I'm not sure if that's the case. I thought there has

15  been some precedent transactions where those elements were

16  present.

Trial Transcript 5/15/23 PM Pg. 83:11-16



# Defendants' Theory # 3 – Novel Transaction



**DAVIS MEIERING**





> 20   Q   Now, the Defendants in this case have argued that the
> 21   2020 transaction that Serta did engage in was, quote,
> 22   "Unprecedented and contrary to the expectations of the
> 23   markets and the parties."
> 24      What's your reaction to that?
> 25   A   I mean, I find that a bit surprising and contrary to
> 1   the expectation of the parties because from an economic
> 2   perspective, their proposal had a lot of similarities.
> 3      You know, from the market broadly, look, I mean, you
> 4   don't see these types of transactions every day.  And, you
> 5   know, maybe there are some nuances to this one.  ==But similar==
> 6   ==types of, you know, transactions that have similar economic==
> 7   ==features have certainly occurred.  So I don't think it==
> 8   ==should have been unexpected.==

# Defendants' Theory # 3 – Novel Transaction



**Michael Searles**





| | | |
|---|---|---|
| 24 | Q | So just I'm clear on the answer -- |
| 25 | A | Yeah. |
| 1 | Q | -- to the question, pre-Serta, specifically with these |
| 2 | | components, did you ever participate in a priming facility |
| 3 | | that was also combined with a debt exchange at a discount? |
| 4 | A | I do believe so, yes, but when you say I think the |
| 5 | | opening was something around specifically more specific to |
| 6 | | it, an exact transaction like this, though. |
| 7 | Q | All right. |
| 8 | A | Again, I'll say generally speaking, yes. |

Trial Transcript 5/17/23 PM Pg. 63:24-64:8

72

# Defendants' Theory # 3 – Novel Transaction



**Michael Searles**





9  Q    You have no more specifics to offer on the deals you

10 have in mind?

11 A    I don't believe you asked me specifically about deals,

12 but I'm happy to give you a sense of some that we have done.

13 Murray Energy we were involved with, Cineworld to a certain

14 extent was somewhat similar in a number of different

15 instances that was [indiscernible 3:31:36] world.  In a high

16 yield world I think we've done a couple of -- Apollo had one

17 that was a 1-1/8 lien I believe at one point.  Now again,

18 different transactions, different circumstances, but there

19 were serial exchanges, some involved new money, some didn't.

Trial Transcript 5/17/23 PM Pg. 64:9-19

# Defendants' Theory # 3 – Novel Transaction

| Defendants' Theories | The Evidence |
|---|---|
| Company Solicited IPCo | Angelo Gordon Group Proposed IPCo First |
| Credit Agreement Never Contemplated Subordination | Angelo Gordon Group Proposed Subordination Through IPCo |
| No Deal Like the 2020 Transaction Had Ever Been Done Before | Many Deals Are Similar to the 2020 Transaction |



74

# Defendants' Theory # 4 - Advent Would Never Deal with Apollo

| Defendants' Theories | The Evidence |
| --- | --- |
| Company Solicited IPCo | Angelo Gordon Group Proposed IPCo First |
| Credit Agreement Never Contemplated Subordination | Angelo Gordon Group Proposed Subordination Through IPCo |
| No Deal Like the 2020 Transaction Had Ever Been Done Before | Many Deals Are Similar to the 2020 Transaction |
| Advent Would Never Deal With Apollo | |



75

# Defendants' Theory # 4 - Advent Would Never Deal with Apollo



| | |
|---|---|
| 1 | And you're going to hear evidence that Advent, which |
| 2 | owned Serta, was the controlling shareholder and Mr. Prince, |
| 3 | they didn't really want to do a deal that involved Apollo |
| 4 | because they were competitors and they didn't want to have a |
| 5 | credit where Apollo had an interest. So and that of course is |

# Defendants' Theory # 4 - Advent Would Never Deal with Apollo



**Roopesh Shah**



21    FEMALE SPEAKER: "Did Mr. Prince ever express a

22 view to you about whether or not he was willing to do a

23 transaction with the group that included Apollo?"

24    THE WITNESS: I believe he was supportive of doing

25 a transaction with Apollo while we were negotiating it.

1 Certainly, by June 4th or 5th, his recommendation or his

2 viewpoint had changed.

3 BY MR. SEILER:

4 Q    So, even though they were on the DQ List, he was

5 supportive of doing a transaction with a group that included

6 Apollo?

7 A    Yes.

8 Q    And he told you that?

9 A    That's why were negotiating with his knowledge and

10 understanding, and there was no other alternative until the

11 very wee last few days.  So, yes.

Trial Transcript 5/15/23 PM Pg. 96:21-97:11

# Defendants' Theory # 4 - Advent Would Never Deal with Apollo



InstantBloomberg:dmeiering (2020-06-05T10:02:50-0400):
Advent earmarked Barings, Oaktree, and TPG to fill the gap

Defendants Exhibit 175 at 2-3 (ECF 250-82)

# Defendants' Theory # 4 - Advent Would Never Deal with Apollo

| Defendants' Theories | The Evidence |
|---|---|
| Company Solicited IPCo | Angelo Gordon Group Proposed IPCo First |
| Credit Agreement Never Contemplated Subordination | Angelo Gordon Group Proposed Subordination Through IPCo |
| No Deal Like the 2020 Transaction Had Ever Been Done Before | Many Deals Are Similar to the 2020 Transaction |
| Advent Would Never Deal With Apollo | Advent Would Deal With Apollo |



79

# Defendants' Theory # 5 - Advent Decided Who Participated

| Defendants' Theories | The Evidence |
|---|---|
| Company Solicited IPCo | Angelo Gordon Group Proposed IPCo First |
| Credit Agreement Never Contemplated Subordination | Angelo Gordon Group Proposed Subordination Through IPCo |
| No Deal Like the 2020 Transaction Had Ever Been Done Before | Many Deals Are Similar to the 2020 Transaction |
| Advent Would Never Deal With Apollo | Advent Would Deal With Apollo |
| Advent Decided Who Participated | |



