# Excluded Lenders' Closing Argument

Serta Simmons Bedding, LLC v. AG Centre Street Partnership L.P., No. 23-ap-9001 (Bankr. S.D. Tex.) (DRJ)

# The Central Question

# Are all "position-enhancing transactions" the same?

# The PETs We Expect…



# ...and the Ones We Don't



Case 23-00645 · Document 144 Filed in TXSB on 05/05/23 · Page 5 of 30

# The Implied Covenant of Good Faith and Fair Dealing Protects a Party's Right to Receive the "Fruits" of the Contract

- Implied in all New York contracts is a "pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract, even if the terms of the contract do not explicitly prohibit such conduct."

  *E. Ramapo Cent. Sch. Dist. V. N.Y. Sch. Ins. Reciprocal, 199 A.D.3d 881, 884 (N.Y. App. Div. (2d Dep't) 2021)*

- A party may breach the implied covenant "even if it is not in breach of its express contractual obligations, when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruits of its bargain."

  *Anexia, Inc. v. Horizon Data Sols. Ctr., LLC, 2022 WL 1995436, at \*3 (N.Y. Sup. Ct. (N.Y. Cnty.) Apr. 21, 2022)*

- To determine whether the implied covenant has been breached, "[t]he appropriate analysis is first to examine the [contract] to determine the fruits of the agreement between the parties, and then to decide whether those fruits have been spoiled."

  *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1518 (S.D.N.Y. 1989)

# The First Lien Lenders' Fruits Under the Credit Agreement Include the Right to *Pro Rata* Sharing of Payments

(c)    If any Lender obtains payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with Loans of such Class, then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans of other Lenders of such Class at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such Class ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not apply to (A) any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with Sections 2.22, 2.23, 9.02(c) and/or Section 9.05.   Each Borrower consents to the foregoing and agrees, to the extent it may

*2016 Credit Agreement § 2.18(c) (Debtors' Ex. 5, ECF No. 853-5)*

6

# The First Lien Lenders' *Pro Rata* Rights are Sacred Under the Credit Agreement

Case 23-90611   Document 854   Filed in TXSB on 05/26/23   Page 1 of 30

**EXECUTION VERSION**

Deal CUSIP: 81753HAA9
Facility CUSIP: 81753HAB7

(A)      the consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders) shall be required for any waiver, amendment or modification that:

as the Top Borrower,

THE OTHER BORROWERS PARTY HERETO,

(6)      waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby (except in connection with any transaction permitted under Sections 2.22, 2.23, 9.02(c) and/or 9.05(g) or as otherwise provided in this Section 9.02);

*2016 Credit Agreement § 9.02(b)(A)(6) (Debtors' Ex. 5, ECF No. 853-5)*

# The Excluded Lenders Reasonably Expected That Their *Pro Rata* Rights Would be Protected

- "In discerning what is 'reasonable,' the Court looks to what the parties would have expected under the contract: the Court will infer that contracts include any promises which a reasonable person in the position of the promisee would be justified in understanding were included at the time the contract was made."

  *Cordero v. Transamerica Annuity Serv. Corp.*, 2023 WL 3061503, at *5 (N.Y. Apr. 25, 2023)

- The relevant inquiry called for by the implied covenant is objective, not subjective: we consider 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included."

  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 605 (S.D.N.Y. 2018)

- "[A] breach of the duty of good faith can be inferred from evidence that the defendant's conduct was arbitrary or contrary to reasonable expectations."

  *Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 731 (S.D.N.Y. 2020)

# The Excluded Lenders Have a Distinct Claim for Breach of the Duty of Good Faith and Fair Dealing

- A party may breach the implied covenant "even if it is not in breach of its express contractual obligations, when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denied or to deprive the other party of the fruits of its bargain."

