IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


| | | |
|---|---|---|
| IN RE: | § | CASE NO. 23-90020-11 |
| | § | JOINTLY ADMINISTERED |
| | § | HOUSTON, TEXAS |
| SERTA SIMMONS BEDDING, LLC, | § | THURSDAY, |
| ET AL, | § | MAY 25, 2023 |
| DEBTORS. | § | 2:19 P.M. TO 7:18 P.M. |

************************************************************

| | | |
|---|---|---|
| SERTA SIMMONS BEDDING, LLC, | § | CASE NO. 23-9001-ADV |
| ET AL, | § | JOINTLY ADMINISTERED |
| | § | HOUSTON, TEXAS |
| VERSUS | § | THURSDAY, |
| | § | MAY 25, 2023 |
| AG CENTRE STREET PARTNERSHIP, | § | |
| ET AL | § | 2:19 P.M. TO 7:18 P.M. |

### **CONFIRMATION CLOSING ARGUMENTS**

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:                          SEE NEXT PAGE



(Recorded via CourtSpeak.)



TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (VIA ZOOM):


FOR THE DEBTOR:                    WEIL GOTSHAL & MANGES, LLP
                                  Ray Schrock, Esq.
                                  David Lender, Esq.
                                  Alexander Welch, Esq.
                                  700 Louisiana, Ste. 1700
                                  Houston, TX  77002
                                  713-546-5000


FOR CITADEL EQUITY FUND, LTD:     FAEGRE DRINKER BIDDLE & REATH
                                  James Millar, Esq.
                                  1177 Avenue of the Americas
                                  41st Floor
                                  New York, NY  10036
                                  212-248-3140


FOR PRIORITY LENDERS:             GIBSON DUNN & CRUTCHER, LLP
                                  Gregg J. Costa, Esq.
                                  Scott Greenberg, Esq.
                                  811 Main Street
                                  Suite 3000
                                  Houston, TX  77002
                                  346-728-6649


FOR THE EXCLUDED LENDERS:         FRIEDMAN KAPLAN SEILER
                                  & ADELMAN, LLP
                                  Eric Seiler, Esq.
                                  7 Times Square
                                  New York, NY  10036-6516
                                  212-833-1103


FOR THE UNSECURED CREDITORS
COMMITTEE:                        KELLEY DRYE & WARREN
                                  Eric R. Wilson, Esq.
                                  3 World Trade Center
                                  175 Greenwich Street
                                  New York, NY  10007
                                  212-808-7800

<u>APPEARANCES (CONT'D) (VIA ZOOM)</u>:


FOR LCM LENDERS:                    HOLWELL SHUSTER & GOLDBERG, LLP
                                   Neil Lieberman, Esq.
                                   425 Lexington Avenue
                                   New York, NY  10017
                                   646-837-5151

FOR AD HOC GROUP OF
FIRST LIEN LENDERS:                PAUL WEISS RIFKIND WHARTON
                                   & GARRISON, LLP
                                   Brian Hermann, Esq.
                                   1285 Avenue of the Americas
                                   New York, NY  10019
                                   212-373-3000




(Please also see Electronic Appearances.)

INDEX

CLOSING ARGUMENTS:                    Page
 By Mr. Lender                         7
 By Mr. Welch                          39, 54
 By Mr. Goldman                        30, 216
 By Mr. Thierry                        46
 By Mr. Costa                          57
 By Mr. Greenberg                      81
 By Mr. Wilson                         95
 By Mr. Lieberman                      98
 By Mr. Seiler                         113
 By Mr. Hermann                        160
 By Mr. Millar                         184

***

1    **HOUSTON, TEXAS; THURSDAY, MAY 25, 2023; 2:19 P.M.**

2    THE COURT:  All right.  Then officially, good

3    afternoon everyone.  This is Judge Jones.  The time is 2:19

4    Central.  Today is May 25, 2023.  This is the Docket for

5    Houston, Texas.

6    We have on the 2:00 o'clock Docket, and I apologize

7    for the delay.  We have closing arguments in the main case,

8    which only is under Case No. 23-90020, Serta Simmons Bedding

9    LLC, as well as the adversary 23-9001, Serta Simmons Bedding

10   LLC, et al, versus AG Center Street Partnership, et al.

11   Mr. Schrock?

12   MR. SCHROCK:  Good afternoon, Your Honor, Ray

13   Schrock, Weil Gotshal Manges, on behalf of Serta Simmons

14   Bedding, and its affiliated Debtors.  I'm joined in the

15   courtroom today by my partners and colleagues, David Lender,

16   Luna Barrington, Alexander Welch, Gabriel Morgan and Stephanie

17   Morrison.

18   We also have the Debtor's general counsel, Krista

19   McDuffie, here in the courtroom with us.  In advance --

20   THE COURT:  What do you need?

21   MR. SCHROCK:  Oh, we have a demonstrative, Your

22   Honor.  We'd just like to --

23   THE COURT:  So then --

24   MR. SCHROCK:  So consistent with the Court's order

25   from last week, we did host a settlement conference at our

1       offices among the management team, the PTL lenders and

2       advisors, non-PTL lenders, the LCM lenders and their advisors,

3       counsel of the Creditors Committee.

4              I would say everybody participated in good faith.

5       Unfortunately the parties will not -- they were not able to

6       reach resolution.  So we are here and moving forward today,

7       Your Honor.

8              THE COURT:  Got it.

9              MR. SCHROCK:  Your Honor, in terms of a roadmap,

10      here's how we'd like to proceed, subject to however Your Honor

11      would like to direct us.  You know, our view has always been

12      that the adversary proceedings have been extrinsically

13      intertwined.

14             That's why we conducted, among other things, a joint

15      trial.  My partner, Mr. Lender, is going to begin by pressing

16      the arguments specific to the adversary proceeding.  I'm next,

17      who's going to handle the confirmation related topics.

18             And Mr. Welch, who's going to handle some of the

19      technical objections including the confirmation order.  We can

20      do that at the end if you prefer, Your Honor, and get the

21      arguments out before Mr. Welch's portion.

22             And then we would cede the podium to the PTL

23      Lenders, of course, being in favor of confirmation that deal

24      with the objectors and any reply.

25             THE COURT:  Okay.  Makes sense to me.

1          MR. SCHROCK:  Okay.  Thanks, Your Honor, and without

2     further ado, I'll cede the podium to my partner, David Lender.

3          THE COURT:  All right.  Mr. Lender, good afternoon.

4          MR. LENDER:  Good afternoon.  David Lender, Weil

5     Gotshal, for the Debtors.

6                          CLOSING ARGUMENT

7          BY MR. LENDER:  The company's witnesses came to

8     Court, and provided a clear and good faith explanation of why

9     the company entered into the transaction with the Gibson Dunn

10    Centerview Group in June of 2020.

11         The company was facing an existential threat due to

12    COVID, and was about to run out of money.  It was also

13    significantly over-leveraged, so it did what any reasonable

14    company would do.

15         It engaged its current lenders, as well as multiple

16    third-party lenders, as part of a competitive process to try

17    to find the best deal that it could in the market.  And after

18    significant negotiations, went with the best deal presented.

19         There's no real dispute as Your Honor recognized,

20    when Mr. Tepner was testifying that the 2020 transaction saved

21    the company at that time.  There's also no dispute that

22    without it, the company would likely have had to file for

23    bankruptcy back in 2020.

24         Engaging the market and picking the best deal

25    available after a competitive process to save the company is

1    the epitome of good faith, and certainly not a breach of the

2    implied covenant of good faith and fair dealing.

3            In response, the Defendants have offered a

4    scattershot approach of what LCM's counsel referred to in

5    opening as "theories," that were short on substance and in so

6    doing, ignore what the implied covenant claim is all about.

7            The implied covenant is not some freestanding,

8    catchall claim that covers anything in business that you don't

9    agree with.  A party who asserts the existence of an implied,

10   in fact covenant bears a heavy burden and must prove not

11   nearly that it would have been more sensible to include such a

12   covenant, but rather that the particular, unexpressed promise

13   sought to be enforced is in fact implicit in the agreement

14   viewed as a whole.

15           A party does not violate the implied covenant by

16   acting in its own self-interest, consistent with its rights

17   under a contract even when such conduct is allegedly

18   unreasonable.

19           A party has not acted in bad faith where it has

20   valid business reasons on the merits for its actions.  The

21   implied covenant also cannot be used to rewrite the party's

22   agreement, or give rights to the contracting party that it

23   could have sought but did not get at the negotiating table.

24           As a New York Bankruptcy Court held in *In Re:*

25   *Solutia* (phonetic), based on an implied covenant claim that

1     the Debtors exploited the barren language of the indenture to

2     enter into a new loan that deliberately desecuritized the

3     notes, quote, "Nothing in the doctrine of good faith and fair

4     dealing allows a court to create contract terms that the

5     parties have not negotiated for."

6           And in so holding, the court relied on numerous

7     court decisions, that it explored the absence of protected

8     provisions in the indentures, and have declined to read into

9     indenture provisions and protections that are not here.

10           Here, everyone agrees that the credit agreements

11     negotiated by sophisticated parties were loose, meaning they

12     favored the company.  In fact, as you can see from this

13     internal Angelo Gordon deck from March of 2020, this is the

14     reason why they thought they could propose an IP code

15     transaction that would have favored certain lenders over

16     others.

17           Now when Angelo Gordon and Gamut started purchasing

18     SSB debt at a discount in 2019 and 2020, and Apollo sought to

19     do the same in March of 2020, they did so pursuant to the

20     terms of those loose credit agreements which did not contain

21     anti-subordination as a sacred right, and can now not be read

22     into the contracts through the implied covenant.

23           They also allowed amendments on majority consent.

24     LCM was subject to those same credit agreements.  Defendants

25     also acquired their debt pursuant to provisions that expressly

1    allowed for open market purchases on a non-pro rata basis, and

2    which carved out open market purchases from the pro rata

3    treatment provision that LCM's attorney argued in his opening

4    was so important to his client.

5         This renders LCM's attorney rote questions to every

6    witness completely irrelevant because the company had no

7    obligation to offer the deal to LCM.  It's also noteworthy

8    that no one from LCM actually showed up to testify.

9         So there is zero evidentiary support for what his

10   lawyer argued about LCM's supposed expectations.  The same is

11   true for Angelo Gordon.  They didn't come to testify either.

12   And although Apollo and Gamut did have witnesses appear, their

13   testimony fully supported our view on what was contemplated

14   under the credit agreements.

15        Indeed, our side called the only witnesses who had

16   personal knowledge about the reasonable expectations of the

17   parties at the time the agreements were made.  The PTL

18   Lenders, who unlike the Defendants bought their debt back in

19   2016, uniformly testified that anyone involved should have

20   known that deals like the 2020 transaction were reasonably

21   expected by the credit agreements.

22        It's also important to remember why Angelo Gordon

23   and their group were buying up debt in 2019 and 2020.  It

24   wasn't because they were benevolent and they were trying to

25   help the company.

1        As Angelo Gordon's Ryan Mollett revealed in this

2  internal document back in April, 2020, they would love to own

3  the business if it files, given its value.  Apollo's internal

4  documents said the exact same thing.

5        And when their strategy failed because the company

6  decided to go with a better transaction, the Angelo Gordon

7  Group did everything in their power to disrupt it.  They first

8  called around to try to prevent the Centerview Group from

9  getting to the 50.1 percent threshold necessary to do that

10  transaction.

11        Here is Angelo Gordon's 30(B)(6) testimony, which we

12  submitted to Your Honor, admitting that Angelo Gordon did

13  precisely that.

14     "Question:  Was Angelo Gordon contacting these other

15  lenders to try to prevent them from joining the Centerview

16  Group?

17     "Answer:  I don't know the specific conversations that

18  took place.  All I know is that they took place."

19        Then they tried to block the transaction in

20  New York, but that failed.  And then they got to a Debtor and

21  agreed never to vote for a Plan of Reorganization unless they

22  all agreed.

23        You heard about this when Apollo's Theo Kwon

24  testified, and Angelo Gordon's 30(B)(6) witness admitted the

25  same thing.

1        "Question:  And so just so we're clear, on September 28,

2    2020, AG, Apollo and Gamut entered into a cooperation

3    agreement and agreed not to vote to accept any Plan of

4    Reorganization that has not been agreed to or consented to by

5    the requisite holders, correct?

6    "Correct.

7    "So whether or not the Plan of Reorganization was better

8    for the company or its stakeholders, Angelo Gordon, Apollo and

9    Gamut were not going to vote in favor of it, correct?

10    "Answer:  Correct."

11       So it's somewhat surprising that the Angelo Gordon

12    Group Defendants could come into Court claiming we're the ones

13    who didn't act in good faith given this testimony.

14       Now during my opening, I stated that the evidence

15    would show three things which prove that the company acted in

16    good faith and did not breach the implied covenant of good

17    faith in connection with the 2020 transaction.

18       Let me now walk through some of the evidence you saw

19    during this trial which shows that all three points were met.

20    First, SSB entered into the 2020 transaction because it was in

21    financial trouble and was trying to stave off bankruptcy, not

22    to harm the Defendants.

23       Evercore's Roopesh Shah and independent Finance

24    Committee member, Harvey Tepner, testified and explained the

25    serious risks facing the company after the COVID pandemic hit

1    the United States, all but shutting down its business.

2           Here are the minutes of the March 31, 2020, Finance

3    Committee meeting, and here is the situation overview that the

4    board and its advisors discussed in the meeting.

5       "Following a strong start to the year, COVID-19 has had a

6    material impact on SSB's and its customers performance.

7       "Current cashflow forecasts indicate the company may run

8    out of liquidity as soon as early July, necessitating an

9    evaluation of transaction alternatives to raise near term

10   liquidity."

11          And Mr. Tepner explained the company's motivation

12   was to give it viability moving, going forward, not to harm

13   specific lenders that weren't participating.

14          Let's now turn to the second point which is that SSB

15   engaged in a good faith, competitive process to find the best

16   deal it could get.

17          The evidence showed that starting in April of 2020,

18   the company was looking at several alternatives to find near

19   term liquidity given its concerns that it would run out of

20   money.

21          As you'll recall from this slide, that presented to

22   the Finance Committee, the company looked at all kinds of

23   options, including sale lease backs, selling its interest in

24   its China JV, and raising financing from third-party lenders.

25          It also believed that its existing lenders could be

1    the most likely source of liquidity for a comprehensive

2    transaction.  As a result, throughout April and May, Evercore,

3    on behalf of the company, solicited proposals from existing

4    holders of SSB debt and potential third-party lenders, and

5    negotiated with those parties trying to get the best deal it

6    could for the company.

7        Evercore's Roopesh Shah explained this to the

8    Finance Committee in April of 2020.  Mr. Shah noted the object

9    of the engagement process was to obtain multiple proposals for

10   any transaction and enable a competitive process to obtain the

11   best terms available for the company.

12       And Mr. Shah explained in his testimony why a

13   competitive process helps get the best deal for the company.

14   It allows us to get multiple bids and keep horses separate, if

15   you will, so we can play terms off each other to get the best

16   deals for the company.

17       Here is an internal Evercore email identifying some

18   of the parties Evercore reached out in connection with a

19   potential transaction for the party.  This included several of

20   SSB's existing lenders, including Oak Tree, Gamut, TSSB and

21   Angelo Gordon, but it also included third-party investors like

22   HBS, Fortress, Center Bridge, Blue Torch, Pemco and Silver

23   Point.

24       Now at the time, Evercore was discussing an IP code

25   financing transaction with these potential lenders.

1    Defendants tried to argue that this was our idea, but the

2    evidence showed was actually their idea first, not ours.

3         As you'll recall, Angelo Gordon proposed an IP code

4    transaction to the company back in March 2020, with a new

5    money component and a debt-for-debt exchange component.  It

6    was only after receiving Angelo Gordon's proposal that the

7    company solicited other existing and third-party lenders to

8    see if they can get a transaction on better terms than the one

9    being proposed by Angelo Gordon.

10        Defendants also argued that we never intended to

11   engage with the Angelo Gordon Group, or we were just stringing

12   them along to try to get a better deal from the Centerview

13   Group.

14        It's not entirely clear why this even matters given

15   that open market purchases can happen on a non-pro rata basis

16   with whoever we want.  But the contemporaneous documents and

17   testimony demolish this theory as well.

18        In the same April 9, 2020 email we just looked at,

19   as you can see, what Evercore wrote on the week of 4/13, or

20   4/20, was:  "If perceived outreach from Gibson Dunn where they

21   get wind of financing process, do not engage, or engage in

22   diligence with advisors while financing process is ongoing."

23        So the actual evidence presented at trial is the

24   opposite of what the Defendants argued.  Evercore and the

25   company were not stringing the Angelo Gordon Group along, but

trying to get a deal, a better deal from the Gibson Dunn
Group.

Mr. Banks was directing his team not to engage with
the Gibson Dunn Group, and Mr. Shah explained why.  He
explained because at that time, they were focusing on
consummating the IP code transaction, and were concerned that
if the Gibson Dunn Group got wind of that transaction, they
might try to disrupt it.

Now at this point in time, in early April, 2020, the
lenders represented by Gibson Dunn and Centerview had not even
made a proposal.  However, as you heard, when Invesco's Philip
Yarrow testified, when he and some of the other lenders
learned of the IP code transaction that SSB was discussing
with potential lenders, they got involved and made a
counterproposal that they believed would be better for the
company and not based on what its lawyer said in its April 24,
2020 letter to Mr. Schrock, not based on a predatory pricing
structure or onerous terms.

Now Your Honor will recall that Gibson Dunn's
April 24th proposal only included a new money component which
did not address the company's separate goal of reducing its
debt burden.

Invesco was concerned that the company was not going
to entertain their proposal without a debt reduction
component, so they had to respond with something else to avoid

1    the IP code.

2            As Kevin Egan (phonetic) wrote to Mr. Yarrow on

3    May 23, 2020, "I agree that we have to put a competitive

4    proposal on the table.  We can ill afford to have that

5    magnitude of assets, in particular the IP, dropped from our

6    borrower."

7            The Gibson Dunn Centerview Group would not make a

8    new offer involving both immediate liquidity and debt capture

9    until May 26, 2020.  So the idea that we were stringing the

10   Angelo Gordon Group along in March and April and throughout

11   most of May makes no sense.

12           There was no competing proposal until the end of

13   May.  In fact, that's why Mr. Shah wrote to his colleague,

14   Mr. Banks, at Evercore on May 5, 2020, and said, "We should

15   focus on Angelo Gordon as they continue to be our best

16   course," because as Mr. Shah explained, they had sent their

17   proposal into the company.  We were negotiating that proposal.

18   They were furthest ahead, and had the most developed proposal.

19           Okay.  Moving forward in time, here are the minutes

20   of the May 22, 2020, meeting of the Independent Finance

21   Committee that you saw during this trial.

22           Mr. Shah and Mr. Tepner both discussed these meeting

23   minutes.  Slide 3 from the board deck summarizes the different

24   outreach done by Evercore, and the pages that follow summarize

25   the different terms Evercore was negotiating with various

1    lenders.

2              As you will recall, among others, Evercore was

3    negotiating with Angelo Gordon, Barings, Fortress and TPG

4    Sixth Street, Blue Torch, Oak Tree and Charles Bank.

5              And this slide shows that Evercore was negotiating

6    with existing lenders holding nearly 1.4 billion of the 1-L

7    debt, or nearly more than 70 percent of that debt.  Looking at

8    the Angelo Gordon Group proposal, you can see how similar it

9    was to the 2020 transaction.

10             It had both the $200 million new money component,

11   and an exchange component for 100 million of existing 1-L term

12   loan would be at an exchange rate of 85 percent.  They also

13   proposed exchanging an additional 493 million of existing 1-L

14   debt, and 41 million of existing 2-L debt at an exchange ratio

15   of 85 percent, and 40 percent, respectively.

16             The structure was different in that it involved the

17   IP code financing structure discussed during the trial, but

18   there can really be no doubt particularly after Mr. Kwon's

19   testimony last Thursday, that their proposal had the exact

20   same effect as the 2020 transaction.

21             They were both positioned enhancing transactions.

22   Mr. Kwon admitted that their proposal would have subordinated

23   certain lender who would have lost priority in favor of the

24   Angelo Gordon Group.

25             Your Honor asked Mr. Kwon, "So the participating

1   lenders would have had senior debt as to the non-participating

2   lenders, correct?"

3        And after some colloquy, he admitted "yeah."

4        "The existing first lien lenders in a drop down

5   transaction would lose priority with respect to claims against

6   transferred collateral, correct?

7        "That's correct."

8             He admitted that both proposals would involve only a

9   limited set of lenders.  Their proposal also would have

10  involved using proceeds to purchase the Angelo Gordon Group's

11  debt at a discount, and canceling that debt through Section

12  9.05(G), the open market purchase provision.

13            You also heard Mr. Kwon testify that their proposal

14  was made in good faith.  Angelo Gordon said the exact same

15  thing in a response to a request for admission.  So given all

16  of this, how can they credibly claim that the 2020 transaction

17  was not done in good faith, but that their proposal, which

18  would have had the exact same effect, was in good faith.

19            Angelo Gordon also knows that its claim that the

20  company somehow breached the implied covenant in the manner by

21  which it used $28 million of additional debt capacity to

22  acquire 1-L, or 2-L debt at a discount after the transaction

23  was announced has no merit.

24            Here is a deck presented by Angelo Gordon to the

25  company back in March of 2020, when they first disclosed the

details of their proposed IP code transaction.  And look what they proposed in the last bullet:

"Company uses excess debt proceeds to opportunistically purchase 1-L, 2-L term loans in the open market or subsequent transactions."

They included the exact same thing about using additional basket capacity in their revised May 4, 2020, proposal.

So they were proposing that after SSB did the debt for debt exchange with their group, the Centerview company -- the company could go into the open market and opportunistically purchase additional debt, precisely what the company did after it announced the 2020 transaction as Mr. Shah explained.

In fact, the evidence showed that the company didn't just randomly decide who could participate and who could not. After announcing the 2020 transaction, several lenders reached out to try to get into the deal.

As you can see from this slide, 218 million of 1-L, and 105 million of 2-L debt reached out.  Notably, LCM never reached out.  They just went immediately to litigation.  The company only had limited remaining capacity so it couldn't let everyone into the deal who asked.

But as you saw from this slide, it was clear business rationales for every single lender the company added,

1    which was all approved by the Independent Finance Committee.

2    This evidence likely explains why, after spilling much ink on

3    this issue in its pleading and briefing, Defendant's counsel

4    abandoned this part of their case during their opening.

5    Here's why Mr. Seiler said, "There's going to be a

6    lot of evidence about who got to be in, and who got to be out

7    of it.  I'm not talking about subsequent purchases.  Those are

8    fine."

9    Let's now turn to the third point, which is that the

10   Independent Finance Committee evaluated the various proposals

11   and selected the best deal the company could get.  As the

12   negotiations proceeded, it eventually came down to the PJT

13   Angelo Gordon Group, and the Centerview Group.

14   Harvey Tepner, a member of the Finance Committee,

15   explained when he testified that after reviewing both

16   proposals, the Committee decided to go with the Centerview

17   proposal because it was a better deal for the company.

18   This slide summarizes some of the benefits that you

19   heard about during this trial, including that the Centerview

20   proposal resulted in less debt and interest expense for SSB,

21   and did not strip away any existing collateral.

22   Angelo Gordon recognized the exact same thing, at

23   least outside of the courtroom.  This slide comes from an

24   update to Angelo Gordon's Investment Committee back in

25   February of 2021.

1        As its 30(B)(6) witness admitted during his

2   deposition, Angelo Gordon is recognizing on this page that the

3   transaction resulted in immediate benefits to Serta Simmons.

4   The 2020 transaction actually worked, and the market responded

5   favorably.

6        Here is the demonstrative tracking the price of SSB

7   debt that Mr. Shah went over when he testified.  After

8   initially dropping in price, SSB debt rebounded and exceeded

9   the pre-transaction price.

10        In fact, the 1-L debt traded as high as 79, nearly

11   double the pre-transaction price before it began to fall more

12   than a year later, due to negative market trends and because

13   Defendants could not refinance their debt.

14        Thus the 2020 transaction clearly benefitted SSB.

15   Without it, the company likely would have had to file for

16   bankruptcy back in 2020.  And the market responded favorably.

17   As a result, Defendants received significant interest payments

18   for several years.

19        And Defendants could have sold out their position as

20   the debt price soared, but they chose not to.  That was their

21   decision, not ours.  Unfortunately, due to the market, the

22   company could not refinance its debt, and was forced to file

23   for bankruptcy.

24        But this doesn't render the 2020 transaction to be

25   one taken in bad faith.  Now in the face of this overwhelming

1    evidence, Defendants have offered a number of theories in this

2    case.

3            But the actual evidence belied and disproved those

4    theories.  Let me now briefly walk through them, some of which

5    we've already discussed.

6            Defendants argued that the company solicited an IP

7    code transaction.  But as we showed you earlier, it was

8    actually the Angelo Gordon Group that proposed that form of

9    transaction first, not us.  Defendants argue that the credit

10   agreements never contemplated subordination.

11           But the very IP code proposal Defendants made which

12   they argued was allowed and contemplated by the credit

13   agreements resulted in the same subordination.  They were both

14   position enhancing transactions that the market has seen over

15   and over again.

16           Defendants argued that the 2020 transaction was

17   never done before, and therefore not on the contemplation of

18   the parties to the credit agreements which somehow means we

19   violated the implied covenant.

20           This argument actually makes no sense when you think

21   about it for a minute because the Court has already found on

22   summary judgment that the 2020 transaction was a permitted

23   open market purchase, so by definition, it was contemplated by

24   the 2016 credit agreements.

25           But you'll also recall the testimony from Michael

1    Searles from Barings.  He explained that no transaction is

2    identical, and by definition, every transaction has never been

3    done before it's done.

4         My alma mater, Duke, had never won a national

5    championship till 1991.  Now we have five.  The J-Crew IP code

6    transaction that the Defendants championed, that hadn't been

7    done before until creative lawyers, looking at the terms of

8    the credit agreement determined that it could be done in

9    December of 2016, which by the way, is two months after the

10   credit agreements were signed.

11        And the fact is that several witnesses testified

12   that the transactions like the 2020 transaction had been done

13   before.  Evercore's Roopesh Shah testified as follows:

14   "Question:  And you're not aware of any such transaction

15   that anyone in the market had worked on with all of those

16   elements together?

17   "Answer:  I'm not sure if that's the case.  I thought

18   there has been some precedent transactions where those

19   elements were present."

20        C-Sam's witness, Davis Myron, said the same thing:

21   "Question:  Now the Defendants in this case have argued

22   that the 2020 transaction that Serta did engage in was, quote,

23   'unprecedented and contrary to the expectations of the markets

24   and the parties.'  What's your reaction to that?

25   "Answer:  I mean, I find that a bit surprising and

1   contrary to the expectation of the parties because from an

2   economic perspective, their proposal had a lot of

3   similarities.  You know, from market broadly, look, I mean you

4   don't see these types of transactions every day, and you know,

5   maybe there are some nuances to this one, but similar types

6   of, you know, transactions that have similar economic features

7   have certainly occurred, so I don't think it should have been

8   unexpected."

9   And who could forget the testimony on this point

10  elicited by Defendants counsel, from Barings' Michael Searles,

11  on cross-examination.  Mr. Serles explained that he had been

12  involved in transactions, pre-Serta, which involved the

13  priming facility and a debt exchange at a discount.

14  And when asked to name specifics, he rattled off a

15  number of transactions, Murray Energy, Sandlewood and even one

16  involving Apollo.  So theory number three also fails.

17  Theory number four was that Advent would never do a

18  deal with Apollo.  And Mr. Seiler argued in opening, "You're

19  going to hear evidence that Advent, who owns Serta, didn't

20  really want to do a deal that involved Apollo because they

21  were competitors and they didn't want to have a credit where

22  Apollo had an interest."

23  But that theory completely fell apart as his

24  cross-examination of Mr. Shah abruptly ended with this line of

25  questioning when it failed to pan out"

1          "Question:  Did Mr. Prince ever express a view to you

2     about whether or not he was willing to do a transaction with a

3     group that included Apollo?

4          "Answer:  I believe he was supportive of doing the

5     transaction with Apollo while we were negotiating it.

6               Mr. Seiler, so:

7          "Question:  So even though they were on the DQ List, he

8     was supportive of doing a transaction with a group that

9     included Apollo?

10         "Answer:  Yes.

11         "Question:  Had he told you that?

12         "Answer:  That's why we were negotiating with his

13    knowledge and understanding, and there was no other

14    alternative until the very last few days, so yes."

15              Defendants then tried to resurrect this argument one

16    more time during cross-examination of the PTL Lenders.  You'll

17    recall they showed C-Sam's, Davis Myron, this Bloomberg

18    message dated June 5, 2020, where it says, "Advent earmarked

19    Barings, Oak Tree and TPG to fill the gap."

20              They suggested this somehow showed that we didn't

21    want to do a deal with their group, but they ignored a

22    critical fact.  When Mr. Shah and Mr. Prince told Angelo

23    Gordon's Ryan Mollett that their IP code transaction wasn't

24    being selected, they asked him if Angelo Gordon wanted to

25    participate in the transaction, and he declined.

1    So the company went back to the lenders who had made

2    their own IP code proposals to see if they were interested.

3    That's who's listed here.  And they got the 50.1 percent

4    threshold they needed to do the deal within a matter of days

5    which Mr. Shah explained he was confident they would be able

6    to get to when the Centerview proposal was selected.  So this

7    theory also failed.

8    Next, the Defendants claim Advent decided who got to

9    participate, again implying an anti-Apollo bias.  What

10   Mr. Tepner made clear when he testified that it was the

11   Independent Finance Committee that made the ultimate decision

12   concerning every lender that was added to the deal.  So this

13   theory also failed.

14   Next, LCM's lawyer argued that LCM reasonably

15   expected to be treated pro rata with their fellow lenders, but

16   LCM never appeared to back up his lawyer's claim.  We also

17   showed you the credit agreements that said the exact opposite

18   with regard to open market purchases under 9.05(G), which is a

19   clear exception to pro rata treatment.

20   And further, LCM's counsel conceded at opening that

21   LCM should be treated the same as the other Defendants.  So

22   his efforts to distinguish LCM also fails.

23   Next, Defendants claim that the amendments

24   explicitly permitted with majority consent somehow violated

25   the implied covenant.

1           But this claim really makes no sense.  Defendants

2       conceded in their pleadings that the Excluded Lenders do not

3       dispute that the new money aspect of what they refer to as the

4       unlawful exchange transaction was permitted since new money

5       loans could be given priority without the unanimous vote.

6           But the new money component required the same

7       amendments as the exchange, as Centerview's Mr. Chopra

8       explained.  So how can the amendments be both allowed and not

9       allowed?

10          The fact is, is that amendments are done by majority

11      vote all the time, as Mr. Kwon admitted when he testified.

12      And here there is no disputes that the amendments that were

13      done here were all permitted with majority consent which the

14      company had.  So this theory also fails.

15          And finally is the issue of the indemnity.  We spent

16      a lot of time talking about the indemnity in this case, but

17      for purposes of the implied covenant claim, it is 100 percent

18      irrelevant.

19          An implied covenant claim must be based on the

20      contract at issue, the 2016 credit agreement, not a subsequent

21      agreement in 2020, to which the Defendants weren't even a

22      party.

23          So as a last ditch effort, Mr. Seiler said, "Well,

24      the indemnity shows that we knew there was a problem."

25      Really?  You heard in this case that practically every deal

1    has an indemnity, and that they are routine in these kinds of

2    transactions.

3              And in fact, the Envision transaction involved

4    Angelo Gordon had an indemnity, and it also had the carve out,

5    from the carve out that the Defendants claim was so insidious.

6    And Mr. Tepner explained why the company agreed to an

7    indemnity in the 2020 transaction, and every PTL Lender who

8    testified explained they wanted one for essentially the same

9    reason.

10             One of the reasons was that it was fraught with

11    litigation risks, and we needed a proper economic inducement

12    for the PTL Lenders to participate and go through with

13    providing new money and providing the discount that the

14    company needed.  So Defendants indemnity theory failed as

15    well.

16             In sum, Your Honor, we believe the evidence is clear

17    that Defendants' multiple theories have no merit, and that the

18    company and the PTL Lenders acted in good faith.

19             We ask that you enter a judgment in favor of SSB and

20    the PTL Lenders, holding that the 2020 transaction did not

21    breach the implied covenant of good faith and fair dealing.

22             Thank you.

23             THE COURT:  Thank you, Mr. Lender.

24             Mr. Schrock?

25             MR. SCHROCK:  Thanks, Your Honor.  For the Record,

1    Ray Schrock, on behalf of the Debtors.

2                    CLOSING ARGUMENTS

3         BY MR. SCHROCK:  Your Honor, you asked at the

4    conclusion of the evidence, that we had a few questions

5    including related to the plan, the propriety of the indemnity

6    claim, whether or not there was business judgment or economic

7    coercion, the absolute priority rule, you had a couple of

8    questions as well as the death trap.  I'm pleased to report on

9    the death trap, we did eliminate it from the plan so that's no

10   longer an issue.

11        We did, of course, file a supplemental brief that

12   addressed these questions.  But I wanted to hit a few high

13   points for you.  On the plan -- oops.  The standards are set

14   forth here which the Court is very much well aware of.  I

15   won't go through them in detail for Your Honor.

16        But we did want to note that the plan incorporates

17   settlements across a number of different classes, that are

18   fair, negotiated at arm's-length.  They're in the best

19   interest of the Debtors, their estates and stakeholders.

20        The evidence overwhelming supports the plan

21   settlements.  You know, the evidence is in favor of this plan

22   settlements.

23        Quote, "It was the best deal for the company at the

24   time.  It allowed us to consummate the transaction

25   contemplated by the RSA to get 200 million of cash, 400

1    million plus of dollars of debt reduction, have liquidity in

2    the company and avoid the pitfall of ruining out of cash and

3    working capital in the summer of 2020."