80

# Defendants' Theory # 5 - Advent Decided Who Participated



**Harvey Tepner**





| 1 | Q   After the transaction was announced to the public, did |
|---|---|
| 2 | the company allow certain other lenders to participate? |
| 3 | A   Yes, they did. |
| 4 | Q   And who made the decision to allow them to participate? |
| 5 | A   The ultimate decision was made by the Finance Committee. |

Trial Transcript 5/16/23 PM Pg. 39:1-5

# Defendants' Theory # 5 - Advent Decided Who Participated

| Defendants' Theories | The Evidence |
|---|---|
| Company Solicited IPCo | Angelo Gordon Group Proposed IPCo First |
| Credit Agreement Never Contemplated Subordination | Angelo Gordon Group Proposed Subordination Through IPCo |
| No Deal Like the 2020 Transaction Had Ever Been Done Before | Many Deals Are Similar to the 2020 Transaction |
| Advent Would Never Deal With Apollo | Advent Would Deal With Apollo |
| Advent Decided Who Participated | The Independent Finance Committee Decided Who Participated |



82

# Defendants' Theory # 6 - LCM's Alleged Expectations

| Defendants' Theories | The Evidence |
| --- | --- |
| Company Solicited IPCo | Angelo Gordon Group Proposed IPCo First |
| Credit Agreement Never Contemplated Subordination | Angelo Gordon Group Proposed Subordination Through IPCo |
| No Deal Like the 2020 Transaction Had Ever Been Done Before | Many Deals Are Similar to the 2020 Transaction |
| Advent Would Never Deal With Apollo | Advent Would Deal With Apollo |
| Advent Decided Who Participated | The Independent Finance Committee Decided Who Participated |
| LCM's Alleged Expectations | |



83

# Defendants' Theory # 6 - LCM's Alleged Expectations

| Defendants' Theories | The Evidence |
| --- | --- |
| Company Solicited IPCo | Angelo Gordon Group Proposed IPCo First |
| Credit Agreement Never Contemplated Subordination | Angelo Gordon Group Proposed Subordination Through IPCo |
| No Deal Like the 2020 Transaction Had Ever Been Done Before | Many Deals Are Similar to the 2020 Transaction |
| Advent Would Never Deal With Apollo | Advent Would Deal With Apollo |
| Advent Decided Who Participated | The Independent Finance Committee Decided Who Participated |
| LCM's Alleged Expectations | LCM Never Appeared |



84

# LCM = Non-PTL Lenders



```
 6              THE COURT:  But you don't think the facts would

 7    support reaching different answers, is that --

 8              MR. LIEBERMAN:  I think the facts support reaching

 9    the answer we're advocating across the board.

10              THE COURT:  Okay.

11              MR. LIEBERMAN:  I mean, I don't think that it's

12    necessary to -- I wouldn't distinguish as I think we're

13    talking about their conduct, vis-à-vis lenders that are

14    excluded from --

15              THE COURT:  Okay.

16              MR. LIEBERMAN:  -- the transaction.
```

# Defendants' Theory # 7 - Amendments Were Improper

| Defendants' Theories | The Evidence |
|---|---|
| Company Solicited IPCo | Angelo Gordon Group Proposed IPCo First |
| Credit Agreement Never Contemplated Subordination | Angelo Gordon Group Proposed Subordination Through IPCo |
| No Deal Like the 2020 Transaction Had Ever Been Done Before | Many Deals Are Similar to the 2020 Transaction |
| Advent Would Never Deal With Apollo | Advent Would Deal With Apollo |
| Advent Decided Who Participated | The Independent Finance Committee Decided Who Participated |
| LCM's Alleged Expectations | LCM Never Appeared |
| Amendments Were Improper | |



86

# Defendants' Theory # 7 - Amendments Were Improper



269.    Serta and the Favored Lenders cannot point to a *single* comparable precedent transaction that has qualified as an "open market purchase."  In the litigation that has occurred to date, Serta and the Favored Lenders have cited a handful of transactions as purportedly adopting their contorted view of "open market purchases," but such transactions involved *solely new money* loans.  ==The Excluded Lenders do not dispute that the new money aspect of the Unlawful Exchange Transaction was permitted, since new money loans could be given priority without a unanimous vote.==  The non-*pro rata* payment of the Favored Lenders' First Lien Term Loans using new Priority Term Loans violated the Credit Agreement's requirement that all First Lien Term Loans share ratably in payments.  None of the so-called precedent transactions cited by Serta and the Favored Lenders included an exchange of existing loans on a non-*pro rata* basis.

Answering Defendants' Amended Counterclaims and Third-Party Claims Against Serta and Favored Lenders (ECF 148 ¶ 269)

87

# Defendants' Theory # 7 - Amendments Were Improper



**Karn Chopra**





16    Q    And you needed to be at least 50.1 percent because you

17    knew amendments were required and that was the minimum

18    required to do amendments?

19    A    For the amendment required to facilitate the $200 million

20    new money superpriority financing, correct.