  *Anexia, Inc. v. Horizon Data Sols. Ctr., LLC, 2022 WL 1995436, at \*3 (N.Y. Sup. Ct. (N.Y. Cnty.) Apr. 21, 2022)*

- New York courts routinely find claims for breach of contract and breach of the implied covenant are not duplicative in intercreditor disputes where majority lenders abused their majority position to deprive minority lenders of their rights under the applicable credit agreement.

  *Marblegate; Credit Agricole; Boardriders; Anexia*

- Judge Failla sustained the LCM plaintiffs' alternative claim against Serta for breach of the implied covenant based on allegations nearly identical to those made here by the Excluded Lenders.

  *See LCM XII Ltd. v. Serta Simmons Bedding, LLC, 2022 WL 953109, at \*14-16 (S.D.N.Y. Mar. 29, 2022)*

9

# The Excluded Lenders Have a Distinct Claim for Breach of the Duty of Good Faith and Fair Dealing

- Secretly abused majority position and improperly manipulated contractual provisions to defeat reasonable expectations of *pro rata* treatment

- Threatened Administrative Agent under false pretenses in attempt to inhibit competition

- Demanded indemnification for bad faith and material breaches, as against public policy

- Added Angelo Gordon, Gamut, and Apollo to the list of Disqualified Institutions to prevent them from holding super-priority loans or buying additional first-lien loans

**\*12** In this case, as to the claims for breach of the implied covenant of good faith, plaintiffs allege in the second amended complaint:

"In violation of this duty and acting in willful bad faith, Marblegate, Field Point, and the Archway Defendants secretly designed the Restructuring Transaction so as to defeat Plaintiffs' contractual expectations of pro rata treatment, concealed the transaction from Plaintiffs until it could be revealed as a *fait accompli*, withheld information from Plaintiffs necessary for them to effectively participate in the restructuring process, and improperly structured a commercially unreasonable foreclosure auction process designed to preclude effective participation by third parties, including Plaintiffs, thereby minimizing, not maximizing, returns from the foreclosure and undermining Plaintiffs' reasonable economic expectations under the Credit Agreement."

*AEA Middle Market Debt Funding LLC v. Marblegate Asset Management LLC, 2023 WL 2394680, at \*12 (N.Y. App. Div. (1st Dep't) Mar. 7, 2023)*

10

# Two Separate, Parallel Sales Processes



**A**

## Drop-Down/IPCo



**B**

## Uptier

# A Drop-Down/IPCo

- Expressly encouraged by Serta and Evercore

- Historic precedents well understood ("J. Crew")

- Valuable collateral available

- Amendments to Loan Documents not needed

# A Drop-Down/IPCo

- Multiple groups explore
    - Angelo Gordon, Gamut, Apollo
    - Barings
    - Others

- Ability to raise at least $200 million

- Ability to provide debt reduction

# Gibson Dunn/Centerview Group – PTL Lenders

- Mostly lenders that purchased First Lien Term Loans at issuance in 2016

- Institutions that usually oppose drop-downs

- Willing to offer new money and make available to all First Lien Lenders *pro rata* as of April 24, 2020

# **B** PTL Lenders' Uptier Proposal

- First of its kind

  - Priming financing plus debt repurchase at a discount

    - Day 1 PM 83:17-84:10 (Shah); Day 3 AM 81:7-17 (Chopra); Day 1 PM 181:15-25 (Prince); Day 2 PM 90:8-11 (Tepner); Day 3 AM 124:14-15 (Sveen); Day 3 PM 10:3-4 (Sveen); Day 3 PM 58:17-22 (Searles); Day 3 PM 128:6-16 (Yarrow)