4         The consenting creditor settlement including the

5    indemnity is embodied in the RSA in the plan, meets the

6    controlling standard because the Debtors were unlikely to

7    successfully organize without the RSA and they believed they

8    had a high probability of success in the merits of litigation

9    with the 2020 transaction.

10        The testimony in support of that is set forth on

11   this slide.  And that go-forward indemnity was a critical

12   component of the 9019 settlement reached with the PTL Lenders,

13   and not a result of collusion or economic coercion.

14        I can say as a restructuring professional, I don't

15   know anyone who would have done a deal to equitize their debt

16   without having an indemnity for a transaction that they were

17   being sued on, and continue to be sued on all the way through

18   this case.

19        We think it's self-evident, but also the testimony

20   backs this up.  It is unrefuted, and we think the Record is

21   clear.  The settlement clearly facilitated the Debtors exit

22   Chapter 11 process.

23        We said it before.  It is critical that this company

24   get out of Chapter 11 soon.  Every day that we're in here is

25   more risk to the business.  There are 3,000 employees plus

1    that are depending on this company to get out.

2          We believe we have met our burden.  But this

3    settlement, including the indemnity are a crux of the Debtors

4    plan with what's required to get the company out of

5    Chapter 11.

6          The consenting equity holder settlement, we thought

7    that the evidence here again was overwhelming that as a result

8    of these settlements, the equity holders are facilitating and

9    cooperating the implementation of the plan including with

10   respect to restructuring transactions, and through the merger

11   of Dawn Holdings and to Dawn Intermediate, they're

12   transferring certain miscellaneous assets to Dawn

13   Intermediate.  All unquestionably provide value to the Debtors

14   and the estates.  They're also facilitating the Debtors use of

15   valuable tax benefits.  The Creditors Committee, global

16   settlement likewise is supported, and I don't think seriously

17   challenged by the parties.

18         The evidence in support of that is set forth on our

19   slide.  And we think that on the Debtors' business judgment,

20   again overwhelming, unrefuted, as Mr. Lender did for Your

21   Honor, our decisions in 2020, are backed up by a sound record.

22         Mr. Shah's testimony, Mr. Tepner's testimony, all

23   back this up that we selected a modified detailed group

24   proposal which provided for significant new money because it

25   offered a dramatically different amount of discount captured.

It was important to the company to help deleverage the balance sheet.

There's no evidence in the Record that the Finance Committee and the Debtors' management were subject to any undue influence from the sponsors, Advent or the PTL Lenders. The negotiations were all at arm's-length, and there's nothing to suggest otherwise.

Likewise, in 2022, the company initiated the refinancing efforts. Mr. Tepner's testimony again here, quote, "Severe headwinds in all aspects of this business including overall market deterioration that affected all mattress producers. The company reevaluated a refinancing of its debt, and engaged Evercore to seek potential investors."

They contacted 20 parties to see if there's additional $1.6 billion capital raise. No parties were interested.

And after months of rigorous arm's-length negotiations with the key stakeholders, we reached out to the existing lenders for a restructuring transaction which included attempts to reach a consensual resolution of the non-PTL group.

We continued to assess our options after proposing the plan including weighing and analyze an alternative proposal from Citadel. And even after the Debtors solicited votes on the plan, the Finance Committee evaluated and

concluded that the alternative proposal from Citadel was not in the best interest of the company.

So I highlight some of the reasons for that on the slide pulled up.

On feasibility, again, we don't think that this is a close call.  There's no evidence in the Record to support a different conclusion.

The standards as Your Honor is aware is a preponderance of the evidence.  There's not a guarantee of success.  And the mere prospect of financial uncertainty cannot defeat confirmation on a feasibility objection.

Here, the projections are credible.  They were not seriously questioned.  They're all based on a balancing of the testimony that even if the projections were aggressive, the Court can find the plan feasible.  Here we don't even think that that's an issue.

Mr. Linker testified that in preparing the financial objections, that he and the management team took upon an exercise to build on a new business plan to turnaround the financial performance of the company.

So it was a set of strategic initiatives that would grow our sales, grow our market share, improve our cost structure, improve our profitability.  We worked on that for a couple of months, pressure tested those assumptions and then ultimately those initiatives and that business plan is what

1    formed the input for the financial projections.

2         He testified further, without knowing the amount of

3    timing, it's not possible for me to include the indemnity

4    obligation in the financial projections.  And so the

5    indemnity, there's some uncertainty about the amount we're

6    going to have to work through with the IRS on finalizing the

7    amount, and presumably there'd be some sort of audit process

8    in order to refund to that size.

9         So there's also upside in the projections that

10   Mr. Linker is speaking to here that also was not included.

11   The Debtors have ample liquidity to service their future debt

12   payments and the Debtors' reorganization plan is not likely to

13   be followed by a liquidation or another reorganization.

14        Mr. Linker's testimony is set forth here.  Nothing

15   has changed since the financial projections were first

16   developed that would cause the financial projections to be

17   modified or altered.

18        And Your Honor, much was made around a contingent

19   indemnity claim rendering the plan infeasible.  I find that to

20   be really a bit of a strange argument because if the plan's

21   confirmed, that means we've actually won the litigation.  The

22   Court has made a decision on what the merits of the litigation

23   are.

24        But the plan is feasible, regardless of whether the

25   Debtors are obligated to identify the PTL Lenders.  That

1    Mr. Tepner testified to this.  There was no testimony or

2    evidence that would be contrary to this.

3         And that indemnity claim would only kick in if the

4    non-PTL Lenders obtain a final non-appealable judgment in

5    their favor, and the likelihood of that, the testimony here

6    from Mr. Tepner details why that's not at issue, just to call

7    into question feasibility.

8         On the absolute priority rule, the intermediate

9    equity interests are receiving value in exchange for

10   consideration.  They're not receiving a distribution on

11   account of the interest.

12        Rather, the 1.5 million is for what the consenting

13   equity law is providing to the Debtors.  We've got the

14   testimony of Mr. Tepner set forth on this slide that details

15   that it was a pretty good trade.

16        We believe that there's unrefuted evidence that it's

17   an exercise of the Debtors business judgment.  They're

18   facilitating, you know, a number of transactions for the use

19   of those tax benefits.

20        We also don't think that, you know, the non-PTL

21   Lenders nor the LCM Lenders really have standing on this

22   point, to raise the absolute party rule objection because the

23   recovery is in Classes 5, 6-A, and 6-B are provided as part of

24   a voluntary carve out from the collateral, securing the class

25   four FLSO claims, and not account of any value that the

1    holders are classified claims that otherwise be entitled to

2    recover.

3            Your Honor, just very briefly on the exculpations,

4    we know that these issues have become forefront for the U.S.

5    Trustee, and with all respect, I will say that I think the

6    evidence here, we made additional findings in the record that

7    we're relying on Section 1107, that was recognized and applied

8    by the Highland Capital Court to the directors.

9            This is a Debtor-in-Possession.  And if, you know,

10   an independent director that is performing the duties of a

11   Debtor-in-Possession under this record can't get an

12   exculpation.

13           I struggle to find where you could get one.  But

14   they are entitled to all rights and powers of a Trustee.  I

15   think they're entitled to an exculpation.  We don't think the

16   Fifth Circuit's findings in *Highland Capital* were, you know,

17   limited to the unique factual circumstance of that case, but

18   were a natural extension of the case law, entitled bankruptcy

19   Trustee's acting within the scope of their duties, to limited

20   immunity, relying on Pacific Lumber.

21           And approving the exculpation for each of the

22   directors under the Highland Capital plan, the Fifth Circuit

23   expressly adopted the Fifth Circuit precedent by providing

24   qualified immunity for Trustees.

25           Your Honor, we're hopeful that the Record we

1    provided on this point is sufficient.  We are not providing

2    exculpations to anyone other than the two independent

3    directors, and we think that the law is certainly in our

4    favor.

5            The testimony that's in support of that and the

6    additional findings is outlined on Slide 111.  And we will be

7    filing a copy of our presentation with the Court so parties

8    interested to have that following today's proceedings.

9            In all stages of these cases, the independent

10   directors of the Finance Committee believe that they owed

11   fiduciary duties to the Debtors and the Debtors estates, and

12   they were guided by those duties to seek to maximize the value

13   of those estates.

14           Mr. Tepner's testimony is unrefuted.  There was no

15   cross examination on these points.  We believe that there

16   shouldn't be any question.

17           Your Honor, unless you have any questions, I'll cede

18   the podium to Mr. Welch, to go ahead and go through some of

19   the more technical issues with the order.

20           THE COURT:  No, thank you very much.

21           MR. SCHROCK:  Sure.

22           THE COURT:  Mr. Welch?

23           MR. WELCH:  Thank you, Your Honor.  For the Record,

24   Alexander Welch, Weil Gotshal Manges for the Debtors.

25                          CLOSING ARGUMENTS

1          BY MR. WELCH:  Your Honor, at the outset,

2    Mr. Schrock offered to dispose of this to the end.  So I'm in

3    your hands a little bit.  I don't want to take us on a detour

4    if you'd prefer to stay on course.

5          THE COURT:  No, it's all just fine.  I frankly would

6    like to know, especially just given the uncertainty exhibited

7    by the Connecticut filing, I'd just like to know what's

8    outstanding.

9          MR. WELCH:  Sure.  So Your Honor, when we were

10   before you last week, there were a number of objections

11   outstanding, and we undertook to work with those parties to

12   see what we could resolve in advance of today.

13          We're happy to report that through the inclusion of,

14   I think we called for some customary language on a number of

15   these issues.  We were able to resolve most of these standard

16   language with respect to Maricopa County Treasurer, resolving

17   their objection at 617, Comptroller objection at 821, and also

18   taxing authorities, Texas Taxing Authorities objection at 823,

19   and the Louisiana Department of Revenue at 830.

20          Those objections have been resolved by the inclusion

21   of language in our amended confirmation order, which is filed

22   on the Docket at 982.  There's a redline.

23          With respect to the minority licensees, we were able

24   to resolve their limited objection, or their objection with

25   some language, again in the confirmation order that just

1    preserves parties rights with respect to setoff.

2              With respect to the Humphries, they filed an

3    objection at 829.  We were able to, over the course of the

4    week, work on language that we could include in the

5    confirmation order that would resolve their objection.  Happy

6    to say it has.

7              In summary, Your Honor, it simply has the parties

8    provide the Trustee, or soon to be Trustee of the trust some

9    time to reconcile -- get across those claims, work in good

10   faith to reconcile, and if they can't, we'll I think be back

11   before Your Honor to lift the stay, let those be estimated or

12   liquidated.

13             With respect to Mr. Thierry, Docket 826 at 891, we

14   were unfortunately not able to resolve Mr. Thierry's

15   objection.  We don't think that Mr. Thierry's objection

16   actually raises to the level of a confirmation objection.

17             Rather, he continues to make the arguments that he

18   did in prior pleadings.  He does have a Proof of Claim which

19   he has filed.  We're happy to offer him the same as which we

20   offered the Humphries, but we don't have a resolution with

21   him, Your Honor.

22             THE COURT:  All right.  Thank you.

23             MR. WELCH:  With respect to the Connecticut

24   Department of Economic Community Development, we did think we

25   did have a resolution which when we filed the Agenda.  I do

1    think, Your Honor, that maybe with some words from yourself,

2    it may be resolved.

3         I think the objection, although I don't want to put

4    words in Mr. Goldman's mouth, I believe his objection relates

5    to concerns over potential amendments to the allocation table

6    that is attached to the plan.

7         He had wanted an opportunity to be heard if in the

8    future that allocation table is amended.  We had offered

9    language that we would not be able to amend that, and indeed,

10   it could only be amended by agreement between ourselves and

11   the Trustee, and of course, still has to be within reason and

12   equitable and all of those things.

13        But what we had offered was it could not be amended,

14   or such amendment could not go into effect without first

15   giving 10 days' notice of that amendment, and that that would

16   give parties an opportunity to be heard and object.

17        THE COURT:  Mr. Goldman, can I get you to hit five

18   star on your telephone, please, sir?

19        All right.  Mr. Goldman, good afternoon.

20   (No audible response.)

21        THE COURT:  Ah, Mr. Goldman, I got you unmuted.  Do

22   you have me muted from your side maybe?

23        MR. GOLDMAN:  You're very prescient on that, Your

24   Honor.  Yes, I did.

25        THE COURT:  All right.  Thank you.  You heard -- I'm

1    sorry, go ahead.

2                MR. GOLDMAN:  Yeah.  It doesn't quite get us there,

3    Your Honor.  You know, we did indeed have discussions several

4    days ago, and I did think that we had this -- our objections

5    resolved.

6                You know, one of them was what we viewed as lack of

7    specificity as to the criteria they're going to use to

8    reallocate, because the public cable exhibit says among other

9    things, they'll consider the claims reconciliation process

10   without saying what the other things would be.

11               So try to kind of elegantly addressed that, my idea

12   was that, okay, give us other appearing creditors advance

13   notice of any reallocation and an opportunity for us to

14   object.

15               Now that's not what their proposed language in the

16   revised confirmation order says.  It says that if it would

17   change the existing language on reallocation, and then at the

18   end, it says quote provided that such reallocation will be

19   effective upon 10 days notice of the reallocation being filed

20   with the court.

21               So two problems with that.  Number one, it doesn't

22   provide that the 10-day notice period is a period to afford

23   creditors with the right to object, doesn't say that.  But

24   more importantly, number two, it doesn't effectively preserve

25   the rights to object because they are now taking the position

1    that even if an objection is filed within that 10-day notice

2    period, it won't prevent the reallocation from becoming

3    effective.

4         I specifically asked them.  In other words, the

5    period has to be extended to allow the Court to resolve any

6    objection before the reallocation becomes effective.

7    Otherwise, the notice period is allusory.

8         THE COURT:  So let me ask you this, Mr. Goldman.

9    Would it resolve your concerns if the reallocation were simply

10   done upon further court order after notice and opportunity for

11   hearing?

12        MR. GOLDMAN:  It certainly would, Your Honor.

13        THE COURT:  I'm happy to undertake that

14   responsibility if it resolves the issue.

15        MR. WELCH:  It does for us, Your Honor.

16        THE COURT:  All right.  So Mr. Goldman, that's

17   acceptable to the Debtors.  You were persuasive on that issue.

18   Someone from the Weil team will send you some corrected or

19   some additional language to implement that proposal for your

20   approval.

21        MR. GOLDMAN:  Right.  The concept is agreeable.  In

22   other words, it's not going to become effective if there's an

23   objection unless Your Honor rules it to be effective.

24        THE COURT:  Actually what I was -- actually, I was

25   trying to make your life easier.  I was just saying that there

1    won't be a reallocation except upon further order.  So

2    Debtors --

3              MR. GOLDMAN:  Okay, even better.

4              THE COURT:  Reorganized Debtors got to file

5    something.  You can choose to object or not, and it's -- if

6    you don't object, my guess is the order will probably be

7    relatively easy to obtain.  And if you do object, then you'll

8    have a hearing.

9              MR. GOLDMAN:  Yeah, absolutely, Your Honor.  It's

10   even better.  Your Honor, we're not looking to object to a

11   reallocation.  This is just a safeguard, and that's all.

12             THE COURT:  It is because of your imminent

13   reasonableness that I was willing to undertake the duty.

14             MR. GOLDMAN:  Thank you very much, Your Honor.

15             THE COURT:  All right.

16             MR. GOLDMAN:  And I don't need to hold you up any

17   longer then.

18             THE COURT:  And I assume someone from the Weil team

19   will send some language to Mr. Goldman?

20             MR. WELCH:  We will, Your Honor.  I just looked over

21   my shoulder to the counsel for the Committee.  They will -- I

22   think it will ultimately be filed by the Trustee, but I think

23   they're okay with the approach as well.

24             THE COURT:  That's perfectly fine.

25             MR. GOLDMAN:  Okay.

1           THE COURT:  All right.

2           MR. GOLDMAN:  Great.  Thank you, Your Honor.

3           THE COURT:  Thank you.  Have a good day.

4     Absolutely.

5           MR. GOLDMAN:  Thank you.

6           THE COURT:  Thank you for appearing.

7           MR. GOLDMAN:  Yeah, thank you, Your Honor.

8           THE COURT:  Is that it?

9           MR. WELCH:  So that is it.  It does leave

10    Mr. Thierry.

11          THE COURT:  All right.  And Mr. Thierry, can you

12    hear me?  Ah, there you go.  How about now?

13          MR. THIERRY:  Hi, good afternoon, Judge.

14          THE COURT:  Good afternoon.

15          MR. THIERRY:  Yeah.  Your Honor, Cameron Thierry

16    here, pro se, on behalf of myself --

17          THE COURT:  Yes, sir.

18          MR. THIERRY:  -- as a party-in-interest with a

19    standing to bring a claim objection under Title 11 of the U.S.

20    Code, Section 502.

21          THE COURT:  I don't think you mean to bring a claim

22    objection.  You want to assert a claim, right?

23          MR. THIERRY:  Yes.  Thank you for that correction,

24    Your Honor.

25          THE COURT:  Okay.  No one's challenging your ability

1    to be here and participate this afternoon.  Have you

2    understood what the Debtors' position is with respect to your

3    objection?

4            MR. THIERRY:  Yeah, they believe that it had to take

5    issue that have been brought up in my motion for a

6    reconsideration and also my appeal.  The notice of appeal and

7    then off of the appellant's designation of the Record filed in

8    the main case.

9            THE COURT:  Okay.  Is there anything else that you

10   want to tell me this afternoon?

11           MR. THIERRY:  Yes.  You know, if I may begin with a

12   few opening remarks, Your Honor?

13           THE COURT:  Both opening and closing remarks, just

14   whatever you want to tell me, I want to hear.

15                          CLOSING ARGUMENTS

16           BY MR. THIERRY:  Okay.  Your Honor, I'm fighting to

17   survive just like the Debtors expressed they are in their

18   opening statement except I'm a human being and they are a

19   self-proclaimed business entity.

20           Clearly with an ability to impact human beings, and

21   in regards to me specifically have impacted me negatively.

22           THE COURT:  Okay.

23           MR. THIERRY:  I'm currently under attack in my

24   current chosen career field, a circumstance I have unwillingly

25   fallen into which varies vastly from my fellow creditors,

47

1      objectors who are based on information and belief.  Still

2      gainfully employed despite this Chapter 11 Plan of

3      Reorganization of the Debtors.

4                  THE COURT:  Right.

5                  MR. THIERRY:  I have lost my job and my livelihood

6      for which cause under Title 11, USC Section 352(D) exists for

7      relief from the automatic stay.  As evidence will show as the

8      Debtors are adequately insured through their employment

9      liability insurance policy providing protections against the

10     bankruptcy estate and other creditors alike.

11                 And I do not intend to seek monetary damages beyond

12     any Debtors insurance proceeds threshold with the exception of

13     any applicable or retained limit.  The Debtors have valued my

14     claim as zero as a part of the pro rata share allocation for

15     Class 6-B creditors in the current proposed plan for

16     confirmation.

17                 And with my objection of a claim value, Exhibit G,

18     worth $1.6 million as an assessed value to my claim which

19     contradicts their zero value assessment.

20                 THE COURT:  Okay.

21                 MR. THIERRY:  As evidence also shows, including

22     evidence newly discovered pursuant to Federal Rules of Civil

23     Procedure, Rule 59(E), I remain unfavorably positioned as a

24     candidate for hire in the corporate finance and accounting

25     employment sector, my chosen career field.

1        Having yet to receive any indication on allegations

2   concerning my now two most recent employment departures.  On

3   May 5, 2023, the United States Equal Employment Opportunity

4   Commission issued me a second notice of right to sue, my

5   second most recent employer related to my departure from them

6   which I started employment with them right after Serta Simmons

7   Bedding, LLC.

8        So again a position, I am, you know, stuck here,

9   left in, you know, before and after the Debtors, you know, get

10  out of their Chapter 11 Plan of Reorganization.  And again

11  this position is unshared with my fellow Class 6-B creditors

12  of Debtors who again are still gainfully employed based on

13  information and belief, regardless of their claims against

14  Debtors.

15       And so unless the Court takes some action regarding

16  my motion for reconsideration, moving the appeal forward or

17  granting me the relief from the automatic stay or any relief

18  from the injunction from the plan, again I'm not protected.

19       THE COURT:  All right.  So Mr. Thierry, and I didn't

20  want to prematurely stop you.  Is that all that you wanted to

21  tell me because I have a couple of questions I wanted to ask

22  you, if I could?

23       MR. THIERRY:  Your Honor, if I may entertain your

24  questions before proceeding and closing out.

25       THE COURT:  Oh, no, I want you to go ahead and

1    finish, and I thought you were done.  That's why I was asking.

2         MR. THIERRY:  Yeah, I guess, you know, Your Honor, I

3    appear today [indiscernible] be able to survive and thrive if

4    the Court with a vindication getting -- received on my

5    discrimination lawsuit for which relief from the automatic

6    stay or any relief from the injunction post the claimant's

7    confirmation would provide me support.

8         The Debtors seem to believe they have the power to

9    dictate lifestyles for certain individuals, thereby having

10   kicked me out of their company due to my protected classes.

11   And further down to the ground because they don't see me as

12   the same human being that they are.

13        That's the bottom line and the impact their decision

14   has with my life and career being the one in jeopardy.  I may

15   be (indiscernible) that the Debtors put off my name.  I have a

16   claim, the right to be sued for the damages they have caused

17   me, and an impairment to my career resulting from their own

18   misconduct.

19        I was hired, I do not condone improper firing of

20   others for reasons not excluding what I'm experiencing as this

21   is happening to me right now.  But how it must be balanced one

22   way or another by the Court, under the law, with the law

23   upheld and violators held accountable.

24        So Judge, I had -- are you going to hold Enterprise

25   life over human life, by denying me relief from the automatic

1    stay to proceed in my prepetition and claims discrimination

2    complaints for damages in front of the appropriate and

3    applicable law.

4          THE COURT:  All right.  Mr. Thierry, does that

5    complete your arguments?

6          MR. THIERRY:  Yes, Your Honor.

7          THE COURT:  Okay.  So let me ask.  Just listening to

8    what you said and trying to work through all of that because

9    you said an awful lot, and I read what you filed.  Is it --

10   are you asking me to treat you differently than any other

11   unsecured creditor?

12         MR. THIERRY:  I'm showing a lack of adequate

13   protection, which puts me in a different position than similar

14   Class 6-B, other general unsecured --

15         THE COURT:  Okay.

16         MR. THIERRY:  -- creditor claims.

17         THE COURT:  So -- and I'm not trying to get you to

18   believe this, but I want you to assume that your belief is

19   just simply incorrect.  Generally all unsecured creditors lack

20   adequate protection.  Otherwise, they wouldn't be unsecured

21   creditors.  And so are you asking me -- and it's hopefully a

22   really simple question.  Are you asking me to treat you

23   differently than other 6-B creditors?

24         MR. THIERRY:  Yes.

25         THE COURT:  Okay.  And is there any provision in the

1    Bankruptcy Code that you believe allows me to do that?

2              MR. THIERRY:  Yeah, Federal -- Title 11 of the U.S.

3    Code, Section 352(B), also the Federal Rules of Civil

4    Procedure, Rule 59(E) provides remedies for relief, which I'm

5    seeking from the Court.

6              THE COURT:  All right.  So I will tell you that

7    neither that rule nor that Code section allows me to treat one

8    unsecured creditor different from another.  So is there any

9    other Code section that you believe allows me to treat one

10   unsecured creditor different than another unsecured creditor

11   under a plan?

12             MR. THIERRY:  I don't have that at my fingertips --

13             THE COURT:  Okay.

14             MR. THIERRY:  -- right now, Your Honor.

15             THE COURT:  So let me ask you the next question.  So

16   I think I understood you to say that you filed a claim for --

17   and I forget the number you told me, but like a million and a

18   half dollars?  Am I remembering close to right?

19             MR. THIERRY:  Yes, Your Honor, 1.6 million.

20             THE COURT:  1.6 million.  I wasn't trying to short

21   change you.

22             All right.  So you filed a claim for 1.6, and for

23   purposes of allocation, the Debtors valued your claim at zero.

24   And did you understand that there's a process by which we will

25   figure out what the right number is?

1          MR. THIERRY:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. THIERRY:  I understand that process, for the

4     motion.

5          THE COURT:  Not suggesting that that's the right way

6     to go about that, but you do understand that there's a process

7     by which the number will be determined?

8          MR. THIERRY:  Yes.

9          THE COURT:  Okay.  So if you understand that there's

10    a process, and with the understanding that you're going to

11    have one way or another, you're going to participate in that

12    process, or let me put it this way, have the opportunity to

13    participate in that process, what is the objection for

14    purposes of confirmation?

15         MR. THIERRY:  You know, that the plan again, if

16    confirmed, you know, I still go in there at an improper value,

17    and this also brings further delay to be able to get the

18    vindication that I need to be able to get a job in my career

19    field again.

20         So I'm going to be unemployed until I can move this

21    matter forward.  And so every day that goes by, I'm not able

22    to put food on my table.  So that's what presents, you know, a

23    dire need if you will in moving this matter forward, and not,

24    you know, waiting for other instances of estimates, and

25    continued negotiation on settlement or lack thereof with the

1    Debtors.

2           THE COURT:  Okay.  All right.  I do have your motion

3    that is at 679, which is your motion for rehearing.  Did you

4    want to have a hearing on that, or do you want me to simply

5    rule on the papers?

6           MR. THIERRY:  I would prefer if you could rule on

7    the papers.

8           THE COURT:  Okay.  I will do that.  Is there

9    anything else you would like to tell me?

10          MR. THIERRY:  Just that I do understand that there's

11   a process to estimate the claim.  I do -- even if it is

12   estimated, Debtors are currently, you know, estimating that

13   the recovery for Class 6-B will only be 8-1/2 percent.

14          But if you do the math on the 1-1/2 million, you

15   know, that's well short of 200 grand which is, you know, quite

16   a blow to the value that I'm entitled to under my statutory

17   rights, Title 7 and Title 42 of the U.S. Code.

18          THE COURT:  Okay.

19          MR. THIERRY:  And again my employment is imminently

20   threatened with now a second issue, similar incidence of

21   discrimination from the (indiscernible) office.

22          THE COURT:  Right.  And how does that factor in to

23   the confirmation process?  I'm just a bit confused.

24          MR. THIERRY:  Again it's just -- this process, if

25   I'm second (indiscernible) within the plan again, I don't get

1    to move my lawsuit forward, and again I don't get to earn

2    income again.

3            THE COURT:  Okay.  All right.  Mr. Thierry, thank

4    you for your participation.  You're obviously free to stay on

5    and watch, but your -- I've heard your arguments.  I've noted

6    your objection.  I got the motion for rehearing.  You're free

7    to go if you wish.

8            MR. THIERRY:  All right.  Thank you so much.  I

9    appreciate it.

10           THE COURT:  Thank you, sir.

11           MR. THIERRY:  Thanks, Your Honor.

12           THE COURT:  All right.  Mr. Welch?

13                        CLOSING ARGUMENTS

14           BY MR. WELCH:  Thank you, Your Honor.  A couple last

15   things before I cede the podium.  As Mr. Schrock mentioned, we

16   did make some amendments to the plan.  We filed a redline at

17   Docket 978, just a few changes in there.  I just wanted to

18   draw them to your attention.  As Mr. Schrock mentioned, we

19   have removed the death trap.  That's in 34 of 78, of

20   Docket 978.

21           THE COURT:  Got it.  Give me two seconds.  Let me

22   get it up.  Just so I get there with you.

23           MR. WELCH:  Sure.

24           THE COURT:  All right.  And page 30, what?

25           MR. WELCH:  34 of 78.

1           THE COURT:  Got it.  Okay.

2           MR. WELCH:  And at -- I apologize.  There was

3    just -- at 30 of 78, we had struck a reference to a commitment

4    letter that's no longer relevant.

5           THE COURT:  I see that.  Okay.

6           MR. WELCH:  And then at 57 of 78, we have made some

7    changes to the -- this is the indemnity, or the indemnity

8    provision that we had made amendments for.  This just further

9    narrows the indemnity, requires that parties -- the indemnity,

10   with respect to the 2020 transaction will be provided for

11   holders of FLFO claims and FLSO claims as of the effective

12   date.

13          THE COURT:  Got it.  Okay.

14          MR. WELCH:  And that is reflected as well in the

15   plan supplement document that was filed in 993, which is the

16   new term loan credit agreement which has that indemnity and

17   that structure and those limitations incorporated in there.

18          THE COURT:  That was the fourth amended?

19          MR. WELCH:  Plan supplement?

20          THE COURT:  Thought so.

21          MR. WELCH:  993 --

22          THE COURT:  993, I'm sorry.  Oh, it was the fifth.

23   I'm sorry.  Got it.  Okay.

24          MR. WELCH:  And that is at -- if you're looking for

25   the indemnity and the changes, that is at 156 of 434 of that

1     document.

2               THE COURT:  All right.  Thank you.  Let me just get

3     it up.

4          (Pause in the proceedings.)

5               THE COURT:  I see it, and I assume that it's all

6     consistent?  I'm not going to be able to reach that

7     conclusion.

8               MR. WELCH:  It is, Your Honor.  I essentially --

9     what it does is, it has two indemnities in it.  It has the

10    2020 indemnity for those who are parties to the settlement as

11    initial holders, and it has another indemnity for --

12              THE COURT:  Yeah, it's -- I can't process it in

13    20 seconds, so I'll take the representation that it's

14    consistent with the plan.

15              MR. WELCH:  Thank you.

16              THE COURT:  All right.  Thank you.

17              MR. WELCH:  With respect to other items, we did file

18    our brief at 879 with respect to the 1129 factors.  Unless

19    Your Honor has any questions, I know there's others waiting in

20    the wings here.  We've aligned our papers on those factors.

21              THE COURT:  I've read the brief.  Thank you.

22              MR. WELCH:  Thank you.

23              THE COURT:  All right.  Thank you.

24              MR. WELCH:  Thank you, Your Honor.

25              THE COURT:  All right.  Mr. Costa?

1           MR. COSTA:  Yes, Your Honor.  Good afternoon.

2           THE COURT:  Good afternoon.

3           MR. COSTA:  It looks like you're -- already

4      switching it to the other --

5           THE COURT:  I was grabbing the video screens.

6           MR. COSTA:  Gregg Costa, from Gibson Dunn for the

7      priority lenders and counterclaim Defendants.  Your Honor, I'm

8      going to do the closing argument on the adversary and then

9      I'll turn it over to my partner, Mr. Greenberg, who will

10     address confirmation issues from our perspective.

11          THE COURT:  All right.  Thank you.

12                      CLOSING ARGUMENTS

13          BY MR. COSTA:  At the start of this trial 10 days

14     ago, I said that two pillars of commercial law would resolve

15     this trial.  The first is that businesses can rely on the

16     words of contracts.

17          The second, that businesses have a duty to seek

18     profit and prevent loss.  The evidence showed why those two

19     principles require this Court to reject the implied covenant

20     claim.

21          Evidence that was overwhelming, that was often

22     uncontroverted showed that the priority lenders acted

23     consistently with both of these principles.  The transaction

24     they entered into in 2020, was supported by the words of the

25     2016 credit agreement, and they did so as an act of self-

defense, to protect their investors against the dropdown transaction that had disastrous downside consequences for the investment in Serta debt.

I'm going to spend the next few minutes walking you through the evidence that shows why these two principles, each on their own, require rejection of the implied covenant claim. So I'll start with the contract.

Just last month, the *Cordero* case from New York's highest court, reiterates that an implied covenant claim must arise from the contract.  It can't be based on extra-contractual hopes, the attempt to write into a contract terms that the parties neglected to negotiate for.

It's a narrow doctrine under New York law.  And when a party does something that's authorized by the plain words of the contract, there is no implied covenant claim.  And that goes back to this principle that a business should be able to rely on the words of contracts.

That's why they spend all kinds of time and money negotiating those contracts and having lawyers review their contracts before they enter into a transaction under those contracts.

And so that there's some certainty that when they conduct a transaction like what happened in 2020, that as long as it's consistent with that contract, they can expect it to be implemented and not to be challenged in court.

1    The implied covenant doesn't override that.  It

2    doesn't allow you to rewrite the contract.  If it did, there

3    would be a cloud over transactions because even if your

4    lawyers tell you that what you did is authorized under the

5    contract, someone can bring a good faith, that implied

6    covenant claim, base it on the testimony of someone a year out

7    of college who didn't even look at the key terms of the

8    contract, and who says, "Well, it's just not what I expected

9    might happen under the contract."

10    There's a reason that New York law puts this

11    emphasis on the contract itself, and that's exactly why your

12    ruling on the contract claim alone requires the dismissal of

13    their implied covenant claim.

14    Now those principles of New York law make the

15    implied covenant claim very narrow in all context.  But when

16    you're dealing with sophisticated parties, it's basically the

17    size of the eye of a needle.

18    There are very, very few cases in New York that have

19    allowed a judgment under the implied covenant when

20    sophisticated parties had a contract that governed the

21    transaction.

22    And certainly the sophistication of these parties

23    can't be denied.  These parties are as sophisticated as it

24    gets with the best counsel money can buy.  So again, no basis

25    for reading into the contract limits that they didn't

1     negotiate for.

2              The Court ruled back in March, at the summary

3     judgment hearing, that this transaction was an open market

4     purchase under 905(G), which is an exception to the pro rata

5     right under the contract.

6              And I said back at that summary judgment hearing

7     that the contract's ruling itself could be game over for the

8     entire case, even for the implied covenant claim.  Now the

9     Court understandably said, "Well, you can have the implied

10    covenant as a fact bound area of the law" and perhaps there's

11    some other conduct out there that wasn't before the Court at

12    that time, showing that there was some bad acts here, even

13    though what our clients did was authorized under the plain

14    words of the 2016 agreement.