Trial Transcript 5/17/23 AM Pg. 12:16-20

# Defendants' Theory # 7 - Amendments Were Improper



**Theodore Kwon**





```
3    Q    Sure.  Would you agree with me that it's common for

4    lenders to make changes by majority vote in a credit agreement

5    that a borrower has already signed.

6    A    Yes, it's common.
```

# Defendants' Theory # 7 - Amendments Were Improper

| Defendants' Theories | The Evidence |
|---|---|
| Company Solicited IPCo | Angelo Gordon Group Proposed IPCo First |
| Credit Agreement Never Contemplated Subordination | Angelo Gordon Group Proposed Subordination Through IPCo |
| No Deal Like the 2020 Transaction Had Ever Been Done Before | Many Deals Are Similar to the 2020 Transaction |
| Advent Would Never Deal With Apollo | Advent Would Deal With Apollo |
| Advent Decided Who Participated | The Independent Finance Committee Decided Who Participated |
| LCM's Alleged Expectations | LCM Never Appeared |
| Amendments Were Improper | Amendments Were Proper |



90

# Defendants' Theory # 8 – Indemnity Was Novel

| Defendants' Theories | The Evidence |
|---|---|
| Company Solicited IPCo | Angelo Gordon Group Proposed IPCo First |
| Credit Agreement Never Contemplated Subordination | Angelo Gordon Group Proposed Subordination Through IPCo |
| No Deal Like the 2020 Transaction Had Ever Been Done Before | Many Deals Are Similar to the 2020 Transaction |
| Advent Would Never Deal With Apollo | Advent Would Deal With Apollo |
| Advent Decided Who Participated | The Independent Finance Committee Decided Who Participated |
| LCM's Alleged Expectations | LCM Never Appeared |
| Amendments Were Improper | Amendments Were Proper |

**Indemnity Was Novel**



91

# Defendants' Theory # 8 – Indemnity Was Novel



3    MR. SEILER:  Well, it shows that they knew that
4    there was a problem.
5          THE COURT:  So let's --
6          MR. SEILER:  That's one thing.
7          THE COURT:   -- it shows -- who's they?
8          MR. SEILER:  The lenders.  It shows that the
9    Priority Lenders appreciated that notwithstanding how things
10   have turned out since Your Honor ruled against us in open
11   market purchase, and they blew against us on good faith and
12   fair dealing.  They cared so much that they wouldn't do the
13   plan unless they got this protection, so that tells us/*sta
14   something about that they knew maybe they were doing something
15   wrong, and that's why we cite the Martha Stewart case in our
16   brief.

# Defendants' Theory # 8 – Indemnity Was Novel



13.5    Payment of Expenses; Indemnification.

(a)    Each of AmSurg Holdings and the Borrower, jointly and severally, agree:

(i)    to pay or reimburse each of the Agents and the Lenders (promptly, and in any event within ten (10) Business Days of written demand) for all their reasonable and documented out-of-pocket costs and expenses (without duplication) incurred in connection with the development, preparation, execution and delivery of, and any amendment, restatement, supplement, modification to, waiver and/or enforcement of this Agreement and the other Credit Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, which, in the case of costs and expenses of counsel, shall be limited to (1) the reasonable fees, disbursements and other charges of one counsel to the Administrative Agent and the Collateral Agent and one counsel to the Lenders taken as a whole (or such other counsel, as may be agreed by the Lenders and the Borrower), one regulatory counsel and (x) one counsel for the Administrative Agent and the Collateral Agent, as applicable, and (y) one counsel for the Lenders, taken as a whole, in each relevant local jurisdiction with the consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed) and (2) the costs of any security interest filing, including the registration tax for any UCC-1 filings or any other security interest filings,

provided that AmSurg Holdings and the Borrower shall have no obligation hereunder to any Indemnified Person with respect to Indemnified Liabilities to the extent arising from (i) the gross negligence or willful misconduct of such Indemnified Person or any of its Related Parties as determined in a final and non-appealable judgment of a court of competent jurisdiction (excluding, in each case, for the avoidance of doubt, arising from any Indemnified Person's participation in the Transactions), (ii) except with respect to the Administrative Agent and its Related Parties, a material breach of the obligations of such Indemnified Person or any of its Related Parties under the terms of this Agreement by such Indemnified Person or any of its Related Parties as determined in a final and non-appealable judgment of a court of competent jurisdiction, or (iii) any proceeding between and among Indemnified Persons that does not involve an act or omission by AmSurg Holdings, the Borrower or any of their Subsidiaries; provided that the Agents, to the extent

(iii)    to pay, indemnify, defend and hold harmless each Lender, each Agent and their respective Related Parties (without duplication) (the "Indemnified Persons") from and against any and all losses, claims, damages, liabilities, obligations, demands, actions (including in connection with any bankruptcy case), judgments, suits, costs, expenses, disbursements or penalties of any kind or nature whatsoever regardless of whether any such Indemnified Person is a party thereto and whether any such proceeding is brought by Enterprise Holdings, Envision Holdings, AmSurg Holdings or any other Person (which, in the case of costs and expenses of counsel, shall be limited to the reasonable and documented out-of-pocket fees, expenses, disbursements and other charges of (x) one firm

93

# Defendants' Theory # 8 – Indemnity Was Novel



**Harvey Tepner**



| 6 | Q    And why did the company provide an indemnity to the PTL |
| 7 | lenders as part of that transaction? |
| 8 | A    One of -- one of the reasons was that it was fraught with |
| 9 | litigation risk and we needed a proper economic inducement for |
| 10 | the PTL lenders to participate and go through with providing |
| 11 | new money and providing the discount that the company needed. |

Trial Transcript 5/16/23 PM Pg. 41:6-11



94

# Defendants' Theory # 8 – Indemnity Was Novel

| Defendants' Theories | The Evidence |
|---|---|
| Company Solicited IPCo | Angelo Gordon Group Proposed IPCo First |
| Credit Agreement Never Contemplated Subordination | Angelo Gordon Group Proposed Subordination Through IPCo |
| No Deal Like the 2020 Transaction Had Ever Been Done Before | Many Deals Are Similar to the 2020 Transaction |
| Advent Would Never Deal With Apollo | Advent Would Deal With Apollo |
| Advent Decided Who Participated | The Independent Finance Committee Decided Who Participated |
| LCM's Alleged Expectations | LCM Never Appeared |
| Amendments Were Improper | Amendments Were Proper |
| Indemnity Was Novel | Indemnity Was Routine |

95



# Confirmation Supplemental Briefing Topics

**Court's Questions & Considerations**

- At the conclusion of last week's hearing, the Court presented the parties with questions and considerations related to Confirmation of the Plan set out below, in addition to those covered by David Lender, including