- Inherently limited to 50.1% or close thereto

15

# PTL Lenders' Proposal Timeline





**May 22**
Internal Consideration

**May 26**
First Gibson Dunn Proposal to Company with Uptier

**June 4**
PTL Lenders Learn They Are Winners

**June 4**
PTL Lenders Send Letter to UBS

**June 5**
Excluded Lenders Learn They Lost

**June 8**
Transaction Publicly Announced

**June 11**
Litigation Commences

**June 20**
Serta Finance Committee Approves Deal

**June 22**
Loan Documents Finalized

16

# AG/Apollo/Gamut Drop-Down v. PTL Lenders' Uptier





| AG/Apollo/Gamut Drop-Down | PTL Lenders' Uptier |
| --- | --- |
| Waterfall intact | Waterfall redistributed |
| Clear precedent | First of its kind |
| Potentially open to all | Inherently restricted |
| Amendment not required | Amendment required |
| No demonstration of bad faith | Additional acts demonstrating bad faith |

# June 4 Letter to UBS Shows PTL Lenders Lacked Good Faith



Although the Secured Lender Group's strong preference is to work constructively and cooperatively with the Company, particularly during these unprecedented times, we are concerned that the Company is actively considering value-destructive transactions that are prohibited either under the Loan Documents or applicable law.  We understand from the Company's advisors that these transactions may include the transfer of Collateral (such as highly valuable intellectual property) away from the security of the Lenders.  In the face of such potential prohibited transactions, the Secured Lender Group is prepared to take the necessary steps to exercise its rights to prevent such a transaction.  The Secured Lender Group does not believe a value-destructive strategy, like any diversion of the Lenders' Collateral through a drop-down transaction, is the type of transaction permitted under the First Lien Credit Agreement, the other Loan Documents, or applicable law.



**Defs.' Ex. 167, ECF No. 250-73**

- Designed to prevent competition

- No basis to assert drop-down transaction would be potential fraudulent conveyance

- No basis to assert that Serta likely was insolvent

- Insisted UBS keep the letter a secret from Serta

18

# June 4 Letter to UBS Shows PTL Lenders Lacked Good Faith



Case 23-09001   Document 250-73 *SEALED*   Filed in TXSB on 05/14/23   Page 3 of 6

GIBSON DUNN

June 4, 2020

In addition, a transfer of Collateral to an Unrestricted Subsidiary for no discernable consideration in return—as may be contemplated in connection with a drop-down transaction—may constitute an actual or constructive fraudulent transfer in violation of applicable law. With a highly levered capital structure, extensive debt service obligations in the face of limited liquidity, significant general cash burn, a stated need for new capital, and a severe decline in revenue with no clear foreseeable recovery to normalized operations, we believe it is highly likely that the Company may very well already be insolvent. This is further

This letter constitutes a confidential Lender to Agent communication and should not be provided or disclosed to, or otherwise shared with, the Company or any of the other Loan Parties.

CONFIDENTIAL
Confidential

CENTERVIEW0004859
SSB  ADVERSARY00117274

**Defs.' Ex. 167, ECF No. 250-73**

19

# Facts Related to Indemnity

- The indemnity for the First Lien Lenders in the 2016 Credit Agreement included a carve-out for gross negligence, willful misconduct, bad faith, and material breach.

  **2016 Credit Agreement, § 9.03(b) (Debtors' Ex. 5, ECF No. 853-5)**

- As of June 20, 2020, that carve-out was preserved in the version of the Super-Priority Term Loan Agreement approved by Serta's Finance Committee on that date.

  **June 20 Final Board Meeting Minutes attaching draft Super-Priority Term Loan Agreement, § 9.03(b) (Debtors' Ex. 249, ECF No. 865-40)**

# Facts Related to Indemnity



- No proof of consideration for broader indemnity eliminating the carveout on June 22, 2020.

- No proof of how or why final exception to carve-out was added, including who changed it or who requested that it be changed.

**Super-Priority Term Loan Agreement § 9.03(b) (Debtors' Ex. 252, ECF No. 865-42)**

# Importance of Indemnity to PTL Lenders

- There is no evidence that any PTL Lender or the PTL Lenders' financial advisor had knowledge of or involvement in the negotiation of the provision, what terms were negotiated, or the importance of eliminating the carve-out in the indemnity.