15             Well, now we've had this trial.  And you've seen

16    that there were no other bad acts.  This was done consistent

17    with the contract, and allowing their claim to prevail here

18    would be allowing them, seven years after the 2016 agreement,

19    to get out a drafting pencil and rewrite the contract.

20             They want to use that pencil to erase Section 2.18,

21    which has the language that carves out from pro rata treatment

22    open market purchases under section 905.  They want to erase

23    other provisions like 905(G) itself, 902(B)(a)(6), to say

24    there are exceptions to pro rata treatment.

25             It's not an absolute right.  The testimony that they

thought they could be first in line forever is just not
consistent with the contract.  I think the evidence that's
shown at this trial that the implied covenant claim really is
nothing more than an attempt to relitigate the contract claim.

It's two sides of the same coin.  It's an attempt to
rewrite the contract.  It's an attempt to undo your ruling a
couple months ago that said this was allowed under the
contract.

And I think a tell for that, Your Honor, was the
expert they wanted to put on.  And you rightly struck that
expert a few days before trial, saying that that expert is
basically just disagreeing with your contract ruling.

And I think really the arguments we heard during the
trial and I expect you're going to hear in a few minutes are
also just really trying to relitigate the contract claim and
undo your contract ruling.

So I think this alone, the fact that the words of
the contract between these sophisticated parties allowed the
2020 transaction.  That alone is enough to rule and reject the
implied covenant claim here.  But there's more, there's a lot
more, other reasons to reject the claim as well.

Now I'm a little reluctant to even get into this
issue of expectations because the best place to look for what
parties should expect under a contract is the words of the
contract.

1          Again that's why you hire lawyers to scrutinize

2     those contracts.  But since there has been a lot of talk about

3     expectations of the parties, I do want to focus on the

4     evidence that entirely shows that this type of transaction,

5     which you deemed a PET, a Position Enhancing Transaction, that

6     the parties in 2016 would have understood that PETs were

7     possible.

8          Mr. Chopra from Centerview talked about the climate

9     in 2016.  It was a very borrower friendly climate, and these

10    liability management transactions were already happening.  And

11    so they were very flexible agreements the parties knew could

12    be used to have people jump the priority line.

13         Same thing from Mr. Sveen at Eaton Vance at the

14    time, 2016.  The agreement was loose and that was expected at

15    the time.  That was consistent with the credit market

16    generally.

17         Mr. Searles, from Barings, the same understanding,

18    flexible, loose documents.  Invesco, Mr. Yarrow, gave

19    testimony consistent with all the other witnesses, and these

20    are the witnesses who talked about 2016, right?

21         They were buying the original debt.  This is the

22    evidence about 2016, and to the extent these expectations are

23    relevant, it has to be the expectations people had in 2016.

24    And this is the evidence you heard about expectations and the

25    business climate in 2016.

1          Now the ultimate question is what would be the

2     reasonable expectations of someone in 2016?  But it's the

3     expectations of someone sophisticated in this area, and we

4     presented this testimony of a number of those sophisticated

5     people who told you what the understanding was back seven

6     years ago.

7          There's no evidence to the contrary.  No one came in

8     who was involved in either negotiating the 2016 agreement, or

9     in buying the original debt in 2016 who said otherwise, right?

10    What did we hear instead?

11         Well, Mr. Kwon who was involved when Apollo later

12    rebought the debt, he understood.  He basically agreed with

13    our witnesses that the 2016 credit agreement was very loose.

14    He agreed with that.  It was company friendly.

15         He didn't dispute that the climate generally allowed

16    for these PETs to happen.  Mr. Hannigan, nice fellow, but he

17    basically knew nothing in 2016.  He was one year out of

18    college.

19         He was working as an investment banking analyst, not

20    in the credit markets, and he didn't ever focus on 905(G).

21    You remember, even to this day, he doesn't understand what an

22    indemnity is, so I don't think he had anything worth saying

23    about what the expectations would have reasonably been in

24    2016.

25         Now at least though, Gamut had someone testify at

1    trial.  Angelo Gordon didn't even have anyone come into this

2    courtroom at trial and say what the expectations might have

3    been in 2016.  Again, they didn't even buy any debt until

4    2020.

5         But they did have a witness, Mr. Gladstone, testify

6    as their 30(B)(6) witness.  In his deposition, he was not the

7    main person at Angelo Gordon on the transaction.  For whatever

8    reason, they decided he was the one though who should be their

9    corporate representative.

10        And what do we know about Angelo Gordon.  Well, they

11   proposed a PET in March of 2020, so that reflects their

12   understanding that this was a loose, flexible agreement.  We

13   also have this document from Angelo Gordon which you've now

14   seen highlighted a number of times, calling it loose, weak,

15   allowing for a liability management solution.

16        Apollo, the same thing, March 2020, Mr. Kwon saying

17   the documents are loose and allow aggressive maneuvers.  And

18   of course, you know, it's always better to look at what people

19   do, than what they say.

20        Now here I don't think those were in conflict.  I

21   think what people are saying in the courtroom and what they

22   did in the real world are consistent.  The people understood

23   this 2016 agreement was flexible and allowed for PETs.

24        But again, let's look at the most persuasive

25   evidence, which is what people actually did in the business

1    world.  And we know that the triumvirate, Angelo Gordon,

2    Apollo, and Gamut made a dropdown proposal in March 2020,

3    before we had even come up with our proposal, that did

4    basically everything they're complaining about in our

5    transaction.

6          They relied on the open market purchase provision

7    for a debt exchange.  It was privately negotiated.  It was

8    going to require new credit agreements.  The participation was

9    limited.  In fact, it was limited to a minority of lenders,

10   unlike ours that had over majority involvement.

11         The participants were prioritized in the event of a

12   default.  I mean, that's the whole reason they wanted to do

13   this.  And the debt was going to be repurchased at a price

14   above the secondary market trading price.

15         So they understood all of those things.  And to use

16   Mr. Hannigan's words, you know, their concern is supposedly

17   that they bargained to be first in line and then they were no

18   longer first in line.

19         I think that's actually the right way to look at it.

20   You know, an implied covenant claim, it's not about the

21   specifics or the mechanics of the transaction.  I mean, that's

22   involved in the breach of contract ruling that you already

23   issued.

24         The implied covenant claim is about what, if it has

25   any scope at all, it's what is the expectations of the parties

who entered into it?  What are they being deprived of?  And it's -- they're saying they're being deprived of being first in line.

But the fact that there were these various PETs out there, including the dropdown they proposed, that would have had that impact of making people jump in front of the line, I think that's the relevant expectation.

And across the board, everyone either testified or through their actions showed that the expectation was that people could jump the line under this loose and flexible credit agreement.

What else do we know about the conduct in the real business world?  Well, after our deal, the Defendants, Apollo and Angelo Gordon, did very similar deals, Mitel, and Envision.

Mitel involved Apollo.  Now it is important here to look at the date because what they're trying to say is, well, yours was in bad faith in 2020, but once you did it, well, that changed the expectations and then it was okay to do it after the first one.

I don't think that makes a lot of sense regardless, because it's basically saying only the first actor's bad, and everyone else can then do copycat transactions and they have some of immunity and it's all kosher.

But the big problem is their dates are wrong.  The

1    Mitel credit agreement was in 2018.  So even under their

2    theory, their theory would only work if the underlying credit

3    agreement for Mitel happened after our 2020 transaction,

4    right?

5         And then their theory is well, you know, now in

6    2023, people have different expectations.  But Mitel, the

7    credit agreement that was being amended occurred in 2018.  And

8    so in 2018, no one knew specifically about the Serta

9    transaction so their whole theory breaks down and falls apart.

10        Now again our point is, in 2016 and 2018, this same

11   time period, the market understood these were loose, flexible

12   agreements so they all are consistent with the expectations of

13   the parties.

14        But there's no basis for differentiating them as

15   they're trying to do, and the chronology, the timing, like I

16   said, blows their theory apart.  Mr. Kwon acknowledged that

17   what happened in Mitel wasn't uptier, the same thing they're

18   complaining about here.

19        Envision, Apollo again, in 2018, the underlying

20   credit agreement in Envision is from 2018, before our

21   transaction.  So our transaction had not happened when those

22   expectations of the parties to the 2018 Envision agreement had

23   been, you know, created.

24        But again, Apollo thinks it's perfectly fine to do

25   an uptier transaction with Envision, amending the 2018

1   agreement.  And then there's a second Envision transaction.

2   I'm sorry, well, this first shows that Apollo recognized they

3   were acting in good faith.

4          They acknowledged good faith in both Mitel and

5   Envision.  That brings us to the second Envision transaction,

6   which involved Angelo Gordon.  This was a dropdown, stripping

7   all the collateral, again under a 2020 agreement.

8          So our view is this shows what was going on in 2016

9   and 2018, flexible agreements.  And again, Angelo Gordon also

10  recognizing good faith when they did it, but for some reason

11  it's terrible when we did it.

12         So to wrap up this point about contracts and

13  expectations, they want to expand the implied covenant claim.

14  They want to override the contract, rewrite it.  And what that

15  would do would lead to, you know, increased litigation even

16  when people are acting under a contract, and it would deter

17  creative business solutions that can solve serious problems

18  like the one Serta found itself in, in the height of the COVID

19  pandemic, in the middle of 2020.

20         The law, it would be bad policy to give such an

21  expansive scope to the implied covenant.  And fortunately the

22  law doesn't allow that kind of implied covenant claim.

23         So now we're going to move onto business

24  justification, our second basic principle, which is that

25  businesses not only have the right to pursue their self-

1    interest and protect against loss, they have a duty, they have

2    a fiduciary duty to do that for their investors.

3         New York law recognizes this principle, just as it

4    does in business judgment rule context, just as in tortuous

5    interference.  Having a business justification is a defense,

6    and the implied covenant, business justification is a complete

7    defense to any implied covenant claim.

8         As long as you're acting for a legitimate business

9    purpose, you can't be held liable under an implied covenant

10   claim.  And what is a legitimate business purpose, it's acting

11   your self-interest.

12        That's the way the business world works.  You're

13   allowed to make money.  And if you're acting that way, that

14   defeats an implied covenant claim.  The implied covenant claim

15   has to be based on malicious acts, acting purely to hurt

16   someone else rather than to benefit yourself.

17        And as we've said, this was a matter of self-

18   defense.  Even if there was no competing offer and we had made

19   this offer, it's still a valid business justification under

20   New York law because we're allowed to make money and take the

21   best risk for our client.

22        But this is an easy case because we were doing

23   this -- we weren't the first actor.  We were doing this as a

24   matter of self-defense.  And I think the critical point in the

25   time line is this May 22 Centerview presentation.

1        You heard Mr. Chopra talk about it.  And it
2   presented some options.  Remember, at this time, the only
3   proposal the priority lenders had made was for new money
4   financing.  It was going to be available to all the first lien
5   lenders.

6        But then the Centerview presentation, there's rumors
7   in the marketplace.  They know there's a competing offer.  And
8   by this time, there's belief it's going to be a dropdown
9   transaction that the other group is pursuing.

10        And so you have the last two options, 3-A and 3-B,
11   are what Centerview feared what the other side was doing.  And
12   you can look at the recovery estimates, and worst case
13   scenario, our clients could have lost, you know, 80,
14   90 percent of their principal, 13 percent, 11 percent
15   recoveries if this dropdown goes through and there's a
16   default.

17        I mean those are disastrous consequences.  It's
18   basically losing your entire investment.  I think Mr. Yarrow,
19   from Invesco, said this threw a curve ball into the whole
20   negotiation.  And of course, they wanted to act to prevent
21   this dire scenario from coming to pass.

22        There's Mr. Yarrow, he says the only reason why we
23   put the deal in front of the company, and he's talking about
24   the exchange part of the deal, the discount part of the deal,
25   was to stop them from doing the Gamut transaction.

1           Again, Mr. Sveen, Eaton Vance, same thing, backed

2       into a corner, having to realize a 25 cent hit, a haircut from

3       our principal, it was tough to swallow, but they had to put an

4       alternative together.

5           That's what was driving the open market purchase

6       that the other side's complaining about.  And again here's

7       just the brief chronology.  I've already talked about.  At

8       first, our group is just putting together new money financing,

9       open to all.

10          It's this late May period, with the Centerview

11      presentation, that causes a change in plans.  We know we have

12      to be more competitive.  We put together the debt exchange,

13      and we put together a proposal that's better for the company,

14      that's going to allow it to delever more than the other side's

15      proposal.

16          And Serta saw that, that our proposal was better for

17      the company on all measures, and accepts our proposal.  Now

18      this was not the deal of the century.  It wasn't viewed at the

19      time as some bonanza for our clients.

20          It wasn't viewed as some windfall.  It was a

21      calculated risk.  They were nervous.  They didn't want to go

22      down to 74 cents on the dollar.  Here's an email from May,

23      this time when it's all happening, saying this is really too

24      low but again we're so worried about this competing proposal,

25      we've got to be competitive.

1          And then after the fact, you know, now, three years

2     later, this is all viewed in hindsight, as well.  We made this

3     great deal and the other side wasn't allowed to do this great

4     deal.

5          For awhile, no one knew if we made a good deal.

6     They didn't know if it was worth that discount, and you've

7     been this demonstrative now many times.  You're familiar with

8     it.

9          In early '21, our folks were sweating it.  They

10    thought they have made a bad deal when it's trading back at

11    80 cents, and if the company had thrived, and we weren't in

12    Bankruptcy Court today, it would have been a bad deal because

13    we took the haircut.

14          So it was a calculated risk like all these business

15    decisions.  But it certainly wasn't some sweetheart deal we

16    got from the company.  And there's the testimony from Sven,

17    saying how this deal was certainly not viewed at the time as a

18    sure fire winner.

19          So for all those reasons, Your Honor, the business

20    justification is rock solid.  It's self-defense.  We were

21    reacting to their proposal.  We had to protect our investors.

22    And so for the priority lender Plaintiffs, the claim should be

23    dismissed on that ground as well as on the fact that the

24    contract allowed what they did.

25          There's some forgotten parties in this case.  The

1    counterclaim Defendants who weren't involved in negotiate --

2    proposing or negotiating this 2020 transaction, they've hardly

3    been mentioned here.

4         And there's no evidence whatsoever that they did

5    anything wrong, and they weren't involved in the transaction,

6    so I don't see how there could be any evidence that they

7    somehow violated the duty of good faith.

8         So now I want to move onto the Defendant's

9    arguments.  I can't beat Mr. Lender's graphics with the flags.

10   I liked that one.  But I first want to talk about jurisdiction

11   which he didn't touch on.

12        You know, the other side's now saying well, you

13   don't even have jurisdiction to decide this case, right, and

14   they have two arguments.  One, it's not core, and two, there's

15   no -- under *Stern versus Marshall*, you can only write a

16   recommendation to the District Court.

17        Well, on the core issue, you've ruled twice.  In

18   staying the New York litigation, you held this was core.  And

19   then in granting judgment on the contract claim, you found

20   that it was a core proceeding.

21        And that's absolutely right.  This is all about, to

22   use their language, who's first in line.  That's a core

23   Bankruptcy Court function.  It's arguably the core Bankruptcy

24   Court function along with administration of the estate.  So

25   I'm not going to spend more on the fact that this was core.

And then as to *Stern*, first of all, the Fifth
Circuit has taken narrow view of *Stern*.  I don't think there's
many cases at all recognizing *Stern* beyond the exact claim at
issue in that case.

And *Stern* itself says, it doesn't apply when -- for
claims that would be resolved in the process of Rule 11
creditors' Proof of Claim.  That's part of what we have here.
And the Fifth Circuit, in the *Renaissance Hospitality* case,
indicated that 157(B)(2)(k) proceedings do not encroach upon
Article 3 courts after *Stern*.  So I think this is perfectly
permissible under *Stern* for you to rule.

And in fact I think the Defendants have also
consented to jurisdiction under *Stern* under the *Wellness
International* decision because what happened back in the
contract claim?  They didn't say in summary judgment briefing,
oh, Judge, you can't rule on this because there's a *Stern*
issue.

And then they agreed to the entry of partial
judgment under 54(b), which had language again saying you had
jurisdiction.  And they didn't say then, well, there's a *Stern*
problem.

And then they asked the Fifth Circuit to authorize
the appeal that trumps the District Court.  And they didn't
identify as an issue for the Fifth Circuit any argument that
you lacked authority under *Stern*.  So for a number of reasons

1     *Stern* isn't an issue.

2            Mr. Lender pressed -- touched on this, and I've

3     already talked about it some, their argument that, you know,

4     ours was unprecedented, and you can never be first.  You can

5     only be second, third, and fourth, and then you can do what

6     you want to people.

7            Again, the testimony is different.  The people who

8     testified about 2016 expectations understood that PETs were

9     possible.

10           I think this is -- I know nothing escapes Your

11    Honor's attention.  But this was a piece of evidence, an

12    exhibit, that didn't get a lot of attention at the trial.  But

13    I think it's important.  It shows that Apollo asked Paul Weiss

14    to do due diligence on the possibility that an uptier

15    transaction exactly like the one we did, whether that was

16    possible under the agreement.

17           Mr. Kwon admitted that the transaction they asked

18    Paul Weiss to diligence was like the one we ended up

19    successfully implementing.  So that's quite telling about

20    whether this was -- is unprecedented as the other side says.

21           But here's the real problem with their argument is

22    that all the parts of this transaction it's undisputed were

23    out there in the marketplace, had happened:  priming debt,

24    debt repurchases, limited participation, amendments by

25    required lenders.

1    I       t's sort of -- their argument is basically like,

2    well, we know there's all those toppings you can put on a

3    pizza, but we don't think you can have that combination of

4    toppings.  And that just doesn't make much sense.  They knew

5    all of these things could have happened individually.  So it's

6    hard to see why that poses any problem.

7           And, again, testimony throughout the trial from

8    various witnesses saying that all these components had

9    happened and were known about in the credit markets.

10          And this sort of gets to the core of it.  They

11   showed no bad faith generally.  They've tried to trumpet this

12   June 4th letter sent to UBS questioning the validity of a

13   dropdown transaction.

14          But there's nothing wrong, as Mr. Chopra said, with

15   saying -- you know, we don't know the details at the time, we

16   don't know exactly what provisions of the credit agreement

17   they're using.  There's nothing wrong with saying you'd better

18   make sure that that's allowed under the credit agreement.

19   It's certainly that letter pales in comparison to the hardball

20   the other side was playing.  You'll remember when they learned

21   that the -- we -- our deal prevails, they offer $30 million to

22   us to say, well, withdraw your proposal so we can -- our

23   proposal will win.

24          I mean, Serta worked hard to have a system that

25   would allow Serta to get the best offer.  They entered into

NDAs, right.  And they wanted to enter into those NDAs so there was no collusion among the lenders and that they would get the best lender proposal for the company.

Well, paying off $30 million to withdraw your proposal guts that whole process Serta put together.  And it would have -- if that had happened -- and there was testimony that calls were actually made.  There was testimony about that.  But if it had gone through, it would have hurt Serta.  They wouldn't have been able to deleverage to the extent they did and survive a few more years after COVID.

Then they say, well, it's bad faith because, you know, you didn't let just everyone join in.  Well, I think it's just basic economics.  Mr. Chopra explained it.  To give the discount we were giving, to give that steep haircut, you had to be getting something in return.

And what were they getting in return?  Well they were going to the front of the line.  And if everyone was going to the front of the line then there wasn't -- that consideration wasn't going to be worth it.

And, again, look at what their proposal, only a minority of lenders were going to be participating.  So how can they complaint about ours as bad faith when we at least had a majority of the lenders who would be benefitting?

Then the indemnity we've heard so much about.  Again, it's common in the industry.  They went immediately to

1    court before we closed in New York State Court, tried to get a

2    TRO to prevent the closing.  It would have been malpractice

3    not to try and get an indemnity agreement.

4    They say, well, it shows the carveout to the carveout saying,

5    you know, well, even if it's bad faith, it -- you can --

6    there's still indemnity if it involves a 2020 transaction.

7    Again, there's nothing wrong with that.

8         They point to public policy concerns with

9    forward-looking indemnities.  And New York courts and other

10   courts are skeptical of those because if you say, well, we'll

11   indemnify you even for intentional conduct and fraud for years

12   to come, that creates bad incentives, right?

13        But here it was a backward-looking indemnity.  The

14   company was indemnifying something they knew everything about.

15   The company was involved in the 2020 transaction so they know

16   what we had done, they knew what they did.  That

17   backward-looking indemnity is not problematic in any way.

18   And of course Angelo Gordon, showing it's perfectly

19   reasonable, had the same language in their envision agreement.

20        Then I don't want to leave out LCM.  LCM, I have to

21   give them credit at least because as I've said, I think this

22   whole trial was really a repackaged breach of contract claim.

23   LCM at least is upfront about it.

24        I mean, in their post-trial brief, they're basically

25   saying you need to revisit the contracts ruling, right,

1    because they have this amend and exit claim where they claim

2    the order in which the amendments and the debt, the new loan

3    agreements happened was somehow violative of the 2016

4    agreement.  So at least give them credit for just being

5    upfront about the fact that they're trying to relitigate

6    breach of contract.

7         The problem is, that ship's sailed and it's docked

8    up in the Fifth Circuit.  You entered a judgment on the

9    contract claim.  That's a binding judgment and the Court can't

10   revisit the contract claim.

11        In any event, there's no basis to do so.  Their

12   theory doesn't make sense.  In *Murray Energy*, the Ohio

13   Bankruptcy Court said it was sophistry, said the claim had no

14   merit.

15        And you can look at the agreements we highlighted in

16   our post-trial briefing.  We made a condition precedent.  The

17   votes and the amendment process were condition precedent to

18   the new loan documents issuing the new loan purchases

19   happening.

20        So to sum up, Your Honor, you've described these as

21   PETs.  We're almost nearing the three-year anniversary of this

22   transaction.  It's been litigated almost from the beginning.

23   And finally, after almost three years, there's been a full

24   hearing in this court.

25        And I think what that trial has shown is that there

1     was nothing about this case other than good, old-fashioned

2     competition.  Two groups put together a proposal.  We just

3     won.  Our proposal was better for the company.  And they're

4     unhappy.  They don't like to lose.  Some of them don't lose

5     that often.  And they're trying to change -- you know, they

6     lost at the negotiating table.  They're now trying to undo

7     that in court.

8           But I think the evidence you've seen shows we both

9     made proposals that had the same economic effect.  There was

10    no bad faith in those proposals.  It was just good,

11    old-fashioned business competition.  And it was good business

12    judgment that our clients exercised.  And as a result, there's

13    no merit to their claims.  You should grant our declaratory

14    judgment and dismiss their counterclaims.

15          Unless the Court has any questions, I'll turn it

16    over to Mr. Greenberg.  But he can decide if he wants that

17    slide to --

18          THE COURT:  Okay.

19          MR. COSTA:  -- stay up.

20          THE COURT:  Thank you, Mr. Costa.

21          Mr. Greenberg.

22          MR. GREENBERG:  Good afternoon, Your Honor.  For the

23    Record, Scott Greenberg, Gibson Dunn & Crutcher, on behalf of

24    the PTL Lender group.

25          Your Honor, I don't have slides.  And I think that

1   was an intentional decision after I saw Mr. Costa's closing

2   slide, that there was not going to be a chance I would outdo

3   them.

4          But in all seriousness, I'm going to focus, I think

5   as Mr. Schrock did, more on the confirmation-related items.

6          THE COURT:  Right.

7          MR. GREENBERG:  Obviously they tie to the adversary.

8   And there are some objections that have been raised.

9                      CLOSING ARGUMENTS

10         BY MR. GREENBERG:  But, Your Honor, obviously we've

11  spent the last five months talking quite a bit about the

12  litigation.  And the litigation, this confirmation are

13  certainly entangled.  But I don't want to lose sight, and I'm

14  sure the Court hasn't lost sight, of where we are in these

15  Chapter 11 cases.

16         The cornerstone of these cases when we filed back in

17  January was an RSA and a plan which had 85 percent of the

18  first lien first outs as signatories and 84 percent of the

19  first lien second out.

20         As Your Honor knows, you approved the Disclosure

21  Statement.  The plan has been solicited.  And the voting

22  deadline has passed.  And as Your Honor knows from the voting

23  tabulation, the plan enjoyed overwhelming support.  The plan

24  was accepted by 99.9 percent of the first lien first outs and

25  95.63 percent of the first lien second outs, a hundred percent

1    of the unsecured trade claimants.

2            And as Your Honor knows, the Unsecured Creditors

3    Committee also supports confirmation of the plan.  And that

4    Committee is a fiduciary for all unsecured creditors, like the

5    PTL Lenders and the future owners of this business have a

6    vested interest in making sure this business succeeds.

7    The objection deadline has passed.  And as Your Honor knows,

8    we just spent last week clogging up what I know is your very

9    busy calendar, putting in evidence in support of confirmation.

10           Your Honor, I'm not going to spend too much time on

11   the 2020 transaction in detail because you've heard a lot.

12   What I will say is that when we all got back together as

13   professionals in the summer of 2020 and the Debtor's

14   professionals reach out to us, but not only us -- as you've

15   heard, they reached out to the non-PTL Lenders as well -- we

16   knew we had an issue on our hand that related to the Debtor's

17   capital structure that was going to require recapitalization

18   transaction and was in all likelihood, and turned out to be

19   true, going to require an in-court process.

20           There was a problem, however, that we had, which was

21   the Debtors and the PTL Lender group had significant

22   litigation ongoing with the non-PTL Lender group.

23           And as Your Honor heard through the first day

24   declarations at the outset of the case, while the parties,

25   both sets of groups, were negotiating with the Debtors in the

1    fall of 2022, Angelo Gordon, Apollo, and Gamut refiled their

2    litigation in New York State Court in front of Justice Masley,

3    the same litigation that they had voluntarily dismissed a

4    couple years earlier.

5          That was by my count the fourth lawsuit we faced

6    collectively we -- the PTL Lenders and the Debtors, since we

7    completed the transaction in 2020.  So I think it's fair to

8    say that the continued and pervasive litigation overhang was

9    going to put a cloud over these cases that we needed to deal

10   with.

11         And we knew collectively that absent a final

12   non-appealable order adjudicating the issues, that there was

13   no liability for the Debtors or the lenders thereunder, we

14   were going to have to come up with a different construct.

15   As Your Honor knows, the Debtors proactively filed an

16   adversary proceeding on day one of these cases.  And part of

17   that was to try to bring finality to the ever-continuing

18   litigation that had been ongoing for the last three years.

19         The non-PTL Lender group, as Your Honor also knows,

20   has not been shy that they have no intention of putting down

21   their litigation swords.  So it should come as no surprise to

22   anyone, as you've heard through the testimony of Mr. Yarrow

23   and Mr. Sveen and Mr. Searles that our clients were very

24   focused on having the proper protections in place as we moved

25   this process forward.

1          So I think we were dealing with a practical problem,

2     Your Honor, as we prepared to file these cases, which is how

3     do you streamline the Chapter 11 cases to protect the company

4     while at the same time dealing with the relentless litigation

5     of the non-PTL Lenders?  And I do believe in retrospect we

6     came up with a pragmatic approach, to delever the balance

7     sheet of the Debtors and try to quickly emerge from

8     bankruptcy.

9          Your Honor, I'm not going to pretend that it was all

10    altruistic.  Obviously our lender group was also focused, as

11    you heard through the testimony last week, on their own

12    litigation overhang, given the relentless litigation by the

13    non-PTL Lenders.

14         But speed was the key to this bankruptcy proceeding,

15    as you've heard throughout.  You heard that through the

16    testimony of John Linker, the CFO of the Debtors, and

17    Mr. Tepner, who's on the transaction and Finance Committee.

18    From the Debtor's perspective, an expedient exit from

19    bankruptcy was paramount.  A quick exit helps the Debtors

20    obviously maintain their business continuity.  It reassures

21    employees, it preserves jobs, and fosters stability.

22         And candidly, Your Honor, I think the parties also

23    wanted to avoid handing any more litigation leverage to the

24    non-PTL Lenders by requiring a non-appealable final order

25    because by definition strategically obviously the other side

1      will do everything in their power to stretch out these cases

2      and keep this company in bankruptcy to create more leverage

3      against the Debtors and our clients.

4              Your Honor, effectively we reached a practical

5      solution which is before Your Honor.  And I think everyone's

6      been entirely transparent throughout these Chapter 11 cases

7      about it.

8              We filed an adversary day one with the Debtors.

9      There's a go-forward indemnity which I'll talk about.  There

10     are CPs to getting a favorable ruling as it relates to the

11     2020 transaction to confirmation, which the Debtors and we

12     have briefed.

13             And the idea was to get the company out on the

14     fastest timeline for the benefit of its employees, its

15     investors, and its customers.

16             Your Honor, the indemnity, which I'll touch on

17     because I know it's been the subject of a lot of objections

18     and a lot of the back and forth with Citadel last week with

19     the competing financing, exit financing proposal.

20             But I think our collective view, and this is in the

21     Debtor's confirmation papers as well, was that the indemnity

22     would also be less likely to be called upon because, as we've

23     talked about, the plan has a CP to confirmation as it relates

24     to a ruling on the 2020 transaction.  And Your Honor has

25     obviously already ruled on the open-market purchase.

1          We recognize that there's still appellate risks.

2     We're well aware of the Fifth Circuit appeal that's pending.

3     But we're narrowing the scope, so to speak, of the risk

4     profile go forward I think from both ours and the Debtor's

5     perspective.

6          Your Honor, the indemnity also makes sense from our

7     perspective.  The first lien second out lenders under the

8     plan, Your Honor, our clients for the most part, obviously

9     others as well, will become the owners of the company.

10    And practically speaking these lenders, if and when this

11    hypothetical ever plays out, obviously we don't think it's a

12    high risk, but if it does ever play out, as the owners of the

13    business in the future, they'll have a decision to make if

14    there's a claim, whether or not they put the claim back

15    against the company and impact their equity or they deal with

16    the claim in some other fashion.  It's a hypothetical but it's

17    one that we'll deal with down the road if and when it ever

18    comes to fruition.

19         If -- and, Your Honor, I would say it's not as

20    draconian as I think the papers have attempted to paint the

21    indemnity as we've talked about and the evidence supports.

22    The indemnity obviously is a very common feature in all of our

23    exit facilities as we emerge from bankruptcy.

24         And we do believe it was a practical solution to

25    deal with the litigation, while at the same time the

1    alternative would have been to say to the Debtors, well, you

2    have to stay in chapter until we get a final non-appealable

3    order and we have a resolution once and for all.  And that

4    would not I think have been to anyone's benefit, and certainly

5    not the Debtors.

6        And really addressing some of the objections that

7    have been raised, Your Honor.  Despite the characterization by

8    the objecting parties, the go-forward indemnity is part of a

9    holistic settlement and compromise that was bargained for

10   under the RSA and embodied in the plan.

11       The indemnity benefits holders of all claims in

12   Class 3 and Class 4.  And it's part of the consideration

13   they're receiving under the plan.  Everyone gets the same

14   treatment.

15       These are allowed claims that were stipulated by the

16   Debtors under the DIP order and never properly challenged by

17   the non-PTL Lenders or any other party-in-interest.

18       And as Your Honor recognized last week, the

19   indemnity is not severable on its own.  It's part of a global

20   settlement.  And I know a lot of this was highlighted in the

21   back and forth with the competing Citadel proposal.  But it

22   was part and parcel, as you heard through the testimony of

23   Mr. Sveen, Mr. Yarrow, and Mr. Searles, of the bargain they

24   reached with the Debtors to support the plan.

25       Your Honor, to hit on some of the issues you raised

1    as well in your commentary to all of us Thursday when we

2    broke, as Your Honor noted, there are limitations under

3    1123(b)(2) of the Bankruptcy Code.  As you note -- as I'm sure

4    the Court noted, the Debtors have amended the plan prior to

5    the confirmation hearing to make it clear that the indemnity

6    is not being assumed in any way.

7            The other issue I'll touch on, and I know we all

8    collectively briefed it, is the 502(e) objection which was

9    raised both by the non-PTL Lenders and Citadel.  And I

10   candidly think that one's a bit of a red herring, Your Honor.

11   The Class 3 and Class 4 holders of the funded debt claims

12   indisputably have allowed claims against the Debtors.  And

13   those holders, as you heard through the testimony, are

14   receiving the indemnities in the takeback credit agreement as

15   part of a distribution of their claims.

16           So 502(e) is irrelevant from our standpoint because

17   those holders, our holders, are not receiving anything on

18   account of our allegedly contingent indemnification claims,

19   Your Honor.

20           And irrespective of the foregoing, I don't want to

21   go too far down the rabbit hole because I don't think we need

22   to, but even if 502(e) did apply in the claims objections that

23   have been brought, I do think those still fail.

24           As you know, the non-PTL Lenders and LCM and others

25   have gone out of their way in front of this Court on multiple

1    occasions, whether it was in the 105 context or otherwise, to

2    make clear that those claim -- that they have claims that are

3    against our clients, the PTL Lenders, only.  So there's a

4    little bit of arguing both sides of the coin here.

5         They've -- they haven't put any evidence in to

6    support conclusory remarks that somehow we are co-liable

7    which, as Your Honor knows, is the first element under

8    502(e)(1)(B).  And that's a conjunctive test under

9    502(e)(1)(B), and we don't feel like there's any evidence to

10   support it.

11        And for the same reason, with a lack of evidence on

12   co-liability, we feel 509(c) fails as well.

13        But I come back to where I started, Your Honor.  We

14   indisputably have allowed claims to the tune of billions of

15   dollars against these Debtors, and they're being compromised.

16   And part of that compromise, if you look at it most simply, is

17   we're getting two pieces of currency.  One is equity on a pro

18   rata basis, and one is a takeback loan.  And embodied in that

19   takeback loan is the indemnity that we bargained for.

20        Your Honor, one other point I want is just

21   transparency.  I think we've been very transparent, as have

22   the Debtors, from the very first day.  And Mr. Schrock going

23   back and looking at the transcript, you know, pointed out to

24   the Court the importance of the indemnity given the litigation

25   overhang and the negotiations that were had around that

1     indemnity.