  – Propriety of the Indemnity Claim: business judgment; not economic coercion

  – Absolute Priority Rule: 9019 settlement; lack of standing to object

  – Death Trap: Plan amendment to remove death trap

- The Debtors' Supplemental Brief and the arguments today address each of these topics and are supported by the evidence before the Court



# Plan Settlements

Business Judgment, Indemnity Claims, Feasibility, and Absolute Priority Rule

# Plan Settlements – Section 1123(b)(3)(A) & 9019 Standard

- A chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A)

- In evaluating settlements under section 1123(b)(3)(A), courts apply "the [same] standards used to evaluate compromises under [Bankruptcy] Rule 9019."  *In re Bigler LP*, 442 B.R. 537, 543 n.6 (Bankr. S.D. Tex. 2010) (citing *In re MCorp Fin., Inc.,* 160 B.R. 941, 951 (S.D. Tex. 1993))

- A court may approve a settlement that is "fair and equitable" and "in the best interest of the estate."  *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995)

  - To determine whether a settlement is fair and equitable, courts apply a three part test, and evaluates:

    (i) The probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law;

    (ii) The complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and

    (iii) All other factors bearing on the wisdom of the compromise, including (a) the best interests of the creditors, with proper deference to their reasonable views, and (b) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.

    *See Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.),* 801 F.3d 530, 540 (5th Cir. 2015) (first citing *Jackson Brewing*, 624 F.2d at 602; then *quoting Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.),* 119 F.3d 349, 356 (5th Cir. 1997); and then quoting *Foster Mortg.*, 68 F.3d at 917–18) (internal quotation marks omitted)

- The Plan incorporates appropriate settlements that incorporate fair terms that were negotiated at arms'-length and are in the best interests of the Debtors, their estates, and stakeholders



# The Evidence Overwhelmingly Supports the Plan Settlements

- The Debtors exercised their valid business judgment in entering into the Restructuring Support Agreement with the Consenting Creditors and the Consenting Equity Holders

  – *"It was the best deal for the company at the time. It allowed us to consummate the transaction contemplated by the RSA to get $200 million of cash, 400-plus million dollars of debt reduction, have liquidity in the company, and avoid the pitfall of running out of cash and working capital in the Summer of 2020."* May 16, 2023 Hr'g Tr. 54:4–9 (Tepner)

**Consenting Creditors' Settlement (including Indemnity)**

- Settlement reached with the PTL Lenders, as embodied in the RSA and Plan, meets the controlling standard, is in the best interest of the estates, and should be approved

  – Debtors were unlikely to successfully reorganize without the RSA and believed they had a high probability of success on the merits in the litigation on the 2020 Transaction. See May 16, 2023 Hr'g Tr. 132:6-11 (Tepner) *("And based upon the review of what was happening, the advice of counsel, [the Debtors] believe that the indemnity is proper, that the litigation -- the successful litigation, as I understand it, succeeding under the indemnity under a lack of indemnity against the [PTL Lenders] is small because the transaction was permitted.")*

  – The go-forward indemnity claim was a critical component of the 9019 settlement reached with the PTL Lenders and not a result of collusion or economic coercion.  See May 16, 2023 Hr'g Tr. 139:23 (Tepner) *("Indemnity was a condition of the deal.")*; see also id. at 192:21–193:5 (Chopra) *(testifying that the continuing indemnity was important to the PTL Lenders "in conjunction with their willingness to provide a significant equitization of their debt and to allow the company to emerge on an expeditious basis that the indemnity continue thereafter.")*; see also Disclosure Statement § III.E3.b (noting the Debtors filed their voluntary petitions with approximately $160 million of liquidity on their balance sheet).

# Plan Settlements (Cont'd)

**Consenting Creditors' Settlement (including Indemnity) (Cont'd)**

– The settlement facilitated the Debtors' expeditious chapter 11 process, avoiding value destruction associated with an extended bankruptcy process.  See May 16, 2023 Hr'g Tr. 123:1-9 (Tepner*) ("[I]f we did not do the indemnity today, I don't think we would have a confirmable plan. . . . [the downside of which is] the delay in exiting Chapter 11, the effect on the business, the effect on your customers, the suppliers, employee morale. I think it's a very negative effect.")*

**Consenting Equity Holders' Settlement**

- The Consenting Equity Holders' Settlement is in the best interest of the estates and should be approved

- As a result of the settlements, the Consenting Equity Holders are:

  – Facilitating and cooperating in the implementation of the Plan, including with respect to Restructuring Transactions, through their role as an equity holder and as a party with certain contractual rights vis-à-vis other equity holders (*e.g.,* drag rights), and

  – Through the merger of Dawn Holdings into Dawn Intermediate, transferring certain miscellaneous assets to Dawn Intermediate, all of which unquestionably provide value to the Debtors and their estates

**Creditors' Committee Global Settlement**

- The Debtors exercised their valid business judgment in entering into the Creditors' Committee Global Settlement

  – *"It was one that was actionable to allow us to get to confirmation and try to get out of chapter 11 in a more speedy manner"*
    May 16, 2023 Hr'g Tr. 56:18–20 (Tepner)

- The Creditors' Committee Global Settlement resolved all claims and causes of action purported by the Creditors' Committee, including claims related to the 2020 Transaction

- The Creditors' Committee affirmed the settlement with the PTL Lenders, including the indemnity, in their own settlement, which provides further evidence of the wisdom of the compromise and the wishes of the creditors



100

# The Evidence in Support of the Debtors' Business Judgment is Overwhelming and Unrefuted

- In 2020, as the impact of the COVID-19 pandemic spread throughout the United States forcing businesses to halt operations and customers to quarantine, the Company faced a liquidity crisis

- The Finance Committee was tasked to consider various liability management transactions to address the Company's liquidity concerns, was delegated authority to make all decisions regarding Debtors' restructuring, and ran an independent process with sound governance