- There is no evidence that any PTL Lender or the PTL Lenders' financial advisor looked at exceptions to carve-out language in connection with RSA, Plan, or exit financing, or participated in the negotiation of the language.

# Importance of Indemnity to PTL Lenders

Execution Version

provided that AmSurg Holdings and the Borrower shall have no obligation hereunder to any Indemnified Person with respect to Indemnified Liabilities to the extent arising from (i) the gross negligence or willful misconduct of such Indemnified Person or any of its Related Parties as determined in a final and non-appealable judgment of a court of competent jurisdiction (excluding, in each case, for the avoidance of doubt, arising from any Indemnified Person's participation in the Transactions), (ii) except with respect to the Administrative Agent and its Related Parties, a material breach of the obligations of such Indemnified Person or any of its Related Parties under the terms of this Agreement by such Indemnified Person or any of its Related Parties as determined in a final and non-appealable judgment of a court of competent jurisdiction, or (iii) any proceeding between

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

AG_SSBADVERSARY-00006022

Debtors' Exhibit No. 359
Page 1 of 693

Envision Credit Agreement §13.5(a)(iii) (Debtors' Ex. 359, ECF No. 889-5)

# PTL Lenders' Exposure to Breach of Contract Claim

- Dependent on Plan confirmation
  - Breach on June 22, 2020
  - Money damages are undetermined
  - Damage occurs at the time of breach

- The PTL Lenders' repeated insistence that Plan support depends on indemnity without carve-out is proof that they are concerned about claims of material breach **and/or** bad faith.

# Last Proposal Submitted by AG/Gamut/Apollo Does Not Prove PTL Lenders' Uptier Satisfied Implied Covenant

• Not final – negotiations went dark

• Could have been opened to others – not inherently limited to 50.1%

• Would not have obliterated *pro rata* waterfall and sharing provisions

• No proof of threat to administrative agent

• No on-the-way-out amendments

# Prior Transactions are Irrelevant & Distinguishable

**J. Crew (2017)**

- Drop-down transaction
- Open to all
- No *pro rata* sacred rights

**PetSmart (2018)**

- Drop-down transaction
- Done on consent
- No *pro rata* sacred rights

**Murray Energy (2018)**

- Open to all

**Trident (2018)**

- Done on consent
- No *pro rata* sacred rights
- No debt repurchase at a discount

**Revlon (2020)**

- Drop-down transaction
- Open to all
- No *pro rata* sacred rights

# Prior Transactions are Irrelevant & Distinguishable

**J. Crew (2017)**

- Drop-down transaction **(Day 3 PM 8:9-18 (Chopra))**

- Open to all

- No *pro rata* sacred rights

**PetSmart (2018)**

- Drop-down transaction **(Day 3 PM 119:25-120: 3 (Yarrow))**

- Done on consent

- No *pro rata* sacred rights

**Murray Energy (2018)**

- Reverse Dutch auction (***In re Murray Energy Holdings Co.***, 616 B.R. 84 (Bank. S.D. Ohio 2020))

## Trident (2018)

- Done on consent **(Day 3 PM 128:2-5 (Yarrow))**

- No *pro rata* sacred rights

- No debt repurchase at a discount

## Revlon (2020)

**(Debtors' Ex. 316, ECF No. 859-14, at 9)**

- Drop-down transaction

- Open to all

- No *pro rata* sacred rights

# Subsequent Transactions are Irrelevant & Distinguishable

- Envision (2022)
  - Multiple transactions  **(Debtors' Ex. 320, ECF No. 859-18, at 7-8.)**
  - Debt-for-debt exchange open to all  **(Day 4 AM 115:13-16 (Kwon))**
  - *Pro rata* sharing and payment waterfall not protected sacred rights
    **(Debtors' Ex. 320, ECF No. 859-18, at 3.)**

- Mitel (2022)
  - Credit agreement did not limit the company's purchases to open market purchases or Dutch auctions; purchases could be made in any manner ("or otherwise")  **(Debtors' Ex. 320, ECF No. 859-18, at 3.)**
  - Subject to litigation  **(Day 4 AM 123:10-14 (Kwon))**

# The Court Cannot Make Additional Findings on "Open Market Purchases"

**Debtors' and Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ECF No. 302**

20. As this Court has held, it is "very clear" that <mark>the open market purchase component of the 2020 Transaction "fits within the definition of" and was "what's intended by a concept of an open market purchase"</mark> under Section 9.05(g). Mar. 28, 2023 Hr'g Tr. at 134.