2              I don't think anyone has ever done anything but been

3     transparent with the Court throughout pleadings, our filings,

4     the supplemental pleadings filing the credit agreement that

5     spells it out so everyone could see it for the world to let

6     them know it was there.  So there's been no attempt to hide

7     the importance of that provision to our clients.

8              And just to get to the punchline, Your Honor,

9     because you heard it last week through the testimony, there

10     would be no confirmable plan without the indemnity.

11             Now, you heard the indemnity was part of the

12     holistic deal.  At trial you heard testimony from four

13     separate institutions of the PTL Lenders, Andrew Sveen from

14     Eaton Vance, Davis Meierings from Credit Suisse, Mike Searles

15     from Barings, and Phil Yarrow from Invesco, each testified of

16     the importance of the indemnity and, when asked, answered

17     clearly that they would not have voted for the plan if that

18     indemnity was not baked into their consideration.

19             And, Your Honor, you also heard testimony from our

20     investment banker, Mr. Chopra, who made clear that without

21     even looking beyond those four holders, those four holders

22     alone hold enough paper in the first lien second out that you

23     cannot confirm a plan around them.

24             So as such we feel like the Debtors would not have,

25     and I think the record supports, a confirmable plan without

1    that indemnification provision baked in.

2         And so what does that equate to and where are we?  I

3    mean, in my mind, Your Honor, it really boils down to the

4    Debtor's business judgment is what we're talking about.  In

5    terms of evaluating whether the plan can be confirmed with

6    this provision, it's a question of whether the Debtors

7    exercised their business judgment.

8         The condition precedent in the plan, Your Honor,

9    that this Court rule favorably an adversary proceeding, plus

10   providing a new go-forward indemnity to holders of Class 3

11   and 4 claims, I believe is a pragmatic solution to implement a

12   significant deleveraging of the Debtor's capital structure now

13   and emerging from bankruptcy in a timely fashion.

14        You heard testimony from Mr. Roopesh Shah, the

15   Debtor's banker, you heard testimony from Mr. Tepner from the

16   board of the Independent Committee, and you heard testimony

17   from Mr. Linker, the CFO, all about the deterioration that

18   would come to this business if it had to mire in bankruptcy

19   for any elongated period of time.

20        And no other party, as Your Honor knows, can

21   substitute its own judgment for that of the Debtors who are

22   fiduciaries for the estate.

23        Your Honor, I would argue that the Debtors received

24   real value in exchange for the indemnity.  I think when we had

25   this dialogue last week in court, just to paraphrase, Your

1    Honor, I think the question was, what did the Debtors give and

2    what did they get?

3         Clearly the Debtors gave in terms of protecting the

4    PTL Lenders from appellate risk until this issue is finally

5    adjudicated.

6         But what did they get in return in exercising their

7    business judgment?  I think the Record would reflect they got

8    a lot, Your Honor.  Mr. Shah and Mr. Chopra both testified

9    about the value the Debtors received here, just in its most

10   simple form, the equitization of over $1.6 billion of debt to

11   effectuate this restructuring.

12        But let's not lose sight on the fact that they also

13   got from our clients an RSA, which we filed when we filed the

14   cases, support for uncontested use of our cash collateral.

15   Our clients were party to and part of the UCC settlement.

16   They -- we voted to accept the plan in overwhelming favor.

17   And, again, we're agreeing to equitize over $1.6 billion of

18   our debt.

19        And as the Debtors themselves noted in their

20   conclusions of fact and findings of law, given all the

21   litigation that's been brought by the non-PTL Lenders to date,

22   there simply would be no plan, no equitization of claims, no

23   reorganization without an indemnity moving forward relating to

24   this litigation.

25        Indeed, no rational party would agree to equitize

1    claims without an indemnity.  I think Mr. Schrock articulated

2    that point well at the outset of today's hearings.

3            So, Your Honor, I think the Record shows pretty

4    clearly that the Debtors received sufficient value in exchange

5    for agreeing to the RSA in the plan with the indemnity

6    provision, but without the requirement, the alternative as I

7    would put it, of a non-appealable final order.

8            Your Honor, just two other points I want to hit

9    quickly because you raised them in our comments to us at the

10   end of the hearing last Thursday.  One was economic coercion.

11   Your Honor, the plan -- I think the testimony and evidence is

12   very clear as you -- we've listened to a week about the

13   competing proposals from the two parties, that this was the

14   result of good faith and arm's-length negotiations.  It

15   certainly wasn't the result of economic coercion.  And the

16   Debtors were not forced to agree to a deal with our group.

17           I'd like to think after all these years I could

18   coerce Mr. Schrock and get him to a deal that I wanted for my

19   clients.  But I've been at it for 20 years and I'm still

20   batting zero.

21           But in all seriousness, Your Honor, the Debtors made

22   a series of reasoned decisions, the benefits of the plan and

23   agreeing to a go-forward indemnity to allow this company to

24   emerge swiftly through Chapter 11.

25           The Debtors were free to negotiate and agree with

1    whatever parties they wanted.  Obviously they were negotiating

2    with the other party.  Again as we came upon these Chapter 11

3    cases in the fall, they simply had a decision to make, and

4    they exercised their business judgment in agreeing to do a

5    deal and sign an RSA with our clients.

6           The last thing, and I'll hit it very briefly because

7    Mr. Schrock covered it and covered it well, feasibility was

8    raised in some of the objections:  1129(a)(11), as Your Honor

9    knows, simply requires that a Debtor show that confirmation

10   proposed plan is not likely to be filed by a liquidation or

11   need for further reorganization.

12          It does not require that a Debtor prove its

13   reorganization will be successful no matter what.  If that was

14   the case I guess we would have no Chapter 22s.

15          Your Honor, the Fifth Circuit law, and it's the

16   applicable law, is that the Debtor needs to show a reasonable

17   assurance of commercial viability.  And that's the matter of

18   *Re Briscoe Enterprises LTD*, 994 F.2d at 1160.

19          As Your Honor knows, to date there's been no adverse

20   decision related to the 2020 transaction, no judgment, and

21   certainly no speak of monetary damages in any definable

22   fashion.  So I think when we talk about feasibility, we are

23   talking about a true hypothetical that in no way should

24   prevent confirmation of this plan.

25          Potential appellate risk years down the road, Your

1    Honor, does not warrant denying conformation of a plan that's
2    supported by 99 percent of the first lien first outs,
3    96 percent of the first lien second outs, a hundred percent of
4    the unsecured trade claimants in the UCC, and delevers the
5    Debtors balance sheet by approximately $1.6 billion.
6         And with that, Your Honor, I -- with no fancy
7    slides, I will rest.
8         THE COURT:  Mr. Greenberg, thank you, sir.
9         MR. GREENBERG:  Thank you.
10        THE COURT:  Okay.  Oh, I am so sorry.  Can we get
11   the Committee since they support?  Thank you.
12        MR. WILSON:  Good afternoon, Your Honor.  Eric
13   Wilson of Kelley Drye for the Creditors Committee.  With me in
14   the room are my colleagues Jason Adams and Sean Wilson.
15   I've been quiet.
16                    CLOSING ARGUMENTS
17        BY MR. WILSON:  I rarely speak unless I have
18   something to add, which is decidedly rare.  But I thought I'd
19   start out the way I have in previous appearances before Your
20   Honor, which is to say that the Committee's always understood
21   the benefits of this plan, even before we reached the
22   settlement.
23        The significant debt reduction, treatment of general
24   unsecured creditors, particularly with respect to go-forward
25   creditors in Class 6, Class 6-A, who were originally scheduled

1    to receive payment in full, albeit over the course of a year,

2    was certainly a good start.

3          So against that backdrop the Committee undertook its

4    investigation of the Debtor's path towards Chapter 11, as well

5    as the assumptions behind the plan and the treatment of all

6    general unsecured creditors, including the non-go-forward

7    creditors in Class 6-B who were receiving a very different and

8    less favorable treatment than the Class 6-A folks.

9          So we did that investigation.  We cast a broad net.

10   We covered not only transactions with the lenders that the

11   Court's been hearing so much about, we did a review of their

12   liens.  And we also looked at numerous other transactions with

13   third parties.

14         And with the cooperation of the Debtors and the PTL

15   Lenders, we were able to quickly conduct some thorough and

16   comprehensive discovery.  We were able to complete our

17   diligence.

18         And despite the testimony you heard from Mr. Tepner

19   last week as to his belief as to the lack of merit with

20   respect to those claims, we did identify value for general

21   unsecured creditors, including some unencumbered assets, a

22   number of viable claims related to historic transactions,

23   including dividend payments.  There was a prepetition KERP and

24   claims arising from the 2020 transaction.

25         Fortunately, following numerous discussions with the

1    parties, we were able to agree to the terms of the settlement

2    that's incorporated into the amended plan that you have before

3    you.  That settlement involves a number of key improvements

4    that Mr. Schrock previewed in his opening statement last week.

5    Those include an accelerated time table for full payment of

6    the Class 6-A go-forward creditors.  They will now be paid

7    within 60 days of the effective date as opposed to one year.

8         The settlement also provides for a material increase

9    in the recovery to non-go-forward creditors in Class 6-B.

10   That took us from a million dollars to $5.75 million, plus the

11   proceeds of certain litigation claims.

12        And, finally, the plan provides trade creditors with

13   a viable go-forward business partner which was at the

14   beginning and remains very important to the Committee.

15        So with those improvements and others, including

16   exculpation of the Committee members, the Committee supports

17   the plan.

18        I would point out and echo the representations made

19   by counsel for the PTL Lenders that we did have full Class 6-A

20   support for the plan and a unanimous vote.

21        And while Class 6-B actually rejected the plan, I

22   think those votes were cast -- or I know they were cast before

23   the settlement was reached.  And as we mentioned, that

24   settlement has exponentially increased the recovery to those

25   folks.  And we believe that with that settlement the plan is

1    fair and equitable with respect to Class 6-B.

2              So with that, unless Your Honor has any questions,

3    we'd ask the Court to approve the settlement and confirm the

4    plan.

5              THE COURT:  Mr. Wilson, thank you.  And I appreciate

6    the pragmatic approach exhibited by the Committee in the case.

7              MR. WILSON:  Thank you, Your Honor, appreciate it.

8              THE COURT:  Thank you.

9              All right.  Have the parties objecting -- I --

10   Mr. Lieberman, are you going first?

11             MR. LIEBERMAN:  I think so.

12             THE COURT:  Okay.  Fair enough.

13        (Pause in the proceedings.)

14             MR. LIEBERMAN:  Good afternoon, Your Honor.

15             THE COURT:  Good afternoon.

16             MR. LIEBERMAN:  Neil Lieberman on behalf of the LCM

17   Defendants.

18                      CLOSING ARGUMENTS

19             BY MR. LIEBERMAN:  At the outset of the trial I told

20   you LCM was focused on specific and narrow claims that Serta

21   and the PTL Lenders breached the 2016 credit agreement by

22   amending the agreement at a time when they no longer held

23   first lien debt; that in the alternative, if the Court found

24   that the 2016 agreement's expressed terms permitted the

25   lenders to simultaneously amend and exit the agreement, it was

1    a breach of the implied covenant to do so.

2            And, finally, that it was a breach of the implied

3    covenant to carve up the 2016 credit agreement in secret with

4    the specific goal of stripping LCM's priority rights.

5            And I said that while LCM's claims were derived from

6    the deal documents themselves, the evidence presented at trial

7    would fully support LCM's theories.  And I submit that it has.

8    It's uncontested that the 2020 transaction required Serta and

9    the PTL Lenders to amend the 2016 credit agreement to permit

10   the transaction.  And it's uncontested that amending the

11   agreement requires the required lenders threshold of

12   50.1 percent of the lender's at the time of the amendments.

13           But as the documents and testimony made clear, the

14   amendments were approved simultaneously with and conditioned

15   upon the PTL Lenders exiting the 2016 agreement.  So there was

16   no moment in time which the PTL Lenders both held first lien

17   loans and were subjects to the amendment they agreed to.

18   Indeed, the amendments were contingent on exit because they

19   were designed to redound to the benefit of the amenders and to

20   disadvantage the remaining holders of the first lien loans.

21   The lenders testified as much.

22           Mr. Sveen testified that there was only one

23   transaction presented, and it was one transaction together,

24   and that he did not believe amendments would be approved

25   without the exchange.

1          Mr. Yarrow agreed that Invesco never considered

2     voting for the amendments without participating in the

3     exchange, and that the deal formed one transaction.  The deal

4     documents confirm this.

5          The amendment itself, it's styled as a condition

6     subsequent, but it is immediately following the execution of

7     the amendment the credit -- PTL credit agreement becomes

8     effective and the PTL new money term loans are funded and

9     initial PTL exchange transactions consummated.  The open

10     market purchase is similar.

11          And the PTL credit agreement actually has it in

12     reverse.  It says that each exchanging lenders "X" sold into

13     an open market purchase and sale transaction its relevant

14     existing loans in exchange for consideration consisting of a

15     new class of loans, and is further described in the open

16     market purchase and cash exchange agreement by providing their

17     consent to amendment number one to the first lien loan

18     agreement.

19          Serta and the PTL Lenders have argued that the

20     amendments occurred just prior to the exchanges.  But it's a

21     tenet of New York law that an agreement has to be read and not

22     to lead to an unreasonable outcome.

23          And here's it commercially unsustainable and

24     unreasonable to interpret the contract in a fashion that

25     allows a majority of contract participants to vote to amend a

1   contract so that the amendments never apply to them.  Indeed,

2   the majority vote requirement is there to protect the lenders.

3   And I point to Section 9.05(G)(6)(a) where affiliated lenders

4   that continue to hold debt don't count towards the tally of

5   required lenders.

6        The exceptions to the contract for amendment that

7   require all adversely affected lenders to vote provide

8   additional support.  How can it be on one hand that there's a

9   set of transaction that -- transactions that specifically

10   required adversely affected lenders to vote for a transaction

11   and a -- but yet another where the transaction doesn't require

12   any remaining lenders to vote for it?

13        Just turning to one of the arguments we heard from

14   Mr. Costa, the summary judgment ruling doesn't foreclose this

15   claim, in our view.  The adversary amended complaint seeks a

16   declaratory judgment that the transaction was permitted under

17   the non-PTL term loan agreement.

18        At the hearing, Your Honor said you were only ruling

19   on the open market purchase and 9.05(g), and that's at the

20   transcript 135, 4 to 9, "What I'm not prepared to find in that

21   all aspects the credit agreement was complied with.  I don't

22   have the evidence before me.  What I was asked to determine,

23   at least the way I read it, was that was whether or not the

24   commercial transaction that was engaged in fit within 9.05(g),

25   and I find that it does."

1     The order on summary judgment states that the Court

2  finds as a matter of law that the term "open market purchase"

3  is clear and unambiguous and, therefore, has not resorted --

4  and the Court did not resort to as stringent evidence to

5  interpret that provision.

6     On that basis the Court grants summary judgment for

7  Plaintiff, declares that the term "open market purchase" in

8  Section 9.05(g) of the non-PTL term loan agreement is clear

9  and unambiguous, and declares that the transaction entered

10 into by Plaintiffs and certain other lenders in June 2020

11 constituted an open market purchase under Section 9.05(g) of

12 the non-PTL term loan agreement.

13     The summary judgment order does say that whereas the

14 parties to this adversary proceeding agree that in light of

15 the Court's summary judgment ruling, the Court should enter

16 partial final judgment in Plaintiff's favor on Plaintiff's

17 claim that the transaction was permitted under the non-PTL

18 term loan agreement, the Court finds that there is no just

19 reason for delay in entering partial final judgment and hereby

20 enters partial final judgment in Plaintiff's favor on that

21 claim under FRCP 54(b).

22     But Weil's notice of proposed order, which is

23 Docket 138, specifically states that it reflects the ruling

24 issued by the Court on the Record, which was limited to the

25 open market purchase.

1        Accordingly, the LCM Defendants still have a live

2   counterclaim for breach of contract to preserve their appeal

3   rights and in light of the Court's statement at the hearing.

4   That partial grant of summary judgment was sufficiently narrow

5   to, in our review, let us continue to bring that argument.

6        Even if the Court were to hold that the amendment

7   process was technically permissible under the credit agreement

8   or that we were foreclosed from making the contract claim,

9   it's -- the uncontested facts of the amendment support a claim

10  for breach of the implied covenant.

11       Manipulation of rights for personal gain to deprive

12  the other party of a benefit of a bargain is a violation of

13  the implied covenant.  And we cite cases in our brief on that,

14  *Shatz v. Chertok*, 180 A.D.3d 609.  That's from the Appellate

15  Division, First Department, 2020.  The *Richbell versus Juniper*

16  *Partner* -- *Jupiter Partner* case, 309 A.D.2d 288, also the

17  First Department, 2003.  And very recently in a very similar

18  case at the trial court level in the *Boardriders* case, which

19  is 2022 Westlaw 10085886.

20       Here, the implied covenant claim is clear.  The PTL

21  Lenders were paid for their consent to amend the credit

22  agreement on their way out, reaping an undeniable personal

23  benefit and destroying LCM's and other lenders' first priority

24  rights.  Testimony has borne this out as well.

25       As discussed, the PTL Lenders unanimously testified

that the amendments and exchange were part of a single transaction and they would not have voted for the amendments without the benefit of the exchange.

And it is uncontested that the PTL Lenders and only them benefitted from the amendments. And, indeed, it was necessary to exclude the nonparticipating lenders to accrue that benefit. As Mr. Chopra testified, all else being equal, the more first lien lenders left behind, the better.

New York law also requires consent of nonparticipants to cleanse any implied duty violation. Those -- that was the holdings in the *Cass* case and in the *Octagon versus NYDJ Apparel* case.

The PTL Lenders will no doubt argue that the transaction agreements were executed simultaneously, and the amendments came in to affect legally a millisecond before the exchange. But this is meaningless sophistry and would elevate form over substance.

And the case *KeyBank versus Franklin Adviser*, 616 B.R. 14, Bankruptcy Southern District of New York from 2020, basically cautions against that saying that transaction that lack economic substance or elevate form over substance and that merely represent efforts to undermine another party's contractual rights are prime examples of matters that may constitute breaches of the implied covenant. And that's precisely what happened here.

1          The transaction also violated the implied covenant

2     because it had the effect of stripping LCM of its pro rata

3     rights, which also is a classic implied covenant claim.  And

4     we heard testimony from Mr. Tepner that priority was a

5     fundamental feature of the 2016 credit agreement.

6          We also -- it's undisputed that amendment was

7     necessary to strip this fundamental feature and that Serta and

8     the PTL Lenders ensured that only the bare majority were

9     invited to participate, that non-participated --

10    nonparticipants were not alerted to the transaction until it

11    was fully baked.  These are the uncontested facts.

12         And New York courts have acknowledged that they are

13    sufficient to support a claim for the violation of the

14    covenant of good faith and fair dealing.  We heard that first

15    from Judge Vela.  We heard it again in *Boardriders*.  And most

16    recently in the *AEA v. Marblegate* case from the First

17    Department, 185 N.Y.S.3d 73.

18         The justifications that you've heard this afternoon

19    and throughout the trial fail.  The arguments that all

20    position-enhancing transactions were commercially encompassed

21    by the 2016 agreement misses the point.  LCM isn't challenging

22    generally position-enhancing transactions.

23         It is challenging this particular transaction on the

24    specific bases that the PTL Lenders violated the implied

25    covenant not to amend the agreement in a manner that would

1    only detrimentally apply to others, and would be contingent on

2    their exit from the credit.

3           The inquiry is then on that level of specificity,

4    not generally whether there was some general risk associated

5    with the credit agreement.  At that level, one key difference

6    here is that a so-called dropdown transaction and the one at

7    issue here is -- that admittedly the dropdown transaction did

8    not require amendment.

9           You need only look to the language and intent of the

10   contract in this analysis.  And we think the *Empresas* and

11   *LightSquared* cases are instructive on that front, and that

12   creative manipulation of agreements that undercut the parties'

13   intent to constitute violations of the implied covenant are

14   nonetheless are not violations of the implied covenant.

15          Plaintiff's business justification for their

16   wrongful conduct also proves too much.  The implied covenant

17   is a contract claim.  We cited *Williston* for this point.

18   There are cases that reiterate at *Parlux v. Carter*

19   *Enterprises*, 204 A.D.3d 72, and *Smile Train v. Ferris*

20   *Consulting Group*, 117 A.D.3d 629.

21          Business justification doesn't absolve one from

22   liability for a breach of contract, and it doesn't resolve one

23   from liability likewise of a breach of implied covenant claim.

24   Serta's brief at paragraph 244 concedes that point.

25          There was -- and I would add that there was no need

1    for some of the gratuitous amendments that were made and

2    actually none offered.  You heard testimony about the creation

3    of another priming tranche that could have been used that was

4    not necessary to effectuate this particular exchange.

5    And we saw presented to Mr. Tepner an amendment that

6    eliminated the requirement for a going concern opinion from

7    the company's auditors for the remaining first lien lenders.

8         I'd add that the Second Circuit rejected the

9    business justification defense in the *Travelers* case cited in

10   our brief, 41 F.3d 1570.  And, indeed, there's always a

11   business justification offered in support of a transaction

12   subject to a good faith and fair dealing allegation.  Using

13   that as a blanket defense would eviscerate the doctrine.

14        And as we've heard a number of things today which

15   would similarly do so that if it's sophisticated parties with

16   sophisticated counsel, you know, they should be allowed to

17   engage in creative business solutions.  And that just simply

18   isn't the law in New York.

19        And, again, I point to the *Empresas Cablevision case*

20   *versus JPMorgan*.  You know, JPMorgan, pretty sophisticated,

21   but there they argued the same thing, that the conduct was

22   expressly permitted by the contract.  They had a business

23   justification to try to sell a participation in a loan when

24   they couldn't syndicate it.  And, you know, they engaged in a

25   quote/unquote "creative" business solution, and yet it's still

1    a breach of the implied covenant.

2              And similarly *LightSquared*, you know, there you had

3    Carlos Slim engaging in a creative business solution, and

4    again under the argument that the conduct was expressly

5    allowed in the contract.

6              So I do want to get back to the point about I think

7    reasonable expectations.  Reasonable expectations, as we set

8    out in our briefs and I said in my opening argument, is an

9    objective standard.  So the argument here that you haven't

10   heard from LCM as a witness about what its reasonable

11   expectations are is it invites an error of law.  It's an

12   objective standard.

13             I think what you heard in general is from the

14   lenders who are parties to the contract in 2016 is they

15   thought the agreement was loose and, therefore, you should

16   have been able to predict all manner of liability management

17   solutions.

18             I would suggest that one doesn't follow from the

19   other.  Just because a document is generally loose doesn't

20   mean that you're now, you know, you have no rights as to any

21   possible transaction.

22             I'd also note that every transaction they refer to

23   occurred after 2016.  So if you're talking about whether it's

24   J. Crew dropdown, Murray Energy, Cineworld I think is after

25   our -- you know, I'm not sure how that came out, that's after

1    Serta.  But all of those happened after the 2016 transaction.

2    So if we're trying to lump these in as like, well, we should

3    have been aware of this or that's not part of our reasonable

4    expectations in 2016, I would suggest in 2016 those were all

5    new.  And so if that's the measuring date then it was

6    reasonable for us not to suspect that.

7         I also think that our -- with respect to our claims,

8    the reasonable expectation still stands.  It was a unique

9    transaction, it was a one-of-a-kind transaction.

10        Finally I'm going to turn to *Stern v. Marshall* which

11   instructs that the Bankruptcy Court cannot sue -- or cannot

12   issue a final judgment on matters of common law like LCM's

13   contract and implied claims.  The exceptions to Stern don't

14   apply here.  There's no public right at issue.

15        We've said all along we're willing to consent to

16   treatment of our claims under the restructuring and without

17   waiver of our ability to pursue the PTL Lenders and seek

18   damages.  That would alleviate the need to decide on our --

19   you know, make a ruling with respect to our Proofs of Claim.

20   And we don't think the ongoing indemnity plays into the

21   analysis.  In fact, I think the indemnity reflects that we

22   have a claim for damages and not a claim about challenging the

23   priority here today.

24        I also -- one of the arguments made in the brief and

25   I think earlier today was that we waived our *Stern* argument.

1    That's not so.  We answered and counterclaimed after you ruled

2    on -- from the bench on summary judgment.  So there was no

3    waiver with respect to those claims.

4         Our claim -- counterclaims are unique in that they

5    seek damages and not a declaration.  And we never sought

6    summary judgment on our counterclaims, so we think we're

7    protected there.

8         We think that the *Saenz* case that was cited is not

9    really on point at all for that reason.  They -- where they

10   went through all of trial without making the argument.

11   And, finally, we always objected to the Court's final judgment

12   jurisdiction which Serta acknowledged in footnote seven of its

13   brief.

14        And our consent to entry on the motion for summary

15   judgment doesn't mean we consent to entry on a different

16   claim, on a counter claim which falls squarely within the --

17   with *Stern's* ambit.

18        THE COURT:  So it's your belief I've got to issue a

19   report and recommendation only on your claims.

20        MR. LIEBERMAN:  That's my belief.

21        THE COURT:  Okay.  I just want to make sure I

22   understood.

23        MR. LIEBERMAN:  In conclusion, LCM has been

24   crusading against this uptier transaction since it was

25   consummated in 2020, and the reasons I think are now clear in

1    the Record.

2         LCM is a CLO investment platform that manages over

3    $12.3 billion in assets, it invests in large financing, and

4    even among our adversaries here is not considered to be a

5    threat to other market participants.  It wasn't invited to

6    participate in the Apollo transaction.  It hasn't been locked

7    up or otherwise affiliated with Apollo group during its quest

8    to right the wrong that was done here.

9         Indeed, it is uncontested that outside of

10   court-administered restructurings, LCM has not participated in

11   a transaction that would have given it differential treatment

12   unless that opportunity was offered to all members of its

13   class pro rata.

14        We're now at another inflection point in our fight.

15   Since we began, New York courts are in accord that the conduct

16   like that on the record here constitute violations of the

17   implied covenant.  First, we have Judge Vela's order, then

18   *Boardrider* is issued by Justice Masley, who permitted this

19   transaction to go forward in the first case.  And now the AEA

20   case by the First Department.

21        This Court should find the same here and issue a

22   report and recommendation that the 2020 transaction violated

23   the 2016 agreement and the implied covenant to it.

24        With that, I'll close LCM's argument here but by no

25   means conclude its fight.

1            THE COURT:  Thank you.

2            MR. LIEBERMAN:  Thanks.

3            THE COURT:  All right.  Who's next?

4            Good afternoon.  I got it transferred.

5            MR. SEILER:  Excellent.  Good afternoon, Your Honor,

6    Eric Seiler for the Excluded Lenders other than LCM.

7    And before -- well, and I'm going to try not to repeat because

8    I agree with much of what LCM --

9            THE COURT:  I was just --

10           MR. SEILER:  Okay.

11           THE COURT:  -- enjoying the whole irony of the whole

12   thing.

13           MR. SEILER:  All right.  Well, it's important to

14   enjoy this a little bit as well as how serious it is.

15   So and before I start, I just want to thank the Court.  I'm

16   sure everyone would have said the same thing, and maybe it

17   does need to be said, but for the time you gave us in the

18   middle of a very busy Docket that you kept inserting around us

19   and still have your full attention and more on top of the

20   exhibits than all the lawyers, and particularly for

21   encouraging the firms to allow other younger lawyers, less

22   experienced lawyers to put on witnesses and to let them do

23   that.  And I think we all took advantage of that, and it's

24   very appreciated.

25           THE COURT:  Good, thank you --

1     MR. SEILER:  -- by everyone.  So --

2     THE COURT:  -- for saying that.

3         CLOSING ARGUMENTS

4     BY MR. SEILER:  And then I think I kind of have two

5 challenges.  One challenge, which comes from Gibson Dunn, is I

6 need to convince the Court that there is a potential implied

7 covenant of good faith and fair dealing claim that is not

8 precluded by the Court's decision on the contract claim

9 already.

10     You allowed us to come forward to have the trial,

11 but they're still arguing that basically the decision on the

12 contract claim makes it impossible, I think talked about the

13 hole in the middle of a needle.  But his first point was

14 there's no hole, there's no needle, you just can't do it.  So

15 I have to convince you to consider it.

16     And I -- we tried to do that in the brief.  I know

17 you've read the brief so we addressed that.  I'm going to talk

18 about it a little because I think that is the law in New York,

19 particularly in *Marblegate*, which is the First Department came

20 down within the last year.

21     But the second hurdle, and we can go to the next --

22 the first slide -- are all position-enhancing transactions the

23 same?  Because when you're -- I was -- the last day after you

24 let that young lawyer, Mr. Ehrlich, do the examinations of

25 some of our witnesses, I was sitting in the back and I'm

1    listening.  And you tell us, well, I think of these as

2    position-enhancing transactions, and acronym PET.

3    And of course it's a wonderful acronym because it got to have

4    pictures in the Gibson Dunn closing, and it's been picked up

5    in the briefs by Weil Gotshal.  It's as though it existed

6    forever.  And indeed it's been in the New York research.  And

7    so the acronym has caught on, so it's a great acronym.

8         But you said that you kind of think they're all the

9    same.  And I'm thinking, well that's a pretty big challenge

10   for me because if they're all the same, and I think ones that

11   were well-known are -- were expected, then I'm not going to

12   overcome the reasonable expectations test and so it's going to

13   be hard to convince you that there's been a violation of the

14   implied covenant of good faith and fair dealing.

15        So anyway I'm sitting in the back of the courtroom

16   listening to all of this.  And I also realize it's all ending

17   earlier than I thought it was going to.  And I'm on this very

18   late flight, can I get on an earlier flight.  And now I'm

19   placed in competition with all of those younger lawyers who

20   are fast at rebooking their flights.  And so I'm trying to

21   then -- by the way, I succeeded.  I was the only old lawyer on

22   the 5:00-whatever --

23             THE COURT:  Got it.

24             MR. SEILER:  -- o'clock flight it was.

25             THE COURT:  So just be honest, who actually did it

1        for you?

2                MR. SEILER:  No, no.  I did it myself but Blair gave

3        me advice admittedly.  Ms. Albom gave me advice but I've been

4        able to do it.

5                And so but I'm thinking, okay, and you talked about

6        walking your dog when you were doing all of this when you were

7        talking about how it came to you.  So I'm thinking, well,

8        going on a flight, walking a dog.  So this is like an

9        emotional support animal on a plane which -- and so this is

10       the PET we expect on the plane, right?  And sometimes you

11       don't like it, but you kind of know that someone sitting next

12       to you might have a dog, a big dog, a small dog, a cat.

13       And I'm thinking, well but do they let all the dogs on the

14       plane?  Are all the pets the same?  Are all the emotional

15       support animals the same?

16               And Ms. Albom reminded me that United had faced this

17       issue in 2018 when -- we go to the next slide -- a customer

18       came to the airport and said, oh, I have an emotional support

19       peacock.  And in fact here's a picture of that peacock.  I

20       guess the people in the Zoom can't see it, but you can.

21       And they didn't let the peacock on the plane.  They treated it

22       -- even though -- and they had documentation from a doctor how

23       it was important to the person who lived in New York.  This is

24       Newark Airport.  They were going to Los Angeles.  And they

25       didn't let them on the plane.

1          So my challenge is to convince you that the uptier

2     transaction is more like the peacock and less like the other

3     emotional support animals because then it should be treated

4     differently.  And so that's my -- so I didn't know that our

5     friends at Gibson Dunn would have a dog and a cat.  I have a

6     dog and an emotional support peacock.

7          So that's my metaphor for today.  I hope it --

8          THE COURT:  I like it.

9          MR. SEILER:  -- at least not --

10          THE COURT:  I'm sure you'll read about it this

11    evening.

12          (Laughter.)

13          MR. SEILER:  Well, I don't know.  They should credit

14    Ms. Albom instead of me.

15          So let's just talk about the law a sec because I

16    don't think we disagree about it very much.  New York doesn't

17    say if you strictly comply with the technical elements and the

18    contract you can't have a implied covenant of good faith and

19    fair dealing because then there would be no implied covenant

20    of good faith and fair dealing.

21          So if we're thinking of a Venn diagram, there's some

22    space where contract complied with but the covenant, which is

23    implied, is not.

24          And this is in our brief, I won't spend time on it,

25    it's a contract claim.  It's not an equitable claim.  It's you

1    can get damages for it.  All we're seeking is damages for it.

2    We address that in the brief.  So it's an implied covenant.

3           Now, it can't contradict the contract, we know that.

4    And it has to go to the essence of what you are trying to get

5    in the contract.  And that's why I put forward here, but we'll

6    file this to the -- for the Court as well, but these are just

7    cases we've cited in the brief.

8           And I want to say that before I go to the specific

9    contractual expectation, the fact that the industry thought of

10   loan agreements as loose or tight or somewhere in between does

11   not change contract law.  That is, it isn't the law that,

12   well, if it's a loose agreement there's no implied covenant of

13   good faith and fair dealing anymore than contract terms don't

14   matter because it's a loose agreement.  The terms still

15   matter.  This is one of them.  It's an implied term.

16          And when they were testifying about loose agreement,

17   they were talking about the existence of baskets where

18   collateral could be carved out.  And they were talking about

19   the possibility of raising additional debt.  Those were things

20   that were in the time of whether all were loose or some were

21   loose.  When you had someone explain to you during the trial

22   what does loose mean, those were the examples they gave.

23          It was not a contract law doesn't apply anymore

24   because it's a loose agreement.  And a little bit I think that

25   was seeping into the argument.  I think I still have to win

1     implied covenant of good faith and fair dealing.  But whether

2     it's loose or tight or in between isn't a legal doctrine.

3          And so let's look -- and I'm going to focus mostly

4     on our claims against the lenders.  A lot of what I say --

5     some of what I say applies to the company as well.  And

6     certainly what Mr. Lieberman talked about applies to the

7     company as well.