  - After weighing multiple proposals through a competitive process, the Finance Committee approved the 2020 Transaction to recapitalize the Company's debt

  - Mr. Shah testified*: "[t]he [PTL Group] proposal was the best in terms of providing the amount of new liquidity the company needed. It provided for greater discount capture. It provided for less interest expense in total. It provided a good step two capacity, and it had the participation and support of a larger number of lenders." See* May 15, 2023 PM Hr'g Tr. 48:10–15

  - Mr. Tepner testified that, in approving the 2020 Transaction, the Finance Committee evaluated several proposals, including from the PTL Group and the Non-PTL Group, *and "selected a modified [PTL Group] proposal which provided for $200 million of new money" because, among other things, it offered a "dramatically different amount of discount capture that was very important to the Company to help them delever its balance sheet." See* May 16, 2023 Hr'g Tr. 37:8–15

- The Finance Committee and Debtors' management were not subject to any undue influence from Debtors' equity sponsors, Advent International, or the PTL Lenders, and negotiations were at arms'-length

101

Case 23-90020 Document 1338 Filed in TXSB on 06/06/23 Page 107 of 124

- In 2022, faced with prolonged macroeconomic uncertainty and looming debt maturities, the Company initiated refinancing efforts before ultimately pursuing restructuring negotiations, culminating in the filing these chapter 11 cases to implement the Plan, which would allow it to continue operating with a substantially healthier balance sheet by restructuring the Debtors' total debt of approximately $1.6 billion
  - Mr. Tepner testified, in early 2022, after experiencing *"severe headwinds in all aspects of its business, including overall market deterioration that affected all mattress producers"* the Company evaluated a refinancing of its debt and *"engaged Evercore to seek potential investors or refinanciers and was not able to obtain new investment."* The Company, through Evercore, *"contacted 20 parties to see if their interest in a $1.6 billion capital raise"* but no parties were interested.  See May 16, 2023 Hr'g Tr. 42:24–43:1, 45:2–3

- The Plan was result of months of rigorous, arms'-length negotiations among Debtors and their key stakeholders, in which Debtors examined all potential strategic options
  - Mr. Tepner testified, the Company *"reached out to its existing lenders for a restructuring transaction"* which included attempts to reach a consensual resolution with the Non-PTL Group.  See May 16, 2023 Hr'g Tr. 47:12–13
  - The Debtors analyzed alternative proposals, including from the PTL Group and the Non-PTL Group, and ultimately determined the proposal from the PTL Group was in the best interests of the Debtors and their estates

- The Debtors continued to assess their options after proposing the Plan, including weighing and analyzing an alternative proposal from Citadel, which was received after the Debtors solicited votes for the Plan
  - Even after the Debtors solicited votes on the Plan, the Finance Committee evaluated and concluded that the alternative proposal from Citadel *"was not in the best interest of the company."*  *See* May 16, 2023 Hr'g Tr. 54:24–25 (Tepner)
  - The Citadel proposal would require re-solicitation, delaying confirmation of the Plan and consequently adversely impacting the Debtors' relationship and reputation with their customers, suppliers, and employees, and financials given the additional expenses associated with remaining in chapter 11.  See May 16, 2023 Hr'g Tr. 122:11–15, 123:6–10 (Tepner); May 17, 2023 PM Hr'g Tr. 141:12–19 (Linker)



# The Debtors' Plan is Feasible and No Evidence Supports a Different Conclusion

- The Plan is feasible if it is not likely to be followed by liquidation or need for further financial reorganization. 11 U.S.C. § 1129(a)(11)

  – Burden of Proof: **Preponderance of the evidence.** *In re Save Our Springs (S.O.S.) Alliance, Inc.,* 632 F.3d 168, 172 (5th Cir. 2011)

  – "[T]he [bankruptcy] court **need not require a guarantee of success** of a reorganization plan. . . [o]nly a reasonable assurance of commercial viability is required." *In re Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1165–66 (5th Cir. 1993)

  – As a matter of law, **"the mere prospect of financial uncertainty cannot defeat confirmation** on feasibility grounds since **a guarantee of the future is not required**." *In re SCC Kyle Partners, Ltd.,* 518 B.R. 393, 406 (W.D. Tex. 2014)

  – "Where the projections are **credible**, based upon the balancing of all testimony, evidence, and documentation, **even if the projections are aggressive, the court may find the plan feasible**." *In re T-H New Orleans,* 116 F.3d 790, 802 (5th Cir. 1997)



# Business Plan is Reasonable and Based on Reasonable Assumptions

- The feasibility analysis relies on Financial Projections that were developed using the Company's Business Plan and based on a detailed set of assumptions that have been pressure tested and benchmarked against the Company's historical financial performance. See May 17, 2023 PM Hr'g Tr. 136:18–138:3 (Linker); May 16, 2023 Hr'g Tr. 59:13–17 (Tepner)
  - When asked how the Debtors prepared the financial projections, Mr. Linker explained that he *"and the management team took upon an exercise to build on a new business plan to turn around the financial performance of the company. So, it was a set of strategic initiatives that would grow our sales, grow our market share, improve our cost structure, improve our profitability. We worked on that for a couple of months and pressure tested those assumptions, and then ultimately, those initiatives and that business plan is what formed the inputs for the financial projections."* May 17, 2023 Hr'g Tr. 137:3–11 (Linker)