206. Section 9.05(g) of the Agreement expressly authorized the Company to repurchase outstanding debt on a non-pro rata basis via "open market purchases." Debtors' Ex. 6 (ECF No. 853-6) § 9.05(g). As this Court recently held, it is "very clear" that the debt buyback process the Lender Plaintiffs and the Debtors' engaged in was "what's intended by a concept of an open market purchase"—"what was intended by the agreements." Mar. 28, 2023 Hr'g Tr. at 134; *see also* ECF No. 142 ¶ 3. In short, <mark>the Term Loan Agreement expressly allowed all aspects of the 2020 Transaction</mark>, and the Lender Plaintiffs' and the Debtors' "mere exercise of [their] contractual rights, without more, cannot constitute . . . a breach" of the implied covenant, *Broad*, 642 F.2d at 957.

**Debtors' and Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ECF No. 302**

207.    The Court's holding on summary judgment that the Transaction constituted an open-market purchase under section 9.05(g) of the Term Loan Agreement and was expressly permitted by the terms of the Term Loan Agreement <mark>has only been confirmed on the fuller trial record</mark>.  As was clear to all parties well before the 2020 Transaction was ever on the table, the Term Loan Agreement gave the Company considerable flexibility. Angelo Gordon and Apollo, for example, recognized that the Company's "loose" credit documents lacked certain "standard 1L protections," would permit "a liability management solution," and offered opportunities for them to be aggressive.  Debtors' Ex. 8 (ECF No. 861-3) at 44, 46; Debtors' Ex. 42 (ECF No. 861-36) at 1; *see also* Debtors' Ex. 374 (ECF No. 941-2) at 62:4-5 (Kwon) ("The credit agreement is very loose."); May 18 Tr. (AM) 56:23-25, 57:1-4 (Kwon).  The PTL Lenders' testimony was consistent with Apollo's and Angelo Gordon's views.  May 17 Tr. (AM) 96:18-97:2 (Sveen); May 17 Tr. (PM) 103:8-13 (Yarrow).  This flexibility brought with it risks to the lenders that were clear on the face of the Term Loan Agreement. As Apollo has admitted, "[t]hese are very sponsor-friendly, company-friendly documents that allow for potential liability management transactions" and "actions that could be taken against" any given lender; "[o]ne hundred percent [Apollo] recognized" "that there could be value taken away from the . . . first lien debt."  Debtors' Ex. 374 (ECF No. 941-2) at 68:17-24, 74:1-12 (Kwon).  LCM offered no evidence to the contrary.

214.  Here, the open market purchase provision in Section 9.05(g) expressly permitted the Company to repurchase debt on a "non pro-rata basis," <mark>which necessarily allowed the Company to treat first-lien lenders differently</mark>.  Any lender reviewing the contract would have seen Section 9.05(g), and seen it referenced in both the pro rata sharing provisions and the sacred rights amendment provisions.  *See* May 18 Tr. (AM) 82:22-87:15 (Kwon).  In particular, the waterfall provision in Section 2.18 that Defendants rely on applies only to a single class of debt, again making clear that different classes of debt could be treated differently, and has a clear carve-out for payments under Section 9.05. Because there is no explicit language in the Term Loan Agreement requiring that all lenders be treated equally, the Court should not imply a term that the Ad Hoc Group of Non-PTL Lenders did not bargain for.