8          But the key contractual promise we had from the

9     lenders is in 2.18(c), which is the -- which allows us to

10    purchase participations in their recovery if they get

11    disproportionate recovery.  That's the promise they gave to

12    us.

13         And I think it's unambiguous in this case that that

14    promise has been completely eviscerated by what happened

15    because we're getting one percent now, they're getting all of

16    the rest.  They're not sharing it with us.  And their

17    technical argument, which you've ruled on, is that -- this is

18    the bottom I highlight -- that Section 905 allows them to do

19    an open market purchase.

20         But the question is whether even so, if doing that

21    and the other things I'm going to talk about, totally

22    eviscerate our expectation of getting this redistribution, if

23    they got extra, that can still be a claim for implied covenant

24    of good faith and fair dealing.

25         To put it in the language of the cases, these are

1    where our fruits are.  Our fruits are if you get extra, you

2    have to give some to me because you have to sell me a

3    participation so I can regain my pro rata interest.  I have

4    other fruits from the company, which is to get paid pro rata

5    in the first place to get my interest and principal and all of

6    that.

7            But as to the lenders, this is the claim, this is

8    the thing I was expecting to get.  And so I'll just -- I'll

9    leave that there and I'll just go to the next slide.

10   The consent is required for a waiver.  The -- it's unanimous

11   consent is required.

12           So not only was this something I expected to get,

13   it's a sacred right.  And the industry calls it a sacred

14   right.  So it's a particularly important fruit that I was

15   trying to figure out what fruit I should use to call it, but I

16   figured I'd wear down my welcome with the peacock so I'll just

17   say it's a particular important fruit.

18           And then if we go to the next slide, and it's not

19   just that I felt that way.  It has to be a reasonable

20   expectation that that's what I'm going to get.  And we all

21   agree on that here.  I don't think anybody has said it's a

22   subjective interpretation.  It's an objective interpretation.

23           And so if they do something that even though they're

24   in technical compliance with the contract destroys an

25   objective expectation, which I think getting this reallocation

1     was an objective expectation, then that at least has the

2     potential of counting as a violation of the implied covenant

3     and good faith and fair dealing, even if it isn't a technical

4     breach of the contract.

5              And what I hope to show -- and there is no case that

6     says and they have to have done it for an evil motive.  There

7     are cases that say when you have evil motives, that is further

8     proof.  And I'm going to use that way that, yes, there are

9     some things they did here, not that many, but some that show

10    evil motive.  And I think you probably anticipate which ones

11    I'm going to point to, but I'll get there in just a minute.

12             So I think -- and I just want to go to the next

13    slide and talk about *Marblegate*, which we talk about in the

14    brief.  And I think it's important because it's the -- it is

15    the most recent First Department case.

16             And it was in this space.  It was a credit case.  It

17    was a different kind of transaction than ours was in an

18    uptier.  But it obliterated the expectation of the

19    reallocation.  And the court looked at the other things they

20    did.

21             And if you go to the next slide, it enumerates them

22    on the right side, which is quoting from it.

23             Some of it was secrecy, some of it was improper

24    interaction with other parties.  And I have -- I listed things

25    I think they did.

1        So they -- so it wasn't a secret that the company

2   was trying to fix its capital structure.  And it certainly

3   wasn't a secret to them that you could see a dropdown

4   transaction as a mechanism to do that.  I'll talk more about

5   that in a second.  But they were able to model almost exactly

6   correctly what we were doing.

7        But it was a secret to us at the end of the timeline

8   that they were doing an uptier transaction.  And the only --

9   Apollo having asked Paul Weiss -- and we don't have Paul Weiss

10  said because it's privileged -- asking about the possibility

11  of something isn't the same as understanding that people are

12  doing something.

13       And then at the end when they've done it, we don't

14  get a chance to do anything about it.  We don't get the chance

15  to further compete with the dropdown transaction and we don't

16  get a chance to try and compete to do the uptier transaction

17  because they decided to go with the 39 percent.

18       And they had Barings sitting off to the side to

19  bring it over the top to 50.1 percent.  And they invited

20  Angelo Gordon maybe, but Angelo Gordon said but we're still

21  with Apollo and Gamut, and they said, no, you're not invited.

22       So that's the record here.  So it was exclusive.

23  And then I'm, you know, going through some of the things I

24  want to talk about.  The June 4th letter is a big deal, and

25  we're going to look at it in some detail.

1          But they threaten the administrative agent, and they

2     said things that weren't true.  And so that's sort of the

3     classic example of -- and the fact that they were hoping to

4     win is no defense for doing that.

5          You don't tell people things that aren't true,

6     important people like the administrative agent, and keep it a

7     secret from the company because you know the company doesn't

8     want you to be saying, by the way, we're insolvent.  And we'll

9     look at the exact words in a second.  So they did that.

10          They demanded an indemnification.  And I'm going to

11     talk about that not from the point of view of whether it's

12     okay under the bankruptcy law to be included in the exit

13     financing.  My friend, Mr. Hermann's going to talk about the

14     confirmation impact of all that because he'll get it right and

15     I'll get it wrong.

16          But it shows they were concerned.  That's -- in

17     fact, the one -- nobody knew what was in the indemnity, but

18     they all knew they had to have it.  And other than actually

19     Mr. Greenberg's testimony, he seemed to know exactly why it

20     was there.  But he wasn't a witness here.  He was making

21     argument about it.  But my hunch is but -- that he had

22     something to do with the negotiation.

23          And then, finally, they add us to the

24     disqualification list after the transaction, Apollo, Angelo

25     Gordon, and Gamut.  And that actually hurt us, right, because

1    we couldn't buy into their deal, we couldn't buy more of what

2    we had because we couldn't buy anything.  And they didn't need

3    to do that either.

4          So I think we're going to look at the things they

5    did.  And they're not so different than *Marblegate*.  I mean,

6    they're not exactly the same but they're additional factual

7    actions that are made that have the effect of hurting us and

8    making it -- maybe making it more likely that we're not an

9    effective competitor.  But I don't think that is a

10   justification if they're gratuitously hurting us.

11         So if we look -- I mean I've drafting some of it.

12   We go to the next slide we should compare the dropdown IP

13   company transaction with the uptier transaction.  And let's

14   just talk about the dropdown because they said some things in

15   the closing that I don't think are quite fair.

16         So it is true that Angelo Gordon floated the idea of

17   a OPCO transaction.  But then the company did invite everybody

18   to participate in doing a dropdown IP code transaction.

19   That's what Evercore went out and told everybody they could

20   do.  So this was something that was openly encouraged by the

21   company.

22         There were precedents that were well understood for

23   dropdown transactions.  They call them J. Crew transactions.

24   You heard testimony to that effect.  There was an express

25   basket that allowed a certain percentage of the collateral to

1    be used for dropdowns.

2           And so nobody thought that there was something

3    impermissible about that.  It is true that some of the clients

4    in their group didn't like those things because they bought

5    the loans at a hundred and other people bought them cheaper so

6    it made them nervous.  But people understood that that was the

7    risk.

8           Indeed, Mr. Chopra was able to model it.  That was

9    model 3-A and 3-B in his chart.  So it -- even though he

10   didn't know the terms.  So -- and also so the collateral was

11   available.

12          And, finally, the amendments to the loan documents

13   were not required.  You didn't need to change anything to do

14   it.  You could do it.  We never get that far.  I'm going to

15   talk about it at the end.  But you don't need to do it.

16          So go to the next slide.  They explore this with our

17   group, with Barings, which jumps from one group to the other

18   and then back again.

19          And, yes, it's able to raise the money they want,

20   okay.  And, yes, it would let them do debt reduction, although

21   when you look at those term sheets, a lot of the debt

22   reduction was using cash at the end to buy back more debt at a

23   discount.

24          And that's different, not in a way that maybe it

25   mattered to the Court's earlier decision than exchanging debt

1   for new debt, which is what is in the uptier transaction.  But

2   those things were all there.

3        No one -- the company did not suggest it was a

4   fraudulent conveyance.  Barings did not suggest it was.  Our

5   clients did not think it was.  You'll see in the June 4th

6   letter there's that suggestion from Mr. Greenberg.  But this

7   was something that was well understood and explored by all

8   these people.

9        So we go to the next slide.

10       And of course the Gibson Dunn group originally comes

11   together, and they're institutions that don't like dropdowns.

12   But they don't propose this new uptier.  In fact, as you know,

13   in the April 24th term sheet they say, we'll give you new

14   money, we will let everyone participate pro rata.  So that's

15   where we were on April 24th.

16       And that's consistent with the expectations that

17   everybody had.  And so but now the question is, well, but they

18   shift.  And is that shift something that we should have

19   expected or not?

20       So let's go to the next slide.

21       And I got all these people to acknowledge, and we'll

22   go through them, that there had never been a priming financing

23   with a debt repurchase at a discount where there were sacred

24   rights and pro rata treatment.  That's the unambiguous

25   testimony from everyone.

1          And I don't think that pizza metaphor works because

2     it would be, well, if there was ham and pineapple and

3     pepperoni, but now you put it on a pizza together, that's not

4     the same thing as knowing that you had ingredients that you

5     could put on a pizza.  It was important that these things were

6     all put together.

7          And the one example they used on their -- in their

8     show was Mr. Shah on the same page that I have from the

9     transcript, page 83, where he said, well, there were things

10    like this.  But then he said, I can't affirmatively say that

11    they did -- that they had all those things.

12         And then he went on to acknowledge that he couldn't

13    disagree with Mr. Chopra when he said it was -- that there had

14    never -- he'd never seen one where all those elements were

15    there.  And in fact that's when I asked him about

16    Ms. Barrington's website, first of a kind, and he couldn't

17    disagree with that.

18         So nobody is saying that all the components came

19    together before.  So we -- if -- now, maybe that won't be

20    enough to convince you that this is a peacock and not an

21    emotional support dog.  But let's not pretend that we've seen

22    them before.  This is the first like this.

23         And I think that's kind of important because the

24    difference is make a difference.  So just think about the

25    dropdown versus this in the most important respect of what

1     happens to the waterfall.

2            So in the dropdown, collateral that everybody knows

3     could be put in a subsidiary gets put there.  And now people

4     own that and they are secured by that.

5            And everybody else is still secured by exactly what

6     they had before except that there was some collateral that you

7     thought might have been with you, but now goes somewhere else.

8            Here, you're in this group and suddenly everybody in

9     your group has jumped ahead of you as to all the collateral

10    because now they're superpriority above you by exchanging the

11    debt that you thought was *pari passu*, that you thought that if

12    they got extra, they'd have to reallocate it to you because

13    you could purchase a participation, and now they don't.

14           Now, again, taking as given the Court's ruling that

15    technically you could do that.  But the expectation that that

16    could happen, nobody has testified to that.  No one has

17    testified that they expected an uptier transaction, not any of

18    these bankers.  They were all asked that.  They testified that

19    there could be transactions that helped someone over someone

20    else.  But -- and we know that.

21           But not this where the one thing you thought -- and

22    I realize the representative of Gamut didn't have hundreds of

23    years of experience.  But it's the absence of anybody

24    testifying that there was an expectation that this could

25    happen that's the problem because then the thing that you

1    thought you were getting has been taken away.

2            And then the question is, well, is that enough for

3    an implied covenant of good faith and fair dealing or do we

4    need more?  I kind of think you don't need more, but we do

5    have more.  So what do we have?

6            First, we have the restriction of 50.1 percent.

7    They allow a basket at the backend.  But you saw the term

8    sheets evolve.  They need to inherently exclude people because

9    that's the way they don't have to give a bigger discount to

10   the company.

11           And that's inherent to an uptier.  It's not actually

12   inherent to a dropdown.  There's a tradeoff, more people who

13   are in.  But it's not inherent that you -- there's no minimum

14   in a dropdown.  You can have less than 50 percent.  But

15   there's no need to come in really tight to a 50 percent.

16   And so that, as you look at the transaction even without the

17   other vino (phonetic) actions I think is something that they

18   enforced on the company to get the best benefit for their

19   group.

20           And I just want to take a look at the timeline for a

21   second because I think they showed you a very --

22           THE COURT:  So can we go back --

23           MR. SEILER:  Sorry.

24           THE COURT:  -- for just a second?  Because I want to

25   ask you.  People have made much about this, about, well, it's

1      just a basket, and with an uptier it's everything.

2              But the testimony was that the basket had coverage.

3      And so if the basket had coverage then it's always going to be

4      the same net effect, is it not?

5              MR. SEILER:  Well, I think the -- I guess if

6      coverage means enough collateral so that --

7              THE COURT:  Remember the testimony.  There was --

8              MR. SEILER:  -- the people who are lending --

9              THE COURT:  -- an argument about it is it covered

10     one time, two times, three times, --

11             MR. SEILER:  Yeah, I got the --

12             THE COURT:  -- and that went back and forth.  But if

13     it's always covered then isn't the net effect exactly the

14     same?

15             MR. SEILER:  So we don't -- so the net effect being

16     the alternative transaction that my group was pursuing.

17             THE COURT:  Well, just --

18             MR. SEILER:  Or just in general a dropdown.

19             THE COURT:  So whether you do a up-PET or a

20     down-PET --

21             MR. SEILER:  Well so --

22             THE COURT:  -- the net effect is exactly the same to

23     the nonparticipants.

24             MR. SEILER:  No, no, no.  So I think not.  I don't

25     -- because the company can't take all of the collateral that's

1       in the --

2                   THE COURT:  But --

3                   MR. SEILER:  -- base case and put --

4                   THE COURT:  But wait a minute.

5                   MR. SEILER:  -- it in the dropdown.  It just --

6                   THE COURT:  If you have a secured debt, --

7                   MR. SEILER:  Right.

8                   THE COURT:  -- you're only the -- you're only

9       entitled to be paid that which you're owed.  So if you have

10      coverage of-- let's just make it easy, a hundred percent.  So

11      if you're owed a hundred million dollars secured by a hundred

12      million dollars' worth of collateral, all you can ever get is

13      paid in full, right?

14                  MR. SEILER:  In the event of a default, okay.

15                  THE COURT:  Well, all you're ever entitled to be

16      paid --

17                  MR. SEILER:  There's --

18                  THE COURT:  -- is paid in full.

19                  MR. SEILER:  Okay.  I agree with that.

20                  THE COURT:  If you have a hundred million dollars

21      secured by $200 million worth of collateral, you're still only

22      entitled to be paid a hundred million dollars.

23                  MR. SEILER:  In the event of a dissolution, --

24                  THE COURT:  Doesn't matter.

25                  MR. SEILER:  -- yeah, in the event --

1          THE COURT:  You're still only entitled to be paid a

2     hundred --

3          MR. SEILER:  -- where you get -- yes, you're still

4     -- your entitlement to pay is your principal plus accrued

5     interest.

6          THE COURT:  Right.

7          MR. SEILER:  That's true.  I can't argue with that.

8          THE COURT:  So why isn't the net effect exactly the

9     same give the testimony that was undisputed that there was

10    coverage?

11         MR. SEILER:  So in the same -- remember, there's a

12    universe of potential events, they testified about this.

13    Somewhere the company just pays their debts as they go on and

14    the transaction is relevant to the coverage.  And then there's

15    some where there's a bankruptcy.

16         And so let's imagine the one in a dropdown where the

17    -- where it turns out to be good in the new subsidiary with

18    the collateral it has and less good to have been left out of

19    it, right, because there's not enough for both because you

20    still have -- everybody who doesn't join the dropdown still

21    has a secured interest in the other collateral of the company.

22         THE COURT:  Right.  But if you do --

23         MR. SEILER:  So it only matters where there isn't

24    enough for both.  And so if your point is we can imagine a

25    world where it's good to be in the dropdown and bad to be left

1    behind, that's what Mr. Chopra modeled for them, we can

2    imagine that world.

3              And in our world we can imagine a world where it's

4    good to be priority lender and bad to be an old 1-L with

5    people jumping over you.

6              THE COURT:  Sure.

7              MR. SEILER:  So if you're asking as an effect could

8    both turn out to be bad?

9              THE COURT:  Well, I know they both can be.

10             MR. SEILER:  Yes.

11             THE COURT:  That's just a valuation issue.

12             MR. SEILER:  Right.  So but then the question is so

13   is anything that puts you in the risk of that position all the

14   same because it puts you in the risk, and I'd say no.

15             THE COURT:  But the undisputed testimony was that

16   there was coverage.  I'm not telling you I believed it but

17   that's the Record.  The Record was there was coverage.

18             MR. SEILER:  At the time of the transaction there

19   and the uptier transaction.

20             THE COURT:  So I'd have to go back and read it.  I

21   don't remember a temporal element being there.  But I just

22   remember the -- because I wanted to ask you this question

23   because no one's dealt with it.

24             MR. SEILER:  Well, I think they model a world in

25   their model where they assume a bankruptcy in 2021,

1     December 31st, where there isn't coverage for the 1-L anymore.

2     They get nothing.  Isn't a -- there isn't full coverage in the

3     priority group.

4              THE COURT:  I'm -- all I'm trying to --

5              MR. SEILER:  I don't --

6              THE COURT:  -- understand is everyone let that

7     testimony go.  And I'm trying to figure out why.

8              MR. SEILER:  So I'm -- maybe the why is we didn't

9     fully appreciate it the way Your Honor is focusing on it.  But

10    I don't think it meant what you're thinking it means, that

11    there was coverage and therefore everything's okay.

12             THE COURT:  It wasn't that it's okay.  I -- so when

13    I -- and I want to -- and I appreciate everybody accommodating

14    my new PET acronym.  The point of saying what I said was I'm

15    focused on effect, not what -- not labels.  I'm focused on

16    effect.  And that's why I'm asking this question.  If there

17    truly was coverage, isn't the effect the same?

18             MR. SEILER:  Well, I'm going to -- I have a -- I

19    want to answer your question first, but I have a second answer

20    that I don't want to --

21             THE COURT:  Okay.

22             MR. SEILER:  -- forget.  But your answer I think not

23    as to expectation, maybe as to in a world -- you can imagine a

24    world where the effect under the same set of subsequent facts

25    is the same.  I think that that -- I agree with that.  But the

1    expectation of that this could be done to you isn't

2    necessarily the same.  And so I think that's a --

3              THE COURT:  Then can we go back to expectation --

4              MR. SEILER:  Okay.

5              THE COURT:  -- for just a second?  So the

6    expectation, as I understand the New York definition, is at

7    the time the contract was entered into; do you agree with

8    that?

9              MR. SEILER:  It's the most -- I don't know that

10   every case talks about it but it's the most logical --

11             THE COURT:  I'm sure --

12             MR. SEILER:  It's the most logical --

13             THE COURT:  I've read more of them than I want to,

14   let me start there.  But I -- my memory is that it says at the

15   time the contract was entered into.  Help me understand, or is

16   there an effect on expectation when someone comes in one year,

17   two years, three years, four years later and buys part of the

18   contractual basket of rights?

19             MR. SEILER:  No.  So I don't think the cases talk

20   about that at al, but I could see why there should be, right?

21   If -- for example, after this decision, --

22             THE COURT:  I couldn't find anything.

23             MR. SEILER:  -- if I -- if tomorrow, I don't know,

24   someone goes out in the secondary market and starts buying

25   debt in XYZ Co. after your decision and they say, well,

1       uptier, open market purchase, what is that, --

2                 THE COURT:  Right.

3                 MR. SEILER:  -- I don't -- and because, look, this

4       was a loan agreement from 2019.  I might say to them, did you

5       not read the decision?  Those are okay now.

6                 And so I think that expectations could be at the

7       time of the transaction, especially if you're a subsequent

8       purchaser.  But I don't think the cases talk about it one way

9       or the other.

10                THE COURT:  All right.  So, but I mean, you do agree

11      that there is case law that says it's at the time the contract

12      was entered into.

13                MR. SEILER:  Yeah.  But I think it's designed to

14      limit the claim that someone would make.  So it's you have to

15      be surprised -- yeah --

16                THE COURT:  No, no, no.  I'm just -- I want --

17      I'm --

18                MR. SEILER:  I think so.

19                THE COURT:  -- baby steps here.  So, I mean, I think

20      I've heard no one dispute, and everybody cites cases that says

21      at the time the contract was entered into.

22                MR. SEILER:  I think --

23                THE COURT:  But you're not aware of any New York

24      decision that -- this was my real question.  Are you aware of

25      any decision that talks about expectation by a, as you --

1              MR. SEILER:  Secondary market --

2              THE COURT:  -- defined it, a secondary market

3      purchaser?

4              MR. SEILER:  -- purchaser.  I don't think that --

5              THE COURT:  Okay.

6              MR. SEILER:  -- I've seen that discussed one way or

7      the other.  But I could see why someone would make that

8      argument against the Plaintiff.

9              THE COURT:  I was just curious.

10             MR. SEILER:  I --

11             THE COURT:  I mean, again, I didn't see it and, you

12     know, I was just wondering if there was --

13             MR. SEILER:  But here --

14             THE COURT:  -- a view --

15             MR. SEILER:  -- whether it's 2016 or 2020 there

16     hadn't been an uptier transaction, right.  So the expectation

17     issue is academically interesting, but I don't think it's

18     practically different.

19             THE COURT:  Right.

20             MR. SEILER:  But the two that we have with I'll talk

21     about, Envision and Mitel are that the credit agreements were

22     before 2020, but the transactions that affected them were

23     after 2022.

24             So -- and informed by Serta.  I mean, these are

25     called Serta transactions now.  I mean, there's no -- you

1     know, it's not like -- just the same way dropdowns are called

2     J. Crew transactions, these are called Serta transactions.  We

3     shouldn't pretend that people thought of this before us.

4           Mr. Greenberg came up with a very good construct, or

5     his team, whoever did it, and that's what is now the Serta

6     transaction.

7           THE COURT:  Well I'm told that there's now a

8     provision called a Serta blocker.

9           MR. SEILER:  A Serta -- okay.  So and it's

10    apparently will be a PET -- I suppose if I lose this argument

11    with you, that all PETs will be the same.

12          So I do want to -- so let me just talk about

13    something and I'll come back to where we were.  But I don't

14    want to leave this out.

15          This -- there is evidence in the Record here that --

16    well, first of all, in our proposed findings and fact, we

17    enumerate all the expectation testimony as proposed finding 77

18    through 80.  So rather than -- I highlighted some of them but

19    they're all enumerated there.

20          And then on this string-along argument, the timeline

21    is the timeline.  And at the beginning no one was thinking

22    about an uptier transaction.

23          But there was evidence that Mr. Prince in particular

24    was hoping to be able to do something with what became the

25    Gibson Dunn group.  And we have in our proposed findings at 20

1    and 21 the desire to get the process going with people like

2    Angelo Gordon, but to be able to come back to the group who

3    they knew were not that excited about dropdown transactions

4    because they challenged them and hoped to do something with

5    them.

6         And I have no doubt that if they had done nothing

7    with them that we would have been I think what was it, the

8    favorite horse or whatever it was in one of the emails talked

9    about that.

10        But they had on their mind using us as the stalking

11   horse for the other group.  And there's documents in the

12   Record and we cite them that show that.  So it's not right to

13   say it was a surprise to the company and to Advent.  It was

14   hoped for I think all along.  And then things change and --

15        THE COURT:  So if this group had done a dropdown

16   that was just better than your dropdown, we -- you're telling

17   me --

18        MR. SEILER:  We --

19        THE COURT:  -- we wouldn't be here?

20        MR. SEILER:  We wouldn't be here.

21        THE COURT:  And why didn't I hear that testimony?

22        MR. SEILER:  Well, you heard that they invited --

23   why didn't you hear that testimony?  I'm trying to think.

24        You did hear that we invited them to talk to us at

25   the beginning.  You heard that Apollo, they viewed this as a

1       negative, but that they offered them the $30 million to drop

2       their deal and do the deal with us and that --

3                   THE COURT:  Yeah, no, they --

4                   MR. SEILER:  -- we were going to compensate them

5       because they had a higher basis --

6                   THE COURT:  Sure.

7                   MR. SEILER:  -- than we did.

8                   THE COURT:  And they're suggesting that was a bribe.

9       I got that.

10                  MR. SEILER:  Yeah, but it wasn't a bribe.  It was

11      a --

12                  THE COURT:  I --

13                  MR. SEILER:  -- compensation --

14                  THE COURT:  -- for -- I want to make that clear.  I

15      wasn't suggesting it was.  That's just why --

16                  MR. SEILER:  But that was an invitation --

17                  THE COURT:  -- they put that out there.

18                  MR. SEILER:  -- to their group to do it all together

19      as a dropdown.  And I think that that's -- we weren't -- the

20      only person who said there's anything wrong with the dropdown

21      is Scott Greenberg's letter on June 4th to UBS that said it

22      might not be legal.

23                  THE COURT:  Well, the only person that says there's

24      something wrong with an uptier is your lawsuit.

25                  MR. SEILER:  Well, if -- I have a lot of people

1   who've joined in with me.  And LCM, don't forget the LCM

2   lawsuit.

3        (Laughter.)

4        THE COURT:  No, they don't want to be here.

5   That's --

6        MR. SEILER:  No, but I think I can't tell you what

7   would have -- because, here, this takes me to where I was

8   going on the -- we don't know what our transaction would have

9   looked like because they stopped talking to us before

10  June 4th.

11       And so we don't know, for example, would other

12  people have been invited to participate.

13       THE COURT:  Right.

14       MR. SEILER:  We don't know for -- and so that takes

15  us to the next slide because I listed them.

16       We don't think an amendment would have been

17  required.

18       There was in our proposal the idea of using open

19  market purchases.  But we don't know if we would needed to

20  have done them.

21       And we don't know whether anybody would have

22  complained.  And, if they did, you know what we might have

23  done?  We might have included them because when you look at

24  these other cases, like *Revlon*, when people complain, they go

25  to court and things get worked out or the judge rules and then

1    things get worked out.

2              So the you tried to do it, too, I think we talked

3    about this in summary judgment, we didn't get to the end of

4    what it was.  And we didn't find out if it -- how different it

5    would be.

6              So just take the one example potentially open to

7    all.  There's nothing to stop -- and Mr. Chopra admitted there

8    was nothing technically to stop them letting more people in

9    except that they didn't want to.

10             THE COURT:  Right.

11             MR. SEILER:  And I concede that we weren't going to

12   them and saying, do a dropdown and invite everybody.  But if

13   they'd come back and said, we've been working with this Gibson

14   Dunn group, you need to include them, some of them want to be

15   in, these are the terms, we don't know that that wouldn't have

16   happened.  And we don't know that we wouldn't have been here.

17   If it'd been worked out we probably wouldn't be here.

18             I mean, you have -- in Envision, which they talk

19   about in -- at length, in Envision, the first transaction was

20   just new money from Angelo Gordon.  That's in the documents.

21   And that's, by the way, where that somewhat similar but not

22   exactly the same indemnity language shows up, which I'll get

23   to in a second.

24             But then when people complain, they had a second

25   thing where 97 percent were in and 3 percent weren't and they

1    were complaining.  But now Envision is filed next door here

2    and this isn't going to happen in that case I don't think

3    because it all got worked out in sequential transactions along

4    the way.

5          So I think the answer to your question is I don't

6    know what would have happened.  But there's no reason to

7    assume it would have been exactly the same fight.

8          And so let's talk about the June 4th letter because

9    I think that that's -- oh, by the way, before I do, I talked

10   about the $30 million payment.  They say, well, we were

11   sticking together as a group.  Okay.  But that's because they

12   tried to pick off one of the members of their group and the

13   group decided we should talk to them together, Apollo, Angelo

14   Gordon, and so I don't think there's anything wrong with that.

15         And the third thing they said that we did that was

16   bad was we brought litigation.  And I believe you have a right

17   to bring litigation if you think someone has violated your

18   right, that's not a sign of bad faith.

19         THE COURT:  I agree.

20         MR. SEILER:  So let's talk about the June 4th

21   letter.  And let's look at the slide where it's highlighted.

22         First, they -- and they talk about this very briefly

23   in the presentation that Mr. Costa made.  And the -- but the

24   letter I found striking because it first suggests on the page

25   I've highlighted that they're going to take steps to stop the

1    transaction.  They do not believe that it's permitted under

2    law.  And that I thought was bad enough.

3              But if you go to the next slide, they say it may

4    constitute an actual or constructive fraudulent transfer,

5    okay.  And they hide behind the word "may," you heard that in

6    the testimony.

7              THE COURT:  Right.

8              MR. SEILER:  But then they say it is highly likely

9    that the company may very well already be insolvent.  And they

10   had no factual basis to mention that at all.  And they hadn't

11   done the analysis, the company hadn't, Mr. Chopra hadn't.  He

12   knew about this letter and didn't stop it from going in,

13   that's what his testimony was.

14             And it's a little unclear because of the timing when

15   on June 4th it happened.  What we know is that Mr. Chopra

16   learned that he was chosen on June 4th, and we learned that

17   this letter goes in, the email shows 7:32 I think.  But I

18   don't know if this went before or after, I don't want to

19   suggest I know, but it's the same day.  And then June 5 they

20   tell our side that they lost June 8, they signed up enough

21   people to get over 50 percent, and then June 22 they sign

22   definitive documents.  That's the time line.

23             But what's the -- so why is this okay, to send a

24   letter to an administrative agent saying that a company might

25   be insolvent when you have no basis to say it, and no

1    belief -- no factual basis to say it, no belief to say it.  If

2    they believed it was insolvent, why would they be doing the

3    uptier transaction with them?

4         So this is entirely designed to stifle -- well, if

5    that's the case, then it wasn't -- because remember, the

6    testimony was, well, we hope everybody gets paid, everything

7    will be great.

8         THE COURT:  Sure.

9         MR. SEILER:  I guess they're giving them extra money

10   but they're an extra day equal for the extra money, so, I'll

11   stick with my first one.  We don't have any reason to think

12   they thought any of us lenders thought this company was

13   insolvent.  We had testimony from one of them that they had

14   done a -- that they looked at it, too, and that it wasn't -- I

15   think C-SAM it was.

16        So I don't think this is okay.  And I think it's --

17   and they knew it wasn't okay because they were at the end,

18   don't tell the company.  So if this was the only thing we had

19   on top of our expectation being eviscerated, I would say, oh,

20   implied covenant of good faith, fair dealing problem for the

21   lenders.  Not for the company, but for the lenders.

22        And so if you were to -- well, I realize I'm

23   probably not going to convince you from all the things that

24   happened, but if you were to decide, you know, you have a

25   point, that's a problem, I'm not going to grant what they

1    want, I'm going to find against them, I still have to come

2    back and prove damages.  I don't know how big they'll be, but

3    there's going to be a fight when you measure them and how you

4    measure them.

5           And then we learned from Mr. Greenberg that his

6    clients have -- as important as that indemnity is, if you

7    confirm the plan, they haven't even decided if they're going

8    to seek to enforce the indemnity.  They'd have to see at the

9    time.  Now he was thinking at the time if the 5th Circuit were

10   to reverse the decision and rule on the contract claim.  But

11   the same would be true on the good faith and fair dealing.

12   They don't know that they would even seek to enforce the

13   indemnity.

14          So I'm not the bankruptcy guy, that's Mr. Hermann,

15   he'll -- but I don't see how this gets in the way, given that

16   testimony this gets in the way of the plan, and this is

17   certainly not my area of expertise, but I don't see how

18   there's an equitable mootness issue.  He's basically saying, I

19   don't care what happens here, we'll fight, we'll decide, if we

20   lose, whether it's worth seeking the indemnity.  We'll have

21   our ownership interest then and we'll work it out.

22          THE COURT:  Yeah, you don't have -- you don't have

23   to worry about equitable mootness in this Circuit.

24          MR. SEILER:  Okay.

25          THE COURT:  It doesn't exist.

1          MR. SEILER:  Oh.  But I -- if they stood up and said

2     they agreed with you, I would be more comfortable, but I'll

3     leave that to --

4          THE COURT:  They'll stand up and say almost all the

5     decisions find that there is no equitable mootness.

6          MR. SEILER:  All right.  Well, anyhow, so I think to

7     that -- so I -- just to close out the area of what I'm talking

8     about then -- so we have -- we go back to the slide that has

9     the A and B, there we go.  So they redistribute the waterfall

10    completely.

11         THE COURT:  Yeah.

12         MR. SEILER:  Different than the side-by-side

13    transaction --

14         THE COURT:  And to be fair, to say on a waterfall

15    intact is not really correct.  Right?  Because you moved --

16    you moved --

17         MR. SEILER:  I moved collateral that I was allowed

18    to move, but as to the collateral that remains --

19         THE COURT:  Then you created --

20         MR. SEILER:   -- the waterfall's intact.

21         THE COURT:   -- you created two waterfalls, and so

22    by saying that the waterfall's intact, a little -- it's a

23    little disingenuous.

24         MR. SEILER:  I don't know it's disingenuous, but

25    I'll take your friendly amendment that there's two waterfalls.

1        THE COURT:  Yeah, okay.

2        MR. SEILER:  Okay.  And clear precedence for it as

3   opposed to first of its kind, potentially open to all because

4   we didn't score it all the way, but some of these dropdowns

5   have been opened to all.

6        THE COURT:  Yeah --

7        MR. SEILER:  This one is inherently restricted,

8   amendments not required versus amendments required, and then I

9   briefly talk about what the amendments do.  Right?  They allow

10   for further subordination that only helps -- that only hurts

11   us --

12        THE COURT:  Right.

13        MR. SEILER:   -- and doesn't hurt them.  They

14   actually say that that subordination is not a default, they

15   changed the documents to say that.  So those were -- and then

16   you have the arguments that LCM made that I won't repeat, and

17   they put us on the DQ List.

18        So we have a bunch of extra things that they did

19   that hurt us that aren't explained by just getting the deal

20   done.  So they're incremental, which meets this test of it's

21   not just the same thing, and they're bad for us and it's --

22   there's no case that says, well, I was afraid that I'd lose

23   money if I didn't do this to you.  None of those cases they

24   cite, I read every single one of them, none of them say that.