- Mr. Linker testified that the Debtors would not include large, contingent assets and liabilities in the Financial Projections where there was uncertainty around the amount and timing of an event. Consistent with this practice, the Debtors did not include any potential cash payments in connection with the indemnification obligation or any potential tax refund in connection with the restructuring in the Financial Projections. Exclusion of such assets and liabilities in the financial projections was an exercise of reasonable business judgment
  - *"[W]ithout knowing the amount and the timing, it's not possible for me to include [the indemnity obligation] in the financial projection."* May 17, 2023 PM Hr'g Tr. 139:16–18 (Linker)
  - *"[S]imilar to the indemnity, there's some uncertainty around the amount we're going to have to work through with the IRS around finalizing the amount, and presumably, there'd be some sort of audit process around a refund of that size, and also, the timing is very much uncertain. So, without knowing the amount or the timing of the payment, or the cash inflow, in that case, we did not include it in the projections."* May 17, 2023 PM Hr'g Tr. 140:4–11 (Linker)

104



# The Debtors' Plan is Feasible

- Debtors have ample liquidity to service future debt payments and the Debtors' reorganization is not likely to be followed by a liquidation or another reorganization

  - *"The cash flow projections of the financial projections show that we're cash flow positive for the period of 2023 to 2027 in the aggregate. So, on that basis, I conclude that the company is able to make all the payments required under the plan. I also conclude that that would mean the company's liquidity position and capital structure would be healthy and not require another restructuring."* May 17, 2023 PM Hr'g Tr. 140:25–141:7 (Linker)

  - Nothing has changed since the Financial Projections were first developed that would cause the Financial Projections to be modified or altered.  *See* May 17, 2023 PM Hr'g Tr. 138:23–139:1 (Linker)



# A Contingent Indemnity Claim Does Not Render Plan Infeasible and Objectors Presented No Evidence to the Contrary

- The structure of the Plan mitigates the risk that the indemnity is called

- The Plan's condition precedent of a favorable ruling on the Adversary Proceeding operates as a safety valve to limit the downside exposure to the Debtors

- The Plan is feasible regardless of whether Debtors are obligated to indemnify the PTL Lenders. See May 16, 2023 Hr'g Tr. 135:7–12 (Tepner) (explaining his probability analysis leading to an estimated indemnity claim of below $200 million which *"might be solvable."*)

- Indemnity Claim will only kick in **if** the Non-PTL Lenders obtain a final non-appealable judgment in their favor, and the likelihood of Non-PTL Lenders prevailing on their Claims and calling the indemnity, and in a manner that renders the Plan infeasible, is unlikely

  - *"But the actual number is unknown because there's an issue of . . . whether the litigation would succeed, whether the strength of the litigation had – could result in damages of a material amount, and there's a series of probabilities. Could the litigation succeed? What would the damages be? And that would form what the potential value is. And based upon the review of what is happening, the advice of counsel, they believe that the indemnity is proper . . . succeeding under the indemnity . . . against the [PTL Lenders] is small because the transaction was permitted."* May 16, 2023 Hr'g Tr. 131:24–132:11 (Tepner)

# Absolute Priority Rule

- Intermediate Equity Interests are receiving value under the Plan in exchange for the consideration they provided to the Debtors pursuant to the Consenting Equity Holders' Settlement (as subsequently settled again pursuant to the Creditors' Committee Global Settlement)

- Holders of Intermediate Equity Interests are not receiving distribution on account of such interests, rather the $1.5 million distribution is consideration for what the Consenting Equity Holders are providing the Debtors
  - *"So that Advent would enact a series of measures that would allow the reorganized company access up to $54 million of potential tax benefits, including tax refunds. And it was seen as a **pretty good trade**."* May 16, 2023 Hr'g Tr. 51:4–9 (Tepner)

- Debtors entered into the Consenting Equity Holders' Settlement in an exercise of their business judgment

- As discussed in slide 100, as part of the Consenting Equity Holders' Settlement, the Consenting Equity Holders are (i) facilitating and cooperating in connection with the implementation of the Plan, inclusive of the Restructuring Transactions as set forth in the Plan Supplement, through their role as an equity holder and as a party with certain contractual rights vis-à-vis other equity holders (e.g., drag rights), and (ii) through the merger of Dawn Holdings, transferring certain miscellaneous assets to Dawn Intermediate, all of which unquestionably provide value to the Debtors and their estates

- The treatment of Consenting Equity Holders under the RSA, implemented by the Plan, does not impact Classes 5, 6A or 6B

- Neither the Non-PTL Lenders nor the LCM Lenders has standing to raise the absolute priority rule objection included in their objections (Docket Nos. 824 and 825) because the recoveries for Classes 5, 6A, and 6B are provided as part of a voluntary carve out from the collateral securing the Class 4 FLSO Claims, and not on account of any value that holders of Class 5 Claims would otherwise be entitled to recover

Exculpations

# Exculpations



# Exculpation Provision: Consistent with Fifth Circuit Case Law

- The inclusion of the Debtors' two independent directors as "Exculpated Parties" is consistent with Fifth Circuit precedent, including *Highland Capital* and *Pacific Lumber*

- Exculpation of Mr. Tepner and Ms. Hilson is supported by section 1107 and 1142(b) of the Bankruptcy Code

  – **Section 1107**: expressly recognized and applied by the *Highland Capital* court to each of the directors. *Highland Cap. Mgmt., L.P.*, 48 F.4th 419 (5th Cir. 2022)

  – **Section 1142(b)**:  In addition to section 1107, for any acts following entry of the Confirmation Order, the provisions of the Plan and Confirmation Order directing directors and officers to implement the Plan and all of the restructuring actions thereunder in accordance with section 1142 provides a further basis to support exculpation.  *See, e.g.*, Confirmation Order §§ 3-4, Plan § 5.3(d)

- In *Highland Capital*, the court reasoned that "[l]ike a debtor-in-possession [under section 1107 of the Bankruptcy Code], the Independent Directors are entitled to all the rights and powers of a trustee" and were therefore entitled to exculpation.  *NexPoint Advisors, L.P. v. Highland Capital Management (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 437–38 (5th Cir. 2022)