25        And it's not the law that you can -- you know, the

1    law is, if you breach a contract, whether it's express term or

2    implied covenant, you can pay damages --

3              THE COURT:  Right.

4              MR. SEILER:   -- for area contract.

5              THE COURT:  Can we go back to the DQ List for a

6    moment?

7              MR. SEILER:  Okay.

8              THE COURT:  What's the impact -- so you're

9    suggesting that being put on the DQ List means something bad.

10   But --

11             MR. SEILER:  Right.  So it means you can't buy so --

12             THE COURT:  No, I know what it means --

13             MR. SEILER:  Okay.

14             THE COURT:   -- so but now you've now agreed that

15   you're on the DQ List.  What's the impact of all of that?

16             MR. SEILER:  All of my clients -- so they can't buy

17   any of this wonderful new debt that's going to turn into

18   equity in the bankruptcy --

19             THE COURT:  Right.  I'm trying to figure out --

20             MR. SEILER:   -- so they can't hedge their

21   position --

22             THE COURT:   -- I got --  I know what happens.  What

23   I'm trying to understand is what's the impact of actually

24   going on the DQ List as part of the settlement that you

25   announced?

1          MR. SEILER:  Or at the --

2          THE COURT:  So --

3          MR. SEILER:  I'm sorry.

4          THE COURT:  -- Apollo announced the settlement --

5          MR. SEILER:  Oh, that's the old DQ List where we

6     couldn't -- before June 20 --

7          THE COURT:  Right.

8          MR. SEILER:  -- we couldn't buy -- this is being

9     put on the DQ List post-June 20 of 2020 and so it's not --

10    they're totally separate.

11         Now we can't buy any of the old debt and we can't

12    buy any of the new debt.  And so that means we can't mitigate

13    our damages.  We could, for example, if there were -- if Eaton

14    Vance wanted to sell because they're worried about the

15    company, and we're more optimistic about the company, before

16    this bankruptcy is confirmed we can't buy the debt.

17         THE COURT:  I got how it works.  What I was trying

18    to understand is what is the impact of complaining that you're

19    on the DQ List and then turning around and agreeing to be on

20    the DQ List?  I think you've told me is that you ascribe value

21    to time.

22         MR. SEILER:  Well, so first of all, Apollo was the

23    only one that was accused beforehand, not my other clients,

24    not --

25         THE COURT:  But you do represent Apollo.

1          MR. SEILER:  I'm saying --

2          THE COURT:  Okay.

3          MR. SEILER:   -- so they agreed -- a settlement was

4    agreed to and it's less good to be able to clear half your

5    trades than all your trades, so that was the settlement of the

6    dispute about whether they were entitled to or not.  But

7    you -- all else equal you don't want to be on a DQ List

8    because it limits your options.

9          THE COURT:  I totally got that.  I'm trying to

10   understand the impact of you agreeing to be on it.

11         MR. SEILER:  My agreement on --

12         THE COURT:  You're complaining that they --

13         MR. SEILER:  Oh, so --

14         THE COURT:   -- put you on it, and then you turn

15   around and agree to be put on it.  That's what I'm trying to

16   understand.  And maybe this is a rabbit trail --

17         MR. SEILER:  All right.  So for -- I think I

18   understand it -- so for Apollo the question is what's the

19   effect on their ability today having agreed last week to

20   settle half the trades and be on the DQ List.

21         THE COURT:  Right.

22         MR. SEILER:  And the answer is, there's nothing to

23   stop them tomorrow from agreeing to not be on the DQ List.

24   One, it's not forever, it's for now, but if -- to the extent

25   that they're on it for future trades in Serta they're -- the

1　　settlement didn't make it worse because Serta had put

2　　everybody on the list in my group --

3　　　　　　　THE COURT:  Right.

4　　　　　　　MR. SEILER:  -- prior.  So it didn't -- agreeing to

5　　it, it didn't affect that designation one way or the other, it

6　　was just agreeing to it as to the -- what was in dispute in

7　　pre-2020.

8　　　　　　　THE COURT:  I'm going to chalk this up that I asked

9　　a bad question.

10　　　　　　MR. SEILER:  Well, I don't know if that's true, but

11　　it took me a while to get to an answer, maybe it's -- so let's

12　　talk about the indemnity.

13　　　　　　THE COURT:  Okay.

14　　　　　　MR. SEILER:  Or at least the facts of it.  And so if

15　　we go to -- there we go.  So, and the Record is clear from the

16　　documents, 903B has carve outs for gross negligence, willful

17　　misconduct, bad faith and material breach.  And we walked

18　　through them with the witnesses.  And on June 20, 2020, the

19　　day that the Finance Committee and the company approved the

20　　deal, they still had those carve outs.  So they weren't --

21　　there was no exception to the carve out on June 20, 2020.

22　　　　　　THE COURT:  Uh-huh.

23　　　　　　MR. SEILER:  We go to the next slide, what I call

24　　the 19 words, which I hope I counted right, the excluding for

25　　these transaction from the carve outs, and that shows up on

1  June 22.  We have heard absolutely no testimony from anybody

2  about how we got from June 20 to June 22.  Not from the

3  company, not from the lenders, not a word.

4  And so we've heard a lot of testimony from people

5  that really want the indemnity, but most of those people

6  couldn't tell you the difference between the two versions of

7  the indemnity.  And I think we'd all agree that the as

8  modified on June 22 indemnity is more valuable to the lenders

9  than what they had before, because it carved -- taking the

10  things we're accusing them of, primarily a material breach of

11  contract, then saying, well, but not if it's from this

12  transaction you just did.  That's a pretty big change.

13  So if you carve out material breach of contract,

14  they're on the hook, if you un-carve it out with the

15  exception, they're off the hook.  And we don't know how it got

16  there, we don't know what the company got for it, and we heard

17  no testimony about that evolution as of the time of the

18  contract in 2020.

19  And I think this next slide repeats it.

20  So we've heard now from Mr. Schrock today --

21  THE COURT:  Right.

22  MR. SEILER:  -- that he says it was reasonable.  We

23  heard from Mr. Greenberg with reasons why the lenders want it.

24  None of those people testified under oath or were subject to

25  cross-examination.  Closings are not evidence.  The

1    evidence --

2              THE COURT:  Right.

3              MR. SEILER:   -- on this evolution and why it's

4    there and why it's important now is from people who says, I

5    wanted an indemnity, I really wanted an indemnity, I wouldn't

6    have voted for it, but it was indemnity.

7              And then yesterday, or maybe it's the day before,

8    they took out the people who were -- are no longer holders of

9    the PTL debt anymore from being indemnified.  And so -- and

10   there are some of them, because new people had purchased.

11             THE COURT:  Sure.

12             MR. SEILER:  So they were able to change the

13   indemnity for the people whose votes they don't care about, I

14   guess people didn't vote probably because -- well, we don't

15   even know, they could have voted for the plan and sold

16   subsequently, but they took them out, and so that's the

17   evolution of the facts of the indemnity.

18             The question you asked me the other day is why do I

19   care?  And I'm going to let Mr. Hermann tell you why I care in

20   the context of confirmation.  But I care for the good faith

21   and fair dealing because I think it illustrates an

22   understanding that being protected against the claim of

23   material breach was something they really, really wanted.

24   That's what they all say.

25             And that's an acknowledgment that there's something

1    to worry about.  And it's not just, oh, you sued us, because

2    people get sued all the time and they don't get indemnities

3    with blanket carve outs for things that are actually void from

4    public policy.  The gross negligence and willful misconduct

5    typically is something you can't indemnify.  And the cases

6    don't all say it's only for future acts.  There are cases that

7    say you can't indemnify people for it, period, that are cited.

8            So they got that, they insisted on it, and they

9    don't know why, and they company gave it and we don't know

10   why.  That's the factual predicate, and I think it's relevant

11   to thinking about their state of mind, and that's why I talk

12   about it in this --

13           THE COURT:  I got it.

14           MR. SEILER:   -- part.

15           And so let me just see if I -- I think I -- yeah, I

16   think I covered that.  So I'm going to go to the other

17   transactions for just a second.  And they talk about this more

18   in their brief than they did today, but first we'll go to the

19   prior -- keep going -- there we go -- one more, one more,

20   there we go.

21           So you have transactions that took place before this

22   deal.  And if we go to the next slide, I've actually annotated

23   it with the -- there you go -- with where you'd find it in the

24   Record.

25           But they're all either drop-down, or they were open

1    to all or they didn't have pro rata sacred rights, and none of

2    them are this case and none of them, just consistent with what

3    I said before, but they talk about them.  They had people say,

4    well, what about -- you know, what about -- I remember

5    J. Crew, I remember *Trident*, but they never told you why they

6    thought they were relevant precedence for the uptier.  And in

7    the Record either people said they're weren't, or they're the

8    documents themselves.

9         And if we go to the next slide, for Envision, so

10   both of the Envision and Mitel transactions took place after

11   this happened.  The underlying credit agreement was earlier,

12   but the transactions that people complain about were after.

13   Envision was multiple transactions and the one that Angelo

14   Gordon participated in was just new money.  And they had a

15   debt-for-debt exchange that was open to all, and the waterfall

16   was not a sacred right.

17        So, and like I said, no one's complaining because

18   they did the subsequent transaction that let 97 percent of the

19   people in, and so -- and, but most importantly, it was

20   informed by Serta.  And by -- not by your decision yet, but by

21   Judge Maisley's decision not to enjoin the transaction.  And

22   then Mitel, which is even later, it's been subject -- Apollo

23   got sued for that.

24        So, you know, I'm not going to litigate the Mitel

25   case in front of Your Honor, but that has hardly been

1       established to be okay.  It's just been established to be

2       under attack.  And I don't know the answer to what happens if

3       you rule with me and you say this is good faith and fair

4       dealing that's been violated and we have a damage trial, we

5       get paid our money, or the 5th Circuit reverses on the

6       interpretation of open market purchase, I don't know what that

7       all means for the Mitels of the world.  And the ones that I

8       told you last time I think are sure to come now.

9              THE COURT:  Right.

10             MR. SEILER:  And so, but I don't think any of that

11      tells you the answer to whether we're entitled to recovery,

12      there is no you have to act pristine in every other

13      transaction rule on a breach of contract claim.

14             So I want to talk about one more topic and then I'll

15      let Mr. Hermann talk.  And this -- and I say this, you know,

16      trying to be completely respectful.  I think Mr. Costa said,

17      in criticizing the LCM, the ship has sailed, you can't

18      re-litigate the contract claim that's been decided.

19             THE COURT:  Uh-huh.

20             MR. SEILER:  And the contract claim that has been

21      decided certainly is that this is an open market purchase in

22      Your Honor's eyes.  And they have submitted, and they're not

23      all equally, in my view, inappropriate, but they have

24      submitted proposed findings of fact that look to me like

25      they're trying to gild the lily, improve the findings, add to

1    the Record.  And I don't think, and we briefed this in our

2    brief, I don't think they can do that --

3              THE COURT:  Right.

4              MR. SEILER:   -- for the 5th Circuit now and I don't

5    think they can pre-do it anticipating the possibility of a

6    remand and have findings that have already been made.  And why

7    we say that in the brief that you read and I didn't want to

8    spend time on it is, we didn't think that was the trial we

9    were having, that was not the discovery anybody let us have,

10   and your decision is your decision.

11             And this -- I think if this is what they're doing,

12   you should -- I don't know how you were going to do proposed

13   findings and conclusions, but I highlight here on this page

14   and the next one findings that I think go further.  For the

15   one that is worse is 207, they say, has only been confirmed on

16   the fuller trial record.  No.  This trial was about good faith

17   and fair dealing.  It's not about the definition of open

18   market purchase, and it can't either confirm or disaffirm

19   their earlier ruling.

20             And I think that in going through your decision, you

21   should be careful, I respect -- most respect not to act on

22   something that you no longer have jurisdiction on to give them

23   something --

24             THE COURT:  No, I don't have --

25             MR. SEILER:   -- that's helpful.

1          THE COURT:  -- I don't have jurisdiction over the

2     adversary, but I have all the jurisdiction in the world with

3     respect to confirmation.  And the issues were tried as part of

4     confirmation.  There's an awful lot of testimony that was

5     surprising to me that if it didn't step over the line, it was

6     right there on it.

7          So I fully understand what I can talk about and what

8     I can't talk about in terms of the adversary.  But there is no

9     appeal in the main case with respect to confirmation.

10          MR. SEILER:  Fair enough.  Then I just would stress

11     the point I made which is that, and this is in the Record

12     attached to our brief, discovery was restricted against

13     anything that looked behind open market purchase.

14          THE COURT:  Well, you --

15          MR. SEILER:  There was --

16          THE COURT:  -- you better than anybody understands

17     the concept of trial by consent.

18          MR. SEILER:  Well, there's an overlap between

19     expectations about what the fruits were and the definition.

20     And to the extent there was -- I'm sorry, Your Honor.

21          THE COURT:  My apologies.

22          MR. SEILER:  -- and to the extent there was

23     testimony that is in that overlap and it leads to findings in

24     your confirmation, that'll be fine.  And I'm just saying to

25     you with respect we might reserve our right to object to the

1    confirmation order to the extent it does something more, and

2    more importantly the parties try to use it for something more,

3    that's all I'm saying so I'm not --

4            THE COURT:  I fully understand that and you know

5    that doesn't bother me one bit.

6            MR. SEILER:  Well, then I was trying to get through

7    this whole thing without bothering you one bit, and I think

8    I'm going to turn it over to Mr. Hermann.

9            THE COURT:  No, no, no, I mean, look, it has been a

10   pleasure to watch you be a litigator.

11           MR. SEILER:  Oh, that's very generous.

12           THE COURT:  It's a wonderful skill set.  I wish you

13   could infest all those around you with what you have.  It's

14   been a pleasure to watch you do your trade.

15           MR. SEILER:  Well, Your Honor, it's very generous to

16   say that.  Usually it's followed by my losing completely, but

17   I'm going to turn it over --

18       (Laughter.)

19           MR. SEILER:   -- to Mr. Hermann.

20           THE COURT:  You have made your case.  I got it.

21           MR. SEILER:  Thank you very much, Your Honor.

22           THE COURT:  Thank you.

23           Mr. Hermann?

24           Can I do one thing before you start?

25           MR. HERMANN:  Of course.

1          (The Court confers with the Clerk.)

2                    THE COURT:  All right.  My apologies.

3                    MR. HERMANN:  Not at all.

4                    Good afternoon, Your Honor.  For the Record, Brian

5     Hermann from Paul Weiss Rifkind Wharton & Garrison on behalf

6     of what I call the Ad Hoc Group of First Lien Lenders.

7                         CLOSING ARGUMENTS

8                    BY MR. HERMANN:  Your Honor, we filed an objection

9     to confirmation to the -- of the Debtors' plan at Docket 824.

10    And our objection really focuses on two things.  One is the

11    provisions dealing with the indemnity, the other is the

12    absolute priority rule, which is the tax treatment relating to

13    the existing equity.  And I want to address each separately,

14    and I'm going to start with the indemnity claim first.

15                   Let me start, Your Honor, by saying, to be crystal

16    clear, after all of this these Debtors deserve a fresh start.

17    And we have an issue with the lenders, we get it.  That issue

18    is not going to go away, you heard that.  But these Debtors

19    deserve a fresh start.

20                   But the indemnity and the continuation of the

21    indemnity is really undermining their fresh start.  And I

22    heard what Mr. Greenberg said, maybe we hit the indemnity,

23    maybe we don't, we'll judge it at the time.  But there's no

24    question that the indemnity is a cloud over this company that

25    will not be lifted until the litigation is finally

1    adjudicated, and that is going to take some time.

2              THE COURT:  Right.

3              MR. HERMANN:  So I do think that is impacting their

4    fresh start.

5              Now the indemnity has had many lives and has lived

6    in many documents, and I just want to trace the existence of

7    this indemnity because I think it's important.  It started out

8    with, you know, the 19 words that Mr. Seiler points to, they

9    didn't even exist when they announced the deal, then they got

10   into the deal, I'm not going to re-argue that.  But it started

11   out in the pre-petition priority term loan agreement.

12             Then the company filed for bankruptcy.  Importantly

13   it did not exist in the term sheet for the exit financing.

14   When they filed their -- when they signed their Restructuring

15   Support Agreement and when they filed it with the Court, there

16   was no indemnity in the exit financing.  So it cannot be

17   stated today that that was a critical component of the exit

18   financing because it didn't exist in the term sheet that they

19   signed when they started the case.

20             Where it did exist was in the plan.  And it existed

21   in a provision that admittedly is in a lot of plans and

22   admittedly does not get objected to in a lot of plans, but is

23   problematic.  Because what they did was they took a specific

24   provision of a financing contract which cannot be assumed and

25   they pulled it out and said, we're going to treat this as

though it's an executory contract, we'll deem it an executory contract and assume it.

You can't do that, and we objected on that basis and they took it out.

THE COURT:  I think I made a comment about it, too, didn't I, along the way?

MR. HERMANN:  I think you did.

THE COURT:  Yes.

MR. HERMANN:  Yeah.  So, sure, if everybody's consenting to many plans and maybe, you know, after this people will look more critically at it, but maybe it's fine. But here, it didn't work and they took it out of the plan.

So then if you take it out of the plan, that claim which exists has got to be treated.  And it is not -- Mr. Greenberg made the comment, We have a bunch of claims under the agreement, we filed a Proof of Claim, they're all being treated under the plan.

This is a very different claim because the way they set up that indemnity is they put it at the top, the very top of the waterfall.  It is the most senior part of their term loan claim, and then the principal and interest comes after it.  So somehow it has to get treated under the plan.  I suspect they didn't want to treat it under the plan because of 502(e)(1)(B) which I'm going to get into.  And so they didn't treat it under the plan.

1        THE COURT:  Right.

2        MR. HERMANN:  Instead, what they did was they put it

3   into the exit financing at the very last minute and said, neat

4   trick, we'll take it out of the plan, we'll put it into the

5   exit financing and we'll just carry it forward that way.  And

6   to me, Your Honor, that's like laundering a claim that should

7   be disallowed under the Bankruptcy Code through a different

8   instrument, and I'm going to tell you why that doesn't work

9   either.

10        THE COURT:  Okay.

11        MR. HERMANN:  And so -- but let me start with the --

12   lay some foundation.  So if you start with Section 1129(a)(1),

13   it says that very basic provision in the plan needs to comply

14   with all applicable provisions of the Bankruptcy Code.  Not a

15   controversial topic.  And then (a)(2) says, the proponent of

16   the plan, the Debtors, needs to comply with all applicable

17   provisions as well.  Okay.

18        So what is the plan?  The plan is the Chapter 11

19   plan, and the way they've defined it, it also includes all of

20   the attachments to the Chapter 11 plan which includes the plan

21   supplement which includes the exit financing.  So using their

22   own terms in the plan, the plan as defined includes the

23   indemnity.  And I don't think there's any -- now the mere fact

24   that they stuck it in the exiting financing has got other

25   problems, but there's no question that by doing it it's still

1    part of the plan.

2          So and, you know, let me say this, we heard at the

3    outset there's a lot of settlements embodied in the plan,

4    there's business judgment, but the plan itself is not a 9019

5    settlement.  It can embody a 9019 settlement, but the plan

6    itself is not a 9019 settlement.  So all of this talk about

7    settlements and treatment of claims, and RSAs and business

8    judgment are sort of irrelevant when it comes to 1129.

9    Because what Congress told us is that with respect to a plan

10   you either comply with 1129 or your plan can't be confirmed,

11   notwithstanding the benefits of settlements and gives and gets

12   and business judgment or any of that stuff.

13         So let's look at whether they can comply with 1129.

14   So I'm not going to go through the specific provisions of the

15   indemnity, and I think they've already been well covered, and

16   again, Your Honor, we're not here objecting to an indemnity in

17   the exit financing, they can have an indemnity in the exit

18   financing, it's really just the 19 words that are the problem

19   that we have with the indemnity.

20         So let's look at 502(e)(1)(B), which we think

21   clearly applies.  And let me also state that 502(e)(1)(B),

22   there's no discretion for Your Honor in 502(e)(1)(B).  If it

23   applies, the claim shall be disallowed.

24         THE COURT:  Agree.

25         MR. HERMANN:  so there's three elements, they don't

contest two of them, they only really contest whether or not there's co-liability.  And so let's look at what that means. I think that a good place to start is the *Drexel Burnham* case in the Southern District of New York, which we cite in our papers, 148 BR 982, the quote that I'm going to read is at page 986 and it's Bankruptcy, Southern District of New York, 1992.  And in talking about co-liability what the Court says there is that the proper standard for determining co-liability is whether, quote, "The causes of action in the underlying lawsuit assert claims upon which, if proven, the Debtor could be liable but for the automatic stay".

There's no question that our lawsuit and their own lawsuit against us contains claims that, if proven by us, would create liability for the Debtor and would create liability for the lenders.  So I don't think the co-liability issue under that definition is really problematic.  Now that's just one of several cases, Your Honor, that confirm that co-liability exists whenever a Debtor and an indemnified non-Debtor are subject to litigation asserting money damages for the same harm.

Now I think it was in Gibson Dunn's papers where they say, well, we have said, and Mr. Seiler I think has said very eloquently, that in the good faith and fair dealing context it could be that we have a good faith and fair dealing claim against the lenders, but maybe not against the Debtors

1    because different behavior could give rise to a different

2    claim.  But that doesn't mean that they could not be -- both

3    be liable for a breach of contract, and that's the essence of

4    our claim.

5         The other thing that I would say about the co-

6    liability argument that they've made in their papers and that

7    Mr. Greenberg reiterated again today is that it undercuts the

8    argument that they made to Your Honor in connection with the

9    stay hearing.  Because in connection with the stay hearing

10   what they said was that there was an identity of interest

11   between the Debtor and the lenders which necessitated a stay

12   of our New York litigation against the favored lenders.

13        And specifically what they said is the following

14   quote, they said, "Indeed, a judgment against the non-Debtor

15   parties concerning the priority of the 2020 transaction would

16   necessarily be a finding that the Debtors also breached the

17   1st lien -- the 1st lien term loan agreement."

18        And so they've essentially conceded, I think, that

19   there is co-liability.  So if you have co-liability, together

20   with -- it's a reimbursement or contribution claim, courts

21   have found that indemnity is a reimbursement or contribution

22   claim and we know the claim is contingent, I think we have

23   satisfied that statute.

24        Now so if we have satisfied the statute, and if you

25   accept that the plan is -- encapsulates the plan supplement

1    and the plan supplement contains the exit financing, and the

2    exit financing contains the indemnity, the plan essentially is

3    letting ride through indemnity that should be disallowed.  And

4    that is a violation of Section 1129(a)(1).

5         Now if you don't believe me on that, Your Honor,

6    there's another section that is implicated by the indemnity

7    and that's Section 509(c).  I'm not going to spend a lot of

8    time on it here because we briefed it, but 509(c) similarly

9    says even if you fix a portion of the claim, that claim has to

10   be subordinated until the party that is bringing the lawsuit,

11   us, gets paid in full.  So what you have here is a situation

12   where you have a claim that's disallowed that's riding

13   through, or alternatively a claim that should be subordinated

14   that's riding through.  Either way that's a violation of 1129.

15        So we don't think that the plan can be confirmed

16   with the indemnity riding through.  Again, if they want to

17   modify the indemnity, take out the 19 words, we're gone on

18   this issue.  But if they're going to leave it in, we don't

19   think that that can be approved.

20        Let me go through some of the arguments that they've

21   made in response to the argument that I've just made in the

22   papers.

23        THE COURT:  Okay.

24        MR. HERMANN:  First, they say we didn't object to

25   their claim, which is wrong.  We did file a claims objection

1    prior to the expiration of the challenge deadline.  It's at

2    Docket 656.  And so -- and we didn't need derivative standing

3    to do it because any party-in-interest can file a claim

4    objection, so I think that takes care of that.

5          And along those lines, Your Honor, when we get to

6    the end, no matter how Your Honor rules, we would like the

7    findings and conclusions that are in both the adversary

8    proceeding proposed findings that the Debtor and the favored

9    lenders put forward, as well as in the confirmation order,

10   that say that no party has filed a timely challenge should

11   come out, because we did file a timely challenge.

12         THE COURT:  So if it helps you, just I am not one of

13   those people that take one party's findings of fact and

14   conclusions of law and signs them.  I appreciate that a lot of

15   hard work went into everybody submitting them.  What you will

16   get from me is -- are my words, my opinion.

17         MR. HERMANN:  I didn't think you were, Your Honor,

18   but I just wanted to --

19         THE COURT:  No, I want everybody to know --

20         MR. HERMANN:   -- didn't want that to unstated.

21         THE COURT:   -- I didn't -- it's I don't think I've

22   ever signed anybody's findings of fact and conclusions of law,

23   except those contained in an uncontested confirmation order.

24         MR. HERMANN:  Thank you, Your Honor.

25         Next, you know, I think, candidly worried about this

502(e)(1)(B) argument.  They stick the indemnity in the exit
financing and kind of say, well, this is a new loan agreement
with a new indemnity, but --

THE COURT:  Right.

MR. HERMANN:   -- oddly the new indemnity up until
yesterday I think was indemnifying people that participated in
a transaction three years ago who no longer own the debt.
They kind of figured that out.  But there's no way that that
would make any sense.  Right?  People entering into a new loan
agreement are not going to indemnify people who aren't parties
to the loan agreement, but did something potentially wrong in
2020.

But more fundamentally I don't think that they can
just -- it's not a question of where the language lives, it's
a question of can this claim survive?  And so I don't think
that's appropriate, and as I said, I don't think that they can
be saved by necessity.  You know, we hear all this testimony
about we need an indemnity if we're going to vote for the
plan, or we're going to do the exit financing, or any of that.

Mr. Seiler, I think, handled that well enough that I
don't need to go over that ground again, but as I said at the
beginning, the indemnity that the lenders wanted in the exit
financing didn't include this language.  So they can't say
they needed it because it didn't exist in the term sheet that
they attached to the RSA.

1        Next we heard that, you know, Mr. Schrock, I think,

2   said this, well, it's a 9019 settlement, or it's a settlement,

3   he might not have used the words 9019, it's a settlement and

4   we're allowed to settle things under a plan.  Sure, you can do

5   that, but the 5th Circuit, like other Circuits, including the

6   2nd Circuit in the *Oweeko* (phonetic) case said, you can't

7   through a settlement do something that violates Section 1129.

8        So if I'm right that the indemnity is problematic

9   under Section 502(e)(1)(B), they can't then say, well, it's

10  just a settlement because you can't settle something that also

11  violates Section 1129(b) -- I'm sorry, 1129, particularly in

12  connection with a plan.  So I think that argument fails.

13       So I think any way you cut it, they've got a problem

14  wit the indemnity under 502(e)(1)(B) and it should be

15  disallowed.

16       I'm happy to answer any questions you have on that

17  topic before moving on.

18       THE COURT:  So I just have one for you, so let's

19  assume for a second that, you know, you've got a situation

20  where you had an indemity, 502 says goes away, and then do you

21  believe in a plan that there could be an exchange of a

22  consideration and a new indemnity given, whether the words are

23  exactly the same, slightly different, I think that's largely

24  irrelevant.  But do you think that if there is sufficient

25  consideration given, and the other requirements under *Oweeko*

1    or *Foster Mortgage* or *Jackson Brewing*, whatever 5th Circuit

2    case you want to choose, do you think that that can be done?

3              MR. HERMANN:  I think that if you have a contingent

4    indemnity pre-petition that is subject to 502(e)(1)(B), I do

5    not think that you can somehow settle that claim and allow it.

6    Maybe if nobody objects, maybe the Court lets it go, but I

7    don't think you can do that.

8              THE COURT:  So let me give you the argument that at

9    least I think is being made, is that we have a billion dollars

10   worth of claims and in order for the company to succeed the

11   capital structure's got to be redone, so we will do the

12   following:  We'll consent to the conversion of our claim to

13   equity and in exchange for that, you give us back an indemnity

14   because we know we lost one that we had when the case was

15   filed.

16             Can you do that?

17             MR. HERMANN:  I don't think so because I think that

18   it's tantamount to the pre-petition indemnity riding through

19   the bankruptcy unimpaired and I think that's exactly what

20   502(e)(1)(B) is saying you cannot do.

21             THE COURT:  The fact that you paid for it, doesn't

22   change anything.

23             MR. HERMANN:  It doesn't.

24             THE COURT:  Interesting.  Okay.

25             MR. HERMANN:  Your Honor, the next -- so that's

1    Objection Number 1.

2              THE COURT:  But they --

3              MR. HERMANN:  Yeah.

4              THE COURT:   -- but they have said, we'll convert

5    our billions dollars worth of claims to equity and you agree

6    to buy us an insurance policy for $500 million.

7              MR. HERMANN:  Yeah, I think they can do that.

8              THE COURT:  So it's -- because an indemnity really

9    is no more than -- it's a different type of insurance policy.

10   Right?

11             MR. HERMANN:  It is, but it happens to be one that

12   the Bankruptcy Code says has to be disallowed.

13             THE COURT:  Oh, I got it, I'm not disputing that,

14   I'm not disputing it says that, but in terms of replacing that

15   right you're saying that assuming that I pay for it, and

16   assuming that I pay enough, you're saying I could go to AIG

17   and buy a policy which would cost money, but I can't go to the

18   Debtor and get an insurance policy from the Debtor.

19             MR. HERMANN:  Well, I would say this, two things,

20   one is I think if they went to AIG to get the insurance

21   policy, I don't think they'd get the indemnity that they have

22   from the Debtors with the carve outs from the carve outs.

23             THE COURT:  I was trying to make it apples-to-

24   apples.

25             MR. HERMANN:  Yeah.

1          THE COURT:  I got those arguments that you're

2     making, I was just trying to understand why is it different

3     who issues the insurance policy if you're telling me one's

4     okay and one's not?

5          MR. HERMANN:  Because I think -- well, I think that

6     if this was a normal -- forget the litigation, if they had

7     gone out to a third party to get exit financing, like Citadel,

8     and Citadel said, we'll give you exit financing, but we want

9     an indemnity, a standard indemnity, no problem.  If they were,

10    again, forget the litigation, if they wanted to include a

11    standard indemnity in their take-back paper, I think that's

12    pretty standard.

13         But what they're doing here, I think, you have to

14    agree with me, but I think they are taking a disallowed claim,

15    they are purposefully not treating it under the plan because

16    they know they have a problem that'll it be disallowed, and

17    they are essentially laundering it through the exit financing

18    to get it to come out the other side, and I don't think you

19    can do that.

20         THE COURT:  So let me -- I really want to understand

21    this because I've thought about this a bunch.  My guess is if

22    I really pressed Mr. Schrock, he'd stand up and -- or the

23    lenders, they'd stand up and say, we agree that that pre-

24    petition indemnity claim is disallowed, withdrawn, whatever,

25    they'll stand up and say that.  I would.  And what they're

1     going to say is, is that we are giving a basket of

2     consideration to make this company work and part of the give

3     and the take is we want a replacement insurance policy for

4     what we lost.

5          That's what I'm really focused on.  I mean, I don't

6     know what they're going to say, but I know what argument I

7     would make.  And then I'm really curious why you draw a

8     distinction between our -- I have friends at AIG, I'm sure I'm

9     going to get a hate email by the time this gets around, but,

10    you know, why it is that you draw a distinction between I can

11    go buy an AIG policy and give it to them, but I can't give

12    them an indemnity, which is really just an insurance policy

13    from a different insurer.

14         MR. HERMANN:  Well, I guess in that circumstance AIG

15    would write a policy, the company would pay for it.  Okay.

16    AIG would probably cost the company a fair amount of money to

17    go get that policy.  And then the lenders could look to that

18    policy, I agree with you, and then AIG could look to indemnity

19    against the company, there's no issue there.  Right?  My own

20    view is that the distinction is that they are taking a claim

21    that should be -- has to be disallowed --

22         THE COURT:  Right.

23         MR. HERMANN:   -- and they are sticking -- letting

24    it go through, and I think that's a problem.

25         THE COURT:  So when Mr. Greenberg stands up and

1     says, we agree the claim's disallowed, what does that do to

2     your argument?  I mean you're not going to call him a liar, I

3     don't think.

4          MR. HERMANN:  Well, then I think it has to come out

5     of the exit financing.

6          THE COURT:  Well, you're going to say that it's a

7     different indemnity, it's a different insurance policy.  It's

8     what you said, I can go buy one, I can go get one from someone

9     else, but you're just saying the Debtor can't make it.  And

10    I'm trying to understand why you draw that distinction and why

11    can't the Debtor?

12         MR. HERMANN:  If you accept -- here's what I would

13    say to that --

14         THE COURT:  Okay.

15         MR. HERMANN:   -- if you accept that it's a

16    completely different indemnity, then there is no distinction

17    between that and the AIG policy.

18         THE COURT:  Okay.  You're just telling me I can't

19    get there, and you're telling me that his words of saying, we

20    agree that the pre-petition indemnity is disallowed?

21         MR. HERMANN:  Right.  Because, again --

22         THE COURT:  You want to hear them say it?  I mean, I

23    bet I can -- I think I can push him into it.

24         MR. HERMANN:  But there's a history here, Your

25    Honor, that I don't think can be ignored.

1          THE COURT:  Right.

2          MR. HERMANN:  Right.  Because they knew -- the whole

3     goal here -- the indemnity sits at the top of the capital

4     structure.  Okay.  So if you wanted to do this right, you

5     would have treated it.  But they didn't want to treat it

6     because they didn't want -- the lenders who were parties in

7     2020 no longer held the debt to walk away with the

8     consideration that's going to the lenders that continue to

9     hold the debt.

10          THE COURT:  Right.  So watch this.

11          So, Mr. Greenberg, assuming that the plan is

12     approved, do you agree that any pre-petition indemnity claim

13     that your clients held is disallowed?