  – The Fifth Circuit's findings in *Highland Capital* were not limited to the unique factual circumstances of that case, but were a natural extension of Fifth Circuit case law entitling bankruptcy trustees acting within the scope of their duties to limited immunity. *See Pacific Lumber,* 584 F.3d 229 (5th Cir. 2009) (approving exculpation of a creditors' committee and its members because section 1103(c) of the Code implies "qualified immunity for [committee members'] actions within the scope of their duties")

  – *See, e.g., Hilal v. Williams (In re Hilal),* 534 F.3d 498, 501 (5th Cir. 2008) ("In this circuit, trustees cannot be subjected to personal liability for damages to the bankruptcy estate unless they are found to have acted with gross negligence." (citation omitted))

  – In approving the exculpation of each of the directors under the *Highland Capital* Plan, the Fifth Circuit expressly adopted and applied Fifth Circuit precedent providing qualified immunity for trustees to directors acting as fiduciaries for a debtor in possession within the scope of duties under section 1107 of the Code

Case 23-90304   Document 1136   Filed in TXSB on 10/25/23   Page 115 of 124

- Subsequent courts in this district have approved chapter 11 plans that provide exculpation to independent directors acting in a fiduciary capacity for the debtors-in-possession

  - *In re Pipeline Health Sys., LLC,* No. 22-90291 (MI) (Bankr. S.D. Tex. Jan. 13, 2023) (Docket No. 1041) at 24 (approving the exculpation of independent directors); *In re Talen Energy Supply, LLC,* No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) (Docket No. 1760) (same); *In re Altera Infrastructure L.P.,* No. 22-90130 (MI) (Bankr. S.D. Tex. Nov. 4, 2022) (Docket No. 533) (same)

- The reasoning of *Highland Capital* applies with equal force to the Debtors' independent directors in these Chapter 11 Cases



# Independent Directors Acted as Estate Fiduciaries

- Each of the independent directors of the Finance Committee should be exculpated under the Plan because (i) Harvey Tepner and Joan Hilson performed the duties of a debtor in possession under section 1107(a), and (ii) each of these independent directors of the Debtors acted within the scope of their duties, including their fiduciary duties, during these Chapter 11 Cases

- The uncontroverted evidence establishes that
  - the Finance Committee was established to consider, evaluate, develop, negotiate and select among various strategic alternatives;
    - **Mr. Tepner** testified that: *"The company was looking at refinancing its debt when it came due. It was concerned about liquidity. It was concerned about its overall leverage. And they wanted to have an independent group of directors to evaluate potential alternatives that were not conflicted."* May 16, 2023, Hr'g Tr. 11:23–12:2 (Tepner)
  - the independent directors were properly appointed by the Board to serve on the Finance Committee;
    - The Debtors filed the resolutions establishing the Finance Committee and appointing the independent directors as Debtors' Exhibits Nos. 2, 21, and 274
    - There is no evidence to the contrary in the record

111



# Independent Directors Acted as Estate Fiduciaries (Cont'd)

■ The uncontroverted evidence establishes that (cont'd)

– the members of the Finance Committee consistently exercised oversight of the Debtors' business and restructuring process, providing updates and recommendations to the Board during the lead up to the 2020 Transaction and throughout the restructuring process, including, but not limited to, when reviewing and approving the Plan (including the release and exculpation provisions), the Disclosure Statement, the Restructuring Support Agreement, and the Plan Settlements;

• **Mr. Tepner** testified that he and Ms. Hilson carried out their fiduciary duties by *"review[ing] the Plan of Reorganization and ha[ving] discussions with the company's professionals, and sometimes the management, about the type of Plan of Reorganization that would work, the debt structure, the allocation of the value of the company, [reviewing] the business plan, [reviewing] financial projections, be[ing] as fully engaged as a director could be, sometimes plus provide guidance as to what they should be looking at, question assumptions, question proposals, make sure I was comfortable and understood them all."* May 16, 2023 Hr'g Tr. 59:9–17 (Tepner)

• The Debtors filed the Finance Committee minutes approving the commencement of the Chapter 11 Cases, entry into the Restructuring Support Agreement, the Plan (including the release and exculpation provisions) and the Disclosure Statement at Debtors' Exhibit No. 293

– in all stages of these Chapter 11 Cases, the independent directors of the Finance Committee believed that they owed fiduciary duties to the Debtors and the Debtors' estates and were guided by such duties by seeking to maximize the value of the Debtors' estates; and

• **Mr. Tepner** testified that he and Ms. Hilson continued to serve as independent directors of the Finance Committee after the Debtors filed for bankruptcy and, during the post-petition period, believed they owed duties to the Debtors and their estates, acted as a fiduciary for the Debtors and their estates, and sought to exercise those fiduciary duties in connection with that role.  *See* May 16, 2023 Hr'g 58:7–60:5 (Tepner)

# Independent Directors Acted as Estate Fiduciaries (Cont'd)

- The uncontroverted evidence establishes that (cont'd)

  - The independent directors of the Finance Committee conducted themselves diligently in their respective roles and acted in the best interests of the entity to which they owed their fiduciary duty

    - Applicable state law provides that directors are entitled to a presumption that they act in accordance with their fiduciary duties and no contrary evidence was presented

    - **Mr. Tepner** testified that:

      - The nature of the duties owed was to *"[pay] attention to the most important one, to try and help the company fashion a Plan of Reorganization or recapitalization that would put it on a solid financial footing, improve its prospects for the future, maintain its long-term viability, ideally continue to support the employment and the business efforts of the company and its employees, and to provide a new capital structure that would allow it to not have to be reorganized in the future."* May 16, 2023 Hr'g Tr. 58:19–59:1 (Tepner)



113

# Other Plan Objections and Plan & Confirmation Order

Resolved & Outstanding Plan Objections, 1129 Factors,
Plan & Confirmation Order Walk-Through