14          MR. GREENBERG:  Your Honor, Scott Greenberg, Gibson

15     Dunn & Crutcher, for the Record.  I think we're thinking about

16     it exactly the same way.  We had pre-petition indemnity

17     claims, which I think is what Mr. Hermann's --

18          THE COURT:  Right.

19          MR. GREENBERG:   -- focused on, and those will get

20     deal with in the plan.

21          THE COURT:  But you didn't answer the question.

22          MR. GREENBERG:  Right.  I haven't answered the

23     question.  And, yes, and then there's a new indemnity that is

24     part of the consideration as I talked about in my opening

25     remarks as part of the overall plan settlement that our

1    clients have been negotiating with Mr. Schrock and the Debtors

2    since the fall of this year.

3         THE COURT:  Got it.

4         Mr. Schrock?

5         MR. SCHROCK:  Yeah, Judge, the pre-petition

6    indemnity will be disallowed.  It's a new indemnity, that's

7    why we have the provision in 8.5(b) granting new indemnity as

8    part of the overall settlement.  We could certainly do that.

9    There's nothing that prohibits the Debtor from, as part of the

10   basket of consideration, giving a new indemnity.  That's the

11   condition that's necessary to get this done.

12        Mr. Hermann has, you know, been doing an admiral job

13   trying to get the lenders carved out and just go against the

14   lenders.  This is just another extension of the argument.

15        THE COURT:  No, I got all of that.  I knew this was

16   out there, and I knew this was coming, this is why I want to

17   give you an opportunity to tell me how does that change your

18   argument with respect to the indemnity?

19        MR. HERMANN:  Again --

20        THE COURT:  They've stood up and said it's gone.

21        MR. HERMANN:  Yeah, well, again, I think that all

22   they've done -- and, listen, it's creative, but if you follow

23   the bouncing ball, this indemnity has lived in the plan

24   through an executory contact, then it lived somewhere else,

25   now it's going to the exit financing, it's the same indemnity.

1    It's just a slight of hand.

2              THE COURT:  But it's a slight of hand though -- I

3    mean you have to deal with the argument now.  If you -- and

4    again, I'm not taking any of your arguments away from you, I'm

5    genuinely trying to understand how -- the path you're walking.

6              So now you have -- if you accept that the pre-

7    petition indemnity is gone, now you have a huge exchange of

8    value in return for that indemnity.  And I'm struggling -- I

9    think you agree and I think it's right that I can exchange

10   value and buy a third-party insurance policy.  Why can't I

11   take the exchange of value and then realize the premium that

12   would otherwise be the insurer's profit, and if they're

13   willing to take it, give them the same -- give them the same

14   promise.

15             MR. HERMANN:  My response to that, Your Honor, is

16   that if it's a new indemnity and you're not buying my argument

17   about it's the same indemnity traveling along the way --

18             THE COURT:  I'm not saying I'm not, Mr. Hermann,

19   I've got it.

20             MR. HERMANN:  And I think you're --

21             THE COURT:  It's showed up in a number of places.

22             MR. HERMANN:   -- I think you're absolutely right.

23             THE COURT:  Okay.  Then I got it that it's reared

24   its head in a number of different places, and you objected to

25   it, I commented on it, and Debtors have reacted along the way,

1    and the lenders have reacted along the way.  I just want to

2    make sure I understand the argument and I always appreciate

3    what you have to say.  I want to understand, because I knew

4    this argument was out there.  You can read between the lines

5    and see it.  And I just wanted to make sure that you had an

6    opportunity to respond to that.

7                    MR. HERMANN:  Okay.  I'll move on to the absolute

8    priority rule.

9                    THE COURT:  Okay.

10                   MR. HERMANN:  So I think we can maybe cut to the

11   chase on this.  As I understood the Plan and Disclosure

12   Statement based on the words that are in it, putting aside all

13   the complexity, the 6-step transaction and all of that, it's a

14   million and a half dollars going to existing equity on account

15   of, or "in respect of" I think is the exact words they use,

16   their existing equity.  That's an absolute priority violation,

17   clear as day.  Now when I read their papers they say, no, no,

18   no, it's really not on account of their existing equity, it's

19   on account of other stuff --

20                   THE COURT:  Yeah.

21                   MR. HERMANN:  -- that's new value.  And what I

22   would say to that is, fine, if it is on account of new value,

23   and that's clear in the conclusions and findings, you find

24   that that new value is sufficient to justify the million and a

25   half dollar payment, we don't have an objection.  But if it on

1    account of existing equity, then I think that's an absolute

2    priority problem.

3            THE COURT:  Right.  So the argument is, is that

4    the -- in my head I remember $54 million of tax benefits.  And

5    that's what they're saying the exchange is.  And you're

6    telling me you just don't think that's -- given all -- and I

7    got it, the supplements are changing and things are moving,

8    but do you think the documents as they exist right now don't

9    say that?

10           MR. HERMANN:  No, I think that -- my own view is

11   that the evidence came in that there is a $54 million tax

12   refund that is out there that they can go get --

13           THE COURT:  Right.

14           MR. HERMANN:   -- if they do the steps transaction.

15   However, to do it as I read their Disclosure Statement, we can

16   look at the words together because it's in two different

17   places --

18           THE COURT:  Right.

19           MR. HERMANN:   -- they say that they have to pay a

20   million and a half dollars on account of -- or in respect of

21   existing equity.  I'm cutting through a bunch of defined

22   terms, but that's essentially what it says.

23           THE COURT:  Sure.

24           MR. HERMANN:  And so my view is, I'm not questioning

25   the trade, you obviously need to make the finding that it's

1    fair, it seems fair, a million and a half for $54 million, but

2    if --

3         THE COURT:  Well, it's a million and a half in

4    exchange for a shot.

5         MR. HERMANN:  A shot at 54.  Correct.  It seems like

6    a fair trade.  However, if they're -- so if they're getting

7    the million and a half on account of new value, we have no

8    issue.  I think that that should just be made clear and the

9    Record should be cleaned up because the Disclosure Statement

10   says it's on account of their existing equity.  If it's not on

11   account of their existing equity, then I don't think we have

12   an absolute priority problem.  If it is, then I think the plan

13   has an absolute priority issue.

14        THE COURT:  Mr. Schrock, did you --

15        MR. SCHROCK:  Yes, Your Honor.  Sorry, Brian, first

16   rising.  We can certainly -- to the extent there's any

17   ambiguity, it certainly is on account of new value.  That'll

18   be clear in the findings of fact and conclusions of law.  It's

19   not account of, you know, their equity distribution.  I

20   thought we made that clear, but to the extent there's any

21   ambiguity, we want to be clear.

22        MR. HERMANN:  That's fine.

23        THE COURT:  Okay.

24        MR. HERMANN:  My last issue, Your Honor, is one that

25   you're going to tell me I don't need to worry about, which

1    makes me happy, is they have a request to waive the 14-day

2    stay for the plan to go effective.  We are not looking to

3    interfere with whenever they want to go effective, assuming

4    that the plan gets confirmed and our objections are overruled,

5    but we don't want to be -- we don't want to have an argument

6    made that because we either didn't move for a stay or didn't

7    oppose the 3020 relief that they were requesting, that somehow

8    we are in some equitable mootness trap.

9              THE COURT:  Right.

10             MR. HERMANN:  And so if they want to go effective by

11   a certain date, and we have to be given the ability to move

12   for a stay, you know, we have no problem with that.  If -- I

13   know you don't like oral motions for a stay, we could always

14   proceed that way to expedite, or if they want to just agree

15   that, you know, they're not going to use that against us, you

16   know, as a basis for -- for an equitable mootness argument,

17   I'm sure we could work through that.  But we cannot be left in

18   a situation where we can't -- don't have the opportunity to

19   move for a stay and then get penalized for it.

20             THE COURT:  I totally got that.  And when I get done

21   with the argument we need to talk about timing, because this

22   is not something I'm going to rule from the bench on.  I know

23   normally I do, but this is something I know it's going up

24   either way, I need to be -- you know, I told you last time

25   with respect to the adversary I was really trying not to

1    create a precedent, I was trying to give you all room to

2    negotiate.  You know, this time I have to.

3        And so I'm actually going to -- I'm actually going

4    to put all of my thoughts down in writing and all of my

5    reasons why.  I know there's some dates that are running, I

6    know that I had a vacation planned for the first time in

7    16 years for next week, and I know I'm not going now, which

8    I'm actually kind of happy about, I was a little insecure

9    about going on vacation.

10       (Laughter.)

11       THE COURT:  So we need to talk about timing and

12   whether it's in the form of a, you know, a stipulation that

13   equitable mootness will not be asserted or whether it's a --

14   you know, we need to have a hearing, or whether or not you

15   need a temporary stay so that you can go to the District

16   Court, I mean we'll work through all of that once I understand

17   what the timing issues are, but I got that.

18       MR. HERMANN:  Great.

19       THE COURT:  All right.

20       MR. HERMANN:  Thank you, Your Honor.

21       THE COURT:  All right.  Thank you.

22       Let me ask, Mr. Millar.  Good evening.

23       MR. MILLAR:  Good evening.  How are you?

24       THE COURT:  Doing fine.  Thank you for asking.

25       MR. MILLAR:  I think -- I guess I'm last.

1          THE COURT:  But certainly the most anticipated.

2     (Laughter.)

3          MR. MILLAR:  I might miss my flight and I would need

4     Mr. Seiler to re-book me if he could.

5          THE COURT:  Well, I'm sure -- he's opening up his

6     own travel booking service --

7          MR. MILLAR:  Right.

8          THE COURT:   -- so he'll get that done for you.

9     (Pause in the proceedings.)

10          MR. MILLAR:  Your Honor --

11          THE COURT:  So you never found a friend throughout

12     the entire week.

13          MR. MILLAR:  No.

14     (Laughter.)

15          MR. MILLAR:  It's the story of my life I suppose.

16          Your Honor, for the Record, James Millar on behalf

17     of Citadel Equity Fund Limited.  And, Your Honor, first of

18     all, I would like to thank the Court for its time and

19     attention to this matter, and thank you for hearing us.

20                    CLOSING ARGUMENTS

21          BY MR. MILLAR:  Your Honor, this is a complicated

22     set of issues, and as complicated as these issues are, I would

23     like to start off with a simple observation that is core to

24     how my client is approaching this case and the company.

25          That is that the indemnity obligations that the

1    reorganized Debtors are attempting to assume are not good for

2    my client as a stakeholder --

3              THE COURT:  Right.

4              MR. MILLAR:   -- but that's because they're not good

5    for Serta.

6              THE COURT:  Could I ask you, just so I have a point

7    of context?

8              MR. MILLAR:  Yes.

9              THE COURT:   Do you -- are you in the same position

10   as Mr. Hermann that you don't have a problem with the

11   indemnity just the 19 words, or you have a problem with the

12   indemnity in its entirety.

13             MR. MILLAR:  I have a problem with any indemnity

14   that allows the favored holders to come back against the

15   company.  And I'm going to --

16             THE COURT:  For anything.

17             MR. MILLAR:  For anything.  Because I'm in a

18   different position, I am an FLSO holder.

19             THE COURT:  I think that's why I was asking --

20             MR. MILLAR:  Yeah.  Right.

21             THE COURT:   -- so thank you.

22             MR. MILLAR:  So my fortunes are tied to the company,

23   and I want to see the company succeed because that's,

24   candidly, what is good for us.

25             THE COURT:  So in one sort of view you're on the

1     wrong side of the room.

2                    MR. MILLAR:  I am.

3                    THE COURT:  Yeah.

4                    MR. MILLAR:  Exactly right.  And I was going to get

5     to it in my prepared remarks.  But let me cut to the chase,

6     Your Honor, and that is we feel we are aligned with the

7     company, not with the Gibson Group, but we are aligned with

8     the company, with their employees, with the customers, with

9     the success of this company.  That's where we sit.  And I know

10    Your Honor -- I don't want to go through the whole financing

11    issue, but you know that we were prepared to invest more

12    money, because that's how we feel about the company.

13                    So, look, you're going to hear me in a couple of

14    minutes go through some of the legal issues, but I don't want

15    the basic economic point to be lost and that is, again, that

16    we view the indemnity as bad.  And in a case that is marked by

17    disagreement over numerous issues, I don't think anybody in

18    this courtroom views the indemnity -- I'm sorry, let me

19    restate that, I don't think anybody thinks the company is

20    better off with the indemnity, as opposed to without it.

21                    THE COURT:  Sure.

22                    MR. MILLAR:  You've heard testimony about that.

23    That is straightforward.  And that's really where we're coming

24    from.

25                    THE COURT:  So what would the cap structure of the

1    Reorganized Debtor look like if there was a billion six worth

2    of debt wherever you think it lies in the capital structure

3    versus being converted to equity?

4         MR. MILLAR:  Well, I don't think the Reorganized

5    Debtor would have a billion six of debt.  I think candidly the

6    plan would look just like the plan does now without the

7    indemnity.  And I think the testimony that people say, I was

8    going to get to this, let's cut to the chase, the testimony

9    that people say, well, we wouldn't have taken that deal.

10   Actually I think you would have.

11        THE COURT:  So but let's assume -- let's assume for

12   a second, because I tried to work my way through this, you

13   actually think you could enforce that absent consent?

14        MR. MILLAR:  You couldn't have forced it absent

15   consent because we have a rule that says you can't convert

16   debt into equity, secured debt --

17        THE COURT:  Right.

18        MR. MILLAR:   -- without their vote.  But what

19   they're telling you is something a little bit different.  What

20   they're telling you is essentially we wouldn't have taken a

21   deal --

22        THE COURT:  Well, yeah, I'm ignoring them for a

23   second.

24        MR. MILLAR:  Yeah.

25        THE COURT:  I'm just trying to look like -- so, you

1  know, obviously the Debtor could have filed a 506 and I could

2  bifurcate and figure out what the secured claim is, what the

3  unsecured claim is, and, you know, who knows what they would

4  end up voting, but the cap structure would look very

5  different, wouldn't it?

6      MR. MILLAR:  Look, I actually don't think so, and

7  here's why.

8      THE COURT:  Okay.

9      MR. MILLAR:  Because they take the same deal without

10  the indemnity, that's why.

11      THE COURT:  Why don't I -- why don't I know that?

12      MR. MILLAR:  I think you have to think about people

13  as economically rational actors, and they got up here and

14  sort of testified, and I don't think you should credit this

15  testimony --

16      THE COURT:  Right.

17      MR. MILLAR:   -- that without the indemnity they

18  wouldn't have done this deal.  Well, what would they have

19  done?  Would they have let the company go into liquidation and

20  driven their investment into zero?

21      THE COURT:  Right.

22      MR. MILLAR:  They wouldn't have done that.

23      THE COURT:  So walk down the path with me.  So let's

24  assume that you convince me that you're all-knowing and right.

25  And so I go --

1           MR. MILLAR:  Do I have to do that?

2           THE COURT:  Well, to go down this path you do.

3           MR. MILLAR:  Because that's harder -- that seems

4      like a real hard issue.  But, yeah, I'm sorry, go ahead.

5           THE COURT:  So I deny confirmation, you actually

6      probably want me to grant the adversary, but I deny

7      confirmation.

8           MR. MILLAR:  When you say, I'm sorry, grant the

9      adversary?

10          THE COURT:  But you probably want me to grant the

11     requested relief in the adversary given where you sit.  But

12     let's say I deny confirmation.

13          MR. MILLAR:  Okay.

14          THE COURT:  And the Debtors win the adversary.

15          MR. MILLAR:  Okay.

16          THE COURT:  What's next?

17          MR. MILLAR:  Then I think, and in your hypothetical

18     have we resolved the appeals?  Probably not.

19          THE COURT:  Oh, no, that's -- they're off --

20          MR. MILLAR:  Yeah, then I --

21          THE COURT:   -- appealing everything.

22          MR. MILLAR:   -- think -- then I think the Debtors

23     have to do what Debtors often do in Chapter 11 and that is

24     face hard issues and a hard bargaining with their

25     counterparties.  And you go to the counterparty and you say,

you're not getting this indemnity.

THE COURT:  Right.

MR. MILLAR:  And so are we going to restructure without the indemnity so the company and your equity value can go up --

THE COURT:  Right.

MR. MILLAR:  -- or are you going to hold up this whole thing so that you, and you remember is a subset --

THE COURT:  Right.  So you think the Debtors just gave up, is that what You're telling me?

MR. MILLAR:  I think that they -- I think that they got a bad deal --

THE COURT:  Okay.

MR. MILLAR:  -- I think it is -- you know, we can talk about it in terms of business judgment, I don't think they satisfied a business judgment test.

THE COURT:  Okay.

MR. MILLAR:  I don't think that they took advantage of their legal avenues to say, this claim is disallowable and you're not getting it.

Also, Your Honor, there's one other point, and that is remember this isn't the FLSO class, or even the FLFO class. This is a subset of parties represented, some by Greenberg, that is saying, we won't do this unless we get the indemnity. If the Debtors were on the ball, would they be saying to them,

1    pardon me, is that's (indiscernible).  Okay.  We can designate

2    your vote on that.

3           And that's true, there is a 5th Circuit case -- now

4    we're going down a rabbit hole, I was wondering which rabbit

5    hole we were going to go down, but let's go down this one.

6    Okay?  There is a 5th Circuit case with Conrad Hill (phonetic)

7    who did exactly this, and the 5th Circuit said, you can do it.

8    And what happened?  They amended the Bankruptcy Code to put in

9    the vote designation provision.

10           THE COURT:  Uh-huh.

11           MR. MILLAR:  And so what they're saying is a subset

12   of them, some of them sit in the FLSO class, some of them sit

13   in the FLFO class, some of them, until they changed the

14   indemnity last night or the night before, weren't even before

15   this Court.  And if that group is saying, we're not going to

16   let this Debtor reorganize unless we get that indemnity,

17   that's bad faith.

18           THE COURT:  And so going down this path, how long

19   does that take?

20           MR. MILLAR:  About vote designation?

21           THE COURT:  No, no, I've both asked for them and

22   presided over them, your alternative plan.

23           MR. MILLAR:  Well, look, my alternative plan, which

24   I think and I mentioned this at my opening, could be confirmed

25   today because the indemnity is not, until perhaps last night,

1     treatment of FLSO claims.

2              THE COURT:  All right.  So let's assume I disagreed

3     with you --

4              MR. MILLAR:  Okay.

5              THE COURT:  -- and you've got to start from

6     scratch.

7              MR. MILLAR:  You know --

8              THE COURT:  So, one, you've got to file your own

9     motion.  Right?

10             MR. MILLAR:  Which motion is this?

11             THE COURT:  To bring exclusivity to an end so that

12    you can file your own plan.

13             MR. MILLAR:  I'd like to think the Debtors would do

14    it.

15             THE COURT:  You'd like to think -- okay.  So --

16             MR. MILLAR:  I mean if this --

17             THE COURT:  -- you're going to go get the Debtors

18    to do it.

19             MR. MILLAR:  But if they're doing their job, I think

20    they should.  Right?  They don't need to team up with just one

21    stakeholder at the risk of their own company.

22             THE COURT:  Okay.  So let's assume you're right.

23             MR. MILLAR:  Okay.

24             THE COURT:  We are six months out from doing this

25    again?

1          MR. MILLAR:  I don't think it needs to be that long.

2     I mean maybe, maybe it's three.  There is a delay, Your Honor,

3     I'm not going to -- I'm not going to tell you --

4          THE COURT:  I'm actually being genuine in my

5     question because --

6          MR. MILLAR:  Yeah.

7          THE COURT:  -- you've got, you know, 28 and 28,

8     let's assume that everybody wants no shortcuts, so, you know,

9     there's two months.  It's going to take everybody -- you know,

10    no one does anything quick anymore, it's going to take 60,

11    90 days to get something drafted, circulated, people are going

12    to fight.  You know, I mediated a certain case and gave them,

13    you know, three months ago and all they had to do was just

14    take my term sheet and write a plan.  They're still fighting

15    over it.

16         MR. MILLAR:  I understand.

17         THE COURT:  I mean I'm --

18         MR. MILLAR:  Well --

19         THE COURT:  -- not complaining, just trying to be

20    realistic.

21         MR. MILLAR:  Sure, there would be delay.

22         THE COURT:  That has a huge cost.

23         MR. MILLAR:  It has a cost, but the answer to that

24    is not to put through a bad plan that has legal infirmities.

25    That would be my answer.  I'm not telling you that delay

1    doesn't have cost.  And indeed it would be cost to the

2    business, it would be fees, it would be candidly the Court's

3    time, it would be a lot of things.

4          THE COURT:  But time is negligible.  I can -- I look

5    at the W-2 at the end of every year, it's negligible.

6          (Laughter.)

7          MR. MILLAR:  Touché, Your Honor.

8          So I don't -- I'm not here to tell you that that

9    wouldn't be a cost.

10          THE COURT:  Okay.

11          MR. MILLAR:  All right.  But it is -- it is --

12          THE COURT:  You think it's worth it.

13          MR. MILLAR:  I do.

14          THE COURT:  Okay.

15          MR. MILLAR:  Because let's -- what's the

16   alternative?  Let's say this plan is confirmed.  You say, you

17   know, Mr. Millar, no, on everything and this plan is

18   confirmed, and the 5th Circuit reverses.

19          THE COURT:  Well, reverses what?

20          MR. MILLAR:  The issue that's pending there now.

21          THE COURT:  Well, that's an interesting question.

22   So I confirm the plan, and the Circuit says, Jones, you should

23   have given us findings and conclusions, which is a likely

24   outcome, given what I did.  So that comes back to me for

25   findings and conclusions, or maybe they decide that I'm not

1  smart enough to actually do that and they do that themselves.

2  What does that do to confirmation?

3         MR. MILLAR:  Well, if you've confirmed the plan, and

4  the plan has gone effective --

5         THE COURT:  What's -- what are the conditions to

6  going effective?

7         MR. MILLAR:  I don't believe that there would be any

8  condition that would prevent them from going effective before

9  the 5th Circuit resolves that issue.  So they can -- what I'm

10  saying is they can go effective if you confirm the plan as I

11  understand it within a matter of days or weeks.

12         THE COURT:  Right.

13         MR. MILLAR:  Right.  The 5th Circuit is six months

14  out.  So I've always assumed the plan is going to be

15  effective.

16         THE COURT:  Right.

17         MR. MILLAR:  And then you're going to have a --

18         THE COURT:  Then where are we?

19         MR. MILLAR:  Then I think we're in a really bad spot

20  candidly because then you're going to have --

21         THE COURT:  So we've got a Reorganized Debtor with a

22  good cap structure, but a potentially horrific indemnity

23  claim.

24  -      MR. MILLAR:  Correct.

25         THE COURT:  All right.  And then -- and more

1       litigation.

2                   MR. MILLAR:  And more litigation.  And by the way,

3       who's actually going to be in control of the Debtor then when

4       the parties that get the equity trade out and then they're

5       just going to be like enforcing their indemnity against a

6       company that they might not have any stake in?

7                   THE COURT:  Yeah, that was the polite strategy call

8       that we heard about earlier that we don't know what would

9       happen because, you know, that'll be just an economic

10      strategy.  Right?

11                  MR. MILLAR:  Sure.

12                  THE COURT:  Yeah.

13                  MR. MILLAR:  So where were we?

14                  THE COURT:  You were telling me why I shouldn't do

15      this.

16                  MR. MILLAR:  Yeah, and so, Your Honor, I think

17      that -- and Your Honor said it when you and I first met, that

18      it could be another restructuring, it could be something

19      worse.

20                  THE COURT:  Right.

21                  MR. MILLAR:  Chapter 22s have sort of bad -- you

22      know, they don't always work out as well as the first one did.

23      You know that, you know that better than anyone.

24                  THE COURT:  Right.

25                  MR. MILLAR:  And we're taking that risk, and we

1    don't need to is my point.  There has to be another solution.

2    There has to be a way to eliminate the indemnity from this

3    company going forward.  And I'm going to talk to you about

4    legal theories, but at the end of the day that's where we're

5    trying to get to, is this company, it's in a Chapter 11 now,

6    and it's spending time here, it's taking -- there's a hit on

7    the business, it's taking that now, it's paying for people --

8              THE COURT:  So --

9              MR. MILLAR:  -- we should deal with this now.

10             THE COURT:  -- so let me come back to my

11   insurance --

12             MR. MILLAR:  Yes.

13             THE COURT:  -- question that I talked to

14   Mr. Hermann about.

15             If the Debtors went out and spent -- and I have no

16   idea of what a policy -- well, you can insure anything, it's

17   just a matter of cost.  Right?  So I have no idea what a

18   policy, an indemnity -- a policy that would provide a similar

19   indemnity like this would cost, but, you know, let's assume

20   that it's $50 million.

21             Would you be okay with the Debtor spending $50

22   million to go buy a policy --

23             MR. MILLAR:  No.

24             THE COURT:  -- if everything else stayed the same?

25   Why not?

1          MR. MILLAR:  No, I'm going to disagree with my

2    friend, Mr. Hermann.

3          THE COURT:  Okay.  Why not?

4          MR. MILLAR:  Because that is in substance the same

5    thing as allowing this indemnity to ride through, and there's

6    a --

7          THE COURT:  How so?

8          MR. MILLAR:  -- there's a case on it.

9          THE COURT:  No, but talk to me about economics

10   because I assume at the end of the day I mean you said

11   economic actor, I assume your clients won.  So be an economic

12   actor --

13         MR. MILLAR:  Okay.

14         THE COURT:  -- number one, you're getting certainty

15   at a, you know, at a price, you factor that into your model

16   and what the value of the equity and everything else is, why

17   wouldn't you do that?

18         MR. MILLAR:  Because you're doing what Congress has

19   prescribed and said you can't do.

20         THE COURT:  No, I want to talk about just economics.

21         MR. MILLAR:  Then they can -- well --

22         THE COURT:  If you could cut all this off --

23         MR. MILLAR:  Yeah.

24         THE COURT:  -- you could get the certainty of

25   confirmation and a restructured Debtor, and you could limit

1   your exposure for whatever it is you want to call that for a

2   sum certain, and let's assume that it's affordable --

3            MR. MILLAR:  Well, okay, therein lies problem number

4   one, is it affordable?

5            THE COURT:  Yeah, but you told me -- you didn't even

6   go to price, you just said, absolutely not, and I'm trying to

7   figure out why you told me that.

8            MR. MILLAR:  But -- because I want to make the legal

9   point, not the economic point.

10            THE COURT:  Okay.

11            MR. MILLAR:  The legal point is if you are trying to

12   take a -- I was about to say a duck and I guess I'm going to

13   go there -- if it looks like a duck and it quacks like a duck,

14   it's a duck.  Okay.  And the case I was going to point you to

15   was District Judge Sullivan in *Leeman* where what they tried to

16   do in that plan was put in administrative expenses, and they

17   said, in this plan we're going to pay, and they gave it like a

18   different name, administrative something or other, on behalf

19   of the individuals' counsel on the Committee.  So, you know,

20   the Committee had whatever, 15 people and --

21            THE COURT:  Okay.  So they said they were going to

22   pay --

23            MR. MILLAR:  They were going to pay those --

24            THE COURT:   -- individual counsel.

25            MR. MILLAR:  Yeah, it was in the plan and the US

1    Trustee objected, the plan got confirmed, that issue was

2    carved out, it went up to Judge Sullivan, he said, no, you

3    can't do that.  Okay?  I know you're not actually doing it

4    under Section 503(b) of the Bankruptcy Code, but that's really

5    what you're doing.  And when the Bankruptcy Code says you

6    can't do this, and then you re-name it and do it in a

7    different way, you can't do that.

8            And here when they go out and they buy that

9    insurance policy, they're -- that's -- they are then realizing

10   double -- I was about to say double counting, but it is what

11   Congress has prescribed in 502(e)(1)(B) which is I'm going to

12   have this allowed claim on the debt and I'm going to have this

13   allowed claim on the indemnity.  That's what they're doing.

14           THE COURT:  Okay.  So let me ask you this:  What is

15   the value of equitizing in this Debtor a billion six worth of

16   debt?

17           MR. MILLAR:  That's a good question.  I can't value

18   that.  It --

19           THE COURT:  Somebody can.

20           MR. MILLAR:  Somebody can and maybe somebody could

21   come up here and put a number on it.

22           THE COURT:  Can we agree that it's a lot?

23           MR. MILLAR:  I would say that when they get

24   99 percent of the equity and all the new debt, they have been

25   paid more than handsomely for that.  They don't need the

1    indemnity, too.

2             THE COURT:  But I'm going in a totally different

3    direction.

4             MR. MILLAR:  Okay.

5             THE COURT:  So what's the value of agreeing to

6    equitize a billion six worth of debt to this company?  Is it

7    significant?

8             MR. MILLAR:  Equitized debt is significant, sure.

9             THE COURT:  Okay.  And so there's a give of

10   something significant, and what they're asking for back is

11   something significant.

12            MR. MILLAR:  The currency that they can't have.

13            THE COURT:  The currency -- that's the first time

14   anybody's told me that.

15            MR. MILLAR:  Yeah.

16            THE COURT:  You say it's a currency they can't have.

17            MR. MILLAR:  Yeah, if you follow the *Leeman* case

18   with a little different -- not on all fours, but they can't

19   have the indemnity.

20            THE COURT:  Okay.

21            MR. MILLAR:  They can't, they can't have the

22   indemnity as they originally drafted the plan --

23            THE COURT:  Right.

24            MR. MILLAR:   -- where it was assumed, and they

25   can't call it something different and get the same thing.

1   They can't have that.

2             THE COURT:  Right.  I agree --

3             MR. MILLAR:  If they want a Labradoodle --

4             THE COURT:  Yeah.

5             MR. MILLAR:   -- they can all have Labradoodles.

6   But they can't have an indemnity.

7             THE COURT:  Okay.  That's the first time anybody's

8   told me that.  So it's -- and it makes -- it's something I

9   can -- that I can put my hands around.  You're just saying

10  they can't deal in this currency.

11            MR. MILLAR:  Correct.

12            THE COURT:  Okay.

13            MR. MILLAR:  That's right.

14            So, Your Honor, I'm not sure if we are at the point

15  where they have stipulated that their 502(e)(1)(B) claim is

16  disallowed, but I do want to return to where we are in this

17  case.

18            And if I may, Your Honor -- I can't see --

19            THE COURT:  No, I got it, I am, too.

20            MR. MILLAR:   -- then I can't see you.

21            THE COURT:  I have the same problem which is why I

22  take them off.

23            MR. MILLAR:  So, Your Honor, on the 502(e)(1)(B)

24  point I just want to make this clear as to how we're walking

25  through the argument.  There is an issue as to whether the

1    501 -- 502(e)(1)(B) disallows the indemnity claim, but further

2    to what we were just talking about, how is that relevant to

3    this plan?  And here's -- this is built on or is consistent

4    with what Mr. Hermann was saying.

5              THE COURT:  Okay.

6              MR. MILLAR:  Since the claim should be disallowed

7    under 502(e)(1)(B), the indemnity cannot survive as a

8    liability of the Reorganized Debtor.  That's the point we

9    just -- we just talked about.

10             THE COURT:  Right.

11             MR. MILLAR:  And, Your Honor, I wanted to just

12   highlight the law on the sort of ride-through point.  And that

13   is that Federal Bankruptcy Rule 3021 states that

14   distribution --

15             THE COURT:  302 what?

16             MR. MILLAR:  3021.

17             THE COURT:  3021, I got it.

18             MR. MILLAR:  I'm sorry.

19             THE COURT:  There's a 3002.1 which is why I was

20   confused.

21             MR. MILLAR:  Oh, yeah, very different.

22             You can't make distributions to creditors who -- I'm

23   sorry, I was reading something different.

24             Distributions shall only be made to creditors whose

25   claims have been allowed.  And as we cite in our brief, the

1  *Diruzzo* case, 527 BR 800, disallowed claims will not

2  participate in the case or receive any payment with regard to

3  that claim.

4       So if we're talking in this case about a claim that

5  we believe to be disallowed, which is -- I enjoyed your

6  hypotheticals but this case is very clear that we're talking

7  about the pre-petition indemnity, they can't get that because

8  that claim should be disallowed.

9       And the other Code section that I would like to

10  point to Your Honor, Mr. Hermann properly mentioned

11  1129(a)(1), I'm going to mention 1123(b)(6) because Your Honor

12  the other day in speaking about the settlement talked about

13  1123(b)(3) which speaks to settlements.

14       But 1123(b)(6) informs all of those other items

15  1123(b)(1) through (b)(5), and what it says is a plan may

16  include any other appropriate provision not inconsistent with

17  the applicable provisions of this title.

18       Again, that informs how one reads 1123(b)(3)

19  regarding, you know, can you have a settlement in a plan.  You

20  can have a settlement in a plan, but it can't do something

21  that is inconsistent with the bankruptcy laws.  And paying a

22  disallowed claim clearly is.

23       Now we would be having maybe a little bit of a

24  different conversation if they truly did buy an insurance

25  policy.  But that's not what they did here.  The first thing

1      they did up until the eve of confirmation is they said they

2      were assuming an indemnity claim.  Mr. Hermann made that

3      point.

4                  THE COURT:  Right.

5                  MR. MILLAR:  But if you look at their plan,

6      Section 8.5, it's entitled, "Survival of the Debtors'

7      indemnification obligations."  To suggest that this isn't the

8      pre-petition indemnity riding through just blanks reality.

9      That's the title of that section.  And indeed, 8.5B, and I

10     quote, says the indemnity is, quote, "On the same terms and

11     limitations as afforded under the PTL credit agreement".

12     They're making no bones about it, it is the pre-petition

13     indemnity riding through.

14                 Your Honor, if I may, I want to touch on a few other

15     confirmation points.

16                 THE COURT:  Sure.

17                 MR. MILLAR:  I think Mr. Hermann has covered the

18     actual co-liability element very well, and I won't belabor

19     that, but I will say this, okay, the Debtors owe the non-PTL

20     Lenders on the notes, there's no dispute about that.  And if

21     the 5th Circuit sides with the Excluded Lenders, the favored

22     lenders are therefore required to pay the Excluded Lenders.