# Status of Other Plan Objections

- The Debtors have consensually resolved all but 1 remaining Plan objections

| No. | Objecting Party / Docket No. | Summary of Objection | Status & Debtors' Response |
|---|---|---|---|
| 1. | Maricopa County Treasurer ("**MCT**") (Docket No. 617) | MCT asserts that the Plan appears to treat secured tax claims in the same manner as priority tax claims and fails to provide for the accrual of statutory interest on these secured liens. | ***Resolved***. See Response Chart (Docket No. 879) |
| 2. | Texas Comptroller of Public Accounts (Docket No. 821) | The Texas Comptroller objects to the Plan to the extent that it restricts their rights to enforce state law in connection with property that is presumed to be abandoned under the Texas Property Code. | ***Resolved***. See Response Chart (Docket No. 879) |
| 3. | Minority Licenses (Docket No. 827) | Minority Licensees assert that the Plan may extinguish (a) their rights of setoff and recoupment and (b) arbitration rights under the 2004 Restructuring Agreement | ***Resolved***. The Debtors have agreed language with the Minority Licensees that clarifies any rights under section 553 of the Bankruptcy Code are preserved included in the Confirmation Order (Docket No. 981). *See* Response Chart (Docket No. 979) |
| 4. | Alan and Ruth Humphries (Docket No. 829) | Humphries assert that (a) SSB Logistics is self-insured and failed to make proper disclosures of the same in the Schedules and Disclosure Statement, (b) Plan is not proposed in good faith, and (c) their unsecured prepetition claim should not be classified with Class 6B because their claim is covered by insurance | ***Resolved***. The Debtors have agreed language to be included in the Confirmation Order that mirrors the settlement terms reached with other Class 6B litigation counterparties. *See* Response Chart (Docket No. 979) |
| 5. | Texas Taxing Authorities (Docket No. 823) | Texas Taxing Authorities assert that (a) Plan lacks specificity on timing of payments, (b) Plan does not properly provide for interest payments, (c) Plan does not retain liens on Texas Taxing Authorities' collateral, (d) Texas Taxing Authorities should be able to amend their 2023 tax claim, and (e) Plan provides for an Exit Financing Facility that may prime or subordinate their senior secured tax liens | ***Resolved***. See Response Chart (Docket No. 879) |

115

# Status of Other Plan Objections (Cont'd)

| No. | Objecting Party / Docket No. | Summary of Objection | Status & Debtors' Response |
|---|---|---|---|
| 6. | Louisiana Department of Revenue ("**LDR**") (Docket No. 830) | LDR asserts that the Plan (a) should provide treatment of Administrative Claims under 1129(a)(9)(A), not 1129(A)(9) (b) does not provide for LDR's interest and penalties allowable under 503(b)(1)(B), (c) may prejudice Priority Tax Claims, and (d) provides for estimation of a greater proportion of claims than contemplated under § 502. | *Resolved*. See Response Chart (Docket No. 879) |
| 7. | DECD (Docket No. 917) | DECD asserts that (a) Class 6B Cash Contribution should be allocated differently (b) Plan violates § 1123(a)(3) because it doesn't clearly specify treatment, and (c) DECD's due process rights have been violated | *Resolved*. The Debtors and DECD have agreed upon language included in the Confirmation Order (Docket No. 981). *See* Response Chart (Docket No. 979) |
| 8. | Cameron Thierry (Docket Nos. 826, 891) | Mr. Thierry asserts that the Plan bars him from proceeding in his prepetition employment discrimination complaint for damages. | *Unresolved*.  The Objection and Mr. Thierry's Brief reiterates issues already pending before the Bankruptcy Court in unrelated Motions brought by Mr. Thierry.  Mr. Thierry's claim will ultimately be liquidated and reduced to an Allowed Amount, if any, in accordance with the procedures set out in the Plan. The Debtors have proposed language to Mr. Thierry for inclusion in the confirmation order that mirrors the settlement terms reached with other Class 6B litigation counterparties as reflected at paragraphs 72–73 and 77 and 79 of the Confirmation Order. Mr. Thierry does not agree to the inclusion of the proposed language to resolve his pending objection. |

# Section 1129

- The Plan satisfies all requirements of Section 1129 of the Bankruptcy Code. Uncontested provisions include:

  - § 1129(a)(3): Plan has been proposed by the Debtors in good faith. Confirmation Brief ¶ ¶ 123–134

  - § 1129(a)(4): Professional fees are subject to Court approval. Plan § 2.2; Linker Decl. ¶ 16; Confirmation Brief ¶ 134

  - § 1129(a)(5): Directors and officers will be disclosed. Linker Decl. ¶ 17; Confirmation Brief ¶ 135

  - § 1129(a)(8): three out of five voting classes have accepted the Plan; cramdown only of two voting classes, subordinated claims (if any), and equity interests. Solicitation Decl. Exhibit A-1; Confirmation Brief ¶ ¶ 142–143

  - § 1129(a)(9): Plan distributions to certain nonvoting classes are appropriate. Plan § 2.1; Confirmation Brief ¶ 144

  - § 1129(a)(10): Plan was accepted by multiple voting classes without regard to insiders. Confirmation Brief ¶ ¶ 145 - 146

  - § 1129(a)(12): Confirmation Order provides for payment of statutory fees. Confirmation Order ¶ 40

  - § 1129(b): Plan complies with cramdown provision on two classes deemed to reject. Confirmation Brief ¶ 164–178



# Section 1129 (Cont'd)

- Outstanding disputed issues have all been disproved by either evidence and/or legal argument:

  - Plan contains all required provisions and properly contains permissible provisions (Non-PTL Lenders Objection & LCM Joinder)

  - Plan Settlements reflect Debtors' valid business judgment

    - Appropriateness of go-forward indemnity (Non-PTL Lender Objection, LCM Joinder & Citadel Objection)

    - Value of distribution to holders of Intermediate Equity Interests is not in violation of the Absolute Priority Rule (Non-PTL Lenders Objection & LCM Joinder)

  - Plan is feasible (Citadel Objection)

  - Appropriateness of exculpations (U.S. Trustee Objection)



118

118