23                 And here's the kicker, any amount that the favored

24     lenders pay to the Excluded Lenders will reduce the amount of

25     the Excluded Lenders' claim against the Debtor.  That is the

1    essence of co-liability.  When they get paid a dollar from --
2    if they win, their claim against the Debtor goes down and
3    that's how the credit agreement works.
4             THE COURT:  Right.  Can you -- it just took me a
5    while to get the current version of the plan up, you cited me
6    a section --
7             MR. MILLAR:  Oh --
8             THE COURT:   -- with the title.
9             MR. MILLAR:  8.5, I believe it's entitled "Survival
10   of the Debtor's indemnification."
11            THE COURT:  I just wanted -- I just wanted to read
12   it again in light of everything.
13            MR. MILLAR:  Yeah.  Okay.  Shall I pause?
14            THE COURT:  If you don't mind.
15        (Pause in the proceedings.)
16            THE COURT:  Okay.  Got it.  Thank you.
17            MR. MILLAR:  Okay.  Thank you.
18            All right.  So I made the co-liability point.  Let
19   me touch on, if I may, Your Honor, the 9019 settlement.
20            THE COURT:  All right.
21            MR. MILLAR:  As Your Honor knows for a court to
22   approve a settlement under 9019 it has to be fair and
23   equitable, in the best interest of the estate, the Debtors
24   have to exercise their business judgment.  And here they have
25   failed to meet that burden for at least two reasons.  First

1    is, Your Honor, there is no actual evidence that the Debtors

2    ever valued the indemnity, or as Mr. Hermann pointed out even

3    included it in the term sheet when they entered into the

4    Restructuring Support Agreement.

5         And that testimony is abundantly clear from

6    Mr. Tepner, Mr. Shah and Mr. Linker, they just didn't value

7    it.  And if it was such an integral part of that settlement,

8    Your Honor, how is it that the settlement keeps changing day-

9    to-day?  Literally in the last 48 hours that settlement

10   changed from indemnifying the so-called PTL Lenders to now

11   just indemnifying people who hold the debt on the effective

12   date.  I don't know who those people are, I don't know if

13   anybody can know who those people are, but if this is such a

14   heavily negotiated term, why is it changing literally day-by-

15   day?

16        And further to that, Your Honor, how could the --

17   granting this indemnity that could cripple the company ever be

18   viewed as in the best interest of the estate?  Mr. Tepner

19   never testified -- I'm sorry, he -- pardon me, he testified

20   that they never offered the exact same deal without the

21   indemnity.  And this goes to my previous point, what exactly

22   would have happened if they had done this deal without the

23   indemnity?

24        You shouldn't -- my suggestion, my argument is you

25   shouldn't credit the testimony that says they would have

1     driven the company into liquidation or some other sort of bad

2     things.

3                 And, Your Honor, I want to make one other point

4     about the indemnity as re-cut as of 48 hours ago.

5                 THE COURT:  Okay.

6                 MR. MILLAR:  So now they say anybody who owns the

7     FLSO debt and the FLFO debt, so Class 3 and 4, as of the

8     effective date, yet to happen, gets the indemnity.  Okay.  So

9     speaking of selling insurance, apparently anybody can go out

10    today or tomorrow when the market's open and buy this debt --

11                THE COURT:  Right.

12                MR. MILLAR:   -- and get an indemnity from the

13    Debtor.  How -- what is that person giving in this so-called

14    intricate settlement?

15                THE COURT:  Yeah, but what are they getting?

16    They're getting indemnity for a transaction that they didn't

17    participate in.

18                MR. MILLAR:  Unless you are an institution that did

19    participate in it --

20                THE COURT:  I guess there could be --

21                MR. MILLAR:   -- and sold out.

22                THE COURT:   -- someone who's really brilliant and

23    is going to make that circle.  I got it.

24                MR. MILLAR:  But understand the other point is, the

25    amount of debt you hold -- let's look at it a little

1       differently.

2                   THE COURT:  Sure.

3                   MR. MILLAR:  Let's say I want to -- I'm one of the

4       institutions that's been sued by the Paul Weiss group, and I

5       want to sell 99 percent of my debt.  As long as I keep a

6       dollar I still get that indemnity.  How is that a settlement

7       when I've sold out of the debt?  It doesn't -- it's not -- the

8       economics aren't rationally related to each other.  It's just

9       if you hold the debt --

10                  THE COURT:  Right.

11                  MR. MILLAR:   -- you get the indemnity.  That's

12      ludicrous.

13                  A few other points.  You asked about economic duress

14      and --

15                  THE COURT:  I think I said coercion, didn't I?

16                  MR. MILLAR:  It may be economic duress and coercion,

17      but it's getting late and I'm just going to call it economic

18      duress.

19                  THE COURT:  Okay.

20                  MR. MILLAR:  If the Court were to view the Debtors'

21      choice as rational, and we don't think you should, then given

22      the circumstances it clearly was a product of economic duress.

23      Let's look at the definition.  And I have a case here, *Mandel*

24      *v Liebman*, it's in our paper, 303 NY 8894, 1951.  It's really

25      old, you know it's good law.

1        (Laughter.)

2                MR. MILLAR:  Those are the best cases.  Right?

3                And the quote from that case is, you know, "The

4        inequality of consideration is so strong and manifest as to

5        shock the conscience and confound the judgment of any man of

6        common sense".  Okay?

7                And giving up everything, all the debt, all the

8        equity, what could be a billions dollars of indemnity

9        liability, that to your -- you asked about -- I think that's

10       economic distress.  We think it's not good faith -- pardon me,

11       not exercise of business judgment, but it is -- if you were to

12       say, well, it was business judgment, then they were under

13       severe economic distress.

14               THE COURT:  Okay.  All right.  Thank you.

15               MR. MILLAR:  Let me turn to feasibility.

16               THE COURT:  Oh, I'm sorry.  Yes, sir.

17               MR. MILLAR:  This is one of my favorite issues.

18               THE COURT:  Got it.  All right.

19               MR. MILLAR:  Because we've seen slides, I don't have

20       any slides, and we've seen case cites.  There is a Circuit

21       level decision on all fours.  It's out of the 9th Circuit, but

22       I would like to briefly talk about that case.

23               THE COURT:  All right.

24               MR. MILLAR:  It is *In Re Harbin*.  Okay.  So what

25       happened in *Harbin*, and it is 486 F.3d 510, 9th Circuit, 2007,

1    relatively recently.

2            THE COURT:  Right.

3            MR. MILLAR:  So in that case, Your Honor, Harbin was

4    an individual Debtor.  He also had a company, he was a lawyer

5    in fact.  But his company and he both went into bankruptcy.

6    We're focused on the individual's bankruptcy case.  And he had

7    been sued by Sherman.  And during Harbin's bankruptcy case,

8    the suit was in State Court, Sherman -- the State Court ruled

9    in favor of the Debtor, Harbin, and said, Sherman, no, no

10   personal liability on behalf of Harbin.

11       (Electronic voice interruption.)

12           THE COURT:  Sorry about that.

13           MR. MILLAR:  Okay.  So Sherman, the creditor, loses,

14   and he appeals and he gets relief from stay, he's proceeding

15   in State Court so it's not in front of the Bankruptcy judge,

16   but it's -- he's appealing, he's lost.

17           THE COURT:  Right.

18           MR. MILLAR:  And Harbin goes to confirm his

19   Chapter 11 case because he converted to a Chapter 11.  And

20   Sherman makes a claim.  And that -- Harbin objects to the

21   claim, the claim is disallowed --

22           THE COURT:  Sure.

23           MR. MILLAR:   -- with the ability to re-file it, but

24   it's disallowed.  While Sherman's appeal was pending, Harbin

25   goes to confirmation, said, I want to confirm my plan, we'll

1    waiting for the Appellate Courts, and Sherman objects on
2    feasibility.
3            And this is his argument quoted from the 9th
4    Circuit, "The plan did not reserve an allowance for Sherman's
5    claim should he prevail on appeal.  In such event Sherman
6    argued, Harbin would not have sufficient assets to cover
7    Sherman's claim and will be forced into further liquidation or
8    reorganization."
9            THE COURT:  Right.
10           MR. MILLAR:  Precisely our situation.  The 9th
11   Circuit reversed.
12           THE COURT:  That's where the concept of triggers
13   came from.
14           MR. MILLAR:  Triggers?
15           THE COURT:  Uh-huh.  You build them in.
16           MR. MILLAR:  I'm sorry, I didn't --
17           THE COURT:  Long story.
18           MR. MILLAR:  Okay.
19           THE COURT:  Not relevant.  Sorry.
20           MR. MILLAR:  But let me just say because this isn't
21   like a case out of the Eastern District of New York, this is
22   the Circuit, and this is the standard that we think should
23   apply to this situation.  When you have a matter on appeal
24   where one -- where the Debtor won down below --
25           THE COURT:  You're from New York, aren't you?

1          MR. MILLAR:  No.

2          THE COURT:  No, You're not?

3          MR. MILLAR:  No.

4          THE COURT:  Oh, I was going to say, you go make that

5    statement and you're going to go home?

6        (Laughter.)

7          MR. MILLAR:  Yeah, maybe not.  No, I'm --

8          THE COURT:  I'm having fun with you.

9          MR. MILLAR:   -- I'm from the Midwest.

10          THE COURT:  All right.  Got it.

11          MR. MILLAR:  A Bankruptcy Court, this is the whole

12   thing, a Bankruptcy Court cannot adequately determine a plan's

13   feasibility for the purposes of Section 1129(a)(11) without

14   evaluating whether a potential future judgment may affect the

15   Debtor's ability to implement its plan.

16          And, Your Honor, that was a reversal on a finding of

17   fact.  That was clear error.

18          THE COURT:  Uh-huh.

19          MR. MILLAR:  So that's precisely the issue here.

20   It's literally on all fours.  And so I would suggest to you

21   that that's the right standard and we have a feasibility

22   problem.

23          THE COURT:  All right.

24          MR. MILLAR:  Okay.  1123(a)(4) very briefly, Your

25   Honor.  You can't provide different treatment to claims in a

1    class.  And here, they've given the indemnity and they say,

2    oh, everybody gets the indemnity, we're not providing

3    different treatment.  But the indemnity only has value to

4    certain of those claimants.  They know that.  There are

5    claimants such as my client that have no interest whatsoever

6    in that indemnity and don't want it.  So you can't say that

7    we're all getting the same thing when they're giving us --

8    purporting to give us something that has no value to us.

9         THE COURT:  You're saying I look at value from the

10   recipient not from the giver?

11        MR. MILLAR:  Correct.

12        THE COURT:  Okay.

13        MR. MILLAR:  Very briefly, Your Honor, on re-

14   solicitation.  I have stood here before and said I don't think

15   they need to re-solicit this plan.  But I'll tell you what, if

16   they -- they have said, oh, we do need to re-solicit the plan

17   if you take out the indemnity.  But now they're doing

18   something entirely inconsistent with that statement.  They are

19   changing the indemnity, they are taking it away from certain

20   people and they're saying they don't need to re-solicit.  I

21   actually agree with them that re-solicitation is not

22   necessary.  But it's not necessary, however, if you extract

23   the indemnity in its entirety.

24        And finally, Your Honor, for the Record, we think

25   that there have been some due process violations here by the

1    Debtors.

2              THE COURT:  Okay.

3              MR. MILLAR:  This indemnity was originally posited

4    as an assumption of an executory contract.  And then on the

5    eve of confirmation they changed that and they've been in

6    court saying, oh, it's a new indemnity.  That's not the plan

7    that they put forth.

8              THE COURT:  Right.

9              MR. MILLAR:  Okay.  And if they want to put forth a

10   plan that has a new indemnity and they want to perhaps value

11   it or allow us to test that theory, they need to do that.

12   They can't come in during confirmation and say, oh, it's

13   totally different, it's a new indemnity, and now apparently

14   stipulating that the original indemnity is disallowed.  We

15   think that is a lack of due process.

16              And on top of that just one final point.  They have

17   apparently changed it yet again, and now it covers different

18   people.  And I don't know who it covers, and if they really

19   want that indemnity to be different, I think they have to

20   actually follow the rules, which is 21 days' notice.

21              THE COURT:  All right.  Got it.

22              MR. MILLAR:  With that, Your Honor, I think I've

23   covered everything.  Thank you so much.

24              THE COURT:  All right.  Thank you.

25              All right.  Mr. Schrock?

CLOSING ARGUMENTS

1   BY MR. SCHROCK:  Yeah.  Well, Your Honor, Ray

2   Schrock, Weil Gotshal Manges, for the Debtors.  Let me just

3   address a few points in addition to anything else you'd like

4   me to hit.  I know the hour is late.

5   First of all, regarding Mr. Hermann's comments

6   about, you know, the confirmation order being stayed, and I

7   appreciate what Your Honor said about if you were inclined to

8   grant confirmation, we'd work out the timing.

9   Just for the Record, if they're going -- you know,

10   the plan has always provided for a waiver --

11   THE COURT:  Right.

12   MR. SCHROCK:   -- of the, you know, of the standard

13   3020(e).  If they have that objection, they should have made

14   it, we would have briefed it, we'd deal with it.  You can't

15   just raise it, you know, at closing arguments, or at least the

16   Court shouldn't allow them to do that.

17   I think that, you know, it's never been raised in

18   the supplemental briefing, and to the extent that they have an

19   issue I understand their issue is they want to go to court, I

20   hear what he's saying is he doesn't want to fight

21   confirmation, but he wants to be able to, you know, go to

22   court.  Based on what the Court said, I think that -- an

23   appeal confirmation rather, I think that what I'm hearing is,

24   you know, he wants to be able to do that.  If he's going to do

1      that, we're not here today, and I heard what Your Honor said

2      about equitable mootness, we're not here to waive any

3      arguments on equitable mootness or otherwise, and we are very

4      much aware of --

5                THE COURT:  Sure.

6                MR. SCHROCK:   -- of how Your Honor thinks about

7      that.

8                THE COURT:  But it's not how I think about it, it's

9      how the Circuit thinks about it.

10               MR. SCHROCK:  Duly noted.

11               THE COURT:  There's a number of those cases.  I was

12     the lawyer that got overruled.

13               MR. SCHROCK:  Yeah.  Understood, Judge.

14               And I think that, you know, listen, if they're

15     going -- you know, we need to get out of Chapter 11, the

16     Record overwhelmingly supports that.  I think that if the

17     Court looks to Mr. Linker's testimony, you know, on May 17,

18     and I'm looking at Pages 894 through 897, that, you know,

19     Mr. Linker testified that if you're going to keep the company

20     in bankruptcy, there's going to be significant adverse impacts

21     to the company.

22               I heard Mr. Millar talk a lot about, well, you could

23     just go out there and form a new plan and, you know,

24     everything would be fine.  We're not going to play

25     brinkmanship with 3,000 jobs.

1              THE COURT:  Right.

2              MR. SCHROCK:  We have a deal.

3              THE COURT:  So let me ask you this --

4              MR. SCHROCK:  Sure.

5              THE COURT:  -- and I'm -- I have all sorts of

6    things I can do.  I'm just --

7              MR. SCHROCK:  Sure.

8              THE COURT:  -- trying to figure out.  Let's assume,

9    and this won't -- this isn't going to happen so this -- it's

10   why the example I'm going to use.  Let's assume that I

11   confirmed it tonight.

12             When do you intend on going effective?

13             MR. SCHROCK:  Your Honor, I think that if you

14   confirmed it tonight, one, we have to -- it's really just a

15   matter of getting the closing and the exit financing done.

16             THE COURT:  Uh-huh.

17             MR. SCHROCK:  So we would -- if you entered an order

18   tonight, we would do our very best to confirm -- or to go

19   effective over the next several days.

20             THE COURT:  Okay.

21             MR. SCHROCK:  I can't tell you like definitively

22   would it be -- it would certainly be several days.

23             THE COURT:  All right.  So let me -- just walk down

24   this path with me.

25             MR. SCHROCK:  Sure.

1          THE COURT:  So Mr. Hermann being the good lawyer

2     that he is said, I'd make an oral motion for stay because he

3     knows he has to present it to me before he can go upstairs.  I

4     don't take oral motions for stay.

5          MR. SCHROCK:  We would brief.

6          THE COURT:  And I also set them along with a bond

7     hearing --

8          MR. SCHROCK:  Yes, of course.

9          THE COURT:  -- we're going to have -- we're going

10    to have a stay hearing and a bond hearing.

11         MR. SCHROCK:  Right.

12         THE COURT:  But if he chooses to go down that path,

13    I'm going to give him that option.  I mean I --

14         MR. SCHROCK:  Understood.

15         THE COURT:  -- just think he deserves that.  And he

16    deserves to have a shot at somebody saying, you know, Jones,

17    you didn't do this the right way, you know, so I'm going to

18    stay it until I can sort it out.  And I'm just trying to --

19    I'm just trying to factor that into the thought process

20    because since I have you here and --

21         MR. SCHROCK:  Yes.

22         THE COURT:  -- go back and visit anything else you

23    wanted to talk about, remind me of your timing issues.

24         MR. SCHROCK:  I believe it's under the RSA, it's

25    June 6 --

1        THE COURT:  That's what I had in my head.

2        MR. SCHROCK:  -- presently.  Yeah, and, Your Honor

3   it's an RSA milestone.  I think from the company's perspective

4   we want to go as quickly as possible --

5        THE COURT:  Of course.

6        MR. SCHROCK:   -- and I would say, you know,

7   Mr. Hermann, if he's worried about not being timely, you know,

8   Paul Weiss is a large sophisticated firm, we could start

9   working on the papers now.  And we'll certainly do the same

10  and we can have it heard promptly.

11       But if we are to go down this hypothetical that

12  you're posing, Your Honor, I think that if you were to enter

13  the order some time in the near future, we understand that --

14  we would just ask that if we're going to have that hearing,

15  that everybody be prepared to do it right away so that we

16  don't have a delay for emergence after issuance of the order,

17  because we're certainly going to be -- you know, I intend on,

18  you know, trying to emerge as quickly as possible.

19       THE COURT:  I got it.  So I mean, and I wasn't

20  joking, I really cancelled next week, so I'm --

21       MR. SCHROCK:  I'm sorry to hear that, Judge.

22       THE COURT:  No, no, it's just what it is.

23       MR. SCHROCK:  Yeah, I've been there.

24       THE COURT:  So I'm going to work on this.

25       MR. SCHROCK:  Yes.

1          THE COURT:  You know, whether or not I can get it

2     done in, you know, three or four days, I don't know --

3          MR. SCHROCK:  Right.

4          THE COURT:  -- we'll just have to see.

5          MR. SCHROCK:  Right.

6          THE COURT:  I have a lot to think about, I have a

7     lot of -- you know, I've been re-reading, now that all the

8     transcripts are up, I've been re-reading the transcripts.  Now

9     I've got a lot to go through and --

10          MR. SCHROCK:  Yes.

11          THE COURT:  -- I have to work my way through.  And,

12     but I do want to -- if Mr. Hermann, again, I mean, I just

13     don't believe in oral motions for stay.  I mean, I --

14          MR. SCHROCK:  Right.

15          THE COURT:  -- I think that if someone wants a

16     stay --

17          MR. SCHROCK:  Yeah, but we would say there's has to

18     be stay, there has to be a bond.

19          THE COURT:  Well, there does have to be a bond.  You

20     know, what that is is based on the evidence that I hear.  The

21     only reason I'm telling you this is I was just raised in the

22     civil courts.  I mean I --

23          MR. SCHROCK:  Understood.

24          THE COURT:  -- had those hearings after every time

25     I lost.  So and we're, you know, we're going to go through the

1    process because I give meaning to the process.

2              MR. SCHROCK:  Understood.

3              THE COURT:  Then I will -- you know, I would -- you

4    know, Mr. Hermann, you know, you can draft this motion and be

5    ready to go.  All I can tell you is I'm going to give you the

6    opportunity to do it because you've told me that you want that

7    opportunity.  So I'm going to give you the opportunity to file

8    it.  I'm going to have to see how -- just how my writing goes

9    and --

10             MR. SCHROCK:  Sure.

11             THE COURT:   -- how quickly I can get this done.

12             In terms of what you're expecting, my thought was,

13   is that one opinion, two orders.  You have thoughts about

14   that?

15             MR. SCHROCK:  I think that certainly having -- I'm

16   not sure if you need two orders, Judge.  I think that we're --

17   you know, we certainly agree with one opinion.  We think

18   that -- as you know, we think they're all --

19             THE COURT:  Well, the orders, you know how I do

20   things, my orders are one page.

21             MR. SCHROCK:  Understood.  Yeah, I understand.  I do

22   think one opinion makes sense, and I'll have -- you know,

23   others they can stand up and weigh in on that.

24             THE COURT:  But I just think because there may be,

25   you know, the appeal in the adversary, I mean, one, you want

1    to -- I would assume you're going to take that and get that

2    consolidated at the Circuit together.  I mean I can't imagine

3    that you're asking the Circuit to weigh in on part when you

4    appeal another part and it's down in the District Court.

5         And I certainly want you -- I certainly want

6    everybody to make sure you tell those folks that that exists.

7    But I can't imagine that they want to deal with that.  So

8    that's why I was thinking two orders so you can get that

9    straight up to the 5th.  I don't know if the 5th would take,

10   you know, a confirmation appeal on a direct appeal, and even

11   if they did, it would be a separate number.  So that's why I

12   was thinking two separate orders.

13        But if people -- I mean we have an appellate

14   specialist who could probably tell me exactly --

15        (Laughter.)

16        THE COURT:  -- criticized me many times before.  I

17   mean, Mr. Costa, again, I'm looking for assistance.  I would

18   think that --

19        MR. COSTA:  I think it's cleaner to have two

20   separate --

21        MR. SCHROCK:  Yeah.

22        MR. COSTA:  -- rulings if --

23        MR. SCHROCK:  The only --

24        MR. COSTA:  -- especially if they're going to

25   follow a separate appellate path.

1          THE COURT:  Right.

2          MR. SCHROCK:  The only thing I would say about that,

3     Judge --

4          THE COURT:  Sure.

5          MR. SCHROCK:  -- is we've always viewed that these

6     issues around the adversary, they're fundamentally about

7     claims against the Debtor and so they're intertwined into the

8     confirmation order.

9          THE COURT:  Tell me --

10          MR. SCHROCK:  That's the way I always thought, you

11     know, and listen, there was a lot of debate do we even need,

12     you know, declaratory judgment actually because we're really

13     taking about how are the claims against the Debtors --

14          THE COURT:  I totally agree, which is why I went one

15     opinion, two orders, because I don't do a whole lot in my

16     orders.  I know I sign orders all the time that are 50 or 60

17     pages long, but they're not mine, they're ones that, you know,

18     that people give me that are agreed to.

19          MR. SCHROCK:  Yeah, because my position would be,

20     for the Debtors, is listen, if you're appealing this portion

21     of the case, it's all an appeal of the confirmation order

22     effectively.  You can't just appeal part -- it's one record.

23          THE COURT:  I'm happy to put it all into one and let

24     you go deal with it.  I was trying to be helpful.

25          MR. SCHROCK:  Understood.  Well, we could certainly

1    address it.  I appreciate you saying that.

2            I did want to hit that, of course we do have a

3    standard provision on Page 18 of our plan that says the

4    headings in the plan are for convenience of reference only and

5    are not otherwise substantive.  We did not want to move the

6    entire provision --

7            THE COURT:  I didn't take anything by that, by

8    that --

9            MR. SCHROCK:  And I will tell you, Judge, I really

10   take umbrage with the fact that a Debtor can't -- as

11   consideration for disallowing the claim, so we're not doing

12   anything under 1123 that's inconsistent --

13           THE COURT:  Right.

14           MR. SCHROCK:   -- with the Bankruptcy Code.  But

15   everybody knows, and listen, if we would have cut the deal

16   with Mr. Hermann's client, he would have insisted on an

17   indemnity which is just, you know, what I find so ironic about

18   this particular argument, but we can certainly give

19   consideration in the form of an indemnity.

20           That term loan has been on file with that indemnity

21   by the way since April 21.  Okay.  So Mr. Millar is saying he

22   didn't know about it.  When we modified the indemnity we

23   tailored --

24           THE COURT:  You've got to listen to him, he's really

25   tricky.  He didn't say he didn't know about it, he said

1   someone out there might not know about it.

2           MR. SCHROCK:  Right.  Right.  No, he wants us to

3   throw out the deal and not re-solicit votes, but, you know,

4   we're under -- this particular deal, we have to go re-solicit

5   everything and throw out the entire plan and throw the company

6   into peril.

7           I think that we want the ability to make sure that

8   we can give this consideration which is clearly part of an

9   unrefuted record around this particular topic.  We don't think

10  there's anything inconsistent in the law about it.  I've got a

11  lot of parties here that say they want the company to have a

12  fresh start, but every single person's going to appeal

13  confirmation to make sure that we don't.

14          And, Your Honor, this company, we need to move

15  forward.  And if Your Honor would be -- I would just ask that

16  if Your -- I understand you're not going to enter an order

17  tonight, but if you -- I'm taking your -- what you're saying,

18  if you're inclined to grant confirmation, I think it would be

19  good to know that, or for the company to be able to know that

20  so they can know that that's where we're -- the direction

21  we're headed.  If you're still open-minded about it, we can --

22  we don't have to go there.  But I wanted to at least put out

23  the request because I'm sure my client was going to be asking

24  about it.

25          THE COURT:  I do not want any additional briefing.

1      I have everything I need --

2              MR. SCHROCK:  Very good.

3              THE COURT:  -- to have.

4              MR. SCHROCK:  Okay.

5              THE COURT:  A lot of issues have been raised that I

6      hadn't thought about.  I have a responsibility to work my way

7      through all of those issues, so I --

8              MR. SCHROCK:  Certainly.

9              THE COURT:  -- and I don't -- I, you know, what is

10     it in California, I used to go out there all the time, they

11     give you those provisional rulings.

12             MR. SCHROCK:  Yes.

13             THE COURT:  And every time I got a --

14             MR. SCHROCK:  I'm not looking for a provisional

15     ruling.

16             THE COURT:  Yeah, every time I got a provisional

17     ruling in my favor, I then lost at the hearing.

18         (Laughter.)

19             MR. SCHROCK:  I don't want that, Your Honor.  So --

20             THE COURT:  So I'm not --

21             MR. SCHROCK:   -- we'll be patient.

22             THE COURT:   -- yeah, I'm -- look, I'm doing

23     everything I can do, I cancelled a vacation, I'm -- none of my

24     staff is allowed in next week.  Ms. Portillo was really happy

25     about that.

1          MR. SCHROCK:  Well, I'm --

2          THE COURT:  Just so --

3          MR. SCHROCK:   -- with that staff.

4          THE COURT:   -- I can -- just so that I can write

5     and I will get it done as quickly as I can.  But there's some

6     things I need to re-read and there's some things that I need

7     to -- that I need to check on.

8          MR. SCHROCK:  Okay.  Very good.

9          THE COURT:  But I understand that time is important.

10         MR. SCHROCK:  Yes.

11         THE COURT:  And I very much appreciate everybody

12    indulging me.  You know, I think through these things and, you

13    know, whether I grant confirmation, enter a declaratory

14    judgment, deny confirmation, or some combination of parts, you

15    know, the outcome irrelevant largely to me, except for one

16    thing, I want to get it right.  And I'm going to do my best to

17    get it right.

18         MR. SCHROCK:  Well, on behalf of all us, Your Honor,

19    we really do want to thank you for taking so much time to hear

20    us today.  I mean five hours plus, or about five hours of

21    closing arguments.

22         THE COURT:  Yeah, look, I learned, I learned some

23    things and it crystalized a lot of the issues for me.  So I

24    very much appreciate it.  I know a number of offers were made,

25    so I'm going to accept them all.  I would very much appreciate

1    everyone uploading their PowerPoints, just because I made some

2    notes and I jotted down some page numbers and I would like to

3    be able, when I sit down to go back and read it,  I, you know,

4    can look at my note and then turn back to the appropriate

5    slide.  That would really be helpful if folks don't mind doing

6    that.

7              MR. SCHROCK:  Very good. Your Honor.

8              THE COURT:  All right.  Thank you.

9              Anything else we need to talk about this evening?

10             Mr. Duran, I haven't heard from you in a week.  Come

11   on up, please.

12             MR. DURAN:  Yes, Your Honor.  Thank you.

13             For the Record, Your Honor, Hector Duran for the US

14   Trustee.

15             THE COURT:  Right.

16             MR. DURAN:  We filed a limited objection.

17             THE COURT:  Yeah, and I am so sorry that I didn't

18   get you sooner.  You just weren't in my eye path.  I do

19   apologize.

20             MR. DURAN:  I understand.  Section 1.74 of the plan

21   defines the term exculpated parties.  The US Trustee's

22   objection focuses only on that part of the definition that

23   includes Harvey Tepner and Joan Hilson as independent

24   directors of the Debtors.  We take the position that the plan

25   improperly provides exculpation coverage to Mr. Tepner and

1    Ms. Hilson in violation of binding 5th Circuit precedent.

2              THE COURT:  So let me ask you, because I had this

3    earlier today, because I overruled one of your colleagues and

4    appointed independent directors with an order.  Do you think

5    they get exculpation now since I appointed them?

6              MR. DURAN:  Yes, we took the position in this case

7    that without a Bankruptcy Court Order --

8              THE COURT:  No, I got it.  I'm just curious to see,

9    because you know I've been a big advocate, I mean I've spoken

10   about this a ton of times about I think independent directors

11   ought to hired because I think it adds transparency to the

12   process and it let's people see.  And, but, you know, one of

13   the -- if you follow the Circuit's recent pronouncement, I

14   mean what that suggests is by entering that order those folks

15   then absolutely get indemnity, even -- I mean with -- in the

16   express suggestions of the order -- or of the opinion.

17             MR. DURAN:  Right.

18             THE COURT:  But you -- because they were simply done

19   pre-petition, the Debtor had the right to do it I assume under

20   the corporate governance, you're just suggesting that they are

21   entitled to exculpations.

22             MR. DURAN:  As long as that order is specifically

23   providing that they're appointed to -- as independent

24   directors.

25             THE COURT:  Right.  So let me ask you this, if I

1   make findings about their conduct in the case based upon the

2   Record that I have, and then implemented a gatekeeper

3   provision, do you think that's consistent?

4          MR. DURAN:  No, I still think that under *Highland*

5   *Capital* you still need that Court Order in this case.

6          THE COURT:  No, I didn't -- I wasn't suggesting that

7   there would be exculpation, but so let's -- let me give you an

8   example.

9          So let's assume the Record reflects that Hector

10   Duran in his capacity as Trustee did nothing wrong.  And so I

11   make a finding, this is based upon the Record, Hector Duran

12   did everything right in this case.  To the extent that you

13   believe you have a -- and that becomes a finding, and then I

14   said, to the extent that you want -- anyone wants to assert a

15   claim against Hector Duran arising out of this case, they have

16   to come to me, show me a colorable claim before it can

17   brought.

18          Don't you think that's consistent with *Highland*?

19          MR. DURAN:  It is consistent with *Highland*.  We --

20   my alternative argument was that Mr. Tepner and Ms. Hilson are

21   released parties.  And to me the third-party release is a much

22   broader one --

23          THE COURT:  Right.

24          MR. DURAN:   -- than the exculpation.  And then it's

25   protected by the injunction, the 1125(e) provision, and the

1    gatekeeper provision.

2              THE COURT:  Got it.

3              MR. DURAN:  To me those provisions screen and

4    prevent bad faith litigation against the Debtors and those

5    released parties, including the two independent directors --

6              THE COURT:  Sure.

7              MR. DURAN:   -- that could disrupt the plan's

8    effectiveness.

9              THE COURT:  Yeah, I was just trying to understand

10   where your policy limits are on implementing *Highland*.  I got

11   it.  I understand the issue, and I'm pretty confident that if

12   I confirm the plan, I know how to deal with that.  But I

13   appreciate you making the argument.

14             MR. DURAN:  Right.

15             THE COURT:  And I appreciate you indulging me for

16   what I started this morning.

17             MR. DURAN:  Absolutely.  I think the difference of

18   opinion here, I mean court opinions are textual documents,

19   they have a purpose and a factual context.  The question here

20   is whether the independent directors in Serta should be

21   treated the same as the independent directors in *Highland*

22   *Capital*.

23             And to answer that question you have to make an

24   inference about the opinion's intent.  I think our inference

25   is different from the Debtors.  They take a much broader view

1    of exculpation coverage and who should get it.  We take a much

2    narrower view and we base that on the paragraph in the opinion

3    where it talks about the order being non-traditional and being

4    unique -- creating a unique governance structure.  And I guess

5    that's the difference.

6            THE COURT:  Sure.  Thank you, Mr. Duran.

7            MR. DURAN:  Okay.

8            THE COURT:  Anyone else before we close up shop for

9    the evening?

10      (No audible response.)

11          THE COURT:  All right.  In terms of boxes,

12    materials, I know it's late, if you want to leave today, come

13    back and get it tomorrow, that's perfectly okay with me.  But

14    if it's here tomorrow afternoon, unless it has intrinsic value

15    that I appreciate, it's going in the trash.

16      (Laughter.)

17          THE COURT:  Everyone safe travels home, make your

18    plane.  We're adjourned.

19          THE CLERK:  All rise.

20      (The parties thank the Court.)

21      (Hearing adjourned 7:18 p.m.)

22

23

24

25                       * * * * *

234

1           I certify that the foregoing is a correct transcript

2       to the best of my ability due to the condition of the

3       electronic sound recording of the ZOOM/video/telephonic

4       proceedings in the above-entitled matter.

5         /S./   MARY D. HENRY

6       CERTIFIED BY THE AMERICAN ASSOCIATION OF

7       ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8       JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9       JTT TRANSCRIPT #67299

10      DATE FILED:  MAY 30, 2023

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25